1  LESLEY HOLMES (BAR NO. 271903)
2  **NORTON ROSE FULBRIGHT US LLP**
   555 South Flower Street
   Forty-First Floor
3  Los Angeles, California  90071
   Telephone:   (213) 892-9200
4  Facsimile:    (213) 892-9494
   lesley.swanson.holmes@nortonrosefulbright.com
5
   Attorneys for Defendant
6  **THE GEO GROUP, INC.**

7

8

9              IN THE UNITED STATES DISTRICT COURT

10          FOR THE CENTRAL DISTRICT OF CALIFORNIA

11                    EASTERN DIVISION

12

13  RAUL NOVOA, individually and on      Civil Action No. 5:17-cv-02514-JGB
    behalf of all others similarly situated,
14
                  Plaintiff,            **DEFENDANT THE GEO GROUP,**
15                                       **INC.'S MEMORANDUM OF**
        v.                               **POINTS AND AUTHORITIES IN**
16                                       **SUPPORT OF MOTION TO**
                                         **DISMISS PLAINTIFF'S**
17  THE GEO GROUP, INC.,                 **COMPLAINT FOR**
                                         **DECLARATORY AND**
18                Defendant.             **INJUNCTIVE RELIEF AND**
                                         **DAMAGES**
19
20                                       Date: March 26, 2018
                                         Time: 9:00 am.
21                                       Courtroom: 1
                                         Judge: The Honorable Jesus G. Bernal
22
                                         *[Filed concurrently with Notice of*
23                                       *Motion; Declaration of Lesley*
                                         *Holmes; and [Proposed] Order]*
24
25                                       Complaint Filed: 12/19/17
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................ii

I.     INTRODUCTION.................................................................................1

II.    SUMMARY OF PLAINTIFF'S ALLEGATIONS........................................3

III.   STANDARD OF REVIEW ....................................................................3

IV.    PLAINTIFF'S MWL CLAIM IS PREEMPTED BY FEDERAL LAW.........4

    A. Preemption Principles..........................................................................4

    B. The Federal Government Exclusively Controls Employability Of Aliens And Allowances For Work While Detained ..........................................5

    C. The MWL is Preempted by Federal Law .............................................8

       1.   Field Preemption..........................................................................9

       2.   Conflict/Obstacle Preemption ....................................................11

V.     ALTERNATIVELY, PLAINTIFF FAILS TO STATE A CLAIM UNDER CALIFORNIA'S MINIMUM WAGE LAW.........................................13

VI.    THE COURT SHOULD DISMISS PLAINTIFF'S FORCED LABOR CLAIM UNDER THE TVPA (18 U.S.C. SECTION 1589(a)).....................16

VII.   THE COURT SHOULD DISMISS PLAINTIFF'S FORCED LABOR CLAIM UNDER THE CALIFORNIA TVPA.............................................21

VIII.  THE COURT SHOULD DISMISS PLAINTIFF'S UNJUST ENRICHMENT CLAIM ..........................................................................23

IX.    PLAINTIFF'S UCL CLAIM IS A DERIVATIVE CLAIM AND SHOULD BE DISMISSED.....................................................................25

X.     CONCLUSION .................................................................................25

DOCUMENT PREPARED ON RECYCLED PAPER

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alvarado Guevara v. INS*,
　902 F.2d 394 (5th Cir. 1990) ................................................................. 8

*Arizona v. United States*,
　567 U.S. 387 (2012) .............................................................. 4, 5, 9, 11

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009) ................................................................ 3, 4, 21

*Baggett v. Hewlett-Packard Co.*,
　582 F. Supp. 2d 1261 (C.D. Cal. 2007) ............................................. 24

*Barker v. Riverside Cty. Office of Educ.*,
　584 F.3d 821 (9th Cir. 2009) .............................................................. 4

*Bayh v. Sonnenburg*,
　573 N.E.2d 398 (Ind. 1991) ............................................................. 19

*Bell Atlantic Corp. v. Twombly*,
　550 U.S. 544 (2007) ..................................................................... 3, 4

*Bijeol v. Nelson*,
　579 F.2d 423 (7th Cir. 1978) ........................................................... 20

*Birdsong v. Apple, Inc.*,
　590 F.3d 955 (9th Cir. 2009) ........................................................... 25

*Brooks v. Donovan*,
　699 F.2d 1010 (9th Cir. 1983) ......................................................... 18

*Brown v. Stored Value Cards, Inc.*,
　2016 WL 4491836 (D.C. Ore. Aug. 25, 2016) .................................... 24

*Channer v. Hall*,
　112 F.3d 214 (5th Cir. 1997) ........................................................... 19

*Chen v. The GEO Group Inc.*,
　No. 3:17-cv-05769 (W.D. Wash.) ..................................................... 14

*Cleghorn v. Blue Shield of Cal.*,
　408 F.3d 1222 (9th Cir. 2005) ............................................................ 4

*Crosby v. Nat'l Foreign Trade Council*,
　530 U.S. 363 (2000) .................................................................... 4, 11

*Ditullio v. Boehm*,
　662 F.3d 1091 (9th Cir. 2011) ......................................................... 17

DOCUMENT PREPARED ON RECYCLED PAPER

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

*In re Facebook PPC Advert. Litig.*,
709 F. Supp. 2d 762 (N.D. Cal. 2010).................................................................23

*In re Gilead Scis. Secs. Litig.*,
536 F.3d 1049 (9th Cir. 2008)...............................................................................4

*Guevara v. INS*,
954 F.2d 733, 1992 WL 1029 (Fed. Cir. Jan. 6, 1992) ...................7, 10, 11, 14

*Hause v. Vaught*,
993 F.2d 1079 (4th Cir. 1993)..............................................................................20

*Hilber v. Int'l Lining Tech.*,
2012 WL 3542421 (N.D. Cal. July 24, 2012) ....................................................14

*Hines v. Davidowitz*,
312 U.S. 52 (1941) .................................................................................................5

*Hutchinson v. Reese*,
2008 WL 4857449 (S.D. Miss. Nov. 7, 2008) ....................................................20

*Jobson v. Henne*,
355 F.2d 129 (2d Cir. 1966) .................................................................................19

*Lofthus v. Long Beach Veterans Hosp.*,
214 F. Supp. 3d 908 (C.D. Cal. 2016)..................................................................23

*Lozano v. Cty. of Hazleton*,
620 F.3d 170 (3d Cir. 2010), *vacated on other grounds by City of
Hazleton v. Lozano*, 131 S. Ct. 2958 (2011) .........................................................5

*Marina Tenants Ass'n v. Deauville Marina Dev. Co.*,
181 Cal. App. 3d 122 (1986) ................................................................................23

*Martinez v. Turner*,
977 F.2d 421 (8th Cir. 1992) ................................................................................20

*Mendez v. Haugen*,
2015 WL 5718967 (D. Minn. Sept. 29, 2015), *aff'd* (Feb. 22, 2016)................20

*Menocal v. The GEO Group, Inc.*,
113 F. Supp. 3d 1125 (D. Colo. 2015) .....................................................14, 15, 16

*Miles v. Apex Marine Corp.*,
498 U.S. 19 (1990) ................................................................................................20

*Miller v. Dukakis*,
961 F.2d 7 (1st Cir. 1992) ..............................................................................10, 14

*Mort v. United States*,
86 F.3d 890 (9th Cir. 1996)...................................................................................23

*Nation v. Cty. of Glendale*,
804 F.3d 1292 (9th Cir. 2015) ..............................................................................11

DOCUMENT PREPARED
ON RECYCLED PAPER

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

*Navarro v. Block*,
　250 F.3d 729 (9th Cir. 2001) ................................................................ 3

*Owuor v. Courville*,
　2013 WL 7877306 (W.D. La. Aug. 7, 2013) ..................................... 20

*Parrish v. NFL Players Ass'n*,
　534 F. Supp. 2d 1081 (N.D. Cal. 2007) ............................................ 23

