UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **EDCV 17-2514 JGB (SHKx)** | Date | June 21, 2018 |
| Title | ***Raul Novoa v. The GEO Group, Inc.*** | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:    Order GRANTING in Part and DENYING in Part Defendant's Motion to Dismiss (Dkt. No. 20)**

Before the Court is Defendant The GEO Group, Inc.'s ("GEO") motion to dismiss. ("Motion," Dkt. No. 20.) On March 26, 2018 and May 14, 2018, the Court held hearings on the Motion and took it under submission. After considering the oral arguments and papers filed in support of, and in opposition to, the Motion, the Court GRANTS in part and DENIES in part the Motion.

## I.   BACKGROUND

On December 19, 2017, Plaintiff Raul Novoa filed a putative class action complaint against Defendant. ("Complaint," Dkt. No. 1.) Plaintiff's Complaint alleges five causes of action arising from his detention at California's Adelanto Detention Center ("Adelanto"): (1) violation of California's Minimum Wage Law, Cal. Labor Code §§ 1194, 1197, 1197.1; (2) unjust enrichment; (3) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq.; (4) violation of California's Trafficking Victims Protection Act, Cal. Civ. Code § 52.5; and (5) attempted forced labor under 18 U.S.C. §§ 1589(a), 1594(a). (See Compl.)

On February 16, 2018, Defendant filed the instant Motion. (Dkt. No. 20.) Plaintiff opposed the Motion on March 5, 2018.[1] ("Opposition," Dkt. No. 23.) Defendant replied on March 12, 2018. ("Reply," Dkt. No. 24.)

---

[1] The Court warns Plaintiff to adhere to the font requirements set forth in the Local Rules for all briefs filed with the Court. The font in Plaintiff's brief particularly that of the footnotes,

The Court held a hearing on the Motion on March 26, 2018, and ordered the parties to submit supplemental briefing.  (Dkt. No. 31.)  On March 30, 2018, Defendant submitted its supplemental brief ("Def. Supp.," Dkt. No. 35) and Plaintiff submitted his supplemental brief ("Pl. Supp.," Dkt. No. 36).  The Court held a second hearing on the Motion on May 14, 2018, and ordered the parties to submit additional briefing.  (Dkt. No. 39.)  On May 21, 2018, Defendant submitted its additional brief ("Def. Supp. 2," Dkt. No. 40) and Plaintiff submitted his additional brief ("Pl. Supp. 2," Dkt. No. 41).

## II.   LEGAL STANDARD

Defendant moves to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in a complaint.  "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."  Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008).  Factual allegations must be enough to "raise a right to relief above a speculative level."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Rule 12(b)(6) must be read in conjunction with Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that a pleader is entitled to relief," in order to give the defendant "fair notice of what the claim is and the grounds upon which it rests."  Id.; see Horosny v. Burlington Coat Factory, Inc., 2015 WL 12532178, at *3 (C.D. Cal. Oct. 26, 2015).  In considering a Rule 12(b)(6) motion to dismiss, a court accepts the plaintiff's factual allegations in the complaint, and construes the pleadings in the light most favorable to the non-moving party.  See Shwarz v. United States, 234 F.3d 428, 435 (9th Cir. 2000).  Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009).

## III.   DISCUSSION

Plaintiff's Complaint alleges the following, which the Court accepts as true for the purposes of this Motion:

Adelanto is a civil immigration detention facility owned by Defendant.  (Compl. ¶ 2.)  Since 2011, GEO has contracted with United States Immigration and Customs Enforcement ("ICE") to operate Adelanto.  (Id. ¶ 28.)  Through its Voluntary Work Program ("Work Program"), GEO hires detainees to perform work at a rate of $1 per day.  (Id. ¶ 38.)  GEO does not pay and has not paid detainees the state minimum wage for the hours worked at Adelanto.  (Id. ¶ 48.)

In the Work Program, detainees are required to work according to an assigned work schedule and to participate in work-related training.  (Id. ¶ 41.)  Work assignments available through the

appears smaller than permitted.  See L.R. 11-3.1.1.  Failure to follow the Local Rules in the future may result in the Court declining to consider the filed document.

Work Program include intake, kitchen worker, recreation, barber, laundry, and janitorial, among others.  (See id. ¶ 45(a)-(i).)  Detainees perform a range of work such as scrubbing bathrooms, preparing detainee meals, performing clerical work for GEO, and managing the law library.  (Id. ¶ 46(a)-(m).)  GEO provides all necessary personal protection equipment and work uniforms.  (Id. ¶ 42.)  GEO also records the hours that detainees work and credits wages to their accounts.  (Id. ¶ 43.)

Novoa is a citizen of Mexico and a legal permanent resident of the United States.  (Compl. ¶ 52.)  From June 2012 to February 2015, Novoa was detained at Adelanto.  (Id. ¶ 54.)  During those three years, he worked as a janitor and a barber.  (Id. ¶¶ 56-57.)  As a janitor, Novoa worked four-hour shifts, up to seven days per week.  (Id. ¶ 56.)  GEO provided the cleaning supplies and equipment.  (Id.)  As a barber, Novoa worked up to ten hours per day, seven days a week.  (Id. ¶ 57.)  Barber supplies and equipment were provided by GEO.  (Id.)  Novoa was paid $1 per day, regardless of the number of hours he worked, and the wages were credited to his commissary account.  (Id. ¶ 58.)

Novoa spent his wages on "food, bottled water, and hygiene products . . . among other necessities" from Adelanto's commissary.  (Compl. ¶ 59.)  Adelanto officers threatened to put Novoa in solitary confinement if he stopped working or encouraged other detainees to stop working.  (Id. ¶ 60.)

## A. California Minimum Wage Law ("MWL")

Plaintiff alleges GEO violates California's minimum wage obligation by paying its detainees just $1 per day for the work performed.  (Compl. ¶ 80.)  Defendant moves to dismiss this claim on the grounds the claim is preempted by federal law and Plaintiff fails to state a claim under California's MWL.  (See Mot.)

### 1. Preemption

The Supremacy Clause provides that the laws of the United States "shall be the supreme Law of the Land[,] . . . anything in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  Federal law can preempt state law in three ways: (1) express preemption, (2) field preemption, or (3) obstacle/conflict preemption.  Nat'l Fed'n of the Blind v. United Airlines Inc., 813 F.3d 718, 724 (9th Cir. 2016).  Preemption analysis begins with the "presumption that Congress does not intend to supplant state law."  Tillison v. Gregoire, 424 F.3d 1093, 1098 (9th Cir. 2005) (quoting N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 654 (1995)).  The power to "regulate employment of unauthorized aliens remains within the states' historic police powers," thus an assumption of non-preemption applies.  Chicanos Por La Causa, Inc. v. Napolitano, 558 F.3d 856, 865 (9th Cir. 2009).

