EXHIBIT C

```
1              UNITED STATES DISTRICT COURT

2         WESTERN DISTRICT OF WASHINGTON AT TACOMA

3    _____

4                               )
     CHAO CHEN,                  )
5                               )  C17-5769-RJB
                Plaintiff,       )
6                               )  TACOMA, WASHINGTON
     v.                          )
7                               )  April 24, 2018
     THE GEO GROUP, INC.,        )
8                               )  Motion Hearing
                Defendant.       )
9    ---------------------------  )  ------------------
                                 )
10   STATE OF WASHINGTON,         )  C17-5806-RJB
                                 )
11              Plaintiff,        )  TACOMA, WASHINGTON
                                 )
12   v.                           )  April 24, 2018
                                 )
13   THE GEO GROUP, INC.,         )  Motion Hearing
                                 )
14              Defendant.        )

15   _____

16            VERBATIM REPORT OF PROCEEDINGS
          BEFORE THE HONORABLE ROBERT J. BRYAN
17            UNITED STATES DISTRICT JUDGE

18   _____

19   APPEARANCES:

20

21

22   For the Plaintiff       Jamal N. Whitehead
     Chao Chen:              Adam J. Berger
23                           Lindsay Halm
                             Schroeter Goldmark & Bender
24                           801 3rd Avenue
                             Suite 500
25                           Seattle, WA  98104
```

Stenographically reported - Transcript produced with computer-aided technology

```
 1                          Devin T. Theriot-Orr
                           Sunbird Law PLLC
 2                         1001 4th Avenue
                           Suite 3200
 3                         Seattle, WA  98154

 4                         R. Andrew Free
                           Law Office of R. Andrew Free
 5                         PO Box 90568
                           Nashville, TN  37209
 6
         For the Defendant    Andrea Brenneke
 7       State of Washington:  LaRond Baker
                           U.S. Assistant Attorney Generals
 8                         Office of the Attorney General
                           800 Fifth Avenue
 9                         Suite 2000
                           Seattle, WA  98104
10

11       For the Defendant:   Joan K. Mell
                           III Branches Law PLLC
12                         1019 Regents Blvd.
                           Suite 204
13                         Fircrest, WA  98466

14                         Charles A. Deacon
                           Norton Rose Fulbright
15                         300 Convent Street
                           Suite 2100
16                         San Antonio, TX  78205

17

18

19

20

21

22

23

24

25
```

1    THE COURT:  Good morning.  This is a combined hearing

2   in cause number 17-5769, Chen versus the GEO Group and

3   17-5806 the State versus the GEO Group.  And it's combined

4   for hearing this morning on the defendant's motion to dismiss

5   based on joinder issues and Rule 19.

6    Let me get your appearances here first.  I know we've got

7   a lot of lawyers here.  Let's start with the state.  Who

8   represents the state this morning?

9    MS. BRENNEKE:  Good morning, Your Honor, my name is

10   Andrea Brenneke and I'm an Assistant Attorney General.  And

11   I'm also here with co-counsel LaRond Baker.

12    THE COURT:  Okay.  And for the plaintiff Chen?

13    MR. WHITEHEAD:  Good morning, Your Honor, Jamal

14   Whitehead on behalf of plaintiff Chao Chen.

15    THE COURT:  I'm sorry, that was Mr. Whitehead?

16    MR. WHITEHEAD:  Correct.  I'm joined this morning by

17   co-counsel Andrew Free and Devin Theriot-Orr.  I've also got

18   behind me my co-counsel Adam Berger and Lindsay Halm.

19    THE COURT:  Okay, Ms. Halm is in the back.  And

20   Ms. Mell and Mr. Deacon for GEO.

21    I'm going to take a break now and I'll tell you why.  I

22   forgot to adjust my hearing aids for the courtroom.  And I

23   have to do that with my telephone, which is connected to my

24   hearing aids.  And Tyler is supposed to remind me.  So we

25   both forgot this morning.  It will just take a second, but

 1   that will help me to hear.

 2                    (Recess.)

 3        THE COURT:  I'm sorry for that little interlude, but

 4   hopefully that will help us proceed here.

 5     Ms. Mell, you have the laboring oar here.  And I wanted to

 6   ask you to cover one thing that we've been working on here

 7   and that your briefing presupposes, and that is whether your

 8   contract with ICE prevents GEO from paying more than a dollar

 9   a day on the voluntary work program, and specifically where

10   that is found in the contract.  And you can cover that, if

11   you would, during your argument.

12        MS. MELL:  All right.

13     Your Honor, my name is Joan Mell and I represent the GEO

14   Group.  GEO is here to ask the court to dismiss both cases

15   because ICE is not here.  ICE does need to be here because

16   this is their issue.  They own the mountain.  They own the

17   problem.  They set the parameters of not only immigration

18   policy, they own that arena --

19        THE COURT:  Just a second.  Move that mike up and

20   speak into it a little more.  You can hit the switch by your

21   knee there and it will raise that little thing up.  Thank

22   you.

23        MS. MELL:  So I think the court has framed the issue

24   in a very narrow perspective of the dollar a day.  And GEO's

25   position is that that framework is too narrow, it's looking

1   at it as if it were a spot on the whole mountain rather than

2   understanding and appreciating that immigration policy is set

3   at a bigger level, and that employment is within that.

4   Immigration policy and processing includes the idea of who

5   gets to work and who does not get to work.  And detention,

6   you can't take detention out of the equation.  Because the

7   economic realities of the situation are that that creates its

8   own universe.  And the contract is designed to address those

9   issues that surround detention processing.  And GEO is like

10   -- they're managing that process.

11      I'll use an analogy.  I just got back from Lake Tahoe.

12   It's as if Heavenly, the ski resort, is owned by ICE.  And

13   Congress owns the mountain.  GEO is just the Ski Patrol.

14   They are regulating what's in bounds, what's out of bounds,

15   trying to get people safely down the mountain.  The dollar a

16   day for the voluntary work program is a component of that.

17   And the other side keeps saying -- I mean, it's like the lift

18   ticket price, right?  You can't charge less than.  They keep

19   saying:  At least.  At least.

20      And there was a policy shift in the language of the

21   contract -- not the contract terms, the contract terms have

22   always been set -- but the policy language changed over time

23   where we see the introduction of the words, "At least a

24   dollar a day."  And that has been an invitation here to

25   suggest that that is merely a floor and not a ceiling.

1     But the only way the court can conclude that at least a

2   dollar a day is a floor, is if the court believes that ICE

3   can entertain the employment in its contract, as well as GEO,

4   of detainees.  And they may not.  And how possibly can a

5   dollar a day be a minimum if we're talking about employment?

6   It can't be.  There is nowhere in the country that designates

7   a dollar a day for labor in the competitive workplace.

8     Here the problem that is presented by the contract -- and

9   I'm just going to put up the conflict that you cannot get

10  around without ICE at the table, or Congress for that matter.

11  If a dollar a day is the bare minimum --

12          THE COURT:  Now, you're showing me something I can't

13  see, because my -- this thing is not on here.

14          MS. MELL:  I can just hand it to you on paper.  I've

15  got it on paper.

16          THE COURT:  Okay.  I've got it.

17          MS. MELL:  May I approach?

18          THE COURT:  Yes.

19          MS. MELL:  All right.  So the issue on joinder is

20  whether or not this court can reach a conclusion and solve

21  the problem without involving ICE or Congress or the

22  appropriately designated agencies.  And the reason it may not

23  is because whatever you do to accomplish what's asked here,

24  ordering a minimum wage payment to detainees, runs head into

25  a contract interpretation as well as a regulatory

1    interpretation of what ICE has included in its contract,

2    because Congress has set the parameters of what will and

3    won't be an appropriate way to handle this issue of what do

4    we do with people who don't belong in this country, who

5    aren't supposed to be here, what do we do during that period

6    of removal?

