**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION**

**HONORABLE JESUS G. BERNAL, U.S. DISTRICT JUDGE**

```
RAUL NOVOA, individually and on )
behalf of all others similarly  )
situated,                       )
              Plaintiff,        )
                                )
      vs.                       ) CASE NO. 17-2514-JGB(SHKx)
                                )
THE GEO GROUP, INC.,            )
                                )
              Defendant.        )
_____)
```

**REPORTER'S TRANSCRIPT OF ORAL PROCEEDINGS**
RIVERSIDE, CALIFORNIA
MONDAY, AUGUST 20, 2018
9:00 a.m.

_____

**ADELE FRAZIER, CSR 9690, CRR, RMR**
Federal Official Court Reporter
United States District Court
3470 Twelfth Street
Riverside, California 92501
adelefraziercsr@gmail.com

**APPEARANCES OF COUNSEL:**

**For the Plaintiff:**

    BURNS CHAREST
    BY:  KOREY A. NELSON
         LYDIA A. WRIGHT
    365 Canal Street, Suite 1170
    New Orleans, Louisiana 70130
        and
    LAW OFFICE OF R. ANDREW FREE
    BY:  R. ANDREW FREE
    P.O. Box 90568
    Nashville, Tennessee 37209
        and
    AHDOOT & WOLFSON
    BY:  TINA WOLFSON
    10728 Lindbrook Drive
    Los Angeles, California 90024-3102

**For the Defendant:**

    NORTON, ROSE & FULBRIGHT
    BY:  LESLEY SWANSON HOLMES
    555 South Flower Street, 41st Floor
    Los Angeles, California 90071

1       RIVERSIDE, CALIFORNIA; MONDAY, AUGUST 20, 2018

2                           9:00 A.M.

3           THE COURTROOM DEPUTY:  Calling Item Number 1, EDCV

4    17-2514-JGB, Raul Novoa vs. The GEO Group, Inc.  Counsel,

5    please state your appearances.

6           MR. FREE:  Good morning, your Honor.  R. Andrew Free

7    for plaintiff Raul Nova.

8           THE COURT:  Good morning.

9           MS. WOLFSON:  Good morning, your Honor.  Tina Wolfson

10   of Ahdoot and Wolfson on behalf of plaintiff Raul Novoa.

11          THE COURT:  Good morning.

12          MS. WRIGHT:  Good morning, your Honor.  Lydia Wright

13   of Burns Charest for plaintiff Raul Novoa.

14          THE COURT:  Good morning.

15          MR. NELSON:  Korey Nelson of Burns Charest on behalf

16   of plaintiffs.

17          THE COURT:  Good morning.

18          MS. HOLMES:  Good morning, your Honor.  Lesley Holmes

19   on behalf of The GEO Group.

20          THE COURT:  Ms. Holmes, good morning.

21          Very well.  The matter is on calendar today for a

22   motion to dismiss filed by the defendants in this case.  There

23   are a couple of issues that are raised by the motion.  The

24   first is whether or not the defendant is entitled to derivative

25   sovereign immunity under the supreme court's decision in 1940

1  called Yearsley.  And the second issue -- well, there's other
2  issues, but the second main issue, as I see it, is, sort of,
3  procedural.  It's unclear to me -- well, the defendants in
4  their motion state that they are moving to dismiss based on
5  both rules 12(b)(1) and 12(b)(6), as well as Rule 19, for
6  failure to join an indispensable party.
7         As to the Rule 12(b)(1) issue, it's unclear from the
8  motion whether the defendants are making a facial attack, as
9  can be permitted, or a factual attack on the allegations in the
10 complaint regarding subject matter jurisdiction.  It's even
11 unclear in their reply which it is.
12        So I guess my position is this:  To the extent that
13 the defendants are making a factual attack, then I believe that
14 that should have been stated straightforwardly in their motion.
15 And also, I don't think that I can properly consider the
16 contract between GEO and ICE since the full contract has not
17 been provided to me in any case.  And there's been no
18 evidentiary submission with respect to whether it's
19 foundationally accurate.  And, of course, I can't take judicial
20 notice of a contract such as that.
21        So I have serious doubts as to whether that contract
22 or any of its provisions are properly before the Court with
23 respect to this motion, okay.
24        So putting that aside, I don't believe that I can
25 consider any contractual provisions between ICE and GEO in

