Korey A. Nelson (admitted *pro hac vice*)
knelson@burnscharest.com
Lydia A. Wright (admitted *pro hac vice*)
lwright@burnscharest.com
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765

Counsel for Plaintiffs
***Additional Counsel on Signature Page.***

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### EASTERN DIVISION

| | |
|---|---|
| **RAUL NOVOA** and **JAIME CAMPOS FUENTES**, individually and on behalf of all others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> **THE GEO GROUP, INC.,** <br><br> *Defendant*. | Civil Action No. 5:17-cv-02514-JGB-SHKx <br><br> **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES** |

## PRELIMINARY STATEMENT

1.     This action arises from systematic and unlawful wage theft, unjust enrichment, and forced labor at the nation's deadliest civil immigration detention facility—California's Adelanto Detention Center (the "Adelanto Facility" or the "Facility").

2.     The Adelanto Facility is a civil immigration detention facility owned and operated for profit by Defendant The GEO Group, Inc. ("GEO").

3.     GEO is a multibillion-dollar corporation that owns and operates detention facilities around the world. GEO has made tens of millions of dollars in profits from its contract to run the Adelanto Facility.

4.     Although it is contractually required to provide for all essential detention services at the Facility, GEO uses the nearly-free labor of detainees to perform these services in order to maximize profits.

5.     GEO pays detainees just $1 per day to maintain and operate the Facility.

6.     This labor is not voluntary in any meaningful sense. GEO maintains a corporate policy and uniform practice at the Adelanto Facility of withholding necessary care from its detainees to ensure a ready supply of available labor needed to operate the Facility. As a result, detainees are forced to submit to GEO's $1 per day scheme in order to buy the basic necessities – including food, water, and hygiene products – that GEO refuses to provide for them.

2

PLAINTIFFS' SECOND AMENDED
COMPLAINT

5:17-cv-02514-JGB

7.      GEO maintains a corporate policy and uniform practice at the Adelanto Facility of threatening detainees who refuse to work with disciplinary segregation or solitary confinement, reporting their actions to the United States Immigration and Customs Enforcement ("ICE"), or referring them for criminal prosecution. These abusive practices and threats of abuse ensure that detainees will continue working for subminimum wages.

8.      GEO significantly reduces its labor costs and expenses, and increases its already vast profits, by unlawfully forcing and coercing detainees to perform labor at subminimum wages. These policies and practices violate California minimum wage law, the California Unfair Competition Law, and federal and state Trafficking Victims Protection Acts, which prohibit forced labor.

9.      Plaintiffs Raul Novoa and Jaime Campos Fuentes, individually and on behalf of all others similarly situated, brings this class action lawsuit to stop the economic exploitation of detainees at the Adelanto Facility, to recover unpaid wages, and to remedy the unjust enrichment resulting from GEO's unlawful failure to pay its detainee workforce legal wages.

**JURISDICTION AND VENUE**

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Trafficking Victims Protection Act, 18 U.S.C. §§ 1589 *et seq.*

3

11.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one defendant; there are more than 100 class members; the aggregate amount in controversy exceeds $5,000,000; and minimal diversity exists.

12.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to the claims occurred in this District.

13.     This Court has personal jurisdiction over GEO because the corporation regularly conducts business in California and has sufficient minimum contacts with California.

14.     Plaintiffs request that this Court exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over their state law claims arising under the California Minimum Wage Order, the California Unfair Competition Law, and California common law.

## PARTIES

15.     Plaintiff Raul Novoa is an adult resident of Los Angeles, California. He is a lawful permanent resident with longstanding family and community ties in the Los Angeles area. From 2012 through 2015, Mr. Novoa was detained at the Adelanto Facility. During those three years, he was employed by GEO as a janitor and a barber. He was paid only $1 per day for his labor, regardless of how many hours he worked.

PLAINTIFFS' SECOND AMENDED
COMPLAINT

5:17-cv-02514-JGB

16.     Plaintiff Jaime Campos Fuentes is an adult resident of Inglewood, California. He is a citizen of El Salvador and is seeking asylum in the United States. From approximately December 2016 through January 2018, Mr. Campos Fuentes was detained at the Adelanto Facility. During that period, he was employed by GEO as a janitor and laundry worker. He was paid only $1 per day for his labor – or nothing at all – regardless of how many hours he worked. Sometimes, he was paid in extra portions of food.

17.     Defendant GEO is a for-profit corporation providing correctional, detention, and community reentry services. GEO is a Florida corporation, with its principal office located at 624 NW 53rd Street, Suite 700, Boca Raton, Florida 33487.

