<pre>
 1                    UNITED STATES DISTRICT COURT
                     CENTRAL DISTRICT OF CALIFORNIA
 2                   EASTERN DIVISION - RIVERSIDE

 3

 4   RAUL NOVOA,                    )  Case No. EDCV 17-2514-JGB (SHKx)
                                    )
 5        Plaintiff,                )  Riverside, California
                                    )  Tuesday, February 12, 2019
 6             v.                   )  12:57 P.M. to 2:09 P.M.
                                    )
 7   THE GEO GROUP, INC.,           )
                                    )
 8        Defendant.                )
     _____)
 9

10

11                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE SHASHI H. KEWALRAMANI,
12                UNITED STATES MAGISTRATE JUDGE.

13

14   Appearances:              See Page 2

15   Deputy Clerk:             I. Vazquez

16   Court Reporter:           Recorded; CourtSmart

17   Transcription Service:    JAMS Certified Transcription
                               16000 Ventura Boulevard #1010
18                             Encino, California  91436
                               (661) 609-4528
19

20

21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
</pre>

```
 1   APPEARANCES:

 2

 3   For the Plaintiff:       Ahdoot & Wolfson PC
                              By:  THEODORE W. MAYA
 4                            10728 Lindbrook Drive
                              Los Angeles, California  90024
 5                            (310) 474-9111
                              tmaya@ahdootwolfson.com
 6
                              Law Office of R. Andrew Free
 7                            By:  R. ANDREW FREE
                              2004 8th Avenue South
 8                            Nashville, Tennessee  37209
                              (844) 321-3221
 9                            Andrew@ImmigrationCivilRights.com

10

11   For the Defendant:       Greenberg Traurig LLP
                              By:  DAWN A. ELLISON
12                            2101 L Street NW, Suite 1000
                              Washington, D.C.  20037
13                            (202) 331-3100
                              ellisond@gtlaw.com
14
                              Greenberg Traurig LLP
15                            By:  ALEXANDER L. LINHARDT
                              1840 Century Park East, Suite 1900
16                            Los Angeles, California  90067
                              (310) 586-7822
17                            linhardta@gtlaw.com

18                            Greenberg Traurig LLP
                              By:  JAMES M. VANT
19                                 JEFFREY W. GREENE
                              One International Place, Suite 2000
20                            Boston, Massachusetts  02110
                              (617) 310-6000
21                            vantj@gtlaw.com
                              greenej@gtlaw.com
22

23

24

25
```

1    RIVERSIDE, CALIFORNIA, TUESDAY, FEBRUARY 12, 2019, 12:57 P.M.

2              THE CLERK:  Good afternoon.  This is Irene with

3    Judge Kewalramani, and who do I have on the line?

4              THEODORE W. MAYA:  Hi.  This is Theodore Maya,

5    counsel for plaintiff.

6              THE CLERK:  Okay.

7              DAWN A. ELLISON:  And this is Dawn Ellison from

8    Greenberg Traurig for defendant.

9              THE CLERK:  Okay.  Is there anybody else joining us

10   this afternoon or just the two of you?

11             MS. ELLISON:  I think and expecting some others to

12   call in, but let me just -- I'll shoot them an email and just

13   confirm.

14             THE CLERK:  Okay.  I'll give you just a few

15   minutes.  I'm going to mute you on my end.  Okay?

16             MS. ELLISON:  (Indecipherable.)

17             MR. MAYA:  Thank you.

18             (Pause.)

19             ALEXANDER L. LINHARDT:  Hello.  This is

20   Alex Linhardt for GEO Group.

21             THE CLERK:  Okay.  Good afternoon.  What's your

22   name again, please?

23             MR. LINHARDT:  Alex Linhardt.

24             THE CLERK:  Okay.

25             And do I have anybody else?

1          R. ANDREW FREE:  Good afternoon.  This is
2    Andrew Free for the plaintiff.

3          THE CLERK:  Okay.

4          Ms. Ellison, is there anybody else?  Is that who
5    we're expecting?

6          MS. ELLISON:  Yeah.  I believe that Jeff Greene and
7    -- is also on the line.

8          THE CLERK:  Okay.  Well, if everybody is okay, I'm
9    going to call the case.  I'm going to ask each attorney to
10   state their name and who they represent, and we'll start with
11   plaintiff's side.  That way we don't talk over one another.

12         So I am calling case No. EDCV 17-2514,
13   *Raul Novoa v. The GEO Group, Inc.*

14         And, counsel, would you please restate your name
15   for the record.

16         MR. MAYA:  This is Theodore Maya of
17   Ahdoot & Wolfson appearing on behalf of plaintiff.

18         MR. FREE:  And this is Andrew Free from
19   The Law Office of Andrew Free for the plaintiffs.

20         MS. ELLISON:  This is Dawn Ellison from
21   Greenberg Traurig for (indecipherable).

22         MR. LINHARDT:  This is Alex Linhardt of
23   Greenberg Traurig for defendants.

24         MS. ELLISON:  And I know that -- I believe that
25   Jeff Greene of Greenberg Traurig will also be entering an

1   appearance.  They're having some trouble calling in, but I

2   don't think that should delay anything.  We don't want to

3   hold anyone up.

4           THE CLERK:  Okay.  Very well.  Thank you.

5           THE COURT:  All right.  Good afternoon, counsel.

6   Thank you for calling in.

7           I read the -- let me just tell you folks what I've

8   read, and then I can -- we'll go into the explanation of what

9   I understand the discovery dispute to be about.

10          I reviewed the Second-Amended Complaint, the

11  previous order that was issued by Judge Bernal denying the

12  motion to dismiss the First-Amended Complaint, as well as the

13  scheduling order that appears to be in place, though I will

14  have some questions regarding the scheduling order in light

15  of the discovery dispute and the Second-Amended Complaint, as

16  well as questions regarding the settlement conference, where

17  it appears the parties have agreed to option one, which is a

18  settlement conference before me.

19          That's -- those are the documents I've read.  Also

20  -- I'm sorry -- I read the Answer as well to the

21  Second-Amended Complaint, and my understanding of the dispute

22  is -- and I'll have some questions regarding what exactly the

23  parties mean by the "family" emails, but it appears that

24  plaintiffs and defendants have a disagreement regarding what

25  information may be redacted as part of the production, and

1 those two categories include whether the "family" -- related

2 "family" emails can be redacted as well as sensitive business

3 information.

4          So just with some ground rules, I think the parties

5 have been on a phone call with me before where the issue of

6 the *Touhy* regulations had come up.  So the same rules will

7 apply.  Please announce yourself before you speak so that the

8 record is clear as to who is speaking if either party wants

9 to get a copy of the recording down the line, and I will try

10 and do my best as well to identify who I'm a directing a

11 question to.

12          So with that being said --

13          (Party joins the conference.)

