# EXHIBIT A

Korey A. Nelson (admitted *pro hac vice*)
knelson@burnscharest.com
Lydia A. Wright (admitted *pro hac vice*)
lwright@burnscharest.com
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765

Counsel for Plaintiffs
***Additional Counsel on Signature Page.***

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### EASTERN DIVISION

| | |
|---|---|
| **RAUL NOVOA**, **JAIME CAMPOS FUENTES**, **ABDIAZIZ KARIM**, and **RAMON MANCIA**, individually and on behalf of all others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> **THE GEO GROUP, INC.**, <br><br> *Defendant*. | Civil Action No. 5:17-cv-02514-JGB-SHKx <br><br> **THIRD AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES** |

## PRELIMINARY STATEMENT

1.     This action arises from systematic and unlawful wage theft, unjust enrichment, and forced labor at one of the nation's largest and deadliest civil

1

immigration detention facilities, California's Adelanto ICE Processing Center ("Adelanto" or the "Adelanto Facility"), and extending to nearly every immigration detention facility operated by Defendant the GEO Group, Inc. ("GEO").

2.     Adelanto is a civil immigration detention center owned and operated for profit by GEO.

3.     GEO is a multibillion-dollar corporation that owns and operates detention facilities around the world, including at least fourteen civil immigration detention centers in the United States. GEO has made billions in revenue from its contracts with United States Immigrations and Customs Enforcement ("ICE") to operate these facilities.

4.     Although it is contractually required to provide for all essential detention services at Adelanto, GEO uses free or nearly-free labor of civilly detained immigrants to perform those services in order to maximize profits.

5.     GEO pays detained immigrants just $1 per day, or nothing at all, to maintain and operate Adelanto.

6.     This labor is not voluntary in any meaningful sense. GEO maintains a corporate policy and uniform practice at Adelanto of withholding necessary care from its detainees to ensure a ready supply of available labor needed to operate the Facility. As a result, detainees are forced to submit to GEO's $1 per day scheme in order to buy the basic necessities – including food, water, and hygiene products – that GEO refuses to provide for them.

2

7.     In at least fourteen of its immigration detention centers nationwide, including Adelanto, GEO requires detained immigrants to perform uncompensated janitorial and maintenance work under threat of solitary confinement and criminal prosecution. This uncompensated labor is neither required nor permitted by ICE's Performance-Based National Detention Standards ("PBNDS") or GEO's contracts with ICE.

8.     GEO maintains a corporate policy and uniform practice at its civil immigration detention centers, including Adelanto, of threatening detainees who refuse to work with disciplinary segregation or solitary confinement, reporting their actions to ICE, or referring them for criminal prosecution. These abusive practices and threats of serious harm ensure that detained immigrants will continue working for subminimum wages or nothing at all, thus unlawfully enhancing GEO's profit margins.

9.     Pursuant to GEO's policies and practices at nearly every civil immigration detention facility the company operates, detained immigrants face an impossible choice: either perform uncompensated labor under threat of serious harm, or "volunteer" to work for GEO for between $1 and $4 per day.

10.    GEO significantly reduces its labor costs and expenses, and increases its already vast profits, by unlawfully forcing and coercing detained immigrants to perform labor at subminimum wages.  These policies and practices violate California minimum wage law, the California Unfair Competition Law, the California common law of unjust

enrichment, and the California and federal Trafficking Victims Protection Acts, which prohibit forced labor.

11. Plaintiffs Raul Novoa, Jaime Campos Fuentes, Abdiaziz Karim, and Ramon Mancia, individually and on behalf of all others similarly situated, bring this class action lawsuit to stop the economic exploitation of detained immigrants in GEO's care, to recover unpaid wages, and to remedy the unjust enrichment resulting from GEO's unlawful failure to pay its detainee workforce legal wages.

## **JURISDICTION AND VENUE**

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Trafficking Victims Protection Act, 18 U.S.C. §§ 1589 *et seq.*

13. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one defendant; there are more than 100 class members; the aggregate amount in controversy exceeds $5,000,000; and minimal diversity exists.

14. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to the claims occurred in this District.

15. This Court has personal jurisdiction over GEO because the corporation regularly conducts business in California and has sufficient minimum contacts with California.

PLAINTIFFS' THIRD AMENDED COMPLAINT                    5:17-cv-02514-JGB

16.   Plaintiffs request that this Court exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over their state law claims arising under the California Minimum Wage Order, the California Unfair Competition Law, and California common law.

## PARTIES

17.   Plaintiff Raul Novoa is an adult resident of Los Angeles, California. He is a lawful permanent resident with longstanding family and community ties in the Los Angeles area. From 2012 through 2015, Mr. Novoa was detained at the Adelanto Facility. During those three years, he was employed by GEO as a janitor and a barber. He was paid only $1 per day for his labor, regardless of how many hours he worked.

18.   Plaintiff Jaime Campos Fuentes is an adult resident of Inglewood, California. He is a citizen of El Salvador and is seeking asylum in the United States. From approximately December 2016 through January 2018, Mr. Campos was detained at the Adelanto Facility. During that period, he was employed by GEO as a janitor and maintenance worker. He was paid only $1 per day for his labor – or nothing at all – regardless of how many hours he worked. Sometimes, he worked in exchange for extra portions of food. Mr. Campos Fuentes has also performed uncompensated labor for GEO under threat of serious harm.

19.   Plaintiff Abdiaziz Karim is an adult citizen of Somalia who is seeking asylum in the United States. Mr. Karim entered the Adelanto Facility as a civil

5

immigration detainee on or around August 22, 2017 and is currently detained there. Mr. Karim is employed by GEO as a porter or janitor. He is paid only $1 per day for his labor – or nothing at all – regardless of how many hours he works. Mr. Karim has also performed uncompensated labor for GEO under threat of serious harm.

20.    Plaintiff Ramon Mancia is an adult resident of Los Angeles, California. He is a citizen of El Salvador with longstanding family and community ties in the Los Angeles area. Mr. Mancia entered the Adelanto Facility as a civil immigration detainee on or around April 2019 and is currently detained there. Mr. Mancia is currently employed by GEO as a kitchen worker. He is paid only $1 per day for his labor – or nothing at all – regardless of how many hours he works. Mr. Mancia has also performed uncompensated labor for GEO under threat of serious harm.

21.    Defendant GEO is a for-profit multinational corporation providing correctional, detention, and community reentry services. GEO is a Florida corporation, with its principal office located at 624 NW 53rd Street, Suite 700, Boca Raton, Florida 33487. GEO is organized as a Real Estate Investment Trust ("REIT") business entity under federal tax laws.

## FACTUAL ALLEGATIONS

### A.    Immigration detention is civil—not criminal.

22.    Each year, hundreds of thousands of individuals are detained in geographically isolated immigration detention facilities while awaiting immigration or

6

citizenship status determinations. These detainees include U.S. citizens, lawful permanent residents (green card holders) with longstanding family and community ties, survivors of torture, asylum seekers, victims of human trafficking, children, and pregnant women.

23.     Some detainees, like Mr. Novoa and Mr. Mancia, were brought to the United States as children. And thousands ultimately have their United States citizenship or legal residency affirmed by an immigration court or federal judge.

24.     Immigration violations are civil violations, and immigration detention is civil in nature.[1] Many detainees have no criminal history at all.

25.     Notwithstanding immigration detention's civil nature and purpose, detainees are often subjected to prison-like conditions. According to Dora Schriro, former head of ICE's Office of Detention Policy and Planning, most detainees are held – systematically and unnecessarily – under circumstances inappropriate for immigration detention's noncriminal purposes.[2]  Detained immigrants are frequently subjected to punitive and long-term solitary confinement, inadequate medical care, sexual and physical assault, and other harsh conditions of confinement.[3]

---

[1] *See Fong Yue Ting v. United States*, 149 U.S. 698, 728–30 (1893) (observing that deportation proceedings have "all the elements of a civil case" and are "in no proper sense a trial or sentence for a crime or offense").

[2] Dora Schriro, U.S. Dep't of Homeland Sec., Immigration Detention Overview and Recommendations 10, 15 (2009).

[3] *See King v. County of Los Angeles*, 885 F.3d 548 (9th Cir. 2018).

PLAINTIFFS' THIRD AMENDED COMPLAINT                                  5:17-cv-02514-JGB

26.     Many detained immigrants submit to deportation simply to obtain release from these intolerable conditions, even when they have valid claims to remain in the United States, including claims to asylum or other discretionary relief.

