Korey A. Nelson (admitted *pro hac vice*)
knelson@burnscharest.com
Lydia A. Wright (admitted *pro hac vice*)
lwright@burnscharest.com
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765

Counsel for Plaintiffs
***Additional Counsel on Signature Page***

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION

| | |
|---|---|
| **RAUL NOVOA, JAIME CAMPOS FUENTES**, **ABDIAZIZ KARIM**, and **RAMON MANCIA**, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>**THE GEO GROUP, INC.**,<br><br>*Defendant*. | Civil Action No. 5:17-cv-02514-JGB-SHKx<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Date: November 18, 2019<br>Time: 9:00 a.m.<br>Courtroom: 1<br>Judge: The Honorable Jesus G. Bernal |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................. 1

II.   FACTUAL BACKGROUND ................................................................. 2

    A.   GEO is Contractually Required to Maintain and Operate Adelanto. ................................................................................. 2

    B.   GEO Unlawfully Benefits From Detained Immigrant Labor at Adelanto. ............................................................................. 3

    C.   GEO Cannot Legally Require Civil Immigration Detainees to Engage in any Work Other Than Four Specific "Personal Housekeeping" Tasks. ............................................................. 4

    D.   GEO's Unlawful Policies and Practices ................................ 5

        1.   GEO's Work Program Policy ...................................... 6

        2.   GEO's Uncompensated Work Program Policy ............. 9

        3.   GEO's Housing Unit Sanitation Policies ("HUSPs") ........... 10

            a.   The HUSP at Adelanto. ..................................... 11

            b.   GEO's HUSPs at its other civil immigration detention facilities. .......................................... 13

            c.   GEO incorrectly contends the broad scope of labor required under the HUSPs is within the Personal Housekeeping Requirement of the PBNDS. ........................................................... 14

        4.   GEO's Deprivation Policy ......................................... 15

            a.   In violation of the PBNDS, GEO deprives detained immigrants of basic living necessities, including sufficient food. ................................... 15

            b.   ICE does not hold GEO accountable for violating the PBNDS. ....................................... 16

        c.     GEO has a financial incentive to ensure a captive workforce and minimize expenditures on daily necessities. ........................................ 17

III.   LEGAL STANDARD ....................................................... 18

IV.   CLASS DEFINITIONS .................................................... 18

    A.   The Adelanto Wage Class ......................................... 18

    B.   The Adelanto Forced Labor Class .............................. 19

        1.   The Work Program Subclass .............................. 19

        2.   The Uncompensated Work Program Subclass ....... 19

    C.   The Nationwide HUSP Class ..................................... 19

V.   ARGUMENT .................................................................. 20

    A.   The Proposed Classes Satisfy Rule 23(a). .................. 20

        1.   Each class likely exceeds 1,000 members. .......... 20

        2.   Common questions of law and fact abound. ......... 21

            a.   The Adelanto Wage Class ............................ 22

            b.   The Nationwide HUSP Class ........................ 23

            c.   The Adelanto Forced Labor Class ................. 24

        3.   Plaintiffs' claims are typical of the class claims. ..... 25

        4.   Plaintiffs and their counsel will fairly and adequately protect the interests of all class members. ..................... 27

    B.   The Adelanto Forced Labor Class and Nationwide HUSP Class Satisfy the Requirements of Rule 23(b)(2). ..................... 28

    C.   The Adelanto Wage Class and Adelanto Forced Labor Class Satisfy the Requirements of Rule 23(b)(3). ......................... 28

        1.   Common issues predominate as to each cause of action. .......................................................... 28

a.    California Minimum Wage claim ................................... 29

b.    California Unfair Competition Law claim .................... 31

c.    Unjust Enrichment claim .................................................. 31

d.    California's Trafficking Victims Protection Act claim ................................................................................. 32

e.    Federal Trafficking Victims Protection Act claims ............................................................................... 33

2.    Class treatment is superior to any alternate means of dispute resolution. ...................................................... 34

VI.    CONCLUSION ................................................................. 35

# TABLE OF AUTHORITIES

**Cases**

*Amchem Prod., Inc. v. Windsor*,
  521 U.S. 591 (1997) .......................................................................28, 29, 34

*Astiana v. Hain Celestial Grp., Inc.*,
  783 F.3d 753 (9th Cir. 2015) .......................................................31

*Bateman v. Am. Multi-Cinema, Inc.*,
  623 F.3d 708 (9th Cir. 2010) .......................................................18

*Briseno v. ConAgra Foods, Inc.*,
  844 F.3d 1121 (9th Cir. 2017) .......................................................18

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)................................................................29

*Cortez v. Purolator Air Filtration Prod. Co.*,
  23 Cal. 4th 163 (2000) ...........................................................31

*Dynamex v. Superior Court*,
  4 Cal. 5th 903 (2018) ............................................................30

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) .......................................................27

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011)..............................................................29

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ......................................................34

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) .......................................................25

*Hernandez v. Lynch*,
  2016 WL 7116611 (C.D. Cal. Nov. 10, 2016) (Bernal, J.), *aff'd sub nom.*
  *Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017) ....................................20

*Just Film, Inc. v. Buono*,
  847 F.3d 1108 (9th Cir. 2017) ..............................................25, 26, 29, 30

*Kasky v. Nike, Inc.,*
   27 Cal. 4th 939 (2002) .................................................................................31

*Martinez v. Combs,*
   49 Cal. 4th 35 (2010) ............................................................................ 29, 30

*Menocal, et al. v. The GEO Group, Inc.,*
   320 F.R.D. 258 (D. Colo. 2017), *aff'd*, 882 F.3d 905 (10th Cir. 2018),
   *cert. denied*, 139 S. Ct. 143 (2018)......................................2, 13, 14, 24, 26, 34

*Munoz v. MacMillan,*
   195 Cal.App.4th 648 (2011)........................................................................31

*Nuñag–Tanedo v. East Baton Rouge Parish School Board,*
   2011 WL 7095434 (C.D. Cal. Dec. 12, 2011) (Kronstadt, J.)...................23

*Nwauzor v. The GEO Group, Inc.,*
   No. 17-cv-5769 (W.D. Wash. Aug. 6, 2018) *petition for permission to appeal denied*, No. 18-80095 (9th Cir. Nov. 8, 2018) ........................ 2, 22, 26

*Parsons v. Ryan,*
   754 F.3d 657 (9th Cir. 2014) ..............................................................21, 26, 28

*People v. Halim,*
   14 Cal. App. 5th 632 (Ct. App. 2017), *cert. denied sub nom. Halim v. California*, 138 S. Ct. 1564 (2018) ................................................................32

*Ramos v. SimplexGrinnell LP,*
   796 F. Supp. 2d 346 (E.D. N.Y. 2011), *vacated in part*, 773 F.3d 394 (2d Cir. 2014) ....................................................................................................34

*Ridgeway v. Wal-Mart Stores, Inc.,*
   2017 WL 363214 (N.D. Cal. 2017)..............................................................31

*Rodriguez v. Hayes,*
   591 F.3d 1105 (9th Cir. 2010) ....................................................................28

*Sali v. Corona Reg'l Med. Ctr.,*
   889 F.3d 623 (9th Cir. 2018) ......................................................................29

*Staton v. Boeing Co.,*
   327 F.3d 938 (9th Cir. 2003) ......................................................................21

*Sullivan v. Oracle Corp.,*
   51 Cal. 4th 1191 (2011) ..............................................................................31

*Tyson Foods, Inc. v. Bouaphakeo,*
   136 S. Ct. 1036 (2016) ........................................................29

*U.S. v. Dann,*
   652 F.3d 1160 (9th Cir. 2011) .............................................23

*Valentino v. Carter-Wallace, Inc.,*
   97 F.3d 1227 (9th Cir. 1996) ..............................................34

*Wal-Mart Stores, Inc. v. Dukes,*
   564 U.S. 338 (2011)..............................................18, 21, 22, 26

*Wright v. Renzenberger, Inc.,*
   656 F. App'x 835 (9th Cir. 2016).........................................26


**Statutes**

22 U.S.C. § 7102(11)(B) ...........................................................32, 33

55 Cal. Jur. 3d Restitution § 2 ......................................................31

California Penal Code § 236.1......................................................32, 33

California Common Law of Unjust Enrichment..........................................18

California Minimum Wage Law ("MWL"),
   Cal. Labor Code §§ 1194, 1197, 1197.1 ..................................18, 22, 29, 31

California Trafficking Victims Protection Act,
   Cal. Civ. Code § 52.5 ...........................................................19, 25, 32

California Unfair Competition Law,
   Cal. Bus. & Prof. Code § 17200 ..............................................18, 31

IWC Wage Order No. 5.............................................................18, 29

Trafficking Victims Protection Act,
   18 U.S.C. §§ 1589(a) and 1594(a).....................................19, 23, 24, 25, 33

## Other Authorities

7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, 518-519 (2d ed. 1986)..........................................28

U.S. Immigration and Customs Enforcement 2011 Performance-Based National Detention Standards .................................. 1, 2, 3, 4, 5, 6, 10, 14, 15, 16, 24

## Rules

Federal Rule of Civil Procedure 23(a)......................................................... 18, 20

Federal Rule of Civil Procedure 23(a)(1)...........................................................20

Federal Rule of Civil Procedure 23(a)(2)...........................................................21

Federal Rule of Civil Procedure 23(a)(3)...........................................................25

Federal Rule of Civil Procedure 23(a)(4)...........................................................27

Federal Rule of Civil Procedure 23(b) ...............................................................18

Federal Rule of Civil Procedure 23(b)(2) .............................................. 18, 28, 35

Federal Rule of Civil Procedure 23(b)(3) ......................................... 18, 28, 29, 35

# I.     INTRODUCTION

This action arises from systematic and unlawful wage theft, unjust enrichment, and forced labor at one of the nation's largest and deadliest civil immigration detention facilities, California's Adelanto ICE Processing Center ("Adelanto" or the "Adelanto Facility"), and extending to nearly every civil immigration detention facility operated by Defendant the GEO Group, Inc. ("GEO"). GEO significantly reduces its labor costs and expenses, and maximizes its already vast profits, by unlawfully coercing detained immigrants to perform virtually all non-security functions at Adelanto. GEO pays these detainees $1 per day for their labor—or nothing at all—regardless of how many hours they work. In at least fourteen of its civil immigration detention facilities nationwide, including Adelanto, GEO requires detained immigrants to perform uncompensated work under threat of serious harm and abuse of process. This uncompensated labor is neither required nor permitted by the U.S. Immigration and Customs Enforcement's ("ICE") 2011 Performance-Based National Detention Standards ("PBNDS") or by GEO's contracts with ICE.

