# EXHIBIT 2

EROIGSA-11-0003

## EROIGSA-11-0003
## INTERGOVERNMENTAL SERVICE AGREEMENT
## BETWEEN THE
## UNITED STATES DEPARTMENT OF HOMELAND SECURITY
## U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
## OFFICE OF ENFORCEMENT AND REMOVAL OPERATIONS
## AND
## THE CITY OF ADELANTO

This Intergovernmental Service Agreement ("Agreement") is entered into between United States Department of Homeland Security Immigration and Customs Enforcement ("ICE"), and the City of Adelanto, **("Service Provider")** for the detention and care of aliens (**"detainees"**). The term "Parties" is used in this Agreement to refer jointly to ICE and the Service Provider.

## FACILITY LOCATION:

The Service Provider shall provide detention services for detainees at the following institution(s):

**City of Adelanto**
**10400 Rancho Road**
**Adelanto, CA 92301-2237**

The following constitutes the complete agreement:
- Intergovernmental Service Agreement (IGSA)
- Appendix A - Statement of Work
- Appendix B - ICE Design Standards
- Appendix C - Structured Cable Plant Standard
- Appendix D - Performance Requirements Summary
- Appendix E - Quality Assurances Surveillance Plan (QASP)
- Appendix F - Title 29, Part 4 Labor Standards for Federal Service Contract Clause
- Appendix G - Wage Determination  Number: 2011-0013, Rev 1 Dated 02/18/2011

**IN WITNESS WHEREOF,** the undersigned, duly authorized officers, have subscribed their names on behalf of the City of Adelanto and Department of Homeland Security, U.S. Immigration and Customs Enforcement.

**ACCEPTED:**

**ACCEPTED:**

U.S. Immigration and Customs Enforcement
Roberta Halls
Contracting Officer

City of Adelanto
D. James Hart, PH.D.
City Manager/Executive Director

Signature: _____
Date: 5-27-11

Signature: _____
Date: 5/13/11

Page 1 of 53

GOWER-GEO 0000477

EROIGSA-11-0003

# Standard Intergovernmental Service Agreement (IGSA)

## Table of Contents

| Article | Title | Page |
|---|---|---|
| I. | Purpose | 2 |
| II. | General | 3 |
| III. | Covered Services | 5 |
| IV. | Receiving and Discharging Detainees | 7 |
| V. | ICE Performance Based Detentions Standards | 8 |
| VI. | No Employment of Unauthorized Aliens | 38 |
| VII. | Period of Performance | 38 |
| VIII. | Inspections | 38 |
| IX. | Inspection Records | 39 |
| X. | Modifications and Disputes | 41 |
| XI. | Adjusting the Bed Day Rate | 42 |
| XII. | Enrollment, Invoicing, and Payment | 42 |
| XIII. | ICE Furnished Property | 44 |
| XIV. | Hold Harmless and Indemnification Provisions | 44 |
| XV. | Records | 45 |
| XVI. | Detainee Telephone Services | 45 |
| XVII. | Maintain Institutional Emergency Readiness | 46 |
| XVIII. | Security Requirements | 47 |
| XIX. | Quality Control | 51 |
| XX. | Contracting Officer's Technical Representative (COTR) | 52 |
| XXI. | Labor Standards and Wage Determination | 53 |

EROIGSA-11-0003

## Article I.  Purpose

A. <u>Purpose:</u>  The purpose of this Intergovernmental Service Agreement (IGSA) is to establish an Agreement between ICE and the Service Provider for the detention and care of persons detained under the authority of the Immigration and Nationality Act, as amended.  All persons in the custody of ICE are "Administrative Detainees."  This term recognizes that ICE detainees are not charged with criminal violations and are only held in custody to assure their presence throughout the administrative hearing process and to assure their presence for removal from the United States pursuant to a lawful final order by the Immigration Court, the Board of Immigration Appeals or other Federal judicial body.

ICE is reforming the immigration detention system to move away from a penal model of detention.  A key goal of reform is to create a civil detention system that is not penal in nature and serves the needs of ICE to provide safe and secure conditions that accommodate the needs of a diverse population, including the need for medical, mental health, and dental care, and ample access to recreation, attorneys, family visitation, religious and other programs.  Reform also includes detaining people close to the sites of their apprehension and near to hospitals, immigration service providers, and transportation hubs.

B. <u>Requirements:</u>  ICE requires a wholly new generation of detention facilities uniquely suited to ICE's civil detention authority.  Preference will be given to facilities that feature innovative and cost-effective designs and new approaches to staffing, and operations; and must be flexible, multipurpose, and expandable.  They must also provide housing environments with abundant natural light, outdoor recreation, contact visitation, noise control, freedom of movement, programming opportunities consistent with detainee demographics, and modern and fully functional medical facilities.  Persons housed at these facilities will range in security level from minimum to high.

C. <u>Responsibilities:</u>  This Agreement sets forth the responsibilities of ICE and the Service Provider.  The Agreement states the services the Service Provider shall perform satisfactorily to receive payment from ICE at the rate prescribed in Article I C.

D. <u>Rates:</u> This is a fixed rate agreement, not a cost reimbursable agreement, with respect to the bed day rate for a total of 1,300 detainees. The Service Provider shall provide the first 650 male bed spaces at the Adelanto Processing Center-East. The additional 650 bed space at the Adelanto Processing Center-West will be ready for occupancy 14 months after the IGSA is signed plus 75 days for ramping up. ICE will be responsible for reviewing and approving the costs associated with this Agreement and subsequent modifications utilizing all applicable federal procurement laws, regulations and standards in arriving at the bed day rate.

GOWER-GEO 0000479

EROIGSA-11-0003

| | | |
|---|---|---|
| Bed Day Rate at 75% Minimum Guarantee for 650 beds At the Adelanto Processing Center-East (488 Beds) | $ 99.00 | Per detainee |
| Bed Day Rate at 75% Minimum Guarantee for 1,300 At the Adelanto Processing Center-East and Adelanto Processing Center-West (975 Beds), Effective 14 months after IGSA signed | $ 99.00 | per detainee |
| Bed Day Rate at 25% for 650 Beds (Incremental 162 Beds) | $ 59.37 | per detainee |
| Bed Day Rate at 25% for 1,300 Beds (Incremental 325 Beds) | $ 59.37 | per detainee |
| *Guaranteed Transportation  Monthly Flat Fee | $43,059.00 | per month |
| Fuel Reimbursement | $ 0.50 | Per gallon |
| Detainee Work Program Reimbursement | $ 1.00 | per day |

* Transportation pricing includes the required transportation teams, a Manager and three (3) vehicles (2 buses and 1 van) responsible for delivering detainees to different locations in the Los Angeles AOR e.g. San Bernardino and Los Angeles Offices. The van will be primarily but not exclusively utilized to deliver detainees to scheduled medical appointments and the Service Provider shall maintain availability to utilize the three (3) vehicles at the same time.  Transportation/Detention officers will be appropriately licensed and will be responsible for transporting detainees with the use of the three appropriately staffed identified vehicles.  If transportation increases in volume whereby additional transportation staff and/or vehicles are required the fixed monthly rate may be adjusted to incur additional costs.  The pricing also includes transporting detainees to scheduled medical appointments, outside courts and ICE Air Operations.  All USDOT Hours of Service will be followed and any approved Over Time incurred will be reimbursed at the overtime rate. All fuel expenses will be a direct pass through to the government on a monthly basis.

## Article II.  General

A. <u>Commencement of Services:</u>  ICE is under no obligation to utilize the facilities identified herein until the need for detention services has been confirmed, funding has been identified and made available, the facility meets ICE requirements, and is in full compliance with ICE detention standards.

B. <u>Exclusivity:</u>  The Service Provider agrees that the Facility is to be for the exclusive use of ICE and its detainee population.  No other agency will be allowed to use the Facility to house its detainees, prisoners, or inmates without prior approval of the Contracting Officer.  If given approval, a separate bed day rate shall be negotiated with the other agency and ICE shall not be responsible for payment related to beds used by another agency.  The other agency will be separately invoiced for the beds it uses.  Detainees shall under no circumstances be commingled with non-ICE detainees or inmates.  The duration of the use of beds will be determined on a case-by-case basis.

C. <u>Funding:</u>  The obligation of ICE to make payments to the Service Provider is contingent upon the availability of Federal funds.  ICE will neither present detainees to the Service Provider nor direct performance of any other services until ICE has the appropriate

GOWER-GEO 0000480

funding.  Orders will be placed under this Agreement when specific requirements have been identified and funding obtained.  Performance under this Agreement is not authorized until the Contracting Officer issues an order in writing.  The effective date of the Services will be negotiated by the Contracting Officer and specified in an order under this Agreement.

D.  <u>Subcontractors:</u>  The Service Provider shall notify and obtain approval from the ICE Contracting Officer's Technical Representative (COTR) or designated ICE official if it intends to house ICE detainees in a facility other than the City of Adelanto.  If either the facility or any future facility is operated by an entity other than the Service Provider, ICE shall treat the entity as a subcontractor to the Service Provider.  The Service Provider shall obtain the Contracting Officer's approval before subcontracting the detention and care of detainees to another entity.  The Contracting Officer has the right to deny, withhold, or withdraw approval of the proposed subcontractor.  Upon approval by the Contracting Officer, the Service Provider shall ensure that any subcontract includes all provisions of this Agreement, and shall provide ICE with copies of all subcontracts.  All payments will be made to the Service Provider.  ICE will not accept invoices from, or make payments to, a subcontractor.  Subcontractors that perform under this agreement are subject to the terms and conditions of this IGSA.

E.  <u>Consistent with Law:</u>  This is a firm fixed rate Agreement, not a cost reimbursable Agreement.  This Agreement is permitted under applicable statutes, regulation, policies or judicial mandates.  Any provision of this Agreement contrary to applicable statutes, regulation, policies or judicial mandates is null and void and shall not necessarily affect the balance of the Agreement.

F.  <u>Use of Service Provider's Policies and Procedures:</u>  Upon concurrence from ERO, the Contracting Officer shall approve the Service Provider's policies and procedures for use under this Agreement.  Upon approval, the Service Provider can use its policies and procedures in conjunction with the detention standards mandated under this Agreement.

G.  <u>Notification and Public Disclosures:</u>  Information obtained or developed as a result of this IGSA is under the control of ICE and shall be subject to public disclosure only pursuant to the provisions of applicable federal laws, regulations, and executive orders or as ordered by a court.  Insofar as any documents created by the Service Provider contain information developed or obtained as a result of this IGSA, such documents shall be subject to public disclosure only pursuant to the provisions of applicable federal laws, regulations, and executive orders or as ordered by a court.  To the extent the Service Provider intends to release the IGSA or any information relating to, or exchanged under, this IGSA, the Service Provider agrees to coordinate with the ICE Contracting Officer prior to such release.  The Service Provider may, at its discretion, communicate the substance of this IGSA when requested.  ICE understands that this IGSA will become a public document when presented to the Service Provider's governing body for approval.

GOWER-GEO 0000481

EROIGSA-11-0003

### Article III.  Covered Services

Below are the general requirements under this Agreement.  Specific requirements for the services under this Agreement are stated in the attached Statement of Work, Part A and Part B (Appendix A).

A.  <u>Bedspace:</u>  The Service Provider shall provide the first 650 male bed spaces at the Adelanto Processing Center-East with a minimum guaranteed of 488 beds. The additional 650 bed space at the Adelanto Processing Center-West is under construction and will be ready for occupancy 14 months after the IGSA is signed plus 75 days for ramping up.

The Service Provider shall provide a total of 1,300 male beds with a minimum guaranteed of 75% (975 beds), effective 14 months after IGSA is signed.  The Service Provider shall house all detainees as determined within the Service Provider's classification system and ICE PBNDS classification standards.  ICE will be financially liable only for the actual detainee bed days as defined in Paragraph C of Article III.

B.  <u>Basic Needs:</u>  The Service Provider shall provide ICE detainees with safekeeping, housing, subsistence, medical and other services in accordance with this Agreement.  In providing these services, the Service Provider shall ensure compliance with all applicable laws, regulations, fire and safety codes, policies and procedures.

If the Service Provider determines that ICE has delivered a person for custody who is under the age of eighteen (18), the Service Provider shall not house that person with adult detainees and shall immediately notify the COTR or designated ICE official.  ICE will make its best efforts to remove the juvenile within seventy-two (72) hours.

C.  <u>Unit of Service and Financial Liability:</u>  The unit of service is called a "bed day" and is defined as one person per day.  The bed day begins on the date of arrival.  The Service Provider may bill ICE for the date of arrival but not the date of departure.  The Service Provider shall not charge for costs that are not directly related to the housing and detention of detainees.  Such unallowable costs include but are not limited to:

1.  Salaries of elected officials
2.  Salaries of employees not directly engaged in the housing and detention of detainees
3.  Indirect costs in which a percentage of all local government costs are pro-rated and applied to individual departments unless, those cost are allocated under an approved Cost Allocation Plan
4.  Detainee services which are not provided to, or cannot be used by, Federal detainees
5.  Operating costs of facilities not utilized by Federal detainees
6.  Interest on borrowing (however represented), bond discounts, costs of financing/refinancing, except as prescribed by OMB Circular A-87.

GOWER-GEO 0000482

EROIGSA-11-0003

    7.  Legal or professional fees (specifically legal expenses for prosecution of claims against the Federal Government, legal expenses of individual detainees or inmates)

    8.  Contingencies

D.  <u>Interpretive/Translation Services:</u>  The Service Provider shall make special provisions for non-English speaking, handicapped or illiterate detainees.  Upon request, ICE will assist the Service Provider in obtaining translation services through a toll free line.  The Service Provider shall provide all instructions verbally, either in English or the detainees' language, as appropriate, to detainees who cannot read.

E.  <u>Escort and Transportation Services:</u>  The Service Provider shall provide, upon request of the COTR or ICE designee, necessary escort and transportation services for ICE detainees to and from designated locations.  Escort services shall be provided for escorting detainees to court hearings, escorting witnesses to the courtroom, and any escort services requested by an ICE judge during proceedings.  Transportation and/or escort services shall be provided to transport detainees from the facility to and from a medical facility for outpatient care.  The Service Provider shall provide transportation services to and from medical facilities and doctor offices for necessary scheduled appointments, the cost of which is included in the bed day rates payable to the Service Provider.

In Addition, the Service Provider shall provide any further transportation services to and from the facility as may be required or requested by the COTR, including but not limited to transportation between the Facility and the Court.

The Service Provider shall use a communications system that has direct and immediate contact with all transportation vehicles.   Transportation and escort services shall be provided in the most economical and efficient manner.  The Statement of Work provides specific escort and transportation services requirements unique to this Agreement.

F.  <u>Guard Services:</u>  The Service Provider shall provide stationary guard services upon request of the COTR which shall include, but is not limited to, escorting and guarding detainees to medical or doctor's appointments, Executive Office of Immigration Review (EOIR) hearings at The City of Adelanto, attorney interviews at The City of Adelanto, Legal Orientation Program (LOP) at The City of Adelanto and other locations stated in the attached Statement of Work (SOW).  Qualified personnel employed by the Service Provider shall perform such services.  The Service Provider agrees to augment such practices as may be requested by ICE to enhance specific requirements for security, detainee monitoring, visitation, legal orientation program, and contraband control.  Staff providing guard services for ICE detainees shall refrain from utilization of social networking services or other electronic programming not directly associated with duties being performed to ensure the safety and welfare and oversight of the detained population.

GOWER-GEO 0000483

EROIGSA-11-0003

G. <u>Medical Services</u>: The Statement of Work provides specific medical service requirements unique to this Agreement. Regardless of the unique requirements for this Agreement, the Service Provider shall provide the following services regarding medical care of detainees:

1. The Service Provider shall provide for medical screening of every detainee upon arrival at the Facility performed by health care personnel or health trained personnel.
2. Medical coverage at the Facility shall be no less than twenty-four (24) hours per day, seven (7) days per week.
3. The Service Provider shall provide the detainees written instructions for gaining access to health care services. Procedures shall be explained to all detainees in the detainees' native language, and orally to detainees who are unable to read. The detainee shall similarly be provided instructions and assistance in personal hygiene, dental hygiene, grooming and health care. It shall be made routinely available to the detainees.
4. The Service Provider shall provide to all detainees a written policy and defined procedure to require that detainees' written health complaints are solicited and delivered to the medical facility for appropriate follow-up. Written policy and defined procedure shall require that health care complaints are responded to and that sick call conducted by health care personnel or health trained personnel is available to detainees daily. If a detainee's custody status precludes attendance at sick call, arrangements shall be made to provide sick call services in the place of the detainee's detention. A minimum of one sick call shall be conducted daily. U.S. Public Health Service ("USPHS") reserves the right to conduct triage and sick call at the place of the detainee's detention.
5. The Service Provider shall provide and maintain basic first aid kits throughout the Facility. First aid kits shall be available at all times to allow quick access.
6. The Service Provider shall provide security with a minimum of a staff of one at all times. When detainees are housed in the infirmary, a security guard shall be posted to the unit 24 hours a day, seven days a week. The Service Provider shall coordinate and escort detainees to the medical clinic for sick call, appointments and pill line.
7. When communicable or debilitating physical problems are suspected, the detainee shall be separated from the detainee population, and USPHS staff shall be notified immediately. Behavioral problems (detainee who is not diagnosed as psychotic) and suicide observation will be the responsibility of the Service Provider.
8. Access to detainee medical files shall not be inhibited by the Service Provider when such access is necessary for confirmation of compliance with ICE PBNDS standards, quality assurance review by designated members of ICE Division of Immigration Health Services or upon demand by the Assistant Field Office Director for ICE.

## Article IV.  Receiving and Discharging Detainees

A. <u>Required Activity:</u> The Service Provider shall receive and discharge detainees only to and from properly identified ICE/ERO personnel or other properly identified Federal law enforcement officials with prior authorization from ICE/ERO. Presentation of U.S. Government identification shall constitute "proper identification." The Service Provider

Page 7 of 53

shall furnish receiving and discharging services twenty-four (24) hours per day, seven (7) days per week.  ICE will furnish the Service Provider with reasonable notice of receiving and discharging detainees.  The Service Provider shall ensure positive identification and recording of detainees and ICE officers.  The Service Provider shall not permit medical or emergency discharges except through coordination with on-duty ICE officers.

