# EXHIBIT 4

Job No. 3431598

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                    EASTERN DIVISION

 4

 5   RAUL NOVOA and JAIME CAMPOS   )
     FUENTES, individual and on    )
 6   behalf of all others          )
     similarly situated,           )
 7                                  )
                    Plaintiffs,    )   Case No. 5:17-cv-02514
 8                                  )            JGB-SHKx
         vs.                        )
 9                                  )
     THE GEO GROUP, INC.,           )
10                                  )
                    Defendants.    )
11   _____ )

12

13

14

15        VIDEOTAPED DEPOSITION OF JAMES JANECKA

16              Los Angeles, California

17             Wednesday, June 26, 2019

18

19

20

21

22

23   REPORTED BY:
     Kathleen Siri
24   CSR No. 9726

25

                                            Page 1
```

Job No. 3431598

```
 1          UNITED STATES DISTRICT COURT
 2          CENTRAL DISTRICT OF CALIFORNIA
 3                EASTERN DIVISION
 4
 5  RAUL NOVOA and JAIME CAMPOS  )
    FUENTES, individual and on   )
 6  behalf of all others         )
    similarly situated,          )
 7                               )
                                 )  Case No. 5:17-cv-02514
 8          Plaintiffs,          )        JGB-SHKx
                                 )
    vs.                          )
 9                               )
    THE GEO GROUP, INC.,         )
10                               )
            Defendants.          )
11  _____  )
12
13
14
15
16
17     Videotaped Deposition of JAMES JANECKA, taken before
18  Kathleen Siri, a Certified Shorthand Reporter for the
19  State of California, with principal office in the
20  County of Los Angeles, commencing at 9:04 p.m.,
21  Wednesday, June 26, 2019, at 400 South Hope Street,
22  Eighth Floor, Los Angeles, California.
23
24
25
                                                    Page 2
```

```
 1  APPEARANCES OF COUNSEL:
 2
    FOR PLAINTIFFS:
 3
       BURNS CHAREST LLP
 4     BY:  LYDIA A  WRIGHT, ESQ
            DANIEL H  CHAREST, ESQ
 5     366 Canal Street, Suite 1170
       New Orleans, Louisiana 70130
 6     Telephone:  (504) 799-2844
       Facsimile:  (650) 714-6825
 7     lwright@burnscharest com
 8
       LAW OFFICE OF R  ANDREW FREE
 9     BY:  R  ANDREW FREE, ESQ
       P O  Box 905678
10     Nashville, Tennessee 37209
       Telephone:  (844) 321-3221
11     Facsimile:  (615) 829-8959
12
13  FOR DEFENDANTS:
14     HOLLAND AND KNIGHT LLP
       BY:  SHANNON ARMSTRONG, ESQ
15          VINCE FARHAT, ESQ
       2300 US Bancorp Tower
16     111 SW 5th Avenue
       Portland, Oregon 97204
17     Telephone:  (503) 517-2924
       Facsimile:  (503) 241-8014
18     shannon armstrong@hklaw com
19
    ALSO PRESENT:
20
       ISRAEL REYES, VIDEOGRAPHER
21
22
23
24
25
                                                    Page 3
```

```
 1             I N D E X
 2  WITNESS                  EXAMINATION
 3  JAMES JANECKA
 4  Examination by:              PAGE
 5  MS. WRIGHT                     8
 6
 7
 8          E X H I B I T S
 9  Exhibit      Description         Page
10
11  Exhibit 22  GEO Policy and Procedure Manual   45
               8.1.8, Detainee Work Plan
12
    Exhibit 23  GEO Policy and Procedure Manual   54
13             12.1.4, Sanitation Procedures/
               Housekeeping Plan
14
    Exhibit 24  GEO Policy and Procedure Manual   60
15             10.3.5, Post Orders
16  Exhibit 25  GEO, Adelanto ICE Processing      66
               Center Supplemental Detainee
17             Handbook
18  Exhibit 26  Printout of an e-mail string from 93
               Joanne Langill, 9/4/18
19
    Exhibit 27  Printout of an e-mail string     104
20             from Michelle Kenney, 3/8/18
21  Exhibit 28  ███████████████████████████
               ████████████████████████ █████
22  ████
23  Exhibit 29  GEO Monthly Food Service         132
               Department Meeting Minutes,
24             7/16/18
25  (Continued...)
                                                    Page 4
```

