# EXHIBIT 5

## Page 1

```
1                UNITED STATES DISTRICT COURT
                 CENTRAL DISTRICT OF CALIFORNIA
2                      EASTERN DIVISION
3             CIVIL ACTION NO. 5:17-cv-02514-JGB
4    RAUL NOVOA and JAIME CAMPOS FUENTES,
     individually and on behalf of all
5    others similarly situated,
6                         Plaintiffs,
     vs.
7
     THE GEO GROUP, INC.,
8
                          Defendant,
9    _____/
10
11
12
13        VIDEOTAPED DEPOSITION OF DANIEL RAGSDALE
14
            VOLUME I, PAGES 1-190
15
            WEDNESDAY, JUNE 12th, 2019
16       515 EAST LAS OLAS BOULEVARD, SUITE 1200
                 FORT LAUDERDALE, FLORIDA
17             9:03 a.m. - 5:40 p.m.
18
19
20
21
22
     STENOGRAPHICALLY REPORTED BY:
23   VALERIE LEHTO, REGISTERED PROFESSIONAL REPORTER
     NOTARY PUBLIC, STATE OF FLORIDA
24   ESQUIRE DEPOSITION SERVICES
     FORT LAUDERDALE OFFICE
25
```

## Page 2

```
1    APPEARANCES:
2
     APPEARING ON BEHALF OF THE PLAINTIFFS:
3
         BURNS, CHAREST, LLP.
4        BY:  DANIEL H. CHAREST, ESQUIRE.
         BY:  LYDIA A. WRIGHT, ESQUIRE.
5        365 CANAL STREET, SUITE 1170
         NEW ORLEANS, LOUISIANA  70130
6        (504) 799-2845
         dcharest@burnscharest.com
7        lwright@burnscharest.com
8
9    LAW OFFICE OF R. ANDREW FREE.
         BY:  R. ANDREW FREE, ESQUIRE.
10       BY:  HENRIETTE VINET-MARTIN, ESQUIRE.
         2004 8th AVENUE SOUTH
11       NASHVILLE, TENNESSEE 37204
         (844) 321-3221
12       andrew@immigrantcivilrights.com
13
14
     APPEARING ON BEHALF OF THE DEFENDANT:
15
         HOLLAND & KNIGHT.
16       BY:  SHANNON L. ARMSTRONG, ESQUIRE.
         BY:  J. MATTHEW DONOHUE, ESQUIRE.
17       111 SOUTHWEST FIFTH AVENUE
         2300 U.S. BANCORP TOWER
18       PORTLAND, OREGON  97204
         (503) 517-2913
19       shannon.armstrong@hklaw.com
         matt.donohue@hklaw.com
20
21   ALSO PRESENT:  FRANCES E. SIMKINS
                    U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
22                  DON SAVOY/VIDEOGRAPHER
23
24
25
```

## Page 3

```
1                        INDEX
2
3    WITNESS                                      PAGE
     DANIEL RAGSDALE
4
5    DIRECT EXAMINATION BY MR. CHAREST             5
6
                   INDEX TO EXHIBITS
7
     EXHIBITS                                     PAGE
8
     EXHIBIT 1  SERVICES CONTRACT                  24
9    EXHIBIT 2  PERFORMANCE-BASED NATIONAL DETENTION 29
                STANDARDS 2011
10   EXHIBIT 3  DETAINEE WORK DETAIL APPLICATION   121
     EXHIBIT 5  ICE/DRO DETENTION STANDARD        145
11              VOLUNTARY WORK PROGRAM
     EXHIBIT 6  5.8 VOLUNTARY WORK PROGRAM        145
12
13
14           (EXHIBIT 4 INCLUDED IN VOLUME II)
15   (ORIGINAL EXHIBITS INCLUDED WITH ORIGINAL TRANSCRIPT)
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1        DEPOSITION OF DANIEL RAGSDALE
2              JUNE 12th, 2019
3
4        THE VIDEOGRAPHER:  We are now on the video
5    record.
6        Today is Wednesday, the 12th day of June of
7    2019.  The time is 9:03 a.m.
8        We're here at 515 East Las Olas Boulevard,
9    Suite 1200 in Fort Lauderdale, Florida for the
10   purpose of taking the videotaped deposition of
11   Daniel Ragsdale.  The case is Raul Novoa and Jaime
12   Campos Fuentes versus The Geo Group, Inc.
13       The court reporter's Valerie Lehto and the
14   videographer is Don Savoy, both from Esquire
15   Deposition Solutions.
16       Will counsel please announce their appearances
17   for the record.
18       MR. CHAREST:  Daniel Charest for the
19   Plaintiff.
20       MS. ARMSTRONG:  Are you guys --
21       MR. FREE:  Andrew Free for the Plaintiff.
22       MS. WRIGHT:  Lydia Wright for the Plaintiffs.
23       MS. ARMSTRONG:  Shannon Armstrong from Holland
24   & Knight for the Defendant GEO Group.  Also Matt
25   Donohue from Holland & Knight also for the
```



DANIEL RAGSDALE                                                June 12, 2019
NOVOA vs THE GEO GROUP                                         5—8

Page 5

1    Defendant GEO Group is not in the room right now,
2    but will be shortly.
3          MR. CHAREST:  And for the record we have an
4    attendee from ICE.  If you can say your name on the
5    record, please.
6          MS. SIMKINS:  Frances Simkins.
7          MR. CHAREST:  Thank you.
8
9                 DANIEL RAGSDALE
10   having been first duly sworn or affirmed, testified as
11   follows:
12                 DIRECT EXAMINATION
13   BY MR. CHAREST:
14       Q.  Good morning, sir.
15           Can you state your name for the record,
16   please.
17       A.  Yes.  It's Daniel Ragsdale.
18       Q.  And what is your current employment, sir?
19       A.  I work for The GEO Group.
20       Q.  In what position?
21       A.  I'm the Executive Vice-President for Contract
22   Compliance.
23       Q.  How long have you worked at The GEO Group?
24       A.  It will be coming up on two years in July.
25       Q.  So July, 2017?

Page 6

1        A.  Correct.
2        Q.  Where did you work before working with The GEO
3    Group?
4        A.  I worked at U.S. Immigration and Customs
5    Enforcement.
6        Q.  Is that commonly known as ICE?
7        A.  It is.
8        Q.  All right, and what position did you hold --
9    What was your last position that you held at ICE, sir?
10       A.  I was a Deputy Director.
11       Q.  Of -- When did you leave that position?
12       A.  In May of 2017.
13       Q.  What was the job you had prior to being the
14   Deputy Director at ICE?
15       A.  I was the Executive Associate Director for
16   Management and Administration.
17       Q.  From when to when, sir?
18       A.  I believe I started acting in that job in I
19   want to say October, 2010 and I was in - was in that job
20   or in that position until December, 2012.
21       Q.  I'm sorry.  Can you tell me when you started
22   again.  I missed it.
23       A.  I believe it was October, 2010.
24       Q.  Gotcha.  Thank you.
25           Have you ever been the Acting Director of ICE?

Page 7

1        A.  On several brief occasions, yes.
2        Q.  Tell me how that works, like brief occasions.
3    I don't understand what you mean.
4        A.  Both the Department of Homeland Security and
5    there's a Federal Statute around political position
6    vacancies that control who is acting in the absence of a
7    Senate confirmed political appointee.
8        Q.  And that was you from time to time then I take
9    it?
10       A.  Correct.
11       Q.  Oh.  On how many occasions were you the Acting
12   Director of ICE?
13       A.  I believe three.
14       Q.  Do you remember the dates?
15       A.  It was briefly in January of 2017.  It was
16   briefly I believe at some point when the Acting
17   Director, his name is John Sandweg left, so it was a
18   couple of weeks.  I believe it was briefly when the
19   Acting Director John Morton left, so it was a couple of
20   occasions.
21       Q.  So that's three, if I'm counting correctly, or
22   unless you've given me two that overlap.  Is it Sandweg?
23       A.  Sandweg, S-a-n-d-w-e-g, John Sandweg.
24       Q.  So when Mr. Sandweg left that was one occasion
25   and the other one was when Mr. Morton left?

Page 8

1        A.  So Mr. Morton was the Senate confirmed
2    Director that began in 2008 and then Sarah Saldana was
3    the second Senate confirmed Director, so it could be as
4    many as four times, and we're talking a matter of weeks
5    in each case.
6        Q.  Can you for the record state - spell the last
7    name you just said.
8        A.  Sarah Saldana, S-a-l-d-a-n-a.
9        Q.  All right, so maybe three, maybe four times in
10   a matter of weeks, and frankly no disrespect, but the
11   stopgap because the regulations require someone to be
12   acting while the - the Senate approved person is not
13   in - in position.  Is that fair?
14          MS. ARMSTRONG:  Objection to the form, vague.
15          THE WITNESS:  I want to be precise.
16   BY MR. CHAREST:
17       Q.  Sure.
18       A.  So there is again --
19       Q.  If you need to review something, let me ask
20   you better.
21           Summarize, if you would, your intermittent
22   positions as Acting Director for ICE.
23       A.  So in the absence of a Senate confirmed
24   political appointee generally speaking the Deputy
25   Director will assume the roles of the Director, so in



DANIEL RAGSDALE
NOVOA vs THE GEO GROUP

June 12, 2019
9–12

Page 9

1  the absence of that person I on several occasions
2  stepped up in that role temporarily.
3      Q.   And you've told us about three occasions and
4  there may or may not have been another one that you're
5  not sure of?
6      A.   There could have been a brief time as well,
7  but I believe that's - that's right.
8      Q.   You, yourself, were never Senate confirmed,
9  correct?
10     A.   No.  I was the career person in the number two
11 job.
12     Q.   All right.
13         Were you paid on the - on the Executive
14 schedule during the time you were at ICE?
15     A.   No.
16     Q.   Do you know what that means?
17     A.   I do.
18     Q.   What does it mean?
19     A.   The Executive schedule is a schedule of
20 salaries that GSA puts out for Senate confirmed and
21 other political appointees.
22     Q.   All right, and you were never even during your
23 time as Acting Director paid on that scale?
24     A.   No.
25     Q.   Okay.  Well, you mean - you said no, but you

Page 10

1  mean yes?  Yes, you were never paid on that scale,
2  correct?
3      A.   No.  I was never paid on the Executive
4  schedule.
5      Q.   Fair.  All right.
6         All right, before October of 2010 you were, if
7  I understand it correctly, effectively a lawyer within
8  ICE, you were Senior Counsel and Chief Enforcement of
9  the law - Chief of the Enforcement Law Division.  Is
10 that fair?
11        MS. ARMSTRONG:  Object to the form, vague,
12    compound.
13        THE WITNESS:  Yeah.  No.
14 BY MR. CHAREST:
15     Q.   Okay, what was your job before being Executive
16 Associate Director?
17     A.   I was Senior Management Counsel, so from I
18 think 2008 until 2010.
19     Q.   Okay, and what did that job entail?
20     A.   So that position was working for the Director
21 and essentially providing counsel on various law
22 enforcement matters and other Agency matters that were
23 assigned to me.
24     Q.   Can you give more color or more detail on what
25 you mean by various law enforcement matters.

Page 11

1      A.   It's a law enforcement agency, so that
2  position was responsible for issues related to both
3  criminal investigations, immigration enforcement, the
4  whole range of the Agency's functions.
5      Q.   You were advising the Director?
6      A.   Correct.
7      Q.   Okay, what job did you hold before that?
8      A.   I was Chief of the Enforcement Law Division in
9  the Office of the Principal Legal Advisor.
10     Q.   What was the type of work you did when you
11 were the Chief - Chief of Enforcement Law Division?
12     A.   So that was in the legal program at ICE and we
13 provide advice to the law enforcement components
14 regarding, you know, the statutory authorities and the
15 statutes the Agency enforced.
16     Q.   You understand this particular case pertains
17 to a facility in Adelanto, California, right?
18     A.   Yes.
19     Q.   All right, is there - what's - what's the --
20 In your work at GEO is there a name for that facility
21 that you all use internally?
22     A.   I believe it's known as the Adelanto ICE
23 Processing Center.
24     Q.   Okay, I've seen acronyms AIPC.  Is there like
25 a - is it AIPC or something or is it they just say the

Page 12

1  word, the letters?
2      A.   I don't know what people generally do.  It's
3  known as the Adelanto ICE Processing Center.
4      Q.   Fair enough.
5         If I say the Adelanto Center or Adelanto you
6  understand that we're talking about that - that
7  facility?  Is that fair?
8      A.   I do.
9      Q.   All right.  Great.
10        Have you been there before to the Adelanto
11 facility?
12     A.   Yes.
13     Q.   How many times?
14     A.   I believe three, but maybe as many as four.
15     Q.   Have you ever been there in connection with
16 learning or investigating issues relating to this
17 particular lawsuit?
18     A.   No.
19     Q.   Your work there or your visits there have all
20 been other work for GEO not pertaining to this lawsuit?
21     A.   Correct.
22     Q.   All right, what type of work have you done
23 when you visited the Adelanto facility?
24     A.   Liaison meetings with ICE on actually both
25 occasions.



Page 13

1    Q.   So you said both.  You suggested you might
2  have been there three or four times.  Do you mean to say
3  each occasion you think there was liaison meetings with
4  ICE?
5        It's not a trap.
6    A.   What you'll have to ask me is, in other words,
7  I was there twice during my tenure at GEO.
8        If you're asking me if I've been there over
9  the course of time then the answer's different.
10   Q.   Perfect.  All right, so thank you for the
11  clarification.  I appreciate it.
12        Since you've been working at GEO you've been
13  to the Adelanto facility twice, both of which were
14  liaison meetings with ICE, correct?
15   A.   Yes.
16   Q.   And prior to your employment with GEO you had
17  visited the Adelanto facility once or twice in your
18  capacity at ICE, correct?
19   A.   Correct.
20   Q.   What were the purpose and scope of the
21  meetings or the visits when you were working at ICE?
22   A.   They were site visits over the time in my
23  career, just visits to the LA field office generally.
24   Q.   Were you involved in any contract performance,
25  non-performance investigations in any of those visits to

Page 14

1  the Adelanto facility?
2    A.   No.
3        MS. ARMSTRONG:  Objection, vague, compound.
4        THE WITNESS:  No.
5  BY MR. CHAREST:
6    Q.   When was the last time you were at the
7  facility?
8    A.   A matter of months ago.  I couldn't tell you
9  precisely.  Two or three months ago.
10   Q.   Is it fair to say that you would view your
11  visits to the facility as part of the regular course of
12  your - of your work at GEO to go have a liaison meeting
13  with ICE at that facility?
14   A.   It was a meeting at ICE's request, so it
15  wasn't part of my normal day-today GEO functions, no.
16   Q.   What was the purpose of the meeting then
17  specifically?
18   A.   ICE wanted to discuss, you know, various
19  issues related to, you know, the performance of the
20  facility, the services that are offered, so it was just
21  at their request to I would say brainstorm.
22   Q.   To - to work to improve the services that were
23  provided?
24   A.   Or to expand on them.
25   Q.   Expand in terms of volume or in terms of

Page 15

1  quality?
2    A.   I would say breadth and depth would be my
3  description.
4    Q.   So both quality and volume?
5        MS. ARMSTRONG:  Objection, misstates --
6        THE WITNESS:  I didn't say --
7        MS. ARMSTRONG:  -- the testimony.
8        THE WITNESS:  -- quality or volume.  I said
9  breadth and depth.
10  BY MR. CHAREST:
11   Q.   Okay.  Well, when you say breadth what do you
12  mean?
13   A.   It could be a range of options.  In other
14  words, you could have recreation, let's just say you
15  could add a particular type of recreation, you could add
16  a particular type of programming.
17   Q.   What do you mean by programming?
18   A.   Courses, you know, activities offered to the
19  detainees.
20   Q.   Okay, and that's what you mean by breadth is
21  adding more services to the then existing or that
22  existing population?
23   A.   Correct.
24   Q.   Okay, what do you mean by depth?
25   A.   Depth could be just in terms of the number of

Page 16

1  hours, the number or the particular type of people
2  providing those services, potentially more credentialed
3  people.
4    Q.   Meaning enhancement of the - of the - the
5  level of service provided?  Is that fair?
6    A.   I'm not sure what you mean by that.
7    Q.   Okay, so you're talking about getting more
8  credentialed people to work at the facility, correct?
9    A.   A possibility for that, yes.
10   Q.   Okay, what - in what capacities for those
11  people that you're looking to get better credentials?
12   A.   I didn't say better.  What I would say is, in
13  other words, if you wanted to say offer a substance
14  abuse class or, you know, an anger management class,
15  those things could be taught by people with some level
16  of credential different than, you know, someone who
17  might teach art class.
18   Q.   Sure.  Like you and I could teach a substance
19  abuse class, but it wouldn't be as good as someone that
20  actually had credentials to do it, fair?
21   A.   I don't know that I'm qualified to teach a
22  substance abuse class.  You may be, but I understand
23  your point.
24   Q.   And that's what we're talking about is finding
25  people that are qualified to do the services that are



DANIEL RAGSDALE
NOVOA vs THE GEO GROUP

June 12, 2019
17–20

Page 17

1  being offered there at the facility, right?
2      A.  Correct.
3      Q.  Okay, was that the nature of both of the
4  liaison meetings that you had while you had been working
5  at GEO at the Adelanto facility?
6      A.  The second one for sure, the first one also
7  may have been a site visit.  I had not been there in
8  many years.
9      Q.  And when you say site visit, is that
10  effectively an informal inspection by you where you go
11  and not necessarily have a checklist but go look around
12  and make sure you're satisfied with the performance of
13  the operation?
14      MS. ARMSTRONG:  Objection, vague.
15      THE WITNESS:  No.
16  BY MR. CHAREST:
17      Q.  Okay, what do you mean by site visit?
18      A.  A tour.
19      Q.  Just a tour?
20      A.  Correct.
21      Q.  So you're going around to learn the facility
22  and intake but not necessarily evaluate and judge?  Is
23  that fair?
24      A.  A tour would simply be walking around and
25  familiarizing yourself with the location meeting the

Page 18

1  folks that are working there and making general
2  observations.
3      Q.  Did you make any observations about the - the
4  conditions about any fixes or any improvements that you
5  would have liked to have seen when you were at Adelanto
6  in any of your three or four visits?
7      A.  Nothing formal.  I had formed a personal
8  opinion on those occasions, but - but nothing that
9  produced anything in my sort of official capacity.
10      Q.  What personal opinion did you produce during
11  your - those visits that you just mentioned?
12      A.  I was pleased with the way the facility
13  looked.
14      Q.  And when you say the way the facility looked,
15  are you talking about just its physical appearance or
16  are you talking about that sort of encompasses also when
17  you're seeing the operations and the people's
18  performance there?
19      MS. ARMSTRONG:  Objection, vague.
20      THE WITNESS:  Yeah, I think -- Could you
21      clarify that question?
22  BY MR. CHAREST:
23      Q.  I'm trying to understand what you mean by when
24  you say you're pleased with the way the facility looked.
25  What's the scope of that when you're saying the way it

Page 19

1  looked?  Are you evaluating just things you see with
2  your eyes and not like the color of the paint or are you
3  saying, oh, look everyone's on time, everybody's doing
4  their job, I'm pleased with the performance as well as
5  just the physical presentation?
6      A.  I mean a general impression of the physical
7  plant, the - what I would say is the mood of the folks.
8  I encountered both employees and detainees.
9      Q.  Anything else?
10      A.  Again just general impressions.
11      Q.  Did you have any other general impressions
12  from those visits?
13      A.  Not that I can recall.
14      Q.  GEO is a private for profit corporation,
15  right?
16      A.  GEO is a publically traded company, yes.
17      Q.  For profit company?
18      A.  Correct.
19      Q.  It is a Federal Government contractor?
20      A.  It is.
21      Q.  Is GEO a real estate investment trust?
22      MS. ARMSTRONG:  Objection, vague.
23      THE WITNESS:  Yes.
24  BY MR. CHAREST:
25      Q.  All right, and you know what a real estate

Page 20

1  investment trust is, right?
2      A.  I do.
3      Q.  Okay, describe for us for the record what -
4  what you understand a real estate investment trust to
5  be.
6      A.  It is a type of company that holds real estate
7  holdings and, you know, performs services of a variety
8  of types on those locations.
9      Q.  What type of services does the - does that
10  type of company provide on those various locations in
11  your experience?
12      MS. ARMSTRONG:  Objection, vague.
13      THE WITNESS:  I know there are multiple types
14      of - of real estate investment trusts, so I'm not
15      quite sure what you mean.
16  BY MR. CHAREST:
17      Q.  Like hotel chains, for example?
18      A.  I know from just basic knowledge that, yes,
19  there are hotel chains that do that or organized that
20  way.
21      Q.  And are there certain qualifications or boxes
22  to tick in order to qualify as a real estate investment
23  trust for the IRS, for example?
24      MS. ARMSTRONG:  Objection, calls for a legal
25      conclusion.



Page 21

1   THE WITNESS:  I assume so, but I don't know.
2   BY MR. CHAREST:
3   Q.  You don't know?
4   A.  No.
5   Q.  When you described a real estate investment
6   trust you mentioned that there were real estate holdings
7   and the provision of services.  What provision of
8   services did you have in mind when you said that answer,
9   sir?
10   A.  The GEO Group provides both residential and
11   non-residential detention services at those locations.
12   That's what the company does.
13   Q.  What do you mean by non-residential?
14   A.  I mean something that I think in normal
15   language would be like a halfway house.
16   Q.  Okay, like a non-permanent place for someone
17   to sleep and reside?  Is that a fair description that
18   we're talking about?
19   A.  I think it would be someplace where someone
20   may spend a period of time where they actually sleep
21   there and they're working at other times and then there
22   are some places where they're there for programming
23   during the day and they sleep in their houses, so it's -
24   it's a range, a blended set of circumstances.
25   Q.  Fair.  All right, so when you're talking about

Page 22

1   residential and non-residential, for the residential
2   we're talking about detainees who live and spend all of
3   their time on a facility and non-residential is one
4   where the stay might be shorter and the person can come
5   and go; is that right?
6   A.  I think generally that would be right.
7   Q.  All right, and those are the services that GEO
8   provides in addition to holding real estate properties,
9   correct?
10   A.  Yes.
11   Q.  All right, and on those facilities that GEO
12   provides it provides for the residents' housing, it's a
13   room and board, some training activities, medical
14   facilities and I guess I'd call it pastime, you know,
15   non-work related activities?  Is that a fair and general
16   description?
17   MS. ARMSTRONG:  Objection, vague.
18   THE WITNESS:  Yeah, I think - could you
19   clarify the question, please?
20   BY MR. CHAREST:
21   Q.  Well, I'm trying to understand the breadth of
22   services.
23   Maybe we can just look at the contract when we
24   get it, so I'll wait on that until later.
25   Does GEO have any shareholder groups that are

Page 23

1   notably larger than any others?
2   MS. ARMSTRONG:  Objection, vague.
3   THE WITNESS:  You know, other than what I know
4   in just of reading and, you know, press releases
5   I'm not really knowledgeable about who owns what.
6   BY MR. CHAREST:
7   Q.  Okay, what did you know reading press
8   releases?  What did you have in mind when you thought
9   about that answer?
10   A.  I know that publicly traded companies put out
11   various, you know, information at - after board meetings
12   and, you know, annual reports.  I don't know precisely
13   who is the largest shareholder.  I don't know.
14   Q.  Do you own any shares in GEO?
15   A.  Yes, I do.
16   Q.  When did you acquire them?
17   A.  I - it's been twice.  In the spring of 20, I
18   guess, '18 and the spring of 2019.
19   Q.  So you didn't own any shares in GEO when you
20   were working at ICE?
21   A.  No.
22   Q.  Do you know anyone while you were working at
23   ICE that owned shares in GEO?
24   A.  I have no idea.
25   Q.  Well, let's be real clear on that point for my

Page 24

1   benefit.  Are you saying that you were not aware of
2   anybody owning it or I just don't know one way or the
3   other?
4   A.  All I know for sure is that I did not.
5   Q.  And you never heard anyone say that they did
6   at ICE?
7   A.  I - I -- No.
8   (Whereupon, Exhibit 1 was marked)
9   BY MR. CHAREST:
10   Q.  I hand you two documents.  We don't have to
11   jump into them right yet, but they will - they may
12   provide you some context to answer some questions as we
13   go forward, so to be fair I'll hand them to you.
14   The first one that's been marked as Exhibit
15   One is the - is titled Services Contract and it's dated
16   17 May, 2011 and it's a contract between the City of
17   Adelanto and The GEO Group and, of course, it appends to
18   it and makes part of it the Intergov - Intergovernmental
19   Service Agreement between ICE and the City of Adelanto.
20   Are you familiar with this agreement, sir?
21   A.  I am generally familiar with it.
22   Q.  Generally familiar with it.  What does that
23   mean?
24   A.  I am aware of what this is.  It was not in my
25   direct day-to-day responsibilities to be knowledgeable



DANIEL RAGSDALE
NOVOA vs THE GEO GROUP

June 12, 2019
25—28

Page 25

1    about this particular contract.
2       Q.   Are you -- You're the Contract Compliance
3    Officer for The GEO Group, right?
4       A.   Correct.
5       Q.   And it's not your job to make sure that this
6    contract is complied with?
7       A.   I didn't say that.
8       Q.   Is it your job to make sure that this contract
9    is complied with?
10      A.   In part.
11           My job is to perform audits to determine how
12   our performance under this contract is going.  I'm not
13   in an operational capacity to - to perform what GEO does
14   under this contract.
15      Q.   I take your point.
16           You're - you're not responsible for the people
17   that are carrying out this contract?  You're responsible
18   for making sure the people that carry out this contract
19   within GEO are doing it correctly?  Is that fair?
20      A.   No.
21      Q.   Okay, what's wrong with what I said?
22      A.   I'm not in their chain of command so, in other
23   words, I'm not responsible for precisely how they do
24   their jobs on a day-to-day basis.  What I'm responsible
25   for is performing audits which are essentially snapshots

Page 26

1    at various points of how folks are performing.
2       Q.   Okay, so when you're doing these audits how
3    does that manifest itself?  What do you do to do an
4    audit?
5       A.   We have reviewed the contract, the standards,
6    the statement of work and we create audit tools to what
7    I'll say is perform tests of a sample of various, you
8    know, services that are performed under the contract to
9    determine whether they comply or not in simple terms.
10      Q.   Did that system exist when you joined GEO?
11      A.   It did.
12      Q.   So you didn't build it from the ground up?
13   You just now - you had a -- There was a system in place
14   that you took over; is that right?
15      A.   Correct.
16      Q.   Did you change the system at all since you
17   took over or you're just adapting or adopting the system
18   that was in place?
19           MS. ARMSTRONG:  Objection, compound.
20           THE WITNESS:  If I understand your question,
21      have I made any changes since I've joined?  Yes.
22   BY MR. CHAREST:
23      Q.   Okay, what changes did you make to the
24   auditing system since you joined GEO?
25      A.   I looked at whether or not every single audit

Page 27

1    had to be done on site, I looked at the audit tools
2    themselves, I looked at some questions about particular
3    areas, but generally the system that was there is
4    largely intact.
5       Q.   What was the third one you said?  You said on
6    whether auditing done on site, with the different audit
7    tools and then the third one?
8       A.   I said, you know, would every audit have to be
9    done on site, looked at audit tools.  I --
10      Q.   I kind of repeated it.  To me it sort of
11   subsumed the first two, so if you can only - can you
12   think of anything other then?
13      A.   I reviewed the overall quality control policy
14   that - you know, we reviewed all those - the policy on
15   that.
16      Q.   Okay, did you make any other changes that you
17   can recall to the audit process?
18      A.   No.
19      Q.   All right, what audit tools are we talking
20   about?  Not just the ones that you changed, but
21   generally what audit tools do you all employ to ensure
22   compliance with this services contract that is Exhibit
23   One?
24      A.   So an audit tool is a term of art.  It doesn't
25   really mean it's a tool.  It is a set of questions

Page 28

1    developed from the contract developed from ICE's
2    Performance-Based National Detention Standards based on
3    the statement of work and we developed those questions
4    and essentially go to the facility to look at those
5    particular areas and make a determination if something
6    is compliant or not.
7       Q.   Do the questions that you use as audit tools
8    pertain to the voluntary work program, any of them?
9       A.   I believe there are some questions related to
10   the voluntary work program, yes.
11      Q.   What questions does GEO employ as audit tools
12   to evaluate the voluntary work program?
13           MS. ARMSTRONG:  Objection, vague.
14           THE WITNESS:  Could you clarify that question?
15   BY MR. CHAREST:
16      Q.   So you identified tools and said the tools are
17   a related set of questions based on the contract, the
18   PBNDS in the statement of work and you said some of
19   those questions pertained to the voluntary work program,
20   so I'm asking you what questions, what tools, if you
21   want to use that term, I don't care, pertain to the
22   voluntary work program that you all use?
23      A.   All right, I don't have the questions
24   memorized, but they would be questions related to the
25   precise standard in the voluntary work program and the



Page 29

1  PBNDS, so the existence of the program, you know, the
2  types of - of vocations that people can participate in,
3  the hours in which it's done, the selection process, you
4  know, making sure folks are paid, just obviously the
5  general administration of the program.
6       (Whereupon, Exhibit 2 was marked)
7  BY MR. CHAREST:
8       Q.  Okay, so I'd suggest I should hand to you a
9  document that's been marked as Exhibit Two --
10      A.  Okay.  Thank you.
11      Q.  -- which is the - it's a printout we have of
12  the Performance-Based National Detention Standards 2011.
13  It is a hefty document.
14      MS. ARMSTRONG:  I just want to note for the
15      record that Exhibit Two is the PBNDS Standards for
16      2011 revised December, 2016.
17      MR. CHAREST:  So noted.
18  BY MR. CHAREST:
19      Q.  When you're talking - when you and I were
20  talking about the PBNDS, we're talking about this
21  document, whatever, there might be different versions?
22  Is that fair?
23      A.  There are multiple versions of this, yes.
24      Q.  And -- But you understand when I say PBNDS and
25  you say PBNDS we're both talking about the

Page 30

1  Performance-Based National Detention Standards that are
2  reflected in Exhibit Two or some variant of Exhibit Two?
3  Is that fair?
4       A.  It would best probably to be precise that if
5  what the document you've handed me just because it does
6  make a difference these are the Performance-Based
7  National Detention Standards that were updated in 2016,
8  so that's the version you've showed me, so I'll assume
9  that's what you mean when we're talking about this
10  document.
11      Q.  Sure.  When we're talking about this document
12  that's easy enough, but when you're talking about we've
13  got these audit tools that led us - that lead us to
14  getting a set of questions that pertain to the contract
15  and to the Performance-Based National Detention
16  Standards and the statement of work, you're not talking
17  about just this revision?  You're talking about whatever
18  revision applies to whatever the location is at the
19  particular time, right?
20      A.  What I would mean is whatever the contract
21  requires --
22      Q.  Okay.
23      A.  -- so this is in some cases subsumed into the
24  contracts, but the contract is the operative document
25  that was the agreement between GEO and any client, so if

Page 31

1  ICE asked for a different set of standards to apply it
2  would not necessarily be this version, it could be
3  something else.
4       Q.  And are you aware of whether or not there are
5  changes between one version of the PBNDS and another as
6  pertains to the voluntary work program?
7       A.  There were changes in 2016, yes.
8       Q.  Okay, what were those changes?  Do you know?
9       A.  I don't know precisely what every change was
10  in that document, so - but I do know there were changes.
11      Q.  Do you remember any of the changes?
12      A.  I do know that there was a change regarding
13  compensation.
14      Q.  What was the change regarding compensation?
15      A.  The term at least a dollar a day is reflected
16  in this version.
17      Q.  And what was it before this version?
18      A.  I believe it said a dollar a day --
19      Q.  Okay.
20      A.  -- or some version of that.
21      Q.  Do you know which version applies to the
22  Adelanto facility contractually?
23      MS. ARMSTRONG:  Objection, vague as to time.
24      THE WITNESS:  I guess it would say when -- The
25      Adelanto facility has been under contract for

Page 32

1       several years.
2  BY MR. CHAREST:
3       Q.  Okay, so that sort of answer it leads me to
4  believe that you believe that contract called for
5  different Performance-Based National Detention Standards
6  over time; is that right?
7       MS. ARMSTRONG:  Objection, calls for a legal
8       conclusion.
9       THE WITNESS:  If I understand your question,
10      this document wasn't written until 2016 and if the
11      facility was in operation before 2016 then this
12      version couldn't have applied, so there must have
13      been another version.
14  BY MR. CHAREST:
15      Q.  Do you know what that prior version was?
16      A.  This on its face, you know, notes that it was
17  written in 2011, so I believe in 2011 it was a different
18  version of this - these set of standards that applied.
19      Q.  Let's not pretend like you never saw the PBNDS
20  before today, okay?
21      MS. ARMSTRONG:  Objection, argumentative.
22  BY MR. CHAREST:
23      Q.  You've seen this document before today, right?
24      A.  Yes.
25      Q.  I mean it is literally the document that you



DANIEL RAGSDALE
NOVOA vs THE GEO GROUP

June 12, 2019
33—36

Page 33

1 would use to go audit all of the entities and facilities
2 under your auspices, correct?
3     MS. ARMSTRONG:  Objection, misstates prior
4     testimony.
5     THE WITNESS:  So as I said, the contract
6     directs us which version of the standards apply in
7     which facilities.
8 BY MR. CHAREST:
9     Q.  Sure.  Okay, whatever version applies through
10 whatever contract you're aware of not only this 2016
11 revision of the Performance-Based National Detention
12 Standards but other revisions, correct?
13     A.  I'm aware of the multiple versions of this
14 over the course of time, yes.
15     Q.  I mean it is literally your sandbox?  This is
16 the job you do is make sure the facilities comply and
17 conform with whatever standards are applicable to that
18 particular facility, right?
19     MS. ARMSTRONG:  Objection, asked and answered,
20     argumentative.
21     THE WITNESS:  So as it relates to ICE which is
22     not the only client that my team audits we also
23     perform work for the Federal Bureau Of Prisons, the
24     United States Marshals Service and some other
25     clients, so the answer is as it relates to ICE I'm

Page 34

1     familiar with this document and we develop audit
2     tools depending on which version of the standards
3     at the time applied.
4 BY MR. CHAREST:
5     Q.  Okay, so do you know given your whatever
6 familiarity you have with the service contract between
7 ICE -- Sorry -- Between GEO and the City of Adelanto
8 which version of the PBNDS applied from the beginning of
9 the life of the services contract?
10     A.  So if you're referring to the document you've
11 handed me here that's dated the 17th of May, 2011 my
12 belief would be that the prior version of these
13 standards would have been what applied when services
14 commenced if that's what you're asking me.
15     Q.  All right, and then when the current version,
16 this 2016 revision came out it's your understanding that
17 the 2016 version is the version that governs the
18 relationship under the services contract; is that right?
19     MS. ARMSTRONG:  Objection, calls for a legal
20     conclusion.
21     THE WITNESS:  I would have to say we'd have to
22     refer to the contract and confirm that this was
23     updated at some point to reflect that this 2016
24     version of the standards apply.
25 BY MR. CHAREST:

Page 35

1     Q.  Okay.  Well, you're the guy that does the
2 audit.  Do you know which version applies to Adelanto,
3 which version of the PBNDS applies to Adelanto?
4     A.  As of when?
5     Q.  Today.
6     A.  Okay, as of today I believe the 2016 version
7 of these standards apply to Adelanto.
8     Q.  What's your basis for that?
9     A.  I believe our audit tools were updated
10 sometime between 2016 and 2017 prior to my arrival at
11 GEO to reflect this version of the standards, but I
12 don't have firsthand knowledge of that.
13     Q.  When you say this version, you put your hands
14 on Exhibit Two which is the 2016 revision, right?
15     A.  Yes.  That's what -- Yes, it says on here that
16 revised December, 2016.
17     Q.  Do you know if this agreement that is Exhibit
18 One, the services contract, is even the valid agreement
19 between the City of Adelanto and GEO?
20     MS. ARMSTRONG:  Objection, calls for a legal
21     conclusion.
22     THE WITNESS:  I'm not sure what you mean.
23 BY MR. CHAREST:
24     Q.  Well, it's a term for sixty months which is
25 five years, five years after May, 2011 to May, 2016, so

Page 36

1 are they - are you all still operating the facility
2 pursuant to this services contract or is there a
3 different one?
4     A.  No.  It's certainly not this contract.
5 There's been about -- It's definitely not this contract.
6     Q.  How do you know that?
7     A.  I know that the City of Adelanto terminated
8 the con - the IGSA agreement.
9     Q.  When did the City terminate the IGSA
10 agreement?
11     A.  Several months ago, I believe.
12     Q.  And what was the -- How did -- What's the
13 current relationship as pertains to GEO and ICE with
14 respect to the Adelanto facility?
15     MS. ARMSTRONG:  Objection, calls for a legal
16     conclusion.
17     THE WITNESS:  Again it's not my area to -- I'm
18     not the person who does the actual procurements,
19     but I understand there is now a direct contract
20     between GEO and ICE for services at Adelanto.
21 BY MR. CHAREST:
22     Q.  And you don't know what that contract is or
23 says or does but you're the one that audits compliance
24 with it?
25     A.  Again my job is not the procurement



Page 37

1  contracting person --
2     Q.  I didn't ask you about procurement
3  contracting.
4        MS. ARMSTRONG:  Please let the witness finish
5  his answer.
6  BY MR. CHAREST:
7     Q.  Go ahead.
8     A.  Well, in Federal Government procurement
9  actions there are different jobs, so while the - while
10  the term contract is in my title I'm not responsible for
11  the contract process in terms, so again am I familiar
12  with the agreement, you know, word for word?  No.  I
13  know generally it's a direct contract between ICE and
14  GEO.
15     Q.  How were you able to audit the contract if
16  you're not familiar with the contract?
17     A.  I don't really understand what you mean.
18     Q.  Your job is to oversee audits for compliance
19  with the performance standards under the contract
20  between ICE and GEO as pertains to two, among others,
21  the Adelanto facility, right?
22     A.  Correct.
23     Q.  All right, how do you do that if you don't
24  know what's in the contract between ICE and GEO as
25  pertains to the Adelanto facility?

Page 38

1     A.  I know that the scope of work hasn't changed,
2  so the nature of the agreement between GEO and ICE or
3  the City of Adelanto may have changed but the scope of
4  services did not.
5     Q.  So the scope of work that was in the services
6  contract that is Exhibit One is the same scope of work
7  that currently exists in the contract between ICE and
8  GEO; is that right?
9        MS. ARMSTRONG:  Objection, calls for a legal
10  conclusion.
11        THE WITNESS:  So I don't know that.  I have
12  not personally done a side-by-side comparison, but
13  it is my understanding that is generally correct.
14  BY MR. CHAREST:
15     Q.  Let me put it this way:  You're not aware of
16  any changes in the scope of work between the services
17  contract that is Exhibit One and the current direct
18  contract between ICE and GEO, correct?
19     A.  I am not aware, no.
20     Q.  And you're the person responsible for auditing
21  that agreement, right?
22     A.  Well, again I want to be precise.  When you
23  say auditing the agreement, I'm responsible for auditing
24  the operations.  I'm not responsible for, you know, to
25  auditing the contract.

Page 39

1     Q.  Your question's better than mine.  I'll ask it
2  that way.
3        You're the person that's responsible for
4  ensuring that GEO performs under the terms of the direct
5  contract between ICE and GEO through audits, correct?
6        MS. ARMSTRONG:  Objection, vague.
7        THE WITNESS:  So, no, because again as we sort
8  of went this - before, I'm responsible for
9  performing audits that make a determination of
10  compliance or noncompliance.  The operational chain
11  of command is the - are the folks that are
12  responsible for how things are done day-to-day.
13  BY MR. CHAREST:
14     Q.  Okay, you're the person responsible for
15  identifying on behalf of through the audit program any
16  conformance or nonconformance with the performance
17  standards under the contract between GEO and ICE, right?
18     A.  Correct.
19     Q.  And therefore you would and your people would
20  need to know what the performance standards are in the
21  contract between GEO and ICE as pertains to Adelanto to
22  do that job, right?
23     A.  Correct.
24     Q.  And you're sitting here telling us under oath
25  that to the best of your knowledge the scope of work

Page 40

1  under the services contract, the predecessor contract
2  and the current contract that is directly between GEO
3  and ICE as pertains to Adelanto is the same, right?
4     A.  To the best of my knowledge, yes.
5     Q.  Okay, thank you.
6        The -- And when you say scope of work, not
7  even my words, you're talking about the statement of
8  work, right?
9     A.  Correct.
10     Q.  Okay, the statement of work that's attached to
11  Exhibit A starts at - there's a Bates label in the
12  bottom right-hand corner it's called GOWER, it says
13  GOWER-GEO 0000531.  Can you flip to that, please.
14        MR. CHAREST:  G-o-w-e-r.
15  BY MR. CHAREST:
16     Q.  Okay, are you with me?
17     A.  I am at page 0000531.
18     Q.  Great.
19        And that's the - you can confirm for me and
20  for the record that that is the statement of work that's
21  appended to ultimately the services contract in Exhibit
22  One, correct?
23     A.  This is what is attached to the what you've
24  handed me as the services contract, yes.
25     Q.  Great.



Page 41

1    And the first standard that's identified
2    performance standard is the 2008 ICE Performance-Based
3    National Detention Standard, correct?
4       A.  Yes.  That's what it reads.
5       Q.  You believe that in the current version of the
6    statement of work you believe that the agreement
7    incorporates the 2011 standards and the 2016 revision of
8    that standard, correct?
9       MS. ARMSTRONG:  Objection, calls for a legal
10      conclusion.
11      THE WITNESS:  I believe this has been updated,
12      yes.
13   BY MR. CHAREST:
14      Q.  Updated to refer to the 2011 standard 2016
15   revision, correct?
16      A.  I believe that's correct, yes.
17      Q.  Are the other standards also included in the
18   current statement of work to your understanding, the
19   ACA, ALDF and NCCHC?
20      MS. ARMSTRONG:  Objection, vague.
21      THE WITNESS:  Could you say that one more
22      time?
23   BY MR. CHAREST:
24      Q.  Yeah.  Well, you see what I'm talking about
25   right in that first paragraph.  It says, "The service

Page 42

1    provider is required to perform in accordance with" and
2    then it lists a series of standards.  Are you with me?
3       A.  So if I understand your question --
4       Q.  Just answer the -- I'm just trying to frame --
5       MS. ARMSTRONG:  Please let Mr. Ragsdale finish
6       his answer then you can ask your next question.
7    BY MR. CHAREST:
8       Q.  Yeah, I'm just trying to point you in the area
9    of the document, okay?  Do you see where I'm talking
10   about?
11      A.  I'm reading - I'm looking at the first
12   paragraph here under I, Performance.
13      Q.  Right, and the form of that paragraph is that,
14   "The service provider is required to perform in
15   accordance with" and then there's a list of standards,
16   right?
17      MS. ARMSTRONG:  I'm just going to object that
18      you didn't read the full piece of the quote there.
19      THE WITNESS:  So if I following you, yes, I
20      see a list here that says 2008 ICE
21      Performance-Based National Detention Standards,
22      American Correctional Association, ACA Standards
23      for Adult Local Detention Facilities and Standard
24      Supplements for Health Services in Jails, latest
25      edition National Commission on Correctional Health

Page 43

1    Care NCCHC.
2    BY MR. CHAREST:
3       Q.  Are you answering my question or hers?
4       A.  I'm trying to answer your question.
5       Q.  Okay, my question was do you see the list?
6       A.  Yes.
7       MS. ARMSTRONG:  Objection, argumentative.
8    BY MR. CHAREST:
9       Q.  Do you see the list?
10      A.  Yes.
11      Q.  Okay, does the current statement of work have
12   a similar situation where there's the PBNDS and another
13   list, a full list of all kinds of standards or is it
14   just the one?
15      A.  So I --
16      MS. ARMSTRONG:  Objection, vague, compound.
17      THE WITNESS:  So I have not seen it
18      personally, but do I -- I know that we are still
19      required to meet ACA standards and NCCHC standards.
20   BY MR. CHAREST:
21      Q.  Okay, so -- And you know that because your
22   audit tools include issues pertaining to those
23   additional standards; is that right?
24      A.  Yes, but it's a slightly different format.  In
25   other words, we don't audit to those standards in the

Page 44

1    same way we audit to different standards, but there's an
2    audit process for those, yes.
3       Q.  Did the economics change at all under the -
4    the new direct agreement with - between GEO and ICE as
5    compared to the prior services contract between GEO and
6    Adelanto and ICE?
7       MS. ARMSTRONG:  Objection, vague.
8       THE WITNESS:  I have no idea.
9    BY MR. CHAREST:
10      Q.  The current agreement between GEO and ICE like
11   the predecessor is a performance-based contract,
12   correct?
13      MS. ARMSTRONG:  Objection, calls for a legal
14      conclusion.
15      THE WITNESS:  So if I understand correctly, it
16      includes - a reference is Performance-Based
17      Detention Standards which are - which are different
18      than - than standards that require precision to do
19      certain things in a very precise way.
20   BY MR. CHAREST:
21      Q.  Correct, meaning here are the standards we
22   want you to meet, you get this - there somehow, but as
23   long as you meet the standards for the price everybody's
24   happy, right?
25      A.  What I would say is these are written in an



Page 45

1   aspirational way, that they are looking for particular
2   outcomes without a prescribed method of - of doing it,
3   that particular function.
4       Q.   And that's how GEO performs under these
5   contracts, correct?
6           MS. ARMSTRONG:  Objection, calls for a legal
7       conclusion and vague.
8           THE WITNESS:  Again performs under the
9       standards or in terms of meeting the standards,
10      yes.  In terms of performance under the contract
11      that would be sort of a different answer, right,
12      because it would be - it's a bigger agreement.
13  BY MR. CHAREST:
14      Q.   So when you audit performance, GEO's
15  performance under the contract you're not looking to see
16  did GEO conform with step A, B and C that's prescribed
17  because step A, B and C are not prescribed --
18          MS. ARMSTRONG:  Objection.
19  BY MR. CHAREST:
20      Q.   -- right?
21          MS. ARMSTRONG:  Calls for speculation.
22          THE WITNESS:  So from - in my role my audits
23      would be did, you know, recreation happen on time,
24      were meals provided properly.  We would not look at
25      every term of the contract and make sure that those

Page 46

1   things let's say is related to, you know, billing
2   or how the government and GEO, you know, speak
3   through the contracting officer.  That's not
4   something I audit.
5   BY MR. CHAREST:
6       Q.   Sure, but even as to those did this happen on
7   time, were the meals served on time and hot and whatever
8   meeting standards we're talking about is meeting the
9   standards that are set out in whatever Performance-Based
10  National Detention Standards apply at that time at that
11  location, correct?
12      A.   Yes.  In other words, as it relates to the
13  operational work we would look at these standards and
14  determine whether or not we were meeting what these
15  standards require.
16      Q.   And I think you and I are communicating, but
17  let's be real clear.  When we're talking about a
18  performance-based contract like this the concept is the
19  vendor.  GEO doesn't have to follow neatly prescribed
20  steps on how to achieve the standard, it just needs to
21  achieve the standard through whatever means it deems
22  necessary, correct?
23          MS. ARMSTRONG:  Objection, calls for a legal
24      conclusion.
25          THE WITNESS:  So, no, and I want to make sure

Page 47

1   that I'm understanding your question.  In other
2   words, and again I'm - I am not an expert in it,
3   but I certainly have - am aware of the terms in
4   government contracting.  There are different types
5   of contracts in the government.  You know, there
6   are direct contracts between vendors, there are
7   intergovernmental service agreements, there are
8   what they call indefinite duration, indefinite
9   quantity type contracts, ID, IQ, so when you say
10      the contract there's - there are specific types of
11      contracts that exist in the government, so I just
12      want to make sure that I'm understanding your
13      question saying as it relates to operational
14      performance under ICE's standards, yes, those are
15      performance-based, but saying the contract is
16      performance-based, I don't know that I would agree
17      with that, but - but I'm not an expert.
18  BY MR. CHAREST:
19      Q.   Fair.  I'm probably -- My question probably is
20  capturing too much and that's, I think, where we're
21  missing each other.
22          In its - in GEO's performance of the
23  operational aspects of the contract, the contract in
24  your work in making sure GEO complies with the contract
25  doesn't go and look at every nit (phonetic) and jot on

Page 48

1   how the job gets done but rather that the job is done to
2   a certain standard, correct?
3       A.   Again as it relates to the standards piece of
4   the contract, yes.
5       Q.   Okay, and the standards piece of the contract
6   includes the voluntary work program, correct?
7       A.   Yes.  There's a voluntary work program
8   statement.
9       Q.   All right, does GEO now in addition to
10  providing the room and board and guard services and
11  recreational services -- Well, let me ask a better
12  question.
13          GEO provides a room and board at Adelanto,
14  right?
15      A.   Yes.  They provide housing for the detainees,
16  yes.
17      Q.   All right, it provides the guard services for
18  the Adelanto facility?
19      A.   Yes.
20      Q.   It provides transportation to the immigrant
21  detainees, correct?
22      A.   When you say transportation, in other words,
23  at ICE's request they transport people, yes.
24      Q.   Okay, food services are provided by GEO,
25  right?



DANIEL RAGSDALE
NOVOA vs THE GEO GROUP

June 12, 2019
49–52

Page 49

1   A.  Yes.

2   Q.  Medical services are provided by GEO?

3   A.  I believe it is a subcontractor of GEO but,

4  yes, it's provided under the contract.

5   Q.  It's GEO's obligation whether it does it

6  itself or has another party source, it's GEO's

7  responsibility under the contract at Adelanto to provide

8  medical services, correct?

9   A.  Correct.  Yes.

10   Q.  And GEO also provides recreational facilities

11  or recreational activities for the detainees at

12  Adelanto?

13   A.  Yes.

14   Q.  And I'm not sure if recreation includes

15  walking in - in the open air, but I mean that this sort

16  of physical -- That's probably recreation.

17      What do they - what do they do about sort of

18  like phys-ed or I mean how does that get classified

19  under your view?

20   A.  There are soccer fields, there's walking

21  areas, there's exercise equipment, so there's, you know,

22  opportunity for physical activity I think both inside

23  and outside.

24   Q.  And those services are provided by GEO under

25  the services - under the current contract between GEO

Page 50

1  and ICE as pertains to Adelanto, correct?

2   A.  Yes.

3   Q.  All right.  All right, flip, if you would, to

4  page eight of fourteen of the statement of work.  The -

5  it's VII is the header for the Detainee Work Program.

6  Is -- Have you reviewed the statement of work under the

7  current direct agreement between GEO and ICE as pertains

8  to Adelanto with respect to the detainee work program?

9   A.  No.  I have told you before I haven't seen

10  that document, the direct contract.

11   Q.  Or even that subsection?

12   A.  No.

13   Q.  Not in preparation for this deposition?

14   A.  No.

15   Q.  You didn't see it?

16      Are these to your understanding are the -- Do

17  you see any difference in your mind between what's set

18  out in the statement of work and what's set out in the -

19  in the applicable PBNDS for Adelanto or in your mind are

20  they the same?

21      MS. ARMSTRONG:  Objection, calls for a legal

22  conclusion.

23      THE WITNESS:  I mean there are different

24  documents.  The standard is, you know, a multiple

25  page document.  This is half a page, so I mean I

Page 51

1  wouldn't say they're the same.  I mean they're -

2  they're -- They are the same topic.

3  BY MR. CHAREST:

4   Q.  Do you -- When you audit for - to conform -

5  to confirm GEO performance under the agreement between

6  GEO and ICE as it pertains to Adelanto do you use the

7  applicable PBNDS or do you use the statement of work?

8   A.  We would use both.

9   Q.  And also the contract itself, I suppose; is

10  that right?

11   A.  Yes.  We would look at all the documents.

12   Q.  Okay, you just haven't done that because you

13  don't - you've not actually looked at the contract or

14  the statement of work, right?

15   A.  So what --

16   Q.  Isn't that true, right?

17   A.  I'm sorry.

18   Q.  You've done -- You've not looked at either of

19  those documents, you personally --

20   A.  No.

21   Q.  -- have not looked at either --

22      MS. ARMSTRONG:  Objection.

23  BY MR. CHAREST:

24   Q.  -- one, right?

25      MS. ARMSTRONG:  Vague.

Page 52

1      THE WITNESS:  No.

2  BY MR. CHAREST:

3   Q.  I'm saying right and you're saying no but

4  we're agreeing with each other.

5      MS. ARMSTRONG:  Objection, vague.

6  BY MR. CHAREST:

7   Q.  Is it true to say that you have never looked

8  at the agreement between GEO and ICE as pertains to

9  Adelanto?

10      MS. ARMSTRONG:  Objection, vague --

11      THE WITNESS:  I have not looked at the

12  direct --

13      MS. ARMSTRONG:  Give me a chance to finish.

14      And misstates prior testimony.

15      THE WITNESS:  So no.

16  BY MR. CHAREST:

17   Q.  Is it true that you've not looked at the

18  document?

19      MS. ARMSTRONG:  Objection.  Same objection.

20      THE WITNESS:  It is true that I have not

21  looked at the document, yes.

22  BY MR. CHAREST:

23   Q.  Okay.  All right, so -- And it's also true

24  that you have not looked at the statement of work that's

25  associated with the agreement between GEO and ICE as



Page 53

1 pertains to Adelanto, the current one, right?

2     MS. ARMSTRONG:  The same objection.

3     THE WITNESS:  Correct.

4 BY MR. CHAREST:

5     Q.  You've certainly looked at the voluntary work

6 program standards in the PBNDS 2011 revision and 2016,

7 right?

8     A.  Yes.  I'm familiar with this.

9     Q.  Okay, so the three sources that drive your

10 audit you're only actually familiar with one of the

11 documents; is that right?

12     MS. ARMSTRONG:  Objection, misstates prior

13     testimony, vague.

14     THE WITNESS:  I'm only familiar with this

15     document, yes.

16 BY MR. CHAREST:

17     Q.  And you put your hand on Exhibit Two which is

18 revision 2016 of the 2011 PBNDS, right?

19     A.  Yes.  The document you've given me marked as

20 Exhibit Two.

21     Q.  Thank you.

22     Am I right to understand that all detainee

23 work programs must be voluntary?

24     A.  Being voluntary is - is absolutely part of the

25 standard, yes.

Page 54

1     Q.  Right.

2     The exception to the voluntary work is that

3 detainees can be required to clean local - I would call

4 it local but like their houses or their -- Let me not

5 guess.  It's right here.

6     Sorry.  I had to cheat where I just pulled it

7 out.

8     Here it is.

9     So in terms of the voluntary nature, work

10 assignments are voluntary except when required to do

11 personal housekeeping, and that's a specific list of

12 four things within the PBNDS, correct?

13     A.  There is a list of detainee housekeeping

14 responsibilities in the PBNDS, yes.

15     Q.  And that's not voluntary, that's mandatory

16 whether or not the detainee wants to do it?  They're

17 required to make their bunks, stack loose papers, keep

18 the floor free of debris and dividers free of clutter

19 and refrain from hanging draping clothing, pictures,

20 keepsakes or other objects from beds, overhanging light

21 fixtures or other furniture, correct?

22     A.  Yes.  I mean assuming you've read that

23 accurately, yes, that's what they're responsible for.

24     Q.  Right, and that's not voluntary?

25     A.  No.  That is detainee housekeeping in their

Page 55

1 immediate living area.

2     Q.  Right.  That's detainee housekeeping that is

3 not voluntary, it's mandatory, correct?

4     A.  Every detainee is, you know, what shall I say,

5 expected to do that, yes.

6     Q.  Not just expected, required, right?

7     A.  The same thing, yes.

8     Q.  Well, I'm not sure it's the same thing because

9 I can expect that you might do something but I can't

10 make you do something.  In this case GEO will make the

11 detainee do those things without pay, correct?

12     A.  No.  It's not compensated as I understand it,

13 no.

14     Q.  I said without pay, sir.

15     A.  Yeah.

16     Q.  So let's make sure we hear each other.  GEO

17 not - doesn't just expect the detainees to do those four

18 things but requires the detainee to do those four things

19 without pay, correct?

20     A.  Those things are not part of the voluntary

21 work program.  Those are as you would say expect -

22 responsible, whatever word you use.

23     Q.  Required?

24     A.  Required, yes.  They are required to do that.

25     Q.  Without pay?

Page 56

1     A.  Yes.

2     Q.  Okay, all other work should be both voluntary

3 and paid; is that correct?

4     MS. ARMSTRONG:  Objection, vague.

5     THE WITNESS:  I don't know precisely what you

6     mean by that.

7 BY MR. CHAREST:

8     Q.  Okay, if the detainee is doing any other work

9 other than cleaning up their personal housekeeping area

10 the detainee only works if the detainee volunteers to do

11 so and if the - if the detainee volunteers to do so the

12 detainee gets paid; is that right?

13     A.  So detainees who participate in the voluntary

14 work program, and it's detailed with some, you know,

15 specificity in the standard in terms of the types of

16 jobs, the hours, et cetera, so detainees who participate

17 in the voluntary work program and voluntary being

18 important, those folks get paid for that work, yes.

19     Q.  Okay, are there any situations at Adelanto

20 where a detainee will be doing work for GEO that is

21 either not personal housekeeping -- Not either.  Let me

22 do it again.

23     Are there any situations where a detainee will

24 be doing work for GEO that is not personal housekeeping

25 and not paid?



DANIEL RAGSDALE
NOVOA vs THE GEO GROUP

June 12, 2019
57—60

Page 57

1     MS. ARMSTRONG:  Objection, vague.

2     THE WITNESS:  So if I understand your

3   question, there is a binary choice here where are

4   you either talking about detainee housekeeping

5   responsibilities that as you said are required and

6   not paid or there's participation in the voluntary

7   work program.  As I understand it those are the

8   only two circumstances.

9   BY MR. CHAREST:

10     Q.   And so if you're not doing personal

11   housekeeping if you're in the voluntary work program you

12   are, A, a volunteer and, B, going to be paid in some

13   form or fashion, correct?

14     A.   As I understand it there's a process to - to

15   apply, sort of as a proactive approach a detainee takes

16   to get into the voluntary work program.  There's a

17   clearance process, there's a suitability process so, you

18   know, assuming folks successfully meet that process they

19   are in the program and therefore they're entitled to the

20   compensation and other benefits assuming there are, you

21   know, some in terms of learning a trade, et cetera as

22   part of the voluntary work program.  Those are the only

23   two things that I understand exist.

24     Q.   Okay, the only two things being the personal

25   housekeeping unpaid required and the voluntary work

Page 58

1   program paid voluntary, correct?

2     A.   Correct.

3     Q.   All right, as I want to do I jumped ahead of

4   myself a little bit, so I'm going to have to backtrack a

5   little bit more on to the contract.

6     Is the current relationship between ICE and

7   GEO at the Adelanto facility, is it now deemed as CDF

8   where it was before an IGSA, I-g-s-a?

9     MS. ARMSTRONG:  Objection, calls for a legal

10   conclusion.

11     THE WITNESS:  So it's my understanding there

12   is now a direct contract.  I think that acronym

13   stands for Contract Detention Facility.

14   BY MR. CHAREST:

15     Q.   Yes, sir, and that's what - that's now what -

16   how Adelanto is considered, a contract detention

17   facility; is that right?

18     A.   Again without having seen the actual

19   agreement, but it's my understanding there's a contract

20   between ICE and GEO.

21     Q.   And the performance-based contract that we've

22   been talking about is a results oriented method of

23   contracting that's focused on outputs, qualities and

24   outcomes not necessarily the means to achieve those

25   output, quality and outcomes; is that right?

Page 59

1     MS. ARMSTRONG:  Objection, calls for a legal

2   conclusion.

3     THE WITNESS:  So again that's not the language

4   that I would use to describe it.  I don't know

5   whose language that is.  Again, you know,

6   government contracting has some very precise terms

7   that, you know, govern it so it's, you know, a

8   contract agreement between the Agency and GEO.

9   BY MR. CHAREST:

10     Q.   When you audit compliance with the contract

11   between GEO and ICE do you focus on outputs, quality and

12   outcome or do you focus on the means that are achieved

13   to - means that are used to achieve the outputs, quality

14   and outcome?

15     A.   I would think it would be both.

16     Q.   Do you think that the contract -- Do you audit

17   how the contractor performs the work, how GEO performs

18   the work?

19     A.   So if I understand your question, we have, you

20   know, something that's called a post order, so it may

21   say that the person who is, you know, doing a particular

22   job is supposed to do a certain job in a certain way and

23   at certain times, let's just say, so we would say is

24   if - is that work getting done as we have described that

25   we would do it internally.

Page 60

1     Q.   Sure.  That's an internal GEO check in order

2   to achieve the intended outcome under the - under the

3   contract between GEO and ICE, correct?

4     A.   Again if I understand, in other words, ICE

5   doesn't prescribe the way we do it, they want an

6   expected outcome, but we would look at the outcome but

7   then internally we would look at that we are doing the

8   steps that we said we were going to do to achieve that

9   outcome.

10     Q.   Do you know whether the current agreement is a

11   firm fixed price contract?

12     A.   I don't know.

13     Q.   Does ICE control the manner of GEO's work at

14   Adelanto, the methods that it uses to achieve the

15   standards it hopes to achieve?

16     A.   I don't think I understand your question

17   precisely.

18     Q.   Does ICE have any ability to directly control

19   any of the work that's being done, the manner of the

20   work that's being done at Adelanto?

21     A.   So ICE is physically co-located with GEO, in

22   other words, there are maybe as many as, you know,

23   probably even about maybe even a hundred ICE employees

24   that are at the facility everyday with the GEO folks.

25   The ICE folks don't supervise the GEO contracted folks.



Page 61

1  However, the ICE folks review all the local policies
2  that The GEO Group uses to do all the things that we've
3  talked about, all the various performance areas of the
4  contract, so I think you used the word control.  The
5  answer is they don't supervise but they are aware and
6  approve of the methods that GEO uses to accomplish the
7  performance requirements of the standards in the
8  contract.
9      Q.   And that's done through periodic inspections
10  of the facility to ensure compliance with ICE's
11  standards, right?
12      A.   That would be one method, yes.
13      Q.   Okay, what other methods?
14      A.   Well, as I said, ICE is physically co-located
15  at the facility.  There is an Assistant Field Officer
16  Director that is there that runs the inherently, you
17  know, Federal portion of - of what goes on at Adelanto.
18  You know, we are a service provider to ICE.  It is - it
19  is their operation and, you know, they're not there
20  because of us, we're there because of them, if that
21  makes sense.
22      Q.   Sure.
23          But given that the contract and your review of
24  the contract is performance-based is it your
25  understanding -- Well, if you know, and it may be beyond

Page 62

1  your scope frankly as I'm learning your job better,
2  whether or not ICE has the ability to actually control
3  employ - GEO employees on site?
4      MS. ARMSTRONG:  Objection, misstates prior
5      testimony and vague.
6      THE WITNESS:  Yeah, I'm not the right person
7      to answer that question, but - but I would just say
8      that I don't think control is the - is the word,
9      the verb that I would use in this case because
10      again ICE is ultimately responsible for the
11      detainee.  The detainees are in ICE's custody.  GEO
12      is providing services around that framework, but
13      it's ICE's operation.
14  BY MR. CHAREST:
15      Q.   It's ICE's operation that they're responsible,
16  but it's GEO's operation in the manner in which the
17  standards that ICE sets are met, correct?
18      A.   Yes.  I think it's -- Yes.
19      Q.   Okay, and in terms of like the applicability
20  or the - I'm trying to marry what I learned through my
21  review of the services contract to what we are kind of
22  believing the current relationship is.  You said the
23  statement of work you believed to be the same between
24  the original services contract and the current direct
25  contract between ICE and GEO.  In the services contract,

Page 63

1  if I - if I read it correctly, GEO assumed all of the
2  City's obligations and so my question there as to the
3  current agreement as far as you understand it has GEO
4  also assumed all of the service obligations under the
5  statement of work even though it may have subcontractors
6  for things?
7      A.   So I don't know precisely, but what I would
8  say is as I know generally a contract detention facility
9  is the four corners of the agreement and there is no
10  third-party like in an IGSA, so it would be logical for
11  me to assume, again it's not my responsibility to, you
12  know, parse the contract terms, but if there was a
13  material change that certainly would have been, you
14  know, relayed to me and so I would say it would be an
15  assumption but potentially a safe one.
16      Q.   Because you've not noted any operational
17  changes in the facility from one contract to the other,
18  right?
19      A.   Correct.
20      Q.   And your review of the contracts the manner in
21  which you audit the contracts has been the same from one
22  contract to the other, right?
23      A.   Well, so what you haven't asked me and I think
24  it's an important distinction is we update audit tools
25  on an annual basis because you can imagine --

Page 64

1      Q.   Fair.
2      A.   -- contracting could change with some speed,
3  so if there was a material change that was brought to my
4  attention we would obviously note that, but just in
5  terms of understanding and being able to compare apples
6  to apples we update audit tools once a year, so that
7  process happens in a way that lets us manage change and
8  again if there's some material intervening change we
9  would note that but we wouldn't, you know, review every
10  contract everytime there's an amendment otherwise the
11  audit tools would change so often we couldn't really
12  keep track.
13      Q.   Okay.  Given all that sitting here today as
14  the person in charge of the auditing of the performance
15  by GEO under the agreement between GEO and ICE as
16  pertains to Adelanto you're not aware of any changes in
17  the standards of performance or scope of work between
18  the current performance and work that's being done and
19  the prior - the work and performance that was done under
20  the prior contract, right?
21      A.   I'm not aware of any changes, no.
22      Q.   Do you know when the new contract between GEO
23  and ICE came into effect?
24      A.   Not precisely.  It was, you know, in the
25  recent past.



DANIEL RAGSDALE
NOVOA vs THE GEO GROUP

June 12, 2019
65—68

Page 65

1    Q.   Recent past?  Can you be more specific?

2    A.   Within the last two months I would say.

3    Q.   Okay.

4         Was the City's termination of the -- Let me --

5    Was there anytime when the services contract was not in

6    effect before the new contract came into effect?  Like

7    is there a bridge of some sort between the two?  Do you

8    know?

9    A.   I don't know precisely.  I know that there was

10   no what I'll say is a gap in operations at Adelanto.

11   Q.   Okay, so -- And no gap or change in the

12   performance or policies that were in place or anything

13   like that from between the services contract, any gap in

14   contracting if any existed in the current contract; is

15   that right?

16   A.   I'm not aware of any changes, no.

17   Q.   Okay.  All right, let's talk -- Do you know

18   why Adelanto terminated its agreement?

19   A.   Only what I've read in the news.  I don't

20   know -- I have no idea really why.

21   Q.   What did you read in the news?

22   A.   Just that there was, you know -- Well, let's

23   put it this way:  I mean California has a perspective as

24   I understand, you know, they're entitled to about

25   immigration detention and I think it was a decision that

Page 66

1    it wasn't something they were interested in doing

2    anymore.

3    Q.   They weren't thinking it was making America

4    great anymore?  I'm not being funny, I'm not trying to

5    be a jerk, but that was - there -- Was there a change in

6    policy at the City of Adelanto?

7    A.   I have no idea.

8    Q.   Okay, did - was there any kind of buyout that

9    was given to the City of Adelanto to walk away from the

10   services, the - the IGSA?

11   A.   I have no idea.

12   Q.   Are you aware of whether or not GEO actually

13   purchased the facility from the City at some point in

14   time?

15   A.   I believe it is an owned facility.  I've not

16   seen the - the title of the property, but I believe it's

17   an affiliate that GEO owns, yes.

18   Q.   Do you know where GEO acquired this facility

19   from?  From whom?

20   A.   I honestly don't know, actually.  If it was

21   the City that could be found.  I don't know

22   whether someone else -- I don't know.

23   Q.   That doesn't pertain to your - your evaluation

24   of performance, I guess, who actually owns the facility?

25   A.   Well, there are some facilities that GEO is

Page 67

1    only the manager of that we don't own the property.  It

2    may have very little impact on the way I audit because

3    the title of the real property is not relevant to my

4    audit.

5    Q.   Okay, is there -- Do you know anything about

6    whether or not there is a Congressional mandate or a

7    statutory mandate for entering into a direct agreement

8    between GEO and ICE for the facility?

9         If you don't know you just tell me you don't

10   know and we'll move on, but if you know --

11   A.   A Congressional mandate, no, I don't know.

12   Q.   Okay.  Let's talk about the voluntary work

13   program in a little more detail and just what I've done

14   is I've taken out the four pages.  It's just easier to

15   handle.  If you want to do the same thing so you don't

16   have to deal with that big chunky thing, that's fine

17   with me.  It starts at page 405 and it's Section 5.8 of

18   the Performance-Based National Detention Standards 2011,

19   revision 2016.

20        Are you with me?

21   A.   Give me one moment here.

22        So I have pages 405 to 409.

23   Q.   Good.  That's where I'm looking as well, and

24   just to be clear just because I'm pointing to you, if

25   you need to refer to any other part of the PBNDS feel

Page 68

1    free.  I'm not -- So my questions aren't necessarily

2    limited to these four pages, but I - as I understand it

3    this is the four pages that address fundamentally the

4    voluntary work program.  We talked about it a little bit

5    already, but I want to understand, make sure that we're

6    on the same page of how to interpret this particular

7    document.

8         Do you know the source of the PBNDS?

9    A.   It's from ICE, the Agency.

10   Q.   Okay, so ICE, this is ICE saying these are the

11   standards we want you vendors to achieve if we invoke

12   this particular standard?  Is that fair?

13   A.   Yeah, assuming this is the applicable standard

14   in the agreement then, yes, it would be these standards.

15   Q.   And to your understanding as the person that

16   audits the existing agreement between ICE and GEO at the

17   Adelanto - the Adelanto facility, this Exhibit Two which

18   is the 2016 revision is the applicable standard, right?

19        MS. ARMSTRONG:  Objection, misstates prior

20   testimony.

21        THE WITNESS:  So again I haven't seen the new

22   document but, yes, it's my understanding it is the

23   2016 version of the 2011 Performance-Based National

24   Detention Standards, yes.

25   BY MR. CHAREST:



Page 69

1      Q.  Is what currently covers the agreement between
2  ICE and GEO at Adelanto?
3      A.  It is --
4          MS. ARMSTRONG:  Objection, vague.
5          THE WITNESS:  -- my understanding, yes.
6  BY MR. CHAREST:
7      Q.  Okay.  All right, must a vendor like GEO have
8  a voluntary work program at all?
9          MS. ARMSTRONG:  Objection, calls for
10         speculation.
11         THE WITNESS:  As I understand it this is a -
12     these standards are mandatory, so GEO has no
13     discretion in whether or not to have a voluntary
14     work program, so if the PBNDS 2011 version 2016 are
15     the operative standards this is a requirement, yes.
16 BY MR. CHAREST:
17     Q.  Okay, so the -- When we talk about the way
18 these standards are broken out and you're - since you're
19 the one that audits compliance with these standards,
20 maybe you can teach me a little bit, the - they have a
21 familiar form through all of them.  The first Roman is
22 Purpose and Scope, the second is Expected Outcomes, the
23 third is Standards Affected, the fourth is References,
24 the fifth is Expected Practices, correct?
25     A.  Yes.  That's the way this is organized, yes.

Page 70

1      Q.  And not just this, not the voluntary, not just
2  the voluntary work program but all of the standards have
3  that same format, right?
4      A.  Yes.
5      Q.  Okay, so the first one is purpose of scope,
6  why are we doing this, right?  The second one is
7  expected outcomes, so when we're talking about
8  performance-based contracts like this am I right to
9  understand that you as the auditor want to make sure
10 that the expected outcomes are the things that are
11 achieved through whatever operations the vendor has at
12 the location?
13     A.  We would create questions related to the
14 expected outcomes in this standard and others.  There
15 are some that are, you know, sort of what I'll say is
16 auditable in a very obvious way, there's a review of
17 documents and some, you know, obviously not as readily
18 auditable, but we - we do our best.
19     Q.  Okay, are you involved in the decision in the
20 determination as to whether or not the voluntary work
21 program is mandatory or discretionary on behalf of the
22 vendor or do you just take it as, look, there is a
23 program, therefore it must comply with the standards?
24     A.  So just making sure I understand your
25 question, the voluntary work program is voluntary, so

Page 71

1  if - when you say mandatory you mean having the program
2  or participating --
3      Q.  Yeah.
4      A.  -- in the program?
5      Q.  We're missing each other.  Let me restate it.
6      A.  Okay.
7      Q.  With respect to the relationship between ICE
8  and the vendor, is the vendor at - does the vendor have
9  discretion as to whether or not to have a voluntary work
10 program or must the vendor have a voluntary work
11 program?
12     A.  If the contract incorporates this set of
13 standards this - you know, the work under this standard
14 is mandatory.  The contractor has no discretion.
15     Q.  Well, does the contractor actually have to
16 make any jobs available to detainees?  Can they just
17 make zero jobs available?
18         MS. ARMSTRONG:  Objection, calls for
19         speculation, vague.
20         THE WITNESS:  So it's my understanding, no,
21         the - this makes it very clear what the vendor is
22         required to do and that is not optional.  It is
23         mandatory.
24 BY MR. CHAREST:
25     Q.  So the first expected outcome is that

Page 72

1  detainees may have opportunities to work and earn money
2  while confined, right?
3      A.  Uh-huh.  (Affirmative response).
4      Q.  The may -- I mean you're a lawyer.  You
5  understand that that's not mandatory, right?  It's
6  optional, right?
7      A.  So the other -- I do know that may is not
8  mandatory, yes.
9      Q.  Okay, if you have something else you want to
10 tell me, go ahead.
11     A.  Well, I'll let you ask the questions.
12     Q.  What's on your mind?  I want to know what
13 you're thinking.
14     A.  Go ahead, sir.
15     Q.  Well, tell me what you're thinking.
16         MS. ARMSTRONG:  Objection.
17         He's asked you to - answered the question and
18         told you.
19 BY MR. CHAREST:
20     Q.  What were you about to say?  That's my
21 question.
22     A.  It's better for you to ask me questions.
23     Q.  That's not a fair answer to my question.
24         All right, the - in the first Roman numeral --
25 Sorry -- The first Arabic numeral after II it says,





DANIEL RAGSDALE
NOVOA vs THE GEO GROUP

June 12, 2019
73—76

Page 73

1  "Detainees may have opportunities to work and earn money
2  while confined subject to the number of work
3  opportunities available and within the constraints of
4  safety, security and good order of the facility."  What
5  sets the number of work opportunities available?  How
6  does the vendor know where to set that number?
7      A.  So I think it's important to note that while
8  the standard addresses the voluntary work program, there
9  would be other references to this in the contract and
10  this would be one part of it, but you'd have to sort of
11  look at the four corners of the agreement and, you know,
12  to I think have necessarily a scope of whether it's in a
13  statement of work or it could be other places.
14      Q.  Well, let's look at the statement of work and
15  see what it says about that issue.
16          So statement of work I'm referring you to
17  Exhibit One and it's Appendix A, page eight of fourteen
18  on the statement of work, and if you want the Bates I
19  can give it to you.  It's GOWER-GEO 0000538.
20      A.  I don't -- Well, go ahead.
21      Q.  Yes, so my question is still how does the
22  vendor know the number of work opportunities to make
23  available under the voluntary work program?
24      A.  I don't know that there's any specificity here
25  either.  There must be a document that prescribes that

Page 74

1  in some level of detail.  It's not in these two places.
2      Q.  Okay, so have you ever seen a document that
3  prescribes the number of work opportunities available at
4  the Adelanto facility?  Adelanto facility.
5      A.  No, I've not seen a document that describes
6  how many opportunities and what number, no.
7      Q.  Do you know how many work opportunities are
8  made available at the Adelanto facility?
9      A.  No.
10      Q.  Do you have any -- When you're doing your
11  auditing of the performance of GEO at the Adelanto
12  facility -- I think I'm mangling that - that word
13  everytime I say it.  Adelanto.  I think I got it right.
14  I just -- All right, when you're doing your job and
15  auditing GEO's performance under the applicable
16  agreement for the Adelanto facility do you ever inquire
17  about the number of work opportunities made available?
18      A.  So again I don't have the audit questions
19  memorized, but I believe we would sort of start at the
20  what I'll say is the top level which would be is there a
21  voluntary work program and then we would dive into a
22  little more specificity as to what types of jobs are
23  available, but the amount of them I don't know that we
24  would sort of audit that precisely.
25      Q.  Okay, what types of jobs are available?

Page 75

1      A.  So I believe it would be jobs in the kitchen,
2  in sanitation, it could be the barber shop, those types
3  of jobs.
4      Q.  Any other?
5      A.  I don't know.  I -- There may be, but not off
6  the top of my head.
7      Q.  Okay, and when you answered my question to get
8  to those, that list of three types of jobs you said I
9  think we would look at the types of jobs, so that
10  suggests to me that you're not really sure what you're
11  looking at.  Are you sure what - what you, the auditor
12  are looking at to ensure compliance with the work
13  opportunities making - being made available, the type of
14  opportunities?
15      A.  What do you mean by being sure?
16      Q.  Well, the - what standard do you apply to -
17  to assess performance of the voluntary work program
18  vis-a-vis the number of work opportunities being made
19  available?
20      A.  Well, again I think as I said the standard
21  sort of gives some basic, you know, options for what
22  folks could and couldn't do.  Again I'm not responsible
23  for the Adelanto facility operations day-to-day.  We
24  would obviously do our due diligence prior to going
25  there and - and making sure that all our questions were

Page 76

1  applicable.
2      Q.  So you said what folks could and couldn't do.
3  I think what you're talking about is what the vendor GEO
4  can and cannot do under the agreement; is that right?
5      A.  No.  I mean what the vendor can do under the
6  standard --
7      Q.  Okay.
8      A.  -- or the statement of work.
9      Q.  Or the agreement?
10      A.  The larger agreement.
11      Q.  Right.
12      A.  If --
13      Q.  Okay.
14      A.  -- that makes sense.
15      Q.  So are you telling -- I just - I'll just ask a
16  more direct question, I guess.  Does GEO audit in terms
17  of ensuring compliance with its obligations to ICE under
18  the agreement as pertains to Adelanto the number of work
19  opportunities made available or not?
20      A.  The quantity I don't know.
21      Q.  Okay, if the person responsible for operations
22  at Adelanto said we will make zero opportunities
23  available, is that a violation of the standards as you
24  understand them?
25      A.  If the contract and standard - standards



Page 77

1 require having a voluntary work program, again I - it
2 would not be up to me and I don't know, but I don't
3 think zero would be an expected result.
4     Q.   The presumption there being that program is
5 mandatory vis-a-vis the vendor, that the vendor must
6 have a program, right?
7     A.   Yes.
8     Q.   And you don't know that to be true?  That's
9 just a presumption you make, right?
10     A.   I know the standard is applicable at Adelanto
11 and I - and I don't think a reasonable understanding of
12 what a program would mean.  A program with zero
13 opportunities isn't really a program.
14     Q.   Okay, how about if the people responsible for
15 operations at Adelanto said one hundred percent of the
16 work done at this facility is done through the voluntary
17 work program?
18         MS. ARMSTRONG:  Objection, calls for
19 speculation.
20 BY MR. CHAREST:
21     Q.   Is that compliant?
22         MS. ARMSTRONG:  Calls for speculation and
23 vague.
24         THE WITNESS:  Again when you say a hundred
25 percent of work, a hundred percent of what work?

Page 78

1 BY MR. CHAREST:
2     Q.   All work.  Every single thing, guards, staff.
3 Everybody.
4     A.   No.
5     Q.   That wouldn't comply, right?  So there --
6     A.   I don't know whether it would comply or not.
7 It doesn't make sense on its face.
8         Detainees could -- I think what you're saying
9 is could detainees run the facility and I think the
10 answer's no.
11     Q.   Well, would that be a violation of the
12 voluntary work program or would that be just some other
13 problem?
14         Do you see my point?  I'm trying to understand
15 the book end, if any, what standards are applied to
16 interpret this Section 5.8 of the PBNDS.
17     A.   I think what you have to understand is we
18 are - GEO is responsible for implementing this program.
19         Now it is possible that no detainee could
20 participate, so that could be zero, but the
21 opportunities have to be provided.  That's mandatory and
22 the vendor has no discretion.
23     Q.   Okay, and is the number of opportunities to
24 your understanding something that's left to the
25 discretion of the vendor or is that mandated by ICE?

Page 79

1     A.   So I -- Again I honestly don't know precisely
2 how that's set up whether it's done by the local office,
3 I don't know precisely where that number would be, but
4 it is an agreement between ICE and the vendor and then
5 the vendor performs to what ICE wants.
6     Q.   Okay, now the next - the next bullet point
7 on - the next numerical entry under II is that,
8 "Detainees shall be able to volunteer for work
9 assignments but otherwise shall not be required to work
10 except to do personal housekeeping," and we - you and I
11 talked about that kind of relationship already.  The
12 work that they're going to be volunteering for though is
13 described -- So there's another -- Let me back up.  I'm
14 not making a good question here.
15         The next entry, number three is, "Essential
16 operations and services shall be enhanced through
17 detainee productivity," so when we're talking about
18 essential operations and services, what are we talking
19 about there?  Is that the services that GEO provides to
20 meet the standards that ICE sets?
21     A.   My interpretation of that is the work should
22 be meaningful and not waste people's time.
23     Q.   So the actual words are that -- I appreciate
24 that.
25         The actual words are, "Essential operations

Page 80

1 and services shall be enhanced through detainee
2 productivity," and what you're saying is we're not just
3 going to have the detainees break rocks or do something
4 or running on a treadmill that makes no - that makes no
5 advances, no interests.  We want them to work on
6 something that enhances the operations and services that
7 we, GEO, are providing, correct?
8     A.   Yeah.  It's supposed to be meaningful.  I
9 don't know that those are the two options I would have
10 chosen but, no, I don't think we would need to waste
11 people's time.
12     Q.   Not just meaningful.  The work must enhance
13 the operations and services that GEO is providing at the
14 facility, correct?
15     A.   It can't be disruptive.
16     Q.   Right.  It's not a negative force, it's an
17 additive force but added to the work that GEO was
18 already doing at the facility, right?
19     A.   No.
20     Q.   No?  What do you mean no?
21     A.   No.  The GEO people are completely separate.
22     Q.   So take, for example, the barber shop, all
23 right?  Is there a GEO paid barber and a detainee barber
24 that's sitting next to each other?
25     A.   I have no idea.  I don't know.



DANIEL RAGSDALE
NOVOA vs THE GEO GROUP

June 12, 2019
81—84

Page 81

1    Q.  Well, when you say they're completely
2  separate, is there a staff paid and employed barber by
3  GEO?
4    A.  I don't know.
5    Q.  Okay, so if there's not then they're not
6  completely separate, right?  Because if the only barber
7  that works at Adelanto is a detainee working through the
8  voluntary work program that's not separate necessarily,
9  it's enhancing the service that GEO is providing?
10        MS. ARMSTRONG:  Objection, misstates prior
11  testimony.
12        THE WITNESS:  This is a better way to look at
13  it:  GEO provides for all detainee welfare, food,
14  hygiene, et cetera, so if there was no detainee
15  barber then we would obviously have people's hair
16  cut, right?
17  BY MR. CHAREST:
18    Q.  Right.
19    A.  So the thing is what they wouldn't do is again
20  I said in terms of meaningful or waste people's time,
21  there wouldn't be a detainee trimming like the hair off
22  a doll, so it has to sort of enhance would be sort of
23  meaningful work, if that makes sense.
24    Q.  It does actually make a lot of sense and I
25  appreciate your distinction because I think you fixed --

Page 82

1  We're on the same page now, I guess.  Let me make sure
2  of that.
3        Pursuant to the agreement between GEO and ICE
4  for the Adelanto facility GEO's obligation is to provide
5  one hundred percent of the needs and services for the
6  detainee population, right?
7    A.  Yes.
8    Q.  Okay, GEO achieves that in part through the
9  use of detainee work through the voluntary work program,
10  right?
11    A.  At ICE's direction, yes.
12    Q.  Yeah.  At whoever's direction it's a fact
13  that's what happens, right?
14    A.  Yeah.  It's required by the standard.
15    Q.  Sure.
16        And so if -- And the jobs that we've
17  identified so far are kitchen work, sanitation and
18  barber shop.  There are probably other types of work,
19  right, that are just not coming to mind?
20    A.  Laundry is another one that comes to mind.
21    Q.  Great.
22        Anything else?
23    A.  That's - that popped in there.  That's my - my
24  list for now.
25    Q.  Okay, you can't think of any others?

Page 83

1    A.  I can't.
2    Q.  Okay, so if say ten people, ten detainees are
3  working in the kitchen to provide the meals for the -
4  for the population in the facility at Adelanto, those
5  are - that's ten people that are providing services
6  through GEO for the population, right?
7        MS. ARMSTRONG:  Objection, calls for
8  speculation, compound and vague.
9        THE WITNESS:  So, no.  They're not through
10  GEO --
11  BY MR. CHAREST:
12    Q.  Okay.
13    A.  -- because they're not GEO employees.
14    Q.  Okay, let's -- You say that and we'll be real
15  careful about what you're willing to say and what you're
16  not willing to say.
17        Are you saying that you know for a fact as a
18  matter of law that these people are not GEO employees or
19  is that just a position you believe to be true?
20    A.  I know that they are not GEO employees as I -
21  as I am a GEO employee, so - so I - they're not GEO
22  employees.
23    Q.  Okay.
24    A.  As a matter of fact.  I don't know whether as
25  a matter of law --

Page 84

1    Q.  Sure.
2    A.  -- but as a matter of fact.
3    Q.  We'll get to that in a bit.  That's okay.
4        MS. ARMSTRONG:  I'd like to take a break when
5  we have a minute.
6        MR. CHAREST:  Yeah, if you want to go now we
7  can go now.
8        MS. ARMSTRONG:  Okay.  Sure.  Thanks.
9        THE VIDEOGRAPHER:  We are going off the video
10  record 10:42 a.m.
11        (Whereupon, there was a brief recess observed)
12        THE VIDEOGRAPHER:  We are back on the video
13  record 11:03 a.m.
14  BY MR. CHAREST:
15    Q.  All right, welcome back, sir, from the break.
16        Before we split we were talking about the, I
17  guess, interplay between the detainees and the voluntary
18  work program and the services provided by GEO and you
19  said that GEO provides one hundred percent of the
20  services and meets one hundred percent of the needs for
21  the facility, for the detainees in the facility.  If
22  there are ten people that are detainees that are working
23  in the kitchen through the voluntary work program and
24  either they - there were none available because there
25  was none that were qualified or none that volunteered



Page 85

1  GEO would have to fill those slots with other workers to
2  do the work; is that right?
3          MS. ARMSTRONG: Objection, calls for
4  speculation.
5          THE WITNESS: GEO is responsible for providing
6  meals, so GEO would be responsible for, you know,
7  feeding the detainees. How they would do it, I
8  don't know. I mean they certainly could just buy
9  food prepared so, you know, you could take it to a
10  completely different method.
11 BY MR. CHAREST:
12     Q.  Fair, and that's within GEO's discretion on
13 how to achieve the standard of providing the meal,
14 right?
15     A.  Right. I mean it is required to have the
16 meals. The method of preparation is not prescribed.
17     Q.  Okay, but whether the labor that's supplied
18 through the voluntary work program is replaced by other
19 civilian labor or through the acquisition of prepared
20 goods that don't require the labor, GEO would have to
21 either procure the additional labor or those additional
22 goods in order to provide the services it's required to
23 provide in the absence of detainee work through the
24 voluntary work program, right?
25         MS. ARMSTRONG: Objection, calls for

Page 86

1  speculation.
2          THE WITNESS: So again as we talked about,
3  the - GEO's responsible for certain outcomes. The
4  contract requires deliverables in the standards.
5  Precisely how that would be done, you know, it
6  would vary.
7          I think it's probably important to know that,
8  you know, if I understand your question you're
9  talking about, you know, a post award contract
10 that's actually in operation. You know, the
11 Federal contracting process has what I'll say is a
12 different portion. The Agency decides what the
13 staffing will look like and what functions will be
14 done by whom, so the Agency decided to have a
15 voluntary work program and say - let's just say to
16 use your example and have detainees in the kitchen
17 at some number, so it's not the vendor that decides
18 that. That's part of the Agency's request for
19 proposal process, it would be a part of the
20 discussion in the response to the Agency's request
21 for proposal, it would be a part of the discussion
22 about the staffing plan and so all that would be
23 agreed upon by the Agency at the - by the Agency's
24 requirements well before we got to a place that,
25 you know, that all of a sudden you had detainees or

Page 87

1  GEO would somehow have to decide how to do those
2  things. It's a meeting of the minds in the
3  contract that happened well before you're sort of
4  at the facility with those issues.
5  BY MR. CHAREST:
6      Q.  There's two parts to that that I want to
7  address. The first is the - I don't think you said I'm
8  wrong and so let's just - let's do that first.
9          If the work that is intended to be performed
10 by the detainees through the voluntary work program is
11 not available through, GEO must nevertheless achieve
12 the result whether through the addition of non-detainee
13 work or the acquisition of the end product of that work
14 or some other form. I'm not saying - there's not just
15 those two. The vendor has to do something to achieve
16 the standard nonetheless, correct?
17     A.  GEO would still be responsible for the
18 expected outcome, but they certainly would have a
19 conversation with the Agency if the underlying
20 assumption in the contract that the Agency required
21 changed so, you know, it would be, you know, obviously a
22 multilayered approach.
23     Q.  Okay, so -- Well, let's do - let's do the one
24 thing first and then we'll do the second thing second,
25 okay?

Page 88

1          The first thing is I'm right, GEO has to meet
2  its standards, right, with or without the detainee work?
3      A.  I wouldn't say GEO has to meet its standards.
4  GEO has to meet ICE's standards and ICE's contract
5  requirements, yes.
6      Q.  GEO has to meet the standards that ICE imposes
7  with or without detainee work, correct?
8      A.  Well, no in the sense that the voluntary work
9  program is a standard in itself --
10     Q.  Sure, but --
11     A.  -- so - so the answer is they would have to
12 meet all the other standards including the voluntary
13 work standard, so I would say --
14     Q.  But if no one volunteers and no one provides
15 voluntary work the work that the voluntary work program
16 would have supplied must nonetheless get done in order
17 for GEO to meet its other standards, right?
18         MS. ARMSTRONG: Objection, calls for
19 speculation.
20         THE WITNESS: I can answer it this way which
21 is to say if the voluntary work program has no
22 volunteers it does not let GEO not meet any of the
23 other standards.
24 BY MR. CHAREST:
25     Q.  It does not what?



DANIEL RAGSDALE
NOVOA vs THE GEO GROUP

June 12, 2019
89—92

Page 89

1      A.  It does not let GEO not meet the rest of the
2   standards.
3      Q.  Okay, so we're saying the same thing.  Even in
4   the absence of volunteers under the voluntary work
5   program GEO must still meet the other standards in terms
6   of service provided to the detainees, correct?
7      A.  Yes.
8      Q.  Thank you.
9          All right, now let's pivot back to this notion
10  of the Agency decides that the staffing kind of I guess
11  I would say like kind of macro aspect of this - this
12  issue.  Are you saying that frankly slightly contrary to
13  what you said earlier the number of work opportunities
14  that are made available is established by ICE through
15  some sort of staffing discussion that happens pre
16  contract?
17      A.  I'm sorry if I - if you didn't understand what
18  I was trying to say before.  What I'm saying is the
19  contract, there's a process that happens before a
20  contract is signed --
21      Q.  Okay.
22      A.  -- and all of those details about the Agency's
23  requirements are discussed and agreed upon, so -- And
24  they're, you know, contracts.  I know we have some
25  excerpts of documents here but, in other words, these

Page 90

1   are voluminous documents, all right?  So, you know, in
2   the various forms of the actual agreement, the full
3   scope of the agreement the Agency and the vendor would
4   have reached some agreement about the size and scope of
5   the entire facility operation including the voluntary
6   work program.
7      Q.  All right.
8      A.  So - so what I would say is, in other words,
9   it would be an agreed upon amount, if at all, right, as
10  part of the contracting process that started well before
11  the contract was signed and the facility was operating.
12  There's no ability for GEO unilaterally after the
13  contract is signed to do or not do something, you know,
14  because obviously they're under the agreement.
15      Q.  You say it would be an agreed upon amount.
16  What is the agreed upon amount of what?
17      A.  In other words, levels of things.  It could be
18  as relates to, you know, transportation in terms of the
19  number of trips, even the size of the facility is
20  something that is obviously negotiated, so all of those
21  things are scalable is what I mean, so that's all part
22  of the agreement, including the number of GEO employees.
23      Q.  Okay, is it your testimony, you're under oath,
24  that you believe that the number of work opportunities
25  that are made available under the voluntary work program

Page 91

1   is something that's a matter of contract that is
2   addressed pre contract in the manner you're describing?
3      A.  I believe, again not my area of expertise, not
4   my area of, you know, vocation at GEO, but I know there
5   is an agreement between the Agency and GEO.  GEO does
6   not just unilaterally decide what we will do at a
7   facility at an ICE Processing Center, so obviously also
8   there are local folks on the ground.  There's - there's
9   a work plan that each detainee gets as part of their
10  participation, so those things are given with greater
11  specificity in other documents that we haven't seen
12  today.
13      Q.  So as I understand it Exhibit One is the
14  complete services contract, the agreement that predated
15  the current agreement between GEO and ICE pertaining to
16  Adelanto.  Can you show me where in this document the
17  number of voluntary work program opportunities is set
18  out?
19          MS. ARMSTRONG:  Objection, assumes facts not
20      in evidence.
21          THE WITNESS:  I don't know if this is the
22      complete.  Like I say I --
23  BY MR. CHAREST:
24      Q.  Yeah.
25      A.  -- I'm familiar with this document, but I'm

Page 92

1   not -- You know, this is again not my area so, you know,
2   I - there - there must be someplace elsewhere it is, but
3   I don't know.
4      Q.  So you've said now when we first talked about
5   it before the break you said you didn't know of any
6   source for the number of work opportunities.  After the
7   break you have a new memory.  That's fine.  However that
8   works out it works out, and your current memory is you
9   think it's - that the number of work opportunities is
10  either expressly or implicitly determined by the number
11  of GEO staff which is a product of the contract.  Am I
12  accurately describing what you're talking about?
13          MS. ARMSTRONG:  Objection, misstates prior
14      testimony, argumentative.
15          THE WITNESS:  Yeah, I don't think I
16      understand, and it's not a question of memory.  I
17      want to make sure I'm being clear.  I am not a
18      contracting expert.  I am not familiar with the
19      entire terms of the contract at Adelanto or any of
20      the other contracts.  It's not - it's not my job,
21      right?  So what I will tell you is what I know
22      about Federal contracting is it's very detailed and
23      it is not the vendor's opportunity to decide the
24      amount of service it provides to the Agency, so I
25      think it would make sense, and again I don't know



Page 93

1   whether this is the entire document, I take you at
2   your word, but again I'm not familiar with this in
3   any great level of detail, so -- And I don't know
4   that this is the entire record of the agreement
5   between ICE and GEO.
6   BY MR. CHAREST:
7      Q.  Whether or not it is, if you as the person who
8   is responsible for auditing the contracts the
9   performance of the contract wanted to say, you know
10  what, I want to make sure that we're providing the
11  correct number of work opportunities available pursuant
12  to Section 5.8, II 1, where would you look?
13     A.  So again I don't know that we asked what I'll
14  say is the level.  In other words, you - I think you
15  asked me about like the volume of opportunities.
16     Q.  The number.
17     A.  Right.
18     Q.  Literally from the standard.
19     A.  Right, so - so I don't know that that's a
20  question that we ask, so the answer's I don't know.
21     Q.  So do you know sitting here under oath that
22  the number of work opportunities is something that as
23  you suggested, but I'm guessing you don't actually know,
24  is prescribed by the Agency?
25         MS. ARMSTRONG:  Objection, misstates prior

Page 94

1   testimony.
2   BY MR. CHAREST:
3      Q.  Do you know that to be true or not or are you
4   guessing?
5      A.  Let's put it this way:  I don't know because I
6   have not seen it in writing myself --
7      Q.  Right.
8      A.  -- so it would be an assumption on my part.
9      Q.  Okay, so everything you said about the Agency
10  decides the level of staffing at least as pertains to
11  the number of work opportunities provided through the
12  voluntary work program you don't really know that to be
13  true, correct?
14         MS. ARMSTRONG:  Objection, misstates prior
15  testimony.
16         THE WITNESS:  I do know through the RFP
17  process and through the response to the RFP
18  process, request for proposal there is a meeting of
19  the minds in an agreement about staff and I know
20  that because to work at an ICE facility people have
21  to have a background check, so if Dan Ragsdale is
22  an employee of the vendor and has to work there,
23  every single person has to go through a process, so
24  GEO does not have any discretion to say we're going
25  to bring five people one day, ten people another

Page 95

1   day, so down to each position it has to be cleared
2   and approved by the Agency, that I know for a fact,
3   so the scalability of performing services has to be
4   agreed upon because the number of staff is in the
5   agreement.
6   BY MR. CHAREST:
7      Q.  And from that you infer that the manpower
8   supplied through the voluntary work program must also be
9   mandated in some regard in order to deal with the - the
10  inflexibility of GEO employees, right?
11     A.  What I'm saying is, in other words, and as we
12  discussed before, GEO's responsible for meeting all of
13  the standards including the voluntary work program but
14  as it relates to all of the other detainee services so,
15  you know, it stands to reason if you have an agreement
16  about the existence of a voluntary work program and you
17  know you have a fixed amount of staff agreed to in the
18  contract, again without having put eyes on it myself I'm
19  reasonably sure it must be specified someplace, but
20  again it's not my area of expertise.
21     Q.  And also not something you actually know to be
22  true in fact?
23     A.  I have not seen it with my own two eyes, yes.
24     Q.  And therefore you don't know with personal
25  knowledge that it's true or not?

Page 96

1      A.  I do not have personal knowledge.
2      Q.  Okay, now do you know whether at Adelanto
3   there is a GEO employed barber?
4      A.  I don't know.
5      Q.  So if no detainees volunteer to be a barber,
6   do the folks just not get their hair cut that day?
7         MS. ARMSTRONG:  Objection, calls for
8   speculation.
9         THE WITNESS:  So I think we just discussed
10  like we used the example of food service.
11  BY MR. CHAREST:
12     Q.  Right.
13     A.  The function still has to get done and GEO's
14  responsible for doing it.  The method of which it gets
15  done as we talked about could be a couple of options,
16  but folks would get their hair cut whether there's a
17  detainee barber or not.
18     Q.  And who pays for that function getting done?
19         MS. ARMSTRONG:  Objection, calls for
20  speculation.
21         THE WITNESS:  So we are a government service
22  provider, so ICE is paying obviously for the
23  services.
24  BY MR. CHAREST:
25     Q.  Does ICE pay more when folks don't volunteer



DANIEL RAGSDALE
NOVOA vs THE GEO GROUP

June 12, 2019
97–100

Page 97

1 for the work program or does GEO absorb that cost?
2     A.  So I - again not my area of expertise.  In
3 terms of billing I wouldn't know.
4         What I know is there's an agreement and a
5 contract in place and obviously there's a possibility to
6 modify contracts, but again it's not my area of
7 expertise in who pays for what.
8     Q.  You know full well that this is a fixed price
9 contract, right?
10     A.  I do not know full well.
11         MS. ARMSTRONG:  Objection.
12 BY MR. CHAREST:
13     Q.  You don't know?
14         MS. ARMSTRONG:  Argumentative.
15 BY MR. CHAREST:
16     Q.  No?
17     A.  Again as I said not my area of expertise.
18     Q.  I'm not asking if you're an expert in whether
19 or not it's a fixed price contract, but you're telling
20 me here under oath that you don't know that this is a
21 fixed price contract?
22         MS. ARMSTRONG:  Objection, asked and answered,
23     argumentative.
24         THE WITNESS:  I don't know the nature of the
25     agreement precisely, no.

Page 98

1 BY MR. CHAREST:
2     Q.  I'm not -- You see, you keep adding these
3 qualifications precisely, expert.  I don't want to know
4 about that.
5         Do you know at all whether or not this is a
6 fixed price contract?
7         MS. ARMSTRONG:  Objection, asked and answered.
8     You've now asked the same question three times and
9     you just keep asking it because you don't like the
10     witness' answer.
11         THE WITNESS:  So I told you before I have not
12     seen the contract, so I don't know.
13 BY MR. CHAREST:
14     Q.  It doesn't -- You can know what - the nature
15 of a contract without seeing it, right, by hearing from
16 somebody talking to someone talking to the people about
17 the nature of the contract, right?  You don't have to
18 see it to know, right?
19     A.  So you just asked me a question before and you
20 said am I speculating or making an assumption.  I don't
21 have personal knowledge, so I have to give you the same
22 answer.  I don't have personal knowledge.  I don't know.
23     Q.  That's not how personal knowledge works
24 because when you hear something you have personal
25 knowledge of what you heard, okay?  So if you can just

Page 99

1 tell me I don't know period --
2     A.  I don't know.
3     Q.  -- at all about the nature of the - of the
4 payment terms under this contract, if you say I don't
5 know at all about the nature of the payment terms under
6 this contract under oath I'll leave you alone but
7 without qualification.
8         MS. ARMSTRONG:  Objection.
9 BY MR. CHAREST:
10     Q.  So what's your answer?
11         MS. ARMSTRONG:  Argumentative, asked and
12     answered.
13         Go ahead.
14         THE WITNESS:  I don't know.
15 BY MR. CHAREST:
16     Q.  You don't know --
17         MS. ARMSTRONG:  I assume we're going to -- I
18     think we need to move on.
19         MR. CHAREST:  You can object after I finish my
20     question.
21 BY MR. CHAREST:
22     Q.  You're stating under oath saying that you have
23 no idea about the nature of the payment terms of this
24 contract?  Is that true?
25         MS. ARMSTRONG:  Objection, argumentative,

Page 100

1 asked and answered.
2         This is bordering on harassment.  We're now
3     asked this question five times.  The prior question
4     you said if you just say I don't know period I'll
5     leave you alone to which the witness answered I
6     don't know and now you're asking the same question
7     and inferring the witness isn't telling the truth.
8         Go ahead and answer.
9         THE WITNESS:  I don't know.
10 BY MR. CHAREST:
11     Q.  In this situation when GEO has to either
12 obtain additional labor to replace voluntary work that
13 decided not to volunteer or to go procure some sort of
14 services that would otherwise have been generated
15 through the voluntary work program, that's not free to
16 GEO, right?  It's a cost that GEO has whether or not it
17 may pass it on, it may not, but GEO has to expend that
18 money to cover those services, right?
19         MS. ARMSTRONG:  Objection, asked and answered,
20     calls for speculation.
21         THE WITNESS:  So as I said, GEO has to meet
22     the standards the method of which, you know,
23     obviously varies.  Again not my area in terms of
24     billing or how precisely the work is covered.  As
25     you've - even your question proposes alternatives.



Page 101

1   ICE absolutely can reimburse it or not.  I don't
2   know.
3   BY MR. CHAREST:
4       Q.   Okay.
5           The voluntary work program - voluntary work
6   program must comply with all applicable Federal, State
7   and local laws, correct?
8           MS. ARMSTRONG:  Are you referring to a
9   document?
10          THE WITNESS:  I actually don't know.  In other
11      words, it's a Federal -- I mean there's Federal
12      preemption, there's all sorts of issues so, no, I
13      don't think, you know, that's the case.
14          I mean I see in paragraph five it says,
15      "Detainee working conditions shall comply," so --
16      And then the paragraph in the beginning says,
17      "While not legally required to do so," ICE affords
18      detainees basic OSHA protections.
19  BY MR. CHAREST:
20      Q.   So you're thinking it's the adoption of
21  Federal, State and local laws is - pertains only to work
22  conditions like safety conditions?  Is that what you're
23  saying?
24      A.   Again without having studied this and parsed
25  through it for that language, you know, this is a

Page 102

1   Federal Agency running a Federal issue.  I'm - I'm
2   basically familiar with the idea of Federal preemption
3   so, you know, I wouldn't say that's a safe assumption
4   that it has to comply with all state laws.
5       Q.   Even if the contract says that?
6       A.   Again we'd have to go through the contract and
7   tell me what you're referring to, but the contract again
8   is a big document.  I wouldn't be able to answer that
9   general statement, no.
10      Q.   Well, let's put the turtle on the table, as
11  they say in Texas.  Some people say it.  In fact, GEO
12  does not pay the detainees that work through the
13  voluntary work program minimum wage for California,
14  right?
15      A.   As far as I understand the compensation is
16  different than minimum wage, yes.
17      Q.   Different and much lower, right?
18      A.   I have no idea what minimum wage is in
19  California, but I suspect it is more than a dollar.
20      Q.   A dollar a day?
21      A.   Yes.
22      Q.   Yeah.  You're correct.
23          And GEO pays a dollar a day for the work that
24  the detainees do through the voluntary work program at
25  the Adelanto facility, correct?

Page 103

1       A.   At ICE's request, yes.
2       Q.   At ICE's request.
3           What do you mean by that?
4       A.   ICE is the one that sets the compensation
5   rate.
6       Q.   ICE sets the reimbursement rate, correct?
7       A.   Yes.  ICE sets the reimbursement rate, yes.
8       Q.   It doesn't necessarily set the compensation
9   rate, right?
10      A.   There is an agreement with ICE on every
11  contract term, so I - there's no discretion in my mind
12  for GEO to - to just, you know, pay whatever GEO sees
13  fit.
14      Q.   Because why?  I didn't understand what you
15  said the first part of your answer.  I didn't understand
16  you.
17      A.   In other words, in my mind the costs under the
18  contract are part of the agreement, so it's not that GEO
19  unilaterally decides to do one thing that costs more or
20  less on its own.  It's part of a larger agreement.  I
21  mean that this - this is subsumed in the expenses of the
22  overall contract.
23      Q.   Well, GEO can spend more money for labor than
24  it had originally budgeted and not violate the - for
25  non-detainee labor and not violate the contract, right?

Page 104

1           MS. ARMSTRONG:  Objection, calls for a legal
2       conclusion.
3           THE WITNESS:  Yeah, I don't think so.  In
4       other words, as part of again the process of
5       reaching the contract agreement itself price is
6       discussed, so all the terms in the contract are,
7       you know, again with some degree of transparency to
8       ICE that GEO doesn't do more or less of something
9       on its own.  It does it as a service provider to
10      ICE, that that's a conversation in a contracting
11      process.
12  BY MR. CHAREST:
13      Q.   Well, let's be real clear.  There's nothing in
14  the contract that you're aware of that limits the
15  payment to detainees in the voluntary work program to a
16  dollar a day, is there?
17      A.   I don't know.  In other words, we would have
18  to go -- It's not again not my area of expertise.  The
19  contract is an agreement that's many many pages.  I
20  don't know.
21      Q.   Well, the - the standard says at least a
22  dollar a day, right?
23      A.   Yes.  It does read that, yes.
24      Q.   So at least is not only, it's a floor, not
25  necessarily a ceiling, right?



Page 105

1    A.  The standard is one --
2    Q.  Can you answer my question before you go on
3  though?
4        MS. ARMSTRONG:  Can you let him finish his
5    answer the way he wants to answer it, not the way
6    you want him to answer it?
7        MR. CHAREST:  Well, it's a yes or no question.
8    You can explain why it's not relevant, but you need
9    to answer my question.
10       MS. ARMSTRONG:  He also can explain a yes or
11    no answer which you need to give him the
12    opportunity to do rather than distract him with
13    another question when you don't like the answer
14    he's giving.
15  BY MR. CHAREST:
16    Q.  Can you answer my question.
17    A.  You have to answer - ask me the question one
18  more time.
19    Q.  The words in the standard are the compensation
20  is at least one dollar per day, correct?
21    A.  Okay, just to make sure --
22    Q.  Page 407, Section - it's K, under K,
23  Compensation.
24    A.  Yes, this reads, "The compensation is at least
25  one dollar per day."

Page 106

1    Q.  And that's the standard that applies to your
2  understanding at the Adelanto facility in the current
3  contract between ICE and GEO, right?
4        MS. ARMSTRONG:  Objection, misstates prior
5    testimony.
6        THE WITNESS:  Yes.  To the extent this is the
7    applicable standard, yes.
8  BY MR. CHAREST:
9    Q.  And you believe this is the applicable
10  standard, right?
11    A.  I do.
12    Q.  Okay, and at least is not only.  There's a
13  difference, right?
14    A.  I am aware of what at least means.
15    Q.  But that's - that's not the question that I'm
16  asking.
17        There is a difference, correct, between the
18  words at least and only a dollar, right?
19    A.  Yeah.  Yes.  There's a difference.
20    Q.  Right, and at least is a floor, it cannot be
21  less than a dollar, right?
22    A.  Yes.
23    Q.  And there's nothing that says cannot be more
24  than a dollar, right?
25    A.  Under the standard, yes.

Page 107

1    Q.  All right, and there's nothing that says it's
2  only a dollar, correct?
3    A.  If you're talking about the standard, yes.
4    Q.  Correct.
5        Okay, so we both agree that the standard sets
6  a floor, not a ceiling of a dollar per day?
7    A.  Correct.
8    Q.  All right, now do you think there's something
9  else in the relationship between ICE and GEO that the
10  relationship the performance of which you monitor and
11  audit that otherwise limits GEO's ability to pay
12  detainee labor more than a dollar a day?
13    A.  I know that the voluntary work program is
14  addressed elsewhere in the contract, so I'm not
15  comfortable in agreeing with your statement that this is
16  the only place it's referenced and that how - that this
17  is what governs the agreement.  I don't know.  I know
18  it's covered elsewhere in the contract.
19    Q.  So my question is is there anywhere else where
20  it's covered where that limits GEO's ability to pay more
21  than a dollar a day?
22    A.  Again not being completely familiar with every
23  contract term I don't know, but I know it's covered
24  elsewhere in the contract.
25    Q.  You know it's somewhere else in the contract

Page 108

1  but you don't know where, this provision?
2    A.  I don't, no.  I don't have this contract
3  memorized so, no, and I don't know what the precise
4  language is elsewhere in the contract.  I know it's
5  addressed elsewhere in the contract other than just the
6  standard.
7    Q.  Do you have any -- So you believe that the
8  payment terms are addressed somewhere else in the
9  contract but you don't know where?
10    A.  I believe -- Let's put it this way:  I know
11  the payment terms are not covered in the standard,
12  right, so I know they must be elsewhere in the contract.
13    Q.  Well, the payment terms aren't covered in the
14  standard, right?  It's a floor of a dollar, right?
15    A.  I meant the payment terms between ICE and GEO.
16    Q.  Okay, do you know -- All right, flip if you
17  would to page three of fifty-three of the IGSA which I
18  realize is not the operative agreement anymore.  It's on
19  GOWER-GEO 0000480.
20        MS. ARMSTRONG:  Is this a document that was
21    produced in this case?
22        THE WITNESS:  I'm sorry?
23        MS. ARMSTRONG:  It just has a Bates number,
24    so --
25        MR. CHAREST:  Yeah.



DANIEL RAGSDALE
NOVOA vs THE GEO GROUP

June 12, 2019
109–112

1    MS. ARMSTRONG:  -- I'm just trying to figure
2  that out.
3    THE WITNESS:  48 --
4    MR. CHAREST:  It's 480.
5    THE WITNESS:  Oh, it was?
6  BY MR. CHAREST:
7    Q.  To the bottom -- These are the payment terms
8  that you were discussing, right, at least in terms of
9  format, and I'm not saying that these are the actual
10  terms that apply to the current relationship, you may
11  know, you may not, but this is the type of information
12  you're talking about with respect to payment terms
13  between GEO and ICE, correct?
14    A.  This has more specificity about costs and
15  obviously the agreement between the Agency and GEO, yes.
16    Q.  Right, and how is the payment term associated
17  with the work program described?  As a cap?
18    A.  The plain language here just says, "Detainee
19  work program reimbursement one dollar per day."
20    Q.  Right, so reimbursement doesn't mean that GEO
21  cannot pay more than a dollar, right?
22    A.  Again I - you'd have to interpret the way the
23  Agency and GEO agreed upon what reimbursement means.
24  There may - there may very well be an agreement that
25  says a dollar is a dollar again is despite the fact the

1  stat -- I mean excuse me -- The standard says something
2  different, the contract which is the agreement says the
3  detainee work program reimbursement is a dollar, so
4  that's the agreement between ICE and GEO.
5    Q.  So you keep saying there may be something else
6  and maybe there is.  What we're looking at right here,
7  detainee work program reimbursement doesn't say, GEO,
8  you can only pay a dollar, does it?
9    A.  It just says detainee work program
10  reimbursement a dollar per day.
11    Q.  Right, meaning, GEO, we, ICE, are only going
12  to pay you a dollar a day for work that's done through
13  the work - the voluntary work program, correct?
14    A.  I understand that's what your interpretation
15  of that - what it means.
16    Q.  Well --
17    A.  I know it's an agreement.  I'm reading it and
18  saying it's an agreement between ICE and GEO for a
19  dollar a day.
20    Q.  Reimbursement of a dollar a day?
21    A.  Right.  Just -- In other words, there - ICE
22  will pay GEO these rates for these activities per bed,
23  for transportation and for the detainee work program a
24  dollar per day.
25    Q.  Right, but there's nothing in - expressly

1  saying and you, GEO, cannot pay more to the work - the
2  workers in the detainee work program, correct?
3    A.  If you're asking me to interpret what this one
4  line here is I do not see any language that says that,
5  no.
6    Q.  All right, now you suggested when we first
7  started looking at this that there might be some other
8  provisions that addressed the detainee work program that
9  do limit GEO's ability to pay more than a dollar a day,
10  right?
11    A.  No.  I didn't say that.
12    Q.  Okay.
13    A.  What I said is I don't know.
14    I know this was addressed elsewhere in the
15  contract.  It's addressed beyond just the standard, so
16  because I'm not, you know, intimately familiar with this
17  and any other agreement I'm not comfortable in agreeing
18  with your conclusion that it is not elsewhere.  I know
19  the terms and pricings are in many places.
20    Q.  I've never said it was not elsewhere.  Just to
21  be real clear I'm not trying to trick you.  I'm - you're
22  suggesting it might be and I keep asking where and I
23  never - we never get to anywhere else.
24    If you know of anywhere else, please show me.
25    A.  I've just been handed this document.  I would

1  have to go through it --
2    Q.  Okay.
3    A.  -- and, you know, so --
4    Q.  If GEO paid more than a dollar a day to
5  detainees who were working in the voluntary work
6  program, would that be a violation of Section 5.8 of the
7  PN -- PBNDS?
8    MS. ARMSTRONG:  Objection, calls for a legal
9  conclusion and calls for speculation.
10    THE WITNESS:  So if I understand your question
11  is if GEO paid a detainee more than a dollar a day
12  would that violate the standard?
13  BY MR. CHAREST:
14    Q.  Yes, sir.
15    A.  I would say no.
16    Q.  Okay.
17    Are you aware whether or not GEO pays more
18  than a dollar a day for voluntary work programs at
19  facilities other than Adelanto?
20    A.  I have heard anecdotally but don't have
21  firsthand knowledge that there are occasions that GEO
22  has paid more than a dollar a day.
23    Q.  Antidotes about occasions, but you don't know
24  one way or the other?
25    A.  No.  I said and I'm going to be clear I do



DANIEL RAGSDALE
NOVOA vs THE GEO GROUP

June 12, 2019
113–116

Page 113

1  know that GEO has on occasion paid more than a dollar a
2  day.
3      Q.   So you said first whatever it was since we're
4  intermittent in impression and on occasion here just in
5  this last answer, are you saying that's not the
6  practice of GEO to pay more than a dollar a day at
7  certain facilities just as a practice?
8      A.   I don't know that.
9      Q.   You don't know that?
10      Is -- I mean am I right to understand based on
11  our discussion so far that the amount that GEO pays to
12  the detainees under the voluntary work program is not
13  something that's subject to your audit process?
14      MS. ARMSTRONG:  Objection, vague.
15      THE WITNESS:  I don't know.  I don't know we
16      have asked a precise question on the amount of
17      compensation.
18  BY MR. CHAREST:
19      Q.   Okay, you would look at confirming that they
20  do, in fact, get paid whatever they're entitled to but
21  that they're getting paid; is that right?
22      A.   It would be pursuant to a local policy and
23  agreement with ICE.  I don't know that we actually audit
24  that question.  I do know that if they participate in
25  the voluntary work program that we would audit whether,

Page 114

1  in fact, they were paid.  That is obviously critical.
2      Q.   Right, and the next standard down, number
3  six, there's no discrimination, that's something that
4  would be part of your audit process, correct?
5      A.   I don't know precisely what the questions are.
6      Q.   Okay, but given that it is one of the expected
7  outcomes, number six on the list, that's - whether it's
8  actually audited or not, it's fair game for auditing to
9  confirm performance by GEO under this voluntary work
10  program standard, correct?
11      A.   It is an expected outcome and I believe ICE
12  could hold us to that outcome, yes.
13      Q.   And the same thing with number seven in terms
14  of the facility shall provide communication assistance
15  to detainees whether it's because they have disabilities
16  or their language is limited in order for the detainees
17  of that - in that circumstance would understand the
18  terms and the scope of the voluntary work program,
19  right?
20      A.   Yes.  In other words, there has to be
21  meaningful communication regardless of the abilities of
22  the detainees, yes, including in the voluntary work
23  program, yes.
24      Q.   And that's an obligation that GEO has pursuant
25  to the standard that ICE imposes, correct?

Page 115

1      A.   It's probably this standard and others.
2      Q.   Okay, but that's yes and maybe other things
3  too, right?
4      A.   Yes.
5      Q.   Okay, so you see in Section III it says
6  Standards Affected?
7      A.   Yes.
8      Q.   Now a long time ago I used to work in industry
9  and I used to have manuals that tell, you know, how to
10  do X, Y and Z and when I read the standards affected
11  language I'm brought to mind of you used to get like
12  here's a new Section Three, replace it and you have a
13  little note in the bottom saying the current version is
14  X.  Is that how the standards affected works where it
15  says this standard here that is - that is PBNDS 2011,
16  December, 2006 (sic) model replaces the, and it tells
17  you what the prior standard that existed that it
18  replaces, is that fundamentally what the standards
19  affected section talks about?
20      A.   So I can't speak for ICE, but I can tell you
21  my understanding would be as the plain language here is
22  it replaces the voluntary work program version of this
23  document that was dated December 2nd, 2008.
24      Q.   Okay, so the reason I'm dwelling on that a
25  little bit is because I think you told me that the 2016

Page 116

1  version differed in the voluntary work program from the
2  2011 version and I read this to tell me that the
3  difference in voluntary work program standards is
4  between - relates back to 2008, meaning there was no
5  prior amendments before 2008 once this one came into
6  place; is that right?
7      A.   On its - on the face of this document it would
8  lead me to an opposite conclusion, so I think no.
9      Q.   What's your conclusion?
10      A.   If the bottom of the page says revised 2016 --
11      Q.   Right.
12      A.   -- the date of the PBNDS is 2011.  I mean
13  it -- What I'll say is this looks incomplete to me.
14      Q.   How do you mean?
15      A.   Well, in other words, this is a version it
16  seems from December, 2016 which should have replaced a
17  version from sometime in 2011, right, based on just the
18  dates here, yet it replaces a standard that was written
19  in 2008.
20      Q.   Unless the standard that we're looking at in
21  5.8 is the same as the 2011 standard which did replace
22  the 2008 standard, right?
23      MS. ARMSTRONG:  Objection, calls for
24      speculation.
25      THE WITNESS:  You know, I don't know.  All I



DANIEL RAGSDALE
NOVOA vs THE GEO GROUP

June 12, 2019
117–120

Page 117

1  would say is it's sloppy.
2  BY MR. CHAREST:
3      Q.  Well, unless what I said is true because if -
4  just -- I mean I'm not trying to trick you.  I'm trying
5  to understand kind of through you because I'm not sure I
6  have a full understanding, but let's get there.
7          If in 2011, not 2016, this Section 5.8 was
8  generated and replaced the 2008 version the words under
9  standards affected would make sense, right?
10     A.  I'm not sure.  I don't know.  I mean that is a
11  possible conclusion, but I don't know, so I couldn't
12  necessarily agree with that.
13     Q.  All right.  Well, let's roll back to what you
14  told me before.
15         Are you certain that the Section 5.8 as we're
16  reading it here, pages 405 to 410 of the 2016 version
17  are different than the 2011 version, are you certain of
18  that?
19     A.  Again now it's been almost two years since
20  I've worked there, but - but during my time at ICE, and
21  I knew there was a revision process going on during 2016
22  and this document on its face says there were revisions
23  to the PBNDS 2011 standards that we published in 2016 --
24     Q.  Sure.
25     A.  -- so I know there were changes, yes.

Page 118

1      Q.  Well, you know there were changes in the inch
2  thick Exhibit Two somewhere --
3      A.  Uh-huh.  (Affirmative response).
4      Q.  -- but not necessarily in the four pages that
5  make up Section 5.8, right?
6      A.  I am fairly certain as I sit here under oath
7  that I am, but if you ask me to red line this compared
8  to the other one that I could not do.  My memory's not
9  that good.
10     Q.  Let's see.  Maybe we can reach this.
11         You believe that there were changes between
12  the 2011 version and the 2016 version but you're not
13  sure?
14     A.  Well, do you have a copy of the 2011 version?
15     Q.  We're working quickly to get it, so we can
16  just look later, in other words, let that be.
17     A.  Well, so the answer's I don't know.
18     Q.  All right, I thought I could get there with
19  that part of it.  It's no big deal.
20     MS. ARMSTRONG:  I was wondering why you
21  weren't showing him the 2011.  It's like we could
22  just look at it.
23     MR. CHAREST:  I know.
24     MS. ARMSTRONG:  I get it now.
25     MR. CHAREST:  Yeah.  It's on its way

Page 119

1  apparently.
2      It's all going to be fine.
3      MS. ARMSTRONG:  We can do that after lunch.
4      MR. CHAREST:  Yeah.  Exactly.
5  BY MR. CHAREST:
6      Q.  Let's -- Going on down to the expected
7  practices I want to focus on -- Well, we talked about C,
8  the housekeeping, I'll call it housekeeping section,
9  the - going to D, detainee selection the text reads,
10  "The Facility Administrator shall develop site-specific
11  rules for selecting work detail volunteers."  Is the
12  Facility Administrator GEO?
13     A.  Yes.  It's a GEO employee.
14     Q.  All right, so then the way this standard
15  applies is that GEO developed site specific rules for
16  selecting work detail volunteers; is that right?
17     A.  Yes.  In other words, there's a local policy
18  on the methodology they used to do it, yes.
19     Q.  All right, and is the local policy something
20  that's subject to your oversight in terms of compliance
21  or is that so discretionary you don't even bother with
22  it?
23     A.  So first of all they're required to meet the
24  four corners of the standards.
25     Q.  Right.

Page 120

1      A.  The local policy would be informed by this.
2  We would - we don't audit local facility policies but we
3  would audit based on the standards, so the local
4  facility policies should meet everything that's in this
5  document, so they - if you're asking do they have
6  discretion to ignore this the answer's no.
7      Q.  Okay, but as long as they're meeting the
8  standards that are set out it's up to the local facility
9  on how to meet those standards vis-a-vis the work, the
10  voluntary work program?
11     A.  They're responsible for developing a facility,
12  site specific facility procedure, yes.
13     Q.  What I said is correct, isn't it?
14     A.  If what you said is they're responsible for
15  developing a local policy the answer's yes.
16     Q.  Sure, but I wasn't talking about the -- As
17  long as they're meeting the standards they have
18  discretion on how they achieve those standards just like
19  we talked about before?
20     MS. ARMSTRONG:  Objection, misstates prior
21  testimony and vague.
22     THE WITNESS:  Well, again, in other words, I
23  think this is fairly proscriptive so, in other
24  words, I think if you'd say the nature of a
25  facility in terms of length of stay so, in other



DANIEL RAGSDALE
NOVOA vs THE GEO GROUP

June 12, 2019
121–124

Page 121

1   words, if you have a kitchen worker that has to be
2   food safe certified and there was some training
3   that's involved you would have to have a site
4   specific policy to make sure that those things
5   could be accomplished, if that makes sense. You
6   wouldn't do that if the person is going to be there
7   for a matter of days because you couldn't get it
8   done, so that the local policy, that's the type of
9   thing it sets.
10  BY MR. CHAREST:
11     Q. I take your point. Okay.
12        All right, and the next sentence says, "The
13  voluntary work program agreement shall document the
14  facility's program and shall be in compliance with this
15  detention standard." What is the voluntary work program
16  agreement to your understanding?
17     A. It's my understanding that is the - once a
18  detainee opts to apply for a work opportunity
19  they would have some agreement between them and the
20  facility as to what they will be doing and the manner
21  and means of it.
22        (Whereupon, Exhibit 3 was marked)
23  BY MR. CHAREST:
24     Q. I'm handing you a document that's been marked
25  as Exhibit Three. This is my best guess as to what

Page 122

1   we're talking about here with respect to this voluntary
2   work program agreement.
3        Have you seen this document before?
4     A. No.
5     Q. All right, is this the voluntary work program
6   agreement?
7     A. Well, it looks - purports to be several
8   things, right? It says detainee work detail application
9   then the next section is the work detail orientation and
10  it looks like the final section is the detainee
11  voluntary work program agreement.
12     Q. Okay, so when your - when you and your folks
13  are doing the auditing one of the requirements is that
14  the voluntary work program agreement document the
15  facility program - the facility's program. Would you
16  then look at this document which we've marked as Exhibit
17  Three and say, okay, look here is where it says detainee
18  voluntary work program as it properly documented the
19  facility's program? I mean it's one of the things you'd
20  do as your checks?
21     A. Correct.
22     Q. Okay, have you personally seen anything else
23  that purports to be a detainee voluntary work program
24  agreement other than this document?
25     A. So, no, and I probably should also add I'm not

Page 123

1   an auditor. You know, I lead the department but I've
2   never done an audit myself --
3     Q. Okay.
4     A. -- so I want to make sure I make that clear.
5     Q. That's fair. Yeah.
6     A. So --
7     Q. You're a manager of auditors, not an auditor
8   yourself?
9     A. Correct.
10    Q. Okay, a leader of men.
11    A. And women.
12    Q. Well, fair. That's fair.
13       Sorry. My apologies.
14       All right, so then do you understand that this
15  section, the bottom section of Exhibit Three is the
16  documentation of the facility's program? Is that - I
17  mean is that what's trying to be achieved here?
18       MS. ARMSTRONG: Objection, calls for
19  speculation.
20       He testified he's never seen this before.
21       THE WITNESS: So I don't know that this is the
22  only document. I'm looking at the plain meaning of
23  this because it purports to be an application, an
24  orientation and a program agreement. It appears to
25  have a place that the detainee signs, so I mean

Page 124

1   I -- It purports to be in service of the standard.
2   I don't know whether this is the only document.
3   BY MR. CHAREST:
4     Q. And who is this work program agreement
5   between? Like who are the - the counter parties? Is it
6   GEO and the - and the detainee?
7        MS. ARMSTRONG: Objection, calls for
8   speculation.
9        THE WITNESS: Again hard to say. This is only
10  signed by the detainee, so I - it's - it's -- It is
11  a detainee acknowledgment, but the agreement is
12  sort of imprecise in who the agreement is between
13  because it's only signed by one person.
14  BY MR. CHAREST:
15    Q. Well, it's on GEO letterhead, right, the GEO
16  Group Adelanto Detention Facility-East West at the top?
17    A. It does say the GEO Group Adelanto Detention
18  Facility at the top, yes.
19    Q. And we're definitely talking about the
20  Adelanto Detention Facility, right?
21    A. That's what it reads, yes.
22    Q. Yeah, we can clear some other underbrush
23  actually while we're looking at this.
24       MS. ARMSTRONG: Oh, I love another Texan
25  phrase. That's great.



Page 125

1  BY MR. CHAREST:
2      Q.  There are a series of positions here to which
3  the detainee if the detainee volunteers to do the work
4  can apply.
5          Are you with me at the top?
6      A.  Yes.
7      Q.  All right, so we talked about some positions.
8  Does this when you fill out the list of other positions
9  that are available at Adelanto, food service?
10     A.  Yes.
11     Q.  Laundry, dorm cleaning?  That's one, right?
12     A.  I think that falls under sanitation.  That's
13  what I meant by --
14     Q.  Okay.
15     A.  -- sanitation.
16     Q.  Do you know what?  It says - I read it as
17  C-o-r-e-s Cores Hallway.  Do you know what that is?
18     A.  I have no idea what that is.
19     Q.  I thought maybe it was a typo for chores, but
20  I don't really understand.
21     A.  I don't know.
22     Q.  You don't know?
23     A.  I don't.
24     Q.  Okay, recreation, do you know what work is
25  being done with recreation?

Page 126

1      A.  I don't.
2      Q.  How about floor crew?  Do you know what work
3  is being done with floor crew?
4      A.  It sounds like sanitation to me, but I don't
5  know precisely what it is.
6      Q.  I mean everybody can figure out what a barber
7  shop does.
8          Intake, do you know what the - what the
9  detainees are doing with intake?
10     A.  I don't.
11     Q.  How about medical detail?  Do you know what
12  they do there?
13     A.  I don't.
14     Q.  How about paint detail?  Paint detail is a bit
15  self-explanatory, but I assume it's painting?
16     A.  I assume so.  I think that again sort of falls
17  under the sanitation type - type work, maintenance.
18     Q.  Okay, so are these areas of work that are done
19  by detainees part of the services that GEO agreed to
20  provide under the agreement between GEO and ICE?
21         MS. ARMSTRONG:  Objection, calls for
22     speculation.
23         THE WITNESS:  So I'm sorry.  I need you to
24     repeat that.
25  BY MR. CHAREST:

Page 127

1      Q.  Sure.
2          When GEO agreed to take care of the detainees
3  at Adelanto and provide, as you put it, one hundred
4  percent of the services required for that, that among
5  those services are providing food, correct?
6      A.  GEO's responsible for providing meals, yes.
7      Q.  And doing laundry?
8      A.  GEO's responsible for providing clean clothes.
9      Q.  So they need a laundry service, right?
10     A.  However they decide to clean clothes but, yes,
11  they need to provide the detainees clean clothes.
12     Q.  Or I guess they could just buy new clothes
13  everyday, right?
14     A.  They can probably do it several ways, but they
15  do have to provide clean clothes.
16     Q.  Okay, keeping the dorm and floors clean is
17  among the services that GEO agreed to provide to ICE at
18  this facility, right?
19     A.  I think the same answer which is that the
20  place has to be habitable and appropriate for, you know,
21  occupancy.
22     Q.  Including keeping it clean, right?
23     A.  That's part of it, yes.
24     Q.  Okay, GEO agreed to provide intake services
25  for arriving detainees, correct?

Page 128

1      A.  Yes.
2      Q.  GEO agrees to provide medical services for the
3  detainees at the - at the Adelanto facility, correct?
4      A.  Yes.
5      Q.  GEO agreed to provide facilities that are
6  adequately maintained, including painting, correct?
7      A.  Exactly.
8      Q.  And GEO even agreed to provide haircutting
9  services to the detainees at the facility, correct?
10     A.  Personal hygiene, yes.
11     Q.  Personal hygiene would include haircutting,
12  right?
13     A.  Yes.
14     Q.  Okay, so all of these jobs that are being done
15  through detainee work are obligations that GEO undertook
16  with respect to the agreement it has with ICE, correct?
17     A.  These are part of the overall responsibilities
18  that GEO has to the detainees.  The how and why and who
19  does it I think is not detailed adequately in this
20  document.  That's part of the original or the
21  overarching agreement between ICE and GEO.
22     Q.  Sure, but if no one volunteered for any of
23  these jobs they would still have to get done in some
24  form or fashion, right?
25         MS. ARMSTRONG:  Objection, calls for



DANIEL RAGSDALE
NOVOA vs THE GEO GROUP

June 12, 2019
129–132

Page 129

1    speculation.
2        THE WITNESS:  Jobs, no.  The function, yes.
3    BY MR. CHAREST:
4        Q.   And the person responsible for achieving that
5    function is GEO, correct?
6        A.   Right.  The entity I would say right --
7        Q.   Yeah.
8        A.   -- but not the person.
9        Q.   Let me do that again because I appreciate
10   that.
11       The entity responsible for achieving that
12   function is GEO, correct?
13       A.   Yes.
14       Q.   GEO provides uniforms for people that work
15   under the voluntary work program, correct?
16       A.   Again I assume so.  We're responsible for
17   providing detainee clothing, so I'm assuming they are if
18   they are going to participate in the work program
19   they're given appropriate clothes to do whatever job
20   they're doing.
21       Q.   Actually before I get too much more into the
22   detail here I'm going to come back to the standard, so
23   we're - I want to go to the bottom of detainee selection
24   which is D starting on 406 but flipping over to 407, the
25   last part of that standard.

Page 130

1        The standard requires that, "The detainee
2    shall be required to sign a voluntary work program
3    agreement" which I think we're talking about here in
4    Exhibit Three, "Before commencing each new assignment"
5    and then it goes on, "Completed agreements shall be
6    filed in the detainee's detention file."
7        Is the recordation of the voluntary work
8    program agreement whether it actually is Exhibit Three
9    or whatever else it might be something that because it's
10   set out in one of the expected practices something that
11   GEO must do in order to meet its obligations to ICE
12   under the contract?
13       A.   So to meet its obligation under this standard
14   and presumably the larger contract folks that are
15   participating in the voluntary work program ICE is
16   telling us we want a record -- Excuse me -- A written
17   record of that agreement between the detainee who was in
18   the program and then they want it in their detention
19   file.
20       Q.   And so I think you just repeated my questions,
21   but in order to comply with the standard GEO must do
22   those things, get the - get the detainee to sign and
23   record the signed agreement in their file, correct?
24       A.   Yes.
25       Q.   Okay, how long does GEO maintain the records

Page 131

1    of detainees?
2        A.   I don't know.
3        Q.   All right, do you know that pursuant to the
4    contract I think, in fact, the standards three years
5    is - is required?
6        A.   I'd have to find it in the standard.  If you
7    tell me it's three years that certainly sounds
8    reasonable.  I don't know.
9        Q.   Is that something that would be -- If it's
10   standard driven it would be something that the auditors
11   would look at in theory, correct?
12       A.   It's not necessarily something that might -
13   we have a separate privacy and records department, so
14   I'm not sure that it would necessarily be something that
15   I audit or my team, I should say --
16       Q.   Fair.
17       A.   -- my men and women.
18       Q.   The -- I want to talk about the special
19   details which is E, the next - the next section down.
20   It says, "Detainees may volunteer for temporary work
21   details that occasionally arise.  The work, which
22   generally lasts for several - from several hours to
23   several days may involve labor-intensive work."
24       To - this is me glossing it, but this reads to
25   me as like an exception to the rule that heavy labor is

Page 132

1    not typically the type of work that's done under the
2    voluntary work program.  Is that - is that a fair
3    reading of what we're talking about here?
4        MS. ARMSTRONG:  Objection, calls for
5        speculation, calls for a legal conclusion.
6        THE WITNESS:  So I have no personal experience
7        as to what the special detail is.  You know, I read
8        the words as well and it does say labor intensive,
9        but I don't - I don't know what that is.  It's a
10       what I would say is probably in the eye of the
11       beholder.
12   BY MR. CHAREST:
13       Q.   Sure.
14       I guess are you aware whether or not the
15   standards preclude regular labor intensive work like day
16   in, day out labor intensive work as part of the
17   voluntary work program?
18       A.   Well, I know that the type of work is agreed
19   upon between the Agency - set by the Agency and the
20   service provider, so I believe that is something that
21   there's a meeting of the minds about, and again as we
22   talked about earlier, the standard requires it to
23   essential operations and services being enhanced to
24   detainee productivity.  You know, again labor intensive
25   is a relative term, but there's not really what I would



DANIEL RAGSDALE
NOVOA vs THE GEO GROUP

June 12, 2019
133—136

Page 133

1  say labor intensive work being done at a facility.
2  There's work certainly, but not labor intensive work as
3  I would understand it.
4      Q.  Right.  They're not out at Angola working on a
5  farm, for example?  That's not the type of work they're
6  doing?
7      A.  Yeah, I don't know where Angola is or who
8  you're referring to, but --
9      Q.  You don't know where Angola is?  Really?
10     A.  The country?
11     Q.  No.  The farm, the labor camp in Louisiana.
12     A.  No.
13     Q.  No?  All right.
14         Okay, once the person volunteers and is clear
15  and signs the agreements, et cetera at that point the -
16  the detainee is required to work pursuant to whatever
17  the schedule for the work is, correct?
18     MS. ARMSTRONG:  Objection, calls for
19  speculation, compound, vague.
20     THE WITNESS:  So I know there is a schedule
21  and participation in the - in the program would
22  subsume - in other words, you know, the hours of
23  work are detailed in the standard, you know, so it
24  says eight hours a day forty hours weekly.
25  BY MR. CHAREST:

Page 134

1      Q.  Where are you reading that?
2      A.  Under Hours of Work, Section VIII on page 407.
3      Q.  Cool.
4         Read the paragraph just before that, the
5  sentence.
6      A.  It says, "Detainees who participate in the
7  voluntary work program are required to work according to
8  a schedule."
9      Q.  Right, so what I said is true under the
10  standard, right?
11     A.  I -- It appears so, yes.
12     Q.  Yeah.
13         Meaning specifically that the Facility
14  Administrator, GEO determines what time the person has
15  to show up at work, how long they have to stay at work,
16  whether they can come and go from that work location or
17  not, those are all things that are set by the - by GEO,
18  correct?
19     A.  Again, and I direct you back to sort of it
20  says enhance, you know, the overall facility operation.
21  There are some places where folks have freedom of
22  movement, but obviously it's a secure environment in
23  other places, so in - as you can imagine folks can't
24  just come and go as they please to sort of show up for
25  work, there's a schedule and there's, you know, folks

Page 135

1  going to various places pursuant to movements in the
2  facility to make sure people are safe.
3      Q.  And the job gets done, right?
4      A.  I imagine.  It depends.  Is it a solitary
5  activity?  Maybe the schedule is flexible.  If it's
6  something that requires, you know, multiple people to
7  work in concert then I imagine again a schedule just
8  sort of makes sense.
9      Q.  So the people that work in the kitchen
10  probably need to be in the kitchen to do their work,
11  right?
12     A.  To be in the kitchen if they're going to be
13  doing kitchen work, yes.
14     Q.  I'm not trying to be glib.  I'm just trying to
15  like - you know, they - I want to be clear that we're
16  not overlooking some obvious things here when you're -
17  when I'm hearing your answer back.
18         So it's GEO that says you need - you're on -
19  you're on breakfast duty, you need to be here at 4:30 in
20  the morning and your shift is from 4:30 till say noon,
21  okay, so --
22     A.  So I don't know the -- Sorry.
23     Q.  Go ahead.
24     A.  I don't know the precise nature, in other
25  words this, you know, food service and it does say

Page 136

1  kitchen, you know.  Precisely the what I'll say is, you
2  know, other documents that relate to scheduling and so
3  it's not in front of us or what time they do those
4  things.  I mean there must be a schedule because meals
5  happen at regular intervals, so --
6      Q.  Right.
7         The schedule and the movements that you've
8  just talked about two questions ago, two answers ago are
9  prescribed by GEO, not the detainee?
10     A.  That would be my understanding, yes.
11     Q.  All right, and if the detainees don't show up
12  for work without some sort of excuse they can be removed
13  from the voluntary work program, correct?
14     A.  There is a process for detainees whose
15  performance is not adequate to be removed, yes.
16     Q.  That's the next question which is -- That's
17  okay.
18         Unexcused absences are an acceptable reason to
19  remove someone from the - the voluntary work program,
20  correct?  It's the last paragraph of H.
21     A.  Yes.
22     Q.  Okay, and unsatisfactory work - unsatisfactory
23  work performance is another reason for removal from the
24  voluntary work program, correct?
25     A.  It says unexcused or unsatisfactory work, yes.



DANIEL RAGSDALE
NOVOA vs THE GEO GROUP

June 12, 2019
137—140

Page 137

1    Q.   But we can both read this.  I want you to
2    agree that that's correct because you're the one that -
3    that's telling me how to understand these - these
4    standards, so I'm correct, right?
5    A.   Right.
6        I'm just trying to make sure I'm following
7    since you put a document in front of me, so --
8    Q.   Sure.
9    A.   -- if I'm repeating you I apologize --
10   Q.   That's okay.
11   A.   -- but I'm making sure that we're --
12   Q.   As long as you're repeating me and saying yes
13   I'm good.
14       Are you saying yes?
15   A.   Yes.
16   Q.   Okay.
17   A.   You read it correctly, yes.
18   Q.   Okay, that's fine.
19       This -- Under K we talked about compensation a
20   little bit, but I want to focus on the first sentence
21   there under K it says, "Detainee shall receive
22   monetary compensation for work completed in accordance
23   with the facility's standard policy," and we - we
24   touched on this a little bit, but am I right to
25   understand that all voluntary work and if there's any

Page 138

1    question we're excluding the keeping your room tidy, all
2    voluntary work must be compensated in order to comply
3    with the standard?
4    A.   That - that would be my understanding.
5        Again if you participate in the voluntary work
6    program and it's work that is, you know, under the
7    auspices of the voluntary work program, yes, they must
8    be compensated.
9    Q.   Okay, is it acceptable under the standards for
10   GEO to allow people to - detainees to volunteer to work
11   outside of the voluntary work program?
12   A.   Not to my knowledge.
13   Q.   Okay, so that's -- I want to be real clear.
14   We're not talking about a separate set like of people
15   that are out there working and not getting paid because
16   they're not "in the program"?  Do you see what I mean?
17   A.   As far as I know there is no other category.
18   Q.   Okay.
19   A.   It is - it is this and that's it.
20   Q.   Okay, so to be compliant with this standard
21   the only work that GEO can either -- I'll say it this
22   way:  In order to be compliant with the standard the
23   only work that GEO condones is mandatory work to take
24   care of your personal area that we talked about, those
25   four things, and a voluntary work program for which the

Page 139

1    detainees both volunteer and get paid, correct?
2    A.   Yes.
3    Q.   Okay.
4        MS. ARMSTRONG:  Can you let me know when you
5    think we should stop for lunch?
6        MR. CHAREST:  Is it ready?
7        MS. ARMSTRONG:  I think it's out there, yeah.
8        I thought you might want to get through that.
9    I don't know.
10       MR. CHAREST:  There's more.
11       We can stop.  That's fine.  I'm good.
12       MS. ARMSTRONG:  Is that good --
13       MR. CHAREST:  Yeah.
14       MS. ARMSTRONG:  -- with everybody?
15       MR. CHAREST:  It's cool.
16       Lunch is always a good idea.
17       THE VIDEOGRAPHER:  We're off the video record
18   12:07 p.m.
19       (Whereupon, there was a lunch recess observed)
20       THE VIDEOGRAPHER:  We are back on the video
21   record 1:00 p.m.
22   BY MR. CHAREST:
23   Q.   All right, Mr. Ragsdale, we have had a little
24   bit of a conversation off the record about a correction
25   that you want to make about your testimony with respect

Page 140

1    to the contract situation at Adelanto, so I guess I'll
2    just ask you what do you understand the situation at
3    Adelanto to be vis-a-vis contracts between GEO, the City
4    of Adelanto and ICE to the best of your understanding?
5    A.   So I now understand.  I was incorrect before.
6    There is no new agreement between GEO and ICE.  They -
7    whatever agreement was in place I believe is still in
8    place, but as I told you before, the contracting area is
9    not my area of sort of jurisdiction, if you will.  Those
10   things don't come across my desk, so I'm incorrect.  I
11   thought it had been done, but I think it is still in the
12   proposed or aspirational stage, so I would like to
13   correct that, please.
14   Q.   Understood, and fine.
15       So then the agreement that is Exhibit One I
16   understand there may have been modifications to it over
17   the course of time, this document that's dated 2011.  To
18   the best of your understanding this services contract
19   between GEO and Adelanto which adopts the
20   intergovernmental servicing agreement between Adelanto
21   and ICE is the operative agreement to your
22   understanding, correct?
23   A.   So I want to say yes, but not having reviewed
24   all of the documents and not wanting to make the same
25   mistake twice there - there - this very well could be



DANIEL RAGSDALE
NOVOA vs THE GEO GROUP

June 12, 2019
141–144

Page 141

1 the framework with subsequent modifications or there
2 could be some other version of this, but I believe at
3 some point this was the operative contract and there may
4 be again as you said modifications that govern the
5 precise agreement today in 2019.
6     Q.  Sure, and I appreciate that vis-a-vis the
7 precise nature, but am I right to understand that your
8 prior statement that you believe that the statement of
9 work that's attached to this Exhibit One fundamentally
10 describes the - the work that GEO does at Adelanto
11 whether for Adelanto, for ICE or directly for ICE still
12 accurately describes this scope of work that GEO
13 performs at Adelanto?
14     A.  Yes.  That's my understanding with again with
15 the same note that there may be other documents that
16 modify this, and I don't have those in front of me.
17     Q.  Sure, but -- Okay, that's fine.  I think
18 we're - we're clear - as clear as we can be on that
19 point.
20       We talked a lot about the - the one dollar per
21 day.
22       Do you want to take that?
23     A.  No.  I'm sorry.
24     Q.  It's okay if you need to.
25     A.  I put it out of the way and yet they still

Page 142

1 vibrate.
2       I'm sorry.
3     Q.  If you need to, you can.
4     A.  No.
5     Q.  All right.
6       All right, do you mind if I start again?
7     A.  Please.
8     Q.  All right, we talked earlier before lunch
9 about the - the source for one dollar a day and I think
10 when you first answered the question you said something
11 to the effect that ICE asked us to set the price at a
12 dollar a day and then we looked at the PBNDS and saw
13 that the compensation was at least a dollar a day and
14 then we looked at the pricing components of this service
15 contract in the intergovernmental service agreement that
16 is Exhibit One and saw that there was a reimbursement
17 for a dollar a day.  Is there anything else whether it's
18 in Exhibit One, any other contractual right, remedy and
19 provision that you're aware of that - that speaks to the
20 applicable rate that detainees should be paid at the
21 Adelanto facility for work under the voluntary work
22 program?
23     A.  So I believe the voluntary work program is
24 mentioned elsewhere in the contract and potentially
25 modifications, but I don't have that whole record here

Page 143

1 and I haven't reviewed the document that you've given me
2 marked as Exhibit One page-by-page, so I've looked at it
3 with you, but for all the reasons we just talked about I
4 want to be precise.  I don't have this memorized.  I
5 know it's addressed in the standard we've talked about,
6 I know it's addressed on the page that we've talked
7 about before, page 40 - 480?  Bates stamp 480?
8     Q.  580?
9     A.  5 -- Well, 480 on the version I'm looking at.
10 GOWER 480?  GOWER-GEO four zeros 480.
11     Q.  I'm with you.  Yes.  Okay.
12     A.  So what I'll say is, you know, I believe it is
13 addressed elsewhere, but I cannot point you to those
14 precise locations.
15     Q.  Okay, back when we thought this was not the
16 operative contract I did not bring you to a specific
17 section.  I'll bring you to it now, okay?  Number 33 in
18 the standard - the performance standards which is at
19 page GOWER-GEO 0000502 talks about the voluntary work
20 program.
21       Let me know when you get there.
22     A.  Okay.  Yes.
23     Q.  Are you with me now?
24     A.  Uh-huh.  (Affirmative response).
25     Q.  All right, now in terms of structure, and I

Page 144

1 think this probably is something you would know based on
2 your work in auditing performance, this agreement sets
3 out a series of standards, right, that - that ICE is
4 supposed to meet and the standards with respect to
5 voluntary work program are set up here at number 33 and
6 there's seven standards.  Are you with me?
7     A.  Yes.
8     Q.  Do you agree with that characterization?
9     A.  This appears to be some summary version of the
10 PBNDS standard.  I haven't done a side-by-side
11 comparison, but I mean it generally sort of subsumes
12 what appears to be elsewhere in the standard.
13     Q.  It very largely tracks the 2011 PBNDS.  I
14 agree with you.
15       MS. ARMSTRONG:  Objection.
16       I'm sorry.
17       MR. CHAREST:  It's all right.
18       MS. ARMSTRONG:  Go ahead.
19       I thought you were going to ask a question.
20       MR. CHAREST:  Yeah, I'm going to.
21 BY MR. CHAREST:
22     Q.  That's what you're observing now is that the
23 language that's included in this - this agreement under
24 33, numbers 1 through 7 largely track the PBNDS 2011
25 standards, correct?



DANIEL RAGSDALE                                June 12, 2019
NOVOA vs THE GEO GROUP                         145—148

Page 145

1      MS. ARMSTRONG:  Objection, misstates prior
2  testimony.
3      THE WITNESS:  So I would say what's
4  interesting is in paragraph seven it says, "The
5  applicable contents and procedures in this standard
6  will be communicated to the detainee."  I'm not
7  sure this purports to be a standard itself.  It's
8  referencing something else, so again I would - my
9  characterization of this this would be a summary of
10  a standard that on its face is referenced somewhere
11  else.  I mean this is probably inartful -
12  unartfully drafted.
13  BY MR. CHAREST:
14    Q.  All right, we'll talk about that.  We're going
15  to get back to that in a moment.
16    What's next?
17      (Whereupon, Exhibits 5 and 6 consecutively were
18  marked)
19  BY MR. CHAREST:
20    Q.  All right, I'm handing you two documents, one
21  marked Exhibit Five and one marked Exhibit Six.
22      Exhibit Five is the 2008 - it's an excerpt of
23  the 2008 PBNDS with respect to the voluntary work
24  program and Exhibit Six is the 2011 version of the same
25  standard.

Page 146

1      MS. ARMSTRONG:  I'm just going to object to
2  the extent that Exhibit Six does not appear to be
3  the entire document.  I understand it's voluminous
4  and you were pulling it together over lunch.
5      Maybe we can be provided with the entire
6  document to see the cover page at some point, just
7  to put that on the record.
8      MR. CHAREST:  Yeah.  It's been identified as
9  an excerpt and it's the standard that governs GEO
10  in like a zillion different things.  I think they
11  know what it is but, okay.
12  BY MR. CHAREST:
13    Q.  Looking at Exhibit Five, sir, do you have any
14  doubt that it is the voluntary work program standard
15  from the 2008 Performance-Based National Detention
16  Standards?
17    A.  I have no reason to doubt that this is what it
18  is.  I mean it says ICE DRO Standard.  I know it's old
19  because it's not DRO anymore.  It's ERO.  The
20  operation -- The name changed.
21    Q.  Right.  You can look in the lower right-hand
22  corner if you want for the date.
23    A.  Yeah, it's says December 2nd, 2008.
24    Q.  Right.
25      And flip, if you would, to Section K,

Page 147

1  Compensation.
2      Are you there?
3    A.  Uh-huh.  (Affirmative response).
4    Q.  All right, the standard that's in place in
5  2008 according to ICE is the first point, "Detainees
6  shall receive monetary compensation for work completed
7  in accordance with the facility's standard policy,"
8  right?  That's what it says?
9    A.  Yes.
10    Q.  Okay, and then it says, the next sentence is,
11  "In SPCs and CDFs, the compensation is one dollar per
12  day."  Did I read that correctly?
13    A.  Yes.
14    Q.  What is an SPC?
15    A.  Service Processing Center.
16    Q.  Is that a facility in the same contractual
17  standing as Adelanto?
18    A.  No.
19    Q.  Okay, what is a CDF?
20    A.  Contract detention facility.
21    Q.  Is that a facility that is the same
22  contracting status as Adelanto as we currently
23  understand it to be?
24    A.  No.
25    Q.  Okay, so neither -- Adelanto doesn't qualify

Page 148

1  as an SPC or a CDF, right?  At least as of right now.
2    A.  It's my understanding, no, they do not.
3    Q.  Okay, and so this standard says as to those
4  types of facilities the compensation is one dollar per
5  day, right?
6    A.  Yes.
7    Q.  It doesn't say anything about limiting
8  compensation for IGSA facilities?
9    A.  IGSAs don't appear to be mentioned in this.
10    Q.  Right, so my question's to my question.  Does
11  this standard limit in any way the compensation
12  available to detainees for work programs at ISGAs (sic)?
13    A.  The answer --
14    Q.  I'm sorry.  I said that wrong.  I said it
15  wrong, so let me do it again.
16      Does this document limit in any way the
17  compensation available to be paid to detainees that are
18  participants in the work program at IGSAs?
19    A.  So the answer's I don't know because this
20  Section K doesn't address IGSAs on its face.
21    Q.  So let's be real clear.  My question is does
22  this limit.  Is there anything in this standard that
23  limits GEO's ability to pay detainees at an IGSA?
24    A.  And I guess the answer is no because it
25  doesn't on its face cover IGSAs.



DANIEL RAGSDALE
NOVOA vs THE GEO GROUP

June 12, 2019
149–152

Page 149

1     Q.  Okay.  Okay, good.
2          And the only facilities as to which the
3  compensation is set at a dollar a day are SPCs and CDFs
4  neither of which would cover Adelanto at this time,
5  correct?
6     A.  I'm sorry.  One more time?
7     Q.  The only type of facilities that are addressed
8  for compensation of a dollar a day in this Section K are
9  SPCs and CDFs neither of which capture Adelanto?
10     A.  So the answer is Section K on its face does
11  not apply to IGSAs and then I'm looking back to page one
12  just to understand the - the four corners of this
13  document and it says, "Procedures" in italics "Are
14  specifically required for SPCs and CDFs" which as you
15  said do not - does not cover where the Adelanto facility
16  is and then it says, "IGSAs must conform to these
17  procedures or adopt or adapt or establish alternatives
18  provided they meet or exceed the intent of the -
19  represented by these procedures."
20     Q.  Right.  That's exactly where we're headed
21  next.
22     A.  Okay.
23     Q.  So --
24     A.  So yes.
25     Q.  I don't know if you answered my question.

Page 150

1     A.  Section K I do not believe this limits
2  specifically IGSAs because it - it doesn't directly
3  address them.
4     Q.  Right, and the provision what the standard
5  does it says with respect to IGSAs you must either meet
6  or exceed whatever the standards are for SPCs and CDFs,
7  correct?
8     A.  Correct.
9     Q.  And to meet or exceed the compensation of a
10  dollar a day would be a dollar or more, correct?
11     A.  I would say yes.  In regular language it would
12  be at least means the floor as you've said.
13     Q.  Correct.
14          So back in 2008 for a place like Adelanto the
15  standard was at least a dollar a day not capped,
16  correct?
17     MS. ARMSTRONG:  Objection, calls for a legal
18  conclusion.
19     THE WITNESS:  I suppose you could interpret it
20     that way.  It means a dollar.
21  BY MR. CHAREST:
22     Q.  So we just got through -- You're the one that
23  suggested to me.  I'm just trying -- Do you now not
24  agree with yourself?
25     A.  No.  I want to make sure I'm being clear.  In

Page 151

1  other words, this says must conform which would be
2  equal, right?
3     Q.  Right.
4     A.  Or exceed.
5     Q.  Right.
6     A.  Right?
7     Q.  Which would mean exceed, right?
8     A.  It could mean meet or exceed.
9     Q.  Correct.
10     A.  Okay, yes.  That's what I'm saying.
11     Q.  So at least a dollar?
12     A.  It could be a dollar or more.
13     Q.  Okay, so there again in 2008 the standards
14  that would apply to a facility like Adelanto were a
15  floor of a dollar but no cap, correct?
16     MS. ARMSTRONG:  Objection, calls for a legal
17     conclusion.
18     THE WITNESS:  I don't see limiting language if
19     that's what you're asking me.
20  BY MR. CHAREST:
21     Q.  I'm not asking you that.  I'm asking you
22  exactly what I asked you.
23     MR. CHAREST:  Can you read it back, please?
24     (Whereupon, the requested portion of the
25  record was read back).

Page 152

1     THE WITNESS:  And I just would like to clarify
2     that it can equal or exceed.  I agree with that
3     statement, whether the - whether it's a floor, a
4     minimum it can - it can equal a dollar or more.
5  BY MR. CHAREST:
6     Q.  Okay, focusing on Exhibit Six, please.
7     MR. FREE:  What was Exhibit Four according to
8     your -- We don't have an Exhibit Four.
9     We might need to backtrack.
10     MR. CHAREST:  I did skip Four.
11     Sorry.  My bad.  I'll figure it out.  I'll
12     give you --
13     MS. ARMSTRONG:  We can just call the next one
14     Four or something.
15     MR. CHAREST:  Yeah.  We'll be fine.
16  BY MR. CHAREST:
17     Q.  Look, if you would, on Six and do you
18  recognize this as an excerpt of the PBNDS 2011
19  unmodified with respect to Section 5.8, the voluntary
20  work program, sir?
21     A.  Yes.
22     Q.  Okay, and back to my part.  Remember where we
23  had that talk about the standards affected?
24     A.  Uh-huh.  (Affirmative response).
25     Q.  Yes?



Page 153

1    You need to say yes or no.
2    A.  Yes.  Yes.
3    Sorry.
4    Q.  And it says the Standards Affected, "This
5  detention standard replaces voluntary work program dated
6  December 2nd, 2008."  Do you see where it says that?
7    A.  Sorry.  Hold on.
8    Q.  It's on the first page, lower right.
9    A.  Okay.  Yes.
10    Q.  Okay, so the detention standard that is
11  replaced by this excerpt that is Exhibit Six is the
12  standard we were just talking about that is Exhibit
13  Five, the December 2nd, 2008 detention standard with
14  respect to the voluntary work program, correct?
15    A.  Yes.
16    Q.  Okay, now let's look at K and see what's new
17  on compensation.
18    It says, "Detainees shall receive monetary
19  compensation for work completed in accordance with the
20  facility's standard policy," right?
21    A.  Uh-huh.  (Affirmative response).
22    Q.  And then it goes on talking about the dollar a
23  day.  The standard that's in place as of 2011 is the
24  compensation is at least one dollar per day.  Have I
25  accurately described the standard of compensation for

Page 154

1  the PBNDS 2011 unmodified?
2    A.  So I agree with you, yes, that that's what
3  this document says.
4    I don't know when this document was published
5  by ICE.  In other words, this is undated.
6    Q.  Okay, but whenever it was published is when it
7  was published, right?
8    A.  Exactly.
9    Q.  And whatever was published is the date that
10  ICE then said this is the standard that applies for
11  facilities that are governed by PBNDS 2011, right?
12    A.  I agree this was an ICE standard.  I agree it
13  was binding at some point.  I don't know when this
14  version was issued because I do know there were multiple
15  versions.
16    Q.  Sure, and we talked about the one that is
17  Exhibit Two, right?  That's the - the version you and I
18  have been talking about all morning before lunch was the
19  Section 5.8 from Exhibit Two which is the 2016 revision
20  of the 2011 Performance-Based National Detention
21  Standard, right?
22    A.  This version, the one you marked as Exhibit
23  Two, is the one that evidences the revision December,
24  2016, yes.
25    Q.  Right, and now what we can do is just to close

Page 155

1  the loop and show - confirm for the record that we're -
2  we've been talking about the same standard we can look
3  at page 407 of Exhibit Two which is K, compensation.
4    Are you with me?
5    A.  Uh-huh.  (Affirmative response).
6    Q.  Is that a yes?
7    A.  Yes.
8    Sorry.
9    Q.  It's okay.
10    And you can either compare with me or agree
11  with me that word for word K, compensation is identical
12  between Exhibit Two and Exhibit Six?  Do you agree with
13  me, sir?
14    A.  Yes.  They appear to be the same.
15    Q.  Okay, so, in fact, word for word all of
16  Exhibit Six is the same as all of Section 5.8, voluntary
17  work program which is on pages 405 to 409 of Exhibit
18  Two, correct?
19    A.  So I haven't read side-by-side the entire
20  documents but, in other words, if you're asking me is it
21  just Section K that you're asking me to compare?
22    Q.  I'm not -- Well, my proposition is that all of
23  Section 5.8 is the same since 2011 through the December,
24  2016 revision.
25    A.  So as I said earlier, I worked at the Agency

Page 156

1  until 2017.  I know that these standards were revised in
2  2016 as is evidenced by Exhibit Two, so I believe there
3  are changes.  I believe there are changes even in 5.8
4  that again because this is an undated version I don't
5  know when this version, the one you've handed me and
6  marked as Exhibit Six was published, so what - if you're
7  asking me to agree that from 2011 to 2016 this standard
8  hasn't changed then my answer would be no.
9    Q.  Okay.  Well, can you identify a single word
10  that's different in Section 5.8 between Exhibit Two and
11  Exhibit Six?
12    A.  So again I haven't compared them word for word
13  the whole pages, right, so --
14    MS. ARMSTRONG:  Would you like us to do that?
15  BY MR. CHAREST:
16    Q.  We can do it off the record if you want and
17  have a look at it.  We'll do it on a break if you want
18  to take your time to do it.
19    If you don't know --
20    MS. ARMSTRONG:  I'd do it on the break just to
21  make sure the record's clear.
22    You can either have him do it now --
23    MR. CHAREST:  All right.
24    MS. ARMSTRONG:  -- or we won't do it at all.
25  BY MR. CHAREST:



Page 157

1    Q.  Are you aware of any differences between the
2  two documents?
3    A.  So the answer is I don't know because I
4  haven't compared the two documents.
5        If there's something you'd like me to
6  specifically address, which I think you've already asked
7  me about Section K, Section K appears to be the same.
8    Q.  Okay, and when you put your hands over the
9  documents in front of you and said when I was at ICE I
10 knew that there were revisions to these standards, to be
11 real clear you meant all of the standards under the
12 PBNDS 2011 version, not just Section 5.8, correct?
13       MS. ARMSTRONG:  Objection, compound, vague.
14       THE WITNESS:  So it's my understanding that at
15    the time I was at ICE there was a what I'll say is
16    a wholesale look at the standards for updating and
17    the decision was made not to - for lots of reasons
18    that I don't have any specificity on not to change
19    the PBNDS 2011 title, so this version was a PBNDS
20    2011 revised December, 2016, so there - there are
21    differences between the two.
22       In fact, I mean again the numbers and the
23    pages are different, right?  This is assuming
24    everything was the same.  I mean this is page 407
25    and the - and the document you've handed me is

Page 158

1    Exhibit Six, you know, it's in the 300s, so again I
2    don't know what the differences are, but I know
3    there were differences.
4  BY MR. CHAREST:
5    Q.  Yeah, I don't think we're disagreeing, but
6  it's really important you listen to my question, okay?
7        When you're talking about these standards were
8  revised, you're not talking about any knowledge that you
9  have that Section 5.8 was revised, you're talking about
10 instead that the standards that are within the 2011
11 PBNDS writ large were revised, correct?
12   A.  No.
13       So - so there was a key change it's my
14 understanding to the best of my recollection in 5.8,
15 specifically Section K that the language was changed to
16 the at least a dollar a day as a result of the 2016
17 changes.
18   Q.  Well, but you know that's not true by looking
19 at Exhibit Six, right?
20   A.  No, because what I - what I also know is that
21 I believe, and again this is based on my recollection,
22 there was a version of the revised 2016 standards that
23 did not have this caveat or qualification on the bottom
24 and I believe that's what this is, but your best - your
25 best source of that information would be ICE.

Page 159

1    Q.  So you think the standards went from the 2008
2  version that we have in Exhibit Five to something that
3  says a dollar a day no more in the 2011 standard to at
4  least a dollar a day in at least the 2016 version of the
5  2011 PBNDS?  Is that your statement?
6    A.  That is my recollection.
7        I know it was changed.  I know there was
8  discussion about it when I was at ICE.  You know, again
9  it's been a couple of years and ICE would be the best
10 person to ask for that chronology, but - but there were
11 changes in 2016 including I believe in that standard in
12 that Section.
13   Q.  And that presumes that the Exhibit Six which
14 doesn't reflect a revision date is actually a revision
15 to the 2011 standard?
16       MS. ARMSTRONG:  I'm just going to restate my
17    objection that it's an excerpt of a document.
18       If we have the full document we can actually
19    compare them.
20       THE WITNESS:  Yeah, I mean again I have some
21    recollection of a version of these that didn't note
22    the errata and the changes, right?  So, in other
23    words, again I think for all the reasons we've -
24    we're having difficulty here is there should be a
25    comparison between the two things.

Page 160

1        There were changes between the 2011 version of
2    the PBNDS and the 2011 PBNDS version from 2016.
3  BY MR. CHAREST:
4    Q.  And you think there's changes in Section
5  5.8 --
6    A.  Yes.
7    Q.  -- and specifically in K?
8    A.  Yes.
9    Q.  Okay.
10   A.  But I would also say ICE would be the best
11 person or entity to ask that question to.
12   Q.  And whatever you think may have been changed
13 from one version to another to another it's not
14 reflected in any of the documents we're seeing here,
15 right?
16   A.  So again in my mind that - that this version
17 is a different version than Exhibit Two despite the fact
18 that they look the same.  They're obviously not the same
19 even again because of the page numbering they're
20 different.  Just the page numbers.  This is Section.
21   Q.  Yes.
22   A.  -- K is in a different -- Putting aside the
23 Bates stamp, Section K is on the bottom of page 326 and
24 it's on page 407 in the version that is Exhibit Two --
25   Q.  Yeah, I understand that, but again this is --

Page 161

1    A.  -- and I don't know why.

2    Q.  This is one of those situations where it's

3  just best to listen to my question because I'm not - I'm

4  just trying to tie it off.

5    A.  Yes, sir.

6    Q.  Your belief that there were the changes that

7  you believe happened is not reflected in any of the

8  documents that I put in front of you whether it be

9  Exhibit Two, Exhibit Five, Exhibit Six as pertains to

10  the voluntary work program, correct?

11    A.  I'm sorry, so Exhibit Two has language that is

12  different than both -- Or sorry.  Exhibit Five has

13  language that is different than both Exhibit Two and

14  Exhibit Six, yes.

15    Q.  Right, but Exhibit Two and Six do not have

16  different language even though you think they should.

17    A.  So again I haven't compared the two word for

18  word, but as it relates to Section K they are the same.

19    Q.  Even though you think they should be

20  different?

21    A.  No.  No.  I don't think they should be

22  different.  All I'm saying is the - the release date or

23  the - when this document was published by ICE is not on

24  here, right?  In other words, this purports to be a

25  version of the PBNDS from 2011 and I'm - I'm going to

Page 162

1  suggest that again from my best recollection that this

2  version, there were multiple versions of this document -

3  of the standards is what I'll say --

4    Q.  Okay.

5    A.  -- probably not made clear by ICE as it should

6  be hence the confusion.

7    Q.  Well, we'll find out.  I mean the documents

8  are what they are, your memory is what it is.

9    A.  Understood.

10    Q.  You agree with me that if the documents don't

11  reflect the change that you think happened you might be

12  wrong?

13    A.  It is entirely possible that I'm wrong.

14    Q.  All right.

15    MS. ARMSTRONG:  I'm glad we got that all

16  cleared up.

17    MR. CHAREST:  We're almost there.

18  BY MR. CHAREST:

19    Q.  All right, so turning back then to Exhibit One

20  which is the services contract, specifically the page we

21  were looking at talking about the voluntary work program

22  where it lists the expected outcomes in the agreement.

23    A.  Just point me to where you are, sir.

24    Q.  The - the top page - the top half of GOWER-GEO

25  502.

Page 163

1    A.  Okay.

2    Q.  With me?

3    And there's seven expected outcomes under the

4  voluntary work program description in the - in the

5  contract between the parties, correct?

6    A.  There are seven items, yes.

7    Q.  Yes, and there are also seven expected

8  outcomes in the 2011 PBNDS whether you're looking at

9  Exhibit Six or Exhibit Two, correct?

10    A.  There are seven in both - in both Sections and

11  there's a couple extra paragraphs in the actual standard

12  it appears.

13    Q.  Right.

14    And you can do it if you want, but are - do

15  you agree with me that the seven expected outcomes that

16  are listed in the contract either exactly or in sum and

17  substance track the seven expected outcomes that are set

18  out in the 2011 PBD - PBNDS whether you're looking at

19  Exhibit Two or Six?

20    A.  So I haven't compared them.

21    As I said earlier, I think that purports to be

22  a summary of the outcomes, but it's not --

23    Q.  Let's do it --

24    A.  -- word for word.

25    Q.  -- if you want to.  That's fine.

Page 164

1    Look, detainees -- You - I'll read from the

2  contract and you read from the standard.

3    A.  Okay.

4    Q.  "Detainees may have opportunities to work and

5  earn money while confined subject to the number of work

6  opportunities available and within the constraints of

7  safety, security and good order."  Is that either

8  exactly or in sum and substance the same as what's set

9  out in the standard?

10    A.  Okay, again just because we haven't done the

11  original comparison, do you want me to look at Exhibit

12  Two or Exhibit Six?

13    Q.  You can look at them both because they're the

14  same.

15    A.  They are largely the same.

16    Q.  Yes.

17    The next one, "Detainees will be able to

18  volunteer for work assignments but otherwise not be

19  able - not be required to work except to do personal

20  housekeeping."

21    A.  That appears also to be the same.

22    Q.  For both?

23    A.  Yes.

24    Q.  "Essential operations and services will be

25  enhanced through productivity from detainees"?



DANIEL RAGSDALE
NOVOA vs THE GEO GROUP

June 12, 2019
165–168

Page 165

1    A.  Phrased differently but, yes.

2    Q.  The sum and substance the same, right?

3    A.  Yes.

4    Q.  And by the way, Exhibit Two and Six are

5  identical, right?

6    A.  I'm looking at both Exhibit Two and Exhibit

7  Six, so when I'm answering I mean for both.

8    Q.  And also that Two and Six are the same again,

9  right?

10    A.  I'm looking at expected outcomes paragraphs

11  one through seven on both Exhibit Two and Exhibit Six

12  and when I'm answering I'm looking at both and agreeing

13  with you when they are the same.

14    Q.  Okay.  Thank you.

15    "The negative impact of confinement will be

16  reduced through less idleness, improved morale and fewer

17  disciplinary incidents."  Same?

18    A.  Yes.

19    Q.  "Detainee working conditions will comply with

20  all applicable Federal, State and local work safety law

21  and regulations."  The same?

22    A.  Yes.

23    Q.  "There will be no discrimination regarding

24  voluntary work program access based on any detainee's

25  race, religion, national origin, gender, sexual

Page 166

1  orientation or disability."  The same?

2    A.  Yes.

3    Q.  All right, and the last one is the one you

4  said looked like a summary, and I agree with you, "The

5  applicable contents and procedures in this standard will

6  be communicated to the designee" -- sorry -- "The

7  detainee in a language or manner which the detainee can

8  understand."  Are the sum and substance the same of the

9  seven that's set out in both 5.8s?

10    A.  Yes, but there's a material difference in the

11  way the 2016 version is at in terms of those with

12  limited proficiency has a lot more detail on - on the

13  type of communication devices, braille, you know, audio

14  recordings, TTY devices, et cetera, et cetera.

15    Q.  Right, so the seven - paragraph seven of VII

16  between Exhibits Two and Six are different; is that

17  right?

18    A.  Yes.

19    Q.  Okay.  All right, so getting back to the

20  contract, the expected outcomes one through seven for

21  the voluntary work program track in sum and substance -

22  sum and substance the expected outcomes under the PBNDS

23  2011 standard whether it's the one we're looking at in

24  2006 or the -- Sorry -- Exhibit Six or Exhibit Two,

25  correct?

Page 167

1    A.  Correct.

2    Q.  All right, now as far as I know there is no

3  other description of the voluntary work program in this

4  agreement.  Are you aware of any, sir?

5    A.  Again to be clear which agreement are you

6  talking about?

7    Q.  I'm sorry.  The - the -- Exhibit One.

8    A.  So again I haven't flipped through every

9  single page.  I'm happy to do that, so if - so I can't -

10  I can't -- The answer is I don't know.

11    Q.  Okay, can you point to anything, sir, that

12  limits GEO's ability to pay detainees more than a dollar

13  a day for work done under the voluntary work program?

14    A.  In general or is there some - something you're

15  referring to specifically?

16    Q.  The whole wide everything.

17    A.  Well, the answer's I don't know because I

18  have - unless I looked at every contract, right, that

19  related and was very precise about the terms of the

20  contract I would say I couldn't answer that question.

21    Q.  Well, I'm not asking for you to tell me

22  everything.  I'm talking - I'm asking you to tell me

23  anything, so if you know of one reason why GEO cannot

24  pay more than a dollar a day to detainees who work in

25  the voluntary work program, please tell me.

Page 168

1    MS. ARMSTRONG:  Objection, asked and answered.

2    THE WITNESS:  So I don't know, right, because

3    just for the same reason I couldn't tell you what

4    they're obligated to do I couldn't in the - in the

5    absence of the information tell you what they can't

6    do, so all I - what I can say is the work that is

7    between the government and the service provider is

8    governed by the contract.

9  BY MR. CHAREST:

10    Q.  Yeah, we all agree the work is governed by the

11  contract.  My question is not what is the work governed

12  by.  My question is do you, sir, as the person who's

13  responsible for overseeing the auditing and compliance

14  with the contract know of anything that prohibits GEO

15  from paying more than a dollar a day to detainees at

16  Adelanto who were working in the voluntary work program?

17    MS. ARMSTRONG:  Objection, asked and answered.

18    THE WITNESS:  Okay, so again I don't know

19    because I am not personally - have personal

20    knowledge about every contract term, so - so the

21    answer's I don't know.

22  BY MR. CHAREST:

23    Q.  Yeah.  All right, that's fine.  That's fine.

24    Is there anything that you're aware of in the

25  same vein to say that if GEO paid more than a dollar per



DANIEL RAGSDALE
NOVOA vs THE GEO GROUP

June 12, 2019
169–172

Page 169

1  day to detainees who were involved in the voluntary work
2  program at Adelanto that GEO would be out of compliance
3  with its contract?
4      A.  I don't know.  Again without being versed in
5  every contract term for every facility I couldn't really
6  ask - answer that question.
7      Q.  I'm talking about Adelanto, not every
8  facility.
9      A.  Oh, okay.
10        Again I don't - I'm not as we already know I'm
11  not completely familiar with all the details of the
12  Adelanto contract or whatever agreement is in place now,
13  so I don't know if there's any limiting language.
14      Q.  And I don't want you to limit to your -- I
15  don't want you to limit your internal inquiry to just
16  what - just this contract or just that contract.  Again
17  my question is as open and broad as it can be:  Can you
18  think of anything in the whole world that would cause
19  GEO to think we can't pay more than a dollar a day to
20  the detainees who were working under the voluntary work
21  program at Adelanto because we'll be in violation of
22  some obligation to ICE?
23        MS. ARMSTRONG:  Objection, asked and answered.
24        THE WITNESS:  So I'm afraid I have to answer
25        the question the same way which is I don't know

Page 170

1  because I'm not personally familiar with every
2  contract term, so - so for all the reasons that I
3  just said in terms of what the nature of the
4  agreement is between GEO and ICE and every term for
5  every particular item because this is one of many I
6  can't really answer that question.
7  BY MR. CHAREST:
8      Q.  Okay, so you don't know of any reason why GEO
9  is precluded from paying more than a dollar a day,
10  correct?
11        MS. ARMSTRONG:  Objection, asked and answered.
12        THE WITNESS:  I only know that --
13  BY MR. CHAREST:
14      Q.  Well, just answer my question.  Do you know or
15  not is the question?
16      A.  I don't know.
17        MS. ARMSTRONG:  Please let him -- Can you let
18        him finish his answers?
19        MR. CHAREST:  I did.
20        MS. ARMSTRONG:  Can we do that going forward?
21        Can we agree that you're going to let him finish
22        before you ask your next question?
23        I can't get that agreement from you?
24        MR. CHAREST:  If he answers the question I
25        will let him answer the question.

Page 171

1        MS. ARMSTRONG:  I don't think that was an
2        agreement.
3        Are you going to let him answer the question
4        before you interrupt?
5        MR. CHAREST:  I would love for him to answer
6        the question.
7        MS. ARMSTRONG:  Is that a question?
8        MR. CHAREST:  We're not doing that.
9        MS. ARMSTRONG:  Okay.  Well, the record is
10        what it is.
11        MR. CHAREST:  It is.
12        MS. ARMSTRONG:  You could just agree, but you
13        won't.
14  BY MR. CHAREST:
15      Q.  Do you know of any reason why GEO's payment of
16  more than a dollar a day to the detainees who work in
17  the voluntary work program would inhibit its ability to
18  comply with standards pertaining to staffing in
19  administration?
20      A.  So I don't know.
21      Q.  Okay.
22        If someone threatened to put a detainee into
23  solitary confinement for stopping work under the
24  voluntary work program, would that be a violation of one
25  of the PBNDS standards?

Page 172

1        MS. ARMSTRONG:  Objection, calls for
2        speculation.
3        THE WITNESS:  So if I understand correctly,
4        if - if you have somebody that is enrolled and as
5        an agreement is participating in the voluntary work
6        program is a possible sanction placement in a
7        special management unit?
8  BY MR. CHAREST:
9      Q.  I guess that's right, yeah.
10      A.  Okay, it's my understanding that you cannot do
11  that.
12      Q.  And if it's done that's a violation of the
13  standard under the agreement between GEO and ICE,
14  correct?
15      A.  I don't think the performance-based standard
16  permits that.
17      Q.  Okay, so given that the performance-based
18  standard does not permit that type of behavior, that
19  type of behavior would violate the performance-based
20  standards and therefore would violate the agreement
21  between ICE and GEO, correct?
22        MS. ARMSTRONG:  Objection, calls for a legal
23        conclusion.
24        THE WITNESS:  Right.  What I would say when
25        you say violate the agreement, you know --



DANIEL RAGSDALE
NOVOA vs THE GEO GROUP

June 12, 2019
173–176

Page 173

1   BY MR. CHAREST:
2       Q.   Fair.  Okay, I'm with you.
3       A.   Right.
4       Q.   Okay, let me - let me - let me cut it down a
5   little bit.
6            Given that type of performance is not
7   permitted under the - under the standards that type of -
8   that type of activity would violate at least the
9   standard, correct?
10      A.   Agree, yes.
11      Q.   Thank you.
12           How about if the detainee was told that they
13  would be put into solitary confinement if they
14  encouraged other detainees to stop work?
15           MS. ARMSTRONG:  Objection, calls for
16      speculation.
17           THE WITNESS:  So I've not been confronted with
18      that situation, so I mean I don't know.
19  BY MR. CHAREST:
20      Q.   Do you agree that GEO in the performance of
21  its obligations in trying to meet these standards
22  benefits from the labor provided by the detained migrant
23  under the voluntary work program?
24           MS. ARMSTRONG:  Objection.
25           THE WITNESS:  No.

Page 174

1           MS. ARMSTRONG:  Vague.
2   BY MR. CHAREST:
3       Q.   You don't think GEO benefits at all?
4       A.   I think we are only responding to what ICE
5   asks us to do, so if ICE asked us to have a voluntary
6   work program, we have the voluntary work program.  If it
7   wasn't part of the ICE standards, and let's just say for
8   like the Marshals Service where they don't have a
9   detainee work program we have very similar facilities
10  that operate without a detainee work program, so we're a
11  service provider based on the government's requirements
12  and we have no sort of stake in that - in that whether
13  they have it or not.
14      Q.   Well, let's tee that up and just use the
15  barber as an example, okay?
16           If the detainee work program did not supply a
17  barber, if that was excluded from the type of work that
18  was permitted, GEO would have to pay someone to be a
19  barber, correct?
20      A.   It - again if you talked about hygiene as a
21  requirement under the contract --
22      Q.   Yes, sir.
23      A.   -- and obviously grooming is a part of the
24  standard so, yes, it would be a service that would -
25  that GEO would provide under the contract.

Page 175

1       Q.   At a cost to GEO, correct?
2       A.   At a cost to ICE.
3       Q.   Well, depending on the contract, I guess,
4   right?  We had that go round about what type of contract
5   this is.  We don't need to do that again --
6       A.   Okay.
7       Q.   -- but before ICE pays for it GEO pays for the
8   cost, right?
9       A.   Well, again as we - as we went back all of
10  that is decided in the RFP in response to the RFP
11  process, so if the Agency says government, you know,
12  suppliers, provide us with a proposal that includes a
13  barber then the responses would include a barber.  If
14  the proposal says, you know, assume, you know, the
15  barber will be part of the voluntary work program then
16  that's the assumption that's built into the proposal,
17  the pricing, the staffing, it's sort of this cascading
18  process, so it's not something that's decided once the
19  contract is signed.  It's part of the overall agreement
20  that is part of the preliminary process, if you will.
21      Q.   I take your point, but I think we can both
22  agree that the services and operations that are
23  performed by GEO are "enhanced" through the voluntary
24  work program, correct?
25      A.   I think that enhancement is to the detainees'

Page 176

1   benefit, not to GEO's benefit as I read that.
2       Q.   Meaning ultimately the - the recipient of the
3   service is the person getting their hair cut, right?
4       A.   Or learning to give haircuts.  I mean --
5       Q.   Oh, the - the enhancement goes to the detainee
6   laborer?  That's your position?
7       A.   Well, as you said as we went through the seven
8   expected outcomes, reducing idleness and not having
9   people, you know, idle that's the enhancement, so --
10      Q.   Careful.  Are you sure?
11      A.   It says, "The negative impact of confinement
12  shall be reduced through decreased idleness, improve
13  morale and fewer disciplinary incidents."
14      Q.   Right.  That's --
15      A.   That's --
16      Q.   -- number four.
17      A.   Right.
18      Q.   Number three is different though, right?
19  Number three says, "Essential operations and services
20  shall be enhanced through detainee productivity," right?
21      A.   Right.  As we talked about earlier that was we
22  don't want to waste people's time, right?  They wouldn't
23  be -- I'm not sure --
24      Q.   What's the thing that's being enhanced in
25  number three, sir?



DANIEL RAGSDALE
NOVOA vs THE GEO GROUP

June 12, 2019
177–180

Page 177

1    A.  I think the overall experience.  I mean
2  confinement can be challenging for folks so, you know,
3  the - the overall sort of atmosphere is enhanced.
4    Q.  It doesn't say that though, does it?  It says
5  literally operations and services are the thing that's
6  being enhanced, right?
7    A.  Again --
8    Q.  The words are, right?
9    MS. ARMSTRONG:  Please let Mr. Ragsdale finish
10   his answers.  We've gone over this now three times
11   and you continue to interrupt the witness when you
12   don't like the answers that he's given.  I'll
13   continue to bring it up everytime you do it until
14   you stop.
15 BY MR. CHAREST:
16   Q.  Those are what the words say, right, sir?
17   A.  So I interpret them differently than you do
18  I - it appears.
19   Q.  Well, there is four words in a row before the
20  word shall, right?  The first word is essential, the
21  second word is operations, the third word is and and the
22  fourth word is services, right?
23   A.  Uh-huh.  (Affirmative response).
24   Q.  Those are the things that shall be enhanced,
25  correct?

Page 178

1    MS. ARMSTRONG:  Objection, asked and answered.
2    THE WITNESS:  That's what I said before, not
3   wasting people's time.
4  BY MR. CHAREST:
5    Q.  But the thing that's being enhanced is the
6  operation and services, not people's time or were
7  detainee experience, right?
8    MS. ARMSTRONG:  Objection, asked and answered.
9    THE WITNESS:  But the detainees - the services
10   are for the detainees, the operations benefit the
11   detainees, so again the way I look at that is
12   because again if you want to pull paragraph three
13   out of the seven I mean I think as we've - since
14   we've read them all to me I read that saying again
15   we're not going to waste people's time and the next
16   paragraph talks about what we expect an outcome to
17   be which is people should have a better experience
18   by not being idle.
19 BY MR. CHAREST:
20   Q.  So you don't agree with me that the operations
21  are enhanced through detainee productivity?
22   MS. ARMSTRONG:  Objection, asked and answered.
23   THE WITNESS:  I didn't say that, no.
24 BY MR. CHAREST:
25   Q.  Are the operations enhanced through detainee

Page 179

1  productivity?
2    A.  That's an expected outcome.
3    Q.  And the services provided by GEO are enhanced
4  by - through detainee productivity, correct?
5    MS. ARMSTRONG:  Objection, misstates prior
6   testimony.
7    THE WITNESS:  Again as I said it's not
8   supposed to waste people's time and sort of work in
9   the opposite way.
10 BY MR. CHAREST:
11   Q.  Yeah.
12   A.  Right?
13    So in other words, we are - we are looking for
14  the totality of the environment.  In other words, we
15  don't want to be working on cross purposes.
16   Q.  Sir, are the services that GEO provides
17  enhanced through detainee productivity?
18    MS. ARMSTRONG:  Objection, asked and answered.
19    THE WITNESS:  I don't know how to answer your
20   question.
21 BY MR. CHAREST:
22   Q.  Yes or no would be nice.
23   A.  I don't really understand your question then.
24   Q.  Are the services that GEO provides enhanced
25  through detainee productivity?

Page 180

1    MS. ARMSTRONG:  Objection, asked and answered.
2    THE WITNESS:  That is an expected outcome,
3   yes.
4  BY MR. CHAREST:
5    Q.  Thank you.
6    This is one of those questions that sounds
7  silly and if you don't understand why I'm asking it I
8  mean we can clarify, but we'll just go for it here:  GEO
9  knows that the labor that's being done by the detainees
10  in the voluntary work program is happening, correct?
11  GEO is aware of that activity, correct?
12   A.  It's under - it's required under the standards
13  in the contract so, yes.
14   Q.  And GEO is not preventing the work that's
15  being done pursuant to the voluntary work program by the
16  detainees, correct?
17   A.  Preventing?  No.  It would be the opposite, I
18  think.
19   Q.  Are the detainees at Adelanto subject to
20  physical restraint under any set of facts during their
21  time there?
22   A.  There's a standard on security.  Obviously,
23  you know, you have a blended set of detainees, some
24  folks who present a security risk, some folks that
25  don't, but there's - there's a regime of security that -



DANIEL RAGSDALE
NOVOA vs THE GEO GROUP

June 12, 2019
181–184

Page 181

1  that obviously potentially has people in restraints
2  whether being transported during intake, et cetera.
3      Q.  Would it be appropriate or inappropriate under
4  the standards as you understand them for someone to
5  threaten a detainee's immigration proceeding in exchange
6  for getting them to work in the voluntary work program?
7      MS. ARMSTRONG:  Objection, vague, calls for
8  speculation.
9      THE WITNESS:  So if I understand your
10  question -- I mean first of all a threat is never
11  appropriate, so I mean the answer would be no.
12  BY MR. CHAREST:
13      Q.  Okay, it's inappropriate?
14      A.  It's not appropriate in terms of the Code of
15  Conduct, it's not appropriate under the standards.  I
16  mean it's - it's -- I mean it's fairly obvious, I
17  suppose.
18      Q.  These are the I think things we both agree on.
19  I'm just making sure we - we read the standards the same
20  way.
21          And the same thing, the threat of force would
22  be inappropriate, correct?
23      A.  Correct.
24      Q.  The threat of physical restraints outside the
25  prescribed uses under the standards would also be

Page 182

1  inappropriate, correct?
2      A.  The standard occupies the field so, yes.
3      Q.  I like the way you said that.  I'll try to
4  remember that, actually.
5          I'm scrambling around for Exhibit Four.  Give
6  me a second.
7          What do you know about the Office of Inspector
8  General, sir?
9      A.  I know that as a Cabinet level department the
10  Department of Homeland Security has an Inspector
11  General.  It's a Senate confirmed politically appointed
12  position.  That person is supposed to help the Secretary
13  in whatever Cabinet department to, you know, run the
14  department in an - an efficient way.  It's a, you know,
15  a credit to its mission and the taxpayer.
16      Q.  Do you believe the OIG achieves its mission in
17  that regard vis-a-vis ICE?
18      A.  I have an opinion about the -- I mean my
19  personal opinion about the Inspector General?  I mean
20  I - you have --
21      Q.  Sure.
22      A.  -- to give me a little more detail.
23      Q.  That's what I want.
24      A.  So the Inspector General has obviously a vital
25  role to play, but as political appointees they sometimes

Page 183

1  have agendas that are, I think, inconsistent with
2  management functions that the Cabinet Secretary and some
3  of the component heads have to do.  Like every audit
4  they follow Generally Accepted Audit Principles that
5  their GAO puts out or, you know, general, you know,
6  auditing standards from other sources, but every audit
7  is a snapshot and I think they - they have an
8  interesting role in publishing their results
9  sometimes in a way that is more sensational than - than
10  helpful to the - the functions of the - of the Agency.
11      Q.  Do you think their current OIG has
12  that potential -- Do you think the current OIG manifests
13  that potential concern you raised?
14      A.  Well, the current IG, John Kelly just retired
15  because he was accused of manipulating reports on FEMA's
16  activity and decided it was time for him to go so, you
17  know, again I don't know John Kelly in particular.  I
18  knew the last IG, John Roth.
19          You know, the Inspector General - you know,
20  ICE has an internal Office of Professional
21  Responsibility function where we have criminal
22  investigators that handle misconduct investigations.
23  I'm certainly familiar with their work.  The Inspector
24  General does that, also.  It's generally a very small
25  organization, so if you can imagine ICE had twenty

Page 184

1  thousand employees and I would say the Office of the
2  Inspector General had a couple hundred, so - and is
3  responsible for all seven operating components of the
4  Department of Homeland Security and all audits, so I
5  mean they're spread at sort of an inch deep and a mile
6  wide and that same auditor that could be auditing an ICE
7  Detention Facility could be looking at a TSA screening
8  machine and then a Coast Guard cutter in the same year,
9  so again I mean I think, you know, all criticism can be
10  helpful and certainly everybody has an obligation to do
11  their best.  Whether the Inspector General process is
12  always the best way to get to the best result, I would
13  have mixed - mixed views.
14      Q.  Aside from the Office of the Inspector General
15  there are other - there are other auditors even aside
16  from your folks that oversee - well, I guess generally
17  ICE but also more specifically GEO's performance under
18  ICE contracts; is that right?
19      A.  So if you're referring to ICE, ICE Enforcement
20  Removal Operations performs audits.  ICE's Office of
21  Professional Responsibilities, Office of Detention
22  Oversight provide - you know, does auditing and then the
23  Department's Office of Civil Rights and Civil Liberties
24  also does auditing.
25      Q.  That's within ICE?



Page 185

1    A.  No.  No.  That's within the Department.
2    Q.  I'm sorry.  The DHS level?
3    A.  Correct.
4    Q.  Thank you.
5        Sorry.
6    A.  It's not Senate confirmed, but it's a
7  political appointment that works with the Secretary.
8    Q.  Okay.
9        Who is the Nakamoto Group?
10   A.  The Nakamoto Group is a subcontractor that
11 works for ICE to do auditing.
12   Q.  And what does the Nakamoto Group audit to your
13 understanding?
14   A.  I'm not precisely familiar with the contract
15 that ICE has with the Nakamoto Group.  I know they
16 perform PBNDS audits, I know they also work for the
17 Marshals Service.  I mean they are a business that does
18 auditing for various Federal agencies.
19   Q.  Do you know the last time that either ICE or
20 the Nakamoto Group inspected, performed that type of
21 inspection at Adelanto?
22   A.  I don't know --
23       MS. ARMSTRONG:  Objection vague.
24       THE WITNESS:  I don't know the date.
25  BY MR. CHAREST:

Page 186

1    Q.  Do you know like within a year, two years kind
2  of range?
3    A.  I don't know precisely when ICE or Nakamoto on
4  their behalf audited Adelanto, no.
5    Q.  I'm not trying to be rude, but I didn't ask
6  precisely.  Do you know even generally, within a year,
7  within two years?
8    A.  I actually don't know whether it was in the
9  last year or two.
10   Q.  Okay.
11       Are you aware whether or not the Nakamoto
12 Group has audited even since you've been at GEO?
13   A.  Yes.
14   Q.  At the Adelanto facility.  I'm sorry.  The
15 Adelanto facility.
16   A.  Again I don't know the precise times ICE has
17 been to the Adelanto facility.  I do know that the
18 Inspector General has been at the facility and other
19 folks.
20   Q.  Hold on a second.  I'm trying to get a
21 question.
22       Okay, the Office -- Do you know when the last
23 time the Office for Civil Rights and Civil Liberties
24 visited the Adelanto facility?
25   A.  I believe in 2017, but it could have actually

Page 187

1  spilled into 2018.
2    Q.  What - when that happens, when there's that
3  type of inspection are they announced or unannounced, or
4  how does that play out?
5    A.  Both the Office of Inspector General and the
6  DHS's Office for Civil Rights and Civil Liberties have
7  independent statutory authority to make unannounced
8  audits, so it is entirely their prerogative to do - to
9  do either.
10       I know from my experience at ICE that unlike
11 the Office of Inspector General the Office of Civil
12 Rights and Civil Liberties will generally coordinate
13 with the Agency before they go.
14   Q.  Meaning announce before they show up?
15   A.  Correct.
16   Q.  When -- Do you know if the Adelanto facility
17 aside from the Office of Inspector General has ever been
18 inspected by anyone who did not tell either GEO or ICE
19 that they were coming to inspect?
20   A.  One more time.
21   Q.  Has anyone ever showed up at Adelanto other
22 than OIG unannounced for an inspection?
23       MS. ARMSTRONG:  Objection, vague.
24       THE WITNESS:  I don't know.
25  BY MR. CHAREST:

Page 188

1    Q.  Well, then let me flip it the other way.
2        Are you aware of that ever happening?
3        MS. ARMSTRONG:  Same objection.
4        THE WITNESS:  I would be guessing, so I really
5    don't know because you've asked about unannounced
6    audits.
7  BY MR. CHAREST:
8    Q.  Yes, sir.
9    A.  Yeah, I don't know.
10   Q.  Well, so you're not aware of a single
11 unannounced audit, right?
12   A.  I believe the Inspector General audits were
13 unannounced.
14   Q.  Okay, in fairness my original question
15 excluded them, so let me be more clear.
16       You're not aware of a single unannounced audit
17 other than the Office of Inspector General, correct?
18   A.  No, because actually let me be clear that ICE
19 is there and walks around the facility everyday, so in
20 terms of, you know, no announcement, you know, our
21 client is there all the time, so they - they are there
22 to inspect in an unannounced way anytime they see fit.
23   Q.  So -- Okay, but that's someone that is at the
24 location all the time, right?  I'm talking about as an
25 auditor, an inspector, someone not really necessarily a



Page 189

1  third-party but someone tasked with the job of coming in
2  and inspecting, are you aware of any of that sort of
3  event ever happening aside from the Office of Inspector
4  General?
5      A.  So I should also add that ICE has something
6  called a detention service monitor --
7      Q.  Okay.
8      A.  -- which is an on site ICE employee that is
9  responsible for essentially monitoring conditions, so
10  that's a job that happens forty hours a week, you know,
11  for the entire year.  That person works for the - the
12  larger field office, if you will so, in other words,
13  there's an Assistant Field Office Director who's
14  responsible for the ICE employees at that location and
15  then a detention service monitor is a person who I
16  believe works for ICE headquarters that is responsible
17  for looking at conditions, and obviously that's also not
18  unannounced because they're there everyday.
19      Q.  Right.
20      A.  Or actually I should say they may have more
21  than one facility, but they're there for some, you know,
22  period of time.
23      Q.  Okay, I think I still didn't get an answer
24  though to my question which is are you aware of any
25  unannounced inspections by anyone other than the Office

Page 190

1  of Inspector General?
2      A.  Again, in other words, if you wanted to say
3  that - use the term like an official audit I'm not
4  aware.
5      Q.  Okay.
6          You, I assume, have looked over the OIG
7  reports that pertain to Adelanto before?
8      A.  I have, yes.
9      Q.  All right, actually I need to organize.  I'm
10  sorry.  So can we take five?
11      A.  Sure.
12          MR. CHAREST:  All right, thanks.
13          THE VIDEOGRAPHER:  We are going off the video
14  record 2:01 p.m.
15
16          (Whereupon, there was a brief recess observed)
17
18
19          (CONTINUED TO VOLUME II)
20
21
22
23
24
25

Page 191

1  Reference No.: 4138233
2
3  Case:  NOVOA vs THE GEO GROUP
4
       DECLARATION UNDER PENALTY OF PERJURY
5
       I declare under penalty of perjury that
6  I have read the entire transcript of my Depo-
   sition taken in the captioned matter or the
7  same has been read to me, and the same is
   true and accurate, save and except for
8  changes and/or corrections, if any, as indi-
   cated by me on the DEPOSITION ERRATA SHEET
9  hereof, with the understanding that I offer
   these changes as if still under oath.
10
11      _____
12          Daniel Ragsdale
13
14      NOTARIZATION OF CHANGES
15          (If Required)
16
17  Subscribed and sworn to on the _____ day of
18
19  _____, 20____ before me,
20
21  (Notary Sign)_____
22
23  (Print Name)                      Notary Public,
24
25  in and for the State of _____

Page 192

1  Reference No.: 4138233
2  Case:  NOVOA vs THE GEO GROUP
3  Page No._____Line No._____Change to:_____
4  _____
5  Reason for change:_____
6  Page No._____Line No._____Change to:_____
7  _____
8  Reason for change:_____
9  Page No._____Line No._____Change to:_____
10  _____
11  Reason for change:_____
12  Page No._____Line No._____Change to:_____
13  _____
14  Reason for change:_____
15  Page No._____Line No._____Change to:_____
16  _____
17  Reason for change:_____
18  Page No._____Line No._____Change to:_____
19  _____
20  Reason for change:_____
21  Page No._____Line No._____Change to:_____
22  _____
23  Reason for change:_____
24
   SIGNATURE:_____DATE:_____
25  Daniel Ragsdale



Page 193

1    Reference No.: 4138233

     Case:  NOVOA vs THE GEO GROUP

2

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24

     SIGNATURE:_____DATE:_____

25   Daniel Ragsdale



---

**Page 191**

```
 1            UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
 2                  EASTERN DIVISION
              CIVIL ACTION NO. 5:17-cv-02514-JGB
 3
   RAUL NOVOA and JAIME CAMPOS FUENTES,
 4 individually and on behalf of all
   others similarly situated,
 5                      Plaintiffs,
 6 vs.

 7 THE GEO GROUP, INC.,

 8                      Defendant,
 9 _____/
10
11
12
13     VIDEOTAPED DEPOSITION OF DANIEL RAGSDALE
14
         VOLUME II, PAGES 191-348
15
          WEDNESDAY, JUNE 12th, 2019
16    515 EAST LAS OLAS BOULEVARD, SUITE 1200
              FORT LAUDERDALE, FLORIDA
17           9:03 a.m. - 5:40 p.m.
18
19
20
21
22
   STENOGRAPHICALLY REPORTED BY:
23 VALERIE LEHTO, REGISTERED PROFESSIONAL REPORTER
   NOTARY PUBLIC, STATE OF FLORIDA
24 ESQUIRE DEPOSITION SERVICES
   FORT LAUDERDALE OFFICE
25
```

---

**Page 192**

```
 1 APPEARANCES:
 2
   APPEARING ON BEHALF OF THE PLAINTIFFS:
 3
      BURNS, CHAREST, LLP.
 4    BY:  DANIEL H. CHAREST, ESQUIRE.
      BY:  LYDIA A. WRIGHT, ESQUIRE.
 5    365 CANAL STREET, SUITE 1170
      NEW ORLEANS, LOUISIANA  70130
 6    (504) 799-2845
      dcharest@burnscharest.com
 7    lwright@burnscharest.com
 8
 9 LAW OFFICE OF R. ANDREW FREE.
      BY:  R. ANDREW FREE, ESQUIRE.
10    BY:  HENRIETTE VINET-MARTIN, ESQUIRE.
      2004 8th AVENUE SOUTH
11    NASHVILLE, TENNESSEE 37204
      (844) 321-3221
12    andrew@immigrantcivilrights.com
13
14
   APPEARING ON BEHALF OF THE DEFENDANT:
15
      HOLLAND & KNIGHT.
16    BY:  SHANNON L. ARMSTRONG, ESQUIRE.
      BY:  J. MATTHEW DONOHUE, ESQUIRE.
17    111 SOUTHWEST FIFTH AVENUE
      2300 U.S. BANCORP TOWER
18    PORTLAND, OREGON  97204
      (503) 517-2913
19    shannon.armstrong@hklaw.com
      matt.donohue@hklaw.com
20
21 ALSO PRESENT:  FRANCES E. SIMKINS
              U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
22            DON SAVOY/VIDEOGRAPHER
23
24
25
```

---

**Page 193**

```
 1                  INDEX
 2
 3 WITNESS                                    PAGE
 4 DANIEL RAGSDALE
 5 DIRECT EXAMINATION CONTINUED BY MR. CHAREST   194
 6
 7              INDEX TO EXHIBITS
 8 EXHIBITS                                   PAGE
 9 EXHIBIT 4  ADELANTO DETENTION FACILITY        194
              WELCOME BOOK
10 EXHIBIT 7  MANAGEMENT ALERT-ISSUES REQUIRING  222
              ACTION AT THE ADELANTO ICE PROCESSING
11            CENTER
   EXHIBIT 8  CONCERNS ABOUT ICE DETAINEE TREATMENT 308
12            AND CARE AT FOUR DETENTION FACILITIES
   EXHIBIT 9  DECLARATION OF GABRIEL VALDEZ       331
13
14
15 (ORIGINAL EXHIBITS INCLUDED WITH ORIGINAL TRANSCRIPT)
16
17
18
19
20
21
22
23
24
25
```

---

**Page 194**

```
 1        (CONTINUED FROM VOLUME I)
 2
 3        THE VIDEOGRAPHER:  We are back on the video
 4   record 2:15 p.m.
 5        (Whereupon, Exhibit 4 was marked)
 6
 7        DIRECT EXAMINATION CONTINUED
 8 BY MR. CHAREST:
 9   Q.  I found Exhibit Four.
10   A.  Thank you.
11   Q.  I've just handed you a document that's been
12 marked as Exhibit Four.  It is a document that is under
13 the GEO Corrections, I guess I'd call it.  It's not
14 really a letterhead but under its emblem.  The title of
15 the document reads Adelanto Detention Facility Welcome
16 Book and the recipient is the American Correctional
17 Association Audit.
18        Tell us, sir, who is - how the American
19 Correctional Association comes to audit the GEO
20 facilities generally and specifically at Adelanto?
21   A.  So the American Corrections Association
22 performs accreditation audits.  They do that through
23 what we call file reviews, so we build files for a
24 particular facility based on the applicable version of
25 the ACA standards.  I've never seen this document before
```



Page 195

1  though.
2      Q.  Okay, so you're not familiar with the document
3  that's been marked as Exhibit Four?
4      A.  No.
5      Q.  Okay, did you know that in connection with
6  audits performed by the ACA that the Adelanto - Adelanto
7  Detention Facility actually created a welcome book for
8  the auditors?
9      A.  I did not know that.  This looks -- Again I've
10 never seen it before.
11     Q.  Yeah.  Okay, surely if the facility management
12 or staff are creating a welcome book that suggests some
13 sort of prior knowledge of the arrival of the ACA
14 auditors?  Yeah?
15     A.  Yes.  An ACA audit is a scheduled event, yes.
16     Q.  Okay, is that always true the ACA audits are
17 always scheduled?
18     A.  So an ACA accreditation audit is a multi part
19 process.  They happen on an, you know, at an interval
20 and then in addition - in addition after the audit the
21 facility goes to what's called a panel hearing and then
22 at the hearing the - just the audit results are
23 discussed among ACA what they call commissioners with
24 the Facility Administrator, either me or someone from my
25 staff is there with the Facility Administrator and they

Page 196

1  go over the report.  There are mandatory and
2  non-mandatory standards.  There's a book of sort of
3  again a file that evidences compliance and then the
4  commissioners vote on whether or not to grant
5  accreditation following the audit.
6      Q.  Who is on the Board, the commissioners?  Like
7  what type of people are sitting on that?
8      A.  So I've only been to I think two of the
9  conferences where they've done panel hearings, two or
10 three, and they were folks ranging from, you know,
11 obviously other Correctional folks, there would have
12 been medical doctors, there are people from various
13 State Department of Corrections.  I mean I believe
14 there's fifteen hundred organizations that are part of
15 the ACA group, so I believe they sort of cross pollinate
16 on various committees.
17     Q.  Fundamentally they are industry appointees
18 though, right?  I mean the people that are in the
19 industry that are on the panels.
20     A.  When you say industry in a general sense that
21 they are people that either work in the government.  I
22 mean there - most of the people I've seen are all
23 government employees.  I've not seen anybody from a
24 commissioner that's been from a private industry person.
25     Q.  I was thinking of when I said industry I

Page 197

1  meant - what I meant to say, I guess, or I had in my
2  mind was people that are involved in Corrections one way
3  or the other, Corrections or Detention.
4      A.  Yes.  Again I couldn't speak to the, you know,
5  all the commissioners, but from what I've seen, yes,
6  it's people that work in that field.
7      Q.  And in your capacity at GEO it's your job to
8  navigate any particular facility through that approval
9  process or accreditation process?
10     A.  Yes.  In other words, we - we work to get them
11 sort of ready for the audit.
12     Q.  The facility when you say they?
13     A.  Correct.  Yes.
14     Q.  And you apply your understanding of applicable
15 standards and try and tune up their performance to make
16 sure when the auditors come everything is all good to
17 go; is that right?
18     A.  Well, let's put it this way:  We do, you know,
19 what we call a mock audit, so it's pretty
20 self-explanatory and then we give those results to the
21 facility and the folks that are obviously in charge.
22         Some of it may be just a question of getting
23 appropriate documentation together which is really most
24 of the case because again I mean all of these things as
25 with just auditing generally is they're samples, right?

Page 198

1  They don't - they don't look at every person that have
2  come and gone from a facility over a period of time.
3  The volume would be too great.
4      Q.  Right.
5         In addition to documentation problems like
6  recordation of this or that there are substantive
7  violations that could unearth whether through the mock
8  audit or the audit process itself, right?
9      A.  There are certainly things where we identify
10 problems and, yes, they can be fixed, yes.
11     Q.  And is that part of your job too to fix those
12 or make sure the fixes get done or do you just identify
13 them and sort of pass them on to somebody else?
14     A.  So the process that I'm responsible for is
15 when we find an area of noncompliance we work with the
16 facility to create what's called a corrective action
17 plan, we capture that information so, in other words, if
18 we say, you know, somebody has keep on person
19 medication, let's just say it's Tylenol and there's not
20 a record that shows a person was taking it three times a
21 day, that could be because they didn't understand, it
22 could be because, you know, they - they -- For a variety
23 of reasons, so we would look at sort of the root cause
24 of what that finding of noncompliance was, partner with
25 them to create a corrective action plan and then capture



DANIEL RAGSDALE Vol. 2
Novoa vs The Geo

June 12, 2019
199—202

Page 199

1  that and then essentially audit that the next time we
2  come to make sure it was successful.
3      Q.  When is the next time we come?  What's the
4  frequency or the cycle behind that corrective action
5  plan in your experience?
6      A.  So we do an annual corporate audit, as I
7  mentioned earlier, and then we do a follow-up audit so,
8  in other words, at least from my Department it's a -
9  it's essentially a two times a year visit.  However, the
10 facility has a person called a Compliance Administrator
11 that works for the Facility Administrator that is - that
12 is on a quarterly basis or depending on what the actual
13 corrective action plan says will test for compliance to
14 make sure that corrective action plan is working.
15     Q.  And then that person, I forgot the title,
16 reports back to your group and says, you know, thumb's
17 up, we've got it done, we've got it taken care of?
18     A.  They send electronic updates.
19     Q.  I'm being colloquial but, yeah, okay, that
20 person at the location reports back to the auditing
21 group saying we have achieved the corrective action that
22 we both agreed we would need to do and then that gets
23 taken off the books as it were or said or checked off as
24 being completed?
25     A.  Yes.  Certain -- And again if you looked at

Page 200

1  the Inspector General report you'd see like open and
2  resolved or closed.  It's some version of that.
3      Q.  Okay.
4      A.  And it also has to be sustained compliance,
5  right?  So other words it can't be compliance for a day
6  if it's something that requires, you know, obviously,
7  you know, just by the nature of the thing to be
8  permanently fixed.
9      Q.  Right.
10         The person that confirms compliance following
11 a corrective action plan is the facility itself though,
12 right?  I mean it's not like you send another - your -
13 one of your auditor people out there to do some sort of
14 checkup?  The facility reports to you, yeah, we've
15 done - we've care of the issue?
16     A.  Well, not quite.
17     Q.  Okay.
18     A.  So again we would - we would -- We would if we
19 found an area of noncompliance during an annual
20 corporate audit we would capture that, we would work the
21 facility to have a corrective action plan, we would see
22 it again at our follow-up audit, follow-up to the annual
23 audit and then if it wasn't resolved we would see them
24 again the next year.
25     Q.  So it could be a year between audits and

Page 201

1  nothing gets done; is that right?
2      A.  No.  So --
3      Q.  Or nothing gets fixed, I guess?  Things get
4  done but there's no fix?
5      A.  No.  I'm sorry.  So let me - let me try this
6  again.
7         So after the finding of noncompliance a
8  corrective action plan is created.  In less than say six
9  months from that date we do our follow-up audit, but in
10 the meantime the facility on a quarterly basis has to
11 update us as to their process - as to their progress, if
12 you will, so - so what I'll say is some things can be
13 immediately corrected, some things require a corrective
14 action plan that would require some modification of some
15 type or staffing change or something like that, so we
16 give them a little opportunity to fix it.
17         Obviously if it's a life safety issue then,
18 you know, those - we move at alacrity when there are
19 reasons to.
20     Q.  What - what's the determining factor as to
21 whether alacrity is required or not?  Is there like a
22 standard, or how does it play out?
23     A.  I would hopefully say common sense.
24         If it's - if it's a recordkeeping issue that
25 obviously has a certain response, right?  It could be a

Page 202

1  training issue, do people know what their - what their
2  jobs are.  If it's a life safety issue that obviously
3  requires immediate action.
4      Q.  Okay, and maybe somewhere along the spectrum
5  for the different types of issues you have different
6  timing of response?  Is that fair?
7      A.  Sure.  In other words, I mean I would say the
8  general impulse is to get things done and corrected as
9  fast as possible for - for reasons because we're
10 required by contract for all the outcomes we've talked
11 about to meet the requirements.
12     Q.  Is Adelanto currently subject to any of the -
13 any open and corrective action plans to your
14 understanding?
15     A.  I'm sure they are.  I couldn't tell you
16 precisely what they are, but I mean generally speaking
17 when we go to do an audit we may ask as many as a
18 thousand questions, so it's -- I've never seen -- I
19 shouldn't say never.  It's rare to see a place where
20 there are no findings on anything, so it's fair to say
21 that, you know, every facility will have something,
22 sometimes they're relatively minor, sometimes they're
23 more significant, that we would find.
24     Q.  How are those tracked?  Is it -- Like I'm
25 thinking in my mind of a bug tracker for a programming



Page 203

1  kind of thing, but there must be audit issue numbers one
2  through whatever and then they are just tracked over
3  time. Are they all assembled in some sort of table or
4  how are they - how are they recorded? How are they
5  recorded and how are they monitored?
6      A.  We have a database that we monitor them in.
7      Q.  What's the database called?
8      A.  I think it's Contract Compliance database.
9  It's not an inspired title.
10     Q.  The original name.
11         All right, Contract Compliance.
12         What - what are the outputs of that? Is it
13 can you - can you go to a particular facility and check,
14 you know, have the things download for all current open
15 ICE items?
16     A.  So I'm not super familiar with the type of
17 output from the - the system. It's not - it's not like
18 a name brand system of some kind. It's - you know, I
19 think it's something that's evolved over time. It was
20 constructed, et cetera before my time.
21     Q.  Have you ever seen a report that's generated
22 from it? Do you get regular reports from it?
23     A.  I get summaries from it, yes. I don't know
24 that I - what version of it and what program is used to
25 prepare it. I don't precisely know.

Page 204

1      Q.  How often do you get the summaries?
2      A.  Following an audit I would get the results of
3  the audit in a - in a summary form.
4      Q.  So annually for whatever the facility had
5  been the - as the audits happen for that particular
6  facility?
7      A.  Correct.
8      Q.  And then I guess maybe semiannual if there's a
9  follow-up six months later, right?
10     A.  Right, so there is a follow-up for every case
11 as part of the policy so, yes, I would get a summary
12 following my folks' work. I would get a summary,
13     Q.  But there's no sort of monthly, hey, these are
14 more than six months outstanding, we need to like raise
15 the awareness, some sort of naughty list of being too
16 long outstanding, anything like that?
17     A.  So my staff folks are responsible for making
18 sure that those updates are happening. They monitor
19 that updates are - are being inputted in the system.
20     Q.  But you don't see those reports, do you?
21     A.  On timeliness, no. I don't know it to be a
22 problem, so I - I mean it's not.
23     Q.  Well, hopefully they're all getting taken care
24 of in due course and there are no untimely ones, right?
25     A.  That's certainly the goal.

Page 205

1      Q.  Is it burdensome -- Well, I mean obviously if
2  your - if your staff are maintaining or observing and
3  monitoring the timeliness of compliance they must be
4  able to draw out reports that show outstanding
5  corrective actions that have not yet been achieved,
6  right, from the system?
7      A.  I don't know precisely how they do it, but
8  they - they are more fast on the database than I am, so
9  I mean there is a way for them to - to check and make
10 sure people are timely.
11     Q.  Yeah, I'm not asking you to tell me how, what
12 keystrokes to hit. My question is you have people that
13 work for you that know how to get that information out
14 of that database, correct?
15         MS. ARMSTRONG:  Objection, vague.
16         THE WITNESS:  Presumably, yes.
17 BY MR. CHAREST:
18     Q.  Okay, and so if one wanted to know all of the
19 correction - corrective action plans that were ever
20 issued for Adelanto, for example, would that be a hard
21 thing to know from your database?
22     A.  I don't know. I've never asked that question.
23 I don't know the scale and scope of it, so again I
24 couldn't really tell you.
25     Q.  Well, as you sit here today as the person in

Page 206

1  charge of the auditing group if you just got sort of I
2  wonder what's going on at that facility, I want to see a
3  lifetime history of performance under this warden or
4  whatever, do you think - would you be surprised to hear
5  that you couldn't get that information?
6          MS. ARMSTRONG:  Objection, calls for
7  speculation.
8          THE WITNESS:  One would presume an electronic
9  database could produce reports. I think that's
10 reasonable so, yes.
11 BY MR. CHAREST:
12     Q.  Yes, you would think you can get it?
13     A.  Correct. It would be unreasonable to think it
14 could not be done.
15     Q.  Thank you.
16         Do you know the manufacturer of the database?
17 Is it like --
18     A.  I don't know.
19     Q.  You don't know?
20     A.  I have no idea.
21     Q.  Does it look like a spreadsheet when it comes
22 to you or is it - do you get a PDF, a paper copy?
23 What's it look like?
24     A.  I get a rolled up sort of memo format, so
25 someone - someone actually writes the summary.



Page 207

1   Q.  Okay, so your summary's a narrative of some
2   other thing that the author is observing and generating
3   the summary of?
4   A.  It's a summary document.  It's written sort of
5   in a memo format, it's - so it's sort of --
6   Q.  Okay.
7   A.  -- easily digestible, if you will.
8   Q.  It's not a database output?  There's some sort
9   of interpretation that's going on?
10  A.  Correct.
11  Q.  Okay.  All right, are there any - are there
12  any other audit based sort of monitoring programs that
13  you're aware of at GEO that measure or observe the
14  performance of GEO under the standards it agreed to
15  perform for ICE other than what we just talked about?
16  A.  No.  I think that my field is, you know, to
17  use the term I said before, I think I occupy that field.
18  Q.  All right.  Excellent.
19     All right, now do you - are you made privy to
20  I guess I'd call it ICE sponsored, ICE originated audits
21  and the results of those?
22  A.  So I would say generally yes, but there are
23  times that ICE will produce things and not - either --
24  And I couldn't tell you for what reason.  Sometimes we
25  get copies of things, sometimes we don't.  We try to be

Page 208

1   very meticulous in terms of when ICE gives us something,
2   but there's - there's a transactional process either
3   through what's called the UCAP process, Uniform
4   Corrective Action Plan or the CDR, the Contractor
5   Discrepancy Report that ICE communicates through
6   something called the Quality Assurance Plan or QASP.
7   Q.  I almost got all of this.
8      All right, CDR, the Contract?
9   A.  Contractor Discrepancy Report.
10  Q.  Thank you.
11     And who is the entity or person that generates
12  a contractor discrepancy report?
13  A.  ICE.
14  Q.  And typically the contractor is the recipient
15  of that?
16  A.  Correct.
17  Q.  And in this case have you ever seen contractor
18  discrepancy reports that have been issued to GEO with
19  respect to Adelanto?
20  A.  I have not seen a CDR for Adelanto.  It does
21  not mean it does not exist, but I don't have - I've not
22  seen one.
23  Q.  Okay, and then the I think it's the Uniform
24  Corrective Action Plan, UCAP?
25  A.  Yes.

Page 209

1   Q.  What - tell me is that something again that's
2   generated by ICE or of its authorized auditors?
3   A.  Yeah, it's generated by ICE.
4   Q.  Okay, and how is that different than the CDR?
5   A.  So the UCAP process is sort of generated by
6   the Office of Enforcement Removal Operations, so it
7   comes from sort of the operational side of ICE where the
8   contractor discrepancy report would come from a
9   contracting officer which is a particular type of
10  position exists throughout the Federal Government and
11  that's a different office in ICE.
12     MR. CHAREST:  Did you get that office name?
13  Because I didn't quite hear it.
14     (Whereupon, the requested portion of the
15  record was read back).
16     MR. CHAREST:  That's fine.  I just - I just
17  didn't -- I didn't hear it.  I want to make sure
18  you caught it.  You caught it.  You caught it.
19  You're better at that than I am.
20     Thank you.
21  BY MR. CHAREST:
22  Q.  All right, so I appreciate the difference now.
23  The CDR comes from the - the contractor's side and the
24  UCAP comes from the operations side.  Is that fair?
25  A.  No.  So it's the contracting officer like in

Page 210

1   this case the service provider would be the contractor,
2   and I'm articulating just to make a point, but the
3   contracting officer is a government employee that
4   generates that report.
5   Q.  Understood, and thank you.  I appreciate that.
6      Are you aware of any UCAPS that pertain to
7   Adelanto at all?
8   A.  So I believe we have seen UCAPS from Adelanto
9   and, in fact, that may have been related to the either
10  Inspector General audit, but I believe we have seen
11  UCAPS.  It's been some period of time since I've seen
12  them but, yes, they - I believe we have seen UCAPS.
13  Q.  How many?
14  A.  I think they all relate to the, you know,
15  2017, 2018 and now what I'll say is even spilling into
16  2019 Inspector General report.  It's sort of - there's
17  been different versions of that report as it was a draft
18  report, it was the report, it was the report with the
19  Agency's comments.
20  Q.  Okay, we're going to talk about those next as
21  you see, so we can - we can get to it when we get to it.
22     Are you aware of any UCAPS other than those
23  that pertain to the OIG reports?
24  A.  I'm not personally aware, but I
25  also wouldn't -- It's entirely possible there are other



Page 211

1  ones.

2     Q.   So that's a good point.

3         Are you as the auditor within GEO the

4  recipient of CDRs or are you kind of a cc kind of person

5  on those?

6     A.   So if a document requires a response that is

7  in the form of a corrective action plan it would be

8  something that would come to me to at least partner on,

9  but as far as the contractor discrepancy report I'm not

10 the administrator -- What I will say is the

11 transactional officer writing the contract so, no, it

12 would be something that - that we would have a piece of

13 but not responsibility for.

14    Q.   It would come to GEO from the ICE contracting

15 officer to that person's counter party within GEO and

16 maybe get escalated to you for some sort of help with

17 the corrective action; is that right?

18    A.   So not quite.

19        I have a peer that essentially is over the

20 contracting transactional piece and it's her office and

21 team that are sort of responsible for that, the

22 transactional pieces of the contract, administering the

23 contracts, if you will.

24    Q.   Okay.  All right, and how about for the UCAPS?

25 Are you the direct recipient, a cc or the same kind of

Page 212

1  dotted line kind of connection?

2     A.   Often things come in at the facility level and

3  then they're sort of routed --

4     Q.   Okay.

5     A.   -- up.

6     Q.   All right, so the fact that you don't know of

7  any CDRs and only know of the UCAPS that are associated

8  with the OIG reports doesn't mean that other ones don't

9  exist?  It's just within your sphere of knowledge that's

10 all you have?  Yeah?

11    A.   Just my personal knowledge.  I mean we have a

12 tracking system for them that would be the official

13 source of information.

14    Q.   Okay, what's the tracking system?

15    A.   It's probably an Excel -- It's probably a --

16 You know, it's another database of some variety.

17    Q.   Well, is it an Excel spreadsheet or a

18 database, sir?

19    A.   I think it's an Excel spreadsheet.

20    Q.   Do you know the name of the - the document?

21    A.   I suspect it has an equally uninspired name

22 like tracking sheet of some kind.  I honestly don't

23 know.

24    Q.   Have you seen that Excel spreadsheet before

25 that tracks the CDRs and UCAPS?

Page 213

1     A.   Yes.  I've seen it, yes.

2     Q.   In my mind I'm imagining a document that gets

3  updated as different things happen and then there's

4  columns that kind of tell you the status of the

5  different open issues.  Is that largely what - what

6  we're talking about?

7     A.   Yes.

8     Q.   Okay, so the point there being it's a document

9  that will change over time, right?

10    A.   Yes.

11    Q.   Is the - is the date of the document like

12 recorded in the - in the file name, or how do you know

13 which one's the most recent one?

14    A.   So we have a clerk that is responsible for it.

15 She has a methodology that she's agreed upon with the -

16 the person responsible for - for auditing.  You know, I

17 don't precisely know.

18    Q.   Who is the clerk?

19    A.   Her name is Wendy Pearman.

20    Q.   Wendy?

21    A.   Wendy Pearman.

22    Q.   Can you spell that for the court reporter,

23 please.

24    A.   Sure.

25        It's W-e-n-d-y.  Pearman is P-e-a-r-m-a-n.

Page 214

1     Q.   Thank you.

2         All right, and then you mentioned -- Well,

3  does the spreadsheet that Miss Pearman - Pearman updates

4  and circulates reflect the activities done to get up to

5  the standards of the UCAP or whatever the - whatever

6  corrective action is being taken?

7     A.   No.

8         So the tracking sheet is more sort of just

9  dates and with inventory, if you will.

10    Q.   Okay.

11    A.   It's not a substantive report.

12    Q.   Okay, if you wanted to know what any

13 particular UCAP was how would you find out what - let

14 me - tell your assistant whatever, I want to see all the

15 UCAPS that pertain to Adelanto?  Is that a hard thing

16 for you to get or is it easy?

17    A.   That's a good question.  I don't know how hard

18 it would be.  There's no -- We don't have a database of

19 ICE's generated documents and ICE generated findings, so

20 I think we would have - we would have again the ones

21 that we have we would - we would inventory in some way,

22 but I don't know.  I would be cautious to say it would

23 be like a fulsome set.

24    Q.   But Miss Pearman's tracking sheet should keep

25 track of all of the ones that you all are - that you all



Page 215

1  being GEO are aware of, correct?
2     A.  If they're active.  In other words, yes.  In
3  other words, in terms of a historical perspective
4  depending on sort of the scope of the question that's
5  where, you know, we get a little more shaky I would say.
6     Q.  And does the spreadsheet break out the
7  tracking by facility?
8     A.  The facility's captured certainly.  I don't
9  know whether it's organized that way.
10    Q.  Gotcha.
11       One of the things that ICE can do if it finds
12  GEO to be noncompliant under any of its agreements but
13  specifically as to let's talk about Adelanto is
14  effectively impose a financial sanction, correct?
15    A.  Yes.  That's my understanding.
16    Q.  All right, are you aware of any financial
17  sanctions that have ever been imposed on GEO for any
18  violation or any issue whatsoever leaving aside the
19  pejorative violation word at Adelanto?
20    A.  So I don't know of any CDRs for Adelanto
21  personally, but I don't also know that there have never
22  been any.  I don't know.
23    Q.  Okay, so you've added an additional element
24  which I think I suspect it's probably correct, but let
25  me make sure I understand what you've done there.

Page 216

1       I asked you about any financial sanction and
2  you said you're not aware of any CDRs.  Are CDRs the
3  only way that GEO might face a financial sanction for
4  non-performance?
5     A.  So I hate to say any because again it's not my
6  complete area of expertise, but the contracting officer
7  is the person who is responsible for binding the Agency,
8  so - so it is - it is that process, not an operational
9  person that can decide to impose a financial penalty.
10    Q.  And as you sit here today you're not aware of
11  any financial penalties that ICE has imposed as it
12  pertains to GEO's performance at Adelanto; is that
13  right?
14    A.  Again I joined GEO in 2017, so to the best of
15  my knowledge, and again I'm not the primary office
16  responsible for CDRs.  I don't know of any, but I
17  certainly as it - as it relates to of all time I don't
18  know.
19    Q.  Right.
20       And that's fine.
21       Is there a source or some sort of record of
22  CDRs that have been imposed historically or -- And
23  really I'm talking about financial sanctions as a result
24  of a CDR.  Is there - do you know of any source like
25  that?

Page 217

1     A.  Not - it's not by my office, so I don't know.
2     Q.  Okay, now the last acronym you shot at me was
3  QA --
4     A.  QASP.
5     Q.  QASP.  Thank you.
6     A.  Quality Assure - Quality Assurance
7  Surveillance Plan.
8     Q.  So Q-a-s-p, strictly speaking?
9     A.  Right.
10    Q.  All right, how does that work, QASP?
11    A.  So the QASP is something that's written by the
12  Agency.  It's required under the Federal Acquisition
13  Regulations that there's a regime in place, it's also, I
14  think, incorporated in the contracts that ICE and then
15  its contractor in a subordinate way has to have a plan
16  in place for monitoring that the government is getting
17  the services that it's asking and paying for.
18    Q.  And does GEO have such a monitoring program in
19  place?
20    A.  We have a quality assurance plan, yes.
21    Q.  What does the S stand for for QASP?
22    A.  Surveillance.
23    Q.  Surveillance.  Thank you.
24    A.  And if I have that wrong I'm - I'm close, I
25  think.

Page 218

1     Q.  Oh.
2     A.  I'm pretty sure it's surveillance.
3     Q.  Like I'll never know.
4        Okay, so I asked you if - or I asked you
5  basically how GEO complies with its obligations under
6  QASP and you tell me that GEO has a quality assurance
7  plan.  Is that a manual that sets out the steps by which
8  GEO monitors its own performance?
9     A.  So it's essentially the policy that describes
10  what I detailed to you before in terms of the annual
11  corporate audit, the follow-up audit, the method in
12  which, you know, we do those audits.
13    Q.  So we've kind of come full circle on that
14  topic then.
15       The quality assurance plan that - that GEO has
16  pursuant to the QASP, Q-a-s-p, gets us back to the
17  annual audits, following audits that we first started
18  talking about with this discussion; is that right?
19    A.  Correct.
20    Q.  Okay, is there any oversight between ICE and
21  GEO to say, look, your quality assurance plan is good
22  enough or not good enough?
23    A.  So as part of the request for proposal way
24  back in the beginning of the idea that QASP language and
25  a quality assurance document from the government service



DANIEL RAGSDALE Vol. 2
Novoa vs The Geo

June 12, 2019
219–222

Page 219

1  provider would be part of the RFP process, so all of
2  that would be proposed and agreed upon as part of the
3  request proposal, the response and then ultimately when
4  the contract is signed there would be some language
5  about those things.
6     Q.  Gotcha.
7        When you're talking about the ACA review, the
8  welcome book that's Exhibit Four reflects you say a file
9  review.  Does that mean are no humans involved or is it
10  just documents that are looked at?
11     A.  So it is just really documents.  In other
12  words, they are - they are assembled for that purpose.
13  In other words, it's - they are created for the
14  accreditation audit.
15     Q.  Can you give me an example of what documents
16  would be created for the accreditation audit?
17     A.  So I have to tell you I've never seen one, so
18  I couldn't tell you precisely what's in them.
19     Q.  Okay, do you know what things the ACA looks at
20  when it's trying to determine whether or not a facility
21  should be accredited under its standards?
22     MS. ARMSTRONG:  Objection, calls for
23  speculation.
24     THE WITNESS:  So again I would have to say I'm
25  not steeped in either the ACA standards or the

Page 220

1  standards for adult local detention facilities, but
2  there are standards that govern - govern, you know,
3  what you would expect to see in a detention
4  facility or a Correctional facility around
5  security, around food service, around medical care
6  similar to the format of these Performance-Based
7  Detention Standards, the Marshals Federal
8  Performance-Based Detention Standards, the Bureau
9  of Prison Standards, State Standards, et cetera.
10  BY MR. CHAREST:
11     Q.  All right, and so are the documents sent to
12  ACA or does ACA show up and sit in a room and look
13  through the documents?
14     A.  ACA shows up and I believe sits in a room and
15  looks at the documents.
16     Q.  Do they also go out into the facility itself
17  and look around?
18     A.  I believe they do a tour too, yes.
19     Q.  So a tour versus inspection, is it -- Is the
20  tour additive to its - what it's learning about the
21  facility or is it just sort of getting to know the area?
22        Do you understand my distinction?
23     A.  I've never been in an ACA audit.  I know that
24  they, you know, do a review and they make a qualitative
25  determination of compliance with the standard and as a

Page 221

1  result of that review that's scored that's what goes to
2  the commissioners who are at the accreditation hearing
3  and that's the - the substance of it.
4     Q.  Whether the - the narrative is informed by the
5  tour, I suspect it is, but I don't know precisely, you
6  know, that they do independent for testing during that
7  tour.  I believe it is again based on the documents.
8     Q.  The score that goes to the commission is not
9  based on the tour, correct?
10     A.  I don't know.
11     Q.  Okay.  Do you know whether or not GEO is a
12  sponsor for the ACA convention?
13     A.  GEO is a member of the ACA.  I don't know that
14  they're a sponsor or not.
15     Q.  Do you know if any current or former official
16  at GEO is a governing member or Board Member for the
17  ACA?
18     A.  David Donahue is a - is a - I forget what his
19  title is.  It may be -- I forget what his title is, but
20  I know he's an active member of ACA and there are many,
21  I think, folks that are either alumni of Correctional
22  associations and still members of ACA even though they
23  work at GEO.
24     Q.  All right, I'm handing you a document that I'm
25  marking as Exhibit Number Seven.

Page 222

1     (Whereupon, Exhibit 7 was marked)
2     MR. CHAREST:  Whoops.  You've got all the
3  copies.
4  BY MR. CHAREST:
5     Q.  Seven is a document issued by the Office of
6  Inspector General titled Management Alert Issues
7  Requiring Action at the Adelanto ICE Processing Center
8  in Adelanto, California dated in the lower right-hand
9  corner September 27th, 2018 with an I guess they call it
10  a file number OIG-18-86.  Have I accurately described
11  the document, sir?
12     A.  Yes.  I believe so.
13     Q.  Okay, have you seen this document before?
14     A.  I have.
15     Q.  All right, this is one of the reports issued
16  by OIG that pertained to not only detention facilities
17  generally but specifically Adelanto, correct?
18     A.  Yes.
19     Q.  All right, now I think when you were telling
20  me the dates of the reports I thought you said 2017
21  going on to '18.  Are you aware of a - a report that
22  predates this one that pertains to Adelanto
23  specifically?
24     A.  No.  What I meant to say is this - the
25  unannounced audits that - that are subsumed in this



Page 223

1  report could have happened as early as into '17. In
2  other words, folks showing up at the door happened over
3  a series of time and this is a culmination of those -
4  those visits.
5        Again I wasn't there. I understand
6  anecdotally that this - this didn't - this does not
7  represent one single visit by the Inspector General's
8  Office. There may have been multiple visits.
9    Q. Okay, that's what you heard?
10   A. Yes.
11   Q. Okay, but don't know one way or the other?
12   A. No. And -- No.
13   Q. All right, so I guess what I'll do is my plan
14 is to walk through it and I want to get your
15 understanding of sort of what's going on that's as
16 reflected in the report here, so the first thing I'd ask
17 you to do is turn to the - the first - well, the second
18 page, I guess, of the document which is, you know, the
19 DHS, OIG highlights, what we found, why we did this
20 alert.
21       The - what we found has four -- Sorry, three
22 headers, nooses in detainee cells, improperly and
23 overly - overly restricted segregation and then the
24 third one is untimely and inadequate detainee medical
25 care.

Page 224

1        Aside from this OIG report have you ever heard
2  of anyone, auditor, detainee, anyone raising concerns
3  about nooses in detainee cells?
4    A. So I - I'll just tell you that I think there
5  was a disagreement as to what those items were or
6  whether they were nooses, so I - you know, I mean if
7  you've asked me again for - at all locations for all
8  times there are self harm incidents that are unfortunate
9  that involve ligatures that happen sometimes in
10 facilities throughout, you know, the Correctional
11 environment, so I guess I need you to qualify that a
12 little bit more.
13   Q. Sure.
14       When you say self harm incidents that involve
15 ligatures, what are - can you dumb that down for me,
16 please.
17   A. In other words, someone who is suicidal,
18 right, who attempts to hurt themselves.
19   Q. Self harm. I understand ligatures that were
20 used.
21   A. But using some sort of device to tie around
22 your neck.
23   Q. Okay, sorry. Thank you. Not to be graphic.
24 I just literally didn't know what the word meant.
25   A. Right. Sorry.

Page 225

1    Q. All right, so your response to my question is
2  you don't agree or you heard maybe that - that things
3  that the OIG found might not have been nooses as a
4  general first proposition; is that right?
5    A. Yes.
6    Q. All right, now in fairness back to me though
7  my question is have you ever heard of there being nooses
8  in any detainee cells outside of this OIG report?
9  That's my question. So take this OIG report and set it
10 aside. Have you ever heard of nooses being found in
11 detainee cells anywhere in your experience at GEO?
12       MS. ARMSTRONG: Objection, vague.
13       THE WITNESS: As it relates to Adelanto?
14 BY MR. CHAREST:
15   Q. No. I said for this one as anywhere, and I'm
16 going to go down to the next one.
17   A. So again as I said, in other words, I couldn't
18 speak with great confidence or authority that I've never
19 heard of a noose or a ligature being in someone's cell
20 because again I know there have been self harm incidents
21 without any specificity, so the answer is yes, I have
22 some latent awareness of it somewhere at some time but I
23 couldn't give you more details, but as it relates to
24 Adelanto I'm only aware of this OIG report.
25   Q. Okay, and then the same question. Leaving

Page 226

1  aside what's in this OIG report have you ever heard of
2  complaints about improperly or overly restricted
3  segregation at any facility within the GEO structure?
4        MS. ARMSTRONG: Objection, vague.
5        THE WITNESS: Yes. In other words, there are
6  obviously, you know, concerns about the use of
7  segregated housing.
8        In 2017 the Department of Justice issued a
9  report on segregated housing generally. What's
10 interesting is between the Department of Justice
11 entities, the Bureau of Prisons and the U.S.
12 Marshals Service the policies that ICE had put in
13 place were generally regarded as model policies, so
14 what's interesting is, you know, there are - there
15 are policies by ICE that are generally considered
16 forward leaning and inappropriate, so this is
17 obviously, you know, disappointing.
18 BY MR. CHAREST:
19   Q. Well, again I'm kind of relating back to my
20 experience in industry, but you can have all the
21 policies in the world. If you don't have conformance to
22 those policies they don't really help you very much,
23 right?
24   A. Employees are a key part, so you want people
25 who are trained and obviously compliant in following



Page 227

1  policies, yes.
2      Q.   And so the complaint, and we'll talk about it
3  in some detail, the complaint that's in OIG's highlights
4  here about improperly and overly restricted segregation
5  isn't that the policies were bad, it's that the - the
6  practices were bad, correct?
7      A.   I think that's a reasonable conclusion, yes.
8      Q.   All right, and like I said we'll talk about
9  it, so we'll get to it, but aside then from the OIG
10  complaints that are in this, the subject of this report
11  what awareness do you have as the auditor for GEO of
12  improper or overly restricted segregation at the
13  Adelanto facility?
14      A.   So again we've had conversations with ICE
15  about the use of restrictive housing to make sure that
16  everybody's facts and understanding are the same and,
17  you know, it's - it's a process that is ongoing for
18  refinement.
19      Q.   Conversations with ICE, what do you mean by
20  that?
21      A.   So again you have a field office and an
22  Assistant Field Office Director that are there at
23  Adelanto.  They are intimately aware of who is in
24  segregated housing and why and it's important to know
25  that, you know, segregated housing encompasses at least

Page 228

1  three different types of reasons why they're there.  You
2  have protective custody, you have what I would say is
3  administrative detention which could be while there's an
4  investigation of us as to what happened, if there was
5  say a detainee fight and then you have disciplinary
6  segregation.  You know, we have if you look at the
7  number of people that are in any facility the percentage
8  of folks in the special management unit is a tiny tiny
9  fraction, but it can be for all those three reasons.
10      Q.   Right, but I'm still trying to understand when
11  you say in conversations with ICE these are situations
12  where ICE has observed people being in either improper
13  or maybe and/or overly restrictive segregation
14  situations, correct?
15      A.   So again, in other words, if you -- And again
16  I don't know whether you're familiar with the DOJ's
17  restrictive housing report, but let's just say you have
18  someone that has a vulnerability of some type or feels
19  unsafe for some reason and they have sort of opted
20  themselves in --
21      Q.   They request --
22      A.   -- to protective custody.  Sure.  Right.
23      Q.   Sure.
24      A.   So that is not an optimal living arrangement
25  for a long period of time.  It's not the same as general

Page 229

1  population, they don't have the same what I'll say is
2  amenities, if you will, so what we try to do is work to
3  get people to the least restrictive environment that's
4  possible, and that's what the DOJ report identifies, so
5  as you can imagine, you know, the people that - that,
6  you know, the DHS law enforcement entities apprehend
7  come in various conditions, you know, some again are
8  asylum seekers, have post traumatic stress disorder, it
9  would be a range of things, right?  So, you know, you
10  want people who are housed in a way that, you know,
11  makes them feel as comfortable as they can but you
12  wouldn't want someone to opt themselves into protective
13  custody until their immigration case was resolved, let's
14  just say, which GEO has absolutely no control over, but
15  it could - it could end up with an extended stay which
16  may not, you know, help their sort of mental state.
17      Does that make sense?
18      Q.   I understand you're identifying a potential
19  issue with people that act - ask to go into protective
20  custody.  I'm not sure how that pertains to your
21  awareness of ICE reports or concerns about improper or
22  overly restrictive segregation necessarily.  I mean
23  you're observing - you're identifying this is a thing
24  that sometimes happens, but my question is more about
25  what did ICE say about improper and/or overly

Page 230

1  restrictive segregation?  Like were they complaints that
2  ICE had and said, hey, you're not performing per the
3  standard, you need to do better?  Were they saying
4  you're doing great?  Were they saying, oh, you need to
5  put people into more restrictive segregation?  I mean
6  what's - what's -- What's happening there?
7      A.   The conversation with ICE was more about folks
8  that are - have some degree of sort of a mental health
9  issue, right, and what - what I guess options there
10  would be for those sorts of people that don't
11  essentially do well in general population, but the
12  option shouldn't be for an extended period being in a
13  special management unit.
14      Q.   And what was the resolution for those folks?
15      A.   There's not a great resolution.  You know,
16  we've worked to increase programming for folks in that
17  situation, but just like every other law enforcement
18  entity, you know, in this day and age in 2019, you know,
19  the people who have evidenced mental health challenges
20  often find themselves in the criminal justice
21  environment and sometimes that spills over into the
22  immigration enforcement environment, so - so the
23  challenges exist everywhere and what to do with those
24  folks is again an ongoing conversation.  I think that's
25  probably, you know, part of the reason why DOJ did the



Page 231

1  report.
2      What I will tell you is that ICE has
3  particularly good policies in place, visibility into the
4  why which is what's depicted in that DOJ report.
5      Q.  Okay, actually you said something that
6  reminded me of a thing I meant to ask a long time ago,
7  so let's take a - a pause in this topic just to ask you
8  a shorter round - a range of questions that I think we
9  should be easily agreeable to.
10     Detention at the facility at Adelanto is not
11 the result of some sort of criminal activity, correct?
12     A.  No.  The detention at Adelanto is only under
13 the authority under the Immigration Nationality Act.
14     Q.  And so therefore it's not criminal, the people
15 that are there that are not - are not deemed as
16 criminals as far as you know, right?
17     A.  They are not --
18     MS. ARMSTRONG:  Objection, vague.
19     THE WITNESS:  -- being prosecuted.
20 BY MR. CHAREST:
21     Q.  I'm sorry?
22     A.  They are not being prosecuted, no.
23     Q.  Okay, and the - the detention is civil, not --
24 In terms of are you in a prison?  No, you're not in a
25 prison, right, because a prison is where people that

Page 232

1  have been convicted of something go, right?
2      A.  It's not under any Federal Code.  It's under
3  the Immigration Nationality Act.
4      Q.  Right.
5      A.  It's a different Section of the U.S. Code.
6      Q.  And so the - the detention is civil in nature,
7  not punitive, not punishment, not part of a criminal
8  act, correct?
9      A.  Correct.
10     Q.  All right, and as a result is it fair to say
11 that the - the detainees probably either deserve or do
12 expect to maintain a higher level of standard or the
13 higher standard of living at the - the facility than you
14 might find at a - at a criminal detention facility?
15     MS. ARMSTRONG:  Objection, vague.
16     THE WITNESS:  So I can't speak to their
17 expectations.
18 BY MR. CHAREST:
19     Q.  Sure.
20     A.  What I can say is, you know, the standards
21 that ICE promulgates in my view are - provide the best
22 conditions out of anywhere in that sort of detainee
23 system regardless of who the custodian is, but it would
24 also be fair to say that you have a blended set of ICE
25 detainees.  You have folks that this is their first

Page 233

1  period of detention and then you can have folks that
2  let's just say, you know, spent many years in the
3  California Department of Corrections for a crime, so it
4  would be their expectations and obviously the
5  appropriate conditions of confinement would vary.
6      Q.  Yeah, so you were right to point out.  My
7  question about their expectations is - doesn't really
8  call it the right question, but I think you've answered
9  it correctly and I just want to capture it.
10     The - the people that are detained at the
11 Adelanto facility, they could be the nicest people in
12 the world to a hardened criminal, you just don't know,
13 right?
14     A.  GEO would only know what ICE would tell us
15 about the individual, you know, person.
16     Sometimes, you know, ICE will tell us a lot
17 because they know more, other times the people could
18 have been apprehended at the border the day before and
19 you have no idea who they are.
20     Q.  Or they could have been wrongfully apprehended
21 and, in fact, not subject to deportation even.  That's a
22 possibility, right?
23     A.  GEO would have no way of knowing that but,
24 I -- You know.
25     Q.  It's a possibility is my point, right?

Page 234

1      A.  Yes.  To the extent anything's possible, yes.
2      Q.  Right, and I just want to make sure that
3  there's no sort of stigma for anyone that's hearing
4  about the fact that people are detainees at the facility
5  that they're somehow criminals.  Their presence at this
6  facility doesn't mean they are criminal or even being
7  accused of anything criminal, correct?
8      A.  It certainly has no applicability to what GEO
9  does.  GEO has no role in - in who comes into the
10 facility, how long their stay - how long they stay or
11 when they go.  It's entirely driven by the Department of
12 Homeland Security or the Department of Justice.
13     Q.  And that's - and that's a civil question, not
14 a criminal question fundamentally, right?
15     A.  It's - again it's a question of the status
16 under the Immigration Nationality Act which is - which
17 is not a criminal violation.
18     Q.  Okay.  All right, thank you.  We're done with
19 the detour.  Back to the segregation questions.
20     A.  Okay.
21     Q.  So the - when you were talking about the
22 conversation with ICE you had that one conversation in
23 mind, that one issue; is that right?
24     A.  Uh-huh.  (Affirmative response).
25     Q.  Have you ever seen aside from that one



Page 235

1  conversation and the report here by OIG any complaints
2  whether by detainees or auditors or even civil right -
3  civil rights activists about improper and/or overly
4  restrictive segregation --
5      MS. ARMSTRONG:  Objection, vague.
6  BY MR. CHAREST:
7      Q.  -- at the Adelanto facility?
8      MS. ARMSTRONG:  Objection, vague, compound.
9      THE WITNESS:  So again I know there's been
10  litigation in the Ninth Circuit as it relates to
11  folks with mental health concerns.  I'm not a
12  hundred percent sure the precise nature of those
13  complaints.  I don't know for a -- I can't recall
14  immediately whether they involved segregated
15  housing, but it was, you know, again the treatment
16  of folks with mental health conditions was a
17  concern.
18      You know, again during my time at ICE, you
19  know, the number of facilities that would be
20  responsible or that ICE was responsible for was a
21  lot, so I wouldn't - I wouldn't know in great
22  detail, no.  I can't think of anything else.
23  BY MR. CHAREST:
24      Q.  And I'm not trying to limit just your time at
25  ICE.  I don't think I did that.  I'm talking ever even

Page 236

1  at GEO are you aware of anything like that?
2      A.  No.
3      MS. ARMSTRONG:  Objection, vague.
4  BY MR. CHAREST:
5      Q.  And are you aware of any corrective action
6  that has ever been taken for any improper or overly
7  restrictive segregation outside of the reports and
8  events surrounding the reports here in this OIG report?
9      A.  So the ones that I am aware of are in response
10  to, you know, the Inspector General's reports.  You
11  know, we obviously went through the allegations and
12  looked at, you know, each thing, so the four corners of
13  that was done, but that's the extent of the - you know,
14  what I'm aware of.
15      Q.  Okay, so aside from corrective action
16  associated with the improper and overly restrictive
17  segregation set out in this report which is Exhibit
18  Seven, you're not aware of any other corrective action
19  taken at the Adelanto facility associated with improper
20  and/or overly restrictive segregation?
21      A.  So I just want to be clear.  Corrective action
22  plan is a term of art.
23      Q.  Okay.
24      A.  Right?  So, in other words, you know, there -
25  theoretically over the course of time or even in, you

Page 237

1  know, with some - in the recent past that - that could
2  be in - somewhere in somebody's file drawer that relates
3  to this.  I am not aware of it.
4      Q.  And that's a perfect answer.  Thank you.
5      When you're saying restrictive housing and/or
6  segregated housing that's what you're describing in
7  point of fact is being in a cell by yourself for between
8  twenty-two and twenty-three hours a day, correct?
9      A.  It would depend.
10      So again as I talked about the celled
11  environment if we're talking about Adelanto is what they
12  use for restrictive housing and there's two sides of
13  that - of that particular housing area, so there are
14  places where depending on the reason why folks are in
15  there that they spend only sleeping time in their cell
16  and then there are other folks potentially in the
17  disciplinary, you know, sanction side that would again
18  be subject to a sanction, right, for, you know, after a
19  grievance process, or excuse me, a disciplinary hearing
20  and a process.  If that's the sanctions it imposed then,
21  yes, it's supposed to disincentive certain behavior.
22      Q.  Okay, let's first talk about the burden of my
23  question that I need to - a background of what you just
24  said.
25      Is it your testimony that when someone's in

Page 238

1  protective custody they're not in a cell by themselves
2  for twenty-two and twenty-three hours a day?
3      A.  So are we talking about Adelanto?
4      Q.  Yes, sir.
5      A.  Okay, so again, in other words, in Adelanto
6  there's - there's the two different sides like an A and
7  B side, if you will, of that particular housing wing.
8  There is a - you know, folks that can recreate together
9  and be out of their cell if they're in protective
10  custody they've done wrong, right, there - there is an
11  opportunity to be out of their cell for much more time,
12  yes.
13      Q.  Okay, and how about for the administrative
14  detention?  What's the - what's the situation with
15  ability to come and go out of your cell?
16      A.  So I would say it would depend.  In other
17  words, there's - there's generally some pretty short
18  time limits for administrative segregation.  In other
19  words, let's just say, you know, again, folks who are
20  playing soccer, there's some pushing and shoving, you
21  know, you sort of have to let - put - let the dust
22  settle, if you will, figure out what, is this something
23  that somebody did to somebody else, you know, that
24  purpose that's, you know, set to the facility specific
25  timeframes, so those people will probably be sort of in



Page 239

1  the more restrictive version of restrictive housing or
2  special management until it's clear, somebody can
3  investigate as to what happened, so I believe those -
4  those people would probably be in the more, you know,
5  rigid environment or being in their cell.
6       Q.   And the more rigid environment in terms of
7  being in their cell that you're talking about is being
8  in a cell for twenty-two hours out of the twenty-four
9  days - hours in the day?
10      A.   Again whatever the rule is if it's twenty-two
11  I don't precisely know off the top of my head, but - but
12  if the investigation is done in two hours they wouldn't
13  spend twenty-three hours in their cell, if that makes
14  sense, so that again that happens with some speed, but
15  if it's something that went over the course of the day
16  or something then, yes, they would be in for that longer
17  period.  It would not be the same as the people in
18  protective custody.
19      Q.   You can be in administrative segregation for
20  up to seventy-two hours, right, before any policies are
21  violated, right?
22           MS. ARMSTRONG:  Objection, vague.
23           THE WITNESS:  You have to ask me that again.
24  BY MR. CHAREST:
25      Q.   Isn't it true to say that a detainee can be in

Page 240

1  administrative segregation for up to seventy-two hours
2  before any policy's violated?
3           MS. ARMSTRONG:  Same objection.
4           THE WITNESS:  I'm not precisely sure what you
5  mean.  In other words --
6  BY MR. CHAREST:
7       Q.   Are you talking about a soccer match?
8       A.   -- for what purpose?
9           MS. ARMSTRONG:  Please let him finish his
10  answer.
11           MR. CHAREST:  He actually says he doesn't know
12  anything.
13  BY MR. CHAREST:
14      Q.   I'm going to try to help you.
15           All right, are you ready?
16           Imagine your soccer match example, right?  You
17  and I, you know, I think it's a goal, you think it's
18  not, okay, and we push and shove, okay, we get put into
19  administrative segregation.  At that moment we're
20  subject to being in our cell for twenty hours out of
21  twenty-four, right?
22           I'm not done with it.  That's point one in the
23  hypo.
24      A.   Okay.
25      Q.   All right?  Are you with me so far?

Page 241

1       A.   So pushing and shoving, some amount of
2  investigation or dust settling and then they're in for
3  how long?
4       Q.   Well, we're subject to being in the cell for
5  twenty-two out of twenty-four hours of that upcoming
6  day.
7           MS. ARMSTRONG:  Objection, calls for
8  speculation.
9           THE WITNESS:  So I don't have the standard
10  memorized.  If you want me to look at something and
11  we can go through the - the timeframes.
12           What I can relate to you in my personal
13  understanding is if someone is in restrictive
14  housing or a special management unit for
15  administrative segregation there is various
16  timetables that are applicable to make a decision
17  as to what - whether that person should be in there
18  or should not.
19  BY MR. CHAREST:
20      Q.   Right.  That's the second part of my hypo
21  which is while the person is in administrative
22  segregation and subject to being in confinement for
23  whatever number of hours out of the twenty-four during
24  that time the facility has up to seventy-two hours to
25  determine whether or not the person should continue with

Page 242

1  administrative segregation or not, correct?
2           MS. ARMSTRONG:  Objection, speculation.
3           THE WITNESS:  I'd have to look at the
4  standard.  I believe it's seventy-two hours, but I
5  hate to guess --
6  BY MR. CHAREST:
7       Q.   Right.
8       A.   -- so if we want to look at it I'm happy to do
9  that.
10      Q.   So then your - when you gave your example
11  about the soccer match you said, oh, a lot of times it
12  gets resolved in a couple hours, but in point of fact
13  the facility has three days to figure out whether or not
14  the person should be in continued confinement beyond the
15  first seventy-two hours, right?
16           MS. ARMSTRONG:  Objection, vague.
17           THE WITNESS:  The facility has what the
18  standard permits.
19           I will tell you that these are generally
20  pretty simple factual scenarios but, of course,
21  that varies.  Is it something that was involved,
22  two people or ten people or is it something that
23  the cameras caught?  Is it something that someone
24  overheard?  So I think there's a variety of
25  factors.  I think what you have is a - a limit that



Page 243

1   imposes some maximum cutoff, but what I'm telling
2   you is at least from a - from a, you know, policy
3   perspective it should be done with speed.
4   BY MR. CHAREST:
5       Q.   And the person who is being investigated and
6   is subject to a disciplinary panel hearing, they're not
7   supposed to be in disciplinary segregation, right?
8   They're supposed to be in the administrative level that
9   you talked about, right?
10      A.   The administrative segregation would be while
11  essentially the process unfolds and the discipline is
12  once a decision is made, in other words, a finding, if
13  you will, and then a sanction is imposed.
14      Q.   I think that's exactly what I said, isn't it?
15      A.   I don't know.  I'm just saying, in other
16  words, they're in administrative segregation while the
17  process happens --
18      Q.   Right.
19      A.   -- and then once there's the result and - and
20  if a decision is made to impose a sanction and that
21  sanction is continued placement in restrictive housing
22  then - then, yes, they would be in restrictive housing.
23      Q.   And so if someone has not yet had a decision
24  from the panel about the disciplinary - from the
25  disciplinary hearing that person should not be in

Page 244

1   disciplinary segregation, correct?
2       MS. ARMSTRONG:  Objection, calls for
3   speculation.
4       THE WITNESS:  It would be my understanding
5   that would be administrative segregation because
6   there is no finding.
7   BY MR. CHAREST:
8       Q.   All right, should be administrative and
9   therefore should not be disciplinary, right?
10      MS. ARMSTRONG:  The same objection.
11      THE WITNESS:  I think that's the same answer,
12  but --
13  BY MR. CHAREST:
14      Q.   But this is one of those ones where I need you
15  to say yes and you can say whatever you want but you're
16  not actually answering my question.
17      MS. ARMSTRONG:  The same objection.
18      THE WITNESS:  If - if you're - if you are
19  asking me to agree that someone who's case is not
20  resolved one way or the other should not be in
21  disciplinary segregation then the answer is yes.
22  BY MR. CHAREST:
23      Q.   Thank you.  Perfect.
24      All right, going to the third bullet point
25  here of under what we found header in the OIG report the

Page 245

1   OIG identified untimely and inadequate detainee medical
2   care.
3       Now the same form of question as I said
4   before.  Aside from this report are you aware of any,
5   whether they be complaints by detainees or audit reports
6   or ICE reports identifying untimely and/or inadequate
7   detainee medical care at Adelanto?
8       A.   So during my time at ICE, you know, there were
9   concerns about medical care at Adelanto, so I mean I
10  know there have been staffing increases as a result of
11  sort of the population who was going to Adelanto so, you
12  know, do I know of other concerns?  I mean ICE has
13  raised concerns.
14      Q.   So it wasn't just OIG on this third one, it
15  was ICE has also raised a concern about this issue?
16      A.   Over a different --
17      MS. ARMSTRONG:  Objection, vague.
18      THE WITNESS:  Over a different period of time.
19  BY MR. CHAREST:
20      Q.   A prior time then, a time prior to the --
21      A.   Yes.
22      Q.   And have you ever heard aside from that prior
23  concern raised by ICE and the concern raised by OIG in
24  this report, are you aware of any other concerns being
25  raised about untimely and/or inadequate detainee medical

Page 246

1   care at Adelanto?
2       A.   I believe also the DHS, Office of Civil Rights
3   and Civil Liberties raised a concern as well.
4       Q.   When was that, sir?
5       A.   I couldn't give you the -- Again recent past,
6   but in the last two or three years I would say.
7       Q.   Was that roughly the same time as the ICE
8   concerns or was it a separate event?  I'm trying to see
9   are they both looking at the same set of facts or is it
10  another vignette along the timeline?
11      A.   I couldn't say for absolutely sure, but it was
12  while I was at ICE, so it would be somewhere around that
13  same timeframe.
14      Q.   Okay, and since you've been at GEO -- Well,
15  are there any other ones before you came over, I guess
16  I'm trying to do the timeline here, that you're aware of
17  other than the ICE identifying concerns and the DHS
18  Office of Civil Rights and Civil Liberties are
19  concerned?
20      A.   Since I've come to GEO?
21      Q.   Well, that's not my question.  That's the next
22  one.
23      The current question is anything in and around
24  the times other than the ICE and DHS concerns, anyone
25  else pre your arrival at GEO?



DANIEL RAGSDALE Vol. 2
Novoa vs The Geo

June 12, 2019
247–250

1    A.  Again as I said there - there may have been
2  claims in litigation.  Without having read obviously
3  those complaints or have them in front of me I
4  couldn't - I couldn't tell you.  I also don't know, you
5  know, with great detail if the California system has
6  produced any concerns, but I don't know, so --
7    Q.  The California system.  You mean the
8  California - the State of California?
9    A.  Correct.  The State of California.
10    Q.  Thank you.
11      Sorry for the stumbling there.
12      And how about since you've been at GEO, are
13  you aware of any concerns raised about the untimely
14  and/or inadequate detainee medical care at Adelanto
15  other than the OIG report?
16    A.  No.  Just - just this one.
17    Q.  Are you aware of what corrective actions were
18  taken in response to the ICE concerns that you've
19  mentioned at Adelanto?
20      MS. ARMSTRONG:  Objection, vague.
21      THE WITNESS:  For what period of time?  Which
22  ICE concerns are we talking about?
23  BY MR. CHAREST:
24    Q.  Well, you -- I mean if there's more than one
25  then I need to know that.  I thought you identified ICE

1  having expressed a concern.  If it's some concerns let's
2  try to figure out when about the untimely and inadequate
3  medical care for detainees.  Is it more than one set of
4  concerns?
5    A.  So again the language on - on untimely or
6  inadequate you're taking obviously from the - the DOJ
7  report.  I'm interpreting that without using that
8  precise language to use the word concern as I would
9  normally understand what you mean, so I know in 2016
10  there were, you know, sort of some ICE concerns and I
11  know there was a staffing adjustment and we increased
12  medical staff at Adelanto.  Again as I think I said
13  earlier, you know, the number of folks that have been
14  apprehended by either Border Patrol or some entity in
15  CVP and ICE have sort of grown sicker over time it
16  appears and the consumption of medical services has
17  increased over time, so I know at least in Adelanto
18  that - that there was an increase in medical staffing
19  sometime in '16 into '17.
20    Q.  So that was -- I'm trying to do my math
21  here -- around the time you left ICE and came to GEO; is
22  that right?
23    A.  No.  So that would have been the year before,
24  so it would have maybe been 2015 and 2016.
25    Q.  Okay, so these events that you're remembering

1  are while you were still working at ICE?
2    A.  Correct.
3    Q.  I see.  All right.  Very good.
4      In your understanding did the staffing
5  adjustments that were made in and around that time
6  whether it's 2015 or '16 or whatever it was, do they
7  adequately address the concerns that you were aware of
8  regarding medical care at Adelanto?
9    A.  Yes.  My concerns at the time when I was still
10  at ICE, yes.
11    Q.  Okay, again applying the math there it looks
12  to me like the DHS Civil Rights and Civil Liberties
13  concerns that you mentioned were raised roughly around
14  the same time.  Did - did the staffing adjustments that
15  were made at Adelanto address those concerns as well or
16  were they of a different nature?
17    A.  So I can't speak to whether CR, CL was
18  satisfied.  What I can tell you is in my role I would
19  have been responsible, you know, to bring, you know, the
20  Agency along to solve the problems.  I believe that was
21  roughly the same timeframe.  I don't have an independent
22  memory of specific, you know, DHS, CR - CR, CL concerns
23  at Adelanto, but the staffing adjustment was made in
24  service of those concerns.
25    Q.  The general concerns I guess --

1    A.  Correct.
2    Q.  -- that were growing at the time, huh?
3      You suggested also that the possibility that
4  litigation may have raised the issue of medical
5  concerns.  Are you, leaving aside sort of the sort of
6  specter of it may have happened, are you aware of any
7  claims that related to medical concerns at Adelanto that
8  resulted in corrective action to your knowledge?
9    A.  No, so I'm not - I'm not thinking of any
10  individual lawsuits.  I'm thinking about litigation that
11  went to the Ninth Circuit relating to competency, and I
12  can't think of the name of the case unfortunately, but
13  there was a regime in place, an immigration judge who
14  thought a person could not sort of materially help
15  themselves in a - in a proper due process sort of way
16  could appoint someone and I believe there was either a
17  regulation or some structure put in place for
18  immigration judges to make that - you know, to have that
19  concern and it's really nothing to do with segregation
20  or particularly sort of treatment.  It was more sort of
21  the quality of the - of the person's comprehension.
22    Q.  The detainee's comprehension?
23    A.  Correct.
24    Q.  All right.  All right.  So, okay, and the same
25  thing with the State of California.  You suggested maybe



Page 251

1 there was some sort of issue, maybe not. Are you aware
2 of any specific issues that the State of California
3 raised as pertains to untimely and/or inadequate medical
4 care?
5    A.  No, but I think it's a -- I know that there
6 was a law passed in California that gave them, the
7 Attorney General's Office authority to inspect
8 facilities, so again without having great detail I just
9 don't want to be blanket and say I don't know.  I mean I
10 don't know any specifics.
11    Q.  Yeah, that's fine, and certainly I suspect
12 you're not aware of any corrective action taken pursuant
13 to those, any issues identified since you don't know the
14 issues that may or may not have been identified?
15    A.  Correct.
16    Q.  All right.  All right, so putting a big circle
17 around all that, and we're not yet to the OIG, basically
18 as I understand it you're aware of some ICE concerns and
19 similarly some DHS concerns pertaining to really it
20 sounds like staffing levels and in - and in your
21 understanding the staffing levels were adjusted in
22 around 2015, '16 and you believe that took care of the
23 problem at Adelanto with respect to untimely and/or
24 inadequate medical care for the detainees; is that
25 right?

Page 252

1    A.  So as broad as that category could be the
2 problems that were identified were addressed.  It was
3 again I would say largely a capacity issue in terms of
4 wellness screenings happening in twelve hours, you know,
5 dental appointments happening at a certain interval,
6 those sorts of things.  That was, you know, again the
7 increased capacity of the medical or Health Services
8 Department was meant to address those issues.
9    Q.  All right, and do you think that today the
10 medical care is sufficiently timely at Adelanto to be
11 compliant with applicable PBNDS standards?
12    A.  So, yes.  I believe the systems are adequate
13 to do that.  You know, is it in every single case?
14 Perhaps not but, yes, I think fundamentally, yes.
15    Q.  Okay, so let's talk -- Now we're going to go
16 into the OIG report.
17      Your - the first answer you gave me was, hey,
18 look, those aren't nooses.  Explain to me what you mean
19 by that.
20    A.  So as you can imagine in certain, you know,
21 detention environments there's not a great deal of
22 privacy, so those devices which in my opinion shouldn't
23 have been used were used for people to have some amount
24 of privacy while they used the toilet.
25    Q.  Okay, so they would kind of unfold the sheet,

Page 253

1 pull it across, go to the bathroom, fold it back up?
2    A.  Correct.
3    Q.  And that was an accepted practice at the
4 Adelanto facility or insofar as the employees didn't
5 stop it in the regular course, correct?
6    A.  That is my understanding.
7    Q.  Okay, now whether as ticky-tack as it is or
8 may seem, hanging cloth from the ceiling is a violation
9 of the standard, correct?
10      MS. ARMSTRONG:  Objection, vague.
11      THE WITNESS:  So I know we discussed before in
12    the voluntary work standard what, you know,
13    detainee housekeeping would be in hanging things
14    specifically mentioned so, yes, that is - that is
15    not a practice that is, you know, endorsed and
16    appropriate under the standard.
17 BY MR. CHAREST:
18    Q.  All right, so while - what I'm hearing today
19 is I, Mr. Ragsdale, don't believe those are nooses, they
20 had some function but they were violative of the PBNDS
21 standard, whether the - the concern raised by OIG was
22 accurate or not is another question?  Is that fair?
23      MS. ARMSTRONG:  Objection, misstates prior
24    testimony.
25      THE WITNESS:  They regardless of what you call

Page 254

1 them it appears to be hanging items that in my view
2 would be violative of the standard, yes.
3 BY MR. CHAREST:
4    Q.  Okay, and so the fact that the guards at
5 Adelanto were allowing that practice to consider - to
6 continue was in violation of the applicable PBNDS
7 standard, correct?
8      MS. ARMSTRONG:  Objection, calls for
9    speculation.
10      THE WITNESS:  All I can say is the outcome
11    whether - I'm not sure who let it happen, but the
12    outcome certainly did not meet the standard.
13 BY MR. CHAREST:
14    Q.  Well, you've read the report, right?
15    A.  Yes.
16    Q.  And the report says that the, what, there were
17 fifteen out of twenty cells had this or some sort of
18 similar apparatus hanging from it, right?
19    A.  Yes.
20    Q.  And it's not like it's hidden, right?
21    A.  Were the items hidden you mean?
22    Q.  No.  I mean you can see it when you walk by
23 the cell it was going on, right?
24    A.  Correct.
25    Q.  And so either fifteen out of twenty people put



Page 255

1  this up randomly on the day that OIG showed up or
2  they've always been up and OIG showed up and observed
3  them, right?
4      MS. ARMSTRONG:  Objection, assumes facts not
5  in evidence.
6      THE WITNESS:  I couldn't tell that probably
7  any better than anybody else, but I will say that
8  they shouldn't be up at all.
9  BY MR. CHAREST:
10     Q.  And, well, right.  I'm just trying to
11  understand you resisted the notion of the suggestion
12  that the guards allowed it to happen.  Do you think that
13  the guards were taking serious the - the violation of
14  the standard by letting these hanging sheets be in the -
15  in the rooms?
16     MS. ARMSTRONG:  Objection, calls for
17  speculation.
18     THE WITNESS:  Well, I've read the report.  You
19  know, if you look at the bottom of page three it's
20  not clear, you know, who - whether it was a GEO
21  objection that sort of fell on deaf ears, whether
22  the ICE local officials didn't consider it a
23  priority.  All I -- If you ask me do I think it was
24  a good practice as I understand the standards the
25  answer's no.

Page 256

1  BY MR. CHAREST:
2      Q.  Right, but let's be real clear because this is
3  exactly -- You're doing a good job of guessing my - my
4  question, but it's not ICE's job to ensure detainee
5  compliance with that standard, it's GEO's job, right?
6      A.  So it's GEO's job to meet the contract
7  requirements and the standards and the day-to-day sort
8  of interactions and service of that as the service
9  provider.  Yes, it's the - it's Geo's responsibility.
10     Q.  Right.
11         So whether ICE did or did not raise an issue
12  with it to the GEO guards it was the GEO guards' job to
13  observe that condition and stop it and bring the
14  detainees back into compliance with those standards,
15  correct?
16     MS. ARMSTRONG:  Objection, calls for
17  speculation.
18     THE WITNESS:  The black letter of the - of
19  the - of the standards require them to take action
20  and not to just let it be so, yes, I agree that the
21  GEO folks should have taken action.
22  BY MR. CHAREST:
23     Q.  Well, you say the black letter as if like it's
24  a real strict interpretation.  That's literally what the
25  standard says, right, that you're not supposed to be

Page 257

1  hanging cloths?
2      A.  It does literally say that, yes.
3      Q.  And whether it's black letter or not, the
4  point of having standards and of having policies as
5  you've said earlier is to give guidance to guards who
6  left to their own devices make take any number of action
7  if they're not properly trained, correct?
8      A.  It is supposed to eliminate individual
9  interpretation, yes.
10     Q.  All right, and that's the very point of having
11  standards and policies and training on those standards
12  and policies, right?
13     A.  Yes.
14     Q.  All right, and so whatever happened whether
15  it's someone thinking that the standard wasn't important
16  enough, someone failing to train the guards, the guards
17  failing to adhere to their training or whatever on the
18  spectrum of possibilities in terms of that root cause
19  analysis you talked about before, something broke down
20  in the process where GEO's performance here fell short
21  of the standards, correct?
22     A.  Yes.
23     Q.  All right, let's go to the - the segregation
24  talk.
25         I feel like I'm going too slow through this.

Page 258

1  I'm sorry.
2         According to OIG on the day the inspectors
3  arrived there were fourteen detainees in disciplinary
4  segregation, right?
5         I'm on page five, the second -- Sorry.  The
6  first paragraph under detainees are placed.
7      A.  Okay, yes.  I'm there.
8      Q.  Okay, and according to OIG again through our -
9  its review of the file OIG found that fourteen out of
10  fourteen people had been placed in disciplinary
11  segregation before they were - had been found guilty of
12  whatever prohibited - prohibited act or rule violation.
13  Do you see that in the - in the report?
14     A.  Yes.
15     Q.  All right, is that a true statement, that
16  fourteen out of fourteen people that were - happened to
17  be in disciplinary segregation on that day were all
18  wrongfully in the disciplinary segregation area?
19     A.  So I don't know the specifics of those
20  fourteen cases.  You know, ultimately ICE is the one who
21  responds to the Attorney General.  Not Attorney General.
22  Excuse me.  Inspector General, so --
23     Q.  You and me both.
24     A.  -- so if ICE, you know, concurred with that
25  finding then that's the final word.  I'm not personally



Page 259

1  familiar with those fourteen cases, but I agree that's
2  what the finding says.
3      Q.  Okay, do you think that that just happened to
4  be a bad day at the Adelanto facility and every other
5  day everybody that's in - in segregation is properly
6  assigned --
7      MS. ARMSTRONG:  Objection.
8  BY MR. CHAREST:
9      Q.  -- and fourteen out of fourteen were wrong on
10  that one particular day?
11      MS. ARMSTRONG:  Calls for speculation.
12      THE WITNESS:  So I don't know.
13      However, what this suggests to me is from the
14  position that I would sit now either there's an
15  interpretation problem, right, there's a process
16  problem or there's some sort of gap or
17  interpretation in what the Inspector General saw in
18  the process, potentially what IE saw in the process
19  and potentially what GEO saw in the process, so in
20  this case, you know, this - to solve this sort of
21  problem it is, you know, a top to bottom review of
22  that process making sure that there's a common
23  understanding at least between GEO and ICE and
24  then, you know, making sure that we've trained to
25  that, the local policy is clarified, so that would

Page 260

1  be the sort of the part of the process that I -
2  that I would be part of.
3  BY MR. CHAREST:
4      Q.  Okay.  Well, ICE concurred with OIG's
5  recommendation from this report, correct?
6      I think there's a letter.
7      Yeah, it's on page twelve and thirteen,
8  Appendix A.
9      A.  So ICE concurs with a single recommendation
10  and the single recommendation was that we conduct a full
11  review, so they concurred in - in conducting a full
12  review of the three issues that are here, so I don't
13  know that they concurred with the conclusions, but they
14  concurred with the recommendation that, "We recommend
15  that ICE conduct a full review of the ICE - Adelanto ICE
16  Processing Center and The GEO Group's management of the
17  center immediately to ensure compliance with the 2011
18  Performance-Based National Detention Standards.  As part
19  of the assessment, ICE must review and ensure compliance
20  with the three items:  Personal housekeeping
21  requirements associated with hanging bedsheets --
22      THE COURT REPORTER:  You have to slow down.
23      THE WITNESS:  Oh, excuse me.
24      "Segregation and medical care," and then
25  obviously it goes on and says, "ICE concurred with

Page 261

1  the one report recommendation."
2  BY MR. CHAREST:
3      Q.  Okay, so there's nowhere in that letter in
4  ICE's review of the OIG draft report that said no, no,
5  you all got it wrong, they were properly detained,
6  there's nothing - there's no factual contest offered by
7  ICE, right?
8      A.  I have -- Again there's generally a process
9  with dealing with the Inspector General.  I agree with
10  you that the September 17th response from Nathalie Asher
11  to John Kelly -- Let's see.  I would say it doesn't
12  dispute or admit the facts of - contained by the IG.  It
13  just accepts the recommendation.
14      Q.  Okay.  Surely -- Well, I mean I don't know.
15  We can, I guess, dispute whether -- Certainly the - ICE
16  had the opportunity to dispute the facts if it wanted to
17  through that letter process, right?
18      MS. ARMSTRONG:  Objection, calls for
19  speculation.
20  BY MR. CHAREST:
21      Q.  Well, I'll take that objection.  I'm
22  sustained.
23      The - the purpose of showing the draft report
24  body of OIG to ICE is to get ICE's comments on the draft
25  report, right?

Page 262

1      A.  Correct.
2      Q.  All right, and the comments that ICE had on
3  the report are reflected in that letter that is made
4  Appendix A to the OIG report, correct?
5      A.  Yes.
6      However, I'll note that if you - if you look
7  at what is the Inspector General's sort of types of
8  reports, so this is a management alert which is a
9  particular type of report.  It's something they do with
10  a little - I guess a little less formality and a little
11  more speed because I think they think it's important and
12  potentially quite rightly, so the type of
13  recommendations and the type of response would be
14  different than it would be in a particular - in an
15  inspection or an audit that, you know, encompassed
16  potentially more than one site visit or -- The process
17  is a little bit different.
18      Q.  Okay, but you're not sitting here saying that
19  ICE didn't have access to the records that OIG had
20  access to, are you?
21      MS. ARMSTRONG:  Objection, calls for
22  speculation.
23      THE WITNESS:  So what I can say is, in other
24  words, unlike, you know, what I'll say is more
25  routine audits where if you pulled a sample and



Page 263

1  said we spoke to John and Joe and Sally and Billy
2  and we said we identified their information. We,
3  you know, showed the detainee files. It's a report
4  orderly process. The Inspector General has their
5  own authority to investigate. They may or may not
6  identify who they talked to.
7       Now I agree with you that if they - if they
8  came on January 1st and there were fourteen people
9  could ICE figure out who it would be? Potentially,
10 yes, but I'll just tell you the process with the
11 Inspector General is a little different.
12      And then the last thing I would add is
13 generally speaking given the special, what shall I
14 say, is authority and role that an IG plays, unless
15 they're sort of clearly wrong about something
16 agencies generally accept the recommendations
17 because the recommendations don't necessarily
18 involve specific facts, they involve sort of more
19 generalized concerns about doing something
20 different.
21 BY MR. CHAREST:
22    Q.  I appreciate all those observations, but my
23 question was literally ICE has the ability to find out
24 which fourteen detainees were in custody that day and
25 has the ability to find out whether it - factually it

Page 264

1  disagrees with what OIG said, it has that ability,
2  right?
3       MS. ARMSTRONG:  Objection, calls for
4  speculation.
5       THE WITNESS:  I don't know about those
6  particular folks. I would say it's possible, but I
7  don't know. I wasn't there for that.
8  BY MR. CHAREST:
9     Q.  Well, hold on. I mean let's -- I'm not trying
10 to be obtuse here, but GEO and ICE can both find out
11 what day OIG inspected, right, through whatever records
12 are at Adelanto, right?
13    A.  Sure. Yes.
14    Q.  GEO and ICE can find out what fourteen
15 detainees were in disciplinary segregation on that
16 particular day, right?
17    A.  I suspect so, yes.
18    Q.  Yeah. I mean can you imagine a world where
19 that's not true?
20      MS. ARMSTRONG:  Objection, vague.
21      THE WITNESS:  Whether I could imagine it or
22 not, I guess - I agree with you that they could
23 find out who those fourteen people were, yes.
24 BY MR. CHAREST:
25    Q.  And GEO and ICE can pull those fourteen

Page 265

1  detainees' records and find out what they were accused
2  of, when they were accused of it and whether or not
3  there had been a disciplinary hearing before they had
4  been put into disciplinary segregation, correct?
5       MS. ARMSTRONG:  Objection, calls for
6  speculation.
7       THE WITNESS:  They can review the process for
8  each one of those fourteen detainees, yes.
9  BY MR. CHAREST:
10    Q.  Right, so the information is fully available
11 to both GEO and ICE to dispute any factual assertions
12 that are set out here in the OIG's report? It's
13 available, right?
14    A.  I again, I would have to speculate, but I
15 believe that is a reasonable conclusion.
16    Q.  Okay, OIG goes on - goes on to say that based
17 on the final reviews and interview with GEO Group staff
18 the Adelanto Center "Places detainees in disciplinary
19 segregation prior to a guilty finding and a written
20 order of segregation." Now this is not just the
21 fourteen people. This is apparently GEO staff saying
22 this is true. Do you understand something differently?
23    A.  I'm reading what this says here and, yes, I
24 believe that's what it's saying.
25    Q.  Yeah, but do you understand -- Is it your

Page 266

1  belief, understanding that, in fact, the GEO staff at
2  Adelanto does not place detainees in disciplinary
3  segregation prior to a guilty finding and a written
4  order of segregation?
5     A.  So --
6       MS. ARMSTRONG:  Objection, vague.
7       THE WITNESS:  So I can't speak to these
8  individual cases, so - but I'm reading what's here.
9       If there was a process problem, right, we
10 would have looked at the process, made sure that
11 the process met the standards under detainee
12 discipline or security and then trained to that
13 standard, so again I don't know what was going on
14 in this precise instance, but the IG has obviously
15 identified an infirmity in the process and it would
16 be my job to work with the facility to put a
17 corrective action plan in place to make sure this
18 does not continue.
19 BY MR. CHAREST:
20    Q.  Okay, so this observation as I read it and
21 then the following sentence is not limited to the
22 fourteen detainees on that particular day but rather
23 statements by staff saying that there was a practice in
24 place for all detainees to go directly to disciplinary
25 segregation after an alleged incident to prevent



Page 267

1 "further issues" with the detainee?

2     A.  Again as I read that that doesn't make sense

3 on its face because disciplinary segregation requires a

4 finding.  There's no mention of administrative

5 segregation, so again I don't know whether it was what I

6 will say is a - a jargon problem or a labeling problem

7 with the Inspector General --

8     Q.  I see.

9     A.  -- because again the Inspector General as I

10 said they're generalists, so maybe they were thinking

11 it's either protective custody and everything else is

12 disciplinary segregation, I don't know, but this

13 paragraph doesn't adequately clarify.

14         What I will say to you is there's a process

15 that is required by the standards that GEO was required

16 to meet.

17     Q.  Sure.  Well, we both agree on that.  We both

18 agree that the process and the standards exist.  The

19 question is are the process and standards met, right?  I

20 mean I don't think anyone's sitting here saying the

21 process doesn't exist, it's right there in that inch

22 thick document next to you, you know, but the question

23 is are the GEO staff living up to it or not, I think,

24 and if you read the words on the paper on the OIG report

25 the conclusion has to be no, right?

Page 268

1         MS. ARMSTRONG:  Objection, vague.

2         THE WITNESS:  So when I read this I - it

3 certainly describes a process that needed a review,

4 but again as I said to you that it doesn't make

5 sense as I understand the general range of

6 restricting housing options as there's no mention

7 of administrative segregation, that this seems

8 incomplete to me, but again, you know, I'm reading

9 this and certainly it's not optimal performance.

10 BY MR. CHAREST:

11     Q.  Well, let's - let's - let's see if we agree on

12 this much:  If the OIG is accurate in describing

13 detention or disciplinary segregation and not what you

14 think is a mistaking administrative segregation

15 misidentification it would be a violation of the

16 standards under the - the PBNDS for GEO Group staff to

17 immediately place a detainee into disciplinary

18 standard - disciplinary segregation immediately

19 following an incident before there was a finding of

20 guilt and a written order of segregation, correct?

21     A.  Yes.

22     Q.  Okay.  The next observation the OIG makes

23 pertains to it says only seven out of the fourteen

24 people that were in segregation that day had

25 disciplinary decisions at all and the - the folks had

Page 269

1 been placed -- The -- Sorry.  The segregation placement

2 had happened before the appeal process had run its

3 course.  If that's true, if that's accurate that would

4 be a violation of the standards that are set out in

5 PBNDS as well, correct?

6         MS. ARMSTRONG:  Objection, vague.

7         THE WITNESS:  Right.  So as I said before,

8     people do not go to disciplinary segregation until

9     they have a decision from the panel, but they would

10     be in administrative segregation, so again I don't

11     know whether someone conflated those two things or

12     didn't understand that nuance and that's why this

13     reads this way, but - but the standard requires

14     prior to being placed in disciplinary segregation

15     that there is a finding that the person, in fact,

16     deserves to be disciplined.

17 BY MR. CHAREST:

18     Q.  Right, so you say people do not go unless, and

19 I think we can both agree people should not go unless,

20 correct?  Like the standard says they should not go,

21 correct?

22     A.  Yes.  I should say should.  They are

23 physically - you know, they're not somehow physically

24 barred, so it should not could, yes.

25     Q.  And the fact is if the guards are not

Page 270

1 conforming to the standards and putting people in

2 disciplinary segregation before the steps that are

3 required, that's a violation of the standards that we

4 were just talking about, right?

5     A.  Yes.

6     Q.  That's what -- Okay.

7         The next observation was as to the seven

8 people that had penalties set out in - as a result of

9 disciplinary panel decisions it says that the sanction

10 imposed - "Sanctions imposed went beyond the penalties

11 listed in the disciplinary panel decision."

12         Now there's not any detail about what the

13 sanctions - what sanctions were imposed and what weren't

14 imposed, but if that's a true statement that's a

15 violation by the GEO guards of the standards that are

16 set out in PBNDS, correct?

17     A.  Yes.  The document should be self-explanatory

18 and be complete.

19     Q.  And, for example, the OIG uses two examples,

20 one about the ability to purchase and keep commissary

21 items and the other one about losing contact with

22 family.  If those sanctions are imposed on detainees --

23 Well, the first one -- I guess, we'll do the commissary

24 items.  If that's imposed on the detainee even though

25 the disciplinary panel did not authorize that as a



Page 271

1  sanction that would be a violation of the standard,
2  correct?
3      A.  Yes.  Those -- Because loss of commissary
4  privileges it can be a sanction in and of itself, so it
5  doesn't surprise me that someone who was in disciplinary
6  segregation doesn't have access to commissary, but the
7  document should say that, yes.
8      Q.  Okay, and similarly the loss of contact for
9  family visits, apparently according to the OIG, you may
10  tell me they're full of it, but OIG says that's not even
11  a legit sanction under any circumstance.
12      A.  So there's an important -- I think you're just
13  misreading that slightly.
14      Q.  Okay.
15      A.  What it says is disciplinary segregation lose
16  contact visits.
17          A contact visit is a visit where you have a
18  physical interaction with a person that's visiting you.
19      Q.  Gotcha.
20      A.  It does not mean they lost contact.
21      Q.  Okay.  Well, thank you for the clarification.
22          Still in all the loss of contact visits is not
23  an appropriate sanction under any circumstance, correct?
24      A.  No.  That I'm not sure of.
25          A contact visit again depending on why the

Page 272

1  person was in disciplinary segregation for contraband is
2  hard to say.
3      Q.  Okay.  Well, OIG says it's not available as a
4  sanction, but who knows.  I don't know.  That's fine.
5          The other issue that the OIG raises was with
6  respect to with respect to a detain - disabled
7  detainee who apparently was stuck in his wheelchair for
8  nine days straight and not either assisted or helped or
9  whatever to get into his bed and/or to brush his teeth.
10  That's not an - that's a violation of at least one, if
11  not several standards, correct, if that's true?
12      A.  So this case I do have some, you know, what
13  I'll say is we looked into this specifically.
14      Q.  Okay.
15      A.  As I understand it, I didn't meet this
16  particular detainee, but as I understand it this person
17  was given a wheelchair as a - as a - as an aid, they
18  were able, they were ambulatory, they could walk with a
19  cane or a walker.  This is what I would say is a
20  circumstance that trying to what I'll say is be -- Let
21  me back up.
22          Generally speaking for an orderly running of
23  facilities people need to follow instructions.  However,
24  not every order that's given, and potentially this was
25  an example, that if someone said please get out of your

Page 273

1  wheelchair and get into bed and if the person refused
2  this was the result, so it's sort of good intentions but
3  not depicted well in an Inspector General report.
4  That's my understanding of what happened here, so --
5      Q.  I'm just - your understanding is that the
6  detainee refused to get out of the chair?
7      A.  Correct.
8      Q.  So if people would just refuse to do what
9  they're told they're just left to their own devices or
10  are they -- I mean what if I just refused to go to bed?
11      A.  So I think that's there is the problem.
12          This - this does not reflect what folks are
13  supposed to do, but we're talking about human beings on
14  both sides --
15      Q.  Right.
16      A.  -- and this is a situation as I understand it
17  that in an effort to be sort of kinder, if you will,
18  this was the result.
19      Q.  The kinder result was to leave the person in
20  the wheelchair for nine days straight?
21      A.  To not forcibly take the person out of the
22  wheelchair.
23      Q.  Okay.
24      A.  But again this is my understanding, but
25  that's - you know, this one I know a little more about.

Page 274

1      Q.  Okay, what prompted the specific investigation
2  into the nine days in the wheelchair as opposed to the
3  fourteen detainees in disciplinary segregation?
4      A.  Well, this to me is a life safety issue just
5  by reading it, right?  This could have been a vulnerable
6  person --
7      Q.  Sure.
8      A.  -- so I think the facts just require that and
9  also it has - you know, it's called out in very plain
10  terms in this report.
11      Q.  Who's the one?  Who's the person that
12  decides -- This is an event worthy of further
13  investigation but this prior one is not.  Who determines
14  that?
15      A.  I don't know the name that determines it, but
16  I'm just telling you that I did.
17      Q.  So you determined it then?  You're the one
18  that went and looked into this nine days in the
19  wheelchair situation?
20      A.  I was more particularly interested in this
21  case, yes.
22      Q.  Okay, and not the fourteen days or the
23  fourteen people detained?
24      A.  Well, for all the reasons we just talked about
25  I think that was an interpretation question as opposed



Page 275

1  to a - a health issue.
2      Q.   You think the sanctions being imposed in
3  excess of what was set out in the written order of
4  segregation or whatever the written order was an
5  interpretation issue?
6      A.   No.  The issue between administrative and
7  disciplinary segregation that the IG doesn't
8  distinguish, I think that's an interpretation issue.
9          The - the four corners of the paperwork from
10  the disciplinary process that did not detail every
11  sanction that they imposed is a recordkeeping issue, an
12  important one, but - but it's not of the same importance
13  to me as this one.
14      Q.   Well, what if the panel actually didn't mean
15  to take away the things that the guards took away and
16  actually meant to be more circumscribed in its - in its
17  punishment and the guards on their own volition added
18  more punishment, it's just not recordkeeping, is it?
19      MS. ARMSTRONG:  Objection, calls for
20  speculation.
21      THE WITNESS:  Yeah, again I don't know
22  anything about that.
23          All I will say is, and maybe this is
24  important, every instance of noncompliance requires
25  action.  All I'm just telling you is just as a

Page 276

1  question of facts I wanted to find out what
2  happened in this particular case.
3  BY MR. CHAREST:
4      Q.   The next item that the OIG points out is this
5  notion of handcuffing and shackling folks that are in
6  disciplinary segregation.  If what the OIG says
7  happened, that all detainees held in disciplinary
8  segregation are placed in restraints when outside their
9  cells, that's a violation of the PBNDS standard, right?
10      A.   Not necessarily.
11      Q.   Okay.  Why not?
12      A.   The standard requires a case-by-case
13  evaluation so, in other words, if for reasons or facts
14  that could be articulated by the folks that are there,
15  let's again without knowing the specifics of this
16  particular group, but let's just say it was five people
17  who were in for fighting, right?
18      Q.   Okay.
19      A.   That and you could articulate that, yes,
20  people had, you know, evidenced some amount of, you
21  know, dangerousness, if you will, then that would be an
22  appropriate reason to use restraints, but if folks were
23  in disciplinary segregation for some other reason and it
24  didn't involve articulable facts or physical violence
25  then the case-by-case basis would sort of tip the other

Page 277

1  way, so what I know about this is it required folks to
2  make sure they're using a case-by-case analysis as
3  opposed to sort of a generalized label of simply being
4  in disciplinary segregation.
5      Q.   I think you ended up where we agree with each
6  other, so let me see if I'm right.
7          Placing all detainees that are in disciplinary
8  segregation and restraints when outside of their cells
9  is a violation of the standard?
10      A.   Again depending on if they were there that
11  day.
12      Q.   No.  I mean all as a policy.
13      A.   Yes.  Yes, as a blanket matter, no, you cannot
14  do that.  It's a case-by-case basis.
15      Q.   Okay, and so if the five folks that were in
16  the - in the detention or the disciplinary segregation
17  area at the time all individually deserved it, as it
18  were, within whoever determines that then that's - your
19  point is you just have to do it case-by-case?
20      A.   Correct.
21      Q.   So if there was blanket policy of placing all
22  detainees held in disciplinary segregation and
23  restraints when outside their cells that would violate
24  the PBNDS, correct?
25      A.   Correct.

Page 278

1      Q.   All right, and what is the current policy now?
2      A.   It's to perform a case-by-case analysis.
3      Q.   And nothing changed as a result of this OIG
4  inspection?
5      A.   It's not a change.  It maybe have been a
6  training issue, it may have been an interpretation
7  issue, I don't know precisely, but - but the folks are
8  required to meet the standard and the standards requires
9  case-by-case.
10      Q.   And before this event was identified in the
11  OIG report do you know what, in fact, was going on?
12      A.   I don't.
13      Q.   Okay, so you can't dispute the OIG's statement
14  that GEO Group segregation supervisor and guards
15  admitted that they place all detainees held in
16  disciplinary segregation into restraints when outside
17  their cells, can you?
18      A.   I don't have any personal knowledge to dispute
19  what's written here.
20      Q.   Did you conduct a factual investigation in and
21  around this or did you just make sure training got
22  better?
23      A.   For - again for everything we, you know,
24  developed a corrective action plan.  I don't know the
25  precise terms of it off the top of my head, but if it



Page 279

1  was a training issue or an interpretation issue that was
2  addressed.
3      Q.  Is it right to say that the PBNDS requires
4  face-to-face medical assessments of all detainees in
5  segregation at least once daily?
6      A.  I believe that's right.  I mean I'd have to
7  look at the standards for the specifics, but - but folks
8  in special management units are entitled to appropriate
9  health care and that requires a knowing and, you know,
10 appropriate level of communication to make sure if they
11 have a medical issue it's addressed.
12     Q.  Yes.  I mean the - the face-to-face assessment
13 is not something people that are in the general areas
14 get on a daily basis, is it?
15     A.  There's a different process for - for it if
16 someone is sick and needs to see a medical professional
17 there's a different process for them to do that.  They
18 have different - obviously freedom of movement during
19 recreation during, you know, in a dormitory style
20 environment.  Obviously if somebody's in restrictive
21 housing the medical professional has to go to them.
22     Q.  Right.  Well, that's -- I mean four people --
23 Maybe I'm wrong.  I assumed that the face-to-face
24 medical assessment was sort of a heightened standard
25 because the person's in solitary confinement rather than

Page 280

1  being in a more healthy environment.  Am I wrong with
2  that?
3      A.  Folks in the special management units there's
4  a - there's a process in place to sort of check on them
5  on a regular basis so, you know, the guards are trained
6  to not just walk by and look to make sure the person
7  is - is physically there.  They're supposed to have a
8  communication, sort of a meeting of some amount of
9  comprehension and obviously that spills over into the
10 medical environment and potentially even more so because
11 you couldn't assess someone's, you know, current state
12 unless there was some communication.
13     Q.  So the medical assessment that we're talking
14 about here in the middle part of page seven is not a
15 doctor going on site but rather a guard making some sort
16 of assessment of the detainee's condition; is that
17 right?
18     A.  So I'm not sure.  I don't know that it's the
19 guard because this says we saw nurses, physicians,
20 mental health providers conducting cursory walk-throughs
21 throughout disciplinary segregation, so this is we saw
22 two doctors, and I mean you're obviously reading this,
23 so I think what - what again this is saying, you know,
24 if folks are not English speakers I mean there has to be
25 a level of comprehension that is - that is knowing and

Page 281

1  meaningful and that's what this is - is saying.
2      Q.  Well, it says that next, but the first thing
3  it says is that out of the fourteen people in
4  segregation the - the folks walked through without even
5  talking to ten of them, right?
6      A.  It says, "Observed them doing so without
7  having any contact with ten of the fourteen in
8  disciplinary segregation."
9      Q.  Right, and that would be a violation of the
10 face-to-face medical assessment standard we just talked
11 about, right?
12     A.  Yes.
13     Q.  Okay, and as to the four the doctor apparently
14 asked in English whether the detainee was okay and then
15 moved on without any acknowledgment or response from the
16 detainee and the - what the OIG points out is, hey, look
17 that's a violation.  Even though you sort of tried to
18 find out their medical condition, you don't know if they
19 spoke English and you didn't wait for acknowledgment,
20 right?
21     A.  Yes.  As I said it has to be a meaningful
22 exchange.
23     Q.  Right, and so if the facts that happened as
24 described here by OIG are accurate, those are both
25 violations of the performance standards, correct?

Page 282

1      A.  Yes, if there was either not a comprehension
2  because of a language issue and then there was a lack of
3  a mean - an opportunity for a meaningful exchange
4  because it was just somebody who was walking by neither
5  one of those two things would meet the standard.
6      Q.  Right.
7          Now what, if anything, was done to address
8  that type of shortcoming?
9      A.  So there is a language line service that is
10 used at Adelanto and it's used in - in tens of thousands
11 of times over the course of a month.  I mean it is - it
12 is -- Because there are many folks there that don't
13 speak English, there are some folks that speak Spanish,
14 there is many staff that speaks Spanish, so - so that's
15 a possibility, but there is a clear and available remedy
16 for language comprehension and there are telephones
17 around to - to get that technology and then again as I
18 talked about in terms of staffing there have been some
19 provider changes since this - this issue, so there are,
20 you know, different medical providers, different medical
21 staff.
22     Q.  I thought you said that the provider changes
23 happened in the 2015, '16 timeframe, didn't you?
24     A.  I meant staffing changes.  So, in other words,
25 there have been increases.  There was a different



DANIEL RAGSDALE Vol. 2
Novoa vs The Geo

June 12, 2019
283—286

Page 283

1 company, there's - there's been a range of changes.
2    Q.   Okay, but adding -- So the first thing you
3 said was, look, we have translation services now.
4 Great. That doesn't do anything with the ten - ten out
5 of fourteen people that had no contact at all, right?
6    A.   All I would say is, in other words, I'm
7 hopeful, and this is generally the practice of the
8 Inspector General, but I obviously wasn't there that
9 day, they will do - you know, once they arrive they will
10 obviously identify themselves, they will walk around the
11 facility and if they see an issue they will immediately
12 communicate something that they -- They don't go back to
13 Washington and write this report and say, you know, you
14 did this wrong. They may very much memorialize the
15 finding, but if it's - they would articulate at the end
16 of that walk around at the end of that day a potential
17 finding, so I would not assume that any of these folks
18 after, you know, this interaction somehow, you know,
19 weren't addressed immediately.
20    Q.   Well, what about the next day when OIG wasn't
21 there? I mean either Adelanto was having a bad day or
22 OIG saw on a day that it wasn't prepared for an
23 inspection a whole bunch of things or maybe it was an
24 interpretation, kind of a mix of both?
25       MS. ARMSTRONG:   Objection.

Page 284

1 BY MR. CHAREST:
2    Q.   Right?
3       MS. ARMSTRONG:   Assumes facts not in evidence
4 and calls for speculation and vague.
5       THE WITNESS:   So there's - I mean again
6 there's at least - there's a couple of findings in
7 here, right? I think we could agree there were
8 some process issues, there was some individual
9 issues that related to specific detainees, but -
10 but my only point is I guess what I was trying to
11 say is that from the time the - the inspectors were
12 there to the time this report was written while the
13 paperwork process of, you know, drafting corrective
14 actions, training, increasing staffing, whatever
15 that remedy would be the conversations happened at
16 that time on the ground. The - it's not a secret,
17 is all I'm saying, that the Inspector General
18 wouldn't have communicated at least their view that
19 something was a problem or noncompliant.
20 BY MR. CHAREST:
21    Q.   You don't know that it happened or not, do
22 you?
23    A.   I'm very familiar with the Inspector General's
24 general process of how they do inspections.
25    Q.   But you just said you didn't know and I'm

Page 285

1 asking you --
2    A.   I was not there that day.
3    Q.   Right, and the fact that the Office of
4 Inspector General identifies a problem on any particular
5 day doesn't mean that the system is changed in order to
6 respond to that, does it?
7    A.   Immediately no, but in other words, that's
8 the point of a corrective action plan. Either --
9    Q.   Are there -- I'm sorry. Go ahead.
10    A.   Well, that's -- I mean you identify a root
11 cause, if it's an interpretation problem, if it's a
12 misapprehension, if it's a training problem, if it's a
13 staffing problem, so that may take some time, but - but
14 again that's the process.
15    Q.   And did - is it -- What was the corrective
16 action that dealt with ignoring ten out of the fourteen
17 people that were in solitary that day?
18    A.   I know again without having paperwork in front
19 of me I know there were changes in medical staffing
20 meaning I know there was a new doctor. In other words,
21 if a doctor was not living up to their performance that
22 doctor didn't remain in the employ, so things like that.
23    Q.   Okay.
24    A.   Right?
25    Q.   And those are, I assume, not done in a vacuum,

Page 286

1 they're done pursuant to either a corrective action plan
2 or some sort of disciplinary action was taken with a
3 doctor or something, there's some sort of record of
4 corrective action in response to this specific event
5 that we're talking about?
6    A.   Yes. I mean there should be. I mean there's
7 a process again for just as you articulated if it was a
8 performance problem from a medical profession there's a
9 process of determining performance and what is an
10 appropriate, you know, remedy, is it training, is it
11 something that someone simply can't do the job.
12 That's - it's a process.
13    Q.   So if something -- And I'm not trying to doubt
14 you. I just want to be sure that we can get to the end
15 of the rainbow here.
16       If someone wanted to prove that some sort of
17 correction action had actually taken - corrective action
18 had actually taken place vis-a-vis the change in
19 personnel or better training or whatever there should be
20 some sort of documentation that reflects that change
21 that resulted from these observations on the bottom half
22 of page seven of Exhibit Seven, right?
23    A.   Yes. The corrective action plan would be
24 captured, yes.
25    Q.   Okay. All right. All right, so you



Page 287

1  understand that there is a corrective action plan that
2  pertains to that very issue about ten out of fourteen
3  people being ignored by the doctors in - in solitary?
4      A.  I don't know precisely as to those ten or
5  fourteen, but if there was a problem with having
6  meaningful - meaningful communications for folks in a
7  special management unit by the medical staff that would
8  have been addressed.  I don't know precisely how it was
9  addressed in this situation.  I'm talking just
10  generally.
11     Q.  Okay.  Well, I'm confused now because you said
12  if there was a problem.  Let me -- Ten out of fourteen
13  people being ignored is a problem if it - if it
14  happened?
15     A.  If it happened, yes, and again I don't - I
16  cannot dispute what this reads, but again I wasn't on
17  the ground there to - to, you know, be familiar with the
18  facts personally.
19     Q.  Right, but we're not hoping that -- I mean
20  we're not relying on whether or not OIG stopped off and
21  said, hey, warden, or whatever floor boss or whatever
22  you call the people that are out there?
23     A.  Right.  Neither of those two things.
24     Q.  Right.  Pit boss, I don't know.  Whatever.
25         We're not relying on - on the notion that OIG

Page 288

1  went and reported this ten out of fourteen people being
2  ignored on that day?  The generation of this report will
3  have spawned some sort of a correction action -
4  corrective action, correct?
5      A.  Yes, and we would obviously take this very
6  seriously.  I mean -
7      Q.  Well, you say would have.  I mean did you?
8  Not abstract --
9      A.  Yes.
10     Q.  -- you would have.
11     A.  Yes.  In other words, every single one of
12  these allegations and concerns would - would have been
13  run down, right?  In other words, not necessarily by me
14  personally, so I can't - I can't tell you the physical
15  steps and, you know, things that were done at Adelanto
16  for these folks, but in response to findings by a client
17  and in this case in a broad sense the Department of
18  Homeland Security, we would look at what happened, look
19  at the instances of non-conformity and put steps in
20  place to make sure that we meet the standards.
21     Q.  And those steps will be reflected in that
22  contract compliance database or Miss Pearman's - Ms.
23  Pearman's tracking Excel spreadsheet?  Yeah?
24     A.  It would be in the database, not in the
25  tracking sheet.  It's not - it wasn't going to be a

Page 289

1  tracking issue.
2      Q.  Cool.  Well, we'll just look at the database
3  eventually, I guess.
4          All right.  Cool.
5          The next topic, the OIG report goes on, is the
6  delay and inadequacy of medical care and the report
7  identifies that four of the thirteen detainees that OIG
8  interviewed reported waiting weeks or months to see a
9  doctor and that the GEO guards said that it was their
10  policy and the GEO guards' policy to start the
11  countdown, I think it was, and maybe I'm looking at the
12  wrong one.
13         Let's talk about the first one first and I'll
14  clarify.
15         If thirteen - four of the thirteen people that
16  were interviewed had to wait weeks or months to see a
17  doctor, is that a violation of the PBNDS?
18     A.  So again I don't know precisely what - what
19  they're talking about, in other words, because it could
20  be many things there.  In other words, within the first
21  twelve hours they already get a medical screening,
22  right, and then I think it's seven days they are to see
23  a medical provider and again if it's not seven days, ten
24  days.  There's a number in here.
25     Q.  Or a magnitude if I get you.  Yeah.

Page 290

1      A.  So there are certain what I'll say is trigger
2  points, if you will, so I don't know whether these are
3  initial health screening visits, I don't know whether
4  these are specialty visits.
5          You know, I will tell you that there's a
6  demand for specialty just like every place in the United
7  States that is probably inadequate.  For time wise
8  everybody would like to see their specialty doctor
9  sooner and then imagine sort of since again GEO has no
10  control over how long someone stays or, you know,
11  whether or not they're granted a change of venue or how
12  their legal process goes on it's a lot to reconcile,
13  so - which is not saying it's mandatory and we have to
14  do our absolute level best to do it, but I don't know
15  that four of the thirteen relating weeks or months to
16  see a doctor I would say for what.
17     Q.  You don't know the circumstances enough to
18  know whether or not you would do that as a violation of
19  the standard I guess is what you're saying?
20     A.  I would say it's not optimal to have someone
21  waiting weeks and months to see a doctor, particularly
22  months, but I don't know in this case what precisely
23  this finding issued to know whether or not it was
24  noncompliant.
25     Q.  And did you do any - did you personally take



Page 291

1  any steps to kind of track down the facts behind that
2  set of interviews or those detainees' histories to - to
3  learn more about whether or not GEO had been compliant
4  with the obligation to provide medical care for the
5  folks at Adelanto?
6      A.  I personally did not, but I know that our
7  health care folks who are in the Provision Department,
8  they don't - they supervise the health care, the
9  facilities, but I know that they are responsible for
10 doing that and they did that.
11     Q.  All right, the report references a 2017
12 outside medical review addressing excessively long as it
13 described here waits to see health care providers.  Do
14 you know what report the OIG is referring to here, the
15 2017 outside medical review?
16     A.  I don't.
17     Q.  Are you aware of whether or not detainee
18 deaths, the death reviews since the fiscal year 2015
19 identified medical care as related to the - the death of
20 the detainees?
21     A.  I have no personal knowledge about the reports
22 and I know they happened and I know that is a process
23 that happens at ICE, but I - but I don't know the
24 specifics.
25     Q.  You're not someone that reviews the - the

Page 292

1  detainee death reports?
2      A.  No.
3      Q.  Who does that?
4      A.  Those are documents generated by ICE.
5      Q.  No one in GEO reviewed them?
6      A.  ICE's reports?  Not that I'm aware of.
7      Q.  So ICE creates like a twenty something page
8  report about a detainee that dies in a GEO facility and
9  GEO doesn't review the report?
10     A.  I have never in my time at GEO seen ICE send a
11 detainee death review report to GEO.  Maybe somebody
12 else gets them, but I do not.
13     Q.  Do you know how many - how many people have
14 died at Adelanto since your time at GEO?
15     A.  No.  Not off the top of my head.
16     Q.  Even an order of magnitude?  Five, ten,
17 fifteen?
18     A.  I - I would be guessing.  I think this fiscal
19 year I want to say there's seven detainee deaths
20 system wide, but I could be wrong.
21     Q.  You know, and so that's system wide.  That's
22 all of GEO's properties?
23     A.  I mean all for ICE.
24     Q.  Oh, all ICE properties?
25     A.  So ICE has a policy, you know, regarding a

Page 293

1  detainee death notification that requires - there's a
2  whole process in terms for adequate transparency, so
3  it's something ICE puts on its website, so I - but I
4  don't know off the top of my head.
5      Q.  So GEO doesn't track that information?
6      A.  GEO certainly tracks mortality events in our
7  facilities, yes, but I - I don't have a tally of them
8  off the top of my head.
9      Q.  Does GEO create some sort of detainee death
10 report, like it doesn't have to be the same one as ICE
11 does but some sort of systematic review of the
12 circumstances around the detainee's death?
13     A.  I know the medical professionals at GEO review
14 them.  The precise documents they create I don't know.
15     Q.  Review them.  What's the them?
16     A.  I'm sorry.  A - a mortality event, untimely
17 death.
18     Q.  So the doctors at the facility will look into
19 the circumstances of the detainee's death?
20     A.  I don't think that the -- No.  Not the
21 provider at the facility level.  In other words, there
22 are medical professionals at the corporate office that
23 oversee the health care provision.  It is that group of
24 folks that would review detainee deaths.
25     Q.  Okay, so the people responsible for the people

Page 294

1  that are the doctors at the facilities are the ones that
2  look into the detainee deaths within GEO; is that right?
3      A.  Right, just to clarify what you would be
4  responsible.  In other words, they're not responsible
5  for actually providing the medical service.  They're
6  supervisors of those folks.
7      Q.  Yeah.  I think we're probably saying the same
8  thing, but let me try and do it more cleanly.
9          The supervisors of the people responsible for
10 providing medical care at the GEO facilities are the
11 same people who review the events and mortality of
12 detainees at GEO facilities, correct?
13     A.  Yes, and then as I - as I put the word
14 supervise it may not be actually also accurate because
15 there are corporate medical practice states, there are
16 places where - that ICE provides medical health care
17 services.  Immigration Health Services Corps is the ones
18 who do it, so it's a range of folks but, in other words,
19 if there's a, you know, a detainee that dies at a GEO
20 facility there is a process that the medical
21 professionals at GEO responsible for detainee health
22 care undertake.  I don't know precisely what documents
23 they create, but I know they are obviously involved.
24     Q.  Yeah, I'm curious about the chain of command
25 there and what I'm - I think you expressed it to me, I



DANIEL RAGSDALE Vol. 2
Novoa vs The Geo

June 12, 2019
295–298

Page 295

1   want to be real clear, you have people at a facility
2   like Adelanto who provide medical care to the detainees,
3   right?
4       A.  Correct.
5       Q.  A detainee passes away at Adelanto.  The
6   people that review the circumstances of that detainee's
7   death are the same people that oversee the people that
8   provide medical care at that location?
9       A.  It may not be quite that simple depending on
10  what type of practice state we're talking about, and I'm
11  not sure whether California is a corporate medical
12  practice state or not.  In other words, there are places
13  where the doctor is sort of an independent contractor
14  and - and then there are peer reviews and there's a
15  process unique to medical providers that how that is
16  evaluated.
17      Q.  But that's external to GEO.  Still within GEO
18  there will be I would assume some sort of review
19  internally about the mortality event, right?
20      A.  Yes.  I believe that's right.
21      Q.  And the people that do that are the same
22  people that oversee the provision of medical care at the
23  local facilities?
24      A.  In some cases, yes.  In some cases, no.
25      Q.  In some cases the no being it's the same group

Page 296

1   of people but that group of people doesn't necessarily
2   oversee the medical care at every location?
3       A.  No.  It could be a place that ICE provides
4   medical care itself and GEO doesn't provide medical
5   services.
6       Q.  Yeah, but the person that does the review of
7   the mortality is the same person that in otherwise -
8   other circumstances would have oversight over the
9   medical care at the different facilities, right?
10      A.  Unless it's provided by ICE is what I'm saying
11  or if we use a sub - I mean again it's a little bit
12  more complicated --
13      Q.  Yeah.
14      A.  -- in the sense that if we have a
15  subcontractor that is responsible for medical we're
16  responsible for the standard, but the relationship among
17  the doctors is different, so it's a nuance, but --
18      Q.  Sure.
19          And you're not on the cc list, as it were, for
20  the reviews of the mortality events that are done within
21  ICE?  I'm sorry.  Within GEO.
22      A.  No.
23      Q.  All right, the next topic on the OIG report is
24  dental care and the header says Dental Providers Do Not
25  Provide Basic Dental Care.  Do you agree, sir, with the

Page 297

1   OIG's observation that the PBNDS requires the provision
2   of checkups and cleanings for dental care every six
3   months?
4       A.  I'd have to actually look precisely at the
5   standard, but I mean provision of basic dental care
6   services is certainly required by PBNDS.
7       Q.  So the period is kind of an issue as well?  I
8   mean do you have any question that six months is
9   accurate?
10      A.  I would have to look at the standard to make
11  sure.  I know it's different from the Marshals Service
12  and I know it's different for BOP, so I'd have to - you
13  know, again I don't -- I try not to memorize these
14  things because you can often be wrong.
15      Q.  Right.
16          Is it -- Do you understand whether -- So the
17  next observation by OIG is that, "The Adelanto Center"
18  which is run by GEO, of course, "Does not include time
19  spent at other ICE facilities when calculating the six
20  month" period between checkups and cleanings and dental
21  procedures.  Do you know if that's an accurate
22  description of the policy at Adelanto or not?
23      A.  So I don't believe that is a policy.  What I
24  would say is that as far as I understand I don't know
25  that the Adelanto facility knows where a detainee came

Page 298

1   from and how long they've been in ICE detention
2   elsewhere.  In other words, if ICE informs us of that,
3   but there's no way - we don't have a system to check
4   someone's immigration detention status over a period of
5   time.  We know when they come into Adelanto, we would
6   know when they would leave Adelanto and I think it's
7   possible, but I don't know that if they went to another
8   GEO facility at someplace we'd obviously have an
9   encounter with them from the other location, but I don't
10  know that there is a system to calculate overall
11  detention time before someone got to Adelanto.
12      Q.  Okay, that surprises me.  I can't prove it
13  otherwise, but I mean I'll tell you the honest truth.  I
14  just can't believe that is it right to say that someone
15  can be in ICE custody for years and you would not -
16  there's no way for the - for the vendor to know that
17  person's prior history at other locations?  Is that -- I
18  mean there's no way to know that?
19      A.  I didn't say there's no way to know it.  What
20  I'm saying is I - I don't know, and again this is - this
21  is my understanding --
22      Q.  Sure.
23      A.  -- that there's not an automated way that
24  there's this what I'll say is dossier or summary, if you
25  will, that sort of, you know, has that information teed



DANIEL RAGSDALE Vol. 2
Novoa vs The Geo

June 12, 2019

299–302

Page 299

1 up.  Now one could read this and be surprised, but I
2 believe that's the case.
3     Q.  All right, so your understanding of the
4 situation on the ground is that the guards were trying
5 to keep track of every six month kind of issue, if that
6 is the correct period to say, don't have sufficient
7 information to reach back before the detainee's arrival
8 at Adelanto - Adelanto, correct?
9     A.  I believe that's right.  I mean again that's
10 my understanding.  There may be people that are closer
11 at the provision of these services that would know more,
12 but that's my understanding.
13     Q.  Is that your understanding based on -- Is that
14 when you asked a question about what's going on here and
15 someone told you, yeah, we can't do any better because
16 we don't have that information?  Was that like kind of
17 the result of your analysis here or is that just your
18 understanding of the world writ large and you're
19 applying that to this set of facts?
20     A.  So that - it doesn't reflect my personal
21 understanding of what went on here.
22     I believe we did increase dental staffing at
23 Adelanto, but I'd have to check to, you know, make sure
24 my recollection is correct, but so - but, you know,
25 again other people who are closer to this than me would

Page 300

1 know more, but it's my understanding that - that this is
2 generally what happens.
3     Q.  Do you dispute the OIG's summary of the dental
4 care logs when OIG says that no detainees received
5 cleanings for almost four years straight?
6     A.  Again I don't - I don't know - I don't know
7 precisely what happened here.  I know that if true this
8 does not meet the standards.
9     I believe where we are now in a place where we are
10 meeting the standards through staffing changes and
11 whatever other, you know, corrective action plans were
12 put in place, so - but I have no factual basis to
13 dispute what's written here.
14     Q.  Okay, and you say what's written here.  You've
15 been kind of gesturing to the bottom page of - bottom
16 part of page eight, and just to be - so the record
17 doesn't have a blank there about what is here, things
18 that are listed are no detainees having received
19 fillings in four years, interviewee is reporting
20 multiple teeth falling out and have been waiting more
21 than two years - having waited more than two years to
22 have cavities filled, right?  Those are the things that
23 you're talking about?
24     A.  Yes.  In other words, I do - you know, as I
25 read on here there was a certain amount of triage

Page 301

1 getting done.  I don't know whether this is true or not
2 true.  I absolutely concede though that is what is
3 written on the page here in the Inspector General
4 report.
5     Q.  Okay, when you're talking about triage in
6 particular, you're talking about the dentist saying he
7 doesn't have time to do cleanings or screening, doesn't
8 do fillings as a result and basically offers to pull
9 teeth out if you have a problem with your teeth; is that
10 right?
11     A.  That's what it says, yes.
12     Q.  Whose job within GEO is it to know the factual
13 information that underlies this OIG report?
14     A.  It would be many people, right?  I mean this
15 has crossed many different - different topics, so we
16 have a chief medical officer that obviously is
17 responsible for medical care sort of generally, there
18 are folks in the operational side in GEO Correction and
19 Detention that we were responsible through the facility
20 chain of command and, you know, they would obviously
21 also have, you know, the physical plant and security
22 issues that would be the same with the operational
23 folks.
24     Q.  And were those people the ones that were
25 tasked with addressing the corrective actions that spun

Page 302

1 off as a result of this report, this OIG report?
2     A.  When you say tasked, in other words, not
3 tasked by me.  You know, they have obviously again their
4 own chain of command which is not in my chain of command
5 so, you know, again I partner with them to make sure
6 that we have identified the root cause and if there are,
7 you know - you know, pushes and pulls that are required
8 to be adjusted that we've sort of taken a look at it
9 comprehensively understanding what the standards require
10 and put, you know, something in place that will lead to
11 lasting compliance.
12     Q.  What was the root cause for this dental
13 situation in the final analysis to your understanding?
14     A.  I believe it was a staffing issue.
15     Q.  Meaning there wasn't enough - there were not
16 enough dentists to handle all the people that were
17 there?
18     A.  I believe that is correct, and that is - that
19 is something that, you know, happens from time to time
20 whether there was a vacancy that wasn't filled.  I don't
21 have, you know, it literally on the tip of my tongue,
22 but - but I believe it was a volume question in terms of
23 capability.
24     Q.  All right, the - having another dentist isn't
25 going to make floss available and change the



Page 303

1  recommendation that people use string from their socks
2  as floss, is it?
3      A.  I'm sorry.  So we provide dental floss as part
4  of the standard hygiene kit.  I don't know where that
5  came from, and obviously if someone offered that sort of
6  answer then shame on them.
7      Q.  So the recommendation to which ICE concurred
8  was a full review of the Adelanto Processing Center and
9  The GEO Group's management of the center immediately to
10 ensure compliance with the entirety of the 2011 PBNDS?
11 Specifically as part of the assessment OIG said ICE must
12 review, ensure compliance with the standards addressing
13 personal housekeeping requirements associated with the
14 bedsheets, segregation and medical care and that's a
15 recommendation that ICE agreed with, correct?
16     A.  Yes.  As I read this report, yes.
17     Q.  All right, and when that happens, when ICE
18 agrees - agreed with this recommendation how - what's
19 the next step in terms of what GEO actually does to
20 address all of the things that are identified in this
21 report that is Exhibit Seven?
22     A.  So it would depend.
23         I think as we talked about before there's -
24 there's the quality assurance surveillance plan.  You
25 know, ICE could - could work in anyway it sees fit.

Page 304

1  This report obviously, you know, in response was after I
2  left ICE, so I don't know precisely what - what ICE, you
3  know, directed the contractor to do.
4      Q.  But you were the contractor, right?  I mean
5  you worked with the contractor.  You're -- Not GEO
6  necessarily, but you worked there.  Are you aware of
7  whatever steps were required by ICE in response to this
8  OIG report?
9      A.  I don't know precisely what steps that I could
10 list out, you know, to you, but as again as I said, you
11 know, remember, there's in addition to the Facility
12 Administrator there's an Assistant Field Office Director
13 whose sole job it is to work side-by-side at Adelanto
14 and is ultimately responsible for the care and treatment
15 of ICE detainees so, you know, that would be what -- You
16 know, whether there was a communication at the field
17 office level, whether there was a communication at
18 headquarters I don't know precisely how they - how ICE
19 implemented this recommendation.
20     Q.  I thought you mentioned corrective action
21 plans that resulted from this.  Was it more than the
22 corrective action plans?
23     A.  So I thought you asked me what ICE did.
24     Q.  I'm sorry.  I guess that's a poor question
25 then.

Page 305

1      What did GEO do -- I assume ICE said, hey, we
2  have this report, fix it, right, but I mean maybe it was
3  more, but what did GEO do to address its sub-performance
4  at the Adelanto facility that's reflected here in this
5  OIG report?
6      A.  So as I said before I can't - I don't have the
7  corrective action plans in front of me, so I couldn't
8  tell you precisely the steps, but I will tell you that
9  in - when an area of nonconformance or noncompliance is
10 identified it's - a corrective action plan is drafted,
11 it is tracked in the process that I described before as
12 part of our quality assurance plan.
13     Q.  Did GEO suffer any financial penalty as a
14 result of the events set out in the OIG report that is
15 Exhibit Seven?
16     A.  I don't again as we talked about before the
17 contractor discrepancy report is not something that
18 comes directly to me.  I don't have personal knowledge
19 of one, so I don't know, but - but I wouldn't say one it
20 didn't happen.  I don't know whether it did happen or
21 didn't happen.
22     Q.  Okay.  Sorry.  Thank you.
23         Are there any corrective action plans that
24 remain open, unaddressed or whatever the term is --
25 Before I ask that question what is the term for

Page 306

1  something, you know, when you start a corrective action
2  plan and it's not yet completed to your satisfaction?
3  What's the term?
4      A.  We call them open.  It could be pending,
5  unresolved, something --
6      Q.  Okay, there's no magic word then?
7      A.  Hu-huh.  (Negative response).
8      Q.  Okay, are there any corrective action plans
9  that remain open, pending or unresolved that were
10 generated as a result of this OIG report that is Exhibit
11 Seven?
12     A.  It's my understanding the - the issues in this
13 report have been resolved, meaning they are - they - a
14 corrective action plan was in place and we should be
15 compliant now.
16     Q.  So does the -- You're not sitting here saying
17 everything was fine when OIG showed up and it's just a
18 bunch of nothing?  They - OIG identified some real
19 issues, right?
20     A.  I'm certainly not saying that the OIG showed
21 up and there's no merit to their report.  I'm not saying
22 that, no.
23     Q.  OIG identified some actual real important
24 issues, correct?
25     A.  I would say every issue identified by the



Page 307

1 client is important.
2     Q.  Leave aside the customer service aspect of it.
3 OIG identified issues that had real material effects on
4 the detainees and their - and their quality of life,
5 correct?
6     A.  Assuming everything in here is true which
7 again I don't - I can't know one way or the other, but
8 there are some significant issues in here that, yes,
9 required immediate action and are significant, yes.
10    Q.  All right, would the immediate action steps
11 also be reflected in a corrective action plan or are
12 they too fast for the corrective action plan process?
13    A.  Yeah, no, it wouldn't - it would not be part
14 of the corrective action process.
15    Q.  How would we know what the immediate steps
16 that were taken -- What immediate steps were taken, if
17 anything?
18    A.  There would be somebody at the local level
19 that I would probably know, you know, that act, you
20 know, that work.
21    Q.  Who is the person most likely to know what
22 immediate steps were taken in your own experience?
23    A.  The Facility Administrator is the one who is
24 the leader of that organization, I mean, so James
25 Janecka is the Facility Administrator.

Page 308

1        MR. CHAREST:  Okay.
2     Let's if you don't mind take five and I've got
3 one more to go through and we'll go faster than
4 this.
5        THE VIDEOGRAPHER:  We are going off the video
6 record 4:40 p.m.
7     (Whereupon, there was a brief recess observed)
8        THE VIDEOGRAPHER:  We are back on the video
9 record 4:54 p.m.
10 BY MR. CHAREST:
11    Q.  How are you doing, Mr. Ragsdale?
12    Have you been deposed before?
13    A.  I have.
14    Q.  You seem like it which is not a bad thing.
15 You're just like you get the game.  It's cool.
16    How many times?
17    A.  Probably under ten.
18    (Whereupon, Exhibit 8 was marked)
19 BY MR. CHAREST:
20    Q.  I'm handing you a document that's been marked
21 as Exhibit Eight.  Eight is an OIG report titled
22 Concerns About ICE Detainee Treatment and Care at Four
23 Detention Facilities dated June 3rd, 2019 and I'm
24 calling it case number OIG-19-47.  Have I accurately
25 described the document, sir?

Page 309

1     A.  Yes.
2     Q.  All right, you're familiar with this report
3 from OIG?
4     A.  Yes.
5     Q.  And it is as its title suggests a - I'll call
6 it a focus on four different detention facilities, one
7 of which is Adelanto, correct?
8     A.  Correct.
9     Q.  All right, and basically it says - it
10 identifies certain performance shortcomings at these
11 four different detention facilities and it's in view of
12 OIG at least, right?
13    A.  I'm sorry.  One more time?
14    Q.  Yeah.
15        Basically the report identifies performance
16 shortcomings by the operator of four different detention
17 facilities at least in the view of OIG, correct?
18    A.  Yes.  As I understand it this is a follow on
19 to at least a portion of the report that we were just
20 talking about, but it's the same type of report even
21 though the title is a little different.
22    Q.  Yeah, so it talks about that.  It says in the
23 middle paragraph under what we found and I'll read it to
24 you and see if you have the same understanding, "Because
25 we," OIG, "Observed immediate risks or egregious

Page 310

1 violation - violations of detention standards at
2 facilities in Adelanto" and one at Essex County,
3 "Including nooses in detainee cells, overly restrictive
4 segregation, inadequate medical care, underreported
5 security incidents and significant food safety issues,
6 we issued individual reports to ICE after our visits to
7 those two facilities."  First off, did I read that
8 correctly?
9     A.  Yes.
10    Q.  All right.  Great.
11        And so what I took that to mean was in
12 connection with OIG's visits to four facilities before
13 they were addressed in this report that is Exhibit Eight
14 it found two facilities, one of which was Adelanto with
15 such violations that in OIG's view were "egregious" and
16 required immediate action.  Is that a fair assessment of
17 the OIG report on the interaction between the report we
18 just talked about which is Exhibit Seven and the report
19 we're about to talk about which is Exhibit Eight?
20    A.  Yes.  I - I believe that's what it says.  I
21 also know that Exhibit Seven is a report about Adelanto.
22 What I wouldn't say with a hundred percent certainty
23 without looking at the OIG website is to know that if it
24 was any other OIG report that they issued on Adelanto
25 and that's what they're referring to here.



DANIEL RAGSDALE Vol. 2
Novoa vs The Geo

June 12, 2019
311–314

Page 311

1    Q.   Right.  Well, the list of egregious violations
2    that the OIG lists here include nooses, overly
3    restricted segregation and inadequate medical care all
4    of which are addressed in the report that is Exhibit
5    Seven, right?
6    A.   Correct.
7    Q.   All right, so either there's another report
8    out there with those topics or that's the report we're
9    talking about, Number Seven.
10   A.   I want to make sure.  I can't say that there's
11   nothing else out there.  I'm just being precise.
12   Q.   Excellent.
13        All right, let's turn to the performance
14   standards that OIG identified as having been not met.
15   The first one that pertains to Adelanto that I noted was
16   on page four.  The second bullet point down says at
17   Adelanto where generally it's talking about food service
18   issues at these facilities, so at the second bullet
19   point the OIG talks about, "At Adelanto, lunch meat and
20   cheese were mixed and stored uncovered in large walk-in
21   refrigerators.  Lunch meat was also unwrapped and
22   unlabeled.  Chicken smelled foul and appeared to be
23   spoiled and food in the freezer was expired."  Did I
24   read that correctly?
25   A.   Yes.

Page 312

1    Q.   All right, does GEO dispute that those
2    conditions existed when OIG visited the Adelanto
3    facility?
4    A.   So I have some understanding of this
5    allegation, again not from personal knowledge, but the
6    lunch meat and cheese were stored in an uncovered sort
7    of larger sort of stainless steel container that did not
8    have a lid on it but they were individually wrapped.
9    The requirement, however, is for the items even though
10   they are individually wrapped to have a cover on them in
11   the freezer, so that was true and that's been corrected.
12        As it relates to the chicken, the chicken as I
13   understand it was cooked by the detainees that were
14   working in the kitchen and it was warm and there's a
15   process for "flash cooling" where you put food in ice
16   water and cool it to, you know, the appropriate
17   temperature for storage.  That is what happened here.  I
18   imagine it created an unpalatable looking container of
19   chicken, but that is what I understand had happened
20   there.
21   Q.   Is flash cooling one of the standard cooking
22   practices at Adelanto?
23   A.   So there's a food safe regime of handling food
24   in a place that serves, you know, meals at an
25   institution and flash cooling is apparently a technique

Page 313

1    that is appropriate to use.  I don't know personally
2    about it, but that is my understanding.
3    Q.   I went to a cooking class and they didn't say
4    anything about flash cooling.
5    A.   It was - it was new to me the first time I
6    heard it too, but that's my understanding.
7    Q.   I'm not trying to be glib, but okay.
8        How about the food in the freezer?  What's
9    your answer there?
10   A.   So I do believe there may have been food that
11   was beyond its expiration date and I believe there's a
12   system in place to make sure that is regularly checked
13   and anything that's expired is discarded.
14   Q.   When you answered about lunch meat was your
15   answer for lunch meat addressing both the first and the
16   second points that pertain to Adelanto both of which
17   start with lunch meat?
18   A.   I believe they were - I'm not sure if they
19   were sandwiches or in what arrangement they were, but I
20   know they were wrapped in some sort of individual
21   container, but there was no metal container on top of
22   the larger container that, you know, held those two
23   items which is noncompliant.  It has to have a metal
24   container on top of it.
25   Q.   All right.

Page 314

1    A.   A metal lid.  Excuse me.
2    Q.   So aside from the flash cooling chicken these
3    are legit violations or shortcomings of the standard
4    that happened at Adelanto - Adelanto under GEO's watch,
5    correct?
6    A.   Correct.
7    Q.   The next topic that the OIG inspector report,
8    OIG-19-47 addresses is inappropriate segregation
9    practices at three facilities, one including Adelanto,
10   infringe on detainees' rights.  The report identifies
11   Adelanto, Essex and Aurora facilities, correct, for that
12   section?
13   A.   Yes.
14   Q.   All right, the - the report says, "Two
15   facilities," one of which is Adelanto, "Prematurely
16   placed detainees in disciplinary segregation and all
17   three facilities," one of which is Adelanto, "Placed
18   detainees in disciplinary segregation and restraints
19   when outside of their cells."
20        Do you understand -- Well, first off, did I
21   accurately describe what the report's findings are?
22   A.   Yes.  I believe you read that right.
23   Q.   All right, did you understand that the issues
24   that are being addressed here on page five of Exhibit
25   Eight are a repeat of the solitary confinement



Page 315

1  discussion we had pertaining to the Exhibit Seven report
2  or are these a different set of infractions that the OIG
3  identified?
4      A.  So this - this report was issued on June 3rd,
5  so I'm familiar with it, I've had a chance to look at
6  it. I - it's still on my desk, you know, for, you know,
7  sort of a more careful review.  However, my
8  understanding, and also sort of reading the two
9  documents together, that the - what is depicted here on
10  page five is a summary and rollup of the OIG 18-18 --
11  Excuse me -- 18-86 September 27th, 2018 report.  I
12  believe this is a summary of the more detail we've
13  already talked about in Exhibit Seven.
14      Q.  So the part that's additive or I guess new to
15  what we talked about with Exhibit Seven is the bottom of
16  the second full paragraph.
17      The last sentence says, "In addition, facility
18  forms incorrectly state that these detainees are in
19  administrative segregation when they are actually in
20  disciplinary segregation." Did I read that correctly?
21      A.  It says, "In addition, facility forms
22  incorrectly state the detainees are in administrative
23  segregation when they were actually in disciplinary
24  segregation," yes.
25      Q.  All right, so when we talked about the

Page 316

1  segregation issues in - as set out in Exhibit Seven you
2  suggested, well, maybe there's some confusion about what
3  administrative segregation is and what disciplinary
4  segregation is because they don't use the term
5  administrative segregation, but here they say it and
6  they say no, no, no, still there's a violation going on
7  with respect to disciplinary segregation being imposed
8  before the disciplinary panel hears and finds the
9  detainee guilty of the charged offense, correct?
10      A.  That's what it - how it reads, yes.
11      Q.  All right, so given the recency of this
12  report, I mean we are today on June 12th, this was
13  issued June 3rd, have you had the chance to drill down
14  and find out what's going on here with respect to the -
15  the disciplinary segregation at Adelanto?
16      A.  No, I have not.
17      Q.  Okay, the use of the phrase administrative
18  segregation in contrast to the phrase disciplinary
19  segregation kind of - I'm not sure it nullifies, but it
20  certainly contradicts the concept that there's a
21  confusion of terminology, correct?
22      A.  It's hard for me to say.  I don't know.  This
23  language is different than it is in the - in the 2018
24  report which is Exhibit Seven, but I don't know yet.
25      Q.  But you agree that the standards in place

Page 317

1  require that a detainee shall be placed in disciplinary
2  segregation only after a finding by a disciplinary
3  hearing panel that the detainee is guilty of a
4  prohibited act or rule violation, correct?
5      A.  Yes.  That's my understanding of the standard,
6  yes.
7      Q.  Okay, what's your plan on how to deal with
8  this report as it pertains to the administrative and
9  disciplinary segregation enforcement and use at
10  Adelanto?
11      A.  So the normal process would be to - to, you
12  know, again this is the larger team, not necessarily me
13  personally, but we would go through the report and
14  identify the findings, if you will, and then, you know,
15  add those to what, you know, we - our client findings
16  and then track - you know, obviously find out what
17  happened or what is happening, see if we can get to the
18  root cause and then again if this is -- You know, figure
19  out what the facts are.  I'm speculating now.  In other
20  words, in one sense it's encouraging to see that --
21  Well, at least we have a form that has administrative
22  segregation on it, so I don't know that that's a
23  problem, but if the form didn't have that on there
24  before that would be a problem and maybe led to the
25  erroneous conclusion by the Inspector General, I don't

Page 318

1  know but, you know, we will - we will parse through this
2  and obviously again get to the root cause to the extent
3  we can.
4      Q.  But so far GEO hasn't taken any corrective
5  action in response to this June 3rd OIG report; is that
6  right?
7          MS. ARMSTRONG:  Objection.
8          THE WITNESS:  No.
9          MS. ARMSTRONG:  Misstates prior testimony.
10          THE WITNESS:  I don't know, so this - this
11      report requires potentially immediate action on the
12      ground at Adelanto by someone in - responsible for
13      the operations of that facility.  That person is
14      not me.
15  BY MR. CHAREST:
16      Q.  Okay, you're not aware of any corrective
17  action having been taken so far in response to this
18  June 3rd OIG report, correct?
19      A.  I don't know if they have or if they have not.
20      Q.  Fair.  You just don't know?
21      A.  Yes.
22      Q.  The person that would have been responsible
23  for that and would know whether or not corrective action
24  was taken in response to the June 3rd, 2019 report is
25  Mr. Janecka; is that right?



Page 319

1    A.   He - he would be the leader on the ground so,
2    yes, he would probably be the best person.
3    Q.   Okay, is your office also going to undertake
4    the generation of a corrective action plan and
5    initiation of that quality assurance process in response
6    to this report that's set out in Exhibit Eight?
7    A.   Yes.  As I said to the extent this raises new
8    things, and I think you obviously have noted one that is
9    different than the September 27th, 2018 report that's
10   Exhibit Seven.  We would look at anything that was new
11   in this report and then obviously work through that
12   quality assurance process, yes.
13   Q.   So - but one of the questions is, hey, OIG, do
14   you really know the difference between administrative
15   segregation, disciplinary segregation, right?  That's a
16   question that would have been answered or could have
17   been answered even in the prior report, right?
18   A.   So again I don't know.  This is new, right?
19   It's not something that I've had a chance yet to fully,
20   you know, digest.  Again the language is different than
21   it is in the 2000 - the 2018 report.  The IG wrote this
22   report and then they wrote this report.  I don't know if
23   they've looked at additional documents, if they've had
24   different conversations with ICE, so the answer is I
25   don't know.

Page 320

1    Q.   We both think -- You think, it doesn't matter
2    what I think, you think that the - the issues that are
3    being identified in this June 3rd report are the same as
4    pertains to segregation practices at Adelanto as were
5    set out in the 2018 report, right?
6    A.   As I read this now, right, this - at least
7    whether or not they called out something different, but
8    when the term in addition suggests something more I
9    don't know whether the Inspector General went back, I
10   don't know whether they looked at additional documents.
11   It - that seems to be something new to me when I say in
12   addition.
13   Q.   Okay.
14        So - all right, and the plan is to sit down
15   and try and get to the bottom of whatever's going on and
16   if that requires corrective action to initiate a
17   corrective action plan under the quality assurance plan
18   that GEO maintains pursuant to the QUSAP (sic), correct?
19   A.   The QASP, yes.
20   Q.   QASP.  Thank you.
21   A.   Sure.
22   Q.   All right, the - the use of restraints looks
23   like the same type of complaint that is the use of
24   restraints as a practice outside of detainees' cells
25   while they're in segregation, right?

Page 321

1    A.   From quickly reading this this looks to be the
2    same concern that was raised in the - what's Exhibit
3    Seven about sort of a, you know, a regular policy
4    without a case-by-case analysis to use restraints for
5    folks in disciplinary segregation, yes.
6    Q.   And were steps already taken with regard to
7    that issue pursuant to the 2018 report?
8    A.   They should have been, yes.
9    Q.   Should have been or were?  Do you know?
10   A.   I don't -- Again without having them in front
11   of me or, you know, a report in front of me I couldn't
12   tell you off the top of my head, but under the normal
13   process the answer is yes, if that - that was months
14   old, yes.
15   Q.   So this raises a question that I want to make
16   sure I'm clear on.  Either no action is taken or
17   immediate action is taken at the facility and
18   Mr. Janecka would know about whatever immediate action
19   was taken or a corrective action report is begun and
20   actions are taken pursuant to the quality assurance plan
21   through the corrective action plan and that runs its
22   course through that process.  Is that the full universe
23   of potential reactions to a report like this?
24   A.   So I'd be speculating as to the full universe.
25        What I can tell you is if, and I'm just going

Page 322

1    to use this as an example.  If there was expired food
2    that clearly should have been thrown out, right, whether
3    it's canned goods it's some, you know, period its gone
4    beyond its expiration date my assumption would that that
5    would have been immediately discarded, right?  And then
6    the process that would take some time thereafter is what
7    is your process for identifying expired food and how do
8    you check to make sure that you don't have any, so if
9    there's a process, a check sheet, a form, an inventory,
10   some process that is then put in place, identify who's
11   responsible, when it's updated, you know, that type of
12   thing that's the process that would be sort of the
13   follow on process from an audit and would then be
14   documented, but whether there's some other reaction
15   between those two things not to my knowledge, but I also
16   couldn't assume that there wouldn't be.
17   Q.   All right, as long as you don't know of
18   anything else, that's all I can get from you, that's
19   fine.
20        Would the exercise of immediate corrective
21   action forestall or forego or prevent later quality
22   assurance type review through corrective action planning
23   to identify like root cause in the more systemic, or
24   systematic is the right word, approach to dealing with
25   issues?



Page 323

1      A.  I would say it would depend.  I mean
2  optimally, you know, you want the facts to be as clear as
3  to what the issue was so, you know, again we have a
4  slightly different circumstance with an Inspector
5  General who may or may not say what files they looked
6  at, who I talked to, where there are other entities that
7  do audits that they preserve what they call audit
8  working papers so you know exactly what folks were
9  looking at, so it's very easy to say, okay, I looked at
10  this file, it was not compliant for these reasons and
11  there's no - there's no question of facts so, you know,
12  I don't generally think immediate action precludes that,
13  but I would also say it depends how complicated the
14  facts are.
15      Q.  Are - is either GEO or ICE unable to get the
16  audit report or the underlying data that OIG used or
17  collected or reviewed in connection with these reports?
18      A.  I can only speak from my own experience.
19          In my experience the IG generally in this kind
20  of context does not share that information.
21      Q.  Has anyone at GEO asked for that information
22  to your knowledge?
23      A.  GEO -- Not to the best of my knowledge, and
24  again the - the entity that responds to the Inspector
25  General is the Agency, not the contractor.  This is

Page 324

1  addressed to the head of the Agency, not to GEO.  This
2  is the service provider.
3      Q.  All right, the next, and this looks like a new
4  concern that OIG raises on page six is recreation time
5  while in segregation, the second sentence down, the
6  first full paragraph, page six under the pictures it
7  says, "At Adelanto our review of disciplinary
8  segregation files identified that some detainees were
9  not offered any recreation or showers while in
10  segregation.  Instead - or in addition," rather,
11  "Detainees in administrative segregation were only
12  offered recreation three days a week instead of each
13  day."  If true are both of those events failures in
14  violations of the - the performance standards?
15      A.  So I would have to refresh my recollection as
16  to what the precise intervals are that are required in
17  the standard, but if it's a deviation from what's
18  required in the standard then, yes, it would be
19  noncompliant.
20      Q.  So the standard I think -- Well, at least
21  according to OIG is set out in - in footnote seven on
22  the same page where it says, "Detainees in the SMU for
23  administrative reasons shall be offered at least one
24  hour of recreation per day - per day outside their cells
25  and scheduled at a reasonable time and at least seven

Page 325

1  days a week," so that would be in contrast to the three
2  days a week that OIG's identified, right?
3      A.  Yes.  If that - and again there's no reason to
4  think that's not the accurate -- If it did not meet
5  what's quoted here then, yes, it would be noncompliant.
6      Q.  All right, and then it goes on, the rest of
7  the standard goes on, "Detainees within the SMU for
8  disciplinary reasons shall be offered at least one hour
9  of recreation per day outside their cells and scheduled
10  at a reasonable time at least five days a week," and if
11  that's the standard, OIG's observation, that
12  disciplinary segregation detainees were not offered any
13  recreation or showers would be a violation of - would
14  reflect a violation of the standard, correct?
15      A.  Yes.
16          My only comment here is, and again this is
17  still not optimal, is this is a review of segregation
18  files, so I wonder whether this is a recordkeeping issue
19  that something was offered or something happened and was
20  not captured on the form or whether or not it was, in
21  fact, not offered and that's something that would again
22  have to be addressed through the process I've - I have
23  described to you.
24      Q.  And both of those two options you identified
25  as possible are violations of the performance standards,

Page 326

1  right?
2      A.  The records have to be kept properly.
3  Absolutely.
4      Q.  And - and recreation has to be offered as
5  provided by the standards, correct?
6      A.  Yes.  I mean but there's - as we've talked
7  about before there's a substantive difference whether if
8  it's a recordkeeping issue or it's something that is
9  actually not being done.
10      Q.  Sure.
11          Either someone's being locked in a room for
12  days on end without seeing the sun or someone's not
13  marking it down on a record, one or the other, but
14  neither is acceptable, correct?
15      A.  Both would be noncompliant.
16      Q.  And then the OIG report expresses some sort of
17  information from Adelanto management with respect to a
18  lack of space and the need to keep detainees segregated
19  from the general populous as - as a reason for denying
20  the detainees this recreation time.  Are you aware of
21  any lack of space that would result in the denial of
22  detainees' recreation time at Adelanto?
23      A.  So I don't know the precise underlying facts
24  here.  I'll tell you that the outdoor recreation space
25  in Adelanto is large, it's larger than many other



Page 327

1  places, it's in a rural area and there's - you know,
2  physically these are big spaces, so I don't know
3  precisely what this is involving.
4      Q.  So it could be that, in fact, Adelanto is
5  designed in a way that does not allow for people who are
6  in segregation to be given recreation time because of
7  concerns about separation from the general population?
8  That's one possibility?  The other possibility is that
9  the - Adelanto management, whoever that is, used that as
10  an excuse and is not a real valid excuse; is that right?
11     A.  Well, I -- No.  I couldn't agree that it's not
12  a valid excuse.  I don't know what is going on here.
13  There - I know that there are - there's outdoor
14  recreation, you know, specifically attached to the
15  special management unit but again, in other words, I do
16  know that there are for a variety of reasons some
17  detainees can while for whatever reason they're in
18  that - that area can have recreation with other
19  detainees and other detainees, you know, it creates a
20  behavioral problem or security problem, so I don't know
21  precisely what is being - what, you know, Adelanto
22  management admitted here, but - but maybe eventually
23  I'll find out.
24     Q.  The next topic that pertains to Adelanto as I
25  see it is on page eight and the OIG report says in the

Page 328

1  second sentence, "At the Adelanto facility we observed
2  detainees' bathrooms that were in poor condition,
3  including mold and peeling paint on walls, floors and
4  showers and unusual - unusable toilets as shown in
5  figure four" which is a picture of a toilet on the next
6  page at the top of page nine.  Did I read that
7  correctly, sir?
8      A.  Yes.
9      Q.  All right, and if, in fact, the bathrooms were
10  in poor condition with mold and peeling paint on the
11  walls, floors and showers and had unusable toilets, that
12  would be in violation of the performance standards at
13  Adelanto, correct?
14     A.  Yes.  It means that obviously the place has to
15  be habitable and the fixtures need to function.
16     Q.  When you went to Adelanto and looked around
17  for your site visit did you observe peeling paint and
18  mold on the walls, floors and showers?
19     A.  So I know in response to this finding that
20  again I think it's part of - of, you know, an earlier
21  OIG visit there was some question of, you know,
22  precisely what was wrong with the showers, but I do know
23  that the showers were all painted.  I do know they use a
24  different chemical for cleaning them.  There's hard
25  water in that area of California, so it pits concrete

Page 329

1  so, you know, there was a remedy in terms of what
2  chemical is being used to clean them.  I also know that
3  is depicted in figure four that toilet on the recreation
4  yard was clogged on that day.  That was immediately
5  rectified and that is not a habitual problem, it is now
6  regularly checked, so that's what I know about that.
7      Q.  And again we have a situation where ICE
8  concurs with the recommendations by OIG, correct?
9      A.  In this case --
10     Q.  Page Twelve.
11     A.  -- there were -- Right.  There were multiple
12  recommendations, and let's see.
13        So there's an April 29th ICE comments in the
14  draft report on page sixteen that - that ICE -- Again
15  this if I'm reading this correctly this says, "The draft
16  report contained one recommendation with which ICE
17  concurs."
18     Q.  Well, that's not what it says, right?  The -
19  on page twelve the recommendation is --
20     A.  There's a single recommendation.
21     Q.  Yes, but the response is literally just
22  concur, but it's okay.
23        There's the letter I think you might be
24  talking about is Appendix B and on page twenty is the
25  letter from ICE back to OIG as pertains to Adelanto

Page 330

1  specifically.  Is that what you're looking for, sir?
2      A.  So as I understand it there's a memo from -
3  for John V. Kelly dated April 29th from Stephen Ronconi,
4  the ICE Chief Financial Officer and Senior Component
5  Accounting - Accountable Official that - that concurs
6  with the one recommendation and then there's an
7  attachment to Appendix B that goes through I guess with
8  more specificity what ICE is doing in response to the
9  report.
10     Q.  Yeah, and that's where I'm trying to point you
11  in that direction, page twenty of --
12     A.  Yes, sir.
13     Q.  -- the overall report just in fairness.
14        Okay, so ICE apparently has taken some steps
15  already however that works.  I presume it's ICE telling
16  the local facility manager do this, that or the other to
17  get these issues taken care of.  Do you know anything
18  about that communication?
19     A.  No.  So what I would say is generally speaking
20  as I said, in other words, the Inspector General does a
21  close-out at the site at the day of the visit and then
22  this process of drafting the report is something that
23  happens later on, so like I said, I mean, not to be -
24  back to the clogged toilet but, in other words, that
25  didn't wait for the report to be written to be acted



DANIEL RAGSDALE Vol. 2
Novoa vs The Geo

June 12, 2019
331–334

Page 331

1  upon.

2  Q.  Right.

3  A.  The same thing with the food things we talked
4  about.  I know that the facility schedule in terms of
5  painting happened over a period of time and the
6  different chemical and so forth and so on that obviously
7  took time.

8  Q.  You mentioned a few times in response -- I'm
9  sorry.  We're going to go past 5:30 but not very far.
10  You mentioned a few times the existence of Field
11  Directors on behalf of ICE being at the location having
12  kind of oversight of operations.  Do you know that
13  topic?

14  A.  Yes.  In other words, if I understand
15  correctly there's an Assistant Field Office Director
16  that is a position within ICE that reports to the Deputy
17  Field Office Director and then the Field Office Director
18  in this case as it relates to Adelanto is in - who's in
19  Los Angeles.

20  Q.  And the deputy -- I'm sorry.  The Assistant
21  Field Office Director that's assigned to Adelanto is
22  named Gabriel Valdez, correct?

23  A.  Correct.

24  Q.  All right.

25  (Whereupon, Exhibit 9 was marked)

Page 332

1  BY MR. CHAREST:

2  Q.  I'm handing you a document that's marked as
3  Exhibit Nine.  Have you seen the - what I've given you
4  as Exhibit Nine before?

5  A.  No.

6  MS. ARMSTRONG:  You handed me two copies.

7  MR. CHAREST:  I gave her two copies as is my
8  practice.

9  BY MR. CHAREST:

10  Q.  All right, so as I understand it this is a
11  declaration provided by Gabriel Valdez in a different
12  piece of litigation in which -- Is Gabriel a man or a
13  woman?

14  A.  It's a man.

15  Q.  All right.  Thank you.

16  A.  Or he's a man I should say.

17  Q.  Fair enough.

18  In which Mr. Valdez describes his work on
19  behalf of ICE at Adelanto, so you agree with me -- Well,
20  you can read paragraph two, the second sentence, "I'm
21  currently - I currently am assigned to the Adelanto ICE
22  Processing Center, APC in Adelanto, California."  You'll
23  agree with that as a true statement, right?

24  A.  That he's assigned to Adelanto?

25  Q.  Yes, sir.

Page 333

1  A.  The times that I've - the last two times that
2  I've been there, yes, he's been the Assistant Field
3  Office Director.  He could be gone today, but I wouldn't
4  know that for sure.

5  Q.  Me neither.

6  Paragraph three Mr. Valdez says, "ICE/ERO is
7  responsible for managing the immigration cases of
8  detained individuals" and he goes on, "In addition,
9  ICE/ER0 has a secondary responsibility to observe,
10  identify and notify the various contractors or
11  subcontractors of any perceived deficiencies in
12  adherence to their responsibilities under the
13  Performance-Based National Detention Standards 2011."
14  Did I read that correctly?

15  A.  Yes.

16  Q.  Do you understand that role on behalf of ICE
17  to be accurate?

18  A.  I think that is a - a summary version of
19  saying there's a quality assurance program that - that
20  ICE has to make sure that the standards are being met.

21  Q.  So the standards though as set out by
22  Mr. Valdez here in paragraph three are the
23  subcontractor's responsibility, right, in adherence to
24  their responsibility, the subcontractor's
25  responsibility, correct?

Page 334

1  A.  Yes.  In other words, if the contractor has
2  responsibilities under the standards, yes.

3  Q.  And GEO is the subcontractor at Adelanto that
4  is responsible for the performance of the standards at
5  that facility, correct?

6  A.  Yes.

7  Q.  All right, we can try and cut to the chase.

8  Flip, if you would, to paragraph eight.

9  Mr. Valdez says, "The IGSA between the City" which is
10  the City of Adelanto "And ICE does not reserve to ICE
11  any direct control of any part of the contracted work
12  and only provides that ICE 'will conduct periodic
13  inspections of the facility to assure compliance with'
14  ICE standards," and it cites a provision in the
15  contract.  Did I read that correctly?

16  A.  Yes.

17  Q.  Does that conform with your understanding
18  about the level of control that ICE exercises over the
19  contracted work at the Adelanto facility?

20  A.  So it says direct control --

21  Q.  Yes.

22  A.  -- of any contracted work, so it doesn't say
23  no control, it says direct control, and I'm not
24  precisely sure what they mean by direct control, but
25  that's what it says, and then it says it will conduct



Page 335

1  periodic inspections of the facility to ensure
2  compliance with ICE standards.
3       Again inspection is a term of art and that
4  could mean something that is a formal, you know, audit
5  type inspection that, you know, other folks can do, but
6  again Mr. Valdez is assigned full-time to Adelanto and
7  is there everyday along with the rest of his staff and
8  is aware of what is going on at Adelanto.
9       Q.  You don't know what Mr. Gabriel - Mr. Valdez
10  is actually aware of or not, right?  That's your
11  presumption what you just said?
12      A.  I have no idea what's in his mind if that's
13  what you're asking me.
14      Q.  Right, and the primary responsibility
15  according to Mr. Gabe -- Mr. Valdez is the managing of
16  immigration cases of detained individuals according to
17  paragraph three of this sworn declaration, correct?
18      A.  That's what it reads, yes.
19      Q.  Right.
20       And he says the - the contract does not
21  reserve to ICE any direct control, so there is no direct
22  control according to Mr. Valdez under the IGSA, the IGSA
23  for Adelanto, correct?
24      A.  Yeah, again I don't know precisely what's
25  meant by direct control.  I mean it's a qualifier so,

Page 336

1  you know, again the ICE folks don't supervise the - the
2  GEO staff.  GEO folks supervise the GEO staff, so again
3  I don't know precisely what that means.
4       Q.  Okay, flip if you would to the last page, the
5  last sentence of paragraph seventeen.
6       Are you with me?
7       A.  Uh-huh.  (Affirmative response).
8       Q.  Mr. Valdez says here under oath, "ICE/ERO does
9  not control GEO's work."
10      A.  I'm sorry.  I'm on paragraph seventeen?
11      Q.  Yes, sir.  It - it splits between page four
12  and page five.
13      A.  It's the paragraph that says, "In general
14  detainee --
15      Q.  Yeah, I'm on --
16      A.  -- enters a hunger strike."
17      Q.  I'm on the last - the last --
18      A.  Okay.
19      Q.  -- the last sentence of that paragraph.
20      A.  Okay.
21      Q.  And I'm reading -- I'll read it again for the
22  record.  "ICE/ERO does not control GEO's work."  Is that
23  an accurate statement of the level of control that ICE
24  exhibits over GEO's work at Adelanto?
25      A.  I don't think you've read the whole sentence

Page 337

1  though.  Now I'm on - I'm on page five of five.
2       Q.  Right.
3       A.  And the sentence reads, "ICE/ERO does not
4  control GEO's work and does not direct their staff on
5  how to interact detainees on a hunger strike."
6       Q.  That's right.  Those are two different things,
7  so ICE does not control GEO's work, A.  B, ICE does not
8  direct their staff on how to interact with detainees on
9  a hunger strike, correct?
10      A.  I mean you're reading that sentence, you know,
11  one sentence out of a - paragraph seventeen.  I - you
12  are correctly stating what is on the page and that is
13  written in the conjunctive.
14      Q.  Right, meaning both are true according to
15  Mr. Valdez, right?
16      A.  Yeah.
17      Q.  All right, and my question to you, sir, is I
18  know what he says.  I can read it.  Is that different or
19  the same as your understanding of whether or not ICE has
20  control over GEO's work at the Adelanto facility?
21      A.  Again hard to say.
22       It's interesting because here it says does not
23  control.  On the paragraph we read before it says direct
24  control, so again this is Mr. Valdez's affidavit.  I
25  obviously - this is the first time I'm seeing this,

Page 338

1  but - and this paragraph is talking about hunger
2  strikes, so what I would say is it's a blended range
3  of - of the agreement, right?  There are certain things
4  that GEO does on its own and there's certain things
5  that, you know, are done at ICE's direction pursuant to
6  the contract.
7       Q.  All right, let's look at the next paragraph,
8  sir, the last line.  Mr. Valdez says again under oath,
9  "ICE/ERO's role is generally to advocate on behalf of
10  the detainees to ensure they are receiving proper care
11  and not to supervise the care provided by GEO."  First
12  did I read that correctly?
13      A.  Yes.
14       Again the sentence before that talks about in
15  the context of a hunger strike but it says, however,
16  "ICE/ERO's role is to generally advocate on behalf of
17  the detainee," I'm not sure to whom, "To ensure they are
18  receiving proper care and not to supervise the care
19  provided by GEO."
20      Q.  So the first one let's break it down, so
21  just --
22      A.  Sorry.
23      Q.  -- answer my question.
24       Did I read that correctly?  The answer is yes,
25  right?



Page 339

1    A.   Yes, I believe you --
2    Q.   Okay.
3    A.   -- read it correctly.
4    Q.   Now is that different than what your
5  understanding is about whether or not ICE is on site to
6  supervise the care provided by GEO of the detainees?
7    A.   In the context of a hunger strike --
8    Q.   I didn't ask that, sir.
9    A.   But I'm reading what I'll say is the plain
10  meaning of paragraph eighteen as I understand it.
11       So in the context of a hunger strike which is
12  what I believe is being discussed here in Mr. Valdez's
13  affidavit, generally the medical provider is the one
14  who's going to make decisions about the well - the
15  welfare of the detainee and that is not something that
16  ICE would direct to its subcontractor in terms of what
17  intervention or what would be done by the medical
18  provider.
19    Q.   Okay, without regard and without limitation to
20  the context of a hunger strike, do you disagree with
21  what Mr. Valdez says here about ICE's role vis-a-vis GEO
22  and the provision of care at Adelanto - Adelanto?
23       MS. ARMSTRONG:  Objection, vague.
24       THE WITNESS:  So again I can't - I haven't had
25  a conversation with Mr. Valdez about this.  I

Page 340

1  don't -- You know, he may have an opinion.
2  BY MR. CHAREST:
3    Q.   I'm asking your view.
4    A.   As I said before, ICE does not supervise GEO
5  employees.
6       Now supervise is a term of art, but it's an
7  employer, employee relationship.
8       The contract is the agreement that ICE - you
9  know, and the quality - the Quality Assurance
10  Surveillance Plan is the way they control what GEO does,
11  and again supervise is the wrong word.
12    Q.   GEO supervises its employees at Adelanto,
13  correct?
14    A.   Correct.
15    Q.   GEO also supervises the detainees that are
16  providing labor through the voluntary work program,
17  correct?
18       MS. ARMSTRONG:  Objection, lacks foundation.
19       THE WITNESS:  So supervise in a different
20  context but, you know, is aware of, yes, and
21  it's -- I mean there's not an employee, employer
22  relationship between detainees who are in the
23  voluntary work program.  It's not supervised in the
24  same sense.
25  BY MR. CHAREST:

Page 341

1    Q.   Well, that's your view, but --
2    A.   You're asking me my view.
3    Q.   I am, but your - my question was does GEO
4  supervise the detainees that are doing the work program
5  and you don't want to say supervise because of the - the
6  legal context of that question.  I get it.  I understand
7  you're coaching, I get it, but the fact is, and I don't
8  know if you took Latin, the - GEO from a position above
9  looks at the people who are doing the work in the
10  voluntary work program and observes them in order to
11  make sure they're doing what they're supposed to be
12  doing, right?
13    A.   Yes.  I agree.
14       MS. ARMSTRONG:  Objection, vague.
15  BY MR. CHAREST:
16    Q.   Thank you.
17       Have you had any - have you ever had any
18  conversations with Tracey Valerio or John Sag - Sandweg
19  about this case, sir?
20    A.   No, I have not.
21    Q.   How about any of these cases that pertain to
22  detention conditions of confinement?
23    A.   I haven't spoken to John Sandweg since the day
24  he left ICE, whenever that was, and I know Tracy
25  Valerio, I've known her since the U.S. Attorney's Office

Page 342

1  in Phoenix, but I have not had any conversation with her
2  about this case.
3    Q.   Is the U.S. Attorney's Office in Phoenix in
4  the courthouse that is like a greenhouse?
5    A.   It is - it is several blocks away in the white
6  courthouse that does not have air-conditioning if that's
7  what you're referring to.
8       MR. CHAREST:  I have no more questions.
9       THE WITNESS:  Thank you.
10       MR. CHAREST:  Do you all have any?
11       Are you going to reserve, I assume?
12       MS. ARMSTRONG:  No.
13       MR. CHAREST:  Are you going to ask questions?
14       MS. ARMSTRONG:  No, I'm not asking questions.
15       MR. CHAREST:  All right, we're done.
16       Thank you.
17       THE VIDEOGRAPHER:  We are going off the video
18  record 5:40 p.m.
19       THE COURT REPORTER:  Read or waive?
20       MS. ARMSTRONG:  Yes, we want to read.
21       THE COURT REPORTER:  Is the transcript
22  ordered?
23       MR. CHAREST:  I'll sign anything you give me,
24  but I never make the decisions, so I'll give you
25  the e-mail address of the paralegal that will know



DANIEL RAGSDALE Vol. 2
Novoa vs The Geo

June 12, 2019
343—346

Page 343

1    what you need to know.

2

3         (The deposition concluded at 5:40 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 344

1                    CERTIFICATE OF OATH

2

3    STATE OF FLORIDA

4    COUNTY OF BROWARD

5

6         I, VALERIE LEHTO, the undersigned authority,

7    certify that DANIEL RAGSDALE personally appeared

8    before me and was duly sworn.

9

10        Dated this 22nd day of June, 2019.

11

12        *Valerie Lehto*

         VALERIE LEHTO, RPR

13        NOTARY PUBLIC - STATE OF FLORIDA

         My Commission Expires:  8/22/2022

14        My Commission No.:  GG 242398

15

16

17

18

19

20

21

22

23

24

25

Page 345

1                    CERTIFICATE

2

3    STATE OF FLORIDA

4    COUNTY OF BROWARD

5         I, VALERIE LEHTO, Registered Professional

6    Reporter, do hereby certify that I was authorized

7    to and did stenographically report the foregoing

8    deposition as hereinabove shown, and the testimony

9    of said witness was reduced to computer transcription

10   under my personal supervision and direction and that

11   the record is a true record of the testimony given

12   by the witness and that the witness has requested

13   a review of said transcript pursuant to Rule 30(e)

14   (2).

15        I further certify that I am not a relative,

16   employee, attorney or counsel of any of the parties,

17   nor am I a relative or employee of any of the parties'

18   attorney or counsel connected with the action, nor

19   am I financially interested in the action.

20        Dated this 22nd day of June, 2019.

21

22

23        *Valerie Lehto*

         VALERIE LEHTO

24        Registered Professional Reporter

         COMMISSION NO. GG 242398

25        MY COMMISSION EXPIRES 8/22/2022

Page 346

1                DEPOSITION ERRATA SHEET

2

3    ASSIGNMENT NO.

4

5         DECLARATION UNDER PENALTY OF PERJURY

6         I declare under penalty of perjury

7    that I have read the entire transcript of

8    my Deposition taken in the captioned matter

9    or the same is true and accurate, save and

10   except for changes and/or corrections, if

11   any, as indicated by me on the DEPOSITION

12   ERRATA SHEET hereof, with the understanding

13   that I offer these changes as if still under

14   oath.

15        Signed on the _____ day of _____,

16

17   2019.

18

19

20   _____

21              WITNESS NAME

22

23

24

25



**Page 347**

```
1              DEPOSITION ERRATA SHEET
2    Page No. _____ Line No. _____ Change to: _____
3    _____
4    Reason for change:_____
5    Page No. _____ Line No. _____ Change to: _____
6    Reason for change:_____
7    Page No. _____ Line No. _____ Change to: _____
8    Reason for change:_____
9    Page No. _____ Line No. _____ Change to: _____
10   Reason for change:_____
11   Page No. _____ Line No. _____ Change to: _____
12   Reason for change:_____
13   Page No. _____ Line No. _____ Change to: _____
14   Reason for change:_____
15   Page No. _____ Line No. _____ Change to: _____
16   Reason for change:_____
17   Page No. _____ Line No. _____ Change to: _____
18   Reason for change:_____
19   Page No. _____ Line No. _____ Change to: _____
20   Reason for change:_____
21   Page No. _____ Line No. _____ Change to: _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25              DANIEL RAGSDALE
```

**Page 348**

```
1              DEPOSITION ERRATA SHEET
2    Page No. _____ Line No. _____ Change to: _____
3    _____
4    Reason for change:_____
5    Page No. _____ Line No. _____ Change to: _____
6    Reason for change:_____
7    Page No. _____ Line No. _____ Change to: _____
8    Reason for change:_____
9    Page No. _____ Line No. _____ Change to: _____
10   Reason for change:_____
11   Page No. _____ Line No. _____ Change to: _____
12   Reason for change:_____
13   Page No. _____ Line No. _____ Change to: _____
14   Reason for change:_____
15   Page No. _____ Line No. _____ Change to: _____
16   Reason for change:_____
17   Page No. _____ Line No. _____ Change to: _____
18   Reason for change:_____
19   Page No. _____ Line No. _____ Change to: _____
20   Reason for change:_____
21   Page No. _____ Line No. _____ Change to: _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25              DANIEL RAGSDALE
```

