EXHIBIT 19

**Page 1**

```
1              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
2                  EASTERN DIVISION
3         CIVIL ACTION NO. 5:17-cv-02514-JGB
4    RAUL NOVOA and JAIME CAMPOS FUENTES,
     individually and on behalf of all
5    others similarly situated,
6                       Plaintiffs,
     vs.
7
     THE GEO GROUP, INC.,
8
                   Defendant,
9    _____/
10
11
12
13        VIDEOTAPED DEPOSITION OF DAVID J. VENTURELLA
14
              VOLUME I, PAGES 1-146
15
              THURSDAY, JUNE 13th, 2019
16        515 EAST LAS OLAS BOULEVARD, SUITE 1200
                FORT LAUDERDALE, FLORIDA
17              9:03 a.m. - 5:40 p.m.
18
19
20
21
22
     STENOGRAPHICALLY REPORTED BY:
23   VALERIE LEHTO, REGISTERED PROFESSIONAL REPORTER
     NOTARY PUBLIC, STATE OF FLORIDA
24   ESQUIRE DEPOSITION SERVICES
     FORT LAUDERDALE OFFICE
25
```

**Page 2**

```
1    APPEARANCES:
2
     APPEARING ON BEHALF OF THE PLAINTIFFS:
3
         BURNS, CHAREST, LLP.
4        BY:  DANIEL H. CHAREST, ESQUIRE.
         BY:  LYDIA A. WRIGHT, ESQUIRE.
5        365 CANAL STREET, SUITE 1170
         NEW ORLEANS, LOUISIANA  70130
6        (504) 799-2845
         dcharest@burnscharest.com
7        lwright@burnscharest.com
8
9        LAW OFFICE OF R. ANDREW FREE.
         BY:  R. ANDREW FREE, ESQUIRE.
10       BY:  HENRIETTE VINET-MARTIN, ESQUIRE.
         2004 8th AVENUE SOUTH
11       NASHVILLE, TENNESSEE 37204
         (844) 321-3221
12       andrew@immigrantcivilrights.com
13
14
     APPEARING ON BEHALF OF THE DEFENDANT:
15
         HOLLAND & KNIGHT.
16       BY:  J. MATTHEW DONOHUE, ESQUIRE.
         BY:  SHANNON L. ARMSTRONG, ESQUIRE.
17       111 SOUTHWEST FIFTH AVENUE
         2300 U.S. BANCORP TOWER
18       PORTLAND, OREGON  97204
         (503) 517-2913
19       shannon.armstrong@hklaw.com
         matt.donohue@hklaw.com
20
21   ALSO PRESENT:  FRANCES E. SIMKINS
                    U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
22                  DON SAVOY/VIDEOGRAPHER
23
24
25
```

**Page 3**

```
1                     INDEX
2
3    WITNESS                              PAGE
4    DAVID J. VENTURELLA
5    DIRECT EXAMINATION BY MR. FREE         5
6
7                INDEX TO EXHIBITS
8
     EXHIBITS                             PAGE
8
     EXHIBIT 10   STANDARD FORM 30         90
9    EXHIBIT 11   STANDARD FORM 30         94
     EXHIBIT 12   SUPPLEMENTAL AGREEMENT   97
10   EXHIBIT 13   STANDARD FORM 30        101
11
12
13   (PREVIOUSLY MARKED EXHIBITS REFERENCED RAGSDALE
     EXHIBIT 1)
14
15
16
17   (ORIGINAL EXHIBITS INCLUDED WITH ORIGINAL TRANSCRIPT)
18
19
20
21
22
23
24
25
```

**Page 4**

```
1         DEPOSITION OF DAVID J. VENTURELLA
2                 JUNE 13th, 2019
3
4         THE VIDEOGRAPHER:  We are now on the video
5    record.
6         Today is Thursday, the 13th day of June, 2019.
7    The time is 8:50 a.m.
8         We're here at 515 East Las Olas Boulevard,
9    Suite 1200, Fort Lauderdale, Florida for the
10   purpose of taking the videotaped deposition of
11   David Venturella.  The case is Raul Novoa and Jaime
12   Campos Fuentes versus The GEO Group, Inc.
13        The court reporter is Valerie Lehto and the
14   videographer is Don Savoy, both from Esquire
15   Deposition Solutions.
16        Will counsel please announce their appearances
17   for the record.
18        MR. FREE:  Andrew Free for the Plaintiffs.
19        MS. WRIGHT:  Lydia Wright for the Plaintiffs.
20        MR. CHAREST:  Daniel Charest for the
21   Plaintiffs.
22        MR. DONOHUE:  Matt Donohue, Holland & Knight
23   of - for the Defendant and also with me is Shannon
24   Armstrong.
25   Thereupon,
```



Page 5

1       DAVID J. VENTURELLA

2 having been first duly sworn or affirmed, was examined

3 and testified as follows:

4

5            DIRECT EXAMINATION

6 BY MR. FREE:

7      Q.  Good morning, sir.  How are you feeling today?

8      A.  Good.

9      Q.  Good.

10          Where do you work?

11     A.  I work for The GEO Group.

12     Q.  What is your position?

13     A.  I'm the Senior Vice-President of Business

14 Development.

15     Q.  When did you begin in that role?

16     A.  I think in February of 2014.

17     Q.  Did you work for The GEO Group prior to

18 February, 2014?

19     A.  Yes.  I was the Executive - Executive

20 Vice-President for Business Development starting in July

21 of 2012.

22     Q.  And so your current position is a promotion

23 from your previous one?

24     A.  Correct.

25     Q.  Where did you work prior to July of 2012?

Page 6

1      A.  Before that I worked for the U.S. Immigration

2 and Customs Enforcement in Washington D.C.

3      Q.  What did you do there?

4      A.  My last position was the Assistant Director

5 for Field Operations.

6      Q.  When did you leave your employment with ICE?

7      A.  May of 2012.

8      Q.  Did you have any employment between ICE and

9 GEO?

10     A.  No.

11     Q.  That was your last position at ICE.  What

12 position or positions did you hold prior to your last

13 one?

14     A.  Prior to that one I served as the Executive

15 Director for the Secure Communities Program.  I was the

16 Acting Director for Enforcement and Removal Operations,

17 and I believe that's it.

18     Q.  If I understand your background correctly --

19 It's okay.  We're just going to have a conversation.

20     A.  Yes.  Sure.

21     Q.  So if I understand your background correctly,

22 there was a period where you left ICE and then went back

23 or left DHS employment and went back; is that right?

24     A.  That is correct.

25     Q.  Okay, and so the two jobs - the jobs that

Page 7

1 you've just told me about were jobs that you held after

2 you went back to ICE?

3      A.  Correct.

4      Q.  Okay, when did you go back to ICE for the last

5 time?

6      A.  I think it was June of 2008.

7      Q.  All right, what did you do before that in the

8 private sector?

9      A.  In the private sector I was Director of

10 Business Development for L3 Communications and then

11 before that I was the Vice-President for Homeland

12 Security in a company called USIS.

13     Q.  What does USIS do?

14     A.  They were primarily a government services

15 provider in the area of personnel secured.

16     Q.  And did you hold any other positions in the

17 private sector during that sort of interstitial period

18 between your employment at ICE and going back?

19     A.  No.

20     Q.  Okay, so just USIS and L3?

21     A.  Correct.

22     Q.  Okay, and right before you went into the

23 private sector in the I think -- What was your last

24 position at ICE?

25     A.  Can you repeat that?

Page 8

1      Q.  So right before you went to work for USIS you

2 were working for ICE, right?

3      A.  Correct.

4      Q.  What were you doing right before you left at

5 that time?

6      A.  I was the Acting Director for the Enforcement

7 and Removal Operations Program.

8      Q.  Also in Washington D.C.?

9      A.  Correct.

10     Q.  Okay, and prior to -- And kind of what were

11 the - generally the date ranges when you were the Acting

12 Director for - for ERO?

13     A.  It was a short period of time, so I would say

14 months, but I - you know, four, five months.

15     Q.  Okay, prior to that?

16     A.  Prior to that I held the position of Deputy

17 Director for the same program.

18     Q.  And the rough periods that you held that

19 position?

20         I'm not going to hold you to like exact dates.

21     A.  Yeah.

22     Q.  Just years, maybe.

23     A.  Yeah, it was a few years.  It's a little fuzzy

24 when I actually started.

25     Q.  Okay, you've been in the Agency prior to your



Page 9

1  leaving ICE in 2004, you've been in the Agency for
2  eighteen years or something like that, right?
3      A.  I started in 1986 and then through 2002,
4  right.
5      Q.  Okay, so '86 to '02?
6      A.  Yeah.
7      Q.  And then you go into the private sector in
8  '02?
9      A.  Again a little fuzzy.  '02 --
10     Q.  Sure.
11     A.  -- maybe '03, but --
12     Q.  Okay.
13     A.  -- it was a four year break in between the
14  two --
15     Q.  Okay.
16     A.  -- stints with the government.
17     Q.  Did you always work in Washington D.C.?
18     A.  No.  I started off in Chicago.
19     Q.  All right, what was the highest level position
20  that you - that you held when you were working I guess
21  then for INS in Chicago?
22     A.  Correct.
23         The highest level --
24     Q.  Yes, sir.
25     A.  -- position would be -- I'm trying to remember

Page 10

1  what the title was back then, but it would have been
2  Deputy District Director.
3      Q.  Was that kind of the equivalent of what we
4  would think of as a Field Office Director today?
5      A.  Yeah.  I would say it's equivalent.
6      Q.  Okay, did you -- But within INS you were on
7  the enforcement side.  Do you understand what I mean
8  after INS gets broken up in 2002 under the Homeland
9  Security Act --
10     A.  Right.
11     Q.  -- and then to ICE and USCIS?
12     A.  Right.
13     Q.  You were not doing the benefits part of INS,
14  you were on the enforcement side, right?
15     A.  That's correct.
16     Q.  Okay, and that was the whole time?  You were
17  never like a benefits officer granting green cards or
18  adjudicating applications?
19     A.  After 2002?
20     Q.  At any time in your career --
21     A.  Oh, well --
22     Q.  -- in ICE.
23     A.  -- sure.  I mean between '86 and 2002 I did
24  have - I worked as an immigration inspector as a
25  collateral duty, not - you know, part of my primary

Page 11

1  function.  I also worked on the benefits side,
2  naturalization, green card renewals, et cetera.
3      Q.  Okay, so you did some application
4  adjudications?
5      A.  Yeah.  Absolutely.
6      Q.  Okay, did you also do enforcement activities?
7      A.  Yes.
8      Q.  Okay, what is your highest level of education?
9      A.  A Bachelor of Science in Political Science.
10     Q.  Okay, have you ever supervised a detention
11  center?
12     A.  Yes.
13     Q.  Which one?
14     A.  The Broadview staging facility.  It's in
15  Chicago.
16     Q.  When did you do that?
17     A.  Sometime in the 90's.
18     Q.  Yeah, roughly again.
19     A.  Right.  Okay.
20     Q.  Twenty years ago.
21         And for how long were you the person in charge
22  of that facility?
23     A.  I would say at least a couple years.
24     Q.  Okay, let's get back to your current
25  employment.

Page 12

1      A.  Okay.
2      Q.  What are your current responsibilities?
3      A.  Well, I'm responsible for all of the business
4  development activities for the company which means
5  identifying opportunities that we would be interested
6  in, we would be well suited for, analyzing, qualifying
7  and then making recommendations to our senior leadership
8  whether or not we should pursue such opportunities and
9  then if we do decide to pursue such opportunities then I
10  have a team of folks that manage the proposal process,
11  scheduling and coordination.
12     Q.  Is it correct to say -- I want to make sure
13  that we understand each other and we're using the same
14  language.  Is it correct to say that the people who work
15  with you are in the business development part of GEO as
16  opposed to the contract compliance part of GEO?
17     A.  Oh, that's correct.
18     Q.  Okay, and to whom do you report?
19     A.  To the CEO.
20     Q.  That's George Zoley?
21     A.  That's correct.
22     Q.  Okay, approximately how many people work for
23  you?
24     A.  About eleven.
25     Q.  And are they all here in Florida?



Page 13

1    A.  Yes.
2    Q.  Okay, how do you go about identifying new
3  business opportunities that might enhance GEO's revenue?
4    A.  Well, you can do it a number of different
5  ways.  Certainly we have a current portfolio or clients
6  that we service now and so certainly in having
7  discussions with them asking them if there are
8  additional opportunities that they foresee in the future
9  is one way.  You know, we attend a lot of conferences,
10  we speak to a lot of people on the ground again figuring
11  out if there are opportunities that are coming.
12  Sometimes you look at - you look at the news, you read,
13  for example, like Miami-Dade is in need of a new
14  facility, a county facility so, you know, that - that
15  then sparks the - the additional activity to - to make
16  some contacts and reach out to see if it's actually a
17  real opportunity.
18    Q.  Sure.
19      It is my understanding, and you tell me if I'm
20  incorrect, that you don't just do business development
21  regarding GEO's ICE detention portfolio but you also do
22  business development on other activities that GEO
23  conducts vis-a-vis Corrections or community supervision
24  or other residential treatment centers; is that right?
25    A.  Correct.

Page 14

1    Q.  Okay, so you're not limited to ICE detention?
2    A.  That is correct.
3    Q.  Okay, but you are responsible for identifying
4  new opportunities and increasing corporate profits,
5  finding new sources of revenue within the immigration
6  detention space, right?
7    A.  Not limited to the immigration detention
8  space.
9    Q.  Okay, but that's one of your --
10    A.  Sure.
11    Q.  -- pieces of work, right?
12    A.  Yes.
13    Q.  Okay, is there anybody who specifically works
14  for you that's tasked with that end of it, the ICE
15  detention end of it?
16    A.  No.
17    Q.  Okay, and prior to getting your promotion and
18  taking over your current role, how did your job differ
19  from what it is today?
20    A.  It was more focused on domestic and very
21  specifically to Detention and Corrections, so Federal,
22  State and local level.
23      When I received the promotion then additional
24  areas of responsibility were added to include
25  international and supporting some of our reentry and

Page 15

1  community Corrections services as well.
2    Q.  Do you advice or suggest to senior leadership
3  potential acquisitions of other companies or -- Yeah,
4  other companies.  Let's start there.
5    A.  No.
6    Q.  You do not?
7    A.  I do not.
8    Q.  Okay, were you here when GEO acquired BI?
9    A.  I was not.
10    Q.  Okay, what was your highest GS level before
11  you - when you left ICE?
12    A.  I was in the Senior Executive Service.
13    Q.  Were you on the executive pay scale?
14    A.  Yes.
15    Q.  Did you seek or receive ethics advice prior to
16  leaving ICE and taking on your employment with GEO --
17    A.  Yes.
18    Q.  -- in July?
19      What was that advice?
20    A.  What were my limitations, what could I do,
21  could not do.  Basically the one-on-one on leaving the
22  government and going into the private sector.
23    Q.  And I want you to understand I'm not asking
24  you for an exhaustive list of things you could or
25  couldn't do, but did you understand there to be certain

Page 16

1  guardrails vis-a-vis GEO's business with ICE?
2    A.  Correct.  Yes.
3      MR. DONOHUE:  Object to the form.
4  BY MR. FREE:
5    Q.  Okay, what did you understand those limits to
6  be?
7    A.  I could not have contact with ICE officials
8  for - or I shouldn't say just ICE officials, DHS, any of
9  the component agencies for a twelve month period, I
10  could not sign correspondence that went to those
11  agencies.  I could certainly advise my company
12  behind-the-scenes, but I could not participate in any
13  meetings, discussions that they would have with any of
14  those components within DHS.
15    Q.  It's correct - it's correct to say that those
16  ethical guidance pieces that you got from your Agency
17  pertained to communications and contacts between your
18  new boss and your old boss, right?
19      MR. DONOHUE:  Object to the form.
20  BY MR. FREE:
21    Q.  Yeah, let's - let me those -- What you've
22  just described to me --
23    A.  Sure.
24    Q.  -- pertains to communications and contacts.
25  Did I understand you correctly?



Page 17

1    A.  With me and -- Yeah.
2    Q.  You directly?
3    A.  Yes.  Me directly.
4    Q.  I'm sorry to interrupt you.
5    A.  Yeah.  No, it's okay.
6    Q.  But that's right?  It's just you individually?
7    A.  Correct.
8    Q.  Okay, it didn't preclude GEO from talking to
9  DHS?
10    A.  That's correct.
11    Q.  All right, and it doesn't preclude you, I
12  think, I understand the rules to be, it doesn't preclude
13  you from taking the information that you've gained in
14  your twenty-two years of experience at ICE and applying
15  some of that information to GEO?
16    MR. DONOHUE:  Object to the form.
17  BY MR. FREE:
18    Q.  You can answer the question.
19    A.  Oh, okay.  I wasn't sure of the process there.
20    Sure, so I could provide advice to - to GEO
21  behind the scenes, yes.
22    Q.  And that was an added benefit to your hire by
23  this company, right?
24    MR. DONOHUE:  Object to the form.
25    THE WITNESS:  I - that I don't know.

Page 18

1  BY MR. FREE:
2    Q.  You probably had a better understanding of how
3  ICE and DHS work than someone who didn't work there?
4  Would you just generally say --
5    A.  I would.
6    Q.  -- that that's probably true?
7    MR. DONOHUE:  Let me just make an objection.
8    Object to the form, calls for speculation.
9    THE WITNESS:  I think my experience and
10    expertise certainly was helpful.
11  BY MR. FREE:
12    Q.  You're a very senior official at ICE?
13    MR. DONOHUE:  Object to the form.
14    THE WITNESS:  I --
15    MR. DONOHUE:  Vague.
16    THE WITNESS:  I wouldn't say - I wouldn't
17    say --
18  BY MR. FREE:
19    Q.  You told me earlier you were a very senior?
20    A.  No.  No.  I said I was in the senior executive
21  service which is just a pay scale.
22    Q.  Okay, I got it.  All right.  Okay, cool.
23    Why did you leave DHS employment?
24    A.  I'm sorry?
25    Q.  Why - what made you want to leave DHS?

Page 19

1    A.  It was for me a time for a change.  I had
2  achieved my twenty years of covered service which is a
3  milestone for law enforcement personnel.
4    Q.  You're on a pension?
5    A.  I'm eligible for a pension.  I don't receive
6  one now.
7    Q.  Do you have to wait it out or is there --
8    A.  I do.  I have to wait.
9    Q.  How far away?
10    A.  Fifty-seven or sixty-two.  It just depends on
11  when I choose to exercise it and how much reduction I
12  get from that.
13    Q.  All right.  Okay, have you ever visited the
14  Adelanto facility?
15    A.  I have.
16    Q.  And I want to be really clear.  When I'm
17  referring to the Adelanto facility I'm referring to the
18  immigration detention facility that's operated under a
19  contract currently, I believe, with GEO and ICE and the
20  City of Adelanto.  I'm not referring to the prison
21  next-door and for the rest of these questions we're just
22  going to talk about the ICE processing center.  Can we
23  agree on that?
24    A.  Yes.
25    Q.  Great.

Page 20

1    When is the most recent time you visited
2  Adelanto?
3    A.  I think in February of this year.
4    Q.  What brought you there?
5    A.  We had a series of visits scheduled throughout
6  the State of California and so we had just stopped by,
7  visited, said - said hello to our folks and just toured
8  around that facility as well as the Desert View
9  facility.
10    Q.  Who's we?
11    A.  Myself, George Zoley, Kyle Schiller who is an
12  employee of the Operations Division, I think John
13  Christakis who's our Chief Medical Officer, our Regional
14  Vice-President.  There may have been a few other people
15  that attended as well.
16    Q.  Is the Regional Vice-President James Black?
17    A.  No.
18    Q.  Who is that?
19    A.  That is Paul Laird, L-a-i-r-d.
20    Q.  Thanks.
21    Is that a regular occurrence or an annual
22  occurrence where you go and tour these facilities or was
23  there some special reason why you were going there in
24  February of this year?
25    A.  As I stated, we had other meetings scheduled



Page 21

1  throughout the state and so since we were in - in the
2  State of California we decided to make that - that trip
3  out there.
4      Q.  How many times had you been there before going
5  in February?
6      A.  I would say at least once annually again
7  mostly to - to visit because we've had meetings or
8  conferences out there and so it's always good when
9  you're in the area to stop by, say hello, see how things
10  are going.
11      Q.  If I understand the timeline of your
12  employment and the existence of Adelanto correctly, you
13  would not have been at DHS when GEO was operating
14  Adelanto, you would not have visited as a DHS official;
15  is that right?
16      A.  Correct.  I did not visit --
17      Q.  Okay.
18      A.  -- that facility.
19      Q.  And so every visit that you've taken has been
20  in your employment with GEO?
21      A.  To Adelanto?
22      Q.  Yes, sir.
23      A.  Correct.
24      Q.  Okay.  Great.
25         How long did you spend there?

Page 22

1      A.  An hour.
2      Q.  Okay, did you actually go inside the secure
3  area or did you go to the sort of office area over on
4  the west side?
5      A.  We did go inside the secure area.
6      Q.  What did you see?
7      A.  Detainee hold rooms, the medical food service,
8  so I mean usually when we go we - we look at all
9  aspects.
10      Q.  Was there somebody responsible for being your
11  point of contact, the person who led your tour?
12      A.  That would have been the Facility
13  Administrator, James Janecka.
14      Q.  Okay, did you go anywhere else within the
15  facility?
16      A.  I think we covered all of the facility.
17      Q.  Okay, did Mr. Janecka or anyone else provide
18  you any written materials in advance of your visit?
19      A.  No.
20      Q.  Okay, did you have any substantive discussions
21  about GEO's performance at the facility or was it more
22  of just a meet and greet?
23      A.  More --
24      MR. DONOHUE:  Object to the form.
25      Go ahead.

Page 23

1      THE WITNESS:  More of a meet and greet.
2  BY MR. FREE:
3      Q.  Okay, nobody sat down in a conference room and
4  said here are the five things that we need to talk
5  about?
6      A.  No.
7      Q.  Okay.  All right.
8      A.  We did sit in the conference room though,
9  okay, so --
10      Q.  What did you talk about?
11      A.  Well, again how - how are things going, you
12  know, so there wasn't a particular agenda, but again
13  more of a meet and greet, okay, let's go look at the
14  facility.
15      Q.  Do you have any recollection as to how things
16  were going?
17      A.  At the facility?
18      Q.  Yes, sir.
19         When you were sitting in the conference room
20  talking about it what was the general sense?
21      A.  That we were performing well.
22      Q.  Okay, at that time was the facility almost at
23  full occupancy or near, near it?
24      A.  I don't recall.
25      Q.  Okay, that wasn't discussed?

Page 24

1      A.  No.
2      Q.  Okay, any discussions of expansion of the
3  facility?
4      A.  No.
5      Q.  Any discussions of alterations in the contract
6  of the facility?
7      A.  No.
8      Q.  Were ICE officials present on your tour?
9      A.  I mean there's always ICE officials around --
10      Q.  Okay.
11      A.  -- but they were not participating in the
12  tour, but certainly if we encountered one we spoke to
13  them.
14      Q.  Who was that?
15      A.  Well, I don't know.  There's a number of
16  officers that work there.
17      Q.  Nobody that sticks out in your mind?
18      A.  No.
19      Q.  Okay, but they weren't on the tour with you,
20  they were just physically located on the site because
21  they have offices, if I understand you correctly?
22      A.  Right, and they're performing their functions
23  and duties.
24      Q.  Okay, this was a GEO event, this wasn't GEO
25  and ICE doing any sort of meet and greet, if I



DAVID J. VENTURELLA  Volume I
NOVOA vs THE GEO GROUP

June 13, 2019
25—28

Page 25

1  understand your recollection?

2     A.  That is correct.

3     Q.  How often have you done visits like that prior

4  to February of 2018?

5        MR. DONOHUE:  Object to the form, vague.

6        THE WITNESS:  At the Adelanto facility?

7  BY MR. FREE:

8     Q.  Yes, sir.

9     A.  Like I said, I think I visited at least once a

10  year.

11    Q.  Okay.  Okay, so The GEO Group is a private

12  publicly traded real estate investment trust; is that

13  right?

14    A.  Yes.

15    Q.  Okay, your main business as an - as a

16  government contractor is to service the needs of your

17  government partners; is that right?

18    A.  Yes.

19    Q.  Okay, and it's my understanding that almost

20  all of the revenue from GEO's - almost all of GEO's

21  revenue comes from government contract partners; is that

22  correct?

23    A.  That is correct.

24    Q.  In fact, governments supply almost exclusively

25  the - the revenues each year that GEO takes in for its

Page 26

1  shareholders; is that right?

2     A.  That's correct.  We are a government services

3  provider.

4     Q.  Right.

5        ICE is GEO's largest customer right now; is

6  that right?

7        MR. DONOHUE:  Object to the form, vague.

8  BY MR. FREE:

9     Q.  Okay, let me - let make it real clear.  I want

10  you to understand my question, okay?

11    A.  Sure.

12    Q.  Where does GEO get the majority of its

13  revenues?

14    A.  From the Federal Government.

15    Q.  Okay, and the largest Federal Government

16  contracting partner by revenue for GEO is ICE; is that

17  right?

18    A.  I think that is correct as of today.

19    Q.  Okay, who are GEO's key competitors in the

20  immigration detention space for Federal Government

21  contracts here in the United States?

22    A.  That would be CoreCivic, LaSalle Corrections,

23  MTC and then, you know, thousands of county jails that

24  provide similar services to ICE.

25    Q.  You see those - those jails as potential

Page 27

1  competitors in the bidding process or -- Is that right?

2     A.  Correct.

3     Q.  Okay, do you have a rough understanding of how

4  much of GEO's revenues come from ICE each year?

5     A.  I do not.

6     Q.  Okay, and do you have any understanding of

7  what portion of ICE's immigration detention needs are

8  serviced by GEO each year in terms of beds?

9     A.  I do not.

10    Q.  Do you have any idea roughly but current

11  average daily population that ICE is detaining for adult

12  immigration detention?

13    A.  Other than what I read in the media reports

14  which I think is north of fifty thousand.

15    Q.  Okay, would you agree that that average daily

16  population that's been reported publicly is an increase

17  from years past?

18        MR. DONOHUE:  Object to the form.

19  BY MR. FREE:

20    Q.  In other words, in this year where ICE is

21  detaining let's say fifty-two thousand it's been

22  reported?

23    A.  Okay.

24    Q.  That's more than ICE has detained ever before

25  on a daily basis?

Page 28

1        MR. DONOHUE:  The same objection.

2        THE WITNESS:  That would be correct.

3  BY MR. FREE:

4     Q.  Okay, do you expect that number to go up?

5        MR. DONOHUE:  Object to the form.

6        THE WITNESS:  I do not know.

7  BY MR. FREE:

8     Q.  As the person responsible for business

9  development for GEO do you anticipate that the Agency

10  will continue to have a need for adult immigration

11  detention into the future?

12    A.  Can you repeat that?

13        MR. FREE:  Can you just read it back, please.

14        (Whereupon, the requested portion of the

15  record was read back).

16        THE WITNESS:  Yes.

17  BY MR. FREE:

18    Q.  Do you think that that need will provide GEO

19  opportunities to enhance its revenues if you can get

20  contracts?

21        MR. DONOHUE:  Object to the form, vague and

22  calls for speculation.

23        THE WITNESS:  I would say it is my opinion

24  that GEO has a very limited inventory of beds at

25  this point, so I don't know if we can offer anymore



Page 29

1   additional capacity to ICE, so it remains to be
2   seen if - if we would benefit from any increase.
3   BY MR. FREE:
4       Q.   When you say a limited inventory of beds, what
5   I understand that to mean, and tell me if I'm wrong, is
6   GEO has a certain number of facilities with a certain
7   number of beds available that it could make available to
8   ICE and that number is limited at this moment?
9       A.   Yes.
10      Q.   Okay, how would GEO go about increasing its
11  supply of beds that it could offer to ICE?
12      A.   We would have to build more, more beds.
13      Q.   Could you enter into intergovernmental
14  services agreements with counties or states instead of
15  building?  In other words, take existing space and
16  manage the facility.
17      A.   As a REIT that's not what we would prioritize.
18      Q.   Why not?
19      A.   Because there are REIT rules that determine or
20  govern how much of your business can be non REIT and
21  that would be non REIT, so that would not be our
22  preference.
23      Q.   Do you have any idea, I'm not going to hold
24  you to an exact number, but do you have any idea how
25  much of GEO's business is non REIT right now?

Page 30

1       A.   I do not know.
2       Q.   Okay, so you don't - you can't tell me today
3   as you're sitting here how much room GEO has to kind of
4   maximize that non REIT income?
5       A.   No, I do not.
6       Q.   Okay, is the contract with Adelanto a REIT or
7   non REIT activity?
8       A.   It is a REIT activity.
9       Q.   Why is that?
10      A.   Because we own and operate the facility.
11      Q.   Okay, so do you have any understanding
12  generally of the benefits of being a REIT to GEO?
13           MR. DONOHUE:  Object to the form.
14           THE WITNESS:  My understanding of the benefit
15      is more tax related and I can't get - I don't know
16      the specifics of that, but I know there's a benefit
17      and then there's certainly a requirement to
18      distribute, I'm not sure if I'm going to get this
19      term right, but your profits back to shareholders.
20  BY MR. FREE:
21      Q.   Do you happen to know the percentage that has
22  to go back to the shareholders?
23      A.   I don't.
24      Q.   Okay.  That's okay.
25           Has GEO always been a REIT since you've worked

Page 31

1   there?
2       A.   No.
3       Q.   Do you recall approximately when that
4   corporate change occurred?
5       A.   I - I'm guessing it might have been around
6   2014.
7       Q.   Did you have any role in shifting the
8   corporate structure from what it was before to what it
9   is now?
10      A.   No.
11      Q.   Okay, that's not something that you were
12  working on?
13      A.   Correct.
14      Q.   Okay, but it does in some way limit the --
15  GEO's REIT structure does in some way limit, if I
16  understand your testimony, the number of beds that GEO
17  can offer ICE?
18           MR. DONOHUE:  Object to the form.
19           THE WITNESS:  I don't think that REIT
20      structure necessarily limits.  It's basically what
21      we - our capacity is and --
22  BY MR. FREE:
23      Q.   Okay.
24      A.   -- I think that's what defines our - our
25  capabilities.

Page 32

1       Q.   Okay, yeah.  I take your point.  I think what
2   you're trying to tell me is in order to provide ICE more
3   beds we would have to own and build more facilities and
4   we don't have many more right now?
5       A.   That is correct.
6       Q.   Thank you.
7           Okay, do you happen to know as you sit here
8   today how many facilities GEO owns that it contracts
9   with ICE to house adult immigration detainees?
10      A.   You said you're not going to hold me to the
11  exact number?  I think fourteen.
12      Q.   I'd like you to do the best you can.
13      A.   I think - I think it's fourteen.
14      Q.   But, yeah.  No, we're --
15      A.   Yeah.
16      Q.   Okay, how many in California?
17      A.   Two.
18      Q.   Okay, which ones are those?
19      A.   That would be the Adelanto facility and the
20  facility known as Mesa Verde.
21      Q.   That's in Bakersfield?
22      A.   Correct.
23      Q.   Okay, do you have any understanding as you sit
24  here today as to the main groups of shareholders that
25  own GEO stock, like who's the biggest?



Page 33

1      A.  I don't know.
2          MR. DONOHUE:  Object to the form.
3          THE WITNESS:  I do not.
4  BY MR. FREE:
5      Q.  Okay.
6          If I understand your position correctly,
7  you're - you're in a position of a corporate officer at
8  GEO?  Do you understand what I mean by that?
9      A.  Yes.
10     Q.  Do you believe that you have a fiduciary duty
11  to the shareholders?
12         MR. DONOHUE:  Object to the form.
13         THE WITNESS:  Yes.
14  BY MR. FREE:
15     Q.  What in your understanding is that fiduciary
16  duty?
17         MR. DONOHUE:  The same objection.
18         THE WITNESS:  Well, I believe that, you know,
19     I have a responsibility of making sure that our
20     company in my capacity as a business development
21     executive that we're pursuing opportunities that
22     would benefit our company.
23  BY MR. FREE:
24     Q.  Is it your understanding as part of your
25  fiduciary duty that -- I'm going to ask it in two parts,

Page 34

1  but I'm going to tell you the whole thing, okay?  I
2  think -- Tell me if I'm wrong here.  I think that you at
3  least have fiduciary duties to maximize profits and make
4  sure the shareholders make as much money as possible off
5  of their share from your activities.  Is that your
6  understanding as well?
7          MR. DONOHUE:  Object to the form.
8          THE WITNESS:  Again I think my responsibility
9      is to make sure that the opportunities we pursue
10     benefit our shareholders --
11  BY MR. FREE:
12     Q.  Financially?
13     A.  -- and our company, yeah.
14     Q.  And that means profit, right?
15         MR. DONOHUE:  Object to the form.
16         THE WITNESS:  Yes.
17  BY MR. FREE:
18     Q.  Okay, what other benefit would a shareholder
19  derive from your activities?
20         MR. DONOHUE:  Object to the form.
21         THE WITNESS:  None come to mind right now.
22  BY MR. FREE:
23     Q.  Yeah, it's just money, right?
24         MR. DONOHUE:  The same objection.
25         THE WITNESS:  Yes.

Page 35

1  BY MR. FREE:
2      Q.  Okay, I also think that, and tell me if I'm
3  wrong again and these are not - you can correct me is
4  what I want you to understand about --
5      A.  Sure.
6      Q.  -- this, okay?  But I also think that you have
7  a fiduciary duty to make sure that your operations in
8  any contract and broadly are compliant with the terms of
9  those contracts so that you can keep getting those
10  contracts, right?  In other words, you have an - you
11  have a duty to make sure that GEO does what it says it's
12  going to do when it contracts with a government partner?
13         MR. DONOHUE:  Object to the form.
14         THE WITNESS:  I think in my role and capacity
15     that directing how certain parts of our company
16     perform are just outside the scope of my authority.
17  BY MR. FREE:
18     Q.  Okay.
19     A.  However, if people are seeking my advice or
20  opinion I will certainly provide it to them.
21     Q.  What would it be on the specific issue of
22  whether GEO should as a general matter comply with its
23  contracts?
24         MR. DONOHUE:  Object to the form.
25         THE WITNESS:  I believe we have to comply with

Page 36

1  our contracts, the terms and conditions.
2  BY MR. FREE:
3      Q.  Right.  Okay, are you familiar with the terms
4  and conditions of the Adelanto Detention Center's
5  contract?
6      A.  No.
7      Q.  Okay, have you ever seen the contract?
8      A.  I've seen pieces of it.
9      Q.  Do you recall which pieces you've seen?
10     A.  The first couple of pages.  Yeah, it's -- I
11  know it's a very lengthy contract so, no.
12     Q.  How long has it been since you looked at those
13  couple of pages?
14     A.  A few days ago.
15     Q.  Okay, was it in connection with your daily
16  activities or in preparation for this deposition?
17         Please don't tell me anything that you talked
18  about with your lawyers.
19     A.  In preparation for this --
20     Q.  Okay.
21     A.  -- testimony.
22     Q.  All right.  Okay, but you have a -- As part of
23  your role at GEO you have a high level understanding of
24  the different types of immigration detention contracts
25  that exist; is that right?



Page 37

1   A.  Yes.
2   Q.  Can you tell me what those types of contracts
3   are.
4   A.  Well, there's two types of contracts.  There -
5   there's what we call a direct contract, and I don't know
6   if that's the proper term, which is where an RFP is
7   issued, the government follows the Federal Acquisition
8   Regulations, we provide a response, they accept it or
9   reject it, if they accept it then we enter into
10  negotiations and then a - a contract is finalized and
11  executed and there's a number of activities and
12  deliverables from that point forward in executing the
13  contract.
14      The other is an intergovernmental service
15  agreement which I think is maybe covered by the FAR as
16  well, but that's - those are the only two types of
17  contracts I'm aware of.
18  Q.  Within the first bucket, the direct contract,
19  it's my understanding that those are contracts that are
20  directly between GEO and ICE; is that right?
21  A.  That's correct.
22  Q.  And then the intergovernmental service
23  agreements or IGSAs are contracts between GEO, ICE and
24  some third-party; is that right?
25  A.  Correct.

