# EXHIBIT 27

OFFICE OF INSPECTOR GENERAL

# Management Alert – Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California


Homeland Security

**September 27, 2018**

**OIG-18-86**

NOVOA_0006018



# DHS OIG HIGHLIGHTS
*Management Alert – Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California*

**September 27, 2018**

## Why We Did This Alert

This Alert is part of an ongoing review to inspect U.S. Immigration and Customs Enforcement (ICE) detention facilities. We conducted an unannounced visit to the Adelanto ICE Processing Center and, using ICE's 2011 *Performance-Based National Detention Standards*, we identified serious violations that are important to inform ICE of immediately.

## What We Recommend

We recommend that ICE conduct a full review of the Adelanto ICE Processing Center and the GEO Group's management of the center immediately to ensure compliance with ICE's 2011 *Performance-Based National Detention Standards*. As part of this assessment, ICE must ensure compliance with the standards addressing personal housekeeping requirements, segregation, and medical care.

**For Further Information:**
Contact our Office of Public Affairs at (202) 981-6000, or email us at
DHS-OIG.OfficePublicAffairs@oig.dhs.gov

## What We Found

During our May 2018 unannounced inspection of the Adelanto ICE Processing Center in Adelanto, California, we identified a number of serious issues that violate ICE's 2011 *Performance-Based National Detention Standards* and pose significant health and safety risks at the facility. Specifically, we are concerned about the following:

- Nooses in Detainee Cells
- Improper and Overly Restrictive Segregation
- Untimely and Inadequate Detainee Medical Care

ICE must ensure the Adelanto Center complies with detention standards to establish an environment that protects the safety, rights, and health of detainees. Mitigation and resolution of these issues require ICE's immediate attention and increased engagement with the center and its operations.

## ICE Response

ICE concurred with the recommendation and is implementing corrective actions to ensure the Adelanto ICE Processing Center meets required detention standards. ICE reported that it will complete a full inspection of the Adelanto facility and a Special Assessment Review to ensure concerns identified in this report are fully inspected and addressed. We consider the one recommendation resolved and open.

NOVOA_0006719



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

September 27, 2018

| | |
|---|---|
| MEMORANDUM FOR: | Ronald D. Vitiello<br>Senior Official Performing the Duties of Director<br>U.S. Immigration and Customs Enforcement |
| FROM: | John V. Kelly<br>Senior Official Performing the Duties of the Inspector General |
| SUBJECT: | *Management Alert – Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California* |

For your action is our final report, *Management Alert – Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California.* We incorporated the formal comments provided by your office.

The report contains one recommendation aimed at improving compliance with these U.S. Immigration and Customs Enforcement (ICE) detention standards and to strengthen its oversight of the Adelanto ICE Processing Center. Your office concurred with the one recommendation.

Based on information provided in your response to the draft report, we consider recommendation 1 open and resolved. Once your office has fully implemented the recommendation, please submit a formal closeout letter to us within 30 days so that we may close the recommendation. The memorandum should be accompanied by evidence of completion of agreed-upon corrective actions. Please send your response or closure request to OIGInspectionsFollowup@oig.dhs.gov.

Consistent with our responsibility under the *Inspector General Act*, we will provide copies of our report to congressional committees with oversight and appropriation responsibility over the Department of Homeland Security. We will post the report on our website for public dissemination.

Please call me with any questions, or your staff may contact Jennifer L. Costello, Chief Operating Officer, or John D. Shiffer, Chief Inspector, at (202) 981-6000.

*www.oig.dhs.gov*

NOVOA_0006720



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Background

The Adelanto ICE Processing Center, owned and operated by the GEO Group, Inc., houses up to 1,940 U.S. Immigration and Customs Enforcement (ICE) detainees through an Intergovernmental Service Agreement.[1] Based on this agreement, the Adelanto Center must comply with ICE's 2011 *Performance-Based National Detention Standards*, as revised in December 2016. These detention standards establish requirements for areas such as:

- environmental health and safety: e.g., cleanliness, sanitation, security, admission into facilities, classification, detainee searches, segregation[2] (Special Management Units), and disciplinary system;
- detainee care: e.g., food service, medical care, and personal hygiene;
- activities: e.g., religious practices, telephone access, and visitation; and
- grievance system.

