# EXHIBIT 29

OFFICE OF INSPECTOR GENERAL

# ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements



**June 26, 2018**
**OIG-18-67**

NOVOA_000161

# DHS OIG HIGHLIGHTS
## ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements

**June 26, 2018**

## Why We Did This Inspection

U.S. Immigration and Customs Enforcement (ICE) inspects and monitors just over 200 detention facilities where removable aliens are held. In this review we sought to determine whether ICE's immigration detention inspections ensure adequate oversight and compliance with detention standards. We also evaluated whether ICE's post-inspection follow-up processes result in correction of identified deficiencies.

## What We Recommend

We made five recommendations to improve inspections, follow-up, and monitoring of ICE detention facilities.

**For Further Information:**
Contact our Office of Public Affairs at (202) 254-4100, or email us at DHS-OIG.OfficePublicAffairs@oig.dhs.gov

## What We Found

ICE uses two inspection types to examine detention conditions in more than 200 detention facilities. ICE contracts with a private company and also relies on its Office of Detention Oversight for inspections. ICE also uses an onsite monitoring program. Yet, neither the inspections nor the onsite monitoring ensure consistent compliance with detention standards, nor do they promote comprehensive deficiency corrections. Specifically, the scope of ICE's contracted inspections is too broad; ICE's guidance on procedures is unclear; and the contractor's inspection practices are not consistently thorough. As a result, the inspections do not fully examine actual conditions or identify all deficiencies. In contrast, ICE's Office of Detention Oversight uses effective practices to thoroughly inspect facilities and identify deficiencies, but these inspections are too infrequent to ensure the facilities implement all deficiency corrections. Moreover, ICE does not adequately follow up on identified deficiencies or consistently hold facilities accountable for correcting them, which further diminishes the usefulness of inspections. Although ICE's inspections, follow-up processes, and onsite monitoring of facilities help correct some deficiencies, they do not ensure adequate oversight or systemic improvements in detention conditions, with some deficiencies remaining unaddressed for years.

## ICE Response

ICE officials concurred with all five recommendations and proposed steps to update processes and guidance to improve oversight over detention facilities.



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

June 26, 2018

MEMORANDUM FOR:   Thomas D. Homan
Deputy Director and Senior Official Performing the
Duties of the Director
U.S. Immigration and Customs Enforcement

FROM:   John V. Kelly
Acting Inspector General

SUBJECT:   *ICE's Inspections and Monitoring of Detention Facilities
Do Not Lead to Sustained Compliance or Systemic
Improvements*

Attached for your information is our final report, *ICE's Inspections and
Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or
Systemic Improvements*. We incorporated the formal comments from the ICE
Office of Custody Management and Office of Detention Oversight in the final
report.

Consistent with our responsibility under the *Inspector General Act*, we will
provide copies of our report to congressional committees with oversight and
appropriation responsibility over the Department of Homeland Security. We will
post the report on our website for public dissemination.

Please call me with any questions, or your staff may contact Jennifer Costello,
Chief Operating Officer, at (202) 254-4100.

Attachment



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

## Table of Contents

Background ............................................................................................... 1

Results of Inspection ............................................................................. 4

    Nakamoto Inspections Are Significantly Limited and Office of Detention Oversight Inspections Are Not Frequent Enough ................................... 5

    Inadequate Inspection Follow-up Leads to Continuing Deficiencies ...... 11

    Onsite Detention Service Managers Face Challenges in Improving Compliance ................................................................................... 14

Conclusion ............................................................................................. 15

Recommendations ................................................................................... 15

## Appendixes

    Appendix A: Objective, Scope, and Methodology ................................. 19
    Appendix B: Management Comments to the Draft Report.................... 20
    Appendix C: National Detention Standards (NDS) and Performance-Based National Detention Standards (PBNDS 2008 and PBNDS 2011) ........................................................... 24
    Appendix D: Core Standards ICE Office of Professional Responsibility's Office of Detention Oversight Uses to Assess Detention Conditions ...... 26
    Appendix E: Office of Inspections and Evaluations Major Contributors to This Report............................................................... 27
    Appendix F: Report Distribution. ....................................................... 28

## Abbreviations

| | |
|---|---|
| ADP | average daily population |
| DSCU | Detention Standards and Compliance Unit |
| DSM | Detention Service Manager |
| ERO | Enforcement and Removal Operations |
| FOD | Field Office Director |
| ICE | U.S. Immigration and Customs Enforcement |
| IGSA | Inter-governmental Service Agreement |
| NDS | National Detention Standards |
| ODO | Office of Detention Oversight |
| OIG | Office of Inspector General |
| PBNDS | Performance-Based National Detention Standards |

NOVOA_0001684



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

SOW          Statement of Work
UCAP         Uniform Corrective Action Plan

NOVOA_0001685



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

# Background

U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) apprehends removable aliens, detains these individuals when necessary, and removes them from the United States. All ICE detainees are held in civil, not criminal, custody. ICE detention is administrative in nature, aimed to process and prepare detainees for removal. At the end of fiscal year 2017, ICE held nearly 38,000 detainees in custody, with more than 35,000 detainees in the facilities that undergo ICE inspections discussed in this report. Table 1 lists the types and numbers of facilities ICE uses to detain removable aliens as well as the average daily population (ADP) at the end of FY 2017.

**Table 1: Types of Facilities ICE Uses for Detention**

| Facility Type | Description | Number of Facilities | FY 17 Year End ADP |
|---|---|---|---|
| **Service Processing Center (SPC)** | Facilities owned by the Department of Homeland Security and generally operated by contract detention staff | 5 | 3,263 |
| **Contract Detention Facility (CDF)** | Facilities owned and operated by private companies and contracted directly by ICE | 8 | 6,818 |
| **Inter-governmental Service Agreement (IGSA)** | Facilities, such as local and county jails, housing ICE detainees (as well as other inmates) under an IGSA with ICE | 87 | 8,778 |
| **Dedicated Inter-governmental Service Agreement (DIGSA)** | Facilities dedicated to housing only ICE detainees under an IGSA with ICE | 11 | 9,820 |
| **U.S. Marshals Service Inter-governmental Agreement (USMS IGA)** | Facilities contracted by the U.S. Marshals Service that ICE also agrees to use | 100 | 6,756 |
| **Total:** | | 211 | 35,435 |

*Source:* ICE data

NOVOA_0001686



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

ICE began operating its detention system under the *National Detention Standards* (NDS), which it issued in 2000 to establish consistent conditions of confinement, program operations, and management expectations in its detention system. Along with stakeholders, ICE revised the NDS and developed *Performance-Based National Detention Standards 2008* (PBNDS 2008) to improve safety, security, and conditions of confinement for detainees. With its *Performance-Based National Detention Standards 2011* (PBNDS 2011), ICE aimed to enhance immigration detention conditions while maintaining a safe and secure detention environment for staff and detainees. Contracts and agreements with facilities that hold ICE detainees include either NDS, PBNDS 2008, or PBNDS 2011.[1] Appendix C lists the standards included in each set.

