**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION**

| | |
|---|---|
| **RAUL NOVOA, JAIME CAMPOS FUENTES, ABDIAZIZ KARIM,** and **RAMON MANCIA,** individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>**THE GEO GROUP, INC.,**<br><br>*Defendant.* | Civil Action No. 5:17-cv-02514-JGB-SHKx<br><br><br>**DECLARATION OF LYDIA WRIGHT IN SUPPORT OF PLAINTIFFS' OPPOSITION TO GEO'S EX PARTE APPLICATION FOR EXTENSION OF TIME TO RESPOND TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

I, Lydia Wright, declare that the following is true and correct based upon my personal knowledge:

1.      I am an attorney for the Plaintiffs in the above-captioned action.

2.      I was present during the deposition of Raul Novoa on October 20, 2019; the deposition of Jaime Campos Fuentes on October 20, 2019; the deposition of Ramon Mancia on October 21, 2019; and the deposition of Abdiaziz Karim on October 23, 2019.

3.      Following the deposition of Mr. Mancia on October 21, 2019, I discussed the deposition of Mr. Karim with GEO's counsel, Adrienne Scheffey and Colin Barnacle, as well as co-counsel R. Andrew Free. During that conversation, the parties agreed to proceed with a telephonic deposition, which would be easier to arrange than a

video conference due to technological constraints in Mogadishu, Somalia, where Mr. Karim currently resides.

4.    During that same conversation on October 21, 2019, Mr. Free and I offered to produce photographic evidence so GEO could verify Mr. Karim's identity, such as a photograph of Mr. Karim holding his passport. Mr. Barnacle declined our offer, and stated that he would accept our representations, as officers of the Court, that the deponent was in fact Mr. Karim.

5.    Attached hereto are the following exhibits in support of Plaintiffs' Opposition to GEO's Ex Parte Application for Extension of Time to Respond to Plaintiffs' Motion for Class Certification, ECF 201:

6.    Attached as **Exhibit A** is a true and correct copy of October 23, 2019 email correspondence between myself and Karen Waters, court reporter from Hunter & Geist/USLegal Support in Denver, Colorado.

7.    Attached as **Exhibit B** is a true and correct copy of the rough draft transcript of the deposition of Abdiaziz Karim. Mr. Karim's deposition was taken in this matter by GEO on October 23, 2019. The transcript has been redacted pursuant to the stipulated protective order entered in this case, ECF 151.

8.    Attached as **Exhibit C** is a true and correct copy of email correspondence between counsel for both parties, dating from October 7, 2019 to October 22, 2019.

9.    Attached as **Exhibit D** is a true and correct copy of email correspondence between counsel for both parties, dating from October 7, 2019 to October 22, 2019.

10.    Attached as **Exhibit E** is a true and correct copy of email correspondence between counsel for both parties, dated October 23, 2019.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

| 1 | Dated: | October 24, 2019 | /s/ Lydia A. Wright |
|---|---|---|---|

2   Lydia A. Wright (admitted *pro hac vice*)
    lwright@burnscharest.com

3   LA Bar # 37926

    **BURNS CHAREST LLP**

4   365 Canal Street, Suite 1170

5   New Orleans, LA 70130
    Telephone: (504) 799-2845

6   Facsimile: (504) 881-1765

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

Thursday, October 24, 2019 at 3:25:19 PM Central Daylight Time

**Subject:** Re: rough draft of Karim ordered
**Date:** Wednesday, October 23, 2019 at 7:30:12 PM Central Daylight Time
**From:** Karen Waters
**To:** Lydia Wright

I am with Hunter & Geist/USLegal Support, Denver. The final will be done Friday, so I can get it to you then if that's okay with you.

On Wed, Oct 23, 2019 at 5:42 PM Lydia Wright <lwright@burnscharest.com> wrote:

Hi Karen,

What court reporter service are you with? We're fine with the rough by Monday, thanks.

Lydia

Sent from my iPhone

> On Oct 23, 2019, at 5:55 PM, Karen Waters ██████████████ wrote:
>
> Good afternoon. This is Karen, the reporter from this mornings telephone dep of Mr. Karim. Opposing counsel requested a rough draft and the final for Friday. Do you also want a rough and final Friday? It's going to be a very clean rough because I'm cleaning it up before I send it since it was a tough one. Please let me know.
> Thank you.
> Karen Waters

Exhibit A                                                                   Page 1 of 1

# EXHIBIT B

1    UNCERTIFIED REALTIME ROUGH DRAFT

2

3         You have requested an unedited, uncertified

4    transcript.  This rough draft transcript has been

5    requested in the form of either a realtime hookup to

6    your computer, an ASCII file delivered after the close

7    of proceedings or my e-mail.

8         This realtime transcript is available only to

9    counsel who order a certified original or a certified

10   copy of today's proceedings.

11        This realtime draft is unedited and uncertified

12   and may contain untranslated stenographic symbols,

13   misspelled proper names, and/or nonsensical word

14   combinations.  All such entries will be corrected on

15   the final certified transcript and final ASCII file.

16        Due to the need to correct entries prior to

17   certification, it is agreed this realtime draft will

18   be used only to augment counsel's notes and will not

19   be cited in any court proceedings or distributed to

20   any other parties.

21

22             * * * * * * * * * * * * * * * * * *

23

24

25

Exhibit B

1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO

2
     Civil Action No. 5:17-cv-02514-JGB-SHK

3    _____

4    DEPOSITION OF:  ABDIAZIZ KARIM - October 23, 2019

5    _____

     RAUL NOVOA, JAIME CAMPOS FUENTES, ABDIAZIZ KARIM, and
6    RAMON MANCIA, individually and on behalf of all others
     similarly situated,

7
     Plaintiffs,

8
     v.

9
     THE GEO GROUP, inc.,

10
     Defendant.

11   _____

12   THE GEO GROUP, inc.,

13   Counter-Claimant,

14   v.

15   RAUL NOVOA, JAIME CAMPOS FUENTES, ABDIAZIZ KARIM, and
     RAMON MANCIA, individually and on behalf of all others
16   similarly situated,

17   Counter-Defendant.

     _____

18

19            PURSUANT TO NOTICE, the telephonic deposition
     of ABDIAZIZ KARIM was taken on behalf of the Defendant
20   at 1900 16th Street, Denver, Colorado 80202, on
     October 23, 2019, at 7:24 a.m. before Karen Waters,
21   Registered Professional Reporter and Notary Public
     within Colorado.

22

23

24

25

Exhibit B

```
 1                A P P E A R A N C E S

 2  For the Plaintiffs (Telephonically):

 3            ANDREW FREE, ESQ.
              Law Office of R. Andrew Free
 4            PO Box 90568
              Nashville, Tennessee 37209
 5            844-321-3221
              andrew@immigrationcivilrights.com
 6                 -and-
              LYDIA WRIGHT, ESQ.
 7            Burns Charest, LLP
              365 Canal Street, Suite 1170
 8            New Orleans, Louisiana 70130
              504-799-2845
 9            lwright@burnscharest.com

10
    For the Defendant:
11
              ADRIENNE SCHEFFEY, ESQ.
12                 -and-
              COLING L. BARNACLE, ESQ.
13            Akerman, LLP
              1900 16th Street, Suite 1700
14            Denver, Colorado 80202
              303-260-7712
15            adrienne.scheffey@akerman.com

16

17

18

19

20

21

22

23

24

25
```

Exhibit B

1                              I N D E X

2    EXAMINATION OF ABDIAZIZ KARIM:                         PAGE
     October 23, 2019
3
     By Ms. Scheffey                                        4, 91
4    By Mr. Free                                               82

5

6

7                                                       INITIAL
8    DEPOSITION EXHIBITS:                               REFERENCE

9    Exhibit 60        Mr. Karim's declaration                24

10   Exhibit 61          Commissary activity                  26

11   Exhibit 62        Resident Account Summary               30

12   Exhibit 63            Detainee file                      63

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit B

 1          WHEREUPON, the following proceedings were

 2   taken pursuant to the Federal Rules of Civil

 3   Procedure.

 4              *       *       *       *       *

 5                     ABDIAZIZ KARIM,

 6   having been first duly sworn to state the whole truth,

 7   testified as follows:

 8              (Deponent's reply to oath:  Yes.)

 9          MS. SCHEFFEY:  So off the record Counsel

10   agreed that this transcript will not be objected to

11   because it is over the phone.  Lydia, is that your

12   understanding as well?

13          MR. FREE:  We are stipulating to the

14   validity of this testimony.

15          MS. SCHEFFEY:  And that he has been sworn

16   over the phone properly?

17          MR. FREE:  Yes.

18                  EXAMINATION

19   BY MS. SCHEFFEY:

20      Q.  Abdi, my name is Adrienne Scheffey and I

21   represent GEO and I'm going to be asking you some

22   questions today about your lawsuit against GEO.  They

23   are going to be written out by the court reporter who

24   is sitting here in Denver and she is transcribing

25   today's deposition.  The purpose of this deposition is

 1   to record your responses to these questions for use at

 2   trial and for other reasons in this case.  So it's

 3   important that you answer truthfully.  Do you

 4   understand that?

 5        A.   Yes, I understand.

 6        Q.   And you understand that are you are under

 7   oath?

 8        A.   Yes, I do understand.

 9        Q.   Okay.  And so you understand you have

10   sworn to tell the truth?

11        A.   Yes, I do understand.

12        Q.   Okay.  So because the court reporter is

13   taking down everything we say, we have to be careful

14   not to speak over each other because she can only

15   write down what one of us says at a single time.  I

16   know that's going to be a little bit difficult because

17   we are on the phone, but I will try to give an extra

18   pause and wait for your response and if you could do

19   the same for my questions, that would be great.  Does

20   that make sense?

21        A.   Yes.

22        Q.   Okay.  If you do not know or don't

23   remember an answer to a question, please say so.  If

24   you don't hear a question, let me know and I will

25   repeat it.  If our connection at any point becomes

Exhibit B

1   poor, please let me know and we will see what we can

2   do.  If I do not hear you tell me that you don't

3   understand or can't hear that the context is bad, I

4   will assume that you heard and understood the

5   question.  Does that seem fair?

6           A.  Yes.

7           Q.  Okay.  If at any point you realize that

8   an earlier answer that you gave me was inaccurate or

9   incomplete, please let me know and you can supplement

10  your earlier answer.

11          A.  Okay.

12          Q.  If you want to take a break, let me know.

13  All I ask is that you first finish answering any

14  pending question before we take a break.

15          A.  Okay.

16          Q.  And I think for purposes of today's

17  deposition if we take any breaks, we can just leave

18  the line on and we will leave the room if you guys

19  need to speak and then we will come back.

20          A.  Okay.

21          Q.  So do you understand the instructions so

22  far?

23          A.  Yes, I understand it very well.

24          Q.  And do you have any questions?

25          A.  No.

Exhibit B

```
 1              Q.   Okay.  Are you taking any medication that
 2    may interfere with your ability to give honest and
 3    truthful answers today?
 4              A.   No.
 5              Q.   Any alcohol or drugs?
 6              A.   No.
 7              Q.   Okay.  Anything else that may affect your
 8    ability to give me accurate testimony today?
 9              A.   No.
10              Q.   Okay.  Did you review any documents in
11    preparation for your deposition today?
12              A.   Can you repeat that?
13              Q.   Did you review any documents to prepare
14    for your deposition today?
15              A.   I didn't review anything.  I talked to my
16    lawyer, Lydia.
17              Q.   Okay.  Were you given any documents for
18    today's deposition, exhibits that we may use?
19              A.   Yes.
20              Q.   Okay.  And are those available to you
21    with document names or with exhibit numbers?  What's
22    the best way to reference them today?
23              A.   I don't have with me because I don't -- I
24    don't have a laptop, so I can't get those documents
25    now.
```

Exhibit B

```
 1              Q.    Okay.  Did you meet with anyone else

 2    prior to your deposition today other than your

 3    attorneys?

 4              A.    No.

 5              Q.    Okay.  Have you discussed the lawsuit

 6    with anyone other than your attorneys?

 7              A.    No.

 8              Q.    Can you state your full legal name for

 9    the record, please?

10              A.    Say it again.

11              Q.    Can you please state your full legal name

12    for the record?

13              A.    Yes my name is Abdiaziz Mohammed Karim.

14              Q.    Have you ever used another name?

15              A.    No.

16              Q.    What is your current address?

17              A.    ███████████████.

18              Q.    How long have you lived there?

19              A.    ███████████████.

20              Q.    Where did you live before that?

21              A.    Adelanto Detention Center.

22              Q.    Okay.  And before that were you living in

23    California?

24              A.    No.  Adelanto.

25              Q.    Okay.  And what is your date of birth?
```

Exhibit B

```
 1          A.    ████████████ .

 2          Q.    Okay.  Do you have an e-mail address that

 3    you use?

 4          A.    Yes.

 5          Q.    What is that?

 6          A.    ██████████████████ .

 7          Q.    And is that the only e-mail address you

 8    have used during the time you were at Adelanto through

 9    now?

10          A.    Yes.  I use before hotmail, but I am no

11    longer using now.

12          Q.    What was your hotmail?

13          A.    It's not working now at this time.

14          Q.    Do you have a cell phone number?

15          A.    Yes.

16          Q.    What is that number?

17          A.    ████████████████████████

18    ██████████

19          Q.    Can you repeat that for the court

20    reporter?

21          A.    █████  █████████ .

22                MS. SCHEFFEY:  And then Andrew, I know

23    you want to mark it.

24                THE COURT REPORTER:  He said some words

25    before the phone number.
```

Exhibit B

```
 1              MS. SCHEFFEY:  He said country code.

 2              MR. FREE:  And, court reporter, we are

 3    going to designate Mr. Karim's e-mail address and

 4    telephone number as confidential the transcript in the

 5    pursuant to ECF-151 and the parties' stipulated

 6    protective order.

 7         Q.   (BY MS. SCHEFFEY):  Abdi, do you use any

 8    social media accounts?

 9         A.   Like WhatsApp?

10         Q.   Or Facebook, WhatsApp, Twitter any of

11    those?

12         A.   At this moment I have only what's app.

13         Q.   Are you currently married?

14         A.   Yes.

15         Q.   What's your spouse's name?

16         A.   ████

17         Q.   What's her last name?

18         A.   ████

19         Q.   Could you spell that for the court

20    reporter?

21         A.   ████████████████████     ████

22    ████████████

23         Q.   When did you get married?

24         A.   I get married 2014.

25         Q.   ████     ████████████████
```

Exhibit B

```
 1   ██████████████
 2        A.   ████   ████████████████
 3        Q.   ████████████████   ██████
 4             Did you have any conversations with your
 5   spouse about this case?
 6        A.   No.
 7        Q.   Okay.  Do you have any children?
 8        A.   No.
 9        Q.   So if you know, can you tell me what your
10   current country of citizenship is?
11        A.   Say it again.
12        Q.   If you know, can you tell me what your
13   current country of citizenship is?
14        A.   The country that I'm citizen?
15        Q.   Yes.
16        A.   Somalia.
17        Q.   Do you have permanent resident status in
18   any other countries?
19        A.   Like?  Can you give me example like what
20   you say?
21        Q.   Like a Green Card in the United States or
22   another immigration status in another country.
23        A.   No.  At this time I don't.  I used to
24   before.  Now no.
25        Q.   Okay.  And when you were at Adelanto, did
```

Exhibit B

 1   you have citizenship in the United States?

 2            A.   No.

 3            Q.   To your knowledge did you have a Green

 4   Card?

 5            A.   No.

 6            Q.   What is your understanding of what your

 7   citizenship status was while you were at Adelanto?

 8            A.   Say it again.

 9            Q.   What was your understanding of what your

10   citizenship status was while you were at Adelanto?

11            A.   Like you mean what I was thought that I

12   was -- like which country I'm from you mean?

13            Q.   Uh-huh.

14            A.   Somalia.

15            Q.   Somalia.  And were you, to your

16   understanding, permitted to work in the United States

17   at that time what you were at Adelanto?

18            A.   Can you repeat that?

19            Q.   Were you legally -- to the best of your

20   understanding were you legally permitted to work in

21   the United States while you were at Adelanto?

22            A.   No.

23            Q.   Okay.  So can you walk me through how you

24   came to be at Adelanto?

25            A.   How I came to Adelanto?

Exhibit B

1          Q.   Yes.  How did you get there?

2          A.   ICE officer brought me there.

3          Q.   Okay.  An ICE officer?

4          A.   Yes.

5          Q.   Did GEO bring you there?

6          A.   I'm not exactly sure who bring me there.

7    The officers.  They were officers.  I don't know if

8    they were ICE or GEO.  I was just new at that time

9    someone bring me there.

10         Q.   Okay.  And they brought you there from

11   where?

12         A.   From the border to San Diego, San Diego

13   to Arizona, Arizona to Adelanto.

14         Q.   Okay.  How long were you in Arizona

15   before you were transferred to Adelanto?

16         A.   Just few days, less than a week.

17         Q.   And where did you stay while you were in

18   Arizona?

19         A.   San Luis, Arizona.

20         Q.   And was that a facility run by GEO, if

21   you know?

22         A.   I don't know.

23         Q.   Okay.  I know you don't have computer

24   today, but as part of this case you helped and worked

25   with your attorneys to create a declaration; is that

1    correct?

2            A.    Say it again.

3            Q.    As part of this case you submitted a

4    declaration to your attorneys; is that correct?

5            A.    Yes, correct.

6            Q.    Okay.  And do you recall the contents of

7    that declaration sitting here today?

8            A.    Can you say it again?

9            Q.    Do you remember the contents of that

10   declaration sitting here today?

11           A.    Yes.

12                 MS. SCHEFFEY:  Can we go off the record

13   for a moment to discuss with counsel how we want to do

14   these.

15                 MR. FREE:  Sure.

16                 (Whereupon a discussion was had off the

17                 record.)

18                 MS. SCHEFFEY:  We are back on the record.

19                 MR. FREE:  So the plaintiffs have

20   received an e-mail with some of the intended exhibits

21   for this deposition from Counsel for the defendant.

22   In light of the fact that the deponent currently does

23   not have a laptop in front of him or the ability to

24   review in real time the exhibits, what we have

25   stipulated to is that we will enter in to the record

Exhibit B

1   of the deposition as an exhibit the document from

2   which Geo's counsel is going to be asking questions

3   for his declaration.  Whatever the paragraph is will

4   be identified and whatever sentence will be read into

5   the record and then Mr. Karim can respond to it.

6              Similarly, other exhibits will be read to

7   Mr. Karim with a note in the record of this deposition

8   to the Bates page that they are on and we can all

9   agree that, you know, Mr. Karim is going to do his

10  best to testify as to these records not having them

11  directly in front of him at this moment.

12         Q.   (BY MS. SCHEFFEY):  All right.  So Abdi,

13  I am handing the court reporter the declaration that

14  you submitted in this case.  And at paragraph 5 of

15  that declaration, it states, I learned upon the work

16  program upon my entry in to the Adelanto facility and

17  requested to take part in that program.

18              So when you say you requested to take

19  part in the work program at Adelanto, how did you do

20  that?

21         A.   Can you repeat whole sentence?

22         Q.   Yes.  The sentence is, I learned about

23  the work program upon my entry into the Adelanto

24  facility and duodenum take part in the program.

25              And my question is, how did you request

Exhibit B

1    to take part in the program?

2         A.    Your question is how did I request to be

3    part of that job?

4         Q.    Yes.

5         A.    I wrote a the form they have at Adelanto

6    to apply to work.

7         Q.    Abdi, could you repeat it for the court

8    reporter, your answer?

9         A.    Yes.  There is a form that they need

10   to -- there's a phone that they for apply to work in

11   Adelanto.  I wrote that one.

12        Q.    Okay.  So you filled out an application,

13   if I'm correct in understanding?

14        A.    Yes.

15        Q.    Okay.  And did you do anything else to

16   request to participate in the work program other than

17   fill out that form?

18        A.    Kites.

19        Q.    Can you tell me what your understanding

20   of a kite is?

21        A.    Kite is the thing that you request for

22   anything you need in Adelanto, not the work

23   application.  There's a kite I fill out too.

24        Q.    When you fill that out, who is that given

25   to?

