**AKERMAN LLP**
DAMIEN P. DELANEY (SBN 246476)
601 West Fifth Street, Suite 300
Los Angeles, California 90071
Telephone: (213) 688-9500
Facsimile: (213) 627-6342
Email: damien.DeLaney@akerman.com

COLIN L. BARNACLE (admitted *pro hac vice*)
ASHLEY E. CALHOUN (SBN 270530)
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: (303) 260-7712
Facsimile: (303) 260-7714
Email: colin.barnacle@akerman.com
          ashley.calhoun@akerman.com

Attorneys for Defendant
THE GEO GROUP, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

| | |
|---|---|
| RAUL NOVOA, JAIME CAMPOS FUENTES, ABDIAZIZ KARIM, and RAMON MANCIA, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>THE GEO GROUP, INC.,<br><br>Defendant. | Case No. 5:17-cv-02514-JGB-SHK<br><br>**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**[Filed concurrently with Declaration of Damien DeLaney, Vol. I Exhibits to Damien DeLaney Declaration, Vol. II Exhibits to Damien DeLaney Declaration, Declaration of Dan Ragsdale and Declaration of Gregory Hillers]** |
| THE GEO GROUP, INC.,<br><br>Counter-Claimant,<br><br>vs.<br><br>RAUL NOVOA, JAIME CAMPOS FUENTES, ABDIAZIZ KARIM, and RAMON MANCIA, individually and on behalf of all others similarly situated,<br><br>Counter-Defendant. | Hearing Date: November 18, 2019<br>Hearing Time: 9:00 a.m.<br>Location:     Courtroom 1<br>Judge: The Honorable Jesus G. Bernal<br><br>TAC Filed:    September 16, 2019<br>Response Date:    October 28, 2019 |

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................. 1

II.   RELEVANT FACTUAL BACKGROUND .................................................... 4

   A.    ICE Contracts with GEO to Fulfill its Statutory Mandate to Detain Undocumented Immigrants.......................................................................... 4

   B.    ICE Imposes Safety Standards, Which Require Detainees to Maintain Clean Living Areas.................................................................................................. 5

   C.    ICE Requires GEO Provide Detainees with a Voluntary Work Program......... 7

   D.    Federal Law Prohibits  Voluntary Work Program Participants From Being Employed in the United States. ...................................................................... 8

   E.    The Detainee Voluntary Work Program Includes a Variety of Positions......... 8

   F.    Each of the Detainees Voluntarily Participated in the Voluntary Work Program. 9

   G.    Plaintiffs Were Not Punished for Declining to Participate in the Voluntary Work Program.................................................................................................... 12

   H.    Detainees Can Freely Raise Concerns Regarding The Conditions Of Confinement.................................................................................................... 13

   I.    GEO Does Not Profit From the Voluntary Work Program. ............................... 14

III.  ARGUMENT ................................................................................................. 14

IV.   PLAINTIFFS FAIL TO ESTABLISH THE ELEMENTS REQUIRED FOR RULE 23 CERTIFICATION. .......................................................................... 15

   A.    Plaintiffs Have Not Met Their Burden To Establish Commonality or Predominance Because Individual Inquiries Pervade. .............................. 15

   B.    The Named Plaintiffs are Not Adequate Representatives Because They Are Not Credible............................................................................................................ 21

   C.    The Named Plaintiffs Claims Are Not Typical. ............................................. 27

     (1)    Plaintiffs' limitations periods are atypical of the class, presenting individualized defenses. ............................................................................ 29

     (2)    Plaintiff Karim's circumstances differ significantly from the other Plaintiffs. 30

   D.    Plaintiffs Have Failed To Establish the Numerosity of the Proposed Classes.31

   E.    Plaintiffs Have Not Established Superiority. ................................................. 34

V.    CONCLUSION. ............................................................................................. 35

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

# TABLE OF AUTHORITIES

**Cases**

*Arreola v. Godinez*, 546 F.3d 788, 797 (7th Cir. 2008) ................................. 31

*Brown v. Abercrombie & Fitch Co.*, No. CV141242JGBVBKX, 2015 WL 9690357, at
*10 (C.D. Cal. July 16, 2015) (Bernal, J.) ............................................. 16

*CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011)
............................................................................................ 21

*Colapinto v. Esquire Deposition Servs., LLC*, No. CV 09-07584 SJO PLAX, 2011 WL
913251, at *5 (C.D. Cal. Mar. 8, 2011) ................................................ 20

*Comcast v. Behrend*, 569 U.S. 27 (2013) ................................................. 15

*Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1030 (9th Cir. 2012) ........... 27

*Garcia v. Cty. of Riverside*, No. EDCV13616JGBSPX, 2017 WL 3052981, at *9 (C.D.
Cal. July 17, 2017) ....................................................................... 16, 29

*Guido v. L'Oreal, USA, Inc.*, No. CV 11-1067 CAS JCX, 2012 WL 2458118, at *4 (C.D.
Cal. June 25, 2012) ........................................................................ 21

*Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.1992) ....................... 15

*Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012) ........... 20

*Hunter v. Am. Gen. Life & Acc. Ins. Co.*, No. CA 301-4506-22, 2004 WL 5231631, at
*6 (D.S.C. Dec. 2, 2004) ................................................................... 29

*Newberry v. Cty. of San Bernardino*, No. EDCV142298JGBSPX, 2015 WL 9701153,
at *4 (C.D. Cal. July 23, 2015) (Bernal, J.) ............................................. 31

*Nghiem v. Dick's Sporting Goods, Inc.*, 318 F.R.D. 375, 383 (C.D. Cal. 2016) (internal
citations omitted) .......................................................................... 21

*Rai v. CVS Caremark Corp.*, No. CV 12-08717-JGB VBKX, 2013 WL 10178675, at *4
(C.D. Cal. Oct. 11, 2013) (Bernal, J.) ................................................ 15, 34

*Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 680–81 (S.D. Cal. 1999) .................. 32

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ............................... 14, 16

**Statutes**

8 U.S.C. § 1226 ............................................................................. 4

8 U.S.C. § 1231 ............................................................................. 4

Fed.R.Civ.P. 23 ..................................................................... 14, 15, 31

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

# I.    INTRODUCTION

Defendant The GEO Group ("GEO") provides rehabilitation, detention, corrections, and mental-health services in partnership with governmental entities across the country. GEO's work for public-sector clients includes design and development, management and operations for correctional solutions, alternatives to detention through supervision in the community, evidence-based rehabilitation, and post-release reintegration programs. A part of GEO's business is a long-standing relationship with U.S. Immigration and Customs Enforcement ("ICE"),that has spanned over 30 years, and has served both parties' administrations. ECF 193-31, 2. Under ICE's direction and oversight, GEO provides for safe and secure housing of undocumented immigrants during adjudication of their immigration status, while removal proceedings are pending, and while awaiting deportation.

Named Plaintiffs Raul Novoa, Jaime Campos Fuentes, Abdiaziz Karim,[1] and Ramon Mancia (collectively "Plaintiffs") were detained in the ICE detention facility GEO operates in Adelanto, California ("Adelanto" or the "Facility"). Plaintiffs seek to certify an amorphous class of individuals who were detained at Adelanto since, at the earliest point in time, May 2011.[2] While Plaintiffs have produced voluminous records

---

[1] For purposes of this Response only, GEO credits the documents submitted by Plaintiff Abdiaziz Karim as though they are submitted on behalf of the detainee with the same name who was housed at Adelanto from August 2017 through August 2019. However, the Ninth Circuit recently dismissed the asylum appeal of the individual housed at Adelanto named Abdiaziz Karim for failure to prosecute. *See Karim v. Barr*, Case No. 19-70126 at ECF 18. It seems peculiar that Mr. Karim would cooperate in the instant case, but not his own immigration asylum case. A copy of the order dismissing this appeal is attached to the Declaration of Damien DeLaney as Exhibit Q. Additionally, during his telephonic deposition last week, Mr. Karim provided information that raised significant questions about his identity, including, but not limited to, that he testified that he has a single Somalian a cell phone number, yet the number he used for the deposition had a Florida area code. He also testified that he did not use any forms of social media, yet called in for his deposition via WhatsApp, a social media platform. GEO has requested evidence from Plaintiffs' counsel confirming that the Mr. Karim who was deposed is indeed, the same person who was housed at the Facility.

[2] Plaintiffs' seek to certify a collective dating back to 2007, but concede in their Motion that the Adelanto Facility was not in operation until May 2011, and GEO did not enter into a contract to operate the facility until May 2011. *See* ECF 193-2.

1

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

in support of their Motion, most of which are publicly available, they fail to meet their burden under Rule 23. A review of Plaintiffs' Motion demonstrates they cite only a small fraction of the documents provided to the Court. And, those documents do not support their theories that: (1) Plaintiffs are subjected to serious harm (defined by Plaintiffs as solitary confinement or threat of adverse legal action) for refusing to participate in the Voluntary Work Program ("VWP") or to perform basic housekeeping and cleaning tasks under the Adelanto Housekeeping and Sanitation Policy ("Adelanto HUSP"); (2) Plaintiffs are forced to participate in the VWP for $1/day in order to afford basic daily necessities at the Facility commissary that they claim GEO systematically deprives them of; and (3) that these alleged policies and/or systematic practices are imposed by GEO, on a nationwide basis.

In an effort to establish commonality among class members, Plaintiffs admit that, "[p]ursuant to its contract with ICE, GEO must comply with the [Performance Based National Detention Standards ('PBNDS')]." ECF 192-1, pg. 10. Plaintiffs also agree that the PBNDS, among other things, provide that all detainees receive basic necessities including food, shelter, and clothing. *Id.* While both parties agree that ICE promulgates standards GEO must follow, and that those standards include various policies addressing detainee work and cleanliness, that is where the parties' mutual understanding ends.

Plaintiffs claim that, separate from the PBNDS, [3] the Facility imposes its own policies, created to deprive detainees of necessities and force them into the VWP. Plaintiffs' claims are based on nothing more than inflammatory rhetoric. While Plaintiffs claim there are widespread policies including a "Deprivation Policy" and an

---

[3] All citations to the PBNDS in this Response are to the current version of those standards, promulgated in 2011 and revised in 2016. Prior to January 1, 2013, Adelanto was contractually required to comply with a prior version of the ICE standards, the 2008 edition of the PBNDS. Ragsdale Deposition ¶ 4, Ex. T. Plaintiffs' seek to certify a class of individuals who have performed labor at the Facility since 2011. *See* Plaintiff's Motion for Class Certification at 19. However, Plaintiffs exclusively refer to the current PBNDS in their Motion. *See id.* at 1. This Response thus addresses and refers to only the current version of the PBNDS.

