# EXHIBIT A

Page 1

1                    UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

3

4                                            )
     RAUL NOVOA, JAIME CAMPOS FUENTES,        )
5    ABDIAZIZ KARIM, and RAMON MANCIA,        )
     individually and on behalf of all       )
6    others similarly situated,              )
                                             )
7                                            )
                         Plaintiff,          )
8                                            )
              vs.                            )Case No. 5:17-cv-
9                                            )02514-JGB-SHKx
                                             )
10   THE GEO GROUP, INC.                     )
                                             )
11                       Defendants.         )
                                             )
12                                           )
     THE GEO GROUP, INC.,                    )
13                                           )
                                             )
14                       Counter-Claimant,   )
                                             )
15            vs.                            )
                                             )
16   RAUL NOVOA, JAIME CAMPOS FUENTES,        )
     ABDIAZIZ KARIM AND RAMON MANCIA,        )
17   INDIVIDUALLY AND ON BEHALF OF ALL       )
     OTHERS SIMILARLY SITUATED               )
18                                           )
                         Counter-Defendant.  )
19                                           )

20            DEPOSITION OF JAIME CAMPOS FUENTES

21            SUNDAY, OCTOBER 20, 2019, 8:51 A.M.

22                   LOS ANGELES, CALIFORNIA

23

24   Reported by Armando Pineda, CSR No. 12670

25   Job No. 170392

1              UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

3

4                                          )
        RAUL NOVOA, JAIME CAMPOS FUENTES,  )
5       ABDIAZIZ KARIM, and RAMON MANCIA,  )
        individually and on behalf of all  )
6       others similarly situated,         )
                                           )
7                                          )
                          Plaintiff,       )
8                                          )
                 vs.                       )Case No. 5:17-cv-
9                                          )02514-JGB-SHKX
                                           )
10      THE GEO GROUP, INC,                )
                                           )
11                        Defendants.      )
                                           )
12                                         )
        THE GEO GROUP, INC.,               )
13                                         )
                                           )
14                        Plaintiff,       )
                                           )
15               vs.                       )
                                           )
16      RAUL NOVOA, JAIME CAMPOS FUENTES,  )
        ABDIAZIZ KARIM, AND RAMON MANCIA,  )
17      INDIVIDUALLY AND ON BEHALF OF ALL  )
        OTHERS SIMILARLY SITUATED,         )
18                                         )
                          Defendants.      )
19                                         )

20         THE DEPOSITION OF JAIME CAMPOS FUENTES, taken

21      at 601 West Fifth Street, Suite 300, Los Angles,

22      California 90071, on Sunday, October 20, 2019, at

23      8:51 a.m., before Armando Pineda, Certified

24      Shorthand Reporter, in and for the State of

25      California.

Page 3

1    APPEARANCES:

2

3    For the Defendant and Counter-Claimant:

4            AKERMAN
             By:  COLIN BARNACLE, ESQ.
5            1900 Sixteenth Street
             Denver, Colorado 80202
6

7

8    For the Plaintiff and Counter-Defendant:

9            LAW OFFICES OF ANDREW FREE
             By:  ANDREW FREE, ESQ.
10           P.O. Box 90568
             Nashville, Tennessee 37209
11

12

13   For the Plaintiff and Counter-Defendant:

14           BURNS CHAREST
             BY:  LYDIA WRIGHT, ESQ.
15           365 Canal Street
             New Orleans, Louisiana 70130
16

17

18   Also Present:  Jacqueline Moore, Spanish Interpreter

19

20

21

22

23

24

25

Page 4

1                          INDEX

2   WITNESS:   Jaime Campos Fuentes

3   EXAMINATION                                    PAGE

4   By Mr. Barnacle                                4, 101

5   By Mr. Free                                    94

6

7

8

9              QUESTIONS NOT ANSWERED

10             PAGE            LINE

11             11              9
              18              4
12             29              24
              87              23
13

14

15

16             Answer Marked Confidential

17             PAGE            LINE

18             18              18

19

20

21

22

23

24

25

1                        INDEX TO EXHIBITS

2    EXHIBITS                                        MARKED

3    Exhibit 1  Spanish Declaration for Jaime Fuentes   31

4    Exhibit 2  Detainee file for Jaime Fuentes         33

5    Exhibit 3  Commissary activity form for            56
                Jaime Fuentes
6
     Exhibit 4 Resident account summary for             64
7               Jaime Fuentes

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            SUNDAY, OCTOBER 20, 2019

2                  8:51 A.M.

3            LOS ANGELES, CALIFORNIA

4

5                  JACQUELINE MOORE,

6   being called as an interpreter, was first duly sworn

7     to translate English to Spanish and Spanish to

8     English the testimony of the following witness:

9

10                JAIME CAMPOS FUENTES,

11  having been first duly sworn, testified through the

12     Spanish/English interpreter as follows:

13

14                   EXAMINATION

15  BY MR. BARNACLE:

16      Q.   Okay.  All right.  Good morning,

17  Mr. Campos Fuentes.

18          Is it okay if we refer to you as

19  Mr. Fuentes?

20      A.   It's okay.

21      Q.   My name is Colin Barnacle, and I represent

22  the Geo Group in this lawsuit, and I'm going to be

23  asking you a series of questions today about your

24  lawsuit against the company.

25          It's very important that you answer all of

Page 7

1    my questions truthfully today.  As you --

2         A.   Okay.

3         Q.   As you've just experienced, you swore

4    under oath to tell the truth.

5         A.   Yes.

6         Q.   Do you understand that there's a penalty

7    of perjury if you don't tell the truth?

8         A.   Yes.

9         Q.   It's against the law not to the tell the

10   truth.

11        A.   Yes.

12        Q.   Okay.  And obviously we have a court

13   reporter here today, and the court reporter is going

14   to be taking down your testimony word for word.

15        A.   Yes.

16        Q.   Okay.  So it's really important that we

17   give verbal answers.

18        A.   Okay.  All right.

19        Q.   Yeses and nos.

20        A.   Yes.

21        Q.   And no "uh-huh" and "huh-uh" and shrugs

22   and things like that.

23        A.   Yes.

24        Q.   We obviously also have a translator, and

25   I'm going to do my best to ask questions as clearly,

1    and you're going to answer questions, and she's

2    going to be translating them.  I'm going to try not

3    to --

4         A.   All right.

5         Q.   I'm going to try not to talk over you.

6         A.   All right.

7         Q.   And we'll let each other answer finish

8    what we're saying before we answer.

9         A.   All right.

10         Q.   With my questions, if you don't understand

11   what I'm asking you, please let me know.

12         A.   All right.

13         Q.   If you want me to repeat a question,

14   please ask.

15         A.   Perfect.

16         Q.   And if you don't tell me you don't

17   understand it, I'm going to assume that you do; is

18   that okay?

19         A.   Okay.

20         Q.   Okay.  You're free to take breaks whenever

21   you feel the need to.

22         A.   Perfect.

23         Q.   And if you need to, just let me know.

24         A.   All right.

25         Q.   The only thing that I ask is we don't take

1    a break while a question is pending.

2          A.    Okay.  All right.

3          Q.    Do you understand these questions so far?

4          A.    Yes.

5          Q.    And you understand these directions so

6    far?

7          A.    Yes.

8          Q.    Mr. Fuentes --

9          MR. FREE:  Counsel, I'm sorry.  Can we do

10   one housekeeping thing?

11         MR. BARNACLE:  Absolutely.

12         MR. FREE:  The interpreter is more --

13         Can I just inquire.  Are you federally

14   certified or certified in California?

15         THE INTERPRETER:  I am certified by the

16   State of California.

17         MR. FREE:  But not in any district court?

18         THE INTERPRETER:  No, I am not.

19         MR. FREE:  Okay.  We're going to lodge an

20   objection to the interpreter.  If it becomes an

21   issue, we'll work on it.

22         MR. BARNACLE:  Understood.

23   BY MR. BARNACLE:

24         Q.    Mr. Fuentes, are you taking any

25   medications today that prohibit you from

Page 10

1    understanding my questions or telling the truth

2    today?

3         A.   No.

4         Q.   Are you under the influence of any drugs

5    or alcohol today?

6         A.   No.

7         Q.   Okay.  Is there any reason why you can't

8    give your best and truthful testimony today?

9         A.   No.

10        Q.   Okay.  Have you ever been deposed before?

11        A.   No.

12        Q.   Okay.  Have you ever been a witness in a

13   legal proceeding?

14        A.   No.

15        Q.   Have you never been a witness in any sort

16   of immigration proceeding before?

17             MR. FREE:  Objection form.

18             You can answer the question.

19             THE WITNESS:  Oh, no.

20   BY MR. BARNACLE:

21        Q.   Okay.  I'm going to ask you a couple of

22   questions about what you did to prepare for today's

23   deposition.

24             Did you review any documents to prepare

25   for today?

Page 11

1        A.    Yes.

2              MR. FREE:  Objection to the extent that it

3    calls for work product.

4              MR. BARNACLE:  Okay.  I'm sorry.  What was

5    the answer?  Can you repeat the answer, please?

6              (Record read)

7    BY MR. BARNACLE:

8        Q.   Can you tell me what documents you

9    reviewed?

10             MR. FREE:  Objection.  The witness is not

11   going to answer information that would reveal

12   attorney-client priveledged work product.  I'm going

13   to instruct the witness not to answer.

14             THE WITNESS:  Okay.

15   BY MR. BARNACLE:

16       Q.   Do you have any copies of the documents

17   that you reviewed with you today?

18             MR. FREE:  Same objection.  I'm

19   instructing the witness not to answer.

20             MR. BARNACLE:  You're instructing him not

21   to say "yes" or "no" to that question?

22             MR. FREE:  I'm instructing him not to

23   answer questions that would reveal the

24   attorney-client privilege or work product doctrine.

25             MR. BARNACLE:  I'm asking him simply does

1    he have documents with him today that he reviewed.

2    I'm not asking for the subject of them or copies of

3    them.  Does he have them with him.

4              MR. FREE:  Okay.  You can answer that

5    question.

6              THE WITNESS:  No.

7    BY MR. BARNACLE:

8        Q.   Okay.  When did you review documents?

9        A.   Yesterday.

10       Q.   Okay.  How long did you spend looking at

11   those documents?

12             MR. FREE:  Objection.

13             You can answer.

14             THE WITNESS:  A couple of hours.

15   BY MR. BARNACLE:

16       Q.   Did you meet with anybody to look at those

17   documents?

18       A.   Yes.

19       Q.   Who did you meet with?

20       A.   With my attorneys.

21       Q.   Tell me who those attorneys were.

22       A.   The ones who are here present.  Ms. Lydia

23   and Mr. Andrew.

24       Q.   Was there anybody else present for that

25   meeting?

Page 13

1        A.    No.

2        Q.    Okay.  Did you meet with anyone else to

3   discuss your deposition before today?

4        A.    Yes.

5        Q.    Who else did you meet with?

6        A.    With Ms. Yolanda.

7        Q.    Can you tell me who Ms. Yolanda is?

8        A.    She's my sponsor.

9        Q.    Can you explain to me what a sponsor is?

10            MR. FREE:  I'm going to lodge a limited

11   objection.  He can respond to the extent that the

12   question calls for attorney-client privilege

13   information or work product -- work product

14   protected information that relates to Ms. Brown is

15   our interpreter.

16            I'm going to instruct him not to answer

17   those questions.  She's a trusted interpreter that

18   we're using.

19            You can answer questions about the facts

20   of the communication but not any of the content.

21            Do you understand?

22            THE WITNESS:  Yes.

23            MR. FREE:  Is that fair?

24            MR. BARNACLE:  I'm going to indicate on

25   the record that that's fair because I don't

Page 14

1    necessarily agree with you.

2            MR. FREE:  You think he shouldn't be able

3    to talk to his lawyers?

4            MR. BARNACLE:  Certainly he can talk to

5    his lawyers with an interpreter.  I have no

6    independent basis to understand that she's an

7    interpreter or what her role as an interpreter is.

8            MR. FREE:  Fair.

9            MR. BARNACLE:  Although to the extent --

10           MR. FREE:  Other than me telling you as an

11   officer of the Court.

12           MR. BARNACLE:  Obviously.

13           MR. FREE:  Okay.  So with all of those

14   objections, if you had a question --

15           MR. BARNACLE:  Understood.  Sure.

16   BY MR. BARNACLE:

17       Q.   When did you meet with your sponsor to

18   discuss your deposition?

19       A.   Yesterday.

20       Q.   Was she present during your meeting with

21   your lawyers?

22       A.   Yes.

23           THE INTERPRETER:  The witness has just

24   stated in English, yes.

25   / / /

Page 15

1    BY MR. BARNACLE:

2        Q.    When I asked you previously who else was

3    there, you didn't indicate your sponsor, right?

4        A.    No.

5        Q.    Why?

6        A.    You asked me who I had spoken to.

7        Q.    Okay.  So you spoke to your lawyers, and

8    your sponsor was interpreting what you were saying.

9             Is that the role she played?

10       A.    She was translating from English into

11   Spanish for me.

12       Q.    Understood.

13            You met with your sponsor separately

14   without your lawyers to talk about your deposition?

