# EXHIBIT B

1              UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

3

4                                        )
    RAUL NOVOA, JAIME CAMPOS FUENTES,   )
5   ABDIAZIZ KARIM, and RAMON MANCIA,   )
    individually and on behalf of all   )
6   others similarly situated,          )
                                        )
7                                        )
                       Plaintiff,       )
8                                        )
            vs.                          )Case No. 5:17-cv-
9                                        )02514-JGB-SHKx
                                        )
10  THE GEO GROUP, INC.                 )
                                        )
11                     Defendants.      )
                                        )
12                                       )
    THE GEO GROUP, INC.,                )
13                                       )
                                        )
14                                       )
    Counter-Claimant,                   )
15                                       )
            vs.                          )
16                                       )
    RAUL NOVOA, JAIME CAMPOS FUENTES,   )
17  ABDIAZIZ KARIM AND RAMON MANCIA,    )
    INDIVIDUALLY AND ON BEHALF OF ALL   )
18  OTHERS SIMILARLY SITUATED           )
                                        )
19                     Counter-Defendant.)
                                        )
20            DEPOSITION OF RAUL NOVOA

21        SUNDAY, OCTOBER 20, 2019, 1:20 P.M.

22              LOS ANGELES, CALIFORNIA

23

24  Reported by Armando Pineda, CSR No. 12670

25  Job No. 170392

1            UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

3

4                                 )
   RAUL NOVOA, JAIME CAMPOS FUENTES,  )
5  ABDIAZIZ KARIM, and RAMON MANCIA,  )
   individually and on behalf of all  )
6  others similarly situated,       )
                                 )
7                                 )
               Plaintiff,    )
8                                 )
        vs.              )Case No. 5:17-cv-
9                           )02514-JGB-SHKX
                                 )
10 THE GEO GROUP, INC,          )
                               )
11            Defendants.   )
                               )
12                               )
   THE GEO GROUP, INC.,        )
13                             )
                               )
14               Plaintiff,    )
                               )
15        vs.              )
                               )
16 RAUL NOVOA, JAIME CAMPOS FUENTES,  )
   ABDIAZIZ KARIM, AND RAMON MANCIA,  )
17 INDIVIDUALLY AND ON BEHALF OF ALL  )
   OTHERS SIMILARLY SITUATED,      )
18               Defendants.   )
19                               )

20

21     THE DEPOSITION OF RAUL NOVOA, taken at 601 West

22  Fifth Street, Suite 300, Los Angles, California

23  90071, on Sunday, October 20, 2019, at 1:20 p.m.,

24  before Armando Pineda, Certified Shorthand Reporter,

25  in and for the State of California.

Page 3

1    APPEARANCES:

2

3    For the Defendant and Counter-Claimant:

4            AKERMAN
             By:  COLIN BARNACLE, ESQ.
5            1900 Sixteenth Street
             Denver, Colorado 80202
6

7

8    For the Plaintiff and Counter-Defendant:

9            LAW OFFICES OF ANDREW FREE
             By:  ANDREW FREE, ESQ.
10           P.O. Box 90568,
             Nashville, Tennessee 37209
11

12

13   For the Plaintiff and Counter-Defendant:

14           BURNS CHAREST
             BY:  LYDIA WRIGHT, ESQ.
15           365 Canal Street
             New Orleans, Louisiana 70130
16

17

18

19

20

21

22

23

24

25

Page 4

```
 1                          INDEX

 2  WITNESS:  Raul Novoa

 3  EXAMINATION                                  PAGE

 4  By Mr. Barnacle                              6

 5  By Mr. Free                                  117

 6

 7

 8

 9            QUESTIONS NOT ANSWERED

10            PAGE           LINE

11            29             2
             29             13
12

13

14

15         Answer Marked Confidential

16            PAGE           LINE

17            16             6
             17             5
18

19

20

21

22

23

24

25
```

Page 5

1                    INDEX TO EXHIBITS

2    EXHIBITS                                          MARKED

3    Exhibit 52  Declaration of Raul Novoa            27

4    Exhibit 53  Detainee File Activation Sheet       75

5    Exhibit 54  Commissary activity for inmate       62
                 Raul Novoa
6

7    Exhibit 55 Amended Complaint for Raul Novoa      104

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1          SUNDAY, OCTOBER 20, 2019

2                1:20 P.M.

3          LOS ANGELES, CALIFORNIA

4

5                RAUL NOVOA,

6   having been first duly sworn, testified as follows:

7

8                EXAMINATION

9   BY MR. BARNACLE:

10      Q.   Good afternoon, Mr. Novoa.

11      A.   Good afternoon.

12      Q.   Thank you for coming in on a Sunday.

13      A.   No problem.

14      Q.   Not really what any of us wants to do on a

15   Sunday, but here we are.

16      A.   It worked out for me because I'm working

17   during the week.

18      Q.   I figured as much.  I'm glad we could make

19   this happen for you.

20      A.   Awesome.  Thank you.

21      Q.   My name is Colin Barnacle, and I represent

22   the GEO group in a lawsuit that you have filed

23   against them, and we're here today for your

24   deposition where we're going to ask you some

25   questions about the allegations that you're making.

Page 7

1        And as you know, we have a court reporter

2   here who is literally taking down every word that we

3   say word for word.

4        A.   I see that.

5        Q.   So what that means is it's really

6   important that we speak clearly.

7        A.   Okay.

8        Q.   And that I ask questions in a clear way.

9   If I don't, let me know.  If you don't understand my

10  question, tell me, and I will try to rephrase it in

11  a way that makes sense.

12       A.   Okay.

13       Q.   We also can't be talking over each other

14  because that confuses the court reporter, and so

15  wait until I finish asking my question before you

16  answer.  I will wait until you finish your answer

17  before I ask another question.

18       A.   Okay.

19       Q.   You just swore under oath to tell the

20  truth in this deposition, and I just want you to

21  understand the importance of that.

22       Do you understand that failure to tell the

23  truth is considered perjury?

24       A.   Yes.

25       Q.   Which is obviously against the law.

1     A.   Very bad, yes.

2     Q.   Okay.  Again, if I say anything that

3  doesn't make sense, if you're confused, if you want

4  me to repeat something, just ask me, and I'm happy

5  to do it.

6     A.   Okay.

7     Q.   If you don't ask me a question or tell me

8  you're confused or ask me to repeat my question, I

9  will assume that you understood the question.

10    A.   Okay.

11    Q.   We're just going to go with that.

12    A.   Keep going.

13    Q.   We can take breaks.  This isn't designed

14 to be a marathon.  So if you have a need to take a

15 break, you need to use the restroom, whatever it may

16 be, just let me know, and we'll take one.

17    A.   Every 10 minutes.  I'm playing.

18    Q.   We'll be here all day and night if we do

19 that.

20    A.   I'm joking.

21    Q.   But the only rule with regards to breaks

22 is you can't take a break in the middle of a

23 question.

24    A.   Okay.

25    Q.   So if I ask you a question and you haven't

1    answered that question, you have to answer the

2    question before you take a break.

3         A.   Okay.  That makes sense.

4         Q.   That's the only rule there.

5              So do you understand these instructions so

6    far?  Is there anything that you want me to repeat

7    or that doesn't make sense?

8         A.   No, I understand.

9         Q.   Okay.  Are -- you sitting here right now,

10   are you on any medications or anything like that,

11   that would make it difficult for you to understand

12   my questions or to tell the truth?

13        A.   No.

14        Q.   Okay.  Are you under the influence of any

15   drugs or alcohol --

16        A.   No.

17        Q.   -- today that would hamper your ability to

18   tell the truth or understand me?

19        A.   No.

20             MR. FREE:  And I'm just going to remind

21   you.  He's going to finish his question and then

22   you're going to answer it.  Not because you're doing

23   anything wrong --

24             THE WITNESS:  Sorry.

25             MR. FREE:  -- but he can only type one set

1    of people's words as the same time.  So wait for him

2    to finish and then you'll go, and we'll have a clean

3    transcript.

4    BY MR. BARNACLE:

5        Q.   There's going to be times where you know

6    the answer to my question, and you're going to

7    answer it before I finish.  It kind of creates

8    confusion for him.

9        A.   My apologies.

10       Q.   No worries.  No worries.

11            All right.  Have you ever had your

12   deposition taken before?

13       A.   No.

14       Q.   Okay.  Have you ever been a witness of any

15   sort in any legal proceeding?

16            MR. FREE:  Object to form.

17            You can answer.

18            THE WITNESS:  Legal proceedings, yes.

19   BY MR. BARNACLE:

20       Q.   Can you tell me what legal proceedings

21   you've been a witness in before?

22       A.   A witness?

23       Q.   Have you ever been on the stand and had

24   somebody ask you questions under oath?

25       A.   Well, yes.  I testified against a case --

1    I went on the stand against a case that was brought

2    against me and an ex-girlfriend.

3         Q.    Okay.  What kind of case was that?

4         A.    It was a domestic violence case.

5         Q.    Okay.  So you were in -- was it a criminal

6    case?

7         A.    It was a misdemeanor.

8         Q.    Okay.

9         A.    Yes, yes.

10        Q.    You were in court, and you testified in

11   that proceeding?

12        A.    Yes.

13        Q.    Okay.  Are there any -- any other legal

14   proceedings where you have given testimony?

15        A.    I have represented myself in immigration.

16        Q.    Tell me about any time that you testified

17   in that proceeding?

18             MR. FREE:  Object to form.

19             You can answer.

20             THE WITNESS:  Well, when I was in removal

21   proceedings in Adelanto, I had to give testimony of

22   what happened in my case and in court, and that's

23   about what I can remember.

24   BY MR. BARNACLE:

25        Q.    Okay.  Any other legal proceedings where

Page 12

1    you have given testimony?

2          A.    No.

3          Q.    Okay.  Have you had any conversations with

4    any of the other named plaintiffs in this case about

5    your case?

6          A.    Not.

7                MR. FREE:  I'm sorry.  Go ahead.  You can

8    answer.

9                THE WITNESS:  No.

10               MR. FREE:  Okay.

11   BY MR. BARNACLE:

12         Q.    Okay.  Have you ever met any of the other

13   named plaintiffs in this case?

14         A.    I just met Jaime yesterday.  It was like a

15   pass by.  "Hi" and "bye."

16         Q.    So yesterday is the first time that you

17   ever met him?

18         A.    That I remember, yes.

19         Q.    Okay.  And did you talk to him yesterday?

20         A.    No.

21         Q.    Okay.  What did you do to prepare for

22   today's deposition?

23         A.    I worked together with my attorneys.

24         Q.    Okay.  And when did you -- when did you

25   work together with them?

Page 13

1      A.    We met up yesterday.

2      Q.    Okay.

3      A.    We pretty much went over the case, and we

4  prepped, and that was about it, yeah.

5      Q.    Okay.  How long did you spend doing that?

6      A.    I don't know the exact time.  I would say

7  a few hours.

8      Q.    Okay.  Did you review any documents?

9            MR. FREE:  I will object to the extent

10  that the question -- I don't believe it is, but

11  assume the question is asking for work product or

12  attorney-client privilege information about the

13  content of the documents we're objecting.

14            You can tell him whether you reviewed

15  documents.  Anything else I'm instructing you not to

16  answer.  Okay.  So you can tell him what you did,

17  but not what.

18            THE WITNESS:  Okay.  Yes.

19  BY MR. BARNACLE:

20      Q.    Okay.  Did you bring those documents with

21  you?

22      A.    No.

23      Q.    All right.  How many documents did you

24  look at?

25            MR. FREE:  I will object.  The same basis.

Page 14

1          You can answer, if you know.

2          THE WITNESS:  A few.

3     BY MR. BARNACLE:

4        Q.   Okay.  Did you meet with anyone else other

5     than your attorneys to prepare for this deposition?

6          MR. FREE:  Object to form.

7          You can answer.

8          THE WITNESS:  No.

9     BY MR. BARNACLE:

10       Q.   Can you tell me everybody that was present

11    during the meeting you had with your attorneys

12    yesterday?

13         MR. FREE:  Object to form.

14         You can answer.

15         THE WITNESS:  Lydia and Andrew.

16    BY MR. BARNACLE:

17       Q.   Nobody else was present?

18       A.   No.

19       Q.   Okay.  Can you tell me, for the record,

20    what your full legal name is?

21       A.   My full name?  I'm sorry.  My full name is

22    Raul Benjimin Novoa.

23       Q.   Can you spell --

24       A.   Novoa?

25       Q.   Spell your middle name.

Page 15

1      A.    Benjimin.  B-e-n-j-i-m-i-n.

2      Q.    Have you ever used another name?

3      A.    No.

4      Q.    What is your current address?

5      ████████████████████████████████████████

6      Q.    Okay.  How long have you lived there?

7      A.    Quite a while.

8      Q.    Okay.

9      A.    I actually just went back to live there

10  again.

11     Q.    Okay.  Where were you -- if you just went

12  back to live there, where were you living before

13  that?

14     A.    With my ex-girlfriend.

15     Q.    How long had you lived there?

16     A.    No more than three years.

17     Q.    Okay.  So three years and then you went

18  back to live where you currently live now?

19     A.    With my mother, yes.

20     Q.    And you lived there before that?

21     A.    Yes.

22     Q.    Okay.  You said it's with your mother.

23           Does anyone else live with you?

24     A.    Yes, my step dad and my three siblings.

25     Q.    Okay.  What is your date of birth?

Page 16

1　████████████████████████████████████

2　　　　Q.　　Okay.　Do you have an e-mail address that

3　you use?

4　　　　A.　　Yes.

5　　　　Q.　　Okay.　Can you tell me what it is?

6　████████████████████████████████████

7　████████████████████████████████████

8　　　　　　MR. FREE:　We're going to designate that

9　response as confidential under 5.2 of our protective

10　order, which is ECF151.

11　BY MR. BARNACLE:

12　　　　Q.　　Okay.　Do you have any other e-mail

13　addresses that you use?

14　　　　A.　　No.

15　　　　Q.　　Have you ever had any other e-mail

16　addresses?

17　　　　A.　　I probably have before I was incarcerated

18　at Adelanto, but I don't remember.

19　　　　Q.　　So this is the only e-mail address that

20　you use today?

21　　　　A.　　Yeah.

22　　　　　　MR. FREE:　Let him finish the question,

23　okay.

24　　　　　　THE WITNESS:　I'm sorry.

25　　　　　　MR. FREE:　That's okay.

1    BY MR. BARNACLE:

2         Q.    Do you have a cell phone that you use?

3         A.    Yes.

4         Q.    Can you tell me what that is?

5    ████████████████████████████████████████████████

6         MR. FREE:   Okay.   Same confidential

7    designation under 5.2 of our protective order.

8    BY MR. BARNACLE:

9         Q.    Were there any other cell phone numbers

10   that you utilize?

11        A.    No.

12        Q.    Okay.   And how long have you had that

13   number?

14        A.    I would say about four or five years now.

15   Since I've been out of Adelanto.

16        Q.    Do you use social media in any way?

17        MR. FREE:   Object to form.

18        You can answer.

19        THE WITNESS:   Yes.

20   BY MR. BARNACLE:

21        Q.    Okay.   Can you tell me what types of

22   social media you use?   And what I'm looking for is

23   if you use Facebook or just things like that.

24        MR. FREE:   Object to form.

25        You can answer it.

Page 18

1            THE WITNESS:  I don't do Facebook.  Never

2    have.  I don't do Instagram.  Never have.  I don't

3    do -- I've never done any of those social medias.