*Pepsi-Cola Metro. Botting Co. v. Ins. Co. of N.A., Inc.*,
　2010 Wl 11549719 ............................................................................ 23

*Rhynes v. Stryker Corp.*,
　2011 WL 2149095 (N.D. Cal. May 31, 2011) ................................... 24

*Rice v. Santa Fe Elevator Corp.*,
　331 U.S. 218 (1947) ............................................................................ 5

*Roman v. Tyco Simplex Grinnell*,
　2017 WL 2427251 (M.D. Fla. June 5, 2017) .................................... 21

*State of Washington v. The GEO Group, Inc.*,
　No. 3:17-cv-05806-RJB (W.D. Wash.) .............................................. 14

*Taylor v. United Parcel Service, Inc.*,
　190 Cal. App. 4th 1001 (2010) .......................................................... 16

*Toll v. Moreno*,
　458 U.S. 1 (1982) ................................................................................ 5

*Tourscher v. McCullough*,
　184 F.3d 236 (3rd Cir. 1999) ............................................................ 14

*United States v. Katz*,
　271 U.S. 354 (1926) .......................................................................... 18

*United States v. Kozminski*,
　487 U.S. 931 (1988) .................................................................... 19, 20

*United States v. Toviave*,
　761 F.3d 623 (6th Cir. 2014) ............................................................ 19

*Valle del Sol Inc. v. Whiting*,
　732 F.3d 1006 (9th Cir. 2013) ............................................................ 5

*Villa v. Maricopa Cty.*,
　865 F.3d 1224 (9th Cir. 2017) ............................................................ 4

*Villarreal v. Woodham*,
　113 F.3d 202 (11th Cir. 1997) .......................................................... 14

*Whyte v. Suffolk Cty. Sheriff's Dep't*,
　91 Mass. App. Ct. 1124, 2017 WL 2274618 (Mass. App. Ct. May
　24, 2017) ............................................................... 14, 15, 16, 24

DOCUMENT PREPARED
ON RECYCLED PAPER

*Wis. Dept. of Indus. v. Gould Inc.*,
    475 U.S. 282 (1986) ..................................................................................... 11

*Wyeth v. Levine*,
    555 U.S. 555 (2009) ....................................................................................... 9

**Statutes**

U.S. Const. amend. XIII ................................................................................... 19

U.S. Const. art. 1, § 8, cl. 4 ............................................................................... 5

U.S. Const. art. VI, cl. 2 .................................................................................... 4

8 U.S.C. § 1103 ............................................................................................. 5, 7

8 U.S.C. § 1225 ............................................................................................. 5, 7

8 U.S.C. § 1226 ............................................................................................. 5, 7

8 U.S.C. § 1226a ..................................................................................... 5, 7, 12

8 U.S.C. § 1231 ............................................................................................. 5, 7

8 U.S.C. § 1324a ............................................................................... 5, 6, 12, 14

8 U.S.C. § 1555(d) ......................................................................... 6, 7, 10, 11

18 U.S.C. § 1584 ......................................................................................... 19, 20

18 U.S.C. § 1589 ........................................................................... 17, 18, 19, 20, 21

18 U.S.C. § 1595 ............................................................................................. 17

22 U.S.C. § 7102(9) ..................................................................................... 22, 23

29 U.S.C. § 202(a) ............................................................................................. 10

2005 Cal. Legis. Serv. Ch. 240 ........................................................................ 22

Cal. Civ. Code § 52.5 ................................................................................. 22, 23

Cal. Lab. Code § 1171.5 ............................................................................. 13, 14

Cal. Lab. Code § 1194 ...................................................................................... 13

Cal. Penal Code § 236.1 ................................................................................... 21

Cal. Penal Code § 2700 .................................................................................... 22

Dep't of Justice Appropriation Act, 1979, Pub. L. No. 95-431, 92 Stat.
    1021 (Oct. 18, 1978)...................................................................................... 6

Dep't of Justice Appropriations Authorization Act, 1979, Pub. L. No.
    96-132, § 2(10), 93 Stat. 1040 (1979) ........................................................... 6

Pub. L. No. 106-386, § 102(a), 114 Stat. 1488 (2000) ................................ 17, 18, 20

15 C.C.R. § 3040(a) .................................................................................... 22, 23

15 C.C.R. § 3041.2 ........................................................................................... 23

8 C.F.R. § 274a2-3 ............................................................................................ 12

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................. 3, 4, 25

**Other Authorities**

INS, *Your CO 243-C Memorandum of November 15, 1991; DOD Request for Alien Labor*, Genco Op. No. 92-63, 1992 WL 1369402 (Nov. 13, 1992).............................................................................. 6, 14

ICE National Detainee Handbook ....................................................................... 8

INS, *The Applicability of Employer Sanctions to Alien Detainees Performing Work in INS Detention*, Genco Op. No. 92-8 (INS), 1992 WL 1369347 (Feb. 26, 1992) ................................................... 7, 13

Performance Based National Detention Standards § 5.8 ........................................ 8

DOCUMENT PREPARED ON RECYCLED PAPER

## I.   **INTRODUCTION**

Since 2011, U.S. Immigration and Customs Enforcement ("ICE") has entrusted The GEO Group, Inc. ("GEO") to operate a civil detention facility, the Adelanto ICE Processing Center ("Adelanto"), in Adelanto, California.[1]  Compl. ¶¶ 2, 28.  GEO operates Adelanto, which houses persons detained by, and in the custody of, ICE while they await a hearing, deportation, or release.   As a federal subcontractor, GEO is subject to statutory and regulatory frameworks, as well as extensive policies, contractual requirements, and oversight by and from ICE and the Department of Homeland Security ("DHS"), who have agents onsite at Adelanto.  As part of GEO's responsibilities in carrying out federal law and federally-approved policy as a government subcontractor, GEO administers at Adelanto the Voluntary Work Program ("VWP")—a longstanding program that provides detainees an opportunity to relieve the boredom of detention by performing basic tasks for purposes of institutional maintenance.

Plaintiff Raul Novoa is a citizen of Mexico, who alleges that he is a lawful permanent resident of the United States and that he lives in Los Angeles, California. *Id.* ¶¶ 15, 52.  Mr. Novoa alleges that he was detained at Adelanto from June 2012 to February 2015, during which he performed janitorial and haircutting services and was paid $1 per day. *Id.* ¶¶ 54, 56-58.  Mr. Novoa filed this putative class action suit on December 19, 2017, asserting claims for violations of the California Minimum Wage Law ("MWL"), both the California and federal Trafficking Victims Protection Act ("TVPA") statutes, and California's Unfair Competition Law ("UCL"), as well as Unjust Enrichment.  Mr. Novoa's claims are invalid and must be dismissed.

**First**, Mr. Novoa's claim that GEO has violated the MWL is premised on a meritless theory that a federal contractor, like GEO, that temporarily houses federal immigration detainees must pay the detainees a state minimum wage for participating

---

[1] *See generally*, The GEO Group, Inc., Adelanto ICE Processing Center (https://www.geogroup.com/FacilityDetail/FacilityID/24).

DOCUMENT PREPARED ON RECYCLED PAPER

in the federally-mandated VWP.  Such a claim is preempted by federal law, which exclusively controls both the employability of aliens and the proper allowance for work done while in immigration detention.  Congress, by statute and through delegated power, has reserved these determinations for itself.  As courts have uniformly reinforced for decades through precedents interpreting the Federal Labor Standards Act ("FLSA"), detainees (like prison inmates) are not "employees," and the $1 daily allowance is not contrary to federal minimum wage requirements because detainees already receive necessities such as food, shelter, clothing, medical, dental, and psychiatric care by virtue of their detention.  Further, the federal government has a strong interest in the uniform administration of its facilities, including those operated by federal contractors. Programs at those facilities—such as the VWP—cannot be subjected to a patchwork of state minimum wage regimes. *See infra* section IV.