Defendant explicitly argues both field preemption and obstacle/conflict preemption are present here.  First, Defendant argues federal law occupies the field with respect to alien

registration and immigration detention, including the payment of detainees.  (Mot. at 9-11.)  Second, Defendant asserts Plaintiff's MWL claim produces a conflict between California law and the Immigration Reform and Control Act ("IRCA").  (Id. at 13.)

### a.  Express Preemption

Though not clearly articulated, Defendant appears to assert IRCA expressly preempts state wage laws for the alien workers.  (See Mot. at 5-9.)  Express preemption applies where Congress explicitly states its intent to preempt state law in the language of a statute.  Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 516 (1992).  Where the intent of the statutory provision speaks expressly to the issue of preemption, "we do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent."  Atay v. Cty. of Maui, 842 F.3d 688, 699 (9th Cir. 2016) (quoting Puerto Rico v. Franklin Cal. Tax-Free trust, -- U.S. --, 136 S. Ct. 1938, 1946 (2016).

IRCA's sole preemption provision is 8 U.S.C. § 1324a(h)(2).  It provides, "The provisions of this section preempt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens."  8 U.S.C. § 1324a(h)(2).

In Washington v. GEO Grp., Inc., 283 F. Supp. 3d 967 (W.D. Wa. 2016), the district court analyzed whether IRCA's preemption clause expressly preempted Washington's Minimum Wage Act.  The court considered whether the provisions of, and potential remedies imposed by, Washington's minimum wage law came within the ambit of the preempted "sanctions."  Washington, 283 F. Supp. 3d at 975-76.  In holding the state minimum wage provision was not expressly preempted, the court found the Washington Minimum Wage Act does not mention immigration status, aliens, or related terms.  In addition, any remy imposed under Washingon law would not result from the employers' hiring of unauthorized aliens, but from their failure to pay the prevailing minimum wage.  Id.

California Labor Code protections explicitly cover "all individuals regardless of immigration status," Cal. Labor Code § 1171.5.  Still, the "plain wording of the [IRCA preemption] clause" focuses on preventing state or local laws that impose sanctions on an employer for hiring an unauthorized alien, not on the aliens themselves.  Similarly to Washington's Minimum Wage Act, California's MWL does not impose penalties on employers for hiring unauthorized aliens.  Instead, California's MWL focuses on ensuring workers, once employed, receive the appropriate minimum wage and provides remedies if they do not.  See Cal. Labor Code § 1194(a).  Accordingly, the Court finds 8 U.S.C. §1324a(h)(2) does not expressly preempt California's Minimum Wage Law.

### b.  Field Preemption

State law is field pre-empted "if federal law so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the states to supplement it.'"

Nat'l Fed'n of the Blind, 813 F.3d at 733 (quoting Cipollone, 505 U.S. at 516 (1992)).  The first step in the field preemption inquiry is "to delineate the pertinent regulatory field." Id. at 734. The second step is to "survey the scope of the federal regulation within that field." Id.

Defendant argues Congress has occupied the field of alien registration.  As stated by the Supreme Court in Arizona v. United States, 567 U.S. 387, 401-02 (2012), "Federal law makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders . . . Even if a State may make violation of federal law a crime in some instances, it cannot do so in a field (like the field of alien registration) that has been occupied by federal law."  However, the "pertinent regulatory field" here is unrelated to alien registration requirements or documents.  Plaintiff's claim concerns the alien's wages while detained in an immigration detention facility.

More to the point, Defendant also asserts Congress has fully occupied the field of employment for unauthorized aliens.  (Mot. at 5.)  The Ninth Circuit has emphasized the need to define the relevant field "with specificity."  Nat'l Fed'n of the Blind, 813 F.3d at 734.  For example, where a passenger challenged the design of an airplane's stairway for lacking additional handrails, the Ninth Circuit defined the relevant field not as the Federal Aviation Act's ("FAA") regulation of "plane design," but the regulation of "airstairs" in particular.  Martin ex rel. Heckman v. Midwest Exp. Holdings, Inc., 555 F.3d 806, 812 (9th Cir. 2009).  Also, in Nat'l Fed'n of the Blind, the court defined the relevant field as the "airport kiosk accessibility for the blind" not "air carrier accessibility" in a lawsuit challenging an airline's policy of using automatic kiosks.  813 F.3d at 737; see also Bernstein v. Virgin America, Inc., 227 F. Supp. 3d 1049, 1071 (N.D. Cal. 2017) (defining the relevant field as "the regulation of meal and rest breaks for flight attendants," not "aviation safety" or "airline employment," where plaintiff flight attendants alleged the airline did not allow them to take rest and meal breaks).  Based on this authority, the Court concludes the pertinent regulatory field here is immigration detainee wages, not the general field of unauthorized alien employment.  Therefore, the Court turns to the second step of the field preemption analysis; determining the scope of federal regulation within the field of immigration detainee wages.

Defendant points to IRCA, which prohibits the hiring of an unauthorized alien.  8 U.S.C. § 1324a(a)(1)(A).  In addition, 8 U.S.C. § 1555(d) provides for appropriations for the Immigration and Naturalization Service ("INS") for "(d) payment of allowances (at such rate as may be specified from time to time in the appropriation Act involved) to aliens, while held in custody under the immigration laws, for work performed."  8 U.S.C. § 1555(d).  In 1978, Congress appropriated funds for the payment of allowances at a rate not in excess of $1 per day for work performed, but has since abandoned direct appropriations for payment of allowances. Act of Oct. 10, 1978, Pub. L. 95-431, 92 Stat. 1021; see, e.g., Act of Nov. 30, 1979, Pub. L. 96-132, 93 Stat. 1042.  Defendant also proffers an opinion by the INS General Counsel that described the allowance paid to INS alien detainees as "currently limited by Congress to $1 per day" and "not subject to the provisions of the Fair Labor Standards Act (FLSA)."  INS, General Counsel Opinion No. 92-8, The Applicability of Employer Sanctions to Alien Detainees Performing Work in INS Detention, 1992 WL 1369347, at *1 (Feb. 26, 1992).  Additionally, Defendant argues

Congress could have explicitly stated immigration detainees could receive the state minimum wage or were employees under FLSA, but chose not to do so.  (Mot. at 10.)