7         And here it says that the Washington Minimum Wage Act --

8    if we assume there's an avenue to interpret state law without

9    ICE, and you look at the Minimum Wage Act, the whole purpose

10   of the Minimum Wage Act, it says, is to encourage employment

11   opportunities within the state.  That is not intended to mean

12   detention.  And it runs headlong into conflict with IRCA

13   federal immigration policy, which expressly says you're to

14   remove the lure of employment.

15        So you cannot take a detention context for an immigration

16   process and treat that as if it is an opportunity to

17   encourage employment within the state to set competitive wage

18   rates.  So the whole focus on whether or not ICE has said and

19   compelled at least a dollar a day has -- it's the tail end of

20   the problem.  It's just a little mini component of, no, the

21   bigger picture is ICE is implementing Congress's policy

22   objectives as to how to deal with this population who is not

23   supposed to be in the United States, and move them either out

24   of the country, or get them legal status, where they then can

25   compete for minimum wage jobs.

1    There is no way for this court to -- first of all,

2   stepping back, I don't think the real problem here is the

3   VWP.  I think the VWP has become a vehicle, by advocates, to

4   hopefully bring national attention to immigration policy.

5   But the fact of the matter is, there's no way to get at $11

6   an hour without creating an employment relationship.  You

7   have to get to an employment relationship.  And in order to

8   get to an employment relationship, you have to interpret the

9   contract which prohibits the employment of detainees.

10    So if you're looking for expressly a provision on what is

11   paid, what is paid is at least a dollar a day, which is

12   reflective of the fact that they are not employees.  If they

13   were able to be employees, then there would be a minimum of

14   whatever the operating laws were in the local jurisdiction,

15   with minimum wage payments of employees.  That would be the

16   floor.  Because in reality, the GEO contract is not only

17   specific about at least a dollar a day, it's also specific

18   about how many positions of real employees you can include on

19   your site, in your facility, and that you pay those folks

20   prevailing federal wage rates.

21    So there are very specific charts.  If you look at the

22   contract that we filed, there's all these addendums.  Well

23   those addendums have to do with the increased wage rates for

24   employees.  And it's clear that those don't apply to

25   detainees, because of all the other provisions in the

1    contract.  And if you look at our reply briefing, we set out

2    a number of bullet points that expressly state you can't have

3    that kind of relationship with detainees.

4        And the problem with this lawsuit, it's like standing at

5    the top of the mountain looking at the first mogul.  The

6    advocates and plaintiffs are like, I don't know, Olympic

7    wannabes.  They've never run the run at Heavenly.  They don't

8    want to involve Ski Patrol.  They don't want to check with

9    ICE before going down the mountain.  But they're sure they

10   can make it down the gun barrel underneath all of the

11   Lookie-Loos coming up on the chair lift.  But they're focused

12   on the first mogul.  And they don't know down below that

13   there's 20 other moguls down below them that's going to cause

14   them to crash.

15       And there's ice on the mountain, that only ICE can clear,

16   because ICE is the one that holds the key to the mountain.

17   They're the ones that run the equipment.  They're the ones

18   that can clear the ice out of the way.  So you can't solve

19   the problem by focusing on the mogul at the top of the

20   mountain, because you're not going to get down the mountain.

21   You have to involve ICE.  You have to address the policy

22   issues that are underlying the essence of what the argument

23   is.

24       And the essence of the argument is that somehow it's not

25   fair -- I think we can all agree that somehow this whole

1   process isn't fair.  But the Minimum Wage Act is the wrong

2   application that directly conflicts with the contract,

3   because a dollar a day is probably more than some people in

4   the population think would be appropriate.

5        But Congress, under 1855 has said, regardless of when,

6   that it's a dollar a day.  That's been implemented in all of

7   the audits.  That's been implemented in practice.  We have

8   the INS ruling where, I mean, people at the agency actually

9   asked:  Are we bound by these provisions?  INS says: No.

10  Nobody has ever contemplated that this is employment.  It's

11  not.  It is detention.  And it is detention with its own set

12  of rules.  And those rules are the rules this state follows.

13  This state does not pay minimum wage.

14       There's an idea that minimum wage is not appropriate when

15  you're having to detain somebody for legal reasons, whether

16  it's civil or criminal.

17            THE COURT:  Ms. Mell, assuming, as you argue, that

18  these individuals are not eligible to be employees --

19            MS. MELL:  Correct.

20            THE COURT:  -- in the traditional sense.

21            MS. MELL:  Correct.

22            THE COURT:  What if GEO is using them as employees?

23  And bear in mind we don't yet know what goes on down there.

24  This is all without discovery and without facts, but if GEO

25  is violating federal law by treating these people as though

1    they were employees, aren't they then entitled to be paid?

2         MS. MELL:  Well, again, remember the analogy.  The

3    mountain is owned by ICE.  ICE writes the contract terms.

4    GEO doesn't promulgate a VWP because it wants one.  GEO

5    promulgates a VWP because it's mandated by contract and the

6    terms are expressly provided that it shall be at least a

7    dollar a day, or a dollar a day is appropriated.  I mean,

8    however you look at it, whatever lineage of that, it has

9    always been a dollar a day.  So it's not as if GEO is

10   exploiting anyone for purposes of operating its contract.

11   It's complying with the mandates and terms and conditions of

12   its contract.

13       And so I think that the court is struggling with this kind

14   of equitable issue and tugging at the concept of a dollar

15   just doesn't seem fair.  Okay.  How are you going to get to

16   $11 a day if you think a dollar ain't fair?  You're going to

17   make them employees?  Oh, well, that's a good idea, look at

18   all those moguls.  Collective bargaining?  That comes with

19   being an employee.  Let's see, unemployment?

20        THE COURT:  Just a minute.  Let's suppose that GEO,

21   in spite of everything else and all these rules that we're

22   aware of, suppose they decide they want to paint the outside

23   of the facility and they get detainees and line them up to

24   work eight hours a day painting the outside of the facility

25   for a dollar a day.  Do those detainees have any rights

1    whatsoever to object to their rate of pay?

2         MS. MELL:  Those detainees do not have the rights of

3    an employee to object to the rate of pay.  Those detainees

4    can choose to stay in their bunk and not go out there.

5    There's been no issue as to the voluntariness of this

6    program.

7         THE COURT:  So they have no remedy whatsoever if they

8    are treated by GEO as though they were employees, doing work

9    that ordinarily would be outside of routine maintenance of

10   their own spaces?

11        MS. MELL:  No, they do have a remedy.  But they don't

12   have a remedy as an employee.  They have a remedy as a

13   detainee where they send a kite to ICE and say:  We're not

14   doing this, this is forced labor.  And ICE would step in and

15   say that's beyond the bounds of the VWP.  That is not what we

16   contemplate when we talk about a VWP.  We have expressly put

17   it in the contract and INS has said that the scope and

18   purposes of a VWP is for rehabilitation, as well as I think

19   -- what's the term of art that they say in the INS bulletin?

20   I have that here.  Institutional maintenance, not

21   compensation.

22     So INS didn't struggle with the idea that institutional

23   maintenance is an acceptable form of participating in the

24   process, the fact that you're a detainee and need to help

25   keep this thing alive.  So if we've exceeded the bounds of

1    that, absolutely I think you can say this isn't a VWP.  This

2    isn't within those bounds.

3        But I don't think you can sit there and say, if you're

4    going to make me paint the outside of the building, make me

5    an employee.  You don't have those rights.