1  determining the issues that are presented in this motion.  And,
2  of course, that affects whether or not the defendant can enjoy
3  derivative sovereign immunity.  And it also affects too, to a
4  lesser extent, the analysis of whether or not ICE is an
5  indispensable party.  So having said that, I am willing to, for
6  the sake of, sort of, argument, consider some of the
7  allegations that the defendant makes with respect to the
8  contract between GEO and ICE.
9           So, I guess, the first question that I have for the
10 defendant is is it your belief that under the Ninth Circuit's
11 decision in 2015 called *Cabalce* that immunity is limited to
12 where the contractor had no discretion in, sort of, operation
13 or the implementation of the contract?  In other words, is --
14 does derivative sovereign immunity require compulsory action
15 under the contract by the contractor, or does it also apply --
16 or could it also possibly apply in a situation in which there's
17 permissive, but not compulsory action by the contractor given
18 the government contract?  What is your view on that?
19          MS. HOLMES:  Your Honor, Lesley Holmes for The GEO
20 Group.  I think it could apply in situations where there could
21 be permissive conduct on the part of the contractor.
22          THE COURT:  And, you know, it's an open question to
23 me, but *Cabalce* seems to limit sovereign immunity analysis in
24 situations in which the contractor had no choice but to do what
25 it did.  In other words, *Cabalce* seems to stand for the

1  proposition that immunity applies where the contractor had no
2  discretion to act otherwise.  So at least the Ninth Circuit's
3  decision in 2015 seems to at least suggest that sovereign
4  immunity applies only when there's compulsory action under the
5  contract and not permissive.
6        So how do you distinguish or what distinguishes --
7  what authority distinguishes that *Cabalce* decision?
8        MS. HOLMES:  Well, I think looking at the *Cunningham*
9  decision -- now I know that's from the Fourth Circuit, but
10 that's a very recent decision that was just issued a few months
11 ago.  And I think that case is very instructive.  It --
12 although factually different, different set of laws were at
13 issue and a different set of circumstances, what was raised was
14 whether the contractor was violating a law while carrying out
15 what the government agency required it to do.
16       Here plaintiffs are alleging, well, GEO could pay
17 more than the one dollar per day --
18       THE COURT:  Right.
19       MS. HOLMES:  -- even though that's what we contend
20 the PBNDS requires, what the contract requires.  And there in
21 *Cunningham* --
22       THE COURT:  The argument to that is the contract
23 doesn't require that.  The contract just requires one dollar
24 reimbursement by GEO or by ICE to GEO.  So where or what
25 specific provision in the contract do you feel obligates GEO to

1  pay the workers one dollar and only one dollar per day?
2          MS. HOLMES:  Well, that reimbursement rate, your
3  Honor -- and it is confusing because it refers to it as a
4  reimbursement rate, but that is the rate that is set.  GEO
5  cannot pay a different rate from that.  That is what the
6  contract says.
7          In other pages of the contract following that
8  reimbursement point, it says that it -- *Detainee labor shall be*
9  *used in accordance with the detainee work plan developed by the*
10 *service provider and in accordance with the PBNDS*.  And the
11 PBNDS does say at least one dollar per day shall be the
12 compensation.  But the contract itself refers to the rate as
13 one dollar.
14         THE COURT:  But isn't -- doesn't the contract just --
15 isn't the contract trying to just establish the parameters of
16 the reimbursement obligations?  Couldn't GEO pay more and be
17 itself on the hook for that and not ICE?
18         MS. HOLMES:  Well, GEO cannot pay more without ICE
19 approval.
20         THE COURT:  And what part of the contract says that?
21         MS. HOLMES:  Well, the contract -- the way that we
22 interpret the contract is that that reimbursement rate is set
23 at one dollar per day.  And the reimbursement is a little
24 misleading because there actually is no reimbursement.  The
25 money comes from ICE, and it flows through GEO simply

1  momentarily, if you will, for GEO to distribute the funds to
2  the detainees' commissary accounts.
3         THE COURT:  But again, that's -- that delineates,
4  sort of, ICE's obligations and its own set limit on the
5  obligation to reimburse only one dollar per day.  Couldn't GEO
6  pay more and then be on the hook itself for more than that
7  regardless of what the contract says that ICE is responsible
8  for?
9         MS. HOLMES:  The question is whether GEO, out of the
10 goodness of its own heart, could go and pay beyond what ICE
11 would pay back.
12        THE COURT:  It wouldn't be out of the goodness of its
13 own heart.  The question is, rather, whether or not the
14 contract prevents or precludes GEO from paying more than one
15 dollar per day.
16        MS. HOLMES:  The contract would simply preclude GEO
17 from making that decision unilaterally.  It would require ICE
18 approval to do that.
19        THE COURT:  Do you agree with that?
20        MR. FREE:  I do not, your Honor.
21        THE COURT:  Okay.  Why?
22        MR. FREE:  Because, as we've put into the record at
23 Docket 52, GEO can and does do this.
24        THE COURT:  Do what?
25        MR. FREE:  Pay more than a dollar when it wants to.