## FACTUAL ALLEGATIONS

### A.    Immigration detention is civil—not criminal.

18.     Each year, hundreds of thousands of individuals are detained in geographically isolated immigration detention facilities while awaiting immigration or citizenship status determinations. These detainees include U.S. citizens, lawful permanent residents (green card holders) with longstanding family and community ties, survivors of torture, asylum seekers, victims of human trafficking, children, and pregnant women.

PLAINTIFFS' SECOND AMENDED
COMPLAINT

5:17-cv-02514-JGB

19.     Some detainees, like Mr. Novoa, were brought to the United States as children. And thousands ultimately have their United States citizenship or legal residency affirmed by an immigration court or federal judge.

20.     Immigration violations are civil violations, and immigration detention is civil in nature.[1] Many detainees have no criminal history at all.

21.     Notwithstanding immigration detention's civil nature and purpose, detainees are often subjected to prison-like conditions. According to Dora Schriro, former head of ICE's Office of Detention Policy and Planning, most detainees are held – systematically and unnecessarily – under circumstances inappropriate for immigration detention's noncriminal purposes.[2]  Detainees are frequently subjected to punitive and long-term solitary confinement, inadequate medical care, sexual and physical assault, and other harsh conditions of confinement, all without a conviction.

22.     Many detainees submit to deportation simply to obtain release from these intolerable conditions, even when they have valid claims to remain in the United States, including claims to asylum or other discretionary relief.

---

[1] *See Fong Yue Ting v. United States*, 149 U.S. 698, 728–30 (1893) (observing that deportation proceedings have "all the elements of a civil case" and are "in no proper sense a trial or sentence for a crime or offense").

[2] Dora Schriro, U.S. Dep't of Homeland Sec., Immigration Detention Overview and Recommendations 10, 15 (2009).

PLAINTIFFS' SECOND AMENDED
COMPLAINT                                                                      5:17-cv-02514-JGB

**B.**   **The privatization of immigration detention and GEO's economic windfall.**

23.   Immigration detention expanded roughly eightfold over the past two decades, from a capacity of 5,532 detention beds in 1994[3] to a current capacity of over 41,000.[4]

24.   During the same period, GEO and other private prison corporates have spent tens of millions of dollars on lobbying efforts.[5]

25.   As immigration detention has expanded, private prison corporations, particularly GEO, have gained an increasing share of the contracts for new detention beds.[6]

26.   Contracts with ICE accounted for 23.1% of GEO's revenues in 2016, up from 17.7% in 2015.[7] GEO officials expect these lucrative ICE contracts to account for a significant percentage of the corporation's ongoing revenues.[8]

---

[3] Sharita Gruberg, How For-Profit Companies are Driving Immigration Detention Policies, Center for American Progress (Dec. 18, 2015), *available at* https://www.americanprogress.org/issues/immigration/reports/2015/12/18/127769/how-for-profit-companies-are-driving-immigration-detention-policies/

[4] Jenny Jarvie, "This industry stands to benefit from Trump's crackdown on the border," Los Angeles Times (Feb. 14, 2017) *available at* http://www.latimes.com/nation/la-na-immigrant-detention-20170214-story.html;

[5] Michael Cohen, How for-profit prisons have become the biggest lobby no one is talking about, Washington Post (Apr. 28, 2015), *available at* https://www.washingtonpost.com/posteverything/wp/2015/04/28/how-for-profit-prisons-have-become-the-biggest-lobby-no-one-is-talking-about/?utm_term=.25de04ae71f9

[6] Bethany Carson & Eleana Diaz, Payoff: How Congress Ensures Private Prison Profit with an Immigrant Detention Quota, Grassroots Leadership (Apr. 2015) at 4, Chart 1-A[A], *available at* https://grassrootsleadership.org/sites/default/files/reports/quota_report_final_digital.pdf

[7] The GEO Group, Inc., 2017 10-K form at 36, available at http://www.snl.com/Cache/c38242453.html.

[8] *Id.*

PLAINTIFFS' SECOND AMENDED COMPLAINT                                        5:17-cv-02514-JGB

27.    GEO's 2016 revenues were over $2 billion, and its stock is publicly traded on the New York Stock Exchange.

28.    GEO's economic windfall, and the profitability of its immigration detention enterprise, arises from its policy of systemically withholding necessary case from detainees to ensure a readily available, captive labor force that cleans, maintains, and operates its facilities for sub-minimal wages under threat of solitary confinement and abuse of legal process. Without this nearly free detainee labor, GEO's windfall from immigrant detention would be substantially decreased.

## C.    GEO withholds necessary care from detainees at the Adelanto Facility.

29.    Since 2011, GEO has contracted with ICE to operate the Adelanto Facility, which is a 1,940-bed immigration detention facility in Adelanto, California. More than 73,000 detainees have passed through the Facility.