14          THE COURT:  Okay.  Somebody just joined?

15          JAMES M. VANT:  Yes.  Jim Vant and Jeff Green from

16 GT Boston.

17          THE COURT:  Jeff Green and who?  I'm sorry?

18          MR. VANT:  Jim Vant.

19          THE COURT:  Vance.  Very good.  All right.

20          So let me first ask the plaintiff.  Who's going to

21 be taking the lead on this matter?

22          MR. MAYA:  That will be me, Your Honor.  This is

23 Theodore Maya.

24          THE COURT:  -- Mr. Maya.

25          And who's going to be taking the lead for this on

 1   behalf of defendant?

 2           MS. ELLISON:  Your Honor, this is Dawn Ellison, and

 3   I'll be taking the lead for defendant.

 4           THE COURT:  Very good.

 5           Okay.  So let me first direct my question to

 6   Mr. Maya.  Sir, what is the -- what do you mean by "family"

 7   -- related "family" emails.

 8           MR. MAYA:  Okay, Your Honor.  A "family group"

 9   simply refers to an email and its attachments.

10           THE COURT:  Okay.  So would this be, for example,

11   let's say there's a string of emails that are provided in

12   discovery, potentially an email before and after it as well

13   as any attachments?

14           MR. MAYA:  Not the email string, Your Honor, and --

15   well, my understanding of the term "family group" is it

16   refers to an email and its attachments.  So members of that

17   family group might be attachments to the email.  GEO Group

18   would like to withhold members of that "family group"

19   (indecipherable) being irrelevant and it -- that goes hand-

20   in-hand with their position on redaction.

21           THE COURT:  Got it.

22           And, Ms. Ellison, is that your understanding what a

23   "family group" of emails means?

24           MS. ELLISON:  It is, but I think it's very

25   important not to conflate the two issues that are before the

1   Court because the issue of withholding nonresponsive email

2   attachments comes up in the context of how we define "family

3   groups" in the ESI protocol, which is actually what we think

4   will be (indecipherable), kind of the protocol there, and in

5   that context, we believe that the emails and their

6   attachments should be assessed separately for relevance and

7   responsiveness, and because they will be outside the scope of

8   discovery except for the fact that they're in a "family

9   group" and because some of the unique document issues in this

10  case makes processing a document very burdensome, GEO has not

11  agreed to produce nonresponsive attachments to emails.

12          And that's a separate issue than the issue of

13  redacting sensitive business information.  So I just would

14  like to keep those issues separate because I think the

15  standards that apply to each issue are different, and I think

16  the reasoning that GEO has for its position is different.  So

17  it would probably be helpful if we could talk about those

18  issues separately.

19          And I think it's important that -- it is because of

20  the way we're defining a "family group" in the ESI protocol

21  that this attachment issue came up because, you know, what

22  the plaintiff would like to put in a protocol is that, if an

23  email is responsive, all attachments have to be produced

24  regardless of whether they're responsive, and GEO's objecting

25  to producing nonresponsive attachments.

1          THE COURT:  Okay.

2          MS. ELLISON:  And just one other thing that --

3          THE COURT:  Hold on.  Hold on.  Hold on.  Hold on.

4          Mr. Maya, is that -- do you find that to be an

5    appropriate way to proceed?  By separating the "family group"

6    versus the sensitive business documents?  Is that fine by

7    you?

8          MR. MAYA:  Separating the issues of redaction

9    (indecipherable) where there's a -- is a attachment to

10   emails?

11         THE COURT:  Yes.

12         MR. MAYA:  Your Honor, the reason why I actually

13   think these issues are related is that -- (indecipherable) is

14   to say, you know, rule -- and as I see it, Rule 34 calls for

15   production of documents.  If the document is an email, I

16   think that would fairly encompass the attachments to that

17   email as well.

18         THE COURT:  Okay.  All right.  So I just want to

19   get each side's (indecipherable).

20         Ms. Maya -- I'm sorry, Ms. Ellison, I cut you off,

21   but go ahead.

22         MS. ELLISON:  I'm sorry.  I just wanted to also

23   make clear that I do think it's important to note that, when

24   it is only an attachment that is responsive, GEO has agreed

25   to only produce the parent email, and I think that's

1  important because we understand that the parent email can be

2  important for context.  So we're not ever proposing to

3  withhold a nonresponsive email if the attachment is

4  responsive.  So this is really just a question of

5  nonresponsive attachments.  For the email issue.  And I

6  actually think that there's voluminous cases that suggest

7  that emails and their attachments should be treated

8  separately for responsiveness and other issues relating to

9  discovery.  Rule 34 does not say that a document is the email

10  and all of its attachments, and there's a lot of case law

11  regarding that point.

12          THE COURT:  Okay.  So -- all right.  Very good.

13          So let me, then, turn it over to you, Mr. Maya.

14  Can you just tell me why you believe they -- GEO should be

15  required to turn over every attachment to a responsive email

16  as well as -- I guess you're not -- well, and let me go back

17  just so I'm clear in my notes, Mr. Maya.

18          Are you saying -- is the plaintiff saying that the

19  "family group" email includes -- I'm a bit unclear on that.

20  Explain to me again what "family group" means.

21          MR. MAYA:  A "family group" is an email with

22  attachments.

23          THE COURT:  Okay.  So I just -- so the narrow issue

24  is, then, whether -- attachments that the defendant may be --

25  or believe to be irrelevant should be produced?  Is that --

1          MR. MAYA:  Right.

2          THE COURT:  Okay.  Okay.  So we're back in line,

3   Mr. Maya.  Can you please go ahead and let me know -- tell me

4   your position on why you believe all attachments should be

5   required to be produced.

6          MR. MAYA:  Quite simply, Your Honor, I think that

7   allowing the defendant to unilaterally decide what

8   attachments to an otherwise responsive email irrelevant and

9   need not be produced simply invites abuse.  You know, if

10  they're attached to a relevant email, I think the presumption

11  should be -- is that these are relevant.  I do see a slight

12  distinction between the issue (indecipherable) and redacting

13  within a document material that GEO may feel is irrelevant,

14  but I think the issues are sufficiently related that that

15  reasoning holds true in their context.

16         THE COURT:  Okay.

17         MR. MAYA:  So, as long as that document is attached

18  to the relevant email, one must ask.

19         THE COURT:  So I recently issued an order on this

20  in another case regarding redaction of items that are

21  irrelevant -- or at least one party deems irrelevant, and the

22  scenario I came up with, in my mind -- and I would like your

23  thoughts on this -- let's say there's an email where the --

24  it's otherwise relevant but there's a last paragraph that

25  says "Hey, I heard about your kid going through chemo, I hope

1    she's doing okay."  Would you feel that redacting that last

2    paragraph would be appropriate or inappropriate?

3              MR. MAYA:  Your Honor, under -- this Theodore Maya

4    again, for the record.

5              Show me the circumstances before us where we are

6    talking about a case where we are -- we have negotiated, in

7    fact, that this has (indecipherable) while that appears to be

8    an issue that we were going to have to bring to Your Honor's

9    attention, possibly, that relate to email.  It appears we've

10   concluded that.