**B.     The privatization of immigration detention and GEO's economic windfall.**

27.     Immigration detention expanded roughly eightfold over the past two decades, from a capacity of 5,532 detention beds in 1994[4] to a current capacity of over 41,000.[5]

28.     During the same period, GEO and other private prison corporations have spent tens of millions of dollars on lobbying efforts.[6]

29.     As immigration detention has expanded, private prison corporations, particularly GEO, have gained an increasing share of the contracts for new detention beds.[7]

---

[4] Sharita Gruber, How For-Profit Companies are Driving Immigration Detention Policies, Center for American Progress (Dec. 18, 2015), *available at* https://www.americanprogress.org/issues/immigration/reports/2015/12/18/127769/how-for-profit-companies-are-driving-immigration-detention-policies/

[5] Jenny Jarvie, "This industry stands to benefit from Trump's crackdown on the border," Los Angeles Times (Feb. 14, 2017) *available at* http://www.latimes.com/nation/la-na-immigrant-detention-20170214-story.html;

[6] Michael Cohen, How for-profit prisons have become the biggest lobby no one is talking about, Washington Post (Apr. 28, 2015), *available at* https://www.washingtonpost.com/posteverything/wp/2015/04/28/how-for-profit-prisons-have-become-the-biggest-lobby-no-one-is-talking-about/?utm_term=.25de04ae71f9

[7] Bethany Carson & Eleana Diaz, Payoff: How Congress Ensures Private Prison Profit with an Immigrant Detention Quota, Grassroots Leadership (Apr. 2015) at 4, Chart 1-A[A], *available at* https://grassrootsleadership.org/sites/default/files/reports/quota_report_final_digital.pdf

8

30.     Contracts with ICE accounted for 23.1% of GEO's revenues in 2016, up from 17.7% in 2015.[8] GEO officials expect these lucrative ICE contracts to account for a significant percentage of the corporation's ongoing revenues.[9]

31.     GEO's revenues in 2016, 2017, and 2018 were over $2 billion, and its stock is publicly traded on the New York Stock Exchange.

32.     GEO's economic windfall, and the profitability of its immigration detention enterprise, arises from its policy of systemically withholding necessary case from detainees to ensure a readily available, captive labor force that cleans, maintains, and operates its facilities for sub-minimal wages under threat of serious harm and abuse of legal process. Without this nearly free detainee labor, GEO's windfall from immigrant detention would be substantially decreased.

33.     As a result of its REIT structure and increasing moves by lending institutions away from extending credit to the private prison industry, GEO depends on the free and nearly free labor of detained immigrants to meet its projected revenues.

## C.     GEO withholds necessary care from detainees at the Adelanto Facility.

34.     Since 2011, GEO has contracted with ICE to operate the Adelanto Facility, which is a 1,940-bed immigration detention facility in Adelanto, California. More than 73,000 people have passed through the Facility.

---

[8] The GEO Group, Inc., 2017 10-K form at 36, available at http://www.snl.com/Cache/c38242453.html.
[9] *Id.*

PLAINTIFFS' THIRD AMENDED COMPLAINT                                    5:17-cv-02514-JGB

35.     Adelanto is notorious for its poor treatment of detainees.

36.     For example, in November 2011, shortly after Adelanto opened, an ICE annual review found that the Facility's "medical officials were not conducting detainee health appraisals within 14 days of arrival, and registered nurses were performing health assessments" without proper training or certification.[10]

37.     Ten months later, ICE's Office of Detention Oversight found that Adelanto officials often delay responding to detainee requests for medical care and fail to promptly review medical records.[11] That report also said that the death of a detainee in March 2012 resulted from "egregious errors" by medical staff and could have been prevented.

38.     In 2014, the Office of Detention Oversight found Adelanto deficient in 26 competency areas, including 16 related to the Facility's efforts to prevent and intervene in sexual abuse.[12]

39.     In 2015, more than two dozen members of Congress wrote a letter to the U.S. Justice Department and ICE officials expressing concerns about reports of

---

[10] https://www.ice.gov/doclib/foia/odo-compliance-inspections/adelantoCorrectionalFac_Adelanto-CA-Sept_18-20-2012.pdf
[11] *Id.*
[12] U.S. Immigration and Customs Enforcement, Office of Professional Responsibility, Office of Oversight Detention, "Compliance Inspection," (July 2014), *available at* https://www.ice.gov/doclib/foia/odo-compliance-inspections/2014AdelantoJuly.pdf

PLAINTIFFS' THIRD AMENDED COMPLAINT                    5:17-cv-02514-JGB

medical neglect at the Facility.[13] That same year, 26 detainees resorted to a two-week

hunger strike to protest GEO's failure to provide adequate care there.[14]

40.     The Adelanto Facility was called "the deadliest detention center of 2017"

by immigrant rights activists because more detainees died there than in any other

detention center in the United States that year.[15]

41.     A peer-reviewed study released in 2017 found that detainees held six

months or more at Adelanto experienced lower likelihoods of receiving any in-person

visitation with their children, as well as fewer total visits.[16]

42.     In 2018, the Department of Homeland Security Office of Inspector

General ("OIG") conducted an unannounced visit of the Adelanto Facility and found

nooses made of braided bedsheets hanging from vents in 15 of the 20 cells they

inspected.[17] OIG also reported that detainees were inappropriately segregated from

---

[13] Kate Linthicum, "Citing neglect, lawmakers urge halt to migrant detention center expansion," Los Angeles Times (July 14, 2015), *available at* http://beta.latimes.com/local/lanow/la-me-ln-adelanto-immigrant-detention-20150713-story.html

[14] Kate Linthicum, "Immigrants end hunger strike at Adelanto detention facility," Los Angeles Times (Nov. 16, 2015), *available at* http://beta.latimes.com/local/lanow/la-me-ln-adelanto-hunger-strike-ends-20151116-story.html

[15] Detention Watch Network, "Third Death in Immigration Detention Makes the Adelanto Detention Center the Deadliest Facility in 2017," (June 2, 2017), *available at* https://www.detentionwatchnetwork.org/pressroom/releases/2017/third-death-immigration-detention-makes-adelanto-detention-center-deadliest

[16] Caitlin Patler and Nicolas Branic, "Patterns of Family Visitation During Immigration Detention," RSF: The Russell Sage Foundation Journal of the Social Sciences, vol. 3 no. 4 18-36 (July 2017) *available at* https://www.rsfjournal.org/content/3/4/18.

[17] Department of Homeland Security, Office of Inspector General, "Management Alert – Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California," (Sept. 7, 2019) *available at* https://www.oig.dhs.gov/sites/default/files/assets/Mga/2018/oig-18-86-sep18.pdf

others without a disciplinary hearing and that that detainees did not have access to medical or dental care in a timely fashion, which OIG concluded was responsible for three deaths since 2015.

43.     Despite this track record, GEO maintains a corporate policy and uniform practice of withholding sufficient food, water, and hygiene products from the immigrants detained at Adelanto. As a result, detained immigrants are forced to either purchase these daily necessities from the Facility's commissary or go without.

44.     By maintaining these harsh conditions and purposely withholding basic necessities from detainees, GEO ensures an available labor pool of detainees will work for only $1 per day, thus allowing it to continue operating the Adelanto Facility at an enormous profit.

**D.     GEO uses detained immigrants to clean, maintain, and operate the Adelanto Facility.**

45.     Through its so-called Voluntary Work Program (the "Work Program"), GEO hires detainees at Adelanto to perform work that directly contributes to institutional operations, at a rate of $1 per day.

46.     GEO pays detainees participating in the Work Program more than $1 per day for their labor at some of the company's other civil immigration detention centers.

47.     Despite its name, the Work Program is not "voluntary." Instead, GEO maintains a corporate policy and uniform practice at the Adelanto Facility of withholding necessary care from its detained immigrants. As a result, detained immigrants are forced

to submit to GEO's $1 per day scheme in order to buy necessities – including food, water, and hygiene products – that GEO refuses to provide for them.

48.     GEO also operates an "Uncompensated Work Program" at Adelanto. Under the Uncompensated Work Program, detained immigrants complete a job application for a position in the Work Program, but must work for an arbitrary period of time – months, in some cases – for no compensation before they are officially hired into the Work Program and begin to receive $1 per day for their labor.

49.     The Uncompensated Work Program is distinct from the Work Program because GEO does not pay detained immigrants in the Uncompensated Work Program for their labor.

50.     In both the Work Program and the Uncompensated Work Program, detained immigrants are required to work according to an assigned work schedule and to participate in work-related training. At all times, GEO controls workers' wages, hours, and working conditions.

51.     In both the Work Program and the Uncompensated Work Program, GEO provides all necessary personal protection equipment and work uniforms. For example, kitchen workers are provided with and required to wear a white top/bottom uniform with a white apron, rubberized work boots, beard guards and hairnets, and freezer jackets and gloves as needed.

PLAINTIFFS' THIRD AMENDED COMPLAINT                                    5:17-cv-02514-JGB

52.     In both the Work Program and the Uncompensated Work Program, GEO tracks the hours detained immigrants work.

53.     In the Work Program only, GEO periodically credits wages to detainee workers' commissary accounts.

54.     GEO refers to detainee workers participating in both the Work Program and the Uncompensated Work Program as "employees."

55.     Detainee workers participating in both the Work Program and the Uncompensated Work Program are "employees" under California's minimum wage laws.