The central legal and factual questions here—whether detained immigrants participating in the Work Program and Uncompensated Work Program at Adelanto are GEO's employees, and whether GEO unlawfully obtains free or underpaid detainee labor at Adelanto and its other civil immigration detention facilities nationwide—are the same for all class members and well-suited for class-wide resolution. Common questions of fact and law abound, since Plaintiffs' claims and those of each class member arise from the same nucleus of facts involving GEO's implementation of the uniform policies and practices at issue. Indeed, the rights of thousands of detained immigrants can be resolved in one fell swoop as part of a single, fair, and efficient proceeding.

Plaintiffs accordingly move for certification of the following classes: (1) the Adelanto Wage Class; (2) the Adelanto Forced Labor Class, including the Work Program Subclass and the Uncompensated Work Program Subclass; and (3) the Nationwide Housing Unit Sanitation Policy ("HUSP") Class. Similar classes have already been

certified in the Ninth and Tenth Circuits.[1] In addition, Plaintiffs respectfully request that the Court designate them as the class representatives; appoint undersigned counsel as class counsel; and order that notice of this action be provided to the classes.

## II.  FACTUAL BACKGROUND

### A.  GEO is Contractually Required to Maintain and Operate Adelanto.

In May 2011, the City of Adelanto (the "City") and United States Immigration and Customs Enforcement ("ICE") entered into an Intergovernmental Services Agreement ("IGSA") for the detention and care of civil immigration detainees awaiting removal proceedings. Declaration of Lydia Wright ("Wright Decl.") at Ex. 2 (IGSA). The City then entered into a Services Contract with GEO, wherein GEO assumed responsibility for the management and operation of the Adelanto Facility. Wright Decl. at Ex. 3 (Services Contract).

Pursuant to its contract with ICE, GEO must comply with the PBNDS as revised in 2016. GEO applies the PBNDS uniformly to all detainees at Adelanto. Wright Decl. at Ex. 4 (Janecka Dep.) at 28:4-7. The IGSA and PBNDS require GEO to provide all detained immigrants housed at Adelanto with basic necessities, including food, shelter, utilities, clothing, bedding, recreation, entertainment, and medical, dental, optical and mental health services. *See* ECF 45 at 13; Wright Decl. at Ex. 5 (Ragsdale Dep.) at 49:5-9; 82:3-14.

---

[1] *See* Declaration of Lydia Wright ("Wright Decl.") at Ex. 1, *Nwauzor v. The GEO Group, Inc.*, No. 17-cv-5769 (W.D. Wash. Aug. 6, 2018)  (certifying a class of immigrants detained at GEO's Tacoma ICE Processing Center alleging GEO violated the Washington Minimum Wage Act by paying detained immigrants participating in the Work Program only $1 per day), *petition for permission to appeal denied*, No. 18-80095 (9th Cir. Nov. 8, 2018) ("*Nwauzor* Orders"); *see also Menocal v. The GEO Group, Inc.*, 320 F.R.D. 258 (D. Colo. 2017) (certifying classes of immigrants detained at GEO's Aurora ICE Processing Center alleging GEO was unjustly enriched by paying detainee workers only $1 per day and challenging GEO's facility-specific HUSP under the federal forced labor statute), *aff'd*, 882 F.3d 905 (10th Cir. 2018), *cert. denied,* 139 S. Ct. 143 (2018).

GEO also creates and implements its own facility-specific policies and procedures which, the company claims, are aligned with the PBNDS.  Wright Decl. at Ex. 5 (Ragsdale Dep.) at 60:4-9; 62:15-18. Like the PBNDS, GEO's local policies and procedures are applied uniformly to all detained immigrants at Adelanto. Wright Decl. at Ex. 4 (Janecka Dep.) at 29:21-30:2. GEO's unlawful local policies at Adelanto include the Work Program Policy, the Uncompensated Work Program Policy, the Housing Unit Sanitation Policy ("HUSP"),[2] and the Deprivation Policy. Each policy is discussed in Section II.D, *infra.*

**B.    GEO Unlawfully Benefits From Detained Immigrant Labor at Adelanto.**

GEO benefits from free or nearly-free detainee labor on a daily basis. Pursuant to the Adelanto HUSP, Work Program Policy, Uncompensated Work Program Policy, and/or Deprivation Policy, detained immigrants comprise GEO's round-the-clock cleaning, sanitation, and maintenance staff. Wright Decl. at Ex. 6 (July 1, 2015 email re: "West Sanitation") ("We need all shifts to start putting detainees to work in the hallways, medical, intake, the 'D-Spaces', and the hallways leading to the housing units, etc."); Wright Decl. at Ex. 7 (April 4, 2017 email re: "East Sanitation") ("There was not one detainee working or being asked to work in the entire building (housing units, hallways, kitchen, laundry, intake, etc. NOT ONE.) This is totally unacceptable!! Once lunch is complete, I expect all TV, XBOX and Recreation to be suspended until the building is clean and presentable."); Wright Decl. at Ex. 8 (July 13, 2017 email re: "West Notes") (listing "areas I see that can use improvement with attention and detainee labor" and noting "[n]o detainee workers were present working").

GEO also relies on detained immigrant labor to ensure it passes external audits and inspections of Adelanto. Wright Decl. at Ex. 9 (Sept. 15, 2012 email re: "ODO

---

[2] GEO admits that it maintains a HUSP at nearly all of its other civil immigration detention centers nationwide. *See* ECF 174 at 7; 8; 12; 13 (conceding the existence of a nationwide corporate HUSP); Wright Decl. at Ex. 34 (Requests for Admission) at Nos. 11-22 (admitting pursuant to Fed. R. Civ. P. 36(a)(3) that GEO operates HUSPs at twelve civil immigration detention centers nationwide).

Audit") ("The auditors will be visiting both facilities so both need to be sparkling…use as many detainee crews as necessary."); Ex. 10 (Sept. 26, 2016 email re: "Day One ACA Mock Walk") ("Follow up and get these things done. Why does maintenance need to do the vents? . . . Why can't FS check out a ladder and let detainees clean the vents?").

Additionally, without detained immigrant workers to staff the kitchens, GEO must either suspend essential food service operations or divert non-detainee GEO employees from their normal tasks. Wright Decl. at Ex. 11 (March 7, 2018 email re: "Kitchen staff and the their [sic] lunchs") ("On Saturday they were only able to run three chow halls at dinner because they only had six detainee workers, one of them being a dishwasher and they were told there wasn't enough officers to run four chow halls."); Ex. 12 (March 30, 2018 email re: "Detainee Payroll") ("Maybe we have enough [detainee workers] to put on a schedule for breakfast service again?"); Ex. 13 (July 26, 2018 "Monthly Food Service Dept. Meeting Minutes") at 2 ("If we didn't have the detainees doing the work, we would have so much more to do ourselves."). GEO even relies on detained immigrants to prepare meals for GEO officers, who eat for free in the staff dining halls. Wright Decl. at Ex. 4 (Janecka Dep.) at 297:14-298:3.

**C.  GEO Cannot Legally Require Civil Immigration Detainees to Engage in any Work Other Than Four Specific "Personal Housekeeping" Tasks.**

GEO is contractually required to comply with some version of ICE's 2011 PBNDS at each of its civil immigration detention facilities nationwide. Wright Decl. at Ex. 34 (Requests for Admission) at No. 27. All applicable versions of the PBNDS require any labor performed by a detained immigrant to be voluntary. *See* Wright Decl. at Ex. 14 (PBNDS § 5.8) at 406 ("Work assignments are voluntary; however all detainees are responsible for personal housekeeping.").

The Personal Housekeeping Requirement, PBNDS § 5.8.V.C, provides:

> **C. Personal Housekeeping Required**
>
> Work assignments are voluntary; however, all detainees are responsible for personal housekeeping.
>
> *Detainees are required to maintain their immediate living areas in a neat and orderly manner by:*
>
> *1. making their bunk beds daily;*
>
> *2. stacking loose papers;*
>
> *3. keeping the floor free of debris and dividers free of clutter; and*
>
> *4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture.*

*Id.* Other than the four personal housekeeping tasks listed in PBNDS § 5.8.V.C, GEO cannot force or compel civil immigration detainees to work.  Wright Decl. at Ex. 4 (Janecka Dep.) at 52:5-9; Ex. 5 (Ragsdale Dep.) at 54:9-56:1. According to the Warden/Facility Administrator of Adelanto, GEO cannot even *ask* detainees to engage in work outside the scope of the Personal Housekeeping Requirement. Wright Decl. at Ex. 4 (Janecka Dep.) at 231:12-15. Nonetheless, and despite the clear prohibition on mandatory labor set forth in PBNDS § 5.8.V.C, GEO in fact requires detained immigrants to work for the benefit of the company and under threat of serious harm and abuse of legal process.

**D.    GEO's Unlawful Policies and Practices.**

GEO maintains and implements at least four unlawful policies and practices that violate California and federal law: (1) the Work Program Policy, (2) the Uncompensated Work Program Policy, (3) the Housing Unit Sanitation Policies, and (4) the Deprivation Policy. Each unlawful policy and practice is discussed below. Through these policies and practices, GEO presents detained immigrants with a Hobson's choice: work under threat of serious harm for $1 per day to afford basic necessities, or work for nothing at all.