B.  Restricted Release of Detainees:  The Service Provider shall not release ICE detainees from its physical custody to any persons other than those described in Paragraph A of Article IV for any reason, except for either medical, other emergency situations, or in response to a federal writ of habeas corpus.  If an ICE detainee is sought for federal, state, or local proceedings, only ICE may authorize release of the detainee for such purposes.  The Service Provider shall contact the ICE COTR or designated ICE official immediately regarding any such requests.

C.  Service Provider Right of Refusal.  The Service Provider retains the right to refuse acceptance, or request removal, of any detainee exhibiting violent or disruptive behavior, or of any detainee found to have a medical condition that requires medical care beyond the scope of the Service Provider's health care provider.  At a minimum though, the Service Provider shall meet the requirements outlined in the ICE PBNDS and shall provide for the same level of health care provided to its own inmates or detainees.  In the case of a detainee already in custody, the Service Provider shall notify ICE and request such removal of the detainee from the Facility.  The Service Provider shall allow ICE reasonable time (up to 72 hours) to make alternative arrangements for the detainee.

D.  Emergency Evacuation:  In the event of an emergency requiring evacuation of the Facility, the Service Provider shall evacuate ICE detainees in the same manner, and with the same safeguards, as it employs for persons detained under the Service Provider's authority.  The Service Provider shall notify the ICE COTR or designated ICE official within two (2) hours of evacuation.

**Article V.  ICE Performance Based Detention Standards**

Satisfactory Performance:

The Service Provider shall house detainees and perform related detention services in accordance with the 2008 edition of ICE Performance Based National Detention Standards (PBNDS).  The complete set of standards applicable to this procurement is available from the following website: http://www.ice.gov/partners/dro/PBNDS/index.htm and incorporated herein.  ICE Inspectors will conduct periodic inspections of the facility to assure compliance with the ICE PBNDS.

The facility's operation shall reflect the PBNDS Expected Outcomes as summarized and outlined at length below.  Where minimum requirements are expressed, innovation is encouraged to further the goals of detention reform.
**Performance Outcomes**
**The Expected Outcomes of the 42 PBNDS are listed below.**

GOWER-GEO 0000485

EROIGSA-11-0003

## PART 1   SAFETY

### 1   Emergency Plans

Each facility will have in place contingency plans to quickly and effectively respond to any emergency situations that arise and to minimize their severity.

1. Staff will be trained at least annually in emergency preparedness and implementation of the facility's emergency plans.
2. An evacuation plan will be in place in the event of a fire or other major emergency, and the plan will be locally approved in accordance with this Detention Standard and updated at least annually.
3. Events, staff responses, and command-related decisions during and immediately after emergency situations will be accurately recorded and documented.
4. Plans will include procedures for handling detainees with special needs during an emergency or evacuation.
5. The applicable content and procedures in this standard will be communicated in a language or other manner that the detainee can understand.

### 2   Environmental Health and Safety

1. Facility cleanliness and sanitation will be maintained at the highest level.
2. Compliance with all applicable safety and sanitation laws will be ensured by documented internal and external inspections and corrective action when indicated.
3. Compliance with all applicable fire safety codes and fire safety performance requirements for the facility furnishings will be ensured.
4. Flammable, poisonous, toxic, and caustic materials will be controlled and used in a safe manner.
5. Compliance with fire prevention regulations, inspection requirements, and practices, including periodic fire drills, will ensure the safety of detainees, staff, and visitors.
6. Staff will be knowledgeable about procedures and responsibilities during emergency situations, including those that require evacuation, in accordance with a written plan and at least annual training.
7. The facility will have a plan for immediate release of detainees from locked areas and provisions for a back-up system
8. A sufficient number of properly positioned emergency exits that are clear from obstruction will be distinctly and permanently marked.
9. Preventive maintenance and regular inspections will be performed to ensure timely emergency repairs or replacement to prevent dangerous and life-threatening situations.
10. Potential disease transfer will be minimized by the proper sanitization of barbering equipment and supplies.
11. Pests and vermin will be controlled and eliminated.
12. Safe potable water will be available throughout the facility.
13. Emergency lighting and life-sustaining equipment will be maintained and periodically tested.
14. Disposal of garbage and hazardous waste will be in compliance with applicable government regulations.

GOWER-GEO 0000486

15. The applicable content and information in this standard will be communicated in a language or manner which the detainee can understand.

### 3   Transportation (by Land)

1. The general public, detainees, and staff will be protected from harm when detainees are transported.
2. Vehicles used for transporting detainees will be properly equipped, maintained, and operated.
3. Detainees will be transported in a safe and humane manner, under the supervision of trained and experienced staff.
4. To the extent practicable, reasonable accommodations (e.g., wheelchairs, canes) will be made for detainees with physical disabilities and impairments in accordance with security and safety needs.

## PART 2   SECURITY

### 4   Admission and Release

1. Upon admission each detainee will be screened to ensure facility safety, security, and good order. Strip searches will be conducted in the least intrusive manner practicable.
1. Upon admission, each detainee's personal property and valuables will be checked for contraband, inventoried, receipted, and stored.
2. Each detainee's identification documents will be secured in the detainee's A-file.
3. Upon admission, each detainee will be medically screened to protect the health of the detainee and others in the facility.
4. Upon admission, each detainee will be given an opportunity to shower and be issued clean clothing, bedding, towels, and personal hygiene items.
5. Upon admission, each detainee will undergo screening interviews and complete questionnaires and other forms.
6. Each newly admitted detainee will be kept separated from the general population until classified and housed accordingly.
7. Each newly admitted detainee will be oriented to the facility through written material on facility policies, rules, prohibited acts, and procedures and, in some facilities, by viewing an orientation video, in a language or manner he or she can understand.
8. Detainees will be released, removed, or transferred from a facility only when staff have followed specified procedures and completed required forms.
9. The facility will maintain accurate records and documentation on all detainees' admission, orientation, and release.
10. Detainees will have access to a telephone during the admission process
11. The applicable contents and procedures in this Standard will be communicated to the detainee in a language or manner which the detainee can understand.

### 5   Classification System

1. The community, staff, contractors, volunteers, and detainees will be protected from

Page 10 of 53

EROIGSA-11-0003

harm through a formal classification process for managing and separating detainees by threat risk that is based on verifiable and documented data.

2. Each detainee will be expeditiously classified upon admission to the facility and before being admitted into general population housing.
3. Non-criminal detainees will be protected from harm by assigning detainees housing with persons of similar backgrounds and criminal history.
4. Each detainee's classification will be reviewed at regular intervals, when required by changes in the detainee's behavior or circumstances, or upon discovery of additional, relevant information.
5. Detainees will be able to appeal their classification levels.
6. The applicable content and procedures in this Standard will be communicated to the detainee in a language or manner which the detainee can understand.

## 6   Contraband
1. Contraband will be identified, detected, controlled, and disposed of properly.
2. Detainee personal property that would be considered contraband within the facility will be mailed to a third party or stored until the detainee's release, unless that property is illegal or a threat to safety or security.
3. Contraband that may be evidence in connection with a violation of a criminal statute will be preserved, inventoried, controlled, and stored so as to maintain and document the chain of custody.
4. The applicable content and procedures in this standard will be communicated to the detainee in a language or manner which the detainee can understand.

## 7   Facility Security and Control
1. Essential security posts and positions will be staffed with qualified personnel.
2. Facility security and safety will be monitored and coordinated by a secure, well-equipped, and continuously staffed control center.
3. The facility's perimeter will ensure that detainees remain within and that public access is denied without proper authorization.
4. Information about routine procedures, emergency situations, and unusual incidents will be continually recorded in permanent post logs and shift reports.
5. Facility safety, security and good order, including the safety, health and well-being of staff and detainees, will be enhanced through ongoing observation, supervision, and personal contact and interaction between staff and detainees.
6. Special security and control measures will consistently be applied to Special Management Unit entrances.
7. Facility safety, security and good order will be enhanced through frequent and documented staff inspections of detainee-occupied and unoccupied areas.

## 8   Funds and Personal Property
1. The security, safety and good order of each facility will be maintained through an immediate search of each newly admitted detainee's property.
2. Each detainee's funds, valuables, baggage, and personal property will be inventoried, receipted, stored and safeguarded for the duration of their detention.

GOWER-GEO 0000488

EROIGSA-11-0003

3. Each detainee will be informed about what funds and property may be retained in his or her possession and about procedures to report missing or damaged property.
4. The applicable content and procedures in this Standard will be communicated to the detainee in a language or manner which the detainee can understand.

**9   Hold Rooms in Detention Facilities**
1. The safety, security, and comfort of detainees temporarily confined in Hold Rooms will be ensured.
2. No detainee will be confined in a Hold Room for more than twelve hours.
3. Males and females will be confined separately.
4. Minors (under 18) will be held apart from adults, except for related adults or legal guardians, provided there are no safety or security concerns with this arrangement.
5. Any detainee with disabilities, including temporary disabilities, will be housed in a manner that provides for his or her safety, comfort and security.
6. Detainees awaiting a medical visit will be seen as promptly as possible.

**10  Key and Lock Control**
1. All staff will be trained in the proper care and handling of keys and locks.
2. Keys will be controlled and accounted for.
3. Locks and locking devices will be continually inspected, maintained, and inventoried.
4. Employees will store their firearms in secure gun lockers before entering the facility.

**11  Population Counts**
Security, safety, and orderly facility operations will be maintained through an ongoing, effective system of population counts and accountability for detainees.

**12  Post Orders**
1. Each officer will have current written Post Orders that specifically apply to the assigned post, with step-by-step procedures in sufficient detail to guide an officer assigned to that post for the first time.
2. Signed and dated records will be maintained to show that assigned officers acknowledged that they read and understood the Post Orders.
3. Post Orders will be formally reviewed annually and updated as needed.

**13  Searches of Detainees**
1. Detainees will live and work in a safe and orderly environment.
2. Contraband will be controlled.
3. Searches of detainees, housing, and work areas will be conducted without unnecessary force and in ways that preserve the dignity of detainees.
4. When body searches are conducted, the least intrusive practicable search method will be employed, as indicated by the type of contraband and the method of suspected introduction or concealment.
5. Pat searches of detainees and metal detector screening will be conducted routinely to control contraband.
6. A strip search will be conducted only when there is reasonable suspicion that contraband may be concealed on the person, or when there is a reasonable suspicion

GOWER-GEO 0000489

EROIGSA-11-0003

that a good opportunity for concealment has occurred, and when properly authorized by a supervisor.

7. A body cavity search will be conducted by designated health personnel only when authorized by the facility administrator on the basis of reasonable suspicion that contraband may be concealed in or on the detainee's person.

8. "Dry cells" will be used for contraband detection only when there is reasonable suspicion of concealment, with proper authorization, and in accordance with required procedures.

9. Contraband that may be evidence in connection with a violation of a criminal statute will be preserved, inventoried, controlled, and stored so as to maintain and document the chain of custody.

10. Canine units (in facilities that have them) may be used for contraband detection when detainees are not present, but canine use for force, intimidation, control, or searches of detainees is prohibited.

11. The applicable contents and procedures in this Standard will be communicated to the detainee in a language or manner which the detainee can understand.

## 14 Sexual Abuse and Assault Prevention and Intervention

1. Sexual abuse and assault of detainees will be prevented.

2. Detainees will be informed about the facility's sexual abuse or assault prevention and intervention program.

3. Detainees will be screened to identify those likely to be sexual aggressors or sexual victims and will be housed to prevent sexual abuse or assault. Detainees who are considered likely to become victims will be placed in the least restrictive housing that is available and appropriate.

4. All allegations of sexual abuse or assault will be promptly and effectively reported and investigated. Detainees will not be punished for truthfully reporting abuse or signs of abuse observed.

5. If sexual abuse or assault of any detainee occurs, the medical, psychological, safety, and social needs of the victim will be promptly and effectively met.

6. Where possible and feasible, a victim of sexual assault will be referred under appropriate security provisions to a specialized community facility for treatment and gathering of evidence.

7. Assailants will be confined and disciplined and may be subject to criminal prosecution.

8. Sexual conduct between detainees, staff, volunteers, or contract personnel, regardless of consensual status, is prohibited and subject to administrative, disciplinary, and criminal sanctions.

9. All case records associated with claims of sexual abuse, including incident reports, investigative reports, offender information, case disposition, medical and counselling evaluation findings, and recommendations for post-release treatment and/or counselling will be retained in accordance with an established schedule.

10. For monitoring, evaluating, and assessing the effectiveness of the sexual abuse and assault prevention and intervention program, incidents of sexual abuse and assault

GOWER-GEO 0000490

EROIGSA-11-0003

will be specifically documented and tracked as specified in this Detention Standard (in addition to standard facility operational and disciplinary documentation of any assault).

11. The applicable content and procedures in this Standard will be communicated to the detainee in a language or manner which the detainee can understand.

## 15 Special Management Units

1. Each facility will have access to Special Management Units with an Administrative Segregation section for detainees segregated from the general population for administrative reasons and a Disciplinary Segregation section for detainees segregated from the general population for disciplinary reasons.

2. Detainees housed in the general population, staff, contractors, volunteers, and the local community will be protected from harm by the segregation of certain detainees in SMUs.

3. Any detainee who represents an immediate, significant threat to safety, security or good order will be immediately controlled by staff and, for cause and with supervisory approval, placed in Administrative Segregation.

4. Health care personnel will be immediately informed when a detainee is admitted to an SMU to provide assessment and review as indicated by health care authority protocols.

5. A detainee will be placed in "protective custody" status in Administrative Segregation only when there is documentation that it is warranted and that no reasonable alternatives are available.

6. A detainee will be placed in Disciplinary Segregation only after a finding by a Disciplinary Hearing Panel that the detainee is guilty of a prohibited act or rule violation classified at a "Greatest", "High", or "High-Moderate" level, as defined in the Detention Standard on Disciplinary System, Attachment A: Prohibited Acts and Sanctions.

7. The status of detainees in Special Management Units will be reviewed in accordance with required time schedules by supervisory staff and the results of those reviews will be documented.

8. A detainee will remain in Disciplinary Segregation for no more than 60 days for violations associated with a single incident, and his or her status will be reviewed after the first 30 days, and each 30 days thereafter by the facility administrator and the Field Office Director notified to determine if continued detention in Disciplinary Segregation is still warranted.

9. Detainees in SMUs will be afforded basic living conditions that approximate those provided to the general population, consistent with the safety and security considerations that are inherent in more controlled housing, and in consideration of the purpose for which each detainee is segregated.

10. In general, when a detainee in an SMU is deprived of any usually authorized items or activity, a report of the action is forwarded to the facility administrator for notice and review.

GOWER-GEO 0000491

EROIGSA-11-0003

11. Detainees in SMUs will have regular access to supervisory, management, program, and health care staff.

12. Each detainee in an SMU will be offered a minimum of one hour of recreation per day, five days a week, unless documented security or safety considerations dictate otherwise.

13. Detainees in SMUs will be able to write and receive mail and correspondence as they would otherwise be able to do while detained within the general population.

14. Detainees in SMUs will be provided opportunities for general visitation, including legal visitation, unless there are substantial, documented reasons for withholding those privileges.

15. Detainees in SMUs will have access to personal legal materials, law library materials, and legal visits, in accordance with provisions in this Detention Standard.

16. Detainees in SMUs will have access to telephones, in accordance with provisions in this Detention Standard.

17. Detainees in SMUs will have access to programs and services such as commissary, library, religious guidance, and recreation, in accordance with provisions in this Detention Standard.

18. Detailed records will be maintained on the circumstances related to a detainee's confinement to the SMU, through required permanent SMU logs and individual detainee records.

19. The applicable contents and procedures in this Standard will be communicated to the detainee in a language or manner which the detainee can understand.

## 16 Staff-Detainee Communication

1. Detainees will have frequent opportunities for informal contact with facility managerial and supervisory staff and with ICE/ERO Field Office staff.

2. Facility managerial and supervisory staff and ICE/ERO Field Office staff will frequently and directly observe facility operations and conditions of confinement.

3. Detainees will be able to submit written questions, requests, and concerns to ICE/ERO staff and receive timely responses.

4. Detainees will be informed about how to directly contact the Department of Homeland Security Office of the Inspector General.

5. Detainee telephone serviceability will be monitored and documented by ICE staff and any problems immediately reported.

6. The applicable content and procedures in this Standard will be communicated to the detainee in a language or manner which the detainee can understand.

## 17 Tool Control

Tools, maintenance implements, culinary utensils, medical and dental instruments, equipment, and supplies (particularly syringes, needles, and other sharps) will be maintained on an inventory, continually controlled and accounted for to insure the safe and orderly operation of the facility.

## 18 Use of Force and Restraints

GOWER-GEO 0000492

EROIGSA-11-0003

1. Physical force will be used only as a last resort and is restricted to instances of justifiable self-defense, protection of others, protection of property, and prevention of escapes.
2. Facilities will endorse the concept that confrontation avoidance is the recommended method for resolving situations and should always be attempted prior to any calculated use of force.
3. Physical force or restraint devices will not be used as punishment.
4. In circumstances when prior supervisory approval is required, restraints will not be applied without that approval.
5. Four/five-point restraints will be applied only in extreme circumstances and only where other types of restraints have proven ineffective. Advance approval is required, as is prompt notification of and examination by the medical staff. These restraints will be continued only in accordance with required procedures and documentation.
6. Intermediate force devices will be used only in circumstances prescribed herein, with required prior approvals.
7. In each facility, all weapons and related equipment will be stored securely in designated areas to which only authorized persons have access.
8. In each facility, chemical agents and related security equipment will be inventoried at least monthly to determine their condition and expiration dates.
9. In each facility, a written record of routine and emergency distribution of security equipment will be maintained.
10. An employee will submit a written report no later than the end of his or her shift when force was used on any detainee for any reason, or if any detainee remains in any type of restraints at the end of that shift. This includes discharge of a firearm and use of less lethal devices to control detainees.
11. Telephonic notification to the FOD shall occur as soon as practicable. The Field Office Director will be notified of any use-of-force incident involving an ICE detainee within two business days via an ICE-approved form or IGSA equivalent.
12. Canines will not be used for force, control or intimidation of detainees.
13. Facilities will adhere to DHS' Use of Deadly Force Policy.
14. The applicable content and procedures in this Standard will be communicated to the detainee in a language or manner which the detainee can understand.