```
 1         E X H I B I T S (CONTINUED)
 2  Exhibit      Description         Page
 3
 4  Exhibit 30  GEO Initial Hazardous           151
               Communication Safety Training
 5
    Exhibit 31  Printout of an e-mail string    170
 6             from Kyle Fouts, 5/29/15
 7  Exhibit 32  Printout of an e-mail string    178
               from Patricia Love, 3/27/18
 8
    Exhibit 33  Printout of an e-mail string    201
 9             from June Long, 2/18/16
10  Exhibit 34  GEO Adelanto ICE Processing     214
               Center House Keeping Plan
11
    Exhibit 35  Printout of an e-mail string    222
12             from Michelle Keeney, 3/6/18
13  Exhibit 36  Printout of an e-mail string    226
               from Hussein Hamed, 7/1/15
14
    Exhibit 37  Printout of an e-mail string    229
15             from Vincent Vantell, 4/4/17
16  Exhibit 38  Printout of an e-mail string    237
               from Vincent Vantell, 2/16/17
17
    Exhibit 39  Adelanto Facility Staffing      253
18             Plan, 12/1/15
19  Exhibit 40  American Correctional           255
               Association Letter to James
20             Janecka from Samuel Meyer,
               9/20/16
21
    Exhibit 41  Printout of an e-mail string    256
22             from Sharon Buczkowske, 9/26/16
23  Exhibit 42  Significant Incident Summary    262
               report, 3/15/17
24
25  (Continued  )
                                                    Page 5
```

2 (Pages 2 - 5)

Veritext Legal Solutions
800-336-4000

E X H I B I T S (CONTINUED)

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 43 | Detainee Death Review, Raul Ernesto Morales-Ramos | 264 |
| Exhibit 44 | Detainee Death Review, Jose Manuel Azurdia-Hernandez | 270 |
| Exhibit 45 | Detainee Death Review, Sergio Alonso Lopez | 274 |
| Exhibit 46 | U S Immigration and Customs Enforcement Memorandum, Investigative Findings, Death of ICE detainee Fernando Dominguez-Valivia | 278 |
| Exhibit 47 | Detainee Death Review Osmar Epifanio Gonzalez-Gadba | 281 |

PREVIOUSLY MARKED EXHIBITS FOR IDENTIFICATION

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 1 | Services Contract and Intergovernmental Services Agreement | 23 |
| Exhibit 2 | GEO Performance-Based National Standards, 2011 | 26 |
| Exhibit 15 | Amendment of Solicitation Modification of Contract, P00020 | 240 |

Page 6

---

June 26, 2019

-o0o-

THE VIDEOGRAPHER: Good morning. We are on the record. The time is 9:04 a.m. Today's June 26th, 2019. 0 My name is Israel Reyes. I'm a notary, video technician for Veritext Legal Solutions, located in Los Angeles, California. We are recording these proceedings at 400 South Hope Street, Los Angeles, California. This is Media 1 for video deposition of James Janecka in the action entitled Raul Novoa and Jaime Campos Fuentes versus the GEO Corp., et al. This deposition is being taken on behalf of plaintiff. The case number is 5:17-cv-02514-JGB-SHKx.

Now, may I please have introductions for the record beginning with counsel.

MS. WRIGHT: Lydia Wright for the plaintiffs.

MR. FREE: Andrew Free for the plaintiffs.

MR. CHAREST: Daniel Charest for the plaintiff.

MS. ARMSTRONG: Shannon Armstrong, Holland and Knight for the defendants GEO Group and with me is Vince Farhat.

MR. FARHAT: Good morning.

THE VIDEOGRAPHER: Now, Ms. Reporter, please administer the oath.

Page 7

---

JAMES JANECKA,

Called as a witness by and on behalf of the Plaintiffs, and having been first duly sworn by the Certified Shorthand Reporter, was examined and testified as follows:

EXAMINATION

BY MS. WRIGHT:

Q   Good morning, Mr. Janecka.

A   Morning.

Q   Mr. Janecka, you are the facility administrator or warden of the Adelanto ICE Processing Center in Adelanto, California; is that right?

A   Yes, ma'am.

Q   If I use the phrase, Adelanto Facility or just Adelanto, will you understand that I mean the Adelanto ICE Processing Center?

A   Yes, ma'am.

Q   Great. Thank you.

On that note, if I use terms or terms of art that are inaccurate or inartful, please correct me. I don't have the detention kind of lingo that you have. So I want to be sure that we're talking about the same things as we go forward.

Can you agree to that?

Page 8

---

A   Yes, ma'am.

Q   Great. Thank you.

How long have you been the warden at Adelanto?

A   Since September of 2014.

Q   How long have you worked for the GEO Group?

A   Since May of 1997.

Q   So a little over 20 years?

A   Yes, ma'am.

Q   Where did you work before Adelanto?

A   Lee County Correctional Facility in Hobbs, New Mexico.

Q   How long were you there?

A   Ten years.

Q   Okay. I lived in Gallop two years. Hobbs is a nice place.

And Lee County Correctional Center, that's a criminal correctional center as opposed to civil immigration detention center?

A   It was a state corrections facility, yes.

Q   Where were you -- and it's a GEO facility?

A   Yes, ma'am.

Q   Where were you before Lee County Correctional Center?

A   In Del Rio, Texas.

Q   What facility were you at there?

Page 9

3 (Pages 6 - 9)

**Page 10**

1    A    The Val Verde Correctional Facility.

2    Q    Were you the warden?

3    A    I was a deputy warden.

4    Q    How long were you there?

5    A    Approximately two years.

6    Q    And before Del Rio, where did you work?

7    A    George W. Hill Correctional Facility in

8    Delaware County, Pennsylvania.

9    Q    How long were you there?

10   A    Approximately three years.

11   Q    What was your position?

12   A    Warden.

13   Q    And these are all GEO facilities?

14   A    Yes, ma'am.

15   Q    And before G.W. Hill?

16   A    I was at the Taft Correctional Facility in

17   Taft, California.

18   Q    Where is that?

19   A    Excuse me?

20   Q    Where is that?

21   A    It's near Bakersfield.

22   Q    Okay.  And what was your position?

23   A    Assistant warden.

24   Q    How long were you there?

25   A    Approximately two years.

**Page 11**

1    Q    And prior to Taft?

2    A    Prior to Taft, I was in Broward County,

3    Florida.

4    Q    What facility?

5    A    It was the Broward County Residential Center

6    Work Center.

7    Q    Is that a -- what kind of facility is that?

8    A    It was a work release center in a company

9    contract with the County of Broward.

10   Q    How long were you there?

11   A    Three months.

12   Q    And what was your position?

13   A    Assistant warden.

14   Q    Before Broward County, where were you?

15   A    I worked for the Texas Department of Criminal

16   Justice.

17   Q    What did you do for them?

18   A    I started out as a correctional officer in

19   January of 1985.  And progressed to sergeant,

20   lieutenant, captain, major before I went to work for the

21   GEO Group.

22   Q    So am I correct in understanding that in the

23   field of corrections, the positions are -- the structure

24   is similar to a military structure?

25   A    Similar, yes.

**Page 12**

1    Q    And can you go through the hierarchy for me one

2    more time?

3    A    My current job or with my previous career?

4    Q    In corrections?

5    A    In corrections, you typically have correctional

6    officers.  Then have you sergeants, lieutenants,

7    captains, majors, assistant wardens and wardens.

8    Q    And you've been each of those positions?

9    A    Yes.

10   Q    In corrections?

11   A    Yes, ma'am, in corrections and/or in detention.

12   Q    Okay.  And then in the field of civil

13   immigration detention, can you go through that hierarchy

14   for me in that field?

15   A    I was a deputy warden in Del Rio.  And then

16   I've been here in Adelanto for the last almost five

17   years as the warden.

18   Q    I think I'm asking a slightly different

19   question, which is in the field of immigration

20   detention, as opposed to corrections, what is the

21   hierarchy of positions?

22   A    Oh, excuse me.  At our facility, we have

23   detention officers, sergeants, lieutenants, captains,

24   chief security/major, assistant warden, deputy warden

25   and warden.

**Page 13**

1    Q    And you being the warden, supervised all of

2    those people below you on that scale; is that right?

3    A    Yes, ma'am.

4    Q    Is Adelanto the first immigration detention

5    center where you've worked?

6    A    No.  Val Verde Correctional Facility in Del Rio

7    had an immigration population.

8    Q    I thought you said that that was a correctional

9    facility?

10   A    The title was correctional.  It did house

11   aliens.  It housed U.S. Marshals.  And it also housed

12   some county jail.

13   Q    Were the people who were being detained in

14   the Del Rio facility, were they there to -- for criminal

15   reason to serve a sentence or were they there for

16   removal proceedings?

17   A    Both.

18   Q    Okay.  So it was a correctional facility that

19   also had removal operations as well; is that correct?

20   A    It had immigration.  Most of the immigrants

21   would go to their -- their immigration hearings and then

22   it would be determined.  So you had criminal aliens and

23   you had aliens.

24   Q    Okay.  Any other immigration detention centers

25   where you've worked besides the Del Rio Facility and

1 Adelanto?

2   A   No, ma'am.

3   Q   Okay.  In your experience, how is civil
4 immigration detention different from corrections, from
5 criminal detention?

6   A   Civil detention, there's nobody that's detained
7 that has been convicted.  Everything -- every program,
8 every activity is voluntary to the population.  Whereas
9 in a criminal -- in a correctional setting, a lot of the
10 programming is -- either a -- sanctioned and it's
11 mandatory for the inmates to go to the programming.  We
12 also have our immigration proceedings on site.  And the
13 detainees have their court proceedings.  And whatever
14 the outcome of their court proceeding is, is the end
15 result of their fate.

16   Q   Have you ever received a paycheck from ICE?
17 ICE, meaning Immigration Customs Enforcement?

18   A   No.

19   Q   Are you a member of any trade groups or
20 professional associations?

21   A   I'm a member of the Adelanto Chamber of
22 Commerce.  I'm a member of the American Correctional
23 Association.

24   Q   Okay.  Did you receive any special training or
25 do you have any special qualifications that help you to

Page 14

1 run a civil immigration detention center?

2   A   Specialized would be just the training that we
3 receive at our annual refresher training.  Otherwise, it
4 is managed in -- from past experience.

5   Q   Your experience in corrections helps inform
6 your day-to-day operations of the Adelanto Facility?

7   A   Corrections and past detention experience, yes.

8   Q   Okay.  Can you tell me about your educational
9 background?

10   A   I have approximately two years of college.

11   Q   Where did you go to college?

12   A   Warden County Junior College.

13   Q   Where is that?

14   A   It is a warden -- it was in Sugarland, Texas.

15   Q   Did you get a degree there?

16   A   No, ma'am.

17   Q   When were you there?

18   A   Approximately 1993 through 1995.

19   Q   Describe for me please your responsibilities as
20 warden of the Adelanto Detention Center?

21   A   My responsibilities are for the management of
22 the day-to-day operations of the entire institution as
23 well as the physical management of the institution.

24   Q   When you say the day-to-day operations, does
25 that mean that you are responsible for overseeing

Page 15

1 operations, staff, detainees, security, the whole -- the
2 whole package of what happens at Adelanto?

3   A   From a management standpoint, yes.

4   Q   Is there another standpoint that we should be
5 considering?

6   A   I don't actually do every intricate and daily
7 detail specific job at the facility.  From a management
8 standpoint, I'm responsible for all those areas.

9   Q   Right, because you have so many subordinates,
10 so you delegate -- you delegate the operations, tasks to
11 your --

12   A   The day-to-day -- the day-to-day details, yes.

13   Q   And you mentioned having fiscal responsibility
14 or responsibility over fiscal management.  What did you
15 mean by that?

16   A   I work very closely with my business manager,
17 my assistant ward of finance for the management of
18 our -- our budget.

19   Q   And who is that person?

20   A   Greg Hillers.

21   Q   So are you responsible for the facility's
22 budget?

23   A   I am responsible for the -- the management and
24 the -- the budget review process, yes.

25   Q   And are you responsible for the expenditures of

Page 16

1 the facility?

2   A   To a point.

3   Q   What do you mean?

4   A   My business offices, the primary responsibility
5 of their area, I get briefed on the details or the -- as
6 to the status of where we're at.

7   Q   But you're ultimately responsible for what your
8 business office does; is that right?

9   A   Yes.

10   Q   So is it fair to say that you direct all
11 facility functions, assign and delegate duties and
12 ensure that the facility operates smoothly?

13   A   No.

14   Q   What did I get wrong there?

15   A   I have deputy, a deputy warden, assistant
16 wardens that will assign tasks and certain -- give
17 direction to staff in certain areas.  I am involved to a
18 point, but I don't manage every detail of the operation.

19   Q   Thank you for that clarification.  That makes
20 complete sense.

21     In the military, there's a saying that you can
22 delegate authority, but not responsibility.  Is that --
23 do you think that that rings true at Adelanto?

24   A   That's -- when you're in the management
25 position, that's typically true.

Page 17

5 (Pages 14 - 17)

Job No. 3431598

1  Q  Do you have a military background?
2  A  No, ma'am.
3  Q  Daniel Ragsdale called you the leader on the
4  ground at Adelanto.  Do you think he's right about that?
5  A  I guess I'll say thank you to Daniel.
6  Q  I thought you might like to hear that.
7      MS. ARMSTRONG:  I won't tell you the other
8  stuff that Daniel Ragsdale talked about.
9  BY MS. WRIGHT:
10  Q  Who is your immediate supervisor?
11  A  Joe Moorehead.
12  Q  What's his title?
13  A  Western region director.
14  Q  And where is his office?
15  A  Los Angeles.
16  Q  And he's western regional director at GEO?
17  A  Yes, ma'am.
18  Q  Do you know who his supervisor is?
19  A  Yes, it's Paul Laird.  He's the western region
20  vice president.
21  Q  Is he also in Los Angeles?
22  A  Yes, ma'am.
23  Q  Who -- who is Mr. Laird's supervisor?
24  A  Be David Donahue.
25  Q  What's his position?

Page 18

1  A  He's senior vice president of U.S. Corrections
2  and Detention and president of the company.
3  Q  President of GEO?
4  A  Yes, U.S. Corrections.  Yes, of GEO.  I'm
5  sorry.
6  Q  So his title is senior vice president of
7  U.S. corrections and detention.  And he's also president
8  of GEO?
9  A  Yes.
10  Q  And is he in L.A.?
11  A  No.
12  Q  Where is he?
13  A  He's in Boca Raton, Florida.
14  Q  How many people do you supervise at Adelanto?
15  A  GEO staff, approximately 450.
16  Q  Okay.  Do you supervise anybody other than GEO
17  staff?
18  A  We contract with a medical company called
19  Wellpath.  And they have approximately 90 employees.
20  Q  And you supervise those 90 Wellpath employees
21  at Adelanto?
22  A  Not directly.  It's an indirect supervision
23  through our contract with them.
24  Q  And what do the Wellpath employees do?
25  A  They do our -- all of our medical and mental

Page 19

1  health care.
2  Q  Okay.  Is there anybody else that you supervise
3  that we haven't discussed already?
4  A  No, ma'am.
5  Q  Okay.  How do you normally communicate with the
6  about 500 people that you supervise at Adelanto?
7  A  Either by -- most of it is by walking and
8  talking.
9  Q  You prefer in-person communication as opposed
10  to e-mail or phone calls?
11  A  When I interact with line staff.
12  Q  Do you use a messaging app to communicate with
13  anybody?
14  A  Can you clarify?
15  Q  Do you Slack or any sort of text message?
16  A  I'll text occasionally to my deputy warden or
17  my administrators.  That's --
18  Q  Who is your deputy warden?
19  A  Frank Karam.
20  Q  Could you spell his last name for me, please?
21  A  K-a-r-a-m.
22  Q  Warden Janecka, what do you think this case is
23  about to the best of your knowledge?
24  A  To the best of my knowledge, it involves the
25  Voluntary Work Program, the Voluntary Work Program.

Page 20

1  Q  Do you know anything more specific than that?
2  A  Specifics, it has to deal with the dollar a day
3  pay for the detainees on the Voluntary Work Program.
4  Q  How did you prepare for your deposition today?
5  A  I met with my attorney yesterday.
6  Q  How long did you meet for?
7  A  Approximately six hours.
8  Q  Did you communicate with any GEO employees
9  about your testimony today?
10  A  No.
11  Q  Did you communicate with any ICE officials
12  about your testimony today?
13  A  No.
14  Q  Did you communicate with anybody else aside
15  from your attorney about your testimony today?
16  A  No.
17  Q  Did you review the transcripts of the
18  depositions of Daniel Ragsdale or David Ventarella that
19  were taken in this case?
20  A  No.
21  Q  Have you been deposed before?
22  A  Yes.
23  Q  When -- about how many times have you been
24  deposed?
25  A  Approximately six.

Page 21

6 (Pages 18 - 21)

1   Q   And what were the -- what was the context of
2   the depositions?
3   A   The majority dealt with former employee
4   litigation.
5   Q   And what else?
6   A   One was inmate litigation in New Mexico.
7   Q   Have you been deposed since you became the
8   warden of Adelanto?
9   A   Yes.
10   Q   How many times?
11   A   Approximately three or four.
12   Q   And were those cases all employee litigation?
13   A   Yes, ma'am.
14   Q   Okay. Warden Janecka, my understanding is that
15   GEO must comply with all applicable federal, state and
16   local laws in the operation of the Adelanto Facility; is
17   that correct?
18   A   Yes, ma'am.
19   Q   So that includes complying with state health
20   codes; is that right?
21        MS. ARMSTRONG:  Object to the form.  Calls for
22   a legal conclusion.
23        THE WITNESS:  Yes.
24   BY MS. WRIGHT:
25   Q   And Adelanto has to comply with fire codes and

Page 22

1   building codes?
2        MS. ARMSTRONG:  Objection to the form.  Calls
3   for legal conclusion.
4        THE WITNESS:  Yes, ma'am
5   BY MS. WRIGHT:
6   Q   And GEO has to comply with municipal zoning
7   regulations at the Adelanto Facility; is that right?
8        MS. ARMSTRONG:  Same objection.
9        THE WITNESS:  Yes, ma'am.
10   BY MS. WRIGHT:
11   Q   I'm going to hand you what has been previously
12   marked as Exhibit 1.  So this was marked as Exhibit 1
13   in -- in a prior deposition.
14        THE REPORTER:  Are you remarking it today?
15        MS. WRIGHT:  Just as Exhibit 1.
16        (Plaintiffs' Exhibit 1 was previously marked
17   for identification by the Certified Shorthand Reporter
18   and attached hereto.)
19        MS. ARMSTRONG:  So we're going to remark this
20   as Exhibit 1?  It's been marked Exhibit 1 before, but
21   this is the version that has Bates numbers.  Just making
22   sure it's clear.
23        MS. WRIGHT:  Actually, this is the exact same
24   version.  We haven't --
25        MS. ARMSTRONG:  Okay.  I understand.

Page 23

1        MS. WRIGHT:  It's the exact same version.
2        MS. ARMSTRONG:  Sure.
3   BY MS. WRIGHT:
4   Q   Warden Janecka, this is the copy of the
5   Services Contract and the Intergovernmental Services
6   Agreement that governed the Adelanto Detention Center.
7        Have you seen this document before?
8   A   Yes, ma'am.
9   Q   Are you familiar with the Intergovernmental
10   Services Agreement or IGSA between ICE and the city of
11   Adelanto?
12   A   Yes.
13   Q   And you're familiar with the services agreement
14   between the city of Adelanto and GEO?
15   A   Yes.
16   Q   And do you understand that under the IGSA, GEO
17   is contractually responsible for the maintenance and
18   operation of the Adelanto Facility?
19        MS. ARMSTRONG:  Object to the form.  Calls for
20   a legal conclusion.
21        THE WITNESS:  Yes, ma'am.
22   BY MS. WRIGHT:
23   Q   And under the IGSA, GEO is required to provide
24   basic necessities to all detainees at the Adelanto
25   Facility?

Page 24

1        MS. ARMSTRONG:  Same objection.
2        THE WITNESS:  Yes, ma'am.
3   BY MS. WRIGHT:
4   Q   Do you agree that those basic necessities
5   include food, shelter, utilities, clothing, bedding,
6   medical care, mental health care, dental care,
7   recreation?  Is that a complete list of the necessities
8   that GEO provides to detainees at Adelanto?
9   A   Yes, ma'am.
10   Q   Is GEO required to comply with the terms of the
11   IGSA?
12        MS. ARMSTRONG:  Object to the form.  Calls for
13   a legal conclusion.
14        THE WITNESS:  Yes, ma'am.
15   BY MS. WRIGHT:
16   Q   And with respect to the relationship between
17   GEO and ICE at Adelanto, GEO is the service provider or
18   the vendor?
19   A   Yes, ma'am.
20   Q   And ICE is the client?
21   A   Yes.
22   Q   Okay.  Now, GEO's also required to comply with
23   the -- with ICE's Performance-Based National Detention
24   Standards or PBNDS; is that right?
25   A   Yes.

Page 25

7 (Pages 22 - 25)

1    Q   I'll hand you Exhibit 2, which has been
2  previously marked.
3         (Plaintiffs' Exhibit 2 was previously marked
4  for identification by the Certified Shorthand Reporter
5  and attached hereto.)
6  BY MS. WRIGHT:
7    Q   Warden Janecka, we're going to be working with
8  paper documents today.  My recommendation to you is when
9  we're finished with the document, if you just put it
10 face down and make a stack and that will keep them in
11 order.
12   A   Okay.
13   Q   Are you familiar with the 2011 PBNDS as revised
14 in 2016?
15   A   Yes.
16   Q   Do you agree that this version of the PBNDS
17 applies at the Adelanto Detention Center?
18       MS. ARMSTRONG:  Let me just object to the
19 extent that the deposition exhibit hasn't been
20 identified yet and you're asking him questions about it.
21       THE WITNESS:  Yes, ma'am.
22 BY MS. WRIGHT:
23   Q   Do you recognize the document in front of you?
24   A   Yes.
25   Q   What is it?

Page 26

1  same under the standards.
2  BY MS. WRIGHT:
3    Q   Okay.  Thank you.
4        Does GEO apply the PBNDS uniformly to all
5  detainees at the Adelanto Facility?
6        MS. ARMSTRONG:  Object to the form.  Vague.
7        THE WITNESS:  Yes, ma'am.
8  BY MS. WRIGHT:
9    Q   And are you as warden ultimately responsible
10 for ensuring that the PBNDS are followed at Adelanto?
11       MS. ARMSTRONG:  Object to the form.  Vague.
12       THE WITNESS:  Yes, ma'am.
13 BY MS. WRIGHT:
14   Q   Now, GEO also has its own facility-specific
15 policies and procedures that are separate from the
16 PBNDS; right?
17   A   Yes, ma'am.
18   Q   And GEO has discretion to create its own
19 policies and procedures so long as they comport with the
20 PBNDS; is that correct?
21       MS. ARMSTRONG:  Object to the form.  Calls for
22 a legal conclusion.
23       THE WITNESS:  Our local policies do reflect the
24 PBNDS standards, yes.
25 ///

Page 28

1    A   I'm sorry?
2    Q   What is the document in front of you?
3    A   It's the Performance-Based National Standards,
4  2011, the 2016 errata.
5    Q   Okay.  Thank you.
6        Which PBNDS standards are applied or enforced
7  at Adelanto?
8        MS. ARMSTRONG:  Object to the form.  Calls for
9  a legal conclusion.  Vague.
10       THE WITNESS:  We follow all the standards.
11 BY MS. WRIGHT:
12   Q   Does GEO have the ability to opt out of the --
13 of any of the standards?
14       MS. ARMSTRONG:  Object to the form.  Vague.
15       THE WITNESS:  Not without approval from ICE,
16 no.
17 BY MS. WRIGHT:
18   Q   Would you agree that one of the purposes of the
19 PBNDS is to ensure that government contractors, like GEO
20 treat detainees fairly and humanely?
21       MS. ARMSTRONG:  Object to the form.  Calls for
22 speculation.
23       THE WITNESS:  I believe the PBNDS standards are
24 designed to ensure, irregardless of who's operating or
25 managing the facility, that everybody gets the treated

Page 27

1  BY MS. WRIGHT:
2    Q   My question was a little different.  It was,
3  does GEO have discretion to create its own policies and
4  procedures so long as they comports with the PBNDS?
5        MS. ARMSTRONG:  Object to the form.  Calls for
6  legal conclusion.
7        THE WITNESS:  Could you clarify that?
8  BY MS. WRIGHT:
9    Q   Sure.
10       Does GEO have the ability to create his own
11 policies and procedures?
12       MS. ARMSTRONG:  Object to the form.  Vague.
13       THE WITNESS:  Yes.
14 BY MS. WRIGHT:
15   Q   And the purpose of GEO's facility-specific
16 policies and procedures -- let me start over.
17       When -- when GEO creates a policy for the
18 Adelanto Detention Center, do you as the warden expect
19 that policy to be implemented on the ground?
20   A   Yes.
21   Q   Are GEO's policies and procedures applied
22 uniformly to all detainees at Adelanto?
23   A   Yes.
24   Q   So GEO applies the same rules and procedures to
25 all detained immigrants at Adelanto?

Page 29

8 (Pages 26 - 29)

**Page 30**

1  A  Yes, ma'am.

2  Q  Are detainees told about GEO's policies and

3  procedures?  Are they notified?

4  A  We issue each detainee a local handbook that

5  references some of the information in our local

6  policies.

7  Q  So detainees are notified about the policies

8  and procedures that apply to them at the Adelanto

9  Facility?

10  A  Yes.

11  Q  Which makes sense, because how could they

12  comply with the policy if they don't know that it

13  exists; right?  Do you agree?

14  A  Right.  They get -- the handbook gives them a

15  good -- is their notification.

16  Q  Can GEO -- excuse me.  Let me start again.

17  Can you as the warden of the Adelanto Facility

18  opt out of a GEO corporate policy?

19  A  Not without corporate approval.

20  Q  Would you say that GEO's corporate policy

21  requires GEO employees to treat detainees fairly, safely

22  and humanely?

23  A  Yes, ma'am.

24  Q  Now, GEO, under the IGSA, GEO must create a

25  detainee work plan at Adelanto; is that right?

**Page 31**

1  A  Yes, ma'am.

2  Q  And GEO's detainee work plan has to be in

3  accordance with the PBNDS standard on the Voluntary Work

4  Program, which is standard 5.8; right?

5  MS. ARMSTRONG:  Object to the form.  Calls for

6  legal conclusion.

7  THE WITNESS:  It has to be compliant with the

8  PBNDS standards.

9  BY MS. WRIGHT:

10  Q  But if I'm understanding this correctly, as

11  long as GEO's detainee work program plan is in

12  accordance with the PBNDS, GEO has discretion on how to

13  operate the work program on the ground.

14  Do you agree?

15  MS. ARMSTRONG:  Object to the form.  Misstates

16  prior testimony.  Vague.  Calls for a legal conclusion

17  and speculation.

18  THE WITNESS:  Our contract that you -- that

19  Exhibit 1 that you handed me, specifically speaks to

20  that we will follow the Performance-Based National

21  Standards.

22  BY MS. WRIGHT:

23  Q  I can ask my question again.

24  As long as GEO's detainee work plan follows the

25  PBNDS, you as the warden of Adelanto, have the

**Page 32**

1  discretion to -- to operate the work program however you

2  see fit.

3  MS. ARMSTRONG:  Same objection and asked and

4  answered.

5  THE WITNESS:  It will only be operated in

6  accordance with what the PBNDS standards allows.  I

7  can't arbitrarily operate a work program.

8  BY MS. WRIGHT:

9  Q  But you can make choices about how to operate

10  the work program based on what's actually happening on

11  the ground at Adelanto as long as it's in accordance

12  with the PBNDS?

13  MS. ARMSTRONG:  Objection.  Misstates prior

14  testimony.  Vague.  Calls for speculation.

15  THE WITNESS:  Can you be a little more specific

16  when you say how to operate the work program?

17  BY MS. WRIGHT:

18  Q  We can just move on.  That's fine.

19  A  Okay.

20  Q  Let's talk a little bit about the Adelanto

21  Facility campus itself.  Adelanto can house up to 1,940

22  detainees per day; is that right?

23  A  Yes, ma'am.

24  Q  How large is the Adelanto Facility campus?

25  A  When you say large, square footage?

**Page 33**

1  Q  Yes, square footage?

2  A  Approximately 410,000 square feet.

3  Q  My understanding is that Adelanto is comprised

4  with two units, which are designated as east and west;

5  is that right?

6  A  Two buildings.

7  Q  Do you call them east unit or west unit, east

8  or west?  What's the terminology?

9  A  Commonly referred to as east and west.

10  Q  Okay.  So that's what we'll use in this

11  conversation; is that alright?

12  A  Yes, ma'am.

13  Q  What is the capacity of east?

14  A  660 beds.

15  Q  Can you describe the layout, the physical

16  layout, of east?

17  A  The east building has two housing units,

18  Housing 1, which is on the south side of the building,

19  Housing 2 is on the north side of the building.  And in

20  between the buildings, the living areas, there's our

21  support services, which includes an intake, a laundry, a

22  medical -- our medical department, a food service

23  department.  There's one courtroom.  There's two law

24  libraries.  There's two multipurpose rooms.  There's a

25  female cosmetology room, if you want to call it,

9 (Pages 30 - 33)

Page 34

1 barbering room. And there's a male barbering room.
2    Q    With respect to the housing units in east, is
3 it correct that they're dormitory style housing units?
4    A    Yes, ma'am.
5    Q    What does that mean?
6    A    They're open bay dormitories that have bunks in
7 them.
8    Q    Bunk beds?
9    A    Bunk beds. Some are single beds, the majority
10 are bunk beds.
11    Q    How many -- so -- so there's the south side
12 living area and the north side living area. Does that
13 mean that there's two dorms in the south side and the
14 north side or are there several dorms in each area?
15    A    In the Housing 1, which is the south side,
16 there's four dormitories that make up the one building.
17 On the north side, Housing 2, there's three open bay
18 dormitories that make up that building.
19    Q    And how many bunks are in each of the dorms
20 that we've been discussing?
21    A    They vary.
22    Q    What's the range?
23    A    The smallest is 29 bunks, that are general
24 population. And the largest is 118 bunks or beds, not
25 bunks. I'm sorry.

Page 35

1    Q    What's the difference between a bed and a bunk?
2    A    Well, a bed is individual, a bunk is two beds
3 comprised to make a bunk.
4    Q    Okay. Thank you.
5       Are there dining halls in east?
6    A    No.
7    Q    Where do detainees eat their meals?
8    A    In their living areas, in the dayrooms, they
9 are satellite fed.
10    Q    So each dorm has its own dayroom?
11    A    Yes.
12    Q    Do two dorms ever share one dayroom?
13    A    No.
14    Q    All of these locations that we've been
15 discussing in east are all inside the secured perimeter;
16 is that right?
17    A    Yes, ma'am.
18    Q    Is there -- are there other administrative
19 offices outside the secured perimeter in east?
20    A    Yes, ma'am.
21    Q    Whose offices are those?
22    A    You have my office, the business office, the
23 human resources office, our IT office. Records for the
24 east building and on the first floor and on the second
25 floor in the administrative offices is the ICE

Page 36

1 officials.
2    Q    So GEO offices are on the first floor. ICE
3 offices are on the second floor of the administrative
4 building in east?
5    A    Yes, ma'am.
6    Q    Are detainees allowed to go inside that
7 building?
8    A    No, ma'am.
9    Q    For any purpose?
10    A    No, ma'am.
11    Q    Who cleans the administrative building outside
12 the secured perimeter of east?
13    A    The administrative building is cleaned by staff
14 janitors.
15    Q    GEO staff?
16    A    GEO staff janitors.
17    Q    How many GEO staff janitors do you employ?
18    A    I'm authorized to employ seven.
19    Q    Do you actually employ seven?
20    A    I think at the moment we have six.
21    Q    Have you always had -- have you always been
22 authorized to employ seven janitors since you became
23 warden of the Adelanto Facility?
24       MS. ARMSTRONG: Object to the form. Vague.
25       THE WITNESS: No.

Page 37

1 BY MS. WRIGHT:
2    Q    When did you become authorized to hire seven
3 janitors?
4    A    Approximately 2000 -- summer of 2016,
5 approximately.
6    Q    Before the summer of 2016, how many janitors
7 were you authorized to hire?
8    A    Three.
9    Q    Do you know why you were suddenly authorized in
10 the summer of '16 to hire four more janitors?
11    A    Yes. We had an expansion of the facility in
12 July of 2015. And it became apparent to me that three
13 janitors were not sufficient to maintain all of the
14 administrative area. So I requested and I was approved
15 for seven.
16    Q    Okay. You requested approval from GEO --
17    A    Yes.
18    Q    -- to hire three more?
19       So these seven janitors, I understand that one
20 of those positions is currently unfilled, but the seven
21 janitors that you are authorized to hire at GEO, these
22 janitors are responsible for the administrative building
23 because detainees can't go outside the secured
24 perimeter; is that right?
25       MS. ARMSTRONG: Object to the form. Lacks

10 (Pages 34 - 37)

1 foundation. Misstates prior testimony. Calls for
2 speculation.
3       THE WITNESS: Their primary work areas are the
4 administrative areas of GEO and ICE.
5 BY MS. WRIGHT:
6   Q   Let's talk about west. How -- what's the
7 capacity of west?
8   A   1,280 general population beds.
9   Q   Is there anything other than general population
10 beds?
11   A   We have restricted housing beds.
12   Q   Is that the same thing as Special Management
13 Unit housing?
14   A   Yes, ma'am.
15   Q   Okay. So for general population beds, there
16 are 1,280 in west?
17   A   Yes.
18   Q   Can you describe for me the layout of west,
19 please?
20   A   The west building, you -- as you come into the
21 building and pass the lobby, to the left is a GEO
22 training room, training area and the ICE training area.
23 To the right is the DHS attorneys area for OPLA. As you
24 proceed down the corridor to the left, we have our five
25 courtrooms and our EOIR staff on the left side.

Page 38

---

1   Q   Could you, rather than using acronyms, could
2 you use the full phrase for the record, OPLA and EOIR?
3   A   I'll try.
4   Q   Appreciate it. Thanks. I won't hold you to
5 it.
6   A   Some of the titles, just commonly referred to,
7 but OPLA is -- I don't want to misstate what their
8 titles are, so...
9   Q   I won't tell anybody. It's okay.
10   A   I apologize.
11   Q   What is OPLA?
12   A   They're the DHS attorneys for the -- that
13 represent the government for the immigration
14 proceedings.
15   Q   Thank you.
16       And EOIR, what is that?
17   A   EOIR is branch of the Department of Justice.
18 And it has -- the immigration judges work for the
19 Department of Justice as well as their staff.
20   Q   I'm sorry for interrupting your description
21 layout of west. So we're at the EOIR office.
22       What's next?
23   A   The EOIR and the courtrooms are to the left.
24 Opposite of that EOIR area are some more ICE
25 administrative offices. And then the GEO west building

Page 39

---

1 administrative offices. Way to the left, you also have
2 the contact visitation, the attorney visitation area.
3 As you proceed to the main corridor, on the north side
4 of the hallway are four housing units of general
5 population, Housing 1, 2, 3 or excuse me, 2, 3, 4 and 5
6 as well as restricted housing. The west building also
7 has our main intake area for all males. It has our
8 medical department with medical observation rooms. As
9 you proceed down the corridor, the -- we have our
10 laundry, our maintenance, our laundry, our food service,
11 our dining hall, four dining halls. And we have two law
12 libraries at -- and two multiple purpose rooms.
13   Q   And what are the housing units like in west?
14   A   Housing unit, there's what we call four pods.
15 Each pod has a capacity of 80 for a grand total of 320
16 in each general population housing unit.
17   Q   And how many general population housing units
18 are there?
19   A   There's four.
20   Q   Okay. So each pod, are those also bunk bed
21 style dormitories in each pod?
22   A   No. The -- there's cells or secure rooms.
23 Sixteen of the rooms in each pod are four-man bunks or
24 four-man beds, two bunks, four beds. And two of the
25 rooms are eight beds, four bunks.

Page 40

---

1   Q   And they all open onto a shared space?
2   A   Yes. They're along the -- excuse me -- along
3 the back walls of the pod. And it has an open dayroom.
4   Q   Where are the bathrooms and the showers located
5 in west?
6   A   The toilets and sinks are in their rooms. And
7 the showers are on the first floor of the dayroom.
8   Q   And the Special Management Unit is also in
9 west; is that right?
10   A   For the men.
11   Q   Where is the woman's SMU?
12   A   It's at the east building.
13   Q   How -- what is the bed capacity for the woman's
14 SMU?
15   A   Total of 18.
16   Q   And what's the capacity for the men's SMU?
17   A   Total capacity 112.
18   Q   And medical segregation is also in east; is
19 that right?
20   A   We don't have a medical segregation. We have a
21 medical observation at west.
22   Q   What is medical observation? What does that
23 mean?
24   A   If medical staff determine a detainee needs
25 close observation for some sort of medical condition,

Page 41

11 (Pages 38 - 41)

1 which our medical observation area also has negative
2 pressure rooms and if there's any reason to try to, if
3 medical would suspect the detainee has some sort of
4 contagious disease, the individual would be placed in a
5 negative pressure room and monitored to make -- to see
6 if, in fact, they actually have or positive for some
7 contagious disease.
8    Q    You're talking about quarantine?
9    A    If they get to the point to where say they have
10 confirmed chicken pox or confirmed something that could
11 be contagious to the population, the individual would be
12 quarantined to the negative pressure room until medical
13 determines otherwise.
14    Q    Okay.  Are there any administrative offices
15 outside the secured perimeter in west, like there are in
16 east?
17    A    That are outside the secure area, yes.
18    Q    And whose offices are those?
19    A    That's where the DHS attorneys offices are.
20 ICE has their administrative offices, EOIR and some of
21 GEO's administrative offices.
22    Q    And are detainees allowed in those spaces?
23    A    No, ma'am.
24    Q    So the seven janitors, the -- the seven
25 non-detainee janitors employed by GEO clean those

Page 42

1    A    Inside.
2    Q    And who cleans the staff dining halls?
3    A    Could be staff and occasionally detainees.
4    Q    Why don't detainees clean the staff locker
5 rooms or the staff toilets?
6         MS. ARMSTRONG:  Objection.  Calls for
7 speculation.
8         THE WITNESS:  The staff locker room areas are
9 outside of the secure perimeter.
10 BY MS. WRIGHT:
11    Q    And detainees are not allowed outside of the
12 secured perimeter; is that right?
13    A    That's correct.
14    Q    Earlier we talked about GEO's ability to create
15 its own facility specific policies and procedures.
16         Do you remember that?
17    A    Yes, ma'am.
18    Q    And you testified, I think we agreed, that GEO
19 has the ability to create policies and procedures as
20 long as they are aligned with the PBNDS, as long as they
21 followed PBNDS; is that correct?
22         MS. ARMSTRONG:  Objection.  Misstates prior
23 testimony.  Vague.
24         THE WITNESS:  Are you speaking to GEO corporate
25 policy or local policy?

Page 44

1 spaces?
2    A    Yes, ma'am.
3    Q    Where is the staff locker room or staff
4 toilets?
5    A    The staff locker room is in the non-secure area
6 of the west building.  And there's one in the
7 non-secured -- non-secured area of the east
8 administration.
9    Q    Do detainees clean the staff locker room and
10 staff toilets in east and west?
11    A    No.
12    Q    Who cleans them?
13    A    The janitors.
14    Q    When you say "janitors," you mean the
15 non-detainee GEO employed janitors?
16    A    Yes, ma'am.
17    Q    It's a mouthful.
18         Is there a staff dining hall?
19    A    Yes.
20    Q    Where is that?
21    A    One is in the -- off the main corridor of the
22 west building.  And one is off the main corridor of the
23 east building.
24    Q    Are they inside or outside the secured
25 perimeter?

Page 43

1 BY MS. WRIGHT:
2    Q    Let's do both.  GEO corporate policy, does GEO
3 have the discretion to create a corporate policy -- let
4 me start over.
5         Is it correct that GEO has the discretion to
6 create a corporate policy as long as the policy is in
7 accord with the PBNDS?
8         MS. ARMSTRONG:  Objection.  Vague.
9         THE WITNESS:  GEO corporate policy is a
10 reference and a guide that will speak to, that the local
11 facility will follow PBNDS, ACA, et cetera in a general
12 term.  The local policies will reflect more the specific
13 terms in PBNDS and ACA.
14 BY MS. WRIGHT:
15    Q    I'd like to hand you Exhibit 22.
16         (Plaintiffs' Exhibit 22 was marked for
17 identification by the Certified Shorthand Reporter and
18 attached hereto.)
19         MS. ARMSTRONG:  So this was previously marked
20 as 22?
21         MS. WRIGHT:  It's being now marked as 22.
22         MS. ARMSTRONG:  Got it.
23 BY MS. WRIGHT:
24    Q    Exhibit 22 is a chapter from the GEO Adelanto
25 ICE Processing Center Policy and Procedure Manual.  It's

Page 45

12 (Pages 42 - 45)

Job No. 3431598

1 titled Chapter:  Detainee Work Program.  The title is
2 Detainee Work Plan.  And the policy number is 8.1.8.
3      Is that all correct?
4    A   Yes, ma'am.
5    Q   Have you seen this before?
6    A   Yes, ma'am.
7    Q   So what is this document?
8    A   It's the detainee work plan.
9    Q   It's GEO's detain -- excuse me.  It's GEO's
10 detainee work plan for implementation at the Adelanto
11 Facility; right?
12   A   Yes.
13   Q   If you look at -- flip to the last page.  It's
14 dated June 15th, 2018; right?
15   A   That's the last reviewed and revised date of
16 this document.
17   Q   So this is the accurate and most up-to-date
18 detainee work plan at the Adelanto Facility?
19   A   This is the most recent that I have, yes.
20   Q   And this Policy 8.1.8 governs the
21 implementation of the work program at Adelanto?
22   A   Yes.
23   Q   Would you agree that there's only one Voluntary
24 Work Program at Adelanto?
25   A   Say that again.  I'm sorry.

Page 46

---

1    Q   Do you agree that that's the policy of the
2 detainee work program at Adelanto?
3    A   That's part of the policy.
4    Q   What's the rest of the policy?
5    A   Well, it's -- the Voluntary Work Program is not
6 only to be able to work or earn money, but it's also to
7 eliminate or help eliminate idleness in the housing
8 units and amongst the population.  And it allows for
9 them to socialize with other individuals while they're
10 out at a -- working.
11   Q   If you look at Section II-B of Policy 8.1.8?
12   A   Okay.
13   Q   Voluntary Work Program Objectives, I think this
14 is what you were starting to describe.  This says that
15 the objectives of the Voluntary Work Program at Adelanto
16 are as follows:  "One, physically and mentally able
17 detainees are gainfully employed while contributing to
18 the orderly operation of the facility.  Two, essentially
19 operations and services improve through the productivity
20 of detainees.  And, three, inactivity-induced idleness
21 and disciplinary-code violations will decline."
22      Did I read that correctly?
23   A   Yes, ma'am.
24   Q   Do you agree that these are the three
25 objectives of the Voluntary Work Program at the Adelanto

Page 48

---

1    Q   Would you agree that there's only one detainee
2 work program at Adelanto and it's governed by this
3 policy?
4    A   Yes.
5    Q   Is your screen working in front of you?
6    A   Oh, yes.  I'm sorry.
7    Q   How are detainees notified about this policy?
8    A   I can't speak to that.  It is a reference in
9 the handbook as to what the Voluntary Work Program is
10 and what the opportunities are.
11   Q   And is this Policy 8.1.8 applied to all
12 detainees at Adelanto?
13   A   Yes, ma'am.
14   Q   It's applied the same way to all detainees at
15 Adelanto?
16   A   All detainees, yes, that are eligible to work.
17   Q   If you look at -- did that zoom in on your
18 screen?
19   A   That helps.
20   Q   What I've highlighted here, this Policy 8.1.8,
21 this document says that the policy is to provide
22 detainees the opportunity to participate in a Voluntary
23 Work Program and earn money.
24      Did I read that correctly?
25   A   Yes, ma'am.

Page 47

---

1 Facility?
2    A   Those are three of the objectives, yes.
3    Q   Are there other objectives of the Voluntary
4 Work Program that are not listed here in Policy 8.1.8?
5    A   Not as written, no.  That's what it states.
6    Q   As warden of the Adelanto Detention Center, are
7 there other objectives that you think should be written
8 here?
9    A   There's no other objectives, no.
10   Q   Let's turn to page 2 of 7 of this document.
11 The Bates number at the bottom is GEO-Novoa-222.  If you
12 look at Section C.  Again, it's on the screen in front
13 of you too.  Section C is titled Required Work
14 Assignments.  The very first sentence is, "Work
15 assignments are voluntary."
16      What does that mean?
17   A   They're voluntary.  The detainee has the choice
18 to work or not work.
19   Q   So an inmate in a correctional facility can be
20 compelled to work for the maintenance and operation of
21 the facility; right?
22   A   Yes.
23   Q   But immigration detention is civil.  It's not
24 criminal; is that correct?
25   A   Correct.

Page 49

---

13 (Pages 46 - 49)

1   Q   In the context of civil detention, detainees
2   cannot be compelled to work for the operation,
3   maintenance of the facility; is that right?
4   A   Correct.
5   Q   So the word voluntary here refers to that
6   distinction; right?  Unlike criminal inmates at
7   Adelanto, detainees cannot be forced to do work or
8   compelled to do work, but they can elect to apply for a
9   job.
10      Would you agree?
11   A   Strictly their choice, yes.
12   Q   So you would agree?
13      And, in fact, GEO permits detainees to work for
14   money in exchange for money?
15   A   Yes.
16   Q   So they're not working for free?
17   A   No.
18   Q   The -- let's look at the remainder of this
19   paragraph.  "Detainees are not required to work except
20   to do personal housekeeping and to clean their housing
21   area."
22      Do you see that?
23   A   Uh-huh, yes, ma'am.
24   Q   Now, this first part of the sentence,
25   "Detainees are not required to work except to do

1   personal housekeeping," that's referring to the personal
2   housekeeping requirement of the PBNDS; isn't it?
3   A   Say that again.  I'm sorry.
4   Q   Personal housekeeping refers to the personal
5   housekeeping requirements that is a part of the PBNDS?
6   A   That's correct.  Housekeeping and Voluntary
7   Work Program are totally separate, but, yes, it refers
8   to a section of PBNDS.
9   Q   Okay.  Great.  Let's look at that section.  If
10   you turn to Exhibit 2, the PBNDS, and go ahead and flip
11   to page 406.  I can also just put it in front of you, if
12   you prefer, easier.
13   A   Okay.
14   Q   So PBNDS Section 5.8.5 C, which is reflected
15   here in Exhibit 2, requires detainees to maintain their
16   immediate living areas in a neat and orderly manner;
17   right?  That's what it says?
18   A   Yes.
19   Q   And it specifies exactly how that's to be done.
20   It says, "Detainees are required to maintain their
21   immediate living areas in a neat and orderly manner by,
22   one, making their bunk beds daily.  Two, stacking loose
23   papers.  Three, keeping the floor free of debris and
24   divider free of clutter.  And, four, refraining from
25   hanging/draping clothing, pictures, keepsakes or other

1   objects from beds, overhead lighting fixtures or other
2   furniture."
3      Did I read that correctly?
4   A   Yes, ma'am.
5   Q   And outside of these four housekeeping,
6   personal housekeeping tasks that are listed here in
7   PBNDS 5.8.5.C, detainees at Adelanto cannot be compelled
8   or forced to work; is that accurate?
9   A   Correct.
10   Q   Is this personal housekeeping requirement
11   enforced at Adelanto?
12   A   Yes.
13   Q   How are detainees notified of the personal
14   housekeeping requirement?
15   A   It's in their handbook.  There's also a
16   photograph of a properly kept room or living space
17   that's posted on the detainee bulletin boards.
18   Q   And does the personal housekeeping requirement
19   apply to all detainees at Adelanto?
20   A   Yes.
21   Q   Let's go back to Policy 8.1.8, Exhibit 22.  So
22   detainees are not required to work except to do personal
23   housekeeping and to clean their housing area.
24      What does this portion of the sentence mean, to
25   clean their housing area?

1   A   Housing area also includes the common area, the
2   dayrooms where they sit, where they eat, where they
3   socialize.
4   Q   What provision of the PBNDS permits GEO to
5   require detainees to do anything other than the four
6   personal housekeeping tasks that we just discussed?
7   A   Do you mind if I refer back to this?
8   Q   Please do.
9   A   Thanks.
10      MS. ARMSTRONG:  What page was it, 406?
11      MS. WRIGHT:  406 is the personal housekeeping
12   requirement.
13      THE WITNESS:  Well, No. 2 and No. 3, because
14   it's part of their immediate living areas of stacking
15   loose papers, keeping the floor free of debris and
16   dividers free of clutter is -- can refer to, because
17   their living area encompasses their area where they eat,
18   where they socialize, where they watch TV.
19   BY MS. WRIGHT:
20   Q   Does that include the showers and the
21   restrooms?
22   A   The -- the volunteer work program employs
23   detainees that takes care of the shower area.
24   Q   Okay.  I'm going to hand you Exhibit 23.
25   ///

1    (Plaintiffs' Exhibit 23 was marked for
2 identification by the Certified Shorthand Reporter and
3 attached hereto.)
4 BY MS. WRIGHT:
5    Q   This is another chapter from the Policy and
6 Procedure Manual.  It's got the GEO logo at the top and
7 it says Adelanto ICE Processing Center.  The chapter is
8 Sanitation.  The title is Sanitation
9 Procedures/Housekeeping Plan.  And the policy number is
10 12.1.4.
11       Are you familiar with Exhibit 23?
12    A   Yes.
13    Q   And if you flip to the back or you can just
14 look at the screen, it's dated February 20th, 2018; is
15 that right?
16    A   Yes, ma'am.
17    Q   And is that your signature where it says
18 approved?
19    A   Yes, ma'am.
20    Q   So you approved of Policy 12.1.4?
21    A   My -- yes.
22    Q   What is this policy?
23    A   It's our housekeeping plan.
24    Q   What does that mean?
25    A   Basic -- it's a policy that gives general

Page 54

1 living area, including walls, floors, sink, toilet,
2 windows and other property within the cell room or
3 living area."
4       Did I get that right?
5    A   Yes, ma'am.
6    Q   Then it says -- I'm sorry.  Is this -- is this
7 accurate, detainees at the Adelanto Facility are
8 responsible for the cleanliness of his or her cell or
9 living area including walls, floors, sinks, toilets,
10 windows and other property within the cell room or
11 living area?
12    A   Yes.
13    Q   My screen froze.
14       How are detainees notified of this policy?
15    A   It's a notice in the handbook.  I lost my --
16    Q   We'll keep going.
17    A   I'll look at the hard copy.
18       MS. ARMSTRONG:  Lydia, I would like to take a
19 break whenever there's a good stopping point for you.
20       MS. WRIGHT:  Maybe we'll go five more minutes.
21    Q   Are detainees paid to clean the walls, floors,
22 sinks, toilets, windows and other property within their
23 cells rooms or living areas pursuant to policy 12.1.4?
24    A   If the detainee is part -- has volunteered for
25 a position as a housing unit janitor or porter, they

Page 56

1 guidance to the sanitation and housekeeping of the
2 facility.
3    Q   Is this policy implemented at Adelanto?
4    A   Yes, ma'am.
5    Q   Is this the current version of this policy?
6    A   To my knowledge, yes.
7    Q   Is this -- does this policy apply to all
8 detainees at Adelanto?
9    A   I'm familiar with the policies, without the
10 details of sitting here reading it, but if it's based on
11 PBNDS standards, it would apply to all the population.
12    Q   What work does GEO -- well, actually, let's
13 just start at the top.  So if you look at the first page
14 of the policy, it says that the policy is to provide
15 staff and detainees with a clean sanitary living
16 environment consistent with all applicable codes
17 standards and sound detention practice; is that right?
18    A   That's correct.
19    Q   Please turn to page 2 of Exhibit 23, the Bates
20 number at the bottom is GEO-Novoa-516.  Start at the
21 top, Detainees Sanitation Responsibilities.
22       Do you see that?
23    A   Yes.
24    Q   It says, quote, "Each detainee will be
25 responsible for the cleanliness of his or her cell or

Page 55

1 will be paid.
2    Q   Are all detainees who participate in this work
3 that we have been discussing paid?
4    A   Detainees do clean their own cells and rooms
5 and bunks.  That's part of the responsibility of living
6 in that room.
7    Q   So this says each detainee is responsible for
8 the enumerative tasks listed here on page 2?
9    A   Okay.
10    Q   Is every detainee paid to do these tasks?
11    A   Not to clean their cell or room, no.
12    Q   Or the walls, floors, sink, toilet, windows and
13 other property?
14    A   The walls, sinks, toilets are part of their
15 room.
16    Q   Okay.  Looks like we're back online.
17       Can you read this?  Well, the next -- skip the
18 next paragraph.  The third paragraph under section B, it
19 says, "Cleaning materials and articles for cleaning will
20 be issued by the dormitory officer to each detainee.
21 The detainee is responsible for the proper use and care
22 of these articles."
23       Is that correct?
24    A   It's what it states, yes, ma'am.
25    Q   And is that policy implemented at the Adelanto

Page 57

15 (Pages 54 - 57)

1 Detention Center?
2    A   Cleaning supplies are available to every
3 detainee in that living area.
4    Q   And the detainees are expected to use the
5 cleaning supplies that are provided by GEO to clean
6 their housing areas; is that right?
7    A   It's preferred they use the cleaning supplies
8 that are provided.
9    Q   What other cleaning supplies would they use?
10   A   Some they just decide to use water and just
11 water, if they choose to do so.
12   Q   Section C, titled Dormitory Sanitation, this
13 says, "At 6:00 a.m. each day, the following items will
14 be issued."  And then there's a list of items.  Mops and
15 buckets, brooms, scrub brushes, cleaning rags and
16 cleaning chemicals.  Is -- is this what happens at
17 Adelanto at 6:00 a.m. each day, those items, those
18 cleaning supplies are issued to detainees?
19   A   At approximately 6:00 a.m. the officer opens up
20 the janitorial supply room and makes it available to the
21 detainees that live in that living area.
22   Q   And that -- this applies to all detainees, so
23 in east and west?
24   A   East is a little bit different than west.  At
25 east, we'll have janitorial carts that will be pushed

Page 58

1 into a dayroom area.  And it's available to the
2 population.
3    Q   But to participate in this sanitation program,
4 which is policy 12.1.4, a detainee does not have to be
5 hired into the Voluntary Work Program; is that right?
6    A   This isn't -- this is a housekeeping plan, not
7 a work program.  This is basic sanitation and hygiene
8 for the individual detainees.  We do have dorm porters
9 that are part of the Voluntary Work Program that will
10 get paid to do detailed cleaning of the living area, in
11 addition to detainees responsible for their own living
12 area.
13   Q   Okay.  Thank you for that.
14       So if I'm understanding correctly, there's the
15 Voluntary Work Program, separate from that is the
16 personal housekeeping requirements.  And then we have
17 the sanitation policy?
18   A   The sanitation.
19       MS. ARMSTRONG:  Objection.  Object to the form.
20 Misstates prior testimony.
21       THE WITNESS:  The housekeeping requirement is
22 part of the hygiene and sanitation policy.
23 BY MS. WRIGHT:
24   Q   Okay.  Why don't we take that break that your
25 counsel requested.

Page 59

1    A   Sure.
2        THE VIDEOGRAPHER:  We are going off the record.
3        10:15  3   The time is        a.m.
4        (Whereupon a recess was taken.)
5        THE VIDEOGRAPHER:  We are going back the on
6        10:32  6   record.  The time is        a.m.
7 BY MS. WRIGHT:
8    Q   Mr. Janecka, I'm going to hand you Exhibit 24.
9        (Plaintiffs' Exhibit 24 was marked for
10 identification by the Certified Shorthand Reporter and
11 attached hereto.)
12 BY MS. WRIGHT:
13   Q   This another chapter from the GEO Policy and
14 Procedure Manual.  It's again reflected on the screen in
15 front of you.  The chapter is Post Orders.  The title is
16 Housing Unit Officer.  And the policy number is
17 10.3.5-ADF.
18       Do you see that?
19   A   Yes, ma'am.
20   Q   And the ADF refers to the Adelanto Detention
21 Facility?
22   A   Yes, ma'am.
23   Q   If you flip it over to the back, this policy
24 10.3.5, which is Exhibit 24, was effective on September
25 2nd, 2016; is that right?

Page 60

1    A   This policy, yeah, or post order, yes, ma'am.
2    Q   And is that your signature next to the word
3 approved?
4    A   Yes.
5    Q   And are these your initials at the bottom of
6 every page?
7    A   Yes.
8    Q   With the date September 6th, 2016?
9    A   Yes.
10   Q   What are post orders?
11   A   They're specific instructions to officers on a
12 certain duty post.
13   Q   What is the duty post to which these post
14 orders apply?
15   A   This is for housing unit officer.
16   Q   Has this policy been implemented at the
17 Adelanto Detention Center?
18   A   This post order.
19   Q   What's the different of -- difference between a
20 post order and a policy?
21   A   Post orders are -- give more specific
22 instruction to a specific duty post.  And policies give
23 a general guidance specific to PBNDS standards, ACA
24 standards.
25   Q   And this specific post order is implemented at

Page 61

16 (Pages 58 - 61)

1 the Adelanto Detention Facility; is that right?
2    A    This was implemented in September of 2016. It
3 may not be the most. It may not be the newest post
4 order, but this is the post order from 2016.
5    Q    How often do you revise post orders?
6    A    They're reviewed annually and revised as
7 necessary.
8    Q    Do you know whether this Post Order No. 1035
9 has been revised since 2016?
10    A    I don't know.
11    Q    If you turn to page 3 of this document, which
12 is Bates No. GEO-Novoa-2179, we'll look at living --
13 Section D is living area/bed and locker assignments.
14       Do you see that? Mr. Janecka, do you see?
15    A    Yes, I see it. I'm sorry.
16    Q    And the first sentence under Section D says,
17 "All detainees in a unit are required to keep clean and
18 sanitary all commonly accessible areas of the unit
19 including walls, floors, windows, window ledges,
20 showers, sinks, microwaves, tables and chairs."
21       Did I read that correctly?
22    A    Yes, ma'am.
23    Q    Is this a correct statement about what happens
24 at the Adelanto Detention Center?
25    A    Yes, ma'am.

Page 62

1    Q    So all detainees at Adelanto are required to
2 keep clean and sanitary all commonly accessible areas of
3 the unit, including walls, floors, windows, window
4 ledges, shower, sinks, microwaves, tables and chairs; is
5 that correct?
6    A    Yes. Yes.
7    Q    This policy applies to both east and west?
8    A    Yes.
9    Q    How are detainees notified about this policy?
10    A    There's a notice in the detainee handbook.
11    Q    If you look at No. 3, D-3, I keep trying to
12 expand it on the paper. If you look at the portion that
13 I've highlighted in D-3, it says, "If the detainees in a
14 unit do not clean the area after being instructed to do
15 so, the television will be turned off and the detainees
16 will not be permitted to participate in any
17 activities/programs until the unit is cleaned.
18 Continued refusal to clean the area will result in
19 future disciplinary action."
20       Did I read that correctly?
21    A    Yes, ma'am.
22    Q    Is that a correct and true statement of the
23 policy at the Adelanto Detention Center?
24    A    That is accurate as this post order reads, yes,
25 ma'am.

Page 63

1    Q    So the answer to my question is yes?
2       MS. ARMSTRONG: Objection. Misstates prior
3 testimony.
4       THE WITNESS: The answer to your question is
5 that's exactly how this post order reads, dated
6 September 6th of '16.
7 BY MS. WRIGHT:
8    Q    I'm asking a different question. I'm asking is
9 this policy in effect at the Adelanto Detention Center
10 as we sit here today?
11    A    As I stated earlier, I don't know if this post
12 order has been revised since this date.
13    Q    As we sit here today, at the Adelanto Detention
14 Center, if detainees in the unit do not clean the area
15 after being instructed to do so, is it correct that the
16 television will be turned off and the detainees will not