Page 38

1   Q.  And in the case of immigration detention
2   that's going to be a state or local government
3   typically; is that right?
4   A.  Correct.
5   Q.  Anybody else who could be the third-party in
6   an IGSA?
7   A.  Not - not that I'm aware of.
8   Q.  Okay, and you can't think of any GEO contracts
9   that don't involve an IGSA - GEO intergovernmental
10  services agreements, excuse me, that are not a state or
11  local government contracting with ICE and GEO?
12  A.  Right.  I'm not aware of any.
13  Q.  Now within the first category that you have
14  described, direct contracts, can you tell me the
15  difference between a service processing center and a
16  contract detention facility?
17  A.  A service processing center is typically a
18  government - a Federal Government owned facility, so I
19  think they have four or five of those throughout the
20  country and a contract detention facility is one that is
21  privately owned.
22  Q.  So the only part, if I understand your
23  testimony correctly, the only one of those that GEO
24  would compete for then is a contract detention facility;
25  is that right?  You couldn't -- If a service -- In other

Page 39

1   words, if a service processing center is federally owned
2   and GEO is not the Federal Government and therefore does
3   not own any Federal facilities then you couldn't enter
4   into a service processing center agreement?
5   A.  That's not correct because --
6   Q.  Okay.
7   A.  -- the operations, the transportation, the
8   medical, the food is all outsourced at NSPC, so
9   potentially, yes, we could bid on any one of those
10  services should the government issue a procurement --
11  Q.  Okay.
12  A.  -- in which they have.
13  Q.  And do you, in fact, provide any of those
14  services at SPCs?
15  A.  We do not.
16  Q.  Okay, would those be REIT activities or non
17  REIT activities?
18  A.  Those would be non REIT activities we wouldn't
19  pursue.
20  Q.  Why?
21  A.  Because we don't own the property.
22  Q.  Okay, so what we're really talking about then
23  are contract detention facilities and IGSAs when we're
24  talking about a detention contract as opposed to
25  services contracts?

Page 40

1       Let me clear this up and say it a different
2   way.
3       The Adelanto ICE Processing Center is operated
4   pursuant to an intergovernmental services agreement,
5   right?
6   A.  Correct.
7   Q.  It's not a contract detention facility?
8   A.  We consider it a contract detention facility
9   because we own and operate that facility.  The mechanism
10  by which ICE is able to obtain our services is through
11  the IGSA, but we consider it a contract detention
12  facility.
13  Q.  And by we you mean GEO?
14  A.  Yeah.  Yes, GEO.
15  Q.  Okay, so you do not consider it an
16  intergovernmental services agreement or you acknowledge
17  that it's an intergovernmental services agreement but
18  you treat it internally as a CDF?
19  A.  Correct.
20  Q.  The second one I said is right?
21  A.  Treated as a CDF?
22  Q.  Yeah.
23  A.  Yes.
24  Q.  Understanding that there is this third-party
25  Adelanto, right?



DAVID J. VENTURELLA  Volume I
NOVOA vs THE GEO GROUP

June 13, 2019
41–44

Page 41

1     A.  Uh-huh.  (Affirmative response).  Yes.
2        I'm sorry.
3     Q.  You're doing great.
4        Okay, do you have any understanding as to
5  whether Adelanto would be able to continue as an
6  intergovernmental services agreement after the end of
7  this month?
8        MR. DONOHUE:  Object to the form.
9        THE WITNESS:  Can you repeat the question?
10 BY MR. FREE:
11    Q.  Sure.
12       Do you have any understanding as to whether
13 the facility at Adelanto will be able to continue as an
14 intergovernmental services agreement after the end of
15 this month?
16       MR. DONOHUE:  The same objection.
17       THE WITNESS:  So my understanding is that the
18    City of Adelanto provided notice of termination to
19    ICE, so the answer would be no.
20 BY MR. FREE:
21    Q.  No, you don't have any understanding or --
22    A.  No.  I'm sorry.  No that it will not continue
23 as an IGSA.
24    Q.  In other words, if I understand your testimony
25 and the structure correctly, it's going to have to be a

Page 42

1  straight contract detention facility with a contract
2  directly between GEO and ICE if Adelanto's like
3  withdrawal from the intergovernmental services agreement
4  actually happens?
5        MR. DONOHUE:  Object to the form.
6        THE WITNESS:  That would be correct.
7  BY MR. FREE:
8     Q.  As - as you sit here today do you have any
9  reason to believe that once Adelanto follows through on
10 its termination of the intergovernmental services
11 agreement operations will stop at Adelanto?
12    A.  Can you repeat that?
13    Q.  I'll just say it a different way.
14    A.  Sure.
15    Q.  Once Adelanto's out the facility's not going
16 to shut down, is it?
17    A.  I can't say that with absolute a hundred
18 percent certainty.
19    Q.  Okay, why not?
20    A.  Because we don't have a contract in place with
21 the Federal Government, with ICE.
22    Q.  What do you see as the impediments from your
23 perspective to getting that contract, if any?
24    A.  Bureaucracy.  I don't know what's going on
25 because I'm not involved in the - the negotiations.  I

Page 43

1  just know that there's a process in place and we're
2  getting close to the end of the IGSA term, so --
3     Q.  I think I know what you mean when you say
4  bureaucracy, but I think you're talking about Federal
5  Government bureaucracy as opposed to GEO's bureaucracy?
6  Am I correct?
7     A.  Correct.
8     Q.  Okay.
9     A.  Correct.
10    Q.  It's probably a little easier to get contracts
11 done here than in the government I think just generally,
12 right?
13    A.  Yes.
14    Q.  Okay, do you know who's responsible within GEO
15 for the process that you've described that's underway to
16 figure out what the structure's going to be after
17 Adelanto pulls out?
18    A.  I don't think I quite understand.  I mean I -
19 we have an individual in a department that administers
20 the contract and then you have operations that actually
21 service - you know, provide the people and the - and the
22 transportation assets, et cetera, so there are different
23 components of GEO that will provide those activities and
24 services, so depending on what you mean.
25    Q.  Yeah, let me clarify.

Page 44

1     A.  Okay.
2     Q.  You said earlier there's a process that's
3  ongoing?
4     A.  Yes.
5     Q.  Okay, who to your understanding is in charge
6  of that process for GEO?
7     A.  That would be Amber Martin who's our head of
8  Contract Administration.
9     Q.  Okay, and she to the extent that there are
10 negotiations back and forth between GEO and ICE,
11 Miss Martin is the person who is the point of contact,
12 probably not exclusively, but she's the person who's
13 talking to ICE; is that right?
14    A.  That is correct.
15    Q.  Okay, anybody else?
16    A.  In her absence whoever she designates under
17 her.
18    Q.  Where does she work physically?
19    A.  At the Boca Raton office.
20    Q.  She's here in Florida?
21    A.  Yes.
22    Q.  Okay, is there anybody regionally who would
23 serve underneath Miss Martin on - on these negotiations
24 with ICE and GEO for whatever the next phase in the
25 contract at Adelanto is?



Page 45

1    A.  No.  That's all performed out of the Boca
2    office.
3    Q.  Okay, have you been apprised of any
4    discussions between Miss Martin and ICE regarding
5    Adelanto?
6    A.  I mean I'm aware that the process is not
7    concluded.  I don't know the specifics and what they've
8    said to each other, but I just know it hasn't concluded.
9    Q.  Do you have any idea what the rough annual
10   revenues to GEO are from the current agreement?
11   A.  I do not.
12   Q.  Okay, do you know why the City of Adelanto
13   issued its termination notice?
14   A.  I do not.
15   Q.  Do you have any information as you sit here
16   today about the process that the City of Adelanto used
17   to issue that termination notice?
18   A.  I do not.
19   Q.  Okay, and I think I know the answer to this,
20   but I'm just going to ask, you, yourself, have not had
21   any discussions with anybody in the City of Adelanto
22   about the termination of the contract; is that right?
23   A.  That is correct.
24   Q.  Okay.  I'm going to hand you an exhibit that's
25   been marked as Exhibit One.  It's the contract.

Page 46

1    MR. DONOHUE:  Yes.
2    BY MR. FREE:
3    Q.  This is the -- I'm going to represent to you
4    that this is an intergovernmental services agreement
5    entered into May of 2011 between the City of Adelanto
6    and GEO to perform functions that the City entered into
7    a contract with ICE to perform.  Now I understand that
8    this is not necessarily the end of the discussion
9    between these contracting parties.  In other words,
10   there may have been modifications to this contract.  Is
11   that your understanding as well?
12   MR. DONOHUE:  Object to the form.
13   THE WITNESS:  I believe there are
14   modifications to this, yes.
15   BY MR. FREE:
16   Q.  Okay, have you been involved in any of those
17   contract modifications, if they happened, to this
18   intergovernmental services agreement?
19   A.  No.
20   Q.  No.
21   Okay, are you aware of any of the
22   modifications to this agreement that may have happened?
23   A.  I'm aware of a collective bargaining agreement
24   that was renegotiated between GEO and the union that
25   services Adelanto and that there was a request for an

Page 47

1    adjustment based on the change in the CBA terms and
2    conditions, but I mean I'm not sure when that was, but I
3    know that was certainly an activity that required a
4    modification.
5    Q.  All right, and why do you know about that?
6    A.  It came up in a --
7    MR. DONOHUE:  Objection.
8    THE WITNESS:  -- in a business development
9    meeting that was presented by our HR executive.
10   BY MR. FREE:
11   Q.  What do you recall about that meeting?
12   A.  Well, just as it reported.  He reported that
13   the CBA had been successfully renegotiated and the terms
14   and conditions needed to be communicated to ICE.
15   Q.  Do you have any understanding as you sit here
16   today about who is covered within the collective
17   bargaining agreement and employed by GEO?
18   A.  I do not.
19   Q.  All right, if I told you it's just the guards,
20   does that sound about right to you?
21   MR. DONOHUE:  Object to the form.
22   THE WITNESS:  It would make sense.
23   BY MR. FREE:
24   Q.  Okay, do you think that the medical
25   professionals would be subject to a collective

Page 48

1    bargaining agreement?
2    MR. DONOHUE:  Object to the form.
3    THE WITNESS:  I don't know.
4    BY MR. FREE:
5    Q.  Okay, do you remember anything else about that
6    meeting?
7    A.  No.
8    Q.  And who's the Human Resources person that told
9    you about that?
10   A.  Chris Ryan.
11   Q.  What's his title?
12   A.  Executive Vice-President of Human Resources.
13   Q.  And when did that occur roughly, if you can
14   recall?
15   A.  I don't know.
16   Q.  Okay, as a result of the renegotiation of the
17   collective bargaining agreement you said GEO had to
18   notify ICE; is that right?
19   A.  Correct.
20   Q.  Okay, do you know whether the collective
21   bargaining resulted in the members of the union getting
22   paid more or getting more benefits or whether they got
23   less benefits, fewer benefits?
24   MR. DONOHUE:  Object to the form.
25   THE WITNESS:  I don't know the nature of the



Page 49

1   agreement.
2   BY MR. FREE:
3       Q.  Okay.
4       A.  No.
5       Q.  Did it increase or decrease GEO's costs?
6       A.  It would have increased.
7       Q.  Do you have any understanding about whether
8   GEO sought help from ICE in covering those costs?
9           MR. DONOHUE:  Object to the form.
10          THE WITNESS:  We had requested a request for
11  equitable adjustment.
12  BY MR. FREE:
13      Q.  Did it - did you get it?
14      A.  I do not know.
15      Q.  Okay.  All right, if you could please turn to
16  page - at the bottom.  It's page two, I believe.  At the
17  bottom says page 308.  Do you see that?
18          Okay, do you see in paragraph four facility
19  capacity the second to last line it says, "Costs
20  reimbursed by the fixed per day per detainee payment
21  rate that is paid to GEO"?  Do you see where that is?
22      A.  Yes.
23      Q.  Okay, is this contract to the best of your
24  understanding a fixed cost contract?
25      A.  Yes.

Page 50

1       Q.  Okay, what does that mean?
2       A.  That means all of the services that we
3   proposed to ICE is included in the bed-day per diem, so
4   medical, food, guard services are all included in that.
5   It's not billed separately.
6       Q.  Are there other types of government contracts
7   apart from fixed costs contracts?
8           MR. DONOHUE:  Object to the form.
9           THE WITNESS:  I - I don't understand.
10  BY MR. FREE:
11      Q.  Do you know what a cost plus contract is?
12      A.  I know what it is, yes.
13      Q.  Okay, what's your understanding of what a cost
14  plus contract is?
15      A.  A bed you can bill the client for the costs of
16  the services plus a profit or margin.
17      Q.  Is GEO's -- But you understand that that's not
18  what this contract is.  This is a fixed cost contract,
19  right?
20      A.  I would agree.
21      Q.  Okay, if I understand correctly, and help me
22  because this is, I think, part of your job, the way that
23  you arrive at your proposal about the fixed costs that
24  you're going to get is by calculating a per diem rate
25  and proposing it to the government counter party; is

Page 51

1   that right?
2           MR. DONOHUE:  Object to the form.
3           THE WITNESS:  Yes, we calculate a per diem
4   rate.
5   BY MR. FREE:
6       Q.  So that the cost, the measure of the cost that
7   you're presenting to the government that they're then
8   going to pay you at a flat rate, I think, is the per
9   diem?  Do I have that basically right?
10          MR. DONOHUE:  Object to the form.
11          THE WITNESS:  That would -- Yes, that would --
12  BY MR. FREE:
13      Q.  Okay.
14      A.  -- be my understanding.
15      Q.  Okay, tell me what's encapsulated in the per
16  diem rate with a bed-day rate.  Can we use those things
17  interchangeably?
18      A.  Yes.
19      Q.  Okay, so what's encapsulated in the per diem?
20          MR. DONOHUE:  Object to the form.
21          THE WITNESS:  So that would include personnel
22      costs, food costs, uniform costs, utilities.  I
23      mean it's a pretty exhaustive list of categories
24      that are required to run the facility and provide
25      the services that we propose to include, you know,

Page 52

1       equipment, copiers, desks, et cetera.
2   BY MR. FREE:
3       Q.  When you say that we propose your - I think
4   you mean that GEO proposes to ICE; is that right?
5       A.  Correct.
6       Q.  Okay, do you have a government website that
7   you can look at and see a - a rate that the Federal
8   Government sets for how much you should buy a desk for
9   or some of the other things that you've listed or do
10  you, GEO, go ahead and figure out what's the best, you
11  know, cost we can get for a desk?
12      A.  We figure that out.
13      Q.  Okay, so that's not set?  Your costs in terms
14  of acquisition of what you need to do the contract
15  that's not set by the Federal Government, that's
16  something you as the contractor figure out and then
17  present to the Federal Government?
18      A.  Correct.
19      Q.  Is that right?
20      A.  Correct.
21      Q.  Is it fair to say that part of your
22  competitive advantage as a government contractor would
23  be in figuring out the way to get the lowest cost on
24  certain items so that you can have the best bed-day
25  rate?



Page 53

1        MR. DONOHUE:  Object to the form.
2        THE WITNESS:  Yeah, I would agree that we try
3   to provide the - the lowest cost that would be
4   sufficient to provide the services or equipment
5   that we propose to provide to the government.
6   BY MR. FREE:
7        Q.   Okay, do you have any understanding as to
8   whether this contract was competitively bid?
9        A.   This was before my time --
10       Q.   Okay.
11       A.   -- so I don't know.
12       Q.   Do you know since this contract was entered
13  into in 2011 whether ICE has announced or, in fact,
14  re-competed this contract and solicited other bids to do
15  the same thing?
16       A.   There was --
17       MR. DONOHUE:  Object to the form.
18       THE WITNESS:  There was recently a request for
19  information issued by ICE a few months ago about
20  bed space in that part of the - the state.  I think
21  it's for the entire state, so potentially this
22  facility could be part of a - a new procurement.
23  BY MR. FREE:
24       Q.   Do you recall when that request for
25  information went out approximately from ICE?

Page 54

1        A.   A couple months ago.
2        Q.   Okay, so this year?
3        A.   Yes.  This year.
4        Q.   What else do you remember about it?
5        A.   Again they were seeking information, location,
6   capacity.  I think those were the two primary
7   requisites, of capacity and location.
8        Q.   How did you find out about it?
9        A.   It was issued through the government website.
10       Q.   How did you find out it was on the government
11  website?
12       A.   We have alert notices that let us know when a
13  particular agency issues that type of activity.
14       Q.   Okay, I think you originally said for that
15  part of the state and then you may have said also that
16  it could be the whole state.
17       A.   Yeah, I think it's for the entire state, but
18  I'm not entirely sure.
19       Q.   Okay, do you know as you sit here today
20  whether it was for the Los Angeles field office or a
21  different field office or whether it was simply the
22  State of California?
23       A.   I don't recall --
24       Q.   Yeah.
25       A.   -- if it was --

Page 55

1        Q.   Okay.
2        A.   -- our field office.
3        Q.   Do you know whether the government website is
4   public and publicly accessible, or is it just available
5   to existing contractors?
6        A.   It's public.
7        Q.   So any competitor can look at it?
8        A.   Anyone.
9        Q.   Anyone?
10       A.   Yeah.
11       Q.   If you knew where to look?
12       A.   Yeah.
13       Q.   Yeah.
14       Okay, is GEO actively preparing a response to
15  the request for information?
16       A.   We prepared our response to the request for
17  information --
18       Q.   And --
19       A.   -- and it was submitted.
20       Q.   Okay, when?
21       A.   In May.
22       Q.   All right, roughly what was the content of the
23  response?
24       A.   That we had a facility available in the City
25  of Adelanto, that we had a facility available in

Page 56

1   Bakersfield and that was it, yeah.  I mean those are the
2   only two facilities we have that could meet those
3   requirements.
4        Q.   What else did you tell the government about
5   that?
6        MR. DONOHUE:  Object to the form.
7        THE WITNESS:  Just the size, the location,
8   when it would be available.
9   BY MR. FREE:
10       Q.   And I believe the facilities that you would be
11  referring to are basically out of a - in the Adelanto
12  Processing Center, both of which are in existence; is
13  that right?
14       A.   That is correct.
15       Q.   Okay, so you don't have another facility in
16  Adelanto?
17       A.   No.
18       Q.   Okay.
19       A.   No.
20       Q.   All right, do you recall roughly the numbers
21  of beds that ICE is looking to fill?
22       A.   I do not.
23       Q.   Do you have any idea as to whether ICE has
24  responded to your request for information?
25       A.   They have not.



Page 57

1    Q.  What's the next step for ICE to take after
2    they've gotten your response?
3    A.  I would anticipate a request for proposal to
4    be issued.
5    Q.  Do you know approximately how long that takes
6    for ICE to do?
7    A.  Historically very long, so I - but I don't
8    know.
9    Q.  What's very long in this time space?  Is it
10   three months?  Is it a year?
11   A.  It could be years.
12   Q.  Okay.
13   A.  It could be years.
14   Q.  Do you have any understanding as to whether
15   the Adelanto - The City of Adelanto's notice of
16   termination was a reason stated by ICE for submitting
17   the request for information?
18   A.  No, I do not know.
19   Q.  Okay, do you know whether they're related at
20   all?
21   A.  I do not know.
22   Q.  Okay, do you know of any competitors in the
23   State of California who could meet the needs of ICE
24   potentially responsive to this request for information?
25   A.  Yes.

Page 58

1        MR. DONOHUE:  Object to the form.
2        THE WITNESS:  Yes.
3    BY MR. FREE:
4    Q.  Who?
5    A.  CoreCivic.
6    Q.  How?
7        MR. DONOHUE:  The same objection.
8        THE WITNESS:  They have a facility in
9        California City that is currently leased to the
10       State of California, but potentially they could
11       offer that to ICE.
12   BY MR. FREE:
13   Q.  Where is California City just geographically?
14   Is it in Southern California or Northern California?
15   A.  I think it's central.
16   Q.  Okay, and it's currently leased to the State?
17   A.  That's my understanding, yes.
18   Q.  Do you know how many beds?
19   A.  Over two thousand.
20   Q.  Okay, do you have any understanding as to any
21   limitations in the State of California that could affect
22   these contracts?
23       MR. DONOHUE:  Object to the form.
24       THE WITNESS:  Yeah, I'm not sure how to answer
25       that.

Page 59

1        The current contracts or future contracts?
2    BY MR. FREE:
3    Q.  Let me ask a better question.
4    A.  Okay.
5    Q.  Does the State of California impose any
6    limitations on private contracting with immigration
7    detention to your understanding?
8    A.  Between the Federal Government and a private
9    provider, not to my knowledge.
10   Q.  Okay, does the State of California impose any
11   limitations on its own state and local governments in
12   permitting sites, in other words, issuing permits to
13   sites that will serve as Federal detention, private
14   immigration detention sites --
15       MR. DONOHUE:  Objection.
16   BY MR. FREE:
17   Q.  -- as far as you understand?
18       MR. DONOHUE:  Sorry.
19       Object to the form.
20       THE WITNESS:  My understanding that there is a
21       process in place for any activity related to the
22       siting of a - a detention facility for the purposes
23       to hold immigration detainees.  I don't know if it
24       prevents them, but I know there's a process.
25   BY MR. FREE:

Page 60

1    Q.  What else do you know about that?
2    A.  I think that's probably the key component of
3    it, but --
4    Q.  Okay, can you tell me what the process is or
5    what you understand about the process?
6    A.  I think there's - there's a requirement to
7    have two public hearings within a hundred and eighty
8    days before a decision is rendered.
9    Q.  A requirement for whom?  Who has to hold the
10   hearings?
11   A.  The - the government entity.  I would assume
12   it was the Planning Commission or the -- Whoever's
13   responsible for permitting and granting those kind of
14   zoning variances, et cetera.
15   Q.  Do you know whether new contracts between
16   private immigration detention contractors and state and
17   local governments are California - in California would
18   be permissible under California law currently?
19       MR. DONOHUE:  Object to the form.
20       THE WITNESS:  Can you repeat that?
21   BY MR. FREE:
22   Q.  Let me ask a better question.
23   A.  Okay.
24   Q.  Do you know whether cities and counties could
25   respond to this request for information under current



Page 61

1  California law?

2     A.  I don't know.

3     Q.  Okay, do you have any understanding as to

4  whether California law permits to your knowledge and

5  understanding a city or a county or a jail to enter into

6  a new detention contract for ICE detention?

7        MR. DONOHUE:  Object to the form.

8        THE WITNESS:  Enter into a new contract with

9  whom?

10  BY MR. FREE:

11     Q.  With you.  With GEO.

12     A.  I don't know.

13     Q.  Okay, are you aware of anybody else who

14  submitted a request for information response?

15     A.  I -- No, I'm not.

16     Q.  Okay, are you aware of any other competitor

17  who could meet the needs laid out in the request for

18  information by ICE apart from CoreCivic?

19     A.  I do not.

20     Q.  Okay, have you or anybody who works for you as

21  far as you know had any direct conversations with ICE

22  about the request for information?

23     A.  No.

24        MR. DONOHUE:  Okay, can we take a break?

25        MR. FREE:  What time is it?

Page 62

1        Yeah.  Sure.

2        9:52.

3        THE VIDEOGRAPHER:  We are going off the video

4  record 9:52 a.m.

5        (Whereupon, there was a brief recess observed)

6        THE VIDEOGRAPHER:  We are back on the record

7  10:08 a.m.

8  BY MR. FREE:

9     Q.  Mr. Venturella, before our break we were

10  talking about this request for information from ICE for

11  immigration detention beds in California that GEO

12  responded to in May.  I want to pick up with that

13  discussion if I can, okay?

14        Was that for adult immigration detention?

15     A.  Yes.

16     Q.  Okay, it does not include any family detention

17  centers to your knowledge?

18     A.  It does not.

19     Q.  Okay, is - as you sit here today do you recall

20  approximately the number of beds ICE is looking to fill

21  with this contract?

22     A.  I do not.

23     Q.  Do you know whether this request for

24  information represents an increase in the total capacity

25  that ICE would have to detain people in California or

Page 63

1  whether it could essentially if you - if GEO does not

2  get the contract whether ICE could fill its current

3  capacity by using this request for information?

4        Do you understand my question?

5        MR. DONOHUE:  Well, I don't, so I --

6        MR. FREE:  Okay, let me --

7        MR. DONOHUE:  -- object to the form.

8  BY MR. FREE:

9     Q.  Let's try it again.

10        So you don't know how many beds the RFI has,

11  right?

12     A.  I don't recall the specific number.

13     Q.  Do you know if it's a hundred or a thousand?

14  Any sort of order of magnitude?

15     A.  I think it's over a couple thousand.

16     Q.  Okay, how many beds are at Adelanto right now?

17     A.  The capacity is one thousand nine hundred and

18  forty.

19     Q.  Okay, do you know as you sit here today

20  whether the RFI asks for more or less than

21  nineteen-forty?

22     A.  It would be more than nineteen-forty.

23     Q.  Okay, do you know how much more?

24     A.  I do not.

25     Q.  Okay, so help me understand.  You've submitted

Page 64

1  a response to this request for information and you've

2  said we have two facilities, we have Mesa Verde and we

3  have Adelanto, right?

4     A.  Correct.

5     Q.  Okay, and those are the two facilities that we

6  propose to use to meet the Agency's needs?

7        MR. DONOHUE:  Object to the form.

8        THE WITNESS:  GEO proposed those two

9  facilities.

10  BY MR. FREE:

11     Q.  In response to the RFI?

12     A.  In response to the RFI.

13     Q.  Okay, so approximately three hundred beds at

14  Mesa Verde?  Do you know?

15     A.  Four.

16     Q.  Four hundred.

17        Okay, so you're talking a total of

18  twenty-three hundred and forty beds, right?

19     A.  Correct.

20     Q.  In two different places?

21     A.  Correct.

22     Q.  Okay, do you know whether ICE asked for more

23  than twenty-three forty in its RFI?

24     A.  I don't recall the exact number.

25     Q.  Okay, as part of your preparation of the



Page 65

1 response to the RFI did you conduct a business analysis
2 of how you would pay for the services that you're
3 offering to the government?
4      MR. DONOHUE:  Object to the form.
5      THE WITNESS:  I don't understand the question.
6 BY MR. FREE:
7    Q.   Do you know approximately -- Let me ask it a
8 different way.
9      Do you think it would increase or decrease
10 GEO's revenues to get awarded whatever contract comes at
11 the end of this RFI, RFP process?
12     MR. DONOHUE:  Object to the form.
13     THE WITNESS:  That would be hard to determine
14     or to answer without knowing what the requirements
15     would be of the - of the final RFP.
16 BY MR. FREE:
17    Q.   Okay, I'm not fully versed in all of your
18 operations and so just help me understand, okay?
19 Because this is not a gotcha or a trick.  None of these
20 are.  I'm just trying to understand.
21     I don't understand why a company would bid for
22 a contract if they were going to make less on that
23 contract than what they're making now.  In other words,
24 if my revenues as a company were going to go down by
25 entering into this new agreement unless I was going to

Page 66

1 eliminate the existing revenue altogether I probably
2 wouldn't bid that agreement.  Do you see what I'm
3 saying?  So my assumption would be that if GEO submitted
4 a response to the RFI, it thought it - it probably
5 thinks it's going to make more money if it gets the
6 contract?
7      MR. DONOHUE:  Object to the form.
8      THE WITNESS:  I think that's an incorrect
9      assumption.
10 BY MR. FREE:
11    Q.   Okay.
12    A.   In a competitive procurement to be competitive
13 you might have to lower your per diem and therefore
14 lower your revenues and profit to win.
15    Q.   Okay, any other reasons that assumption would
16 be incorrect?
17    A.   No.
18     MR. DONOHUE:  Object to the form.
19     Sorry.
20 BY MR. FREE:
21    Q.   So you say in a competitive -- Would you call
22 this a bid structure at this point?  Would you call this
23 like you and CoreCivic, GEO and CoreCivic bidding for
24 this contract at this point or are we not there yet?
25    A.   We are not there yet.

Page 67

1    Q.   Okay, do you have any idea what the - whether
2 GEO has already thought through what the per diem would
3 look like?
4    A.   We have not.
5    Q.   Okay, and so I guess what I hear you saying,
6 and I really appreciate this answer is, you may have to
7 take a lower per diem in order to get the contract --
8      MR. DONOHUE:  Object.
9 BY MR. FREE:
10    Q.   -- in order to be competitive?  Is that what
11 you're implying here?
12     MR. DONOHUE:  Object to the form.
13     THE WITNESS:  We would have to do an analysis
14     and understand what the competition, the
15     competitive landscape is and make a determination
16     at some point what the per diem should be.
17 BY MR. FREE:
18    Q.   At this point I think the only competitor that
19 you've told me about is CoreCivic.  Are there any
20 others?
21    A.   That's the only one I'm aware of at this
22 point.
23    Q.   █████████████████████████████
24 ██████████████████████████████████
25 ██████████████████████████

Page 68

1      MR. DONOHUE:  ████████████
2      THE WITNESS:  ██████████████████████
3 █████████████████████████████
4 ███████████████████████████
5 ████████████████████████████
6 ████████████████████████████████
7 ██████████████████████████████████
8 █████████████████████████████████
9 ██████████████████████████████
10 ███████████████████████████████████
11 █████████████████
12 BY MR. FREE:
13    Q.   So there's one competitor, if I understand
14 your testimony, and that's CoreCivic; is that right?
15     MR. DONOHUE:  Object to the form.
16     THE WITNESS:  I only know of one competitor.
17     There could be more.
18 BY MR. FREE:
19    Q.   Who else could that be?
20     MR. DONOHUE:  Object to the form.
21     THE WITNESS:  It could be Management and
22     Training Corporation, it could be LaSalle
23     Corrections, and again I don't know if counties or
24     other law enforcement, local law enforcement or
25     state - law enforcement could participate in - in



Page 69

1    that procurement.  I just don't know.
2    BY MR. FREE:
3      Q.  You don't know whether California or some
4    local governments could participate in its procurement?
5      A.  I don't.
6      Q.  Okay, so that's the competitor.
7          The location I think you told me was
8    California City?  That's the one that you know about,
9    this two thousand bed facility that's currently leased
10   to the State of California?
11     A.  Correct.
12     Q.  The utility rates would be I think the same
13   for both companies.  Is there any reason that they
14   wouldn't?
15         MR. DONOHUE:  Object to the form.
16         THE WITNESS:  I don't know what the utility
17   rates would be in California City, so I - I don't
18   know.
19   BY MR. FREE:
20     Q.  Oh, okay.  So you're saying the utility rates
21   could be lower there than in Adelanto?
22     A.  Yes.
23     Q.  But those - both of those things would be
24   knowable to each company, right?
25     A.  Yes.

Page 70

1          MR. DONOHUE:  Object to the form.
2    BY MR. FREE:
3      Q.  You can't do like a private PG&E contract for
4    your power bill, or do you know?  I don't know.
5      A.  Not that I'm aware of.
6      Q.  Okay, and the utilities, they're the rate,
7    right?
8      A.  Right.
9      Q.  Okay, the same thing with taxes; is that
10   right?
11         MR. DONOHUE:  Object to the form.
12   BY MR. FREE:
13     Q.  These things are known and knowable and
14   they're equal to both competitors?
15     A.  Correct.
16     Q.  California's not going to give you a better,
17   you know, land - land tax rate?
18         You know what?  Forget it.
19         Did you say labor costs already?
20     A.  I did.
21     Q.  Okay, so what would you think about when
22   you're talking about labor costs?
23     A.  What the hourly rate would be with the - for
24   the various positions to support a detention facility.
25     Q.  ███████████████████████████

Page 71

1    ███████
2      A.  ████████████████████████
3    ██████████████████████████████
4    ██████████████████████████████
5    ██████████████████████████████
6    ████████████████████████████████
7    ██████████████████████████████
8    ██████████████████████████
9    ██████████████████████████
10   ██████████████████████████████
11   ██████████████████.
12     Q.  What else?
13     A.  About?
14     Q.  Labor costs.
15     A.  I think that's - I think that's it.
16     Q.  The prevailing wage rates that the Federal
17   Government sets shouldn't change based on the
18   contractor, should they?
19     A.  They change based on location.
20     Q.  Right.  Okay, but the company -- All things
21   being equal, if they're doing the same task like the
22   same labor like job determination, let's call it a cook,
23   you know, one, so you're saying -- Let me back up.
24         You're saying they could be different?  The
25   Federal Government's prevailing wage rate could be

Page 72

1    different in California City than Adelanto?
2      A.  Correct.
3      Q.  Okay, do you know whether they are?
4      A.  I do not.
5      Q.  All right, and is the same true about the
6    State's determinations if any have been made?
7          MR. DONOHUE:  Object to the form.
8    BY MR. FREE:
9      Q.  That they could be different from --
10   California could have a different prevailing rate in
11   Adelanto than it does in --
12     A.  I haven't done the analysis, so I don't know.
13     Q.  ████████████████████████
14   ████████████████████████████████
15   ██████████████████████
16         MR. DONOHUE: ███████████████.
17         THE WITNESS: ██████████████████
18   ██████████████████████████████
19   ██████████████████████████
20   ██████████████████████████
21   ████████████████████████████
22   ██████████████████████████████
23   ██████████████████████████
24   ██████████████████████████████
25   ██████████████████████



Page 73

1   BY MR. FREE:
2       Q.   I presume you know your costs at Adelanto,
3   right?
4           MR. DONOHUE:  Object to the form.
5       THE WITNESS:  I don't know all of the costs at
6   Adelanto, but somebody in the company does.
7   BY MR. FREE:
8       Q.   GEO - GEO knows what the - the facility
9   structure is, what the bond allegations are?  GEO has
10  that information at its disposable, right?  At its
11  disposal, right?
12      A.   Correct.
13      Q.   Okay, and so the thing that you're trying to
14  figure out if you're competing in this contract is what
15  are those factors that you described for California City
16  in that facility, right?
17          MR. DONOHUE:  Object to the form.
18          THE WITNESS:  California City or any --
19  BY MR. FREE:
20      Q.   Or any other competitor.
21      A.   Yes.
22      Q.   Okay, but we've only identified one, right?
23          MR. DONOHUE:  Object to the form,
24  mischaracterizes --
25          THE WITNESS:  As of --

Page 74

1           MR. DONOHUE:  -- asked and answered.
2           THE WITNESS:  As of now that's the only one I
3   know, but we haven't initiated our analysis yet.
4   BY MR. FREE:
5       Q.   Okay, when would you do that typically?  When
6   would you initiate the analysis?  Would it be once the
7   RFP goes out?
8       A.   When the RFP goes out.
9       Q.   Okay.  All right, anything else that you would
10  take into consideration when you're thinking about how
11  to submit to the Federal Government the most competitive
12  bid if this RFI eventually gets to an RFP and you're
13  trying to get the contract?  What else would you take
14  into consideration?
15          MR. DONOHUE:  Object to the form.
16          THE WITNESS:  Can you repeat that?
17  BY MR. FREE:
18      Q.   Sure.
19  So GEO's going to submit something to the
20  Federal Government to try and get this contract is my
21  understanding of what's going to happen; is that right?
22      A.   Correct.
23      Q.   Okay, and you've just described to me a number
24  of factors that GEO will consider and plug into a model
25  before it makes that submission to the Federal

Page 75

1   Government?  Did I understand that testimony correctly?
2       A.   Correct.
3       Q.   Okay, and I understand those not exhaustively,
4   but I - you've talked about labor, right?
5       A.   Yes.
6       Q.   Okay, you talked about I'm going to call it
7   facility overhead.  I know that that's probably not what
8   you would use.  If there's another term that you would
9   use let me know, but when I'm talking about facility
10  overhead I'm talking like the debt obligations of owning
11  it or having a bond on it.  That's what I understand
12  you're talking about when you're saying --
13      A.   Yes.
14      Q.   Yeah.
15          Okay, and then we've got taxes and we've got
16  like property taxes; is that right?
17      A.   Correct.  Yeah.
18      Q.   And utilities?
19      A.   Correct.  Right.
20      Q.   What else do you take into consideration when
21  you're building your model to make the most competitive
22  bid to the Federal Government on behalf of your
23  shareholders?
24          MR. DONOHUE:  Object to the form.
25          THE WITNESS:  Again it's not my area of

Page 76

1   expertise on what all of the categories are, but I
2   can say a lot of it is also going to be driven by
3   the requirements of the RFP and right now those
4   aren't known to us, so it's hard to speculate what
5   else would we have to consider in - in building up
6   our - our costs, but again I'm just not the expert
7   on it.  This is not what I do at the company.
8   BY MR. FREE:
9       Q.   Is that Miss Martin that you talked about
10  earlier who would be primarily responsible for that or
11  is it somebody else?
12      A.   All pricing determinations would come out of
13  our CFO's office.
14      Q.   Who's that?
15      A.   Who's our CFO?
16      Q.   Uh-huh.
17      A.   Brian Evans.
18      Q.   And so when you say I'm not the expert on
19  that, it's somebody else, it's Mr. Evans?
20      A.   All of -- So he is responsible for that.
21  Obviously he has -- I shouldn't say obviously.  He has
22  staff that have the appropriate backgrounds to help
23  determine the pricing and the cost, et cetera.
24      Q.   Okay, have you personally seen GEO's model
25  that you would -- I think you said model earlier, right?



Page 77

1      A.  I -- No, I have not personally seen the model.
2          You know, I think model is kind of used
3   loosely.  I don't know what - all the algorithms and
4   formulas that go into that so, no, I haven't seen --
5      Q.  Okay.
6      A.  -- that.  I've seen a screen shot of the
7   categories or a printout of the categories, but I don't
8   know all the math that goes behind it.
9      Q.  When you say the categories, are you talking
10  about the inputs that we've discussed so far or
11  something else?
12     A.  It would be those - those inputs.
13     Q.  Okay, and can you think of any other inputs
14  that would go into the - the model, for lack of a better
15  word, that you've seen the screen shot of?
16         MR. DONOHUE:  Object to the form.
17         THE WITNESS:  Again I just can't recall all of
18     the categories.
19  BY MR. FREE:
20     Q.  Okay, in addition to the prevailing wage
21  determinations and collective bargaining agreements do
22  you include as a labor cost nonexempt executive
23  compensation or administrators who might not have their
24  salary or their wage determined by the Federal
25  Government or the State Government?