In May 2018, we visited the Adelanto ICE Processing Center as part of our latest round of unannounced spot inspections. At the time, 307 contract guards oversaw 1,659 detainees housed in different facilities around the center. On the west side of the center, detainees resided in 16 housing units consisting of 18 cells each that can hold approximately 4 to 8 detainees per cell. On the east side of the center, detainees resided in 2 open bay housing modules with 7 dormitories and an average of 94 detainees per dormitory. While at the center, we identified serious issues relating to safety, detainee rights, and medical care that require ICE's immediate attention. These issues not only constitute violations of ICE detention standards but also represent significant threats to the safety, rights, and health of detainees.

**Nooses Made from Braided Bed Sheets Present Ongoing Safety and Security Risks**

ICE standards[3] prohibit detainees from hanging or draping objects from their beds, fixtures, or other furniture. However, in about 15 of the approximately 20 male detainee cells we visited within 4 housing units on the west side, we observed braided bedsheets, referred to as "nooses" by center staff and

---

[1] The Intergovernmental Service Agreement (IGSA) was established between the City of Adelanto and ICE.
[2] Segregation is the process of separating certain detainees from the general population for administrative, disciplinary, or protective reasons.
[3] ICE, *Performance-Based National Detention Standards, 2011,* Section 5.8.V.C, Voluntary Work Program, Expected Practices, Personal Housekeeping Required (Revised Dec. 2016). The pertinent part of this standard requires detainees to maintain their immediate living areas in a neat and orderly manner by making their bunk beds daily; stacking loose papers; keeping the floor free of debris and dividers free of clutter; and refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures, or other furniture.



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

detainees, hanging from vents (see figure 1). The contract guard escorting us during our visit removed the first noose found in a detainee cell, but stopped after realizing many cells we visited had nooses hanging from the vents. We also heard the guard telling some detainees to take the sheets down.

During our interviews, detainees provided a range of reasons for braiding and hanging bedsheets in the cells. One detainee told us, "I've seen a few attempted suicides using the braided sheets by the vents and then the guards laugh at them and call them 'suicide failures' once they are back from medical." Four detainees told us the braided sheets can be easily unfurled to temporarily create privacy within the cell, specifically the bathroom area or individual bunk area. Two detainees reported tying the braided sheets from one bedpost to another to serve as a clothesline.




**Figure 1**. Nooses hanging from vents in detainee cells observed by the Office of Inspector General (OIG) at the Adelanto Center on May 1, 2018.
*Source*: OIG

ICE has not taken seriously the recurring problem of detainees hanging bedsheet nooses at the Adelanto Center; this deficiency violates ICE standards. According to the guard escorting us, the nooses are a daily issue and very widespread. When we asked two contract guards who oversaw the housing units why they did not remove the bed sheets, they echoed it was not a high priority. In March 2018, an ICE contractor who conducts daily center checks noted that detainees were hanging bedsheets in their cells and began sending a weekly deficiency report to ICE for action. According to a senior ICE official, however, local ICE management at Adelanto does not believe it is necessary or a priority to address the braided sheets issue.

NOVOA_0006722



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

ICE must prioritize addressing the issue of sheets hanging in detainee cells, as they represent the potential to assist suicide acts. In March 2017, a 32-year-old male died at an area hospital after being found hanging from his bedsheets in an Adelanto cell. In the months after this suicide, ICE compliance reports documented at least three suicide attempts by hanging at Adelanto, two of which specifically used bedsheets. Media reports based on 911 call logs indicate at least four other suicide attempts at the center from December 2016 to July 2017.[4] In total, these reports represent at least seven suicide attempts at the Adelanto Center from December 2016 to October 2017. Nationwide, self-inflicted strangulation accounts for 4 of the 20 detainee deaths reported between October 2016 to July 2018, according to ICE news releases. The most recent ICE detainee death, on July 10, 2018, at the Stewart Detention Facility in Georgia, again highlights the current need to prioritize this issue, as ICE preliminarily attributed that death to self-inflicted strangulation. ICE's lack of response to address this matter at the Adelanto Center shows a disregard for detainee health and safety.