As part of its layered approach, various ICE offices manage the oversight and monitoring of detention standards and have different roles and responsibilities. Specifically, ICE uses the following inspections[2] and onsite monitoring program to determine whether facilities comply with applicable detention standards.[3]

- **Inspections by Nakamoto Group, Inc. (Nakamoto):** ICE ERO Custody Management, which manages ICE detention operations and oversees the administrative custody of detained aliens, contracts with Nakamoto[4] to annually or biennially inspect facilities that hold ICE detainees more than 72 hours.[5] Nakamoto inspects about 100 facilities per year to determine compliance with 39 to 42 applicable detention standards.[6] Nakamoto inspected or re-inspected 103 facilities in 2015, 83 facilities in 2016, and 116 facilities in 2017. ICE uses Nakamoto to inspect all types of facilities listed in table 1.

---

[1] ICE also uses *Family Residential Standards* for Family Residential Centers holding families and juveniles; we did not examine oversight of these facilities in this review.

[2] The inspection types evaluated in this report inspect facilities holding detainees more than 72 hours because about 99 percent of ICE detainees are in such facilities.

[3] ICE also has procedures for operational review self-assessments, which allow facilities with an average daily population of fewer than 10 detainees or those designated as short-term facilities that house detainees under 72 hours to conduct their own inspections, under the guidance of the local ICE ERO field office. We did not assess these operational review self-assessments.

[4] ICE ERO has been contracting with Nakamoto since 2007; ICE ERO last re-competed and re-awarded the contract in 2016.

[5] Nakamoto also conducts quality assurance reviews, technical assistance reviews, follow-up inspections, special assessments, and pre-occupancy inspections; we only assessed Nakamoto's annual/biennial inspections. Nakamoto also inspects a few facilities holding detainees less than 72 hours.

[6] As shown in appendix C, the number of standards inspected depends on whether the facility operates under NDS or PBNDS.

NOVOA_0001687



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

- **Inspections by the Office of Detention Oversight (ODO):** ODO is unit of the ICE's Office of Professional Responsibility, Inspections and Detention Oversight Division. ODO is institutionally separate from ERO. As such, ODO inspections aim to provide ICE executive leadership with an independent assessment of detention facilities. About once every 3 years, ODO also inspects detention facilities that hold ICE detainees more than 72 hours (and have an average daily population of more than 10 detainees). ODO adjusts its inspection schedule based on perceived risk, ICE direction, or national interest. ODO leadership determines the facilities to review each year based on staffing budget, agency priorities, and special requests by ICE leadership. Contract staff from Creative Corrections, LLC support ODO teams. ODO inspects facilities to determine compliance with 15 to 16 "core" standards, identified in appendix D. ODO inspected 23 facilities in FY 2015, 29 in FY 2016, and 33 in FY 2017. ODO also inspects all types of facilities listed in table 1, but less frequently.

- **Monitoring by the Detention Service Managers (DSM):** ICE ERO Custody Management also has a Detention Monitoring Program through which onsite DSMs at select facilities, covering each facility type listed in table 1, continuously monitor compliance with ICE detention standards. In December 2017, 35 DSMs monitored compliance with ICE detention standards at 54 facilities holding more than 70 percent of detainees. Both Nakamoto and ODO still inspect facilities that have DSMs as the inspection processes are separate from the onsite monitoring.

The responsibility for monitoring follow-up and corrective actions resulting from ICE's detention oversight falls to the Detention Standards and Compliance Unit (DSCU), also within ICE ERO Custody Management, and to ICE ERO field offices. Detention facilities develop Uniform Corrective Action Plans (UCAP) when either Nakamoto or ODO inspections find instances of noncompliance. DSCU and ICE ERO field office managers work with facilities to resolve the issues.

We evaluated policies, procedures, and inspection practices, and we observed Nakamoto and ODO inspections of detention facilities. Between April and August 2017, we observed Nakamoto inspections at Irwin County Detention Center in Ocilla, Georgia, and at Johnson County Detention Center in Cleburne, Texas. We observed ODO inspections at Eloy Detention Center in Eloy, Arizona, and at Stewart Detention Center in Lumpkin, Georgia. We also reviewed a sample of Nakamoto and ODO inspection reports and UCAPs to evaluate how ICE reports on and corrects identified deficiencies. For our observations, we used a limited judgmental sample and relied on our

NOVOA_0001688



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

professional judgment as inspectors to draw conclusions when we observed practices of Nakamoto and ODO inspection teams. We also interviewed nine DSMs from various types of facilities. In this review we sought to determine the effectiveness of both ICE's immigration detention inspection and follow-up processes as well as its monitoring of detention facilities.

## Results of Inspection

Neither type of inspection ICE uses to examine detention facilities ensures consistent compliance with detention standards or comprehensive correction of identified deficiencies. Specifically, because the Nakamoto inspection scope is too broad, ICE's guidance on procedures is unclear, and Nakamoto's inspection practices are not consistently thorough, its inspections do not fully examine actual conditions or identify all compliance deficiencies. In contrast, ODO uses effective methods and processes to thoroughly inspect facilities and identify deficiencies, but the inspections are too infrequent to ensure the facilities implement all corrections. Moreover, ICE does not adequately follow up on identified deficiencies or systematically hold facilities accountable for correcting deficiencies, which further diminishes the usefulness of both Nakamoto and ODO inspections. In addition, ICE ERO field offices' engagement with onsite DSMs is inconsistent, which hinders implementation of needed changes. Although ICE's inspections, follow-up processes, and DSMs' monitoring of facilities help correct some deficiencies, they do not ensure adequate oversight or systemic improvements in detention conditions; certain deficiencies remain unaddressed for years.

As some of our previous work indicates, ICE's difficulties with monitoring and enforcing compliance with detention standards stretch back many years and continue today. In 2006, the Office of Inspector General (OIG) identified issues related to ICE detention facility inspections and implementation of corrective actions. In our 2006 report, we recommended that ICE "improve the inspection process and ensure that all non-compliance deficiencies are identified and corrected."[7] In a December 2017 report, which related to OIG's unannounced

---

[7] *Treatment of Immigration Detainees Housed at Immigration and Customs Enforcement Facilities*, OIG-07-01, December 2006

NOVOA_0001689



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

inspections of five detention facilities, we identified problems in some of the same areas noted in the 2006 report.[8]

## Nakamoto Inspections Are Significantly Limited and Office of Detention Oversight Inspections Are Not Frequent Enough

After observing Nakamoto and ODO inspections in detention facilities and evaluating their inspection methods, practices, and reports, we determined that ICE detention facility compliance enforcement is lacking because Nakamoto's inspection scope is too broad; ICE does not provide clear guidance on procedures; and the Nakamoto inspectors are not always thorough. In contrast, ODO's inspections are better scoped and more comprehensive, but are too infrequent to ensure compliance and effect regular and consistent changes in detention conditions. Both sets of inspections have value, but their weaknesses render them inadequate to promote effective oversight. In the following paragraphs we detail the inspections' strengths and weaknesses.

**Pre-inspection:** ICE only requires the Nakamoto teams to review previous oversight reports and inspection results for a facility during pre-inspection research. Therefore, Nakamoto inspectors typically limit their pre-inspection research to reviewing previous Nakamoto inspection reports and UCAPs for the inspected facility. Prior to each inspection, according to a Nakamoto manager, an introductory letter, inspection notification letter, and a blank facility incident form are sent to the detention facility. When applicable, the detention facilities complete the incident form, detailing any incident that may have occurred during the year between inspections.