Exhibit B

```
1          A.   The kite?

2          Q.   Yes.

3          A.   I put it in the kite box.

4          Q.   Okay.  And then do you receive a response

5   to those kites?

6          A.   Some of them.

7          Q.   Okay.  And did you also receive a

8   handbook that describes the work program?

9          A.   Yes.

10          Q.   Okay.  So the next thing it says in your

11   declaration at paragraph 6 is, I currently work as a

12   porter in the work program.  As a porter I work in a

13   five-to-seven-person crew to clean windows, floors,

14   showers, and communal areas in the Adelanto facility.

15   I work up to seven days a week.  I have worked as a

16   porter since approximately 2017.

17               So did you begin working as a porter as

18   soon as you arrived in Adelanto?

19          A.   As soon as I arrived in Adelanto I

20   started working, but I was not getting paid right

21   away.

22          Q.   Had you filled out the volunteer work

23   program application at that point?

24          A.   Say it again.

25          Q.   Had you filled out the voluntarily work
```

1    program application at the time you started working?

2                MR. FREE:  I am going to object to the

3    form.

4                But Abdi, you should answer the question.

5         A.   (BY THE WITNESS):  Can you repeat it?

6         Q.   (BY MS. SCHEFFEY):  Yes.  When you

7    started working had you already filled out the

8    application?

9         A.   Yes.  I did application and I was working

10   for free because the officer told me if I work free

11   long time, then I will see my name on the list.

12        Q.   Okay.  And did you ever see your name on

13   the list?

14        A.   Yes.

15        Q.   About how long after you entered Adelanto

16   did you see your name on the list?

17        A.   It takes a long time.  I'm not exactly

18   sure.

19        Q.   Okay.  And in your declaration you say

20   that you cleaned communal areas.  Can you tell me what

21   communal areas you cleaned?

22        A.   Explain it for me what you mean, please.

23        Q.   It says that you worked in a crew to

24   clean communal areas.  And I'm wondering in that

25   declaration what did you mean by communal areas?

1          A.    What is communal areas?  I don't know

2    what you are saying.

3          Q.    When you cleaned, did you clean the area

4    near your bunk?

5          A.    I cleaned near my bunk, but not only

6    there.  I cleaned the drawer, all drawer.  I cleaned

7    the hallways.  I cleaned the kitchen.  I cleaned the

8    medical area.  I cleaned the station area.  I cleaned

9    the shower.  I cleaned the windows.  I cleaned the

10   tables.  I cleaned many places.

11         Q.    Okay.  And can you tell me about how you

12   were told which days and which areas you would clean?

13         A.    Can you repeat that?

14         Q.    Yes.  Can you tell me how you knew what

15   area to clean each day?

16         A.    The officer used to tell me what to do

17   and where to clean.

18         Q.    Okay.  And was there a sign-in sheet when

19   you performed that cleaning work?

20         A.    Say it again.

21         Q.    Was there a sign-in sheet for you to sign

22   when you performed that cleaning work?

23         A.    Sometimes yes, sometimes no.

24         Q.    And when there was a sign-in sheet, did

25   you sign your name?

Exhibit B

```
 1          A.   Yes.

 2          Q.   And what was the significance of signing

 3   your name?

 4          A.   What do you mean?

 5          Q.   Why did you sign your name?

 6          A.   To see -- the officer told me if I sign

 7   my name and clean many times, I will see my name on

 8   the list and I will get paid.

 9          Q.   So even on days when you were not getting

10   paid you signed a sheet indicating you were cleaning?

11          A.   Yes.  Sometimes they sign me in the

12   paper.  They used to write my name on the paper or

13   sometimes he used to write on the porter list.

14   Sometimes he used to tell me.  I sign for you and I

15   say okay.  I don't know what he was doing.

16          Q.   Okay.  You also said that you cleaned the

17   kitchen.  Were there any other jobs you did in the

18   kitchen?

19          A.   Yes.  I cleaned the dishes.  I cook

20   sometimes.  I don't cook, but I help somebody with

21   cooking.  I chopped the onions, tomatoes.  Did a lot

22   of things.  I took the trash.  Sometimes I help the

23   officer to dish the food.  I did a lot of things in

24   the kitchen.

25          Q.   Okay.  And did you work in the kitchen on
```

Exhibit B

1   the same days you worked cleaning?

2          A.   Yes, yes.  I was cleaning and I was also

3   working the kitchen.

4          Q.   Okay.  And so did you begin -- when did

5   you begin working in the kitchen?

6          A.   I began working in the kitchen when I got

7   in Adelanto after few months.

8          Q.   Okay.  So about how many months would you

9   say before you started working in the kitchen?

10         A.   I'm not exactly sure, but I think like

11  three months, something like that.  But I'm not sure.

12         Q.   Okay.

13         A.   I was still new.

14         Q.   Was your work in the kitchen part of the

15  voluntary work program?

16         A.   Yes.  The officer told me if you want to

17  work in the kitchen, you have to go with me and work

18  for free few days; it may take a week; it may take a

19  month, and then you will see your name on the list and

20  I used to go with him.

21         Q.   Was there a sign-in sheet for the

22  kitchen?

23         A.   The first time, no.

24         Q.   What about subsequent times?

25         A.   The last time only one day he signed my

Exhibit B

1   name on the sheet.

2        Q.   Okay.  And if you were working in the

3   voluntary work program, what was your understanding of

4   what you would get paid each day, what amount?

5        A.   One dollar.  They tell us they don't have

6   more than that.

7        Q.   It was your was it your understanding

8   that you got one dollar regardless of the number of

9   jobs you did that day?

10       A.   Say it again.

11       Q.   Was it your understanding that you got a

12   dollar regardless of the number of jobs you did each

13   day?

14       A.   Yes.

15       Q.   So if you worked in the kitchen and as a

16   cleaner in the same day, it was your understanding you

17   would get one dollar that day?

18       A.   Yes.

19       Q.   Tell me about the extra food you would

20   get.

21       A.   Yeah.  They say, If you work in the

22   kitchen, you will get food, you will eat as much as

23   you want in the kitchen.  You get nothing except one

24   dollar, but you can eat, eat, eat all day when in

25   you're the kitchen.  So that was the benefit of going

Exhibit B

1    to the kitchen, because we were so hungry and they all

2    food they give us was not enough, so we need it.  And

3    one of the reasons I went to work in the kitchen is

4    the officer, midnight, used to come and wake us.

5    Whether we work in the kitchen or not, he used to wake

6    us up so I couldn't sleep.  So I just work in the

7    kitchen because I'm not sleeping, stress, a lot of

8    stress, and because officer, when he wakes up one

9    person in the room, he wakes up everybody; he shouts;

10   he makes noise, so everybody in the room wakes up.  So

11   it's better working in the kitchen.  I can he eat some

12   food instead of waking you up because when officer

13   awakened me up I couldn't sleep again.

14          Q.   Okay.  So every day you worked in the

15   kitchen you had access to additional food, if I'm

16   understanding you correctly?

17          A.   Yes.  I had access to eat extra food, but

18   not like a lot, lime some of the food.  Not

19   everything, but some of the food.

20          Q.   Okay.  And did you have friends that you

21   worked with?

22          A.   What did you say?

23          Q.   Did you make friends with the people you

24   worked with in the kitchen?

25          A.   Yes, some people who work in the kitchen

Exhibit B

 1   too we are friends.

 2        Q.   Did those people live in your dorm?

 3        A.   Yes.

 4        Q.   Okay.  Were you able to see those people

 5   when you were not working?

 6        A.   Yes.

 7        Q.   Okay.  So I am going to move to another

 8   paragraph in your declaration, paragraph 17.

 9             MR. FREE:  I just want to make sure we

10   mark the declaration as Exhibit 60.

11             MS. SCHEFFEY:  Yes.  The court reporter

12   has got it.  Thank you.

13             MR. FREE:  Awesome.

14             (Deposition Exhibit 60 was marked.)

15        Q.   (BY MS. SCHEFFEY):  So I'm going to go to

16   paragraph 17.  It says, I participate in the work

17   program in order to buy daily necessities that GEO

18   fails to provide for me.  I rely on my wages to buy

19   food and personal hygiene items from the commissary.

20   I fear that if I stop participating in the work

21   program, I will not have access to those necessities.

22             Do you remember writing that sentence or

23   helping your attorneys write that sentence, Abdi?

24        A.   Yes, I remember.

25        Q.   So it was your position that you had to

Exhibit B

1    work in order to afford items from the commissary?

2            A.   Say it again.

3            Q.   It's your position that you had to work

4    in order to afford the items in the commissary?

5            A.   I don't understand this question.

6            Q.   I will try again.  In order to buy items

7    from commissary, did you have to work?

8            A.   Yes.

9            Q.   Okay.  And so you said you bought

10   necessities.  Can you tell me the kinds of things you

11   considered to be necessities?

12           A.   Like soup, fish, coffee, and many things

13   that I need at that time.

14           Q.   Could you repeat that for the court

15   reporter?

16           A.   Yes.  I mean when I say what I need soup,

17   fish, and a lot of things that I could eat at that

18   time, anything that could fill my stomach.

19           Q.   Okay.  Were there any other necessities

20   you bought?

21           A.   Yes.  Like coffee, tea that GEO didn't

22   give us too, and a lot of things.

23           Q.   Was there coffee served in the dining

24   hall?

25           A.   They serve coffee in the morning, but it

Exhibit B

1   is not real coffee.

2        Q.   Okay.  Were there soups served in the

3   dining hall?

4        A.   No.

5        Q.   Okay.  And was there fish served in the

6   dining hall?

7        A.   No.

8             MS. SCHEFFEY:  Okay.  So I am going hand

9   the court reporter what will be 61.  That is going to

10  be the commissary activity.  For Counsel on the phone,

11  I think I previously noted in the PDF copy that it

12  will be 62, but it will be 61.  It will be the

13  commissary activity.

14            (Deposition Exhibit 61 was marked.)

15       Q.   (BY MS. SCHEFFEY):  So, Abdi, I'm looking

16  at GEO Bates number 00030257.  There's a list of

17  things you purchased from the commissary.  I see on

18  here a few purchases of cookies.  Would you consider

19  cookies a necessities?

20       A.   Yes.

21       Q.   Can you explain that to me?

22       A.   Because cookies, when I eat cookies it

23  fills my stomach.  And sometimes I am very hungry

24  because GEO, they give us little food around

25  5:00 p.m., and around 9:00 p.m. I am very hungry, so I

Exhibit B

 1   need to eat some cookies so I will feel a little bit

 2   okay, and drink some water.  So it was the cookies was

 3   in the position of food for me at that time.

 4          Q.   And where did you get the water that you

 5   would drink?

 6          A.   In Adelanto.

 7          Q.   Okay.  That was provided to you?

 8          A.   Yes, but was not clean water all the

 9   time.

10          Q.   Okay.  So I'm now looking at

11   GEO Novoa 00030258.  On there it says you bought gummy

12   bears.  Would you consider gums to be a necessity?

13          A.   Yes, because candies and all those things

14   are calories.  And I was -- I didn't have energy in my

15   body.  I was feeling dizzy, so I was buying anything

16   to feel energy.  That's why I bought the candy.  If

17   GEO will give enough food, I wouldn't buy all those

18   things because I'm not going to need any calories.

19          Q.   With what about butterscotch candy?

20          A.   Say it again.

21          Q.   What about butterscotch candy?

22          A.   Yes, all the candy.  I bought it to get

23   calories and to get energy because I was feeling so

24   dizzy, I was almost fall down.

25          Q.   And what about hair gel?

Exhibit B

```
 1          A.   Hair gel was -- while I was in Adelanto I
 2    lose all my -- most of my hair.  And GEO wouldn't give
 3    us anything for apply on the hair since I came.  To
 4    the best of my knowledge the first day I came until
 5    the day I left GEO didn't give anything to apply my
 6    hair even when I tell the doctor, I'm losing my hair,
 7    he didn't even answer me very good and he just laugh
 8    at me.  That's why I buy anything to apply on my hair
 9    and body lotion to apply on my body and my hair.
10          Q.   Okay.  And what about chips?
11          A.   What did you say?
12          Q.   And what about chips?  Would you consider
13    chips a necessity?
14          A.   Chips is one of the calories.  That's why
15    I bought.
16          Q.   Did you buy any deodorant?
17          A.   What's that?
18          Q.   Deodorant is -- antiperspirant maybe is
19    another word for it.
20          A.   I'm not remember, but I bought a lot of
21    things.
22          Q.   What about vitamins, did you buy vitamins
23    at the commissary?
24          A.   Yes, of course I buy.
25          Q.   Okay.  And so is fish a meat you prefer
```

Exhibit B

1    over other meats?

2           A.   What did you say?

3           Q.   Is fish a meat you prefer over other

4    meats if given a choice?

5           A.   Yes.  That is a meat I love.  And because

6    one of the reason I bought I was so -- like I lose a

7    lot of muscles.  I become fat because the junk food

8    they give us only.  And I was so dizzy.  I was -- my

9    body, no nutrition.  So that's why I bought fish, to

10   survive.

11          Q.   Did you buy any shampoo?

12          A.   I don't remember.

13          Q.   Do you remember buying any soap?

14          A.   I don't remember.

15          Q.   Okay.  Were you allowed to choose what

16   items you bought?

17          A.   In the commissary?

18          Q.   Yes.

19          A.   Yes.  But they don't used to have

20   everything we need also.

21          Q.   So as long as it was one of the options

22   provided to you, you could choose which one of those

23   options you wanted?

24          A.   Yes.  Sometimes whatever we need it was

25   not in there, so we were buying something else to put

Exhibit B

1    the position of what we needed.

2            Q.    And did Adelanto provide with you

3    toothpaste?

4            A.    What did you say?

5            Q.    Did Adelanto provide with you toothpaste?

6            A.    Yes.

7            Q.    What about soap?

8            A.    Yes.   They give us soap and toothpaste.

9            Q.    Did they provide you with shampoo?

10           A.    Yes.

11           Q.    Okay.

12           A.    But all those things they be gave us is

13   not -- they don't have quality.   And sometimes when

14   you need it at the right time you need it, they don't

15   used to give it to us.

16           Q.    Okay.   I'm going to hand the court

17   reporter the Resident Account Summary which starts

18   with Bates number 00030279 and we are going to mark it

19   as Exhibit 62.   Is it your recollection that during

20   your time at Adelanto an number of people made

21   deposits in your account?

22                 (Deposition Exhibit 62 was marked.)

23           A.    Can you say it again?

24           Q.    Do you remember individuals or people

25   that you knew making deposits in your commissary

Exhibit B

 1    account while you were at Adelanto?

 2         A.   Yes.

 3         Q.   Okay.  I have a list of those deposits

 4    here in front of me and I think you received this that

 5    on your computer earlier when you reviewed documents.

 6    I'm going to go through and ask you some questions

 7    about those deposits.  Okay?

 8         A.   Okay.

 9         Q.   As I go through aim going to say Bates

10    numbers which are not necessarily relevant to you at

11    this moment, but they are to your attorneys.  Okay?

12         A.   Can you say it again?

13         Q.   Can you repeat that?

14         A.   Can you repeat what you just said?

15         Q.   Yes.  I'm going to say Bates numbers, but

16    those are not part of my question; they are just so

17    your attorneys can follow along.  Okay?

18         A.   Okay.

19         Q.   So I'm going to start on

20    GEO Novoa 00030279.  So on here we have a deposit of

21    $300 from 8/15/19 from Hanna Saori.  Do you who that

22    is?

23         A.   Yes.

24         Q.   Who is that?

25         A.   My friend.

```
 1          Q.    Your friend?

 2          A.    Yes.

 3          Q.    How do you know that friend?

 4          A.    She is a volunteer in California who was

 5   helping me when I was in there.

 6          Q.    Okay.  And why did she give you money?

 7          A.    She gave me that money to with her

 8   friends in the community, volunteer community, to help

 9   me when I get in Somalia because I was about to be

10   deported.  So to save my life they gave some money for

11   me.

12          Q.    Was that money for your commissary?

13          A.    No.  That money was for my security when

14   I come Somalia.

15          Q.    Can you repeat that for the court

16   reporter?

17          A.    That money was for my security when I

18   came to Somalia because I was waiting my deportation

19   at that time.  So that volunteer group helped me

20   because if you don't have money, it's not safe in

21   Somalia.  So that's the reason they contribute that

22   money for me.  That money was not money to use in

23   Adelanto.

24          Q.    That was not money to use in Adelanto.

25   Okay.  And so I'm going to turn to page GEO Novoa
```

Exhibit B

```
 1    00030280.  So on 7/29/2019 I see a deposit from Lydia

 2    Wright.  Who was that?

 3              A.    My lawyer, my attorney about this case.

 4              Q.    Okay.  And what was that for?

 5              A.    For phone call.

 6              Q.    Okay.  What about Islam Mohammed on

 7    7/15/2019 a deposit for $90?

 8              A.    He is my friend who know me in Adelanto,

 9    so he send me -- when I tell him I lose my case and I

10    had to go back, he send me some money.

11              Q.    Okay.  So he was also detained in

12    Adelanto?

13              A.    Yes, because he knew my situation when I

14    was in there.  That's the reason he was helping me.

15              Q.    How did you meet him?

16              A.    In Adelanto.  We were friends in the

17    dorm.

18              Q.    Did you guys work together?

19              A.    Islam?

20              Q.    Yes, Islam.  Did you work together?

21              A.    Sometimes.  He used to do volunteer work.

22    I don't know if he got paid, but sometimes he would

23    clean with us.

24              Q.    So you got to clean together?

25              A.    Yes.
```

Exhibit B

```
1          Q.   And became friends?

2          A.   Yes.

3          Q.   Okay.  I am going to turn to GEO Novoa

4    00030282.  On 6/11/2019 there's a deposit from Bonnie

5    Ellman for $50.  Do you know what that was for?

6          A.   Say it again.

7          Q.   On 6/11/2019 there was a deposit from

8    Bonnie Ellman, E-l-l-m-a-n, for $50.  Do you know what

9    that was for?

10         A.   What date?

11         Q.   June 11, 2019?

12         A.   It was for money to use when I get

13   deported to Somalia.

14         Q.   Who is Bonnie?

15         A.   A friend.

16         Q.   How do you know Bonnie?

17         A.   I know from her same as Hanna.

18         Q.   So she was in a volunteer group?

19         A.   Yes.

20         Q.   Okay.  I also see on June 14, 2019, a

21   deposit for $1,000.  Who was that from?

22         A.   That's from volunteer group in California

23   with Saori and that money was money to use in Somalia.

24         Q.   Okay.  I see one on June 2019 from Robert

25   Hannah or Hannah Robert.
```

Exhibit B

```
 1        A.    Yes.

 2        Q.    Who was that?

 3        A.    Same group, volunteer group from

 4   California.

 5        Q.    Okay.  I'm also looking at this and it

 6   looks like some of this money went towards $40 of

 7   commissary purchases on June 13, 2019.  Can you

 8   explain to me what portion of the money you were

 9   receiving was for the commissary?

10              MR. FREE:  Object to form.

11              You can answer, Abdi.

12        Q.    Abdi?

13        A.    Yes.

14        Q.    Do you want me to repeat it?

15              THE WITNESS:  I hear, but I don't know

16   what did you say Andrew?

17              MR. FREE:  Just for purposes of the court

18   reporter, I was making an objection.  But I was

19   telling you you should answer her question.  Okay?

20              THE WITNESS:  Okay.

21        A.    (BY THE WITNESS):  So can you repeat the

22   question?

23        Q.    (BY MS. SCHEFFEY):  Yes.  It looks like

24   on June 13, 2019, you made a purchase for $40.83 from

25   the commissary.  I was asking what portion of the
```

Exhibit B

1    money that you received from the individuals who we

2    have been discussing was for the commissary?

3           A.   I didn't get it exactly the question.

4    Can you be more specific and like more like different

5    way?

6           Q.   Was any of the money from the volunteer

7    group meant for the commissary purchases?

8           A.   The money they gave to me was not made

9    for commissary.  It was made to give it to me and to

10   use it in Somalia.  But, anyway, that money was mine,

11   my own money, and if I was in need, like just

12   necessary I need, that time I was using it to buy what

13   I need that time.

14          Q.   Okay.  And what day did you learn you

15   were going to be deported?

16          A.   I learned sometime in June 3 when they

17   checked my -- what do you call it -- stay on removal.