CASE No. 5:17-cv-02514-JGB-SHK

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

"Uncompensated Work Policy," they provide evidence demonstrating that these policies exist. These self-proclaimed (and named) policies are not enumerated in any policy submitted by Plaintiffs, including the Adelanto Housekeeping Plan (ECF 193-18)[4] and an Adelanto Handbook (ECF 193-16). Neither document provides for policies beyond what is permitted by the PBNDS, and more critically, neither contain any policies matching those Plaintiffs claim exist at Adelanto.

In an attempt to escape the fact that the documents do not support their theories, Plaintiffs have submitted unsubstantiated accounts of isolated incidents where they were required to clean their personal living areas. Plaintiffs claim they were threatened with solitary confinement or abuse of legal process if they did not clean. Plaintiffs do not, however, state they were ever credibly threatened with either of these forms of "serious harm"—conceding they were never placed in any form of solitary confinement for declining to clean and unaware of any specific detainee who was.

Indeed, when pressed on the details, Plaintiffs' admit they were not subject to "serious harm" or "abuse of legal process." For example, when Mancia was asked about his sworn statement that he believes detainees who refuse to clean are subject to solitary confinement, he described a single situation where an "officer," presumably from GEO or ICE, discovered toothpaste smeared on a light. DeLaney Dec., Ex. C, 48:2-6. He claimed the officer then told him and others, "if you guys don't clean it by the time I come back, there's going to be some consequences." *Id.* Alone, a threat of "consequences" is not a threat of serious harm. And, Mancia did not have a legitimate fear that the officer's "consequences" could have included solitary confinement or serious harm, as he conceded he was not aware of any detainee who had been placed in segregation for failing to clean and he was *never disciplined for anything* while at Adelanto. *Id.* 48: 7-17. This anecdote is insufficient to establish any class-wide harm.

---

[4] There is no evidence that this Housekeeping Plan is implemented in any other GEO facility other than the Adelanto Facility and GEO vigorously opposes Plaintiffs' mischaracterization of its earlier filed motions as conceding such a policy exists.

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Further, it demonstrates the nature of Plaintiffs' claims: individual grievances with little or no connection to broader policies at Adelanto.

Plaintiffs' accounts also conflate their participation in the VWP with their general responsibilities to clean their personal and common living areas under the Adelanto housekeeping policies. In so doing, they allege they were forced participate in the VWP under the threat of deprivation of necessities or serious harm. But, Plaintiffs do not sufficiently delineate any distinction between incidents that occurred in connection with the VWP and those that occurred in connection with the Adelanto HUSP.[5] Accordingly, as detailed herein, Plaintiffs fail to sufficiently establish they are members of the classes they seek to represent. Because Plaintiffs have failed to support even their *own* allegations, they have failed to provide any evidentiary support that widespread policies exist. Therefore, Plaintiff's Motion should be denied.

## II.  RELEVANT FACTUAL BACKGROUND

### A.  ICE Contracts with GEO to Fulfill its Statutory Mandate to Detain Undocumented Immigrants.

By enacting 8 U.S.C. § 1226, Congress instructed ICE to detain undocumented immigrants in the United States pending a decision of removal. In executing that mandate, ICE exercises discretion to contract with entities that provide detention services. 8 U.S.C. § 1231(g). Through this authority, ICE entered an Intergovernmental Service Agreement ("IGSA") with the City of Adelanto for operation of an immigration detention facility. In turn, the City of Adelanto contracted with GEO to operate the facility as a sub-contractor. *See* ECF 48-2; 193-3. Under the IGSA, in addition to other obligations, GEO must comply with ICE's standards:  the PBNDS. ECF 193-2**,** Article

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

---

[5] This distinction is, of course, critical as the PBNDS explicitly permit discipline (including solitary confinement) for failing to clean their common living area. PBNDS § 3.1.  In contrast, an individual who declines to participate in the VWP cannot be disciplined in any way other than being cut from the program.

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

1    V; Ragsdale Dec. ¶ 4 .[6]  As many as 100 ICE employees work with GEO at Adelanto

2    each day to "review all the local polices that [GEO] uses . . . and [to] approve of the

3    methods that GEO uses to accomplish the performance requirements." in the PBNDS.

4    ECF 193-5, pgs. 16-17.

5        **B.    ICE Imposes Safety Standards, Which Require Detainees to Maintain**
6              **Clean Living Areas.**

7        The PBNDS seek to create a safe environment for detainees, staff, volunteers,

8    and contractors by, among other things, "maintaining high facility standards of

9    cleanliness and sanitation." DeLaney Dec., Ex. E § 1.2 (I).[7] Through the PBNDS, ICE

10   imposes responsibilities on each detainee to keep their living spaces clean and sanitary.

11   *Id.* Upon arrival at the Facility, each detainee receives two handbooks detailing his or

12   her rights and responsibilities while in custody. Detainees receive a copy of GEO's

13   Adelanto Handbook, which is developed in cooperation with ICE and sets forth the

14   standards and requirements of detainees reflected in the PBNDS.  Detainees also receive

15   a copy of the ICE National Detainee Handbook ("ICE Handbook"), which is compiled

16   and maintained by ICE and also sets forth various standards and requirements of

17   detainees reflected in the PBNDS and other applicable standards.   Each Plaintiff

18   acknowledged receiving both handbooks, even accurately recalling that the ICE

19   Handbook has a blue cover page. DeLaney Dec, Ex. D, 84, 87:16-18; Ex C, 49; Ex.

20   A,38, 93-95; Ex. B, 35.

21       ICE's Handbook sets forth the same standards and requirements for sanitation

22   and cleanliness as the Adelanto Handbook, and both are in accord that detainees are not

23   entitled to pay for cleaning in their cells and common living areas.   Specifically, the

24

25   [6] Because the Federal Government has occupied the field of immigration, the contract provides for all
26   standards that must be followed in accordance with federal, not state law. *Arizona v. United States*,
     567 U.S. 387, 401 (2012).
27   [7] A full copy of the PBNDS has been submitted in connection with this Response, as Plaintiffs'
28   submission contained only a single excerpt of the policies. The PBNDS are also publicly available at
     https://www.ice.gov/detention-standards/2011.

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

5                                    CASE NO. 5:17-CV-02514-JGB-SHK

ICE Handbook provides that detainees will not be paid for keeping their living areas clean, noting "[y]ou must keep areas that you use clean, including your living area *and any general-use areas that you use*. If you do not keep your areas clean, you may be disciplined." DeLaney Dec., Ex. F at 12.[8] (emphasis added). The Adelanto Handbook, which is based upon the ICE Handbook, similarly sets forth detainees' rights and responsibilities. ECF 193-16 at 6. The Adelanto Handbook provides "basic detainee responsibilities" which states, among other things, that "in the simplest terms, you are expected to . . . keep yourself, your clothing[,] *and living area* clean at all times." *Id.* (emphasis added). The Adelanto Handbook makes clear the "living area" is not limited to a detainee's bunk bed and surrounding area, but instead, includes the common living areas used by the detainee. *Id.* at 9. ("Special care should be taken in housing unit restrooms to maintain cleanliness and sanitary conditions for everyone's benefit.").

Not only do the PBNDS spell out detainees' obligations to keep living areas clean, they also impose sanctions on detainees who do not comply. Detainees who fail to clean their living area risk a variety of sanctions, including the loss of the detainee's job,[9] disciplinary transfer, loss of privileges, reprimand, or warnings. DeLaney Dec., Ex. E § 3.1 (III.A.306); § 3.1 (III.B). The Adelanto Handbook similarly provides that "being unsanitary or untidy, failing to keep self and living area in accordance with standards" is a Category IV offense, punishable by a variety of sanctions. ECF 193-16. In addition, the Adelanto Handbook permits a number of other less severe sanctions for failing to clean—left to the officer's discretion.  More willful violations involving the "refusal" to clean a living area are a Category III offense, punishable under both the PBNDS and the Adelanto Handbook by a broader list of sanctions, including "disciplinary restriction up to 72 hours." ECF 193-16. These sanctions are all prescribed

---

[8]  ICE National Detainee Handbook: Custody Management, April 2016, *available at* https://www.ice.gov/sites/default/ files/documents/Document/2017/detainee-handbook.PDF

[9] As is clear from the PNBDS' repeated references to "loss of job" as a <u>sanction</u> for offenses, it is clear that ICE considers the ability to have a VWP  position while in custody (regardless of the pay level) a benefit for detainees**.**

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

by ICE—not GEO.

To that end, while the PBNDS give GEO the discretion to impose solitary confinement as a sanction for refusing to clean, as GEO recently clarified: "We've never given a detainee solitary confinement for refusing to clean their areas." Martin Dep. 134:22-24.[10] In fact, "it's never been a policy of GEO to put somebody in solitary confinement, a detainee, for not cleaning their area." Id. Under this informal policy, detainees who are housed at GEO facilities, including Adelanto, are not subject to solitary confinement for a refusal to clean. Further, as evidenced by Plaintiffs' submissions, no Adelanto detainee has ever been placed in solitary confinement. ECF 193-4, 20 Janecka Dep. In fact, Adelanto does not even have solitary confinement, as all of the disciplinary rooms are double bunk. Id. at 21.

### C.   ICE Requires GEO Provide Detainees with a Voluntary Work Program.

ICE also requires that GEO provide detainees with a VWP – "subject to the number of work opportunities available." DeLaney Dec., Ex. E § 5.8.[11] This requirement is set forth not only in the PBNDS, but in the IGSA as well. ECF 193-2, ¶ 33. The VWP is not intended to substitute for work that would be performed by civilian employees, but rather to reduce the "negative impact of confinement . . . through decreased idleness, improved morale and fewer disciplinary incidents." DeLaney Dec., Ex. E § 5.8 (II.4). In essence, the VWP provides a means to involve detainees in the "essential operations and services" of the Facility. Id. § 5.8 (II.3). Detainees are not required to participate in the VWP.  In fact, not all detainees are eligible to participate, and for those who are, there are often not enough positions available. But those who qualify, based upon their classification level, may apply to participate in the VWP. Id.