15       A.    No.

16       Q.    Can you give me your full legal name?

17       A.    Jaime Roberto Campos Fuentes.

18       Q.    Okay.  Have you ever used any other name?

19       A.    No.

20       Q.    What is your current address?

21

22

23

24

25

Page 16

1      ████████████████████████████████████

2      ████████████████████████████████████

3      ████████████████████████████████████

4      Q.   What is your date of birth?

5      ████████████████████████████████████

6      Q.   Do you have an e-mail address that you

7 use?

8      A.   Yes.

9      Q.   What is your e-mail address?

10      ████████████████████████████████████

11      Q.   Do you have any other e-mail addresses

12 that you use?

13      A.   I usually use it for accounts.  I'm not

14 really familiar with e-mails.

15      Q.   So is that the only e-mail address that

16 you use?

17      A.   Since I created it, I have not sent any

18 e-mail.  I just use it to go onto my social media

19 automatically.

20      Q.   Prior to your deposition today, have you

21 had any conversations with Raul Novoa?

22      A.   Yes.

23      Q.   And can you tell me when you had

24 conversations with Mr. Novoa?

25      A.   Do you want exact dates?

1    Q.    If you have them.

2    A.    No, I don't recall exact dates, but I did

3  get together with him several times.

4    Q.    Okay.  When you say "several times," how

5  many do you think that is?

6    A.    Two to three.

7    Q.    Can you tell me generally when you think

8  those meetings were?

9    A.    Excuse me?

10   Q.    Do you know generally when those meetings

11 were?

12   A.    Since last year.

13   Q.    So over the last year you have met with

14 Mr. Novoa two to three times?

15   A.    Yes.

16   Q.    When was the last time you talked with

17 Mr. Novoa?

18   A.    Yesterday.

19   Q.    Yesterday.

20        Did you meet with him with your lawyers

21 and your sponsor?

22   A.    Yes.

23   Q.    Okay.  Was he in the same meeting with

24 you?

25   A.    Are you talking to me directly about

Page 18

1    Mr. Novoa or the representative of Mr. Novoa?

2         Q.   I'm asking you if Mr. Novoa was present in

3    the meeting you discussed previously with your

4    lawyers and your sponsor?

5         A.   No.

6         Q.   Okay.  So did you meet -- you met

7    separately with Mr. Novoa?

8         A.   No.

9         Q.   Who was in the meeting with you and

10   Mr. Novoa?

11        A.   My attorneys.

12        Q.   Same attorneys that are sitting here right

13   now?

14        A.   Yes.

15        Q.   Did he have different lawyers?

16        A.   No.

17        Q.   So the meeting had you with Novoa -- it

18   was with all of the attorneys that are sitting here

19   today?

20             MR. FREE:  Objection.  Misstates his

21   testimony.

22             You can answer.

23             THE WITNESS:  Could you repeat the

24   question, please?

25   / / /

Page 19

1    BY MR. BARNACLE:

2        Q.    So the meeting that you had yesterday with

3    Mr. Novoa was with your attorneys who are sitting

4    here at this table today?

5        A.    Yes.

6        Q.    Did you have any conversations with

7    Mr. Novoa outside of the presence of your lawyers?

8        A.    No.

9        Q.    Okay.  Have you ever had any conversations

10   with Mr. Abdiaziz Karim?

11       A.    No.

12       Q.    How about Mr. Ramon Mancia?

13       A.    No.

14       Q.    You referenced some other meeting that you

15   had with Mr. Novoa prior to yesterday?

16       A.    I was referring to -- with the attorneys

17   as a representative.

18       Q.    Okay.  So every meeting that you've had

19   with Mr. Novoa has been in the presence of your

20   attorneys?

21       A.    I have gotten together with the attorneys.

22       Q.    Have you ever met with Mr. Novoa

23   separately?

24       A.    No.

25       Q.    Separate from your lawyers?

Page 20

1        A.    No, no, no.

2        Q.    Do you have a cellphone number?

3        A.    Yes.

4        Q.    Can you tell me what it is?

5              MR. FREE:  Objection.  Relevance.  And

6   unless you're going to demonstrate some nonharassing

7   reason why you need that, I'm going to instruct the

8   witness not to answer.

9              MR. BARNACLE:  Okay.  First of all, that's

10  not an appropriate objection.  Nonetheless we're

11  entitled to know his E-mail address and his cell

12  phone number in the event we have to get discovery

13  on text messages he might have sent with Mr. Novoa

14  outside of your presence.

15             MR. FREE:  You can give him your telephone

16  number.  We're going to mark it as personally

17  identifiable information under our protective order.

18  ███████████████████████████████████████████████████

19  BY MR. BARNACLE:

20       Q.    Thank you.

21             I think you referenced earlier that you

22  have an e-mail address so you can access social

23  media accounts; is that correct?

24       A.    Yes.

25       Q.    Can you tell me what social media accounts

Page 21

1    you're referring to?

2         A.    It's Facebook.

3         Q.    Anything else?

4         A.    Whatsapp.

5         Q.    Whatsapp.  Okay.  Facebook and Whatsapp.

6               Anything else?

7         A.    No.

8         Q.    Okay.  What is your Facebook handle?

9    ██████████████████████████████████████████████

10        Q.    When did you start using Facebook under

11   that handle?

12        A.    I don't recall.  A long time ago.

13        Q.    Fair enough.

14              How about Whatsapp?  What is your Whatsapp

15   handle?

16   ██████████████████████████████████████████████

17        Q.    Okay.  Do you know how long you've had

18   that handle for Whatsapp?

19        A.    Since I've had the phone.

20        Q.    Okay.  When did you first have the phone?

21        A.    For three years since I've been here --

22   well, I'm sorry.  A year and a half.

23        Q.    When you refer to the phone, are you

24   referring to a cell phone associated with the number

25   that you gave us previously?

Page 22

1      A.   Yes.

2      Q.   Okay.  Are you currently married?

3      A.   No.

4      Q.   Have you ever been married?

5      A.   No.

6      Q.   Do you have any children?

7      A.   Yes.

8      Q.   How many children?

9      A.   Two.

10     Q.   What are their ages?

11     A.   One is 12 years old, and the little girl

12  is three years and seven months old.

13     Q.   Do they live with you?

14     A.   No.

15     Q.   Who do they live with?

16     A.   With their moms.

17     Q.   Can you tell us what your country of

18  citizenship is?

19     A.   El Salvador.

20     Q.   Okay.  What currently is your immigration

21  status in the United States?

22          MR. FREE:  Objection to the extent it

23  calls for a legal conclusion.

24          But can answer your understanding.

25          THE WITNESS:  Okay.  I'm unaware of what

Page 23

1    the last judge's decision is.

2            MR. FREE:  I'm going to ask for if an

3    objection to the interpretation.  I believe he's

4    saying ultimo decision.  Was the final decision as

5    opposed to last.  We're just going to put that

6    objection on the record.

7            MR. BARNACLE:  Okay.

8    BY MR. BARNACLE:

9        Q.   When was that final decision, if you know?

10       A.   It's scheduled for January 2nd of next

11   year.

12       Q.   To the extent that you are aware -- what

13   was your immigration status while you were a

14   detainee at Adelanto?

15           MR. FREE:  Same objection to the extent it

16   calls for a legal conclusion about -- or his

17   awareness about a legal conclusion.

18           But you can explain again your response to

19   his question.

20           THE WITNESS:  Could you repeat that,

21   please?

22   BY MR. BARNACLE:

23       Q.   Yes.

24           I believe I asked to the extent that you

25   were aware, what was your immigration status when

Page 24

1    you were detained at the Adelanto facility.

2         A.    I was there as a detainee at the GEO

3    facilities.

4         Q.    Do you understand what your immigration

5    status in the United States was while you were

6    detained at Adelanto?

7         A.    I am asking for asylum.

8         Q.    Okay.  To the extent that you know, were

9    you work authorized in the United States while you

10   were detained at the Adelanto facility?

11        A.    Repeat the question, please.

12        Q.    To the extent that you know -- were you

13   work authorized in the United States?

14        A.    No.

15             MR. FREE:  I'm going to object to the

16   form, but you can put the answer on the record.

17   He's answered no.

18   BY MR. BARNACLE:

19        Q.    Are you aware of any of your fellow

20   detainees at Adelanto who were work authorized in

21   the United States while you were at the Adelanto

22   facility?

23        A.    I'm totally unaware.

24        Q.    Okay.  You said you were seeking asylum

25   while you were detained at Adelanto, correct?

Page 25

1          A.    Uh-huh, correct.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

18      Q.    Okay.  So immigration detained you.

19            Where did they detain you?

20      A.    As far as I know, it would be in Jacumba.

21            MR. FREE:  I will object to the

22  interpretation.

23  BY MR. BARNACLE:

24      Q.    Is that a U.S. town across the border of

25  Mexico?

Page 27

1      A.   I'm unaware of the immigration documents.

2  It said Jacumba.

3      Q.   Understood.

4           You said -- you said immigration detained

5  you; is that correct?

6      A.   Yes.

7      Q.   Do you understand, sitting here today,

8  what immigration is?

9           MR. FREE:  Objection to the form.

10          You can answer, if you understand.

11          THE WITNESS:  Could you repeat that,

12  please?

13  BY MR. BARNACLE:

14     Q.   Sitting here today, you referenced that

15  you were detained by immigration.  Sitting here

16  today, do you know what immigration is?

17          MR. FREE:  Same objection.

18          You can answer.

19          THE WITNESS:  The officers from the patrol

20  guard.

21  BY MR. BARNACLE:

22     Q.   I guess my question then is did the GEO

23  group detain you?

24     A.   No.

25     Q.   Did you have any conversations,

Page 28

1    communications at all, with GEO in El Salvador

2    before you fled?

3         A.   No.

4         Q.   Did GEO have anything to do with your

5    decision to flee?

6         A.   No.

7         Q.   I think you said you were detained by

8    immigration.

9              Is it immigration that took you to the GEO

10   facility?

11        A.   I was detained by guard patrol.  I was

12   taken for a certain time to a place known as ICE.

13             MR. FREE:  I'm sorry.  I will object to

14   the translation.

15             THE INTERPRETER:  This is the interpreter

16   speaking, Counsel.  May I interpreter seek

17   clarification.

18             MR. FREE:  Sure.

19             THE INTERPRETER:  I just want to find out

20   if the word he used stays in Spanish, or if it is

21   called "the cooler," which would be --

22             MR. FREE:  The icebox.  Llelera.

23             INTERPRETER:  Thank you.  Then I do not

24   seek clarification.

25             The interpreter would like to make a

Page 29

1   correction for the record.  When the interpreter

2   said "ICE," the interpreter should have said "the

3   cooler."

4   BY MR. BARNACLE:

5       Q.    Okay.  Can you tell me what the cooler is?

6       A.    That's how I know it.  It's a place where

7   people are confined while there is a space where the

8   detainees can be taken to.

9       Q.    Okay.  Is the cooler the same as the

10  Adelanto facility?

11      A.    No.

12      Q.    So how long did you spend at the cooler?

13      A.    I think about eight to ten days.

14      Q.    Okay.  Tell me.  Where did you go after

15  you left the cooler?

16      A.    Adelanto.

17      Q.    And did GEO, as far as you know, operate

18  the cooler?

19      A.    I'm unaware.

20      Q.    And are you currently employed?

21      A.    I work for myself.

22      Q.    Okay.  What do you do?

23      A.    Whatever I can find.  Cleaning, gardening.

24      Q.    Okay.  So do you have jobs that you do for

25  people?

Page 30

1      A.   Well, if they hire me.

2      Q.   Okay.  So tell me the last job you were

3  hired to do?

4      A.   I cleaned a storage, a garage.

5      Q.   How much did you make for that job?

6      A.   Twenty dollars.

7      Q.   Okay.  What was the job that you had

8  before that?

9      A.   I cleaned a garden -- I fixed up a garden.

10      Q.   How much did you make for that job?

11      A.   I was paid $100.

12      Q.   Okay.  How do people know to hire you?

13          MR. FREE:  Objection.  Calls for

14  speculation.

15          You can answer.

16          THE WITNESS:  There's a place called Home

17  Depot, and you go there, and you ask somebody if

18  they need help, and they ask you, what can you do.

19  BY MR. BARNACLE:

20      Q.   What Home Depot did you go to, to find

21  work?

22      A.   That's an opportunity in order to survive.

23      Q.   Understood.

24          What Home Depot do you go to, to find

25  work?

Page 31

1      A.   Gardena, Los Angeles.  It all depends on

2  where I am.

3           (Exhibit 1 was marked for identification.)

4  BY MR. BARNACLE:

5      Q.   Mr. Fuentes, what I have handed you is

6  going to be identified as Exhibit 1.

7           Can you tell me what this document is?

8      A.   This is my statement.

9      Q.   Is this an accurate copy of your

10 statement?

11     A.   Yes.

12     Q.   Can you tell me what you did to prepare

13 this statement?

14          MR. FREE:  I'm going to object to the

15 extent that it calls for information about

16 communications with his counsel or interpreters or

17 legal workers acting on their behalf.

18          You can answer anything that doesn't

19 involve your communications with your lawyers or

20 their staff or their interpreters.