4    But as far as social media, it would be You Tube.

5        Q.   Okay.  And when you say You Tube, what do

6    you do on You Tube?

7        A.    Watch videos, documentaries, activist

8    videos, police brutality videos.  Things like that.

9    First Amendment rights.  Things like that.

10        Q.   Do you post things to You Tube?

11        A.   I've made some comments.

12        Q.   Okay.  So you've made comments to

13    different things that you're seeing on You Tube?

14        A.   Yes.

15        Q.   Okay.  Have you ever uploaded a video of

16    your own to You Tube?

17        A.   No.

18        Q.   Okay.  Any other types of social media

19    that you use?

20            MR. FREE:  Object to the form.

21            You can answer.

22            THE WITNESS:  That I recall?  Maybe making

23    donations through a You Tube video but, no.

24    BY MR. BARNACLE:

25        Q.   Okay.  Do you use Twitter at all?

1    A.   No.

2    Q.   Are you married?

3    A.   No.

4    Q.   Have you ever been married?

5    A.   No.

6    Q.   Okay.  Do you have any children?

7    A.   Yes.

8    Q.   How many children?

9    A.   One.

10   Q.   How old is your one child?

11   A.   My child is -- my son is 18 years old.

12   Q.   Okay.  And is he in high school?

13   A.   He just graduated.

14   Q.   Where does he live?

15   A.   With his mother.

16   Q.   Where is that?

17   

18   Q.   So what is your -- what is your current

19   country of citizenship?

20   A.   Of citizenship?  It would be Mexico.

21   Q.   Sitting here right now, what is your

22   understanding of your immigration status?

23        MR. FREE:  Object to the question to the

24   extent it calls for a legal conclusion.

25        But you can tell him what you understand.

Page 20

1          THE WITNESS:  Can you repeat the question?

2    BY MR. BARNACLE:

3          Q.   Yeah, what I want to understand is,

4    sitting here right now, what is your understanding

5    of your current citizenship status?

6          A.   I'm a permanent resident.

7          Q.   Okay.  Do you have -- do you have a green

8    card, or any other document identifying that status?

9          A.   I have a card that says I'm a permanent

10   resident, but I don't go as in -- I don't call it a

11   green card.

12         Q.   Okay.

13         A.   I do have a card that says permanent

14   resident.

15         Q.   Is there something that you call other

16   than a green card?

17         A.   Permanent resident.

18         Q.   Permanent resident card?

19         A.   Yes.

20         Q.   And what is your understanding of what

21   your immigration status was when you were in

22   Adelanto?

23         A.   Permanent resident.

24         Q.   Okay.  So same as it is now?

25         A.   Yes.

Page 21

1        Q.    Okay.  While you were at Adelanto, were

2   you work authorized in the United States?

3              MR. FREE:  Objection to the extent it

4   calls for a legal conclusion.

5              You can tell him what your understanding

6   of your work authorization status at Adelanto is

7   based upon your own knowledge.

8              THE WITNESS:  I was authorized to work out

9   here legally through my permanent residence.  I

10  would say, yes.

11  BY MR. BARNACLE:

12       Q.    Okay.  So tell me why you were -- why were

13  you detained and placed into Adelanto?

14             MR. FREE:  Objection to form.

15             You can answer.

16             THE WITNESS:  For a criminal case.

17  BY MR. BARNACLE:

18       Q.    Can you tell me what that criminal case

19  was?

20             MR. FREE:  Object to form.

21             You can answer.

22             THE WITNESS:  What I was charged for by

23  ICE or?

24  BY MR. BARNACLE:

25       Q.    Well, you -- I asked -- I asked you why

Page 22

1    were you -- why were you at Adelanto, and you

2    answered it was a criminal case.  I'm just trying to

3    understand what the underlying criminal case was.

4              MR. FREE:  Is there a question?

5    BY MR. BARNACLE:

6         Q.   Can you tell me what the underlying case

7    was?

8         A.   Firearm by a felon.

9         Q.   Okay.  So you were alleged to have a

10   firearm?

11        A.   Being a noncitizen and being a felon in

12   possession of a firearm.

13             MR. FREE:  Let him finish the question.

14   Sorry.

15             THE WITNESS:  Sorry.

16             MR. FREE:  You're fine.

17   BY MR. BARNACLE:

18        Q.   Okay.  Were you convicted of that crime?

19        A.   Yes.

20        Q.   Okay.  And then tell me about the process

21   after that conviction that led you to Adelanto.

22             MR. FREE:  Objection.  Vague.

23             You can answer.

24             THE WITNESS:  My view of the process would

25   be going home from work and almost being shot by

Page 23

1    gang members, and I found my life and my family was

2    in jeopardy.

3              I received a firearm and was caught with

4    it and arrested and went through the criminal

5    process in L.A. County.

6              The judge gave me the best time possible,

7    asked the DA to do less than a year because I was

8    trying to avoid immigration issues, and I get nine

9    months for it.  I did two months for good behavior,

10   and that's when ICE gave me a letter saying that

11   they would pick me up within 36 hours, but it wasn't

12   until a week, maybe a week and a half that they kept

13   me illegally detained and then I went through my

14   immigration process at Adelanto, and that's how that

15   process ended up there.

16             And I'm sorry for making that long, but

17   it's a little personal thing that got me to this

18   situation.

19        Q.   Don't apologize at all.  I appreciate the

20   detail.

21             So you spent two months in jail?

22        A.   In L.A. County.

23        Q.   And then you got a letter from --

24        A.   ICE.

25        Q.   -- ICE telling you within 36 hours they're

Page 24

1    going to pick you up; is that correct?

2         A.   Yes.

3         Q.   So once ICE actually picked you up, where

4    did they take you?

5         A.   They took me to a holding facility in

6    downtown L.A.  I believe it is 300 North Los Angeles

7    Boulevard or Street.

8         Q.   Okay.

9         A.   And detained for another -- no more than

10   24 hours and handcuffed me and basically handcuffed

11   me from -- shackled me and took me to Adelanto.

12        Q.   So how long did you spend at the facility

13   in downtown L.A.?

14        A.   No more than 24 hours.

15        Q.   So you spent up to 24 hours at that

16   facility and then --

17        A.   No, more.

18        Q.   -- they immediately took you to Adelanto?

19        A.   Adelanto.

20             MR. FREE:  Let him finish his questions.

21   BY MR. BARNACLE:

22        Q.   It was ICE that performed all of those

23   acts and transportations?

24             MR. FREE:  Object to the form.

25             You can answer.

Page 25

1              THE WITNESS:  Yes.

2    BY MR. BARNACLE:

3       Q.   Okay.  Did GEO have any role in your

4    initial detention and placement at the holding

5    facility in downtown L.A.?

6              MR. FREE:  Object to the form.

7    Speculation.

8              You can answer.

9              THE WITNESS:  I know they have a contract

10   with ICE.  I don't know if they had anything to do

11   with me being shackled up.  No.

12   BY MR. BARNACLE:

13      Q.   Okay.  Are you -- sitting here now, are

14   you aware of any of the other detainees that you

15   were at Adelanto with having work authorizations in

16   the United States?

17             MR. FREE:  Object to the form.

18             You can answer it.

19             THE WITNESS:  I wasn't personally involved

20   in every detainee's life so I wouldn't know.

21   BY MR. BARNACLE:

22      Q.   Okay.  Fair enough.

23             Do you have a job now?

24      A.   Yes.

25      Q.   Where do you work?

Page 26

1     A.    In a local union.  It's a labor union.  It

2  is Local 300.

3     Q.    What union is that?

4     A.    Labor union.

5     Q.    Labor.  I'm sorry.  I was thinking

6  something else.

7           What do you do for them?

8     A.    Construction.  It's a construction craft

9  labor union, and we basically work in anything that

10 has to do with construction that's sponsored by the

11 state or huge contractors.

12    Q.    Okay.

13    A.    Commercial.  I'm sorry.

14    Q.    Do you perform construction duties, or do

15 you work for the union?

16    A.    I work for the union.  I pay union dues,

17 and I work for union company who is So Cal Grading

18 and, yes, we perform construction duties.

19    Q.    Okay.  What is your -- what is your

20 compensation from them?

21    A.    When you say "compensation"?

22    Q.    How much do you make working for them?

23    A.    Recently I took a blueprint reading class

24 for a week, which upgraded me to fourth period

25 because we go by periods before we journey up and

Page 27

1   currently I'm at 26.77.

2       Q.   And that's an hour?

3       A.   Yes.

4       Q.   And how many hours a week do you typically

5   work?

6       A.   About 40.

7       Q.   Okay.  How long have you worked for the

8   labor union?

9       A.   I have been paying union dues since 2016,

10  '17.  I would say I have worked for them then

11  because I paid union dues but I wasn't hired

12  through -- I wasn't dispatched through my local.  So

13  I would say no more than two years.

14      Q.   Two years.  Okay.

15           And before you took the blueprint reading

16  course, what was your hourly rate of pay?

17      A.   My third period grad was 23.90.

18      Q.   Okay.  And I'm sorry for the detail here

19  but when specifically did your pay change from 23.90

20  to 26.77, if you recall?

21      A.   After my blueprint reading class which was

22  in September 23rd through the 27th, and that's

23  when I got my upgrade.

24  / / /

25  / / /

Page 28

1           (Exhibit 52 was marked for

2           identification.)

3           MR. BARNACLE:  Okay.  This is Exhibit 52.

4    BY MR. BARNACLE:

5      Q.   Mr. Novoa, do you recognize this document?

6      A.   Yes, I do.

7      Q.   Can you tell me what it is?

8      A.   It's my declaration.

9      Q.   Is this an accurate copy of what you

10   provided to your attorneys?

11     A.   Yes.

12     Q.   Can you tell me the process that you

13   utilized to create this document?

14           MR. FREE:  I will object to the form to

15   the extent it calls on communications that you had

16   with attorneys or people working for your attorneys

17   to prepare this declaration.

18           I'm going to instruct you not to answer

19   because that's privileged work product.  If you can

20   answer without revealing the substance or just want

21   to tell the process.  In other words, like what did

22   you do as opposed to what was said, you can respond.

23           Do you understand?

24           THE WITNESS:  I just worked with my

25   attorneys.

Page 29

1  BY MR. BARNACLE:

2      Q.   Okay.  Did they tell you why?

3           MR. FREE:  No, no.  I'm instructing him

4  not to answer.

5  BY MR. BARNACLE:

6      Q.   Okay.

7           MR. FREE:  Based on attorney-client

8  privilege.

9  BY MR. BARNACLE:

10     Q.   Did you meet with your attorneys to

11 prepare this?

12     A.   Yes.

13     Q.   Okay.  Did they interview you to prepare

14 this?

15          MR. FREE:  Objection.  Work product.  Do

16 not answer.

17 BY MR. BARNACLE:

18     Q.   Let's turn to paragraph 6, please.

19     A.   Okay.

20     Q.   Can you read this for the record, please?

21     A.   You want me to read it out loud?

22     Q.   Yes.

23     A.   "I learned about the work program upon my

24 entry to Adelanto facility and requested to take

25 part in the program."

Page 30

1      Q.   Okay.  Do you recall what you did to the

2   request participation in the program?

3           MR. FREE:  Object to the form.

4           You can answer?

5           THE WITNESS:  I filled out some kind of

6   paper.

7   BY MR. BARNACLE:

8      Q.   Okay.  Do you recall when you would have

9   done that?

10     A.   When?

11     Q.   Uh-huh?

12     A.   I believe when I was in there after a few

13  months.

14     Q.   Okay.  So do you remember -- do you

15  remember the date that you arrived at Adelanto?

16     A.   June 12th or June 14th.  Between those

17  dates in 2012.

18     Q.   2012.  Okay.

19     A.   Or June 19th.  I'm not too sure.

20     Q.   Okay.  And you requested to take part of

21  the program.  Based on that entry date, did it give

22  you any better sense of when you might have

23  requested to be a part of the program?

24     A.   I don't really recall the month or date,

25  but I would say May, June.  Between May and June.

Page 31

1      Q.   Okay.  So if you entered the facility on

2  June -- in June of 2012, you requested to be a part

3  of the program --

4      A.   I'm sorry.

5      Q.   -- about a year later?

6      A.   No.  I'm sorry.  That was -- I misspoke.

7  If it was in June, then maybe around November,

8  December.

9      Q.   Okay.  Of 2012?

10     A.   Yes.

11     Q.   Okay.  So safe to say roughly five or six

12  months after your entry into Adelanto?

13          MR. FREE:  Objection.  Vague.

14          You can answer.

15          THE WITNESS:  I won't say I'm totally sure

16  about it, but I think roughly under five months, six

17  months.

18          MR. BARNACLE:  Okay.  Fair enough.

19          Unfortunately this is not stapled, which

20  is not ideal.

21          Should we get some big clips?  Let's take

22  a break, and we'll put clips on this because the

23  other way it would be unwieldily.

24          (Brief recess)

25          MR. FREE:  So during the break counsel for

Page 32

1   GEO and counsel for the plaintiff have noted that in

2   previous depositions in this case, the parties have

3   been using sequential numbering of exhibits from

4   deposition to deposition.  The previous four

5   exhibits that were in introduced in the deposition

6   of Mr. Campos Fuentes were marked one through four.

7   Those exhibits are now going to be 48, 49, 50, and

8   51.  With today's exhibit beginning at 52.  That was

9   the declaration.  I guess we're now on 53.

10            MR. BARNACLE:  We are.

11            MR. FREE:  And so we had a brief

12  off-the-record discussion about the fact that

13  plaintiffs were provided the file Bates stamp 29799

14  to 30058 I believe on Friday night, which was two

15  days ago.  We were here on a Sunday morning.

16            This is I understand to be the detainee

17  file of Mr. Novoa.  GEO listed this detainee file in

18  its initial disclosures that were provided on August

19  16th, 2018.  We have served discovery in July of

20  2018 -- excuse me.  Yeah, July of 2018, yeah, and

21  we've got this on Friday.

22            I think counsel and I have agreed we're

23  going to check on the responsiveness of this

24  request, but we can go forward today.  We're just

25  lodging an objection that these were only produced

Page 33

1    on Friday, okay.

2          MR. BARNACLE:  Fair enough.

3    BY MR. BARNACLE:

4       Q.   If you don't mind, Mr. Novoa, if you could

5    turn to the very bottom where it says GEO-Novoa and

6    then there's a number.

7          MR. FREE:  Try to keep it together.  That

8    way --

9          THE WITNESS:  Okay.  I'm sorry.

10         MR. BARNACLE:  Put it on the corner

11   because it makes it easier to flip.

12         MR. FREE:  Which page?  I'm sorry.

13   BY MR. BARNACLE:

14      Q.   We're going to turn to GEO-Novoa 300007.

15      A.   All right.

16         MR. FREE:  The witness has turned to

17   30007.

18   BY MR. BARNACLE:

19      Q.   So when you say that --

20         MR. FREE:  Hang on just a second.  Do you

21   need time to look at this?

22         THE WITNESS:  Yes, please.

23   BY MR. BARNACLE:

24      Q.   Okay.  Go for it.

25         MR. FREE:  Let us know when you're ready.

Page 34

1          THE WITNESS:  Okay.

2    BY MR. BARNACLE:

3        Q.   So when you said in your declaration that

4    you requested to take part in the voluntary work

5    program, is it this form that you filled out to

6    request to be a part of it, or was there something

7    else that you requested?