Even assuming *arguendo* that the MWL claim is not preempted, Mr. Novoa fails to state a claim under the MWL.  Although the MWL does not define "employee," cases interpreting the FLSA uniformly hold that detainees are not entitled to a minimum wage because they are outside the class of people that Congress intended to protect under the FLSA.  Mr. Novoa and the putative class members are not "employees" under the MWL and GEO is not their "employer," and therefore Mr. Novoa fails to state a claim on which relief may be granted.  *See infra* section V.

**Next**, Mr. Novoa's claims based on the California and federal TVPA also fail as a matter of law.  As the plain text of the TVPA and its legislative history make clear, Congress, like California, enacted the TVPA to combat human trafficking and protect victims of trafficking crimes.  It is absurd to read the TVPA to authorize a detainee to obtain damages or restitution for voluntarily participating in a housekeeping program sanctioned—and overseen—by DHS and ICE, some of the very agencies charged with enforcing the TVPA.  Furthermore, courts have long

recognized a civic-duty exemption to the federal prohibition against involuntary servitude by concluding that a federal detainee, like Mr. Novoa, can be required to perform general housekeeping duties while in detention.  Additionally, Mr. Novoa fails to plausibly assert proper TVPA claims even were those laws to apply.  *See infra* sections VI, VII.

**Finally**, Mr. Novoa's remaining claims for Unjust Enrichment and violations of the UCL are purely derivative in nature and rely on the viability of Mr. Novoa's claims under the MWL, TVPA, and California TVPA.  Therefore, these derivative claims should also be dismissed.  *See infra* sections VIII, IX.

## II.   SUMMARY OF PLAINTIFF'S ALLEGATIONS

Mr. Novoa seeks to represent a class of current and former detainees who challenge GEO's alleged "economic exploitation of detainees at the Adelanto Facility."  Compl. ¶ 9.  Alleging that GEO pays detainees $1 per day to maintain and operate Adelanto, and that the current state minimum wage is $10.50, Plaintiff seeks "to recover unpaid wages, and to remedy the unjust enrichment resulting from GEO's unlawful failure to pay its detainee workforce legal wages."  *Id.* ¶¶ 5, 9, 48.  Mr. Novoa claims that GEO's policies and practices of "unlawfully forcing and coercing detainees to perform labor at subminimum wages" violates the MWL, the UCL, and the federal and state TVPA.  *Id.* ¶ 8.  Mr. Novoa further alleges that detainees at Adelanto are "employees" and GEO is their "employer" for purposes of the MWL.  *Id.* ¶ 44.  He seeks damages, and declaratory and injunctive relief, as well as attorneys' fees and expenses.  *Id.* at 16 (prayer for relief).

## III.   STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim."  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S.

544, 570 (2007)); *Villa v. Maricopa Cty.*, 865 F.3d 1224, 1228 (9th Cir. 2017).  A claim is facially plausible only if the plaintiff has pled "factual content [that] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

To assess plausibility, the Court accepts all facts alleged in the complaint as true, and makes all inferences in the light most favorable to the non-moving party. *See Barker v. Riverside Cty. Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009).  The Court is not, however, bound to accept the plaintiff's legal conclusions. *Iqbal*, 556 U.S. at 678.  While detailed factual allegations are not necessary, the plaintiff must provide more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.  Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted).  A court may also grant a motion to dismiss under Rule 12(b)(6) based on a defendant's preemption defense. *See Cleghorn v. Blue Shield of Cal.*, 408 F.3d 1222, 1226 (9th Cir. 2005).

## IV.   PLAINTIFF'S MWL CLAIM IS PREEMPTED BY FEDERAL LAW

### A.   Preemption Principles

The Supremacy Clause establishes that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, anything in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.  Under this principle, Congress has the power to preempt state law. *Arizona v. United States*, 567 U.S. 387, 399 (2012); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) ("A fundamental principle of the Constitution is that Congress has the power to preempt state law.") (citations omitted).  States are "precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance," which "can be inferred from a framework of regulation 'so pervasive…that Congress left no

DOCUMENT PREPARED
ON RECYCLED PAPER

29603363.3                                - 4 -                      5:17-cv-02514-JGB
──────────────────────────────────────────────
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

1   room for the States to supplement it' or where there is a 'federal interest…so

2   dominant that the federal system will be assumed to preclude enforcement of state

3   laws on the same subject.'" *Arizona*, 567 U.S. at 399 (quoting *Rice v. Santa Fe*

4   *Elevator Corp.*, 331 U.S. 218, 230 (1947)).  State laws are also preempted "when

5   they conflict with federal law," including where state law "stands as an obstacle to

6   the accomplishment and execution of the full purposes and objectives of Congress."

7   *Id.* (citations omitted).

    **B.**    **The Federal Government Exclusively Controls Employability Of**

8

9   **Aliens And Allowances For Work While Detained**

10   "The Government of the United States has broad, undoubted power over the

11   subject of immigration," such that "[t]he federal power to determine immigration

12   policy is well settled." *Id.* at 394.  The supremacy of federal power "in the general

13   field of foreign affairs, including power over immigration, naturalization and

14   deportation, is made clear by the Constitution." *Hines v. Davidowitz*, 312 U.S. 52,

15   62 (1941); *see also* U.S. Const. art. 1, § 8, cl. 4 ("To establish an uniform Rule of

16   Naturalization"); *Toll v. Moreno*, 458 U.S. 1, 10 (1982); *Valle del Sol Inc. v. Whiting*,

17   732 F.3d 1006, 1023 (9th Cir. 2013) (power over immigration also rests significantly

18   on federal government's "inherent power as a sovereign to control and conduct

19   [foreign] relations") (citing U.S. Const. art. 1, § 8, cl. 4).  This power includes

20   Congress's prohibition on employing illegal aliens.  8 U.S.C. § 1324a.  It also

21   includes Congress's authority, delegated to DHS and ICE, to detain aliens pending

22   removal or a removal hearing, or to detain certain categories of aliens.  *See* 8 U.S.C.

23   §§ 1225, 1226, 1226a, 1231.  These agencies, in turn, have broad administrative

24   discretion that includes the authority to contract with private entities, such as GEO,

25   to provide secure facilities.  *See* 8 U.S.C. § 1231(g); 8 U.S.C. § 1103.

26   In 1986, Congress enacted the Immigration Reform and Control Act

27   ("IRCA"), which "clearly made the regulation of the employment of unauthorized

28   aliens a central concern of federal immigration policy." *Lozano v. Cty. of Hazleton*,

620 F.3d 170, 206 (3d Cir. 2010), *vacated on other grounds by City of Hazleton v. Lozano*, 131 S. Ct. 2958 (2011).  IRCA made it unlawful "to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien…with respect to such employment."  8 U.S.C. § 1324a(a)(1)(A). IRCA also prohibits continuing to employ anyone after that person's ineligibility has been discovered.  8 U.S.C. § 1324a(a)(2).  Under IRCA's enforcement regulations, all employment—under state or federal law—requires an employer to first verify the potential employee's work eligibility.  8 U.S.C. § 1324a(b).

Congress also determines when and how much federal immigration detainees are paid, if at all, for work performed in custody.  In a statute enacted in 1950, and unchanged today, Congress provided that:

> Appropriations now or hereafter provided for the Immigration and Naturalization Service shall be available for. . . (d) payment of allowances (at such rate as may be specified from time to time in the appropriation Act involved) to aliens, while held in custody under the immigration laws, for work performed . . .