The Court concludes Congress did not preempt the field of immigration detainee wages.  The Ninth Circuit found a Department of Transportation regulation "pervasively regulate[d] the accessibility of airport kiosks," and was "exhaustive," containing technical and design requirements for accessible airport kiosks, preempting the claim.  813 F.3d at 735.  Here, the sole regulation Defendant proffers on detainee wages, 8 U.S.C. § 1555(d), permits appropriations for the payment of allowances for work performed.  Congress however, has not directly appropriated such funds since 1979.  This subsection speaks to Congressional intent to authorize appropriations for detainee labor, but Congress' abandonment of such appropriations refutes any reasonable inference that Congress left no room for states to supplement the field.  Moreover, one subsection does not create a "pervasive" or "exhaustive" set of regulations on detainee wages.  See Bernstein, 227 F. Supp. 3d at 1071 (finding a lone regulation on the provision of breaks to flight attendants was not "comprehensive, detailed, or pervasive enough to justify federal preemption of the field" for claim regarding meal and rest breaks); see also Salas v. Sierra Chemical Co., 59 Cal. 4th 407, 423 (2014) (concluding IRCA has not occupied the field so as to leave no room for any state law on the subject of unauthorized aliens and worker protection laws).

Further, Defendant's arguments that Congress has chosen not to classify these detainees as FLSA employees or recipients of state minimum wages invite the Court to find preemption through a lack of regulation.  This absence of regulation is a far cry from the regulation in Nat'l Fed'n of the Blind that "instruct[ed] [the airline] exactly what it must do to address th[e] problem" alleged, thereby preempting the claim.  813 F.3d at 735.  See Heckman, 555 F.3d at 812 (9th Cir. 2009) (finding that a single FAA regulation regarding airstairs was not enough to preempt state law claims that the stairs were defective).  In addition, as the Washington court noted, the Work Program currently has "no preemptive force at law."  283 F. Supp. 3d at 977.  If ICE intended the Work Program's wage payment to preempt state law on detainee wages, it would need to follow the specific requirements set forth in Executive Order 13132.  Id. (citing Federalism, 64 FR 43255, E.O. 13132 (1999)).

Accordingly, Defendant has not shown that IRCA or 8 U.S.C. § 1555(d) field preempt Plaintiff's MWL claim.

### c.  Obstacle/Conflict Preemption

When state law "actually conflicts with federal law," it is preempted.  Cipollone, 505 U.S. at 516.  Such a conflict arises when "compliance with both federal and state regulations is a physical impossibility," or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  Pacific Gas & Elec. Co. v. State Energy Resources Conserv. & Dvlpmt Commission, 461 U.S. 190, 203 (1983).

Defendant argues Plaintiff's claim is preempted because IRCA prohibits the hiring of unauthorized aliens and Plaintiff's claim would require Defendant to have employed the

detainees.  (Reply at 4-5.)  In addition, Defendant argues that to subject ICE and its contractors to individual state minimum wage laws would "create a patchwork of state wage regimes," imposing an obstacle to immigration detention.  (Id. at 5-6.)

California courts have considered whether claims for wages under California state law brought by unauthorized aliens are preempted by IRCA.  In Reyes v. Van Elk, Ltd., 148 Cal. App. 4th 604, 617 (2007) cert. denied, Van Elk, Ltd. v. Reyes, 552 U.S. 1180 (2008), the court held California's wage law was not preempted by IRCA, because there was no "actual conflict" and the state law was not an obstacle to the accomplishment of IRCA objectives.  The Reyes court concluded that allowing employers to hire unauthorized workers and pay them less than the prevailing wage would subvert the goals of IRCA by encouraging employers to hire these workers.  Id. at 617.  Allowing unauthorized aliens to obtain back pay for work performed while the employer knew of their status furthered IRCA's objective of removing an incentive to hire undocumented workers.  Id. at 618.  In Salas v. Sierra, 59 Cal. 4th 407 (2014), the California Supreme Court analyzed whether an undocumented worker's claim under California's Fair Employment and Housing Act (FEHA) for back pay after alleged wrongful termination was preempted by IRCA.  The Salas court held that compensating the unauthorized alien worker under state law for loss of employment for the period after discovery of his unauthorized status directly conflicted with federal immigration law prohibiting the continued employment of workers the employer knows to be unauthorized.  59 Cal. 4th at 424.  The court limited its preemption analysis to awards for wages after the employer discharged the unauthorized worker.  Id. at 424 n.3.  Moreover, the court expressly did not address a situation in which an employer knowingly hired or continued to employ an unauthorized alien.  Id.  Imposing full liability for lost wages when the employer knowingly hires or continues to employ an unauthorized worker, the court commented, would "provide a disincentive for such immigration law violations, thereby furthering the goals of federal immigration law [and] in these situations arguably federal law would not preempt lost wages remedies for violations of state laws like California's FEHA."  Id.

The Court finds the reasoning in these cases persuasive.  IRCA focuses on the employer's conduct.  Under IRCA, employers are prohibited from hiring an unauthorized alien for employment in the United States, or continuing to employ the alien knowing he or she is or has become unauthorized with respect to such employment.  8 U.S.C. §§ 1324a(a)(1)(A), 1324a(a)(2).  By contrast, the only IRCA sanctions applicable to the unauthorized alien are for the knowing or reckless use of false documents to obtain employment.  See 8 U.S.C. § 1324(c).  IRCA does not forbid undocumented aliens from seeking or maintaining employment.  Therefore the alleged conflict is not so apparent here, where the unauthorized alien has not committed an IRCA violation, and the employment relationship stems from an employer's alleged knowing violation of IRCA prohibitions.  Once the employer has committed IRCA violations, there is no conflict with California's MWL in compensating the unauthorized alien at the minimum wage rate for work performed.  The Court recognizes the inherent tension in permitting an unauthorized alien to advance a claim for wages when the worker's very employment is prohibited.  However, doing so merely ensures that the employer does not unfairly benefit from the undocumented worker's labor.  To allow an employer to benefit from hiring unauthorized workers and paying them lower wages would discourage employer compliance with both federal

immigration and state laws more than would a benefit award for the undocumented worker. While Plaintiff's detained status presents an additional aspect to his claim, the Court finds no distinction based on detention in IRCA. The Court concludes Plaintiff's MWL claim is not preempted.