6        Look at Mr. Chen.  We are not talking about DREAMers down

7    here.  We are talking about a population that the government,

8    rightly or wrongly is categorizing, in a very thorny issue,

9    who gets down there and who doesn't.  The reason they're down

10   there, like Mr. Chen, is that they are dangerous.  Mr. Chen

11   spent ten years in prison.  He's got victims out there who

12   are frightened of him.

13       What do you do?  You put him in a place where he may not

14   harm people.  What do you do with him while he is there?  He

15   can opt to sit in his bunk or he can opt to do something.

16   What he opted to do?  He opted, because he had high-risk

17   status and he couldn't go anywhere, he opted to empty the

18   trash can, he opted to put the toilet rolls back on the

19   toilet paper.  I mean, it's nothing more than taking care of

20   your own collective living space.  It's not competitive work.

21   It's not and cannot be competitive work.  It's not real

22   world.  It's not real economics.

23       And to impose real world economics into a situation,

24   simply because GEO is a profitable corporation, is erroneous.

25   And it limits ICE's capacity to contract out for those cost

1    savings.  It limits the opportunities for investors and

2    shareholders to become a part of a corporation that is

3    willing to provide these services and partner with

4    government.  Rightly or wrongly, whatever you think about

5    privatization -- and the court seems to be getting at the

6    issue of does privatization open the door for exploitation of

7    immigrants -- if you go down there you'll see that's not the

8    case.  But since you aren't down there and this isn't a fact

9    issue, the reality is you have to ask ICE.  What are they

10   letting them do down there?  ICE occupies the space.  ICE

11   enforces the contract.  ICE is there controlling who does

12   what, what positions are available.  It's not GEO.  We're the

13   Ski Patrol.  We say:  This side.  This side.  Stay inbounds.

14   Stay in bounds.

15       So the idea that this court has the liberty to take on

16   fashioning some sort of relief based on what it feels may not

17   be a fair situation, can't be done without ICE at the table.

18   You have to have ICE and Congress here answering that

19   question.  Because no matter what I say, it's just my side of

20   the equation.  You've got ICE saying:  No, this is why we do

21   this.

22       And I honestly think the INS ruling tells us what ICE

23   would say if ICE were standing here, in terms of has it set a

24   dollar a day.  Of course it has.  That's what Congress

25   appropriated.  The fact that they haven't updated their

1  appropriations is reflective of the national interest in not

2  spending more money on immigration detention.  Not that they

3  think these are employees who are working competitively.

4        THE COURT:  That's pretty speculative to guess what

5  ICE would say if they were here.  They might say:  We don't

6  care.

7        MS. MELL:  But isn't that their prerogative?  Isn't

8  that what is essential here?  Isn't that why joinder is

9  necessary?  I mean, the *Mudarri* case that I argued against

10  the state, on these very principles, like you said.  There's

11  a way we can look at this contract and we can get, you know,

12  competitive gaming rights for individuals who are non-tribal

13  entities, without violating the tribal contract.  But the

14  state comes in and says:  Oh, no you can't.  The tribe has to

15  be at the table.  If you're going to say that somehow we have

16  a process that could be competitive, that's going to affect

17  the tribal interests, so they have to be at the table.  So

18  *Mudarri v. State*, the state's own argument on joinder, they

19  say they have to be in.

20      And you've got the two cases here before you -- also

21  tribal cases, it's interesting.  Sovereign immunity is pretty

22  easy with the tribe, right?  But the federal government is

23  involved here.

24      The cases that we cite are not even as specific as this

25  situation where ICE is the contracting party.  ICE is the one

1   who writes this contract.  ICE sets the terms.  And if you

2   try to start extricating the VWP and treat it as a

3   competitive work scenario, you don't accomplish the real

4   issue of immigration detention.  Who is there, who is not,

5   and how they're used.  Because those dollars are just going

6   to get reallocated to Congress or need to be reappropriated

7   and paid out.

8       So you avoid the real issue of how long these people are

9   sitting there.  If the people were processing through longer

10  -- you know, Mr. Chen, he stays there because China won't

11  take him back.  They don't want him.  He's a risk.  What do

12  we do with him?  So he sits there.  Well, the idea that you

13  have to then make him employable and treat him as an employee

14  is truly inequitable.  GEO has no rights as an employer.  GEO

15  can't decide, well, Mr. Chen, I don't like the way you

16  emptied that garbage can today, you're done.  I'm going to

17  save that work for somebody who does it more efficiently and

18  effectively.  No, GEO has to keep a whole operating list,

19  trying to get as many people in that position as possible.

20  There's just absolutely no way to use the Minimum Wage Act,

21  which presupposes an employment relationship, to get at a

22  fair rate of pay.

23      And if you go to the state's argument, well, let's just

24  base it on equity.  How do you get to a number that's not

25  arbitrary and capricious, and sets up a disparity anyway

1    between real employees?  That's not the right answer.  So ask

2    ICE, what do you want to appropriate to fix this problem?

3    Assuming it is a problem.  I think there's a lot of people in

4    Congress who would say they shouldn't get anything.  But they

5    have to be here.  And you can't spend all the time

6    interpreting the contract, which you've invited GEO to

7    explain, without ICE.  It's their contract.

8        Joinder is appropriate.  The cases should be dismissed,

9    Your Honor.

10           THE COURT:  Well, would you go back to the question I

11   asked to begin with?

12           MS. MELL:  The specific cite, I'll get it for you.

13   You're going to see in the contract the provisions that say,

14   it's at least a dollar a day.  Do you not have that

15   provision?  Do you want me to get you that actual contract

16   language?

17           THE COURT:  I want to know if you think that the

18   contract prevents payment of over a dollar a day?

19           MS. MELL:  Without asking ICE, absolutely.  You have

20   to ask ICE.  And it's at least a dollar --

21           THE COURT:  I'm asking you, though, because you're

22   trying to get your client out of this deal.  And one of the

23   issues is whether -- what the court might do is put you

24   between a rock and a hard place, or whether it doesn't.  And

25   I want to know if you think the contract prevents you from

1    paying more than a dollar a day.

2         MS. MELL:  The contract prevents us from paying more

3    than a dollar a day.

4         THE COURT:  Where does it say that?

5         MS. MELL:  The provisions of the Northwest Detention

6    handbook are derived from the Performance Based National

7    Detention Standards.  And the National Detention Standards

8    say you shall have a VWP.  Those standards are incorporated

9    into the contract.  And the Performance Based National

10   Detention Standards expressly state that you shall be paid at

11   least a dollar a day.  GEO may not then pay $10 a day without

12   asking ICE.  The corollary provision in the contract

13   expressly states, you may not pay more than a dollar a day

14   without asking ICE.

15        THE COURT:  Where does it say that?  I think I know

16   where arguably you can argue from that, but I want to know

17   what you think.

18        MS. MELL:  I will pull up the contract and actually

19   show you that provision.  And that does create a rock and a

20   hard spot.

21        THE COURT:  Pardon?

22        MS. MELL:  Therein lies the rock and the hard spot.

23   The harder rock, the bigger mogul is employment.  You can't

24   get off a dollar a day without getting into employment.  They

25   are two inextricably linked concepts.

1        THE COURT:  Here's the thing.  You indicated a minute

2   ago that you didn't think the court should treat this as a

3   competitive work scenario.

4        MS. MELL:  Correct.

5        THE COURT:  The question is, how does GEO treat it?

6   Are they treating it as a competitive work scenario?

7        MS. MELL:  No.

8        THE COURT:  Well, how do I know that?  We're way

9   ahead of any facts, fact development in this case.

10        MS. MELL:  Well, ICE will tell you that.  If ICE were

11   here they would tell you they don't allow that, that the

12   contract is very specific what a VWP is and what it is not.