1  GEO is able to say we have these employment needs within our
2  facility in order to staff up the facility.
3          THE COURT:  You're saying GEO pays detainees more
4  than one dollar?
5          MR. FREE:  Yes.  Not at Adelanto, but at three --
6  actually, four other facilities we know, three of which are on
7  the record.  We have binding judicial admissions from
8  Mr. Embry.
9          THE COURT:  Where in the contract it says the
10 reimbursement is limited?
11         MR. FREE:  That's correct, your Honor.  It is not a
12 matter could they do that out of the goodness of their heart;
13 the question is when do they do that.  The answer is they do it
14 when they don't have enough workers.  We actually see in the
15 records that we've submitted a request for admission response
16 by GEO.  We've also seen the invoices that they send to ICE
17 saying here we're getting 6,100 bucks, but we paid another
18 7,600 bucks to detainees.  And we've seen their handbooks that
19 say if you work in the kitchen, $4; if you work in the laundry,
20 we're going to pay you $3; as a barber, $2; $1.
21         You know, they can do that.  The reimbursement rate
22 is just that; it is a reimbursement that the federal government
23 in its -- through agency process will pay to GEO.
24         And it's very important that we understand what this
25 contract is.  This is not a policy contract.  This is a

1  performance-based contract.  What that means is that ICE has
2  set forth to GEO -- really to the city of Adelanto, and the
3  city of Adelanto has subcontracted out.  ICE has set forward
4  its expectations of outcomes.  And it said GEO, we want you to
5  design a performance work statement and a statement of work
6  that complies with those outcomes.  And so GEO is the party
7  that designed the staffing model at Adelanto and said here's
8  how much we're going to pay.
9          That puts GEO squarely in the same category as the
10 two CIA psychologists in Salim where *Yearsley* immunity was
11 denied twice.  It wasn't the CIA saying we want you to do XYZ
12 in your interrogation or torture program; it was them designing
13 that program for the CIA.  That level of discretion -- and this
14 is two cases -- the court considered derivative sovereign
15 immunity twice after *Cabalce* and once after *Campbell-Ewald vs.*
16 *Gomez*.  And it said when you have discretion -- when you as the
17 contractor is implementing and executing the alleged conduct,
18 we're not going to cloak you in the immunity of the sovereign.
19         THE COURT:  So, Ms. Holmes, do you concede that GEO
20 pays more than one dollars pursuant to other detention
21 facilities?
22         MS. HOLMES:  My understanding, your Honor, is that
23 there have been narrow circumstances at some of the other
24 detention facilities where ICE approval has been sought and
25 given for those narrow specific circumstances.  And my

1  understanding at those time periods where more than one dollar
2  was paid with ICE approval that it was for a finite period of
3  time.
4          THE COURT: And when GEO pays more than one dollar at
5  those other facilities, are they reimbursed for that amount by
6  ICE since it was made with ICE -- ICE's permission?
7          MS. HOLMES: Your Honor, I'm not certain of that.
8  I'm not certain of the answer. I don't want to misspeak.
9          THE COURT: Again, I think it highlights, sort of,
10 the central issue with respect to this motion, that it is very
11 important for this analysis to have all the information,
12 including the full contract, and discovery on the intent of
13 that contract, before I feel comfortable making a determination
14 as to whether or not, as you say, GEO's acts are, sort of,
15 compulsory or mandated by the ICE contract or they are not.
16 And I think that's an important decision that I have to make,
17 and at this point I think I have incomplete information on
18 which to make that.
19         So that's, ultimately, I think what's driving my
20 thinking with respect to this motion. So I will deny the
21 motion. You are free to raise, of course, this issue again at
22 summary judgment when you believe the facts are more fully
23 developed in order for me to be able to make the
24 determination -- the factual determinations that I have to make
25 in order to determine whether or not derivative sovereign

```
 1   immunity applies.  So I will deny the motion.  And you can
 2   proceed with discovery and see whether things change.
 3              I do, you know -- this is, again, preliminary, and I
 4   don't want to, kind of, bind myself into a certain position,
 5   but I do foresee some problems with the plaintiff's case with
 6   respect to class certification, especially because you allege
 7   certain coercive measures that were taken by Mr. Novoa.  And
 8   you try to, I think pretty successfully, tie those coercive
 9   measures to his compliance with the work program requirements.
10   That analysis is going to be very tough when, and if, I reach
11   the issue of whether or not there's commonality among the class
12   members.
13              So I foresee some issues with respect to the
14   certification of the class in this case.  You're probably
15   already aware of that, I'm sure, but I thought I'd throw that
16   out there.
17              MR. FREE:  Thank you, your Honor.
18              THE COURT:  Very well.  So I will deny the motion,
19   and we can go forward.
20              MS. HOLMES:  Thank you, your Honor.
21              (Proceedings Concluded.)
22
23
24
25
```

```
 1              CERTIFICATE OF OFFICIAL REPORTER
 2
 3
 4         I, ADELE C. FRAZIER, FEDERAL OFFICIAL REALTIME
 5   COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR
 6   THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT
 7   PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE
 8   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE
 9   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE
10   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
11   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
12   THE UNITED STATES.
13
14
15                   DATED THIS 23rd DAY OF AUGUST, 2018
16
17
18                   /s/ ADELE C. FRAZIER
19                   _____
20                   ADELE C. FRAZIER, CSR No. 9690, CRR, RMR
21                   FEDERAL OFFICIAL COURT REPORTER
22
23
24
25
```