30.    The Adelanto Facility is notorious for its poor treatment of detainees.

31.    For example, in November 2011, shortly after the Adelanto Facility opened, an ICE annual review found that the facility's "medical officials were not conducting detainee health appraisals within 14 days of arrival, and registered nurses were performing health assessments" without proper training or certification.[9]

---

[9] https://www.ice.gov/doclib/foia/odo-compliance-inspections/adelantoCorrectionalFac_Adelanto-CA-Sept_18-20-2012.pdf

PLAINTIFFS' SECOND AMENDED COMPLAINT                                                          5:17-cv-02514-JGB

32.     Ten months later, ICE's Office of Detention Oversight found that Adelanto Facility officials often delay responding to detainee requests for medical care and fail to promptly review medical records.[10] That report also said that the death of a detainee in March 2012 resulted from "egregious errors" by medical staff and could have been prevented.

33.     In 2014, the Office of Detention Oversight found the Adelanto Facility deficient in 26 competency areas, including 16 related to the facility's efforts to prevent and intervene in sexual abuse.[11]

34.     In 2015, more than two dozen members of Congress wrote a letter to the U.S. Justice Department and ICE officials expressing concerns about reports of medical neglect at the Facility.[12] That same year, 26 detainees resorted to a two-week hunger strike to protest GEO's failure to provide adequate care there.[13]

---

[10] *Id.*

[11] U.S. Immigration and Customs Enforcement, Office of Professional Responsibility, Office of Oversight Detention, "Compliance Inspection," (July 2014), *available at* https://www.ice.gov/doclib/foia/odo-compliance-inspections/2014AdelantoJuly.pdf

[12] Kate Linthicum, "Citing neglect, lawmakers urge halt to migrant detention center expansion," Los Angeles Times (July 14, 2015), *available at* http://beta.latimes.com/local/lanow/la-me-ln-adelanto-immigrant-detention-20150713-story.html

[13] Kate Linthicum, "Immigrants end hunger strike at Adelanto detention facility," Los Angeles Times (Nov. 16, 2015), *available at* http://beta.latimes.com/local/lanow/la-me-ln-adelanto-hunger-strike-ends-20151116-story.html

PLAINTIFFS' SECOND AMENDED                                          5:17-cv-02514-JGB
COMPLAINT

35.     The Adelanto Facility was called "the deadliest detention center of 2017" by immigrant rights activists because more detainees died there than in any other detention center in the United States that year.[14]

36.     A peer-reviewed study released in 2017 found that detainees held six months or more in the Adelanto Facility experienced lower likelihoods of receiving any in-person visitation with their children as well as fewer total visits.[15]

37.     Despite this track record, GEO maintains a corporate policy and uniform practice of withholding sufficient food, water, and hygiene products from the detainees at the Adelanto Facility. As a result, detainees are forced to either purchase these daily necessities from the Facility's commissary or go without.

38.     By maintaining these harsh conditions and purposely withholding basic necessities from detainees, GEO ensures an available labor pool of detainees will work for only $1 per day, thus allowing it to continue operating the Adelanto Facility at an enormous profit.

---

[14] Detention Watch Network, "Third Death in Immigration Detention Makes the Adelanto Detention Center the Deadliest Facility in 2017," (June 2, 2017), *available at* https://www.detentionwatchnetwork.org/pressroom/releases/2017/third-death-immigration-detention-makes-adelanto-detention-center-deadliest

[15] Caitlin Patler and Nicolas Branic, "Patterns of Family Visitation During Immigration Detention," RSF: The Russell Sage Foundation Journal of the Social Sciences, vol. 3 no. 4 18-36 (July 2017) *available at* http://www.rsfjournal.org/doi/pdf/10.7758/RSF.2017.3.4.02

PLAINTIFFS' SECOND AMENDED COMPLAINT                                              5:17-cv-02514-JGB

**D.     GEO uses detainees to clean, maintain, and operate the Adelanto Facility.**

39.     Through its so-called Voluntary Work Program (the "Work Program"), GEO hires detainees to perform work that directly contributes to institutional operations, at a rate of $1 per day.[16]

40.     Despite its name, the Work Program is not "voluntary." Instead, GEO maintains a corporate policy and uniform practice at the Adelanto Facility of withholding necessary care from its detainees. As a result, detainees are forced to submit to GEO's $1 per day scheme in order to buy necessities – including food, water, and hygiene products – that GEO refuses to provide for them.

41.     Further, GEO maintains a corporate policy and uniform practice at the Facility of threatening to place those who refuse to work into solitary confinement. These conditions, policies, and practices ensure that detainees continue working for subminimum wages.

42.     In the Work Program, detainees are required to work according to an assigned work schedule and to participate in work-related training. At all times, GEO controls detainees' wages, hours, and working conditions.