11             So this is a situation where we can assume we've

12   got a protective order in place that allows designation of

13   material, and with the amount of health information in this

14   case (indecipherable), which a protective order allows to be

15   designated "confidential" or "highly confidential" depending

16   on the circumstances -- I would say in this case, where we

17   have that order in place, there is health information --

18   relevant and responsive, protected health information but it

19   -- that may be produced, I don't think that should be

20   redacted here.

21             And not because we want to know about the child who

22   has chemo but because the rule that allows defendant to

23   redact that information is going to allow defendant to redact

24   a lot of information that actually is important to the case.

25             THE COURT:  Okay.  So, Mr. Maya, this question is

1  again to you, which is are you saying that redactions based

2  on relevancy are never allowed?

3          MR. MAYA:  Yes, Your Honor, to a document that is

4  otherwise relevant and responsive.

5          THE COURT:  Okay.  Okay.

6          MR. MAYA:  And nonprivileged.

7          THE COURT:  Sure.  Sure.  And I'm only focusing on

8  relevancy-based redactions.  So plaintiff's position is that

9  relevancy-based redactions in an otherwise relevant document

10  are never appropriate; is that correct, Mr. Maya?

11          MR. MAYA:  That's correct, Your Honor.

12          THE COURT:  Okay.

13          Ms. Ellison, can you -- first, I just want to get

14  some threshold issue, and that is whether -- obviously, the

15  plaintiffs now believe that redaction of -- based on

16  relevancy of information that is otherwise in a relevant

17  document or material can never be redacted.  Can you tell me

18  your thoughts on that.

19          MS. ELLISON:  And, again, I do -- the only time GEO

20  is proposing to redact was in a document that's a very narrow

21  category of information.  We disagree entirely that it's

22  never permitted.  There's numerous cases that acknowledge in

23  certain circumstances it is appropriate to redact

24  nonrelevant, otherwise sensitive information.

25          THE COURT:  Okay.

1              MS. ELLISON:  The only thing that GEO --

2              THE COURT:  All right.  Ms. Ellison?  I'm sorry.

3              MS. ELLISON:  Oh, sorry.

4              THE COURT:  So let me follow up on that.  So

5    (indecipherable) qualified -- just, my ears perked up because

6    one of the things I did see in my research was if there is a

7    stay with respect to certain discovery areas or if there is

8    sensitive information where there is no protective order in

9    place, those are the cases I saw that allowed for redactions

10   based on relevancy in an otherwise -- in an otherwise

11   relevant document.  (Indecipherable) --

12             MS. ELLISON:  Your Honor, and I agree with that,

13   but what I -- the trend that I saw in the cases is that the

14   party arguing for redaction usually identifies some injury it

15   will suffer that can't be remedied, you know, through a

16   protective order in a case, and it turns on, you know, what

17   the court thinks of that injury.

18             And I think -- it would be helpful, I think, if you

19   understood that the only information we are proposing to

20   redact is sensitive business information that relates to

21   other GEO facilities, and there's a particular reason, and I

22   think a reasonable concern, that GEO has regarding potential

23   injury from disclosing that information to these particular

24   plaintiff lawyers in this case.

25             THE COURT:  Okay.  Tell me --

```
 1              MS. ELLISON:   It's a very --

 2              THE COURT:  Tell me what that injury is.

 3              MS. ELLISON:  Well, Andrew Free, who is on this

 4   line, is common counsel across several similarly styled class

 5   actions, and, in fact, in one of the other cases, a

 6   plaintiff's counsel has produced what they call a "common

 7   interest privilege log," and on that privilege log Mr. Free

 8   has listed as referring to one of these cases as, quote,

 9   "impact litigation."

10              Given that the plaintiffs themselves are referring

11   to these sorts of cases as "impact litigation," it seems

12   reasonable to have a concern that they might use otherwise

13   not relevant information about other facilities to try to

14   find fodder to file additional cases, and that is really the

15   only -- we start from a position that the information is not

16   relevant or responsive and because it is sensitive and

17   because GEO has what I believe to be a reasonable concern

18   about the prospect of other cases, we would propose to redact

19   that nonresponsive information.

20              THE COURT:  Okay.  So -- and thank you,

21   Ms. Ellison.  So, in summary, basically, there's a concern by

22   GEO if they provide information in this case under -- certain

23   information regarding other facilities in this case, even

24   though there's a protective order, because there's common

25   counsel, specifically Mr. Free, there is a concern that
```

1    Mr. Free would use information that is appropriate -- or,

2    like, being produced only for this case may be utilized in

3    other cases?  Is that fair to say?

4              MS. ELLISON:  Yes.

5              THE COURT:  Okay.

6              MS. ELLISON:  Well, and to bring other cases,

7    basically.  You know, using knowledge of that information.  I

8    think there's ways of navigating around a protective order in

9    a way that, you know, you can't un-know what you know, and

10   given that, you know, this has been self-described by the

11   plaintiff as "impact litigation," it seems likely that they

12   might look for other similar cases to file.

13             THE COURT:  Let me ask you this, though:  If the

14   protective prohibits use in other cases, aren't we

15   necessarily relying on attorneys who appear before any court

16   as officers of the court to utilize that information

17   appropriately pursuant to any order that a judge may issue?

18             MS. ELLISON:  I'd have to look at the protective

19   order, Your Honor, but my read of it, when I read it -- read

20   it carefully, it didn't seem to protect against this concern

21   because, you know, there were (indecipherable) pleading

22   requirements and -- you know, I'm not sure that the

23   protective order can achieve -- can mitigate the concern

24   we've identified.

25             THE COURT:  Okay.

1          MS. ELLISON:   I think it speaks mostly to

2   disclosing the confidential information, and I don't know

3   that necessarily you would have to do that.

4          THE COURT:   And I haven't read the -- I haven't

5   read the protective order specifically -- or carefully lately

6   or -- I mean, at least the one in this case today.   My

7   general sense would be that the discovery produced in this

8   case can only be used in this case, and if I remember

9   correctly, there's actually even a provision that requires

10  for the discovery that is marked "confidential" or "highly

11  confidential" to be returned or certified of being destroyed

12  at the end of this case.   Is that not your understanding,

13  Ms. Ellison?

14         MS. ELLISON:   That is my understanding, Your Honor,

15  and I just don't necessarily think that you would have to use

16  the exact information that was disclosed in order to justify

17  bringing another lawsuit.

18         THE COURT:   (Indecipherable) --

19         MS. ELLISON:   And as a result, I'm not sure that

20  the (indecipherable) of a protective order can address with

21  particular concern, and then, of course, you get into

22  constitutional issues about -- you know, I just think that

23  the easiest thing to do, given that this is not relevant

24  information we're talking about, is to allow redaction in

25  this very limited situation.