56.     GEO is an "employer" under California's minimum wage laws.

57.     GEO informs all detained immigrants entering the Adelanto Facility that the following work assignments may be available through the Work Program and the Uncompensated Work Program:

      a.   Intake

      b.   Kitchen Worker

      c.   Recreation

      d.   Library

      e.   Barber

      f.   Laundry

      g.   Living area clean-up/janitorial

PLAINTIFFS' THIRD AMENDED COMPLAINT                                      5:17-cv-02514-JGB

h.  Evening workers (facility janitorial)

i.  Maintenance

58.     In the course of their labor and employment by GEO, detained immigrants employed in the Work Program and the Uncompensated Work Program perform a wide range of work, including but not limited to:

a.  Scrubbing bathrooms, showers, toilets, and windows;

b.  Cleaning and maintaining GEO's on-site medical facility;

c.  Cleaning patient rooms and medical staff offices;

d.  Sweeping, mopping, stripping, and waxing floors throughout the facility;

e.  Washing detainee laundry;

f.  Preparing, cooking, and serving detainee meals;

g.  Washing dishes;

h.  Cleaning the kitchen and cafeteria before and after detainee meals;

i.  Performing clerical work for GEO;

j.  Running and managing the law library;

k.  Providing barber services to detainees;

l.  Cleaning intake areas and solitary confinement units; and

m.  Cleaning and maintaining recreational areas.

59.     The Work Program and the Uncompensated Work Program allow GEO to avoid recruiting from the traditional labor market, complying with the terms of its

15

union contracts, and paying all costs associated with potential, current, and former employment relationships, thereby reducing operational costs and increasing its own profits.

60.     GEO maintains the ability to hire and fire detained immigrant workers in both the Work Program and the Uncompensated Work Program.

61.     GEO does not pay and has not paid detained immigrant workers the state minimum wage – currently, $12 per hour – for the hours they worked at Adelanto.

62.     GEO's contract with ICE requires GEO to comply with all federal, state, and local laws.

63.     No clause in GEO's contract with ICE or any rule or standard incorporated by reference into the contract requires GEO to maximize its profits by paying detainees subminimum wages or nothing at all.

64.     GEO maintains a corporate policy and uniform practice at Adelanto of threatening to place detainees who refuse to work into solitary confinement. These conditions, policies, and practices ensure that detainees continue working for subminimum wages.

65.     GEO's pay policies violate California's minimum wage laws.

**E.    GEO secures free detainee labor at nearly all of its civil immigration detention centers nationwide through systematic threats of serious harm.**

66.     GEO owns or operates at least fourteen civil immigration detention centers nationwide, including Adelanto, under contracts with ICE.

67.    At each facility, GEO is contractually required to comply with some version of ICE's 2011 PBNDS.

68.    GEO's contracts with ICE to operate civil immigration detention facilities, including Adelanto, incorporate the PBNDS.

69.    All applicable versions of the PBNDS require any labor performed by a detained immigrant to be voluntary: "Work assignments are voluntary; however all detainees are responsible for personal housekeeping." PBNDS § 5.8.V.C.

70.    The Personal Housekeeping Requirement, PBNDS § 5.8.V.C, provides:[18]

> **C. Personal Housekeeping Required**
>
> Work assignments are voluntary; however, all detainees are responsible for personal housekeeping.
>
> *Detainees are required to maintain their immediate living areas in a neat and orderly manner by:*
>
> *1. making their bunk beds daily;*
>
> *2. stacking loose papers;*
>
> *3. keeping the floor free of debris and dividers free of clutter; and*
>
> *4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture.*

71.    Outside of the four personal housekeeping tasks enumerated in PBNDS § 5.8.V.C, GEO cannot force or compel civil immigration detainees to work.

72.    However, in violation of the PBNDS, its contracts with ICE, and the California and federal forced labor statutes, GEO promulgates and enforces corporate

---

[18] *Available at* https://www.ice.gov/doclib/detention-standards/2011/5-8.pdf (last visited Aug. 14, 2019).

PLAINTIFFS' THIRD AMENDED COMPLAINT                           5:17-cv-02514-JGB

policies known as Housing Unit Sanitation Policies ("HUSPs") at nearly all of its civil immigration detention facilities, including Adelanto.

73. GEO's HUSPs require detained immigrants to perform a wide range of completely uncompensated work for the company's enrichment.

74. Under the HUSPs, detained immigrants are forced to perform uncompensated labor, such as cleaning and maintaining areas of its facilities that are outside the scope of the Personal Housekeeping Requirement, PBNDS § 5.8.V.C. For instance, the HUSPs require detained immigrants to clean and sanitize walls, bathrooms, showers, toilets, microwaves, furniture, windows and floors—work well outside the four personal housekeeping tasks enumerated in PBNDS  § 5.8.V.C.

75. Detained immigrants do not perform labor under the HUSPs as part of the ICE-sanctioned Work Program.

76. Detained immigrants are not paid to perform labor under the HUSPs.

77. The work required by the HUSPs is outside the scope of the four specified personal housekeeping tasks articulated by ICE in PBNDS § 5.8.V.C.

78. At Adelanto and nationwide, GEO obtains compliance with its HUSPs by detained immigrants with serious harm, including actual or threatened physical restraint, physical assault such as pepper spray or use of force, deprivation of legally required services such as recreation, law library, and telephone time; solitary confinement, and

abuse of legal process, including reporting misbehavior to ICE or to the immigration court, and even criminal prosecution.

79.     The Detainee Handbooks provided to each detained immigrant during intake at GEO's facilities across the country classifies "[r]efusal to clean assigned living area" as a 300-level "High Moderate" offense punishable by, *inter alia*, up to 72 hours in disciplinary restriction (also known as solitary confinement) or even criminal prosecution.

80.     The Detainee Handbooks also threaten solitary confinement for disobeying guards and refusing to comply with corporate facility policies.

81.     Detained immigrants thus have no meaningful choice but to comply with a demand from a GEO official to perform free labor.

82.     The HUSPs are GEO-created corporate policies.

83.     Detained immigrants at nearly all GEO immigration detention centers are notified when they enter the facility of GEO's requirement that they must perform uncompensated, non-personal cleaning and maintenance work, and that the consequence of refusal can be disciplinary action, including solitary confinement.

84.     In addition to the text of the HUSPs themselves, GEO employs a false binary of so-called "Rights and Responsibilities" in its corporate, facility-specific Detainee Handbooks in which GEO informs detained immigrants in English and Spanish (but no other languages) that they have a "right" to participate in a work

program as far as resources are available, but also a corresponding "responsibility" to take advantage of activities which may help them live a successful and law-abiding life within the facility and in the community" and to abide by the regulations governing these programs.

85.     Taken together with the HUSPs, GEO's facility-specific local Detainee Handbooks are intended to leave detained immigrants with the false impression that the company can compel them to perform work outside the four personal housekeeping tasks set forth in Section 5.8.V.C of the PBNDS.

86.     No clause in GEO's contracts with ICE or any rule or standard incorporated by reference therein permits GEO to compel or force detainees to work for free at Adelanto or any other GEO civil immigration detention facility.

87.     GEO's contracts with ICE incorporating the PBNDS expressly prohibit the company from forcing, coercing, or mandating detainees to complete work assignments that fall outside the scope of the personal housekeeping requirement, PBNDS § 5.8.V.C.

88.     As a federal contractor, GEO is also prohibited by Executive Order, the Federal Acquisition Regulations, and Homeland Security Acquisition Regulations from using forced labor in the performance of its contracts with ICE.

PLAINTIFFS' THIRD AMENDED COMPLAINT                                    5:17-cv-02514-JGB

89.     GEO must promptly report allegations of forced labor made against the corporation to the federal government, regardless of whether it contests those allegations.

90.     On information and belief, GEO has not complied with the requirement that it promptly report allegations of forced labor made by Plaintiffs in this action to the federal government.

91.     By carrying out a scheme requiring detained immigrants to perform uncompensated janitorial and maintenance work pursuant to corporate HUSPs and under threat of serious harm, GEO violates the federal forced labor statute. 18 U.S.C. § 1589.

**F.      Plaintiff Raul Novoa's individual allegations.**

92.     Mr. Novoa is citizen of Mexico and a legal permanent resident of the United States. He has lived in Los Angeles since age four.

93.     Mr. Novoa is employed by a commercial construction company to complete roofing, tiling, drywalling, and framing projects. He currently earns more than $15 per hour.

94.     Mr. Novoa was detained at the Adelanto Facility from June 2012 through February 2015.

95.     Mr. Novoa performed work for GEO at the Adelanto Facility and was not paid the state minimum wage for that work.

21

96.     As a janitor, Mr. Novoa worked in a five-person crew to clean windows, floors, showers, bathrooms, and communal areas in the Facility. He worked four-hour shifts, up to seven days per week. He used cleaning supplies and equipment provided by GEO.