1. **GEO's Work Program Policy**

The PBNDS require any labor performed by a detained immigrant to be voluntary. Wright Decl. at Ex. 14 (PBNDS § 5.8.V.C). Pursuant to the PBNDS and its local Work Program Policy, GEO utilizes detained immigrant labor to clean, operate, and maintain Adelanto in exchange for $1 per day. Wright Decl. at Ex. 14 (PBNDS § 5.8); Declaration of Raul Novoa ("Novoa Decl.") at ¶¶ 11, 17; Declaration of Jaime Campos Fuentes ("Campos Fuentes Decl.") at ¶¶ 9, 13; Declaration of Abdiaziz Karim ("Karim Decl.") at ¶ 16; Declaration of Ramon Mancia ("Mancia Decl.") at ¶¶ 7, 13; Declaration of Fernando Munoz ("Munoz Decl.") at ¶¶ 8, 12; Declaration of Gagandeep Marwaha ("Marwaha Decl.") at ¶¶ 7, 8, 15, 16. GEO operates one detainee Work Program at Adelanto. Wright Decl. at Ex. 4 (Janecka Dep.) at 46:20-47:4.

The Work Program Policy is set forth in Section 8.1.8 of GEO's Adelanto Policy and Procedure Manual. Wright Decl. at Ex. 15 ("Work Program Policy"); *see also* Ex. 4 (Janecka Dep.) at 46:20-47:4.  The objectives of the Work Program are as follows:

> Through the voluntary work program: 1) Physically and mentally able detainees are gainfully employed while contributing to the orderly operation of the facility; 2) Essential operations and services improve through the productivity of detainees; and 3) Inactivity-induced idleness and disciplinary-code violations will decline.

*Id.* at 1.

GEO issues each detained immigrant an Adelanto Supplemental Detainee Handbook which notifies them of the specific rules, regulations, policies, and procedures concerning the Work Program. Wright Decl. at Ex. 4 (Janecka Dep.) at 30:2-15; Ex. 16 ("Supp. Detainee Handbook") at 14; *see also* ECF 48-2 at 30.  GEO informs new detained immigrants about the Work Program as part of its orientation to Adelanto and makes "[e]very effort . . . to provide [detainees] an opportunity to participate in the voluntary work program." Wright Decl. at Ex. 16 (Supp. Detainee Handbook) at 14. GEO's Work Program policies, procedures, and practices apply uniformly to all detained immigrants at Adelanto. Wright Decl. at Ex. 4 (Janecka Dep.) at 29:21-30:2; 47:11-15.

Under the Work Program Policy, all detained immigrants are eligible to work at Adelanto, although restrictions may apply to specific work assignments depending on the individual's risk classification. Wright Decl. at Ex. 15 (Work Program Policy) at 1; Ex. 16 (Supp. Detainee Handbook) at 14. GEO maintains a non-discriminatory hiring policy with respect to detained immigrant workers and provides reasonable accommodations to workers with disabilities. Wright Decl. at Ex. 15 (Work Program Policy) at 2-3; Ex. 4 (Janecka Dep.) at 99:12-15; 100:2-18.

GEO's process for hiring detainee workers is uniform throughout Adelanto. First, GEO requires all potential detainee workers to fill out a Work Detail Application. Wright Decl. at Ex. 15 (Work Program Policy) at 2; Ex. 17 (Work Detail Application); Ex. 4 (Janecka Dep.) at 94:5-9. The application is submitted to a GEO classification officer, who reviews it and determines whether to hire the applicant. Wright Decl. at Ex. 15 (Work Program Policy) at 2; Ex. 4 (Janecka Dep.) at 96:3-12.

Next, GEO staff assigns new hires to a work crew. Wright Decl. at Ex. 15 (Work Program Policy) at 3. Work assignments include food service, laundry, dorm cleaning, cores/hallway, Court/visit, recreation, floor crew, barbershop, intake, medical detail, paint detail, and warehouse. Wright Decl. at Ex. 17 ("Work Detail Application"). GEO requires detainee workers to sign a "voluntary work program agreement" before every new assignment, and issues written job descriptions including the duties, responsibilities, and expectations for each job in the Work Program. Wright Decl. at Ex. 15 (Work Program Policy) at 2; Ex. 5 (Ragsdale Dep.) at 121:12-21.

GEO controls all working conditions for detainee workers at Adelanto. Wright Decl. at Ex. 4 (Janecka Dep.) at 150:3-24. GEO sets detainee work schedules and assigns detainee workers to shifts. Wright Decl. at Ex. 4 (Janecka Dep.) at 187:1-4; Ex. 15 (Work Program Policy) at 3; Ex. 5 (Ragsdale Dep.) at 134:13-135:2. At Adelanto, "[t]he normal scheduled workday for a detainee employed full-time is a maximum of 8 hours." Wright Decl. at Ex. 15 (Work Program Policy) at 3. GEO provides all detainee workers at Adelanto with the uniforms, training, tools, and instructions necessary to perform their

jobs. *Id.* at 4-5; Ex. 16 (Supp. Detainee Handbook) at 14; Ex. 4 (Janecka Dep.) at 147:25-148:24. GEO also provides detainee workers with safety equipment that, it claims, meets Occupational Safety and Health Administration ("OSHA") standards. Ex. 15 (Work Program Policy) at 5.

GEO supervises detained immigrant workers for the duration of their shifts. Wright Decl. at Ex. 4 (Janecka Dep.) at 187:17-22; Ex. 18 ("Housekeeping Plan") at 2-3 ("The Kitchen Supervisor will supervise the kitchen detainee work force in daily routing [sic] cleaning duties."); *id.* ("The staff member supervising detainee workers will ensure they are under that individual's constant direct visual observation while cleaning the Medical area."); *id.* ("Supervising housekeepers is the responsibility of the Officers assigned to the Housing Unit. Supervision includes ensuring detainees are working safely and using Personal Protective equipment, supervising work as it is done.").

GEO officials regularly evaluate worker job performance and may terminate detained immigrant workers for unexcused absences or unsatisfactory work performance. Wright Decl. at Ex. 15 (Work Program Policy) at 3, 5; Ex. 4 (Janecka Dep.) at 164:8-13; Ex. 18 ("Housekeeping Plan") at 3 ("Housing Unit Officers must notify the Chief of Security of any detainee removed from worker status for non-performance of duties . . .").

GEO decides how many detained immigrants to hire into the Work Program based on the needs of the Adelanto Facility. Wright Decl. at Ex. 4 (Janecka Dep.) at 191:7-11; 200:1-201:10. When there are not enough detainee workers to staff a Work Program crew, GEO must either pay GEO staff to perform those job functions— sometimes for overtime pay—or suspend essential operations of the Facility altogether. Wright Decl. at Ex. 4 (Janecka Dep.) at 221:10-19; 222:24-223:3; *see also* Section II.B, *supra.*

As a matter of policy and practice, GEO fixes the rate of compensation for each detained immigrant at Adelanto at exactly $1 per day, even though detainee workers at other GEO immigration detention facilities are paid different and higher rates. Wright

Decl. at Ex. 4 (Janecka Dep.) at 118:3-12; Ex. 19 (Venturella Dep.) at 292:18-20; ECF 52-2 at 7 (conceding that detained immigrants in other detention facilities owned and/or operated by GEO are paid more than $1 per day for their participation in the Work Program).

At Adelanto, each detainee worker must sign a detainee pay sheet on the day the work is performed. Wright Decl. at Ex. 15 (Work Program Policy) at 4. GEO tracks detainee work hours and maintains detainee payroll sheets. Wright Decl. at Ex. 4 (Janecka Dep.) at 117:10-21; 144:11-23. GEO pays each detainee worker in the same way: by periodically depositing money into their commissary accounts. Wright Decl. at Ex. 4 (Janecka Dep.) at 142:3-5. GEO has never paid its detainee workers' wages that remotely approximate the minimum hourly wage required by California law.

GEO prohibits all detained immigrants from working outside Adelanto's secured perimeter. Wright Decl. at Ex. 4 (Janecka Dep.) at 44:11-13. As a result, and due to their status as detainees, detained immigrants cannot seek offsite employment during their detention. *See* Novoa Decl. at ¶ 10. GEO also prohibits all detained immigrants from running their own businesses while detained. Wright Decl. at Ex. 16 (Supp. Detainee Handbook) at 30 (listing "conducting a business" as a Category IV offense).

## 2. **GEO's Uncompensated Work Program Policy**

GEO also operates an "Uncompensated Work Program" at Adelanto. Under the company's Uncompensated Work Program Policy, detained immigrants who complete a Work Detail Application for a position in the Work Program must work for an arbitrary period of time—months, in some cases—for no compensation before they are officially hired into the Work Program and begin to receive $1 per day for their labor. Wright Decl. at Ex. 34 (Requests for Admission) at No. 25 (admitting pursuant to Fed. R. Civ. P. 36(a)(3) that "GEO permits detainees at the Adelanto Facility to work for no compensation if all paid Work Program positions are filled"). *See also* Karim Decl. at ¶¶ 7, 9, 10; Mancia Decl. at ¶ 8; Munoz Decl. at ¶ 9; Marwaha Decl. at ¶ 8. In fact, GEO's

Work Detail Application invites detained immigrants to "volunteer" for the Uncompensated Work Program if all paid positions in the Work Program are filled:

> There are 40 paid positions in the work member detail program.  If all paid positions are filled, would you be interested in working on a voluntary basis?  **YES**____  **NO**____

Wright Decl. at Ex. 17 (Work Detail Application).