## PART 3   ORDER

### 19 Disciplinary System
1. Detainees will be informed of facility rules and regulations, prohibited acts, disciplinary sanctions that may be imposed, their rights in the disciplinary system and the procedure for appealing disciplinary findings.
2. Each facility will have graduated severity scales of prohibited acts and disciplinary consequences.
3. Where permitted by facility policy, staff will informally settle minor transgressions by mutual consent, whenever possible.

GOWER-GEO 0000493

4. Staff who witness a prohibited act that cannot or should not be resolved informally, or have reason to suspect that a detainee has engaged in a prohibited act, will prepare a clear, concise, and complete Incident Report.
5. Each Incident Report will be objectively and impartially investigated and reported, ordinarily by a person of supervisory rank.
6. When appropriate, a serious incident that may constitute a criminal act will be referred to the proper investigative agency, and the administrative investigation will be suspended, pending the outcome of that referral.
7. At each step of the disciplinary and appeal process, the detainee will be advised of his or her rights in a language he or she understands, and translation or interpretation services will be provided as needed.
8. A Unit Disciplinary Committee (UDC) will further investigate and adjudicate the incident and may impose minor sanctions or refer the matter to a higher level disciplinary panel.
9. An Institution Disciplinary Panel (IDP) will conduct formal hearings on Incident Reports referred from UDCs and may impose higher level sanctions for "Greatest" and "High" level prohibited acts.
10. Detainees before the IDP will be afforded a staff representative, upon request, or automatically if the detainee is illiterate, has limited English language skills or otherwise needs special assistance.
11. Actions of the IDP will be reviewed by the facility administrator, who may concur with the findings and sanctions or modify them.
12. At all steps in the disciplinary process, any sanctions imposed will be commensurate with the severity of the committed prohibited act and intended to encourage the detainee to conform with rules and regulations in the future.
13. All steps of the disciplinary process will be done within the required time limits.
14. At all steps of the disciplinary process, accurate and complete records will be maintained. The detainee will receive copies of all reports, exhibits, and other documents considered or generated in the hearing process, except insofar as the disclosure of such documents may pose an imminent threat to the safety and security of the facility staff or other detainees, or if the document or other evidence is otherwise protected from disclosure.
15. If a detainee is found not guilty at any stage of the disciplinary process, the incident records will not be placed or retained in the detainee's file, even if they are retained elsewhere for statistical or historical purposes.
16. Detainees will be able to appeal disciplinary decisions through a formal grievance system. No detainee will be harassed, disciplined, punished, or otherwise retaliated against for filing a complaint or grievance.
17. Detainees shall be afforded the following rights: the right to protection from abuse, the right to freedom from discrimination, the right to pursue a grievance, the right to correspond with persons or organizations and the right to due process.
18. The applicable content and procedures in this standard will be communicated to the detainee in a language or manner which the detainee can understand.

**PART 4   CARE**

EROIGSA-11-0003

### 20  Food Service

1. All detainees will be provided nutritionally balanced diets that are reviewed at least quarterly by food service personnel and at least annually by a qualified nutritionist or dietician.
2. Detainees, staff and others will be protected from harm and facility order will be maintained by the application of sound security practices in all aspects of food service and dining room operations.
3. Detainees, staff, and others will be protected from injury and illness by adequate food service training and the application of sound safety and sanitation practices in all aspects of food service and dining room operations.
4. Dining room facilities and operating procedures will provide sufficient space and time for detainees to eat meals in a relatively relaxed, unregimented atmosphere.
5. Food service facilities and equipment will meet established governmental health and safety codes, as documented by an independent, outside source.
6. Detainees, staff, and others will be protected from health-related harm by advance medical screening and clearance before any detainee is assigned to work in food service operations.
7. Food service areas will be continuously inspected by food service staff and other assigned personnel on schedules determined by the food service administrator and by applicable policy requirements.
8. Stored food goods will be maintained in accordance with required conditions and temperatures.
9. Therapeutic medical diets and supplemental food will be provided as prescribed by appropriate clinicians.
10. Special diets and special ceremonial meals will be provided for detainees whose religious beliefs require the adherence to religious dietary laws.
11. Detainees will receive a religious or special diet free of any personal cost.
12. Food will never be used for reward or punishment.

### 21  Hunger Strikes

1. Any detainee who does not eat for 72 hours will be referred to the medical department for evaluation and possible treatment.
2. When medically advisable, a detainee on a hunger strike will be isolated for close supervision, observation, and monitoring.
3. The ICE/ERO Field Office Director (FOD) will be notified when a detainee is on a hunger strike.
4. The detainee's health will be carefully monitored and documented, as will the detainee's intake of foods and liquids.
5. A detainee on a hunger strike will be counseled and advised of the medical risks and will be encouraged to end the hunger strike or accept medical treatment.
6. Involuntary medical treatment will be administered only with the medical, psychiatric, and legal safeguards specified herein.
7. A record of interactions with the striking detainee, provision of food, attempted and successful medical treatment, and communications between the Clinical Medical Authority, Facility Administrator, and ICE/ERO will be established.

GOWER-GEO 0000495

EROIGSA-11-0003

8. The information in this detention standard will be communicated in a language or other manner which the detainee can understand.

## 22  Medical Care

1. Detainees will have access to a continuum of health care services, including prevention, health education, diagnosis, and treatment.
2. Health care needs will be met in a timely and efficient manner.
3. Newly admitted detainees will be informed, orally and in writing, about how to access health services.
4. Detainees will be able to initiate requests for health services on a daily basis.
5. Detainees will receive timely follow-up to their health care requests.
6. Detainees will have continuity of care from admission to transfer, discharge, or removal, including referral to community-based providers when indicated.
7. A detainee who needs health care beyond facility resources will be transferred in a timely manner to an appropriate facility where care is available. A written list of referral sources, including emergency and routine care, will be maintained as necessary and updated at minimum annually.
8. A transportation system will be available that ensures timely access to health care services that are only available outside the facility, including: prioritization of medical need, urgency (such as the use of ambulance instead of standard transportation) and transfer of medical information.
9. A detainee who requires close, chronic or convalescent medical supervision will be treated in accordance with a written plan approved by licensed physician, dentist, or mental health practitioner that includes directions to health care providers and other involved medical personnel.
10. Detainees will have access to specified 24-hour emergency medical, dental, and mental health services.
11. Minimum requirements for medical housing units will be met.
12. Female detainees will undergo pregnancy testing and pregnancy management services.
13. Screening, prevention and control measures will be utilized to assist in prevention and management of infectious and communicable diseases.
14. Bio hazardous waste will be managed and medical and dental equipment decontaminated in accordance with standard medical practices and in compliance with applicable laws.
15. Detainees with chronic conditions will receive care and treatment for conditions where non-treatment would result in negative outcomes or permanent disability as determined by the clinical medical authority.
16. The facility administrator will develop a plan to ensure that ICE is notified in writing of any detainee whose special medical or mental health needs require special consideration in such matters as housing, transfer, or transportation.

GOWER-GEO 0000496

EROIGSA-11-0003

17. Detainees will have access to emergency and specified routine dental care provided under direction and supervision of a licensed dentist.

18. Detainees will be provided health education and wellness information.

19. Each newly admitted detainee, including transfers, will receive a documented medical, dental, and mental health screening upon intake and, within 14 days of arrival, a comprehensive health appraisal by qualified personnel in a private setting as practicable to ensure safety.

20. Detainees with suspected or known mental health concerns will be referred as needed for evaluation, diagnosis, treatment, and stabilization.

21. Mental health crisis intervention services will be identified and available for detainees who experience acute mental health episodes.

22. Restraints for medical or mental health purposes will be authorized only by the facility's clinical medical authority, in accordance with the requirements specified in this Detention Standard.

23. Prior to placement in a non-detention facility or special unit within the facility specifically designated for the care of the severely mentally ill or developmentally disabled, a detainee shall be afforded due process in compliance with applicable laws.

24. Medical and dental orthoses or prostheses and other aids to impairment are supplied in a timely manner when the health of the detainee would otherwise be adversely affected, as determined by the responsible physician or dentist.

25. Detoxification from alcohol, opiates, hypnotics, other stimulants, and sedatives is done only under medical supervision in accordance with applicable laws.

26. Pharmaceuticals and non-prescription medicines will be secured, stored and inventoried.

27. Prescriptions and medications will be ordered, dispensed, and administered in a timely and sufficient manner as prescribed by a health care professional.

28. Health care services will be administered by the health administrative authority, and clinical decisions will be the sole province of the clinical medical authority.

29. Health care services will be provided by a sufficient number of appropriately trained and qualified personnel, whose duties are governed by thorough and detailed job descriptions and who are verifiable licensed, certified, credentialed, and/or registered in compliance with applicable state and federal requirements.

30. Detention and health care personnel will be trained, initially and annually, to respond to health-related emergency situations within four minutes and in the proper use of emergency medical equipment

31. Information about each detainee's health status will be treated as confidential, and health records will be maintained in accordance with accepted standards separately from other detainee detention files and be accessible only in accordance with written procedures and applicable laws. Health record files on each detainee will be well organized, available to all practitioners, and properly maintained and safeguarded.

32. Informed consent standards will be observed and adequately documented. Staff will make reasonable efforts to ensure that detainees understand their medical condition and care.

GOWER-GEO 0000497

EROIGSA-11-0003

33. Medical and mental health interviews, screenings, appraisals, examinations, and procedures will be conducted in settings that respect detainees' privacy in accordance with safe and orderly operations of the facility.

34. Detainees will be provided same sex chaperones as appropriate or as requested.

35. When a detainee is transferred to another facility, the transferring facility will send a completed medical transfer summary and other medical documentation as appropriate to the receiving facility.

36. Detainees in Special Management Units will have access to the same health care services as detainees in the general population.

37. Non-English speaking detainees and/or detainees who are deaf and/or hard at hearing will be provided interpretation/translation services or other assistance as needed for medical care activities.

38. Detainees with special needs, including physical or developmental disabilities, will be evaluated and given the appropriate care and communication their situation requires.

## 23  Personal Hygiene

1. Each facility will maintain an inventory of clothing, bedding, linens, towels and personal hygiene items that is sufficient to meet the needs of detainees.
2. Each detainee will have suitable, clean bedding, linens, blankets, and towels.
3. Each detainee will have sufficient clean clothing that is properly fitted, climatically suitable, durable, and presentable.
4. Detainees will be held accountable for clothing, bedding, linens, and towels assigned to them.
5. Detainees, including those with disabilities, will be able to maintain acceptable personal hygiene practices.

## 24  Suicide Prevention and Intervention

1. All staff responsible for supervising detainees will be trained, initially during orientation and at least annually, on effective methods of suicide prevention and intervention with detainees.
2. Staff will act to prevent suicides with appropriate sensitivity, supervision, and medical referrals.
3. Any clinically suicidal detainee will receive preventive supervision, treatment, and therapeutic follow-up, in accordance with ICE policy.
4. The information in this standard will be communicated in a language or manner which the detainee can understand.

## 25  Terminal Illness, Advance Directives, and Death

1. The continuum of health care services provided detainees will address terminal illness, fatal injury, and advance directives.
2. Each detainee who has a terminal illness or potentially fatal injury will receive medical care consistent with standard medical practices.
3. In the event of a detainee's death, specified officials and the detainee's designated next of kin will be immediately notified.

GOWER-GEO 0000498

EROIGSA-11-0003

4. In the event of a detainee's death, required notifications will be made to authorities outside of ICE/ERO (such as the local coroner or medical examiner), and required procedures will be followed regarding such matters as autopsies, death certificates, burials, and the disposition of decedent's property. Established guidelines and applicable laws will be observed in regard to notification of a detainee death while in custody.

5. The medical records of detainees addressed herein will be complete.

6. The information in this standard will be communicated in a language or manner which the detainee can understand.

## PART 5   ACTIVITIES

### 26 Correspondence and Other Mail

1. Detainees will be able to correspond with their families, the community, legal representatives, government offices, and consular officials.

2. Detainees will be notified of the facility's rules on correspondence and other mail through the Detainee Handbook, or supplement, which is provided to each detainee upon admittance.

3. The amount and content of correspondence detainees send at their own expense will not be limited except to protect public safety or facility security and order.

4. Indigent detainees will receive a specified postage allowance to maintain community ties and necessary postage for privileged correspondence.

5. Detainees will have access to general interest publications.

6. Incoming and outgoing mail, with the exception of Special Correspondence and Legal Mail, will be opened to inspect for contraband and to intercept cash, checks, and money orders.

7. General correspondence will be read or rejected only to protect the safe, secure and orderly operation of the facility, and detainees will be notified in writing when correspondence is withheld in part or in full.

8. Detainees will be permitted to send Special Correspondence and Legal Mail to a specified class of persons and organizations, and incoming mail from these persons will opened only in the presence of the detainees (unless waived) to check for contraband (except when contamination is suspected).

9. Incoming and outgoing letters will be held for no more than 24 hours and packages no more than 48 hours before distribution, excluding weekends, holidays, or exceptional circumstances.

10. Detainees in SMUs will have the same correspondence privileges as detainees in the general population.

11. The applicable content and procedures in this Standard will be communicated to the detainee in a language or manner which the detainee can understand.

### 27 Escorted Trips for Non-Medical Emergencies

1. Within the constraints of safety and security, selected detainees will be able to visit critically ill members of the immediate family or to attend their funerals, while under constant staff supervision.

GOWER-GEO 0000499

2. Safety and security will be primary considerations in planning, approving, and escorting a detainee out of a facility for a non-medical emergency.

## 28 Marriage Requests

1. Each marriage request from an ICE/ERO detainee will receive a case-by-case review.
2. Consistency in decisions to approve or deny a marriage request will be achieved by the application of guidelines.
3. Ordinarily, a detainee's request for permission to marry will be granted.

## 29 Recreation

1. Detainees will have daily opportunities to participate in leisure-time activities outside their respective cells or rooms.
2. Detainees will have access to exercise opportunities and equipment, including at least one hour daily of physical exercise outside the cell, and outdoors, when practicable.
3. Any detainee housed in a facility that cannot meet minimum standards for indoor and outdoor recreation will be considered for voluntary transfer to a facility that does.
4. Each detainee in an SMU will receive (or be offered) a minimum of one hour of exercise per day, five days a week, unless documented security or safety considerations dictate otherwise.
5. Each citizen volunteer who provides or participates in facility recreational programs will complete an appropriate, documented orientation program and sign an acknowledgement of his or her understanding of the applicable rules and procedures and agreement to comply with them.

## 30 Religious Practices

1. Detainees will have opportunities to participate in practices of their religious faith that are deemed essential by that faith, limited only by a documented showing of threat to the safety of persons involved in such activity itself, or disruption of order in the facility.
2. All religions represented in a detainee population will have equal status without discrimination based on any detainee's race, ethnicity, religion, national origin, gender, sexual orientation, or disability.
3. Each facility's religious program will be planned, administered, and coordinated in an organized and orderly manner.
4. Adequate space, equipment and staff (including security and clerical) will be provided for conducting and administering religious programs.
5. Detainees of faiths not directly represented by chaplaincy staff will be assisted in contacting external clergy or religious service providers.
6. Each facility's religious program will be augmented and enhanced by community clergy, contractors, volunteers and groups that provide individual and group assembly religious services and counseling.
7. Detainees in Special Management Units and hospital units will have access to religious programs and services.
8. Special diets will be provided for detainees whose religious beliefs require the adherence to religious dietary laws.

GOWER-GEO 0000500

EROIGSA-11-0003

9. The applicable content and procedures in this Standard will be communicated to the detainee in a language or manner that the detainee can understand.

## 31 Telephone Access

1. Detainees will have reasonable and equitable access to reasonably priced telephone services.
2. Detainees with hearing or speech disabilities will have reasonable accommodations to allow for appropriate telephone services.
3. Detainees in Special Management Units will have access to telephones, commensurate with facility security and good order.
4. Detainees will be able to make free calls to the ICE/ERO-provided list of free legal service providers for the purpose of obtaining initial legal representation, to consular officials and to the DHS Office of Inspector General.
5. Telephone access procedures will foster legal access.
6. Telephones will be maintained in proper working order.
7. The applicable contents and procedures in this Standard will be communicated to the detainee in a language or manner which the detainee can understand.

## 32 Visitation

1. Detainees will be able to receive visits from their families, associates, legal representatives, consular officials, and others in the community.
2. Visits between legal representatives and assistants and an individual detainee are confidential and shall not be subject to auditory supervision. Private consultation rooms shall be available for such meetings.
3. Detainees will be advised of their right to contact their consular representatives and receive visits from their consulate officers.
4. Detainees will be advised of visiting privileges and procedures as part of the facility's admission and orientation program in a language they can understand.
5. Information about visiting policies and procedures will be readily available to the public.
6. The number of visitors a detainee may receive and the length of visits will be limited only by reasonable constraints of space, scheduling, staff availability, safety, security, and good order. The minimum duration for a visit shall be 30 minutes.
7. Visitors will be required to adequately identify themselves and register to be admitted into a facility, and safety, security and good order will be maintained.
8. A background check will be conducted on all new volunteers prior to their being approved to provide services to detainees.
9. Each new volunteer will complete an appropriate, documented orientation program and sign an acknowledgement of his or her understanding of the applicable rules and procedures and agreement to comply with them.
10. The applicable contents and procedures in this Standard will be communicated to the detainee in a language or manner which the detainee can understand.