17 be permitted to participate in any activities or
18 programs until the unit is cleaned?
19    A    I -- not to my knowledge.
20    Q    Is it correct that as we sit here today, at the
21 Adelanto Facility, continued refusal to clean the area
22 will result in further disciplinary action?
23    A    PBNDS does allow the disciplinary action can be
24 taken for failure to clean their living areas.
25    Q    My question, again, was continued -- is it

Page 64

1 correct that continued refusal to clean the area will
2 result in further disciplinary action, yes or no?
3       MS. ARMSTRONG: Objection. Asked and answered.
4 Argumentative.
5       THE WITNESS: It can, but not necessarily
6 always.
7 BY MS. WRIGHT:
8    Q    So continued refusal to clean the area can
9 result in further disciplinary action is a correct
10 statement as applied to the Adelanto Detention Center
11 today?
12    A    State that again, please.
13    Q    "Continued refusal to clean the area can result
14 in further disciplinary action."
15       Is that a correct and true statement as applied
16 to the Adelanto Detention Center today?
17       MS. ARMSTRONG: Object to the form. Vague.
18       THE WITNESS: It can, yes, in accordance with
19 PBNDS standards.
20 BY MS. WRIGHT:
21    Q    The answer my question is -- it's a yes or no
22 question.
23       MS. ARMSTRONG: Object. Argumentative. Asked
24 and answered. He can give more than a yes or no answer
25 to your yes or no question. You can't instruct him not

Page 65

17 (Pages 62 - 65)

Page 66

1 to give a further answer.
2      THE WITNESS:  It can, yes.
3 BY MS. WRIGHT:
4   Q   What is the further disciplinary action that
5 GEO can take against the detainee who refuses to clean
6 his or her commonly accessible areas, including walls,
7 floors, windows window ledges, showers, sinks,
8 microwave, tables and chairs?
9      MS. ARMSTRONG:  Objection.  Vague.  Compound.
10      THE WITNESS:  I'm not specific with the details
11 of each category of the disciplinary sanctions in PBNDS,
12 but the different levels of disciplinary infractions are
13 governed by the PBNDS standards as to the sanctions that
14 can be imposed.
15 BY MS. WRIGHT:
16   Q   I'm going to hand you Exhibit 25.
17      (Plaintiffs' Exhibit 25 was marked for
18 identification by the Certified Shorthand Reporter and
19 attached hereto.)
20 BY MS. WRIGHT:
21   Q   This is the GEO Adelanto ICE Processing Center
22 Supplemental Detainee Handbook.  If you look at the
23 bottom left-hand corner -- and, again, I'll display it
24 on your screen -- Version 4.1.4, Detainee Handbook.  And
25 it looks like the date is October 9th, 2018.

Page 67

1      Is that correct?
2   A   Yes, ma'am.
3   Q   Are you familiar with this document?
4   A   Yes, ma'am.
5   Q   In fact, if you flip over to the back, is that
6 your signature above the line that says facility
7 administrator?
8   A   Yes, ma'am.
9   Q   And the date is October 9th, 2018?
10   A   Yes, ma'am.
11   Q   What is this document?
12   A   It's our Local Supplemental Detainee Handbook.
13   Q   What do you use this document for?
14   A   Each detainee receives it upon intake as a
15 general guide to -- informational guide while they're
16 detained at the detention facility.
17   Q   Turn, if you would, to page 29, the Bates stamp
18 is 3853, GEO-Novoa.  This is the -- this a portion of
19 the section that's entitled detainee disciplinary
20 process.  We're looking at Category III Offenses.  At
21 the top, which I've highlighted here, says, "These are
22 considered to be Category III or High, Moderate
23 Offenses.  The discipline committee may impose any
24 combination of penalties from Category IV offenses as
25 well as the following penalties."  Then there's a list

Page 68

1 of 13 penalties and a list of seven acts, which may be
2 subject to disciplinary penalty; is that right?
3   A   Yes.
4   Q   If you look at No. 306.  Offense No. 306 says,
5 "Refusal to clean assigned living area."
6      Do you see that?
7   A   Yes.
8   Q   So is it correct that refusal to clean assigned
9 living area pursuant to GEO's disciplinary policy can be
10 punished -- punishable by any one of these 13
11 punishments, penalties?
12      MS. ARMSTRONG:  Objection.  Compound.  Vague.
13      THE WITNESS:  Again, in accordance with PBNDS,
14 those sanctions may be imposed, yes.
15 BY MS. WRIGHT:
16   Q   What is disciplinary transfer, which is the
17 second penalty listed under Category III Offenses?
18   A   I'm not familiar with the disciplinary
19 transfer.
20   Q   You don't know what this means?
21   A   I would have to make an assumption.  And I
22 don't want to make an assumption.  I'm not familiar with
23 that sanction.
24   Q   What do you think it means?
25   A   I --

Page 69

1   Q   As the warden of the Adelanto Detention Center?
2   A   I don't have the authority at my level to
3 transfer a detainee from the facility.
4   Q   But that's what detainee transfers means, that
5 the detainee would be transferred to another facility?
6   A   Reading it, it would be a transfer somewhere.
7 I don't know.  I'm not familiar with that sanction.
8   Q   So as -- your testimony is that as the warden
9 of the Adelanto Detention Center for about five years,
10 you do not know what the disciplinary penalty
11 disciplinary transfer refers to?
12      MS. ARMSTRONG:  Objection.  Asked and answered.
13      THE WITNESS:  To my knowledge, I've never used
14 it.  I'm not familiar with it.
15 BY MS. WRIGHT:
16   Q   What is a disciplinary restriction up to 72
17 hours?  What does that mean?
18   A   It would mean that a detainee is placed in a
19 restricted housing area for up to 72 hours.
20   Q   What is a restricted housing area?
21   A   As I described earlier this morning, we have a
22 restricted housing area that has the 112 beds in it at
23 the men's side.
24   Q   And 18 beds in the SMU for women; is that
25 right?

18 (Pages 66 - 69)

**Page 70**

1  A   That's correct.

2  Q   So a punishment for refusing to clean assigned
3  living area pursuant to the sanitation policy, 12.1.4,
4  is disciplinary restriction up to 72 hours; is that
5  correct?

6  A   According to this -- the sanctions that are
7  written in accordance with PBNDS, it may be a sanction,
8  yes.

9  Q   Though 118 SMU beds in east, is that the same
10  thing as solitary confinement?

11  A   The -- the terminology solitary confinement, we
12  don't use.  I don't use.  And my staff don't use.  We
13  don't have a solitary confinement.  All of our rooms on
14  the disciplinary side of restricted housing are double
15  bunk.

16  Q   Is there a -- so disciplinary restriction means
17  being put in a room with one other person in a double
18  bunk?

19  A   I didn't write the definition for solitary, but
20  solitary would seem to be alone.

21  Q   So my question is disciplinary restriction at
22  the Adelanto Detention Center means placing a detainee
23  in a cell with one other detainee?

24  A   It's not the -- can you clarify that, because I
25  don't understand exactly the question you're asking?

**Page 71**

1  Q   Sure.

2     Is it the case that detainees are placed into
3  disciplinary restriction alone?

4  A   In a -- in a room alone?

5  Q   Yes, correct?

6  A   They can be.

7  Q   But that's not always the case?

8  A   No.

9  Q   Because sometimes a detainee who is placed into
10  disciplinary restriction will have a roommate; is that
11  right?

12  A   They can.

13  Q   Okay.  And two bunks means two people or does
14  it mean four people?

15  A   Let me clarify, two beds, one bunk.

16  Q   Okay.  Change of housing is the sixth penalty
17  that can be imposed for refusal to clean assigned living
18  area at the Adelanto Facility.

19     What does change of housing mean?

20  A   They would -- they may be moved to another
21  appropriate housing unit appropriate to their custody
22  level.

23  Q   Does that mean that somebody could be moved
24  from east to west?

25  A   They may be.

**Page 72**

1  Q   Or from west to east?

2  A   They may be, yes.

3  Q   Approximately how many people are in
4  disciplinary restriction at the Adelanto Facility on a
5  weekly basis?

6  A   Monday morning, there was one.  And he wasn't
7  on disciplinary status.

8  Q   What status was he on?

9  A   Facility initiated status.

10  Q   What does that mean?

11  A   It means he has chose to live in the restricted
12  housing east side, which is a housing area that
13  disciplinary detention detainees are housed in.  And he
14  has chose to live -- live there for his own personal
15  reasons.

16  Q   What's the difference between disciplinary
17  segregation and administrative segregation?

18  A   Administrative segregation are detainees or
19  houses detainees that have not been sanctioned.
20  Disciplinary detainees have been sanctioned.

21  Q   So with respect to this policy, that's in this
22  Supplemental Detainee Handbook, Exhibit 25, refusal to
23  clean assigned living area can result in disciplinary
24  action of being placed in disciplinary restriction or
25  disciplinary segregation; is that correct?

**Page 73**

1     MS. ARMSTRONG: Object to the form.  Compound.
2  Vague.

3     THE WITNESS:  As written, it may -- it may be a
4  sanction.

5  BY MS. WRIGHT:

6  Q   So the answer to my question is yes?

7     MS. ARMSTRONG: Objection.  Asked and answered.

8     THE WITNESS:  It's one of the 13 sanctions that
9  are allowed by PBNDS.

10  BY MS. WRIGHT:

11  Q   And by GEO?

12  A   GEO as governed by contract to follow PBNDS
13  standards.

14  Q   So if a detainee refuses to clean assigned
15  living area, GEO can decide to put that person in
16  disciplinary restriction for up to 72 hours; is that
17  correct?

18  A   It's one of the allowed sanctions by PBNDS that
19  may be imposed.

20  Q   So the answer to my question is yes?

21     MS. ARMSTRONG: Objection.  Asked and answered.

22     THE WITNESS:  My answer is it's one of 13
23  sanctions that may be imposed.

24  BY MS. WRIGHT:

25  Q   I'm not asking what the PBNDS allows.  I'm

19 (Pages 70 - 73)

1 asking what GEO can do at the Adelanto Facility. So let
2 me ask this question again.
3        At Adelanto, if a detainee refuses to clean the
4 assigned living area, does GEO have the ability to put
5 that person in disciplinary restriction for up to 72
6 hours?
7        MS. ARMSTRONG: Objection. Asked and answered.
8        THE WITNESS: It's one of 13 sanctions that are
9 allowed by the PBNDS standards.
10 BY MS. WRIGHT:
11    Q   Does it ever happen at the GEO facility that
12 when a detainee refuses to clean their assigned living
13 area, they are put into disciplinary restriction?
14    A   Not to my knowledge.
15    Q   That has never happened, to your knowledge, at
16 the Adelanto Facility?
17    A   Not to my knowledge, since I've been there.
18    Q   Let's look at page 28 of this document. We're
19 still on Exhibit 25. The Bates number is
20 GEO-Novoa-3852. Under the section titled Category II
21 Offenses says, "These acts listed below shall be
22 considered Category II or High Offenses. The discipline
23 committee may impose any combination of penalties from
24 Category III or IV Offenses as well as the following
25 penalties."

Page 74

1        Do you see that?
2    A   Yes, ma'am.
3    Q   Okay. And continuing onto page 29 of the same
4 document, the very top, Offense No. 214 is encouraging
5 others to participate in a work stoppage or to refuse to
6 work; is that correct?
7    A   It's what it states, yes.
8    Q   And at the Adelanto Facility, encouraging
9 others to participate in a work stoppage or a refuse to
10 work is punishable by any one of these 12 penalties that
11 are listed on page 28; is that correct?
12    A   They may be imposed, yes.
13    Q   Here we see again that Penalty No. 2 is
14 disciplinary transfer. And in parentheses it says
15 recommended; is that right?
16    A   Yes.
17    Q   But your testimony is you do not know what this
18 means, disciplinary transfer means?
19        MS. ARMSTRONG: Objection. Asked and answered.
20        THE WITNESS: I'm not familiar with it.
21 BY MS. WRIGHT:
22    Q   So you don't know what it means?
23        MS. ARMSTRONG: Same objection.
24        THE WITNESS: I'm not familiar with it. I
25 don't want to make an assumption to something I'm not

Page 75

1 familiar with.
2 BY MS. WRIGHT:
3    Q   Make an assumption.
4    A   I'm not going to make an assumption. I -- it's
5 a disciplinary transfer. I've never used it, nor am I
6 familiar with it.
7    Q   You signed this handbook; didn't you? We've
8 already covered that?
9    A   Yes.
10    Q   Have you read this handbook?
11    A   Yes.
12    Q   Is it your practice to sign documents when you
13 don't know what the content means?
14        MS. ARMSTRONG: Objection. Argumentative.
15 He's answered that. He doesn't know what that means.
16 Can we move on?
17        THE WITNESS: I'm not familiar with that
18 sanction.
19 BY MS. WRIGHT:
20    Q   Another sanction for encouraging others to
21 participate in a work stoppage or to refuse to work is
22 disciplinary restriction up to 30 days; is that correct?
23    A   Yes, ma'am.
24    Q   And we already discussed that disciplinary
25 restriction means placement in a special management

Page 76

1 unit; is that right?
2    A   Yes, ma'am.
3    Q   For up to 30 days; correct?
4    A   It may be imposed for 30 days, yes.
5    Q   And we also see that change of housing is a
6 penalty for refusing to work or inciting a work
7 stoppage; is that correct?
8    A   It's -- it's one of 12, yes.
9    Q   Let's put this aside for a moment and return to
10 Exhibit 24, which is policy 10.3.5, the Post Orders. Go
11 ahead and turn to page 3. And we'll look at the bottom
12 right above your initials there says, "Housing Unit
13 Sanitation, each and every detainee must participate in
14 the facilities sanitation program. A list of detainees
15 is to be developed each day by the housing unit
16 officer."
17        Do you see where I'm reading?
18    A   Yes, ma'am.
19    Q   So is it correct that each and every detainee
20 at the Adelanto Facility is required to comply with this
21 policy, which is to keep clean and sanitary all commonly
22 accessible areas of the unit, including walls, floors,
23 windows, window ledges, showers, sinks, microwaves,
24 tables and chairs?
25    A   They're responsible to keep their entire

Page 77

1 immediate living area cleaned in accordance with the
2 PBNDS standards of the sanitation and hygiene -- of
3 their own living, immediate living areas, yes.
4     Q   Says, "A list of detainees is to be developed
5 each day by the housing unit officer."
6         What does that mean?
7     A   I -- I don't know specifically.
8     Q   Well, how does the housing -- I mean, do the
9 detainees take turns cleaning the -- all of the these
10 spaces that are listed here in this post order, the
11 floors, the windows, everything else?  Do the detainees
12 take turns doing that in their living areas?
13        MS. ARMSTRONG:  Objection to form.  Vague.
14 Compound.
15        THE WITNESS:  The officers have a housing unit
16 roster with every detainee's name that's in -- that's
17 under their supervision for that day.  So that's their
18 list or their roster of detainees.
19 BY MS. WRIGHT:
20    Q   And then the officer selects detainees to
21 participate in the cleaning tasks that are listed here
22 in Post Order 10.3.5?
23    A   I'm -- I'm not familiar with the specifics of
24 what the officers actually do at the -- at the level --
25 at their level on a day-to-day basis.

Page 78

1     Q   Who would know the answer to that question?
2     A   Possibly an -- an officer or their immediate
3 supervisor.
4     Q   So each and every detainee at the Adelanto
5 Facility, so up to 1,940 detainees at max capacity, is
6 responsible for completing these tasks of cleaning and
7 sanitizing their common areas; is that correct?
8         MS. ARMSTRONG:  Object to the form.  Vague.
9         THE WITNESS:  As stated in this policy,
10 references PBNDS standards about cleaning their
11 immediate living areas, yes.
12 BY MS. WRIGHT:
13    Q   Does each and every detainee get paid to do
14 that work?
15    A   The cleaning of their living areas, immediate
16 living areas, is separate from the volunteer work
17 program.  It's a totally separate standard in PBNDS.
18 And the post orders and policies that you introduced to
19 me are separate from the Voluntary Work Program.
20    Q   So they don't get paid to do this work?
21    A   It's not a part of the Voluntary Work Program.
22 It's a totally separate standard in PBNDS, that's a
23 requirement for the detainees to take care and clean
24 their immediate living area.  The volunteer work program
25 is a totally separate program inside the institution.

Page 79

1     Q   Participation in the Voluntary Work Program is
2 paid; right?
3     A   Yes.
4     Q   This is a separate program, a separate policy
5 from the Voluntary Work Program; right?
6     A   It's a separate pro -- PBNDS standard as this
7 post order reflects, yes, separate.
8     Q   Which standard does this PB -- which PBNDS
9 standard does this post order reflect?
10    A   I can't refer to the number off the top of my
11 head.  It's the housekeeping and sanitation that you
12 referred to that you asked me to look at earlier.
13    Q   The personal housekeeping requirements?
14    A   Yes, ma'am.
15    Q   So going back to my question, it's correct that
16 detainees do not get paid to do these tasks?
17        MS. ARMSTRONG:  Objection.  Vague.
18        THE WITNESS:  Correct.  It's separate from -- a
19 separate PBNDS standard, totally separate from the
20 Voluntary Work Program.
21 BY MS. WRIGHT:
22    Q   Okay.  Let's look at that standard, since we
23 are talking about it.  Let's go back to the PBNDS page
24 406.  Your testimony, as I understand it, and correct me
25 if I'm wrong, is that the sanitation policy which is

Page 80

1 reflected in Post Order 10.3.5, Exhibit 24, and also
2 policy 12.1.4, which is the sanitation procedures,
3 Exhibit 23, is a part of the personal housekeeping
4 requirement under the PBNDS; is that accurate?
5     A   It's -- yes, it speaks to the -- maintaining
6 the personal housekeeping -- I'm sorry -- of their
7 living areas.
8     Q   The personal housekeeping requirement.  And we
9 are at Section 5.8.5.C of the 2011 PBNDS revised in
10 2016.  States at the top, "Work assignments are
11 voluntary.  However, all detainees are responsible for
12 personal housekeeping"; is that correct?
13    A   Yes, ma'am.
14    Q   Let's read this again.  Quote, "Detainees are
15 required to maintain their immediate living areas in a
16 neat and orderly manner by:  One, making their bunk beds
17 daily.  Two, stacking loose papers.  Three, keeping the
18 floor free of debris and dividers free of clutter.  And
19 four, refraining from hanging/draping clothing,
20 pictures, keepsakes or other objects from beds, overhead
21 lighting fixtures or other furniture."
22        Did I get that correct?
23    A   Yes, ma'am.
24    Q   Where in the housekeeping, personal
25 housekeeping provision of the PBNDS, does it mention

Page 81

21 (Pages 78 - 81)

1 scrubbing toilets and sinks?
2    A   It doesn't specifically speak to it.  Although,
3 it does state they are to maintain their immediate
4 living areas.
5    Q   Where in the PBNDS does it mention cleaning
6 windows and window ledges?
7    A   It doesn't specifically speak to it under this
8 standard, but, again, it's part of their immediate
9 living area.
10    Q   Where does it mention mopping floors?
11    A   Under the personal housekeeping section, it
12 doesn't speak to it, but, again, it's part of their
13 immediate living area.
14    Q   Where does it mention -- where does the
15 personal housekeeping requirement mention cleaning out
16 microwaves?
17    A   It doesn't mention it, but it's part of the
18 immediate living area.
19    Q   Where does the personal housekeeping
20 requirement of the PBNDS mention cleaning tables and
21 chairs?
22    A   It doesn't mention it, specifically, but,
23 again, it's part of their immediate living areas where
24 they eat and socialize.
25    Q   Do you agree that the personal housekeeping

Page 82

1 requirement is limited to the four -- the four
2 categories of work that are listed here?
3    MS. ARMSTRONG:  Object to the form.  Asked and
4 answered.  Misstates prior testimony.  Lacks foundation.
5    THE WITNESS:  I agree that this standard refers
6 to their immediate living area as a whole and it
7 outlines four other areas.
8 BY MS. WRIGHT:
9    Q   So your testimony is that there is a list of
10 unwritten cleaning tasks that are a part of the personal
11 housekeeping requirement of the PBNDS?
12    MS. ARMSTRONG:  Objection.  Vague.
13    THE WITNESS:  My testimony was that the
14 detainees are required, in accordance with PBS -- PBNDS
15 for the sanitation and cleanliness of their immediate
16 living area.  And in addition, there's four examples
17 listed in the PBNDS standard.
18 BY MS. WRIGHT:
19    Q   But there's no in addition.  I mean, let's go
20 back and look at the language.  This says, "Detainees
21 are required to maintain their immediate living areas in
22 a neat or orderly manner by."  And then it lists four
23 specific things.
24    Do you see that?
25    A   I see it.

Page 83

1    Q   This does not say, for instance, detainees are
2 required to maintain their immediate living areas in a
3 neat and orderly manner including, but not limited to
4 the following tasks.
5    Do you understand the difference?
6    A   My understanding of the standard is the
7 immediate living area, which includes those four areas,
8 immediate living area includes the entire area they live
9 in.
10    Q   What is that understanding based on?
11    A   Knowing the physical plant of where detainees
12 live, that each housing unit, how it's designed and
13 what's considered their immediate living area would be
14 where they sleep.  They have their restrooms.  They have
15 their dayroom activities, their socializing tables,
16 et cetera.
17    Q   And your understanding is also based on how GEO
18 applies this standard at the Adelanto Facility; is that
19 right?
20    A   My understanding is how PBNDS reads and it's
21 part of our policy as the standard.
22    Q   The standard the personal housekeeping standard
23 that is applied at the Adelanto Facility, is what you
24 just described; is that correct?
25    MS. ARMSTRONG:  Sorry.

Page 84

1 BY MS. WRIGHT:
2    Q   Meaning the personal housekeeping standard as
3 applied at the Adelanto Facility is that each and every
4 detainee is required to keep clean and sanitary all
5 commonly accessible areas of their housing unit,
6 including walls, floors, windows, window ledges,
7 showers, sinks, microwaves, tables, chairs, toilets and
8 other property within the living area?
9    A   It's part of their immediate living area, yes.
10    Q   And do you act consistent with that standard at
11 the Adelanto Facility?
12    MS. ARMSTRONG:  Object.  Vague.
13    THE WITNESS:  We may in accordance with PBNDS.
14 It allows for it.  So, yes, the PBNDS standard allows
15 for all the detainees or requires all the detainees to
16 clean their immediate living area.
17 BY MS. WRIGHT:
18    Q   And that is what GEO implements at Adelanto?
19    A   We implement the PBNDS standards, yes.
20    Q   You implement the standard that you just
21 described to me; is that correct?
22    MS. ARMSTRONG:  Object.  Vague.
23    THE WITNESS:  We implement the PBNDS standards
24 and as you stated several areas, those are all part of
25 the living area.

Page 85

22 (Pages 82 - 85)

1 BY MS. WRIGHT:
2    Q   What's the difference between a commonly
3 accessible area and a living area, an immediate living
4 area?
5    A   When you say commonly accessible area, will you
6 be a little more specific?
7    Q   Well, I'm just asking if you know the
8 difference between those two terms?
9    A   I have my understanding of both.
10    Q   And what is that understanding, sir?
11    A   They sleep in a room or on a bed and they have
12 a common area that's accessible to them to socialize, to
13 eat, to gather, to watch TV.  And it's all within their
14 living area.
15    Q   So you're describing the immediate -- immediate
16 living area?
17    A   Where they live and socialize, is it all inside
18 their one living area, their pod, their dorm, yes.  It's
19 all inclusive.
20    Q   And referring back now to policy 10.3.5, which
21 is Exhibit 24, what does all commonly accessible areas
22 of the unit mean?
23    A   That would be the dayroom area, which includes
24 the tables, the seating, the TVs, the telephones, the
25 microwaves, the hot pots, the legal kiosk, the

1 commissary kiosk, et cetera.
2    Q   And detainees are responsible for keeping clean
3 and sanitary all of those areas that you just listed?
4      MS. ARMSTRONG:  Object to the form.  Vague.
5      THE WITNESS:  Their -- their immediate living
6 areas, which includes those areas.
7 BY MS. WRIGHT:
8    Q   If you look at the bottom of Exhibit 24,
9 page 3, the Bates stamp is GEO-Novoa-2179.  This is
10 policy -- excuse me.  This is commissary kiosk 10.3.5.
11 We've discussed some of this language before, but I'll
12 read it again.  Under Housing Unit Sanitation it says,
13 "Each and every detainee must participate in the
14 facility sanitation program.  A list of detainees is to
15 be developed each day by the housing unit officer.
16 During a general clean up, all detainees must
17 participate."
18      Do you see where I'm reading?
19    A   Yes, ma'am.
20    Q   Is this correct that during a general clean up
21 at the Adelanto Detention Center all detainees must
22 participate?
23    A   It's as written.  All detainees must
24 participate.  They're given notice it's clean up time
25 for their immediate living area.

1    Q   Who gives the notice?
2    A   The officer in the housing unit.
3    Q   And what is the form of that notice?
4    A   I'm sorry?
5    Q   What is the form of that notice?
6    A   I don't know specifically.  The officers give a
7 verbal notice.  I don't know exactly how it's announced.
8    Q   And then so the officer gives a verbal notice
9 that now it's time to conduct the general clean up and
10 that all detainees must participate.  And at that point,
11 does the officer hand out the list of cleaning supplies
12 that we discussed earlier?
13    A   I think as earlier, it was stated that those
14 become available at approximately 6:00 a.m., when the
15 officer opens up the janitor's sanitation closet or the
16 cart is moved into an open dormitory.
17    Q   And does clean up time in each housing unit
18 occur every day?
19    A   It occurs, yes.
20    Q   Does it occur every day?
21    A   Yes.
22    Q   Let's return, if you would, to Exhibit 22.
23 This is policy number 8.1.8.  This is the detainee work
24 plan that we have discussed earlier.
25    A   I have got these out of order.

1      MS. ARMSTRONG:  That's okay.  I can help you
2 with them.  Do you have 22 in front of you?
3      THE WITNESS:  Yes.
4      MS. ARMSTRONG:  Okay.
5 BY MS. WRIGHT:
6    Q   Now, just to make sure that I'm clear, the
7 Voluntary Work Program is separate from the sanitation
8 cleaning policy that we've just been discussing, Policy
9 12.1.4 and Post Order 10.3.5; is that right?
10      MS. ARMSTRONG:  Objection.  Objection.  Asked
11 and answered.
12      THE WITNESS:  The Voluntary Work Program is a
13 totally separate standard in PBNDS from the housekeeping
14 or the -- I forget exactly how that standard reads as
15 titled.
16 BY MS. WRIGHT:
17    Q   You're talking about the sanitation
18 procedures/housekeeping plan, which is Policy
19 No. 12.1.4?
20    A   Yes.
21    Q   Your testimony, as I understand it, is that the
22 sanitation procedures/housekeeping plan applies to
23 immediate living areas, personal living areas.  What
24 is -- what kind of work is outside the scope of the
25 sanitation procedures/housekeeping plan?

1     MS. ARMSTRONG:  Object to the form.  Vague.
2  Compound.
3     THE WITNESS:  Can you be a little more specific
4  when you say out of the scope of the immediate -- the
5  housekeeping?
6  BY MS. WRIGHT:
7     Q   Does barbering fall within the purview of
8  sanitation Policy 12.1.4?
9     A   No.
10    Q   Because that's within the purview of the
11  Voluntary Work Program, which is Policy 8.1.8; is that
12  right?
13    A   Barber -- barbering position is a Voluntary
14  Work Program position, yes.
15    Q   What other work that detainees do at the
16  Adelanto Facility is within the purview of the Voluntary
17  Work Program, but is not part of the sanitation
18  housekeeping plan.
19    A   Some of the positions are can work in food
20  service, laundry.  And we have detainees that are
21  assigned as -- do janitorial-type porter work.
22    Q   So the term porter as it's used at Adelanto
23  means janitor -- janitorial work?
24    A   Yes, sanitation.
25    Q   And do those jobs that you just described, food

Page 90

---

1  Voluntary Work Program is to keep idleness down and keep
2  the detainees minds and hands busy with activities.  So
3  we have detainees that voluntarily sign up for a
4  janitorial job that would like to make a little extra
5  money.  They do deep cleaning, the PBNDS standards
6  allows for that as one of the jobs that are able to be
7  offered to the detainee population as part of the
8  Voluntary Work Program.
9     Q   The deep cleaning that detainee workers who
10  participate in the Voluntary Work Program complete in
11  the housing units, is that separate, different from the
12  sanitation work that all detainees are expected to do in
13  the housing units?
14    MS. ARMSTRONG:  Objection.  Asked and answered.
15    THE WITNESS:  It can be very similar or it can
16  be much more detailed.
17  BY MS. WRIGHT:
18    Q   Looking at Exhibit 22, which should be in front
19  of you Policy 8.1.8.  Let's look at page 2.  The Bates
20  stamp is GEO-Novoa-222.  And we are looking at the
21  Detainees Selection provision of this policy.  My
22  understanding is that this section outlines the
23  procedures by which GEO will assess whether detainee job
24  applicant is suitable for any particular job; is that
25  accurate?

Page 92

---

1  service, you said laundry and you said porter or
2  sanitation, where in the Adelanto Facility are those
3  jobs located?  Where do they take place?
4     A   Food service will take place in food service.
5  Laundry in laundry.  And the sanitation janitorial-type
6  work can take place in the main corridors, intake,
7  different departments.  And we also have janitors that
8  are assigned in the housing units.
9     Q   When you say janitors are assigned in the
10  housing units, do you mean detainee janitors?
11    A   Detainee janitor, porter, the term is -- I use
12  janitor loosely, but it's janitorial-type work or
13  cleaning work.
14    Q   What do those individuals who are participating
15  in the Voluntary Work Program as janitors or porters do
16  inside the housing units?
17    A   They'll do detailed cleaning of their living
18  areas.
19    Q   But that's separate from the sanitation policy?
20    A   That's correct.
21    Q   If -- if each and every detainee has to comply
22  with the sanitation policy and clean their immediate
23  living area, why would GEO hire and pay detainee
24  janitors to do that work?
25    A   Because we -- the entire part of the work

Page 91

---

1     A   Yes.
2     Q   The first line here is, "Detainee will submit a
3  completed job application to the classification staff";
4  is that correct?
5     A   Yes.
6     Q   Okay.  I'll hand you Exhibit 26.
7     (Plaintiffs' Exhibit 26 was marked for
8  identification by the Certified Shorthand Reporter and
9  attached hereto.)
10  BY MS. WRIGHT:
11    Q   If you look at the first page of Exhibit 26.
12  This is an e-mail.  And you can look at the screen if
13  you'd like.  This is an e-mail from Joanne Langill sent
14  on September 4th, 2018.  And the subject is detainee
15  applications.  And there's an attachment to the e-mail,
16  which is what I really want to talk about.  If you look
17  at GEO-Novoa-3294, this document is titled Detainee Work
18  Detail Application.  And then below it says The GEO
19  Group, Adelanto ICE Processing Center East and West.
20    Do you recognize this document?
21    A   Yes.
22    Q   What is this?
23    A   It's an application for a detainee work detail.
24    Q   And is it fair to say that -- that this work
25  detail application is -- was effective on September 4th,

Page 93

---

24 (Pages 90 - 93)

1 2018, which is the date of the e-mail to which it was
2 attached?
3 A According to what Ms. Langill wrote, she's
4 stating there apparently were some old forms in
5 circulation. And that this is the current form for
6 applying for work.
7 Q So is this the current work detail application
8 in effect at the Adelanto Detention Center?
9 A I don't deal with the applications on a
10 day-to-day basis. I can't speak to that as to yes or
11 no, if it's the actual form that's used today.
12 Q Do you know if the form has been updated since
13 September of 2018?
14 A I don't know.
15 Q Okay. So the procedure for the Voluntary Work
16 Program at the Adelanto center is that a detainee will
17 fill out a work detail application, such as what we see
18 in Exhibit 26; is that correct?
19 A Yes.
20 Q And after detainee fills this out, then GEO
21 will determine what jobs, if any, the detainee is
22 qualified for?
23 A Reading this form, it states the position that
24 the detainee would like to voluntarily work -- apply
25 for.

Page 94

1 Q My question was, after detainee fills this out,
2 is it correct then that GEO determines which job the
3 detainee should be hired to do?
4 A If the detainee selects one position, it's his
5 voluntary choice as to what position he's applying for.
6 Q Is a detainee guaranteed a job in the voluntary
7 program?
8 A No.
9 Q If a detainee selects multiple jobs, is the
10 detainee guaranteed to have multiple different jobs in
11 the Voluntary Work Program?
12 A No.
13 Q Who makes the decision about what job the
14 detainee works?
15 A I honestly can't speak to that. I don't know.
16 Q Is it a GEO employee?
17 A The application's turned in to a GEO
18 classification officer, yes.
19 Q And who is that?
20 A We have five classification officers.
21 Q Do you know their names?
22 A Not all five.
23 Q Whose names do you know?
24 A Mary McCormick, last name Cerrulli.
25 Q How do you spell that?

Page 95

1 A C-e-r-r-u-l-l-i. And I'm not familiar with the
2 other officers' names.
3 Q So the GEO classification officer will review
4 this form once a detainee fills it out; right?
5 A Correct.
6 Q And will assign a detainee to a job; is that
7 right?
8 A I believe there's a review process that's
9 outlined in PBNDS that has to do with their
10 classification, the job that they're applying for that
11 speaks to some jobs require a medical or mental health
12 clearances also.
13 Q And the classification officer will review the
14 information that the detainee provides here and then
15 review that additional information and then figure out
16 where to place the detainee; is that correct?
17 MS. ARMSTRONG: Objection. Calls for
18 speculation.
19 THE WITNESS: I don't want to -- I can't speak
20 for the classification officers, I'm not involved in
21 that daily process.
22 BY MS. WRIGHT:
23 Q Do you agree that this work detail application
24 outlines GEO's expectations for detainee workers?
25 MS. ARMSTRONG: Objection. Vague.

Page 96

1 THE WITNESS: I don't see where it states
2 expectations.
3 BY MS. WRIGHT:
4 Q That's not the question that I asked.
5 Let me ask it this way: What is the purpose of
6 this work detail application?
7 MS. ARMSTRONG: Object to the form. Calls for
8 speculation.
9 THE WITNESS: The purpose is to have the -- for
10 the detainee population to have the ability to
11 voluntarily take this form out of a rack, per se, a
12 magazine-type rack, fill the form out and have the
13 opportunity to request to participate in the volunteer
14 work program.
15 BY MS. WRIGHT:
16 Q Do all detainee workers receive a work detail
17 application to fill out?
18 A They're not issued. The forms are available in
19 their living areas. And they can voluntarily take the
20 form, fill it out, submit it and it will be reviewed for
21 consideration.
22 Q It will be reviewed by a classification
23 officer?
24 A That's -- yes.
25 Q And the detainee will be considered for a

Page 97

25 (Pages 94 - 97)

1  Voluntary Work Program position?
2      A   May be, yes.
3      Q   When would the answer to that be known?  When
4  would a detainee not be considered for a Voluntary Work
5  Program position?
6      A   One could be their classification level doesn't
7  allow for them to work in that position in accordance
8  with the PBNDS standards.  There may be a medical
9  condition that does not allow for the individual to work
10  in a certain position.
11      Q   Does GEO -- excuse me.  Does GEO require
12  detainees to fill this work detail application out in
13  order to participate in the Voluntary Work Program?
14      A   We don't require them.  They voluntarily fill
15  it out.
16      Q   In order to participate in the Voluntary Work
17  Program, does a detainee first need to fill out this
18  application?
19      A   That's the start of the process, yes.
20      Q   Is it ever the case where a detainee
21  participates in the Voluntary Work Program without
22  filling out a work application?
23      A   Not to my knowledge.
24      Q   We're going to refer back to this, so you might
25  keep it close by, but let's go back to Policy 8.1.8, the

Page 98

1      A   Yes.
2      Q   Below that it says, "Expediency or convenience
3  will not justify the rejection of a detainee, who with
4  reasonable accommodation, can perform the essential
5  function of the work involved."
6      Is that true?
7      A   That's what it states, yes.
8      Q   But that's true as applied at the Adelanto
9  Detention Center?
10      MS. ARMSTRONG:  Objection.  Vague.
11      THE WITNESS:  To the best of my knowledge, yes.
12  BY MS. WRIGHT:
13      Q   So GEO must provide reasonable accommodations
14  to detainee workers with disabilities; is that correct?
15      MS. ARMSTRONG:  Objection.  Calls for a legal
16  conclusion.
17      THE WITNESS:  To the best of my knowledge, yes.
18  That's -- yes.
19  BY MS. WRIGHT:
20      Q   Let's look at Section H, Hours of Work.  The
21  portion that I've highlighted reads, "Detainees
22  participate" -- excuse me.  "Detainees participating in
23  the volunteer work program are required to work
24  according a fixed schedule.  The normal scheduled
25  workday for a detainee employed full-time is a maximum

Page 100

1  work -- Detainee Work Program Policy, Exhibit 22.  We're
2  still on page 2, Bates No. 222, Section F.  It's
3  entitled Discrimination In Hiring Detainee Workers.
4  This states that volunteering detainees will not be
5  denied work opportunities based on non-merit factor,
6  such as race, religion, natural origin, gender and
7  sexual orientation or disability; is that correct?
8      A   That's correct.
9      Q   And is this policy applied at the Adelanto
10  Detention Center?
11      A   To the best of my knowledge, yes.
12      Q   So GEO has a non-discrimination policy
13  regarding hiring detainee workers into the Voluntary
14  Work Program?
15      A   Yes.
16      Q   And that's this policy that we're looking at
17  here?
18      A   Yes.
19      Q   Go ahead and flip to the next page of Exhibit
20  22, page 3.  The Bates stamp is 223, Section G,
21  Physically and Mentally Challenged Detainees.  If you
22  look at the portion that I've highlighted, it says,
23  "Discrimination on the basis of disability is prohibited
24  in the detainee work program."
25      Is that true?

Page 99

1  of eight hours.  Detainees who wish to participate in
2  the work program will not be permitted to work in excess
3  of eight hours daily, 40 hours weekly."
4      Is that true and accurate as applied at the
5  Adelanto Detention Center?
6      A   To the best of my knowledge, yes.
7      Q   Who sets the fixed schedule by which detainee
8  workers work?
9      MS. ARMSTRONG:  Objection.  Vague.
10      THE WITNESS:  I -- I'm not sure who sets the
11  schedule.
12  BY MS. WRIGHT:
13      Q   Do detainee workers set their own schedule?
14      A   They can.  It's a voluntary program.  If they
15  choose to work for an hour and decide they want to go
16  back to their living area, they can.
17      Q   But can detainee workers decide what time they
18  start a shift?
19      A   They can.
20      Q   In what context?
21      A   If we were to go in and wake an individual up,
22  at -- I'm just going to use loosely an hour of a day,
23  say, 8:00 a.m., he says, "Nah, I don't want to go to
24  work yet," but yet he's an approved -- he or she is an
25  approved worker.  He may decide -- he or she may decide

Page 101

26 (Pages 98 - 101)

1 at 10:00 a.m., "Hey, I'm up. I'm about. I'll go to
2 work now." It's strictly a voluntary program as to --
3 we can't make them go to work at 0800 hours.
4     Q   So detainees can freely come and go from their
5 assigned jobs?
6         MS. ARMSTRONG: Objection. Misstates prior
7 testimony.
8         THE WITNESS: They can say that I'm done
9 working for the day. They would be escorted back to
10 their living area. They have that opportunity, yes.
11 BY MS. WRIGHT:
12     Q   But they also -- you just said they have the
13 opportunity to decide when to show up for a shift. So
14 they can freely go to a shift. If their shift starts at
15 8:00 a.m., but they prefer to start working at
16 10:00 a.m., the detainee can just show up at the shift
17 at 10:00 a.m.?
18     A   They would, yes, have to be escorted to the
19 area, unless they work in their living area and that's
20 their voluntary job, they can go to work at 10:00 a.m.
21     Q   So there's no set schedule for detainee work
22 shifts?
23         MS. ARMSTRONG: Object. Misstates prior
24 testimony. Lacks foundation.
25         THE WITNESS: I can't speak to set schedules
Page 102

1 specifically. I don't set the set schedules.
2 BY MS. WRIGHT:
3     Q   But your testimony here is that detainees can
4 decide when to work, when to show up and when to leave a
5 shift?
6     A   They can, yes.
7     Q   If a detainee showed up two hours late, to a
8 shift, would that detainee be punished in any way?
9     A   No.
10     Q   If one of your officers, a GEO guard, showed up
11 two hours late to a shift, would that person be punished
12 in any way?
13     A   We have standards that govern our staff, so
14 yes.
15     Q   But you don't have standards that govern the
16 Voluntary Work Program with respect to the work
17 assignments?
18     A   To my knowledge, we do not discipline
19 detainees. It's strictly, as stated, a Voluntary Work
20 Program. There's no sanctions disciplinary-wise tied to
21 it.
22     Q   Now, this says that the normal scheduled
23 workday for a detainee employed full-time is a maximum
24 of eight hours per day.
25         Do you see that?
Page 103

1     A   Yes, ma'am.
2     Q   So if a detainee wants to work more than eight
3 hours per day, they can do that?
4     A   This policy states it's a maximum of eight
5 hours. It definitely means they -- to me it means they
6 can work less than eight hours a day.
7     Q   But you just said that detainees could choose
8 when to start and end shifts?
9     A   They can, yes.
10     Q   But a detainee cannot choose to work more than
11 eight hours a day?
12     A   According to the policy, the maximum is eight
13 hours a day.
14     Q   And this policy is implemented at the Adelanto
15 Facility, I think was your previous testimony; is that
16 correct?
17     A   To the best of my knowledge, yes.
18     Q   Hand you Exhibit 27.
19         (Plaintiffs' Exhibit 27 was marked for
20 identification by the Certified Shorthand Reporter and
21 attached hereto.)
22 BY MS. WRIGHT:
23     Q   This is an e-mail. It is from you, James
24 Janecka. And, again, you can look at the screen. The
25 date is March 9th, 2018. The subject of this e-mail is,
Page 104

1 Forward: Detainee work schedule. And the attachment is
2 titled, West Detainee Kitchen Workers Schedule. And
3 with e-mails, it's a chain, so let's start at the
4 bottom. That would be the first e-mail in the chain.
5 The first e-mail in the chain is an e-mail from Michelle
6 Keeney on March 8th, 2018 to you.
7     Q   Do you see your name in the "to" line? You can
8 look at the screen, if you'd like?
9     A   I see it in the copy, the cc line.
10     Q   In the cc line. The subject is Detainee Work
11 Schedule.
12         Do you recall receiving this e-mail?
13     A   No.
14     Q   Do you have any reason to think that you didn't
15 receive this e-mail?
16     A   No.
17     Q   Ms. Keeney says, "This is the prep and pickup
18 schedule for kitchen detainees. The breakfast detainees
19 should be woke and prepped by 2:30 and brought into the
20 kitchen by 300 hours before count. These detainees stay
21 in the kitchen from 300 hours to approximately 0830."
22         Do you see that?
23     A   Yes, ma'am.
24     Q   Then she says, "The lunch detainees should be
25 woke and prepped by 900 and brought to the kitchen by
Page 105

27 (Pages 102 - 105)

1 930. These detainees stay in the kitchen from 930 to
2 approximately 1430 to 1500 hours"; is that correct?
3    A   Yes, ma'am.
4    Q   "The dinner detainee workers are prepped at
5 1500 and should arrive in the kitchen by 1530. This
6 shift of workers leave the kitchen after the 1830 count
7 has cleared, usually around 1915"; is that correct?
8    A   Yes.
9    Q   And then she says, "Thank you and we appreciate
10 your continuing efforts in helping our kitchen run
11 smoothly." Right?
12   A   Yes.
13   Q   You agree that this is a prep and pickup
14 schedule for kitchen detainees?
15   A   That's what Ms. Keeney wrote.
16   Q   Is that what this is?
17   A   That's what Ms. Keeney wrote. I can't speak to
18 why -- what she wrote.
19   Q   So you're not sure if this is a schedule for
20 the kitchen shifts for detainee workers?
21   A   I can't speak to it as being a specific
22 schedule, but that's what Ms. Keeney wrote.
23   Q   Let's look at the attachment, Bates
24 GEO-Novoa-670.
25       Have you seen this graph before?

Page 106

1    A   I'm on the e-mail string.
2    Q   Have you seen this graph before?
3    A   I don't recall it.
4    Q   This appears to be a graphic representation of
5 the three detainee kitchen workers schedules; is that
6 correct?
7    A   That's what she attached to her e-mail.
8    Q   But your testimony here today is that if a
9 breakfast worker didn't want to show up at 0300 hours,
10 but wanted to show up at 5:00 a.m. instead, that that
11 would be acceptable; is that right?
12   A   That's correct.
13   Q   So a guard would be dispatched to the housing
14 unit to pick up the detainee whenever she or he wanted
15 to show up at shift; is that correct?
16   A   The detainee can go to work at a time that's
17 when he chooses, he or she.
18   Q   So my question was, how does the detainee get
19 to their shift?
20   A   They would be escorted to wherever they're
21 going.
22   Q   Who would the detainee ask for the escort?
23 What is that process?
24   A   It would start with their housing unit officer.
25   Q   So the detainee would go to the housing unit

Page 107

1 officer and say I'm ready to go to my work shift now,
2 even though it started two hours ago?
3    A   It's my understanding, yes.
4    Q   And the housing unit officer would call a
5 guard?
6    A   Somebody. I'm not -- I don't know specifically
7 who they call.
8    Q   And then the guard would escort the detainee to
9 the shift?
10   A   They may, yes.
11   Q   What's the purpose of having a work schedule if
12 detainees can come and go freely to their work shifts?
13   A   If you're speaking to this e-mail, I can't
14 speak to Ms. Keeney, but --
15   Q   I'm asking you as a warden of the facility?
16   A   Okay. I can't speak to Ms. Keeney's e-mail.
17   Q   As the warden of the facility, what is the
18 purpose of having set shifts?
19   A   We run the facility as set on a schedule.
20 Everything is scheduled, the hours for court, the hours
21 for sick call, the hours for meal delivery, meal
22 service. It's a paramilitary type schedule.
23   Q   But you don't run a paramilitary type schedule
24 with respect to the Voluntary Work Program?
25   A   There are times when staff are going to call

Page 108

1 for detainees to go to work. If they don't show up upon
2 initial call, they can go to work later, if they still
3 need them.
4    Q   Okay. So detainees can go to work any time
5 they want. What if a detainee wants to go work in the
6 kitchen after 1915, so when -- what if a detainee wants
7 to go work in the kitchen at 11:00 p.m.? Can a detainee
8 do that?
9    A   I can't speak to that, but if the food service
10 department is closed, we're not going to open it at
11 11:00 p.m.
12   Q   Okay. I'll hand you Exhibit 28.
13       (Plaintiffs' Exhibit 28 was marked for
14 identification by the Certified Shorthand Reporter and
15 attached hereto.)
16 BY MS. WRIGHT:
17



Page 109

28 (Pages 106 - 109)



Page 110

Page 111

16 BY MS. WRIGHT:
17     Q   Let's go back to Policy 8.1.8, which is
18 Exhibit 22.  Now, this says the normal scheduled workday
19 for a detainee employed full-time is a maximum of eight
20 hours.  Are there detainee workers that participate in
21 the work program who are employed on a part-time basis?
22         MS. ARMSTRONG:  Objection.  Calls for a legal
23 conclusion.
24         THE WITNESS:  I don't know.
25 ///

Page 112

1 BY MS. WRIGHT:
2     Q   How long are kitchen shifts generally?
3     A   I don't know.  They can vary, but I don't know
4 specifically how long.
5     Q   We're still on page 3 of Policy 8.1.8.  Says,
6 "Detainee performance will be regularly evaluated and
7 recorded."
8         Is that correct?
9     A   That's what it states.
10     Q   Is that correct?
11     A   I am not involved with the specifics of
12 evaluated and recorded.
13     Q   You testified earlier that this policy is
14 implemented at the Adelanto Detention Center.
15         Do you remember that?
16     A   To the best of my knowledge, it's implemented.
17     Q   But you don't know whether detainee performance
18 is regularly evaluated and recorded as the policy
19 states?
20         MS. ARMSTRONG:  Objection.  Asked and answered.
21         THE WITNESS:  I'm not involved in that process
22 of evaluating and recording their evaluations.
23 BY MS. WRIGHT:
24     Q   I'm not asking if you do the evaluation and
25 recording yourself.  You're the warden.  It's not your

Page 113

29 (Pages 110 - 113)

1 job. I'm asking do you know if this part of the Policy
2 8.1.8 is actually implemented at the Adelanto Detention
3 Center?
4     MS. ARMSTRONG: Objection. Asked and answered.
5     THE WITNESS: I'm not familiar with that --
6 that process of this policy, so I don't want to misspeak
7 to it.
8 BY MS. WRIGHT:
9   Q   Who would know the answer to that question?
10   A   Possibly line staff.
11   Q   Who's line staff? What does that mean?
12   A   People that supervise detainee workers.
13   Q   Like who?
14   A   A number, could be a food service worker or
15 could be a laundry person.
16   Q   Who supervises food service workers?
17   A   Sharon Buczkowske.
18   Q   Who supervises laundry?
19   A   Mr. Mendoza.
20   Q   Who supervises the warehouse crew?
21   A   We don't have a warehouse crew.
22   Q   Who supervises the barber shop?
23   A   The rec. specialist.
24   Q   Who's that?
25   A   Ms. Nimke.

Page 114

1   Q   Who supervises the dorm cleaning crew?
2   A   The officers assigned.
3   Q   Meaning the officer assigned to guard each
4 dorm?
5   A   I have approximately 330 officers. I can't
6 name 330 officers.
7   Q   There's not a specific person who's in charge
8 of the dorm cleaning work assignment; is that correct?
9     MS. ARMSTRONG: Objection. Vague.
10     THE WITNESS: Not to my knowledge.
11 BY MS. WRIGHT:
12   Q   This says, unexcused -- and we're looking back
13 at Policy 8.1.8, page 3, "Unexcused absences from work
14 or unsatisfactory work performance may result in removal
15 from the Voluntary Work Program."
16     Did I read that correctly?
17   A   Yes.
18   Q   Is that an accurate statement as applied to
19 Adelanto Detention Center?
20   A   Yes.
21   Q   Does a detainee need to -- you testified
22 earlier that a detainee can choose when to show up for a
23 shift and when to leave a shift.
24     How does a detainee get approval or an excuse
25 to do that?

Page 115

1     MS. ARMSTRONG: Objection. Vague. Compound.
2     THE WITNESS: To my knowledge, they ask.
3 BY MS. WRIGHT:
4   Q   Who do they ask?
5   A   Whomever they're working with or for.
6   Q   Could they ask another detainee for the
7 approval to come to work late?
8   A   No. So they would have to ask their
9 supervisor, a staff member.
10   Q   A GEO staff member; is that right?
11   A   Yes.
12   Q   Look at the bottom of Policy 8.1.8, Section I,
13 Work Restrictions. "A detainee may participate in only
14 one work detail per day"; is that correct?
15   A   Yes.
16   Q   So does this mean that a detainee could not be
17 a janitor and a barber in the same day?
18   A   To the best of my knowledge, yes.
19   Q   How does GEO keep track of how many work
20 details a detainee works per day?
21   A   I don't know specifics to that.
22   Q   Do you know generally?
23   A   No.
24   Q   Who would know?
25   A   Classification staff.

Page 116

1   Q   Is there a manager of the classification
2 department?
3   A   It would be Lieutenant Johnny White.
4   Q   Do you know whether GEO keeps track of detainee
5 hours?
6     MS. ARMSTRONG: Objection. Vague.
7     THE WITNESS: I -- will you say that again?
8 I'm sorry.
9 BY MS. WRIGHT:
10   Q   Do you know whether GEO keeps track of detainee
11 hours?
12     MS. ARMSTRONG: Same objection.
13     THE WITNESS: Hours of?
14 BY MS. WRIGHT:
15   Q   Of work?
16   A   If they're participating in a detainee work
17 program, their hours of work are tracked.
18   Q   How are they tracked?
19   A   I don't know the details.
20   Q   But GEO keeps track of detainee work hours?
21   A   Yes.
22   Q   That's correct.
23     Okay. Go ahead and flip to page 4 of
24 Exhibit 22. Section J is Compensation. "Detainees
25 shall receive a stipend of $1 per day to be paid daily."

Page 117

30 (Pages 114 - 117)

1    Do you see that?
2    A   Yes.
3    Q   So as a matter of policy and practice, GEO
4  fixes the rate of compensation for the detainee work
5  program at $1 a day is; that right?
6    A   Yes.
7    Q   And detainee workers are paid $1 a day
8  regardless of how many hours they work in a day?
9    A   Yes.
10    Q   Is every job in the Voluntary Work Program
11  compensated the same way, $1 a day?
12    A   Yes.
13    Q   Who determined the -- that detainees at
14  Adelanto would be paid exactly $1 per day for their
15  labor in the work program?
16    A   Our contract, there's a reimbursement section
17  that speaks to the detainee work program.  It states
18  there will be a reimbursement by the government to the
19  service provider of $1 per day.  Later in the contract,
20  the contract language refers to the service providers
21  detainee work plan, program/plan.  And in our work
22  program, detainee shall receive a stipend of $1 per day.
23  I also asked ICE officials if detainees could be
24  compensated more than a $1 a day at the expense of GEO
25  and the response was no.

Page 118

1  didn't know when they came in.  So just an activity to
2  keep -- keep them from being idle and busy.
3    Q   But it would incentivize them to participate in
4  the work program if they were paid more than a $1 a day?
5    MS. ARMSTRONG:  Object.  Vague.
6    THE WITNESS:  I can't speak if it would have
7  been effective.  It was just an idea that I had.
8  BY MS. WRIGHT:
9    Q   Did you propose an amount that you thought that
10  detainees should be paid?
11    A   I don't recall an amount.
12    Q   As you sit here today, what do you think
13  detainees in the Voluntary Work Program should be paid
14  at Adelanto?
15    A   I don't think to that, I go specifically by
16  what our contract requires and what the client agrees --
17  or told me was.  We're going to follow the $1 a day.  I
18  don't -- I don't manage operations or the contract on
19  personal opinions or beliefs.  And I'm not going to
20  state one today.
21    Q   When did you have this conversation with ICE
22  officials?
23    A   It would have been the latter part of 2014,
24  approximately.  I don't recall the exact date, but it
25  was shortly after I got to Adelanto.

Page 120

1    Q   Why did you ask ICE officials if detainees
2  could be compensated more than $1 per day?
3    A   I did it shortly after coming to Adelanto.  And
4  I was becoming more familiar with the Adelanto ICE
5  Processing Center and the policies and PBNDS.  And I
6  wanted to -- I'm always looking for opportunities to
7  enhance programs.  So I felt I would sit down with the
8  client, discuss the matter with them to see if they
9  would be open to maybe allowing me or the company to
10  enhance the program by paying a little more to the
11  workers at the expense of the company.  And the response
12  I got was no.
13    Q   Why did you think that paying detainee workers
14  more than $1 a day would enhance the Voluntary Work
15  Program?
16    A   I just -- I like to -- if they would get more
17  detainees to be involved, it would maybe keep the
18  idleness down and the -- just give them more
19  opportunities to keep themselves busy on a daily basis.
20    Q   So it would incentivize more detainees to
21  participate in the work program if they're paid more
22  than a $1 a day?
23    A   To keep them busy, to keep them occupied, to --
24  you know, if they learned something from being involved
25  with the job, that's great.  They learn something they

Page 119

1    Q   And you got there in September?
2    A   September of '14.
3    Q   Okay.  And who did you speak with at ICE?
4    A   I spoke with the AFOD.
5    Q   What does that mean?
6    A   Assistant field office director.
7    Q   And what is that person's name?
8    A   Gabriel Valdez.
9    Q   And did this conversation occur at Adelanto?
10    A   Yes.
11    Q   Does Mr. Valdez maintain an office at Adelanto?
12    A   Excuse me?
13    Q   Does Mr. Valdez maintain an office at Adelanto?
14    A   Yes.
15    Q   Did you have more than one conversation with
16  Mr. Valdez or anybody else about increasing the
17  compensation in the Voluntary Work Program?
18    A   I don't recall any other conversations with
19  Mr. Valdez.  I may have had a conversation with the
20  Corps, the contracting officer also.
21    Q   And when was that conversation?
22    A   It would have been around the same time as the
23  conversation with Mr. Valdez.
24    Q   Was it after the conversation with Mr. Valdez?
25    A   I honestly don't remember.

Page 121

31 (Pages 118 - 121)

1  Q   And what did the contracting officer tell you?
2  A   I don't remember, but the ultimate was, no,
3  it's going to -- we're going to stick with that the
4  contract states and what the $1 a day payment to the
5  detainee population.
6  Q   What was the name of the contracting officer
7  that you spoke with?
8  A   Dan Pomplun.
9  Q   Can you spell that?
10  A   P-o-m-p-l-u-n.
11  Q   Since late 2014, have you had any other
12  conversations with anybody about increasing the
13  compensation for the work program?
14  A   No.
15  Q   Did you report either the conversation with
16  Mr. Valdez or the conversation about Pomplun up your
17  chain of command?
18  A   Not that I recall.
19  Q   Have you ever asked anybody at GEO about
20  increasing the wages for the work program?
21  A   Not after that date.
22  Q   How about before that date?
23  A   I spoke to my -- at the time, was my regional
24  vice president and mentioned that I would see if he was
25  okay with me approaching ICE officials with that

Page 122

1  conversation.
2  Q   And who was that person?
3  A   James Black.
4  Q   And what did Mr. Black say?
5  A   He was in favor -- he was fine with me to speak
6  to the ICE officials.
7  Q   So Mr. Black's position is the regional vice
8  president of -- is that his full title, regional vice
9  president?
10  A   Yes.  He was the regional -- of the western
11  region.  He's now in a different region.
12  Q   At the time you had this conversation with him,
13  was he based in Adelanto?
14  A   No.
15  Q   Where was he based?
16  A   Los Angeles.
17  Q   Los Angeles.
18      So you approached Mr. Black and requested
19  permission to speak with ICE about increasing detainee
20  wages?
21      MS. ARMSTRONG: Objection.  Vague.
22      THE WITNESS:  I don't remember the specifics of
23  the conversation, but I -- I mentioned it to him.  And
24  he didn't have objections that I would speak to the ICE
25  officials, but I don't -- I don't remember the specifics

Page 123

1  of the conversation.
2  BY MS. WRIGHT:
3  Q   Was Mr. Black in favor of increasing
4  compensation for detainee workers?
5  A   I don't remember the conversation.  I just know
6  I wasn't told not to talk to ICE.  I don't remember the
7  specifics.
8  Q   And what did you want the compensation to be
9  increased to?
10  A   I'm sorry?
11  Q   What did you want the compensation to be
12  increased to when you were having these conversations?
13  A   I didn't have a number.  I just asked ICE if
14  the company was willing to -- would ICE consider it.
15  And my response back to me was no.
16  Q   Is it your understanding that Mr. Valdez has
17  authority to modify the contract that's in place at
18  Adelanto?
19      MS. ARMSTRONG: Objection.  Calls for a legal
20  conclusion.
21      THE WITNESS:  I can't speak to his authority
22  with modifications of the contract.
23  BY MS. WRIGHT:
24  Q   Do you know who is empowered to modify the
25  contract?

Page 124

1  A   I don't, not specifically with ICE.  It's --