Page 78

1          MR. DONOHUE:  Object to the form.
2          THE WITNESS:  Can you be a little more
3      specific?
4   BY MR. FREE:
5      Q.  Yeah.  Sure.
6          So the Federal Government and the prevailing
7   wage sets, you know, wages for like various positions,
8   right?
9      A.  Correct.
10     Q.  All right, warden, an assistant warden are not
11  within those wage rates, right?  GEO gets to figure out
12  what it's going to pay those people?
13     A.  I don't know if they are or aren't in those --
14     Q.  Oh, okay.
15     A.  -- DOL.
16     Q.  Do you know the difference between exempt and
17  nonexempt labor?
18     A.  I don't.  I'm not a labor expert.
19     Q.  Fair enough.
20         I'm going to put the turtle on the table.
21         MR. DONOHUE:  Oh, please don't.
22  BY MR. FREE:
23     Q.  Is profit one of the considerations that you
24  put into the model when you're figuring out what - that
25  bed rate you're going to propose to the government?

Page 79

1          MR. DONOHUE:  Object to the form.
2          THE WITNESS:  Profit is a category.
3   BY MR. FREE:
4      Q.  That's a factor in your model, right?
5      A.  Correct.
6      Q.  Okay, as it should be, right?  You're a
7   publicly traded company?
8          MR. DONOHUE:  Object to the form.
9          THE WITNESS:  It's a consideration.
10  BY MR. FREE:
11     Q.  Okay, do you have any understanding right now
12  whether -- I'm going to -- These next set of questions
13  are going to be about Adelanto, okay, and I know that
14  you're not an expert on that and you haven't reviewed
15  more than a couple pages of the agreement, so if you
16  don't know, you just tell me you don't know, okay?
17     A.  Okay.
18     Q.  All right, do you have any understanding of
19  whether or not Adelanto if your assumptions about what
20  it's going to cost you, GEO, to provide the services to
21  the Federal Government are wrong, right, so, you know,
22  you've --
23     A.  I'm sorry.  I didn't hear.
24     Q.  Sure.  Okay, so I understand that you have a
25  bed-day rate that you're paid by the Federal Government

Page 80

1   as part of your contract?
2      A.  Uh-huh.  (Affirmative response)?
3      Q.  Yeah?
4          And I understand it's a fixed price agreement?
5      A.  Yes.
6      Q.  Not a cost plus agreement, not any other type
7   of agreements, a fixed price agreement, right?
8      A.  Correct.
9      Q.  Okay, and I understand that to mean that you
10  have calculated - GEO has calculated all of the costs
11  that it's going to incur in order to meet the
12  requirements that the Federal Government has set forth,
13  you figure that out and you've built it into your per -
14  your bed-day rate, right, and if your costs are more you
15  don't get to just as a matter of course pass those
16  increased costs on to the Federal Government; is that
17  right?
18         MR. DONOHUE:  Object to the form.
19         THE WITNESS:  That is correct.  If our model
20     was wrong we eat those costs.
21  BY MR. FREE:
22     Q.  Okay, so under a fixed price agreement if
23  your - if you can find ways to say save like a dollar on
24  the - maybe like the clothing that you would procure for
25  the people who are there under what you thought then you



Page 81

1  can really get more out of the per diem than what the
2  expectation was, right?
3        MR. DONOHUE: Object to the form.
4        THE WITNESS: Again if our cost estimates were
5  high or low, yes, it would have an impact.
6  BY MR. FREE:
7     Q.  So if they're higher you eat the costs,
8  conversely if they're lower you keep what the Federal
9  Government's giving you, right, under a fixed price
10  agreement?
11        MR. DONOHUE: Object to the form.
12        THE WITNESS: Yes.
13  BY MR. FREE:
14     Q.  Okay, so GEO will do everything it can I would
15  think in this round of procurement to make sure that
16  you're able to ascertain as much as you can what
17  everything that you're going to give the government is
18  going to cost GEO?
19        MR. DONOHUE: Object to the form.
20        THE WITNESS: We're certainly going to
21  validate the - the model to make sure that the cost
22  is correct.
23  BY MR. FREE:
24     Q.  Okay, how would you validate the model?
25     A.  I don't know how they would validate the

Page 82

1  model.  Again it's just not my area of expertise, so --
2     Q.  All right, as a dumb guy when I think validate
3  the model I would think you figured out what it's going
4  to cost you to buy soap.  GEO doesn't make soap, right,
5  so you're going to have to buy it from someone.  You
6  figured out what it's going to cost you to buy soap and
7  you want to make sure that that cost is correct and
8  validating the model would be just confirming that that
9  is the actual price that it's going to cost us for soap,
10  you know, as an input into this model.  Is that kind of
11  what you're talking about?
12        MR. DONOHUE: Object to the form.
13        THE WITNESS: I wouldn't - I wouldn't argue
14  with that.  I mean it's I'm sure one way of
15  validating.  I just don't know who does the
16  validation, how they do it, what they compare
17  against.
18  BY MR. FREE:
19     Q.  Okay, but someone at GEO does that?
20     A.  I'm sure there are many people that do that.
21     Q.  Okay, does the Federal Government as part of
22  any of GEO's contracts set a ceiling on the profit
23  margin the company can take?
24     A.  Yes.
25     Q.  Which contracts?

Page 83

1     A.  All of the contracts.
2     Q.  Are they in the text of the contract, these
3  ceilings?
4     A.  No.
5     Q.  How does the Federal Government set that
6  ceiling?
7     A.  Through the -- Well, how do they set it?  I
8  think it's set in the Federal Acquisition Regulations
9  certain types of contracts that are permissible profit
10  or profit margins, I don't know how that's defined
11  there, and through the negotiation process through the
12  review of our proposal, cost proposal in particular they
13  will determine whether or not that profit is reasonable
14  within the FAR.
15     Q.  Do you as you sit here today know what the
16  ceiling, if any, is at Adelanto on the acceptable level
17  of profit that the Federal Government has set?
18     A.  I don't know what the FAR ranges are.
19     Q.  Okay, so I think I understand your testimony
20  to be that if I wanted to know what the Federal
21  Government's using in setting that limit I could look at
22  the Federal Acquisition Regulations; is that right?
23        MR. DONOHUE: Object to the form.
24        THE WITNESS: That's where I would go.
25  BY MR. FREE:

Page 84

1     Q.  Okay.
2     A.  Yes.
3     Q.  All right, do you know any facilities as you
4  sit here today where a profit ceiling is included in the
5  contract between GEO and ICE?
6        MR. DONOHUE: Object to the form.
7        THE WITNESS: I'm not aware.
8  BY MR. FREE:
9     Q.  Okay.
10        Do you know whether GEO is still serving any
11  debt obligations on its purchase of the Adelanto
12  Detention Facility?
13     A.  I do not know.
14     Q.  If GEO ends up having to spend more than it
15  thought it was going to spend on any particular item,
16  let's say the collective bargaining agreement, for
17  example, I believe you said they can seek an equitable
18  adjustment?  Are you -- Not about this specific
19  question, but there's an equitable adjustment process
20  where you go back to the Federal Government and say it's
21  going to cost us more, can we have more money?  Is that
22  basically the way it works?
23        MR. DONOHUE: Object to the form.
24        THE WITNESS: There is a process to request a
25  rate adjustment.  I don't know all the

Page 85

1    circumstances that would trigger that, but there is
2    a process.
3   BY MR. FREE:
4       Q.  Okay, but unless the government agrees to pay
5   GEO more, GEO is going to receive the per diem rate that
6   was proposed and agreed upon regardless of what GEO
7   actually ends up having to pay to deliver the service?
8       MR. DONOHUE:  Object to the form.
9       THE WITNESS:  Right.  The per diem rate is
10      what we would be paid.
11  BY MR. FREE:
12      Q.  Okay, so if costs go up or down to GEO again
13  you eat the up and you keep -- GEO eats the, you know,
14  the increased costs and it keeps the benefit of the
15  lower costs generally; is that right?
16      MR. DONOHUE:  Object to the form, asked and
17      answered.
18      THE WITNESS:  Correct.
19  BY MR. FREE:
20      Q.  Okay, cool.
21          What is a blended per diem rate?
22      A.  A blended per diem rate is - it's the - the
23  guaranteed rate plus the incremental per diem, so if the
24  government decides to use the extra capacity the -
25  there's a different per diem rate for that and I believe

Page 86

1   you add the two, divide it and come up with a blended
2   per diem rate.
3       Q.  How does GEO determine the difference between
4   what it's going to offer as the per diem, like the
5   guaranteed capacity and then the per diem for whatever
6   in addition that the government decides to use?
7       MR. DONOHUE:  Object to the form.
8       THE WITNESS:  That's all determined by the
9       costs required to support the - the minimum
10      guaranteed and all the services that we propose and
11      in the same for the incremental, so whatever costs
12      are required to provide those services are factored
13      in.
14  BY MR. FREE:
15      Q.  Okay, do you happen to know the blended per
16  diem at Adelanto?
17      A.  I do not.
18      Q.  Do you know what the minimum bed guaranteed
19  cost is?
20      A.  The cost?
21      Q.  The per diem, the minimum bed guaranteed per
22  diem rate.
23      A.  I do not.
24      Q.  Okay, if you would please flip to page 480 on
25  the document in Exhibit One that's in front of you.

Page 87

1   It's at the bottom here.  It's 480.
2       A.  Oh.
3       Q.
4
5
6
7
8       A.
9       Q.
10
11
12      A.
13      Q.
14
15
16
17
18      MR. DONOHUE:
19  BY MR. FREE:
20      Q.
21      A.
22      Q.
23
24      THE VIDEOGRAPHER:
25  BY MR. FREE:

Page 88

1       Q.
2
3
4
5       A.
6       Q.
7
8
9       A.
10      Q.
11
12      A.
13
14
15
16      A.
17      Q.
18
19      A.
20
21
22
23
24
25





Page 89

1 ██████████████████████████████████

2   Q.  ████████████████

3   A.  █████████████████████

4 ██████████████████████████████

5 ████████████████████████████

6   Q.  Is it fair to say that either ICE or GEO could

7 initiate that change in per diem or try to initiate it

8 if you're going to try and agree, so GEO could ask to

9 increase the per diem or ICE could ask to reduce the per

10 diem?  Is that fair?

11       MR. DONOHUE:  Object to the form.

12       THE WITNESS:  I don't think that the premise

13       is correct.  I mean there certainly is a process

14       that allows for GEO or a provider to initiate a

15       request for an equitable adjustment and I would

16       assume there's the same for the government to again

17       initiate GEO to submit a proposal for additional

18       services or they could reduce services which could

19       impact the per diem as well.

20 BY MR. FREE:

21   Q.  So what part of the premise did you think was

22 incorrect in my question?

23   A.  Well, I guess I just didn't completely

24 understand where you're going with it, but there are

25 prescribed processes in the FAR that allow either party

Page 90

1 to initiate.  For us it's a request I think on GEO.  On

2 the Feds it would be not a request but you shall, but

3 I - again I know there is a process.

4   Q.  Yeah?

5   A.  Yeah.

6   Q.  Just as a layperson it would seem to me that

7 the only other option that GEO would have if the

8 government says we're going to reduce your rate is,

9 well, we don't want to do the contract anymore, right?

10       MR. DONOHUE:  Object to the form.

11 BY MR. FREE:

12   Q.  You're saying for the government it's not

13 really a request?

14       MR. DONOHUE:  Object to the form.

15       THE WITNESS:  If the government determines

16       that they don't no longer need specific services

17       then we would have to adjust.

18 BY MR. FREE:

19   Q.  Okay, I'm going to hand you what we are

20 marking as Exhibit Ten.

21       (Whereupon, Exhibit 10 was marked)

22 BY MR. FREE:

23   Q.  So Exhibit Ten is what I think you were

24 talking about earlier or an example of what I think you

25 were talking about earlier when there's a different

Page 91

1 collective bargaining agreement between GEO and the

2 people who work there that might increase GEO's costs

3 that is then going to need to be reflected in the - the

4 costs to GEO and therefore the bed-day rate.  Is that a

5 fair summarization of what's happening in this document?

6       MR. DONOHUE:  Object to the form.

7       THE WITNESS:  Your question again?

8 BY MR. FREE:

9   Q.  Do you recognize this document?

10   A.  I don't.  It's the first time I've seen it.

11   Q.  Okay, do you know generally what this

12 government form, Standard Form 30 is?

13   A.  By the title it's an amendment of the

14 solicitation or modification of a contract.

15   Q.  Who are the parties?

16   A.  ICE and the City of Adelanto.

17   Q.  When you see in box two it says amendment

18 modification number P19, do you see that?

19   A.  Excuse me.  Yes.

20   Q.  To me that means there's probably eighteen

21 modifications before that happens.  Is that what that

22 means to you?

23       MR. DONOHUE:  Object to the form.

24       THE WITNESS:  I do not know.

25 BY MR. FREE:

Page 92

1   Q.  Okay, it's signed by the mayor on

2 October 28th, 2015.  That's box 15C.  Do you see that?

3   A.  I do.

4   Q.  So I understand this to mean that that's -

5 that's when this modification at least was signed by the

6 City of Adelanto?  Is that your understanding of it as

7 well?

8   A.  That's what it appears to be.

9   Q.  Okay, and in box E14 - or excuse me - 14,

10 description of amendment modification, do you see that?

11   A.  Yes.

12   Q.  The, I guess, third line of text says, "The

13 purpose of this modification is to incorporate the

14 following:"  Have I read that right?

15   A.  Yes.

16   Q.  ████████████████████████████████

17 ██████████████████████████████████████

18 ███████████████████████████████████████

19 █████████████████████████████████████

20 ████████████████████████████████████████

21 ████████████████████████████████████████

22 █████████████████████████████████████████

23 ███████████████████████████████

24   A.  ██████

25   Q.  And the effective date looks like 9/1/2014.



Page 93

1  Do you see that?
2      A.  Yes.
3      Q.  It looks like it was signed on October 28th,
4  2015.  When does the Federal fiscal year start?  What
5  date?
6      A.  October 1st.
7      Q.  Okay.  All right, so you talked earlier about
8  you remembered there having been a modification based on
9  a collective bargaining agreement change.  I'm not
10  representing to you that that is that modification, but
11  is this what you're talking about --
12          MR. DONOHUE:  Object to the form.
13  BY MR. FREE:
14      Q.  -- when you were thinking about changing the
15  bed-day rate based on this additional cost?
16      A.  I mean this is the - the type of activity that
17  would change it.
18      Q.  Okay.  All right, and so this is GEO because
19  of the collective bargaining agreement and its
20  obligations under that agreement is going to increase
21  the detention - the pay of people in the CBA, right?
22          MR. DONOHUE:  Object to the form.
23          THE WITNESS:  Correct.
24  BY MR. FREE:
25      Q.  Okay, and then the bed-day rate is ICE and GEO

Page 94

1  are agreeing, or ICE and the City of Adelanto, which
2  then GEO has assumed its obligations, are agreeing the
3  bed-day rate is going to increase; is that right?
4          MR. DONOHUE:  Object to the form.
5          THE WITNESS:  Correct.
6  BY MR. FREE:
7      Q.  Okay, so I'm going to hand you what we'll mark
8  as Exhibit Eleven.
9          (Whereupon, Exhibit 11 was marked.)
10          THE WITNESS:  Thank you.
11  BY MR. FREE:
12      Q.  This is another Standard Form 30 between it
13  looks like Immigration and Customs Enforcement in the
14  City of Adelanto under the GEO contract, right?
15          MR. DONOHUE:  Object to the form.
16          THE WITNESS:  Yes.
17  BY MR. FREE:
18      Q.  Okay, this - in box number two it says
19  amendment modification number and it says P00003.  Do
20  you see that?
21      A.  Yes.
22      Q.  All right, it looks like it was signed box 16,
23  see all the way on the bottom right on December 12th,
24  2012?  Do you see that?
25      A.  December 5th?

Page 95

1      Q.  ████████████████████████
2          ██████████
3          ██████████████████
4      ████████████████████████████
5      ██████████████████████████████
6      ████████████████████
7      A.  ████
8      Q.  ██████████████████
9      A.  ████
10     Q.  ██████████
11     ██████████████████████████
12     ████████████████████████████████
13     ██████████████████████████
14     ██████████████████████████
15     A.  ████
16     Q.  ██████████████████████████
17     ██████████████████████████████
18     ██████████████████████████████
19     ████████████████████
20     ██████████████████████████
21
22     A.  ████
23     Q.  Okay, is this another example of a situation
24  in which additional costs that GEO is going to have to
25  pay are resulting in an increase in the per diem rate so

Page 96

1  you -- Do you understand my question?
2          MR. DONOHUE:  Object to the form.
3          THE WITNESS:  I don't know who initiated the
4      request, but there was an agreement that the number
5      of medical staff would increase therefore impacting
6      the per diem rate.
7  BY MR. FREE:
8      Q.  Okay, so the more medical providers you have
9  on site the more you're going to have to pay --
10          MR. DONOHUE:  Object to --
11  BY MR. FREE:
12      Q.  -- generally, right?
13          MR. DONOHUE:  Object to the form.
14          THE WITNESS:  Correct.
15  BY MR. FREE:
16      Q.  ████████████████████████████████
17     ██████████████████████████████
18     ██████████████████████████████████
19     ████
20          MR. DONOHUE:  ██████████████
21          THE WITNESS:  ████
22  BY MR. FREE:
23      Q.  ██████████████████████████████
24     ██████████████████████████
25     ████████████████████████████



Page 97

```
1  [redacted]
2    A.  [redacted]
3    Q.  Okay.
4       MR. FREE:  This is going to be marked Twelve,
5  Exhibit Twelve.
6       (Whereupon, Exhibit 12 was marked)
7  BY MR. FREE:
8    Q.  I don't know why they did this, but in Exhibit
9  Eleven it references P00004 in box 14 and I think that
10 that's this.  I think that's this document, okay?
11   A.  I'm sorry.  Which?
12   Q.  Yeah, let me show you.
13      So if you look back at Exhibit Eleven, the one
14 we looked at just a second ago --
15   A.  Okay.
16   Q.  -- and you look at paragraph -- Box 14.  Do
17 you see in accordance with IGSA modification P00004?
18   A.  Yes.
19   Q.  Okay, this is P0004 I'm going to represent to
20 you that you're sitting and that you're looking at, and
21 so we're going to look at Exhibit Twelve now.
22      Do you see in box - box 12 on the first page
23 it says, "This supplemental agreement is entered
24 pursuant to the authority of" and it just has a check
25 box and it says "Mutual agreement."  Do you see that?
```

Page 98

```
1    A.  Yes.
2    Q.  All right, I understand this to mean that the
3  parties to the contract have all agreed to this
4  modification.  Do you have the same understanding?
5       MR. DONOHUE:  Object to the form.
6       THE WITNESS:  Yes.
7  BY MR. FREE:
8    Q.  Okay, and it appears to me in box 14 that
9  there's several modifications that are being included,
10 and I'll tell you why that is what I'm seeing.  I'm
11 seeing to change the bed-day rate, this is a quote, so
12 to change the bed -- Do you see where I'm reading?
13 Where it starts A to change the bed-day rate.
14   A.  Yes.
15   Q.  [redacted]
16   [redacted]
17   [redacted]
18   [redacted]
19   A.  [redacted]
20   Q.  [redacted]
21   A.  [redacted]
22   Q.  [redacted]
23   [redacted]
24   [redacted]
25   [redacted]
```

Page 99

```
1  [redacted]
2    A.  [redacted]
3    Q.  [redacted]
4  [redacted]
5  [redacted]
6  [redacted]
7    A.  [redacted]
8    Q.  [redacted]
9    A.  [redacted]
10   Q.  [redacted]
11   A.  [redacted]
12   Q.  [redacted]
13   A.  [redacted]
14   Q.  [redacted]
15   A.  [redacted]
16   Q.  [redacted]
17   [redacted]
18   [redacted]
19   A.  [redacted]
20   Q.  [redacted]
21   [redacted]
22   [redacted]
23   A.  [redacted]
24   Q.  [redacted]
25   [redacted]
```

Page 100

```
1    A.  [redacted]
2    Q.  [redacted]
3  [redacted]
4  [redacted]
5  [redacted]
6    A.  [redacted]
7    Q.  [redacted]
8  [redacted]
9  [redacted]
10 [redacted]
11 [redacted]
12 [redacted]
13 [redacted]
14 [redacted]
15   MR. DONOHUE:  [redacted]
16   THE WITNESS:  [redacted]
17 [redacted]
18 [redacted]
19 BY MR. FREE:
20   Q.  And as a consequence GEO was going to have to
21 incur more costs to pay those people; is that right?
22   A.  Yes.
23   Q.  And consequently their per day value the per
24 diem rate would increase for GEO, right?
25   A.  Correct.
```



ESQUIRE
DEPOSITION SOLUTIONS



Page 101

1    Q.  And then GEO and ICE agreed to increase the
2  contracts per day rates; is that right?
3    A.  Correct.
4    Q.  Okay, so the - the -- Okay.  All right.
5        I'm going to hand you a document that we'll
6  mark as Exhibit Thirteen.
7        (Whereupon, Exhibit 13 was marked)
8  BY MR. FREE:
9    Q.  This is another Standard Form 30.  In box 2 it
10  reads the amendment modification number is P00020.  Do
11  you see that?
12    A.  Yes.
13    Q.  Did I read that correctly?
14    A.  Yes.
15    Q.  Then if we look at box 13 or field 13 it
16  says - there's a checkmark by bilateral mutual agreement
17  of both parties.  Do you see where I've read that?
18    A.  Yes.
19    Q.
20
21
22
23
24
25

Page 102

1    A.
2    Q.
3    A.
4
5    Q.
6
7
8
9
10
11
12    A.
13    Q.
14    A.
15    Q.
16
17
18    A.
19    Q.
20
21
22
23    A.
24    Q.
25

Page 103

1
2
3    A.
4    Q.
5
6    A.
7    Q.
8
9
10
11    A.
12    Q.
13
14
15
16
17
18        MR. DONOHUE:
19        THE WITNESS:
20  BY MR. FREE:
21    Q.
22
23
24    A.
25    Q.

Page 104

1
2
3
4
5
6    A.
7    Q.
8    A.
9    Q.
10
11
12
13    A.
14    Q.
15
16    A.
17    Q.
18
19
20
21
22        MR. DONOHUE:
23        THE WITNESS:
24
25  BY MR. FREE:







Page 109

3    A.
10   Q.
11   A.
17   A.
21   A.
22   Q.

Page 110

1    A.
2    Q.

4    A.
5    Q.

11   A.
12   Q.

14   A.
15   Q.

17   A.
18   Q.
19   A.
20   Q.  Okay, so then we have - we have what I think
21   is the difference between these two plans, and you'll
22   correct me if I'm wrong, if you look at the minimum plan
23   on page 1838 it's cell G134.  Do you see it?
24   A.  Yes.
25   Q.  Which - which program does this part of the

Page 111

1    staffing plan address?
2          MR. DONOHUE:  Object to the form.
3          THE WITNESS:  Which program?
4    BY MR. FREE:
5          Q.  Yeah, so, you know, we've been talking about
6    these categories.  You've got food service, you've got
7    recreation, you've got medical.  Which category is this?
8          A.  This would be the security staff or the
9    detention officers.
10   Q.
13   A.
14   Q.
18   A.
19   Q.
20   A.
21   A.
22   A.
23   Q.
24   A.
25   Q.

Page 112

1    A.
2    Q.

6    A.
7    Q.

11
12   A.
13   Q.

16   A.
17   Q.

21   A.
22   Q.

25        MR. DONOHUE:  Object to the form.





DAVID J. VENTURELLA  Volume I
NOVOA vs THE GEO GROUP

June 13, 2019

113—116

Page 113

1  BY MR. FREE:
2      Q.   Why -- I'll ask a different question.
3          Why are the - the detention officers higher
4  for the second plan?
5          MR. DONOHUE:  The same objection.
6          THE WITNESS:  Because you - as you bring on
7  more detainees you bring on or activate more pods
8  or dorms and so whether you have one detainee or
9  five hundred in there you need a certain number of
10  officers to staff it, so it's based on the physical
11  plant and the number of staff needed to - to manage
12  that particular unit.  I'm assuming it -- Excuse
13  me.
14          These are dorm units or beds where they -
15  where they sleep and spend most of their days, so
16  as you activate those you need officers to staff
17  it.
18          Like I said, whether it's one or sixty-four in
19  there you still need the same number of officers,
20  so you can't pull officers from another unit to go
21  staff it.
22  BY MR. FREE:
23      Q.   The officers can't do double duty on one unit
24  and another is what you're saying, right?
25      A.   Correct.

Page 114

1      Q.   Okay, so if you're going to have - you said
2  they're - you're going to open different pods?  Did I
3  understand that right?  What did you mean when you said
4  pods, the additional pods?
5      A.   Well, I'm assuming as you increase the
6  capacity you're going to house detainees in the
7  housing units that are now currently idle and when you
8  do that you have to add the appropriate number of staff.
9      Q.   Why?
10      A.   One, because those are the requirements of the
11  contract.  You need to provide safety and security and
12  all the other services that we proposed to provide to
13  ICE that they agreed to.
14      Q.   By we you're talking about GEO, right?
15      A.   Correct.
16      Q.   Okay, and did I understand you to mean that
17  when you said the requirements of the contract what do
18  you mean?
19      A.   There are specific requirements that are
20  outlined in - in an RFP and any modifications after that
21  that say you shall do this or you shall do that and you
22  propose to GEO how you're going to implement that, how
23  would you manage that, how would you staff that and so
24  as a result of those requirements we'll provide whether
25  it's additional personnel or other services back to ICE

Page 115

1  and provide a - a price to it for them to review and
2  accept or negotiate to another - to another amount or
3  reject it.
4      Q.   How does GEO determine the additional level of
5  people that you would need based on the additional
6  capacity when you're making these proposals to ICE?
7  Like what factors does GEO take into consideration?
8          MR. DONOHUE:  Object to the form.
9          THE WITNESS:  It depends on the size of the -
10  of the unit, it depends on the configuration.  It
11  would also determine what kind of services, the
12  classification of the detainees, et cetera.  You
13  know, it's a number of factors that we consider in
14  determining the appropriate number of staff to
15  support a housing unit.
16  BY MR. FREE:
17      Q.   Is that determination as far as you know
18  something that varies from contractor to contractor?  In
19  other words, does GEO make a determination based on its
20  experience and present that determination to ICE for an
21  agreement that could be different than CoreCivic, for
22  example?
23          MR. DONOHUE:  Object to the form.
24          THE WITNESS:  I don't know what CoreCivic, how
25  they developed their staffing models.

Page 116

1  BY MR. FREE:
2      Q.   You don't?
3      A.   I don't.  No, I don't.
4      Q.   You couldn't reverse engineer it?
5      A.   I don't know.  I haven't seen their staffing
6  plan, so I don't know if I could or could not, but we
7  don't have a need to.  We - we provide our proposal
8  based on like I said a number of factors to include the
9  facility layout and that's up to ICE to accept or not.
10          MR. DONOHUE:  Okay, can we take a break and
11      let him clear up his throat?
12  BY MR. FREE:
13      Q.   Do you need a break?
14      A.   How much longer are we going to go?
15          MR. DONOHUE:  Let's take a break.
16          THE WITNESS:  Okay.
17          MR. FREE:  So you're asking for a break?
18          MR. DONOHUE:  Yeah.
19          THE VIDEOGRAPHER:  We are going off the video
20      record 11:17 a.m.
21          (Whereupon, there was a brief recess observed)
22          THE VIDEOGRAPHER:  We are back on the video
23      record 11:27 a.m.
24  BY MR. FREE:
25      Q.   Okay, Mr. Venturella, prior to the break to



Page 117

```
1   attend to your allergies, and again if you need a break
2   just let us know, okay?
3       A.  Thank you.
4       Q.  ████████████████████████
5   ████████████████████████████████
6   ████████████████████████████████
7   ██████████████
8   ████████████████████████████████
9   ████████████████████████████████
10  ████████████████████████████████
11  ████████████████████████████████
12  ████████████████████████████████
13  ████████████████████████████████
14  ████████████████████████████████
15  ████████████████████
16  ████████████████████████████████
17  ████████████████████████████████
18  ████████████████████████████████
19  ██████████████████████
20      A.  ██████████
21      Q.  ████████████████
22  ██████████████████████
23      A.  ██████
24      Q.  ████████████████████
25
```

Page 118

```
1   ██████████████████████████████
2   ████████████████████████
3   ██████████████████████████████
4   ██████████████████████████████
5       MR. DONOHUE: ████████████████
6       THE WITNESS: ██████████████████
7   ████████████████████████
8   ██████████████████████████████
9   ██████████████████████████████
10  ██████████
11  BY MR. FREE:
12      Q.  Okay.
13      THE VIDEOGRAPHER:  Right hand.
14  BY MR. FREE:
15      Q.  As I compare the detention officer positions
16  listed in each version of these staffing plans and the
17  minimum and the maximum I don't just see pods.  I see a
18  pretty granular accounting of where these detention
19  officers would work, and I'll tell you what I mean:
20  There's a - there's a listing, for instance, in rows 110
21  through 113 that encompasses the east side of the
22  facility.  Do you see that?
23      A.  Yes.
24      Q.  And then 114 through 117 it looks like west
25  housing.  Do you see that?
```

Page 119

```
1       A.  Yes.
2       Q.  And then 118 through 121 looks like the new
3   west expansion housing.  Do you see that?
4       A.  Yes.
5       Q.  All right, but then -- So those are the pods
6   you're talking about, I think, is that fair?
7       A.  Housing units.
8       Q.  Yeah.
9       A.  Sure.
10      Q.  Okay, but then you also have other things.
11  You have the recreation yard -- I'm on page 1838 -- And
12  GEO has the recreation yard in row 122, GEO has a guard
13  or some staffing for the intake and release area in 123.
14  Do you see those things?
15      A.  Yes.
16      Q.  All right, there's also detention officer
17  positions it looks like in rows 1 - row 130 for food
18  service.  Do you see that?
19      A.  Yes.
20      Q.  All right, and then if we look at page 1848 --
21      A.  I'm sorry?  Which page?
22      Q.  1841.  Excuse me.
23      A.  41.
24      Q.  The max staffing plan.
25          The equivalent basic structure you have east
```

Page 120

```
1   housing, west housing, U.S. expansion housing, detention
2   officers who are going to be there.  Those numbers
3   increased from the minimum guaranteed to the max
4   capacity staffing plans, right?
5       A.  Yes.
6       Q.  All right, and then you have - similarly you
7   have detention officers who are going to be in food
8   service in the law library and those are listed under
9   the staffing plan as well?  Yeah?
10      A.  Yes.
11      Q.  All right.
12      A.  That's what I'm reading.
13      Q.  Okay, do you happen to know whether the
14  detention officer positions for, say, food service --
15  Let's take that as an example, okay, so we'll be real
16  specific.
17          Do you know whether those detention officers
18  are actually preparing the food on the one hand or on
19  the other hand whether they're making sure that the
20  people who are working there are secure?  Do you know
21  one way or the other?
22      MR. DONOHUE:  Object to the form.
23      THE WITNESS:  They are not preparing food.
24  They're providing security in the food and dining
25  areas.
```


ESQUIRE
DEPOSITION SOLUTIONS

Page 121

1   BY MR. FREE:
2       Q.   Why does there have to be security in the food
3   and dining areas?
4       A.   It's a detention facility and you've got to
5   control movements.  You've got to make sure people
6   aren't fighting, you've got to make sure that people are
7   doing what they're supposed to be doing and where
8   they're supposed to be, so there is some level of
9   security and supervision that's required in all areas of
10  the facility.
11      Q.   Who would be fighting in the - the food
12  service areas?
13      A.   I don't --
14          MR. DONOHUE:  Object to form.
15          THE WITNESS:  I don't know.
16  BY MR. FREE:
17      Q.   Would it be GEO employees?
18          MR. DONOHUE:  Object to the form.
19          THE WITNESS:  I - I don't know.
20  BY MR. FREE:
21      Q.   Okay.  Well, let's not beat around the bush.
22      These detention officers are in the food
23  service area because people who are detained there are
24  in the food service area; is that correct?
25      A.   There are detainees in - in that area, yes.

Page 122

1       Q.   Well, that's not my question.  My question --
2       A.   I'm sorry.  I didn't understand your question.
3       Q.   It's okay.
4       My question was the detention officers are in
5   the food service area because that's where detainees are
6   as well; is that right?
7           MR. DONOHUE:  Object to the form.
8           THE WITNESS:  I guess I'm not understanding
9       your question.
10  BY MR. FREE:
11      Q.   Why do you need a detention officer in the
12  food service area was my original question and you said,
13  well, it's a secure facility, you've got to maintain
14  security, you don't want people fighting and I guess
15  what I'm asking and what I'm getting at is it is because
16  there are detainees in the food service area, that a
17  detention officer needs to be incorporated into that
18  staffing plan; is that right?
19          MR. DONOHUE:  Object to the form.
20          THE WITNESS:  I understand so, yes, there are
21      detainees in that area.
22  BY MR. FREE:
23      Q.   Okay, you don't need a detention officer
24  necessarily in GEO's executive offices, you know, in an
25  adjacent little annex, right?

Page 123

1       A.   That is correct.
2       Q.   Because there's no detainees there?
3       A.   That is correct.
4       Q.   
5
6
7
8
9
10
11
12
13
14          MR. DONOHUE:
15          THE WITNESS:
16
17
18
19  BY MR. FREE:
20      Q.   That was a bad example, yeah.
21      A.   -- where there are no detainees.
22      Q.   Okay, that's a bad example.  I take your
23  point.  I think that's right.
24      They're not cooking, the detention officers
25  are not cooking, they're there to supervise is the first

Page 124

1   part, that's correct, right?
2           MR. DONOHUE:  Object to the form.
3           THE WITNESS:  They are not cooking.  They're
4       providing security.
5   BY MR. FREE:
6       Q.   Okay, the people over whom they are providing
7   security are the people who are detained in the
8   facility, right?
9       A.   Yes.
10      Q.   Okay, so I looked at these two plans, I'm
11  going to look at the minimum plan and I look at the food
12  service part.  It's row 130.
13      A.   Which page?
14      Q.
15
16
17
18
19
20      A.
21      Q.
22
23
24
25





Page 125

1  ███
2  A. ███
3  Q. ███████████
4  ███████████████
5  ███████████████
6  ██████████
7  A. █████████
8  Q. ██████████████
9  █████████████████
10 █████████████
11 ██████████████
12 ██████████████
13 ██████
14 A. ████
15 Q. ██████████
16 A. ██████████████.
17 Q. ████████████
18 █████████████
19 █████████████
20 ████████████████
21 █████████████
22 A. ██████
23 Q. Twice as many people providing security. Can
24 we agree on that in that area?
25 A. Correct.

Page 126

1  Q. Okay, why do you need double the number of
2  security officers in the food service area, if you know,
3  when you've got - between the two plans?
4  A. I do not.
5  Q. You can - can you think of any reason why you
6  would need to double the number of detention officers in
7  the food service area between one plan or the other?
8  A. No. I can't guess at that. I don't know.
9  Q. Okay, when GEO is constructing this plan I
10 think you explained to me that when there are more
11 people in the facility you may have to have more
12 detention officers because, for instance, GEO has opened
13 a new pod and so there will be more detainees that GEO
14 is responsible for supervising, correct?
15 A. Correct.
16 Q. Okay, does the same logic hold with GEO's
17 staffing plan for the food service area? In other
18 words, there will be more detention officers in the food
19 service area under the second staffing plan because
20 there will be more detained immigrants in the food
21 service area?
22 MR. DONOHUE: Object to the form.
23 THE WITNESS: I - I wouldn't say that the same
24 logic follows that, excuse me, because I - I don't
25 know how that is managed at Adelanto.