**Inappropriate Segregation Restricts Detainee Rights**

Detainees may be separated from the center's general population because they committed a serious prohibited act or rule violation (disciplinary segregation)[5] or to protect themselves, others and property, for medical reasons, and for secure and orderly facility operations (administrative segregation). ICE standards[6] obligate the Adelanto Center to meet numerous requirements for segregation, including:

- preventing the commingling of detainees in administrative and disciplinary segregation;
- placing detainees in disciplinary segregation only after they are found to have committed a prohibited act and only when alternative dispositions may inadequately regulate the detainee's behavior;
- avoiding the use of restraints on detainees;

---

[4] Paloma Esquivel, *'We don't feel OK here': Detainee deaths, suicide attempts and hunger strikes plague California immigration facility*, LOS ANGELES TIMES (Aug. 8, 2017), http://www.latimes.com/local/lanow/la-me-ln-adelanto-detention-20170808-story.html.
[5] A prohibited act or rule violation must be classified at a "greatest" (e.g., killing, rioting, assault), "high" (e.g., fighting, drug possession, bribery), or "high-moderate" (e.g., theft, refusal to obey staff or officer orders, gambling) level as defined in ICE standards.
[6] ICE, *Performance-Based National Detention Standards, 2011,* Section 2.12, Special Management Units (Revised Dec. 2016). "This detention standard protects detainees, staff, contractors, volunteers and the community from harm by segregating certain detainees from the general population in Special Management Units with an Administrative Segregation section for detainees segregated for administrative reasons and a Disciplinary Segregation section for detainees segregated for disciplinary reasons."



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

- providing communications assistance to detainees in segregation who cannot speak English or who may be blind or deaf; and,
- providing regular access to supervisory, management, program, and health care staff.

Nonetheless, our review of disciplinary segregation revealed multiple violations of ICE detention standards. These violations pose a significant threat to maintaining detainee rights and ensuring their mental and physical well-being.

<u>Detainees Are Placed in Disciplinary Segregation Prematurely and Inappropriately</u>

During our visit to the Adelanto Center, there were 14 detainees in disciplinary segregation. Through our file review, we found that the Adelanto Center inappropriately placed all 14 detainees in disciplinary segregation before they were found guilty of a prohibited act or rule violation. We also identified one detainee who requested placement in administrative segregation but was inappropriately held in disciplinary segregation for more than a week.

ICE standards state that a detainee shall be placed in disciplinary segregation only after a disciplinary hearing panel finds the detainee guilty of a prohibited act or rule violation and the disciplinary panel chair completes a written order for segregation. Yet, based on file reviews and interviews with GEO Group staff, the Adelanto Center places detainees in disciplinary segregation prior to a guilty finding and a written order for segregation. GEO Group staff indicated it is the center's practice to place all detainees directly in disciplinary segregation after an alleged incident to prevent further issues with the detainee. We reviewed files for the 14 detainees in disciplinary segregation and only found disciplinary panel decisions for 7 of the detainees. File reviews indicated that this segregation placement is also done before the disciplinary panel assesses a penalty for the violation and the detainee has the opportunity to appeal, thereby violating the detainee's right to due process.

This premature placement in disciplinary segregation may further restrict detainee rights by imposing additional sanctions not included in the disciplinary panel's decision or orders. In the seven cases where we found a disciplinary panel decision in the detainee file, the sanctions imposed went beyond the penalties listed in the disciplinary panel decision. For example, through interviews and observations, we learned that these detainees lost the ability to purchase or keep commissary items in their cells while in disciplinary segregation, but the disciplinary panel's decisions did not include this penalty. Further, according to center staff, all detainees in disciplinary segregation lose contact visits with family. However, neither the disciplinary segregation orders



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

for the 14 detainees nor the center handbook's description of rule violation penalties listed loss of contact visits with family as an available penalty.