In contrast, before visiting a detention facility, ODO policies direct ODO inspection teams to research and compile information from the facility and the relevant ERO field office.[9] We reviewed ODO's pre-inspection packages, which included documents from the facility and ICE ERO, such as contracts, facility records, local ERO policies and procedures, complaints the ICE Joint Intake Center received about the facility, and any detainee death reports. The pre-inspection materials also included policies on emergency response, safety inspections, and use of force. Through this research, ODO teams check for potential deficiencies before they arrive at the facility, which allows more time on site to assess detention conditions instead of reviewing policies and procedures.

---

[8] *Concerns about ICE Detainee Treatment and Care at Detention Facilities*, OIG-18-32, December 2017

[9] ICE ERO has 24 field offices that manage detention operations in their geographic area.

NOVOA_0001690



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

**Scope:** The Nakamoto inspection scope is too broad to be completed by a small team in a short timeframe. Under its Statement of Work (SOW) with ICE, Nakamoto must determine compliance with all 39 to 42 applicable detention standards by examining more than 650 elements of the standards at more than 100 facilities a year. Typically, three to five inspectors have only 3 days to complete the inspection, interview 85 to 100 detainees, brief facility staff, and begin writing their inspection report for ICE. Even with a full 5-member inspection team, each of four inspectors has to evaluate compliance with about 10 standards. The fifth inspector completes a Quality of Medical Care Assessment,[10] when applicable, which includes using 20 checklists, each requiring review of 10 to 20 patient records. Nakamoto inspectors also told us that it was difficult to complete their work in the allotted time.

Under ODO's guidance, ODO teams assess compliance with 15 or 16 "core" standards selected because deficiencies in these standards could most significantly impact a detainee's health, safety, civil rights, and civil liberties.[11] Hence, ODO inspections appear to be appropriately scoped for the size of the teams performing the work. A typical ODO team has six or seven inspectors, consisting of three ODO employees and three or four contractors from Creative Corrections, LLC. Each member of the ODO team has 3 days to assess compliance with either two or three detention standards. We observed an adequate number of ODO inspectors and contractors, who appeared to have a reasonable workload and enough time to thoroughly inspect facilities, as well as observe and validate actual detention conditions. However, although it helps to narrow the scope, by limiting its inspections to assessing just the "core" standards, ODO is scrutinizing compliance with fewer than half of the NDS or PBNDS standards.

**Guidance and Inspection Practices:** ICE provides Nakamoto with detention review summary forms and inspection checklists to determine compliance with detention standards, but it does not give Nakamoto clear procedures for evaluating detention conditions. In general, the Nakamoto inspection practices we observed fell short of the SOW requirements. Specifically, we saw some inspectors observing and validating "the actual conditions at the facility," per the SOW, but other Nakamoto inspectors relied on brief answers from facility

---

[10] In 2016, ICE added a Quality of Medical Care Assessment to Nakamoto's inspection of "over-72 hour" facilities. ICE Health Service Corps and the DHS Office for Civil Rights and Civil Liberties developed a standardized quality of care audit toolkit. Most of the measures are not detention standard requirements.
[11] ODO may review standards outside of the "core" standards based on conditions at the facility or at the request of ICE leadership. Appendix D contains details on the core standards.

NOVOA_0001691



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

staff and merely reviewed written policies and procedures instead of observing and evaluating facility conditions. Some inspectors did not consistently look at documentation to substantiate responses from staff or ensure the facility was actually implementing the policies and procedures.[12] For example:

- An inspector documented that A-files[13] contained required identification documents without checking the actual files.
- Facility staff told inspectors that drivers had commercial driving licenses as required, but the inspectors did not review records to confirm.
- An inspector encountered two detainees held in administrative segregation[14] because, according to the facility officer, they arrived late the night before and no space was available in the general population area of the facility. The inspector did not follow up to ensure the placement in administrative segregation was properly documented as required.
- Some Nakamoto inspectors relied on responses from facility employees who were not responsible for the areas and functions the inspectors were inquiring about, such as asking a classification officer responsible for admissions about the standards relating to Visitation and Law Library, instead of asking staff responsible for those areas.

In contrast, ODO has developed clear procedures and effective tools to help inspectors thoroughly inspect facilities. During the two inspections we observed, each ODO inspector used the checklist to determine "line-by-line" compliance with two or three detention standards. In addition, the inspectors devoted most of their time to observing facility practices, validating observations through records review, and interviewing ICE and facility employees and detainees.

ODO teams consistently identify more deficiencies than Nakamoto when the two groups inspect the same facilities. For example, in FY 2016, for the same

---

[12] Several ICE employees in the field and managers at ICE ERO headquarters commented that Nakamoto inspectors "breeze by the standards" and do not "have enough time to see if the [facility] is actually implementing the policies." They also described Nakamoto inspections as being "very, very, very difficult to fail." One ICE ERO official suggested these inspections are "useless."

[13] A-file refers to an Alien File, a file that identifies a non-citizen by unique personal identifier called an Alien Registration Number. A-Files are official files for all immigration and naturalization records.

[14] Detention facility staff sometimes segregate detainees from a detention facility's general population using two types of segregation disciplinary and administrative. Although separated from other detainees, detainees in segregation are permitted daily contact with detention and medical staff, as well as time for recreation, library, and religious activities.

NOVOA_0001692



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

29 facilities ODO and Nakamoto inspected, ODO's teams found 475 deficiencies while Nakamoto teams reported 209 deficiencies. Given that ODO looks at 15 to 16 standards and Nakamoto inspects 39 to 42 standards, the much larger number of deficiencies identified by ODO is surprising.

**Detainee Interviews:** For the two inspections we observed, Nakamoto reported interviewing between 85 and 100 detainees, but the interviews we saw during these two inspections did not comply with the SOW and we would not characterize them as interviews. The SOW requires detainee interviews to include "private conversations with individual detainees (in a confidential area)," but we did not see any interviews taking place in private settings. Instead, inspectors had brief, mostly group conversations with detainees in their detention dorms or in common areas in the presence of detention facility personnel, generally asking four or five basic questions about treatment, food, medical needs, and opportunities for recreation. Describing these discussions between Nakamoto inspectors and detainees as "interviews" is not consistent with the SOW requirements.

The SOW also requires Nakamoto inspectors to interview detainees who do not speak English, but we did not observe any interviews Nakamoto inspectors conducted in a language other than English, nor any interviews in which inspectors used available DHS translation services. In fact, inspectors selected detainees for interviews by first asking whether they spoke English. During one inspection, a facility guard translated for a detainee. Inspectors did not consistently follow up with the facility or ICE staff on issues detainees raised.

Conversely, we observed ODO teams closely following ODO guidance on interviewing a representative sample of detainees, in confidential settings, and in languages detainees understand. ODO teams used an interview form that included a wide range of questions about the living conditions, safety, and well-being of detainees and elicited candid responses and insight on facility conditions. According to ODO policy, depending on the size of the facility, inspectors interview between 10 and 40 detainees, including all detainees in segregation. We observed ICE ODO staff interviewing about 30 detainees one-on-one in a confidential setting, separate from facility staff and ICE employees. We also observed ODO inspectors interviewing every detainee in segregation.