18   But not only that time.  I learned before that time

19   when I missed the deadline of stay on removal.  I

20   don't know what they call.  Like I learned before that

21   time.

22          THE COURT REPORTER:  I didn't understand

23   the whole answer.

24          MS. SCHEFFEY:  The court reporter would

25   like you to repeat the answer after, I think, the June

Exhibit B

 1  3rd comment.

 2            MR. FREE:  I am going to clarify if it's

 3  okay, Adrienne.

 4            MS. SCHEFFEY:  Yes.

 5            MR. FREE:  I don't want to impose.

 6            What Abdi is saying -- he is saying he a

 7  stay on removal.  That's the term he is using.

 8            THE COURT REPORTER:  That's what I didn't

 9  understand.  Thank you.

10            MR. FREE:  I thought that might have been

11  it.

12        Q.   (BY MS. SCHEFFEY):  All right.  So I am

13  going to go to GEO Novoa 00030284.  On this page I see

14  a deposit for cash on April 16, 2019, for $200.  Do

15  you know what that was for?

16        A.   Can you repeat that?

17        Q.   Yes.  On April 16th you deposited $200

18  cash.  Do you know who that's from?

19        A.   Yes.

20        Q.   Who was that from?

21        A.   That money came from my cousin from

22  Minnesota.

23        Q.   What's your cousin's name?

24        A.   Ayan (Phonetic).

25        Q.   And he was not detained at that time?

 1          A.   My cousin, she's in Minnesota.  She's not

 2   detained.

 3          Q.   Okay.  And then a few days before that on

 4   April 11th there was a money order deposit for $145.

 5   Who was that from?

 6          A.   Say it again.

 7          Q.   On April 11th you deposited a money order

 8   for $145.  Who was that from?

 9          A.   400?

10          Q.   $145.

11          A.   It was when?

12          Q.   April 11, 2019.

13          A.   Yes.  Friends send to me for my birthday.

14          Q.   Okay.  What friends sent that to you?

15          A.   The volunteer group.

16          Q.   Okay.  There was also a deposit on

17   April 3rd from Lilly Sim.  Who is Lilly Sim?

18          A.   Lilly Sim is the daughter of my friend

19   who was detained in Adelanto.

20          Q.   What was that deposit for?

21          A.   It was for phone call and commissary.

22   She just gave it to me.  I don't know what to do.  She

23   just gave it to me.

24          Q.   And her father was detained at that time?

25          A.   He was deported to Cambodia.

Exhibit B

 1          Q.    Okay.  And why didn't she give that same

 2   money to her father, do you know?

 3                MR. FREE:  Object to form.

 4                You can answer, Abdi.

 5                THE WITNESS:  What do you say?  Can I

 6   answer?

 7                MR. FREE:  Yes.  Go ahead and answer if

 8   you know the answer.

 9          A.    (BY THE WITNESS):  I don't know why she

10   don't send her father.  Me, I call her and she know

11   about my situation because her father told her about

12   me because her father saw me in there, I was suffering

13   in there.  And her father was my best friend, so

14   that's why she send me.  I don't know anything else.

15          Q.    (BY MS. SCHEFFEY):  How did you meet her

16   father?

17          A.    In Adelanto.  He was my roommate.

18          Q.    He was your roommate?

19          A.    Yes.

20          Q.    Did you work together?

21          A.    Yes.

22          Q.    Did you become friends while working

23   together?

24          A.    We were friends in the dorm, not just

25   working together.  We were roommates we were in the

1    dorm together.

2         Q.   Okay.  I'm going to go to GEO Novoa

3    00030285.  There was a deposit on March 1, 2019, from

4    Bonnie Ellman --

5         A.   Yes.

6         Q.   -- for $16.  Who is Bonnie Ellman?

7         A.   Bonnie Ellman is a friend from volunteer

8    group.

9         Q.   Okay.  And what was that money for?

10        A.   That money was just to help me.

11        Q.   Was it for commissary purchases?

12        A.   For anything I need.  She just give it to

13   me.

14        Q.   Okay.  And then I am going turn to

15   GEO Novoa 00030289.  It looks like there's another

16   deposit from Islam Mohammad for $99.  What was that

17   for?

18        A.   Just to help me.

19        Q.   To help you in what way?

20        A.   Just to help me, to give it to me,

21   whatever I need, phone calls to talk to my family, to

22   communicate, to do anything I need.

23        Q.   And was he detained at that time as well?

24   This is November 7, 2018.

25        A.   No.

Exhibit B

```
 1          Q.   He was not detained?

 2          A.   No.

 3          Q.   Did you meet him in detention?

 4          A.   Yes.

 5          Q.   How long was he detained with you before

 6   he left?

 7          A.   Almost six months.

 8          Q.   Okay.

 9          A.   I'm not sure exactly, but almost six

10   months.

11          Q.   There's a deposit on 10/28/2018 from

12   Charles Prieri, P-r-i-e-r-i.  Who is that?

13          A.   A friend.

14          Q.   How do you know Charles?

15          A.   I know him before I came to the USA.

16          Q.   How?

17          A.   I know him social media.  I used to know

18   him a long time and then when I came there he knows

19   that I was there, and then he visit me and he saw me

20   and he is my friend.

21          Q.   Okay.  And it says here he gave you $116.

22   What was that for?

23          A.   He gave it to me, myself, so he just gave

24   it to me.  There was no reason, for anything I need.

25          Q.   Okay.  And then I'm going to go to
```

 1   00030290.  On September 21, 2018, you got a deposit

 2   from Chen Austin Singh for $8.  Do you know what that

 3   was for?

 4        A.   Say it again.

 5        Q.   On September 21, 2018, you received a

 6   deposit from Chen Austin Singh for $8.  Do you know

 7   what that was for?

 8        A.   Just for friend.  He was my friend and he

 9   gave it to me.

10        Q.   And who is Chen Austin Singh?

11        A.   Volunteer group too.

12        Q.   Can you repeat that?

13        A.   Volunteer group like Saori Hannah and

14   Bonnie Ellman.

15        Q.   Okay.  I'm going to turn to GEO Novoa

16   00030297.  On January 30, 2018, there was a cash

17   deposit for $500.  Do you know who that was from?

18        A.   Yes.

19        Q.   Who?

20        A.   My uncle.

21        Q.   How did he know to deposit in your

22   account?

23        A.   What did you say?

24        Q.   How did he know how to deposit into your

25   account or that you needed money?

Exhibit B

```
 1          A.   I don't understand.  Can you explain?

 2          Q.   Yes.  Why did he give you that $500?

 3          A.   Because I asked for it.

 4          Q.   How did you ask him?

 5          A.   I called him.

 6          Q.   Okay.  Did your uncle live in the United

 7   States?

 8          A.   Yes.

 9          Q.   Okay.  And then on GEO Novoa 000303031 it

10   looks like on August 22, 2017, there's a cash deposit

11   for $410.  Do you know who that's from?

12          A.   Yes.

13          Q.   Who is that from?

14          A.   That is mine.

15          Q.   That was yours?

16          A.   Yes.

17          Q.   Was that the money you had on you at the

18   time you were brought to Adelanto?

19          A.   Yes.

20          Q.   Okay.  So I'm going to go back to

21   GEO Novoa 00030279.  It looks like when you left

22   Adelanto you had $2,401.95 in your account.  Does that

23   sound right?

24          A.   Yes.

25               MS. SCHEFFEY:  Okay.  Do you guys mind if
```

 1    we take a five-minute break?  I am pretty close to

 2    done.

 3                   MR. FREE:  That's good on our end, yes.

 4                   (Recess taken, 8:23 a.m. to 8:31 a.m.)

 5                   MS. SCHEFFEY:  Back on the record.

 6         Q.   (BY MS. SCHEFFEY):  So, Abdi, in the

 7    declaration we have been discussing today in certain

 8    points it looks like -- I will point to you a specific

 9    paragraph.  At paragraph 11 it states, GEO officials

10    routinely require detainees to clean the common spaces

11    and showers of my housing unit for no compensation.

12                   When you wrote that sentence were you

13    talking about your own experience or the experience of

14    someone else?

15         A.   My own experience and experience of all

16    my friends.

17         Q.   And when you talked about the common

18    spaces and showers, are those the showers you used?

19         A.   Say it again.

20         Q.   You talked about, in this, cleaning the

21    common spaces and showers.  Would those be the showers

22    that you would use?

23         A.   I don't get the last word of your point.

24    Like what did you say the shower?

25         Q.   The showers that you cleaned, were they

Exhibit B

1    the showers you used to shower?

2              A.    Yes.

3              Q.    And the common spaces, explain to me what

4    you mean by common spaces.

5              A.    Common spaces, the dorm, the tables, the

6    windows, my room, the light, the walls.

7              Q.    And the tables, what were those used for?

8              A.    Tables in the dorm.  Everybody uses.

9              Q.    What do you do at the tables?  Do you

10   eat?  Do you play games?

11             A.    We don't eat.  We eat in the dining room.

12   We were playing games.  People sit at the table.

13             Q.    Do you watch TV from the tables?

14             A.    Sometimes.

15             Q.    Okay.  Were the TVs typically on?

16             A.    What did you say?

17             Q.    Were the TVs usually turned on?

18             A.    Sometimes.

19             Q.    How many TVs were there in the dorm?

20             A.    Two TVs.

21             Q.    Were you in east or west, if you know?

22             A.    I was east.

23             Q.    East.

24             A.    No, no, no.  W.  It's west, west.  Sorry.

25             Q.    Okay.  Can you describe to me the kind of

1  layout, what it looked like in west?

2          A.    I was in West 4, so there's four dorms

3  and every two dorms they have one small yard between

4  two dorms.  And inside the dorm there's a tables,

5  there's two TVs, and the sleeping rooms.  It's like

6  that.

7          Q.    And then --

8          A.    And then one shower.

9          Q.    One shower for your dorm?

10         A.    Yes.  In the dorm there's one shower, so

11 inside the shower they have like six like places to

12 enter, like that.

13         Q.    Six places to enter, is that what you

14 said?

15         A.    Yes.  Inside the shower they have six

16 different -- there's one big shower, so inside you

17 have like six -- I don't know how to explain.

18         Q.    Okay.  Maybe six different shower heads?

19         A.    Yes.  Six heads of shower inside one big

20 place.

21         Q.    Okay.  And that was the area you had to

22 clean?

23         A.    Yes.

24         Q.    Okay.  And was there Xbox in your dorm?

25         A.    What did you say?

Exhibit B

1        Q.   Was there an Xbox in your dorm?

2        A.   Yes.

3        Q.   And where was that?

4        A.   Close to the shower in storage.

5        Q.   When could you use the Xbox?

6        A.   The daytime.  I never used it.  They used

7   daytime.

8        Q.   Okay.  So you never used the Xbox?

9        A.   No, I never used.

10       Q.   Would you have been sad if they took away

11   the Xbox?

12       A.   What did you say?

13       Q.   Would you have been upset if the guards

14   took away the Xbox?

15       A.   Well, I saw them harassing the other

16   detainees who are like me, I feel sad.  Even though I

17   don't like the Xbox, but when I see them harassing the

18   other detainees and they take it away and they using

19   power and we cannot do nothing, at that time, I feel

20   like so bad.

21       Q.   Okay.  How often did that happen?

22       A.   That happened when any detainee refused

23   to clean or he said he is not ready at this time, they

24   take away the Xbox; they turn off the TV; sometimes

25   they all day no day room.  We have been in our rooms

Exhibit B

1    and we don't get our daily needs like shampoo and

2    toothpaste, toothbrush, lotion, all those ethics.

3    Like any time the officer is angry the Xbox will go

4    away.

5         Q.   Let me make sure I understand.  If they

6    were angry, they would come and take away everyone's

7    toothbrush?

8         A.   What did you say?

9         Q.   If a guard was angry, they would go into

10   each dorm and take away everyone's toothbrush?

11              MR. FREE:  Object to form.

12              You can answer, Abdi.

13        A.   (BY THE WITNESS):  Yes.  Can you be like

14   more clear?  I don't understand the question.

15        Q.   (BY MS. SCHEFFEY):  Yes.  So if someone

16   got in trouble for refusing to clean, is what you are

17   saying, guards would take away their toothbrushes?

18        A.   Like when the guards are angry and you

19   need a toothbrush or you need anything from them, even

20   when you want to use the toilet and you need a toilet

21   roll, like tissue, they are not going to give you.

22   When the officer is angry, he don't want you give you

23   nothing.  Anything you need from them, you are not

24   going to get that day.  Like since that officer was

25   there and he is angry, you are not going to get

Exhibit B

 1  nothing until the next shift and new officer come.

 2  Even sometimes the other officer will tell the officer

 3  who is going to come, and if the officer is mad too,

 4  he will be the same, like all day you are not going to

 5  get toothbrush, toothpaste, toilet roll.  All

 6  necessary things you need that day, you are not going

 7  to get because of one officer get mad or because one

 8  detainee refused to clean or something that's very

 9  minor.

10        Q.   So it wouldn't matter -- let me start

11  over.

12             So it wasn't necessarily you who would

13  refuse to clean, right?

14        A.   Yes.

15        Q.   If someone else who you had no control

16  over refused to clean, it would be the same outcome?

17        A.   Sometimes.

18        Q.   Can you give me an example of the type of

19  -- you said some of it is minor -- type of things that

20  people would refuse to clean?

21        A.   Sometimes an officer will tell a detainee

22  to clean the shower or to clean the dayroom or to

23  clean somewhere and the detainee gets angry and the

24  detainee says, I'm not cleaning it, I'm not ready, and

25  the officer stands up and he shouts at that guy to

1   clean and the guy refused and officer start turning

2   off the TV everybody was watching.  The officer went

3   somebody else to step up and do this guy's job.  One

4   day I asked the officer, I said, You don't not even

5   ask us, like you don't even talk to us nicely.  Like

6   he is the one who refused to clean, why are you

7   punishing all of us?  He said, Okay, you heard me when

8   I was talking to you, why don't you step up and do?

9   And I said, So you want me to understand like without

10  you are telling me?  I'm not an angel; I cannot know

11  what you say when he's talking to him and you never

12  told me.  I told him to not be rude and to calm down

13  and turn on the TV.  And he said, No, until you guys

14  clean, nobody is going to watch TV.  And he stand up

15  and he turned off everything.  And when I saw him he

16  is using like power and like dictator and like

17  everybody get angry and like everybody saying that we

18  will clean, but don't use like power.  And he make us

19  go back to our dorm, our rooms.  He talk on the radio

20  and he put us back in our rooms.  And we were in the

21  room like more than 20 minutes.

22          Q.   More than 20 minutes?

23          A.   Yes, because one person refused to clean.

24          Q.   Okay.  And then after that were you

25  allowed back into the room with the TVs?

Exhibit B

```
 1          A.   After that we come out and we were

 2   watching the TV, but the officer whole day he was

 3   angry, and whole day like when we need tissue or

 4   anything like necessary things, he show his face, he's

 5   angry, like you look at him he wants to like kill you,

 6   like when you look at his eyes you fear.  Like

 7   everybody don't want to mess with him.  All day he was

 8   agree and everybody was sad that day.

 9          Q.   Do you remember the name of that officer?

10          A.   Yes.

11          Q.   What is the name?

12          A.   That guy's name is what you call Ramirez.

13          Q.   Ramirez.  Okay.

14               Were you ever personally disciplined for

15   anything you did?

16          A.   I was not being in segregation, but I was

17   punished in different ways.

18          Q.   Can you tell me about how you were

19   punished and what for?

20          A.   One day officer came to my room and I was

21   eating soup and she said, Hey, pick those tissue

22   rolls.  And it was not close to my bed; it was very

23   far from me and just organized in the corner close to

24   the toilet.  And I was eating food and she said I have

25   to pick those tissue rolls.  And she was not talking
```

Exhibit B

 1   to me nicely.  And I said, Ma'am, I am going to take

 2   it, no problem.  And she said, You have to take it

 3   now, stand up and take it now.  And then I said,

 4   Ma'am, calm down, I'm eating now, so let me finish my

 5   food and I will pick it later on.  And she shouted at

 6   me, she said, Take it now or you will go to

 7   segregation.  She threatened me like to take those

 8   things right now.  And then I said, Ma'am, take it

 9   easy.  And then she get angry and left.  She told me

10   she is going to call the sergeant.  She talk on the

11   radio and came back with plastic.  She throw away all

12   my belongings.  She even throw away the clothes that

13   GEO gave to me because GEO gave me three pants, three

14   shirts, three T-shirts.  She throw away everything

15   except what I was wearing.  She even throw away my

16   blanket.  That night I sleep without blankets.  And

17   also she throw away some of my commissary stuff.  I

18   was angry and I don't know what to do.  I was so

19   frustrated.  I asked, Why are you doing this, and she

20   refused to talk to me.  And I just be patient that day

21   and I not take it serious.  I just leave it alone and

22   since she's a woman, I don't need to argue with her a

23   lot.  And after two-day or like three-day then the

24   sergeant came and same case, telling me that, Why

25   don't you follow the officer what she told you that

Exhibit B

1    day and that day.  And I said, Hey, what are you

2    talking about I was the one who been harassed.  I'm

3    the one who's supposed to complain, what are you

4    talking about.  Even that woman, she even discriminate

5    me and insulted me and I don't even answer.  I

6    explained to the supervisor that day; I said, I don't

7    know what you are talking about.  I am the one being

8    discriminated.  I'm the one being who all his stuff

9    thrown away.  I show my bed.  There was not even a

10   blanket on it.  I show everything in there.  I show

11   even myself.  I was wearing one trouser and one shirt

12   and one T-shirt and one boxer.  And I didn't have

13   anything else.  I show everything.  And he said to me

14   Okay, okay, okay.  And first time he was -- he

15   handcuffed me.  He tell me to against the wall, face

16   the wall and put my hands at my back and he handcuffed

17   me and he shouted at me and he threatened me he's

18   going to take me to segregation.  And when I explained

19   to him everything he don't want to listen to me.  And

20   he's angry at me and shouting at me, insulting me,

21   telling me that he is going put me in segregation and

22   beat me up and do this if another time this woman

23   complain about me.  And he left so that time.

24              Another time --

25              Q.   So did you go to segregation on that

Exhibit B

 1    occasion?

 2           A.    No, I didn't go to segregation.

 3           Q.    When you were eating soup where were you

 4    eating soup?

 5           MR. FREE:  I'm sorry.  He was not

 6    finished with his answer.

 7           Abdi, did you have more to say?

 8           THE WITNESS:  Yes, I have more to say.

 9           MS. SCHEFFEY:  Okay.

10           A.    (BY THE WITNESS):  So that day was one

11    day that I get punished.  I didn't get to segregation,

12    but it was a big punishment for me because it was a

13    very cold night and I slept without blanket.  And two

14    days I couldn't take shower --

15           Q.    Abdi, did we lose you?

16           MR. FREE:  Abdi, I'm sorry, we lost you

17    at two days I couldn't take a shower.  And then the

18    call dropped, so if you can, just pick up if you can.

19           A.    (BY THE WITNESS):  Okay.  No problem.

20           Two days I didn't take shower because

21    whenever I what about to take shower I need to wear

22    same clothes again and that was very big punishment

23    for me and very disappointment for me.  I couldn't

24    even sleep those nights, like very stressful.

25           And another time I get punished in

                              Exhibit B

 1  Adelanto, but I was not taken to segregation, but same

 2  like segregation, like solitary.  I was alone all day

 3  in one room myself alone.  It was in intake.  And

 4  intake and segregation, segregation is better because

 5  session have a bed to sleep and blanket.  In

 6  December 28th my ICE officer called me to sign

 7  deportation, 2018, December 28, 2018.  My ICE officer

 8  called me to sign deportation because my VIA case was

 9  denied.  And then it was around lunchtime.  I ate my

10  lunch intake.  I finished with my ICE officer right

11  way in ten-minute.  And then the GEO officer, he was

12  taking back some other detainees to their dorm.  And I

13  said to him, Okay, what about me?  Are you going to

14  take me back too?  And he said, No, you have to clean

15  hear first and then I will take you back.  And then I

16  said, Hey, what are you talking about?