---

[10] Amber Martin's deposition was conducted for Menocal v. The GEO Group, a case pending in the District of Colorado, Case Number 14-cv-02887. Plaintiffs' counsel Andrew Free, along with others, also represent the plaintiffs in that case.
[11] Since 1950, Congress has authorized ICE and its predecessor agencies to pay detained aliens "for work performed"  "while held in custody under the immigration laws."  8 U.S.C. § 1555(d).

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

§ 5.8 (IV). Because detainees are not guaranteed a position in the VWP, whether a detainee is ultimately able to participate depends on the availability of positions and ICE discretion. The PBNDS provide that the compensation for VWP participation is "at least $1.00 (USD) per day." At the Facility, the IGSA specifically sets the rate of pay for the VWP at exactly $1.00 per day.  ECF 193-2, Article I.D. Additionally, the IGSA states that ICE is "responsible for reviewing and approving the costs associated with this Agreement and subsequent **modifications utilizing all applicable federal procurement laws, regulations and standards. . . ."** *Id.* at 2. Thus, GEO cannot independently set VWP pay rates, and instead must comply with the amount imposed by ICE in the contract.

**D.    Federal Law Prohibits Voluntary Work Program Participants From Being Employed in the United States.**

In nearly all cases, detainees at the Facility are immigrants not legally authorized to work in the United States.  This is true of at least two of the four named Plaintiffs in this action. DeLaney Dec., Ex. A. at 4; Ex. D at 15. Thus, under applicable federal law, they cannot be legally employed in the United States and therefore, by law, cannot be "employees" pursuant to Cal. Labor Code §§ 1194, 1197, 1197.1. Consequently, the IGSA specifically provides that GEO may not "employ aliens unauthorized to work in the United States." ECF 193-2 Article VI. Accordingly, the contract provides that each employee working at the Facility must successfully pass the e-verify program, have a social security card issued and approved by the Social Security Administration, and is not an "illegal or undocumented alien[]." ECF 193-2, Article XVIII.E. The VWP, which is designed as a diversion for detainees, is distinct from employment.  The IGSA specifically differentiates between detainees in the VWP from GEO employees in Appendix A to the Contract, which makes clear the work detainees perform under the VWP is distinct from the work performed by employees. ECF 193-2, pg. 56.

**E.    The Detainee Voluntary Work Program Includes a Variety of Positions.**

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Plaintiffs incorrectly describe the PBNDS as prohibiting any work in the VWP other than basic housekeeping. Contrary to Plaintiffs' limited excerpts of the PBNDS constructed to fit their narrative, the Statement of Work ("SOW") included in the IGSA does not limit work performed in the VWP to housekeeping tasks. Instead, the SOW states "the detainee work plan must be voluntary, and may include work or program assignments for industrial, maintenance, custodial, service, or other jobs." ECF 193-2, pg. 63. Additionally, neither GEO, nor its staff, may unilaterally select individuals for the VWP, but instead it is "the sole responsibility of ICE to determine whether a detainee will be allowed to perform on voluntary work details and at what classification level." *Id.* at 9. Thus, any detainee's ability to participate in the VWP is based upon the sole discretion of ICE, not GEO. *Id.*

### F.   Each of the Detainees Voluntarily Participated in the Voluntary Work Program.

Participation in the VWP is completely voluntary. Under the PBNDS, each detainee must voluntarily request a job in the VWP, and sign a written consent before performing any work in the VWP. Each of the declarants supporting the Motion for Class Certification admits that he *requested* to participate in the VWP upon learning about it. *See* Novoa Dec., ECF 192-3 ¶ 6 ("I learned about the Work Program upon my entry to the Adelanto Facility and requested to take part in the program."); Fuentes Dec., ECF 192-4 ¶ 6 (same); Karim Dec., ECF 192-5 ¶ 5 (same); Mancia Dec., Dkt. No. 192-6 ¶ 6 (same); Marwaha ECF No. 192-7 ¶ 6 (same); Munoz Dec., ECF. 192-5 ¶ 7 (same).

Plaintiffs are not faced with a Hobson's choice to join the VWP or be deprived of basic necessities, as they claim. ECF 192-1, pg. 5. Rather, detainees are provided with all of their basic needs and may supplement these provisions with other auxiliary items from the commissary. The PBNDS require that in addition to clothing, each detainee receive soap, toothpaste, shampoo, razors, and other personal hygiene products upon entering detention. DeLaney Dec. Ex. E § 4.5(V)(D). And, those items must be replenished as needed. *Id.* Consistent with these standards, and those in the Adelanto

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Handbook, Plaintiffs' received soap, toothpaste, shampoo and other personal hygiene items from GEO, at no cost.  DeLaney Dec. Ex. D <u>Karim</u> 30-33; Ex. B <u>Novoa</u> 69-70; Ex. A <u>Fuentes</u> 63:17; 95:7-15; Ex. C <u>Mancia</u> 67:22-25. Additionally, GEO provided ice water in jugs in each unit. *Id.* at Ex. C 31-32. Those jugs were refilled multiple times per day. *Id.* Rather, Plaintiffs' actual grievance is that the personal hygiene items weren't their preferred type, were "poor quality," or were not the brands Plaintiffs preffered. *Id.* at Ex. B 69:9. For example, Novoa simply preferred the soap sold through the commissary, characterizing the provided soap as "bad soap." *Id.* 70:11. He did not purchased Dove soap from the commissary (one of the more expensive brands offered), instead *Id.* at Ex. I (showing a purchase of Dove soap for $2.30 and Ivory soap for $1.10). Likewise, Mancia purchased styling gel with aloe vera for his hair, as it was not provided by GEO. *Id.* at Ex. C 35-36. As did Karim. *Id.* at Ex. D 30.

The Declarants' commissary accounts indicate they were not dependent upon VWP earnings to shop the commissary; rather, each had significant sources of outside funding. *Id.* at Exs. M-P (Resident Account Summaries). Plaintiffs also frequently had internal funding, each admitted to recieving commissary deposits from *other detainees* and their families. *Id.* Ex. C <u>Mancia</u> 40 (describing how other detainees would pay him for commissary items); Ex. D <u>Karim</u> 34-36 (describing deposits from other detainees); Ex. A <u>Fuentes</u> 66 (same). In fact, the vast majority of funds in Declarants' commissary accounts came from non-VWP sources. Mancia made approximately $51 dollars in the VWP, but had approximately $500 deposited in his account from outside sources, and spent $346 on commissary purchases. *Id.* Ex. N. In other words, only 10% of his funding came from the VWP. Karim made approximately $385, received approximately $4,417 from outside sources, and spent $1,289 at the commissary. *Id* Ex. P. Approximately 8% of Karim's funding came from his participation in the VWP.  Fuentes made approximately $190 through the VWP, received $384 from outside sources, and spent $220 on commissary purchases—only 33% of Fuentes' funding came from the VWP.

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

1   *Id.* Ex. O. Novoa received approximately $498 from the VWP, $1,282 from sources

2   other than the VWP, and spent $1,393 at the commissary. *Id.* Ex. M. Approximately

3   28% of his funding came from the VWP. This testimony and evidence completely

4   undermines Plaintiffs' allegations that everyone within Adelanto's walls was destitute

5   and participating in the VWP for the $1/day was the only way to obtain basic daily

6   necessities and survive.

7   When the Declarants made commissary purchases, it was typically for snacks –

8   cookies, candy, and chips—not basic necessities. *Id.* Exs. I-L. For instance, Karim

9   stated that he could "eat, eat, eat all day" in the kitchen (where he claims he worked

10   every day); yet still purchased cookies from the commissary. *Id.* Ex. D, 25. And, he

11   bought fish, which was "a meat I love." *Id.* at 31.  Likewise, Fuentes bought cheese

12   puffs to escape his daily life, as the food GEO provided "was not delicious at all." *Id.*

13   Ex. A, 60. And, while GEO served coffee in the morning, Karim bought a different

14   brand from the commissary because GEO's coffee "is not real coffee." *Id.* Ex. D, 28.

15   Mancia bought Tapatio hot sauce to "add some flavor to my food." *Id.* Ex. C, 35. To be

16   clear, this is the purpose of the commissary—to provide detainees the items that suit

17   their preferences, not the items they need to survive.

18   Detainees also participated in the VWP to access special privileges, not because

19   of coercion or necessity. For example, Fuentes participated in laundry work because, in

20   addition to the $1 per day, he had "the privilege of exchanging my clothes. The one that

21   I'm wearing at that moment." *Id.* Ex. A, 86:6-9. Fuentes' fellow detainees were able to

22   exchange their clothes, but were not able to hand-select their replacements. Indeed, this

23   special privilege is "why [Fuentes] got involved in the laundry work" in the first place.

24   *Id.* 50:8-9. Novoa, in his time as a barber, would receive "donations" from other

25   detainees whose hair he cut. *Id.* Ex. B, 50:8-9. At one point, Novoa was collecting

26   "donations" so routinely, other detainees complained they could not obtain a haircut

27   unless they paid him. *Id.* Ex. R. Despite denying he ever received cash from detainees,

28

11

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

Novoa curiously had numerous cash deposits in his account that he could not explain. *Id.* at 88.

Karim explained that one of the perks of working in the kitchen was that VWP workers could "eat as much as you want in the kitchen. You get nothing except one dollar, but you can eat, eat, eat all day when in the kitchen . . . So it's better working in the kitchen." *Id.* Ex. D, 25. Likewise, Mancia participated in the VWP, in part, because he would receive extra food. *Id.* Ex. C, 45:23. The food was no different than what other detainees received, but Mancia was able to regularly obtain six extra meals a week. *Id.* at 46:1-14; 49 (Mancia "gained weight" and requested bigger clothing because the food made him "fat"). Accordingly, if the experiences of Plaintiffs are indicative of all detainees at Adelanto, as Plaintiffs claim, there is no basis for certification. Indeed, any work was voluntarily performed and not coerced by a deprivation of necessities or fear of harm. Rather, it was incentivized by commissary snacks and other small incentives.