21          THE WITNESS:  I had an interview with my

22 attorneys of what I had lived inside GEO.

23 BY MR. BARNACLE:

24     Q.   Okay.  And this is an accurate reflection

25 of your answers during that interview?

Page 32

1    MR. FREE:  I'm going to object, and I will

2  instruct the witness not answer.  That's privileged.

3    MR. BARNACLE:  I'm simply asking whether

4  it's an accurate reflection of his answers to an

5  interview.

6    MR. FREE:  Same objection.  You have his

7  declaration.

8  BY MR. BARNACLE:

9    Q.  Did anyone help you with the substance of

10  your declaration?

11    MR. FREE:  Objection.  Vague.

12    You can answer, if you know.

13    THE WITNESS:  Repeat that question.

14  BY MR. BARNACLE:

15    Q.  Did anybody help you with the answers to

16  your declaration?

17    MR. FREE:  Objection.  Vague.

18    You can answer, if you know.

19    THE WITNESS:  Let me repeat.  This is

20  something that I lived.  My declaration is sworn

21  about what I lived at GEO.

22  BY MR. BARNACLE:

23    Q.  Okay.  Fair enough.

24    If you could turn to paragraph 6, if you

25  could please read that for the record.

Page 33

1      A.    "I learned about the work program when I

2  entered Adelanto facility, and I requested to

3  participate in the program."

4           MR. FREE:  Do you want me to keep this?

5           MR. BARNACLE:  We're going to refer back

6  to it a couple of times.

7           (Exhibit 2 was marked for identification.)

8  BY MR. BARNACLE:

9      Q.    Mr. Fuentes, Exhibit 2 is in front of you.

10  It's a copy of your detainee file from Adelanto

11  facility.

12           Can you please turn to page 2 GEO-Novoa

13  29767, and you'll see there are numbers in the very

14  bottom right corner.  Just let me know when you're

15  there.

16           MR. FREE:  Counsel, is going to turn the

17  page to 29767.

18           I'm instructing the witness.

19           You can take as much time as you need to

20  review this document before answering the questions.

21           THE WITNESS:  Uh-huh.  Okay.

22  BY MR. BARNACLE:

23      Q.    Okay.  So when you say in your declaration

24  that you requested to take part in the program, is

25  this the form that you used to request participation

Page 34

1    in the program?

2         A.   No, this is an application that GEO gives

3    to fill those vacancies in which one can apply.

4         Q.   Okay.  So when you say you requested to

5    take part in the program, can you tell me what you

6    did to request participation?

7              THE INTERPRETER:  Interpreter correction.

8    At GEO there are documents called KITE.

9              MR. FREE:  KITEs.

10             THE WITNESS:  And you fill them out, and

11   you hand them to the officers from GEO.

12   BY MR. BARNACLE:

13        Q.   Okay.  So did you request to take part in

14   the work program via a KITE?

15        A.   Yes.

16        Q.   Did they immediately grant you the ability

17   to work?

18        A.   No.  You work without the right of getting

19   paid for a while, while you wait to be given the

20   position in cleaning or another available position.

21        Q.   If you can please turn to 29753, is this a

22   KITE?

23        A.   Yes.

24        Q.   Can you tell us what you're asking for in

25   this KITE?

Page 35

1      A.    It's in English.  It was filled out for me

2   by an officer.  I don't write nor understand

3   English.

4      Q.    In your review of this KITE, do you have

5   any ability to understand what it is that you were

6   asking to do?

7      A.    In this document?

8      Q.    Yes.

9      A.    Let me repeat.  It's in English.

10      Q.    So from what I can tell under the other

11   request language what I can read is, "Will like to

12   be on the list of cleaners.  Thank you.  Happy new

13   year."

14      A.    Okay.

15      Q.    And the date is 1/3 of '17.

16      A.    Yes.  While I was detained at Adelanto, I

17   entered on December 27th and the ones who were

18   working for GEO, I saw that they would put in a KITE

19   because they were paid one dollar, and I talked to

20   an officer -- the one who signed here below and the

21   captain confirmed it.  Personnel from GEO, right, so

22   you can become part of a consideration to have the

23   job for one dollar while I worked without receiving

24   pay or for a plate of extra food while I was on the

25   work list.

1     Q.   Okay.  So reading this form, the response

2  states, "You're application is on file.  Jobs are

3  assigned first come first serve based on date of

4  application.  You must wait your turn."

5          MR. FREE:  What is the question?

6          MR. BARNACLE:  I haven't asked it yet.

7          MR. FREE:  That's what I'm saying.

8  BY MR. BARNACLE:

9     Q.   Do you understand that was the answer to

10  your request to take part in the volunteer work

11  program?

12     A.   That was an application that I submitted.

13  The answer is when I'm already assigned, and they

14  start paying me one dollar.  Up until then, I am

15  hired by GEO.  In the meantime I need to work for

16  free without having the right to be paid.

17     Q.   So your testimony today under oath is that

18  while you waited to be put on the volunteer work

19  program payment system, you worked for no pay; is

20  that correct?

21     A.   Yes, or for a plate of extra food.

22     Q.   Okay.  Can you point -- go back to

23  Exhibit 1 and point me to anywhere in your exhibit,

24  in your declaration, of your experience at Adelanto

25  where you state that before you were allowed to work

Page 37

1   for a dollar in the volunteer work program, you were

2   forced to work for no pay?

3           MR. FREE:  Take as much time as you need

4   to review that declaration.

5           THE WITNESS:  Could you repeat the

6   question, please?

7   BY MR. BARNACLE:

8       Q.   I asked you to review your declaration in

9   Exhibit 1 and identify anywhere that you have stated

10  in your declaration that after you applied to work

11  in the volunteer work program for a dollar a day,

12  GEO required you to work without pay while you

13  awaited a position?

14      A.   In paragraph 7, 8, and 11, 12.

15      Q.   Okay.  If we go back to Exhibit 2 -- and

16  we're going to turn back to page GEO-Novoa 29767 --

17  when we looked at this previously -- and I think you

18  indicated that this was the actual application that

19  you filled out in order to work in the volunteer

20  work program; is that correct?

21      A.   Yes.

22      Q.   So when you signed up for the program, did

23  you understand that you had received one dollar a

24  day for any work that you performed?

25      A.   Yes.

Page 38

1    Q.   Okay.  When you entered the Adelanto

2  facility, did you also receive any sort of handbook

3  from GEO?

4    A.   Yes.

5    Q.   Did the handbook say anything to you about

6  the volunteer work program, if you remember?

7         MR. FREE:  Objection.  Vague.

8         Answer if you know.

9         THE WITNESS:  Yes, it says it.

10 BY MR. BARNACLE:

11   Q.   Okay.  Did the handbook also talk about

12  the payment of one dollar a day for work in the

13  volunteer work program?

14   A.   Yes.

15   Q.   Okay.  So now we're going to go back to

16  Exhibit 1, which is your declaration.  If we look at

17  paragraph 7 it says you worked as a janitor in the

18  work program.

19         Do you recall when you began work as a

20  janitor in the program work?

21   A.   I don't recall the exact date when they

22  started paying me the dollar, but I started working

23  December 27th doing cleaning or janitorial work.

24   Q.   So I think you just -- correct me if I'm

25  misunderstanding this.

Page 39

1        You said you began work as a janitor on

2  December 27th of 2016; is that correct?

3        MR. FREE:  Objection.  Misstates

4  testimony.

5        You can answer.

6        THE WITNESS:  Since GEO took me or

7  detained me, we started working for GEO cleaning

8  inside the unit.

9  BY MR. BARNACLE:

10    Q.   Okay.  So when you talked about the work

11  that you started doing when you first came to

12  Adelanto, you're referring to the work that you did

13  inside of your housing unit?

14    A.   My housing unit.  Let me specify and

15  clarify that it's my bed, and I do have to fix it.

16  Other than my bed, I did work for GEO with no pay.

17    Q.   Okay.  So the question I asked was when

18  you first came to Adelanto, I believe you testified

19  that you began working as a janitor in your housing

20  unit; is that correct?

21        MR. FREE:  Objection.  Misstates

22  testimony.

23        THE WITNESS:  Yes.

24  BY MR. BARNACLE:

25    Q.   Okay.  When I -- and what I'm asking you

Page 40

1    to clarify is what work you're talking about.

2              Are you referring to janitorial work

3    inside of your housing unit?

4        A.   Let me repeat.  The housing unit is my

5    bed.  I fix up my bed every day.  For GEO -- working

6    that housing unit is cleaning the shower, microwave,

7    hallways, the officers' offices, and I worked while

8    I was detained without any pay.  Just for one dollar

9    or an extra plate of food, and I consider that to be

10   illegal.

11       Q.   Okay.  So the work that you did when you

12   first came to the facility -- is it your testimony

13   that all you did was clean your bed?

14       A.   Yes.

15       Q.   Did you do any of the other work you just

16   testified to before you applied to work in the

17   volunteer work program?

18             MR. FREE:  Objection to form.  Maybe -- do

19   you want to clarify?  Is it the application or the

20   KITE?

21             MR. BARNACLE:  Good.

22             MR. FREE:  We're asking the same question.

23   You're asking the same question.

24   BY MR. BARNACLE:

25       Q.   We know that you submitted a KITE to

Page 41

1    participate in the volunteer work program.  I'm just

2    trying to understand what work you did from the time

3    that you entered the facility and the time that you

4    submitted the KITE to participate in the volunteer

5    work program?

6            So can you clarify that for me?

7        A.   What work did I do?

8        Q.   Yes.

9        A.   I cleaned intake, the offices of the

10   captains from GEO, the officer's offices, the GEO

11   hallways, showers, microwaves.  I did everything

12   free while I was waiting to get the job for one

13   dollar.

14       Q.   Did you do that work before you submitted

15   your KITE?

16       A.   Yes.

17       Q.   So from the day you entered Adelanto,

18   you -- before you even submitted a KITE to work in

19   the volunteer work program, it's your testimony that

20   you cleaned all of the things that you just

21   testified that you cleaned?

22       A.   Yes.

23       Q.   Okay.  I guess I'm going to ask you to go

24   back to Exhibit 1 and point to me where it is in

25   that declaration that you make that allegation?

Page 42

1            MR. FREE:  Objection to the form.

2            You can answer, if you know.

3            THE WITNESS:  In seven, eight.

4    BY MR. BARNACLE:

5        Q.   Is that it?

6        A.   Yes.

7        Q.   Okay.  So let's look at your -- let's look

8    at the same document, and let's look at paragraph

9    eight, and it says you also worked as a laundry

10   worker in the work program; is that correct?

11       A.   Yes.

12       Q.   Do you remember when you first started

13   working as a laundry worker?

14       A.   No.

15       Q.   Okay.  So you worked as both a janitor and

16   as a laundry worker; is that correct?

17       A.   Yes.

18       Q.   And did you work as a janitor the entire

19   time that you were at the facility?

20       A.   I worked all of the time and also the

21   times that the officers would bring us.  I did not

22   have a specific schedule.  If they would bring me at

23   2:00 a.m., 3:00 p.m., 7:00 p.m.

24       Q.   So did you work as both a janitor and as a

25   laundry worker at the same time?

1      A.    Not at the same time.  Different

2    schedules.

3      Q.    Not at the same time but on any given day

4    would you --

5      A.    Yes.

6      Q.    Are there a times where you -- you would

7    work one shift as a janitor and another shift as a

8    laundry worker?

9      A.    Yes.

10      Q.    And then you also just testified that you

11    worked all of the time.

12            Did you work every single day of the week?

13      A.    Yes, including Sundays.

14      Q.    Okay.  So you would work either as a

15    janitor or as a laundry worker or both for every day

16    of the week?

17      A.    Yes.

18      Q.    Okay.  So just tell me a little bit more

19    about when you performing work as either a janitor

20    or as a laundry worker.

21            How do you make GEO know that you worked

22    on a particular day?

23            MR. FREE:  Object to form.

24            You can go ahead and answer.

25            THE WITNESS:  There's somebody from GEO's

Page 44

1    personnel who comes to get us or the person

2    responsible.  If it has do with cleaning, the

3    officer in charge of cleaning would come to me, and

4    we would look for the other people -- and the

5    officer -- it was his responsibility to fill out a

6    document where we would put our names, our ID

7    numbers, the numbers used to identify us, and he

8    testifies or affirms that the cleaning job was

9    performed.  As detainee we cannot enter or exit our

10   rooms without an officer coming to get us.

11   BY MR. BARNACLE:

12        Q.    Okay.  So there's a sheet that would be

13   filled out by the officer to --

14        A.    Yes.

15        Q.    -- identify whether you participated in

16   your shift on any given day?

17        A.    Correct.  It's put in the captain's office

18   exactly on the captain's desk.

19        Q.    Okay.  So would you sign that sheet on a

20   given day?

21        A.    It was signed by the officer.

22        Q.    Okay.  Did you write your name or your

23   signature on that sheet in any way?

24        A.    Everything was done by the officer.

25        Q.    Okay.  Let's look at Exhibit 1 in

Page 45

1    paragraph nine, please.

2        A.    Should I read it?

3        Q.    Yes, please do.

4        A.    "GEO supervised and controlled all of the

5    aspects of my job."