8        A.   That I recall -- I'm going to be truly

9    honest.  I don't remember seeing this document and

10   from what I'm seeing, this is not my writing.

11       Q.   Okay.

12       A.   That is it looks like my signature, but

13   that's not my signature.

14          MR. FREE:  Let the record reflect that the

15   witness is pointing to the detainee signature

16   line in the middle of the page on 30007.

17   BY MR. BARNACLE:

18       Q.   Okay.  Did you request to be a barber in

19   the voluntary work program?

20       A.   Yes.

21       Q.   When did you first become or first perform

22   work as a barber?

23       A.   I don't remember the dates.

24       Q.   Okay.  Do you recall ever being provided

25   with a voluntary work program agreement to perform

Page 35

1   work as a barber?

2           MR. FREE:  Object to the form.

3           You can answer.

4           THE WITNESS:  I don't remember the

5   specifics of the document, but I remember filling

6   out something to become a barber.

7   BY MR. BARNACLE:

8       Q.   Okay.  Before you filled out whatever

9   document you remember filling out, do you remember

10  understanding that payment for that work would be at

11  one dollar a day?

12          MR. FREE:  Object to the form.

13          You can answer.

14          THE WITNESS:  Yes.

15  BY MR. BARNACLE:

16      Q.   Do you recall receiving -- when you

17  entered Adelanto, do you recall receiving a handbook

18  to review?

19      A.   A detainee handbook, yes.

20      Q.   Did you keep that detainee handbook during

21  your time at Adelanto?

22      A.   I tried.

23      Q.   Did -- if you remember, did the detainee

24  handbook talk at all about the voluntary work

25  program?

Page 36

1          MR. FREE:  Object to the form.

2          You can answer.

3          THE WITNESS:  I don't remember.

4    BY MR. BARNACLE:

5       Q.   Okay.  So you worked as a barber from what

6    I understand; is that correct?

7       A.   Correct.

8       Q.   Did you also work as janitor?

9       A.   Janitorial duties, yes.

10      Q.   So tell me, if you remember, when during

11   your detention were you a barber?

12      A.   I'm not too sure.  I might remember later

13   on, but I believe I became janitorial first and then

14   a barber, but I don't remember the dates.

15      Q.   Okay.  Were you a barber and a janitor at

16   the same time at all?

17      A.   Yes.

18      Q.   Okay.  Were there times when you were just

19   a barber and not a janitor?

20      A.   Yes.

21      Q.   Were there times when you were a janitor

22   but not a barber?

23      A.   Yes.

24      Q.   Okay.  So once you started your work as a

25   barber, were you a barber the rest of your detention

Page 37

1  period?

2       A.   I would say the majority of my detention.

3       Q.   Okay.  Were there times when -- after you

4  became a barber, were there times when you were no

5  longer a barber?

6            MR. FREE:  I will object to the form.

7            Go ahead.  You can answer.

8            THE WITNESS:  Not that I remember.

9  BY MR. BARNACLE:

10       Q.   Okay.  Did you ever resign your position

11  as a barber?

12       A.   I made some complaints, but I didn't get

13  nowhere.  So I just quit cutting hair.

14       Q.   So you never quit your position as a

15  barber?

16       A.   Not really, no.

17       Q.   I want to understand.  When you say "not

18  really," I want to understand what you mean.

19       A.   There were situations where, you know,

20  there wasn't chemicals to disinfect the clips.

21  There wasn't the proper supplies to take care of the

22  machine, and sometimes they didn't have the supplies

23  that in general we needed to cut hair.  So I would

24  just back off until they got those things.

25       Q.   Okay.

Page 38

1        A.    That's why I say, like, sometimes back up

2   but then later on they would get them, and I would

3   go back to cutting hair.

4        Q.    Did you ever formerly resign your position

5   as a barber?

6              MR. FREE:  Object to the form.

7              You can answer, if you know.

8              THE WITNESS:  As of this moment right now,

9   I don't remember.

10  BY MR. BARNACLE:

11       Q.    Okay.  Did GEO ever tell you, you couldn't

12  be a barber any more?

13       A.    Not that I recall.

14       Q.    Okay.  Can you turn to 29840.

15       A.    Yeah.

16       Q.    And do you recognize this form?

17             MR. FREE:  You can take as long as you

18  need to review it.

19             THE WITNESS:  Yes, this is my writing.

20  BY MR. BARNACLE:

21       Q.    Can you tell me what this form is?

22       A.    This is a detainee KITE.

23       Q.    What is a detainee KITE?

24       A.    A form requesting -- for a request for

25  things.

1      Q.   Okay.  Can you tell us on this particular

2   KITE what were you requesting?

3      A.   A pair of batteries.

4           MR. FREE:  I'm sorry.

5           MR. BARNACLE:  29840.

6           MR. FREE:  He's at --

7           THE WITNESS:  I'm sorry.  04.  I'm sorry.

8           MR. FREE:  You're looking at 40.

9           THE WITNESS:  29840.  There you go.

10          MR. FREE:  That's 43.  I'm sorry.

11          THE WITNESS:  There you go.

12          MR. FREE:  You can review that as well.

13          THE WITNESS:  Can I review that?

14   BY MR. BARNACLE:

15      Q.   Yes, please do.

16      A.   Okay.

17      Q.   So on this particular KITE form, can you

18   tell us what it is that you were asking?

19      A.   Why my name is not on the payroll for

20   barber.

21      Q.   Okay.  And the response says you were

22   fired as a barber.

23           Do you see that?

24      A.   Uh-huh.

25      Q.   Do you recognize that?

Page 40

1          MR. FREE:  I'm sorry.

2          You need to answer "yes" or "no" as

3     opposed to "uh-huh" or "huh-uh."  Okay.  So what was

4     your answer to that question?

5          THE WITNESS:  Can you ask me again?

6          MR. FREE:  I'm sorry.

7     BY MR. BARNACLE:

8        Q.   I was pointing your attention to the

9     response that was you're fired as barber.

10          I asked if you saw that.

11       A.   Yes.

12       Q.   And then I asked you do you recognize the

13    signature at the bottom?

14       A.   No.

15       Q.   Okay.  Do you recall receiving this

16    response?

17       A.   No.  But as of this moment, this is my

18    writing, and I do remember now sort of making this

19    request because I was still cutting hair.

20       Q.   Okay.  And then you were informed that you

21    had been fired as a barber; is that correct?

22       A.   While still cutting hair.

23       Q.   Okay.

24       A.   Yes, I guess so, yes.

25       Q.   Do you know why you were fired?

Page 41

1      A.   I believe there was some complaints, but I

2  don't remember, no.

3      Q.   There were some complaints about you as a

4  barber?

5      A.   Yes.

6      Q.   Okay.  Do you have any recollection of

7  what those complaints were?

8      A.   Well, detainees.  You know, you're in a

9  room with a variety of people.  People who aren't

10  segregated.  People who have -- you know, might have

11  some, you know, psych issues, might have some kind

12  of mental health issues.

13           You respect everybody for who they are,

14  but some people felt like, you know, they were being

15  chosen over other people or that -- I believe at one

16  moment thought that I was choosing people over

17  certain people and made complaints about me.

18      Q.   Okay.  Choosing people for haircutting

19  over other people?

20      A.   Yes.

21      Q.   Okay.  Do you remember who made those

22  types of complaints?

23           MR. FREE:  Object to the form.

24           You can answer, if you know.

25           THE WITNESS:  I believe there were a few

Page 42

1   detainees.  They came up and spoke to me man-to-man,

2   and I told them, hey, I don't get to pick people.

3   There's a barber's list, and you have to be on it.

4   And if you don't wake up on time or you're not there

5   when I'm cutting hair, then you get skipped, and

6   some people didn't like that.

7   BY MR. BARNACLE:

8        Q.   Okay.  Can you turn to document 29863?

9        A.   29863.  Okay.  Okay.  Can I go over it?

10       Q.   Please, do.

11       A.   Yes.

12       Q.   Can you tell us what this KITE was

13  requesting?

14            MR. FREE:  Objection to the form.

15            You can answer.

16            THE WITNESS:  That it came down to me

17  cutting hair most of the day, and it was only me and

18  GEO was not providing an extra barber.  They refused

19  to.

20            So I asked them that if they didn't get

21  another barber, that I no longer wanted to cut hair

22  and would recommend another detainee.

23  BY MR. BARNACLE:

24       Q.   Okay.  And then the response says you are

25  no longer a barber.

Page 43

1      A.   Correct.

2      Q.   Do you remember this happening?  You no

3   longer being a barber after filing this report?

4           MR. FREE:  Objection to the form.

5           You can answer it.

6           THE WITNESS:  Maybe for a few days.

7   BY MR. BARNACLE:

8      Q.   Okay.  Why just a few days?

9      A.   There was no one else to cut hair.  No one

10  else liked how anybody else in the dorm cut hair.

11  So officers would still give me the machine and say,

12  hey, you know, just go ahead and do your thing.

13  BY MR. BARNACLE:

14     Q.   Okay.  So you elected to continue being a

15  barber after a couple of days?

16          MR. FREE:  Objection to the form.

17          You can answer.

18          THE WITNESS:  I wouldn't say I'm so sure

19  but, yes.

20  BY MR. BARNACLE:

21     Q.   Okay.  Let me ask you this.  When you --

22  at least on this occasion when you said, "I don't

23  want to be a barber any more," and you didn't cut

24  hair for a couple of days --

25     A.   Right.

Page 44

1       Q.    -- were you disciplined for that?

2             MR. FREE:  Objection to the form.

3             You may answer.

4             THE WITNESS:  No.  When I made these

5    complaints, I was harassed.  You know, some

6    sergeants would get in my face and tell me to

7    stop -- excuse my language -- F'ing complaining.

8    And if I don't like it, that they can throw me in

9    another dorm.

10   BY MR. BARNACLE:

11      Q.   Okay.  But you weren't disciplined in any

12   other way other than that?

13            MR. FREE:  I will object to the form.

14            You can answer.

15            THE WITNESS:  I wouldn't get some things

16   that I needed.  My bunk was scattered.  They would

17   go through my bunk.  I would consider that

18   discipline.  That's -- when it comes to this

19   occasion, that's all I can recall at this moment

20   yes.

21   BY MR. BARNACLE:

22      Q.   You recall specifically with this occasion

23   where you say, "I no longer want to be a barber."

24   You recall having your bunk --

25      A.   I do recall one time, yes.

Page 45

1       Q.    One time?

2       A.    I wouldn't say specifically on this KITE,

3   but I do remember making complaints about the barber

4   machinery and sanitizing equipment, to sanitize the

5   clips.  There was only one barber.  I couldn't be

6   cutting hair, you know, eight, ten hours a day every

7   day, and you know it just -- it just seemed like

8   they didn't care.

9       Q.    So you recall --

10      A.    I was harassed on one occasion.

11      Q.    So you recall one occasion where your bunk

12  was -- what happened to your bunk?

13           MR. FREE:  Objection to the form.

14           You can answer.

15           THE WITNESS:  Well, I would say they hit

16  my bunk.  They would basically go through my stuff

17  and scatter my papers.  Throw away my detainee

18  handbook.  Wouldn't call me for law library.  Things

19  like that.  Retaliation I guess you could say.

20  BY MR. BARNACLE:

21      Q.    So specifically with regard to them going

22  through your bunk, you recall that happening one

23  time?

24      A.    Oh, no, there was a few times.

25      Q.    And do you remember it happening

Page 46

1    specifically after you made this KITE request?

2         A.   Not on this KITE request but for the

3    barber reasons.

4         Q.   Okay.

5         A.   Or complaints.

6         Q.   If we could turn to GEO-Novoa 300009 way

7    towards the back again.

8              MR. FREE:  You can take a second to review

9    it, and let him know when you're ready, okay.

10             THE WITNESS:  I've read it some.

11   BY MR. BARNACLE:

12        Q.   Okay.  We talked a little bit earlier

13   about the time where you were -- they said you were

14   fired as a barber based upon complaints.

15             Are these the complaints that you're

16   referring to?

17             MR. FREE:  Objection to the form.

18             You can answer, if you know.

19             THE WITNESS:  I'm not too sure, but I

20   would say this was one of the complaints that

21   detainees made.

22   BY MR. BARNACLE:

23        Q.   Okay.  And who is -- who is

24   Mrs. Hernandez, if you know?

25        A.   Mrs. Hernandez -- I don't remember.

Page 47

1      Q.   If you see at the bottom it says, "Thank
2  you KC Chavez."
3           Do you see that?
4      A.   Yes.
5      Q.   Do you know who KC Chavez is?
6      A.   I do recall.  I believe it's a male.
7      Q.   Okay.
8      A.   I don't --
9      Q.   Is it a detainee?
10      A.   No, I believe it's a sergeant.
11      Q.   Okay.  Do you know who Salgado is?
12      A.   Sounds very familiar.  Well, I'm sorry.  I
13  just seen.  It's a detainee Salgado.
14           MR. FREE:  Let the record reflect that the
15  witness is pointing to the word Salgado on the --
16           THE WITNESS:  I didn't realize it was a
17  detainee because there were officers that had that
18  last name.  I don't remember Salgado at the moment,
19  no.
20  BY MR. BARNACLE:
21      Q.   Okay.  You don't recall there being
22  another barber with the name Salgado?
23           MR. FREE:  Object to the form.
24           You can answer, if you know.
25           THE WITNESS:  No.

Page 48

1   BY MR. BARNACLE:

2        Q.   Okay.  If we look at this particular

3   complaint, which was made on January 24th of 2014,

4   it says that the barbers Novoa, Salgado, are

5   charging three dollars per haircut.

6              Do you see that?

7        A.   Yes.

8              MR. FREE:  I will object to the

9   characterization of this document.

10             You can continue.

11  BY MR. BARNACLE:

12       Q.   Were you ever made aware that detainees

13  had complained that you had been charging three

14  dollars per haircut?

15       A.   I do remember.  I do recall there was a

16  time when a detainee made some complaints, and he --

17  like I said, not every detainee was, you know, I

18  guess -- how do I say?

19             We were not segregated.  So some of these

20  detainees had certain issues, and there were moments

21  when the detainees would donate something because

22  they didn't want anybody else to cut their hair.  So

23  this person took it personal and said, hey, you know

24  what, you're not cutting my hair.

25             I do remember.  I do recall one situation.

Page 49

1    And I said, no, man.  You've got to get on the list.

2    You can't just go in and jump in front of people and

3    say, hey, cut my hair.

4            Oh, is it because these people are giving

5    you soups?

6            I go, no.  I'm not --

7            Is it because you're charging?

8            I said, no.  These are donations.  Like I

9    get a dollar a day.  I cut all day, you know.  And

10   he had a problem with it, and this is how this issue

11   arose.

12       Q.   Okay.  So some detainees who would be

13   getting their haircut would make donations; is that

14   correct?

15       A.   Yes.

16       Q.   What kind of donations would they get?

17       A.   Well, maybe a soup, maybe a candy bar, you

18   know, because they understood the situation.  You

19   know, it's hard in there.  It's not easy, and that's

20   how I can remember right now.

21       Q.   Okay.  So they would make donations of

22   food items and things like that?

23       A.   Right, yes.

24       Q.   Okay.  Did they ever actually pay you

25   money as a donation?