8 U.S.C. § 1555(d).

From 1950 to 1979, Congress specifically appropriated these "allowances." The appropriations bills for this time period authorized reimbursement for the VWP "at a rate not in excess of $1.00 per day."  *See*, *e.g*., Dep't of Justice Appropriation Act, 1979, Pub. L. No. 95-431, 92 Stat. 1021, 1027 (Oct. 18, 1978).  After the 1979 appropriation, Congress ceased specifically appropriating monies for the VWP program, opting instead to delegate that decision to the appropriate federal agency. *See* Dep't of Justice Appropriations Authorization Act, 1979, Pub. L. No. 96-132, § 2(10), 93 Stat. 1040, 1042 (1979).  Under this delegation, INS (and now ICE) retained authority to reimburse VWP detainees, but without the requirement that "Congress [] set the rate of compensation for each fiscal year."  *See* INS, *Your CO 243-C Memorandum of November 15, 1991; DOD Request for Alien Labor*, Genco Op. No. 92-63, 1992 WL 1369402, *1 (Nov. 13, 1992) (citing 93 Stat. at 1042) (noting that discontinuance of annual appropriation of $1 daily allowance "does not abrogate

[INS/ICE] authority to pay aliens for labor performed while in [INS/ICE] custody" and "[INS/ICE] retains authority to expend appropriated funds to pay aliens for labor performed while in custody."). Congress ratified the use of voluntary detainee labor, and through Section 1555(d), "Congress provided that under certain circumstances aliens who are lawfully detained pending disposition may be paid for their volunteer labor. The wage level is a matter of legislative discretion." *Guevara v. INS*, 954 F.2d 733, 1992 WL 1029, at *2 (Fed. Cir. Jan. 6, 1992). Notably, the INS General Counsel (thirteen years *after* Congress ceased direct appropriations) still described the pay as an "allowance" paid to a detainee that is "specifically provided for by 8 U.S.C. § 1555(d) and currently limited by Congress to $1 per day." INS, *The Applicability of Employer Sanctions to Alien Detainees Performing Work in INS Detention*, Genco Op. No. 92-8 (INS), 1992 WL 1369347, at *1 (Feb. 26, 1992) (**Attachment A** to the Declaration of Lesley Holmes, filed concurrently herewith). Put simply, the $1 allowance was created by, and is still subject to, federal law.

As noted, Congress has delegated broad authority to agencies not only to detain aliens, but also to contract with private entities, such as GEO, to provide secure facilities. *See* 8 U.S.C. §§ 1103, 1225, 1226, 1226a, 1231(g). Those agencies have broad discretion to determine how to carry out their duty to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," 8 U.S.C. § 1231(g), and enter into cooperative agreements with local governments "to establish acceptable conditions of confinement and detention services in any State or unit of local government which agrees to provide guaranteed bed space for persons detained by the Service." 8 U.S.C. § 1103(a)(11). ICE contracts with the City of Adelanto, which subcontracts with GEO to operate the Adelanto facility.

In operating Adelanto, GEO is contractually required to follow the 2011 Performance Based National Detention Standards ("PBNDS"). The PBNDS provides, as an "Expected Practice," that "[d]etainees shall be provided the opportunity to participate in a voluntary work program." PBNDS, § 5.8.V.A

1    Voluntary Work Program, https://www.ice.gov/doclib/detentionstandards/2011
2    /pbnds2011.pdf.   The policy provides specific details on how the VWP is to be
3    administered.   It specifically provides that "[d]etainees shall receive monetary
4    compensation for work completed in accordance with the facility's standard policy,"
5    and that compensation is "at least $1.00 (USD) per day."  PBNDS, § 5.8.V.K; *see*
6    *also*    ICE    National    Detainee    Handbook,    at    12,
7    https://www.ice.gov/sites/default/files/documents/Document/2017/detainee-hand
8    book.PDF.   Thus, the alleged payment of $1 per day for VWP participation at
9    Adelanto is consistent with ICE standards. Compl. ¶ 38.  This policy does not require
10   that compensation adhere to the minimum wage of any state.

11       Demonstrating the degree to which Congress (and the federal agencies to
12   which it has delegated power) control the field of detainee employment and pay, the
13   $1 daily allowance has withstood legal challenges for decades, including challenges
14   by federal detainees who have sought a minimum wage under the FLSA.  In *Alvarado*
15   *Guevara v. INS*, immigration detainees challenged the $1 daily rate, claiming that
16   they were entitled to the federal minimum age for work in grounds, maintenance,
17   cooking, laundry, and other services.  902 F.2d 394, 395 (5th Cir. 1990).  The Fifth
18   Circuit noted that, "[d]espite this apparent exchange of money for labor," the
19   detainees were not "employees" under the FLSA.  Specifically, "[I]t would not be
20   within the legislative purpose of the FLSA to protect [the detainees]," because "[t]he
21   congressional motive for enacting the FLSA," was to protect the "standard of living"
22   and "general well-being" of the worker in American industry.  *Id*. at 396 (citations
23   omitted).  Because detainees are "removed from American industry," they are "not
24   within the group that Congress sought to protect in enacting the FLSA."  *Id*.  As
25   discussed below, courts have uniformly concluded that federal immigration detainees
26   are not "employees" for purposes of minimum wage laws.

27       **C.    <u>The MWL is Preempted by Federal Law</u>**
28           "[T]he purpose of Congress is the ultimate touchstone in every preemption

case." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).  As previously discussed, Congress has used direct statutory authority to reserve for itself the determination of whether and how much federal immigration detainees will be paid, and it has delegated broad authority to federal agencies to administer work programs (including through private contractors like GEO).   Nowhere has Congress provided any indication that state minimum wage laws were intended to create an employer-employee relationship between federal immigration detainees and government contractors, or to set wage rates for them.  To the contrary, Congress and the courts have made it overwhelmingly clear that detainees are ***not employees*** who benefit from a minimum wage because they are already provided necessities while in detention.  Moreover, subjecting federal immigration detention to a patchwork of state minimum wage laws would conflict with federal interests.  California's MWL is preempted by federal law in at least two ways: (1) field preemption and (2) conflict/obstacle preemption.

### 1.    Field Preemption

States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance. *Arizona*, 567 U.S. at 399.  The intent to displace state law can be inferred from a framework of regulation "so pervasive…that Congress left no room for the States to supplement it" or where there is a "federal interest…so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id*.

In *Arizona*, the Supreme Court concluded that "[f]ederal law makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders." *Id*. at 401-02.  In that case, the Supreme Court specifically concluded that Congress had occupied the field of alien registration, such that the State of Arizona's registration statute was preempted.  Field preemption reflects a congressional decision to foreclose any state regulation in the

area, even if it is parallel to federal standards: "[w]here Congress occupies an entire field, as it has in the field of alien registration, even complementary state regulation is impermissible." *Id*. The basic premise of field preemption is that States may not enter, in any respect, areas the federal government reserves for itself. *Id*. at 402.

In addition to alien registration, Congress preempts the field of immigration detention, including payment of detainees. As explained above, Congress determines whether unauthorized aliens can be employed by any person. And if aliens work while in federal detention, Congress determines whether, and how much, they are paid. "Congress provided that under certain circumstances aliens who are lawfully detained pending disposition may be paid for their volunteer labor," and that their "wage level is a matter of legislative discretion." *Guevara*, 1992 WL 1029, at *2. Congress made the decision to appropriate monies for "payment of allowances … to aliens, while held in custody under the immigration laws, for work performed." 8 U.S.C. § 1555(d). Thus, Congress has arrogated for itself the determination of what detainees would be paid. To date, the only "rate" that Congress has ever specified is $1 per day. *See supra* section IV.B.

Congress's intent is further clarified by its decision not to afford other labor protections to detained aliens. If Congress intended that federal immigration detainees would be paid a state minimum wage, it could have stated that directly rather than specifying $1 per day, or it could have designated detainees as "employees" under the FLSA. It did neither. Instead, the FLSA deems federal detainees to ***not*** be "employees" despite its broad reach. Indeed, Congress has made the contrary determination that the "the minimum wage is not needed to protect the [detainees'] well-being and standard of living." *Miller v. Dukakis*, 961 F.2d 7, 9 (1st Cir. 1992); *see* 29 U.S.C. § 202(a). "[A]n employee under the FLSA is one who finds employment in the business of others out of economic necessity," but detainees "are both confined and provided for" in detention facilities. *Guevara*, 1992 WL 1029, at *1. "Because they volunteer and do not seek employment out of any economic

1    necessity, [detainees] are not employees within the meaning of the FLSA." *Id*.