### 2. Failure to State a Claim

Defendant contends Plaintiff fails to state a claim under California's MWL because detainees are not considered employees under the statute and in analogous situations detainees are frequently excluded from FLSA minimum wage protection. (Mot. at 13-15.) Plaintiff argues the MWL is written broadly, inclusive of detainees, and under the common law test of control, GEO was Plaintiff's employer. (Opp'n at 11-12.)

California Labor Code § 1194 provides for a civil action by employees receiving less than the legal minimum wage or overtime compensation. Cal. Labor Code § 1194(a). However, this section does not define "employee." Other California Labor Code provisions state the Labor Code applies to "men, women and minors employed in any occupation, trade, or industry. . ." and all protections, rights, and remedies "are available to all individuals regardless of immigration status who have applied for employment, or who are or who have been employed, in this state." Cal. Labor Code §§ 1171, 1171.5. Still, definitions of "employer" and "employee" are not readily available in the California Labor Code.

In California, the "essential predicate of each employer's obligation to pay a minimum wage" is the Industrial Welfare Commission's (IWC) issuance of an applicable wage order fixing the minimum wage and providing the legal basis for an action by the employee to recover unpaid minimum wages. Martinez v. Combs, 49 Cal. 4th 35, 56 (2010). An individual who sues to recover unpaid minimum wages under § 1194 "actually sues to enforce the applicable wage order." Id. at 62. The California Supreme Court noted the IWC exercised its authority "to provide employees with greater protection than federal law affords," distinguishing it from FLSA. 49 Cal. 4th at 59-60. In addition, the court held the IWC wage orders must be given "independent effect" and where they intend FLSA to apply, it is specifically stated. Id. at 66-68. The California Supreme Court abrogated its precedent in holding that under § 1194 the relevant IWC wage order defines the employment relationship, not the common law. Id. at 62. Thus, the Court disagrees with both parties' assertions of the relevant legal doctrines to interpret California's MWL. The Court concludes the appropriate analysis requires construing the IWC wage orders to determine whether immigration detainees such as Plaintiff have a civil action under § 1194 for work performed at a detention facility.

Defendant states California prisoners are expressly exempted from the MWL and IWC wage orders under the California Penal Code. (Def. Supp. at 2.) California's Department of Corrections requires labor of prisoners to be paid, if at all, in accordance with California Penal Code § 2700, as prescribed by the Department of Corrections. Cal. Penal Code § 2700. Thus, by analogy, Defendant argues, detainees should also be exempted because they also do not need

to maintain a standard a living.  (Mot. at 15.)  In <u>Menocal v. GEO Group, Inc.</u>, 113 F. Supp. 3d 1125, 1129 (D. Colo. 2015), the court considered the Colorado minimum wage law and held the detainees were not employees even though, unlike prisoners, they were not expressly exempted. In so concluding, the court found persuasive that the purpose of the minimum wage law to maintain living standards was not served by including detainees, FLSA precedent had excluded detainees and prisoners, and prisoners were exempted by the Colorado Department of Labor.  <u>Id.</u>

Nevertheless, the Court heeds the California Supreme Court's directive in <u>Martinez</u> that the IWC wage orders be given independent effect from FLSA.  49 Cal. 4th at 66-68.  Moreover, a substantial portion of Plaintiff's allegations involve detainees being forced into the Work Program to purchase necessities such as food and water, which are not otherwise adequately provided. Thus, the general rationale that prisoners need not receive a minimum wage to maintain a living standard may not apply in this case, where the allegations concern the detainees' need to support their basic living needs.

Defendant also argues the IWC wage orders do not apply categorically, such as in <u>Gerard v. Mitchell Sys.</u>, 2016 WL 4479987 (C.D. Cal. Aug. 22, 2016).  In <u>Gerard</u>, the court held the students working for a cosmetology school as part of their training were not employees under the wage order for the Personal Service Industry.  2016 WL 4479987, at *2-*3.  The court determined the students were not employees using the "primary beneficiary approach" and found the primary beneficiaries were the students because they received hours for licensing and practical training required by the state regulators.  <u>Id.</u> at *7.  In addition, the <u>Gerard</u> court held the students were not employees subject to the wage order because California law established that Cosmetology Board as the only governmental agency with the authority to determine whether students should be paid for services performed while completing a cosmetology school. <u>Id.</u>  Here, Defendant argues, the IWC wage orders cannot create an employment relationship where the governing ICE agency has already stated there is none.  (Def. Supp. at 5 (citing INS, General Counsel Opinion No. 92-8).)  Plaintiff counters that <u>Gerard</u> is completely inapposite because Plaintiff is not a student nor is there a governmental agency with sole regulatory power over detainee wages.  (Pl. Supp. at 6.)  As the Court has determined neither IRCA nor ICE's Work Program preempt state law, the Court does not find <u>Gerard</u> persuasive.  Further, unlike the students in <u>Gerard</u>, Adelanto and GEO allegedly benefit from detainee labor more than the detainees themselves.  Thus, the Court considers whether the IWC wage orders cover Defendant.

Plaintiff asserts IWC Wage Order 5 regulating the "Public Housekeeping Industry" applies to private immigration facilities such as Adelanto, or, alternatively, that the catch-all Wage Order 17 applies.  (Pl. Supp. at 2, 5.)  As quasi-legislative regulations, the IWC wage orders are to be construed "in accordance with the ordinary principles of statutory interpretation."  <u>Collins v. Overnite Transp. Co.</u>, 105 Cal. App. 4th 171, 178 92003).  The interpretation should "begin[] with and focus[] on the text as the best indicator of legislative purpose."  <u>Brinker Restaurant Corp. v. Super. Ct.</u>, 53 Cal. 4th 1004, 1026 (2012).

The Public Housekeeping Industry is defined as "any industry, business, or establishment which provides meals, housing, or maintenance services whether operated as a primary business or when incidental to other operations in an establishment not covered by an industry order of the Commission. . ." Cal. Code. Regs., tit. 8 § 11050, subd. 2(P). Wage Order 5 covers entities such as "Hospitals, sanitariums, rest homes, child nurseries, child care institutions, homes for the aged, and similar establishments offering board or lodging in addition to medical, surgical, nursing, convalescent, aged, or child care." Cal. Code. Regs., tit. 8 § 11050, subd. 2(P)(4). Plaintiff argues GEO is like a hospital, rest home, or private school because it provides room and board for the individuals who reside there, as well as all other essential services. (Pl. Supp. at 3.)