13        THE COURT:  ICE may know that, but certainly GEO

14   would know it regardless of what ICE thinks.

15        MS. MELL:  But you're asking GEO, in the form of a

16   joinder motion, to assure the court that it's not offering

17   VWP positions or creating those positions for purposes of

18   employment.  And I would say absolutely.  I'll take you down

19   there and I'll show it to you.  I'd love to show it to you.

20        THE COURT:  We've got to decide this motion based on

21   what's before the court now.  And my point -- a point I'm

22   making is that there's a whole lot of things that are not

23   before the court at this point, including whatever is going

24   on down on the tide flats.

25        MS. MELL:  But how can the court go look and invade

1   Congress and ICE's prerogative of how they process

2   immigration, without a theory to get there?  How do you get

3   to go down and look?  The process for ensuring that things

4   are running equitably and fairly are by following National

5   Detention Standards, which is the standard implemented across

6   the board.

7          THE COURT:  You find out what's going on down there

8   by asking GEO and the detainees.  And if you want to, by

9   asking ICE.  You know, at this point I don't know how much --

10  to what extent ICE supervises GEO in the daily operation of

11  this contract.  There's so much I don't know at this point.

12         MS. MELL:  But your uncertainty and the court's

13  hesitancy to feel like there's something that the court needs

14  to embrace, because it's uncomfortable and it may be wrong,

15  is error in law.  That is allowing the emotions to take over

16  when the law expressly limits the court's involvement in

17  congressional activity and policy setting at the national

18  level and implemented by ICE.  You have to have an inroad.

19  The Minimum Wage Act doesn't give you the inroad, because you

20  know on the face of the contract that it's not possible or

21  feasible to employ them.  And you have to know from ICE

22  whether or not they're -- whether or not they've contemplated

23  anything differently.  And honestly INS has told you that

24  they don't.  We've passed all of the protocols.

25         I don't want to go down that path you're inviting me to go

1   down to argue the facts, because we're here on the law.  And

2   the law doesn't let you go there, without the policy entity

3   that establishes the processing.  I mean, how can you -- how

4   can you go after the tail end of the problem and not have the

5   mountain there?  If you're worried about the conditions, you

6   have to have the owner of the mountain involved.  You can't

7   just go after Ski Patrol and say:  You're not making sure

8   everybody stays in the lines.

9        Well, the line was set by somebody else.  We're

10  implementing our contract.  The very conflict that you're

11  proposing to suggest fact finding to ensure GEO isn't doing

12  something wrong, is the line.  It's the VWP.  And you can't

13  get past -- contractually we have to have that.  So you can't

14  complain about us following the express terms of our

15  contract.  And if you do and you say you can't have that

16  boundary line, then you've invaded ICE's prerogative of how

17  to ensure the safekeeping of individuals in detention.  That

18  is the detention standard.  And you're proposing they need to

19  get into a fact finding to blow up a standard that exists

20  nationwide for immigration, but in this very state, in jails.

21       So this fear is totally blown out of proportion.  This

22  didn't just happen.  This has been going on since the

23  beginning of time, since the beginning of immigration

24  processing.  So there's no true issue here of getting at,

25  well they should be paid more than a dollar a day.  No.  No.

1    This is bigger.  This is much bigger.

2              THE COURT:  Well, I hear what you're saying.

3              MS. MELL:  Thank you, Your Honor.

4              THE COURT:  Ms. Brenneke.

5              MS. BRENNEKE:  May it please the court, my name is

6    Andrea Brenneke and I'm here on behalf of the State of

7    Washington.  We are here to enforce the state's minimum wage

8    laws to protect the workers of Washington, both those inside

9    the Northwest Detention Center and those workers who live in

10   the surrounding areas who would otherwise be employed if

11   there wasn't free, or relatively free labor happening on the

12   inside.

13       We're also here to protect the Washington economy, because

14   it's not fair if an employer can violate the minimum wage

15   laws and increase its profits when other employers actually

16   have to comply with that law.

17       We have brought this litigation against GEO only.  It is a

18   private for-profit employer.  It owns the Northwest Detention

19   Center and developed that property in order to contract with

20   ICE.  And it has a thriving international business of

21   providing detention services like they do at the Northwest

22   Detention Center, through contracts with the federal

23   government.

24       We are here simply on the motion to dismiss that GEO has

25   brought.  And that motion fails for two primary reasons in

1   our case.  First, the traditional joinder rules don't even

2   apply under the public rights exception.  Washington's case

3   is brought in its parens patriae capacity, because those

4   workers inside the facility do not have any opportunity to

5   challenge the dollar-a-day policy.  And it's also brought for

6   the public benefit because Washington's claims benefit both

7   those workers, our economy, and the outside workers.

8        Further, Washington's claims would not abrogate GEO's

9   contract with ICE in any way or do anything to harm ICE's

10  interest in that contract.  And so for those two reasons --

11  and we'll go into the public rights exception in a little

12  more detail -- but that should apply and end the inquiry

13  right there.

14       But secondly, even if the traditional joinder rules do

15  apply, ICE is not a necessary party under Rule 19(a).

16  Complete relief can be granted among the existing parties.

17  And it is undisputed that ICE has not claimed a legal

18  interest in this case.

19       So, Your Honor, let's start with the public rights

20  exception to the traditional joinder rules.  The U.S. Supreme

21  Court in *National Licorice v. National Labor Relations Board*,

22  first recognized the public exception in 1940 and established

23  only two basic parts of the test as to whether it should

24  apply.  And the courts have consistently applied those parts

25  ever since.

1       The first is that the litigation must transcend the

2   private interests of the litigants and seek to vindicate a

3   public right.  And the second part of the test is that

4   although the litigation may adversely affect absent parties'

5   interests, that the litigation not destroy the legal

6   entitlements of those absent parties.  The litigation brought

7   here by Washington meets both parts of that public rights

8   exception test.

9       First, this litigation clearly transcends private

10  interests and vindicates public rights.  The court has

11  already determined and recognized that Washington is acting

12  in its parens patriae capacity in bringing these state-law

13  claims to require GEO to recognize the state minimum wage

14  laws and to protect its workers and the economy.

15      There are no private rights at stake at all in

16  Washington's law enforcement claims.  We're seeking that

17  prospective relief to apply to the minimum wage law and to

18  unjustly -- and to disgorge the unjustly accumulated profits

19  as a result of GEO's failure to pay the wages in the past.

20      So Washington, as a public entity, just like the National

21  Labor Relations Board was in the *National Licorice* case,

22  bringing an enforcement action against a private employer to

23  halt unfair labor practices and to prevent the employer from

24  taking the benefit of having violated those laws in the past.

25      And here, as in the *National Licorice* case, that action is

1   taken against the employers alone, without joining the absent

2   third parties, who have related contracts with the employer.

3   In *National Licorice* it was the employees.  Here it's ICE.

4      Because the issues are deriving out of the labor laws at

5   issue, they are not being derived from the terms of the

6   contract in any respect.  Those absent third parties are

7   necessary, and the private -- and the public rights exception

8   applies.

9      The second prong of this is that the litigation not

10  destroy the legal entitlements of the absent parties.  And

11  here Washington seeks nothing from ICE and does not intend or

12  bring forth any claims that would have the effect of

13  abrogating or changing the relationship between ICE and GEO

14  in any way.

15     In fact, the litigation we are bringing, to the extent GEO

16  brings in the contract, actually enforces the terms of the

17  contract that GEO already agreed to because they've already

18  agreed to comply with state labor laws.

19     Here, Your Honor, ICE is free to engage in its contracting

20  with GEO.  GEO is free to engage in that.  All we're asking

21  is that when GEO is an employer in Washington State, it pays

22  the minimum wage laws.