43.     GEO provides all necessary personal protection equipment and work uniforms. For example, kitchen workers are provided with and required to wear a white

---

[16] *Id.*

PLAINTIFFS' SECOND AMENDED
COMPLAINT                                                                5:17-cv-02514-JGB

top/bottom uniform with a white apron, rubberized work boots, beard guards and hairnets, and freezer jackets and gloves as needed.

44.     GEO records the hours detainees work and periodically credits wages to their accounts.

45.     The detainee workers are "employees," and GEO is an "employer" under California's minimum wage laws.

46.     GEO informs all detainees entering the Adelanto Facility that the following work assignments may be available through the Work Program:

      a.   Intake

      b.   Kitchen Worker

      c.   Recreation

      d.   Library

      e.   Barber

      f.   Laundry

      g.   Living area clean-up/janitorial

      h.   Evening workers (facility janitorial)

      i.   Maintenance

47.     In the course of their labor and employment by GEO, detainees employed in the Work Program performed a wide range of work, including but not limited to:

      a.   Scrubbing bathrooms, showers, toilets, and windows;

b. Cleaning and maintaining GEO's on-site medical facility;

c. Cleaning patient rooms and medical staff offices;

d. Sweeping, mopping, stripping, and waxing floors throughout the facility;

e. Washing detainee laundry;

f. Preparing, cooking, and serving detainee meals;

g. Washing dishes;

h. Cleaning the kitchen and cafeteria before and after detainee meals;

i. Performing clerical work for GEO;

j. Running and managing the law library;

k. Providing barber services to detainees;

l. Cleaning intake areas and solitary confinement units; and

m. Cleaning and maintaining recreational areas.

48.   The Work Program allows GEO to avoid recruiting from the traditional labor market, complying with the terms of its union contracts, and paying all costs associated with potential, current, and former employment relationships, thereby reducing operational costs and increasing its own profits.

49.   GEO does not pay and has not paid detainees the state minimum wage – currently, $10.50 per hour – for the hours they worked at the Adelanto Facility.

PLAINTIFFS' SECOND AMENDED
COMPLAINT

5:17-cv-02514-JGB

50.     GEO's contract with ICE requires GEO to comply with all federal, state, and local laws.

51.     No clause in GEO's contract with ICE or any rule or standard incorporated by reference into the contract requires GEO to maximize its profits by paying detainees sub-minimum wages.

52.     GEO's pay policies violate California's minimum wage laws.

**E.      Plaintiff Novoa's employment at the Adelanto Facility**

53.     Mr. Novoa is citizen of Mexico and a legal permanent resident of the United States. He has lived in Los Angeles since age four.

54.     Mr. Novoa is employed by a commercial construction company to complete roofing, tiling, drywalling, and framing projects. He currently earns $15.65 per hour.

55.     Mr. Novoa was detained at the Adelanto Facility from June 2012 through February 2015.

56.     Mr. Novoa has performed work for GEO at the Adelanto Facility and was not paid the state minimum wage for the work he has performed.

57.     As a janitor, Mr. Novoa worked in a five-person crew to clean windows, floors, showers, bathrooms, and communal areas in the Facility. He worked four-hour shifts, up to seven days per week. He used cleaning supplies and equipment provided by GEO.

14

58.     As a barber, Mr. Novoa provided haircutting services to other detainees. He worked up to 10 hours per day, seven days per week. He used barber supplies and equipment provided by GEO.

59.     In return for this labor, GEO paid Mr. Novoa $1 per day, regardless of the number of hours he worked. GEO credited these wages to Mr. Novoa's commissary account.

60.     GEO withheld daily necessities from Mr. Novoa, thereby forcing him to work for subminimum wages in order to buy those daily necessities for himself and avoid serious harm, including, but not limited to, malnutrition, unsanitary living quarters, extreme isolation, and unhygienic conditions of confinement.

61.     During his detention, Mr. Novoa was often undernourished and dehydrated because GEO withheld sufficient food and water. He was also served rotten meat, moldy bread, and inedible produce.

62.     The drinking water provided by GEO ran black for days at a time and caused nausea or headaches if ingested.

63.     Mr. Novoa lost approximately 30 pounds in detention at the Adelanto Facility.

64.     In order to survive, Mr. Novoa purchased food and water from the commissary using his wages from the Work Program.

PLAINTIFFS' SECOND AMENDED
COMPLAINT                                                                    5:17-cv-02514-JGB

65.     GEO did not provide Mr. Novoa with sufficient quantities of shampoo, lotion, or soap. As a result, Mr. Novoa was often forced to purchase those necessities from the commissary using his wages from the Work Program.