 1          THE COURT:  Okay.  And I'm going to, Ms. Ellison,
 2   direct this, again, question towards you, where this analogy
 3   is the one that comes to mind right now -- it may not be most
 4   appropriate -- but in patent cases there are certain types of
 5   information that is allowed to go to outside counsel and is
 6   not allowed to go to in-house counsel if they are the ones
 7   with business decisions such that it cannot be disclosed to
 8   in-house counsel such that it can be used in a business
 9   manner going forward.  Wouldn't that sort of be the same
10   situation here, where your concern that Mr. Free may use this
11   information in other matters outside the scope of this case?
12          MS. ELLISON:  I'm going to -- I think,
13   conceptually, something like that might work except it isn't
14   really outside counsel because of the context of this case.
15          THE COURT:  Okay.
16          MS. ELLISON:  -- class counsel, and they're
17   representing the (indecipherable), I'm not sure who could be
18   permitted to see this.  And all of the plaintiff's lawyers
19   have been listed on this other common-interest privilege log,
20   which suggests that, you know, they're working together in
21   some sense.  So I'm not sure who it could be disclosed to
22   that would adequately address this concern.  Because it isn't
23   really outside counsel, unless I'm misunderstanding.
24          THE COURT:  No, I appreciate where you're coming
25   from, and that's why I said my analogy may not be applicable,

1    but it's, generally, kind of what I was thinking about with

2    respect to the concerns that defendant has.

3         Mr. Maya, you've heard now the concern regarding

4    proliferation of this information with counsel in this matter

5    who may use it improperly in other litigation.  Do you have a

6    response to that, sir?

7         MR. MAYA:  Yes, Your Honor.  I'd like to respond to

8    that (indecipherable) point that I just heard.

9         One is the protective order.  We are still

10   negotiating that.  In fact, Ms. Ellison and I had a phone

11   call about that earlier today, and I think that we have

12   reached agreement on the protective order that we will submit

13   to the Court for its approval.  If there's something that

14   needs -- now, it does use the Central District model

15   protective order language that limits use of designated

16   material to this litigation only.  I think that should and

17   must suffice, and we shouldn't presume that Mr. Free or any

18   other attorney (indecipherable) violate the terms of that

19   order.

20        There is a protective order on file in this case

21   that was very limited to a single deposition.  We

22   (indecipherable) continually to have the present conflict

23   about -- and it was at that time in the protective order as

24   (indecipherable) ESI protocol in the discussion, both of

25   which would have allowed relevant redactions that we're

 1   discussing here.

 2          Second of all, this is the first time that I've

 3   heard this justification for GEO's position, and it's a

 4   culmination of the types of information that it wants  to

 5   redact has morphed over time.  Basically, it started out with

 6   relevance, whatever -- anything relevant.  The last written

 7   articulation I've seen is nonresponsive sensitive business

 8   information that is not necessary to understand the

 9   responsive information in the documents.  I think that gives

10   them far too much leeway to redact whatever they want from an

11   otherwise responsive document.

12          But today we're hearing something completely

13   different, and we're hearing that the sensitive business

14   information they want to redact is actually evidence of

15   illegal behavior or unlawful behavior for which they might be

16   liable, and I think that, if they had phrased it that way, it

17   would have seemed rather preposterous, and this is the first

18   I've heard about the reliance on the statement regarding

19   impact litigation that has been made in other case.  I don't

20   know anything about that.

21          But I'm struggling with the justification that they

22   can redact material because it might reflect badly on them.

23   It might show that they violated the law, had another

24   petition or something like that, and given the claims in this

25   case, I also struggle -- I think that it really does invite

1    abuse to allow them to redact such material given that I --

2    you know, such evidence could be directly relevant to this

3    case and show overall pattern and practice and policy of

4    illegal behavior on GEO's behalf.

5           So I just want to put that out there.  I -- none of

6    the (indecipherable) for GEO's position have -- seems

7    (indecipherable) to but the latest one perhaps even less so.

8           THE COURT:  Ms.  Ellison, with respect to

9    Mr. Maya's argument that --

10          And, Mr. Maya, please -- I'll give you an

11   opportunity -- Mr. Maya, I'll first ask you whether I'm

12   summarizing it appropriately because I want to put it into my

13   question for Ms. Ellison.

14          So my understanding, Mr. Maya, is that you are

15   saying the information of any improper activity at other

16   facilities operated by GEO are relevant to the present case

17   because they would be relevant to any case and evidence that

18   was presented to show that this is not just an isolated event

19   or anything like that?  Is that fair to say, Mr. Maya?

20          MR. MAYA:  Perhaps, Your Honor.  I'm a little bit

21   hesitant to agree because I think we are talking about such

22   hypotheticals at this point without seeing the documents.  At

23   the same time, that highlights another real problem with

24   allowing such redactions in that it's going to require more

25   Court intervention, and it's going to require us to bring

1    more disputes up with GEO and then with the Court when we're

2    trying to figure out what was redacted from this, clearly,

3    relevant and responsive document.

4              THE COURT:  All right.  Ms. Ellison, so you've

5    heard Mr. Maya's argument.  What's your -- I'll tell you my

6    initial inclination is to agree with Mr. Maya in that

7    information that is how GEO operates at a facility that may

8    be relevant to the present case and the present claims, I

9    think is a difficult basis on which to say -- on which to

10   support redactions on this regard.

11             But I also want to hear from you, Ms. Ellison, with

12   respect to me -- well, let me just stop there.  Let me have

13   you answer that question first.  What are your -- what's your

14   response to Mr. Maya and that this information of other

15   potential wrongdoing or potential actions by GEO at a

16   facility shouldn't be produced?

17             MS. ELLISON:  I think as a preliminary matter, I'd

18   like to address the allegation that this is the first time

19   Mr. Maya is hearing any of this.  I have represented a number

20   of --

21             THE COURT:  Ms. Ellison --

22             MS. ELLISON:  -- and counsel --

23             THE COURT:  Ms. Ellison --

24             MS. ELLISON:  -- now for --

25             THE COURT:  Ms. Ellison, that's not really relevant

 1  to my consideration.  If you want to just tell me -- Mr. Maya

 2  made this argument regarding relevancy.  What's wrong with

 3  that?

 4           MS. ELLISON:  Well, I think it's -- this is -- and,

 5  again, part of the reason this might be confusing -- and

 6  we've been focusing mostly on the redaction piece of this.  I

 7  think the last analysis of what we're proposing to do is very

 8  different and the analysis is very different for the email

 9  families and for the redactions, and I know we're talking

10  about the redactions, but some of the moving target about

11  what our position has been and what the justification has

12  been is because we approach these very differently.

13           In terms of the relevant piece of what we're

14  proposing to redact, these facilities that are at issue in

15  cases -- in a couple of other cases, each facility -- and the

16  facility at issue in this case is Adelanto -- is the

17  performance of -- is the performance of a contract, and each

18  facility has its own contract at issue, and it is not that

19  there's evidence of wrongdoing.  There's evidence of

20  performance of a contract under a contract.