97.     As a barber, Mr. Novoa provided haircutting services to other detained immigrants. He worked up to 10 hours per day, seven days per week. He used barber supplies and equipment provided by GEO.

98.     In return for this labor, GEO paid Mr. Novoa $1 per day, regardless of the number of hours he worked. GEO credited these wages to Mr. Novoa's commissary account.

99.     GEO withheld daily necessities from Mr. Novoa, thereby forcing him to work for subminimum wages in order to buy those daily necessities for himself and avoid serious harm, including, but not limited to, malnutrition, unsanitary living quarters, extreme isolation, and unhygienic conditions of confinement.

100.    During his detention, Mr. Novoa was often undernourished and dehydrated because GEO withheld sufficient food and water. He was also served rotten meat, moldy bread, and inedible produce.

101.    The drinking water provided by GEO ran black for days at a time and caused nausea or headaches if ingested.

PLAINTIFFS' THIRD AMENDED COMPLAINT                                    5:17-cv-02514-JGB

102.   Mr. Novoa lost approximately 30 pounds in detention at the Adelanto Facility.

103.   In order to survive, Mr. Novoa purchased food and water from the commissary using his wages from the Work Program.

104.   GEO did not provide Mr. Novoa with sufficient quantities of shampoo, lotion, or soap. As a result, Mr. Novoa was often forced to purchase those necessities from the commissary using his wages from the Work Program.

105.   On several occasions, Mr. Novoa developed a blistering sunburn on his face. GEO did not provide him with sunscreen, even after he requested it from medical personnel.  Instead, Mr. Novoa was forced to purchase sunscreen from the commissary using his wages form the Work Program.

106.   The shoes issued to Mr. Novoa when he arrived at the Adelanto Facility fell apart within his first week in detention. GEO did not replace them. Instead, Mr. Novoa was forced to purchase another pair of shoes from the commissary using his wages from the Work Program.

107.   Mr. Novoa spent his wages on soap, shampoo, lotion, sunscreen, food, clean drinking water, shoes, and other necessities. These items were not provided to Mr. Novoa regularly or in sufficient quantities. Some of these necessities, like sunscreen, were not provided to Mr. Novoa at all.

PLAINTIFFS' THIRD AMENDED COMPLAINT                    5:17-cv-02514-JGB

108.   Officers threatened to put Mr. Novoa in disciplinary segregation, *i.e.*, solitary confinement, if he stopped working, encouraged other detainees to stop working or complained about subminimum wages.

109.   On several occasions, officers threatened to or actually forced Mr. Novoa to move to a different dorm – isolated from his peers and friends – after he complained about the Work Program, subminimum wages and/or the deprivation of necessities at the Adelanto Facility.  During these transfers, officers would "toss" Mr. Novoa's dorm by throwing his belongings and papers in disarray. As a result of these actions, Mr. Novoa felt harassed, intimidated, threatened, and embarrassed.

110.   Officers threatened to segregate detainees who complained about the Work Program, working conditions, and/or subminimum wages.

111.   From his review of the Detainee Handbook and experience as a detained immigrant at Adelanto, Mr. Novoa understood that detainees who disobeyed GEO officials or refused to clean could be subject to disciplinary action, including solitary confinement.

112.   If given a meaningful choice, Mr. Novoa would not have worked for $1 per day.

113.   GEO falsely led Mr. Novoa to believe the corporation could not pay him more than $1 per day, despite the fact that it does so as a matter of course at several of its other immigration detention facilities.

PLAINTIFFS' THIRD AMENDED COMPLAINT                                         5:17-cv-02514-JGB

114. Mr. Novoa provided GEO with his labor because GEO's threats of serious harm and/or abuse of the legal process if he refused to work.

115. GEO retained the value of Mr. Novoa's labor by realizing this value as corporate profits, rather than using it to provide for safer, more humane living conditions for detainees at the Adelanto Facility.

**G.   Plaintiff Jaime Campos Fuentes' individual allegations.**

116. Mr. Campos Fuentes is citizen of El Salvador and is seeking asylum in the United States.

117. Mr. Campos Fuentes was detained at the Adelanto Facility from December 2016 through January 2018.

118. Mr. Campos Fuentes has performed work for GEO at the Adelanto Facility and was not paid the state minimum wage for the work he has performed.

119. As a janitor, Mr. Campos Fuentes worked in a five-person crew to clean windows, floors, showers, bathrooms, and communal areas in the Facility. He worked three-hour shifts, up to seven days per week. He sometimes worked multiple shifts in a single day. He used cleaning supplies and equipment provided by GEO.

120. As a laundry worker, Mr. Campos Fuentes worked to sort, wash, dry, and fold clothing and bedding used by detainees and in Facility operations. He worked three-hour shifts, up to five days per week. He used supplies and equipment provided by GEO.

PLAINTIFFS' THIRD AMENDED COMPLAINT                     5:17-cv-02514-JGB

121.    In return for this labor, GEO paid Mr. Campos Fuentes $1 per day, regardless of the number of hours he worked. GEO credited these wages to Mr. Campos Fuentes's commissary account.

122.    Sometimes, Mr. Campos Fuentes was not paid for his labor. Instead, he was given extra portions of food or nothing at all.

123.    GEO officials routinely required detainees to clean the common spaces and bathrooms of the housing units for no compensation. For example, GEO officials required Mr. Campos Fuentes to clean bathrooms, showers, floors, sinks, microwaves, and furniture in his housing unit for free.

124.    Mr. Campos Fuentes observed GEO officials threaten to lock detainees in their cells, suspend their attorney and personal visits, and prohibit them from interacting with other detained immigrants if they refused to clean areas of the Adelanto Facility for free.

125.    From his review of the Detainee Handbook and experience as a detained immigrant at Adelanto, Mr. Campos Fuentes understood that detainees who disobeyed GEO officials or refused to clean were subject to disciplinary action, including solitary confinement.

126.    Mr. Campos Fuentes spent his wages on food, medicine, clothing, soap, and shampoo from the Adelanto commissary, among other necessities.

26

127.    GEO withheld daily necessities from Mr. Campos Fuentes, thereby forcing him to work for subminimum wages in order to buy those daily necessities for himself and avoid serious harm, including, but not limited to, malnutrition, unsanitary living quarters, extreme isolation, and unhygienic conditions of confinement.

128.    During his detention, Mr. Campos Fuentes was often undernourished and dehydrated because GEO withheld sufficient food and water. He was also served rotten meat, moldy bread, and inedible produce.

129.    In order to survive, Mr. Campos Fuentes purchased food and drink from the commissary using his wages from the Work Program.

130.    GEO did not provide Mr. Campos Fuentes with sufficient quantities of shampoo, lotion, or soap. As a result, Mr. Campos Fuentes was often forced to purchase those necessities from the commissary using his wages from the Work Program.

131.    If given a meaningful choice, Mr. Campos  Fuentes would not have worked for $1 per day or for free.

132.    GEO falsely led Mr. Campos Fuentes to believe the corporation could not pay him more than $1 per day, despite the fact that it does so as a matter of course at several of its other immigration detention facilities.

133.    Mr. Campos provided GEO with his labor because GEO threatened him with serious harm and/or abuse of the legal process if he refused to work.

PLAINTIFFS' THIRD AMENDED COMPLAINT                                5:17-cv-02514-JGB

134.    GEO retained the value of Mr. Campos Fuentes's labor by realizing this value as corporate profits, rather than using it to provide for safer, more humane living conditions for detainees at the Adelanto Facility.

**H.    Plaintiff Abdiaziz Karim's individual allegations.**

135.    Mr. Karim is citizen of Somalia and is seeking asylum in the United States.

136.    Mr. Karim entered the Adelanto Facility as a civil immigration detainee in or around August 2017 and is currently detained there.

137.    Mr. Karim has performed work for GEO at the Adelanto Facility and has never been paid the state minimum wage for the work he has performed.

138.    As a porter, Mr. Karim currently works in a five to seven-person crew to clean windows, floors, showers, and communal areas in the Adelanto Facility. He works up to seven days per week. He uses cleaning supplies and equipment provided by GEO, and is supervised by GEO employees.

139.    Mr. Karim is currently paid $1 per day for his labor as a porter. However, he was not paid at all during his first three months on the job.

140.    During that period, GEO officials required him to work for free before he would be hired into the Work Program.

141.    Similarly, Mr. Karim was not paid for his labor as a porter from approximately mid-May through July of 2018.

142.   During those months, GEO officials again required him to work without compensation.

143.   Mr. Karim has previously worked in the kitchen at the Adelanto Facility. As a food service worker, he prepared food, served meals, cleaned the kitchen and dining halls, and washed dishes. He worked from approximately 2:00 a.m. until 8:00 a.m., up to seven days per week, for about one month.  He used supplies and equipment provided by GEO, and was supervised by GEO employees.