In all respects other than compensation, the Work Program and Uncompensated Work Program are operated in the same way. *See* Section II.D.1, *supra*. In both Programs, GEO officials control all aspects of the job, including providing all uniforms, training, tools, safety equipment, instructions, supervision, and work schedules. *Id. See also* Karim Decl. ¶ 14; Mancia Decl. at ¶ 9; Munoz Decl. at ¶ 10; Marwaha Decl. at ¶ 9. *See also* Wright Decl. at Ex. 20 (December 29, 2013 email) ("Could you please verify if he is in fact a detainee worker in a paid position or a volunteer."); Ex. 21 (Nov. 6, 2012 email re: "Detainee Workers") ("Have these detainees been cleared by ice [sic] yet? They are volunteering."). GEO even includes at least some Uncompensated Work Program participants (called "volunteers") on the same Detainee Payroll rosters used by the company to track paid workers. Wright Decl. at Ex. 22 (Detainee Payroll rosters).

## 3. **GEO's Housing Unit Sanitation Policies ("HUSPs")**

As discussed in Section II.C, *supra*, GEO cannot legally force, compel, or otherwise require civil immigration detainees to work outside the narrow scope of the Personal Housekeeping Requirement. *See* Wright Decl. at Ex. 14 (PBNDS § 5.8). But in violation of the PBNDS, its contracts with ICE, and the California and federal forced labor statutes, GEO develops and enforces corporate policies known as Housing Unit Sanitation Policies ("HUSPs") at nearly all of its civil immigration detention facilities, including Adelanto. *See* ECF 174 at 7; 8; 12; 13 (conceding the existence of a nationwide corporate HUSP); Wright Decl. at Ex. 34 (Requests for Admission) at Nos. 11-22 (admitting pursuant to Fed. R. Civ. P. 36(a)(3) that GEO operates HUSPs at twelve civil immigration detention centers nationwide). GEO's HUSPs require detained immigrants to perform a wide range of completely uncompensated work for the company's enrichment, under threat of serious harm and abuse of legal process.

### a. The HUSP at Adelanto.

GEO's HUSP at Adelanto is set forth in several sections of the company's facility-specific Policy and Procedure Manual. First, Section 12.1.4, entitled "Sanitation Procedures/Housekeeping Plan," provides in part:

---

**B. Detainee Sanitation Responsibilities**

Each detainee will be responsible for the cleanliness of his or her cell or living area, including walls, floors, sink, toilet, windows, and other property within the cell, room, or living area.

---

Wright Decl. at Ex. 23 ("Policy 12.1.4") at 2. Policy 12.1.4 requires GEO's Dormitory Officer to issue mops and buckets, brooms, scrub brushes, cleaning rags, and cleaning chemicals at 6:00 a.m. each day to "each detainee." *Id.* GEO officers supervise the mandatory cleaning. *Id.* Policy 12.1.4 is applied uniformly to all detained immigrants at Adelanto, who are notified of the HUSP through the Supplemental Detainee Handbooks provided to them at intake. Wright Decl. at Ex. 4 (Janecka Dep.) at 55:7-11; 56:14-16.

The Adelanto HUSP is also set forth in Section 10.3.5 of the Adelanto Policy and Procedure Manual, entitled "Post Orders-Housing Unit Office," which states in part:

---

**D.   Living Area/Bed and Locker Assignments**

All detainees in a unit are required to keep clean and sanitary all commonly accessible areas of the unit, including walls, floors, windows, window ledges, showers, sinks, microwaves, tables, and chairs.

1.   Cleaning supplies will be provided as needed to maintain the highest sanitation standards.
2.   Detainees will take turns cleaning the area.
3.   The day room area will be kept clean at all times.  Should an Officer notice that the area is not clean, the Officer will make available necessary cleaning supplies.  If the detainees in the unit do not clean the area after being instructed to do so, the television will be turned off and the detainees will not be permitted to participate in any activities/programs until the unit is cleaned.  Continued refusal to clean the area will result in further disciplinary action.
4.   Bulletin boards contain information beneficial to detainees and are not to be defaced in any manner.  Posted material is to remain on the boards until staff removes the item(s).

---

Wright Decl. at Ex. 24 ("Policy 10.3.5") at 3. Under Policy 10.3.5, "each and every detainee must participate in the facility's sanitation program," which includes cleaning "all commonly accessible areas of the unit." *Id.* at 3, 4 (emphasis added).  The housing

unit officer develops a list of detainees each day to assign to housing unit sanitation, though "[d]uring a general cleanup all detainees must participate." *Id.* In addition, "[a]ll detainees must participate" in a mandatory, general cleanup of their housing units every day. Wright Decl. at Ex. 4 (Janecka Dep.) at 87:8-88:21. Policy 10.3.5 is applied uniformly to all detained immigrants at Adelanto. Wright Decl. at Ex. 4 (Janecka Dep.) at 62:11-63:8. Detained immigrants are notified of Policy 10.3.5 in the Supplemental Detainee Handbook and are given verbal notice by GEO officers during the mandatory daily clean ups. *Id.* at 62:9-10; 87:8-88:21.

Finally, GEO's Housekeeping Plan provides that "[o]n a weekly basis or as needed, all Housing Units will be subject to a total sanitation mission to assure standards are met and maintained." Wright Decl. at Ex. 18 (Housekeeping Plan) at 2. This "total sanitation mission" is carried out by detained immigrants pursuant to the HUSP.

GEO obtains compliance with the Adelanto HUSP by threatening detained immigrants with punishment. Novoa Decl. at ¶ 13; Campos Fuentes Decl. at ¶¶ 14, 15; Karim Decl. at ¶¶ 10-13; Mancia Decl. at ¶¶ 10-11; Munoz Decl. at ¶¶ 5, 6, 9; Marwaha Decl. at ¶¶ 11-13. The Supplemental Detainee Handbook classifies "[r]efusal to clean assigned living area" as a 300-level "High Moderate" offense punishable by up to 72 hours in disciplinary restriction (also known as solitary confinement) or even criminal prosecution. Wright Decl. at Ex. 16 (Supp. Detainee Handbook) at 29; Ex. 4 (Janecka Dep.) at 67:17-68:14.

A detained immigrant may be moved to another housing unit—thereby disrupting the individual's community and threatening his sense of safety—as a sanction for refusing to clean. Wright Decl. at Ex. 4 (Janecka Dep.) at 71:16-25; Novoa Decl. at ¶ 14; Marwaha Decl. at ¶ 12. GEO also suspends programs and recreation unless and until detainees clean the housing units, hallways, kitchens, laundry, and intake area upon demand and without compensation. Wright Decl. at Ex. 4 (Janecka Dep.) at 232:11-23; *see also* Karim Decl. at ¶ 11. Indeed, Policy 10.3.5 prohibits detained immigrants from participating in "any activities/programs until the unit is cleaned," and threatens that

"[c]ontinued refusal to clean the area will result in further disciplinary action." Wright
Decl. at Ex. 24 (Policy 10.3.5) at 3.

GEO's HUSP applies to all immigrants detained at Adelanto. All detained
immigrants are notified of GEO's requirement that they perform uncompensated
cleaning and maintenance work, and that the consequence of refusal can be serious
harm, including solitary confinement. Novoa Decl. at ¶¶ 5, 12; Karim Decl. at ¶¶ 11,
13; Munoz Decl. at ¶¶ 5-6; Marwaha Decl. at ¶¶ 11-13; Mancia Decl. at ¶¶ 5, 10, 11.
GEO officials enforce the Adelanto HUSP in each housing unit of the Facility. *See*
Wright Decl. at Ex. 4 (Janecka Dep.) at 52:21-53:3 (defining "housing area" to include
"the common area, the dayrooms where they sit, where they eat, where they socialize");
57:10-15 ("The walls, sinks, toilets are part of their room."). Accordingly, more than
10,000 detainees have been subjected to the HUSP since GEO assumed responsibility
for Adelanto in May 2011.

Because of its HUSP, GEO can avoid paying non-detainee custodians or janitors
to clean the housing units. In fact, for all 1,940 beds and approximately 400,000 square
feet of the Adelanto campus, GEO employs only <u>six</u> non-detainee janitors, each assigned
to clean the ICE and GEO offices located outside the secured perimeter, where detained
immigrants are prohibited. Wright Decl. at Ex. 4 (Janecka Dep.) at 35:18-37:15; 42:14-
44:13. Before 2016, GEO employed only <u>three</u> non-detainee janitors at Adelanto. *Id.*

**b. GEO's HUSPs at its other civil immigration detention facilities.**

GEO admits that all immigrants detained in GEO's civil immigration detention
facilities nationwide are subject to the HUSP. *See* ECF 174 at 7; 8; 12; 13 (conceding the
existence of a nationwide corporate HUSP). The Tenth Circuit has already affirmed
certification of a class of detained immigrants challenging the HUSP at GEO's Aurora
ICE Processing Center. *See Menocal v. GEO Grp., Inc.*, 882 F.3d 905 (10th Cir.), *cert.
denied,* 139 S. Ct. 143  (2018).

Like at its Adelanto and Aurora facilities, GEO threatens detained immigrants
nationwide with serious harm or abuse of legal process for refusing or failing to perform

uncompensated work pursuant to each HUSP. *See* Wright Decl. at Ex. 25 (Northwest Detention Center Detainee Handbook) at 18 (classifying "[r]efusal to clean assigned living area" as a 300-level "High Moderate" offense punishable by up to 72 hours in disciplinary restriction—*i.e.*, solitary confinement—or even criminal prosecution);[3] Ex. 34 (Requests for Admission) at No. 24.

### c. GEO incorrectly contends the broad scope of labor required under the HUSPs is within the Personal Housekeeping Requirement of the PBNDS.

GEO incorrectly interprets the Personal Housekeeping Requirement as *carte blanche* to require all detained immigrants to perform almost any janitorial work necessary in the dormitories or pods. Indeed, GEO admits the company "interprets ICE's PBNDS 5.8.V.C to permit GEO to require detainees to perform tasks for no compensation that are in addition to and separate from the four enumerated personal housekeeping tasks identified in PBNDS 5.8.V.C." Wright Decl. at Ex. 34 (Requests for Admission) at No. 23. Similarly, GEO's corporate representative testified in *Menocal* that the Personal Housekeeping Requirement permits mandatory detained immigrant labor outside the four personal housekeeping tasks. *See Menocal v. GEO*, No. 1:14-cv-02887 (D. Colo.), ECF 50-1 at 13.