GOWER-GEO 0000501

EROIGSA-11-0003

**33 Voluntary Work Program**

1. Detainees may have opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of safety, security, and good order.
2. Detainees will be able to volunteer for work assignments but otherwise not be required to work, except to do personal housekeeping.
3. Essential operations and services will be enhanced through productivity from detainees.
4. The negative impact of confinement will be reduced through less idleness, improved morale and fewer disciplinary incidents.
5. Detainee working conditions will comply with all applicable federal, state, and local work safety laws and regulations.
6. There will be no discrimination regarding voluntary work program access based on any detainee's race, religion, national origin, gender, sexual orientation, or disability.
7. The applicable contents and procedures in this Standard will be communicated to the detainee in a language or manner which the detainee can understand.

## PART 6   JUSTICE

**34 Detainee Handbook**

1. Upon admission to a facility, each detainee will be provided the comprehensive written orientation materials in the form of a detainee handbook.  The local facility shall provide a detainee handbook supplement, which describes such matters as:
   - grievance system,
   - services and programs,
   - medical care,
   - law libraries and legal material,
   - correspondence and other material,
   - staff–detainee communication
   - classification system, and
   - disciplinary system,
2. Each detainee will verify, by signature and date, receipt of those orientation materials, and that acknowledgement will be maintained in the detainee's detention file.
3. The ICE National Detainee Handbook will be provided in English, Spanish, and other languages as determined necessary by the Field Office Director (FOD).  Orientation materials will be read to detainees who cannot read, or they will be provided the material via audio or video recordings.
4. Interpretative services will be provided to detainees who do not speak the languages in which the orientation materials are written.
5. The information in this standard will be communicated in a language or manner which the detainee can understand.

**35 Grievance System**

1. Detainees will be informed about the facility's informal and formal grievance system in a language or manner he or she understands.

GOWER-GEO 0000502

EROIGSA-11-0003

2. Staff and detainees will mutually resolve most complaints and grievances orally and informally in their daily interaction.
3. Detainees will be able to file formal grievances, including medical grievances, and receive written responses, including the basis for the decision, in a timely manner.
4. Detainees will be able to file emergency grievances that involve an immediate threat to their safety or welfare and receive written responses, including the basis for the decision, in a timely manner.
5. Detainees will be able to appeal initial decisions on grievances to at least one higher level of review.
6. Accurate records will be maintained on grievances filed and their resolution.
7. No detainee will be harassed, disciplined, punished, or otherwise retaliated against for filing a complaint or grievance.
8. The applicable contents and procedures in this standard will be communicated in a language or manner which the detainee can understand.

## 36 Law Libraries and Legal Material

1. Detainees will have regular access (no less than five hours per week) to law libraries, legal materials and related materials.
2. Detainees will not be forced to forgo recreation time to use the law library and requests for additional time to use the law library shall be accommodated to the extent possible, including accommodations of work schedules when practicable, consistent with the orderly and secure operation of the facility.
3. Detainees will have access to courts and counsel.
4. Detainees will be able to have confidential contact with attorneys and their authorized representatives in person, on the telephone and through correspondence.
5. Detainees will have access to a properly equipped law library, legal materials and equipment to facilitate the preparation of documents as well as photocopying resources.
6. Detainees who are illiterate, non-English-speaking or indigent will receive appropriate special assistance.
7. Detainees in special management units will have access to legal materials on the same basis as the general population.
8. The applicable contents and procedures in this Standard will be communicated to the detainee in a language or manner which the detainee can understand.

## 37 Legal Rights Group Presentations

1. Detainees will have access to available group presentations on United States immigration law and procedures.
2. Persons and organizations requesting to make such group presentations will be able to obtain clear information about how to request such visits and how to conduct them.
3. Facility security and good order will be maintained.
4. Detainees shall not be subject to reprisals, retaliation, or penalties for attending legal rights group presentations.

GOWER-GEO 0000503

5. Detainees will be able to communicate and correspond with representatives from the legal groups who make presentations at the facilities.
6. Detainees will have access to information and materials provided by legal groups. Organizations will be permitted to distribute information in response to specific legal inquiries.
7. Foreign nationals will have access to the diplomatic representative of their country of origin.

## PART 7   ADMINISTRATION & MANAGEMENT

### 38 Detention Files
1. A Detention File will be maintained on each detainee admitted to a detention facility for more than 24 hours.
2. Each Detention File will include all documents, forms, and other information specified herein.
3. The security of each Detention File and its contents will be maintained.
4. Staff will have access to Detention Files, as needed, for official purposes.
5. Information from a Detention File will be released to an outside third party only with the detainee's signed consent.
6. Release of information on detainees will be in accordance with applicable federal and state regulations.
7. Electronic record-keeping systems and data will be protected from unauthorized access.
8. Field Offices will maintain files necessary to carry out their responsibilities and will maintain them for a minimum of 18 months for auditing purposes.
9. Inactive, closed Detention Files will be properly archived.

### 39 News Media Interviews and Tours
1. The public and the media will be informed of operations and events within the facility's areas of responsibility.
2. The privacy of detainees and staff will be protected, including the right of a detainee to not be photographed or recorded.

### 40 Staff Training
1. Before assuming duties, each new employee, contractor, or volunteer will be provided an appropriate orientation to the facility and the ICE/ERO National Detention Standards.
2. All part-time staff and contract personnel shall receive formal orientation training appropriate to their assignments. Any part-time, volunteer, or contract personnel working more than twenty hours per week shall receive training appropriate to their position and commensurate with their full-time colleagues.
3. Training for staff, contractors, and volunteers will be provided by instructors who are qualified to conduct such training.

GOWER-GEO 0000504

EROIGSA-11-0003

4. Staff and contractors who have minimal detainee contact (such as clerical and other support staff) will receive initial and annual training commensurate with their responsibilities.

5. Professional, support, and health care staff and contractors who have regular or daily contact with detainees, or who have significant responsibility involving detainees, will receive initial and annual training commensurate with their position.

6. Security staff and contractors will receive initial and annual training commensurate with their position.

7. Facility management and supervisory staff and contractors will receive initial and annual training commensurate with their position.

8. Personnel and contractors assigned to any type of emergency response unit or team will receive initial and annual training commensurate with these responsibilities including annual refresher courses or emergency procedures and protocols.

9. Personnel and contractors authorized to use firearms will receive appropriate training before being assigned to a post involving their use and will demonstrate competency in firearms use at least annually.

10. Personnel and contractors authorized to use chemical agents will receive thorough training in their use and in the treatment of individuals exposed to a chemical agent.

11. Security staff and contractors will be trained in self-defense and use-of-force procedures to include confrontation avoidance and emergency protocols.

12. In addition to employment training requirements, employees and contractors will be encouraged to continue their education and professional development through such incentives as salary enhancement, reimbursement of costs, and administrative leave.

13. Initial orientation, initial training, and annual training programs will include information on drug-free workplace requirements and procedures.

14. Initial orientation, initial training, and annual training programs will include information on the facility's written code of ethics.

15. Initial orientation, initial training, and annual training programs will include updates on new issues and procedures and include reviews of the Detainee Handbook and detainee rights.

16. New staff, contractors, and volunteers will acknowledge in writing that they have reviewed facility work rules, ethics, regulations, conditions of employment, and related documents, and a copy of the signed acknowledgement will be maintained in each person's personnel file.

17. Training shall be conducted on the requirements of special-needs detainees.

## 41 Transfer of Detainees

1. Decisions to transfer detainees will be made by authorized officials on the basis of complete and accurate case information.

2. The legal representative-of-record will be properly notified when a detainee is transferred, in accordance with sound security practices.

3. The detainee will be properly notified, orally and in writing when he or she is being transferred to another facility in accordance with sound security practices.

4. Transportation and receiving facility staff will have accurate and complete records on each transferred detainee.

GOWER-GEO 0000505

5. Transfer of detainees will be accomplished safely and securely, particularly those with special health care concerns including appropriate medical information.

6. Transferred detainees funds, valuables and other personal property will be safeguarded.

7. The applicable content and procedures in this Standard will be communicated to the detainee in a language or manner which the detainee can understand.

## 42 Definitions

**A-FILE, ALIEN FILE** - The legal file maintained by DHS for each detainee.  Contents include but are not limited to the detainee's identification documents (passport, driver's license, other identification cards, etc.), photographs, immigration history, prior criminal record if any, and all documents and transactions relating to the detainee's immigration case.

**ACA** – American Correctional Association.

**ADMINISTRATIVE HEALTH AUTHORITY** - The administrative authority is responsible for all access to care, personnel, equipment, and fiscal resources to support the delivery of health care services.

**ADMINISTRATIVE SEGREGATION** - A form of separation from the general population used when the continued presence of the detainee in the general population would pose a threat to life, property, self, other detainees or staff, or to the security or orderly running of the facility. This housing status also includes detainees who require protective custody, those who cannot be placed in the local population because they are en route to another facility (holdovers), those who are awaiting a hearing before a disciplinary panel and those requiring separation for medical reasons.

**ADMISSION/ADMISSIONS PROCESS** - In-processing of newly arrived detainees, which includes an orientation to the policies, programs, rules, and procedures of the facility. Classification, assignment of living quarters, various inspections, medical screening and safeguarding of funds, valuables and other personal property is completed during this process.

**AMBULATORY RESTRAINTS** - "Soft" or "hard" equipment used to restrict a detainee's movement but leaving him or her able to eat, drink or attend to basic bodily functions without staff intervention.

**AMMUNITION CONTROL OFFICER (ACO)** – An individual who has been designated in writing as the officer responsible for the physical and administrative control of ammunition in the authorizing official's area of accountability.

**ATTORNEY** - Any person who is a member in good standing of the bar of the highest court of any state, possession, territory, commonwealth or the District of Columbia, and is not under an order of any court suspending, enjoining, restraining, disbarring or otherwise restricting him or her in the practice of law.  (See 8 CFR § 1.1(f)).

**BODY-CAVITY SEARCH** - The visual inspection or physical probing of body openings (anus, vagina, ears, nose, mouth, etc) where weapons, drugs, or other contraband could be secreted. This is the most intrusive means of searching an individual, reserved for instances where other search techniques have been considered but rejected as ineffective under the particular circumstances of the case. Body-cavity search procedures govern physical probes, but not visual inspections.

GOWER-GEO 0000506

For example, the procedures would not be appropriate for a *visual* inspection of the inside of the mouth, nose, or ears, unless contraband is found during the course of that inspection. Body-search procedures apply whenever contraband is found, because retrieving/seizing the item will involve physical entry into or probing within the cavity (in this example, the mouth, nose, or ear).

**CAUSTIC** - Capable of burning, corroding, eroding or destroying by chemical action.

**CENSUS CHECK-** See **INFORMAL COUNT.**

**CHAIN OF COMMAND** - Order of authority (rank): executive, senior management, senior staff, etc. The position titles may vary according to the type of facility (SPC, CDF, or IGSA) and local facility titles.  The on-site order of authority at a detention facility descends from the facility administrator to assistant or associate facility administrators to department heads to shift supervisors and other supervisors.  Similarly, the ICE/ERO chain-of-command at a detention facility descends from the Officer–In-Charge (OIC) to the Associate OIC to the Chief Detention Enforcement Officer/Chief of Security, Detention Operations Supervisor, etc.

**CHEMICAL** - A substance with a distinct molecular composition produced by or used in a chemical process.

**CHIEF OF SECURITY** – A generic term for the department head in charge of a detention facility's security employees and operations.  The position titles may vary according to the type of facility (SPC, CDF, or IGSA) and local facility titles.  Ordinarily, a chief of security (Chief Detention Enforcement Agent, captain, etc.) is organizationally directly under an assistant or associate facility administrator.

**CLASS R (RESTRICTED) TOOLS** - Devices to which detainees are forbidden access except in the presence and constant supervision of staff for reasons of safety or security. Class R includes devices that can be used to manufacture or serve as weapons capable of doing serious bodily harm or structural damage to the facility. All portable power tools and accessories are in this category.  Class R also includes ladders and other such items that are not inherently dangerous but could prove useful in unauthorized activities, such as escape attempts.

**CLASSIFICATION** - A process used to make housing and program assignments by assessing detainees on the basis of objective information about past behavior, criminal records, special needs, etc.

**CLINICAL DIRECTOR (CD)** –An official with overall responsibility for the delivery of health care services to ICE detainees.

**CLINICAL MEDICAL AUTHORITY** - The medical authority is responsible for the delivery of all health care services to the detainee population.  These services include, but are not limited to, medical, nursing, dental, mental health and nutritional services.

**COMBUSTIBLE LIQUID**—A substance with a flash point at or above 100° Fahrenheit.

**COMMISSARY**—An area or system where detainees may purchase approved items.

**CONSULTATION VISITATION** - A discussion, either in person or by telephone, between a detainee subject to Expedited Removal and a person of the detainee's choosing.

**CONTACT VISIT**—A meeting between detainee and another person authorized to take place in an area free of obstacles or barriers that prevent physical contact.

GOWER-GEO 0000507

**CONTAINER**—Any bag, barrel, bottle, box, can, cylinder, drum, reaction vessel, storage tank, or other vessel holding a hazardous chemical; does not include pipes or piping systems.

**CONTRABAND**—Any unauthorized item in the facility: illegal, prohibited by facility rules, or otherwise posing a threat to the security or orderly operation of the facility. This includes unauthorized funds.

**CONTRACT DETENTION FACILITY (CDF)** – A facility that provides detention services under a competitively bid contract awarded by the ICE.

**CONTROL OFFICER**—An officer who directs security activities from the Control Center.

**COUNT SLIP** - Documentation of the number of detainees confirmed present during a population count in a specific area, signed by the officers involved in the count.

**CORRESPONDENCE**—Letters, postcards and other forms of written material not classified as packages or publications. Large envelopes containing papers qualify as correspondence, but boxes, sacks, and other shipping cartons do not. Books, magazines, newspapers and other incoming printed matter are not "correspondence."

**CRIMINAL ALIEN**—A foreign national convicted of one or more crimes.

**DETAINEE HANDBOOK**—The policies and procedures governing detainee life in the facility: daily operations, rules of conduct, sanctions for rule violations, recreation and other programs, services, etc.; defined in writing and provided to each detainee upon admission to the facility.

**DETENTION FILE** – Contents include receipts for funds, valuables, and other personal property; documentation of disciplinary action; reports on detainee behavior; detainee's written requests, complaints, and other communications; official responses to detainee communications; records from Special Management Unit, etc.

**DIETICIAN** - Individual registered or eligible for registration with the American Dietetic Association or who has the documented equivalent in education, training, or experience, with evidence of relevant continuing education.

**DISCIPLINARY HEARING**—Non-judicial administrative procedure to determine whether substantial evidence supports finding a detainee guilty of a rule violation.

**DISCIPLINARY COMMITTEE** - One or more impartial staff members who conduct and/or oversee a disciplinary hearing. A lower-level committee (Unit Disciplinary Committee) investigates a formal Incident Report and may impose minor sanctions or refer the matter to a higher-level disciplinary committee. A higher-level committee (Institution Disciplinary Panel) conducts formal hearings on Incident Reports referred from the lower level committee and may impose higher level sanctions for higher level prohibited acts. Also see "INSTITUTION DISCIPLINARY PANEL."

**DISCIPLINARY SEGREGATION**—Confinement in a cell removed from the general population after a serious violation of facility rules in accordance with written procedures.

**DIHS** – Division of Immigration Health Services.

**DRY CELL** – A cell or room without running water where a detainee can be closely observed by staff until the detainee has voided or passed contraband or until sufficient time has elapsed to preclude the possibility that the detainee is concealing contraband. Dry cells may be used when there is reasonable suspicion that a detainee has ingested contraband or concealed contraband in a body cavity.

GOWER-GEO 0000508

EROIGSA-11-0003

**EMERGENCY CHANGES** - Measures immediately necessary to maintain security or to protect the health and safety of staff and detainees.

**EXPOSURE/EXPOSED**—Subjected or potentially subjected to a hazardous substance by any means (inhalation, ingestion, skin contact, absorption, etc.).

**FACE-TO-PHOTO COUNT**—A process that verifies identity of each detainee by comparing every person present with the photographic likeness on his/her housing card.

**FACILITY ADMINISTRATOR** – A generic term for the chief executive officer of a detention facility.  The formal title may vary (warden, officer in charge, sheriff, jail administrator, etc.).

**FIELD OFFICE DIRECTOR (FOD)** - Individual with chief responsibility for facilities in his assigned geographic area.

**FIREARMS CONTROL OFFICER (FCO)** - Individual designated responsible for the physical and administrative control of all firearms under the jurisdiction of the authorizing official.

**FLAMMABILITY HAZARD**—Has a flash point below 200 degrees Fahrenheit, closed cup, or is subject to spontaneous heating.

**FLAMMABLE LIQUID**—A substance with a flash point below 100 degrees Fahrenheit (37.8 Centigrade).

**FLASH POINT**—The minimum temperature at which the vapor of a combustible liquid can form an ignitable mixture with air.

**FOOD SERVICE ADMINISTRATOR (FSA)**—The official responsible for planning, controlling, directing, and evaluating Food Service Department operations.

**FORMAL COUNT**—Detainee population assembled at specific times for attendance check, conducted in accordance with written procedures.

**FOUR/FIVE-POINT RESTRAINT**—A restraint system that confines an individual to a bed or bunk in either a supine or prone position. Ordered by the facility administrator when a detainee's unacceptable behavior appears likely to continue risking injury to self or others.

**FULL-TIME WORK ASSIGNMENT**—Employed from beginning to end of a shift.

**FUNDS**—Cash, checks, money orders, and other negotiable instruments.

**GENERAL CORRESPONDENCE**—All correspondence other than "Special Correspondence."

**GENERAL POPULATION** – Detainees whose housing and activities are not specially restricted.  The term is ordinarily used to differentiate detainees in the "general population" from those in Special Housing Units.

**GRIEVANCE**—A complaint based on a circumstance or incident perceived as unjust.

**HARD CONTRABAND**—Any item that poses a serious threat to the life, safety or security of the facility detainees or staff.