2  it's above me, over my level.  And I don't want to
3  misspeak for the government.
4  Q   Uh-huh.
5      Did you record in any way or take any notes
6  following your conversation with Mr. Black?
7  A   Not that I recall.
8  Q   Did you record or memorialize in any way your
9  conversations with Mr. Valdez or Mr. Pomplun?
10  A   Not that I can recall.
11  Q   Sitting here today, if ICE came to you, if
12  Mr. Valdez came to you and said that ICE would permit
13  GEO to pay more than $1 a day to detainee workers, would
14  you recommend that to your supervisors?
15      MS. ARMSTRONG: Objection.  Calls for
16  speculation.
17      THE WITNESS:  I wouldn't make a recommendation.
18  I would relay whatever was communicated to me up my
19  chain of command.
20  BY MS. WRIGHT:
21  Q   Do you think it would be a good idea to
22  increase detainee wages?
23  A   I'm not going to speak to that.  I get paid to
24  and I'm hired to manage the Adelanto Detention Facility
25  as our contract is written and as PBNDS states.

Page 125

32 (Pages 122 - 125)

**Page 126**

1　Q　In 2014, you felt that this was important
2　enough to raise it with your supervisor, Mr. Black, with
3　Mr. Valdez and Mr. Pomplun.
4　　What's changed for you since 2014?
5　　MS. ARMSTRONG: Objection. Vague. Compound.
6　　THE WITNESS: As I stated earlier, I was
7　relatively new to the facility, becoming familiar with
8　the facility. And it was actually a conversation that
9　that was part of my understanding the ICE officials and
10　their position on certain matters.
11　　MS. ARMSTRONG: The food is here, just so we
12　know.
13　　MS. WRIGHT: Just a couple more minutes and
14　we'll get to a good stopping point.
15　Q　If you could just flip to PBNDS, which is page,
16　407.
17　A　It's out of order.
18　　MS. ARMSTRONG: I'll fixed them, but --
19　　THE WITNESS: I'm sorry.
20　　MS. ARMSTRONG: It's okay.
21　BY MS. WRIGHT:
22　Q　We're on 407 or you could just look up here, if
23　you'd like. PBNDS stated 5.8.5.K is entitled
24　Compensation. And it says, "The compensation is at
25　least $1 per day."

**Page 127**

1　　Do you see that?
2　A　Yes.
3　Q　So this says, "The compensation is at least $1
4　per day." This is the PBNDS. So "at least" means that
5　the service provider can pay whatever it wants, so long
6　as it's equal to or more than A $1 a day?
7　　MS. ARMSTRONG: Objection. Compound. Calls
8　for a legal conclusion. Calls for speculation.
9　Misstates prior testimony and lacks foundation.
10　　THE WITNESS: As stated earlier, our contract
11　under the reimbursement section speaks to a $1 a day.
12　The contract also refers to the detainee work plan, as
13　a -- will be used as part of the pay scale and our pay
14　scale in detainee work plan is $1 per day. And, again,
15　ICE officials have told me that we will only pay $1 per
16　day in Adelanto.
17　BY MS. WRIGHT:
18　Q　But you agree that the PBNDS does not prohibit
19　GEO from paying more than a $1 a day?
20　　MS. ARMSTRONG: Objection. Misstates prior
21　testimony.
22　　THE WITNESS: PBNDS states the compensation is,
23　at least, $1 per day.
24　BY MS. WRIGHT:
25　Q　So you agree that the PBNDS does not prohibit

**Page 128**

1　GEO from paying more than a $1 a day?
2　　MS. ARMSTRONG: Objection. Misstates prior
3　testimony.
4　　THE WITNESS: I don't agree to that. I -- it's
5　a national standard. It's applicable to the national
6　detention.
7　BY MS. WRIGHT:
8　Q　Does this standard, the compensation provision
9　of standard 5.8 prohibit GEO from paying more than a $1
10　a day? I understand the contract does. I'm asking
11　about this sentence, this standard. Does this prohibit
12　GEO from paying more than a $1 per day?
13　　MS. ARMSTRONG: Objection. Asked and answered.
14　　THE WITNESS: I can't speak to the legal
15　aspects of how that would be interpreted from a
16　contractual standpoint. I don't want to speak -- I
17　can't speak to that.
18　BY MS. WRIGHT:
19　Q　What does "at least" mean to you?
20　A　At the minimal.
21　Q　Are you aware that GEO pays detainee workers
22　more than a $1 a day at some other immigration detention
23　centers?
24　A　No.
25　Q　Does it surprise you to hear that?

**Page 129**

1　A　I can't speak for them. I can't speak for
2　their contract. I can't speak for their local clients.
3　Q　So it doesn't surprise you to hear that GEO
4　pays more than a $1 a day at other facilities?
5　A　I -- I strictly -- I don't manage those
6　facilities, so I manage mine in accordance with the
7　contract and with my client.
8　Q　Knowing now, you've learned for the first time
9　today that GEO paid more than a $1 a day at other civil
10　immigration detention centers, knowing that now, would
11　you consider reapproaching your supervisor or ICE
12　officials to ask for an increase in compensation at
13　Adelanto?
14　　MS. ARMSTRONG: Objection. Lacks foundation.
15　Calls for speculation.
16　　THE WITNESS: As stated earlier, I've -- since
17　my conversation with ICE, I manage it in accordance with
18　our contract. Our work plan, and the conversation that
19　I had with the ICE officials that are still at the
20　facility.
21　BY MS. WRIGHT:
22　Q　You're not answering my question. And it's
23　not -- it's not meant to be a tricky question.
24　　Could you please read back my last question.
25　　(The record was read as follows:

33 (Pages 126 - 129)

1    "QUESTION: Knowing now, you've
2    learned for the first time today that
3    GEO paid more than a $1 a day at other
4    civil immigration detention centers,
5    knowing that now, would you consider
6    reapproaching your supervisor or ICE
7    officials to ask for an increase in
8    compensation at Adelanto?")
9    MS. ARMSTRONG: Same objections that I made on
10   the record at the time.
11   THE WITNESS: No.
12   BY MS. WRIGHT:
13   Q  Do you think that the current rate of
14   compensation is fair?
15   MS. ARMSTRONG: Objection. Asked and answered.
16   THE WITNESS: I'm not going to state a personal
17   opinion. I strictly operate our institution as I stated
18   earlier by contract and by conversation I had with my
19   client.
20   BY MS. WRIGHT:
21   Q  I'm not asking how you implement this policy.
22   I'm asking whether you think that $1 a day is fair?
23   A  I can't speak to that.
24   Q  Would you work for $1 a day?
25   MS. ARMSTRONG: Objection. Lacks foundation.

Page 130

1 1    THE WITNESS: I can't speak to that either.
2 2    BY MS. WRIGHT:
3 3    Q  What do you mean you can't speak to that?
4 4    A  I don't fall under --
5 5    Q  Seems like the easiest question of this whole
6 6    deposition.
7 7    You would consider working for $1 a day?
8 8    MS. ARMSTRONG: Objection. Calls for
9 9    speculation.
10 10   THE WITNESS: If you were -- I'm not really
11 11   going to speak to that. That standard isn't applicable
12 12   to me or to me personally.
13 13   BY MS. WRIGHT:
14 14   Q  Well, we'll be sure to let Mr. Ragsdale and
15 15   Mr. Venturella that you are apparently open to a
16 16   significant decrease in compensation.
17 17   Why don't we take our lunch break and we'll go
18 18   ahead and pick up after the break.
19 19   THE VIDEOGRAPHER: We are going off the record.
20    12:11 20    The time is    p.m.
21    12:11 21    (Lunch recess was taken at
p.m. and
22
22 22   resumed at 1:00 p.m.)
23
23    THE VIDEOGRAPHER: We are going back on the
24
24   record. The time is 1:00 p.m.
25
25   ///

Page 131

1 BY MS. WRIGHT:
2    Q  Mr. Janecka, before our lunch break, we were
3 discussing the compensation provided to detainee workers
4 at Adelanto who participate in the Voluntary Work
5 Program. And you testified that the policy at Adelanto
6 is that every Voluntary Work Program job is compensated
7 the same way, which is $1 a day; is that right?
8    A  Yes.
9    Q  Does GEO ever pay bonuses or incentives to
10 detainees for their labor?
11   A  Are you speaking at Adelanto?
12   Q  Yes.
13   A  Not to my knowledge.
14   Q  I'm going to hand you Exhibit 29.
15   (Plaintiffs' Exhibit 29 was marked for
16 identification by the Certified Shorthand Reporter and
17 attached hereto.)
18 BY MS. WRIGHT:
19   Q  Exhibit 29 is titled monthly food service
20 department meeting minutes, July 26th, 2018. It is on
21 GEO letterhead, specifically Adelanto ICE Processing
22 Center letterhead. And the Bates number is
23 GEO-Novoa-728.
24   Have you ever seen this document before?
25   A  Not to my -- no, not that I'm aware of.

Page 132

1    Q  Okay. Who runs the monthly food service
2 department meetings?
3    A  It would be the food service manager.
4    Q  And who's that?
5    A  Ms. Sharon Buczkowske.
6    Q  Is that -- is she also known as Ms. B?
7    A  Yes.
8    Q  Do you ever attend the monthly food service
9 department meetings?
10   A  No, ma'am.
11   Q  Is that because as warden, you delegate the
12 responsibility to running the monthly food services
13 meetings to the food service manager, Ms. B?
14   A  They have their internal meetings, yes.
15   Q  You delegate the responsibility for running
16 those meeting to Ms. B; is that right?
17   A  Yes.
18   Q  Let's look at page 2 of Exhibit 28. The
19 paragraph that I have highlighted here on your screen.
20 Says, "Showing appreciation to our detainee workers
21 would go a long way with it comes to detainee
22 retention." I think that's a typo. "Its okay to thank
23 the detainees for doing task, such as cleaning the line
24 or chow hall with extra attention, taking out trash or
25 for putting away heavy items. This is all work that

Page 133

1 should be recognized and appreciated. If we didn't have
2 the detainees doing the work, we would have so much more
3 to do ourselves. We have been granted extra permission
4 from Warden Janecka to treat our detainees to treats,
5 such as extra dessert, ice cream, peanut butter and
6 jelly sandwiches, breakfast tacos, money bread, et
7 cetera. When expectations are set higher for what is
8 needed for the detainees and we treat the detainees well
9 and with respectful voices, we will incur a higher
10 retention working rates."
11        MS. ARMSTRONG: I just want to let you know it
12 says granted permission from Warden Janecka and not
13 extra permission.
14        MS. WRIGHT: Thank you for that correction.
15    Q    Other than that, did I read that correctly?
16    A    Yes.
17    Q    Is there anything about this paragraph that is
18 incorrect to your knowledge?
19    A    Not to my knowledge.
20    Q    Does it violate the PBNDS to compensate
21 detainee workers with extra food or treats?
22        MS. ARMSTRONG: Objection. Calls for legal
23 conclusion.
24        THE WITNESS: I don't think it says compensate.
25 We let them have the leftovers. If there's extras, they

Page 134

1        MS. ARMSTRONG: Objection.
2 BY MS. WRIGHT:
3    Q    -- do you agree?
4        MS. ARMSTRONG: Objection. Lacks foundation.
5        THE WITNESS: The section highlighted states
6 the same fare. They do eat the same meals.
7 BY MS. WRIGHT:
8    Q    My question was, do you agree that it violates
9 this PBNDS standard to provide detainee workers with
10 extra treats like ice cream and monkey bread and
11 breakfast tacos, like we just saw in the monthly meeting
12 minutes?
13        MS. ARMSTRONG: Objection. Lacks foundation.
14        THE WITNESS: These standards state they shall
15 receive the same fare as other detainees. And they
16 still had the same meals as the other detainees as their
17 main meal.
18 BY MS. WRIGHT:
19    Q    Do all detainees get extra treats, like ice
20 cream and monkey bread?
21    A    We serve it occasionally, but as far as extra
22 treats, occasionally, we serve extra food in the dining
23 room for the population.
24    Q    Do you understand the monthly food service
25 department minutes that we just looked at Exhibit 29?

Page 136

1 eat it. If they want to have a little extra function
2 form among themselves and food service, they may have
3 had an extra function, like to cook some extra items. I
4 don't see it as compensation.
5 BY MS. WRIGHT:
6    Q    What do you mean when you say extra function?
7    A    They could just say thank you to the detainee
8 workers as a -- we're going to have this, leftovers,
9 extras, extra dessert, extra, a thank you.
10    Q    So you have granted GEO staff permission to
11 treat the detainee workers in the kitchen to treats such
12 as extra dessert, ice cream, et cetera?
13    A    In the past, yes, as a thank you for --
14    Q    If you return to Exhibit 2, the PBNDS. Go
15 ahead and flip to page 232. We're looking at Section
16 4.1, which is the food service section, at subsection
17 C-5. Do you see here highlighted, says, Meals For Food
18 Service Workers?
19    A    Yes.
20    Q    And it says, "Detainee workers shall receive
21 the same fare as other detainees"; is that correct?
22    A    Yes.
23    Q    So it's a violation of this PBNDS standard for
24 GEO staff to give food service detainees extra treats
25 and extra food --

Page 135

1    A    Uh-huh.
2    Q    Do mean that the kitchen worker detainees,
3 receive something additional or different from the
4 general population of detainees?
5        MS. ARMSTRONG: Objection. Vague.
6        THE WITNESS: They -- it states they have been
7 granted permission from me to treat our detainee workers
8 to treats such as extra dessert, ice cream, peanut
9 butter and jelly sandwiches, breakfast tacos, monkey
10 bread, et cetera. So they were given some extra treats
11 of those as a thank you for the work they do in our --
12 namely food service.
13 BY MS. WRIGHT:
14    Q    Was the general population of detainees given
15 those extra treats on that day?
16        MS. ARMSTRONG: Objection. Calls for
17 speculation.
18        THE WITNESS: I don't -- can't speak to that.
19 I don't know.
20 BY MS. WRIGHT:
21    Q    What does extra treats mean?
22    A    I don't know what she meant by extra treats.
23    Q    You testified that you approved this policy of
24 giving detainee workers in the kitchen extra treats?
25        MS. ARMSTRONG: Objection.

Page 137

35 (Pages 134 - 137)

1 BY MS. WRIGHT:
2    Q    What are extra treats?
3        MS. ARMSTRONG:  Mischaracterizes testimony
4 regarding policy.
5        THE WITNESS:  This isn't a policy.
6 BY MS. WRIGHT:
7    Q    What is it?
8    A    It's a meeting minutes from a food service
9 meeting that I wasn't involved in.
10    Q    You testified that you instructed GEO staff to
11 provide kitchen worker detainees with extra treats.
12        Do you remember that?
13        MS. ARMSTRONG:  Objection.  Misstates prior
14 testimony.
15        THE WITNESS:  Can you -- can someone repeat my
16 testimony?
17 BY MS. WRIGHT:
18    Q    No.
19    A    Okay.
20    Q    You don't recall testifying to that effect?
21    A    What I stated --
22        MS. ARMSTRONG:  Same objection.  Asked and
23 answered.  Argumentative.
24        THE WITNESS:  What I stated was that they were
25 given permission to have extras that are leftover.  And

Page 138

1 if they were given some extra treats, it was a thank you
2 for their work in the food service department.
3 BY MS. WRIGHT:
4    Q    Go ahead and turn to page 229 of the PBNDS,
5 Exhibit 2.  The portion that I've highlighted here,
6 enumerated No. 13, says, "Food shall never be used for
7 reward or punishment."
8        Do you agree that using food for a reward at
9 the Adelanto Detention Center violates this PBNDS
10 standard?
11        MS. ARMSTRONG:  Objection.  Calls for legal
12 conclusion.  Vague.  Lacks foundation.
13        THE WITNESS:  The standard states it shall
14 never be used as a reward or punishment, yes.  It does
15 state that.
16 BY MS. WRIGHT:
17    Q    You agree that it violates the this standard to
18 use food as a reward?
19        MS. ARMSTRONG:  Objection.  Calls for legal
20 conclusion.
21        THE WITNESS:  It could be considered that.
22 BY MS. WRIGHT:
23    Q    Do you consider it that?
24    A    They still receive their -- to my knowledge,
25 they still receive their compensation for the Voluntary

Page 139

1 Work Program.  And it could be construed as oversight of
2 that standard.
3    Q    I'm not sure I understand.  I don't follow.
4 Would you tell me what you mean?
5        MS. ARMSTRONG:  Objection.  Vague.
6        THE WITNESS:  It could be construed as a
7 violation of that standard.  If they were given extra
8 treats or if you want to say I used treats loosely,
9 treats means some of the items she described in her
10 meeting minutes.
11 BY MS. WRIGHT:
12    Q    How often are detainees working in the kitchen
13 given extra food or extra treats?
14    A    I can't speak to that.  I don't know.
15    Q    Is it a -- have you authorized GEO staff today
16 as we sit here today to reward kitchen worker detainees
17 with extra food or extra treats?
18        MS. ARMSTRONG:  Objection.  Vague.
19        THE WITNESS:  I don't recall the conversation
20 recently.  I mean, this is dated sometime in 2018.  I
21 don't recall the last time it's been mentioned.
22 BY MS. WRIGHT:
23    Q    So you don't know as you sit here today, you
24 have no personal knowledge about whether GEO kitchen
25 staff are giving detainees extra food or extra treats?

Page 140

1        MS. ARMSTRONG:  Objection.  Misstates prior
2 testimony.
3        THE WITNESS:  I have no personal knowledge of
4 how often they're giving them any extra food or any
5 other treats as she describes.
6 BY MS. WRIGHT:
7    Q    Turning back to Policy 8.1.8, Exhibit 22,
8 page 4.  We're still looking at the compensation section
9 which is J.  Now, this says that detainees shall be paid
10 daily.
11        Do you see that?
12    A    I do, yes.
13    Q    Is it GEO's policy to pay detainees who
14 participate in the Voluntary Work Program every day?
15        MS. ARMSTRONG:  Objection.  Vague.
16        THE WITNESS:  I don't know the specifics of
17 their -- when they receive their pay.  They're paid $1
18 per day for their days they work, but I don't know the
19 actual transaction of the funds.  If it's paid daily,
20 monthly.  I don't know the specifics of that.
21 BY MS. WRIGHT:
22    Q    So you understand that the policy here that
23 we're looking at, 8.1.8, says that detainees shall be
24 paid daily, but you have no personal knowledge of
25 whether detainees are actually paid daily at Adelanto;

Page 141

36 (Pages 138 - 141)

1 is that correct?
2     A    Correct.
3     Q    GEO pays the detainees by putting money in
4 their commissary accounts.  Is that how that works?
5     A    Correct.
6     Q    And then GEO submits an invoice to ICE for
7 reimbursement for those payments?
8     A    Correct.
9     Q    How does GEO -- what records does GEO maintain
10 to determine which detainees should get paid for which
11 days?
12    A    I don't know all the specific documents.
13 There's -- the work rosters that acknowledge a detainee
14 worked on that day.  And I'm not familiar with all the
15 specific steps that are -- that is involved with what's
16 maintained in the business office.
17    Q    Okay.  So there's a work roster.  Who maintains
18 the work roster?
19    A    I'm not -- I'm not familiar with the details as
20 to who maintains it.  It ultimately ends up in the
21 business office for the detainee payments.
22    Q    Do detainees control the work roster?
23    A    No.
24    Q    So GEO controls the work roster?
25    A    Yes.

Page 142

1     Q    And is the work roster a list of who's going to
2 work on any particular crew?  What is -- tell me more
3 about the work roster?
4         MS. ARMSTRONG:  Objection.  Vague.
5         THE WITNESS:  To my knowledge, it's a roster of
6 detainees that are eligible and approved to work in a
7 certain area.  And it has their names.  And it has a
8 series of dates as to a period of time when they
9 actually worked or did not work.
10 BY MS. WRIGHT:
11    Q    Do detainees sign the work roster after every
12 shift?
13    A    I'm not 100 percent sure.
14    Q    But the work rosters are an accurate list of
15 who worked on any given shift on any given day in the
16 Voluntary Work Program; is that right?
17        MS. ARMSTRONG:  Objection.  Calls for
18 speculation.
19        THE WITNESS:  It's to my knowledge a list of
20 detainees that are approved and eligible to work in --
21 at a certain job for that department or that area.
22 BY MS. WRIGHT:
23    Q    But the question is, how does GEO know who to
24 pay?  If the work roster is -- is just a list of people
25 who are eligible and could show up if they wanted to for

Page 143

1 a shift, that's not the same thing as a list of who
2 earned $1 a day.
3         Do you see the distinction?
4         MS. ARMSTRONG:  Objection.  Vague.
5         THE WITNESS:  I'm not familiar with the
6 processes that -- as to how it's filled out and how it
7 goes from point A to point B.  I understand your
8 question, but I'm not familiar with the specific
9 processes.
10 BY MS. WRIGHT:
11    Q    My question is, does GEO keep track of it's
12 payments to detainees under the Voluntary Work Program?
13    A    Yes.  There's a tracking mechanism.  I can't
14 speak to the specifics of it.  That ends up in the
15 business office for payment to the detainee population.
16    Q    Is the tracking mechanism a physical piece of
17 paper?
18    A    I don't know.  I don't know what it is.
19    Q    Is it a computer program?
20    A    I -- I don't want to misspeak.  I don't know.
21    Q    What is it called?
22    A    I've heard it referred to as the detainee
23 payroll sheets, detainee payroll sheets.
24    Q    But as you sit here today, you don't know what
25 form the detainee payroll sheets take, whether

Page 144

1 they're --
2     A    No.
3     Q    -- a physical piece of paper or a computer
4 program?
5     A    No, I don't.
6     Q    And as you sit here today, you have -- you
7 don't know whether detainees have to sign to confirm
8 that they've worked any specific day?
9     A    Not 100 percent, I don't know.
10    Q    Do you know to any percentage of certainty?
11    A    No.
12    Q    So all you know as warden of the facility is
13 that detainees work and detainees get paid through
14 commissary, but you don't know what happens in between;
15 is that correct?
16        MS. ARMSTRONG:  Objection.  Misstates prior
17 testimony.  Calls for speculation and lacks foundation.
18        THE WITNESS:  I don't know the specifics to the
19 processes that leads up to their payment from the
20 business office.
21 BY MS. WRIGHT:
22    Q    I'm not asking for specifics.  I'm asking for
23 generally what happens.  So can you tell me generally
24 how do detainees get paid?  What is that process?
25    A    The detainee works.  The hours and days that

Page 145

37 (Pages 142 - 145)

1 they work is recorded in some fashion or form and it's
2 forwarded to -- eventually to the business office for
3 payment.
4    Q    And who in the business office handles that
5 transaction?
6    A    To the best of my knowledge, Peggy Turner.
7    Q    What's her job title?
8    A    Her title is bookkeeper.
9    Q    So to the best of your knowledge, Peggy Turner
10 is the person who's responsible for ensuring that the
11 detainees actually are paid?
12    A    For processing the payroll or -- yes, that
13 ultimately pays them to the best of my knowledge, yes.
14    Q    Are you the person who's ultimately responsible
15 for ensuring that detainees are paid pursuant to this
16 policy?
17    A    The business -- ultimately, if there's an issue
18 with the payroll of any type for the detainee
19 population, I would get involved to look at the issue
20 and have it corrected, if there is an issue, if it rose
21 to my level, yes.
22    Q    When the facility is audited, do the auditors
23 check the detainee payroll sheets?
24    A    I don't know.
25    Q    Do you know if the auditors verify in any way

Page 146

1 whether the detainee workers are actually paid the $1 a
2 day that they've earned?
3        MS. ARMSTRONG:  Objection.  Vague as to
4 auditing -- auditors.
5        THE WITNESS:  I don't know.
6 BY MS. WRIGHT:
7    Q    So you have no personal knowledge whether
8 there's any outside oversight of the compensation system
9 of the Voluntary Work Program?
10        MS. ARMSTRONG:  Objection.  Vague.
11        THE WITNESS:  I'm not aware of the outer
12 process, if there is.
13 BY MS. WRIGHT:
14    Q    You're not aware of the audit process.  What do
15 you mean by that?
16    A    If there is an audit process or an audit of the
17 detainee payroll, I'm not familiar with it at all.
18    Q    Are you, as the warden, informed of the results
19 of audits of the Adelanto Facility?
20        MS. ARMSTRONG:  Objection.  Vague as to audits.
21        THE WITNESS:  If there's findings.
22 BY MS. WRIGHT:
23    Q    What do you mean if there's findings?
24    A    If there's a negative finding.
25    Q    Let's look at Section L on Exhibit 22.

Page 147

1 Voluntary Work Program Policy, Detainee Responsibility,
2 if you look at that portion that I've highlighted.
3 Says, "The detainee will exercise care in performing
4 assigned work using safety equipment and other
5 precautions in accordance with the work supervisor's
6 instructions."
7        Did I read that correctly?
8    A    Yes, ma'am.
9    Q    Now, the work supervisor is a GEO employee;
10 right?
11    A    Yes.
12    Q    And the work supervisor --
13        So a GEO employee provides the detainee worker
14 with instructions of how to complete the functions of
15 their job?
16    A    Yes.
17    Q    And the GEO work supervisor also provides
18 safety equipment to the detainees; is that right?
19    A    Yes.  If safety equipment is necessary, yes.
20    Q    And the GEO worker supervisor instructs the
21 detainees on the precautions that the detainee needs to
22 take in order to complete the assigned job; is that
23 right?
24    A    Yes.
25    Q    And it's correct that GEO assigns the work for

Page 148

1 the detainees in the Voluntary Work Program?
2        MS. ARMSTRONG:  Objection.  Vague.
3        THE WITNESS:  Yes, in accordance with PBNDS
4 standards.
5 BY MS. WRIGHT:
6    Q    Right.  But the detainees don't assign
7 themselves work?
8    A    No, ma'am.
9    Q    The GEO tells detainees where to go and what to
10 do once they get there?
11    A    If the detainee volunteers for work, signs up,
12 fills out one of the applications we discussed earlier,
13 they are considered -- if approved, they're ultimately
14 assigned to the job that they asked to work.
15    Q    And GEO provides all detainee workers with not
16 just the safety equipment that they need, but all
17 equipment that they need to fulfill their jobs; is that
18 right?
19    A    Yes.
20    Q    Do detainee workers have keys to the tool room
21 or the maintenance room where tools are kept?
22    A    No.
23    Q    Who has those keys?
24    A    Staff, GEO staff.
25    Q    So GEO staff controls detainee access to the

Page 149

38 (Pages 146 - 149)

1  tools, the equipment that they need?
2      A  Yes.
3      Q  Go ahead and flip to page 7 of Exhibit 22.
4  Subsection M of Policy 8.1.8 is Detainee Training and
5  Safety.  "Detainee working conditions shall comply with
6  all applicable federal state or local work safety laws
7  and regulations."
8          Did I read that correctly?
9      A  Yes.
10     Q  And then it gives some examples, including but
11  not limited to occupational safety and health
12  administration or OSHA regulations, national fire
13  protection association and it kind of goes on from
14  there; right?
15     A  Yes.
16     Q  So GEO is responsible for ensuring that the
17  detainee working conditions at Adelanto comply with
18  federal, state or local work safety laws and
19  regulations; is that correct?
20     A  Yes.
21     Q  And GEO controls the working conditions for
22  detainee workers at Adelanto?
23         MS. ARMSTRONG:  Objection.  Vague.
24         THE WITNESS:  Yes.
25  ///

Page 150

1  BY MS. WRIGHT:
2      Q  No. 2 in Subsection M says, "Upon the
3  detainee's assignment to a job or detail, the supervisor
4  shall provide thorough instructions regarding safe work
5  methods and, if relevant, hazardous materials."
6          Did I read that correctly?
7      A  Yes.
8      Q  You agree that GEO is -- a GEO supervisor
9  provides detainee workers with thorough instructions
10  regarding the safe work methods that need to be applied
11  at the facility?
12     A  There's safety training for detainees when they
13  take a voluntary job.
14     Q  Do all detainees receive safety training?
15     A  To the best of my knowledge, if they have a --
16  if they're approved for a job.
17     Q  Let's look at an example.  I'm going to hand
18  you Exhibit 30.
19         (Plaintiffs' Exhibit 30 was marked for
20  identification by the Certified Shorthand Reporter and
21  attached hereto.)
22  BY MS. WRIGHT:
23     Q  This is a packet on GEO letterhead.  It's
24  entitled the GEO Group, Inc. Initial/Hazardous
25  Communications Safety Training.

Page 151

1      Have you ever seen this document before?
2      A  Not that I'm aware of.
3      Q  Okay.  If you flip to the very last page of the
4  packet.  You see at the bottom it says updated,
5  September 19th, 2016.  You can look at the screen also?
6      A  I see it.
7      Q  Do you see it?  Do you see that?
8      A  Yes.
9      Q  Now, this is a -- this appears to be a sort of
10  new hire packet for a kitchen worker at the Adelanto
11  Facility.
12         Is that an accurate characterization of this
13  exhibit?
14     A  I'm not familiar with the document.  Initial
15  Hazardous Communication Safety Training is what the
16  document states.
17     Q  Okay.  Well let's go through it.  So on the
18  first page we see food service department safety
19  training certification.  This is certification that
20  training has been conducted in accordance with OSHA
21  hazard communications standard and then it lists the
22  statute.
23         Do you see that?
24     A  Yes.
25     Q  So are kitchen workers, kitchen -- you

Page 152

1  mentioned training earlier on hazardous materials.  Is
2  this an example of the training that a kitchen worker
3  would receive with respect to hazardous materials?
4          MS. ARMSTRONG:  Objection.  Calls for
5  speculation.
6          THE WITNESS:  I'm not familiar with the
7  document.  That's what the document says they would
8  receive.
9  BY MS. WRIGHT:
10     Q  Look at page -- the next page of this packet,
11  Bates stamped 117.  Do you see at the bottom of this
12  page, says revised March 20th of 2017.
13         Do you see that?
14     A  Yes.
15     Q  This is entitled Detainee Kitchen Worker
16  Orientation Checklist.
17         Have you ever seen this document?
18     A  No, not that I'm aware of.
19     Q  Do you have any understanding of what this
20  document is?
21     A  States Detainee Kitchen Worker Orientation
22  Checklist, is what the title of it is?
23     Q  So this appears to be a checklist that's used
24  in training a new kitchen worker; is that right?
25     A  The document states Detainee Kitchen Worker

Page 153

39 (Pages 150 - 153)

Page 154

1 Orientation Checklist.

2 Q   Do you agree that this appears to be a

3 checklist used in training a new kitchen worker?

4     MS. ARMSTRONG: Objection. Asked and answered.

5 He says he doesn't know.

6     THE WITNESS: I don't know if it's new --

7 existing. I don't know how often it's used in the food

8 service department.

9 BY MS. WRIGHT:

10 Q   Do you agree that this is a checklist for

11 training a food service, a kitchen worker at Adelanto?

12     MS. ARMSTRONG: Objection. Asked and answered.

13     THE WITNESS: It's an orientation checklist and

14 food service.

15 BY MS. WRIGHT:

16 Q   At Adelanto?

17 A   Yes.

18 Q   Turn to the next page, which is Bates 118.

19 What's the title of this page, sir?

20 A   Kitchen Worker Rules and Regulations.

21 Q   What is this document to the best of your

22 understanding?

23 A   It appears to be the rules and regulations for

24 a kitchen worker.

25 Q   The rules and regulations that -- that are set

Page 155

1 by GEO for a detainee kitchen worker; is that correct?

2     MS. ARMSTRONG: Objection. Calls for

3 speculation.

4     THE WITNESS: It's -- it's got a GEO Group

5 header on it. It sets forth kitchen worker rules and

6 regulations. I'm not familiar with the document.

7 BY MS. WRIGHT:

8 Q   Do detainees create their own rules and

9 regulations for their jobs?

10 A   No.

11 Q   GEO creates the rules and regulations for each

12 detainee job; right?

13 A   GEO does in accordance with the contract and

14 PBNDS, yes.

15 Q   Let's look at the next page, Bates stamp is

16 GEO-Novoa-119. Read the title of this page, please?

17 A   Sanitation Practices and Food Handling.

18 Q   And what is this document to the best of your

19 understanding?

20 A   It appears to be some bullets of safe

21 sanitation practices and food handling.

22 Q   So GEO instructs detainee workers in the

23 kitchen regarding safe sanitation practices. Is that

24 accurate?

25 A   I'm not familiar with the processes, but if

Page 156

1 this document is utilized, the detainees would receive

2 this information.

3 Q   Well, even if it's not utilized, I mean just

4 generally, GEO employees, the food service manager, this

5 food service supervisor will train detainees on

6 sanitation in the kitchen before they work in the

7 kitchen; is that right?

8 A   Yes.

9 Q   The next page Bates stamp is 120, what is the

10 title of this document?

11 A   Excuse me?

12 Q   What is the title of this document, please?

13 A   Hand Washing Procedures.

14 Q   And what is this to the best of your

15 understanding?

16 A   Basic instructions for washing their hands for

17 proper sanitation and cleanliness.

18 Q   So to the best of your knowledge, detainee

19 workers participating in the Voluntary Work Program in

20 the food service on a food service crew are instructed

21 by GEO about proper handwashing procedures; is that

22 correct?

23     MS. ARMSTRONG: Objection. Calls for

24 speculation.

25     THE WITNESS: To the best of my knowledge.

Page 157

1 BY MS. WRIGHT:

2 Q   Let's look at the next page, Bates Stamp 121,

3 titled Sanitation Rules. Does GEO instruct detainee

4 workers on a food service crew about appropriate

5 sanitary rules?

6 A   The -- GEO does instruct, yes.

7 Q   And GEO ensures that these rules and all the

8 rules are actually complied with by detainee workers;

9 right?

10     MS. ARMSTRONG: Objection. Vague.

11     THE WITNESS: This is the information that's

12 provided to the detainee population. I'm not in food

13 service on a daily basis.

14 BY MS. WRIGHT:

15 Q   Generally speaking, GEO creates these rules for

16 detainee workers; is that right?

17 A   Yes.

18 Q   And GEO expects that detainee workers follow

19 the rules; is that right?

20 A   Yes.

21 Q   And GEO supervises detainee workers to make

22 sure that they're following the rules; is that right?

23 A   Yes.

24 Q   And if detainee workers break a rule, the

25 worker can be penalized or punished in some way; is that

1 right?
2    A    Depends on the severity of the rule violation.
3    Q    So the detainee workers who break a rule, can
4 be punished, but there's a scale of the severity of the
5 punishment?  Is that what you're saying?
6    A    They can be.
7    Q    And a detainee who violates a rule -- excuse
8 me.  A detainee participating in the Voluntary Work
9 Program who violates one of GEO's rules with respect to
10 the job can be terminated from that position?
11    A    They can be.
12    Q    Let's look at the next page, Bates Stamp 122,
13 titled Equipment Safety.  Now, I think you already
14 testified that GEO provided detainee workers with all of
15 the equipment that they'll need for their given job
16 assignments; is that right?
17    A    Yes.
18    Q    That includes personal protective equipment?
19    A    Yes.
20    Q    Or PPE?
21    A    Yes.
22    Q    Is that what it's known as?
23    A    Yes.
24    Q    And that includes uniforms?
25    A    Yeah, well, are you speaking specifically to

Page 158

1 food service or are you speaking to different jobs?
2    Q    Well, let's take a holistic view.  Certain jobs
3 require detainee workers to wear uniforms; right?
4    A    Yes.
5    Q    Food service is one of those jobs?
6    A    Yes.
7    Q    What other jobs require detainees to wear
8 uniforms?
9    A    Different than their normal uniform?
10    Q    Right.  Yes.  Thank you.
11    A    To the best of my knowledge, only food service.
12    Q    Does GEO -- does GEO provide detainees working
13 in the kitchen through the Voluntary Work Program with
14 the uniforms that are required as part of their jobs in
15 the kitchen?
16    A    Yes.
17    Q    Turn to the next page, 74.  Bates stamp is
18 GEO-Novoa-123.
19        What is the title of this document, please?
20    A    Hazardous Chemical Training Acknowledgment.
21    Q    And what is this document to the best of your
22 understanding?
23    A    It's an overview of chemical training and
24 possible chemical hazards.
25    Q    And then at the bottom, there's a place for the

Page 159

1 trainer and the trainee, the detainee to sign?
2    A    Correct.
3    Q    So is it your understanding that all detainees
4 working in food service are provided with hazardous
5 chemical training by GEO?
6    A    To the best of my knowledge.
7    Q    Let's flip to page 76.  The Bates stamp is 125.
8 This document is entitled Equipment Training.
9        What is this document to the best of your
10 knowledge?
11    A    It appears to be an -- an initial training
12 checklist on some of the different equipment that's in
13 the food service department.
14    Q    So detainee workers are not only provided with
15 all the equipment that they need to fulfill their jobs,
16 but GEO also trains them on how to use that equipment;
17 is that right?
18        MS. ARMSTRONG:  Objection.  Calls for
19 speculation.  Vague.
20        THE WITNESS:  To the best of my knowledge.
21 BY MS. WRIGHT:
22    Q    Flip to the next page.  This is Bates
23 Stamped 126.  This is entitled Kitchen Worker Skills
24 Checklist.
25        What is this document to the best of your

Page 160

1 knowledge?
2    A    It appears to be a checklist for the proper
3 sanitation and cleaning methods for some of the areas in
4 food service.
5    Q    These, again, GEO instructs and trains the
6 detainees on the proper sanitation and cleaning methods
7 that the detainees should use to fulfill their jobs in
8 the work program; is that right?
9    A    To the best of my knowledge, yes.
10    Q    And then GEO expects the detainees to actually
11 use those methods in accomplishing their jobs; is that
12 right?
13    A    Yes.
14    Q    Go to Bates Stamp 127, the next document in
15 this packet.  Now, this is titled Offender Kitchen
16 Worker Orientation Checklist.  Is it your understanding
17 that this document is used at Adelanto Detention Center?
18    A    Again, I'm not familiar with this document.
19 This is the first time that I've seen it.
20    Q    Do you know whether there's an orientation
21 checklist that GEO supervisors use when they train
22 detainees in any department or any work crew?
23    A    There is a training process, that's conducted,
24 but I'm not sure the specific documents that are used.
25    Q    And to be clear, there's a training process of

Page 161

41 (Pages 158 - 161)

Job No. 3431598

1 detainee workers that is conducted by GEO supervisors;
2 is that right?
3    A    Correct.
4    Q    The detainees don't train themselves and they
5 don't train each other; right?
6    A    Correct.
7    Q    Okay.  Next page, GEO-Novoa 128 is the Bates
8 stamp.  If you look at the bottom, it says updated
9 9/19/2016.
10       Do you see that?
11    A    Yes.
12    Q    And at the top it says, Adelanto Detention
13 Facility West Detainee Job Description.  And the job
14 title is dishwasher/pots and pans.
15       Do you see that?
16    A    Yes.
17    Q    What is this document to the best of your
18 knowledge?
19    A    It appears to be the job description for
20 detainee dishwasher/pots and pans.
21    Q    Is there a detainee job description that GEO
22 creates for every Voluntary Work Program position?
23    A    To the best of my knowledge, yes.
24    Q    What's the purpose of this document?
25       MS. ARMSTRONG:  Objection.  Calls for

Page 162

1 bottom; right?
2    A    Yes.
3    Q    So it also informs the detainee of what
4 specific actions or misconduct will result in the
5 detainee being terminated from the job; correct?
6    A    If -- yes.  If a detainee fails to follow these
7 basic instructions, yes.
8    Q    So, for example, unsatisfactory work
9 performance is on this list.  If a GEO supervisor
10 concludes that the detainee's work on the job is
11 unsatisfactory, then GEO can terminate the detainee from
12 the work program?
13    A    Yes.
14    Q    And for the sake of completeness, let's look at
15 the very last page in this packet.  This is a detainee
16 job description for a cook, prep, server position.
17       Do you -- to the best of your knowledge is this
18 an accurate and updated job description for the detainee
19 cook, prep, server position?
20    A    I'm not sure if it's the most recent.  The date
21 on here is September 19th of '16.  I'm not sure if it's
22 the most recent.
23    Q    Who at GEO is in charge of creating these
24 detainee job descriptions?
25    A    Not 100 percent sure.

Page 164

1 speculation.
2       THE WITNESS:  To give some basic work duties
3 that the job will entail and some of the training
4 requirements.
5 BY MS. WRIGHT:
6    Q    Does the detainee worker receive this job
7 description?
8    A    To the best of my knowledge, yes.
9    Q    So this lays out -- well, specific work duties,
10 so what the detainee will be expected to do on the job;
11 right?
12    A    Yes.
13    Q    And it lays out special requirements that the
14 detainee needs to fulfill in order to be eligible to be
15 hired for the job; right?
16    A    Yes.
17    Q    Lays out specific training requirements, so
18 specific training programs that the detainee will have
19 to undergo in order to be qualified to work the specific
20 job; is that right?
21    A    Yes.
22    Q    These trainings are -- I think you already said
23 provided by GEO?
24    A    Yes.
25    Q    And then there's a termination policy at the

Page 163

1    Q    What's your best guess?
2    A    It would be food service personnel.  Maybe the
3 food service manager for her department.
4    Q    So the supervisor of each specific department
5 is responsible for creating a detainee job description
6 for the detainee jobs within that department?
7    A    They have input.  I'm not sure as to who
8 actually develops them, but there is input.
9    Q    Would it be the classification office?
10    A    I'm not sure.
11    Q    So let's go back to Exhibit 22, Policy 8.1.8.
12 Flip to page 6, please.  At the very bottom, Subsection
13 Q.  It says Work Detail Job Descriptions.  "The office
14 records manager will maintain written work detail job
15 descriptions."
16       Do you see that?
17    A    Yes.
18    Q    Do you think the work -- the office records
19 manager is responsible for creating work detail job
20 descriptions?
21    A    I'm not sure.
22    Q    But you agree that the office records manager
23 is responsible for maintaining written work detail job
24 descriptions?
25    A    That's what the policy states.  I'm not 100

Page 165

42 (Pages 162 - 165)

1 percent sure.

2   Q   So if the office records manager did not
3 maintain written work detail job descriptions, that
4 would be a violation of this policy.

5     Do you agree?

6   A   It would not be consistent with the policy, but
7 I'm not sure where they're maintained.

8   Q   So it would be a violation of the policy, you
9 agree?

10   A   It wouldn't be consistent with the policy, yes.

11   Q   I'm not asking if it would be consistent. I'm
12 asking if the office records manager failed to maintain
13 written work detailed job descriptions, if the office
14 records manager would be violating Policy 8.1.8?

15     MS. ARMSTRONG: Objection. Vague as to
16 violate. Vague as to office records manager. Asked and
17 answered.

18     THE WITNESS: I don't know if it would be
19 considered as a violation. It would just not be
20 consistent with the policy.

21 BY MS. WRIGHT:

22   Q   As the warden of the detention center, your
23 testimony is that you don't know whether it would
24 violate the policy that's written right here if the
25 office records manager did the opposite of what is

                  Page 166

1 written in the policy?

2     MS. ARMSTRONG: Objection --

3 BY MS. WRIGHT:

4   Q   That's your testimony?

5     MS. ARMSTRONG: -- vague. Compound. Misstates
6 prior testimony. Asked and answered.

7     THE WITNESS: My testimony was that it is not
8 consistent with the way the policy is written, if that
9 person or that position did not maintain that policy.

10 BY MS. WRIGHT:

11   Q   Now, GEO can create a new Voluntary Work
12 Program position when it becomes necessary; right?

13     MS. ARMSTRONG: Object. Vague.

14     THE WITNESS: It would -- it would have to be
15 with the approval of ICE, if it's outside the scope of
16 PBNDS, what PBNDS outlines as jobs that detainees may
17 have as voluntary jobs.

18 BY MS. WRIGHT:

19   Q   Have you ever requested an approval from ICE to
20 create a new detainee work program job?

21   A   I had discussions when I first got to the
22 facility about the possibility of having outside grounds
23 crew. And ICE did not authorize it.

24   Q   Why did you -- why did you want to have an
25 outside grounds crew of detainee workers?

                  Page 167

1   A   I was looking at the -- at doing some
2 beautification projects, as far as like, I use the term,
3 say, flower beds, or having some beautification
4 projects. And ICE at the facility told me they would
5 not allow it.

6   Q   Who did you ask at ICE?

7   A   I had the conversation with the AFOD,
8 Mr. Valdez.

9   Q   Is this part of the same conversation where you
10 discussed the compensation rate of the detainee work
11 program with Mr. Valdez?

12   A   I don't recall if it was the exact same
13 conversation, but it was right around the same time.

14   Q   So right around September of 2014?

15   A   I'm not going say that early. It would have
16 been in the fall of 2014, somewhere in the latter part
17 of 2014?

18   Q   Mr. Valdez's job title at the time was AFOD?

19   A   Assistant field office director.

20   Q   What is your understanding of the job
21 responsibilities of the assistant field office director?

22   A   The assistant field office director is the
23 highest ranking ICE official at that time on grounds
24 that had oversight and responsibility over the daily
25 operations of the facility.

                  Page 168

1   Q   So is it your understanding that at the time
2 Mr. Valdez had the authority to create a new Voluntary
3 Work Program job?

4   A   I don't know if he had the authority personally
5 or if he would have to get approval from above him. I
6 don't know exactly ICE's processes to approve that.

7   Q   At the time, who was directly above Mr. Valdez
8 in the chain of command?

9   A   I don't remember who the -- the position is
10 called a DFOD. I don't recall who the DFOD was then.

11   Q   But the DFOD is not -- does not maintain an
12 office at Adelanto?

13   A   No.

14   Q   Where is that office located?

15   A   The L.A. field office -- L.A. I'm sorry.

16   Q   Did you -- when Mr. Valdez denied your request
17 to create an outside grounds crew position in the
18 Voluntary Work Program, did you ask anybody else at ICE
19 to create that position?

20   A   Not that I recall.

21   Q   Did you ask anybody at GEO about creating that
22 position?

23   A   Not that I recall.

24   Q   So Mr. Valdez denied your request to create an
25 outside grounds crew or a landscaping crew, it sounds

                  Page 169

43 (Pages 166 - 169)

1 like what you're describing; is that accurate?
2    A    Similar, yes.
3    Q    Did you end up doing the landscaping?
4    A    We contracted with a private landscape crew to
5 come out.  And they come out routinely to do our grounds
6 and some landscaping as needed.
7    Q    Hand you Exhibit 31.
8         (Plaintiffs' Exhibit 31 was marked for
9 identification by the Certified Shorthand Reporter and
10 attached hereto.)
11 BY MS. WRIGHT:
12    Q    Actually, before we move on to this, did
13 Mr. Valdez give you a reason for his denial of the --
14 your request to create an outside grounds crew?
15    A    To the best of my memory, he wasn't comfortable
16 with having detainees outside of the secure facility.  I
17 don't remember the specifics of the conversation.
18    Q    And my understanding, as we've discussed
19 earlier, is that to date detainees are not allowed
20 outside of the secured perimeter?
21    A    That's correct.
22    Q    Is that the right lingo?
23    A    That's correct.
24    Q    Thinking back to your conversation with
25 Mr. Valdez about increasing compensation for detainees

Page 170

1 in the work program, what was the reason that Mr. Valdez
2 gave for declining your request to increase
3 compensation?
4    A    If I recall, he said something to the effect of
5 he did not want to set a precedence for paying more.  He
6 felt that it could have a negative impact or
7 repercussion on other detention facilities if a detainee
8 that was in Adelanto was receiving a higher
9 compensation.  And if they were ever in another
10 detention facility, that it could cause -- maybe cause a
11 disruption for that facility.  And he didn't think it
12 was a good idea.  I don't remember his exact words, but
13 in a gist.
14    Q    So when you say that he thought it might set a
15 bad precedence, what exactly do you mean by that?
16    A    Well, the -- to my understanding, that his --
17 his understanding of PBNDS and our contract speaks to $1
18 a day.  And that was his position.  And I don't want to
19 make an assumption for him, but the conversation lead me
20 to believe that his previous experience with detainee
21 pay has always been the $1 a day for a day's work.  And
22 I respect his position and his authority.  And that's
23 the conversation we had.  We left it at that.
24    Q    And do you know if Mr. Valdez at the time had
25 the authority to authorize an increase in compensation?

Page 171

1    A    Again, I don't know the ICE processes, if he
2 would have to get that approval above him or -- I didn't
3 ask.
4    Q    Did he provide the answer to you on the spot
5 during your conversation or did he take some time to
6 think about it and come back to you with an answer?
7    A    To the best of my recollection, it was a
8 conversation we had.  In the conversation, he gave me
9 the -- his response during the conversation, at that
10 time, was no, we're not going to pay more.  I don't
11 recall him coming back to me at a later date or
12 anything.
13    Q    Okay.  Now, we're ready for Exhibit 31.  This
14 is an e-mail.  And we're going to review the e-mail from
15 the back, because that's the newest one, but before we
16 do that, I'll just show you at the very top, the most
17 recent e-mail in this chain is from Kyle Fouts.  It was
18 sent on May 29th, 2015 to you.  The subject line is
19 Forward Regarding New Worker Positions.  And there are a
20 couple of attachments here containing Detainee Work
21 Detail Application and Warehouse Worker.
22         Is that all right?
23    A    (No audible response.)
24    Q    Who is Kyle Fouts?
25    A    He was deputy warden at that time.

Page 172

1    Q    And that's the person directly under you as the
2 warden?
3    A    Correct.
4    Q    Is there only one deputy warden?
5    A    Yes.
6    Q    Who is the current deputy warden?
7    A    Frank Carroll.
8    Q    Right.  Okay.
9         And, actually, this -- the e-mail at the bottom
10 of this page, is the first e-mail in this chain?
11         MS. ARMSTRONG:  Page 2262?
12         MS. WRIGHT:  That's correct.
13    Q    Do you recall receiving this e-mail?
14    A    I don't recall receiving it.
15    Q    But you do agree that it was sent to your
16 e-mail address?
17    A    Yes.
18    Q    Okay.  If you look at the bottom of this first
19 page, 2262, it looks like Mr. Fouts wrote to Angelica.
20 And I believe that would be Angelica Hernandez on May
21 28th, 2015.
22         Do you see that?  You can look on the screen
23 too, if that's easier.
24    A    Yes.
25    Q    Who is Angelica Hernandez?

Page 173

44 (Pages 170 - 173)

1    A    She was a former employee of GEO. I'm not sure
2   what her position was.
3    Q    When did she leave GEO?
4    A    I don't know.
5    Q    Was she fired from GEO?
6    A    No. No.
7    Q    Did she leave GEO recently?
8    A    I -- it's been a couple of years maybe.
9    Q    If you turn to page 2263, you've got
10   Ms. Hernandez's signature block. It says classification
11   officer.
12        Does that jog your memory?
13   A    Okay. Yes.
14   Q    She was probably the classification officer?
15   A    She was probably one of the classification
16   officers.
17   Q    One of five; right?
18   A    Yes.
19   Q    So Mr. Fouts says to Ms. Hernandez, "Please
20   create two positions for the west warehouse manager to
21   use in addressing his daily duties. These two will be
22   screened under the same criteria as the detainees we use
23   in the laundry."
24        Do you see that?
25   A    Yes.

Page 174

1   have been. I don't recall. After the construction in
2   July of 2015, our warehouse was moved outside the secure
3   perimeter. We no longer have detainee workers in the
4   warehouse.
5    Q    Okay. And that was in 2015 that the warehouse
6   was moved outside the secured perimeter?
7    A    The extension -- when the expansion occurred
8   and was completed in July of 2015, the warehouse --
9   there was a warehouse built outside of the secured
10   perimeter that's staffed with two GEO employees. No
11   detainee workers.
12   Q    Do you have any reason to believe -- this
13   e-mail is dated May 28th, 2015. So is it possible that
14   GEO created two warehouse worker positions to help the
15   west warehouse manager in addressing his daily duties
16   for the months between the date of this e-mail and when
17   the expansion was completed and the warehouse was moved
18   outside the secured perimeter?
19        MS. ARMSTRONG: Objection. Vague.
20        THE WITNESS: I don't recall.
21   BY MS. WRIGHT:
22   Q    If --
23   A    May be possible, but I don't remember or
24   recall.
25   Q    Do you have any reason to believe that it

Page 176

1    Q    So in May of 2015, GEO created two new
2   warehouse worker positions for west; is that right?
3        MS. ARMSTRONG: Objection. Assumes facts not
4   in evidence.
5        THE WITNESS: The document says here's the job
6   description and the work detail for the application. I
7   don't recall if we actually created the positions. I
8   don't recall.
9   BY MS. WRIGHT:
10   Q    But you recall -- do you recall seeing or
11   receiving a request to create a warehouse worker
12   position?
13   A    I don't recall.
14   Q    Do you recall having any discussion with
15   anybody about creating a warehouse worker position?
16   A    I don't recall.
17   Q    Is there currently a warehouse worker
18   position --
19   A    No.
20   Q    -- in the work program?
21        Has there ever been a warehouse worker position
22   in the worker program?
23   A    Prior to July 2015 our warehouse was inside the
24   main building at west, I don't recall if we had detainee
25   workers in -- working in that department. There may

Page 175

1   didn't happen?
2    A    No.
3    Q    If you look up the chain of e-mails,
4   Ms. Hernandez responds, "Copy that." And then she again
5   e-mails Eric Fouts on May 29th, 2015. And she says,
6   "Here's the warehouse work description and an updated
7   work detail application. As soon as I get approved
8   workers I will hire them immediately."
9        Is that correct?
10   A    Yes.
11   Q    So is the best of your knowledge, is a
12   classification officer in charge of creating job work
13   descriptions?
14        MS. ARMSTRONG: Objection. Asked and answered.
15        THE WITNESS: They may play a role, but
16   specifically, I don't know if they're the people that
17   actually create the job description.
18   BY MS. WRIGHT:
19   Q    Okay. Turn to the next page. This is Bates
20   2264. Really quickly, we have here a warehouse worker
21   job description that was attached to the e-mail that you
22   received from Kyle Fouts.
23        Is that an accurate description of this
24   document?
25   A    It's titled warehouse worker. Gives a

Page 177

45 (Pages 174 - 177)

**Page 178**

1 description of the duties or responsibilities, safety,
2 sanitation and job controls.
3     Q   And on the last page, Bates 2265, we see a
4 Detainee Work Detail Application.  And you can see that
5 the warehouse position has been added.
6        Do you see that?
7     A   Yes.
8     Q   But we know that there's a more updated work
9 detail application; right?  That's what we've been
10 talking about, Exhibit 26?
11        MS. ARMSTRONG:  Objection.  Vague.
12        THE WITNESS:  I don't recall the dates on the
13 other documents you showed me.
14 BY MS. WRIGHT:
15     Q   That's fine.  Let's look at Exhibit 32.
16        (Plaintiffs' Exhibit 32 was marked for
17 identification by the Certified Shorthand Reporter and
18 attached hereto.)
19 BY MS. WRIGHT:
20     Q   Okay.  This is an e-mail chain.  So we will
21 start with the last e-mail in the chain, which is on the
22 page labeled Bates GEO-Novoa-128.  Okay.  Again, you can
23 look up at the screen, if that helps.
24        So this is an e-mail from Todd Larson.  It was
25 sent on Friday, March 23rd, 2018.  And it was sent to

**Page 179**

1 you among other people.
2        Do you see that?
3     A   Yes.
4     Q   And the subject is Clean Team.  Is that correct
5 so far?
6     A   Yes.
7     Q   Who is Todd Larson?
8     A   He -- I don't know him personally.  It's my --
9 I think he works in our -- either in one of our regional
10 offices or worked -- I'm not sure what his position is.
11 He was in the food service either -- I think in the --
12 in corporate office.
13     Q   So he's GEO corporate?
14     A   Yes.  He was -- he was, I don't know the
15 gentleman personally.
16     Q   But he doesn't still work at GEO to the best of
17 your knowledge?
18     A   I don't know.
19     Q   Okay.
20     A   I don't know.
21     Q   Have you received any correspondence with him
22 after March 23rd, 2018 to your knowledge?
23     A   Not that I can remember.
24     Q   Okay.  In this e-mail Mr. Larson says, "As you
25 all know, we need a clean team in place in each of your

**Page 180**

1 facilities.  This is a requirement.  It will be
2 discussed in Mr. Donahue's conference call on April
3 4th."
4        So this is -- when he says, "This is a
5 requirement," do you understand him to mean this is a
6 GEO requirement?
7     A   It was instructions that came out of the
8 corporate office, yes.
9     Q   And who is Mr. Donahue?
10     A   Mr. Donahue is senior vice present and
11 president of the company.
12     Q   What are his responsibilities to the best of
13 your knowledge?
14     A   I -- I don't know what his responsibilities
15 are.  He -- he's responsible for a lot of things, but
16 specifically I don't know what -- what his
17 responsibilities are.
18     Q   Does he ever visit the Adelanto Facility?
19     A   Periodically.
20     Q   Does he conduct tours, walk throughs of the
21 Adelanto Facility?
22     A   He has periodically.
23     Q   Does he check in on how things are going at the
24 facility?
25        MS. ARMSTRONG:  Objection.  Vague.

**Page 181**

1        THE WITNESS:  Yeah, I mean, he looks at --
2 walks through the entire facility.  And what he's
3 exactly looking at, I don't know.  I mean he looks at
4 the sanitation.  He looks at the operation, the overall
5 facility.
6 BY MS. WRIGHT:
7     Q   Okay.  So here Mr. Larson -- Mr. Larson is
8 telling a host of people, including you, to create a
9 clean team.  He says, "This clean team is above and
10 beyond your daily and monthly cleaning schedule.  You
11 may only have one or two shifts instead of four, but put
12 the roster of inmates/detainees on the schedule."
13        So do you understand this to mean that
14 Mr. Larson is telling you to create a clean team and
15 staff it with detainee workers?
16     A   Yes.
17     Q   Do you understand that Mr. Larson is telling
18 you that create a daily and monthly cleaning schedule
19 for the clean team?
20     A   I don't see where he uses -- oh, this schedule
21 is generic form.  He gave us a -- apparently a generic
22 guide, a generic schedule as to what he was instructed
23 as far as areas of the facilities be cleaned.
24     Q   Then he says, "This is not a weekly or monthly
25 list.  You already have" -- excuse me.  "This is not the

46 (Pages 178 - 181)

1  weekly or monthly list you already have.  It's a daily
2  schedule you will adjust for your facilities schedule."
3      Do you see that?
4   A  Yes.
5   Q  Do you agree that he's instructing you to
6  create a daily clean team schedule?
7   A  That's his instructions, yes.
8   Q  And but it's something separate from your
9  facility schedule?
10  A  It tells us to adjust for your facility
11  schedule.
12  Q  So there's a facility schedule ███████
██████████████████████████████████
████████████████████  And then he's
15  telling you to create the clean team and create a
16  schedule for the clean team that fits within the
17  facility schedule; is that right?
18  A  We will -- the way I understood his direction
19  is that we are to adjust our daily schedule to --
20  Q  To make room for the clean team?
21  A  Correct, to add the duties.
22  Q  What is a clean team?
23  A  It's -- it's a cleaning crew that goes to a
24  certain area and deep cleans that area.
25  Q  When -- when you say cleaning crew, it's a

Page 182

1  cleaning crew of detainee workers; is that right?
2   A  If we have detainees that volunteer to work on
3  that crew or if the detainees don't volunteer or if they