Page 127

1  BY MR. FREE:
2  Q. Other than an increased number of detained
3  immigrants in that area of the facility in the food
4  service area of the facility, can you think of anything
5  else that would require GEO to double the number of
6  detention officers there?
7  MR. DONOHUE: Object to the form.
8  THE WITNESS: Scheduling. Scheduling more --
9  Scheduling to accommodate the larger population so
10 they can attend, you know, for breakfast, lunch
11 and - and dinner. That's about the only reason I
12 could think of that.
13 BY MR. FREE:
14 Q. Okay, tell me why scheduling took on to
15 accommodate the larger populations would double the
16 position?
17 A. You would have people coming from another --
18 I'm sorry -- Housing unit into that area, we may have to
19 have the security officers move the other people out to
20 accommodate. Again I'm just - that would be, I think,
21 the only reason, but I'm not the expert in that, so I
22 don't know.
23 Q. Would you concede that it is possible that GEO
24 doubled the number of officers in the food service area
25 because there are more detained immigrants in the food

Page 128

1  service area when the population of the facility
2  increases?
3  A. No.
4  MR. DONOHUE: Object to the form.
5  BY MR. FREE:
6  Q. You would not concede that?
7  A. No.
8  Q. Okay.
9  A. Because I don't know. I don't know --
10 Q. You don't know?
11 A. -- the reason or the basis for why the
12 increase.
13 Q. Do you have any idea?
14 A. No.
15 MR. DONOHUE: Object to the form.
16 BY MR. FREE:
17 Q. Let's do it an easier way.
18 A. Okay.
19 Q. █████████████████████
20 ████████████████████████
21 ██████████████████████
22 ███████████████████████
23 ██████████████████
24 A. ████
25 Q. ██████████████████████





Page 129

1  ████████████████████████████
2  ████████████████████████████
3  ██████████████████
4      MR. DONOHUE:  ███████████
5      THE WITNESS:  ████████████
6  ████████████████
7  BY MR. FREE:
8      Q.  █████████████████████████
9  ████████████████████████████████████
10     A.  ██
11     Q.  ████████████████████████████
12 ████████████████████████████████████
13 ████████████████████
14     A.  ██
15     Q.  That's twice as many, right?
16     A.  Yes.
17     Q.  Who uses the law library at Adelanto?
18     A.  The detainees.
19     Q.  Anybody else?
20     A.  I don't know.
21     Q.  Is it open to the public?
22     A.  No.
23     Q.  Does GEO make it available to ICE officials?
24     A.  I don't know.
25     Q.  Is GEO required to have a law library by this

Page 130

1  contract to your knowledge?
2      A.  Yes.
3      Q.  Why are there twice as many law library
4  detention officer positions in the second staffing plan
5  than on the first?
6      MR. DONOHUE:  Object to the form.
7      THE WITNESS:  I don't know.
8  BY MR. FREE:
9      Q.  No idea?
10     A.  No idea.
11     Q.  What do you think?
12     A.  I don't know.
13     Q.  Let's look at recreation on the same page.
14 It's row 123.
15     Excuse me.  Let's look at 125, utility escort.
16 Do you see that?
17     A.  Yes.
18     Q.  ██████████████████████████
19 █████████████████████████████████████
20 █████████████
21     A.  ██████████████████████
22     Q.  Look back at 1838.
23     The same number, right?
24     A.  Correct.
25     Q.  All right.

Page 131

1      How - you said that there would be more guards
2  because potentially there would be more people -- You
3  said in essence that one explanation other than the fact
4  that there's more people who were working, more
5  detainees who were working in the food service area an
6  explanation that you offered is that there could be
7  because there are more people, I think, more people
8  going to that area to get food.  Do I understand that
9  explanation as you've described it to me?
10     A.  What was the first part of your question?
11     Q.  Yeah, so the first part of my question is I
12 asked you if the reason you need twice as many detention
13 officers, guards in the food service area if GEO needs
14 twice as many guards in the food service area because
15 there's more - twice as many -- There's more detainees
16 there and I don't think you've said yes to that.
17     A.  Right.  I said I don't know.
18     Q.  Yeah, and I think I asked if it's possible.
19 If I haven't asked, let me just ask you, is it possible
20 that's the reason you need twice - GEO needs twice as
21 many guards?
22     MR. DONOHUE:  Object to the form, vague.
23     THE WITNESS:  I don't know.
24 BY MR. FREE:
25     Q.  Okay, so you don't know whether GEO doubled

Page 132

1  the number of detention officers in the food service
2  area because there would be more detainees there when
3  there's more people in the facility, you don't know the
4  answer to that?
5      MR. DONOHUE:  Object to the form, vague, asked
6      and answered.
7      THE WITNESS:  Correct.  I don't know.
8  BY MR. FREE:
9      Q.  Okay, and you have also told me, I believe,
10 that an alternate explanation is that more people will
11 need meals and so they're coming to the food service
12 area and so maybe that's why you need twice as many
13 detention officers?  Do I understand the gist of that
14 explanation?
15     MR. DONOHUE:  Object to the form, vague, asked
16     and answered, mischaracterizes.
17     THE WITNESS:  Again I speculated on what could
18     be a possible cause but I don't know that for a
19     fact.
20 BY MR. FREE:
21     Q.  Okay.
22     If there are fewer detained immigrants at
23 Adelanto would you agree that GEO needs fewer guards?
24     MR. DONOHUE:  Object to the form.
25     THE WITNESS:  I guess it depends on what



DAVID J. VENTURELLA  Volume I
NOVOA vs THE GEO GROUP

June 13, 2019
133—136

Page 133

1    you're defining as fewer and what the population
2    is.
3   BY MR. FREE:
4        Q.   Are those two variables connected?
5        A.   I'm sorry?
6        Q.   Are those two variables basically connected?
7   Are they related to each other, the number of detained
8   immigrants inside the facility to the number of guards
9   that you must employ?  They have to be, right?
10        MR. DONOHUE:  Object to the form.
11        THE WITNESS:  It depends on the - the number
12        and how ICE wants them housed, so -- It just
13        depends on the requirements of the - of the client
14        in this case.
15   BY MR. FREE:
16        Q.   Okay.
17        How is it that there could be an additional --
18   Strike that.
19        How is it that the number of food service
20   employees stays the same between both plans?
21        MR. DONOHUE:  Object to the form.
22        THE WITNESS:  I don't know.
23   BY MR. FREE:
24        Q.   You have no idea?
25        A.   I don't.

Page 134

1        Q.   How is GEO able to provide potentially almost
2   five hundred more meals without paying any additional
3   people?
4        A.   I don't know.
5        MR. DONOHUE:  Object - object to form.
6   BY MR. FREE:
7        Q.   You don't know?
8        What do you think?
9        A.   I don't know.
10        Q.   Who prepares the meals at Adelanto?
11        A.   I don't know.
12        Q.   You told me earlier that there are detainees
13   in the food service area, didn't you?
14        MR. DONOHUE:  Object to the form, vague.
15   BY MR. FREE:
16        Q.   Are there detainees in the food service area
17   at Adelanto?
18        MR. DONOHUE:  The same objection.
19        THE WITNESS:  Yes.
20   BY MR. FREE:
21        Q.   Yes.
22        What are they doing there?
23        A.   That I don't know.
24        Q.   What do you think they're doing there?
25        A.   I don't know.

Page 135

1        Q.   Really?
2        I mean I'm not trying to be difficult --
3        A.   I know.
4        Q.   -- with you, honestly.
5        You're saying --
6        A.   You're asking me --
7        Q.   -- to me you have no idea what - what a
8   detainee is doing in the kitchen?
9        A.   I don't know what --
10        MR. DONOHUE:  Objection.
11   BY MR. FREE:
12        Q.   They're not for recreation, are they?
13        MR. DONOHUE:  Hang on a second.
14        MR. FREE:  Okay.  Sorry.
15        MR. DONOHUE:  Yeah, let's not - let's not be
16        argumentative.
17   BY MR. FREE:
18        Q.   You - you have - you do not know, you have no
19   idea, let me just say that, do you have any idea what a
20   detained immigrant at Adelanto would be doing in the
21   food service area at that facility?
22        MR. DONOHUE:  Object to the form, vague, and I
23        don't know what a food service area means.
24   BY MR. FREE:
25        Q.   Let's -- This is GEO's staffing plan, right?

Page 136

1        A.   I'm sorry?
2        Q.   Okay, answer my first question.  You don't
3   have any idea what a detained immigrant at Adelanto
4   would be doing in the food service area?
5        MR. DONOHUE:  Yeah, and objection, vague,
6        asked and answered about a thousand times.
7        THE WITNESS:  I don't have any firsthand
8        knowledge what they're - they're doing.
9   BY MR. FREE:
10        Q.   That's not what I asked.  I asked if you had
11   any idea.
12        MR. DONOHUE:  And same objections.
13        THE WITNESS:  I don't.
14   BY MR. FREE:
15        Q.   Have you been in the food service area at
16   Adelanto?
17        A.   Yes.
18        Q.   What did you see there?
19        A.   I saw people in the food service area
20   performing cleaning, mopping, not -- I didn't actually
21   see any meals being served at the time, so it was very
22   early in the day.
23        Q.   What time?
24        A.   Around 10:00 a.m.
25        Q.   Who - who were the people?



DAVID J. VENTURELLA  Volume I
NOVOA vs THE GEO GROUP

June 13, 2019
137–140

Page 137

1    A.  I -- Both GEO employees and immigration
2  detainees.
3    Q.  Could you tell them apart?
4    A.  Yes.
5    Q.  How?
6    A.  By their uniforms.
7    Q.  Who was mopping?
8    A.  The detainees.
9    Q.  What were the GEO employees doing as you
10  recall?
11    A.  Working in the kitchen.
12    Q.  Okay, so you do have some idea what the
13  detainees are doing in the food service area?
14    A.  I can tell you what I saw.
15    Q.  Please do.
16    A.  That's what I saw.  They were in the - the
17  kitchen area, you say food service area, and they were
18  performing some tasks.
19    Q.  Anything other than mopping that you saw them
20  do?
21    A.  No.  I don't recall any specific activities.
22    Q.  Did you tell me that it wasn't during a meal
23  service?
24    A.  Right.  It wasn't during a meal service.
25    Q.  Okay, did you see any GEO guards there?

Page 138

1    A.  Yes.
2    Q.  What were they doing?
3    A.  Supervising, providing security.
4    Q.  As you read GEO's staffing plan that it
5  developed and submitted to ICE and that ICE agreed to in
6  this modification and you say the food service area part
7  of the detention officer section I'm talking about row
8  130 on page 1838.  Do you see that?
9    A.  Yep.
10    Q.  What do you understand food service to refer
11  to?
12    A.  The kitchen, the cafeteria and I guess the
13  ability to provide meals outside of that area as well.
14    Q.  Okay, did you see any cafeterias while you
15  were there in February?
16    A.  I'm sorry?
17    Q.  Did you see any cafeterias while you were at
18  Adelanto in February?
19    A.  There was a dining hall.
20    Q.  So the answer to my question is yes?
21    A.  Well, if a cafeteria and a dining hall are the
22  same thing then yes.
23    Q.  You used the term cafeteria, so I'm just
24  trying to understand what you mean.
25    A.  So I'm just being -- Yeah, I'm not being as

Page 139

1  specific but, yeah, it's where they dine, where they
2  have their meals.
3    Q.  The same thing though, right?
4    A.  The same thing.
5    Q.  We're talking about the same --
6    A.  Sure.
7    Q.  Okay, did you see any detainees working in the
8  dining hall?
9    A.  No.  There was no one in the dining hall at
10  the time I was there.
11    Q.  So it was empty?
12    A.  Yes.
13    Q.  Okay.
14      Is there anything else that a food service
15  line item could encompass other than the kitchen and the
16  dining hall?
17      MR. DONOHUE:  Object to the form.
18      THE WITNESS:  I don't know.
19  BY MR. FREE:
20    Q.  Can I just -- I'm just going to put -- I'm
21  going to be really honest with you.  I have a hard time
22  understanding how GEO and how you can put together a per
23  diem rate for these facilities without knowing the
24  activities in each area and what the detention officers
25  are doing there.  I just don't - I don't understand why

Page 140

1  you don't know that, and I'm not being argumentative.
2  I'm just asking you like it would seem to me that you
3  saw people working in the kitchen, right?
4    A.  Yes.
5    Q.  You said - you told me you saw people work
6  being in the kitchen?
7    A.  I saw people, yes, in there.
8    Q.  And so GEO knows that detainees work there?
9      MR. DONOHUE:  Object to the form.
10      THE WITNESS:  So there are people within GEO
11    who know what the activities are who participate in
12    putting together the staffing plans and develop the
13    cost.  I am not one of those individuals, so I'm --
14    Basically I'm an outside observer watching what
15    happens there, but I don't know how they put it
16    together, I don't know what they're supposed to be
17    doing, when they're supposed to be doing it.  It's
18    just not my area of expertise in the company.
19  BY MR. FREE:
20    Q.  All right, I think I understand.
21      You're telling me, tell me if I'm right here,
22  that I'm asking you questions about what you don't have
23  personal knowledge?
24    A.  Correct, or no responsibility or no
25  participation.



1    Q.  Okay, can you help me understand who at GEO
2  would know that?
3    A.  There are people in Operations that know
4  exactly what - what staffings are required based on
5  facilities, the facility layout, the contract
6  requirements.
7    Q.  Who at - who at GEO within the Operations
8  Department would be responsible for knowing that at
9  Adelanto?
10    A.  Certainly the Facility Administrator.
11    Q.  Was that James Janecka?
12    A.  Yes.
13    Q.  Okay, anybody else?
14    A.  I think all of the - the management team at
15  the facility, the Deputy Facility Administrator and
16  maybe the business manager.
17    Q.  What are their names?
18    A.  I don't -- I don't know.
19    Q.  Do the people that you've just named come up
20  with the staffing plan?
21    MR. DONOHUE:  Object to form.
22    THE WITNESS:  I don't know their level of
23    participation in it.
24  BY MR. FREE:
25    Q.  Who at GEO approves this before giving it to

1  ICE, this staffing plan that I'm holding?  These are
2  the -- Thirteen.
3    A.  That would be the - Senior Vice-President of
4  Operations.
5    Q.  Who is that?
6    A.  Currently that is David Donahue.
7    Q.  All right, I appreciate you clarifying.
8    What I think you've told me is that I'm asking
9  you questions about this staffing plan that you don't
10  have personal knowledge of in your role as Senior
11  Vice-President for Business Development.  Did I
12  understand your answers correctly?
13    A.  That is correct.
14    Q.  ███████████████████.
15  ███████████████████████████████
16  ███████████████████████████
17  ███████████
18  ██████████████████████████████
19  ███████████████████████████
20  ██████████████████████████████
21  ████████████
22    A.  █████████████████
23    Q.  And is it James Donahue and potentially the
24  Facility Administrator, James Janecka in Operations?
25  Anybody else?  Are those two of the people that we

1  should talk to?
2    A.  They would have, one, the responsibility and,
3  two, the expertise and the knowledge.
4    Q.  Anybody else?
5    A.  There are a lot of people who probably possess
6  that.  I don't -- Again I don't know who participates in
7  that process.
8    Q.  All right, but you -- I mean I understand that
9  it would be part of your role to know whether GEO's
10  going to make money off a contract, right?
11    MR. DONOHUE:  Objection to form.
12    THE WITNESS:  You know, I don't know, so when
13    you qualify an opportunity I look at more of are we
14    able to provide those services then after we
15    qualify that then folks in Operations in other
16    parts of the company determine whether or not
17    it's - it's viable from a financial perspective, so
18    I don't have that financial expertise.  My job is
19    simply to qualify and determine whether or not this
20    is an opportunity the company should pursue.  After
21    a contract's awarded I have no involvement, no role
22    in the operations or the administration of the
23    contract.  I move on to the next business
24    development opportunity, so that's why I can't
25    answer a lot of these questions.

1  BY MR. FREE:
2    Q.  I appreciate that.
3    I want to make sure I understand some lingo
4  that I think I just heard you use.  The verb was qualify
5  and the noun was opportunity.  What do you mean by
6  qualify?
7    A.  Well, it is -- So you may read something that
8  suggests that there is a need for bed space somewhere
9  whether it's at the Federal, State or local level and so
10  you try to find out whether or not that is a valid
11  opportunity.  Somebody may have a need but they don't
12  have the funding, they don't have the ability to procure
13  it and so once we go through all of that and determine,
14  yeah, there may be a need but there's no ability to -
15  to proceed with a procurement then we back off.  If
16  there is the ability then we'll find out, okay, well,
17  when do you think it's going to be an opportunity, so
18  that's what I mean by qualify.
19    Q.  Okay, and what's an opportunity?
20    A.  Again the opportunity to either deliver a
21  facility, build a facility and deliver the services that
22  we provide to our government providers.
23    Q.  Okay.
24    Are the Operations people that you've
25  described to me in conjunction with the Chief Financial



DAVID J. VENTURELLA  Volume I
NOVOA vs THE GEO GROUP

June 13, 2019
145–146

---

Page 145

1  Officer the folks at GEO who are responsible for
2  developing the per diem rate?
3      MR. DONOHUE:  Object to the form.
4  BY MR. FREE:
5      Q.  Or is that you?
6      A.  No.  I do not develop the per diem rate.
7      Q.  Do you know how it's developed?
8      A.  I do not.  Not specifically.
9      Q.  Okay, you don't have personal knowledge of
10  like the factors that go into it?
11      A.  I do not.
12      Q.  Okay, you don't -- And I'm not just talking
13  about once the contract's -- Let me be clear.  I'm not
14  just talking about once the contract has been agreed to,
15  once the opportunity's been seized, right?  I'm also
16  talking about proposals.  Is it the same answer as to
17  proposals?
18      A.  Right.  It's - pricing is not within my area
19  of responsibility, so I don't know how that is
20  developed.
21      Q.  Okay.  I understand.
22      MR. FREE:  Did we order lunch?
23      MR. DONOHUE:  Yes.
24      Lunch?  The short answer's yes.
25      MR. FREE:  It's not here though?

---

Page 146

1      MR. DONOHUE:  It may be here.
2      MS. ARMSTRONG:  It's probably here.
3      MR. DONOHUE:  It's probably here.
4      I'm speculating.
5      MR. FREE:  I think we might be at like a -
6  like a pivot point, but I don't - what I don't want
7  to do is I don't want to go off the record and then
8  wait for lunch because I don't want to keep the
9  witness here longer than he needs to be, so I can
10  move to the next section.
11      MR. DONOHUE:  Well, why don't we take --
12      MS. ARMSTRONG:  Take twenty seconds to check
13  if it's here.
14      MR. FREE:  Let's do it.
15      THE VIDEOGRAPHER:  We are going off the video
16  record 12:04 p.m.
17
18      (Whereupon, there was a lunch recess observed)
19
20
21      (CONTINUED TO VOLUME II)
22
23
24
25



**Page 147**

```
 1            UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
 2                  EASTERN DIVISION
 3         CIVIL ACTION NO. 5:17-cv-02514-JGB
 4  RAUL NOVOA and JAIME CAMPOS FUENTES,
    individually and on behalf of all
 5  others similarly situated,
 6                    Plaintiffs,
    vs.
 7
    THE GEO GROUP, INC.,
 8
                      Defendant,
 9  _____/
10
11
12
13      VIDEOTAPED DEPOSITION OF DAVID J. VENTURELLA
14
            VOLUME II, PAGES 147-315
15
            THURSDAY, JUNE 13th, 2019
16    515 EAST LAS OLAS BOULEVARD, SUITE 1200
              FORT LAUDERDALE, FLORIDA
17            9:03 a.m. - 5:40 p.m.
18
19
20
21
22
    STENOGRAPHICALLY REPORTED BY:
23  VALERIE LEHTO, REGISTERED PROFESSIONAL REPORTER
    NOTARY PUBLIC, STATE OF FLORIDA
24  ESQUIRE DEPOSITION SERVICES
    FORT LAUDERDALE OFFICE
25
```

**Page 149**

```
 1                      INDEX
 2
 3  WITNESS                                    PAGE
 4  DAVID J. VENTURELLA
 5  DIRECT EXAMINATION CONTINUED BY MR. FREE    150
 6
                   INDEX TO EXHIBITS
 7
    EXHIBITS                                   PAGE
 8
 9  EXHIBIT 14   2/14/18 LETTER                170
    EXHIBIT 15   5/30/18 LETTER                211
10  EXHIBIT 16   6/21/18 LETTER                212
    EXHIBIT 17   DECLARATION                   216
11  EXHIBIT 18   SUPPLEMENTAL DECLARATION      245
    EXHIBIT 19   DECLARATION                   267
12  EXHIBIT 20   1/18/19 AURORA REPORT         275
    EXHIBIT 21   1/18/19 GEO STATEMENT/WEBSITE 275
13
14
15
16   (PREVIOUSLY MARKED EXHIBITS REFERENCED RAGSDALE
     EXHIBIT 2)
17
18
19
20
21
22
23
24
25
```

**Page 148**

```
 1  APPEARANCES:
 2
    APPEARING ON BEHALF OF THE PLAINTIFFS:
 3
        BURNS, CHAREST, LLP.
 4      BY:  DANIEL H. CHAREST, ESQUIRE.
        BY:  LYDIA A. WRIGHT, ESQUIRE.
 5      365 CANAL STREET, SUITE 1170
        NEW ORLEANS, LOUISIANA  70130
 6      (504) 799-2845
        dcharest@burnscharest.com
 7      lwright@burnscharest.com
 8
 9      LAW OFFICE OF R. ANDREW FREE.
        BY:  R. ANDREW FREE, ESQUIRE.
10      BY:  HENRIETTE VINET-MARTIN, ESQUIRE.
        2004 8th AVENUE SOUTH
11      NASHVILLE, TENNESSEE 37204
        (844) 321-3221
12      andrew@immigrantcivilrights.com
13
14
    APPEARING ON BEHALF OF THE DEFENDANT:
15
        HOLLAND & KNIGHT.
16      BY:  J. MATTHEW DONOHUE, ESQUIRE.
        BY:  SHANNON L. ARMSTRONG, ESQUIRE.
17      111 SOUTHWEST FIFTH AVENUE
        2300 U.S. BANCORP TOWER
18      PORTLAND, OREGON  97204
        (503) 517-2913
19      shannon.armstrong@hklaw.com
        matt.donohue@hklaw.com
20
21  ALSO PRESENT:  FRANCES E. SIMKINS
                    U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
22                  DON SAVOY/VIDEOGRAPHER
23
24
25
```

**Page 150**

```
 1        (CONTINUED FROM VOLUME I)
 2
 3        THE VIDEOGRAPHER:  We are back on the video
 4   record 1:06 p.m.
 5
 6        DIRECT EXAMINATION CONTINUED
 7   BY MR. FREE:
 8     Q.  Mr. Venturella, what did you do to prepare for
 9   today's deposition?
10        Please don't tell me anything you've discussed
11   with your attorneys.
12     A.  Actually very little to prepare other than
13   having my discussion with the attorneys here.
14     Q.  Okay, did you look at any documents?
15     A.  Outside of the preparation with my attorneys?
16     Q.  During your preparation.
17     A.  During, yes.
18     Q.  Which documents do you recall looking at?
19        MR. DONOHUE:  I'm going to instruct him not to
20   answer.  You're not entitled to learn the documents
21   he looked at in prep with the attorneys.
22        MR. FREE:  I'm not sure that's true, but
23   you've made your instruction.
24   BY MR. FREE:
25     Q.  Did you speak with anybody other than your
```



Page 151

1 attorneys in preparation for today's deposition?

2    A. No.

3    Q. Prior to speaking with your attorneys did you

4 have any knowledge about this lawsuit, the Novoa case

5 versus GEO and Adelanto?

6    A. Yes.

7    Q. What did you know about this lawsuit before

8 speaking with your attorneys?

9      MR. DONOHUE: And I'm going to -- I assume

10 that you don't want him to divulge anything he

11 learned from any attorney about those lawsuits.

12      In other words, if he learned information from

13 an attorney then -- Well, let me instruct you I

14 don't want you to divulge that information.

15 BY MR. FREE:

16    Q. Please answer the question.

17    A. So all of the information that I received was

18 from our counsel.

19    Q. Who's our?

20    A. The GEO, general counsel.

21    Q. Who's that?

22    A. The particular individual currently is Joseph

23 Negron.

24    Q. When you say current, does that imply there

25 was somebody before that?

Page 152

1    A. That is correct.

2    Q. Who was that?

3    A. John Bulfin.

4    Q. Okay.

5    A. B-u-l-f-i-n.

6    Q. Okay, and so everything that you know about

7 this lawsuit is based on communications with those two

8 attorneys or their staff, their legal staff; is that

9 right?

10    A. Correct.

11    Q. Okay, none of what you know about this lawsuit

12 is based on any communications with non attorneys at

13 GEO; is that correct?

14    A. Can you repeat that?

15      MR. FREE: Can you read it back, please.

16      (Whereupon, the requested portion of the

17 record was read back).

18      THE WITNESS: I think that's correct.

19 BY MR. FREE:

20    Q. Have you ever discussed the litigation with

21 any non attorney, this - this litigation in this case?

22    A. No.

23    Q. Have you ever discussed this litigation or

24 communicated about this litigation with anybody who's

25 not your lawyer?

Page 153

1    A. No.

2    Q. Have you ever received communications about

3 this litigation from anyone who's not your lawyer?

4    A. No.

5    Q. What do you understand to be the Plaintiff's

6 claims without revealing anything that your lawyer's

7 told you to your own understanding to be what's the -

8 the core of the Plaintiff's claim in these cases or in

9 this case?

10    A. My understanding is that the - the Plaintiffs

11 believed that GEO should be paying detainees minimum

12 wage based on the State minimum wage laws.

13    Q. Anything else?

14    A. That we're in violation of the trafficking,

15 Federal trafficking statutes.

16    Q. Anything else?

17    A. And something that I don't understand, unjust

18 enrichment, so whatever that is.

19    Q. Anything else?

20    A. No.

21    Q. Okay, have you received any communications,

22 and I don't care if they're attorneys, but

23 communications from people at ICE outside the presence

24 of your lawyers about this litigation?

25    A. About this litigation, no.

Page 154

1    Q. Okay, have you had any communications with

2 anyone at ICE regarding the voluntary work program that

3 GEO operates at the Adelanto Detention Center?

4    A. Not for the Adelanto Detention Facility, no.

5    Q. Have you had any communications, lawyers or no

6 from ICE outside the presence of your counsel about the

7 voluntary work program lawsuits at other facilities?

8    A. We've had -- Yes. We've had communications

9 with ICE about the - the other lawsuits.

10    Q. Who's we?

11    A. I'm sorry. That would be myself, John Bulfin,

12 George Zoley, Amber Martin and Louis Carrillo.

13    Q. With whom at ICE did you speak?

14    A. We spoke to Tom Homan, Tom Blank, Mike Davis,

15 Mike Davidson and there was other individuals present,

16 but I don't recall who they were.

17    Q. Was this one meeting or more than one meeting?

18    A. That was one meeting.

19    Q. What is Thomas Homan's position at ICE at the

20 time that you had these conversations?

21    A. He was the Acting Director or Acting

22 Secretary. I'm not sure which was --

23    Q. For Immigration and Customs Enforcement?

24    A. Correct.

25    Q. How about Mr. Blank?



DAVID J. VENTURELLA  Volume II
NOVOA vs THE GEO GROUP

June 13, 2019
155–158

Page 155

1    A.  He was the Chief of Staff.
2    Q.  When did that meeting occur?
3    A.  Sometime in 2018.
4    Q.  Where did it occur?
5    A.  At the ICE headquarters.
6    Q.  In Washington D.C.?
7    A.  I'm sorry.  In Washington D.C.
8    Q.  What was the purpose of that meeting?
9    A.  To discuss our request for an equitable
10  adjustment regarding the legal expenses defending the
11  lawsuits regarding the voluntary work program that -
12  the violation of the trafficking laws.
13  Q.  Anything else?
14  A.  At that meeting?
15  Q.  Yes, sir.
16  A.  No.  It was the primary focus of the meeting.
17  Q.  Were there any secondary focuses?
18  A.  Not that I recall.
19  Q.  Were there any meetings after that meeting
20  that you had with any official at ICE?
21  A.  Regarding this lawsuit?
22  Q.  Yes, sir.
23  A.  No.
24  Q.  Or these - the voluntary work program
25  litigation?

Page 156

1    A.  No.
2    Q.  Okay, were there subsequent communications
3    between you or anyone at GEO that you're aware of at ICE
4    regarding the voluntary work program lawsuits?
5    A.  I'm not aware of any specific communications.
6    Q.  Do you remember anything generally?
7    A.  Well, we did make a request for an equitable
8    adjustment at the time of that meeting, so we were
9    awaiting a response back from ICE, but I do not know
10  what the response was --
11  Q.  Do you --
12  A.  -- because it wasn't directed to me.  It was
13  directed to Amber Martin who's the head of Contract
14  Administration.
15  Q.  What was the basis for the equitable
16  adjustment again?
17  A.  The legal expenses that were incurred in
18  defending the lawsuits.
19  Q.  And you don't know whether ICE has approved or
20  made a decision on the equitable adjustments?
21  A.  I don't have any firsthand knowledge of what
22  that outcome was.
23  Q.  Can you look at Exhibit One, please, that's in
24  front of you.
25  A.  I'm sorry?

Page 157

1    Q.  Can you look at Exhibit One in front of you,
2    please.
3    A.  One?
4    Q.  Yes, please.
5    A.  Okay.
6    Q.  If you could turn to 473, please.  Do you see
7    a paragraph marked 20.1 with the heading
8    Indemnification?
9    A.  Yes.
10  Q.  It reads, "GEO agrees to indemnify and hold
11  harmless the City and ICE, their officers, agents
12  employee and their assigns from and against."  Correct?
13  Did I read that correctly?
14  A.  You did.
15  Q.  It lists six claims or demands arising from or
16  related to things.  Do you see those six - those six
17  enumerated types of things?
18  A.  Yes.
19  Q.  Do you see the sixth one?  It's Roman vi.
20  A.  Yes.
21  Q.  "Any claim of any kind by or on behalf of any
22  detainee or former detainee detained under GEO's
23  supervision and arising from detainee's treatment,
24  conditions of custody, care, property or any other claim
25  arising from confinement of any detainee in the

Page 158

1    facility."  Have I read that correctly?
2    A.  You have.
3    Q.  The paragraph below reads, "GEO shall be
4    responsible for all costs, including but not limited to
5    attorney's fees, expenses incurred and liabilities
6    arising from any claim, demand, action, litigation,
7    lawsuit or other proceeding related to the management
8    and operation of the facility."  Have I read that
9    correctly?
10  A.  Yes.
11  Q.  Okay, do you recall the basis of the request
12  for the equitable adjustment?
13  A.  I don't.
14  Q.  Do you agree that in this paragraph GEO has
15  accepted indemnification of ICE and the City regarding
16  any claim of any kind brought by a detainee?
17  MR. DONOHUE:  Object to the form.
18  THE WITNESS:  I'm not a lawyer but, yes, I
19  would say that that language does that.
20  BY MR. FREE:
21  Q.  Do you agree that GEO pursuant to this
22  paragraph is responsible for all costs, including
23  attorney's fees?
24  MR. DONOHUE:  Object to the form.
25  THE WITNESS:  I don't know.



DAVID J. VENTURELLA  Volume II
NOVOA vs THE GEO GROUP

June 13, 2019
159–162

Page 159

1  BY MR. FREE:
2      Q.  Okay, but's that's what it says, right?
3      A.  That's what I read.
4      Q.  Okay, do you as you sit here today have any
5  understanding of why -- First of all, let me back up.
6          Did you discuss the indemnification provision
7  of this or any other contract involving the voluntary
8  work program litigation during your meeting in D.C. with
9  ICE?
10     A.  No.
11     Q.  In any communications that you're aware of
12  between GEO and ICE has the indemnification provision of
13  any contract been raised?
14     A.  Not to my knowledge.
15     Q.  Okay, what was ICE's response during that
16  meeting to the equitable adjustment request, if you
17  recall?
18     A.  That they would review the request and provide
19  a response back.
20     Q.  How long did the meeting last?
21     A.  An hour.
22     Q.  Who spoke?
23     A.  Everyone.
24     Q.  You included?
25     A.  Yes.

Page 160

1      Q.  What did you say?
2      A.  I don't recall.
3      Q.  Do you recall anything about what you said?
4      A.  Sure.  I thanked them for taking the time to
5  meet with us, but I mean I don't remember specific
6  discussions of what I said.
7      Q.  Do you remember specific discussions of what
8  anybody said?
9      A.  No, I don't.
10         Primarily John Bulfin, our general counsel,
11  was the one leading some of that discussion, but I - I
12  don't recall the specifics.
13     Q.  Which part of the discussion did Mr. Bulfin
14  lead?
15     A.  I don't recall.
16     Q.  Can you tell me everything you do recall about
17  the substance of those discussions as you sit - you sit
18  here today, please?
19     A.  What I recall in general is that we presented
20  the letter, they discussed aspects of the case, aspects
21  of why - why we were issuing or making this request.
22         That's about all I recall.
23     Q.  Who's they?
24     A.  I'm sorry?
25     Q.  Who's they?  You said they discussed aspects.

Page 161

1      A.  The GEO representatives and the ICE
2  representatives.
3      Q.  Which GEO representatives?
4      A.  John Bulfin primarily, maybe Louis Carrillo.
5      Q.  Anybody else?
6      A.  I don't recall.
7      Q.  Which ICE representatives participated in that
8  part of the discussions?
9          THE COURT REPORTER:  I'm sorry?
10  BY MR. FREE:
11     Q.  Which ICE representatives participated in that
12  part of the discussion to your recollection?
13     A.  I don't recall.
14     Q.  Did Thomas Homan speak?
15     A.  He did.
16     Q.  What do you remember him saying?
17     A.  I think he was the one who said that they
18  would review the request and someone from ICE will get
19  back to GEO.
20     Q.  Anything else?
21     A.  I don't recall.
22     Q.  Did anyone during this meeting ask ICE whether
23  the Agency thought GEO was breaking the law?
24     A.  Can you repeat that?
25         MR. FREE:  Can you read that back, please.

Page 162

1          (Whereupon, the requested portion of the
2  record was read back).
3          THE WITNESS:  I don't recall anybody asking
4      that question.
5  BY MR. FREE:
6      Q.  Do you recall anyone discussing ICE's position
7  regarding whether GEO is breaking the law?
8      A.  No.
9      Q.  Do you recall anyone discussing changes that
10  GEO would have to make in the performance of its
11  contracts with ICE if the Plaintiffs in any of these
12  lawsuits are successful?
13     A.  No.
14     Q.  Do you think that that could have been
15  discussed but that you might not remember it as you sit
16  here today?
17         MR. DONOHUE:  Object to the form.
18         THE WITNESS:  I do not believe that was
19      discussed.
20  BY MR. FREE:
21     Q.  Okay, you have no specific recollection of it
22  being discussed?
23     A.  No, sir.
24     Q.  Are you aware of any changes that GEO would
25  have to make in its performance of contracts in the



DAVID J. VENTURELLA  Volume II
NOVOA vs THE GEO GROUP

June 13, 2019
163–166

Page 163

1   event of the Plaintiffs succeeding in any of these
2   lawsuits?
3         MR. DONOHUE:  Object to the form.
4         THE WITNESS:  I am not.
5   BY MR. FREE:
6     Q.   Did anyone outside of ICE attend that meeting
7   other than GEO employees?
8     A.   No.
9     Q.   Nobody from the Department of Justice?
10    A.   No.
11    Q.   Nobody from the Department of Homeland
12  Security's Executive Office?
13    A.   No.
14    Q.   Have there been any discussions that you are
15  aware of between the Secretary of Homeland Security's
16  Office and GEO regarding the voluntary work program
17  litigation you discussed with ICE in that meeting?
18    A.   Can you repeat the question?
19         I'm sorry.
20    Q.   It's okay.
21         (Whereupon, the requested portion of the
22  record was read back).
23         THE WITNESS:  Not that I'm aware of.
24  BY MR. FREE:
25    Q.   Did you take any notes during that meeting?

Page 164

1     A.   No.
2     Q.   Did anyone take any notes during that meeting?
3     A.   I don't know.
4     Q.   Did you observe anybody with a notepad during
5   that meeting?
6     A.   I did not.
7     Q.   Did you observe anyone with an open laptop
8   during that meeting?
9     A.   No.
10    Q.   Were there any communications that you
11  received after that meeting from other GEO officials
12  regarding the meeting?
13    A.   Not that I'm aware of, no.
14    Q.   Who asked for the meeting?
15    A.   I made the formal request.
16    Q.   How did you do that?
17    A.   I'm sorry?
18    Q.   How did you do that?
19    A.   E-mail, a phone call probably.
20    Q.   To whom?
21    A.   To Mr. Homan.
22    Q.   Okay, was that the first time that you had
23  spoken with Mr. Homan on behalf of GEO?
24    A.   About this case?
25    Q.   Just generally.  We'll start there and then

Page 165

1   we'll go about this case.
2     A.   No.
3     Q.   Okay, how often were you speaking with
4   Mr. Homan when he was employed with ICE, approximately?
5     A.   I don't know.  The best of my recollection a
6   few times.  Not often.
7     Q.   Okay, did you have a way to contact him
8   directly when he was at ICE or did you have to go
9   through staff?
10    A.   No.  I could contact him directly.
11    Q.   At his office or on his cell phone?
12    A.   Both.
13    Q.   Did he have a way to contact you directly?
14    A.   Yes.
15    Q.   On - at your office or on your cell phone?
16    A.   Both.
17    Q.   Did you all message or call each other at all
18  regarding your work with GEO?
19         MR. DONOHUE:  Object to the form.
20         THE WITNESS:  We've had communication, sure.
21  BY MR. FREE:
22    Q.   Have any of those been in writing?
23    A.   There may have been e-mails.
24    Q.   Anything else?
25    A.   Text messages.