Our file review also revealed that a disabled detainee who had requested to be placed in administrative segregation, was instead placed in disciplinary segregation. This violates two aspects of the Special Management Units standard: one requiring a guilty finding before disciplinary segregation, and another prohibiting commingling detainees in administrative and disciplinary segregation. The center initially placed the detainee in disciplinary segregation due to an unrelated behavioral problem in administrative segregation at the time of transfer but inappropriately held him there for 9 days until we raised the issue to the center's Medical Health Services Administrator. Based on our file review, in those 9 days, the detainee never left his wheelchair to sleep in a bed or brush his teeth. During our visit, we saw that the bedding and toiletries were still in the bag from his arrival. We also observed medical staff just looking in his cell and stamping his medical visitation sheet rather than evaluating the detainee, as required by ICE standards. After our notification, the Medical Health Administrator moved the detainee from segregation to medical for observation.

Detainees in Disciplinary Segregation Are Improperly Handcuffed and Shackled

According to ICE standards, placement in disciplinary segregation alone does not constitute a valid basis for using restraints (i.e., handcuffs and shackles) on detainees. However, in disciplinary segregation, we observed GEO Group contract guards moving six detainees in physical restraints, including handcuffs and shackles. The GEO Group segregation supervisor and guards said they place all detainees held in disciplinary segregation in restraints when outside their cells. The center reported using restraints for security reasons, though according to ICE standards, restraints should only be used if necessary as a precaution against escape during transfer, when directed by the medical officer for medical reasons, or to prevent self-injury, injury to others, or serious property damage. Physically restraining all disciplinary segregation detainees whenever they are outside their cells does not comport with ICE standards and gives the appearance of criminal, rather than civil, custody.

Detainees in Disciplinary Segregation Lack Communication Assistance

ICE standards require facilities to provide communication assistance to detainees in segregation with disabilities or who are limited in their English proficiency. During our visit, we encountered a blind, limited English proficient detainee in disciplinary segregation but found the center had no auxiliary aids or translated materials for the detainee to read or understand documents he was given. In addition, file reviews of the 14 detainees in disciplinary



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

segregation at the time of our visit revealed that none of the segregation orders or information provided to detainees while in segregation was translated or otherwise communicated to ensure the detainee's understanding. Without proper communication assistance, ICE cannot ensure that detainees placed in disciplinary segregation understand the reasoning for their segregation and are aware of their rights.

**Failure to Provide Timely and Adequate Medical Care for Detainees Increases Health Risks**

ICE has not ensured that Adelanto Center general population and segregated detainees receive appropriate and necessary medical and dental care, as required by ICE standards.[7] We observed medical staff performing limited checks on detainees in disciplinary segregation, which do not effectively ensure detainee well-being. Based on interviews with detainees and medical staff and a review of independent reports, we concluded that detainees do not have timely access to proper medical care. Also, our detainee interviews and review of medical records revealed that detainees are placed on waitlists for months and, sometimes, years to receive basic dental care, resulting in tooth loss and unnecessary extractions in some cases.

<u>Medical Oversight in Disciplinary Segregation Is Ineffective in Ensuring Detainee Well-Being</u>

Although ICE standards require face-to-face medical assessments of all detainees in segregation at least once daily to ensure their welfare, we observed Adelanto Center medical providers, including nurses, physicians, and mental health providers, conducting cursory walk-throughs of disciplinary segregation. For example, we observed two doctors walking through disciplinary segregation and stamping their name on the detainee records, which hang outside each detainee's cell, indicating that they visited with the detainee. However, we observed them doing so without having any contact with 10 of the 14 detainees in disciplinary segregation. For the four detainees a doctor did speak with, the doctor asked if the detainee was "ok" in English, not necessarily a language the detainee understood. We confirmed with guards that these four detainees were non-English speakers, and the doctor left without any acknowledgment or response from the detainee. Although ICE's detainee death review of the March 2017 suicide at Adelanto previously identified similar issues with medical oversight of detainees in segregation, our spot inspection of the center confirmed these issues persist.