Inspectors selected detainees to interview based on a number of factors, such as length of detention, age, medical history, and the detainee's country of origin. ODO used the DHS language telephone line for translation and interviewed some detainees in Spanish and other languages. ODO teams discussed every issue raised during these interviews with facility and ICE

NOVOA_0001693



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

officials and identified a number of deficiencies that may have gone undetected without these interviews.

**Onsite Briefings:** Both Nakamoto and ODO inspectors briefed facility staff at the end of each day. As a result, we identified some deficiencies that were corrected while inspectors were onsite, such as discontinuing the practice of charging ICE detainees for medical co-payments, requiring more privacy for medical examinations, repairing inoperable telephones, and updating facility handbooks. Although Nakamoto does not track such onsite corrective actions, ODO does — for example, in FY 2016, ODO recorded 106 onsite corrections to 475 identified deficiencies at 29 facilities. Initiating onsite corrections is a good practice.

**Reporting:** Following each inspection, Nakamoto sends ERO a completed checklist with an assessment of each element of the evaluated standards and a summary of the inspection. We identified inaccuracies in Nakamoto's summary reports and checklists we selected for our sample. In some instances, Nakamoto's reports misrepresented the level of assurance or the work performed in evaluating the actual conditions of the facility and the information in the reports was inconsistent with what we observed during inspections. For example:

- Nakamoto reported "Detainees were familiar with ICE officers and understood how to obtain assistance from ICE officers and the case managers. Interviews yielded positive comments regarding access to library services, access to case managers and visiting opportunities." However, we heard detainees tell inspectors they did not know the identity of their ICE deportation officer or how to contact the officer. We did not observe inspectors asking any detainees about law library services or visiting opportunities.

- At one facility, we discovered it was impossible to dial out using any toll-free number, including the OIG Hotline number, due to telephone company restrictions on the facility. We alerted the facility, which started working to correct this facility-wide issue by modifying the directions for dialing toll-free numbers. Although the issue was not corrected until the third day of the inspection, a Nakamoto inspector wrote on a checklist that an inspector could reach the OIG Hotline from several units on the second day of the inspection.

- At another facility, Nakamoto inspectors questioned an ICE employee about the facility's correction officer duties, instead of actually interviewing

NOVOA_0001694



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

correction officers. Yet, Nakamoto inspectors concluded in the summary report that "[correction] officers ... exhibited an understanding of the detention standards and civil detention."

ODO teams also issue compliance inspection reports to various ICE stakeholders and the public, detailing their findings, as well as any immediate remedial actions facilities initiated or completed in response to identified deficiencies. We did not identify any inconsistencies between what ODO inspectors discovered at the facilities during the inspections we observed and what they then reported. However, ICE ERO officials remarked that occasionally ODO reports are not timely.

**Frequency:** Based on our analysis, Nakamoto inspections target about 100 facilities a year, thus reaching a large number of the facilities ICE uses. ODO teams only inspect about 30 facilities per year.[15] The infrequency of ODO inspections limits the ability to produce regular improvements in detention conditions. Although ODO thoroughly assesses and reports on a facility's deficiencies and compliance, the deficiencies may go unnoticed or unreported for 3 years, and ODO cannot evaluate whether a facility has corrected them until its next inspection. ODO officials suggested more frequent potential follow-up visits to facilities that perform very poorly during inspections, but said this might be difficult with current staffing. Also, all Nakamoto and ODO inspections are scheduled in advance and announced to the facilities, which, according to ICE field staff, allows facility management to temporarily modify practices to "pass" an inspection.

**Quality Control:** Although Nakamoto inspections have clear weaknesses, ICE ERO does not exercise enough quality control over these contracted inspections to evaluate or improve Nakamoto's performance. Specifically, we could not find evidence that ICE ERO performed quality assurance visits in the past 4 years. An ICE ERO headquarters employee said that, in the past, ERO quality assurance visits with Nakamoto inspectors took place two to three times a year, but ICE could not provide documentation of any visits in 2014 or 2015. ICE ERO officials in Custody Management admitted they were unable to perform any quality assurance visits during FY 2016 and that there were no planned visits for FY 2017 because ERO does not have "the right tools" to evaluate Nakamoto performance.

---

[15] ODO leadership determines the number of facilities to review each FY based on staffing, budget, and agency priorities or special requests by ICE leadership.

NOVOA_0001695



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

ODO internal guidance requires that Section Chiefs join teams inspecting detention facilities once a quarter and the Division Chief has to accompany ODO inspectors at least twice a year. We reviewed records that confirmed ODO has conducted supervisory visits over the past 3 years. Also, the ODO Section Chief and Division Chief were present at ODO inspections we observed.

## Inadequate Inspection Follow-up Leads to Continuing Deficiencies

The usefulness of ICE inspections is further diminished by ICE's failure to ensure that identified deficiencies are consistently corrected.

When Nakamoto and ODO inspections find instances of noncompliance, the Detention Standards and Compliance Unit in ICE ERO Custody Management develops a UCAP for the facility. A UCAP typically lists the applicable standards, indicates how the facility did not comply with the standards (resulting in a deficiency), and provides blank columns for the facility or the ICE ERO field office to propose corrective actions. ERO field office officials must return the UCAP containing proposed or competed corrective actions within 55 days to DSCU for tracking and verification. In limited circumstances, ICE will grant waivers for components within detention standards, in essence exempting the facility from compliance.[16] We identified problems with these corrective measure procedures, which have led to ongoing deficiencies:

**Inadequate Response to UCAPs:** ERO field offices do not always respond to DSCU with proposed corrections; some respond late, submit incomplete responses, or report that facility deficiencies will continue due to local policies or conditions. For example, our document review revealed that in FY 2015 and FY 2016, ERO field offices only responded to 8 of 20 and 12 of 25 ODO inspection UCAPs, respectively. Further, in 2015 and 2016, some field offices sent UCAPs to DSCU from 2 to 6 months past the 55-day deadline.

Submitted UCAPs from some facilities did not have proposed corrective actions for a number of identified deficiencies and contained responses with corrections only for certain deficiencies. In addition, rather than proposing corrective actions, some facilities indicated that deficient practices would continue because of local policies or conditions, which essentially amounts to

---

[16] OIG is currently reviewing ICE's processes for granting waivers, including ICE's specific authority to do so.

NOVOA_0001696



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

an intent to continue not complying with standards. Such practices are not consistent with the detention standards for civil custody, which facilities agree to comply with when entering into contracts with ICE. For example:

- A detention standard requires the facility to allow detainees to help other detainees voluntarily and free-of-charge prepare legal documents. In addressing a deficiency in this area, the facility responded that it did not permit such assistance, stating, "It is the policy of the [facility] not to allow inmates/detainees to assist others with their legal issues.... The [facility] chooses not to change its policy regarding the issues noted."

- A detention standard requires that the facility handbook describe official population count times and procedures. One facility had a deficiency in this area because the handbook did not include the count times. In its response, the facility asserted that it would not be adding exact count times to the handbook.