17  (Unintelligible) condition I said.  To clean here and

18  take me back, these are different things.  I explained

19  for him, To take me back is your duty, your job, you

20  are officer.  I finish my things.  I finished with my

21  other (Unintelligible).  You're taking the other

22  detainees, so you have to take me back.  Don't tell me

23  to clean after you are going to take me back.  And he

24  said -- he was angry.  And I was sitting on top of

25  somewhere -- I don't know how to say now -- he told

Exhibit B

1   me, Get your black ass down.  He insulted me.  And

2   then when I come down and I said, Don't insult me.

3   And he said to me, Clean it here.  If you don't clean,

4   you are not going nowhere.  And then I said, I'm not

5   going to clean.  And then he take all other detainees

6   back to the dorm except me.  From lunchtime until

7   night I was in the solitary alone in -- what do you

8   call it -- intake.  And in intake it was very cold and

9   I didn't have a blanket; I didn't have a jacket.  And

10  the conditions, the weather was very cold.  I was so

11  frustrated.  I don't know what to do.  I tried to

12  knock the window.  I talked to the other officers, I

13  said, Hey, why don't you take me back?  Why are you

14  making me alone?  And I tell him that this guy,

15  because I'm black, he don't want to take me back

16  because he told me, Get your black ass down.  And I

17  remember that all day and I was very headache, I had

18  headache.  And I said, Because I am black, that's why

19  you don't want to take me back.  And that was the

20  reason he don't want to take me back, I knew.  And I

21  said, You take everybody else except me.  Why?  And he

22  said he is not going to take me back because I refused

23  to clean.  And then I said if, So if I refused to

24  clean, you don't need to punish me.  This punishment

25  is torturing me, it's torture.  Then he said, You are

Exhibit B

1  going nowhere and he was angry.  And I tried to talk

2  to the other officers and the other officers, they

3  talked to me like mocking at me like saying, Hey, why

4  did you do yourself like this, why don't you just

5  clean.  And every officer come and talk to me same

6  way; every officer come and talk to me same way.  Even

7  other detainees who come after and they finish their

8  thing, again they were taking back.  Another officer,

9  he was trying to take me back.  This officer come and

10 he said, No, no, no, don't take this guy, except those

11 others.  And all day I was there, all day very cold.

12 I couldn't sleep.  Standing up until like all my legs

13 were like swollen, all my face like change, I was

14 lying in hell and I don't know what to do.  And then I

15 was very angry.  I start knocking the window, nobody

16 talking to me, everybody laughing at me.  And I saw a

17 phone inside intake and I tried to call my lawyer or

18 anybody else that can answer.  When I tried to make

19 call, the intake telephone doesn't work.  It just says

20 press nine to report V-I-E-A -- I'm not exactly sure.

21 It was saying something like that.  I didn't know what

22 does that mean.  But at that moment what I was

23 (Unintelligible) was reporting something.  And my

24 point was to report something.  And then I just dial

25 nine because -- not by mistake.  I dial nine because I

Exhibit B

```
 1   want to report something.  I was punished,

 2   discriminated; I was tortured in there all day; the

 3   officer is rude to me illegally and nobody knows; and

 4   I want to report something.  And then when I dial nine

 5   it says to me, Record your voice, and I record my

 6   voice.  And then in 10 minutes or 20 minutes the

 7   supervisor called me and then he told me, What

 8   happened you?  Why did you dial nine?  Did they rape

 9   you?  Like by saying like mocking at me, like

10   disrespecting way.  And I said, Nobody raped me.  He

11   said, Do you sexually get assault?  And then I said,

12   No.  And he said, Did you physically get assault?  And

13   then I said no.  And he started to giving me small

14   paper that explains about sexual assault and all those

15   things.  And then he said -- and then I said, They

16   don't sexually assault me.  I tried to explain what

17   happened to me.  I said, This officer, this guy

18   discriminate me; he insulted me; he punished me; all

19   day I was in there; he didn't like this because I

20   reviewed to clean.  And then he don't want to listen

21   to me.  He look at me and said to me, Those things you

22   want to say, you will say in grievance; you don't tell

23   me.  He said, What I want is you dial nine and if you

24   dial it -- so he said to me, When you dial nine it

25   means that they rape you, so if they don't rape you,
```

Exhibit B

1  you have to sign this paper saying that I dialed nine

2  by mistake; I was not sexually been assaulted; I'm

3  okay, say like this.  And I said, I don't dial by

4  mistake.  I said to him, I dial it because I needed to

5  dial because I need to report something, but not

6  sexual assault, but torture and punishment and the

7  officer using power that I don't know who give that

8  power to punished me all day.  So that's why tell

9  this.  And then he coerced me, like shouting at me,

10  and said, Hey, you don't get sexual assault, you have

11  to sign this paper, otherwise you will be in trouble

12  because you are not sexually been assaulted and

13  (Unintelligible) is when you sexually been assaulted,

14  so you have to say all these things.  And then I said,

15  I cannot dial nine by mistake.  I say, I dial nine

16  because of this and this.  And he don't want to listen

17  to me.  Then he forced me, You have to do it.  And

18  then I did it because I fear him because he can beat

19  me because the officer punished me like that.  So I

20  think supervisor come buy and can punish me more than

21  that.  So I accept everything he was saying and I

22  signed everything he was saying and also that time I

23  was get punished.

24          Q.   Okay.  So can I go back to your first

25  story about the officer.  Were you in your bunk when

Exhibit B

1    you were eating those noodles?

2              A.    I was sitting on the table inside my

3    room.

4              Q.    In your room.  Okay.

5              A.    Yes.  I was sitting -- there's a table

6    and -- what do you call it -- chair.  So I was sitting

7    on the chair and my food was on top of the table.

8              Q.    And the tissue she asked to you pick up

9    were where?

10             A.    Next to the toilet.

11             Q.    Next to the toilet.  Is the toilet near

12   your bunk or your bed?

13             A.    No.  It's very far.  My room is very big,

14   was eight persons room and I was a one low, 2011 low.

15   And the toilet is close to 2014 low.  It's very far

16   from me and tissue was in a little corner, and it was

17   organized too.  And I was eating food, so it's not

18   right when you are eating food to take the tissue

19   because it's not clean time.

20             Q.    But was the tissue in the room with your

21   sleeping bunk?

22             A.    What did you say?

23             Q.    Was the tissue in the room where your

24   bunk was, where your bed was?

25             A.    Not my bed.  It was next to the toilet.

1          Q.   And is the toilet in a different room

2    than your bed?

3          A.   The toilet is same room, but the toilet

4    is very far from my bed.

5          Q.   Okay.  But in the same room?

6          A.   Yes, same room, but the room is very big

7    it's not like the other room four people.  Eight

8    people room.

9          Q.   And the toilet is not in the common area;

10   is that correct?

11         A.   What's did you say?

12         Q.   The toilet is not out in the common area

13   with the TVs; is that correct?

14         A.   No.  Toilet is in the room.

15         Q.   Okay.  And then the time that you said

16   you were put in intake, were you working on the

17   voluntary work program that day?

18         A.   That day I come to intake just to sign my

19   deportation, to meet with my ICE officer.

20         Q.   So it was the ICE officer you were with?

21         A.   What did you say?

22         Q.   You were with the ICE officer in the

23   intake?

24         A.   I meet with him and I finished with him

25   and the ICE officer left and I supposed to come back

1   to my dorm.

2          Q.   Okay.

3          A.   But GEO officer refused to take me back.

4   He punished me because I refused to clean.

5          Q.   And why didn't you write about this in

6   your declaration?

7               MR. FREE:  Object to form.

8          A.   (BY THE WITNESS):  Yes.  I tell my

9   lawyer.  I explained for him.

10         Q.   (BY MS. SCHEFFEY):  Okay.  So were you

11   ever placed in solitary confinement other than what

12   you just described of the intake situation?

13         A.   No, only that day.  And it was more

14   difficult than segregation, because I asked the people

15   who been in segregation how segregation look like.

16         Q.   When you called the phone that you

17   described you made a phone call and you were told to

18   file a grievance.  When was your understanding of what

19   that officer meant?

20         A.   What did you say?

21         Q.   When the officer told to you file a

22   grievance when you were on the phone, did you file a

23   grievance?

24         A.   When he was telling me to file a

25   grievance I was not on the phone.  I was with the

1   supervisor's office.

2            Q.   Okay.  And did you file a grievance?

3            A.   No.

4            Q.   Why not?

5            A.   Because I was punished by the GEO officer

6   and the supervisor (Unintelligible) was angry with me,

7   he don't want to help me, and because of my

8   understanding, even the grievance (Unintelligible) the

9   GEO officer.  So I don't consider grievance would help

10  because I know what was happening in front of my eyes

11  because I was eyewitness in there what was happening.

12  I was a living witness.  I was living in there and I

13  know the situation in Adelanto.  And because GEO

14  officers punish the people who write grievance, I fear

15  for my life in there because I didn't know that how

16  long I am going to live in there.  So that's why I

17  didn't have the confidence to do all those things.

18            Q.   Okay.  Thank you.

19                 I am going hand the court reporter the

20  detainee file and we are going to mark it as 63.

21                 (Deposition Exhibit 63 was marked.)

22                 THE WITNESS:  Can I have a five-minute

23  break?

24                 MS. SCHEFFEY:  Of course.

25                 (Recess taken, 9:59 a.m. to 9:06 a.m.)

Exhibit B

1          Q.   (BY MS. SCHEFFEY):  Okay.  Right as we

2     were going off the record, I had handed the court

3     reporter the detainee file and we marked it as

4     Exhibit 63.  I am now going to go to page GEO Novoa

5     00030190.

6          A.   Okay.

7          Q.   Abdi, do you remember using kite forms to

8     request clothing while in Adelanto?

9          A.   Yes.  I remember using the kite form for

10    clothing, but they don't give us all the time what we

11    request.

12         Q.   Okay.  I'm looking at a kite that asks

13    for two T-shirts small size, and one boxer M.  Thank

14    you.  And at the bottom it says, Approved.  There's a

15    box and there's a line near it and it says, One boxer

16    and one T-shirt.

17              Do you remember a time when you received

18    a boxer and a T-shirt from a guard or from --

19         A.   Yes.  Yes.  Many times.

20         Q.   Many times?

21         A.   Yes, but not all the time I needed.

22    Example, like when I request ten times, maybe I get

23    three time or four time.

24         Q.   Okay.  But you were able to get clothing

25    through kite forms?

Exhibit B

```
 1            A.    No, not every time.  And let me explain
 2    this.  To get -- when you write a kite, only when you
 3    have -- example, if I have my T-shirt and my T-shirt
 4    is like old, they will take it from me.  But if I lose
 5    my T-shirt -- like GEO officer sometimes come and
 6    throw away all your things.  Like the day that GEO
 7    officer throw all my clothes, I couldn't get any
 8    clothes with kite because they needed the old clothes
 9    to give you the other one, new one.  And even
10    sometimes when you write a kite and put in the
11    request, sometimes they don't even give you they just
12    throw away the kite.  Sometimes sergeants will tell
13    you, I didn't see, I haven't seen.  Sometimes you get,
14    but not all the time.
15            Q.    Okay.
16            A.    It's very difficult.
17            Q.    Was there another way to get clean
18    laundry, like a laundry list or some other way?
19            A.    Yes, there's other way.  The easiest way
20    was you have to follow the officer.  He will tell you,
21    Go with me.  And you clean the hallways; you clean the
22    dining rooms; you clean the medical; you clean the
23    station area.  When you work get tired, like you work
24    three hours, four hours, then he give you some new
25    clothes like pants or shirt or T-shirt or boxer.
```

1    Otherwise when I write a kite and they approved for

2    two T-shirts, sometimes they give me the very old like

3    the one I had before, like old boxer.  Even some

4    boxers have some yellow stain on it that they are

5    giving me and then I couldn't use it and I need to

6    write another kite.  And when I write another kite, he

7    brought back same boxer that I wanted him to change

8    for me.  So that's what was happening there.

9              Q.   Okay.  Was there a laundry list?

10             A.   What do you mean?

11             Q.   Is there a laundry list where you can

12   request laundry?

13             A.   I just write a kite.  I don't know what

14   else they have there.  I don't remember.

15             Q.   Okay.  I'm going to turn to GEO Novoa

16   00030210.  This is a kite.  At the top it says,

17   Attention laundry.  And on it it says, My clothes were

18   lost slash stolen.  I was left with these items which

19   are not mine, two small white T shirts, two pairs of

20   socks, one small boxer, and one towel.  Thank you.

21             A.   Uh-huh.

22             Q.   So on here it says you need a signature

23   required for reissuing clothing.  Is that your

24   recollection?

25             A.   What do you mean?

1          Q.   The response is that you need a signature

2    for reissuing clothing when yours was stolen.  Is that

3    what you were talking about?

4          A.   I don't get you.  Like what I need

5    signature like how?  I don't understand what that

6    entails.

7          Q.   So GEO informed you that you needed a

8    signature to reissue the clothing?

9          A.   Uh-huh.

10         Q.   Is that --

11         A.   Not only that one.  Many times that I

12   wrote a kite asking for clothes to get new clothes.

13   Sometimes when I send my clothes to laundry for

14   cleaning I don't get it back.  They put it by mistake

15   in other dorm and I don't get my clothes back.

16   Sometimes my clothes, officer throw away.  Sometimes

17   my clothes where stolen.  When I write a kite I don't

18   used to get it back, my clothes.  I remember I wrote

19   almost five, six kites and I didn't have clothes.  I

20   was wearing like one pair that I was wearing and I was

21   not -- I didn't get nothing until other detainee who

22   was leaving, who was going outside, give me some of

23   his clothes and I put it in a kite saying, Change it

24   for me.  When I say, Change it for me, they will

25   change.  But when I say -- like when they throw my

Exhibit B

1    clothes or all those things they never used to give

2    me.  Even the exchanging, they don't give you even

3    sometimes.  And even when they give it to you

4    sometimes they give you exchange, but old clothes,

5    very old clothes, like more than like the one you were

6    changing.

7            Q.   And why is that not in your declaration?

8            A.   What did you say.

9                 MR. FREE:  I am going to object to the

10   form.

11                But you can answer.  Okay, Abdi?

12                THE WITNESS:  Okay.

13           Q.   (BY MS. SCHEFFEY):  Why are these

14   comments you are making about the laundry not in your

15   declaration?

16           A.   Because I tell my lawyer all those

17   things.  And when I was in Adelanto I was not mentally

18   okay because you guys punished me.  Like I was

19   frustrated and I need to remember a lot of things.

20   And what was happening in Adelanto was not something

21   that like what's going to happen here in Somalia.

22   Here in Somalia something can happen to me today and

23   after a month something can happen to me, but that was

24   living day.  Like food, you eat three times a day,

25   like tomorrow you eat, like tomorrow you eat.  You

1    cannot talk about all what you eat this year, but if

2    you go back to all this year, you will remember every

3    day new things, every day.  Even every day when I

4    sleep nighttime sometimes I have like nightmare what

5    was happening in GEO that even I can't even tell you

6    now.  There's a million things.  Like this will be in

7    my mind like even until -- today I'm 25 years old.

8    Until like 75 years, until I die, this is not going to

9    finish, the punishment I receive in Adelanto.  So

10   that's not something that I can tell everything with

11   my lawyer, but I try my best and I tell everything

12   that day when I meet with my lawyer because my lawyer

13   was just with me a few hours and I couldn't say

14   everything and it was so difficult.  Like even when I

15   was talking, I couldn't talk even like.

16           Q.   I understand.  Did you have family in

17   Adelanto with you?

18           A.   ████████████████████████████████

19   ████████████████  ████████████████████████████

20   ████████████████████████████████████████████

21   ████████████████████████  ████████████████████████

22   ████████████████████████████████████████████

23   ████████████████████████████████████████████

24   ████████████  ████████████████  ████████████████████

25   ████████████████

Exhibit B



```
1       Q.    ██████████████████████
2    ██████
3       A.    ████████████
4       Q.    ██████████████████
5    ██████
6       A.    ████
7             MR. FREE:  ████████████████
8    ████████████████████████████  ████
9    ███████████████
10            THE WITNESS:  ██████████████  ████████
11   ██████████████  ██████████████  █
12   █████████████████████████████████
13   █████████████████████████████████
14   ███████████████████████████████
15   ██████████████████  ██████████████
16   ███████████████████████  ██████
17   ████████████████  ████████████████
18   ██████████  ███████████████████████
19   ██████████████████████████████
20   ████████████████  ██████████████
21   ███████████████████████████████
22   ███████████████████  █████████████
23   ██████████████████████████████
24   █████████████████
25            Q.    (BY MS. SCHEFFEY):  ████████████
```

Exhibit B



1
2          A.
3          Q.
4
5          A.
6
7
8
9
10
11
12

13          Q.    Did you get to work with those people?

14          A.    Like cleaning?

15          Q.    Yes.

16          A.    Yes, yes, because they were working.

17    They were like me and they needed the money and so

18    that's why they worked.

19          Q.    So if you didn't work, would you have

20    been able to see those people?

21          A.    Like what do you mean?

22          Q.    Would you have been able to spend time

23    with your cousins if you didn't do your voluntary work

24    job?

25          A.    No.   That has nothing to do with working

1    or to meet cousins.  Cousins, we meet in -- what do

2    you call -- in the church or in somewhere like that or

3    some of them move to my dorm.  They have nothing to do

4    with meeting with my cousin, working.

5          Q.    Okay.  Did you ever move dorms while at

6    Adelanto?

7          A.    Yes, many times.

8          Q.    Many times?

9          A.    Yes.

10         Q.    Did you ever request to move dorms?

11         A.    Yes.

12         Q.    And was that request granted or approved?

13         A.    Like 90 percent my request was rejected.

14   One time my request was accepted.

15         Q.    One time?

16         A.    But once I was in five side.  They moved

17   me to four side; they accepted me.  But they moved me

18   more than four times by different reason like changing

19   the dorms or something like that or officer was angry

20   with me, so he wants to move me to another dorm.  They

21   only move me when they need.  When I need, they don't

22   move me.  And they don't move me the way I like or I

23   have cousin or friend in there.  They moved me one

24   time and I thanks for them that time because I was so

25   stressed and frustrated.  I was in Five Charlie and

```
 1   all the Somalis were moved to four side because they
 2   were Muslim, so they moved all Muslims together.  And
 3   when they moved everybody, all the Somalis, and even
 4   the Africans, and even people who speak Arabic -- me,
 5   I speak Arabic and I speak Somalia and I speak -- the
 6   other African people, we are same culture, we
 7   understanding each other.  So when they move all those
 8   people four side I was so stressed and I was so
 9   depressed, like I don't know what to do, so sad.  And
10   I wrote a kite, again, and again, and again and they
11   moved me.  I asked them to let me move with those
12   people because I want to talk to them; I want to be
13   less stress; I want to socialize.  And it was
14   dangerous sometimes to live with people that who don't
15   understand you, different culture, different
16   community.  So it was very danger.  And I requested to
17   move with my Somali brothers and they accepted one
18   time and I was so grateful for that.  And that's one
19   of the good things they do.
20            Q.   Good.  So you did eventually get to move
21   and live with your cousins, friends, other
22   East Africans?
23            A.   Yes.
24            Q.   Okay.
25            A.   Once.
```

Exhibit B

1          Q.   Would you say you used kites frequently?

2          A.   What do you mean?

3          Q.   Would you say you felt free to submit a

4    kite whenever you needed something?

5          A.   Most of the time.

6          Q.   All right.  So we discussed that you were

7    a cleaner.  I think it's been described in your

8    declaration as being a porter.  How many people did

9    you work with in that position?

10          A.   Like sometimes seven, sometimes six,

11    sometimes five.  But there's no like limit and there's

12    no exact number that I can tell you.  But like if I

13    guess, like those numbers.

14          Q.   Okay.  And you previously said that you

15    worked with some of your friends doing that, right?

16          A.   What did you say?

17          Q.   You previously said some of your friends

18    worked with you as cleaners?

19          A.   Not like everybody is my friend.

20    Everybody who is in there, we are friends because the

21    situation make us friends, not like the really friends

22    of outside, but many people working.  And normally

23    everybody was in Adelanto like me and I was very

24    friendly with them, so everybody was my friend.

25    Everybody was working, like everybody who was in the

1    rooms, everybody who was -- everybody was my friend.

2    So many friends of mine we are working in the

3    cleaning.

4           Q.   Do you remember any of the names of the

5    people you worked with who were your friends?

6           A.   There's too many.  Like I can't remember

7    some of them because at that time I was so -- my mind

8    was not okay, so I can't remember all those names.