### G. Plaintiffs Were Not Punished for Declining to Participate in the Voluntary Work Program.

Poor performance or failure to participate in the VWP is not punishable by solitary confinement or deprivation of other privileges. Instead, because the program is voluntary, the only punishment available when a detainee refuses to participate, or otherwise performs unsatisfactorily, is removal from the work program. *Id.* Ex. E § 5.8 (V)(L). Contrary to Plaintiffs' allegations, the Adelanto Handbook states that "withholding of, or variation from, the standard menu, as a disciplinary measure [] is prohibited," undermining the assertions that failing to work results in the deprivation of necessities. ECF 193-16. Consistent with the PBNDS, none of the Plaintiffs were ever punished for refusing to participate in the VWP.[12] Moreover, none of the Plaintiffs were

---

[12] Karim notes that he was once punished for not cleaning up toilet paper in his dorm. He stated that he was eating soup on his bed at the time, not participating in the VWP, and was in his living area. It is clear from these details that the only punishment he received was not for failing to participate in the VWP, but for failing to clean his living area as is permitted by the PBNDS. DeLaney Dec., Ex. D, 52,

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

ever placed in solitary confinement, or administrative segregation, for failing to clean, separate and apart from the VWP—despite the fact that ICE's standards specifically permit this sanction.[13]

### H.    Detainees Can Freely Raise Concerns Regarding The Conditions Of Confinement.

Should any of the conditions of confinement fall short of the requirements of the PBNDS, detainees can communicate with GEO staff (or ICE where needed) about the conditions of confinement. ECF 193-16, 7. Both the ICE and Adelanto Handbooks set forth a process for detainees to submit written questions, concerns, or requests (also called "Kites"). DeLaney Dec., Ex. F; ECF 193-16, 7. All submitted Kites are maintained in each detainees' files. *Id.* Plaintiffs understood and took advantage of the Kite process frequently. DeLaney Dec. Ex. A, 51-54; Ex. B, 38-41; Ex. C, 49-51; Ex. D, 18: 67-68. Indeed, Novoa recurrently used Kites to request free batteries, changes of clothing and linens, and information related to his termination from his VWP job. *Id.* Ex. B, 38-41. Similarly, Mancia used Kites to exchange his clothing and request additional time with his family during their visits. *Id.* Ex. C, 49-51. Curiously, none of the Plaintiffs <u>ever</u> submitted Kites that indicated they were not provided adequate food or were otherwise being subjected to untenable living conditions. Notwithstanding their regular Kite use, none of the Plaintiffs ever complained of threats of serious harm – solitary confinement or abuse of legal process.  Nor did they use Kites to request personal hygiene products. While the Complaint contains a number of inflammatory and vague[14] descriptions about the food served at Adelanto, none of those conditions

---

61-62. Likewise Mancia testified that he had to clean toothpaste off of the light in his room—clearly a task related to his living area. *Id.* Ex. C, 47.

[13] <u>Novoa Dep.</u> 97; <u>Karim Dep.</u>52, 61-62; <u>Mancia Dep.</u> 47; <u>Fuentes Dep.</u> 82.

[14] The Declarations do not raise specific concerns about the food schedule or its quality. Rather, they vaguely state that GEO failed to provide necessities "such as food."  These vague allegations not only lack credibility, but also the requisite specificity to form the basis for class certification. Indeed, it is impossible to know whether the Declarants are alleging the same type of injury: Are they stating they were deprived meals outright? That the meals they received were not sufficient? That they did not like the type of food they were served? From the Declarations, it is impossible to tell. While the Complaint

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

13

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

1    were ever previously reported, despite each of the declarants submitting numerous Kites

2    while detained.

### I.     GEO Does Not Profit From the Voluntary Work Program.

4         The number of individuals in the VWP varies each day because detainees are free

5    to refuse to work at any time—as noted above, the program is completely voluntary. If

6    detainees choose not to work, GEO staff will complete any work that would have

7    otherwise been performed by a detainee. Dkt. No. 193-4, 196:20-25; 217:12-14. Indeed,

8    because of the voluntary nature of the VWP, GEO must always be prepared for this

9    possibility as "there is really no way to gauge how many detainees are going to actually

10   show up for work on any given day." *Id.* at pg. 196. While GEO sometimes uses

11   overtime to handle unexpected situations, GEO does not determine its staffing needs by

12   taking into account any set number of detainee workers. DeLaney Dec. Ex. G, 182:15-

13   198:10. Accordingly, GEO does not derive a benefit from detainee labor in the way

14   Plaintiffs describe—as GEO must always be prepared for circumstances where staff

15   will necessarily complete the tasks detainees refuse to complete. ECF 193-4, 221:13-

16   15. Additionally, under the contract, ICE reimburses the City of Adelanto (and by

17   extension GEO) the exact amount GEO pays detainees in the VWP—in other words,

18   GEO does not derive a profit from the program. ECF 193-5, 45 (explaining that the cost

19   of adding additional staff positions is borne by ICE). The VWP is a 100% pass-through

20   program. DeLaney Dec., Ex. H, 40-45.[15]

### III.    ARGUMENT

22        A party seeking class certification must affirmatively demonstrate compliance

23   with Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). A district court

---

25   asserts that the food provided was moldy, it appears this claim is derived not from Plaintiffs'
26   underlying claims, but rather the unrelated news articles cited therein.  In fact, when Mancia was asked
     on re-direct by his own attorney during his deposition if he ever encountered mold on the food during
27   his VWP kitchen work, he said "no." DeLaney Dec, Ex. C, 67:1-2.

[15] James Hill's deposition was taken in the *State of Washington v. The GEO Group*, a case pending in
28   the Federal District Court for the Western District of Washington, Case Number 17-cv-05806.

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

must conduct a "rigorous analysis" that frequently "will entail some overlap with the merits of the plaintiff's underlying claim." *Id.* "[A] party must not only be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)," but "also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast v. Behrend*, 569 U.S. 27 (2013) (internal citations and emphasis omitted). A party seeking class certification must demonstrate the following prerequisites: "(1) numerosity of plaintiffs; (2) common questions of law or fact predominate; (3) the named plaintiff's claims and defenses are typical; and (4) the named plaintiff can adequately protect the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.1992) (citing Fed.R.Civ.P. 23(a)). The party may not rest on mere allegations, but must provide facts to satisfy these requirements. *Rai v. CVS Caremark Corp.*, No. CV 12-08717-JGB VBKX, 2013 WL 10178675, at *4 (C.D. Cal. Oct. 11, 2013) (Bernal, J.).

Where, as here, a plaintiff moves for class certification under Rule 23(b)(3), Plaintiffs must also establish that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). Here, Plaintiffs seek to certify the three classes, all based upon the theory that there were common policies in place, that forced detainees to work: (1) the Adelanto Wage Class; (2) the Forced Labor Class, which is divided into two subclasses, those who were compensated for cleaning and those who were not;  and (3) The Nationwide HUSP Class. Plaintiffs have failed to meet their burden with respect to all three classes.

## IV.   PLAINTIFFS FAIL TO ESTABLISH THE ELEMENTS REQUIRED FOR RULE 23 CERTIFICATION.

### A.   Plaintiffs Have Not Met Their Burden To Establish Commonality or Predominance Because Individual Inquiries Pervade.

Plaintiffs cannot meet their burden to establish commonality of issues among the class. To do so, they must establish their "claims [] depend on a common contention . .

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

. is capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Brown v. Abercrombie & Fitch Co.*, No. CV141242JGBVBKX, 2015 WL 9690357, at *10 (C.D. Cal. July 16, 2015) (Bernal, J.). Here, Plaintiffs have not demonstrated that common contentions exist that can be resolved on a class wide basis. At best, they have described a collection of discrete grievances, requiring heavily individualized inquiries. As this Court has previously explained "the need for heavily individualized inquiries at the outset undermines the ascertainability and commonality of the class." *Garcia v. Cty. of Riverside*, No. EDCV13616JGBSPX, 2017 WL 3052981, at *9 (C.D. Cal. July 17, 2017).

Plaintiffs advance three common contentions: (1) they were deprived of basic necessities—requiring them to work in the VWP for $1/day, (2) they risked serious harm if they did not work, and (3) the "uncompensated work is neither required nor permitted by [ICE]."[16] Despite Plaintiffs' allegations, there is no policy or circumstance within GEO's control that is applicable to the entire class. Thus, Plaintiffs cannot establish the commonality requirement of Rule 23.

As for the first claim, there is no policy that deprives Adelanto detainees of basic necessities. Plaintiffs claim that because detainees are deprived of "necessities," (delineated in their Complaint as food, water, soap, lotion, and shampoo) they are coerced into participating in the VWP to purchase the minimum essentials needed to maintain basic standards of cleanliness and nutrition. The crux of their claim being that, without the $1/day allowance, detainees would not have access to food, water, and personal hygiene products. Put simply, there is no policy in place at the Facility that deprives detainees of necessities, as described in the PBNDS. Plaintiffs cannot point to the existence of any such policy and rely solely on unsupported conclusory allegations.

---

[16] Plaintiffs also allege that because they all suffered violations of the TVPA, they have established a common issue. However, an assertion that putative class members "have all suffered a violation of the same provision of law" does not support a finding of commonality. *Dukes*, 564 U.S. at 350.

CASE NO. 5:17-CV-02514-JGB-SHK

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Rather, individuals at Adelanto are provided basic necessities, as prescribed by the PBNDS, at no charge. DeLaney Dec., Ex. D, 32-33; Ex. B, 69-70; Ex. A, 63:17; 95:7-15; Ex. C, 67:22-25. Thus, there can be no commonality.

Because there is no general policy of withholding necessities, the inquiry into whether a particular detainee felt compelled to participate in the VWP is highly individualized. The named Plaintiffs do not even have a common understanding about what constitutes basic necessities. Fuentes explained that "necessities" include Snickers bars, Atomic Fire Ball candies, oatmeal cookies, and honey buns—because these items could purportedly be used to treat blood pressure conditions. *Id.* at Ex. A, 57, 59. In contrast, Novoa did not consider his numerous purchases of Jolly Ranchers, M&Ms, or chips to be necessities. *Id.* at Ex. B, 63-65. And Mancia, in direct opposition to Fuentes, stated that Snickers bars were not a daily necessity. *Id.* at Ex. C, 35. Thus, even among a small group of individuals, there is no commonality whatsoever about what "necessities" were allegedly withheld.