6        Q.    You don't have to read it.  What I

7    meant -- what I meant is you can read it to

8    understand what I'm going to ask you.  I don't need

9    you to read it on the record.

10       A.    I'm sorry.

11             MR. FREE:  We made it a whole hour without

12   me reminding you to just let him finish his

13   question.  He'll ask you a question when he's ready,

14   okay, and that way we're not talking over each

15   other.

16             THE WITNESS:  Okay.

17   BY MR. BARNACLE:

18       Q.    I wanted to give you an opportunity to

19   read it before I asked you a question.

20       A.    Okay.  All right.  So I should read it to

21   myself, right.

22       Q.    Yes, absolutely.

23       A.    Okay.

24             MR. BARNACLE:  Let's take a break.

25   Everyone wants water.  There's no question pending.

Page 46

1          MR. FREE:  Off the record.

2          (Recess taken)

3          MR. FREE:  We're back on the record.

4          Pursuant to document 151, which is the

5    parties stipulated protective order and specifically

6    sections 2.3, 2.9, 5.1, and 5.2(c) of the protective

7    order, counsel is designating all asylum-related

8    questions and answers as highly confidential,

9    attorneys eyes only, for purposes of the transcript.

10          Now, he's going to ask you some questions.

11   Okay.

12          THE WITNESS:  Okay.

13   BY MR. BARNACLE:

14      Q.   All right before we went on our break we

15   were looking at Exhibit 1, and we were talking about

16   paragraph nine, and my question is, if the -- if the

17   volunteer work program at the facility was not

18   available, would you, to your knowledge, have been

19   permitted by ICE to go outside of the facility to

20   obtain a job?

21          MR. FREE:  Objection.  Calls for

22   speculation.

23          THE WITNESS:  GEO has different positions

24   for work.  We ask the officers why couldn't we work

25   outside and to be paid the necessary fee if we were

Page 47

1   detained.  GEO is the one that can control all of

2   the jobs they have, and the only ones that can

3   employ us.

4   BY MR. BARNACLE:

5       Q.    So your testimony is you were only allowed

6   to work inside of the Adelanto facility?

7               MR. FREE:  Objection.  Misstates

8   testimony.

9               Answer if you understand.

10              THE WITNESS:  Yes.

11  BY MR. BARNACLE:

12      Q.    Okay.  It's your testimony that you

13  believe that that was GEO's decision?

14      A.    The work decision?

15      Q.    When you were allowed to leave the

16  facility and get work outside of the Adelanto

17  facility?

18      A.    No, no.

19      Q.    So do you have an understanding of whose

20  decision that was?

21              MR. FREE:  Objection.  Calls for

22  speculation.

23              Answer if you know.

24              THE WITNESS:  No, I don't.

25  / / /

Page 48

1   BY MR. BARNACLE:

2       Q.   But your testimony is that was not GEO's

3   decision about whether you could leave the facility

4   and get a job?

5            MR. FREE:   Objection.   Misstates

6   testimony.

7            THE WITNESS:   Okay.   Let me explain.

8   While I was detained over that period of time, I

9   worked for GEO.   We asked my work group why was it

10  that GEO did not allow to do jobs outside if they

11  were the ones who were supervising us.   What we

12  wanted was to receive a fair salary, but it was GEO.

13  GEO would control us inside of the facility.

14  BY MR. BARNACLE:

15      Q.   So you and your work group asked GEO why

16  you could not work outside of the Adelanto facility?

17      A.   To the GEO officers.

18      Q.   Okay.   And what did the GEO officers tell

19  you as to why you could not work outside of the

20  boundaries of the Adelanto facility?

21      A.   Because we were detained.   We all had

22  different cases.   They were all in the process.

23      Q.   Okay.   Can you turn to paragraph one,

24  please and please read that to yourself before I ask

25  questions.

Page 49

1      A.    Uh-huh, okay.

2      Q.    So the first sentence says, "I participate

3  in the work program in order to buy daily

4  necessities that GEO failed to provide for me."

5            Is that correct?

6      A.    Correct.

7      Q.    Can you just tell me what you considered

8  to be daily necessities?

9      A.    Soap, toothpaste, brushes, clothes, food.

10     Q.    Anything else?

11     A.    That's it.  Basic necessities.

12     Q.    And did the commissary at the Adelanto

13  facility sell each of those daily necessities that

14  you just listed?

15     A.    Yes, they sell lotion, underwear, pants.

16     Q.    So lotion and underwear and pants?  Those

17  are also -- you consider those to be daily

18  necessities?

19     A.    Basic necessities.

20     Q.    According to paragraph 11, you

21  participated in the work program in order to buy

22  those items; is that correct?

23     A.    Yes.

24     Q.    Because GEO was not providing those to

25  you; is that correct?

Page 50

1    A.   Correct.

2    Q.   Okay.  Did you, in fact, buy each of those

3    types of items from the commissary?

4    A.   No.

5    Q.   You did not?  You did not?

6    A.   No, I did not buy clothes.  One pants cost

7    approximately 30 to 40 dollars.  I would buy basic

8    needs for myself which was food.  That's why I got

9    involved in the laundry work.

10         When I entered the GEO detention center,

11   they provide two uniforms, three uniforms worn off

12   and dirty underwear.  I believe that's not hygienic,

13   and I preferred to work in the laundry where I could

14   exchange for acceptable clothing than buy the pants.

15   That's why we asked the officers if we could do work

16   outside in order to earn more money, but GEO always

17   paid us one dollar.

18   Q.   Okay.  So at least with regard to clothing

19   items, pants, I think you said underwear.  You were

20   able to exchange those because you worked in the

21   laundry?

22   A.   No, that was prohibited.  When you entered

23   the laundry, the officer in charge -- last name

24   Mendoza -- would exchange our clothes -- the one

25   that we used, and would give us new clothes or a

Page 51

1    used one but a more acceptable one.

2        Q.    Understood.

3              Let's turn to back to Exhibit 2, please.

4              MR. FREE:  Exhibit 2?

5              MR. BARNACLE:  Yes.

6              MR. FREE:  What page?

7              MR. BARNACLE:  Pages 29738.

8              MR. FREE:  You can take all the time you

9    need to review this document.  Let him know when

10   you're ready.

11             THE WITNESS:  All right.

12   BY MR. BARNACLE:

13       Q.    Is this a KITE form?

14       A.    Yes.

15       Q.    What is the date of this KITE?

16       A.    1/4/2018.

17             MR. FREE:  Let the record reflect that the

18   witness is pointing to the handwritten date at the

19   bottom right hand corner of the text in the middle

20   of page 238 -- 2973.

21   BY MR. BARNACLE:

22       Q.    Can you read to us what your request was?

23       A.    My request -- I requested it on 1/3, and I

24   am requesting two boxers, and I asked if they're

25   new.

Page 52

1          On this KITE I'm showing that my clothes

2      was either used, worn out, and that we knew that

3      they were about to hand new uniforms.

4          Q.    Okay.  And is this KITE approved?

5              MR. FREE:  Objection.  Speculation.

6              Answer, if you know.

7              THE WITNESS:  Yes.  When one sends the

8      KITE, you put the date when you are requesting it.

9      When it gets to the officer who you are requesting

10     it to -- in this case Officer Mendoza -- he signs

11     and puts the date that this -- that this application

12     is requested.  Just so you can compare it.  Almost a

13     month later my boxers were approved.

14     BY MR. BARNACLE:

15         Q.    Well, let's look at this.  The date on the

16     top appears to me to be 1/3 of 2018 the 3rd of

17     January of 2018.

18             MR. FREE:  Hang on.

19             What is your question?

20     BY MR. BARNACLE:

21         Q.    Correct?

22         A.    Uh-huh, correct.

23         Q.    If you look at the bottom of the form, it

24     says "approved."  The box "yes" is checked, and the

25     date is January 4th of 2018; is that correct?

Page 53

1      A.    Correct.

2      Q.    Okay.  Let's turn to page GEO-Novoa 29741.

3            Let me with know when you've reviewed it.

4      A.    All right.

5      Q.    Is this also a KITE form that you

6  submitted?

7      A.    Yes.

8      Q.    Can you tell me the date of this request?

9      A.    The request was on 16 -- on October 16th

10  of 2017.

11      Q.    Can you tell us what you were requesting?

12      A.    I'm asking to change two boxers, two

13  T-shirts, large.

14      Q.    If you look at the bottom of this form,

15  was this request approved?

16      A.    On 7/10.

17            THE INTERPRETER:  Interpreter's

18  correction.  On 10/7.

19  BY MR. BARNACLE:

20      Q.    Okay.  If your request was on the 16th of

21  October 2017, does it appear this was approved the

22  next day on the 17th?

23      A.    It says seven.

24      Q.    Understood.

25            MR. FREE:  Let the record reflect that the

Page 54

1    witness is pointing to the date in the bottom

2    right-hand corner of the KITE in the middle of

3    page 29741.

4            MR. BARNACLE:  Understood.

5    BY MR. BARNACLE:

6        Q.   But your testimony is that this request

7    was approved?

8        A.   It was approved.

9        Q.   If you could turn to GEO-Novoa 29745,

10   please?

11       A.   I'm sorry.  Once again?

12       Q.   I'm sorry.  GEO-Novoa 29745.

13       A.   -45.  Here it is.  I'm ready.

14       Q.   Have you reviewed this document?

15       A.   Yes.

16       Q.   And what is the date of this request?

17       A.   7/11.

18       Q.   Of what year?

19       A.   12.  I mean, 2017.  I'm sorry.

20       Q.   Can you tell us what you were requesting

21   in this form?

22       A.   Two "L" size T-shirts.

23       Q.   In your review of this form, this was also

24   approved?

25       A.   Yes.

Page 55

1      Q.    If you could turn to GEO-Novoa to 9747,

2  please.

3      A.    Seven?

4      Q.    47?

5      A.    I'm ready.

6      Q.    Is this a KITE form that you submitted?

7      A.    Yes.

8      Q.    What is the date in this request?

9      A.    5/2.

10      Q.    Of what year?

11      A.    2017.

12      Q.    Can you tell us what you were requesting

13  here?

14      A.    Two pairs of socks.

15      Q.    And this KITE was also approved; is that

16  correct?

17      A.    Yes.

18      Q.    So you testified previously -- and correct

19  me if I'm misstating it.  You purchased certain

20  daily necessities from the commissary, and I think

21  you testified that you purchased food; is that

22  correct?

23      A.    Yes.

24      Q.    Did you purchase any other daily

25  necessities from the commissary?

Page 56

1       A.    Food.

2       Q.    Anything else that was a daily necessity?

3       A.    I usually bought food because I didn't

4  have enough to purchase other necessities.

5             (Exhibit 3 was marked for identification.)

6  BY MR. BARNACLE:

7       Q.    Mr. Campos, I have given you what is

8  marked as Exhibit 3.  I will represent to you this

9  is a commissary activity form for your purchases at

10 the commissary during your time at the Adelanto

11 facility.

12      A.    Yes.

13      Q.    Would you consider a Snickers bar to be a

14 daily necessity?

15      A.    Yes.

16      Q.    How about oatmeal cookies?

17      A.    Yes.

18      Q.    And cakes?

19      A.    Define cakes.

20      Q.    A Honey Bun cake?

21      A.    Is it bread?

22      Q.    It's a desert bread.

23      A.    Oh, yes.

24      Q.    Do you consider that to be a daily

25 necessity?

Page 57

1       A.    So a bread.  A bread, yes.

2       Q.    And candy?  Is that a daily necessity?

3       A.    Yes.

4       Q.    Jolly Ranchers?

5       A.    Yes.

6       Q.    Atomic Fireball candies?

7       A.    Yes.

8       Q.    Was there ever a time that you utilized

9   your purchases from the commissary to make alcohol

10   while in detention?

11       A.    To make what?

12       Q.    Alcohol?

13       A.    Oh, no, no.

14       Q.    If you look on the first page, which is

15   30059.

16       A.    300...

17       Q.    59.  If you look at the date 3/16 of '17.

18       A.    Oh, here.  Okay.

19       Q.    If you look --

20       A.    Yes.

21       Q.    If you look down four entries to where you

22   purchased lime chile with shrimp Ramen, do you see

23   that?

24       A.    Ramen?

25       Q.    Yes.

Page 58

1      A.   Yes.

2      Q.   It looks like you purchased seven; is that

3   correct?

4      A.   Yes.

5      Q.   How much -- how much did seven Ramen cost

6   you?

7      A.   A total of four dollars.

8      Q.   If you look then to the very bottom entry,

9   which is dated 9/21 of 2017, do you see that?

10     A.   Yes.

11     Q.   Where it looks like you purchased an

12   Atomic Fireball candy, do you see that?

13     A.   Yes.

14     Q.   How much does an Atomic Fireball candy

15   cost?

16     A.   A dollar 10.

17     Q.   Okay.  So you purchased seven Ramen for

18   four dollars?

19     A.   Uh-huh.

20     Q.   And then you spent a dollar 10 on an

21   Atomic Fireball candy?

22     A.   Oh, it's not a candy.  It's a bag of

23   candies.  Approximately 10 to 15 candies.