Page 50

1          MR. FREE:  Objection.

2          THE WITNESS:  No.

3    BY MR. BARNACLE:

4          THE WITNESS:  Can I add on the record

5    something?  They stopped that.  The facility stopped

6    the donations.

7    BY MR. BARNACLE:

8      Q.   Okay.

9      A.   Officers were allowing it but that stopped

10    too.

11      Q.   When did that stop?

12      A.   I believe it was maybe after these

13    complaints.

14      Q.   Okay.

15      A.   So I couldn't accept any more donations.

16      Q.   Okay.  I believe you testified that you

17    also performed work in the voluntary work program as

18    a janitor; is that correct?

19      A.   Yes.

20      Q.   I know when we first talked about this,

21    you couldn't quite figure out whether you were a

22    janitor first and then a barber or kind of the time

23    frame of it.

24          After talking about the barber role, do

25    you have a better sense of when you might have also

Page 51

1    worked as a janitor?

2              MR. FREE:  Object to the form.

3              You can answer it.

4              THE WITNESS:  I believe I started working

5    as a janitor first.

6    BY MR. BARNACLE:   --

7         Q.   Okay.

8         A.   -- a few months after being detained.

9    Maybe no more than five, six months.

10        Q.   Okay.  When you say you worked as a

11   janitor, tell me -- tell me what that means?  What

12   did you do?

13        A.   Well, janitorial duties require that, you

14   know, you scrub the urinals.  You clean the

15   bathroom, the shower areas, the dorm, the table, the

16   microwave, the ceilings, the windows.  They had some

17   foam seats.  That's all I can remember right now.

18        Q.   So when you're talking about working as a

19   janitor, are you talking about -- the types of

20   things that you just talked about, are those just

21   within your housing unit, or are those outside of

22   your own housing unit?

23             MR. FREE:  Objection.  Vague.

24             You can answer.

25             THE WITNESS:  What do you mean by housing

Page 52

1    unit?

2    BY MR. BARNACLE:

3        Q.   From what I understand, you have your

4    cells, and you have your pod.  These janitorial

5    duties that you just talked about, are those all

6    within your own pod, or are you talking about doing

7    those in other pods and outside of your own pod?

8            MR. FREE:  Object to the form.

9            You can answer, if you know.

10           THE WITNESS:  Adelanto has two facilities

11   they have east and west.

12   BY MR. BARNACLE:

13       Q.   Okay.

14       A.   East is a dorm facility.

15       Q.   Okay.

16       A.   They have no cells.

17       Q.   Okay.

18       A.   So in a dorm you would have to clean

19   everybody's area under the bunk in the west

20   facility.  And then people would be required to

21   clean their own living area, which is their bunk.

22   And outside of the cell then, that would be

23   janitorial work.

24       Q.   Okay.  So when we're talking about the

25   janitorial work you were doing, were you in east or

Page 53

1   were you in west?

2       A.   Both.

3       Q.   Okay.  So did you live in both east and

4   west at different times?

5       A.   Yes.

6       Q.   Okay.  So when you lived in east, the

7   janitorial duties that you're talking about are the

8   entire bunk area; is that correct?

9           MR. FREE:  Objection to the form.

10          You can answer.

11          THE WITNESS:  No.  Janitorial duties would

12   be the whole dorm.  Not just your bunk.  Janitorial

13   duties would be you clean under everybody's bunk.

14   You sweep under everybody's bunk.  You clean

15   everybody's shower and tables, windows, phones,

16   ceilings, walls, yeah.

17   BY MR. BARNACLE:

18      Q.   Was every detainee in the east building at

19   a particular time at various moments responsible for

20   that kind of work?

21          MR. FREE:  Objection to the form.

22          You can answer.

23          THE WITNESS:  Well, if you had

24   janitorial -- janitorial duties, yes.  And if you

25   volunteered and you wanted to get into the work

Page 54

1   program, then you would start working for free and

2   then you would get hired into the janitorial.

3   BY MR. BARNACLE:

4       Q.   So the work you're talking about is all

5   part of the voluntary work program that would pay a

6   dollar a day --

7       A.   Yes.

8       Q.   -- for the performance?

9            MR. FREE:  Objection to the form.

10           You can answer.

11  BY MR. BARNACLE:

12      Q.   How did you -- when you are working as a

13  barber, how did you let GEO know -- or how did GEO

14  know that you were working as a barber and that they

15  needed to pay you for that day?

16      A.   Well you were on the payroll.  So an

17  officer would take note of it and their notebook.

18  I'm not too sure.

19      Q.   Okay.  So there was some way in which the

20  officer would write down that you were working that

21  day?

22      A.   Yes.

23      Q.   Okay.  Did you -- did you ever see that

24  sheet?

25      A.   No.

1    Q.   So you worked -- you weren't required to

2  sign on a given day that you worked as a barber?

3           MR. FREE:  Objection to the form.

4           You can answer, if you can.

5           THE WITNESS:  At this moment I don't

6  remember if I did.

7  BY MR. BARNACLE:

8    Q.   Okay.  How about as a janitor?  What was

9  the process for letting GEO know that you had worked

10  a particular day as a janitor?

11           MR. FREE:  Objection to form.

12           You can answer, if you want.

13           THE WITNESS:  Once you were employed,

14  unless there was some kind of complaint, then they

15  would know that you worked through an officer

16  notifying them.

17  BY MR. BARNACLE:

18    Q.   So from your experience, an officer would

19  write down that you had worked as a janitor on a

20  particular day?

21    A.   Yes.

22    Q.   And then you would be paid the dollar for

23  that day?

24    A.   Yes.

25           MR. FREE:  Objection.  Compound.

Page 56

1        You can answer, if you know.

2   BY MR. BARNACLE:

3        Q.   If you don't mind, let's go back to

4   Exhibit 52, which is your declaration.

5        A.   Okay.

6        Q.   If you look at paragraph 10, please it

7   says, "Because of my detainee status, GEO did not

8   permit me to seek employment from another employer

9   outside of the walls of the Adelanto facility."

10        Did I read that correctly?

11        A.   Yes.  Can I read it?

12        Q.   Please do, yes.

13        A.   Yes.

14        Q.   Okay.  So if the voluntary work program at

15   Adelanto didn't exist, would you have been permitted

16   by ICE to go outside of the Adelanto facility and

17   get a job?

18             MR. FREE:  Objection.  Calls for

19   speculation.

20             Answer if you know.

21             THE WITNESS:  I'm not sure.

22   BY MR. BARNACLE:

23        Q.   Okay.  Do you understand -- did you ever

24   ask GEO why you couldn't leave Adelanto and get a

25   job?

Page 57

1        A.    On my own belief I don't think I asked

2    them.

3        Q.    Okay.  Do you know why you didn't ask them

4    that?

5        A.    Well, I was turned down most of the time

6    by deportation officers, ICE officers.

7        Q.    Turned down by ICE officers for what?  And

8    what did you --

9        A.    Asking for help or making complaints.

10        Q.    Okay.  So your testimony is when you asked

11    for help or made complaints to ICE officers, you

12    were turned down; is that correct?

13        A.    For the majority of the complaints, yes.

14        Q.    Okay.  And that's part of the reason why

15    you didn't ask to get a job outside of the Adelanto

16    facility?

17            MR. FREE:  Object to the form.

18            THE WITNESS:  I would say, yes, but for

19    the fact that I knew I was a prisoner at Adelanto,

20    too.

21    BY MR. BARNACLE:

22        Q.    Okay.

23        A.    Or a detainee.  I'm sorry.

24        Q.    Understood.

25            If you could turn to paragraph 15 of that

Page 58

1    same document.

2         A.   Okay.  I see.  Okay.

3         Q.   So you wrote in here, "I participate in

4    the work program in order to buy daily necessities

5    that GEO failed to provide for me."

6              Is that correct?

7         A.   Correct.

8         Q.   Can you tell me, sitting here right now,

9    what you considered to be daily necessities?

10        A.   Well, for one, you're in the high desert.

11        Q.   Okay.

12        A.   The sun can be extremely hot, and I'm real

13   light skinned.  So I was getting blemishes.  GEO

14   said they wouldn't give me sunscreen.  So I had to

15   buy sunscreen.

16             The shampoo and lotion that they provided

17   was really bad.  It caused a lot of dandruff.  So I

18   had to buy my own shampoo.  At one moment they

19   didn't have any shampoo for no detainee.  So people

20   were forced to buy shampoo and soap because the soap

21   they provided was really bad quality.

22        Q.   Okay.  Is there anything else that you are

23   referring to when you said daily necessities?

24             MR. FREE:  Object to the form.  You had

25   him read one half of the sentence.  Did you want him

Page 59

1    to read the second half?

2              MR. BARNACLE:  He can read it if he wants

3    to.  I'm asking him separately if there's anything

4    other than daily necessities.

5              THE WITNESS:  Okay.  Can I add more?

6    BY MR. BARNACLE:

7         Q.   Yeah, absolutely.

8         A.   Shoes.  I would definitely -- I bought

9    shoes there.  I bought water.  I bought lotion.  I

10   believe I bought lotion at some point and food such

11   as peanut butter, soups, and sometimes create some

12   chocolate.  I love chocolate.  So that would --

13   that's all I can remember.

14        Q.   Okay.  So you would buy water.  What kind

15   of water did they sell at the commissary?

16        A.   Bottled water.

17        Q.   Okay.

18        A.   Yeah.

19        Q.   And you purchased bottle water at the

20   commissary?

21        A.   Honestly I tried but the seven dollars a

22   day were not enough for a two-dollar water bottle.

23   And so, you know, when I did buy it, it's because

24   GEO had something going on with their plumbing

25   issues where the water was coming out like black.

Page 60

1     Q.   Okay.  And you bought shoes from the

2  commissary?

3     A.   Yes.

4     Q.   Okay.  Did you buy clothing from the

5  commissary?

6     A.   As of this moment, I don't remember buying

7  clothing.

8     Q.   Okay.  Let's take a look at --

9          MR. FREE:  Can we take a quick break?  I

10  need to use the bedroom before you go to the next

11  exhibit.

12          MR. BARNACLE:  Sure.

13          MR. FREE:  Thanks.

14          (Recess taken)

15  BY MR. BARNACLE:

16     Q.   Well, speaking of art -- a perfect

17  segue -- I remember seeing that there were art

18  contests at the Adelanto facility and that you

19  participated in them; is that correct?

20     A.   Correct.

21     Q.   Tell me about those contests.

22          MR. FREE:  Object to the form.

23          You can answer, if you know?

24          THE WITNESS:  They had art contests for

25  detainees.

Page 61

1    BY MR. BARNACLE:

2        Q.    Okay.  When would they have those

3    contests?

4        A.    That I recall, once or twice a year.

5        Q.    Okay.  What were they asking detainees to

6    submit?

7        A.    It may be you're drawing about Easter.  It

8    may be you're drawing about Halloween.  Maybe you're

9    drawing about Christmas.

10       Q.    Okay.  Did you submit drawings for those

11   contests?

12       A.    Yes.

13       Q.    And did you -- did you win?

14       A.    I got first prize a few times.

15       Q.    Okay.  What would you -- what would you

16   win if you got first prize?

17       A.    A candy bar.

18       Q.    Okay.  Is that it?

19       A.    That I remember, yes.

20       Q.    Okay.  You don't recall there ever being

21   money deposited into your commissary for winning

22   those contests?

23       A.    Did I remember?  Yes.

24       Q.    Okay.

25       A.    Yes.

Page 62

1    Q.   What do you remember?

2    A.   I believe there was a price for a certain

3    amount.  I don't remember the amount, but I do

4    remember -- I believe I do remember there was some

5    money.

6    Q.   Okay.

7    A.   And then they stopped it.

8         (Exhibit 54 was marked for

9         identification.)

10   BY MR. BARNACLE:

11   Q.   Okay.  So before we went on break, we were

12   about to look at another exhibit.  This is

13   Exhibit 54.

14        MR. FREE:  So this is still part of the

15   documents that we got on Friday?

16        MR. BARNACLE:  It is, yes.  It was

17   Thursday.

18        MR. FREE:  Yeah, all right.  The same

19   standing objection to using these documents at the

20   deposition.  We've already addressed it previously,

21   but you can go ahead.

22        MR. BARNACLE:  Okay.

23   BY MR. BARNACLE:

24   Q.   And feel free to take a look at it.  Let

25   me know when you finish.

Page 63

1      A.    Okay.

2      Q.    Okay.

3      A.    Thank you.

4      Q.    This is a copy of your commissary activity

5  during your time at Adelanto?

6      A.    Yes.

7      Q.    I think you testified earlier that you had

8  to purchase daily necessities from the commissary;

9  is that correct?

10      A.    Uh-huh.

11           MR. FREE:  You need to answer "yes" or

12  "no."

13           THE WITNESS:  Yes, I'm sorry.

14           MR. FREE:  That's okay.

15  BY MR. BARNACLE:

16      Q.    And did you consider peanut M&Ms to be a

17  daily necessity?

18      A.    No, but there wasn't enough protein in our

19  food at Adelanto.

20      Q.    So you bought peanut M&Ms to supplement

21  your protein?

22      A.    Yes.

23      Q.    How about hot and spicy pork grinds?  Is

24  that a daily necessity?

25      A.    It was not but when you eat soup in there,

Page 64

1   it's hard to eat it plain.  So we used the pork

2   grinds to put it in the soup.

3       Q.   How about Sriracha hot sauce?  Is that a

4   daily necessity?

5       A.   No, it is not.

6       Q.   What about sunflower kernels?

7       A.   That's protein.

8       Q.   Okay.  Hot Cheese Crunchy?

9            MR. FREE:  You looking at something

10  specific?

11           MR. BARNACLE:  I'm looking at his

12  commissary record.

13           MR. FREE:  Do you want to look at what

14  you're actually pointing at, and what page number

15  for instance.

16           MR. BARNACLE:  I would be happy to.

17  Thanks for pointing that out.

18  BY MR. BARNACLE:

19      Q.   30158, the first page.  So if you look at

20  three at the bottom where it says CA hot cheese

21  crunchy?

22           MR. FREE:  Right above the moisturizing

23  soap.

24           MR. BARNACLE:  Yes, exactly.

25           MR. FREE:  You see that right at the

Page 65

1    bottom?

2              THE WITNESS:  Yes, yes, yes, yes.

3    BY MR. BARNACLE:

4         Q.   Do you know what that is?

5         A.   Chips.

6         Q.   Okay.  Is that a daily necessity?

7         A.   No.

8         Q.   If you want to look at page 30160.

9              MR. FREE:  The page numbers are right

10   there.

11             THE WITNESS:  Uh-huh.  Okay.

12   BY MR. BARNACLE:

13        Q.   If you look down the line, there's one,

14   two -- two different entries for Jolly Ranchers.

15             Do you see those?

16             MR. FREE:  Tell him which lines they are.

17             MR. BARNACLE:  Half way down.  If you

18   scroll down, you see two entries for Jolly Ranchers.

19             MR. FREE:  Above or below?

20             MR. BARNACLE:  He can count it just as

21   easily as I can.

22             MR. FREE:  You're not counting it.  You're

23   just telling him half way down.  So is it above or

24   below?

25             MR. BARNACLE:  He can scroll down.  And

Page 66

1    stop coaching the witness by the way.  It's

2    unbelievable.  Did you object?

3            MR. FREE:  I'm trying to figure out what

4    you're asking him about.

5            MR. BARNACLE:  You're coaching the

6    witness.