2    This legal framework shows Congress's intent to preempt the fields of alien

3    detention, employment, and pay.  Given Congress' direct arrogation of the issue of

4    detainee pay, and the fact that even federal minimum wage law does not reach federal

5    immigration detainees, Congress did not intend for states to redefine the employer-

6    employee relationship and set payment rates for federal immigration detainees.  In

7    *Arizona*, the Supreme Court noted that, consistent with the notion that there is a single

8    sovereign in charge of keeping track of aliens, the preemption doctrine did not

9    tolerate a situation in which "every State could give itself independent authority to

10   prosecute federal registration violations, 'diminish[ing] the [Federal Government]'s

11   control over enforcement' and 'detract[ing] from the 'integrated scheme of

12   regulation' created by Congress.'"  *Arizona*, 567 U.S. at 402 (quoting *Wis. Dept. of

13   Indus. v. Gould Inc*., 475 U.S. 282, 288-89 (1986)).  Likewise, here, if the Court were

14   to recognize that Mr. Novoa (with or without his purported class) could compel a

15   federal contractor like GEO to pay a state minimum wage, it would allow every state

16   to enter an area Congress claims for itself.  Congress would lose control over its own

17   determination—under Section 1555(d) and through delegated policymaking through

18   DHS and ICE—whether and how much detainees are paid.  Congress controls the

19   field, and federal law, therefore, preempts the MWL in this context.

20   ### 2.    Conflict/Obstacle Preemption

21   Conflict or obstacle preemption arises when a challenged state law "stands as

22   an obstacle to the accomplishment and execution of the full purposes and objectives

23   of Congress."  *Nation v. Cty. of Glendale*, 804 F.3d 1292, 1297 (9th Cir. 2015).

24   "What is a sufficient obstacle is a matter of judgment, to be informed by examining

25   the federal statute as a whole and identifying its purpose and intended effects."

26   *Crosby,* 530 U.S. at 373.

27   Mr. Novoa's arguments relating to employment must fail because he and his

28   putative class members could not be GEO's employees as a matter of law.  Mr. Novoa

alleges that Adelanto detainees are "employees," and that GEO is their "employer" because the detainees "employed in the Work Program performed a wide range of work." Compl. ¶¶ 44, 46. Although the Complaint acknowledges that GEO subcontracts with ICE for the detention of adult civil immigration detainees, it ignores the fact that GEO, like other employers, cannot employ illegal aliens. 8 U.S.C. § 1324a(a).

In IRCA, Congress indicated its intent to forbid the employment of the population that is housed at federal detention facilities such as Adelanto.[2] IRCA and corresponding regulations require employers to verify that potential employees are eligible to work before hiring them, prohibit employers from hiring people they knows are ineligible, and prohibit employers from continuing to employee people after they are found to be ineligible.[3] But under federal law, a detainee cannot have work authorization without an express grant by the Attorney General of the United States. 8 U.S.C. § 1226(a)(3). Because that provision makes lawful permanent residence a *prerequisite* to such authorization, it necessarily means that even lawful permanent residents have no work authorization while they are detained *unless they have also been authorized by the Attorney General*. *See id.* Mr. Novoa has alleged no such authorization and seeks to represent a class that facially cannot meet this requirement in at least some instances. Thus, any success on Mr. Novoa's claim will

---

[2] 8 U.S.C. § 1324a(a)(1)(A) (making it unlawful "to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien (as defined in subsection (h)(3)) with respect to such employment"). Subsection (h)(3) defines the term "unauthorized alien" to mean, "with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the Attorney General."). *See also* 8 U.S.C. § 1226(a)(3) (providing that Attorney General "–may not provide the [detained] alien with work authorization . . . unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization").

[3] 8 U.S.C. § 1324a; 8 C.F.R. § 274a.2-3.

1    necessarily produce a direct conflict between California and federal law.

2           Indeed, the federal government has stated this very position in its own policies.

3    The General Counsel of INS—ICE's predecessor—has explicitly addressed whether

4    work performed by alien detainees at detention facilities "operated by *or contracted*

5    *through*" INS is subject to IRCA's sanctions.  *See* INS Genco Opinion No. 92-8

6    (INS), 1992 WL 1369347, at *1.  INS answered "no" because "*an alien detained in*

7    *an INS facility does not meet the definition of 'employee,' nor does INS meet the*

8    *definition of 'employer,'*" because "[a] *detainee performs work for institution*

9    *maintenance, not compensation*."  *Id.*  INS further explained that because IRCA was

10   intended to "deter illegal immigration by removing the lure of employment," and

11   because detainee work is performed "incident to their detention," such work was not

12   Congress's target in passing IRCA.  *Id.*  In this context, ruling in Mr. Novoa's favor

13   would produce an unconstitutional conflict: Mr. Novoa would be an employee under

14   state law even though he is not, and cannot be, employed under federal law.  Thus,

15   there can be no employer-employee relationship between GEO and Mr. Novoa.  His

16   claim therefore fails.

## V.    ALTERNATIVELY, PLAINTIFF FAILS TO STATE A CLAIM UNDER CALIFORNIA'S MINIMUM WAGE LAW

19          Even if the MWL were not preempted by federal law, Mr. Novoa's claim still

20   fails as a matter of law.  His MWL cause of action only applies if he, and other

21   members of the proposed class, are considered GEO's employees.  Mr. Novoa was

22   not an employee of GEO during his detention at Adelanto, so this claim must be

23   dismissed.

24          California's Labor Code does not define "employee" as it relates to the

25   payment of minimum wage.[4]  *See* Cal. Lab. Code § 1194.  However broadly the term

---

[4] Labor Code § 1171.5(a) states that "[a]ll protections, rights, and remedies available under state law…are available to all individuals regardless of immigration status who have applied for employment, or who are or who have been employed, in this state." GEO does not assert that the Labor Code is inapplicable to Mr. Novoa because of his

DOCUMENT PREPARED
ON RECYCLED PAPER

"employee" may be read, it cannot extend past federal prohibitions on hiring illegal aliens.  Thus, the Labor Code cannot extend to immigrant detainees who voluntarily work in a detention center, because IRCA "makes it unlawful to knowingly hire or continue to employ an unauthorized alien." *Hilber v. Int'l Lining Tech.*, 2012 WL 3542421, at *1 n.3 (N.D. Cal. July 24, 2012) (citing 8 U.S.C. § 1324a); Genco Opinion, 1992 WL 1369402, at *1.  If Mr. Novoa and his class members cannot be a detention facility's employees under federal law, they cannot be employees under state law either.

Moreover, as previously discussed, courts have held that detainees are not entitled to a minimum wage under the FLSA or state law, frequently reasoning that detainees need no minimum wage because they are already provided with necessities during their detention.  *See*, *e.g*., *Guevara*, 1992 WL 1029, at *1-2; *Miller*, 961 F.2d at 8-9 ("the minimum wage is not needed to protect the [detainees'] well-being and standard of living"); *Tourscher v. McCullough*, 184 F.3d 236, 244 (3rd Cir. 1999) (pretrial detainee not an employee entitled to minimum wage under FLSA because, like a prisoner, his standard of living is protected and the work "bears no indicia of traditional free-market employment"); *Villarreal v. Woodham*, 113 F.3d 202, 206-07 (11th Cir. 1997) (pretrial detainees performing translation services for prison not employees under FLSA); *Whyte v. Suffolk Cty. Sheriff's Dep't*, 91 Mass. App. Ct. 1124, 2017 WL 2274618, at *1-2 (Mass. App. Ct. May 24, 2017) (unpublished) ("*Whyte*") (affirming dismissal of ICE detainee's claim for minimum wage and unjust enrichment); *Menocal v. The GEO Group, Inc*., 113 F. Supp. 3d 1125, 1129 (D. Colo. 2015) (granting motion to dismiss ICE detainee claim for minimum wage at GEO facility).[5]

---

immigration status; rather, the Labor Code does not apply to immigration detainees in lawful custody.  Furthermore, § 1171.5 presumes the individual is an employee, which Mr. Novoa was not.