In Menocal, the court also analyzed whether a GEO-run immigration detention facility was an "employer" within the meaning of the Colorado Minimum Wage Order's "health and medical" industry. 113 F. Supp. 3d at 1129-1130. In concluding that it was not, the court relied on a Tenth Circuit case interpreting the food and beverage section of the Colorado Minimum Wage Order to require the businesses served the general public. Id. at 1130 (citing Salazar v. Butterball, LLC, 644 F.3d 1130, 1144 (10th Cir. 2011)). Thus, the court found that because the facility did not serve any health or medical services to the general public, it was not a health and medical employer. Id. Moreover, the court found the facility was more akin to a government operated hospital, which was expressly exempted from the Wage Order by the Colorado Department of Labor, than a private business for the general public. Id.

Conversely, a judge in this district denied a defendant's argument that IWC Wage Order 5 did not apply to the entity because its simulated villages were not open to the "general public." Niazi v. Tatitlek Support Servs., Inc., 2018 WL 1725077, at *2 (C.D. Cal. Apr. 2, 2018). In Niazi, the business operated simulated pre-deployment combat training for the U.S. Marine Corps at a federal military base. Id., at *1. The court analogized the defendant's villages to farm labor camps with board and lodging, which the California Department of Labor identified as falling within Wage Order 5. Id., at *3. In both types of businesses, the workers were bussed onto the location and were not open to the public, and the court concluded the defendant's business was covered by Wage Order 5. Id.

A business may have limited patrons, such as the Marine Corps on the military base in Naizi, but a consumer base far narrower than the general public does not appear to preclude the application of Wage Order 5. Like the business in Naizi and farm labor camps with board and lodging, that Adelanto is not open to the general public does not preclude a finding that Wage Order 5 applies to GEO.

In a case directly on point, a Southern District of California court recently held that IWC Wage Order 5 applied to a civil immigration detention facility. Owino v. CoreCivic, Inc., 2018 WL 2193644, at *26 (S.D. Cal. May 14, 2018). The court concluded that although the provision of meals, housing or maintenance were incidental to the facility's role in housing detainees, the facility provided essential services for those under its charge, similar to the other entities listed in the wage order. Id.

Wage Order 5's broad language encompasses "any industry, business, or establishment which provides meals, housing, or maintenance services whether operated as a primary business or when incidental to other operations in an establishment not covered by an industry order of the Commission. . ." Cal. Code. Regs., tit. 8 § 11050, subd. 2(P). Entities that offer medical services in addition to housing and board are included on the list of types of covered entities. Cal. Code. Regs., tit. 8 § 11050, subd. 2(P)(4). This Court finds Adelanto may be similar enough to other Wage Order 5 entities because it provides housing and board for the detainees, in addition to offering medical services. Though health or care services occupy a more central role in Wage Order 5's enumerated establishments than at Adelanto, the regulation uses the broad term "offering." Adelanto's provision of housing, board, and medical services may plausibly bring it under IWC Wage Order 5.

To counter, Defendant points to the California Division of Labor Standards Enforcement's ("DLSE") July 22, 1997 opinion letter that clarified the Commission intended the definition of "provides" in Wage Order 5 to mean "provided to the public or other businesses." Dept. Industrial Relations, DLSE Opn. Letter No. 1997.07.22-1 (1997). In this opinion letter, DLSE cited a school providing lunch for its pupils and a law firm operating a janitorial service it offered to other firms as covered entities. Id. at 1-2. Conversely, an insurance company employing a small kitchen staff to have a commissary on its premises "for its employees," was not subject to Wage Order 5. Id. at 2.

The DLSE interpretation of IWC Wage Order 5 is not binding on the Court. The DLSE is the state agency empowered to enforce California's labor laws and wage orders. Augustus v. ABM Sec. Servs., Inc., 2 Cal. 5th 257, 267 (2016). However, DLSE's opinion letters are not controlling on the courts, though they "do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." Brinker, 53 Cal. 4th at 1029 (2012); see also Abdullah v. United States Sec. Assocs., Inc., 731 F.3d 952, 959-960 (9th Cir. 2013) (adopting DLSE's interpretation of meal period statute as set forth in DLSE opinion letters). Courts still must nevertheless independently analyze the relevant statutory provision to determine its application. See Augustus, 2 Cal. 5th at 264-67 (interpreting rest period provisions of wage order 4 before looking to DLSE's opinion letters); Morillion v. Royal Packing Co., 22 Cal. 4th 575, 582-584 (2000) (first analyzing "hours worked" in wage order 14 independently of DLSE advice letters).

Here, DLSE's July 22, 1997 letter reads meaning into Wage Order 5 that is contrary to its plain language. By interpreting Wage Order 5 to only cover entities that "provide" meals, housing, or maintenance services to "the public or other businesses," DLSE narrowed the scope of included entities beyond the plain meaning of the provision. The Court finds DLSE's interpretation unpersuasive, particularly in light of the California Supreme Court's advice to "liberally construe[]" statutory provisions concerning the regulation of wages and hours "with an eye to promoting such protection." Brinker, 53 Cal. 4th at 1026-027. In sum, the Court concludes Wage Order 5 applies to Defendant.

Plaintiff asserts IWC Wage Order 17 applies if Wage Order 5 does not.  (Pl. Supp. at 5.)
Wage Order 17 applies to "[a]ny industry or occupation not previously covered by, and all
employees not specifically exempted in, the Commission's wage orders in effect in 1997, or
otherwise exempted by law."  Cal. Code Regs., tit. 8, § 11170.  Nevertheless, DLSE has not
identified any occupations that meet the definition of "miscellaneous employees."  DLSE,
Which IWC Order? Classifications (2013), http://www.dir.ca.
gov/dlse/WhichIWCOrderClassifications.pdf.  Therefore, the Court finds Wage Order 17 is not
applicable.

Plaintiff alleges he worked as a janitor and barber at Adelanto.  (See Compl. ¶¶ 54, 57.)
Under IWC Wage Order 5, an employee is defined as "any person employed by an employer,"
and an employer is any entity who "employs or exercises control over the wages, hours, or
working conditions of any person."  See Cal. Code. Regs., tit. 8 § 11050, subd. 2(F),(H).  To
employ means "to engage, suffer, or permit to work."  See, e.g., id. at subd. 2(E).  As Martinez
clarifies, the definition of "employ" encompasses liability on a business that knows prohibited
labor is occurring and fails to prevent it, despite the absence of a common law employment
relationship.  49 Cal. 4th at 69.  These definitions do not facially exclude detainees from their
coverage, and Defendant has not pointed to any authority so stating.