23     So even if the public rights exception didn't apply and

24  traditional joinder rules did, ICE would not be a necessary

25  party that must be joined for full adjudication of the issues

1    before the court under Federal Rule of Procedure 19(a).

2        There are basically two reasons why ICE is not a necessary

3    party under 19(a).  You know, there are all these different

4    subparts, so I'm going to go through each that matter here.

5    So first, in ICE's absence the court can accord complete

6    relief among the existing parties.  That's 19(a)(1)(A).

7        And the second reason it's not a necessary party is that

8    ICE has not claimed an interest in this action.  And it

9    claiming an interest is the predicate condition of both

10   prongs of Rule 19(a)(1)(B).  And because ICE has not claimed

11   a legal interest in the action, the court cannot find that it

12   is a necessary party.

13       So I would like to start, Your Honor, with that

14   19(a)(1)(B) analysis, because I think it's a fairly simple

15   way of addressing the issue that's actually before the court

16   right now.  So, it is undisputed that ICE has claimed no

17   legal interest in the action.  Although counsel would say

18   that they should be here, counsel had -- GEO had the

19   contractual obligation to notify ICE in September of 2017 of

20   this litigation.  And as Ms. Mell has brought before the

21   court, in March of 2018 members of Congress officially

22   notified ICE of this litigation and asked them to get

23   involved.

24       Here, as in other similar litigation around minimum wage

25   and fair wage laws around the country, including *Menocal* in

1   Colorado, ICE has not asserted any interest in the matter.

2   And, Your Honor, it would not be any kind of a misstep

3   legally, as counsel would suggest, for you therefore to find

4   that they are not a necessary party.

5       In *United States v. Bowen*, the Ninth Circuit found that

6   joinder is contingent upon an initial requirement that the

7   absent party claim a legally protected interest relating to

8   the subject matter of the action.  And then in *Ward v. Apple*

9   said that when a person or agency is aware of an action, like

10  ICE is here, but chooses not to claim an interest, the

11  district court does not err by finding joinder unnecessary.

12      They have observed a neutral and disinterested posture in

13  this and similar litigation, as in *Northrop*, when the court

14  analyzed a similar situation.  And here silence is

15  communication.  They don't show up because they don't have a

16  legal interest that they need to protect in this employment

17  law matter.

18      Your Honor, we can go into a little more detail about why

19  ICE has no legal interest to protect.  But essentially what

20  I'd like to just reaffirm is that this is a state law

21  enforcement matter and it does not implicate the terms of the

22  contract in any way.  And because its substantial contract

23  rights will not be impaired by this action, it has no legal

24  interest to protect.

25      The court can also, if we shift now to the 19(a)(1)(A)

1    analysis, the court can also provide complete justice and

2    accord complete relief among the existing parties.  Here

3    Washington is bringing the Minimum Wage Act claims for

4    declaratory and injunctive relief moving forward, requiring

5    its -- requiring a large employer in the State of Washington

6    simply to comply with the minimum wage laws.  This GEO can do

7    alone, and faces no conflicting legal obligations with any

8    existing party.

9        And if Your Honor would indulge me I'd love to go through

10   the contract and maybe answer some questions that you had

11   asked of GEO's counsel in a moment.

12       We're also seeking to disgorge ill-gotten profits by which

13   GEO has been unjustly enriched.  And the elements of unjust

14   enrichment run only against the entity that has benefited

15   from and accumulated those profits at the expense of another.

16   Only GEO profited from this practice of avoiding fair wages

17   in the past, and they're the only ones necessary for the

18   court to afford complete justice.

19       It is also clear that GEO has no legal claims against ICE.

20   It has no right of indemnification or contribution from ICE

21   for the claims brought here.  In fact, GEO agreed to

22   indemnify and hold harmless ICE under the terms of its

23   contract with ICE, not the other way around.

24       So when you look at where are the legal interests, they're

25   all represented by the parties who are already before the

1    court.

2       And other cases of enforcing Washington's minimum wage

3    laws similarly have accorded complete relief when brought

4    against the employers alone.  Joinder of the federal agencies

5    have not been necessary to do justice, even when those

6    employers, like GEO, were federal contractors, and the

7    employers raised defenses based upon what they perceived to

8    be conflicting terms in those contracts.  And we've cited to

9    the *Lanier Brugh* litigation looking at the overtime issues at

10   United States Parcel Service.  And they said:  Oh, we weren't

11   paying those because we thought our contract didn't require

12   it.  Well, the law was enforced and then they did apply it.

13      Your Honor, we look to this joinder question and this

14   motion to dismiss based upon the terms of joinder and based

15   upon the fact that the traditional joinder rules don't even

16   apply and ICE is not a necessary party.  The court's analysis

17   and legal determination, we would submit, would be based upon

18   those factors.  So we're not going to go into what would

19   happen if it were a necessary party, could it be joined or

20   what would the equities be.

21      THE COURT:  Let me ask you this:  There's so much, as

22   I indicated earlier, so much I don't know about this case or

23   your claims.  And I guess I'm curious what you think is going

24   on that would trigger minimum wage.

25      MS. BRENNEKE:  Okay.

1          THE COURT:  Understanding that this is probably not a

2    necessary answer on this analysis regarding joinder.  But

3    what is this case about?

4          MS. BRENNEKE:  Thank you, Your Honor.  I'm fairly new

5    to this case and felt I needed to wrap my head around that as

6    well.  And I've spent some time.  And here are the things I

7    believe are clear from the terms of the contract and the

8    materials already before the court.

9          First of all, GEO owns this facility and operates it under

10   the terms of the contract that Your Honor has in the record.

11   It's a civil immigration facility.  Unlike what we've heard

12   from counsel, people are not detained there because of any

13   criminal background.  In fact, if they have a criminal issue

14   pending, they are in state prison or federal prison.  And

15   when they've finished their terms of their service, then if

16   they have immigration issues they might get moved to the

17   Northwest Detention Center.

18         There are lots of DREAMers in that space.  There are lots

19   of people who have applied for asylum.  There are a lot of

20   people who have claims that will eventually be granted.  And

21   there are a lot of people whose immigration status will

22   remain such that they'll have to be deported.  There's a

23   whole range of ages and people and countries from which they

24   come.

25         GEO operates this facility under the terms of a contract

1  that allow them to operate a detainee work program.  And they

2  have full discretion in how they operate that program.  There

3  are minimum floors and parameters that are set by the

4  contract.

5       The first primary parameters of the contract, and they

6  call them constraints in the contract that they have to abide

7  by, are applicable federal, state and local labor laws and

8  codes.  Okay?  And that's on page -- ECF page 48 of the

9  contract, Document 19.

10       Within those constraints -- within those general

11  constraints they are agreeing to run --

12            THE COURT:  Wait a minute.  I think I understand

13  that.  What are they doing that you think is wrong?

14            MS. BRENNEKE:  What they're doing is running a

15  detainee work program.  And they have authorization to do

16  this.  And they are using the detainee workers to run the

17  facility, all of the non-guard facility aspects of the

18  operation.  Okay?  So they have 20 to 30 people at a time in

19  the kitchen preparing the food, serving the food, and

20  bringing the food to all the inmates.  They have people

21  working up to eight hours a day in the laundry facilities,

22  doing the laundry, folding the laundry, distributing the

23  laundry.  They also have people cleaning.  And it's not just

24  in their own living quarters.  They have people who are on

25  duty cleaning the halls, literally stripping and rewaxing and

1    buffing the floors on the night duty.  They have people who

2    are painting in the corridors.

3         GEO has guests, visitors audit from the outside.  And they

4    get extra bonuses when the facility is in tip-top shape.  The

5    detainee workers are performing all of those functions, all

6    of the non-necessary security functions in the facility.