66.     On several occasions, Mr. Novoa developed a blistering sunburn on his face. GEO did not provide him with sunscreen, even after he requested it from medical personnel.  Instead, Mr. Novoa was forced to purchase sunscreen from the commissary using his wages form the Work Program.

67.     The shoes issued to Mr. Novoa when he arrived at the Adelanto Facility fell apart within his first week in detention. GEO did not replace them. Instead, Mr. Novoa was forced to purchase another pair of shoes from the commissary using his wages from the Work Program.

68.     Mr. Novoa spent his wages on soap, shampoo, lotion, sunscreen, food, clean drinking water, shoes, and other necessities. These items were not provided to Mr. Novoa regularly or in sufficient quantities. Some of these necessities, like sunscreen, were not provided to Mr. Novoa at all.

69.     Officers threatened to put Mr. Novoa in disciplinary segregation, *i.e.*, solitary confinement, if he stopped working, encouraged other detainees to stop working or complained about subminimum wages.

70.     On several occasions, officers threatened to or actually forced Mr. Novoa to move to a different dorm – isolated from his peers and friends – after he complained

about the Work Program, subminimum wages and/or the deprivation of necessities at the Adelanto Facility.  During these transfers, officers would "toss" Mr. Novoa's dorm by throwing his belongings and papers in disarray. As a result of these actions, Mr. Novoa felt harassed, intimidated, threatened, and embarrassed.

71.     Officers threatened to segregate detainees who complained about the Work Program, working conditions, and/or subminimum wages.

72.     If given a meaningful choice, Mr. Novoa would not have worked for $1 per day.

73.     GEO falsely led Mr. Novoa to believe the corporation could not pay him more than $1 per day, despite the fact that it does so as a matter of course at several of its other immigration detention facilities.

74.     Mr. Novoa provided GEO with his labor because GEO's threats of serious harm and/or abuse of the legal process if he refused to work.

75.     GEO retained the value of Mr. Novoa's labor by realizing this value as corporate profits, rather than using it to provide for safer, more humane living conditions for detainees at the Adelanto Facility.

**F.     Plaintiff Campos Fuentes's employment at the Adelanto Facility**

76.     Mr. Campos Fuentes is citizen of El Salvador and is seeking asylum in the United States.

77.     Mr. Campos Fuentes was detained at the Adelanto Facility from December 2016 through January 2018.

78.     Mr. Campos Fuentes has performed work for GEO at the Adelanto Facility and was not paid the state minimum wage for the work he has performed.

79.     As a janitor, Mr. Campos Fuentes worked in a five-person crew to clean windows, floors, showers, bathrooms, and communal areas in the Facility. He worked three-hour shifts, up to seven days per week. He sometimes worked multiple shifts in a single day. He used cleaning supplies and equipment provided by GEO.

80.     As a laundry worker, Mr. Campos Fuentes worked to sort, wash, dry, and fold clothing and bedding used by detainees and in Facility operations. He worked three-hour shifts, up to five days per week. He used supplies and equipment provided by GEO.

81.     In return for this labor, GEO paid Mr. Campos Fuentes $1 per day, regardless of the number of hours he worked. GEO credited these wages to Mr. Campos Fuentes's commissary account periodically.

82.     Sometimes, Mr. Campos Fuentes was not paid at all for his labor. Instead, he was given extra portions of food.

83.     Mr. Campos Fuentes spent his wages on food, medicine, clothing, soap, and shampoo from the Adelanto Facility commissary, among other necessities.

84.    GEO withheld daily necessities from Mr. Campos Fuentes, thereby forcing him to work for subminimum wages in order to buy those daily necessities for himself and avoid serious harm, including, but not limited to, malnutrition, unsanitary living quarters, extreme isolation, and unhygienic conditions of confinement.

85.    During his detention, Mr. Campos Fuentes was often undernourished and dehydrated because GEO withheld sufficient food and water. He was also served rotten meat, moldy bread, and inedible produce.

86.    In order to survive, Mr. Campos Fuentes purchased food from the commissary using his wages from the Work Program.

87.    GEO did not provide Mr. Campos Fuentes with sufficient quantities of shampoo, lotion, or soap. As a result, Mr. Campos Fuentes was forced to purchase those necessities from the commissary using his wages from the Work Program.

88.    If given a meaningful choice, Mr. Campos Fuentes would not have worked for $1 per day.

89.    GEO falsely led Mr. Campos Fuentes to believe the corporation could not pay him more than $1 per day, despite the fact that it does so as a matter of course at several of its other immigration detention facilities.

90.    Mr. Campos Fuentes provided GEO with his labor because GEO's threats of serious harm and/or abuse of the legal process if he refused to work.