21           THE COURT:  Well --

22           MS. ELLISON:  There are different contracts at each

23  facility --

24           THE COURT:  Okay.  Well, let me stop --

25           MS. ELLISON:  -- performance --

 1            THE COURT:  Ms. Ellison, and this, I guess -- you

 2    -- I hear what you're saying with respect to identification

 3    of what the lawsuit is about.  In reading Judge Bernal's

 4    denial of the motion to dismiss, I understood that one of the

 5    bases was the interpretation and complication of the contract

 6    by GEO was outside the scope of the pleadings and therefore

 7    that was one of the bases for denying the motion to dismiss.

 8    So not only is it a contract, is it fair to say that

 9    plaintiffs may be arguing that GEO's application and

10    interpretation of that contract is something that's -- that

11    GEO may be doing improperly in violation of certain rules or

12    laws?

13            MS. ELLISON:  I'm not sure that what the plaintiff

14    is arguing about that, Your Honor, but the fact is that there

15    is a very specific contract at issue in Adelanto.  It is

16    different than other facilities because it's the function of

17    an idea so -- which is a particular kind of contract, and

18    there are different rules that govern its interpretation and

19    performance than other facilities, and always the performance

20    at any particular facility is a function of the particular

21    contract that governs that facility, and because of that --

22    although Mr. Maya wants to paint our reluctance to disclose

23    information about other facilities as an attempt to hide

24    wrongdoing, I understand the allegations in this case.  I

25    believe that all of the issues, whether or not GEO was

1    allegedly performing outside of the contract or not, are a

2    function of this particular contract, and as a result,

3    evidence about other facilities is not relevant to this case.

4              THE COURT:  Okay.  Thank you, Ms. Ellison.

5              Mr. Maya, can you respond to that, please.

6              MR. MAYA:  Your Honor, you know, I don't know if

7    it's going to be relevant or not.  I don't know what they're

8    going to redact or withhold, but my point is that allowing

9    them to do this invites abuse.

10             THE COURT:  Well, let me -- this is one of the

11   issues I had in the last -- we met -- in our form of

12   litigation, we necessarily rely on the good-faith efforts of

13   opposing counsel.  Anytime a request of documents is sent

14   out, we rely on opposing counsel doing a thorough search and

15   inquiring of their client in that regard.  So I get that we

16   don't -- you may not trust the other side, but isn't that

17   just how our system is set up and we necessarily have to rely

18   on opposing counsel as officers of the court?

19             MR. MAYA:  Your Honor, I think we do have to rely

20   on opposing counsel to be officers of the court, but I don't

21   think that the Federal Rules, and Rule 34 in particular,

22   allow for redaction of material that, one, a producing party

23   deems irrelevant from an otherwise relevant and responsive

24   document.

25             THE COURT:  Okay.  And in that sense -- and I

1    appreciate your coming from the standpoint of, if there's a

2    document that is relevant, irrelevant information can never

3    be redacted from it.  I get that's where you're coming from.

4    Okay.  I think with that -- that's just a stark difference

5    between the both sides.  Is that fair to say, Mr. Maya?

6              MR. MAYA:  I think it is fair to say, Your Honor,

7    and that's why we're here in front of you today.  You know,

8    looking at the claims in our complaint, I mean, I don't know

9    if there are -- if there's information about them violating

10   the minimum-wage law at other facilities in California.  That

11   does seem like it might be relevant for me.

12             THE COURT:  Sure.  No, I -- but each one of these,

13   as Ms. Ellison has said, is dictated by a separate --

14   potentially a separate contract at each facility.

15             MR. MAYA:  Right.  Right.  But if they're paying

16   detainees minimum wage at other facilities, that could be

17   relevant.

18             THE COURT:  Okay.

19             All right.  Can you -- I'm sorry.  Ms. Ellison,

20   would you like to respond?  I just want to take a minute to

21   gather my thoughts, but go ahead, Ms. Ellison.

22             MS. ELLISON:  Sure.  I mean, I just think that,

23   generally, information at the other facilities is not

24   relevant to this case, and I think that there is -- there are

25   numerous cases that support that redaction for certain

1    reasons is appropriate.  You know, you don't get all other

2    pharmaceutical information if you're -- you have a product

3    liability case for one type of drug.  You don't get

4    information about all other benefit plans in ERISA

5    litigation.  There is abundant case law that acknowledges

6    that there is a limit and there is an appropriate time to

7    redact information, and we do think that information about

8    the other facilities is not relevant to this particular

9    litigation or this facility.

10            THE COURT:  Okay.

11            MS. ELLISON:  And I do hope we can come back to the

12   issue of the email families because I think that's a

13   different issue.  I know I keep saying that, but I don't -- I

14   think the redaction issue is trickier, and I understand that

15   the burden is really on us to convince you that we might

16   suffer injuries that can't be otherwise addressed through one

17   of the orders on the case.  I do agree that the case law does

18   put the burden on GEO to make a showing that the redaction is

19   necessary, and we've tried to do this on this call, and we

20   will offer examples in papers if we (indecipherable).

21            I think that the analysis is a little different

22   when we're talking about entirely nonresponsive email

23   attachments, and it's not framed the same way.  So I know you

24   want to think about this "redaction within the document"

25   issue, and I don't want to, you know, derail that thought

 1   process, but I would like to, at some point, come back to the

 2   issue of the email families.

 3          THE COURT:  Sure.  So I guess I was to some degree

 4   viewing it as the same as the redaction within the email as

 5   well as the attachment to the email.  In either case, I will

 6   say this:  It's obviously a little -- not "obviously."  It's

 7   more difficult, in my mind, to either redact or excise an

 8   attachment if it would hinder the opposing party's ability to

 9   view information in the proper context.

10          With that being said, go ahead with respect to the

11   attachments.

12          MS. ELLISON:  Thank you, Your Honor.

13          I think that the way -- when we've been looking at

14   the case law and assessing our position on this, there are

15   numerous cases that make the point that the emails and their

16   attachments need to be assessed separately for relevance, for

17   privilege, or for a variety of other document processes, and

18   when we're talking about this issue, we kind of go back to

19   how discovery works, and we have these different documents,

20   and the plaintiff has to make a showing that they're within

21   the scope of discovery.

22          This, again, is coming up in the "family group"

23   definition of the ESI protocol, where the plaintiff is

24   saying, "If you produce an email, you have to produce

25   everything," and GEO is saying, "Wait.  There are not

1    responsive attachments.  They're not relevant to the case.

2    So they're not within the proper scope of discovery under

3    26(b)(1)."

4           And then on top of that, producing them is not

5    proportional to (indecipherable) of this case because we

6    haven't been in front of you explaining the unique document

7    processes on this case yet, although I think that's probably

8    just a matter of time, but there are numerous processes that

9    GEO has to engage in when a document has to be produced.  Not

10   just privilege, which you see in every other case, but there

11   are extensive confidentiality requirements in these

12   documents, there is a need for ICE to review certain

13   documents so we have to assess the documents for that, there

14   are unique redaction requirements, and then -- so the

15   document has to be assessed for whether it needs to be

16   redacted, and then redaction has to be applied, if required.