144.   Mr. Karim was only paid approximately $1 total – not daily – for his labor in the kitchen. He was told by GEO officials that he had to work for free before he would be paid through the Work Program.

145.   On multiple occasions, GEO officials have ordered Mr. Karim and other detained immigrants to clean various areas of the Adelanto Facility, including hallways, the visitation area, the kitchen, and the yard, for no compensation.

146.   For example, GEO officials routinely require detained immigrants to clean the common spaces and showers of Mr. Karim's housing unit for no compensation. If detainees refuse to clean for free, GEO officials prohibit all detained immigrants in the housing area from using the telephones or the showers, and evacuate the day room. When this happens, detained immigrants must remain in their cells or bunks until a detained immigrant "volunteers" to complete the sanitation and cleaning tasks that GEO has required.

PLAINTIFFS' THIRD AMENDED COMPLAINT                                    5:17-cv-02514-JGB

147.    GEO officials have threatened to take disciplinary action against Mr. Karim for refusing to clean areas of the Adelanto Facility for free. For example, in approximately August 2018, a GEO officer threatened to send Mr. Karim to solitary confinement for refusing to clean for no compensation. The same GEO officer "tossed" Mr. Karim's cell by throwing his belongings and papers in disarray, in full view of other detained immigrants. GEO was able to compel Mr. Karim to work for free because of this threatened and actual serious harm.

148.    On another occasion, a GEO official threatened to "write up" Mr. Karim unless he cleaned certain walls and light fixtures in the Adelanto Facility for free. GEO officials have told Mr. Karim that "write ups" will negatively impact his asylum case. GEO was able to compel Mr. Karim to work for free because of this threat of serious harm.

149.    GEO has knowingly obtained Mr. Karim's labor by causing him to believe that he would suffer serious physical or legal harm – including solitary confinement, transfer to a different housing unit, and harm to his legal case – if he refuses to work.

150.    Mr. Karim participates in the Work Program in order to buy daily necessities that GEO fails to provide for him. Mr. Karim spends his wages on food, vitamins, and deodorant from the Adelanto Facility commissary, among other necessities.

151.   GEO withholds daily necessities from Mr. Karim, thereby forcing him to work for subminimum wages in order to buy those necessities for himself and avoid serious harm, including, but not limited to, malnutrition, unsanitary living quarters, extreme isolation, and unhygienic conditions of confinement.

152.   Mr. Karim is often undernourished and dehydrated because GEO withholds sufficient food and water. He has been served dirty drinking water, rotten fruit, and undercooked chicken. Mr. Karim is rarely served fresh produce. As a result, he has lost muscle mass and hair, and often feels dizzy and weak.

153.   Mr. Karim fears that if he stops participating in the Work Program, he will not have access to sufficient daily necessities or nutrition.

154.   If given a meaningful choice, Mr. Karim would not work for $1 per day.

155.   Mr. Karim provides GEO with his labor because GEO officials threaten him with serious harm and/or abuse of the legal process if he refuses to work.

156.   GEO retained the value of Mr. Karim's labor by realizing this value as corporate profits, rather than using it to provide for safer, more humane living conditions for detainees at the Adelanto Facility.

I.   **Plaintiff Ramon Mancia's individual allegations.**

157.   Mr. Mancia is a resident of Los Angeles and a citizen of El Salvador.

158.   Mr. Mancia entered the Adelanto Facility as a civil immigration detainee in or around April 2019 and is currently detained there.

31

159.   Mr. Mancia has performed work for GEO at the Adelanto Facility and has never been paid the state minimum wage for the work he has performed.

160.   As a food service worker, Mr. Mancia works with a crew of approximately a dozen other detained immigrants to prepare food, serve meals, and clean the kitchen and dining halls. He works from approximately 9:00 a.m. until 3:00 p.m., up to seven days per week.  He uses cleaning supplies and equipment provided by GEO, and is supervised by GEO employees.

161.   Mr. Mancia is currently paid $1 per day for his labor in the kitchen.

162.   Mr. Mancia also works as a porter, but he is not paid for that work. Every day, Mr. Mancia collects trash and empty water jugs from each housing unit, and then refills and returns the water jugs. He works with a crew of two or three other detainees for approximately two hours per day, up to seven days per week. Mr. Mancia uses supplies and equipment provided by GEO, and is supervised by GEO officials.

163.   Mr. Mancia has never been compensated for his labor as a porter. Instead, GEO officials occasionally give him extra food or milk, in violation ICE's PBNDS and GEO's contracts with ICE. Sometimes, Mr. Mancia receives nothing at all for his work.

164.   Mr. Mancia has performed other uncompensated janitorial and maintenance work for GEO.

165.   For example, GEO officials have ordered Mr. Mancia to paint a dining hall, clean the medical unit, and clean the recreation yard. He has never been paid for that

PLAINTIFFS' THIRD AMENDED COMPLAINT                    5:17-cv-02514-JGB

work. Instead, GEO officials occasionally give Mr. Mancia extra food, batteries, or clothing for his labor. Other times, he receives nothing at all.

166. The uncompensated labor GEO ordered Mr. Mancia to perform often corresponded with impending site visits and inspections by auditors at Adelanto. To leave independent inspectors with a false impression of the state of the Facility and to head off any complaints about maintenance, sanitation, and upkeep that could result in adverse audit results, GEO routinely forced Mr. Mancia and other detained immigrants at Adelanto to perform uncompensated labor in advance of inspections.

167. Mr. Mancia participates in the Work Program in order to buy daily necessities that GEO fails to provide for him, including food and personal hygiene items.

168. GEO withholds daily necessities from Mr. Karim, thereby forcing him to work for subminimum wages in order to buy those necessities for himself and avoid serious harm, including, but not limited to malnutrition, unsanitary living quarters, extreme isolation, and unhygienic conditions of confinement.

169. GEO has knowingly obtained Mr. Mancia's labor by causing him to believe that he would suffer serious physical or legal harm, including solitary confinement, transfer to a different housing unit, and harm to his legal case, if he refuses to work.

170. From his review of the Detainee Handbook and experience as a detained immigrant at Adelanto, Mr. Mancia understands that detainees who disobey GEO

officials or refuse to clean can be subject to disciplinary action, including solitary confinement, reporting to ICE, or criminal prosecution.

171.   If given a meaningful choice, Mr. Mancia would not work for $1 per day or no money at all, as GEO has required him to do.

172.   GEO retained the value of Mr. Mancia's labor by realizing this value as corporate profits, rather than using it to provide for safer, more humane living conditions for detainees at Adelanto.

## CLASS ACTION ALLEGATIONS

173.   Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated under Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

A.   **Class Definitions**

174.   **The California Wage Class.** For Plaintiffs' claims arising under the California Labor Code and IWC Wage Order No. 5, the California Unfair Competition Law, and the common law of unjust enrichment, Plaintiffs seek to certify the following class:   All civilly detained immigrants who (i) were detained at the Adelanto ICE Processing Center any time between December 19, 2014 and the date of final judgment in this matter, and either (ii) participated in the Voluntary Work Program at any point during their detention, or (iii) performed work for no compensation in the

Uncompensated Work Program pending their participation in the Voluntary Work Program, or (iv) performed work for no compensation pursuant to the Adelanto Housing Unit Sanitation Policy (the "California Wage Class").

175. **The California Forced Labor Class.** For Plaintiffs' claim for forced labor arising under the California Trafficking Victims Protection Act, Plaintiffs seek to certify the following class: All civil immigration detainees who (i) were detained at the Adelanto ICE Processing Center any time between May 1, 2011 and the date of final judgment in this matter, and (ii) performed janitorial, maintenance, or other work at the Adelanto ICE Processing Center above and beyond the four personal housekeeping tasks enumerated in ICE PBNDS § 5.8.V.C (the "California Forced Labor Class").

176. **The Nationwide HUSP Class.** For Plaintiffs' claim for forced labor arising under the federal Trafficking Victims Protection Act, Plaintiffs seek to certify the following class: All civilly detained immigrants who (i) were detained at any civil immigration detention center owned or operated by GEO in the United States between December 19, 2007 and the date of final judgment in this matter, and (ii) performed janitorial, maintenance, or other work anywhere in any GEO civil immigration detention facility above and beyond the four personal housekeeping tasks enumerated in ICE PBNDS § 5.8.V.C (the "Nationwide HUSP Class").

177. Excluded from the definition of the Nationwide HUSP Class are the following: (1) individuals detained in GEO's family residential detention facility in

Karnes City, Texas; (2) individuals detained in the Alexandria Staging Facility in Alexandria, Louisiana; (3) any individual detained in the custody of the U.S. Marshalls or any other law enforcement agency at a GEO facility where the company also detains civil immigration detainees pursuant to contracts with ICE; and (4) civilly detained immigrants detainees held at the Aurora ICE Processing Center in Aurora, Colorado at any time before October 22, 2014.