David Venturella, GEO's Senior Vice President of Client Relations, has confirmed GEO's position that its HUSPs are permissible under the PBNDS. On February 14, 2018, Mr. Venturella wrote to then-Acting ICE Director Thomas D. Homan "to address recent lawsuits that have put GEO in a burdensome and costly position defending the agency's legal framework and the policies to which GEO is bound as a federal contractor." Wright Decl. at Ex. 26 (Venturella Letter) at ICE-

---

[3] According to Acting ICE Director Matt Albence, the Adelanto Facility is "representative of all our detention centers. That is how we run our detention facilities." "Fox News gets exclusive access to one of nation's largest ICE detention facilities," Fox and Friends, Fox News (July 26, 2019) at 4:55-5:13, *available at* https://www.youtube.com/watch?v=SdgN4jfxiqU&feature=youtu.be

FOIA2018_0000704. Mr. Venturella was referring to this and similar lawsuits alleging wage theft and/or forced labor at GEO's civil immigration detention facilities. According to Mr. Venturella, "[t]o the extent that plaintiffs allege that disciplinary segregation is an unlawful threat for refusal to work, this sanction comes directly from ICE policies . . ." *Id.* at ICE-FOIA2018_0000707.

### 4.   GEO's Deprivation Policy

#### a. In violation of the PBNDS, GEO deprives detained immigrants of basic living necessities, including sufficient food.

The Department of Homeland Security Office of Inspector General ("OIG") conducts unannounced inspections of civil immigration detention centers, including Adelanto, to evaluate their compliance with the PBNDS.  Following an unannounced inspection of Adelanto, OIG issued a report on September 27, 2018 identifying "a number of serious issues that violate ICE's 2011 [PBNDS] and pose significant health and safety risks at the facility." Wright Decl. at Ex. 27 (OIG-18-86, "Management Alert – Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California"). On June 3, 2019, OIG reiterated its concerns of "immediate risks or egregious violations of detention standards" at Adelanto, "including nooses in detainee cells, overly restrictive segregation, inadequate medical care, unreported security incidents, and significant food safety issues" such as "issues with expired food, which puts detainees at risk for food-borne illnesses." Wright Decl. at Ex. 28 (OIG-19-47, "Concerns about ICE Detainee Treatment and Care at Four Detention Facilities"). With respect to food safety, OIG reported:

> At Adelanto, lunch meat and cheese were mixed and stored uncovered in large walk-in refrigerators; lunch meat was also unwrapped and unlabeled; chicken smelled foul and appeared to be spoiled; and food in the freezer was expired.

*Id.* at 4.

Indeed, the food, clothing, and personal hygiene items provided by GEO to immigrants detained at Adelanto are insufficient in both quality and quantity. Novoa Decl. at ¶ 15; Campos Fuentes Decl. at ¶ 11; Karim Decl. at ¶ 17; Mancia Decl. at ¶ 14; Munoz Decl. at ¶ 13; Marwaha Decl. at ¶ 17. To supplement their rations, detained immigrants must purchase these necessities items from commissary. *Id.* The only way for a detained immigrant to fund his or her commissary account is to work through the Work Program for $1 per day or have someone outside the Facility transfer funds into it. GEO secures a virtually free labor force by withholding sufficient food and basic living necessities from detained immigrants and compelling them to work for $1 per day in order to buy those necessities from commissary.

Detained immigrants also work for no compensation in the hopes of receiving extra food, clothing, or necessities from GEO officials. Wright Decl. at Ex. 34 (Requests for Admission) at No. 26 (admitting pursuant to Fed. R. Civ. P. 36(a)(3) that "GEO occasionally provides extra food, clothing, batteries, and/or personal hygiene items to detainees at the Adelanto Facility who perform work, tasks, or other labor"). *See also* Campos Fuentes Decl. at ¶ 9; Mancia Decl. at ¶¶ 8, 10; Marwaha Decl. at ¶ 10. In violation of the PBNDS, GEO induces detained immigrants to work in the kitchen by promising them extra food. Wright Decl. at Ex. 13 (Monthly Food Service Dept. Meeting Minutes) at 2 ("We have been granted permission from Warden Janecka to treat our detainee workers to treats, such as extra dessert, ice cream, peanut butter & jelly sandwiches, breakfast tacos, monkey bread, etc."). *See also* PBNDS § 4.1.C.5 ("Detainee workers shall receive the same fare as other detainees.").

### b. ICE does not hold GEO accountable for violating the PBNDS.

OIG has reported that ICE does not adequately ensure that GEO complies with the PBNDS, hold GEO accountable for violating those detention standards, or promote comprehensive deficiency corrections. *See* Wright Decl. at Ex. 29 (OIG-18-67, "ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements"); Ex. 30 (OIG-19-18, "ICE Does Not Fully

Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards").

Indeed, Warden Janecka testified that ICE has <u>never</u> imposed a financial penalty against GEO for failure to correct a deficiency at Adelanto. Wright Decl. at Ex. 4 (Janecka Dep.) at 293:12-15. Despite GEO's continued and documented noncompliance with the PBNDS, GEO has received only one contract deficiency report from ICE related to Adelanto, a December 2015 report regarding medical staffing. *Id.* at 293:16-21. That report did not result in any financial penalty against the corporation. *Id.*

### c. GEO has a financial incentive to ensure a captive workforce and minimize expenditures on daily necessities.

GEO has several incentives to reduce daily operating costs by exploiting detainee labor and minimizing expenditures on daily necessities. First, lowering operating costs increases GEO's ability to secure competitive ICE contracts. To bid for an ICE contract, GEO calculates a per diem or bed-day rate, which includes all daily operating costs, such as personnel, food, health care, supplies, utilities, maintenance, infrastructure, depreciation, cost of capital, overhead and profit. Wright Decl. at Ex. 19 (Venturella Dep.) at 250:5-24; Ex. 31 (Declaration of David Venturella, Dec. 22, 2015) at 3-4. Staffing and labor costs constitute approximately 65 percent of Adelanto's total operating costs. Wright Decl. at Ex. 19 (Venturella Dep.) at 240:18-241:4.

The bidding process for ICE contracts is competitive, so government contractors like GEO have an incentive to submit the lowest per diem bid. *Id.* at 251:14-18. GEO can lower the per diem rate, and thus increase its competitive advantage, by reducing costs related to staffing, exempt and non-exempt labor, food service, and medical services and supplies. *Id.* at 251:1-18. Accordingly, by minimizing costs related to staffing Adelanto and caring for detained immigrants, GEO is better positioned to secure competitive ICE contracts and therefore  maximize corporate profits. *Id.* at 252:14-24.

GEO's incentive to reduce daily operating costs also stems from the nature of GEO's contract with ICE. The IGSA is a fixed-cost or fixed-priced contract, so the

amount ICE pays to GEO to operate Adelanto does not depend on the resources GEO actually uses. *See id.* at 49:23-50:5; 266:12-267:9. As a result, if GEO's actual costs are higher than the per diem rate set forth in the contract, the company is responsible for those costs unless ICE agrees to increase the per diem rate. *Id.* at 85:4-10; 79:24-80:20 ("If our model was wrong we eat those costs."). But if GEO's actual costs are lower than the established per diem rate, the company can pocket the difference. *Id.* at 81:7-12. By depriving detainees of sufficient basic necessities and relying on un- and underpaid detainee labor to maintain and operate the Facility, GEO pads its bottom line by maximizing profits and minimizing actual costs.

## III.   LEGAL STANDARD

A trial court has broad discretion to grant a motion for class certification. *See Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010). In order for a class action to be certified, plaintiffs must establish the four prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). In addition, plaintiffs must establish at least one of the alternative requirements of Rule 23(b).[4] Plaintiffs seek to certify the Adelanto Wage Class under Rule 23(b)(3), the Adelanto Forced Labor Class and Subclasses under Rules 23(b)(2) and 23(b)(3), and the Nationwide HUSP Class under Rule 23(b)(2).[5] As demonstrated below, Plaintiffs satisfy all requirements of Rule 23 and certification of the proposed classes is appropriate.

## IV.   CLASS DEFINITIONS

Plaintiffs seek to certify the following classes and subclasses:

**A.    The Adelanto Wage Class.** For Plaintiffs' claims arising under the California Minimum Wage Law ("MWL"), Cal. Labor Code §§ 1194, 1197, 1197.1; IWC Wage Order No. 5; the California Unfair Competition Law, Cal. Bus. & Prof. Code

---

[4] While some circuits have adopted an "ascertainability" prerequisite to certification, the Ninth Circuit has not. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 n.4 (9th Cir. 2017).

[5] *See* Wright Decl. at Ex. 32 (Summary of Proposed Classes and Subclasses).

§ 17200, *et seq.*; and the California common law of unjust enrichment, Plaintiffs seek to certify the following class:

> All civilly detained immigrants who (i) were detained at the Adelanto ICE Processing Center any time between December 19, 2014 and the date of final judgment in this matter, and either (ii) participated in the Voluntary Work Program at any point during their detention, or (iii) performed work for no compensation in the Uncompensated Work Program pending their participation in the Voluntary Work Program, or (iv) performed work for no compensation pursuant to the Adelanto Housing Unit Sanitation Policy.

**B.    The Adelanto Forced Labor Class.** For Plaintiffs' claims for forced labor and attempted forced labor arising under the California Trafficking Victims Protection Act, Cal. Civ. Code § 52.5, and the federal Trafficking Victims Protection Act, 18 U.S.C. §§ 1589(a) and 1594(a), Plaintiffs seek to certify the following class:

> All civil immigration detainees who were detained at the Adelanto ICE Processing Center any time between May 1, 2011 and the date of final judgment in this matter.

Plaintiffs seek to certify two subclasses of the Adelanto Forced Labor Class, as follows:

> 1. **The Work Program Subclass**: All individuals who participated in the Voluntary Work Program at any point during their detention.
>
> 2. **The Uncompensated Work Program Subclass**: All individuals who participated in the Uncompensated Work Program at any point during their detention.