**HEALTH AUTHORITY**—The Health Administrator or Agency responsible for the provision of health care services at a facility or system of facilities.  The responsible physician may be the Health Authority.  Health Authority may also be referred to as the Medical Department.

**HEALTH CARE PRACTITIONER** - Defined as an individual who is licensed, certified, or credentialed by a state, territory, or other appropriate body to provide health care services within the scope and skills of the respective health care profession.

GOWER-GEO 0000509

**HEALTH HAZARD**—Includes carcinogens, toxic agents, reproductive toxins, irritants, corrosives, senitizers, hepatotoxins, nephrotoxins, neurotoxins, and other agents that act on the hemopoietic system or damage the lungs, skin, eyes, or mucous membranes.

**HEALTH SCREENING**-A system for preliminary assessment of the physical and mental condition of individual detainees upon arrival at the facility; conducted by health care personnel or by a health trained officer. The combination of structured inquiry and observation is designed to prevent new arrivals, who appear to pose a health or safety threat to themselves or others, from moving into the general population.

**HEALTH SERVICES ADMINISTRATOR (HSA)**-Executive responsible for the facility's health care program; may also serve as Clinical Director.

**HOLD ROOM**-A secure area used for temporary confinement of detainees before in-processing, institutional appointments (court, medical), release, transfer to another facility, or deportation-related transportation.

**HOLY DAY**-A day specified for religious observance.

**HUNGER STRIKE** - A voluntary fast undertaken as a means of protest or manipulation. Whether or not a detainee actually declares that he or she is on a hunger strike, staff are required to refer any detainee who is observed to not have eaten for 72 hours for medical evaluation and monitoring.

**ILLEGAL CONTRABAND**—Any item prohibited by law, the possession of which constitutes grounds for felony or misdemeanor charges.

**INDIGENT** - Without funds, or with only nominal funds. Ordinarily, a detainee is considered "indigent" if he or she has less than $15.00 in his or her account.

**INDOOR RECREATION AREA**-A covered and enclosed exercise space 1,000 square feet or larger, encompassing 15 square feet per detainee for the planned capacity (number using the space at one time).

**INFORMAL COUNT**-Population count conducted according to no fixed schedule, when detainees are working, engaged in other programs, or involved in recreational activities. Unless a detainee is missing, these counts are not reported; also called "census check" or "irregular count."

**INFORMAL RESOLUTION** - Brings closure to a complaint or issue of concern to a detainee, satisfactory to the detainee and staff member involved; does not require filing of a written grievance.

**INFORMED CONSENT** - A patient's knowing choice about a medical treatment or procedure, made after a physician or other healthcare provider discloses whatever information a reasonably prudent provider in the medical community would give to a patient regarding the diagnosis, risks and benefits involved in the proposed treatment or procedure, and prognosis.

**IN-PROCESSING** – Administrative processing of a detainee arriving at a detention facility (See "Admissions").

**INSTITUTION DISCIPLINARY PANEL (IDP)**-Review board responsible for conducting disciplinary hearings and imposing sanctions for cases of detainee misconduct referred for disposition following the hearing. The IDP usually comprises a Hearing Officer and representatives of different departments in the facility.

**INTERGOVERNMENTAL SERVICE AGREEMENT (IGSA)**-A cooperative agreement between ICE and any State, territory or political subdivision for the construction, renovation or acquisition of equipment, supplies or materials required to

GOWER-GEO 0000510

establish acceptable conditions of confinement and detention services. ICE may enter into an IGSA with any such unit of government guaranteeing to provide bed space for ICE detainees, and to provide the clothing, medical care, food and drink, security and other services specified in the ICE/ERO Detention Standards; facilities providing such services are referred to as "IGSA facilities."

**INVESTIGATING OFFICER** - An individual of supervisory or higher rank who conducts an investigation of alleged misconduct and was not involved in the incident; usually a Supervisory Detention Enforcement Officer or shift supervisor.

**IRREGULAR COUNT**-See **INFORMAL COUNT.**

**LEGAL ASSISTANT** - An individual (other than an interpreter) who, working under the direction and supervision of an attorney or other legal representative, assists with group presentations and in representing individual detainees. Legal assistants may interview detainees, assist detainees in completing forms and deliver papers to detainees without the supervisory attorney being present.

**LEGAL CORRESPONDENCE** – See **"SPECIAL CORRESPONDENCE"**

**LEGAL FILE**- See **A-FILE.**

**LEGAL REPRESENTATIVE** – An attorney or other person representing another in a matter of law, including law students, law graduates not yet admitted to the bar; "reputable individuals"; accredited representatives; accredited officials and attorneys outside the United States (see 8 CFR § 292.1, "Representation and Appearances").

**LEGAL RIGHTS GROUP PRESENTATION** - Informational session held in a detention facility by an attorney or other legal representative to inform detainees about U.S. immigration law and procedures; not a forum for providing confidential or case-specific legal advice.

**LIFE-SUSTAINING PROCEDURE (LIFE SUPPORT)** – A medical intervention or procedure that uses artificial means to sustain a vital function.

**MAIL INSPECTION**-Examination of incoming and outgoing letters, packages, etc., for contraband, including cash, checks and money orders.

**MASTER COUNT**-Total number of detainees housed at a facility.

**MATERIAL SAFETY DATA SHEET (MSDS)**-Basic information about a hazardous chemical, prepared and issued by the manufacturer, in accordance with Occupational Safety and Health Administration regulations (see 29 CFR 1910.1200; see also OSHA Form 174); among other things, specifies precautions for normal use, handling, storage, disposal, and spill cleanup.

**MEDICAL PERSONNEL** -Those individuals authorized by a "scope of practice" or "scope of privileges" to perform health care delivery consistent with their licensure, certification or     training.

**MENTAL HEALTH PROVIDER** - psychiatrist, clinical or counseling psychologist, physician, licensed clinical social worker or any other mental health professional licensed to practice and provide mental health services at the independent level.

**MESSENGER**-A person (neither a legal representative nor a legal assistant) whose purpose is to deliver or convey documents, forms, etc., to and from the detainee; not afforded the visitation privileges of legal representatives and legal assistants.

**MINOR**-A juvenile; a person under the age of 18.

**NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE**-Establishes the standards for health service in correctional facilities on which accreditation is based.

GOWER-GEO 0000511

EROIGSA-11-0003

**NATIONAL FIRE PROTECTION ASSOCIATION**-Principal source of fire protection standards and codes.

**NCCHC** – National Commission on Correctional Healthcare.

**NON-CONTACT VISIT**-Visitation with a barrier preventing physical contact between the detainee and his or her visitors.

**NON-MEDICAL EMERGENCY ESCORTED TRIP**-Authorized detainee visit to a critically ill member of his/her immediate family, or to attend the funeral of a member of his/her immediate family.  "Immediate family" member refers to a parent (including stepparent and foster parent), child, spouse, sister, or brother of the detainee.

**NON-MERIT FACTOR** - Any characteristic or factor immaterial to a detainee's mental or physical ability to perform a given assignment.

**NON-SECURITY KEY** – A key which if duplicated by unauthorized persons and/or lost, would not constitute an emergency requiring urgent action; not critical to facility safety and security.

**OUT COUNTS**-Detainees temporarily away from the facility, but included in the master count.

**OUTDOOR RECREATION AREA**-Open-air space for exercise or other leisure activities, large enough to allow 15 square feet per detainee for the largest group expected to use the area at any one time; but not less than 1,500 square feet.

**PAT-DOWN SEARCH**-Relies on the sensitivity of the officer's hands as they tap or run over the detainee's clothed body; may require the detainee to reveal pocket contents. The least intrusive body search.

**PHYSICAL EXAMINATION**—A thorough evaluation of an individual's physical condition and medical history conducted by or under the supervision of a trained medical professional.

**PLAN OF ACTION**-Describes steps the facility will take to convert a condition that has caused a determination of noncompliance with a standard.

**POSSESSION** - Control over an item on one's person, or in one's assigned or personal space.

**POST ORDERS**—Written orders that specify the duties of each position, hour-by-hour, and the procedures the post officer will follow in carrying out those duties.

**PROGRESSIVE RESTRAINTS**-Control the detainee in the least restrictive manner required, until and unless the detainee's behavior warrants stronger and more secure means of inhibiting movement.

**PROTECTIVE CUSTODY (PC)**—Administrative segregation for the detainee's own safety.

**REASONABLE SUSPICION**—Not intuition, but articulable facts that lead staff to suspect a particular person is concealing a weapon, contraband, or evidence of a crime.

**RELIGIOUS PRACTICES**-Worship, observances, services, meetings, ceremonies, etc., associated with a particular faith; access to religious publications, religious symbolic items, religious counseling and religious study classes; and adherence to dietary rules and restrictions.

**REPRESENTATIVE OF THE NEWS MEDIA**-Persons whose principle employment is to gather, document or report news for:
- A newspaper that circulates among the general public and publishes news of a general interest such as political, religious, commercial, or social affairs.  A key criterion is

GOWER-GEO 0000512

whether the paper qualifies to publish legal notices in the community in which it is located.

- A news magazine with a national circulation sold to the general public by newsstands and mail subscription.
- A national or international news service.
- A radio or television news program of a station licensed by the Federal Communications Commission.

**SALLY PORT**-An enclosure situated in the perimeter wall or fence surrounding the facility, containing double gates or doors, of which one cannot open until the other has closed, to prevent a breach in the perimeter security; handles pedestrian and/or vehicular traffic.

**SANITATION**-The creation and maintenance of hygienic conditions; in the context of food, involves handling, preparing, and storing items in a clean environment, eliminating sources of contamination.

**SATELLITE FEEDING**-Food served and consumed in a location other than where prepared.

**SECURITY KEY**— A key which if duplicated by unauthorized persons and/or lost, would jeopardize life, safety, property or security; or would facilitate escape.

**SEGREGATION**—Confinement in an individual cell isolated from the general population; for administrative, disciplinary, or protective reasons.

**SERVICE PROCESSING CENTER (SPC)** - A detention facility the primary operator and controlling party of which is ICE.

**SEXUAL ACT** -- Contact between the penis and the vulva or the penis and the anus, where contact involving the penis occurs upon penetration, however slight; contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus; or the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, arouse or gratify the sexual desire of any person.

**SHIFT** – The time period of an employee work shift or watch -- for example, the morning shift, day shift, or evening shift.

**SHIFT SUPERVISOR** -- A generic term for the detention security supervisor in charge of operations during a shift. The position titles may vary according to the type of facility (SPC, CDF, or IGSA) and local facility titles. Ordinarily, a shift supervisor (Detention Operations Supervisor, lieutenant, etc.) is, organizationally, directly under the chief of security (Chief Detention Enforcement Agent, captain, etc.).

**SOFT CONTRABAND**-Any unauthorized item that does not constitute hard contraband, i.e., does not pose a serious threat to human safety or facility security; includes that quantity of an item possessed in an amount exceeding the established limit.

**SPECIAL CORRESPONDENCE** - "Special Correspondence" is the term for detainees' written communications to or from private attorneys and other legal representatives; government attorneys; judges, courts; embassies and consulates; the president and vice president of the United States, members of Congress, the Department of Justice (including the DOJ Office of the Inspector General), the Department of Homeland Security Office for Civil Rights and Civil Liberties, the Department of Homeland Security (including U.S. Immigration and Customs Enforcement, the Office of Detention and Removal Operations, and the DHS Office of the Inspector General); the U.S. Public

GOWER-GEO 0000513

EROIGSA-11-0003

Health Service (including the Division of Immigration Health Services); administrators of grievance systems; and representatives of the news media.

**SPECIAL MANAGEMENT UNIT (SMU)** - A housing unit for detainees in administrative or disciplinary segregation.

**SPECIAL-NEED DETAINEE** - A detainee whose mental and/or physical condition requires special handling and treatment by staff. Special needs detainees include but are not limited to those who are emotionally disturbed, mentally challenged or mentally ill, physically disabled, infirm and drug or alcohol addicts/abusers.

**TERMINALLY ILL/INJURED** - In critical condition, beyond medical intervention, with death imminent or expected during the course of detention or hospitalization according to the attending physician.

**TJC - The Joint Commission** [formerly the Joint Commission on Accreditation of Healthcare Organizations (JCAHO)], an independent, not-for-profit organization that evaluates and accredits more than 15,000 health care organizations and programs in the United States.  TJC is the Nation's predominant standards-setting and accrediting body in health care.

**TOXIC** - Poisonous; capable of causing injury or death.

**TRAINING** - An organized, planned, and evaluated activity designed to achieve specific learning objectives and enhance personnel performance. Training may occur on site, at an academy or training center, an institution of higher learning, professional meetings, or through contract service or closely supervised on-the-job training. Training programs usually include requirements for completion, attendance records, and certification of completion. Meetings of professional associations are considered training where there is clear evidence of the direct bearing on job performance. In all cases, the activity must be part of an overall training program.

**UNENCUMBERED SPACE** - Open, usable space measuring at least seven feet in at least one dimension, free of plumbing fixtures, desk, locker, bed, and other furniture and fixtures (measured in operational position).

**UNAUTHORIZED FUNDS** - Negotiable instruments (checks, money orders, etc.) or cash in a detainee's possession exceeding the facility-established limit.

**UNAUTHORIZED PROPERTY**- Not inherently illegal, but against the facility's written rules.

**UNIT DISCIPLINARY COMMITTEE** - See **DISCIPLINARY COMMITTEE.**

**VOLUNTEER GROUP** - Individuals who collectively donate time and effort to enhance the activities and programs offered to detainees; selected on basis of personal qualities and skills (recreation, counseling, education, religion, etc.).

**WORK ASSIGNMENT** - Carpentry, plumbing, food service and other operational activities included in the facility's Voluntary Work Program, for which a detainee may volunteer.

### Article VI. No Employment of Unauthorized Aliens

Subject to existing laws, regulations, Executive Orders, and addenda to this Agreement, the Service Provider and its subcontractors shall not employ aliens unauthorized to work in the United States.  Except for maintaining personal living areas, ICE detainees shall not be required to perform manual labor.

GOWER-GEO 0000514

EROIGSA-11-0003

### Article VII. Period of Performance

This Agreement shall become effective upon the date of final signature by the ICE Contracting Officer and the authorized signatory of the Service Provider and will remain in effect for a period not to exceed 60 months unless extended by bilateral modification for successive periods of performance or terminated in writing by either party. Either party must provide written notice of intention to terminate the agreement, 120 days in advance of the effective date of formal termination, or the Parties may agree to a shorter period under the procedures prescribed in Article X.

### Article VIII. Inspections

The Facility and services shall be inspected in accordance with the following procedures:

A. Definitions. "Services" as used in this clause include services performed, workmanship and material furnished or utilized in the performance of services.

B. The Service Provider shall provide and maintain an inspection system acceptable to the government covering the services under this agreement. Complete records of all inspection work performed by the Service Provider shall be maintained and made available to the government during contract performance and for as long afterwards as the agreement requires.

C. The Government has the right to inspect and test all services called for by the Agreement, to the extent practicable, at all times and places during the term of the Agreement. The Government shall perform inspections and tests in a manner that will not unduly delay or interrupt the work.

D. If the government performs inspections or test on the premises of the Service Provider or a subcontractor, the Service Provider shall furnish and shall require subcontractor to furnish, at no increase in Agreement price, all reasonable facilities and assistance for the safe and convenient performance of these duties including unfettered access to any and all materials and files related to detainee custody and care.

E. If any of the services do not conform to the Agreement requirements, the Government may require the Service Provider to perform the services again in conformity with the Agreement requirements, at no increase to the price stated in the Agreement. When the defects in services cannot be corrected by re-performance, the Government may (1) require the Service Provider to take necessary action to ensure that future performance conforms to the Agreement requirements and (2) reduce the Agreement price to reflect the reduced value of the services performed.

F. If the Service Provider fails to promptly perform the services again or to take the necessary action to ensure future performance in conformity with the Agreement requirements, the Government may (1) by contract or otherwise, perform the services and

GOWER-GEO 0000515

charge to the Provider any cost incurred by the Government that is directly related to the performance of such service or (2) terminate the agreement for default.

## Article IX. Inspection Records

A. <u>Inspection Report</u>:  The Inspection Report stipulates minimum requirements for fire/safety code compliance, supervision, segregation, sleeping utensils, meals, medical care, confidential communication, telephone access, legal counsel, legal library, visitation, and recreation. The Service Provider shall allow ICE to conduct inspections of the Facility, as required, to ensure an acceptable level of services and acceptable conditions of confinement as determined by ICE. No notice to the Service Provider is required prior to an inspection. ICE will conduct such inspections in accordance with the Inspection Report. ICE will share findings of the inspection with the Service Provider's facility administrator. The Inspection Report will state any improvements to facility operation, conditions of confinement, and level of service that will be required by the Service Provider.

B. <u>Possible Termination</u>:  If the Service Provider fails to remedy deficient service ICE identifies through inspection, ICE may terminate this Agreement without regard to the provisions of Articles VII and X.

C. <u>Share Findings</u>:  The Service Provider shall provide ICE copies of facility inspections, reviews, examinations, and surveys performed by accreditation sources.

D. <u>Access to Detainee Records</u>:  The Service Provider shall, upon request, grant ICE access to any record in its possession, regardless of whether the Service Provider or its subcontractor created the record, concerning any detainee held pursuant to this Agreement. This right of access shall include, but is not limited to, incident reports, to the detainee's medical condition and behavior while in the Service Provider's custody. Furthermore, the Service Provider shall retain all records where this right of access applies for a period of two (2) years from the date of the detainee's discharge from the Service Provider's custody.