4  don't show up for work, then GEO staff do the cleaning.
5   Q  So the clean teams best case scenario is it's
6  staffed by detainee workers.  Worst case scenario is
7  it's staffed by GEO employees?
8   A  I don't call worst or best.  It's a matter of
9  if detainees sign up for it and go to work, then they'll
10  do the cleaning under the direction of staff.  If
11  detainees don't go to work or don't sign up and
12  volunteer, then the staff do the cleaning.
13  Q  Go ahead and flip to the first page of this
14  e-mail chain.  This is Bates GEO-Novoa 1216.
15      Now, it looks like this e-mail is kind of
16  forwarded around internally.  On Tuesday, March 27,
17  2018, Patricia Love sent an e-mail to you and cc'd some
18  other people.  And the subject is Regarding Forward,
19  Clean Team.
20      Do you see that?
21  A  Yes.
22  Q  Who is Patricia Love?
23  A  She was formerly an assistant warden.
24  Q  What is she now?
25  A  She left the company approximately year and a

Page 183

1  half ago maybe.
2   Q  Was she fired?
3   A  No.
4   Q  Do you know why she left?
5   A  She went to work for the state of Washington.
6   Q  At the Tacoma Center?
7   A  No.
8   Q  Do you know what she does for the state of
9  Washington?
10  A  I don't know her exact title.
11  Q  Who took her place at GEO at the Adelanto
12  Facility?
13  A  Joshua Johnson.
14  Q  And is he still employed there now as assistant
15  warden?
16  A  Yes.
17  Q  Okay.  So Ms. Love says in her e-mail to you,
18  "Michelle and Dionne did a great job of going the extra
19  mile to formulate a document inclusive of daily, weekly,
20  and monthly cleaning crew work schedule.  We will
21  utilize four crews of three detainees from 0700 to 1200
22  hours and 1500 to 1730 hours at west and four crews of
23  two detainees from 0700 to 1200 hours and 1400 to 1800
24  hours at east on a daily basis.  We have requested the
25  new jobs through Classification/Work Crew Assignments."

Page 184

1      Is that all correct?
2   A  That's what she wrote, yes.
3   Q  Do you have any reason to believe that what she
4  wrote is incorrect?
5   A  No.
6   Q  On or around March 27th of 2018, GEO added 24
7  clean team detainee work positions in west and 16 clean
8  team positions in east; is that right?
9   A  Appears, if I'm reading her e-mail correctly,
10  we're trying to formulate four crews of three detainees
11  at west, which is 12.  And four crews of two detainees
12  at east, which is eight.  So a total of 20 positions.
13  Q  But at both east and west, there are two
14  shifts; right?  And, for instance -- well, correct?  Am
15  I correct?  There's two shifts of the clean team at east
16  and two shifts at the clean team at west?
17  A  Yes.
18  Q  And if we look at east, the first shift is five
19  hours long.  The second shift is four hours long.  And
20  so one detainee cannot work both shifts, right, because
21  that would exceed the four-hour maximum that we've
22  already discussed?
23  A  Correct.
24  Q  And same thing -- is it the same thing at west?
25  The hours at west are a little bit different; right?

Page 185

47 (Pages 182 - 185)

1 They're a little bit less.

2    A   They're different.

3    Q   So, therefore, pursuant to Ms. Love's e-mail,
4 GEO created 24 positions at west and 16 positions at
5 east for the clean team for a total of 40 positions for
6 the clean team; right?

7        MS. ARMSTRONG: Objection. Calls for
8 speculation.

9        THE WITNESS: We created the four crews of
10 three at west. It was her direction. And the four
11 crews of two at east for the two different shifts at
12 both buildings, yes.

13 BY MS. WRIGHT:

14    Q   Is the clean team part of the Voluntary Work
15 Program?

16    A   I don't recall if it is currently. It was at
17 that time.

18    Q   Does it still exist?

19    A   I don't recall if our actual positions, if we
20 title it clean team, at this time. I don't know.

21    Q   Who would know?

22    A   One of our classification staff.

23    Q   Were detainees who worked on the clean team
24 compensated for their labor?

25    A   If they showed up to work, yes.

Page 186

1        THE WITNESS: It's -- we operate and manage the
2 facility.

3 BY MS. WRIGHT:

4    Q   And the detainees work inside the facility?

5    A   Yes.

6    Q   So GEO operates and manages the spaces in which
7 detainees work?

8    A   Yes.

9    Q   So GEO controls the spaces in which detainees
10 work?

11    A   When you say "controls," can you be a little
12 more -- when you say "control," control is a broad -- in
13 my view pretty broad.

14    Q   What do you think control means?

15    A   We operate and we manage it. We have the keys
16 to it. It allows access in and out, so we control who's
17 in and who's not in the area.

18    Q   GEO's in charge at the Adelanto Facility?

19    A   Yes.

20    Q   Okay. Let's return to Exhibit 26, which is the
21 detainee work detail application. It's part of an
22 e-mail.

23    A   I got them out of order.

24    Q   Again, you can look up here too.

25        Now, on the program application we discussed

Page 188

1    Q   So you agree that GEO sets detainee worker
2 shifts; right?

3    A   We have the basic hours, yes, for the period of
4 time they're going to work, yes.

5    Q   And that GEO controls detainee worker hours?

6        MS. ARMSTRONG: Objection. Vague.

7        THE WITNESS: To the point that a detainee
8 shows up on time or stays for their entire time that
9 they're going to work that day.

10 BY MS. WRIGHT:

11    Q   But GEO controls that detainees can't work
12 longer than eight hours a day?

13    A   Yes.

14    Q   And you agree that GEO supervises detainees for
15 the duration of their shift?

16    A   Can you say that again? I'm sorry.

17    Q   You agree that GEO supervises detainee workers
18 for the duration of their shift?

19    A   Yes.

20    Q   And you agree that GEO controls detainee -- the
21 spaces in which detainees work?

22    A   Yes.

23    Q   So GEO controls detainee worker conditions; is
24 that right?

25        MS. ARMSTRONG: Objection. Vague.

Page 187

1 earlier, which is Exhibit 26, it says at the top there
2 are 40 paid positions in the Work Member Detail Program.
3 Do you see that? You can look up here if you'd like.

4    A   What the document states, yes.

5    Q   What does that mean that there are 40 paid
6 positions in the Work Member Detail Program?

7    A   Not exactly sure of the meaning, if it's by
8 individual job or if it's -- I would -- I'm not exactly
9 sure. I'm not familiar with this document,
10 specifically. I didn't create the documents.

11    Q   So as you sit here today, you don't know
12 whether 40 paid positions means 40 positions total
13 across all of the different crews or whether it means 40
14 positions for each individual crew?

15    A   I don't know specifically, no. I -- 40 would
16 be low for all of those positions.

17    Q   What do you mean?

18    A   It's a lot of different positions.

19    Q   So you need more than 40 detainees to work to
20 fill all of these positions on any given day?

21    A   I don't know if the word need is correct, but
22 we typically open it up, to my knowledge, for all of
23 those different areas for more than 40 positions or
24 opportunities.

25    Q   So even though it says there are 40 paid

Page 189

48 (Pages 186 - 189)

1 positions in the Work Member Detail Program on the
2 ground, there are more than 40 paid jobs available to
3 detainees?
4    A    Throughout the entire buildings, yes.
5    Q    On any given day, how many detainees do you
6 think work in the work program at Adelanto?
7    A    I don't know the specific number.
8    Q    Ballpark?
9    A    Estimate, maybe 2- to 300 that have been
10 approved for the Voluntary Work Program.
11    Q    200 to 300 have been approved?
12    A    That may have been approved for the Voluntary
13 Work Program.
14    Q    And do you expect that those detainees who have
15 been approved for the work program actually do work in
16 the work program?
17    A    I can't expect it.  It's strictly up to them if
18 they're going to work each day.  I don't know how many
19 of them -- what the percentage is that actually work on
20 a given day.
21    Q    Who would have that information?
22    A    It may be in our classification staff have that
23 information.
24    Q    But on any given day 2- to 300 workers could
25 work in the work program?

Page 190

1    A    I don't know the specific number.  I'm giving
2 you an estimate of -- I would estimate that 2- to 300
3 have been approved as -- in the Voluntary Work Program.
4    Q    Which means that they're eligible to show up
5 for a shift; is that correct?
6    A    Correct.
7    Q    And GEO decides ultimately how many detainees
8 to hire for a work program job; right?
9    A    Yes.
10    Q    That's not in the PBNDS to your knowledge?
11    A    To my knowledge, no.
12    Q    How do you decide how many detainee workers to
13 hire for any given work crew?
14    A    I don't really decide.  We get feedback from
15 different areas of the building, whether it's food
16 service, whether it's laundry as to how many positions
17 they could make available to the population.
18    Q    How often do you -- do you solicit that
19 feedback from GEO supervisors in each department?
20    A    Periodically, nothing periodically, yes.
21    Q    And do you know how the GEO supervisors in each
22 department determine how many detainee workers they'll
23 need for their department?
24    A    Not specifically.
25    Q    Generally?

Page 191

1    A    Well, you look at the opportunities that we can
2 make available to the population.  If you take food
3 service department at west, there's different jobs they
4 can create for the population.  So -- and just total up
5 the different areas that a detainee would work in.
6    Q    So, okay, you say food service as an example.
7 There's -- in food service there's dishwashers, for
8 example.  How many dishwashers are needed to -- to run
9 the two kitchens in -- the kitchen in east and the
10 kitchen in west for a shift?
11    A    To my knowledge, we have -- we have five
12 dishwashers between the two buildings, if I'm correct.
13    Q    And is that five positions that are available
14 or just five detainees who regularly show up to do
15 dishwashing?
16    A    It would be five positions that could be
17 available to the population.
18    Q    Okay.  How many cooks, detainee cooks, do you
19 have in the kitchens?
20    A    I don't know.
21    Q    Ballpark?
22    A    I -- I don't know.  I would -- if I give you a
23 ballpark number, I would be -- I don't know.  It would
24 be maybe 12, 15.
25    Q    In each kitchen?

Page 192

1    A    Between the two.
2    Q    So 12 or 15 detainee cooks in east and west
3 combined?
4    A    That would be a total guess, an estimate.  I
5 don't know the specific number.
6    Q    Do you know how many detainees are hired to do
7 cleaning or sanitation work outside of the housing
8 units?
9    A    I don't know the number.
10    Q    Which job is the most popular?
11    A    I can't really speak to that.  I mean largest
12 work crew would be the food service or the -- would
13 probably be one of the -- or dorm porter.
14    Q    What do you base that knowledge on?
15    A    The high custody detainees, one, meaning the
16 medium, highs and highs.  PBNDS restricts them from
17 working outside of the housing unit.  So their primary
18 work would be as an -- on a cleaning crew inside of
19 their living area.  So that would be the largest number.
20    Q    And what's your sense of how many pod porters
21 there are?
22    A    I -- I don't know the number.  I honestly do
23 not know how many total.
24    Q    On -- do you -- is it your understanding that
25 on any given day at Adelanto, 200 to 300 detainees work

Page 193

49 (Pages 190 - 193)

1 in the Voluntary Work Program?
2      MS. ARMSTRONG: Objection. Misstates prior
3 testimony.
4      THE WITNESS: I -- I couldn't say that --
5 that's not my understanding. My understanding -- my --
6 if I recall, my response was I would estimate 2- to 300
7 that may have been approved for the Voluntary Work
8 Program. How many actually worked each day, I don't
9 know.
10 BY MS. WRIGHT:
11  Q   What do you base that understanding on, that 2-
12 to 300 workers have been approved for the Voluntary Work
13 Program?
14  A   That's just strictly an estimate that you asked
15 me for, based on the size of the buildings.
16  Q   Okay. Do you agree that the number of detainee
17 workers who are hired for any given work assignment is
18 based on the actual needs of the facility?
19  A   No. I think that's based on providing the
20 opportunities for the Voluntary Work Program to the
21 population.
22  Q   Let's return to the PBNDS. This is Exhibit 2.
23 If you could flip to page 231, please. This is the Food
24 Service Section 4.1 of the PBNDS at Subsection C-1.
25      With respect to the detainee workforce, it

Page 194

1 service department shall be designed according to actual
2 needs of the facility?
3      MS. ARMSTRONG: Objection. Vague.
4      THE WITNESS: I -- this is the first time that
5 I've -- actually have read that specific language in
6 PBNDS. It states that it shall eliminate any bias
7 towards over- or understaffing.
8 BY MS. WRIGHT:
9  Q   You are ultimately responsible at Adelanto for
10 ensuring that the PBNDS are implemented and followed at
11 the facility; right?
12  A   Yes.
13  Q   Do you agree that if there is not a quota of
14 detainees assigned to food service that is based on
15 actual needs of food service at Adelanto, that that is
16 in violation of PBNDS 4.1.C.1?
17      MS. ARMSTRONG: Objection. Calls for
18 speculation. Calls for a legal conclusion. Vague.
19 Ambiguous.
20      THE WITNESS: It's strictly a volunteer
21 detainee work program. If detainees don't show up for
22 work, staff are going to prepare the meals, serve the
23 meals. There's really no way to gauge how many
24 detainees are actually going to show up for work on any
25 given day.

Page 196

1 says, "The number of detainees assigned to the food
2 service department shall be based on a quota developed
3 by the FSA and approved by the facility administrator."
4      Did I read that correctly?
5  A   Yes.
6  Q   What does FSA stand for?
7  A   I'm not familiar with the title FSA.
8  Q   Do you know who the FSA is at Adelanto?
9  A   I don't have anyone that goes by that acronym.
10  Q   But you are the facility administrator; right?
11  A   Correct.
12  Q   So do you agree that the number of detainees
13 assigned to food service is based on a quota that's
14 approved by you?
15  A   I'm not familiar with this section of PBNDS.
16  Q   So you have not approved a quota for food
17 service?
18  A   Not that I recall.
19  Q   The second sentence is, "The quota shall be" --
20 "The quota shall provide staffing according to actual
21 needs and shall eliminate any bias towards over- or
22 understaffing."
23      Do you see that?
24  A   Yes.
25  Q   Do you disagree that the staffing in the food

Page 195

1 BY MS. WRIGHT:
2  Q   That's not what I asked.
3      If the Adelanto Facility does not staff the
4 kitchen with detainee workers based on the actual needs
5 of the food service department at Adelanto, does that
6 violate the express terms of the PBNDS, which are right
7 in front of you?
8      MS. ARMSTRONG: Objection. Vague.
9 Argumentative. Asked and answered. Calls for
10 speculation.
11      THE WITNESS: Again, not to my knowledge,
12 because if detainees do not show up to work, the work
13 will be performed by GEO staff in order to serve the
14 meal to the population.
15 BY MS. WRIGHT:
16  Q   You understand that this is talking about the
17 number of detainees assigned to food service; correct?
18  A   I understand that.
19  Q   Not the number of detainees who actually show
20 up to work food service.
21      Do you understand?
22  A   Yes.
23  Q   This is talking about the number of food
24 service positions available to detainees.
25      Do you understand?

Page 197

50 (Pages 194 - 197)

1   A  Yes.
2   Q  The number of food service positions that are
3 available to detainees is based on the needs of the
4 facility; is that correct?
5   A  It states that the quota will be developed.
6 The quota shall provide staffing according to the actual
7 needs. As I stated earlier, we look at every available
8 opportunity that's available in food service. If I have
9 four serving lines at the west building with four
10 inserts in each serving line for the dining room, that's
11 16 positions that I can make available per shift. If I
12 have four dishwashers at my west building, there's four
13 additional positions that I can offer to the population.
14 Makes 20. Then you mentioned cooks and some other
15 areas. I don't know how many cooks that we employ as
16 far as in the Voluntary Work Program. And there are a
17 few other jobs that we can offer in food service. So
18 when we're looking at a job, it's what can we offer that
19 there is productive work for a detainee to do in a
20 certain department. And when I look at it, that's what
21 I reflect on, what can we offer that's available
22 positionwise to -- offered to the population.
23   Q  And you testified earlier that GEO cannot pick
24 and choose which PBNDS standards to apply at Adelanto?
25   A  We currently operate off the PBNDS 2011, 2016

Page 198

1   Q  I understand.
2     Okay. So you look at what the actual workload
3 is for each department first. And then you figure out
4 how many detainees are needed to handle that work; is
5 that correct?
6   A  In general, we -- periodically I discuss it
7 with my different department heads. And then we discuss
8 what jobs we can make available.
9   Q  Is there anything about the statement that I
10 just made that's incorrect?
11   A  I don't --
12     MS. ARMSTRONG: Objection. Vague.
13     THE WITNESS: I don't specifically look at
14 every position in the building.
15 BY MS. WRIGHT:
16   Q  Because you're the warden and you delegate
17 those assignments to your subordinates, but my question
18 is, my understanding of your testimony, and I think
19 we're finally on the same page about this, is that you
20 look at the volume of work that needs to be done. And
21 say the kitchen for dishwashers, you look at the volume
22 of work that needs to be done. And then GEO figures out
23 how many detainee workers can be put into the position
24 to get all that work done?
25   A  It's -- I'm using the word opportunities that

Page 200

1 errata.
2   Q  Can you answer my question, please?
3   A  No, we can't.
4   Q  So if GEO is not staffing the kitchen with
5 detainee workers based on actual needs, that is a
6 violation of the PBNDS. You would agree with that?
7     MS. ARMSTRONG: Objection. Misstates prior
8 testimony. Asked and answered. Vague.
9     THE WITNESS: I don't -- I don't consider it a
10 violation. We look at the opportunities that we can
11 make available to the population. For other positions
12 that are in a certain department. If it's -- I don't
13 see it as a violation.
14 BY MS. WRIGHT:
15   Q  How do you know what opportunities you can make
16 available to the population? What is that calculus?
17   A  I used food service for an example. I
18 listed -- I stated some of the different functions of
19 different areas of the department, that would be a
20 productive job for a detainee to work at.
21   Q  But how do you know, for instance, that you
22 need four dishwhasers in west?
23   A  Because I have four dishwashers. It's enough
24 work to keep four individuals active and busy through
25 their day or through their work.

Page 199

1 we can provide to the detainee population, that if
2 they -- there's enough work to be done in the building,
3 that's what we determine, is we can offer these many
4 jobs or opportunities for a detainee to get out of
5 their -- or if they can work outside of their living
6 area, to work and learn some new skills, make a $1 a
7 day.
8   Q  But you offered the number of opportunities
9 that you do based on the work that's available?
10   A  Correct.
11   Q  Exhibit 33.
12     (Plaintiffs' Exhibit 33 was marked for
13 identification by the Certified Shorthand Reporter and
14 attached hereto.)
15 BY MS. WRIGHT:
16   Q  This is an e-mail. Again, we'll read from the
17 bottom. From June Long sent on February 18th of 2016
18 sent to Greg Hillers. And the subject is Cleaning and
19 Food Service. And then if you look at the next e-mail
20 in the chain. It looks like this was maybe forwarded --
21 forwarded to you by Sharon Buczkowske, Ms. B, on
22 February 24th, 2016.
23     Do you see that?
24   A  Yes.
25   Q  Okay. Who is June Long?

Page 201

51 (Pages 198 - 201)

1   A   June Long is with our corporate food service
2 department.
3   Q   And where is she?  Is she located at Adelanto?
4   A   No.
5   Q   Do you know where she's based?
6   A   I don't know exactly where her office is.
7   Q   But corporate is in Boca Raton, Florida?
8   A   I'm not sure if she offices in Boca or one of
9 the regional offices.  I'm not sure.
10   Q   And Gregory Hillers, can you remind me who he
11 is?
12   A   He's my assistant warden of finance.
13   Q   In this e-mail, June Long says to Mr. Hillers,
14 "You wanted 22 detainees per shift on the roster,
15 correct?"  And she's talking about cleaning and food
16 service.  Do you see that?
17   A   Yes.
18   Q   How many shifts are available in food service?
19   A   Three.
20   Q   So three shifts times two detainees, times two
21 kitchens is 132 detainees between east and west?
22       MS. ARMSTRONG:  Objection.  Vague.
23 BY MS. WRIGHT:
24   Q   Is that right?  Sorry.  122.
25       MS. ARMSTRONG:  I think you might just want to

Page 202

1 start over.
2       MS. WRIGHT:  I think you might be right.
3   Q   First of all, do you have any reason to believe
4 that -- that this is incorrect, that there should be 22
5 detainees per shift on the roster for food service?
6       MS. ARMSTRONG:  Vague.
7       THE WITNESS:  From what I'm reading, that's
8 what apparently Mr. Hillers and Ms. Long discussed.  I
9 don't know.  If I understand the e-mail correct, that's
10 what I gather from it.
11 BY MS. WRIGHT:
12   Q   And so 22 detainees times three shifts is 66
13 detainees, total; right?  You agree with my math?
14   A   Yes.
15   Q   And there are two kitchens at Adelanto, one in
16 east and one at west; right?
17   A   Yes.
18   Q   And 66 times two is 132; right?
19   A   Yes.
20   Q   This is correct that there should be 22
21 detainees per shift on the roster, then we're looking at
22 132 detainees working in the kitchen any given day?
23   A   I don't see where they're speaking to the two
24 kitchens in this e-mail, but I mean it may be 22
25 detainees for three shifts divided by two buildings.  I

Page 203

1 don't know.  I wasn't involved in this specific
2 conversation.
3   Q   Okay.  At the end it says, "The sanitation is
4 going to be a huge issue with Mr. Donahue."
5       Now, Mr. Donahue is the -- is from GEO
6 corporate; right?  He's the senior vice president?
7   A   Yes.
8   Q   We talked about him before.
9       Why do you think sanitation would be a huge
10 issue with Mr. Donahue?
11       MS. ARMSTRONG:  Objection.  Calls for
12 speculation.
13       THE WITNESS:  I can't speak for Mr. Donahue.
14 It's a topic he stresses, is sanitation of the
15 facilities.
16 BY MS. WRIGHT:
17   Q   You said that he comes to visit the center
18 sometimes; right?
19   A   He has.  He visits all the -- all our
20 facilities in GEO.
21   Q   Okay.  Looking back at Exhibit 26, this is the
22 work --
23       MS. ARMSTRONG:  These are --
24 BY MS. WRIGHT:
25   Q   Look up here as well.  If you look -- now, we

Page 204

1 talked about the 40 paid positions in the Work Member
2 Detail Program.  And we discussed that there are more
3 than 40 detainees working the Voluntary Work Program at
4 any given time; right?
5   A   Yes.
6   Q   The second part of this line here is, "If all
7 paid positions are filled, would you be interested in
8 working on a voluntary basis?"  And then there's a space
9 for the detainee to check yes or no.
10       Do you see that?
11   A   Yes.
12   Q   So what does this mean, if all paid positions
13 are filled, would you be interested in working on a
14 voluntary basis?  What is your understanding of that
15 sentence?
16       MS. ARMSTRONG:  Objection.  Calls for
17 speculation.  He's testified he hasn't seen this.
18       THE WITNESS:  Like I say, I'm not familiar with
19 the document.  I didn't create it.  But it's asking
20 detainees if they're interested in working on a
21 voluntary basis.
22 BY MS. WRIGHT:
23   Q   Is it policy and procedure at the Adelanto
24 Detention Center that detainees can work in the
25 Voluntary Work Program for no compensation?

Page 205

52 (Pages 202 - 205)

1  A   I'm not -- I don't recall if it's written in
2  our policy, but I don't recall if it's in the policy
3  that they may volunteer for other work that's not part
4  of the volunteer program.
5  Q   In your experience, as the warden responsible
6  for day-to-day operations, the man on the ground, leader
7  on the ground, your testimony is that you do not know
8  whether GEO has a policy of permitting detainees to work
9  in the Voluntary Work Program for no pay; is that
10  correct?
11      MS. ARMSTRONG:  Objection.  Misstates prior
12  testimony.
13      THE WITNESS:  Every detainee that is part of
14  the Voluntary Work Program will get paid if they show up
15  for work.  I am not positive if our policy speaks to
16  working on a voluntary basis.
17  BY MS. WRIGHT:
18  Q   So if there is a program where detainees can
19  work in the work program without pay, that would be
20  separate from the Voluntary Work Program?
21  A   If a detainee volunteers to do something,
22  they're volunteering to do something.  If they're on the
23  approved volunteer worker list or program part of it,
24  they're going to get paid their $1 a day.
25  Q   When you say if a detainee volunteers, they're

Page 206

1  Q   But it is possible that detainees at Adelanto
2  complete shifts of Voluntary Work Program jobs for no
3  payment?
4      MS. ARMSTRONG:  Objection.  Calls for
5  speculation.  Vague.
6      THE WITNESS:  To my knowledge, if they're in a
7  Voluntary Work Program, they get paid for the day they
8  work -- the days they work.
9  BY MS. WRIGHT:
10  Q   I'm asking a different question.  So we've
11  covered that the Voluntary Work Program has these 40
12  paid positions, but we know that it's actually more than
13  40.  And if you work your shift, you get paid your $1;
14  right?
15      MS. ARMSTRONG:  Objection.  Compound.
16      THE WITNESS:  They work and are part of the
17  voluntary program, they get paid.
18  BY MS. WRIGHT:
19  Q   Okay.  Now, there's this other program here,
20  where if all paid positions in the Voluntary Work
21  Program are taken, would you be willing to work one of
22  these jobs, one of these voluntary work program jobs, on
23  a voluntary basis, which means for free.
24      Do you understand?
25      MS. ARMSTRONG:  Objection.  Misstates prior

Page 208

1  volunteering to do something, do you mean they're
2  volunteering to do something for free?
3  A   I can't speak to that.  I don't know of a
4  detainee volunteering, but if they decide to voluntarily
5  do something, I -- I don't know if that's written
6  anywhere.  I'm not familiar with it.
7  Q   I think we're using the word volunteer and
8  volunteering in some different ways, because of the
9  title of this policy.  So I'm just trying to understand
10  what you're saying.  So if a detainee initiates this
11  policy, if all detainee -- all paid positions are
12  filled, there's no more paid positions, the facility is
13  at max capacity, there's no more need for a detainee
14  worker as part of the Volunteer Work Program, if a
15  detainee still wants to work in, say, the barber shop,
16  can that detainee work in the barber shop?
17  A   I'm not familiar with that being done.  Barbers
18  have to be part of the approved workers program, because
19  they have to have a medical clearance to do so.  So I'm
20  not familiar with this document or the language that's
21  written on it.
22  Q   Have you ever heard of detainees working in the
23  voluntary work program for no compensation?
24  A   No.  If they're approved and in the Voluntary
25  Work Program, they receive pay.

Page 207

1  testimony.  Calls for speculation.  Vague.  Ambiguous.
2  Lacks foundation.
3      THE WITNESS:  Again, I'm not familiar with this
4  document or this specific language.  And it -- the
5  question asks, would you be interested in working on a
6  volunteer basis, yes or no.  What occurs from there, I
7  don't know.  I'm not familiar with it.
8  BY MS. WRIGHT:
9  Q   And when you say working on a voluntary basis,
10  what do you mean?
11      MS. ARMSTRONG:  Objection.  Calls for
12  speculation.  He said he has not seen this document.
13      THE WITNESS:  I'm reading the language on the
14  document.  I'm not familiar with this document or the
15  language that's on it.
16  BY MS. WRIGHT:
17  Q   You are responsible for the policies and
18  procedures in place at the Adelanto Detention Center,
19  aren't you, Warden Janecka?
20  A   The overall, yes.
21  Q   And you're responsible for ensuring that GEO's
22  policies and procedures at the Adelanto Facility are
23  implemented in practice; right?
24  A   Ultimately, yes.
25  Q   You are responsible for making sure that the

Page 209

53 (Pages 206 - 209)

1 boots on the ground actually follow the policies and
2 procedures that GEO has created for the Adelanto Center;
3 is that right?
4     A   Ultimately, yes.
5     Q   Do you have any understanding of how often
6 detainees check the yes box after the sentence, if all
7 paid positions are filled, would you be interested in
8 working on a voluntary basis?
9         MS. ARMSTRONG:  Objection.  Calls for
10 speculation.  He's testified probably 18 times that he's
11 never seen this document and doesn't know what it says.
12        THE WITNESS:  I have no idea.
13 BY MS. WRIGHT:
14    Q   Who would know?
15    A   Possibly a classification officer.  I don't
16 know.
17    Q   And if a detainee received this work
18 application and checked the yes box indicating an
19 interest in working on a quote, "voluntary basis," you
20 agree that that would violate the PBNDS?
21        MS. ARMSTRONG:  Objection.  Calls for
22 speculation.  Calls for a legal conclusion.  Vague.
23        THE WITNESS:  I'm not familiar with the
24 document or what its intended purpose is.  I don't -- as
25 I stated before, I do not know once a detainee checks
Page 210

1 yes or no what the process is from there.  I'm not
2 familiar with it.
3         MS. WRIGHT:  Could you read back my question,
4 please.
5         (The record was read as follows:
6         "QUESTION:  And if a detainee
7         received this work application and
8         checked the yes box indicating an
9         interest in working on a quote,
10        'voluntary basis,' you agree that that
11        would violate the PBNDS?")
12 BY MS. WRIGHT:
13    Q   And the --
14        MS. ARMSTRONG:  Same objections that I put on
15 the record earlier related to that question.
16        THE WITNESS:  Not to my knowledge.
17 BY MS. WRIGHT:
18    Q   You agree that the PBNDS regulation 5.8, which
19 governs the Voluntary Work Program states that the
20 detainee shall be paid at least $1 a day.  Do you
21 remember we discussed that earlier?
22        MS. ARMSTRONG:  Objection.  Compound.
23        THE WITNESS:  I don't recall the specific
24 language that we discussed, but it speaks to detainees
25 that have been approved through the Voluntary Work
Page 211

1 Program, something to that effect.
2 BY MS. WRIGHT:
3     Q   So a detainee that -- who is working in the
4 Voluntary Work Program must be paid $1 per day per
5 the PBNDS; is that correct?
6     A   Under the detainee work program standard.
7     Q   Of the PBNDS; correct?
8     A   Correct.
9     Q   But a detainee who is working in some other
10 program, a detainee who volunteers to work outside of
11 the Voluntary Work Program does not need to be paid a $1
12 a day; is that correct?
13        MS. ARMSTRONG:  Objection.  Calls for a legal
14 conclusion and speculation.
15        THE WITNESS:  If they're going to volunteer, if
16 they see there's a piece of paper on the trash -- on the
17 floor and pick it up and they voluntarily pick it up.  I
18 I'm not familiar with this.  I mean, it's something they
19 did voluntarily and wasn't under the direction of staff.
20 BY MS. WRIGHT:
21    Q   The detainee did a shift in laundry, would that
22 detainee be paid a $1 a day?
23    A   Again, I'm not familiar with this document or
24 the processes.  If they're a part of the Voluntary Work
25 Program and have been approved, they would receive the
Page 212

1 $1 a day pay.
2     Q   If the detainee did not receive the $1 a day
3 pay, would that violate the PBNDS?
4         MS. ARMSTRONG:  Objection.  Calls for
5 speculation.  Calls for legal conclusion.
6         THE WITNESS:  If the -- can you be a little
7 more specific as to that question?  Are you speaking to
8 a detainee that's approved through the Voluntary Work
9 Program.
10 BY MS. WRIGHT:
11    Q   Yes?
12    A   Wouldn't be -- if he didn't receive it that
13 day, there may have been a mistake and it can be
14 rectified.  They would receive the payment once it was
15 noticed as a mistake.
16    Q   If a detainee worked a shift in the laundry
17 through the voluntary work program and was never paid
18 the $1 for his labor, would that violate the PBNDS?
19    A   If a detainee was part of the Voluntary Work
20 Program never received his pay, it would violate the
21 PBNDS.
22    Q   I'm going to hand you Exhibit 33 -- 34.  Thank
23 you.  34.
24 ///
25 ///
Page 213

54 (Pages 210 - 213)

Job No. 3431598

1    (Plaintiffs' Exhibit 34 was marked for
2  identification by the Certified Shorthand Reporter and
3  attached hereto.)
4  BY MS. WRIGHT:
5    Q   This is the GEO Group Adelanto ICE Processing
6  Center Housekeeping Plan.
7      Have you seen this document before?
8    A   I've seen it.
9    Q   In fact, if you look at the last page, is that
10 your signature, on the last page following reviewed by?
11   A   Yes.
12   Q   And you signed this on June 18th, 2018?
13   A   That's the date, yes, on the document.
14   Q   What is this document?
15   A   It's the Adelanto ICE Processing Center
16 Housekeeping Plan.
17   Q   What does that mean?
18   A   It's the daily housekeeping plan.
19   Q   So this is the set of guidelines which GEO
20 implements at Adelanto for cleaning and sanitation; is
21 that accurate?
22   A   It's -- yes, basic guide for the cleaning and
23 sanitation of the facility.
24   Q   And at the very top it says that the
25 housekeeping -- the facility establishes this

Page 214

1  housekeeping plan to maintain the physical plant and to
2  ensure that sanitation and safety practices applies with
3  applicable laws, codes, regulations and standards
4  relating to sanitation and safety within the facility;
5  is that correct?
6    A   Yes.
7    Q   Is this housekeeping plan implemented on the
8  ground at the Adelanto Detention Center?
9    A   Yes.
10   Q   If you turn to page 3 of this document,
11 Exhibit 34?  "Pot cleaning, on a weekly basis or as
12 needed, all housing units will be subject to a total
13 sanitation mission to assure standards are met and
14 maintained. The responsibility for cleaning each
15 housing unit will be shared by all shifts."
16     Do you see that?
17   A   Yes.
18   Q   Is this talking about the sanitation policy
19 that we discussed earlier, 12.1.4, which is Exhibit 23?
20     MS. ARMSTRONG:  Objection. Calls for
21 speculation. What was the exhibit number?
22     MS. WRIGHT:  23.
23     MS. ARMSTRONG:  I'll find it for you.
24     THE WITNESS:  Can you restate your question?
25 I'm sorry.

Page 215

1  BY MS. WRIGHT:
2    Q   This pot cleaning policy that we're looking at
3  here on page 3 of Exhibit 34, my question is, does this
4  relate to the Sanitation Policy 12.1.4?
5      MS. ARMSTRONG:  Objection. It calls for
6  speculation.
7      THE WITNESS:  I don't see where the
8  housekeeping plan reflects stating this policy of
9  12.1.4. It's -- it's the housekeeping plan that's for
10 the facility. I can't state that it's specifically part
11 of 12.1.4.
12 BY MS. WRIGHT:
13   Q   Are detainees responsible for cleaning and
14 maintaining their pods and housing units?
15   A   Their immediate living areas, yes.
16   Q   And that's pursuant to Policy 12.1.4?  Yes?
17   A   PBNDS standard that we discussed earlier where
18 it spoke to it that they will be responsible for
19 cleaning their immediate living areas.
20   Q   And GEO policy 12.1.4, the sanitation policy;
21 correct?
22   A   Detainee 12.1.4 does state detainees are
23 responsible for the cleanliness of those areas. Their
24 immediate living areas.
25   Q   Thank you.

Page 216

1      Looking at Exhibit 34, at page 3, which is on
2  your screen, under facility clean up, daily cleaning
3  schedule, there's a chart of different areas of the
4  facility that need to be cleaned, per the daily cleaning
5  schedule.
6      Are there any of these areas that are not
7  cleaned by detainee workers in the Voluntary Work
8  Program?
9      MS. ARMSTRONG:  Object as vague. Ambiguous.
10     THE WITNESS:  There's -- there's windows and
11 floors and walls and restrooms throughout the building,
12 secure side and non-secure side. So, yes, and if
13 detainees don't go to work one day in a certain area,
14 staff will clean it.
15 BY MS. WRIGHT:
16   Q   With respect to the secure side only, are there
17 any of these areas that we're looking at on this chart
18 on page 3 of Exhibit 34, where detainees do not clean?
19     MS. ARMSTRONG:  Objection. Vague.
20     THE WITNESS:  There's jobs available for all
21 those areas to be cleaned. And if it's in a housing
22 unit and it's part of their immediate living area,
23 they're responsible to clean it.
24 BY MS. WRIGHT:
25   Q   So the answer to my question is yes?

Page 217

55 (Pages 214 - 217)

1   A   Yes.
2   Q   Sorry. I think I'm tripping myself up here.
3   To make sure we're on the same page, within the secure
4   side of the facility in east and west, detainees are
5   responsible for cleaning all of the areas that are
6   listed on the chart on page 3 of Exhibit 34?
7       MS. ARMSTRONG: Objection. Misstates prior
8   testimony.
9   BY MS. WRIGHT:
10  Q   Correct?
11      MS. ARMSTRONG: Vague.
12      THE WITNESS: They'll clean -- there's jobs
13  available for them to clean all of these areas. And if
14  it isn't cleaned by detainee population, it will be
15  cleaned by staff.
16  BY MS. WRIGHT:
17  Q   What's the difference between an immediate
18  living area and a living area?
19  A   A living area is, in general, a housing unit.
20  The immediate living area is the area of a housing unit
21  that they actually are assigned to. As I stated
22  earlier, there's four pods in a housing unit. So you
23  have four individual pods that are comprised of living
24  areas.
25  Q   Turn to the next page, please, of Exhibit 34.

Page 218

1   On page 4, this is called -- entitled Housing Unit
2   Cleaning Schedule.
3       Within the secured area of east and west, are
4   there any areas represented in this chart where
5   detainees do not clean?
6       MS. ARMSTRONG: Objection. Vague.
7       THE WITNESS: Detainees, there are jobs for
8   them to clean this or there's also several areas that
9   would be part of their immediate living area. Again, if
10  it's not cleaned by the population, it would be cleaned
11  by staff.
12  BY MS. WRIGHT:
13  Q   So the answer is that there are no areas in
14  this list where detainees do not clean; is that correct?
15      MS. ARMSTRONG: Objection. Vague.
16      THE WITNESS: My answer was there's jobs that
17  would -- detainee jobs through the Voluntary Work
18  Program that would allow for the -- or call for the
19  cleaning of all of these areas. And several of these
20  areas are a part of the immediate living area that PBNDS
21  allows for or requires them to maintain.
22  BY MS. WRIGHT:
23  Q   And the PBNDS requires each and every detainee
24  to maintain these spaces within their immediate living
25  area? That's your testimony?

Page 219

1       MS. ARMSTRONG: Objection. Vague?
2       THE WITNESS: My testimony, if I recall, was
3   there -- according to PBNDS, they're responsible for the
4   cleanliness of their immediate living area.
5   BY MS. WRIGHT:
6   Q   So within a detainee's immediate living area
7   each and every detainee at Adelanto is responsible for
8   cleaning the floors, divider walls, window sills, sinks
9   and commodes, showers, trash receptacles, furniture,
10  equipment and stainless steel showers and sinks; is that
11  your testimony?
12      MS. ARMSTRONG: Objection. Misstates prior
13  testimony.
14      THE WITNESS: I'm saying that's what is stated
15  in PBNDS as part of their immediate living area.
16  There's also jobs through the Voluntary Work Program for
17  detainee porters that allow for those functions to be
18  done through the Voluntary Work Program.
19  BY MS. WRIGHT:
20  Q   My question is really simple. It's really
21  clear. The personal housekeeping requirement of the
22  PBNDS as you interpret it requires each and every
23  detainee to clean the areas that are listed in this
24  chart; is that correct?
25  A   If it's part of the immediate living area.

Page 220

1   Q   Thank you.
2       MS. ARMSTRONG: Can we take a break?
3       MS. WRIGHT: Sure.
4       THE VIDEOGRAPHER: We are going off the record.
5   The time is 3:02 p.m.
6       (Whereupon a recess was taken.)
7       THE VIDEOGRAPHER: We are going back on the
8   record. The time is 3:25 p.m.
9   BY MS. WRIGHT:
10  Q   Warden Janecka, what happens when there's an
11  insufficient number of detainee workers to staff any
12  particular Voluntary Work Program crew?
13  A   If we need somebody to perform the job
14  function, we get staff from throughout the building to
15  perform those functions.
16  Q   Do you have to pay that GEO staff overtime?
17  A   If there's a need to, we will. If it can be
18  accomplished during their normal hours of work they'll
19  get their straight pay.
20  Q   Are there any other consequences to the
21  facility when an insufficient number of detainees work
22  in the Voluntary Work Program?
23  A   Not to my knowledge, no.
24  Q   Let's look at Exhibit 35.
25  ///

Page 221

56 (Pages 218 - 221)

1    (Plaintiffs' Exhibit 35 was marked for
2  identification by the Certified Shorthand Reporter and
3  attached hereto.)
4  BY MS. WRIGHT:
5    Q   This is an e-mail.  And, again, you can look at
6  the screen.  This is an e-mail chain and we'll start at
7  the very end, because that's the earliest e-mail.
8  Exhibit 35 is an e-mail chain that starts with an e-mail
9  from Theodore Hauser, dated March 4th, 2018.  The e-mail
10  is sent to you, James Janecka.  And the subject is
11  Kitchen Staff and Their Lunches.
12    Do you see that?
13  A  Yes.
14  Q  Did you receive this e-mail?
15  A  I'm on the e-mail string, yes.
16  Q  Now, it says, "This evening, we are only
17  running three chow halls again, because in addition to
18  the lacking detainee workers, kitchen staff took their
19  lunch."
20    What do you understand Mr. Houser to be talking
21  about here?
22    MS. ARMSTRONG:  Objection.  Calls for
23  speculation.
24    THE WITNESS:  My understanding of the e-mail is
25  there weren't enough detainee workers or staff at that

Page 222

1  time to run four dining halls at west.  So the meal that
2  appears to be the evening meal was fed out of three
3  dining halls.
4  BY MS. WRIGHT:
5    Q   And if you look at the next e-mail in the
6  chain, this is from Patricia Love on March 4th.  And
7  you're not copied on this part of the chain, but she
8  says, "It is never our expectation to run fewer than all
9  four dining halls."
10    Do you agree with that sentence?
11  A  It's -- we have four dining halls, so it's
12  expected.  It's not required.
13  Q  What is "it" in that sentence?
14  A  To run all four dining halls, there's no
15  requirement for it.
16  Q  But you expect to run all four dining halls at
17  the Adelanto Facility?
18  A  If we can, yes.
19  Q  Are there any other circumstances aside from a
20  worker shortage or staffing shortage that prevent you
21  from running all four dining halls?
22    MS. ARMSTRONG:  Objection.  Vague.
23    THE WITNESS:  If I can think of something, it
24  may be that maybe we had an equipment failure or
25  something in one of the dining halls.  Other than

Page 223

1  that -- or not enough staff that was there, but our
2  mission is to serve the meal.
3  BY MS. WRIGHT:
4    Q   How often would you estimate that it occurs
5  that GEO has to shut down one of the dining halls,
6  because there's not enough staff to run the dining hall?
7  A  Periodically.  I don't know exactly.
8  Q  What -- ballpark, has it happened this month?
9  A  Not to my knowledge.
10  Q  Has it happened in 2019 that not all four
11  dining halls could be run on any given shift, because of
12  a lack of staff?
13  A  I don't know exactly.  It's -- I know it's the
14  exception and not the norm.
15  Q  But you have no knowledge as you sit here today
16  that this has happened this year; is that right?
17  A  Not that I can think of, specifically.  It may
18  have.
19  Q  Go ahead and turn to the first page of this
20  e-mail chain, Exhibit 35.  You see that Michelle Keeney
21  forwarded this e-mail -- this e-mail chain on March 6th,
22  2018 to Patricia Love and Theodore Hauser.  And the
23  subject line is, again, Kitchen Staff and the Their
24  Lunches.
25    Do you see that?

Page 224

1  A  Yes.
2  Q  Now, Ms. Keeney is reporting that on Saturday,
3  they were only able to run three chow halls at dinner,
4  because they had only six detainee workers, one of them
5  being a dishwasher.  And they were told there wasn't
6  enough officers to run four chow halls.
7    Do you see that?
8  A  Yes.
9  Q  Do you have any reason to believe that's not
10  true?
11  A  That's what's written.  I don't have a reason
12  to believe she would lie.
13  Q  And then it says the reason they only ran three
14  chow halls was because they only had seven detainees,
15  who two of which were dishwashers.
16    Do you see that?
17  A  Yes.
18  Q  Do you have any reason to believe that's not
19  true?
20  A  It's what's written, so...
21  Q  Do you have any reason to believe that that's
22  not true?
23  A  No.
24  Q  So when there are not enough detainee workers
25  to staff all four chow halls, GEO suspends operation in

Page 225

57 (Pages 222 - 225)

1 some of the chow halls; is that right?
2    A   If we have to run less than four, we run four,
3 but the meal is still served to the population.
4    Q   So you agree with that I just said?
5       MS. ARMSTRONG:  Objection.  Vague.
6       THE WITNESS:  I agree that if we don't have
7 enough staff, GEO staff, or detainee workers, that we
8 may have to shut down the dining hall.
9 BY MS. WRIGHT:
10    Q   Hand you now Exhibit 36.
11       (Plaintiffs' Exhibit 36 was marked for
12 identification by the Certified Shorthand Reporter and
13 attached hereto.)
14 BY MS. WRIGHT:
15    Q   This is another e-mail chain.  So as before,
16 we'll start on the last page, which in this context here
17 is really page 2, which is Bates Stamped 2295.
18 Geo-Novoa-2295.
19       Now, this is an e-mail from you, James Janecka.
20 Do you see?
21    A   Yes.
22    Q   And it was sent on Tuesday, May 26th of 2015
23 is that correct?
24    A   Yes.  That's the date.
25    Q   Okay.  And you wrote, "After walking through

Page 226

1 were not working in these areas prior to your e-mail?
2    A   It was -- apparently, it was evident to me that
3 the sanitation slipped.  If they were working, it wasn't
4 up to standards of -- that I set for the facility
5 sanitation.
6    Q   So these detainees that you're referencing here
7 in this e-mail are detainee workers participating in the
8 Voluntary Work Program?
9    A   Yes.
10    Q   What's a D-space?
11    A   It's the area around the housing unit control.
12    Q   Are detainees allowed inside housing unit
13 control?
14    A   No.
15    Q   Who cleans that space?
16    A   Staff.
17    Q   Is -- are D-spaces subject to the personal
18 housekeeping policy that we've discussed earlier?
19    A   It's a common area outside of the actual living
20 areas in the housing unit.  It's -- it's like an
21 octagon.  If you want to describe.  You have a control
22 center in the middle of four pods that are outside of
23 the pods, in the middle.  It's basically a round
24 hallway.  And there are -- that's areas that the
25 volunteer work program works.

Page 228

1 west today, it is very evident sanitation has slipped
2 backwards several notches.  We need all shifts to start
3 putting detainees to work in the hallways, medical
4 intake, the D-spaces and hallways leading to the housing
5 units, et cetera."
6       Is that correct?
7    A   Yes.
8    Q   What did you mean when you wrote, "We need all
9 shifts to start putting detainees to work in the
10 hallways, medical intake, the D-spaces and the hallways
11 leading to the housing units, et cetera."
12    A   Those are all areas that the voluntary work
13 crews work in.
14    Q   What did you mean when you said we need all
15 shifts to start putting detainees to work in those
16 spaces?
17    A   Calling the crews out to work and working.
18    Q   How do you start putting detainees to work?
19    A   You call them out.  If they show up for work,
20 they go to work.
21    Q   What do you mean call them out?
22    A   You announce those detainees names for those
23 job assignments to come out and work.  If they come out
24 to work, they go to work.
25    Q   So is it your recollection that the detainees

Page 227

1    Q   But that area is not part of the immediate
2 living area that is subject to the personal housekeeping
3 requirement?
4    A   It's in the immediate housing unit.  I'm not
5 for sure if it's considered immediate housing area that
6 we talked about earlier, but it's in the immediate
7 housing unit itself.
8    Q   So under the personal housekeeping requirement
9 as you interpret it, each and every detainee could be
10 required to clean the D-spaces?
11    A   They could.  It's part of the housing area,
12 part of the immediate area.
13    Q   I'll hand you Exhibit 37.
14       (Plaintiffs' Exhibit 37 was marked for
15 identification by the Certified Shorthand Reporter and
16 attached hereto.)
17 BY MS. WRIGHT:
18    Q   We have another e-mail chain.  And we'll start
19 at the bottom of the first page, which is Bates
20 No. GEO-Novoa-5839.  That's where it starts.  This is an
21 e-mail from you, James Janecka, dated Tuesday,
22 April 4th, 2017.  The subject is East Sanitation.
23       Do you see that?
24    A   Yes.
25    Q   Okay.  If you turn to the next page.  You

Page 229

58 (Pages 226 - 229)

1 wrote, "After a tour of the east building this morning,
2 I was totally frustrated with the lack of cleaning that
3 has been done in the last week.  The building honestly
4 looked the worst I have ever seen it in the 2.5 years
5 that I have been here.  There was not one detainee
6 working or being asked to work in the entire building,
7 housing units, hallways, kitchen, laundry, intake,
8 et cetera."  And then in capital letters, "Not One.
9 This is totally unacceptable," followed by two
10 exclamation marks.  "Once lunch is complete, I expect
11 all TV, Xbox and recreation to be suspended until the
12 building is clean and presentable.  We can't shut down
13 courts, medical visits, attorney visits, et cetera.  We
14 have a tour tomorrow and Friday."
15     Did I read that correctly?
16 A   Yes.
17 Q   Can you describe to me why you sent this
18 e-mail?
19 A   Again, the sanitation expectations are the --
20 the sanitation was not up to my expectations of what I
21 believe should be there.
22 Q   How often are you frustrated with the lack of
23 cleaning in the facility?
24 A   Again, it's the expectation and not the norm.
25 Q   You said there was not one detainee working or

Page 230

1 BY MS. WRIGHT:
2 Q   But it happens on occasion?
3 A   Very rarely, but it has happened.
4 Q   Is removing the TV a form of punishment?
5 A   It's not a punishment.  There's no normal
6 sanctions that go with it.
7 Q   Is removing access to recreation a punishment?
8 A   It's not -- it's not a formal sanction.  We can
9 give them recreation later.  Do what we call a make up
10 day to give them a make up day.
11 Q   But the point here is that you ordered your
12 subordinates in east to suspend TV, Xbox and recreation
13 so that the detainees would clean the facility; right?
14 A   Well, they would have cleaned the housing
15 units, which are required.  And if -- if they didn't
16 have detainees that went to work in those areas that I
17 was going to have to have all staff available to get
18 those areas clean.
19 Q   But this is talking about more than just the
20 housing units.  This is talking about the hallways, the
21 kitchen, the laundry, the intake, et cetera; right?  So
22 this is talking about the entire east facility?
23 A   That's correct.
24 Q   So your practice and policy at the Adelanto
25 Detention Center is to suspend recreation to incentivize

Page 232

1 being asked to work in the entire building.
2     Do you mean here that there was not a single
3 detainee working in the Voluntary Work Program in the
4 entire building?
5 A   I didn't see any detainees out working that
6 day.
7 Q   When you said there was not one detainee being
8 asked to work in the entire building, does that refer to
9 the personal housekeeping requirement?
10 A   I'm referring to housing unit, so that's their
11 immediate living area.
12 Q   Right.  Because GEO can't ask detainees to work
13 except for that personal housekeeping requirement;
14 right?
15 A   Right.
16 Q   You said that this was totally unacceptable
17 with two exclamation marks.  Once lunch is complete, you
18 expect all TV, Xbox and recreation to be suspended until
19 the building is clean and presentable.  How often do you
20 suspend all recreation until the entire building,
21 including hallways, kitchen, laundry and intake is clean
22 can presentable?
23     MS. ARMSTRONG:  Objection.  Compound.  Vague.
24     THE WITNESS:  Very rare.
25 ///

Page 231

1 or entice workers to clean when you feel it's necessary?
2     MS. ARMSTRONG:  Objection.  Misstates prior
3 testimony.
4     THE WITNESS:  I didn't say it was a policy or
5 practice.  It can be allowed.  And if I don't have
6 enough detainees from the Voluntary Work Program to go
7 into those departments, then the staff that are working
8 there, they are going to have to GI them.
9 BY MS. WRIGHT:
10 Q   What does GI mean?
11 A   Clean them thoroughly.
12 Q   What does GI stand for?
13 A   I don't -- GI is referred to -- it's a military
14 term as a GI, a thorough cleaning.
15 Q   Do you agree that suspending recreation time
16 for a detainee is a form of punishment?
17     MS. ARMSTRONG:  Objection.  Misstates prior
18 testimony.
19     THE WITNESS:  It's allowed.  And if I need to
20 make up recreation time.  I can make up the number of
21 hours at a make up day during that week.
22 BY MS. WRIGHT:
23 Q   That's not the question I asked.  I asked, do
24 you agree that suspending recreation time is a form of
25 punishment?

Page 233

59 (Pages 230 - 233)

1    A    No.
2    Q    Is it a reward?
3    A    Excuse me?
4    Q    Is it a reward?
5    A    No.
6    Q    How often do you suspend recreation for
7 detainees?
8    A    Rarely.
9    Q    Do detainees have a right to recreation?
10    A    It's a program activity that can be suspended.
11    Q    My question was do detainees have a right to
12 recreation?
13    A    To my knowledge, it's not a right.
14    Q    Is access to recreation a requirement under the
15 PBNDS?
16    A    Yes.
17    Q    So detainees at the Adelanto Detention Facility
18 have a right under the PBNDS to recreation time?
19        MS. ARMSTRONG:  Objection.  Vague.
20        THE WITNESS:  PBNDS speaks to the number of
21 hours of recreation or outdoor time or out of cell time.
22 I don't know specifically what it states.
23 BY MS. WRIGHT:
24    Q    In this case, did you actually, you or your
25 subordinates actually suspend TV, Xbox and recreation

Page 234

1 time until the entire east building was clean and
2 presentable?
3    A    I don't recall.
4    Q    Do you recall whether you made up the
5 recreation time, if you did indeed suspend it?
6        MS. ARMSTRONG:  Objection.  Calls for
7 speculation.  He's testified he doesn't remember.
8        THE WITNESS:  I can't recall at this time.
9 BY MS. WRIGHT:
10    Q    Now, with respect to the detainee workers who
11 are not being asked to work in their housing units, we
12 agreed that that was part of the personal housekeeping
13 requirement; right?  Detainees can be asked to work
14 pursuant to the personal housekeeping requirement;
15 right?
16    A    Yes.  PBNDS requires or states that detainees
17 are responsible for cleaning their immediate living
18 areas.
19    Q    And under the sanitation policy, there are
20 other disciplinary measures that are available when
21 detainees do not participate in cleaning pursuant to the
22 housekeeping policy; right?
23    A    There was some listed.  I can't quote them.
24    Q    Do you remember earlier today our discussion
25 about the use of disciplinary restriction or segregation

Page 235

1 as a form of punishment when a detainee declines to
2 clean their living space?
3    A    Remember we discussed that sanction as one of
4 12 or 13 other sanctions, yes.
5    Q    Do you recall whether any detainee were placed
6 in disciplinary segregation or restriction as a result
7 of the incident that you're discussing here in
8 Exhibit 37?
9    A    No.
10    Q    You don't recall or it didn't happen?
11    A    To my knowledge, it did not happen.
12    Q    Do you agree that GEO relies on detaining
13 workers to perform daily operation and maintenance tasks
14 at the Adelanto Facility?
15    A    If they go to work, we rely on them to perform
16 the function.  If they don't go to work, then staff
17 perform the function.
18    Q    Is it more expensive for GEO when the staff
19 performs those functions than when the detainees perform
20 those functions?
21        MS. ARMSTRONG:  Objection.  Vague.
22        THE WITNESS:  I have to pay staff irregardless
23 if they work.  So they're at work for their normal work
24 schedule.  I have their labor cost irregardless.
25 ///

Page 236

1 BY MS. WRIGHT:
2    Q    But sometimes, they have to pay overtime;
3 right?
4    A    Periodically.
5    Q    How often does that happen?
6        MS. ARMSTRONG:  Objection.  Vague.
7        THE WITNESS:  I -- when you say how often does
8 that recur, can be a little more specific?
9 BY MS. WRIGHT:
10    Q    I can.  And we'll do that with Exhibit 37 --
11 excuse me -- 38.
12        (Plaintiffs' Exhibit 38 was marked for
13 identification by the Certified Shorthand Reporter and
14 attached hereto.)
15 BY MS. WRIGHT:
16    Q    This is another e-mail chain, so we'll start at
17 the last page.  This e-mail starts with a message from
18 Sharon Buczkowske, Ms. B, on February 16th on 2017.  And
19 it's been forwarded up to you.
20        Do see your name here?
21    A    Yes.
22    Q    Okay.  And Ms. B says, "I've instructed the
23 morning staff to stay for overtime to help serve lunch.
24 Detainee workers are not coming to work today."
25        Do you see that?

Page 237

60 (Pages 234 - 237)

1    A   Yes.
2    Q   So is this an example on February 26th, 2017
3  when GEO morning staff had to be paid overtime to stay
4  because not enough detainee workers volunteered for the
5  lunch shift?
6    A   It appears to be, according to Ms. B's e-mail.
7    Q   But you have no personal knowledge of how often
8  this occurs where GEO staff have to be paid overtime for
9  stepping in when --
10   A   Not --
11   Q   -- detainees -- when there are not enough
12 detainees to do the work?
13       MS. ARMSTRONG: Objection. Vague.
14       THE WITNESS: Not specifically. It happens
15 periodically.
16 BY MS. WRIGHT:
17   Q   If -- it sounds like it's not ideal for GEO to
18 have its own staff running the maintenance and operation
19 functions that detainee workers can perform.
20       Do you agree with that?
21       MS. ARMSTRONG: Objection. Vague.
22       THE WITNESS: It may not be ideal, but it's
23 hour responsibility to provide the services.
24 BY MS. WRIGHT:
25   Q   I'm not sure I understand your question -- your
                                                Page 238

1 service?
2    A   Approximately -- approximately 30.
3    Q   Does GEO employ any dishwashers non-detainee
4  dishwashers?
5    A   Not -- I mean not specific titles to that, no.
6  They're --
7    Q   I'm going to hand you what has been previously
8  marked as Exhibit 15.
9        MS. ARMSTRONG: Again, this -- is this an
10 exhibit that was previously marked and now we have a
11 version that has Bates numbers?
12       MS. WRIGHT: This is identical to the version
13 that we've used in one of the other depositions.
14       MS. ARMSTRONG: As Exhibit 15. And now this
15 version includes the Bates number ADELANTO-SDT-0002103.
16       MS. WRIGHT: We did not have those Bates
17 numbers.
18       MS. ARMSTRONG: I'm sorry. I understand.
19       MS. WRIGHT: Yeah, no problem.
20       (Plaintiffs' Exhibit 15 was previously marked
21 for identification by the Certified Shorthand Reporter
22 and attached hereto.)
23 BY MS. WRIGHT:
24   Q   Mr. Janecka, this is an Amendment of
25 Solicitation Slash/Modification of Contract,
                                                Page 240

1 answer. It's not ideal -- well, actually, it's fine.
2        How many warehouse clerks do you employ at the
3  Adelanto Detention Center?
4    A   Staff?
5    Q   That's right?
6    A   GEO staff?
7    Q   GEO staff. Thank you for the clarification.
8    A   I have a warehouse supervisor and one clerk.