Page 166

1     Q.   Anything else?
2     A.   No.
3     Q.   Do you use an encrypted text application?
4     A.   No.
5     Q.   Do you know if Mr. Homan used an encrypted
6   text application?
7     A.   I do not.
8     Q.   Do you know what Good is, G-o-o-d for
9   BlackBerry?
10    A.   I do not.
11    Q.   Okay, have you had any of your subordinates or
12  staffers communicating with Mr. Homan on your behalf or
13  any of his staffers on his behalf?
14         Sure.  I'm sorry.
15         Have you had anybody who works for you reach
16  out to anyone who works for Mr. Homan to communicate
17  regarding GEO's relationship with ICE or the
18  contracting?
19    A.   No.
20    Q.   No?
21    A.   My subordinate staff?
22    Q.   Uh-huh.  Yeah.
23    A.   No.
24    Q.   Is it fair to say you two have dealt with each
25  other directly?



Page 167

1    A.  Yes.
2    Q.  Okay.  That's - I'm just making sure.
3    A.  Yeah.  I understand.
4    Q.  Okay.  Thanks.
5        What time was the meeting?
6    A.  What time was the meeting?
7    Q.  Uh-huh.
8    A.  You know, I don't recall.
9    Q.  Was it in the morning or the afternoon?
10   A.  I honestly don't recall.
11   Q.  Did you fly up for the meeting?
12   A.  Yes, we did.
13   Q.  How far in advance did you arrive?
14   A.  I don't recall.  I don't recall if we went a
15   day in advance or the morning of.
16   Q.  Did you meet at 12th Street Southwest, the ICE
17   headquarters?
18   A.  Yes.
19   Q.  Did you log in when you met?
20   A.  Yes.
21   Q.  Did you sign your name?
22   A.  Yes.
23   Q.  Did you log out when you left?
24   A.  Yes.
25   Q.  Do you know if the other GEO officials did as

Page 168

1    well?
2    A.  Yes.
3    Q.  Did you all leave together?
4    A.  Yes.
5    Q.  Okay, did the ICE officials stay or did you
6    all go out together after you left?
7    A.  No.  The ICE officials stayed.
8    Q.  Okay, and did you see anyone with ICE while
9    you were in D.C. during that period?
10   A.  I'm sorry?
11   Q.  Apart from the meeting --
12   A.  Yeah.
13   Q.  -- when you were in D.C. did you see anyone or
14   meet with anyone with ICE apart from the meeting that
15   you had?
16   A.  I don't recall.  I don't think so, but I don't
17   recall having additional meetings with any ICE personnel
18   during that time.
19   Q.  I'm not just talking about meetings.  I'm just
20   saying did you - did you see them socially?  Did you --
21   A.  Oh, no.
22   Q.  No.  Okay.
23       Do you know if anybody else with GEO did?
24   A.  I do not.
25   Q.  Where did you stay?

Page 169

1    A.  Where did I stay?  I don't know if we -- Like
2    I said, I can't recall if we went the night before or if
3    we flew up and flew out - flew back the same day.
4    Q.  How did you fly up there?
5    A.  On a plane.
6    Q.  Was it a commercial jet or private jet?
7    A.  I'm sorry?
8    Q.  Was it a commercial jet, a private plane?
9    A.  I'm trying to remember.
10       I think it's possibly private.
11   Q.  Is it possible that you stayed at the Old Post
12   Office, the Trump Hotel while you were there?
13   A.  If we stayed overnight?  Yes.
14   Q.  Is it possible that in addition to staying
15   there you went there?  Whether you did or not, did you
16   go to that hotel when you were there?
17       MR. DONOHUE:  Object to the form.
18       THE WITNESS:  I don't recall.
19   BY MR. FREE:
20   Q.  Have you been there before?
21   A.  To the Trump Hotel?
22   Q.  Uh-huh.
23   A.  Yes.
24   Q.  Have you put any GEO expensed credit cards on
25   bills that you've accrued at the Trump Hotel?

Page 170

1    A.  Yes.
2    Q.  All right, how many times?
3    A.  I don't - I don't recall.
4    Q.  More than one?
5    A.  Certainly more than one.
6    Q.  More than four?
7    A.  Yes.
8    Q.  More than ten?
9    A.  Yes.
10   Q.  More than twenty?
11   A.  That I don't know.
12       I don't think it's more than twenty.
13   Q.  Okay, so somewhere between ten and twenty?
14   A.  Correct.
15   Q.  Okay, did you stay anywhere else after
16   January, 2017 when you go to D.C.?
17   A.  Yes.
18   Q.  Where?
19   A.  The Mandarin Hotel, the Hyatt.
20   Q.  Okay.
21       I'll hand you a document we're going to mark
22   as Exhibit Fourteen.
23       (Whereupon, Exhibit 14 was marked)
24   BY MR. FREE:
25   Q.  Do you recognize this document?



DAVID J. VENTURELLA  Volume II
NOVOA vs THE GEO GROUP

June 13, 2019
171–174

Page 171

1    A.  Yes.
2    Q.  What is it?
3    A.  It's a letter to Mr. Homan regarding the issue
4  we just discussed, the request for the equitable
5  adjustment.
6    Q.  For how much?
7    A.  A little over two million dollars.
8    Q.  What is the date on the letter?
9    A.  February 14th, 2018.
10    Q.  Who's the letter from?
11    A.  From me.
12    Q.  You requested the meeting for the Thursday
13  morning of February 22nd.  Do you believe -- That's on
14  the last page right above your signature.  Do you
15  believe that that's when the meeting happened?
16    A.  Thereabouts.  I don't know if it was exactly
17  the - the - February 22nd, but --
18    Q.  Okay, when did you last review this letter?
19    A.  With -- On Monday with -- Or Tuesday?
20    Q.  Okay, don't --
21    A.  Yeah.
22    Q.  I don't --
23        Can you turn to page two.
24    A.  Two.  Sure.
25    Q.  It says State of California Lawsuit and

Page 172

1  Legislation.  Do you see that?
2    A.  Yes.
3    Q.  All right, that is the part of the letter that
4  discusses the Novoa case that we're here on today.
5  Would you agree?
6    A.  Yes.
7    Q.  Did you ever house minors in the State of
8  California?
9    A.  No.
10    Q.  Does The GEO Group have any responses to
11  requests for information or requests for proposals
12  regarding the detention of minors in the State of
13  California?
14    A.  Can you repeat that?
15        (Whereupon, the requested portion of the
16  record was read back).
17        THE WITNESS:  Thank you.
18        No, we do not.
19  BY MR. FREE:
20    Q.  Are you aware of any upcoming opportunities
21  that GEO would try and qualify for regarding the housing
22  of minors in the State of California?
23        THE COURT REPORTER:  Regarding?
24        MR. FREE:  The housing of minors in the State
25  of California.

Page 173

1        THE WITNESS:  No.
2  BY MR. FREE:
3    Q.  Page four, Concerted Challenges to ICE
4  Authority and to the Federal Law.  Do you see where I
5  am?
6    A.  Yes.
7    Q.  You wrote, "These lawsuits have placed GEO's
8  operation of facilities at odds with Correctional -
9  Congressional direction."  Do you see that?
10    A.  Yes.
11        MR. DONOHUE:  Just for the record it says
12  operation of ICE facilities at odds.
13        MR. FREE:  Thank you.
14  BY MR. FREE:
15    Q.  You say, "Obviously, GEO does not engage in
16  forced labor that violates the TVPA."  Do you see that?
17    A.  Yes.
18    Q.  GEO is a Federal Government contractor,
19  correct?
20    A.  Correct.
21    Q.  GEO has contracts with the Department of
22  Homeland Security, correct?
23    A.  Correct.
24    Q.  Those contracts are governed in part by the
25  Homeland Security Acquisition Regulations.  Do you - are

Page 174

1  you aware of that?
2    A.  Yes.
3    Q.  They're also governed by the Federal
4  Acquisition Regulations?
5    A.  Correct.
6    Q.  You write, "To the extent that the Plaintiffs
7  allege -- To the extent that Plaintiffs allege that
8  disciplinary segregation is an unlawful threat for
9  refusal to work, this sanction comes directly from ICE
10  policies which ICE should assist in defending."  Have I
11  read that correctly?
12    A.  You have.
13    Q.  As you sit here today do you know what ICE
14  policy allows disciplinary segregation for a refusal of
15  a detained immigrant to work?
16    A.  I don't - I don't recall what specific policy
17  contains that.
18    Q.  Do you know of any general policy that might
19  contain that?
20    A.  It would be - I would believe it's in the
21  Detention Standards, the Perform - the Performance-Based
22  National Detention Standards.
23    Q.  Let me show you what's been marked as Exhibit
24  Two.
25        Do you have any idea as you sit here -- Before



DAVID J. VENTURELLA  Volume II
NOVOA vs THE GEO GROUP

June 13, 2019
175—178

Page 175

1  you start looking at the document, where in the
2  standards I would find the disciplinary segregation for
3  refusal to work?
4      A.  Either in the - in the detainee work program
5  or possibly any policies regarding administrative
6  segregation.
7      Q.  Okay, let's take those in turn.
8         Let's start with the detainee work program, so
9  I'll turn you to Section 5.8 of the PBNDS which begins
10  in this version on page 405.
11      A.  Which page?
12      Q.  405.
13      A.  Oh.  405.
14         THE VIDEOGRAPHER:  Your microphone is
15      slipping.
16  BY MR. FREE:
17      Q.  Have you ever seen these Performance-Based
18  National Detention Standards before today in any
19  version?
20      A.  Yes.
21      Q.  Aside from - before we dive into this, aside
22  from the voluntary work program standard and the
23  segregation standard is there anywhere else in the PBNDS
24  you believe would allow a contractor like GEO to
25  threaten disciplinary segregation for a detainee's

Page 176

1  refusal to work at an ICE Detention Center?
2      A.  I don't think there is anywhere in here that
3  authorizes anyone to threaten a detainee.  There are
4  sanctions for refusing work assignments or instructions
5  but, no, not threaten.
6      Q.  Okay, the sanctions that you just spoke of for
7  refusing work assignments or instructions include
8  disciplinary segregation as far as you understand it?
9      A.  Some form of segregation.  I don't know the
10  specifics.
11      Q.  Okay, and when you say segregation, do you
12  mean a special management unit as that term is used in
13  the Performance-Based National Detention Standards?
14  What are you thinking of when you say segregation?
15      A.  Removal from the general population.
16      Q.  To where?
17      A.  To a unit where others who need that type of
18  housing are housed.
19      Q.  What type of housing?
20      A.  Either protective custody because they can't
21  be in the general population or some other type of
22  qualifications that would allow them to be moved into -
23  outside of the general population.
24      Q.  Would you agree that segregation is another
25  way of saying being alone by yourself, being in a cell

Page 177

1  alone by yourself?
2      A.  No.
3      Q.  So there can be multiple people in a special
4  management unit cell on disciplinary segregation?  Is
5  that your testimony?
6      A.  It's my understanding that those types of
7  units do allow for more than one individual in a - in a
8  unit or a pod.
9      Q.  Do you have any understanding as to the up -
10  the upward bound of that allowance?  In other words,
11  what's the maximum number that you think you can put
12  into a special management unit cell?
13      A.  I do not.
14      Q.  In fact, like do you have any understanding of
15  in practice how many people are actually in the special
16  management unit cells?
17      A.  I do not.
18      Q.  Okay.  All right, I am not going to go through
19  the entire 5.8, okay, point by point.  That's the
20  Performance-Based National Detention work standard
21  governing the voluntary work program.
22      A.  Okay.
23      Q.  But you would agree with me that it's called
24  the voluntary work program, right?
25      A.  Yes.

Page 178

1      Q.  You would agree that under this standard all
2  work with the exception, like a few very limited
3  exceptions that I'll show you in a minute must be
4  voluntary in the voluntary work program, wouldn't you?
5      A.  Yes.
6      Q.  Okay, so there is a Section -- I'm sorry.
7  Tell me again, you told me before, but I want to make
8  sure I understood your answer.  Tell me again what you
9  think the Performance-Based National Detention Standards
10  allow GEO to threaten disciplinary segregation for on
11  when a person refuses to work.  Like you said a couple
12  of things, I think, like not showing up at assignments.
13  Can you just tell me so that I understand the behavior
14  and can you explain to me what you think the behavior is
15  that a detainee worker can do where GEO can put them in
16  disciplinary segregation for refusal to work?
17         MR. DONOHUE:  Object to the form,
18      mischaracterizes, compound, vague.
19         THE WITNESS:  Again I think I stated that
20      nowhere in here does it allow anyone to threaten a
21      detainee, but there are, I think, examples in here
22      of when a detainee can be placed into segregation
23      or some form of discipline being rendered in a - in
24      a process that describes how - how that is managed
25      and - and executed by the contractor.



DAVID J. VENTURELLA  Volume II
NOVOA vs THE GEO GROUP

June 13, 2019
179—182

Page 179

1  BY MR. FREE:
2      Q.   In your letter to ICE you said, "To the extent
3  that Plaintiffs allege that disciplinary segregation is
4  an unlawful threat for refusal to work, this sanction
5  comes directly from ICE policies."  That's what you said
6  in your letter.  As you sit here today, do you see
7  anything in 5.8 that allows a threat of disciplinary
8  segregation by GEO for a detainee's refusal to work?
9      MR. DONOHUE:  Object to the form.
10     THE WITNESS:  No.  I do not see anything that
11  authorize - authorizes anyone to threaten a
12  detainee for refusal to work.
13  BY MR. FREE:
14     Q.   The other standard that you mentioned I
15  believe was the disciplinary system.  Is that a fair
16  description of what you told me?
17     A.   Yes.
18     Q.   So we're going to look at 3.1 which begins on
19  215.
20         Are you there with me?
21     A.   Yes.
22         215?
23     Q.   Yes, sir.
24         Excuse me.  It begins on 214.
25     A.   Yes.

Page 180

1      Q.   There you go.
2          So this is the Performance-Based National
3  Detention Standard Section 3.1 disciplinary system and
4  the version that's in front of you is the PBNDS 2011
5  revised in 2016.  Do you see that?
6      A.   Yes.
7      Q.   All right, is there any other standard that
8  you could have been referring to when you wrote this
9  letter, or is this the one you were talking about?
10     A.   I thought there might have been a section that
11  covered housekeeping.
12     Q.   Okay.  Well, let's look back.  I'm just
13  going --
14     A.   Okay.
15     Q.   -- to help you because I think I know what
16  you're talking about.
17     A.   Okay.
18     Q.   All right?
19         Let's look back at 5.8.
20     A.   What page was that again?
21     Q.   It is -- I'm sorry.  I'm just getting to it
22  myself.
23         It's 407.
24         Excuse me.  406.
25         Do you see that page?

Page 181

1      A.   Yes.
2      Q.   Section C, personal housekeeping required, is
3  that what you were thinking of?
4      A.   Yes.
5      Q.   Okay, so it says, "Work assignments are
6  voluntary."  Do you agree I read that correctly?
7      A.   Uh-huh.  (Affirmative response).  Yes.
8      Q.   "However, all detainees are responsible for
9  personal housekeeping."  Is - have I read that
10  correctly?
11     A.   Yes.
12     Q.   All right, and then, "Detainees are required
13  to maintain their immediate living areas in a neat and
14  orderly manner by:  One, making their bunk beds daily;
15  two, stacking loose papers; three, keeping the floor
16  debris free of debris and dividers free of clutter; and
17  four, refraining from hanging/draping clothing,
18  pictures, keepsakes or other objects from beds, overhead
19  lighting fixtures or other furniture."  Have I read that
20  correctly?
21     A.   Yes.
22     Q.   As you sit here today do you understand any of
23  the lawsuits that you've written about to ICE on behalf
24  of GEO to include any of these four required personal
25  housekeeping tasks?

Page 182

1      MR. DONOHUE:  Object to the form.
2      THE WITNESS:  I guess I don't understand your
3  question.
4  BY MR. FREE:
5      Q.   Let me see if I can help you.
6      A.   Yeah.  Thank you.
7      Q.   Look at page two of your letter.
8      A.   Yeah.
9      Q.   You summarize for ICE the allegations as GEO
10  understands them, I think.  I'm starting at the second
11  sentence, "Novoa, a former detainee at the Adelanto
12  Detention Center, alleges that GEO maintains a corporate
13  policy and uniform practice of withholding sufficient
14  food, water and hygiene products from detainees at
15  Adelanto.  As a result, detainees are forced to either
16  purchase these daily necessities from the facility's
17  commissary or go without.  Novoa further alleges that by
18  maintaining these harsh conditions and purposely
19  withholding necessities from detainees, GEO ensures an
20  available pool of labor" -- excuse me -- "An available
21  labor pool of detainees will work for only one dollar
22  per day," and "Finally, Novoa alleges that the VWP is
23  not 'voluntary' because detainees that refuse to
24  participate in the voluntary work program are placed
25  into solitary confinement," so you've also summarized



DAVID J. VENTURELLA  Volume II
NOVOA vs THE GEO GROUP

June 13, 2019
183–186

Page 183

1  the other lawsuits in your letter to - in GEO's letter
2  to ICE, haven't you?  And that's at page one and page
3  two.
4      A.  Yes.
5      Q.  Okay, so we're going to bracket out the State
6  of Washington lawsuits on page two because those are
7  about minimum wage, right?
8      A.  Yes.
9      Q.  All right, so the only other thing we're going
10  to be talking about is the State of Colorado lawsuit.
11      When you're saying disciplinary segregation
12  for refusal to work is an ICE policy, it's really the
13  lawsuit you could be talking about, right?
14      MR. DONOHUE:  Object to the form,
15  mischaracterizes.
16      THE WITNESS:  Can you repeat the question?
17  I'm sorry.
18  BY MR. FREE:
19      Q.  So the only other lawsuit if - if Mr. Novoa's
20  lawsuit does not mention anything and your - and your
21  summarization of the allegations in this case don't say
22  anything about personal housekeeping, right, which is
23  the situation in which you think you can be put in
24  solitary under ICE policies, the only other case where
25  that could be true is this Colorado case, right?

Page 184

1      A.  I'm thinking.  I'm sorry.
2      Q.  We'll do it easier.
3      A.  Yeah.  I don't think I'm tracking here.
4      Q.  Where is this coming from?  You say -- Just
5  help me understand where you think any of these
6  lawsuits -- No.  So we're back at page four.
7      "To the extent that Plaintiffs allege that
8  disciplinary segregation is an unlawful threat for
9  refusal to work, this sanction comes directly from ICE
10  policies."  Do you see that - that sentence or part of
11  the sentence?
12      A.  Yes.
13      Q.  Have I read it correctly?
14      A.  Yes.
15      Q.  What allegation are you talking about?
16      MR. DONOHUE:  Do you want to give him the
17  Complaint?
18      MR. FREE:  No.
19      MR. DONOHUE:  If you can answer that without
20  looking at the Complaint which has lots of
21  different obligations then go ahead.
22      MR. FREE:  I really would appreciate it if you
23  didn't testify throughout this.
24      MR. DONOHUE:  Well, I'd appreciate it if you
25  wouldn't torture him on - and take out of context a

Page 185

1  sentence from a letter that he wrote, but I don't
2  always get what I want.
3      MR. FREE:  We're not doing this.
4  BY MR. FREE:
5      Q.  What allegations were you referring to when
6  you wrote this letter on behalf of GEO to ICE?
7      A.  I don't have those documents in front of me,
8  so I --
9      Q.  Okay.
10      A.  -- can't answer.
11      Q.  As you sit here today are you aware -- Now
12  that we've looked at the personal housekeeping
13  requirement are you aware of any policy that would
14  permit GEO, any ICE policy that would permit GEO to use
15  disciplinary segregation as a threat for refusing to
16  work?
17      A.  I don't -- Yeah, I don't know.
18      Q.  Okay.
19      Did you know the answer to that question when
20  you wrote this letter?
21      MR. DONOHUE:  Object to the form.
22      THE WITNESS:  And what was the question?
23  BY MR. FREE:
24      Q.  Did you know the answer to the question I just
25  asked you about whether there's an ICE policy that

Page 186

1  allows GEO to threaten disciplinary segregation on a
2  detainee for refusal to work when you wrote the letter?
3  Is it possible, in other words, that you knew that -
4  what you were talking about but it's been sixteen months
5  and you just forgot?
6      MR. DONOHUE:  Object to the form,
7  mischaracterizes, vague.
8      THE WITNESS:  I just can't recall the source
9  of that information.
10  BY MR. FREE:
11      Q.  Okay.
12      Lower down the page at the fourth - fifth to
13  the last line -- I'm sorry.
14      You signed this letter, right?
15      A.  Yes.
16      Q.  Okay, and you reviewed it on Monday, right?
17      A.  I think it was Tuesday.
18      Q.  Whenever.
19      Did you believe it was true when you signed
20  it?
21      A.  Yes.
22      Q.  Do you still believe it's true?
23      A.  Yes.
24      Q.  Okay, so you still believe?
25      A.  Yeah.  I just can't point to the policy right



DAVID J. VENTURELLA  Volume II
NOVOA vs THE GEO GROUP

June 13, 2019
187–190

Page 187

1  at this currently.
2      Q.  Okay.
3          How do you know it's true?
4          MR. DONOHUE:  Object to the form.
5          THE WITNESS:  I believe there is policy or
6      language contained in these documents that allow
7      for some form of discipline for individuals who
8      refuse assignments, orders and jeopardize the
9      security of the facility, but again I cannot at
10     this - right now find that - that document.
11  BY MR. FREE:
12     Q.  And that's -- We're talking about the
13  voluntary work program and not the personal
14  housekeeping, right?
15         MR. DONOHUE:  Object to the form.
16         THE WITNESS:  I am referring to the allegation
17     that says that we put people in disciplinary
18     segregation for refusing work assignments.
19  BY MR. FREE:
20     Q.  Okay, and you're saying in this letter, "To
21  the extent that the Plaintiffs allege that disciplinary
22  segregation is an unlawful threat for refusal to work,
23  this sanction comes directly from ICE policies"?
24         MR. DONOHUE:  Object to the form.
25         THE WITNESS:  Again I don't recall the source

Page 188

1      document that I was referring to when I was writing
2      that, but again it was more I believe to
3      individuals, detainees refusing orders or
4      assignments not necessarily tied to the voluntary
5      work program.
6  BY MR. FREE:
7      Q.  What assignments to your understanding when
8  you wrote this letter could GEO have given a detainee
9  that would under ICE policy result in disciplinary
10 segregation if the detainee refused?
11     A.  You're asking for a specific example of?
12     Q.  I'm asking the question --
13         (Whereupon, the requested portion of the
14 record was read back).
15         THE WITNESS:  If they refused to clean their -
16     their areas, the personal housekeeping
17     requirements, a form of discipline could be imposed
18     but not automatically disciplinary segregation.
19  BY MR. FREE:
20     Q.  Anything else?
21     A.  There could be fighting, there could be other
22 things, activities where discipline can be imposed.
23     Q.  That's not my question.  My question --
24     A.  Refusing to stand for counts.
25     Q.  Okay, before you go down this rabbit hole, I'm

Page 189

1  not asking you all the reasons that GEO can impose
2  discipline on an ICE detainee in the Adelanto facility
3  or anywhere else.  What I'm asking you is other than
4  these four specified things in the personal housekeeping
5  section of Section 5.8 of the PBNDS, which I appreciate
6  you pointed me to that, what other work assignment could
7  GEO give an ICE detainee that ICE's policies would allow
8  GEO to impose disciplinary segregation if they refused?
9          MR. DONOHUE:  Object to the form.
10         THE WITNESS:  Other than those four I don't -
11     I don't - I don't know what other work assignments
12     would be available at the - at the facility.
13  BY MR. FREE:
14     Q.  Do you believe that there are other work
15  assignments available at any facility that do not
16  include the four enumerated tasks in personal
17  housekeeping?  In other words, are there - is there
18  anything else other than these four things according to
19  your understanding that GEO could tell a detainee you've
20  got to do this thing, this task and if they don't ICE's
21  policy say GEO can put them in disciplinary segregation,
22  any other work that GEO could task a detainee with apart
23  from these four enumerated tasks?
24     A.  I understand --
25         MR. DONOHUE:  Hang on a second.

Page 190

1      THE WITNESS:  Sure.
2      MR. DONOHUE:  Sorry.
3      THE WITNESS:  No.  It's okay.
4      MR. DONOHUE:  Object to the form.
5      THE WITNESS:  So, no, I don't think there are
6  other work assignments that GEO could assign a
7  detainee and if they refuse that would result in
8  some form of discipline.
9  BY MR. FREE:
10     Q.  Is your understanding of any of the claims
11  that you discussed with ICE during this meeting either
12  in this case or in the Colorado case, because that's the
13  only other TVPA case, right, a forced labor case, is
14  your understanding of the claims that the - that the
15  Plaintiffs are bringing that ICE - that GEO should be
16  held liable for forcing them to do one of these four
17  things under the threat of solitary confinement?  Do you
18  think that that's what the Plaintiffs are saying?
19         MR. DONOHUE:  Object to the form.
20         THE WITNESS:  I don't understand the question.
21  BY MR. FREE:
22     Q.  Well, these -- I mean over and over again in
23  this letter you referred to the voluntary work program.
24         We'll start at page one.  It's in the second
25  full paragraph.  That's the Colorado lawsuit.  It says,



DAVID J. VENTURELLA  Volume II
NOVOA vs THE GEO GROUP

June 13, 2019
191–194

Page 191

1  "The suit alleges that GEO's payment of a dollar per day
2  to detainees who work in the voluntary work program as
3  authorized by ICE and mandated by ICE's PBNDS and GEO'S
4  contract violates the minimum wage law" and then they
5  say, "The suit also alleges that detainees are entitled
6  to disgorgement of money under a theory of unjust
7  enrichment for work performed by detainees."  Did I read
8  that correctly?
9      A.  Yes.
10     Q.  Okay, and then -- No.  I see it.  At the top
11  of that paragraph -- We're not turning the page yet.  At
12  the top of that paragraph you say, "Menocal versus The
13  GEO Group, et al, a class action suit by former
14  detainees at the Aurora Colorado ICE Processing Facility
15  has been pending since 2014 and represents the first
16  lawsuit claiming that GEO by having detainees at the
17  Aurora facility perform basic housekeeping chores for no
18  pay under the alleged threat of solitary confinement,
19  has engaged in forced labor in violation of the
20  Trafficking - Trafficking Victims Protection Act." Did I
21  read that correctly?
22     A.  Yes.
23     Q.  Okay, is - is that allegation as you have
24  summarized it in this letter on behalf of GEO to ICE the
25  allegation that you're referring to on page four that

Page 192

1  disciplinary segregation is an unlawful threat for
2  refusal to work?
3      A.  Can you ask the question again?
4      Q.  I can.
5      A.  I'm sorry.  I just -- I'm not a lawyer, so
6  it's hard for me to track some of this stuff.
7      Q.  I'm just trying to understand what you were
8  thinking when you wrote this, and I know you're not a
9  lawyer, but --
10     A.  Right.
11     Q.  -- I'm just reading your words.
12     A.  Yeah.
13     Q.  Okay?  And I just want to make sure that it's
14  clear, and I think you do too, right?
15     A.  Yes.
16     Q.  Yes.
17     Okay, so, you know, you've said, "To the
18  extent that Plaintiffs allege that disciplinary
19  segregation is an unlawful threat for refusal to work
20  and this sanction comes directly from ICE policies," and
21  you've only in the letter talked about two instances -
22  you know, you've summarized these two cases, right, the
23  Colorado case and this case that involved disciplinary
24  segregation for refusal to work.  You following me so
25  far?

Page 193

1      A.  Yes.
2      Q.  Okay, so in - in this case we went over the
3  allegations on top of page three, "Novoa alleges that
4  the VWP is not voluntary because detainees that refused
5  to participate in the VWP are placed into solitary
6  confinement," I think I understand you to have said that
7  ICE policies would not allow GEO to impose a threat of
8  disciplinary segregation for refusing to participate in
9  the voluntary work program.  Did I understand your
10  testimony correctly?
11         MR. DONOHUE:  Object to the form.
12         THE WITNESS:  Correct.
13  BY MR. FREE:
14     Q.  In other words, nothing - ICE is not going to
15  allow GEO - as far as you understand it, ICE's policies
16  would not allow GEO to throw somebody in segregation for
17  refusal to work, correct?
18     A.  Under the VWP?
19     Q.  Yes, sir.
20     A.  Correct.
21     Q.  Okay, and ICE's policies would not allow GEO
22  to threaten segregation - threaten imposition of
23  segregation on a detainee, so the first question was
24  about actually imposing segregation.  My next - this
25  question is about GEO threatening to impose segregation

Page 194

1  for refusal to work in the VWP.  Do you understand the
2  distinction between the two questions that I'm asking?
3      A.  I do.
4      Q.  Okay, so this -- You've said, "Novoa alleges
5  that the VWP is not voluntary because detainees that
6  refused to participate in the VWP are placed into
7  solitary confinement," and I think we agree that there
8  is no ICE policy that would allow GEO to impose solitary
9  confinement for refusing to participate in the VWP.  Do
10  we agree on that?
11         MR. DONOHUE:  Object to the form.
12         THE WITNESS:  I would agree that there's no
13     policy that - that would allow the contractor to
14     put someone in a - segregation for refusing to
15     participate in the VWP.
16  BY MR. FREE:
17     Q.  Including GEO?
18     A.  Including GEO.
19     Q.  All right, so then what you're talking about,
20  I think -- I'm sorry.  Did you have something to -- I
21  didn't --
22     A.  No.  No.  No.
23     Q.  -- want to interrupt.
24     A.  No.  I'm was just clearing my throat.
25     Q.  Okay, I think what you're talking about then



Page 195

1  the only other thing you could be talking about is back
2  on page one which is having detainees at the Aurora
3  facility perform basic housekeeping chores for now pay
4  under the alleged threat of solitary confinement?
5      A.  That would be correct.
6      Q.  Okay, and so your understanding when you're
7  writing this letter is that the Aurora case is about
8  detainees refusing to do the four things in the personal
9  housekeeping tasks?
10     A.  Correct.
11     Q.  Okay, if GEO were doing things outside - if
12 GEO were forcing people at Aurora to do anything other
13 than these four things, these four enumerated tasks, do
14 you understand ICE's policies to permit the threat or
15 imposition of solitary - segregation on a detainee by
16 GEO?
17         MR. DONOHUE:  Object to the form.
18         THE WITNESS:  I don't think ICE would allow us
19     to - to make any additional assignments beyond
20     those four as it relates to housekeeping.
21 BY MR. FREE:
22     Q.  Okay.  I understand.
23     A.  Okay.
24     Q.  I think we're there.
25     A.  Okay.

Page 196

1      Q.  In the next paragraph you say on page four,
2  "Likewise, the demand that GEO pay a state mandated
3  minimum wage is directly contrary to Federal law in the
4  terms of ICE and GEO's contracts."  Did I read that
5  correctly?
6      A.  What page are you on?
7      Q.  On page four, fourth paragraph.
8      A.  Yes.
9      Q.  Is the Federal law that you are talking about
10 included in this letter?
11         MR. DONOHUE:  Object to the form.
12         THE WITNESS:  Yes.
13 BY MR. FREE:
14     Q.  It's the next couple sentences.
15     A.  Yes.
16     Q.  Is there any other Federal law that GEO
17 contends that you on behalf of GEO were thinking about
18 that a state mandated minimum wage would be directly
19 contrary to?
20         MR. DONOHUE:  Object to the form.
21 BY MR. FREE:
22     Q.  Directly contrary to.
23     A.  No.
24     Q.  Just this?
25     A.  Just this.

Page 197

1      Q.  Okay.  When you wrote this letter do you know
2  if - do you remember if you knew what the potential
3  monetary damages GEO could be facing would be in terms
4  of an actual number?  Had anybody told you that or did
5  you know it?
6      A.  No, I did not.
7      Q.  Okay, the fifth page it says, "Monetary
8  damage - damages in each of the Colorado, Washington and
9  California cases could reach several millions of
10 dollars."  Do you see that?
11     A.  Yes.
12     Q.  Have I read it correctly?
13     A.  You have.
14     Q.  Turn to page one, please.
15         In the first paragraph you wrote on behalf of
16 GEO to ICE, "GEO cannot bear the costs of this defense
17 on its own."  Do you see that?
18     A.  Yes.
19     Q.  Why did you write that?  What were you basing
20 that statement on?
21     A.  It was based on the amount of expense that we
22 incurred and the belief that the government had some
23 interest or equities in these cases and that they should
24 be part of it.
25     Q.  Okay, and to be fair to you it's a compound

Page 198

1  sentence.  I've only read you the first clause.  It
2  says, "GEO cannot bear the cost of this defense on its
3  own."  I understand that you've said a couple of other
4  things, but I just want to focus you on - you kind of
5  brought in the Federal Government's interests and things
6  like that, but I'm just asking you about the costs of
7  defense.  You've asked them for a little over two
8  million dollars, okay, and then you've projected in the
9  final page several millions of dollars each, right?
10     A.  At which page?
11     Q.  The final page.  Five.
12     A.  Yes.  Yes.
13     Q.  All right, you don't know -- I think you just
14 told me you don't know what those actual costs would be,
15 but you've told ICE, GEO has told ICE you can't bear
16 those costs on your own, right?
17     A.  Correct.
18     Q.  Why not?
19     A.  Again as this continues every single day more
20 and more individuals are added to the class.  If there
21 were to be an adverse outcome, yeah, that could be
22 millions and millions of dollars expense to GEO, so I
23 think that's what I was referring to.
24     Q.  Remember a moment ago when we were talking
25 about the indemnification provision of your



Page 199

1  intergovernmental services agreement between GEO, ICE
2  and the City of Adelanto?
3      A.  Yeah.  Yes.
4      Q.  And do you remember agreeing that GEO is going
5  to bear the risk or at least the terms of that contract
6  would indicate that GEO is going to bear the risk of any
7  of that litigation?
8      A.  Of litigation, yes.
9      Q.  And those costs including expenses and
10  attorney's fees, do you remember that?
11     A.  I do remember that.
12     Q.  Okay, what are GEO's annual revenues ballpark?
13     A.  Annual revenues?  2.5 billion.
14     Q.  You've asked ICE for two million dollars,
15  right?
16     A.  Correct.
17     Q.  What's GEO's annual profit?
18     A.  That I don't know.
19     Q.  What's GEO's current market capitalization?
20     A.  Precisely?
21     Q.  Yeah.  Ballpark.
22     A.  Three billion.
23     Q.  Do you know ballpark profits?
24     A.  I don't.
25     Q.  So you don't have -- Do you have any idea what

Page 200

1  the - on the revenue is, you don't have any idea how
2  much of it is a profit?
3      A.  I don't.
4      Q.  Is GEO currently operating at a loss?
5      A.  As a company overall?
6      Q.  Yes, sir.
7      A.  No.
8      Q.  Is GEO currently profitable?
9      A.  I would say yes.
10     Q.  Has GEO's profit increased since August of
11  2016 until today?
12     A.  That I don't know.
13     Q.  I'm pegging August of 2016 because that's when
14  the stock got cut.  You know what I'm talking about,
15  right?
16     A.  Yes.
17     Q.  That's the leaked memo and the fifty percent
18  in a day or something that - the market cut that you
19  lost?
20     A.  Correct.
21     Q.  All right, since then it's been an upward
22  trend, right, in terms of revenues and profitability?
23     A.  Yes.
24     Q.  And in each shareholder call whether it's Mr.
25  Zoley, Mr. Bulfin or others GEO's shareholders are being

Page 201

1  told that they expect the market for immigration
2  detention to continue and that GEO will stay profitable,
3  right?
4          MR. DONOHUE:  Object to the form.
5          THE WITNESS:  They have made those statements,
6  correct.
7  BY MR. FREE:
8      Q.  GEO has disclosed this litigation to its
9  shareholders, but are you aware of any communication of
10  shareholders that says GEO's going to have to cease to
11  function as an entity if the Plaintiffs win?
12     A.  I'm not aware of any communication like that.
13     Q.  Are you aware of any communication to the
14  shareholders or anyone that says if we have to pay
15  several million dollars to the Plaintiffs in Colorado,
16  Washington and California we cannot bear the costs of
17  the defense and --
18     A.  You're asking if I'm aware of any
19  communication?
20     Q.  Yes, sir.
21     A.  No.
22     Q.  Do you think there has been such?
23     A.  I do not know.
24     Q.  All right, when's the last time that -- You
25  own GEO stock?

Page 202

1      A.  I do.
2      Q.  When's the last time you sold GEO stock?
3      A.  Maybe about fourteen months ago.
4      Q.  Like August of 2017, something like that or
5  20 -- I've got it.  Never mind.
6          About fourteen months ago you said?
7      A.  I think so.
8      Q.  How many shares did you sell?
9      A.  I don't recall the precise number.
10     Q.  Is it like around twenty thousand, twenty-five
11  thousand, something like that?
12     A.  I don't remember.
13     Q.  Were these restricted -- Do you own shares
14  that are restricted or shares that are -- In other
15  words, could you dispose - could you tomorrow go and
16  just liquidate your GEO stock options?
17     A.  I cannot.
18     Q.  Okay, do you know ballpark how much you sold?
19     A.  I don't.
20     Q.  All right, and as an officer you had to clear
21  that, right, through various channels?
22     A.  Yes.
23     Q.  Yeah.
24          Okay, you have to disclose it as well, I
25  think, right?



DAVID J. VENTURELLA  Volume II
NOVOA vs THE GEO GROUP

June 13, 2019
203—206

Page 203

1    A.  Correct.

2    Q.  Do you know about how much you got from the

3  sale?