---

[7] ICE, *Performance-Based National Detention Standards, 2011*, Section 4.3, Medical Care (Revised Dec. 2016). "This detention standard ensures that detainees have access to appropriate and necessary medical, dental and mental health care, including emergency services."

NOVOA_0006726



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Medical Care for Detainees Is Delayed and Inadequate

From November 2017 to April 2018, detainees filed 80 medical grievances (about 34 percent of all grievances filed) with the center for not receiving urgent care, not being seen for months for persistent health conditions, and not receiving prescribed medication. Four of the 13 detainees we interviewed reported waiting weeks and months to see a doctor. They also reported that their appointments were sometimes canceled with no explanation, and that they were then placed back on the waiting list for a future appointment. In 2017, the medical unit conducted a quality improvement investigation and identified 60 to 80 clinic appointments that were canceled because contract guards were not available to take detainees from their cells to their appointments.

Detainee statements also corroborated a 2017 outside medical review that reported wait times to see a provider for both acute illness/injury and chronic care needs are often excessively long. Further, ICE's detainee death reviews for three Adelanto Center detainees who have died since fiscal year 2015 also cited medical care deficiencies related to providing necessary and adequate care in a timely manner. ICE must take these continuing violations seriously and address them immediately.

Dental Providers Do Not Provide Basic Dental Care

ICE standards expect detention facilities to provide dental care, including checkups, cleanings, and procedures, after an individual has been in detention for 6 months. The Adelanto Center, however, does not include time spent at other ICE facilities when calculating the 6 months, and only adds detainees requesting dental cleanings to a waitlist for dental care after they have been at the Adelanto Center for more than 6 months. Records indicated and center staff corroborated that the center was waiting for detainees to leave rather than providing cleanings. Further, the Adelanto Center has only two dentists on staff to provide care for up to 1,940 detainees. According to center logs, no detainees received cleanings for almost 4 years. Dental cleanings began shortly before our visit due to findings from an external medical review.

Our review of all requests for fillings since 2014 also found that although the center's two dentists identified cavities and placed detainees on a waitlist for fillings, no detainees have received fillings in the last 4 years. One detainee we interviewed reported having multiple teeth fall out while waiting more than 2 years for cavities to be filled. When we asked one of the dentists why fillings were not performed, he said he barely has time to do cleanings and screening, so as a result he does not do fillings. He offered extractions over other types of



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

dental care; we corroborated this information through detainee interviews. In our interviews with detainees, one reported having to wait 8 months for an extraction and another reported having the wrong tooth pulled. We reviewed the detainee dental records for tooth extraction and corroborated the detainee statements.

During our interviews, a center dentist stated that he only provides "palliative care" and does not have time to complete cleanings or fillings. The dentist dismissed the necessity of fillings if patients commit to brushing and flossing. Floss is only available through detainee commissary accounts, but the dentist suggested detainees could use string from their socks to floss if they were dedicated to dental hygiene.

## Conclusion

ICE must ensure the Adelanto Center complies with detention standards to establish an environment that protects the safety, rights, and health of detainees. Although this form of civil custody should be non-punitive, some of the center conditions and detainee treatment we identified during our visit and outlined in this management alert are similar to those one may see in criminal custody. Mitigation and resolution of these issues require ICE's immediate attention and increased engagement with the center and its operations.

## Recommendation

**Recommendation 1**: We recommend that ICE conduct a full review of the Adelanto ICE Processing Center and the GEO Group's management of the center immediately to ensure compliance with ICE's 2011 *Performance-Based National Detention Standards*. As part of this assessment, ICE must review and ensure compliance with those standards addressing:

1. Personal housekeeping requirements, associated with hanging bedsheets
2. Segregation
3. Medical Care

## Management Comments and OIG Analysis

ICE concurred with the one report recommendation. Appendix A contains a copy of ICE's management comments in their entirety. We also received technical comments from ICE, and we incorporated those comments in the report where appropriate. We consider this recommendation to be resolved and open. A summary of ICE's response and our analysis follows.