**Inconsistent Implementation of Corrective Actions:** ICE does not consistently enforce compliance with detention standards. ICE DSCU sometimes receives follow-up documentation, such as updated policies or photos of corrections, supporting implementation of corrective actions, but ICE does not require, and many field offices do not send, such evidence. Although ICE ERO has 24 Field Office Directors (FOD)[17] whose staff are supposed to work with DSCU to ensure that deficiencies are actually corrected, we found that ERO field offices' engagement in detention oversight varies widely. ICE does not appear to have a comprehensive process to verify whether facilities implemented all the corrective actions until the next Nakamoto or ODO inspection.

The frequency of repeat deficiencies in the same facilities,[18] and the high number of deficiencies inspectors identify at facilities expose the problems associated with ICE's inability to consistently follow up on corrective actions. Even well documented deficiencies that facilities commit to fixing routinely remain uncorrected for years. For example, several facilities continue to strip search all incoming detainees without establishing reasonable suspicion, as required by detention standards.[19] Even when inspections documented this as

---

[17] FODs are responsible for managing detention operations in their geographic area.
[18] A repeat deficiency is any deficiency identified in 2 or more consecutive years of annual inspections by the same inspection entity (i.e., Nakamoto or ODO).
[19] According to PBNDS 2008 and 2011, strip searches are conducted only when there is reasonable belief or suspicion that contraband may be concealed on the person, and when properly authorized.

NOVOA_0001697



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

a deficiency, the facilities continued routine strip searches of detainees during intake without proper documentation. Other examples of repeat deficiencies include facilities failing to notify ICE about alleged or proven sexual assaults. We also found less egregious repeat deficiencies such as instances where officers open incoming general correspondence without the presence of the addressed detainee or do not allow detainees to participate in recreation for the maximum time required by the standard.

Our review of 10 Nakamoto inspection reports from 2015 and 2016 showed that 6 of the 10 included at least 1 repeat deficiency, as shown in the preceding examples. Further, in 2015, ODO identified 18 repeat deficiencies during 23 inspections, and in 2016, ODO teams identified 21 repeat deficiencies during 29 inspections. Under current ICE ERO practices, these repeat deficiencies may be present for the entire 3-year period between ODO inspections.

**Inappropriate Use of Waivers:** Granting waivers that allow some facilities to opt out of complying with particular standards may be appropriate in some cases. However, we identified examples in which the repeated use of waivers allowed facilities to exempt themselves from standards that ICE deems critically important, including those related to health, safety, and security.[20] For example:

- In one facility, ICE granted a waiver to allow the comingling of detainees of different custody classification levels. The standard requirement is to avoid comingling of low-custody detainees, who have minor, non-violent criminal histories or only immigration violations, with high-custody detainees, who have histories of serious criminal offenses. The facility asserted that "a corrective plan of action is not readily available due to overwhelming expense, time and space limitations associated with full compliance with the standards…. Separation of detainees by classification levels … may prove to be an undue burden upon the facility."

- At another facility, ICE granted a waiver for the fire prevention, control, and evacuation planning standard, which requires the posting of emergency plans. The facility "expressed safety concerns regarding the posting of such detailed and specific exit diagrams within its detention facility."

---

[20] These standards are called "Priority Components" on inspection checklists. ICE selects Priority Components from a range of detention standards, based on their importance to factors such as health and life safety, facility security, detainee rights, and quality of life in detention.

NOVOA_0001698



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Other common examples of waivers range from those allowing strip searches of detainees to barbershop availability and reducing the frequency of razor distribution. Granting waivers after inspections identify discrepancies negates the effectiveness of the inspections process and allows inherently deficient practices to continue.

## Onsite Detention Service Managers Face Challenges in Improving Compliance

In addition to oversight provided by the Nakamoto and ODO inspections, in 2010, ICE ERO established the Detention Monitoring Program and placed DSMs in 52 detention facilities. The program goals were to monitor compliance with applicable detention standards, enable "on the spot" resolution of facility issues, ensure regular inspection checks, and enhance collaboration with ERO field offices and facility staff to address concerns. Although DSMs are meeting these goals, their effectiveness is sometimes limited by a lack of support from ERO field office management.

In the facilities they monitor, DSMs provide a needed service for ICE ERO Custody Management by assessing compliance with standards nearly daily or weekly. DSMs we interviewed described duties such as monitoring food services and kitchen operations, observing housing units for cleanliness, checking the status of detainees' medical requests, looking at special management units (segregation), reviewing grievances, and talking to detainees and addressing their concerns. DSMs also identify deficiencies independent of Nakamoto and ODO inspections and correct deficiencies "on the spot." For example, DSMs noted 6,216 and resolved 4,331 deficiencies in FY 2017. In addition, DSMs provide technical guidance to the facilities on implementing corrective action plans.

Although DSMs keep ERO Custody Management officials informed about conditions at more than 50 facilities and address detention issues, their results in improving detention conditions are mixed. To correct instances of noncompliance, DSMs typically must rely on local ERO field office assistance because corrective actions are a field office responsibility. Thus, DSMs have the expertise to propose appropriate corrective actions, but not the authority to implement them. According to some DSMs, when the ERO field office supports them, correcting identified deficiencies is collaborative and productive. In contrast, when ERO field office management does not support and collaborate with the DSM, facility compliance is challenging. Specifically, DSMs at a few facilities portrayed local ERO management as "disengaged" or "reluctantly

NOVOA_0001699



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

responsive" in detention issues; they described the relationship between DSMs and ERO field management as "not very productive." One Custody Management supervisor said that some ERO field office managers are "hands off" and consider DSMs "a nuisance."

ICE ERO headquarters officials explained that DSMs' influence is directly related to their respective ERO field office's commitment to improving compliance and facility conditions. Officials added that Nakamoto and ODO inspections tend to reveal fewer problems at facilities where ERO field offices' leadership demonstrates understanding and concern about detention conditions. We found that ERO field offices with ICE ERO Field Office Compliance teams[21] were more engaged in detention issues.

## Conclusion

To detain approximately 38,000 removable aliens at more than 200 facilities, ICE Custody Operations receives about $2.3 billion of ERO's total operations budget of about $3.2 billion. Given ICE's investment in detention operations, a potentially rising number of detainees and facilities, and the issues we identified during this review, ICE needs to comprehensively examine and assess its inspections process, improve its follow-up procedures for corrective actions, and ensure ERO field offices more consistently engage in overseeing detention operations. Taking such actions will help limit and correct persistent deficiencies, as well as effect long-lasting changes and systemic improvements in ICE detention facilities.

## Recommendations

We recommend the Assistant Director for ICE ERO Custody Management:

**Recommendation 1:** Revise the inspection scope and methodology for annual and biennial contracted inspections to ensure that the inspection procedures are adequate to evaluate actual conditions at facilities.

**Recommendation 2:** Reinstate a quality assurance program for contracted inspections of detention facilities to ensure the reported inspection results are thorough and accurate. Document all quality assurance conclusions.

---

[21] Field Office Compliance teams consist of ICE ERO compliance officers who receive training on the detention standards and ensure standards are followed in their respective facilities. Compliance officers are ICE ERO field office employees and keep ICE ERO field management informed of compliance concerns.

NOVOA_0001700



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

We recommend the Associate Director for ICE Office of Professional Responsibility:

**Recommendation 3:** Develop a follow-up inspection process for select facilities where the Office of Detention Oversight identifies egregious or numerous deficiencies. Consider the feasibility and appropriateness of making some of such visits unannounced.