9           Q.   Can you remember any names?

10          A.   Like Sim, my friend from Cambodia, he

11   used to clean also when I cleaned.  And he was so sad

12   and he used to cry and we used to talk to each other.

13   He was cleaning and, me, I was cleaning.  And my other

14   friends, Shakur (Phonetic), we were roommates, we used

15   to clean together.  And my other friend Khan, he was

16   also cleaning and I was cleaning.  And also Khan was

17   same room with me.  And my other Egyptian friend,

18   Solomon Mina (Phonetic), he was my roommate.  And I

19   also used to help him sometimes writing something.  He

20   used to clean.  Many friends would clean, but he was

21   not cleaning at same place.  Somebody clean this side

22   and the other one clean the other side.

23          Q.   Can you spell the names of your friends

24   you just mentioned for the court reporter?

25          A.   I don't know how to spell those names

 1   because they are foreign names.  But I can call them

 2   the way they were calling themselves and the way the

 3   officer was calling them because I don't know those

 4   languages.

 5          Q.   That's fine.  You can just do a guess of

 6   how you would write those names so she can write them

 7   down.

 8          A.   Okay.  Like Sim.

 9          Q.   Would that be S-i-m?  Would that be fair?

10          A.   I'm not sure.  Maybe.  And then the next

11   name Khan, like I think K-h-a-n, something like that.

12          Q.   Okay.  And then the next one?

13          A.   Shakur.

14          Q.   And then the last one?

15          A.   It's like, what do you call, Mina.

16          Q.   Mina?

17          A.   Yes, Mina.  M-i-n-a, I think.

18          Q.   Thank you.

19          A.   And many more, not only those three or

20   four.  Like many more my friends and everybody was

21   working because he the money and he don't have any

22   choice to do any other job because they don't allow us

23   to work another job like outside, so that's only thing

24   we get.  So everybody in there, he was doing that job

25   because that's only opportunity we could get.

Exhibit B

1          Q.   Did you ever ask to have a job outside of

2     Adelanto?

3          A.   I never asked because I know they will

4     not going to give me.

5          Q.   Why not?

6          A.   Because I never saw.  I know what was

7     happening in there.

8          Q.   Okay.  And then in the kitchen, how many

9     people did you work with?

10          A.   Kitchen too, many people, like ten,

11     sometimes eight, sometimes six.  I cannot tell you one

12     number.  I don't know.  Too many people.  Sometimes

13     more, sometimes like that.

14          Q.   So the people you worked with were not

15     working every day?

16          A.   Most of the time they work, like some

17     people it's different people.  I don't know them like

18     those people because they come from other dorms some

19     of them come from same dorm but I don't know like all

20     those people.

21          Q.   Was it the same people every day?

22          A.   Same people every day sometimes one time

23     when I was new.

24          Q.   But usually was it the same people every

25     day?

```
 1          A.   Yes.

 2          Q.   Okay.  The same eight or ten people?

 3          A.   Not like I cannot give you a number.

 4          Q.   And what about the cleaning, was it the

 5   same people every day?

 6          A.   Those who cleaned the dishes, I remember

 7   same people sometimes.

 8          Q.   Okay.

 9          A.   Because I was always near the dishes.

10          Q.   Okay.  So there were not -- were there

11   100 people working in the kitchen?

12          A.   Like hundred people working in the

13   kitchen?

14          Q.   Yes.  Were there?

15          A.   Not 100 people working in the kitchen,

16   but people who's on the list so many like most of the

17   dorms work in the kitchen and there were not 100

18   people working in the kitchen, but there were 100

19   people working in the cleaning areas.

20          Q.   Okay.  Did you ever work in the library?

21          A.   Library, no.

22          Q.   Did you ever work as a barber?

23          A.   Barber, like hair?

24          Q.   Hair barber.

25          A.   I cleaned the thing that they used to
```

1   barber, but I never cut the hair.

2            Q.   So you never cut hair?

3            A.   Yeah, but I clean stuff, the machine they

4   used to cutting the hair.

5            Q.   Okay.  Did you ever work in laundry?

6            A.   No.

7            Q.   Did you ever go to the laundry room?

8            A.   No.

9            Q.   Do you know any detainees at other GEO

10  facilities?

11           A.   What did you say?

12           Q.   Do you know other detainees at other GEO

13  facilities?

14           A.   Other GEO facilities, not Adelanto?

15           Q.   Right.

16           A.   I don't know.  One detainee told me he

17  was in another GEO facility, but I don't know where he

18  is at.

19           Q.   Okay.  I am now looking at the Detainee

20  Handbook GEO Novoa 00030228.  This document says it's

21  a handbook and video verification.  The document, Says

22  by signing below I verify I have received the GEO and

23  the ICE handbooks and have been shown the intake

24  orientation videos.  Were you given a GEO and ICE

25  handbook?

```
 1              MR. FREE:  Objection.

 2              Abdi, you can answer if you understand.

 3         A.   BY THE WITNESS:  Can you repeat for me

 4    that question?

 5         Q.   (BY MS. SCHEFFEY):  Well, the sentence it

 6    has a signature at the bottom and your A number.  It

 7    says, I verify I've received the GEO and the ICE

 8    handbook and have been shown the intake orientation

 9    video.

10              Did you receive a handbook when you

11    entered Adelanto?

12         A.   I received the handbook when I enter ed

13    Adelanto, but I didn't get video orientation.

14         Q.   You were not shown a video?

15         A.   No, I was not shown a video.  There was a

16    TV there.  They were showing me something, but they

17    didn't show me, myself, anything like showing the

18    orientation, no.

19         Q.   Did you read the handbook?

20         A.   I read it and at that time I was like new

21    and I didn't know English very well.  So I didn't

22    understand very well when I read it first time, but I

23    tried to read and understand some.

24         Q.   Did you keep a copy of the handbook?

25         A.   What do you mean?
```

Exhibit B

1          Q.   Did you have it while you were in

2    Adelanto?  Did you have a copy?

3          A.   I had the handbook itself and then when I

4    left there I gave it back.

5          Q.   Did you try to read anything about the

6    voluntary work program?

7          A.   I saw some one time a little bit.

8          Q.   So if you couldn't read the handbook, how

9    did you learn about the voluntary work program?

10         A.   I read some, not everything.

11         Q.   So you read it about it?

12         A.   Yes, some.

13         Q.   Were you able to read how much the

14   voluntary work program would pay?

15         A.   Yes.  I saw that one, one dollar.

16         Q.   Were you able to read that the program

17   was voluntary?

18         A.   Like what do you mean?

19         Q.   That you didn't have to work if you

20   didn't want to?

21         A.   I read that.

22         Q.   You read that, okay.

23         A.   Yes.

24              MS. SCHEFFEY:  I don't think I have any

25   more questions.

Exhibit B

 1          A.   (BY THE WITNESS):  I read that, but they

 2   didn't show --

 3               THE COURT REPORTER:  I didn't understand

 4   that.

 5          Q.   (BY MS. SCHEFFEY):  Can you repeat that

 6   for the court reporter?

 7               MR. FREE:  Can you say the last words

 8   that you just said so that the court reporter can

 9   write it down, please.

10          A.   (BY THE WITNESS):  I said I read the

11   book, the volunteer, that they can't force you to

12   work, but they are not throwing following that

13   sentence.

14               MS. SCHEFFEY:  I don't think I have any

15   other questions.

16               Andrew, do you have any questions?

17               MR. FREE:  We will do some quick

18   redirect.

19                        EXAMINATION

20   BY MR. FREE:

21          Q.   So, Abdi, I'm going to ask you some

22   questions now.  Okay?

23          A.   Okay.

24          Q.   And you just listen to me just like you

25   were listening to Adrienne and you will response and

Exhibit B

1    the court reporter will write your answers down.

2         A.   Okay.

3         Q.   Approximately how long were you detained

4    at Adelanto?

5         A.   Almost two years and few days.

6         Q.   What is your first language?

7         A.   Somalia.

8         Q.   When you were working as a porter did you

9    ever clean areas that only the GEO guards were allowed

10   in?

11        A.   Yes.

12        Q.   Where did you clean?

13        A.   Like the cafeteria, like the room that

14   GEO officers ate at break time.

15        Q.   Okay.  Give me one second.  I'm just

16   going over my notes.

17             Do you remember what color the handbook

18   was that you received when you got that Adelanto?

19        A.   Yes.

20        Q.   What color was it?

21        A.   It was blue.  And the other one was

22   white.

23        Q.   Okay.  How were you able to make phone

24   calls while you were at Adelanto?

25        A.   I was making phone calls with the money

1    that my family gave to me and my friends and  the

2    money that I came in Adelanto.  And I was working

3    because I needed the money to make phone calls too.

4         Q.   Do you have any idea how much a phone

5    call costs?

6         A.   It's very expensive.  Like I 'm not

7    exactly sure.  But when I talked to somebody like few

8    minutes, it costs a lot of money.

9         Q.   Just one second.  Okay?

10        A.   Okay.

11        Q.   While you were at Adelanto did anyone

12   from GEO ever tell you that your participation in a

13   work program or your cleaning up at the direction of

14   GEO could affect your immigration case?

15        A.   Yes, of course.  Yes.  You want me to

16   explain?

17        Q.   Yes, please.

18        A.   When I was new to Adelanto an officer

19   told me if I participate in a work program, it would

20   be good for my case.  It would be good for my -- what

21   do you call -- bond hearing, like to get released from

22   Adelanto, he said it would help me because he said

23   they consider where I was living in Adelanto if I was

24   participating in the work program, like all those

25   things will help me to get bond.  So that was one of

Exhibit B

```
 1   the reasons I was working.  And once GEO officer told
 2   me to clean -- it was early in the morning -- when I
 3   moved from five side to four side, I was new to the
 4   room and then the light there was a lot of toothpaste
 5   on the light.  And the wall, there was something
 6   written on the wall and the GEO officer told me to
 7   clean early -- in the morning he woke me up.  I was
 8   sleeping, like I was so sleepy.  And he woke me up and
 9   said, Clean the light and clean the wall.  And I said,
10   Hey, I cannot do this time; it's early in the morning;
11   I will do it later on.  He said, You have to do it
12   now.  And then I was trying to refuse.  I said, I'm
13   not going to do now.  And then he shout at me and he
14   forced me and I said no.  And then he said to me he
15   would write me up or I'm going to go to segregation or
16   if I don't clean this, like it will affect my case,
17   like he said to me it will be bad for.  That was very
18   dangerous to me, like when somebody tell me it will
19   affect your case, that was like very like big thing to
20   me, like when somebody talk about my case and then --
21   because very dangerous when somebody talk about my
22   asylum case.  And then I stand up and clean the light
23   and I clean the wall because I realize that if I don't
24   do those things, it will affect my case; I was not
25   going to get bond; I was not going to get released.
```

Exhibit B

1   So that's why I clean the wall and I clean the light.

2   And that officer threatened me that if I don't do it,

3   it will affect my case.

4          Q.   Did you ever have a bond hearing while

5   you were at Adelanto?

6          A.   Yes.

7          Q.   Did anyone at GEO ever show up to your

8   bond hearing and tell the Court that you had worked in

9   the work program?

10         A.   No.  Nobody show up and tell those

11  things.  Nobody came there.  I don't know if they tell

12  anything.  I don't know.  I'm not sure.

13         Q.   Okay.  You testified that you worked for

14  free for a long time until you could get your name on

15  the list.  What does it mean to get your name on the

16  list?

17         A.   To get your name on the list is when they

18  approve you as a worker and at that time they will pay

19  you one dollar a day.  Otherwise you will work and you

20  will not going to get nothing.

21         Q.   Was there any way as far as you knew a

22  while you were at Adelanto for over two years to get

23  paid a dollar a day without first working for free?

24         A.   I never saw it.  Whenever I went to work

25  to get my name on the list to get the one dollar, I

Exhibit B

1    used work, work, work for free, and then after working

2    a long time I used to get my name on the list.

3            Q.    Turning now to your work in the kitchen.

4    I believe you testified earlier that you washed dishes

5    and helped chop onions; is that correct?

6            A.    Yes.

7            Q.    Did you ever actually physically help in

8    the service of the food, in other words putting food

9    on trays that would go out and be eaten?

10           A.    The trays that the detainees eat?  You

11   mean that?

12           Q.    Yes.

13           A.    Sometimes, yes.

14           Q.    Okay.  Who was responsible in the kitchen

15   for determining how much food got onto a plate?

16           A.    The officer's name, I don't know who rely

17   they are.  I don't know if they are GEO; I don't know

18   if they work for another company.  I'm not sure.  They

19   wear blue -- not, blue, sorry, green T-shirts like

20   Keef something like that.

21           Q.    Is it K-e-e-f-e?

22           A.    No, no.  K-e-e-f, something like that.

23           Q.    Okay.

24           A.    I'm not sure.  So those guys are in

25   charge of the kitchen and also the officers sometimes.

1          Q.   Which officers?  Who do they work for?

2          A.   The GEO officers.

3          Q.   Okay.  Did you ever witness anyone who

4   was not a detainee in the kitchen telling the workers

5   to put less food onto the trays?

6          A.   The officers sometimes tell you to put

7   less food and they watch you.  When you see you

8   putting a lot of food, they think your friend in the

9   dining room, you want to help, like that.  So they

10  limit food like that.  They have rules.  They put only

11  the limit and no other detainee can put more than

12  that.

13         Q.   Okay.  And were you ever aware of a time

14  where the limit of food that the people who worked

15  there many the kitchen were provided?  In other words

16  the amount food that you were supposed to provide was

17  actually reduced?  So in other words, the officers

18  working in the kitchen told the detained workers to

19  provide less than what was supposed to be provided to

20  your understanding?  Were you ever there witnessing

21  that?

22         A.   Yes.  Once I saw the detainee, he was

23  putting the food and the officer come and get angry

24  and he take all the food and he put small, small

25  things I saw.  But not myself, like other people I

Exhibit B

 1    saw.

 2                   MR. FREE:  Okay.  Those are all the

 3    questions that I have, Abdi.  Adrienne might have some

 4    more for you or not.

 5                   MS. SCHEFFEY:  I just have two quick

 6    follow-up questions.

 7                   THE WITNESS:  And I need to say one

 8    thing before you ask me questions because I don't want

 9    to forget.

10                   MS. SCHEFFEY:  Okay.

11                   THE WITNESS:  Just before I left

12    Adelanto, like just two days before I left Adelanto, I

13    left Sunday Adelanto, so this was a Friday night.  The

14    officer, GEO officer, came and I was standing in the

15    dayroom with my friend, my Turkish friend.  We were

16    standing there and we were talking.  It was nighttime,

17    like around 12:00.  So we were standing there and

18    there was some newspaper on the ground, so the officer

19    came and he said, Clean it up or I will clean your

20    fit.  The officer told me that.  And then I said

21    looked at him and said, What do you mean you will

22    clean my fit?  And then he said, You don't know what

23    does that mean?  I don't know what does that mean.

24    Explain for me.  And he said he will clean my all

25    stuff, like he will throw away all my belongings.  I

```
 1   said, What do you mean?  How can you throw away all my
 2   belongings?  And he said he will, because if you don't
 3   clean, he will clean my fit.  I said, You can't throw
 4   away all my belongings because I have to receipt,
 5   slip.  Like everything I buy I have slip.  And I said,
 6   I will write grievance; I will report you.  And then
 7   he said, Even if you have a receipt -- no, he told me,
 8   Do you have a receipt for everything?  And I said I
 9   have receipt for everything.  And he said, Even if you
10   have receipt, I will tell that you eat your food.  How
11   they know that you eat your soup?  He said, Even if
12   you have a receipt and you have like ten soups on your
13   receipt, I will say that you eating your things and I
14   will throw way.  So nobody can tell me like anything;
15   I can throw away your things, so you better clean
16   whatever I tell you to clean.  You better fear me.  He
17   telling me like that.  He was threatening me.  It was
18   just before I left.
19            MS. SCHEFFEY:  Okay.  Thank you for that.
20   I have just a few quick questions and then we can
21   finish.
22
23
24
25
```

Exhibit B

1                    EXAMINATION

2    BY MS. SCHEFFEY:

3         Q.   When was your bond hearing?

4         A.   My bond hearing, I had two times bond

5    hearing.  One was when I was new to Adelanto and one

6    was like in 2018 in February sometime.

7         Q.   When you say when you were new to

8    Adelanto, do you know approximately what month and

9    year that was?

10        A.   Like when I was in Adelanto like three

11   months.

12        Q.   Okay.  So three months after you entered

13   Adelanto you had your bond hearing and no one from GEO

14   showed up to discuss whether you worked in the

15   voluntary work program?

16        A.   I don't know what they discussed.  I

17   don't remember all those things.  And I was just new

18   so, after six months I had a second bond hearing and I

19   don't know anything what happened in there.  And I

20   don't think so that they discuss about any GEO stuff.

21   I'm not sure what happened.

22        Q.   AND did you have an attorney for those

23   bond hearings?

24        A.   Yes.

25        Q.   Okay.  And then can you tell me why

Exhibit B

1  people put toothpaste on the lights in Adelanto?

2          A.   I don't know that.

3          Q.   Did it happen frequently?

4          A.   No.  Sometimes when the room is new like

5  when new people come to a room you saw toothpaste on

6  the light because the dorm we was like Four Bravo

7  before it was red people.  So the red people do those

8  things.  We, the blues, when we come to the dorm,

9  sometimes when we forget and we don't clean, the

10  officers tell us to clean.  So we don't know why they

11  put those things.

12          Q.   So you didn't put toothpaste on the

13  lights?

14          A.   I never put.  I never even saw somebody

15  put it.

16          Q.   So any time you had to clean it would

17  have just been one time moving into a new dorm?

18          A.   What did you say?

19          Q.   If you had to clean it, it would only be

20  when you just moved into a new dorm?

21          A.   That was the time they forced me, but I

22  clean many times like myself; nobody forced me to

23  clean.  I did many times by myself when I saw

24  toothpaste on the light sometimes, I did myself just

25  to make the room look good.

Exhibit B

```
 1            MS. SCHEFFEY:  Okay.  I think that's all
 2   I have then.
 3            MR. FREE:  Okay.  Those are all the
 4   questions I have too.  We are going to get a rush copy
 5   to so that you can review it and make sure that the
 6   words you testified today are consistent with what
 7   came through on the transcription.  Because of the way
 8   that we have done this, we want to make sure that you
 9   are able to see what's been written down.  Okay?
10            THE WITNESS:  Okay.
11            MS. SCHEFFEY:  All right.  So we will
12   coordinate with the stenographer separately, but for
13   now we are going hang up.
14
15            UNCERTIFIED REALTIME ROUGH DRAFT
16
17       You have requested an unedited, uncertified
18   transcript.  This rough draft transcript has been
19   requested in the form of either a realtime hookup to
20   your computer, an ASCII file delivered after the close
21   of proceedings or my e-mail.
22       This realtime transcript is available only to
23   counsel who order a certified original or a certified
24   copy of today's proceedings.
25       This realtime draft is unedited and uncertified
```

1   and may contain untranslated stenographic symbols,

2   misspelled proper names, and/or nonsensical word

3   combinations.  All such entries will be corrected on

4   the final certified transcript and final ASCII file.

5        Due to the need to correct entries prior to

6   certification, it is agreed this realtime draft will

7   be used only to augment counsel's notes and will not

8   be cited in any court proceedings or distributed to

9   any other parties.

10

11                    * * * * * * * * * * * * * * * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit B

# EXHIBIT C

Thursday, October 24, 2019 at 9:08:17 AM Central Daylight Time

| | |
|---|---|
| **Subject:** | RE: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK |
| **Date:** | Tuesday, October 22, 2019 at 7:08:22 PM Central Daylight Time |
| **From:** | adrienne.scheffey@akerman.com |
| **To:** | nick.mangels@akerman.com, Lydia Wright, Andrew Bynum, Novoa - External |
| **CC:** | colin.barnacle@akerman.com |
| **Attachments:** | Exhibit 63__ Resident Account Summary .pdf, Exhibit 64_Complaint.pdf |

Counsel,

The remaining exhibits attached here.