But even for the items Plaintiffs agree were necessities, such as clothes, shoes, and hygiene products, they fail to provide evidence that there was widespread deprivation. Plaintiffs instead rely on individualized anecdotes. For example, Novoa alleges in the Complaint that during his first week of detention his shoes fell apart and, as a result, he had to purchase new shoes with his VWP funds. Compl. ¶ 106. Putting his credibility aside, [17] Plaintiffs have not shown this to be any more than an isolated incident. Indeed, none of the other individuals who submitted declarations indicated that they had any issue obtaining shoes while at Adelanto, or that this was a common

---

[17] During his deposition, Novoa stated that the allegations in the Complaint were correct and did not misrepresent the events that occurred. DeLaney Dec. Ex. B,105:8-25;106:1-4. Novoa, however, also testified that he did not apply to enter the VWP until at least five months after entering the Facility. *Id.* at 31:11-12 (barber position); 51:8-9 (janitor position). Indeed, his first payment for his participation in the VWP was not deposited until April 19, 2013, approximately ten months after Novoa arrived at Adelanto. *Id.* Ex. M. Moreover, his commissary account shows that he did not purchase new shoes during his first few weeks. *Id.* Ex. I.Novoa also alleged the water ran black for days, requiring him to purchase bottled water. He never bought a single bottle of water. *Id.*

17

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

occurrence that depleted their commissary accounts. As this Court has previously noted, a "[p]laintiff cannot establish that there are shared legal interests when it is not clear that anyone but him suffered a [] violation." *Garcia*, 2017 WL 3052981, at *9.

Adding another layer of individualized inquiry, each Plaintiff had different sources of income. While Karim had near constant deposits to "do anything I need," other Plaintiffs' outside income was more sporadic. DeLaney Dec., Ex E, 41. And, Plaintiffs had different expectations about what a sufficient amount of commissary funds would be. For example, Karim worked regularly despite a surplus of over $1,000 in his commissary account for an extended period of time. *Id.* Ex. P. In contrast, Novoa decided not to work for at least the first five months of his detainment, despite the fact that his balance was frequently under $20. *Id.* Ex. M. Because the amount of commissary funding a detainee needed to forego participation in the VWP is nebulous, there are no common issues that could be resolved on a class-wide basis. Instead, in order to identify whether any individual was deprived of a "necessity," GEO would need to depose each detainee class member regarding his or her commissary accounts, account summary, and work history. Further, insofar as Plaintiffs claim they are due back-wages, the number of meals each detainee received will require an individual deposition of each, as it is clear from the deposition testimony of Plaintiffs that many detainees were consistently receiving additional meals. Similarly, an individualized analysis will be required to identify which days Plaintiffs worked in the VWP. Thus, individualized issues predominate.

Plaintiffs also fail to establish a widespread policy that detainees participated in the VWP (not the necessary chores in their common living area) under the threat of serious harm. Plaintiffs seem to argue that even if GEO meets their basic needs by providing—among other items—three meals a day, shelter, clothing, outdoor recreation activities, television, and Xboxes, their work is still not voluntary. To create this illusion, Plaintiffs allege that work is performed under constant threat of solitary

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

confinement or deprivation of life necessities. This is false.

To be clear, "it's never been a policy of GEO to put somebody in solitary confinement, a detainee, for not cleaning their area." *Id.* Ex. G, 134:22-24. Consistent with GEO's informal policy, no Plaintiff was ever deprived of meals, water, or other necessities, nor were they placed in solitary confinement for failing to work. They do not allege that detainees were regularly (or ever) sent to solitary confinement for failing to work or clean. Nor do they credibly allege that there was a general fear among other detainees in the VWP that not participating in the program would result in solitary confinement or an adverse impact on their legal case. In fact, none of the Plaintiffs could name even one other detainee who was placed in solitary confinement. Such an assertion would necessarily need to be based upon conversations and interactions with other detainees. Yet, Plaintiffs do not allege that they had such conversations, but instead rely upon cursory and vague assertions. *Id.* Ex. C, 53 ("Obviously I knew everything is the same in every dorm").

Because Plaintiffs were *never* subjected to solitary confinement, the inquiry about what constitutes "serious harm" is inherently individualized. *Id.* Ex. B, 97; Ex. D, 52, 61-62; Ex. C, 47; Ex. A, 82. For Karim, the "serious harm" he faced allegedly occurred, not while he was participating in the VWP, but when all detainees in his unit failed to clean a mess in the common area. As a result, all detainees lost television and Xbox privileges for 20 minutes and during that time were limited to interacting with others in their bunk area. *Id.* Ex. C, 51-53. Although he never played Xbox, Karim felt this punishment was unjust. *Id.* In another instance, he alleges he was told to get his "black ass down" when he was "sitting on top of somewhere." *Id.* at 58. On a separate occasion, Karim picked up dirty tissues at the direction of a guard. *Id.* at 54. In the only incident involving the VWP, Karim testified that he was told participating in the VWP would help him obtain bond. *Id.* at 88. Each of these allegations involves a personal circumstance that had no relation to other detainee—and that do not substantiate a

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

legitimate fear of "serious harm."

The other Plaintiffs allegations are factually distinct from Karim's allegations. Fuentes testified that when he did not clean in the common area, his microwave privileges were taken away. *Id.* Ex. A, 75. On another occasion, he refused to perform his janitorial work and as a result was not paid $1. *Id.* at 81. Mancia cleaned toothpaste off of a light (which, of course, was first smeared on the light inappropriately) under the threat of "consequences." *Id.* Ex. C, 48:2-6. As is demonstrated by these individual anecdotes, there is no common and pervasive policy under which Plaintiffs' were subject to "serious harm" sufficient to certify a class. Even more, allegations that GEO has taken steps to preserve order in compliance with the PBNDS (like those above) do not give rise to TVPA liability. *See Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012) (warnings of "legitimate consequences" are not improper means under the TVPA). Likewise, class actions under the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 usually cannot be certified, because significant individualized factual issues arise regarding whether the proposed class was fraudulently, unfairly, or unlawfully induced by Defendant. *Colapinto v. Esquire Deposition Servs.*, LLC, No. CV 09-07584 SJO PLAX, 2011 WL 913251, at *5 (C.D. Cal. Mar. 8, 2011).

Finally, contrary to Plaintiff's allegations that GEO has enacted Housing Unit Sanitation Policies (HUSPs) "in violation of the PBNDS, its contracts with ICE, and the California and federal forced labor statutes" which in turn "require detained immigrants to perform a wide range of completely uncompensated work for the company's enrichment," GEO's HUSPs are in compliance with all ICE contracts, PBNDS and ACA standards, the ICE Handbook and relevant laws. Ragsdale Dec., ¶ 6 . In fact, ICE itself reviewed and signs off on the HUSP. *Id.* ¶ 7. Contrary to their allegations, Plaintiffs have presented evidence that each facility creates its own local policies which reflect the PBNDS standards. ECF 193-4 at 9. And, Plaintiffs have not

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

1   cited any evidence to establish that any local Adelanto HUSP is applied nationwide.  In

2   fact, they do not, and cannot, point to a single fact regarding how any HUSP is applied

3   at any other facility, the experiences of any detainee at any other facility under its

4   HUSP, or allegations of threats of solitary confinement or abuse of legal process for

5   refusing to clean a cell or common living area. Nor do they identify a single facility that

6   would be included within the class, or a single representative from another state.

7   Therefore, the contentions do not raise sufficiently common issues that would be

8   appropriate for nationwide certification.

9       **B.    The Named Plaintiffs are Not Adequate Representatives Because They
10             Are Not Credible.**

11      In considering the requirements of Rule 23, courts are mindful that, named

12  plaintiffs who have serious credibility problems or who are likely to devote too much

13  attention to rebutting an individual defense, may not be adequate class representatives.

14  *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011).

15  "The honesty and credibility of a class representative is a relevant consideration when

16  performing the adequacy inquiry because an untrustworthy plaintiff could reduce the

17  likelihood of prevailing on the class claims." *Nghiem v. Dick's Sporting Goods, Inc.*,

18  318 F.R.D. 375, 383 (C.D. Cal. 2016) (internal citations omitted). Courts in this district

19  have previously concluded found a class representative inadequate where "he and his

20  counsel will have to devote most of their time and resources trying to refute Defendants'

21  attacks on his character. . . at the expense of [Plaintiffs'] ability to vigorously prosecute

22  this case on behalf of the rest of the class . . . . "  *Id.*; *see also Guido v. L'Oreal, USA,*

23  *Inc.*, No. CV 11-1067 CAS JCX, 2012 WL 2458118, at *4 (C.D. Cal. June 25, 2012)

24  (granting a motion to reconsider certification where the discrepancies in Plaintiff's

25  deposition testimony and other evidence threatened to "undermine her credibility").

26  Here, Plaintiffs' are not adequate representatives based upon significant and deeply

27  troubling inconsistencies in their deposition testimony, Complaint, and Declarations.

28  In fact, GEO believes each of the declarants committed verifiable perjury in their sworn

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

21

statements and deposition testimony. Therefore, there is no question individual credibility determinations will predominate the litigation of the named Plaintiffs—to the detriment of any proposed class.

Plaintiffs' claims rely upon a common allegation: "GEO maintains a corporate policy and uniform practice of withholding sufficient food, water, and hygiene products from the immigrants detained at Adelanto. As a result, detained immigrants are forced to either purchase these daily necessities from the Facility's commissary or go without." Comp. ¶¶ 43, 47. Plaintiffs' allege that the necessities that were withheld include soap, lotion, shampoo, food, and water.[18]  However, deposition testimony and the Plaintiffs' own detention records indicate that Plaintiffs did not go without necessities, particularly not those they claim were withheld from the proposed class.  For ease of reference, the summary chart below provides specific details of each Plaintiffs' dishonest statements made under oath.

| Plaintiff Novoa | | |
|---|---|---|
| **Complaint** | **Declaration** | **Deposition and Records** |
| "Novoa spent his wages on soap, shampoo, lotion, sunscreen, food, clean drinking water, shoes, and other necessities." Compl. ¶ 107. | "I participated in the Work Program in order to buy daily necessities . . . such as food, bottled water, shampoo, lotion, soap, sunscreen, and even shoes." Dkt. 192-3 at ¶ 15. | • Used commissary money to buy "probably the most awesome headphones you can buy at the commissary," for $39.  DeLaney Dec., Ex. I; Ex. B 68-69:5.<br><br>• Did not buy a single bottled water. *Id.* Ex. I. Was provided free shampoo, soap, toothpaste. *Id.* Ex. B, 69-71.<br><br>• Bought Jolly Ranchers to "treat other detainees that didn't have any money." *Id.* at 68. |

---

[18] Plaintiffs also allude to a claim that detainees receive delayed or insufficient medical treatment. While this allegation is inflammatory, it does not add to their case. They do not allege that by working detainees get better medical treatment. Nor do they allege that by having additional funding certain detainees are provided superior medical treatment Therefore, regardless of whether the detainees work in the VWP or clean their rooms and common areas, their access to medical treatment is unaffected. Therefore, these allegations are not relevant to the certification analysis.