24          Since I did not have the necessary amount

25   to buy, what we did was buy different candies, and

Page 59

1   we would exchange it amongst the other people to

2   have a variety because some of us suffered of --

3   they suffered of sugar or blood pressure problems

4   and with a candy, we could level out that depression

5   a little.

6        Q.   And you had the ability to choose what you

7   used your commissary account funds to buy?

8             MR. FREE:  Objection to the form.

9             You can answer.

10            THE WITNESS:  Repeat it, please.

11   BY MR. BARNACLE:

12        Q.   You had the ability to use your commissary

13   money in whatever way you want, correct?

14            MR. FREE:  Object to the form.

15            You can answer.

16            THE WITNESS:  We could only use it to make

17   phone calls and buy commissary things.

18   BY MR. BARNACLE:

19        Q.   But nobody from GEO told you what you had

20   to buy at the commissary, did they?

21            MR. FREE:  Object to the form.

22            You can answer.

23            THE WITNESS:  In a certain way, yes.  And

24   let me explain why.

25            When GEO does not provide me with the

Page 60

1    necessary amount of food, so I need to decide if I

2    am going to buy food or bare the hunger.

3    BY MR. BARNACLE:

4        Q.   Which also -- by making that decision,

5    you -- to help with your hunger, you would buy M&Ms;

6    is that correct?

7        A.   Yes.

8        Q.   Okay.  Those are daily necessities?

9        A.   Let me repeat.

10            They were my daily necessities because it

11    would help me stay far away from what I was living.

12    What I was going through.

13       Q.   Cheese Puffs would help you to escape what

14    you were living on a daily basis?

15       A.   Yes.  And let me explain why.

16            When GEO gives us the three meal periods

17    that were not delicious at all, some foods were bad,

18    ruined, so I had to eat, and I needed the cookies or

19    soups or eat what GEO gave me and possibly have food

20    poisoning.

21       Q.   Did you -- did the commissary sell bottle

22    water?

23       A.   I'm unaware if they had bottled water.

24       Q.   So did the -- you're unaware of whether

25    the commissary sold water at all?

Page 61

1      A.    I'm unaware if the commissary sold

2   water -- water in a bottle.

3      Q.    Okay.  And you said in your paragraph 11

4   of your declaration that you bought personal hygiene

5   items from the commissary, correct?

6            MR. FREE:  Take a second to look at it.

7            THE WITNESS:  11?

8   BY MR. BARNACLE:

9      Q.    11, yes.

10      A.    Uh-huh, correct.

11      Q.    So if you don't mind going back to

12   Exhibit 3, which is your commissary history, and

13   review it for me, please, and point out what

14   personal hygiene items you were purchased from

15   commissary.

16            MR. FREE:  Objection.  This is a document

17   in English.  You can have the interpreter read every

18   word on here -- English to Spanish.  You can provide

19   a Spanish language document if you're going to ask

20   him to identify English language things on this

21   document.

22            MR. BARNACLE:  Actually, I don't need that

23   to happen.

24            MR. FREE:  You're asking him to answer

25   about this document in English and identify from a

Page 62

1   six-page document with approximately 30 entries all

2   in English where he purchased something.

3           That's the question?

4   BY MR. BARNACLE:

5       Q.   Are you able to review this commissary

6   report and identify whether any of the items you

7   purchased are personal hygiene items?

8           MR. FREE:  I'm going to object on the

9   basis that this document is in English.  If you

10  would like the interpreter to read it to him, you

11  can, or you can provide us with a translated

12  document, but he's not going to testify about a

13  document in English that he doesn't understand.

14          MR. BARNACLE:  Understood.

15  BY MR. BARNACLE:

16      Q.   Let's just confirm once again for the

17  record then that paragraph 11 of your declaration

18  specifically states that you relied on your wages to

19  buy food and personal hygiene items from the

20  commissary; is that correct?

21      A.   Correct.

22      Q.   Did you sign this declaration

23  understanding that you were under oath, under

24  penalty of perjury?

25      A.   Correct.

Page 63

1    Q.    Okay.

2    A.    And let me explain.

3          When I make my declaration in the

4    commissary, in the computer, all the variety is

5    there that one can buy.  Personal hygiene, basic

6    necessities.

7          When I mentioned that I participated in

8    the work program, if you have this document among

9    the documents of necessary needs that GEO did not

10   provide me with, I think I purchased envelopes to

11   send mail, batteries, that GEO provides for the use

12   for the radio or to send personal mail.

13         Everything that is here in my declaration

14   is because I lived it.  I bought those basic

15   necessities inside what GEO offers as basic

16   necessities, is personal hygiene.  I personally did

17   not buy basic necessities -- soaps, lotions --

18   because I did not have the financial means but

19   others did purchase.

20   BY MR. BARNACLE:

21   Q.    Well, let's just look at your declaration

22   under line 11, please and the second sentence says,

23   "I relied on my wages to buy food and personal

24   hygiene items from commissary."

25   A.    Yes.

Page 64

1    Q.   Is that your statement?

2    A.   It says that I depended on my salary to

3  buy food and hygiene -- hygiene supplies from the

4  commissary.  That's what GEO offers in their slogan

5  at the commissary.

6    Q.   Okay.  And it's your testimony that --

7  Strike the question.

8           (Exhibit 4 was marked for identification.)

9           MR. BARNACLE:  I will mark this as

10  Exhibit 4, please.

11  BY MR. BARNACLE:

12    Q.   Mr. Fuentes, I have given you what's

13  identified as Exhibit 4.  I will represent to you

14  this is a resident account summary which provides a

15  listing of your commissary balance and your various

16  purchases from that account during your detention

17  time.

18    A.   Correct.

19    Q.   Okay.  Can you turn to GEO-Novoa 30074,

20  please?

21           If you look towards the second to last

22  entry the date would be March 1st of 2017.

23           Do you see that?

24    A.   March 1st.  Oh, yes.

25    Q.   Do you know who Miguel A. Meldez is?

Page 65

1       A.    I don't recall.

2       Q.    Did Miguel Meldez deposit money into your

3   commissary account?

4       A.    Yes, $20.

5       Q.    Okay.  But you don't know who Miguel

6   Meldez is?

7       A.    I don't know him personally.

8       Q.    Do you know who he is?

9       A.    As far as I know, he's a friend of a

10  female client of my mom's.

11           MR. FREE:  Object to the translation.

12           Did you finish it?  After client of my

13  mom's?

14           THE INTERPRETER:  No, I did not, Counsel.

15           MR. FREE:  Okay.  I will object to the

16  translation.

17           THE INTERPRETER:  May I continue?

18           MR. FREE:  Yes, go ahead.

19           THE WITNESS:  A female friend of my mom's

20  who received me here.

21           Let me repeat.  Most of the names that

22  appear here are people who were inside the Adelanto

23  facility.  And as help or solidarity to me, they

24  deposited these amounts because they also lived

25  through the same thing I was living through.

Page 66

1    BY MR. BARNACLE:

2         Q.    So Miguel Meldez is a friend of your

3    mother's; is that correct?

4         A.    Let me repeat.  I don't know him, and

5    that's what I know.

6         Q.    Okay.  Who -- if you look on the 11th of

7    March, 2017 who is Rosendo Rodriguez?

8         A.    Oh, he was a detainee.  He had hearing

9    problems, and he made that deposit.

10        Q.    Okay.  So Rosendo Rodriguez was a fellow

11   detainee of yours while you were at Adelanto

12   facility?

13        A.    Yes, yes.

14        Q.    Again, why would he give you $20?

15             MR. FREE:  Objection.  Calls for

16   speculation.

17             Answer, if you know.

18             THE WITNESS:  He worked in the cleaning

19   group.  I believe he already resided here in the

20   United States, and he would tell us about the value

21   of working inside without having enough money, and

22   he deposited this because he knew that I did not

23   have financial help.  At this point in time I was

24   working for free.  If you notice starting February

25   10th, I started having money in my commissary.

Page 67

1    Before I was already working for GEO for free.

2    Together with Rosendo and many others who are on the

3    list.

4    BY MR. BARNACLE:

5        Q.   Understood.  We already talked about that.

6             Please turn to GEO-Novoa 30072.

7             MR. FREE:  Same exhibit?

8             MR. BARNACLE:  Yes, same exhibit.  Sorry.

9             THE WITNESS:  300?

10   BY MR. BARNACLE:

11       Q.   72.

12            All right.  If you would go towards the

13   top on 7/8 of 2017, do you know who Portillo

14   Gonzales is?

15       A.   She's a volunteer who works for an

16   organization called The Other Side.

17            MR. FREE:  We can do it in Spanish.

18            THE WITNESS:  Al Otro Lado.

19            MR. FREE:  A-l for the transcriber.

20   BY MR. BARNACLE:

21       Q.   So she deposited $30 into your account; is

22   that correct?

23       A.   Correct.

24       Q.   Had you met with Ms. Gonzales prior to

25   that deposit?

Page 68

1        A.    No.

2        Q.    Have you ever met with her?

3        A.    No.

4        Q.    Okay.  If you turn to the page just before

5    that which is 30071, if we look at the entry on

6    7/17/of 2017.

7        A.    7/17.

8        Q.    7/17?

9        A.    Yes.

10       Q.    And do you know who Alexandra Valle is?

11       A.    She was one of my sponsors who submitted

12   my immigration papers.

13       Q.    Okay.  Ms. Valle deposited $40 into your

14   commissary account on that day?

15       A.    Yes, I worked cleaning with her dad.

16       Q.    If you go up to the entry on 7/19 of '17,

17   do you know who Alexander Mensing is?

18       A.    Yes.

19       Q.    Can you tell me who he is?

20       A.    He's a voluntary who works Al Otro Lado.

21       Q.    And he deposited $20 into your commissary

22   account on that day?

23       A.    Yes, it wasn't just $20.  He deposited

24   that on several occasions.

25       Q.    Okay.  Had you ever met Alexander Mensing?

Page 69

1      A.    I was close to him when we had problems

2   with GEO with the repressions and threats that GEO

3   was giving us when we were detained.  Mensing worked

4   as a voluntary for Al Otro Lado.

5      Q.    I think you just testified that

6   Mr. Mensing deposited $20 into your commissary

7   account on multiple occasions; is that correct?

8      A.    Yes, you can see that there are several

9   deposits here.  And Esther too.

10      Q.    Okay.  Esther.  Who is Esther?

11      A.    Esther Portillo.

12      Q.    Okay.  We talked about her previously.

13      A.    Uh-huh.

14      Q.    If you turn to the page before 30070 if

15   you look at the entry on August 22nd of 2017, do

16   you know who Claudia Gazpar is?

17      A.    She was -- she is the coworker of an --

18          THE INTERPRETER:  The interpreter needs to

19   seek clarification from the witness, Counsel.  May

20   I?

21          MR. FREE:  Sure.

22          MR. BARNACLE:  Yes.

23          THE WITNESS:  Of a detainee that was in

24   the cleaning crew.

25          MR. FREE:  Object to the translation.

Page 70

1          THE INTERPRETER:  Counsel, this is the

2     interpreter speaking.  The word compañero -- I will

3     spell it for the record in a second.

4          MR. FREE:  That wasn't the basis of the

5     interpretation.  That was not the basis compañero is

6     the not the basis.

7          THE INTERPRETER:  Okay.  Counsel, you're

8     not letting me speaking.  I lost my train of

9     thought.  It's okay.  Thank you.

10    BY MR. BARNACLE:

11         Q.   Nonetheless Claudia Gazpar deposited $19

12    into your commissary account on that day, correct?

13         A.   Uh-huh, correct.

14         Q.   Let's go up to August 31st of 2017.  Do

15    you see the entry for Edgar Quintanilla?

16         A.   Yes.

17         Q.   Can you tell me who Edgar Quintanilla is?

18         A.   He is my representative in the immigration

19    case.  He's my attorney.

20         Q.   And on that date he deposited $100 into

21    your commissary account?

22         A.   Yes.

23         Q.   Let's go up to the entry on

24    September 9th of 2017.

25              Do you know who Brenda Avelica is?

Page 71

1      A.    She is also the daughter of another

2  detainee in cleaning by the name of Romelo Avelica.

3      Q.    Okay.  On that date she deposited $10 into

4  your commissary account?

5      A.    Yes.

6      Q.    Did your -- did her father tell you that

7  she was going to do that?

8      A.    He was already out.

9      Q.    At that time -- let's just look on 9/9 of

10  2017.

11          Can you state for the record what your

12  balance in your commissary account was?

13          MR. FREE:  Counsel, do you want to point

14  him to a specific -- you're talking about 997 --

15          MR. BARNACLE:  17.

16          MR. FREE:  Can I just direct him to it?

17          MR. BARNACLE:  Sure.

18          MR. FREE:  So let the record reflect that

19  I'm pointing to the balance on column on September

20  9th, 2017.

21          THE WITNESS:  This one.

22  BY MR. BARNACLE:

23      Q.    Can you state for the record what that

24  number is?

25      A.    232.

Page 72

1      Q.   If we go to GEO-Novoa 30069 on 9/20 of

2 2017, can you tell me who Christina Cardona is?

3           MR. FREE:  Counsel is pointing to 9/20

4 entry on 30069 for the witness.