7            MR. FREE:  I'm really not.

8            MR. BARNACLE:  It's tiresome.

9            MR. FREE:  Okay.  Ask your question.

10   BY MR. BARNACLE:

11       Q.   Like I asked, if you scroll down the list,

12   do you see two entries for Jolly Ranchers?

13           MR. FREE:  Watch your tone, okay, please.

14           MR. BARNACLE:  Watch your tone.

15           MR. FREE:  Do we need to take a break for

16   you to calm down?

17           MR. BARNACLE:  Do you need to take a

18   break?

19           MR. FREE:  I do not.

20           MR. BARNACLE:  Good.  Let's continue.

21           THE WITNESS:  Okay.

22           MR. FREE:  What's your question.

23   BY MR. BARNACLE:

24       Q.   For the third time my question is:  Do you

25   see the two entries for Jolly Ranchers on the list?

Page 67

1          MR. FREE:  Why are you yelling?

2          MR. BARNACLE:  That you've interrupted me

3   three times now.  I will let the record reflect that

4   this behavior of constant interpretations of asking

5   me to repeat a very clear question three separate

6   times is absolutely unnecessary.  It's abusive and

7   it has to stop.

8          MR. FREE:  I'm asking you to please lower

9   your tone.

10          MR. BARNACLE:  Let's take a break.

11          MR. FREE:  Thank you.

12          (Recess taken)

13          MR. BARNACLE:  All right.  We're ready.

14   BY MR. BARNACLE:

15      Q.   So we're back.  On 30160 if you look at

16   half way down there's a reference to Jolly Ranchers,

17   quantity one, price dollar 35.

18          Do you see that?

19      A.   Yes.

20      Q.   If you go down 10 entries, there's another

21   entry for Jolly Ranchers.  Again, quantity $1.35.

22          Do you see that?

23      A.   Yes.

24      Q.   Did you consider Jolly Ranchers to be a

25   necessity?

Page 68

1          A.     No.   But sometimes I would treat other

2     detainees that didn't have any money.

3          Q.     Okay.   Was there any -- ever a time when

4     you were a detainee at Adelanto where you would

5     utilize the things that you purchased from the

6     commissary to make an alcoholic beverage?

7          A.     Never.   No.

8          Q.     Did that happen at Adelanto?

9          MR. FREE:   Objection.   Calls for

10    speculation.

11          You can answer, if you know.

12          THE WITNESS:   I don't remember it being

13    done in my living dorm or cell or anything.

14    BY MR. BARNACLE:

15          Q.     Are you aware of it happening in other

16    living areas or cells?

17          A.     At Adelanto, yes.   I've been made aware of

18    it.

19          Q.     Okay.   If you go to 30163.

20          A.     Okay.

21          Q.     Two down.   It says cost CL20 headphone,

22    quantity one, $39.

23          Do you see that?

24          A.     Yes, I do.

25          Q.     Did you purchase headphones for $39?

Page 69

 1        A.    Yes, I did.

 2        Q.    Was that a daily necessity?

 3        A.    I would say it was a psychological

 4    necessity to get away from the environment.  So they

 5    were probably the most awesome headphones you can

 6    buy at the commissary.

 7        Q.    Okay.  So at Adelanto did they -- did they

 8    provide shampoo?

 9        A.    Poor quality shampoo.

10        Q.    I think you said earlier it caused

11    dandruff?

12        A.    Dandruff.

13        Q.    Do you know what brand of shampoo they

14    provided?

15        A.    I don't know.  I don't recall the brand,

16    but it was real poor.  People used to wash their

17    socks instead of their hair.

18        Q.    Did it come in a bottle that had no

19    indication of its brand, or was it a -- is it a

20    branded item?

21        A.    No -- I'm sorry.  Yes, it had a brand.

22        Q.    Okay.  But you don't recall what it was?

23        A.    No.

24        Q.    Okay.  How about the soap that they

25    provided?

Page 70

1           Well, the first question is did they

2     provide you with soap?

3           MR. FREE:  Objection to the form.

4           You can answer, if you know.

5           THE WITNESS:  Yes.

6     BY MR. BARNACLE:

7       Q.   Do you know what kind of soap they offered

8     you?

9           MR. FREE:  Objection.

10          You can answer.

11          THE WITNESS:  Bad soap.  The brand?  I

12    don't understand.

13    BY MR. BARNACLE:

14      Q.   Was there a -- was there any indication of

15    the brand of soap it was, or was it just a piece of

16    soap with no indication of the brand?

17          MR. FREE:  Objection to the form.

18          You can answer, if you know.

19          THE WITNESS:  Two types of soaps.  So in

20    the beginning they provided white soap with no brand

21    and then they came up with a liquid soap, and I

22    don't think it had a brand.  Not that I remember at

23    this moment.

24    BY MR. BARNACLE:

25      Q.   Okay.  Did they provide toothpaste to you?

Page 71

1          MR. FREE:  Objection to the form.

2          You can answer if you want.

3          THE WITNESS:  Yes.

4   BY MR. BARNACLE:

5      Q.   Okay.  Do you know what brand of

6   toothpaste they offered to you?

7      A.   It had a brand.  It was a commercial

8   brand.  I don't remember.

9      Q.   Okay.  I think you stated in your

10  complaint that you suffered a blistering sunburn on

11  multiple occasions?

12     A.   My cheeks, yes.

13     Q.   Tell me would you suffer that sunburn from

14  the time you would be out in recreation?

15     A.   Well, I would say both because it didn't

16  make a difference.  I didn't want to stay inside

17  incarcerated 24 hours a day.  So going out and

18  coming in I still have to suffer with the pain, but

19  it was due to the sun I would get.

20     Q.   Did you request sunscreen from GEO?

21     A.   Many times.

22     Q.   Okay.  Can you tell me the ways in which

23  you requested sunscreen from GEO?

24     A.   Verbally I would ask them that -- if they

25  can get me some sunscreen because I had real bad

Page 72

1    blemishes that were turning into blisters, and they

2    were brown, and they were visual, and you could see

3    them, but they didn't help.

4            So I -- I went to the doctor and it took

5    months to see the doctor.  By then, you know, they

6    were just scars, and I asked him, you know, can you

7    give me -- prescribe me sunscreen, and he said, no.

8    GEO doesn't provide sunscreen.  They wouldn't allow

9    me.

10       Q.   Okay.  Do you remember if you submitted a

11   KITE form requesting sunscreen?

12       A.   I believe I did.  I'm not too sure.

13       Q.   Okay.  I think you testified that you then

14   purchased sunscreen.

15            Do you know how many times you purchased

16   sunscreen?

17       A.   A few times.

18       Q.   Okay.

19       A.   I tried to use it wisely.

20       Q.   I'll go back to Exhibit 52.

21            Is it your contention in this lawsuit that

22   you had to participate in the voluntary work program

23   in order to afford your commissary purchases?

24            MR. FREE:  Object to the form.

25            THE WITNESS:  I'm sorry, Colin.  I was

Page 73

1    looking at this.  I thought you were going to ask --

2    BY MR. BARNACLE:

3        Q.   I'm going to.  But before we do that, I

4    just have a question.

5        A.   I started reading.  I'm sorry.

6        Q.   I understand.

7             Aside from your declaration, is it your

8    position in this lawsuit that you had to participate

9    in the voluntary work program for the dollar a day

10   in order to pay for your commissary purchases?

11       A.   Yes.

12       Q.   I think before you mentioned something

13   about the water at GEO -- at Adelanto there being a

14   plumbing issue?

15       A.   Horrible, yes.

16       Q.   Can you tell me more about that?

17       A.   There were a few times -- more than a few

18   times where they wouldn't notify detainees what was

19   going on in the facility.  So our shower water, our

20   urinal waters, our sink water, toilet water, was

21   coming out black.  Like reddish, oranges.  Kind of

22   like it went through a rusted pipe, and it would

23   last for a few days.

24             Detainees couldn't shower they couldn't

25   brush their teeth.  The most they can do is probably

Page 74

1  use the urinals and the toilets and so at that

2  moment I would be forced to buy a bottle of water.

3  As it is, I just didn't even like drinking the water

4  there, but that's when I would buy the water, yes.

5      Q.  Okay.  So you just mentioned the water and

6  the sinks, the shower, the urinals, et cetera.

7          The drinking water that you would have

8  would come out this way?

9      A.  All the water in the facility.

10      Q.  Okay.  So in those circumstances you would

11  have to buy water?

12      A.  Yes.

13      Q.  Okay.  Did you -- do you remember making

14  complaints to GEO about the water being in that

15  condition?

16      A.  That I recall in formal writing I might

17  have but verbally, yes.

18      Q.  Okay.  So for the two positions that you

19  participated in for the voluntary work program --

20  the barber and the janitor -- while you were engaged

21  in the voluntary work program, did you work seven

22  days a week?

23      A.  Yes.

24      Q.  Okay.

25      A.  Yes.

Page 75

1       Q.    Every week you would work seven days a

2   week?

3             MR. FREE:  Objection to the form.

4             You can answer, if you remember.

5             THE WITNESS:  I won't say every single

6   week.

7   BY MR. BARNACLE:

8       Q.    Sure.

9       A.    The majority of my time detained there,

10  yes.

11            (Exhibit 53 was marked for

12            identification.)

13  BY MR. BARNACLE:

14      Q.    Okay.  If you don't mind, let's go back to

15  the big document, which is Exhibit 53.

16            If you could turn to 29965.  If you look

17  at the top, you'll see this.  Is titled a "Resident

18  Account Summary."

19            Do you see that?

20      A.    Yes, I'm sorry.

21      Q.    And then your name was just below that.

22  It says Raul Novoa.

23            Do you see that?

24      A.    Yes.

25      Q.    Feel free to scan through the next --

Page 76

1  let's see.  All the way to 29979, which is the end

2  of it.  I will ask you some questions about that.

3          MR. FREE:  So we're going 29965 to 29979,

4  right?

5          MR. BARNACLE:  That's correct.

6          THE WITNESS:  I'm sorry.  Can you repeat

7  that?

8  BY MR. BARNACLE:

9      Q.  The one you're on 29965 all the way to

10  29979.

11     A.  Okay.

12     Q.  And you can verify this?  Represent that

13  the last page, which is 29979, appears to be from

14  6/21 to 2012 being the first entry.

15         Do you see that?

16     A.  (Witness nods.)

17     Q.  So that corresponded to when you entered

18  the facility?

19     A.  More or less, yes.

20     Q.  Okay.  And then if you go all the way to

21  the front --

22     A.  Right.

23     Q.  -- 29965, the very top entry, would be

24  February 3rd of 2015.  It says release with CA

25  release or close out trans.

Page 77

1          Do you see that?

2      A.   Yes.

3      Q.   Does that corresponded with when you left

4  the facility?

5      A.   To my knowledge, this looks more or less

6  like it does.  I can't say every single detail here

7  corresponds to the truth.

8      Q.   Okay.

9      A.   But it's close.

10     Q.   Okay.  So let's just walk through a couple

11 of things in these reports.  If you look on 29965,

12 that first page --

13     A.   Yes.

14     Q.   -- there's an entry on 1/29/2015.  It says

15 secure d-e-p-o-s, and it says Guiterrez Josie.

16          Do you see that?

17          MR. FREE:  I'm pointing to the entry

18 that -- the line that you're talking about.

19 BY MR. BARNACLE:

20     Q.   Okay.

21     A.   Yes.

22     Q.   It looks like there's a deposit of $32.05.

23          Do you see that?

24     A.   Uh-huh.

25     Q.   Can you tell me who Josie Gutierrez is?

Page 78

1      A.   At this moment I have no idea.  I don't

2  even remember this person.

3      Q.   Okay.  But do you recognize the record at

4  least states that a person named Josie Gutierrez

5  deposited the $32.05 into your commissary account?

6           MR. FREE:  Object to the form.

7           THE WITNESS:  I do recognize that on the

8  form.

9  BY MR. BARNACLE:

10     Q.   Now, let's go down on that same page to

11  1/10 of 2015 there's another secure d-e-p-o-s.

12     A.   Yes.



18     Q.   Okay.  And she deposited $20 into your

19  commissary; is that correct?

20     A.   I would say, yes.

21     Q.   Okay.  Let's go down to the 12/30 of 2014

22  on that same page.

23     A.   Uh-huh.

Page 79

1              Do you see that?

2     A.    Yes.

3     Q.    Let's go to 29968.

4     A.    Okay.

5     Q.    There's a 9/18/2014 secure deposit.

6     A.    9/18/2014.

7     Q.    From Roberto Quezada.

8              Do you see that?

9     A.    Yes.

10    Q.    Do you know who Roberto Quezada is?

11    A.    I have no idea what that person is.

12    Q.    Sitting here today, do you remember

13    receiving $20 into your commissary from somebody

14    named Roberto Quezada?

15    A.    No.

16    Q.    Now, let's turn to 29969.  There's an

17    entry on 7/17/of 2014.  That says debit INMABATT.

18             Do you see that?

19    A.    Yeah, yes for zero amount.

20    Q.    For zero amount, yes.  Can you help me

21    understand what that is referring to?

22             MR. FREE:  Objection.  Calls for

23    speculation.

24             Answer if you actually know.

25             THE WITNESS:  I have no idea at this

Page 80

1   point.

2   BY MR. BARNACLE:

3       Q.   Okay.  Do you recall receiving batteries

4   that you wouldn't have to pay for?

5           MR. FREE:  Objection.  Vague.

6           Answer if you know.

7           THE WITNESS:  It looks -- yes, I have.

8   BY MR. BARNACLE:

9       Q.   Okay.  Tell me -- so you have a

10  recollection of receiving batteries that you didn't

11  have to pay for?

12      A.   Uh-huh.

13      Q.   Tell me how that would happen?

14          MR. FREE:  Object to form.

15          You can answer.

16          THE WITNESS:  By verbally or writing a

17  KITE.

18  BY MR. BARNACLE:

19      Q.   Okay.  What kind of KITE request would you

20  make in order to get batteries at no cost?

21      A.   Inmate request.

22      Q.   I'm sorry?

23      A.   Inmate request form.  The KITE.  I'm sorry

24  detainee request form.

25      Q.   Okay.  So would you request batteries?

Page 81

1   Would you request to not have to pay for those

2   batteries or just request them?

3          MR. FREE:  Object to form.

4          You can answer.

5          THE WITNESS:  Well, there's momentary

6   requested batteries.  But to get batteries I think

7   there was also a moment where I would have to buy

8   them, but I wasn't charged if I received batteries.

9   BY MR. BARNACLE:

10     Q.   Okay.  So you could buy batteries from the

11  commissary; is that correct?

12     A.   If I can remember, yes.

13     Q.   So if you could buy them in the commissary

14  and they obviously cost money at the commissary, I'm

15  just trying to understand how -- how it would come

16  about that you would get them free?

17         MR. FREE:  Objection to form.

18         Answer if you can.

19         THE WITNESS:  Well, there was probably a

20  moment probably one time that I might have bought

21  batteries but most of the time I would ask for

22  batteries, and it would take a while for the

23  batteries to come, and I wasn't charged.

24         I requested them in person verbally or I

25  wrote a KITE or I spoke to a sergeant.  And while

Page 82

1    that took -- the process, I would talk to the

2    detainees and, you know, exchange a soup or two for

3    batteries.

4    BY MR. BARNACLE:

5        Q.   Okay.  Do you recall submitting any KITEs

6    in which you had to write on the KITE that you were

7    indigent?