[5] A single judge in the Western District of Washington denied two motions to dismiss minimum wage claims under Washington law with respect to GEO's Washington

In *Menocal*, which is still being litigated in Colorado federal court, the district court judge concluded that the immigrant detainees at GEO's Aurora facility were not "employees" entitled to minimum wage protection under the Colorado Minimum Wage Order. The district court found it persuasive that the Colorado minimum wage law, like the FLSA, "was not intended to be extended to those working in government custody." *Menocal*, 113 F. Supp. 3d at 1129. The court found persuasive the Fifth Circuit's reasoning in *Alvarado* that even the FLSA's broad definition of "employee" was not intended to cover immigration detainees "because the congressional motive for enacting the FLSA," like the Colorado law, was to protect the "standard of living" and "general well-being" of the worker in American industry. *Id.*

Similarly, a Massachusetts appellate court recently affirmed the dismissal of a claim by an ICE detainee that he was entitled to a minimum wage under Massachusetts law. *Whyte*, 2017 WL 2274618, at *1. Whyte was a citizen of Jamaica and permanent resident of the United States. ICE detained Whyte and placed him in custody for immigration removal proceedings at a facility operated by the Suffolk County sheriff's department under a contract with ICE. *Id.* While detained at the Suffolk County House of Corrections, Whyte signed up for a voluntary inmate work program and received $1 per day in wages for performing janitorial work inside the facility. *Id.* Like the *Menocal* court, the Massachusetts court was "guided in the interpretation of our wage laws by Federal case law interpreting the [FLSA]." *Id.* As that court concluded, "[f]ederal decisions consistently recognize that minimum wage and overtime laws intended to apply to work in the national economy do not apply to incarcerated individuals employed within the prison walls." *Id.* The appellate court found "no reason why [plaintiff] Whyte's status as a detainee should

---

facility. However, he did so based on the absence of an exception under the state statute, and state rules narrowing exceptions in favor of a putative employee. *See Chen v. The GEO Group Inc.*, No. 3:17-cv-05769 (W.D. Wash.) (Dkt. 28); *State of Washington v. The GEO Group, Inc.*, No. 3:17-cv-05806-RJB (W.D. Wash.) (Dkt. 29 at 17-18). Thus, the denial of the motion to dismiss is limited to Washington law.

DOCUMENT PREPARED
ON RECYCLED PAPER

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

result in a different outcome from Federal cases," which have excluded inmate or detainee labor within a facility "because the primary goals of the FLSA—ensuring a basic standard of living and preventing wage structures from being undermined by unfair competition in the marketplace—do not apply in that context." *Id*. Thus, "[t]he rationale of the Federal cases is equally applicable to the Massachusetts wage laws at issue here." *Id*.

The same reasoning applies here: detainees like Mr. Novoa were provided with necessities during their time at Adelanto. They were not forced to go into the labor market and obtain a wage to provide for themselves.[6] The wage laws are therefore inapplicable to them. California's wage law, like those of Colorado and Massachusetts, does not specifically address federal immigration detainees, but the district court in *Menocal* had no difficulty concluding that the minimum wage laws do not apply by reference to FLSA precedents.[7]

There is no reason for the MWL to be interpreted differently than the wage laws at issue in *Menocal* or *Whyte*. It is reasonable to interpret the same FLSA intent to exclude federal immigration detainees from the definition of "employee," and doing so would maintain congruity between the MWL and the FLSA.

## VI.   THE COURT SHOULD DISMISS PLAINTIFF'S FORCED LABOR CLAIM UNDER THE TVPA (18 U.S.C. SECTION 1589(a))

Mr. Novoa's fifth cause of action alleges GEO violated 18 U.S.C. § 1589(a)

---

[6] Mr. Novoa claims that the VWP is not truly voluntary because GEO does not provide adequate necessities like "food, water, and hygiene products." Compl. ¶ 39. This allegation is flatly contradicted by one of the sources Mr. Novoa cites in his own complaint. *See id.* ¶ 30 n.9 (citing https://www.ice.gov/doclib/foia/odo-compliance-inspections/adelantoCorrectionalFac_Adelanto-CA-Sept_18-20-2012.pdf). That review of the Adelanto facility found that the menu was "nutritionally adequate," and that the food served was "appetizing and appropriately portioned." Compliance Inspection, at 10.

[7] California courts similarly give the FLSA, and cases interpreting the FLSA, persuasive, if not binding, weight. *See, e.g.*, *Taylor v. United Parcel Service, Inc.*, 190 Cal. App. 4th 1001, 1015 (2010).

DOCUMENT PREPARED ON RECYCLED PAPER

by "knowingly maintaining a corporate policy and uniform practice at the Adelanto Facility aimed at obtaining nearly free detainee labor and services by: (a) Withholding daily necessities from Plaintiff and the Class Members, thereby forcing them to work for subminimum wages…[and] (b) Threatening Plaintiff and the Class Members with physical restraint, serious harm, and abuse of law or legal process if they refuse to provide their labor… ."  Compl. ¶ 102.  Mr. Novoa alleges that detainees performed such duties as cleaning the floors, bathrooms, showers, toilets and windows in their living and community areas, preparing, cooking and serving detainee meals, and performing clerical work for GEO. *Id*. ¶¶ 45-46.  Section 1589 makes it a crime to:

> knowingly provide[] or obtain[] the labor or services of a person by any one of, or by any combination of, the following means—(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint[.]

Section 1595 authorizes a victim of a violation of section 1589 to bring a civil action against the "perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known was engaged in an act in violation of [section 1589])."  18 U.S.C. § 1595(a).

Section 1589 was enacted in 2000 as part of the Trafficking Victims Protection Act ("TVPA").  *See Ditullio v. Boehm*, 662 F.3d 1091, 1094 (9th Cir. 2011).  Congress explicitly declared that the purpose of the TVPA was "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims."  Pub. L. No. 106-386, § 102(a), 114 Stat. 1488 (2000) (emphasis added).  That stated purpose was supported by twenty-four congressional

DOCUMENT PREPARED ON RECYCLED PAPER

findings, all of which focused on the evils of "[t]rafficking in persons."  Pub. L. No. 106-386, § 102(b), 114 Stat. 1488 (2000).

Given Congress's clear intent to target, prosecute, and deter human traffickers—those who transport persons "across international borders" or take them "from their home communities to unfamiliar destinations" and force them to work— it could not have intended the TVPA to prohibit immigration officials or their contractors from requiring immigration detainees to participate in routine housekeeping tasks in and around the facilities lawfully detaining them.  Neither ICE nor GEO brought Mr. Novoa from his home to Adelanto for the purpose of cleaning the facility.  Indeed, the facility would not need to be cleaned *unless* people were detained in it.  And ICE and GEO are not perpetrating a transnational crime.  In fact, Mr. Novoa admits he is a non-citizen of the United States and does not contend that he was unlawfully detained at Adelanto while awaiting immigration proceedings.  Compl. ¶¶ 52, 54.

To conclude that GEO was engaging in the "trafficking of persons" as required in Section 1589 would be contrary to any plausible interpretation of that provision.  Where the literal application of a criminal statute would lead to "extreme or absurd results, and where the legislative purpose gathered from the whole act would be satisfied by a more limited interpretation, the "[g]eneral terms descriptive of a class of persons made subject to a criminal statute may and should be limited."  *United States v. Katz*, 271 U.S. 354, 362 (1926); *see also Brooks v. Donovan*, 699 F.2d 1010, 1011 (9th Cir. 1983) (a court "must look beyond the express language of a statute where a literal interpretation would thwart the purpose of the over-all statutory scheme or lead to an absurd result") (internal quotations omitted).  To interpret the phrase "labor or services of a person" found in Section 1589 to include lawfully detained aliens who are required to clean up after themselves is both extreme and absurd.