Plaintiff alleges GEO assigned work to the detainees and required work-related training.
(Compl. ¶ 41.)  Plaintiff also alleges GEO provided all necessary protection equipment and
supplies for the work shifts.  (See, e.g., id. ¶¶ 56-57.)  In return for his labor, Plaintiff received $1
per day from GEO.  (Id. ¶ 58.)  These allegations are sufficient to raise a plausible claim that
GEO "exercised control" over the working conditions, schedule, and wages so as to make GEO
Novoa's employer and/or that GEO "employed" Novoa by knowing of his labor and failing to
prevent the work from occurring.  The Court DENIES Defendant's Motion for Plaintiff's MWL
claim.

## B.  California Trafficking Victims Protection Act ("CTVPA")

Plaintiff alleges GEO forced and coerced him and the putative class members to perform
uncompensated labor in order to drive its profits.  (Compl. ¶ 97.)  Plaintiff also alleges GEO did
not provide Adelanto detainees with sufficient necessities, forcing them to work in order to be
able to purchase items such as bottled water and extra food.  (Id. ¶ 98.)  Defendant argues the
CTVPA was not meant to apply to federal immigration detainees and Plaintiff's factual
allegations are deficient.  (Mot. at 22-23.)

As a threshold issue, Plaintiff and Defendant disagree on whether the CTVPA can apply to
federal immigration detainees, yet neither identifies any authority that directly supports their
position.  Defendant points to the California's Legislature's silence on whether the TVPA
applies to immigration detainees, and Plaintiff conversely construes that silence as not excluding
the CTVPA's coverage of detainees.  (See Mot. at 22; Opp'n at 21.)

While not directly on point, the Supreme Court has held that state law remedies are available to inmates in federal prisons run by private corporations. In <u>Correctional Servs. Corp. v. Malesko</u>, 543 U.S. 61, 74 (2001), the Supreme Court denied a prisoner's Eighth Amendment-based suit against a private corporation managing a federal prison. In doing so, the Supreme Court determined that a Bivens[2] action was unnecessary given the prisoner's ability to bring state tort actions against the private defendants. <u>Id.</u> at 72-73. Later in <u>Minecci v. Pollard</u>, 565 U.S. 118, 126 (2012), the Supreme Court reiterated the alternate remedies available to prisoners in federally run facilities and privately run facilities, noting that ordinarily prisoners "cannot bring state-law tort actions against employees of the Federal Government . . . But prisoners ordinarily can bring state-law tort actions against employees of a private firm." Relying on <u>Malesko</u> and <u>Minneci</u>, the Eleventh Circuit declined to recognize a First Amendment-based <u>Bivens</u> action for an inmate of a privately-run facility due to the availability of the adequate state common law and statutory tort actions. <u>Robles v. Kane</u>, 550 F. App'x 784, 788 (11th Cir. 2013). Although Plaintiff does not seek to bring a constitutional claim against Defendant, these cases stand for the proposition that persons confined in privately run federal facilities can bring causes of action under state law against the private entity. Hence, in the absence of statutory text or case law to the contrary, the Court concludes causes of action under the CTVPA are available to federal immigration detainees in privately-run facilities, and Plaintiff can bring a claim under the CTVPA.

A victim of human trafficking may bring a civil action for damages or injunctive relief under California Civil Code § 52.5. Cal. Civ. Code § 52.5(a). California's human trafficking statute provides in pertinent part that "[a] person who deprives or violates the personal liberty of another with the intent to obtain forced labor or services, is guilty of human trafficking." Cal. Penal Code § 236.1. The elements of the criminal offense are (1) the defendant either deprived another person of personal liberty or violated that other person's personal liberty; and (2) when the defendant did so, he or she intended to obtain forced labor or services from that person. <u>People v. Halim</u>, 14 Cal. App. 5th 632, 643 (2017), <u>petition for cert. filed</u>, <u>Astati Halim, et al. v. California</u>, -- U.S. -- (Mar. 1, 2018) (No. 17-1224).

Section 236.1(g) equates its definition of human trafficking with the federal definition of a severe form of trafficking, defined in relevant part as "the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion, for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery." 22 U.S.C. § 7102(9)(B). Section 236.1 goes on to define "Deprivation or violation of the personal liberty of another" to include:

> substantial and sustained restriction of another's liberty accomplished through
> force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful
> injury to the victim or to another person, under circumstances where the person

---

[2] <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971).

receiving or apprehending the threat reasonably believes that it is likely that the
person making the threat would carry it out.

Cal. Penal Code § 236.1(h)(3). Forced labor services are defined as "labor or services that are
performed or provided by a person and are obtained or maintained through force, fraud, duress,
or coercion, or equivalent conduct that would reasonably overbear the will of the person." Cal.
Penal Code §236.1(h)(5). Therefore, the Court analyzes Plaintiff's CTVPA claim in harmony
with its provided definitions and § 7102(9)(B)'s definition for severe forms of trafficking.

Plaintiff was a detainee at Adelanto from June 2012 to February 2015. (Compl. ¶ 54.) In
addition, Novoa alleges he was required to work in Adelanto's Work Program in order to buy
basic necessities, such as food and bottled water that GEO refused to provide. (Id. ¶¶ 39, 59.)
Novoa further alleges officers at Adelanto threatened him with solitary confinement if he stopped
working or encouraged other detainees to stop working. (Id. ¶ 60.) Finally, Novoa claims he
would not have worked for $1 per day if given a meaningful choice. (Id. ¶ 61.) The Court
construes Plaintiff's allegations to mean his freedom to stop working was violated by the officers'
threats of solitary confinement and the need to purchase necessities, which forced him to
continue participating in the Work Program.

The severe form of trafficking definition contained in 22 U.S.C. § 7102 makes clear that the
deprivation/violation of a person's liberty must be "for the purpose of subjection to" involuntary
servitude or other forms of forced labor. 22 U.S.C. § 7102. Thus, the Court reads the "intent
to" requirement in the CVTPA to be congruent with § 7102's "for the purpose of subjection
to." Adelanto is a civil immigration detention facility operated by GEO pursuant to an ICE
contract. Novoa has nowhere alleged that his detention itself was unlawful. Consequently the
ongoing deprivation of his liberty through detention appears to have been in accordance with
immigration laws. Thus, his detention in Adelanto was not "for the purpose of subjection to
involuntary servitude" or his provision of labor. If his claim were so based, the Court would find
it fails as a matter of law.