7         And what the guards do, what they call real workers, is

8    they essentially hire them, they find out who wants to be

9    involved in the work program.  So there is an election

10   process.  They get on a list.  And then the guards will

11   determine, hey, there's a position open, would you like this

12   position?  And they will assign people to do the work.  They

13   supervise.  And if someone is not doing their work under the

14   terms of the contract right here before you, they can

15   terminate someone from that work.  And then they get replaced

16   by someone else who wants to do the job.

17        So what you have is an operation that -- and we don't have

18   exactly, like you're saying, at this early stage of

19   discovery, the specific details of how many hours.  But what

20   we do know is that the essential functions of that operation

21   are being done by the detainee workers.

22        And those detainee workers -- I think this is also really

23   significant, because when we get to the application of the

24   Minimum Wage Act, the real question is:  Are employers

25   permitting employees to work?  That's really the standard.

1   And is there some economic necessity?  What I can tell you

2   is, the only way detainee workers can work in the Northwest

3   Detention Center is by participating in this process.  That's

4   the only way they can earn money.  They get a dollar a day.

5   They have no way of getting more than that.

6       So people who depend upon earning some income to be able

7   to have contact with their families, to make telephone calls,

8   people who depend upon that money to get some essentials like

9   some additional shampoo or some additional food to supplement

10  what they have at the center, they need that money.  And so

11  it's heartbreaking, actually, because it's expensive to make

12  calls, to buy postage stamps.  And people are earning just a

13  dollar a day just to be in contact with their family.  Some

14  people are there a short time.  Some people are there in

15  excess of two, three years.  So this is an essential program.

16      And to have this whole body of workers be immune from the

17  Minimum Wage Act, disrupts not only justice for them but it

18  also disrupts the whole economy.  And while we are here to

19  enforce the minimum wage laws, we're doing that on behalf of

20  all of those people inside and the people on the outside who

21  would otherwise have well paying jobs and could definitely

22  use those.

23          THE COURT:  And I'm mindful that these are

24  allegations or claims and are not part of the record as any

25  proof.  But I understand what you think you have.

1    MS. BRENNEKE:  And, Your Honor, in terms of the

2  contract, you know, they do -- it very explicitly says, you

3  know, they must comply with the applicable state and local

4  laws and codes.  It very clearly states that if they have a

5  detainee work program, that they would conform with the

6  standards, the national standards, performance based

7  standards.  And those standards clearly say at least a dollar

8  a day.

9    I think what's confusing is that counsel is conflating

10  what GEO gets reimbursed for that money, with what they

11  actually pay the detainees.  And those are different things.

12  Clearly the contract presupposes there might be ambiguities

13  or conflicts with all of the overlays of the laws and the

14  standards that apply.  And the contract itself says that if

15  the contractor is unable to determine which standard -- it

16  says, "Should a conflict exist between any of these

17  standards, the most stringent shall apply."

18    And in this case when we are talking about detainee labor,

19  the most stringent, compared to a dollar a day, is certainly

20  the minimum wage.

21    And the standards, the national standards very clearly say

22  that compensation is at least a dollar a day.  So that

23  provides the floor and certainly not the ceiling.

24    Your Honor, the other piece that I just wanted to point

25  out factually, based upon what the questions were that you

1   were directing to Ms. Mell, is in the contract that there is

2   clearly on page 101 of the ECF Document 19, there is the

3   issue of how do you modify the contract and what are the

4   consequences of not conforming to it?

5       So even if you were to believe that GEO couldn't pay more

6   than a dollar a day under the terms of the contract, which we

7   don't, because that's a minimum, there is the possibility of

8   modifying the contract.  And the clear terms of the contract

9   say, hey, if you do something that's not authorized, like if

10  they decided to go ahead and conform with the Minimum Wage

11  Act tomorrow, they simply wouldn't get paid the difference

12  because ICE wouldn't have authorized them to pay more and

13  they wouldn't get reimbursed more.

14      We're talking about a question of their profits not a

15  question of their legal capacity to engage.

16      So, they have the requirement to conform with state labor

17  laws, which is the minimum wage.  They've agreed to, in their

18  contract, a dollar-a-day reimbursement.  But that doesn't

19  stop them from paying the minimum wage.  They could ask for

20  greater reimbursement or they could simply eat the

21  difference, because they don't have the preauthorization.

22  And at this point, Your Honor, how they choose to operate

23  moving forward, is not something, of course, that we can

24  control.  All we can say is that the minimum wage laws mean

25  something and that if this case is dismissed, we have no way

1  of enforcing our state laws.  And that is what we are here to

2  do as the State of Washington.

3       THE COURT:  I had one other question.  And let me

4  think for a minute what it was.  If ICE and GEO change this

5  contract and come to an agreement that they cannot pay more

6  than a dollar a day, rather than a floor it becomes a

7  ceiling, does that moot this whole thing?  I should say,

8  would that moot the whole thing?

9       MS. BRENNEKE:  Your Honor, GEO will face whatever

10 determination it needs to face in terms of how it wants to

11 operate that facility.  What we're saying is, whoever does

12 that work, whoever is permitted to be working to do those

13 essential functions of that operation, should be paid at

14 least minimum wage, not a dollar a day.

15     They can determine how they modify their contract.  But

16 that basic premise of state law where you have a private

17 employer employing people needs to operate under our state

18 laws.

19     So it is possible that they would decide, well, instead of

20 having detainee workers work, we'll have outside workers

21 work.  It's possible that they'll say, oh, well, let's just

22 keep the operation exactly as it is and just pay them more.

23 The marginal difference is, in the end, the difference of the

24 profits.  And maybe they'll get reimbursed, maybe they won't.

25     We can't be concerned about exactly how this will manifest

1    in the future.  But what we need to be concerned about is

2    that our laws mean something, and that they figure out how to

3    conform with the laws of the State of Washington as well as

4    operating their facility.

5              THE COURT:  Okay.  Thank you, Ms. Brenneke.

6              MS. BRENNEKE:  Thank you, Your Honor.

7              THE COURT:  Mr. Whitehead.  We've been over a lot of

8    stuff here, I want to give you the opportunity to be heard,

9    but would hope you don't repeat all the arguments.

10             MR. WHITEHEAD:  Good morning, Your Honor.  I don't

11   ski and so I don't know that I can keep up with counsel's

12   extended ski metaphor.  Instead what I'll do is ground my

13   comments today, which will be brief, in the contract and in

14   the complaint.

15        Mr. Chen is not seeking to challenge ICE's ability to

16   detain alien residents.  Mr. Chen is not challenging ICE's

17   ability or authority to engage for-profit detention centers

18   like GEO.  Mr. Chen is not challenging any sort of

19   congressional appropriation.  Mr. Chen has brought a

20   Washington Minimum Wage Act claim seeking fair payment for

21   work that has already been performed by others and by him and

22   others similarly situated like him.

23        So to answer the question that you asked counsel at the

24   outset, does the contract more or less put GEO in between a

25   rock and a hard place, similar to the defendants in

1    *Dawavendewa* and *Peabody*, with respect to having to choose

2    between compliance with the contract and with the law, or

3    whatever the outcome of the lawsuit should be?

4        And the answer to that is no.  And, in fact, it's quite

5    the opposite.  Compliance with the contract is compliance

6    with the law and vice versa.  So as you said, I don't want to

7    rehash any ground that's already been covered.  But there are

8    a few points that I'd like to make to bring into sharper

9    focus, perhaps, some of the reasons as to why we believe that

10   GEO's position with respect to joinder of ICE isn't grounded

11   in the evidence that's been educed to date, and the law.