PLAINTIFFS' SECOND AMENDED COMPLAINT

5:17-cv-02514-JGB

91.     GEO retained the value of Mr. Campos Fuentes's labor by realizing this value as corporate profits, rather than using it to provide for safer, more humane living conditions for detainees at the Adelanto Facility.

## CLASS ACTION ALLEGATIONS

92.     Plaintiffs bring this lawsuit as a class action on behalf of himself, and all others similarly situated as members of the proposed classes, under Federal Rules of Civil Procedure 23(a) and (b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

**A.     Class Definition**

93.     Plaintiffs seek to certify the following class: All civil immigration detainees who performed work for GEO at the Adelanto Detention Center in the Work Program since GEO assumed responsibility for the Facility in May 2011.

94.     Excluded from the definition are the defendants, their officers, directors, management, employees, subsidiaries, and affiliates, and all federal governmental entities. Plaintiffs reserve the right to revise the Class Definition based upon information learned through discovery.

**B.     Class Certification Requirements under Rule 23**

95.     **Numerosity:  Rule 23(a)(1).** Each class is so numerous that joinder of all members is impracticable.  Plaintiffs do not know the exact size of the class since that information is within the control of GEO. However, upon information and belief,

PLAINTIFFS' SECOND AMENDED
COMPLAINT

5:17-cv-02514-JGB

Plaintiffs allege that the number of class members is numbered in the thousands. Membership in the class is readily ascertainable from GEO's detention and employment records.

96.    **Commonality and Predominance:  Rules 23(a)(2) and 23(b)(3)**. There are numerous questions of law or fact common to the Class, and those issues predominate over any question affecting only individual class members. The common legal and factual issues include the following:

a.  Whether Plaintiffs and the Class Members were entitled to the protections of the California Minimum Wage Order;

b.  Whether Plaintiffs and the Class Members performed compensable work;

c.  Whether Plaintiffs and the Class Members were paid $1 per day for their labor;

d.  Whether GEO engaged in conduct that violated California law – including the California Minimum Wage Order, the California Unfair Competition Law, and the California Trafficking Victims Protection Act;

e.  Whether GEO engaged in conduct that violated the federal Trafficking Victims Protection Act;

21

f. Whether Plaintiffs and the Class Members are entitled to equitable relief, including injunctive and declaratory relief; and

g. Whether Plaintiffs and the Class Members are entitled to damages and other monetary relief and, if so, in what amount.

97. **Typicality: Rule 23(a)(3).** The claims asserted by Plaintiffs are typical of the claims of the Class, in that the representative plaintiffs, like all Class Members, were paid subminimum wages while employed by GEO at the Adelanto Facility. Each member of the proposed Class has been similarly injured financially by GEO's misconduct.

98. **Adequacy:  Rule 23(a)(4).** Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained attorneys experienced in class and complex litigation, including wage and hour class action litigation. Plaintiffs intend to vigorously prosecute this litigation. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other class members.

99. **Superiority:  Rules 23(b)(3).** Plaintiffs and the Class Members have all suffered and will continue to suffer harm and damages as a result of GEO's wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that

numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many members of the proposed class who could not individually afford to litigate a claim such as is asserted in this complaint. This class action likely presents no difficulties in management that would preclude maintenance as a class action.

## CAUSES OF ACTION

### COUNT I
### CALIFORNIA MINIMUM WAGE LAW
### Cal. Labor Code §§ 1194, 1197, 1197.1

100.    Plaintiffs reallege and incorporate by reference herein all allegations above.

101.    The California Legislature set the following minimum wages for 2011-2017:[17]

| January 1, 2017 | $10.50 for employers with 26 employees or more |
|---|---|
| January 1, 2014 | $9.00 |
| January 1, 2008 | $8.00 |

102.    The minimum wage is an obligation of the employer and cannot be waived by any agreement.

---

[17] *See* http://www.dir.ca.gov/iwc/MinimumWageHistory.htm/;
https://www.dir.ca.gov/dlse/faq_minimumwage.htm

23

103.    Detainees at the Adelanto Facility do not forfeit their rights to wage protections.

104.    Employees protected by California's minimum wage laws must be paid at least the set hourly minimum wage.

105.    Detainees at the Adelanto Facility who participate in the Work Program qualify as employees of GEO under California law.

106.    GEO qualifies as an employer under California law.

107.    Labor in the immigration detention context is not intended as a punitive measure.

108.    GEO does not compensate detainees the state minimum wage for the work they performed at the Adelanto Facility. Instead, GEO pays detainees $1 per day – or nothing at all -- for work they perform at the Facility. Sometimes, GEO pays detainees in extra portions of food.

109.    Plaintiffs seek to recover, on their own behalf and on behalf of all others similarly situated, unpaid minimum wages and costs of this suit.