17          So the argument on the attachments would go they're

18   not relevant so they're not -- they don't -- the plaintiff

19   can't satisfy that prong of 26(b)(1), and even if they could,

20   GEO would argue that producing them is not proportional to

21   the needs of the case because there's a substantial burden

22   associated with production and the claimant can't identify

23   any real benefit that it gets from getting these

24   nonresponsive documents.

25          In terms of the context, the plaintiff will be

1    getting the parent email and responsive attachments, and

2    we've also told the plaintiff that, you know, the metadata

3    will contain the reason for redactions so there will be a

4    little information there as well, and of course if there's

5    some reason that they can't discern the context, although I

6    think that will be apparent from the cover email, we would be

7    happy to meet and confer about it.  But I think

8    (indecipherable), given that it's not a responsive document

9    and there's a substantial burden associated with producing

10   it, the position that they should be withheld is justified --

11            THE COURT:  Okay.

12            MS. ELLISON:  -- under the rules.

13            THE COURT:  Ms. Ellison, a quick question, and I

14   didn't -- I don't quite appreciate the interplay of ICE's

15   involvement as well as any other aspects of agreements with

16   the government that may require the redactions -- or, I'm

17   sorry -- before production is made to jump through certain

18   hoops.  My first question is what volume of documents are we

19   talking about here, Ms. Ellison?

20            MS. ELLISON:  I went to our vendor, anticipating

21   that you might ask that question, Your Honor, and the

22   estimate we were given -- and we're still in the beginning

23   phases of processing our documents.  They're estimate, based

24   on application of the search terms and knowing how many more

25   documents are added when we factor in the family members, is

1  that it will require processing of over 40 percent more

2  documents if we have to process nonresponsive family members.

3        THE COURT:  And when you say "processing 40 percent

4  more," the vendor -- can you explain that to me?  What do you

5  mean by that?  "Processing"?

6        MS. ELLISON:  Once a document -- so every single

7  document that -- is going to be reviewed for responsiveness,

8  but once we determine that the document is not responsive, we

9  don't have to apply these other review processes that take up

10 a lot of time and cost a lot of money, and so the 40 percent

11 estimate is the number of documents that would have to be

12 processed for production, and so once -- because there's --

13 it would be -- there'd be one, you know, responsive

14 attachment, and so the family group is implicated, and if

15 they all have to be processed, then we have to then apply the

16 additional processing, you know, tools that we use when we

17 have to be assessing for confidentiality and privilege and

18 ICE review and redaction.

19        THE COURT:  And --

20        MS. ELLISON:  So there's substantial work that --

21 so the 40 percent is the number of documents that appear to

22 be implicated.  We don't know yet have -- we can't put a

23 dollar value on that yet.

24        THE COURT:  Got it.  Now, with respect to this

25 40 percent, has it been culled for redundancy such that the

1   document at issue may be repeated such that the number goes

2   down, or has that not been done?

3          MS. ELLISON:  Well, I understand that the documents

4   have already been deduplicated, if that's what you're asking,

5   but of course --

6          THE COURT:  (Indecipherable.)

7          MS. ELLISON:  -- these are documents that are

8   attachments to emails, and if the email is unique, even if

9   the attachment has been produced already, it would be

10  implicated and reproduced as an attachment because, you know,

11  that's the -- that's what the protocol contemplates.

12         THE COURT:  So the 40 percent accounts -- takes

13  into account the deduplication of what may be considered

14  irrelevant attachments?

15         MS. ELLISON:  I don't know -- I'm not -- I think I

16  don't understand what you mean by that.

17         THE COURT:  (Indecipherable) --

18         MS. ELLISON:  I think in some sense, once a

19  document is attached to an email, it becomes unique as an

20  attachment to that email so that the deduplication, as you

21  might ordinarily think of it, doesn't take the document out

22  of the mix, if that makes sense.

23         THE COURT:  Okay.  All right.  I'm just wondering,

24  sometimes the emails get sent multiple times or forwarded,

25  responded to, et cetera, with the attachment such that the

1   email string may be unique; however, that email at issue with

2   the the attachment at issue is actually a duplicate.

3          MS. ELLISON:  I did not ask, Your Honor, that

4   particular question of our vendor, but I understand our

5   proposal has been to do email threading, which would create

6   more efficiency in how the emails are produced, but it does

7   note that, if a lower email has an attachment, the attachment

8   would be produced as well.  I don't know if that goes to what

9   you're saying, but we are, you know, doing what we can to

10  make the email production efficient.  I just don't think,

11  because of the way the "family group" is defined, that

12  deduplication is entirely possible across the attachments

13  because, you know, doing so -- they're not exactly identical

14  because it's a little bit different once it gets attached to

15  an email.

16         THE COURT:  And with respect to my analysis, what I

17  have to look at is -- and the proportionality with respect to

18  how much time this is going to take to get through those

19  other hoops you mentioned to determine -- and this -- is

20  confidentiality -- and please excuse me, I may be ignorant in

21  this regard of the requirements that any government agency

22  may put on production of documents -- that a protective order

23  wouldn't necessarily give your client cover, for lack of a

24  better term, where, just because there's a lawsuit going on,

25  there may be certain requirements you -- where you have to

1   notify the other -- the counterparties to that contract, that

2   document.  Is there a way for you to quantify how much extra

3   effort it would cost to look through those extra documents?

4            MS. ELLISON:  Your Honor, I think we probably can

5   work to quantify it.  The processes are ongoing, and, you

6   know, we're a little (indecipherable) because some of this

7   dispute is caused because we've been very transparent in how

8   we want to proceed, but we're not through the process yet.

9   But I can work with our vendor to try to quantify the burden

10  we've identified because it's certainly a big part of our

11  proposal that we shouldn't have to process those documents.

12           THE COURT:  Okay.

13           Mr. Maya, anything you'd like to add at this point,

14  sir?

15           MR. MAYA:  Yes, Your Honor.  Thank you.

16           A couple of things about this is that, in my

17  experience -- and I do have experience on the defense side

18  producing documents, as well as on the plaintiff's side -- is

19  that once they are loaded into a system for review, the

20  burden associated with producing documents is not all that

21  significant.  We're not talking about them having to,

22  obviously, print out the documents or we can anything like

23  that.  Right?  (Indecipherable.)  If they're being reviewed,

24  (indecipherable).  I don't think that should -- we should

25  assume that that is a prohibitive burden there, just

1    producing what's already been loaded for review.

2         But second of all, (indecipherable) more

3    importantly, I think GEO has been using the ICE review

4    process as a shield in this case.  So for instance,

5    Your Honor, we have been careful -- we were careful with our

6    discovery requests not to request the detainee files, knowing

7    that GEO would take the position that those have to go

8    through ICE for its review and that it would be and

9    impossible, difficult, and time-consuming process.

10        But now -- and during the meet-and-confer on --

11   preceding this hearing here, they said that the documents

12   we've requested are in the detainee files so we're going to

13   have to go through that same process here, and I don't

14   understand that.  I mean, just because a document is in a

15   certain file, doesn't mean that the whole file necessarily

16   has to be produced.  Right?