178.   **The Adelanto Forced Labor Class.** For Plaintiffs' claim for attempted forced labor arising under the federal Trafficking Victims Protection Act, Plaintiffs seek to certify the following class: All civilly detained immigrants who (i) were detained at the Adelanto ICE Processing Center any time between May 1, 2011 and the date of final judgment in this matter, and (ii) participated in the Work Program or Uncompensated Work Program at any point during their detention. (The "Adelanto Forced Labor Class").

179.   Excluded from each class definition are the defendants, their officers, directors, management, subsidiaries, and affiliates, and all federal governmental entities. Plaintiffs reserve the right to revise the class definitions based upon information learned through discovery.

**B.   Class Certification Requirements under Rule 23**

180.   **Numerosity:  Rule 23(a)(1).** Each class is so numerous that joinder of all members is impracticable.  Plaintiffs do not know the exact size of the classes, since that

36

information is within the control of GEO. However, Adelanto can house up to 1,940 individuals, with a guaranteed minimum of 1,455 filled beds daily. Further, "the total number of participants in the Work Program at the Adelanto Facility since December 19, 2007 exceeds 1,000." ECF 45 at 6. With respect to the Nationwide HUSP Class, GEO's facilities house more than 10,000 civilly detained immigrants each night, all of whom are subject to the uncompensated labor requirements and corresponding threats of GEO's HUSPs and facility discipline policies. Accordingly, Plaintiffs allege that the number of class members for each class is numbered in the thousands. Membership in each class is readily ascertainable from GEO's detention and employment records.

181. **Commonality and Predominance:  Rules 23(a)(2) and 23(b)(3)**. There are numerous questions of law or fact common to each class, and those issues predominate over any question affecting only individual class members.

182. With respect to the California Wage Class, the common legal and factual issues include the following:

    a. Whether GEO is an "employer" and the detained immigrant workers are "employees" under the California Minimum Wage Law ("MWL");

    b. Whether Plaintiffs and California Wage Class Members are entitled to the protections of the California Minimum Wage Order;

    c. Whether Plaintiffs and California Wage Class Members performed compensable work;

    d. Whether Plaintiffs and California Wage Class Members were paid $1 per day for their labor;

e.  Whether GEO was unjustly enriched by paying subminimum wages to its detained immigrant workers;

f.  Whether GEO engaged in conduct that violated California law – including the California Minimum Wage Order, and the California Unfair Competition Law;

g.  Whether Plaintiffs and California Wage Class Members are entitled to equitable relief, including injunctive and declaratory relief; and

h.  Whether Plaintiffs and California Wage Class Members are entitled to damages and other monetary relief and, if so, in what amount.

183.    With respect to the California Forced Labor Class, common legal and factual issues include the following:

a.  Whether GEO unlawfully forces, coerces, or otherwise compels civil immigration detainees at Adelanto to work for no compensation;

b.  Whether GEO obtains detained immigrant labor through threats of serious harm  or abuse of legal process;

c.  Whether GEO's HUSPs require detained immigrants to perform janitorial, maintenance, or other work above and beyond the four personal housekeeping tasks enumerated in the ICE PBNDS;

d.  Whether GEO's conduct violates the California Trafficking Victims Protection Act;

e.  Whether Plaintiffs and California Forced Labor Class Members are entitled to equitable relief, including injunctive and declaratory relief; and

f.  Whether Plaintiffs and California Forced Labor Class Members are entitled to damages and other monetary relief and, if so, in what amount.

38

184.    With respect to the Nationwide HUSP Class, common legal and factual issues include the following:

      a.  Whether GEO forces, coerces, or otherwise compels civil immigration detainees at its civil immigration detention centers nationwide to work for no compensation;

      b.  Whether GEO threatens detained immigrants with serious harm or abuse of legal process for refusing or failing to perform uncompensated work;

      c.  Whether GEO maintains HUSPs at its civil immigration detention centers nationwide;

      d.  Whether GEO's HUSPs require detained immigrants to perform janitorial, maintenance, or other work above and beyond the four personal housekeeping tasks enumerated in the ICE PBNDS;

      e.  Whether GEO's conduct violates the federal Trafficking Victims Protection Act;

      f.  Whether Plaintiffs and Nationwide HUSP Class Members are entitled to equitable relief, including injunctive and declaratory relief; and

      g.  Whether Plaintiffs and Nationwide HUSP Class Members are entitled to damages and other monetary relief and, if so, in what amount.

185.    With respect to the Adelanto Forced Labor Class, common legal and factual issues include the following:

      a.  Whether GEO withholds basic living necessities from immigrants detained at Adelanto;

      b.  Whether GEO attempts to compel detainees to work, either through the Work Program or otherwise, through threats of serious harm;

      c.  Whether a reasonable person would provide labor to GEO under the circumstances present here;

39

d. Whether GEO's conduct violates the federal Trafficking Victims Protection Act; and

e. Whether Plaintiffs and Adelanto Forced Labor Class Members are entitled to equitable relief, including injunctive and declaratory relief.

186. **Typicality: Rule 23(a)(3).** The claims asserted by Plaintiffs are typical of the claims of the Classes, in that the representative plaintiffs, like all class members, were paid subminimum wages – or nothing at all – while employed by GEO at the Adelanto Facility. Each Plaintiff, like each class member, was subject to similar GEO policies and practices, including the HUSP and the Work Program, and each faced the threat of serious harm for refusing to work. Each member of each proposed class has been similarly injured by GEO's misconduct.

187. **Adequacy: Rule 23(a)(4).** Plaintiffs will fairly and adequately protect the interests of the classes. Plaintiffs have retained attorneys experienced in class and complex litigation, including wage and hour class action litigation. Plaintiffs intend to vigorously prosecute this litigation. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other class members.

188. **Superiority: Rules 23(b)(3).** Plaintiffs and the Class Members have all suffered and will continue to suffer harm and damages as a result of GEO's wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum

PLAINTIFFS' THIRD AMENDED COMPLAINT                    5:17-cv-02514-JGB

simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many members of the proposed classes who could not individually afford to litigate a claim such as is asserted in this complaint. This class action likely presents no difficulties in management that would preclude maintenance as a class action.

189.    **Rule 23(b)(2).** This action concerns GEO policies and practices that place every detainee at the Adelanto and GEO's other civil immigration detention facilities in peril of wage theft, forced labor, attempted forced labor, and serious harm. All members of the California Forced Labor Class, Nationwide HUSP Class, and Adelanto Forced Labor Class seek the same injunctive relief. Accordingly, final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## CAUSES OF ACTION

### COUNT I
### CALIFORNIA MINIMUM WAGE LAW
### Cal. Labor Code §§ 1194, 1197, 1197.1

190.    Plaintiffs reallege and incorporate by reference herein all allegations above.

191.    The California Legislature set the following minimum wages for 2011-2019:[19]

---

[19] *See* http://www.dir.ca.gov/iwc/MinimumWageHistory.htm/;
https://www.dir.ca.gov/dlse/faq_minimumwage.htm

41

| January 1, 2019 | $12.00 for employers with 26 employees or more |
| January 1, 2017 | $10.50 for employers with 26 employees or more |
| January 1, 2014 | $9.00 |
| January 1, 2008 | $8.00 |

192.    The minimum wage is an obligation of the employer and cannot be waived by any agreement.

193.    Detained immigrants at the Adelanto Facility do not forfeit their rights to wage protections.

194.    Employees protected by California's minimum wage laws must be paid at least the set hourly minimum wage.

195.    Detained immigrants at the Adelanto Facility who participate in the Work Program qualify as employees of GEO under California law.

196.    GEO qualifies as an employer under California law, including Industrial Wage Commission ("IWC") Order 5.

197.    Labor in the immigration detention context is not intended as a punitive measure.

198.    GEO does not compensate detained immigrants the state minimum wage for the work they performed at the Adelanto Facility. Instead, GEO pays detainees $1

per day – or nothing at all -- for work they perform at the Facility. Sometimes, GEO pays detainees with extra food, batteries, socks, or boxers.

199.   Plaintiffs and California Wage Class Members have suffered damages in an amount to be determined at trial.

200.   Plaintiffs and California Wage Class Members are entitled to recover unpaid minimum wages and other monetary damages, including exemplary damages. C.R.S. § 13- 21-102.

201.   Plaintiffs and California Wage Class Members are entitled to recover their reasonable attorney's fees and costs.

202.   Plaintiffs and California Wage Class Members are entitled to equitable relief, including injunctive and declaratory relief.

## COUNT II
## UNJUST ENRICHMENT
### California Common Law

203.   Plaintiffs reallege and incorporate by reference herein all allegations above.

204.   GEO materially and significantly reduced its labor costs and expenses, and increased its profits, because Plaintiffs and California Wage Class Members perform undercompensated labor.

205.   Plaintiffs and California Wage Class Members conferred non-gratuitous benefits upon GEO by performing work for $1 per day, for which GEO would otherwise have had to pay at least the applicable minimum wage or more, thereby

43

significantly and materially increasing GEO's profits, unjustly enriching GEO at the expense of and detriment to Plaintiffs and California Wage Class Members.