**C.    The Nationwide HUSP Class.** For Plaintiffs' claim for forced labor and attempted forced labor arising under the federal Trafficking Victims Protection Act, Plaintiffs seek to certify the following class:

> All civilly detained immigrants who (i) were detained at any civil immigration detention center owned or operated by GEO in the United States between December 19, 2007 and the date of final judgment in this matter, and (ii) were subject to a GEO Housing Unit Sanitation Policy (HUSP) at any point during their detention.

Excluded from the definition of the Nationwide HUSP Class are the following: (1) individuals detained in GEO's family residential detention facility in Karnes City,

Texas; (2) individuals detained in the Alexandria Staging Facility in Alexandria, Louisiana; (3) any individual detained in the custody of the U.S. Marshalls or any other law enforcement agency at a GEO facility where the company also detains civil immigration detainees pursuant to contracts with ICE; and (4) civilly detained immigrants held at the Aurora ICE Processing Center in Aurora, Colorado at any time before October 22, 2014.

# V.     ARGUMENT

## A.     The Proposed Classes Satisfy Rule 23(a).

### 1.     <u>Each class likely exceeds 1,000 members.</u>

A class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no numerical cutoff for sufficient numerosity, but forty or more members will generally satisfy the numerosity requirement. *Hernandez v. Lynch*, 2016 WL 7116611, at *15 (C.D. Cal. Nov. 10, 2016) (Bernal, J.), *aff'd sub nom. Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017).

Numerosity is easily satisfied here. With respect to the Adelanto Wage Class and the Adelanto Forced Labor Class, Adelanto can house up to 1,940 individuals every day, with a guaranteed minimum of 1,455 beds. GEO admits "the total number of participants in the Work Program at the Adelanto Facility since December 19, 2007 exceeds 1,000." ECF 45 at 6. The true number of Work Program participants is likely much higher. James Janecka, Facility Administrator/Warden of the Adelanto Facility, testified that 200 to 300 detained immigrants are currently eligible to report for a Work Program shift. Wright Decl. at Ex. 4 (Janecka Dep.) at 190:5-191:6. With respect to food service jobs alone, Warden Janecka explained:

> If I have four serving lines at the west building with four inserts in each
> serving line for the dining room, that's 16 positions that I can make
> available per shift. If I have four dishwashers at my west building, there's
> four additional positions that I can offer to the population. Makes 20.
> Then you mentioned cooks and some other areas. I don't know how many
> cooks that we employ as far as in the Voluntary Work Program. And there
> are a few other jobs that we can offer in food service. So when we're

looking at a job, it's what can we offer that there is productive work for a detainee to do in a certain department.

Wright Decl. at Ex. 4 (Janecka Dep.) at 198:8-20. Data obtained from the City of Adelanto show that GEO sought reimbursements from ICE for 30,048 Work Program shifts from August 29, 2012 through November 5, 2012 alone, and 49,258 shifts from September 1, 2014 through August 31, 2015. Wright Decl. at Ex. 33 (Amendments of Solicitation/Modification of Contract).

With respect to the Nationwide HUSP Class, GEO's facilities house more than 10,000 individuals every day. Each of those detained immigrants are subject to the uncompensated labor requirements and corresponding threats of GEO's HUSPs and facility discipline policies. Each proposed class is thus sufficiently numerous that joinder of all class members would be impracticable.

### 2. Common questions of law and fact abound.

In the Ninth Circuit, "Rule 23(a)(2) has been construed permissively. . . . The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Staton v. Boeing Co.*, 327 F.3d 938, 953 (9th Cir. 2003). The commonality requirement is satisfied when plaintiffs assert claims that "depend upon a common contention . . . capable of classwide resolution—which means that a determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350; *see also id.* ("What matters to class certification . . . is not the raising of common questions . . . but, rather, the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.") (internal quotation marks and citations omitted). This does not mean, however, that plaintiffs must show that "every question in the case, or even a preponderance of questions, is capable of class wide resolution. So long as there is even a single common question, a would-be class can satisfy the commonality requirement . . ." *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) (internal quotation marks omitted). Accordingly, a class may be

certified even if not perfectly tailored to every person who may have suffered the relevant harm.

### a. The Adelanto Wage Class

With respect to the Adelanto Wage Class, the primary factual and legal questions at issue include:

(1) Whether GEO is an "employer" and the detainee workers are "employees" under the MWL;

(2) Whether GEO violated the MWL by failing to pay detainee workers the statutory minimum wage;

(3) Whether GEO was unjustly enriched by paying subminimum wages to its detainee workers; and

(4) Whether Plaintiffs' MWL claim should be preempted by federal law.

Here, as in *Nwauzor*, "[c]ommon answers will resolve these common issues." Wright Decl. at Ex. 1 (*Nwauzor* Orders) at 2 (certifying a class of immigrants detained at GEO's Tacoma ICE Processing Center alleging that GEO violated the Washington Minimum Wage Act by paying detained immigrants participating in the Work Program only $1 per day). Indeed, the foundational questions of whether a private contractor can be an employer of civil detainees under the MWL and whether the MWL is preempted by federal law are indisputably common questions that apply equally to all class members and can be answered in a single stroke. That is, the "truth or falsity" behind the nature of the relationship between GEO and the detainee workers depends on factual predicates that are common to the class, *Wal-Mart*, 564 U.S. at 350; namely: (a) GEO's degree of control over the method, timing, and performance of detainee labor; (b) the inability of detainee workers to alter their income beyond the standard payment of $1 per day regardless of skill, initiative, or any other factor; (c) GEO's training and equipment furnished to detainee workers; (d) GEO's restrictions on the ability of detainee workers to seek outside employment; and (e) GEO's control over the detainee workers' rate of pay.

There is no dispute that the Work Program is a standardized program run by GEO that applies the same rules and procedures to all detainee workers at Adelanto. *See* Wright Decl. at Ex. 15 (Work Program Policy). All detained immigrants are eligible to participate in the Work Program, work in the same universe of job classifications, receive the same level of direction and supervision from GEO, and are paid the same subminimum wages. *See* Section II.D.1, *supra.* The relationship between GEO and the detained immigrants in the Work Program is the same for all participants, and there are no individual differences that affect the basic and universal nature of that relationship. Accordingly, the Adelanto Wage Class satisfies the commonality requirement.

### b.  The Nationwide HUSP Class

To establish a claim of forced labor under the federal Trafficking Victims Protection Act (TVPA), Plaintiffs must show that GEO "knowingly provide[d] or obtain[ed]" their labor "by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. § 1589(a). Serious harm is defined as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel *a reasonable person* of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c) (emphasis added).

This statutory language makes clear that the first inquiry under the federal forced labor statute is GEO's intent in threatening harm. *See U.S. v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011) ("The linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall her."). To determine if the harms threatened were serious, the statute employs a reasonable person test: Was the threat sufficiently serious that a reasonable person of the same background and circumstances would feel compelled to continue working? *See id.*; *see also Nuñag–Tanedo v. East Baton Rouge Parish School Board,*

2011 WL 7095434, (C.D. Cal. Dec. 12, 2011) (Kronstadt, J.) (certifying a federal TVPA class where the putative class members shared the same background and circumstances such that a reasonable person standard could be used to determine whether it was the defendants' scheme that ultimately compelled the plaintiffs to work). Accordingly, the first question susceptible to common proof is whether GEO obtains the labor of detained immigrants via improper means, including threats of harm.

Other common factual and legal questions at issue with respect to the Nationwide HUSP Class include:

> (1) Whether GEO forces, coerces, or otherwise compels detained immigrants held at its civil immigration detention centers nationwide to work for no compensation;
>
> (2) Whether GEO threatens detained immigrants with serious harm or abuse of legal process for refusing or failing to perform uncompensated work;
>
> (3) Whether GEO requires detained immigrants to perform janitorial, maintenance, or other work above and beyond the four personal housekeeping tasks enumerated in the ICE PBNDS;
>
> (4) Whether GEO's HUSPs constitute improper means of coercion under the forced labor statutes; and
>
> (5) Whether GEO's conduct violates the federal Trafficking Victims Protection Act.

These common questions apply equally to all class members and can be answered in a single stroke. Indeed, as the *Menocal* court observed, "GEO has a specific, uniformly applicable Sanitation Policy that is the subject of Representatives' forced labor claim." *Menocal*, 320 F.R.D. 258 at 264 (certifying a class of detained immigrants challenging the HUSP at GEO's Aurora ICE Processing Center under the federal TVPA).

### c.  The Adelanto Forced Labor Class

For the same reasons discussed above with respect to the Nationwide HUSP Class, all members of the Adelanto Forced Labor Class will likewise rely on facts that

are shared among the class and thus are susceptible to class-wide proof. Plaintiffs' claims on behalf of the Adelanto Forced Labor Class depend on whether GEO attempted to obtain detainee labor by improper means. The primary factual and legal questions at issue include:

(1) Whether GEO attempts to compel detained immigrants to join the Work Program or face significant hardship;

(2) Whether GEO attempts to compel detained immigrants to join the Uncompensated Work Program or face significant hardship;

(3) Whether GEO threatens detained immigrants with serious harm or abuse of legal process for refusing or failing to perform un- or under-compensated work;

(4) Whether GEO withholds sufficient basic living necessities and food from immigrants detained at Adelanto;

(5) Whether GEO provides detained immigrants with extra food, clothing, and/or necessities in exchange for their labor;

(6) Whether a reasonable person would provide labor to GEO under the circumstances present here;

(7) Whether GEO's conduct violates the California Trafficking Victims Protection Act; and

(8) Whether GEO's conduct violates the federal Trafficking Victims Protection Act.

These common questions apply equally to all class members and can be answered in a single stroke. Accordingly, the Adelanto Forced Labor Class satisfies the commonality requirement.