E. <u>Detainee Privacy</u>:  The Service Provider agrees to comply with the Privacy Act of 1974 and the Agency rules and regulations issued under the Act in the design, development, or operation of any system of records on individuals to accomplish an agency function when the Agreement specifically identifies (i) the system or records; and (ii) the design, development, or operation work that the Service Provider performs. The Service Providers shall also include the Privacy Act into any and all subcontracts when the work statement in the proposed subcontract requires the redesign, development or operation of a system of records on individuals that is subject to the Act; and in the event of violations of the Act, a civil action may be brought against the Agency involved when the violation concerns the design, development, or operation of a system of records on individuals to accomplish an Agency function, and criminal penalties may be imposed upon the officers or employees of the Agency when the violation concerns the operation of a system of records on individuals to accomplish an Agency function. For purposes of the Act, when

GOWER-GEO 0000516

EROIGSA-11-0003

the Agreement is for the operation of a system of records on individuals to accomplish an Agency function, the Service Provider is considered to be an employee of the Agency.

"Operation of a system of records," as used in this clause, means performance of any of the activities associated with maintaining the system of records.

"Record," as used in the clause, means any item, collection, or grouping of information about an individual that is maintained by an Agency, including, but not limited to, education, financial transactions, medical history, and criminal or employment history and that contains the person's name, or the identifying number, symbol, or other identifier particular to the individual, such as a fingerprint, voiceprint or a photograph.

"System of records on individuals," as used in this clause, means a group of any records under the control of any Agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual.

**Article X. Modifications and Disputes**

A.  <u>Modifications:</u>  Actions other than those designated in this Agreement will not bind or incur liability on behalf of either Party.  Either Party may request a modification to this Agreement by submitting a written request to the other Party.  A modification will become a part of this Agreement only after the ICE Contracting has approved the modification in writing.

B.  <u>Change Orders:</u>
1.  The Contracting Officer may at any time, by written order, and without notice to the Service Provider, make changes within the general scope of this Agreement in any one or more of the following:
     (a) Description of services to be performed, including revisions to the PBNDS detention standards.
     (b) Place of performance of the services.
2.  If any such change causes an increase or decrease in the cost of the services under the Agreement, the Contracting Officer will make an equitable adjustment in the agreement price and will modify the Agreement accordingly.
3.  The Service provider must assert its right to an adjustment under this Article within 30 days from the date of receipt of the written order including a proposal addressing the cost impacts and detailed supporting data.
4.  If the Service Provider's proposal includes costs that are determined unreasonable and/or unsupportable, as determined by the Contracting Officer, the Contracting Officer will disallow those costs when determining a revised rate, if any.
5.  Failure to agree to any adjustment will be a dispute under the Disputes section of the Agreement.  However, nothing in this Article shall excuse the Service Provider from proceeding with the Agreement as changed.

GOWER-GEO 0000517

EROIGSA-11-0003, P00010

C. Disputes: The ICE Contracting Officer and the authorized signatory of the Service
Provider will settle disputes, questions and concerns arising from this Agreement.
Settlement of disputes shall be memorialized in a written modification between the ICE
Contracting Officer and authorized signatory of the Service Provider. In the event a
dispute is not able to be resolved between the Service Provider and the ICE Contracting
Officer, the ICE Contracting Officer will make the final decision. If the Service Provider
does not agree with the final decision, the matter may be appealed to the ICE Head of the
Contracting Activity (HCA) for resolution. The ICE HCA may employ all methods
available to resolve the dispute including alternative dispute resolution techniques. The
Service Provider shall proceed diligently with performance of this Agreement pending
final resolution of any dispute.

## Article XI.  Adjusting the Bed Day Rate

ICE shall reimburse the Service Provider at the fixed detainee bed day rate shown in Article I
paragraph C.  The Service Provider may request a rate adjustment no less than twelve (12)
months after the effective date of the Agreement unless required by law (see Article XIX).
After twelve (12) months, the Service Provider may request a rate adjustment by completing
a Jail Services Cost Statement (JSCS).  The Parties shall base the cost portion of the rate
adjustment on the principles of allowability and allocability as set forth in OMB Circular A-
87, Cost Principles for State, Local, and Indian Tribal Governments, federal procurement
laws, regulations, and standards in arriving at the bed day rate.  If ICE does not receive an
official request for a bed day rate adjustment that is supported by an ICE Jail Services Cost
Statement, the fixed bed day rate as stated in this Agreement will be in place indefinitely.

ICE reserves the right to audit the actual and/or prospective costs upon which the rate
adjustment is based.  All rate adjustments are prospective.  As the bed day rate is fixed, there
are no retroactive adjustment(s).

## Article XII.  Enrollment, Invoicing, and Payment

A. Enrollment in Electronic Funds Transfer:  The Service Provider shall provide ICE with
the information needed to make payments by electronic funds transfer (EFT).  Since
January 1, 1999, ICE makes all payments only by EFT.  The Service Provider shall
identify their financial institution and related information on Standard Form 3881,
Automated Clearing House (ACH) Vendor Miscellaneous Payment Enrollment Form
http://www.fms.treas.gov/pdf/3881.pdf.  The Service Provider shall submit a completed
SF 3881 to ICE payment office prior to submitting its initial request for payment under
this Agreement.  If the EFT data changes, the Service Provider shall be responsible for
providing updated information to the ICE payment office.

B. Consolidated Invoicing:  The Service Provider shall use these procedures when
submitting an invoice:

GOWER-GEO 0000518

EROIGSA-11-0003, P00010

1. <u>Invoice Submission:</u> Invoices shall be submitted in a <u>.pdf format</u> on a monthly basis via email to: <u>Invoice.Consolidation@ice.dhs.gov</u>

Each email shall contain only one (1) invoice and the subject line of the email will annotate the invoice number. The emailed invoice shall include the "bill to" address shown below:

> DHS, ICE
> Financial Operations - Burlington
> P.O. Box 1620
> ATTN: *ERO-FOD-FLS*
> Williston, VT 05495-1620

Note: the Service Provider's or Contractor's Dunn and Bradstreet (D&B) DUNS Number <u>must</u> be registered in the System for Award Management (SAM) at <u>https://www.sam.gov</u> prior to award and shall be notated on every invoice submitted to ensure prompt payment provisions are met. The ICE program office identified in the task order/contract shall also be notated on every invoice.

2. <u>Content of Invoices:</u> Each invoice submission shall contain the following information:

> (i) Name and address of the Service Provider/Contractor. Note: the name, address and DUNS number on the invoice <u>MUST</u> match the information in both the Contract/Agreement and the information in the SAM. If payment is remitted to another entity, the name, address and DUNS information of that entity must also be provided which will require Government verification before payment can be processed;
> (ii) Dunn and Bradstreet (D&B) DUNS Number;
> (iii) Invoice date and invoice number;
> (iv) Agreement/Contract number, contract line item number and, if applicable, the order number;
> (v) Description, quantity, unit of measure, unit price and extended price of the items delivered;
> (vi) Shipping number and date of shipment, including the bill of lading number and weight of shipment if shipped on Government bill of lading;
> (vii) Terms of any discount for prompt payment offered;
> (viii) Remit to Address;
> (ix) Name, title, and phone number of person to notify in event of defective invoice; and

3. <u>Invoice Supporting Documentation</u>. In order to ensure payment, the vendor must also submit supporting documentation to the Contracting Officer's Representative (COR) identified in the contract as described below. Supporting documentation shall be submitted to the COR or contract Point of Contact (POC) identified in the contract or task order with all invoices, as appropriate. See paragraph 4 for details regarding the safeguarding of information. Invoices without documentation to support invoiced items, containing charges for items outside the scope of the contract, or not based on the most recent contract base or modification rates will be considered improper and returned for resubmission. Supporting documentation requirements include:

GOWER-GEO 0000519

EROIGSA-11-0003, P00010

(i). Firm Fixed Price Items (items not subject to any adjustment on the basis of the contractor's cost experience, such as pre-established monthly guaranteed minimums for detention or transportation): do not require detailed supporting documentation *unless* specifically requested by the Government.

(ii). Fixed Unit Price Items (items for allowable incurred costs, such as detention and/or transportation services with no defined minimum quantities, stationary guard or escort services, transportation mileage or other Minor Charges such as sack lunches and detainee wages): shall be fully supported with documentation substantiating the costs and/or reflecting the established price in the contract and submitted in .pdf format.

(iii). Detention Services (other than firm fixed price):
        (1) Bed day rate;
        (2) Resident's/detainee's check-in and check-out dates;
        (3) Number of bed days multiplied by the bed day rate;
        (4) Name of each detainee;
        (5) Resident's/detainee's identification information

(iv). Transportation Services (other than firm fixed price):
        (1) The mileage rate being applied for that invoice.
        (2) Monthly billing reports listing transportation services provided; number of miles; transportation routes provided; locations serviced and/or names/numbers of detainees transported; an itemized listing of all other charges; and, for reimbursable expenses (e.g. travel expenses, special meals, etc.) copies of all receipts.

(v). Stationary Guard Services (other than firm fixed price):
        (1) The itemized monthly invoice shall state the number of hours being billed, the duration of the billing (times and dates) and the name of the resident(s)/detainee(s) that was/were guarded.

(vi). Other Direct Charges:
The invoice shall include appropriate supporting documentation for any direct charge billed for reimbursement.

4. Safeguarding Information: As a contractor or vendor conducting business with Immigration and Customs Enforcement (ICE), you are required to comply with DHS Policy regarding the safeguarding of Sensitive Personally Identifiable Information (PII). Sensitive PII is information that identifies an individual, including an alien, and could result in harm, embarrassment, inconvenience or unfairness. Examples of Sensitive PII include information such as: Social Security Numbers, Alien Registration Numbers (A-Numbers), or combinations of information such as the individual's name or other unique identifier and full date of birth, citizenship, or immigration status.

As part of your obligation to safeguard information, the follow precautions are required:

GOWER-GEO 0000520

EROIGSA-11-0003, P00010

- Email supporting documents containing Sensitive PII in an encrypted attachment with password sent separately.
- Never leave paper documents containing Sensitive PII unattended and unsecure.  When not in use, these documents will be locked in drawers, cabinets, desks, etc. so the information is not accessible to those without a need to know.
- Use shredders when discarding paper documents containing Sensitive PII.
- Refer to the DHS Handbook for Safeguarding Sensitive Personally Identifiable Information (March 2012) found at http://www.dhs.gov/xlibrary/assets/privacy/dhs-privacy-safeguardingsensitivepiihandbook-march2012.pdf for more information on and/or examples of Sensitive PII.

5. If you have questions regarding payment, please contact ICE Financial Operations at 1-877-491-6521 or by e-mail at OCFO.CustomerService@ice.dhs.gov

GOWER-GEO 0000521

EROIGSA-11-0003

property. Upon request of the Contracting Officer, the Service Provider shall furnish to
ICE all reasonable assistance and cooperation, including assistance in the prosecution of
suit and execution of the instruments of assignment in favor of ICE in obtaining recovery.

## Article XV. Records

A. <u>Retention of Records</u>:  All records, supporting documents, statistical records, and other
records pertinent to contracts or subordinate agreements under this Agreement shall be
retained by the Service Provider for three (3) years for purposes of federal examinations
and audit.  The three (3) year retention period begins at the end of the first year of
completion of service under the Agreement.  If any litigation, claim, negotiation, audit, or
other action involving the records has been started before the expiration of the three (3)
year period, the records must be retained until completion of the action and resolution of
all issues which arise from it or until the end of the regular three (3) year period,
whichever is later.

B. <u>Access to Records</u>:  ICE and the Comptroller General of the United States, or any of their
authorized representatives, shall have the right of access to any pertinent books,
documents, papers or other records of the Service Provider or its subcontractors, which
are pertinent to the award, in order to make audits, examinations, excerpts, and
transcripts.  The rights of access must not be limited to the required retention period, but
shall last as long as the records are retained.

C. <u>Delinquent Debt Collection</u>:  ICE will hold the Service Provider accountable for any
overpayment, or any breach of this Agreement that results in a debt owed to the Federal
Government.  ICE shall apply interest, penalties, and administrative costs to a delinquent
debt owed to the Federal Government by the Service Provider pursuant to the Debt
Collection Improvement Act of 1982, as amended.

## Article XVI. Detainee Telephone Services

A. The Service Provider shall provide detainees with reasonable and equitable access to
telephones as specified in ICE Performance Based Detention Standards on Telephone
Access.  Telephones shall be located in an area that provides for a reasonable degree of
privacy and a minimal amount of environmental noise during phone calls.

B. If authorized to do so under applicable law, the Service Provider shall monitor and record
detainee conversations.  If detainee telephone conversations can be monitored under
applicable law, the Service Provider shall provide notice to detainees of the potential for
monitoring.  However, the Service Provider shall also provide procedures at the facility
for detainees to be able to place unmonitored telephone calls to their attorneys.

C. Telephone rates shall not exceed the dominant carrier tariff rate and shall conform to all
applicable federal, state, and local telephone regulations.

GOWER-GEO 0000522

EROIGSA-11-0003

D. The ICE designated DTS-IV vendor will be the exclusive provider of detainee telephones for this facility. The DTS-IV contractor shall be allowed to install vending debit machines and shall receive 100 percent of all revenues collected by sale of prepaid debit services. The DTS-IV provider shall be responsible for furnishing all inventory and supply of prepaid debit cards to the Service Provider. The DTS-IV provider shall be responsible for the costs incurred for installation of the equipment, any monthly telephone charges incurred from the operation of DTS-IV, and the maintenance and operation of the system. The Service Provider shall not be entitled to any commissions, fees, or revenues generated by the use of the DTS-IV or the detainee telephones.

E. The Service Provider shall inspect telephones for serviceability in accordance with ICE policies and procedures. The Service Provider shall notify the COTR or designee of any inoperable telephones.

## Article XVII. Maintain Institutional Emergency Readiness

A. The Service Provider shall submit an institutional emergency plan that will be operational prior to start of this Agreement. The plan shall receive the concurrence of he Contracting Officer's Technical Representative (COTR) prior to implementation and shall not be modified without the further written concurrence of the COTR.

B. The Service Provider shall have written agreements with appropriate state and local authorities that will allow the Service Provider to make requests for assistance in the event of any emergency incident that would adversely affect the community.

C. Likewise, the Service Provider shall have in place an internal corporate nation-wide staff contingency plan consisting of employees who possess the same expertise and skills required of staff working directly on this agreement. At the discretion of ICE, these employees would be required to respond to an institutional emergency at the Facility, when necessary.

D. The emergency plans shall include provisions for two or more disturbance control teams. Protective clothing and equipment for each team member and 30 percent of all additional facility staff members shall be provided by the Service Provider, and maintained in a secure location outside the secure perimeter of the facility.

E. Any decision by ICE or other federal agencies to provide and/or direct emergency assistance will be at the discretion of the Government. The Service Provider shall reimburse the Government for any and all expenses incurred in providing such assistance.

F. The COTR shall be notified immediately in the event of all serious incidents. Serious incidents include, but are not limited to, the following: activation of disturbance control team(s); disturbances (including gang activities, group demonstrations, food boycotts, work strikes, work-place violence, civil disturbances/protests); staff use of force including use of lethal and less-lethal force (includes inmates in restraints more

Page 46 of 53

EROIGSA-11-0003

than eight hours); assaults on staff/inmates resulting in injuries requiring medical attention (does not include routine medical evaluation after the incident); fights resulting in injuries requiring medical attention; fires; full or partial lock down of the Facility; escape; weapons discharge; suicide attempts; deaths; declared or non-declared hunger strikes; adverse incidents that attract unusual interest or significant publicity; adverse weather (e.g., hurricanes, floods, ice/snow storms, heat waves, tornadoes); fence damage; power outages; bomb threats; detainee admitted to a community hospital; witness security cases taken outside the Facility; significant environmental problems that impact the facility operations; transportation accidents (i.e. airlift, bus) resulting in injuries, death or property damage; and sexual assaults.

G.  Attempts to apprehend the escapee(s) shall be in accordance with the Emergency Plan, which should comply with ICE Detention Operations Manual regarding Emergency Plans.

H.  The Service Provider shall submit to the COTR a proposed inventory of intervention equipment (weapons, munitions, chemical agents, electronics/stun technology, etc.) intended for use during performance of this Agreement. Prior to the start of this Agreement, the Contracting Officer shall approve the intervention equipment. The approved intervention equipment inventory shall not be modified without prior written concurrence of the Contracting Officer.

I.  The Service Provider shall obtain the appropriate authority from state or local law enforcement agencies to use force as necessary to maintain the security of the institution. The use of force by the Provider shall at all times be consistent with all applicable policies of ICE Detention Operations Manual regarding Use of Force.

## XVIII. Security Requirements

A.  <u>General</u>:  Performance under this Inter-Governmental Service Agreement requires access to sensitive DHS information. The Service Provider shall adhere to the following.

B.  <u>Suitability Determination</u>:  DHS shall have and exercise full control over granting, denying, withholding or terminating unescorted Government facility and/or sensitive Government information access for Service Provider employees, based upon the results of a background investigation. DHS may, as it deems appropriate, authorize and make a favorable Entry-On-Duty (EOD) decision based on preliminary security checks. The favorable EOD decision would allow the employees to commence work temporarily prior to the completion of the full investigation. The granting of a favorable EOD decision shall not be considered as assurance that a full employment suitability authorization will follow as a result thereof. The granting of a favorable EOD decision or a full employment suitability determination shall in no way prevent, preclude, or bar the withdrawal or termination of any such access by DHS, at any time during the term of the agreement. No employee of the Service Provider shall be allowed to EOD and/or access sensitive information or systems without a favorable

GOWER-GEO 0000524

EROIGSA-11-0003

EOD decision or suitability determination by the Office of Professional Responsibility, Personnel Security Unit (OPR-PSU). No employee of the Service Provider shall be allowed unescorted access to a Government facility without a favorable EOD decision or suitability determination by the OPR-PSU. Service Provider employees assigned to the Agreement not needing access to sensitive DHS information or recurring access to DHS facilities will not be subject to security suitability screening.