9    Q   How many janitors did you say that you employ?
10   A   I'm authorized seven.
11   Q   But only six are currently employed?
12   A   I believe that's correct.
13   Q   How many laundry technicians do you employ?
14   A   I believe it's three.
15   Q   And you said that there are five detainee
16 workers who work in the laundry as part of the Voluntary
17 Work Program; is that right?
18   A   I don't recall stating that, but that's an
19 approximate number.
20   Q   How many GEO employees work in maintenance at
21 Adelanto?
22   A   I have a supervisor, five or six maintenance
23 techs. I forget the exact number. And two -- two tool
24 room clerks.
25   Q   And how many GEO employees work in food
                                                Page 239

1 Amendment No. P00020. And it looks like it was signed
2 on December 1st, 2015 by Cynthia Herrera. This is a
3 modification to the IGSA.
4        Have you seen this document before?
5    A   Yes.
6    Q   When was the last time you saw this?
7    A   I can't be specific as to what date it was.
8    Q   Was it this week?
9    A   This is an old document, so it's been a while
10 since I referred to it.
11   Q   Okay. Let's look at page Bates Stamp
12 ADELANTO-SDT-2105. This is a Minimum Guaranteed
13 Staffing Plan. My understanding is that this is -- this
14 is a staffing plan for when there are 1,455 detainees at
15 the Adelanto Detention Center; is that correct?
16   A   It's correct.
17   Q   Okay. So under this staffing plan, the Minimum
18 Guaranteed Staffing Plan -- you know what, we're going
19 to do -- we're going to go through the staffing plan.
20 And I'm going to make a little chart as we go. And then
21 we will enter that into evidence. So if you will
22 indulge me.
23       How many warehouse clerks are provided for in
24 this staffing plan, full-time employees?
25   A   On this staffing plan?
                                                Page 241

1 Q   That's correct.
2 A   Zero.
3 Q   So Minimum Guarantee Staffing Plan, there's
4 zero warehouse clerks.
5       How many janitors are provided for in this
6 staffing plan?
7 A   On this staffing document, three.
8 Q   How many laundry technicians?
9 A   Two.
10 Q   Let's turn to the next -- oh, no, same page.
11       How many maintenance -- maintenance workers?
12 A   Total of six.
13 Q   A total of six.  And that includes a
14 maintenance supervisor; right?
15 A   Correct.
16 Q   And we've already established that detainees
17 are not supervisors --
18 A   Correct.
19 Q   -- in the work program?
20       How many food service workers are presented for
21 in this staffing plan total?
22 A   Twenty-seven.
23 Q   And that includes managers, supervisors,
24 workers and clerks; right?
25 A   That's correct.

Page 242

---

1 document?
2 BY MS. WRIGHT:
3 Q   That is what I'm asking.  We're just talking
4 about this document right now.
5 A   Okay.  Because --
6 Q   We're talking about the document that is Bates
7 labeled ADELANTO-SDT-0002108.
8 A   Right.  On the document, it's six -- or I'm
9 sorry -- 8.  I didn't see it clearly.
10 Q   And how many food service workers including
11 managers and supervisors are required when the staffing
12 plan is at max capacity pursuant to this document?
13 A   The staffing plan authorizes 27.
14 Q   So the difference here between minimum
15 guaranteed and maximum beds is 485 detainees, but
16 according to these staffing plans, despite an increase
17 in the population of 485 detainees, GEO does not need to
18 staff additional janitors.
19       You see that; right?
20 A   On the --
21       MS. ARMSTRONG:  Objection.  Assumes facts not
22 in evidence.
23       THE WITNESS:  On this staffing document, there
24 were none allotted.
25 ///

Page 244

---

1 Q   Okay.  Go ahead and flip the page of Exhibit 15
2 to the page Bates marked ADELANTO-SDT-0002107.  Here
3 we've got-- oops.  I'm sorry.  Wrong page.
4       Please turn to the page marked 2108?
5       MS. ARMSTRONG:  2108?
6       THE WITNESS:  Okay.
7 BY MS. WRIGHT:
8 Q   This is the staffing plan at full capacity,
9 which is 1,940 beds; right?
10 A   Yes.
11 Q   Okay.  When there is full capacity, when there
12 are 1,940 detainees at the Adelanto Detention Center,
13 how many warehouse clerks do you need?
14 A   We have one.
15 Q   How many janitors do you need?
16 A   We have seven at the moment --
17 Q   And that's --
18 A   -- authorized -- on the document, it says
19 three?
20 Q   Okay.  How many laundry technicians do you
21 need?
22 A   Strictly technicians, it has two.
23 Q   How many maintenance workers do you need total
24 including the supervisor?
25       MS. ARMSTRONG:  Are you asking what's on the

Page 243

---

1 BY MS. WRIGHT:
2 Q   And that's because detainee workers would
3 theoretically work to clean the facility?
4 A   No.  The janitor strictly worked the
5 administrative areas outside of the secure area.  I
6 can't speak to the company and ICE's rationale for
7 agreeing to this document.
8 Q   So more janitors are not needed with the
9 facility increases, because why?  Can you explain that
10 to me?
11 A   I can't speak to why this document didn't have
12 more janitors built into it.
13 Q   Why would GEO need to employ only two laundry
14 technicians in the context when the detainee population
15 increases by 485 people?
16       MS. ARMSTRONG:  Objection.  Calls for
17 speculation.
18       THE WITNESS:  I can't speak to it, but the
19 laundry departments did not change in their physical
20 plant size.
21 Q   But the quantity of laundry that needs to be
22 laundered would change with 485 additional bodies.
23       Don't you agree?
24 A   I can't speak to why the company and ICE agreed
25 that those were the approved numbers.  I had no

Page 245

---

62 (Pages 242 - 245)

1 involvement in it.
2    Q   Do you agree that the amount -- the quantity of
3 laundry that would need to be laundered would increase
4 with the addition of 485 detainees?
5    A   The laundry will increase.
6    Q   And the work in the laundry rooms will increase
7 as a result.
8        Do you agree with that?
9    A   There would be some increase.
10   Q   And let's look at the food service column.
11 Under this staffing plan, GEO needs 27 food service
12 workers at minimum capacity and 27 food service workers
13 at maximum capacity.
14       Why do you think that there's no change in
15 between those two plans?
16       MS. ARMSTRONG: Objection. Calls for
17 speculation.
18       THE WITNESS: Again, I didn't have involvement
19 in developing the staffing document. I can't speak for
20 whomever developed it.
21 BY MS. WRIGHT:
22   Q   Do you know who developed this staffing plan?
23   A   Not off the top of my head, no.
24   Q   Is it someone at GEO?
25   A   Not for sure.

Page 246

1    Q   But you as the warden of the Adelanto Detention
2 Center are not responsible for coming up with staffing
3 plans for your own facility?
4        MS. ARMSTRONG: Objection. Misstates prior
5 testimony.
6        THE WITNESS: I don't have the authority to
7 develop an entire staffing plan.
8 BY MS. WRIGHT:
9    Q   Who does?
10   A   It's done at a level much higher than mine.
11   Q   Which level?
12   A   I'm not exactly sure who develops them in the
13 corporate office.
14   Q   Okay. Let's talk about the corporate office.
15 Your immediate supervisor, remind me of who that is?
16   A   Joe Moorehead.
17   Q   And he's in Los Angeles?
18   A   Correct.
19   Q   And his title is?
20   A   Director western region director of operations.
21   Q   Do you know whether Joe Moorehead creates
22 staffing plans for the Adelanto Detention Center?
23   A   He may have some involvement, but as far as
24 creating them to become a contractual document not to my
25 knowledge.

Page 247

1    Q   Do you know whether Paul Laird, the western
2 regional vice president, has authority to create
3 staffing plans at Adelanto?
4    A   To my knowledge, no. He may have some input,
5 but create, no, not to my knowledge.
6    Q   No, he doesn't have authority to do it or no,
7 you don't know?
8    A   To my knowledge, I -- I'm not aware of him
9 having the authority to do it.
10   Q   Does David Donahue create staffing plans for
11 Adelanto?
12   A   He has involvement. I can't speak to his
13 authority. I don't know all of his authorities when it
14 comes to these documents.
15   Q   Do you, as the warden of the Adelanto Detention
16 Center, have any input in creating staffing plans, like
17 the one that we're looking at right now?
18   A   I can make a suggestion or a comment, may
19 not -- may or may not be considered.
20   Q   How frequently do you make suggestions or
21 comments?
22   A   I think I mentioned this morning, when we were
23 speaking, regarding janitor -- GEO janitorial staff,
24 that there was a discussion between my regional vice
25 president, Mr. James Black, and myself, that GEO added

Page 248

1 for additional janitors, whether I make a suggest and
2 it's considered or not it way above my authority.
3    Q   Did you have any input with respect to these
4 staffing numbers that were looking at in Exhibit 15?
5    A   On this document, your -- specific to this
6 document; correct?
7    Q   I'm talking about Exhibit 15, that's correct,
8 the document in front of you?
9    A   I don't recall specific input. I -- not that I
10 recall at this time.
11   Q   So your testimony is that you don't know who
12 created this staffing plan that we're looking at here
13 for the Adelanto Detention Center; is that correct?
14   A   I don't know who created a final version. I
15 don't.
16   Q   Who created a draft version?
17   A   I don't know.
18   Q   Who should we be asking these questions to if
19 it's not you?
20   A   Someone at the corporate office develops our
21 contractual staffing plan. I'm not sure who that
22 individual is.
23   Q   And these numbers are different today, you've
24 said; is that correct?
25       MS. ARMSTRONG: Objection. Vague.

Page 249

63 (Pages 246 - 249)

1     THE WITNESS:  The number that I recognize as
2  being different is the janitor numbers.
3  BY MS. WRIGHT:
4     Q   Okay.  So let's add this today.  And how many
5  janitors are staffed pursuant to the current Adelanto
6  Detention Center staffing plan at minimum guaranteed
7  capacity?
8     A   Right now, we operate off the 1,940.  My
9  authorized staffing for janitors is seven.
10    Q   Okay.  But there are only six currently on
11  staff?
12    A   I believe.  I'm not 100 percent sure, but I
13  believe seven -- excuse me -- six of seven are filled.
14    Q   Okay.  How many warehouse clerks do you employ
15  at the Adelanto Detention Center?
16    A   One.
17    Q   How many laundry technicians?
18    A   Two.
19    Q   How many maintenance workers?
20    A   Eight.
21    Q   How many food service workers?
22    A   The 27.
23    Q   Okay.  So the only change between the document
24  that we're looking at, Document 15, and today, to
25  your knowledge is that four additional janitors --

Page 250

1  BY MS. WRIGHT:
2     Q   You're the warden of the detention center.  You
3  have an understanding of what it takes to maintain and
4  operate the Adelanto Detention Center; right?
5     A   Yes.
6     Q   You have an understanding of what it takes to
7  do the laundry for 1,940 people; right?
8     A   Yes.
9     Q   And to run the kitchens for that many people;
10  right?
11    A   Yes.
12    Q   So if no detainee workers showed up or the
13  Voluntary Work Program ceased to exist, would you have
14  to hire additional staff to fulfill those functions?
15        MS. ARMSTRONG:  Objection.  Compound.  Calls
16  for speculation.  Vague.
17        THE WITNESS:  I don't know.  As of right now,
18  if detainees don't show up, we use additional staff
19  resources to accomplish whatever tasks needs to be
20  accomplished.  It would be above my authority.  I don't
21  know if it would have to be increased.
22        MS. WRIGHT:  We'll enter this chart into the
23  record as Exhibit 39.
24  ///
25  ///

Page 252

1  janitor positions have been created?
2     A   To those columns, yes.
3     Q   And all seven of those janitor positions are to
4  clean and maintain areas outside the secured perimeter?
5     A   Primarily, yes.
6     Q   That's -- earlier you said that janitors
7  maintain the administrative buildings, where detainees
8  can't go.
9         Are you changing your testimony now?
10        MS. ARMSTRONG:  Objection.  Misstates prior
11  testimony.  Argumentative.  If you're going to state
12  things like that, at least, be accurate about what he
13  did state earlier, which isn't what you just said.
14  BY MS. WRIGHT:
15    Q   Go ahead, sir.
16    A   I'm not changing any statement.  That is where
17  the areas they clean.
18    Q   If no detains showed up for any voluntary work
19  program shifts ever, would these numbers have to change,
20  staffing program numbers have to change?
21        MS. ARMSTRONG:  Objection.  Calls for
22  speculation.
23        THE WITNESS:  I can't speak to that.  I don't
24  know.
25  ///

Page 251

1         (Plaintiffs' Exhibit 39 was marked for
2  identification by the Certified Shorthand Reporter and
3  attached hereto.)
4  BY MS. WRIGHT:
5     Q   Okay.  Warden Janecka, the Adelanto Facility is
6  audited on occasion by governmental or non-governmental
7  organizations; right?
8         MS. ARMSTRONG:  Objection.  Compound.
9         THE WITNESS:  Yes, it's audited.
10  BY MS. WRIGHT:
11    Q   How do you prepare for those audits?
12    A   We prepare by trying to ensure that we're
13  meeting the PBNDS standards and the ACA standards.
14    Q   What specific tasks do you undertake in advance
15  of an audit?
16    A   Could be to ensure our sanitation levels are
17  up.  It could be to ensure -- try to ensure that our
18  policies are up to date, post orders, meet with staff
19  are some of the things we do.
20    Q   When you meet with staff in advance of an
21  audit, what is the purpose of that conversation?
22        MS. ARMSTRONG:  Objection.  Vague.
23        THE WITNESS:  It's for their staff awareness of
24  their departments.
25  ///

Page 253

64 (Pages 250 - 253)

1 BY MS. WRIGHT:
2    Q    Now, the Adelanto Detention Center is
3 accredited by the America Credential Association; is
4 that right?
5    A    That's correct.
6    Q    That's known as ACA?
7    A    Correct.
8    Q    And to obtain that accreditation and to
9 maintain it, ACA conducts audits of Adelanto; right?
10   A    Correct.
11   Q    How frequently does ACA conduct an audit of
12 Adelanto?
13   A    Once every three years.
14   Q    When was the most recent inspection.
15   A    It was in 2016, the fall.  I forget the month,
16 but it was in the fall of 2016.
17   Q    When is the next ACA inspection?
18   A    This fall, 2019.
19   Q    What day?
20   A    I don't know -- it's the latter part of
21 October, early November.  I don't know the specific
22 dates off the top of my head.
23   Q    But ACA has notified you of the date?
24   A    I was -- been notified by my regional office as
25 of the date.  I don't know it specifically.

Page 254

1    Q    Have you started preparing for that audit yet?
2    A    We try to stay prepared on a daily basis.
3    Q    But have you undertaken any tasks specifically
4 in anticipation of that audit?
5    A    I emphasized to staff what some of the auditors
6 look for as their on their walk throughs and some of the
7 requirements.
8    Q    Okay.  I'll hand you Exhibit 40.
9        (Plaintiffs' Exhibit 40 was marked for
10 identification by the Certified Shorthand Reporter and
11 attached hereto.)
12 BY MS. WRIGHT:
13   Q    This is a letter to American Correctional
14 Association letterhead.  It is dated September 20th,
15 2016, addressed to you, James Mr. Janecka, warden of
16 Adelanto Detention Facility.  And its signed by -- at
17 the bottom by Samuel Meyer at Standards and
18 Accreditation, ACA.
19       Are you familiar with this document?
20   A    Yes.
21   Q    What is this document?
22   A    It's the notice from ACA that -- when the
23 facility will be going through the ACA audit.
24   Q    So this pertains to the 2016 audit, which is
25 the most recent ACA audit; right?

Page 255

1    A    Correct.
2    Q    Okay.  So you were notified that an audit would
3 take place on October 24th or 25th of 2016; right?
4    A    Correct.
5    Q    And this letter is dated September 20th, 2016.
6 So you had a little over a month's notice?
7    A    Approximately, yes.
8    Q    But in this case, you've got more than a couple
9 of months notice of the next audit.  You already know
10 the date of that; right?
11   A    Our audits are pretty consistent, every three
12 years.  It's going to be around that time period.  So I
13 said late October, early November.  I don't know exactly
14 the dates.
15   Q    But you've been notified of the date of the
16 audit.  You just can't recall it as you sit here today?
17   A    Correct.
18   Q    Hand you Exhibit 41.
19       (Plaintiffs' Exhibit 41 was marked for
20 identification by the Certified Shorthand Reporter and
21 attached hereto.)
22 BY MS. WRIGHT:
23   Q    Exhibit 41 is an e-mail from Sharon Buczkowske,
24 Ms. B, sent on September 26th of 2016 to you.  And the
25 subject line is Day One ACA Mock Walk.

Page 256

1        Do you see that?
2    A    Yes.
3    Q    Do you recall receiving this e-mail?
4    A    I don't recall receiving it, but I'm on the
5 e-mail.
6    Q    Do you have any reason to think you didn't
7 receive it?
8    A    No.
9    Q    Let's look at the last e-mail in this chain,
10 which actually starts at the bottom of the first page.
11 So we're looking at the bottom of the page Bates Stamped
12 2274.  You can look at the screen, if that's helpful.
13 This is an e-mail from you, James Mr. Janecka, dated
14 July 20th, 2016.  The subject is Day One ACA Mock Walk;
15 correct?
16   A    Yes.
17   Q    And in the e-mail you say that you weren't able
18 to attend all of the Day One ACA Mock Walk, but you did
19 get to attend about two-thirds of it.
20       What is an ACA mock walk?
21   A    An ACA mock walk is our company sends staff in
22 from our regional office or other facilities, typically,
23 six -- four to six months prior to the actual audit.
24 And those individuals go through and they are -- they go
25 through all the different ACA standards and things that

Page 257

65 (Pages 254 - 257)

1  the actual ACA auditors may look at, and point out areas
2  that -- if they need improvement or things that could be
3  improved upon.
4      Q    And who from corporate conducts the ACA mock
5  walk?
6      A    It could be -- it could be somebody from the
7  corporate office.  Typically, it's some -- our regional
8  compliance director or one of her staff.
9      Q    And what's her name?
10     A    Heather West.
11     Q    Who conducted this ACA mock walk from
12  corporate?
13     A    I don't recall who was on the walk.  I don't
14  remember.
15     Q    Have you already had the ACA mock walk for the
16  2019 inspection?
17     A    No.
18     Q    Have you planned it?
19     A    We have an upcoming remote audit, second or
20  third week in July.
21     Q    And who from corporate is going to conduct the
22  remote audit?
23     A    It's going to be some of the regional
24  compliance team.
25     Q    And who is that?

Page 258

1      A    Heather West, if I'm not mistaken, a gentleman
2  by the name of Christopher Nardozi.  And there's another
3  lady that works in -- for Heather, that I don't remember
4  her name.  She may be on the team also.
5      Q    And are those individuals also going to conduct
6  an in-person ACA -- ACA mock walk for the 2019
7  inspection?
8      A    To my knowledge, I haven't been notified of a
9  personal walk.  I have been notified of the remote
10  audit.
11     Q    What does the remote audit entail?
12     A    It -- it's a review of files and policies and
13  procedures.
14     Q    Does the remote audit review the conditions on
15  the ground, the sanitation and the maintenance on the
16  ground?
17     A    I haven't been notified that we're going to
18  have a physical audit at the facility, mock audit yet.
19     Q    So the remote audit does not involve an audit
20  of the conditions on the ground?
21     A    Not if it's a remote, no.
22     Q    So -- and you said the remote audit does
23  involve looking through records?  Is that what you said?
24  Can you remind me?
25     A    It involves looking through ACA files that we

Page 259

1  build.  It involves review of policy and post orders.
2      Q    What ACA files do you build?  What does that
3  mean?
4      A    There's -- I can't quote the exact number, but
5  there's approximately 400 standards that ACA audits.
6  And there are files that are built for supporting
7  documentation on each one of those approximately 400
8  standards.
9      Q    Who maintains those files?
10     A    My compliance manager.
11     Q    Who is that?
12     A    Joanne Langill, L-a-n-g-i-l-l.
13     Q    And what exactly is in the files?  Are they
14  physical files or computer files?
15     A    They're computer files.  It's in an -- I guess
16  I'm not an electronics person.  I'm not that savvy, but
17  it's an electronic database-type that maintains the
18  files.
19     Q    What is the database called?
20     A    I -- I don't know the specific name of the
21  database.
22     Q    And so what -- what is specifically within each
23  file?
24     A    There's a copy of the standard that ACA
25  provides to all facilities that fall under their

Page 260

1  standards.  And it will state whatever the standard is.
2  And then behind it, there will be supporting
3  documentation to show that you meet the standard.
4      Q    And who creates the supporting documentation to
5  show that the standard is met?
6      A    The documentation is collected from the
7  different departments where the standard is applicable
8  to.  So each department has a set of standards.  Their
9  paperwork is designed to meet the ACA standards.  So
10  it's collected and turned over to Ms. Langill.
11     Q    And how often do these ACA files get audited?
12  How often are they added to?
13     A    Some standards require quarterly documentation.
14  Some standards require annual.  It varies on the
15  standard.
16     Q    Let's look at page -- the first page of
17  Exhibit 41, Bates Stamp 2274.  So you e-mailed your team
18  on July 20th, 2016 about the mock walk with a list of
19  tasks that you thought should be attended to before the
20  mock walk; is that right?
21     A    I think it was actually during the mock audit,
22  because I was -- said I was not able to attend all of
23  day one.  So it was either during or immediately after
24  the mock audit.
25     Q    Okay.  And then Ms. Buczkowske responded to

Page 261

66 (Pages 258 - 261)

1 your e-mail to you on September 26th, 2016 and she says,
2 "The ceilings need to be done by maintenance when
3 they're able.  The cleaning will be done by staff and
4 detainees"; is that correct?
5     A    That's correct.
6     Q    So the detainee workers contribute to preparing
7 for the audits; is that right?
8         MS. ARMSTRONG: Objection.  Vague.
9         THE WITNESS:  The detainees would be performing
10 functions under the their voluntary work assignment.
11 BY MS. WRIGHT:
12     Q    So it's correct that the detainees would be
13 performing work in preparation for this audit?
14     A    If they choose to do so as part of their
15 Voluntary Work Program.
16     Q    So it is correct, the detainees working in the
17 Voluntary Work Program, who perform work that
18 contributes to preparing for an ACA audit?
19     A    It can.
20     Q    Okay.  Let's look at Exhibit 42.
21         (Plaintiffs' Exhibit 42 was marked for
22 identification by the Certified Shorthand Reporter and
23 attached hereto.)
24 BY MS. WRIGHT:
25     Q    This is a Significant Injury Summary.  It's got

Page 262

1 an ACA logo at the bottom and the Bates number is ACA
2 144.
3         MS. ARMSTRONG:  I think it says Significant
4 Incident Summary.
5         MS. WRIGHT:  I don't know what I said, but that
6 is correct.
7         MS. ARMSTRONG:  Injury.
8 BY MS. WRIGHT:
9     Q    Okay.  Have you seen this document before?
10     A    Yes.
11     Q    When was the last time you saw this?
12     A    This specific document?  This one in particular
13 or in general?
14     Q    Well, when did you last see this particular
15 document?
16     A    I couldn't tell you the last time I saw this
17 document.
18     Q    When did you see this document in general?
19     A    I've seen it over the years I have worked in
20 corrections and detention.  It would have been prior to
21 possibly our last ACA audit.
22     Q    If you look at the top here, the reporting
23 period is January 2017 to December 2017; right?
24     A    Okay.
25     Q    Is that right?

Page 263

1     A    Yes.
2     Q    And during this period, there is one event that
3 is recorded in this Significant Incident Summary by ACA.
4 What is that event?
5     A    A suicide.
6     Q    On March 28th, 2017, a 32-year-old man died at
7 an area hospital after he was found hanging from his bed
8 sheets in his cell at the Adelanto Facility; right?
9     A    Correct.
10     Q    What was his name?
11     A    If I'm not mistaken, it was -- Gonzalez Gadba,
12 Gadba Gonzalez.
13     Q    How many detainees have died during their
14 detention at the Adelanto Facility since you became
15 warden?
16     A    Five, I believe.
17     Q    This is Exhibit 43.
18         (Plaintiffs' Exhibit 43 was marked for
19 identification by the Certified Shorthand Reporter and
20 attached hereto.)
21 BY MS. WRIGHT:
22     Q    This the detainee death review of Raul Ernesto
23 Morales Ramos.
24         Have you ever seen this document before?
25     A    I don't recall.  I don't recall seeing it

Page 264

1 specifically.  I may have.
2     Q    Who creates these documents, these detainee
3 death reviews?  Do you know?
4     A    I don't know.  I was looking for who conducted
5 this.  I don't know off the top of my head.
6     Q    Is this a GEO document?
7     A    It doesn't appear to be.
8     Q    Have you ever heard of the ICE Office of
9 Professional Responsibility External Review and Analysis
10 Unit?
11     A    I've heard of it, yes.
12     Q    What's your understanding of that unit?
13     A    I don't -- I'm not that familiar with that part
14 of the DHS.
15     Q    Is there an external reviews and analysis unit
16 located at the Adelanto Facility?
17     A    I'm sorry.  Can you say that again?
18     Q    Does ICE maintain an Office of Professional
19 Responsibility External Reviews and Analysis Unit at the
20 Adelanto Facility?
21     A    No, not that I'm aware of.
22     Q    Does ICE conduct its own external reviews after
23 a detainee dies while in detention there?
24     A    When you refer to ICE, there's multiple
25 branches.

Page 265

67 (Pages 262 - 265)

1  Q   I'm sorry.
2      Does GEO conduct its own internal reviews
3  following a detainee death in detention at the facility?
4  A   Sometimes.
5  Q   When does GEO conduct internal reviews?
6  A   They -- whenever the corporate office would
7  deem it's necessary to send in a team to come in and do
8  an aftercation review.
9  Q   And under what circumstances has corporate sent
10  a team to do an aftercation review?
11  A   It's been at -- since I've been there, I can
12  think of the one suicide that you mentioned.  And I
13  don't recall if we had aftercation reviews on any of the
14  other incidents from GEO.
15  Q   Does GEO, at the facility level, so you as
16  warden, do you take any steps to conduct any kind of
17  internal investigation following a detainee death?
18  A   We'll take an initial review of the process,
19  but the incident is going to be ultimately reviewed by
20  someone, an entity possibly from ICE.
21  Q   And that's what your -- are you referring to
22  these detainee death reviews?
23  A   This -- I'm -- I'm not -- I think you told me
24  who did this, but ICE Office of Professional
25  Responsibility, it appears to be the one who did the

Page 266

1      Do you see that?
2  A   Yes.
3  Q   Do you recall the death of Mr. Morales?
4  A   Generally, yes.
5  Q   What do you recall about it?
6  A   If I recall, he -- he died at an outside
7  hospital.  I forget which outside hospital.  It was
8  somewhere found that he had some internal organ failure.
9  I don't remember all the specifics of it.
10  Q   ERAU, which is the acronym for the ICE office
11  that conducted this detainee death review, found that
12  Mr. Morales had been scheduled to see a medical
13  provider, but the provider documented the appointment
14  was not indicated, that the detainee was seen for the
15  same complaint a month prior and that that violated the
16  PBNDS standard on medical care, which is Section 5.A.3
17  and 6 of that standard.
18      Do you agree that this incident as reported
19  here is a violation of the PBNDS?
20      MS. ARMSTRONG:  Objection.  Vague.
21      THE WITNESS:  I'm not a medical provider.  I
22  mean, I can read what is written.  I do not see where it
23  says it was a violation, but I'm not a doctor to make
24  that assessment.
25  ///

Page 268

1  review, yes.
2  Q   And just so that I'm clear, the only
3  aftercation review that you are aware of from GEO
4  corporate, it was in response to the March 2017 suicide
5  at the Adelanto Detention Center?
6  A   The one that I can recall.  There may have been
7  others, but I recall that one.
8  Q   Would you see the aftercation review, if there
9  is one?
10  A   Possibly.  I don't recall if I've seen any
11  aftercation reviews on any of the deaths from the
12  company.
13  Q   But if there was an aftercation review, would
14  it be sent to you?
15  A   Possibly.  I can't recall if I received them.
16  Q   Now, Mr. Morales was 44-years-old.  Do you see
17  where I'm reading here?  You can look at the screen?  He
18  died on April 6th, 2017.  The cause of death was
19  preliminarily found to be liver and kidney failure.
20      Do you see that?
21  A   Yes.
22  Q   Down below, it says, "Mr. Morales had been
23  transferred to the Adelanto Detention Facility in
24  Adelanto, California on May 6th, 2014, where he remained
25  until the date -- until his date of death."

Page 267

1  BY MS. WRIGHT:
2  Q   Do you see where it says, "ODO determined the
3  medical care provided to Morales by ADF, the Adelanto
4  detainee did not meet all the requirements of the ICE
5  PBNDS 2011 Medical Care."
6      Do you see that?
7  A   Yes, I do.
8  Q   But this is the first time you've seen this
9  document that you know of?
10  A   I don't recall if I've seen it or not, but if
11  I've seen it, I can't remember all the detail to it.
12  Q   Then it says, "Deficiencies were identified in
13  the following components."
14      Do you see that?
15  A   Yes.
16  Q   You see that ICE found that the medical care
17  standard was deficient as applied to Mr. Morales?
18      Do you see that?
19  A   Yes.
20  Q   ICE found on the following page, which is Bates
21  Stamped 3489, that the Adelanto Facility violated ICE
22  PBNDS standard on medical care, Section 5.G.12, which
23  requires that each detainee facility complies with a
24  written policy for the management of pharmaceuticals.
25      Do you see that?

Page 269

68 (Pages 266 - 269)

1   A   I see.
2   Q   Were you aware of this finding before today?
3   A   If I've seen of this document, I was aware. I
4   don't recall it at the moment.
5   Q   At you sit here today, you don't recall seeing
6   this finding?
7   A   I don't specifically recall it, no.
8   Q   Exhibit 44.
9       (Plaintiffs' Exhibit 44 was marked for
10   identification by the Certified Shorthand Reporter and
11   attached hereto.)
12   BY MS. WRIGHT:
13   Q   Do you recall the death of Jose Manuel
14   Azurdia-Hernandez?
15   A   Generally.
16   Q   What do you recall about it?
17   A   I don't recall the specifics of his death. If
18   I'm not mistaken, he died at an outside hospital
19   somewhere near Christmas of 2015. I don't recall at
20   this moment the specifics of it.
21   Q   Have you seen his detainee death review, which
22   is Exhibit 44 before today?
23   A   Again, I don't specifically recall it. I may
24   have seen it, but I don't remember it at the moment.
25   Q   Mr. Azurdia died on December 24th, 2015. And

Page 270

1   Q   But this is the first time that you've seen
2   this document to your recollection --
3       MS. ARMSTRONG: Objection. Misstates prior
4   testimony.
5   BY MS. WRIGHT:
6   Q   -- is that correct?
7   A   I did not say that. I said if I've seen the
8   document, I do not recall the document.
9   Q   Your recollection, this is the first time
10   you've seen this document?
11       MS. ARMSTRONG: Same objection. Misstates
12   prior testimony.
13       THE WITNESS: I can't honestly say that. I may
14   have seen the document. I do not recall the document.
15   And it's -- and the specifics, if I've seen it.
16   BY MS. WRIGHT:
17   Q   You understand that under the PBNDS Medical
18   Care section, a detainee must receive a comprehensive
19   health assessment including a physical examination and a
20   mental health screening within 14 days of his arrival at
21   the facility; right?
22   A   Yes.
23   Q   And ICE found that Mr. Azurdia, his initial
24   physical assessment was delayed by 22 days beyond that
25   14-day requirement; right?

Page 272

1   the cause of death is cardiogenic shock, massive right
2   ventricular infarction and severe systemic heart
3   disease.
4       Do you see that?
5   A   Yes.
6   Q   And he was detained at the Adelanto Detention
7   Facility at Adelanto, California at the time of his
8   death.
9       Do you see that?
10   A   Yes.
11   Q   Do you have any reason to dispute those facts?
12   A   No.
13   Q   Please turn to the page Bates Stamp Novoa-3413
14   in Exhibit 44. It's page 16 or just look up here.
15   A   Oh.
16   Q   The conclusion of this detainee death report is
17   that the Adelanto Detention Facility is deficient in the
18   following areas of ICE PBNDS 2011 Medical Care.
19       Do you see that?
20   A   Yes.
21   Q   And then it lists several ways in which the
22   medical care that was received at Adelanto by Azurdia
23   was deficient in violation of the PBNDS.
24       Do you see that?
25   A   Yes.

Page 271

1   A   That's what's stated, yes.
2   Q   And you agree that that violates this PBNDS
3   standard that we just discussed?
4   A   That's what is stated, yes.
5   Q   Have you taken any steps following
6   Mr. Azurdia's death to improve the medical care program
7   at Adelanto in response to his death?
8       MS. ARMSTRONG: Objection. Vague.
9       THE WITNESS: In -- shortly after, in February
10   of 2016, the company made the decision to outsource -- I
11   don't know if it was directly related to Mr. Azurdia's
12   death, but in 2016, the company contracted with a
13   medical provider to do the medical care at the facility.
14   And staffing levels were increased in the medical
15   department.
16   BY MS. WRIGHT:
17   Q   How many staff work in the medical department
18   at Adelanto?
19   A   Approximately 85 to 90.
20   Q   And who was the contractor that you contract
21   with?
22   A   Currently, it's Wellpath.
23   Q   And who was it before Wellpath?
24   A   Correct Care Solutions.
25   Q   And do you know why the corporation shifted

Page 273

69 (Pages 270 - 273)

1 from Correct Care Solutions to Wellpath?
2    A   It's my understanding, they -- there was a
3 merger between Correct Care Solutions and Wellpath. I
4 don't know all the business details of it.
5    Q   Okay. Now, a detainee at the Adelanto Facility
6 died there on May 31st, 2017.
7        Do you recall that?
8    A   I don't remember the specific date, but there
9 may have been a death.
10   Q   It was Vicente Caseros. Do you recognize that
11 name?
12   A   I recognize the name.
13   Q   And what were the circumstances of his death?
14   A   I don't recall the specifics. I don't recall
15 them off the top of my head.
16   Q   Hand you Exhibit 45.
17       (Plaintiffs' Exhibit 45 was marked for
18 identification by the Certified Shorthand Reporter and
19 attached hereto.)
20 BY MS. WRIGHT:
21   Q   Can you -- did you conduct -- before I do that,
22 did you conduct -- did you or GEO corporate conduct an
23 internal investigation following the death of
24 Mr. Morales?
25   A   Ramos.

Page 274

1    A   From the general remembrance, he had some
2 serious medical conditions. I don't remember the
3 details of it.
4    Q   Was there any kind of internal investigation at
5 GEO following the death of Mr. Lopez?
6    A   I don't recall.
7    Q   Flip to page 15, Bates Stamp Novoa 3121, the
8 conclusions. "ERAU found the Adelanto Detention
9 Facility deficient in the following areas with the ICE
10 PBNDS 2011." And then it lists medical care as one of
11 those areas.
12       Do you see that?
13   A   Yes.
14   Q   On the next page, Bates Stamped 3122, "Medical
15 staff did not monitor and assess Mr. Lopez while he
16 underwent withdrawal. Did not conduct a mental health
17 evaluation. Did want complete an HIV test, urinalysis
18 or EKG."
19       Do you see that?
20   A   Yes.
21   Q   "Nurses did not identify Mr. Lopez's withdraw
22 symptoms when responding to a sick call request."
23       Do you see that?
24   A   Yes.
25   Q   "Mr. Lopez was not seen by a provider until

Page 276

1    Q   Mr. Morales?
2    A   Oh, Morales, I don't recall.
3    Q   Did you or the GEO corporation conduct an
4 internal investigation following the death of
5 Mr. Azurdia?
6    A   I don't recall.
7    Q   Did you -- you don't recall if you personally
8 looked into the death of Mr. Azurdia?
9    A   I can't recall if myself or GEO did a review.
10   Q   This is Exhibit 45. This is a detainee death
11 review of Mr. Sergio Alonso Lopez.
12       Have you seen this document before?
13   A   I may have. I don't -- if I have, I don't
14 remember the details of it.
15   Q   On April 13th, 2017, Mr. Lopez died. And the
16 cause of his death is upper gastrointestinal bleed,
17 among other things.
18       Do you see that?
19   A   Yes.
20   Q   And Mr. Lopez was detained at the Adelanto
21 Detention Facility in Adelanto, California from
22 February 9th, 2017 until his death; is that right?
23   A   Yes.
24   Q   What do you recall about the circumstances of
25 Mr. Lopez's death?

Page 275

1 March 30th, 2017, more than four weeks following a
2 doctor's February 25th -- 25th, 2017 review of his lab
3 test results, which show abnormal findings."
4        Do you see that?
5    A   Yes.
6    Q   Do any of these things violate the PBNDS?
7        MS. ARMSTRONG: Objection. Calls for
8 speculation. Calls for a legal conclusion. Vague.
9        THE WITNESS: I can't quote the PBNDS medical
10 standards.
11 BY MS. WRIGHT:
12   Q   PBNDS medical care standard 5.A.2 and 6 states.
13 "Every facility shall directly or contractually provide
14 its detainee population with the following: Medical --
15 medically necessary and appropriate medical dental and
16 mental health care and pharmaceutical services and
17 timely responses to medical complaints."
18       Do you see that?
19   A   I see it.
20   Q   So the question is, do any of these
21 deficiencies that are laid out in this detainee death
22 report violate the PBNDS?
23       MS. ARMSTRONG: Objection. Calls for a legal
24 conclusion. Calls for speculation. Vague.
25       THE WITNESS: If it's stated in the -- if ERAU

Page 277

70 (Pages 274 - 277)

Job No. 3431598

1 stated it, that was their finding.

2 BY MS. WRIGHT:

3    Q    You agree with their finding?

4    A    I'm not a -- do not have a medical background,

5 so I would have to defer to ERAU's findings.

6    Q    Now, in March 20th of this year, March 20th of

7 2019, a man died of a possible brain hemorrhage at the

8 Adelanto Facility.

9        Do you remember that?

10    A    2019.

11    Q    Uh-huh?

12    A    I -- I don't recall that.

13    Q    Do you recall the name Jose Busio?

14    A    In 2019, no, I don't recall that occurring.

15    Q    Do you know the name Fernando Dominguez?

16    A    I've heard the name.

17    Q    Who is Fernando -- Fernando Dominguez?

18    A    I -- I don't recall the circumstances.  I --

19 I've heard the name as a detainee.  I don't know the

20 individual.

21    Q    I believe this is Exhibit 46.

22        (Plaintiffs' Exhibit 46 was marked for

23 identification by the Certified Shorthand Reporter and

24 attached hereto.)

25 ///

Page 278

1 BY MS. WRIGHT:

2    Q    These are the investigative findings of the ICE

3 detainee, Fernando Dominguez Valivia.

4        Have you seen this document before?

5    A    I don't recall seeing this document.

6    Q    Now, you see that it says that Mr. Dominguez

7 died on March 4th, 2012, which precedes your tenure as

8 the warden at the Adelanto Facility; right?

9    A    Correct.

10    Q    When you started as the warden, were you

11 informed about Mr. Dominguez's death?

12    A    Not in any detail.  I was advised there was a

13 death at one point in time, but no details.

14    Q    So were you informed as it says here that a

15 doctor's review of the medical care provided to

16 Mr. Dominguez determined that Dominguez's death --

17 demise could have been prevented and that Dominguez

18 received an unacceptable level of medical care while

19 detained at Adelanto Detention Center"?

20    A    I was never briefed on any specifics of the

21 incident.  I don't know.

22    Q    Who briefed you on the general incident?

23    A    I don't -- I don't -- just other than it was a

24 death that occurred in that year.  I didn't have any

25 specifics.  I had no -- can't remember who briefed me or

Page 279

1 even told me there was a death.

2    Q    Is it a -- is it a big deal that a detainee

3 died due to an unacceptable level of medical care while

4 detained at the Adelanto Detention Center?

5    A    You never want a death anywhere, period,

6 irregardless of what findings or not findings.  The

7 deaths, you never wish them on anybody.

8    Q    Were any steps taken to your knowledge to

9 correct the unacceptable level of medical care that lead

10 to and caused Mr. Dominguez's death at the Adelanto

11 Detention Center?

12    A    I can't speak to that.  That was over two years

13 prior to me getting there.  I'm not going to speak to

14 before I was there.

15    Q    Nothing that you know of, as you sit here

16 today?

17    A    Nothing that I've been -- no, nothing that I'm

18 aware of.

19    Q    Is there anything more serious than the death

20 of a detainee at your facility?

21    A    Again, it's -- you never want a death.

22    Q    Is there anything more serious than the death

23 of a detainee at your facility?

24    A    It's major event.  It's a serious event.

25    Q    What's more serious than the death of a

Page 280

1 detainee at your facility?

2    A    I'm not saying there's anything more serious.

3 You never want harm to come to anyone.

4    Q    Did you know that more detainees have died

5 after being detained at the Adelanto Facility than any

6 other civil immigration detention center in the country?

7    A    No.

8    Q    Do you keep track of statistics of how many

9 people die under your custody?

10    A    The number, yes.

11    Q    And the total number of deaths under your

12 custody is how many?

13        MS. ARMSTRONG:  Objection.  Vague.

14        THE WITNESS:  Since I've been at the facility?

15 BY MS. WRIGHT:

16    Q    Correct?

17    A    If I recall, five.

18    Q    This is Exhibit 47.

19        (Plaintiffs' Exhibit 47 was marked for

20 identification by the Certified Shorthand Reporter and

21 attached hereto.)

22 BY MS. WRIGHT:

23    Q    This is the detainee death review of

24 Mr. Gonzalez, who hung himself in his cell at the

25 Adelanto Facility and died on March 28th, 2017.

Page 281

71 (Pages 278 - 281)

1    Have you seen this document before?

2    A   I don't remember it specifically.

3    Q   Do you see that it says Mr. Gonzalez was

4    contained at the Adelanto Detention Facility at

5    Adelanto, California at the time of his death?

6    A   Yes.

7    Q   What do you recall about Mr. Gonzalez's death?

8    A   He was in the restricted housing unit on the B

9    side.  And he tied a bed sheet to his bunk, either the

10   ladder or the top bunk.  I don't recall.  And he used it

11   to hang himself.

12   Q   Look at page 18, Bates Stamped Novoa 3100 of

13   Exhibit 47.

14       "ERAU reviewed the medical care that

15   Mr. Gonzalez was provided at the Adelanto Facility, as

16   well as the facility's efforts to ensure that he was

17   safe and secure while detained at the facility.  And

18   ERAU found deficiencies in the Adelanto Facility's

19   compliance with certain requirements of the ICE PBNDS

20   2011?"

21       Do you see that?

22   A   Yes.

23   Q   Were you, as the warden of the facility,

24   notified of the deficiencies in compliance with the

25   requirements of the PBNDS that ERAU found?

Page 282

1    sexually assaulted, but medical staff did not consult a

2    medical assessment in response to that allegation."

3        Do you see that?

4    A   I see it.

5    Q   Does that violate the PBNDS?

6    A   That was one of their findings.

7    Q   Does that violate the PBNDS?

8    A   According to their finding.

9    Q   It does?

10   A   As they state in their document, yes.

11   Q   "ICE found that when Mr. Gonzalez was put into

12   segregation.  On several occasions, the security rounds

13   exceed the 30-minute requirement under the PBNDS.  And

14   of note, on the day that Mr. Gonzalez died by suicide,

15   an officer logged a security round at 7:16 p.m. and

16   Mr. Gonzalez was discovered hanging at 7:53 p.m., 37

17   minutes later."

18       Does that violate the PBNDS?

19   A   PBNDS requires periodic irregular rounds.  If

20   they found it -- if that was one of their findings, it

21   was a finding of theirs.

22   Q   Do you see PBNDS Standard, Special Management

23   Unit, Section 5-L, which states detainees in SMU or

24   special management units shall be personally observed

25   and logged, at least, every 30 minutes on an irregular

Page 284

1    A   I don't remember specifically, but if I was

2    able to review this document, then I was notified, but I

3    don't remember specifically.

4    Q   "ICE found that Adelanto failed to provide

5    Mr. Gonzalez with language interpretation during his

6    sick call encounters."

7        Does that violate the PBNDS to your knowledge?

8    A   If that's what ICE found, they found it as a

9    violation.

10   Q   It violates to the PBNDS to your knowledge?

11   A   According to the document, yes.

12   Q   "ICE found that the Adelanto Facility failed to

13   complete a consent form for psychotropic medications for

14   Mr. Gonzalez."

15       Does that violate the PBNDS?

16   A   That was one of their findings.

17   Q   ICE found that Adelanto -- Adelanto's medical

18   staff did not conduct a medical assessment of

19   Mr. Gonzalez in response to his report that he was

20   sexually assaulted?

21   A   Which section are you on?

22   Q   Page 20, Bates Stamp Novoa-3102, at No. 4.  You

23   can look up here, if you'd like.

24   A   Okay.

25   Q   "On March 7, 2017, Mr. Gonzalez reported he was

Page 283

1    schedule?

2    A   Yes.

3    Q   You agree that if Mr. Gonzalez was not

4    personally observed and logged, at least, every 30

5    minutes, that violates this PBNDS standard; correct?

6    A   Their findings showed that it was -- it was 37

7    minutes between checks.

8    Q   And that violates this PBNDS standard, because

9    it's not every 30 minutes.

10       Do you agree?

11   A   It's not in compliance with the standard.

12   Q   Did you make any changes at Adelanto as a

13   result of Mr. Gonzalez's death?

14   A   We bumped our -- our daily rounds, our rounds

15   in RHU segregation.  We bumped them to 15- to 20-minute

16   checks to be performed by the detention staff in the

17   housing units.

18   Q   What else?

19   A   I don't recall all the specific changes, but I

20   do recall that as one of the changes.

21   Q   It's GEO's responsibility to complete those

22   checks; right?

23       MS. ARMSTRONG:  Objection.  Vague.

24       THE WITNESS:  It's the detention officers'

25   responsibility that are assigned to the segregation

Page 285

72 (Pages 282 - 285)

1 unit.
2 BY MS. WRIGHT:
3    Q    And those detention officers are GEO employees?
4    A    Correct.
5    Q    And it's GEO's responsibility to accurately
6 complete the logs of those -- of those observations;
7 right?
8    A    It's part of their job assignment, yes.
9    Q    Did the guard or guards who failed to complete
10 the observations of Mr. Gonzalez every 30 minutes on the
11 day that he died by suicide face any disciplinary
12 action?
13    A    I don't recall specifically.  I don't remember.
14    Q    Who would know?
15    A    My HR manager, possibly.
16    Q    Who's that?
17    A    Berta Berrasio Sullivan.
18    Q    Why don't we take a break.
19         THE VIDEOGRAPHER:  We are going off the record.
20 The time is 4:53 p.m.
21         (Whereupon a recess was taken.)
22         THE VIDEOGRAPHER:  We are going back on the
23 record.  The time is 5:10 p.m.
24 BY MS. WRIGHT:
25    Q    Mr. Janecka, we spoke a little bit about the

Page 286

1 ACA audits or inspections of the Adelanto Facility.
2         Do you recall that?
3    A    Yes.
4    Q    Adelanto is also subjected to spot inspections
5 or unannounced inspections by The Office of Inspector
6 General by the Department of Homeland Security; right?
7    A    Yes.
8    Q    And in a September 27th, 2018 OIG report, the
9 OIG found serious deficiencies with respect to the
10 safety, detainee rights and medical care at the Adelanto
11 Facility.
12         Are you familiar with that report?
13    A    I'm familiar with the report.
14    Q    And OIG found that those issues constitute
15 violations of ICE detention standards, the PBNDS.
16         Do you understand that?
17    A    I'm familiar with the report, yes.
18    Q    Do you understand that OIG found that those
19 issues constituted violation of the PBNDS?
20    A    I don't remember the specific language, but if
21 it's in their documents, then that was one of their
22 findings.
23    Q    And OIG also found that the issues at Adelanto
24 represent significant threats to the safety, rights and
25 health of the detainees there.

Page 287

1         Do you understand that to be true?
2    A    If that's what they wrote in the document,
3 that's -- I don't recall the specific language in the
4 document of their -- for findings.
5    Q    What steps have you taken as the warden of
6 Adelanto to remedy the deficiencies identified in the
7 September 27th, 2018 OIG report?
8    A    Do you want to -- can you recant the findings
9 specifically?
10    Q    Well, for example, OIG found that detainees
11 were hanging nooses from the vents in their rooms.
12         Do you recall that?
13    A    I recall that OIG wrote that in their report.
14    Q    Have you ever seen that -- I'm sorry.  I
15 interrupted you.
16    A    I've seen the document.  I've seen the photo
17 that they put in their report.
18    Q    Have you ever seen nooses hanging from the
19 vents at Adelanto?
20    A    No.  I've seen facility-issued bed sheets that
21 detainees would take a golf issued pencil, a little
22 pencil like you'd get at a golf course, or a paperclip
23 that they may have got through mail or legal mail, stick
24 in the vent, one of the holes in the vent that's drilled
25 in the wall of the cell above the toilet, hanging the

Page 288

1 bed sheet from either the paperclip or bed sheet.  And
2 then tie it to a leg of a bunk nearest the toilet.  And
3 then would utilize it as a privacy curtain when they
4 would use the restroom.  When they were done with it,
5 the detainees would take the sheet and tie it or twist
6 it much like a construction worker would tie or loop an
7 extension cord to where you pull it at the bottom.  And
8 it falls loose.  And the next detainee may use it for
9 the same privacy curtain and put it back in the same
10 fashion or form.
11    Q    Do you agree with the OIG that what you just
12 described violates the personal housekeeping requirement
13 of the PBNDS?
14    A    It was a standard that we did not overly
15 enforce.  Since the OIG audit, we've enforced the
16 standard.  It's language that's been added into our
17 training, our annual and pre-service trainings for
18 staff, to emphasize the no hanging of linens or other
19 articles in the living area.  We've also made it part of
20 routine shift briefing notes and minutes.  And it's also
21 part of supervisor and administrate -- administrator's
22 rounds to look for those type findings.
23    Q    So you agree that that violated the personal
24 housekeeping requirement?
25         MS. ARMSTRONG:  Objection.  Vague.

Page 289

73 (Pages 286 - 289)

1    THE WITNESS:  We did not enforce that standard
2 to the max.
3 BY MS. WRIGHT:
4    Q   You're answering a question that I'm not
5 asking.  I'm not asking if you enforced the standard to
6 the max.
7    A   If OIG found it as a finding, we did not -- as
8 a finding of not being in compliance with PBNDS, then it
9 was, yes, noncompliant with PBNDS standard.
10    Q   You understand that OIG found in that same
11 report that there had been, at least, seven suicide
12 attempts at the Adelanto Facility from December 2016
13 until 2017?
14    A   That was their finding.  There's different
15 interpretations between operations.  The medical
16 department or medical's definition of a suicide attempt.
17 The differences were in the -- from the operational side
18 for serious incident reporting.  A -- a suicide attempt
19 is a serious life-threatening event that requires
20 off-sight medical attention.
21    Q   I'm sorry.  That's your view, that a suicide
22 attempt is a serious incident?
23    A   That is part of when we report, we, meaning
24 GEO, as our serious incident reporting requirements,
25 that's our requirements for serious incident reporting.
Page 290

1 Some incidents, medical classified them as suicide
2 attempts.  Under our definition from an operation side,
3 they were considered self-harm, because they were not
4 life-threatening events.
5    Q   OIG found in that report that detainees wait
6 months to be seen by a doctor for persistent health
7 conditions and do not receive prescribed medication.
8    What steps have you taken as warden of the
9 Adelanto Detention Center to remedy that violation of
10 the PBNDS?
11    A   I can't speak specific to that, what steps.
12 Our health services administrator at that time was
13 involved in developing the corrective actions for that.
14 And I don't recall the steps that have been taken at
15 this moment.
16    Q   OIG found that the Adelanto Detention Center
17 does not provide adequate dental care to detainees.  And
18 that no detainees had received dental cleaning or dental
19 fillings in the four years prior to the date of the
20 report?
21    A   There was a backlog of initial exams and some
22 dental care at that time.  There was a weakness found in
23 our medical department at that time, where the dentist
24 was doing all initial intake examinations of detainees.
25 After that, OIG brought that to light.  The medical
Page 291

1 personnel examined their processes, examined the PBNDS
2 requirements.  And nursing staff was trained by
3 dental -- the dentist or other providers to do the
4 initial examination, which does not require an actual
5 dentist to do the initial in-take screening.
6    Q   And so those steps that you just described to
7 me were the steps that you took to address the violation
8 of the PBNDS standard pertaining to dental care that was
9 identified by the OIG?
10    A   They were the steps that our medical
11 contractor, CCS put into place to correct that finding.
12    Q   Who's the Nakomoto Group?
13    A   The Nakomoto Group is an -- an agency that --
14 it's my understanding that ICE contracts with to -- it's
15 an outside group to come in and audit the PBNDS
16 standards at the ICE facilities.
17    Q   How often does the Nakomoto Group conduct an
18 inspection of Adelanto?
19    A   Annually.
20    Q   When was the last inspection?
21    A   Last fall, October, November of last fall.
22    Q   How did you go?
23    A   It went well.
24    Q   Did you pass the inspection -- the facility
25 pass the inspection?
Page 292

1    A   Yes.
2    Q   How much advance warning do you get before a
3 Nakomoto Group audit?
4    A   I don't know specifically, maybe a month or
5 two, something -- I don't know exactly.
6    Q   Do you do mock walks prior to Nakomoto audits
7 the way that you do for ECA audits?
8    A   Not from the company.  I do them on a daily --
9 as I get through the building.  I mean, I just do a walk
10 of expectations, that -- of the facility.  And I try to
11 educate and train my staff to do on a constant basis.
12    Q   Has ICE ever imposed a financial penalty
13 against the Adelanto Facility for failure to correct a
14 deficiency?
15    A   Failure to correct, not to my knowledge.
16    Q   Has ICE ever levied a financial penalty against
17 the Adelanto Facility for any reason?
18    A   Since I've been there, there was a contract
19 deficiency report that was issued sometime in possibly
20 the latter part of December 2015.  And we were given an
21 opportunity to remedy the findings.
22    Q   What were the findings of that report?
23    A   I don't remember the specifics.  If I recall,
24 it was primarily with medical care.
25    Q   And did you remedy the findings?
Page 293

74 (Pages 290 - 293)

1    A    Yes.
2    Q    What did you do to remedy the findings, if you
3 recall?
4    A    One of the findings was the addition of
5 medical -- needed additional medical staff.  It was
6 shortly thereafter when the company contracted with CCS
7 at the time.  And staffing levels were raised in the
8 medical staffing.
9    Q    CCS is Correct Care Solutions?
10    A    Correct.
11    Q    Have there been any other deficiency reports
12 aside from the one in December 2015 that you just told
13 me about?
14    A    Not that I can recall.
15    Q    Would you know if there was a deficiency
16 report?
17    A    If it was one of a contract deficiency report,
18 I would know.  And I don't recall any other than that
19 one.
20    Q    Are they -- is it serious when a facility gets
21 a deficiency report?
22    A    It's a serious finding or -- yes.
23    Q    So GEO corporate makes sure that you are aware
24 of the deficiency report, because it can result in a
25 financial penalty?

Page 294

1 commissary?
2    A    No.
3    Q    So does GEO make a commission on the sale of
4 any commissary items?
5    A    To my knowledge, the commission that's made off
6 the commissary goes into the detainee welfare account.
7    Q    What is that?
8    A    It's a -- it's an account that's to benefit the
9 entire population.  We can use it for special
10 activities, special meals, recreation equipment, leisure
11 activities and items.  It's for the entire population.
12    Q    Generally, what is the amount of the commission
13 that's levied on commissary items?
14    A    I'm not sure, between 15 and 18 percent maybe.
15 I don't know exactly.
16    Q    Does GEO set that percentage?
17    A    It's my understanding it's set by the
18 commissary vendor, Keafy -- Keaf.
19    Q    So Keaf sets the commissary prices?
20    A    Yes.
21    Q    And Keaf automatically builds in 15 to 18
22 percent for commissary items to go towards the detainee
23 welfare fund?
24    A    I don't know the specifics if -- my business --
25 our assistant warden of finance works with Keaf to

Page 296

1        MS. ARMSTRONG:  Objection.
2        THE WITNESS:  I've become aware of it.  All the
3 implications of the financial, I'm not that familiar
4 with, because I just had one.
5 BY MS. WRIGHT:
6    Q    And to be clear, there was no financial penalty
7 as a result of the deficiency report that we have been
8 discussing?
9    A    I don't recall if it was a specific dollar
10 amount that I can remember, no.  I can't remember one.
11    Q    You don't recall if --
12    A    I don't.
13    Q    Has the Adelanto Facility ever received a
14 waiver from ICE for compliance with the PBNDS?
15    A    To my knowledge, we have one waiver.
16    Q    What is that for?
17    A    For the toilet and shower ratios at the east
18 building.
19    Q    Did you seek that waiver from ICE, you meaning
20 you, personally, Warden Janecka?
21    A    If I recall, I initiated it through the
22 company.  I don't recall who exactly sent it to ICE.
23    Q    Any other waivers that you know of?
24    A    Not that I can think of.
25    Q    Does GEO make any money from operating the

Page 295

1 establish and come up with.  And I don't know the exact
2 involvement he has, but it's Keaf's -- it's a commission
3 that's made that goes into a detainee welfare.
4    Q    What are some of the -- I think you said --
5 special projects that are funded by the detainee welfare
6 fund?
7    A    We've done pizza for the population.  We've
8 done Carl's Jr.  We've done burritos for the entire
9 population.  For some of the holiday meals, we'll
10 enhance it with extra items.  Recreational equipment can
11 be anything from leisure activities, such as checkers
12 and Xbox, extra TVs, board games, rec- -- outdoor
13 recreation equipment, some of the things.
14    Q    Do GEO officers or guards eat the same meals
15 that detainees eat?
16    A    They can.
17    Q    Do they pay for that?
18    A    No.
19    Q    Do they eat in the detainee dining halls?
20    A    No.
21    Q    They eat in the staff dining halls?
22    A    Yes.
23    Q    So putting this all together, GEO guards or
24 officers can eat meals that are prepared in the detainee
25 kitchens by detainee workers in the staff dining halls?

Page 297

75 (Pages 294 - 297)