4    A.  I don't.

5    Q.  Why did you sell?

6    A.  Why did I sell?

7    Q.  Yes, sir.

8    A.  I had an expense that I needed to take care

9  of.

10    Q.  All right, did you get it taken care of?

11    A.  Yes.

12    Q.  All right.  Good.

13        Do you know comparatively where the GEO's

14  share price was at the time that you sold to historical

15  prices?

16        MR. DONOHUE:  Object to the form.

17        THE WITNESS:  I don't recall the precise price

18    the day I sold, but it's certainly a lot less than

19    when they were granted to me.

20  BY MR. FREE:

21    Q.  You said it was a lot less when they were

22  granted to you?

23    A.  I believe so.

24    Q.  How much less?

25    A.  I don't - I don't know.

Page 204

1    Q.  Does about twenty-five dollars a share sound

2  right?

3        MR. DONOHUE:  Object.

4  BY MR. FREE:

5    Q.  Twenty-five seventy is what you sold at?

6    A.  I -- It sounds right.

7    Q.  All right.

8    A.  Close.

9    Q.  What was it worth when you got it?

10    A.  When I - when I was granted the stock?

11    Q.  Uh-huh.

12    A.  I don't know.

13    Q.  Then how do you know it's a lot less?

14    A.  I know our share price was in the thirties at

15  one point, so --

16    Q.  When's the last time it was in the thirties?

17    A.  I don't recall the date.

18    Q.  Ballpark.

19    A.  2014, 2015.

20    Q.  It's been awhile, right?

21    A.  Yeah.  Yeah.

22    Q.  You -- How much was the expense just ballpark

23  that you had to cover to sell these shares?

24    A.  I'm sorry?

25    Q.  How much was the expense ballpark that you had

Page 205

1  to cover to sell those shares?

2    A.  More than - more than the amount that I got

3  for the shares.

4    Q.  You don't remember what the expense was?

5    A.  Yeah.  I mean do I have to disclose what my

6  personal expenses are?

7    Q.  I don't want to know what it's for,

8  Mr. Venturella.  I'm not trying -- I'm just trying to

9  understand --

10    A.  Well, what are you trying to understand?

11    Q.  If you could, please, if you can answer that

12  question I'd really appreciate it.

13        Thank you.

14    A.  Do I -- So ask the question again.

15        MR. DONOHUE:  Ask the question again.

16  BY MR. FREE:

17    Q.  I'm just asking ballpark what was the expense

18  that you were trying to cover?

19        MR. DONOHUE:  The amount of the expense.

20  BY MR. FREE:

21    Q.  Yeah, the amount.

22        MR. DONOHUE:  You don't have to say anything

23    more.

24  BY MR. FREE:

25    Q.  I don't want to know that.  Yeah.

Page 206

1        MR. DONOHUE:  You don't have to say anything

2    more and then he's going to be done with this

3    because we're so far afield that I can understand

4    why you would feel it's intrusive, so just if you

5    can give him the amount then we'll move on.

6        THE WITNESS:  All right, it was over eight

7    hundred thousand.

8  BY MR. FREE:

9    Q.  Okay, and did the sale cover the expense?

10        MR. DONOHUE:  Asked and answered.

11        THE WITNESS:  It did not.

12  BY MR. FREE:

13    Q.  Did not.  Okay.

14        All right, so as you sit here today do you

15  still believe that GEO cannot bear the cost of its

16  defense on its own?

17    A.  I believe the expense is extraordinary so,

18  yes.

19    Q.  On what do you base that belief that the

20  expense is extraordinary?

21    A.  Again I base it on the potential of an adverse

22  decision in - in these cases and the fact that hundreds,

23  if not thousands of people go through our detention

24  facilities every single day and if they're - they become

25  a member or class member of these cases then that number



Page 207

1  is - is high, it's great.  I don't know what it will be
2  at the end, but I think it's pretty extraordinary.
3     Q.  Do you have any understanding regarding the
4  monetary damages on page five that you - that GEO wrote
5  to ICE about, you wrote to them on behalf of GEO, do you
6  have any understanding as to what those monetary damages
7  would be?
8     A.  No.
9     Q.  Okay.
10    A.  No.  No.  Not in specifics, no.
11    Q.  A couple of them were minimum wage cases,
12  right?
13    A.  Correct.
14    Q.  So you assume that the monetary damages would
15  be the minimum wage or the difference between the wage
16  and what they're getting, a dollar for the work they
17  performed, right?
18    A.  Correct.
19    Q.  And you're telling me that -- You haven't told
20  me yet.
21       The paragraph above that you said, "Thus far,
22  GEO's legal fees and costs in Menocal exceed 1.6 million
23  dollars which will increase sharp - sharply now that the
24  Tenth Circuit has affirmed the class-certification.  In
25  the Washington litigation the defense fees and costs are

Page 208

1  already approximately four hundred and forty thousand
2  dollars and could quickly exceed one million once
3  discovery begins or increase exponentially if
4  class-certification is granted in each lawsuit."  Do you
5  see that?
6     A.  I do.
7     Q.  Have I read that correctly?
8     A.  Yes.
9     Q.  And then it says, "Even more concerning is
10  that there is the potential for damages under the TVPA
11  reaching as many as sixty thousand detainees at the
12  Aurora facility over ten years and claims for the
13  disgorgement of unpaid wages to VWP participants
14  stemming back multiple years."  Did I read that
15  correctly?
16    A.  Yes.
17    Q.  Why is that even more concerning?
18    A.  Again I don't recall the source of that.  I
19  think that's - the TVP is also criminals based on I
20  think my limited knowledge of that, so I think that's
21  one of the reasons why I spoke to or mention that.
22    Q.  Why didn't you include that in that letter or
23  in that --
24    A.  I don't --
25    Q.  -- sentence?

Page 209

1     A.  I don't recall.
2     Q.  Okay, you don't know why you didn't include
3  the criminal aspect of the TVPA?
4     A.  No.
5     Q.  And what you say is there's the potential for
6  damages under the TVPA reaching as many as sixty
7  thousand detainees at the Aurora facility, right?
8     A.  Yes.
9     Q.  Would this judgment put GEO out of business in
10  your estimation?
11    A.  I don't know.  I don't know.
12    Q.  Who -- Did you write this letter by yourself?
13    A.  I did not.
14    Q.  Who else collaborated on this letter?
15    A.  Our Office of General Counsel.
16    Q.  Anybody else?
17    A.  Contract Administration.
18    Q.  Who in Contract Administration?
19    A.  That would be Amber Martin.
20    Q.  Anybody else?
21    A.  No.
22    Q.  Any other departments aside from the General
23  Counsel and the Office of Contract Administration?
24    A.  No.
25    Q.  Did you write multiple drafts of it?

Page 210

1     A.  I would assume we did, yes.
2     Q.  Do you know one way or the other?
3     A.  I would say, yes, we did.
4     Q.  Did you personally write any of the passages
5  in this letter?
6     A.  I don't recall which - which portions were
7  mine.
8     Q.  But there are some portions that are yours?
9     A.  Yes.
10    Q.  Which ones?  You don't recall which ones?
11    A.  I don't recall.
12    Q.  That's fine.
13       MR. DONOHUE:  Can we take a break?
14       MR. FREE:  No.
15       I mean is the witness asking for a break?
16       MR. DONOHUE:  What?
17       MR. FREE:  I'm --
18       MR. DONOHUE:  Are you saying we cannot take a
19  break?
20       MR. FREE:  I would prefer to power through if
21  it's possible.
22       MR. DONOHUE:  Well, I would prefer to take a
23  break, so --
24       MR. FREE:  Okay.  Take a break.
25       MR. DONOHUE:  Thank you.



Page 211

1 THE VIDEOGRAPHER: We are going off the video
2 record 2:24 p.m.
3     (Whereupon, there was a brief recess observed)
4 THE VIDEOGRAPHER: We are back on the video
5 record 2:39 p.m.
6 BY MR. FREE:
7     Q. Mr. Venturella, I'm going to hand you an
8 exhibit that we're marking as Number Fifteen.
9     (Whereupon, Exhibit 15 was marked)
10 BY MR. FREE:
11     Q. Have you seen this document before?
12     A. I have not.
13     Q. It appears to be a letter from Chairman and
14 CEO George Zoley of The GEO Group to Pete Edge, Acting
15 Deputy Director of ICE dated May 30th regarding the
16 equitable adjustment request that you sent on
17 February 14th, 2018. Have I accurately characterized
18 what this letter looks like?
19     A. Yes.
20     Q. This is following up on your 20 - your letter
21 of February 14th, right?
22     A. Yes.
23     Q. Okay, were you involved in the April 18th
24 updated individual requests for equitable adjustments
25 out of Adelanto, Aurora and Tacoma that is reflected in

Page 212

1 this letter?
2     A. No.
3     Q. Okay, did you know that those updated
4 individual requests for equitable adjustments had been
5 submitted to ICE on behalf of GEO?
6     A. I was not aware of their submittal, but
7 aware - I was aware that they were being prepared.
8     Q. Okay, and how did you know that?
9     A. With counsel.
10     Q. Okay, have you had any communications with
11 anyone at ICE about this letter? I know you haven't
12 seen it before today, but --
13     A. No.
14     Q. Okay.
15     A. Excuse me.
16     Q. That's all right.
17         And do you know if anybody else at GEO has
18 followed up on this May 30th letter?
19     A. I do not.
20     Q. I'm going to show you Sixteen, Exhibit Sixteen
21 now.
22         (Whereupon, Exhibit 16 was marked)
23 BY MR. FREE:
24     Q. This appears to be a letter dated June 21st,
25 2018 from U.S. Immigration and Customs Enforcement to

Page 213

1 The GEO Group and it's redacted, but I think the
2 Executive VP for Contract Administration here in Boca
3 Raton based on your testimony is Amber Martin; is that
4 correct?
5     A. That is correct.
6     Q. All right, and so this - combining these two
7 letters, you know, you submitted the one on 20 - on
8 February 14th for all of the cases and then on
9 April 18th you submitted individual contract equitable
10 adjustment requests based on Exhibit Fifteen and then
11 this is a response to that individual equitable
12 adjustment request for Adelanto; is that right?
13         MR. DONOHUE: Object to the form.
14         THE WITNESS: Yes.
15 BY MR. FREE:
16     Q. Okay, on page - the second page of this
17 document I'm reading - the last numbers are 4013 or 6060
18 depending on which one you look at.
19         There's a bunch of redactions and then it
20 says, "Based on the above, GEO's REA, request for
21 equitable adjustment is denied in its entirety." Do you
22 see that?
23     A. Yes.
24     Q. Have I read that correctly?
25     A. Yes.

Page 214

1     Q. "As a threshold matter, GEO has failed to show
2 its entitlement to such a modification under the IGSA
3 terms or applicable laws and regulations." Do you see
4 that?
5     A. Yes.
6     Q. All right, "Additionally, GEO has failed to
7 address the reasonableness or provide adequate
8 supporting data for the quantum sought." Do you see
9 that?
10     A. Yes.
11     Q. Did I read that correctly?
12     A. Yes.
13     Q. And then it points GEO to a disputes clause in
14 the intergovernmental services agreement and then a
15 contract disputes act. Do you see that?
16     A. Yes.
17     Q. I believe you testified earlier that you did
18 not know the result of your February 14th or February --
19 What was the date? I'm sorry. Your Valentine's Day
20 letter, right?
21     A. Right.
22     Q. So you didn't - you didn't know what the
23 result was; is that right?
24     A. Correct.
25     Q. Okay, do you now understand that the request



Page 215

1  for equitable adjustment has been denied?
2      A.  I do.  Yeah, it's the first time I've seen
3  this but, yes, I do.
4      Q.  All right.
5          GEO appears to still be operational, correct?
6      A.  Correct.
7      Q.  All right, so at least since Valentine's Day
8  2018 up to today, June 13th, 2019 GEO has borne the
9  costs of its defense on its own?
10     A.  We have.
11     Q.  Okay.
12         I think we should clear some brush because I -
13  I worry about some of that stuff getting folded into the
14  exhibits in front of you, so I'm going to let your
15  counsel kind of move the PBNDS out of the way.  Yes.
16         MR. DONOHUE:  Can you take those and just put
17     it back into one exhibit.
18  BY MR. FREE:
19     Q.  Oh, I did mean to ask, I know you hadn't seen
20  that.  Let's just -- I'm sorry.  Let's go back to --
21  Yes, Exhibit Fifteen.  I know you haven't seen that
22  letter before that's in front of you, Exhibit Fifteen,
23  but were you aware of any - that this had gone out?
24     A.  I was not.
25     Q.  Okay, and did you attend or know about any

Page 216

1  meetings regarding the preparation or submission of
2  this?
3      A.  No.
4      Q.  Okay, is it fair to say that you have not been
5  in the loop on subsequent communications about the
6  equitable adjustment sought to ICE by GEO for voluntary
7  work regarding lawsuits?
8      A.  That would be fair.
9      Q.  Okay, Mr. Venturella, I'm going to hand you a
10  document we're marking as Exhibit Seventeen.
11         (Whereupon, Exhibit 17 was marked)
12  BY MR. FREE:
13     Q.  Have you ever seen this document before?
14     A.  Yes.
15     Q.  What is it?
16     A.  It's a declaration.
17     Q.  By whom?
18     A.  By me.
19     Q.  Okay, if you turn to the last page.  It's on
20  the back of the package, page ten.  What date did you
21  sign this letter?
22     A.  December 22nd, 2015.
23     Q.  Okay, and you submitted this letter on behalf
24  of GEO to the United States District Court from the
25  Southern District of New York.  Do you remember doing

Page 217

1  that?
2      A.  I do.
3      Q.  Okay, or someone did it on your behalf, right?
4      A.  Right.
5      Q.  Okay.
6      A.  Right.
7      Q.  At the time in 2015 you're the Senior
8  Business - Senior Vice-President of Business Development
9  for GEO?
10         We're back on this one.
11     True?
12     A.  Yes.
13     Q.  The declaration was based on your personal
14  knowledge in your capacity as the person responsible for
15  proposals at GEO and is described herein, true?
16     A.  True.
17     Q.  And then you explained that you went to GEO in
18  2012 and prior to that you were employed at ICE for
19  twenty-two years where you held various positions,
20  right?
21     A.  Correct.
22     Q.  Did you review this declaration in preparation
23  for the deposition?
24     A.  No.
25     Q.  All right, when's the last time you saw this

Page 218

1  declaration?
2      A.  Probably December 22nd, 2015.
3      Q.  Okay, fair enough.
4          All right, you say in paragraph three since
5  GEO was founded in 1984.  Was it called GEO in 1984 do
6  you know?
7      A.  No.  It was part of the Wackenhut Group.
8      Q.  Okay, so when you're referring to GEO's
9  founding you're talking about Wackenhut, right?
10     A.  Correct.
11     Q.  Probably the Corrections Department of
12  Wackenhut, right?
13     A.  I don't know.
14     Q.  Okay, that's fine.
15         You are not the company historian, I think,
16  right?
17     A.  That is correct.
18     Q.  Cool.
19         At the time you had twelve detention
20  facilities of different types for ICE, that's paragraph
21  four, right?
22     A.  Correct.
23     Q.  And GEO - so GEO had twelve detention
24  facilities, not you, David Venturella?
25     A.  GEO.  Correct.



DAVID J. VENTURELLA  Volume II
NOVOA vs THE GEO GROUP

June 13, 2019
219—222

Page 219

1    Q.  Okay.
2        If I said you and you've responded probably
3  GEO.
4        There were seventy-five thousand beds overseen
5  by GEO in the United States in sixty-four different
6  places, correct?
7    A.  Correct.
8    Q.  Turn to page three.  Paragraph twelve, pricing
9  information staffing plans, do you see that?
10   A.  Yes.
11   Q.  You testified under oath, "A bed-day or per
12 diem rate is the daily rate paid by the con - by the
13 government to a contractor for the comprehensive secure
14 residential care of detainees at a CDF."  That's a
15 contract detention facility, right?
16   A.  Correct.
17   Q.  And the bed-day or per diem rates are the
18 things we were talking about earlier, right?
19   A.  Correct.
20   Q.  And you were saying about that's how you
21 established the price in - for a fixed rate contract?
22 Yeah?
23   A.  Correct.
24   Q.  Okay, so this is the same thing we're talking
25 about?

Page 220

1    A.  Correct.
2    Q.  Okay, "The bed-day rate broadly includes all
3  daily operating costs of the facility including
4  personnel, food, health care, supplies, utilities,
5  maintenance, infrastructure, depreciation, cost of
6  capital, overhead and profit," correct?
7    A.  Correct.
8    Q.  All right, has any of that changed since 2015
9  or is that what the bed-day or per diem rate encompasses
10 still?
11   A.  Broadly, yes.
12   Q.  Anything that is - it's leaving out?
13   A.  No.  I don't think so.
14   Q.  Okay.
15   A.  I think those are broad categories.
16   Q.  Okay.  Okay, when you say broadly, what you're
17 saying is these are just kind of high level descriptions
18 of what's in the bed-day rate?
19   A.  Correct.
20   Q.  Okay, the next sentence says, "Of these costs
21 the largest single cost is for personnel."  That's still
22 at the bottom of three.  Do you see that?
23   A.  Yes.
24   Q.  Is that true?
25   A.  Yes.

Page 221

1    Q.  Okay, "Representing approximately
2  sixty-five percent of the total facility costs."  Do you
3  see that?
4    A.  Yes.
5    Q.  Did I read that correctly?
6    A.  You did.
7    Q.  Is that true?
8    A.  That is true.
9    Q.  Okay, "The labor costs are calculated based on
10 the application of the company's proprietary staffing
11 plan to the design and operation of the facility with
12 personnel decision" -- Excuse me -- "Personnel positions
13 priced in accordance with the minimum wages and benefits
14 set forth in the Department of Labor wage determination
15 issue for that particular RFP in the geographical area
16 that facility will serve."  Did I read that correctly?
17   A.  You did.
18   Q.  The RFP is a request for proposal?
19   A.  Yes.
20   Q.  Okay, you say, "Each company has its own
21 proprietary approach to staffing based on its analysis -
22 based upon its analysis of the RFP work statement
23 requirements, company philosophy and operational
24 policies."  Is that right?
25   A.  Yes.

Page 222

1    Q.  Okay, so when you say each company, you're
2  talking about private corporations that are doing
3  immigration detention contracts, correct?
4    A.  Or detention contracts.
5    Q.  Okay.
6    A.  Yeah.
7    Q.  All right, broader than just immigration?
8    A.  Right.
9    Q.  Okay, this is industry wide, right?
10   A.  Correct.
11   Q.  Okay, then you say, "The bed-day rates and
12 staffing plans contained in the contractor's proposal or
13 bid are incorporated into the final contract unless they
14 are revised as a result of subsequent negotiation with
15 ICE."  Is that right?
16   A.  Yes.
17   Q.  That's what you said and that's what's true,
18 right?
19   A.  Yes.
20   Q.  And we've seen reflections of that already in
21 the documents we've - we've looked at, right?
22   A.  Yes.
23   Q.  We saw the initial bed-day rate in the initial
24 IGSA of ninety-nine dollars per bed-day at a certain
25 level and then something lower at a secondary level



DAVID J. VENTURELLA  Volume II
NOVOA vs THE GEO GROUP

June 13, 2019
223—226

Page 223

1  after the minimum guarantee, right?

2      A.  Yes.

3      Q.  Yeah, and then you get the blended rate going

4  forward it moves.  We've seen some of the modifications

5  that say we're going to increase the bed-day rate based

6  on an increased cost that GEO has to bear, right?

7      A.  Correct.

8      Q.  Okay, so we looked at the one regarding the

9  collective bargaining agreement for guards, right?

10      A.  Yes.

11      Q.  We looked at the one regarding medical

12  staffing - medical staffing being increased, right?

13      A.  Yes.

14      Q.  And so that increased cost increased the

15  bed-day rate, correct?

16      A.  Correct.

17      Q.  And you've said, you know, labor is

18  approximately sixty-five percent of the total costs,

19  correct?

20      A.  Correct.

21      Q.  Yeah.

22          Okay, and I think the next sentence explains

23  what we've been looking at.  "Over the duration of the

24  contract, there are often minor modifications that may

25  adjust the bed-day rate and overall contract pricing."

Page 224

1  Is that right?  That's in paragraph thirteen.

2      A.  Oh, okay.

3      Q.  Is that right?

4      A.  Yes.

5      Q.  Okay, I've read it correctly and that's still

6  true?

7      A.  Yes.

8      Q.  All right, then you describe a facility

9  staffing plan.  Do you see in paragraph fourteen?

10      A.  Yes.

11      Q.  And you explain that -- Well, first do you

12  remember when we were looking at the minimum staffing

13  plan of fourteen fifty-five beds and the max staffing

14  plan of nineteen-forty beds?

15      A.  I do.

16      Q.  Is that a facility staffing plan?

17      A.  Yes.

18      Q.  Is that what you're referring to here when you

19  say a facility staffing plan?

20      MR. DONOHUE:  Object to the form.

21  BY MR. FREE:

22      Q.  Or not that specific document, but that's the

23  kind of document you're talking about, right?

24      A.  Yes.

25      Q.  Okay.  Thank you.

Page 225

1      Is it fair to say that this facility staffing

2  plan reflects the cost of the labor, at least some of

3  them as you've described here?

4      MR. DONOHUE:  Object to the form.

5      THE WITNESS:  Yes.

6  BY MR. FREE:

7      Q.  Okay, so the facility - "A facility staffing

8  plan" -- This is paragraph fourteen -- "Contains every

9  position that the contractor intends to employ or retain

10  for the operation of the facility and includes the shift

11  that position will be required to work, generally

12  morning, afternoon or night, relief factor, reflecting

13  the number of persons required to fill each position

14  taking into account whether the position is a part-time

15  or full-time (five or seven day) post and how company -

16  many company specific sick days, vacation days, jury

17  duty days, et cetera must be taken into account in the

18  relief factor calculation for each position, whether the

19  position is a fixed or a static post, the hourly or

20  annual wage to be paid for each such position and the

21  payroll tax and benefit costs for each position."  Have

22  I read that correctly?

23      A.  Yes.

24      Q.  Is that still as true today as it was in 2015?

25      A.  Yes.

Page 226

1      Q.  Okay, "Every one of these calculations and

2  considerations can and will affect the overall cost

3  calculation associated with a facility's labor costs."

4  Did I read that correctly?

5      A.  Yes.

6      Q.  Is that true?

7      A.  Yes.

8      Q.  Okay, if you have to pay someone to do a job

9  and then you for - let's say the prevailing wage change,

10  it goes up.  That's an example of what you're talking

11  about when it says every one of these calculations --

12  I'm just giving you an example to make sure I

13  understand, that every one of these calculations and

14  considerations can and will affect the overall cost

15  calculation associated with the facility's labor costs?

16  So is that an example of one of the - like one of the

17  things that you have to take into consideration in this

18  calculation of the labor costs?

19      A.  The changing --

20      Q.  Yes, sir.

21      A.  -- wage, yes.

22      Q.  Okay, what about if you're required to give an

23  employee some type of fringe benefit like an individual,

24  like an employer mandate or something for insurance,

25  would that affect your labor costs?



Page 227

1    A.  Yes.
2    Q.  And what about if you were required to give
3  some form of paid time off, that would affect your labor
4  costs?
5    A.  Yes.
6    Q.  And similarly if you had to pay greater
7  payroll tax rates because they change, for example, that
8  would affect the labor costs?
9    A.  Yes.
10    Q.  It says, "In so much as the - inasmuch as the
11  labor costs," I'm still at page - excuse me, paragraph
12  fourteen.  "Inasmuch as the labor costs are such a major
13  part of the overall facility pricing, these models are
14  highly proprietary and confidential.  GEO's proposed
15  staffing plans submitted with its bid become part of its
16  contract."  Do you see where I read that?
17    A.  I do.
18    Q.  Did I read it correctly?
19    A.  Yes.
20    Q.  Okay, if you could look at paragraph
21  twenty-one you've given four examples of competitive
22  contracts in the DHS ICE market.  Do you see that?
23    A.  Yes.
24    Q.  All right, are these four examples facilities
25  that -- So the first one is the 2015 contract detention

Page 228

1  facility in the Houston area.  Did I read that
2  correctly?
3    A.  Yes.
4    Q.  You've listed the known competitors as GEO,
5  CCA and Emerald?
6    A.  Correct.
7    Q.  The second one involves it appears Southern
8  Border Transportation.  Do you see that?
9    A.  Yes.
10    Q.  Is that a detention contract?
11    A.  No.  It's a transportation contract.
12    Q.  Okay, do you use the same staffing and bed-day
13  situation with transportation contracts as you do
14  detention?
15    A.  I'm sorry?
16    Q.  ICE -- Okay, so when we're talking about
17  bed-day rates and per diems --
18    A.  Right.
19    Q.  -- I understood all of the staffing plan
20  bed-day rate stuff that you said in this declaration to
21  pertain to detention centers, right?
22    A.  Uh-huh.  (Affirmative response).  Correct.
23    Q.  So here I see a transportation cost and it
24  says the price and staffing plan are determining factors
25  in GEO's loss of the Southern Border Transportation

Page 229

1  competitive contract.  Do you see that?
2    A.  I do.
3    Q.  But that wasn't a detention contract?
4    A.  No, but it was an example of a competitive
5  contract.
6    Q.  Okay.  I see.
7       The next one is Guantanamo Bay it looks like,
8  a migrant operation center in GTMO?  Do you see that?
9    A.  Yes.
10    Q.  That was in 2011?
11    A.  Yes.
12    Q.  Okay, above that in paragraph twenty you
13  describe the process of ICE -- I'll just tell you what
14  you said.  You said, "Based on my information and
15  belief, there are four factors that affect ICE CDF -
16  that affect competition for ICE CDF contracts."  Have I
17  read that correctly?
18    A.  Yes.
19    Q.  The first one is, "ICE identifies a restricted
20  geographic radius typically fifty miles in reasonable
21  proximity to the permanent ICE field office or an
22  airport that ICE uses for detainee transportation."  Did
23  I read that correctly?
24    A.  You did.
25    Q.  "Such locations and participating airports are

Page 230

1  relatively static but nonetheless drive the geographic
2  requirements for the proposed CDF."  Did I read that
3  correctly?
4    A.  Yes.
5    Q.  I'm going to take a pause.
6       Do you remember the RFI that ICE put out that
7  we talked about earlier for the State of California?
8    A.  Yes.
9    Q.  Is it geographically limited to fifty miles in
10  radius from an ICE field office for the airport?
11    A.  I don't recall.
12    Q.  Okay.  Thank you.
13       All right, the second is, "The prescribed ICE
14  geographic area the acceptable radius is regulated by
15  local county and city ordinances that restrict the
16  establishment of such a facility and are subject to
17  vocal opposition by neighboring residents."  Do you see
18  that?
19    A.  Yes.
20    Q.  So that's your second of the four factors
21  affecting the competition for ICE CDF contracts, right?
22    A.  Yes.
23    Q.  When you wrote this or now do you understand
24  that there is any contractor that would be more
25  susceptible, that would be at a competitive disadvantage



DAVID J. VENTURELLA  Volume II
NOVOA vs THE GEO GROUP

June 13, 2019
231–234

1  because of these local regulations and vocal opposition
2  by neighboring residents?
3       MR. DONOHUE:  Object to the form.
4  BY MR. FREE:
5    Q.  I guess I just don't understand -- Go ahead,
6  sir.
7    A.  No.  No.  I was going ask --
8    Q.  Do you understand my question?  You look
9  confused.
10   A.  Yeah, I don't.
11   Q.  I don't know why - I just don't know why
12  that - these two things affect - why competitors are
13  actually like at a disadvantage as to each other as to
14  these two things.  Can you explain that?
15      MR. DONOHUE:  Object to the form.
16      THE WITNESS:  So your question is why is this
17  a consideration?
18  BY MR. FREE:
19   Q.  Yeah.  Why is that the four factors that
20  affects competition price among CDF contracts among the
21  competitors that you've listed, CCA, MTC, CSC and
22  Emerald.
23   A.  If you have to site a new facility depending
24  on as I said in there the ordinances or statutes or what
25  regulations may not allow for such a facility to be

1  built, I mean that has to be one of the considerations
2  of where you would site a facility to qualify for ICE
3  consideration or a government agency's consideration.
4       You could have a facility that is - meets all
5  their standards but it's outside their radius and
6  wouldn't qualify.  Trying to site one closer in a county
7  that is not receptive would impact your ability to bid.
8    Q.  When you say you, you mean GEO?
9    A.  GEO or a company's ability to bid.
10   Q.  I understand what you mean.  I mean it, too.
11      The - and you're saying that that -- I think
12  you're saying here that that could actually affect one
13  of these competitors more than the other.  If it's one
14  of the four factors then GEO could be more at a
15  disadvantage based - based on, for instance, vocal
16  opposition by neighboring residents than say maybe
17  Emerald?
18   A.  More disadvantage?
19   Q.  Or less.  Maybe they have a better position.
20   A.  I think it could be either or.
21   Q.  Okay, so you're saying it's variable as to the
22  company based --
23   A.  Not to the company but I guess to the - to the
24  geographic area --
25   Q.  Okay.

1    A.  -- in which --
2    Q.  All right, the third factor is, "The cap - the
3  third CDFs are capital intensive and typically cost
4  several tens of millions of dollars due to ICE's
5  objectives in achieving economies of scale pricing
6  through larger facilities and the application of the new
7  ICE 2011 Performance-Based National Detention
8  Standards."  Why is that a competitive factor?
9    A.  The amount of capital that needs to be
10  invested could possibly limit some companies from
11  participating.
12   Q.  Okay, and then the fourth, "The typical
13  contract term of one base year plus several one year
14  options creates a very risky investment thesis for many
15  potential competitors."  Did I read that correctly?
16   A.  You did.
17   Q.  Was that true then?
18   A.  Yes.
19   Q.  Is it still true now?
20   A.  Yes.
21   Q.  Can you think of any ICE GEO detention
22  contract where this risk has actually been realized?
23   A.  There have been facilities that have been
24  discontinued.  I just don't recall where and how many.
25   Q.  Facilities between ICE and GEO?

1    A.  ICE - ICE and GEO or ICE in the private
2  sector?
3    Q.  I'm asking - asking specifically about ICE and
4  GEO's contracts.  I'm asking if you know whether there's
5  ever been a situation where there's a contract term of
6  one base - one base year plus several one year options
7  and then ICE did not exercise one or more of those
8  options in its contract with GEO, do you know of any
9  situation in which that's happened?
10   A.  Not in my time there, no.
11   Q.  Okay, what would cause ICE to do that, if you
12  know?
13      MR. DONOHUE:  Object to form.
14      THE WITNESS:  I don't.  I don't know.
15  BY MR. FREE:
16   Q.  Would non-performance or inadequate
17  performance be a part of that risk?  By the contractor I
18  mean.
19      MR. DONOHUE:  Object to the form.
20      THE WITNESS:  I think that could be a factor
21  that's considered, yes.
22  BY MR. FREE:
23   Q.  What about health or safety issues that were
24  created by the contractor's failure to comply, could
25  that be a factor in ICE choosing not to exercise one or



Page 235

1  more of its option years?
2      A.  It could be a factor.
3      Q.  Okay, does GEO in its operations take that
4  into consideration in computing these contracts, that
5  risk?
6      A.  Yes.
7      Q.  Okay.  I think what we're talking about with
8  Adelanto is in paragraph twenty-three, it's on page
9  seven.  You testified under oath, "ICE also obtains
10  detention services under IGSAs awarded to counties and
11  cities.  ICE selects specific facilities, in some cases
12  between competing city or county facilities that are
13  geographically close to each other.  While the IGSA
14  process is not as formal and structured as a competitive
15  procurement, the evaluation and award of an IGSA are
16  based on similar factors, i.e., detention capacity,
17  compliance with National Detention Standards and ICE
18  policy and procedures, the level and types of services
19  provided and most importantly - most importantly the
20  daily per diem rate/cost."  Is that - is that true?
21      A.  Yes.
22      Q.  Okay, it was true then, it's still true now?
23      A.  Yes.
24      Q.  Do those competitive factors -- Excuse me.
25          Do the -- Turn back to paragraph twelve,

Page 236

1  pricing information and staffing plans.  This is the one
2  about the bed-day rate that we read.  Do you see that?
3      A.  Yes.
4      Q.  Is everything that you've written in paragraph
5  twelve regarding the bed-day rate and what's included in
6  the cost applicable to intergovernmental service
7  agreement contracts --
8          MR. DONOHUE:  Object to the form.
9  BY MR. FREE:
10      Q.  -- like what you've described in twenty-three?
11      A.  Yes.
12      Q.  Okay, so when you say most importantly the
13  daily per diem rate/cost I can know what you mean when I
14  look at paragraph twelve, right?
15          MR. DONOHUE:  Object to the form.
16          THE WITNESS:  Yes.
17  BY MR. FREE:
18      Q.  Thank you.
19          And then, "Subcontracts to provide services as
20  an operator on behalf of a county or a city under IGSA
21  can also be competitively bid."  Do you see that?
22      A.  Yes.
23      Q.  Did I read that correctly?
24      A.  Yes.
25      Q.  All right, is that true?

Page 237

1      A.  Yes.
2      Q.  Are you aware of any responses to
3  competitively bid intergovernmental service agreements
4  from ICE that GEO has responded to?
5      A.  That we have responded to?  I don't recall.
6      Q.  Okay, I will save -- There's one that you list
7  in this I think right below that in 2003.  You might not
8  remember that just right off the bat, but do you see as
9  an example in October, 2003 this is in paragraph
10  twenty-three at the bottom of page seven.  Do you see
11  that?  So I'm here.
12      A.  Yeah.  No.  No.  I --
13      Q.  Yeah.  You're just reading the whole sentence?
14      A.  Yeah.
15      Q.  Okay, so, "As an example in October, 2003 GEO
16  responded to a county RFP --
17      A.  Right.
18      Q.  -- to provide management services for the
19  Reeves.  GEO was selected to manage the Reeves County
20  Detention Complex which at the time provided services to
21  the BOP, Bureau of Prisons, under an IGSA."  Did I read
22  that right?
23      A.  Correct.
24      Q.  "Similarly in 2007, GEO responded to an RFP to
25  provide maintenance and operation -- Similarly in 2007,"

Page 238

1  I'm sorry, "GEO responded to an RFP to provide
2  maintenance and operation of a facility to house Federal
3  prisoners from Montgomery County, Texas."  Do you see
4  that?
5      A.  Yes.
6      Q.  Did I read that correctly?
7      A.  You did.
8      Q.  When you say Federal prisoners, I think you're
9  distinguishing prisoners in Federal custody, in other
10  words, criminally convicted or criminally detained
11  prisoners or pretrial detainees from immigration
12  detainees.  Is that the distinction that you're making
13  by saying Federal prisoners?
14      A.  Yes.
15      Q.  Okay, you are excluding immigrant detention -
16  civil immigration detention from that definition, right?
17      A.  Correct.
18      Q.  Okay, immigration detention is civil, not
19  criminal, right?
20      A.  Correct.
21      Q.  Okay, and ICE has the standards in place to
22  recognize that distinction, right?
23      A.  Correct.
24      Q.  Okay, and if you're in immigration detention
25  you're not there as punishment; correct?



DAVID J. VENTURELLA  Volume II                                    June 13, 2019
NOVOA vs THE GEO GROUP                                            239–242

Page 239

1    A.  That is correct.
2    Q.  And there's - it might not even necessarily be
3  because you've - because you are going to be deported?
4  In other words, lots of people who are in immigration
5  detention end up getting out and winning their cases,
6  right?
7    A.  Yes.  That's an outcome.
8    Q.  So the purpose of the detention -- You know,
9  would you agree that the purpose of immigration
10  detention, civil immigration detention is to ensure
11  that, you know, some people who have been removed are
12  removed are going to be present for ICE's execution of
13  their removal order, number one, would you agree with
14  that?
15    A.  Yes.
16    Q.  Okay, and then second that for some people who
17  are either ineligible for a bond by statute or who don't
18  qualify because the judge says I don't think you're
19  going to show up or you're a danger to the community
20  that those people are housed as well in secure
21  facilities?
22    A.  That would be correct.
23    Q.  Yeah, so awaiting your removal proceeding or
24  awaiting your deportation is the reason you're in an
25  immigration detention center, right, civil immigration

Page 240

1  detention center?
2    MR. DONOHUE:  Object to the form.
3    THE WITNESS:  Yes.
4  BY MR. FREE:
5    Q.  Okay.  Okay, so I want to look at paragraph
6  twenty-four on page eight and I'm looking at the fifth
7  line down that begins - it's the first full sentence
8  that says, "The bed-day rate broadly includes all daily
9  operating costs of the facility, including personnel,
10  food, health care, supplies, utilities, maintenance,
11  infrastructure, depreciation, cost of capital, overhead
12  and profit."  Did I read that correctly?
13    A.  You did.
14    Q.  Was that true then?
15    A.  Yes.
16    Q.  Is it true now?
17    A.  Yes.
18    Q.  All right, so a - the next sentence says, "A
19  staffing plan is the most important component of a
20  contractor's overall pricing model because the costs
21  associated with the overall staffing of a facility
22  constitute approximately sixty-five percent or more of
23  the facility's total operating costs."  Did I read that
24  correctly?
25    A.  You did.