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

**ICE Response to Recommendation 1:** ICE concurred with this recommendation. ICE reported that it has scheduled a contractor to inspect the Adelanto ICE Processing Center, beginning October 10, 2018. The inspection is intended to gauge compliance with the 2011 PBNDS [*Performance-Based National Detention Standards*]. In addition, ICE Office of Enforcement and Removal Operations (ERO) has implemented a Special Assessment Review in response to this Management Alert. The Special Assessment Review is an additional detention facility review to target emergent concerns like those identified by the OIG. Additionally, ERO and the ICE Health Services Corps will meet to discuss an ongoing plan for providing technical assistance, monitoring, and oversight to ensure corrective actions are completed. ICE anticipates these actions to be completed by January 31, 2019.

**OIG Analysis:** We consider these actions responsive to this recommendation, which is resolved and open. We will close this recommendation when we receive sufficient evidence that ICE has completed both the full inspection of Adelanto and a Special Assessment Review that will cover the areas of concern identified in this report. Once we receive documentation that these two inspections have been completed and ICE's plan to address these reports, we will close this recommendation.

## Scope and Methodology

We visited the Adelanto ICE Processing Center as part of our larger effort to inspect ICE detention facilities. We used ICE's 2011 *Performance-Based National Detention Standards* to conduct our inspection, as these are the standards under which the center reported currently operating. These standards, which were developed in coordination with component stakeholders, prescribe the expected outcomes of each standard and the expected practices required to achieve them. ICE detention standards were also designed to improve safety, security, and conditions of confinement for detainees.

During our inspection, we interviewed the following ICE staff members: ICE Supervisory Detention and Deportation Officer, ICE Assistant Field Office Director, Detention Management and Compliance Officer, and medical oversight staff at the Adelanto ICE Processing Center. We interviewed employees of the GEO Group, including the Warden, Assistant Warden, Grievance Coordinator, Classification Officer, Segregation Supervisor, Health Services Administrator, and medical providers. We also interviewed detainees held in the general population and segregation. We reviewed documentation from previous ICE inspections, center documents, detainee records, and documentation of grievances.

NOVOA_0006729



**OFFICE OF INSPECTOR GENERAL**

Department of Homeland Security

As part of our inspection we toured the following areas of the center:

- General medical unit for detainees
- Kitchens
- Special Management Unit (segregation)
- Modular housing units, including individual cells
- Center intake
- Control room

We reviewed disciplinary and administrative segregation files, as well as medical files and records for detainee care, including dental logs for patients awaiting care.

We conducted this review from May 2018 to July 2018 under the authority of the *Inspector General Act 1978*, as amended, and in accordance with the *Quality Standards for Inspection and Evaluation* issued by the Council of the Inspectors General on Integrity and Efficiency. Major contributors to this report are: John D. Shiffer, Chief Inspector; Stephanie Christian, Lead Inspector; Michael Rich, Lead Inspector; Ryan Nelson, Senior Inspector; and LaDana Crowell, Independent Reference Reviewer.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

# Appendix A
# ICE Response to the Draft Management Alert

*Office of the Chief Financial Officer*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536



**U.S. Immigration and Customs Enforcement**

September 17, 2018

MEMORANDUM FOR:   John V. Kelly
Senior Official Performing the Duties of the Inspector General

FROM:   Nathalie Asher   *Nathalie R. Asher*
(A) Executive Associate Director
Enforcement and Removal Operations

SUBJECT:   Management Response to OIG Draft Report: "Management Alert - Issues Requiring Attention at the Adelanto ICE Processing Center in Adelanto, California"
(Project No. 17-123-ISP-ICE MA-Adelanto)

Thank you for the opportunity to review and comment on this draft report. U.S. Immigration and Customs Enforcement (ICE) appreciates the work of the Office of Inspector General (OIG) in planning and conducting its review and issuing this report.