We recommend the Executive Associate Director for ICE ERO and the Assistant Director for ICE ERO Custody Management:

**Recommendation 4:** Update and enhance current procedures to ensure verification of all corrective actions for identified deficiencies. Track all corrective actions by facility, responsible field office, and status of resolution.

**Recommendation 5:** Develop protocols for ERO field offices to require facilities to implement corrective actions resulting from Detention Service Managers' identification of noncompliance with detention standards.

## Management Comments and OIG Analysis

ICE concurred with all recommendations. Appendix B contains a copy of ICE management comments in their entirety. We also received technical comments and incorporated them in the report where appropriate. We consider all recommendations to be resolved and open. A summary of ICE's responses and our analysis follows.

**ICE Response to Recommendation 1:** ICE concurred with the recommendation. ICE will re-evaluate the existing inspection scope and methodology in the statement of work for annual and biennial contracted inspections to ensure that inspection procedures are adequate and appropriately resourced to fully evaluate detention conditions at facilities. ICE anticipates these actions to be complete by July 30, 2019.

**OIG Analysis:** We consider these actions responsive to the recommendations, which is resolved and open. We will close this recommendation when we receive the new inspection scope and methodology for annual and biennial

NOVOA_0001701



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

contracted inspections that ensure inspection procedures are adequate and appropriately resourced to fully evaluate detention conditions at facilities.

**ICE Response to Recommendation 2:**  ICE concurred with the recommendation. ICE has initiated steps to bolster the quality assurance process for contracted inspections. ICE is in the process of hiring additional federal staff with subject matter expertise in ICE detention and facility inspections to conduct on-site quality assurance reviews of ICE's contract inspectors. ICE anticipates these employees will start by October 30, 2018. ICE also has directed officers from the DSCU to attend all out-briefings by the ICE inspections contractor to ERO field offices, starting this quality assurance element by June 30, 2018. In addition, starting in July 2018, the existing monthly meetings with the ICE inspections contractor will include quality assurance-related input by the ICE Contracting Officer and Contracting Officer's Representatives. ICE's Mission Action Plan, due to the OIG within 90 days of the issuance of this report, will outline additional actions to address this recommendation. ICE anticipates all actions responsive to this recommendation be completed by July 30, 2019.

**OIG Analysis:**  We consider these actions responsive to the recommendation, which is resolved and open. We will close this recommendation when we receive documentation that the proposed actions are completed or occurring regularly, as appropriate.

**ICE Response to Recommendation 3:**  ICE concurred with the recommendation. ICE OPR has already planned for the ODO to conduct at least two follow-up inspections during FY 2018. During these more targeted inspections, ODO will focus on either where ODO identified deficiencies during most recent compliance inspection of the facility or in response to concerns that may be identified by agency leadership or third parties. Additionally, the ODO has decreased the amount of advanced notice to facilities in preparation for an ODO inspection. Although ODO continues to consider conducting some unannounced inspections in FY 2019, ODO's significant pre-inspection documentation review makes conducting unannounced inspections difficult. ICE requests that OIG consider this recommendation resolved and closed.

**OIG Analysis:**  We consider these actions responsive to the recommendation, which is resolved and open. We will close this recommendation when we receive documentation that ODO developed a follow-up inspection process and conducted the follow-up inspections using a more targeted approach with a more specific focus.

NOVOA_0001702



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

**ICE Response to Recommendation 4:**  ICE concurred with the recommendation. ICE stakeholders are working together to improve the existing corrective action process, and have initiated new steps, such as: 1) requiring ERO field offices to provide validating documentation to the DSCU to confirm that corrective actions have been implemented and for DSCU to track them; 2) directing the DSCU to provide copies of completed UCAPs to on-site federal DSMs for validation that corrective actions have been implemented by management at their facilities; 3) directing DSMs to monitor that the implemented changes are being maintained between inspections; 4) directing the DSCU to provide copies of completed UCAPs and the contractor inspections' most recent findings to ODO for each facility scheduled for an ODO compliance inspection; and 5) updating the existing Detention Management Control Program (DMCP) directive. On June 12, 2018, an ERO Headquarters working group began meeting weekly to update the program directive and incorporate any new compliance-related and quality assurance program changes. Once finalized, a copy of the new directive will be distributed to ERO field offices to enhance facilities' compliance with ICE detention standards. ICE anticipates all actions responsive to this recommendation be completed by July 30, 2019.

**OIG Analysis:**  We consider these actions responsive to the recommendation, which is resolved and open. We will close this recommendation when we receive adequate supporting documentation demonstrating that the proposed actions are completed.

**ICE Response to Recommendation 5:**  ICE concurred with the recommendation. On June 12, 2018, an ERO Headquarters working group began meeting weekly to update the DMCP directive and explore various options to enhance collaboration and support between field offices, facility staff, and on-site DSMs. The directive will include guidelines and requirements on how ERO field office staff will work with on-site DSMs. ICE's Mission Action Plan, due to the OIG within 90 days of the issuance of this report, will outline additional actions to address this recommendation. ICE anticipates all actions responsive to this recommendation be completed by July 30, 2019.

**OIG Analysis:**  We consider these actions responsive to the recommendation, which is resolved and open. We will close this recommendation when we receive the new DMCP directive and evaluate the proposed protocols on how ERO field office staff will work with on-site DSMs.

NOVOA_0001703



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix A
## Objective, Scope, and Methodology

DHS OIG was established by the *Homeland Security Act of 2002* (Public Law
107–296) by amendment to the *Inspector General Act of 1978.* In this review,
we sought to determine whether ICE's inspection process ensures adequate
oversight of detention facilities, compliance with detention standards, and
correction of deficiencies.

To answer the objective, we reviewed ICE's policies and procedures for
performing immigration detention inspections. We reviewed whether the
methodology ICE uses for its various inspections is conducive to thorough and
independent oversight. We reviewed the contract and SOW between ICE and
the contractor (Nakamoto) performing detention facility inspections to
understand the role, requirements, and responsibilities of the contractor.

Using ICE data, we selected four ICE detention facilities to visit and observe
inspections, based on a range of factors including facility type and detention
standards governing the facility. We observed ICE ODO inspections of two
detention facilities (Eloy Detention Center in Eloy, Arizona, and Stewart
Detention Center in Lumpkin, Georgia) and observed ICE ERO contractor
(Nakamoto) inspections of two facilities (Irwin County Detention Center in
Ocilla, Georgia, and Johnson County Detention Center in Cleburne, Texas).

To determine the thoroughness and accuracy of detention inspections, we
reviewed ICE documentation of the inspection results and interviewed ICE
officials, including both ICE staff and contract personnel working in the
detention facilities. To assess the process for correcting deficiencies identified
by ICE inspections, we reviewed ICE processes and procedures for correcting
deficiencies. We interviewed ICE officials responsible for tracking, analyzing,
and making remedial decisions about identified issues. We reviewed UCAPs for
deficiencies identified in both Nakamoto and ODO inspections.

We also met with staff from DHS' Office for Civil Rights and Civil Liberties to
discuss the adequacy of ICE immigration detention oversight.