Best,

**Adrienne Scheffey**
Akerman LLP | 1900 Sixteenth Street, Suite 1700 | Denver, CO 80202
D: 303 640 2512 | T: 303 260 7712
adrienne.scheffey@akerman.com

---

**From:** Scheffey, Adrienne (Assoc-Den)
**Sent:** Tuesday, October 22, 2019 6:04 PM
**To:** Mangels, Nick (LAA-Den) <nick.mangels@akerman.com>; 'Lydia Wright' <lwright@burnscharest.com>; 'Andrew Bynum' <abynum@burnscharest.com>; 'Novoa - External' <Novoa-External@burnscharest.com>
**Cc:** Barnacle, Colin (Ptnr-Den) <colin.barnacle@akerman.com>
**Subject:** RE: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Counsel,

I received a bounce-back from one of your email addresses for the email below. I am resending the exhibits for tomorrow in two parts. The first three are attached here and the rest will be attached in my next email.

Best,

**Adrienne Scheffey**
Akerman LLP | 1900 Sixteenth Street, Suite 1700 | Denver, CO 80202
D: 303 640 2512 | T: 303 260 7712
adrienne.scheffey@akerman.com

---

**From:** Scheffey, Adrienne (Assoc-Den)
**Sent:** Tuesday, October 22, 2019 4:17 PM
**To:** Mangels, Nick (LAA-Den) <nick.mangels@akerman.com>; 'Lydia Wright' <lwright@burnscharest.com>; 'Andrew Bynum' <abynum@burnscharest.com>; 'Novoa - External' <Novoa-External@burnscharest.com>
**Cc:** Barnacle, Colin (Ptnr-Den) <colin.barnacle@akerman.com>
**Subject:** RE: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Counsel,

As the deposition will be conducted via telephone tomorrow, please find attached the exhibits we intend to

Exhibit C

**Page 1 of 14**

use. We will have hard copies for the court reporter.

Best,

**Adrienne Scheffey**
Akerman LLP | 1900 Sixteenth Street, Suite 1700 | Denver, CO 80202
D: 303 640 2512 | T: 303 260 7712
adrienne.scheffey@akerman.com

***

**From:** Mangels, Nick (LAA-Den) <nick.mangels@akerman.com>
**Sent:** Tuesday, October 22, 2019 2:33 PM
**To:** 'Lydia Wright' <lwright@burnscharest.com>; 'Andrew Bynum' <abynum@burnscharest.com>; 'Novoa -
External' <Novoa-External@burnscharest.com>
**Cc:** Barnacle, Colin (Ptnr-Den) <colin.barnacle@akerman.com>; Scheffey, Adrienne (Assoc-Den)
<adrienne.scheffey@akerman.com>
**Subject:** RE: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-
JGB-SHK

Counsel:

My apologies.  Please reverse the numbers below.  Please call (303) 640-2515 first; (303) 640-2530 if there
are any issues.

Thanks!

**Nick Mangels**
Legal Administrative Assistant, Labor & Employment Practice Group
Akerman LLP | 1900 Sixteenth Street, Suite 1700 | Denver, CO 80202
D: 303 640 2541 | T: 303 260 7712
nick.mangels@akerman.com

***

**From:** Mangels, Nick (LAA-Den)
**Sent:** Tuesday, October 22, 2019 1:32 PM
**To:** Barnacle, Colin (Ptnr-Den) <colin.barnacle@akerman.com>; Lydia Wright <lwright@burnscharest.com>
**Cc:** Scheffey, Adrienne (Assoc-Den) <adrienne.scheffey@akerman.com>; DeLaney, Damien (Ptnr-Lax)
<damien.delaney@akerman.com>; Andrew Bynum <abynum@burnscharest.com>; Maritz, Maxine (LAA-Lax)
<maxine.maritz@akerman.com>; Miller, Karen (Para-Lax) <karen.miller@akerman.com>; Novoa - External
<Novoa-External@burnscharest.com>
**Subject:** RE: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-
JGB-SHK

All:

Per the Parties' agreement to take the deposition by telephone, below is the call-in information.  Please call
the **first number** which connects to our office's PolyCom.  The second number is being provided as a failsafe
in the event the PolyCom experiences connection or other technical issues.

- (303) 640-2530
- (303) 640-2515

Exhibit C                                                                                     **Page 2 of 14**

Thank you!

**Nick Mangels**
Legal Administrative Assistant, Labor & Employment Practice Group
Akerman LLP | 1900 Sixteenth Street, Suite 1700 | Denver, CO 80202
D: 303 640 2541 | T: 303 260 7712
nick.mangels@akerman.com

---

**From:** Barnacle, Colin (Ptnr-Den) <colin.barnacle@akerman.com>
**Sent:** Monday, October 21, 2019 5:59 PM
**To:** Lydia Wright <lwright@burnscharest.com>
**Cc:** Mangels, Nick (LAA-Den) <nick.mangels@akerman.com>; Scheffey, Adrienne (Assoc-Den)
<adrienne.scheffey@akerman.com>; DeLaney, Damien (Ptnr-Lax) <damien.delaney@akerman.com>; Andrew
Bynum <abynum@burnscharest.com>; Maritz, Maxine (LAA-Lax) <maxine.maritz@akerman.com>; Miller,
Karen (Para-Lax) <karen.miller@akerman.com>; Novoa - External <Novoa-External@burnscharest.com>
**Subject:** Re: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-
JGB-SHK

Confirmed.  Thanks, Lydia.

Sent from my iPhone

On Oct 21, 2019, at 4:14 PM, Lydia Wright <lwright@burnscharest.com> wrote:

> Colin and Adrienne,
>
> This email is to confirm our verbal agreement that the deposition of Mr. Karim will proceed via
> telephone, not by video conference. Safe travels back to Denver.
>
> **Lydia A. Wright**
> Burns Charest LLP
> 365 Canal Street, Suite 1170
> New Orleans, LA 70130
> 504.799.2845 main
> 504.881.1765 fax
>
> ---
>
> **From:** "nick.mangels@akerman.com" <nick.mangels@akerman.com>
> **Date:** Monday, October 21, 2019 at 12:49 PM
> **To:** Lydia Wright <lwright@burnscharest.com>, "adrienne.scheffey@akerman.com"
> <adrienne.scheffey@akerman.com>, "damien.delaney@akerman.com"
> <damien.delaney@akerman.com>, Andrew Bynum <abynum@burnscharest.com>
> **Cc:** "colin.barnacle@akerman.com" <colin.barnacle@akerman.com>,
> "maxine.maritz@akerman.com" <maxine.maritz@akerman.com>,
> "karen.miller@akerman.com" <karen.miller@akerman.com>
> **Subject:** RE: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case
> No. 5:17-cv-02514-JGB-SHK
>
> Thanks, Lydia.

Exhibit C                                    Page 3 of 14

Andrew, please give me a call when you have a moment.  My direct dial is in my signature block.

Thank you!


**Nick Mangels**
Legal Administrative Assistant, Labor & Employment Practice Group
Akerman LLP | 1900 Sixteenth Street, Suite 1700 | Denver, CO 80202
D: 303 640 2541 | T: 303 260 7712
nick.mangels@akerman.com

---

**From:** Lydia Wright <lwright@burnscharest.com>
**Sent:** Monday, October 21, 2019 1:20 PM
**To:** Mangels, Nick (LAA-Den) <nick.mangels@akerman.com>; Scheffey, Adrienne (Assoc-Den) <adrienne.scheffey@akerman.com>; DeLaney, Damien (Ptnr-Lax) <damien.delaney@akerman.com>; Andrew Bynum <abynum@burnscharest.com>
**Cc:** Barnacle, Colin (Ptnr-Den) <colin.barnacle@akerman.com>; Maritz, Maxine (LAA-Lax) <maxine.maritz@akerman.com>; Miller, Karen (Para-Lax) <karen.miller@akerman.com>
**Subject:** Re: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Nick – I'm looping in Andrew Bynum (abynum@burnscharest.com) to organize the logistics for Wednesday's deposition.

Thanks,

**Lydia A. Wright**
Burns Charest LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
504.799.2845 main
504.881.1765 fax

---

**From:** "nick.mangels@akerman.com" <nick.mangels@akerman.com>
**Date:** Monday, October 21, 2019 at 9:22 AM
**To:** Lydia Wright <lwright@burnscharest.com>, "adrienne.scheffey@akerman.com" <adrienne.scheffey@akerman.com>, "damien.delaney@akerman.com" <damien.delaney@akerman.com>
**Cc:** "colin.barnacle@akerman.com" <colin.barnacle@akerman.com>, "maxine.maritz@akerman.com" <maxine.maritz@akerman.com>, "karen.miller@akerman.com" <karen.miller@akerman.com>
**Subject:** RE: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Hi Lydia:

Is there an IT contact in your office/firm we can have our IT team reach out to in order to ensure video conferencing runs smoothly on Wednesday morning?  We will also need to know how Mr.

Exhibit C                                                    Page 4 of 14

Karim plans to connect – via Skype or some other platform?

Thank you.


**Nick Mangels**
Legal Administrative Assistant, Labor & Employment Practice Group
Akerman LLP | 1900 Sixteenth Street, Suite 1700 | Denver, CO 80202
D: 303 640 2541 | T: 303 260 7712
nick.mangels@akerman.com

---

**From:** Lydia Wright <lwright@burnscharest.com>
**Sent:** Saturday, October 19, 2019 8:23 PM
**To:** Scheffey, Adrienne (Assoc-Den) <adrienne.scheffey@akerman.com>; DeLaney, Damien (Ptnr-Lax) <damien.delaney@akerman.com>; Mangels, Nick (LAA-Den) <nick.mangels@akerman.com>
**Cc:** Barnacle, Colin (Ptnr-Den) <colin.barnacle@akerman.com>; Cizmorris, Melissa (Assoc-Den) <melissa.cizmorris@akerman.com>; Maritz, Maxine (LAA-Lax) <maxine.maritz@akerman.com>; Novoa - External <Novoa-External@burnscharest.com>
**Subject:** Re: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Adrienne,

Wednesday, October 23 at 6:00 a.m. PST works for Mr. Karim. Please notice his deposition accordingly.

Thanks,

**Lydia A. Wright**
Burns Charest LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
504.799.2845 main
504.881.1765 fax

---

**From:** "adrienne.scheffey@akerman.com"
**Date:** Friday, October 18, 2019 3:05 PM
**To:** Lydia Wright , "damien.delaney@akerman.com" , "nick.mangels@akerman.com"
**Cc:** "colin.barnacle@akerman.com" , "melissa.cizmorris@akerman.com" , "maxine.maritz@akerman.com" , Novoa - External
**Subject:** RE: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Lydia,

We are not available on Tuesday at 6:00 a.m. PST. We are available to depose Mr. Karim on Wednesday October 23rd at 6:00 a.m. PST. Please let us know if that time works for Mr. Karim.

Exhibit C                                        Page 5 of 14

Best,

**Adrienne Scheffey**
Akerman LLP | 1900 Sixteenth Street, Suite 1700 | Denver, CO 80202
D: 303 640 2512 | T: 303 260 7712
adrienne.scheffey@akerman.com

---

**From:** Lydia Wright
**Sent:** Friday, October 18, 2019 1:27 PM
**To:** Scheffey, Adrienne (Assoc-Den) ; DeLaney, Damien (Ptnr-Lax) ; Mangels, Nick (LAA-Den)
**Cc:** Barnacle, Colin (Ptnr-Den) ; Cizmorris, Melissa (Assoc-Den) ; Maritz, Maxine (LAA-Lax) ;
Novoa - External
**Subject:** Re: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No.
5:17-cv-02514-JGB-SHK

Counsel,

Mr. Karim has withdrawn his request for a Somali interpreter. He remains available for his
deposition at 6:00 am PST on Tuesday, October 22. If you wish to depose Mr. Karim at that time,
please notice his deposition accordingly.

Best,

**Lydia A. Wright**
Burns Charest LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
504.799.2845 main
504.881.1765 fax

---

**From:** "adrienne.scheffey@akerman.com"
**Date:** Thursday, October 17, 2019 at 9:40 AM
**To:** Lydia Wright , "damien.delaney@akerman.com" , "nick.mangels@akerman.com"
**Cc:** "colin.barnacle@akerman.com" , "melissa.cizmorris@akerman.com" ,
"maxine.maritz@akerman.com" , Novoa - External
**Subject:** RE: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case
No. 5:17-cv-02514-JGB-SHK

Lydia,

As Damien previously mentioned, we are still trying to obtain a Somali interpreter for a 6:00
a.m. PST deposition. We have been unable to find an interpreter for either Monday or Tuesday
of next week as you have proposed. As soon as we get availability from the interpreter we will
let you know.

As for Mr. Munoz, because he is still detained in ICE's custody, we must receive ICE's approval to
depose him. As of this morning, we still do not have approval. As soon as we receive approval
we will let you know.

Exhibit C                                                    **Page 6 of 14**

Can you please let us know who will be attending the Sunday deposition from your team? We
will need to provide security with their names so that they can get into the building.

Best,

**Adrienne Scheffey**
Akerman LLP | 1900 Sixteenth Street, Suite 1700 | Denver, CO 80202
D: 303 640 2512 | T: 303 260 7712
adrienne.scheffey@akerman.com

---

**From:** Lydia Wright
**Sent:** Thursday, October 17, 2019 7:22 AM
**To:** DeLaney, Damien (Ptnr-Lax) ; Mangels, Nick (LAA-Den)
**Cc:** Barnacle, Colin (Ptnr-Den) ; Cizmorris, Melissa (Assoc-Den) ; Scheffey, Adrienne (Assoc-Den) ;
Maritz, Maxine (LAA-Lax) ; Novoa - External
**Subject:** Re: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No.
5:17-cv-02514-JGB-SHK

Damien,

We have not received new deposition notices for Mr. Karim or Mr. Munoz. As I have mentioned
previously, the delay with respect to the deposition schedule is jeopardizing our ability to ensure
that the depositions move forward as proposed. At this point, it is unclear whether you seek to
depose Mr. Karim on Monday, Tuesday, or some other day altogether.

Do you intend to depose Mr. Karim and Mr. Munoz next week? If so, please provide us with
deposition notices today.

Thanks,
Lydia

**Lydia A. Wright**
Burns Charest LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
504.799.2845 main
504.881.1765 fax

---

**From:** Lydia Wright
**Date:** Tuesday, October 15, 2019 at 2:30 PM
**To:** "damien.delaney@akerman.com" , "nick.mangels@akerman.com"
**Cc:** "colin.barnacle@akerman.com" , "melissa.cizmorris@akerman.com" ,
"adrienne.scheffey@akerman.com" , "maxine.maritz@akerman.com" , Novoa - External
**Subject:** Re: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case
No. 5:17-cv-02514-JGB-SHK

Damien,

Exhibit C                                                                    Page 7 of 14

Mr. Karim can also be available at 6:00 a.m. PST on Monday, October 21. Please propose
alternate dates and times if that doesn't work for you.

Please serve the deposition notices as soon as possible so that we can finalize scheduling on our
end.

Best,

**Lydia A. Wright**
Burns Charest LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
504.799.2845 main
504.881.1765 fax

---

**From:** "damien.delaney@akerman.com"
**Date:** Tuesday, October 15, 2019 at 1:47 PM
**To:** Lydia Wright , "nick.mangels@akerman.com"
**Cc:** "colin.barnacle@akerman.com" , "melissa.cizmorris@akerman.com" ,
"adrienne.scheffey@akerman.com" , "maxine.maritz@akerman.com" , Novoa - External
**Subject:** RE: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case
No. 5:17-cv-02514-JGB-SHK

Hi Lydia,

We are working on getting out the amended deposition notices, but we are going to need to
further confer on Mr. Karim's deposition. We are not going to be able to logistically make it work
at 6:00 am Tuesday morning, in part because, despite our best efforts, we have still not been
able to identify a qualified Somali translator. Can you provide alternative dates/times?

Thanks,
Damien

**Damien P. DeLaney**
Akerman LLP | 601 West Fifth Street, Suite 300 | Los Angeles, CA 90071
D: 213 533 5920
damien.delaney@akerman.com

---

**From:** Lydia Wright
**Sent:** Monday, October 14, 2019 1:24 PM
**To:** DeLaney, Damien (Ptnr-Lax) ; Mangels, Nick (LAA-Den)
**Cc:** Barnacle, Colin (Ptnr-Den) ; Cizmorris, Melissa (Assoc-Den) ; Scheffey, Adrienne (Assoc-Den) ;
Maritz, Maxine (LAA-Lax) ; Novoa - External
**Subject:** Re: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No.
5:17-cv-02514-JGB-SHK

Damien,

Thanks for clarifying. We can confirm that Mr. Mancia's deposition will take place at your offices

Exhibit C                                                                      **Page 8 of 14**

in Los Angeles, not at Adelanto. He is now available on October 21, not October 22. Please re-notice each of the five depositions, and kindly let us know about Mr. Marwaha's departure date from Adelanto.

Best,

**Lydia A. Wright**
Burns Charest LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
504.799.2845 main
504.881.1765 fax

---

**From:** "damien.delaney@akerman.com" <damien.delaney@akerman.com>
**Date:** Monday, October 14, 2019 at 1:36 PM
**To:** Lydia Wright <lwright@burnscharest.com>, "nick.mangels@akerman.com" <nick.mangels@akerman.com>
**Cc:** "colin.barnacle@akerman.com" <colin.barnacle@akerman.com>, "melissa.cizmorris@akerman.com" <melissa.cizmorris@akerman.com>, "adrienne.scheffey@akerman.com" <adrienne.scheffey@akerman.com>, "maxine.maritz@akerman.com" <maxine.maritz@akerman.com>, Novoa - External <Novoa-External@burnscharest.com>
**Subject:** RE: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Lydia,

Should Mr. Mancia's deposition be scheduled at Adelanto we will need to set aside the entire day for his deposition to account for the travel time to and from Adelanto. Accordingly, we will be unable to also set aside time on that same day for Mr. Karim's deposition. As you stated, Mr. Karim's deposition will be taken remotely which will not require extensive travel for any of the parties. With that in mind, can you please provide us with an alternate day for his deposition?

Thanks,

**Damien P. DeLaney**
Akerman LLP | 601 West Fifth Street, Suite 300 | Los Angeles, CA 90071
D: 213 533 5920
damien.delaney@akerman.com

---

**From:** Lydia Wright <lwright@burnscharest.com>
**Sent:** Friday, October 11, 2019 6:09 PM
**To:** DeLaney, Damien (Ptnr-Lax) <damien.delaney@akerman.com>; Mangels, Nick (LAA-Den) <nick.mangels@akerman.com>
**Cc:** Barnacle, Colin (Ptnr-Den) <colin.barnacle@akerman.com>; Cizmorris, Melissa (Assoc-Den) <melissa.cizmorris@akerman.com>; Scheffey, Adrienne (Assoc-Den) <adrienne.scheffey@akerman.com>; Maritz, Maxine (LAA-Lax) <maxine.maritz@akerman.com>; Novoa - External <Novoa-External@burnscharest.com>
**Subject:** Re: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No.

Exhibit C                                                    Page 9 of 14

5:17-cv-02514-JGB-SHK

Damien,

Thanks for your response. We look forward to receiving the new deposition notices. To answer your questions:

1. Mr. Mancia is currently in detention but may be released prior to October 22. We should be able to confirm the deposition location on or before October 18.
2. It is unclear why the location of Mr. Mancia's deposition would impact the scheduling of Mr. Karim's deposition, which will be conducted by remote means or written question. Please further explain the issue as you see it.
3. We have been trying to contact Mr. Marwaha following his deportation, but it has been difficult. We are hopeful of establishing contact in the near term. It would be helpful if GEO could provide us with the date Mr. Marwaha left Adelanto. Please let us know if that's possible.

Best,

**Lydia A. Wright**
Burns Charest LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
504.799.2845 main
504.881.1765 fax

---

**From:** "damien.delaney@akerman.com" <damien.delaney@akerman.com>
**Date:** Friday, October 11, 2019 at 5:40 PM
**To:** Lydia Wright <lwright@burnscharest.com>, "nick.mangels@akerman.com" <nick.mangels@akerman.com>
**Cc:** "colin.barnacle@akerman.com" <colin.barnacle@akerman.com>, "melissa.cizmorris@akerman.com" <melissa.cizmorris@akerman.com>, "adrienne.scheffey@akerman.com" <adrienne.scheffey@akerman.com>, "maxine.maritz@akerman.com" <maxine.maritz@akerman.com>, Novoa - External <Novoa-External@burnscharest.com>
**Subject:** RE: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Lydia,

It is our plan to adjust our schedules to accommodate the dates and times you have noted below. Before sending out new notices, we have a few remaining questions:

(1) Is Mr. Mancia still in detention? If so, can you please let us know why you believe he will be able to leave the detention facility for the deposition?