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

| | | |
|---|---|---|
| | | • Spent the vast majority of his commissary money on snacks – cookies, candy, and chips. *Id.* at Ex. I. |
| "[W]as often forced to purchase those necessities from the commissary using his wages from the Work Program." Compl. ¶ 104. | "I relied on my wages to buy those items from the commissary. I knew that if I stopped Participating in the Work Program, I would not have access to these items." Dkt. 192-3 at ¶ 15. | • Received "donations" from other detainees as a barber. Novoa Dep. *Id.* at Ex. B, 49:16-23. <br><br> • Received cash prizes from art contests held at the Adelanto Facility. *Id.* at 61. Received commissary funds from his sister and others. *Id.* at 78-79; Ex. M. <br><br> • Received free batteries when his account balance was low. *Id.* |
| "Novoa provided GEO with his labor because GEO's threats of serious harm and/or abuse of the legal process if he refused to work." Compl. ¶ 114. | "On several occasions officers threatened to or actually forced me to move to a different living unit, away from my peers and friends, after complained [sic] about the Work Program. . ." Dkt. 192-3 at ¶ 14. | • Did not work for at least six months after arriving at the Adelanto Facility. *Id.* <br><br> • Was not disciplined when he quit his barber job. *Id.* Ex. B, 46. Was fired from being a barber without consequence. *Id.* at 39-40. <br><br> • His bunk was moved when he complained about law library hours. *Id.* at 99-100. <br><br> • Requested to be moved out of his bunk area because there were individuals he knew from "county jail." *Id.* at 113. <br><br> • Was never put in solitary confinement or threatened with abuse of the legal process for refusing to work. *Id.* at 9:7-15. |

| Plaintiff Fuentes | | |
|---|---|---|
| **Complaint** | **Declaration** | **Deposition and Records** |
| "Fuentes spent his wages on food, medicine, clothing, soap, and shampoo from the Adelanto commissary." Compl. ¶ 126. | "I participated in the Work Program in order to buy daily necessities . . . [including] food and personal hygiene items." Dkt. 192-4 at ¶ 11. | • "I personally did not buy basic necessities—soaps, lotions—because I did not have the financial means but others did purchase." *Id.* Ex. A, 63:16-18. <br><br> • Bought candy to alleviate depression. *Id.* at 59. Bought candy to trade with other detainees. *Id.* at 101. |

CASE NO. 5:17-cv-02514-JGB-SHK

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

| | | |
|---|---|---|
| | | • Spent the vast majority of his commissary money on snacks – cookies, candy, and chips.  *Id.* Ex. J. <br><br> • Never bought bottled water, soap, shampoo, or lotion. *Id.* |
| "GEO withheld daily necessities from Mr. Campos Fuentes, thereby forcing him to work for subminimum wages in order to buy those daily necessities. . ." Compl. ¶ 127. | "I feared that if I stop [sic] participating in the Work Program, I would be unable to access those necessities." Dkt. 192-4 at ¶ 11. | • Received routine deposits from "people who were inside the Adelanto facility. And as help or solidarity to me, they deposited these amounts because they also lived through the same thing I was living through." *Id.* Ex. A, 65:21-25. <br><br> • Received routine deposits from individuals who were not detained in Adelanto. *Id.* at 69-71. |
| "Campos provided GEO with his labor because GEO's threats of serious harm and/or abuse of the legal process if he refused to work." Compl. ¶ 133. | "If we refused to clean, GEO officials would threaten to lock us in our cells. Sometimes they actually did so. Other times, GEO officials threaten to suspend our attorney or personal visits, or prohibit us from interacting with other detained immigrants." Dkt. 192-4 at ¶ 14. | • If he refused to work, he would not receive his $1 compensation or any additional meal that was provided for participating in the VWP.  *Id.* at 80-81. <br><br> • I always did the work that the officer would require me to do. In order to have a low profile with them, I did not want to get in trouble.  *Id.* at 82:15-18 |

| Plaintiff Mancia | | |
|---|---|---|
| **Complaint** | **Declaration** | **Deposition and Records** |
| "Mancia participates in the Work Program in order to buy daily necessities . . . including food and personal hygiene items." Compl. ¶ 167. | "I participated in the Work Program in order to buy daily necessities . . . [including] food and personal hygiene items." Dkt. 192-6 at ¶ 14. | • Mancia never bought soap or shampoo from the commissary. *Id.* Ex. C, 37. <br><br> • Mancia was routinely fed up to three extra meals per day. *Id.* at 46. <br><br> • Spent the vast majority of his commissary money on snacks – cookies, candy, and chips.  *Id.* Ex. K. Never bought bottled water, soap, or shampoo. *Id.* |

CASE NO. 5:17-CV-02514-JGB-SHK

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

| "Mancia participates in the Work Program in order to buy basic necessities . . . including food and personal hygiene items." Compl. ¶ 167. | "I participate in the Work Program in order to buy daily necessities…I fear that if I cannot afford purchases from commissary, I will not have access to those necessities." Dkt. 192-6 at ¶ 14. | • Received at least $136 for purchasing commissary items for other detainees (more than double what he made in the VWP). *Id.* Ex. C, 40-44.<br><br>• Received routine deposits from individuals who were not detained in Adelanto. *Id.* at 43. |
| "GEO has knowingly obtained Mr. Mancia's labor by causing him to believe that he would suffer serious physical or legal harm…" Compl. ¶ 169. | None. | • "[A]n officer from Geo . . . went into his room and the light had toothpaste, it had toothpaste on the light. And she said if you guys don't clean it by the time I come back, there's going to be some consequences . . . We had to take off the toothpaste from the light." *Id.* at 47-48.<br><br>• Has never been placed in segregation for refusing to clean or work, but has "heard stories from other inmates [sic]." *Id.* at 48. |

| Plaintiff Karim | | |
| --- | --- | --- |
| **Complaint** | **Declaration** | **Deposition and Records** |
| "Karim participated in the Work Program in order to buy . . . food, vitamins, and deodorant." Compl. ¶ 150. | "I participated in the Work Program in order to buy daily necessities . . . [including] food and personal hygiene items." Dkt. 192-5 at ¶ 17 | • Karim does not know what deodorant is. *Id.* Ex. D, 31.<br><br>• Spent the vast majority of his commissary money on snacks – cookies, candy, and chips. *Id.* Ex. L. Bought hair gel and baby oil. *Id.*<br><br>• Never bought bottled water, soap, or shampoo. *Id* |

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

CASE NO. 5:17-cv-02514-JGB-SHK

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

| | | |
|---|---|---|
| "Karim feared that if he stopped participating in the Work Program he would not have access to sufficient daily necessities or nutrition." Compl. ¶ 153. | "I participate in the Work Program in order to buy daily necessities…I fear that if I cannot afford purchases from commissary, I will not have access to those necessities." Dkt. 192-5 at ¶ 17. | • Received routine deposits from people inside the Adelanto facility (sometimes for as much as $100 per deposit) for "whatever I need . . . to do anything I need." *Id.* at 43.<br><br>• Received money from his attorney in this case, Lydia Wright, three days after signing his declaration and when he already had $1,890.54 in his account.  *Id.* Ex. P.<br><br>• Left Adelanto with $2,401.95. *Id.* |
| "GEO officials have threatened to take disciplinary action against Mr. Karim for refusing to clean areas of the Adelanto Facility for free. For example, in approximately August 2018, a GEO officer threatened to send Mr. Karim to solitary confinement for refusing to clean for no compensation. The same GEO officer 'tossed' Mr. Karim's cell by throwing his belongings and papers in disarray, in full view of other Detained immigrants." Compl. ¶ 147.<br><br>"GEO officials told Mr. Karim that 'write ups' will negatively impact his asylum case." Compl. ¶ 148. | "GEO officials routinely require detainees to clean the common spaces and showers of my housing unit for no compensation. If we refuse, GEO officials turn off the TV and the Xbox, prohibit detainees from using the telephones or the showers, and evacuate the day room until a detainee volunteers to complete the sanitation and cleaning tasks." Dkt. 192-5 at ¶ 11.<br><br>"GEO officers have threatened to take disciplinary action against me for refusing to clean areas of the Adelanto Facility for free."  Dkt 192-5 at ¶ 12. | • Never used the Xbox. *Id.* Ex. D, 49. When a detainee refused to clean in the common living area, the officer turned off the TVs and Xbox and placed detainees in their rooms for "more than 20 minutes." After that, the detainees were allowed out of their rooms to watch TV. *Id.* at 51-52.<br><br>• Has never been placed in segregation for refusing to clean or work.  *Id.* at 54. After he refused, was told he would go to segregation if he did not clean up toilet paper next to his bunk and toilet *Id.* at 54-56.<br><br>• Karim's bond hearing took place approximately three months after he entered Adelanto and no one from GEO participated or in any way influenced his case. He continued working after that date.  *Id.* at 90. |

The evidence makes clear, Plaintiffs' claims are largely based upon puffery and exaggeration—and in certain instances, deceptive. In fact, during their depositions,

CASE NO. 5:17-cv-02514-JGB-SHK

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

1  some realized the inconsistencies and asserted that the reason they did not buy soap,

2  water, or other items, despite their Complaint and/or declaration stating they had, was

3  because those items, compared to candy, were too expensive. However, a review of the

4  commissary menu makes clear that this is simply untrue. Hillers Dec., Ex. S. By way

5  of example, bottled water cost $1.25; less than Jolly Ranchers or Hot Spicy Pork Rinds,

6  items that Plaintiffs frequently bought. *Id.* Accordingly, Plaintiffs are inadequate

7  representatives because their deposition testimony raises significant credibility

8  concerns.