5           THE WITNESS:  No, no, no.  I don't know --

6 I don't remember who she is.  It must have been a

7 relative of a detainee.

8 BY MR. BARNACLE:

9      Q.   Okay.  On that date 9/20 of 2017

10 Ms. Cardona deposited $25 into your commissary

11 account; is that correct?

12     A.   Yes.

13     Q.   Okay.  You don't know who she is; is that

14 correct?

15     A.   I don't recall who she is.

16     Q.   If we could go back to your declaration in

17 your Exhibit 1, please.

18           MR. FREE:  Counsel, before we move on, is

19 there a reason why we got these documents on Friday

20 after requesting them on July 27th, 2018 for the

21 first time an amending Mr. Campos Fuentes in this

22 case late last year?

23           MR. BARNACLE:  We can certainly talk about

24 it off the record, but I'm in the middle of a

25 deposition.

Page 73

1          MR. FREE:  It looks like these documents

2    were created on October 15th.  Is there a reason

3    they weren't provided by the defendants first?

4          MR. BARNACLE:  As I just stated to you, we

5    can talk about this off the record, I'm in the

6    middle of a deposition.  I'm trying to question the

7    witness.  I would appreciate you ending your

8    disruption.

9          MR. FREE:  I'm just asking if there's a

10   reason why we don't --

11         MR. BARNACLE:  I know what you asked.

12         MR. FREE:  You just don't want to answer.

13         MR. BARNACLE:  We can talk about it off

14   the record.

15         MR. FREE:  Okay.

16   BY MR. BARNACLE:

17      Q.   If you look at paragraph 14, if you could

18   read to yourself, please.  Just tell me when you're

19   finished reading it.

20      A.   Yes, I am done.

21      Q.   Okay.  So you note that GEO required

22   detainees to clean areas of the Adelanto facility

23   for no compensation.  The areas that you're talking

24   about in paragraph 14 -- are you referring to the

25   common living areas in your housing pod?

Page 74

1          MR. FREE:  Objection.  Form.

2          You can answer.

3          THE WITNESS:  I will repeat.

4          The common areas to me that is the area of

5     my bed.  GEO here required that we, as detainees,

6     cleaned the facilities.  I'm referring to intake,

7     the captain's offices and hallways, or wherever

8     there was a need to clean or maintain.

9     BY MR. BARNACLE:

10        Q.   And that would be part of the janitorial

11    duties you were doing and the volunteer work

12    program; is that correct?

13         MR. FREE:  Object to form.

14         You can answer.

15         THE WITNESS:  Correct.  GEO would see me

16    as a --

17         THE INTERPRETER:  The witness has just

18    stated in English a handyman.

19         THE WITNESS:  And they knew that they had

20    personnel to work anywhere.

21    BY MR. BARNACLE:

22        Q.   Okay.  Understood.

23         Just so I'm clear.  What you're talking

24    about in paragraph 14 are the duties you performed

25    as a janitor in the voluntary work program; is that

1  correct?

2      A.   Correct.

3      Q.   Okay.  And then if you also look at

4  paragraph 14 in the middle it says, "if you refuse

5  to clean, GEO officials would threaten to lock us in

6  our cells."

7           Did I read that correctly?

8      A.   Correct.

9      Q.   So tell me -- tell me what you mean by

10  your cell?  What does a cell encompass in this

11  declaration?

12     A.   Okay.  Inside GEO there are facilities.

13  Facilities known as tanks where there are usually

14  approximately 80 to 85 people.  Inside those tanks

15  there are rooms or cells.  Each cell has four beds.

16          If we did not do what the officers told us

17  to do -- cleaning -- we were deprived of our rights.

18  The necessary rights.  The shower or heating up food

19  in the microwave.  Because since there wasn't the

20  right of pay, GEO or the officers would lock us up

21  in our rooms or cells until somebody went to do it.

22          If there wasn't that someone, they would

23  choose from the cleaning group, and I was included

24  in that group.

25     Q.   Okay.  So I'm just -- I'm trying to

Page 76

1    understand what we're talking about here.

2              So we talked just previously that the work

3    regarding the cleaning of the bathroom, shower,

4    sink, floors, furniture, officer's offices,

5    hallways, that was part of your work as a janitor

6    for the volunteer work program, correct?

7              MR. FREE:  Objection.  Objection.  Vague.

8    compound.

9              MR. BARNACLE:  I would just state for the

10   record.  I would really appreciate it if you would

11   allow her to finish her translation before you

12   object.  I think it's confusing the questions and

13   answers.

14             MR. FREE:  We can agree on that.

15   BY MR. BARNACLE:

16        Q.   Is that correct?  Maybe I need to restate

17   this.

18        A.   Yes, please.

19        Q.   And what we're talking about in

20   paragraph 14 -- the work you're talking about I

21   think you testified that that was related to the

22   janitorial work you did as part of the volunteer

23   work program; is that correct?

24             MR. FREE:  Objection.  Misstates prior

25   testimony.

Page 77

1          Answer, if you know.

2          THE WITNESS:  My work cleaning was

3    cleaning the hallways.  That is what GEO hired me to

4    do in the positions that GEO has.

5          Since there was nobody that would do the

6    work that I mentioned -- the sinks, the showers --

7    the officers chose us to do this job.  And in order

8    not to involve the one dollar payment, they would

9    give us an extra plate of food.

10   BY MR. BARNACLE:

11       Q.   So when you said that if you refused to

12   clean, GEO officials would threaten to lock us in

13   our cells, are you referring to refusing to do your

14   janitor position in the volunteer work program, or

15   are you referring to the cleaning duties related to

16   your housing unit?

17          MR. FREE:  Objection.  Compound.  I just

18   want to clarify.  Is the question about

19   paragraph 14?

20          MR. BARNACLE:  Yes, it is.

21          MR. FREE:  Okay.

22          THE WITNESS:  Okay.  Let me clarify.

23   There isn't a volunteer work.  The work is done

24   while GEO pays us one dollar.  When you don't do the

25   cleaning that you are demanded to do of the

Page 78

1    facilities, we have to be locked up in our cells.

2          I acknowledge that my unit -- my living

3    unit is my bed, and I don't have any problem making

4    my bed outside of my unit and bed.  That is the

5    responsibility of maintenance and cleaning from GEO.

6        Q.   Okay.  I appreciate that.

7          But you didn't answer my question.  My

8    question was.  Were you threatened with being locked

9    in your cell for refusing to do your janitor duties

10   that they assigned you to do that you applied to do

11   as a part of the voluntary program?

12       A.   Yes.

13          MR. FREE:  Are you finished with your

14   question?

15          MR. BARNACLE:  Yes.

16          MR. FREE:  Okay.  Objection misstates his

17   testimony.  It's compound.  It's argumentative.

18   You.

19          Can answer, if you understand.

20          MR. BARNACLE:  He did answer.  He answered

21   yes.

22          THE WITNESS:  Okay.

23          MR. FREE:  Is that before or after the

24   translation was finished?  I thought we agreed that

25   you're going to wait until the translation.

Page 79

1          MR. BARNACLE:  You still haven't done it.

2     BY MR. BARNACLE:

3          Q.   So you answered yes?

4          A.   Yes, I was threatened by Officer Batello

5     and other officers.

6          Q.   For refusing to do your janitor job as

7     part of the voluntary work program, correct?

8               MR. FREE:  Objection.

9               THE WITNESS:  Yes.

10    BY MR. BARNACLE:

11         Q.   Was there a time that you refused to do

12    your volunteer work program job?

13         A.   Excuse me?

14         Q.   Was there --

15         A.   Could you repeat it?

16         Q.   Was there a time when you were -- you had

17    a shift to be a janitor as part of the volunteer

18    work program?  Is there a time that you refused to

19    do that job?

20              MR. FREE:  Okay.  You done?  We need to

21    make sure that everybody is finished talking before

22    you respond, okay.  I'm lodging an objection to

23    form.

24              If you understand his question, you can

25    answer his question.

Page 80

1              THE WITNESS:  Yes.  Let me repeat.

2              Previously I said that I did not have a

3    set schedule.  Officer Batello, Marinello, and many

4    others would come at the time that it had to be

5    cleaned -- the GEO facilities -- whether you call it

6    voluntary work or for a one-dollar pay.

7              When you are told at 2:00 a.m. you need to

8    go clean where everybody is sleeping, where

9    supposedly we are resting, my fellow detainees and I

10   would have to go work in that voluntary program.  If

11   you said no, we were threatened on several

12   occasions.  That was a personal decision.  You

13   either did it, or you stayed here in the room.

14   BY MR. BARNACLE:

15       Q.   And your testimony is that -- did you ever

16   make the decision at one of those times to refuse to

17   perform the job being asked?

18              MR. FREE:  Objection to form.

19              You can answer.

20              THE WITNESS:  Yes.

21   BY MR. BARNACLE:

22       Q.   So you refused to do the work and then you

23   wouldn't have received the dollar for performing

24   that work, correct?

25              MR. FREE:  Objection.  Form.

Page 81

1           You can answer.

2           THE WITNESS:  Yes.  And let me explain

3   why.

4           On any given day at 1:00 a.m., 2:00 a.m.

5   the officer arrives, ask me to go and do the

6   cleaning, and I say no.  I'm sleeping or tired

7   because the other day I had also had a workday.

8           What were the consequences?  I was

9   repressed by the officers.  They would cancel the

10  telephone calls.  We had ex-appropriation of our

11  belongings.

12          When I use the words we were threatened to

13  be locked up in our cells, that is one of the -- one

14  of a few threats that the officers would tell us

15  because they would also deprive us of the right --

16  let me repeat -- of going to the bathroom, or they

17  would not hand us the basic necessities.  Shampoo,

18  toothpaste.  So my decision was to go and do the

19  cleaning in order to at least not have problems with

20  those threats.

21     Q.   So they would threaten to lock you in your

22  cell at 1:00 or 2:00 in the morning?  Is that your

23  testimony?

24     A.   Not at that time because we were already

25  locked up.  They couldn't lock us up if we were

Page 82

1   already locked up.

2        Q.   Okay.

3        A.   But later on during the day, yes.

4        Q.   Okay.  Were you ever put into

5   administrative segregation for refusing to perform

6   your voluntary work program position?

7             MR. FREE:  Objection to the form.

8   Compound.

9             You can answer.

10            THE WITNESS:  Segregation, no.

11  BY MR. BARNACLE:

12       Q.   Were you ever placed in disciplinary

13  segregation for refusing to perform your voluntary

14  work program position?

15       A.   No.  And let me state.  I always did the

16  work that the officer would require me to do.  In

17  order to have a low profile with them, I did not

18  want to get in trouble.

19            MR. FREE:  Are you at the end of the

20  line for questioning?

21            MR. BARNACLE:  Yeah, we can take a break.

22            MR. FREE:  Okay.  Do you want to put on

23  the record the brief off the record conversation?

24            MR. BARNACLE:  Yes.

25            MR. FREE:  Okay.  So while we were off the

Page 83

1    record, counsel and I had a discussion that we

2    agreed to have -- what's your -- I think we --

3              MR. BARNACLE:  I believe that the

4    questions that were raised on the record previously

5    were related to why certain of the documents that

6    are exhibits in this deposition had been produced on

7    I believe Friday of this last week.

8              Off the record we had a discussion, and I

9    committed that I would review all of the potentially

10   relevant discovery requests as well as GEO's

11   responses to those requests and identify where, if

12   anywhere, the requests for these type of documents

13   had been made.  Identify where they exist within

14   GEO's system and provide more clarity as to the date

15   of the production, and I'm happy to do that and will

16   do so early next week.

17             MR. FREE:  We're lodging a form objection,

18   but we're going to proceed today.

19             MR. BARNACLE:  Okay.

20   BY MR. BARNACLE:

21        Q.   Okay.  Mr. Fuentes, if we could go back to

22   Exhibit 1 of your declaration.  I think we had

23   previously discussed that you worked as a janitor;

24   is that correct?

25        A.   Correct.

Page 84

1   Q.   How many people were on your cleaning

2   crew?

3   A.   Usually four per day.  When the cleaning

4   day was done, we were sometimes up to eight.

5   Q.   And would the various people on the

6   cleaning crew with you be the same from day to day

7   or would it be different?

8   A.   They were the same ones while we were

9   detained.

10   Q.   Okay.  Can you tell me the names of the

11   four people who were on your cleaning crew with you?

12   A.   We barely knew the people by name, but

13   there were several nicknames, or we called them by

14   rooms.

15   Q.   Okay.  So the four people that were on

16   your cleaning crew, can you tell me what their --

17   either nicknames were, or what you called them?

18   A.   Miguel.

19   MR. FREE:  Okay.  I'm just going to remind

20   you to wait for her to finish translating, take a

21   pause in case I need to object.  I don't need to

22   object, but I just wanted to remind you.  Okay.

23   THE WITNESS:  Okay.

24   MR. FREE:  So you said Miguel.

25   THE WITNESS:  Miguel.  Since I entered

Page 85

1    GEO, I'm going to remember them the way I remember.

2           Miguel Morena, Giovanni, La Guerra, that's

3    a nickname.  El Chapo, Francisco, El Pollo,

4    Mr. Romolo Avelica.  I don't remember the rest.

5    BY MR. BARNACLE:

6           Q.   And you also worked a voluntary work

7    program position in the laundry area; is that

8    correct?