8        A.   Indigent?  What do you bean mean by that?

9        Q.   Would you ever write the word indigent on

10   a KITE form when you were requesting something?

11           MR. FREE:  Object to the form.

12           THE WITNESS:  What do you mean by

13   indigent?  What does that word mean?  I don't

14   remember writing --

15   BY MR. BARNACLE:

16       Q.   Okay.  That's all I'm asking.  Do you

17   recall --

18       A.   I'm sorry.

19       Q.   -- literally writing the words indigent on

20   a KITE at any point in time?

21           MR. FREE:  Object to the form.

22           THE WITNESS:  It rings a bell but, no, I

23   don't.

24   BY MR. BARNACLE:

25       Q.   Let's turn to 29975.

Page 83

1      A.   Okay.

2      Q.   All right.  Towards the top 7/24 of 2013

3 it says secured deposit Fortino Estorga.

4           Do you see that?

5           MR. FREE:  Counsel is going to highlight

6 or just point to that.

7           THE WITNESS:  You said am 2014?  I'm

8 sorry.

9 BY MR. BARNACLE:

10     Q.   Yeah, sorry.  No, I said 7/24 of 2013.

11     A.   Okay.  I see it.

12     Q.   Do you know who Fortino Estorga is?

13     A.   It sounds familiar.  I believe -- I

14 believe he was a detainee.

15     Q.   Okay.  And do you remember on that date

16 Fortino Estorga depositing $30 into your commissary?

17     A.   I don't remember him depositing that money

18 on that date, but I do believe he was released and

19 planned on sending me money.  I'm not too sure to

20 the date.

21     Q.   But you know who he is?

22     A.   I believe so, yes.  He's a detainee.

23     Q.   Do you remember him at least telling you

24 that he was going to deposit that money for you?

25     A.   Right.

Page 84

1    Q.   Okay.  If you could turn to 29978, please.

2    A.   Okay.

3    Q.   It looks like on 12/7 of 2012 there's an

4    entry entitled deposit MO.

5         Do you see that?

6    A.   Yes.

7    Q.   And it says $100.

8    A.   Yes.

9    Q.   Do you know what deposit MO stands for?

10   A.   I have no idea.  I don't even know what

11   28445 is.

12   Q.   Is it possible that that's referring to a

13   money order?

14        MR. FREE:  Objection.  Calls for

15   speculation.

16        You can answer.

17        THE WITNESS:  Yes, it could be.

18   BY MR. BARNACLE:

19   Q.   Do you remember anyone ever depositing a

20   money order into your commissary account?

21   A.   There were a few times where I was sent a

22   money order.  I'm not too sure.

23   Q.   Do you know who sent money orders to you?

24   A.   No, I don't remember at this time.

25   Q.   Okay.  So on 12/7 of 2012 somebody

Page 85

1    deposited a hundred dollars via money order into

2    your account, but you don't know who did it?

3            Is that accurate?

4        A.   Yes.

5        Q.   And actually if we go to the very first

6    entry on that same page at the very top of 12/21 of

7    2012 where it says deposit CHE.

8            Do you see that?

9        A.   Yes.

10       Q.   For $50.

11       A.   Yes.

12       Q.   Do you know what deposit CHE stands for?

13       A.   No, I don't remember.  It might be a

14   check.  I don't know if Adelanto took checks.  I

15   know they accepted money orders.

16       Q.   Do you remember if on 12/21 of 2012 anyone

17   depositing a 50-dollar check into your commissary?

18       A.   No.

19       Q.   If you flip over to the page just before

20   that 29977 on 1/11 of 2013 there's another deposit

21   MO.

22            Do you see that?

23       A.   You said --

24       Q.   I'm sorry.  1/11 of 2013.

25       A.   Yes, yes.

Page 86

1    Q.   Another deposit MO for a hundred dollars.

2    A.   Yes.

3    Q.   Do you know who deposited that hundred

4  dollars into your account?

5    A.   I would -- my recollection tells me, no,

6  right now, but it might have been my sister.

7    Q.   Okay.  And then you go down a little bit

8  to 1/2 of 2013.  There's another deposit MO.

9    A.   Yes.

10    Q.   For $50.

11    A.   Yes.

12    Q.   Sitting here right now, do you know who

13  made that money order deposit into your account?

14    A.   No.  These MOs I don't recall because

15  these deposits -- and if it's a money order --

16  should have a name, and they should state the name

17  if it's a money order because we, as detainees, are

18  supposed to know who we're getting the money from.

19  And if they just put MO, anybody can just type this

20  in.  So, no, I'm not sure who it's from, or how I

21  got it.

22    Q.   Okay.

23    A.   But I can see now.  I'm sorry.  My

24  sister's name is on there.  So when she's deposited

25  money, her name is on there.

Page 87

1     Q.   It looks like -- you're right.  The one

2  right above that on 1/2/2013 where it says secure

3  deposit.

4     A.   Yes.

5  ████████████████████████████████████████████████

6     A.   Uh-huh.

7     Q.   Do you know, sitting here right now, the

8  difference between a secured deposit and a deposit

9  of a money order?

10         MR. FREE:  Objection to the form.

11         You can answer, if you know.

12         THE WITNESS:  I would say, yes, but I

13  don't know what this sheet is referring to by

14  deposit MO without a reference to a name or

15  anything.

16  BY MR. BARNACLE:

17     Q.   Okay.  If we go to 29968.

18     A.   Okay.

19     Q.   If we look at 9/18 of 2014.  Just below

20  the one for Roberto Quezada there's also --

21     A.   Yes.

22     Q.   -- a reference to deposit CAS.

23         Do you see that?

24     A.   Yes.

25     Q.   And it says for $20; is that right?

Page 88

1     A.    Yes.

2     Q.    Do you know what deposit CAS means?

3     A.    I don't know if Adelanto accepted cash.

4     Q.    Do you recall on 9/18 of 2014 somebody

5   deposited the $20 in cash into your commissary

6   account?

7     A.    No, I don't recall.

8     Q.    So let's turn now to GEO-Novoa 29980.

9     A.    29980.

10    Q.    I'm going to ask to you go to 29980 all

11  the way through 29988.  So the next eight pages.

12    A.    Up to?

13          MR. FREE:  Eight.

14          THE WITNESS:  Okay.  Yes.

15  BY MR. BARNACLE:

16    Q.    If we look at the very first page,

17  29980 --

18    A.    Yes.

19    Q.    -- do you recognize what a property

20  receipt document is?

21    A.    A property receipt is a receipt that an

22  officer writes to the detainee.  Its pertaining to

23  be sent to, yes.  It's deposited in this occasion.

24    Q.    Okay.  So if we look at this very first

25  one.  It has the number 04016 at the bottom?

Page 89

1         A.   Yes.

2         Q.   On the very bottom it says detainee, and

3    there's a signature.

4              Is that your signature?

5         A.   Yes.

6         Q.   Okay.  And it looks like the date is 1/22

7    of '15.

8              Does that look correct?

9         A.   Yes.

10        Q.   Okay.  So it looks like to me there's $20

11   cash?

12        A.   Right.

13        Q.   That you are asking to be deposited as

14   property into your commissary account; is that

15   correct?

16             MR. FREE:  Objection to the form.

17             You can answer, if you know.

18             THE WITNESS:  I do note that here.  Also,

19   note that -- I don't know how I got ahold of this

20   receipt that I wrote my name for the officer on this

21   receipt, and I wrote my detainee number, and I also

22   note that the one and the two if you see that on

23   top, the one and two are dark and the other two are

24   light.

25             So I'm not too sure if I received it on

Page 90

1   this date on January the second or January the

2   22nd because those two numbers look really far

3   apart.

4       Q.   Okay.  Do you have any independent

5   recollection at some point in January of 2015

6   whether it was the 2nd or the 22nd being in

7   possession of $20 cash that you asked to be input as

8   property?

9           MR. FREE:  Form.

10          You can go ahead.

11          THE WITNESS:  I believe so.  I might have,

12  yes.

13  BY MR. BARNACLE:

14      Q.   Okay.  How -- if you recall, how did you

15  obtain $20 cash in January of 2015 to put into

16  property?

17      A.   Taking into consideration now that because

18  it's been so long that Adelanto does accept cash

19  envelopes, that I received this cash and requested

20  it to be deposited into my account.

21      Q.   Okay.  So you believe that you received

22  cash in an envelope mailed to you?  Is that --

23      A.   Yes.

24      Q.   -- what you believe?

25      A.   Yes.

Page 91

1        Q.   Okay.  Let's turn to -- let me ask one

2   another question.

3             Sitting here right now, do you have any

4   recollection of who might have sent you $20 cash on

5   that date?

6             MR. FREE:  Objection to the form.

7             You can answer, if you can.

8             THE WITNESS:  Gee, I think it could have

9   been an ex-girlfriend.  Maybe a family member, yes.

10  BY MR. BARNACLE:

11       Q.   Do you recall other times that people

12  would send you cash in the mail?

13            MR. FREE:  Objection.  Form.

14            You can answer.

15            THE WITNESS:  Maybe a detainee that left

16  the facility and knew how hard it was, and would go

17  out of his way to send money.  That might have been

18  the situation.

19  BY MR. BARNACLE:

20       Q.   Okay.  Let's flip to 29984.

21       A.   Yes.

22       Q.   If you look at the first property receipt

23  with the number 028910 at the bottom, do you see

24  that?

25       A.   21980, yes.

Page 92

1    Q.   It looks like a hundred dollar money

2  order; is that correct?

3    A.   Yes.

4    Q.   Is that your signature at the bottom?

5    A.   Yes, it most definitely is my signature.

6    Q.   So on January 10th of 2013, do you

7  recall receiving a hundred dollar money order from

8  anyone?

9    A.   I do recall receiving a hundred dollars at

10  some point.  I don't know if it was a money order or

11  cash.  It could have been a money order.

12    Q.   Do you remember who sent that to you?

13    A.   No, I don't remember.

14    Q.   If you turn to 29986.

15    A.   Okay.

16    Q.   You see the property receipt 28455?

17    A.   Yes.

18    Q.   Is that your signature at the bottom?

19    A.   It looks like it, yes.

20    Q.   Okay.  Now, if we look at the next one

21  28731, do you see that?

22    A.   Yes.

23    Q.   Is that also your signature at the bottom?

24    A.   I would say that doesn't look like my

25  signature because of the detention officer going

Page 93

1    over my signature.  So I'm not too sure.

2         Q.    Okay.  Fair enough.

3               If you turn to 29988.

4         A.    Yes.

5         Q.    Property receipt 006221.

6               Do you see that?

7         A.    Yes.

8         Q.    Do you recall somebody sending you $50.30

9    cash?

10        A.    $50.30s, no, I don't recall that.

11        Q.    Okay.  Is that your signature at the

12   bottom?

13        A.    Again, the officer wrote over my

14   signature -- or supposedly my signature.  I would

15   say, no, I don't recognize that signature.

16        Q.    Okay.  If you don't mind, we'll go back to

17   Exhibit 52.

18        A.    Okay.

19               MR. FREE:  I want to make sure we get to

20   finish this line, but I need a bathroom break.

21               MR. BARNACLE:  Let's do it right this

22   second.  I need one too.

23               MR. FREE:  Okay.  Cool.

24               (Recess taken.)

25   / / /

Page 94

1   BY MR. BARNACLE:

2       Q.   Let's go to Exhibit 52.  If you could look

3   at paragraphs 13 and 14 for me.

4       A.   Yes, I have them.

5       Q.   Okay.  And go ahead and read those, if you

6   would like?

7            MR. FREE:  Do you want him to read it to

8   himself or out loud?

9            MR. BARNACLE:  To himself.

10           MR. FREE:  Okay.

11           THE WITNESS:  Yes.

12  BY MR. BARNACLE:

13      Q.   Okay.  So under 13 it says, "On several

14  occasions GEO officials threatened to put me into

15  disciplinary segregation for solitary confinement if

16  I stopped working."

17           MR. FREE:  Can we just read the entire

18  sentence, please?

19           MR. BARNACLE:  I will go into the second

20  section in a moment.  I would appreciate not being

21  interrupted in the middle of my question.

22  BY MR. BARNACLE:

23      Q.   So as part of that first sentence -- first

24  part of the sentence, it says, "If I stopped

25  working."

Page 95

1          What working are you referring to?

2          MR. FREE:  Objection to the form.

3          Go ahead.

4          THE WITNESS:  When it came to doing

5   janitorial work, if I complained that I didn't want

6   to work any more for cutting hair, if -- basically

7   if I just didn't want to clean or work at all.

8   BY MR. BARNACLE:

9      Q.   So you're referring to work, and you're

10  referring to there is the voluntary work program

11  positions that you had?

12         MR. FREE:  Objection to the form.

13         THE WITNESS:  Well, the voluntary work

14  program is how you get in to work.  After I would

15  say a week or so, you would be hired.  So if you

16  consider that, yes.

17  BY MR. BARNACLE:

18     Q.   Okay.  I'm just trying to understand when

19  you said if you stop working.  I think you testified

20  that the working you're talking about would be the

21  janitorial job you had as well as the barber job

22  that you had; is that correct?

23     A.   Yes.

24     Q.   And then the next part of the sentence

25  says, "Threatened to put you in disciplinary

Page 96

1   segregation or solitary confinement if you

2   encouraged other detainees to stop working or

3   complained about sub minimum wages."

4           MR. FREE:  Objection.  Form.

5           You can answer.

6           What is the question?  I'm sorry.

7   BY MR. BARNACLE:

8       Q.  I was going to get there but for your

9   untimely objection.  Why don't we do that.

10          MR. FREE:  If you want to read the entire

11  sentence, that's fine.  But what we can't do is read

12  parts of the sentences and then put an ellipsis in

13  and --

14          MR. BARNACLE:  I can.  This is my

15  deposition, and you can object all you want.  You're

16  not to do a speaking objection like you've been

17  doing, but you can object all you want.  So why

18  don't you lodge an appropriate objection and leave

19  the rest out.

20  BY MR. BARNACLE:

21      Q.  So when I'm talking about encouraging

22  other detainees to stop working, tell me what

23  working you're referring to in that section?

24      A.  The work that I did there in Adelanto.

25  And at one point I encouraged detainees to not work

Page 97

1   for a dollar verbally, and I was threatened that I

2   would be put in segregation if I didn't shut up, and

3   I was harassed.

4            So at that point it's like I don't want to

5   lose those four quarters I get a day.  So I just

6   left it at that.

7       Q.   Were you ever placed in administrative

8   segregation for stopping working?

9       A.   That I recall at this moment for refusing

10  to stop working, no, because I never really stopped

11  working.

12      Q.   Okay.  Were you ever placed in

13  disciplinary segregation for stopping working?

14      A.   As of this moment not that I recall.  It

15  was only threats and harassment.

16      Q.   Okay.  Are you aware of any other

17  detainees at Adelanto who were placed in

18  administrative segregation for refusing to work?

19      A.   I do recall a few.  One or two.  But I do

20  recall one for sure.

21      Q.   Okay.  Tell me about that.

22           MR. FREE:  Objection.  Vague.

23           THE WITNESS:  What do you mean tell me

24  about that?  What do you mean?

25  / / /

Page 98

1    BY MR. BARNACLE:

2         Q.   Do you recall a specific instance where a

3    detainee was put into administrative segregation for

4    refusing to work?  So I guess my question is:  Tell

5    me about your knowledge of that happening.