Indeed, in a non-detention, but relevant context, the Sixth Circuit refused to

extend Section 1589 to criminalize conduct such as forcing one's children to do their homework, babysit on occasion, and do household chores. *United States v. Toviave*, 761 F.3d 623, 630 (6th Cir. 2014) ("[W]e should not—without a clear expression of Congressional intent—transform a statute passed to implement the Thirteenth Amendment against slavery or involuntary servitude into one that generally makes it a crime for a person *in loco parentis* to require household chores.").

A similar principle has long been recognized in pretrial detention settings, as well. In *United States v. Kozminski*, the Supreme Court was tasked with interpreting the phrase "involuntary servitude" in 18 U.S.C. § 1584. 487 U.S. 931, 934 (1988). The court held that the phrase had the same meaning as the phrase "involuntary servitude" in the Thirteenth Amendment. *Id*. at 944-45. It also held that "involuntary servitude" "does not prevent the State or Federal Governments from compelling their citizens, by threat of criminal sanction, to perform certain civic duties," such as military, jury, or roadwork service. *Id*. at 943-44.

The Fifth Circuit applied this civic-duty exception to immigration detainees in *Channer v. Hall*, in which a detainee alleged that federal officials "compel[ed] him to work in the Food Services Department while he was an INS detainee," in violation of the Thirteenth Amendment. 112 F.3d 214, 215 (5th Cir. 1997). The detainee alleged he was "intimidated and threatened with solitary confinement if he failed to work." *Id*. at 218. Applying the civic-duty exemption in *Kozminski*, the court held that the detainee was not subjected to involuntary servitude because "the federal government is entitled to require a communal contribution by an INS detainee in the form of housekeeping tasks." *Id*. at 218-19. The court relied on other cases that exempted housekeeping chores by civil detainees, such as "fixing meals, scrubbing dishes, doing the laundry, and cleaning the building." *Id*. at 219 (citing *Bayh v. Sonnenburg*, 573 N.E.2d 398 (Ind. 1991); *Jobson v. Henne*, 355 F.2d 129 (2d Cir. 1966)).

The Fourth, Seventh, and Eighth Circuits have similarly recognized that

1   requiring pretrial detainees to perform "general housekeeping responsibilities" is

2   permissible.  *See Hause v. Vaught*, 993 F.2d 1079, 1085 (4th Cir. 1993) (denying

3   pretrial detainee's involuntary servitude claim that alleged no more than "general

4   housekeeping responsibilities" of common areas); *Martinez v. Turner*, 977 F.2d 421,

5   423 (8th Cir. 1992) ("Requiring a pretrial detainee to perform general housekeeping

6   chores, on the other hand, is not" punishment); *Bijeol v. Nelson*, 579 F.2d 423, 424-

7   25 (7th Cir. 1978) (denying pretrial detainee's claim that he was required to perform

8   general housekeeping duties in his cell and community areas "without pay and, when

9   refusing to do so, he was placed in segregation" because "general housekeeping

10   responsibilities are not punitive in nature and for health and safety must be routinely

11   observed in any multiple living unit").

12       Congress enacted Section 1589 after *Kozminski* and *Channer*.  It did so, in part,

13   to reverse *Kozminski*'s holding that involuntary servitude under § 1584 did not

14   include psychological coercion.  *See* Pub. L. No. 106-386, § 102(b)(13), 114 Stat.

15   1488 (2000).  The final version incorporated *Kozminski*'s physical and legal coercion

16   components of involuntary servitude, *see* 18 U.S.C. § 1589(a)(1)-(a)(3), and added

17   the psychological coercion component rejected by *Kozminski*, *see* 18 U.S.C. §

18   1589(a)(4).  However, it left in place *Kozminski*'s (and *Channing*'s) civic-duty

19   exception to involuntary servitude.  Courts "assume that Congress [wa]s aware of

20   existing law when it passe[d] [the] legislation" and "intended to incorporate" it.

21   *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990).  Nothing in Section 1589's

22   legislative history suggests Congress intended to eradicate the civic-duty exception.

23       Since Congress enacted Section 1589, courts have continued to recognize the

24   viability of this civic-duty exception against claims brought by immigration

25   detainees.  *See*, *e.g.*, *Owuor v. Courville*, 2013 WL 7877306, at *4 (W.D. La. Aug.

26   7, 2013); *Hutchinson v. Reese*, 2008 WL 4857449, at *4 (S.D. Miss. Nov. 7, 2008);

27   *see also Mendez v. Haugen*, 2015 WL 5718967, at *5 (D. Minn. Sept. 29, 2015), *aff'd*

28   (Feb. 22, 2016) (in pretrial detainee context, recognizing involuntary servitude does

1  not prohibit general housekeeping chores such as "fixing and distributing meals,
2  scrubbing dishes, laundering the sheets and clothing of other inmates, cleaning
3  communal bathrooms and shower stalls, removing trash from common areas, and
4  sweeping, mopping, and vacuuming general-use hallways and rooms"). There is no
5  basis to deny the exception now.

6      Even assuming that the TVPA extends to routine housekeeping tasks by
7  immigration detainees, Mr. Novoa does not allege plausible facts to support a claim.
8  His Complaint is simply "a formulaic recitation of the elements" of the TVPA
9  supported only by "conclusory statements." *See* Compl. ¶¶ 102-105; *Iqbal*, 556 U.S.
10 at 662, 678. He baldly alleges GEO forced or coerced him (and members of the
11 proposed class) by "withholding daily necessities" thereby "forcing [Plaintiff and
12 Class Members] to work for subminimum wages" and "[t]hreatening Plaintiff and
13 Class Members physical restraint, serious harm, and abuse of law or legal process if
14 they refuse to provide their labor, organize a work stoppage, or participate in a work
15 stoppage." Compl. ¶ 102. But Mr. Novoa fails to provide details or the necessary
16 factual predicates to support such blanket, conclusory allegations. For example, Mr.
17 Novoa does not identify who threatened him, how he was threatened, or when he was
18 threatened. Nor does he connect any purported threat to any specific demand to work.
19 Mr. Novoa does not even identify what specifically he was forced to do or when he
20 was forced to do it. Mr. Novoa only contends that he and other unknown class
21 members were required to perform forced labor throughout the duration of their
22 detention at Adelanto. That is insufficient. *See Roman v. Tyco Simplex Grinnell*,
23 2017 WL 2427251, at *5 (M.D. Fla. June 5, 2017) (dismissing § 1589(a) TVPA claim
24 where plaintiff failed to allege "who threatened him, how he was threatened, and for
25 what purpose).

26 **VII.  THE COURT SHOULD DISMISS PLAINTIFF'S FORCED LABOR**
27     **CLAIM UNDER THE CALIFORNIA TVPA**
28     Mr. Novoa's third cause of action is brought pursuant to the California TVPA.

1    Under that statute, a "victim of human trafficking, as defined in Section 236.1 of the

2    Penal Code, may bring a civil action for actual damages, compensatory damages,

3    punitive damages, injunctive relief, any combination of those, or any other

4    appropriate relief."  Cal. Civ. Code § 52.5(a).  Section 236.1(a) of the Penal Code

5    states: "A person who deprives or violates the personal liberty of another with the

6    intent to obtain forced labor or services, is guilty of human trafficking."  Subsection

7    (g) of that statute states that "the definition of human trafficking in this section is

8    equivalent to the federal definition of a severe form of trafficking found in Section

9    7102(9) of Title 22 of the United States Code."