However, Plaintiff's claim pertains to the conditions in, and GEO's operation of, Adelanto.
The restriction on Plaintiff's liberty was his inability to stop working, not solely his status as
a detained person. GEO allegedly accomplished this restraint on Novoa's choice not to work by
threatening him with solitary confinement. Moreover, he alleges GEO withheld necessities to
ensure a labor pool for the Work Program. (Compl. ¶ 37.) Essentially, Plaintiff claims GEO
maintained a compulsory work program at Adelanto. Thus, while GEO did not orchestrate
Novoa's initial detention or administer his ongoing detention with the intent to obtain forced
labor services, Plaintiff alleges Defendant violated his liberty by creating conditions within
Adelanto for the purpose of obtaining forced labor in the Work Program.

While the Court finds Plaintiff is not precluded from stating a claim under the CTVPA, his
claim is insufficiently pleaded, particularly with respect to his allegations of GEO's coercive
tactics. Plaintiff fails to provide more than conclusory assertions about GEO's "policy and
uniform practice" of withholding necessities or about threats levelled at him if he stopped

working.  Without more, Plaintiff has not sufficiently stated a claim.  The Court GRANTS the Motion as to Plaintiff's claim under the CTVPA.

## C.  Attempted Forced Labor, 18 U.S.C. §§ 1589(a), 1594(a)

Like in his CTVPA claim, Plaintiff alleges GEO violated § 1589 by withholding necessities from Plaintiff and the putative class members, forcing them to work at subminimum wages in order to buy these products.  (Compl. ¶ 102.)  In addition, Plaintiff alleges he and the putative class members were threatened with solitary confinement, referral to an ICE officer, or abuse of legal process if they refused to work.  (Id. ¶¶ 102(b)-103.)

Enacted as part of the Trafficking and Victims Protection Act of 2000 ("TVPA"), 18 U.S.C. § 1589 proscribes a party from "knowingly provid[ing] or obtain[ing] the labor or services of a person" through force, physical restraint, serious harm, abuse of law or legal process, threats of any of those means, or any combination of those methods.  18 U.S.C. § 1589(a).  Also liable is a party who "knowingly benefits, financially or by receiving anything of value, from participation in a venture" involving forced labor.  18 U.S.C. § 1589(b).  Title 18 U.S.C. § 1595 provides the civil remedy to a victim of forced labor.  18 U.S.C. § 1595.

Defendant first argues applying the TVPA here would go beyond the intent and purpose of the statute, which was to prosecute and deter the trafficking of persons over geographic spaces. (Mot. at 17-18.)  The Court disagrees.  The plain language of § 1589 holds no limitation on who it applies to; indeed, subdivision (a) begins "whoever . . . ."  18 U.S.C. § 1589.  Moreover, as the Ninth Circuit noted, Congress passed the TVPA to correct the Supreme Court's holding in United States v. Kozminski, which limited the definition of involuntary servitude in 18 U.S.C. § 1584 to physical or legal coercion.  487 U.S. 931, 952 (1988).  The legislative history of the TVPA notes that trafficking also "involves violations of other laws, including labor and immigration codes and laws against kidnapping, slavery, false imprisonment . . . ."  H.R. Conf. Rep. 106-939, at 4 (2000).  The statute merely proscribes knowingly providing or obtaining labor through defined means.  There is no basis for Defendant's proposition that a federal detention center run by a private entity is excluded from the reach of the TVPA.

Defendant next argues the civic-duty exception prevents Plaintiff from asserting a claim based on performing housekeeping duties in detention.  (Mot. at 19-20.)  In Channer v. Hall, 112 F.3d 214, 215 (5th Cir. 1997), the Fifth Circuit considered an INS detainee's Thirteenth Amendment claim for being "compell[ed] [ ] to work in the Food Services Department."  The court held the "federal government is entitled to require a communal contribution by an INS detainee in the form of housekeeping tasks" and that the plaintiff's kitchen service did not violate the Thirteenth Amendment's prohibition on involuntary servitude.  Id. at 219; see also Kozminski, 487 U.S. at 944 ("The Court has recognized that the prohibition against involuntary servitude does not prevent the State or Federal Governments from compelling their citizens, by threat of criminal sanction, to perform certain civic duties.").  Defendant argues that although § 1589 was enacted after Channer and Kozminski, Congress "left in place" the civic-duty exception to involuntary servitude.  (Mot. at 20.)  Defendant cites several out-of-circuit district

cases that recognize the civic-duty exception for claims brought by immigration detainees.  (Id.)
Plaintiff counters there is no authority applying the civic-duty exception to a private prison
contractor, and the scope of housekeeping work permitted by ICE itself is narrower than that set
forth in Channer.  (Opp'n at 20.)

     The Court first considers whether the civic duty exception applies to privately-run federal
detention facilities.  In explaining the rationale of the "civic duty" exception, the Supreme Court
stated:

> [T]he 13th Amendment declares that neither slavery nor involuntary servitude
> shall exist . . . It introduced no novel doctrine with respect of services always
> treated as exceptional, and certainly was not intended to interdict enforcement of
> those duties which individuals owe to the state, such as services in the army,
> militia, on the jury, etc.

Butler v. Perry, 240 U.S. 328, 332-333 (1916).  Accordingly, the Supreme Court has held the
Thirteenth Amendment is not violated in all situations of compelled labor.  See, e.g., Hurtado v.
United States, 410 U.S. 578 (1973) (payment of $1 per day to incarcerated witness to ensure
appearance at trial does not violate the Thirteenth Amendment); Selective Draft Law Cases, 245
U.S. 366 (1918) (compulsory service in the armed forces does not violate amendment); Butler,
240 U.S. at 333 (requiring work on public roads does not violate the amendment).  By extension,
some Circuits have held that compelling detained or confined individuals to perform
housekeeping tasks does not violate the prohibition on involuntary servitude.  See, e.g., Hause v.
Vaught, 993 F.2d 1079, 1085 (4th Cir. 1993) (pretrial detainees' general housekeeping
responsibilities are not inherently punitive and are related to the legitimate governmental
objective of prison cleanliness); Jobson v. Henne, 355 F.2d 129, 131-32 (2d Cir. 1966) (inmates in
mental hospitals can be required to perform housekeeping chores).