12       So briefly I'd like to talk about what we are seeking.  I

13   said that we are seeking minimum wages under the Washington

14   Minimum Wage Act for work that has already been performed by

15   Mr. Chen and others.  So in this way the relief that we are

16   requesting is rearward facing.  We're not looking to affect

17   ICE's interests or GEO's interests moving forward.  We are

18   simply looking to make Mr. Chen and others like him, whole

19   for the work that they have already performed.  And this is

20   an important distinction under the law.

21       I look at GEO's reply brief where they cite the *Hoffman*

22   *Plastic* decision.  And they overstate the holding of the case

23   by stating that anyone that is unauthorized to work is unable

24   to recover back pay.  Well, that's a crude view of the

25   holding of the case.  What the case talks about is tolling

1    the accrual of back pay damages to the extent that the

2    claimant is no longer working and is no longer authorized to

3    work in the country.

4        But to the extent that the person has worked, they're

5    entitled to receive wages for the uncompensated labor that

6    they performed.  And we've got decisions that we cite in our

7    brief, primarily the *Sandoval v. Rizzuti Farms* case in the

8    Eastern District of Washington, and the *Saucedo* case also in

9    the Eastern District of Washington, that get the *Hoffman*

10   analysis correct, that there is no prohibition or comment

11   about status under certain Washington State laws, the MWA

12   being one of them, and does not in any way impair Mr. Chen's

13   ability to seek relief for work that he's already performed.

14       And that also really dovetails with the second question

15   that you posed to counsel.  Your question I believe was,

16   well, these people have already worked.  And that's another

17   important point to bring into focus here, is that all of the

18   talk about IRCA and what it entails, and work authorization,

19   those are valid questions.  And I suppose as we go along

20   we'll analyze those points.  But the fact remains that the

21   work has already been performed.  So it's our position that

22   we are entitled to payment under the contract, payment under

23   the law.

24       So to the point about the contract and what it entails and

25   how performance under the contract is, in fact, compliance

1  with the law, we see this on the face of the contract.  The

2  contract has all sorts of provisions.  But first and foremost

3  among them is compliance with state and local law.  Ordering

4  GEO to pay under the Minimum Wage Act is compliance with

5  state and local law.  Counsel talked about the most stringent

6  standard and applying that here.  That is compliance under

7  the law and that's consistent with the contract, if the MWA

8  is applied here.

9      I think primarily, though, what we're looking at is the

10  line about GEO and the rate that it must pay the volunteer

11  work program participants.  It's at least a dollar a day.

12  And that's crucial language that's found within the

13  Performance Based National Detention Standards.  Because what

14  it allows is for GEO to exceed that amount, which is what the

15  Washington Minimum Wage Act is requiring here.  So there is

16  no conflict in the way that we see in *Dawavendewa* and

17  *Peabody*, where the relief requested by the plaintiff is more

18  or less rescission, modification or outright termination of

19  key considerations in the contract.

20      Here ICE gets everything that it has bargained for.  GEO

21  is still detaining detainees, civil detainees.  GEO is still

22  administering the voluntary work program.  In that way ICE's

23  interests are not affected and compliance with the law is not

24  in any way inconsistent or repugnant with the Washington

25  Minimum Wage Act.

1    GEO talks about conflicts that arise with the differing

2    definitions of the word "employee."  And the term "employee"

3    admittedly is not a one-size-fits-all determination.  You

4    look at Title 7.  You look at the ADA.  You look at the Age

5    Discrimination Employment Act.  Even FLSA.  They all employ

6    different tests.  But what we're looking at here is the

7    Washington Minimum Wage Act.  It's not our duty or job to

8    reconcile these different standards.

9    And when you look at the way these terms are used within

10   the contract, it only makes sense, contextually speaking, the

11   contract may mean something that is not necessarily

12   consistent with the terms of art that are used in the law.

13   The Washington Minimum Wage Act is concerned with protecting

14   workers, creating a modern workplace, and to make sure that

15   there are minimum protections afforded to employees.

16   So in terms of what the contract the and motivation behind

17   the use of the term "employee" as observed in the contract,

18   it stands to reason that there might be differences there.

19   I think really what this boils down to is GEO's desire to

20   bring in ICE as a matter of convenience.  I don't want to

21   talk about the preemption-type arguments that counsel began

22   by making.  It seemed to be a rehash to me of the motion to

23   dismiss that this court already denied, finding that the

24   record was such that we really couldn't get into the

25   preemption arguments that were rehashed here.

1        But for purposes of the joinder motion, what it really

2    looks like is ease of discovery.  But as the court pointed

3    out in its order denying GEO's motions for relief from a

4    deadline, mere convenience is not enough to warrant joinder.

5    And that's what we see here.  The parties can still conduct

6    third-party discovery on ICE.  My co-counsel, Mr. Free, is

7    involved in the medical litigation in the District Court of

8    Colorado.  And as I understand it -- and I've got an order I

9    can cite for you -- but GEO has produced thousands of pages

10   of responsive documents, pursuant to the judge's order

11   rejecting arguments that plaintiffs would have to go through

12   ICE's regulations in order to obtain documents.

13        So in the end there is no rock and hard place here that

14   GEO faces.  GEO was not contractually obligated to violate

15   the MWA.  In fact, it's quite the opposite.  GEO's required

16   to comply with its dictates, and in doing so here does not in

17   any way decimate the contract, which is the language that we

18   see in *Dawavendewa* and *Peabody*.  GEO was able to act in a

19   manner that's consistent with the MWA and the contract.

20             THE COURT:  Okay.

21             MS. MELL:  Thank you, Your Honor.  Joan Mell back

22   with a citation for you, because you've asked for it.  And I

23   want to be very specific.  Docket 19 at 13, contract terms

24   that specifically state, "Detainee volunteer wages for the

25   detainee work program."  Now mind you, this is a line item in

1    the contract.  "Reimbursement" --

2              THE COURT:  Just a second.

3              MS. MELL:  Docket 19 at 13.

4              THE COURT:  That's the contract at page 13?

5              MS. MELL:  Yes.

6              THE COURT:  Let me grab it.

7              MS. MELL:  The one I've got is on 05769.

8              THE COURT:  I'm sorry, I didn't hear what you said.

9              MS. MELL:  The case number 05769.  Document 19 at 13.

10   Filed 11/17/17.

11             THE COURT:  Wait a minute, my contract is at Docket

12   16.

13             MS. MELL:  Which cause are you under?  It might be

14   under the different cause of action than I'm looking at.

15             THE COURT:  I'm sorry, now she's trying to say

16   something to me.

17             MS. BRENNEKE:  I'm wondering if you would like to put

18   it up in the overhead so the court can see it.

19             MS. MELL:  I could do that.  Which cause of action is

20   your Docket 13 on?  Is it the other cause of action?

21             THE COURT:  I'd like to see it while we're talking

22   about it.

23             MS. BRENNEKE:  It's in many places.

24             MS. MELL:  If I can approach, I'll give you these

25   documents.

1      MS. BRENNEKE:  Put them on the monitor, please.

2      MS. MELL:  I'll give it to him.

3      MR. WHITEHEAD:  It's difficult to follow along.  I

4  just gave you my copy.

5      THE COURT:  Okay.  I'm familiar with that language.

6      MS. MELL:  I think they want it back.

7      THE COURT:  But you had cited -- well, anyway, I have

8  that language in front of me.  Go ahead.  Go ahead.

9      MS. MELL:  All right.  Well, the reason that the line

10  item is in the contract is because Congress has specifically,

11  in statute, set forth that ICE, ICE gets to set those rates.

12  It is authorized to set those rates.  Then Congress

13  appropriates those dollars according to 8 U.S.C. 1555(d).

14  You can't get around that.  So the argument the state has

15  made in particular is that we're simply asking to enforce

16  labor laws.  There's the rub.  It's not the rate, it's labor

17  laws.