<u>**COUNT II**</u>
**UNJUST ENRICHMENT**
**California Common Law**

110.    Plaintiffs reallege and incorporate by reference herein all allegations above.

111.    GEO materially and significantly reduced its labor costs and expenses, and increased its profits, because Plaintiffs and the Class Members perform undercompensated labor.

112.    Plaintiffs and the Class Members conferred non-gratuitous benefits upon GEO by performing work for $1 per day, for which GEO would otherwise have had to pay at least the applicable minimum wage or more, thereby significantly and materially increasing GEO's profits, unjustly enriching GEO at the expense of and detriment to Plaintiffs and the Class Members.

113.    GEO's retention of any benefit collected directly and indirectly from this uncompensated labor violated principles of justice, equity, and good conscience.

114.    As a direct and proximate result of GEO's forced labor practices, Plaintiffs and the Class Members have suffered concrete harm and injury, including physical and emotional injury, monetary loss, and the unlawful violation of their rights.

115.    Plaintiffs and the Class Members are entitled to recover from GEO all amounts that GEO has wrongfully and improperly obtained, and GEO should be required to disgorge to Plaintiffs and the Class Members the benefits it has unjustly obtained. Plaintiffs and the Class Members are also entitled to recover exemplary damages. C.R.S. § 13- 21-102.

PLAINTIFFS' SECOND AMENDED
COMPLAINT

5:17-cv-02514-JGB

## COUNT III
## CALIFORNIA UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code § 17200, *et seq.*

116.   Plaintiffs reallege and incorporate by reference herein all allegations above.

117.   California's Unfair Competition Law ("UCL") prohibits unfair competition, defined as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [California's False Advertising Law]."  Cal. Bus. & Prof. Code § 17200.

118.   GEO willfully violated, and continues to violate, the "unlawful" prong of the UCL by violating California labor law.

119.   The acts, omissions, and practices of GEO constitute unfair and unlawful business acts and practices under the UCL in that GEO's conduct offends public policy against forced labor, and seeks to profit by violating Plaintiffs' rights under state and federal law.

120.   As a direct and proximate result of GEO's unlawful and unfair business practices, Plaintiffs and the Class Members have suffered economic injury.

## COUNT IV
## CALIFORNIA TRAFFICKING VICTIMS PROTECTION ACT
### Cal. Civ. Code § 52.5

121.   Plaintiffs reallege and incorporate by reference herein all allegations above.

122.   Pursuant to the California Trafficking Victims Protection Act, Cal. Civ. Code § 52.5, "a victim of human trafficking, as defined in Section 236.1 of the Penal

26

Code, may bring a civil action for actual damages, compensatory damages, punitive damages, injunctive relief, any combination of those, or any other appropriate relief."

123.    Human trafficking is defined as the deprivation or violation of the personal liberty of another "with the intent to obtain forced labor or services." Cal. Penal Code § 236.1.

124.    Forced labor or services is defined as "labor or services that are performed or provided by a person and are obtained or maintained through force, fraud, duress, or coercion, or equivalent conduct that would reasonably overbear the will of the person." Cal. Penal Code § 236.1(h)(5).

125.    GEO materially and significantly reduced its labor costs and expenses, and increased its profits, by unlawfully forcing and coercing Plaintiffs and the Class Members to perform uncompensated labor. In order to drive profits, GEO acted with the intent to obtain forced labor or services from its detainees.

126.    As alleged herein, GEO did not and does not provide detainees at the Adelanto Facility with sufficient provisions and necessities for daily life. In order to purchase these necessary items, including bottled water and extra food, Plaintiffs and the Class Members were forced or coerced to perform labor and services for GEO for $1 per day.

127.    Plaintiffs and the Class Members are entitled to recover from GEO all amounts that GEO has wrongfully and improperly obtained, and GEO should be

27

required to disgorge to Plaintiffs and the Class Members the benefits it has unjustly obtained. Plaintiffs and the Class Members are also entitled to recover exemplary damages. C.R.S. § 13- 21-102.

## COUNT V
## ATTEMPTED FORCED LABOR
### 18 U.S.C. §§ 1589(a) & 1594(a)

128.   Plaintiffs reallege and incorporate by reference herein all allegations above.

129.   Plaintiffs and the Class Members are victims of attempted forced labor as defined by 18 U.S.C. § 1589(a).

130.   GEO attempts to violate 18 U.S.C. § 1589(a)(2) by knowingly maintaining a corporate policy and uniform practice at the Adelanto Facility aimed at obtaining nearly free detainee labor and services by:

   a. Withholding daily necessities from Plaintiffs and the Class Members, thereby forcing them to work for subminimum wages in order to buy those daily necessities for themselves and avoid serious harm, including, but not limited to, malnutrition, unsanitary living quarters, extreme isolation, and unhygienic conditions of confinement; and

   b. Threatening Plaintiffs and the Class Members with physical restraint, serious harm, and abuse of law or legal process if they refuse to provide their labor, organize a work stoppage, or participate in a work stoppage.