17        So that's just something to be cognizant of and I

18   -- and I have great respect for Dawn, but I am very skeptical

19   about the "40 percent more greater burden" figure that GEO is

20   asserting that would be (indecipherable).

21        THE COURT:  Okay.  All right.  I appreciate that,

22   and I've also been on the end where I've had to produce

23   documents as a litigator and they have provisions in there

24   where I have to get permission from a third party who we

25   entered into with a contract that was meant to be -- and we

1    have to notify them and jump through certain hoops to allow

2    the third party to basically assert any objections that they

3    may want to do.  I don't know if that's the case or not where

4    ICE may want to -- or whoever is -- the counterparty may want

5    to assert their own objections.  I presume -- and I'll leave

6    this up to Ms. Ellison -- they know their job better than I

7    do with respect to who they have to notify to cover GEO's

8    responsibilities.

9           Let me -- here's what I -- here's -- if you guys

10   can -- I'm sorry -- can give me a couple of minutes.  Let me

11   just get my thoughts together and so I can just write out

12   what I would propose, and then I'd like to hear from you as

13   far as a path going forward with respect to resolving this.

14          Okay.  So, Mr. Maya, can you give me a couple

15   minutes?

16          And, Ms. Ellison, could you give me a couple

17   minutes, please?

18          MS. ELLISON:  absolutely, Your Honor.

19          MR. MAYA:  (Indecipherable.)

20          THE COURT:  Thank you.

21          (Pause.)

22          THE COURT:  All right, counsel.  Thank you.  I

23   apologize.

24          So here's going to be my proposal, and I'd like to

25   get your thoughts on it before I issue the order.

1          I would like a three-page -- no longer than a

2     three-page letter brief.  Single space is fine.  What I would

3     like the parties to agree to is -- at least what they're

4     presenting to me is what is the definition of a "family

5     group" because I just want to make sure I'm understanding the

6     appropriate thing as compared to an email string.  My

7     understanding of a "family group," as we're talking about

8     here, is an email and its attachment, not the email string

9     which -- and this was just being infected by my own practice

10    in the past where you have a parent and child email in the

11    email string.  So first thing would be a definition of what a

12    "family group" is.

13          Second thing would be we issue -- the issues that

14    you would like me to describe and also the question presented

15    -- if you would do an appellate brief, if the parties could

16    agree to what the question presented, that would be helpful

17    to me.

18          And then the three pages would not include any

19    declarations that the parties may like to add with respect to

20    arguing proportionality under the Federal Rules and why

21    producing these documents or attachments would be

22    disproportionate.

23          So that would be my proposal, and if I gave you

24    folks a week -- let me first ask Mr. Maya one question.

25          The discovery cutoff I had read earlier was

1  April 15, 2019.  That's no longer the discovery cutoff, is

2  it?

3          MR. MAYA:  I believe not, Your Honor, but we had a

4  -- we have been discussing with GEO -- GEO's requested a

5  further six-month extension.

6          THE COURT:  Okay.

7          MR. MAYA:  And let me see if I can tell you what

8  the current --

9          THE COURT:  I may have overlooked this in the --

10          And, Ms. Ellison, if you can find what the

11  discovery cutoff is, that would be helpful as well.

12          MS. ELLISON:  Your Honor, I believe it is -- it's

13  still April 15th, which is why last week we sent a letter to

14  the plaintiff requesting that we could file a joint motion

15  for an extension of that deadline.

16          THE COURT:  Okay.  All right.  So -- okay.

17          So, Mr. Maya, with respect to what I'm proposing on

18  the briefing, I'm trying to keep it cost effective by not

19  requiring the parties to necessarily go through the Rule 37

20  process, but I wanted to get the information.  So, Mr. Maya,

21  what are your thoughts on that process?

22          MR. MAYA:  Yeah.  Your Honor, I think that could

23  work in principle.  I just have a question.  Your Honor, is

24  that a joint --

25          THE COURT:  No.

1              MR. MAYA:  -- three-page brief?

2              THE COURT:  No.  Each side would provide a three-

3    page letter brief.

4              MR. MAYA:  Okay.  And then, second of all, so what

5    we -- you know, we -- before having this call, we did send a

6    (indecipherable) a Rule 37 style letter to defense counsel,

7    and what we would be asking for is not just a ruling that

8    they can't redact (indecipherable) for relevance but

9    (indecipherable) also important issue is also that they have

10   to complete their initial disclosures because it would help

11   documents (indecipherable) on this basis, and then, you know,

12   what -- that they've actually produce documents responsive to

13   our requests for production by a date certain before the

14   discovery cutoff.  Or at least commit to a date

15   (indecipherable) to ICE for its review if that's what they're

16   going to say --

17             THE COURT:  Okay.

18             MR. MAYA:  -- is necessary.

19             THE COURT:  Okay.  Let me -- and, Mr. Maya, I

20   appreciate where you're coming from.  I'm just trying to look

21   at the wolf at the door, which is the relevancy withholdings

22   or the relevancy redaction or excisement, and let me address

23   that because that may have a domino effect into some of your

24   other issues.

25             And with respect to not producing the documents in

1   a timely fashion, I think, as you appreciate, both with

2   plaintiffs and defendants in these types of case, either

3   party does that at their peril, where the party not only may

4   be prohibited from using those documents in further

5   proceedings, but it may result in other actions by the Court.

6   I'm not saying sanctions or anything but just other things

7   that may impact the litigation of the case, especially, for

8   example, in discovery if a deposition is set and the

9   documents aren't provided in a timely fashion.

10          So let me -- I hope that answers your questions,

11   but I'd like to kind of focus it on the relevancy redactions

12   and the excisements at this point, and I'll venture to,

13   hopefully, get this ruling out within a week after I get your

14   -- each side's three-page letter briefs.

15          So with that said, Mr. Maya, any thoughts, sir?

16          MR. MAYA:  Your Honor, we can definitely brief

17   relevant redactions within the three-page limit.

18          THE COURT:  Very good.  Okay.  Yeah, and that was

19   one of the reasons I wanted to give that to you.  I don't --

20   I wanted -- I think this is my -- I wanted each side to have

21   a full -- at least an opportunity, and three pages single

22   spaced, I think, will give you that opportunity.

23          Ms. Ellison, your thoughts?

24          MS. ELLISON:  Your Honor, we should be able to

25   brief this issue with that three-page limit as well.

1           And the only -- the other issue that Mr. Maya

2 raised, we did respond with a lot of detail about our

3 document processes.  This is not a situation where there's

4 delay for no reason.  We are -- there are complicated and

5 challenging aspects to this production for a variety of

6 reasons, and we'd prefer to stick to this discrete issue

7 because addressing the (indecipherable) the issues Mr. Maya

8 raised requires, I think, a further meet-and-confer with the

9 plaintiff because we've been trying to work with them to

10 explain some of the challenges and adjust the schedule so

11 that, you know, we can complete the processes in a time that,

12 you know, enables them to litigate the case appropriately.