206.   GEO's retention of any benefit collected directly and indirectly from this uncompensated labor violated principles of justice, equity, and good conscience.

207.   As a direct and proximate result of GEO's forced labor practices, Plaintiffs and California Wage Class Members have suffered concrete harm and injury, including physical and emotional injury, monetary loss, and the unlawful violation of their rights.

208.   Plaintiffs and California Wage Class Members have suffered damages in an amount to be determined at trial.

209.   Plaintiffs and California Wage Class Members are entitled to recover exemplary damages.

210.   Plaintiffs and California Wage Class Members are entitled to recover the benefits GEO has unjustly obtained through their un- or under-compensated labor.

211.   Plaintiffs and California Wage Class Members are entitled to recover their reasonable attorney's fees and costs.

## COUNT III
## CALIFORNIA UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code § 17200, *et seq.*

212.   Plaintiffs reallege and incorporate by reference herein all allegations above.

213.   California's Unfair Competition Law ("UCL") prohibits unfair competition, defined as "any unlawful, unfair or fraudulent business act or practice and

44

unfair, deceptive, untrue or misleading advertising and any act prohibited by [California's False Advertising Law]."  Cal. Bus. & Prof. Code § 17200.

214.   GEO willfully violated, and continues to violate, the "unlawful" prong of the UCL by violating California law.

215.   The acts, omissions, and practices of GEO constitute unfair and unlawful business acts and practices under the UCL in that GEO's conduct offends public policy against forced labor, and seeks to profit by violating Plaintiffs' rights under state and federal law.

216.   As a direct and proximate result of GEO's unlawful and unfair business practices, Plaintiffs and California Wage Class Members have suffered economic injury.

217.   Plaintiffs and California Wage Class Members have suffered damages in an amount to be determined at trial.

218.   Plaintiffs and California Wage Class Members are entitled to recover their reasonable attorney's fees and costs.

## COUNT IV
### FORCED LABOR
### CALIFORNIA TRAFFICKING VICTIMS PROTECTION ACT
### Cal. Civ. Code § 52.5

219.   Plaintiffs reallege and incorporate by reference herein all allegations above.

220.   Plaintiffs and California Forced Labor Class Members are victims of forced labor as defined by Cal. Civ. Code § 52.5.

45

221.   Pursuant to the California Trafficking Victims Protection Act, Cal. Civ. Code § 52.5, "a victim of human trafficking, as defined in Section 236.1 of the Penal Code, may bring a civil action for actual damages, compensatory damages, punitive damages, injunctive relief, any combination of those, or any other appropriate relief."

222.   Human trafficking is defined as the deprivation or violation of the personal liberty of another "with the intent to obtain forced labor or services." Cal. Penal Code § 236.1.

223.   Forced labor or services is defined as "labor or services that are performed or provided by a person and are obtained or maintained through force, fraud, duress, or coercion, or equivalent conduct that would reasonably overbear the will of the person." Cal. Penal Code § 236.1(h)(5).

224.   GEO violates Cal. Civ. Code § 52.5 by knowingly maintaining corporate policies and uniform practices at Adelanto aimed at obtaining free detainee labor and services by:

a.   Forcing or coercing Plaintiffs and California Forced Labor Class Members to perform uncompensated janitorial, maintenance, or other work at the Adelanto Facility above and beyond the four personal housekeeping tasks enumerated in the ICE PBNDS pursuant to GEO's HUSP;

b.   Forcing or coercing Plaintiffs and California Forced Labor Class Members to perform uncompensated janitorial, maintenance, or other work at the Adelanto Facility pursuant to GEO's Uncompensated Work Program Policy;

46

     c.   Threatening Plaintiffs and California Forced Labor Class Members with physical restraint and/or serious harm, including solitary confinement, referral to an ICE officer, or criminal prosecution, if they refuse to provide their uncompensated labor; and

     d.   Actually subjecting Plaintiffs and California Forced Labor Class Members with physical restraint and/or serious harm, including solitary confinement, referral to an ICE officer, or criminal prosecution, if they refuse to provide their uncompensated labor.

225.   GEO materially and significantly reduced its labor costs and expenses, and increased its profits, by unlawfully forcing and coercing Plaintiffs and California Forced Labor Class Members to perform uncompensated labor. In order to drive profits, GEO acted with the intent to obtain forced labor or services from its detainees.

226.   Plaintiffs and California Forced Labor Class Members have suffered damages in an amount to be determined at trial.

227.   Plaintiffs and California Forced Labor Class Members are entitled to recover from GEO all amounts that GEO has wrongfully and improperly obtained, and GEO should be required to disgorge to Plaintiffs and California Forced Labor Class Members the benefits it has unjustly obtained.

228.   Plaintiffs and California Forced Labor Class Members are also entitled to recover compensatory and punitive damages.

229.   Plaintiffs and California Forced Labor Class Members are entitled to declaratory and injunctive relief.

47

230.    Plaintiffs and California Forced Labor Class Members are entitled to recover their reasonable attorney's fees and costs.

### COUNT V
### FORCED LABOR
### FEDERAL TRAFFICKING VICTIMS PROTECTION ACT
### 18 U.S.C. §§ 1589(a) and 1594(a)

231.    Plaintiffs and Nationwide HUSP Class Members are victims of forced labor as defined by the federal Trafficking Victims Protection Act.

232.    18 U.S.C. §§ 1589(a) and 1594(a) prohibits any entity from knowingly providing or obtaining the labor of a person "by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. § 1589(a).

233.    Serious harm is defined as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c).

234.    GEO provides or obtains the labor or services of Plaintiffs and Nationwide HUSP Class Members by means of physical restraint or threats of physical restraint to Plaintiffs and others. 18 U.S.C. § 1589(a)(1).

48

235.   GEO also provides or obtains the labor or services of Plaintiffs and Nationwide HUSP Class Members by means of serious harm or threats of serious harm. 18 U.S.C. § 1589(a)(2).

236.   GEO provided or obtained the labor or services of Plaintiffs and Nationwide HUSP Class Members by means of a scheme, plan, or pattern intended to cause them to believe that, if they did not perform such labor or services, they would suffer serious harm or physical restraint, including solitary confinement. 18 U.S.C. § 1589 (a)(4).

237.   GEO violates 18 U.S.C. §§ 1589(a) and 1594(a) by knowingly maintaining corporate policies and uniform practices at most of its civil immigration detention centers aimed at obtaining free detainee labor and services by:

    a.   Forcing or coercing Plaintiffs and Nationwide HUSP Class Members to perform uncompensated janitorial, maintenance, or other work at a GEO civil immigration detention facility above and beyond the four personal housekeeping tasks enumerated in the ICE PBNDS pursuant to GEO's HUSPs;

    b.   Threatening Plaintiffs and Nationwide HUSP Class Members with physical restraint and/or serious harm, including solitary confinement, referral to an ICE officer, or criminal prosecution, if they refuse to provide their uncompensated labor; and

    c.   Actually subjecting Plaintiffs and Nationwide HUSP Class Members with physical restraint and/or serious harm, including solitary confinement, referral to an ICE officer, or criminal prosecution, if they refuse to provide their uncompensated labor.

238.   GEO materially and significantly reduced its labor costs and expenses, and

49

increased its profits, by unlawfully forcing and coercing Plaintiffs and Nationwide HUSP Class Members to perform uncompensated labor. In order to drive profits, GEO acted with the intent to obtain forced labor or services from its detainees.

239.   Plaintiffs and Nationwide HUSP Class Members have suffered damages in an amount to be determined at trial.

240.   Plaintiffs and Nationwide HUSP Class Members are entitled to recover from GEO all amounts that GEO has wrongfully and improperly obtained, and GEO should be required to disgorge to Plaintiffs and Nationwide HUSP Class Members the benefits it has unjustly obtained.

241.   Plaintiffs and Nationwide HUSP Class Members are also entitled to recover compensatory and punitive damages.

242.   Plaintiffs and Nationwide HUSP Class Members are entitled to declaratory and injunctive relief.

243.   Plaintiffs and Nationwide HUSP Class Members are entitled to recover their reasonable attorney's fees and costs.

**<u>COUNT VI</u>**
**FORCED AND ATTEMPTED FORCED LABOR**
**FEDERAL TRAFFICKING VICTIMS PROTECTION ACT**
**18 U.S.C. §§ 1589(a) and 1594(a)**

244.   Plaintiffs reallege and incorporate by reference herein all allegations above.

245.   Plaintiffs and Adelanto Forced Labor Class Members are victims of forced labor and attempted forced labor as defined by 18 U.S.C. §§ 1589(a) and 1594(a).