### 3.   Plaintiffs' claims are typical of the class claims.

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992); Fed. R. Civ. P. 23(a)(3). The typicality inquiry focuses

on the claims, not the specific facts underlying them. *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017). "The requirement is permissive, such that 'representative claims are typical if they are reasonably coextensive with those of absent class members; they need not be substantially identical.'" *Id.* "Measures of typicality include whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* (internal quotations and citations omitted). The Ninth Circuit's post-*Wal-Mart* decisions have not required proof of injury to establish typicality; rather, they have found typicality to be met on the basis of the plaintiffs' allegations. *See, e.g.*, *Just Film*, 847 F.3d at 1117; *Parsons v*, 754 F.3d at 685; *see also Wright v. Renzenberger, Inc.*, 656 F. App'x 835, 839-40 (9th Cir. 2016) (unpublished) ("[W]hether a named plaintiff actually suffered injury is irrelevant; what matters is whether the plaintiff has alleged the same type of injury as other plaintiffs.").

Here, Plaintiffs' claims are typical of the classes they seek to represent. Each Plaintiff was or is currently an immigrant civilly detained at Adelanto, where he was or is subjected to the same uniform policies and practices and suffered the same injuries as all absent class members. Indeed, each GEO policy at issue here—the HUSPs, Work Program Policy, Uncompensated Work Program Policy, and Deprivation Policy—applied uniformly to every detained immigrant, including Plaintiffs.

Each Plaintiff participated in the Work Program and/or Uncompensated Work Program at Adelanto, received subminimum or zero wages for their labor, and suffered substantially the same financial injury as all absent class members due to GEO's failure to pay the prevailing minimum wage. *See* Wright Decl. at Ex. 1 (*Nwauzor* Orders) at 3-4 (finding typicality under similar facts). Each Plaintiff, like all class members, labored for GEO under threat of serious harm or abuse of legal process. Indeed, with respect to the Nationwide HUSP class, "the claims of all the class members—including the representatives—share the same theory: that GEO knowingly obtained class members' labor by means of the [HUSP], which threatened—or was intended to cause them to

believe they would suffer—serious harm or physical restraint if they did not fulfill their cleaning assignments." *Menocal*, 882 F.3d 905, 917 (10th Cir.), *cert. denied*, 139 S. Ct. 143 (2018) (affirming typicality under similar facts).

In sum, the typicality requirement is satisfied because each Plaintiff alleges the same or similar injuries as the absent class members. These injuries result from a course of conduct that is not unique to any Plaintiff. Instead, the injuries of Plaintiffs and all class members follow from GEO's conduct at the center of the class claims.

### 4. <u>Plaintiffs and their counsel will fairly and adequately protect the interests of all class members.</u>

The adequacy inquiry turns on: (1) whether the representative plaintiffs and class counsel have any conflicts of interest with other class members; and (2) whether the representative plaintiffs and class counsel can vigorously prosecute the action on behalf of the class. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011); Fed. R. Civ. P. 23(a)(4).

Plaintiffs will adequately represent the interests of all proposed class members. Because Plaintiffs seek the same relief as all absent class members, there are no potential conflicting interests. Plaintiffs understand their obligation to vigorously pursue the interests of the classes, and their fiduciary responsibility to represent other class members as fairly and adequately as they would represent and consider their own interests. Novoa Decl. at ¶¶ 18-20; Campos Fuentes Decl. at ¶¶ 16-18; Karim Decl. at ¶¶ 19-21; Mancia Decl. at ¶¶ 16-18.

Finally, Plaintiffs' counsel have sufficient resources, experience, and knowledge to litigate this matter on behalf of the proposed classes, and have thoroughly investigated and pursued potential claims in this action. *See* Declaration of Daniel Charest; Declaration of Tina Wolfson; Declaration of R. Andrew Free. Plaintiffs' counsel are well qualified, have significant experience prosecuting complex cases, and have previously been certified as lead counsel in complex class actions, multidistrict litigation, and other

high-impact cases. *Id.* Finally, the undersigned counsel have no conflicts of interest within any putative class. As a result, the adequacy requirement is satisfied.

**B.    The Adelanto Forced Labor Class and Nationwide HUSP Class Satisfy the Requirements of Rule 23(b)(2).**

Rule 23(b)(2) permits certification of a class seeking declaratory or injunctive relief where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed.R.Civ.P. 23(b)(2). In the Ninth Circuit, "[i]t is sufficient to meet the requirements of Rule 23(b)(2) [when] class members complain of a pattern or practice that is generally applicable to the class as a whole." *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010) (internal citation and quotation marks omitted).

This action concerns GEO policies and practices applicable to every member of each proposed Rule 23(b)(2) class that, if unlawful, subject all class members to forced labor, attempted forced labor, and serious harm. The patterns and practices alleged here—namely, GEO's Work Program Policy, Uncompensated Work Program Policy, Deprivation Policy, and HUSPs—are generally applicable to each class as a whole. All class members seek essentially the same injunctive relief enjoining GEO from its current unlawful course of conduct. Rule 23(b)(2)'s requirements are therefore satisfied. *See Parsons v. Ryan*, 754 F.3d 657, 689 (9th Cir. 2014) (Rule 23(b)(2) satisfied where state department of corrections established policies and practices that placed "every inmate in custody in peril" and all class members sought essentially the same injunctive relief).

**C.    The Adelanto Wage Class and Adelanto Forced Labor Class Satisfy the Requirements of Rule 23(b)(3).**

**1.    Common issues predominate as to each cause of action.**

"The Rule 23(b)(3) predominance inquiry tests whether [the] proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997) (citing 7A Charles Alan Wright, Arthur R. Miller &

Mary Kay Kane, Federal Practice and Procedure, 518-519 (2d ed. 1986)). Courts must consider "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). The inquiry rests on "legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement, and tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 594.

In order to satisfy Rule 23's predominance requirement, plaintiffs must show "that the whole class suffered damages traceable to the same injurious course of conduct underlying the plaintiffs' legal theory." *Just Film*, 847 F.3d at 1120 (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 34–38 (2013)). In assessing whether common issues predominate the analysis of state law claims, courts look to the elements of those claims as defined by state law. *See Sali v. Corona Reg'l Med. Ctr.*, 889 F.3d 623, 638-39 (9th Cir. 2018); *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action."). Here, common issues predominate as to each claim for which Plaintiffs seek certification under Rule 23(b)(3).

### a. California Minimum Wage claim

In California, the "essential predicate of each employer's obligation to pay a minimum wage" is the Industrial Welfare Commission's ("IWC") issuance of an applicable Wage Order fixing the minimum wage and providing the legal basis for an action by the employee to recover unpaid minimum wages. *Martinez v. Combs*, 49 Cal. 4th 35, 56 (2010). The Court has already determined that IWC Wage Order No. 5 applies to this action. *See* ECF 44 at 11. Plaintiffs seek a remedy under California Labor Code § 1194. The California Supreme Court has held that "to employ" within the meaning of Section 1194 means: "(a) to exercise control over the wages, hours or working conditions, or (b) to suffer or permit to work, or (c) to engage, thereby creating a common law employment relationship." *Martinez*, 49 Cal. 4th at 64.

Plaintiffs have put forth substantial evidence that GEO exercises complete control over the wages, hours and working conditions of its detained immigrant workforce at Adelanto. GEO controls the method, timing, and performance of detainee labor; furnishes all training and equipment to detainee workers; controls detainee workers' rate of pay; prevents detainee workers from altering their income beyond the standard payment of $1 per day regardless of skill, initiative, or any other factor; and restricts detainee workers from seeking outside employment. *See* Sections II.D.1, II.D.2, *supra*. No individualized evidence is necessary to determine the actual extent of control GEO exercises over its detained immigrant workforce, because GEO applies the same policies bearing on these questions to all class members. *Id.* As a result, common questions predominate under the first prong of the *Martinez* test.

Plaintiffs also have established predominance under the second prong of the *Martinez* test. To establish that the class members were employees under the "suffer or permit to work" test, it is sufficient for Plaintiffs to show that the work performed by the class members was in the usual course of GEO's business. *See Dynamex v. Superior Court*, 4 Cal. 5th 903, 956-57 (2018). GEO concedes that it is contractually required to provide for the housing, board, and medical services of detained immigrants at Adelanto. ECF 45 at 13; *see also* Section II.A, *supra*. Plaintiffs have established that GEO relies on detained immigrants for many of those functions, including food service, maintenance, cleaning, and sanitation. *See* Sections II.B, II.D, *supra*. Because the type of work performed by the putative Adelanto Wage Class and the scope of GEO's business are capable of determination on a class-wide basis, common issues predominate.

Finally, Plaintiffs have proffered common, class-wide evidence that every member of the Adelanto Wage Class received less than the minimum wage in any given hour of work. *See* Section II.D, *supra*. Plaintiffs have furnished sufficient evidence of the existence of common policies applicable to all detained immigrants hired by GEO. *See* Section II.D, *supra*. As a result, Plaintiffs have demonstrated they can establish on a class-wide basis that under the Work Program Policy, Uncompensated Work Program Policy,

and/or Adelanto HUSP, detained immigrants "suffered damages traceable to the same injurious course of conduct underlying the plaintiffs' legal theory." *See Just Film*, 847 F.3d at 1120. Consequently, common issues predominate the analysis of the minimum wage claim.

### b.  California Unfair Competition Law claim

"California's unfair competition law (UCL) . . . defines 'unfair competition' to mean and include 'any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law (§ 17500 et seq.)].'" *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 949 (2002) (quoting Cal. Bus. & Prof. Code § 17200). "By defining unfair competition to include any 'unlawful . . . business act or practice', the UCL permits violations of other laws to be treated as unfair competition that is independently actionable." *Id.* (citations omitted).