C.  Background Investigations:  Service Provider employees (to include applicants, temporaries, part-time and replacement employees) under the Agreement, needing access to sensitive information, shall undergo a position sensitivity analysis based on the duties each individual will perform on the agreement.  The results of the position sensitivity analysis shall identify the appropriate background investigation to be conducted.  Background investigations will be processed through the Personnel Security Unit.  Prospective Provider employees with adequate security clearances issued by the Defense Industrial Security Clearance Office (DISCO) may not be required to submit complete security packages, as the clearance issued by DISCO may be accepted.  Prospective Service Provider employees without adequate security clearances issued by DISCO shall submit the following completed forms to the Personnel Security Unit through the COTR, no less than five (5) days before the starting date of the Agreement or five (5) days prior to the expected entry on duty of any employees, whether a replacement, addition, subcontractor employee, or vendor:

1.  Standard Form 85P, "Questionnaire for Public Trust Positions."  Form will be submitted via e-QIP (electronic Questionnaires for Investigation Processing)  (2 copies)

2.  FD Form 258, "Fingerprint Card" (2 copies)

3.  Foreign National Relatives or Associates Statement

4.  DHS 11000-9, "Disclosure and Authorization Pertaining to Consumer Reports Pursuant to the Fair Credit Reporting Act"

5.  Optional Form 306 Declaration for Federal Employment (applies to Providers as well)

6.  Authorization for Release of Medical Information

Required forms will be provided by DHS at the time of award of the agreement.  Only complete packages will be accepted by the OPR-PSU.  Specific instructions on submission of packages will be provided upon award of the agreement.

Be advised that unless an applicant requiring access to sensitive information has resided in the United States for three (3) of the past five (5) years, the Government may not be able to complete a satisfactory background investigation.  In such cases,

GOWER-GEO 0000525

EROIGSA-11-0003

DHS retains the right to deem an applicant as ineligible due to insufficient
background information.

The use of Non-U.S. citizens, including Lawful Permanent Residents (LPRs), is not
permitted in the performance of this Agreement for any position that involves access
to, development of, or maintenance to any DHS IT system.

D. <u>Continued Eligibility</u>:   If a prospective employee is found to be ineligible for access
to Government facilities or information, the COTR will advise the Service Provider
that the employee shall not continue to work or to be assigned to work under the
Agreement.

The OPR-PSU may require drug screening for probable cause at any time and/or
when the Provider independently identifies, circumstances where probable cause
exists.

The OPR-PSU may require reinvestigations when derogatory information is received
and/or every five (5) years.

DHS reserves the right and prerogative to deny and/or restrict the facility and
information access of any Service Provider employee whose actions are in conflict
with the standards of conduct, 5 CFR 2635 and 5 CFR 3801, or whom DHS
determines to present a risk of compromising sensitive Government information to
which he or she would have access under this Agreement.

The Service Provider will report any adverse information coming to their attention
concerning Service Provider employees under the Agreement to the OPR-PSU
through the COTR.  Reports based on rumor or innuendo should not be made.  The
subsequent termination of employment of an employee does not obviate the
requirement to submit this report.  The report shall include the employees' name and
social security number, along with the adverse information being reported.

The OPR-PSU must be notified of all terminations/ resignations within 5 days of
occurrence.  The Provider will return any expired DHS issued identification cards
and building passes, or those of terminated employees to the COTR.  If an
identification card or building pass is not available to be returned, a report must be
submitted to the COTR, referencing the pass or card number, name of individual to
whom issued, the last known location and disposition of the pass or card.  The COTR
will return the identification cards and building passes to the responsible ID Unit.

E. <u>Employment Eligibility</u>: Each employee working on this contract shall successfully
pass the DHS Employment Eligibility Verification (E-Verify) program operated by
USCIS to establish work authorization.

The E-Verify system, formerly known as the Basic Pilot/Employment Eligibility
Verification Program, is an Internet-based system operated by DHS USCIS, in

GOWER-GEO 0000526

EROIGSA-11-0003

partnership with the Social Security Administration (SSA) that allows participating employers to electronically verify the employment eligibility of their newly hired employees. E-Verify represents the best means currently available for employers to verify the work authorization of their employees.

Each employee working on this contract shall have a Social Security Card issued and approved by the Social Security Administration. The Contractor shall be responsible to the Government for acts and omissions of his own employees and for any subcontractor(s) and their employees.

Subject to existing law, regulations and/or other provisions of this contract, illegal or undocumented aliens shall not be employed by the Contractor, or under this contract. The Contractor shall ensure that this provision is expressly incorporated into any and all Subcontracts or subordinate agreements issued in support of this contract.

F. <u>Security Management</u>: The Contractor shall appoint a senior official to act as the Corporate Security Officer. The individual shall interface with the OPR-PSU through the COTR on all security matters, to include physical, personnel, and protection of all Government information and data accessed by the Contractor.

The COTR and the OPR-PSU shall have the right to inspect the procedures, methods, and facilities utilized by the Contractor in complying with the security requirements under this contract. Should the COTR determine that the Contractor is not complying with the security requirements of this contract, the Contractor will be informed in writing by the Contracting Officer of the proper action to be taken in order to effect compliance with such requirements.

The following computer security requirements apply to both Department of Homeland Security (DHS) operations and to the former Immigration and Naturalization Service operations (FINS). These entities are hereafter referred to as the "Department."

G. <u>Information Technology Security Clearance</u>: When sensitive Government information is processed on Department telecommunications and automated information systems, the Service Provider agrees to provide for the administrative control of sensitive data being processed and to adhere to the procedures governing such data as outlined in *DHS IT Security Program Publication DHS MD 4300.Pub.* or its replacement. Service Provider personnel must have favorably adjudicated background investigations commensurate with the defined sensitivity level.

Service Providers who fail to comply with Department security policy are subject to having their access to Department IT systems and facilities terminated, whether or not the failure results in criminal prosecution. Any person who improperly discloses sensitive information is subject to criminal and civil penalties and sanctions under a variety of laws (e.g., Privacy Act).

GOWER-GEO 0000527

EROIGSA-11-0003

H. <u>Information Technology Security Training And Oversight</u>: All Service Provider employees using Department automated systems or processing Department sensitive data will be required to receive Security Awareness Training. This training will be provided by the appropriate component agency of DHS.

Service Providers who are involved with management, use, or operation of any IT systems that handle sensitive information within or under the supervision of the Department shall receive periodic training at least annually in security awareness and accepted security practices and systems rules of behavior. Department Service Providers, with significant security responsibilities, shall receive specialized training specific to their security responsibilities annually. The level of training shall be commensurate with the individual's duties and responsibilities and is intended to promote a consistent understanding of the principles and concepts of telecommunications and IT systems security.

All personnel who access Department information systems will be continually evaluated while performing these duties. Supervisors should be aware of any unusual or inappropriate behavior by personnel accessing systems. Any unauthorized access, sharing of passwords, or other questionable security procedures should be reported to the local Security Office or Information System Security Officer (ISSO).

## XIX. Quality Control

A. The Service Provider shall establish and maintain a complete Quality Control Program (QCP) acceptable to the Contracting Officer and in consultation with the COTR to assure the requirements of this Agreement are provided as specified in the Performance Requirement Summary (PRS) - Attachment 3.

The QCP shall:
1. Be implemented prior to the start of performance.
2. Provide quality control services that cover the scope of the Agreement and implement proactive actions to prevent non-performance issues.

B. A complete QCP addressing all areas of agreement performance shall be submitted to the COTR no later than 30 days after the Agreement effective date. All proposed changes to the QCP must be approved by the Contracting Officer. The Service Provider shall submit a resume of the proposed individual(s) responsible for the QCP to the Contracting Officer for approval. The Service Provider shall not change the individual(s) responsible for the QCP without prior approval of the Contracting Officer.

C. The QCP shall include, at a minimum:
1. Specific areas to be inspected on either a scheduled or unscheduled basis and the method of inspection.

GOWER-GEO 0000528

EROIGSA-11-0003

2. Procedures for written and verbal communication with the Government regarding the performance of the Agreement.

3. Specific surveillance techniques for each service identified in the Agreement and each functional area identified in the PRS.

4. The QCP shall contain procedures for investigation of complaints by the Service Provider and Government staff and feedback to the Government on the actions taken to resolve such complaints.

D. A file of all inspections, inspection results, and any corrective action required, shall be maintained by the Service Provider during the term of this Agreement. The Service Provider shall provide copies of all inspections, inspection results, and any corrective action taken to the COTR and Contracting Officer.

E. Failure by the Service Provider to maintain adequate quality control can result in monetary deductions based upon the schedule of deductions incorporated herein.

**Article XX. Contracting Officer's Technical Representative (COTR)**

A. The COTR will be designated by the Contracting Officer. When and if the COTR duties are reassigned, an administrative modification will be issued to reflect the changes. This designation does not include authority to sign contractual documents or to otherwise commit to, or issue changes, which could affect the price, quantity, or performance of this Agreement.

B. Should the Service Provider believe it has received direction that is not within the scope of the agreement; the Service Provider shall not proceed with any portion that is not within the scope of the agreement without first contacting the Contracting Officer. The Service Provider shall continue performance of efforts that are deemed within the scope.

GOWER-GEO 0000529

EROIGSA-11-0003

**Article XXI.  Labor Standards and Wage Determination**

A.  The Service Contract Act, 41 U.S.C. 351 et seq., Title 29, Part 4 Labor Standards for Federal Service Contracts, is hereby incorporated as Appendix F.  These standards and provisions are included in every contract/IGSA entered into by the United States or the District of Columbia, in excess of $2,500, or in an indefinite amount, the principal purpose of which is to furnish services through the use of service employees.

B.  Wage Determination:  Each service employee employed in the performance of this Agreement shall be paid not less than the minimum monetary wages and shall be furnished fringe benefits in accordance with the Contract-Specific wages and fringe benefits determined by the Secretary of Labor or authorized representative, as specified in any wage determination attached to this contract.  (See Appendix G - Wage Determination).

Page 53 of 53

GOWER-GEO 0000530

EROIGSA-11-0003

# DEPARTMENT OF HOMELAND SECURITY (DHS)
## IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE)
## OFFICE OF ENFORCEMENT AND REMOVAL OPERATIONS (ERO)

## STATEMENT OF WORK

FACILITY LOCATION

City of Adelanto
Subcontractor: The GEO Group Inc. (GEO)
One Park Place, Suite 700
621 Northwest 53rd Street
Boca Raton, FL 33487

**I.   Performance:**

**(PROVIDE HOUSING AS REQUIRED BY ICE FOR 1,300 BEDS A DAY**

The Service Provider is required, in units housing U.S. Immigration and Customs Enforcement
(ICE) detainees, to perform in accordance with the 2008 ICE Performance Based Performance
Based National Detention Standards (PBNDS), American Correctional Association (ACA)
Standards for Adult Local Detention Facilities (ALDF), and Standards Supplement, Standards
for Health Services in Jails, latest edition, National Commission on Correctional Health Care
(NCCHC).  Some ACA standards are augmented by ICE policy and/or procedure.  In cases
where other standards conflict with ICE Policy or Standards, ICE Policy and Standards prevail.
ICE Inspectors will conduct periodic inspections of the facility to assure compliance of the ICE
Performance Based Performance Based National Detention Standards.

**II.      Anticipated Start of Performance:  May 01, 2011**

**III.     Armed Transportation Services:**

   A.  Transportation services shall include the following:

   1.  The Service Provider hereunder shall provide transportation services to and from
       off-site medical facilities and doctors appointments.

   2.  The Service Provider shall furnish suitable vehicles in good condition, approved
       by the COTR, to safely provide the required transportation services. The Service
       Provider shall comply with all federal and state laws with regard to inspections,
       licensing, and registration for all vehicles used for transportation.

   3.  Nothing in this Agreement shall restrict the Service Provider from acquiring
       additional vehicles as deemed necessary by the Service Provider at no cost to the
       Government.  The Service Provider shall not allow employees to use their

**Appendix A - Statement of Work**

GOWER-GEO 0000531

EROIGSA-11-0003

privately owned vehicles to transport detainees.  The Service Provider shall furnish vehicles equipped with interior security features (such as, but not limited to door lock controls, window locks, a wire cage with acrylic panel between the driver seat and the rear passenger seats) and be in accordance with ICE Performance Based National Detention Standards including physical separation of detainees from guards.

4. All transportation shall be accomplished in the most economical manner.

5. The Service Provider shall, upon order of the COTR, or upon its own decision in an urgent medical situation with notification to the COTR immediately thereafter, transport a detainee to a hospital location. An officer(s) shall keep the detainee under supervision 24 hours per day until the detainee is ordered released from the hospital, or at the order of the COTR.  The Service Provider shall then return the detainee to the Facility.

6. The Service Provider personnel provided for the above services shall be of the same qualifications, receive the same training, complete the same security clearances, and wear the same uniforms as those Service Provider personnel provided in the other areas of this Agreement.

7. All transportation Officers shall be armed in the performance of these duties.

8. The Service Provider shall establish a fully operational communication system that has direct and immediate contact with all transportation vehicles and post assignments. Upon demand, the COTR shall be provided with current status of all vehicles and post assignment employees.

9. Failure on the Service Provider's part to comply fully with the detainee(s) departure as pre-scheduled shall result in the Service Provider having deductions made for non-performance.

10. The itemized monthly invoice for transportation services for offsite medical and doctor's appointments shall state the number of miles being billed, the duration of the billing (times and dates) and the names of the detainees that were transported. Such services shall be denoted as a separate item on submitted invoices.

11. The Service Provider shall provide any further transportation services to and from the Facility as may be required or requested by the COTR, including but not limited to transportation between the Facilities.

**IV.    Guard and Escort Services**

A. The Service Provider shall provide stationary guard and escort services in accordance with the ICE Performance Based National Detention Standards. In addition, the service provider will provide guard and escort services as requested by the COTR for Executive

**Appendix A - Statement of Work**

Page 2 of 14

GOWER-GEO 0000532

Office of Immigration Review (EOIR) hearings at The City of Adelanto, attorney interviews at The City of Adelanto, Legal Orientation Program (LOP) at The City of Adelanto, and detainee visitation at The City of Adelanto. The Service provider will also provide guard services for The City of Adelanto Detainees that are sent to medical facilities or doctor's appointments. Qualified officer personnel employed by the Service Provider under its policies, procedures, and practices will perform such services. The Service Provider agrees to augment such practices as may be requested by ICE to enhance specific requirements for security, detainee monitoring, visitation, and contraband control.

B.  The itemized monthly invoice for guard services for offsite medical care shall state the number of hours being billed, the duration of the billing (times and dates) and the names of the detainees that were guarded.  Such services shall be denoted as a separate item on submitted invoices.

## V.  Medical Services

A.  The Service Provider shall be responsible for the provision of health care services for ICE detainees at the facility including: on-site sick call, over the counter medication and routine drugs and medical supplies.

B.   In the event of an emergency, the Service Provider shall proceed immediately with necessary medical treatment. In such event, the Service Provider shall notify ICE COTR and ICE Health Services Corps (IHSC) Managed Care Coordinator (MCC) immediately regarding the nature of the transferred detainee's illness or injury and type of treatment provided.

C.  The Service Provider shall ensure that all health care service providers utilized for ICE detainees hold current licenses, certifications, and/or registrations with the State and/or City where they are practicing.  The Service Provider shall retain a registered nurse to provide health care and sick call coverage unless expressly stated otherwise in this Agreement.

D.  The Service Provider shall ensure that onsite medical and health care coverage as defined below is available for all ICE detainees at the facility for twenty-four (24) hours per day, seven (7) days per week.  The Service Provider shall ensure that its employees solicit each detainee for health complaints and deliver complaints in writing to the medical and health care staff.

E.  The Service Provider shall furnish onsite health care under this Agreement as defined by the Facility local health authority.  The Service Provider shall not charge any ICE detainee an additional fee or co-payment for medical services or treatment provided at the Service Provider's facility.  The Service Provider shall ensure that ICE detainees receive no lower level of onsite medical care and services than those it provides to local inmates, if there are any.

**Appendix A - Statement of Work**

GOWER-GEO 0000533

F.  Onsite health care services shall perform initial medical screening within twelve (12) hours of arrival to the facility, sick call coverage, provision of over-the-counter medications, treatment of minor injuries, treatment of special needs and mental health assessments.  A full health assessment to include a history and hands on physical examination must be done within the first 14 days of detainee arrival.  Detainees with chronic conditions shall receive prescribed treatment and follow-up care.

G.  Arrival screening shall include at a minimum TB symptom screening, planting of the Tuberculin skin test (PPD), or digital chest x-ray per the ICE teleradiology provider and recording the history of past and present illnesses (mental and physical, pregnancy status, history of substance abuse). If ICE installs a teleradiology machine there will be no need to plant a PPD.

H.  The Service Provider shall furnish mental evaluations as determined by the Facility local health authority and provide custody oversight and medication as needed.

I.  If the Service Provider determines that an ICE detainee has a medical condition which renders that person unacceptable for detention under this Agreement, (for example, contagious disease, condition needing life support, uncontrollable violence), the Service Provider shall notify ICE.  Upon such notification, the Service Provider shall allow ICE reasonable time to make the proper arrangements for further disposition of that detainee.

J.  The ICE Health Service Corps (IHSC) acts as the agent and final health authority for ICE on all off-site detainee medical and health related matters.  The Service Provider shall release any and all medical information for ICE detainees to the IHSC representatives upon request, except where prohibited by federal or state law or regulation.  The Service Provider shall submit a Medical Payment Authorization Request (MedPAR) to IHSC for request authorization for payment of services before proceeding with non-emergency, off-site medical care (e.g. off site lab testing, eyeglasses, cosmetic dental, prosthetics, and dental care for cosmetic purposes).

K.  The Service Provider shall submit supporting documentation for non-routine, off-site medical/health services to IHSC.  For medical care provided outside the facility, the IHSC may determine that an alternative medical provider or institution that more aptly meets the needs of ICE and the detainee.  The Service Provider shall send requests for pre-approval for non-emergency off-site care electronically to **http://inshealth.org/ManagedCare/Providers.shtm**

L.  The Service Provider shall furnish twenty-four (24) hour emergency medical care and facility emergency evacuation procedures.  In an emergency, the Service Provider shall obtain all medical treatment required.  The Service Provider shall have access to an off site emergency medical provider at all times.  The Health Authority of the Service Provider shall notify

IHSC Managed Care Coordinators

**Appendix A - Statement of Work**

Page 4 of 14

EROIGSA-11-0003

**Western Region**
**CDR Anissa Davis**
Office: 202-732-4509
Fax#: 866-808-8154
ADavis1@fins3.dhs.gov

as soon as possible, and in no case more than seventy-two (72) hours after detainee receipt of such care.  The Health Authority will obtain pre-authorization for payment from the IHSC Managed Care Coordinator for service(s) beyond the initial emergency situation.