```
 1    A   They can, yes.
 2    Q   And they don't pay for those meals?
 3    A   No.
 4    Q   You said earlier that you've been deposed a
 5  couple of times since you became the warden of GEO.  And
 6  you said that it was -- let's see here.  You said the
 7  context was in employment-related litigation.
 8        Do you remember that?
 9    A   Yes.
10    Q   I think you said that you've been deposed six
11  times.  And three or four of those times were related to
12  employment litigation involving the Adelanto Detention
13  Center; is that correct?
14    A   Approximately six times, that I -- in the
15  entirety.  And since I've been in Adelanto, to my
16  recollection, they have all been employment-related
17  matters, employee-related matters that I can recall.
18    Q   When was the last employment related matter
19  that you were deposed for with respect to GEO?
20    A   Maybe March, April of this year.  I'm not sure.
21    Q   And what was that matter about?  What was the
22  case about?
23    A   The employee was litigating a wrongful
24  termination, if I recall.
25    Q   What was the employee's name?
                                        Page 298
```

```
 1    A   If I recall, it was Ashley Broussard.
 2    Q   Was that -- is this a case that's currently
 3  pending or is it over?  Do you know?
 4    A   To my knowledge, it's still pending -- I don't
 5  know -- I don't always get notified when the cases are
 6  over.
 7    Q   Prior to Ms. Bissourd's case, what was the --
 8    A   Oh, Lord.
 9    Q   -- the next most recent deposition?
10    A   Maybe -- maybe a year prior to that.
11    Q   20- -- sometime in 2018?
12    A   Possibly.  I don't recall exactly.
13    Q   What was that matter about?
14    A   It was an employee litigation case.  I don't
15  remember the name of the person or the specific details
16  of that case.
17    Q   Both of these cases so far, Ms. Bissourd's case
18  and the one in 2018, were against GEO or were they
19  against you personally?
20    A   No.  They -- I don't recall exactly how the
21  cases were -- who was named and what.  I just recall I
22  was required to provide a deposition as part of the
23  case.
24    Q   What about the other two employee lawsuits that
25  you've mentioned?
                                        Page 299
```