Page 241

1    Q.  Is that true?
2    A.  Yes.
3    Q.  Okay, then and now, right?
4    A.  Yes.
5    Q.  This - the business hasn't changed since
6  you're discussing it in 2015, right?
7    A.  It is not.
8    Q.  In terms of this particular element of the
9  staffing plan being - that's the labor being the most
10  important part of your per diem?
11    A.  It's --
12    MR. DONOHUE:  Object to the form.
13    Go ahead.
14    THE WITNESS:  Sorry.
15    It's been the same.
16  BY MR. FREE:
17    Q.  Okay, and then you say, "A competitor could
18  develop a cost model of the staffing component of GEO's
19  bed-day rate as described in paragraph fourteen above,"
20  we've been through that and "It could then," the
21  competitor, "Could then identify the relative
22  percentages of the remaining approximately
23  thirty-five percent in direct and indirect costs with a
24  percentage breakdown estimate of GEO's food, health
25  care, supplies, utilities, maintenance,

Page 242

1  infrastructure -- Utilities, maintenance,
2  infrastructure, depreciation cost of capital, overhead
3  profit."  Is that true?
4    A.  Yes.
5    Q.  That's a competitor sort of
6  reverse-engineering what GEO's doing if it had GEO's
7  staffing plan, right?
8    A.  Correct.
9    Q.  They can take your sixty-five percent labor
10  costs and then they can take the other
11  thirty-five percent and attempt to figure out what the
12  relative percentages are in the direct and indirect
13  costs captured in the thirty-five percent food, health
14  care, supplies utilities, maintenance, infrastructure
15  depreciation, cost of capital, overhead and profit and
16  they can try and underbid you, right?
17    A.  Correct.
18    Q.  All right, and you can do the same to a
19  competitor?
20    MR. DONOHUE:  Object to the form.
21    THE WITNESS:  If - if we had access to that
22  information.
23  BY MR. FREE:
24    Q.  Yeah, you would need their staffing plan?
25    A.  Right.

Page 243

1     Q.  So the staffing plan tells you how you could
2  do that?
3     A.  In large part it does.
4     Q.  I guess.
5         So you could reverse-engineer a bed-day rate,
6  right?
7         MR. DONOHUE:  Object to the form.
8         THE WITNESS:  You could.
9  BY MR. FREE:
10    Q.  Okay, have you, you ever?
11    A.  No.
12    Q.  Okay, have you done it just as like a thought
13  exercise?
14    A.  No.
15    Q.  All right, then you say in twenty-seven,
16  paragraph twenty-seven on page nine the second sentence,
17  "GEO's pricing strategy" -- I'm reading part of the
18  sentence.
19        It says, "GEO's pricing strategy, based on a
20  proprietary staffing plan is the same" and I'll read the
21  whole paragraph so you know what we're talking about.
22        "In some procurements, GEO has no competition
23  for CDF solicitations and in other procurements for CDF
24  solicitations it faces competition."  Did I read that
25  correctly?

Page 244

1     A.  You did.
2     Q.  Is that true?
3     A.  That is true.
4     Q.  In the California City versus Adelanto RFI it
5  might be a procurement if ICE puts out an RFP that we
6  were talking about earlier today.  Do you remember when
7  we were talking about that in the deposition earlier?
8     A.  Yes.
9     Q.  Okay, so that could be a situation in which
10  GEO does face competition, right?
11    A.  Yes.
12    Q.  Okay.
13        All right, in twenty-eight it says - actually
14  look at paragraph thirty-five.  It's the last page.  It
15  says, "Therefore, the ultimate outcome of releasing the
16  ICE records pursuant to the Plaintiff's FOIA request
17  will not only be substantial competitive injury to The
18  GEO Group but to all other detention facilities both
19  public and private."  That's what you wrote on
20  December 22nd, 2015; is that right?
21    A.  Yes.
22    Q.  As you sit here today can you identify any
23  injury that GEO has suffered from the release of the
24  bed-day rates and staffing plans in this FOIA
25  litigation?

Page 245

1     A.  No.
2     Q.  Okay, do you know whether any injury has
3  happened?
4     A.  No.
5     Q.  Okay.
6     A.  Nor was I aware that any staffing plans or
7  bed-day rates were released, so I wasn't aware of that
8  outcome.
9     Q.  Okay, in fact, you said in this declaration
10  essentially that if they were released then a competitor
11  could reverse-engineer it and underbid you, right?
12    A.  Yes.
13    Q.  Has GEO's competitive position suffered
14  vis-a-vis - I think CoreCivic is the only real market
15  competitor with the capital, right?
16        MR. DONOHUE:  Object to the form.
17        THE WITNESS:  I would say that's accurate.
18  BY MR. FREE:
19    Q.  Okay.  We're going to look at a document we'll
20  mark as Exhibit Eighteen.
21        (Whereupon, Exhibit 18 was marked)
22  BY MR. FREE:
23    Q.  This appears to be a supplement - supplemental
24  declaration by you.  Do you see that at the top?
25    A.  Yes.

Page 246

1     Q.  I'm going to represent to you that it was
2  filed in the same case, the Detention Watch Network and
3  Center For Constitutional Rights versus ICE and DHS.  Do
4  you see - do you see that at the very top?
5     A.  Yes.
6     Q.  Okay, on page nine you signed this
7  declaration?
8     A.  I did.
9     Q.  Do you see your signature --
10    A.  I do.
11    Q.  -- on page nine?
12    A.  Yes.
13    Q.  You signed it on February 26th, 2016.  Do you
14  see that?
15    A.  Yes.
16    Q.  Have you seen this declaration since you
17  signed it?
18    A.  No.
19    Q.  Okay, again you explained you're the SVP for
20  Business Development at GEO, it's based on personal
21  knowledge, you're the person responsible for proposals
22  at GEO.
23        Now I'd like to turn your attention to page
24  three.  In paragraph six at the bottom the final
25  sentence it says, "Such harm would result from a



Page 247

1 competitor using GEO's proprietary bed-day rates and
2 staffing plans to reverse-engineer the build-up of GEO's
3 pricing and arrive at a lower per diem bed-day rate than
4 GEO's expected per diem rate."  Do you see that?
5      A.  Yes.
6      Q.  Did I read that correctly?
7      A.  You did.
8      Q.  Is that true?
9      A.  Yes.
10      Q.  Okay, you then say in paragraph seven, "Using
11 the 'CCA staffing plan," and that's in quotes, "For a
12 state contracted Correctional facility, which I
13 understand was attached to one of the filings in this
14 case (as it was released in response to a State Freedom
15 of Information Request) it is possible to specifically
16 show how a competitor could use this information to
17 reverse-engineer a contractor's proprietary per diem
18 rates and cause competitive harm in competing for a CDF
19 procurement contract.  The same analysis could be done
20 using a GEO staffing plan such as one of those attached
21 to its contracts with ICE."  Do you see that?
22      A.  Yes.
23      Q.  And did I read that correctly?
24      A.  You did.
25      Q.  Okay, so in the next paragraph, paragraph

Page 248

1 eight you say -- Is that true before we go on?
2      A.  That paragraph?
3      Q.  Yeah.
4      A.  Yes.
5      Q.  Everything is okay.  Cool.
6          The next paragraph you've listed four parts of
7 a proprietary bed-day or per diem rate and they're
8 composed of several elements per part.  The first part
9 is labor - "Labor charges for non-exempt hourly staff
10 used to operate the facility."  Do you see that?
11      A.  Yes.
12      Q.  Is that true?
13      A.  Yes.
14      Q.  The second part is, "Labor charges for exempt
15 salaried staff in management and supervisory positions."
16 Do you see that?
17      A.  Yes.
18      Q.  True?
19      A.  Yes.
20      Q.  The third part is -- Sorry -- "Medical
21 services and supplies, food service, inmate expenses,
22 security expenses, utilities (based on local research on
23 rates), program expenses, repairs and maintenance,
24 leases, insurance, professional fees, personnel
25 expenses, travel expenses, administration expenses and

Page 249

1 appropriate taxes."  Did I read that correctly?
2      A.  Yes.
3      Q.  Is that true?
4      A.  Yes.
5      Q.  Is that a complete summary of the non labor
6 whether it's exempt or non-exempt nonprofit component
7 parts of a per diem rate?
8      A.  Is it complete?  I couldn't say if it was a
9 hundred percent complete, but it's --
10      Q.  Is there anything that you can think of as you
11 sit here today that's left out of this list?
12      A.  Not at this moment.
13      Q.  Okay, and then the fourth part is profit,
14 right?
15      A.  Yes.  That's what it says there.
16      Q.  So I just want to make sure I understand,
17 parts one and two are labor, right?  Parts one and two
18 you've said contractors proprietary bed-day or per diem
19 rate in an amount composed of several elements, elements
20 one and two are labor, correct?
21      A.  Correct.
22      Q.  Three is basically overhead, your costs,
23 correct?
24      A.  Correct.
25      Q.  And four is profit, right?

Page 250

1      A.  Correct.
2      Q.  All right, so labor is sixty-five percent or
3 more of the per diem based on your testimony, right?
4      A.  Yes.
5      Q.  And then costs and profit are
6 thirty-five percent or less, correct?
7      A.  Correct.
8      Q.  Okay, of the per diem rate, right?
9          "In order to reverse-engineer a contractor's
10 proprietary per diem rates, a competitor could first use
11 the contractor's staffing plan to break down the
12 contractor's proprietary per diem rates into these
13 component parts," right?
14      A.  Yes.
15      Q.  And so if you working for GEO were trying to
16 deliver to the Federal Government, specifically ICE, a
17 lower per diem rate than CoreCivic, for example, or
18 Emerald or MTC you would benefit from saving money on
19 any one of these four component parts?  In other words,
20 if you lower any one of these four elements of the per
21 diem rate then the per diem rate will be - you know, it
22 will go down, right?
23          MR. DONOHUE:  Object to the form.
24          THE WITNESS:  Yes.
25 BY MR. FREE:



DAVID J. VENTURELLA  Volume II
NOVOA vs THE GEO GROUP

June 13, 2019
251–254

Page 251

1    Q.  Okay, so if you spend less on exempt labor
2  that's element two, the per diem rate goes lower?
3    A.  Yes.
4    Q.  Spend less on non-exempt labor, element one,
5  it goes lower?
6    A.  Yes.
7    Q.  Costs, food service, inmate expenses, medical
8  services and supplies, if you spend less on that your
9  per diem rate goes lower, correct?
10    A.  Yes.
11    Q.  And if you take less of a profit, that's
12  element four, your per diem rate goes lower, right?
13    A.  Yes.
14    Q.  Okay, and you have the incentive to lower a
15  per diem rate as GEO in a competitive market environment
16  so that you can get the contract, correct?
17        MR. DONOHUE:  Object to the form.
18        THE WITNESS:  Yes.
19  BY MR. FREE:
20    Q.  Okay, would you agree that generally all
21  things being equal the - the lowest bid will be the one
22  most likely to be approved by the government?
23        MR. DONOHUE:  Object to the form.
24        THE WITNESS:  All things being equal all the
25    evaluation factors being equal?

Page 252

1  BY MR. FREE:
2    Q.  Yes, sir.
3    A.  Yes.
4    Q.  So I'm bracketing out like a contractor with
5  just a pitiful performance record, you know, maybe their
6  facility burned down or something like that.  I'm
7  bracketing them out, but if everything else is basically
8  equal per diem is going to determine whether GEO gets
9  the contract over a competitor?
10        MR. DONOHUE:  Object to the form.
11  BY MR. FREE:
12    Q.  Right?
13    A.  Yes.
14    Q.  Okay, now GEO also has a fiduciary duty to its
15  shareholders to maximize profit, correct?
16        MR. DONOHUE:  Object to the form.
17        THE WITNESS:  I don't know about maximize
18    profit, but deliver profit, sure.
19  BY MR. FREE:
20    Q.  Well, if you --
21    A.  I don't know what that means, maximize profit.
22    Q.  To get the most that you can.
23        MR. DONOHUE:  The same objection.
24        THE WITNESS:  Yes.
25  BY MR. FREE:

Page 253

1    Q.  Okay, so if you have an option between two per
2  diem rates and one of them has a ten percent profit
3  margin, the other one has a twelve percent profit margin
4  and you think that there's two ways to -- Let me say
5  this a different way so it's really clear, okay?
6        Let's say you can arrive at the same per diem
7  rate as you, GEO can arrive at the same per diem rate
8  weighting these four elements differently.  Do you
9  understand the premise of --
10    A.  I do.
11    Q.  -- of what I'm about to ask?
12        Okay, so you know, you can - you can come out
13  with a hundred dollar per diem spending a little bit
14  more on labor and a little bit less on profit or you can
15  come out with a hundred dollar per diem spending a
16  little bit less on labor and a little bit more on profit
17  but you know you're going to be able to do a hundred
18  dollar per diem.  Do you understand the premise, the
19  second premise?
20    A.  I do.
21    Q.  Okay, you have a fiduciary duty to choose the
22  second one, right?
23        MR. DONOHUE:  Object to the form.
24        THE WITNESS:  I have a responsibility to be
25    able to win the procurement.  That's my role and

Page 254

1    responsibility.
2  BY MR. FREE:
3    Q.  I - I don't think you answered my question.
4    A.  Okay.
5    Q.  It's okay.
6        The per diem rate's the same, so the weighting
7  of it doesn't have anything to do with whether you win
8  because we've just discussed that all things being equal
9  between the two competitors the per diem rate with the
10  lower - the competitor with the lower per diem rate is
11  going to win, right?
12    A.  Correct.
13    Q.  Okay, let's say you know this one hundred
14  dollars is probably going to be the most competitive
15  because you've done your due diligence, you've
16  reversed-engineered if you can as much as possible what
17  these four elements look like for your competitors,
18  right?  Let's say you've done that, which I think you
19  do.
20        MR. DONOHUE:  Object to the form.
21  BY MR. FREE:
22    Q.  Right?
23    A.  Correct.
24    Q.  Do you do that?
25    A.  Correct.  Correct.



Page 255

1    Q.  You do?

2    A.  We do an analysis to determine, right.

3    Q.  Okay, and we as GEO?

4    A.  We as GEO.

5    Q.  Okay.

6    A.  Correct.

7    Q.  So as between a per diem rate of a hundred
8  dollars that has a twelve percent profit and one of a
9  hundred dollars that has an eight percent profit GEO
10  would want the twelve percent profit, right?

11        MR. DONOHUE:  Object to the form.

12        THE WITNESS:  We would -- It's just not as
13    simple as that.

14        If we're submitting a proposal they also look
15    at the - the staffing and whether or not that
16    staffing is adequate and if your staffing costs are
17    lower because you're reducing the number of staff
18    then that could be a factor in the evaluation, so
19    while the profit may be more you may have hurt
20    yourself by not meeting all of the requirements of
21    the RFP.

22  BY MR. FREE:

23    Q.  Is there any limitation on other than - I
24  think what you've just described is ICE might not like
25  your staffing model and they might decide I'll take a

Page 256

1  more expensive per day rate than have this bad staffing
2  model.  Is that a fair summary of what you've just told
3  me?

4        MR. DONOHUE:  Object to the form.

5        THE WITNESS:  That is fair.

6  BY MR. FREE:

7    Q.  All right, this company's taking too much
8  profit and they're skimping on labor and so we're going
9  to go with the other people who are taking less profit
10  but they're charging us more, is that the hypothetical
11  that you were describing?

12    A.  I --

13        MR. DONOHUE:  Object to the form.

14        THE WITNESS:  I don't know if it's an
15    evaluation of the percentage of profit.  It's more
16    of the evaluation of whether or not that staffing
17    plan that was submitted meets the requirements.

18  BY MR. FREE:

19    Q.  Okay, but as a competitive bidder GEO is
20  incentivized to have the labor sixty-five percent of
21  part of it's bed-day rate that is labor to have that be
22  as lean as possible subject to the requirements that ICE
23  has put out, right?

24        MR. DONOHUE:  Object to the form.

25        THE WITNESS:  I would say not lean but

Page 257

1    accurate as possible.

2  BY MR. FREE:

3    Q.  Okay.  Well, let's do what you did.  In
4  paragraph twelve, page five you've talked about how you
5  would reverse-engineer a per diem for a competitor, "The
6  first step is to evaluate the labor portion of the
7  incumbent's per diem bed-day rate for non-exempt hourly
8  staff," right?

9    A.  Yes.

10    Q.  And then you do the second - in paragraph
11  thirteen you do the second thing - you do the same
12  exercise for each non-exempt position of the plan,
13  right?

14    A.  Correct.

15    Q.  And then next you look at your own staffing
16  plan and expected labor costs and you identify places
17  you propose to eliminate, right?

18    A.  Correct.

19    Q.  And then in paragraph fifteen you say that in
20  order to underbid CCA GEO would propose eliminating 38.8
21  full-time equivalent positions, right?

22    A.  Yes.

23    Q.  "These reductions reflect GEO confidential and
24  proprietary approach to managing such facilities,"
25  correct?

Page 258

1    A.  Correct.

2    Q.  All right, and then based on that, the cost
3  savings that you're getting from eliminating those
4  thirty positions you underbid them by two dollars and
5  forty-four cents in paragraph sixteen.  It's the last
6  page, the last sentence in paragraph sixteen, right?

7    A.  Yes.

8    Q.  All right, is it fair to say generally that
9  the less you spend on labor the lower the per diem rate
10  is going to be?

11        MR. DONOHUE:  Object to the form.

12        THE WITNESS:  I think that's fair.

13  BY MR. FREE:

14    Q.  Okay, and is it fair to say that if you can
15  weight the elements with those four elements that you've
16  identified within the per diem so that you have - GEO
17  has the labor costs as low as possible, the element --
18  So that's elements one and two -- The operations costs
19  as low as possible, that's element three, you would want
20  element four, the profit to be as high as possible?  Is
21  that a fair description of the way GEO would put
22  together the per day rate?

23        MR. DONOHUE:  Object to the form.

24        THE WITNESS:  I would say that profit has to
25    be acceptable to the client.



Page 259

1  BY MR. FREE:
2     Q.  Right, but apart from that what I've said is
3  accurate?
4        MR. DONOHUE:  Object to the form.
5        THE WITNESS:  I believe so.
6  BY MR. FREE:
7     Q.  Okay.  Thank you.
8        And I think what I've said is reflected in
9  paragraph nineteen where you say on behalf of GEO on
10 page seven it says, "The next step involves estimating
11 non-labor expenses including medical services and
12 supplies, food service, inmate expenses" and so forth.
13 Do you see where you said that?
14    A.  In paragraph nineteen?
15    Q.  Uh-huh.
16    A.  Yes.
17    Q.  You say, "These costs are generally the same
18 for all CDF market competitors and are based on market
19 rates."  It's the second to last sentence.
20    A.  If we're competing for the same area?
21    Q.  Uh-huh.
22    A.  Yes.
23    Q.  And I want to be really clear we're talking
24 about ICE detention facilities.  I know that there's
25 some overlap in this declaration.  For instance, you're

Page 260

1  using a CCA State Prison contract to reverse-engineer
2  the per diem, but my question is about costs being
3  generally the same for all CDF market competitors and
4  based on market rates.
5     A.  Yes.
6     Q.  Okay, paragraph twenty, "A CDF market
7  competitor can roughly identify the profit included in a
8  per diem rate from another competitor by adding together
9  the, one, labor charges for non-exempt hourly staff used
10 to operate the facility based on the staffing plan and
11 wage determination, two, estimated labor charges for
12 exempt, salaried staff in management and supervisory
13 positions and, three, estimated non labor charges."  Do
14 you see that?
15    A.  Yes.
16    Q.  So you're basically saying you can figure out
17 their profits if you can figure out elements one through
18 three, right?
19    A.  You can, yeah.  You can get --
20    Q.  Okay.
21    A.  -- pretty close.
22    Q.  Okay.
23       In fact, GEO does that as a business practice,
24 correct?
25    A.  Does what?

Page 261

1     Q.  Attempts to identify a competitor's profit
2  based on its research as to elements one - one through
3  three so that you can then deliver a lower per day rate,
4  GEO can develop a lower per day rate in response to a
5  proposal?
6     A.  No.  That answer is no.
7     Q.  Okay.
8     A.  We don't focus on what the competitor's profit
9  is.
10    Q.  What do you focus on?
11    A.  Mostly on what we think the per diem rate is -
12 is going to be.  Again I mean depending on the
13 procurement and the location, the type of facility, how
14 it's laid out, et cetera could all drive, you know,
15 factors into - into the per diem, so you look at a
16 facility that's thirty years old versus a facility
17 that's five years old.  The thirty year facility's going
18 to be more labor intensive than the five year facility -
19 five year old facility so, I mean those are the types of
20 factors we - we research and analyze to determine where
21 we think they're going to come out on a per diem.
22    Q.  And by we you mean GEO?
23    A.  GEO.
24       I'm sorry.
25    Q.  It's okay.  I'm doing it, too.

Page 262

1     A.  Yeah, that's fine.
2     Q.  GEO proposes and ICE approves a per diem rate,
3  correct?
4     A.  Yes.
5     Q.  The per diem rates in the Adelanto contract
6  are the results of GEO's application of the four factors
7  that you've laid out, correct?
8        MR. DONOHUE:  Object to the form.
9        THE WITNESS:  Yes.
10 BY MR. FREE:
11    Q.  There's no other factor other than labor costs
12 in - in your per diem rate, correct, at Adelanto?
13    A.  Say that again.  I'm sorry.
14    Q.  In your per diem rate in the Adelanto contract
15 there's no other factor other than labor costs and
16 profit, pieces one - elements one and two, element three
17 and element four?
18    A.  All four elements?
19    Q.  Uh-huh.
20    A.  Yes.
21    Q.  All right, so if you can reduce labor you can
22 theoretically increase profit if you're GEO?
23       MR. DONOHUE:  Object to the form.
24       THE WITNESS:  In the case of Adelanto?
25 BY MR. FREE:



Page 263

1    Q.  Just generally.

2    A.  I mean I think that's hard -- Well, I would

3  say no, you can't.  If you've submitted a proposal and

4  it was accepted then, no, you can't.

5    Q.  I understand what --

6    A.  Oh.

7    Q.  I think I understand what you're saying is

8  once you - once you've agreed to the contract with

9  ICE --

10    A.  ICE, yeah.

11    Q.  -- you don't get to change from an example

12  staffing plan that we've looked at --

13    A.  Right.

14    Q.  -- that says you're going to do

15  twenty-seven --

16    A.  Yeah.

17    Q.  -- kitchen positions.  You don't get to do

18  twenty-five and keep the rest, right?

19    A.  Correct.

20    Q.  Okay, but if you can minimize the costs that

21  you're spending on that if you're GEO in the initial

22  term, right, if you can - if you can figure out that we

23  only need twenty-seven and ICE will accept that they

24  will enter into this contract as opposed to thirty then

25  GEO can do the same thing that you described doing to

Page 264

1  CoreCivic in that reverse-engineer.  You can maximize

2  profit based on the lowering of the labor costs, right?

3    A.  Maximize profit?

4    Q.  You can - you know --

5    A.  That would bring about a lower per diem rate

6  if we were to reduce the staffing or the costs for the

7  staffing, so we would have to reduce the per diem rate.

8  You couldn't keep it the same and maximize your profit.

9  I mean there would be an expectation that if you're

10  providing less staff than what they think should be

11  there should be a lower per diem.

12    Q.  Does ICE give GEO model staffing plans in the

13  procurement process?

14    A.  They do not.

15    Q.  Does ICE set staffing ratios for GEO to abide

16  by in the procurement process?

17    A.  If they do it's - it's not provided to us.

18    Q.  I understood your testimony earlier today to

19  be that GEO would propose to ICE the staffing plan based

20  on its proprietary confidential formula, its company

21  philosophy and values.  Did I understand that correctly?

22    A.  Correct.

23    Q.  Okay, and so ICE is functionally looking at

24  what GEO has proposed when it's looking at the staffing

25  plan, correct?

Page 265

1    MR. DONOHUE:  Object to the form.

2    THE WITNESS:  It is looking at it and it's

3    comparing it to its estimates --

4  BY MR. FREE:

5    Q.  Okay.

6    A.  -- and I don't know what those are.

7    Q.  And sure.

8    And maybe the contract officer knows kind of

9  what it's going to take to do nineteen hundred and forty

10  beds from other contracts or from talking within ICE to

11  what that looks like and so they can tell whether a

12  contractor is, you know, shorting on staff, but my basic

13  question and I think that you've agreed is GEO presents

14  the staffing plan to ICE, ICE doesn't say you're going

15  to do twenty-seven people in the kitchen and build your

16  model after that?  It's initiated by GEO correct?

17    MR. DONOHUE:  Object to the form.

18    THE WITNESS:  So we initiate it and - but ICE

19    does have the opportunity to come back and say you

20    need to change it.

21  BY MR. FREE:

22    Q.  Yeah, they can negotiate it --

23    A.  Sure.

24    Q.  -- with you?

25    A.  Yes.

Page 266

1    Q.  And if - if you have a contract and you agree

2  then you've agreed, right?

3    A.  Yes.

4    Q.  Okay, and then the bed-day rate reflects the

5  agreement on staffing which is labor really which is

6  sixty-five percent of the average, you know, on the

7  normal per day rate based on your testimony, right?

8    MR. DONOHUE:  Object to the form.

9    THE WITNESS:  It reflects all the costs, not

10    just the labor.

11  BY MR. FREE:

12    Q.  All right, now once you've got the contract --

13  Let's take Adelanto specifically.  Adelanto is a fixed

14  price agreement, right?

15    A.  Yes.

16    Q.  Which means unless there's a modification or

17  an equitable adjustment GEO is stuck with the per diem

18  rate that GEO and ICE agreed to, correct?

19    A.  Yes.

20    Q.  Okay, and you said earlier, you know, you can

21  get the windfall of savings and you can bear the cost of

22  benefits.  The substance of your testimony earlier is I

23  think in a fixed price contract if you have a cost

24  overrun, the contractor, that's on you?

25    A.  Correct.



Page 267

1    Q.  You can come back and say we need more money
2  or if ICE is forcing you to overrun your costs then you
3  can ask them for more money but, you know, the price of
4  milk goes up or if GEO does business with a - let's take
5  out the price of milk.  If GEO does business with a
6  third-party for some contract and they are not getting
7  the best price then GEO eats that cost, right?
8    A.  Correct.
9    Q.  All right.
10       Are you okay?
11   A.  Yeah.  No, I was probably hitting the mic, so
12  I apologize.
13   Q.  We're going to hand you a document being
14  marked as Exhibit Nineteen.
15      (Whereupon, Exhibit 19 was marked)
16  BY MR. FREE:
17   Q.  This is a declaration from you on GEO's behalf
18  seeking to file limited redaction - redacted pages
19  incamera and under seal.  Do you know what incamera
20  means?
21   A.  I do not.
22   Q.  Do you know what under seal means?
23   A.  Yes.
24   Q.  All right, I'm just going to tell you they
25  wanted to just give it, GEO just wanted to give it to

Page 268

1  the Court and not give it to the Plaintiffs and so you
2  were - this declaration was in support of that, I think.
3       Again if you look to the final page.  Actually
4  look at page six of seven it says on the top.  Do you
5  see that?
6    A.  Yeah.
7    Q.  Because it's not paginated at the bottom.
8  That's your signature?
9    A.  Yes.
10   Q.  Did you sign this document?
11   A.  Yes.
12   Q.  Have you seen it since you signed it?
13   A.  No.
14   Q.  Did you sign it on December 1st, 2017?
15   A.  I assume I did.
16   Q.  Okay, fair.
17      Once again you're making this declaration as
18  GEO's SVP for Business Development.  You say in
19  paragraph one your "Duties include responsible for
20  leading GEO's business development and proposal efforts
21  in response to requests for proposal for GEO's contract
22  detention facilities which includes RFPs from
23  Immigration and Customs Enforcement" and everything in
24  here is based on your personal knowledge and other -
25  as - in your capacity as the person responsible for

Page 269

1  proposals at GEO and as described, do you agree that's
2  what you told the Court?
3    A.  Yes.
4    Q.  All right, if you'll flip over to page four of
5  seven in paragraph nine the discussion we were having
6  earlier about how GEO puts the staffing plan together
7  and then ICE looks at it, sees if it's reasonable, maybe
8  you negotiate and then the per diem rate is a reflection
9  of an agreement on what that staffing plan is.  Do you
10  recall that discussion?
11   A.  Yes.
12   Q.  All right, so you say, "Solicitations by ICE
13  and other agencies for contract detention services
14  typically require bidders to submit a comprehensive" and
15  it's capitalized, "Technical Response" and then it says,
16  (To include operational procedures and policies,
17  detailed staffing plan, facility design plans and
18  physical plant descriptions) detailed pricing cost
19  information and past performance information."  Did I
20  read that correctly?
21   A.  Yes.
22   Q.  Is that as true now as it was when you signed
23  this on December 1st, 2017?
24   A.  It is.
25   Q.  "When all other factors are more or less

Page 270

1  equal, the government will base the award on the overall
2  cost."  Is that true?
3    A.  Yes.
4    Q.  Okay, it's true that you wrote that and it's
5  true that that, in fact, is what the government does?
6    A.  Yes.
7    Q.  All right, "The winning proposal in almost
8  every Federal procurement competition in the detention
9  or prison contracting area is awarded to the lowest
10  bidder unless the bidder has an unsatisfactory
11  performance record."  Did I read that correctly?
12   A.  You did.
13   Q.  Is that true?
14   A.  I believe it is.
15   Q.  Well, you wrote it.
16   A.  Yeah.  I - listen, I don't know all the
17  procurements that have gone on, but it's as far as I
18  know, yes, that's true.
19   Q.  Okay, you once again describe the - in
20  paragraph ten, "The proprietary approach to staffing and
21  pricing plans based on the contractor's analysis of the
22  request for proposal work statement requirements
23  published by ICE or another soliciting agency along with
24  company philosophy and operational policies."  Did I
25  read that correctly?



Page 271

1   A.  You did.
2   Q.  What's GEO's company philosophy?
3   A.  Our philosophy?
4   Q.  Uh-huh.
5   A.  Treat people humanely.  I'm trying to remember
6   the - the statement, but it's basically treating people
7   humanely, open and honest communications, delivering
8   quality services, et cetera.  Something like that, to
9   that effect.
10   Q.  Is that written down somewhere?
11   A.  It is written down.
12   Q.  Where would I find it?
13   A.  On the wall next to my office.
14   Q.  All right.
15   A.  It could be on the website.  I don't know.
16   Q.  But that's a public document?
17   A.  I wouldn't say it's a public document, but if
18   it's on our website I guess it is.
19   Q.  Okay.
20   A.  Yeah.
21   Q.  And you take these into consideration in
22   responding to the RFPs?
23   A.  Yes.
24   Q.  What are the operational policies?
25   A.  What are?  I'm sorry?

Page 272

1   Q.  You also say operational policies.  I'm just
2   wondering what those are.
3   A.  There's hundreds.  Well, there's a lot of
4   operational policies.
5   Q.  Which ones bear on your submissions in
6   response to RFPs --
7   MR. DONOHUE:  Object to the form.
8   BY MR. FREE:
9   Q.  -- if you know?
10   A.  I think all of them.
11   Q.  Okay.
12   A.  Yeah.
13   Q.  So there's a lot of them and all of them are
14   relevant to how you do this?
15   A.  Yes.  I believe so.
16   Q.  All right.
17   MR. FREE:  Let's take a quick break.
18   It's 3:50.  Can we endeavor to come back at
19   4:00?
20   MR. DONOHUE:  No.
21   MR. FREE:  Okay.  Well --
22   MR. DONOHUE:  I'm joking.
23   MR. FREE:  He's refusing to endeavor to come
24   back at 4:00.
25   MR. DONOHUE:  I'm joking.

Page 273

1   What time were we off?
2   THE VIDEOGRAPHER:  3:51.
3   (Whereupon, there was a brief recess observed)
4   THE VIDEOGRAPHER:  We are back on the video
5   record 4:07 p.m.
6   BY MR. FREE:
7   Q.  Mr. Venturella, which part of the four
8   elements in the per diem rate is commissary?
9   MR. DONOHUE:  Object to the form.
10   THE WITNESS:  I don't believe commissary is
11   part of that.
12   BY MR. FREE:
13   Q.  What --
14   A.  We don't manage commissary, we don't profit
15   from commissary, we don't derive any, excuse me,
16   revenues from commissary is my understanding.
17   Q.  Okay, and we is GEO?
18   A.  We as GEO.
19   Q.  And that's all GEO's immigration and detention
20   centers or just Adelanto as far as you know?
21   A.  I believe that applies to all of our
22   facilities.
23   Q.  Do you know whether GEO uses one commissary
24   vendor or more than one?
25   A.  I believe more than one.

Page 274

1   Q.  Okay, do you know who Keefe is, K-e-e-f-e?
2   A.  I do know, yes.
3   Q.  Okay, do you know if Keefe provides commissary
4   to Adelanto?
5   A.  I do not know.
6   Q.  All right, and so there is a commissary, a
7   physical area where the goods are stored at Adelanto,
8   right?
9   A.  The commissary?
10   Q.  Yes, sir.
11   A.  Yes.
12   Q.  Have you seen it?
13   A.  I don't think I -- I don't recall seeing it.
14   Q.  Okay, and I think I understand you to mean
15   that the commissary vendor, that GEO doesn't run
16   commissary or profit from it, that means that Keefe
17   would be staffing the commissary; is that right?
18   A.  That's -- I believe that's correct.
19   Q.  Okay, does GEO derive any revenues from the
20   commissary?
21   A.  No.
22   Q.  Does GEO make any profit from commissary?  I
23   think you said no.
24   A.  Right.  No.
25   Q.  Does GEO use any part of the commissary



Page 275

1  revenues to fund any operations in any of its
2  facilities?
3      A.  Not to my knowledge.
4      Q.  Okay, does GEO control or approve of the
5  pricing in its commissaries at ICE detention centers?
6      A.  I don't know.
7      Q.  Do you know whether GEO contracts directly
8  with the commissary vendor or on the other hand whether
9  it's ICE doing the commissary vendor contract?
10     A.  At Adelanto?
11     Q.  Yes, sir.
12     A.  GEO contracts directly with the commissary
13 vendor.
14     Q.  Okay, does GEO approve the prices of the
15 commissary vendor?
16     A.  I do not know.
17     Q.  Okay, who would know that?
18     A.  I would - somebody in our Operations
19 Department I would believe.
20     Q.  Okay, let me hand you two documents.  The
21 first will be marked as Exhibit Twenty, the second one
22 will be marked as Exhibit 21.
23         (Whereupon, Exhibits 20 and 21 consecutively
24 were marked)
25         THE WITNESS:  Thank you.

Page 276

1  BY MR. FREE:
2      Q.  Exhibit Twenty is a printout from Aurora's
3  report by Michelle Conlin and Kristina Cooke that was
4  dated January 18th, 2019.  Exhibit Twenty-one is I
5  believe a January 18th, 2019 statement published on
6  GEO's website.  The reason I'm saying that is at the
7  bottom left-hand corner it's the - the link is
8  wearegeo.com.  That's GEO's website, right?  I'm
9  pointing to --
10     A.  Yes.
11     Q.  -- the first page of Exhibit Twenty-one.  Do
12 you see that?
13     A.  I do.  I see it.
14     Q.  Okay, so I'm going to represent to you that I
15 think that this is GEO's statement, this, Exhibit
16 Twenty-one is GEO's statement "correcting the record"
17 about the Reuters piece that is Exhibit Twenty.
18     A.  Okay.
19     Q.  Do you follow?
20     A.  Yeah, I follow it now.
21     Q.  Okay, if you'll turn on Exhibit Twenty-one,
22 the GEO statement --
23     A.  Okay.
24     Q.  -- to the second page.
25         GEO has echoed what you've said today in the

Page 277

1  second paragraph.  "Additionally, in no way does GEO
2  profit from the commissary operations which are provided
3  and operated by a third-party vendor" and then GEO says,
4  "Any minimal commission from each commissary sale almost
5  entirely goes into a welfare fund which is used for
6  recreational equipment for detainees with a small
7  portion used to cover costs only."  Do you see that?
8      A.  I do.
9      Q.  Is that true?
10     A.  I do not know.
11     Q.  Okay, what commission would be taken by GEO?
12     A.  I don't know.
13     Q.  Why wouldn't the entirety of a sale to the
14 third-party vendor at a GEO facility, Adelanto, for
15 instance, where the detainee buys something, there's a
16 sale, why wouldn't the entirety of that go to a
17 third-party vendor?
18         MR. DONOHUE:  Object to the form.
19         THE WITNESS:  I don't know.
20 BY MR. FREE:
21     Q.  Okay, what is a welfare fund?
22     A.  I don't know.
23     Q.  Okay, is a welfare fund part of your proposal
24 that you would put in front of ICE as part of bidding or
25 renegotiating a detention contract if you're GEO?