In its prior work, the OIG has acknowledged that treatment and care of detainees can be challenging. The OIG has reported on ICE's collaboration with stakeholders for more than a decade to improve the safety, security, and conditions of confinement for detainees. The OIG reported that ICE's Office of Professional Responsibility (OPR) implemented a thorough inspection methodology and recognized the persistent efforts of ICE's Office of Enforcement and Removal Operations (ERO) on-site detention monitoring personnel.

ICE is committed to continually enhancing civil detention operations to promote a safe and secure environment for both administrative detainees and staff. ICE utilizes a layered approach to monitor detention conditions at facilities, with processes in place to implement corrective actions in instances where non-compliance to ICE detention standards is found. ICE maintains a rigorous and multi-faceted inspection schedule for its detention facilities. ICE's detention operations are governed by national detention standards and are overseen by field office personnel, inspections by OPR, and other programmatic oversight and inspections by ERO. ICE works on a daily basis with the ERO field offices, the OPR Office of Detention Oversight, and the DHS Office for Civil

www.ice.gov

NOVOA_0006731



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

Rights and Civil Liberties to ensure that facilities comply with ICE detention standards or take the necessary corrective action to address problems and concerns.

The safety, rights, and health of detainees in ICE's care are paramount. ICE is concerned by the OIG's findings. However, the OIG's draft report lacks important context on some issues. For example, when a disciplinary infraction occurs, it may be necessary to remove the detainee from the general population while the matter is investigated to ensure the safety and security of the facility. During the investigation, the detainee is placed under administrative segregation protocols, which are less restrictive than the disciplinary protocols described. Additionally, ICE maintains a robust program to provide meaningful access to limited English proficient individuals. Current language resources include translation and interpretation through both government run and contract language lines. ICE will evaluate whether additional services may be required.

ICE concurs with OIG's single recommendation in the draft report. Attached is ICE's response to the recommendation. ICE provided technical comments under separate cover.

Again, thank you for the opportunity to review and comment on this draft report. Please feel free to contact us if you have any questions. We look forward to working with you again in the future.

Attachment

2



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Attachment: Management Response to Recommendation Contained in 17-123-ISP-ICE MA-Adelanto**

The OIG recommended that ICE:

**Recommendation 1:** Conduct a full review of the Adelanto ICE Processing Center and the GEO Group's management of the center immediately to ensure compliance with ICE's 2011 *Performance-Based National Detention Standards* [PBNDS]. As part of this assessment, ICE must review and ensure compliance with those standards addressing:
1. Personal housekeeping requirements, associated with hanging bedsheets
2. Segregation
3. Medical Care

**Response:** Concur. ICE ERO's contracted inspection firm is scheduled to inspect the Adelanto ICE Processing Center, beginning October 10, 2018. The inspection is intended to gauge compliance with the 2011 PBNDS. In addition, ICE ERO has implemented a Special Assessment Review (SAR) in response to this Management Alert. The SAR is an additional detention facility review to target emergent concerns like those identified by the OIG. Additionally, ERO and the ICE Health Services Corps will meet to discuss an ongoing plan for providing technical assistance, monitoring, and oversight to ensure corrective actions are completed.

Estimated Completion Date: January 31, 2019.

3



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

# Appendix B
# Report Distribution

**Department of Homeland Security**

Secretary
Deputy Secretary
Chief of Staff
General Counsel
Executive Secretary
Director, GAO/OIG Liaison Office
Assistant Secretary for Office of Policy
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs
Director, ICE
ICE Component Liaison

**Office of Management and Budget**

Chief, Homeland Security Branch
DHS OIG Budget Examiner

**Congress**

Congressional Oversight and Appropriations Committees

## Additional Information and Copies

To view this and any of our other reports, please visit our website at: www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov.
Follow us on Twitter at: @dhsoig.



## OIG Hotline

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click on the red "Hotline" tab. If you cannot access our website, call our hotline at (800) 323-8603, fax our hotline at (202) 254-4297, or write to us at:

> Department of Homeland Security
> Office of Inspector General, Mail Stop 0305
> Attention: Hotline
> 245 Murray Drive, SW
> Washington, DC 20528-0305