We conducted this review between April and October 2017 pursuant to the
*Inspector General Act of 1978*, as amended, and according to the *Quality
Standards for Inspection and Evaluation* issued by the Council of the Inspectors
General on Integrity and Efficiency. We believe that the evidence obtained
provides a reasonable basis for our findings and conclusions based upon our
objectives.

NOVOA_0001704



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

## Appendix B
## Management Comments to the Draft Report

Office of the Chief Financial Officer

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536



**U.S. Immigration and Customs Enforcement**

June 15, 2018

| | |
|---|---|
| MEMORANDUM FOR: | John V. Kelly<br>Acting Inspector General<br>Office of the Inspector General |
| FROM: | Stephen A. Roncone<br>Chief Financial Officer and<br>Senior Component Accountable Official |
| SUBJECT: | Management's Response to OIG Draft Report: "ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements"<br>(Project No. 17-049-ISP-ICE) |

Thank you for the opportunity to review and comment on this draft report. U.S. Immigration and Customs Enforcement (ICE) appreciates the work of the Office of Inspector General (OIG) in planning and conducting its review and issuing this report.

ICE appreciates the OIG's positive recognition of our on-going collaboration with stakeholders for more than a decade to improve the safety, security, and conditions of confinement for detainees. In particular, we noted OIG's recognition of the Office of Professional Responsibility (OPR) in its implementation of a thorough inspection methodology, as well as the Office of Enforcement and Removal Operations (ERO) for the persistent efforts of its on-site detention monitoring personnel. ICE is committed to continually enhancing civil detention operations to promote a safe and secure environment for both administrative detainees and staff. ICE utilizes a layered approach to monitor detention conditions at facilities, with processes in place to implement corrective actions in instances where non-compliance to ICE detention standards is found. ICE will continue to ensure its detention facilities comply with relevant policies and standards through an aggressive inspections program.

The draft report contained five recommendations, with which ICE concurs. Attached find our detailed response to each recommendation. Technical comments were provided under separate cover.

Again, thank you for the opportunity to review and comment on this draft report. Please feel free to contact us if you have any questions. We look forward to working with you again in the future.

Attachment

www.ice.gov

NOVOA_0001705



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

**Attachment:  Management's Response to Recommendations
Contained in 17-049-ISP-ICE**

The OIG recommended that the Assistant Director for ICE ERO Custody Management:

**Recommendation 1:**  Revise the inspection scope and methodology for annual and biennial contracted inspections to ensure that the inspection procedures are adequate to evaluate actual conditions at facilities.

**Response:**  Concur.  The Assistant Director (AD) for Custody Management (CM) will re-evaluate the existing inspection scope and methodology in the statement of work for annual and biennial contracted inspections to ensure that inspection procedures are adequate and appropriately resourced to fully evaluate detention conditions at facilities.  Estimated Completion Date (ECD):  July 30, 2019.

**Recommendation 2:**  Reinstate a quality assurance program for contracted inspections of detention facilities to ensure the reported inspection results are thorough and accurate. Document all quality assurance conclusions.

**Response:**  Concur.  The AD for CM has already initiated several steps to bolster the division's quality assurance process for contracted inspections:

- The AD for CM is in the process of hiring additional journeyman level federal staff, with subject matter expertise in ICE detention and facility inspections, to conduct on-site quality assurance reviews of ICE's contract inspectors during the entirety of the inspection process.  Projected entry on duty date for these employees is no later than October 30, 2018.

- The AD for CM has directed that docket officers assigned to the Detention Standards Compliance Unit will attend all out-briefings provided by the ICE inspections contractor to ERO field offices.  Attendance will be in-person or via conference call.  Start date for this quality assurance element is no later than June 30, 2018.

- The AD for CM has required that the existing monthly meetings with the ICE inspections contractor incorporate a quality assurance component to enhance program oversight of the inspection methodology and related findings.  The meetings will routinely include quality assurance-related input by the Contracting Officer and Contracting Officer's Representatives.  Start date for this quality assurance element is no later than July 30, 2018.

Additional actions to address this recommendation will be outlined in ICE's Mission Action Plan, which will be submitted to OIG with the 90-day status update for this report.  Overall ECD: July 30, 2019.

The OIG recommended that the Associate Director for ICE Office of Professional Responsibility:

2

NOVOA_0001706



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

**Recommendation 3:**  Develop a follow-up inspection process for select facilities where the Office of Detention Oversight identifies egregious or numerous deficiencies.  Consider the feasibility and appropriateness of making some of such visits unannounced.

**Response:**  Concur.  The Associate Director for ICE OPR has already planned for the Office of Detention Oversight (ODO) to conduct at least two follow-up inspections during Fiscal Year (FY) 2018.  ODO anticipates that these inspections will be more targeted than its typical compliance inspections, in order to focus on either those areas where deficiencies were identified during ODO's most recent compliance inspection of the facility or in response to areas of concern that may be identified by agency leadership or third parties.

Additionally, in FY 2018, the ODO has decreased the amount of advanced notice provided to facilities in preparation for an ODO inspection.  Although ODO continues to consider the possibility of conducting some unannounced inspections in FY 2019, as noted in this report, ODO does conduct a significant amount of pre-inspection documentation review, which would make conducting unannounced inspections difficult.  That pre-inspection review enables ODO to ensure that its inspections process while on-site is streamlined to minimize disruption to facility operations and to enable the staff to focus a significant portion of its time in the facility on detainee interviews and on-site documentation review.

We request that OIG consider this recommendation resolved and closed.

The OIG recommended that the Executive Associate Director for ICE ERO and the Assistant Director for ICE ERO Custody Management:

**Recommendation 4:**  Update and enhance current procedures to ensure verification of all corrective actions for identified deficiencies.  Track all corrective actions by facility, responsible field office, and status of resolution.

**Response:**  Concur.  The AD for CM, working closely with the AD for Field Operations (FO), has already initiated several steps to improve the existing corrective action process:

- The Ads for CM and FO will require ERO field offices to provide validating documentation (e.g., photos, copies of logs, checklists) to the Detention Standards Compliance Unit to confirm that corrective actions identified in a facility's Uniform Corrective Action Plan have been implemented.  The documentation will be saved to SharePoint and will track corrective actions by facility, responsible field office, and status of resolution.

- The Ads for CM and FO will require Uniform Corrective Action Plans to be reviewed and signed off by the relevant ERO Assistant Field Office Director or above to confirm appropriateness off facility corrective actions and their implementation.

- The AD for CM has directed the Detention Standards Compliance Unit to provide copies of completed Uniform Corrective Action Plans to on-site federal Detention Service Managers so that they can validate that corrective actions have been implemented by

3

NOVOA_0001707



# OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

management at their facilities.  Detention Service Managers will monitor that those implemented changes or processes are being maintained between inspections.

- The AD for CM has directed the Detention Standards Compliance Unit to provide copies of completed Uniform Corrective Action Plans and the inspections contractor's most recent inspections findings to ODO for each facility scheduled for an ODO compliance inspection.

- CM is in the process of updating the existing Detention Management Control Program (DMCP) directive.  On June 12, 2018, an ERO Headquarters working group began meeting weekly to update the program directive and incorporate any new compliance-related and quality assurance program changes.  Once finalized, a copy of the new directive will be distributed to ERO field offices to enhance facilities' compliance with ICE detention standards.