(2) If. Mr. Mancia is in detention and must be deposed at the Adelanto facility, does Mr. Karim have any alternate availability? Given that the Adelanto facility is a three hour drive from the Akerman offices, scheduling both depositions on that day may be difficult.

Exhibit C

(3) As Mr. Marwaha is unavailable for a deposition, and therefore cannot be cross-examined regarding the contents of his declaration, will you be withdrawing his declaration?

Best,

**Damien P. DeLaney**
Akerman LLP | 601 West Fifth Street, Suite 300 | Los Angeles, CA 90071
D: 213 533 5920
damien.delaney@akerman.com

---

**From:** Lydia Wright <lwright@burnscharest.com>
**Sent:** Friday, October 11, 2019 10:22 AM
**To:** Mangels, Nick (LAA-Den) <nick.mangels@akerman.com>
**Cc:** Barnacle, Colin (Ptnr-Den) <colin.barnacle@akerman.com>; Cizmorris, Melissa (Assoc-Den) <melissa.cizmorris@akerman.com>; Scheffey, Adrienne (Assoc-Den) <adrienne.scheffey@akerman.com>; DeLaney, Damien (Ptnr-Lax) <damien.delaney@akerman.com>; Maritz, Maxine (LAA-Lax) <maxine.maritz@akerman.com>; Novoa - External <Novoa-External@burnscharest.com>
**Subject:** Re: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Counsel,

We have not received a response regarding our effort to accommodate GEO's request for an expedited deposition schedule. While we are unable to accommodate your request to set six depositions next week, we organized a schedule that would allow the depositions of Mr. Novoa, Mr. Campos Fuentes, Mr. Mancia, Mr. Karim, and Mr. Munoz to be completed by October 24.

Coordinating five depositions on short notice and in three different geographic locations is a complicated undertaking, and your continued silence with respect to the deposition schedule is jeopardizing our ability to ensure that the depositions move forward as proposed.

Please advise by 5 p.m. today whether GEO still seeks to depose Mr. Novoa, Mr. Campos Fuentes, Mr. Mancia, Mr. Karim, and Mr. Munoz on an expedited basis. If so, please re-notice the depositions accordingly. I can be reached at the number below if you would like to discuss further.

Best,

**Lydia A. Wright**
Burns Charest LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
504.799.2845 main
504.881.1765 fax

---

**From:** Lydia Wright <lwright@burnscharest.com>
**Date:** Wednesday, October 9, 2019 at 9:13 AM
**To:** "nick.mangels@akerman.com" <nick.mangels@akerman.com>

Exhibit C                                                                 Page 11 of 14

**Cc:** "colin.barnacle@akerman.com" <colin.barnacle@akerman.com>, "melissa.cizmorris@akerman.com" <melissa.cizmorris@akerman.com>, "adrienne.scheffey@akerman.com" <adrienne.scheffey@akerman.com>, "damien.delaney@akerman.com" <damien.delaney@akerman.com>, "maxine.maritz@akerman.com" <maxine.maritz@akerman.com>, Novoa - External <Novoa-External@burnscharest.com>
**Subject:** Re: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Counsel,

In a good faith effort to accommodate GEO's request for an expedited deposition schedule, Plaintiffs are available as follows:

1. Jaime Campos Fuentes is available for a deposition at your offices in Los Angeles on Sunday, October 20, 2019. Mr. Campos Fuentes will require a Spanish interpreter.

2. Raul Novoa is available for a deposition at your offices in Los Angeles on Sunday, October 20, 2019.

3. Ramon Mancia is available for a deposition on Tuesday, October 22, either at the Adelanto Facility or at your offices in Los Angeles. We anticipate being able to confirm the deposition location on or before October 18.

4. Abdiaziz Karim has been deported to Somalia. He is available for a deposition by videoconference or telephone on Tuesday, October 22. Because of the time difference, the deposition must begin no later than 6:00 a.m. PST. Mr. Karim will require a Somali interpreter. In the alternative, Mr. Karim will agree to a deposition by written questions. In a further effort to accommodate GEO's request for an expedited deposition schedule, we will agree to return Mr. Karim's written deposition responses within seven days of receipt of notice.

5. Fernando Munoz Aguilera is tentatively available for a deposition at the Adelanto Facility on Thursday, October 24, 2019. We anticipate being able to confirm that date by early next week. Mr. Munoz will require a Spanish interpreter.

6. Gagandeep Marwaha has been deported and is not available for a deposition at this time.

I can be reached at the number below if you would like to discuss further.

Best,

**Lydia A. Wright**
Burns Charest LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
504.799.2845 main
504.881.1765 fax

Exhibit C                                    Page 12 of 14

**From:** Lydia Wright <lwright@burnscharest.com>
**Date:** Monday, October 7, 2019 at 6:43 PM
**To:** "nick.mangels@akerman.com" <nick.mangels@akerman.com>
**Cc:** "colin.barnacle@akerman.com" <colin.barnacle@akerman.com>,
"melissa.cizmorris@akerman.com" <melissa.cizmorris@akerman.com>,
"adrienne.scheffey@akerman.com" <adrienne.scheffey@akerman.com>,
"damien.delaney@akerman.com" <damien.delaney@akerman.com>,
"steven.gallagher@akerman.com" <steven.gallagher@akerman.com>,
"maxine.maritz@akerman.com" <maxine.maritz@akerman.com>, Novoa - External
<Novoa-External@burnscharest.com>
**Subject:** Re: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case
No. 5:17-cv-02514-JGB-SHK

Counsel,

We are in receipt of the six deposition notices that you served at 5:27 p.m. CST today, October 7,
2019. You unilaterally set all six depositions for next week, beginning on Monday, October 14
and ending on Friday, October 18.

That timeframe is unreasonable and will not work for us. Indeed, the notices request that
Plaintiffs provide written notice "at least five (5) business days prior to said deposition" if the
deponent requires an interpreter. There are not five business days prior to the first noticed
deposition.

We will, of course, work in good faith with GEO and the deponents to set a reasonable
deposition schedule that considers the availability of all parties. I will be in touch with our
availability. In the meantime, I can be reached at the number below if you would like to discuss
further.

Best,

**Lydia A. Wright**
Burns Charest LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
504.799.2845 main
504.881.1765 fax

---

**From:** "nick.mangels@akerman.com" <nick.mangels@akerman.com>
**Date:** Monday, October 7, 2019 at 5:27 PM
**To:** Jacob Gower <jgower@burnscharest.com>, Korey Nelson
<knelson@burnscharest.com>, Lydia Wright <lwright@burnscharest.com>, Andrew Free
<andrew@immigrantcivilrights.com>, Robert Ahdoot <rahdoot@ahdootwolfson.com>,
Tina Wolfson <twolfson@ahdootwolfson.com>, Ted Maya <tmaya@ahdootwolfson.com>,
Ruhandy Glezakos <rglezakos@ahdootwolfson.com>, Will Thompson
<wthompson@burnscharest.com>, "Warren T. Burns" <wburns@burnscharest.com>,
Daniel Charest <dcharest@burnscharest.com>
**Cc:** "colin.barnacle@akerman.com" <colin.barnacle@akerman.com>,

Exhibit C                                                    Page 13 of 14

"melissa.cizmorris@akerman.com" <melissa.cizmorris@akerman.com>,
"adrienne.scheffey@akerman.com" <adrienne.scheffey@akerman.com>,
"damien.delaney@akerman.com" <damien.delaney@akerman.com>,
"steven.gallagher@akerman.com" <steven.gallagher@akerman.com>,
"maxine.maritz@akerman.com" <maxine.maritz@akerman.com>
**Subject:** Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No.
5:17-cv-02514-JGB-SHK

Counsel:

Attached are the following deposition notices in connection with the above-captioned matter.
Hard copies will be served via U.S. Mail per the proofs of service.

- Raul Novoa
- Jaime Campos Fuentes
- Abdiaziz Karim
- Ramon Mancia
- Gagandeep Marwaha
- Fernando Munoz Aguilera

Thank you.


**Nick Mangels**
Legal Administrative Assistant, Labor & Employment Practice Group
Akerman LLP | 1900 Sixteenth Street, Suite 1700 | Denver, CO 80202
D: 303 640 2541 | T: 303 260 7712
nick.mangels@akerman.com



CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and
confidential, and is intended only for the use of the individual or entity named above. If the
reader of this message is not the intended recipient, you are hereby notified that any
dissemination, distribution or copying of this communication is strictly prohibited. If you have
received this transmission in error, please immediately reply to the sender that you have
received this communication in error and then delete it. Thank you.

Exhibit C                                                                    Page 14 of 14

Exhibit C                                                                    Page 15 of 14

# EXHIBIT D

Thursday, October 24, 2019 at 3:41:35 PM Central Daylight Time

**Subject:** RE: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

**Date:** Tuesday, October 22, 2019 at 3:21:24 PM Central Daylight Time

**From:** damien.delaney@akerman.com

**To:** Lydia Wright, nick.mangels@akerman.com, adrienne.scheffey@akerman.com

**CC:** colin.barnacle@akerman.com, maxine.maritz@akerman.com, karen.miller@akerman.com, Novoa - External

Lydia,

We have heard back from ICE that the conditions of taking the deposition are that the detainee must be a named plaintiff, plaintiff's counsel must be notified, and that plaintiff's counsel have equal access to the detainee and are able to attend.  Assuming that someone from your office is available to attend on 10/24, Mr. Aguilera is not as yet a named plaintiff and it is not clear to us whether you represent him in any capacity.

Perhaps you are able to persuade ICE to make Aguilera available, but at this point it appears that we are unable to proceed.

Damien

**Damien P. DeLaney**
Akerman LLP | 601 West Fifth Street, Suite 300 | Los Angeles, CA 90071
D: 213 533 5920
damien.delaney@akerman.com

**From:** Lydia Wright <lwright@burnscharest.com>
**Sent:** Tuesday, October 22, 2019 12:18 PM
**To:** DeLaney, Damien (Ptnr-Lax) <damien.delaney@akerman.com>; Mangels, Nick (LAA-Den) <nick.mangels@akerman.com>; Scheffey, Adrienne (Assoc-Den) <adrienne.scheffey@akerman.com>
**Cc:** Barnacle, Colin (Ptnr-Den) <colin.barnacle@akerman.com>; Maritz, Maxine (LAA-Lax) <maxine.maritz@akerman.com>; Miller, Karen (Para-Lax) <karen.miller@akerman.com>; Novoa - External <Novoa-External@burnscharest.com>
**Subject:** Re: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Counsel,

Please let us know by 5pm PST today whether Mr. Munoz's deposition will proceed.

Thanks,

**Lydia A. Wright**
**Burns Charest LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
504.799.2845 main
504.881.1765 fax

Exhibit D                                                                 **Page 1 of 13**

**From:** "damien.delaney@akerman.com" <damien.delaney@akerman.com>
**Date:** Monday, October 21, 2019 at 10:24 AM
**To:** Lydia Wright <lwright@burnscharest.com>, "nick.mangels@akerman.com" <nick.mangels@akerman.com>, "adrienne.scheffey@akerman.com" <adrienne.scheffey@akerman.com>
**Cc:** "colin.barnacle@akerman.com" <colin.barnacle@akerman.com>, "maxine.maritz@akerman.com" <maxine.maritz@akerman.com>, "karen.miller@akerman.com" <karen.miller@akerman.com>, Novoa - External <Novoa-External@burnscharest.com>
**Subject:** RE: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Lydia,

You should have the Karim notice now.  Let's get the logistics confirmed since you agree there is a lot of advance footwork necessary.

Munoz's deposition requires ICE approval.  We've told you that several times now.  We don't have it yet.  We will re-notice the deposition when we do, but we can't get blood from a stone either.

Thanks,
Damien

---

**From:** Lydia Wright <lwright@burnscharest.com>
**Sent:** Monday, October 21, 2019 1:18 PM
**To:** DeLaney, Damien (Ptnr-Lax) <damien.delaney@akerman.com>; Mangels, Nick (LAA-Den) <nick.mangels@akerman.com>; Scheffey, Adrienne (Assoc-Den) <adrienne.scheffey@akerman.com>
**Cc:** Barnacle, Colin (Ptnr-Den) <colin.barnacle@akerman.com>; Maritz, Maxine (LAA-Lax) <maxine.maritz@akerman.com>; Miller, Karen (Para-Lax) <karen.miller@akerman.com>; Novoa - External <Novoa-External@burnscharest.com>
**Subject:** Re: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Damien,

Due to Mr. Karim's security situation in Somalia, coordinating his deposition requires significant advanced notice and planning. However, we cannot engage in any meaningful logistical coordination until you actually notice the deposition. Nicks' email of this morning was the first indication that GEO intends to depose Mr. Karim by video conference. Relatedly, we still have not received the notice for Mr. Munoz's deposition, which you originally noticed for last week. As a result, it is unclear whether GEO actually intends to move forward with that deposition.

We have requested the deposition notices for Mr. Karim and Mr. Munoz several times, both in writing and in person. Again, we will be happy to coordinate logistics once the depositions are properly noticed.

**Lydia A. Wright**
Burns Charest LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
504.799.2845 main
504.881.1765 fax

Exhibit D

**Page 2 of 13**

**From:** "damien.delaney@akerman.com" <damien.delaney@akerman.com>
**Date:** Monday, October 21, 2019 at 9:53 AM
**To:** Lydia Wright <lwright@burnscharest.com>, "nick.mangels@akerman.com" <nick.mangels@akerman.com>, "adrienne.scheffey@akerman.com" <adrienne.scheffey@akerman.com>
**Cc:** "colin.barnacle@akerman.com" <colin.barnacle@akerman.com>, "maxine.maritz@akerman.com" <maxine.maritz@akerman.com>, "karen.miller@akerman.com" <karen.miller@akerman.com>, Novoa - External <Novoa-External@burnscharest.com>
**Subject:** RE: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Lydia,

In fairness, you all confirmed the date and time over the weekend and it is not even 10 AM LA time on Monday morning.   Is there an actual reason that we cannot have our teams discuss logistics now so that there is not unnecessary delay?  Thanks.

Damien

---

**From:** Lydia Wright <lwright@burnscharest.com>
**Sent:** Monday, October 21, 2019 12:40 PM
**To:** Mangels, Nick (LAA-Den) <nick.mangels@akerman.com>; Scheffey, Adrienne (Assoc-Den) <adrienne.scheffey@akerman.com>; DeLaney, Damien (Ptnr-Lax) <damien.delaney@akerman.com>
**Cc:** Barnacle, Colin (Ptnr-Den) <colin.barnacle@akerman.com>; Maritz, Maxine (LAA-Lax) <maxine.maritz@akerman.com>; Miller, Karen (Para-Lax) <karen.miller@akerman.com>; Novoa - External <Novoa-External@burnscharest.com>
**Subject:** Re: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Nick,

We have not received a notice for Mr. Karim's deposition. Once we do, we'll be happy to work with you to coordinate logistics.

Thanks,

**Lydia A. Wright**
Burns Charest LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
504.799.2845 main
504.881.1765 fax

---

**From:** "nick.mangels@akerman.com" <nick.mangels@akerman.com>
**Date:** Monday, October 21, 2019 at 9:22 AM
**To:** Lydia Wright <lwright@burnscharest.com>, "adrienne.scheffey@akerman.com"

<[adrienne.scheffey@akerman.com](mailto:adrienne.scheffey@akerman.com)>, "[damien.delaney@akerman.com](mailto:damien.delaney@akerman.com)" <[damien.delaney@akerman.com](mailto:damien.delaney@akerman.com)>
**Cc:** "[colin.barnacle@akerman.com](mailto:colin.barnacle@akerman.com)" <[colin.barnacle@akerman.com](mailto:colin.barnacle@akerman.com)>, "[maxine.maritz@akerman.com](mailto:maxine.maritz@akerman.com)" <[maxine.maritz@akerman.com](mailto:maxine.maritz@akerman.com)>, "[karen.miller@akerman.com](mailto:karen.miller@akerman.com)" <[karen.miller@akerman.com](mailto:karen.miller@akerman.com)>
**Subject:** RE: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Hi Lydia:

Is there an IT contact in your office/firm we can have our IT team reach out to in order to ensure video conferencing runs smoothly on Wednesday morning?  We will also need to know how Mr. Karim plans to connect – via Skype or some other platform?

Thank you.


**Nick Mangels**
Legal Administrative Assistant, Labor & Employment Practice Group
Akerman LLP | 1900 Sixteenth Street, Suite 1700 | Denver, CO 80202
D: 303 640 2541 | T: 303 260 7712
[nick.mangels@akerman.com](mailto:nick.mangels@akerman.com)

---

**From:** Lydia Wright <[lwright@burnscharest.com](mailto:lwright@burnscharest.com)>
**Sent:** Saturday, October 19, 2019 8:23 PM
**To:** Scheffey, Adrienne (Assoc-Den) <[adrienne.scheffey@akerman.com](mailto:adrienne.scheffey@akerman.com)>; DeLaney, Damien (Ptnr-Lax) <[damien.delaney@akerman.com](mailto:damien.delaney@akerman.com)>; Mangels, Nick (LAA-Den) <[nick.mangels@akerman.com](mailto:nick.mangels@akerman.com)>
**Cc:** Barnacle, Colin (Ptnr-Den) <[colin.barnacle@akerman.com](mailto:colin.barnacle@akerman.com)>; Cizmorris, Melissa (Assoc-Den) <[melissa.cizmorris@akerman.com](mailto:melissa.cizmorris@akerman.com)>; Maritz, Maxine (LAA-Lax) <[maxine.maritz@akerman.com](mailto:maxine.maritz@akerman.com)>; Novoa - External <[Novoa-External@burnscharest.com](mailto:Novoa-External@burnscharest.com)>
**Subject:** Re: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Adrienne,

Wednesday, October 23 at 6:00 a.m. PST works for Mr. Karim. Please notice his deposition accordingly.

Thanks,

**Lydia A. Wright**
Burns Charest LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
504.799.2845 main
504.881.1765 fax

---

**From:** "[adrienne.scheffey@akerman.com](mailto:adrienne.scheffey@akerman.com)"
**Date:** Friday, October 18, 2019 at 3:05 PM
**To:** Lydia Wright , "[damien.delaney@akerman.com](mailto:damien.delaney@akerman.com)" , "[nick.mangels@akerman.com](mailto:nick.mangels@akerman.com)"
**Cc:** "[colin.barnacle@akerman.com](mailto:colin.barnacle@akerman.com)" , "[melissa.cizmorris@akerman.com](mailto:melissa.cizmorris@akerman.com)" ,

"maxine.maritz@akerman.com" , Novoa - External
**Subject:** RE: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Lydia,

We are not available on Tuesday at 6:00 a.m. PST. We are available to depose Mr. Karim on Wednesday October 23rd at 6:00 a.m. PST. Please let us know if that time works for Mr. Karim.

Best,

**Adrienne Scheffey**
Akerman LLP | 1900 Sixteenth Street, Suite 1700 | Denver, CO 80202
D: 303 640 2512 | T: 303 260 7712
adrienne.scheffey@akerman.com

---

**From:** Lydia Wright
**Sent:** Friday, October 18, 2019 1:27 PM
**To:** Scheffey, Adrienne (Assoc-Den) ; DeLaney, Damien (Ptnr-Lax) ; Mangels, Nick (LAA-Den)
**Cc:** Barnacle, Colin (Ptnr-Den) ; Cizmorris, Melissa (Assoc-Den) ; Maritz, Maxine (LAA-Lax) ; Novoa - External
**Subject:** Re: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Counsel,

Mr. Karim has withdrawn his request for a Somali interpreter. He remains available for his deposition at 6:00 am PST on Tuesday, October 22. If you wish to depose Mr. Karim at that time, please notice his deposition accordingly.