9  **C.    The Named Plaintiffs Claims Are Not Typical.**

    Just as the Plaintiffs cannot establish adequacy, they likewise cannot show they

10 were in any way "typical" of the proposed class. "The test of typicality is whether other

11 members have the same or similar injury, whether the action is based on conduct which

12 is not unique to the named plaintiffs, and whether other class members have been

13 injured by the same course of conduct." *Evon v. Law Offices of Sidney Mickell*, 688

14 F.3d 1015, 1030 (9th Cir. 2012) (internal citations omitted). Here, it is clear the concerns

15 raised by the named Plaintiffs do not establish a common policy.  And, it is likely that

16 individual defenses would predominate Plaintiffs' litigation.

17     First, Plaintiffs admit they never faced serious harm for failing to work. And, the

18 only reason any of the Plaintiffs had to believe a detainee would be put in solitary

19 confinement was based on unsubstantiated rumor, rather than personal experience. In

20 addition, Plaintiffs never encountered adverse legal action for failing to participate in

21 the VWP. Indeed, Novoa both quit and was fired from his VWP position—without

22 consequence. Accordingly, Plaintiffs have failed to demonstrate that they faced serious

23 harm at all, let alone harm that is typical of the class they seek to represent.

24     Likewise, Plaintiffs were not deprived of necessities. GEO provided ice water in

25 jugs in each unit. DeLaney Dec., Ex. C, 31-32. Those jugs were refilled multiple times

26 per day. *Id.* GEO also provided three meals a day, soap, shampoo, and toothpaste to all

27 detainees. Indeed, toothpaste was anything but scarce, as two Plaintiffs recalled

28

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

cleaning it off of light fixtures in their dorms. *Id.* Ex. D, 93; Ex. C, 47. Because Plaintiffs had the basic necessities they needed, they frequently bought candy, chips, and other snacks—even when doing so was more expensive than buying basic staples. *Id.* Exs. I-L. These snacks were traded among detainees—indicating that there was more than enough to go around. In the most extreme case, Novoa bought a $39 pair of headphones, because they were "awesome," even though he could have spent that money on dozens of food items. Therefore, Plaintiffs are not typical of a class they purport to represent—a group of individuals who were allegedly denied soap, water, and food and did not have sufficient commissary funding to buy the same, let alone $39 headphones.

Further, there is no evidence that Plaintiffs lived in the same dorms, were under the supervision of the same guards, or otherwise lived under the same policies and conditions. As Novoa testified, there were two separate dorms, East and West. *Id.* Ex. B, 51-52. The cleaning tasks he was responsible for were limited to his own dorm. Each dorm varies in size and layout. There are seven different dorms. ECF 193-4, 11. Three are "open layout." *Id.*  The smallest dorm is 29 bunks and the largest is 118 beds. *Id.* The East dorms do not have dining halls (i.e. no dining areas to clean). *Id.* In the West dorms only, the buildings are divided into "pods," each with a capacity of 80 detainees. *Id.* at 12. In the pods, rather than an open layout (i.e. all of the beds in a single room with the televisions and other amenities), the room is subdivided into bunks with bunk rooms separated from the common living space. *Id.* Plaintiffs have presented no evidence that they represent all of these different dorms and living situations, nor do they explain how they are typical of each dorm. These differences are not insignificant. A detainee who is housed in a pod could plausibly be confined to only his bunk area, while a detainee in an open layout could not. Likewise, whether a detainee lives in a pod with 29 bunks or 118 changes how many individuals he can purport to have personal knowledge of.

Just as Plaintiffs cannot show that they have knowledge of each living area at

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

1   Adelanto they likewise do not have a basis to represent individuals nationwide, at
2   facilities that they have no knowledge of. Indeed, Plaintiffs have failed to allege any
3   nationwide policy that required them to work or clean. Each admitted in their deposition
4   that they do not know any individuals housed at other facilities. Moreover, no Plaintiff
5   provided a reason to believe that the policies or practices at Adelanto are common in all
6   GEO facilities. Instead, Plaintiffs single out their experience at Adelanto. Therefore,
7   they cannot be typical representatives of the proposed Nationwide HUSP class.

8       **(1)   Plaintiffs' limitations periods are atypical of the class,
9             presenting individualized defenses.**

10      In addition, Plaintiffs are not typical representatives of the class because their
11  claims are not viable for the time periods they seek to certify. *Hunter v. Am. Gen. Life*
12  *& Acc. Ins. Co.*, No. CA 301-4506-22, 2004 WL 5231631, at *6 (D.S.C. Dec. 2, 2004),
13  ("It is the differences relating to the statute of limitations which cause the greatest
14  concern as to commonality and typicality.") The first Complaint in this action was filed
15  on December 19, 2017. Claims under California's Wage Order WO 5-2001 ("IWC
16  Wage Order No. 5") are subject to a oneyear statute of limitations. Cal. Code Civ. Proc.
17  § 340 (providing limitations period for penalties); Cal. Code Regs. tit. 8, § 11050
18  (providing for "penalties" as a remedy for failure to pay minimum wage). Thus,
19  Novoa's claims under the IWC are time-barred, as he was released in February 2015.
20  Dkt. 192-3 ¶ 4; Compl. ¶ 174 (seeking to represent a class for violations of the wage
21  order). Additionally, his claims under the Labor Code are significantly limited, as only
22  the work he performed in December 2014 and January 2015 gives him a basis for a
23  claim under the three-year statute of limitations. Cal. Lab. Code § 1194.

24      Further, Fuentes was not detained until December 2016. Karim and Mancia were
25  not detained until 2017 and 2019, respectively. Accordingly, no Plaintiff suffered an
26  injury between February 3, 2015 and December, 2016 when Fuentes alleges he was
27  detained, and cannot represent individuals who may have been aggrieved during that
28  time frame. Dkt. 192-3 ¶ 4. *See e.g., Garcia*, 2017 WL 3052981, at *9 ("Plaintiff's

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

29                                              CASE NO. 5:17-cv-02514-JGB-SHK

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**

method for identifying class members—which encompasses every detainee for whom the County's records reflect non-matching CII . . . necessarily captures even those who have not suffered a violation. And his imprecise and overbroad definition—together with the closely related failure to show that common issues predominate—undermines the propriety of certification at this stage."). Indeed, Plaintiffs have no knowledge of the conditions of the Facility during that time.  Therefore, Plaintiffs are not typical members insofar as their request to certify is overbroad in temporal scope.

Additionally, assuming *arguendo* that Plaintiffs' could show a class-wide policy at the Facility, their claims would not be typical of other individuals. In their Motion, Plaintiffs list twelve separate VWP jobs, of which Plaintiffs only represent seven. ECF 192-1, pg. 15. As there are five jobs that no Plaintiff has ever worked, they have no knowledge of the terms and conditions of participation in the other VWP positions. Accordingly, Plaintiffs are not adequate representatives of the VWP positions in which they never worked.

For these same reasons, Plaintiffs are not adequate representatives of the "Nationwide HUSP Class" and "Adelanto Forced Labor Classes." There is no question that none of the Plaintiffs were detained between May 1, 2011 and June 2012, the date when Novoa alleges he entered detention; and (2) GEO did not begin operating the Facility until May 2011. Moreover, none of the Plaintiffs claim to have any knowledge that conditions or policies were the same nationwide at the time they were detained, and therefore they cannot represent the "Nationwide HUSP Class."

### (2)   Plaintiff Karim's circumstances differ significantly from the other Plaintiffs.

Further, Karim is not a typical representative. Karim lives in Somalia. He is beyond the jurisdiction, and subpoena power, of this Court and both legally, and logistically, cannot appear anywhere in the United States for a hearing, deposition, or other matter. According to Plaintiffs' counsel, he is constantly in hiding in Somalia for

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**

fear of religious persecution. As a result, his whereabouts at any given time are hard to verify, making participation in the legal process exceptionally difficult. Indeed, he appeared to face difficulties obtaining a secure internet connection for his deposition. And, the Parties are now in a dispute about how to verify his identity—a dispute that is taking time and resources away from the needs of a class as a whole.  Furthermore, just recently, Karim's asylum immigration case was dismissed for a failure to prosecute— an ominous sign for those individuals who he may represent. DeLaney Dec., Ex. S. Thus, Karim is not an adequate class representative.

**D.      Plaintiffs Have Failed To Establish the Numerosity of the Proposed Classes.**

Plaintiffs must establish that the proposed classes are so numerous that joinder of individual class members would be impracticable. *See* Fed. R. Civ. P. 23(a)(1). In doing so, Plaintiffs cannot rely on "mere speculation" or "conclusory allegations" as to the size of the putative class to prove that joinder is impractical for numerosity purposes. *Arreola v. Godinez*, 546 F.3d 788, 797 (7th Cir. 2008). This Court previously held that Plaintiffs failed to establish numerosity where Plaintiffs offered "a single statement that 'the class number is in excess of one hundred.'" *Newberry v. Cty. of San Bernardino*, No. EDCV142298JGBSPX, 2015 WL 9701153, at *4 (C.D. Cal. July 23, 2015) (Bernal, J.), aff'd, 750 F. App'x 534 (9th Cir. 2018). This Court explained that an "estimate of class size is only appropriate if accompanied by evidence." *Id.* In *Newberry*, this Court concluded that evidence of numerosity based upon the number of apartments in a complex was insufficient when there was no evidence that every resident of the apartment complex had actually been aggrieved. Plaintiffs' allegations suffer from the same deficiencies as those in *Newberry.*

Plaintiffs ask this Court certify three classes (four including sub-classes) of unknown size, but that, as a matter of Plaintiff's speculation "likely exceed[] 1,000 members."  Dkt. No. 192-1 at 28. As support for this proposition, Plaintiffs cite ECF

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

45.  *Id.* Plaintiff's quotation appears nowhere in the cited docket entry. Rather, the only admission on the cited page is: "The Adelanto Facility has capacity for approximately 1,950 detainees." Dkt. No. 45, 6 ¶ 28. Accordingly, Plaintiff's "support" that the class would exceed 1,000 potential plaintiffs, not only is misleading, but based upon a fabricated admission.