9           A.   Yes.

10          Q.   And how many people would you typically

11   work with when you're on a laundry shift?

12          A.   We were five or six.

13          Q.   If you could tell me generally what work

14   you would do on a laundry shift?

15          A.   We folded clothes.  We would wash all of

16   the detainees' clothes.  We would also answer to the

17   KITE requests.  We would go and hand the clothing to

18   the units where they belonged, and we would clean

19   inside the laundry room.

20          Q.   So you just testified that you would

21   answer to the KITEs.  I want to try to understand

22   that a little bit better.

23               So you're talking about --

24          A.   Okay.

25          Q.   -- detainees who would request different

Page 86

1    items of clothing and you would fulfill those

2    requests?

3         A.    Remember that I had a KITE where I

4    requested -- okay.  While I was not working in the

5    laundry, I would have to present a KITE in order to

6    exchange my clothing, right?  When I started working

7    at the laundry, I don't present the KITE any longer.

8    The officer directly gives me the privilege of

9    exchanging my clothes.  The one that I'm wearing at

10   that moment.  But the KITEs that we respond to are

11   the ones that the other detainees from the entire

12   facility would send, and we would give them what

13   they wanted.

14        Q.    Understood.

15             You mentioned generally you would have a

16   group of five or six people on a laundry --

17        A.    Yes.

18        Q.    -- group?

19             MR. FREE:  Just a reminder.  Wait for the

20   end of the translation --

21             THE WITNESS:  Okay.

22             MR. FREE:  -- even if you know the answer.

23             THE WITNESS:  Okay.

24   BY MR. BARNACLE:

25        Q.    Can you tell me who those five or six

Page 87

1   people were?

2        A.    No.

3        Q.    Was it a different five or six each shift,

4   or would you generally work with the same people?

5        A.    From my group it was three, four.

6   Sometimes they would choose my group, 4 Delta, to go

7   to the laundry.  In the laundry there were already

8   other people from other groups.

9        Q.    So from your group there were roughly

10  three or four people, can you tell me who those

11  people were?

12       A.    Sometimes.  Some of the ones who worked

13  with me in cleaning would go.  Other times it was

14  other detainees that did not have the privilege of

15  having commissary, and they were incorporated to the

16  laundry in order for them to have a benefit of an

17  extra plate.

18       Q.    If you turn back to Exhibit 1, which is

19  your declaration, if you turn to paragraph 13,

20  please, I believe it says, "To the best of my

21  knowledge, hundreds of detainees, if not more, took

22  part in the voluntary work program while I was at

23  the Adelanto facility."

24            Did I read that correctly?

25       A.    Yes.

Page 88

1    Q.   Did you personally witness hundreds of

2    people working in the voluntary work program?

3    A.   Yes.

4    Q.   Would those hundreds of people be part of

5    the janitor in the cleaning jobs that you performed?

6    A.   Yes.

7         MR. FREE:  Objection.  Compound.  The

8    witness responded, yes.

9         Again, wait until she's finished and then

10   you can answer.

11   BY MR. BARNACLE:

12   Q.   Did you ever work in food service?

13   A.   No.

14   Q.   Did you ever work in the library?

15   A.   No.

16   Q.   Did you ever work in the barber shop?

17   A.   No.

18   Q.   So when you're talking about hundreds of

19   detainees, are you talking only about the janitor

20   positions and the cleaning -- and the laundry

21   positions?

22   A.   It actually says -- according to my

23   belief, hundreds of detainees, if not more,

24   participated in the voluntary work program during my

25   time.  Remember that I was detained for almost one

Page 89

1  year, and I could see the different people who

2  worked for GEO in those positions of all

3  nationalities.

4      Q.  Did you ever work with Mr. Novoa?

5      A.  No.

6      Q.  Were you detained at the same time as

7  Mr. Novoa?

8      A.  No.

9      Q.  Did you ever work with Mr. Karim?

10      A.  No.

11      Q.  Were you detained at the same time as

12  Mr. Karim?

13          MR. FREE:  Objection.  Calls for

14  speculation.

15          If you know, you can answer.

16          THE WITNESS:  No.

17  BY MR. BARNACLE:

18      Q.  Did you ever work with Mr. Ramon Mancia?

19      A.  No.

20      Q.  Were you detained at the same time as

21  Mr. Mancia?

22      A.  No.

23      Q.  In your conversations and meeting with

24  Mr. Novoa, did he ever tell you about outside

25  funding that he received for his commissary

Page 90

1   accounts?

2           MR. FREE:  I'm objecting and instructing

3   the witness not to answer.  The witness has

4   previously testified that all conversations he had,

5   meetings that he had with Mr. Novoa happened with

6   counsel or his staff.

7           As such anything that Mr. Novoa would tell

8   Mr. Campos during these meetings, is covered not

9   only by the attorney-client privilege and

10  work-product doctrine but also by the joint

11  prosecution privilege.  On that basis I'm

12  instructing him not to answer that question or any

13  questions regarding what Mr. Novoa told him during

14  meeting with attorneys.

15          If you want to ask about stuff that

16  happened outside of presence of counsel, then you

17  can.

18          MR. BARNACLE:  I don't agree with your

19  objection.  Facts shared from Mr. Novoa to

20  Mr. Fuentes during any conversation, there's no

21  legal advice given with regard to those facts that

22  were shared by and between these two individuals.

23  So we can certainly take up this particular use of

24  attorney-client privilege, work-product doctrine

25  after this deposition.

Page 91

1        MR. FREE:  Can you mark this as a

2    potential 37-1 discovery dispute for the magistrate,

3    please, Court Reporter.

4    BY MR. BARNACLE:

5        Q.   So do you have any personal knowledge

6    about any of the voluntary work program positions

7    other than the two that you performed, which were as

8    a janitor and working in laundry?

9        MR. FREE:  Objection.  Compound.  Vague.

10       You can answer.

11       THE WITNESS:  Can you repeat that, please?

12   BY MR. BARNACLE:

13       Q.   Yes.  I asked you:  Do you have any

14   personal knowledge about any of the voluntary work

15   program positions -- other than the two that you

16   performed -- which were as a janitor and working in

17   laundry?

18       MR. FREE:  Same objection.

19       You can answer.

20       THE WITNESS:  Yes, kitchen.

21   BY MR. BARNACLE:

22       Q.   Okay.  Tell me how you have personal

23   knowledge of the work performed by detainees in the

24   voluntary work program related to the kitchen?

25       A.   Because they would talk of what was done

Page 92

1    inside and because I did cleaning inside of the

2    kitchen and I was able to observe what was done

3    there.

4         Q.   But you never worked in a voluntary work

5    program position in the kitchen; is that correct?

6         A.   No, I tried to apply.

7         Q.   Okay.  Do you have any personal knowledge

8    of voluntary work program positions that worked in

9    the library?

10        A.   No.

11        Q.   Okay.  Do you have any personal knowledge

12   of voluntary work program positions that worked in

13   the barber shop?

14        A.   No.

15        Q.   Do you know any detainees at any other of

16   GEO's facilities outside of Adelanto?

17             MR. FREE:  Objection.  Form.

18             You can answer.

19             THE WITNESS:  I don't understand.  Could

20   you explain that, please?

21   BY MR. BARNACLE:

22        Q.   Yeah, I'm asking you:  Do you know any

23   current or former detainees at any GEO facility

24   other than at Adelanto?

25        A.   No.

Page 93

1    Q.   Okay.  If we could go to back to Exhibit

2    2, if we could turn to 29765.

3    A.   This one?

4    Q.   Yes.  Do you know what this document is?

5    A.   This is the verification of my manual when

6    I handed it in and a video that we watched.

7    Q.   Okay.  So when you -- were you provided

8    this when you first entered the Adelanto facility?

9    A.   GEO.  Fills out this document when I'm

10   handed this manual of their policies.  It's like a

11   verification that it was handed.

12   Q.   Okay.  So did GEO hand you something

13   called the GEO handbook when you entered the

14   facility?

15   A.   Yes.

16   Q.   And did they hand you something called the

17   ICE handbook when you entered the facility?

18          MR. FREE:  Object to the form.

19          You can answer.

20          THE WITNESS:  The ICE handbook?

21   BY MR. BARNACLE:

22   Q.   Yes.

23   A.   GEO.  It says "GEO handbook."

24   Q.   Did you receive two separate handbooks

25   when you entered the facility?

Page 94

1     A.    I received a blue handbook.  A blue book

2  of the GEO policies.

3     Q.    Okay.  Did you review the blue book with

4  GEO policies?

5     A.    Yes.

6     Q.    And as part of that blue book, were

7  there -- was there one part that had GEO policies?

8     A.    Yes.

9     Q.    Was there another part that had ICE

10  policies?

11          MR. FREE:  Objection.  Vague.  Calls for

12  speculation.  Calls for a legal conclusion.

13          Answer, if you know.

14          THE WITNESS:  Okay.  If it was in English,

15  I obviously did not understand it.  If it was in

16  Spanish, the policy, as far as our understood it,

17  was that there was going to be an ICE officer who

18  would be verifying our cases and that any question

19  or concern we could ask him.

20  BY MR. BARNACLE:

21     Q.    Just so we're clear.  You don't separately

22  recall there being an ICE handbook that had ICE

23  policies provided to you when you entered the

24  Adelanto facility?

25          MR. FREE:  Object to form.

Page 95

1           You can answer.

2           THE WITNESS:  When you said separately,

3    you are verifying that I did, in fact, receive it.

4    And what I recall is receiving a blue handbook with

5    the GEO policies.

6    BY MR. BARNACLE:

7        Q.   Okay.  Understood.  And just so I'm clear.

8    Did you ever purchase shampoo from the commissary?

9        A.   No.

10       Q.   Okay.  Did you ever purchase lotion from

11   the commissary?

12       A.   No.

13       Q.   Did you ever purchase soap from the

14   commissary?

15       A.   No.

16           MR. BARNACLE:  I think I'm done.

17           MR. FREE:  Can we take five minutes?

18           MR. BARNACLE:  Yes.

19           MR. FREE:  I do have a couple of

20   questions.

21            (Brief recess taken)

22           MR. BARNACLE:  Yes.

23           MR. FREE:  Okay.

24   / / /

25   / / /

Page 96

1                      EXAMINATION

2    BY MR. FREE:

3        Q.   Do you recall approximately what month and

4    year you entered Adelanto?

5        A.   I was detained on the 25th of December

6    of 2016, and I don't recall when I was taken to

7    Adelanto.

8        Q.   And do you recall the date you were

9    released from Adelanto?

10       A.   January 24th of 2018.

11       Q.   Okay.  I would like you to look at

12   paragraph nine of Exhibit 1, which is your

13   declaration, and I will point you to the last

14   sentence on line 19 starting with "aveces" or

15   "sometimes."  Can you read that out loud, please?

16   Those two sentences.

17       A.   "Sometimes I was paid nothing.  On other

18   occasions I was paid with extra portions of food."

19       Q.   Is that true?

20       A.   Yes.

21       Q.   Okay.  Did you actually receive the items

22   that you requested on the day that you received a

23   response from ICE to your KITE asking for clothing?

24            MR. BARNACLE:  Object to the form.

25            THE WITNESS:  No.

Page 97

1   BY MR. FREE:

2       Q.   How long would it take to receive the

3   items that you asked for?

4           MR. BARNACLE:  Object to the form.

5           THE WITNESS:  Sometimes it would take

6   days.  Let me repeat.  We are 84, 80 people in each

7   tank.  If I would send a KITE among all of the

8   hundreds of KITEs in order to be given an answer, it

9   would take days.

10  BY MR. FREE:

11      Q.   Did the commissary sell fresh fruit?

12      A.   No, not at the commissary.

13      Q.   Did it sell fresh vegetables?

14      A.   No.

15      Q.   Did the commissary sell any form of meat

16  and protein?

17      A.   I'm not aware.

18      Q.   In order to buy four-dollar packets of

19  Ramen containing seven Ramen packages, how many days

20  would you have to work?

21      A.   Four if they paid me for them.

22      Q.   How do you make phone calls at Adelanto?

23      A.   With the money from the commissary from my

24  work.

25

Page 98



12    Q.   Did you ever have a free telephone call

13  with your attorney while you were inside Adelanto?

14  Your immigration attorney?

15    A.   No.   They only give us three minutes on a

16  card.  Upon entering, most people used it to call

17  their relatives.  If you had any money left, you can

18  use it to make calls.

19    Q.   Do you know approximately how much the

20  calls cost per minute?

21    A.   No.

22    Q.   You testified earlier about an extra

23  plate.

24         Do you remember that?

25    A.   Yes.

Page 99

1      Q.   Why was that a benefit to you while you

2   were at Adelanto?

3      A.   One, because the food was not enough that

4   GEO gave us because of the time that we were given

5   to eat and by giving us a second plate, they could

6   give it to us in a bag.  What we call a lunch bag.

7   The officer would authorize me to take it to the

8   room and to eat more peacefully.