6              MR. FREE:  Objection form.

7              You can answer.

8              THE WITNESS:  My experience.  My visual

9    experience of what I saw.  He didn't get off his

10   bunk.  He didn't want to clean.  An officer had an

11   attitude.  He had an attitude.  They kicked his

12   bunk, told him to get -- I'm sorry.  Excuse my

13   language.  To get the fuck up.  And the guy said,

14   no.  So other officers -- GEO officers were called

15   in.  They got him, took him out, and segregated him.

16   BY MR. BARNACLE:

17        Q.   Do you know who that was?

18        A.   I don't remember the officers.

19        Q.   Do you have any other knowledge about

20   where they took him?

21        A.   Segregation.

22        Q.   Okay.  How do you know that?

23        A.   I was told by the officer.

24        Q.   Do you remember him coming back?

25        A.   No.

Page 99

1      Q.   So any other personal knowledge of any

2  other detainee being placed in segregation for

3  refusing to work?

4      A.   He was taken out of our dorm.  They had a

5  conversation outside of the sliding door.  Officers

6  came, grabbed his stuff.  I never seen him again.

7      Q.   Okay.  And then in paragraph 14, you

8  complained that on several occasions officers

9  threatened -- or actually forced me to move on to a

10  different living unit away from my peers and friends

11  after complaining about the work program, subminimal

12  wages and or their depravation of necessities at

13  Adelanto.

14          Do you see that?

15      A.   Yes.

16      Q.   Tell me about when they actually forced

17  you to move to a different living unit.

18      A.   It was in the west facility.  I made

19  comments about the conditions that we were living

20  in.  I made comments about not having the supplies

21  we needed to perform our job.

22          I complained about my law library hours.

23  That I couldn't finish my motion for appeal.  And so

24  GEO -- I take it -- didn't like the fact that I was

25  complaining, sent a few officers into my cell tossed

1    it around, grabbed my stuff, put it in a bag, took

2    me out of the west facility, and removed me back to

3    east max facility.

4        Q.   Do you remember when that was?

5        A.   I don't recall the date, but it happened.

6    It should be on record, and it was in the west

7    detention facility.

8        Q.   Okay.  Do you remember a time when you

9    asked or requested to be moved?

10       A.   There was a time where I didn't like my

11   comfort zone because of certain detainees.  So I

12   might have once or twice asked to be moved.  Most of

13   the time I probably asked to be moved or relocated

14   to a different bunk in the same dorm.

15       Q.   If you could turn to 53, if you could turn

16   to 29804.

17       A.   29804.  I see it.

18       Q.   Okay.  Can you tell me what you're

19   requesting in this KITE form?

20       A.   I'm requesting a pair of batteries.

21       Q.   Okay.  Do you recall these batteries being

22   issued to you?

23       A.   It took some time, but I got batteries at

24   some point, yeah.

25       Q.   Okay.  If we could turn to 29812.

1       A.   Can you repeat that?

2       Q.   29812.

3       A.   Okay.

4       Q.   Can you tell us what you're requesting in

5    this form?

6       A.   A pair of batteries.

7       Q.   And under the other request you see the

8    word "indigent"?

9       A.   Yes, I do.

10       Q.   Is that your handwriting?

11       A.   It looks, yes.  It looks like my writing.

12       Q.   Okay.  Do you know what you meant by

13    putting in indigent on that form?

14       A.   I have no idea as of this moment.

15       Q.   Can you turn to the next page 2983.

16       A.   Yes.  Okay.  I see it.

17       Q.   And is this a KITE form where you're

18    requesting batteries again?

19       A.   Yes.

20       Q.   And is that your handwriting where you

21    indicated the word indigent?

22       A.   Yes.

23       Q.   Sitting here right now, do you understand

24    why you wrote the word indigent on there?

25       A.   I don't know now.  But if I can recollect

Page 102

1    of what it meant, it might have been something to

2    do -- not with -- I guess clothing.  It had

3    something to do with electronics I'm taking.

4    Because I keep writing indigent with batteries.  So

5    I'm not too sure.

6        Q.   Do you remember putting on a KITE form

7    that you didn't have sufficient commissary funds for

8    what you were requesting?

9        A.   I don't, but I don't remember at this

10   moment.

11       Q.   Why would -- why would you put something

12   like that on a KITE form?

13            MR. FREE:  Objection form.

14            THE WITNESS:  I don't remember if I did.

15   I might have.

16   BY MR. BARNACLE:

17       Q.   Do you think the word indigent on this

18   KITE form -- and this is obviously based on your

19   recollection.

20            Do you think the word indigent on there is

21   meant to tell GEO that you can't afford batteries,

22   and you're requesting them?

23            MR. FREE:  Objection form.

24            THE WITNESS:  That might be it.

25   / / /

1  BY MR. BARNACLE:

2      Q.   Okay.  So does that cause you to refresh

3  your recollection that there was an ability, if you

4  were requesting an item and you didn't have the

5  funds in your commissary to pay for it, that if you

6  indicated that you were indigent, there was a

7  possibility that they would give it to you without

8  cost.

9          Does that sound right?

10         MR. FREE:  Objection.  Form.

11         THE WITNESS:  A possibility.

12 BY MR. BARNACLE:

13     Q.   Okay.  Turn to 29821, please.

14     A.   Okay.  I have a page.  I'm there.

15     Q.   Okay.  Can you tell us what you're

16 requesting in this KITE form?

17     A.   An exchange for one towel and two pairs of

18 socks.

19     Q.   Okay.  Do you recall that you received a

20 towel and two pairs of socks in response to this

21 request?

22     A.   I don't recall.

23     Q.   Turn to 29825, please.

24     A.   Yes, I'm sorry.

25     Q.   Okay.  Can you tell us what you're

1    requesting with this KITE form?

2         A.   Requesting a, one, 2X orange T-shirt and,

3    one, 2X boxers.  Boxers in exchange for a 2X.

4         Q.   Okay.  Thank you.  Just so I understand

5    the process at Adelanto.  If you were seeking a new

6    pair of boxers, T-shirt, pants -- you know, some

7    other clothing item -- is this the process that you

8    would go through to request those and receive those?

9              MR. FREE:  Objection.  Form.

10             THE WITNESS:  For the majority of the time

11   if these officers -- most of them didn't care -- or

12   sergeants didn't care, then we would -- you would

13   have to write KITE to request these things to

14   receive them, yes.  This would be the process.

15             (Exhibit 55 was marked for

16             identification.)

17   BY MR. BARNACLE:

18        Q.   Okay.  We're on 55 I believe.

19             Do you recognize this document that's been

20   labeled as Exhibit 55?

21        A.   Yes.

22        Q.   And what is it?

23        A.   This is my -- this is my Amended

24   Complaint.  My motion.

25        Q.   Do you know when you filed this document?

Page 105

1          MR. FREE:  Objection form.

2          THE WITNESS:  I believe it was filed on

3    September 16th, 2019.

4    BY MR. BARNACLE:

5      Q.   Okay.  If you don't mind turning to

6    paragraph 106, which is on page 23.

7      A.   23.  Yes.

8      Q.   Now, I will just read 106.  It says, "The

9    shoes issued to Mr. Novoa when you arrived at the

10   Adelanto facility fell apart within his first week

11   in detention.  GEO did not replace them.  Instead

12   Mr. Novoa was forced to purchase another pair of

13   shoes from the commissary using his wages from the

14   work program."

15         Is that correct?

16     A.   That's what it says, yes.

17     Q.   Is that an accurate statement of what

18   happened?

19     A.   I would say more or less, yes.

20     Q.   Okay.  So within your first week your

21   shoes they gave you, fell apart; is that correct?

22     A.   Yes.

23     Q.   And you then purchased a new pair of shoes

24   from the commissary to replace them?

25     A.   I did purchase shoes from the commissary.

1      Q.   And you had to use your wages from the

2  work program to pay for those new shoes; is that

3  correct?

4      A.   I would say so, yes.

5      Q.   Okay.  Going back to Exhibit 52.

6      A.   52.

7      Q.   I'm just going to ask you a couple of

8  questions without referring to that.

9           So you worked as a barber --

10     A.   Yes.

11     Q.   -- during your detention, correct?

12     A.   Yes.

13     Q.   And just sitting here right now, do you

14  recall the name of any other detainees who worked as

15  a barber at the same time?

16          MR. FREE:  Objection form.

17          THE WITNESS:  That I can remember I

18  requested one detainee to work.  I believe he was a

19  barber at some point.  That's the only one that I

20  can recall.

21  BY MR. BARNACLE:

22     Q.   Do you remember that person's name?

23     A.   No, I would have to go back to the

24  requested KITE thing.

25     Q.   Were there -- were you aware of barbers

Page 107

1    for any of the other groups -- groups of detainees

2    in other pods?

3         A.    I was aware that each pod had its own

4    barbers, yes.

5         Q.    Did you know any of those other barbers?

6         A.    I probably did, but I wasn't allowed to

7    communicate with them.

8         Q.    Sitting here right now, do you know any of

9    their names?

10        A.    No.

11        Q.    Okay.  And then you were also a janitor

12   during a portion of time while you were at Adelanto,

13   correct?

14        A.    Yes.

15        Q.    Can you tell me about who you worked with?

16   Was it a part of a crew?  Did you work by yourself?

17        A.    The janitorial work -- when I came to

18   janitorial duties was a crew, yeah.

19        Q.    Was it the same crew the entire time, or

20   did it change?

21             MR. FREE:  Objection to form.

22             THE WITNESS:  It changed.  People weren't

23   too happy.  Yeah, it changed.

24   BY MR. BARNACLE:

25        Q.    Okay.  Sitting here right now, can you

Page 108

1    remember any of the names of the people that worked

2    on your janitorial crew with you?

3        A.    No.

4        Q.    Do you remember nicknames that you may

5    have referred to them as?

6        A.    I mean -- God there's so many.  I mean,

7    people were so unhappy with the dollar a day.  They

8    quit.  They went in and out.  I remember one

9    nickname.  Pooh.

10       Q.    Pooh?

11       A.    Yeah, a chubby guy, yeah.

12       Q.    P-o-o-h?

13       A.    Yeah.

14       Q.    Do you know how he got that name nickname?

15       A.    Well, he was round, and he was funny, and

16   he -- we just didn't know how to pronounce his name.

17   So we called Pooh.

18       Q.    Do you know who came up with that name?

19       A.    A few of the other fellows that were

20   there.

21       Q.    Okay.  Do you remember any other names --

22   actual names or nicknames of any of the other people

23   that you worked as janitor?

24       A.    No, there's too many.

25       Q.    Now, if we look at Exhibit 52

Page 109

1  paragraph 17 --

2      A.   Okay.

3      Q.   -- it says, "To the best of my knowledge

4  hundreds of detainees, if not more, took part in the

5  work program while I was at the Adelanto facility."

6          Do you see that?

7      A.   Yes.

8      Q.   Tell me how you have the knowledge that

9  hundreds of detainees took part in the work program

10 while you were there?

11     A.   Well, for one, I would -- I mean, you

12 would have to take into consideration that there's

13 many pods there and each pod has its own cleaning

14 crew and with my pod going through ups and downs,

15 there's so many detainees being replaced, being

16 deported, being bonded out, being segregated, being

17 harassed, okay, you know, put down.  So hundreds.  I

18 mean hundreds of detainees went through the work

19 program.  That's my knowledge.

20     Q.   Okay.  Understood.

21          Did you ever perform any voluntary work in

22 the kitchen?

23     A.   No.

24     Q.   Okay.  How about the laundry area?

25     A.   No.

Page 110

1      Q.    How about the library?

2      A.    Definitely not.  No.

3      Q.    Okay.  What other voluntary work

4  opportunities were there besides -- I'm sorry.

5  Besides kitchen, laundry, library?  Obviously barber

6  shop where you worked.  Janitorial work where you

7  worked.  What else was there?

8      A.    That I --

9            MR. FREE:  Objection to the form.

10           You can answer, if you can.

11           THE WITNESS:  That I'm aware of?

12  BY MR. BARNACLE:

13     Q.    Yeah.

14     A.    Those are the only ones that I know.  I

15  can maybe recollect that you can clean the nursery

16  room, clean the hallways, clean officers' dining

17  area.  Basically to keep clean up after the officers

18  and cells -- holding cells.  That's all I can

19  remember at the moment.

20     Q.    Are you aware of other detainees receiving

21  money from outside of the Adelanto facility from

22  people to put into their commissary accounts?

23           MR. FREE:  Form.

24           THE WITNESS:  I mean, I would say of

25  course.  Family members.

Page 111

1    BY MR. BARNACLE:

2        Q.   Okay.  Did any -- do you have any personal

3    recollection of anybody telling you about money they

4    might have received from somebody outside of the

5    facility?

6        A.   I'm sure I do, yeah.

7        Q.   Any specific recollections sitting here

8    right now?

9        A.   So many faces.  So many names, no.

10       Q.   Okay.  Do you know any detainees at any

11   other GEO facility outside of Adelanto?

12       A.   Can you repeat that again?

13       Q.   Do you know any detainees at any GEO

14   facility outside of the Adelanto facility?

15       A.   As of the moment, no.

16       Q.   I remember we were talking a little

17   earlier about the time that you requested to be

18   moved out of your cell or your pod at the time.

19            I believe it was because there were some

20   individuals around you that you had been in there

21   with that you had been in county jail with; is that

22   correct?

23       A.   No.

24       Q.   So you never requested to move cells or

25   move living areas because some people you knew from

1    county were in the same living area as you?

2         A.    No.

3              MR. FREE:  Objection.  Form.

4              THE WITNESS:  No.

5    BY MR. BARNACLE:

6         Q.    You didn't have any issues with anybody at

7    county that made you uncomfortable living around

8    them at Adelanto?

9              MR. FREE:  Objection.  Form.

10             THE WITNESS:  That I recall at this

11   moment, no.

12   BY MR. BARNACLE:

13        Q.    If you go to Exhibit 53.

14             MR. FREE:  What page?

15             MR. BARNACLE:  Page 30021.

16             THE WITNESS:  Can you repeat that?

17   BY MR. BARNACLE:

18        Q.    Sorry.  30021.

19        A.    30021, yes.

20        Q.    If you can -- if you could just read after

21   where it says, "statement of grievance."

22        A.    Statement of grievance.  Okay.

23        Q.    Do you mind reading it out loud for the

24   record.

25        A.    No.  "I have some issues with people here

1  in three side, slash, west facility.  These are

2  people that were with me in county jail and had

3  problems with me.  I would, please, like to be moved

4  to side as soon as possible."

5          That's a surprise to me.  I don't remember

6  having issues with somebody, yeah.

7      Q.   Okay.

8      A.   I'm sorry.

9      Q.   Go ahead.

10     A.   That definitely -- I mean, that's my

11  writing.

12     Q.   Okay.  Okay.  Can you tell me -- so when

13  it says people in three side west, can you tell me

14  what that is referring to?

15     A.   West facility.

16     Q.   Uh-huh?

17     A.   Three side I don't remember.  I know it's

18  the west facility though.  Three side I don't

19  remember.

20     Q.   Okay.  Then it's saying, "I would please

21  like to be moved to" -- I think it says two side; is

22  that correct?

23     A.   Yes.

24     Q.   Would that also be in the west facility,

25  or is that the east facility?

Page 114

1      A.   If I didn't add east facility most likely

2  it's in the west facility yes.

3      Q.   Okay.  Did you ever have any disciplinary

4  issues at the Adelanto facility related to fighting?