10       Mr. Novoa's California TVPA claim is premised on the same allegations as

11   his federal TVPA claim.  Compl. ¶¶ 93-99.  It fails for all the same reasons.  The

12   California Legislature clearly did not intend for that statute to prohibit requiring

13   immigration detainees to participate in routine housekeeping tasks in and around the

14   facilities lawfully detaining them.  *See* 2005 Cal. Legis. Serv. Ch. 240 (A.B. 22)

15   (discussing legislative intent, including its intent to "establish the crime of trafficking

16   of a person for forced labor or services").  Indeed, it could not have.  As discussed

17   previously, the detention of immigrants is exclusively a federal function; California

18   has no authority to interfere with that function through its own criminal laws.  Thus,

19   California's legislature could not have intended its TVPA to apply to federal

20   immigration detainees.  That it did not intend for the statute to apply in any detention

21   setting is supported by the legislature's enactment of Cal. Penal Code § 2700, which

22   requires prisoners in the custody of the California Department of Corrections and

23   Rehabilitation ("CDCR") to work.  *See also* 15 C.C.R. § 3040(a).[8]

24       Finally, Mr. Novoa's factual allegations are themselves deficient.  Like his

25

26   [8] Inmates in the custody of CDCR are "obligated to work as assigned by department
     staff," but they are compensated at a fraction of the minimum wages that Mr. Novoa
27   demands GEO pay federal detainees.  *See* California's CDCR Regulations, 15 C.C.R.
     §§ 3040(a), 3041.2 (capping compensation as high as $56 per month, or less than 37
28   cents per hour, based on a 40-hour week).

1    federal TVPA allegations, Mr. Novoa merely recites the elements of the statute and

2    lofts conclusory statements.  An additional glaring omission is his failure to allege

3    that GEO "recruit[ed], harbor[ed], transport[ed], provi[ded], or obtain[ed] [them] *for*

4    labor or services" and "*for the purpose of* subjection to involuntary servitude,

5    peonage, debt bondage, or slavery," as required by 22 U.S.C. § 7102(9) (emphasis

6    added).  To the contrary, Mr. Novoa alleges he is a citizen of Mexico detained by

7    ICE and held at Adelanto while awaiting immigration proceedings.  Compl.  ¶¶ 52,

8    54;  *see also Lofthus v. Long Beach Veterans Hosp.*, 214 F. Supp. 3d 908, 916 (C.D.

9    Cal. 2016) (dismissing § 52.5 claim where plaintiff failed to allege he was detained

10   for labor services).

## VIII.  THE COURT SHOULD DISMISS PLAINTIFF'S UNJUST ENRICHMENT CLAIM

13       As an initial matter, Mr. Novoa's second cause of action for unjust enrichment

14   relies entirely on his other claims under the federal TVPA, the California TVPA, and

15   California's MWL.  Compl. ¶¶ 83-87.  Therefore, this derivative claim should be

16   dismissed to the extent the predicate claims are dismissed.

17       But Mr. Novoa's unjust enrichment claim fails for an additional reason.  "[T]he

18   mere fact that a person benefits another is not of itself sufficient to require the other

19   to make restitution therefor."  *Pepsi-Cola Metro. Bottling Co. v. Ins. Co. of N.A., Inc.*,

20   2010 WL 11549719, at *2 (citing *Marina Tenants Ass'n v. Deauville Marina Dev.*

21   *Co.*, 181 Cal. App. 3d 122, 134 (Cal. App. 2d Dist. 1986)).  An equitable theory of

22   recovery is barred if an adequate remedy exists at law against the same person.  *See*

23   *Mort v. United States*, 86 F.3d 890, 892 (9th Cir. 1996).  "[T]he remedy for unjust

24   enrichment applies only in the absence of an adequate remedy at law."  *In re*

25   *Facebook PPC Advert. Litig.*, 709 F. Supp. 2d 762, 770 (N.D. Cal. 2010) (citation

26   omitted).

27       Here, Mr. Novoa's unjust enrichment claim should be dismissed unless he can

28   establish the absence of an adequate remedy at law.  *See Parrish v. NFL Players*

*Ass'n*, 534 F. Supp. 2d 1081, 1100 (N.D. Cal. 2007). Courts typically find that unjust enrichment is an unavailable remedy under California law when the plaintiff pleads other claims seeking redress against the same defendant, finding the other claims prove that adequate remedies exist. *See, e.g., Rhynes v. Stryker Corp.*, 2011 WL 2149095, *4 (N.D. Cal. May 31, 2011) ("Where the claims pleaded by a plaintiff may entitle her to an adequate remedy at law, equitable relief is unavailable."); *Baggett v. Hewlett-Packard Co.*, 582 F. Supp. 2d 1261, 1271 (C.D. Cal. 2007) (dismissing unjust enrichment claim where plaintiff also claimed fraudulent concealment, violation of California unfair business practices law; trespass to chattels, and conversion). Here, Mr. Novoa has alleged several legal remedies, and no unjust enrichment claim could even lie unless all of his legal claims fail.

In any event, Mr. Novoa's unjust enrichment claim should be dismissed because there is no "fair market value" of his services. Indeed, there is no "market" for those services at all. Detainees like Mr. Novoa are asked only to help clean the very facility that houses them. Congress authorized payment of allowances to alien detainees who do this work as part of the VWP program. But in doing so, Congress did not convert detainees into employees who engage in bargained-for exchanges of services-for-compensation during their time in a federal detention facility. Mr. Novoa has pled nothing that plausibly establishes as a factual matter that he had, or could have had, any reasonable expectation of obtaining "fair market value" for his VWP work at Adelanto. *See Brown v. Stored Value Cards, Inc.*, 2016 WL 4491836, *4-5 (D.C. Ore. Aug. 25, 2016) (stating that the reasonable expectations of the plaintiff must be considered when determining whether a payment is unjust).

In *Whyte*, a Massachusetts court of appeals affirmed the dismissal of a similar unjust enrichment claim brought by a detainee who participated in the facility's work program. The court of appeals held that "[a]bsent some factual allegation that he reasonably expected compensation at a higher rate, and the defendants accepted the benefit of his labor with actual or chargeable knowledge of his expectation, the

DOCUMENT PREPARED ON RECYCLED PAPER

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

1  complaint fails to state a claim for quantum meruit or unjust enrichment." 2017 WL

2  2274618, at *2 (citation omitted).

3  Under these circumstances, the allegations that GEO retained benefits from the

4  labor of Mr. Novoa or others (thereby violating "principles of justice, equity, and

5  good conscience") are conclusory.  Compl. ¶ 85.  Put simply, there is not, and never

6  was, any "market" for Mr. Novoa's work under the VWP, and the Court should not

7  create one.

8  **IX.   PLAINTIFF'S  UCL  CLAIM  IS  A  DERIVATIVE  CLAIM  AND**

9  **SHOULD BE DISMISSED**

10  Like his unjust enrichment claim, Mr. Novoa's UCL claim is derivative in

11  nature and relies on the viability of his claims under the California TVPA and

12  California's MWL.  Mr. Novoa contends that "GEO willfully violated, and continues

13  to violate, the 'unlawful' prong of the UCL by violating California labor law…[and]

14  that GEO's conduct offends public policy against forced labor…."  Compl. ¶ 90-91.

15  To state a claim under the unlawful prong of the UCL, a plaintiff must allege acts by

16  the defendant that violated some separate law.  *See Birdsong v. Apple, Inc.*, 590 F.3d

17  955, 960 n.3 (9th Cir. 2009).  Thus, where the conduct alleged by a plaintiff does not

18  violate any law, the plaintiff has not stated a claim for relief under the unlawful prong

19  of the UCL.

20  **X.   CONCLUSION**

21  For the foregoing reasons, GEO respectfully requests that this Court dismiss

22  the Complaint without leave to amend under Rule 12(b)(6).

23  Dated:       February 16, 2018          LESLEY HOLMES

24                                         **NORTON ROSE FULBRIGHT US LLP**

25

26                                         By */s/ Lesley Holmes*

26                                         LESLEY HOLMES

27                                         Attorneys for Defendant

27                                         THE GEO GROUP, INC.

28