     However, these cases had a direct government nexus - government service or work at
government-run facilities.  As Butler identified, the civic duty exception was necessary so as to
insulate "duties which individuals owe to the state" from the Thirteenth Amendment's
prohibitions.  240 U.S. 333.  Defendant has not provided any authority that the civic duty
exception can apply to a privately run facility or an instance where a court did so.  As the
Supreme Court makes clear, a private entity contracting with the federal government is not
necessarily a federal agent.  See Minneci, 565 U.S. at 126 (noting the Court specifically rejected
the proposition that a private prison-management firm is a federal agent like a federal employee
in Malesko).  As the Second Circuit observed in Jobson, "[T]he states are not thereby foreclosed
from requiring that a lawfully committed inmate perform without compensation certain chores
designed to reduce the financial burden placed on a state . . ."  335 F.2d at 132.  Compelling
inmates at federally operated facilities to engage in certain cost-defraying actions when these
savings accrue to the government fits neatly within the bounds of the civic duty exception.  These
are duties which an individual may more clearly "owe to the state" or be required by the state to
perform.  When the recipient of the labor benefits is a private entity, the rationale behind the
civic duty exception less obviously applies, even where the private entity has contracted with the

federal government.  Any cost savings accruing to the private entity ultimately may not reach the government.  Such an attenuated scheme does not clearly fall under the civic duty exception, and the Court is hesitant to find otherwise.  Thus, based on the rationale underlying the civic duty exception and its historical usage, the Court finds it inapplicable to a claim against a private corporation contracting with the federal government to run an immigration detention facility.

Even assuming the civic duty exception applies, Plaintiff has alleged he was a barber, which appears to exceed the housekeeping responsibilities a detainee may be required to perform. Moreover, what duties and tasks the detainees were compelled to undertake and whether these assignments amounted to more than general housekeeping tasks are factual issues.  Plaintiff has sufficiently alleged duties outside housekeeping responsibilities for the purposes of this Motion.

Finally, Defendant argues Plaintiff fails to provide more than conclusory assertions in support of his TVPA claim.  (Id. at 21.)  The Court agrees.  While Plaintiff has alleged a scheme involving GEO withholding necessities for detainees and officer threats of solitary confinement or criminal prosecution for refusing to work, Plaintiff does not sufficiently substantiate these allegations. Plaintiff has not described when he was threatened or who threatened him.  He also fails to allege any additional information about the withheld necessities to make his allegations more than conclusory assertions.  Simply alleging GEO had a "policy and uniform practice" of withholding necessities is insufficient to state a plausible claim.  Therefore, the Court GRANTS the Motion as to Plaintiff's TVPA claim.

## D.  California Unfair Competition Law ("UCL")

Plaintiff alleges GEO violated the unlawful prong of the UCL by violating California labor laws.  (Compl. ¶¶ 90-91.)  Defendant argues Plaintiff's UCL claim is derivative of his other claims and should be dismissed.  (Mot. at 25.)

A claim under the UCL requires a showing of either an unlawful, unfair, or fraudulent business act or practice, or an unfair, deceptive, untrue, or misleading advertising.  Steward v. Life Ins. Co. of N. Am., 388 F. Supp. 2d 1138, 1143 (E.D. Cal. 2005).  The unlawful practices prohibited are any practices forbidden by law.  Saunders v. Super. Ct., 27 Cal. App. 4th 832, 838 (Ct. App. 1994).  Thus, to plead a violation of the UCL under the unlawful prong, a plaintiff must plead a violation of another statute or common law.  See Farmers Ins. Exchange v. Super. Ct., 2 Cal. 4th 377, 383 (1992).

The Court has determined Plaintiff has adequately pleaded a claim under the MWL. Therefore, Plaintiff's claim under the UCL also survives the Motion.  The Court DENIES Defendant's Motion as to this claim.

## E.  Unjust Enrichment

Plaintiff alleges he and the putative class members conferred non-gratuitous benefits on GEO by performing undercompensated labor, such that GEO received materially increased profits and

was unjustly enriched at the detainees' expense.  (Compl. ¶¶ 83-85.)  Defendant argues Plaintiff's unjust enrichment claim should be dismissed because it is derivative of his other claims and he has an adequate remedy at law.  (Mot. at 23.)

To plead a claim for unjust enrichment, a plaintiff must allege a receipt of a benefit and unjust retention of the benefit at the expense of another.  Baltazar v. Apple, Inc., 2011 WL 588209, at *5 (N.D. Cal. Feb. 10, 2011).  However, unjust enrichment is not an independent cause of action.  Price v. Synapse Group, Inc., 2017 WL 3131700 at *10 (S.D. Cal. July 24, 2017) (citing Durell v. Sharp Healthcare, 108 Cal. Rptr. 3d 682, 699 (Ct. App. 2010).  Nevertheless, the Ninth Circuit has held a court "may construe the cause of action as a quasi-contract claim seeking restitution." Id. (quoting Astiana v. Hain Celestial Grp., Inc., 783 F.3d 753, 762 (9th Cir. 2015).

Here, Novoa contends he was coerced into performing undercompensated work that materially increased GEO's profits.  (Compl. ¶¶ 83-85.)  He also alleges GEO retained these benefits and seeks their disgorgement to himself and the other putative class members.  (Id. ¶ 87.)  Plaintiff alleges the detainees were compensated at $1 per day regardless of the hours worked, and GEO financially benefitted from not having to pay California's minimum wage. These allegations are sufficient to state a claim for unjust enrichment.  In addition, the remedy sought under Plaintiff's MWL claim may not necessarily be duplicative of restitution under his unjust enrichment claim.  Menocal v. GEO Group, Inc., 113 F. Supp. 3d 1125, 1133 (D. Colo. 2015) ("[T]he remedies sought by [the formerly detained plaintiff for] the [Colorado minimum wage] claim and the unjust enrichment claim are different, and the unjust enrichment claim is not duplicative.")  Further, the Ninth Circuit has noted dismissing a quasi-contract cause of action because it was duplicative "is not grounds for dismissal" pursuant to Federal Rule of Civil Procedure 8(d)(2).  Astiana, 783 F.3d at 762; Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones.")  The Court will not now dismiss Plaintiff's unjust enrichment claim.  The Court DENIES Defendant's Motion as to Plaintiff's unjust enrichment claim.

## F.  Leave to Amend

The Court finds amendment is appropriate here.  See Kendall v. Visa USA, Inc., 518 F.3d 1042, 1051 (9th Cir. 2008) ("Dismissal without leave to amend is proper if it is clear that the complaint could not be saved by amendment.").

## IV.   CONCLUSION

The Court GRANTS in part and DENIES in part Defendant's Motion.  Plaintiff shall file an amended complaint, if any, **no later than July 6, 2018.**

**IT IS SO ORDERED.**