18      Labor laws run you headstrong into -- if you assume that

19  8 U.S.C. 1555 has any meaning, you have to assume that it

20  doesn't mean that they're required to follow state labor laws

21  and minimum wage acts.  It says they get to decide.

22      But also you have 8 U.S.C. 1324(a).  The whole idea behind

23  controlling immigration, undocumented individuals coming to

24  this country who then present the problem of what to do with

25  them, particularly with those who present a security risk, is

1    that you may not employ them, period.

2        The whole premise of enforcing Washington's labor laws

3    conflicts with the whole idea of immigration detention,

4    because they're detained because they can't be working

5    competitively in the workforce.

6        So what actually happens in the facility -- Judge Bryan, I

7    know you.  I know you care about people.  I know you care

8    about what happens in this community.  I do too.  And I've

9    been a practitioner a long time.  And I've represented GEO a

10   long time.  I can assure you the detainees down at the

11   detention center have constant oversight by ICE.  I have said

12   ICE owns the mountain, because ICE owns the mountain.  Yes

13   GEO owns the property.  ICE occupies the property.  They

14   occupy more of the property than GEO does.  They want to

15   occupy even more.

16       This is not just a lock-up facility.  There are four

17   courtrooms.  There are people coming and going.  ICE occupies

18   most of the administrative offices.  None of that

19   operationally has anything to do with the detainees doing

20   anything.  Detainees are not picking up ICE's garbage.

21   They're not picking up the security officers' garbage.  They

22   are functioning on a secure site, in a limited VWP capacity.

23   They interact with ICE and GEO in coming up with some of

24   these program ideas of what to do with their time.

25       If I walked you down the hallway of the gray mile, the

1   walls are covered with these phenomenal murals, incredible

2   artistic designs you don't see in any buildings -- you don't

3   have them down here in your beautiful building -- where

4   they've created these sceneries, because that's how they want

5   to occupy their time.  And that's approved and that functions

6   in the VWP.

7       If you make this about competitive employment labor

8   standards and labor laws, when it's detention and it's not

9   labor laws, you will lose the opportunity to keep these

10  people occupied.  And the whole idea that the contract terms

11  have specified at least a dollar a day, that in and of

12  itself, in corporate America, acts as a deterrent to abusing

13  and exploiting detainees.

14      There is no corporation who will employ a workforce of

15  100, at a dollar a day, if at least a dollar a day means that

16  they're in violation of local labor laws.  They're not going

17  to do it.  They're federal contractors.  They have to comply

18  with the law.

19      So it is not a floor, it is the standard that has been

20  adopted and established.  The Attorney General is not

21  invoking the jurisdiction of this court because he's worried

22  that all of the contractors running DOC facilities, our local

23  jails, are having people do work in those jails, are

24  underpaid, or taking away jobs that union folks should have.

25  And he's comfortable allowing his agencies to have the

1    oversight to ensure that those people aren't exploited.

2        Why now at this moment are detainees in the immigration

3    realm more at risk of exploitation than Washington's own

4    citizens in their own correctional and detention facilities?

5    They aren't.  It's not what this is about.  It's a political

6    statement.  This is a fear tactic.  This is stepping on the

7    toes of an agency enforcing policies that are thorny,

8    complex, and sometimes unfair.  But it's their policies.

9    It's their mountain.  It's their rules.  It's their program.

10   It's a national standard that's been adopted.  There is no

11   way you can come in from the side, obliquely, and say we have

12   jurisdiction to start dictating what 18 U.S.C. allows ICE to

13   decide.  This matter should be dismissed.

14           THE COURT:  Okay.  Thank you, Ms. Mell.

15       This contract I have as Docket 16, and I think when we

16   were first getting into this I asked for the contract, and

17   two of them got filed.  And the one I've been working with is

18   Docket 16.

19           MS. MELL:  Okay.

20           THE COURT:  And the language that you referred to is

21   at page 5 of that document, or page 6 of ECF 16.

22       Now, what is not clear to me about that contract provision

23   is -- what that is is a lengthy list of supplies and

24   services.  And I don't know exactly how that fits into the

25   language of the contract itself.  And that's one thing.

1          The other thing is, that provides that the contractor

2   shall not exceed the amount shown without prior approval by

3   the contracting officer.  But I don't know what the amount

4   shown refers to.  It may be one dollar a day.  It may be the

5   unit price, which is blacked out.  It may be the amount.  It

6   seems more likely the amount total in the right hand column.

7   So I'm not sure exactly what that is intended to mean.

8          MS. MELL:  Your Honor, I certainly could ask whether

9   or not I can file that page without the redactions.  But the

10  very question you ask is the reason ICE needs to be here.

11  ICE is the one who writes the contract in this way, with

12  these kinds of additions and addendums and language set forth

13  precisely like this.  And the dollar a day means a dollar a

14  day.  There's never been any other amount.  But I can stand

15  up here and say that all day long.  The point is, ICE should

16  say that.

17       But if the court is asking for an unredacted version, I

18  can certainly provide one to the court of that section.

19          THE COURT:  I don't think that matters.  I assume

20  there's a unit price in there of some dollars.

21          MS. MELL:  Actually the amount is the calculation of

22  a dollar a day, I believe.  That's what we tried to redact

23  was the total sum.

24          THE COURT:  Yeah, okay.

25          MS. MELL:  But the fact of the matter is ICE gets to

1  dictate whether or not that changes.  And there are actually

2  very complicated rules with federal contracting in terms of

3  what ICE then pays for, that it has approved.  Once it puts

4  its stamp of approval on something, that does implicate

5  reimbursement.

6          THE COURT:  Well, you know, I don't think we're

7  talking here about reimbursement rates.  We're talking about

8  how much you have to pay.  And that may or may not be the

9  same as the reimbursement rate.

10          MS. MELL:  Well, even if you presuppose that it's a

11  reimbursement rate rather than an actual rate of pay, what

12  would the rate of pay -- how would the rate of pay be set?  I

13  mean, you can't get to enforce using labor laws to get there,

14  because the other provisions of the contract expressly say

15  you can't employ detainees.  You can't, in a detention

16  setting, have employment of detainees.  It's prohibited.  All

17  of the provisions of the contract expressly state the

18  relationship is different.  Detainees are detainees.

19  Employees are employees.  Employees get prevailing wage

20  rates.  And it's very specific about that.

21          THE COURT:  Okay.  I know we're going to run out of

22  time here, but I wanted to raise one other thing with you.

23  Man, you make it hard for me to read your briefing with the

24  amount of footnotes you all use.  Some of the arguments -- in

25  fact, the reference to this very section, which I think is an

1    important thing for the court to look at, was found in a

2    footnote.  It's not in the body of the briefing.

3        If you have citations in footnotes, that doesn't bother me

4    much.  But when I'm trying to read a brief, then I have to

5    come to a footnote and stop and look down, it affects the

6    flow.  And I know different judges feel differently about

7    that.  But this judge doesn't like footnotes.  So I throw

8    that out for you.

9        I know that we are near the class representative issue and

10   so forth in the Chen case, and we'll proceed with that in

11   accord with the schedule.  I want to look at this more.  I

12   guess we'll write a short order, hopefully shorter than your

13   briefing on it.  And I would, I guess, only suggest that you

14   proceed with whatever you have to do to move the litigation

15   forward while I'm looking at this more carefully.

16            MS. MELL:  Thank you, Your Honor.

17                      (Adjourned.)

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3

4      I certify that the foregoing is a correct transcript from

5   the record of proceedings in the above-entitled matter.

6

7

8

9   /s/ Debbie Zurn

10  DEBBIE ZURN
    COURT REPORTER
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25