PLAINTIFFS' SECOND AMENDED COMPLAINT

5:17-cv-02514-JGB

131.   GEO further violated 18 U.S.C. § 1589 by maintaining a corporate policy and uniform practice at the Adelanto Facility of threatening Plaintiffs and the Class Members with serious harm, including solitary confinement, referral to an ICE officer, or criminal prosecution if they refused to work.

132.   GEO attempted to perpetrate the offense of forced labor against Plaintiffs and the Class Members.

133.   GEO knowingly benefitted financially from participation in a venture GEO knew or should have known engaged in unlawful coercion of labor in violation of 18 U.S.C. § 1589.

134.   Plaintiffs and the Class Members have suffered damages in an amount to be determined at trial.

135.   Plaintiffs and the Class Members are entitled to recover compensatory and punitive damages.

136.   Plaintiffs and the Class Members are entitled to recover mandatory restitution in the full amount of their losses.

137.   Plaintiffs and the Class Members are entitled to recover their reasonable attorney's fees.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of the Class, request that the Court:

PLAINTIFFS' SECOND AMENDED
COMPLAINT

5:17-cv-02514-JGB

a. Certify this action as a class action, with a class as defined above;

b. Find that Plaintiffs are proper representatives of the Class, and appoint the undersigned as Class Counsel;

c. Order GEO to pay for notifying Class Members of the pendency of this suit;

d. Order disgorgement of GEO's unjustly-acquired revenue, profits, and other benefits resulting from its unlawful conduct;

e. Award declaratory and other equitable relief as is necessary to protect the interests of Plaintiffs and the Class Members;

f. Award injunctive relief as is necessary to protect the interests of Plaintiffs and the Class Members, including enjoining GEO from continuing to conduct business through the unlawful and unfair practices alleged herein;

g. Award Plaintiffs and the Class Members monetary damages for lost wages in an amount to be determined at trial;

h. Award Plaintiffs and the Class Members their reasonable litigation expenses and attorneys' fees; and

i. Award any further relief that the Court deems just and equitable.

Dated:          December 24, 2018          */s/ Lydia Wright*_____
                                          Korey A. Nelson (admitted *pro hac vice*)
                                          knelson@burnscharest.com
                                          LA Bar # 30002
                                          Lydia A. Wright (admitted *pro hac vice*)
                                          lwright@burnscharest.com

30

PLAINTIFFS' SECOND AMENDED COMPLAINT                                          5:17-cv-02514-JGB

LA Bar # 37926
C. Jacob Gower (admitted *pro hac vice*)
jgower@burnscharest.com
LA Bar # 34564
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765


R. Andrew Free (admitted *pro hac vice*)
andrew@immigrantcivilrights.com
TN Bar # 030513
**LAW OFFICE OF R. ANDREW FREE**
P.O. Box 90568
Nashville, TN 37209
Telephone: (844) 321-3221
Facsimile: (615) 829-8959


Nicole Ramos (admitted *pro hac vice*)
nicole@alotrolado.org
NY Bar # 4660445
**AL OTRO LADO**
511 E. San Ysidro Blvd., # 333
San Ysidro, CA 92173
Telephone: (619) 786-4866


Robert Ahdoot (CA Bar # 172098)
rahdoot@ahdootwolfson.com
Tina Wolfson (CA Bar # 174806)
twolfson@ahdootwolfson.com
Theodore W Maya (CA Bar # 223242)
tmaya@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
10728 Lindbrook Drive
Los Angeles, California 90024-3102
Telephone:  (310) 474-9111
Fax:  (310) 474-8585

31

Will Thompson (CA Bar # 289012)
wthompson@burnscharest.com
Warren Burns (admitted *pro hac vice*)
wburns@burnscharest.com
TX Bar # 24053119
Daniel H. Charest (admitted *pro hac vice*)
dcharest@burnscharest.com
TX Bar # 24057803
**BURNS CHAREST LLP**
900 Jackson St., Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002

*Attorneys for Plaintiffs.*

32

# CERTIFICATE OF SERVICE

I, Lydia A. Wright, electronically submitted the foregoing document with the clerk of the court for the U.S. District Court, Central District of California, using the electronic case filing system. I hereby certify that I have provided copies to all counsel of record electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

Dated:     December 24, 2018       /s/ Lydia Wright

Lydia A. Wright (admitted *pro hac vice*)
lwright@burnscharest.com
LA Bar # 37926
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765

PLAINTIFFS' SECOND AMENDED COMPLAINT        5:17-cv-02514-JGB