13 But we've been open with them about what's going on and think

14 it's appropriate to try to limit this issue to the discrete

15 one we've been discussing today.

16           THE COURT:  Okay.  So -- thank you.

17           So how much time do you think you folks would need

18 to get me the letter brief?

19           Mr. Maya?

20           MR. MAYA:  I think we could do that within one

21 week.

22           THE COURT:  Okay.  So by the 19th?  Is that fine by

23 you, Mr. Maya?

24           MR. MAYA:  That's fine by me.  Even, I think, the

25 18th is fine if you prefer Monday, Your Honor.

```
 1                    THE COURT:  You can email it.  I certainly can look
 2      at it.  It's -- the court is off, but I'm going to -- you
 3      know, the emails come in.  I'll take a look at it.  So why
 4      don't we do it the 19th just to give you that extra -- well,
 5      why don't you send it on the 18th.  That's fine.  So I'll
 6      look at it on my desk the first thing -- I'll start looking
 7      at it the 18th evening, 19th morning.
 8                    Is that -- before I commit to that date, though,
 9      Ms. Ellison, is that fine by defendants?
10                    MS. ELLISON:  Your Honor, and so we're talking
11      about a simultaneous three-page brief?
12                    THE COURT:  Correct.  I think you guys are -- and
13      I'm hesitant -- and -- sometimes it doesn't work out, but in
14      this type of a case, where I believe you guys have had
15      sufficient meet-and-confers and you -- we've had this
16      discussion on the record, I think it's a fair assumption that
17      both sides know each other's positions.  So, yes, it would be
18      a simultaneous three-page brief.
19                    MS. ELLISON:  And, Your Honor, I am out on travel
20      this weekend.  So, if we could have until the 19th, that
21      would be really helpful.
22                    THE COURT:  Why don't we do that.
23                    Is that okay, Mr. Maya?
24                    MR. MAYA:  Your Honor, it is okay.  I would just
25      like to say there's one point, that we have not seen any
```

1    briefing from defendant --

2              THE COURT:  Okay.

3              MR. MAYA:  -- this issue.

4              THE COURT:  Well, in that regard, would you prefer

5    open-response-reply format, Mr. Maya?

6              MR. MAYA:  Ideally, I suppose so.

7              THE COURT:  Okay.

8              Ms. Ellison, is that what you would prefer as well?

9              MS. ELLISON:  That is fine with me, Your Honor.

10             THE COURT:  Okay.  Why don't we do this -- let's do

11   this -- I'm guessing three pages single space would equal

12   seven pages double space.  Actually, with the file

13   requirement of (indecipherable) 19, I'll give you eight pages

14   -- or, let's do ten pages double spaced.

15             So why don't we do this:  The opening motion on

16   this matter will be a ten-page opening brief due by -- if you

17   want to do it the 18th, Mr. Maya, and then I could give

18   defendants a week, until the 25th, to file a ten-page

19   response, and then by March 1st, perhaps, do a five-page

20   reply.  So opening brief would be February 18th by

21   plaintiffs, responsive brief February 25th by defendants, and

22   reply brief by plaintiff, if they choose to do so, by

23   March 1st.

24             Is that agreeable, Mr. Maya?

25             MR. MAYA:  It is, Your Honor.  When I said the

1    18th, I did not realize that was President's Day, and I am

2    planning on observing that holiday --

3              THE COURT:  Okay.

4              MR. MAYA:  -- if possible.

5              THE COURT:  Okay.  That's okay.  No, you know, you

6    (indecipherable).  Whether we observe it or not, our children

7    are going to observe it so we got to go with them.

8              MR. MAYA:  (Indecipherable.)

9              THE COURT:  So I -- I was kind of surprised.  I was

10   like, "Wow, I'm jealous."

11             With that being said, so why don't we do 19th,

12   26th, and 1st.  Is that okay, Mr. Maya?

13             MR. MAYA:  And March 1st for a reply?

14             THE COURT:  Yes.

15             MR. MAYA:  Okay, Your Honor.  Yeah --

16             THE COURT:  Or, you know what?  Would you like --

17   how about March 4th?

18             MR. MAYA:  Okay.

19             THE COURT:  Okay.  So 19th, 26th, 4th.  Is that

20   agreeable, Ms. Ellison?

21             MS. ELLISON:  Yes, Your Honor.

22             THE COURT:  Very good.  Hey, thank every -- for --

23   the order will be -- and so just e-file it through the normal

24   process, and label it as a discovery motion so that the

25   district judge doesn't get it and it comes to me.  So we'll

1  have a ten-page limit on the opening brief, as well as the

2  response, and a five-page limit on the reply brief, and then,

3  if I need a further hearing on it, I'll let you folks know,

4  but I'll -- we'll get on it as soon as we get those

5  documents.

6          Is that -- so that will be the order, and the order

7  will -- the minute order you'll see some out from me will

8  just say the matter was discussed on the record, a briefing

9  schedule was set where plaintiffs opening brief no longer

10  than ten pages is due on February 19th, defendant's response

11  brief will be, again, no longer than ten pages filed on

12  February 26th, and plaintiff's reply brief, if any, will be

13  filed no later than March 4th and no longer than five pages.

14          All right.  So with that being said, is there

15  anything further, Mr. Maya?

16          MR. MAYA:  Yes, Your Honor.  Thank you.  Another

17  question.

18          THE COURT:  (Indecipherable.)

19          MR. MAYA:  The style of this motion, does it need

20  to have a notice of motion or anything like that, or can we

21  just get straight into the issues?

22          THE COURT:  Just get straight into the issues.

23          MR. MAYA:  Great.

24          THE COURT:  And I would like -- I would like,

25  because, Mr. Maya, you guys are going to get the extra five

1  pages in reply, just to lift out the issues presented and the

2  definition of "family group" in conjunction with -- if you

3  could discuss that matter with defendants, that would be very

4  helpful.

5          MR. MAYA:  Got it, Your Honor.

6          THE COURT:  Okay.

7          Ms. Ellison, is that agreeable to defense?

8          MS. ELLISON:  Yes, Your Honor.

9          THE COURT:  Very good.  Thank you, both, for your

10  patience and for educating me.  I appreciate it, and I look

11  forward to your briefing.  Have a great week.

12          MS. ELLISON:  Thank you, Your Honor.

13          THE COURT:  All right.  Thank you.

14          MR. MAYA:  Thank you, Your Honor.

15          THE COURT:  Bye.

16      (Proceedings adjourned at 2:09 p.m.)

17  ///

18  ///

19

20

21

22

23

24

25

1

2

3

4                                        CERTIFICATE

5           I certify that the foregoing is a correct transcript

6      from the electronic sound recording of the proceedings in the

7      above-entitled matter.

8

9      /s/ Julie Messa                    April 9, 2019
       Julie Messa, CET**D-403            Date
10     Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25