50

246.    GEO attempts to violate 18 U.S.C. § 1589(a)(2) by knowingly maintaining corporate policies and uniform practices at the Adelanto Facility aimed at obtaining free or nearly free detainee labor and services by:

    a.    Withholding daily necessities from Plaintiffs and Adelanto Forced Labor Class Members, thereby forcing them to work for subminimum wages in order to buy those daily necessities for themselves and avoid serious harm, including, but not limited to, malnutrition, unsanitary living quarters, extreme isolation, and unhygienic conditions of confinement; and

    b.    Threatening Plaintiffs and Adelanto Forced Labor Class Members with physical restraint, serious harm, including solitary confinement, referral to an ICE officer, criminal prosecution, and abuse of law or legal process, if they refuse to provide their labor, organize a work stoppage, or participate in a work stoppage.

247.    GEO further violated 18 U.S.C. §§ 1589 and 1594 by maintaining a corporate policy and uniform practice at the Adelanto Facility of threatening Plaintiffs and Adelanto Forced Labor Class Members with serious harm, including solitary confinement, referral to an ICE officer, or criminal prosecution if they refused to work.

248.    GEO attempts and perpetrates the offense of forced labor against Plaintiffs and Adelanto Forced Labor Class Members.

249.    GEO knowingly benefitted financially from participation in a venture GEO knew or should have known engaged in unlawful coercion of labor in violation of 18 U.S.C. §§ 1589(a) and 1594(a).

250.    Plaintiffs and Adelanto Forced Labor Class Members have suffered damages in an amount to be determined at trial.

51

251.    Plaintiffs and Adelanto Forced Labor Class Members are entitled to recover compensatory and punitive damages.

252.    Plaintiffs and Adelanto Forced Labor Class Members are entitled to recover their reasonable attorney's fees and costs.

**COUNT VII**
**RETALIATION**

253.    Plaintiffs reallege and incorporate by reference herein all allegations above.

254.    On July 3, 2018, GEO answered Plaintiff's original Complaint and alleged two conditional counterclaims against Plaintiff Raul Novoa and "any putative class or classes certified by the Court" for "unjust enrichment/offset" and "declaratory relief." ECF No. 45 at 18.

255.    Plaintiffs brought a reply counterclaim for retaliation against GEO on July 24, 2018. ECF No. 50.

256.    GEO answered Plaintiffs' reply counterclaim for retaliation on August 14, 2018. ECF No. 58.

257.    On November 30, 2018, the Court dismissed GEO's counterclaim for "unjust enrichment/offset" with prejudice. ECF No. 101.

258.    On December 19, 2018, GEO filed its First Amended Answer and Counterclaim to Plaintiff's First Amended Complaint, ECF No. 106, wherein GEO alleged, again, a counterclaim against Plaintiff Novoa and "against any putative class or classes certified by the Court" for "declaratory relief."

259.    Plaintiffs filed their Second Amended Complaint on December 24, 2018. ECF No. 108.

260.    On January 28, 2019, GEO filed its Answer and Counterclaim to Plaintiffs' Second Amended Complaint, ECF No. 113, yet again alleging a conditional counterclaim for "declaratory relief" against Plaintiffs and "any putative class or classes certified by the Court."

261.    On February 18, 2019, Plaintiffs filed their Answer and Affirmative Defenses to GEO's Conditional Counterclaim and again brought a reply counterclaim for retaliation against GEO. ECF No. 117.

262.    GEO's counterclaim for "declaratory relief" is a retaliatory *in terrorem* tactic against Plaintiffs and the class members for bringing their claims to court.

263.    Plaintiff Raul Novoa was detained at the Adelanto Facility from June 2012 through February 2015.

264.    On December 19, 2017, Plaintiff Novoa, on behalf of himself and all others similarly situated, filed a class action complaint seeking money damages and injunctive relief from GEO for the continued and unlawful  economic exploitation of civil immigration detainees at the Adelanto ICE Detention Center. ECF No. 1. By filing this lawsuit, Plaintiff Novoa engaged in a protected activity.

265.    GEO waited until July 3, 2018 – ***more than three years*** after Plaintiff Novoa was released from the Adelanto Facility, and only after this Court denied in part

PLAINTIFFS' THIRD AMENDED COMPLAINT                                    5:17-cv-02514-JGB

GEO's motion to dismiss – to file its counterclaims against Mr. Novoa and all putative class members for "unjust enrichment/offset" and "declaratory relief."

266.    GEO's motive in bringing these counterclaims is to retaliate against Plaintiffs and deter the class members – thousands of vulnerable and indigent individuals – from exercising their protected right to litigate their claims against GEO.

267.    GEO's counterclaim targets each and every putative class members, i.e. every individual who has been civilly detained at Adelanto since May 1, 2011.

268.    GEO has a strong financial interest in deterring Plaintiffs and the putative class members from prosecuting their case.

269.    GEO represented to the United States Court of Appeals for the Tenth Circuit that a similar federal class action lawsuit currently pending Colorado "poses a potentially catastrophic risk to GEO's ability to honor its contracts with the federal government."  Petition for Permission to Appeal Class Certification at 30, *Menocal et. al. v. The GEO Group*, Inc., No.14-02887 (10th Cir.  March 13, 2017) ("potentially catastrophic risk").

270.    GEO's counterclaim for "declaratory relief" is wholly without merit and is reasonably likely to deter the protected activity of filing and prosecuting a lawsuit.

271.    Plaintiffs' counterclaim in reply of retaliation arises out of the same transaction or occurrence and the same set of aggregate facts that are the subject matter of GEO's counterclaims.

272.    Plaintiffs' counterclaim in reply does not require adding another party over whom the Court cannot acquire jurisdiction.

273.    Plaintiffs are entitled to an Order enjoining GEO from continuing to retaliate against Plaintiffs and class members; declaratory and other equitable relief as is necessary to protect the interests of Plaintiffs and class members; and Plaintiffs' reasonable expenses and attorney's fees incurred as a result of defending GEO's frivolous counterclaim.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the Classes they seek to represent, request that the Court:

a.  Certify this action as a class action, with four classes as defined above;

b.  Find that Plaintiffs are proper representatives of the Classes and appoint the undersigned as Class Counsel;

c.  Order GEO to pay for notifying Class Members of the pendency of this suit;

d.  Order disgorgement of GEO's unjustly-acquired revenue, profits, and other benefits resulting from its unlawful conduct;

e.  Award declaratory and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

f.  Award injunctive relief as is necessary to protect the interests of Plaintiffs and Class Members, including enjoining GEO from continuing to conduct business through the unlawful and unfair practices alleged herein;

g.  Award Plaintiffs and Class Members monetary damages for lost wages in an amount to be determined at trial;

h.  Award Plaintiffs and Class Members their reasonable litigation expenses and attorneys' fees; and

i.  Award any further relief that the Court deems just and equitable.

Dated:        August 16, 2019            _/s/ Lydia Wright_____
                                         Korey A. Nelson (admitted *pro hac vice*)
                                         knelson@burnscharest.com
                                         LA Bar # 30002
                                         Lydia A. Wright (admitted *pro hac vice*)
                                         lwright@burnscharest.com
                                         LA Bar # 37926
                                         C. Jacob Gower (admitted *pro hac vice*)
                                         jgower@burnscharest.com
                                         LA Bar # 34564
                                         **BURNS CHAREST LLP**
                                         365 Canal Street, Suite 1170
                                         New Orleans, LA 70130
                                         Telephone: (504) 799-2845
                                         Facsimile: (504) 881-1765

                                         R. Andrew Free (admitted *pro hac vice*)
                                         andrew@immigrantcivilrights.com
                                         TN Bar # 030513
                                         **LAW OFFICE OF R. ANDREW FREE**
                                         P.O. Box 90568
                                         Nashville, TN 37209
                                         Telephone: (844) 321-3221
                                         Facsimile: (615) 829-8959

                                         Nicole Ramos (admitted *pro hac vice*)
                                         nicole@alotrolado.org
                                         NY Bar # 4660445
                                         **AL OTRO LADO**
                                         511 E. San Ysidro Blvd., # 333
                                         San Ysidro, CA 92173

56

Telephone: (619) 786-4866

Robert Ahdoot (CA Bar # 172098)
rahdoot@ahdootwolfson.com
Tina Wolfson (CA Bar # 174806)
twolfson@ahdootwolfson.com
Theodore W Maya (CA Bar # 223242)
tmaya@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
10728 Lindbrook Drive
Los Angeles, California 90024-3102
Telephone:  (310) 474-9111
Fax:  (310) 474-8585

Will Thompson (CA Bar # 289012)
wthompson@burnscharest.com
Warren Burns (admitted *pro hac vice*)
wburns@burnscharest.com
TX Bar # 24053119
Daniel H. Charest (admitted *pro hac vice*)
dcharest@burnscharest.com
TX Bar # 24057803
**BURNS CHAREST LLP**
900 Jackson St., Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002


***Attorneys for Plaintiffs.***

PLAINTIFFS' THIRD AMENDED COMPLAINT                    5:17-cv-02514-JGB