The California Supreme Court has made clear that a violation of California Labor Code § 1194 constitutes an unlawful business act or practice under the UCL and that payment of those wages is therefore available as a restitutionary remedy. *See, e.g.*, *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1206 (2011); *Cortez v. Purolator Air Filtration Prod. Co.*, 23 Cal. 4th 163, 177 (2000) (an employer that has unlawfully withheld wages from an employee "has acquired the money . . . by means of an unlawful practice that constitutes unfair competition as defined by section 17200"). *See also Ridgeway v. Wal-Mart Stores, Inc.*, 2017 WL 363214, *2 (N.D. Cal. 2017) ("having previously found that [employer's] pay policies violate California minimum wage law, plaintiffs were entitled to summary judgment on their UCL claim"). Consequently, Plaintiffs have established that common issues predominate their UCL claim as to the Adelanto Wage Class.

### c.  Unjust Enrichment claim

Unjust enrichment "describe[s] the theory underlying a claim that a defendant has been unjustly conferred a benefit 'through mistake, fraud, coercion, or request.'" *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (citing 55 Cal. Jur. 3d Restitution § 2). The return of that benefit is the remedy "typically sought in a quasi-

contract cause of action." *Id.*; *see also Munoz v. MacMillan*, 195 Cal.App.4th 648, 661 (2011). Accordingly, the Court has already construed Plaintiffs' unjust enrichment claim as a quasi-contract claim seeking restitution. ECF 44 at 18.

Plaintiffs have proffered common, class-wide evidence that every member of the Adelanto Wage Class conferred a benefit on GEO, and that GEO unjustly retained that benefit at their expense. *See* Sections II.B, II.D.4, *supra*. Plaintiffs also have put forth sufficient evidence that all members of the Adelanto Wage Class were coerced into performing under- or un-compensated work that materially increased GEO's profits. *Id.* Consequently, Plaintiffs have established that common issues predominate their unjust enrichment claim as to the Adelanto Wage Class.

### d. California's Trafficking Victims Protection Act claim

A victim of human trafficking may bring a civil action for damages or injunctive relief under California Civil Code § 52.5. California's human trafficking statute provides in pertinent part that "[a] person who deprives or violates the personal liberty of another with the intent to obtain forced labor or services, is guilty of human trafficking." Cal. Penal Code § 236.1. The elements of the criminal offense are (1) the defendant either deprived another person of personal liberty or violated that other person's personal liberty; and (2) when the defendant did so, he or she intended to obtain forced labor or services from that person. *People v. Halim*, 14 Cal. App. 5th 632, 643 (Ct. App. 2017), *cert. denied sub nom. Halim v. California*, 138 S. Ct. 1564 (2018).

Section 236.1(g) equates its definition of human trafficking with the federal definition of a severe form of trafficking, defined in relevant part as "the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion, for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery." 22 U.S.C. § 7102(11)(B). Section 236.1 goes on to define "Deprivation or violation of the personal liberty of another" to include:

substantial and sustained restriction of another's liberty accomplished through force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person, under circumstances where the person receiving or apprehending the threat reasonably believes that it is likely that the person making the threat would carry it out.

Cal. Penal Code § 236.1(h)(3). Forced labor services are defined as "labor or services that are performed or provided by a person and are obtained or maintained through force, fraud, duress, or coercion, or equivalent conduct that would reasonably overbear the will of the person." Cal. Penal Code §236.1(h)(5). As this Court already determined, the "intent to" requirement in the California TVPA is congruent with 22 U.S.C. § 7102's requirement that the deprivation/violation of a person's liberty must be "for the purpose of subjection to" involuntary servitude or other forms of forced labor. ECF 44 at 14.

Plaintiffs have put forth sufficient evidence that GEO forced and coerced the Adelanto Forced Labor class to perform under- or uncompensated labor in order to drive corporate profits. *See* Sections II.B, II.D.4, *supra*. In addition, Plaintiffs have proffered common, class-wide evidence that GEO withholds basic necessities—including sufficient food, clothing, and personal hygiene items—to ensure a labor pool at Adelanto. *See* Section II.D.4, *supra*. Finally, Plaintiffs provide substantial evidence that GEO restrains their choice to stop working by threatening them with serious harm (including solitary confinement) and abuse of legal process. *See* Sections II.D.3, II.D.4, *supra*. This class-wide evidence demonstrates that GEO maintains a compulsory work program at Adelanto. Plaintiffs have established that common issues predominate the California forced labor claim as to the Adelanto Forced Labor Class and Subclasses.

### e. Federal Trafficking Victims Protection Act claims

Under 18 U.S.C. § 1589, GEO may not "knowingly provide[] or obtain[] the labor or services of a person" through force, physical restraint, serious harm, abuse of law or legal process, threats of any of those means, or any combination of those methods. 18 U.S.C. § 1589(a). Nor may GEO "knowingly benefit[], financially or by receiving anything of value, from participation in a venture" involving forced labor. 18 U.S.C.

§ 1589(b). 18 U.S.C. § 1595 provides a civil remedy to victims of forced labor. 18 U.S.C. § 1595.

Plaintiffs' federal TVPA claims are susceptible to class-wide proof. Plaintiffs have demonstrated the existence of GEO's policy or practice of withholding sufficient food and other necessities from class members, thereby forcing or attempting to force them to work at subminimum wages in order to buy those necessities from commissary. *See* Section II.D.4, *supra*. GEO further coerces or attempts to coerce class members to work by sometimes offering them extra food, clothing, or necessities. *See id.* Finally, GEO threatens all class members with serious harm or abuse of legal process if they refuse to work. *See* Sections II.D.3, II.D.4, *supra*. Thus, Plaintiffs satisfy the predominance requirement with respect to their claims arising under the federal forced labor statute.

### 2.   Class treatment is superior to any alternate means of dispute resolution.

A class action is superior "[w]here classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). The superiority determination "involves a comparative evaluation of alternative mechanisms of dispute resolution." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1023 (9th Cir. 1998), *overruled on other grounds by Wal-Mart*, 564 U.S. 338. In many ways, wage and hour claims are "perhaps the most perfect questions for class treatment." *Ramos v. SimplexGrinnell LP*, 796 F. Supp. 2d 346, 359 (E.D.N.Y. 2011), *vacated in part*, 773 F.3d 394 (2d Cir. 2014).

Class treatment is far superior to any other manner of litigating the claims at issue here. As past or current civil immigration detainees, many putative class members have a limited understanding of the law, limited English skills, and limited resources to devote to pursuing recovery. These considerations strongly "weigh in favor of class certification." *Menocal*, 882 F.3d at 915 (citation omitted) (finding superiority under similar facts). Without class treatment, the putative class members would have no effective remedy for their injuries. *See Amchem*, 521 U.S. at 617; *Menocal*, 882 F.3d at 915.

1    These concerns are magnified in this instance by the fear of retaliation or adverse

2    immigration consequences that could deter many current and former detainees from

3    pursuing individual legal actions against GEO. *See* Third Amended Complaint, ECF 184

4    at ¶¶ 253-273 (alleging that GEO has already unlawfully retaliated against all putative

5    class members for bringing this lawsuit). This action presents no manageability problems

6    that would make a class action inferior to separate individual actions. For all these

7    reasons, the superiority requirement is satisfied.

8                              **VI.   CONCLUSION**

9         Plaintiffs respectfully request that the Court certify the Adelanto Wage Class

10   under Rule 23(b)(3); the Adelanto Forced Labor Class, including the Work Program

11   Subclass and the Uncompensated Work Program Subclass, under Rules 23(b)(2) and

12   23(b)(3); and the Nationwide HUSP Class under Rule 23(b)(2). Plaintiffs further

13   respectfully request that the Court designate Plaintiffs Raul Novoa, Jaime Campos

14   Fuentes, Abdiaziz Karim, and Ramon Mancia as class representatives; appoint the law

15   firms of Burns Charest, Ahdoot and Wolfson, and the Law Office of R. Andrew Free

16   as class counsel; and order that notice of this action be provided to the classes.

17

18   Dated:      September 27, 2019      */s/ Lydia A. Wright*

19                                       Korey A. Nelson (admitted *pro hac vice*)
                                         knelson@burnscharest.com
20                                       LA Bar # 30002

21                                       Lydia A. Wright (admitted *pro hac vice*)
                                         lwright@burnscharest.com
22                                       LA Bar # 37926

23                                       C. Jacob Gower (admitted *pro hac vice*)
                                         jgower@burnscharest.com
24                                       LA Bar # 34564

25                                       **BURNS CHAREST LLP**
                                         365 Canal Street, Suite 1170
26                                       New Orleans, LA 70130
                                         Telephone: (504) 799-2845
27                                       Facsimile: (504) 881-1765

28

R. Andrew Free (admitted *pro hac vice*)
andrew@immigrantcivilrights.com
TN Bar # 030513
**LAW OFFICE OF R. ANDREW FREE**
P.O. Box 90568
Nashville, TN 37209
Telephone: (844) 321-3221
Facsimile: (615) 829-8959

Nicole Ramos (admitted *pro hac vice*)
nicole@alotrolado.org
NY Bar # 4660445
**AL OTRO LADO**
511 E. San Ysidro Blvd., # 333
San Ysidro, CA 92173
Telephone: (619) 786-4866

Robert Ahdoot (CA Bar # 172098)
rahdoot@ahdootwolfson.com
Tina Wolfson (CA Bar # 174806)
twolfson@ahdootwolfson.com
Theodore W Maya (CA Bar # 223242)
tmaya@ahdootwolfson.com
Alex R. Straus (CA Bar # 321366)
astraus@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
10728 Lindbrook Drive
Los Angeles, California 90024-3102
Telephone:  (310) 474-9111
Fax:  (310) 474-8585

Will Thompson (CA Bar # 289012)
wthompson@burnscharest.com
Warren Burns (admitted *pro hac vice*)
wburns@burnscharest.com
TX Bar # 24053119
Daniel H. Charest (admitted *pro hac vice*)
dcharest@burnscharest.com
TX Bar # 24057803
**BURNS CHAREST LLP**
900 Jackson St., Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550

Facsimile: (469) 444-5002


**_Attorneys for Plaintiffs._**