M.  The Service Provider shall allow IHSC Managed Care Coordinators reasonable access to its facility and medical records of detainees for the purpose of liaison activities with the local IGSA Health Authority and associated Service Provider departments.

N.  The Service Provider shall provide ICE detainee medical records to ICE whether created by the Provider or its subcontractors/vendor upon request from the Contracting Officer's Technical Representative or ICE Designee.

O.  The Service Provider shall submit all claims for authorized medical care to:

ICE Health Service Corps
VA Financial Services Center
P.O. Box 149345
Austin, TX 78714-9345
(800) 479-0523

P.  The ICE and PHS may refuse to reimburse the Service Provider for non-emergency medical costs incurred that were not pre-approved by the IHSC.

Q.  The Service Provider agrees to accept and provide for the secure custody, care, and safekeeping of detainees in accordance with the State, and local laws, standards, policies, procedures, or court orders applicable to the operations of the facility.

R.  The IHSC provides limited prescription drug coverage for individuals in the custody of ICE.

Prescriptions are filled at local pharmacies which are part of the Script Care Network (or other designated Pharmacy Benefits Manager).  Below is the process for obtaining prescriptions for ICE detainees:

1.  The Service Provider shall request a group number which should be used at the pharmacy in conjunction with the BIN# 004410 and Processor Control # IHSC (*assigned by Script Care Network*) to designate this is an ICE detainee. The custodial facility should either fax or take a copy of the prescription to their participating pharmacy and indicate that this is an ICE detainee.

**Appendix A - Statement of Work**

Page 5 of 14

GOWER-GEO 0000535

EROIGSA-11-0003

2. The pharmacy will run the prescription through the Script Care network for processing.

3. Formulary prescription will be dispensed; however, there will be no need for an exchange of cash between the pharmacy and custodial facility as the pharmacy will receive payment directly from Script Care.

4. Non-Formulary prescriptions will follow the same procedure as formulary prescriptions; however, because non-formulary medications require prior authorization the pharmacy will receive a rejection indicating prior authorization is required.  At that point the custodial facility will fax to Script Care the Drug Prior Authorization Request Form (409-833-7435) to the number designated at the top of the form.  The authorization will be loaded into the Script Care network and the pharmacy will receive a call indicating the prescription has been approved.  Non-Formulary urgent request must be submitted in the above manner except an X should be placed on the form in the space for URGENT REQUEST and faxed to 409-923-7391.  The authorization will be loaded into the Script Care network and the pharmacy will receive a call indicating the prescription has been approved.

For further information regarding the Script Care Network please contact the VA Financial Services Center at 800-479-0523 or Script Care directly at 800-880-9988.

**VI.    ICE Physical Plant Requirements**

A. ICE Office Space – The Service Provider shall refer to ICE Design Standards (see Attachment B) for specific office and workstation sizes and specific furnishing requirements for a 1,300 beds facility.  The Standards include but are not limited to the following:

1. A total of 39 offices and 53 workstations as outlined below (respectively)

| LAFO 1300 Bed Staffing Model | |
| --- | --- |
| **Operations/Administration** | |
| | Quantity |
| AFOD | 1 |
| SDDO | 1 |
| Mission Support Specialist | 1 |
| Contracting Officer Technical Representative | 2 |
| Secretary | 1 |
| Receptionist/ Admin Assistant | 1 |
| Mission Support Assistant | 2 |
| ICE IT Specialist | 1 |
| Subtotals | 10 |
| **Removal Unit** | |
| Supervisory Detention and Deportation Officer | 5 |

**Appendix A - Statement of Work**

Page 6 of 14

EROIGSA-11-0003

| | |
|---|---|
| Deportation Officer | 20 |
| Deportation Removal Assistant | 20 |
| Subtotals | 45 |
| **Detainee Living Zone** | |
| Supervisory Detention and Deportation Officer | 2 |
| Supervisory Immigration Enforcement Agent | 4 |
| Immigration Enforcement Agent | 30 |
| Subtotals | 36 |
| **Staff Services/Training** | |
| Training Officer | 1 |
| Subtotals | 1 |
| Grand Totals | 92 |

   a.   File rooms (see Standards for size and quantity)

   b.   Conference rooms adjacent to or within ICE area (see Standards for size and quantity)

   c.   Employee break rooms (see Standards for size and quantity)

   d.   IT computer support rooms must be provided through out ICE space per the specifications.  Including specialized requirements for climate control of IT equipment rooms for PHS, EOIR and ICE office area.

   e.   Actual location, layout, configuration, and size of rooms will be determined during the final design phase.

B.  OPLA Space:  The Standards include but are not limited to the following:

1.  (1) Deputy Chief Counsel
2.  (7) Assistant Chief Counsel (*ACC)(2.3/Courtroom*)
3.  (3) Legal Technicians (*1 per 3 ACCs*)
4.  (1) Mail/File Clerk

C.  EOIR Space:  The Standards include but are not limited to the following:

1.  (3) Court Rooms
2.  (3) Judges
3.  (10) Administrative Staff
4.  (1) Mail/File Clerk

D.  Health Services Space:  Health Services to be provided by The City of Adelanto;

Healthcare Services Design Standards shall be in accordance with American Correctional Association requirements when provided by the Service Provider.

E.  ICE Processing Area

**Appendix A - Statement of Work**

Page 7 of 14

GOWER-GEO 0000537

EROIGSA-11-0003

    1. Processing area shall be designed to process male detainees as required in high frequency rates and varying numbers, i.e., up to 50 detainees at one time.

    2. Processing area shall be in compliance with the ICE Hold Room Standard and ICE Performance Based National Detention Standards.

F. Furniture – All furniture and case goods (modular cubical, shelving, drawers, etc.) shall be furnished by the Service Provider in accordance with ICE Design Guide and specifications as required in accordance with the ICE Design Standards.

G. ICE IT Equipment - ICE shall provide and install IT equipment in office spaces for ICE personnel only, to include computer workstations and screens, printers and fax machines. All infrastructure and cabling shall be provided by the Service Provider in accordance with the Structured Cable Plant Standard.

    **NOTE:** ICE IT system must be a complete, independent and physically separate system from the Service Provider's IT system. The system shall serve all operational components: ICE, OPLA, and IHSC.

## VII.   Detainee Work Program

A. Detainee labor shall be used in accordance with the detainee work plan developed by the Service Provider, and will be in accordance with the ICE Performance Based National Detention Standards on Detainee Voluntary Work Program. The detainee work plan must be voluntary, and may include work or program assignments for industrial, maintenance, custodial, service, or other jobs. The detainee work program shall not conflict with any other requirements of the contract and must comply with all applicable laws and regulations.

B. Detainees shall not be used to perform the responsibilities or duties of an employee of the Service Provider. Detainees shall not be used to perform work in areas where sensitive documents are maintained (designated ICE workspace). Custodial/janitorial services to be performed in designated ICE work space will be the responsibility of the Service Provider.

C. Appropriate safety/protective clothing and equipment shall be provided to detainee workers as appropriate. Detainees shall not be assigned work that is considered hazardous or dangerous. This includes, but is not limited to, areas or assignments requiring great heights, extreme temperatures, use of toxic substances, and unusual physical demands.

D. The Service Provider shall supply sufficient staff to monitor and control detainee work details. Unless approved by the COTR, these work details must be within the security perimeter.

**Appendix A - Statement of Work**

Page 8 of 14

EROIGSA-11-0003

E. It will be the sole responsibility of ICE to determine whether a detainee will be allowed to perform on voluntary work details and at what classification level. All detainees shall be searched when they are returned from work details.

## VIII.   Law Library

The Service Provider shall provide secure space within the secure perimeter, either a dedicated room or a multipurpose room for books and materials to provide a reading area "Law Library" - in accordance with the ICE Performance Based National Detention Standards on the Access to Legal Materials.

## IX.   Training

Employees shall not perform duties under this Agreement until they have successfully completed all initial training and the COTR receives written certification from the Service Provider.

A. General Training Requirements

1. All employees must have the training described in the ACA Standards and in this section. Any remuneration (pay) due Service Provider employees in accordance with Department of Labor regulations for any training time is the responsibility of the Service Provider. The Service Provider shall provide the required refresher courses or have an institution acceptable to the COTR to provide the training. Failure of any employee to complete training successfully is sufficient reason to disqualify him or her from duty.

2. All new Officers and Custody staff will receive 54 hours of basic training, not to include firearms, if applicable and 40 hours of on-the-job training prior to entering on duty. The Service Provider's Training Officer will be responsible for administering an on-the-job training program for new employees. A senior Officer, at all times during this latter 40-hour period, must accompany the Officers and Custody staff. The Service Provider's Training Officer shall send a copy of the documentation to the COTR upon successful completion of the employee's on-the-job training.

3. In addition, after completion of the first 94 hours of training, the Service Provider has 60 days to complete an additional 40 hours of training. During the remainder of the first year on duty, the Officer and Custody staff will have an additional 40 hours of training for a total of 174 hours within the first year of employment. The training program must directly relate to the employee's assigned position and afford application of necessary job skills. Training site shall be provided by the Service Provider at no cost to the Government.

B. Basic Training Subjects:

1. Employees must complete the following list of basic training subjects. The course title is followed by the estimated hours of training for that subject.

**Appendix A - Statement of Work**

Page 9 of 14

GOWER-GEO 0000539

EROIGSA-11-0003

| | | |
|---|---|---|
| a. | In-service Orientation/Social Diversity | 2 HRS |
| b. | Counseling Techniques/Suicide Prevention | 2 HRS |
| c. | Conduct/Duties/Ethics and Courtroom Demeanor | 2 HRS |
| d. | Bomb Defense and Threats | 1 HR |
| e. | Telephone Communications/Radio Procedures | 1 HR |
| f. | Fire and other Emergency Procedures | 2 HRS |
| g. | Treatment and Supervision of Detainees | 2 HRS |
| h. | ICE Use of Force Policy | 2 HRS |
| i. | Security Methods/Key Control/Count | 1 HR |
| j. | Procedures/Observational Techniques | 4 HRS |
| k. | EEO/Sexual Harassment | 2 HRS |
| l. | Detainee Escort Techniques | 1 HR |
| m. | ICE Paperwork/Report Writing | 2 HRS |
| n. | Detainee Searches/Detainee Personal Property | 4 HRS |
| o. | Property/Contraband | 2 HRS |
| p. | Detainee Rules and Regulations | 2 HRS |
| q. | First Aid* | 4 HRS |
| r. | Cardiopulmonary resuscitation (CPR)* | 4 HRS |
| s. | Blood-borne Pathogens* | 2 HRS |
| t. | Self Defense | 8 HRS |
| u. | Use of Restraints | 6 HRS |
| v. | Firearm Training | ** |
| w. | Sexual Abuse/Assault Prevention & Intervention* | 2 HRS |
| x. | ICE Performance Based National Detention Standards | |

2 HRS

*Critical Training Subjects*

**Firearm Training for Required Armed Detention Services in accordance with* State licensing requirements. Service Provider shall certify proficiency every* quarter.*

C.  Refresher Training

**Appendix A - Statement of Work**

Page 10 of 14

GOWER-GEO 0000540

1. Every year the Service Provider shall conduct 40 hours of Refresher Training for all Officers and Custody staff including Supervisory Officers. Refresher training shall consist of these critical subjects listed above and a review of basic training subjects and others as approved by ICE.

2. The Service Provider shall coordinate recertification in CPR and First Aid with the ICE training staff. This training shall be provided at no cost to the Government. Annually, upon completion, the Service Provider shall provide documentation of refresher training to the COTR.

3. In addition to the refresher training requirements for all Officers and Custody staff, supervisors must receive refresher training relating to supervisory duties.

D. On-the-Job Training

1. After completion of the minimum of 54 hours basic training, all Officers and Custody staff will receive an additional 40 hours of on-the-job training at specific post positions. This training includes:

   a. Authority of supervisors and organizational code of conduct.

   b. General information and special orders.

   c. Security systems operational procedures.

   d. Facility self-protection plan or emergency operational procedures.

   e. Disturbance Control Team training.

E. Training During Initial 60 Day Period

The Service Provider shall provide an additional 40 hours of training for Officers and Custody staff within 60 days after completion of first 94 hours of training. The Service Provider shall provide the training format and subjects, for approval by the COTR and CO, prior to the commencement of training.

F. Basic First Aid and CPR Training

1. All members of the Service Provider's security staff shall be trained in basic first aid and CPR. They must be able to:

   a. Respond to emergency situations within four minutes.

   b. Perform cardiopulmonary resuscitation (CPR).

   c. Recognize warning signs of impending medical emergencies.

   d. Know how to obtain medical assistance.

**Appendix A - Statement of Work**

Page 11 of 14

    e.   Recognize signs and symptoms of mental illness.

    f.   Administer medication.

    g.   Know the universal precautions for protection against blood-borne diseases.

G.  Supervisory Training - all new Supervisory Officers assigned to perform work under this agreement must successfully complete a minimum of 40 hours of formal supervisory training provided by the Service Provider prior to assuming duties. This training is in addition to mandatory training requirements for Officers.  Supervisory training shall include the following management areas:

| | | |
|---|---|---|
| a. | Techniques for issuing written and verbal orders | 2 HRS |
| b. | Uniform clothing and grooming standards | 1 HR |
| c. | Security Post Inspection procedures | 2 HRS |
| d. | Employee motivation | 1 HR |
| e. | Scheduling and overtime controls | 2 HRS |
| f. | Managerial public relations | 4 HRS |
| g. | Supervision of detainees | 4 HRS |
| h. | Other company policies | 4 HRS |

Additional classes are at the discretion of the Service Provider with the approval of the COTR.

The Service Provider shall submit documentation to the COTR, to confirm that each supervisor has received basic training as specified in the basic training curriculum.

H.  Proficiency Testing - The Service Provider shall give each Officer and Custody staff a written examination consisting of at least 25 questions after each classroom-training course is completed.  The Service Provider may give practical exercises when appropriate.  The COTR shall approve the questions before the Service Provider can administer the examination.  To pass any examination, each officer and custody staff must achieve a score of 80% or better.  The Service Provider must provide the COTR with the eligible Officer or Custody staff's completed exam before the Officer or Custody staff may be assigned to duties under the agreement.  Should an employee fail the written test on the initial attempt, he or she shall be given additional training by the Service Provider and be given one additional opportunity to retake the test.  If the employee fails to complete and pass the test the second time, the Service Provider shall remove the employee from duties on this agreement.

I.  Certified Instructors - Certified instructors shall conduct all instruction and testing.  A state or nationally recognized institution shall certify instructors unless otherwise approved in writing by the COTR.  Certifications of instructors may be established by

**Appendix A - Statement of Work**

GOWER-GEO 0000542

documentation of past experience in teaching positions or by successful completion of a course of training for qualifying personnel as instructors. The COTR must approve the instructor prior to the training course.

J.   Training Documentation

1.   The Service Provider shall submit a training forecast and lesson plans to the COTR or ICE designee, on a monthly basis, for the following 60-day period. The training forecast shall provide date, time, and location of scheduled training and afford the COTR observation/evaluation opportunity.

2.   The Service Provider shall certify and submit the training hours, type of training, date and location of training, and name of the instructor monthly for each employee to the COTR or ICE designee.

## X.   Establish and Maintain Program for Prevention of Sexual Abuse/Assault

The Service Provider shall develop and implement a comprehensive sexual abuse/assault prevention and intervention program. This program shall include training that is given separately to both staff and detainees.

## XI.   Business Permits and Licenses

The Service Provider must obtain all required permits and licenses by the date of agreement award. The Service Provider must (depending on the state's requirements) be licensed as a qualified security service company in accordance with the requirements of the district, municipality, county, and state in which ICE work site(s) is/are located. Throughout the term of this agreement, the Service Provider shall maintain current permits/business licenses and make copies available for Government Inspection. The Service Provider shall comply with all applicable federal, state, and local laws and all applicable Occupational Safety and Health Administration (OSHA) standards.

## XII.   Firearms / Body Armor

The Service Provider shall comply with their Firearms and Body Armor Policy and comply with all applicable federal, state, and local laws.

## XIII.   Federal Government Quality Assurance

A.   The Government's Quality Assurance Program (QASP) is based on the premise that the Service Provider, and not the Government, is responsible for management and quality control actions to meet the terms of the Agreement. The QASP procedures recognize that the Service Provider is not a perfect manager and that unforeseen and uncontrollable problems do occur. Good management and use of an adequate Quality Control Plan will allow the facility to operate within acceptable quality levels.

**Appendix A - Statement of Work**

Page 13 of 14

EROIGSA-11-0003

B.  Each phase of the services rendered under this Agreement is subject to inspection both during the Service Provider's operations and after completion of the tasks.

C.  When the Service Provider is advised of any unsatisfactory condition(s), the contractor shall submit a written report to the Contracting Officer addressing corrective/preventive actions taken. The QASP is not a substitute for quality control by the Service Provider.

D.  The COTR may check the Service Provider's performance and document any noncompliance, however, only the Contracting Officer may take formal action against for unsatisfactory performance.

E.  The Government may reduce the invoice or otherwise withhold payment for any individual item of nonconformance observed.  The Government may apply various inspection and extrapolation techniques (i.e., 100 % surveillance, random sampling, planned sampling, unscheduled inspections) to determine the quality of services and the total payment due.

F.  FAILURE TO PERFORM REQUIRED SERVICES. The rights of the Government and remedies described in this section are in addition to all other rights and remedies set forth in this agreement. Any reductions in the invoice shall reflect the agreement's reduced value resulting from the failure to perform required services.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

END OF DOCUMENT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Appendix A - Statement of Work**

Page 14 of 14

GOWER-GEO 0000544