```
 1    A   They would have been within -- that's two
 2  years -- with -- over the two or three years prior to
 3  that  And I do not recall what the litigation was
 4    Q   Do you recall the names of the plaintiffs in
 5  that -- those litigations?
 6    A   No, I don't
 7    Q   Have you ever been sued in your personal
 8  capacity?
 9    A   No, not to my knowledge, no
10    Q   Those are all my questions for today  Thank
11  you very much
12    A   Thank you
13        MS ARMSTRONG:  Thank you
14        THE VIDEOGRAPHER:  This is the end of Media 1
15  And this marks the conclusion of today's deposition of
16  James Janecka  We are going off the record  The time
17  is 5:31 p m
18        (Whereupon the deposition concluded at
19  5:31 p m )
20
21        (DECLARATION UNDER PENALTY OF PERJURY ON THE
22  FOLLOWING PAGE HEREOF )
23
24
25
                                        Page 300
```

```
 1                   ***
 2
 3
 4
 5        I do solemnly declare under penalty of
 6  perjury that the foregoing is my deposition under oath;
 7  that these are the questions asked of me and my answers
 8  thereto; that I have read same and have made the
 9  necessary corrections, additions, or changes to my
10  answers that I deem necessary.
11        In witness thereof, I hereby subscribe my name
12  this day of _____, 2019.
13
14
15        _____
16        WITNESS SIGNATURE
17
18
19
20
21
22
23
24
25
                                        Page 301
```

76 (Pages 298 - 301)

1        CERTIFICATION

2          OF

3    CERTIFIED SHORTHAND REPORTER

4

5     I, the undersigned, a Certified Shorthand

6 Reporter of the State of California do hereby certify:

7     That the foregoing proceedings were taken

8 before me at the time and place herein set forth; that

9 any witnesses in the foregoing proceedings, prior to

10 testifying, were placed under oath; that a verbatim

11 record of the proceedings was made by me using machine

12 shorthand which was thereafter transcribed under my

13 direction; further, that the foregoing is an accurate

14 transcription thereof.

15     That before completion of the deposition, a

16 review of the transcript [x] was [ ] was not requested.

17     I further certify that I am neither financially

18 interested in the action nor a relative or employee of

19 any attorney of any of the parties.

20     IN WITNESS WHEREOF, I have this date subscribed

21 my name

22 Dated July 12, 2019

23

24     _Kathleen Siri_

       Kathleen Siri

25     Certificate Number 9726

                          Page 302

Veritext Legal Solutions
800-336-4000