Page 278

1      A.  No.
2      Q.  Okay, this does not appear in elements one,
3  two, three or four of your bed-day rate formulation,
4  right?
5      A.  That's correct.
6      Q.  Okay, what would be the need for recreational
7  equipment for detainees from the welfare fund?
8      A.  I don't know.
9          MR. DONOHUE:  Object to the form.
10         THE WITNESS:  I don't know.
11 BY MR. FREE:
12     Q.  Okay, so I just want to understand this
13 paragraph.  It looks like GEO is saying we don't profit
14 from commissary, we take a minimal commission, we then
15 put that commission almost entirely into a welfare fund
16 and then we use that to buy recreational equipment for
17 detainees, right?
18     A.  That's what it says, yeah.
19     Q.  Okay, so the almost minimal and the small
20 portion is the stuff that I don't understand.  Can you
21 help me understand that.
22     A.  Unfortunately I cannot.  I don't - I don't
23 know what that is.
24     Q.  Okay, you don't know what a small portion
25 constitutes?



DAVID J. VENTURELLA  Volume II
NOVOA vs THE GEO GROUP

June 13, 2019
279–282

Page 279

1        Okay.
2        A.  I do not.
3        Q.  All right, and this is - this welfare fund,
4    this commission to GEO which is not entirely put into
5    the welfare fund does not appear in your cost
6    calculations that result in your bed-day rate approved
7    by ICE?
8        A.  No.  Not to my knowledge.
9        Q.  Okay, so GEO is -- Because GEO is not putting
10   all of the commissary commission that it gets from the
11   third-party vendor into the welfare fund GEO has some
12   money and then I think it says with a small portion used
13   to cover costs only, so my question is what are the
14   costs?
15       A.  I don't know.
16          MR. DONOHUE:  Object to the form.
17          THE WITNESS:  I don't know.
18   BY MR. FREE:
19       Q.   So there is a program operated within the
20   Adelanto detention facility within the commissary that
21   is not reflected in the bed-day rate, right?
22          MR. DONOHUE:  Object to the form.
23          THE WITNESS:  Correct.
24   BY MR. FREE:
25       Q.  Okay.

Page 280

1        Who would know the answer to these questions
2    that I've asked you, if you know?
3        A.  I don't.
4        Q.  Do you know who puts out these sorts of
5    statements from GEO?
6        A.  That would be Pablo Paez, P-a-e-z.
7        Q.  Is that GEO's spokesperson?
8        A.  Yes.
9        Q.  Where would Pablo get the information that's
10   contained in the statement, if you know?
11       A.  I believe from the Operations unit.
12       Q.  Okay, in the paragraph above it says
13   main brand -- Excuse me, brand -- It says, "Furthermore,
14   brand name products are available for purchase at the
15   center's commissary and include the option to purchase
16   toothpaste for one dollar and fifty cents in addition to
17   the free toothpaste that is provided on demand."  Do you
18   see that?
19       A.  I do.
20       Q.  I think I know the answer to this, but do you
21   know whether that's true?
22       A.  I don't.
23       Q.  If GEO had a choice between choosing brand
24   name products and generic products with the generic
25   products being cheaper the rational thing for GEO to do

Page 281

1    would be to buy the cheaper product to give to the
2    detainees, correct?
3          MR. DONOHUE:  Object to the form.
4          THE WITNESS:  We don't run the commissary, so
5    I don't think that's a - a factor.
6    BY MR. FREE:
7        Q.  Well, you do run the sanitation - the hygiene
8    products that are offered free of charge to all
9    detainees, right?  GEO does that?
10       That's at the top of the paragraph.
11       A.  Right.  We provide products to the detainees.
12       Q.  All right, so I'll ask my question again.
13       If you had a choice between a brand name
14   product and a generic product and you're a procurement
15   person for GEO and the generic is cheaper you're going
16   to buy the generic, right?
17          MR. DONOHUE:  Object to the form.
18          THE WITNESS:  I don't know that for a fact.
19   BY MR. FREE:
20       Q.  What do you think?
21          MR. DONOHUE:  The same objection.
22          THE WITNESS:  I don't know.  I don't know.
23   BY MR. FREE:
24       Q.  Based on the principals that we've laid out
25   throughout the day about getting the most competitive

Page 282

1    cost for each of the four elements of the bed-day rate
2    so that you can have the most competitive bed-day rate
3    would it make any sense for GEO to buy the more
4    expensive product?
5          MR. DONOHUE:  Object to the form.
6          THE WITNESS:  Again I don't know what they
7       purchase, the brands, the types, et cetera, so I
8       don't know.
9    BY MR. FREE:
10       Q.  But that's not my question.  My question is
11   just as a principle, I'm not asking you like Dove
12   versus, you know, with a bar of soap that you'll get at
13   Dollar General.  I'm just asking if you have a choice
14   between two products, one of them is more expensive, one
15   of them is less, you buy the cheaper one if you're
16   trying to keep your costs down so you can have the most
17   competitive bed-day rate if you're GEO, right?
18          MR. DONOHUE:  Object to the form.
19          THE WITNESS:  Again I don't know what the
20       criteria is for the purchase.
21   BY MR. FREE:
22       Q.  Do you know if the Operations people would
23   know that though?
24       A.  I think they would.
25       Q.  Okay, great.



Page 283

1    Does GEO operate the -- You know what?  Thank
2 you.
3    Is the - the work program at the Adelanto
4 Detention Center for immigration detainees who are paid
5 a dollar a day voluntary?
6    A.  Yes.
7    Q.  It is each detainee's choice whether he or she
8 wishes to participate in the work program at Adelanto,
9 correct?
10    A.  That's my understanding.
11    Q.  And just so we're clear, I'm not talking about
12 personal housekeeping listed in 5.8.  I'm only talking
13 about the VWP.
14    A.  Understood.
15    Q.  Can we agree on that?
16    A.  Agreed.
17    Q.  All right, it is conceivable then that no
18 people you can find in Adelanto would make the choice to
19 work, correct?
20    A.  Can you repeat that?
21    Q.  If everybody at Adelanto has a choice whether
22 they want to work in the voluntary work program it is
23 conceivable, it's possible that nobody wants to work
24 there, right?
25    A.  It's -- Yeah.  I think that's possible.

Page 284

1    Q.  Okay, it doesn't happen, right?
2    A.  Right.
3    Q.  But it is possible that the number of
4 voluntary work - voluntary workers at GEO and Adelanto
5 could be zero, right?
6    A.  Yes.
7    Q.  It is truly voluntary?
8       MR. DONOHUE:  Object to the form.
9       THE WITNESS:  Yes.
10 BY MR. FREE:
11    Q.  Thanks.
12    Who determines the number of voluntary workers
13 at Adelanto?
14    A.  I don't know.
15    Q.  Who would know the answer to that question?
16    A.  Excuse me.
17    The Facility Administrator.
18    Q.  Mr. Janecka?
19    A.  Yes, Mr. Janecka.
20    Q.  Okay, is that consideration included in the
21 request for proposal process that you supervise and
22 lead?
23       MR. DONOHUE:  Object to the form.
24       THE WITNESS:  Can you repeat the question?
25 BY MR. FREE:

Page 285

1    Q.  Sure.
2    Is the number of detainee voluntary workers at
3 Adelanto or at any other facility that you're
4 contracting with with ICE, is that number included in
5 your proposal in your negotiations with ICE if you're
6 GEO?
7    A.  It's not - it's not because it's not known.
8 It's not known until after the contract's awarded and
9 then there's discussions between the facility
10 administrator and the ICE representative, so at the time
11 we submit a proposal we do not know what the numbers or
12 percentages will be.
13    Q.  You can't predict that based on historical
14 data?
15    A.  No.
16    Q.  Why not?
17    A.  Every - every office is different, so there is
18 no standard formula of being able to predict that.
19    Q.  And so you don't as GEO?
20    A.  No, so we don't --
21    Q.  Okay.
22    A.  -- so it's not included in our proposal that
23 we submit to ICE.
24    Q.  And that -- I'm assuming when you say the
25 proposal that - it includes the component parts of the

Page 286

1 technical offering, is that how you described it, or the
2 technical response?
3    A.  Correct.
4    Q.  Okay, so that includes the staffing plan,
5 right?
6    A.  Correct.
7    Q.  And the historical performance information if
8 there is any, right?
9    A.  Correct.
10    Q.  And that could also include like labor
11 determinations for prevailing wages, right?
12    A.  I think that's provided by ICE, the labor
13 determinations.
14    Q.  Oh, yeah.  Through the DOL.
15    A.  Correct.
16    Q.  The Department of Labor?
17    Okay, as part of this response to the RFP that
18 GEO submits to ICE there's no set number of expected
19 detainee voluntary workers at the facility, correct?
20    A.  That is correct.
21    Q.  Okay, is that because you can't depend on
22 having that labor because it's all voluntary, or what --
23 I just don't understand how you -- Like why is that?  Is
24 it just - just because you don't know?
25       MR. DONOHUE:  Object to the form.



Page 287

1    THE WITNESS: Right. We just don't know at
2  the time.
3  BY MR. FREE:
4    Q. Okay, when you're making your staffing
5  proposals that go into the bed-day rate, is GEO
6  factoring in tasks that will be performed by voluntary
7  workers at the facility?
8    A. No.
9    Q. I know you've told me you haven't seen the
10  model, the spreadsheet, but you've seen a screen shot of
11  it. Did you tell me that earlier?
12    A. Of?
13    Q. Of the - the way that GEO gets the bed-day
14  rate. You know, you add in all the costs, the labor.
15  You know, basically you add in elements one through
16  four, but that's in the spreadsheet, right?
17    A. Yes.
18    Q. Okay, and you submit it to ICE, right?
19    A. Correct.
20    Q. And detainee labor is not accounted for
21  anywhere in that spreadsheet, correct?
22    A. I don't know.
23    Q. Because you haven't seen it?
24    A. I -- Yeah.
25    Q. Who knows the answer to that question, if you

Page 288

1  know?
2    A. Probably our folks in the CFO's office.
3    Q. Okay, ICE requires GEO as part of the contract
4  to run a voluntary work program, correct?
5    MR. DONOHUE: Object to the form.
6    THE WITNESS: Can you repeat that?
7  I'm sorry.
8  BY MR. FREE:
9    Q. As far as you understand the contract at
10  Adelanto or really any ICE contract subject that GEO's
11  done you have to run the voluntary work program under
12  ICE, right?
13    A. Correct.
14    Q. That's like one of the premises of your letter
15  to ICE is we're doing this because you're telling me.
16  We're - GEO is running the voluntary work program
17  because you're making us do it, right?
18    A. Yes. I agree.
19    Q. All right, so - so you know there's going to
20  be a voluntary work program, you know they have -
21  detainees have a choice to work or not and GEO also
22  knows that it's not just supposed to be make work
23  volunteering, right? In other words, it's supposed to
24  enhance essential - essential functions at the facility
25  is one of the purposes of the voluntary work program,

Page 289

1  correct?
2    A. I don't recall that specifically.
3    Q. Okay. I posed a hypothetical to you earlier
4  that there could be a day when nobody decides to work
5  who's in - in the Adelanto Detention Center, right?
6    A. Yes.
7    Q. If it is truly voluntary?
8    A. Yes.
9    Q. Okay, who would perform the jobs of all those
10  people if they did not show up to work?
11    MR. DONOHUE: Object to the form.
12    THE WITNESS: The GEO staff.
13  BY MR. FREE:
14    Q. In evaluating the costs are for the bed-day
15  rate does GEO budget for full staff by non-detainees?
16    A. I don't understand the question.
17    Q. Does GEO budget for that day when nobody shows
18  up where all the staff have to do all the labor that the
19  voluntary work program workers would do in its proposals
20  to ICE when it's trying to get a contract?
21    A. Our proposals include staff to support the
22  entire operation so, yes.
23    Q. It - does it -- Does that proposal include the
24  assumption that there will be no workers?
25    MR. DONOHUE: Object to the form.

Page 290

1  BY MR. FREE:
2    Q. No detainee workers.
3    A. Again we - at the time we submit that proposal
4  we do not know numbers or percentages, so it - it does
5  not assume any number.
6    Q. Okay. It is true then, I think, and tell me
7  if you disagree that if no voluntary workers showed up
8  on a day to do all the jobs that they're going to do you
9  told me GEO would do those jobs, right? GEO employees
10  would do those jobs?
11    A. GEO would be responsible for it, yes.
12    Q. Yeah.
13    Would GEO have to alter its staffing of its
14  employees in order to bear that responsibility?
15    MR. DONOHUE: Object to the form.
16    THE WITNESS: That I don't know.
17  BY MR. FREE:
18    Q. Is that a question that is considered by GEO
19  in crafting the bed-day rate in the response to the RFP?
20    MR. DONOHUE: Object to the form.
21    THE WITNESS: Can you repeat that?
22  BY MR. FREE:
23    Q. Yeah.
24    Is that a consideration that GEO takes into
25  account when you're putting together your response to



DAVID J. VENTURELLA  Volume II
NOVOA vs THE GEO GROUP

June 13, 2019
291–294

Page 291

1    ICE's RFP?  In other words, does GEO project out its
2    cost of having GEO employees do all of the work that
3    voluntary workers would do if they weren't there?
4         MR. DONOHUE:  Object to the form.
5         THE WITNESS:  Again because we don't know what
6    the numbers are, percentages that proposal that we
7    submit to ICE would provide services, full services
8    to manage and - and operate that facility with or
9    without the detainee workforce.
10   BY MR. FREE:
11       Q.  Okay, thanks.
12           How much are voluntary workers paid, detainee
13   workers paid at Adelanto for their work?
14       A.  The detainees participating in the VWP?
15       Q.  Yes, sir.
16       A.  I believe a dollar a day.
17       Q.  Okay, what do you base that belief on?
18       A.  The lawsuit.
19       Q.  Does GEO budget in a dollar a day into its
20   labor costs?
21       MR. DONOHUE:  Object to the form.
22       THE WITNESS:  No.
23   BY MR. FREE:
24       Q.  Why not?
25       A.  I don't know why.

Page 292

1    Q.  Okay.  Go ahead.
2    A.  No, I was -- I guess I was being a little flip
3    with the - the answer about the dollar a day, so and -
4    but it is - it is part of our existing contract that
5    detainees who participate in the voluntary work program
6    are reimbursed a dollar a day, so I believe that's been
7    part of the contract since 2011.
8        Q.  Okay, no.  I understand.  You're talking about
9    I knew from the lawsuit.
10       A.  Yeah.
11       Q.  You know from the contract?
12       A.  Yeah.
13       Q.  Okay, that's fine.
14       A.  Like I said, I was being flip.
15       Q.  No.  I took that.  I understand.
16       A.  Sorry.
17       Q.  You're fine.
18           Is that the same rate at all GEO ICE detention
19   facilities, a dollar a day?
20       A.  No.
21       Q.  What's the most GEO pays a detainee, if you
22   know?
23       A.  I do not.
24       Q.  Okay, what is the reason behind the
25   determination whether GEO will pay a dollar a day for

Page 293

1    work?
2         MR. DONOHUE:  Object to the form.
3         THE WITNESS:  I don't know the reason, but I
4    do know that those rates have to be approved by the
5    local ICE contracting representative, so - but as
6    far as the factors of what goes into it I don't
7    know and then what eventually is agreed upon I
8    don't know.
9    BY MR. FREE:
10       Q.  Okay, and in order to get the local ICE
11   contact - contracting representative to approve GEO
12   would need to propose it, correct?
13       MR. DONOHUE:  Object to the form.
14       THE WITNESS:  Yes.  GEO would propose it.
15   BY MR. FREE:
16       Q.  Okay, and at some point GEO did propose it in
17   the facilities where detainee workers are paid more than
18   a dollar, correct?
19       MR. DONOHUE:  Object to the form.
20       THE WITNESS:  I don't know what triggered it,
21   but it -- Yes.  I mean there - there was some
22   agreement.
23   BY MR. FREE:
24       Q.  Okay, is that a proposal that is made in the -
25   the response to request for proposal process that you

Page 294

1    supervise in Business Development?
2        A.  No.
3        MR. DONOHUE:  Object to the form.
4    BY MR. FREE:
5        Q.  During the negotiations between GEO and ICE
6    GEO is not considering the rate of detainee pay in its
7    proposal, correct?
8        A.  That is correct.
9        Q.  As far as you understand it?
10       A.  Yes.  As far as I understand it.
11       Q.  Okay, and GEO's not including as far as I
12   understand your testimony today an expected number of
13   detainee workers for any given task in the voluntary
14   work program, correct?
15       A.  At the time of the proposal?
16       Q.  Yes, sir.
17       A.  Correct.
18       Q.  Okay.  All right.
19           Do you happen to know why it's a dollar a day
20   at Adelanto and some other places and more elsewhere?
21       A.  No, I don't.
22       Q.  Do you know who at GEO would know that?
23       A.  I think each local Facility Administrator
24   would have the best knowledge of how that transpired.
25       Q.  So for Adelanto that's going to be James



Page 295

1  Janecka?
2      A.  I don't know if Mr. Janecka was around in
3  2011.  Again that's before my time too, so I don't know
4  who negotiated that.
5      Q.  Okay, and who at GEO would be responsible for
6  negotiating a higher rate now with ICE?
7      A.  At Adelanto?
8          MR. DONOHUE:  Object to the form.
9  BY MR. FREE:
10     Q.  Yes, sir.
11     A.  At Adelanto it would be Amber Martin.
12     Q.  Okay, and she's with the Contract Operations
13  Administration?
14     A.  Yes.
15     Q.  Contracts Administration, right?
16     A.  Yeah.  She leads that department.
17     Q.  Okay.  I think I understand your answer to the
18  question about the differences in pay rates among GEO
19  facilities to detainees in the voluntary work program to
20  be that at those facilities there was some level of
21  local negotiation between GEO and ICE to get a higher
22  rate approved.  Did I understand that testimony?
23         MR. DONOHUE:  Object to the form.
24         THE WITNESS:  That is correct.
25  BY MR. FREE:

Page 296

1      Q.  Okay, so the thing that you need to do if
2  you're GEO and you're going to pay more than a dollar a
3  day would be to get ICE's approval, right?
4          MR. DONOHUE:  Object to the form.
5          THE WITNESS:  Correct.
6  BY MR. FREE:
7      Q.  Okay, do you know of anything stopping GEO
8  from doing that at Adelanto?
9          MR. DONOHUE:  Object to the form.
10         THE WITNESS:  It's already part of the
11     contract.
12  BY MR. FREE:
13     Q.  Well, the contract allows for modifications,
14  right?
15     A.  Sure.
16     Q.  Yeah, so you could renegotiate a mutual
17  modification to the pay rate, right?
18         MR. DONOHUE:  Object to the form.
19         THE WITNESS:  We could, sure.  We could
20     propose if we thought there was a reason to
21     increase it we could approach ICE.
22  BY MR. FREE:
23     Q.  Okay, can you think of any reason why GEO
24  would believe there would be a need to increase the
25  dollar a day rate?

Page 297

1          MR. DONOHUE:  Object to the form.
2          THE WITNESS:  At Adelanto?
3  BY MR. FREE:
4      Q.  Yes, sir.
5      A.  Not at this time.
6      Q.  If the Court ordered that GEO pay the minimum
7  wage GEO would be under court obligation to pay detainee
8  workers the California minimum wage, right, and I
9  understand that that hasn't happened yet, but I also
10  understand your testimony to be that there's nothing
11  stopping GEO from asking ICE to modify the contract so
12  that they can pay the minimum wage?
13         MR. DONOHUE:  Object to the form.
14         THE WITNESS:  I'm sorry.  There was - there
15     was a lot there.
16  BY MR. FREE:
17     Q.  Sure.
18     A.  So what --
19     Q.  All right, so you've got a facility where
20  you're paid the four bucks, right?  The LaSalle
21  Detention Facility --
22     A.  Okay.
23     Q.  -- GEO has - you know, you pay four bucks
24  to --
25     A.  Right.

Page 298

1      Q.  -- laundry, kitchen.  Do you have any idea why
2  there's a different wage rate for each work?
3      A.  I do not.
4      Q.  All right, who -- Okay.
5          If the - do you know at all what the people
6  who work in the voluntary work program at Adelanto can
7  do with their money?  Like how -- What would you do?  Do
8  you have any understanding of what people who are in an
9  ICE Detention Center like Adelanto would spend the money
10  on?
11         MR. DONOHUE:  Object to the form.
12         THE WITNESS:  I think to pay for purchases
13     from the commissary.
14  BY MR. FREE:
15     Q.  Okay, so that's one thing.
16         What about phone calls?  Would you - is that
17  something that they could spend the money on inside the
18  facility?
19     A.  I don't know.
20     Q.  You don't know?
21         Okay, even from your time of running a
22  detention center you don't have any like sort of ambient
23  knowledge of --
24     A.  No, because we don't run the phone system --
25     Q.  Okay.



DAVID J. VENTURELLA  Volume II
NOVOA vs THE GEO GROUP

June 13, 2019

299–302

Page 299

1    A.  -- at any ICE facility, so I'm just not sure

2  how that works.

3    Q.  Right.

4        Who could - who could I ask about where

5  detained immigrants at Adelanto can spend the money they

6  make in the voluntary work program?  Who at GEO could I

7  ask about that?

8        MR. DONOHUE:  Object to the form.

9        THE WITNESS:  You could ask Mr. Janecka.

10 BY MR. FREE:

11   Q.  Okay, anyone else?

12   A.  I'm sure there's others that know.

13   Q.  All right, would you agree that people who are

14 locked in immigration detention centers can reasonably

15 expect to want to use the telephone?

16       MR. DONOHUE:  Object to the form.

17       THE WITNESS:  Yes.  I think that's a

18 reasonable expectation.

19 BY MR. FREE:

20   Q.  And at no GEO facility are all telephone calls

21 free, right?

22   A.  Not to my knowledge.  Again we don't manage

23 the telephone system, so I don't know.  That's operated

24 by ICE.

25   Q.  Okay, is it part of your bed-day rate

Page 300

1  calculation to determine how much it will cost to

2  operate the telephone system at GEO?

3    A.  No.  Again for ICE facilities or Adelanto

4  specifically no.  Again ICE has a separate contract for

5  that, so we don't have any involvement in that.

6    Q.  Have you ever seen a calculation of a per

7  detainee cost for housing a person at Adelanto?  In

8  other words, what does GEO spend as a company to house a

9  person in the facility?

10   A.  I've never seen --

11   Q.  Okay.

12   A.  -- a calculation like that.

13   Q.  All right, is such a -- Regardless of whether

14 you've seen it, does GEO have - are you aware of whether

15 GEO has internally as a corporation such a - a number?

16       MR. DONOHUE:  Object to the form.

17       THE WITNESS:  I do not.

18 BY MR. FREE:

19   Q.  Okay, so you've never seen or been aware of in

20 your role in putting together proposals for GEO it's

21 going to cost us fifty-two bucks to do all the food,

22 care, lodging, activities, all the stuff in element

23 number three of the bed-day rate?

24       Do you remember element three?

25   A.  Yes.

Page 301

1    Q.  All right, so you've never seen anything that

2  actually breaks down what GEO's cost per detainee is,

3  right?

4    A.  No, I don't.

5    Q.  Okay.  Fair.

6        We talked about earlier how people in

7  immigration detention facilities, including Adelanto,

8  are there either awaiting removal pursuant to an order,

9  maybe they're fighting their case but they've been

10 removed or they're awaiting a determination from an

11 immigration judge or a court on whether they should be

12 removed, right?

13   A.  Yes.  I recall that, yeah.

14   Q.  The purpose of detention, right?

15   A.  Yes.

16   Q.  Those people are not entitled to a free lawyer

17 at government expense as a general rule, correct?

18   A.  That's my understanding.

19   Q.  Those people have to either find someone who

20 will work for their - for free to be their lawyer or

21 they have to hire a lawyer, correct?

22       MR. DONOHUE:  Object to the form.

23       THE WITNESS:  I think that's correct.

24 BY MR. FREE:

25   Q.  Okay, they have a right - the detainees at

Page 302

1  Adelanto and other GEO facilities have a right to access

2  the mail, correct?  In other words, send and receive

3  letters, right?

4    A.  Yes.

5    Q.  Okay, and I understand that based on this

6  contract to require indigent detainees to receive some

7  postage allowance.  Is that your understanding as well?

8    A.  Yes.  There's accommodations for that.

9    Q.  But at some level that can't just be

10 unlimited, right?  Like that cost to GEO cannot be

11 unlimited?

12   A.  I don't know.

13   Q.  Okay, is that something that's factored in

14 when you calculate the bed-day rate, if you know?

15   A.  I don't know.

16   Q.  Okay, if no detainee workers showed up anymore

17 in any of the tasks at Adelanto would GEO have to alter

18 its staffing plan such that those tasks would be

19 completed?

20       MR. DONOHUE:  Object to the form.

21       THE WITNESS:  I don't know.

22 BY MR. FREE:

23   Q.  Who would know the answer to that question?

24   A.  That would be Mr. Janecka.

25   Q.  Okay.



DAVID J. VENTURELLA  Volume II
NOVOA vs THE GEO GROUP

June 13, 2019
303–306

Page 303

1  If you did have to hire people from outside
2  the facility to do the work that would cost more than a
3  dollar a day, right?
4      MR. DONOHUE:  Object to the form.
5      THE WITNESS:  Yes.
6  BY MR. FREE:
7      Q.  There's nobody who's not locked inside the
8  facility that you could pay a dollar a day to do the
9  work, right?
10     A.  I'm sorry?
11     Q.  There's nobody inside who's not locked inside
12  the facility that you could pay a dollar a day, right?
13  Those are the only people you could pay a dollar a day?
14     MR. DONOHUE:  Object to the form.
15     THE WITNESS:  I guess that's true, yes.  Yeah.
16  BY MR. FREE:
17     Q.  Right.
18     A.  Yeah.
19     Q.  Do you have any idea of the timeline for the
20  Adelanto contract as it exists right now and whether
21  there will be a stopgap between the end of the IGSA and
22  the contract detention facility contract between GEO and
23  ICE?
24     A.  I do not know.
25     Q.  Do you know who's negotiating that?

Page 304

1      A.  That would be Amber Martin.
2      Q.  Okay, would that affect GEO's revenues if the
3  contract were cancelled?
4      A.  Yes.
5      Q.  Negatively, right?
6      A.  Yeah.  Negatively.
7      Q.  Okay, if you had to go out and hire someone
8  from outside the facility and pay them more than a
9  dollar a day, I think we've said that would cost GEO,
10  correct?
11     MR. DONOHUE:  Object to the form.
12     THE WITNESS:  Correct.
13  BY MR. FREE:
14     Q.  You could go to ICE and say, look, just like
15  you did with medical staffing or the collective
16  bargaining agreement GEO could go to ICE and say, look,
17  we're incurring this additional cost, pay us more,
18  there's our increased bed-day rate, right?
19     MR. DONOHUE:  Object to the form.
20     THE WITNESS:  Correct.
21  BY MR. FREE:
22     Q.  The fact that GEO doesn't do that, that they
23  don't have to do that, they don't - GEO doesn't have to
24  do it, go out right now and hire workers to do what the
25  volunteer worker program people are doing, right,

Page 305

1  because they're doing it?
2      MR. DONOHUE:  Object to the form.
3      THE WITNESS:  I don't know in absence of the -
4  the voluntary work - worker program participants if
5  there were none I do not know if we would have to
6  hire more staff.
7  BY MR. FREE:
8      Q.  Okay.
9      A.  I just don't know.
10     Q.  But I think Miss Martin or Mr. Janecka would
11  know that?
12     A.  I think more so Mr. Janecka.
13     Q.  Okay.  I think what you've told me I think I
14  understand it is -- You know what?  I think I
15  understand.  I think I get it.
16     MR. FREE:  We're going to take a break.
17     Shoot for 5:00 and we'll come back.
18     THE VIDEOGRAPHER:  We are going off the video
19  record 4:46 p.m.
20     (Whereupon, there was a brief recess observed)
21     THE VIDEOGRAPHER:  We are back on the video
22  record at 5:04 p.m.
23  BY MR. FREE:
24     Q.  Mr. Venturella, is there anything that stops
25  GEO from paying more than a dollar a day even though

Page 306

1  it's not being reimbursed for that by ICE, in other
2  words, GEO could just eat the costs, is there anything
3  stopping GEO from doing that?
4      MR. DONOHUE:  Object to the form, asked and
5      answered.
6      THE WITNESS:  Other than the agreement,
7      contractual agreement that's already in place we
8      would have to propose it and get approval by ICE.
9  BY MR. FREE:
10     Q.  Why?
11     A.  Because it's a change in terms and conditions
12  of the contract that we agreed to, what we propose and
13  what was agreed to and then incorporated into the
14  contract --
15     Q.  And --
16     A.  -- at Adelanto.
17     Q.  At Adelanto.  Yeah, I want to make sure you're
18  really clear about what I'm asking.  I'm not saying that
19  you would get more money from ICE and then pass that
20  through to a detainee worker.  My question is could GEO
21  set up a detainee welfare program for voluntary workers
22  and instead of paying the reimbursed rate of a dollar a
23  day by ICE pay an increased rate?
24     MR. DONOHUE:  Object to the form, asked and
25     answered.



DAVID J. VENTURELLA  Volume II
NOVOA vs THE GEO GROUP

June 13, 2019
307–310

Page 307

1      THE WITNESS:  I do not know, but what I can
2  say is that any changes that we make at the
3  facility would have to get ICE approval.
4  BY MR. FREE:
5      Q.  Other than ICE approval do you think that
6  there's - as you understand it is there anything
7  stopping GEO from doing - from paying detainees more?
8      MR. DONOHUE:  Object to the form.
9      THE WITNESS:  No.
10  BY MR. FREE:
11     Q.  Okay, does GEO provide substance abuse
12  counseling at Adelanto?
13     A.  I don't know.
14     Q.  Okay, probably the same answer for cognitive
15  and behavior therapy?
16     A.  Yeah, I don't know.
17     Q.  All right, you're just not aware of the
18  programs provided there, right?
19     A.  No, I'm not.
20     Q.  And probably Amber Martin or James Janecka
21  would be the people I would ask about that?
22     A.  I think Mr. Janecka would be the most
23  appropriate person.
24     Q.  Is your understanding of the agreement between
25  ICE and GEO at Adelanto that the dollar a day rate is

Page 308

1  fully passed through from ICE to GEO -- The entire
2  dollar goes to the detained worker for the work?  Is
3  that your understanding of it?
4      A.  That is my understanding.
5      Q.  Okay, I think that we can agree that the PBNDS
6  requires the person to be paid daily for the work.  Can
7  we agree on that?
8      A.  Yes.
9      Q.  Okay, and so GEO is making the payment, right,
10  to the detained worker?
11     A.  Yes.
12     Q.  Okay, and then ICE is paying GEO the
13  reimbursement for the payment that GEO's made to the
14  worker, right?
15     A.  Yes.
16     Q.  Okay.  As you sit here today do you have any
17  idea how many people have died in GEO's custody in
18  immigration detention this year?
19     A.  I do not.
20     Q.  Do you know how many people have died at
21  Adelanto since the facility opened?
22     A.  I do not.
23     Q.  You said earlier you're having allergies.  I
24  can relate.  Are you taking anything for your allergy
25  medication?

Page 309

1      A.  Allegra-D.
2      Q.  Does it affect your ability to remember or
3  like recall or understand stuff?
4      A.  No.
5      Q.  No?  Okay.
6      Do you understand throughout the day we were
7  referring to the contracting process that GEO does with
8  ICE, particularly your role in it, you, David
9  Venturella's role in it.  I've used the word you, you've
10  responded about GEO and GEO's activities.  Sometimes you
11  use we when you'd respond.  I understand you're talking
12  about GEO.  You understand that when I'm asking about
13  GEO's operations and I've said you I've meant GEO,
14  right?
15     MR. DONOHUE:  Object to the form.
16     THE WITNESS:  Yes.
17     MR. FREE:  Okay.  All right, we've been joined
18  today after we made appearances by counsel for ICE.
19  I just want to get on the record that she's here.
20     MS. SIMKINS:  Frances Simkins present at the
21  deposition.
22     MR. FREE:  Those are all the questions I have,
23  Mr. Venturella.
24     Thank you for being here.
25     MR. DONOHUE:  Do you want to put your

Page 310

1  colleague on the record, too?
2      MR. FREE:  Oh, yeah.  Henriette Vinet-Martin
3  as well.
4      MS. VINET-MARTIN:  Henriette Vinet-Martin.
5      MR. FREE:  Okay, questions?
6      MR. DONOHUE:  I don't have any questions at
7  this time.
8      MR. FREE:  Okay, thanks for being here.
9      THE WITNESS:  You're welcome.
10     THE VIDEOGRAPHER:  We are going off the video
11  record 5:10 p.m.
12     THE COURT REPORTER:  Read or waive?
13     MR. DONOHUE:  Read.
14
15
16     (The deposition concluded at 5:10 p.m.)
17
18
19
20
21
22
23
24
25



**Page 311**

1                    CERTIFICATE OF OATH

2

3    STATE OF FLORIDA

4    COUNTY OF BROWARD

5

6            I, VALERIE LEHTO, the undersigned authority,

7    certify that DAVID J. VENTURELLA personally appeared

8    before me and was duly sworn.

9

10           Dated this 23rd day of June, 2019.

11

12           Valerie Lehto

             VALERIE LEHTO, RPR

13           NOTARY PUBLIC - STATE OF FLORIDA

             My Commission Expires:  8/22/2022

14           My Commission No.:  GG 242398

15

16

17

18

19

20

21

22

23

24

25

**Page 312**

1                      CERTIFICATE

2

3    STATE OF FLORIDA

4    COUNTY OF BROWARD

5            I, VALERIE LEHTO, Registered Professional

6    Reporter, do hereby certify that I was authorized

7    to and did stenographically report the foregoing

8    deposition as hereinabove shown, and the testimony

9    of said witness was reduced to computer transcription

10   under my personal supervision and direction and that

11   the record is a true record of the testimony given

12   by the witness and that the witness has requested

13   a review of said transcript pursuant to Rule 30(e)

14   (2).

15           I further certify that I am not a relative,

16   employee, attorney or counsel of any of the parties,

17   nor am I a relative or employee of any of the parties'

18   attorney or counsel connected with the action, nor

19   am I financially interested in the action.

20           Dated this 23rd day of June, 2019.

21

22

23           Valerie Lehto

             VALERIE LEHTO

24           Registered Professional Reporter

             COMMISSION NO. GG 242398

25           MY COMMISSION EXPIRES 8/22/2022

**Page 313**

1                 DEPOSITION ERRATA SHEET

2

3    ASSIGNMENT NO. J4138234

4    NOVOA vs. THE GEO GROUP, INC.

5

6        DECLARATION UNDER PENALTY OF PERJURY

7        I declare under penalty of perjury

8    that I have read the entire transcript of

9    my Deposition taken in the captioned matter

10   or the same is true and accurate, save and

11   except for changes and/or corrections, if

12   any, as indicated by me on the DEPOSITION

13   ERRATA SHEET hereof, with the understanding

14   that I offer these changes as if still under

15   oath.

16        Signed on the _____ day of _____,

17   2019.

18

19

20   _____

21            WITNESS NAME

22

23

24

25

**Page 314**

1                 DEPOSITION ERRATA SHEET

2    Page No. _____ Line No. _____ Change to: _____

3    _____

4    Reason for change:_____

5    Page No. _____ Line No. _____ Change to: _____

6    Reason for change:_____

7    Page No. _____ Line No. _____ Change to: _____

8    Reason for change:_____

9    Page No. _____ Line No. _____ Change to: _____

10   Reason for change:_____

11   Page No. _____ Line No. _____ Change to: _____

12   Reason for change:_____

13   Page No. _____ Line No. _____ Change to: _____

14   Reason for change:_____

15   Page No. _____ Line No. _____ Change to: _____

16   Reason for change:_____

17   Page No. _____ Line No. _____ Change to: _____

18   Reason for change:_____

19   Page No. _____ Line No. _____ Change to: _____

20   Reason for change:_____

21   Page No. _____ Line No. _____ Change to: _____

22   Reason for change:_____

23

24   SIGNATURE:_____DATE:_____

25            DAVID J. VENTURELLA



Page 315

```
 1                    DEPOSITION ERRATA SHEET

 2    Page No. _____ Line No. _____ Change to: _____

 3    _____

 4    Reason for change:_____

 5    Page No. _____ Line No. _____ Change to: _____

 6    Reason for change:_____

 7    Page No. _____ Line No. _____ Change to: _____

 8    Reason for change:_____

 9    Page No. _____ Line No. _____ Change to: _____

10    Reason for change:_____

11    Page No. _____ Line No. _____ Change to: _____

12    Reason for change:_____

13    Page No. _____ Line No. _____ Change to: _____

14    Reason for change:_____

15    Page No. _____ Line No. _____ Change to: _____

16    Reason for change:_____

17    Page No. _____ Line No. _____ Change to: _____

18    Reason for change:_____

19    Page No. _____ Line No. _____ Change to: _____

20    Reason for change:_____

21    Page No. _____ Line No. _____ Change to: _____

22    Reason for change:_____

23

24    SIGNATURE:_____DATE:_____

25            DAVID J. VENTURELLA
```