Any additional actions by CM and FO to address this recommendation will be outlined in ICE's Mission Action Plan to the OIG, which will be submitted to OIG with the 90-day status update for this report.  Overall ECD:  July 30, 2019.

**Recommendation 5:**  Develop protocols for ERO field offices to require facilities to implement corrective actions resulting from Detention Service Managers' identification of noncompliance with detention standards.

**Response:**  Concur.  As indicated above, on June 12, 2018, an ERO headquarters working group began meeting weekly to update the DMCP directive.  The directive will include guidelines and requirements on how ERO field office staff will work with on-site Detention Service Managers to enhance and verify facility compliance to ICE detention standards.  The working group will explore various options to enhance collaboration and support between field offices, facility staff, and on-site federal managers.

Any additional actions by CM and FO to address this recommendation will be outlined in ICE's Mission Action Plan to the OIG, which will be submitted to OIG with the 90-day status update for this report.  Overall ECD:  July 30, 2019.

4

NOVOA_0001708



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix C
### *National Detention Standards* (NDS) and *Performance-Based National Detention Standards* (PBNDS 2008 and PBNDS 2011)

| Number | NDS 2000 | PBNDS 2008 / PBNDS 2011* |
|---|---|---|
| 1. | Access to Legal Materials | Emergency Plans |
| 2. | Admission and Release | Environmental Health and Safety |
| 3. | Correspondence and Other Mail | Transportation |
| 4. | Classification System | Admission and Release |
| 5. | Detainee Handbook | Custody Classification System |
| 6. | Food Service | Contraband |
| 7. | Funds and Personal Property | Facility Security and Control |
| 8. | Detainee Grievance Procedures | Funds and Personal Property |
| 9. | Group Legal Rights Presentations | Hold Rooms in Detention Facilities |
| 10. | Issuance and Exchange of Clothing, Bedding, and Towels | Key and Lock Control |
| 11. | Marriage Requests | Population Counts |
| 12. | Non-Medical Emergency Escorted Trips | Post Orders |
| 13. | Recreation | Searches of Detainees |
| 14. | Religious Practices | Sexual Abuse and Assault Prevention and Intervention |
| 15. | Detainee Telephone Access | Special Management Units |
| 16. | Visitation | Staff-Detainee Communication |
| 17. | Voluntary Work Program | Tool Control |
| 18. | Hunger Strikes | Use of Force and Restraints |
| 19. | Access to Medical Care | Disciplinary System |
| 20. | Suicide Prevention and Intervention | Food Service |
| 21. | Terminal Illness, Advanced Directives, and Death | Hunger Strikes |
| 22. | Contraband | Medical Care |
| 23. | Detention Files | Medical Care – Women (as applicable) |
| 24. | Disciplinary Policy | Personal Hygiene |
| 25. | Emergency (Contingency) Plans | Significant Self-Harm and Suicide Prevention and Intervention |
| 26. | Environmental Health and Safety | Terminal Illness, Advanced Directives, and Death |

NOVOA_0001709



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

| | | |
|---|---|---|
| 27. | Hold Rooms in Detention Facilities | Correspondence and Other Mail |
| 28. | Key and Lock Control | Trips for Non-Medical Emergencies |
| 29. | Population Counts | Marriage Requests |
| 30. | Post Orders | Recreation |
| 31. | Security Inspections | Religious Practices |
| 32. | Special Management Unit (Administrative Segregation) | Telephone Access |
| 33. | Special Management Unit (Disciplinary Segregation) | Visitation |
| 34. | Tool Control | Voluntary Work Program |
| 35. | Transportation | Detainee Handbook |
| 36. | Use of Force | Grievance System |
| 37. | Staff Detainee Communications | Law Libraries and Legal Materials |
| 38. | Detainee Transfer Standard | Legal Rights Group Presentations |
| 39. | Sexual Abuse and Assault Prevention and Intervention | Detention Files |
| 40. | | Interviews and Tours |
| 41. | | Staff Training |
| 42. | | Detainee Transfers |

*Source:* ICE ERO

NOVOA_0001710



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix D
## Core Standards ICE Office of Professional Responsibility's Office of Detention Oversight Uses to Assess Detention Conditions

| Number | NDS (2000) | PBNDS (2008) | PBNDS (2011) |
|--------|-----------|--------------|--------------|
| 1 | Access to Legal Materials | Law Libraries and Legal Material | Law Libraries and Legal Material |
| 2 | Admission and Release | Admission and Release | Admission and Release |
| 3 | Detainee Classification System | Classification System | Custody Classification System |
| 4 | Detainee Grievance Procedures | Grievance System | Grievance System |
| 5 | Detainee Handbook | Detainee Handbook | Detainee Handbook |
| 6 | Environmental Health and Safety | Environmental Health and Safety | Environmental Health and Safety |
| 7 | Food Service | Food Service | Food Service |
| 8 | Funds and Personal Property | Funds and Personal Property | Funds and Personal Property |
| 9 | Medical Care | Medical Care | Medical Care |
| 10 | Special Management Unit (Administrative Segregation) | Special Management Units | Medical Care (Women) |
| 11 | Special Management Unit (Disciplinary Segregation) | Staff-Detainee Communication | Special Management Units |
| 12 | Staff-Detainee Communication | Suicide Prevention and Intervention | Staff-Detainee Communication |
| 13 | Suicide Prevention and Intervention | Telephone Access | Significant Self-Harm and Suicide Prevention and Intervention |
| 14 | Telephone Access | Use of Force and Restraints | Telephone Access |
| 15 | Use of Force | Sexual Abuse and Assault Prevention and Intervention | Use of Force and Restraints |
| 16 | Sexual Abuse and Assault Prevention and Intervention | **Not Applicable** | Sexual Abuse and Assault Prevention and Intervention |

*Source:* ICE ODO

NOVOA_0001711



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

**Appendix E**
**Office of Inspections and Evaluations Major Contributors to This Report**

Tatyana Martell, Chief Inspector
Ayana Henry, Senior Inspector
Kimberley Lake de Pulla, Senior Inspector
Jason Wahl, Senior Inspector
Erika Algeo, Inspector
James Johnson, Inspector
Kelly Herberger, Communications and Policy Analyst
Jennifer Berry, Independent Referencer

NOVOA_0001712



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

**Appendix F**
**Report Distribution**

**<u>Department of Homeland Security</u>**

Secretary
Deputy Secretary
Chief of Staff
General Counsel
Executive Secretary
Director, GAO/OIG Liaison Office
Assistant Secretary for Office of Policy
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs
ICE Liaison

**<u>Office of Management and Budget</u>**

Chief, Homeland Security Branch
DHS OIG Budget Examiner

**<u>Congress</u>**

Congressional Oversight and Appropriations Committees

NOVOA_0001713

## Additional Information and Copies

To view this and any of our other reports, please visit our website at: www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov.
Follow us on Twitter at: @dhsoig.



## OIG Hotline

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click on the red "Hotline" tab. If you cannot access our website, call our hotline at (800) 323-8603, fax our hotline at (202) 254-4297, or write to us at:

Department of Homeland Security
Office of Inspector General, Mail Stop 0305
Attention: Hotline
245 Murray Drive, SW
Washington, DC 20528-0305

NOVOA_0001714