Best,

**Lydia A. Wright**
Burns Charest LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
504.799.2845 main
504.881.1765 fax

---

**From:** "adrienne.scheffey@akerman.com"
**Date:** Thursday, October 17, 2019 at 9:40 AM
**To:** Lydia Wright , "damien.delaney@akerman.com" , "nick.mangels@akerman.com" ,
**Cc:** "colin.barnacle@akerman.com" , "melissa.cizmorris@akerman.com" ,
"maxine.maritz@akerman.com" , Novoa - External
**Subject:** RE: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Lydia,

As Damien previously mentioned, we are still trying to obtain a Somali interpreter for a 6:00 a.m. PST deposition. We have been unable to find an interpreter for either Monday or Tuesday of next week as you have proposed. As soon as we get availability from the interpreter we will let you know.

As for Mr. Munoz, because he is still detained in ICE's custody, we must receive ICE's approval to depose him. As of this morning, we still do not have approval. As soon as we receive approval we will let you know.

Can you please let us know who will be attending the Sunday deposition from your team? We will need to provide security with their names so that they can get into the building.

Best,

**Adrienne Scheffey**
Akerman LLP | 1900 Sixteenth Street, Suite 1700 | Denver, CO 80202
D: 303 640 2512 | T: 303 260 7712
adrienne.scheffey@akerman.com

---

**From:** Lydia Wright
**Sent:** Thursday, October 17, 2019 7:22 AM
**To:** DeLaney, Damien (Ptnr-Lax) ; Mangels, Nick (LAA-Den)
**Cc:** Barnacle, Colin (Ptnr-Den) ; Cizmorris, Melissa (Assoc-Den) ; Scheffey, Adrienne (Assoc-Den) ; Maritz, Maxine (LAA-Lax) ; Novoa - External
**Subject:** Re: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Damien,

We have not received new deposition notices for Mr. Karim or Mr. Munoz. As I have mentioned previously, the delay with respect to the deposition schedule is jeopardizing our ability to ensure that the depositions move forward as proposed. At this point, it is unclear whether you seek to depose Mr. Karim on Monday, Tuesday, or some other day altogether.

Do you intend to depose Mr. Karim and Mr. Munoz next week? If so, please provide us with deposition notices today.

Thanks,
Lydia

**Lydia A. Wright**
Burns Charest LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
504.799.2845 main
504.881.1765 fax

---

**From:** Lydia Wright
**Date:** Tuesday, October 15, 2019 at 2:30 PM
**To:** "damien.delaney@akerman.com" , "nick.mangels@akerman.com"
**Cc:** "colin.barnacle@akerman.com" , "melissa.cizmorris@akerman.com" ,

"adrienne.scheffey@akerman.com" , "maxine.maritz@akerman.com" , Novoa - External
**Subject:** Re: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Damien,

Mr. Karim can also be available at 6:00 a.m. PST on Monday, October 21. Please propose alternate dates and times if that doesn't work for you.

Please serve the deposition notices as soon as possible so that we can finalize scheduling on our end.

Best,

**Lydia A. Wright**
Burns Charest LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
504.799.2845 main
504.881.1765 fax

---

**From:** "damien.delaney@akerman.com"
**Date:** Tuesday, October 15, 2019 at 1:47 PM
**To:** Lydia Wright , "nick.mangels@akerman.com"
**Cc:** "colin.barnacle@akerman.com" , "melissa.cizmorris@akerman.com" ,
"adrienne.scheffey@akerman.com" , "maxine.maritz@akerman.com" , Novoa - External
**Subject:** RE: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Hi Lydia,

We are working on getting out the amended deposition notices, but we are going to need to further confer on Mr. Karim's deposition. We are not going to be able to logistically make it work at 6:00 am Tuesday morning, in part because, despite our best efforts, we have still not been able to identify a qualified Somali translator. Can you provide alternative dates/times?

Thanks,
Damien

**Damien P. DeLaney**
Akerman LLP | 601 West Fifth Street, Suite 300 | Los Angeles, CA 90071
D: 213 533 5920
damien.delaney@akerman.com

---

**From:** Lydia Wright
**Sent:** Monday, October 14, 2019 1:24 PM
**To:** DeLaney, Damien (Ptnr-Lax) ; Mangels, Nick (LAA-Den)
**Cc:** Barnacle, Colin (Ptnr-Den) ; Cizmorris, Melissa (Assoc-Den) ; Scheffey, Adrienne (Assoc-Den) ; Maritz, Maxine (LAA-Lax) ; Novoa - External
**Subject:** Re: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-

Exhibit D                                    **Page 7 of 13**

JGB-SHK

Damien,

Thanks for clarifying. We can confirm that Mr. Mancia's deposition will take place at your offices in Los Angeles, not at Adelanto. He is now available on October 21, not October 22. Please re-notice each of the five depositions, and kindly let us know about Mr. Marwaha's departure date from Adelanto.

Best,

**Lydia A. Wright**
Burns Charest LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
504.799.2845 main
504.881.1765 fax

---

**From:** "damien.delaney@akerman.com" <damien.delaney@akerman.com>
**Date:** Monday, October 14, 2019 at 1:36 PM
**To:** Lydia Wright <lwright@burnscharest.com>, "nick.mangels@akerman.com" <nick.mangels@akerman.com>
**Cc:** "colin.barnacle@akerman.com" <colin.barnacle@akerman.com>, "melissa.cizmorris@akerman.com" <melissa.cizmorris@akerman.com>, "adrienne.scheffey@akerman.com" <adrienne.scheffey@akerman.com>, "maxine.maritz@akerman.com" <maxine.maritz@akerman.com>, Novoa - External <Novoa-External@burnscharest.com>
**Subject:** RE: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Lydia,

Should Mr. Mancia's deposition be scheduled at Adelanto we will need to set aside the entire day for his deposition to account for the travel time to and from Adelanto. Accordingly, we will be unable to also set aside time on that same day for Mr. Karim's deposition. As you stated, Mr. Karim's deposition will be taken remotely which will not require extensive travel for any of the parties. With that in mind, can you please provide us with an alternate day for his deposition?

Thanks,

**Damien P. DeLaney**
Akerman LLP | 601 West Fifth Street, Suite 300 | Los Angeles, CA 90071
D: 213 533 5920
damien.delaney@akerman.com

---

**From:** Lydia Wright <lwright@burnscharest.com>
**Sent:** Friday, October 11, 2019 6:09 PM
**To:** DeLaney, Damien (Ptnr-Lax) <damien.delaney@akerman.com>; Mangels, Nick (LAA-Den) <nick.mangels@akerman.com>
**Cc:** Barnacle, Colin (Ptnr-Den) <colin.barnacle@akerman.com>; Cizmorris, Melissa (Assoc-Den)

<melissa.cizmorris@akerman.com>; Scheffey, Adrienne (Assoc-Den) <adrienne.scheffey@akerman.com>; Maritz, Maxine (LAA-Lax) <maxine.maritz@akerman.com>; Novoa - External <Novoa-External@burnscharest.com>
**Subject:** Re: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Damien,

Thanks for your response. We look forward to receiving the new deposition notices. To answer your questions:

1. Mr. Mancia is currently in detention but may be released prior to October 22. We should be able to confirm the deposition location on or before October 18.
2. It is unclear why the location of Mr. Mancia's deposition would impact the scheduling of Mr. Karim's deposition, which will be conducted by remote means or written question. Please further explain the issue as you see it.
3. We have been trying to contact Mr. Marwaha following his deportation, but it has been difficult. We are hopeful of establishing contact in the near term. It would be helpful if GEO could provide us with the date Mr. Marwaha left Adelanto. Please let us know if that's possible.

Best,

**Lydia A. Wright**
Burns Charest LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
504.799.2845 main
504.881.1765 fax

---

**From:** "damien.delaney@akerman.com" <damien.delaney@akerman.com>
**Date:** Friday, October 11, 2019 at 5:40 PM
**To:** Lydia Wright <lwright@burnscharest.com>, "nick.mangels@akerman.com" <nick.mangels@akerman.com>
**Cc:** "colin.barnacle@akerman.com" <colin.barnacle@akerman.com>, "melissa.cizmorris@akerman.com" <melissa.cizmorris@akerman.com>, "adrienne.scheffey@akerman.com" <adrienne.scheffey@akerman.com>, "maxine.maritz@akerman.com" <maxine.maritz@akerman.com>, Novoa - External <Novoa-External@burnscharest.com>
**Subject:** RE: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Lydia,

It is our plan to adjust our schedules to accommodate the dates and times you have noted below. Before sending out new notices, we have a few remaining questions:

(1) Is Mr. Mancia still in detention? If so, can you please let us know why you believe he will be able to leave the detention facility for the deposition?

(2) If. Mr. Mancia is in detention and must be deposed at the Adelanto facility, does Mr. Karim have any

alternate availability? Given that the Adelanto facility is a three hour drive from the Akerman offices, scheduling both depositions on that day may be difficult.

(3) As Mr. Marwaha is unavailable for a deposition, and therefore cannot be cross-examined regarding the contents of his declaration, will you be withdrawing his declaration?

Best,

**Damien P. DeLaney**
Akerman LLP | 601 West Fifth Street, Suite 300 | Los Angeles, CA 90071
D: 213 533 5920
damien.delaney@akerman.com

---

**From:** Lydia Wright <lwright@burnscharest.com>
**Sent:** Friday, October 11, 2019 10:22 AM
**To:** Mangels, Nick (LAA-Den) <nick.mangels@akerman.com>
**Cc:** Barnacle, Colin (Ptnr-Den) <colin.barnacle@akerman.com>; Cizmorris, Melissa (Assoc-Den) <melissa.cizmorris@akerman.com>; Scheffey, Adrienne (Assoc-Den) <adrienne.scheffey@akerman.com>; DeLaney, Damien (Ptnr-Lax) <damien.delaney@akerman.com>; Maritz, Maxine (LAA-Lax) <maxine.maritz@akerman.com>; Novoa - External <Novoa-External@burnscharest.com>
**Subject:** Re: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Counsel,

We have not received a response regarding our effort to accommodate GEO's request for an expedited deposition schedule. While we are unable to accommodate your request to set six depositions next week, we organized a schedule that would allow the depositions of Mr. Novoa, Mr. Campos Fuentes, Mr. Mancia, Mr. Karim, and Mr. Munoz to be completed by October 24.

Coordinating five depositions on short notice and in three different geographic locations is a complicated undertaking, and your continued silence with respect to the deposition schedule is jeopardizing our ability to ensure that the depositions move forward as proposed.

Please advise by 5 p.m. today whether GEO still seeks to depose Mr. Novoa, Mr. Campos Fuentes, Mr. Mancia, Mr. Karim, and Mr. Munoz on an expedited basis. If so, please re-notice the depositions accordingly. I can be reached at the number below if you would like to discuss further.

Best,

**Lydia A. Wright**
Burns Charest LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
504.799.2845 main
504.881.1765 fax

---

**From:** Lydia Wright <lwright@burnscharest.com>
**Date:** Wednesday, October 9, 2019 at 9:13 AM

**To:** "nick.mangels@akerman.com" <nick.mangels@akerman.com>
**Cc:** "colin.barnacle@akerman.com" <colin.barnacle@akerman.com>, "melissa.cizmorris@akerman.com" <melissa.cizmorris@akerman.com>, "adrienne.scheffey@akerman.com" <adrienne.scheffey@akerman.com>, "damien.delaney@akerman.com" <damien.delaney@akerman.com>, "maxine.maritz@akerman.com" <maxine.maritz@akerman.com>, Novoa - External <Novoa-External@burnscharest.com>
**Subject:** Re: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-02514-JGB-SHK

Counsel,

In a good faith effort to accommodate GEO's request for an expedited deposition schedule, Plaintiffs are available as follows:

1. Jaime Campos Fuentes is available for a deposition at your offices in Los Angeles on Sunday, October 20, 2019. Mr. Campos Fuentes will require a Spanish interpreter.

2. Raul Novoa is available for a deposition at your offices in Los Angeles on Sunday, October 20, 2019.

3. Ramon Mancia is available for a deposition on Tuesday, October 22, either at the Adelanto Facility or at your offices in Los Angeles. We anticipate being able to confirm the deposition location on or before October 18.

4. Abdiaziz Karim has been deported to Somalia. He is available for a deposition by videoconference or telephone on Tuesday, October 22. Because of the time difference, the deposition must begin no later than 6:00 a.m. PST. Mr. Karim will require a Somali interpreter. In the alternative, Mr. Karim will agree to a deposition by written questions. In a further effort to accommodate GEO's request for an expedited deposition schedule, we will agree to return Mr. Karim's written deposition responses within seven days of receipt of notice.

5. Fernando Munoz Aguilera is tentatively available for a deposition at the Adelanto Facility on Thursday, October 24, 2019. We anticipate being able to confirm that date by early next week. Mr. Munoz will require a Spanish interpreter.

6. Gagandeep Marwaha has been deported and is not available for a deposition at this time.

I can be reached at the number below if you would like to discuss further.

Best,

**Lydia A. Wright**
Burns Charest LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
504.799.2845 main
504.881.1765 fax

---

**From:** Lydia Wright <lwright@burnscharest.com>
**Date:** Monday, October 7, 2019 at 6:43 PM

**To:** "nick.mangels@akerman.com" <nick.mangels@akerman.com>
**Cc:** "colin.barnacle@akerman.com" <colin.barnacle@akerman.com>,
"melissa.cizmorris@akerman.com" <melissa.cizmorris@akerman.com>,
"adrienne.scheffey@akerman.com" <adrienne.scheffey@akerman.com>,
"damien.delaney@akerman.com" <damien.delaney@akerman.com>,
"steven.gallagher@akerman.com" <steven.gallagher@akerman.com>, "maxine.maritz@akerman.com"
<maxine.maritz@akerman.com>, Novoa - External <Novoa-External@burnscharest.com>
**Subject:** Re: Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-
02514-JGB-SHK

Counsel,

We are in receipt of the six deposition notices that you served at 5:27 p.m. CST today, October 7, 2019. You
unilaterally set all six depositions for next week, beginning on Monday, October 14 and ending on Friday,
October 18.

That timeframe is unreasonable and will not work for us. Indeed, the notices request that Plaintiffs provide
written notice "at least five (5) business days prior to said deposition" if the deponent requires an interpreter.
There are not five business days prior to the first noticed deposition.

We will, of course, work in good faith with GEO and the deponents to set a reasonable deposition schedule
that considers the availability of all parties. I will be in touch with our availability. In the meantime, I can be
reached at the number below if you would like to discuss further.

Best,

**Lydia A. Wright**
Burns Charest LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
504.799.2845 main
504.881.1765 fax

---

**From:** "nick.mangels@akerman.com" <nick.mangels@akerman.com>
**Date:** Monday, October 7, 2019 at 5:27 PM
**To:** Jacob Gower <jgower@burnscharest.com>, Korey Nelson <knelson@burnscharest.com>, Lydia
Wright <lwright@burnscharest.com>, Andrew Free <andrew@immigrantcivilrights.com>, Robert
Ahdoot <rahdoot@ahdootwolfson.com>, Tina Wolfson <twolfson@ahdootwolfson.com>, Ted Maya
<tmaya@ahdootwolfson.com>, Ruhandy Glezakos <rglezakos@ahdootwolfson.com>, Will Thompson
<wthompson@burnscharest.com>, "Warren T. Burns" <wburns@burnscharest.com>, Daniel Charest
<dcharest@burnscharest.com>
**Cc:** "colin.barnacle@akerman.com" <colin.barnacle@akerman.com>,
"melissa.cizmorris@akerman.com" <melissa.cizmorris@akerman.com>,
"adrienne.scheffey@akerman.com" <adrienne.scheffey@akerman.com>,
"damien.delaney@akerman.com" <damien.delaney@akerman.com>,
"steven.gallagher@akerman.com" <steven.gallagher@akerman.com>, "maxine.maritz@akerman.com"
<maxine.maritz@akerman.com>
**Subject:** Notices of Depositions - Novoa, et al. v. The GEO Group, Inc. - C.D. Cal. Case No. 5:17-cv-

02514-JGB-SHK

Counsel:

Attached are the following deposition notices in connection with the above-captioned matter. Hard copies will be served via U.S. Mail per the proofs of service.

- Raul Novoa
- Jaime Campos Fuentes
- Abdiaziz Karim
- Ramon Mancia
- Gagandeep Marwaha
- Fernando Munoz Aguilera

Thank you.

**Nick Mangels**
Legal Administrative Assistant, Labor & Employment Practice Group
Akerman LLP | 1900 Sixteenth Street, Suite 1700 | Denver, CO 80202
D: 303 640 2541 | T: 303 260 7712
nick.mangels@akerman.com



CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

Exhibit D

# EXHIBIT E

Thursday, October 24, 2019 at 9:12:02 AM Central Daylight Time

**Subject:** Re: Novoa
**Date:** Wednesday, October 23, 2019 at 11:14:54 AM Central Daylight Time
**From:** Lydia Wright
**To:** colin.barnacle@akerman.com, Andrew Free, Novoa - External
**CC:** damien.delaney@akerman.com, adrienne.scheffey@akerman.com

Hi Colin,

It was nice to meet you, too.

While we understand that litigation can be unpredictable, we're not able to accommodate your request to alter the parties' September 18, 2019 agreed briefing schedule for the class certification motion (ECF 186). Plaintiffs have worked in good faith to accommodate GEO's request for an expedited deposition schedule of the four class representatives and two declarants. GEO has now deposed all four class representatives. And as I explained in my October 21, 2019 correspondence, GEO failed to provide the detention files of Mr. Novoa and Mr. Campos Fuentes until the eve of those depositions, even though Plaintiffs requested them in July 2018 and GEO listed those records in its Rule 26 Initial Disclosures of August 2018.

On October 7, 2019 at 5:27 p.m. CST, GEO noticed Mr. Munoz's deposition for October 18, 2019 at the Adelanto Facility. On October 9, 2019, Plaintiffs proposed to set Mr. Munoz's deposition for October 23, 2019 instead. The parties have been working together since then to accommodate that schedule. Yesterday at 1:21 p.m. PST, Damien DeLaney notified us that GEO will not depose Mr. Munoz's deposition on October 23 after all, and that "we may be able to work with you and ICE to make [Mr. Munoz's deposition] happen next week." However, we have received no confirmation from ICE to support GEO's assertion, or to explain why GEO believes that Mr. Munoz's deposition would be possible next week but not tomorrow.

We are unaware of any published, written ICE policy reflecting the rules set forth in Mr. DeLaney's October 22 email with respect to depositions at Adelanto. If such a policy did exist, it would violate the separation of powers by putting an executive agency in charge of powers held by the judiciary.

Counsel for Plaintiffs remain available to conduct an oral examination of Mr. Munoz by telephone, just as we did this morning for Mr. Karim in Somalia.

Best,
Lydia

**Lydia A. Wright**
Burns Charest LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
504.799.2845 main
504.881.1765 fax

---

**From:** "colin.barnacle@akerman.com" <colin.barnacle@akerman.com>
**Date:** Wednesday, October 23, 2019 at 5:58 AM
**To:** Lydia Wright <lwright@burnscharest.com>, Andrew Free <andrew@immigrantcivilrights.com>, Novoa - External <Novoa-External@burnscharest.com>
**Cc:** "damien.delaney@akerman.com" <damien.delaney@akerman.com>,

"adrienne.scheffey@akerman.com" <adrienne.scheffey@akerman.com>
**Subject:** Novoa

Good morning, Lydia –

Nice to meet you over the weekend in LA.  I'm writing to inquire about your clients' willingness to stipulate to a one (1) week extension of time for GEO to submit its response to their motion for class certification – up to and including Monday, November 4, 2019.  We seek this extension for two (2) reasons – first, Adrienne Scheffey and I are now going to trial in a case pending before the USDC – Colorado on Monday (September 28, 2019).  The case, Aaron, Bell International, Inc. v. John Rowell, USDC – Colorado, Case 1:18-cv-01015-RBJ, was slated to settle, but settlement negotiations cratered last night and we are almost certainly now going to trial, starting Monday.  Trial is expected to last 3-4 days.  Second, we do want the opportunity to depose Mr. Aguilera prior to filing our response and believe we may be able to work with you and ICE to make that happen next week – assuming availability, of course.

In any event, please let us know your position on our request for a one (1) week extension.

Much thanks.

Colin

**Colin Barnacle**
Partner
Akerman LLP | 1900 Sixteenth Street, Suite 1700 | Denver, CO 80202
D: 303 640 2534
colin.barnacle@akerman.com


vCard | Profile



CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.