Putting aside Plaintiffs' misrepresentation, the maximum population of the Facility is not the same as the number of individuals that participated in the VWP or performed unpaid work. There is no evidence that <u>all</u> individuals at Adelanto were deprived of necessities. or  that <u>all</u> detainees participated in the VWP. To the contrary, this broad allegation, based upon the number of beds at the Facility, provides no detail about how many aggrieved individuals exist. Rather, it appears that the number is based upon pure speculation, which could range from a few members, to over a thousand. *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 680–81 (S.D. Cal. 1999) ("The central question is whether Plaintiffs have sufficiently identified and demonstrated the existence of the numbers of persons for whom they speak."). This alone establishes Plaintiffs have not met their burden.

Likewise, Plaintiffs' reliance upon Mr. Janecka's deposition that "200-300 detained immigrants are currently eligible to report for a Work Program Shift" is unavailing. Dkt. No. 192-1 at 20. When viewed in context, it is clear Janeka did not know how many detainees worked in the work program any given day. ECF 193-4, 50 ("I don't know the specific number."). Rather, he could only estimate how many were <u>eligible</u> to report for a work program shift. *Id.* at 51. As he further explained, just because an individual was eligible did not mean he or she would choose to work. *Id.* 51-52. Because it is entirely up to each detainee whether he or she will work on a given day, the number of *eligible* detainees on a given day does not accurately reflect participation. *Id.*

As further evidence that Plaintiffs have not met their burden, when asked in their

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

depositions about how many individuals worked in the VWP on each day, the numbers dropped precipitously. *See* DeLaney Dec, Ex. U; Ex. A, Ex. B, Ex. C, Ex. D.

As is clear from the deposition testimony, on the high end, Plaintiffs' worked with approximately 38 detainees who <u>may</u> be appropriate class members, while the number could be as few as 21. Plaintiffs only know the circumstances as they experienced them and can only speak for individuals who had common experiences. As Plaintiffs did not work with individuals in other units, other positions, or other dorms[19] they cannot make representations about their working conditions—and cannot make assertions that those individuals were subject to similar policies. Further, as noted above, there is no reason to believe Plaintiffs lived in every dorm or pod. Even then the 38 individuals listed above suffered the same harms that Plaintiffs are alleging in the present action. For example, Fuentes testified that he received money from Rodriguez, who "worked in the cleaning group . . . he deposited this because he knew I did not have financial help." Ex. A, 66. As Rodriguez had money to spare, and therefore was not being deprived of the basic necessities, including him would be improper. *See e.g. Colapinto* 2011 WL 913251, at *4 ("Plaintiffs' proposed class definition includes members who are unharmed . . . This alone is sufficient to warrant denial."). And, Plaintiffs note that their experiences were limited to those in their small groups, undermining any allegation that they knew the circumstances of hundreds of individuals.

Plaintiffs have not provided any evidence about why they believe that other detainees were forced to work, rather than that they voluntarily chose to work. Instead, they allege that they observed other individuals working, but had no insight into their motivations for doing so, or financial status. This is insufficient evidence on which to assume that <u>every</u> individual at Adelanto was involuntarily working. Indeed, Plaintiffs' deposition testimony indicates that sometimes detainees would clean for personal

---

[19] As Novoa stated in his deposition, the Facility is divided into two separate dorms with different layouts and policies. <u>Novoa</u> <u>Dep.</u> 51-52.

CASE NO. 5:17-cv-02514-JGB-SHK
**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

reasons, or do so because they wished to make new friends. Ex. D, 97 ("I clean many times like myself; nobody forced me to clean. I did many times by myself when I saw toothpaste on the light sometimes, I did myself just to make the room look good. "); *Id.* at 25 ("I just work in the kitchen because I'm not sleeping, stress a lot of stress. . . ").

Finally, Plaintiffs' offer <u>no</u> evidence of nationwide harm, and in fact, fail to mention any specific facilities that should be included in the nationwide certification or a basis for their inclusion. And, none of the Plaintiffs know anyone at another GEO facility. Plaintiffs' Motion is devoid of evidence that any policies and/or practices that applied at Adelanto were applied elsewhere. Thus, the assertion that a nationwide class is sufficiently numerous lacks any support. Plaintiffs provide no credible evidence that there are aggrieved individuals, beyond those named above who shared their same experiences. Accordingly, the class does not meet the minimum numerosity requirements.

### E.   Plaintiffs Have Not Established Superiority.

"If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'" *Rai*, 2013 WL 10178675, at *9. Plaintiffs fail to establish, let alone meaningfully address, that class treatment is the superior method for resolving all claims efficiently and economically.  It is not. Plaintiffs argue that potential plaintiffs do not speak English and therefore should be permitted to litigate as a class. However, multiple languages do not provide a basis for combining plaintiffs. Here, each class member could be in a different state or country with little or no access to counsel. The proposed class plaintiffs may also consist of individuals who are struggling to avoid dire circumstances in countries they are seeking to flee. Indeed, it is important that these individuals do not have another burden thrust upon them.

And the depositions of the Plaintiffs presently before the Court, indicate that the Plaintiffs are transitory and without a permanent residence. Thus, when faced with

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

questions about a particular Plaintiff's identity, a fact-specific inquiry is necessary. This is made more difficult by the fact that Plaintiffs and the proposed class members often are not in possession of legal documentation of identity.  Plaintiffs do not provide a workable solution for managing identity concerns on a class-wide basis. Nor do Plaintiffs offer an explanation of how they plan to manage three classes (four with subclasses included) of thousands of people scattered across the world, in different time zones, and with varying access to communication. Indeed, even with only six declarants, Plaintiffs have already indicated that they are not in touch with one (despite the fact that he signed his declaration in late July) and required Karim's deposition be taken at a time that was convenient in Somalia, which is ten hours ahead of California. This time was outside the normal hours for court reporters and translators, increasing logistical burdens and costs.  It is unclear how Plaintiffs purport to manage classes of a much greater magnitude. Furthermore, Plaintiffs' proposed class raises issues that are highly individualized, with each raising unique allegations of alleged wrongdoing. The diverse geographic locations, disparate personal circumstances, and transitory nature of the proposed class indicates that each case would be better handled on an individual basis.  Accordingly, Plaintiffs' motion for class certification should be denied.

## V.     CONCLUSION.

For the foregoing reasons, Defendant GEO respectfully requests that this Court deny Plaintiff's Motion for Class Certification and also grant any other relief the Court deems just and proper.

Dated:  October 28, 2019

**AKERMAN LLP**

By: _/s/ Damien P. DeLaney_
Damien P. DeLaney
Colin L. Barnacle (admitted _pro hac vice_)
Ashley E. Calhoun

Attorneys for Defendant
THE GEO GROUP, INC.

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**PROOF OF SERVICE**

STATE OF CALIFORNIA          )

COUNTY OF LOS ANGELES  )

    I am employed in the County of Los Angeles, State of California; I am over the age of 18 years and not a party to this action.  My business address is 601 West Fifth Street, Suite 300, Los Angeles, California 90071.

    On **October 28, 2019**, I served the following document(s) described as:

**DEFENDANT THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

on the persons as indicated below:

☒    **(CM/ECF ELECTRONIC FILING)** I caused the above document(s) to be transmitted to the office(s) of the addressee(s) listed below by electronic mail at the e-mail address(es) set forth above pursuant to Fed.R.Civ.P.5(d)(1). "A Notice of Electronic Filing (NEF) is generated automatically by the ECF system upon completion of an electronic filing. The NEF, when e-mailed to the e-mail address of record in the case, shall constitute the proof of service as required by Fed.R.Civ.P.5(d)(1). A copy of the NEF shall be attached to any document served in the traditional manner upon any party appearing pro se."

Charles J. Gower (admitted pro hac vice)
jgower@burnscharest.com
Korey A. Nelson (admitted pro hac vice)
knelson@burnscharest.com
Lydia A. Wright (admitted pro hac vice)
lwright@burnscharest.com
BURNS CHAREST LLP
365 Canal Street, Suite 1170
New Orleans, Louisiana 70130
Telephone: (504) 799-2845
Facsimile:  (504) 881-1765

Robert Ahdoot (CA Bar # 172098)
rahdoot@ahdootwolfson.com
Tina Wolfson (CA Bar # 174806)
twolfson@ahdootwolfson.com
Theodore W Maya (CA Bar # 223242)
tmaya@ahdootwolfson.com
Ruhandy Glezakos (CA Bar # 307473)
rglezakos@ahdootwolfson.com
AHDOOT & WOLFSON, PC
10728 Lindbrook Drive
Los Angeles, California 90024-3102
Telephone:  (310) 474-9111
Facsimile:   (310) 474-8585

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

1  Will Thompson (CA Bar # 289012)
   wthompson@burnscharest.com
2  Warren Burns (admitted pro hac vice)
   wburns@burnscharest.com
3  TX Bar # 24053119
   Daniel H. Charest (admitted pro hac vice)
4  dcharest@burnscharest.com
   TX Bar # 24057803
5  BURNS CHAREST LLP
   900 Jackson St., Suite 500
6  Dallas, Texas 75202
   Telephone: (469) 904-4550
7  Facsimile:  (469) 444-5002

8  ☒   (MAIL) I placed the envelope to R. Andrew Free for collection and mailing. I
        am a resident or employed in the county where the mailing occurred.  The
9       envelope or package was placed in the mail at Los Angeles, California.

10 R. Andrew Free (admitted pro hac vice)
   andrew@immigrantcivilrights.com
11 TN Bar # 030513
   LAW OFFICE OF R. ANDREW FREE
12 P.O. Box 90568
   Nashville, Tennessee 37209
13 Telephone: (844) 321-3221
   Facsimile:  (615) 829-8959
14

15     I declare under penalty of perjury that I am employed in the office of a member
16 of the bar of this Court at whose direction this service was made and that the foregoing
   is true and correct.
17 ☐   (State)     I declare under penalty of perjury under the laws of the State of
                   California that the above is true and correct.
18
19 ☒   (Federal)   I declare that I am employed in the office of a member of the Bar of
                   this Court at whose direction the service was made.  I declare under
20                 penalty of perjury under the laws of the United States of America that
                   the above is true and correct.
21

22     Executed on October 28, 2019, at Los Angeles, California.

23
24 _____          _____
           Maxine Maritz                              (Signature)
25
26
27
28

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342