9      Q.   Why, if you understand, were you able to

10  be released from Adelanto in January of 2018?

11     A.   Repeat the question, please.

12     Q.   Why, if you know, were you able to be

13  released from Adelanto in January of 2018?

14     A.   At my last court date the immigration

15  judge said that I had three possibilities.  The

16  appeals board notified --

17          THE INTERPRETER:  The interpreter needs to

18  clarify, Counsel.

19          MR. FREE:  I understand.  I can help.

20          THE INTERPRETER:  I know you may, but if

21  you don't mind.

22          THE WITNESS:  They could win my case.

23  BY MR. FREE:

24     Q.   Okay.  Did you pay a bond to get out?

25     A.   I received help to pay it because I don't

1   have the means.

2        Q.   Okay.  Who helped you?

3        A.   Several people.  Among them were my

4   sponsor and other people who were involved.

5        Q.   How did you communicate with those people

6   while you were inside Adelanto?

7        A.   It was through the voluntary program Al

8   Otro Lado.

9        Q.   Did you ever communicate with people

10  outside by telephone about your bond process?

11       A.   No.

12       Q.   Okay.  It was face-to-face?

13       A.   No, I'm not aware of how it was paid.

14       Q.   Okay.  If you had not been able to make

15  phone calls to anyone because you had no money in

16  your commissary, do you believe you would still be

17  in Adelanto today?

18       A.   No.

19       Q.   Explain why?

20       A.   Had I not been able to make the telephone

21  calls to call my family, talk to Al Otro Lado, I'm

22  almost sure I would have been deported and murdered

23  in my country.

24       Q.   Is it fair to say that the money in your

25  commissary made a difference between whether you

Page 101

1    were free and safe or detained?

2        A.   Yes.

3        Q.   Is it fair to say that the money in your

4    commissary helped you avoid deportation and

5    potential death in El Salvador?

6        A.   Yes.

7        Q.   The candy that you have purchased at the

8    commissary that GEO's attorney asked you about

9    earlier, did you always use all of that candy for

10   your own personal use as opposed to other people

11   eating it?

12       A.   Oh, no.

13       Q.   Okay.

14       A.   We would exchange it with the other

15   detainees.  For example, I would buy candy, and I

16   would exchange it with the other ones who had maybe

17   shampoo.  They would give me a little bit or

18   toothpaste.  Whatever they had in their hand.

19       Q.   You used candy you got at the commissary

20   to get soap or other hygiene items; is that correct?

21       A.   Yes.

22       Q.   Was the work that you did for GEO at

23   Adelanto voluntary?

24       A.   No, it wasn't voluntary because I had to

25   work for one dollar or for a plate of extra food.

Page 102

1    Q.   Why did you have to work for those things?

2    A.   Because I needed to cover my basic needs.

3    I needed to make a phone call so I could be paid one

4    dollar, and the most important thing is the threats

5    from the officers.  They would punish all of us in

6    general or specifically the group.

7    Q.   Why would you be punished?

8    A.   For refusing not to work.

9    Q.   Did you ever personally refuse to work?

10   A.   Yes.

11   Q.   What happened when you did so?

12   A.   The officers -- on that occasion they

13   took -- they appropriated themselves with my

14   personal belongings.  I remember that I had worked

15   at 2:00 a.m., and we had been given a lunch bag.

16        They came at 7:00 a.m. to go and do

17   another job and we said no and a few minutes later

18   an officer came to do a seizure and took away what

19   we had as food.

20   Q.   Do you remember whether it was one officer

21   or more than one officer?

22   A.   There are different officers.

23   Q.   Do you remember the name of any of those

24   officers?

25   A.   There's Officer Otello, Marionello.  A

1    female Officer Gonzales.  Mendoza, Ny, and many

2    officers whose names are in English and I can't

3    remember.

4         Q.   As far as you know, do all of those

5    officers work for GEO?

6         A.   Yes.

7              MR. FREE:  Those are all of the questions

8    that I have.

9              MR. BARNACLE:  I have one follow up.

10                        EXAMINATION

11   BY MR. BARNACLE:

12        Q.   If you don't mind turning to Exhibit 2.

13             MR. FREE:  Do you have a page?

14             MR. BARNACLE:  Yes.  29751.

15   BY MR. BARNACLE:

16        Q.   Is this a KITE form that you submitted?

17        A.   Yes.

18        Q.   Can you tell us what you requested?

19        A.   To help me call my family.

20        Q.   And what did -- what was GEO's response to

21   that request?

22             MR. FREE:  If you know.  It's in English.

23             THE WITNESS:  No, I don't know what it

24   says.

25             MR. FREE:  Do you want to read it to him?

Case 5:17-cv-02514-JGB-SHK   Document 206-1   Filed 10/28/19   Page 105 of 114   Page ID
#:3168

Page 104

1    BY MR. BARNACLE:

2        Q.   The response says one free 5-minute call

3    expires 3/5 of '17.

4             Do you see that?

5        A.   Yes.

6        Q.   Did you receive a free five minute call in

7    response to this KITE?

8        A.   No.

9        Q.   So this is inaccurate?  Is that what

10   you're saying?

11       A.   If you see the date of my kite -- of my

12   request, it's in February.

13            MR. FREE:  Let the record reflect that the

14   witness is pointing to the date part at the top of

15   279751.

16            THE WITNESS:  And I imagine that what is

17   mentioned here is that GEO gives us a card when we

18   enter GEO in order to communicate.

19            MR. FREE:  Let the record reflect that the

20   witness is pointing at the response section of the

21   KITE on 29751.

22            THE WITNESS:  When I asked them for help

23   to communicate with my family, it's among the

24   privileges that we have when we work in the

25   positions.  We would fill out a KITE, and the GEO

Page 105

1    officer would take the people in order to make a

2    phone call.  I'm unaware of the location because I

3    never had that privilege.

4    BY MR. BARNACLE:

5        Q.    Okay.  You requested the help to call your

6    family on February 12th of 2017, correct?

7        A.    Correct.

8        Q.    The bottom portion says that it was

9    completed and the date is February 22nd of 2017,

10   correct?

11       A.    Yes.

12       Q.    And the response says one free five minute

13   call expires 3/5 of '17, correct?

14       A.    Yes.

15       Q.    And it's your testimony right now that

16   despite this form and despite the fact that the

17   response says five-minute call expires 3/5/17 and

18   despite the fact that there's a telephone number

19   listed, you didn't get a free five-minute call?

20            MR. FREE:  Objection.  Compound.

21            You can answer.

22            THE WITNESS:  Okay.  If I don't remember

23   incorrectly, this is the date when we entered GEO.

24   The date that I put in the KITE to get ahold of my

25   family was on February 12th.

1          MR. FREE:  So for the record, when he said

2     the date that he was entering GEO, he was pointing

3     to the time date stamp box in the top right-hand

4     corner of this Bates stamped page.

5          He's now pointing to the center column of

6     the call-out box in the middle of the page in the

7     Spanish section.  It says market.

8          THE WITNESS:  And GEO responds on the

9     22nd.  I think there's a 10-day difference.  Where

10    they tell me that on March 5th, I'm going to have

11    five free minutes, which I was never able to do

12    because if there were a log of my calls, they will

13    only appear inside the tank for Delta.

14    BY MR. BARNACLE:

15         Q.   Okay.  I understand what you're saying.

16    The response says one free five-minute call expires

17    3/5 of '17?

18         A.   Uh-huh, correct.

19         Q.   Is it your understanding of the word

20    "expires" means you can make that phone call for

21    five minutes for free at any time after the 22nd

22    of February to 3/5 of '17?

23         MR. FREE:  Object to form.

24    You can answer, if you know.

25         THE WITNESS:  Okay.  Yes, I understand

Page 107

1    what you're saying.  But exactly what is said is not

2    complied.  Because my need was at this moment to

3    call my family.

4              GEO responds 10 days later that they

5    cannot communicate me with my family until March.

6    If we look at the dates of February 22nd to

7    March 5th, I did not have communication with my

8    family.  If there was an officer -- if there was,

9    I'm sure I did not go.

10   BY MR. BARNACLE:

11       Q.   Okay.  Can you turn to GEO-Novoa 29754.

12            Is this also a KITE form that you

13   submitted on January of 2017 regarding making a

14   phone call to your family?

15       A.   It's in English.  The officer filled it

16   out for me.

17       Q.   Okay.  It says -- if I can read part of

18   it.

19       A.   Yes.

20       Q.   "I know if I could get a free call,

21   please, Officer.  Thanks so much."

22            MR. FREE:  I'm going to object.  That's

23   not what it says completely.  If you want to read to

24   him all of what it says, that's fine.

25            MR. BARNACLE:  It's hard to read the top

1    part.

2              MR. FREE:  I agree.  So let's decide

3    whether we're going to read all of what it says --

4    BY MR. BARNACLE:

5         Q.   The response section says, "You have one

6    free three-minute phone call that expires February

7    2nd of 2017."

8              Do you see that?

9         A.   Yes.

10        Q.   Did you utilize your one free three-minute

11   phone call prior to February 2nd of 2017 to call

12   your family?

13        A.   I will repeat.

14             If these are calls that I supposedly made,

15   I did not make them.  The only thing that GEO gave

16   me was a card in order to make a three-minute call.

17   It wouldn't make any sense that I wanted to talk to

18   my family.  That's why I sent these KITEs.

19        Q.   Understood.

20             And if you look at, you know, back at

21   29751, you stated on February 12th, 2017 you

22   wanted to speak to your family, and that wasn't

23   the -- the free five-minute card wasn't granted to

24   you until 10 days later, correct?

25             MR. FREE:  Objection to the form.

Page 109

1          You can answer.

2          THE WITNESS:  Let me clarify.  Once again

3    a little slower.

4          All detainees, specifically myself, was

5    given one card.  Just one card for three minutes.

6    Other than that card, GEO does not hand any more

7    telephone cards unless one has money in the

8    commissary to use.  My KITE.

9          THE INTERPRETER:  Interpreter's

10   correction.

11         THE WITNESS:  My KITEs are to ask an

12   officer to allow me to make a call.  Where the

13   officer comes to the unit, makes the call for you on

14   that exact day that it was scheduled, and you are

15   taken to another location to make it.

16         That's why I am clarifying, once again, I

17   never made another call other than my first

18   three-minute call for the first time.  All these

19   were attempts to communicate with my family.

20   BY MR. BARNACLE:

21     Q.   Okay.  So looking at the KITE on 29754,

22   you request the ability to call your family, and the

23   response is you have one free three-minute phone

24   call that expires February 2nd of 2017.

25         Do you see that?

Page 110

1         A.    Yes.

2         Q.    Did you use that three-minute phone

3    call -- free three-minute phone call to call your

4    family before --

5         A.    No.

6         Q.    -- February 2nd of 2017?

7         A.    No.

8              MR. BARNACLE:   Okay.   I have no further

9    questions.

10

11

12              (Deposition concluded at 12:13 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 111

DECLARATION UNDER PENALTY OF PERJURY

      I, JAIME CAMPOS FUENTES, do hereby certify under penalty of perjury that I have reviewed the foregoing transcript of my deposition taken on October 20, 2019; that I have made such corrections as appear noted herein in ink; that my testimony as contained herein, as corrected, is true and correct.

      DATED this _____ day of _____, 2019, at _____, California.

 

 

 

 

               _____

                   Jaime Campos Fuentes

Page 112

REPORTER'S CERTIFICATION

1

2

3        I, Armando L. Pineda, Certified Shorthand

4   Reporter in and for the State of California, do

5   hereby certify:

6        That the foregoing witness was by me duly

7   sworn; that the deposition was then taken before me

8   at the time and place herein set forth; that the

9   testimony and proceedings were reported

10  stenographically by me and later transcribed into

11  typewriting under my direction; that the foregoing

12  is a true record of the testimony and proceedings

13  taken at that time.

14       I further certify that I am not counsel for nor

15  related to any party to said action nor in any way

16  interested in the outcome thereof.

17

18       IN WITNESS WHEREOF, I have subscribed my name

19  on this 22nd day of October, 2019.

20

21

                              *Armando Pineda*
22  _____

          ARMANDO L. PINEDA, CSR No. 12670
23

24

25

```
                                                    Page 113
 1                      ERRATA SHEET

 2    Case Name:

 3    Deposition Date:

 4    Deponent:

 5    Pg.  No. Now Reads      Should Read  Reason

 6    ____ ____ _____   _____  _____

 7    ____ ____ _____   _____  _____

 8    ____ ____ _____   _____  _____

 9    ____ ____ _____   _____  _____

10    ____ ____ _____   _____  _____

11    ____ ____ _____   _____  _____

12    ____ ____ _____   _____  _____

13    ____ ____ _____   _____  _____

14    ____ ____ _____   _____  _____

15    ____ ____ _____   _____  _____

16    ____ ____ _____   _____  _____

17    ____ ____ _____   _____  _____

18    ____ ____ _____   _____  _____

19    ____ ____ _____   _____  _____

20

21                                 _____

22                                 Signature of Deponent
      SUBSCRIBED AND SWORN BEFORE ME
23    THIS ____ DAY OF _____, 2019.

24    _____

25    (Notary Public)   MY COMMISSION EXPIRES:_____
```