5           MR. FREE:  Objection.  Form.

6           THE WITNESS:  Yes.

7  BY MR. BARNACLE:

8      Q.   Can you explain to me what happened to you

9  as a result of that?

10          MR. FREE:  Objection.  Form.

11          THE WITNESS:  What happened in the process

12 of me being...

13 BY MR. BARNACLE:

14     Q.   Walk me through exactly what happened.

15          If you were disciplined for fighting, walk

16 me through the events leading to them saying you had

17 engaged in a fight.

18          MR. FREE:  Objection.  Vague and compound.

19          THE WITNESS:  I would say I was in my cell

20 in west facility going through my legal paperwork as

21 I did a lot of studying, a lot of reading, and I

22 heard a scuffle outside of my door, and I walked

23 out, and there's a huge riot going on.  And I get

24 punched out of nowhere, thrown, kicked.

25          So I get up.  I start pushing people off.

1   GEO facilities rush in, grab everyone, go towards, I

2   guess, everyone's cell, came into my cell, got in my

3   face, started screaming at me and harassed me,

4   telling me that -- they're cursing at me telling me

5   they think I have something to do with it.

6           And being honest I got upset.  The officer

7   grabs me by the neck, turns me around, grabs my

8   hands, and tells me you're going to go to seg'.  And

9   while in segregation being disciplined, they went

10  over the cameras.  They investigated and found out

11  that I had nothing to do with it and released me as

12  if that -- other than that, I don't remember being

13  disciplined.

14  BY MR. BARNACLE:

15      Q.   Okay.  So when you said the officer was in

16  your cell --

17      A.   Yes.

18      Q.   -- and you said you got upset.

19      A.   Yes.

20      Q.   When you say you got upset, what does that

21  mean --

22      A.   Because.

23      Q.   -- happened?

24      A.   He's harassing me and my celly standing by

25  the door and then he gets in my face and then I go

Page 116

1    to try to get down on him.  He says you have an

2    f'ing problem with this.  Blah, blah, blah, and, you

3    know, most likely it has something to do with it.

4           I said, man, you're making the wrong

5    mistake.  I had nothing to do with it, and he starts

6    cursing at me, grabs me, turns me around, and just

7    walks me out of the cell, and takes me to

8    discipline.

9       Q.   When you say you got upset, did you say

10   anything back to him?

11      A.   I think I cursed at him too, yeah.

12      Q.   If we turn to the big exhibit, 29999.

13      A.   Okay.  I see it.

14      Q.   Is that your signature after detainee's

15   signature?

16      A.   Yes, it looks like my signature.

17      Q.   Okay.  Now, let's take five minutes.  I'm

18   going to go through my notes and see if I have

19   anything else and then we'll come back on the

20   record.

21      A.   Okay.

22           MR. BARNACLE:  Thank you.

23           THE WITNESS:  Great.

24           (Recess taken)

25           MR. BARNACLE:  All right.  I don't have

1    any further questions.

2              MR. FREE:  I might have a couple.

3              MR. BARNACLE:  Okay.

4                        EXAMINATION

5    BY MR. FREE:

6         Q.   If you turn to Exhibit 53 Bates number

7    29966.

8              It is this big one?

9         A.   Yup, 29 what?

10        Q.   Excuse me.  Is that right.  Never mind.

11   I'm sorry.  I'm sorry.  30018.  I'm sorry about

12   that.

13        A.   30018.  Okay.  I got it.

14        Q.   Got it.

15        A.   Yeah, okay.

16        Q.   Take a second to read that while I read it

17   out loud.  I'm reading starting at statement of

18   grievance.

19             First of all, do you recognize this

20   document?

21        A.   It looks familiar, yes.

22        Q.   What do you think it is?

23        A.   It's a detainee grievance form.

24        Q.   Who submitted it?

25        A.   It looks like I submitted it.

1    Q.   Okay.  Do you know approximately when you

2    submitted it?

3    A.   It says here on 12/20/2012.

4    Q.   Okay.  Read along with me as I read out

5    loud.  "I would like to know why we cannot have a

6    filter for our drinking water?  Because it seems no

7    tenant or sergeant seems to care about the detainee

8    drinking water.  They all carry water bottles.  I

9    can't emphasis" -- I think that means emphasize --

10   "enough on how contaminated our drinking water is.

11   A detainee like me is always forced to drink the

12   cold water from the jug after working out because

13   there is no other water.  I'm hardly drinking water,

14   and I'm tired of this.  I would like to see

15   something done about this please.  Thank you."

16        Did I read that correctly?

17   A.   Yeah, yes.

18   Q.   Did you write that?

19   A.   I definitely wrote that.

20   Q.   Okay.  What prompted you to write this

21   grievance, if you can recall?

22   A.   After a long day at the yard and being

23   thirsty.  I would want to drink water, but the water

24   was so unhealthy.  And as I mentioned earlier, it

25   would come out dark sometimes and drinking the water

1  would sometimes give me headaches, and I just hated

2  drinking the water.

3         And I would ask officers why couldn't we

4  drink clean water.  They drank such clean water

5  bottles.  Why couldn't we drink water if we're not

6  prisoners, but I had to write a grievance because

7  again nothing was done.

8     Q.   Turn to 30024.

9     A.   Uh-huh.

10    Q.   Do you see that?

11    A.   30024.  Okay.

12    Q.   I want you to read with me while I read

13 out loud under statement of grievance.

14         First of all, do you know what this

15 document is?

16    A.   Detainee grievance form.

17    Q.   Who submitted it as far as you can --

18    A.   I believe I submitted it, yes.

19    Q.   Okay.  Do you remember the date, or can

20 you tell from this document what date you submitted

21 it on?

22    A.   August 21st, 2012.

23    Q.   What is the difference between a KITE and

24 a grievance?

25    A.   A KITE would be to request something.  You

Page 120

1   can possibly put a complaint in a KITE and a

2   grievance form would be, I guess, more serious where

3   it would go to the head honcho and whoever is in

4   charge at the facility to actually take a look at

5   it.  That's my version of it.

6       Q.   Okay.  Was there any requirement as far as

7   you recollect to file a KITE before you filed a

8   grievance?

9       A.   Can you repeat that?

10      Q.   Yeah.  As far as you can remember, was

11  there any requirement that you filed a KITE before

12  you filed a grievance?

13      A.   I usually made verbal complaints -- a lot

14  of verbal complaints and then I would file a KITE.

15  And if it was real serious, then I would go straight

16  to the grievance form.

17      Q.   Okay.  It says statement of grievance, I

18  put in a sick call about a week and a half ago

19  because I had a severe flu.  The nurse told me she

20  couldn't help --

21      A.   Me.

22      Q.   -- me at the moment but that as soon as

23  a...

24      A.   Doctor.

25      Q.   Doctor gave her permission, she can then

Page 121

1   give me what he prescribed.  I was really sick and

2   couldn't...

3        A.   Eat.

4        Q.   Eat for a few days.  I'm not the only

5   detainee that this has happened to.  I'm tired of

6   hearing different excuses.  I want to know what is

7   going on.

8        A.   Yeah.

9        Q.   Why wasn't I attended.

10            Did I read that correctly?

11       A.   Yeah, yes.  I definitely wrote that.

12       Q.   Okay.  You see the findings below.  It

13   says -- I believe that's a zero relief sought.

14   Thank you.  We'll investigate.

15            Do you see that?

16       A.   Yes.

17       Q.   Did anyone ever tell talk to you about

18   this incident?

19       A.   Never.

20       Q.   Did you ever complain to ICE about the

21   treatment that you were receiving at Adelanto?

22       A.   I made -- if I can remember, I made a few

23   complaints.  I made -- I stopped complaining because

24   I spoke to a deportation officer, which was my ICE

25   officer.  I asked him -- I told him about these

1    complaints.  And he said he wasn't here to help me.

2    And excuse my language, but I'm going quote what he

3    said.  "I'm not here to help you.  I'm here to

4    fucking deport you."  So I stopped complaining to

5    him.

6         Q.   Do you recall that officer's name?

7         A.   A white male.  No, I don't.  If I see

8    pictures, I could most likely.

9         Q.   Earlier today you said seven dollars a day

10   was not enough to buy a bottle of drinking water

11   that you needed from the commissary.

12             Were you ever paid more man dollar a day

13   at Adelanto?

14        A.   Seven dollars a day?

15        Q.   Yeah.

16        A.   Or seven dollars a week?

17        Q.   Is that what you meant?

18        A.   Seven dollars -- no.  One dollar a day

19   wasn't enough to buy bottled water from the

20   commissary.

21        Q.   At any point did you get paid seven

22   dollars a day?

23        A.   No.

24        Q.   You also testified that at some point GEO

25   stopped having these art contests; is that right?

1        A.    Yes.

2        Q.    Do you know why GEO stopped paying

3    detainees to do these things?

4        A.    At the moment I don't recall why.

5        Q.    Okay.  Now, I want to turn to your

6    testimony about your work as a barber.

7        A.    Uh-huh.

8        Q.    Where did you get your clippers?

9        A.    From GEO officials.

10       Q.    Okay.  Where did you get the guards for

11   the clippers?

12       A.    From GEO official.

13       Q.    Where did you get the chemicals that

14   needed to sanitize the clippers.

15       A.    From GEO officials.

16       Q.    Where did you actually physically cut

17   people's hair within the facility?

18       A.    In the -- in the dorm.

19       Q.    In the dorm where you lived?

20       A.    Uh-huh.

21       Q.    As far as you can recall, were GEO

22   officials responsible for supervising the dorm?

23       A.    Yes.

24       Q.    Okay.  You testified earlier about the

25   jobs that you did.

Page 124

1      A.   Yes.

2      Q.   Would you look at Exhibit 53 at Bates

3   number 29966 towards the middle.

4      A.   299 what?

5      Q.   66.

6      A.   29966.  299866?

7      Q.   29966.

8      A.   Okay.  Sorry.

9      Q.   You past it.

10     A.   No.  299.  29986?

11     Q.   No.  66.  Take your time.  That's fine.

12     A.   Okay.  29966.  I have it.

13     Q.   Do you see these entries that say DET

14   payroll REEC.  That kind of go throughout the

15   page so it says DET.

16     A.   Yes.

17     Q.   And then payroll.

18     A.   Yes.

19     Q.   And then REC.

20     A.   Yes.

21     Q.   Which I'm going to call rec'.

22          And you see the amount column that has a

23   dollar next to each one of those payments.

24          Do you see that?

25     A.   Yes.

Page 125

1    Q.   As far as you can recall, do you remember

2  what these payments were for?

3    A.   I believe it's my dollar a day.

4    Q.   Okay.  Do you know what kind of work it

5  was for?

6    A.   For everything I did.  Janitorial or

7  barber.

8    Q.   Okay.

9    A.   Sometimes both.

10    Q.   All right.  You were asked earlier if you

11  were ever terminated from your position as a barber.

12        Do you recall that?

13    A.   I recall, yes.

14    Q.   Do you recall that question?

15    A.   Yes.

16    Q.   Okay.  Who told you that you were no

17  longer going to be able to work as a barber?

18    A.   I believe I got a KITE or something in

19  return.

20    Q.   Do you know from whom?

21    A.   I don't remember from whom.

22    Q.   Do you know whether the KITE came from a

23  GEO employee?

24    A.   Yes.

25    Q.   All right.  Now, why was it important to

Page 126

1   have money in your commissary while you were locked

2   up at Adelanto for two and a half years?

3        A.   To me I believe every detainee there it

4   was important because the quality of the food, the

5   clothing, the shoes, the hygiene, the water.  Things

6   like that that I can recall at the moment.

7             MR. FREE:  I'm sorry.  I'm just taking a

8   moment.

9   BY MR. FREE:

10       Q.   Turn it 30005.

11       A.   Okay.

12       Q.   Look at five and six and then 3004 before

13  that as well.

14       A.   Okay.

15       Q.   I'm just going to ask you a general

16  question.  You don't have to read the whole thing.

17            Do you recognize this 30005?

18       A.   I don't recognize it at the moment.

19       Q.   You see at the top where it says barber

20  shop equipment training?

21       A.   Yes.

22       Q.   Was there a supervisor or an assistant who

23  gave you these tools as far as you can recall?

24       A.   The sergeant.

25       Q.   All right.  Whose initials are these on

Page 127

1    this page?

2         A.    They look like my initials.

3         Q.    The sergeant -- was that a GEO official or

4    an ICE official?

5         A.    A GEO official.

6         Q.    Okay.  Look at the next page 30006.

7         A.    Uh-huh.

8         Q.    Do you see that?

9         A.    Uh-huh.

10        Q.    You see where it says trustee safety

11   training at the top?

12        A.    Yes.

13        Q.    Is that your name at the top?

14        A.    Yes.

15        Q.    Okay.  Are those your initials in the

16   center column all the way down?

17        A.    I believe those are my initials, yes.

18             MR. FREE:  Okay.  Those are all of the

19   questions that I have for you.

20             MR. BARNACLE:  I have nothing further.

21             MR. FREE:  Okay.  So we're off the record

22   at 4:39.

23             (Deposition concluded at 4:39 p.m.)

24

25

Page 128

DECLARATION UNDER PENALTY OF PERJURY

    I, RAUL NOVOA, do hereby certify under
penalty of perjury that I have reviewed the
foregoing transcript of my deposition taken
on October 20, 2019; that I have made such
corrections as appear noted herein in ink;
that my testimony as contained herein, as
corrected, is true and correct.

    DATED this _____ day of _____,
2019, at _____, California.




                    _____
                              RAUL NOVOA

Page 129

1                REPORTER'S CERTIFICATION

2

3        I, Armando L. Pineda, Certified Shorthand

4   Reporter in and for the State of California, do

5   hereby certify:

6        That the foregoing witness was by me duly

7   sworn; that the deposition was then taken before me

8   at the time and place herein set forth; that the

9   testimony and proceedings were reported

10  stenographically by me and later transcribed into

11  typewriting under my direction; that the foregoing

12  is a true record of the testimony and proceedings

13  taken at that time.

14       I further certify that I am not counsel for nor

15  related to any party to said action nor in any way

16  interested in the outcome thereof.

17

18       IN WITNESS WHEREOF, I have subscribed my name

19  on this 22nd day of October, 2019.

20

21

22   *Armando Pineda*
     _____
23   ARMANDO L. PINEDA, CSR No. 12670

24

25

Page 130

```
 1                        ERRATA SHEET

 2    Case Name:

 3    Deposition Date:

 4    Deponent:

 5    Pg.  No. Now Reads      Should Read  Reason

 6    ___  ___ _____     _____   _____

 7    ___  ___ _____     _____   _____

 8    ___  ___ _____     _____   _____

 9    ___  ___ _____     _____   _____

10    ___  ___ _____     _____   _____

11    ___  ___ _____     _____   _____

12    ___  ___ _____     _____   _____

13    ___  ___ _____     _____   _____

14    ___  ___ _____     _____   _____

15    ___  ___ _____     _____   _____

16    ___  ___ _____     _____   _____

17    ___  ___ _____     _____   _____

18    ___  ___ _____     _____   _____

19    ___  ___ _____     _____   _____

20

21                                    _____

22                                    Signature of Deponent

      SUBSCRIBED AND SWORN BEFORE ME
23    THIS ____ DAY OF _____, 2019.

24    _____

25    (Notary Public)   MY COMMISSION EXPIRES:_____
```