**EXHIBIT E**



# Performance-Based National Detention Standards 2011



U.S. Immigration
and Customs
Enforcement

# Preface

In keeping with our commitment to transform the immigration detention system, U.S. Immigration and Customs Enforcement (ICE) has revised its detention standards. These new standards, known as the Performance-Based National Detention Standards 2011 (PBNDS 2011), are an important step in detention reform.

ICE is charged with removing aliens who lack lawful status in the United States and focuses its resources on removing criminals, recent border entrants, immigration fugitives, and recidivists. Detention is an important and necessary part of immigration enforcement. Because ICE exercises significant authority when it detains people, ICE must do so in the most humane manner possible with a focus on providing sound conditions and care. ICE detains people for no purpose other than to secure their presence both for immigration proceedings and their removal, with a special focus on those who represent a risk to public safety, or for whom detention is mandatory by law.

The PBNDS 2011 reflect ICE's ongoing effort to tailor the conditions of immigration detention to its unique purpose. The PBNDS 2011 are crafted to improve medical and mental health services, increase access to legal services and religious opportunities, improve communication with detainees with no or limited English proficiency, improve the process for reporting and responding to complaints, and increase recreation and visitation.

The PBNDS 2011 are also drafted to include a range of compliance, from minimal to optimal. As such, these standards can be implemented widely, while also forecasting our new direction and laying the groundwork for future changes.

In closing, I would like to thank the ICE employees and stakeholders who provided significant input and dedicated many hours to revising these standards. I appreciate the collaboration and support in this important mission - reforming the immigration detention system to ensure it comports with our national expectations. The PBNDS 2011 are an important step in a multiyear process and I look forward to continued collaboration within ICE, with state and local governments, nongovernmental organizations, Congress, and all of our stakeholders as we move forward in reforming our detention system.

John Morton
Director

# Table of Contents

1. SAFETY ............................................................. 1
  1.1 Emergency Plans.......................................... 1
  1.2 Environmental Health and Safety ........................... 20
  1.3 Transportation (by Land) ................................ 38
2. SECURITY ........................................................ 51
  2.1 Admission and Release ................................... 51
  2.2 Custody Classification System........................... 62
  2.3 Contraband................................................ 80
  2.4 Facility Security and Control ........................... 84
  2.5 Funds and Personal Property .............................. 94
  2.6 Hold Rooms in Detention Facilities ...................... 104
  2.7 Key and Lock Control ................................... 109
  2.8 Population Counts ...................................... 117
  2.9 Post Orders ............................................ 121
  2.10 Searches of Detainees.................................. 124
  2.11 Sexual Abuse and Assault Prevention and
    Intervention .......................................... 134
  2.12 Special Management Units .............................. 181
  2.13 Staff-Detainee Communication........................... 199
  2.14 Tool Control.......................................... 203
  2.15 Use of Force and Restraints .......................... 211
3. ORDER .......................................................... 226
  3.1 Disciplinary System.................................... 226
4. CARE ........................................................... 241
  4.1 Food Service .......................................... 241
  4.2 Hunger Strikes ........................................ 268
  4.3 Medical Care........................................... 272
4.4 Medical Care (Women)..................................... 322
4.5 Personal Hygiene ........................................ 327
4.6 Significant Self-harm and Suicide Prevention and
  Intervention ............................................ 331
4.7 Terminal Illness, Advance Directives and Death ..... 338
4.8 Disability Identification, Assessment, and
  Accommodation ........................................... 344
5. ACTIVITIES...................................................... 358
  5.1 Correspondence and Other Mail........................... 358
  5.2 Trips for Non-Medical Emergencies ...................... 365
  5.3 Marriage Requests ..................................... 368
  5.4 Recreation ............................................ 371
  5.5 Religious Practices ................................... 376
  5.6 Telephone Access ...................................... 386
  5.7 Visitation ............................................ 393
  5.8 Voluntary Work Program................................. 407
6. JUSTICE ........................................................ 412
  6.1 Detainee Handbook...................................... 412
  6.2 Grievance System ...................................... 416
  6.3 Law Libraries and Legal Materials...................... 424
  6.4 Legal Rights Group Presentations ...................... 438
7. ADMINISTRATION AND MANAGEMENT ......... 445
  7.1 Detention Files ....................................... 445
  7.2 Interview and Tours ................................... 449
  7.3 Staff Training ........................................ 457
  7.4 Detainee Transfers .................................... 461
  7.5 Definitions ........................................... 468

# Acronyms and Abbreviations

AFOD: Assistant Field Office Director

BIA: DOJ Board of Immigration Appeals

CBP: DHS Customs and Border Protection

CD: Clinical Director

CDC: Center for Disease Control, Department of Health and Human Services

CDF: Contract Detention Facility

CMA: Clinical Medical Authority

COR: Contracting Officer's Representative

CRCL: DHS Civil Rights and Civil Liberties

DHS: Department of Homeland Security

DOJ: Department of Justice

DRIL: ICE ERO Detention and Reporting Information Line

DSCU: ICE ERO Detention Standards Compliance Unit

EOIR: DOJ Executive Office for Immigration Review

ERO: ICE Enforcement and Removal Operations

FOD: Field Office Director

FSA: Food Service Administrator

GAB: Grievance Appeals Board

GO: Grievance Officer

HSA: Health Services Administrator

IAO: ICE Air Operations

IDP: Institution Disciplinary Panel

IGSA: Intergovernmental Service Agreement

IHSC: ICE Health Services Corps

JIC: DHS Joint Intake Center

LEP: Limited English Proficiency

LOP: Legal Orientation Program

LPR: Legal Permanent Resident

MDR: Multi-Drug Resistant

MOU: Memorandum of Understanding

MSDS: Material Safety Data Sheet

NCCHC: National Commission on Correctional Health Care

NCIC: National Crime Information Center, Federal Bureau of Investigation

NIC: DOJ National Institute of Corrections

OIC: Officer in Charge

OIG: DHS Office of the Inspector General

OPLA: ICE Office of the Principal Legal Advisor

OPR: ICE Office of Professional Responsibility

ORR: Office of Refugee Resettlement, Department of Health and Human Services

OSHA: Occupational Safety and Health Administration, Department of Labor

PBNDS: Performance-Based National Detention Standards

PII: Personally Identifiable Information

PREA: Prison Rape Elimination Act

SAFE: Sexual Assault Forensic Examiner

SANE: Sexual Assault Nurse Examiner

SART: Sexual Assault Response Team

SIR: Significant Incident Report

SMI: Serious Mental Illness

SMU: Special Management Unit

SPC: Service Processing Center

SRT: Situation Response Team

SRT: Special Response Team

# 1.1 Emergency Plans

## I. Purpose and Scope

This detention standard ensures a safe environment for detainees and employees by establishing contingency plans to quickly and effectively respond to emergency situations and to minimize their severity.

This detention standard applies to the following types of facilities housing ICE Enforcement and Removal Operations (ERO) detainees:

- Service Processing Centers (SPCs);
- Contract Detention Facilities (CDFs); and
- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs and CDFs.* IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Each facility shall have in place contingency plans to quickly and effectively respond to emergency situations and to minimize their severity.

2. Staff shall be trained annually, at a minimum, in emergency preparedness and implementation of the facility's emergency plans.

3. An evacuation plan, in the event of a fire or other major emergency, shall be in place, and the plan shall be approved locally in accordance with this standard and updated annually at a minimum.

4. Events, staff responses and command-related decisions during and immediately after emergency situations shall be accurately recorded and documented.

5. Plans shall include procedures for assisting detainees with special needs during an emergency or evacuation.

6. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Emergency Plans"

dated 12/2/2008.

# IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-1C-01, 1C-02, 1C-03, 1C-04, 1C-05, 1C-06.

ICE/ERO *Performance-based National Detention Standards 2011:*

- "1.2 Environmental Health and Safety," which provides requirements and guidelines for avoiding and mitigating dangerous situations, specifically with regard to fires, environmental hazards and evacuations; and

- "2.15 Use of Force and Restraints," which provides requirements and guidelines for emergency situations requiring the use of force.

Memorandum dated 7/14/2006 on "Escape Reporting" from the ICE/ERO Director, which specifies requirements for the reporting, tracking and investigating of the escape of an ICE/ERO detainee.

A helpful resource: *A Guide to Preparing for and Responding to Prison Emergencies*. The guide is available at www.ncicic.org.

# V. Expected Practices

## A. Staff Training

Each facility shall include emergency preparedness as part of the initial orientation and training provided to all new employees, and all staff shall be trained annually, at a minimum, on the facility's emergency plans.

Other training requirements, for example, climate monitoring, special response teams (SRTs), disturbance control teams (DCTs), hostage negotiation teams (HNTs), video equipment and the command post—are specified in other sections of this standard.

## B. Preventive Action

### 1. Climate Monitoring

Staff alertness to changes in facility "climate," promptly reported, can be of critical importance in defusing a potentially explosive situation. Detention management experience indicates that certain circumstances may predictably contribute to increased tensions in a detained population. Often such issues can be controlled or lessened before erupting into an incident or disturbance.

Staff shall be trained to watch for signs of mounting tension among the detainee population, such as a spike in the number of detainee requests and incident reports; sullen, restless and short-tempered behavior; or detainees avoiding contact with staff (including eye contact).

Factors known to exacerbate tensions that may lead to group disturbances include, but are not limited to:

a. racism;

b. heightened complaints about food;

c. dissatisfaction with the performance or attitude of a post officer;

d. increasing complaints about recreation, medical care, visits, mail, etc.;

e. gang activity;

f. prohibited sexual activity; and

g. inaccurate or incomplete information about detainee cases or facility policies.

### 2. Staff Actions

Staff may improve their chances of resolving and deflecting detainee unrest by:

a. discussing plans, programs and procedures among themselves;

b. engaging in open dialogue between staff and detainees to address concerns;

c. continuing to treat detainees fairly and impartially;

d. reducing misunderstandings among detainees (for example, by enforcing and explaining rules that prevent any individual or group from imposing its will on other detainees);

e. resolving misunderstandings and conflicts as they arise;

f. encouraging participation in work and recreational programs;

g. routinely reporting to the facility administrator on facility climate and detainee attitudes; and

h. alerting supervisors at the first sign(s) of trouble, gang activity, group hostilities, etc.

Quick, decisive staff action can prevent the start or spread of a disturbance.

The facility administrator shall develop written procedures for staff to follow when reporting an emergency and should notify facility staff in a timely manner when changes are made to the emergency plan.

### 3. Pre-incident Considerations

When all attempts to defuse a volatile situation have failed, the facility administrator shall determine how to proceed, based on considerations of the safety, welfare and protection of detainees, personnel, the general public and property.

## C. Contingency Plan Development

### 1. Basic Planning

a. Responsibility

Every facility shall designate the individual(s) responsible for developing and implementing emergency contingency plans. All plans shall comply with the ICE/ERO detention standards for confidentiality, accountability, review and revision included in this section.

1) Each plan shall include procedures for

rendering emergency assistance (e.g., supplies, transportation and temporary housing for detainees, personnel and/or TDY staff) to another ICE/ERO facility.

2) The Chief of Security or facility administrator designee is the individual responsible for developing each contingency plan and implementing the plan when an emergency situation occurs. In the development process, he or she shall rely upon the expertise of all department heads and ensure all departments have understood and are fully prepared to execute their responsibilities under the plan.

3) Each facility shall maintain an accurate inventory of identified equipment and shall review that inventory every six months, at a minimum, to ensure its accuracy.

b. *Planning with Other Agencies*
*Each facility shall develop contingency plans with local, state and federal law enforcement agencies and shall formalize those agreements with memoranda of understanding (MOU).*

1) *Facility/agency legal staff and/or the respective ICE Office of Chief Counsel shall review MOUs for legal sufficiency and, in particular, adherence to other agency rules regarding arrest authority, use of intermediate and deadly force, jurisdiction and outside-agency involvement.*

2) *The facility administrator, or agency designee and representatives from the affected agencies shall co-sign the MOUs.*

3) *Simulated exercises to test the contingency plans shall occur on a regular, mutually agreed-upon basis and recur annually at a minimum.*

4) *The facility administrator shall review and approve contingency plans annually at a minimum.*

*If any local, state or federal agency deemed*

essential to emergency planning declines to participate, the facility administrator shall inform the Field Office Director in writing and make periodic contact to revisit the issue.

### 2. Keeping Plans Current

The Chief of Security or facility administrator designee shall:

a. update the plans as often as necessary and forward them for facility administrator approval. If the facility administrator requests changes, the Chief of Security or facility administrator designee shall incorporate necessary changes and resubmit the plans within 30 days. Facility staff shall also be notified of changes;

b. conduct annual contingency plan reviews, with participation of every department head; and

c. document each annual review and plan approval on the contingency plan file master copy, even when review results in no changes.

### 3. Safeguarding Plan Confidentiality

Every plan that is under development or is final must include a statement prohibiting unauthorized disclosure. Staff may not discuss any aspect of a plan within hearing distance of a detainee, visitor or anyone else not permitted access to the plan.

The Chief of Security or facility administrator designee shall determine where copies of plans are to be stored, and in what quantity. A master copy shall be kept outside the secure perimeter, along with an itemized list of plans and where to find them.

The Chief of Security or facility administrator designee shall implement a checkout system that accounts for all plans at all times, with safeguards against detainee access. Release of contingency plan details requires the written approval of the facility administrator.

The Chief of Security or facility administrator designee shall send an electronic file containing the

facility's contingency plans to the Field Office Director and Assistant Director of the Detention Management Division, Office of Enforcement and Removal. Electronic files containing the facility's contingency plans shall be marked "Confidential."

### 4. Organization of the Contingency Plan File

a. General Plans
A general section shall contain policy, procedures and plans common to most emergency situations.

b. Contingency-specific Plans

The sections that follow the general section shall contain contingency-specific plans, as detailed below. They may reference the provisions of the general section and will only reference the exceptions and/or additions applicable to the particular contingency.

## D. General Implementation of Contingency Plans

Each facility shall establish written policy and procedures addressing, at a minimum: chain of command, command post/center, staff recall, staff assembly, emergency response components, use of force, video recording, records and logs, utility shutoff, employee conduct and responsibility, public relations, and facility security.

The respective Field Office Director shall maintain current data on the physical capacities of each facility that can be used to quickly identify the best source(s) of emergency assistance.

### 1. Chain of Command

The facility administrator shall identify the chain of command for directing operations in an emergency.

### 2. Command Post

a. Equipment for the Command Post
The facility shall set up a primary command post outside the secure perimeter that, at a minimum, is equipped as follows:
1) internal/external phone capabilities;

a) *private outside lines with:*
- *a speakerphone for open conference calls between the facility and Field Office, to include Detention Management Division command posts as applicable; and*
- *a second outside line to conduct all other calls;*

b) *a separate line for internal communications;*

2) radio equipment equipped for facility frequencies, and where permitted local law enforcement communications and, as applicable, other federal law enforcement agencies;

3) *a computer with Internet capabilities;*

4) *a facility plot plan, including property maps, current building blueprints, local maps and overhead photographs;*

5) *video recordings of building interiors within the secure perimeter (showing doors, windows, closets, ceilings, floors, etc.);*

6) *escape-post kits, including maps, directions, etc. (as detailed under "E. Contingency-specific Plans," "Escape");*

7) *contingency plans–one or more copies;*

8) *Hostage Negotiating Team (HNT) equipment;*

9) *a videotape or digital video disc (DVD) player/television;*

10) *a voice-activated recorder or conventional tape recorder;*

11) *assault/breaching plans (building specific, as appropriate for the facility); and*

12) *a supply kit containing general supplies that may be needed (at a minimum:  logbooks, blank rosters, purchase orders and writing instruments).*

b. *Staffing the Command Post*
*Command post staffing shall include, but is not limited to, the following:*

1) *facility administrator or incident commander;*

2) *assistant facility administrator;*

3) *Chief of Security or facility administrator designee;*

4) *a staff member to log activities in chronological order;*

5) *a staff member to manage communications with the Field Office, maintaining open lines of communication during the situation; and,*

6) *a staff member to control traffic into and out of the command post. To control incoming and outgoing command post traffic, the Chief of Security or facility administrator designee may implement a pass system.*

*To ensure alertness and to prevent mistakes and misjudgments as a result of fatigue or stress:*

1) *command post staff must rotate shifts with personnel from the relief roster after each shift;*

2) *command post staff shall be relieved by personnel from the relief roster for short breaks during each shift; and*

3) *briefing should take place which covers the events of the previous shift and any activities carrying over to the next shift.*

c. *Activating the Command Post*
*The Chief of Security or facility administrator designee shall activate the command post at the facility administrator's direction.*

*The activated command post shall immediately open the conference-call line to the Field Office and ERO headquarters Detention Management, and the Response Coordination Divisions, if applicable. The Field Office Director or headquarters divisions may wait until the dimensions of the unfolding incident are known before deciding to activate their command posts.*

*The facility's command post shall remain activated 24 hours-a-day until the situation is resolved or until the facility administrator, in consultation with the Field Office Director, determines activation to be no longer necessary.*

d. *Testing and Training*

*Emergency preparedness activities shall include activating the command post phone lines and other logistical support systems monthly, at a minimum, to test equipment and familiarize staff with the command post and its equipment.*

### 3. Emergency Recall List

*As detailed in standard "2.4 Facility Security and Control," the facility control center is required to maintain a list of the phone numbers of every officer, administrative/support services staff, emergency response components and law enforcement agencies. The facility should prominently feature the following notice:*

*"This information must be safeguarded. Use is restricted to those who need the information in the performance of their official duties. Misuse may subject the user to criminal liability. This agency shall view any misuse of this information as a serious violation of the employee code of conduct, which may result in disciplinary action, including removal."*

*For emergency response purposes, the control center shall also maintain a current roster of all Field Office and ICE/ERO headquarters Detention Management and Response Coordination Division numbers.*

### 4. Assembly of Staff

*The facility administrator shall:*

a. *develop control center procedures for executing an all-staff recall;*

b. *designate primary and secondary areas for staff assembly, preferably in a location where they cannot be observed by detainees; and*

c. *designate backup areas for each primary and secondary area and specify exceptions, if any, for a specific contingency.*

### 5. Emergency Response Components

*The facility administrator shall ensure that the appropriate personnel are trained, and shall establish and maintain DCTs, SRTs and HNTs based on ICE criteria.*

*The DCT shall consist of trained staff members in protective equipment who are capable of an unarmed response to a crisis. They shall have access to less-than-lethal response tools, including standard riot batons and chemical agents.*

*SRTs are highly trained, well-equipped tactical teams capable of providing both less-than-lethal as well as lethal response options.*

*HNTs are trained negotiators whose goal is to bring successful resolution to a crisis through verbal dialogue.*

*If the facility does not have the capacity to establish or maintain these emergency response components, the facility administrator shall develop agreements or MOUs with local, state or federal agencies, as appropriate, for these resources.*

### 6. Use of Force

Any force that must be used to control an emergency situation shall be in accordance with standard "2.15 Use of Force and Restraints" and any other applicable ICE policies on the use of force.

*Emergency plans shall be based on, and consistent with, ICE policy governing the use of force, as reflected in the following three documents:*

a. *ICE Interim Use of Force Policy (July 7, 2004), as amended or updated;*

b. *ICE Interim Firearms Policy (July 7, 2004), as amended or updated; and*

c. *"ERO Addendum to Interim ICE Firearms" memorandum to Field Office Directors from Wesley J. Lee, Acting ICE Director (July 11, 2005), as amended or updated.*

### 7. Video Equipment

At least one video camera shall be maintained in the control center for use in emergency situations, and the facility administrator shall ensure that it is

maintained, tested and supplied as required in "K. Maintaining Audiovisual Recording Equipment and Records" found in standard "2.15 Use of Force and Restraints."

The detention standard on "2.15 Use of Force and Restraints," also details requirements and procedures for video-recording use-of-force incidents.

*Shift supervisors or facility administrator designees, along with other designated staff, shall be trained to use video equipment and receive additional training on such technical issues as how to identify tapes or DVDs and photographs by date and location.*

### 8. Records and Logs

*The facility administrator shall designate the command post staff member who shall keep a date-and-time chronological logbook record of events during the emergency, including all command-related decisions and discussions, phone calls and radio transmissions.*

*Radio transmissions shall be documented by a voice-activated or conventional tape recorder whenever possible.*

*Command post staff shall also maintain a reading file to update staff coming on duty.*

### 9. News Media/Public Relations

The public information officer is responsible for coordinating briefings with news and television media. All media releases shall be coordinated through the Field Office public affairs liaison.

### 10. Facility Security

The facility administrator shall provide written procedures for:

a.  detainee recall and lockdown;

b.  counts (in accordance with the standard "2.8 Population Counts");

c.  intensified security;

d.  security key access (including issuance and

accountability, drop chute, etc.); and

e.  evidence seizure and preservation.

### 11. Health Services Responsibilities

The plan shall specify procedures for providing immediate and follow-up medical care to detainees and staff under every emergency scenario outlined in "E. Contingency-specific Plans."

### 12. Food Service Responsibilities

The plan shall specify procedures for updating the Food Service Administrator (FSA) on such issues as the number of people who shall be on duty and require meals.

The FSA shall make contingency plans for providing meals to detainees and staff during an emergency, including access to community resources, which the FSA shall negotiate during the planning phase.

### 13. Maintenance Department Responsibilities

The plan shall provide for emergency utility control, including plot plans identifying locations of water and gas shut-off valves and electrical circuit breakers. It is suggested that the utility shut-offs be photographed and included in the plans for quick identification during an emergency.

### 14. Employee Conduct and Responsibility

The plan shall address professional conduct and responsibility, including what to do if taken hostage, with instructions and guidelines.

### 15. Facility Access Routes

The plan shall specify alternate means of reaching the facility for emergency staff if the main approach becomes dangerous or inaccessible (e.g., during a civil disturbance, adverse weather conditions, fire, etc.).

### 16. Nearby Residents

*The plan shall specify how and when staff shall notify nearby residents of the situation, including sharing information such as type of emergency,*

*actions being taken, evacuation routes (if applicable) and special precautions.*

### 17. Communications Equipment/Radio

*The plan shall specify whether the remote battery charging units shall be maintained in the control center or outside the secure perimeter. A determination as to the type of radios being used in the facility shall dictate whether the battery charging units shall be maintained outside the secure perimeter. If the radios can be taken off-line and rendered useless, the battery charging units may be maintained inside the secure perimeter. If not, they shall remain outside the secure perimeter.*

### 18. Post-emergency Procedures

The post-emergency part of the plan shall include the following action items:

a.  segregating the detainees involved in the incident;

b.  treating and documenting employee and detainee injuries;

c.  seizing, documenting and preserving evidence;

d.  assigning accountability (especially for sensitive equipment and staff);

e.  assessing damage and necessary repair; collecting written reports;

f.  coordinating legal actions/prosecutions;

g.  debriefing involved staff, and following-up for additional analysis and/or implicated changes in policy or procedures; and

h.  conducting general review and critique of emergency operations and management, with a follow-up agenda including, but not limited to:

    1) monitoring the facility climate, and

    2) revising the contingency plan.

### E. Contingency-specific Plans

The facility shall compile individual contingency specific plans, as needed, and approved by the Field Office Director in the following order:

1. fire;

2. work/food strike;

3. disturbance;

4. escape emergency;

5. hostages (internal);

6. search (internal);

7. bomb threat;

8. adverse weather;

9. civil disturbance;

10. environmental hazard;

11. detainee transportation system;

12. evacuation;

13. ICE-wide lockdown;

14. staff work stoppage; and

15. if needed, other site-specific plans.

### 1. Fire

*The safety/maintenance supervisor shall develop a comprehensive fire control plan, in accordance with the "Fire Prevention and Control" section of standard "1.2 Environmental Health and Safety."*

*The Chief of Security or facility administrator designee shall develop a procedural outline for shift supervisors or facility administrator designees to follow in the event that a fire occurs during non-duty hours.*

### 2. Work/Food Strike

*The facility administrator shall determine the course of action to pursue, based on:*

*1.  whether strikers have announced when the strike shall end;*

*2.  occurrence of or potential for violence;*

*3.  the number of detainees involved; and*

4. *prospects for neutralizing the problem.*

### 3. Disturbance (Internal)

*After determining the course of action to pursue, the facility administrator shall direct staff to implement the action plan, which shall cover at a minimum:*

1. *controlling utilities;*

2. *securing available emergency entrances (e.g., food service, housing areas, etc.);*

3. *notifying and assembling trained emergency responders/other staff and equipment;*

4. *dispensing chemical agents in specific areas;*

5. *maintaining perimeter security (including crowd, traffic and media control);*

6. *shutting down detainee telephone systems;*

7. *notifying outside agencies; and*

8. *removing controlled substances from the pharmacy area.*

### 4. Escape

a. *Implement Local Procedures*
*The facility administrator shall deploy staff to primary and secondary escape posts, or to directional escape posts, designating a timekeeper/recorder for each:*

1) *Primary*
*Fixed and mobile posts near the facility;*

2) *Secondary*
*Fixed and mobile posts beyond the immediate facility area;*

3) *Directional Posts*
*No fixed location and based on situational intelligence that indicates a direction for the search.*

b. *Notification to Authorities*
*The facility administrator shall:*

*Immediately notify local, state and federal law enforcement officials and ensure that the*

*respective Field Office is immediately notified. Ordinarily, in a CDF, notification shall be through the facility's ICE/ERO Contracting Officer's Representative (COR) and, in an IGSA facility, through the ICE/ERO representative.*

*Within one hour of discovery, the escape shall be reported to the nearest U.S. Marshals Service office if the escapee was:*

1) *convicted of a criminal violation, and/or*

2) *paroled for deportation prior to the completion of his or her sentence.*

*Additional requirements for ICE/ERO are detailed in the 7/14/2006 memorandum from the ICE/ERO Director cited above under References. Briefly, those requirements include reporting the escape through the Significant Incident Reporting (SIR) system, and forwarding an escape report to the ERO Detention Management Division for tracking in the National Escape Tracking System (NETS) database. The Field Office Director is also required to conduct an investigation, determine whether proper procedures were observed and provide a report to the Detention Management Division.*

c. *Escape-post Equipment*
*Escape-post equipment kits shall be stored in the command center and include, at a minimum:*

1) *a flashlight;*

2) *restraints (handcuffs and/or flex-cuffs) and tools necessary for removal;*

3) *a packet containing post location, map(s), fact sheet highlighting arrest authority, search procedures, apprehension techniques, etc.;*

4) *a radio; and*

5) *binoculars (as applicable).*

d. *Escape by Aircraft*
1) *Staff should observe and record aircraft description, including details such as colors,*

*registration or tail number, direction of flight, etc.*

*2) Notify local law enforcement and Federal Aviation Administration.*

*3) Firing on aircraft is prohibited, except to return fire originating from the aircraft. Even in such case, however, the usual deadly-force considerations apply, and staff must carefully weigh consequences (e.g., the aircraft may crash into a building, the pilot is most likely under duress, etc.).*

### 5. Hostage Situations

a. *ICE/ERO Field Office Hostage Situation Management Plan*
*The Field Office hostage situation management plan shall make available the essential logistical support and local and/or backup resources (e.g., equipment, expertise, personnel) to any affected facility in the jurisdiction.*

*1) The Field Office and Response Coordination Division shall jointly provide designated facilities with well-trained and well-equipped HNTs.*

*2) The plan shall identify, for each facility, the backup personnel, mental health professionals and others as needed during a prolonged crisis. The Field Office shall maintain a list of all ICE/ERO hostage-negotiation trainers/consultants and trained negotiators in the jurisdiction.*

*3) The Field Office Director, in consultation with the facility administrator, shall ensure the availability of crisis support teams, consisting of trained counselors/therapists, to:*

*a) provide post-crisis services to staff and families, and*

*b) upon request, assist facilities to develop site-specific emergency plans for victims and their families.*

b. *Hostage Negotiation Teams (HNTs)*
*1) Each facility's core negotiation group (generally the team leader, primary negotiator and mental health expert) shall attend hostage negotiation training and be certified as hostage negotiators.*

*a) Requirements for the team leader include: experience and skill applying hostage negotiation principles and strategies, demonstration of working effectively under stress and proven leadership ability. The facility administrator shall generally select a department head as the team leader.*

*b) Negotiators must possess strong verbal/interpersonal skills, personal maturity, a commitment to negotiation as the key to conflict resolution, flexibility and a history of working well under pressure.*

*2) The headquarters response coordination division shall:*

*a) maintain a roster of ICE/ERO personnel who are trained in hostage negotiation and qualified and available for work on an HNT in any ICE/ERO facility; and*

*b) provide copies of the roster to the Field Offices and keep them updated.*

*3) HNT members shall convene for no less than eight hours of duty time every month to plan and practice negotiation scenarios, and consult with other law enforcement agencies. To solidify working relations and complementary strategies and techniques/tactics, an SRT member shall serve as team liaison and routinely attend the negotiation team's monthly sessions.*

*4) Whenever possible, the negotiation team shall conduct annual joint training sessions with negotiators from other law enforcement agencies and maintain contact with counterparts in other agencies.*

5) Training exercises integrating the activities of the command post, HNT and SRT, shall occur every six months to underscore the importance of a total facility response to a hostage situation. As participants collaborate and interact, they shall experience how other operational teams think and function, and shall learn what each can contribute in a crisis.

6) Every negotiation team shall have access to portable communication equipment or "throw phones." To operate the equipment when needed in an emergency, team members shall have access to the equipment for routine practice sessions. A communications equipment expert, thoroughly familiar with the operation of the throw phone, shall be available to each negotiation team during practice exercises.

7) Each facility shall maintain a list of translator services and interpreters, in the event one is needed for hostage negotiation.

8) Each facility shall also make provisions for use of an electronic translator, such as a hand-held computer that translates spoken English phrases into other languages.

c. Chain of Command in Hostage Situations
The facility administrator shall ensure the Field Office Director is kept informed of every aspect of the crisis on a regular schedule until the crisis is resolved. The ERO headquarters Field Operations Assistant Director may assume control of a large-scale operation involving coordination with other ICE/ERO components and law enforcement agencies, as necessary.

1) The facility administrator shall immediately report a hostage situation to the Field Office Director, who shall in turn notify the Field Operations Assistant Director. The facility administrator shall assign a senior manager to serve as liaison with the Field Office and Field Operations.

2) The facility administrator shall notify the FBI and other agencies, as appropriate, of the situation.

3) Under no circumstances may facilities cede command authority to external law enforcement agencies (such as the FBI) unless required in a signed MOU.

d. Disturbance Containment and Facility Security
The facility administrator shall:

1) prevent movement into or out of the scene of the hostage area;

2) add exterior, armed patrols;

3) terminate detainee telephone usage;

4) limit or curtail staff radio usage;

5) remove visitors and civilians, including contract employees and volunteers;

6) recall detainees for immediate official count;

7) remove detainees from the hostage area. If in a housing unit, move the detainees into temporary housing, in accordance with written, site-specific procedures; and

8) conduct staff roll call, in accordance with written procedures, to determine the number and identity of hostages.

e. Negotiations
The facility administrator shall have no hands-on involvement in the negotiation process. Once the emergency response component has contained and stabilized the immediate situation, the trained HNT shall take over.

1) Hostage negotiators act as intermediaries between the command post and the hostage-takers, keeping the lines of communication with the hostage-takers open and maintaining calm while working toward a nonviolent resolution.

2) The HNT shall include:

a) a team leader (manages negotiations; command post liaison);

b) a primary negotiator (communicates directly with hostage-takers);

c) a secondary negotiator (advises/assists primary negotiator);

d) a mental health professional (observes, provides psychological analyses/assessments and advice; monitors stress levels and emotional climate); and

e) a note-taker (documents all communication to/from hostage takers).

3) Hostage negotiators shall have no decision-making authority. Negotiators shall maintain close contact with the decision makers and persons in charge of tactical assault teams by means of continuous briefings on the status of negotiations.

4) Certain issues, such as releasing hostage-taker(s) from custody, providing weapons, arranging hostage exchange and immunity from prosecution are not open to negotiation.

5) Third-party participation in negotiations shall be consultative only.

6) Unless formally involved in negotiations, staff shall have no contact with hostage-takers.

f. Status of Certain Staff during and after a Hostage Situation
1) Regardless of the individual's rank or authority under normal conditions, facility personnel shall not be bound by instructions/orders/suggestions from any supervisor or other staff member who is a hostage.

2) A staff member with a relative or close associate among the hostages shall be relieved from duty, responsibility and authority pending resolution of the incident.

3) Emergency plans shall specify procedures for screening freed hostages for medical and psychological problems.

a) The designated Employee Assistance Program (EAP) contact shall coordinate and conduct the screenings and debriefings of all hostages and other employees involved in the disturbance.

b) Psychological screenings should take place before the freed hostage is relieved of duty, to guide decisions about counseling/therapy and work reentry.

4) The facility administrator shall ensure a debriefing with former hostages after their psychological and medical screenings, unless IHSC staff advises postponement.

5) Emergency plans shall also provide for debriefing personnel not taken hostage, but significantly involved in the operation to free hostages. This debriefing should take place prior to the staff member being released from duty.

g. Hostage Family Services
1) The facility administrator shall notify hostages' families of the situation as early as possible.

2) If the hostage situation is not resolved quickly, the Field Office Director (or designee) shall identify members of a crisis support team and direct them to establish a family service center at the facility.

a) The crisis support team shall be distinct from the HNT.

b) The two teams shall have no members in common.

3) At the family service center, the crisis support team shall provide members of affected families accurate information, updates and breaking news and professional advice and help.

4) The crisis support team shall directly address children's stress and stress-generated behavior. The EAP may assist with family stress management.

h. Media

News media organizations shall abide by the policies and procedures of the facility. The staff member handling press releases and inquiries is responsible for:

1) situating any present media representatives in an area where their presence shall not interfere with emergency operations;

2) arranging regular briefings; and

3) handling incoming inquiries.

**6. Search (Internal)**

a. Search Teams

The shift supervisor or facility administrator designee shall serve as search coordinator, dispatching a separate two-officer search team for every missing detainee, at least one of whom shall be thoroughly familiar with the assigned search area.

The supervisor shall direct search teams to draw designated keys from the facility's key control area, specify  which search method to use, instruct assigned teams to search areas identified to be searched, including areas with non-standard construction features (temporary or permanent), and assign a designated radio frequency.

b. Equipment (at a minimum):

1) master blueprint or schematic for search coordinator;

2) separate blueprints for each search area;

3) radios (one per team);

4) flashlights;

5) restraints;

6) ladders;

7) tools as needed; and

8) riot batons.

**7. Bomb Threat**

a. Immediate Response

1) Phone Threat
The facility administrator shall develop a "script" for staff to follow upon receiving a telephoned bomb threat; script shall be available at every staff telephone for instant access. (FBI Bomb Threat DATA Form, DOJ 370)

The objective of the scripted questions is to secure the following information from and about the caller:

a) bomb location;

b) time set for detonation;

c) type of explosive;

d) caller's affiliation/self-identification (credibility of threat); and

e) caller's gender, accent, tone, and other characteristics.

2) Mail Threat
The facility administrator shall instruct staff to consider suspect any letter or package with:

a) oily/greasy stains/discoloration;

b) an incorrect title/department for the addressee;

c) the addressee's name misspelled;

d) disproportionate weight relative to the size of the envelope or box; and/or

e) no return address.

3) Written Threat
Upon receipt of a written threat, staff shall treat the paper or other means of communication as they would any other criminal evidence, preventing unauthorized

handling of the material and saving all material associated with the delivery (e.g., envelope, wrapping).

4) *In-person Threat*
Staff shall elicit as much information as possible from the person who has delivered an in-person threat; a supervisor shall be contacted as soon as possible.

b. *Searching for a Bomb*

When searching for a bomb following a perceived or real threat, the shift supervisor or facility administrator designee shall notify the local fire department and hospital, in addition to the Chief of Security or facility administrator designee, facility administrator, safety/maintenance supervisor and other appropriate facility officials.

1) Search teams shall report any suspicious object immediately upon discovery. At least one member of each search team shall know the assigned area well enough to spot changes (e.g., unusual objects, items moved from their normal locations, etc.).

2) If appropriate, the facility administrator shall order a power shutdown.

c. *If a Bomb Is Found*

1) Team members shall keep as still as possible, and power off all radios, body alarms, cell phones and any and all electronic equipment capable of emitting an RF signal.

2) Incoming traffic shall cease.

3) The shift supervisor or facility administrator designee shall notify the bomb-removal agency listed in the written procedures.

4) Officers shall clear the surrounding area.

d. *After an Explosion*

1) The safety/maintenance supervisor shall implement appropriate measures, in

accordance with written procedures, that assume:

a) structural damage; and

b) additional bomb(s)

2) An explosives expert from the Bureau of Alcohol, Tobacco and Firearms, the FBI, the local fire chief or other explosives expert, shall conduct the investigation.

### 8. Adverse Weather

After defining and mapping the interior- and perimeter-post areas, the facility administrator shall:

a. prepare a separate map showing locations of all unarmed interior posts;

b. establish and equip fog-patrol posts;

c. establish procedures and assign responsibility for ensuring equipment is available and in working order at all times;

d. prepare another map showing locations of all perimeter/exterior posts:

1) identify each as armed or unarmed;

2) list the weapons to be used at armed posts, and where they can be drawn; and

3) store multiple copies of the interior—and perimeter—post maps in the control center and command center.

e. ensure that perimeter security has been enhanced with additional staff;

f. remove objects and items that could become airborne and act as missiles during high winds;

g. ensure staff is appropriately provided with necessary foul weather gear;

h. ensure generators are functioning properly and have an adequate supply of fuel for a protracted situation; and

i. ensure that if the institution is placed on lockdown status, a briefing with staff occurs.

### 9. Civil Disturbance

a. *Scenarios*

*The plan shall address various civil disturbance scenarios including, at a minimum, the following: a single event (small/large); several coordinated events at one or more locations, at once or at staggered multiple times; type of event and individuals involved; and involvement of other law enforcement agencies.*

*For each of the several scenarios, the plan shall specify procedures for multiple deployments involving the same and/or different kinds of equipment and teams, e.g. in the event of simultaneous demonstrations.*

b. *Basic Procedures*

*The plan shall specify procedures for standard activities, including but not limited to the following:*

1) *denying access to facility property (e.g., via barricades, roadblocks);*

2) *using crowd control equipment with the general public;*

3) *notifying/involving other law enforcement agencies;*

4) *establishing detention areas;*

5) *marking unmarked property lines; and*

6) *providing medical care.*

### 10. Environmental Hazard

a. *Safe Harbors*

*The facility administrator shall identify and equip one or more "safe harbor" area(s) in the facility.*

1) *Designated areas shall have the capacity to house a large number of detainees safely and securely for two or three hours, providing amenities such as a gym, auditorium, food service area, etc.*

2) *Every designated safe harbor shall maintain supplies of, at a minimum, potable water, duct tape, plastic and other items intended for use during an environmental hazard.*

*Every department (e.g., food service, medical, maintenance, recreation, administration, etc.) shall have written procedures and at least three days' provisions for use in temporary quarters, with the objective to minimize disruption to daily routine.*

b. *Procedures for an Environmental Hazard*

1) *The facility administrator shall designate an officer to supervise a detainee crew, which shall seal off specified area(s) in a timely manner.*

   a) *Staff and detainees shall receive necessary training as part of the facility's emergency-preparedness training program.*

   b) *The plan shall specify how often and where specialized training shall occur.*

   c) *The plan shall specify the number of employees and detainees to receive the training.*

2) *The safety/maintenance supervisor shall, if necessary, shut down ventilation units (e.g., cooling/heating systems, fans, etc.).*

3) *The shift supervisor or facility administrator designee shall direct the detainees' orderly transfer to safe harbor areas.*

4) *To ensure accountability, staff shall transport detainee identification cards to safe harbor areas.*

5) *Detainees may take no personal property, with the exception of prescribed medicine, into safe harbor areas.*

6) *When the danger has passed, the shift supervisor or facility administrator designee shall direct the detainees to return to their housing areas, after which staff shall conduct a population count.*

7) If environmental conditions worsen or fail to improve within an acceptable time frame, the facility administrator shall implement the facility's evacuation plan.

## 11. Detainee Transportation System

If an emergency occurs while detainees are being transported, the facility administrator shall, upon request of transportation staff, provide any or all of the following:

a. vehicular escort;

b. personnel;

c. mechanical assistance;

d. medical assistance;

e. replacement transportation (if vehicle is disabled);

f. notification to other law enforcement agencies; and/or

g. holdover lodging.

## 12. Evacuation

The facility administrator shall have emergency contracting authority during an officially approved evacuation. In the event of an emergency, community resources shall likely be directed towards hospitals, nursing homes, schools and other vital infrastructure and may not be available. Therefore, it is recommended that facilities enter into contract negotiations with vendors within 75 to 100 miles to provide needed resources at an agreed-upon cost.

a. Facility Evacuation Plan
The facility's plan shall factor in all variables, and combinations of variables, that may precipitate or affect a mass evacuation, such as the following contingencies and their repercussions:

1) minimal warning/preparation time;

2) weather-related complications (e.g., tornadoes, hurricanes, blizzards);

3) an area-wide disaster that would limit facility

access to state and local emergency services (e.g., police, fire department, hospitals, military, etc.) and transportation providers; and

4) failure of at least 10 percent of staff to respond when recalled. [NOTE: The type and scope of the emergency shall determine whether and by how much that percentage may increase.]

b. Evacuation Scenario
For every evacuation scenario, the plan shall:

1) identify and prepare a list of suppliers to provide essential goods and materials during the emergency;

2) prepare an alternative list, identifying product substitutions and alternate suppliers; and

3) assign priorities among the essentials listed, recognizing shortages likely to occur during an area-wide emergency.

c. Transportation and Supplies
The facility administrator shall secure as many signed contracts, agreements and commitments for transportation and supplies as needed in the event that federal and other public-sector resources are unavailable.

d. Pre-evacuation Procedures
The facility administrator shall perform the following pre-evacuation procedures:

1) enact emergency staff recall (time permitting);

2) implement procedures to retrieve/pack detainees' personal property, central files, medical records, etc.;

3) implement department-by-department procedures to transport material needed to conduct daily operations at the temporary site (e.g., personnel files, blank rosters, forms, etc.);

4) deploy emergency equipment;

5) notify state and local authorities; and

6) conduct (exit) emergency count.

e. Facility Shutdown
To achieve facility shutdown, the facility administrator shall:

1) verify detainee count;

2) implement internal search plan, as appropriate;

3) apply emergency utility controls; and

4) secure the site, to extent possible.

f. Transition to Temporary Site
To transition to a temporary site, the facility administrator shall:

1) confirm the previously projected number of vehicles needed for:

   a) detainees, and

   b) supplies.

2) record vehicle data, including number and source(s);

3) reconfirm security arrangements with other ICE/ERO components, the Bureau of Prisons, U.S. Marshals Service, local and state agencies and the military;

4) separate Special Management Unit (SMU) detainees before moving, individually or as a group, to another such unit or to a local detention facility equipped to accommodate SMU detainees' security and safety needs; and

5) confirm staffing/assignments, including temporary duty arrangements.

### 13. Nationwide Lockdown

In the event of a compelling need to secure all ICE/ERO facilities, the ERO headquarters Field Operations Assistant Director shall notify Field Office Directors, who shall notify the facility administrators.

a. Lockdown Procedures
The facility administrator shall implement the following lockdown procedures:

1) perform emergency detainee count;

2) conduct staff briefing (may include interim increase to 12-hour shifts);

3) suspend detainee access to telephones and televisions;

4) suspend visitation (designated staff shall attempt to contact individuals with visits planned; detainees may notify interested persons of the lockdown and suspension of visits by mail);

5) provide meal service in the housing units;

6) activate the command post; and

7) contact specialized personnel and teams, as appropriate (SRTs, HNTs, etc.).

b. Communication
The facility administrator shall inform the detainees, in writing, why the lockdown is necessary, what to expect, and how long it is likely to last. The facility administrator shall provide this detainee notification as soon as possible after implementing the necessary procedures (as detailed in the preceding paragraph).

c. Health Services
Health services staff shall make their regularly scheduled rounds.

d. Termination of Lockdown
When the nationwide lockdown is terminated, the facility administrator shall:

1) relax the lockdown systematically, according to written procedures;

2) implement a lockdown recovery plan;

The plan shall include slowly returning the facility to normal operating procedures by bringing small groups out at a time (e.g., one range of a pod in each housing unit), feeding one range at a time, then gradually increasing over a period of 48 hours. This gradual return affords staff the ability to accurately assess the

*mood of the population and take appropriate*          *actions as needed.*

# 1.2 Environmental Health and Safety

## I. Purpose and Scope

This detention standard protects detainees, staff, volunteers and contractors from injury and illness by maintaining high facility standards of cleanliness and sanitation, safe work practices and control of hazardous substances and equipment.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Facility cleanliness and sanitation shall be maintained at the highest level.

2. Compliance with all applicable federal, state and local safety and sanitation laws shall be ensured by documented internal and external inspections, and by corrective action when indicated.

3. Compliance with all applicable fire safety codes

and fire safety performance requirements for facility furnishings shall be ensured.

4. Flammable, poisonous, toxic and caustic materials shall be controlled and used in a safe manner.

5. Compliance with fire prevention regulations, inspection requirements and other practices, including periodic fire drills, shall ensure the safety of detainees, staff and visitors.

6. Staff shall be knowledgeable about procedures and responsibilities during emergency situations, including those that require evacuation, in accordance with a written plan and with training at least annually.

7. The facility shall have a written plan for immediate release of detainees from locked areas, and provisions for a back-up system.

8. A sufficient number of properly positioned emergency exits, clear from obstruction, shall be distinctly and permanently marked.

9. Plans shall include procedures for assisting detainees with special needs during an emergency or evacuation.

10. Preventive maintenance and regular inspections shall be performed to ensure timely emergency repairs or replacement and to prevent dangerous and life-threatening situations.

11. Potential disease transfer shall be minimized through proper sanitization of barbering equipment and supplies.

12. Pests and vermin shall be controlled and eliminated.

13. Safe, potable water shall be available throughout the facility.

14. Emergency lighting and life-sustaining equipment shall be maintained and periodically tested.

15. Disposal of garbage and hazardous waste shall be in compliance with applicable government

regulations.

16. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Environmental Health and Safety" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-1A-01, 1A-02, 1A-03, 1A-07, 1A-14, 1A-15, 1A-16, 1A-17, 1A-18, 1A-19, 1A-20,1C-01, 1C-02, 1C-03, 1C-04, 1C-05, IC-07, 1C-08, 1C-09, 1C-10, 1C-11, 1C-12, 1C-13, 1C-14, 1C-15, 4B-07, 4C-18.

Occupational Safety and Health Administration

(OSHA) Regulations.

NFPA Standards.

U.S. Public Health Service Report on Carcinogens.

## V. Expected Practices

### A. Environmental Health and Safety

#### 1. General Environmental Health

Environmental health conditions shall be maintained at a level that meets recognized standards of hygiene, including those from the:

a. American Correctional Association;

b. Occupational Safety and Health Administration;

c. Environmental Protection Agency;

d. Food and Drug Administration;

e. National Fire Protection Association's Life Safety Code; and

f. National Center for Disease Control and Prevention.

The facility administrator designee for environmental health is responsible for developing and implementing policies, procedures and guidelines for the environmental health program that are intended to identify and eliminate or control as necessary, sources of injuries and modes of transmission of agents or vectors of communicable diseases.

The facility administrator designee shall:

a. conduct special safety investigations and comprehensive surveys of environmental health conditions; and

b. provide advisory, consultative, inspection and training services regarding environmental health conditions.

For the medical clinic, the health services administrator or equivalent is responsible for:

a. implementing a program that assists in

maintaining a high level of environmental sanitation; and

b. providing recommendations to the facility administrator concerning environmental health conditions, in consultation with the environmental health designee.

## 2. Staff and Detainee Safety

The facility administrator shall ensure that adequate provisions are made for staff and detainee safety, in accordance with these detention standards and applicable law. Standard "7.3 Staff Training" further addresses employee training-related issues. Standard "5.8 Voluntary Work Program" addresses detainee training issues for workers. Detainees shall receive safety instruction as necessary for living area-related assignments, such as working with cleaning products to clean general use areas.

Detainee living area safety shall be emphasized to staff and detainees to include providing, as noted in the standards, a housekeeping plan. For example, when there are safety concerns with a detainee sleeping in a top bunk that is not along a wall and that has no bed rail, accommodations shall be made to ensure safety. (Because of the potential safety risk they pose, bed rails are not common in detention settings except for medical housing units.) In locations where ladders are unavailable, alternate accommodations, such as the use of bottom bunks or the addition of a ladder or step, shall be made for detainees on a case-by-case basis. Detainees who have medical or physical problems that may be aggravated by sleeping on a top bunk shall be referred to the medical unit for consideration of a lower bunk permit.

## 3. General Housekeeping

The facility administrator shall ensure that staff and detainees maintain a high standard of facility sanitation and general cleanliness. When possible, the use of non-toxic cleaning supplies is recommended.

a. All horizontal surfaces shall be dampdusted daily with an approved germicidal solution used according to the manufacturer's directions.

b. Windows, window frames and windowsills shall be cleaned on a weekly schedule.

c. Furniture and fixtures shall be cleaned daily.

d. Floors shall be mopped daily and when soiled, using the double-bucket mopping technique and with a hospital disinfectant-detergent solution mixed according to the manufacturer's directions.

e. A clean mop head shall be used each time the floors are mopped.

f. Waste containers shall weigh less than 50 lbs., be non-porous and lined with plastic bags; the liner shall be changed daily.

g. Waste containers shall be washed weekly at a minimum, or as needed when they become soiled.

h. Cubicle curtains shall be laundered monthly or during terminal cleaning following treatment of an infectious patient.

## 4. Pests and Vermin

The facility administrator shall contract with licensed pest-control professionals to perform monthly inspections to identify and eradicate rodents, insects and other vermin. The contract shall include a preventive spraying program for indigenous insects and a provision for callback services as necessary. Doors to the outside should be tight fitting and door sweeps should be installed to prevent the entry of vermin from outside.

## 5. Certification of Facility Water Supply

At least annually, a state laboratory shall test samples of drinking and wastewater to ensure compliance with applicable standards. A copy of the testing and safety certification shall be maintained on site.

## 6. Emergency Electrical Power Generator

At least every two weeks, emergency power generators shall be tested for one hour, and the oil,

water, hoses and belts of these generators shall be inspected for mechanical readiness to perform in an emergency situation.

Power generators are to be inspected weekly and load-tested quarterly at a minimum, or in accordance with the manufacturer's recommendations and instruction manual. Technicians shall check starting battery voltage, generator voltage and amperage output at a minimum, and shall perform all other necessary checks as well.

Other emergency equipment and systems shall be tested quarterly, and all necessary follow-up repairs or replacement shall be performed as soon as feasible.

### 7. Garbage and Refuse

a. Garbage and refuse includes all trash, rubbish and other putrescible and non-putrescible solid waste, except the solid and liquid waste discharged into the sanitary sewer system of the facility.

b. Garbage and refuse shall be collected and removed from common areas at least daily to maintain sanitary conditions and to avoid creating health hazards.

c. Facilities shall comply with all federal, state and local environmental regulations and requirements governing methods for handling and disposing of refuse.

## B. Hazardous Materials

Every facility shall establish a system for storing, issuing, using and maintaining inventories of and accountability for hazardous materials. The facility program shall be supervised by an individual trained in accordance with OSHA standards. The effectiveness of any such system depends not only on written policies, procedures and precautions, but also on adequate supervision and responsible behavior of staff and detainees, including following instructions precisely, taking prescribed precautions

and using safety equipment properly.

A list of common flammable, toxic and caustic substances is included at the end of this detention standard as "Appendix 1.2.A: Common Flammable, Toxic and Caustic Substances."

### 1. Personal Responsibility

Every individual who uses a hazardous substance must:

a. be trained in accordance with OSHA standards;

b. be knowledgeable about and follow all prescribed precautions;

c. wear personal protective equipment when indicated; and

d. promptly report hazards or spills to the designated authority.

### 2. Protective Equipment

a. Protective eye, face, and other appropriate equipment (such as footwear, gloves, gowns, and/or aprons) is required where there is a reasonable probability of injury preventable by such equipment. Areas of the facility where such injuries can occur shall be conspicuously marked with eye-hazard warning signs.

b. Eyewash stations that meet OSHA standards shall be installed in designated areas throughout the facility, and all employees and detainees in those areas shall be instructed in their use.

### 3. Inventories

Every area shall maintain a current inventory of the hazardous substances (e.g., flammable, toxic or caustic) used and stored there. Inventory records shall be maintained separately for each substance. Entries for each shall be logged on a separate card (or equivalent), and filed alphabetically by substance. The entries shall contain relevant data, including purchase dates and quantities, use dates and quantities and quantities on hand.

### 4. Material Safety Data Sheet Files

a. Every department or other area of the facility using hazardous substances shall maintain a file of Material Safety Data Sheets (MSDS) that includes a list of the locations where hazardous substances are stored, along with a diagram and legend of these locations. Designated staff from each department or area shall provide a copy of each file to the maintenance supervisor.

b. MSDS are produced by manufacturers and provide vital information on individual hazardous substances, including instructions on safe handling, storage and disposal; prohibited interactions; etc.

c. Staff and detainees shall have ready and continuous access to the MSDS for the substances with which they are working. Staff and detainees who do not read English shall not be authorized to work with these materials.

d. Because changes in MSDS occur often and without notice, staff must:

1) review the latest issuance from the manufacturers of the relevant substances;

2) update the MSDS files as necessary; and

3) forward any changes to the maintenance supervisor, so that the copy is kept current.

## 5. Master Index

The maintenance supervisor or facility administrator designee shall compile:

a. a master index of all hazardous substances in the facility and their locations;

b. a master file of MSDS; and

c. a comprehensive, up-to-date list of emergency phone numbers (e.g., fire department, poison control center, etc.).

The maintenance supervisor shall maintain this information in the safety office (or equivalent) and ensure that a copy is sent to the local fire department.

## 6. General Guidelines Regarding Hazardous Substances

a. Issuance
Flammable, caustic and toxic substances (hazardous substances) shall be issued (i.e., drawn from supply points to canisters or dispensed) only under the supervision of the designated officer.

b. Amounts
Hazardous substances shall be issued in single-day increments (the amount needed for one day's work).

c. Supervision
Qualified staff shall closely monitor detainees working with hazardous substances.

d. Accountability
Inventory records for a hazardous substance must be kept current before, during and after each use.

## 7. Flammable and Combustible Liquids

a. As required by the Federal Hazardous Substances Labeling Act, any liquid or aerosol labeled "flammable" or "combustible" must be stored and used as prescribed on the label.

b. Lighting fixtures and electrical equipment installed in flammable liquid storage rooms must meet National Electrical Code requirements in hazardous locations.

c. Every hazardous material storage room shall:

1) be of fire-resistant construction and properly secured;

2) have self-closing fire doors at each opening;

3) be constructed with either a four-inch sill or a four-inch depressed floor; and

4) have a ventilation system (mechanical or gravity flow), which provides at least six air changes per hour, within 12 inches of the floor.

d. Every storage cabinet shall:

1) be constructed according to the applicable code and securely locked at all times;

2) be clear of open passageways, stairways and other emergency exit areas;

3) be conspicuously labeled: "Flammable—Keep Fire Away"; and

4) contain not more than 60 gallons of Class I or Class II liquids, or more than 120 gallons of Class III liquids.

e. Storage rooms and cabinets may be entered only under secure conditions and under the supervision of authorized staff.

f. Any portable container that is not the original shipping container must be designated as an approved safety canister, and must be listed or labeled by a nationally recognized testing laboratory. Each container shall bear a legible label that identifies its contents.

g. Excess liquids shall remain in original containers, tightly closed, in the storage room or cabinet.

h. The MSDS shall govern use of particular flammable or combustible liquids.

i. Only authorized staff may dispense flammable and combustible liquids, using acceptable methods for drawing from or transferring these liquids.

j. Drawing from or transferring any of these liquids into containers indoors is prohibited except:

1) through a closed piping system;

2) from a safety can;

3) by a device drawing through the top; or

4) by gravity, through an approved self-closing system.

An approved grounding and bonding system must be used when liquids are dispensed from drums.

k. Without exception, cleaning liquids must have a flash point at or above 100° F (e.g., Stoddard solvents, kerosene). Cleaning operations must be in an approved parts-cleaner or dip tank, fitted with a fusible link lid with a 160 degree F melting-temperature link.

l. Staff shall follow MSDS directions:

1) when disposing of excess flammable or combustible liquids; or

2) after a chemical spill.

## 8. Toxic and Caustic Substances

a. All toxic and caustic materials must be stored in secure areas, in their original containers, with the manufacturer's label intact on each container.

b. Only authorized staff shall draw/dispense these substances, in accordance with the applicable MSDS.

c. Staff shall either return unused amounts to the original container(s) or, under certain circumstances, to another suitable, clearly labeled container within the storage area.

d. MSDS directions shall determine the disposal and spill procedures for toxic and caustic materials used in the facility.

## 9. Poisonous Substances

Poisonous substances or chemicals (e.g., methyl alcohol, sulfuric acid, muriatic acid, caustic soda or tannic acid, etc.) pose a very high (Class I) caustic hazard due to their toxicity.

Methyl alcohol, variously referred to as wood alcohol and methanol, is commonly found in industrial applications (e.g., shellac thinner, paint solvent, duplicating fluid, solvents for leather cements and dyes, flushing fluid for hydraulic brake systems).

a. If ingested, methyl alcohol can cause permanent blindness or death.

b. Staff must directly supervise the use of any product containing methyl alcohol. Products that

contain methyl alcohol in highly diluted amounts (e.g., shoe dye) may be issued to detainees, but only in the smallest workable quantities.

c. Immediate medical attention is vital any time methyl alcohol poisoning is suspected.

## 10. Other Toxic Substances

a. Permanent antifreeze containing ethylene glycol shall be stored in a locked area and dispensed only by authorized staff.

b. Typewriter cleaner containing carbon tetrachloride or trichlorochane shall be dispensed in small quantities and used under direct staff supervision.

c. Cleaning fluids containing carbon tetrachloride or tetrachloride or trichlorochane shall be strictly controlled.

d. Glues of every type may contain hazardous chemicals. Toxic glues must be stored in a locked location, for use only by authorized staff. When use of a nontoxic product is not possible, staff must closely supervise all stages of handling.

e. The use of dyes and cements for leather requires close supervision. Nonflammable types shall be used whenever possible.

f. Ethyl alcohol, isopropyl alcohol and other antiseptic products shall be stored and used only in the medical department and only under close supervision. To the extent practical, such chemicals shall be diluted and issued in small quantities to prevent any injuries or lethal accumulation.

g. Pesticides not currently approved by the Environmental Protection Agency, such as DDT and 1080 (sodium fluoroacetate) are prohibited. The maintenance supervisor is responsible for purchasing, storing (in a locked area) and dispensing all pesticides used in the facility.

h. The maintenance supervisor or other staff members responsible for herbicides must hold a current state license as a certified private applicator. Persons applying herbicides must wear proper clothing and protective gear.

i. Lyes may be used only in dye solutions and only under the direct supervision of staff.

## 11. Labeling of Chemicals, Solvents and Other Hazardous Materials

The facility administrator shall individually assign the following responsibilities associated with the labeling procedure:

a. identifying the nature of potentially hazardous materials adopted for use;

b. overseeing the use of properly labeled containers for hazardous materials, including any and all miscellaneous containers into which employees might transfer materials;

c. instructing staff in the meaning of the classification code and the MSDS, including the safe handling procedures for each material;

d. working with staff to ensure that containers are properly labeled; and

e. correctly labeling all smaller containers to correspond to the manufacturer-affixed labels on larger shipping containers.

## 12. Controlled Hazardous Materials

Certain substances require special treatment and careful planning and precautions before use. These controlled materials are classified according to the type of hazard and the nature of the restrictions imposed for their safe use, as specified in OSHA regulations.

a. Class I: Industrial Solvents
Industrial solvents and chemicals used as paint thinners, degreasers and cleaning agents may have toxic properties and low flash points, making them dangerous fire hazards.

b. Class II: Restricted Materials
Beryllium and its alloys and compounds, and

silver solder containing cadmium, pose a danger to workers, for whom special precautions must be taken.

c.  Class III: Recognized Carcinogens
OSHA-listed carcinogens are governed by the OSHA regulations provided in 29 CFR 1910.1000.

Although asbestos appears on the OSHA list, it is exempt from the regulation when:

1)  no asbestos fibers shall be released into the air during handling and use; and

2)  the asbestos consists of firmly bound fibers contained in a product such as a transit pipe, wallboard, or tile (except when being sawed or otherwise handled in a way that releases fibers into the air).

d.  Class IV: Suspected Carcinogenic, Teratogenic and Mutagenic Materials
Chemical agents, substances, mixtures and exposures are listed in the biennial *Report on Carcinogens* issued by the U.S. Public Health Service, in accordance with the Public Health Service Act. The maintenance supervisor shall ensure that the facility has copies of the report and that there is compliance with the provisions of the latest edition.

## C. Fire Prevention and Control

### 1. Fire Safety Codes

Every facility shall comply with standards and regulations issued by:

a.  OSHA;

b.  the American Correctional Association "mandatory" Expected Practices [Mandatory ACA Expected Practice 4-ALDF-1C-07 requires that the facility conform to applicable federal, state and/or local fire safety codes, and that of the authority having jurisdiction over document compliance. A fire alarm and automatic detection system are required (or else there must be a plan

for addressing these or other deficiencies within a reasonable time period), as approved by the authority having jurisdiction. If the authority approves any variance, exceptions or equivalencies, they must not constitute a serious life-safety threat to the occupants of the facility.];

c.  local and national fire safety codes; and

d.  applicable standards of the American Society for Testing and Materials, American National Standards Institute and Underwriters' Laboratories or Factory Mutual Engineering Corporation.

New construction, alterations and renovations, shall comply with:

a.  the latest revision or update of the International Council Codes;

b.  the Uniform Building Code; or

c.  the Standard Building Code, in accordance with 40 U.S.C. § 619 and local law.

If the local government does not mandate adherence to a particular code, construction must conform to the International Council Codes.

In addition, construction shall comply with the latest edition of the National Fire Protection Association (NFPA)'s 101, Life Safety Code and National Fire Codes (NFCs). If the fire protection and life safety requirements of a local building code differ from NFPA 101 or the NFCs, the requirements of NFPA 101 and the NFCs shall take precedence and be recognized as equivalent to those of the local building code.

### 2. Inspections

a.  A qualified departmental staff member shall conduct weekly fire and safety inspections.

b.  Facility maintenance (safety) staff shall conduct monthly inspections.

c.  Written reports of the inspections shall be forwarded to the facility administrator for review and, if necessary, corrective action determinations.

The maintenance supervisor shall maintain inspection reports and records of corrective action in the safety office. Fire safety deficiencies shall be promptly addressed.

### 3. Fire Prevention, Control and Evacuation Plan

Every facility shall develop a written fire prevention, control and evacuation plan that includes the following:

a. control of ignition sources;

b. control of combustible and flammable fuel load sources;

c. provisions for occupant protection from fire and smoke;

d. inspection, testing and maintenance of fire protection equipment, in accordance with NFPA codes, etc.;

e. monthly fire inspections;

f. installation of fire protection equipment throughout the facility, in accordance with NFPA codes;

g. accessible, current floor plans (including all buildings and rooms); prominently posted evacuation maps/plans; and exit signs and directional arrows for traffic flow, with a copy of each revision filed with the local fire department; and

h. exit diagrams that shall be conspicuously posted throughout the facility.

### 4. Fire Drills

Fire drills shall be conducted and documented at least quarterly in all facility locations including administrative areas.

a. Fire drills in housing units, medical clinics and other areas occupied or staffed during non-working hours shall be timed so that employees on each shift participate in an annual drill.

b. Detainees shall be evacuated during fire drills, except:

1) in areas where security would be jeopardized;

2) in medical areas where patient health could be jeopardized; or

3) in individual cases when the evacuation of patients or detainees is logistically not feasible.

   Staff shall simulate drills in areas where detainees are not evacuated.

c. Emergency-key drills shall be included in each fire drill, and timed. Emergency keys shall be drawn and used by the appropriate staff to unlock one set of emergency exit doors not in daily use. NFPA recommends a limit of four and one-half minutes for drawing keys and unlocking emergency doors. However, when conducting fire drills, emphasis shall be placed on safe and orderly evacuation rather than speed.

### 5. Exit Diagram

In addition to a general area diagram, the following information must be provided on signs:

a. instructions in English, Spanish and the next most prevalent language at the facility;

b. "You are here" markers on exit maps; and

c. emergency equipment locations.

"Areas of Safe Refuge" shall be identified and explained on diagrams. Diagram posting shall be in accordance with applicable fire safety regulations of the jurisdiction.

## D. Medical Operation

The medical department will develop and implement an exposure control plan for the medical clinic that addresses the management of potentially sharp objects (sharps), standard and transmission-based precautions, post-exposure prophylaxis and management, bloodborne pathogens and other potentially infectious materials, disposal of medical and hazardous waste, and cleaning and disinfection.

Only sharps and medical waste generated within the medical department or by medical staff shall be managed in accordance with the medical department's exposure control plan.

## 1. Needles and Other Sharp Objects

A mandatory, uniform procedure shall be established for the safe handling and disposal of used needles and other sharps to prevent both mechanical injury and the percutaneous transmission of infectious disease organisms, such as the hepatitis B virus (HBV) and human immunodeficiency virus (HIV). Sharps are defined as all disposable or discarded items derived from detainee care that could potentially transmit disease via direct subdermal inoculation. Items included are: hypodermic needles and syringes, scalpel blades, glass vials or ampules containing materials deemed to be infectious, burrs, glass cartridges and lancets.

Accidental injuries from sharp objects are common in health care programs; most are from needle sticks caused by staff attempting to recap hypodermic needles. A uniform procedure for used needles and other disposable sharps is necessary to reduce the number of such injuries by preventing the secondary handling of needles and other dangerous sharp objects used in the delivery of medical care.

## 2. Standard Precautions (includes "Universal Precautions")

Staff shall frequently wash their hands and take additional routine precautions to prevent contact with blood or other body fluids.

a. Gloves shall be worn: prior to touching blood and body fluids, mucous membranes, or non intact skin of all patients; prior to handling items or surfaces soiled with blood or body fluids; and prior to performing venipuncture and other vascular access procedures.

b. Gloves shall be changed after contact with each detainee.

c. Masks and protective eyewear or face shields shall be worn during procedures that are likely to generate droplets of blood or other body fluids.

d. Gowns and/or aprons shall be worn during procedures that are likely to generate splashes of blood or other body fluids.

e. Hands and other skin surfaces shall be washed immediately and thoroughly if contaminated with blood or other body fluids. Hands shall be washed immediately after gloves are removed.

f. All health-care workers shall take precautions to prevent injuries caused by needles, scalpels and other sharp instruments or devices during procedures, especially at the following times: when cleaning used instruments, during disposal of used needles and when handling sharp instruments after procedures. Instruments and drugs shall be maintained in a secure and sanitary condition.

g. To prevent needle-stick injuries, needles shall not be recapped, purposely bent or broken, removed from disposable syringes, or otherwise manipulated by hand. After use, disposable syringes and needles, scalpel blades and other sharp items shall be placed in puncture-resistant containers for disposal.

h. Large-bore reusable needles shall be placed in a puncture-resistant container for transport to the reprocessing area.

i. To minimize the need for emergency mouth-to-mouth resuscitation, mouthpieces, resuscitation bags or other ventilation devices shall be available for use in areas in which the need for resuscitation is foreseeable.

j. Health-care workers who have exudative lesions or weeping dermatitis shall refrain from all direct patient care and from handling patient care equipment until the condition resolves.

k. Pregnant health-care workers shall strictly adhere to precautions to minimize the risk to the fetus of perinatal transmission of HIV.

l. Isolation precautions shall be used as necessary if associated conditions, such as infectious diarrhea or tuberculosis, are diagnosed or suspected. Implementation of standard blood and body fluid precautions for all detainees eliminates the need for the use of the isolation category of "blood and body fluid precautions" previously recommended by the Centers for Disease Control for individuals known or suspected to be infected with blood-borne pathogens.

Staff shall encourage detainees to wash their hands frequently and to take additional routine precautions to prevent contact with blood or other body fluids.

### 3. Accidental Needle Sticks

Any employee or detainee who receives a needle stick or who is cut while handling potentially contaminated sharps shall be counseled regarding baseline testing for HBV and HIV, and referred to his/her usual source of health care. If the injury also involves a person who is a known source of possible infection, that person shall also be tested for HBV and HIV. The incident shall be reported as an occupational injury and documented in accordance with applicable regulations for commissioned officers and civil service employees, respectively.

The leading health service provider's exposure-control plan shall be followed in the event of a needle stick.

### 4. Inventory

Items that pose a security risk, such as sharp instruments, syringes, needles and scissors, shall be inventoried and checked weekly by an individual designated by the medical facility's Health Service Administrator (HSA) or equivalent.

### 5. Handling

Without removing the needles or replacing the needle covers, staff shall place used (disposable) syringes in a plastic disposal box or container.

a. Disposal Containers

1) Use only commercially available, biohazardous-waste sharps containers approved by the National Institute of Safety and Health (e.g., a "Winfield Sharps Container").

2) Do not use milk cartons or plastic milk jugs or other plastic containers of similar thickness.

3) Use containers with a two-gallon capacity (approximate).

4) Under no circumstances shall an item be removed from the Winfield Sharps Container (Sharps Container).

b. Location
Sharps Containers shall be located on top of counters or, if on the wall, at least five feet above ground. Sharps Containers shall never sit on the floor.

c. Disposal
When the disposal box is one-half to two-thirds full, the lid shall be closed and locked, and tape shall be placed over the top of the lid to indicate that it is ready for disposal. The Sharps Container shall be labeled with the words "infectious waste" or with the universal biohazard symbol, and placed in the proper area for removal and disposal.

Sharps are considered infectious waste, and final disposal of the Sharps Container and contents shall be through a commercial contractor that handles disposal of infectious waste in accordance with all local and federal regulations.

The HSA shall make arrangements for disposal with an approved contractor and is responsible for validating that the contractor's disposal methods are in accordance with all infectious and hazardous waste disposal laws and regulations. Arrangements shall be made with local hospitals, when possible, for disposal with the hospitals' own infectious waste.

### 6. Environmental Health in Medical Operations

While many of the following considerations,

precautions and specific procedures apply to situations that typically arise in medical operations, in many cases they have general application to all facility operations.

a. General Housekeeping

Environmental cleanliness shall reduce, control and prevent nosocomial infections due to contaminated environmental surfaces. The HSA or designee is responsible for ensuring the cleanliness of the medical facility.

Using an acceptable health agency standard as a model, the HSA shall establish:

1) the cleaning equipment, cleansers, disinfectants and detergents to be used;

2) the methods of cleaning; and

3) the frequency of cleaning and inspections.

The HSA or designee shall make a daily visual inspection of the medical facility, noting the condition of floors, walls, windows, horizontal surfaces and equipment.

All surfaces touched by detainees or staff shall be cleaned using fresh solutions of appropriate disinfectant products, applied with clean cloths, mops or wipes. Cleaned surfaces need not be monitored microbiologically since the results of such tests have been shown not to correlate with infection risk. Floors, walls, beds, tables and other surfaces that usually come in contact with intact skin require low-level disinfection

Horizontal surfaces in detainee care areas are cleaned on a regular basis, when soiling or spills occur. Additionally, short-stay units are cleaned when a detainee is discharged. Cleaning of walls, blinds or curtains is required only when visibly soiled.

The Chief Nurse (or equivalent) is responsible for training all staff and detainees in using proper housekeeping procedures and proper handling of hazardous materials and chemicals.

1) General Cleaning

a) All horizontal surfaces shall be damp dusted daily with an approved germicidal solution.

b) Windows, window frames and windowsills shall be cleaned on a regular schedule, but do not require daily cleaning.

c) Furniture and fixtures shall be cleaned daily.

d) Floors shall be mopped daily and when soiled using the double bucket mopping technique. The cleaning solution shall be a hospital disinfectant-detergent solution mixed according to the manufacturer's directions. A clean mop head shall be used each time the floors are mopped.

e) Waste containers shall be lined with plastic bags and the liner shall be changed daily. The container itself shall be washed at least weekly, or as needed when it becomes soiled.

f) Cubicle curtains shall be laundered monthly or during terminal cleaning following treatment of an infectious patient.

2) Isolation Cleaning

a) An approved germicidal detergent solution shall be freshly prepared in accordance with the manufacturer's specifications for each cleaning.

b) After cleaning the isolation room, mops and cleaning cloths shall be laundered before being reused.

c) Dirty water and used disinfecting solutions shall be discarded and the buckets and basins disinfected before being refilled. Items used in cleaning a contaminated isolation room shall never be taken into another area.

d) Linens shall be carefully removed from the

bed and double-bagged for transport.

e) All waste materials shall be double-bagged and disposed of as contaminated waste.

3) Terminal Cleaning

a) Every item in the room must be cleaned with an approved hospital germicidal solution.

b) When applicable, linen shall be stripped from the bed, with care taken not to shake the linen. Linen shall be folded away from the person and folded inward into a bundle, then removed with minimal agitation.

c) When applicable, all reusable receptacles (e.g., drainage bottles, urinals, bedpans, water pitchers) shall be emptied and rinsed with germicidal solutions.

d) All equipment that is not to be discarded (e.g., IV poles, respirators, suction machines) shall be washed with an approved germicidal solution following manufacturer's guidelines for cleaning the specific piece of equipment.

e) When applicable, mattresses and pillows covered with durable plastic covers shall be washed thoroughly with the approved germicidal solution.

f) When applicable, beds shall be washed thoroughly, using a small brush soaked in germicidal solution to gain access to small holes and crevices, to areas between the springs and to the casters.

g) All furniture shall be washed with a germicidal detergent solution. Use a small brush if necessary. Outside and underside as well as legs and casters must also be washed.

h) Wastebaskets shall be thoroughly washed with a germicidal solution after trash and liner have been removed.

i) Telephones shall be thoroughly cleaned with a clean cloth soaked in the germicidal solution. The earpiece and mouthpiece shall be unscrewed, scrubbed, dried and replaced.

j) Walls and ceilings need not be washed entirely, but areas that are soiled shall be washed with germicidal solution.

4) Choice of Disinfecting Materials
Hospital-grade disinfectant detergent formulations registered by the Environmental Protection Agency (EPA) may be used for environmental surface cleaning, but the physical removal of microorganisms by scrubbing is as imperative as any antimicrobial effect of the cleaning agent used.

Cost, safety and acceptance by staff shall be the criteria for selecting any such registered agent. The manufacturer's instructions for use shall be followed exactly.

b. Blood and Body Fluid Clean-up
Spills of blood and body fluids shall be cleaned up and the surface decontaminated in such a manner as to minimize the possibility of workers becoming exposed to infectious organisms, including HIV and HBV. A suitable cleanup kit shall be maintained for use in cases of spills of blood and body fluids. Cleanup kits may be obtained from commercial sources, or may be compiled by Health Services Department (HSD) staff or the designated health care provider.

1) Compiling a Cleanup Kit

To prepare a cleanup kit for blood and body fluid spills, package the following materials in a 12" x 15" clear zip-lock bag:

a) gloves, rubber or vinyl, household-type (2 pair);

b) clean absorbent rags (4);

c) absorbent paper towels (15);

d) disposable bag marked "contaminated" size 23"x10"x39", minimum thickness 1.5 mils.;

e) Clear plastic bag 13"x10"x39", minimum thickness 1.5 mils.; and

f) Bottle of "hospital disinfectant" (containing quaternary ammonium chlorides in at least 0.8% dilution), or a bottle of household bleach such as "Clorox" or "Purex" (5.25% sodium hypochlorite).

2) Selection of Disinfectants

Dilute solutions of sodium hypochlorite are reported extremely effective against both HIV and the Hepatitis B virus and therefore have been recommended for use in environmental decontamination procedures. Quaternary ammonium compounds are less effective against Hepatitis B. Chlorine in solution inactivates viruses quickly and efficiently, but must reach the virus particles to do so.

Proteinaceous materials may interfere with the ability of the appropriate disinfectant solution to reach the virus particles. Since quaternary disinfecting compounds may act as a detergent as well as a disinfectant, these compounds may be used for cleaning and removal of proteinaceous materials from surfaces. However, when using such a compound to clean a surface, it shall be necessary to follow with the use of chlorine solution for final disinfection.

Most blood or fluids shall be removed from the surface during routine medical cleaning procedures before application of the disinfectant; in such cases, use of sodium hypochlorite solution shall be sufficient.

3) Selection of Gloves

Household or industrial rubber gloves are recommended for use rather than surgical rubber gloves, as surgical gloves are somewhat porous and are less resistant to mechanical damage and punctures during clean-up procedures.

4) Assignment of Cleaning Duties to Detainees in Medical Facilities

Detainee workers may be assigned duties cleaning the medical facility. Detainees are permitted to clean floors and walls and to remove trash, but are not permitted to clean medical equipment.

5) Instructions for Use of Clean-Up Kit

a) Open the bag and remove the supplies.

b) Put on one pair of gloves.

c) Depending on the type of disinfectant in the kit, take out bottle of "hospital disinfectant," or prepare a dilute solution of sodium hypochlorite. To prepare a 1:10 dilution of 5.25% sodium hypochlorite, mix 1 part of 5.25% sodium hypochlorite (common household bleach) with 10 parts water.

d) Open the large clear plastic bag and the large bag marked "contaminated." Place them next to each other.

e) Use paper towels to absorb as much of the spilled fluid as possible; then place soiled paper towels in the large clear plastic bag.

f) Pour the solution carefully onto the spill area. Dispose of the empty bottle in the large, clear plastic bag. Leave disinfectant in place for 15 minutes.

g) Use the rags to clean the area, and place rags in the large clear plastic bag.

h) Tie off the clear plastic bag and place it inside the large plastic bag marked "Contaminated."

i) Remove gloves carefully and place them in the plastic bag marked "Contaminated."

j) Put on the second pair of gloves and tie the "Contaminated" trash bag closed.

k) Properly dispose of the "Contaminated" trash bag in a contaminated-waste receptacle.

l) Properly dispose of the second pair of gloves in the contaminated-waste receptacle.

m) Wash your hands.

n) Prepare a new clean-up kit.

NOTE: Do not place linen or non-disposable articles in the "Contaminated" trash bag.

c. Hazardous and Infectious Waste Disposal
Infectious and hazardous waste generated at a medical facility shall be stored and disposed of safely and in accordance with all applicable federal and state regulations.

For identified wastes that represent sufficient risk of causing infection or injury during handling and disposal, the following precautions shall be applied.

1) Definitions
Hazardous or infectious waste is defined as: microbiology laboratory waste; human blood and blood products; sharps; laboratory and other chemicals; or certain drugs such as antineoplastic.

Miscellaneous biomedical waste is defined as waste materials that are not specifically defined as infectious waste. Such waste includes bandages, dressings, casts, catheters and disposable pads.

Waste from detainees in isolation is not considered to be infectious waste unless it falls within the specific definition of infectious waste as stated above.

2) Collection and Storage
Infectious waste must be separated from the general waste stream and clearly labeled as infectious, adhering to the following practices:

a) Infectious waste shall be double-bagged and tied and labeled "Infectious Waste."

b) The bags used must be impermeable, commercially supplied red bags intended specifically for biohazardous waste storage.

c) Miscellaneous biomedical waste shall be double-bagged and tied but need not be labeled as infectious.

3) Treatment and Disposal
Blood products and designated body fluids shall be poured slowly and carefully down a toilet to prevent splash. Compacting of untreated infectious waste is prohibited. The waste disposal contractor must meet all state and local requirements for transportation and disposal.

## E. Barber Operations

Sanitation in barber operations is imperative because of the possible transfer of diseases through direct contact or by towels, combs and clippers. Towels shall not be reused by other detainees until sanitized. Instruments such as combs and clippers shall not be used successively on detainees without proper cleaning and disinfecting.

1. For sanitation reasons, it is preferable that barbering operations be located in a room that is not used for any other purpose. The room must have sufficient light, and be supplied with hot and cold running water. The floors, walls and ceilings shall be smooth, nonabsorbent and easily cleaned.

2. Each barbershop shall have all equipment and facilities necessary for maintaining sanitary procedures for hair care, including covered metal containers for waste, disinfectants, dispensable headrest covers, laundered towels and haircloths.

3. After each detainee visit, all hair care tools that

came in contact with the detainee shall be cleaned and effectively disinfected. Ultraviolet lights are not appropriate for sterilization but may be used for maintaining tools that have already been properly sterilized.

4. Detailed hair care sanitation regulations shall be conspicuously posted in each barbershop for the use of all hair care personnel and detainees. Cotton pads, absorbent cotton and other single or dispensable toilet articles may not be reused, and shall be placed in a proper waste receptacle

immediately after use. The common use of brushes, neck dusters, shaving mugs and shaving brushes is prohibited.

5. Barbers or beauticians shall not provide service to any detainee when the skin of the detainee's face, neck or scalp is inflamed, or when there is scaling, pus or other skin eruptions, unless service of such detainee is performed in accordance with the specific authorization of the chief medical officer. No person who is infested with head lice shall be served.

# Appendix 1.2.A: Common Flammable, Toxic and Caustic Substances

## Class I Liquids

Gasoline

Benzene (Petroleum ether)

Acetine

Hexane

Lacquer

Lacquer thinner

Denatured alcohol

Ethyl alcohol

Xylene (Xylol)

Contact cement (flammable)

Toudi (Toluene)

Methyl ethyl ether

Methyl ethyl ketone

Naphtha Y, M and P

## Class II Liquids

Diesel fuel

Motor fuel

Kerosene

Cleaning solvents

Mineral spirits

Agitene

## Class III Liquids

Paint (oil base)

Linseed oil

Mineral oil

Neat's-foot oil

Sunray conditioner

Guardian fluid

## Toxic Substances

Ammonia

Chlorine

Antifreeze

Duplicating fluid

Methyl alcohol

Defoliants

Herbicides

Pesticides

## Caustic Substances

Lye

Muriatic acid

Caustic soda

Sulfuric acid

Tannic acid

# 1.3 Transportation (by Land)

## I. Purpose and Scope

This detention standard prevents harm to the general public, detainees and staff by ensuring that vehicles used for transporting detainees are properly equipped, maintained and operated and that detainees are transported in a secure, safe and humane manner, under the supervision of trained and experienced staff.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. The general public, detainees and staff shall be protected from harm when detainees are transported.

2. Vehicles used for transporting detainees shall be properly equipped, maintained and operated. This includes equipment appropriate and necessary to transport detainees with disabilities and special needs.

3. Detainees shall be transported in a safe and humane manner, under the supervision of trained and experienced staff.

4. Except in emergency situations, a single officer may not transport a single detainee of the opposite gender. Further, if there is an expectation that a pat down will occur during transport an officer of the same gender as the detainee(s) must be present.

5. Reasonable accommodations shall be made for detainees with physical disabilities and/or special needs in accordance with security and safety needs and all applicable laws and regulations.

6. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Transportation (Land Transportation)" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-1B-01, 1B-03, 1B-04, 1B-05, 1B-06

ICE/ERO *Performance-based National Detention Standards 2011:*

- "1.1 Emergency Plans";
- "2.1 Admission and Release";
- "2.5 Funds and Personal Property";
- "2.9 Post Orders";
- "2.15 Use of Force and Restraints";
- "4.1 Food Service";
- "4.7 Terminal Illness, Advance Directives and Death"; and
- "7.4 Detainee Transfers."

Memorandum dated 7/14/2006 on "Escape Reporting" from the ICE/ERO Director, which specifies requirements for the reporting, tracking and investigating of the escape of an ICE/ERO detainee.

## V. Expected Practices

### A. Written Policy and Procedures Required

The facility administrator shall develop and implement written policy, procedures and guidelines for the transportation of detainees, including, at a minimum:

1. general policy and procedures governing safety, security, operations, communications and equipment;

2. vehicle inspections and repair;

3. vehicle occupancy;

4. the seating of detainees in transportation vehicles; and

5. procedures and necessary equipment in the event of:

   a. vehicle failure;

   b. traffic accident;

   c. severe weather or natural disaster;

   d. an emergency situation (as specified later in "S. Emergency Situations" of this standard);

   e. transport of females or minors; and

   f. transport of detainees whose disabilities or special needs preclude prolonged travel.

### B. Vehicle Inspection

All vehicles used for transporting ICE/ERO detainees shall comply with annual safety inspections requirements in accordance with applicable federal and state law. Vehicles may not be used for transportation if any safety repairs are needed. Vehicles equipped with specialized gear for the transportation of detainees with physical disabilities must also undergo appropriate inspections and maintenance to ensure the equipment remains in good order.

### C. Transportation Planning and Scheduling

The Field Office Director has overall responsibility for all aspects of vehicle operations.

The facility administrator (or designee) is responsible for setting schedules and monitoring vehicular

maintenance, making logistical arrangements to transport detainees, supervising and instructing personnel, and protecting detainee security. Before departure, the plans shall be revised as necessary, based on weather and road conditions and any other relevant considerations.

## D. Transporting Officer Responsibilities

### 1. Training Required

To be assigned to a bus transporting detainees, an officer must have successfully completed the ICE/ERO bus driver training program, or a comparable approved training program, and all local state requirements for a commercial driver's license (CDL). In addition, the driver must have the appropriate state issued CDL.

Bus-driver trainees may operate the vehicle during any segment of a run when detainees are not on board, but only under the direct supervision of a certified bus instructor licensed by the state in which they reside.

### 2. Forms and Files

For each vehicle operator and other employees assigned to bus transportation duties, supervisors shall maintain at the official duty station a file containing:

a.  certificate of completion from a bus training program, as applicable;

b.  copy of the CDL;

1)  *every motor vehicle operator shall complete the following forms (or equivalent) for his/her official personnel folder (OPF): SF-47, G-392 and G-294. Every motor vehicle operator is also responsible for renewing these documents as necessary, and for providing to the OPF copies of all renewals and other changes/updates.*

### 3. Operating the Vehicle

The driver shall operate the vehicle in accordance with the CDL manual or the highest prevailing standard and must maintain complete control of the vehicle at all times.

Driving under the influence of drugs or alcohol is prohibited. In addition to any other random testing as part of a drug-free workplace program, all officers assigned to transportation are subject to the U.S. Department of Transportation (DOT) drug—and alcohol—testing program.

The transporting officers shall comply with all state and federal motor vehicle regulations (including DOT, Interstate Commerce Commission and Environmental Protection Agency), including, but not limited to:

a.  wearing a seat belt when the vehicle is moving;

b.  holding a valid state issued CDL;

c.  inspecting the vehicle, using a checklist and noting any defect that may render the vehicle unsafe or inoperable;

d.  transporting detainees in a safe and humane manner;

e.  verifying individual identities and checking documentation when transferring or receiving detainees;

f.  driving defensively, taking care to protect the vehicle and occupants, obeying traffic laws and immediately reporting damage or accidents;

g.  re-inspecting the vehicle after each trip and completing a vehicle inspection report, including an odometer reading;

h.  returning the vehicle keys to the control officer or supervisor, according to facility procedures;

i.  recording authorized expenses (e.g., fuel, emergency services, oil) on Form G-205 or (applicable current form; in event of an update, use the "Government-owned Vehicle Record"), specifying the exact amount and the date, and keeping all receipts and submitting them along

with the appropriate form at the end of each month; and

j.  Safeguarding credit cards assigned to the vehicle.

#### 4. Driving Hours and Number of Operators

Each officer must recognize the limitations imposed by his/her own driving skills, personal distractions and environmental conditions, and must modify his/her driving accordingly. The following rules apply to all members of the vehicle crew, whether driving or not, and it is the officer's responsibility to inform a transportation supervisor if he/she is unable to make a trip because of these rules:

a.  A CDL is required for each officer assigned to bus operations.

b.  While operating a vehicle requiring a CDL, drivers must comply with all rules and regulations pertaining to CDL operations.

c.  Drivers must be off-duty for the eight (8) hours immediately before any trip or trip segment.

d.  Maximum driving time (i.e., time on the road) is governed by USDOT.

e.  In an emergency or under unforeseen and adverse driving conditions only, the vehicle crew may drive as long as necessary to reach a safe and secure stopping area.

f.  When vehicles without detainees travel in tandem, a single officer may be assigned to each. Unaccompanied officers may also drive empty vehicles for certain purposes, such as maintenance trips.

#### 5. Vehicle Security

Officers shall secure a vehicle before leaving it unattended, including removing keys from the ignition immediately upon parking the vehicle.

Officers shall avoid parking in a spot where the vehicle may attract undue attention or be vulnerable to vandalism or sabotage. If officers cannot locate a parking area with adequate security, they shall contact the local law enforcement agency for advice or permission to use one of its parking places.

### E. Officer Uniform and Equipment

All officers transporting ICE/ERO detainees shall wear their prescribed uniforms unless other attire is authorized by the facility administrator.

1.  Every transporting officer shall wear a uniform in accordance with established procedures. Certain transportation details may require wearing of street or business attire; in these cases, the facility administrator shall establish a dress code for such occasions. The dress code shall prohibit the wearing of jumpsuits.

2.  Every transporting officer shall be issued and instructed to wear a protective vest while participating in the transportation program.

3.  Equipment recommended for each trip includes, but is not limited to, the following:

    a.  flashlights;

    b.  extra handcuffs;

    c.  flex-cuffs and cutter; and

    d.  other authorized intermediate force ("non-lethal," "non-deadly") weapons.

### F. Pre-departure Vehicle and Security Check

Prior to departure, all officers assigned to transport detainees must be present to ensure a complete and thorough inspection and search, and shall:

1.  inspect the vehicle for mechanical and electrical problems;

2.  take any necessary special precautionary measures for transporting a detainee identified as a special-handling case (e.g., for reasons of security, medical, physical, psychological problems, and/or transporting juveniles) while the search is in progress;

3.  test the emergency exits and test the key for every

lock located in or on the vehicle. A complete set of these keys shall travel with the vehicle at all times, in a secure place known to every transporting officer;

4. search for hidden weapons and other contraband before every trip, including the driver's compartment and glove compartment, the detainee seating area and the cargo compartment;

5. search the staging area prior to loading detainees to ensure that the area is clear of any weapons or contraband;

6. thoroughly search each detainee as he/she is about to board the vehicle; and

7. ensure that when vehicles are equipped with seatbelts, detainees are properly secured before the transport begins according to established ICE policies and procedures regarding searches.

## G. Required Documents

### 1. Transport Documentation

No detainee may be transported to/from any facility, including Field Office detention areas, unless a Form G-391, I-216, I-203, or equivalent, is furnished, authorizing the removal. These forms must be properly signed and shall clearly indicate the name of the detainee(s), the place or places to be escorted, the purpose of the trip and other information necessary to carry out the detail efficiently.

In SPCs, CDFs, and IGSAs with a sufficient ICE/ERO onsite presence, the authorized ICE official shall check records and ascertain if the detainee has a criminal history, is dangerous or has an escape record.  Any information of an adverse nature shall be clearly indicated on the G-391 and the escorting officers shall be warned to take the necessary precautions. Before beginning the detail, escorting and transportation officers shall read their instructions and clearly understand the reason that the detainee is being taken from the facility. The officers shall also discuss emergency and alternate

plans with the SIEA or authorized designee before beginning the detail.

All completed G-391 forms, or equivalents shall be filed in order by month, with the previous month's forms readily available for review, and shall be retained for a minimum of three years.

### 2. Documents That Accompany the Detainee

The Directive on Detainee Transfers explains the files and documents that must be prepared and organized in preparation for a detainee's transfer. ICE/ERO staff of the sending facility is required to complete a Detainee Transfer Checklist to ensure all procedures are completed and place a copy in the detainee's A-file or work folder.

Standard 7.4 "Detainee Transfers" also requires that a Medical Transfer Summary accompany the detainee. If official health records accompany the detainee, they are to be placed in a sealed envelope or other container labeled with the detainee's name and A-number and marked "Confidential Medical Records."

Transportation staff may not transport a detainee without the documents as required by the Directive on Detainee Transfers and Standard 7.4 "Detainee Transfers." Staff is responsible for delivering all required documents and the transfer summary to personnel at the receiving facility.

To ensure that the receiving facility also receives the detainee's files and other required documentation:

a. transportation officers may not accept a detainee without the required documents;

b. the receiving facility may refuse to accept a detainee without the required documents; and

c. the receiving facility must report any exceptions to the Field Office and the Deputy Assistant Director, Detention Management Division.

## H. Departure Scheduling and Security

The vehicle crew shall organize driving time so

detainees arrive at the designated meeting area on schedule.

Before transferring detainees from one facility to another, a designated officer shall inform the receiving office of:

1. the estimated time of departure and arrival (ETD/ETA);

2. the number of detainees in each of the following categories:

   a. new arrivals (remaining at the facility);

   b. drop-offs; and

   c. overnighters;

3. the total number of detainees;

4. any special-handling cases, with details about the special requirements (e.g., medications, restraints, special equipment); and

5. any actual or estimated delays in departure, and the accordingly revised ETA(s).

## I. Transfer of Funds, Valuables and Personal Property

In accordance with standards "2.1 Admission and Release" and "2.5 Funds and Personal Property," facility staff shall inspect and inventory the personal property of detainees transferring from one facility to another.

In addition, at the originating facility:

1. Staff shall ask each detainee whether he/she has in his/her possession all funds, valuables and other personal property listed on the property inventory form:

   a. If a detainee answers "yes," he/she may board the vehicle; or

   b. If a detainee claims missing funds, valuables, or personal property, the detainee shall remain at the facility until required paperwork is completed. Photocopies of completed forms

are sufficient documentation for the transfer to proceed.

2. Staff shall include, in the "checked baggage" section on each I-216, the I-77 numbers, to be verified by receiving facility staff;

3. The lead driver shall check the manifest against the number of packages by detainee name and A-number before signing the I-216 or placing the baggage on the bus.

4. In addition to the requirements of standard "2.5 Funds and Personal Property":

   a. Staff shall complete a separate I-77 for each piece of baggage, and shall record the detainee's name on the top, middle, and bottom portions; and

   b. Staff shall enact the following procedure for each piece of baggage and corresponding I-77 form, and:

      1) attach the string on the top of the I-77 to the corresponding piece of baggage, and secure the detainee's signature on the back of the I-77;

      2) attach the middle section to the copy of the I-385 that shall accompany the detainee to the final destination; and

      3) provide the bottom portion to the detainee as a receipt.

## J. Loading a Vehicle

### 1. Security and Occupancy

Armed officers shall be posted whenever detainees enter or exit a vehicle outside a secure area.

The facility administrator shall ensure that all vehicles are assigned an occupancy rating in compliance with the U.S. Department of Transportation (DOT). The number of detainees transported may not exceed the established occupancy level.

The escorting officer/assistant driver shall instruct the detainees about rules of conduct during the trip.

The lead driver shall be responsible for managing the detainees' move from the staging area into the vehicle. The number of available officers shall determine whether detainees move at one time or in groups.

### 2. Items Detainees May Keep in Their Possession

Ordinarily, detainees in transport may keep the following in their possession: jewelry (wedding rings and approved religious items), eyeglasses, and receipts for property and money (G-589, I-77). However, if the transporting officers determine that any of these items may compromise officer or detainee safety, the items shall be removed from the detainee's possession and returned to the detainee or placed in an appropriate storage area.

In some instances, the vehicle crew shall safeguard and dispense prescription medicines as prescribed, noting the detainee's name, A-number, date and time(s) dispensed, and by whom. Such notes shall be attached to the detainee's medical record or A-file.

### 3. Count, Identification, and Seating

To confirm the identities of the detainees they are transporting, the vehicle crew shall:

a. summon the detainee, by surname, to the vehicle;

b. ask detainee to state his/her complete name;

c. compare name and face with the Booking Card (I-385) or equivalent and attached photo and the Record of Persons and Property Transferred (I-216) or equivalent. If necessary, refer to the I-385 or equivalent for additional biographical information;

d. seat each detainee in accordance with written procedures from the facility administrator, with particular attention to detainees with physical or mental health conditions, or who may need to be afforded closer observation for their own safety;

e. to transport detainees with disabilities safely and securely, transportation officers shall make reasonable accommodations for them, in so far as is practicable;

f. seat detainees in restraints (whose documents or behavior in transit indicate a security risk) in the first seats behind the security screen and record in a log maintained by the officers the detainee's name, reason for using restraints, type of restraints, and times restraints were applied and removed;

g. conduct a visual count once all passengers are seated on board, and every time before resuming the trip after the vehicle makes a scheduled or unscheduled stop; and

h. assist detainees with disabilities and special needs to their designated seat and ensure females and minors are seated according to the directives in section T of this standard.

## K. Responsibilities En Route

### 1. Point of Contact

The next receiving office on the vehicle route serves as the contact point and is responsible for monitoring the vehicle's schedule.

Upon making contact with an arriving vehicle, the receiving officers shall certify, by signing the accompanying Form I-216, that they are taking custody of the specified detainees.

Each office shall develop and post written guidelines for tracing procedures to locate an overdue vehicle. If the vehicle does not arrive within range of the ETA, the contact point shall set the tracing procedures in motion.

### 2. Safety and Security

For safety purposes, all personnel shall remain seated while the vehicle is in motion.

The vehicle crew shall keep the cage doors locked whenever detainees are on board, and the assistant

driver is responsible for detainee oversight during transport. Officers must maintain a clear view of the entire vehicle compartment and remain alert for behavior that could jeopardize safety and security.

Detainees shall not have access to any personal baggage or packages while in transit (except as specified above in "Section J.2, Items Detainees May Keep in Their Possession").

A complete set of keys for every lock located in or on the vehicle shall travel with the vehicle at all times, in a secure place known to every transporting officer, and the crew shall keep bolt cutters in the forward compartment with the outer equipment for use in an emergency.

An armed officer may not enter the secure area of the vehicle. If he/she must enter that area, the officer shall first leave the weapon(s) with another officer for safekeeping or, if the vehicle is equipped with weapons lockers, in a locker.

### 3. Stops

During stops, which the vehicle crew shall keep to a minimum, detainees shall not leave the vehicle until the transporting officers have secured the area. When the detainees disembark, the officers shall keep them under constant observation to prevent external contact(s) and/or contraband smuggling or exchange. At least one officer shall remain in the vehicle when one or more detainees are present.

## L. Meals

The vehicle crew shall provide meals and snacks during any transfer that exceeds six hours. Officers shall consider when the detainees last ate before serving meals and snacks. Special considerations shall be given to minors, pregnant female detainees, and detainees who have medical conditions.

Meal times, the number of meals, and the types of meals provided shall be recorded. Officers also shall record the identifying information of any detainee who refuses a meal and that information shall be

appropriately documented.

The requirements specified in standard "4.1 Food Service" apply equally to food served in transit and in detention facilities.

In the interest of safety, detainees shall have no access to eating utensils (disposable or otherwise) while in transit.

Transporting officers shall observe safe-handling procedures at all times.

In transit, the crew shall store and serve food at the required temperatures. The crew shall maintain a constant supply of drinking water and ice in the water container(s), along with paper cups. A small number of disposable garbage receptacles (i.e., plastic bags) shall be kept in the driver's compartment, with the remainder stored in the equipment box located in the forward baggage compartment.

The food service administrator shall monitor the condition and routine cleansing and sterilizing of drinking-water containers, basins, latrines, etc., in vehicles to ensure compliance with standard "4.1 Food Service."

In an emergency, the transporting officers may purchase meals from a commercial source, obtaining receipts for later reimbursement.

## M. Vehicle Communication

Every vehicle shall be equipped with a functioning two-way radio. Every crew shall also carry at least one portable radio, so that officers can maintain contact if one or more must leave the vehicle. The vehicle's communications system shall also include a cellular phone for use when radio communications are degraded (e.g., in dead zones, on different frequencies).

## N. Vehicle Sanitation

Vehicles must be kept clean and sanitary at all times. The facility administrator shall establish the

procedures and schedule for sanitizing facility vehicles. Vehicle crew responsibilities include, but are not limited to:

1. dumping septic tank contents at the locations specified; and

2. maintaining an adequate supply of water and chemicals in the toilet at all times, including monitoring the inventory of chemical supplies stored in the forward baggage compartment.

## O. Officer Conduct

Recognizing the effect of personal appearance, speech, conduct and demeanor in communicating the appropriate sense of authority, assigned transportation staff shall dress, speak and act with the utmost professionalism. Assigned transportation staff shall conduct themselves in a manner that reflects positively on ICE/ERO.

The vehicle crew falls under the responsibility of the Field Office Director with jurisdiction at each facility en route, whether during an intermediate stop or at the final destination. This responsibility remains in effect until the vehicle's departure, and applies only to the current trip. If problems arise, the lead driver must contact the Field Office Director, or designee.

Transportation staff shall comply with all rules and procedures governing use of government vehicles. They shall not transport any personal items other than those needed to carry out their assigned duties during the trip. The possession or use of alcoholic beverages and illegal drugs is strictly prohibited.

Using common sense, transportation staff shall handle any crises that may arise. While treating all persons with courtesy and respect, they shall not compromise security or the accomplishment of their mission.

## P. Firearms Storage

Every facility administrator shall ensure that the on-site supply of gun lockers can accommodate the non-resident vehicle crews during stops at the facility.

## Q. Vehicle Equipment

*In SPCs and CDFs, the Field Office will provide the following equipment as appropriate for each vehicle:*

1. *mobile radio(s) able to communicate on frequencies used by Border Patrol and/or other law enforcement agencies;*

2. *cellular phone (backup communication system);*

3. *in the forward baggage compartment, of buses, two equipment boxes containing:*

   a. *(in box #1:) large bolt cutters, fuses, fan belts, jack, small hand tools, flashlight, lantern, rags, disposable trash bags, broom, ground cloth, two sets of coveralls, and work gloves (fleet officer/shop supervisor maintains inventory and checks written inventory quarterly);*

   b. *(in box #2:) transmission fluid, water for radiator, oil, toilet disinfectant, extra fire extinguisher(s), road flares, and reflectors (transporting officers record amount and date used and by whom on inventory sheets kept in box #2, likewise maintaining MSDS sheets as necessary); and*

   c. *other equipment to be added as necessary (transporting officers shall provide supervisors with written notification of inventory needs, including items that need replenishing or replacing).*

4. *first-aid equipment bag (disaster kit), auxiliary to the first-aid kit in the driver's compartment (officers shall document each emergency requiring first-aid treatment, including whether and how quickly the injured individual(s) received proper medical care);*

5. *emergency blankets equal to the rated capacity of the vehicle;*

6. *boarding bag containing extra forms, a camera that produces instant photographs, film, batteries,*

and emergency phone numbers for ICE/ERO offices, local police, state police, etc.;

7.  spare tire and snow chains (if applicable);

8.  restraining equipment, including, at a minimum:

    a.  on buses: 50 sets of waist chains; 50 sets of leg irons; and 2 sets of leg irons modified for use as hand cuffs (extra-large); or

    b.  on other vehicles: equipment equal to the rated capacity of the vehicle.

9.  All restraining equipment must be of high quality and must be maintained in good operating condition and kept in the forward baggage compartment with the other supplies; and

10. appropriate storage for firearms.

The vehicle crew shall determine which safety and security equipment to use in an emergency. The crew shall maintain restraints and other equipment in good working order.

## R. Use of Restraints

In accordance with this standard and "2.15 Use of Force and Restraints," officers shall use authorized techniques and common sense when applying restraints. To ensure safe and humane treatment, the officers shall check the fit of restraining devices immediately after application, at every relay point, and any time the detainee complains. Properly fitting restraints do not restrict breathing or blood circulation.

The officers shall double-lock the restraining device(s) and secure the handcuffs to the waist chain. Under no circumstances shall officers attach a restraining device to an immovable object, including, but not limited to, security bars, seats, steering wheel, or any other part of a vehicle. Officers carrying firearms shall exercise caution if close contact with a detainee becomes necessary in an emergency.

Barring exigent circumstances, transporting officers shall not handcuff women or minors unless they have shown or threatened violent behavior, have a history of criminal activity, or an articulable likelihood of escape exists. If an exception arises, the officers shall document the incident, recording the facts and the reasoning behind the decision.

## S. Emergency Situations

If an emergency occurs within a reasonable distance of an ICE/ERO office, assigned transportation staff shall make every effort to reach that office before taking extraordinary measures. However, if moving seems ill-advised or impossible, assigned transportation staff shall contact the office, stating their location and the nature of the problem, to ensure provisions for secure and immediate assistance.

If the situation is life-threatening, the vehicle crew shall not wait for help from an ICE/ERO office but shall take immediate action.

The facility administrator shall establish written procedures for transportation staff to follow during an en-route emergency. The written procedures shall cover the following scenarios.

### 1. Attack

If attacked, the vehicle crew must request assistance from the nearest law enforcement agency, continuing to drive until the vehicle becomes incapacitated. The transportation staff shall do everything possible to protect the safety of everyone in the vehicle.

### 2. Escape

If a detainee escapes, the assigned transportation staff shall not jeopardize the security of the remaining detainees by chasing the escapee. Instead, transportation staff shall notify the nearest ICE/ERO office, providing the escapee's name, A-number, height, weight, type of clothing, and direction of flight (if known). The office shall relay this information directly to local law enforcement

agencies.

The vehicle crew shall prepare a fully documented written report of the escape and/or attempted escape.

### 3. Hostages

If a hostage situation occurs on board the vehicle, at least one assigned transportation staff member shall secure the vehicle perimeter while another notifies the closest ICE/ERO office of the situation. The assigned transportation staff shall make every effort to determine who is involved and whether they are armed, relaying this information to the ICE/ERO office and local law enforcement agencies. Under no circumstances shall an assigned transportation officer bargain with or take orders from the hostage-taker(s), regardless of the status or rank of the hostage(s).

The vehicle crew shall hold all detainees on board until help arrives, in the event that the hostage-taker(s) allow(s) non-participants to disembark. Regardless of demands, the transportation staff shall not allow any hostage-taker(s) off the bus, with or without the hostages.

Because of the need to interview witnesses, examine the crime scene, etc., a hostage situation shall effectively end a transportation assignment. Once the hostage situation is resolved, assigned transportation staff shall receive instructions regarding how and where to proceed.

The vehicle crew's incident report shall note participants, witnesses and action taken.

### 4. Illness

If a detainee becomes ill while in transit, the assigned transportation staff shall take appropriate action and alert the receiving office in order to prepare to handle the situation.

If a detainee becomes ill while in transit and the illness requires immediate medical treatment (e.g., in the event of a heart attack), assigned

transportation staff shall request assistance from the nearest medical facility, local law enforcement agencies and emergency services. The transportation staff shall initiate life-saving procedures as time-appropriate, proceeding if security permits. The closest ICE/ERO office shall prepare procurement paperwork and make arrangements for hospitalization, security, etc.

### 5. Death

If a detainee dies while in transit, assigned transportation staff shall notify the originating or receiving office as soon as possible and shall follow procedures specified in standard "4.7 Terminal Illness, Advance Directives and Death."

The closest ICE/ERO office shall coordinate with other agencies, including the coroner, required to be on the scene when the body is removed from the vehicle. The removal must take place in the state where death occurred. Standard "4.7 Terminal Illness, Advance Directives and Death" specifies the procedures with which assigned transportation staff must comply.

### 6. Fire

In case of fire in or on the vehicle, the driver shall immediately stop the vehicle. The crew shall fight the fire with the on-board equipment. If necessary, assigned transportation staff shall request assistance from the local fire department and law enforcement agency. If the fire forces evacuation of the bus, the crew is responsible for maintaining accountability and security while removing detainees in an orderly fashion.

### 7. Riots

If a riot, fight, or any disturbance occurs on the bus, the assistant driver shall order the detainees to cease and the driver shall attempt to move the bus to the side of the road. If necessary, the crew shall request assistance from the local law enforcement agency. Efforts shall be made to determine the instigators, number of detainees involved, names and A-

numbers.

*When sufficient assistance is available, the assigned transportation staff shall attempt to regain control, using only as much force (e.g., with restraints or pepper spray) as necessary. Assigned transportation staff may not enter the screened area bearing arms.*

### 8. Traffic Accident

*The facility administrator shall establish written procedures for vehicle crews involved in traffic accidents.*

*After an accident, assigned transportation staff shall secure the area, request assistance from a local law enforcement agency, and obtain medical assistance for anyone injured. Regardless of the severity of the accident, the assigned transportation staff must report the accident to the local law enforcement agency and the nearest ICE/ERO office. They must also obtain a police report for the record, in case of future allegations or lawsuits against ICE/ERO or individual officers. The driver must record witnesses' names, addresses, and phone numbers on Form SF-94.*

*The assigned transportation staff shall discuss the issue of responsibility for the accident only with their chain of command. Upon arriving at the receiving office, the assigned transportation staff shall report the accident to the Field Office Director, or designee and prepare the required forms.*

### 9. Vehicle Failure

*The facility administrator shall develop written procedures for assigned transportation staff to follow when the vehicle develops mechanical problems en route.*

*Crew in an ICE/ERO-owned vehicle that develops mechanical problems en route shall attempt to isolate the problem, and shall then contact the nearest ICE/ERO office. Unless the vehicle constitutes a traffic hazard in its current location, the crew shall not move it until instructed to do so. If the assigned transportation staff fail to connect with the ICE/ERO office, they shall try to reach a local law enforcement*

*agency.*

### 10. Natural Disasters

*The facility administrator shall develop written procedures for transportation officers to follow in the event of severe weather or a natural disaster.*

*In a flood, dust storm, ice storm, tornado or other natural disaster, the vehicle crew shall contact state authorities to assess road conditions along the planned route.*

*If driving conditions are unlikely to improve, the vehicle crew shall look for a safe area to park the vehicle and request further instructions from the receiving office.*

*Should it become necessary to exit the vehicle, the detainees must be directed to a safe area. In such a case, officers must maintain a heightened alertness for the duration of the emergency. When the emergency has passed, the assigned transportation staff shall return all detainees to the vehicle and conduct an accurate count.*

## T. Transportation of Females and Minors

The facility administrator shall develop written procedures for vehicle crews transporting females.

Except for emergent or extraordinary circumstances as approved by the Field Office Director(s), females may not be transported by bus for more than ten hours. Otherwise, transportation by auto or van is required, with frequent breaks.

Females shall be seated in the front of the vehicle.

Minors shall be separated from unrelated adults at all times during transport and seated in an area of the vehicle near officers and under their close supervision.

Assigned transportation staff shall search a detainee of the opposite sex only in extraordinary circumstances and only when a same-sex officer is not available.

When transporting detainees of the opposite gender,

assigned transportation staff shall call in their time of departure and odometer reading; and then do so again upon arrival, to account for their time.

Except in emergency situations, a single transportation staff member may not transport a single detainee of the opposite gender. Further, if there is an expectation that a pat down will occur during transport, an assigned transportation staff member of the same gender as the detainee(s) must be present.

# 2.1 Admission and Release

## I. Purpose and Scope

This detention standard protects the community, detainees, staff, volunteers and contractors by ensuring secure and orderly operations when detainees are admitted to or released from a facility.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

For all types of facilities, procedures that appear in italics with a marked (**) on the page indicate optimum levels of compliance for this standard.

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Each detainee shall be screened to ensure facility safety, security and good order. Searches should be conducted in the least-intrusive manner possible. Absent reasonable suspicion that a detainee is concealing contraband, detainees shall not be strip searched when entering ICE detention facilities.

2. Each detainee's personal property and valuables shall be checked for contraband, inventoried, receipted and stored.

3. Each detainee's identification documents shall be provided to ICE/ERO and, as appropriate a copy placed in the detention file.

4. Medical and mental health screening shall be conducted to identify requirements for medical care, special needs and housing, and to protect the health of others in the facility.

5. Each detainee shall undergo screening interviews and shall complete questionnaires and other forms in accordance with the PBNDS.

6. Each detainee shall be given an opportunity to shower and shall be issued clean clothing, bedding, towels, and personal hygiene items.

7. Each newly admitted detainee shall be kept separated from the general population until health, housing and custody classification is completed but not longer than 12 hours.

8. Each newly admitted detainee shall be oriented to the facility through written material on facility policies, rules, prohibited acts and procedures and, in some facilities, by viewing an orientation video.

9. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including

bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

10.     Detainees shall be released, removed or transferred from a facility only when staff have followed specified procedures and completed required forms.

11. The facility shall maintain accurate records and documentation in an ICE/ERO approved electronic format on all detainees' admission, orientation, discipline and release.

Detainees shall have access to one free telephone call during the admission process as provided in the directive on "Detainee Transfers."

## III. Standards Affected

This detention standard replaces "Admission and Release" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-2A-08, 2A-17, 2A-19, 2A-20, 2A-21, 2A-22, 2A-23, 2A-24, 2A-25, 2A-26, 2A-27, 2A-28, 2A-29, 2A-30, 2A-32, 2A-33, 2C-03, 2C-04, 2C-05, 3A-01, 4B-02, 4B-06, 4C-29, 5B-18, 6A-05, 7D-11, 7D-20.

ICE/ERO *Performance-based National Detention Standards 2011:*

- "2.2 Custody Classification System";

- "2.3 Contraband";

- "2.5 Funds and Personal Property";

- "2.10 Searches of Detainees";

- "4.5 Personal Hygiene";

- "5.6 Telephone Access"; and

- "6.1 Detainee Handbook."

"*Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities,*" 79 Fed. Reg. 13100 (Mar. 7, 2014).

## V. Expected Practices

## A. Overview of Admission, Orientation and Release

As detailed below, each facility is required to implement written policies and procedures for the intake and reception of newly arrived detainees, and to provide these detainees with information about facility policies, rules and procedures. At intake, detainees shall be searched, and their personal property and valuables checked for contraband, inventoried, receipted and stored. Each detainee's identification documents shall be secured and given to ICE/ERO. Medical screening protects the health of the detainee and others in the facility, and the detainee shall be given an opportunity to shower and shall be issued clean clothing, bedding, towels and personal hygiene items.

Each new arrival shall undergo screening interviews, and shall complete questionnaires and other forms. For safety, security and good order of the facility, each newly arrived detainee shall be kept separated from the general population until he/she is classified and housed accordingly.

Each new arrival shall be oriented to facility operations through written material in the form of an *ICE National Detention Handbook* or equivalent, covering such issues as access to health care services, sick call and grievance procedures, and

the facility's rules and prohibited acts. In some facilities, they may have an opportunity to view an orientation video.

Before a detainee's release, removal or transfer from a facility, staff must follow specified procedures and complete various forms.

## B. Intake and Reception

### 1. Admission Processes

All facilities shall have in place a written policy and procedure related to the admissions process, which shall include intake and admissions forms and screening forms. Staff members shall be provided with adequate training on the admissions process at the facility. Admission processes for a newly admitted detainee shall include, but not be limited to:

a. recording basic personal information;

b. criminal history check;

c. photographing and fingerprinting, including notation of identifying marks or other unusual physical characteristics;

d. medical and mental health screenings; and

e. inventory of personal property.

### 2. Screening of Detainees

All detainees shall be screened upon admission; screening shall ordinarily include:

a. screening with a metal detector;

b. a thorough pat search; and

c. a search of each detainee's clothing (and issuance of institutional clothing).

Staff shall permit the detainee to change clothing and shower in a private room without being visually observed by staff, unless the staff member has reasonable suspicion to search the detainee in accordance with the following section on "Strip Searches" and standard "2.10 Searches of Detainees." A staff member of the same gender shall be present

immediately outside the room where the detainee changes clothing and showers, with the door ajar to hear what transpires inside. The staff member must be prepared to intervene or provide assistance if he/she hears or observes any indication of a possible emergency or contraband smuggling.

To maintain standards of personal hygiene and to prevent the spread of communicable diseases and other unhealthy conditions within the housing units, where possible, every detainee shall shower before entering his/her assigned unit. During the detainee's shower, an officer of the same gender shall remain in the immediate area as described above.

### 3. Search of Clothing and Personal Items

Staff shall focus search efforts on commonly used hiding and smuggling places, such as pockets, waistbands, seams, collars, zipper areas, cuffs and shoe exteriors and interiors, including under the inner soles.

Staff shall also inspect all open containers, and inventory and store factory-sealed durable goods in accordance with facility procedures.

Items discovered during the search of a detainee or his/her property shall be identified as:

a. contraband, and processed in accordance with standard "2.3 Contraband"; or

b. funds, valuables or other personal property, to be kept in the detainee's possession or inventoried, receipted, stored or mailed to an address provided by the detainee, in accordance with standard "2.5 Funds and Personal Property."

### 4. Strip Searches

a. Description
Staff shall not routinely require a detainee to remove clothing or require a detainee to expose private parts of his/her body to search for contraband.

A strip search must take place in an area that affords privacy from other detainees and from

2.1 | Admission and Release                    51                    PBNDS 2011
*(Revised December 2016)*

facility staff who are not involved in the search. Observation must be limited to members of the same sex.

The articulable facts supporting the conclusion that reasonable suspicion exists must be documented.

During all strip searches, a Form G-1025 (Record of Search) or its equivalent shall be completed.

b. Reasonable Suspicion

Officers must obtain supervisory approval before conducting strip searches during admission or release. Staff may conduct a strip search during admission and release, only when there is reasonable suspicion that contraband may be concealed on the person. "Reasonable suspicion" means suspicion based on specific and articulable facts that would lead a reasonable detention officer to believe that a specific detainee is in possession of contraband. This "reasonable suspicion" standard is a more permissive (lower) standard than the "probable cause" standard, but it nevertheless requires more than a mere hunch. It must be based on specific and articulable facts— along with reasonable inferences that may be drawn from those facts—that the officer shall document in Form 1025 (or contractor equivalent).

No simple, exact or mathematical formula for reasonable suspicion exists. In order for an officer to ascertain whether or not there is reasonable suspicion to believe that a detainee may have contraband that could pose a threat to him/herself, staff members or other detainees, the officer must review the totality of the individual's circumstances. As part of this process, an officer could consider certain factors, including but not limited to:

1) observation of unusual, surreptitious or suspicious appearance or behavior;

2) evasive or inconsistent responses to questions

by law enforcement officers;

3) discovery of a weapon or other contraband during a pat search, metal detector scan or other non-intrusive search;

4) the detainee's criminal history, particularly felony or misdemeanor convictions of crimes involving violence, weapons, contraband and illegal substances. Ordinarily, convictions for minor or non-violent offenses shall not be the only basis for reasonable suspicion;

5) the detainee's detention in concurrence with an arrest for a crime of violence; or the detainee's arrest in possession of a weapon or contraband such as illegal drugs;

6) information from law enforcement databases or from other reliable sources suggesting that the detainee has affiliations with terrorist organizations, criminal gangs or organized crime; or

7) the detainee's history during confinement, particularly of violence or possession of contraband.

The lack of identity documents alone does not ordinarily constitute reasonable suspicion.

Before strip searching a detainee to search for contraband, an officer shall first attempt to resolve his/her suspicions through less intrusive means, such as a thorough examination of reasonably available ICE, CBP and other law enforcement records; a pat-down search; a detainee interview; or (where available) the use of a magnetometer or Boss chair. The officer shall document the results of those other, less intrusive, search methods on Form G-1025 (or contractor equivalent).

c. Gender of Inspector Staff of the same gender as the detainee shall perform the search, except when circumstances are such that a delay would mean the likely loss of contraband. Except in the case of an emergency or exigent circumstance, a

staff member may not perform strip searches of detainees of the opposite gender. When a member of the opposite gender from the detainee must perform a strip search, a staff member of the same sex as the detainee must be present.

When staff members of the opposite gender conduct a strip search, staff shall document the reason for the opposite-gender search in any logs used to record searches and in the detainee's detention file. Special care should be taken to ensure that transgender detainees are searched in private.  **Whenever possible, medical personnel shall be present to observe the strip search of a transgender detainee.*

### 5. Search of Baggage and Personal Property

In accordance with standard "2.5 Funds and Personal Property," each facility shall have a procedure for taking inventory and receipt of detainee baggage and personal property (other than funds and valuables, which are addressed below).

Identity documents, such as passports, birth certificates and driver's licenses, shall also be inventoried and given to ICE/ERO staff.

a.  Facility staff shall prepare an itemized list of the detainee's baggage and personal property using the personal property inventory form, or its equivalent. If a detainee has no baggage, staff shall use a facility container to store his/her personal property.

### 6. Missing Detainee Property

In accordance with standard "2.5 Funds and Personal Property," each facility shall institute procedures for inventory and receipt of detainee funds and valuables.

When a newly arrived detainee claims his/her property has been lost or left behind, staff shall complete a Form I-387, "Report of Detainee's Missing Property." IGSA facilities shall forward completed Forms I-387 to ICE/ERO.

### 7. Medical Screening

To protect the health of the detainee and others in the facility, each facility shall medically screen each newly arrived detainee utilizing IHSC Form 795A, or equivalent, in accordance with standard "4.3 Medical Care."

### 8. Establishment of a Detainee Detention File

As part of the admission process, staff shall open a detainee detention file that shall contain all paperwork generated by the detainee's stay at the facility, in accordance with standard  "7.1 Detention Files."

## C. Clothing and Bedding

In accordance with standard "4.5 Personal Hygiene," staff shall issue clothing and bedding items that are appropriate for the facility environment and local weather conditions.

## D. Classification

In accordance with standard "2.2 Custody Classification System" staff shall use the documentation accompanying each new arrival for identification and classification purposes. If the classification staff members are not ICE/ERO employees, ICE/ERO shall provide only the information needed for classification.

Under no circumstances may non-ICE/ERO personnel have access to the detainee's A-file.

The classification process determines the appropriate level of custody for each detainee. Once this is established, staff can issue the detainee clothing or a wristband in the appropriate color for his/her classification level, if applicable.

New detainees shall remain segregated from the general population during the orientation and classification period, to the maximum extent practicable.

## E. Admissions Documentation

An Order to Detain or an Order to Release the detainee (Form I-203 or I-203a), bearing the appropriate ICE/ERO Authorizing Official signature, must accompany each newly arriving detainee. Medical records and/or a book-in packet must accompany the arriving detainee, unless ICE/ERO and facility officials have authorized other arrangements.  Staff shall prepare specific documents in conjunction with each new arrival to facilitate timely processing, classification, medical screening, accounting of personal effects and reporting of statistical data.

*Forms requiring completion include, but are not limited to, the Alien Booking Record (Form I-385 or equivalent); the housing assignment card and any others used by the booking entity. Based on a one-on-one interview with the newly arrived detainee, the specially trained detention officer or designated medical officer shall also complete the IHSC Intake Screening Form I-795A or comparable form.*

*For SPCs the following criteria shall apply; CDFs and IGSAs shall develop an equivalent process for processing detainees:*

*The Form I-385 or equivalent, Alien Booking Record or booking card, contains blocks in which the processing officer shall enter information during the admissions process. In some circumstances, the arresting or delivering office shall enter biographical information, including name, sex, age, date of birth, birthplace, country of citizenship, A-number, medical alert, date apprehended, booking office, date of transfer and places involved in transfer (origin and destination).*

*If the arresting/delivering officer has not initiated a Form I-385 or equivalent, the admissions processing officer is responsible for its completion, excluding the release information. The admissions processing officer shall:*

a. *circle or write the name of the facility receiving the detainee;*

b. *complete the biographical information in blocks 1, 2, 3, 4, 5 and 6 with information provided in the detainee's A-file or I-385. (The detainee's presence is not required for this step);*

c. *attach the detainee's photograph to the right of the biographical data;*

d. *record detainee responses (checking "yes" or "no") to section I interview questions covering recent doctor visits, hospital stays, drug and alcohol abuse and other physical and mental health conditions and concerns (on the forms for male detainees, strike the pregnancy question and enter "N/A");*

e. *mark the diagrams of the human anatomy, printed to the right of section I, to indicate the approximate locations of any bruises, scars, cuts and other marks and distinguishing characteristics observed on the detainee (if the officer who searches the detainee is not the officer completing the questionnaire, he/she shall likewise mark the diagram);*

f. *respond "yes" or "no" to the questions in section II, based on general observations of the detainee during the admissions process so far (e.g., compliance with orders, responsiveness, demeanor, etc.);*

g. *circle the appropriate action of the above questioning in "Section III," below:*

1) *"General Population"—applicable when 100 percent of responses to questions in sections I and II are negative ("no" circled); this authorizes the detainee's release into the facility's general population after health screening has been completed, once the classification level is established;*

2) *"General Population with Referral to Medical Care"—applicable when one or more responses to questions in sections I and II are positive ("yes" circled) and,*

though this could indicate any of several conditions, none causes immediate concern; the detainee's release into the facility's general population is authorized, with follow-up by the medical department;

3) "Referral for Immediate Medical Attention"—applicable when one or more positive responses in sections I and II cause immediate concern for the detainee's physical or mental health; the officer informs the shift supervisor of the need for immediate medical attention; the shift supervisor then contacts the medical department, describes the situation and does as instructed; and

4) "Isolation until Medically Evaluated" — applicable when a positive response in section I or II suggests a contagious disease, or when the detainee's behavior during questioning seems threatening to self or others; the officer prepares an administrative segregation order and, in accordance with facility procedures, the detainee is placed in the Special Management Unit (SMU) pending medical review. The medical review shall take place as soon as practical, but no later than 24 hours after isolation, even if this means involving on-call medical staff.

h. after completing the form, provide signature and ID number in the signature block and, if the signature is illegible, neatly print name above it;

i. print onto a color-coded wristband, if applicable, the detainee's information, including but not limited to the following: name and A-number; housing and bunk assignment; and the Form I-77 number; and

j. strap the color-coded wristband, if applicable, around the detainee's wrist in a way that shall not cause circulation problems. Advise the

detainee that the wristband must remain on his/her wrist until removed by an officer, and that disregarding this requirement may lead to disciplinary action.

## F. Orientation

All facilities shall have a method to provide ICE/ERO detainees an orientation to the facility as soon as practicable, in a language or manner that detainees can understand. Orientation procedures in CDFs and IGSAs must be approved in advance by the local ICE/ERO Field Office.

At SPCs, CDFs, and dedicated IGSAs, the facility administrator shall produce an orientation video that covers the required topics listed below and shall screen it for every detainee.  The video shall generally be in English and Spanish and provisions shall be made for other significant segments of the population with limited English proficiency. The facility administrator shall establish procedures that ensure the availability of an interpreter for a detainee who does not speak the language(s) used in the video. The interpreter shall be available for orientation and scheduled meetings with the detainee. Outside sources may be used if necessary to ensure compliance with this requirement, consistent with security measures.

The orientation shall include the following information:

1. an overview of the facility operations that most affect the detainees;

2. typical detention-case chronology (what most detainees can expect);

3. authority, responsibilities and duties of security officers;

4. procedures for the detainee to contact the deportation officer handling his/ her docket;

5. availability of pro bono legal services, and how to pursue such services in the facility, including accessing "Know Your Rights" presentations

(e.g., location of current listing);

6. standards of conduct, including acceptable and unacceptable detainee behavior, with an overview of other rules and requirements;

7. disciplinary procedures, including criminal prosecution, grievance procedures, appeals process;

8. the facility's Sexual Abuse and Assault Prevention and Intervention Program, including (at a minimum):

   a. self-protection;

   b. prevention and intervention;

   c. reporting sexual abuse or assault; and

   d. treatment and counseling.

9. introduction to the individual departments (e.g., recreation, medical); the various housing units; and food services, including availability of diets which satisfy religious requirements;

10. schedule of programs, services and daily activities, including visitation, telephone usage, mail service, religious programs, count procedures, access to and use of the law library and the general library, and sick-call procedures;

11. voluntary work program, with specific details including how to volunteer; and

12. how the detainee can file formal complaints with the DHS Office of the Inspector General (OIG).

Facility administrators at non-dedicated facilities shall, to the extent practicable, produce an orientation video as described above and screen it for all detainees. Facility administrators at non-dedicated facilities shall screen for all detainees any orientation video provided to them by ICE/ERO.

Following the orientation, staff shall conduct a question-and-answer session. Staff shall respond to the best of their ability. Under no circumstance may staff give advice about a legal matter or recommend a professional service. Staff shall also demonstrate clearly to detainees how to use the telephone system to make telephone calls, including free telephone calls to consulates and free legal service providers.

## G. Detainee Handbook

1. In accordance with standard "6.1 Detainee Handbook," every facility shall issue to each newly admitted detainee a copy of the *ICE National Detainee Handbook* (handbook) and local supplement that fully describes all policies, procedures and rules in effect at the facility.

2. The handbook and supplement shall provide a more detailed discussion of the material covered in the video overview. The handbook and supplement shall be in English and Spanish or English and provisions for written translation shall be made for other significant segments of the population with limited English proficiency. Detainees shall be allowed to keep the handbook and supplement with them in their living quarters.

3. If a detainee does not understand the language of the handbook and supplement, the facility administrator shall provide a translator or access to interpreter services as soon as possible for the purpose of orientation. When needed, and in compliance with security regulations, the facility administrator may contact an outside source.

4. As part of the admissions process, the detainee shall acknowledge receipt of the handbook and supplement by signing where indicated on the back of the Form I-385 (or on a separate form).

   a. The designated spot on the back of the Form I-385 may be a stamped entry containing the date of issue; handbook number, if applicable; initials and ID number of the issuing officer; detainee-signature line; and space for date of return and the receiving officer's initials and ID number.

   b. The stamp used for the handbook and supplement issuance may contain an identical

section for locker-key issuance.

c. If a form is used instead of a stamp or comparable notation on the back of the Form I-385, the officer must record the detainee's name and A-number in addition to the above-required information. The form is maintained in the detainee's detention file.

## H. Releases

Facility staff assigned to processing must complete certain procedures before any detainee's release, removal, or transfer from the facility. Necessary steps include, but are not limited to:  completing out-processing forms; closing files and fingerprinting; returning personal property; reclaiming facility-issued clothing, identification cards, handbooks, and bedding; and checking wants and warrants. ICE/ERO shall approve all facility release procedures.

1. A detainee's out-processing begins when release processing staff receive the Form I-203, "Order to Detain or Release," signed by an authorizing official.

2. The requesting ICE/ERO official is responsible for having all documentation required for the detainee's release or transfer complete and ready for use by out-processing officers.

3. After verifying the documents, the facility shall use the most expeditious communication system (e.g., public address system) to instruct the detainee to report to the nearest officer.

4. Provide detainee medications and a detailed medical care summary as described in "Medical Records" in Standard "4.3 Medical Care."

5. The officer shall check the wristband of the detainee, who reports as instructed, to verify his/her identity.

6. The officer shall advise the detainee to remove all facility-issued items, including the handbook, supplement and locker key (if issued) and personal property from the housing unit, and

after doing so, to return to the officer for further instruction. If the detainee is physically unable to remove his/her facility-issued and personal items, assistance shall be provided.

7. The officer shall remove the detainee's housing-identification card from the file system and turn it over to the detainee. The detainee will then report to the processing office.

8. At this stage of the detainee's out-processing, the control officer shall remove any Form G-589 receipts from the detainee's detention file. The control officer shall give the Form G-589(s) to the shift supervisor for further action, and send the remaining documents to the processing office.

a. The shift supervisor shall compare the information on the blue portion of the Form G-589 with that on the pink triplicate portion and, if they match in all particulars, shall remove the pink copy from its safeguards.

b. After verifying the information on each portion of the G-589, the shift supervisor shall remove the funds and valuables from safeguards, attach the two portions of the Form G-589, make the necessary log entries, place the items in a secure container, and deliver the container to the processing officer.

9. When the detainee arrives in the processing office, the processing officer shall verify the detainee's identity, and take physical possession of the housing-identification card, handbook, supplement and locker key (if issued) handed back by the detainee. The officer shall then date and sign the back of the Form I-385 or specified form and remove the bottom portion(s) of the detainee's Form I-77(s).

a. The Form I-77 authorizes the removal from storage of the detainee's personal property, as inventoried on the form.

b. Before returning the property to the detainee,

the officer shall explain the form and require the detainee to sign his/her name on the bottom of the Form I-77 or on a separate piece of paper. The officer shall compare this signature with the signature on the back of the top portion of the I-77 that is attached to the property. If the signatures appear the same, the officer shall return the items to the detainee.

c. The detainee shall check his/her property against the original personal property inventory form. If all property is correctly accounted for, the detainee shall sign the inventory sheet, a copy of which the officer shall place in the detainee's detention file. The detainee shall be provided a copy of the signed form upon request.

d. If after property is checked against the detainee's property inventory sheet Form G-589, I-77 or equivalent, it is determined that property is missing or unaccounted for, the detainee shall complete a Form I-387 'Report of Detainee's Missing Property' or equivalent. The detainee shall be informed as to how the property shall be returned to him/her when/if it is located. The detainee shall be provided instructions on the appropriate office to contact in order to follow-up on the government's search for the detainee's lost property, in accordance with standard "2.5 Funds and Personal Property."

10. The detainee shall be permitted to change into his or her own clothing in a private part of the processing area, within earshot but not eyeshot. The staff shall:

a. instruct the detainee to remove all facility-issued clothing, and to dress in his/her personal clothing;

b. inspect the condition and quantity of facility-issued clothing, bedding, etc., surrendered by the detainee;

c. place the returned clothing and bedding, excluding the mattress, in the bin designated for soiled items—these shall be laundered and sanitized as appropriate before reuse;

d. set aside the plastic-covered or -sheathed mattress for rinse and wipe-down with disinfectant or other solution prescribed by the medical department; and

e. in the event property is missing, provide Form I-387 to the detainee.

11. The processing officer shall compare the blue and pink copies of the Form G-589 with the white copy presented by the detainee. If the detainee's documentation is in order, the officer shall return the detainee's funds and secure the detainee's signature, confirming receipt of the inventoried property on the blue copy of the G-589. The facility shall retain all three copies (blue, pink and white) of the closed-out G-589 in the detainee's detention file.

If the detainee claims to have lost the white portion of the Form G-589, the processing officer shall note this on the blue copy, which he/she and the detainee shall certify by signing immediately below. Staff should ensure that the content of the form is clear and that the detainee is made fully aware of what he/she is signing in a language or other manner which the detainee can understand.

## I. Releases or Removals

The time, point and manner of release from a facility shall be consistent with safety considerations and shall take into account special vulnerabilities. Prior to release, the detainee shall be notified of the upcoming release and provided an opportunity to make a free phone call to facilitate release arrangements.

Facilities that are not within a reasonable walking distance of, or that are more than one mile from, public transportation shall transport detainees to

local bus/train/subway stations prior to the time the last bus/train leaves such stations for the day. If public transportation is within walking distance of the detention facility, detainees shall be provided with an information sheet that gives directions to and describes the types of transportation services available. However, facilities must provide transportation for any detainee who is not reasonably able to walk to public transportation due to age, disability, illness, mental health or other

vulnerability, or as a result of weather or other environmental conditions at the time of release that may endanger the health or safety of the detainee.

Detainees will be provided with a list of legal, medical, and social services that are available in the release community, and a list of shelter services available in the immediate area along with directions to each shelter.  Detainees will be released with one set of non-institutionalized, weather-appropriate clothing.

# 2.2 Custody Classification System

## I. Purpose and Scope

This detention standard protects detainees, staff, contractors, volunteers and the community from harm, and contributes to orderly facility operations, by requiring a formal classification process for managing and separating detainees based on verifiable and documented data.

In accordance with the requirements and guidelines of this detention standard, each facility is required to have in place a formal detainee classification system that starts at admission and is based on verifiable and documented information. Each detainee's custody classification must be determined through application of the ICE custody classification process described herein or a similar locally established system approved by ICE/ERO, to categorize detainees and physically separate them in accordance with those classification levels.

Some factors relevant to custody classification are part of the broader ICE intake risk assessment process that often begins before a detainee's arrival at a detention facility. Classification of ICE detainees also occurs in a variety of contexts and may be performed by a variety of personnel, including ICE or facility staff. The general principles articulated in this standard apply to all facilities that ICE uses. Facilities are also encouraged to utilize the ICE Custody Classification Worksheet, Instructions, Severity of Offense Scale, and Disciplinary Offenses Involving Violence or Behavior Representing a Threat to the Facility attached as Appendices 2.2.A, 2.2.B, 2.2.C, and 2.2.D. Facilities which receive a recommended custody classification or custody classification score generated by an ICE Field Office are encouraged to follow it.

"Classification" and "reclassification" are initial and periodic staff reviews, not only of a detainee's custody classification, but of that detainee's general case status, disciplinary record, housing, special needs, adjustment to institutional living, opportunities for voluntary work assignments and general well-being.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices"):

1. The community, staff, contractors, volunteers and detainees shall be protected from harm through a formal classification process, for managing and separating detainees by threat risk and special vulnerabilities or special management concerns that is based on verifiable and documented data.

2. Each detainee shall be expeditiously classified upon admission to the facility and before being admitted into general population housing.

3. Detainees shall be protected from harm by assigning detainees housing with persons of similar backgrounds and criminal history.

4. Each detainee's custody classification, housing, and work assignment shall be reviewed at regular intervals, as well as when required by changes in the detainee's behavior or circumstances, and upon discovery of additional, relevant information.

5. Detainees shall be able to appeal their custody classification level and other assignments.

6. Detainees with special vulnerabilities will be identified and consideration will be given to providing appropriate accommodation.

7. Detainees shall be assigned to the least restrictive housing unit consistent with facility safety and security.

8. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

# III. Standards Affected

This detention standard replaces "Classification System" dated 12/2/2008.

# IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-2A-30, 2A-31, 2A-32, 2A-33, 2A-34.

ICE/ERO *Performance-based National Detention Standards 2011:*

- "2.11 Sexual Abuse and Assault Prevention and Intervention";

- "2.12 Special Management Units";

- "2.13 Staff-Detainee Communication";

- "5.8 Voluntary Work Program"; and

- "6.2 Grievance System."

"*Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities,*" 79 Fed. Reg. 13100 (Mar. 7, 2014).

# V. Expected Practices

## A. Standards

Each facility shall develop and implement a system for classifying detainees in accordance with this Detention Standard. Facilities may rely on the ICE Custody Classification Worksheet, or a similar locally established system, subject to ICE/ERO evaluation and approval, as long as the classification criteria are objective and uniformly applied, and all procedures meet ICE/ERO requirements.

Each facility administrator shall require that the facility's classification system ensures the following:

1. All detainees shall be classified upon arrival and before being admitted into the general population of the facility. ICE/ERO staff shall provide facilities the data needed from each detainee's file to complete the classification process;

2. All facility staff assigned to classification duties shall be adequately trained in the facility's classification process. Each staff member with detainee in-processing responsibilities shall receive on-site training;

3. Any detainee who cannot be classified because of missing information at the time of processing (e.g., the results of a criminal record check) shall be kept separate from the general population. Once the needed information is obtained, classification shall be expedited, and the detainee may be housed in the general population, if warranted;

4. Each detainee's classification shall be reviewed and approved by a first-line supervisor or classification supervisor; and

5. Detainees shall be assigned to housing, offered recreation and other activities, and assigned to voluntary work, according to their classification levels.

## B. Custody Classification Score

"Classification" is a process of categorizing detainees as low, medium or high custody and housing them accordingly. Research has shown that discretionary decisions about custody classification are more objective and consistent when guided by a process that systematically uses verifiable and documented information, and scores those factors appropriately.

In making classification decisions, facilities use the recommended custody classification generated by the ICE Field Office, or utilize the ICE Custody Classification Worksheet (or similar system) to systematically produce a classification score for each detainee.

## C. Classification Information

During the classification process, staff shall reference facts and other objective, credible evidence documented in the detainee's A-file, work-folders, ICE automated records systems, criminal history

checks, or other objective sources of information. Relevant considerations include any current criminal offense(s), past criminal offense(s), escape(s), institutional disciplinary history, documented violent episode(s) and/or incident(s), medical information or a history of victimization. Personal opinion, including opinions based on profiling, familiarity or personal experience, may not be considered in detainee classification.

Special consideration shall be given to any factor that would raise the risk of vulnerability, victimization or assault. Detainees who may be at risk of victimization or assault include, but are not limited to, persons with disabilities, persons who are transgender, elderly, pregnant, suffering from a serious medical or mental illness, and victims of torture, trafficking, abuse, or other crimes of violence. This process should incorporate the requirements in Standard 2.11 "Sexual Abuse and Assault Prevention and Intervention" regarding assessment of risk for victimization or perpetration of sexual abuse or assault.

Consistent with Standard 4.8 "Disability Identification, Assessment, and Accommodation," the facility shall use any information about identified disabilities in making classification and housing decisions. Detainees with disabilities shall be housed in the least restrictive and most integrated setting possible consistent with facility safety and security, and provided an equal opportunity to participate in or benefit from the facility's programs and activities.

When making classification and housing decisions for a transgender or intersex detainee, staff shall consider the detainee's gender self-identification and an assessment of the effects of placement on the detainee's health and safety. A medical or mental health professional shall be consulted as soon as practicable on this assessment. Placement decisions of transgender or intersex detainees should not be based solely on the identity documents or physical anatomy of the detainee, and a detainee's self-

identification of his/her gender and self-assessment of safety needs shall always be taken into consideration as well.  The placement shall be consistent with the safety and security considerations of the facility, and placement and programming assignments for each transgender or intersex detainee shall be reassessed at least twice each year to review any threats to safety experienced by the detainee.

As appropriate, ICE/ERO offices shall provide non-ICE/ERO facilities with the relevant information for the facility to classify ICE/ ERO detainees.

Classification staff shall utilize translation services when necessary.

### 1. Examples of Acceptable Forms and Information

- I-862—Notice to Appear (charging document for aliens in removal proceedings);

- I-221—Order to Show Cause (OSC/WA) and Notice of Hearing, with bond conditions (charging documents for aliens in deportation proceedings);

- I-110 and I-122—Notice to Applicant for Admission, Detained for Hearing before Immigration Judge (charging documents for aliens in exclusion proceedings);

- Form I-203—Order to Detain or Release;

- All conviction documents relating to charges on Form I-221, I-862, and I-110/122 above;

- Criminal History (Rap Sheet)—NCIC/CII/TII, etc.;

- Final order of removal; and

- Any Executive Office for Immigration Review (EOIR) or other official record or observation that is verifiable.

### 2. Examples of Unacceptable Sources of Information that May Not Form the Sole Basis of Classification

- A written or oral account from any interested party, unless and until it has been officially confirmed;

- Unconfirmed and unverified information provided by the detainee; and

- The unverified personal opinion of officers and other personnel.

## D. Intake Processing and Initial Classification

The facility shall segregate the detainee from the general population pending receipt and processing of information needed for classification, as specified above.

The initial classification process and initial housing assignment shall be completed within 12 hours of admission to the facility. If the process takes longer, documentation shall be maintained to explain the cause of the delay and to indicate that the detainee shall be housed appropriately.

After completion of the in-processing health screening form (IHSC-795A or equivalent), the classification officer assigned to intake processing shall review information provided by ICE/ERO and complete a custody classification worksheet or equivalent.

Upon completion of the classification process, at facilities where applicable, staff shall assign individual detainee's color-coded uniforms, wristbands, or other means of custody identification. A system of color-coding permits staff to identify a detainee's classification on sight, thereby eliminating confusion, preventing potentially serious miscommunication, and facilitating consistent treatment of detainees.

## E. Supervisory Review and Custody Classification Assignment

The designated classification supervisor or facility administrator designee shall review the intake

processing officer's classification files for accuracy and completeness and ensure that each detainee is assigned to the appropriate housing unit.

The reviewing supervisor may recommend changes in classification due to:

1. Pertinent incidents of any kind (e.g., disciplinary, medical, victimizations, sexual assaults as either a victim or perpetrator, etc.) while in custody;

2. A classification appeal by a detainee or recognized representative (see below); or

3. Specific, creditable, documented and articulated facts that surface after the detainee's admissions processing.

## F. Classification Levels and Housing Assignments

All facilities shall ensure that detainees are housed according to their classification levels. Participation in work assignments and available activities shall be determined to be consistent with safety and security considerations.  Under no circumstances shall issues of facility management, or other factors external to the detainee classification system, influence a detainee's classification level.

SPCs, CDFs and dedicated IGSAs use either the recommended custody classification generated by the ICE Field Office or the point total from the ICE Custody Classification Worksheet to determine the classification level of each detainee.

Non-dedicated IGSAs are encouraged to use the ICE Custody Classification Worksheet, or to adopt the ICE custody classification score generated by an ICE Field Office when one is provided.

Non-dedicated IGSAs that do not use the ICE Custody Classification Worksheet or rely on an ICE custody classification recommendation shall follow the guidelines below when classifying detainees.

### 1. Low Custody

Low custody detainees may not be comingled with

high custody detainees.

- May not include any detainee with an arrest or conviction that included an act of physical violence, or any detainee with a history of assaultive behavior.

- May not include any detainee with a felony conviction for an offense that is listed under the "High" or "Highest" section of the severity of offense guideline (Appendix 2.2.C).

- May include detainees with minor criminal histories and non-violent felony charges and convictions.

### 2. Medium Custody

Medium custody detainees may not ordinarily be co-mingled with high or low custody detainees, except as specified below in the section on "G. Housing Detainees with Different Classification Levels."

- May not include a detainee whose most recent conviction was for any offense listed under the "Highest" section of the severity of offense guideline (Appendix 2.2.C).

- May not include any detainee with a history or pattern of violent assaults.

- May not include a detainee convicted for assault on a correctional officer while in custody or where a previous institutional record suggests a pattern of assaults while in custody.

### 3. High Custody

- High custody detainees may be reclassified to medium only based on institutional behavior provided items under number 2 above do not apply.  A detainee must be in custody for a minimum of 60 days before reclassification.

- High custody detainees shall not be assigned work duties outside their assigned living areas.

- High custody detainees:

- are considered high-risk,

- require medium- to maximum-security housing,

- are always monitored and escorted, and

- may not be co-mingled with low custody detainees.

The facility classification system shall assign detainees to the least restrictive housing unit consistent with facility safety and security. Grouping detainees with comparable histories together, and isolating those at each classification level from all others, reduces non-criminal and nonviolent detainees' exposure to physical and psychological danger. The system identifies and isolates the detainees whose histories indicate the characteristics of the "hardened criminal" and who are most likely to intimidate, threaten or prey on the vulnerable.

In facilities that have single cell living arrangements, detainees that pose an immediate and serious threat of violence to staff, other detainees, or themselves shall be housed there.

## G. Housing Detainees with Different Classification Levels

Ordinarily, detainees in different custody classification levels are housed separately. When it becomes necessary to house detainees of different classification levels in the same housing unit, the following guidelines shall apply:

1. High custody detainees may not be housed with low custody detainees.

2. Low custody detainees and medium-low custody detainees may be housed together, and medium-high custody detainees and high custody detainees may be housed together:

3. Medium-low custody detainees are those with no history of violent or assaultive charges or convictions, no institutional misconduct, and no gang affiliation.

4. Medium-high and high custody detainees are those with a history of violent or assaultive charges, convictions, institutional misconduct, or those with a gang affiliation

5. Under no circumstance may a medium custody detainee with a history of assaultive or combative behavior be placed in a low custody housing unit.

ICE may provide to facilities specific recommendations or scores based on the ICE custody classification system to further guide facility housing assignments.

## H. Reclassification

All facility classification systems shall ensure that a detainee is reassessed and/or reclassified. Reclassification assessments shall take into account, among other factors, the detainee's risk of victimization or abusiveness.

Staff shall record whether a classification process is being conducted for an initial classification or subsequent reclassification:

1. The first reclassification assessment shall be completed 60 to 90 days after the date of the initial classification.

2. Subsequent reclassification assessments shall be completed at 90- to 120-day intervals.

3. Special Reclassification Assessments
Staff shall complete a special reclassification within 24 hours before a detainee leaves the Special Management Unit (SMU), following an incident of abuse or victimization, and at any other time when warranted based upon the receipt of additional, relevant information, such as after a criminal act, or if a detainee wins a criminal appeal, is pardoned or new criminal information comes to light.

If it is documented, suspected or reported that a detainee has been physically or sexually abused or assaulted, the victim's perception of his or her own safety and well-being shall be among the

factors considered.

A detainee may request reclassification in writing by submitting a detainee request form, as described in standard "2.13 Staff-Detainee Communication." The classification officer shall ordinarily respond in person or in writing as soon as possible and practicable, but no later than within 72 hours of receipt. Any reclassification, however, requires prior supervisory approval on the custody classification form.

4. Permissible Changes

- A detainee may be reclassified at any time to correct classification errors or when new information becomes available.

- A detainee may be reclassified to high custody based on documented behavior, including threats to the facility, other detainees or personnel. Any reclassification to high custody that is not validated by the total custody classification score on the custody classification form must be approved by the classification officer within 72 hours of any event requiring reclassification.

- A medium custody detainee may be reclassified to low custody based on institutional behavior, provided the detainee has been in custody for at least 60 days.

- A detainee may be reclassified any time there are medically documented changes in his/her medical or mental health condition.

## I. Classification Appeal

Classification decisions should be provided to the detainee along with information on the appeal process in a language and manner understood by the detainee.

Classification systems shall include procedures for detainees to appeal their classification levels through written detainee request forms or by filing formal grievances as described in standard "6.2 Grievance System."

## J. Documentation

Classification forms and supporting documentation shall be placed in the detention file.

## K. Notice to Detainees

The *ICE Detainee Handbook* standard section on classification shall include:

- An explanation of the classification levels, with the conditions and restrictions applicable to each.

- The procedures by which a detainee may appeal his or her classification.

# Appendix 2.2.A: ICE Custody Classification Worksheet

ICE Custody Classification Worksheet

| Part 1. Basic Information | | Initial | Reclassification | Special Classification |
|---|---|---|---|---|
| Field/Sub Office: | | Facility: | | Date: |
| Officer Name: | | Language(s) Used during the Interview: | | |

| Alien Number: | | DOB: | | Gender: | ☐ F    ☐ M |
|---|---|---|---|---|---|
| Last Name: | | First Name: | | | |

| Part 2. Special Vulnerabilities and Management Concerns | |
|---|---|
| | Does a Special Vulnerability exist? Inquire, observe, and review all documentation. If based on your assessment the vulnerability exists, select the appropriate boxes below. Also indicate whether there are other management concerns that may affect the custody decision. ☐ Y    ☐ N |
| | ☐ serious physical illness <br> ☐ serious mental illness <br> ☐ disability <br> ☐ elderly <br> ☐ pregnancy <br> ☐ nursing <br> ☐ sole caretaking responsibility <br> ☐ risk based on sexual orientation/gender identity <br> ☐ victim of persecution/torture <br> ☐ victim of sexual abuse or violent crime <br> ☐ victim of human trafficking <br> ☐ other (specify): |
| | Provide further explanation as necessary: |
| | |
| | *If any boxes are checked, consult with the local ICE Field Office regarding appropriate placement and other management considerations, and record the date and time of consultation here:* |

| Part 3. Custody Classification Worksheet | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | Severity of Charge/ Conviction Associated with the ICE Encounter (Use Appendix 2.2.C Severity of Offense Scale) | | | | | | |
| | None | | | | | 0 | Enter the score here: |
| | Low | | | | | 2 | |
| | Moderate | | | | | 4 | |
| | High | | | | | 6 | |
| | Highest | | | | | 7 | _____ |
| 2 | Single Most Serious Conviction in the Individual's Criminal History (Excluding Item 1) | | | | | | |

| | | None | >15 Years | 10-15 Years | 5-10 Years | < 5 Years | Enter the score here: |
|---|---|---|---|---|---|---|---|
| See Appendix 2.2.C | Highest | 0 | 5 | 5 | 6 | 7 | |
| | High | 0 | 5 | 5 | 6 | 6 | |
| | Moderate | 0 | 1 | 2 | 3 | 4 | _____ |
| | Low | 0 | 0 | 0 | 1 | 2 | |

| 3 | Additional Prior Convictions (Excluding Items 1 and 2) | | |
|---|---|---|---|
| | None | 0 | Enter the score here: |
| | 1-2 misdemeanors, no felonies | 1 | |
| | 3-4 misdemeanors, or 1 felony | 2 | |
| | 5 or more misdemeanors, or 2 felonies | 4 | _____ |
| 4 | Supervision History | | |
| | None | 0 | |
| | Walk-away or attempted escape from an unsecured facility, absconding, bond breach, violations of prior voluntary departure orders or conditions of supervision, or prior revocation of supervision | 3 | Enter the score here: |
| | Escape or attempted escape from a secure facility | 7 | _____ |
| 5 | Security Threat Group (STG) | | |
| | The individual has no known membership or affiliation with an STG | 0 | Enter the score here: |
| | The individual is a member of an STG | 5 | _____ |
| 6 | History/Pattern of Violence (Two or more arrests) | | |
| | 15 or more years ago | 1 | |
| | Over 10 years and less than 15 years ago | 2 | Enter the score here: |
| | Over 5 years and less than 10 years ago | 3 | |
| | Within the last 5 years | 5 | _____ |
| 7 | Number of Sustained Disciplinary Infractions Involving Violence or Behavior Representing a Threat to the Facility (Institution(s)): | | |
| | None | 0 | |
| | One | 2 | |
| | Two | 4 | Enter the score here: |
| | Three or more | 6 | |
| | Check if data not available: | ☐ | _____ |
| Total Custody Classification Score  _____ | | | |

| | Custody Level Guideline Ranges | | | | | |
|---|---|---|---|---|---|---|
| | If there is no arrest or conviction for a violent offense, use this table. | | | If the person has an arrest or conviction for a violent offense, use this table. | | |
| | Low Custody | 0-2 | | | | |
| | Medium-Low Custody | 3-5 | | | | |
| | Medium-High Custody | 6-11 | | | | 0-6 |
| | High Custody | 12+ | | | | 7+ |

If the Officer makes a custody recommendation outside of the custody level guideline ranges above, provide the rationale and include aggravating/ mitigating circumstances that were considered in the decision:

| Recommendation Outside the Guideline Ranges | Low          Medium-Low          Medium-High          High |
|---|---|
| Officer Signature | | Date | |

In the section below, check the custody level of the individual's housing assignment, following the guidance provided in the instructions, F. Housing Assignment.

For purposes of housing medium-custody individuals with low-or high level custody individuals, use the following guidelines:

Medium-Low may be housed with low custody individuals;

Medium-High may be housed with high-custody individuals; but,

Low custody individuals may never be housed with high-custody individuals, or medium custody individuals who have any history of assaultive or combative behavior.

If the individual is to be placed in administrative segregation, a copy of the administrative segregation order shall be immediately provided to the Field Office Director or his designee, as required by Standard 2.12 "Special Management Units."

| Final Housing Assignment  Custody Level | Low     Medium-Low     Medium-High     High     Administrative |
|---|---|
| If the Supervisor decides to override the Officer's custody level recommendation, provide the rationale below: | |
| Supervisor Signature | | Date | |

# Appendix 2.2.B: Instructions for Completing the ICE Custody Classification Worksheet

## 1. Introduction

Each facility is required to have a formal detainee classification system that starts at admission and is based on verifiable and documented information.

"Classification" and "reclassification" are initial and periodic staff reviews, not only of a detainee's custody classification, but of that detainee's general case status, disciplinary record, housing, special needs, adjustment to institutional living, opportunities for voluntary work assignments, and general well-being.

Custody classification is a process of categorizing detainees as low, medium or high custody and housing them accordingly. The ICE Custody Classification Worksheet, attached as Appendix 2.2.A, is designed to systematically document and score information about each detainee in order to produce a total custody classification score that may be used, in conjunction with professional experience and judgment, to guide classification decisions.

The factors considered for custody classification closely align with the "public safety factors" that are part of the broader ICE intake risk assessment and classification process that often begins even before a detainee's arrival at a detention facility.

While the protection of detainees, staff, contractors, volunteers and the community from harm is an important consideration in determining a detainee's custody classification, a decision about where and how to house a detainee is also based on the detainee's physical and mental health and other important factors relating to a detainee's special needs, which are referred to as "special vulnerabilities" or "management concerns."

## 2. Specific Instructions for Completing the

### ICE Custody Classification Worksheet

#### A. Basic Information – Part 1

Check the appropriate box to indicate whether the form is being completed for:

- Initial classification

- Reclassification. (The first reclassification assessment should be completed 60 to 90 days after the initial classification. Subsequent reclassification assessments should be completed at 90 to 120-day intervals.)

- Special reclassification (see standard "2.2 Custody Classification System").

Enter the Field/Sub Office, facility and date.

Enter the name of the classification officer and the language(s) used during the interview.

Enter the detainee's alien number, last name, first name, date of birth, and gender.

#### B. Special Vulnerabilities and Management Concerns – Part 2

Special vulnerabilities and management concerns should be taken into account in assigning levels of detention custody.

The classification officer should inquire about and remain alert to signs of any special vulnerability or management concern that may affect the custody determination. Special vulnerabilities may include disability, serious medical or mental health needs, risk based on sexual orientation or gender identity, advanced age, pregnancy, nursing, sole caretaking responsibilities, or victimization, including individuals who may be eligible for relief related to the Violence Against Women Act (VAWA), victims of crime (U visa), or victims of human trafficking (T visa). (To detain individuals confirmed to have vulnerabilities, ICE Officers must prior to the individual's arrival at the facility have obtained concurrence from the Field Office Director (FOD)

and sent a significant event notice (SEN) to Headquarters.)

Use the boxes provided to check any vulnerability that applies, and provide an explanation if necessary. If any boxes are checked, consult with the local ICE Field Office regarding appropriate placement and other management considerations.

## C. Custody Classification Scoring – Part 3

Item 1—Severity of Charge/Conviction Associated with the ICE Encounter.

Determine the charge or conviction, if any, that is associated with the individual's current ICE encounter, and locate it or a similar offense in "Appendix 2.2.C:  Severity of Offense Scale" to determine if it is in the "Low," "Moderate," "High," or "Highest" category. If more than one charge or conviction is involved, choose only the most serious charge/conviction that led to the encounter by consulting the Severity of Offense Scale.

Identify the score associated with the severity category into which the individual's most serious offense falls.

Enter the score in the field provided.

If the individual was last booked and returned to custody for a parole or probation violation, the severity of the current charge/conviction should be based on the offense(s) for which parole or probation was granted.

Item 2—Single Most Serious Conviction in the Individual's Criminal History.

Excluding the entry in Item 1, determine the individual's most serious prior conviction under "Appendix 2.2.C: Severity of Offense Scale" to determine if it or a similar offense is in the "Low," "Moderate," "High," or "Highest" category.

Separate convictions for multiple crimes should be considered independently of each other, regardless of whether they occurred on the same date.

Based on how long ago this conviction occurred, use the table located on the ICE Custody Classification Worksheet to assign a score. For example, if an individual was convicted of burglary with an assault, this would be a "Highest" offense and the row labeled "Highest" on the ICE Custody Classification Worksheet would be used. If the individual was convicted of this offense less than 5 years from the date this form is being completed, then the individual would receive a score of 7.

If the individual's most serious conviction is trespass, this would be a "Low" offense according to "Appendix 2.2.C" and the row labeled "Low" on the ICE Custody Classification Worksheet would be used. If the individual was convicted of this offense within 10-15 years of the date this form is being filled out, then the individual would receive a score of 0.

If the individual has no record of prior convictions, enter 0.

Enter the score in the field provided.

Item 3—Additional Prior Convictions Excluding Items 1 and 2.

Use the ICE Custody Classification Worksheet to score all other misdemeanor and felony convictions that have not been scored in Items 1 and 2 (including all separate convictions obtained for multiple crimes, regardless of whether they occurred on the same date).

Select the highest score applicable to the individual's history of additional prior convictions.  For instance, if the individual has been convicted of 2 misdemeanors and 1 felony, a score of 2 (and not 1) should be assigned.

Item 4—Supervision History.

Escapes from correctional settings or programs should be counted if the individual was found guilty of the escape or escape attempt by an institutional disciplinary committee, regardless of court prosecution or conviction status. Do not consider any escapes or attempts scored in Item 1.

With regard to "violations of prior voluntary departure orders," an individual should be scored 3 points only if he/she has *repeated* failures to appear for his/her immigration hearings. Do not include a single failure to appear for an immigration hearing.

Enter the score corresponding to the individual's most serious escape attempt in the field provided.

Item 5—Security Threat Group.

### Security Threat Group (STG)

A Security Threat Group (STG) member is any individual, who through association, ideology, self-identification, identifying symbol(s), or activities and/or conduct (both inside and outside custodial environments), is known to pose a threat to the safety of the community, the security of ICE staff, ICE facilities, and/or those in ICE custody.

### Security Threat Group (STG) Examples

- Traditional Prison Gangs
- Traditional Street Gangs
- Non-Traditional Gangs
- Transnational Criminal Organizations
- Foreign and Domestic Terrorist Organizations
- Special Groups

**Enter 0** if there is no known affiliation or membership.

**Enter 5** if there is documentation or a self-admission that the individual is a member of an STG.

### Item 6 – History/Pattern of Violence

If the individual has two or more prior arrests for violence against the person, use Item 6 to score those arrests.   The less recent the occurrence of the arrests, the lower the score. Use the most recent arrest to calibrate the time period. If the more recent of the two arrests for a violent offense occurred within the last 5 years, score this item as a 5. If the more recent of the two arrests occurred over 5 years ago, and less

than 10 years ago, score the item as a 3. If the more recent of the two arrests occurred more than 10 years ago, and less than 15 years ago, score this item as a 2.  If the arrest occurred more than 15 years ago, score this item as a 0.

### Item 7—Number of Sustained Institutional Disciplinary Infractions

Sustained disciplinary infractions should be counted if they involved violence or behavior representing a threat to the facility. Using records from a current period of ICE detention and/or prior periods of detention or imprisonment, calculate and enter the appropriate number of points. As a general matter disciplinary offenses that involve violence or behavior representing a threat to the facility are those listed in the "Greatest" and "High" offense categories in standard "3.1 Disciplinary System", Appendix 3.1.A. These offenses are also listed in Appendix 2.2.D.  If no information is available, check the box and score Item 7 as 0.

### D. Total Custody Classification Score

Add the points in Items 1 through 7 to calculate the detainee's total custody classification score.

### E. Classification Officer's Recommended Custody Level

In the area designated "Custody Level Guideline Ranges," check the box that corresponds to the value entered for the total custody classification score.  If the detainee has no violent conviction, use the following scoring ranges.  If the total score is 0-2, check the Low Custody box. If the total score is 3-5, check the Medium-Low Custody box. If the total score is 6-11, check the Medium-High Custody box. If the total score is 12 or more, check the High Custody Box.  If the detainee has a violent conviction, use the following scoring ranges.  If the detainee's total score is 0-6, check the Medium-High Custody box.  If the total score is 7 or more, check the High Custody box.

If a decision is made to recommend a custody level

that falls outside of the ranges prescribed by the worksheet, note in the space provided the aggravating/mitigating or other circumstances that justify that decision. The space should also be used for any other matters the classification officer would like to document or call to the attention of the supervisor with regard to the detainee's custody classification and housing.

In the area designated "Recommendation Outside the Guideline Ranges," check the custody level box that corresponds to the custody level recommendation made that differs from that prescribed by the Custody Level Guideline Ranges.

### F. Housing Assignment

In the area designated "Final Housing Assignment Custody Level," check the level of custody of the individual's housing assignment.

If the detainee is to be placed in administrative segregation, a copy of the administrative segregation order shall be immediately provided to the Field Office Director or his designee, as required by

Standard 2.12 "Special Management Units."

For purposes of housing medium-custody individuals with low or high level custody individuals, use the following guidelines:

Medium-Low may be housed with low custody individuals;

Medium-High may be housed with high-custody individuals; but,

Low custody individuals may never be housed with high-custody individuals, or medium custody individuals who have any history of assaultive or combative behavior.

ICE may periodically provide additional recommendations and guidance.

### G. Supervisory Approval

In the area designated "Supervisor Signature," the supervisor should sign and date the ICE Custody Classification worksheet indicating his/her approval of the decisions recorded in this worksheet.

# Appendix 2.2.C: Severity of Offense Scale

## I. HIGHEST

Aiding Escape

Aggravated

Battery with Deadly Weapon

Armed Robbery (Multiple with injury)

Burglary with Assault

Escape (Secure Facility)

Inciting Riot

Kidnapping

Murder (1st, 2nd degree)

Sexual Battery (with violence upon a minor)

## II. HIGH

Aggravated Assault

Aggravated Battery

Aggravated Child Abuse

Arson

Battery Law Enforcement Officer

Burglary (Armed)

Extortion

False Imprisonment

False Report of Bombings

Controlled Substances (Importation, Trafficking)

Introduction of Contraband into Detention

Facility

Manufacture of Explosives

Robbery (armed, strong armed)

Sexual Battery (other than capital or life felony)

## III. MODERATE

Armed Trespass

Burglary

Carrying Concealed Firearm

Forgery

Grand Theft

Manslaughter

Sale, Delivery, Possession of Controlled Substance

Tampering with Witness

Worthless Checks (felony)

Welfare Fraud (felony)

Escape (Non-secure Facility)

## IV. LOW

Driving under the Influence

Leaving the scene of Accident

Battery (Simple Assault)

Carrying Concealed Weapon (other than firearm)

Disorderly Conduct

Gambling

Offering to Commit Prostitution

Possession Marijuana (misdemeanor)

Possession Drug Paraphernalia

Petit Theft

Trespass

Worthless Check (misdemeanor)

# Appendix 2.2.D: Disciplinary Offenses Involving Violence or Behavior Representing a Threat to the Facility

## I. "Greatest" Offense Category

100   Killing

101   Assaulting any person (includes sexual assault)

102   Escape from escort; escape from a secure facility

103   Setting a fire (charged with this act in this category only when found to pose a threat to life or a threat of serious bodily harm or in furtherance of a prohibited act of greatest severity [e.g., a riot or an escape]; otherwise the charge is classified as Code 218 or 321)

104   Possession or introduction of a gun, firearm, weapon, sharpened instrument, knife, dangerous chemical, explosive, escape tool, device or ammunition

105   Rioting

106   Inciting others to riot

107   Hostage-taking

108   Assaulting a staff member or any law enforcement officer

109   Threatening a staff member or any law enforcement office with bodily harm

*198   Interfering with a staff member in the performance of duties (conduct must be of the greatest severity; this charge is to be used only if another charge of greatest severity is not applicable)

*199   Conduct that disrupts or interferes with the security or orderly running of the facility (conduct must be of the greatest severity; this charge is to be used only if another charge of greatest severity is not applicable)

## II. "High" Offense Category

200   Escape from unescorted activities open or secure facility, proceeding without violence

201   Fighting, boxing, wrestling, sparring and any other form of physical encounter, including horseplay, that causes or could cause injury to another person, except when part of an approved recreational or athletic activity

202   Possession or introduction of an unauthorized tool

203   Loss, misplacement or damage of any restricted tool

204   Threatening another with bodily harm

205   Extortion, blackmail, protection and demanding or receiving money or anything of value in return for protection against others, avoiding bodily harm or avoiding a threat of being informed against

206   Engaging in sexual acts

207   Making sexual proposals or threats

208   Wearing a disguise or mask

209   Tampering with or blocking any lock device

210   Adulterating of food or drink

211   Possessing, introducing, or using narcotics, narcotic paraphernalia or drugs not prescribed for the individual by the medical staff

212   Possessing an officer's or staff member's clothing

213   Engaging in or inciting a group demonstration

214   Encouraging others to participate in a work stoppage or to refuse to work

215   Refusing to provide a urine sample or otherwise cooperate in a drug test

216   Introducing alcohol into the facility

217   Giving or offering an official or staff member a bribe or anything of value

218   Giving money to, or receiving money from, any person for an illegal or prohibited purpose (e.g., introducing/conveying contraband)

219   Destroying, altering, or damaging property (government or another person's) worth more than $100

220   Being found guilty of any combination of three or more high moderate or low

moderate offenses within 90 days

222   Possessing or introducing an incendiary device (e.g., matches, lighter, etc.)

223   Engaging in any act that could endanger person(s) and/or property

*298   Interfering with a staff member in the performance of duties (conduct must be of highest severity; this charge is to be used only when no other charge of highest severity is applicable)

*299   Conduct that disrupts or interferes with the security or orderly operation of the facility (conduct must be of highest severity; this charge is to be used only when no other charge of highest severity is applicable)

# 2.3 Contraband

## I. Purpose and Scope

This detention standard protects detainees and staff while enhancing facility security and good order by identifying, detecting, controlling and properly disposing of contraband.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);
- Contract Detention Facilities (CDFs); and
- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices"):

1. Contraband shall be identified, detected, controlled and disposed of properly.

2. Detainee personal property that would be considered contraband within the facility shall be mailed to a third party or stored until the detainee's release, unless that property is illegal to possess or constitutes a threat to safety or security.

3. Contraband that may be evidence in connection with a violation of a criminal statute shall be preserved, inventoried, controlled and stored with a documented chain of custody.

4. Any facility-approved auxiliary aids, services, or items used by a detainee with a disability shall not be considered contraband.

5. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces the standard on "Contraband" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 2C-01, 2C-02, 2C-06.

ICE/ERO *Performance-based National Detention*

*Standards 2011:*

- "2.5 Funds and Personal Property"; and
- "6.2 Grievance System."

# V. Expected Practices

## A. "Hard" and "Soft" Contraband

Contraband is anything detainees are not authorized to have in their possession.

1. A detainee found in possession of hard contraband could face disciplinary action or criminal prosecution.

   Hard contraband includes, but is not limited to, any item that:

   a. is inherently dangerous;

   b. is a tool or device that could be used to escape; or

   c. may otherwise interfere with security, safety, or the good order of facility operations.

   Examples of hard contraband include:

   a. tools that could aid in an escape (e.g., ropes, keys);

   b. ammunition or explosives;

   c. combustible or flammable liquids;

   d. hazardous or poisonous chemicals and gases;

   e. weapons;

   f. intoxicants;

   g. currency (where prohibited); and

   h. narcotics and other controlled substances not dispensed or approved by the medical department, not used as prescribed, or in the possession of a detainee other than the person for whom it was prescribed.

   Staff shall consult the facility pharmacist or other health services staff members when uncertain about whether a prescribed medication represents contraband.

   Medicine the detainee brings into the facility upon arrival shall be forwarded to the facility medical staff for disposition as specified under standard "4.3 Medical Care." Only replacement medication duly approved by the facility medical staff shall be returned to the detainee.

2. Soft contraband includes, but is not limited to, "nuisance" items that do not pose a direct and immediate threat to safety or security, but which have the potential to create dangerous or unsanitary conditions in the facility (e.g., excess papers that create a fire hazard; food items that are spoiled or retained beyond the point of safe consumption).

   If excessive authorized legal materials create a fire hazard, the facility shall provide an alternate storage area accessible to the detainee.

## B. Procedures for Handling Contraband

All facilities shall have written policies and procedures for handling contraband, including the seizure of contraband, disputed ownership, detainee or government property defined as contraband, and the preservation, inventory, and storage of contraband as evidence of a crime. Facilities shall ordinarily consult a religious authority before confiscating a religious item deemed "soft" contraband.

Any facility-approved auxiliary aids, services, or items used by a detainee with a disability shall not be considered contraband.

### 1. Seizure of Contraband

*Staff shall seize contraband:*

a. *Found in the physical possession or living area of a detainee (including a detainee awaiting voluntary return);*

b. *Found in common areas;*

c.  *Found in incoming or outgoing mail;*

d.  *Discovered during admission in-processing; and,*

e.  *Found in transport vehicles.*

*Exceptions may occur only upon written authorization of the facility administrator.*

### 2. Religious Items

The facility administrator shall ordinarily consult a religious authority before confiscating a religious item that is deemed "soft" contraband (see also standard "5.5 Religious Practices").

### 3. Disputed Ownership

*When a detainee's claimed ownership of potential contraband material is in question, staff shall:*

a.  *inventory and store the items pending verification of ownership; and*

b.  *provide the detainee with a copy of the inventory as soon as practicable, and place a second copy in the detainee's detention file. The detainee shall have seven days following receipt of the inventory to prove ownership of the listed items.*

*Staff shall deny claims:*

a.  *arising from the unauthorized use of government property; and*

b.  *for any item acquired, without authorization, from another detainee.*

### 4. Detainee Property Defined as Contraband

*Staff shall seize all hard and soft contraband. In the event that the contraband is not illegal to possess under criminal statutes and would not otherwise pose a threat to security, staff shall inventory and provide a receipt for the property. At the detainee's request, the staff will mail the property to a third party, or store it with the detainee's other stored personal property, in accordance with standard "2.5 Funds and Personal Property." If a detainee chooses not to provide an appropriate mailing address within 30 days, or is unable to pay the postage, the facility*

*administrator after ICE/ERO concurrence, and after providing the detainee with written notice of the intent to destroy the property along with information on how to retain the property in question, may dispose of the property in accordance with the section on "Destruction of Contraband" below in this standard. If a detainee cannot establish ownership, staff shall attempt to resolve the matter. If ownership cannot be reasonably established, the property may be destroyed, as also described below in this standard.*

### 5. Evidence of a Crime

Contraband that is illegal to possess or may be evidence in connection with a violation of a criminal statute shall be preserved, inventoried, controlled and stored with a documented chain of custody, and shall be reported to the appropriate law enforcement authority for action and possible seizure, destruction or disposition of contraband is detailed under standard "2.5 Funds and Personal Property."

### 6. Government Property

*Contraband which is government property shall be retained as evidence for possible disciplinary action or criminal prosecution, after which, as appropriate, it may be:*

a.  *returned to the issuing authority;*

b.  *returned to normal stock for reissue; or*

c.  *destroyed, with the approval of the facility administrator.*

## C. Destruction of Contraband

The facility administrator shall establish a procedure for the destruction of contraband items.

*Contraband may be destroyed when no longer needed for disciplinary action or criminal prosecution. It may also be kept for official use, such as use as a training tool, if secured in the facility armory when not in use.*

1.  *The Chief of Security, or equivalent, shall*

*determine whether an item shall be destroyed.*

*2.   The Chief of Security shall send the facility administrator a memorandum, through official channels, describing what is to be destroyed and the rationale for destruction.*

*3.   The facility administrator shall require that an item of questionable ownership be held for 120 days before its destruction can be considered, to afford the detainee ample opportunity to obtain proof of ownership and appeal the decision in accordance with standard "6.2 Grievance System."*

*Where disciplinary action is appropriate, the facility administrator shall defer his/her decision about the property until the disciplinary case, including any appeals, is resolved.*

*4.   The officer who physically destroys the property and at least one official observer shall attest, in writing, to having witnessed the property's destruction.*

*5.   A copy of the property disposal record shall be given to the detainee, and another copy shall be placed in the detainee's detention file.*

## D. Canine Units

Canine units (in facilities that have them) may be used for contraband detection, but their use for force, control, or intimidation of detainees is prohibited, in accordance with standard "2.15 Use of Force and Restraints."

Any facility that has a canine unit shall establish a clear and detailed written policy and procedures governing the circumstances in which canine units may be used, in regard to ICE/ ERO detainees.

Canines shall not be used in the presence of ICE detainees.

## E. Notice to Detainees

The detainee handbook, or equivalent, shall notify detainees in a language or manner that they understand relative to:

1. The facility's rules and procedures governing contraband; and

2. The applicability of standard "2.5 Funds and Personal Property," as it relates to contraband.

# 2.4 Facility Security and Control

## I. Purpose and Scope

This detention standard protects the community, staff, contractors, volunteers and detainees from harm by ensuring that facility security is maintained and events which pose risk of harm are prevented.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices"):

1. The facility administrator shall develop and document comprehensive detainee supervision guidelines, as well as a comprehensive staffing analysis and staffing plan, to determine and meet the facility's detainee supervision needs; these shall be reviewed and updated at least annually.

2. Essential security posts and positions will be staffed with qualified personnel.

3. Facility security and safety will be monitored and coordinated by a secure, well-equipped, and continuously staffed control center.

4. The facility's perimeter will ensure that detainees remain within and that public access is denied without proper authorization.

5. Information about routine procedures, emergency situations, and unusual incidents will be continually recorded in permanent post logs and shift reports.

6. Facility safety, security and good order, including the safety, health and well-being of staff and detainees, will be enhanced through ongoing observation, supervision, and personal contact and interaction between staff and detainees.

7. Special security and control measures will consistently be applied to Special Management Unit entrances.

8. Facility safety, security and good order will be enhanced through frequent and documented staff inspections of detainee-occupied and unoccupied areas.

9. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

## III. Standards Affected

This detention standard replaces "Facility Security and Control" dated 12/2/2008.

# IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-2A-01 through 2A-14, 2A-18, 2C-01, 2C-02, 7F-06

ICE/ERO *Performance-based National Detention Standards 2011*:

- "2.3 Contraband";
- "2.5 Funds and Personal Property";
- "2.7 Key and Lock Control";
- "2.8 Population Counts";
- "2.9 Post Orders";
- "2.12 Special Management Units";
- "2.15 Use of Force and Restraints";
- "2.14 Tool Control";
- "5.1 Correspondence and Other Mail";
- "5.7 Visitation"; and
- "6.2 Grievance System."

"*Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities*," 79 Fed. Reg. 13100 (Mar. 7, 2014).

# V. Expected Practices

## A. Detainee Supervision and Monitoring

Each facility shall ensure that it maintains sufficient supervision of detainees, including through appropriate staffing levels and, where applicable, video monitoring, to protect detainees against sexual abuse assault, other forms of violence or harassment, and to prevent significant self-harm and suicide. Security staffing shall be sufficient to maintain facility security and prevent or minimize events that pose a risk of harm to persons and property.

The facility administrator shall develop and document comprehensive detainee supervision guidelines, as well as a comprehensive staffing analysis and staffing plan, to determine and meet the facility's detainee supervision needs; these shall be reviewed and updated at least annually.  Essential posts and positions shall be filled with qualified personnel.

In determining adequate levels of detainee supervision and determining the need for video monitoring, the facility administrator shall take into consideration generally accepted detention and correctional practices, any judicial findings of inadequacy, the physical layout of each facility, the composition of the detainee population, the prevalence of substantiated and unsubstantiated incidents of sexual abuse as well as other incidents reflecting on facility security and detainee safety, the findings and recommendations of sexual abuse incident review reports or other findings reflecting on facility security and detainee safety, the length of time detainees spend in agency custody, and any other relevant factors.

At least one male and one female staff member shall be on duty at all times in a facility housing both male and female detainees.

All security posts shall be guided by standard "2.9 Post Orders."

## B. Control Centers

Each facility shall have a secure control center that is staffed continuously, 24/7.  Control center staff shall monitor and coordinate facility security, life-safety and communication systems.

*The Chief of Security shall carefully screen officers for the highly responsible control center post assignment(s). The Control officer's responsibilities include (but are not limited to) key control, count procedures and public-address-system operations. The standards on "Key and Lock Control" and "Population Counts" detail requirements for key*

*control and counts.*

*The facility administrator shall establish procedures to implement the following control center requirements:*

1. *round-the-clock staffing;*

2. *limited staff access;*

3. *no detainee access (in a control center, staff must perform cleaning duties that elsewhere in the facility may ordinarily be assigned to detainees);*

4. *round-the-clock communications;*

5. *maintenance of a list of the current home and cell phone numbers of every staff member assigned to the facility, including administrative/support services staff members, all situation response team members (SRTs), hostage negotiation team member (HNTs) and applicable law enforcement agencies.   If any staff member is inaccessible by phone, other means of off-duty contact approved by the facility administrator, such as a pager number or e-mail address, may be listed; the list shall:*

   a. *be on file in both the control center and the shift supervisor's office;*

   b. *be maintained in a secure file;*

   c. *be used for emergency recall or urgent business only;*

   d. *be updated at least quarterly; and*

   e. *prominently feature the following notice:*

      *"This information must be safeguarded. Use is restricted to those who need the information in the performance of their official duties. Misuse shall subject the user to criminal liability. This agency shall view any misuse of this information as a serious violation of the Employee Code of Conduct, which may result in disciplinary action, including removal."*

6. *round-the-clock accountability for equipment; and*

7. *a watch call system (officer safety checks) to the control center by all staff, ordinarily to occur every half-hour between 6:00 P.M. and 6:00 A.M. Individual facility policy may designate another post to conduct watch calls. Any exception to exempt staff from making watch calls as described in this standard requires the approval of the facility administrator.*

## C. Perimeter Security

### 1. Front Entrance

The facility's front entrance shall be a controlled access point. Entrance into the secure perimeter shall be controlled by a sally port (or equivalent with electronic interlocking doors or grilles) to prevent unauthorized entry or exit.

Staff assigned to the front entrance post shall be selected and expected to present a neat and professional appearance, exercise public relations skills of courtesy and tact, and interact and communicate easily and effectively with diverse people. Front entrance staff is expected to uphold these responsibilities while also maintaining security and enforcing regulations.

a. Identification and Searches
   The officer assigned to this post shall check the identification documents of every visitor, employee and other person entering or leaving the facility. No adult visitor may be admitted without government-issued photo identification.

b. Record

   1) The post officer shall maintain the visitor logbook, a bound ledger in which all non-staff visits are to be recorded.

   2) Every entry in the logbook shall identify the person or department visited, date and time of the visitor's arrival, purpose of visit, unusual requests and time of departure.

   3) The entry for a person visiting a detainee shall also include the name and A-number of the

detainee being visited, and the address and relationship to the detainee. The post officer shall require the visitor to print and sign his/her name in the visitor logbook.

4) *All ICE/ERO employees shall wear ICE/ERO-issued identification cards (to include photograph and name). The facility shall maintain a tracking mechanism for all staff permanently stationed at the facility. This mechanism shall include a process to rapidly verify all staff entering and leaving the perimeter.*

5) *The facility administrator shall establish procedures for tracking the arrivals and departures of contract employees. However, the main gate/front entrance officer shall maintain a separate file of contract employee Forms G-74, or equivalent, laminated, with photograph, issue date, expiration date (if applicable), and the facility administrator's signature.*

c. Visitor Passes

The facility administrator shall establish procedures for issuing color-coded visitor passes to all visitors entering the facility via the main gate/front entrance. Visitors must prominently display this pass on an outer garment, where it is visible (at a glance) to staff.

*The post officer shall check the validity of the identification. In exchange for the photo-identification card (e.g., driver's license, student ID card), the post officer shall issue the visitor a color-coded pass, provided the photo resembles the visitor closely enough to identify the visitor. The visitor must leave his/her photo-identification card with the post officer until the end of the visit, marked by the time-out entry in the logbook.*

*The post officer shall hold all visitor identification cards at the main gate front entrance, for the*

*following security reasons:*

1) *to account for visitors in the event of an emergency (e.g., medical, fire, hostage situation, or other incident);*

2) *as a check on logbook data; and*

3) *as a disincentive for criminal or disruptive behavior (e.g., distributing drugs or other contraband; inciting an internal disturbance or riot, etc.).*

d. *Blue Visitor Passes (or color-coded equivalent) ICE/ERO employees not permanently stationed at the facility, and official visitors from other Department of Homeland Security agencies, shall receive "blue" passes. Visitors with blue passes do not need, but may request, escorts.*

*The post officer shall record every official visitor's arrivals and departures in the visitor logbook, including the person or department visited, date and time of visitor's arrival, purpose of visit, unusual requests and time of departure.*

*To save time, all ICE/ERO employees with frequent business at the facility but stationed elsewhere shall complete a G-74 form, or equivalent, for the front-entrance personal data card file.*

e. *Yellow Visitor Passes (or color-coded equivalent) Law enforcement officers not directly connected with ICE/ERO, vendors and other persons visiting in an official capacity shall receive "yellow" passes. Their visits shall be recorded in the visitor logbook. Escorts are required for visitors with yellow passes.*

f. *Orange Visitor Passes (or color-coded equivalent) "Orange" passes shall be distributed to contractual construction service personnel, including:*

1) *representatives of the Army Corps of Engineers, and*

2) *contractors, including sub-contractors, employees, laborers, supervisors, etc.*

*Each facility administrator shall require such persons to identify themselves, consistent with the photo-ID requirements stated above in the standard, and shall devise procedures for issuing construction visitor passes, including requirements for each visitor to display his/her pass. Procedures will also provide for a listing of facility areas where construction visitors are authorized to be present and to work. Visitors with orange visitor passes must be escorted.*

g. *Red Visitor Passes (or color-code equivalent)*
*Non-official persons visiting detainees or visiting the facility, regardless of affiliation, shall receive "red" passes. The post officer shall enter their visits in the visitor logbook as specified under the "Record" section of this standard. Escorts are required for visitors with red passes.*

*If a visitor leaves the facility without surrendering the visitor pass and retrieving his/her identification card, the post officer shall photocopy the identification card and attach it to a memo to the shift supervisor stating the:*

*1) visitor's name;*

*2) visitor's title (if applicable);*

*3) person or department visited;*

*4) time the pass was issued;*

*5) reason for not retrieving the pass from the visitor and/or not returning the identification card; and*

*6) other relevant observations (for example, suspicious or emotionally charged behavior, use of rude language, demeanor).*

*The main gate front-entrance assigned staff member must account for all visitor passes when coming on duty, immediately reporting any discrepancies to the shift supervisor. The post officer is also responsible for monitoring the inventory of visitor passes and identification*

*cards, and reporting to the shift supervisor any unusually long visits (as indicated by an identification card which has yet to be retrieved and/or a missing visitor's pass which has yet to be returned).*

## 2. Vehicle Entrance

a. Identification
The main-gate front-entrance assigned staff member shall control all (vehicle) traffic entering and leaving the facility. The officer shall check the driver's license of the driver entering into the facility, regardless of purpose (e.g., visit, delivery), and may require proof of insurance, especially for vehicles to be driven on the grounds. The officer will also check the identification of every passenger in the vehicle. The officer may admit the vehicle only if the license and insurance are valid. While the driver is within the facility's secure perimeter, the officer shall hold the driver's license or identification of every person entering the facility, as specified under the "Visitor Passes" section in this standard.

b. Vehicle Log
The post officer shall log the following information regarding every vehicle: tag number, driver's name, firm represented, purpose of the visit, (e.g., repairs, delivery, etc.), vehicle contents, date, time in, time out and facility employee responsible for the vehicle on-site.

c. Controls

1) The main-gate front-entrance assigned staff member shall search the vehicle before it enters or leaves the facility, both to prevent the introduction/removal of contraband and to prevent the vehicle's use as a means of escape. All drivers making deliveries must submit to a personal search and questioning about firearms, munitions, knives, ropes, jacks, narcotics and other items considered contraband. (For more detailed information,

see standard "2.3 Contraband").

2) Any article posing a threat to the facility's security shall be held at the gate or removed from facility grounds. The driver of a delivery vehicle may be accompanied by one or more co-worker(s), but not by unauthorized passengers.

3) *The facility employee responsible for vehicle oversight shall, as escort:*

   a) *walk behind the vehicle;*

   b) *directly supervise loading and unloading;*

   c) *retain the ignition keys, never leaving them in the vehicle; and*

   d) *close windows, lock doors and trunks, secure toolboxes, ladders, etc., before leaving the vehicle unattended.*

4) *Before approaching the exit gate, the driver shall stop at a spot designated. The gate operator shall not allow the vehicle to depart until he/she is satisfied that neither the driver nor the escorting officer is under duress. With that established, officers shall again search the vehicle. If a thorough search is impossible to conduct, the vehicle shall be unloaded or held pending completion of the next official count. If the vehicle or vehicular equipment must remain inside the compound overnight, staff shall render it inoperable.*

5) *If the post officer has doubts about a person's identity, he/she shall not permit the person to exit, pending positive identification.*

6) Staff shall handle any legal or special mail delivered to the facility for detainees in accordance with standard "5.1 Correspondence and Other Mail"

## D. General Population Housing Units

### 1. Post Orders and Housing Records

For each housing unit, the facility administrator shall establish written post orders with step-by-step

procedures, in accordance with standard "2.9 Post Orders." Those post orders shall require that housing officers maintain a housing unit log for recording information regarding routine unit operations, as well as unusual and emergency incidents.

*Housing unit post orders shall follow the event schedule format, for example, "0515—Lights on" and shall direct the assigned staff member to maintain a unit log of pertinent information regarding detainee activity.*

*The shift supervisor shall visit each housing area and initial the log on each shift at least once per tour.*

### 2. Supervision and Communication

Security officer posts shall be located in or immediately adjacent to detainee housing units to permit officers to see or hear and respond to emergency situations. Personal contact and interaction between housing staff and detainees shall be expected and required.

As prescribed by standard "2.9 Post Orders," staff shall observe, supervise and control movement of detainees from one area to another. No detainee may ever be given authority over, or be permitted to exert control over, any other detainee.

The facility administrator, designated assistant facility administrator, supervisors and others designated by the facility administrator shall be required to visit all housing units weekly at minimum to observe living conditions and interact informally with detainees. Such visitors shall record their visits by initialing the housing unit log.

## E. Special Management Unit (SMU)

Because Special Management Units are inherently among the most secure areas of any detention facility, special security and control measures are required for these units.

### 1. Control of Contraband and Tools

Every facility administrator shall establish a written policy and procedures to secure the SMU from

contraband.

Items allowed to enter SMUs shall be kept to an absolute minimum. Any item allowed into the unit, including laundry, commissary, food carts and personal property, shall be thoroughly inspected and searched to prevent the introduction of contraband.

In the event that it becomes necessary to introduce tools into the unit, special care shall be taken. Prior to entering, all tools shall be inventoried by the special housing officer. Tools shall be identified and checked against the inventory upon departing to ensure that no tools, hazardous objects, or materials are left in the unit.

## 2. Control of Entrances

In facilities with the ability to do so, the SMU entrance in regular use shall have a sally port, which shall be operated so that the inner and outer doors cannot both be open simultaneously. Officers on the inside and outside shall independently check the identification of every person going in or out, and each officer must positively confirm a person's identity before allowing him/her through the door.

Also, in accordance with written procedures established by the facility administrator, these officers shall take precautions to ensure that the person requesting entry or exit is not doing so under duress.

## 3. Control of Food Carts

Food carts shall be securely locked before leaving the food service area for delivery to the SMU. If this is not possible, a staff escort is required.

## 4. Control of Keys

Staff assigned to the SMU or SMU visiting area shall have keys to the inner door(s) of the sally port, but not to the outside door(s). Conversely, staff outside the SMU or SMU visiting area shall have keys to the sally port's outer door(s) but not the inner door(s). Under no circumstances shall one individual hold keys to both the inner and outer doors of the sally port.

## F. Security Inspections

### 1. Required Written Security Inspection Procedures

Each facility shall establish a comprehensive security inspection system that addresses every area of the facility, specifically including the perimeter fence line and other areas specified below in the standard.

Frequent unannounced security inspections shall be conducted on day and night shifts to control the introduction of contraband; identify and deter sexual abuse of detainees; ensure facility safety, security and good order; prevent escapes; maintain sanitary standards; and eliminate fire and safety hazards. Each facility shall prohibit staff from alerting others that these security inspections are occurring, unless such announcement is related to the legitimate operational functions of the facility.

*Each officer who assumes a post assignment shall conduct a security check of the area, record the results in the post logbook, and prepare and submit maintenance work requests as necessary.*

*Documentation of all daily inspections—shift, area and post—is required. Completed inspection forms, along with the schedule of inspections shall be submitted to the Chief of Security. The daily inspection plan shall also provide guidelines for security-feature checks and for reporting security concerns, vulnerabilities and inconsistencies, such as inoperable security cameras.*

The facility administrator shall identify the staff member responsible for the oversight of the facility's daily security inspection process.

*Normally, the shift supervisor (or equivalent) shall handle this responsibility, under the Chief of Security (or equivalent). The shift supervisor or designee shall review all search and inspection documentation.*

*The shift supervisor or designee shall report recurrent maintenance work problems to the*

*department head and/or assistant facility
administrator. Such problems include, for example,
unresponsiveness to work orders, failure to take
corrective action, and/or failed attempts to resolve a
problem within a reasonable timetable.*

## 2. Perimeter Inspections

Perimeter inspections shall occur frequently, but at
irregular times, as follows.

a.  Walls, fences and exits, including all outside
    windows shall be inspected for defects at least
    once per shift, and perimeter alarm systems shall
    be tested daily.

b.  Once per shift or daily, at the facility
    administrator's discretion, locations on the
    grounds shall be inspected where detainees could
    arrange for visitors to leave contraband.

c.  Daily along the perimeter fence, checked by the
    assigned staff member(s):

    1)  walking the entire fence line; checking the
        tension wire and binding straps and all
        hardware attached to the poles to ensure
        tautness; examining wings for cut links; and
        testing the links fastening the sides of the fence
        bottom to the fence; and

    2)  simulating a detainee's climbing the fence by
        pulling on the fence. (Jerking the fence back
        and forth does not simulate climbing and is an
        insufficient simulation.) In a functional alarm
        system, the pull-test shall activate the alarm,
        after which staff shall immediately notify the
        control center of the need to reset the alarm.
        In the event that the fence-climbing simulation
        is insufficient to activate the alarm, the facility
        administrator shall be immediately notified so
        as to take corrective action.

d.  The facility maintenance supervisor and Chief of
    Security shall check the fence monthly,
    documenting the results in the shift supervisor's
    daily log.

## 3. Housing Units

Each facility administrator shall establish a written
policy and procedures for housing unit and personal
area searches and the use of canine units. Canine
units may be used only for contraband detection.
Canine units shall not be used for force, control or
intimidation of detainees (see standard "2.15 Use of
Force and Restraints").

a.  *Searches of Detainee Housing Areas*
    *Staff may search a detainee's housing area and
    personal items without prior notice, without
    detainee approval and without the detainee being
    present.  Housing area searches shall take place
    irregularly, so as not to establish a predictable
    pattern.*

    *For a cell search, staff shall remove the detainee
    from the cell. Staff must pay particular attention
    to plumbing facilities, ventilators, beds, bedding,
    tables, chairs, books, etc., and be on the alert for
    contraband in false bottoms, hidden
    compartments, hollow legs, etc.*

    *After the search, staff shall restore all items as
    close as possible to their original order.*

b.  Search Log
    Each housing unit, including the SMU, shall
    document cell and area searches in a search log
    that registers the date, time and findings,
    including location where contraband was found,
    type of contraband and the searching officers'
    names.

## 4. Searches of Utility Areas

Staff shall conduct irregular searches of storage and
supply rooms, plumbing accesses, walls (particularly
around ventilators and windows), lighting and
plumbing fixtures, drains, etc., in the housing areas.
These searches shall occur at least once per shift.

## 5. Searches of Shops and Buildings

Assigned staff shall routinely inspect all areas of the
facility, at odd hours, according to no fixed

schedule. For searches of areas with specialized equipment or supplies, the respective department head shall be present to ease access to locked areas and to help determine the status of any questionable items.

Staff shall document these searches in a logbook maintained by the shift supervisor.

## G. Detainee-on-Detainee Physical Assaults

The facility administrator shall ensure that the FOD is notified of any physical assault on an ICE detainee by another detainee or inmate housed at the facility. This includes one or more detainees or inmates engaging in an act of violence against another ICE detainee or the intentional attempt to harm that detainee through force or violence, regardless of whether injury results or a weapon is used. The facility shall ensure a thorough investigation of any incidents of physical assault perpetrated on an ICE detainee, consistent with the requirements of Standard 3.1 "Disciplinary System."

## H. Staff-on-Detainee Physical Assaults

The facility administrator shall ensure that the FOD

is notified of any incident or allegation of a physical assault perpetrated by staff against a detainee. This includes any incident or allegation of facility staff engaging in an act of violence against a detainee, or any intentional attempt to harm that detainee through force or violence, regardless of whether injury results or a weapon is used. The facility shall ensure a thorough investigation of any incident or allegation of staff-on-detainee physical assault, and staff determined to have perpetrated a physical assault on a detainee shall be appropriately disciplined; the results of the investigation shall be transmitted to the FOD.

## I. Staff Misconduct

The facility administrator shall ensure that the FOD is promptly notified of any incident or allegation of staff misconduct if that misconduct relates to treatment of ICE detainees, to the security or safety of the facility, or to compliance with detention standards or the provisions of the facility's contract with ICE. Note that Standard 6.2 "Grievance System" also requires that ICE be notified of any allegation of staff misconduct that is contained in a detainee grievance.

# 2.5 Funds and Personal Property

## I. Purpose and Scope

This detention standard ensures that detainees' personal property, including funds, valuables, baggage and other personal property, is safeguarded and controlled, and that contraband does not enter a detention facility.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.*  Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may also be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices"):

1. The security, safety and good order of each facility shall be maintained through an immediate search of each newly admitted detainee's property.

2. Each detainee's funds, valuables, baggage and personal property shall be inventoried, receipted, stored and safeguarded for the duration of their detention.

3. Each detainee shall be informed of what funds and property may be retained in his/her possession, and of procedures to report missing or damaged property.

4. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Funds and Personal Property" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-2A-20, 2A-23, 2A-24, 6A-07(M)

ICE/ERO *Performance-based National Detention Standards 2011:* "2.3 Contraband."

# V. Expected Practices

## A. General

All detention facilities are required to have written policies and procedures to:

1. account for and safeguard detainee property from time of admission until date of release;

2. inventory and receipt detainee funds and valuables;

3. inventory and receipt detainee baggage and personal property (other than funds and valuables);

4. inventory and audit detainee funds, valuables and personal property;

5. return funds, valuables and personal property to detainees being transferred or released and

6. provide a way for a detainee to report missing or damaged property.

In many facilities, detainee funds are deposited in the detainee's commissary or canteen account. Any facility without a commissary shall provide:

1. a cash box for currently held detainee funds, which can be accessed only by designated supervisor(s) and/or property officer(s);

2. valuable-property envelopes, which can be accessed only by designated supervisor(s) and/or property officer(s) or

3. a dedicated safe for the cash box and property envelopes.

All facilities, at a minimum, shall provide:

1. a secured locker for holding large valuables, which can be accessed only by designated supervisor(s) and/or property officer(s) and

2. a baggage and property storage area that is secured when not attended by assigned

admissions processing staff.

Both the safe and the large-valuables locker shall either be kept in the shift supervisor's office or otherwise secured in an area accessible only to the shift supervisor.

The baggage and property storage area shall be maintained in a clean and orderly manner and inspected as often as necessary to protect detainee property.

## B. Contraband

In accordance with standard "2.3 Contraband," if any unauthorized personal property is contraband, it must be surrendered to staff for securing, receipting and inventorying.

## C. Notice to Detainees

The detainee handbook or equivalent shall notify the detainees of facility policies and procedures related to personal property, including:

1. which items, including cash they may retain in their possession;

2. that, upon request, they shall be provided an ICE/ERO-certified copy of any identity document (e.g., passport, birth certificate), which shall then be placed in their A-files;

3. the rules for storing or mailing property not allowed in their possession;

4. the procedure for claiming property upon release, transfer, or removal;

5. the procedure for filing a claim for lost or damaged property and

6. access to detainee personal funds to pay for legal services.

## D. Admission

Staff shall search all arriving detainees' personal property.

Staff shall search and inventory detainee property

only in the presence of the detainee(s), unless instructed otherwise by the facility administrator.

Medical staff shall determine the disposition of all medicine accompanying an arriving detainee.

Standard operating procedure shall include obtaining a forwarding address from every detainee for use in the event that personal property is lost or forgotten in the facility after the detainee's release, transfer, or removal.

## E. Limitations on Possession of Funds and Personal Property

1. The facility administrator shall establish whether a detainee may keep cash in his/her personal possession while in detention and, if so, how much cash each detainee may keep.

2. Detainees may keep a reasonable amount of personal property in their possession, provided it poses no threat to detainee safety or facility security. Detainees shall be granted an opportunity to store excess property with a third party or, with the facility administrator's permission, in the facility's personal property storage area.

3. Identity documents (e.g., passports and birth certificates) are held in each detainee's A-file. Upon request, staff shall provide the detainee a copy of a document, certified by an ICE/ERO official to be a true and correct copy.

4. For each housing area, the facility administrator shall designate a storage area for storing detainee personal property.

Each detainee shall be permitted to keep in his/her possession reasonable quantities of the following, as long as a particular item does not pose a threat to the security or good order of the facility:

1. small religious items including religious jewelry items;

2. religious and secular reading material

(softbound) and correspondence;

3. legal documents and papers, including property receipts;

4. up to ten photographs measuring no more than 5" x 7";

5. prescription glasses;

6. dentures;

7. personal address book or pages;

8. wedding ring; and/or

9. other item(s) approved by the facility administrator or chief security officer.

*Examples of items detainees may not retain include the following:*

1. *cash in excess of the established facility limit;*

2. *any negotiable instrument;*

3. *jewelry, other than small religious items and wedding rings;*

4. *other items of value, for example, cameras, radios, stereos;*

5. *personal clothing and hygiene items when the facility provides them;*

6. *drugs and medications not prescribed or authorized by facility medical staff and*

7. *prohibited publications, including but not limited to: publications depicting activities that present a substantial risk of physical violence or group disruption (e.g., material dealing with self-defense, weaponry, armaments, explosives, or incendiary devices); publications containing sexually explicit material; or publications describing the production of drugs, alcohol, or weapons.*

Every housing area shall have lockers or other securable space for storing detainees' authorized personal property. The amount of storage space shall be proportional to the number of detainees assigned

to that housing area.

Space constraints may cause the facility administrator to limit the number of newspapers, magazines, etc., allowed to each detainee.

## F. Excess Property

To prevent overcrowding and related storage problems, staff shall encourage detainees to send extra suitcases, televisions and other "soft" (not illegal or dangerous) contraband to a third party of his/her choosing.

1. The facility may make shipping arrangements for a detainee requiring such help.

2. If a detainee does not provide an appropriate mailing address within 30 days of entry, the facility may make reasonable accommodations to store the property until the detainee's removal or release. Ordinarily the amount stored may not exceed 40 pounds.

3. If a detainee does not provide an appropriate mailing address or is unable to pay the postage, the facility administrator may dispose of the property in accordance with standard "2.3 Contraband," after providing the detainee with written notice.

4. When personal property is shipped, staff shall prepare an inventory record and shall maintain a copy in the detainee's detention file.

## G. Officer Processing of Funds and Valuables

Facilities lacking automated detainee funds systems must process detainee funds and valuables as follows.

### 1. Funds

For recordkeeping and accounting purposes, use of the G-589 Property Receipt form or its equivalent is mandatory to inventory any funds removed from a detainee's possession, and a separate G-589 form or its equivalent is required for each kind of currency

and negotiable instrument.

Removal and inventory of detainee funds shall be conducted by at least two officers and in the presence of the detainee. Separate documentation should be made for each kind of currency and negotiable instrument, and should include detainee identification information and a description of the amount and type of currency or other negotiable instrument inventoried. Officers should then deposit the funds with a copy of the documentation in the drop safe or similarly secured depository.

*The G-589 shall include:*

a. *the detainee's A-number or facility detainee number in the center area, just above the biographic information;*

b. *the ICE facility designation code ("DETLOC");*

c. *the current date;*

d. *the complete name of the detainee, printed legibly;*

e. *in the "Quantity" column, the number of checks, money orders, or other negotiable instruments and*

f. *in the "Description" column:*

    *1) the amount and type of currency, the kind of check, money order, or other negotiable instrument;*

    *2) the name of the issuing bank, the register or check number and the account name;*

    *3) for U.S. currency, the dollar sign ($) followed by the dollar amount (e.g., $100); and*

    *4) for foreign currency, the currency amount followed by the type (e.g., 140 Japanese Yen, 300 Euros, 4,000 Mexican Pesos).*

*For a detainee with more than one kind of negotiable instrument, the officers shall prepare as many G-589 or equivalent forms as necessary to list separately all checks, all money orders, each additional category of negotiable instrument; and*

each type and amount of foreign currency.

If cash is returned to the detainee for possession inside the facility, staff shall record the transaction in the "Description" column of the affected G-589 form or equivalent.

The two officers and the detainee shall sign all copies, after which the copies shall be distributed as follows:

a.  white original/first copy to the detainee (property receipt);

b.  blue/second copy to detainee's I-385 booking card or detention file (attachment), and

c.  pink/third copy to funds envelope (insert).

The admissions processing officer shall record each Form G-589, or equivalent, issued and enter the initials and any corresponding identifiers of receipting officers in the facility's G-589 Property Receipt Logbook, or equivalent. The officer shall then deposit an envelope containing the currency, checks, money orders, other negotiable items and G-589 receipt(s) in the drop safe.

### 2. Small Valuables, Including Jewelry

The Form G-589 or equivalent should be used to describe generally each item of value.  The officers should then record the issuance of this Form G-589 in the facility's Property Receipt Logbook or equivalent, place the valuables in a secured envelope, and deposit the envelope in the drop safe or similarly secured depository.

The Form G-589, or equivalent, shall describe each item of value. Jewelry shall be described in general terms (e.g., ring—"yellow/white metal with red/white stone"), with no mention of brand name or monetary value. The detainee and two processing officers shall sign the G-589 or equivalent with copies distributed as noted above in this standard. The officers shall then place the valuables (and pink/third copy of G-589) in a clear envelope, which they shall secure via approved techniques for tamper-proofing.

The processing officer shall record the issuance of this G-589 in the G-589 Property Receipt Logbook or equivalent. The officer shall then deposit the secured valuables envelope and G-589 receipts in the drop safe provided. Zippered nylon bags are not authorized.

### 3. Large Valuables

Large valuables are items that do not fit into property envelopes, for example, televisions or musical instruments.   The Form G-589 or equivalent should be used to describe generally each item of value. The officers should then record the issuance of this Form G-589 in the facility's Property Receipt Logbook or equivalent, tag the large valuable with a copy of the Form G-589 and a Baggage Check (Form I-77), and secure the item(s) in the designated storage area.  The Form G-589, or equivalent, including a description of each item, shall be prepared and distributed as above. The large valuables shall then be tagged with a copy of the Form G-589 and a Baggage Check (Form I-77). The officers shall attach a copy of the Form G-589 and the center portion of the Form I-77 to the detainee's booking card or detention file. The processing officer shall record the G-589 issuance in the facility's G-589 Property Receipt Logbook or equivalent and secure the item(s) in the designated storage area.

## H. Supervisor Processing of Funds and Valuables

During each shift, the supervisory security officer shall verify the accuracy of all G-589 Forms or equivalent, record all funds and items in the drop safe or similarly secured depository in the supervisors' property log, and verify the disposition of all large valuables in the designated secured locked area.

The supervisory security officer or equivalent shall remove the contents of the drop safe during his/her

shift and initial the G-589 accountability log. The supervisor shall:

1. verify the correctness of all G-589 Forms or equivalents;

2. record the amount of cash and describe each item in the supervisors' property log and

3. verify the proper disposition of funds and valuables by checking the sealed envelopes in the cash box, the property envelopes in the safe, and the safekeeping of all large valuables in the designated secured locked area.

## I. Officer Processing of Baggage and Personal Property Other Than Funds and Valuables

An itemized inventory of all detainee baggage and personal property (separate from funds and valuables) shall be completed during admissions processing using the personal property inventory form. Each facility shall inventory all property, even in the event that the property was previously inventoried by another facility and is contained in a sealed bag. If a detainee has no baggage, a facility container shall be provided to store his/her personal property.

A Form I-77 or equivalent shall also be issued for each separate item of baggage or container.

All detainee luggage and facility containers used for storing detainee personal property shall be secured in a tamper-resistant manner and shall only be opened in the presence of the detainee.

These procedures do not apply to identity documents (e.g., passports, birth certificates, etc.), which are held in each detainee's A-file.

The personal property inventory form must contain the following information at a minimum:

1. date and time of admission;

2. detainee's complete name and A-number or facility detainee number;

3. description, quantity and disposition of articles; disposition may be indicated as either:

   a. "S" for "safekeeping" (by the facility); or

   b. R" for "retained" (by the detainee);

4. general condition of the property and

5. signatures of the officer completing the inventory and the detainee.

After being properly inventoried and inspected for contraband, all baggage and facility containers shall be tagged and stored securely.

A pre-numbered, three-part Form I-77 or its equivalent shall be issued for each separate item of baggage or container. The front side of the Form I-77 has three parts: top (Part I); center (Part II); and bottom (Part III), the reverse side of which provides additional space to describe and identify the baggage or container.

1. Each Form I-77 or its equivalent shall bear the detainee's full name and A-number/facility detainee number and the date.

2. The detainee's signature must appear on both the top (Part I) and bottom (Part III) of the Form I-77 or its equivalent.

3. The top part of the Form I-77 or its equivalent shall be attached to the detainee's property.

4. The center part shall provide a brief description of the property container (for example, black suitcase, paper bag, etc.) and shall be attached to the detainee's booking card or detention file.

5. The bottom part shall be given to the detainee and the reverse side shall also contain a brief description of the property container.

All detainee luggage and facility containers used for storing detainee personal property shall be secured in a tamper-resistant manner (e.g., by a tamper-proof numbered tie strap) and shall only be opened in the presence of the detainee.

A logbook shall be maintained listing detainee name,

A-number or facility detainee number, I-77 number, security tie-strap number, property description, date issued and date returned.

Tagged baggage and other property tagged only with an Form I-77, or equivalent, shall then be stored in the facility baggage storage area.

## J. Inventory and Audit

Both on-coming and off-going supervisors shall simultaneously conduct an audit of detainee funds, property envelopes and large valuables where physical custody of, or access to such items changes with facility shift changes.  The property and valuables logbook shall record the date, time and the name of the officer(s) conducting the inventory. Any discrepancies shall be immediately reported to the Chief of Security, who shall follow facility procedure to ensure that all detainee funds and valuables are accounted for.

For each audit, facilities shall use Form G-786 Alien Funds Audit Sheet, or equivalent, reflecting, at a minimum, the following information:

1. Funds Held by Officers Other than the On-Duty Supervisor
At no time shall funds be held by officers other than the on-duty supervisor;

2. Cash on Hand
The count is to be made by the incoming processing supervisor, who shall fill in the appropriate blanks with the amount of each denomination (U.S. currency);

3. Checks, Money Orders, or Other Negotiable Items
The count is to be made by the in-processing supervisor, and the appropriate blanks are to be filled in reflecting the amount of checks, money orders and other negotiable items;

4. Total of G-589 Property Receipts
This figure represents the total amount of funds, checks, money orders and other negotiable items as reflected by the copies of the Form G-589 or

equivalents in the cash box;

5. Disbursed During Shift
This figure represents the total amount of funds disbursed during the shift. The out-going processing supervisor shall enter disbursal information;

6. Received During Shift
This figure represents the total amount of funds collected during the shift. The out-going processing supervisor shall complete this information;

7. Cash on Hand at End of Shift
This figure represents the amount on hand as counted by the out-going processing supervisor. (If the logged figure does not match with the cash currently on hand, a new audit shall be conducted.) The Chief of Security or equivalent shall follow facility procedures to ensure that all detainee funds and valuables are accounted for; and

8. Number of Sealed Property Bags
In facilities without commissaries, a comprehensive weekly audit shall be completed jointly by the detention operations supervisor or equivalent, and a detention staff member. The audit shall be logged in the property and valuables logbook. Discrepancies shall be reported to the Chief of Security (or equivalent). The Chief of Security or equivalent shall take the necessary steps, according to facility policy, to ensure that all detainee funds and valuables are accounted for.

An inventory of detainee baggage and other non-valuable property shall be conducted by the facility administrator's designee at least once each quarter.

The facility's inventory audit shall indicate the inventory's date and time, and the name of the officer(s) conducting the inventory. Any discrepancies shall be reported immediately to the facility administrator.

## K. Release or Transfer

After checking the I-385 Form or equivalent, wristbands and property receipts to positively identify the detainee being released or transferred, the detainee shall present the white copy of both the G-589 Form(s) and I-77 Form(s) or equivalents for all receipted property.

Staff shall compare signatures on Form I-77 receipt portions, and match cash funds, negotiable instruments, and valuables against property descriptions on G-589 forms.

*For each I-77 presented, staff shall compare the signature on the detainee's portion with the portion on the stored item and the portion on the booking card. Depending on the size and kind of funds and valuables listed on the G-589, staff shall conduct checks as follows:*

*1. Small Valuables*
   *Match the contents of the property envelope against the itemized list on all three copies of the G-589 Form or equivalent.*

*2. Large Valuables*
   *Match the tagged items against the description on all three copies of the G-589 Form or equivalent.*

*3. Negotiable Instruments*
   *Match the negotiable instruments against the description on all three copies of the G-589 Form or equivalent.*

*4. Cash Funds*
   *Compare the property description(s) on the white, pink and blue copies of the G-589 Form or equivalent.*

*After the property check, the property shall be returned to the detainee. The detainee shall then sign the blue/second copy of the G-589 Form or equivalent, indicating his/her receipt of all funds and personal property due him/her. The property log and inventory sheets shall reflect the transaction.*

## L. Lost or Damaged Property

### 1. General

Supervisory personnel shall be notified when properly receipted detainee property is reported missing or damaged. Supervisory staff shall investigate and, if necessary, take prompt action to prevent further loss.

If the property is not recovered or is recovered, but in damaged condition, staff shall prepare a report for the facility administrator, providing:  a description of any damage; the circumstances under which the property was last seen; the circumstances under which the loss or damage was discovered; and sworn statements from the detainee and all witnesses.

*If the property is not recovered or is recovered, but in damaged condition, staff shall prepare a report for the facility administrator, providing:*

*a. name and A-number/facility detainee number of the detainee claiming ownership;*

*b. description of the property and, if applicable, damage;*

*c. date and time the loss or damage was discovered;*

*d. name(s) of person(s) discovering the loss or damage;*

*e. the circumstances under which the person(s) discovered the loss or damage;*

*f. names and statements of all witnesses;*

*g. place, date and time the property was last seen (before reported missing or damaged);*

*h. the circumstances under which the property was last seen (before reported missing or damaged); and*

*i. sworn statements from the detainee and all witnesses.*

A detainee being transferred, released, or removed from the country with a property claim shall be allowed to initiate the claim before leaving the facility. The facility administrator shall forward the result of the claim to the claimant's forwarding address (provided upon admission or in conjunction

with the claim).

## 2. Lost or Damaged Property in SPCs

*In addition to all procedures specified above, SPC staff must complete Form I-387 Report of Detainees Missing Property for missing property (but not for damaged property). The original copy of this form shall be placed in the detainee's A-file. The facility shall retain a copy.*

*In accordance with the administrative manual, the facility administrator shall report allegations of impropriety against staff in the handling of detainee funds or valuables.*

## 3. Lost and Damaged Property

All facilities shall have and follow a policy for loss of or damage to properly receipted detainee property, as follows:

a.  all procedures for investigating and reporting property loss or damage shall be implemented as specified in this standard;

b.  supervisory staff shall conduct the investigation;

c.  the senior facility contract officer shall promptly process all detainee claims for lost or damaged property;

d.  the official deciding the claim shall be at least one level higher in the chain of command than the official investigating the claim;

e.  the facility shall promptly reimburse detainees for all validated property losses caused by facility negligence;

f.  the facility may not arbitrarily impose a ceiling on the amount to be reimbursed for a validated claim; and

g.  the senior contract officer shall immediately notify the designated ICE/ERO officer of all claims and outcomes.

## M. Abandoned Property

All facilities shall report and turn over to ICE/ERO all detainee abandoned property.

1.  Contraband shall be handled in accordance with standard "2.3 Contraband."

2.  Property that is of minimal value, broken, or clearly abandoned shall be discarded.

3.  Because property obtained through non-appropriated funds cannot be donated, donations of abandoned property to charitable organizations are prohibited.

# 2.6 Hold Rooms in Detention Facilities

## I. Purpose and Scope

This detention standard ensures the safety, security, and comfort of detainees temporarily held in hold rooms while awaiting further processing. An individual may not be confined in a facility's hold room for more than 12 hours.

Hold rooms are used for detention of individuals awaiting removal, transfer, EOIR hearings, medical treatment, intra-facility movement, or other processing into or out of a facility.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);
- Contract Detention Facilities (CDFs); and
- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

For all types of facilities, procedures that appear in italics with a marked (**) on the page indicate optimum levels of compliance for this standard.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. The safety, security and comfort of detainees temporarily confined in hold rooms shall be ensured.

2. No detainee shall be confined in a hold room for more than 12 hours.

3. Males and females shall be confined separately.

4. Minors (persons under 18) shall be held apart from adults, except for documented related adults or legal guardians, provided this arrangement incites no safety or security concerns.

5. Any detainee with a disability, including temporary disabilities, shall be held in a manner that provides for his/her safety, comfort and security.

6. Detainees awaiting a medical visit shall be seen within two hours.

## III. Standards Affected

This detention standard replaces "Hold Rooms in Detention Facilities" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 1A-04, 1A-09, 1A-10, 1A-11, 1A-14, 1A-19, 1A-20, 1A-21, 6B-04.

ICE/ERO *Performance-based National Detention Standards 2011:*

- "2.6 Hold Rooms in Detention Facilities";
- "2.10 Searches of Detainees";
- "2.15 Use of Force and Restraints"; and
- "4.6 Significant Self-harm and Suicide Prevention and Intervention."

ICE/ERO "Family Residential" standards "Searches of Residents."

ICE/ERO "Family Residential" standards "Use of Physical Force."

# V. Expected Practices

## A. Physical Conditions

Based on the ICE/ERO Hold Room Design Guide, hold rooms in SPCs and CDFs must comply with the criteria in italics in this subsection.  All other facilities are encouraged to make appropriate modifications to meet the criteria specified in the ICE/ERO Hold Room Design Guide.

1. *Each hold room shall be situated within the facility's secure perimeter.*

2. *Each single-occupant hold room shall contain a minimum of 37 square feet (seven unencumbered square feet for the detainee, five square feet for a combination lavatory/toilet fixture and 25 square feet for wheelchair turnaround). Multiple-occupant hold rooms shall provide an additional seven square feet of unencumbered space for each additional detainee. "Unencumbered space" does not include space taken up by benches and tables.*

3. Each hold room shall be well ventilated and well lit. All activating switches and controls shall be located outside the room, in places accessible to staff only.

4. *Each hold room shall contain sufficient seating for the maximum room-capacity but shall contain no moveable furniture. Benches shall provide 18" of seat space per detainee and may be bolted to the floor or attached to the wall if the wall is of suitable construction.*

5. *Bunks, cots, beds and other sleeping apparatus are not permitted inside hold rooms. Exceptions shall be made for detainees who are ill, and for minors and pregnant women.*

6. *Each hold room shall be equipped with stainless steel, combination lavatory/toilet fixtures with modesty panels, in compliance with the applicable federal and state accessibility standards. Consistent with the International Plumbing Code:*

   a. *each small hold room (up to 14 detainees) shall have one combination unit; and*

   b. *each large hold room (15 to 49 detainees), shall have at least two combination units. (The Hold Room Design Standards A-E, HDR Architecture, recommends a third combination unit for a hold room with 30 or more detainees, or one combination unit for every 15 detainees.)*

7. *Each hold room shall have floor drain(s).*

8. *Hold-room walls shall be escape- and tamper-proof (e.g., an eight-inch, reinforced concrete masonry unit wall). Impact-resistant, steel-studded surfaces shall meet this standard in existing buildings that cannot support reinforced concrete. The walls shall extend and be built into the floor/room structure above. Ceilings shall also be escape- and tamper-proof, preferably 10 to 16 feet high but no less than nine feet, except in currently existing facilities with lower floor-to-floor heights.*

9. *Each hold room shall have two-inch thick, detention-grade 14-gauge steel doors that swing outward, and the 14-gauge steel doorframes shall be grouted into the surrounding wall. Also required are tamper-resistant bolt locks, door-mounted with paracentric keys or jamb-mounted with mogul keys.*

10. *The solid doors shall be equipped with security-glass or barred windows, 12"x12", installed at eye level for convenient visual checks. Security bars or mesh doors shall be of appropriately sturdy construction to prevent escape.*

11. *Primary surveillance shall be through observation windows to the side of the hold-room doors. Observation windows shall start about three feet from the floor and extend no higher than the top of the door.*

12. *The glazing shall meet or exceed the impact-resistant standard of glass-clad polycarbonate*

*laminate. Window jambs shall be 14-gauge steel.*

13. Detainees shall have access to potable water in hold rooms.

## B. Unprocessed Detainees

An individual may not be held in a hold room for more than 12 hours.

1. Unaccompanied minors (persons under 18) and parent(s) or legal guardians accompanied by minor children shall not be placed in hold rooms, unless they have shown or threatened violent behavior, have a history of criminal activity, or have given staff reasonable grounds to expect an escape attempt. As soon as it is determined that an unaccompanied minor is being detained, immediate efforts shall be coordinated with the ICE/ERO Juvenile Family and Residential Management Unit (JFRMU) to move the minor within 72 hours, to an approved facility designated for the placement of unaccompanied minors by the U.S. Department of Health and Human Services Office of Refugee Resettlement (ORR) procedures. While in custody juveniles shall be detained in the least restrictive setting appropriate to the juvenile's age and special needs, provided that such setting is consistent with the need to protect the juvenile's well-being and that of others, as well as with any other laws, regulations, or legal requirements.

2. Persons exempt from placement in a hold room due to obvious illness, special medical, physical and or psychological needs, or other documented reasons shall be seated in an appropriate area designated by the facility administrator outside the hold room, under direct supervision and control, barring an emergency. If the physical layout precludes holding such individuals outside the hold room, they may be held in separate rooms, if available.

3. Males shall be segregated from females at all times (even if married).

4. Any minor (persons under 18) shall be held apart from adults, **minimizing sight, sound, and physical contact,** unless the juvenile is in the presence of an adult member of the family unit (determined through reliable evidence of a family relationship) or legal guardian, and provided there are no safety or security concerns with this arrangement. (For more information regarding juveniles, see Flores v. Reno.)

5. Detainees with open, obvious, apparent, or other identified disabilities, including temporary disabilities, shall be housed in a manner that accommodates their disability(ies) and provides for safety, comfort and security.

6. Detainees shall be provided with basic personal hygiene items (e.g., water, disposable cups, soap, toilet paper, feminine-hygiene items, diapers and sanitary wipes), as appropriate.

7. If the hold room is not equipped with restroom facilities, the shift supervisor shall position an officer within sight or earshot of the hold room, to provide detainees with regular access to toilet facilities, which shall be as close as possible within the facility's security perimeter. Detainees using the restroom shall be closely monitored, under direct supervision. Detainees with disabilities shall be provided appropriate assistance and access to accessible toilet facilities in the hold room or holding area.

## C. Detainee Search

Officers shall inspect parcels, suitcases, bags, bundles, boxes and other property before accepting any item of property.

Before placing a detainee in a room, staff shall do a pat-down search for weapons or contraband.

1. The pat-down search shall be done by a staff member of the same gender as the detainee, unless one is not available.

2. A pat-down search is required, even if another section

or agency claims to have completed one.

If the pat-down search indicates the need for a more thorough search (e.g., in cases of reasonable suspicion of contraband or weapon possession), a strip search shall be conducted, in accordance with standard "2.10 Searches of Detainees" and/or the "Family Residential" standard on "Searches of Residents."

Staff shall remove from a detainee's possession any sharp objects, including pens, pencils, knives, nail files and other objects that could be used as weapons or to deface property.

## D. Basic Operational Procedures

1. Before placing a detainee in a hold room, an officer shall observe and evaluate whether the detainee presents any open, obvious or apparent disabilities, mental health concerns, or other special needs. If any  such special needs, including any disabilities, or concerns, are apparent, the officer shall notify appropriate staff.

2. Each facility shall maintain a detention log (manual or electronic) into which the hold room officer shall immediately enter specific information on an ICE/ERO detainee's placement in a hold room.

   *The detention log shall record each detainee's:*

   *a. name;*

   *b. sex;*

   *c. age;*

   *d. A-number;*

   *e. nationality;*

   *f. reason for placement;*

   *g. time in;*

   *h. time out; and*

   *i. date and time of new age determination.*

   *The log shall also provide space to record meal*

*times, visual checks, security concerns (which may also necessitate an incident report) and comments.*

3. Meals:

   a. Officers shall offer a meal to any adult held in a hold room for more than six hours. (Officers shall question newly arrived individuals to determine when he/she last ate, and, if appropriate, provide a meal soon after arrival in the hold room.)

   b. Each minor shall receive meal service regardless of the time in custody or time of arrival.

   c. Minors, pregnant women and others with evident medical needs shall have access to snacks, milk and juice.

   d. To the extent practicable, officers shall be sensitive to detainees' cultural, religious and medical culinary restrictions and differences.

4. Staff shall ensure that sanitation, temperatures and humidity in hold rooms are maintained at acceptable and comfortable levels. Minors, pregnant women and others with evident medical needs shall have temporary access to temperature-appropriate clothing and blankets.

5. Officers shall closely and directly supervise hold rooms through the following means:

   a. continuous auditory monitoring, even when the hold room is not in the officer's direct line of sight;

   b. visual monitoring at irregular intervals at least every 15 minutes, each time recorded in the detention log, to include the time, the officer's printed name, and any unusual behavior or complaints under "comments"; and

   c. constant surveillance of any detainee exhibiting signs of hostility, depression, or similar behaviors. In such cases, the officer shall notify the shift supervisor. (See standard

"4.6 Significant Self-harm and Suicide Prevention and Intervention.")

6. Staff shall not permit detainees to use tobacco products in a hold room.

7. The occupant load/detainee capacity shall be posted outside of each holding cell.

8. *No officer may enter a hold room unless another officer is stationed outside the door, ready to respond as needed. Officers may not routinely carry firearms, pepper spray, a baton or any other non-deadly force devices into a hold room, and any required physical force to control a situation shall be in accordance with standard "2.15 Use of Force and Restraints" and/or the "Family Residential" standard on "Use of Physical Force."*

9. When the last detainee has been removed, officers shall ensure the hold room is thoroughly cleaned and inspected for any evidence of tampering with doors, locks, windows, grills, plumbing, electrical fixtures, or contraband, and shall report any such problems to the shift supervisor for corrective action or repair.

## E. Fire, Building Evacuations and Medical Emergencies

1. The facility administrator shall develop and distribute a written plan to be followed in the event of a fire, building evacuation, or medical emergency.

   *Evacuation procedures shall include posting the evacuation map and advance designation of the officer responsible for removing detainees from the hold room(s) in case of fire and/or building evacuation.*

2. Staff shall immediately:

   a. contact the medical emergency service when a detainee appears to be in need of urgent medical treatment; and

   b. notify the supervisor of any such emergencies.

3. If a detainee is removed from a hold room for medical treatment, an officer detail shall accompany and remain with that detainee until medical personnel determine whether the condition requires hospitalization.

   a. If the detainee is not hospitalized, the officer detail shall remain with the detainee until treatment is complete and then escort the detainee back to the facility.

   b. If the detainee is hospitalized, the officer detail shall notify the supervisor and await further instructions.

# 2.7 Key and Lock Control

## I. Purpose and Scope

This detention standard enhances facility safety and security by requiring that keys and locks be properly controlled and maintained.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs and CDFs.*   IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

For all types of facilities, procedures that appear in italics with a marked (**) on the page indicate optimum levels of compliance for this standard.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. All staff shall be trained in the proper care and handling of keys and locks.

2. Keys shall be accounted for and controlled.

3. Locks and locking devices shall be continually inspected, maintained and inventoried.

4. All firearms shall be stored in secure gun lockers before their carriers enter the facility.

## III. Standards Affected

This detention standard replaces "Key and Lock Control" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-2D-01, 7B-10.

## V. Expected Practices

### A. Proper Care and Handling of Keys and Locks

All staff shall be trained in and held responsible for adhering to proper procedures for the care and handling of keys, including electronic key pads where used. Initial training shall be completed before staff is issued keys, and key control shall be among the topics covered in subsequent annual training. Ordinarily, such training shall be done by the security officer (key control officer), as described below.

1. *An employee who leaves the facility with a key ring shall return it immediately upon realizing his/her mistake or when instructed to by the facility. Such an act shall constitute unauthorized possession of facility property as well as a breach of security procedures.*

2. *An employee who loses, misplaces, or otherwise cannot account for a key or key ring shall immediately alert the shift supervisor and promptly submit a written report.*

3. *Under no circumstances shall staff allow a detainee to handle facility keys.*

4. *Key rings, including those for gun lockers, shall be securely fastened to a belt with a metal clip or other approved device. Fastening keys to a holster or belt loop is prohibited.*

5. *Employees shall not refer to key numbers or other*

means of key identification within earshot of a detainee.

6. *Employees shall neither throw nor slide keys to one another.*

7. *Locks should not be forced. If a key fails to operate a lock, a supervisor shall be notified immediately.*

8. *If a key breaks inside a lock, the employee shall maintain visual oversight of the lock until the problem is repaired. If the key breaks inside a padlock, the padlock itself shall be removed and taken to the control center. In every instance, the employee shall submit a memorandum on the incident to the facility administrator.*

9. *Facilities shall use key covers for large security keys to prevent detainees or other unauthorized persons from observing and duplicating them.*

## B. Security Officer (Key Control Officer)

Each facility administrator shall establish the position of security key control officer, or at a minimum, shall assign a staff member the collateral security officer duties, as described herein.

### 1. Major Duties and Responsibilities of the Security Key Control Officer

The security key control officer shall have a written position description that includes duties, responsibilities and a chain of command

*The security key control officer:*

a. *reports directly to the Chief of Security;*

b. *conducts physical security surveys of all buildings and provides the Chief of Security written recommendations regarding deficiencies and needed corrective actions;*

c. *plans and implements adequate preventive maintenance/replacement locks and other security devices;*

d. *identifies technical problems or malfunctions in*

*electronic/automated and manually operated security systems and immediately repairs them or coordinates prompt repairs with the facility maintenance department;*

e. *overhauls, adjusts and replaces worn parts on locking devices and systems;*

f. *maintains, adjusts and services machines used in the lock shop;*

g. *is trained in operation of gas/oxygen-cutting tools and end-saw equipment in case of an emergency;*

h. *conducts routine tests on emergency-exit doors;*

i. *checks the keys to all emergency exits every 30 days and all other keys needed in emergencies quarterly, and documents the results; and*

j. *reviews all major work orders and in-house designs, plans and specifications with the facility maintenance department for compliance with security requirements.*

*The facility maintenance supervisor, or equivalent, shall consult with the Chief of Security or equivalent and security officer before proceeding with new construction and renovation projects involving door hardware.*

### 2. Required Locksmith Training

*All security key control officers shall successfully complete an approved locksmith-training program.*

*The security key control officer shall complete an approved locksmith training program.*

*This training shall be supplemented with additional training in Occupational Safety and Health Administration standards and the National Fire Prevention Association's life safety codes. Manufacturer's instructions, user manuals, product orientations and demonstrations also provide useful guidance and shall be housed in a secure location.*

### 3. Administrative Responsibilities

*The security key control officer is responsible for all*

administrative duties, including record keeping, concerning keys, locks and related security equipment.

The security key control officer or equivalent:

a.  maintains a record keeping system that cross-references keys in the control center and lock shop, alphabetically and numerically, to facilitate quick identification of the key or key ring needed for a particular lock;

b.  maintains accurate inventories of padlocks in use, master keys for cabinets, key blanks and all keys currently in use; and

c.  maintains, for the historical record, a collection of reference material on locking devices and systems, including devices and systems previously used in the facility.

### 4. Supervision and Training

The security key control officer shall train and direct employees in key control, including electronic key pads where used.

The security key control officer is responsible for training an assistant security officer in all duties related to the position. The security officer must be proficient in all phases of security and be able to demonstrate proper equipment use to other employees.

## C. Lock Shop Operation

### 1. Inventories

The security key control officer shall maintain inventories of all keys, locks and locking devices in the lock shop.

Lock shop inventories shall include, at a minimum, the following:

a.  A secure master-key cabinet containing at least one pattern key (never issued), and one or more spare keys. The cabinet shall be kept locked; except when in immediate use. The contents shall be itemized on an inventory form;

b.  All key blanks, identified by model number and manufacturer's name, inventoried in a bound ledger or electronic database;

c.  All unassigned padlocks; and

d.  An inventory of assigned padlocks, with locations identified alphabetically or numerically.

### 2. Compromised Keys and Locks

The facility administrator or Chief of Security shall establish procedures for handling compromised keys and locks.

Note: Compromised keys shall be cut into pieces until irretrievably destroyed. The facility shall document the type of key or lock, the number of keys or locks compromised and the date, time and method of destruction.

### 3. Safe Combinations

The security key control officer shall implement procedures for protecting the integrity of all safe combinations.

 Note: The combination for each safe shall be changed at least every 12 months and any time a staff member with access to a combination is assigned to another post. The combination to a safe shall be sealed in an envelope bearing across the flap the date and signature of the person who deposited and sealed the combination inside the envelope. Any person(s) authorized to open the envelope shall be listed, by name and title, on the front of the envelope. Envelopes containing safe combinations shall be stored in the lock shop.

### 4. Keying, Authorized and Non-Authorized Locks

a.  Either deadbolts or deadlocks shall be used in detainee-accessible areas.

b.  Locks not authorized for use in detainee-accessible areas include, but are not limited to: snap-, key-in-knob, thumb-turn, push-button, rim-latch, barrel or slide bolt and removable-core-type locks (including padlocks). Any such

locks in current use shall be phased out and replaced with mortise lock sets and standard cylinders.

c. Grand master-keying systems are not authorized.

d. A master-keying system may be used only in housing units where detainees have individual room keys. The number of doors shall be kept to a minimum and the unit officer's key must override all functions of such locks.

e. After removing the facility number and key cuts, the security key control officer shall cut up and dispose of worn or discarded keys and locks.

f. Entrance/exit door locks of housing units, work areas, chapels, gyms and other areas with room capacity of 50 or more people shall meet the standards specified in the Occupational Safety and Environmental Health Manual (Chapter 3) and in the National Fire Protection Association Life Safety Code (#101). Specifically, the doors shall be equipped with prison type locking devices modified to function when pressure is applied from inside the room. Panic-hardware is an acceptable alternative to the prison-type-locking device.

g. Individual doors to areas with room capacity of 50 or more people shall have no more than one lock each. Padlocks shall not be used on exit doors or intermediate doors along the exit route.

h. Padlocks and/or chains may not be used on cell doors.

1) Padlocks and hasps may be used only where specified below:

a) fence-gates in areas without ceilings;

b) freezer-door interiors whose lock -release systems include panic-release device(s); and

c) vehicle roll-up door walk-through exit(s).

2) Entrances and exits from the secured perimeter shall be controlled by sally ports, with all doors and gates interlocking electronically. (Controls shall be set such that only one door can unlock at a time, canceling the electrical control of other doors until the unlocked door is returned to its secure position.)

3) Under no circumstances may prison-type security keys and/or blanks—active, non-active, or discarded—be used or distributed for presentation purposes.

## 5. Preventive Maintenance

The security key control officer, or designee, shall implement a preventive maintenance program.

The security key control  officer shall perform preventive maintenance services, including but not limited to the following:

1) adjust and service all cellblock-locking mechanisms in the Special Management Unit and in housing units with secure rooms, annually at a minimum;

2) adjust and service vehicle-gates for changing (i.e., hot/cold) weather conditions twice a year, in the spring and early fall;

3) adjust and service front-entrance and other gate operations at least once a year;

4) lubricate all other locks quarterly, per manufacturers' instructions;

5) perform maintenance checks on locks and locking systems, taking corrective action as necessary; and

6) once every five years, at least:

a) steam-clean vehicle-gates; and

b) clean locking mechanisms of front-entrance gates, other gates and cellblock locking mechanisms using steam or other means.

The facility maintenance supervisor is responsible for door-hardware installation and maintenance (e.g., closures, hinges, pulls, kick plates, etc.), and for providing certain support

*services (e.g., welding, electrical-work) to the security officer, as needed.*

## 6. Preventive Maintenance Documentation

The security key control officer shall maintain all preventive maintenance records.

*The security key control officer's preventive maintenance files shall include:*

*a. date;*

*b. location of lock or locking mechanism;*

*c. type of maintenance performed;*

*d. rationale for changing key combination(s); and*

*e. signature of service provider.*

## D. Key Cabinet

### 1. Location

An operational keyboard large enough to accommodate all facility key rings, including keys in use, shall be located in a secure area.

*This operational keyboard shall be located in the control center. An electronic key control box may be placed outside the control center if in a secure unit.*

### 2. Basic Construction

*The key cabinet shall be constructed so that keys are visible only when being issued. Keys may never be seen by detainees or visitors.*

*Small, closet-type space in the control center may be used instead of a cabinet, as long as:*

*a. access limitations are the same as for a key cabinet;*

*b. all other key/lock standards are met; and*

*c. the space is used solely for key control.*

*In the key cabinet:*

*a. keys in vertical rows shall be arranged in alphabetical order,*

*b. keys in horizontal rows shall be arranged in*

*numerical order.*

*c. the label identifying the letter or number of the key ring that belongs on a particular hook shall be visible even when the key ring is on the hook, and*

*d. any hook without an assigned key ring shall be tagged with a metal chit that indicates "hook not in use."*

### 3. Key Rings

The security officer shall implement procedures for identifying every key ring and every key on each key ring, and for preventing keys from being removed from key rings, once issued.

*All key rings shall be heavy-gauge wire that has been welded or brazed to prevent removal of keys from the ring.*

*Two metal tags of unequal size shall be attached to each key ring:*

*a. the larger tag shall identify the key ring with a number/letter corresponding to the hook number/letter; and*

*b. the smaller tag shall identify the number of keys on the key ring.*

### 4. Emergency Keys

Emergency keys shall be on hand for every area to or from which entry or exit might be necessary in an emergency.

*a. Emergency keys may be kept in a separate key cabinet or in a readily identified area of the regular-issue key cabinet. A separate key cabinet located in the control center is recommended for the emergency keys.*

*b. The emergency key cabinet shall contain a hook for each key ring. If an emergency key ring is kept outside the main emergency key cabinet (e.g., in a tower), a metal tag providing the key ring's location shall hang on the hook intended for that key ring in the main emergency key*

cabinet.

c. The emergency keys shall be cut precisely to manufacturer's specifications.

d. Emergency keys shall not be rotated in and out of the lock shop.

## E. Issue of Key Rings

### 1. Chit System

Facilities shall use a chit system or other standard system for the issuance and accountability of key distribution. A key chit is a tag (usually metal) that identifies the person who has drawn a set of keys.

The chit shall be labeled with the officer's first initial and last name. All key rings shall be issued as needed (e.g., at the beginning of a shift, etc.) with the exchange of a chit for a key and with the chit placed on the hook from which the key was removed.

An employee who reports to work without chits must obtain temporary chits from the control room officer, which he/she can exchange for keys according to standard procedure.

a. The control room officer shall maintain accountability for the issued chits.

b. At the end of the shift, the employee shall personally return the temporary chits to the control room officer.

At shift rotation, to obtain keys from an officer on post, the relief officer must first exchange his/her key chit at the control room center for the key chit of the employee being relieved. The relief officer shall take his/her key chit to the employee being relieved and exchange the key chit for the appropriate ring of keys. The officer shall then count the keys on his/her ring, immediately reporting any discrepancies to the shift supervisor. If the relief officer needs to gain access to any location while heading from the control enter to his/her post, the control room officer may issue him/her a second set of keys. In such a case, the officer shall return the extra set of keys to the control room officer at the

end of the relief shift.

### 2. Restricted Keys

The facility administrator shall establish rules and procedures for authorizing use of restricted keys.

The control room officer must have authorization from the shift supervisor to issue a restricted key.

a. Pharmacy
   Pharmacy keys shall be strictly controlled.

   Ordinarily, such controls include:

   1) maintaining pharmacy keys in a restricted keys cabinet in the control room, and issuing them only to authorized pharmacy staff; and

   2) maintaining a second set of pharmacy keys in the lock shop.

   In the event of a non-medical emergency that necessitates entry into the pharmacy by anyone other than authorized pharmacy staff, the highest-ranking supervisor on duty may authorize immediate entry to the pharmacy. The supervisor shall then document the reasons for entry and sign the authorization.

   Such documentation shall not impede the immediate provision of emergency medical care to a detainee by medical staff.

b. ICE and EOIR Offices
   Keys to ICE and the Executive Office for Immigration Review (EOIR) office and courtroom areas shall similarly be restricted and controlled. In the event that a key is authorized for emergency withdrawal, a copy of the restricted key form is to be provided to ICE.

### 3. 24-Hour Issue Keys

No key or key ring may be issued on a 24-hour basis without the facility administrator's written authorization.

A key chit identifying the borrower of the key ring shall be placed on the appropriate hook in the key cabinet, along with a metal tag marked "24-hour

*issue."*

*Individual authorizing record forms shall be used to record the following information about each set of 24-hour-issue keys: the key ring identifiers (number and title), the number of keys on the ring, the individual key numbers and the door each key unlocks. Each record must bear the signatures of the authorizing facility administrator, Chief of Security and the employee to whom the keys are issued.*

### 4. Security Keys

*Key rings used but not issued on a 24-hour basis because of the attached security keys shall be kept in a dedicated glass-front, lockable box in the control center. Identical boxes may be kept and used in different departments, provided staff members are authorized to receive 24-hour keys. The key to every such box shall be issued on a 24-hour basis.*

*The staff member removing keys from the box shall place his/her chit on the hook in place of the key ring, and shall return the keys and reclaiming the chit at the end of the shift. The individual to whom the keys were issued shall personally return the keys to the box, without exception.*

*Security keys may not be taken off facility property (except for bus, van and other authorized-vehicle keys). As a rule, security keys shall not be issued on a 24-hour basis.*

### 5. Key Accountability

The facility administrator shall establish written policy and implementation procedures to ensure key accountability.

*The control room officer shall conduct a key ring audit upon reporting for duty, accounting for each key ring in the control center logbook, and shall immediately report discrepancies in the record to the shift supervisor.*

*The control room officer shall also identify broken or bent keys. All keys (regular-issue and emergency) shall be checked and counted daily.*

*To ensure accountability, keys shall be issued only on the assigned key rings.*

### 6. Request for Key Change

*Key-change requests shall be submitted, in writing, to the facility administrator. Upon facility administrator approval, only the security officer may add or remove a key from a ring.*

### 7. Split Key Ring

*The splitting of key rings into separate rings is not authorized.*

## F. Gun-Locker Keys

Officers shall store all their weapons in individual lockers before entering the facility.

The facility administrator shall develop and implement site-specific procedures for controlling gun-locker access.

In all facilities, gun lockers shall:

1. be placed in locations where officers can continuously observe them, in person or on a video-monitor, and not in any area that has detainee or public access;

2. be used to store the weapons of all on-duty officers, except those whose assignments require them to carry weapons; and

3. not be used for long-term storage. (A staff member may arrange with the facility firearms control officer for long-term storage of a weapon in the armory.)

Chits and logbooks are useful for maintaining accountability for gun locker keys and gun locker use.

# 2.8 Population Counts

## I. Purpose and Scope

This detention standard protects the community from harm and enhances facility security, safety and good order by requiring that each facility have an ongoing, effective system of population counts and accountability for detainees.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs and CDFs.* IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcome

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

Security, safety and orderly facility operations shall be maintained through an ongoing, effective system of population counts and accountability for detainees.

The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Population Counts" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-2A-16, 2A-17.

ICE/ERO *Performance-based National Detention Standards 2011:*

- "2.9 Post Orders"; and

- "4.3 Medical Care."

## V. Expected Practices

### A. Formal Counts

Formal counts are conducted in a predetermined manner at specific times of the day and night. A formal count shall be conducted at least once every eight hours, with a shift supervisor verifying its accuracy. Additional counts, at the discretion of the

facility, are encouraged.

1. *The formal count(s) shall be conducted at least once every eight hours (once per shift at minimum) at times determined by the Chief of Security. Counts shall be scheduled to achieve full accountability with minimal interference with daily work and activity schedules.*

2. *Count procedures must be strictly followed. If the accuracy of a count is in doubt, the officers shall do a recount and any other double-checking necessary. Officers performing the count shall never rely on a roll call.*

   a. *An unaccompanied officer shall never perform a count in an open area (e.g., housing units, food service area). One officer shall count while a second officer observes all detainee movements, to ensure that no detainee is miscounted. Upon completing the first count, the officers shall change positions and count again.*

   b. *The officers assigned the count shall have primary responsibility for the count accuracy, and shall be familiar with possible sources of error. The officers must know the specific manner of counting detainees in different types of locations (e.g., housing units, open-type areas, or work areas). A system for counting each detainee, including those who are outside the housing unit, shall be developed. The officers shall encourage detainees to accept the count as a facility necessity.*

   c. *Prior to counting a detainee present, officers must make positive identification of the living body of the detainee and shall ascertain non-use of decoys (e.g., mannequins, replicas, dummies). Counting officers shall remain in the count area until the facility control center verifies and clears the count.*

   d. *When making night counts, officers shall use*

*flashlights judiciously, but with sufficient light to make a positive identification of a living body. The officer must not count a detainee based on a part or parts of clothing, hair, shoes, or the appearance of a human form.*

3. *Officers shall encourage detainee cooperation; however, they shall not allow detainees to perform the count, nor participate in the preparation or documentation of the count process.*

4. *There shall be no movement of detainees during formal counts. All detainee movements into, out of and within the facility must cease before the count begins. Detainee movement shall not resume anywhere in the facility until the complete facility count has been cleared. If, while conducting a count, staff observe an unusual incident (e.g., medical emergency, criminal act), they shall cease the count and respond appropriately according to local procedures. Should an emergency arise during the count that necessitates the movement of detainees, a new count shall be conducted as soon as possible after the emergency subsides.*

5. *All detainee units/areas shall be counted simultaneously. Each detainee shall be counted at a specific location, and all movement of detainees shall cease before the count begins. Movement shall not resume until the total detainee population count is verified and cleared. The counting officer from each location shall report his/her count to the facility control officer, who is responsible for collecting and maintaining the count.*

   a. *After the count is reported, a signed paper count slip shall be delivered to the control center. This count slip shall be used to verify the area count.*

   b. *Count slips must be prepared and signed in indelible ink. The control center shall not accept an improperly prepared count slip or*

one that contains erasures or alterations of any kind.

c. Both officers conducting the count must sign the count slip.

d. The control officer shall take into account the current out-count in verifying the population count against the master count.

6. As each area reports its count, the control officer shall indicate that count in the control log.

a. If any area/unit reports an incorrect count, all areas/units shall be required to count again. If the count remains incorrect, the shift supervisor shall be notified and additional staff shall be dispatched to the count area to assist with a third count.

b. No count shall be cleared until all counting errors have been corrected, or until the cause of error has been identified and corrective action taken.

c. If a detainee is in the wrong count area, the detainee shall be escorted to the correct count area. If this occurs, officers in all count areas/units shall re-count, recall the earlier counts and deliver the new count slip to the control officer.

7. If all recounts fail to clear the count, the shift supervisor shall conduct a face-to-photo count, matching photos on facility identification cards with detainee faces, individual by individual. When the face-to-photo count has been completed, the control officer shall report that count to the shift supervisor responsible for accepting and clearing the count.

8. In the event that a detainee is unaccounted for after the face-to-photo count, the supervisor on duty shall institute the escape policy.

## B. Face-to-Photo Counts

Face-to-photo counts shall be conducted as necessary. Facilities shall conduct at least one face-to-photo count daily.

Face-to-photo counting procedures are the same as the formal count procedures, except each detainee shall be matched with the photo on his/her I-385 card or facility equivalent photo-identification card.

## C. Informal/Census Counts

Each officer shall make irregular, but frequent checks to verify the presence of all detainees in his/her charge.

These informal counts or checks occur between formal counts. For work crews, a count is made when the crew assembles for work, at frequent intervals during the work period and when the crew is dismissed at the end of the work period. An informal count is reported only if a detainee appears to be missing. In that case, an emergency (formal) count shall be taken.

## D. Master Count

The facility control center shall maintain a master count.

The facility control officer maintains the master count record. He/she must be provided with up-to-the-minute information regarding detainee admissions, releases, housing changes, hospital admissions, outside work details and any other changes that may affect detainee accountability. An up-to-the-minute count record shall be maintained at all times in the control center. The master count shall take into account the current out-count.

## E. Out-Counts

The control officer shall maintain an out-count record of the number and destination of all detainees who temporarily leave the facility.

This record must contain an accurate and up-to-the-minute listing of every temporary departure and return of a detainee. It must be updated regularly and used in any formal count.

## F. Emergency Count

An emergency count shall be conducted when there is reason to believe a detainee is missing, or after a major disturbance has occurred.

An emergency count is a formal count taken in addition to, and at a different time, from the regularly scheduled formal counts. When a detainee is unaccounted for, or after a major disturbance has ended, a count shall be taken to determine that no one has escaped or is in hiding. The facility control officer must always be prepared to produce an up-to-the-minute count for such use.

*All detainees shall be returned to their housing units during emergency counts. An emergency count shall be conducted in the same manner as a formal count.*

# 2.9 Post Orders

## I. Purpose and Scope

This detention standard protects detainees and staff and enhances facility security and good order by ensuring that each officer assigned to a security post knows the procedures, duties and responsibilities of that post.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);
- Contract Detention Facilities (CDFs); and
- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

For all types of facilities, procedures that appear in italics with a marked (**) on the page indicate optimum levels of compliance for this standard.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Each officer shall have current written post orders that specifically apply to the assigned post, with step-by-step procedures written in sufficient detail to guide an officer assigned to that post for the first time.

2. Signed and dated records shall be maintained to show that assigned officers acknowledge that they have read and understood the post orders.

3. Post orders shall be formally reviewed annually, and updated as needed.

## III. Standards Affected

This detention standard replaces "Post Orders" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-2A-04.

ICE Interim Use of Force Policy (2004).

ICE Interim Firearms Policy (2004).

ICE/ERO *Performance-based National Detention Standards 2011:* "2.15 Use of Force and Restraints."

## V. Expected Practices

### A. Post Orders Required

The facility administrator shall ensure that:

1. there are written post orders for each security post;

2. copies are available to all employees;

3. written facility policy and procedures exist, which:

   a. provide official on-duty time for officers to read the applicable post orders when assigned to a post, and

   b. ensure that officers read those applicable post orders prior to assuming their posts; and

4. as needed, post orders for non-permanent assignments (e.g., details, temporary housing units, emergencies) are developed in advance, or as soon as possible after the need arises.

## B. Reading and Understanding of Post Orders

Officers and supervisors shall use the post orders to familiarize themselves with the duties for which they are responsible and to remain situationally aware of changes that occur in the operation and duties of that post. Even in the event that an officer has worked a post in the past, he/she shall assume the post orders have changed, and shall be required to read and comprehend all Post Order documents upon assuming their posts.

Supervisors shall ensure that officers understand the post orders, regardless of whether the assignment is temporary, permanent, or due to an emergency.

## C. Preparation of Post Orders

*The chief security officer shall supervise the preparation of all post orders, which shall:*

1. *be based on ICE/ERO detention standards, ICE/ERO policies and facility practices and policies; and*

2. *specifically state the duty hours for each post.*

*The facility administrator (or designee) shall:*

1. *approve, sign and date each Post Order on the last page of each section;*

2. *initial and date all other pages and*

3. *initial and date any subsequent changes to the Post Order.*

## D. Format of Post Orders

*The post orders for each post shall be issued in a six-part classification folder and shall be organized as follows:*

*Section 1: Specific post orders, listing activities chronologically, with responsibilities clearly defined;*

*Section 2: Special instructions, if any, relating to the specific post;*

*Section 3: General post orders applicable to all posts;*

*Section 4: Memoranda changing or updating the post orders;*

*Section 5: ICE/ERO detention standards and policies and facility practices relevant to the post; and*

*Section 6: Review and signature form, dated and with the officer's name printed and signed.*

## E. Housing Unit Post Orders

*In addition to the above requirements for all post orders, housing unit post orders shall follow the event schedule format (e.g., "0515—Lights on") and shall direct the assigned officer to maintain a unit log of pertinent information regarding detainee activity.*

*The shift supervisor shall visit each housing area and initial the log on each shift.*

## F. Armed and Perimeter-Access Post Assignments

In addition to the above requirements for all post orders, post orders for armed and perimeter-access post assignments shall describe and explain:

1. the proper care and safe handling of firearms; and

2. circumstances and conditions under which use of firearms is authorized.

Any officer assigned to an armed post must be qualified to use the firearms assigned to that post. With the exception of emergencies, armed employees shall be assigned only to transportation details, mobile patrols, or other posts inaccessible to detainees.

Post Orders for armed posts, and for posts that control access to the institution perimeter, shall clearly state that:

1. any staff member who is taken hostage is considered to be under duress; and

2. any order issued by such a person, regardless of his/her position of authority, is to be disregarded.

Specific instructions for escape attempts shall be included in the post orders for armed posts.

The post orders shall be based on and consistent with standard "2.15 Use of Force and Restraints" and the ICE/ERO Interim Use of Force Policy.

## G. Maintenance of Post Orders

Post Orders shall be kept current at all times. Post orders shall be formally reviewed annually, at a minimum, and updated as needed. Should staff members become aware that any part of a folder containing post orders is out of date, or in need of repair or replacement, they shall immediately notify the shift supervisor.

1. Post Orders and logbooks are confidential and must be kept secure (under lock and key) at all times, and shall never be left in an area accessible to detainees.

2. The Chief of Security shall determine whether post orders require updates during any period between annual reviews. Any time the Chief of Security determines a page is too difficult to read, it shall be removed and replaced by a clean copy.

3. Two weeks before the annual review, supervisory staff shall solicit written suggestions for changes or additions to post orders from ICE/ERO staff, contract staff and other affected staff.

The security supervisor or equivalent shall review and comment on all suggested changes prior to submitting them to the Chief of Security for review and possible inclusion in post orders. All submissions shall be retained in a historical file for two years.

The Chief of Security shall forward the updated post orders to the facility administrator for approval.

4. Emergency changes may be made by memorandum, and immediately placed in the post orders with an immediate notification made to the union, when required. During each review, post orders must be revised to incorporate or delete emergency changes, at which time any emergency memoranda are to be removed.

5. A post orders master file shall be maintained in the office of the Chief of Security, and shall be made available to all staff. Copies of the applicable post orders may be retained at the post, only if secure from detainee access.

6. The Chief of Security shall ensure that all post orders are transcribed on a computer and that all back-up disks are properly accounted for and maintained in a secure location.

# 2.10 Searches of Detainees

## I. Purpose and Scope

This detention standard protects detainees and staff and enhances facility security and good order by detecting, controlling and properly disposing of contraband.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Detainees shall live and work in a safe and orderly environment.

2. Contraband shall be controlled.

3. Cross-gender pat-down searches of male detainees shall not be conducted unless, after reasonable diligence, staff of the same gender is not available at the time the pat-down search is required, or in other exigent circumstances.

Cross-gender pat-down searches of female detainees shall not be conducted unless in exigent circumstances. Staff of the same gender as the detainee should perform the strip search of the detainee. Searches of the detainee's property, housing unit or other areas can be made by staff of either gender.

4. Searches of detainees, housing and work areas shall be conducted without unnecessary force and in ways that preserve the dignity of detainees.

5. When body searches are conducted, the least intrusive practicable search method shall be employed, as indicated by the type of contraband and the method of suspected introduction or concealment.

6. Pat searches of detainees and metal detector screening shall be conducted routinely to control contraband.

7. A strip search shall be conducted only when properly authorized by a supervisor and only in the event that there is reasonable suspicion that contraband may be concealed on the person, or when an officer has reasonable suspicion that a good opportunity for concealment has occurred or as may be outlined in facility procedures for post contact visits as indicated in standard "5.7 Visitation."

8. A body cavity search shall be conducted by designated health personnel only when authorized by the facility administrator on the basis of reasonable suspicion that contraband may be concealed in or on the detainee's person.

9. "Dry cells" shall be used for contraband detection, with proper authorization and in accordance with required procedures, only when there is reasonable suspicion of concealment.

10. Contraband that may be evidence in connection with a violation of a criminal statute shall be preserved, inventoried, controlled and stored so as to maintain and document the chain of

custody.

11. Canine units (in facilities that have them) may be used for contraband detection when detainees are not present, but canine use for force, intimidation, control, or searches of detainees is prohibited.

12. As needed and on an individualized basis, the facility shall provide reasonable accommodations, and modify its policies, practices, or procedures relating to pat, strip, and body cavity searches of detainees with disabilities.

13. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Searches of

Detainees" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-2C-01, 2C-02, 2C-03, 2C-04, 2C-05, 2C-06, 2A-20, 6C-19.

Notice Admission and Release—National detention standard Strip Search Policy (10/15/2007).

This detention standard incorporates the restrictions on the use of canines originally communicated via a memorandum on ICE use of canines in support of ICE detention operations dated 11/18/2004 from the Acting Director of Enforcement and Removal Operations.

ICE/ERO *Performance-based National Detention Standards 2011:*

- "2.1 Admission and Release";

- "2.3 Contraband";

- "2.6 Hold Rooms in Detention Facilities";

- "2.12 Special Management Units"; and

- "5.7 Visitation."

"*Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities,*" 79 Fed. Reg. 13100 (Mar. 7, 2014).

## V. Expected Practices

### A. Written Policy and Procedures Required

All facilities shall have written policy and procedures consistent with this standard for the following:

1. searches of detainee housing and work areas;

2. body searches, including pat searches ("pat downs"), strip searches, body cavity searches and x-rays;

3. close observation in "dry cells" to detect

contraband;

4. employing the least intrusive method of search practicable, as indicated by the type of suspected contraband and the method of suspected introduction or concealment;

5. avoiding unnecessary force during searches and preserving the dignity of the detainee being searched;

6. leaving a searched housing or work area and detainee's property in its original order, to the extent practicable;

7. handling of contraband;

8. use of canine units (in facilities that have them);

9. preservation of evidence; and

10. administration of medical treatment during "lock-downs."

## B. Staff Training

All staff who conduct searches of housing, work areas or of a detainee's body shall receive initial training regarding search procedures prior to entering on duty, and shall receive annual training in authorized and effective techniques thereafter.

## C. Search of Detainee Housing and Work Areas

Staff may search a detainee's housing and work area, and personal items contained within those areas, without notice to, or approval from, the detainee and in the detainee's absence.

Each facility shall establish procedures to ensure all housing units and work areas are searched routinely, but irregularly, as such inspections are primarily intended to:

1. detect and deter the introduction of contraband;

2. prevent escapes;

3. maintain sanitary standards; and

4. eliminate fire and safety hazards.

Staff shall maintain written documentation of each housing-unit search within the individual housing unit. Work areas shall be searched each workday by shop supervisors, and these inspections shall be supplemented with periodic searches by designated search teams. When property is taken during a housing search, a receipt shall be given to the detainee. The Chief of Security shall maintain documentation of search-team inspections.

Facilities shall have written procedures to provide for basic detention services (e.g., delivery of food services, toilet access, medication delivery) during lockdowns.

## D. Body Searches of Detainees

### 1. Pat Search

a. Description

A pat search (or "pat down") is a sliding or patting of the hands over the clothed body of a detainee by staff to determine whether the individual possesses contraband.

A pat search does not require the detainee to remove clothing, although the inspection includes a search of the detainee's clothing and personal effects.

A hand-held and/or stationary metal detector, when available, may be used in conjunction with a pat search.

Staff shall conduct a pat search of a detainee on a routine or random basis to control contraband without a threshold level of suspicion.

All pat searches shall be conducted in a professional and respectful manner, and in the least intrusive manner possible, consistent with security needs, including consideration of officer safety.

Security staff shall be trained in proper procedures for conducting pat searches, including cross-gender pat searches and searches of transgender and intersex detainees.

b. Gender of Officer

Cross-gender pat-down searches of male detainees shall not be conducted unless, after reasonable diligence, staff of the same gender is not available at the time the pat-down search is required, or in exigent circumstances.  Cross-gender pat-down searches of female detainees shall not be conducted unless in exigent circumstances.

All cross-gender pat-down searches shall be documented.

## 2. Strip search

a. Description

A strip search is a search that requires a person to remove or arrange some or all clothing so as to permit a visual inspection of the person's breasts, buttocks, or genitalia. Staff shall not routinely require a detainee to remove clothing or require a detainee to expose private parts of his/her body to search for contraband. To the extent reasonably possible, the inspector shall refrain from touching the skin surface of the detainee; however, the inspector may request that the detainee move parts of the body to permit visual inspection. A strip search is considered more intrusive than a pat search, and shall be conducted in a manner designed to ensure as much privacy to the detainee as practicable.

A strip search requires the removal or rearrangement of some or all of the detainee's clothing to examine the clothing and/or to permit the inspection of exterior skin surfaces of the body, including breasts and exterior anal and genital areas, as well as inside of the nose, ears and mouth. If items are discovered that protrude from a body cavity, the removal of those items is governed by the procedures applicable to body-cavity searches, addressed below.

The facility shall not search or physically examine a detainee for the sole purpose of determining the detainee's genital characteristics. If the detainee's

gender is unknown, it may be determined during conversations with the detainee, by reviewing medical records, or, if necessary, learning that information as part of a standard medical examination that all detainees must undergo as part of intake or other processing procedure conducted in private, by a medical practitioner.

All strip searches shall be documented.

Except in cases where strip searches are performed in accordance with a facility's post contact visitation procedure, whenever a strip search is conducted, the articulable facts supporting the conclusion that reasonable suspicion exists shall be documented on Form G-1025 (Record of Search) or the equivalent.

Unless there is specific and articulable suspicion that contraband has been transferred to a detainee, detainees shall not be subjected to a strip search after a visit by a consular representative, an attorney, a legal assistant working under the supervision of an attorney, or an accredited representative. Policy regarding post contact visitation searches can be found in "V. Expected Practices" of standard "5.7 Visitation."

b. Reasonable Suspicion

Officers must obtain supervisory approval before conducting strip searches. Staff may conduct a strip search where there is reasonable suspicion that contraband may be concealed on the person. "Reasonable suspicion" means suspicion based on specific and articulable facts that would lead a reasonable officer to believe that a specific detainee is in possession of contraband. It is a more permissive (lower) standard than probable cause, but it is more than a mere hunch. It must be based on specific and articulable facts—along with reasonable inferences that may be drawn from those facts—that the officer shall document in Form G-1025 or equivalent.

Reasonable suspicion is determined under the

totality of the circumstances. There is no simple, exact, or mathematical formula for reasonable suspicion. It may be based on one, or a combination, of the following factors:

1) observation of unusual, surreptitious, or suspicious appearance or behavior;

2) evasive or inconsistent responses to questions by law enforcement officers;

3) discovery of a weapon or other contraband during a pat search, metal detector scan, or other non-intrusive search;

4) the detainee's criminal history, particularly prior felony or misdemeanor for convictions of crimes involving violence, weapons, contraband, or illegal substances (convictions for minor or non-violent offenses shall not be the only basis for reasonable suspicion);

5) whether the detainee was detained concurrently with an arrest for a crime of violence; or whether the detainee was arrested in possession of a weapon, or in possession of contraband such as illegal drugs;

6) information from law enforcement databases or from other reliable sources suggesting that the detainee has affiliations with terrorist organizations, criminal gangs, or organized crime; or

7) the detainee's history during confinement, particularly of violence, or of possession of contraband.

The lack of identity documents alone does not ordinarily constitute reasonable suspicion.

Before strip-searching a detainee to search for contraband, an officer shall first attempt to resolve his/her suspicions through less intrusive means, such as a thorough examination of reasonably available ICE, CBP and other law enforcement records; a pat-down search; a detainee interview; or (where available) the use

of a magnetometer or Boss chair. The officer shall document the results of those other, less intrusive, search methods on Form G-1025 or equivalent.

In accordance with standard "5.7 Visitation," facilities may not adopt policies permitting strip searches after contact visits in the absence of reasonable suspicion unless detainees are provided the right to choose non-contact visitation instead of contact visitation and are fully informed of such right.  Consistent with standard "5.7 Visitation," any such policies must be communicated to detainees in a language or manner that they understand.

c.  Gender of Officer

An officer of the same gender as the detainee shall perform the search.  Special care should be taken to ensure that transgender detainees are searched in private.

In the case of an emergency, a staff member of the same gender as the detainee shall be present to observe a strip search performed by an officer of the opposite gender.

When an officer of the opposite gender conducts a strip search which is observed by a staff member of the same gender as the detainee, staff shall document the reasons for the opposite-gender search in any logs used to record searches and in the detainee's detention file.

### 3. Body-cavity Searches

A body-cavity search is an inspection for contraband or any other foreign item, in a body cavity of a detainee, by use of fingers or simple instruments, such as an otoscope, tongue blade, short nasal speculum and simple forceps. A body-cavity search is considered the most intrusive type of search. A body cavity search must be performed by a medical professional and take place in an area that affords privacy from other detainees and from facility staff who are not involved in the search.

Before proceeding in cases of drawing blood for toxicology studies and DNA testing, written, informed consent must be granted by the detainee and recorded in the detainee's medical records before the blood sample is drawn (see also standard "4.3 Medical Care"). Requests for forensic studies shall be referred to the medical facility health services administrator (HSA) who is authorized to facilitate arrangement for these services off-site.

a. A body-cavity search may only be conducted by authorized medical personnel, upon approval of the facility administrator or acting facility administrator, and only if that person has reasonable suspicion that contraband may be concealed in or on the detainee's person.

b. The articulable facts supporting the conclusion that reasonable suspicion exists shall be documented.

c. A body-cavity search may be advisable to protect the health and safety of a detainee.

d. Only designated qualified health personnel (for example, physicians, physician assistants and nurses) may conduct a digital or simple instrument search in a licensed medical setting.

e. The detainee's health and welfare shall be considered prior to performance of any digital or simple instrument search.

f. Although a detainee's written consent should be obtained prior to conducting a digital or simple instrument search, such written consent is not required.

g. Whenever possible, transgender detainees shall be permitted to choose the gender of the staff member conducting a body-cavity search.

h. Staff, other than the designated qualified health personnel, of the opposite gender from the detainee may not observe a body cavity search.

i. If located, the contraband or foreign item may be removed immediately by medical staff, if such removal can easily be effected by use of fingers or simple medical instruments.

j. IHSC staff is not authorized to collect or participate in the collection of specimens or other information that shall be used for forensic purposes, except for toxicology studies, rape kits and DNA testing.

Staff shall document all body cavity, digital, and simple instrument searches, the authorizations and the reasons for the searches in any logs used to record searches and in the detainee's detention file.

## E. Close Observation in a "Dry Cell"

### 1. Description and Authorization

When an officer has reasonable suspicion to believe that a detainee may have ingested contraband or concealed contraband in a body cavity, and the methods of search specified above are inappropriate or likely to result in physical injury to the detainee, the facility administrator or designee may authorize that the detainee be placed in a room or cell to be closely observed by staff until the detainee has voided or passed the contraband or until sufficient time has elapsed to preclude the possibility that the detainee is concealing contraband.

Such placement is commonly referred to as "dry cell" status, which may be approved:

a. during regular duty hours by the facility administrator or designee, or

b. at other times by the shift supervisor.

### 2. Requirements for "Dry Cells"

It is recommended that one or more rooms or cells be identified as dry cells; such rooms must meet the following requirements:

a. The room shall be free of hiding places and be equipped with only a bed.

b. Doors shall have proper observation panels to protect staff and to allow unobstructed observation.

c. Windows in the dry cell shall have a security screen to prevent loss of contraband.

d. If the designated area is equipped with a toilet and/or sink, the water to the cell shall be shut off for the duration of the dry cell process and the toilet and sink removed prior to the detainee being allowed into the room.

e. Prior to a detainee's placement in dry cell status, the room to be used shall be completely searched and determined to be free of contraband. Potential hiding places, if any, for contraband shall be noted

### 3. Advising the Detainee

The supervisor responsible for initiating the close observation watch shall advise the detainee of the conditions and what is expected, and shall document the notification on an Administrative Segregation Order. The detainee shall be advised of the reasons he/she is being placed in a dry cell, the purpose of this placement, the conditions he/she can expect and the means by which he/she can request items and services including, but not limited to, food and water, medical care, hygiene products and bedpans.

### 4. Conditions of "Dry Cell" Status

a. For the detainee's safety, he/she shall be required to provide a urine sample within two hours of placement under close observation. A second urine sample shall be required prior to releasing the detainee from close observation.

b. The light shall be kept on at all times.

c. The detainee shall have regular access to potable water.

d. The detainee shall be provided telephone access.

e. The detainee may not be allowed to come in contact with another detainee.

f. Ordinarily, the detainee may not be allowed personal property, except legal and personal mail and a reasonable amount of legal materials.

g. Personal hygiene items shall be controlled by staff. When the detainee requests to shave, brush teeth, or perform other toiletry tasks, a wash pan and container of water shall be provided for use in the cell.

h. When the detainee is lying on a bed, the detainee shall be required to lie on top of the mattress in full view, weather and room temperature permitting. When necessary for the detainee to use cover, hands must remain visible at all times so that staff can observe any attempt to move contraband.

i. Because a detainee might attempt to remove and/or insert contraband from or into a body cavity, staff must observe the detainee's hands at all times.

j. The detainee shall not be permitted to leave the cell or room, except in case of extreme emergency.

k. The detainee shall be served the same meals as the general population, unless medically advised. All meals are to be inspected for contraband prior to delivery to the detainee, and any food remaining after the meal, as well as the utensils and tray, are to be thoroughly inspected before their return to food service.

l. Only medications prescribed and administered directly to the detainee by medical personnel may be given to the detainee. No laxatives may be given, except natural ones (e.g., coffee, prune juice).

m. When the detainee needs to urinate and/or defecate, he/she shall be furnished an empty hospital bedpan, which shall afterward be closely inspected to ascertain whether any contraband is present.

n. Since the detainee is in administrative segregation status even if not actually housed in the Special Management Unit (SMU), the requirements for medical and supervisory and staff visits in

standard "2.12 Special Management Units" apply.

o. Dry cells must be cleaned in accordance with standard "1.2 Environmental Health and Safety."

## 5. Post Orders

The Chief of Security shall have post orders for closely observing a detainee in dry cell status. A video camera shall be used whenever possible and as appropriate.

## 6. Requirements for Close Observation

The detainee shall be constantly observed and supervised by a staff member of the same gender.

It is the observer's responsibility to ensure the detainee does not dispose of any concealed item, and to prevent activity which would allow the detainee access to it, thereby jeopardizing the security and good order of the facility, staff and detainees. Any questions, emergency, or other situation that arises shall immediately be brought to the attention of the shift supervisor.

Under no circumstances shall the detainee be allowed freedom to move around unsupervised, or be given an opportunity to dispose of any objects he/she may be concealing.

a. The observing staff member shall be issued a portable radio or telephone and flashlight, so that he/she does not have to interrupt constant observation to communicate with other staff (such as for watch calls).

b. Detainees shall be monitored by medical staff for changes in medical and mental health status.

c. A daily log and SMU record shall be maintained on each detainee in dry cell status.

d. The shift supervisor shall ensure observers have reviewed the post orders.

e. The shift supervisor shall provide periodic staff relief to the observer and at any other time the observer must leave the area. The detainee must not be left unattended.

f. Trash may not be allowed to accumulate, and each item shall be thoroughly searched before final disposal.

g. Periodic searches shall be conducted as follows:

1) a strip search of the detainee when he/she is placed in the dry cell after which the detainee shall be issued a jump suit (or other suitable loose-fitting clothing);

2) a strip search of the detainee at least once each shift, if necessary; and

3) a search of the dry cell at least once each shift.

Searches shall be conducted so as not to reveal to the detainee a predictable pattern. Prior to each search, the shift supervisor must be notified and a second staff member provided to ensure continual close observation and supervision of the detainee. Each search must be documented on Form G-1025 or equivalent.

h. Staff shall notify the shift supervisor when contraband is found, secure the contraband in a properly documented evidence bag, and maintain the chain of evidence.

## 7. Length of Observation

The length of close-observation status must be determined on an individual basis. Ordinarily, the Chief of Security during regular work hours or the shift supervisor, at other times, in consultation with qualified health personnel, shall determine when termination is appropriate.

a. Three Days
The status of a detainee under close observation for as long as three days must be reviewed by medical staff and the administrative segregation review official in accordance with standard "2.12 Special Management Units" (irrespective of whether the observation actually occurs in the SMU).

b. Seven Days
Since it is unlikely that the objective of dry cell

status will not be achieved within seven days, maintaining a detainee under close observation beyond seven days requires prior approval of the facility administrator and medical staff.

## F. X-Ray

### 1. Medical

The facility physician may authorize use of an x-ray for medical reasons and only with the consent of the detainee.

### 2. Security

Only the facility administrator, upon approval by the respective Field Office Director (or persons officially acting in that capacity) may authorize the facility physician to order a non-repetitive x-ray examination for the purpose of determining whether contraband is concealed in or on the detainee (for example:  in a cast or body cavity).

Such approval and authorization shall be based on the facility administrator and physician's determination that:

a.  An x-ray examination is necessary for the security, safety, good order, or discipline of the facility;

b.  No reasonable alternative exists; and

c.  The examination is not likely to result in serious or lasting medical injury or harm to the detainee, based on the determination of qualified medical staff.

Staff shall place documentation of the examination, the authorizations and the reasons for the examination in the detainee's detention file and medical file.

An x-ray examination may not be performed on a detainee without the detainee's consent. Staff shall solicit the detainee's consent and cooperation prior to the x-ray examination. Force may not be used to gain consent and cooperation. If the detainee does not provide consent and fails to cooperate, x-ray examination should not be performed

### 3. Objects

The facility administrator may direct x-rays of inanimate objects where the detainee is not exposed.

## G. Major Instrument, Fluoroscope, or Surgical Intrusion

Only a physician may authorize use of a fluoroscope, major instrument (including anoscope or vaginal speculum), or surgical intrusion for medical reasons only and only with the detainee's consent.

## H. Preservation of Evidence

Contraband that may be evidence in connection with a violation of a criminal statute shall be preserved, inventoried, controlled and stored so as to maintain and document the chain of custody, and shall be reported to the appropriate law enforcement authority for action and possible seizure and prosecution.

# 2.11 Sexual Abuse and Assault Prevention and Intervention

## I. Purpose and Scope

This detention standard requires that facilities that house ICE/ERO detainees act affirmatively to prevent sexual abuse and assaults on detainees; provide prompt and effective intervention and treatment for victims of sexual abuse and assault; and control, discipline and prosecute the perpetrators of sexual abuse and assault.

This detention standard applies to the following types of facilities housing ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs).

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

Specific requirements are defined in "V. Expected Practices." The expected outcomes of this detention standard are as follows:

1. The facility shall articulate and adhere to a written zero tolerance policy for sexual abuse or assault, outlining the facility's approach to preventing, detecting, and responding to such conduct.

2. A designated Prevention of Sexual Assault Compliance Manager (PSA Compliance Manager) will assist in ensuring facility compliance with sexual abuse and assault prevention and intervention policies and procedures.

3. Staff shall receive training on their responsibilities under the facility's Sexual Abuse and Assault Prevention and Intervention Program.

4. Detainees shall be informed about the facility's Sexual Abuse and Assault Prevention and Intervention Program.

5. The facility will take appropriate steps to ensure that detainees with disabilities or limited English proficiency have an equal opportunity to participate in or benefit from all aspects of the facility's Sexual Abuse and Assault Prevention and Intervention Program.

6. The facility will utilize available community resources to provide victim services and other appropriate support to the fullest extent possible following incidents of sexual abuse or assault.

7. Staff shall be alert to potential risks or signs of sexual abuse or assault, and take appropriate action to mitigate any identified risks or protect a detainee as necessary.

8. Detainees shall be screened upon intake for risk of sexual victimization or abusiveness, and housed accordingly.

9. The facility will use a coordinated, multidisciplinary team approach to effectively respond to all incidents of sexual abuse or assault and address any safety, medical, or mental health needs.

10. Staff shall immediately report any knowledge, suspicion, or information regarding an incident of sexual abuse or assault, retaliation against individuals who reported an incident,

or any staff neglect or violation of responsibilities which may have contributed to an incident or retaliation.

11.  All allegations of sexual abuse or assault shall be immediately reported to ICE/ERO, and any other required entities based on the nature of the allegation.

12.  Alleged victims shall be promptly referred for medical or mental health services, as appropriate, and receive any necessary emergency or ongoing care related to the incident.

13.  Staff suspected of perpetrating sexual abuse or assault shall be removed from all duties requiring detainee contact pending the outcome of the investigation.

14.  The facility shall ensure that each allegation of sexual abuse or assault is investigated by an appropriate criminal or administrative investigative entity, and shall cooperate with all investigative efforts to ensure a thorough and objective investigation.

15.  Staff or detainee perpetrators will be appropriately disciplined for any confirmed acts of sexual abuse or assault.

16.  The facility shall conduct a review following every investigation of sexual abuse or assault, and on an annual basis, to assess whether changes to facility policy or practice could better prevent, detect, or respond to sexual abuse and assault.

17.  The facility shall maintain all records associated with incidents of sexual abuse or assault in appropriately secure files and locations.

18.  The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Sexual Abuse and Assault Prevention and Intervention" dated 12/2/2008.

## IV. References

National Commission on Correctional Health Care, *Standards for Health Services in Jails (2014)*.

ICE/ERO *Performance-based National Detention Standards 2011*:

"2.1 Admission and Release";

"2.2 Custody Classification System";

"2.4 Facility Security and Control";

"2.6 Hold Rooms in Detention Facilities";

"2.10 Searches of Detainees";

"2.12 Special Management Units";

"3.1 Disciplinary System";

"4.3 Medical Care";

"4.4 Medical Care (Women)";

"4.5 Personal Hygiene";

"6.2 Grievance System"; and

"7.1 Detention Files".

"*Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities*," 79 Fed. Reg. 13100 (Mar. 7, 2014).

# V. Expected Practices

## A. Written Policy and Procedures Required

Each facility's policy and procedures shall reflect the unique characteristics of each facility, based on factors such as the availability of specialized community-based services, including rape crisis/trauma units in local medical centers, clinics and hospitals.

Each facility shall have written policy and procedures for a Sexual Abuse or Assault Prevention and Intervention Program. This policy must mandate zero tolerance toward all forms of sexual abuse or assault, outline the facility's approach to preventing, detecting, and responding to such conduct and include, at a minimum:

1. procedures on preventing sexual abuse and assault, including:

    a) procedures for assessing all detainees for their risk of sexual abusiveness or victimization;

    b) procedures for housing detainees in accordance with their classification assessment;

    c) training of all employees, contractors, and volunteers on the agency's and facility's zero tolerance policies and their responsibilities under those policies; and

    d) notification to detainees of the facility's Sexual

Abuse and Assault Prevention and Intervention Program.

2. procedures for immediate reporting of sexual abuse allegations, including:

    a) procedures for immediate reporting of sexual abuse allegations through the facility's chain of command, **from the reporting official to the highest facility official as well as the Field Office Director, as well as a method by which staff can report outside the chain of command;**

    b) responsibility of all staff to report allegations or suspicions of sexual assault;

    c) referrals to law enforcement agencies;

    d) written documentation requirements to ensure that each allegation or suspicion is properly reported and addressed;

    e) a method to receive third-party reports of sexual abuse in its facility, with information made available to the public regarding how to report sexual abuse on behalf of a detainee.

3. procedures for prompt and effective intervention to address the safety and treatment needs of detainee victims if an alleged assault occurs, including:

    a) procedures for offering immediate protection, including prevention of retaliation and medical and mental health referrals;

    b) plan to coordinate actions taken by staff first responders, medical and mental health practitioners, investigators, and facility leadership in response to an incident of sexual abuse;

    c) methods for addressing the alleged victim's future safety, medical, and mental health needs;

4. procedures to include victim advocate services in sexual abuse or assault prevention and intervention programs, if such resources are available;

5. procedures for investigation and discipline of

assailants, including:

a)   coordinating with ICE and other appropriate investigative agencies to ensure that an administrative or criminal investigation is completed for all allegations of sexual abuse;

b)   following a uniform evidence protocol, including access to a forensic medical exam, which maximizes the potential for obtaining usable physical evidence for administrative proceedings and criminal prosecutions;

c)   procedures for coordination of internal administrative investigations with the assigned criminal investigative entity to ensure non-interference with criminal investigations, as well as coordination with the ICE Office of Professional Responsibility (OPR);

d)   disciplinary sanctions for staff, up to and including termination when there is a substantiated allegation of sexual abuse, or when staff has violated agency sexual abuse policies

6.   procedures for data collection and reporting; and the facility's requirement to cooperate with all ICE audits and monitoring of facility compliance with sexual abuse and assault policies and standards.

"Appendix 2.11.A: Sample Sexual Abuse Prevention and Intervention Protocols" in this standard offers sample protocols as guidelines for the development of written policies and procedures.
The facility's written policy and procedures require the review and approval of the Field Office Director.

The facility administrator shall ensure that, within 90 days of the adoption of this detention standard, written policy and procedures are in place and that the facility is in full compliance with its requirements and guidelines. The facility must meet all other requirements in this standard on the date the standard is adopted.

Each facility shall also post its protocols on its website, if it has one, or otherwise make the protocol available to the public.

## B. Acts of Sexual Abuse and/or Assault

For the purposes of this standard, the following definitions apply:

### 1. Detainee-on-detainee Sexual Abuse and/or Assault

Sexual abuse of a detainee by another detainee includes any of the following acts by one or more detainees who, by force, coercion, or intimidation, or if the victim did not consent or was unable to consent or refuse, engages in or attempts to engage in:

a.   contact between the penis and the vagina or anus and, for purposes of this subparagraph, contact involving the penis upon penetration, however slight;

b.   contact between the mouth and the penis, vagina or anus;

c.   penetration, however slight, of the anal or genital opening of another person by a hand or finger or by any object;

d.   touching of the genitalia, anus, groin, breast, inner thighs or buttocks, either directly or through the clothing, with an intent to abuse, humiliate, harass, degrade or arouse or gratify the sexual desire of any person; or

e.   threats, intimidation, or other actions or communications by one or more detainees aimed at coercing or pressuring another detainee to engage in a sexual act.

### 2. Staff-on-detainee Sexual Abuse and/or Assault

Sexual abuse of a detainee by a staff member, contractor, or volunteer includes any of the following acts, if engaged in by one or more staff members, volunteers, or contract personnel who, with or without the consent of the detainee, engages in or attempts to engage in:

a. contact between the penis and the vagina or anus and, for purposes of this subparagraph, contact involving the penis upon penetration, however slight;

b. contact between the mouth and the penis, vagina or anus;

c. penetration, however slight, of the anal or genital opening of another person by a hand or finger or by any object that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

d. intentional touching of the genitalia, anus, groin, breast, inner thighs or buttocks, either directly or through the clothing, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

e. threats, intimidation, harassment, indecent, profane or abusive language, or other actions  or communications aimed at coercing or pressuring a detainee to engage in a sexual act;

f. repeated verbal statements or comments of a sexual nature to a detainee;

g. any display of his or her uncovered genitalia, buttocks, or breast in the presence of an inmate, detainee, or resident, or;

h. voyeurism, which is defined as the inappropriate visual surveillance of a detainee for reasons unrelated to official duties.  Where not conducted for reasons relating to official duties, the following are examples of voyeurism:  staring at a detainee who is using a toilet in his or her cell to perform bodily functions; requiring an inmate detainee to expose his or her buttocks, genitals, or breasts; or taking images of all or part of a detainee's naked body or of a detainee performing bodily functions.

## C. Compliance Manager

The facility administrator shall designate a Prevention of Sexual Assault Compliance Manager (PSA Compliance Manager) who shall serve as the facility point of contact for the ICE PSA Coordinator and who has sufficient time and authority to oversee facility efforts to comply with facility sexual abuse prevention and intervention policies and procedures. The Compliance Manager shall:

1. assist with the development of written policies and procedures for the Sexual Abuse and Assault Prevention and Intervention Program, as specified above in this standard, and with keeping them current;

2. assist with the development of initial and ongoing training protocols;

3. serve as a liaison with other agencies;

4. coordinate the gathering of statistics and reports on incidents of sexual abuse or assault, as detailed in "O. Data Collection" in this standard;

5. review the results of every investigation of sexual abuse and assist in conducting an annual review of all investigations in compliance with the Privacy Act to assess and improve prevention and response efforts; and

6. review facility practices to ensure required levels of confidentiality are maintained.

## D. Sexual Conduct between Detainees Prohibited

In addition to the forms of sexual abuse and/or assault defined above, all other sexual conduct – including consensual sexual conduct – between detainees is prohibited and subject to disciplinary sanctions.  However, staff should be sensitive to the possibility that seemingly consensual behavior may have involved coercion by either person involved.

Consensual sexual conduct between detainees and staff, volunteers, or contract personnel is included within the definition of staff-on-detainee sexual abuse and/or assault above.

## E. Staff Training

Training on the facility's Sexual Abuse or Assault
Prevention and Intervention Program shall be
included in training for all employees, and shall also
be included in annual refresher training thereafter.

Employee training shall ensure facility staff are able
to fulfill their responsibilities under this standard,
and shall include:

1. The facility's zero-tolerance policies for all
   forms of sexual abuse;

2. definitions and examples of prohibited and illegal
   sexual behavior;

3. the right of detainees and staff to be free from
   sexual abuse, and from retaliation for reporting
   sexual abuse;

4. instruction that sexual abuse and/or assault is
   never an acceptable consequence of detention;

5. recognition of situations where sexual abuse
   and/or assault may occur;

6. how to avoid inappropriate relationships with
   detainees;

7. working with vulnerable populations and
   addressing their potential vulnerability in the
   general population;

8. recognition of the physical, behavioral and
   emotional signs of sexual abuse and/or assault and
   ways to prevent and respond to such occurrences;

9. the requirement to limit reporting of sexual abuse
   and assault to personnel with a need-to-know in
   order to make decisions concerning the detainee-
   victim's welfare, and for law
   enforcement/investigative purposes;

10. the investigation process and how to ensure that
    evidence is not destroyed;

11. prevention, recognition and appropriate
    response to allegations or suspicions of sexual
    assault involving detainees with mental or
    physical disabilities;

12. how to communicate effectively and
    professionally with detainees, including lesbian,
    gay, bisexual, transgender, intersex, or gender
    nonconforming detainees;

13. instruction on reporting knowledge or suspicion
    of sexual abuse and/or assault; and

14. instruction on documentation and referral
    procedures of all allegations or suspicion of
    sexual abuse and/or assault.

The facility shall ensure that all volunteers and other
contractors who have contact with detainees have
been trained on their responsibilities under the
facility's sexual abuse prevention, detection,
intervention and response policies and procedures.
The level and type of training for volunteers and
contractors will be based on the services they
provide and their level of contact with detainees;
however, all volunteers and contractors who have
any contact with detainees must be notified of the
facility's zero-tolerance policy and informed how to
report such incidents.  In this paragraph "other
contractor" means a person who provides services
on a non-recurring basis to the facility pursuant to a
contractual agreement with the agency or facility.

The facility must maintain written documentation
verifying employee, volunteer and contractor
training.  In addition to the general training
provided to all facility employees, the facility shall
provide specialized training on sexual abuse and
effective cross-agency coordination to facility
investigators who conduct investigations into
allegations of sexual abuse at immigration detention
facilities.  This training must cover, at a minimum,
interviewing sexual abuse and assault victims, sexual
abuse and assault evidence collection in confinement
settings, the criteria and evidence required for
administrative action or prosecutorial referral, and
information about effective cross-agency
coordination in the investigation process.  The
facility must maintain written documentation

verifying specialized training provided to investigators pursuant to this paragraph.

Facility medical staff shall be trained in procedures for examining and treating victims of sexual abuse, in facilities where medical staff may be assigned these activities. This training shall be subject to the review and approval of the Field Office Director or other designated ICE official.

## F. Detainee Notification, Orientation and Instruction

The facility administrator shall ensure that the orientation program, required by standard "2.1 Admission and Release," and the detainee handbook required by standard "6.1 Detainee Handbook," notify and inform detainees about the agency's and the facility's zero tolerance policies for all forms of sexual abuse and assault.

Following the intake process, the facility shall provide instruction to detainees on the facility's Sexual Abuse and Assault Prevention and Intervention Program and ensure that such instruction includes (at a minimum):

1. the facility's zero-tolerance policy for all forms of sexual abuse or assault;

2. prevention and intervention strategies;

3. definitions and examples of detainee-on-detainee sexual abuse, staff-on-detainee sexual abuse and coercive sexual activity;

4. explanation of methods for reporting sexual abuse or assault, including one or more staff members other than an immediate point-of-contact line officer, the Detention and Reporting Information Line (DRIL), the DHS/OIG and the ICE/OPR investigation processes;

5. information about self-protection and indicators of sexual abuse;

6. prohibition against retaliation, including an explanation that reporting an assault shall not

negatively impact the detainee's immigration proceedings; and

7. right of a detainee who has been subjected to sexual abuse to receive treatment and counseling.

Detainee notification, orientation and instruction must be in a language or manner that the detainee understands, including for those who are limited English proficient, deaf, visually impaired or otherwise disabled, as well as to detainees who have limited reading skills. The facility shall maintain documentation of detainee participation in the instruction session.

The facility shall develop policies and procedures to ensure that detainees have multiple ways to privately report sexual abuse, retaliation for reporting sexual abuse, or staff neglect or violations of responsibilities that may have contributed to such incidents:

1. Each facility's sexual abuse or assault prevention and intervention program shall provide detainees who are victims of sexual abuse or assault the option to report the incident or situation to a designated staff member other than an immediate point-of-contact line officer (e.g., the program coordinator or a mental health specialist). The facility shall provide detainees with the name of the program coordinator or designated staff member and information on how to contact him or her. Detainees will also be informed that they can report any incident or situation regarding sexual abuse, assault or intimidation to any staff member (as outlined above), the DHS Office of Inspector General, and the Joint Intake Center.

2. The facility shall provide instructions on how detainees may contact their consular official, the DHS Office of Inspector General, or as appropriate, another designated office, to confidentially and, if desired, anonymously report these incidents.

3. The facility shall inform the detainees of at least one way for detainees to report sexual abuse to a public or private entity or office that is not part of

the agency, and that is able to receive and immediately forward detainee reports of sexual abuse to agency officials, allowing the detainee to remain anonymous upon request.  As cited earlier under "III. Standards Affected," ICE/ERO has provided a sexual assault awareness notice to be posted on all housing-unit bulletin boards, as well as a "Sexual Assault Awareness Information" pamphlet to be distributed (see "Appendix 2.11.B: Sexual Abuse and Assault Awareness Brochure" in this standard).  The facility shall post with this notice the name of the PSA Compliance Manager and information about local organizations that can assist detainees who have been victims of sexual assault, including mailing addresses and telephone numbers (including toll-free hotline numbers where available).  If no such local organizations exist, the facility shall make available the same information about national organizations.  This information will be provided in English and Spanish, and to other segments of the detainee population with limited English proficiency, through translations or oral interpretation.

## G. Accommodating Detainees with Disabilities or Limited English Proficiency

Each facility shall take appropriate steps to ensure that detainees with disabilities (including, for example, detainees who are deaf or hard of hearing, those who are blind or have low vision, or those who have intellectual, psychiatric, or speech disabilities) have an equal opportunity to participate in or benefit from all aspects of the facility's efforts to prevent, detect, and respond to sexual abuse.  Such steps shall include, when necessary to ensure effective communication with detainees who are deaf or hard of hearing, or detainees who have intellectual, psychiatric, or speech disabilities, limited reading skills, or who are blind or have low vision,

a)   providing access to in-person, telephonic, or

video interpretive services that enable effective, accurate, and impartial interpretation, both receptively and expressively, using any necessary specialized vocabulary.

b)   providing access to written materials related to sexual abuse in formats or through methods that ensure effective communication.

Each facility shall take steps to ensure meaningful access to all aspects of the facility's efforts to prevent, detect, and respond to sexual abuse to detainees who are limited English proficient, including steps to provide in-person or telephonic interpretive services that enable effective, accurate, and impartial interpretation, both receptively and expressively, using any necessary specialized vocabulary.

In matters relating to allegations of sexual abuse, each facility shall employ effective expressive and receptive verbal communication techniques while communicating with detainees with disabilities in accordance with professionally accepted standards of care.  Each facility shall provide detainees with disabilities and detainees with Limited English Proficiency with in-person or telephonic interpretation services that enable effective, accurate, and impartial interpretation, both receptively and expressively, using any necessary specialized vocabulary.  Interpretation services shall be provided by someone other than another detainee, unless the detainee expresses a preference for another detainee to provide interpretation and the agency determines that such interpretation is appropriate and consistent with DHS policy.  The provision of interpreter services by minors, alleged abusers, detainees who witnessed the alleged abuse, and detainees who have a significant relationship with the alleged abuser is not appropriate in matters relating to allegations of sexual abuse.

Where practicable, provisions for written translation of materials related to sexual abuse or assault shall be made for other significant segments of the population with limited English proficiency. Oral

interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## H. Victim Advocate Services

Each facility shall utilize available community resources and services to provide valuable expertise and support in the areas of crisis intervention, counseling, investigation and the prosecution of sexual abuse perpetrators to most appropriately address victims' needs.  Each facility administrator shall establish procedures to make available, to the full extent possible, outside victim services following incidents of sexual abuse. The facility shall also attempt to make available such victim services for any individuals identified as having experienced sexual victimization prior to entering DHS custody.

The facility administrator shall maintain or attempt to enter into memoranda of understanding (MOU) or other agreements with community service providers or, if local providers are not available, with national organizations that provide legal advocacy and confidential emotional support services for immigrant victims of crime. The facility shall enable reasonable communication between detainees and these organizations and agencies, in as confidential a manner as possible. The facility shall also inform detainees, prior to giving them access to outside resources, of the extent to which such communications will be monitored and the extent to which reports of abuse will be forwarded to authorities in accordance with mandatory reporting laws.

## I. Prevention

All staff and detainees are responsible for being alert to signs of potential situations in which sexual assaults might occur, and for making reports and intervention referrals as appropriate.  If a facility staff member has a reasonable belief that a detainee is subject to a substantial risk of imminent sexual

abuse, he or she shall take immediate action to protect the detainee.

## 1. Classification and Screening

In accordance with standards "2.1 Admission and Release" and "2.2 Custody Classification System", the facility shall assess all detainees on intake to identify those likely to be sexual aggressors or sexual abuse victims and shall house detainees to prevent sexual abuse, taking necessary steps to mitigate any such danger. The facility shall also use the information to inform assignment of detainees to recreation and other activities, and voluntary work.

Each new arrival shall be kept separate from the general population until he/she is classified and may be housed accordingly.

The facility shall consider, to the extent that the information is available, the following criteria to assess detainees for risk of sexual victimization:

  (a) Whether the detainee has a mental, physical, or developmental disability;

  (b) The age of the detainee;

  (c) The physical build and appearance of the detainee;

  (d) Whether the detainee has previously been incarcerated or detained;

  (e) The nature of the detainee's criminal history;

  (f) Whether the detainee has any convictions for sex offenses against an adult or child;

  (g) Whether the detainee has self-identified as gay, lesbian, bisexual, transgender, intersex, or gender nonconforming;

  (h) Whether the detainee has self-identified as having previously experienced sexual victimization; and

(i) The detainee's own concerns about his or her physical safety. The initial screening shall consider prior acts of sexual abuse, prior convictions for violent offenses, and history of prior institutional

violence or sexual abuse, as known to the facility, in assessing detainees for risk of being sexually abusive.

Detainees shall not be disciplined for refusing to answer, or for not disclosing complete information in response to, questions asked pursuant to items (a), (g), (h), or (i) above. The facility shall implement appropriate controls on the dissemination within the facility of responses to questions asked pursuant to this screening in order to ensure that sensitive information is not exploited to the detainee's detriment by staff or other detainees or inmates. Detainees who are considered at risk shall be placed in the least restrictive housing that is available and appropriate.  Such detainees should be assigned to administrative segregation for protective custody only until an alternative means of separation from likely abusers can be arranged, and such an assignment shall not ordinarily exceed a period of 30 days.

## 2. Transportation

Detainees identified as being "at risk" for sexual victimization shall be transported in accordance with that special safety concern. The section on "Count, Identification and Seating," found  in standard "1.3 Transportation (by Land)," requires that transportation staff seat each detainee in accordance with written procedures from the facility administrator, with particular attention to detainees who may need to be afforded closer observation for their own safety.

## 3. Upgrades to Facilities and Technologies

When designing or acquiring any new facility and in planning any substantial expansion or modification of existing facilities, the facility shall consider the effect of the design, acquisition, expansion, or modification upon its ability to protect detainees from sexual abuse.

When installing or updating a video monitoring system, electronic surveillance system, or other monitoring technology in a facility, the facility shall

consider how such technology may enhance its ability to protect detainees from sexual abuse.

## J. Prompt and Effective Intervention

Staff sensitivity toward detainees who are victims of sexual abuse and/or assault is critical.

Staff shall take seriously all statements from detainees claiming to be victims of sexual assaults, and shall respond supportively and non-judgmentally. Any detainee who alleges that he/she has been sexually assaulted shall be offered immediate protection and separation from the assailant and shall be referred for a medical examination and/or clinical assessment for potential negative symptoms. Staff members who become aware of an alleged assault shall immediately follow the reporting requirements set forth in the written policies and procedures.

If a victim is transferred between detention facilities, the sending facility shall, as permitted by law, inform the receiving facility of the incident and the victim's potential need for medical or social services (unless, in the case of transfer to a non-ICE facility, the victim requests otherwise).  If the receiving facility is unknown to the sending facility, the sending facility shall notify the Field Office Director, so that he or she can notify the receiving facility.

Facilities should use a coordinated, multidisciplinary team approach to responding to sexual abuse, such as a sexual assault response team (SART), which in accordance with community practices, includes a medical practitioner, a mental health practitioner, a security staff member and an investigator from the assigned investigative entity, as well as representatives from outside entities that provide relevant services and expertise.  The facility shall attempt to make available to the victim a victim advocate from a rape crisis center.   If a rape crisis center is not available to provide victim advocate services, ICE will provide these services by making available a qualified staff member from a community-based organization, or a qualified agency staff member. A qualified agency

staff member or a qualified community-based staff member means an individual who has received education concerning sexual assault and forensic examination issues in general. The outside or internal victim advocate shall provide emotional support, crisis intervention, information, and referrals.

Care shall be taken to place the detainee in a supportive environment that represents the least restrictive housing option possible (e.g. in a different housing unit, transfer to another facility, medical housing, or protective custody), and that takes into account any ongoing medical and mental health needs of the alleged victim.

Victims shall not be held for longer than five days in any type of administrative segregation, except in highly unusual circumstances or at the request of the detainee.   A detainee victim who is in protective custody after having been subjected to sexual abuse shall not be returned to the general population until completion of a proper re-assessment, taking into consideration any increased vulnerability of the detainee as a result of the sexual abuse.

Where an alleged victim of sexual abuse or assault that occurred elsewhere in ICE custody is subsequently transferred to the facility, the facility shall comply with all applicable response and intervention requirements in this standard, as appropriate based on the nature and status of the case.

## K. Protection Against Retaliation

Staff, contractors, volunteers, and detainees shall not retaliate against any person, including a detainee, who reports, complains about, or participates in an investigation into an allegation of sexual abuse, or for participating in sexual abuse as a result of force, coercion, threats, or fear of force.

The facility shall employ multiple protection measures, such as housing changes, removal of alleged staff or detainee abusers from contact with

victims, and emotional support services for detainees or staff who fear retaliation for reporting sexual abuse or for cooperating with investigations.

For at least 90 days following a report of sexual abuse, the facility shall monitor to see if there are facts that may suggest possible retaliation by detainees or staff, and shall act promptly to remedy any such retaliation. Items the facility should monitor include any detainee disciplinary reports, housing, or program changes, or negative performance reviews or reassignments of staff.  The facility shall continue such monitoring beyond 90 days if the initial monitoring indicates a continuing need.

## L. Reporting, Notifications and Confidentiality

Each facility shall require all staff to report immediately any knowledge, suspicion, or information regarding an incident of sexual abuse that occurred in a facility; retaliation against detainees or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation.

Staff members who become aware of alleged sexual abuse shall immediately follow the reporting requirements set forth in the facility's written policies and procedures.

Apart from such reporting, staff shall not reveal any information related to a sexual abuse report to anyone other than to the extent necessary to help protect the safety of the victim or prevent further victimization of other detainees or staff in the facility, make medical treatment, investigation, law enforcement, or other security and management decisions.

If the alleged victim is under the age of 18 or considered a vulnerable adult under a State or local vulnerable persons statute, the facility shall report that information to the Field Office Director so that the agency can report the allegation to the designated

State or local services agency under applicable mandatory reporting laws.

Staff shall accept reports made verbally, in writing, anonymously, and from third parties, and promptly document any verbal reports.

Each facility shall establish a method to receive third-party reports of sexual abuse in its facility and shall make available to the public information on how to report sexual abuse on behalf of a detainee.

### 1. Alleged Detainee Perpetrator

When a detainee(s) is alleged to be the perpetrator, it is the facility administrator's responsibility to ensure that the incident is promptly referred to the appropriate law enforcement agency having jurisdiction for investigation (if the incident is potentially criminal) and reported to the Field Office Director, who shall report it to the OPR Joint Intake Center.

### 2. Alleged Staff Perpetrator

When an employee, contractor or volunteer is alleged to be the perpetrator of detainee sexual abuse and/or assault, it is the facility administrator's responsibility to ensure that the incident is promptly referred to the appropriate law enforcement agency having jurisdiction for investigation (if the incident is potentially criminal) and reported to the Field Office Director, who shall report it to the OPR Joint Intake Center.  The local government entity or contractor that owns or operates the facility shall also be notified.

Staff, contractors, and volunteers suspected of perpetrating sexual abuse or assault shall be removed from all duties requiring detainee contact pending the outcome of an investigation.

Upon receiving an allegation that a detainee was sexually abused while confined at another facility, the facility whose staff received the allegation shall notify the Field Office Director and the appropriate administrator of the facility where the alleged abuse occurred. The notification provided in this section shall be provided as soon as possible, but no later than 72 hours after receiving the allegation.  The facility shall document that it has provided such notification. The facility where the alleged abuse occurred shall then ensure the allegation is referred for investigation and reported to the appropriate Field Office Director in accordance with this standard.

## M. Investigation, Discipline and Incident Reviews

If a detainee alleges sexual assault, a sensitive and coordinated response is necessary. The facility shall coordinate with ICE and other appropriate investigative agencies to ensure that an administrative or criminal investigation is completed for all allegations of sexual abuse.

All investigations into alleged sexual assault must be prompt, thorough, objective, fair and conducted by specially trained, qualified investigators.

Where an alleged victim of sexual abuse or assault that occurred elsewhere is subsequently transferred to the detention facility, the facility shall cooperate with any administrative or criminal investigative efforts arising from the incident.

### 1. Preservation of Evidence

The first security staff member to respond to a report of sexual abuse, or his or her supervisor, shall preserve and protect, to the greatest extent possible, any crime scene until appropriate steps can be taken to collect any evidence.   If the abuse occurred within a time period that still allows for the collection of physical evidence, the responder shall request the alleged victim not to take any actions, and shall ensure that the alleged abuser does not take any actions, that could destroy physical evidence, including, as appropriate, washing, brushing teeth, changing clothes, urinating, defecating, smoking, drinking, or eating.  If the first staff responder is not

a security staff member, the responder shall be required to request that the alleged victim not take any actions that could destroy physical evidence and then notify security staff.

## 2. Forensic Examinations

Where evidentiarily or medically appropriate, at no cost to the detainee, and only with the detainee's consent, the facility administrator shall arrange for an alleged victim to undergo a forensic medical examination by qualified health care personnel, including a Sexual Assault Forensic Examiner (SAFE) or Sexual Assault Nurse Examiner (SANE) where practicable. If SAFEs or SANEs cannot be made available, the examination can be performed by other qualified health care personnel.

As requested by a victim, the presence of his or her outside or internal victim advocate, including any available victim advocacy services offered by a hospital conducting a forensic exam, shall be allowed for support during a forensic exam and investigatory interviews.

The results of the physical examination and all collected physical evidence are to be provided to the investigative entity. Part of the investigative process may also include an examination and collection of physical evidence from the suspected assailant(s).

In the event the investigation is being conducted by a non-federal investigating agency, the facility shall request that the investigating agency follow the applicable requirements of this standard, including subsections 1 and 2 of this section.

## 3. Procedures for Administrative Investigations

Upon conclusion of a criminal investigation where the allegation was substantiated, or in instances where no criminal investigation has been completed, an administrative investigation shall be conducted. Upon conclusion of a criminal investigation where the allegation was unsubstantiated, the facility shall review any available completed criminal investigation reports to determine whether an administrative investigation is necessary or appropriate. Substantiated allegation means an allegation that was investigated and determined to have occurred. Unsubstantiated allegation means an allegation that was investigated and the investigation produced insufficient evidence to make a final determination as to whether or not the event occurred.

Administrative investigations shall be conducted after consultation with the appropriate investigative office within DHS, and the assigned criminal investigative entity. The ICE Office of Professional Responsibility will typically be the appropriate investigative office within DHS, as well as the DHS OIG in cases where the DHS OIG is conducting an investigation.

The facility shall develop written procedures for administrative investigations, including provisions requiring:

(a) Preservation of direct and circumstantial evidence, including any available physical and DNA evidence and any available electronic monitoring data;

(b) Interviewing alleged victims, suspected perpetrators, and witnesses;

(c) Reviewing prior complaints and reports of sexual abuse involving the suspected perpetrator;

(d) Assessment of the credibility of an alleged victim, suspect, or witness, without regard to the individual's status as detainee, staff, or employee, and without requiring any detainee who alleges sexual abuse to submit to a polygraph;

(e) An effort to determine whether actions or failures to act at the facility contributed to the abuse;

(f) Documentation of each investigation by written report, which shall include a description of the physical and testimonial evidence, the reasoning behind credibility assessments, and

investigative facts and findings; and

(g) Retention of such reports for as long as the alleged abuser is detained or employed by the agency or facility, plus five years.

Such procedures shall govern the coordination and sequencing of administrative and criminal investigations, in accordance with the first paragraph of this section, to ensure that the criminal investigation is not compromised by an internal administrative investigation.

The departure of the alleged abuser or victim from the employment or control of the facility shall not provide a basis for terminating an investigation.

When outside agencies investigate sexual abuse, the facility shall cooperate with outside investigators and shall endeavor to remain informed about the progress of the investigation.

Following an investigation conducted by the facility into a detainee's allegation of sexual abuse, the facility shall notify the Field Office Director of the results of the investigation and any responsive actions taken so that the information can be reported to ICE headquarters and to the detainee.

## 4. Discipline

### (a) Disciplinary sanctions for staff

Staff shall be subject to disciplinary or adverse action up to and including removal from their position for substantiated allegations of sexual abuse or for violating agency or facility sexual abuse rules, policies or standards.  Removal from their position is the presumptive disciplinary sanction for staff who have engaged in or attempted or threatened to engage in those acts of sexual abuse defined in paragraphs (a)-(d) and (g)-(h) of "Staff on Detainee Sexual Abuse and/or Assault" in "B. Acts of Sexual Abuse and/or Assault" in this standard.

The facility shall report all incidents of substantiated sexual abuse by staff, and all removals of staff, or resignations in lieu of removal for violations of

agency or facility sexual abuse policies, to appropriate law enforcement agencies unless the activity was clearly not criminal.

The facility shall also report all such incidents of substantiated abuse, removals or resignations in lieu of removal to the Field Office Director, regardless of whether the activity was criminal, and shall make reasonable efforts to report such information to any relevant licensing bodies, to the extent known.

### (b) Corrective action for contractors and volunteers

Any contractor or volunteer who has engaged in sexual abuse shall be prohibited from contact with detainees.  The facility shall take appropriate remedial measures, and shall consider whether to prohibit further contact with detainees by contractors or volunteers who have not engaged in sexual abuse, but have violated other provisions within these standards.

Incidents of substantiated sexual abuse by a contractor or volunteer shall be reported to law enforcement agencies, unless the activity was clearly not criminal. The facility shall also report such incidents to the Field Office Director regardless of whether the activity was criminal, and shall make reasonable efforts to report such incidents to any relevant licensing bodies, to the extent known.

### (c) Disciplinary sanctions for detainees

Detainees shall be subjected to disciplinary sanctions pursuant to a formal disciplinary process following an administrative or criminal finding that the detainee engaged in sexual abuse, consistent with the requirements of Standard 3.1 "Disciplinary System." The facility shall not discipline a detainee for sexual contact with staff unless there is a finding that the staff member did not consent to such contact.  For the purpose of disciplinary action, a report of sexual abuse made in good faith based upon a reasonable belief that the alleged conduct occurred shall not constitute falsely reporting an incident or lying, even if an investigation does not establish evidence sufficient to substantiate the allegation.

## 5. Sexual Abuse Incident Reviews

Each facility shall conduct a sexual abuse incident review at the conclusion of every investigation of sexual abuse and, where the allegation was not determined to be unfounded, prepare a written report within 30 days of the conclusion of the investigation recommending whether the allegation or investigation indicates that a change in policy or practice could better prevent, detect, or respond to sexual abuse. Unfounded allegation means an allegation that was investigated and determined not to have occurred. The facility shall implement the recommendations for improvement, or shall document its reasons for not doing so in a written response. Both the report and response shall be forwarded to the Field Office Director or his or her designee, for transmission to the ICE PSA Coordinator. The facility shall also provide any further information regarding such incident reviews as requested by the ICE PSA Coordinator.

The review team shall consider whether the incident or allegation was motivated by race; ethnicity; gender identity; lesbian, gay, bisexual, transgender, or intersex identification, status, or perceived status; or gang affiliation; or was motivated or otherwise caused by other group dynamics at the facility.

Each facility shall conduct an annual review of all sexual abuse investigations and resulting incident reviews to assess and improve sexual abuse intervention, prevention and response efforts. If the facility has not had any reports of sexual abuse during the annual reporting period, then the facility shall prepare a negative report. The results and findings of the annual review shall be provided to the facility administrator, Field Office Director or his or her designee, for transmission to the ICE PSA Coordinator.

## N. Medical and Mental Health Care

Detainee victims of sexual abuse shall be provided emergency medical and mental health services and ongoing care. All treatment services, both emergency and ongoing, shall be provided to the victim without financial cost and regardless of whether the victim names the abuser or cooperates with any investigation arising out of the incident.

### 1. Access to emergency medical and mental health services

(a) Detainee victims of sexual abuse and assault shall have timely, unimpeded access to emergency medical treatment and crisis intervention services, including emergency contraception and sexually transmitted infections prophylaxis, in accordance with professionally accepted standards of care.

(b) Where evidentiary or medically appropriate, the facility administrator shall arrange for an alleged victim to undergo a forensic medical examination, in accordance with the requirements of "M. Investigation, Discipline and Incident Reviews" of this standard.

(c) Transportation of an alleged victim for emergency care or other services provided off-site shall be arranged in a manner that takes into account the special needs of victimized detainees.

### 2. Ongoing medical and mental health care for sexual abuse victims and abusers

(a) Each facility shall offer medical and mental health evaluation and, as appropriate, treatment to all detainees who have been victimized by sexual abuse while in immigration detention.

(b) The evaluation and treatment of such victims shall include, as appropriate, follow-up services, treatment plans, and, when necessary, referrals for continued care following their transfer to, or placement in, other facilities, or their release from custody.

(c) The facility shall provide such victims with medical and mental health services consistent with the community level of care.

(d) Detainee victims of sexually abusive vaginal penetration by a male abuser while incarcerated shall be offered pregnancy tests. If pregnancy results from an instance of sexual abuse, the victim shall receive timely and comprehensive information about lawful pregnancy-related medical services and timely access to all lawful pregnancy-related medical services.

(e) Detainee victims of sexual abuse while detained shall be offered tests for sexually transmitted infections as medically appropriate.

(f) The facility shall attempt to conduct a mental health evaluation of all known detainee-on-detainee abusers within 60 days of learning of such abuse history and offer treatment when deemed appropriate by mental health practitioners.

## O. Data Collection

Each facility shall maintain in a secure area all case records associated with claims of sexual abuse, including incident reports, investigative reports, offender information, case disposition, medical and counseling evaluation findings, and recommendations for post-release treatment, if necessary, and/or counseling shall be maintained in appropriate files in accordance with these detention standards and applicable policies, and retained in accordance with established schedules.

Particularly applicable to the storage, confidentiality and release of case records are the requirements of the "Confidentiality and Release of Medical Records" section of standard "4.3 Medical Care" and the requirements of standard "7.1 Detention Files," especially in regard to the Privacy Act of 1974. Because of the very sensitive nature of information about victims and their medical condition, including infectious disease testing, staff must be particularly vigilant about maintaining confidentiality and releasing information only for legitimate need-to-know reasons.

Monitoring and evaluation are essential for assessing both the rate of occurrence of sexual assault and agency effectiveness in reducing sexually abusive behavior. Accordingly, the facility administrator must maintain two types of files of sexual abuse and assault incidents which include the following minimum information:

1. General files include:

   a. the victim(s) and assailant(s) of a sexual assault;

   b.  the date, time, location, and nature of the incident;

   c. the demographic background of the victim and perpetrator (including citizenship, age, gender, and whether either has self-identified as gay, lesbian, bisexual, transgender, intersex, or gender nonconforming);

   d. detailed reporting timeline, including the names of the individuals who reported the incident and received the report of sexual assault, date and time the report was received, and steps taken to communicate the report up the chain of command;

   e. any injuries sustained by the victim;

   f. all formal and/or informal action taken, including all post-report follow up response taken by the facility (e.g. housing placement/custody classification, medical examination, mental health counseling, etc.);

   g. all reports;

   h. medical forms or other relevant medical information;

   i. supporting memos and videotapes, if any;

   j. any sanctions imposed on the perpetrator; and

   k. any other evidentiary materials pertaining to the allegation.

The facility administrator shall maintain these files chronologically in a secure location.

In addition, the facility administrator shall maintain a listing of the names of sexual assault victims and assailants, along with the dates and locations of all sexual assault incidents occurring within the facility, on his/her computerized incident reporting system. Such information shall be maintained on a need-to-know basis in accordance with the standards "4.3 Medical Care" and "7.1 Detention Files," which includes protection of electronic files from unauthorized access. At no time may law enforcement sensitive documents or evidence be stored at the facility.  Access to this designation shall be limited to those staff involved in the treatment of the victim or the investigation of the incident. The authorized designation shall allow appropriate staff to track the detainee victim or assailant of sexual assault across the system.

On an ongoing basis, the facility PSA Compliance Manager and facility administrator must work with the Field Office and ICE PSA Coordinator to share data regarding sexual abuse incidents and response.

## P. Facility Audits

Facilities shall cooperate with all DHS audits of the facility's compliance with this standard, including by making available relevant documents, records, and other information as requested (including available videotapes and other electronically available data). Upon request, facilities shall also provide to DHS the results of any audits conducted of the facility against the DOJ "National Standards to Prevent, Detect, and Respond to Prison Rape."

Facilities shall permit auditors access to all areas of the facility, and shall make available space suitable for interviews of detainees and staff.  Detainees shall be permitted to have private interviews with auditors, and to send confidential information or correspondence to the auditor.

# Appendix 2.11.A: Sample Sexual Abuse and Assault Prevention and Intervention Program Policy[1]

## I. Zero Tolerance Policy

[FACILITY] maintains a zero-tolerance policy for all forms of sexual abuse or assault.  It is the policy of [FACILITY] to provide a safe and secure environment for all detainees, employees, contractors, and volunteers, free from the threat of sexual abuse or assault, by maintaining a Sexual Abuse and Assault Prevention and Intervention (SAAPI) Program that ensures effective procedures for preventing, reporting, responding to, investigating, and tracking incidents or allegations of sexual abuse or assault.

Sexual abuse or assault of detainees by other detainees or by employees, contractors, or volunteers is prohibited and subject to administrative, disciplinary, and criminal sanctions.

## II. Definitions

For the purposes of this policy, the following definitions apply:

*Sexual abuse of a detainee by another detainee includes any of the following acts by one or more detainees who, by force, coercion, or intimidation, or if the victim did not consent or was unable to consent or refuse, engages in or attempts to engage in:*

a. Contact between the penis and the vulva or anus and, for purposes of this subparagraph, contact involving the penis upon penetration, however slight;

b. Contact between the mouth and the penis, vagina, or anus;

c. Penetration, however slight, of the anal or genital opening of another person by a hand or finger or by any object;

d. Touching of the genitalia, anus, groin, breast, inner thighs or buttocks, either directly or through the clothing, with an intent to abuse, humiliate, harass, degrade or arouse or gratify the sexual desire of any person; or

e. Threats, intimidation, or other actions or communications by one or more detainees aimed at coercing or pressuring another detainee to engage in a sexual act.

*Sexual abuse of a detainee by a staff member, contractor, or volunteer includes any of the following acts, if engaged in by one or more staff members, volunteers, or contract personnel who, with or without the consent of the detainee, engages in or attempts to engage in:*

a. Contact between the penis and the vulva or anus and, for purposes of this subparagraph, contact involving the penis upon penetration, however slight;

b. Contact between the mouth and the penis, vagina, or anus;

c. Penetration, however slight, of the anal or genital opening of another person by a hand or finger or by any object that is unrelated to official duties or where the staff member,

---

[1] This document represents a template Sexual Abuse and Assault Prevention and Intervention Program policy, as required by Standard 2.11 "Sexual Abuse and Assault Prevention and Intervention" of the ICE 2011 Performance-Based National Detention Standards (PBNDS 2011). Facilities may choose to use this format as a manner of fulfilling the requirements for a written policy detailed in "A. Written Policies and Procedures" of Standard 2.11.

COLOR KEY:
Provisions indicated in black font comprehensively incorporate the requirements in Standard 2.11 and DHS PREA standards.
Text indicated in **red bold font** identifies sections where facility-specific information must be included to satisfy the requirements.

contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

d.  Intentional touching of the genitalia, anus, groin, breast, inner thighs or buttocks, either directly or through the clothing, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

e.  Threats, intimidation, harassment, indecent, profane or abusive language, or other actions or communications aimed at coercing or pressuring a detainee to engage in a sexual act;

f.  Repeated verbal statements or comments of a sexual nature to a detainee;

g.  Any display of his or her uncovered genitalia, buttocks, or breast in the presence of a detainee; or

h.  Voyeurism, which is defined as the inappropriate visual surveillance of a detainee for reasons unrelated to official duties. Where not conducted for reasons relating to official duties, the following are examples of voyeurism: staring at a detainee who is using a toilet in his or her cell to perform bodily functions; requiring a detainee to expose his or her buttocks, genitals, or breasts; or taking images of all or part of a detainee's naked body or of a detainee performing bodily functions.

Staff and detainee perpetrators of sexual abuse, as well as detainees who engage in consensual sexual conduct, are subject to administrative and disciplinary sanctions.  The facility shall not discipline a detainee for sexual contact with staff unless there is a finding that the staff member did not consent to such contact.

*Contractor:* A person who or entity that provides services on a recurring basis pursuant to a contractual agreement with the facility.

*Volunteer:* An individual who donates time and effort on a recurring basis to enhance the activities and programs of the facility.

## III. Compliance Manager

The facility shall designate a Prevention of Sexual Assault (PSA) Compliance Manager who shall serve as the facility point of contact for the local field office and ICE PSA Coordinator.  The PSA Compliance Manager must have sufficient time and authority to oversee facility efforts to comply with facility sexual abuse and assault prevention and intervention policies and procedures. The Compliance Manager shall:

1.  Assist with the development of written policies and procedures for the SAAPI Program, and with keeping them current;

2.  Assist with the development of initial and ongoing training protocols;

3.  Serve as a liaison with other agencies;

4.  Coordinate the gathering of statistics and reports on allegations of sexual abuse or assault;

5.  Review the results of every investigation of sexual abuse and assist in conducting an annual review of all investigations to assess and improve prevention and response efforts; and

6.  Review facility practices to ensure required levels of confidentiality are maintained.

[INSERT ANY ADDITIONAL DUTIES OF THE COMPLIANCE MANAGER AT THIS FACILITY RELATED TO SEXUAL ABUSE PREVENTION OR INTERVENTION]

## IV. Prevention

All staff (employees, volunteers, and contractors) are responsible for being alert to signs of potential sexual abuse or assault, and to situations in which sexual abuses or assaults might occur.  If a facility staff member has a reasonable belief that a detainee is subject to a substantial risk of imminent sexual

abuse, he or she shall take immediate action to protect the detainee.

## A. Screening and Classification

1. *Screening and Classification Requirements*

   a. All detainees shall be screened upon arrival at the facility for potential risk of sexual victimization or sexually abusive behavior, and shall be housed to prevent sexual abuse or assault, taking necessary steps to mitigate any such danger.

   b. Each new detainee shall be kept separate from the general population until he/she has been classified and may be housed accordingly.

   c. The initial classification process and initial housing assignment should be completed within twelve hours of admission to the facility.

   d. The facility shall consider, to the extent that the information is available, the following criteria to assess detainees for risk of sexual victimization:

     1) Whether the detainee has a mental, physical, or developmental disability;

     2) The age of the detainee;

     3) The physical build and appearance of the detainee;

     4) Whether the detainee has previously been incarcerated or detained;

     5) The nature of the detainee's criminal history;

     6) Whether the detainee has any convictions for sex offenses against an adult or child;

     7) Whether the detainee has self-identified as gay, lesbian, bisexual, transgender, intersex, or gender nonconforming;

     8) Whether the detainee has self-identified as having previously experienced sexual victimization; and

     9) The detainee's own concerns about his or her physical safety.

Detainees shall not be disciplined for refusing to answer, or for not disclosing complete information in response to, questions asked pursuant to items (1), (7), (8), or (9) above.

   e. The initial screening shall consider prior acts of sexual abuse or assault, prior convictions for violent offenses, and history of prior institutional violence or sexual abuse or assault, as known to the facility, in assessing detainees for risk of being sexually abusive.

   f. The facility shall implement appropriate protections on responses to questions asked pursuant to this screening, limiting dissemination, and ensuring that sensitive information is not exploited to the detainee's detriment by staff or other detainees or inmates.

   g. If screening indicates that a detainee has experienced prior sexual victimization or perpetrated sexual abuse, staff shall, as appropriate, ensure that the detainee is immediately referred to a qualified medical or mental health practitioner for medical and/or mental health follow-up as appropriate. When a referral for medical follow-up is initiated, the detainee shall receive a health evaluation no later than two working days from the date of assessment. When a referral for mental health follow-up is initiated, the detainee shall receive a mental health evaluation no later than 72 hours after the referral.

   h. Detainees considered at risk for sexual victimization shall be placed in the least restrictive housing that is available and appropriate.  If appropriate custodial options

are not available at the facility, the facility will consult with the ICE Field Office Director to determine if ICE can provide additional assistance.  Such detainees may be assigned to administrative segregation for protective custody only until an alternative means of separation from likely abusers can be arranged, and such an assignment shall not ordinarily exceed a period of 30 days.

i. The facility shall reassess each detainee's risk of victimization or abusiveness between 60 and 90 days from the date of the initial assessment, and at any other time when warranted based upon the receipt of additional, relevant information or following an incident of abuse or victimization.

j. When making assessment and housing decisions for a transgender or intersex detainee, the facility shall consider the detainee's gender self-identification and an assessment of the effects of placement on the detainee's health and safety.  The facility shall consult a medical or mental health professional as soon as practicable on this assessment.  The facility should not base placement decisions of transgender or intersex detainees solely on the identity documents or physical anatomy of the detainee; a detainee's self-identification of his/her gender and self-assessment of safety needs shall always be taken into consideration as well.  The facility's placement of a transgender or intersex detainee shall be consistent with the safety and security considerations of the facility, and placement and programming assignments for each transgender or intersex detainee shall be reassessed at least twice each year to review any threats to safety experienced by the detainee.

k. When operationally feasible, transgender and intersex detainees shall be given the opportunity to shower separately from other detainees.

2. *Screening and Classification Procedures*

[INSERT FACILITY PROCEDURES THAT MEET REQUIREMENTS, INCLUDING, E.G.:

- REFERENCES TO SPECIFIC SCREENING FORMS OR DOCUMENTS USED BY THE FACILITY

- REFERENCES TO SPECIFIC SOURCES OF INFORMATION AT THE FACILITY RELATED TO SCREENING CRITERIA

- PROCEDURES TO PROTECT SCREENING INFORMATION

- RELEVANT PROCEDURES FOR REFERRAL FOR MEDICAL OR MENTAL HEALTH FOLLOW-UP

- RELEVANT STANDARDS AND REQUIREMENTS ON THE MANAGEMENT OF ADMINISTRATIVE SEGREGATION

- SPECIFIC HOUSING OPTIONS TO BE CONSIDERED FOR DIFFERENT DETAINEES OF VARYING RISK LEVELS INCLUDING VULNERABLE DETAINEES

- PROCEDURES FOR CLASSIFICATION REVIEW

- PROCESS FOR CLASSIFICATION AND HOUSING OF TRANSGENDER AND INTERSEX DETAINEES ]

## B. Staff Training

1. *Staff Training Requirements*

a. Training on the facility's SAAPI Program shall be included in initial and annual refresher training for all employees.

b. Training shall include:

1) The facility's zero-tolerance policies for all forms of sexual abuse;

2) Definitions and examples of prohibited and illegal sexual behavior;

3) The right of detainees and staff to be free from sexual abuse, and from retaliation from reporting sexual abuse;

4) Instruction that sexual abuse and/or assault is never an acceptable consequence of detention;

5) Recognition of situations where sexual abuse and/or assault may occur;

6) How to avoid inappropriate relationships with detainees;

7) Working with vulnerable populations and addressing their potential vulnerability in the general population;

8) Recognition of the physical, behavioral, and emotional signs of sexual abuse and/or assault and ways to prevent and respond to such occurrences;

9) The requirement to limit reporting of sexual abuse and assault to personnel with a need-to-know in order to make decisions concerning the detainee-victim's welfare, and for law enforcement/investigative purposes;

10) The investigation process and how to ensure that evidence is not destroyed;

11) Prevention, recognition and appropriate response to allegations or suspicions of sexual assault involving detainees with mental or physical disabilities;

12) How to communicate effectively and professionally with detainees, including lesbian, gay, bisexual, transgender, intersex, or gender nonconforming detainees;

13) Instruction on reporting knowledge or suspicion of sexual abuse and/or assault; and

14) Instruction on documentation and referral procedures of all allegations or suspicion of sexual abuse and/or assault.

c. All volunteers and other contractors [2] who have contact with detainees shall be trained on their responsibilities under the facility's sexual abuse prevention, detection, intervention and response policies and procedures.  The level and type of training for volunteers and contractors will be based on the services they provide and their level of contact with detainees; however, all volunteers and contractors who have any contact with detainees must be notified of ICE and the facility's zero-tolerance policy and informed how to report such incidents.

d. In addition to the general training, all facility staff responsible for conducting sexual abuse or assault investigations shall receive specialized training that covers, at a minimum, interviewing sexual abuse and assault victims, sexual abuse and assault evidence collection in confinement settings, the criteria and evidence required for administrative action or prosecutorial referral, and information about effective cross-agency coordination in the investigation process.  The facility must maintain written documentation verifying specialized training provided to investigators pursuant to this requirement.

e. Facility medical staff shall be trained in procedures for examining and treating victims of sexual abuse, in facilities where medical staff may be assigned these activities.

[2] In this section, the term *other contractor* means a person who provides services on a non-recurring basis to the facility pursuant to a contractual agreement with the facility.

Such specialized training shall include detecting and assessing signs of sexual abuse and assault, preserving physical evidence of sexual abuse, responding effectively to victims of sexual abuse and assault, and how and to whom to report allegations or suspicions of sexual abuse or assault.

f. The facility shall maintain documentation verifying employee, volunteer and contractor training.

2. *Staff Training Procedures*

[INSERT FACILITY PROCEDURES THAT MEET REQUIREMENTS, INCLUDING, E.G.:

- MORE SPECIFIC DESCRIPTION OF GENERAL AND/OR SPECIALIZED TRAINING CONTENT MEETING MINIMUM ELEMENTS ABOVE

- DESCRIPTION OF HOW TRAINING RECORDS ARE DOCUMENTED AT THE FACILITY

- PROCEDURES FOR TRAINING OTHER CONTRACTORS AND VOLUNTEERS]

## C. Detainee Education

1. *Detainee Education Requirements*

a. Upon admission to [FACILITY], all detainees shall be notified of the facility's zero-tolerance policy for all forms of sexual abuse and assault through the orientation program and detainee handbook, and provided with information about the facility's SAAPI Program. Such information shall include, at a minimum:

1) the facility's zero tolerance policy for all forms of sexual abuse or assault;

2) the name of the facility PSA Compliance Manager, and information about how to contact him/her;

3) prevention and intervention strategies;

4) definitions and examples of detainee-on-detainee sexual abuse and assault, staff-on-detainee sexual abuse and assault and coercive sexual activity;

5) explanation of methods for reporting sexual abuse or assault, including one or more staff members other than an immediate point-of-contact line officer, the DHS/OIG and the ICE/OPR investigation processes;

6) information about self-protection and indicators of sexual abuse and assault;

7) prohibition against retaliation, including an explanation that reporting an assault shall not negatively impact the detainee's immigration proceedings; and

8) the right of a detainee who has been subjected to sexual abuse to receive treatment and counseling.

b. The facility shall provide the detainee notification, orientation, or instruction in formats accessible to all detainees, including those who are limited English proficient, deaf, visually impaired or otherwise disabled, as well as to detainees who have limited reading skills.

c. The facility shall maintain documentation of detainee participation in the instruction session.

d. The facility shall post on all housing unit bulletin boards the following notices:

1) The DHS-prescribed sexual abuse and assault awareness notice;

2) The name of the PSA Compliance Manager; and

3) Information about local organization(s) that can assist detainees who have been victims of sexual abuse or assault, including mailing addresses and

telephone numbers (incl. toll-free hotline numbers where available).  If no such local organizations exist, the facility shall make available the same information about national organizations.

   a.  The facility shall make available and distribute the DHS-prescribed "Sexual Assault Awareness Information" pamphlet.

2. *Detainee Education Procedures*

[INSERT FACILITY PROCEDURES THAT MEET REQUIREMENTS, INCLUDING, E.G.:

* SPECIFIC METHOD OF ORIENTATION AT THE FACILITY (E.G. IN-PERSON SESSION, VIDEO)

* SPECIFIC CONTENT OF DETAINEE ORIENTATION PROGRAMS AS RELATED TO SEXUAL ABUSE

* SPECIFIC PROCEDURES FOR LEP DETAINEES, DETAINEES WITH DISABILITIES, AND DETAINEES WHO HAVE LIMITED LITERACY

* LOCAL ORGANIZATION INFORMATION TO BE PROVIDED

* MORE SPECIFIC DESCRIPTION OF HOW DETAINEE PARTICIPATION IS TO BE DOCUMENTED AT THE FACILITY]

## D. Limits to Cross-Gender Viewing and Searches

1. *Viewing and Searches Requirements for Detainees of the Opposite Gender*

   a.  Pat-down searches of male detainees by female staff shall not be conducted unless, after reasonable diligence, staff of the same gender is not available at the time the pat-down search is required or in exigent circumstances.

   b.  Pat-down searches of female detainees by male staff shall not be conducted unless in exigent circumstances.

   c.  All pat-down searches by staff of the opposite gender shall be documented.

   d.  Strip searches or visual body cavity searches by staff of the opposite gender shall not be conducted except in exigent circumstances, including consideration of officer safety, or when performed by medical practitioners. Staff shall not conduct visual body cavity searches of juveniles and, instead, shall refer all such body cavity searches of juveniles to a medical practitioner.

   e.  All strip searches and visual body cavity searches shall be documented.

   f.  Detainees shall be able to shower, perform bodily functions, and change clothing without being viewed by staff of the opposite gender, except in exigent circumstances or when such viewing is incidental to routine cell checks or is otherwise appropriate in connection with a medical examination or monitored bowel movement.  Staff of the opposite gender shall announce their presence when entering an area where detainees are likely to be showering, performing bodily functions, or changing clothing.

   g.  The facility shall not search or physically examine a detainee for the sole purpose of determine the detainee's genital characteristics.  If the detainee's gender is unknown, it may be determined during conversations with the detainee, by reviewing medical records, or, if necessary, learning that information as part of a medical examination that all detainees must undergo as part of intake or other processing procedure conducted in private, by a medical practitioner.

h. All pat-down searches shall be conducted in a professional and respectful manner, and in the least intrusive manner possible, consistent with security needs and policy, including officer safety.

2. *Viewing and Searches Procedures for Detainees of the Opposite Gender*

[INSERT FACILITY PROCEDURES THAT MEET REQUIREMENTS, INCLUDING:

- PROTOCOLS FOR CONDUCTING PROFESSIONAL AND RESPECTFUL BODY SEARCHES

- PROCEDURES FOR ASCERTAINING WHETHER STAFF OF THE SAME GENDER IS AVAILABLE TO CONDUCT A PAT SEARCH

- SPECIFIC METHOD OR LOCATION FOR SEARCH DOCUMENTATION AT THE FACILITY]

## E. Detainee Supervision

1. *Detainee Supervision Requirements*

a. The facility shall ensure that it maintains sufficient supervision of detainees, including through appropriate staffing levels and, where applicable, video monitoring, to protect detainees against sexual abuse.

b. The facility administrator shall determine security needs based on a comprehensive staffing analysis and a documented comprehensive supervision guideline that is reviewed and updated at least annually.

c. In determining adequate levels of detainee supervision and determining the need for video monitoring, the facility shall take into consideration generally accepted detention and correctional practices, any judicial findings of inadequacy, the physical layout of each facility, the composition of the detainee population, the prevalence of substantiated

and unsubstantiated incidents of sexual abuse as well as other incidents reflecting on facility security and detainee safety, the findings and recommendations of sexual abuse incident review reports or other findings reflecting on facility security and detainee safety, the length of time detainees spend in agency custody, and any other relevant factors.

d. Frequent unannounced security inspections shall be conducted to identify and deter sexual abuse of detainees. Inspections will occur on night as well as day shifts. Staff are prohibited from alerting others that these security inspections are occurring, unless such announcement is related to the legitimate operational functions of the facility.

2. *Detainee Supervision Procedures*

[INSERT FACILITY PROCEDURES THAT MEET REQUIREMENTS, INCLUDING:

- ELEMENTS OF THE COMPREHENSIVE SUPERVISION GUIDELINE

- PROCEDURE FOR ANNUAL REVIEWS

- PROCEDURES FOR CONDUCTING FREQUENT UNANNOUNCED SECURITY INSPECTIONS]

## F. Transportation

1. *Transportation Requirements*

a. Detainees identified as being "at risk" for sexual victimization shall be transported in accordance with that special safety concern.

b. Transportation staff shall seat each detainee in accordance with written procedures from the facility administrator, with particular attention to detainees who may need to be

afforded closer observation for their own safety.

2. *Transportation Procedures*

   [INSERT FACILITY PROCEDURES THAT MEET REQUIREMENTS, INCLUDING:

   • SPECIFIC INSTRUCTIONS FOR SEATING DETAINEES WHO MAY NEED CLOSER OBSERVATION]

## G. Upgrades to Facilities and Technologies

1. *Requirements for Upgrades to Facilities and Technologies*

   a. When designing or acquiring any new facility and in planning any substantial expansion or modification of existing facilities, the facility shall consider the effect of the design, acquisition, expansion, or modification upon its ability to protect detainees from sexual abuse.

   b. When installing or updating a video monitoring system, electronic surveillance system, or other monitoring technology in a facility, the facility shall consider how such technology may enhance its ability to protect detainees from sexual abuse.

2. *Upgrades to Facilities and Technology Procedures*

   [INSERT FACILITY PROCEDURES THAT MEET REQUIREMENTS, INCLUDING:

   • FACTORS THE FACILITY SHOULD TAKE INTO CONSIDERATION IN ASSESSING HOW UPGRADE PLANS CAN HELP BETTER PROTECT AGAINST ABUSE – E.G. EFFECTS ON BLIND SPOTS IN PHYSICAL LAYOUT, ETC.]

## V. Accommodating Detainees with Detainees or Limited English Proficiency

## A. Accommodation Requirements

1. The facility shall take appropriate steps to ensure that detainees with disabilities (including, for example, detainees who are deaf or hard of hearing, those who are blind or have low vision, or those who have intellectual, psychiatric, or speech disabilities) have an equal opportunity to participate in or benefit from all aspects of the facility's efforts to prevent, detect, and respond to sexual abuse.  Such steps shall include, when necessary to ensure effective communication with detainees who are deaf or hard of hearing, or detainees who have intellectual, psychiatric, or speech disabilities, limited reading skills, or who are blind or have low vision, by:

   a. Providing access to in-person, telephonic, or video interpretive services that enable effective, accurate, and impartial interpretation, both receptively and expressively, using any necessary specialized vocabulary.

   b. Providing access to written materials related to sexual abuse in formats or through methods that ensure effective communication.

2. The facility shall take steps to ensure meaningful access to all aspects of the facility's efforts to prevent, detect, and respond to sexual abuse to detainees who are limited English proficient, including steps to provide in-person or telephonic interpretive services that enable effective, accurate, and impartial interpretation, both receptively and expressively, using any necessary specialized vocabulary.

3. In matters relating to allegations of sexual abuse, the facility shall employ effective expressive and receptive verbal communication techniques while communicating with detainees with disabilities in accordance with professionally accepted standards of care.  The facility shall provide detainees with disabilities and detainees

with limited English proficiency with in-person or telephonic interpretation services that enable effective, accurate, and impartial interpretation, both receptively and expressively, using any necessary specialized vocabulary.  Interpretation services shall be provided by someone other than another detainee, unless the detainee expresses a preference for another detainee to provide interpretation and ICE determines that such interpretation is appropriate and consistent with DHS policy.  The provision of interpreter services by minors, alleged abusers, detainees who witnessed the alleged abuse, and detainees who have a significant relationship with the alleged abuser is not appropriate in matters relating to allegations of sexual abuse.

4. Where practicable, provisions for written translation of materials related to sexual abuse or assault shall be made for any significant segments of the population with limited English proficiency.  Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

**B.  Accommodation Procedures**

[INSERT FACILITY PROCEDURES THAT MEET REQUIREMENTS, INCLUDING:

- SPECIFIC METHODS AT THE FACILITY FOR ARRANGING IN-PERSON, TELEPHONIC, AND/OR VIDEO INTERPRETIVE SERVICES (DESIGNATED STAFF AND PROFESSIONAL INTERPRETATION SERVICES AVAILABLE AT THE FACILITY)

- INSTRUCTIONS FOR USING FACILITY TELEPHONIC INTERPRETER LINE OR REQUESTING WRITTEN TRANSLATIONS

- INSTRUCTIONS FOR WORKING WITH DETAINEES WITH DISABILITIES AND PROCURING ANY NECESSARY ACCOMMODATIONS

- PROCEDURES FOR OBTAINING APPROVAL BY AN ICE OFFICIAL FOR THE USE OF ANOTHER DETAINEE TO PROVIDE INTERPRETATION

- ANY APPLICABLE CROSS-REFERENCES TO THE FACILITY'S LEP PLAN OR PROCEDURES]

**VI. Detainee Reporting Procedures**

**A.  Detainee Reporting Requirements**

1. Detainees shall have multiple ways to privately, and if desired, anonymously, report signs or incidents of sexual abuse and assault, retaliation for reporting sexual abuse, or staff neglect or violations of responsibilities that may have contributed to such incidents, and will not be punished for reporting.

2. Staff shall take seriously all statements from detainees claiming to be victims of sexual abuse or assault, and shall respond supportively and non-judgmentally.

3. Any detainee may report acts of sexual abuse or assault to any employee, contractor, or volunteer.

4. If a detainee is not comfortable with making the report to immediate point-of-contact line staff, he/she shall be allowed to make the report to a staff person with whom he/she is comfortable in speaking about the allegations.

5. The facility shall provide instruction on how detainees may contact their consular official or the DHS Office of the Inspector General, to confidentially and if desired, anonymously, report these incidents.

6. Reporting Through Grievance System

   a.  Formal grievances related to sexual abuse and assault may be filed at any time during, after, or in lieu of lodging an informal grievance or

complaint and with no time limit imposed on when a grievance may be submitted.

b.  Written procedures must be implemented for identifying and handling time-sensitive grievances that involve an immediate threat to detainee health, safety, or welfare related to sexual abuse or assault. Decisions on grievances shall be issued within five days of receipt and appeals shall be responded to within 30 days.

c.  Detainees may obtain assistance from another detainee, the housing officer or other facility staff, family members, or legal representatives. Staff shall take reasonable steps to expedite requests for assistance from these other parties

d.  All grievances related to sexual abuse and the facility's decision on any such grievance must be forwarded to the Field Office Director.

## B.  Detainee Reporting Procedures

Detainee reports of sexual abuse or assault, retaliation for reporting sexual abuse or assault, and/or staff neglect or violations of responsibilities that may have contributed to such incidents may be made using any available methods of communication, including but not limited to:

*Reports to the Facility:*

a.  Verbal reports to any staff member (including the PSA Compliance Manager or medical staff)

b.  Written informal or formal requests or grievances to the facility

c.  Sick call requests

*Reports to Family Members, Friends, or Other Outside Entities:*

d.  Reports to an individual or organization outside the facility who can contact facility staff

*Reports to DHS/ICE:*

e.  Written informal or formal requests or grievances (including emergency grievances) to the ICE Field Office

f.  Telephone calls or written reports to the DHS/OIG, ICE/OPR, or ICE/DRIL

*Reports to Consulates:*

g.  Telephone calls or written reports to consular officials

[INSERT SPECIFIC METHODS FOR WRITTEN COMMUNICATION WITH FACILITY STAFF, INCLUDING:

● PROCESS FOR HANDLING DETAINEE GRIEVANCES RELATED TO SEXUAL ASSAULT

● PROCESS FOR FORWARDING GRIEVANCES RELATED TO SEXUAL ABUSE TO THE ICE FOD

● ANY ADDITIONAL METHODS AT THE FACILITY FOR DETAINEES TO MAKE PRIVATE REPORTS]

## VII. Staff Notification and Reporting

## A.  Staff Notification and Reporting Requirements

1.  All staff must immediately report:

a.  Any knowledge, suspicion, or information regarding an incident or allegation of sexual abuse occurring at the facility;

b.  Any retaliation against detainees or staff who reported or participated in an investigation about sexual abuse or assault; and

c.  Any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation.

2. Staff must also be able to report the above outside of the chain of command.

3. Staff shall accept reports made verbally, in writing, anonymously, and from third parties, and promptly document any verbal reports.

4. The facility shall establish a method to receive third-party reports of sexual abuse in its facility, and shall make available to the public information on how to report sexual abuse on behalf of a detainee.

5. The facility administrator shall promptly report the incident to the ICE Field Office Director, and refer all cases that appear potentially to support criminal prosecution to the appropriate law enforcement agency having jurisdiction for investigation.

6. If an employee, contractor, or volunteer is alleged to be the perpetrator of detainee sexual abuse or assault, the facility administrator shall also notify the local government entity or contractor that operates the facility.

7. If the alleged victim is under the age of 18 or considered a vulnerable adult under a State or local vulnerable persons statute, the facility shall report that information to the Field Office Director so that ICE can report the allegation to the designated State or local services agency under applicable mandatory reporting laws.

8. Information concerning the identity of a detainee victim reporting a sexual assault, and the facts of the report itself, shall be limited to those who have a need-to-know in order to make decisions concerning the victim's welfare, and for law enforcement/investigative purposes.  Apart from such reporting, staff shall not reveal any information related to a sexual abuse and assault report to anyone other than to the extent necessary to help protect the safety of the victim or prevent further victimization of other detainees or staff in the facility, or to make medical treatment, investigation, law enforcement, or other security and management decisions.

9. Upon receiving an allegation that a detainee was sexually abused or assaulted while confined at another facility, the facility administrator shall notify the Field Office Director and the appropriate administrator of the facility where the alleged abuse occurred as soon as possible, but no later than 72 hours after receiving the allegation.  The facility administrator shall notify the detainee in advance of such reporting.  The facility shall document that it has provided such notification.  A facility receiving such notification shall ensure the allegation is referred for investigation and reported to the Field Office Director.

B. Staff Notification and Reporting Procedures

[INSERT FACILITY PROCEDURES THAT MEET REQUIREMENTS, INCLUDING:

- FACILITY CHAIN-OF-COMMAND REPORTING STRUCTURE AND PROCEDURES/FORMS FOR DOCUMENTING IN WRITING ALL REPORTED ALLEGATIONS OR SUSPICIONS

- METHOD(S) FOR STAFF TO REPORT OUTSIDE THE CHAIN-OF-COMMAND

- METHOD FOR FACILITY TO RECEIVE THIRD-PARTY REPORTS OF SEXUAL ABUSE

- METHOD BY WHICH FACILITY MAKES AVAILABLE TO THE PUBLIC INFORMATION ON HOW TO REPORT SEXUAL ABUSE ON BEHALF OF A DETAINEE

- FACILITY PROCEDURES FOR REFERRAL TO APPROPRIATE LAW ENFORCEMENT AGENCIES

- **METHOD OF FACILITY REPORTING TO ICE**

- **FACILITY REPORTING TO OTHER CONFINEMENT FACILITIES]**

## VIII. Response

### A. First Response

1. *First Response Requirements*

   a. Staff shall take immediate action to separate any detainee who alleges that he/she has been sexually abused or assaulted from the alleged assailant, and shall refer the detainee for a medical examination and/or clinical assessment for potential negative symptoms.

   b. Staff suspected of perpetrating sexual abuse or assault shall be removed from all duties requiring detainee contact pending the outcome of an investigation.

   c. The first security staff member to respond to a report of sexual abuse, or his or her supervisor, shall preserve and protect, to the greatest extent possible, any crime scene until appropriate steps can be taken to collect any evidence.

   d. If the abuse occurred within a time period that still allows for the collection of physical evidence, the first responder shall:

      1) Request the alleged victim not to take any actions that could destroy physical evidence, including, as appropriate, washing, brushing teeth, changing clothes, urinating, defecating, smoking, drinking, or eating; and

      2) Ensure that the alleged abuser does not take any actions that could destroy physical evidence, including, as appropriate, washing, brushing teeth, changing clothes, urinating, defecating, smoking, drinking, or eating.

   e. If the first staff responder is not a security staff member, the responder shall request that the alleged victim not take any actions that could destroy physical evidence and then notify security staff.

2. *First Response Procedures*

   **[INSERT FACILITY PROCEDURES THAT MEET REQUIREMENTS, INCLUDING:**

   - **INSTITUTIONAL PLAN TO COORDINATE STAFF FIRST RESPONDERS, MEDICAL AND MENTAL HEALTH PRACTITIONERS, INVESTIGATORS, AND FACILITY LEADERSHIP RESPONSE**

   - **REMOVING STAFF SUSPECTED OF PERPETRATING SEXUAL ABUSE FROM DETAINEE CONTACT**

   - **WHERE APPLICABLE, FACILITY UNIFORM EVIDENCE PROTOCOL, WHICH MAXIMIZES THE POTENTIAL FOR OBTAINING USABLE PHYSICAL EVIDENCE FOR ADMINISTRATIVE PROCEEDINGS AND CRIMINAL PROSECUTIONS]**

### B. Specialized Response and Victim Services

1. *Specialized Response and Victim Services Requirements*

   a. The facility must use a coordinated, multidisciplinary team approach to responding to sexual abuse, such as a sexual assault response team (SART), which includes a medical practitioner, a mental health practitioner, a security staff member, and an investigator from the assigned investigative entity, as well as representatives from outside entities that provide relevant services and expertise.

   b. Staff shall utilize available community resources and services to provide valuable expertise and support in areas of crisis intervention, counseling, investigation and

the prosecution of sexual abuse and assault perpetrators to most appropriately address victims' needs.

c.  The facility shall attempt to enter into memoranda of understanding or other agreements with community service providers or, if local providers are not available, national organizations that provide legal advocacy and confidential emotional support services for immigrant victims of crime.

d.  The facility administrator shall establish procedures to make available to detainees information about local organizations that can assist detainees who have been victims of sexual abuse, including mailing addresses and telephone numbers (including toll-free hotline numbers where available). If no such local organizations exist, the facility shall make available the same information about national organizations.

e.  Following an allegation of sexual abuse, the facility administrator shall also establish procedures to make available, to the full extent possible, additional outside victim services.

f.  The facility shall attempt to make available to the victim a victim advocate from a rape crisis center. If a rape crisis center is not available, the facility shall work with ICE to provide these services from a qualified staff member from a community-based organization, or a qualified ICE staff member.[3] The victim advocate shall be able to provide emotional support, crisis intervention, information, and referrals.

g.  The facility shall enable reasonable communication between detainees and these organizations or agencies, in as confidential a manner as possible.

h.  Staff shall inform detainees, prior to giving them access to outside resources, of the extent to which such communications will be monitored and the extent to which reports of abuse will be forwarded to authorities in accordance with mandatory reporting laws.

i.  If a victim is transferred between detention facilities, the sending facility shall, as permitted by law, inform the receiving facility of the incident and the victim's potential need for medical or social services (unless the victim requests otherwise  in the case of transfer to a non-ICE facility).  If the receiving facility is unknown to the sending facility, the sending facility shall notify the Field Office Director, so that he or she can notify the receiving facility.

j.  Where an alleged victim of sexual abuse or assault that occurred elsewhere in ICE custody is subsequently transferred to the detention facility, the facility shall comply with all response and intervention requirements outlined by this policy, as appropriate based on the nature and status of the case.

k.  If any of these requirements cannot be met, the facility will consult with the ICE Field Office Director to determine if ICE can provide additional assistance.

2.  *Specialized Response and Victim Services Procedures*

[INSERT FACILITY PROCEDURES THAT MEET REQUIREMENTS, INCLUDING:

●  FACILITY PLAN TO COORDINATE ACTIONS TAKEN BY STAFF FIRST RESPONDERS, MEDICAL AND MENTAL HEALTH

---

[3] A qualified ICE staff member or a qualified community-based staff member is an individual with training on sexual assault and forensic examination issues in general.

PRACTITIONERS, INVESTIGATORS, AND FACILITY LEADERSHIP

- REFERENCES TO ANY MEMORANDA OF UNDERSTANDING (MOU) OR OTHER FACILITY AGREEMENTS WITH COMMUNITY SERVICE PROVIDERS TO PROVIDE SUPPORT SERVICES FOR VICTIMS

- CONTACTS FOR AVAILABLE COMMUNITY SERVICE PROVIDERS IN THE AREA (INCLUDING ANY RAPE CRISIS CENTERS), AND PROCEDURES FOR CONTACTING THEM

- FACILITY PROCESSES TO INVOLVE AVAILABLE OUTSIDE COMMUNITY RESOURCES AND SERVICES, INCLUDING NATIONAL ORGANIZATIONS IF LOCAL ORGANIZATIONS ARE NOT AVAILABLE]

## C. Housing and Protection for Victims

1. *Housing and Protection Requirements*

   a. Victims and vulnerable detainees shall be housed in a supportive environment that represents the least restrictive housing option possible (e.g. in a different housing unit, transfer to another facility, medical housing, or protective custody), and that will, to the extent possible, permit the victim the same level of privileges he/she was permitted immediately prior to the sexual assault. This placement should take into account any ongoing medical or mental health needs of the victim.

   b. Victims may not be held for longer than five days in any type of administrative segregation for protective purposes, except in highly unusual circumstances or at the request of the victim. The facility shall notify the appropriate ICE Field Office Director whenever a detainee victim, or detainee placed due to vulnerability to sexual abuse or

assault, has been held in administrative segregation for 72 hours.

   c. A detainee victim who is in protective custody after having been subjected to sexual abuse shall not be returned to the general population until completion of a proper re-assessment, taking into consideration any increased vulnerability of the detainee as a result of the sexual abuse or assault.

   d. Staff, contractors, and volunteers shall not retaliate against any person, including a detainee, who reports, complains about, or participates in an investigation into an allegation of sexual abuse, or for participating in sexual abuse as a result of force, coercion, threats, or fear of force.

   e. The facility shall employ multiple protection measures, such as housing changes, removal of alleged staff or detainee abusers from contact with victims, and emotional support services for detainees or staff who fear retaliation for reporting sexual abuse or for cooperating with investigations.

   f. For at least 90 days following a report of sexual abuse or assault, the facility, in concert with ICE, shall monitor to see if there are facts that may suggest possible retaliation by detainees or staff, and facility shall monitor to see if there are facts that may suggest possible retaliation by detainees or staff, and shall act promptly to remedy any such retaliation. Items the facility should monitor include any detainee disciplinary reports, housing, or program changes, or negative performance reviews or reassignments by staff. The facility shall continue such monitoring beyond 90 days if the initial monitoring indicates a continuing need.

   g. If any of these requirements cannot be met, the facility will consult with the ICE Field

Office Director to determine if ICE can provide additional assistance.

2. *Housing and Protection Procedures*

[INSERT FACILITY PROCEDURES THAT MEET REQUIREMENTS, INCLUDING:

- SPECIFIC FACILITY HOUSING OPTIONS TO BE CONSIDERED FOR VICTIMS AND ASSAILANTS OF VARIOUS SECURITY CLASSIFICATION LEVELS

- SPECIFIC PROTECTION MEASURES THE FACILITY MAY TAKE FOR DETAINEES OR STAFF FEARING RETALIATION

- ANY ADDITIONAL ITEMS TO BE MONITORED FOR SIGN OF POSSIBLE RETALIATION AGAINST VICTIMS OR INDIVIDUALS WHO REPORT SEXUAL ABUSE]

## IX. Health Care Services

### A. Health Care Services Requirements

1. Detainee victims of sexual abuse and assault shall have timely, unimpeded access to emergency medical treatment and crisis intervention services, including emergency contraception and sexually transmitted infections prophylaxis, in accordance with professionally accepted standards of care.

2. Transportation of an alleged victim for emergency care or other services provided off-site shall be arranged in a manner that takes into account the special needs of victimized detainees.

3. The facility shall offer medical and mental health evaluation and, as appropriate, treatment to all detainees who have been victimized by sexual abuse while in immigration detention.

4. The evaluation and treatment of such victims shall include, as appropriate, follow-up

services, treatment plans, and, when necessary, referrals for continued care following their transfer to, or placement in, other facilities, or their release from custody.

5. Detainee victims of sexually abusive vaginal penetration by a male abuser while incarcerated shall be offered pregnancy tests. If pregnancy results from an instance of sexual abuse, the victim shall receive timely and comprehensive information about lawful pregnancy-related medical services and timely access to all lawful pregnancy-related medical services.

6. Detainee victims of sexual abuse while detained shall be offered tests for sexually transmitted infections as medically appropriate.

7. The facility shall attempt to conduct a mental health evaluation of all known detainee-on-detainee abusers within 60 days of learning of such abuse history and offer treatment when deemed appropriate by mental health practitioners.

8. All treatment services, both emergency and ongoing, shall be provided to the victim without financial cost and regardless of whether the victim names the abuser or cooperates with any investigation arising out of the incident. The facility shall provide such victims with medical and mental health services consistent with the community level of care.

### B. Health Care Services Procedures

[INSERT FACILITY PROCEDURES THAT MEET REQUIREMENTS, INCLUDING:

- PROCEDURES FOR COORDINATING WITH AVAILABLE OFF-SITE SERVICE PROVIDERS, AS NECESSARY]

## X. Investigation

## A. Investigation Requirements

1. The facility to establish a protocol, to ensure that each allegation of sexual abuse is investigated by facility, or referred to an appropriate investigative authority. This protocol shall be posted on the facility website, or otherwise made available to the public.

2. The facility shall coordinate with ICE and other appropriate investigative entities to ensure that an administrative or criminal investigation is completed for all allegations of sexual abuse.  All investigations must be prompt, thorough, objective, fair, and conducted by specially trained, qualified investigators.

3. Where evidentiarily or medically appropriate, at no cost to the detainee, and only with the detainee's consent, the facility administrator shall arrange for an alleged victim to undergo a forensic medical examination by a Sexual Assault Forensic Examiner (SAFE) or Sexual Assault Nurse Examiner (SANE), where practicable.  If SAFEs or SANEs cannot be made available, the examination can be performed by other qualified health care personnel.

4. As requested by a victim, the presence of his or her outside or internal victim advocate, including any available victim advocacy services offered by a hospital conducting a forensic exam, shall be allowed for support during a forensic exam and investigatory interviews.

5. The results of the physical examination and all collected physical evidence are to be provided to the investigative entity.

6. In the event the investigation is being conducted by a non-federal investigating agency, the facility shall request that the investigating agency follow the applicable requirements of this policy, including requirements related to evidence preservation and forensic examinations.

7. Upon conclusion of a criminal investigation where the allegation was substantiated, an administrative investigation shall be conducted. Upon conclusion of a criminal investigation where the allegation was unsubstantiated, the facility shall review any available completed criminal investigation reports to determine whether an administrative investigation is necessary or appropriate. Administrative investigations shall be conducted after consultation with the appropriate investigative office within DHS, and the assigned criminal investigative entity.

8. Administrative investigations procedures include:

    a. Preservation of direct and circumstantial evidence, including any available physical DNA evidence and any available electronic monitoring data;

    b. Interviewing alleged victims, suspected perpetrators, and witnesses;

    c. Reviewing prior complaints and reports of sexual abuse or assault involving the suspected perpetrator;

    d. Assessment of the credibility of an alleged victim, suspect, or witness, without regard to the individual's status as detainee, staff, or employee and without requiring any detainee who alleged sexual abuse or assault to submit to a polygraph;

    e. An effort to determine whether actions or failures to act at the facility contributed to the abuse;

    f. Documentation of each investigation by written report, which shall include a

description of the physical and testimonial evidence, the reasoning behind credibility assessments, and investigative facts and findings;

g.  Retention of such reports for as long as the alleged abuser is detained or employed by the agency or facility, plus five years; and

h.  Coordination and sequencing of administrative and criminal investigations to ensure that a criminal investigation is not compromised by an internal administrative investigation.

9.  The facility uses no standard higher than a preponderance of the evidence in determining whether allegations of sexual abuse are substantiated.

10.  The departure of the alleged abuser or victim from the employment or control of the facility shall not provide a basis for terminating an investigation.

11.  When outside agencies investigate sexual abuse and assault, the facility shall cooperate with outside investigators and shall endeavor to remain informed about the progress of the investigation.  Where an alleged victim of sexual abuse or assault that occurred elsewhere in ICE custody is subsequently transferred to the facility, the facility shall also cooperate with any administrative or criminal investigative efforts arising from the incident.

12.  Following an investigation conducted by the facility into a detainee's allegation of sexual abuse, the facility shall notify the Field Office Director of the results of the investigation and any responsive actions taken so that the information can be reported to ICE headquarters and to the detainee.

**B.  Investigation Procedures**

[INSERT FACILITY PROCEDURES THAT MEET REQUIREMENTS, INCLUDING:

- ADDITIONAL OR MORE SPECIFIC FACILITY PROCESSES FOR CONDUCTING INTERNAL ADMINISTRATIVE INVESTIGATIONS (E.G. EVIDENCE PROCESSING PROTOCOLS, INTERVIEWING PROTOCOLS, ETC.)

- FACILITY PROCEDURES FOR ARRANGING FORENSIC EXAMS, AND FOR ATTEMPTING TO PROCURE A SAFE OR SANE

- SPECIFIC FACILITY PROCEDURES FOR COORDINATION AND SEQUENCING OF INTERNAL ADMINISTRATIVE INVESTIGATIONS AND CRIMINAL INVESTIGATIONS

- GUIDELINES FOR DETERMINING WHEN AN ADMINISTRATIVE INVESTIGATION WILL BE NECESSARY OR APPROPRIATE FOLLOWING A CRIMINAL INVESTIGATION'S FINDING OF UNSUBSTANTIATION

- MEANS BY WHICH THE FACILITY POLICY IS MADE PUBLICALLY AVAILABLE]

**XI. Disciplinary Sanctions**

**A.  Staff Discipline**

*1.  Staff Discipline Requirements*

a.  Staff shall be subject to disciplinary or adverse action, up to and including removal from their position, for substantiated allegations of sexual abuse or for violating ICE or facility sexual abuse rules, policies, or standards.

b.  Removal from their position is the presumptive disciplinary sanction for staff who have engaged in, attempted, or threatened to engage in sexual abuse, as defined under the definition of staff-on-detainee abuse in Section II, paragraphs (a)-(d) and (g)-(h).

c.  The facility shall report all incidents of substantiated sexual abuse by staff, and all removals of staff, or resignations in lieu of removal for violations of sexual abuse policies, to appropriate law enforcement agencies unless the activity was clearly not criminal.  The facility shall also report all such incidents of substantiated abuse, removals, or resignations in lieu of removal to the Field Office Director, regardless of whether the activity was criminal, and shall make reasonable efforts to report such information to any relevant licensing bodies, to the extent known.

d.  Contractors suspected of perpetrating sexual abuse or assault shall be removed from all duties requiring detainee contact pending the outcome of an investigation.

e.  Any contractor or volunteer who has engaged in sexual abuse or assault shall be prohibited from contact with detainees.  The facility shall take appropriate remedial measures, and shall consider whether to prohibit further contact with detainees by contractors or volunteers who have not engaged in sexual abuse or assault, but have violated other sexual abuse policies.

f.  Incidents of substantiated sexual abuse by a contractor or volunteer shall be reported to law enforcement agencies, unless the activity was clearly not criminal.  The facility shall also report such incidents to the Field Office Director regardless of whether the activity was criminal, and shall make reasonable efforts to report such incidents to any relevant licensing bodies, to the extent known.

2.  *Staff Discipline Procedures*

**[INSERT FACILITY PROCEDURES THAT MEET REQUIREMENTS, INCLUDING:**

- **FACILITY DISCIPLINARY PROCESSES AND SANCTIONS FOR STAFF, CONTRACTOR OR VOLUNTEER OFFENSES RELATING TO SEXUAL ABUSE**

- **PROCEDURES FOR IDENTIFYING AND REPORTING TO RELEVANT LICENSING BODIES]**

**B.  Detainee Discipline**

1.  *Detainee Discipline Requirements*

a.  Detainees shall be subjected to disciplinary sanctions pursuant to a formal disciplinary process following an administrative or criminal finding that the detainee engaged in sexual abuse or assault.

b.  The facility shall not discipline a detainee for sexual contact with staff unless there is a finding that the staff member did not consent to such contact.

c.  For the purpose of disciplinary action, a report of sexual abuse or assault made in good faith based upon a reasonable belief that the alleged conduct occurred shall not constitute falsely reporting an incident or lying, even if an investigation does not establish evidence sufficient to substantiate the allegation.

d.  If a detainee is mentally disabled or mentally ill but competent, the disciplinary process shall consider whether the detainee's mental disabilities or mental illness contributed to his or her behavior when determining what type of sanction, if any, should be imposed.

2.  *Detainee Discipline Procedures*

**[INSERT FACILITY PROCEDURES THAT MEET REQUIREMENTS, INCLUDING:**

- FACILITY DISCIPLINARY PROCESSES AND
  SANCTIONS FOR DETAINEE OFFENSES
  RELATING TO SEXUAL ABUSE (OR CROSS-
  REFERENCES TO FACILITY DETAINEE
  DISCIPLINARY POLICY)]

## XII. Sexual Abuse Incident and Annual Reviews

### A. Review Requirements

1. The facility shall conduct a sexual abuse and assault incident review at the conclusion of every investigation of sexual abuse or assault.

2. For any substantiated or unsubstantiated allegation, the facility shall prepare a written report within 30 days of the conclusion of the investigation recommending whether the allegation or investigation indicates that a change in policy or practice could better prevent, detect, or respond to sexual abuse and assault.

3. The facility shall implement the recommendations for improvement, or shall document its reasons for not doing so in a written response. Both the report and response shall be forwarded to the Field Office Director, or his or her designee, for transmission to the ICE PSA Coordinator. The facility shall also provide any further information regarding such incident reviews as requested by the ICE PSA Coordinator.

4. The review team shall consider whether the incident or allegation was motivated by race; ethnicity; gender identity; lesbian, gay, bisexual, transgender, or intersex identification, status, or perceived status; or gang affiliation; or was motivated or otherwise caused by other group dynamics at the facility.

5. The facility shall conduct an annual review of all sexual abuse investigations and resulting

incident reviews to assess and improve sexual abuse intervention, prevention, and response efforts. If the facility has not had any reports of sexual abuse during the annual reporting period, then the facility shall prepare a negative report. The results and findings of the annual review shall be provided to the facility administrator and Field Office Director, or his or her designee, for transmission to the ICE PSA Coordinator.

### B. Review Procedures

[INSERT FACILITY PROCEDURES THAT MEET REQUIREMENTS, INCLUDING:

- SPECIFIC PROCEDURES FOR CONDUCTING INCIDENT REVIEWS, INCLUDING DETAILED FACTORS OR CRITERIA TO BE TAKEN INTO CONSIDERATION

- SPECIFIC PROCEDURES FOR CONDUCTING ANNUAL REVIEWS, INCLUDING DETAILED FACTORS OR CRITERIA TO BE TAKEN INTO CONSIDERATION]

## XIII. Data Collection

### A. Data Collection Requirements

1. The facility shall maintain in a secure area all case records associated with claims of sexual abuse or assault, including incident reports, investigative reports, offender information, case disposition, medical and counseling evaluation findings, and recommendations for post-release treatment, if necessary.

2. The facility administrator shall maintain two types of files regarding incidents of sexual abuse and assault, which include the following minimum information:

   a. General files include:

   - the victim(s) and assailant(s) of a sexual assault

- the date, time, location, and nature of the incident

- the demographic background of the victim and the perpetrator (including citizenship, age, gender, and whether either has self-identified as gay, lesbian, bisexual, transgender, intersex, or gender nonconforming)

- detailed reporting timeline, including the names of the individual who reported the incident and  received the report of sexual assault, date and time the report was received, and steps taken to communicate the report up the chain of command

- any injuries sustained by the victim

- all formal and/or informal action taken, including all post-report follow up response taken by the facility (e.g. housing placement/custody classification, medical examination, mental health counseling, etc.)

- all reports

- medical forms or other relevant medical information

- supporting memos and videotapes, if any

- any sanctions imposed on the perpetrator

- any other evidentiary materials pertaining to the allegation

3. The facility administrator shall maintain these files chronologically in a secure location.

4. The facility administrator shall maintain a listing of the names of sexual assault victims and assailants, along with the dates and locations of all sexual assault incidents

occurring within the facility, on his/her computerized incident reporting system. Such information shall be maintained on a need-to-know basis; access shall be limited to those staff involved in the treatment of the victim or the investigation of the incident. At no time may law enforcement sensitive documents or evidence be stored at the facility.

5. On an ongoing basis, the PSA Compliance Manager and facility administrator must work with the Field Office and ICE PSA Coordinator to share data regarding sexual abuse incidents and response.

**B. Data Collection Procedures**

[INSERT FACILITY PROCEDURES THAT MEET REQUIREMENTS, INCLUDING:

- NAMES/TYPES OF FILES TO BE MAINTAINED REGARDING INCIDENTS OF SEXUAL ABUSE, TO BE MAINTAINED IN A SECURE AREA]

**XIV. Facility Audits**

The facility shall cooperate with all DHS audits of the facility's compliance with sexual abuse and assault policies and standards, including by:

1. In advance of and during the on-site audit, making available relevant documents, records, and other information as requested (including available videotapes and other electronically available data);

2. Permitting auditors access to all areas of the facility;

3. Permitting detainees to have private interviews with auditors, and to send confidential correspondence to the auditor; and

4. Making available space suitable for interviews of detainees and staff.

## XV. ICE Approval of Facility Policy

The following policies and procedures require approval by the local ICE Field Office.

1. Facility Zero Tolerance Policy outlining the facility's approach to preventing, detecting, and responding to all forms of sexual abuse.

2. Facility policy and procedures to ensure medical staff is trained in procedures for examining and treating victims of sexual abuse (where medical staff may be assigned these duties).

3. Facility policy and procedures specifying appropriate procedures for staff to report any knowledge, suspicion, or information regarding an incident of 1) sexual abuse that occurred in a facility; 2) retaliation against detainees or staff who reported or participated in an investigation about such an incident; and any staff neglect or violation of

responsibilities that may have contributed to an incident or retaliation.

4. Facility policy and procedures for coordination and conduct of internal administrative investigations with the assigned criminal investigative entity to ensure non-interference.

5. Facility policy and procedures regarding disciplinary or adverse actions for staff, up to and including removal, when there is a substantiated allegation of sexual abuse, or when there has been a violation of agency sexual abuse rules, policies, or standards.

[INSERT FACILITY PROCEDURES TO REQUEST AND MAINTAIN RECORDS OF ICE FIELD OFFICE REVIEW AND APPROVAL]

- **Appendix 2.11.B1: Sexual Abuse and Assault Awareness Brochure (English)**

- **Appendix 2.11.B2: Sexual Abuse and Assault Awareness Brochure (Spanish)**

This document is intended to be distributed as a tri-fold brochure.

## How to Report Sexual Abuse and Assault

If you feel at risk of being victimized, or if you become a victim of sexual abuse or assault, report the incident immediately. There are many options for reporting. Your ICE Detainee Handbook has more information about each of these:

### Report to the Facility

1. Tell any trusted staff member at the facility.
2. File an informal or formal grievance (including an emergency grievance) with the facility.

### Report to the ICE Field Office

3. Tell any ICE/ERO staff member who visits the facility.
4. File a written informal or formal request or grievance to ICE/ERO.

### Report to DHS or ICE Headquarters

5. Contact the ICE Detention Reporting and Information Line: **1-888-351-4024 or 9116#**. Language assistance is available.
6. Contact the DHS Office of Inspector General (OIG):

   Write a letter to:

   **Office of Inspector General/MAIL STOP 0305**

   Department of Homeland Security

   245 Murray Lane, SW Washington, DC 20528-0305

   (202) 254-4100 / FAX: (202) 254-4285

   Call the toll-free hotline at:

   **1-800-323- 8603 / 1-844-889-4357 – TTY**

### Report to Your Consular Official

7. Call or write to your consular official.

## Anonymous Reporting

You do not have to give your name to report a sexual abuse or assault. You can choose to report anonymously to the Detention Reporting and Information Line (DRIL) or the DHS OIG. You can also have somebody else report on your behalf to the facility, ICE Headquarters, or the OIG.

## Will this Impact my Immigration Case or Detention?

Any report of sexual abuse, or fear of being abused or assaulted, will not negatively affect your immigration case. No one can retaliate against you in any way for reporting sexual abuse or assault.

## Confidentiality

Information concerning your identity and the facts of your report will be limited to only those who need to know.



**For more information on this content, please read the ICE Detainee Handbook or ask a trusted facility staff person.**





## U.S. Immigration and Customs Enforcement



# SEXUAL ABUSE and ASSAULT AWARENESS

**www.ICE.gov**

## What is Sexual Abuse and Assault

**Detainee-on-detainee sexual abuse and assault:**

All forms of sexual abuse and assault by a detainee against another detainee(s) are prohibited. If another detainee forces you or tries to force you to engage in a sex act, touches the sexual parts of your body, forces you or tries to force you to touch the sexual parts of their body, or uses threats or intimidations to pressure you to engage in sex, it is sexual abuse.

**Staff-on-detainee sexual abuse and assault:**

All forms of sexual acts between a detainee and a staff member (including contract guards, medical professionals, and volunteers) are prohibited and against the law, regardless of whether they are consensual. If a staff member tries to or actually does have sex with you, intentionally touches you in a sexual manner, makes sexual advances or repeated sexual comments, displays his or her genitals, or engages in voyeurism, it is sexual abuse.



## If You Are a Victim of Sexual Abuse or Assault

Whatever your reactions or fears, it is important to understand that you are not to blame. Sexual abuse can violate your sense of safety and trust. You may feel shocked, angry, anxious, depressed, or guilty. You may also experience a variety of physical reactions, from changes in eating and sleeping patterns to nightmares or flashbacks.

These reactions are normal, and help is available. The facility and ICE will help you get support and offer resources specific to your needs.

## What Support Can You Expect from ICE and the Facility

You will be offered immediate protection from the perpetrator and you will be referred for a medical examination, when appropriate. You will also be offered mental health services and outside victim services. Some victims may also be encouraged

to receive a sexual assault forensic medical exam, which can help in criminally prosecuting the perpetrator.

## How Will Reports be Investigated?

When you report a sexual abuse or assault incident the facility and/or an appropriate law enforcement agency will conduct an investigation. You may be asked to participate in an interview to gather information. ICE will inform you of the result of any investigation once it is completed.

There is a difference between reporting the incident and choosing to press charges. You may choose not to immediately press charges, but you can always decide to do so later. If criminal charges are filed, it will be presented for possible prosecution. It is important for you to discuss any concerns you have with the prosecutor (or your attorney) or a victim advocate.

## How Can I Protect Myself from Sexual Abuse or Assault?

Sexual abuse and assault is never the victim's fault. Knowing the warning signs and red flags can help you stay alert and aware:

1. Report concerns.

2. Carry yourself in a confident manner. Many abusers choose victims who look like they would not fight back or who they think are emotionally weak.

3. Do not accept gifts or favors from others. Gifts or favors can come with demands or terms that the giver expects you to accept.

4. Do not accept an offer from another detainee to be your protector.

5. Find a staff member with whom you feel comfortable discussing your fears and concerns.

6. Do not use drugs or alcohol; these can weaken your ability to stay alert and make good judgments.

7. Be clear, direct and firm. Do not be afraid to say "no" or "stop it now."

8. Choose your associates wisely. Look for people who are involved in positive activities like educational programs, work opportunities or counseling groups. Get yourself involved in these activities, if they are available at your facility.

9. If you suspect another detainee is being sexually abused or assaulted, report it using one of the methods listed in this pamphlet.

10. Trust your instincts. Be aware of situations that make you feel uncomfortable. If it does not feel right or safe, leave the situation or seek assistance. If you fear for your safety, report your concerns to staff.

y folleto será doblado y luego podrá ser distribuido como un folleto tríptico.

## Como Reportar un Abuso o una Agresión Sexual

Si usted se siente a riesgo de ser victimizado o si usted se convierte en una víctima de abuso o agresión sexual, reporte el incidente inmediatamente. Hay muchas opciones para reportar. Su Manual para los Detenidos de ICE contiene más información acerca de éstas:

### Repórtelo al Centro

1. Dígaselo a cualquier empleado de confianza del centro.
2. Entregue una queja formal o informal (incluyendo una queja de emergencia) en el centro.

### Repórtelo a la Oficina Regional de ICE

3. Dígaselo a cualquier empleado de ICE/ERO que visite el centro.
4. Entregue una petición o queja informal o formal a ICE/ERO.

### Repórtelo a las Oficinas Centrales de DHS o ICE

5. Contacte la Línea de Reportes e Información de Detención de ICE: 1-888-351-4024 o 9116#. Hay asistencia de idiomas.
6. Contacte la Oficina del Inspector General de DHS (OIG por sus siglas en inglés):

   Envíe una carta a:

   **DHS Office of Inspector General**
   Attention: Office of Investigations
   Hotline 245 Murray Lane, SW

   Building 410/Mail Stop 0305
   Washington, DC 20528

Llame gratuitamente a la línea de asistencia:

   **1-800-323- 8603 / 1-844-889-4357 – TTY**

### Repórtelo a su Oficial Consular

7. Llame o escríbale a su oficial consular.

## Reportar Anónimamente

Usted no tiene que dar su nombre para reportar un abuso o asalto sexual. Usted puede elegir reportar anónimamente a la Línea de información y denuncias del Centro de Detenciones del ICE (DRIL) o al DHS OIG. Usted también puede hacer que otra persona lo reporte por usted a las Oficinas Centrales de ICE o al OIG por usted.

## ¿Esto impactará mi caso de inmigración o detención?

Cualquier reporte de abuso sexual o temor de ser abusado o agredido no afectará negativamente su caso de inmigración. *Nadie podrá tomar ninguna represalia en contra de usted por haber reportado un abuso o una agresión sexual.*

## Confidencialidad

La información concerniente a su identidad y los hechos de su reporte serán limitados a quienes necesitan saberlos.



\*\*Para más información sobre este tema, por favor lea el Manual para los detenidos de ICE o pregúntele a un empleado de confianza del centro.\*\*







# CONOCIMIENTO DEL ABUSO Y LA AGRESIÓN SEXUAL

### www.ICE.gov

## ¿Qué es el abuso y la agresión sexual?

**Abuso y agresión sexual por parte de un detenido hacia otro detenido:**

Todos los tipos de abuso y agresión sexual por parte de un detenido hacia otro detenido son prohibidos. Si un detenido lo fuerza o intenta forzarlo a participar en cualquier acto sexual, le toca las partes sexuales del cuerpo, lo fuerza a tocarle las partes sexuales de su cuerpo o usa amenazas o intimidación para presionarlo a participar en relaciones sexuales, eso es un abuso sexual.

**Abuso o agresión sexual por parte de un empleado hacia un detenido:**

Todos los tipos de actos sexuales entre un detenido y un empleado (incluyendo los guardias contratistas, profesionales médicos y voluntarios) son prohibidos y contrarios a la ley, aún si son con consentimiento. Si un empleado intenta o logra tener sexo con usted, intencionalmente lo toca en una manera sexual, le hace proposiciones sexuales o comentarios sexuales repetidos, le muestra su área genital o participa en voyerismo, es un abuso sexual.



## Si usted es una víctima de abuso o agresión sexual

Cualesquiera que sean sus reacciones o temores, es importante que entienda que no es culpable. El abuso sexual puede violar su sentido de seguridad y confianza. Puede ser que usted se sienta ofendido, bravo, ansioso, deprimido o culpable. Puede ser que usted también experimente una variedad de reacciones físicas, desde cambios en sus hábitos de comer y dormir hasta pesadillas y flashbacks. Estas reacciones son normales y hay ayuda disponible. El centro y ICE le ayudarán a conseguir apoyo y ofrecen recursos específicos para sus necesidades.

## ¿Qué apoyo puede esperar de ICE y su centro?

Se le ofrecerá protección inmediata del culpable y usted será referido para un examen médico, cuando sea apropiado. También se le ofrecerán servicios de salud mental y servicios externos para las víctimas. A algunas víctimas también se les recomendará que reciban un examen de medicina forense de    abuso sexual, lo cual puede ayudar a procesar criminalmente al culpable.

## ¿Cómo se investigarán los reportes?

Cuando usted reporte un incidente de abuso o agresión sexual, el centro y/o una agencia adecuada del cumplimiento de la ley realizará una investigación. Puede ser que se le pida que participe en una entrevista para colectar información. ICE le informará el resultado de cualquier investigación una vez que ésta haya terminado.

Hay una diferencia entre reportar el incidente y elegir poner cargos. Puede ser que usted elija no poner cargos inmediatamente, pero usted siempre podrá decidir hacerlo luego. Si se formulan cargos criminales, se presentarán para un posible enjuiciamiento. Es importante que usted discuta cualquier preocupación que tenga con el fiscal (o su abogado) o un defensor de víctimas.

## ¿Cómo puedo protegerme del abuso o la agresión sexual?

El abuso y la agresión sexual nunca son culpa de la víctima. El conocer las señales de alerta y actitudes sospechosas pueden ayudarle a mantenerse alerto y consciente:

1. Reporte sus preocupaciones.
2. Compórtese con firmeza. Muchos abusadores eligen víctimas que lucen como que no se defenderían o que ellos perciben como débiles.
3. No acepte regalos o favores de otros. Los regalos o los favores pueden venir con demandas o términos con los cuales el donante espera que usted cumpla.
4. No acepte una oferta por parte de otro detenido para ser su protector.
5. Busque un empleado con el cual usted se siente cómodo discutiendo sus temores y preocupaciones.
6. No use drogas o alcohol. Estos puede debilitar sus habilidades para mantenerse alerta y tener buen juicio.
7. Sea claro, directo y firme. No tema decir "no" o "pare ya".
8. Elija cuidadosamente sus asociados. Busque personas que estén involucradas en actividades positivas como los programas educacionales, oportunidades de empleo o grupos de asesoramiento. Involúcrese en estas actividades, si están disponibles en su centro.
9. Si usted sospecha que otro detenido está siendo abusado o agredido sexualmente, repórtelo usando uno de los métodos listados en este panfleto.
10. Confíe en sus instintos. Esté consciente de situaciones que lo hacen sentirse incómodo. Si no se siente bien o seguro, apártese de la situación o busque asistencia. Si teme por su seguridad, repórte sus preocupaciones a un empleado.

Ya Basta 

# 2.12 Special Management Units

## I. Purpose and Scope

This detention standard protects detainees, staff, contractors, volunteers and the community from harm by segregating certain detainees from the general population in Special Management Units with an Administrative Segregation section for detainees segregated for administrative reasons and a Disciplinary Segregation section for detainees segregated for disciplinary reasons.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

For all types of facilities, procedures that appear in italics with a marked (**) on the page indicate optimum levels of compliance for this standard.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. The facility shall have a Special Management Unit (SMU) with provisions for separating the administrative segregation section, for detainees segregated from the general population for administrative reasons, from the disciplinary segregation section, for detainees segregated from the general population for disciplinary reasons.

2. Detainees housed in the general population, staff, contractors, volunteers and the local community shall be protected from harm by the segregation of certain detainees in an SMU.

3. Any detainee who represents an immediate, significant threat to safety, security or good order shall be immediately controlled by staff and, if cause exists and supervisory approval granted, placed in administrative segregation. ICE and the detainee shall be immediately provided a copy of the administrative segregation order describing the reasons for the detainee's placement in the SMU.

4. Administrative segregation may also be available to detainees for the purpose of providing "protective custody." A detainee shall be placed in "protective custody" status in administrative segregation only when there is documentation and supervisory approval that it is necessary to protect a detainee from harm and that no reasonable alternatives are available.

5. A detainee shall be placed in disciplinary segregation only after a finding by a disciplinary hearing panel that the detainee is guilty of a prohibited act or rule violation classified at a "greatest," "high" or "high-moderate" level, as defined in "Appendix 3.1.A: Offense Categories," found in "3.1 Disciplinary System."

6. Disciplinary segregation shall only be ordered when alternative dispositions may inadequately regulate the detainee's behavior.

7. Health care personnel shall be immediately informed when a detainee is admitted to an SMU and shall conduct an assessment and review of the detainees medical and mental health status and care needs. Health care personnel shall at a minimum conduct a daily assessment of detainees

in an SMU. Where reason for concern exists, a qualified medical, or mental health professional shall conduct a complete evaluation.

8. Detainees with serious mental illness may not be automatically placed in an SMU on the basis of such mental illness.  Every effort shall be made to place detainees with serious mental illness in a setting in or outside of the facility in which appropriate treatment can be provided, rather than an SMU, if separation from the general population is necessary.

9. The status of detainees in SMUs shall be reviewed by supervisory staff in accordance with required time schedules, and the results of those reviews shall be documented.

10. A detainee shall remain in disciplinary segregation for no more than 30 days per incident, except in extraordinary circumstances, such as incidents involving violations of offenses 100 through 109 listed in the "Greatest" offense category in Appendix 3.1.A, and his/her status shall be reviewed by the facility administrator after the first 30 days and each 30 days thereafter, to determine whether continued detention in disciplinary segregation is warranted.

11. Detainees in SMU shall be afforded basic living conditions that approximate those provided to the general population, consistent with the safety and security considerations that are inherent in more controlled housing, and in consideration of the purpose for which each detainee is segregated.

12. In general, when a detainee in an SMU is deprived of any usually authorized items or activity, a report of the action shall be forwarded to the facility administrator for notice and review.

13. Detainees in SMU shall have regular access to supervisory, management, program and health care staff.

14. Each detainee in an SMU shall be offered individual recreation or appropriate group recreation time, unless documented security, safety, or medical considerations dictate otherwise.

15. Detainees in SMU shall be able to write, send and receive mail and correspondence as they would otherwise be able to do while detained within the general population.

16. Detainees in SMU shall be provided opportunities for general visitation, including legal visitation, unless there are substantial, documented reasons for withholding those privileges.

17. Detainees in SMU shall have access to personal legal materials, law library materials and legal visits, in accordance with provisions in the PBNDS.

18. Detainees in SMU shall have access to telephones, in accordance with provisions in the PBNDS.

19. Detainees in SMU shall have access to programs and services such as commissary, library, religious guidance and recreation, in accordance with provisions in the PBNDS.

20. Detailed records shall be maintained on the circumstances related to a detainee's confinement to the SMU, through required permanent SMU logs and individual detainee records.

21. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance,

including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Special Management Unit (Administrative Segregation)" and "Special Management Unit (Disciplinary Segregation)," both dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-2A-44 through 2A-66.

ICE/ERO *Performance-based National Detention Standards 2011:*

- "2.4 Facility Security and Control";
- "2.6 Hold Rooms in Detention Facilities";
- "2.10 Searches of Detainees";
- "2.13 Staff-Detainee Communication";
- "3.1 Disciplinary System";
- "4.5 Personal Hygiene";
- "4.6 Significant Self-harm and Suicide Prevention and Intervention";
- "5.1 Correspondence and Other Mail";
- "5.4 Recreation";

- "5.6 Telephone Access";
- "5.7 Visitation"; and
- "6.3 Law Libraries and Legal Material."

"*Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities,*" 79 Fed. Reg. 13100 (Mar. 7, 2014).

## V. Expected Practices

### A. Placement in Administrative Segregation

Administrative Segregation status is a nonpunitive status in which restricted conditions of confinement are required only to ensure the safety of detainees or others, the protection of property, or the security or good order of the facility. For matters of safety and security, staff may have to take immediate action to control a detainee, including placement in administrative segregation.

Detainees in administrative segregation shall not be commingled with detainees in disciplinary segregation.

Each facility shall develop and follow written procedures, consistent with this standard, governing the management of its administrative segregation unit.  These procedures should be developed in consultation with the Field Office Director having jurisdiction for the facility.  These procedures must document detailed reasons for placement of an individual in administrative segregation. Detainees and the Field Office Director (or his designee) must be provided a copy of the administrative segregation order.

Prior to the detainee's placement in administrative segregation, the facility administrator or designee shall review the case to determine whether administrative segregation is in fact warranted. The facility administrator may delegate to a supervisor the authority to place a detainee in administrative segregation.

## 1. Reasons for Placement in Administrative Segregation

A detainee may be placed in administrative segregation when the detainee's continued presence in the general population poses a threat to life, property, self, staff, or other detainees; for the secure and orderly operation of the facility; for medical reasons; or under other circumstances as set forth below. Some examples of incidents warranting a detainee's assignment to administrative segregation include, but are not limited to, the following.

a. A detainee is awaiting an investigation or a hearing for a violation of facility rules. Pre-disciplinary hearing detention shall be ordered only as necessary to protect the security and orderly operation of the facility.

   1) Pre-disciplinary hearing detention is not to be used as a punitive measure.

   2) A detainee who demonstrates good behavior during pre-disciplinary hearing detention should be considered for release to the general population while awaiting his or her disciplinary hearing.

   3) Time served in pre-disciplinary hearing detention shall  be deducted from any time ordered by the Institution Disciplinary Panel (IDP).

   4) Absent compelling circumstances, such as a pending criminal investigation, a detainee should not remain in pre-disciplinary hearing detention for a longer period of time than the maximum term of disciplinary segregation permitted for the most serious offense charged.

b. A detainee is a threat to the security of the facility. The facility administrator may determine that a detainee's criminal record, past behavior at other institutions, behavior while in ICE/ERO detention, or other evidence is sufficient to warrant placement of the detainee in administrative segregation.

   1) As a general matter, a detainee should not be placed directly in administrative segregation as a security threat on the basis of the detainee's misconduct at that detention facility, in the absence of any disciplinary proceedings. Instead, the facility should address the misconduct through the facility's disciplinary processes, and may place the detainee in pre-disciplinary hearing detention pending the outcome of the disciplinary proceedings.

   2) Continued placement in segregation based on prior behavior should be reviewed at the required intervals, taking into account the detainee's behavior while in segregation.  The facility shall continue to consider, in coordination with the Field Office Director where necessary, whether there are more appropriate alternatives to segregation, such as medium- to maximum-security general population housing units either within the facility or elsewhere.

   3) Copies of records supporting this action shall be attached to the administrative segregation order.

c. A detainee requires protection. Protective custody may be initiated at the detainee's request or by staff as needed to protect the detainee from harm. Each facility shall develop procedures to consider continued placement in protective custody as well as provisions for release from protective custody when appropriate. Frequently, the types of detainees who require this type of treatment include, but are not limited to:

   1) victims of detainee assaults;

   2) detainee informants or witnesses (e.g., detainees who provide information to institutional staff or any law enforcement agency concerning improper or criminal activities by others);

3) sexual predators or other detainees charged with a heinous or notorious crime;

4) detainees who have been pressured by other detainees to participate in sexual activity;

5) detainees who refuse to enter the general population because of alleged intimidation from other detainees;

6) detainees who refuse to return to the general population, but who do not provide the reason for refusal;

7) detainees who appear to be in danger of bodily harm;

8) detainees who seek protection, claiming to be former law enforcement officers or to have held sensitive law enforcement positions, whether or not there is official information to verify the claim; or

9) detainees who request protective custody.

A detainee's age, disability, sex, sexual orientation, gender identity, race, color, national origin, or religion may not provide the sole basis for a decision to place the detainee in involuntary segregation. An individualized assessment must be made in each case.

Use of administrative segregation to protect detainees with special vulnerabilities , including detainees vulnerable to sexual abuse or assault, shall be restricted to those instances where reasonable efforts have been made to provide appropriate housing and shall be made for the least amount of time practicable, and when no other viable housing options exist, and as a last resort.

Detainees who have been placed in administrative segregation for protective custody shall have access to programs, services, visitation, counsel and other services available to the general population to the maximum extent possible.

d. A detainee is scheduled for release, removal, or transfer within 24 hours. Such segregation may be ordered for security reasons or for the orderly operation of the facility.

e. The IDP may recommend a detainee  be placed in administrative segregation following disciplinary segregation if it determines that releasing the detainee into the general population would pose a threat to the detainee or security and orderly operation of the facility. However, a subsequent placement in administrative segregation requires an administrative segregation order justifying the placement after the completion of the term served in disciplinary segregation, with the detainee's behavior while in disciplinary segregation being taken into account.

f. A detainee transferred from disciplinary segregation to administrative segregation shall enjoy the same privileges as all other detainees in administrative segregation, provided receipt of such privileges poses no threat to the safety, security, or orderly operation of the facility.

g. A medical professional who ordered a detainee removed from the general population shall complete and sign an administrative segregation order (see below), unless the detainee is to stay in the medical department's isolation ward.

## 2. Administrative Segregation Order

A written order shall be completed and approved by the facility administrator or designee before a detainee is placed in administrative segregation, except when exigent circumstances make such documentation impracticable. In such cases, an order shall be prepared as soon as possible.

a. Prior to a detainee's actual placement in administrative segregation, the facility administrator or designee shall complete the administrative segregation order (Form I-885 or equivalent), detailing the reasons for placing a

detainee in administrative segregation.

b. In an emergency, the detainee's placement in administrative segregation may precede the paperwork, which the facility administrator or designee shall prepare as soon as possible after the detainee's placement.

c. All memoranda, medical reports and other relevant documents shall be attached to the administrative segregation order.

d. If the segregation is ordered for protective custody purposes, the order shall state whether the detainee requested the segregation, and whether the detainee requests a hearing concerning the segregation.

e. The administrative segregation order shall be immediately provided to the detainee in a language or manner the detainee can understand, unless delivery would jeopardize the safe, secure, or orderly operation of the facility.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

f. A copy of the administrative segregation order shall also be immediately provided to the Field Office Director or his designee.

g. The order shall remain on file with the SMU until the detainee is returned to the general population.

h. When the detainee is released from the SMU, the releasing officer shall indicate the date and time of release on the administrative segregation order. The completed order shall then be forwarded to the Chief of Security for inclusion in the detainee's detention file.

### 3. Review of Detainee Status in Administrative Segregation

All facilities shall implement written procedures for the regular review of all detainees held in administrative segregation, consistent with the procedures specified below.

a. A supervisor shall conduct a review within 72 hours of the detainee's placement in administrative segregation to determine whether segregation is still warranted.

   1) The review shall include an interview with the detainee.

   2) A written record shall be made of the decision and the justification. The administrative segregation review (Form I-885) shall be used for the review.

   3) If the detainee has been segregated for his/her own protection, but not at the detainee's request, the signature of the facility administrator or assistant facility administrator is required on the Form I-885 to authorize the alien's continued detention.

b. A supervisor shall conduct an identical review after the detainee has spent seven days in administrative segregation, and every week thereafter, for the first 30 days and every 10 days thereafter, at a minimum.

c. The review shall include an interview with the detainee, and a written record shall be made of the decision and its justification.

d. When the reviewing authority concludes that the detainee should be removed from administrative segregation, he/she shall submit that recommendation to the facility administrator (or designee) for approval.

e. A copy of the decision and justification for each review shall be given to the detainee unless, in exceptional circumstances, this provision would jeopardize the facility's safety, security, or orderly

operations. The detainee shall also be given an opportunity to appeal a review decision to the facility administrator.

f.  After seven consecutive days in administrative segregation, the detainee may exercise the right to appeal the conclusions and recommendations of any review conducted to the facility administrator. The detainee may use any standard form of written communication, for example, a detainee request, to file the appeal.

g.  If a detainee has been in administrative segregation for more than 30 days and objects to that status, the facility administrator shall review the case to determine whether that status should continue. This review shall take into account the detainee's views and shall result in a written record of the decision and its justification. A similar review shall take place each 30 days thereafter.

A multi-disciplinary committee of facility staff, including facility leadership, medical and mental health professionals, and security staff, shall meet weekly to review all detainees currently housed in the facility's SMU.  During the meeting, the committee shall review each detainee individually to ensure all staff are aware of the detainee's status, current behavior, and physical and mental health, and to consider whether any change in status is appropriate.  Upon the request of the Field Office Director, the facility administrator shall permit ICE/ERO personnel to participate in the weekly meetings, either in person or by teleconference.

## B. Placement in Disciplinary Segregation

To provide detainees in the general population a safe and orderly living environment, facility authorities may discipline anyone whose behavior does not comply with facility rules and regulations. Such discipline may involve temporary confinement in the SMU, apart from the general population. A detainee may be placed in disciplinary segregation only by

order of the IDP, or its equivalent, after a hearing in which the detainee has been found to have committed a prohibited act and only when alternative dispositions may inadequately regulate the detainee's behavior.

### 1. Duration

The maximum sanction is 30 days in disciplinary segregation per incident, except in extraordinary circumstances, such as incidents involving violations of offense 100 through 109 listed in the "Greatest" offense category in Appendix 3.1.A. After the first 30 days, and each 30 days thereafter, the facility administrator shall send a written justification for the continued segregation to the Field Office Director.

### 2. Disciplinary Segregation Order

A written order shall be completed and signed by the chair of the IDP (or disciplinary hearing officer) before a detainee is placed into disciplinary segregation.

a.  Prior to a detainee's actual placement in disciplinary segregation, the IDP chairman shall complete the disciplinary segregation order (Form I-883 or equivalent), detailing the reasons for placing a detainee in disciplinary segregation. All relevant documentation must be attached to the order.

b.  The completed disciplinary segregation order shall be immediately provided to the detainee in a language or manner the detainee can understand, unless delivery would jeopardize the safe, secure, or orderly operation of the facility.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

The order shall remain on file with the SMU until the detainee is returned to the general population.

c. When the detainee is released from the SMU, the releasing officer shall indicate the date and time of release on the disciplinary segregation order. The completed order shall then be forwarded to the Chief of Security for inclusion in the detainee's detention file.

### 3. Review of Detainee Status in Disciplinary Segregation

All facilities shall implement written procedures for the regular review of all disciplinary segregation cases, consistent with the following procedures:

a. A security supervisor, or the equivalent, shall interview the detainee and review his/her status in disciplinary segregation every seven days to determine whether the detainee:

   1) Abides by all rules and regulations; and,

   2) Is provided showers, meals, recreation and other basic living standards, as required by this detention standard.

b. The supervisor shall document his/her findings after every review, by completing a disciplinary segregation review (Form I-887).

   1) The supervisor may recommend the detainee's early release from the SMU upon finding that time in disciplinary segregation is no longer necessary to regulate the detainee's behavior.

   2) An early-release recommendation must have the facility administrator's approval before the detainee may be returned to the general population.  In conducting this review, the facility administrator will consider any request by the detainee to present written evidence or available witnesses. The review shall take into account the detainee's views.

   3) The supervisor may shorten, but not extend, the original sanction.

   4) All review documents shall be placed in the detainee's detention file.

   5) After each formal review, the detainee shall be given a written copy of the reviewing officer's decision and the basis for his/her finding, unless such a copy may result in a compromise of institutional security. If a written copy cannot be delivered, the detainee shall be advised of the decision orally, and the detention file shall so note, identifying the reasons why the notice was not provided in writing.

c. The facility administrator  shall review the status of a detainee in disciplinary segregation after the first 30 days of segregation, and each 30 days thereafter, to determine whether continued detention in disciplinary segregation is warranted.

A multi-disciplinary committee of facility staff, including facility leadership, medical and mental health professionals, and security staff, shall meet weekly to review all detainees currently housed in the facility's SMU.  During the meeting, the committee shall review each detainee individually to ensure all staff are aware of the detainee's status, current behavior, and physical and mental health, and to consider whether any change in status is appropriate.  Upon the request of the Field Office Director, the facility administrator shall permit ICE/ERO personnel to participate in the weekly meetings, either in person or by teleconference.

## C. Notifying ICE of Segregation Placements and Facilitating ICE Review

### 1. Extended Segregation Placements

The facility administrator must notify the appropriate Field Office Director in writing whenever an ICE detainee has been held continuously in segregation for:

   a.  14 days, or 14 days out of any 21 day period;

   b.  30 days; and

c.  At every 30-day interval thereafter.

## 2. Immediate Notifications

The facility administrator must notify the
appropriate Field Office Director in writing as soon
as possible, but no later than 72 hours after the
initial placement of an ICE detainee in segregation if:

a.  The detainee has been placed in administrative
segregation on the basis of a disability,
medical or mental illness, or other special
vulnerability, or because the detainee is an
alleged victim of a sexual assault, is an
identified suicide risk, or is on a hunger
strike; or

b.  A detainee placed in segregation for any
reason has a mental illness, a serious medical
illness, a serious physical disability, or is
pregnant or recently had a miscarriage.

For the purposes of this standard, detainees with
special vulnerabilities include those:

a.  Who are known to be suffering from mental
illness or serious medical illness;

b.  Who have a disability or are elderly, pregnant,
or nursing;

c.  Who would be susceptible to sexual abuse or
assault in the general population;

d.  Who would be susceptible to harm in the
general population due in part to their sexual
orientation or gender identity; or

e.  Who have been victims – in or out of ICE
custody – of sexual assault, torture,
trafficking, or abuse.

## 3. Updates to Segregation Status

The facility administrator must also notify the
appropriate Field Office Director in writing
whenever a detainee who has been the subject of a
prior notification pursuant to this section is
subsequently released from segregation.

## 4. Coordination with Field Offices in Reviewing Segregation Placements

The facility administrator shall provide all
information and supporting documentation
regarding segregation placements as requested by the
Field Office Director.  The facility administrator shall
also coordinate with the Field Office Director in:

a.  considering whether a less restrictive housing
or custodial option is appropriate and
available, including return to the general
population or options to limit isolation while
housed in the SMU, such as additional out of
cell time and the ability to participate in
group activities; and

b.  recommending whether transfer may be
appropriate to a hospital or to another facility
where the detainee can be housed in the
general population or in an environment
better suited to the needs of the detainee,
such as a facility that has dedicated medical
beds in its clinic, a medical observation
unit, a facility that has a dedicated
protective custody unit, or a facility that has
a Special Management Unit with enhanced
privileges.

## D. Logs and Records

### 1. Permanent SMU Log

A permanent log shall be maintained in the SMU to
record all activities concerning SMU detainees (e.g.,
meals served, recreational time, visitors, etc.).

The SMU log shall record the detainee's name, A-
number, housing location, date admitted, reasons
for admission, status review dates, tentative release
date (for detainees in disciplinary segregation), the
authorizing official, and date released.  These logs
shall also be used by supervisory staff and other
officials to record their visits to the unit.

### 2. Visitors' Log

A separate log shall be maintained in the SMU of all

persons visiting the unit. This separate record shall include notation of:

a.  the time and date of the visit, and

b.  any unusual activity or behavior of an individual detainee, with a follow-up memorandum sent through the facility administrator to the detainee's file.

### 3. Special Management Housing Unit Record

The Special Management Housing Unit Record or comparable form shall be prepared immediately upon the detainee's placement in the SMU.

a.  The special housing unit officer shall immediately record:

    1) whether the detainee ate, showered, recreated and took any medication; and

    2) any additional information, such as whether the detainee has a medical condition, or has exhibited suicidal/assaultive behavior.

    3) the officer that conducts the activity shall print his/her name and sign the record.

b.  The facility medical officer shall sign each individual's record when he/she visits a detainee in the SMU. The housing officer shall initial the record after the medical visits are completed, but no later than the end of the shift.

c.  A new form must be created for each week the detainee is in the SMU. The completed weekly forms shall be retained at the SMU until the detainee is released from the SMU.

d.  Upon a detainee's release from the SMU, the releasing officer shall attach that detainee's entire housing unit record to either the administrative segregation order or disciplinary segregation order and forward it to the Chief of Security or equivalent for inclusion into the detainee's detention file.

### E. Basic Requirements for All Special Management Units

Conditions of confinement are based on the amount of supervision required to control a detainee and to safeguard the detainee, other detainees and facility staff.

In every instance, any exceptions to these requirements shall be:

1.  made only for the purpose of ensuring detainee and facility staff safety and security (i.e., not for purposes of punishment);

2.  approved by a supervisor (or higher official);

3.  on a temporary and situational basis, continued only for as long as it is justified by threat to the safety or security of the facility, its staff, or detainee population; and

4.  documented in the Permanent SMU Unit log and, under circumstances specified later in this detention standard, documented in a memo which shall be placed in the individual detainee's detention file.

When a detainee in an SMU is deprived of any usual authorized items or activity, a report of the action shall be forwarded to the facility administrator for review. This report shall be made part of the detainee's detention file.

Placement in an SMU does not constitute a valid basis for the use of restraints while in the SMU or during movement around the facility.  Consistent with Standard 2.15, restraints should only be used if necessary as a precaution against escape during transfer, for medical reasons (when directed by the medical officer), or to prevent self-injury, injury to others, or serious property damage.

### F. Translation/Interpretation Services

Detainees shall be provided translation or interpretation services while in the SMU, to assist with their understanding of the reason and conditions of confinement as well as their rights and

responsibilities while in confinement.

## G. Special Needs

Detainees in the SMU shall be provided appropriate accommodations and professional assistance for disabilities and/or other special needs (e.g., medical, therapeutic, or mental health treatment), on an equal basis as those in the general population.

## H. Control of Contraband and Tools

In accordance with procedures detailed in standard "2.4 Facility Security and Control," each facility administrator is required to establish written policy and procedures to control and secure SMU entrances, contraband, tools and food carts.

## I. Cell Occupancy

Ordinarily, the number of detainees confined to each cell or room may not exceed the capacity for which it was designed. Under exigent circumstances, before approving any additional cell occupancy on a temporary basis, the facility administrator shall consult with ICE/ERO Detention Management Division, who shall consult with DHS/ICE legal counsel. If a decision is made to approve such additional cell occupancy, a report of the action shall be filed with the facility and with the Field Office Director.

## J. Cell Condition

Cells and rooms used for purposes of segregation must be well ventilated, adequately lit, appropriately heated/cooled and maintained in a sanitary condition at all times in accordance with the standards for general population, consistent with safety and security.

1. All SMU cells must be equipped with beds that are securely fastened to the cell floor or wall. SMU cells must also be conducive to maintaining a safe and secure environment for all detainees, with particular emphasis on allowing for full visibility and appropriate observation by staff and

wherever possible on eliminating potential safety hazards such as sharp edges and anchoring devices.

2. Conditions for close observation in a "dry cell" without water are detailed in standard "2.10 Searches of Detainees."

## K. Personal Property

Each facility shall issue guidelines in accordance with this standard concerning the property detainees may retain in each type of segregation. Generally, detainees in disciplinary segregation shall be subject to more stringent personal property restrictions and control than those in administrative segregation, given the non-punitive nature of administrative segregation.

## L. Privileges

Each facility shall issue guidelines in accordance with this standard concerning the privileges detainees may have in each type of segregation.

### 1. Administrative Segregation

Generally, these detainees shall receive the same privileges available to detainees in the general population, consistent with any safety and security considerations for detainees, facility staff and security.

When space and resources are available, detainees in administrative segregation may be provided opportunities to spend time outside their cells (in addition to the required recreation periods), for such activities as socializing, watching TV and playing board games, and may be assigned to work details (e.g., as orderlies in the SMU).

### 2. Disciplinary Segregation

Generally, these detainees shall have fewer privileges than other detainees in either the general population or in administrative segregation. More specifically, they are subject to more stringent personal property control including, but not limited to, limitations on

their reading material and television viewing (which may be completely terminated), and restricted commissary or vending machine purchases.

## M. Close Supervision

Detainees in SMU shall be personally observed and logged at least every 30 minutes on an irregular schedule. For cases that warrant increased observation, the SMU personnel shall personally observe detainees accordingly. (See also standard "4.6 Significant Self-harm and Suicide Prevention and Intervention" and the "Dry Cells" section in standard "2.10 Searches of Detainees.")

## N. Supervisory and Staff Visits

In addition to the direct supervision performed by unit staff:

1. The shift supervisor shall see each segregated detainee daily, including on weekends and holidays.

2. The facility administrator (or designee) shall visit each SMU daily.

3. Program staff may visit a detainee upon his/her request.

The facility administrator may require other staff to visit each detainee daily.

## O. Specialized Training

Assignments of dedicated and specially trained security staff to SMUs permit staff to have both an improved understanding of the nature of the population and a greater familiarity with particular detainees. Interactions with security staff may be the primary human contact regularly afforded to detainees, and positive communications with security staff can reduce violence and are also important to the well-being of segregated detainees. Adequate training and supervision can ensure that all staff assigned to SMUs live up to this principle.

Security staff assigned to SMU shall receive specialized training in relevant topics, such as:

1. Identifying signs of mental health decompensation;

2. Techniques for more appropriate interactions with mentally ill detainees;

3. The impact of isolation; and

4. De-escalation techniques.

## P. Health Care

Detainees must be evaluated by a medical professional prior to placement in an SMU (or when that is infeasible, as soon as possible and no later than within 24 hours of placement). The assessment should include a review of whether the detainee has been previously diagnosed as having a mental illness.

Health care personnel shall conduct face-to-face medical assessments at least once daily for detainees in an SMU. Where reason for concern exists, assessments shall be followed up with a complete evaluation by a qualified medical or mental health professional, and indicated treatment.

Medical visits shall be recorded on the SMU housing record or comparable form, and any action taken shall be documented in a separate logbook. The facility shall provide out-of-cell, confidential psychological assessments and visits for detainees whenever possible, to ensure patient privacy and to eliminate barriers to treatment.

Mental health staff shall conduct a face-to-face psychological review of all detainees in an SMU at least once every 30 days.

Detainees with a medical or mental illness, or identified as being a suicide risk or on a hunger strike shall be removed from segregation if IHSC or facility medical staff determine that the segregation placement has resulted in deterioration of the detainee's medical or mental health, and an appropriate alternative is available.

### 1. Detainees with Serious Mental Illnesses

Detainees with a serious mental illness, disorder or

condition (SMI), as defined in Standard 4.3 "Medical Care", may not be automatically placed in an SMU on the basis of such mental illness. Every effort shall be made to place detainees with an SMI in a setting in or outside of the facility in which appropriate treatment can be provided, rather than an SMU, if separation from the general population is necessary.

The facility shall coordinate with the Field Office Director in seeking alternatives to SMU housing for detainees with an SMI, potentially including transfer to a hospital or to another facility.

For any detainee with an SMI placed in restrictive housing:

1. Mental health staff shall conduct a mental health consultation within 72 hours of the detainee's placement in restrictive housing;

2. A multi-disciplinary committee of facility staff, including facility leadership, medical and mental health professionals, and security staff, shall meet weekly to review the detainee's placement in restrictive housing;

3. At least weekly, a mental health provider shall conduct face-to-face clinical contact with the detainee, to monitor the detainee's mental health status, identify signs of deterioration, and recommend additional treatment as appropriate.

The facility shall seek to develop enhanced opportunities for in-cell and out-of-cell therapeutic activities and additional unstructured out-of-cell time for detainees with an SMI, to the extent such activities can be conducted while ensuring the safety of the detainee, staff, and other detainees.

### 2. Pregnant Detainees

Women who are pregnant, who are post-partum, who recently had a miscarriage, or who recently had a terminated pregnancy should as a general matter not be placed in an SMU. In very rare situations, a woman who is pregnant, is postpartum, recently had a miscarriage, or recently had a terminated

pregnancy may be placed in an SMU as a response to behavior that poses a serious and immediate risk of physical harm, or if the detainee has requested to be placed in protective custody administrative segregation and there are no more appropriate alternatives available. Even in such cases, this decision must be approved by a representative of the detention facility administration, in consultation with a medical professional, and must be reviewed every 48 hours.

## Q. Meals

Detainees in SMU shall be provided three nutritionally adequate meals per day, according to the general population meal schedule and ordinarily from the same menu. Deviation from meals served to the general population must be documented, including an explanation as to why SMU did not receive the same meal.

## R. Clothing and Personal Hygiene

In accordance with standard "4.5 Personal Hygiene," detainees in SMU may shave and shower at least three times weekly and receive other basic services such as laundry, hair care, barbering, clothing, bedding and linen equivalent to general population detainees and consistent with safety and security of the facility.

1. As needed, staff shall provide toilet tissue, a wash basin, tooth brush and shaving utensils, and may issue retrievable kits of toilet articles.

2. A detainee may be denied such items as clothing, mattress, bedding, linens, or pillow for medical or mental health reasons if his/her possession of such items raises concerns for detainee safety and/or facility security.

   a. All denials of such items shall be documented.

   b. If a detainee is so disturbed that he/ she is likely to destroy clothing or bedding, or create a disturbance by risking harm to self or others, the medical department shall be notified

immediately and a regimen of treatment and control shall be instituted by the medical staff, as necessary.

c. Extreme detainee behavior, such as destroying clothing or bedding or harmful behavior to self or others, must be documented, made part of the detainee's file with the facility, and reported to the Field Office Director to implement necessary efforts to protect and care for the detainee.

## S. Correspondence

In accordance with standard "5.1 Correspondence and Other Mail," detainees in an SMU may write, send and receive letters and other correspondence, in a manner similar to those housed in the facility's general population.

## T. Visitation

In accordance with standard "5.7 Visitation," while in an SMU, a detainee ordinarily retains visiting privileges.

Segregated detainees may ordinarily use the visiting room during normal visiting hours. However, the facility may restrict or disallow visits for a detainee who violates visitation rules or whose behavior otherwise indicates the detainee would be a threat to the security or the good order of the visiting room.

1. Visitation may be restricted or disallowed when a detainee in administrative segregation is charged with, or has been found to have committed a prohibited act related to visiting privileges, or has otherwise acted in a way that would reasonably indicate that he/she would be a threat to the orderliness or security of the visiting room.

2. Under no circumstances may detainees participate in visitation while in restraints. If the detainee's behavior warrants restraints, the visit may not be granted under general population visiting conditions.

3. Where visits are restricted or disallowed, a report

shall be filed with the facility administrator and ICE/ERO, and made part of the detainee's file.

4. Detainees in protective custody, and violent and disruptive detainees, shall not use the visitation room during normal visitation hours. In cases in which a visit would present an unreasonable security risk, visits may be disallowed for a particular detainee.

## U. Legal Visits

In accordance with standard "5.7 Visitation," detainees in SMU may not be denied legal visitation. However, the facility administrator or designee may implement whatever security precautions are necessary to protect the detainee and visitors and maintain good order. In such cases, staff shall advise legal service providers and assistants of any security concerns as soon as possible.

## V. Religious Guidance

In accordance with standard "5.5 Religious Practices," detainees in an SMU shall be permitted to participate in religious practices, consistent with the safety, security, and orderly operation of the facility.

Detainees in an SMU shall be allowed visits by members of the clergy or other religious service providers, upon request, unless the supervisor determines that such a visit presents a safety or security risk or would interfere with the orderly operation of the facility. Violent or uncooperative detainees may be temporarily denied access to religious guidance. Staff shall advise the religious service provider of the detainee's present state of behavior before he/she agrees to visit the detainee.

Each facility shall develop procedures to allow detainees to retain religious items within their possession (e.g., religious wearing apparel, religious headwear, prayer rugs, beads, prayer rocks, medallions) consistent with good security practices. (See also standard "5.5 Religious Practices").

## W. Reading Materials (Non-Legal)

Detainees in SMU shall have access to reading materials, including religious materials, in English, Spanish, and other languages frequently encountered in the facility population. The Recreation Specialist shall offer each detainee soft-bound, reading materials of this type on a rotating basis.

## X. Legal Materials

Detainees in SMU shall have access to legal materials in accordance with standard "6.3 Law Libraries and Legal Material."

Detainees may retain all personal legal material upon admittance to an SMU, provided such material does not create a safety, security, or sanitation hazard.

Detainees with a large amount of personal legal material may be required to place a portion with their stored personal property, with access permitted during scheduled hours. Requests for access to such legal material shall be accommodated as soon as possible, but in no case more than 24 hours after receipt of the initial detainee request to retrieve documents, except in the event of documented security reasons.

## Y. Law Library and Legal Rights Group Presentations Access

In accordance with standard "6.3 Law Libraries and Legal Material," detainees housed in administrative segregation or disciplinary segregation units shall have the same law library access as the general population, unless compelling security concerns require limitations.

1. Facilities may supervise the library use of a detainee housed in an SMU as warranted by the individual's behavior.  Violent or uncooperative detainees may be temporarily denied access to the law library if necessary to maintain security, until such time as their behavior warrants resumed access. In some circumstances, legal material may be brought to individuals in disciplinary segregation.

2. Detainees segregated for protection must be provided access to legal materials. Such detainees may be required to use the law library separately or, if that is not feasible, legal materials must be brought to them, upon request.

3. Denial of access to the law library must be:

    a. supported by compelling security concerns;

    b. for the shortest period required for security; and

    c. fully documented in the SMU housing logbook.

The facility administrator shall notify ICE/ERO every time access is denied, with documentation placed in the detention file.

In accordance with standard "6.4 Legal Rights Group Presentations," facility staff and/or ICE/ERO shall notify detainees in segregation in advance of legal rights group presentations and provide these detainees an opportunity to attend.  Group legal rights presentations shall be open to all detainees, including detainees in SMUs, except when a particular detainee's attendance may pose a security risk.  If a detainee in segregation cannot attend for this reason, designated facility staff shall make alternative arrangements to offer a separate presentation and individual consultation to the detainee, if the detainee or the presenter so requests.

## Z. Recreation

Recreation for detainees housed in the SMU shall be separate from the general population.

Facilities are encouraged to maximize opportunities for group participation during recreation and other activities, consistent with safety and security considerations.  Recreation  for certain individuals shall occur separate from all other detainees when necessary or advisable to prevent assaults and to reduce management problems. In accordance with standard "5.4 Recreation":

1. Each detainee in the SMU shall receive (or be

offered) access to exercise opportunities and equipment outside the living area and outdoors, unless documented security, safety or medical considerations dictate otherwise.

2. Detainees in the SMU for administrative reasons shall be offered at least one hour of recreation per day, outside their cells and scheduled at a reasonable time, at least seven days per week. Detainees in the SMU for disciplinary reasons shall be offered at least one hour of recreation per day, outside their cells and scheduled at a reasonable time, at least five days per week.

   *\*Detainees in the SMU for administrative reasons shall be offered at least two hours of exercise per day, seven days a week, unless documented security, safety or medical considerations dictate otherwise.*

   *\*Detainees in the SMU for disciplinary reasons shall be offered at least one hour of exercise per day, seven days a week, unless documented security, safety or medical considerations dictate otherwise.*

3. Where cover is not provided to mitigate inclement weather, detainees shall be provided weather-appropriate equipment and attire

4. The recreation privilege shall be denied or suspended only if the detainee's recreational activity may unreasonably endanger safety or security:

   a. A detainee may be denied recreation privileges only with the facility administrator's written authorization, documenting why the detainee poses an unreasonable risk even when recreating alone. However, when necessary to control an *immediate* situation for reasons of safety and security, SMU staff may deny an instance of recreation, upon verbal approval from the shift supervisor, and shall document the reasons in the unit logbook(s). The supervisor may also require additional written

documentation from the SMU staff for the facility administrator. When a detainee in an SMU is deprived of recreation (or any usual authorized items or activity), a written report of the action shall be forwarded to the facility administrator. Denial of recreation must be evaluated daily by a shift supervisor.

   b. A detainee in disciplinary segregation may temporarily lose recreation privileges upon a disciplinary panel's written determination that he/she poses an unreasonable risk to the facility, himself/herself, or others.

   c. When recreation privileges are suspended, the disciplinary panel or facility administrator shall provide the detainee written notification, including the reason(s) for the suspension, any conditions that must be met before restoration of privileges, and the duration of the suspension provided the requisite conditions are met for its restoration.

   d. The denial of recreation privileges shall be included as part of the regular reviews required for all detainees in SMU status.  In accordance with SMU procedures, and using the forms required by this standard, the reviewer(s) shall state, in writing, whether the detainee continues to pose a threat to self, others, or facility security and, if so, why.

   e. Denial of recreation privileges for more than seven days requires the concurrence of the facility administrator and a health care professional. It is expected that such denials shall rarely occur, and only in extreme circumstances.

   f. The facility shall notify the Field Office Director in writing when a detainee is denied recreation privileges in excess of seven days.

## AA. Other Programs and Activities

The facility should seek ways to increase the minimum amount of time that detainees in the SMU

spend outside their cells, and to offer enhanced in-cell opportunities.  In addition to recreation, out-of-cell time might include opportunities for education, clinically appropriate treatment therapies, skill-building, and social interaction with staff and other detainees.

## BB Telephone Access

As detailed in standard "5.6 Telephone Access," detainees in SMU shall have access to telephones in a manner that is consistent with the special safety and security requirements of such units. Detainees shall be permitted to place calls to attorneys, other legal representatives, courts, government offices (including the DHS Office of the Inspector General, DHS Office for Civil Rights and Civil Liberties, ICE/OPR Joint Intake Center, and embassies or consulates, according to the facility schedule. Any denial of telephone access shall be documented.

In general, any detainee in an SMU may be reasonably restricted from using or having access to a phone if that access is used for criminal purposes or would endanger any person, or if the detainee damages the equipment provided. In such instances, staff must clearly document why such restrictions are necessary to preserve the safety, security and good order of the facility. Detainees in disciplinary segregation may be restricted, as part of the disciplinary process, from using telephones to make general calls. However, even in disciplinary segregation, detainees shall have telephone access for special purposes.

## CC. Review of policies

The facility administrator shall establish a standing committee, consisting of security, medical, and other staff, to regularly evaluate SMU policies and practices, and seek to develop safe and effective alternatives to restrictive housing, as well as enhanced SMU conditions and programs.

# 2.13 Staff-Detainee Communication

## I. Purpose and Scope

This detention standard enhances security, safety and orderly facility operations by encouraging and requiring informal direct and written contact among staff and detainees, as well as informal supervisory observation of living and working conditions.

This standard also requires the posting of hotline informational posters from the Department of Homeland Security (DHS) Office of the Inspector General (OIG).

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Detainees shall have frequent opportunities for informal contact with facility managerial and supervisory staff and with ICE/ERO Field Office

staff.

2. Facility managerial and supervisory staff and ICE/ERO Field Office staff shall directly observe facility operations and conditions of confinement.

3. Detainees shall be able to submit written questions, requests, grievances and concerns to ICE/ERO staff and receive timely responses.

4. Detainees shall be informed how to directly contact DHS/OIG.

5. Detainee telephone serviceability shall be monitored and documented by ICE staff, and any problems shall be reported immediately.

6. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces the standard on

"Staff-Detainee Communication" dated 12/2/2008.

# IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-2A-05, 2A-06, 2A-12, 5A-03.

# V. Expected Practices

## A. Staff and Detainee Contact

ICE/ERO detainees shall not be restricted from having frequent informal access to and interaction with key facility staff members, as well as key ICE/ERO staff, in a language they can understand. ICE/ERO staff members shall announce their presence when entering a housing unit.

The local supplement to the detainee handbook shall include contact information for the ICE/ERO Field Office and the scheduled hours and days that ICE/ERO staff is available to be contacted by detainees at the facility. The same information shall be posted in the living areas (or "pods") of the facilities. Posted contact information shall be updated quarterly or more frequently as necessary to reflect changes in ICE/ERO personnel.

## B. Written Detainee Requests to Staff

Detainees may submit written questions, requests, grievances or concerns to ICE/ERO staff, using the detainee request form, a local IGSA form, or a sheet of paper.

Facilities must also allow any ICE/ERO detainee dissatisfied with the facility's response to file a grievance appeal and communicate directly with ICE/ERO.

Such informal written requests are not intended as a substitute for the more formal process specified in standard "6.2 Grievance System." However, informal written requests may be used to resolve informal grievances, as described in that standard.

To prepare a written request, a detainee may obtain assistance from another detainee, the housing officer, or other facility staff and may, if he/she chooses, seal the request in an envelope that is clearly addressed with name, title, and/or office to which the request is to be forwarded.

Each facility administrator shall:

- Ensure that adequate supplies of detainee requests forms, envelopes and writing implements are available.

- Have written procedures to promptly route and deliver detainee requests to the appropriate ICE/ERO officials by authorized personnel (not detainees) without reading, altering, or delaying such requests.

- Ensure that the standard operating procedures include provisions to translate detainee requests and staff responses and otherwise accommodate detainees with special assistance needs based on, for example, disability, illiteracy, or limited English proficiency. When language services are needed, the facility should use bilingual staff or qualified interpretation and translation services to communicate with limited English proficient detainees.  The facility will provide detainees with disabilities auxiliary aids and services, when such aids and services are needed to ensure effective communication with a detainee with a disability.

- The facility shall provide a secure drop-box for ICE detainees to correspond directly with ICE management. Only ICE personnel shall have access to the drop-box.

### 1. Response Times

a. In Facilities with ICE/ERO Onsite Presence
The ICE/ERO staff member receiving the request shall normally respond in person or in writing as soon as possible and practicable, but no later than within three (3) business days of receipt.

b. In Facilities without ICE/ERO Onsite Presence
Each detainee request shall be forwarded to the
ICE/ERO office of jurisdiction within two
business days and answered as soon as
practicable, in person or in writing, but no later
than within three business days of receipt. All
dates shall be documented.

### 2. Record Keeping and File Maintenance

All requests shall be recorded in a logbook (or
electronic logbook) specifically designed for that
purpose. At a minimum, the log shall record:

a. date of receipt;

b. detainee's name;

c. detainee's A-number;

d. detainee's nationality;

e. name of the staff member who logged the
request;

f. date that the request, with staff response and
action, was returned to the detainee;

g. any other pertinent site-specific information,
including detention condition complaints;

h. specific reasons why the detainee's request is
urgent and requires a faster response; and

i. the date the request was forwarded to ICE/ERO
and the date it was returned shall also be
recorded.

*A copy of each completed detainee request shall be
filed in the detainee's detention file and be retained
there for three years at minimum. Copies of
confidential requests shall be maintained in the A-
file.*

### 3. Detainee Handbook

As required by standard "6.1 Detainee Handbook,"
each facility's handbook (or supplement) shall advise
detainees in a language or manner that they
understand of the procedures to submit written
questions, requests, or concerns to ICE/ERO staff, as

well as the availability of assistance to prepare such
requests.

## C. Monitoring Detainee Telephone Services

Field Office Directors shall ensure that all phones for
detainee use are tested at least weekly in accordance
with standard "5.6 Telephone Access."

Staff shall report any telephone serviceability
problem within 24 hours to the appropriate ICE
point of contact.

Staff shall document each serviceability test on a
form that has been provided by ERO, and each Field
Office shall maintain those forms, organized by
month, for three years.

## D. OIG Hotline Informational Posters

DHS/OIG periodically revises a "DHS OIG Hotline"
poster which is to be posted in facilities that house
ICE/ERO detainees.

1. The chief of the Detention Standards Compliance
Unit in the ERO headquarters Detention
Management Division is designated as the contact
point for coordination with OIG and is
responsible for distribution of hotline posters to
Field Office Directors.

2. Field Office Directors shall distribute sufficient
numbers of the posters to all facilities that house
ICE/ERO detainees. Each Field Office shall
maintain a master copy from which additional
copies may be duplicated as needed.

3. The facility administrator shall ensure that posters
are mounted in every housing unit and in
appropriate common areas (e.g., recreation areas,
dining areas, processing areas).

4. During staff-detainee communication visits,
ICE/ERO staff shall verify the presence of posters
at designated locations and shall ensure that any
missing or destroyed posters are replaced as soon
as possible.

# 2.14 Tool Control

## I. Purpose and Scope

This detention standard protects detainees, staff, contractors and volunteers from harm and contributes to orderly facility operations by maintaining control of tools, culinary utensils and medical and dental instruments, equipment and supplies.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs and CDFs.*  IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

For all types of facilities, procedures that appear in italics with a marked (**) on the page indicate optimum levels of compliance for this standard.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcome

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Tools, maintenance implements, culinary utensils, medical and dental instruments, equipment and supplies (particularly syringes, needles and other sharps) shall be maintained on an inventory, and continually controlled and accounted for to ensure the safe and orderly

operation of the facility.

## III. Standards Affected

This detention standard replaces "Tool Control" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-2D-02, 2D-03.

## V. Expected Practices

### A. Control, Care and Accountability for Tools

1. Prevents their use in escape attempts, as weapons, and in other ways that can be hazardous to individual safety or the good order of the facility.

2. Improves the appearance of shop and construction areas.

3. Helps ensure that tools are in good repair when needed.

4. Reduces costs of tool maintenance and inventory.

5. Holds detainees accountable for tools that have been assigned to them.

### B. Written Policy and Procedures Required

Each facility administrator shall develop and implement a written tool control system that establishes the following:

1. a staff position responsible for:

   a. developing and implementing tool control procedures, and

   b. establishing an inspection system to ensure accountability;

The facility administrator shall delegate these responsibilities to the Chief of Security and shall also assign, in writing, the duties of tool control officer to a staff member of the Facility Maintenance Department;

2. a tool classification system;

3. procedures for marking tools so they are readily identifiable;

4. procedures for storing tools;

5. procedures and schedules for regular inventories of tools;

6. procedures for issuing tools to staff and detainee workers;

7. procedures governing lost tools;

8. procedures for surveying and destroying excess, broken, or worn-out tools; and

9. procedures for inspecting and controlling tools and equipment brought into the facility temporarily (e.g., repair and maintenance workers, sports teams.)

## C. Tool Classification

The facility shall develop and implement a tool classification system.

*Tools are assigned one of two categories:*

*1. restricted (class "R")—dangerous/hazardous tools; and*

*2. non-restricted—non-hazardous tools.*

*Class "R" tools include:*

*1. tools too dangerous for detainees to handle without constant staff supervision;*

*2. tools to which detainee access is prohibited;*

*3. tools that could facilitate an escape or an escape attempt;*

*4. tools that are useful in making weapons, could double as weapons, or are capable of causing*

*serious bodily harm;*

*5. power hand tools, with or without cords; and*

*6. other tools which are generally hazardous to facility security or personal safety.*

*Examples of restricted tools include:*

*1. metal cutting blades;*

*2. mixing chambers;*

*3. bolt cutters;*

*4. ramset gun and ammunition (stored in armory only);*

*5. diamond-tipped tools;*

*6. core drills;*

*7. drills;*

*8. circular saws; and*

*9. knives and other sharp culinary utensils.*

*The facility administrator shall establish a policy document on facility tool use and storage that includes separate, comprehensive, alphabetical lists of both restricted and non-restricted tools.*

*1. The lists shall indicate which of the listed tools are available on-site, describe them by type, and specify tool sizes.*

*2. The lists shall be kept current by formatting them as attachments to the policy document, and shall be maintained and updated electronically.*

*3. The lists shall be updated and distributed at least quarterly.*

*Tools included in tool sets and tools sized sequentially in standard increments may appear as a single listing. For example:*

- *drill bits, metal/wood 1/32"-7/8"*

- *drill bits, metal/wood 7/16"-7/8"*

- *wrench, comb. box/open end 1/4"-7/16"*

- *wrench, comb. box/open end 7/16"-7/8"*

When a single set listing is insufficiently clear, each tool must be listed separately—for example, if a facility had a single "wrench, combination box/open end, 1 7/8 inches" but not the smaller or larger sizes; or had several wrenches in different sizes, but without standard size differences.

## D. Daily Removal and Storage of Class "R" Tools

Staff shall remove restricted tools from work areas at the end of each workday for safekeeping in a secure tool room, the armory, or the control center.

## E. Acetylene

Staff shall:

1. restrict the supply of acetylene entering the facility to the amount needed in a single day; and

2. at the end of each workday, store the used and unused acetylene tanks outside the secured perimeter in accordance with applicable codes, standards and regulations (Occupational Safety and Health Administration's industrial safety regulations, etc.).

## F. Departmental Responsibilities

At a minimum, the following departments shall maintain tool inventories:

1. Facility Maintenance Department;

2. Medical Department;

3. Food Service Department;

4. Electronics Shop;

5. Recreation Department; and

6. Armory

Each department head is responsible for implementing tool control procedures in that department, and the following procedures are specifically required of the facility maintenance department head, health services administrator (HSA), food service manager, electronics technician, recreation specialist and senior firearms instructor:

1. prepare a computer-generated inventory of all class "R" tools in the maintenance restricted-tool room, the medical facility, the food service department, the electronics work area, recreation areas and the armory;

2. post a copy of the class "R" tool inventory with the equipment in a prominent position in the equipment area;

3. submit a second copy of the inventory to the Chief of Security;

4. retain a third copy in the department;

5. review and where necessary revise the class "R" tool inventory on a regular schedule:

   a. weekly—food service,

   b. monthly—facility maintenance, medical, and

   c. quarterly—electronics work area, recreation areas, armory;

6. forward a copy of the inventory report to the facility administrator;

7. report missing tools in accordance with procedures specified below; and

8. include on all inventory sheets the date of issuance/revision.

## G. Tool Identification

The facility administrator shall establish written procedures for marking tools and making them readily identifiable.

1. The tool control officer shall mark every tool in every work location with a symbol signifying its storage location (e.g., "armory," "control center"). Some tools shall require AMIS bar-coding.

2. Tools too small, fragile, or otherwise susceptible to damage (e.g., surgical instruments, micrometers, small drill bits) shall be inventoried and kept in locked storage when not in use.

## H. Storage in Work Areas

The facility administrator shall establish written procedures for a tool-storage system that ensures accountability. Commonly used, mounted tools shall be stored so that a tool's disappearance shall not escape attention.

1. Work-detail supervisors shall account for all tools at the end of every work period.

2. Shadow boards shall provide storage for tools that can be mounted, as follows:

   a. one tool per shadow;

   b. tool and shadow identical in size and shape; and

   c. color-coded:

      1) white backgrounds for all shadow boards

      2) red shadows for restricted tools

      3) black shadows for non-restricted tools

3. When a tool is removed from the inventory, its shadow shall likewise be removed from the shadow board;

4. Shadow boards accessible to detainees shall have expanded-metal covers and shall be locked when not in use;

5. All restricted tools shall be secured in a central tool room, isolated from the housing units;

6. If maintenance workers are assigned personal shadow boards, the boards must have expanded-metal covers;

7. Infrequently used tools may be stored in individual tool cages with shadow boards, secured by hasp and padlock:

   a. they must be included in the regular inventory checks;

   b. a tag shall indicate the tool has been removed from its cage and a sign-in/out board shall indicate area, date, times and user;

   c. the staff member responsible shall maintain an inventory sheet in the tool cage and provide a copy to the tool control officer;

   d. Tools not adaptable to shadow boards shall be kept in a locked drawer or cabinet;

   e. Staff shall not open sterile packs for inventory or any other non-medical reason, except when tampering or theft is suspected, in which case staff shall contact the health services department before opening a pack from which instruments may have been removed. To prevent such incidents, sterile packs shall be stored under lock and key at all times; and

   f. Individual toolboxes containing tools used on a daily basis must be secured with hasp and padlock. The individual responsible for the toolbox shall keep an inventory sheet in the toolbox, and the tool control officer shall maintain copies of all such inventory sheets.

## I. Receipt of Tools

1. If the warehouse is located outside the secure perimeter, the warehouse shall receive all tool deliveries.

   If the warehouse is located within the secure perimeter, the facility administrator shall develop site-specific procedures (e.g., storing the tools at the rear sally port until picked up and receipted by the tool control officer). The tool control officer shall immediately place certain tools (e.g., band saw blades, files and all restricted tools) in secure storage.

2. New tools shall be issued only after the tool control officer has marked and inventoried them. Inventories that include any portable power tools shall provide brand name, model, size, description and inventory control/AMIS number.

## J. Tool Inventories

The facility administrator shall schedule and establish procedures for the quarterly inventorying of all

tools. Facilities shall use inventory control number/AMIS bar code labels as necessary.

1. *Inventory maintenance at each work location is the responsibility of the detail supervisor and department head.*

2. *The work detail supervisor or staff member assigned a toolbox shall be accountable for the control of his/her assigned tools on a daily basis.*

3. *Any tool permanently removed from service shall be turned in to the tool control officer for record keeping and safe disposal.*

4. *Tool inventories shall be numbered and posted conspicuously on all corresponding shadow boards, toolboxes and tool kits. While all posted inventories must be accurate, only the master tool inventory sheet in the office of the Chief of Security requires the certifiers' signatures.*

5. *Tools in current use shall be inventoried in accordance with the following schedule:*

   a. *Annual*
   *Once each year at a minimum, the tool control officer and employees responsible for tools shall together inventory all tools/equipment on-site.*

      1) *Each inventory-taker shall certify with name, title and identification number the accuracy of that inventory. Certification must be approved by the facility maintenance supervisor and Chief of Security.*

      2) *The tool control officer shall provide the Chief of Security a complete set of the separate inventories (e.g., restricted tools, non-restricted tools) referred to as the Master Tool Inventory Sheet.*

   b. *Quarterly*
   *To ensure the accuracy and completeness of current inventory listings and check the condition of shadows and markings, every*

   *three months the employees responsible for tools shall conduct verification inventories and initial the appropriate column on the master tool inventory sheet in the Office of the Chief of Security.*

   *The Chief of Security shall assign an officer to monitor the quarterly inventories. This officer shall clearly initial the bottom of each form certifying that the records have been checked and all inventories completed.*

6. *Inventory Files*
   *The facility administrator's designee shall maintain a separate file folder for each shop or area in which tools are stored.*

   a. *The left side of the folder shall contain the master tool inventory sheet(s).*

   *When an addition or deletion is made to the master inventory, the page on which the change is made shall be completely retyped or reprinted and inserted into the master inventory. Staff shall not destroy any of the original pages, but shall move them to the right side of the folder for future reference.*

   b. *The right side of the folder shall also contain documentation including, but not limited to:*

      1) *lost or missing tool reports;*

      2) *requests for inventory additions or deletions;*

      3) *survey requests and reports;*

      4) *store room requisition forms; and*

      5) *any other document directly related to site-specific tool control procedures.*

   c. *When the annual inventory is completed, staff shall place the form on the left side of the folder and move the previous year's to the right side. Each folder shall contain the materials for the current year plus the preceding two years, with a divider to separate*

*the annual records.*

7. *Tools Used by Contractors*
   *Staff shall conduct an inventory of all contractor tools upon their arrival and departure. The Chief of Security shall establish control procedures, particularly for restricted tools. The Chief of Security, facility maintenance supervisor and construction foreman shall maintain copies of all such inventories and control procedures.*

8. *Tools Purchased from Surplus Property*
   *Tools purchased or acquired from surplus property shall be stored in the designated secure storage area. The responsible employee shall maintain a continual inventory of unmarked or excess tools returned to secure storage for issue or reissue. The tool control officer has sole authority to draw tools from this source. Any such tools kept in the tool control officer's storage area shall be registered in a continual inventory.*

9. *Control and Inventory of Certain Items Not Classified as Tools*
   *Other items that require strict property management controls, like weapons (other than firearms), chemical agents, restraints, other use-of-force and disturbance control equipment, binoculars, communication equipment and similar items shall be inventoried (with serial numbers), maintained, issued and disposed of in accordance with the procedures for tools established herein.*

   *Control, inventory, maintenance and destruction of ICE firearms are governed by the ICE Interim Firearms Policy (7/7/2004).*

10. *Tool and Equipment Accountability*
    *All tools and equipment shall be accounted for and documented on a regular basis.*

## K. Issuing Tools

Each facility shall have procedures in place for the issuance of tools to staff and detainees; security issues of restricted and unrestricted tools; and control of

ladders, extension cords and ropes.

1. *The Chief of Security shall issue a restricted tool only to the individual who shall be using it.*

2. *Detainees may use non-restricted tools under intermittent supervision; however, the detail supervisor shall account for all tools at the end of every work period.*

3. *A metal or plastic chit receipt shall be taken for all tools issued, and when a tool is issued from a shadow board, the receipt chit shall be visible on the shadow board.*

4. *The facility administrator shall establish site-specific procedures for the control of ladders, extension cords, ropes and hoses, according to the following procedures:*

   a. *all ladders, extension cords, ropes and hoses over three feet long shall be stored in the designated location when not in use;*

   b. *every staff member supervising the use of extension ladder and/or heavy equipment shall have at his/her disposal a portable two-way radio;*

   c. *ladders shall be inventoried and stored by size to facilitate inspection and handling;*

   d. *extension cords must be inventoried and have a metal or plastic tag attached, indicating issue number (by location) and length of cord;*

   e. *extension cords longer than 10 feet shall be classified and handled as Class "R" tools; and*

   f. *in high-rise facilities, electrical cords attached to buffers, vacuum cleaners, etc., may not exceed two feet.*

5. *Scissors used for in-processing shall be securely tethered to the fixture at which they are used.*

6. *Issuance of tools from a storage location for a specified project for extended periods requires approval of the Chief of Security. The work detail supervisor shall conduct daily on-site checks of*

extended-use tools issued from the central tool room, and the facility maintenance supervisor shall conduct such checks monthly at a minimum.

## L. Lost Tools

The facility administrator shall develop and implement procedures governing lost tools, including, verbal and written notification to supervisory officials, addressing detainees with prior access to the tool(s) in question, and documentation and review.

1. *When a restricted or non-restricted tool is missing or lost, staff shall notify a supervisor immediately and the Chief of Security in writing as soon as possible.*

2. *When the tool is a restricted (class "R") tool, staff shall inform the shift supervisor orally immediately upon discovering the loss. Any detainee(s) who may have had access to the tool shall be held at the work location pending completion of a thorough search.*

3. *When a medical department tool or equipment item is missing or lost, staff shall immediately inform the HSA, who shall make the immediate verbal notification to the Chief of Security or shift supervisor and written notification to the facility administrator.*

4. *The shift supervisor's office shall maintain a lost-tool file, monitor the individual reports for accuracy, ascertain any unusual patterns or occurrences of loss in one or more shops, document search efforts, and send written notification to the Chief of Security.*

5. *On the day a tool is recovered, staff shall complete the lost or missing tool report and send copies to the Chief of Security and shift supervisor.*

6. *The facility administrator shall implement quarterly evaluations of lost/missing tool files, reviewing the thoroughness of investigations and*

efforts to recover tools. Documentation of the quarterly evaluations shall be maintained on the right side of the tool inventory folder for the shop or area concerned.

## M. Disposition of Excess Tools

All broken or worn-out tools shall be surveyed and destroyed in accordance with the written procedures established by the facility administrator.

1. *The tool control officer or security officer shall implement procedures for storing broken and/or worn-out tools in a secure area, pending survey and disposition.*

2. *Excess tools not being surveyed shall remain in a designated secure storage area until included in a subsequent survey or returned to use.*

3. *To maintain tool inventories at the most efficient operating level, staff in every shop and department shall identify and move to a secure storage area all rarely used tools. Bin cards shall account for the tools moved from shop to storage areas.*

4. *Either the tool control officer or security key control officer shall be responsible for destroying all surveyed tools.*

5. *The office of the Chief of Security shall maintain records of all tool surveys.*

## N. Private/Contract Repair and Maintenance Workers

Before entering or leaving the facility, all visitors, including repair and maintenance workers who are not ICE/ERO or facility employees, shall submit to an inspection and inventory of all tools, tool boxes and equipment that could be used as weapons.

Contractors shall retain a copy of the tool inventory while inside the facility.

*An officer shall accompany non-employee workers in the facility to ensure that security and safety precautions and procedures are followed at all times,*

*including removing tools at the end of each shift.*

*Before a detainee, employee, or contractor may enter a housing unit, the housing officer shall inventory tools and similar items to be carried into that unit and then, before departure from the unit, verify their removal in a second inventory. The housing officer shall immediately report discrepancies to the shift supervisor.*

# 2.15 Use of Force and Restraints

## I. Purpose and Scope

This detention standard authorizes staff to use necessary and reasonable force after all reasonable efforts to otherwise resolve a situation have failed, for protection of all persons; to minimize injury to self, detainees, staff and others; to prevent escape or serious property damage; or to maintain the security and orderly operation of the facility.

Staff shall use only the degree of force necessary to gain control of detainees and, under specified conditions, may use physical restraints to gain control of a dangerous detainee.

This detention standard does not specifically address the use of restraints for medical or mental health purposes, which is addressed by standard "4.3 Medical Care."

Canine units, where available, may be used for contraband detection, but their use for force, control, or intimidation of detainees is prohibited.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);
- Contract Detention Facilities (CDFs); and
- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices"):

1. Physical force shall only be used, when both necessary and reasonable,

2. Facilities shall endorse confrontation avoidance as the preferred method for resolving situations, always to be attempted prior to any calculated use of force.

3. Physical force shall only be used to the minimum extent necessary to restore order, protect safety and provide security.

4. Physical force or restraint devices shall not be used as punishment.

5. Restraints shall not be applied without approval in those circumstances for which prior supervisory approval is required.

6. Four/five-point restraints shall be applied only in extreme circumstances and only when other types of restraints have proven ineffective. Advance approval is required, as is prompt notification of and examination by the medical staff. Use of these restraints shall be continued only in accordance with required procedures and documentation.

7. Intermediate force devices shall be used only in circumstances prescribed herein.

8. In each facility, all weapons and related equipment shall be stored securely in designated areas to which only authorized persons have access.

9. In each facility, chemical agents and related security equipment shall be inventoried at least once per month to determine their condition and expiration dates.

10. In each facility, a written record of routine and

emergency distribution of security equipment shall be maintained.

11. An employee shall submit a written report no later than the end of his/her shift when force was used on any detainee for any reason, or if any detainee remains in any type of restraints at the end of that shift. This documentation includes written report of discharge of a firearm and use of less lethal devices to control detainees.

12. Telephonic notification to the Field Office Director shall occur as soon as practicable. Documentation shall be submitted to the Field Office Director within two business days via an ICE-approved form or equivalent, of any use-of-force incident involving an ICE detainee. Appropriate documentation shall be maintained when physical force is used.

13. Canines shall not be used for force, control, or intimidation of detainees.

14. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Use of Force" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-2B-01, 2B-02, 2B-03, 2B-04, 2B-05, 2B-06, 2B-07, 2B-08, 2C-01, 2C-02, 2C-06, 7B-15, 7B-16.

ICE Interim "Use of Force Policy" (7/7/2004), as amended or updated.

DHS "Use of Deadly Force Policy" (06/25/2004).

National Enforcement Standard, "Use of Intermediate Force."

## V. Expected Practices

### A. Overview

1. Use of force in detention facilities is never used as punishment, is minimized by staff attempts to first gain detainee cooperation, is executed only through approved techniques and devices, and involves only the degree necessary and reasonable to gain control of a detainee or provide for self-defense or defense of a third person.

2. Various levels of force may be necessary and reasonable, depending on the totality of the circumstances.

3. Generally, use of force is either immediate or calculated; calculated force is preferable in most cases as it is most likely to minimize harm to detainees or staff.

4. Use of force may involve physical control and placement of a detainee in secure housing,

and/or the application of various types and degrees of restraint devices.

5. Follow-up (e.g., medical attention), documentation (e.g., audiovisual recording for calculated use of force), reporting and an after-action review are required for each incident involving use of force.

## B. Principles Governing the Use of Force and Application of Restraints

1. Instruments of restraint shall be used only as a precaution against escape during transfer; for medical reasons, when directed by the medical officer; or to prevent self-injury, injury to others, or property damage. Restraints shall be applied for the least amount of time necessary to achieve the desired behavioral objectives.

2. Under no circumstances shall staff use force or apply restraints to punish a detainee.

3. Staff shall attempt to gain a detainee's willing cooperation before using force.

4. Staff shall use only that amount of force necessary and reasonable to gain control of a detainee.

5. Staff may immediately use restraints, if warranted, to prevent a detainee from harming self or others or from causing serious property damage.

6. Absent one or more of the factors listed above, placement in an SMU does not constitute a valid basis for the use of restraints while in the SMU or during movement around the facility.

7. Detainees subjected to use of force shall be seen by medical staff as soon as possible. If the use of force results in an injury or claim of injury, medical evaluation shall be obtained and appropriate care provided.

8. Facility Administrator approval is required for continued use of restraints, if they are considered necessary, once a detainee is under control.

9. Staff may apply additional restraints to a detainee who continues to resist after staff achieve physical control. If a restrained detainee refuses to move or cannot move because of the restraints, staff may lift and carry the detainee to the appropriate destination. Staff may not use the restraints to lift or carry the detainee. If feasible, an assistive device (e.g., ambulatory chair, gurney) shall be used to help move the restrained detainee.

10. Staff may not remove restraints until the detainee is no longer a danger to himself or others.

11. Staff may not use restraint equipment or devices (e.g., handcuffs):

    a. on a detainee's neck or face, or in any manner that restricts blood circulation or obstructs the detainee's airways (e.g., mouth, nose, neck, esophagus). See "V. Expected Practices."E below for more information; or

    b. to cause physical pain or extreme discomfort. While some discomfort may be unavoidable even when restraints are applied properly, examples of prohibited applications include: improperly applied restraints, unnecessarily tight restraints, "hog-tying," and fetal restraints (i.e., cuffed in front with connecting restraint drawn-up to create the fetal position).

12. Staff shall comply with defensive tactics training and the proper application of those techniques.

13. Staff shall monitor all detainees placed in restraints.

14. Documenting, reporting and investigating use-of-force incidents helps prevent unwarranted use of force and protects staff from unfounded allegations of improper or excessive use of force.

15. Calculated use of force requires supervisor pre-authorization and consultation with medical staff to determine if the detainee has medical issues requiring specific precautions.

16. Deadly force may be used only when an officer

has probable cause that the detainee poses an imminent danger of death or serious physical injury to the officer or to another person. Deadly force may not be used solely to prevent the escape of a fleeing suspect.

## C. Use-of-Force Continuum

The Use-of-Force Continuum is a five-level model used to illustrate the levels of force staff may use to gain control of a detainee. The levels are:

1. Staff Presence without Action

2. Verbal Commands

3. Soft Techniques
   Techniques from which there is minimal chance of injury (e.g., grasping, using empty-hand and/or "come-along" holds, using impact weapons for holds, applying pressure to pressure points, using chemical agents).

4. Hard Techniques
   Techniques with which there is a greater possibility of injury (e.g., strikes, throws, "take-downs," or striking using impact weapons such as expandable batons, straight batons, authorized less-lethal devices and specialty impact weapons).

5. Deadly Force
   The use of any force that is reasonably likely to cause death or serious physical injury. Deadly force does not include force that is not reasonably likely to cause death or serious physical injury, but unexpectedly results in such death or injury.

Staff are trained and required to use only a level of force that is necessary and reasonable to gain control of a detainee; however, the totality of the circumstances may necessitate use of a higher level of force. Staff may have to rapidly escalate or de-escalate through the Use of Force Continuum, depending on the totality of circumstances present.

## D. Training

### 1. General Training

All new officers shall be sufficiently trained during their first year of employment. Through ongoing training (to occur annually at a minimum), all detention facility staff must be made aware of their responsibilities to effectively handle situations involving aggressive detainees.

At a minimum, training shall include:

a. requirements of this detention standard;

b. use-of-force continuum, to include use of deadly force;

c. communication techniques;

d. cultural diversity;

e. management of detainees with mental health conditions;

f. confrontation-avoidance techniques;

g. approved methods of self-defense and defensive tactics;

h. forced cell move techniques;

i. prevention of communicable diseases, particularly precautions to be taken when using force;

j. application of restraints (progressive and hard);

k. reporting procedures; and

l. forced medication procedures.

Staff shall also be advised of the "Prohibited Force Acts and Techniques," listed below in "Section E" of this standard. Staff shall receive defensive tactics training before being placed in a detainee-contact position.

### 2. Specialized Training

Any officer who is authorized to use an intermediate force device shall be specifically trained and certified to use that device. Training in the use of chemical agents also shall include treatment of individuals exposed to them.

Training shall also cover use of force in special circumstances (detailed below).

All employees who participate in a calculated use-of-force move shall have received prior training.

The employee shall receive training on an annual basis, and documentation of that training shall be maintained in the employee's training record for the duration of his/her employment at the facility. The employee must also maintain certification.

## E. Prohibited Force Acts and Techniques

The following acts and techniques are specifically prohibited, unless deadly force would be authorized:

1. Choke holds, carotid control holds and other neck restraints;

2. Using a baton to apply choke or "come-along" holds to the neck area;

3. Intentional baton strikes to the head, face, groin, solar plexus, neck, kidneys, or spinal column;

The following acts and techniques are generally prohibited, unless both necessary and reasonable in the circumstances:

1. Striking a detainee when grasping or pushing him/her would achieve the desired result;

2. Using force against a detainee offering no resistance; and

3. Restraining detainees to fixed objects not designed for restraint.

## F. Use of Force in Special Circumstances

Occasionally, after the failure of confrontation-avoidance techniques, staff must make a judgment whether to use higher levels of force with detainees in special circumstances. Except in instances where immediate use of force is necessary, staff shall consult medical staff, in certain cases set forth below, before unilaterally determining a situation sufficiently grave to warrant the use of physical force.

### 1. Restraints on Pregnant Women

A pregnant woman or woman in post-delivery

recuperation shall not be restrained absent truly extraordinary circumstances that render restraints absolutely necessary as documented by a supervisor and directed by the on-site medical authority. This general prohibition on restraints applies to all pregnant women in the custody of ICE, whether during transport, in a detention facility, or at an outside medical facility.  Restraints are never permitted on women who are in active labor or delivery.

Restraints should not be considered as an option, except under the following extraordinary circumstances:

a. a medical officer has directed the use of restraints for medical reasons;

b. credible, reasonable grounds exist to believe the detainee presents an immediate and serious threat of hurting herself, staff or others; or

c. reasonable grounds exist to believe the detainee presents an immediate and credible risk of escape that cannot be reasonably minimized through any other method.

In the rare event that one of the above situations applies, medical staff shall determine the safest method and duration for the use of restraints and the least restrictive restraints necessary shall be used.

Even in the extraordinary circumstance when restraints are deemed necessary, no detainee known to be pregnant shall be restrained in a face-down position with four-point restraints, on her back, or in a restraint belt that constricts the area of the pregnancy. All attempts will be made to ensure that the detainee is placed on her left side if she is immobilized.

The use of restraints requires documented approval and guidance from the on-site medical authority. Record-keeping and reporting requirements regarding the medical approval to use restraints shall be consistent with other provisions within these standards, including documentation in the detainee's

A-file, detention and medical file.

## 2. Detainees with Wounds or Cuts

Staff shall wear protective gear when restraining aggressive detainees with open cuts or wounds. If force is necessary, protective gear shall include a full-body shield.

*Aggressive detainees in restraints shall be placed in administrative segregation, and segregated from all other detainees. Such detainees shall remain in a Special Management Unit (SMU) until cleared to return to the general population by the chief immigration enforcement agent and the clinical director, with the facility administrator's approval.*

## 3. Detainees with Special Medical or Mental Health Needs

If a situation arises involving a detainee with special needs, the appropriate medical or mental health staff shall be consulted prior to the calculated use of force. "Detainees with special needs" include detainees with physical, intellectual, and developmental disabilities and detainees with a mental health condition that may impair their ability to understand the situation. Medical staff shall be consulted in circumstances involving special-needs detainees.  "Special needs" is defined in Standard 7.5 "Definitions."

# G. Intermediate Force Weapons

In this detention standard, "Intermediate Force Weapons" refers to weapons otherwise known as "non-deadly force weapons," "non-lethal weapons," or "less-than-lethal weapons."

## 1. Storage

Ordinarily, when not actually in use, intermediate force weapons and related equipment are permitted only in designated areas:

a.  where access is limited to authorized personnel, and

b.  to which detainees and non-authorized personnel have no access.

If such equipment is kept in an SMU, staff shall store and maintain it under the same conditions as Class "A" tools. If an SMU lacks appropriate secure space, the equipment must be kept in a secure location elsewhere in the facility.

## 2. Recordkeeping and Maintenance

Each facility shall maintain a written record of routine and emergency distribution of security equipment and shall specifically designate and incorporate, in one or more post orders, responsibility for staff to inventory chemical agents and related security equipment at least monthly to determine their condition and expiration dates.

## 3. Use

The facility administrator may authorize the use of intermediate force weapons if a detainee:

a.  is armed and/or barricaded; or

b.  cannot be approached without danger to self or others; and

c.  a delay in controlling the situation would seriously endanger the detainee or others, or would result in a major disturbance or serious property damage.

Staff shall consult medical staff as practicable, before using pepper spray or other intermediate force weapons unless escalating tension makes such action unavoidable. When possible, medical staff shall review the detainee's medical file for a disease or condition that an intermediate force weapon could seriously exacerbate, including, but not limited to, asthma, emphysema, bronchitis, tuberculosis, obstructive pulmonary disease, angina pectoris, cardiac myopathy or congestive heart failure.

In the use-of-force continuum, the collapsible steel baton authorized below is an "impact weapon" that is considered:

a.  a "soft" technique when used during "come-

alongs" or to apply gradual pressure for compliance, or

b. a "hard" technique when used for striking.

As with any use of force, staff using an impact weapon shall choose the appropriate level as required by the totality of circumstances, and its use must be discontinued when adequate control of a detainee has been achieved.

### 4. Authorized Intermediate Force Devices

The following devices are authorized:

a. oleoresin capsicum (OC) spray ("pepper spray");

b. collapsible steel baton;

c. a 36" straight, or riot, baton; and

d. ICE authorized chemical and impact munitions

### 5. Unauthorized Force Devices

The following devices are not authorized:

a. saps, blackjacks and sap gloves;

b. mace, CN, tear gas, or other chemical agents, except OC spray;

c. homemade devices or tools; and

d. any other device or tool not issued or approved by ICE/ERO.

## H. Immediate use of force

An "immediate-use-of-force" situation is created when a detainee's behavior constitutes a serious and immediate threat to self, staff, another detainee, property, or the security and orderly operation of the facility. In that situation, staff may respond without a supervisor's direction or presence.

Upon gaining control of the detainee, staff shall seek the assistance of qualified health personnel to immediately:

1. Determine if the detainee or facility staff requires continuing care and, if so, make the necessary arrangements. Continuing care may involve such

measures as admission to the facility hospital.

2. Examine the detainee and immediately treat any injuries. The medical services provided and diagnosed injuries shall be documented.

3. Examine any involved staff member who reports an injury and, if necessary, provide initial emergency care. The examination shall be documented.

4. A written report shall be provided to the shift supervisor by each officer involved in the use of force by the end of the officer's shift.

The shift supervisor shall provide a written report to the facility administrator or designee no later than the end of a tour of duty when force was used on any detainee, or if any detainee remains in restraints at the end of that shift.

## I. Calculated Use of Force and/or Application of Restraints

If a detainee is in a location where there is no immediate threat to the detainee or others (for example, a locked cell or range), staff shall take the time to assess the possibility of resolving the situation without resorting to force.

A calculated use of force needs to be authorized in advance by the facility administrator (or designee).

Medical staff shall review the detainee's medical file for a disease or condition that an intermediate force weapon could seriously exacerbate, including, but not limited to, asthma, emphysema, bronchitis, tuberculosis, obstructive pulmonary disease, angina pectoris, cardiac myopathy, or congestive heart failure.

Calculated use of force is feasible and preferred to immediate use of force in most cases and is appropriate when the detainee is in a location where the detainee poses no immediate threat of harm, even if the detainee is verbalizing threats or brandishing a weapon, provided staff sees no immediate danger of the detainee's causing harm to

himself or others. Calculated use of force affords staff time to strategize and resolve situations in the least confrontational manner and assist to de-escalate the situation.

## 1. Confrontation Avoidance

Before authorizing the calculated use of force, the on-site ranking detention official, a designated health professional and others as appropriate shall assess the situation. Taking into account the detainee's history and the circumstances of the immediate situation, they shall determine the appropriateness of using force.

The conferring staff may consider in their assessment the detainee's medical/mental history, recent incident reports involving the detainee, if any, and emotional shocks or traumas that may be contributing to the detainee's state of mind (e.g., a pending criminal prosecution or sentencing, divorce, illness, death).

Interviewing staff familiar with the detainee might yield insight into the detainee's current agitation or even pinpoint the immediate cause. Such interviews may also help identify those who have established rapport with the detainee or whose personalities suggest they might be able to reason with the detainee.

## 2. Documentation and Audiovisual Recording

While ICE/ERO requires that all use-of-force incidents be documented and forwarded to ICE/ERO for review, for calculated use of force, it is required that the entire incident be audio visually recorded. The facility administrator or designee is responsible for ensuring that use of force incidents are audio visually recorded. Staff shall be trained in the operation of audiovisual recording equipment. There shall be a sufficient number of cameras appropriately located and maintained in the facility. The audiovisual record and accompanying documentation shall be included in the investigation package for the after-action review described below.

Calculated use-of-force incidents shall be audio visually-recorded in the following order:

a. Introduction by team leader stating facility name, location, time, date, etc., describing the incident that led to the calculated use of force, and naming the audiovisual camera operator and other staff present.

b. Faces of all team members shall briefly appear (with helmets removed and heads uncovered), one at a time, identified by name and title.

c. Team Leader offers the detainee a last chance to cooperate before team action, outlines the use-of-force procedures, engages in confrontation avoidance and issues use-of-force order.

d. Record entire use-of-force team operation, unedited, until the detainee is in restraints.

e. Take close-ups of the detainee's body during a medical exam, focusing on the presence/absence of injuries. Staff injuries, if any, are to be described but not shown.

f. Debrief the incident with a full discussion/analysis/assessment of the incident.

## 3. Use-of-Force Team Technique

When a detainee must be forcibly moved and/or restrained during a calculated use of force, staff shall use the use-of-force team technique to prevent or diminish injury to staff and detainees and exposure to communicable disease. The technique usually involves five or more trained staff members clothed in protective gear, including helmet with face shield, jumpsuit, stab-resistant vest, gloves and forearm protectors. Team members enter the detainee's area together and have coordinated responsibility for achieving immediate control of the detainee.

a. Staff shall be trained in the use-of-force team technique in sufficient numbers for teams to be quickly convened on all shifts in different locations throughout the facility. To use staff resources most effectively, the facility

administrator shall provide use-of-force team technique training for all staff members who could potentially participate in a calculated use of force.

b. The use-of-force team technique training shall include the technique, its application, confrontation-avoidance, professionalism and debriefing.

c. Training shall also address the use of protective clothing and handling of spilled blood and body fluids.

1) Use-of-force team members and others participating in a calculated use of force shall wear protective gear, taking particular precautions when entering a cell or area where blood or other body fluids could be present.

2) Staff members with a skin disease or skin injury shall not participate in a calculated use-of-force action.

d. The shift supervisor or another supervisor on duty:

1) must be on the scene prior to any calculated use of force to direct the operation and continuously monitor staff compliance with policy and procedure;

2) shall not participate except to prevent impending staff injury;

3) shall seek the advance guidance of qualified health personnel (based on a review of the detainee's medical record) to identify physical or mental issues and, whenever feasible, arrange for a health services professional to be present to observe and immediately treat any injuries;

4) shall exclude from the use-of-force team any staff member involved in the incident precipitating the need for force; and

5) may expand the use-of-force team to include staff with specific skills (e.g., those who handle chemical agents).

e. When restraints are necessary, the team shall choose ambulatory or progressive models (described later in this document) and may resort to four/five-point restraints only if the less restrictive devices prove ineffective.

f. The supervisor shall provide a written report to the facility administrator or designee, no later than the end of a tour of duty when force was used on any detainee, or if any detainee remains in restraints at the end of that shift.

## J. Evidence Protection and Sanitation

The supervisor shall inspect areas of blood or other body-fluid spillage after a use-of-force incident. Unless the supervisor determines that the spillage must be preserved as evidence, as specified under standard "2.3 Contraband," staff or properly trained detainees shall immediately sanitize those areas, based on medical department guidance on appropriate cleaning solutions and their use. Standard "1.2 Environmental Health and Safety" provides detailed guidance for cleaning areas with blood and other body fluid spills.

Standard sanitation procedures shall be followed in areas with blood or other body fluid spillage. Wearing the appropriate protective gear, staff and/or detainees shall immediately apply disinfectant to sanitize surfaces such as walls and floors, furniture, etc. Articles of clothing and use-of-force equipment contaminated with body fluids shall likewise be disinfected or destroyed as needed and appropriate.

## K. Maintaining Audiovisual Recording Equipment and Records

Staff shall store and maintain audiovisual recording equipment under the same conditions as "restricted" tools. The equipment must be kept in a secure location elsewhere in the facility.

Since audiovisual recording equipment must often be readily available, each facility administrator shall

designate and incorporate in one or more post orders responsibility for:

1. maintaining cameras and other audiovisual equipment;

2. regularly scheduled and documented testing to ensure all parts, including batteries, are in working order; and

3. keeping back-up supplies on hand (e.g., batteries, tapes or other recording media, lens cleaners).

Each audiovisual record shall be catalogued and preserved until no longer needed, but shall be kept no less than six years after its last documented use. In the event of litigation, the facility shall retain the relevant audiovisual record a minimum of six months after the litigation has concluded or been resolved.

*\*\*The relevant audiovisual record shall be retained by the facility for one year after litigation or any investigation has concluded or been resolved.*

The audiovisual records may be catalogued electronically or on 3" x 5" index cards, provided that the data can be searched by date and detainee name. A log shall document audiovisual record usage.

Use-of-force audiovisual records shall be available for supervisory, Field Office and ICE/ERO headquarters incident reviews and may also be used for training.

Release of use-of-force audiovisual recordings to the news media may occur only if authorized by the Director of Enforcement and Removal Operations, in accordance with ICE/ERO procedures and rules of accountability.

## L. Approved Restraint Equipment

The following restraint equipment is authorized:

1. handcuffs: stainless steel, 10 oz.;

2. leg irons: stainless steel and must meet the National Institute of Justice standard;

3. martin chain;

4. waist or belly chain: case-hardened chains with a minimum breaking strength of approximately 800 pounds;

5. handcuff cover: cases for the security of handcuffs used on high security detainees;

6. soft restraints: nylon/leather type with soft arm and leg cuffs containing soft belts with key locks;

7. plastic cuffs: disposable; and

8. any other ICE/ERO-approved restraint device.

Deviations from this list of restraint equipment are strictly prohibited.

## M. Ambulatory and Progressive Restraints

When sufficient for protection and control of a detainee, staff shall apply ambulatory restraints, which are soft and hard equipment that provides freedom of movement sufficient for eating, drinking and other basic needs without staff assistance or intervention;

If ambulatory restraints are insufficient to protect and control a detainee, staff may apply progressive restraints, which are more secure or restrictive. The facility administrator shall decide on the appropriate restraint method, i.e., hard restraints with/without waist chain or belt; four/five-point soft restraints with hard restraints to secure the detainee to a bed; four/five-point hard restraints, etc.

In situations involving a highly assaultive and aggressive detainee, progressive restraints may be needed as an intermediate measure while placing a detainee in, or removing a detainee from, four/five-point restraints.

Once a detainee has been placed in ambulatory restraints, the shift supervisor is required to conduct a physical check of the detainee once every two hours to determine if the detainee has stopped the behavior which required the restraints and thus restraints are no longer necessary. Once a positive

behavioral change has been achieved, a decision to remove the restraints or place the detainee in less restrictive restraints shall be made. If this has not been achieved, the shift supervisor shall document the reason for continuance of the ambulatory restraints.

The supervisor shall provide a written report to the facility administrator no later than the end of the tour of duty when any detainee remains in restraints at the end that shift.

## N. Four/Five-Point Restraints

### 1. General Requirements

When four/five-point restraints are necessary, staff shall:

a.  Use soft restraints (e.g., vinyl), unless they:

   1) were previously ineffective with this detainee, or

   2) proved ineffective in the current instance.

b.  Provide the detainee with temperature-appropriate clothing and a bed, mattress, sheet, and/or blanket. Under no circumstance shall a detainee remain naked or without cover (sheet or blanket) unless deemed necessary by qualified health personnel.

c.  Check and record the detainee's condition at least every 15 minutes to ensure that the restraints are not hampering circulation and to monitor the general welfare of the detainee. If the detainee is confined by bed restraints, staff shall periodically rotate the detainee's position to prevent soreness or stiffness.

d.  All facilities shall document all checks of detainees in four/five point restraints every 15 minutes.

   Staff shall use the SMU logbook to record each 15-minute check of detainees in four/five-point restraints. Documentation shall continue until restraints are removed. The shift supervisor shall be immediately notified if the detainee is calm, to

permit re-evaluation of the use of restraints.

### 2. Medical Staff

A health professional shall test the detainee's breathing, other vital signs and physical and verbal responses. If the detainee is bed-restrained, the health professional shall determine how the detainee must be placed. Qualified health personnel are required to visit the detainee at least twice per eight-hour shift. When qualified health personnel are not immediately available, staff shall place the detainee in a "face-up" position until the medical evaluation can be completed. Medical checks shall be documented. Mental health assessments shall be conducted by a qualified health professional when restraints are utilized for more than eight hours. In such instances, detainees should also be assessed by a qualified mental health professional as soon as possible.

### 3. Shift Supervisor

The shift supervisor shall be responsible for the following:

a.  The shift supervisor shall review a detainee in four/five-point restraints every two hours. If the detainee has calmed down and restraints are no longer necessary, they may be removed and, if appropriate, replaced by a less restrictive device.

b.  At every two-hour review, the detainee shall be afforded the opportunity to use the toilet, unless the detainee actively resists or becomes combative when released from restraints for this purpose.

c.  The decision to release the detainee or apply less restrictive restraints shall not be delegated below the shift supervisor's level. The shift supervisor may seek advice from mental or medical health professionals about when to remove the restraints.

The shift supervisor shall document each two-hour review in the SMU logbook.

### 4. Facility Administrator

a. When any detainee is restrained for more than eight hours, the facility administrator shall telephonically notify the Assistant Field Office Director and provide updates every eight hours until the restraints are removed.

b. The facility administrator shall provide the Field Office Director with written documentation of the reason(s) for placing the detainee in four/five-point restraints, regardless of duration, on the following workday.

## O. Documentation of Use of Force and Application of Restraints

Staff shall prepare detailed documentation of all incidents involving use of force, including chemical agents, or intermediate force weapons. Staff shall also document the use of restraints on a detainee who becomes violent or displays signs of imminent violence. A copy of the report shall be placed in the detainee's detention file.

### 1. Report of Incident

Facilities shall promptly notify FODs of all uses of force involving:

1) Intermediate force devices, including:

   a) Pepper spray or other chemical agents

   b) Batons

   c) Impact munitions

   d) Tasers

2) Other hard control techniques, such as:

   a) Strikes, kicks or punches

   b) Throws or "take-downs"

3) Deadly force (i.e., any use of force that is reasonably likely to cause death or serious physical injury)

4) Use of Progressive (i.e., Four-Point and Five-Point) Restraints

Notifications are typically not necessary for:

1) Soft techniques, such as grasping and empty-hand holds

2) Use of ambulatory restraints.

Note that PBNDS requires that detainees placed in ambulatory restraints be checked every two hours, with written reports to the facility administrator at the end of each shift. Accordingly, use of ambulatory restraints for periods that exceed 36 hours require notification to the Field Office.

### 2. Use of Force Form

All facilities shall have an ICE/ERO-approved form to document all uses of force.

Within two working days, copies of the report shall be placed in the detainee's A-File and sent to the Field Office Director.

A report is not necessary for the general use of restraints (for example, the routine movement or transfer of detainees).

Staff shall prepare a use of force form for each incident involving use of force. The report shall identify the detainee(s), staff and others involved and describe the incident. If intermediate force weapons are used (e.g. collapsible steel baton or 36-inch straight (riot) baton), the location of the strikes must be reported on the use of force form. Each staff member shall complete a memorandum for the record to be attached to the original Use of Force form. The report, accompanied by the corresponding medical report(s), must be submitted to the facility administrator by the end of the shift during which the incident occurred.

### 3. Audiovisual Recording Use-of-Force Incidents

Staff shall immediately obtain an audiovisual camera to record any calculated use of force incident, unless such a delay in bringing the situation under control would constitute a serious hazard to the detainee, staff, or others, or would result in a major disturbance or serious property damage.

The facility administrator shall review the

audiovisual recording within four working days of the incident and shall then send the Field Office Director a copy for review. The Field Office Director shall forward audiovisual recordings of questionable or inappropriate cases to the Deputy Assistant Director, Detention Management Division, for further review.

When an immediate threat to the safety of the detainee, other persons, or property makes a delayed response impracticable, staff shall activate a video camera and start recording the incident as quickly as possible. After regaining control of the situation, staff shall follow the procedures applicable to calculated use-of-force incidents.

### 4. Recordkeeping

All facilities shall assign a designated individual to maintain all use-of-force documentation.

The designated individual shall maintain all use of force documentation, including the audiovisual record and the original after-action review form for a minimum of six years. A separate file shall be established on each use of force incident.

## P. After-Action Review of Use of Force and Application of Restraints

### 1. Written Procedures Required

All facilities shall have ICE/ERO-approved written procedures for after-action review of use of force incidents (immediate or calculated) and applications of restraints. The primary purpose of an after-action review is to assess the reasonableness of the actions taken and determine whether the force used was proportional to the detainee's actions.

All facilities shall model their incident review process after ICE/ERO's process and submit it to ICE/ERO for ERO review and approval. The process must meet or exceed the requirements of ICE/ERO's process.

### 2. Medical Evaluation

When any use of force resulting in an injury or claim of injury occurs, the staff member must immediately prepare an incident report. The detainee will be referred immediately to medical staff for an examination. A copy of the staff member's incident report will be forwarded to medical and to ICE/ERO.

### 3. Composition of an After-Action Review Team

*The facility administrator, the assistant facility administrator, the Field Office Director's designee and the health services administrator (HSA) shall conduct the after-action review. This four-member after-action review team shall convene on the workday after the incident. The after-action review team shall gather relevant information, determine whether policy and procedures were followed, make recommendations for improvement, if any, and complete an after-action report to record the nature of its review and findings. The after-action report is due within two workdays of the detainee's release from restraints.*

### 4. Review of Audiovisual Recording

The after-action review team shall also review the audiovisual recording of any use-of-force incidents for compliance with all provisions of this standard, with particular attention paid to:

a.  whether the use-of-force team technique was exercised properly;

b.  the professionalism of the shift supervisor;

c.  adherence to the requirement of wearing prescribed protective gear;

d.  ensuring that unauthorized items, equipment or devices (e.g., towels, tape, surgical masks, hosiery) were not used;

e.  whether team members applied only as much force as necessary to subdue the detainee, including whether team members responded appropriately to a subdued or cooperative detainee or a detainee who discontinued his/her violent behavior;

f.  whether the shift supervisor was clearly in charge

of team and situation. This includes intervention at the first sign of one or more team members applying more force than necessary;

g. whether the detainee received and rejected the opportunity to submit to restraints voluntarily before the team entered the cell/area. If he/she submitted, team action should not have been necessary;

h. whether team members exerted more pressure than necessary to the detainee's thorax (chest and back), throat, head and extremities when applying restraints;

i. the amount of time needed to restrain the detainee. Any non-resisting detainee restrained for longer than necessary could indicate training problems/ inadequacies;

j. whether team members wore protective gear inside the cell/area until the operation was completed;

k. whether there was continuous audiovisual coverage from the time the camera started recording until the incident concluded. The review team shall investigate any breaks or sequences missing from the audiovisual record;

l. whether a medical professional promptly examined the detainee, with the findings reported on the audiovisual record;

m. whether use of chemical agents, pepper spray, etc., was appropriate and in accordance with written procedures;

n. whether team member(s) addressed derogatory, demeaning, taunting, or otherwise inappropriate/inflammatory remarks made to detainee or person(s) outside the cell or area; and

o. if the incident review reveals a violation of ICE/ERO policy or procedures, the after-action review team shall then determine whether the situation called for improvised action and, if so, whether the action taken was reasonable and appropriate under the circumstances.

The after-action review team shall complete and submit its after-action review report to the facility administrator within two workdays of the detainee's release from restraints. The facility administrator shall review and sign the report, acknowledging its finding that the use of force was appropriate or inappropriate.

## 5. Report of Findings to Field Office Director

Within two workdays of the after-action review team's submission of its determination, the facility administrator shall report with the details and findings of appropriate or inappropriate use of force, by memorandum, to the Field Office Director and whether he/she concurs with the finding. Included in the report shall be consideration of the following: whether proper reporting procedures were followed; in the event of five point restraints, whether checks were made and logged at the appropriate times; and whether appropriate medical care was provided once the situation was under control.

## 6. Further Investigation

The review team's investigative report will be forwarded to the Field Office Director for review. The Field Office Director will determine whether the incident shall be referred to the Office of Professional Responsibility, the Department of Homeland Security, Office of the Inspector General or the Federal Bureau of Investigation.

# 3.1 Disciplinary System

## I. Purpose and Scope

This detention standard promotes a safe and orderly living environment for detainees by establishing a fair and equitable disciplinary system, requiring detainees to comply with facility rules and regulations, and imposing disciplinary sanctions to those who do not comply.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Detainees shall be informed of facility rules and regulations, prohibited acts, disciplinary sanctions that may be imposed, their rights in the disciplinary system and the procedure for appealing disciplinary findings.

2. Each facility shall have graduated severity scales of prohibited acts and disciplinary consequences.

3. Disciplinary segregation shall only be ordered when alternative dispositions may inadequately regulate the detainee's behavior.

4. Where permitted by facility policy, staff shall informally settle minor transgressions through mutual consent, whenever possible.

5. Staff who have reason to suspect that a detainee has engaged in a prohibited act or who witness a prohibited act that cannot or should not be resolved informally, shall prepare a clear, concise and complete Incident Report.

6. Each Incident Report shall be objectively and impartially investigated and reported, ordinarily by a person of supervisory rank.

7. A serious incident that may constitute a criminal act shall be referred to the proper investigative agency as appropriate, and administrative investigations shall be suspended pending the outcome of that referral.

8. At each step of the disciplinary and appeal process, the detainee shall be advised in writing of his/her rights in a language he/she understands, and translation or interpretation services shall be provided as needed.

9. When a detainee has a diagnosed mental illness or mental disability, or demonstrates symptoms of mental illness or mental disability, a mental health professional, preferably the treating clinician, shall be consulted to provide input as to the detainee's competence to participate in the disciplinary hearing, any impact the detainee's mental illness may have had on his or her responsibility for the charged behavior, and information about any known mitigating factors in regard to the behavior.

10. A Unit Disciplinary Committee (UDC) shall further investigate and adjudicate the incident and may impose minor sanctions or refer the matter to a higher level disciplinary panel.

11. An Institution Disciplinary Panel (IDP) shall

conduct formal hearings on Incident Reports referred from investigations or UDCs and may impose higher level sanctions for "greatest" and "high" level prohibited acts.

12. Detainees before the IDP shall be afforded a staff representative, upon request, or automatically if the detainee is illiterate, has limited English language skills or otherwise needs special assistance.

13. Actions of the IDP shall be reviewed by the facility administrator, who may concur with the findings and sanctions or modify them.

14. At all steps in the disciplinary process, any sanctions imposed shall be commensurate with the severity of the committed prohibited act and intended to encourage the detainee to conform with rules and regulations in the future.

15. All steps of the disciplinary process shall be performed within the required time limits.

16. At all steps of the disciplinary process, accurate and complete records shall be maintained. The detainee shall receive copies of all reports, exhibits and other documents considered or generated in the hearing process, except insofar as the disclosure of such documents may pose an imminent threat to the safety, security and orderly conduct of the facility staff or other detainees, or if the document or other evidence is otherwise protected from disclosure.

17. If a detainee is found not guilty at any stage of the disciplinary process, the incident records shall not be placed or retained in the detainee's file, even if these records are retained elsewhere for statistical or historical purposes.

18. Detainees shall be allowed to appeal disciplinary decisions through a formal grievance system. No staff member shall harass, discipline, punish or otherwise retaliate against any detainee for filing a complaint or grievance.

19. Detainees shall be afforded rights including, but not limited to, the following: the right to protection from abuse; the right to freedom from discrimination; the right to pursue a grievance; the right to correspond with persons or organizations; and the right to due process.

20. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Disciplinary Policy" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-3A-01, 3A-02, 6B-05, 6C-01 through 6C-19.

# V. Expected Practices

## A. Guidelines

1. Detainees with limited English proficiency (LEP) shall receive translation or interpretation services, and detainees with disabilities shall receive appropriate accommodations  in order to meaningfully participate in the investigative, disciplinary, and appeal process.

2. Each facility holding ICE/ERO detainees in custody shall have a detainee disciplinary system with progressive levels of reviews, appeals, procedures and documentation procedures. Written disciplinary policy and procedures shall clearly define detainee rights and responsibilities. The policy, procedures and rules shall be reviewed annually at a minimum.

3. Disciplinary action may not be capricious or retaliatory nor based on race, religion, national origin, gender, sexual orientation, disability or political beliefs.

4. At all steps in the disciplinary process, any sanctions imposed shall be commensurate with the severity of the committed prohibited act and intended to encourage the detainee to conform with rules and regulations in the future.

5. Staff may not impose or allow imposition of the following sanctions: corporal punishment; deprivation of food services, to include use of Nutraloaf or "food loaf"; deprivation of clothing, bedding or items of personal hygiene; deprivation of correspondence privileges; deprivation of legal access and legal materials; or deprivation of indoor or outdoor recreation, unless such activity would create a documented unsafe condition within the facility. Any sanction imposed shall be approved by the facility administrator and reviewed by the Field Office Director.

6. When a detainee has a diagnosed mental illness or mental disability, or demonstrates symptoms of mental illness or mental disability, a mental health professional, preferably the treating clinician, shall be consulted to provide input as to the detainee's competence to participate in the disciplinary hearing, any impact the detainee's mental illness may have had on his or her responsibility for the charged behavior, and information about any known mitigating factors in regard to the behavior.

7. The facility shall not hold a detainee accountable for his/her conduct if a medical authority finds him/her mentally incompetent. For purposes of these standards, a mentally incompetent individual is defined as an individual who is unable to appreciate the difference between appropriate and inappropriate behavior, or between "right" and "wrong." Such an individual is not capable of acting in accordance with those norms and therefore, cannot be held responsible for his/her "wrongful" actions.

8. If a detainee has a mental disability or mental illness  but is competent, the disciplinary process shall consider whether the detainee's mental disabilities or mental illness contributed to his or her behavior when determining what type of sanction, if any, should be imposed.  A mental health professional should also be consulted as to whether certain types of sanctions, (e.g., placement in disciplinary segregation, loss of visits, or loss of phone calls) may be inappropriate because they would interfere with supports that are a part of the detainee's treatment or recovery plan.

9. A person who cannot assist in his/her own defense because he/she lacks the ability to understand the nature of the disciplinary proceedings, as determined by a medical authority, shall be considered incompetent. Disciplinary proceedings against such a detainee shall be postponed until such time as the detainee is able to understand the nature of the disciplinary proceedings and to assist in his/her

own defense. If the detainee's mental status does not improve within a reasonable amount of time, the officer must find the detainee incompetent to assist in his/her own defense, and note such finding on the Incident Report.

## B. Notice to Detainees

The detainee handbook, or supplement, issued to each detainee upon admittance, shall provide notice of the facility's rules of conduct and prohibited acts, the sanctions imposed for violations of the rules, the disciplinary severity scale, the disciplinary process and the procedure for appealing disciplinary findings. Detainees shall have the following rights and shall receive notice of them in the handbook:

1. The right to protection from personal abuse, corporal punishment, unnecessary or excessive use of force, personal injury, disease, property damage and harassment;

2. The right of freedom from discrimination based on race, religion, national origin, gender, sexual orientation, physical or mental ability, or political beliefs;

3. The right to pursue a grievance in accordance with procedures provided in the detainee handbook, without fear of retaliation;

4. The right to pursue a grievance in accordance with standard "6.2 Grievance System" and procedures provided in the detainee handbook.

5. The right to correspond with persons or organizations, consistent with safety, security and the orderly operation of the facility; and

6. The right to due process, including the prompt resolution of a disciplinary matter.

Copies of the rules of conduct, rights and disciplinary sanctions shall be provided to all detainees and posted in English, Spanish, and other languages spoken by significant segments of the population with limited English proficiency. Copies to be provided and posted are as follows:

1. Disciplinary Severity Scale;

2. Prohibited Acts; and

3. Sanctions.

## C. Disciplinary Severity Scale and Prohibited Acts

All facilities shall have graduated scales of offenses and disciplinary consequences as provided in this section.

*Prohibited acts are divided into four categories: "greatest," "high," "moderate" and "low moderate." The sanctions authorized for each category shall be imposed only if the detainee is found to have committed a prohibited act (see "Appendix 3.1.A: Offense Categories").*

### 1. Greatest Offenses

*The IDP shall impose and execute at least one sanction in the 1 through 5 range. Additional sanctions may be imposed and either executed or suspended, at the discretion of the panel.*

### 2. High Offenses

*The IDP shall impose and execute at least one sanction in the 1 through 12 range. Additional sanctions (1 through 12) may be imposed or may be suspended at the discretion of the panel.*

### 3. High Moderate Offenses

*The IDP shall impose at least one sanction in the 1 through 13 range, but may suspend any or all, once imposed. Similarly, the UDC shall impose at least one sanction in the 7 through 13 range, but may suspend any or all, once imposed.*

### 4. Low Moderate Offenses

*The IDP shall impose at least one sanction in the 1 through 9 range, but may suspend any or all, once imposed. Similarly, the UDC shall impose at least one sanction in the 3 through 9 range, but may suspend any or all, once imposed.*

## D. Incident Report

Officers who witness a prohibited act, or have reason to suspect one has been committed, shall immediately prepare and submit an Incident Report. All Incident Reports must state facts clearly, precisely and concisely, omitting no details that may prove significant. Reports also shall identify the officer(s), the detainee(s) and all witnesses to the incident.

Minor transgressions shall be settled informally and by mutual consent whenever possible. If, however, the officer involved thinks an informal resolution is inappropriate or unattainable, he or she shall prepare an Incident Report and submit it to the appropriate supervisor before the end of the assigned shift.

ICE/ERO pre-approval is required for use of ICE Incident Report forms in CDFs and IGSA facilities.

*The Incident Report shall cite the relevant rule or standard without quoting it in its entirety. (For example, in the event of destruction of government property, the report shall cite, briefly, "Code 218—Destroying Government Property," specify the exact manner in which the detainee is alleged to have violated the cited rule or standard, and include all relevant facts such as time, dates and places.)*

*If the officer observes anything unusual in the detainee's behavior or demeanor, he/she shall so note in the report. The reporting officer shall also list all staff, contract officers, and/or detainee witnesses to the incident and the disposition of any physical evidence (e.g., weapons, property, etc.) relating to the incident. The reporting officer shall sign the report and include title, date and time the report was signed. The shift supervisor shall review all Incident Reports before going off duty.*

## E. Investigations

All facilities shall have procedures in place to ensure that all Incident Reports are investigated within 24 hours of the incident.

The investigating officer must have supervisory rank or higher (unless prevented by personnel shortages) and shall have had no prior involvement in the incident, as either witness or officer at the scene. If an officer below supervisory rank conducts the investigation, the shift supervisor shall review his/her report(s) for accuracy and completeness and sign them.

The investigating officer shall:

1. Commence the investigation within 24 hours of receipt of the Incident Report.

2. Advise the detainee of his/her right to remain silent at every stage of the disciplinary process, and ensure that he/she has a complete listing of detainee rights.

3. Complete the investigation within 72 hours of receipt of the Incident Report, barring exceptional circumstances.

4. Provide the detainee a copy of the Incident Report and notice of charges immediately after the conclusion of the investigation..

5. Terminate the administrative investigation, if the incident is under investigation on different grounds (i.e., the prohibited act is under criminal investigation), unless and until the agency with primary jurisdiction concludes its investigation or indicates it shall not pursue the matter.

   Contraband that may be evidence in connection with a violation of a criminal statute shall be preserved, inventoried, controlled and stored so as to maintain and document the chain of custody. Contraband shall be reported to the appropriate law enforcement authority for action and possible seizure and prosecution. See "Preservation of Evidence" in standard "2.10 Searches of Detainees."

6. Advise the detainee in writing of his/her due process rights before the UDC, or before the IDP if the case is being referred directly to the IDP, as provided in this standard.

7. Record personal observances and other potentially material information.

8. Prepare a factual report of the investigation, including the location or disposition of any physical evidence.

9. Forward to the UDC or directly to the IDP all reports relevant to the disciplinary hearing—..

## F. Unit Disciplinary Committee (UDC)

All facilities shall establish an intermediate level of investigation/adjudication process to adjudicate low or moderate infractions. They shall also ensure that the detainee is afforded all the UDC rights listed below.

The UDC administering unit discipline shall comprise up to three members, at least one of whom is a supervisor. The UDC shall not include the reporting officer, the investigating officer, or an officer who witnessed or was directly involved in the incident, except in the unlikely event that every available officer witnessed or was directly involved in the incident.

The UDC shall conduct hearings and, to the best extent possible, shall informally resolve cases involving high moderate or low moderate charges in accordance with the list of charges and related sanctions noted as "Appendix 3.1.A: Offense Categories." Unresolved cases and cases involving serious charges are forwarded to the institution disciplinary panel, and may be referred to the IDP without a hearing.

The UDC shall have authority to:

1. conduct hearings and resolve incidents involving high moderate or low moderate charges;

2. consider written reports, statements and physical evidence;

3. hear pleadings on the part of the detainee;

4. make findings that a detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of evidence; and

5. impose minor sanctions in accordance with the table of prohibited acts and associated sanctions later in this document; minor sanctions are those listed sanctions other than initiation of criminal proceedings, recommended disciplinary transfer, disciplinary segregation, or monetary restitution.

The detainee in UDC proceedings shall have the right to due process, which includes the rights to:

1. remain silent at any stage of the disciplinary process;

2. have a UDC hearing within 24 hours after the conclusion of the investigation, unless the detainee:

   a. waives the notification period and requests an immediate hearing, or

   b. requests more time to gather evidence or otherwise prepare a defense;

3. attend the entire hearing (excluding committee deliberations), or waive the right to appear.

   If security considerations prevent detainee attendance, the committee must document the security considerations and, to the extent possible, facilitate the detainee's participation in the process via telephonic testimony, document submission, written statements or questions to be asked of witnesses;

4. Present statements and evidence, including witness testimony on his/her own behalf; and

5. Appeal the committee's determination through the detainee grievance process.

The UDC shall:

1. verify that the detainee has been advised of and afforded his/her due process rights, as provided above in this standard;

2. refer to the IDP any incident involving a serious violation that may result in the following sanctions: initiation of criminal proceedings, recommended disciplinary transfer, disciplinary

segregation, or monetary restitution. This includes all code violations in the "greatest" and "high" categories (100s and 200s), and must include code violations in the "high moderate" category (300s)  in order for any of the sanctions listed above to be imposed;

3. serve the detainee with:

   a. a copy of the UDC decision which must contain the reason for the disposition and sanctions imposed; or

   b. written notification of charges and hearing before the IDP; and

4. if the detainee's case is being referred to the IDP, advise the detainee, in writing, of his/her due process rights as provided in this standard.

## G. Staff Representation for the IDP

The facility administrator shall upon the detainee's request, assign a staff representative to help prepare a defense prior to the commencement of the IDP. This help shall be automatically provided for detainees who are illiterate, have limited English-language skills, or who are without means of collecting and presenting essential evidence.  Detainees shall also have the option of receiving assistance from another detainee of their selection rather than a staff representative, subject to approval from the facility administrator.

1. *A staff representative must be a full-time employee.*

2. *Because of the potential conflict of interest, the facility administrator, members of the IDP and of the UDC initially involved in the case, eyewitnesses, the reporting and investigating officers and anyone else with a stake in the outcome shall not act as staff representative.*

3. *The detainee may select his/her staff representative, barring those identified in paragraph 2 above.*

4. *The IDP shall arrange for the presence of the staff representative selected by the detainee. If that staff member declines or is unavailable, the detainee may:*

   a. *select a different representative;*

   b. *wait for the unavailable staff member to become available (within a reasonable period); or*

   c. *proceed without a staff representative.*

5. *A staff member who declines to serve must state the reason on the staff representative form.*

6. *If several staff decline, the facility administrator shall assign one.*

7. *The staff representative shall be free to speak to witnesses and to present evidence on the detainee's behalf, including evidence of any mitigating circumstances. The staff representative must act in good faith on behalf of the charged detainee, and interview witnesses and obtain documentary evidence as requested by the detainee or as otherwise reasonably seen as relevant to the defense of the charges or in mitigation of the charges.*

8. *The IDP shall allow the staff representative enough time to speak with the detainee and interview witnesses prior to commencement of the proceeding. The IDP may grant a request for extension of time if required for an adequate defense.*

9. *The IDP shall establish the reliability of information provided by a confidential source before considering it in the disciplinary proceedings.*

10. *The IDP may withhold the confidential source's identity from the staff representative. While the staff representative may challenge the substance of any confidential information the IDP discloses, he/she may not question its reliability (which is pre-established by the IDP).*

11. In the event that a detainee cannot effectively present his/her own case, the facility administrator shall appoint a staff representative, even if not requested by the detainee.

## H. Institution Disciplinary Panel (IDP)

All facilities that house ICE/ERO detainees shall have a higher level disciplinary panel to adjudicate detainee Incident Reports. Only the disciplinary panel may place a detainee in disciplinary segregation.

The term "Institution Disciplinary Panel" or "IDP" refers either to a three-person panel appointed by the facility administrator, or a one-person disciplinary hearing officer, depending on the practice at the facility.

The panel may not include the reporting officer, the investigating officer, any member of the referring UDC, or anyone who witnessed or was directly involved in the incident. Exceptions may occur only if the number of officers required for the panel cannot be filled due their direct involvement in the incident.

The IDP may receive incident reports following a referral from the UDC or directly from the investigative officer following the conclusion of the investigation.

The IDP shall have authority to:

1. conduct hearings on all charges and allegations referred by the UDC or sent directly from the investigating officer;

2. call witnesses to testify;

3. consider written reports, statements, physical evidence and oral testimony;

4. hear pleadings by detainee and staff representative;

5. make findings that the detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of

evidence; and

6. impose sanctions as listed and authorized in each category.

The detainee in IDP proceedings shall have the right to due process, which includes the rights to:

1. remain silent at any stage of the disciplinary process;

2. have an IDP hearing within 48 hours after the conclusion of the investigation or the conclusion of the UDC hearing, unless the detainee:

   a. waives the notification period and requests an immediate hearing, or

   b. requests more time to gather evidence or otherwise prepare a defense;

3. attend the entire hearing (excluding committee deliberations), or waive the right to appear.

   If security considerations prevent the detainee's attendance, the committee must document the security considerations and, to the extent possible, facilitate the detainee's participation in the process by telephonic testimony, the submission of documents, written statements or questions to be asked of witnesses;

4. present statements and evidence, including witness testimony, on his/her behalf;

5. have a staff representative; and

6. appeal the committee's determination through the detainee grievance process.

The IDP shall:

1. verify that the detainee has been advised of and afforded his/her due process rights, as provided above in this standard;

2. remind the detainee of his/her right to a staff representative, provide one if requested and verify that a staff representative has been assigned when a representative is requested;

3. advise the detainee of his/her right to waive the

hearing and admit having committed the offense;

4. conduct the hearing within 48 hours after the conclusion of the investigation  or the conclusion of the UDC hearing, unless the detainee requests more time to gather evidence or otherwise prepare a defense. In cases where a hearing is delayed, the reason(s) must be documented (e.g., a continuing investigation of facts, unavailability of one or more essential witnesses, etc.) and, unless the detainee has requested the delay, approved by the facility administrator. If the detainee is being held in segregation, the delay shall not exceed 72 hours, barring an emergency;

5. prepare a written record of any hearing. This record must show that the detainee was advised of his/her rights. It must also document the evidence considered by the Panel and subsequent findings and the decision and sanctions imposed, along with a brief explanation;

6. forward the entire record to the facility administrator, who may (a) concur, (b) terminate the proceedings or (c) impose more severe or more lenient sanctions; and

7. serve the detainee with written notification of the decision, which must contain the reason for the decision.

## I. Confidential Information

When a decision relies on information from a confidential source, the UDC or IDP shall disclose as much confidential information as may be disclosed without jeopardizing the safety and security of facility staff and other persons, and shall include in the hearing record the factual basis for finding the information reliable.

## J. Postponement of Disciplinary Proceedings

All facilities shall permit hearing postponements or continuances under certain circumstances.

Circumstances justifying the postponement or

continuance of a hearing might include, but are not limited to: defense preparation, physical or mental illness, security, escape, disciplinary transfer or pending criminal prosecution.

An uncooperative detainee may also cause a delay in the proceedings, either because of inappropriate behavior during the hearing process or a refusal to participate in a productive manner.

## K. Duration of Sanctions

The duration of sanctions shall be within established limits. Neither the panel recommending sanctions nor the facility administrator making the final decision shall impose sanctions arbitrarily, beyond these limits.

1. Sanctions range from the withholding of privilege(s) to segregation. Disciplinary segregation shall only be ordered when alternative dispositions may inadequately regulate the detainee's behavior.

2. Time in segregation or the withholding of privileges after a hearing shall generally not exceed 30 days per incident, except in extraordinary circumstances, such as violations of offenses 100 through 109 listed in the "Greatest" offense category in Appendix 3.1.A.

3. While a detainee may be charged with multiple prohibited acts and may receive multiple sanctions for one incident, sanctions arising from a single incident shall run concurrently.

4. Time served in segregation pending the outcome of the proceedings shall be credited to the number of days to be spent in the segregation unit after an adverse decision is announced.

5. The detainee's good behavior subsequent to the rule violation or prohibited act should be given consideration when determining the appropriate penalty.

6. The disciplinary report and accompanying documents are not placed in the file of a detainee

who is found not guilty. The facility, however, may retain the material in its own files for Institution statistical or historical purposes.

## L. Documents

All documents relevant to the incident, subsequent investigation and hearing(s) shall be completed and distributed in accordance with facility procedures.

### 1. Incident Report/Notice of Charges

The officer shall prepare an Incident Report and submit it to the supervisor immediately after the incident takes place. If the incident is resolved informally, the officer shall so note on the original report, which shall then be forwarded to the Chief of Security.

*If the UDC is to be involved, the supervisor shall serve the detainee with a copy of the Notice of Charges upon completion of the investigation, no less than 24 hours before the UDC hearing.*

*The UDC receives the original copy.*

*If the UDC hears the matter, the ranking member of that committee shall serve the detainee with a copy of the Incident Report/Notice of Charges indicating their decision. The UDC, upon conclusion of its proceedings, shall forward the entire record to either the Chief of Security or the IDP, as appropriate.*

### 2. Investigation Report

*The original shall be submitted to the UDC.*

*The detainee does not receive a copy.*

### 3. UDC Report of Findings and Action

*The original shall be served on the detainee after the committee issues its findings.*

*A copy shall be included in the detainee detention file (guilty finding only).*

### 4. Notice of IDP Hearing

*The original shall be served on the detainee after the committee issues its findings.*

*A copy shall be included in the detainee detention file.*

### 5. Detainee Rights at IDP Hearing

*The original shall be served on the detainee after the committee issues its findings.*

*A copy shall be included in the facility detention file.*

### 6. IDP Report

*The original shall be included in the detainee detention file.*

*A copy shall be provided to the detainee.*

## M. Criminal Prosecution

Facilities, in coordination with the Field Office Director, shall work with prosecutors and other law enforcement officials to ensure that detainees who engage in serious criminal activity, including violence against staff and other detainees, face criminal prosecution when appropriate.

# Appendix 3.1.A: Offense Categories

## I. "Greatest" Offense Category

### A. Prohibited Acts

100   Killing

101   Assaulting any person (includes sexual assault)

102   Escape from escort; escape from a secure facility

103   Setting a fire (charged with this act in this category only when found to pose a threat to life or a threat of serious bodily harm or in furtherance of a prohibited act of greatest severity [e.g., a riot or an escape]; otherwise the charge is classified as Code 222, 223 or 322))

104   Possession or introduction of a gun, firearm, weapon, sharpened instrument, knife, dangerous chemical, explosive, escape tool, device or ammunition

105   Rioting

106   Inciting others to riot

107   Hostage-taking

108   Assaulting a staff member or any law enforcement officer

109   Threatening a staff member or any law enforcement office with bodily harm

*198   Interfering with a staff member in the performance of duties (conduct must be of the greatest severity; this charge is to be used only if another charge of greatest severity is not applicable)

*199   Conduct that disrupts or interferes with the security or orderly running of the facility (conduct must be of the greatest severity; this charge is to be used only if another charge of greatest severity is not applicable)

### B. Sanctions

1.  Initiate criminal proceedings

2.  Disciplinary transfer (recommend)

3.  Disciplinary segregation (up to 60 days)

4.  Make monetary restitution, if funds are available

5.  Loss of privileges (e.g., commissary, vending machines, movies, recreation, etc.)

## II. "High" Offense Category

### A. Prohibited Acts

200   Escape from unescorted activities open or secure facility, proceeding without violence

201   Fighting, boxing, wrestling, sparring and any other form of physical encounter, including horseplay, that causes or could cause injury to another person, except when part of an approved recreational or athletic activity

202   Possession or introduction of an unauthorized tool

203   Loss, misplacement or damage of any restricted tool

204   Threatening another with bodily harm

205   Extortion, blackmail, protection and demanding or receiving money or anything of value in return for protection against others, avoiding bodily harm or avoiding a threat of being informed against

206   Engaging in sexual acts

207   Making sexual proposals or threats

208   Wearing a disguise or mask

209   Tampering with or blocking any lock device

210   Adulterating of food or drink

211   Possessing, introducing, or using narcotics, narcotic paraphernalia or drugs not prescribed for the individual by the medical

*staff*

212   Possessing an officer's or staff member's clothing

213   Engaging in or inciting a group demonstration

214   Encouraging others to participate in a work stoppage or to refuse to work

215   Refusing to provide a urine sample or otherwise cooperate in a drug test

216   Introducing alcohol into the facility

217   Giving or offering an official or staff member a bribe or anything of value

218   Giving money to, or receiving money from, any person for an illegal or prohibited purpose (e.g., introducing/conveying contraband)

219   Destroying, altering, or damaging property (government or another person's) worth more than $100

220   Being found guilty of any combination of three or more high moderate or low moderate offenses within 90 days

222   Possessing or introducing an incendiary device (e.g., matches, lighter, etc.)

223   Engaging in any act that could endanger person(s) and/or property

*298   Interfering with a staff member in the performance of duties (conduct must be of highest severity; this charge is to be used only when no other charge of highest severity is applicable)

*299   Conduct that disrupts or interferes with the security or orderly operation of the facility (conduct must be of highest severity; this charge is to be used only when no other charge of highest severity is applicable)

**B. Sanctions**

1. Initiate criminal proceedings

2. Disciplinary transfer (recommend)

3. Disciplinary segregation (up to 30 days)

4. Make monetary restitution, if funds are available

5. Loss of privileges (e.g., commissary, vending machines, movies, recreation, etc.)

6. Change housing

7. Remove from program and/or group activity

8. Loss of job

9. Impound and store detainee's personal property

10.   Confiscate contraband

11.   Restrict to housing unit

12.   Warning

## III. "High Moderate" Offense Category

### A. Prohibited Acts

300   Indecent exposure

301   Stealing (theft)

302   Misusing authorized medication

303   Loss, misplacement or damage of a less restricted tool

304   Lending property or other item of value for profit/increased return

305   Possessing item(s) not authorized for receipt or retention and not issued through regular channels

306   Refusing to clean assigned living area

307   Refusing to obey the order of a staff member or officer (may be categorized and charged as a greater or lesser offense, depending on the kind of disobedience: continuing to riot is Code 105—Rioting; continuing to fight Code 201—Fighting; refusing to provide a urine sample, Code 215—Refusing to provide a urine sample or otherwise

cooperate in a drug test).

308    Insolence toward a staff member

309    Lying or providing false statement to staff

310    Counterfeiting, forging or other unauthorized reproduction of money proceedings or other official document or item (e.g., security document, identification card, etc.); may be categorized as greater or lesser offense, depending on the nature and purpose of the reproduction (e.g., counterfeiting release papers to effect escape—Code 102 or 200).

311    Participating in an unauthorized meeting or gathering

312    Being in an unauthorized area

313    Failing to stand count

314    Interfering with count

315    Making, possessing, or using intoxicant(s)

316    Refusing a breathalyzer test or other test of alcohol consumption

317    Gambling

318    Preparing or conducting a gambling pool

319    Possessing gambling paraphernalia

320    Unauthorized contact with the public

321    Giving money or another item of value to, or accepting money or another item of value from, anyone, including another detainee, without staff authorization

322    Destroying, altering, or damaging property (government or another person's) worth equal to or less than $100

323    Signing, preparing, circulating, or soliciting support for  group petitions that threaten the security or orderly operation of the facility.

*398    Interfering with a staff member in the performance of duties (offense must be of high moderate severity; this charge to be used only when no other charge in this category is applicable)

*399    Conduct that disrupts or interferes with the security or orderly running of the facility (offense must be of high moderate severity; this charge is to be used only when no other charge in this category is applicable)

NOTE: Any combination of high moderate and low moderate offenses during a 90-day period shall constitute a high offense.

### B. Sanctions

1. Initiate criminal proceedings

2. Disciplinary transfer (recommend)

3. Disciplinary segregation (up to 72 hours)

4. Make monetary restitution, if funds are available

5. Loss of privileges (e.g. commissary, vending machines, movies, recreation, etc.)

6. Change housing

7. Remove from program and/or group activity

8. Loss of job

9. Impound and store detainee's personal property

10.    Confiscate contraband

11.    Restrict to housing unit

12.    Reprimand

13.    Warning

## IV. "Low Moderate" Offense Category

### A. Prohibited Acts

400    Possessing property belonging to another person

401    Possessing unauthorized clothing

402    Malingering; feigning illness

403    Smoking where prohibited

*404*   Using abusive or obscene language

*405*   Tattooing, body piercing or self-mutilation

*406*   Unauthorized use of mail or telephone (with restriction or temporary suspension of the abused privileges often the appropriate sanction)

*407*   Conduct with a visitor in violation of rules and regulations (with restriction or temporary suspension of visiting privileges often the appropriate sanction)

*408*   Conducting a business

*409*   Possessing money or currency, unless specifically authorized

*410*   Failing to follow safety or sanitation regulations

*411*   Unauthorized use of equipment or machinery

*412*   Using equipment or machinery contrary to posted safety standards

*413*   Being unsanitary or untidy; failing to keep self and living area in accordance with posted standards

*\*498*   Interfering with a staff member in the performance of duties (offense must be of low moderate severity; this charge is to be used only when no other charge in this category is applicable)

*\*499*   Conduct that disrupts or interferes with the security or orderly running of the facility (offense must be of low moderate severity; this charge is to be used only when no other charge in this category is applicable)

**B. Sanctions**

1. Loss of privileges, commissary, vending machines, movies, recreation, etc.

2. Change housing

3. Remove from program and/or group activity

4. Loss of job

5. Impound and store detainee's personal property

6. Confiscate contraband

7. Restrict to housing unit

8. Reprimand

9. Warning

# 4.1 Food Service

## I. Purpose and Scope

This detention standard ensures that detainees are provided a nutritionally balanced diet that is prepared and presented in a sanitary and hygienic food service operation.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs and CDFs.* IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

For all types of facilities, procedures that appear in italics with a marked (**) on the page indicate optimum levels of compliance for this standard.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. All detainees shall be provided nutritionally balanced diets that are reviewed at least quarterly by food service personnel and at least annually by a qualified nutritionist or dietitian.

2. Detainees, staff and others shall be protected from harm, and facility order shall be maintained, by the application of sound security practices in all aspects of food service and dining room operations.

3. Detainees, staff and others shall be protected from injury and illness by adequate food service training and the application of sound safety and sanitation practices in all aspects of food service and dining room operations.

4. Dining room facilities and operating procedures shall provide sufficient space and time for detainees to eat meals in a relatively relaxed, unregimented atmosphere.

5. Food service facilities and equipment shall meet established governmental health and safety codes, as documented in independent, outside sources.

6. Detainees, staff and others shall be protected from health-related harm by advance medical screening and clearance before any detainee is assigned to work in food service operations.

7. Food service areas shall be continuously inspected by food service staff and other assigned personnel on schedules determined by the food service administrator and by applicable policy requirements.

8. Stored food goods shall be maintained in accordance with required conditions and temperatures.

9. Food service personnel shall provide nutritious and appetizing meals. Nutritional needs are diverse because of differences in age, activity, physical condition, gender, religious preference and medical considerations. Food service personnel shall accommodate the ethnic and religious diversity of the facility's detainee population when developing menu cycles. While each facility must meet all ICE/ERO standards and follow required procedures, individuality in menu planning is encouraged.

10. Therapeutic medical diets and supplemental food shall be provided as prescribed by appropriate clinicians.

11. Special diets and ceremonial meals shall be provided for detainees whose religious beliefs require adherence to religious dietary laws.

12. Detainees shall receive a religious or special diet free of any personal cost.

13. Food shall never be used for reward or punishment.

14. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Food Service" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ADLF-4A-01 through 4A-18. (Five of those Expected Practices are mandatory for accreditation: 4A-07, 4A-11, 4A-13, 4A-15 and 4A-16.)

ICE/ERO *Performance-based National Detention Standards 2011:*

- "2.7 Key and Lock Control"; and
- "2.14 Tool Control."

FDA Public Health Services Food Code.

## V. Expected Practices

### A. Administration

#### 1. Food Service Administrator or Equivalent

The food service program shall be under the direct supervision of an experienced food service administrator (FSA) who is responsible for the following:

a. Planning, controlling, directing and evaluating food service;

b. Training and developing cook foremen (CF);

c. Managing budget resources;

d. Establishing standards of sanitation, safety and security;

e. Developing nutritionally adequate menus and evaluating detainee acceptance of them;

f. Developing specifications for procurement of food, equipment and supplies; and

g. Establishing a training program that ensures operational efficiency and a high quality food service program.

The food service department shall also be staffed by one or more cook supervisors (CS) and CF, although the organizational structure may differ among facilities, particularly when food service is provided by a food service contractor. Therefore, references to the CS and CF in this detention standard describe

typical duties for those positions, although the functions may be performed by others, depending on the organizational structure.

## B. Security

### 1. Custody and Security

The facility's custody and security policy and procedures shall address the following:

a.  buildings or portions of buildings housing the food service department;

b.  all types of detainee traffic in and out of the department;

c.  detainee behavior;

d.  control of repairs;

e.  control of utensils with a custodial hazard potential (e.g., knives, cleavers, saws, tableware);

f.  official counts and census;

g.  area searches; and

h.  any other matters having a direct or indirect bearing on custody and security.

The facility's training officer shall devise training curricula and provide appropriate training to all food service personnel in detainee custodial issues. Among other topics, this training shall cover ICE/ERO's current detention standards.

### 2. Knife Control

The knife cabinet must be equipped with an approved locking device. The on-duty CF, under direct supervision of the CS, shall maintain control of the key that locks the cabinet..

Knives must be physically secured to workstations for use outside a secure cutting room. Any detainee using a knife outside a secure area must receive direct staff supervision. Knives shall be inventoried and stored in accordance with standard "2.14 Tool Control."

*To be authorized for use in the food service*

*department, a knife must have a steel tang through which a metal cable can be mounted. The facility's tool control officer is responsible for mounting the cable to the knife through the steel tang.*

*The FSA/CS shall monitor the condition of knives and other food service utensils, disposing of items not in good working order and ordering replacements. If a knife is misplaced or lost, staff shall immediately notify the FSA and Chief of Security, and shall hold detainees who may have had access to the missing knife in the area until a thorough search is conducted. The responsible CS shall provide the details of the loss in a written report to the Chief of Security.*

The knife cabinet shall meet the tool-control standards of the Occupational Safety and Health Administration, as well as any site-specific standards developed by the facility.

### 3. Key Control

Keys shall be inventoried and stored in accordance with standard "2.7 Key and Lock Control."

*The control room officer shall issue keys only in exchange for a name chit from receiving staff. Under no circumstances shall detainees have access to facility keys.*

*The CS shall return the keys to the control room before going off duty. At no time may anyone carry facility keys outside the facility.*

### 4. Controlled Food Items/Hot Items

All facilities shall have procedures for handling food items that pose a security threat.

a.  Yeast and Yeast Products
    All yeast must be stored in an area with no detainee access, preferably in a locked metal yeast cabinet for which the food service department has only one key. The locked yeast cabinet shall be maintained in a secure area.

    Until the yeast is thoroughly incorporated as an ingredient in a food item being prepared, only

one member of the food service staff, closely supervised, may handle and dispense it.

Staff shall keep a record of the yeast inventory (in pounds and ounces), indicating quantity of receipt and issue, balance on hand and the record-keeper's initials.

b. Other Food Items
Mace, nutmeg, cloves, sugar and alcohol-based flavorings also require special handling and storage.

1) The purchase order for any of these items shall specify the special-handling requirements for delivery.

2) Staff shall store and inventory these items in a secure area in the food service department.

3) Staff shall directly supervise use of these items.

## 5. Work Area Searches

All facilities must establish daily searches of detainee work areas (e.g., trash) as standard operating procedures, paying particular attention to trash receptacles.

Searches of detainees leaving certain work areas (e.g., bakery, vegetable preparation, dining room, warehouse) are required to reduce the possibility that hot food or contraband can leave the restricted area. Unless otherwise directed by facility policy or special instructions, staff shall prevent detainees from leaving the food service department with any food item.

Food service personnel as well as facility detention staff shall conduct food service area searches.

## 6. Counts

The FSA shall establish procedures for informing staff of the local counting procedures, and shall establish measures to ensure that the procedures are followed.

Staff must be able to account for detainees at all times.

The counting officer must have a staff observer/backup during each count. Detainees shall be assembled in one section of the dining room and be required to remain seated until their names are called, and shall then move to another section of the dining room.

## C. Detainee Workers

### 1. Detainee Workforce

Detainees may volunteer for work in accordance with standard "5.8 Voluntary Work Program" and must work in accordance with standard "2.2 Custody Classification System."

The number of detainees assigned to the food service department shall be based on a quota developed by the FSA and approved by the facility administrator. The quota shall provide staffing according to actual needs, and shall eliminate any bias toward over- or understaffing.

### 2. Detainee Job Descriptions

The FSA shall review detainee job descriptions annually to ensure accuracy and specific requirements. Before starting work in the department, the detainee shall sign for receipt of the applicable job description. A copy of the detainee's job description shall remain on file for as long as the detainee remains assigned to the food service department.

### 3. Detainee Orientation and Training

To ensure a quality food service program and instill good work habits, each CS shall instruct newly assigned detainee workers in the rules and procedures of the food service department. During the orientation and training session(s), the CS shall explain and demonstrate safe work practices and methods and shall identify the safety features of individual products and equipment.

Training shall also include workplace-hazard recognition and deterrence, including the safe handling of hazardous materials. Detainees shall learn

to use and understand protective devices and clothing and to report any malfunctions or other safety-related problems to their supervisors.

The CS must document all training in each detainee's detention file.

### 4. Detainee Work Hours and Pay

Detainee volunteers shall work and be paid in accordance with standard "5.8 Voluntary Work Program."

### 5. Meals for Food Service Workers

The FSA shall establish the meal schedules for detainee food service workers.

Detainee workers shall receive the same fare as other detainees. The CS shall not allow detainees to prepare "special" dishes or condiments for their own or other detainees' consumption.

Detainee workers assigned to the staff dining room may be allowed to eat in that area. All others shall eat in the main dining room, or, if the facility has no main dining room, the FSA shall designate an area for workers to eat.

### 6. Detainee Clothing

Detainees assigned to the food service department shall have a neat and clean appearance.

*Unless the facility administrator establishes other policy, the detainee food worker uniform shall consist of the following: white, short-sleeved, summer-type uniform shirts and pants; safety work shoes; and a white paper hat or white cap. White aprons or smocks of either cloth or disposable plastic may be part of the uniform.*

a. Detainees with hair shoulder-length or longer shall be required to wear a hair net under their hats or caps.

b. Detainees with facial hair shall be required to wear beard guards when working in the food preparation or food serving areas.

c. Detainees working in the garbage room, dish machine room, pan-washing area, etc., shall be required to wear rubber or plastic aprons suited to the task and rubber boots, if required, for sanitation or safety.

d. Detainees working in refrigerated and freezer areas shall be provided appropriately insulated clothing.

### 7. Use of Tobacco

Tobacco in all its forms is prohibited in the food service department.

## D. Food Service Dining Room/Satellite Meals Operations

### 1. General Policy

Ordinarily detainees shall be served three meals every day, at least two of which shall be hot meals; however, the facility administrator may approve variations in the food service schedule during religious and civic holidays, provided that basic nutritional goals are met. The dining room schedule must allow no more than 14 hours between the evening meal and breakfast.

Clean, potable drinking water must be available.

Meals shall always be prepared, delivered and served under staff (or contractor) supervision.

Meals shall be served in as unregimented a manner as possible. The FSA's table arrangement should facilitate ease of movement and ready supervision. The dining room shall have the capacity to allow each detainee a minimum of 20 minutes dining time for each meal.

### 2. Display and Service

The following procedures apply to the display, service and transportation of food to main and satellite food service areas:

a. Before and during the meal, the CS in charge shall inspect the food service line to ensure:

   1) all menu items are ready for consumption;

2) food is appropriately presented; and

3) sanitary guidelines are observed, with hot foods maintained at a temperature of at least 140 F degrees (120 F degrees in food trays) and foods that require refrigeration maintained at 41 F degrees or below.

b. Every open food item and beverage shall be protected from contaminants by easily cleaned sneeze-guards, cabinets, display cases or other such equipment.

c. Servers must wear food-grade plastic gloves and hair nets whenever there is direct contact with a food or beverage. Servers must use tongs, forks, spoons, ladles or other such utensils to serve any food or beverage. Serving food without use of utensils is strictly prohibited.

d. Servers shall use scoops, tongs or other approved utensils when handling or dispensing ice for consumption. The FSA shall consider the practicability of purchasing automatic ice-dispensing equipment.

e. Utensils shall be sanitized:

1) as often as necessary to prevent cross-contamination and other food-handling hazards during food preparation and service;

2) after every food preparation/service session; and

3) again, if necessary, immediately before being used.

f. Sugar, condiments, seasonings and dressings available for self-service shall be provided in individual packages, closed dispensers, or automated condiment-dispensing systems. Salad dressings may be served in open containers if the serving ladle extends beyond the top edge of the container.

g. If the facility does not have sufficient equipment to maintain the minimum or maximum temperature required for food safety, the affected

items (e.g., salad bar staples such as lettuce, meat, eggs, cheese) must be removed and discarded after two hours at room temperature.

Food shall be delivered from one place to another in covered containers. These may be individual containers, such as pots with lids, or larger conveyances that can move objects in bulk, such as enclosed, satellite-meals carts.

In any facility, if food carts are delivered to housing units by detainees, they must be locked unless they are under constant supervision of staff.

All food-safety procedures (e.g., sanitation, safe-handling, storage, etc.) apply without exception to food in transit.

h. Soiled equipment and utensils must be transported to the appropriate receptacles in closed containers.

i. A member of the food service staff shall oversee the loading of satellite meal carts. Staff shall inspect all food carts before allowing their removal from the food service area.

## 3. Dining Room Workers

The CF in charge shall train dining room workers in the requirements of the job, including how to perform specific tasks. A basic task common to all dining room workers is to keep the tables and floors clean during the meal service. Once the meal service is over and the detainees have left the room, the workers can undertake major cleaning tasks.

## 4. Serving Lines

The serving counter shall be designed and constructed to separate and insulate the hot foods on the one hand and the cold foods on the other. A transparent "sneeze guard" is required.

## 5. Salad Bars and Hot Bars

Food items at salad bars and hot bars shall be arranged for logical and efficient service. A

transparent "sneeze guard" is required.

## 6. Beverage Counter/Bar

Self-service beverage-and-ice stations shall be designed for quick and easy access. These stations shall be designed for sanitary and efficient service, including traffic flow.

## 7. Staff Dining Room

*The FSA shall have jurisdiction over the staff dining room. The staff dining room shall offer the same food items as the detainee dining room.*

## 8. Meal tickets

The facility may establish a meal ticket program for employees and guests.

*Examples of persons who may receive meals gratis include advisors, guest speakers, technicians/others rendering a service without charge, equipment demonstrators, athletic teams, entertainers, foreign visitors, volunteers and others whose service to the facility is in the best interest of the government.*

*Individuals receiving government reimbursement for their services (e.g., contract employees, per-diem-status personnel) are ineligible for guest meals provided free of charge.*

## E. Menu Planning

### 1. General Policy

The FSA shall base menu selections on the best nutritional program the facility can afford meeting U.S. minimum daily allowances. The ICE/ERO standard menu cycle is 35 days.

The food service program significantly influences morale and attitudes of detainees and staff, and creates a climate for good public relations between the facility and the community.

The overall goal of a quality food service program is to provide nutritious and appetizing meals efficiently and within constraints of the existing budget, personnel resources, equipment and physical layout

of the facility. Nutritional needs are diverse because of differences in age, activity, physical condition, gender, religious preference and medical considerations.

The FSA shall accommodate the ethnic and religious diversity of the facility's detainee population when developing menu cycles. While each facility must meet all ICE/ERO standards and follow required procedures, individuality in menu planning is encouraged. Institutions geographically near one another shall consider the benefits of coordinating their menus and the cost-reductions to be achieved through joint purchasing.

The FSA is solely responsible for food service program planning and resource allocation and use.

## 2. Nutritional Analysis

A registered dietitian shall conduct a complete nutritional analysis that meets U.S. Recommended Daily Allowances (RDA), at least yearly, of every master-cycle menu planned by the FSA. The dietitian must certify menus before they are incorporated into the food service program. If necessary, the FSA shall modify the menu in response to the nutritional analysis to ensure nutritional adequacy. In such cases, the menu shall be revised and re-certified by the registered dietician.

If the master-cycle menus change significantly during the year, the cycle shall be reevaluated to ensure nutritional values are maintained.

## F. Food Preparation

### 1. General Policy

The CS or equivalent is responsible for ensuring that all items on the master-cycle menu are prepared and presented according to approved recipes. This responsibility includes assessing the availability and condition of ingredients required by particular recipes, and communicating supply needs to the FSA. For this reason, the CS shall review upcoming menu items as much in advance as possible.

The CS or equivalent has the authority to change menu items when necessary. Every such change or substitution must be documented and forwarded to the FSA. The CS shall exercise this menu-changing authority as infrequently as possible.

Knowledge of ingredients, quantities and food preparation techniques and procedures is essential for producing quality products.

## 2. Preparation Guidelines

Food shall be prepared with minimal manual contact. Food service workers shall thoroughly wash fruits and vegetables with fresh water before cooking or serving raw.

A worker shall test-taste with a clean fork or spoon only; using a soiled food preparation utensil is prohibited. Test-tasting utensils, unless disposable, must be washed after every usage. Disposable test-tasting utensils shall be discarded after a single use.

Any food cooked at a lower temperature than provided below constitutes a food safety hazard and shall not be served. Food service staff and detainee workers involved in cooking shall ensure that the following foods are cooked at the required temperatures:

a.  Raw eggs, fish, meat and foods containing these items—145 F degrees or higher

b.  Game animals, comminuted (ground) fish and meats, injected meats and eggs not intended for immediate consumption—155 F degrees or higher

c.  Stuffing containing fish, meat, or poultry—165 F degrees or higher

d.  Roast beef and corned beef—145 F degrees or higher

Potentially hazardous foods that have been cooked and then refrigerated shall be quickly and thoroughly reheated at a minimum of 165 F degrees before being served. Steam tables, warmers and similar hot food holding equipment are prohibited

for the rapid reheating of these foods.

After being reheated at 165 F degrees, the food may be maintained at 140 F degrees on a heated steam line or equivalent warming equipment.

The facility shall obtain pasteurized milk and milk products from approved facilities only. Manufactured milk products shall meet federal standards for quality.

The facility may use reconstituted dry milk and dry milk products for cooking and baking purposes, in instant desserts and in whipped items. If reconstituted in-house, the dry milk and milk products shall be used for cooking purposes only. Powdered milk reconstituted in an approved milk-dispensing machine or "mechanical cow" may be used for drinking purposes. To ensure wholesomeness, an approved laboratory shall test milk produced in the mechanical cow twice monthly for presence of bacteria. The mechanical cow shall be disassembled, cleaned and sanitized before and after each use.

Powdered milkshake or ice cream mix, reconstituted in an approved ice cream machine, may be used. An approved laboratory shall test dairy-based products produced in the machine for the presence of bacteria monthly. The ice cream machine shall be disassembled, cleaned and sanitized before and after each use.

Liquid, frozen and dry eggs and egg products are pasteurized at temperatures high enough to destroy pathogenic organisms that might be present; however, because of the possibility of contamination or recontamination after opening, thawing or reconstitution, these products shall be primarily used in cooking and baking.

Nondairy creaming, whitening or whipping agents may be reconstituted in-house only if immediately stored in sanitized, covered containers not larger than one gallon, and cooled to 41 F degrees or lower within four hours of preparation.

The CF shall use thermometers to ensure the attainment and maintenance of proper internal cooking, holding or refrigeration temperatures of all potentially hazardous foods.

To prevent cross-contamination, separate cutting boards must be used for raw and cooked foods. The cutting boards must be washed, rinsed and sanitized between every use.

The FSA may require use of color-coded cutting boards, which reduce the risk of cross-contamination during food preparation.

### 3. Food Cooling

Potentially hazardous food must be cooled from 140 to 70 F degrees within two hours of cooking, and from 70 to 41 F degrees or below within four hours. Foods prepared from ingredients at ambient temperature, such as reconstituted foods and canned tuna, must be cooled to 41 F degrees within two hours of cooking/preparation.

The food service department can meet time-and-temperature requirements for cooling by using any or all of the following techniques, which expedite cooling:

a. placing the food in shallow pans;

b. separating food into smaller or thinner portions;

c. using rapid cooling equipment;

d. stirring the food in a container placed in an ice water bath;

e. using containers that facilitate heat transfer;

f. adding ice as an ingredient; and/or

g. using a commercial blast-chiller.

During cooling, the food containers shall be arranged in cooling or cold-holding equipment in a way that maximizes heat transfer through the walls of the containers.

Food protected from overhead contamination shall be left uncovered during the cooling period. If the

risk of overhead contamination exists, the food must be loosely covered to facilitate heat transfer from the surface of the food.

### 4. Food Thawing

Potentially hazardous food shall be thawed according to one of the following procedures:

a. under refrigeration that maintains the food at 41 F degrees or below;

b. submerged in running water;

   1) at a water temperature of 70 F degrees or below;

   2) with sufficient water velocity to agitate and float off loose particles in an overflow; and

   3) for a period that does not allow thawed portions of ready-to-eat or raw animal foods to rise above 41 F degrees; also

   4) the allowed periods for thawing include the time the food is exposed to the running water, the time to prepare food for cooking, and/or the time it takes under refrigeration to cool the food to 41 F degrees; or

c. as part of a cooking process, provided there is continuous cooking throughout the process.

### 5. Food Protection—General Requirements

Food and ice shall be protected from dust, insects and rodents, unclean utensils and work surfaces, unnecessary handling, coughs and sneezes, flooding, drainage, overhead leakage and other sources of contamination. Protection shall be continuous, whether the food is in storage, in preparation, on display or in transit.

All food storage units must be equipped with accurate easy-to-read thermometers. New heating and/or refrigeration equipment purchases shall include a zone-type thermometer with temperature graduations. Refrigeration equipment shall be designed and operated to maintain a temperature of 41 F degrees or below.

## 6. Hermetically Sealed Foods

Canned food that has abnormal color, taste or appearance, or which is contained in cans that show abnormalities such as bulging at ends, swelling or leakage, shall not be served. Unsuitable canned food shall be surveyed, reported and destroyed.

## 7. Potentially Hazardous Foods

Potentially hazardous foods are those foods that provide a good medium for bacteria growth. They include any perishable food that consists in whole or part of milk, milk products, eggs, meat, poultry, fish or shellfish or other high-protein foods.

Potentially hazardous foods shall be prepared with minimal manual contact. Such products shall be prepared from chilled ingredients whenever feasible. The surfaces of equipment, containers, cutting boards and utensils used for preparation and subsequent storage of potentially hazardous food shall be cleaned effectively after each use.

Potentially hazardous food shall be prepared as close to serving time as practicable. Potentially hazardous raw frozen food shall be cooked from the frozen state whenever practical. Tempering shall be accomplished by refrigeration at 40 F degrees or below or, with potable running water, at 70 F degrees or below. The potable water technique may be used only if the product is sealed in its original container. At no time shall potentially hazardous food thaw at room temperature.

All precooked, potentially hazardous, refrigerated or frozen food intended for reheating hall be heated rapidly to a temperature above 165 F degrees.

## 8. Leftovers

Prepared food items that have not been placed on the serving line may be retained for no more than 24 hours. Leftovers offered for service a second time shall not be retained for later use, but shall be discarded immediately after offering. All leftovers shall be labeled to identify the product, preparation date and time.

## G. Religious/Special Diets

### 1. General Policy

All facilities shall provide detainees requesting a religious diet a reasonable and equitable opportunity to observe their religious dietary practice, within the constraints of budget limitations and the security and orderly running of the facility, by offering a common fare menu. While each request for religious diet accommodation is to be determined on a case-by-case basis, ICE anticipates that facilities will grant these requests unless an articulable reason exists to disqualify someone for religious accommodation or the detainee's practice poses a significant threat to the secure and orderly operation of the facility. Information about the availability of religious and special diets shall be provided to detainees in a language or manner that they can understand.

"Common Fare" refers to a no-flesh protein option provided whenever an entrée containing flesh is offered as part of a meal. Likewise, a "Common Fare" meal offers vegetables, starches and other foods that are not seasoned with flesh. This diet is designed as the foundation from which modifications can be made to accommodate the religious diets of various faiths.

When considering denying a request by a detainee to participate in the religious diet program, or removal of a detainee from the religious diet program, the facility administrator, or his/her designee, shall consult with the local FOD prior to denying the request or prior to removing a detainee from the program. To participate in the common fare program, a detainee shall initiate an "Authorization for Common Fare Participation" form (Appendix 4.1.A) for consideration by the chaplain (or FSA). On the form, the detainee shall provide a written statement articulating the religious motivation for participation in the common fare program. Oral interpretation or written assistance

shall be provided to illiterate or limited-English proficient detainees as necessary in completing this form.  If participation is approved, the chaplain or FSA shall forward a copy of the form for inclusion in the detainee's detention file.

Detainees whose religious beliefs require adherence to particular dietary laws or generally accepted religious guidelines and practices shall be referred to the chaplain. The chaplain shall verify the religious diet requirement by reviewing files and consulting with religious representatives.  In the case of an unorthodox request, the chaplain or religious services coordinator is encouraged to consult established clergy contacts in the community to determine whether a request pertaining to a particular faith is appropriate.  Facilities may employ different mechanisms to determine if a detainee's request should be granted; however, the determination may not impose a substantial burden on a detainee's religious exercise or necessitate lengthy questionnaires or numerous interviews. Response to the request for a religious diet must be provided in a timely manner, and documented. Absent an articulable reason to deny the request, the presumption must be that the detainee's request constitutes a legitimate exercise of religious belief and practice.

The chaplain or religious services coordinator and FSA shall issue specific written instructions for the implementation of the diet as soon as practicable and within 10 business days of verification.

*Once a religious diet has been approved, the FSA shall issue, in duplicate, a special-diet identification card.*

*This diet-identification card shall contain the following information:*

*a.  detainee name and A-number;*

*b.  type of religious diet prescribed;*

*c.  expiration date, within 90 days; and*

*d.  signature of the FSA.*

*The FSA shall contact the appropriate individual or department to obtain a photo of the detainee, and shall attach the photo to the identification card. The FSA shall ensure that the food service department receives one copy of the special-diet identification card. The second identification card shall be issued to the detainee who, at every meal, must present the card to the CS on duty. The second copy of the consultation sheet shall be filed in the detainee's detention file.*

*Any time a detainee on a religious diet refuses a meal and/or accepts the regular mainline meal in place of the religious meal, the cook on duty shall notify the FSA in writing.*

## 2. Standard Common Fare Menu (Religious Diet)

Common fare is intended to accommodate detainees whose religious dietary needs cannot be met on the mainline. The common fare menu is based on a 14-day cycle, with special menus for the ten federal holidays. The menus must be certified as exceeding minimum daily nutritional requirements and meeting RDAs. Beverages shall be selected from the regular menu.

## 3. Changes to the standard Common Fare Menu

Modifications to the standard common fare menu may be made at the local level for various reasons. For example, seasonal variations affect the availability of fresh produce in different locations, making menu modifications inevitable. Modifications may also be made to meet the requirements of various faith groups (e.g., for the inclusion of kosher and/or halal flesh-food options).

With the facility administrator's concurrence, the FSA may make temporary, nutritionally equal substitutions for fresh seasonal produce that violates no religious dietary requirements. The chaplain or local religious representatives shall be consulted if technical questions arise. The Chaplain shall escort other clergy to the common fare preparation area for

frequent, random monitoring of compliance with religious dietary requirements.

## 4. Hot Entree Availability

To the extent practicable, a hot flesh-food entree shall be available to accommodate detainees' religious dietary needs. Hot entrees shall be offered daily and shall be purchased, prepared and served in a manner that does not violate the religious requirements of any faith group.

## 5. Kosher Requirements

With the exception of fresh fruits and vegetables, the facility's kosher-food frozen entrees shall be purchased precooked in a sealed container, heated and served hot. Other kosher-food purchases shall be fully prepared, ready-to-use and bearing the symbol of a recognized kosher-certification agency. Any item containing pork or a pork product is prohibited. Only bread and margarine labeled "parev" or "parve" shall be purchased for the kosher tray.

## 6. Plates and Utensils

Kosher trays shall be served with disposable plates and utensils, except when a supply of reusable plates and utensils has been set aside for kosher-food service only. Separate cutting boards, knives, food scoops, food inserts and other such tools, appliances and utensils shall be used to prepare kosher-foods, and shall be identified accordingly. Meat and dairy food items and the service utensils used with each group shall be stored in areas separate from each other. A separate dishpan shall be provided for cleaning these items, if a separate or three-compartment sink is not available.

## 7. Religious Requirements

If a facility has a no-pork menu, in order to alleviate any confusion for those who observe no-pork diets for religious reasons, the above information, within "Section G," shall be included in the facility's handbook and the facility orientation. If the facility has a chaplain, he/she shall also be made aware of

the policy.

## 8. Nutritional Requirements

Common fare menus shall meet RDAs. A detainee who chooses the common fare menu shall select beverages only from the regular menu.

## 9. Instant Food and Beverages

The food service shall provide a hot-water urn for reconstituting instant beverages and foods for use by detainees.

## 10. Plates and Utensils

Common Fare meals shall be served with disposable plates and utensils, except when a supply of reusable plates and utensils has been set aside for common fare service only. Separate cutting boards, knives, food scoops, food inserts and other such tools, appliances and utensils shall be used to prepare common fare foods, and shall be identified accordingly. Meat and dairy food items and the preparation and service utensils used with each group shall be stored in areas separate from each other. A separate dishpan shall be provided for cleaning these items, if a separate or three-compartment sink is not available.

The chaplain shall escort other clergy to the common fare preparation area for frequent, random monitoring of compliance with religious dietary requirements.

## 11. Application and Removal

The facility administrator, in consultation with the chaplain, shall be the approving official for a detainee's removal from the common fare program. The facility administrator or chaplain is required to consult with the local FOD prior to denying any request for a religious diet.  In addition, once a detainee has been approved for a religious diet program, he or she may not be removed from the program without prior consultation with and concurrence from the FOD.  Denial or removal from a religious diet must be documented with the

date and reason, and must be approved by the facility administrator. The documentation should also include the date of FOD concurrence.

Food service staff shall refer to the daily roster to identify detainees in the common fare program. Staff shall not use this information to disparage a detainee's religion or religious views or to attempt to dissuade him/her from participating in the program.

a. The FSA shall monitor the food selections of all detainees participating in the common fare program to ensure the legitimacy of their participation.

b. Staff shall train and supervise all detainees with common fare assignments.

c. A detainee's temporary adoption of a medically prescribed diet or placement in a Special Management Unit (SMU) shall not affect his/her access to common fare meals. However, if a prescribed medical diet conflicts with the common fare diet, the medical diet takes precedence.

d. A detainee who has been approved for a common fare menu must notify the chaplain, in writing, if he/she wishes to withdraw from the religious diet. Oral interpretation or written assistance shall be provided to illiterate or limited-English proficient detainees as necessary in providing written notice of withdrawal from a religious diet.

The Chaplain may recommend withdrawal from a religious diet if the detainee is documented as being in violation of the terms of the religious diet program to which the detainee has agreed in writing. If a detainee refuses five consecutive common fare meals, the chaplain may recommend in writing that the facility administrator remove the detainee from the program. Detainees participating in the common fare program may also consume items for sale through the facility's commissary program without risk of being removed from the

program, as long as such purchases are consistent with the common fare program. However, purchase of foods items inconsistent with the common fare program may be grounds for removal from the program.

To preserve the integrity and orderly operation of the religious diet program and to prevent fraud, detainees who withdraw or are removed may not be immediately re-established back into the program.

The process of re-approving a religious diet for a detainee who voluntarily withdraws or who is removed ordinarily may take up to ten days. However, repeated withdrawals, voluntary or otherwise, may result in a waiting period of up to one month before the re-approval request is decided. The decision to remove and/or reinstate a detainee rests with the facility administrator, in consultation with the chaplain and/or local religious representatives, if necessary.

## 12. Annual Ceremonial Meals

The chaplain, in consultation with local religious leaders as necessary, shall develop the ceremonial meal schedule for the subsequent calendar year and shall provide this schedule to the facility administrator. The schedule shall include the date, religious group, estimated number of participants and special foods required. Ceremonial and commemorative meals shall be served in the food service facility, unless otherwise approved by the facility administrator.

The food service department shall be the only source of procurement for food items. To maintain equity in menu design, all meals shall be limited to food items on the facility's master-cycle menu. To facilitate food preparation, consultations between the FSA and local religious representative(s) concerning appropriate menus shall occur six to eight weeks in advance of the scheduled observance. The religious provider may, through the food service department, procure the ritual observance food items (in minimal quantities). Such items shall not generally constitute

the main entree for the ceremonial meal.

### 13. Religious Fasts and Seasonal Observances

The common fare program shall accommodate detainees abstaining from particular foods or fasting for religious purposes at prescribed times of year, including, but not limited to:

a. Ramadan

During Ramadan, Muslims participating in the fast shall receive the approved meals after sundown for consumption in the food service department or SMU.

During the December fast, vegetarian or hot fish dishes shall replace meat entrees. Fasters shall receive both noon and evening meals after sundown.

Detainees not participating in the common fare program, but electing to observe Ramadan or the December fast shall be served the main meal after sundown. If the main menu does not meet religious requirements, the detainee may participate in the common fare program during the period in question.

Each facility may provide a bag breakfast or allow detainees to go to the food service department for breakfast before dawn. Bag breakfasts shall contain nonperishable items such as ultra-high pasteurized milk, fresh fruit, peanut butter, dry cereal, etc. The menu for the common fare program cannot be used for a bag breakfast.

b. Passover

The facility shall have the standard Kosher-for-Passover foods available for Jewish detainees during the eight-day holiday. The food service department shall be prepared to provide Passover meals to new arrivals.

All Jewish detainees observing Passover shall be served the same Kosher-for-Passover meals, whether or not they are participating in the common fare program.

c. Lent

During the Christian season of Lent, a meatless meal (lunch and dinner) shall be served on the food service line on Fridays and on Ash Wednesday.

### 14. Common Fare Recordkeeping and Costs

The FSA shall estimate quarterly costs for the common fare program and include this figure in the quarterly budget. The FSA shall maintain a record of the actual costs of both edible and non-edible items.

## H. Medical Diets

### 1. Therapeutic Diets

Detainees with certain conditions—chronic or temporary; medical, dental, and/or psychological—shall be prescribed special diets as appropriate.

Special (therapeutic) diets shall be authorized by the clinical director (CD) on Form IHSC-819, or equivalent, detainee special need(s). The form shall specify the type of therapeutic diets to be prescribed and, if necessary, renewed, in 90-day increments. Once prescribed, the diet shall be made available to the detainee by the next business day.

*The cook on duty shall notify the FSA and/or CS in writing any time a detainee on a therapeutic diet refuses the special meal or accepts the regular meal from the main food service line.*

### 2. Snacks or Supplemental Meals

The physician may order snacks or supplemental meals for such reasons as:

a. insulin-dependent diabetes;

b. a need to increase protein or calories for pregnancy, cancer, AIDS, etc.; and/or

c. a need to take prescribed medication with food.

## I. Specialized Food Service Programs

### 1. Satellite Meals

"Satellite meals" refers to food prepared in one

location for consumption elsewhere (e.g., general housing units, the SMU, remote housing areas, etc.).

The sanitary standards required in the food service department, from preparation to actual delivery, also apply to satellite meals. Satellite meals and microwave instructions (if applicable) shall be posted where satellite meals are served.

Foods shall be kept sufficiently hot or cold to arrest or destroy the growth of infectious organisms. The FSA shall ensure that staff members understand the special handling required with potentially hazardous foods, such as meat, cream or egg dishes. Staff must understand the critical importance of time and temperature in delivering safe food.

To prevent bacteria growth, food must be prepared and held at the proper temperatures until served. Satellite tray meals must be delivered and served within two hours of food being plated.

Foods in the potentially hazardous category shall remain under refrigeration until cooking time and, after cooking, maintained at or above 140 F degrees. Hot foods must be placed in a heated serving line during tray assembly. Thermal bags and carts, refrigerated carts, thermal compartment trays, etc., shall be used for satellite meals.

Outside foods prepared in bulk for transportation to a remote housing unit or other location shall be transported in thermal containers that maintain cold items at temperatures below 41 F degrees and/or hot items at temperatures above 140 F degrees, excluding items served within the two-hour window for meal service.

## 2. Weekend and Holiday Meal Schedule

When weekend and/or holiday meal schedules differ from the weekday schedule, detainees in the SMU shall receive a continental breakfast or regular breakfast items. Brunch service shall conform to the breakfast meal pattern, and dinner service to the noon or evening meal pattern.

## 3. Selection of Menu Courses

Care must be taken to ensure that culturally diverse meals are provided in such portions as to be nutritionally adequate.

## 4. Segregation Unit Food Rations

Food items in excess of the normal prescribed ration shall not be given to detainees in segregation units as a reward for good behavior, nor shall food rations be reduced or changed or otherwise used as a disciplinary tool.

## 5. Segregation Unit Sack Lunches

Detainees in segregation units shall receive sack meals only with the facility administrator's written authorization. The medical department shall be consulted when necessary.

## 6. Sack Meals

All meals shall be served from established menus in the dining room or housing units. In some circumstances, detainees may be provided sack meals.

Sack meals shall be provided for detainees being transported from the facility, detainees arriving or departing between scheduled meal hours, and detainees in the SMU, as provided above.

a. Quality
   Sack meals shall be of the same nutritional quality as other meals prepared by the food service.

b. Preparation
   Members of the food service staff shall prepare sack meals for detainees who are being transported to/from other locations by bus or air service. While detainee volunteers assigned to the food service department shall not be involved in preparing meals for transportation, they may prepare sack meals for on-site consumption.

A designated member of the transportation by land or plane crew shall pick up all sack meals prepared for detainee transportation from the food service department. Before departing, this crew member shall inspect the sacks for:

1) quality of contents;

2) proper wrapping; and

3) correct individual counts.

c.  Contents

For any detainee who shall be transported by the ICE Air Operations (IAO), the sack lunch must comply with IAO criteria. Otherwise, the following requirements are applicable:

Each sack shall contain at least two sandwiches, of which at least one shall be meat (non-pork). Commercial bread or rolls may be preferable because they include preservatives. To ensure freshness, fresh, facility-made bread may be used only if made on the day of lunch preparation. Sandwiches shall be individually wrapped or bagged in a secure fashion to prevent the food from spoiling. Meats, cheeses, etc., shall be freshly sliced the day of sandwich preparation. Leftover cooked meats shall not be used after 24 hours.

In addition, each sack shall include:

1) one piece of fresh fruit, or properly packaged canned fruit (or paper cup with lid), complete with a plastic spoon;

2) one ration of a dessert item, like cookies, doughnuts and fruit bars; and

3) such extras as:

   a)  properly packaged fresh vegetables, like celery sticks and carrot sticks; or

   b)  commercially packaged "snack foods," such as peanut butter crackers, cheese crackers and individual bags of potato chips.

These items enhance the overall acceptance of the lunches.

Extremely perishable items such as fruit pie, cream pie and other items made with milk, cream or other dairy ingredients shall be excluded.

d.  Packaging

Whenever possible, the food service department shall pack sack meals intended for bus or air service in disposable "snack boxes" that are designed for proper placement of contents and to afford maximum protection during handling, packaging and transporting.

If necessary, paper bags may be used.

These lunches shall be stored in a secured, refrigerated area until pickup.

## J. Safety and Sanitation

### 1. General Policy

All food service employees are responsible for maintaining a high level of sanitation in the food service department. An effective food sanitation program prevents health problems, creates a positive environment and encourages a feeling of pride and cooperation among detainees.

Food service staff shall teach detainee workers personal cleanliness and hygiene; sanitary methods of preparing, storing and serving food; and the sanitary operation, care and maintenance of equipment, including automatic dishwashers and pot and pan washers.

### 2. Personal Hygiene of Staff and Detainees

a.  All food service personnel shall wear clean garments, maintain a high level of personal cleanliness and practice good hygiene at all times. They shall wash hands thoroughly with soap or detergent before starting work and as often as necessary during the shift to remove soil or other contaminants.

b.  Staff and detainees shall not resume work after visiting the toilet facility without first washing their hands with soap or detergent. The FSA shall post signs to this effect.

c.  Neither staff nor detainees shall use tobacco in a food service work area. If they use tobacco in a smoking-permitted area, they shall wash their hands before resuming work.

d. All staff and detainees working in the food preparation and service area(s) shall use effective hair restraints. Personnel with hair that cannot be adequately restrained shall be prohibited from food service operations. Head coverings, gloves and beard guards are encouraged, but not required, when staff members are distributing covered serving trays.

e. Detainee food service workers shall be provided with and required to use clean white uniforms while working in a food preparation area or on the serving line.

f. All food service personnel working in the food service department shall be provided with and required to use approved rubber-soled safety shoes.

g. To prevent cross-contamination, staff and detainees who prepare or serve food shall not be assigned to clean latrines, garbage cans, sewers, drains or grease traps, or other such duties, during the period of food preparation.

h. Only authorized food service personnel shall be tasked with preparing and serving food.

i. Authorization is based on approval from the facility's health services department.

j. Only authorized personnel shall be allowed in the food preparation, storage or utensil-cleaning areas of the food service area.

## 3. Medical Examination

The facility administrator shall document that food service personnel have received a pre-employment medical examination to identify communicable diseases that may contraindicate food service work.

The medical department shall document detainees' clearance for food service work prior to their assuming food service duties. The food service department shall refer to the medical department detainees that have been absent from work for reasons of communicable illness, for a determination of medical clearance prior to resuming food service work.

## 4. Daily Health Checks

The CF or detention staff assigned to food service shall inspect all detainee food service workers on a daily basis at the start of each work period. Detainees who exhibit signs of illness, skin disease, diarrhea (admitted or suspected) or infected cuts or boils shall be removed from the work assignment and immediately referred to health services for determination of fitness for duty. The detainees shall return to work only after the FSA has received written clearance from health services staff.

## 5. Environmental Sanitation and Safety

All facilities shall meet the following environmental standards:

a. Facilities must be clean and well-lit, and must display orderly work and storage areas.

b. Overhead pipes must be removed or covered to eliminate the food-safety hazard posed by leaking or dusty pipes.

c. Walls, floors and ceilings in all areas must be cleaned routinely.

d. Facilities must employ ventilation hoods to prevent grease buildup and wall/ceiling condensation that can drip into food or onto food contact surfaces. Filters or other grease-extracting equipment shall be readily removable for cleaning and replacement.

e. The area underneath sprinkler deflectors must have at least an 18-inch clearance.

f. Facilities must possess hazard-free storage areas:

1) Bags, containers, bundles, etc., shall be stored in tiers and stacked, blocked, interlocked and limited in height for stability and security against sliding or collapsing.

2) No flammable material, loose cords, debris or other obvious hazards may be present.

3) No pests or infestations may be present.

g. Aisles and passageways shall be kept clear and in good repair, with no obstruction that may create a hazard or hamper egress.

h. To prevent cross-contamination, kitchenware and food-contact surfaces shall be washed, rinsed and sanitized after each use and after any interruption of operations during which contamination may occur.

i. Facilities must possess a ready supply of hot water (105-120 F degrees).

j. Garbage and other trash shall be collected and removed as often as possible. Garbage/refuse containers shall have sufficient capacity for the volume and shall be kept covered, insect- and rodent-proof and frequently cleaned. The facility shall comply with all applicable regulations (local, state and federal) on refuse handling and disposal and standard "1.2 Environmental Health and Safety."

k. The premises shall be maintained in a condition that prevents the feeding or nesting of insects and rodents. Outside openings shall be protected by tight-fitting screens, windows, controlled air curtains and self-closing doors.

## 6. Equipment Sanitation

Information about the operation, cleaning and care of equipment shall be obtained from manufacturers or local distributors. A file of such reference material shall be maintained in the food service department and used in developing equipment cleaning procedures for training. Sanitation shall be a primary consideration in the purchase and placement of equipment.

Equipment shall be installed for ease of cleaning, including the removal of soil, food materials and other debris that collects between pieces of equipment or between the equipment and walls or floor. Older facilities that may not have the advantage of the latest designs and equipment can

meet sanitation standards through careful planning, training and supervision.

The FSA shall develop a schedule for the routine cleaning of equipment.

## 7. Equipment and Utensils

a. Information
   All food service equipment and utensils shall meet the National Sanitation Foundation International (NSF) standards or equivalent standards of other agencies.

b. Materials

   1) Materials used in the construction or repair of multi-use equipment and utensils shall:

      a) be non-toxic, non-corrosive, non-absorbent, durable under normal use, smooth and easily cleaned;

      b) impart no odors, colors or tastes; and

      c) retain their original properties under repeated use, creating no risk of food-adulteration as they deteriorate.

   2) Paint is prohibited on any surface that may come into contact with food.

   3) Milk-dispensing tubes shall be cut diagonally about two inches from the cutoff valve. Bulk milk dispensers shall be equipped with thermometers.

c. Design and Fabrication

   1) All food service equipment and utensils (including plastic ware) shall be designed and fabricated for durability under normal use.

      a) Such equipment shall be readily accessible, easily cleaned and resistant to denting, buckling, pitting, chipping and cracking.

   2) Equipment surfaces not intended for contact with food, but located in places exposed to splatters, spills, etc., require frequent cleaning. Therefore, they shall be reasonably smooth,

washable, free of unnecessary ridges, ledges, projections and crevices. Upkeep of equipment surfaces shall contribute to cleanliness and sanitation.

d.  Installation

1) Equipment shall be installed in accordance with the manufacturer's instructions and good engineering practices.

2) Installers shall allow enough space between pieces of equipment and between equipment and walls to facilitate routine cleaning. Adjacent pieces may be butted together if the gap between them is sealed.

e.  General Cleaning Procedures

1) Moist cloths for wiping food spills on kitchenware and food-contact surfaces on equipment shall be clean, rinsed frequently in sanitizing solution and used solely for wiping food spills. These cloths shall soak in the sanitizing solution between uses.

2) Moist cloths used for non-food-contact surfaces like counters, dining table tops and shelves shall be cleaned, rinsed and stored in the same way as the moist cloths used on food-contact surfaces. They shall be used on non-food-contact surfaces only.

3) Detergents and sanitizers must have Food and Drug Administration approval for food service uses.

f.  Manual Cleaning and Sanitizing

1) A sink with at least three labeled compartments is required for manually washing, rinsing and sanitizing utensils and equipment. Each compartment shall have the capacity to accommodate the items to be cleaned. Each shall be supplied with hot and cold water.

2) Drain-boards and/or easily movable dish-tables shall be provided for utensils and equipment

both before and after cleaning.

3) Equipment and utensils shall be pre-flushed, pre-scraped and, when necessary, pre-soaked to remove gross food particles. A fourth sink compartment with a garbage-disposal is useful for these purposes and shall be included in plans for facilities being built or renovated.

4) Except for fixed equipment and utensils too large to be cleaned in sink compartments, the following procedures apply to cleaning equipment and utensils:

a) Wash in the first sink compartment, using a hot detergent solution changed frequently to keep it free from soil and grease.

b) Rinse in or under hot water in the second compartment, changing the rinse water frequently. This compartment shall be kept empty, and a sprayer shall be used for rinsing to prevent rinse water from becoming soapy or contaminated.

c) Sanitize in the third compartment using one of the following methods:

i.  Immerse for at least 30 seconds in clean water at a constant temperature of 171 F degrees that is maintained with a heating device and frequently checked with a thermometer. Use dish baskets to immerse items completely.

ii.  Immerse for at least 60 seconds in a sanitizing solution containing at least 50 parts per million (ppm) chlorine at a temperature of at least 75 F degrees.

iii. Immerse for at least 60 seconds in a sanitizing solution containing at least 12.5 ppm iodine, with a pH not higher than 5.0 and a temperature of at least 75 F degrees.

iv.  Immerse in a sanitizing solution containing an equivalent sanitizing

chemical at strengths recommended by the U.S. Public Health Service.

   v.   Periodically check and adjust as necessary the chemical concentrations in a sanitizing solution, using a test kit.

   vi.  Air dry utensils and equipment after sanitizing.

   vii.   Steam clean oversized equipment, provided the steam can be confined to the piece of equipment. Alternatively, rinse, spray or swab with a chemical sanitizing solution mixed to at least twice the strength required for immersion sanitizing.

g. Mechanical Cleaning and Sanitizing
Spray or immersion dishwashers or devices, including automatic dispensers for detergents, wetting agents and liquid sanitizer, shall be maintained in good repair. Utensils and equipment placed in the machine must be exposed to all cycles.

   1) The pressure of the final rinse water must be between 15 and 25 pounds per square inch (psi) in the water line immediately adjacent to the final-rinse control valve.

   2) Machine- or water line-mounted thermometers must be installed to check water temperature in each dishwasher tank, including the final rinse water.

   Baffles, curtains, etc., must be used to prevent wash water from entering the rinse water tank(s) and time conveyors to ensure adequate exposure during each cycle.

   Equipment and utensils must be placed on conveyors or in racks, trays and baskets to expose all food-contact surfaces to detergent, washing and rinsing without obstruction and to facilitate free draining.

   3) The  following temperatures must be

maintained for hot-water sanitizing:

   a) Single-tank, stationary rack, dual-temperature machine: wash temperature of 150 F degrees; final rinse, 180 F degrees.

   b) Single-tank, stationary rack, single-temperature machine: wash and rinse temperature of 165 F degrees.

   c) Multi tank, conveyor machine: wash temperature of 150 F degrees; pumped rinse, 160 F degrees; final rinse, 180 F degrees.

   d) Single-tank, pot/pan/utensil washer (stationary or moving rack): wash temperature of 140 F degrees; final rinse, 180 F degrees.

      i.   When using a chemical spray in a single-tank, stationary rack, glass-washer, maintain a wash temperature of at least 120 F degrees, unless otherwise specified by the manufacturer.

      ii.  Air-dry all equipment and utensils after sanitizing, by means of drain boards, mobile dish tables and/ or carts.

h. Equipment and Utensil Storage.  Eating utensils shall be picked up by their bases or handles only. Utensils shall be stored in perforated pans only.

   Glasses, tumblers and cups shall be inverted before storing. Other tableware and utensils may be either covered or inverted.

## 8. Storage of Clothing and Personal Belongings

Clothes and other personal belongings (e.g., jackets, shoes) shall be stored in designated areas, apart from:

a. areas for the preparation, storage and serving of food; and

b. areas for the washing and storing of utensils.

The FSA shall identify space for storing detainee belongings.

## 9. Lavatories

Adequate and conveniently located toilet facilities shall be provided for all food service staff and detainee workers.

a.  Toilet fixtures shall be of sanitary design and readily cleaned.

b.  Toilet rooms and fixtures shall be kept clean and in good repair.

c.  Signs shall be prominently displayed.

d.  Lavatories shall have readily available hot and cold water.

e.  Soap or detergent and paper towels or a hand-drying device providing heated air, shall be available at all times in each lavatory.

f.  Waste receptacles shall be conveniently placed near the hand-washing facilities.

## 10. Pest Control

Good sanitation practices are essential to an effective pest control program. The FSA is responsible for pest control in the food service department, including contracting the services of an outside exterminator as necessary.

To protect against insects and other pests, air curtains or comparable devices shall be used on outside doors where food is prepared, stored or served.

## 11. Hazardous Materials

Only those toxic and caustic materials required for sanitary maintenance of the facility, equipment and utensils shall be used in the food service department.

a.  All food service staff shall know where and how much toxic, flammable or caustic material is on hand, and shall be aware that their use must be controlled and accounted for daily.

b.  Detainee-type combination locks shall not be used to secure such material.

c.  All containers of toxic, flammable or caustic materials shall be prominently and distinctively labeled for easy content identification.

d.  All toxic, flammable and caustic materials shall be segregated from food products and stored in a locked and labeled cabinet or room.

e.  Cleaning and sanitizing compounds shall be stored apart from food products.

f.  Toxic, flammable and caustic materials shall not be used in a manner that may contaminate food, equipment or utensils or may pose a hazard to personnel or detainees working with or consuming food service products.

g.  A system for intermediate storage of received hazardous substances shall secure the materials from time of receipt to time of issue.

The FSA shall obtain and file for reference Material Safety Data Sheets (MSDSs) on all flammable, toxic and caustic substances used in the facility as required by standard "1.2 Environmental Health and Safety."

## 12. General Safety Guidelines

a.  Extension cords shall be UL-listed and UL-labeled and may not be used in tandem.

b.  All steam lines within seven feet of the floor or working surface, and with which a worker may come in contact, shall be insulated or covered with a heat-resistant material or otherwise be guarded from contact.  Inaccessible steam lines, guarded by location, need not be protected from contact.

c.  Machines shall be guarded in compliance with OSHA standards:

1)  Fans within seven feet of the floor or work surface shall have blade guard openings no larger than two inches.

2)  Protective eye and face equipment shall be used, as appropriate, to avert risk of injury. Dangerous areas presenting such risks shall be conspicuously marked with eye-hazard

warning signs.

3) Safety shoes shall be worn in FSA-designated
foot hazard areas.

4) Meat saws, slicers and grinders shall be
equipped with anti-restart devices.

5) The maintenance manager shall provide
ground fault protection wherever needed in
the food service department, and shall
document this protection for the FSA.

d. Light fixtures, vent covers, wall-mounted fans,
decorative materials and similar equipment and
materials attached to walls or ceilings shall be
maintained in good repair.

e. Lights in food production areas, utensil and
equipment washing areas, and other areas
displaying or storing food, equipment, or utensils
shall be equipped with protective shielding.

f. An approved, fixed fire-suppression system shall
be installed in ventilation hoods over all grills,
deep fryers and open flame devices. A qualified
contractor shall inspect the system every six
months. The fire-suppression system shall be
equipped with a locally audible alarm and
connected to the control room's annunciator
panel.

g. Hood systems shall be cleaned after each use to
prevent grease build-up, which constitutes a fire
risk. All deep fryers and grills shall be equipped
with automatic fuel or energy shut-off controls.

### 13. Mandatory Inspection

The facility administrator shall implement written
procedures requiring the food service administrator
or designee to conduct the weekly inspections of all
food service areas, including dining, storage,
equipment and food-preparation areas.

All of the food service department equipment (e.g.,
ranges, ovens, refrigerators, mixers, dishwashers,
garbage disposal) require frequent inspection to
ensure their sanitary and operable condition. Staff

shall check refrigerator and water temperatures daily
and record the results. The FSA or designee shall
verify and document requirements of food and
equipment temperatures.

The FSA or CS shall inspect food service areas at least
weekly.

An independent, external inspector shall conduct
annual inspections to ensure that the food service
facilities and equipment meet governmental health
and safety codes.

Personnel inspecting the food service department
shall note any recommended corrective actions in a
written report to the facility administrator. The
facility administrator shall establish the date by
which identified problems shall be corrected.

Checks of equipment temperatures shall follow this
schedule:

a. dishwashers: every meal;

b. pot and pan washers: daily, if water in the third
compartment of a three-compartment sink is used
for sanitation and the required minimum
temperature is 180 F degrees; and

c. refrigeration/freezer equipment (walk-in units):
site-specific schedule, established by the FSA.

All temperature-check documentation shall be filed
and accessible.

The FSA shall develop a cleaning schedule for each
food service area and post it for easy reference. All
areas (e.g., walls, windows, vent hoods) and
equipment (e.g., chairs, tables, fryers, ovens) shall
be grouped by frequency of cleaning (e.g., after
every use, daily, weekly, monthly, semiannually or
annually).

## K. Food Storage, Receiving and Inventory

### 1. General Policy

Since control and location of subsistence supplies are
site-specific, each FSA shall establish procedures for
storing, receiving and inventorying food.

On the purchase request for potentially dangerous items (e.g., knives, mace, yeast, nutmeg, cloves and other items considered contraband if found in a detainee's possession), the FSA shall mark them "hot," signaling the need for special handling.

## 2. Receiving

The first step in receiving food is matching incoming items with the invoice, purchase order and control specifications. Weekly deliveries of fresh produce, meats and other perishable items shall be inspected for freshness, quality and general appearance. Staff shall supplement their inspections of perishables with random checks of weight, count, size, etc.

Receiving staff shall examine deliveries promptly to determine acceptability both for quantity and quality, consistent with the contract. If immediate examination is not practical upon delivery because inspection shall involve time-consuming tests, the vendor shall receive a receipt confirming delivery of a particular number/gross weight of containers in good condition (or, if not, noting exceptions).

## 3. Food Receipt and Storage

The following procedures apply when receiving or storing food:

a.  Inspect the incoming shipment for damage, contamination and pest infestation. Rats, mice or insects may be hiding in the middle of a pallet.

b.  Promptly remove damaged pallets and broken containers of food. Separate damaged food containers from other food and store separately for disposal. Take special care in handling flour, cereal, nuts, sugar, chocolate and other such products highly susceptible to contamination.

c.  Upon finding that an incoming food shipment has been contaminated, contact the FSA/CS for instructions on the next course of action.

d.  Store all food item products at least six inches from the floor and sufficiently far from walls to facilitate pest-control measures. A painted line may guide pallet placement. Wooden pallets may be used to store canned goods and other non-absorbent containers, but not to store dairy products or fresh produce.

e.  Store perishables at 35-40 F degrees to prevent spoilage and other bacterial action, and maintain frozen foods at or below zero degrees.

f.  Prevent cross-contamination by storing foods requiring washing or cooking separately from those that do not.

g.  For rapid cooling, use shallow pans (depth not to exceed four inches). Cover or otherwise shield refrigerated food from contamination.

h.  Do not store food in locker rooms, toilet rooms, dressing rooms, garbage rooms or mechanical rooms, or under sewer lines, potentially leaking water lines, open stairwells or other sources of contamination.

## 4. Inventory

Determining inventory levels and properly receiving, storing and issuing goods are critical to controlling costs and maintaining quality. While the FSA shall base inventory levels on facility needs, each facility shall always stock a 15-day food supply at a minimum.

Procedures for checking the quality and quantity of food and other supplies and their distribution to the point of use shall comply with industry-established policies and financial management practices.

Food service inventory represents significant financial resources converted into goods in the form of food, supplies and equipment. All food service personnel must be aware of the value of the inventory and of his/her responsibility for the security of these goods upon receipt.

The master-cycle menus offer guidance to managers planning inventory levels.

Inventory levels shall be established, monitored and periodically adjusted to correct excesses or shortages.

## 5. Stock Rotation

Each facility shall establish a written stock rotation schedule.

## 6. Perpetual Inventory

"Perpetual Inventory" is the process of recording all food service purchases and food distribution. Although details may vary, the information recorded always includes the quantity on hand, quantity received, quantity issued and unit cost for each food and supply item.

Perpetual inventory records are important because they provide the FSA with up-to-date information on product usage, and act as a guide for further purchases.

For accurate accounting of all food and supplies, a perpetual inventory record is insufficient. An official inventory of stores on hand must be conducted annually.

All food service departments shall complete a physical inventory of the warehouse quarterly.

## 7. The Dry Storeroom

Proper care and control of the dry storeroom involves the following:

a. keeping the storeroom dry and cool (45-80 F degrees) to prevent swelling of canned goods and general spoilage;

b. sealing or otherwise making impenetrable all wall, ceiling and floor openings to prevent entry of dirt, water, pests, etc.;

c. vigilant housekeeping to keep the room clean and free from rodents and vermin (a drain for flushing is desirable); and

d. securing the storeroom under lock and key to prevent pilferage—the FSA is responsible for key distribution.

## 8. Refrigerators

Butter, milk, eggs and cream shall be separated from foods having strong odors. Eggs shall not be subjected to freezing temperatures.

Refrigeration units shall be kept under lock and key when not in use. Walk-in boxes shall be equipped with safety locks that require no more than 15 pounds of pressure to open easily from the inside. If latches and locks are incorporated in the door's design and operation, the interior release mechanism must open the door with the same amount of pressure even when locks or bars are in place.

Whether new or used, the inside lever of a hasp-type lock must be able to disengage locking devices and provide egress. The FSA, along with the Safety Manager, shall review the walk-in freezer(s) and refrigerator(s) to ensure that they operate properly.

# Appendix 4.1.A: Authorization for Common Fare Participation

Name of detainee:

_____ A-number: _____

I hereby request authorization to participate in the Common Fare Program. I agree to comply with the program requirements. I understand that if I am observed consuming mainline foods or violating other program requirements, I may be removed from program participation and will not be eligible for immediate reinstatement. Repeated program violations may result in removal from the program for up to one year. I further understand that the same conditions for reinstatement may apply if I voluntarily withdraw from the program for any reason.

I understand that I must have a recorded religious preference in order to be eligible for the program and that I must provide a written reason for requesting to participate in the religious diet program.

Religious preference: _____

Specific reason for wanting to participate in the Common Fare Religious Diet Program:

Signature of detainee:

_____ A-number: _____

Date: _____

Signature of Chaplain:

_____

Date: _____

Record Copy—Detainee Detention File; Copy - Chaplaincy File; Copy—Detainee

# 4.2 Hunger Strikes

## I. Purpose and Scope

This detention standard protects detainees' health and well-being by monitoring, counseling and providing appropriate treatment to any detainee who is on a hunger strike.

Nothing in this detention standard is intended to limit or override the exercise of sound medical judgment by the clinical medical authority (CMA) responsible for a detainee's medical care. Each case must be evaluated on its own merits and specific circumstances, and treatment shall be given in accordance with accepted medical practice.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Any detainee who does not eat for 72 hours shall be referred to the medical department for evaluation and possible treatment by medical and mental health personnel. Prior to 72 hours, staff may refer a detainee for medical evaluation, and when clinically indicated, medical staff may refer the detainee to a hospital;

2. The ICE/ERO Field Office Director shall be immediately notified when a detainee is on a hunger strike, declared or otherwise;

3. The detainee's health shall be carefully monitored and documented, as shall the detainee's intake of foods and liquids. The clinical director, designated physician or treating medical staff shall conduct a full clinical and mental health assessment and evaluation, and recommend a course of treatment, intervention or follow-up;

4. When medically advisable, a detainee on a hunger strike shall be isolated for close supervision, observation and monitoring;

5. Medical, mental health or hospital staff shall offer counseling regarding medical risks and detainees shall be encouraged to end the hunger strike or accept medical treatment;

6. Refusal of medical treatment shall be documented in the detainee's medical file;

7. Involuntary medical treatment shall be administered only with medical, psychiatric and legal safeguards;

8. A record of interactions with the striking detainee, the provision of food, attempted and successfully administered medical treatment, and communications between the CMA, facility administrator and ICE/ERO regarding the striking detainee shall be established; and

9. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone

handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language into which written material has not been translated, or who is illiterate.

## III. Standards Affected

This detention standard replaces "Hunger Strikes" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-2A-52, 4D-15.

National Commission on Correctional Health Care, *Standards for Health Services in Jails (2014).*

ICE/ERO *Performance-based National Detention Standards 2011:* "4.3 Medical Care."

## V. Expected Practices

### A. Staff Training

All staff shall be trained initially and annually thereafter to recognize the signs of a hunger strike, and to implement the procedures for referral for medical assessment and for management of a detainee on a hunger strike.

### B. Initial Referral

Procedures for identifying and referring a detainee suspected or announced to be on a hunger strike to medical staff shall include obtaining from qualified medical personnel an assessment of whether the detainee's action is reasoned and deliberate, or the manifestation of a mental illness.

Facilities shall immediately notify the local Field Office Director or his/her designee when an ICE/ERO detainee begins a hunger strike.

1. Staff shall consider any detainee observed to have not eaten for 72 hours to be on a hunger strike, and shall refer him/her to the CMA for evaluation and management.

2. Medical personnel shall document the reasons for placing a detainee in a single occupancy observation room. This decision shall be reviewed every 72 hours. Medical personnel shall monitor the detainee in a single-occupancy observation room, when medically advisable and taking into consideration the detainee's mental health needs. If measuring food and liquid intake/output becomes necessary, medical personnel shall make a decision about appropriate housing placement.

### C. Initial Medical Evaluation and Management

Medical staff shall monitor the health of a detainee on a hunger strike. If a detainee engaging in a hunger strike has been previously diagnosed with a mental condition, or is incapable of giving informed consent due to age or illness, appropriate medical/administrative action shall be taken in the best interest of the detainee.

1. During the initial evaluation of a detainee on a hunger strike, medical staff shall:

   a. measure and record height and weight;

   b. measure and record vital signs;

   c. perform urinalysis;

   d. conduct psychological/psychiatric evaluation;

e. examine general physical condition; and

f. if clinically indicated, proceed with other necessary studies.

2. Medical staff shall measure and record weight and vital signs at least once every 24 hours during the hunger strike and repeat other procedures as medically indicated.

3. Qualified medical personnel may modify or augment standard treatment protocols when medically indicated.

4. Medical staff shall record all examination results in the detainee's medical file.

5. If the detainee refuses the initial medical evaluation or any treatment or other medical procedures, medical staff must attempt to secure the detainee's signature on a "Refusal of Treatment" form. If the detainee will not cooperate by signing, staff shall note this on the "Refusal of Treatment" form.

6. Any detainee refusing medical treatment shall be monitored by medical staff to evaluate whether the hunger strike poses a risk to the detainee's life or permanent health. See "Section V," "E, Refusal to Accept Treatment" below in this standard.

7. If medically necessary, the detainee may be transferred to a community hospital or a detention facility appropriately equipped for treatment.

8. After the hunger strike, medical staff shall continue to provide appropriate medical and mental health follow-up. Only a physician may order a detainee's release from hunger strike treatment and shall document that order in the detainee's medical record. A notation shall be made in the detention file when the detainee has ended the hunger strike.

9. Records shall be kept of all interactions with the striking detainee, the provision of food, attempted and successfully administered medical

treatment, and communications between the CMA, facility administrator, and ICE/ERO regarding the striking detainee.

## D. Food and Liquid Intake and Output

After consultation with the CMA, the facility administrator may require staff to measure and record food and water intake and output as follows:

1. Record intake and output in the medical record using an IHSC "Hunger Strike Form" or equivalent;

2. Deliver three meals per day to the detainee's room unless otherwise directed by the CMA—staff shall physically deliver each meal regardless of the detainee's response to an offered meal;

3. Provide an adequate supply of drinking water or other beverages; and

4. Remove from the detainee's room all food items not authorized by the CMA. During the hunger strike, the detainee may not purchase commissary/vending machine food.

## E. Refusal to Accept Treatment

An individual has a right to refuse medical treatment. Before involuntary medical treatment is administered, staff shall make reasonable efforts to educate and encourage the detainee to accept treatment voluntarily. Involuntary medical treatment shall be administered in accordance with established guidelines and applicable laws and only after the CMA determines the detainee's life or health is at risk.

1. Medical staff shall explain to the detainee the medical risks associated with refusal of treatment, and shall document treatment efforts in the detainee's medical record.

2. The physician may recommend involuntary treatment when clinical assessment and laboratory results indicate the detainee's weakening condition threatens the life or long-term health of

the detainee.

a. The facility administrator shall notify ICE/ERO if a detainee is refusing treatment, and the health services administrator shall notify the respective ICE/ERO Field Office Director in writing of any proposed plan to involuntarily feed the detainee if the hunger strike continues.  Under no circumstances may a facility administer involuntary medical treatment without authorization from ICE/ERO.

b. The Field Office Director, in consultation with the CMA, shall then contact the respective ICE Office of Chief Counsel and the U.S. Attorney's Office with jurisdiction. After discussing the case, the attorneys shall recommend whether or not to pursue a court order. ICE policy is to seek a court order to obtain authorization for involuntary medical treatment. If a court determines that it does not have jurisdiction to issue such an order, or a hospital refuses to administer involuntary sustenance pursuant to a court order, ICE/ERO may consider other action if the hunger strike continues.

1) If a court order is to be pursued, ICE/ERO shall work with the local ICE Office of Chief Counsel to work with the U.S. Attorney's Office to make the arrangements for a court hearing.

3. Medical staff shall:

a. document all treatment efforts and each treatment refusal in the detainee's medical record;

b. continue clinical and laboratory monitoring as necessary until the detainee's life or health is out of danger; and

c. continue medical and mental health follow-up as necessary.

## F. Release from Treatment

Only the physician may order the termination of hunger strike treatment; the order shall be documented in the detainee's medical record.

# 4.3 Medical Care

## I. Purpose and Scope

This detention standard ensures that detainees have access to appropriate and necessary medical, dental and mental health care, including emergency services.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

For all types of facilities, procedures that appear in italics with a marked (**) on the page indicate optimum levels of compliance for this standard.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Detainees shall have access to a continuum of health care services, including screening, prevention, health education, diagnosis and treatment.

   *\*\*Medical facilities within the detention facility shall achieve and maintain current accreditation with the National Commission on Correctional Health Care (NCCHC), and shall maintain compliance with those standards.*

2. The facility shall have a mental health staffing component on call to respond to the needs of the detainee population 24 hours a day, seven days a week.

3. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

   All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

   Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

   Newly-admitted detainees shall be informed orally or in a manner in which the detainee understands about how to access, appeal or communicate concerns about health services.

4. Detainees shall be able to request health services on a daily basis and shall receive timely follow-up.

5. Detainees shall receive continuity of care from

time of admission to time of transfer, release or removal. Detainees, who have received medical care, released from custody or removed shall receive a discharge plan, a summary of medical records, any medically necessary medication and referrals to community-based providers as medically-appropriate.

6. A detainee who is determined to require health care beyond facility resources shall be transferred in a timely manner to an appropriate facility. A written list of referral sources, including emergency and routine care, shall be maintained and updated annually.

7. A transportation system shall provide timely access to health care services that are not available at the facility. Procedures for use of this transportation system shall include: a) prioritization of medical needs; b) urgency (such as the use of an ambulance instead of standard transportation); c) transfer of medical information and medications; and d) safety and security concerns of all persons.

8. A detainee who requires close, chronic or convalescent medical supervision shall be treated in accordance with a written treatment plan conforming to accepted medical practices for the condition in question, approved by a licensed physician, dentist or mental health practitioner.

9. Twenty-four hour emergency medical and mental health services shall be available to all detainees.

10. Centers for Disease Control and Prevention (CDC) guidelines for the prevention and control of infectious and communicable diseases shall be followed.

11. Occupational Safety and Health Administration (OSHA) and applicable state guidelines for managing bio-hazardous waste and decontaminating medical and dental equipment shall be followed.

12. Detainees with chronic conditions shall receive

care and treatment, as needed, that includes monitoring of medications, diagnostic testing and chronic care clinics.

13. The facility administrator shall notify ICE/ERO, in writing, of any detainee whose medical or mental health needs require special consideration in such matters as housing, transfer or transportation.

14. Each detainee shall receive a comprehensive medical, dental and mental health intake screening as soon as possible, but no later than 12 hours after arrival at each detention facility. Detainees who appear upon arrival to raise urgent medical or mental health concerns shall receive priority in the intake screening process.

15. Each detainee shall receive a comprehensive health assessment, including a physical examination and mental health screening, by a qualified, licensed health care professional no later than 14 days after entering into ICE custody or arrival at facility. For the purposes of the comprehensive medical examination, a qualified licensed health provider includes the following: physicians, physician assistants, nurses, nurse practitioners, or others who by virtue of their education, credentials and experience are permitted by law to evaluate and care for patients.

16. Qualified, licensed health care professionals shall classify each detainee on the basis of medical and mental health needs. Detainees shall be referred for evaluation, diagnosis, treatment and stabilization as medically indicated.

17. At no time shall a pregnant detainee be restrained, absent truly extraordinary circumstances that render restraints absolutely necessary.

18. Detainees experiencing severe, life-threatening intoxication or withdrawal symptoms shall be transferred immediately for either on-site or off-site emergency department evaluation.

19. Pharmaceuticals and non-prescription medicines shall be secured, stored and inventoried.

20. Prescriptions and medications shall be ordered, dispensed and administered in a timely manner and as prescribed by a licensed health care professional. This shall be conducted in a manner that seeks to preserve the privacy and personal health information of detainees.

21. Health care services shall be provided by a sufficient number of appropriately trained and qualified personnel, whose duties are governed by thorough and detailed job descriptions and who are licensed, certified, credentialed and/or registered in compliance with applicable state and federal requirements.

22. Detention and health care personnel shall be trained initially and annually in the proper use of emergency medical equipment and shall respond to health-related emergency situations.

23. Information about each detainee's health status shall be treated as confidential, and health records shall be maintained in accordance with accepted standards separately from other detainee detention files and be accessible only in accordance with written procedures and applicable laws. Health record files on each detainee shall be well organized, available to all practitioners and properly maintained and safeguarded.

24. Informed consent standards shall be observed and adequately documented. Staff shall make reasonable efforts to ensure that detainees understand their medical condition and care.

25. Medical and mental health interviews, screenings, appraisals, examinations, procedures and administration of medication shall be conducted in settings that respect detainees' privacy in accordance with safe and/orderly operations of the facility.

26. A detainee's request to see a health care provider

of the same gender should be considered; when not feasible, a same-gender chaperone shall be provided. When care is provided by a health care provider of the opposite gender, a detainee shall be provided a same-gender chaperone upon the detainee's request.

27. Detainees in Special Management Units (SMUs) shall have access to the same or equivalent health care services as detainees in the general population, as specified in standard "2.12 Special Management Units."

28. **Adequate space and staffing for the use of services of the ICE Tele-Health Systems, inclusive of tele-radiology (ITSP) and tele-medicine, shall be provided.*

29. All detainees shall receive medical and mental health screenings, interventions and treatments for gender-based abuse and/or violence, including sexual assault and domestic violence.

30. This standard and the implementation of this standard will be subject to internal review and a quality assurance system in order to ensure the standard of care in all facilities is high.

## III. Standards Affected

This detention standard replaces "Medical Care" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-2A-15, 4C-01 through 4C-31, 4C-34 through 4C-41, 4D-01 through 4D-21, 4D-23 through 4D-28, 2A-45, 7D-25.

American College of Obstetricians and Gynecologists, *Guidelines for Women's Health Care* (3rd edition. 2007); "Special Issues in Women's Health" (2005).

American Public Health Association *Standards for*

*Health Services in Correctional Institutions*, *Health Services for Women*.

Centers for Disease Control and Prevention website, www.cdc.gov (for the most current guidelines and recommendations on tuberculosis case management and control, HIV management, health care acquired infections, infection control, influenza management, respiratory protection, infectious diseases of public health significance, emerging infectious diseases, and correctional health)

United States Department of Health and Human Services, HIV Clinical Guidelines Portal, http://aidsinfo.nih.gov/Guidelines/default.aspx (for the most current national guidelines on HIV Management)

Infectious Diseases Society of America, http://www.idsociety.org/Content.aspx?id=9088 (for the most current infectious diseases practice guidelines prepared or endorsed by the Infectious Diseases Society of America)

National Commission on Correctional Health Care, *Standards for Health Services in Jails* (2014).

Exec. Order 13166.

ICE/ERO *Performance-based National Detention Standards 2011*:

- "1.2 Environmental Health and Safety," particularly in regard to storing, inventorying and handling needles and other sharp instruments; standard precautions to prevent contact with blood and other body fluids; sanitation and cleaning to prevent and control infectious diseases; and disposing of hazardous and infectious waste;

- "2.11 Sexual Abuse and Assault Prevention and Intervention";

- "4.2 Hunger Strikes";

- "4.6 Significant Self-harm and Suicide Prevention and Intervention"; and

- "4.7 Terminal Illness, Advance Directives and Death."

ICE Health Service Corps (IHSC) *Policies and Procedures Manual*.

The Joint Commission.

www.flu.gov

www.aids.gov

"*Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities,*" 79 Fed. Reg. 13100 (Mar. 7, 2014).

# V. Expected Practices

## A. General

Every facility shall directly or contractually provide its detainee population with the following:

1. Initial medical, mental health and dental screening;

2. Medically necessary and appropriate medical, dental and mental health care and pharmaceutical services;

3. Comprehensive, routine and preventive health care, as medically indicated;

4. Emergency care;

5. Specialty health care;

6. Timely responses to medical complaints; and

7. Hospitalization as needed within the local community.

8. Staff or professional language services necessary for detainees with limited English proficiency (LEP) during any medical or mental health appointment, sick call, treatment, or consultation.

**Medical facilities within the detention facility shall achieve and maintain current accreditation with the National Commission on Correctional Health Care (NCCHC), and shall maintain compliance with those standards.*

## B. Designation of Authority

A designated health services administrator (HSA) or the equivalent in non-IHSC staffed detention facilities shall have overall responsibility for health care services pursuant to a written agreement, contract or job description. The HSA is a physician or health care professional and shall be identified to detainees.

The designated clinical medical authority (CMA) at the facility shall have overall responsibility for medical clinical care pursuant to a written agreement, contract or job description. The CMA shall be a medical doctor (MD) or doctor of osteopathy (DO). The CMA may designate a clinically trained professional to have medical decision making authority in the event that the CMA is unavailable.

When the HSA is other than a physician, final clinical judgment shall rest with the facility's designated CMA. In no event shall clinical decisions be made by non-clinicians.

The HSA shall be authorized and responsible for making decisions about the deployment of health resources and the day-to-day operations of the health services program. The CMA together with the HSA establishes the processes and procedures necessary to meet the medical standards outlined herein.

All facilities shall provide medical staff and sufficient support personnel to meet these standards. A staffing plan will be reviewed at least annually  which identifies the positions needed to perform the required services.

Health care personnel perform duties within their scope of practice for which they are credentialed by training, licensure, certification, job descriptions, and/or written standing or direct orders by personnel authorized by law to give such orders.

The facility administrator, in collaboration with the CMA and HSA, negotiates and maintains arrangements with nearby medical facilities or health care providers to provide required health care not available within the facility, as well as identifying custodial officers to transport and remain with detainees for the duration of any off-site treatment or hospital admission.

## C. Communicable Disease and Infection Control

### 1. General

Each facility shall have written plans that address the management of infectious and communicable diseases, including screening, prevention, education, identification, monitoring and surveillance, immunization (when applicable), treatment, follow-up, isolation (when indicated) and reporting to local, state and federal agencies.

Plans shall include:

a.  coordination with local public health authorities;

b.  ongoing education for staff and detainees;

c.  control, treatment and prevention strategies;

d.  protection of detainee confidentiality;

e.  media relations, in coordination with the local Public Affairs Officer (PAO);

f.  procedures for the identification, surveillance, immunization, follow-up and isolation of patients;

g.  hand hygiene

h.  management of infectious diseases and reporting them to local and/or state health departments in accordance with established guidelines and applicable laws; and

i.  management of bio-hazardous waste and decontamination of medical and dental equipment that complies with applicable laws and standard "1.2 Environmental Health and Safety."

Facilities shall comply with current and future plans implemented by federal, state or local authorities addressing specific public health issues including

communicable disease reporting requirements. Infectious and communicable disease control activities shall be reviewed and discussed in the quarterly administrative meetings as described in Section V.DD of this detention standard. Designated medical staff shall report to the IHSC Public Health, Safety, and Preparedness Unit all detainees diagnosed with a communicable disease of public health significance.

## 2. Tuberculosis (TB) Management

As indicated in this standard below in section "J. Medical and Mental Health Screening of New Arrivals," screening for TB is initiated at intake and in accordance with Center for Disease Control and Prevention (CDC) guidelines.

All new arrivals shall receive TB screening within 12 hours of intake and in accordance with CDC guidelines (www.cdc.gov/tb). For detainees that have been in continuous law enforcement custody, symptom screening plus documented TB screening within one year of arrival may be accepted for intake screening purposes.

Annual or periodic TB testing shall be implemented in accordance with CDC guidelines; annual TB screening method should be appropriately selected with consideration given to the initial screening method conducted or documented during intake.

Detainees with symptoms suggestive of TB, or with suspected or confirmed active TB disease based on clinical and/or laboratory findings, shall be placed in a functional airborne infection isolation room with negative pressure ventilation and be promptly evaluated for TB disease. Patients with suspected active TB shall remain in airborne infection isolation until determined by a qualified provider to be noncontagious in accordance with CDC guidelines.

For all patients with confirmed and suspected active tuberculosis, designated medical staff shall:

a. Report all cases to local and/or state health departments within one working day of meeting reporting criteria and in accordance with established guidelines and applicable laws, identified by the custodial agency and the detainee's identifying number of that agency (ICE detainees are reported as being in ICE custody and are identified by their alien numbers).

b. Report all detainees with suspected or confirmed TB to the ICE Health Service Corps (IHSC), Public Health, Safety, and Preparedness Unit within one working day of initial identification with suspected or confirmed TB disease.

Reporting shall include names, aliases, date of birth, alien number, case status/classification, available diagnostic and lab results, treatment status (including drugs and dosages), treatment start date, a summary case report, and a point of contact and telephone number for follow-up.

c. Promptly report any movement of TB patients, including hospitalizations, facility transfers, releases, or removals/deportations to the local and/or state health department and the IHSC Public Health, Safety, and Preparedness Unit.

When treatment is indicated, multi-drug, anti-TB therapy shall be administered using directly observed therapy (DOT) in accordance with American Thoracic Society (ATS) and CDC guidelines. For patients with drug-resistant or multi-drug-resistant TB, the state or local health department shall be consulted to establish a customized treatment regimen and treatment plan. Patients receiving anti-TB therapy shall be provided with a 15 day supply of medications and appropriate education when transferred, released or deported, in an effort to prevent interruptions in treatment until care is continued in another location.

Treatment for latent TB infection (LTBI) shall not be initiated unless active TB disease is ruled out.

Designated medical staff shall coordinate with the IHSC Epidemiology Unit and the local and/or state health department to facilitate an international referral and continuity of therapy. Designated

medical staff shall collaborate with the local and/or state health department on tuberculosis and other communicable diseases of public health significance.

### 3. Significant Communicable Disease

Designated medical staff shall notify the IHSC Public Health, Safety, and Preparedness Unit of any ICE detainee with a significant communicable disease and of any contact or outbreak investigations involving ICE detainees exposed to a significant communicable disease without known immunity. Significant communicable diseases include, but are not limited to, varicella (chicken pox), measles, mumps, pertussis (whooping cough), and typhoid.

### 4. Bloodborne Pathogens

Infection control awareness shall be communicated on a regular basis to correctional and medical staff, as well as detainees. Detainees exposed to potentially infectious body fluids (e.g., through needle sticks or bites) shall be afforded immediate medical assistance, and the incident shall be reported as soon as possible to the clinical director or designee and documented in the medical file.  All detainees shall be assumed to be infectious for bloodborne pathogens, and standard precautions are to be used at all times when caring for all detainees.

Each facility shall establish a written plan to address exposure to bloodborne pathogens; the management of hepatitis A, B, and C; and the management of HIV infection, including reporting.

a.  Hepatitis

A detainee may request hepatitis testing at any time during detention

b.  HIV
A detainee may request HIV testing at any time during detention. Persons who must feed, escort, directly supervise, interview or conduct routine office work with HIV patients are not considered at risk of infection. However, persons regularly exposed to blood are at risk. Facilities shall develop a written plan to ensure the highest

degree of confidentiality regarding HIV status and medical condition. Staff training must emphasize the need for confidentiality, and procedures must be in place to limit access to health records to only authorized individuals and only when necessary.

The accurate diagnosis and medical management of HIV infection among detainees shall be promoted. An HIV diagnosis may be made only by a licensed health care provider, based on a medical history, current clinical evaluation of signs and symptoms and laboratory studies.

c.  Clinical Evaluation and Management
Medical personnel shall provide all detainees diagnosed with HIV/AIDS medical care consistent with national recommendations and guidelines disseminated through the U.S. Department of Health and Human Services, the CDC, and the Infectious Diseases Society of America.  Medical and pharmacy personnel shall ensure that all Food and Drug Administration (FDA) medications currently approved for the treatment of HIV/AIDS are accessible. Medical and pharmacy personnel shall develop and implement distribution procedures to ensure timely and confidential access to medications.

Many of these guidelines are available through the following links:
http://aidsinfo.nih.gov/Guidelines/default.aspx
http://www.cdc.gov/hiv/resources/guidelines/index.htm#treatment
http://www.idsociety.org/Content.aspx?id=9088

Medical and pharmacy personnel shall ensure the facility maintains access to adequate supplies of FDA-approved medications for the treatment of HIV/AIDS to ensure newly admitted detainees shall be able to continue with their treatments without interruption. Upon release, detainees currently receiving highly active antiretroviral therapy and other drugs shall receive up to a 30-

day supply of their medications as medically appropriate.

When current symptoms are suggestive of HIV infection, the following procedures shall be implemented.

1) Clinical evaluation shall determine the medical need for isolation.

   Detainees with HIV shall not be separated from the general population, either pending a test result or after a test report, unless clinical evaluation reveals a medical need for isolation. Segregation of HIV-positive detainees is not necessary for public health purposes.

2) Following a clinical evaluation, if a detainee manifests symptoms requiring treatment beyond the facility's capability, the provider shall recommend the detainee's transfer to a local hospital or other appropriate facility for further medical testing, final diagnosis and acute treatment as needed, consistent with local operating procedures.

3) Any detainee with active tuberculosis shall also be evaluated for possible HIV infection.

4) New HIV-positive diagnoses must be reported to government bodies according to state and local laws and requirements; the HSA is responsible for ensuring that all applicable state requirements are met.

   The "Standard Precautions" section of standard "1.2 Environmental Health and Safety" provides more detailed information.

## D. Notifying Detainees about Health Care Services

In accordance with standard "6.1 Detainee Handbook," the facility shall provide each detainee, upon admittance, a copy of the detainee handbook and local supplement, in which procedures for access to health care services are explained.

Health care practitioners should explain any rules about mandatory reporting and other limits to confidentiality in their interactions with detainees. Informed consent shall be obtained prior to providing treatment (absent medical emergencies). Consent forms and refusals shall be documented and placed in the detainee's medical file.

In accordance with the section on Orientation in standard "2.1 Admission and Release," access to health care services, the sick call and medical grievance processes shall be included in the orientation curriculum for newly admitted detainees.

## E. Translation and Language Access for Detainees with Limited English Proficiency

Facilities shall provide appropriate interpretation and language services for LEP detainees related to medical and mental health care. Where appropriate staff interpretation is not available, facilities will make use of professional interpretation services. Detainees shall not be used for interpretation services during any medical or mental health service. Interpretation and translation services by other detainees shall only be provided in an emergency medical situation.

Facilities shall post signs in medical intake areas in English, Spanish, and languages spoken by other significant segments of the facility's detainee population listing what language assistance is available during any medical or mental health treatment, diagnostic test, or evaluation.

## F. Facilities

### 1. Examination and Treatment Area

Adequate space and equipment shall be furnished in all facilities so that all detainees may be provided basic health examinations and treatment in private while ensuring safety.

A holding/waiting area shall be located in the medical facility under the direct supervision of custodial officers. A detainee toilet and drinking

fountain shall be accessible from the holding/waiting area.

## 2. Medical Records

Medical records shall be kept separate from detainee detention records and stored in a securely locked area within the medical unit.

## 3. Medical Housing

If there is a specific area, separate from other housing areas, where detainees are admitted for health observation and care under the supervision and direction of health care personnel, consideration shall be given to the detainee's age, gender, medical requirements and custody classification and the following minimum standards shall be met:

a.  Care

   1) Physician at the facility or on call 24 hours per day;

   2) Qualified health care personnel on duty 24 hours per day when patients are present;

   3) Staff members within sight or sound of all patients;

   4) Maintenance of a separate medical housing record distinct from the complete medical record; and

   5) Compliance with all established guidelines and applicable laws.

      Detainees in medical housing shall have access to other services such as telephone, legal access and materials, consistent with their medical conditions.

      Prior to placing a detainee with a mental illness  in medical housing, a determination shall be made by a medical or mental health professional that placement in medical housing is medically necessary.

b.  Wash Basins, Bathing Facilities and Toilets

   1) Detainees shall have access to operable washbasins with hot and cold running water at a minimum ratio of 1 for every 12 detainees, unless state or local building codes specify a different ratio.

   2) Sufficient bathing facilities shall be provided to allow detainees to bathe daily, and sufficient bathing facilities shall be physically accessible for detainees with  disabilities, as required by the applicable accessibility standard. Water shall be thermostatically controlled to temperatures ranging from 100 F to 120 F degrees.

   3) Detainees shall have access to operable toilets and hand-washing facilities 24 hours per day and shall be permitted to use toilet facilities without staff assistance. Unless state or local building or health codes specify otherwise:

      a)  toilets shall be provided at a minimum ratio of 1 to every 12 detainees in male facilities and 1 for every 8 in female facilities, and

      b) all housing units with three or more detainees shall have a minimum of two toilets.

## G. Pharmaceutical Management

Each detention facility shall have and comply with written policy and procedures for the management of pharmaceuticals, to include:

1.  a formulary of all prescription and nonprescription medicines stocked or routinely procured from outside sources;

2.  identification of a method for promptly approving and obtaining medicines not on the formulary;

3.  prescription practices, including requirements that medications are prescribed only when clinically indicated, and that prescriptions are reviewed before being renewed;

4.  procurement, receipt, distribution, storage, dispensing, administration and disposal of

medications;

5. secure storage and disposal and perpetual inventory of all controlled substances (DEA Schedule II-V), syringes, and needles;

6. medicine administration error reports to be kept for all administration errors;

7. all staff responsible for administering or having access to pharmaceuticals to be trained on medication management before beginning duty;

8. all pharmaceuticals to be stored in a secure area with the following features:

    a. a secure perimeter;

    b. access limited to authorized medical staff (never detainees);

    c. solid walls from floor to ceiling and a solid ceiling;

    d. a solid core entrance door with a high security lock (with no other access); and

    e. a secure medication storage area;

9. administration and management in accordance with state and federal law;

10. supervision by properly licensed personnel;

11. administration of medications by properly licensed, credentialed, trained personnel under the supervision of the health services administrator (HSA), clinical medical authority (CMA), both; and

12. documentation of accountability for administering or distributing medications in a timely manner, and according to licensed provider orders.

## H. Nonprescription Medications

The facility administrator and HSA shall jointly approve any nonprescription medications that are available to detainees outside of health services (e.g., sold in commissary, distributed by housing officers, etc.), and shall jointly review the list, on an annual basis at a minimum.

## I. Medical Personnel

All health care staff must be verifiably licensed, certified, credentialed, and/or registered in compliance with applicable state and federal requirements. Copies of the documents must be maintained on site and readily available for review. A restricted license does not meet this requirement.

## J. Medical and Mental Health Screening of New Arrivals

As soon as possible, but no later than 12 hours after arrival, all detainees shall receive, by a health care provider or a specially trained detention officer, an initial medical, dental and mental health screening and be asked for information regarding any known acute or emergent medical conditions. Any detainee responding in the affirmative shall be sent for evaluation to a qualified, licensed health care provider as quickly as possible, but in no later than two working days. Detainees who appear upon arrival to raise urgent medical or mental health concerns shall receive priority in the intake screening process. For intrasystem transfers, a qualified health care professional will review each incoming detainee's health record or health summary within 12 hours of arrival, to ensure continuity of care.

For LEP individuals, interpretation for the screening will be conducted by facility staff with appropriate language capabilities or through professional interpretation services, as described in Section E of this standard ("Translation and Language Access for Detainees with Limited English Proficiency").

If screening is performed by a detention officer, the facility shall maintain documentation of the officer's special training, and the officer shall have available for reference the training syllabus, to include education on patient confidentiality of disclosed information.

The screening shall inquire into the following:

1. any past history of serious infectious or communicable illness, and any treatment or symptoms;

2. history of physical and mental illness;

3. pain assessment;

4. current and past medication;

5. allergies;

6. past surgical procedures;

7. symptoms of active TB or previous TB treatment;

8. dental care history;

9. use of alcohol, tobacco and other drugs, including an assessment for risk of potential withdrawal;

10. possibility of pregnancy;

11. other relevant health problems identified by the CMA responsible for screening inquiry;

12. observation of behavior, including state of consciousness, mental status, appearance, conduct, tremor, sweating;

13. history of suicide attempts or current suicidal/homicidal ideation or intent;

14. observation of body deformities and other physical abnormalities;

15. inquire into a transgender detainee's gender self-identification and history of transition-related care, when a detainee self-identifies as transgender;

16. past hospitalizations;

17. chronic illness (including, but not limited to, hypertension and diabetes);

18. dietary needs; and

19. any history of physical or sexual victimization or perpetrated sexual abuse, and when the incident occurred.

Where there is a clinically significant finding as a result of the initial screening, an immediate referral shall be initiated and the detainee shall receive a health assessment no later than two working days from the initial screening.

For further information and guidance, see standard "2.1 Admission and Release."

Initial screenings shall be conducted in settings that respect detainees' privacy and include observation and interview questions related to the detainee's potential suicide risk and mental health. For further information, see standard "4.6 Significant Self-harm and Suicide Prevention and Intervention."

If, at any time during the screening process, there is an indication of need of, or a request for, mental health services, the HSA must be notified within 24 hours. The CMA, HSA or other qualified licensed health care provider shall ensure a full mental health evaluation, if indicated. Mental health evaluations must be conducted within the timeframes prescribed in "O. Mental Health Program" of this standard.

All facilities shall have policies and procedures in place to ensure documentation of the initial health screening and assessment.

The health intake screening shall be conducted using the IHSC Intake Screening Form (IHSC 795A) or equivalent and shall be completed prior to the detainee's placement in a housing unit. The Intake Screening Form attached as Appendix 4.3.A mirrors form IHSC 795A and may be used by facilities to ensure compliance with screening requirements in these standards.

Upon completion of the In-Processing Health Screening form, the detention officer shall immediately notify medical staff when one or more positive responses are documented. Medical staff will then assess priority for treatment (e.g. urgent, today or routine).

Limited-English proficient detainees and detainees who are hearing impaired shall be provided

interpretation or translation services or other assistance as needed for medical care activities.

Language assistance may be provided by another medical staff member competent in the language or by a professional service, such as a telephone interpretation service.

## K. Substance Dependence and Detoxification

All detainees shall be evaluated through an initial screening for use of and/or dependence on mood- and mind-altering substances, alcohol, opiates, hypnotics, sedatives, etc. Detainees who report the use of such substances shall be evaluated for their degree of reliance on and potential for withdrawal from the substance.

The CMA shall establish guidelines for evaluation and treatment of new arrivals who require detoxification.

Detainees experiencing severe or life-threatening intoxication or withdrawal shall be transferred immediately to an emergency department for evaluation.

Once evaluated, the detainee will be referred to an appropriate facility qualified to provide treatment and monitoring for withdrawal, or treated on-site if the facility is staffed with qualified personnel and equipment to provide appropriate care.

## L. Privacy and Chaperones

1.  Medical Privacy

Medical and mental health interviews, screenings, appraisals, examinations, procedures, and administration of medication shall be conducted in settings that respect detainees' privacy.

2.  Same-Gender Providers and Chaperones

A detainee's request to see a health care provider of the same gender should be considered; when not feasible, a same-gender chaperone shall be provided.

When care is provided by a health care provider of the opposite gender, a detainee shall be provided a same-gender chaperone upon the detainee's request.

A same-gender chaperone shall be provided, even in the absence of a request by the detainee, when a medical encounter involves a physical examination of sensitive body parts, to include breast, genital, or rectal examinations, by a provider of the opposite gender.

Only medical personnel may serve as chaperones during medical encounters and examinations.

## M. Comprehensive Health Assessment

Each facility's health care provider shall conduct a comprehensive health assessment, including a physical examination and mental health screening, on each detainee within 14 days of the detainee's arrival unless more immediate attention is required due to an acute or identifiable chronic condition. Physical examinations shall be performed by a physician, physician assistant, nurse practitioner, RN (with documented training provided by a physician) or other health care practitioner as permitted by law.

Facility medical personnel are encouraged to use the form "Physical Examination/Health Appraisal" attached as Appendix 4.3.B when conducting the comprehensive health assessment.

If documentation exists of such a health assessment within the previous 90 days, the facility health care provider upon review may determine that a new appraisal is not required.

The CMA shall be responsible for review of all comprehensive health assessments to assess the priority for treatment.

Detainees diagnosed with a communicable disease shall be isolated according to national standards of medical practice and procedures.

## N. Medical/Psychiatric Alerts and Holds

Where a detainee has a serious medical or mental

health condition or otherwise requires special or close medical care, medical staff shall complete a Medical/Psychiatric Alert form (IHSC-834) or equivalent, and file the form in the detainee's medical record.  Where medical staff furthermore determine the condition to be serious enough to require medical clearance of the detainee prior to transfer or removal, medical staff shall also place a medical hold on the detainee using the Medical/Psychiatric Alert form (IHSC-834) or equivalent, which serves to prevent ICE from transferring or removing the detainee without the prior clearance of medical staff at the facility.  The facility administrator shall receive notice of all medical/psychiatric alerts or holds, and shall be responsible for notifying ICE/ERO of any medical alerts or holds placed on a detainee that is to be transferred.

Potential health conditions meriting the completion of a Medical/Psychiatric Alert form may include, but are not limited to:

1. medical conditions requiring ongoing therapy, such as:

    a. active TB

    b. infectious diseases

    c. chronic conditions

2. mental health conditions requiring ongoing therapy, such as:

    a. suicidal behavior or tendencies

3. ongoing physical therapy

4. pregnancy

## O. Mental Health Program

### 1. Mental Health Services Required

Each facility shall have an in-house or contractual mental health program, approved by the appropriate medical authority that provides:

a. intake screening Form IHSC 795A (or equivalent)

for mental health concerns;

b. referral as needed for evaluation, diagnosis, treatment and monitoring of mental illness by a competent mental health professional.

c. crisis intervention and management of acute mental health episodes;

d. transfer to licensed mental health facilities of detainees whose mental health needs exceed the capabilities of the facility; and

e. a suicide prevention program.

### 2. Mental Health Provider

The term "mental health provider" includes psychiatrists, physicians, psychologists, clinical social workers and other appropriately licensed independent mental health practitioners

### 3. Mental Health Evaluation

Based on intake screening, the comprehensive health assessment, medical documentation, or subsequent observations by detention staff or medical personnel, any detainee referred for mental health treatment shall receive an evaluation by a qualified health care provider no later than 72 hours after the referral, or sooner if necessary.  If the practitioner is not a mental health provider and further referral is necessary, the detainee will be evaluated by a mental health provider within the next business day.

Such evaluation and screenings shall include:

a. reason for referral;

b. history of any mental health treatment or evaluation;

c. history of illicit drug/alcohol use or abuse or treatment for such;

d. history of suicide attempts;

e. current suicidal/homicidal ideation or intent;

f. current use of any medication;

g. estimate of current intellectual function;

h.  mental health screening, to include prior history physical, sexual or emotional abuse;

i.  impact of any pertinent physical condition, such as head trauma;

j.  recommend actions for any appropriate treatment, including but not limited to the following:

   1) remain in general population with psychotropic medication and counseling,

   2) "short-stay" unit or infirmary,

   3) Special Management Unit, or

   4) community hospitalization; and

k.  recommending and/or implementing a treatment plan, including recommendations concerning transfer, housing, voluntary work and other program participation.

## 4. Referrals and Treatment

Any detainee referred for mental health treatment shall receive an evaluation by a qualified health care provider no later than 72 hours after the referral, or sooner if necessary.  If the practitioner is not a mental health provider and further referral is necessary, the detainee will be evaluated by a mental health provider within the next business day.

The provider shall develop an overall treatment/management plan.

If the detainee's mental illness or developmental or intellectual disability needs exceed the treatment capability of the facility, a referral for an outside mental health facility may be initiated.

Any detainee prescribed psychiatric medications must be regularly evaluated by a duly-licensed and appropriate medical professional, at least once a month, to ensure proper treatment and dosage;

## 5. Medical Isolation

The CMA may authorize medical isolation for a detainee who is at high risk for violent behavior because of a mental health condition. The CMA shall be responsible for the daily reassessment of the need for continued medical isolation to ensure the health and safety of the detainee.

Medical isolation shall not be used as a punitive measure.

## 6. Involuntary Administration of Psychotropic Medication

Involuntary administration of psychotropic medication to detainees shall comply with established guidelines and applicable laws, and shall be performed only pursuant to the specific, written and detailed authorization of a physician. Absent declared medical emergency, before psychotropic medication is involuntarily administered, it is required that the HSA contact ERO management, who shall then contact respective ICE Office of Chief Counsel to facilitate a request for a court order to involuntarily medicate the detainee.

Prior to involuntarily administering psychotropic medication, absent a declared medical emergency, the authorizing physician shall:

a.  review the medical record of the detainee and conduct a medical examination;

b.  specify the reasons for and duration of therapy, and whether the detainee has been asked if he/she would consent to such medication;

c.  specify the medication to be administered, the dosage and the possible side effects of the medication;

d.  document that less restrictive intervention options have been exercised without success;

e.  detail how medication is to be administered;

f.  monitor the detainee for adverse reactions and side effects; and

g.  prepare treatment plans for less restrictive alternatives as soon as possible.

Also see section "Z: Informed Consent and

Involuntary Treatment" later in this detention standard.

## P. Referrals for Sexual Abuse Victims or Abusers

If any security or medical intake screening or classification assessment indicates that a detainee has experienced prior sexual victimization or perpetrated sexual abuse, staff shall, as appropriate, ensure that the detainee is immediately referred to a qualified medical or mental health practitioner for medical and/or mental health follow-up as appropriate.

When a referral for medical follow-up is initiated, the detainee shall receive a health evaluation no later than two working days from the date of assessment. When a referral for mental health follow-up is initiated, the detainee shall receive a mental health evaluation no later than 72 hours after the referral.

For the purposes of this section, a "qualified medical practitioner" or "qualified mental health practitioner" means a health or mental health professional, respectively, who in addition to being qualified to evaluate and care for patients within the scope of his/her professional practice, has successfully completed specialized training for treating sexual abuse victims.

## Q. Annual Health Examinations

Any detainee in ICE custody for more than one year continuously shall receive health examinations on an annual basis. Such examinations may occur more frequently for certain individuals, depending on their medical history and/or health conditions. Detainees shall have access to age- and gender-appropriate exams annually, including re-screening for TB.

## R. Dental Treatment

An initial dental screening shall be performed within 14 days of the detainee's arrival. The initial dental screening may be performed by a dentist or a properly trained qualified health provider.

1. Emergency dental treatment shall be provided for immediate relief of pain, trauma and acute oral infection.

2. Routine dental treatment may be provided to detainees in ICE custody for whom dental treatment is inaccessible for prolonged periods because of detention for over six months, including amalgam and composite restorations, prophylaxis, root canals, extractions, x-rays, the repair and adjustment of prosthetic appliances and other procedures required to maintain the detainee's health. Dental exams and treatment shall be performed only by licensed dental personnel.

## S. Sick Call

Each facility shall have a sick call procedure that allows detainees the unrestricted opportunity to freely request health care services (including mental health and dental services) provided by a physician or other qualified medical staff in a clinical setting. This procedure shall include:

1. clearly written policies and procedures;

2. sick call process shall be communicated in writing and verbally to detainees during their orientation;

3. regularly scheduled "sick call" times shall be established and communicated to detainees;

4. an established procedure shall be in place at all facilities to ensure that all sick call requests are received and triaged by appropriate medical personnel within 24 hours after a detainee submits the request. All written sick call requests shall be date and time stamped and filed in the detainee's medical record. Medical personnel shall review the request slips and determine when the detainee shall be seen based on acuity of the problem. In an urgent situation, the housing unit officer shall notify medical personnel immediately.

If the procedure requires a written request slip, such

slips shall be provided in English and the most common languages spoken by the detainee population of that facility. Limited-English proficient detainees and detainees who are hearing impaired shall be provided interpretation/translation services or other assistance as needed to complete a request slip.

All detainees, including those in SMUs, regardless of classification, shall have access to sick call. See standard "2.12 Special Management Units" for details.

All facilities shall maintain a permanent record of all sick call requests.

## T. Emergency Medical Services and First Aid

1. Each facility shall have a written emergency services plan for delivery of 24-hour emergency health care. This plan shall be prepared in consultation with the facility's CMA or the HSA, and must include the following:

   a. an on-call physician, dentist and mental health professional, or designee, that are available 24 hours per day;

   b. a list of telephone numbers for local ambulances and hospital services available to all staff;

   c. an automatic external defibrillator (AED) shall be maintained for use at each facility and accessible to staff;

   d. all detention and medical staff shall receive cardio pulmonary resuscitation (CPR, AED), and emergency first aid training annually;

   e. detention and health care personnel shall be trained annually to respond to health-related situations within four minutes; and

   f. security procedures that ensure the immediate transfer of detainees for emergency medical care.

2. The health services administrator ensures that medical staff have training and competency in implementing the facility's emergency health care plan appropriate for each staff's scope of practice or position.  The facility administrator ensures that non-medical staff  have appropriate training and competency in implementing the facility's emergency plan appropriate for each staff's position.  Training and competency assessment shall include the following areas::

   a. recognizing of signs of potential health emergencies and the required responses;

   b. administering first aid, AED and cardiopulmonary resuscitation (CPR);

   c. obtaining emergency medical assistance through the facility plan and its required procedures;

   d. recognizing signs and symptoms of mental illness and suicide risk; and

   e. the facility's established plan and procedures for providing emergency medical care including, when required, the safe and secure transfer of detainees for appropriate hospital or other medical services, including by ambulance when indicated. The plan must provide for expedited entrance to and exit from the facility.

3. When a non-medical employee is unsure whether emergency care is required, he/she shall immediately notify medical personnel to make the determination.

4. Medical and safety equipment shall be available and maintained, and staff shall be trained in proper use of the equipment.

5. The facility administrator, in consultation with the designee for environmental health and safety, determines the number, contents, and placement of first aid kits, and establishes protocols for monthly inspections of first aid kits.

6. Victims of sexual abuse shall have timely access to emergency medical treatment and crisis intervention services in accordance with standard "2.11 Sexual Abuse and Assault, Prevention and Intervention."

## U. Delivery of Medication

Distribution of medication (including over the counter) shall be performed in accordance with specific instructions and procedures established by the HSA in consultation with the CMA. Written records of all prescribed medication given to or refused by detainees shall be maintained.

1. If prescribed medication must be delivered at a time when medical staff is not on duty, the medication may be distributed by detention officers, where it is permitted by state law to do so, who have received proper training by the HSA or designee.

2. The facility shall maintain documentation of the training given any officer required to distribute medication, and the officer shall have available for reference the training syllabus or other guide or protocol provided by the health authority.

3. Detainees may not deliver or administer medications to other detainees.

4. All prescribed medications and medically necessary treatments shall be provided to detainees on schedule and without interruption, absent exigent circumstances.

5. Detainees who arrive at a detention facility with prescribed medications or who report being on such medications, shall be evaluated by a qualified health care professional as soon as possible, but not later than 24 hours after arrival, and provisions shall be made to secure medically necessary medications.

6. Detainees shall not be charged for any medical services to include pharmaceuticals dispensed by medical personnel

## V. Health Education and Wellness Information

Qualified health care personnel shall provide detainees health education and wellness information on topics including, but not limited to, the following:

1. dangers of self-medication;

2. personal and hand hygiene and dental care;

3. prevention of communicable diseases;

4. smoking cessation;

5. self-care for chronic conditions; and

6. benefits of physical fitness.

## W. Special Needs and Close Medical Supervision

Consistent with Standard 4.8 "Disability Identification, Assessment, and Accommodation" and the IHSC Detainee Covered Services Package, detainees will be provided medical prosthetic devices or other impairment aids, such as eyeglasses, hearing aids, or wheelchairs.

When a detainee requires close medical supervision, including chronic and convalescent care, a written treatment plan, including access to health care and other care and supervision personnel, shall be developed and approved by the appropriate qualified licensed health care provider, in consultation with the patient, with periodic review. Likewise, staff responsible for such matters as housing and program assignments and disciplinary measures shall consult with the responsible qualified licensed health care provider or health services administrator.

Exercise areas shall be available to meet exercise and physical therapy requirements of individual detainee treatment plans.

Transgender detainees who were already receiving hormone therapy when taken into ICE custody shall have continued access. All transgender detainees shall

have access to mental health care, and other transgender-related health care and medication based on medical need. Treatment shall follow accepted guidelines regarding medically necessary transition-related care.

For special needs related to female detainees, see standard "4.4 Medical Care (Women).

## X. Notifications of Detainees with Serious Illnesses and Other Specified Conditions

The facility administrator and clinical medical authority shall ensure that the Field Office Director is notified as soon as practicable of any detainee housed at the facility who is determined to have a serious physical or mental illness or to be pregnant, or have medical complications related to advanced age, but no later than 72 hours after such determination.  The written notification shall become part of the detainee's health record file.

### 1. Serious Physical Illness

For purposes of this subsection only, the following non-exhaustive categories of medical conditions may be considered to constitute serious physical illness –

- any terminal illness;

- active cancer, including but not limited to aliens undergoing chemotherapy;

- Acquired Immuno- Deficiency Syndrome (AIDS) or diagnosed HIV-positive conditions requiring medication;

- multi-drug-resistant (MDR) or extensively drug-resistant (XDR) tuberculosis disease;

- any condition that requires dialysis;

- any condition that requires tube-feedings, mechanical ventilation, an implanted cardiac device, or an oxygen tank;

- any chronic deteriorating condition requiring multiple medications, to include progressive immune-suppressive conditions;

- any active condition that has caused repeated loss of consciousness;

- any condition that requires an imminent medical procedure or other medical intervention to prevent deterioration;

- any condition or infirmity that requires continuous or near-continuous medical care, such as those who are bedbound or incapable of caring for themselves; or any ongoing or recurrent conditions that have required a recent or prolonged hospitalization, typically for greater than 14 days, or a recent and prolonged stay in the medical clinic of a detention or correctional facility, typically for greater than 30 days;

- conditions requiring frequent care that is beyond the medical capabilities of detention facilities where the alien may be housed;

- any condition that would preclude the alien from being housed, typically for greater than 30 days, in a non-restrictive setting (such as a general population housing unit, as opposed to a special management unit or a medical clinic); or

- any other physical illness determined to be serious by facility medical personnel or by IHSC.

### 2. Serious Mental Illness

For the purposes of this section, the following non-exhaustive categories of conditions should be considered to constitute a serious mental illness:

(a) conditions that a qualified medical provider has determined to meet the criteria for a "serious mental disorder or condition" **pursuant to applicable ICE policies**, including:

- a mental disorder that is causing serious limitations in communication, memory, or general mental and/or intellectual functioning (e.g. communicating, conducting activities of daily life, social skills); or a severe medical condition(s) (e.g. traumatic brain injury or dementia) that is significantly impairing mental function; or

- one or more of the following active psychiatric symptoms and/or behavior:  severe disorganization, active hallucinations or delusions, mania, catatonia, severe depressive symptoms, suicidal ideation and/or behavior, marked anxiety of impulsivity.

- significant symptoms of one of the following:

    ▪ Psychosis or Psychotic Disorder;

    ▪ Bipolar Disorder;

    ▪ Schizophrenia or Schizoaffective Disorder;

    ▪ Major Depressive Disorder with Psychotic Features;

    ▪ Dementia and/or a Neurocognitive Disorder; or

    ▪ Intellectual Development Disorder (moderate, severe, or profound).

b) any ongoing or recurrent conditions that have required a recent or prolonged hospitalization, typically for greater than 14 days, or a recent and prolonged stay in the medical clinic of a detention or correctional facility, typically for greater than 30 days;

c) any condition that would preclude the alien from being housed, typically for greater than 30 days, in a non-restrictive setting (such as a general population housing unit, as opposed to a special management unit or a medical clinic);

d) any other mental illness determined to be serious by IHSC.

### 3. Pregnancy

The notification requirement in this section applies to all women who have been medically certified as pregnant, regardless of the stage of the pregnancy.

## Y. Restraints

Restraints for medical or mental health purposes may be authorized only by the facility's CMA or designee, after determining that less restrictive measures are not appropriate.  In the absence of the CMA, qualified medical personnel may apply restraints upon declaring a medical emergency. Within one-hour of initiation of emergency restraints or seclusion, qualified medical staff shall notify and obtain an order from the CMA or designee.

a. The facility shall have written procedures that specify:

1) the conditions under which restraints may be applied;

2) the types of restraints to be used;

3) the proper use, application and medical monitoring of restraints;

4) requirements for documentation, including efforts to use less restrictive alternatives; and

5) after-incident review.

The use of restraints requires documented approval and guidance from the CMA.  Record-keeping and reporting requirements regarding the medical approval to use restraints shall be consistent with other provisions within these standards, including documentation in the detainee's A-file, detention

and medical file.

## Z. Continuity of Care

The facility HSA must ensure that a plan is developed that provides for continuity of medical care in the event of a change in detention placement or status.

The detainee's medical needs shall be taken into account prior to any transfer of the detainee to another facility. Alternatives to transfer shall be considered, taking into account the disruption that a transfer will cause to a detainee receiving medical care. Upon transfer to another facility, the medical provider shall prepare and provide a Medical Transfer Summary as required by "C. Responsibilities of the Health Care Provider at the Sending Facility," found in Standard 7.4 "Detainee Transfers." In addition, the medical provider shall ensure that at least 7 day (or, in the case of TB medications, 15 day and in the case of HIV/AIDS medications, 30 day) supply of medication shall accompany the detainee as ordered by the prescribing authority.

Upon removal or release from ICE custody, the detainee shall receive up to a 30 day supply of medication as ordered by the prescribing authority and a detailed medical care summary as described in "BB. Medical Records" of this standard. If a detainee is on prescribed narcotics, the clinical health authority shall make a determination regarding continuation, based on assessment of the detainee. The HSA must ensure that a continuity of treatment care plan is developed and a written copy provided to the detainee prior to removal.

## AA. Informed Consent and Involuntary Treatment

Involuntary treatment is a decision made only by medical staff under strict legal restrictions. When a detainee refuses medical treatment, and the licensed healthcare provider determines that a medical emergency exists, the physician may authorize involuntary medical treatment. Prior to any contemplated action involving non-emergent

involuntary medical treatment, respective ICE Office of Chief Counsel shall be consulted.

1. Upon admission at the facility, documented informed consent shall be obtained for the provision of health care services.

2. All examinations, treatments, and procedures are governed by informed consent practices applicable in the jurisdiction.

3. A separate documented informed consent is required for invasive procedures, including surgeries, invasive diagnostic tests, and dental extractions.

4. Prior to the administration of psychotropic medications, a separate documented informed consent, that includes a description of the medication's side effects, shall be obtained.

5. If a consent form is not available in a language the detainee understands, professional interpretation services will be provided as described in Section E ("Translation and Language Access for Detainees with Limited English Proficiency") and documented on the form.

6. If a detainee refuses treatment and the CMA or designee determines that treatment is necessary, ICE/ERO shall be consulted in determining whether involuntary treatment shall be pursued.

7. If the detainee refuses to consent to treatment, medical staff shall make reasonable efforts to explain to the detainee the necessity for and propriety of the recommended treatment.

8. Medical staff shall ensure that the detainee's questions regarding the treatment are answered by appropriate medical personnel.

9. Medical staff shall explain the medical risks if treatment is declined and shall document their treatment efforts and refusal of treatment in the detainee's medical record. Detainees will be asked to sign a translated form that indicates that they have refused treatment.

10. The clinical medical authority and facility administrator shall look into refusals of treatment to ensure that such refusals are not the result of miscommunication or misunderstanding.

11. Facilities should make efforts to involve trusted individuals such as clergy or family members should a detainee refuse treatment.

12. A detainee who refuses examination or treatment may be segregated from the general population when such segregation is determined medically necessary by the CMA. Segregation shall only be for medical reasons that are documented in the medical record, and may not be used for punitive purposes. Such segregation shall only occur after a determination by a component mental health professional has taken place that shows the segregation shall not adversely affect the detainee's mental health.

13. In the event of a hunger strike, see standard "4.2 Hunger Strikes."

Standard "4.7 Terminal Illness, Advance Directives and Death" provides details regarding living wills and advance directives, organ donations and do not resuscitate (DNR) orders.

## BB. Medical Records

### 1. Health Record File

The HSA shall maintain a complete health record on each detainee that is:

a. Organized uniformly in accordance with appropriate accrediting body standards;

b. Available to all practitioners and used by them for health care documentation; and

c. Properly maintained and safeguarded in a securely locked area within the medical unit.

### 2. Confidentiality and Release of Medical Records

All medical providers, as well as detention officers and staff shall protect the privacy of detainees' medical information in accordance with established guidelines and applicable laws. These protections apply, not only to records maintained on paper, but also to electronic records where they are used. Staff training must emphasize the need for confidentiality and procedures must be in place to limit access to health records to only authorized individuals and only when necessary.

Information about a detainee's health status and a detainee's health record is confidential, and the active medical record shall be maintained separately from other detention records and be accessible in accordance with applicable laws and regulations.

The HSA shall provide the facility administrator and designated staff information that is necessary as follows:

a. to preserve the health and safety of the detainee, other detainees, staff or any other person;

b. for administrative and detention decisions such as housing, voluntary work assignments, security and transport; or

c. for management purposes such as audits and inspections.

When information is covered by the Privacy Act, specific legal restrictions govern the release of medical information or records.

Detainees who indicate they wish to obtain copies of their medical records shall be provided with the appropriate request form. ICE/ERO, or the facility administrator, shall provide limited-English proficient detainees and detainees who are hearing impaired with interpretation or translation services or other assistance as needed to make the written request, and shall assist in transmitting the request to the facility HSA.

Upon his/her request, while in detention, a detainee or his/her designated representative shall receive information from their medical records. Copies of health records shall be released by the HSA directly to a detainee or their designee, at no cost to the detainee, within a reasonable timeframe after receipt

by the HSA of a written authorization from the detainee.

A written request may serve as authorization for the release of health information, as long as it includes the following information, and meets any other requirements of the HSA:

a. address of the facility to release the information;

b. name of the individual or institution to receive the information;

c. detainee's full name, A-number (or other facility identification number), date of birth and nationality;

d. specific information to be released with inclusive dates of treatment; and

e. detainee's signature and date.

Following the release of health information, the written authorization shall be retained in the health record.

Detainees are to be informed that if they are released or removed from custody prior to laboratory results being evaluated, the results shall be made available by contacting the detention facility and providing a release of information consent.

### 3. Inactive Health Record Files

Inactive health record files shall be retained as permanent records in compliance with locally established procedures and the legal requirements of the jurisdiction.

### 4. Transfer and Release of Detainees

ICE/ERO and the HSA shall be notified when detainees are to be transferred or released. Detainees shall be transferred, released or removed, with proper medication to ensure continuity of care throughout the transfer and subsequent intake process, release or removal (see "W. Continuity of Care," above). Those detainees who are currently placed in a medical hold status must be evaluated and cleared by a licensed independent practitioner

(LIP) prior to transfer or removal. In addition, the CMA or designee must inform the facility administrator in writing if the detainee's medical or psychiatric condition requires a medical escort during removal or transfer.

a. Notification of Medical/Psychiatric Alerts or Holds
Upon receiving notification that a detainee is to be transferred, appropriate medical staff at the sending facility shall notify the facility administrator of any medical/psychiatric alerts or holds that have been assigned to the detainee, as reflected in the detainee's medical records. The facility administrator shall be responsible for providing notice to ICE/ERO of any medical alerts or holds placed on a detainee that is to be transferred.

b. Notification of Transfers, Releases and Removals
The HSA shall be given advance notice by ICE/ERO prior to the release, transfer or removal of a detainee, so that medical staff may determine and provide for any medical needs associated with the transfer, release or removal.

c. Transfer of Medical Information

1) When a detainee is transferred to another detention facility, the sending facility shall ensure that a Medical Transfer Summary accompanies the detainee, as required in "C. Responsibilities of the Health Care Provider at the Sending Facility" found in Standard 7.4 "Detainee Transfers.". Upon request of the receiving facility, the sending facility shall transmit a copy of the full medical record within 5 business days, and sooner than that if determined by the receiving facility to be a medically urgent matter.

2) Upon removal or release from ICE custody, the detainee shall be provided medication, referrals to community-based providers as medically appropriate, and a detailed medical care summary. This summary should include

instructions that the detainee can understand and health history that would be meaningful to future medical providers.  The summary shall include, at a minimum, the following items:

a)  patient identification;

b)  tuberculosis (TB) screening results (including results date) and current TB status if TB disease is suspected or confirmed;

c)  current mental, dental, and physical health status, including all significant health issues, and highlighting any potential unstable issues or conditions which require urgent follow-up;

d)  current medications, with instructions for dose, frequency, etc., with specific instructions for medications that must be administered en route;

e)  any past hospitalizations or major surgical procedures;

f)  recent test results, as appropriate;

g)  known allergies;

h)  any pending medical or mental health evaluations, tests, procedures, or treatments for a serious medical condition scheduled for the detainee at the sending facility.  In the case of patients with communicable disease and/or other serious medical needs, detainees being released from ICE custody are given a list of community resources, at a minimum;

i)  copies of any relevant documents as appropriate;

j)  printed instructions on how to obtain the complete medical record; and

k)  the name and contact information of the transferring medical official.

The IHSC Form 849 or equivalent, or the Medical Transfer Summary attached as Appendix 4.3.C, which mirrors IHSC Form 849, may be used by facilities to ensure compliance with these standards.

## CC. Terminal Illness or Death of a Detainee

Procedures to be followed in the event of a detainee's terminal illness or death are in standard "4.7 Terminal Illness, Advance Directives and Death." The standard also addresses detainee organ donations.

## DD. Medical Experimentation

Detainees shall not participate in medical, pharmaceutical or cosmetic research while under the care of ICE.

This stipulation does not preclude the use of approved clinical trials that may be warranted for a specific inmate's diagnosis or treatment when recommended and approved by the clinical medical director. Such measures require documented informed consent.

## EE. Administration of the Medical Department

### 1. Quarterly Administrative Meetings

The HSA shall convene a meeting quarterly at minimum, and include other facility and medical staff as appropriate. The meeting agenda shall include, at minimum, the following:

a.  an account of the effectiveness of the facility's health care program;

b.  discussions of health environment factors that may need improvement;

c.  review and discussion of communicable disease and infectious control activities;

d.  changes effected since the previous meetings; and

e.  recommended corrective actions, as necessary.

Minutes of each meeting shall be recorded and kept on file.

### 2. Health Care Internal Review and Quality Assurance

The HSA shall implement a system of internal review and quality assurance. The system shall include:

a. participation in a multidisciplinary quality improvement committee;

b. collection, trending and analysis of data along with planning, interventions and reassessments;

c. evaluation of defined data;

d. analysis of the need for ongoing education and training;

e. on-site monitoring of health service outcomes on a regular basis through the following measures:

1) chart reviews by the responsible physician or his/her designee, including investigation of complaints and quality of health records;

2) review of practices for prescribing and administering medication;

3) systematic investigation of complaints and grievances;

4) monitoring of corrective action plans;

5) reviewing all deaths, suicide attempts and illness outbreaks;

6) developing and implementing corrective-action plans to address and resolve identified problems and concerns;

7) reevaluating problems or concerns, to determine whether the corrective measures have achieved and sustained the desired results;

8) incorporating findings of internal review activities into the organization's educational and training activities;

9) maintaining appropriate records of internal

review activities; and

10) ensuring records of internal review activities comply with legal requirements on confidentiality of records.

### 3. Peer Review

The HSA shall implement an intra-organizational, external peer review program for all independently licensed medical professionals. Reviews shall be conducted at least annually.

## FF. Examinations by Independent Medical Service Providers and Experts

On occasion, medical and/or mental health examinations by a practitioner or expert not associated with ICE or the facility may provide a detainee with information useful in administrative proceedings.

If a detainee seeks an independent medical or mental health examination, the detainee or his/her legal representative shall submit to the Field Office Director a written request that details the reasons for such an examination. Ordinarily, the Field Office Director shall approve the request for independent examination, as long as such examination shall not present an unreasonable security risk. Requests for independent examinations shall be responded to as quickly as practicable. If a request is denied, the Field Office Director shall advise the requester in writing of the rationale.

Neither ICE/ERO nor the facility shall assume any costs of the examination, which will be at the detainee's expense. The facility shall provide a location for the examination but no medical equipment or supplies and the examination must be arranged and conducted in a manner consistent with maintaining the security and good order of the facility.

## GG. Tele-Health Systems

**The facility, when equipped with appropriate technology and adequate space, shall provide for the*

*use of services of the ICE Tele-Health Systems, inclusive of tele-radiology (ITSP), tele-psychiatry and tele-medicine.*

1. The cost of the equipment, equipment maintenance, staff training and credentialing (as outlined in the contract), arrangements for x-ray interpretation and administration by a credentialed radiologist; and data transmission to and from the detention facility, shall be provided by the facility and charged directly to ICE.

2. The facility administrator shall coordinate with the ITSP to ensure adequate space is provided for the equipment, connectivity is available, and electrical services are installed.

3. Immediate 24-hour access, seven days a week, to equipment for service and maintenance by ITSP technicians shall be granted.

4. A qualified tele-health coordinator shall be appointed and available for training by the ITSP. Qualified, licensed and credentialed medical staff shall be available to provide tele-health services as guided by state and federal requirements and restrictions.

## Medical Forms:

- Appendix 4.3.A: Intake Screening
- Appendix 4.3.B: Physical Examination/Health Appraisal
- Appendix 4.3.C: Medical Transfer Summary

# INTAKE SCREENING

**Identification**

| |
|---|
| Patient was identified by (check 2 sources): ☐ Wrist Band ☐ Picture ☐ Verbally ☐ ID Badge ☐ Other: |
| Chaperone Present? ☐ Yes ☐ No If yes, give chaperone name: |
| Date of arrival at facility: Time of arrival: Time of initial screening: |
| If transferred from another facility, did medical transfer summary accompany the patient? ☐ Yes ☐ No ☐ Not Applicable |
| Was the Pre-Screening Note reviewed? ☐ Yes ☐ No |

## Subjective

**Communication Assessment:**

| |
|---|
| What language do you speak? ☐ English ☐ Spanish ☐ Other: |
| Interpreter provided? ☐ Yes ☐ No If yes, name or INT number: |
| If No, patient speaks: ☐ English fluently ☐ Provider fluent in patient's native language ☐ No interpreter available at this time |
| Do you have any difficulty with: ☐ Hearing ☐ Speech ☐ Vision Check if yes. If yes, what accommodation do you need to help you read, communicate, or navigate the facility? |

**Disability Screening:**

| |
|---|
| Do you have any difficulty with walking, standing, or climbing stairs? ☐ Yes ☐ No If yes, explain: |
| Do you have any difficulty reading or writing? ☐ Yes ☐ No If yes, explain: |
| What was the highest grade completed in school? |
| Do you have any difficulty understanding directions? ☐ Yes ☐ No If yes, explain: |

**Medical Screening:**

| | | | |
|---|---|---|---|
| How do you feel today? (Explain in his/her own words) | | | |
| Are you currently having any pain? ☐ Yes ☐ No If yes, complete pain assessment below | | | |
| a. Character of pain: | b. Location: | c. Duration: | d. Intensity: (0-10 pain scale) |
| e. What relieves pain or makes it worse? | | | |
| Do you have any current or past medical problems? ☐ Yes ☐ No If yes, explain: | | | |

| | |
|---|---|
| Last Name: | First Name: |
| A#: | Country of Origin: |
| Date of Arrival: | DOB: |
| Facility: | Sex: |

**Medical Screening (continued)**

| |
|---|
| Are you currently or in the past year have you taken any medication on a regular basis, including over the counter and herbal?  ☐Yes  ☐No  If yes, list medications: |
| Do you have your medications with you?  ☐Yes  ☐No  If yes, list medications and disposition: |
| Do you have any allergies to medication or food?  ☐Yes  ☐No  If yes, list all: |
| Are you now or have you ever been treated by a doctor for a medical condition to include hospitalizations, surgeries, infectious or communicable diseases?  ☐Yes  ☐No  If yes, explain: |
| Do you now or have you ever had Tuberculosis (TB)?  ☐Yes  ☐No |
| In the past 2 months, have you experienced any of the following signs or symptoms continuously for more than 2 weeks:<br><br>Cough?  ☐Yes  ☐No  Coughing up blood?  ☐Yes  ☐No  Chest pain?  ☐Yes  ☐No  Loss of appetite?  ☐Yes  ☐No<br><br>Fever, chills, or night sweats for no known reason?  ☐Yes  ☐No  Unexplained weight loss?  ☐Yes  ☐No |
| Symptom screening with positive responses(s) is concerning for active TB:  ☐Yes  ☐No  If yes, explain: |
| Referred to provider for further evaluation.  ☐Yes  ☐No |
| Have you had any recent sudden changes with your vision or hearing?  ☐Yes  ☐No  If yes, explain: |
| Do you have any specific dietary needs?  ☐Yes  ☐No  If yes, explain: |
| Have you traveled outside of the US within the past 30 days?  ☐Yes  ☐No  If so, where? |
| Have you ever had or have you ever been vaccinated against Chicken Pox?  ☐Yes  ☐No  ☐Admits prior infection |

**LGBT Screening**

| |
|---|
| Are you gay, lesbian, bisexual, transgender, intersex or gender non-conforming?  ☐ Yes  ☐ No |
| If transgender, what is your gender self-identification? |

| | |
|---|---|
| Last Name: | First Name: |
| A#: | Country of Origin: |
| Date of Arrival: | DOB: |
| Facility: | Sex: |

**Female Patient Only**

| | |
|---|---|
| Are you pregnant? ☐ Yes ☐ No ☐ Not Applicable   If yes, date of last menstrual period: | |
| Are you currently breastfeeding? ☐ Yes ☐ No   If yes, when is the last day you breastfed? | |
| Have you had unprotected sexual intercourse in the past 5 days? ☐ Yes ☐ No<br><br>If yes, would you like to speak to a medical provider about emergency contraception to prevent a possible pregnancy? ☐ Yes ☐ No<br><br>**If yes, contact a medical provider immediately for guidance.** | |

**Oral Screening**

| |
|---|
| Are you having any significant dental problems? ☐ Yes ☐ No  If yes, explain: |
| Do you have dentures, partials, braces, etc? ☐ Yes ☐ No  If yes, do you have these items with you? |

**Mental Health Screening**

| |
|---|
| Have you ever been diagnosed with mental illnesses or mental health conditions? ☐ Yes ☐ No  If yes, what illness? |
| Have you ever received counseling, medication or hospitalization for mental health problems (to include outpatient treatment)? ☐ Yes ☐ No   If yes, explain.<br><br><br>**Refer for follow-up and appropriate treatment as necessary.** |
| Do you have a history of self-injurious behavior? ☐ Yes ☐ No  If yes: ☐ Cutting ☐ Self-mutilation ☐ Other<br>Most recent                     **If yes, refer for follow-up and appropriate treatment as necessary.** |
| Have you ever tried to kill or harm yourself? ☐ Yes ☐ No  If yes, when did the attempt occur?<br>Method:   ☐ Gun ☐ Hanging ☐ Cutting skin ☐ Pills ☐ Other<br>**If attempt was within the last 90 days, make referral to mental health immediately.** |
| Are you currently thinking about killing or harming yourself? ☐ Yes ☐ No   **If yes, make referral to mental health immediately.** |
| Do you have a history of assaulting or attacking others? ☐ Yes ☐ No |
| Do you know of someone in this facility whom you wish to attack or harm? ☐ Yes ☐ No<br>If yes, who is this person?                     **If yes, make referral to mental health immediately.** |
| Do you now or have you ever heard voices that other people don't hear, seen things or people that others don't see, or felt others were trying to harm you for no logical or apparent reason? ☐ Yes ☐ No  If yes, explain: |

| | |
|---|---|
| Last Name: | First Name: |
| A#: | Country of Origin: |
| Date of Arrival: | DOB: |
| Facility: | Sex: |

**Sexual Abuse and Assault Screening**

\\\\\

| | |
|---|---|
| Have you been a victim of physical or sexual abuse or assault?  ☐ Yes  ☐ No   If yes, explain: <br><br> **If yes, refer for medical or mental health evaluation as appropriate.** | |
| Do you feel that you are in danger of being physically or sexually assaulted while you are in custody?  ☐ Yes  ☐ No  If yes, explain: <br><br> **If yes, refer for follow-up and appropriate treatment as necessary.** | |
| Have you ever sexually assaulted or abused another person?  ☐ Yes  ☐ No  If yes, explain: <br><br> **If yes, refer for medical or mental health evaluation as appropriate.** | |

**Trauma History Screening**

Have you had a physical or emotional trauma due to abuse or victimization?  ☐ Yes  ☐ No

Have you ever experienced, witnessed or been confronted with an event that involved actual or threatened death or serious injury (can include domestic violence, sexual assault, robbery, natural disaster, war, serious illness, terrorism).  ☐ Yes  ☐ No

If yes, answer the following:

| | No | Some | Moderate | Extreme |
|---|---|---|---|---|
| • Was your response to this event intense fear, helplessness or horror? | ☐ No | ☐ Some | ☐ Moderate | ☐ Extreme |
| • Has this experience caused significant distress or impairment in your life? | ☐ No | ☐ Some | ☐ Moderate | ☐ Extreme |
| • Has it affected your interpersonal relationships, work or other areas? | ☐ No | ☐ Some | ☐ Moderate | ☐ Extreme |
| • Is this experience currently causing significant distress or impairment in your life? | ☐ No | ☐ Some | ☐ Moderate | ☐ Extreme |

**If the patient experienced any of the above, refer for follow-up and appropriate treatment as necessary.**

**Cultural/Religious Assessment**

Is there anything important to know about your religious or cultural beliefs that are of concern to you while in detention?  ☐ Yes ☐ No
If yes, explain:

**Substance Use/Abuse Screening**

| | |
|---|---|
| Have you ever been treated for drug and/or alcohol problems? | ☐ Yes ☐ No |
| Have you ever suffered withdrawal symptoms from drug and/or alcohol use? | ☐ Yes ☐ No |
| Are you able to stop using drugs or alcohol if you want? | ☐ Yes ☐ No |
| Have you ever blacked out or experienced memory loss from drinking or drug use? | ☐ Yes ☐ No |
| Have drug or alcohol use negatively impacted your life (family, work, relationships, criminal charges)? | ☐ Yes ☐ No |

If yes to any of the above questions, explain:



**Refer for follow-up and appropriate treatment as necessary.**

| | |
|---|---|
| Last Name: | First Name: |
| A#: | Country of Origin: |
| Date of Arrival: | DOB: |
| Facility: | Sex: |

**Substance Use/Abuse Screening (continued)**

In the past three months, have you used tobacco, alcohol, illegal drugs, or misused prescription drugs? ☐ Yes ☐ No

If yes, complete the following (refer for follow-up and appropriate treatment as necessary).

| Substance Used/Route of Use | Date of Last Use | Amount/Quantity Last Used |
|---|---|---|
| | | |
| | | |
| | | |

## Objective

Patient does not appear to have abnormal physical, mental, and/or emotional characteristics. ☐ Yes ☐ No

Patient does not appear to have barriers to communication. ☐ Yes ☐ No

Patient is oriented to: Person ☐ Yes ☐ No Place ☐ Yes ☐ No Time ☐ Yes ☐ No

If you observe any of the following, check the appropriate box and document findings below:

Appearance: ☐ Sweating ☐ Shaking/tremors ☐ Anxious ☐ Disheveled ☐ Ill appearance
Findings:

Behavior: ☐ Disorderly ☐ Appropriate ☐ Insensible ☐ Agitation ☐ Inability to focus/concentrate Findings:

State of Consciousness: ☐ Alert ☐ Responsive ☐ Lethargic
Findings:

Ease of Movement: ☐ Body deformities ☐ Gait
Findings:

Breathing: ☐ Persistent cough ☐ Hyperventilation
Findings:

Skin: ☐ Lesions ☐ Jaundice ☐ Rashes ☐ Infestations ☐ Nits (lice) ☐ Bruises ☐ Scars ☐
☐ Tattoos Needle Marks or Indications of Drug Use Findings:

Developmental or Physical Disabilities: ☐ Developmental Delay ☐ Para/quadriplegia ☐ Stroke ☐ Amputation ☐ Cardiac condition
Findings:

Assistive Devices: ☐ Glasses/Contacts ☐ Hearing aid(s) ☐ Denture(s)/Partial(s) ☐ Orthopedic brace ☐ Prosthetic ☐ Cane
Findings:

☐ None Observed

Comments/Other Findings:

## Vital Signs

| T | P | Resp | BP | HT | WT | HCG Results: ☐ Pos ☐ Neg ☐ N/A |
|---|---|---|---|---|---|---|

| Last Name: | First Name: |
|---|---|
| A#: | Country of Origin: |
| Date of Arrival: | DOB: |
| Facility: | Sex: |

## Assessment

**Initial Medical Screening:**

| |
|---|
| ☐ No findings requiring referral |
| ☐ Findings requiring referral identified. See disposition below. |
| ☐ List all findings: |

## Plan

**Disposition:**

| |
|---|
| ☐ General population |
| ☐ General population with referral for:   ☐ Medical   ☐ Mental health care |
| ☐ Isolation until medically evaluated |
| ☐ Referral for immediate:   ☐ Medical   ☐ Mental health   ☐ Dental care |
| Details of referral: |

**Care/Intervention/Follow-up:**

| |
|---|
| ☐ Physical examination/Health Assessment will be performed within 14 days. |
| ☐ Physical exam will be scheduled for patient. |
| ☐ Tuberculin Skin Test (TST) administered   ☐ Left forearm   ☐ Right forearm |
| ☐ Chest X-Ray (CXR) completed with appropriate shielding |
| ☐ TST or CXR not needed. Transfer Summary accompanying patient documents negative screening within timeframe allowed by policy. |
| ☐ The following care/treatment was provided during this Intake Screening. |

| Last Name: | First Name: |
|---|---|
| A#: | Country of Origin: |
| Date of Arrival: | DOB: |
| Facility: | Sex: |

**Patient Education:**

| | |
|---|---|
| ☐ Tuberculosis screening and need for tuberculin skin test (TST) or chest x-ray (CXR) explained to patient prior to performance. |
| ☐ Access to medical, dental, and mental health care explained to patient as well as grievance process. |
| ☐ Given the Dealing with Stress brochure in                    language. |
| ☐ Given the Medical Orientation brochure in                    language. |
| ☐ Given the Health Information brochures in                    language. |
| ☐ Patient verbalized understanding of teaching or instruction provided. |
| ☐ Patient was asked if he or she had any additional questions and all questions were addressed. |
| ☐ Female ONLY: Educated and provided brochure describing female medical and mental health services related to pregnancy, terminated/miscarried pregnancies, contraception, family planning and age-appropriate gynecological health care. |
| ☐ Other education provided: |

_____            _____            _____      _____
Provider's Signature                     Stamp / Printed Name                      Date                Time


_____            _____            _____      _____
Reviewer's Signature                     Stamp / Printed Name                      Date                Time

| | |
|---|---|
| Last Name: | First Name: |
| A#: | Country of Origin: |
| Date of Arrival: | DOB: |
| Facility: | Sex: |

## Physical Examination/Health Appraisal

Patient was identified by (check 2 sources):  □ Wrist Band, □ Picture, □ Verbally, □ ID Badge, □ Other _____
Chaperone Present? □ Yes □ No If yes, give chaperone name: _____

**Communication Assessment:**
What language do you speak? □ English, □ Spanish, □ Other: _____
Interpreter provided? □ Yes □ No If yes, Name or INT#:_____
Detainee speaks □ English Fluently; □ Provider fluent in patient's native language; □ No interpreter available at this time

Do you have any difficulty with □ hearing, □ speech or □ vision?  Check if Yes.
        If yes, what accommodations, do you need to help you read, communicate, or navigate the facility? _____

**Subjective:**

| Current Significant Medical Problems | Date Problem began | Current Status |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**Current Medications including OTC and Herbal:**

| Name | Dose | Route | Frequency |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

**Allergies:**

Medications/Food/Environmental:  List All: _____\

**Pain Assessment**

Are you currently in pain? □ Yes □ No If yes, pain began when?_____ Intensity: (0/10 scale)_____
Character of Pain:_____        Location:_____
Duration:_____
Has anything you have done or tried in the past relieved the pain or made it worse?  □ Yes □ No
If yes, explain_____

| Last Name: | First Name: |
|---|---|
| A#: | Country of Origin: |
| Date of Arrival: | DOB: |
| Facility: | Sex: |

## Physical Examination/Health Appraisal (con't)

**Disability**

Do you have any difficulty with walking, standing, or climbing stairs?  □ Yes □ No
　　　If yes, do you use a wheelchair, walker, cane or crutches? _____

Have you ever had an injury to your head or brain which resulted in the loss of consciousness and/or recurring headaches, dizziness, confusion or memory loss? □ Yes □ No If yes, when was the injury mm/yyyy _____
Can you read? □ Yes □ No If yes, in which language? _____Do you have difficulty reading? □ Yes □ No
Can you write? □ Yes □ No If yes, in which language? _____Do you have difficulty writing? □ Yes □ No
What was the highest grade you completed in school? _____
Do you have difficulty understanding directions? □ Yes □ No
　　　If yes, does someone normally assist you with any regular tasks of daily living? _____

**Medical History**　　　　Has a medical professional ever diagnosed you with any of the following?

| □Yes □No Asthma | □Yes □No Cardiovascular disease | □Yes □No Tuberculosis | Comment: **Type |
|---|---|---|---|
| □Yes □No Cancer | □Yes □No Kidney Disease | □Yes □No Stroke | |
| □Yes □No HIV | □Yes □No Hyperlipidemia | □Yes □No Hepatitis** | |
| □Yes □No Seizures | □Yes □No Diabetes | □Yes □No Sexually Transmitted Infections** | |
| □Yes □No Hypertension　　　□Yes □No Sickle Cell Anemia | | | |
| Varicella □ Yes □ No □ Admits to prior infection □ Admits being vaccinated □ History denied at physical exam | | | |
| Other | | | |

**Surgical/Hospitalization History**:

| Surgery or reason for hospitalization | When (mm/yyyy) |
|---|---|
| | |
| | |
| | |
| | |

**Dental**

Do you have any significant dental problems? □No, □Cavity, □ Broken tooth, □Infection, □Broken jaw, □ Other_____
Do you have any dental prosthesis?  □None, □Full upper denture, □full lower denture, □partial denture upper, □partial denture lower, □braces, □retainer

| Last Name: | First Name: |
|---|---|
| A#: | Country of Origin: |
| Date of Arrival: | DOB: |
| Facility: | Sex: |

## Physical Examination/Health Appraisal (con't)

**Family History**

| | | |
|---|---|---|
| Asthma ▢ Yes ▢ No | Hypertension ▢ Yes ▢ No  Diabetes ▢ Yes ▢ No | Cardiovascular Disease    ▢ Yes ▢ No |
| Cancer ▢ Yes ▢ No | Tuberculosis ▢ Yes ▢ No  Stroke  ▢ Yes ▢ No | Other: _____ |
| Breast or gynecological problems ▢ Yes ▢ No | | |

**Female Only**

**OB History:**
Have you ever been pregnant? ▢No ▢Yes    #Pregnancies_____        #C-Sections_____
#Live Births _____#Full Term_____#Pre-Term_____        #Abortions_____   #Miscarriages_____ #Living_____
Are you pregnant? ▢No ▢Yes
Are you currently receiving prenatal care? ▢No ▢Yes Where? _____
Have you ever been told that you had a 'high risk' pregnancy?  If yes, what was the reason?
_____
Are you currently breast feeding? ▢No ▢Yes
If yes, how old is the nursing child? _____  When was the last time you breast fed? (mm/dd/yyyy)_____

**GYN History:**
When was the first day of your LMP? _____ If more than 30 days, why?
_____
Do you have a history of breast or gynecological problems? ▢No ▢Yes  Explain_____
Do you use birth control?  ▢No ▢Yes What type? _____ When was the last time you used it? _____
When was your last PAP smear?  _____ If known, results_____

**Sexual Abuse and Assault/Vulnerabilities**

Have you ever been a victim of physical abuse?  ▢No ▢Yes
Have you ever been a victim of sexual abuse or assault?  ▢No ▢Yes
If yes, refer patient for medical evaluation in two working days or for mental health evaluation in 72 hours.

Are you gay/ lesbian, bisexual, transgender, intersex or gender non- conforming?  ▢Yes   ▢No
        If transgender, what gender do you identify with_____

Do you believe you are vulnerable to sexual abuse or assault in ICE custody? ▢Yes   ▢No    If yes, why?_____
If yes, implement treatment plan.

Have you ever been involved in an incident where you sexually abused others? ▢Yes   ▢No
If yes, refer patient for medical evaluation in two working days or for mental health evaluation in 72 hours.

**Mental Health**

Do you have a history of:
| | | |
|---|---|---|
| Manic episodes   ▢Yes   ▢No | Depression ▢Yes   ▢No | Psychotropic medications ▢Yes   ▢No |
| Severe anxiety    ▢Yes ▢No | Psychosis    ▢Yes ▢No | Violence towards others ▢Yes ▢No |
| Suicide attempts/gestures ▢Yes   ▢No | | |

Are you currently having any mental health issues? ▢Yes   ▢No    If yes, explain problem and date problem began _____
_____

| | |
|---|---|
| Last Name: | First Name: |
| A#: | Country of Origin: |
| Date of Arrival: | DOB: |
| Facility: | Sex: |

# Physical Examination/Health Appraisal (con't)

**Social History**

**Drug Use History:**

Have you used drugs other than those for medical reasons in the past 12 months? □No □Yes   If yes, what?

PCP □No □Yes              Ketamine □No □Yes          Marijuana □No □Yes          Prescription Opiates □No □Yes

LSD □No □Yes              Ecstasy □No □Yes           Methamphetamine □No □Yes

Heroin    □No □Yes        Route:    Injected □No □Yes        Intranasal □No □Yes          Smoked □No □Yes

Cocaine □No □Yes          Route:    Injected □No □Yes        Intranasal □No □Yes          Smoked □No □Yes

When did you last use? _____          Are you having any withdrawal symptoms? □No □Yes If yes, which apply?
□Nausea □Vomiting □Diarrhea □Chills □Sweating □Insomnia □Aches & pains □ Anxiety

Have you ever gone through withdrawal from drugs? □No □Yes If yes, when? _____

Are you currently in a drug treatment program? □No □Yes If yes, Name of program? _____

Type of Program:  □Detox  □Methadone □Residential Treatment  □Outpatient □12 Step□ Other

**Alcohol Use History:**

Do you drink alcohol?         □ No □Yes  If yes, type? □Beer        □Malt liquor        □Wine    □Liquor

How often do you drink?   □ Daily   □Weekly  □Monthly □Rarely

How much do you drink when you drink? _____

Do you notice over time that you need to drink more for the same effect? □No □Yes

When was your last drink? _____

Are you having any withdrawal symptoms? □No □Yes If yes, which apply? □Headache   □Fever  □Nausea
□Vomiting □Insomnia □Tremor   □Hallucinations □Convulsions

Have you ever gone through alcohol withdrawal in the past? □No □Yes     How long ago? _____

Have you ever been in treatment for alcohol use? □No □Yes   If yes, when? _____

What type of program? □Outpatient   □Inpatient

Have you ever been convicted for driving under the influence of alcohol?  □No □Yes If yes, when? _____

**Tobacco History:**

Have you ever used tobacco products?  □No □Yes  If yes, please answer the following questions:

Do you currently use tobacco products? □No □Yes  If yes, what type of products? □ Cigarettes □Cigar □Pipe □Chewing tobacco

How long have you used tobacco products? _____     How frequently did/do you use tobacco?_____

When did you last use tobacco products?_____

Are you having any withdrawal symptoms from not using tobacco? □No □Yes  If yes, what symptoms are you experiencing?
□Cravings □Irritation □Anger □Increased Appetite □Weight Gain □Concentration Problems  □Restlessness □Insomnia
□Anxiety

**Preventative Medicine/Screening History**

Have you had screening for cancer? □Yes  □No     When? (mm/yyyy) _____
        What type screening & results if known? _____

Have you had a mammogram? □Yes   □No   When? (mm/yyyy)_____ Results, if known_____

Have you had a pap smear? □Yes   □No   When? (mm/yyyy)_____ Results, if known_____

| Last Name: | First Name: |
|---|---|
| A#: | Country of Origin: |
| Date of Arrival: | DOB: |
| Facility: | Sex: |

# Physical Examination/Health Appraisal (con't)

**OBJECTIVE:**
**Vital Signs**

T_____ P_____ R_____ BP_____ HT_____ WT_____
Visual Acuity (Snellen):  Left_____ Right_____ Both_____
Hearing:  □ Grossly intact □ Other_____

**General Physical Examination**

| | R = Refused | NE = Not Evaluated | |
|---|---|---|---|
| General | R | NE | Findings: |
| ENT | R | NE | Findings: |
| Dental | R | NE | Findings: |
| Neurological | R | NE | Findings: |
| Cardiac | R | NE | Findings: |
| Pulmonary | R | NE | Findings: |
| Gastrointestinal | R | NE | Findings: |
| Genitourinary | R | NE | Findings: |
| Extremities | R | NE | Findings: |
| Skin | R | NE | Findings: |
| Comments/Other Findings: | | | |

**Mental Status Examination**

| | |
|---|---|
| Orientation | Alert □No □Yes  Oriented to person □No □Yes  Place □No □Yes   Time □No □Yes |
| Perceptions/ Thought Content | Perceptual disturbances?  □No □Yes<br>If yes, □ Auditory hallucinations      □ Visual hallucinations      □ Delusions |
| Appearance | □ Appropriately dressed □ well groomed; □ Disheveled; □ Other |
| Posture | □ Erect; □ Stooped; □ Slouched; □ Other |
| Gait/Walk | □ Steady; □ Shuffle; □ Limp; □ Other |
| Movement | □ Appropriate; □ Tics; □ Repetitive; □ Rigid; □ Agitated; □ Slow; □ Other |
| Mood | □ Appropriate; □ Labile; □ Relaxed; □ Happy; □ Calm; □ Distressed; □ Angry; □ Agitated; □ Sad/Depressed; □ Fearful/Anxious; □Irritable, □ Other |
| Attitude | □ Cooperative; □ Uncooperative; □ Threatening; □ Evasive |
| Speech | □ Coherent; □ Incoherent; □ Pressured; □ Average speed; □ Rapid; □ Slow; □ Slurred; □ Mumbled; □ Talkative; □ Loud; □ Soft; □ Other |
| Intelligence | □ Appears normal; □ Appears developmentally delayed |
| Insight | □ Good; □ Impaired |
| Comments: | |

| | |
|---|---|
| Last Name: | First Name: |
| A#: | Country of Origin: |
| Date of Arrival: | DOB: |
| Facility: | Sex: |

## Physical Examination/Health Appraisal (con't)

**Assessment:**

___Physical exam/health appraisal shows no significant medical, mental health or dental issues currently.

___Physical exam/health appraisal shows the following significant issues:

**Plan:**

Treatment including medications: _____

_____

_____

_____

Immunizations, Injections, Imaging, Labs:

Referrals:

Other

Preventative Medicine/Patient Education:
__Given the Staying Healthy brochure in the _____ language.
__Verbally given instruction on dental hygiene.
__Provided with instruction appropriate to patient's health needs.
__Patient verbalized understanding of teaching or instructions provided.
__Patient was asked if he/she had any additional questions, and any questions were addressed.
__Patient was instructed to return to medical clinic as needed.
__Patient was instructed to return to clinic for appointment.
__Health Assessment was rescheduled until [_____] to provide sign language interpreter for health assessment.
__Health Assessment was rescheduled until [_____] to provide foreign language interpreter for health assessment.
__Other:_____

| | |
|---|---|
| Last Name: | First Name: |
| A#: | Country of Origin: |
| Date of Arrival: | DOB: |
| Facility: | Sex: |

## MEDICAL TRANSFER SUMMARY

| Last Name: | First Name: |
|---|---|
| A#: | Country of Origin: |
| Date of Arrival at Sending Facility: | DOB: |
| Sending Facility: | Sex: |

**1. General Information:**

Cleared for Travel by Ground Transportation: □ Yes □ No  Date of Departure: _____

Cleared for Travel by Air Transportation:      □ Yes □ No      Final Destination, if known: _____

Reason for Transfer: □ Custody □ Medical      Medical Escort required: □ Yes □ No      If yes, type: □ Medical   □ Psychiatric

**2. Current Medical, Dental, and/or Mental Health Diagnoses/Problems:**                          **URGENT**

_____

_____

_____

_____

**3. Allergies:** _____

**4. Current Prescribed Medications: List All (Name, Dosage, Directions in layman's terms)**

*Check off Medication Required for Care en Route*

| | Medication | Dose | # Sent | Route | Instructions for use (include proper time for administration) | Stop Date |
|---|---|---|---|---|---|---|
| □ | | | | | | |
| □ | | | | | | |
| □ | | | | | | |
| □ | | | | | | |
| □ | | | | | | |
| □ | | | | | | |
| □ | | | | | | |

**5. TB Clearance Status for Transfer or Transportation**

Screening Modality *(Check all that apply and document below)*: □ CXR  □ TST  □ IGRA  □ Symptom Screen

**CXR:** Date: _____

　　　　TB Screening: □ Negative, not consistent w/TB    □ Positive, consistent w/TB

**TST:** Administered Date**:** _____    **TST** Read Date: _____    Results: _____ mm induration

**IGRA:** Collection Date: _____    Results: □ Positive  □ Negative  □ Indeterminate

**Symptom Screening** Date: _____    Results: □ Positive  □ Negative

Is the patient being treated for TB?    □ No    □ Yes, select options:    □ Cleared for general detention population

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　□ Not cleared for general detention population

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　□ Being treated for TB, see attached TB Case Management
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　documentation

## Medical Transfer Summary (con't)

**6. Healthcare Follow-Up:**

Recent (within 6 months) Test Results: _____

Recent (within 6 months) Hospitalizations/Surgeries: _____

Recommended Future Lab Work: _____

Pending Specialty Appointment (s):_____

Recommended Specialty Appointment (s):_____

**Requires Immediate Follow Up**: _____

**7. Special Needs Affecting Transportation:  -- Use Standard Infection Control Precautions for all patients --**

Are there any medical, dental, or mental health condition that restricts the length of time the patient can be on travel status? ▢Yes ▢No

Reason(s) and maximum length of travel time: _____

Does the patient have any special needs that escorting staff should be aware of? ▢Yes ▢No

If so, what? _____

Equipment provided by:  ▢ Medical Authority ▢ Other_____     Equipment owned by:  ▢ Medical Authority ▢ Other_____ _____

Patient will keep equipment upon arrival at destination?  ▢Yes ▢No

Is there any medical equipment required to accompany the patient during travel?  ☐  Yes   ☐  No

If so, what? _____

Are any special precautions required during transport?  ▢Yes ▢No

Precautions needed for the patient: _____

Precautions needed for the escorting staff: _____

**8.  Additional Comments** (Mark through if no comments are made):  Attach additional pages or medical records as needed

(blank box)

**9. Release from custody: Attach  ▢ Instructions for Requesting Complete Medical Records**
**▢ Community Resource Information, if applicable**

Sending Facility Point of Contact: _____

Sending Facility Contact Number: _____

_____   _____   _____   _____
Completed by Provider Printed Name              Date                      Time                  Provider Signature

| Last Name: | First Name: |
|---|---|
| A#: | Country of Origin: |
| Date of Arrival at Sending Facility: | DOB: |
| Sending Facility: | Sex: |

# 4.4 Medical Care (Women)

## I. Purpose and Scope

This detention standard ensures that female detainees in U.S. Immigration Customs and Enforcement (ICE) custody have access to appropriate and necessary medical and mental health care.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

For all types of facilities, procedures that appear in italics with a marked (**) on the page indicate optimum levels of compliance for this standard.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Female detainees shall receive routine, age appropriate gynecological and obstetrical health care, consistent with recognized community guidelines for women's health services.

   *\*\*The facility's provision of gynecological and obstetrical health care shall be in compliance with standards set by the National Commission on Correctional Health Care (NCCHC).*

2. As part of every detainee's intake health assessment, female detainees shall also receive age-appropriate assessments and preventive women's health services, as medically appropriate.

3. A pregnant detainee in custody shall have access to pregnancy services including routine or specialized prenatal care, pregnancy testing, comprehensive counseling and assistance, postpartum follow up, lactation services and abortion services.

4. At no time shall a pregnant detainee be restrained, absent truly extraordinary circumstances that render restraints absolutely necessary.

5. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

   All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

   Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

6. Medical and mental health interviews, screenings, appraisals, examinations, procedures, and administration of medication shall be

conducted in settings that respect detainees' privacy in accordance with safe and/orderly operations of the facility.

7. A detainee's request to see a health care provider of the same gender should be considered; when not feasible, a same-gender chaperone shall be provided. When care is provided by a health care provider of the opposite gender, a detainee shall be provided a same-gender chaperone upon the detainee's request.

## III. Standards Affected

Not applicable.

## IV. References

American College of Obstetrics and Gynecology, *Guidelines for Women's Health Care* (3rd edition, 2007).

National Commission on Correctional Health Care, *Standards for Health Services in Jails* (2014)

National Commission on Correctional Health Care: *Position Statement on Women's Health Care in Correctional Settings* (2005)

"*Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities,*" 79 Fed. Reg. 13100 (Mar. 7, 2014).

## V. Expected Practices

### A. Overview

In addition to the medical, mental health and dental services provided to every detainee as required by standard "4.3 Medical Care," every facility shall directly or contractually provide its female detainees with access to:

1. pregnancy services, including pregnancy testing, routine or specialized prenatal care, postpartum follow up, lactation services and abortion services as outlined herein;

2. counseling and assistance for pregnant women in keeping with their express desires in planning for their pregnancy, whether they desire abortion, adoptive services or to keep the child; and

3. routine, age-appropriate, gynecological health care services, including offering women's specific preventive care.

### B. Initial Health Intake Screening and Health Assessment

#### 1. Initial Screening

Within 12 hours of arrival, during their initial medical screening, all female detainees shall receive information on services related to women's health care as provided for in this standard and standard "4.3 Medical Care."

#### 2. Initial Health Assessment

If the initial medical intake screening indicates that a detainee has experienced prior sexual victimization or perpetrated sexual abuse, staff shall, as appropriate, ensure that the detainee is immediately referred to a qualified medical or mental health practitioner for medical and/or mental health follow-up as appropriate.  Consistent with Standard "4.3 Medical Care," when a referral for medical follow-up is initiated, the detainee shall receive a health evaluation no later than two working days from the date of assessment, and when a referral for mental health follow-up is initiated, the detainee shall receive a mental health evaluation no later than 72 hours after the referral.

If the initial medical intake screening indicates the possibility of pregnancy, referral shall be initiated and the detainee shall receive a health assessment as soon as appropriate or within two working days.

If the initial medical intake screening indicates any history of domestic abuse or violence, the detainee shall be referred for and receive a mental health evaluation by a qualified mental health provider within 72 hours, or sooner if appropriate, consistent

with Standard "4.3 Medical Care."

All initial health assessments of female detainees shall be conducted by a trained and qualified health provider. In addition to the criteria listed on the health assessment form, the evaluation shall inquire about the following:

a.  pregnancy testing for detainees aged 18-56 and documented results;

b.  if the detainee is currently nursing (breastfeeding);

c.  use of contraception;

d.  reproductive history (number of pregnancies, number of live births, number of spontaneous/elective abortions, pregnancy complications, etc.);

e.  menstrual cycle;

f.  history of breast and gynecological problems;

g.  family history of breast and gynecological problems; and

h.  any history of physical or sexual victimization and when the incident occurred.

A pelvic and breast examination, pap test, baseline mammography and sexually transmitted disease (STD) testing shall be offered and provided as deemed appropriate or necessary by the medical provider.

## C.  Same-Gender Providers or Chaperones

Consistent with the provisions in Standard 4.3 "Medical Care," a detainee's request to see a health care provider of the same gender should be considered; when not feasible, a same-gender chaperone shall be provided.

When care is provided by a health care provider of the opposite gender, a detainee shall be provided a same-gender chaperone upon the detainee's request.

A same-gender chaperone shall be provided, even in the absence of a request by the detainee, when a

medical encounter involves a physical examination of sensitive body parts, to include breast, genital, or rectal examinations, by a provider of the opposite gender.   Only medical personnel may serve as chaperones during medical encounters and examinations.

## D. Preventive Services

Preventative services specific to women shall be offered for routine age appropriate screenings, to include breast examinations, pap smear, STD testing and mammograms. These services shall not interfere with detainee's deportation or release from custody date.

### 1. Contraception

Upon request, appropriately trained medical personnel within their scope of practice shall provide detainees with non-directive (impartial) advice and consultation about family planning and contraception, and where medically appropriate, prescribe and dispense medical contraception.

## E. Pregnancy

Upon confirmation by medical personnel that a female detainee is pregnant, she shall be given close medical supervision. Pregnant detainees shall have access to prenatal and specialized care, and comprehensive counseling inclusive of, but not limited to: nutrition, exercise, complications of pregnancy, prenatal vitamins, labor and delivery, postpartum care, lactation, family planning, abortion services and parental skills education.

The facility administrator shall ensure that the FOD is notified as soon as practicable of any female detainee determined to be pregnant, but no later than 72 hours after such determination, consistent with the notification requirements in Standard "4.3 Medical Care."

The medical provider will identify any special needs (e.g. diet, housing, or other accommodations such as the provision of additional pillows) and inform all

necessary custody staff and facility authorities. If a pregnant detainee has been identified as high risk, the detainee shall be referred, as appropriate, to a physician specializing in high risk pregnancies.

All chemically dependent pregnant detainees (psychological dependence includes alcohol, sedatives/hypnotics, anxiolytics and opioids) are considered high risk and referred to an obstetrician or another provider capable of addressing their needs immediately.

Pregnancy management and outcomes shall be monitored, quarterly, through a continuous quality improvement process.

### 1. Non-Use of Restraints

Restraints on Pregnant Women: A pregnant woman or women in post-delivery recuperation shall not be restrained absent truly extraordinary circumstances that render restraints absolutely necessary as documented by a supervisor or directed by the on-site medical authority. This general prohibition on restraints applies to all pregnant women in the custody of ICE, whether during transport, in a detention facility, or at an outside medical facility. Restraints are never permitted on women who are in active labor or delivery.

Restraints shall not be considered as an option, unless one or more of the following applies:

a. a medical officer has directed the use of restraints for medical reasons;

b. credible, reasonable grounds exist to believe the detainee presents an immediate and serious threat of hurting herself, staff or others; or

c. reasonable grounds exist to believe the detainee presents an immediate and credible risk of escape that cannot be reasonably minimized through any other method.

In the rare event that one of the above situations applies, medical staff shall determine the safest method and duration for the use of restraints and the

least restrictive restraints necessary shall be used.

Even in the extraordinary circumstance when restraints are deemed necessary, no detainee known to be pregnant shall be restrained in a face-down position with four-point restraints, on her back, or in a restraint belt that constricts the area of the pregnancy. All attempts shall be made to ensure that the detainee is placed on her left side if she is immobilized.

The use of restraints requires documented approval and guidance from the on-site medical authority. Record-keeping and reporting requirements regarding the medical approval to use restraints shall be consistent with other provisions within these standards, including documentation in the detainee's A-file, detention and medical files.

### 2. Abortion Access

In the event continued detention is necessary and appropriate, and consistent with the practice of our federal partners, if the life of the mother would be endangered by carrying a fetus to term, or in the case of rape or incest, ICE will assume the costs associated with a female detainee's decision to terminate a pregnancy.

a. In this instance, or in a situation where a female detainee opts to fund the termination of her pregnancy, ICE shall arrange for transportation at no cost to the detainee for the medical appointment and, if requested by the detainee, for access to religious counseling, and non-directive (impartial) medical resources and social counseling, to include outside social services or women's community resources groups.

b. If a detainee requests to terminate her pregnancy, ICE will document the request in the detainee's medical records. The detainee's statement should be signed personally by the detainee and include clear language of the detainee's intent.

## F. Mental Health Services

In addition to mental health services offered to all
detainees, mental health assessments shall be offered
to any detainee who has  given birth, miscarried or
terminated a pregnancy in the past 45 days.

# 4.5 Personal Hygiene

## I. Purpose and Scope

This detention standard ensures that each detainee is able to maintain acceptable personal hygiene practices through the provision of adequate bathing facilities and the issuance and exchange of clean clothing, bedding, linens, towels and personal hygiene items.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

For all types of facilities, procedures that appear in italics with a marked (**) on the page indicate optimum levels of compliance for this standard.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Each facility shall maintain an inventory of clothing, bedding, linens, towels and personal hygiene items that is sufficient to meet the needs of detainees;

2. Each detainee shall have suitable, clean bedding, linens, blankets and towels;

3. Each detainee shall have sufficient clean clothing that is properly fitted; climatically suitable, durable and presentable;

4. Detainees shall be held accountable for clothing, bedding, linens and towels assigned to them; and

5. Detainees, including those with disabilities and special needs, shall be able to maintain acceptable personal hygiene practices.

6. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate

## III. Standards Affected

This detention standard replaces the standard on "Personal Hygiene" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-4B-01 through 4B-09, 6A-08, 6B-05 through 6B-08.

"*Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities*," 79 Fed. Reg. 13100 (Mar. 7, 2014).

## V. Expected Practices

### A. Supply of Clothing, Bedding, Linen, Towel and Personal Hygiene Items

Each detention facility shall have written policy and procedures for the regular issuance and exchange of clothing, bedding, linens, towels and personal hygiene items. The supply of these items shall exceed the minimum required for the number of detainees to prevent delay in replacing the items.

To be prepared for unforeseen circumstances, it is a good practice for a detention facility to maintain an excess clothing inventory that is at least 200 percent of the maximum funded detainee capacity.

Each SPC and CDF shall have available, at all times, more clothing, bedding, linen and towels than needed to supply the maximum funded detainee capacity.  This excess will allow for the immediate replacement of items that are lost, destroyed, or worn out.

Clothing or shoes that are lost, unserviceable, indelibly stained, or bear offensive or otherwise unauthorized markings shall be discarded and replaced as soon as practicable.

### B. Issuance of Clothing

At no cost to the detainee, all new detainees shall be issued clean, laundered, indoor/outdoor temperature-appropriate, size appropriate, presentable clothing during intake.

The standard issue of clothing is at least two uniform shirts and two pairs of uniform pants or two jumpsuits; two pairs of socks; two pairs of underwear; two brassieres, as appropriate; and one pair of facility-issued footwear.  Additional clothing shall be issued as necessary for changing weather conditions or as seasonally appropriate. Footwear that is worn out or damaged shall be replaced at no cost to the detainee.

*For both males and females, personal items of clothing, including undergarments, are not permitted.*

Clothing issued at release shall be in accordance with standard "2.1 Admission and Release."

### C. Special Uniforms and Protective Equipment

Each detainee assigned to a special work area shall be clothed in accordance with the requirements of the job and, when appropriate, provided protective clothing and equipment in accordance with safety and security considerations.

### D. Personal Hygiene Items

Staff shall directly supervise the issuance of personal hygiene items to male and female detainees appropriate for their gender and shall replenish supplies as needed. Distribution of hygiene items shall not be used as reward or punishment.

Each detainee shall receive, at a minimum, the following items:

1. one bar of bath soap, or equivalent;

2. one comb;

3. one tube of toothpaste;

4. one toothbrush;

5. one bottle of shampoo, or equivalent; and

6. one container of skin lotion.

The facility administrator may modify this list as needed (e.g., to accommodate the use of bulk liquid soap and shampoo dispensers).

The distribution of razors must be strictly controlled. Disposable razors shall be provided to detainees on a daily basis. Razors shall be issued and collected daily by staff. Detainees shall not be permitted to share razors.

Female detainees shall be issued and may retain sufficient feminine hygiene items, including sanitary pads or tampons, for use during the menstrual cycle, and may be permitted unbreakable brushes with soft, synthetic bristles to replace combs. Cosmetics are prohibited, as are electric rollers, curling irons, hair dryers and similar appliances.

The responsible housing unit officer shall replenish personal hygiene items on an as-needed basis, in accordance with written facility procedures. The facility administrator may establish an empty container exchange system.

*If the facility has no detainee commissary, personal hygiene items from sources other than the issuing officer(s) may be permitted into the housing units only with the approval of the health services staff and the Chief of Security.*

## E. Bathing and Toilet Facilities

Detainees shall be provided:

1. an adequate number of toilets, 24 hours per day, which can be used without staff assistance when detainees are confined to their cells or sleeping areas.

   ACA Expected Practice 4-ALDF-4B-08 requires that toilets be provided at a minimum ratio of one for every 12 male detainees or one for every 8 female detainees. For males, urinals may be substituted for up to one-half of the toilets. All housing units with three or more detainees must have at least two toilets.

2. an adequate number of washbasins with temperature controlled hot and cold running water 24 hours per day.

   ACA Expected Practice 4-ALDF-4B-08 requires one

washbasin for every 12 detainees.

3. operable showers that are thermostatically controlled to temperatures between 100 and 120 F degrees, to ensure safety and promote hygienic practices.

   ACA Expected Practice 4-ALDF-4B-09 requires a minimum ratio of one shower for every 12 detainees.

Inspections of housing units shall periodically measure and document water temperature in the daily log.

Detainees shall be provided with a reasonably private environment in accordance with safety and security needs.  Detainees shall be able to shower, perform bodily functions, and change clothing without being viewed by staff of the opposite gender, except in exigent circumstances or when such viewing is incidental to routine cell checks or is otherwise appropriate in connection with a medical examination or monitored bowel movement.   Staff of the opposite gender shall announce their presence when entering an area where detainees are likely to be showering, performing bodily functions, or changing clothing.

When operationally feasible, transgender and intersex detainees shall be given the opportunity to shower separately from other detainees.

Detainees with disabilities shall be provided the facilities and support needed for self-care and personal hygiene in a reasonably private environment in which the individual can maintain dignity. When necessary, assistance to  detainees with disabilities who cannot perform basic life functions shall be provided by individuals who are trained and qualified to assist persons with physical and/or mental impairments. Such training may be provided by the health services authority and may involve the expertise of relevant community organizations and government agencies. Discrimination on the basis of disability is prohibited.

## F. Hair Care

Detainees are allowed freedom in personal grooming unless a valid safety, security, or medical concern requires an exception that is fully justified and documented.

Detainees shall be provided hair care services in a manner and environment that promotes sanitation and safety, in accordance with the requirements for "Barber Operations" in standard "1.2 Environmental Health and Safety" and requirements in standard "5.5 Religious Practices."

## G. Issuance of Bedding, Linen and Towels

All detainees shall be issued clean bedding, linens and a towel and be held accountable for those items.

The standard issues shall be, at a minimum:

1. bedding: one mattress, one blanket and one pillow (additional blankets shall be issued, based on local indoor-outdoor temperatures);

2. linens: two sheets and one pillowcase; and

3. towel: one towel.

## H. Exchange Requirements

Detainees shall be provided with clean clothing, linen and towels on the following basis:

1. a daily change of socks and undergarments; an additional exchange of undergarments shall be made available to detainees if necessary for health or sanitation reasons;

2. at least twice weekly exchange of outer garments (with a maximum of 72 hours between changes) at a minimum;

3. weekly exchange of sheets, towels and pillowcases at a minimum; and

4. an additional exchange of bedding, linens, towels or outer garments shall be made available to detainees if necessary for health or sanitation reasons, and more frequent exchanges of outer garments may be appropriate, especially in hot and humid climates.

Volunteer detainee workers may require exchanges of outer garments more frequently than every 72 hours; and

Volunteer food service workers shall exchange outer garments daily.

*Clothing exchanges shall generally be on a one-for-one basis to prevent hoarding and to ensure an adequate supply.*

*Detainees are not permitted to wash clothing, bedding, linens, tennis shoes, or other items in the living units, unless proper washing and drying equipment is available and the facility has written policy and procedures for their use. Any washing and drying policies and procedures shall be posted in the washing area and shall be included in the detainee handbook.*

# 4.6 Significant Self-harm and Suicide Prevention and Intervention

## I. Purpose and Scope

This detention standard protects the health and well-being of ICE detainees through a comprehensive Significant Self-Harm and Suicide Prevention and Intervention Program that minimizes risk.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

For all types of facilities, procedures that appear in italics with a marked (**) on the page indicate optimum levels of compliance for this standard.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. All facility staff members who interact with and/or are responsible for detainees shall receive comprehensive training initially during orientation and repeated at least annually, on effective methods for identifying significant self-harm, as well as suicide prevention and intervention with detainees.

2. Staff shall act to prevent significant self-harm and suicides with appropriate sensitivity, supervision, medical and mental health referrals and emergency medical procedures.

3. *Any clinically suicidal detainee or detainee at risk for significant self-harm shall receive preventive supervision, treatment and therapeutic follow-up, in accordance with ICE policies and detention standards.*

   *\*\*The facility shall be in compliance with standards set by the National Commission on Correctional Health Care (NCCHC) in its provision of preventive supervision, treatment, and therapeutic follow-up for clinically suicidal detainees or detainees at risk for significant self-harm.*

4. *The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.*

All written materials provided to detainees shall generally be translated into Spanish. Provisions for written translation shall be made for other significant segments of the population with limited English

proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Suicide Prevention and Intervention" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-4C-32, 4C-33, 2A-52.

American Correctional Association, *Performance-based Standards for Correctional Health Care for Adult Correctional Institutions:* 1-HC-1A-27, 1-HC-1A-30.

National Commission on Correctional Health Care, *Standards for Health Services in Jails.* (2014).

ICE/ERO *Performance-based National Detention Standards 2011:* "4.3 Medical Care."

ICE Notification and Reporting of Detainee Deaths Directive, No 7-9.0.

## V. Expected Practices

Each detention facility shall have a written suicide prevention and intervention program, including a multidisciplinary suicide prevention committee, that shall be reviewed and approved by the clinical medical authority (CMA), approved and signed by the health services administrator (HSA) and facility administrator, and reviewed annually.

The multidisciplinary suicide prevention committee shall, at a minimum, comprise representatives from custody, mental health, and medical staff.  The committee shall meet on at least a quarterly basis to provide input regarding all aspects of the facility's

suicide prevention and intervention program, including suicide prevention policies and staff training.  The committee shall convene following any suicide attempt to review and, if necessary, assist in the implementation of corrective actions.

At a minimum, the suicide prevention and intervention program shall include procedures to address suicidal detainees. Key components of this program must include the following:

1. staff training;
2. identification;
3. referral;
4. evaluation;
5. treatment;
6. housing;
7. monitoring;
8. communication;
9. intervention;
10. notification and reporting;
11. review; and
12. debriefing.

## A. Staff Training

All facility staff members who interact with and/or are responsible for detainees shall receive comprehensive suicide prevention training, during orientation and at least annually.

Initial suicide prevention training for all staff responsible for supervising detainees should consist of a minimum of eight hours of instruction. Subsequent annual suicide prevention training should consist of a minimum of two hours of refresher instruction.

All of the following interests should be incorporated into the required suicide prevention training:

1. Environmental concerns: why the environments

of detention facilities are conducive to suicidal behavior.

2. First Aid training: standard first aid training, cardiopulmonary resuscitation (CPR) training and training in the use of emergency equipment (that may be located in each housing area of the detention facility).

3. Liability: liability issues associated with detainee suicide.

4. Recognizing verbal and behavioral cues that indicate potential suicide.

5. Demographic, cultural and precipitating factors of suicidal behavior.

6.  Responding to suicidal and depressed detainees.

7. Effective communication between correctional and health care personnel.

8. Necessary referral procedures.

9. Constant observation and suicide-watch procedures.

10. Follow-up monitoring of detainees who have already attempted suicide.

11. Reporting and written documentation procedures.

Requesting that a detainee promise not to engage in suicidal behavior, also known as "contracting for safety," is not recognized or supported by experts, and is an ineffective method of suicide prevention. "Contracting for safety" provides no guarantee that the patient shall not attempt suicide, and may give staff a false sense of security. This practice is not to be relied on by staff.

## B. Identification

Detainees may be identified as being at risk for self-harm or suicide at any time.

### 1. Initial Screening

All detainees shall receive an initial mental health screening within 12 hours of admission by a qualified health care professional or health-trained correctional officer who has been specially trained, as required by "J. Medical and Mental Health Screening of New Arrivals" in Standard 4.3 "Medical Care". The results of the screening shall be documented on the approved intake screening form, which contains observation and interview questions related to the potential for significant self-harm/suicide.

At the time of screening, staff should also assess relevant available documentation as to whether the detainee has been a suicide risk in the past, including during any prior periods of detention or incarceration.

### 2. Ongoing Identification

Detainees also may be identified as being at risk for significant self-harm/suicide at any time while in ICE custody.  Staff must therefore remain vigilant in recognizing and appropriately reporting when a risk is identified.  This identification may result from a self-referral or through daily observation and/or interaction with medical staff, contract security staff or an ICE officer. Qualified, on-call clinical medical staff shall be available 24 hours per day for immediate consultation.

### 3. Significant Self-Harm/Suicidal Detainee

If medical staff determines that a detainee is at imminent risk of bodily injury or death, medical staff may make a recommendation to hospitalize the detainee for purposes of his/her evaluation and/or treatment. If the detainee is mentally incompetent, or is mentally competent and refuses, it may be necessary to petition the appropriate federal court to intervene against the detainee's refusal for purposes of his/her hospitalization and treatment. In such cases, the local ICE Office of Chief Counsel shall be consulted regarding appropriate further action.

## C. Referral

Detainees who are identified as being "at risk" for significant self-harm or suicide shall immediately be

referred to the mental health provider for an evaluation, which shall take place within 24 hours of the identification. Until this evaluation takes place, security staff shall place the detainee in a secure environment on a constant one-to-one visual observation.

## D. Evaluation

This evaluation shall be conducted by a qualified mental health professional which will determine the level of suicide risk, level of supervision needed, and need for transfer to an inpatient mental health facility. This evaluation shall be documented in the medical record and must include the following information:

1. relevant history;

2. environmental factors;

3. lethality of suicide plan;

4. psychological factors;

5. diagnoses;

6. a determination of seriousness of suicide risk;

7. level of supervision needed;

8. referral/transfer for inpatient care (if needed);

9. instructions to medical staff for care; and

10. a treatment plan, including reassessment time frames.

Detainees placed on suicide watch shall be re-evaluated by appropriately trained and qualified medical staff on a daily basis. The re-evaluation must be documented in the detainee's medical record.

Only the mental health professional, CMA, or designee may terminate a suicide watch after a current suicide risk assessment is completed. A detainee may not be returned to the general population until this assessment has been completed.

## E. Treatment

Based on the evaluation, as stipulated above, a mental health provider or other appropriately trained medical personnel shall develop a treatment plan. This plan must be documented and placed in the detainee's medical record. The treatment plan shall address the environmental, historical and psychological factors that contribute to the detainee's suicidal ideation. The treatment plan shall include:

1. strategies and interventions to be followed by the staff and detainee if suicidal ideation reoccurs;

2. strategies for the detainee's improved functioning; and

3. regular follow-up appointments based on the level of acuity.

## F. Housing and Monitoring

A suicidal detainee requires close supervision in a setting that minimizes opportunities for self-harm. If a staff member identifies someone who is at risk of significant self-harm or suicide, the detainee must be placed on suicide precautions and immediately referred to a qualified mental health professional.

The qualified mental health professional may place the detainee in a special isolation room designed for evaluation and treatment with continuous monitoring that must be documented every 15 minutes or more frequently if necessary. All suicidal detainees placed in an isolated confinement setting will receive continuous one-to-one monitoring, welfare checks at least every 8 hours conducted by clinical staff, and daily mental health treatment by a qualified clinician. The isolation room must be suicide resistant, which requires that it be free of objects and structural elements that could facilitate a suicide attempt. Security staff shall ensure that the room is inspected prior to the detainee's placement so that there are no objects that pose a threat to the detainee's safety.

If the qualified mental health professional determines that the detainee requires a special isolation room but there is either no space in the

medical housing unit or a medical housing unit does not exist, the detainee may, as a last resort, be temporarily placed in an administrative segregation cell in a Special Management Unit, provided space has been approved for this purpose by the medical staff and such space allows for constant and unobstructed observation. The facility administrator shall immediately notify ICE of such placement and indicate what level of monitoring the facility is providing. The facility administrator shall also work with ICE and the medical authority to identify alternative placements, including transfer of the detainee to a facility that can provide appropriate housing.

Suicidal detainees who are temporarily placed in a Special Management Unit shall have access to all programs and services, including recreation, visitation, telephones, counsel, and other services available to the general population, to the maximum extent possible.  The facility shall ensure that the decision to place a suicidal detainee in an administrative segregation cell in Special Management Unit is not punitive in nature, and, as required by "A. Placement in Administrative Segregation" in Standard 2.12 "Special Management Units", detainees in administrative segregation shall not be commingled with detainees in disciplinary segregation.

Detainees on suicide precautions who have not been placed in an isolated confinement setting by the qualified mental health professional will receive documented close observation at staggered intervals not to exceed 15 minutes (e.g. 5, 10, 7 minutes), checks at least every 8 hours by clinical staff, and daily mental health treatment by a qualified clinician.

## 1. No Excessive Deprivations

Deprivations and restrictions placed on suicidal detainees must be kept at a minimum. Suicidal detainees may be discouraged from expressing their intentions if the consequences of reporting those intentions are unpleasant or understood to result in punitive treatment or punishment. Placing suicidal detainees in conditions of confinement that are worse than those experienced by the general population detainees can result in the detainee not discussing his or her suicidal intentions and falsely showing an appearance of a swift recovery.

## 2. Clothing, Hygiene, and Privacy

The qualified mental health professional shall assess the detainee to determine whether a suicide smock is necessary. The facility may allow suicidal detainees under constant one-to-one monitoring to wear the standard issue clothing, minus any shoe laces, belts, or other accessories that could be used by a detainee to commit suicide or self-harm. Detainees should be provided suicide smocks to wear only when clinically indicated. Such special clothing must provide the detainee with sufficient warmth and modesty. A decision whether to provide underwear to detainees in suicide smocks shall be made by the clinical medical authority. Under no circumstance shall detainees be held without clothing.

Suicidal detainees shall be allowed to shower, perform bodily functions, and change clothing with as much privacy as possible under the continuous observation of staff, and without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances. Although staff of the opposite gender can be assigned to suicide watch, including constant observation, the facility must have procedures in place that enable a detainee on suicide watch to avoid exposing himself or herself to nonmedical staff of the opposite gender. This may be accomplished, for example, by substituting medical staff or same gender security staff to observe the periods of time when a detainee is showering, performing bodily functions, or changing clothes. It may also be accomplished by providing a shower with a partial curtain or other privacy shields. The privacy standards apply whether the viewing occurs in a cell or elsewhere.

However, any privacy accommodations must be implemented in a way that does not pose a safety risk for the individual on suicide watch. Safety is paramount when conducting a suicide watch, and if an immediate safety concern or detainee conduct makes it impractical to provide same gender coverage during a period in which the inmate is undressed, the detainee should continue to be observed, and any such incident should be documented.

### 3. Transfer to an Outside Facility

Any detainee who is believed to be in need of seclusion, and/or restraint due to self-harming or suicidal behavior should be transferred to a psychiatric facility, if deemed medically necessary to appropriately treat the needs of the detainee.

### 4. Post-Discharge from Suicide Watch

All detainees discharged from suicide observation should be re-assessed within 72 hours and then periodically at intervals prescribed by the treatment plan and consistent with the level of acuity by an appropriately trained and qualified medical staff member.

## G. Communication

### 1. Transfer of Detainee to ICE/ERO Custody

Upon change of custody to ICE/ERO from federal, state or local custody, ICE/ERO staff or designee shall inquire into any known prior suicidal behaviors or actions, and, if behaviors or actions are identified, shall ensure detainee safety pending evaluation by a medical provider. The patient's "medical summary report" shall be transferred in accordance with standard "7.4 Detainee Transfers."

### 2. Continuity of Communication Regarding Detainees in ICE/ERO Custody

Consistent communication shall be maintained between medical, mental health and correctional staff through a variety of mechanisms, in order to mitigate the risk for significant self-harm/suicide.

Such communication shall include the following:

a. intake forms;

b. daily briefings;

c. shift change briefings;

d. medical progress notes;

e. special needs forms;

f. medical/psychiatric alerts; and

g. transfer summaries.

## H. Intervention

Following a suicide attempt, security staff shall initiate and continue appropriate life-saving measures until relieved by arriving medical personnel. Arriving medical personnel shall perform appropriate medical evaluation and intervention. The CMA or designee shall be notified when a detainee requires transfer to a local hospital or emergency room.

## I. Notification and Reporting

In the event of a suicide attempt, all appropriate ICE and ICE Health Service Corps (IHSC) officials shall be notified through the chain of command. The detainee's family, if known, and appropriate outside authorities shall also be immediately notified.

In the event that a detainee dies as a result of a suicide, the Notification and Reporting of Detainee Deaths Directive shall be followed.

In both cases, medical staff shall complete an Incident Report Form within 24 hours, and all staff who came into contact with the detainee before the suicide attempt or death shall submit a statement describing their knowledge of the detainee and the incident.

## J. Review

Every death that results from a suicide shall be subject to a mortality review process and the Notification and Reporting of Detainee Deaths

Directive shall be followed. ICE shall make arrangements to complete a psychological reconstruction of the suicide. The mortality review process shall include review of: circumstances surrounding the incident, facility procedures relevant to the incident, training of staff, medical/mental health reports, identification of possible precipitating factors, recommendations for changes in response to the incident (e.g. policy, training or re-training, counseling, reprimand or discipline of staff identified as failing to follow suicide prevention procedures, physical plant, medical or mental health services and operational procedures).

## K. Debriefing

A critical incident debriefing following a suicide or serious suicide attempt shall be offered to all affected staff and detainees within 24 to 72 hours after the critical incident.

## L. Detainee Mental Health Follow-up

Following a suicide or serious suicide attempt, the facility should offer appropriate mental health services to other detainees who may have been affected.

# 4.7 Terminal Illness, Advance Directives and Death

## I.  Purpose and Scope

This detention standard ensures that each facility's continuum of health care services addresses terminal illness and advance directives, and provides specific guidance in the event of a detainee's death.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.*  Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1.  The continuum of health care services provided to detainees shall address terminal illness and advance directives. Appropriate to the circumstances, each detainee shall be provided with an option to complete an advance medical directive;

2.  *\*\*The facility shall be in compliance with standards set by the National Commission on Correctional Health Care (NCCHC) in its provision of medical care to terminally ill detainees.*

3.  In the event of a detainee's death, or a detainee becomes gravely ill, specified officials as listed herein and required by ICE policies and the detainee's designated next of kin shall be notified immediately;

4.  In the event of a detainee's death, required notifications shall be made to authorities outside of ICE/ERO (e.g., the local coroner or medical examiner), and required procedures shall be followed regarding such matters as autopsies, death certificates, burials and the disposition of decedent's property. Established guidelines and applicable laws shall be observed in regard to notification of a detainee death while in custody;

5.  The health services administrator (HSA) at the facility where the detainee was housed at the time of his/her death shall ensure the decedent's medical record is reviewed for completeness and closed out; and

6.  In the event of a detainee death, all property of the detainee shall be returned within two weeks to the detainee's next of kin, unless property of the decedent is being held as part of an investigation into the circumstances of death;

7.  The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including

bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Terminal Illness, Advance Directives and Death" dated 12/2/2008.

## IV. References

National Commission on Correctional Health Care, *Standards for Health Care in Jails* (2014).

ICE/ERO *Performance-based National Detention Standards 2011:* "4.3 Medical Care."

ICE Directive on "Notification and Reporting of Detainee Deaths," Directive 7.9-0, October 1, 2009

## V. Expected Practices

### A. Terminal Illness

When a detainee's medical condition becomes life-threatening, the facility's clinical medical authority (CMA), or HSA, shall:

1. Arrange the transfer of the detainee to an appropriate off-site medical or community facility if appropriate and medically necessary; and

2. Immediately notify the facility administrator and/or ICE/ERO Field Office Director both verbally and in writing of the detainee's condition. The memorandum shall describe the detainee's illness and prognosis.

The facility administrator, or designee, shall immediately notify ICE/ERO and IHSC.

A detainee in a community hospital remains detained under ICE/ERO authority, such that ICE/ERO retains the authority to make administrative, non-medical decisions affecting the detainee (visitors, movement, authorization of care services, etc.). However, upon physical transfer of the patient to the community hospital's care, the hospital assumes:

1. medical decision-making authority consistent with the contract (drug regimen, lab tests, x-rays, treatments, etc.); and

2. authority over the detainee's treatment, which is exercised by the hospital's medical staff once IHSC is notified of admission. However, IHSC managed care and the facility's HSA shall follow up on a daily basis to receive information about major developments.

To that end, the hospital's internal rules and procedures concerning seriously ill, injured and dying patients shall apply to detainees. The Field Office Director or designee shall immediately notify (or make reasonable efforts to notify) the detainee's next-of-kin of the medical condition and status, the detainee's location, and the visiting hours and rules at that location, in a language or manner which they can understand.

ICE/ERO, in conjunction with the medical provider, shall provide family members and any others as much opportunity for visitation as possible, in keeping with the safety, security and good order of the facility. Facility staff shall be reminded to observe and maintain safety and security measures while finding ways to respectfully accommodate the family and detainee needs at this sensitive time.

### B. Living Wills and Advance Directives

Once a detainee is diagnosed as having a terminal illness or remaining life expectancy of less than one year, the medical staff shall offer the detainee access

to forms or other related materials on Advance
Directives or Living Wills, including the appropriate
translation services when needed. Likewise, when
the detainee is held at an off-site facility, staff at that
facility may assist the detainee in completing an
Advance Directive and/or Living Will.

All facilities shall use the State Advance Directive
form, appropriate to the state in which the facility is
located, for implementing Living Wills and Advance
Directives, the guidelines for which include
instructions for detainees who wish to:

1. have a living will other than the generic form
   made available by medical staff; or

2. appoint another individual to make advance
   decisions for him/her.

At any time, a detainee may request forms or other
related materials on Advance Directives or Living
Wills. These may be prepared by the detainee's
attorney at the detainee's expense.

When the terms of the Advance Directive must be
implemented, the medical professional overseeing
the detainee's care shall contact the appropriate
ICE/ERO representative.

ICE/ERO may seek judicial or administrative review
of a detainee's Advance Directive as appropriate.

## C. Do Not Resuscitate (DNR) Orders

Each facility holding detainees shall establish written
policy and procedures governing DNR orders. Local
procedures and guidelines must be in accordance
with the laws of the state in which the facility is
located.

Health care shall continue to be provided consistent
with the DNR order. If the DNR order is not
physically present or there is any question about the
validity of the document, appropriate resuscitative
aid shall be rendered until the existence of an active,
properly executed DNR is verified.

Each facility's DNR policy shall comply with the
following stipulations:

1. a DNR written by a staff physician requires the
   CMA's approval;

2. the policy shall protect basic patient rights and
   otherwise comply with state requirements and
   jurisdiction in which the facility is located;

3. a decision to withhold resuscitative services shall
   be considered only under specified conditions:

   a. the detainee is diagnosed as having a terminal
      illness;

   b. the detainee has requested and signed the
      order (if the detainee is unconscious,
      incompetent, or otherwise unable to
      participate in the decision, staff shall attempt
      to obtain the written concurrence of an
      immediate family member, and the attending
      physician shall document these efforts in the
      medical record); and

   c. the decision is consistent with sound medical
      practice, and is not in any way associated with
      assisting suicide, euthanasia or other such
      measures to hasten death; and

4. the detainee's medical file shall include
   documentation validating the DNR order:

   a. a standard stipulation at the front of the in-
      patient record, and explicit directions: "do not
      resuscitate" or "DNR"; and

   b. forms and memoranda recording:

      1) diagnosis and prognosis;

      2) express wishes of the detainee (e.g., living
         will, advance directive, or other signed
         document);

      3) immediate family's wishes, if immediate
         family has been identified;

      4) consensual decisions and recommendations
         of medical professionals, identified by
         name and title;

      5) mental competency (psychiatric)
         evaluation, if detainee concurred in, but did

not initiate, the DNR decision; and

6) informed consent evidenced, among other things, by the legibility of the DNR order, signed by the ordering physician, and CMA; and

5. a detainee with a DNR order may receive all therapeutic efforts short of resuscitation;

6. the facility shall follow written procedures for notifying attending medical staff of the DNR order; and

7. as soon as practicable, the CD or HSA shall notify the IHSC medical director and the respective ICE Office of Chief Counsel of the basic circumstances of any detainee for whom a DNR order has been filed in the medical record.

## D. Organ Donation by Detainees

If a detainee wants to donate an organ:

1. the organ recipient must be a member of the donor's immediate family;

2. the detainee may not donate blood or blood products;

3. all costs associated with the organ donation (e.g., hospitalization, fees) shall be at the expense of the detainee, involving no Government funds;

4. the detainee shall sign a statement that documents his/her:

   a. decision to donate the organ to the specified family member;

   b. understanding and acceptance of the risks associated with the operation;

   c. that the decision was undertaken of his/her own free will and without coercion or duress; and

   d. understanding that the Government shall not be held responsible for any resulting medical complications or financial obligations incurred;

5. IHSC medical staff shall assist in the preliminary medical evaluation, contingent on the availability of resources; and

6. the facility shall coordinate arrangements for the donation.

## E. Death of a Detainee in ICE/ERO Custody

Each facility shall have written policy and procedures to be followed to notify ICE/ERO officials, next-of-kin and consulate officials of a detainee's death, in accordance with ICE Directive on Notification and Reporting of Detainee Deaths, Directive 7.9-0, October 1, 2009.

## F. Disposition of Property

Facilities shall turn over the property of the decedent to ICE/ERO within one week for processing and disposition. Unless property of a decedent is being held as part of an investigation into the circumstances of death, that property should be returned to the decedent's next of kin, if known, within two weeks.

## G. Disposition of Remains

Within seven calendar days of the date of notification, either in writing or in person, the family shall have the opportunity to claim the remains. If the family chooses to claim the body, the family shall assume responsibility for making the necessary arrangements and paying all associated costs (e.g., transportation of body, burial).

If the family wishes to claim the remains, but cannot afford the transportation costs, ICE/ERO may assist the family by transporting the remains to a location in the United States. As a rule, the family alone is responsible for researching and complying with airline rules and federal regulations on transporting the body; however, ICE/ERO may coordinate the logistical details involved in returning the remains.

If family members cannot be located or decline orally

or in writing to claim the remains, ICE/ERO shall notify the consulate, in writing, after which the consulate shall have seven calendar days to claim the remains and be responsible for making the necessary arrangements and paying all costs incurred (e.g., moving the body, burial).

If neither the family nor the consulate claims the remains, ICE/ERO shall schedule an indigent's burial, consistent with local procedures. However, if the detainee's record indicates U.S. military service, before proceeding with the indigent burial arrangements, ICE/ERO shall contact the Department of Veterans Affairs to determine whether the decedent is eligible for burial benefits.

The Chaplain may advise the facility administrator and others involved about religious considerations that could influence the decision about the disposition of remains.

Under no circumstances shall ICE/ERO authorize cremation or donation of the remains for medical research.

## H. Death Certificate

The facility administrator shall specify policy and procedures regarding responsibility for proper distribution of the death certificate, as follows:

1. send the original to the person who claimed the body, with a certified copy in the A-file on the decedent; or

2. if the decedent received an indigent's burial, place the original death certificate in the A-file.

## I. Autopsies

Each facility shall have written policy and procedures to implement the provisions detailed below in this section.

1. the facility chaplain shall be involved in formulation of the facility's procedures;

2. because state laws vary greatly, including when to contact the coroner or medical examiner, the respective ICE Office of Chief Counsel shall be consulted; and

3. a copy of the written procedures shall be forwarded to the ICE Office of Chief Counsel.

The written procedures shall address, at a minimum, the following;

1. contacting the local coroner or medical examiner, in accordance with established guidelines and applicable laws;

2. scheduling the autopsy;

3. identifying the person who shall perform the autopsy;

4. obtaining the official death certificate; and

5. transporting the body to the coroner or medical examiner's office.

   a. Who May Order an Autopsy
   The FBI, local coroner, medical examiner, ICE personnel or clinical medical/administrative health authority may order an autopsy and related scientific or medical tests to be performed in a homicide, suicide, fatal accident or other detainee's death, in accordance with established guidelines and applicable laws.

   The FBI, local coroner, medical examiner, ICE personnel or clinical medical/administrative health authority may order an autopsy or post-mortem operation for other cases, with the written consent of a person authorized under state law to give such consent (e.g., the local coroner or medical examiner, or next-of-kin), or authorize a tissue transfer authorized in advance by the decedent.

   b. Making Arrangements for an Autopsy
   Medical staff shall arrange for the approved autopsy to be performed by the local coroner or medical examiner, in accordance with established guidelines and applicable laws:

1) while a decision on an autopsy is pending, no action shall be taken that shall affect the validity of the autopsy results; and

2) local law may also require an autopsy for death occurring when the decedent was otherwise unattended by a physician.

3) Religious Considerations

It is critical that the Field Office Director, or designee, verify the detainee's religious preference prior to final authorizations for autopsies or embalming, and accommodate religious-specific requirements.

# 4.8 Disability Identification, Assessment, and Accommodation

## I. Purpose and Scope

This detention standard requires that facilities housing ICE/ERO detainees act affirmatively to prevent disability discrimination.  It outlines the necessary processes to ensure that detainees with a disability will have an equal opportunity to participate in, access, and enjoy the benefits of the facility's programs, services, and activities.  Such participation will be accomplished in the least restrictive and most integrated setting possible, through the provision of reasonable accommodations, modifications, and/or auxiliary aids and services, as necessary, and in a facility that is physically accessible.

This detention standard applies to the following types of facilities housing ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.*  Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices"). For purposes of this standard, reasonable accommodations, disability-related modifications, and auxiliary aids and services are collectively referred to as "accommodations" or "reasonable accommodations."

1. In addition to the requirements in this detention standard, the facility shall comply with Section 504 of the Rehabilitation Act of 1973 (Section 504), Title II of the Americans with Disabilities Act of 1990, as amended (ADA), if applicable, and any other applicable federal, state or local laws or regulations related to nondiscrimination and accommodation for individuals with disabilities.

2. The facility will provide reasonable accommodations to provide detainees with disabilities an equal opportunity to access, participate in, or benefit from the facility's programs, services, and activities.

3. When considering what reasonable accommodations to provide, the facility will engage in an interactive and individualized process that considers the detainee's needs and gives primary consideration to the preferences of the detainee with a disability, as outlined in this standard.

4. The facility shall develop policies or procedures to allow for effective communication with detainees with disabilities – which may include the provision of auxiliary aids and services – during the interactive process as well as within the facility generally.

5. Each facility shall designate at least one staff member to serve as the facility's Disability Compliance Manager.  This individual will assist in ensuring compliance with this standard and all applicable federal, state and local laws related to

accommodations for detainees with disabilities.

6. The facility orientation program and the detainee handbook shall notify and inform detainees about the facility's disability accommodations policy, including their right to request reasonable accommodations and how to make such a request.

7. Facility staff shall receive training on reasonable accommodations policies and procedures, to include the actions they must take upon identifying a detainee with a disability who may require an accommodation, modification, and/or auxiliary aid or service.

8. The facility shall provide detainees with disabilities who are limited in their English proficiency (LEP) with meaningful access to its programs and activities through language assistance, including bilingual staff or professional interpretation and translation services. Meaningful access to facility programs and activities includes the effective communication of the applicable content and procedures in this standard.

9. The facility shall provide physical access to programs and activities in the least restrictive setting possible, and in the most integrated setting appropriate to the needs of the detainee with a disability. Detainees with disabilities requiring an assistive device, such as a crutch or wheelchair, shall normally be permitted to keep those items with them at all times. Removal of any such devices because of concerns related to safety and security must be based on individualized review and the justification documented. A detainee's disability or need for assistive devices or equipment may not provide the sole basis for the facility's decision to place the detainee apart from the general population.

10. Compliance with the reasonable accommodations policies and procedures articulated in this standard shall be consistently

documented where practicable, as stated in this standard.

11. The facility administrator shall convene a multidisciplinary team to assess the cases of detainees with communication and mobility impairments, detainees whose initial requests for accommodations have been denied, and complex cases. The multidisciplinary team will determine whether the detainee has a disability, whether the detainee requires an accommodation to access the facility's programs and activities, and whether to grant or recommend denying the requested accommodation. Any denial by the multidisciplinary team of a request for accommodation related to a disability must be approved by the facility administrator or assistant facility administrator.

12. The local ICE/ERO Field Office shall be notified no later than 72 hours after the completed review and assessment of any detainee with a communication or mobility impairment. Facilities shall also notify the Field Office within 72 hours of any denial of a detainee's request for a disability-related accommodation.

13. Detainees shall be permitted to raise concerns about disability-related accommodations and/or the accommodations process through the grievance system, as outlined in standard 6.2 "Grievance System." Facilities shall ensure that detainees with disabilities have equal opportunity to access and participate in the grievance system, including by allowing for effective communication, which can include the provision of auxiliary aids and services, throughout the process.

## III. Standards Affected

Not applicable.

## IV. References

ICE/ERO *Performance-Based National Detention*

*Standards 2011*:

- "1.3 Transportation (by Land)";
- "2.1 Admission and Release";
- "2.2 Custody Classification System";
- "2.6 Hold Rooms in Detention Facilities";
- "2.11 Sexual Abuse and Assault Prevention and Intervention";
- "2.13 Staff-Detainee Communication";
- "3.1 Disciplinary System";
- "4.3 Medical Care";
- "4.5 Personal Hygiene";
- "5.2 Trips for Non-Medical Emergencies";
- "5.4 Recreation";
- "5.5 Religious Practices";
- "5.6 Telephone Access";
- "5.8 Voluntary Work Program";
- "6.2 Grievance System"; and
- "7.3 Staff Training."

Title II of the Americans with Disabilities Act of 1990, as amended, and its implementing regulation at 28 C.F.R. Part 35.

The Architectural Barriers Act of 1968, as amended.

Section 504 of the Rehabilitation Act of 1973, and DHS implementing regulation at 6 C.F.R. Part 15.

DHS Directive 065-01, "Nondiscrimination for Individuals with Disabilities in DHS-conducted Programs and Activities (Non-Employment)" (Sept. 25, 2013).

ICE Directive "Assessment and Accommodations for Detainees with Disabilities" (December 15, 2016).

ICE Policy No. 11065.1, "Review of the Use of Segregation for ICE Detainees" (Sept. 4, 2013).

# V. Expected Practices

## A. Definitions

### 1. Disability

For purposes of these detention standards, the term "disability" means either of the below:

a.  a physical or mental impairment that substantially limits one or more of an individual's major life activities; or

b.  a record of such a physical or mental impairment.

"Major life activities" are basic activities that a detainee without a disability in the general population can perform with little or no difficulty, including, but  not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.  A major life activity can also include the operation of major bodily functions, like the immune, endocrine, and neurological systems; normal cell growth; digestion, respiration, and circulation; and the operations of the bowel, bladder, and brain.

### 2. Communication Impairments

Detainees with "communication impairments" include detainees with physical, hearing, vision, and speech impairments (e.g., detainees who have hearing loss or are deaf; blind; have visual impairments; or nonverbal).

### 3. Mobility Impairments

Detainees with "mobility impairments" include detainees with physical impairments who require a wheelchair, crutches, prosthesis, cane, or other mobility device, or other assistance.

### 4. Programs, Services, or Activities

For purposes of these standards, the "programs," "services," "benefits," and/or "activities" of a

detention facility include all aspects of the facility's operations that involve detainees.  These include, but are not limited to, housing placements, medical care, safety and security protocols, food services, correspondence, visitation, grievance systems, transfers, and detainee programming and scheduled activities such as law and leisure libraries, religious services, educational or vocational classes, work programs, and recreation.

### 5. Auxiliary Aids or Services

"Auxiliary aids or services" are services or devices that allow for effective communication by affording individuals with impaired vision, hearing, speaking, sensory, and manual skills an equal opportunity to participate in, and enjoy the benefits of, programs and activities.  Such aids or services include interpreters, written materials, note-takers, video remote interpreting services, or other effective methods of making aurally delivered materials available to detainees with hearing impairments; readers, taped texts, materials or displays in Braille, secondary auditory programs, or other effective methods of making visually delivered materials available to detainees with visual impairments; acquisition or modification of equipment or devices; and other similar services and actions.

### 6. Reasonable Accommodations

For purposes of these standards, "reasonable accommodation" means any change or adjustment in detention facility operations, any modification to detention facility policy, practice, or procedure, or any provision of an aid or service that permits a detainee with a disability to participate in the facility's programs, services, activities, or requirements, or to enjoy the benefits and privileges of detention programs equal to those enjoyed by detainees without disabilities.  Examples of "reasonable accommodations" include, but are not limited to, proper medication and medical treatment; accessible housing, toilet, and shower facilities; devices like bed transfer, accessible beds or

shower chairs, hearing aids, or canes; and assistance with toileting and hygiene.

When considering requests for reasonable accommodations or modifications, the facility shall engage in an interactive and individualized process as outlined in section F below.

For the purposes of this standard, and particularly section F below, reasonable accommodations, disability-related modifications, and auxiliary aids and services are collectively referred to as "accommodations" or "reasonable accommodations."

## B. Written Policy and Procedures, and Compliance Manager

### 1. Reasonable Accommodation Policy

The facility shall develop written policy and procedures, including reasonable timelines, for reviewing detainees' requests for accommodations related to a disability and for providing accommodations (including interim accommodations), modifications, and reassessments. These policies and procedures shall be consistent with the processes outlined in this standard.

### 2. Disability Compliance Manager

The facility shall designate a Disability Compliance Manager to assist facility personnel in ensuring compliance with this standard and all applicable federal, state, and local laws related to accommodation of detainees with disabilities.  The Disability Compliance Manager may be the Health Services Administrator, a member of the medical staff, or anyone with relevant knowledge, education, and/or experience.

## C. Identification

A detainee may identify him- or herself as having a disability and/or request a reasonable accommodation at any point during detention. Detainees may submit a formal or informal (i.e., verbal or written) request for accommodations or

assistance.  Requests should be reviewed in context, and do not need to include the words "disability" or "accommodation" to be considered a request for accommodations.  The facility shall also consider information submitted by a third party, such as an attorney, family member, or other detainee identifying a detainee with a disability or a detainee's need for an accommodation.

Further, it is incumbent upon facility staff to identify detainees with impairments that are open, obvious, and apparent.  Identification of detainees with potential disabilities (i.e., impairments that are open, obvious, and apparent) may occur through medical or intake screenings, or through direct observation.  Staff should be particularly vigilant for impairments that affect a detainee's mobility or ability to communicate.  Upon identifying a detainee with a potential disability, the facility shall review the need for any necessary accommodations pursuant to Section F below.

The processes described in this standard apply to any detainee who has requested an accommodation or auxiliary aid or service, or who has otherwise been identified as potentially needing an accommodation.

## D. Physical Accessibility and Most Integrated Setting Possible

### 1. Physical Accessibility

The facility shall comply with all applicable federal, state, and local laws and regulations related to the accessibility of safe and appropriate housing for detainees with disabilities.

The facility will ensure that detainees with disabilities are able to physically access its programs, services, and activities.  This includes, for example, ensuring detainees with disabilities can access telephones, as well as toileting and bathing facilities.

### 2. Most Integrated Setting

Every detainee with a disability will be housed in a space that affords him or her safe, appropriate living conditions.  Detainees with disabilities should be provided access to the facility's programs and services in the least restrictive setting possible and the most integrated setting appropriate to the needs of the detainee with a disability.

Detainees with disabilities shall generally be permitted to keep assistive devices (including such aids as canes and crutches) with them at all times, including in general population.  Placement apart from the general population due to security concerns related to the use of any such item must be based on individualized review, and the justification for the placement must be documented, whether the detainee is placed in an SMU, medical clinic, or elsewhere.  The justification shall set forth the individualized assessment of the safety or security concern created by the assistive device that could not be eliminated or mitigated by modification of policies or procedures.

A detainee's disability or need for accommodations may not provide the sole basis for a decision to place the detainee in an SMU.  An individualized assessment must be made in each case, and the justification for the placement documented.

## E. Effective Communication

Throughout the facility's programs and activities, including at all stages of the reasonable accommodation process, the facility must take appropriate steps to allow for effective communication with detainees with disabilities to afford them an equal opportunity to participate in, and enjoy the benefits of, the facility's programs and activities.  Steps to ensure effective communication may include the provision and use of auxiliary aids or services for detainees with vision, hearing, sensory, speech, and manual impairments, as needed.  The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual detainee, the nature, length, and complexity of the

communication involved, and the context in which the communication is taking place.  In determining what types of auxiliary aids or services are necessary, the facility shall give primary consideration to the request of the detainee with a disability.

Use of other detainees to interpret or facilitate communication with a detainee with a disability may only occur in emergencies.

## F. Reasonable Accommodations Process

The facility's process to appropriately accommodate a detainee with a disability will differ depending on the nature of the impairment or disability being addressed.  However, in certain cases, the facility administrator or his or her designee shall automatically convene a multidisciplinary team, as described in section 4 below.

### 1. Immediate Accommodations

The facility shall provide detainees with disabilities with necessary accommodations in an expeditious manner.  In many situations, the facility will be able to immediately grant a detainee's request for an accommodation.  Where a request for accommodation is immediately granted and provided, and the accommodation fully addresses the detainee's ability to access the facility's programs and activities, the facility's response will not ordinarily involve referral to a multidisciplinary team.

### 2. Medical and Mental Health Treatment

Many detainees with disabilities will receive medical and/or mental health treatment from the facility's clinical medical authority.  Where a detainee with a disability is fully able to access the facility's programs and activities through the provision of appropriate medical or mental health treatment, further interactive process may not be necessary.  However, where the provision of accommodations depends on medical expenditures requiring ICE authorization, the facility shall consider whether there are any interim accommodations that would afford the detainee access to its programs and activities pending ICE authorization (for example, providing a wheelchair as an interim accommodation to allow for mobility while a prosthesis is repaired), and shall provide to the detainee any such interim accommodations it identifies.

### 3. Detainees with Cognitive, Intellectual, or Developmental Disabilities

Referral to the multidisciplinary team may be appropriate for detainees who are identified as having a cognitive, intellectual, or developmental disability, including a traumatic brain injury.  Such detainees may face difficulties navigating the detention environment, including disciplinary, grievance, and other processes.  Additionally, such detainees may not understand the process for requesting an accommodation or be aware of limitations on their access to facility programs.  Facility staff should not require the detainee's participation in the assessment process, and should be sensitive to the fact that some detainees in this category may not perceive themselves as having a disability.  However, facility staff should provide appropriate assistance to a detainee with a cognitive, intellectual, or developmental disability, even if not explicitly requested (for example, reading and explaining a form to a detainee with limited cognitive abilities).  Pursuant to Standard 4.3 "Medical Care," the facility is also required to report the identification of detainees with certain cognitive, intellectual, or developmental disabilities to the ICE/ERO Field Office.

### 4. Multidisciplinary Team

Requests or referrals that require an evaluation by a multidisciplinary team include (1) detainees with mobility impairments; (2) detainees with communication impairments; (3) detainees whose initial requests for accommodations or assistance have been denied; (4) detainees who have filed

grievances about the accommodation of their disabilities or impairments; (5) detainees whose requests are complex or best addressed by staff from more than one discipline (e.g., security, programming, medical, or mental health, etc.); and (6) detainees whose cases are otherwise determined by facility staff to be appropriate for referral to the team.

The multidisciplinary team will include a healthcare professional and any additional facility staff with requisite knowledge of and/or responsibility for compliance with disability policies and procedures. The team may consist of two or more staff and may have different members at different times, depending on the detainee or request for accommodations under review.  When appropriate, the multidisciplinary team shall consult with ICE/ERO to obtain guidance, information, and/or resources for providing accommodations.

The team is encouraged to consult with local and community resources that may have subject matter expertise on the provision of accommodations, modifications, and services.  This consultation may include training, information on the availability of accommodations and services, and best practices. However, all external communications regarding individual detainees are subject to applicable privacy limitations and protections and must be conducted in a manner consistent with the Privacy Act.

a.  Interaction with the Detainee

Given the importance of considering information from the detainee, the multidisciplinary team shall make a good faith attempt to interview the detainee and determine the nature of the detainee's disability, any difficulties the detainee experiences in accessing the facility or its programs or services, and the detainee's specific requests or needs for accommodation, if any. The multidisciplinary team will respect any detainee's decision to decline to participate in the accommodation process, including the invitation

to interview with the multidisciplinary team.  If a detainee declines such an invitation, the multidisciplinary team will document this declination.

b.  Multidisciplinary Team Determinations

The multidisciplinary team will determine whether the detainee has a disability, whether the detainee requires an accommodation to meaningfully access the facility's programs and activities, and whether to grant or recommend denying the requested accommodation (if any) or propose an alternate, equally effective accommodation.  The multidisciplinary team will issue a written decision, including the documentation outlined below, within 5 working days of the request or referral.

If there is a delay in determining whether to approve an accommodation request or in providing the detainee with an approved accommodation, the multidisciplinary team shall consider whether there are any interim accommodations that would afford the detainee access to its programs and activities pending the final disposition of the request or the provision of approved accommodations.  The facility shall provide to the detainee any such interim accommodations it identifies.

Where the multidisciplinary team approves a request for an accommodation, but the recommended accommodation requires approval from ICE (i.e., expenditures on medical treatment, medication, and durable medical equipment that require IHSC authorization), the team will inform the detainee of the decision and the status of the request with ICE and shall consider whether to provide an interim accommodation.  The facility shall provide to the detainee any such interim accommodations it identifies.

Where the multidisciplinary team approves a request for accommodations, and can

immediately provide the necessary accommodation, that decision will be the final facility determination, and the team will follow the notification procedures outlined below and implement the approved accommodations as quickly as possible.

c. Final Review of Any Denial by Facility Administrator or Assistant Facility Administrator

Any denial by the multidisciplinary team of a request for accommodation related to a disability must be approved by the facility administrator or assistant facility administrator. Such denials include all cases in which the multidisciplinary team determines that accommodations, including all requested accommodations, should be denied; or that alternate unrequested accommodation(s) should be provided. The facility administrator shall complete his or her review of the multidisciplinary team's decision within 3 working days of the team decision.

d. Detainee Notification

The facility will provide the detainee with written notification of the final decision on his or her request for accommodation, regardless of whether an accommodation was granted or denied, and regardless of whether the accommodation requires further approval by ICE. Notification that an approved accommodation request has been granted or submitted to ICE will be provided at the conclusion of the multidisciplinary team review. Notification of a denied accommodation, or provision of an alternate, unrequested accommodation, will be provided only after review and concurrence by the facility administrator or assistant facility administrator, and will include a justification for the denial. Notification shall be provided in a language or manner the detainee can understand.

e. Staff Notification

Where an accommodation is granted, facility policy or procedures will ensure that all relevant facility staff, including facility security staff, receive timely notification and, as needed, instructions for successful implementation of the accommodation. These procedures will also account for any applicable privacy and confidentiality considerations.

f. Initial and Periodic Reassessments

An initial re-assessment of approved accommodations must be completed within 30 days of the original assessment by the multidisciplinary team. All reassessments shall include a good faith attempt to interview the detainee regarding the current accommodations provided and the need, if any, for changes to the detainee's accommodation plan.

Subsequent periodic reassessments of approved accommodations shall take place at a minimum every 90 days thereafter, unless requested sooner by the detainee. Such reassessments should evaluate the efficacy of the accommodation(s) provided, the continued need for accommodation and whether alternate accommodation(s) would be more effective or appropriate. Initial and periodic reassessments shall be documented in the detainee's medical and/or facility file.

g. Documentation

After the facility has completed its review of a detainee with a disability or of a request for an accommodation, facility staff shall place written documentation of the following in the detainee's medical and/or detention file, as appropriate:

1) date of the initial assessment interview with the detainee with a potential disability, along with the name(s) and title(s) of any/all facility staff in attendance;

2) summary of the detainee's request, if any, including any specific accommodations requested, and any information or

observations related to the detainee's disability;

3) finding on whether the detainee has a disability and how the disability or impairment limits the detainee's ability to access programs or activities within the detention setting;

4) the facility's final decision on any requested accommodations;

5) provision of any aids or services to the detainee, including the specific type(s) of accommodation provided and/or steps taken by the facility, and the implementation date(s);

6) a copy of any written notification provided to the detainee, including the justification in the case of a denial; and

7) the results and date(s) of any reassessment(s), if applicable, including reasons for any decisions made.

## G. Denial of an Accommodation

Permissible reasons for the facility to deny an accommodation to a detainee who has been determined to have a disability include:  (1) the detainee is not denied access to the facility's programs or activities because of a disability; (2) there is not a nexus between the disability and the requested accommodation; (3) the requested accommodation would fundamentally alter the nature of the program, service, or activity; (4) the requested accommodation would result in an undue financial and administrative burden; or (5) the detainee poses a direct threat to staff or other detainees.

Both "fundamental alteration" and "undue financial and administrative burden" are generally high standards that are difficult to meet.  Further, if a particular accommodation would result in an undue financial and administrative burden or fundamental alteration, the facility must take any other action that would not result in such an undue burden or fundamental alteration but would nevertheless ensure that, to the maximum extent possible, detainees with a disability receive the benefits and services of the program or activity.  Similarly, determinations that individuals pose a "direct threat" are generally very rare, and require a careful, individualized assessment as described below.

### 1. Fundamental Alteration

A "fundamental alteration" to a facility's programs, services, or activities is a change that is so significant that it alters the essential nature of the program, service, or activity offered.  Whether a change constitutes a fundamental alteration is a determination that must be made on a case-by-case basis, and that must consider the unique characteristics of each facility and each detainee with a disability.

### 2. Undue Financial and Administrative Burden

An "undue financial and administrative burden" is a significant difficulty or expense related to a facility's operations, programs, or activities.  In evaluating whether a particular accommodation would result in an undue burden, the facility must consider all resources available for use in the funding and operation of the conducted program or activity *as a whole*.

### 3. Direct Threat

The facility may justify the denial of an accommodation to a detainee with a disability on the basis of the detainee posing a direct threat to staff or other detainees only if providing the accommodation would unavoidably exacerbate the threat.  The determination that a detainee with a disability poses such a direct threat to staff or other detainees must be reached through an individualized assessment by a multidisciplinary team.  The assessment must rely on reasonable judgment and current medical evidence, or the best available

objective evidence, to determine the nature, duration, and severity of the risk, and whether any modifications of policies, practices, or procedures can mitigate or eliminate the risk.  Detainees who are found to pose a direct threat are nevertheless entitled to auxiliary aids or services to allow for effective communication.

## H. External Notifications

### 1. Notification of a Detainee with a Communication or Mobility Impairment

The facility shall notify the Field Office Director as soon as practicable, but no later than 72 hours, after the multidisciplinary team has completed its review of the needs of any detainee with a communication or mobility impairment.  This notification must include, at a minimum,

a.  the nature of the detainee's disability or impairment;

b.  the accommodation requested by the detainee; and

c.  the facility's plan to accommodate the detainee.

### 2. Notification of Facility Denials and Provision of Alternative Accommodations

The facility shall notify the Field Office Director in writing within 72 hours of any final denial by the facility administrator or assistant facility administrator of any accommodations request reviewed by the multidisciplinary team.  This notification must include, at a minimum,

a.  the nature of the detainee's disability;

b.  the accommodation requested by the detainee;

c.  the reason for denial; and

d.  any steps the facility has taken to address the detainee's needs.

ICE may review the facility's denial of a request for an accommodation.  The facility shall provide additional information as needed to further ICE's

review, and shall cooperate with ICE on any additional steps that may be necessary.

## I. Staff Training

Training on the facility's Disability and Reasonable Accommodations procedures shall be provided to employees, volunteers, and contract personnel, and shall also be included in annual refresher training thereafter.  New facility staff, including contractors and volunteers, shall receive this training as part of the Initial Orientation training required by Standard 7.3.  The level and type of training for volunteers and contractors will be based on the services they provide and their level of contact with detainees; however, all volunteers and contractors who have any contact with detainees must be notified of the facility's disability accommodations policy.

"Appendix 4.8.A: Resources" following this standard lists resources available from the U.S. Department of Justice and organizations that may be useful in developing a training program, and/or for direct use in training.

## J. Detainee Orientation

The facility orientation program required by standard 2.1, "Admission and Release," and the detainee handbook required by standard 6.1, "Detainee Handbook," shall notify and inform detainees about the facility's disability accommodations policy, including their right to request reasonable accommodations and how to make such a request.  The facility will post other documents for detainee awareness in detainee living areas and in the medical unit, as requested by the local ICE/ERO Field Office.

# Appendix 4.8.A:  Resources

*Note:  This appendix is not, and should not be interpreted as, legal advice.  This appendix is intended only as a reference.  The materials referenced herein are non-exhaustive, and facilities are responsible for determining whether and how any additional laws apply.*

## Applicable Federal Laws and Regulations

**Section 504 of the Rehabilitation Act of 1973**, as amended, 29 U.S.C. § 794 (Section 504)

- Section 504 prohibits discrimination on the basis of disability in programs conducted by Federal agencies, in programs receiving Federal financial assistance, in Federal employment, and in the employment practices of Federal contractors. Section 504 requires that no individual with a disability may be denied the opportunity to participate in a program, service, or activity solely by reason of a disability.  The facility is required to provide reasonable modifications to provide individuals with disabilities with an equal opportunity to access, participate in, or benefit from the facility's programs, services, and activities. When considering what reasonable modifications to provide, the facility will engage in an interactive and individualized process that considers the individual's needs and gives primary consideration to the preferences of the individual with a disability.

- DHS' Section 504 implementing regulations: 6 C.F.R. Part 15

- Link to DHS' Section 504 regulations: https://www.gpo.gov/fdsys/pkg/CFR-2004-title6-vol1/pdf/CFR-2004-title6-vol1-part15.pdf

**Architectural Barriers Act of 1968**, 42 U.S.C. §§ 4151 *et seq.* (ABA)

- The ABA requires that buildings and facilities that are designed, constructed, or altered with Federal funds, or leased by a Federal agency, comply with Federal standards for physical accessibility.  ABA requirements are limited to architectural standards in new and altered buildings and in newly leased facilities.  They do not address the activities conducted in those buildings and facilities.

- Implementing Regulations:  41 CFR Subpart 101-19.6

- Link to the ABA:  https://www.access-board.gov/guidelines-and-standards/buildings-and-sites/about-the-aba-standards

## U.S. Department of Homeland Security (DHS) Resources

**Directive No. 065-01:  Nondiscrimination for Individuals with Disabilities in DHS-Conducted Programs and Activities (Non-Employment)**

- This Directive establishes the DHS policy and implementation mechanisms for ensuring nondiscrimination for individuals with disabilities served by DHS-conducted programs and activities under Section 504.

  https://www.dhs.gov/sites/default/files/publications/dhs-management-directive-disability-access_0_1.pdf

**Directive 065-01-001:  Instruction on Nondiscrimination for Individuals with a Disability in DHS-Conducted Programs and Activities (Non-Employment)**

- This Instruction implements the DHS Directive 065-01, Nondiscrimination for Individuals with Disabilities in DHS-Conducted Programs and Activities (Non-Employment).

  https://www.dhs.gov/sites/default/files/publications/dhs-instruction-nondiscrimination-individuals-disabilities_03-07-15.pdf

**A Guide to Interacting with People who Have Disabilities:**

- The DHS Office for Civil Rights and Civil Liberties developed this Guide to assist DHS personnel, contractors, and grantees in their interactions with people who have disabilities. Under Section 504, DHS has a legal obligation to ensure nondiscrimination in the employment of people with disabilities as well as by providing program access, physical access, effective communication, and reasonable accommodation to people with disabilities encountered and served by DHS programs and activities. Examples of these interactions include detainees with disabilities who are in ICE custody awaiting a hearing or removal; this also includes individuals with disabilities who are members of the public, a family member, friend and/or attorney of a detainee who seek to access ICE programs, services and activities. Ensuring nondiscrimination often begins by practicing effective methods for interaction, such as treating individuals with respect and using appropriate language. This Guide offers a summary of disability myths and facts, guidance on appropriate language, and tips for successfully interacting with people who have disabilities. It is intended as a general overview of the topic and does not supplant any specific policies and procedures used by the DHS Components.

  https://www.dhs.gov/sites/default/files/public ations/guide-interacting-with-people-who-have-disabilties_09-26-13.pdf

## Other Federal Government Resources

**Disability.gov:**  www.disability.gov

- Disability.gov is the U.S. federal government website for comprehensive information about disability-related programs, services, policies, laws and regulations nationwide. The site links to thousands of resources from many different federal government agencies, as well as state and local governments and nonprofit organizations across the country. New resources are frequently added to Disability.gov's 10 main subject areas: Benefits, Civil Rights, Community Life, Education, Emergency Preparedness, Employment, Health, Housing, Technology and Transportation.

**U.S. Department of Justice, Disability Rights Section:** www.ada.gov

- ADA.gov is a website operated by the Disability Rights Section in the Civil Rights Division of the U.S. Department of Justice (DOJ) to continuously provide new and updated information and guidance on the Americans with Disabilities Act (ADA) and its requirements. DOJ also operates a toll-free information line for those seeking to comply with the ADA: (800) 514-0301 for voice calls; or (800) 514-0383 for TTY. [Note: The ADA does not apply to ICE's detention programs and activities. However, ada.gov provides helpful disability-related technical assistance materials on various subjects.]

**The U.S. Access Board:**  www.access-board.gov

- The U.S. Access Board is an independent federal agency that promotes equality for people with disabilities through leadership in accessible design and the development of accessibility guidelines and standards for the built environment, transportation, communication, medical diagnostic equipment, and information technology. The Board develops and maintains design criteria for the built environment, transit vehicles, telecommunications equipment, medical diagnostic equipment, and information technology. The Board also provides technical assistance and training on these requirements and on accessible design and continues to enforce accessibility standards that cover federally funded facilities. The Board's Section 508 Standards apply to electronic and information technology procured by the federal government, including computer hardware and software, websites, phone systems, and

copiers.  They were issued under section 508 of the Rehabilitation Act which requires access for both members of the public and federal employees to such technologies when

developed, procured, maintained, or used by federal agencies.  The Board operates a toll-free-line: (800) 872-2253 or TTY (800) 993-2822.

# 5.1 Correspondence and Other Mail

## I. Purpose and Scope

This detention standard ensures that detainees shall be able to correspond with their families, the community, legal representatives, government offices and consular officials consistent with the safe and orderly operation of the facility.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Detainees shall be able to correspond with their families, the community, legal representatives, government offices and consular officials.

2. Detainees shall be notified of the facility's rules on correspondence and other mail through the detainee handbook, or supplement, provided to each detainee upon admittance.

3. The amount and content of correspondence detainees send at their own expense shall not be limited, except to protect public safety or facility security and order.

4. Indigent detainees shall receive a specified postage allowance to maintain community ties and necessary postage for privileged correspondence.

5. Detainees shall have access to general interest publications.

6. Incoming and outgoing mail, with the exception of special correspondence or legal mail, shall be opened to inspect for contraband and to intercept cash, checks and money orders.

7. General correspondence shall be read or rejected only to protect the safe, secure and orderly operation of the facility, and detainees shall be notified in writing when correspondence is withheld in part or in full.

8. Detainees shall be permitted to send special correspondence or legal mail to a specified class of persons and organizations, and incoming mail from these persons shall be opened only in the presence of the detainees (unless waived) to check for contraband (except when contamination is suspected).

9. Incoming and outgoing letters shall be held for no more than 24 hours and packages no more than 48 hours before distribution, excluding weekends, holidays or exceptional circumstances.

10. Detainees in Special Management Units (SMU) shall have the same correspondence privileges as detainees in the general population.

11. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the

provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Correspondence and Other Mail" dated 12/2/2008.

## VI. References

American Correctional Association 4th Edition, *Standards for Adult Detention Facilities:* 4-ALDF-5B-05, 5B-06, 5B-07, 5B-08, 5B-09, 5B-10, 2A-27, 2A-60, 6A-09.

## V. Expected Practices

### A. General

Each facility shall have written policy and procedures concerning detainee correspondence and other mail.

The quantity of correspondence a detainee may receive or send at his/her own expense shall not be limited. Facilities shall not limit detainees to postcards and shall allow envelope mailings. For reasons of safety, security and the orderly operation

of the facility, non-correspondence mail, such as packages and publications, shall be subject to certain restrictions.

### B. Indigent Detainees

Ordinarily, a detainee is considered "indigent" if he/she has less than $15.00 in his/her account. Facilities shall make a timely determination as to whether a detainee is indigent.

Each facility shall have written procedures that explain how indigent detainees can request postage at government expense. Such procedures shall also be posted in a common area where all detainees can view them.

At government expense, as determined by ICE/ERO, indigent detainees shall be permitted to post a reasonable amount of mail each calendar week (see "J. Postage Costs") below, including the following:

1. an unlimited amount of special correspondence or legal mail, within reason;

2. three pieces of general correspondence; and/or

3. packages as deemed necessary by ICE/ERO.

### C. Detainee Notification

The facility shall notify detainees of its rules on correspondence and other mail through the detainee handbook, or supplement, provided to each detainee upon admittance. At a minimum, the notification shall specify:

1. That a detainee may receive mail, the mailing address of the facility, and instructions on how envelopes shall be addressed;

2. That a detainee may send mail, the procedure for sending mail, and instructions on how outgoing mail must be addressed;

3. That general correspondence and other mail addressed to detainees shall be opened and inspected in the detainee's presence, unless the facility administrator authorizes inspection without the detainee's presence for security

reasons;

4.  The definition of special correspondence or legal mail, including instructions on the proper labeling as "special correspondence" or "legal mail" to ensure that it is treated as privileged mail; the notification shall clearly state that it is the detainee's responsibility to inform senders of the labeling requirement;

5.  That incoming special correspondence or legal mail may only be opened in the detainee's presence, and may be inspected for contraband, but not read, and that outgoing special correspondence or legal mail shall not be opened, inspected or read;

6.  That packages may neither be sent nor received without advance arrangements approved by the facility administrator, as well as information regarding how to obtain such approval;

7.  A description of mail which may be rejected by the facility and which the detainee shall not be permitted to keep in his/her possession;

8.  That identity documents, such as passports, birth certificates, etc., in a detainee's possession are contraband and may be used by ICE/ERO as evidence against the detainee or for other purposes authorized by law (however, upon request, the detainee shall be provided a copy of each document, certified by an ICE/ERO officer to be a true and correct copy; the facility shall consult ICE/ERO with any and all requests for identity documents);

9.  The procedure to obtain writing implements, paper and envelopes; and

10.    The procedure for purchasing postage (if any), and the rules for providing indigent and certain other detainees free postage.

The rules notification shall be posted in each housing area.

The facility shall provide key information to detainees in languages spoken by any significant portion of the facility's detainee population. Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## D. Processing

Detainee correspondence and other mail shall be delivered to the detainee and to the postal service on regular schedules.

1.  Incoming correspondence shall be distributed to detainees within 24 hours (one business day) of receipt by the facility.

2.  Outgoing correspondence shall be delivered to the postal service no later than the day after it is received by facility staff or placed by the detainee in a designated mail depository, excluding weekends and holidays.

3.  An exception may be made for correspondence or other mail that requires special handling for security purposes. For example, in exceptional circumstances, special correspondence may be held for 48 hours, to verify the status of the addressee or sender.

As a routine matter, incoming mail shall be distributed to detainees on the day received by the facility. Incoming priority, overnight, certified mail and deliveries from a private package delivery service, etc., shall be recorded with detainee signatures in a logbook maintained by the facility.

## E. Packages

Each facility shall implement policies and procedures concerning detainee packages.

*Detainees shall not be allowed to receive or send packages without advance arrangements approved by the facility administrator. The detainee shall pay postage for packages and oversized or overweight mail.*

## F. Inspection of Incoming Correspondence and Other Mail

### 1. General Correspondence and Other Mail

All facilities shall implement procedures for the inspection of all incoming general correspondence and other mail (including packages and publications) for contraband.

Staff shall open and inspect incoming general correspondence and other mail (including packages and publications) in the presence of the detainee unless otherwise authorized by the facility administrator. Incoming general correspondence may be read to the extent necessary to maintain security, as authorized by the facility administrator.

Inspection is generally for the purpose of detecting contraband. Reading of mail, which requires approval of the facility administrator, may be conducted at random. Mail may also be read when a specific security concern arises with respect to an individual detainee, including, but not limited to, for obtaining information such as escape plots, plans to commit illegal acts and plans to violate institution rules.

### 2. Special Correspondence or Legal Mail

"Special correspondence" or "legal mail" shall be defined as the term for detainees' written communications to or from any of the following:

a. private attorneys and other legal representatives;

b. government attorneys;

c. judges and courts;

d. embassies and consulates;

e. the president and vice president of the United States;

f. members of Congress;

g. the Department of Justice (including the DOJ Office of the Inspector General);

h. the Department of Homeland Security (including

U.S. Immigration and Customs Enforcement, ICE Health Services Corps, the Office of Enforcement and Removal Operations, the DHS Office for Civil Rights and Civil Liberties, and the DHS Office of the Inspector General);

i. outside health care professionals;

j. administrators of grievance systems; and

k. representatives of the news media.

Correspondence shall only be treated as special correspondence or legal mail if the title and office of the sender (for incoming correspondence) or addressee (for outgoing correspondence) are unambiguously identified on the envelope, and the envelope is labeled "special correspondence" or "legal mail."

All facilities shall implement procedures for inspecting for contraband, in the presence of the detainee, all special correspondence or legal mail. Detainees shall sign a logbook upon receipt of special correspondence and/or legal mail to verify that the special correspondence or legal mail was opened in their presence.

Staff shall neither read nor copy special correspondence or legal mail. The inspection shall be limited to the purposes of detecting physical contraband and confirming that any enclosures qualify as special correspondence or legal mail.

## G. Inspection of Outgoing Correspondence and Other Mail

### 1. General Correspondence and Other Mail

Outgoing general correspondence and other mail may be inspected or read if:

a. the addressee is another detainee; or

b. there is evidence the item might present a threat to the facility's secure or orderly operation, endanger the recipient or the public or facilitate criminal activity.

The detainee must be present when the

correspondence or other mail, including packages, is inspected, unless otherwise authorized by the facility administrator.

### 2. Special Correspondence or Legal Mail

Staff shall neither read nor copy outgoing special correspondence or legal mail. The inspection shall be limited to the purposes of detecting physical contraband and confirming that any enclosures qualify as special correspondence or legal mail.

Staff shall treat outgoing correspondence as special correspondence or legal mail only if the name, title and office of the recipient are clearly identified on the envelope and the envelope is labeled "special correspondence" or "legal mail."

## H. Rejection of Incoming and Outgoing Mail

All facilities shall implement policies and procedures addressing acceptable and non-acceptable mail. Detainees may receive as correspondence any material reasonably necessary for the detainee to present his/her legal claim, in accordance with this standard.

Incoming and outgoing general correspondence and other mail may be rejected to protect the security, good order or discipline of the institution; to protect the public; or to deter criminal activity.

When incoming or outgoing mail is confiscated or withheld (in whole or in part), the detainee shall be notified and given a receipt.

The facility administrator shall ordinarily consult a religious authority before confiscation of a religious item that constitutes "soft" contraband.

Correspondence and publications that may be rejected include, but are not limited to, the following:

1. Material depicting activities that present a significant risk of physical violence or group disruption (e.g., material with subjects of self-defense or survival, weaponry, armaments, explosives or incendiary devices); however, note that newspaper articles that depict or describe violence in a detainee's country of origin may be relevant to a detainee's legal case and should not automatically be considered contraband;

2. Information regarding escape plots, or plans to commit illegal activities, or to violate ICE/ERO rules or facility guidelines;

3. Information regarding the production of drugs or alcohol;

4. Sexually explicit material that is obscene or prurient in nature;

5. Threats, extortion, obscenity or gratuitous profanity;

6. Cryptographic or other surreptitious code that may be used as a form of communication; or

7. Other contraband (any package received without the facility administrator's prior authorization is considered contraband).

Both sender and addressee shall be provided written notice, signed by the facility administrator, with explanation, when the facility rejects incoming or outgoing mail. Rejected mail shall be considered contraband and handled as detailed in the next section of this standard.

A detainee may appeal rejection of correspondence through the Detainee Grievance System.

## I. Contraband Recording and Handling

When an officer finds an item that must be removed from a detainee's mail, he/she shall make a written record that includes:

1. the detainee's name and A-number;

2. the name of the sender and recipient;

3. a description of the mail in question;

4. a description of the action taken and the reason for it;

5. the disposition of the item and the date of disposition; and

6. the officer's signature.

Prohibited items discovered in the mail shall be handled as follows:

1. A receipt shall be issued to the detainee for all cash, which shall be safeguarded and credited to the detainee's account in accordance with standard "2.5 Funds and Personal Property."

2. Identity documents (e.g., passports, birth certificates) shall be placed in the detainee's A-file and, upon request, the detainee shall be provided with a copy of the document, certified by an ICE/ERO officer to be a true and correct copy.

3. Other prohibited items found in the mail shall be handled in accordance with standard "2.3 Contraband"; however, at the discretion of the facility administrator, soft contraband may be returned to the sender.

4. The facility administrator shall ensure that facility records of the discovery and disposition of contraband are accurate and current.

## J. Postage Costs

1. The facility shall not limit the amount of correspondence detainees may send at their own expense, except to protect public safety or facility security and order.

2. The facility shall provide a postage allowance at government expense under two circumstances:

   a. to indigent detainees only; or

   b. to all detainees, if the facility does not have a system for detainees to purchase stamps.

3. Free postage is generally limited to letters weighing one ounce or less, with exceptions allowed for special correspondence; however, in compelling circumstances, the facility may also provide free postage for general correspondence and other mail.

4. Detainees who qualify for a postage allowance as defined above shall be permitted to mail, at government expense, the following:

   a. a reasonable amount of mail each week, including at least three pieces of general correspondence;

   b. an unlimited amount of correspondence related to a legal matter, within reason, including correspondence to a legal representative, free legal service provider, any court, opposing counsel or to a consulate, potential legal representative and any court, as determined by the facility administrator; and

   c. packages containing personal property, when the facility administrator determines that storage space is limited and that mailing the property is in the government's best interest. See standard "2.5 Funds and Personal Property" for detailed information.

## K. Writing Implements, Paper and Envelopes

The facility shall provide writing paper, writing implements and standard sized envelopes at no cost to detainees. Special sized envelopes may be provided to detainees at their cost.

## L. Detainees in Special Management Units (SMU)

All facilities shall have written policy and procedures regarding mail privileges for detainees housed in an SMU.

Detainees in administrative or disciplinary segregation shall have the same correspondence privileges as detainees in the general population.

## M. Correspondence with Representative of the News Media

A detainee may use special correspondence to communicate with representatives of news media.

A detainee may not receive compensation or anything of value for correspondence with news media, including, but not limited to, publishing under a byline. A detainee may not act as a reporter.

Representatives of news media may initiate correspondence with a detainee; however, such correspondence shall be treated as special correspondence only if the envelope is properly addressed with the name, title and office of the media representative and is clearly labeled "special correspondence."

## N. Notaries, Certified Mail and Miscellaneous Needs Associated With Legal Matters

If a detainee without legal representation requests certain services in connection with a legal matter, such as notary public or certified mail, and has no family member, friend or community organization to provide assistance, the facility shall consult with ICE/ERO to provide the necessary services and shall assist the detainee in a timely manner.

If it is unclear whether the requested service is necessary in pursuit of a legal matter, the respective ICE Office of Chief Counsel shall be consulted.

## O. Facsimile Communication

When timely communication through the mail is not possible, the facility administrator may in his/her discretion allow for a reasonable amount of communication by means of facsimile device between the detainee and his/her designated legal representatives.

# 5.2 Trips for Non-medical Emergencies

## I. Purpose and Scope

This detention standard permits detainees to maintain ties with their families through emergency staff-escorted trips into the community to visit critically ill members of the immediate family or to attend their funerals.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Within the constraints of safety and security, selected detainees shall be able to visit critically ill members of the immediate family, attend their funerals or attend family-related state court proceedings, while under constant staff supervision.

2. Safety and security shall be primary

considerations in planning, approving and escorting a detainee out of a facility for a non-medical emergency.

## III. Standards Affected

This detention standard replaces "Escorted Trips for Non-medical Emergencies" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-1B-06.

ICE/ERO *Performance-based National Detention Standards 2011*:

- "1.3 Transportation (by Land)";

- "2.10 Searches of Detainees"; and

- "2.15 Use of Force and Restraints."

ICE Interim Use of Force Policy (7/7/2004), as amended or updated.

## V. Expected Practices

### A. Non-Medical Emergency Trip Requests and Approvals

On a case-by-case basis, and with approval of the respective Field Office Director, the facility administrator may allow a detainee, under ICE/ERO staff escort, to visit a critically ill member of his/her immediate family, attend an immediate family member's funeral and/or wake or attend a family-related state court proceeding.

"Immediate family member" refers to a parent (including stepparent or foster parent), brother, sister, biological or adopted child and spouse (including common-law spouse).

The Field Office Director is the approving official for non-medical emergency escorted trips from SPCs, CDFs and IGSAs, and may delegate this authority to the Assistant Field Office Director-level for any

detainee who does not require a high degree of control and supervision.

The facility administrator shall designate staff to help detainees prepare requests for non-medical emergency trip requests, according to the following stipulations.

1. That staff member shall forward the completed request to the detainee's deportation officer.

2. The deportation officer shall review the merits of the request, to include consultations with immigration enforcement agents, medical staff, the detainee's family and other persons in positions to provide relevant information.

3. On the basis of the information collected, the deportation officer shall report to the facility administrator on the appropriateness of the detainee's request and the amount of supervision the travel plan may entail.

## B. Types of Trips and Travel Arrangements

### 1. Local Trip

A "local" trip constitutes up to and including a 10-hour absence from the facility. ICE/ERO assumes the costs, except that the detainee must pay for his/her own commercial carrier transportation (e.g., plane, train), if needed for the trip.

### 2. Extended Trip

An "extended" trip involves more than a 10-hour absence and may include an overnight stay. The cost of the detainee's roundtrip transportation on a commercial carrier must be prepaid by the detainee, the detainee's family or another source approved by the Field Office Director.

### 3. Travel Arrangements

ICE/ERO shall make all travel arrangements; however, travel involving a commercial carrier may not commence until the detainee or person acting on his/her behalf has submitted an open paid-in-full ticket or electronic-ticket voucher in the detainee's

name.

As needed, ICE/ERO shall provide overnight housing in an SPC, CDF or IGSA facility.

ICE/ERO shall pay the travel costs incurred by the transporting officers.

## C. Selection of Escorts

No less than two escorts are required for each trip. The Field Office Director or his/her designee shall select and assign the roles of the transporting officers (escorts) and delegate to one the decision-making authority for the trip. Ordinarily, probationary officers may not be assigned, and in no case may more than one probationary officer be on an escort team.

## D. Supervision and Restraint Requirements

Except when the detainee is housed in a detention facility, transporting officers shall maintain constant and immediate visual supervision of any detainee who is under escort and shall follow the policy and procedures in the standards on "Transportation (By Land)" and "Use of Force and Restraints."

## E. Training

Escort officers and others, as appropriate, shall receive training on:

1. standard "5.2 Trips for Non-medical Emergencies"; and

2. standards "1.3 Transportation (By Land)" and "2.15 Use of Force and Restraints."

## F. Escort Instructions

1. Escorts shall follow the applicable policies, standards and procedures listed above in this standard.

2. Routes, meals and lodgings (if necessary) shall be arranged prior to departure.

3. Escorts shall follow the schedule included in the

trip authorization, arriving at and departing from the place(s) and event(s) listed at the specified times.

4. For security reasons, the trip route and schedule shall be confidential.

5. The responsible transporting officer shall report unexpected developments to the Control Center at the originating facility. Control Center staff shall relay the information to the highest-ranking supervisor on duty, who shall issue instructions for completion of the trip.

6. Escorts shall deny the detainee access to any intoxicant, narcotic, drug paraphernalia or drug not prescribed for his/her use by the medical staff.

7. If necessary, the transporting officers may increase the minimum restraints placed on the detainee at the outset of the trip, but at no time may reduce the minimum restraints. Since escorts may exercise no discretion in this matter and are prohibited from removing the restraints, the detainee shall visit a critically ill relative, attend a funeral or attend a family-related state court proceeding in restraints.

8. Escorts shall advise the detainee of the rules in effect during the trip, in a language or manner the detainee can understand.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall

be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

9. Among other things, the escorted detainee may not:

   a. bring discredit to ICE/ERO;

   b. violate any federal, state or local law;

   c. make unauthorized phone call(s); or

   d. arrange any visit(s) without the express permission of the facility administrator.

10. If the detainee breaches any of these rules, the responsible officer may decide to terminate the trip and immediately return to the facility.

11. Officers shall also remind the detainee that, during the trip and upon return to the facility, he/she is subject to searches in accordance with standard "2.10 Searches of Detainees," as well as tests for alcohol or drug use.

12. Officers may not accept gifts or gratuities from the detainee or any other person in appreciation for performing escort duties or for any other reason.

13. Escorts shall ensure that detainees with physical or mental disabilities are provided reasonable accommodations in accordance with security and safety concerns.

# 5.3 Marriage Requests

## I. Purpose and Scope

This detention standard ensures that each marriage request from an ICE/ERO detainee receives a case-by-case review, based on internal guidelines for approval of such requests.

The guidelines provided in this Detention Standard are internal and shall not be construed as creating rights for detainees or other persons or preventing the facility administrator from exercising discretion in conducting the required case-by-case review.

This detention standard applies to the following types of facilities housing ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Each marriage request from an ICE/ERO detainee shall be reviewed on a case-by-case basis.

2. Consistency in decisions to approve or deny a marriage request shall be achieved by the application of guidelines.

3. Ordinarily, a detainee's request for permission to marry shall be granted.

4. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Marriage Requests" dated 12/2/2008.

## IV. References

None

## V. Expected Practices

### A. Written Policy and Procedures Required

All facilities shall have in place written policy and procedures to enable eligible ICE/ERO detainees to

marry.

## B. Detainee Notification

The *National Detainee Handbook* and local facility supplement, provided each detainee upon admittance, shall advise detainees of the facility's marriage request procedures.

## C. Detainee Request to Marry

A detainee, or his/her legal representative, may submit to the facility administrator or Field Office Director (FOD) a written request for permission to marry.

The request must:

1. specifically express that the detainee is legally eligible to be married in the state where the detainee is being held; and

2. be accompanied by the intended spouse's written affirmation of his/her intent to marry the detainee.

## D. Consideration and Approval

### 1. SPCs and CDFs

*The facility administrator may approve or deny a marriage request, using the guidelines that follow. Approval or denial of all marriage requests should be reviewed by the FOD or designee.*

*a. Any facility administrator's decision to deny a marriage request shall be forwarded to the respective FOD for review.*

*b. The Field Office Director (or designee), after whatever consultations he or she believes are advisable, may uphold or reverse the facility administrator's denial.*

If the request is denied, ICE/ERO shall notify the detainee, in writing, of the reasons for the denial within 30 days from the date of the request.

Detainees may seek legal assistance throughout the marriage application process.

### 3. IGSAs

The facility administrator shall notify and consult the respective Assistant Field Office Director, who shall use the guidelines below to approve or deny the request. Approval or denial of all marriage requests should be reviewed by the FOD (or designee).

a. The FOD (or designee), after whatever consultations he or she believes are advisable, may uphold or reverse the facility administrator's denial.

b. If the request is approved, the marriage ceremony shall take place at the facility. If necessary under some extraordinary circumstances, ICE/ERO may assume temporary custody of the detainee for the marriage ceremony.

If the request is denied, ICE/ERO shall notify the detainee, in writing, of the reasons for the denial within 30 days from the date of the request.

Detainees may seek legal assistance throughout the marriage application process.

## E. Guidelines

When a detainee requests permission to marry:

1. The facility administrator or Field Office Director shall consider each marriage request on a case-by-case basis.

2. A detainee's request for permission to marry shall be denied if:

   a. the detainee is not legally eligible to be married;

   b. the detainee is not mentally competent, as determined by a qualified medical practitioner;

   c. the intended spouse has not affirmed, in writing, his/her intent to marry the detainee;

   d. the marriage would present a threat to the security or orderly operation of the facility; or

   e. there are compelling government interests for

denying the request.

If the request is denied, the detainee may file an appeal to the Field Office Director.

3. When a request is approved, the detainee, legal representative or other individual(s) acting on his/her behalf must make all the marriage arrangements, including, but not limited to:

   a. blood tests;

   b. obtaining the marriage license; and

   c. retaining an official to perform the marriage ceremony.

      ICE/ERO personnel shall not participate in making marriage arrangements nor serve as witnesses in the ceremony.

4. The facility administrator or designated Field Office staff shall notify the detainee in a timely manner of a time and place for the ceremony.

   The marriage may not interrupt regular or scheduled processing or action in a detainee's legal case. Specifically, it may neither interrupt nor stay any hearing, transfer to another facility or removal from the United States.

   Transfers shall not occur solely to prevent a marriage.

5. Ordinarily, arrangements made by the detainee or persons acting on his/her behalf shall be accommodated, consistent with the security and orderly operation of the facility, according to the following stipulations:

   a. the ceremony shall take place inside the facility; the detainee may not leave the facility to make arrangements;

   b. all expenses relating to the marriage shall be borne by the detainee or person(s) acting on his/her behalf; and

   c. the ceremony shall be private with no media publicity.  Only individuals essential for the marriage ceremony, such as required witnesses may attend.

   The facility administrator or FOD reserves the right of final approval concerning the time, place and manner of all arrangements.

## F. Revocation of Approval

The FOD may revoke approval of a marriage request for good cause in writing to the detainee. In such instances, the detainee may file an appeal.

## G. Documentation in Detention File

Once the marriage has taken place, the facility administrator shall forward original copies of all documentation to the detainee's A-file and maintain copies in the facility's detention file.

# 5.4 Recreation

## I. Purpose and Scope

This detention standard ensures that each detainee has access to recreational and exercise programs and activities, within the constraints of safety, security and good order.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);
- Contract Detention Facilities (CDFs); and
- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

For all types of facilities, procedures that appear in italics with a marked (**) on the page indicate optimum levels of compliance for this standard.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Detainees shall have daily opportunities at a reasonable time of day to participate in leisure-time activities outside their respective living areas.

2. Detainees shall have access to exercise opportunities and equipment at a reasonable time of day, including at least one hour daily of physical exercise outside the living area, and outdoors when practicable. Facilities lacking formal outdoor recreation areas are encouraged to explore other, secure outdoor areas on facility grounds for recreational use. Daily indoor recreation shall also be available. During inclement weather, detainees shall have access to indoor recreational opportunities, preferably with access to natural light.

*\*\*Detainees shall have at least four hours a day access, seven days a week, to outdoor recreation, weather and scheduling permitted. Outdoor recreation shall support leisure activities, outdoor sports and exercise as referenced and defined by the National Commission on Correctional Health Care Standards, provided outside the confines of the housing structure and/or other solid enclosures.*

3. Any detainee housed in a facility that does not meet minimum standards for indoor and outdoor recreation shall be considered for voluntary transfer to a facility that does meet minimum standards for indoor and outdoor recreation.

4. Each detainee in a Special Management Unit (SMU) shall receive (or be offered) access to exercise opportunities and equipment outside the living area and outdoors, when practicable, unless documented security, safety or medical considerations dictate otherwise. Detainees in the SMU for administrative reasons shall receive at least one (1) hour a day, seven (7) times a week, detainees in the SMU for disciplinary reasons shall receive at least one (1) hour a day, five (5) times per week.

5. Each recreation volunteer who provides or participates in facility recreational programs shall complete an appropriate, documented orientation program and sign an acknowledgement of his/her understanding of the applicable rules and procedures and agreement to comply with them.

6. The facility shall provide communication assistance to detainees with disabilities and

detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to English speaking detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

# III. Standards Affected

This detention standard replaces "Recreation" dated 12/2/2008.

# IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-5C-01, 5C-02, 5C-03, 5C-04, 2A-66, 5A-01, 6B-04, 7B-03, 7C-02, 7F-05.

# V. Expected Practices

## A. Indoor and Outdoor Recreation

1. It is expected that every ICE/ERO detainee shall be placed in a facility that provides indoor and outdoor recreation. However, in exceptional circumstances, a facility lacking outdoor recreation opportunities or any recreation area may be used to provide short-term housing.

2. If a facility does not have an outdoor area, a large recreation room with exercise equipment and access to sunlight shall be provided.

3. If a detainee is housed for more than 10 days in a facility that provides neither indoor nor outdoor recreation, he/she may be eligible for a voluntary transfer to a facility that does provide recreation.

4. If a detainee is housed for more than three months in a facility that provides only indoor recreation, he/she may be eligible for a voluntary transfer to a facility that provides outdoor recreation.

## B. Recreation Schedule

If outdoor recreation is available at the facility, each detainee in general population shall have access for at least one hour, seven days a week, at a reasonable time of day, weather permitting.

Detainees shall have access to clothing appropriate for weather conditions.

If only indoor recreation is available, detainees in general population shall have access for no less than one hour, seven days a week and shall have access to natural light.

*\*\*Detainees in the general population shall have access at least four hours a day, seven days a week to outdoor recreation, weather and scheduling permitted. Daily indoor recreation shall also be available. During inclement weather, detainees shall have access to indoor recreational opportunities with access to natural light.*

Recreation schedules shall be provided to the detainees or posted in the facility.

Under no circumstances shall the facility require detainees to forgo basic law library privileges for recreation privileges. (See standard "6.3 Law

Libraries and Legal Material.")

## C. Recreation Specialist

The facility administrator shall designate an individual responsible for the development and oversight of the recreation program.  Every facility with a rated capacity of 350 or more ICE detainees shall employ a fulltime recreation specialist with special training in implementing and overseeing a recreation program.  The recreation specialist shall assess the needs and interests of the detainees.

## D. General Requirements

1. All facilities shall provide recreational opportunities for detainees with disabilities.

2. Exercise areas shall offer a variety of equipment. Weight training, if offered, must be limited to fixed equipment. Free weights are prohibited.

3. Cardiovascular exercise shall be available to detainees for whom outdoor recreation is unavailable.

4. Recreational activities shall be based on the facility's size and location. Recreational activities may include limited-contact sports, such as soccer, basketball, volleyball and table games, and may extend to intramural competitions among units.

   Dayrooms in general population housing units shall offer board games, television and other sedentary activities.

   Detention personnel shall supervise dayroom activities, distributing games and other recreation materials daily.

5. All detainees participating in outdoor recreation shall have access to drinking water and toilet facilities.

6. Detention or recreation staff shall search recreation areas before and after use to detect altered or damaged equipment, hidden contraband and potential security breaches. They

shall also issue all portable equipment items, and check each item for damage and general condition upon its return.

7. Programs and activities are subject to the facility's security and operational guidelines and may be restricted at the facility administrator's discretion.

8. Recreation areas shall be under continuous supervision by staff equipped with radios or other communication devices to maintain contact with the Control Center.

9. Contraband searches of detainees who are moving from locked cells or housing units to recreation areas shall be conducted in accordance with standard "2.10 Searches of Detainees."

10. Detainees may engage in independent recreation activities, such as board games and small-group activities, consistent with the safety, security and orderly operation of the facility.

11. The facility administrator shall establish facility policy concerning television viewing in dayrooms. All television viewing schedules shall be subject to the facility administrator's approval.

    **Detainees shall be provided FM wireless headsets for television viewing, with access to appropriate language stations or choices.*

## E. Recreation for a Special Management Unit (SMU)

Recreation for detainees housed in the SMU shall occur separately from recreation for the general population.

Facilities are encouraged to maximize opportunities for group participation in recreation and other activities, consistent with safety and security considerations.  Recreation for certain individuals shall occur separate from all other detainees when necessary or advisable to prevent assaults and reduce management problems. The facility administrator shall develop and implement procedures to ensure that detainees who must be kept apart never

participate in activities in the same location at the same time.

Unless documented security, safety or medical considerations dictate otherwise:

Each detainee in a Special Management Unit (SMU) shall receive (or be offered) access to exercise opportunities and equipment outside the living area and outdoors, unless documented security, safety or medical considerations dictate otherwise.

Detainees in the SMU for administrative reasons shall be offered at least one hour of exercise opportunities per day, seven days a week, outside their cells, and outdoors when practicable, and scheduled at a reasonable time.

**Facilities operating at the optimal level shall offer detainees at least two hours of recreation or exercise opportunities per day, seven days a week.*

Detainees in the SMU for disciplinary reasons shall be offered at least one hour of exercise opportunities per day, five days per week, outside their cells, and outdoors when practicable, and scheduled at a reasonable time.

**Facilities operating at the optimal level shall offer detainees at least one hour of recreation or exercise opportunities per day, seven days a week.*

Where cover is not provided to mitigate inclement weather, detainees shall be provided weather-appropriate equipment and attire.

The recreation privilege shall be denied or suspended only if the detainee's recreational activity may unreasonably endanger safety or security:

1. A detainee may be denied recreation privileges only with the facility administrator's written authorization, documenting why the detainee poses an unreasonable risk even when recreating alone; however, when necessary to control an immediate situation for reasons of safety and security, SMU staff may deny an instance of recreation, upon verbal approval from the shift

supervisor, and shall document the reasons in the unit logbook(s). The supervisor may also require additional written documentation for the facility administrator. When a detainee in an SMU is deprived of recreation (or any usual authorized items or activity), a written report of the action shall be forwarded to the facility administrator. Denial of recreation must be evaluated daily by a shift supervisor.

2. A detainee in disciplinary segregation may temporarily lose recreation privileges upon a disciplinary panel's written determination that he/she poses an unreasonable risk to the facility, himself/herself or others.

3. When recreation privileges are suspended, the disciplinary panel or facility administrator shall provide the detainee written notification, as well as documentation of the reason for the suspension, any conditions that must be met before restoration of privileges, and the duration of the suspension provided the requisite conditions are met for its restoration.

4. The case of a detainee denied recreation privileges shall be reviewed at least once each week as part of the reviews required for all detainees in SMU status.

5. In accordance with SMU procedures, and using the forms required in standard "2.12 Special Management Units," the reviewer(s) shall state, in writing, whether the detainee continues to pose a threat to self, others, or facility security and, if so, why.

6. Denial of recreation privileges for more than seven days requires the concurrence of the facility administrator and a health care professional. It is expected that such denials shall rarely occur and only in extreme circumstances.

7. The facility shall notify the ICE/ERO Field Office Director in writing when a detainee is denied recreation privileges in excess of seven days.

## F. Other Programs and Activities

Facilities shall offer access to leisure reading materials, through libraries with regular hours, book carts or other means.  Reading materials in English, Spanish and, if practicable, other languages, should be made available.

*\*\* Facilities shall offer other programmatic activities, such as:*

*1.  educational classes or speakers;*

*2.  sobriety programs such as alcoholics anonymous; and*

*3.  other organized activities or recreational programs.*

## G. Volunteer Program Involvement

A volunteer group may provide a special recreational or educational program, consistent with security considerations, availability of detention personnel to supervise participating detainees, and sufficient advance notification to the facility administrator.

Standard "5.7 Visitation" details requirements that must be met for a volunteer to be approved to visit with or provide religious activities for detainees.

# 5.5 Religious Practices

## I. Purpose and Scope

This detention standard ensures that detainees of different religious beliefs are provided reasonable and equitable opportunities to participate in the practices of their respective faiths, constrained only by concerns about safety, security and the orderly operation of the facility.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

For all types of facilities, procedures that appear in italics with a marked (**) on the page indicate optimum levels of compliance for this standard.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices"):

1. Detainees shall have regular opportunities to participate in practices of their religious faiths, limited only by a documented threat to the safety of persons involved in such activity itself or disruption of order in the facility;

2. All religions represented in a detainee population shall have equal status without discrimination based on any detainee's race, ethnicity, religion, national origin, gender, sexual orientation or disability;

3. Each facility's religious program shall be planned, administered and coordinated in an organized and orderly manner;

4. Adequate space, equipment and staff (including security and clerical) shall be provided for in order to conduct and administer religious programs;

5. The chaplain or religious services coordinator will make documented efforts to recruit external clergy or religious service providers to provide services to adherents of faith traditions not directly represented by chaplaincy or religious services provider staff.  Detainees are encouraged to provide information about local religious providers;

6. Each facility's religious program shall be augmented and enhanced by community clergy, contractors, volunteers and groups who provide individual and group assembly religious services and counseling;

7. Detainees in Special Management Units (SMUs) and hospital units shall have access to religious activities and practices to the extent compatible with security and medical requirements;

8. Special diets shall be provided for detainees whose religious beliefs require adherence to religious dietary laws; and

9. Detainees shall be provided information about religious programs at the facility, including how to contact the chaplain or religious services coordinator, how to request visits or services by other religious services providers, how to request religious diets and how to access religious property and headwear as part of the facility's admission and orientation program in a language

or manner the detainee can understand.

10. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Religious Practices" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-5C-17, 5C-18, 5C-19, 5C-20, 5C-21, 5C-22, 5C-23, 5C-24, 2A-66, 4A-10, 6B-02, 6B-05, 7B-03, 7F-04.

ICE/ERO *Performance-based National Detention Standards 2011:*

- "4.1 Food Service"; and

- "5.7 Visitation."

The Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb et seq.

Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc et seq.

# V. Expected Practices

## A. Religious Opportunities and Limitations

1. Detainees shall have opportunities to engage in practices of their religious faith consistent with safety, security and the orderly operation of the facility. Religious practices to be accommodated are not limited to practices that are compulsory, central or essential to a particular faith tradition, but cover all sincerely held religious beliefs. Attendance at all religious activities is voluntary.

Efforts shall be made to allow for religious practice in a manner that does not adversely affect detainees not participating in the practice. Detainees cannot be required to participate in or attend a religious activity in order to receive a service of the facility or participate in other, non-religious activities. Chaplains, religious services coordinators and volunteers shall not provide unsolicited religious services or counseling to detainees.

2. Religious activities shall be open to the entire detainee population, without discrimination based on a detainee's race, ethnicity, religion, national origin, gender, sexual orientation or disability.

Language services shall be provided to detainees who have limited English proficiency to provide them with meaningful access to religious activities.  As needed, accommodations will be provided to detainees with disabilities to provide them with equal  access to religious services.

3. When necessary for the security or the orderly

operation of the facility, the facility administrator may discontinue a religious activity or practice or limit participation to a reasonable number of detainees or to members of a particular religious group after consulting with the chaplain or religious services coordinator. Facility records shall reflect the limitation or discontinuance of a religious practice, as well as the reason for such limitation or discontinuance.

4. Ordinarily, when the nature of the activity or practice (e.g., fasts, ceremonial meals, headwear requirements, work proscriptions) indicates a need for such a limitation, only those detainees whose files reflect the pertinent religious preference shall be included.

5. When a detainee submits a request concerning the reason for denial of access to religious activities, facilities or meals, a copy of the request and response to the request shall be placed in the detention file.

## B. Religious Preferences

Each detainee shall designate any religious preference, or none, during in processing. Staff, contractors and volunteers may not disparage the religious beliefs of a detainee, nor coerce or harass a detainee to change religious affiliation.

A detainee may request to change his/her religious preference designation at any time by notifying the chaplain, religious services coordinator or other designated individual in writing, and the change shall be effected in a timely fashion.

In the interest of maintaining the security and orderly running of the facility and to prevent abuse or disrespect by detainees of religious practice or observance, the chaplain or religious services coordinator shall monitor patterns of changes in declarations of religious preference.

In determining whether to allow a detainee to participate in specific religious activities, staff may refer to the initial religious preference information and any subsequent changes in the detainee's religious designation. Detainees whose files show "No Preference" may be restricted from participation in those activities deemed appropriate for members only.

## C. Chaplains or Other Religious Services Coordinators

The facility administrator shall designate a staff member, contractor or volunteer to manage and coordinate religious activities for detainees. Ordinarily, that person shall be the facility chaplain, who shall, in cooperation with the facility administrator and staff, plan, direct and supervise all aspects of the religious program, including approval and training of both lay and clergy volunteers from faiths represented in the detainee population. The facility administrator shall provide non-detainee clerical staff support for confidential materials.

The chaplain or other religious services coordinator, regardless of his/her specific religious affiliation, shall have basic knowledge of different religions and shall ensure equal status and protection for all religions.

The chaplain or other religious services coordinator shall have physical access to all areas of the facility to serve detainees.

A chaplain shall have a minimum qualification of clinical pastoral education or specialized training, and endorsement by the appropriate religious-certifying body. In lieu of these, the facility administrator may accept adequate documentation of recognized religious or ministerial position in the faith community.

The chaplain shall be available to provide pastoral care and counseling to detainees who request it, both through group programs and individual services. Detainees who belong to a religious faith different from that of the chaplain or religious services provider staff may, if they prefer, have access to pastoral care and counseling from external clergy and

religious service providers. The chaplain may, for the purpose of informed decision-making, ask a detainee to explain special or unfamiliar requests.

If the facility has a religious services coordinator rather than a chaplain, the coordinator shall have the necessary training to connect detainees with a broad range of religious services and be prepared to arrange religious services for multiple faith traditions and connect incoming detainees with resources and services specific to the detainee's particular faith.

The term "individual services" includes counseling services provided to individual detainees or members of their families in personal crisis and family emergency situations.

## D. Schedules and Facilities

All facilities shall designate adequate space for religious activities.

This designated space must be sufficient to accommodate the needs of all religious groups in the detainee population fairly and equitably and the general area shall include office space for the chaplain, storage space for items used in religious programs, and proximity to lavatory facilities for staff and volunteers.

Religious service areas shall be maintained in a neutral fashion suitable for use by various faith groups.

The chaplain or religious services coordinator shall schedule and direct the facility's religious activities, and current program schedules shall be posted on all unit and detainee bulletin boards in languages understood by a majority of detainees.

When scheduling approved religious activities, chaplains or religious services coordinator must consider both the availability of staff supervision and the need to allot time and space equitably among different groups. The chaplain or religious services coordinator shall not ordinarily schedule religious services to conflict with meal times.

If outdoor recreation is available at the facility, detainees shall have opportunities for outside worship, prayer and meditation, which shall be provided in a manner that does not conflict with meal times.

## E. Contractors and Volunteers

All facilities shall have procedures so that clergy, contractors, volunteers and community groups may provide individual and group assembly religious services and counseling that augment and enhance the religious program. When recruiting citizen volunteers, the chaplain or religious services coordinator and other staff shall be cognizant of the need for representation from all cultural and socioeconomic parts of the community. Each facility shall provide security, including staff escorts, to allow such individuals and groups facility access for sanctioned religious activities.

The chaplain or religious services coordinator may contract with representatives of faith groups in the community to provide specific religious services that he/she cannot personally deliver, and may secure the assistance and services of volunteers.

"Representatives of faith groups" includes both clergy and spiritual advisors. All contractual representatives of detainee faith groups shall be afforded the same status and treatment to assist detainees in observing their religious beliefs, unless the security and orderly operation of the facility warrant otherwise.

Standard "5.7 Visitation" details requirements that must be met for a volunteer to be approved to visit with and/or provide religious activities for detainees, including advance notice, identification, a background check, an orientation to the facility and a written agreement to comply with applicable rules and procedures. Visits from religious personnel shall not count against a detainee's visitor quota. Provided they meet established security requirements for entrance into the facility, religious services providers' interpreters shall be allowed to

accompany the religious services provider within the facility.

The facility administrator or designee (ordinarily the chaplain) may require a recognized representative of a faith group to verify the religious credentials of contractors or volunteers prior to approving their entry into the facility.

Detainees who are members of faiths not represented by clergy may conduct their own services, provided these do not interfere with facility operations.

## F. Pastoral Visits

If requested by a detainee, the chaplain or religious services coordinator or designee shall facilitate arrangements for pastoral visits by a clergyperson or representative of the detainee's faith.

The chaplain or religious services coordinator may request documentation of the person's religious credentials, as well as a criminal background check.

Pastoral visits shall ordinarily take place in a private visiting room during regular visiting hours. Accommodation may be made in the legal visitation area when available.

## G. Detainees in Special Management (SMU) and Hospital Units

Detainees in an SMU (e.g., administrative, disciplinary or protective custody) or hospital unit shall be permitted to participate in religious practices, consistent with the safety, security and orderly operation of the facility.

Detainees in an SMU or hospital unit shall have regular access to the chaplain or other religious services provider staff. The chaplain or other religious services provider staff shall provide pastoral care in SMUs and hospital units weekly at minimum.

Detainees of any faith tradition may ordinarily have access to official representatives of their faith groups while housed in SMUs or hospital units, by requesting such visits through the chaplain or other

religious service coordinator. Requests shall be accommodated consistent with the terms of the representative's contract and the security and orderly operation of the facility.

If the representative of the faith group is a volunteer, he/she shall at all times be escorted in an SMU.

## H. Introduction of New or Unfamiliar Religious Components

If a detainee requests the introduction of a new or unfamiliar religious practice, the chaplain or religious services coordinator may ask the detainee to provide additional information to use in deciding whether to include the practice.

Detainees may make a request for the introduction of a new component to the Religious Services program (e.g., schedule, meeting time and space, religious items and attire) to the chaplain or religious services coordinator. The chaplain or religious services coordinator may ask the detainee to provide additional information to use in deciding whether to include the practice. Ordinarily, the process shall require up to 30 business days for completion.

The chaplain or religious services coordinator shall research the request and make recommendations to the facility administrator, who shall add his/her own recommendations and forward them to the respective Field Office Director for approval. Such decisions are subject to the facility's requirement to maintain a safe, secure and orderly facility, and the availability of staff for supervision. The Field Office Director shall forward the final decision to the facility administrator, and the chaplain or religious services coordinator shall communicate the decision to the detainee.

## I. Religious Holy Days

Each facility shall have in place written policy and procedures to facilitate detainee observance of important holy days, consistent with the safety, security and orderly operation of the facility, and the

chaplain or religious services coordinator shall work with detainees to accommodate proper observances.

The facility administrator shall facilitate the observance of important religious holy days that involve special fasts, dietary regulations, worship or work proscription. When the facility administrator, chaplain or religious services provider is unfamiliar with the requested observance, the facility administrator may direct the chaplain or religious services coordinator to consult with community representatives of the detainee's faith group and other appropriate sources.

## J. Religious Property and Personal Care

Each facility administrator shall allow detainees to have access to personal religious property, consistent with the safety, security and orderly operation of the facility.  If necessary, the religious significance of such items shall be verified by the chaplain prior to facility administrator approval.  The facility administrator may also direct the chaplain or religious services coordinator to obtain information and advice from representatives of the detainee's faith group or other appropriate sources, about the religious significance of the items.

Detainee religious property includes, but is not limited to, holy books, rosaries and prayer beads, oils, prayer rugs, prayer rocks, phylacteries, medicine pouches and religious medallions. Such items are part of a detainee's personal property and are subject to normal considerations of safety, security and orderly operation of the facility.

As is consistent with the safety, security and orderly operation of the facility, the facility administrator shall ordinarily allow a detainee to wear or use personal religious items during religious services, ceremonies and meetings in the chapel, and may, upon request of a detainee, allow a detainee to wear or use certain religious items throughout the facility.

Items of religious wearing apparel include, but are not limited to:

1. prayer shawls and robes;

2. kurda or ribbon shirts;

3. medals and pendants;

4. beads; and

5. various types of headwear.

"Appendix 5.5.A: Religious Headwear, Garments and Other Religious Property" provides examples of acceptable religious headwear, garments and other religious property. There may be circumstances in which it is not advisable to permit the use of these items in a facility. Nothing in these guidelines is intended to prevent facilities from making individualized decisions based on the need to maintain good order and the safety of detainees and staff. Any denial and the reason for it shall be documented and placed in the alien's detention file.

Religious headwear, notably kufis, yarmulkes, turbans, crowns and headbands, as well as scarves and head wraps for Orthodox Christian, Muslim and Jewish women are permitted in all areas of the facility, subject to the normal considerations of the safety, security and orderly operation of the facility, including inspection by staff. Religious headwear and other religious property shall be handled with respect at all times, including during the in-take process.

Consistent with safety, security and the orderly operation of the facility, the facility shall not cut or shave religiously significant hair.

A detainee who wishes to have religious books, magazines or periodicals must comply with the facility's general rules for ordering, purchasing, retaining and accumulating personal property. Religious literature is permitted in accordance with the procedures governing incoming publications. Distribution to detainees of religious literature purchased by or donated to ICE/ERO is contingent upon approval from the chaplain or religious services coordinator.

## K. Dietary Requirements

When a detainee's religion requires special food services, daily or during certain holy days or periods that involve fasting, restricted diets, etc., staff shall make all reasonable efforts to accommodate those requirements (e.g., by modifying the detainee's menus to exclude certain foods or food combinations or providing the detainee's meals at unusual hours).

A detainee who wants to participate in the religious diet ("common fare") program may initiate the "Authorization for Common Fare Participation" form that is attached to standard "4.1 Food Service." That standard also details the circumstances under which a detainee may be removed from a special religious diet because he/she has failed to observe those dietary restrictions.

"Common fare" refers to a no-flesh protein option provided whenever an entrée containing flesh is offered as part of a meal. Likewise, a "common fare" meal offers vegetables, starches and other foods that are not seasoned with flesh. The diet is designed as the foundation from which modifications can be made to accommodate the religious diets of various faiths.  Modifications to the standard common fare menu may be made to meet the requirements of various faith groups (e.g. for the inclusion of kosher and/or halal flesh-food options).

When there is any question about whether a requested diet is nutritious or may pose a threat to health, the chaplain or religious services coordinator shall consult with the medical department.

## L. Religious Fasts

The chaplain or religious services coordinator shall develop the religious fast schedule for the calendar year and shall provide it to the facility administrator or designee. There are generally two different types of fasts: a public fast and a private or personal fast.

When detainees observe a public fast that is mandated by law or custom for all the faith adherents (e.g., Ramadan, Lent, Yom Kippur), the facility shall provide a meal nutritionally equivalent to the meal(s) missed. Public fasts usually begin and end at specific times.

When a detainee fasts for personal religious reasons, no special accommodations need to be made for the meal(s) missed. Requests for meals after a personal fast shall be determined by the facility administrator on a case-by case basis.

## M. Work Assignments

Detainees who have voluntary work assignments shall not be compelled to work on their religious holy days.

## N. Religious Use of Wine

Religious use of wine by clergy members is generally permitted when mandated by the particular faith and pursuant to strict controls and supervision, to include the following provisions:

1. Only a small amount of wine for clergy members and that which is necessary to perform religious ceremonies or services shall be permitted in the facility.

2. All wine brought into the facility shall be secured in an appropriate area by staff prior to the religious ceremony or service for which the wine is needed.

3. Following the religious ceremony or service, unused portions of wine shall be immediately discarded, stored in a secure area, or removed from the facility.

## O. Death or Serious Illness of Family Members

The facility administrator will establish procedures to involve the chaplain or religious services coordinator in notifying detainees of serious illness or death of their family members.

# Appendix 5.5.A: Religious Headwear, Garments and Other Religious Property

The following are examples of generally acceptable religious headwear, garments and other religious property/articles of faith. There may be circumstances in which it is not advisable to permit the use of these items in a facility. Nothing in these guidelines is intended to prevent facilities from making individualized decisions based on the need to maintain good order and the safety of detainees and staff. Any denial of accommodation and the reason for it shall be documented and placed in the alien's detention file.

## A. Religious Headwear

Examples of religious headwear include:

- yarmulke (Jewish)

- kufi (Muslim)

- hijab (Muslim; worn by women)

- crown (Rastafarian)

- turban (Sikh)

Facilities may restrict the color, size or other features of religious headwear, as necessary to maintain the safety, security and the orderly operation of the facility. Where facilities restrict the color, size, or other features of religious headwear, and the detainee's personal religious headwear does not conform to the standard, the facility must ensure that detainees are provided conforming religious headwear for free or at a de minimums cost. The chaplain or religious services coordinator, in consultation with community representatives of the detainee's faith group and other appropriate sources, when necessary, shall ensure that the facility restrictions on color, size, or other features of religious headwear are appropriate and meet the needs of the respective faith traditions.

## B. Religious Garments

Examples of religious attire and garments include but are not limited to:

- Scarves and headwraps (hijabs) (Jewish, Muslim, Rastafarian, Orthodox Christian; worn by women). These may be black, white or off-white.

- Jumper dresses may be worn by women who wear loose-fitting clothing for the sake of modesty as consistent with their religious beliefs.

- Kachhehra (soldier's shorts) (Sikh men)

- Prayer shawls and robes

- Kurda or ribbon shirts during ceremonial use

## C. Religious Property and Articles of Faith

Examples of religious property and articles of faith include but are not limited to:

- Holy books: Examples include but are not limited to: the Bible (Christian); the Koran (Muslim); and the Torah (Jewish).  Holy books are permitted in accordance with the facility's general rules relating to retention of personal property and incoming publications, such as types of binding permitted.

- Kara (steel bracelet) (Sikh) may be permitted during meal times and under other limited circumstances depending on the size, weight and appearance of the Kara and in light of security considerations. For example, a plain, light-weight and non-decorative Kara is generally appropriate for low and medium security detainees.

- Rosaries and prayer beads.

- Oils.

- Prayer rugs.

- Prayer rocks.

- Phylacteries.

- Religious medallions and pendants.

# 5.6 Telephone Access

## I. Purpose and Scope

This detention standard ensures that detainees may maintain ties with their families and others in the community, legal representatives, consulates, courts and government agencies by providing them reasonable and equitable access to telephone services.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

For all types of facilities, procedures that appear in italics with a marked (\*\*) on the page indicate optimum levels of compliance for this standard.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Detainees shall have reasonable and equitable access to reasonably priced telephone services.

2. Detainees with hearing or speech disabilities shall be granted reasonable accommodations to allow for equal access to telephone services.

3. Detainees in Special Management Units (SMU) shall have access to telephones, commensurate with facility security and good order.

4. Detainees and their legal counsel shall be able to communicate effectively with each other.

5. Privacy for detainee telephone calls regarding legal matters shall be ensured.

6. Telephone access procedures shall foster legal access and confidential communications with attorneys.

7. Detainees shall be able to make free calls to the ICE/ERO-provided list of free legal service providers for the purpose of obtaining initial legal representation, to consular officials, to the Department of Homeland Security (DHS) Office of the Inspector General (OIG), and to the ICE Office of Professional Responsibility (OPR) Joint Intake Center (JIC). Indigent detainees, who are representing themselves pro se, shall be permitted free calls on an as-needed basis to family or other individuals assisting with the detainee's immigration proceedings.

8. Telephones shall be maintained in proper working order.

9. Facilities shall strive to reduce telephone costs, including through the use of emerging telecommunications, voiceover and Internet protocol technologies.

10. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide

detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

# III. Standards Affected

This detention standard replaces "Telephone Access" dated 12/2/2008.

# IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-2A-65, 2A-66, 5B-11, 5B-12, 6a-02, 6A-09.

ICE/ERO *Performance-based National Detention Standards 2011:* "2.13 Staff-Detainee Communication," in regard to monitoring and documenting telephone serviceability.

# V. Expected Practices

## A. Telephones and Telephone Services

### 1. Number

To ensure sufficient access, each facility shall provide at least one operable telephone for every 25 detainees.

**\*\*Facilities shall be operating at the optimal level when at least one telephone is provided for every ten (10) detainees.**

### 2. Cost

Generally, detainees or the persons they call shall be responsible for the costs of telephone calls; required exceptions are listed below.

Each facility shall provide detainees with access to reasonably priced telephone services. Contracts for such services shall comply with all applicable state and federal regulations and be based on rates and surcharges comparable to those charged to the general public. Any variations shall reflect actual costs associated with the provision of services in a detention setting. Contracts shall also provide the broadest range of calling options including, but not limited to, international calling, calling cards and collect telephone calls, determined by the facility administrator to be consistent with the requirements of sound detention facility management. Facilities shall post a list of card and calling rates in each housing unit. Facility administrators are encouraged to explore the use of new technologies which can facilitate the provision of cost effective means for enhancing detainees' ability to communicate by telephone, such as, and not limited to, wireless and/or internet communications.

### 3. Maintenance

Each facility shall maintain detainee telephones in proper working order. Designated facility staff shall inspect the telephones daily, promptly report out-of-order telephones to the repair service so that required repairs are completed quickly. This information shall be logged and maintained by each Field Office. Facility staff shall notify detainees and the ICE/ERO free legal service providers of procedures for reporting problems with telephones.

ICE/ERO headquarters shall maintain and provide Field Offices a list of telephone numbers for current free legal service providers, consulates and the Department of Homeland Security's (DHS) Office of the Inspector General (OIG), as determined by ICE. All Field Offices are responsible for ensuring facilities which house ICE detainees under their jurisdiction are provided with current pro bono legal service

information.

4. Monitoring Detainee Telephone Services

a.  Facility Staff Requirements
Facility staff members are responsible for
ensuring on a daily basis that telephone systems
are operational and that the free telephone
number list is posted. After ensuring that each
phone has a dial tone, when testing equipment
the officers must be able to demonstrate that an
individual has the ability to make calls using the
free call platform. Any identified problems must
immediately be logged and reported to the
appropriate facility and ICE/ERO staff. ICE/ERO
staff shall review and follow up on problems
reported by detainees and others.

## B. Monitoring of Detainee Telephone Calls

Each facility shall have a written policy on the
monitoring of detainee telephone calls. If telephone
calls are monitored, the facility shall:

1.  include a recorded message on its phone system
    stating that all telephone calls are subject to
    monitoring;

2.  notify detainees in the detainee handbook, or
    equivalent, provided upon admission; and

3.  at each monitored telephone, place a notice that
    states the following:

    a.  that detainee calls are subject to monitoring;
        and

    b.  the procedure for obtaining an unmonitored
        call to a court, a legal representative or for the
        purposes of obtaining legal representation.

ICE/ERO and the facility shall coordinate in posting
the notice in Spanish and in the language of
significant segments of the population with limited
English proficiency, where practicable.

A detainee's call to a court, a legal representative,
DHS OIG, DHS Civil Rights and Civil Liberties
(CRCL) or for the purposes of obtaining legal

representation, may not be electronically monitored
without a court order.

## C. Detainee Notification

Each facility shall provide telephone access rules in
writing to each detainee upon admission, and also
shall post these rules where detainees may easily see
them. ICE/ERO and the facility shall coordinate in
posting these rules where practicable in Spanish and
in the language of significant segments of the
population with limited English proficiency.

Telephone access hours shall also be posted. Updated
telephone and consulate lists shall be posted in
detainee housing units. Translation and
interpretation services shall be provided as needed.

## D. Detainee Access

Each facility administrator shall establish and oversee
rules and procedures that provide detainees
reasonable and equitable access to telephones during
established facility "waking hours" (excluding the
hours between lights-out and the morning
resumption of scheduled activities). Telephones shall
be located in parts of the facility that are accessible to
detainees. Telephone access hours shall be posted
near the telephones.

Each facility shall provide detainees access to
international telephone service.

Ordinarily, a facility may restrict the number and
duration of general telephone calls only for the
following reasons.

### 1. Availability

When required by the volume of detainee telephone
demand, rules and procedures may include, but are
not limited to, reasonable limitations on the duration
and the number of calls per detainee, the use of
predetermined time-blocks and institution of an
advanced sign-up system.

### 2. Orderly Facility Operations

Calls may be restricted or limited if necessary to

prevent interference with counts, meals, scheduled detainee movements, court schedules, or other events constituting the orderly operation of the facility.

### 3. Emergencies

Telephone access and use may be limited in the event of escapes, escape attempts, disturbances, fires, power outages, etc. Telephone privileges may be suspended entirely during an emergency, but only with the authorization of the facility administrator or designee and only for the briefest period necessary under the circumstances. If suspension of telephone access exceeds 12 hours, ICE/ERO should be notified.

## E. Direct or Free Calls

Even if telephone service is generally limited to collect calls, each facility shall permit detainees to make direct or free calls to the offices and individuals listed below. The Field Office Director shall ensure that all information is kept current and is provided to each facility. Updated lists need to be posted in the detainee housing units. A facility may place reasonable restrictions on the hours, frequency and duration of such direct and/or free calls, but may not limit a detainee's attempt to obtain legal representation. Full telephone access shall be granted in order for a detainee to contact the following:

- the Executive Office for Immigration Review or local immigration court;

- the Board of Immigration Appeals;

- federal and state courts where the detainee is or may become involved in a legal proceeding;

- consular officials;

- DHS/OIG;

- legal representatives, to obtain legal representation, or for consultation when subject to expedited removal (when a detainee is under an expedited removal order, his/her

ability to contact pro bono legal representatives shall not be restricted);

- legal service providers or organizations listed on the ICE/ERO free legal service provider list;

- United Nations High Commissioner for Refugees (UNHCR), from asylum-seekers and stateless individuals;

- federal, state or local government offices to obtain documents relevant to his/her immigration case;

- immediate family or others for detainees in personal or family emergencies or who otherwise demonstrate a compelling need (to be interpreted liberally); or

- ICE/OPR Joint Intake Center (JIC).

### 1. Request Forms

Free and direct calls shall be easily accessible. If detainees are required to complete request forms to make direct or free calls, facility staff must assist them as needed, especially illiterate or non-English speaking detainees.  The detainees should also be permitted to seek assistance from their legal representatives, family, or other detainees.

### 2. Time Requirements

Staff shall allow detainees to make such calls as soon as possible after submission of requests, factoring in the urgency stated by the detainee. Access shall be granted within 24 hours of the request, and ordinarily within eight facility-established "waking hours." Staff must document and report to ICE/ERO any incident of delay beyond eight "waking hours."

### 3. Indigent Detainees

Ordinarily, a detainee is considered "indigent" if he/she has less than $15.00 in his/her account for ten (10) days. A facility shall make a timely effort to determine indigence.

Indigent detainees are afforded the same telephone access and privileges as other detainees. Each facility

shall enable all detainees to make calls to the ICE/ERO-provided list of free legal service providers and consulates at no charge to the detainee or the receiving party. The indigent detainee may request a call to immediate family or others in personal or family emergencies or on an as-needed basis.

### 4. Phone System Limitations

If the limitations of an existing phone system preclude meeting these requirements, the facility administrator must notify ICE/ERO so that a means of telephone access may be provided.

SPCs, CDFs, and dedicated IGSAs shall require its telephone service providers to program and keep current, the telephone system to permit detainees free calls to numbers on the official pro bono legal representation list and to consulates. Other facilities shall adopt equivalent procedures.

## F. Legal Calls

### 1. Restrictions

A facility may neither restrict the number of calls a detainee places to his/her legal representatives, nor limit the duration of such calls by rule or automatic cut-off, unless necessary for security purposes or to maintain orderly and fair access to telephones. If time limits are necessary for such calls, they shall be no shorter than 20 minutes, and the detainee shall be allowed to continue the call at the first available opportunity, if desired.

A facility may place reasonable restrictions on the hours, frequency and duration of such direct and/or free calls but may not otherwise limit a detainee's attempt to obtain legal representation.

### 2. Privacy

For detainee telephone calls regarding legal matters, each facility shall ensure privacy by providing a reasonable number of telephones on which detainees can make such calls without being overheard by staff or other detainees. Absent a court order, staff may not monitor phone calls made in reference to legal

matters.

The facility shall inform detainees to contact an officer if they have difficulty making a confidential call relating to a legal proceeding. If notified of such a difficulty, the officer shall take measures to ensure that the call can be made confidentially.

Privacy may be provided in a number of ways, including:

a.  telephones with privacy panels (side partitions) that extend at least 18 inches to prevent conversations from being overheard;

b.  telephones placed where conversations may not be readily overheard by others; or

c.  office telephones on which detainees may be permitted to make such calls; and

d.  detainees shall be supervised within eyeshot, but out of earshot

## G. Telephone Access for Detainees with Disabilities

The facility shall provide a TTY device or Accessible Telephone (telephones equipped with volume control and telephones that are hearing-aid compatible for detainees who are deaf or hard of hearing). Detainees who are deaf or hard of hearing shall be provided access to the TTY on the same terms as hearing detainees are provided access to telephones. Except to the extent that there are time limitations, detainees using the TTY shall be granted additional time, consistent with safety and security concerns..

If an Accessible Telephone or TTY is not available in the same location as telephones used by other detainees, detainees shall be allotted additional time to walk to and from the Accessible Telephone or TTY location. Consistent with the order and safety of the facility, the facility shall ensure that the privacy of telephone calls by detainees using Accessible Telephones or TTY is the same as other detainees using telephones.

** *The facility shall maintain other equipment, such as video relay service and video phones, for detainees who are deaf or hard of hearing.*

Accommodations shall also be made for detainees with speech disabilities.

Consistent with Standard 4.8 "Disability Identification, Assessment, and Accommodation," the facility shall engage in an interactive and individualized process that considers whether a detainee with a disability needs any additional accommodation to access facility telephones.

# H. Telephone Privileges in Special Management Units (SMU)

While there are differences in telephone access in SMU, depending on whether a detainee is in Administrative Segregation or Disciplinary Segregation, in general a detainee in either status may be reasonably restricted from using or having access to a phone for the following reasons.

- If that access is used for criminal purposes or would endanger any person, including that detainee.

- If the detainee damages the equipment provided.

- For the safety, security and good order of the facility.

In such instances, staff must clearly document why such restrictions are necessary to preserve the safety, security and good order of the facility in the appropriate SMU log. Detainees and their legal counsel shall nevertheless be accommodated in order for them to be able to communicate effectively with each other. Telephone access for legal calls, courts, government offices (including the DHS OIG and the DHS JIC) and embassies or consulates shall not be denied.

## 1. Administrative Segregation

Generally, detainees in administrative segregation

should receive the same privileges available to detainees in the general population, subject to any existing safety and security considerations. This requirement applies to a detainee in Administrative Segregation pending a hearing because he/she has been charged with a rule violation, as well as a detainee in Administrative Segregation for other than disciplinary reasons, such as protective custody or suicide risk.

## 2. Disciplinary Segregation

Detainees in Disciplinary Segregation may be restricted from using telephones to make general calls as part of the disciplinary process. Even in Disciplinary Segregation, however, detainees shall have some access for special purposes. Ordinarily, staff shall permit detainees in Disciplinary Segregation to make direct and/or free and legal calls as previously described in above in sections V.E and V.F, except in the event of compelling and documented reasons of threats to the safety, security and good order of the facility.

# I. Inter-facility Telephone Calls

Upon a detainee's request, facility staff shall make special arrangements to permit the detainee to speak by telephone with an immediate family member detained in another facility. Immediate family members include spouses, common-law spouses, parents, stepparents, foster parents, brothers, sisters, natural or adopted children and stepchildren.

Reasonable limitations may be placed on the frequency and duration of such calls. Facility staff shall liberally grant such requests to discuss legal matters and shall afford the detainee privacy to the extent practicable, while maintaining adequate security.

# J. Incoming Calls

The facility shall take and deliver telephone messages to detainees as promptly as possible.

When facility staff receives an emergency telephone

call for a detainee, the caller's name and telephone number shall be obtained and promptly given to the detainee. The detainee shall be permitted to promptly return an emergency call at their own cost within the constraints of security and safety. The facility shall enable indigent detainees to make a free return emergency call.

# 5.7 Visitation

## I. Purpose and Scope

This detention standard ensures that detainees shall be able to maintain morale and ties through visitation with their families, the community, legal representatives and consular officials, within the constraints of the safety, security and good order of the facility.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

For all types of facilities, procedures that appear in italics with a marked (**) on the page indicate optimum levels of compliance for this standard.

Various terms used in this standard may be defined in standard "7.5 Definitions."

News media interviews and tours are outlined in standard "7.2 Interviews and Tours."

Conjugal visits for ICE/ERO detainees are prohibited.

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Facilities are encouraged to allow detainees to maintain ties to their family and friends in the community. Detainees shall be able to receive visits from legal representatives, consular officials and others in the community.

2. Visits between legal representatives and assistants and an individual detainee are confidential and shall not be subject to auditory supervision. Private consultation rooms shall be available for such meetings.

3. Detainees shall be advised of their right to contact their consular representatives and receive visits from their consulate officers.

4. Facilities are encouraged to provide opportunities for both contact and non-contact visitation with approved visitors during both day and evening hours.

5. Information about visiting policies and procedures shall be readily available to the public.

6. The number of visitors a detainee may receive and the length of visits shall be limited only by reasonable constraints of space, scheduling, staff availability, safety, security and good order. Generally visits should be for the maximum period practicable but not less than one hour with special consideration given to family circumstances and individuals who have traveled long distances.

7. Visitors shall be screened and approved upon arrival and shall be required to adequately identify themselves and register to be admitted into a facility, so that safety, security and good order can be maintained.

8. A background check shall be conducted on all new volunteers prior to their being approved to provide services to detainees.

9. Each new volunteer shall complete an appropriate, documented orientation program and sign an acknowledgement of his or her understanding of the applicable rules and procedures and agreement to comply with them.

10. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Visitation" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF: 5B-01, 5B-02, 5B-03, 5B-04, 2A-21, 2A-27, 2A-61, 6A-06, 7B-03, 7C-02, 7F-05, 7F-06.

ICE/ERO *Performance-based National Detention Standards 2011:*

- "2.10 Searches of Detainees";

- "3.1 Disciplinary System"; and

- "7.2 Interviews and Tours."

## V. Expected Practices

### A. Overview

Facilities that house ICE/ERO detainees shall provide visiting procedures for detainees to maintain communication with persons in the community. Safety, security and good order are always primary considerations in a detention facility, and visitors must be properly identified and attired and are subject to search upon entering the facility and at any other time. Except as otherwise permitted herein, visitors may not give anything directly to a detainee, although it may be permissible for visitors to leave certain items and funds for a detainee with a staff member, at the discretion of the facility administrator. An itemized receipt that lists funds and property brought for the detainee shall be provided to the visitor.

Any violation of the visitation rules, by the detainee, may result in disciplinary action against the detainee and introduction of contraband or other criminal violations may lead to criminal prosecution of a visitor, detainee or both.

Differences in the various conditions of each visit, including who may visit, when they may visit, how they may be approved to visit and where in the facility they may visit, are detailed later in this standard and are dependent on the type of visitation, according to the following designations:

1. social visitation: family, relatives, friends and associates; minors may be subject to special restrictions (see "I. Visits by Family and Friends" in this standard);

2. legal visitation: attorneys, other legal representatives, legal assistants (see "J. Visits by Legal Representatives and Legal Assistants" in this standard);

3. consultation visitation: for detainees subject to expedited removal (see "K. Consultation Visits for Detainees Subject to Expedited Removal" in this standard);

4. consular visitation: similar to legal visitation but with consular officials who have state department issued identification (see "L. Consular Visitation" in this standard);

5. community service organization visitation: representatives of civic, religious, cultural groups, etc. (see "M. Visits from Representatives of Community Service Organizations" in this standard); and

6. other special visitation (see "N. Other Special Visits" in this standard; for non-governmental organizations (NGO) please see standard "7.2 Interviews and Tours.")

## B. General

Each facility shall establish written visiting procedures, including a schedule and hours of visitation and make them available to the public.

Each facility administrator shall decide whether to permit contact visits, as appropriate for the facility's physical plant and detainee population. Exceptions to this standard can be made by the facility administrator on a case-by-case basis when warranted by compelling circumstances or individual needs or conduct.

A facility administrator may temporarily restrict visiting when necessary to ensure the security and good order of the facility. Each restriction or denial of visits, including the duration of and reasons for the restriction, shall be documented in writing.

## C. Notification of Visiting Rules and Hours

Each facility shall:

1. Provide written notification of visitation rules and hours in the detainee handbook or local supplement given each detainee upon admission,

and post those rules and hours where detainees can easily see them. Such information shall be posted in each housing unit.

2. Make the schedule and procedures available to the public, both in written form and telephonically. A live voice or recording shall provide telephone callers the rules and hours for all categories of visitation.

3. Post schedule, procedures and notification of visitation rules and hours in the visitor waiting area in English, Spanish and, where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

## D. Visitor Logs

Each facility shall maintain a log of all general visitors, and a separate log of legal visitors. If the stated purpose of the visit is for Expedited Removal consultation, the visit shall be logged in the Legal Visitation Log. Staff shall record in the general visitors' log:

1. the name and alien-registration number (A-number) of the detainee visited;

2. the visitor's name and address;

3. the visitor's relationship to the detainee; and

4. the date, arrival time and departure time.

## E. Incoming Property and Funds for Detainees

In accordance with standard "2.5 Funds and Personal Property," each facility shall have written procedures regarding incoming property and money for detainees.

The facility administrator may permit a visitor to leave cash or a money order with a designated staff member for deposit in a detainee's account; the staff member must provide the visitor a receipt for all money or property left at the facility. Under no circumstances may visitors give property or money

directly to a detainee.

The shift supervisor must approve all items brought for detainees. The visiting room officer may not accept articles or gifts of any kind for a detainee, unless the facility administrator and/or shift supervisor has approved these items in advance.

Due to the relatively short length of stay and the fact that ICE/ERO provides all necessities, detainees may receive only minimal amounts of personal property, including:

1. small religious items;
2. religious and secular reading material (soft cover);
3. legal documents and papers;
4. pictures: 10 maximum, measuring 5" x 7" or smaller each;
5. prescription glasses;
6. dentures;
7. personal address book or pages;
8. correspondence;
9. wedding rings;
10. telephone calling cards; and
11. other items approved by the facility administrator.

## F. Sanctions for Violation of Visitation and Contraband Rules

Any violation of the visitation rules by the detainee may result in disciplinary action against the detainee, including loss of visitation privileges, excluding legal and consular visits. Visiting privileges may be revoked only through the formal detainee disciplinary process. However, the facility administrator has the authority to restrict or suspend a detainee's ordinary visiting privileges temporarily when there is reasonable suspicion that the detainee has acted in a manner constituting a threat to the

safety, security or good order of the facility. Each incident shall be documented, and the restriction or suspension shall be limited to the time required to investigate and complete the disciplinary process. Legal visitation shall be suspended only if necessary to maintain the safety or security of the facility.

A visitor's failure to abide by visiting rules may result in immediate cancellation or termination of a visit and/or suspension of future visitation privileges.

Introduction of contraband or other criminal violations may lead to criminal prosecution of a visitor, a detainee or both.

## G. Dress Codes for Visitors

If the facility establishes and maintains a dress code for visitors, it shall be made available to the public, e.g., posted on the facility's website, telephone message and included in the detainee handbook.

## H. Visiting Room Conditions

The facility's visiting areas shall be appropriately furnished and arranged, and made as comfortable and pleasant as practicable. Also, as practicable, space shall be provided outside of the immediate visiting areas for the secure storage of visitors' coats, handbags and other personal items.

The facility administrator shall provide adequate supervision of all visiting areas, and the visiting area officer shall ensure that all visits are conducted in an orderly and dignified manner.

## I. Visits by Family and Friends

### 1. Hours and Time Limits

Each facility shall establish a visiting schedule based on the detainee population and the demand for visits. Visits shall be permitted during set hours on Saturdays, Sundays and holidays, and to the extent practicable, facilities shall also establish visiting hours on weekdays and during evening hours. The facility shall accommodate the scheduling needs of

visitors for whom scheduled visiting hours pose a hardship, for example, authorizing special visits for family visitors.

To accommodate the volume of visitors within the limits of space and staff resources, and to ensure adequate security, the facility administrator may restrict visits (e.g., some or all detainees and visitors may be limited to visiting on Saturday or on Sunday, but not both days). ICE/ERO does not require a facility to permit every visitor to visit on both days of a weekend, nor to permit every detainee to have visits on both days of a weekend. However, to the extent practicable, ICE/ERO encourages the facility administrator to establish visiting hours for each detainee on both days of the weekend, and to try to accommodate visitors who can only visit on a specific weekend day.

The facility's written rules shall specify time limits for visits, no less than one hour, under normal conditions.

ICE/ERO encourages more generous limits when possible, especially for family members traveling significant distances. In unforeseen circumstances, such as the number of visitors exceeding visiting room capacity, the facility administrator may modify visiting periods.

## 2. Persons Allowed to Visit

Individuals from the following categories shall be permitted to visit, unless they pose a threat to the security and good order of the facility:

a. Immediate Family: Immediate family may include mothers, fathers, stepparents, foster parents, brothers, sisters, stepbrothers, stepsisters, biological and adopted children, stepchildren, foster children and spouses, including common-law spouses.

  Immediate family members detained at the same facility may visit with each other during normal visiting hours, regardless of gender, when practicable.

b. Minors: Facilities should have provisions to allow for contact or non-contact visitation with minor children, stepchildren and foster children. Facilities that allow visitations by minor children, stepchildren and foster children should try to facilitate contact visitation when possible. Facilities should allow detainees to see their minor children as soon as possible after admission. Generous time allotments for visitation with minor children are recommended.

  At facilities where there is no provision for visits by minors, upon request, ICE/ERO shall arrange for a visit by children, stepchildren and foster children within the first 30 days. After that time, upon request, ICE/ERO shall consider a request for transfer, when possible, to a facility that shall allow such visitation. Upon request, ICE/ERO shall continue monthly visits, if transfer is not approved, or until an approved transfer can be effected.

  At the supervisor's discretion, a minor without positive identification may be admitted if the accompanying adult visitor vouches for his/her identity. Minors must remain under the direct supervision of an adult visitor so as not to disturb other visitors, and excessively disruptive conduct by minors may result in termination of the visit.

c. Others may include grandparents, uncles, aunts, in-laws, cousins, nieces, nephews, non-relatives and friends.

## 3. Visitor Identification and Search Procedures

Staff shall verify each adult visitor's identity before admitting him/her to the facility. No adult visitor may be admitted without government-issued photo identification. All visitors shall be subject to identification and personal search in accordance with standard "2.4 Facility Security and Control."

The facility administrator may establish a procedure for random criminal background and warrant checks for the purpose of ensuring facility safety, security

and good order. Visitors shall not be precluded from visiting a detainee solely because of a past conviction. Facilities can exclude visitors based on an examination of the underlying conduct of the conviction.

Staff shall escort visitors to the visiting room only after completing identification and inspection as provided in the facility's written procedures. All visitors are subject to a personal search, which may include a pat ("pat-down") search as well as a visual inspection of purses, briefcases, packages and other containers. Written procedures shall be publicly available to inform visitors that they are subject to search procedures. Any person who refuses to be searched is prohibited from visiting a detainee.

In each facility, written procedures shall provide for the prevention, cancellation or termination of any visit that appears to pose a threat to safety, security or good order. Visiting area officers or other staff, who believe a situation poses such a threat, shall alert the shift supervisor or equivalent; the supervisor may then prevent, cancel or terminate the visit.

*The inspecting officer may ask the visitor to open a purse, briefcase, package, and other container for visual inspection of its contents. If warranted, the officer may ask the visitor to remove the contents and place them on a table; however, the officer may not place his or her hands inside the container. Facilities shall provide and promote visitors' use of lockers or a secure area provided for safekeeping of personal belongings during visits.*

*Only an officer with the rank of supervisor or above may deny or cancel a visit. In those cases, the officer shall document his or her action in a memorandum sent through official channels to the facility administrator. The visiting room officer, with concurrence from the shift supervisor, may terminate visits involving inappropriate behavior.*

*Facilities shall not require approved visitor lists from ICE/ERO detainees.*

## 4. Contact Visits

Written procedures shall detail the limits and conditions of contact visits in facilities that permit them. Ordinarily, within the bounds of propriety, handshaking, embracing and kissing are permitted only at the beginning and end of the visit; however, staff may limit physical contact to minimize opportunities for contraband introduction and to otherwise maintain the orderly operation of the visiting area.

Detainees receiving contact visits shall be given a thorough pat-down search prior to entering the visiting room. Upon exiting, searches of detainees shall be conducted in accordance with facility policy and procedures, which should be reflective of such factors as:

a. the nature of the facility;

b. whether the facility houses detainees pending trial for violent or drug-related crimes;

c. the availability of appropriate screening devices; monitoring technology; and/or

d. concern for contraband entering the facility.

A facility may only adopt a policy permitting strip searches after contact visits in the absence of reasonable suspicion if detainees have the right to choose non-contact visitation instead.  Detainees must be fully informed of that option and the policy generally in a language or manner they understand. The facility must document all strip searches that are performed based on such policy.

## 5. Visits for Administrative and Disciplinary Segregation Detainees

While in administrative or disciplinary segregation status, a detainee ordinarily retains visiting privileges.

Segregated detainees may ordinarily use the visiting room during normal visiting hours. However, the facility may restrict or disallow visits for a detainee who violates visiting rules or whose behavior

indicates that he/she may be a threat to the security or good order of the visiting room.

Under no circumstances may detainees be permitted to participate in visitation while in restraints. If the detainee's behavior warrants restraints, the visit may not be granted under general population visiting conditions. Any restriction or denial of visits shall be documented in writing.

Detainees in protective custody, and violent and/or disruptive detainees, shall not use the visitation room during normal visitation hours. In cases in which a visit may present an unreasonable security risk, visits may be disallowed for a particular detainee.

## J. Visits by Legal Representatives and Legal Assistants

### 1. General

In visits referred to as "legal visitation," each detainee may meet privately with current or prospective legal representatives and their legal assistants. Legal visits may not be terminated for routine official counts.

### 2. Hours

Each facility shall permit legal visitation seven days a week, including holidays, for a minimum of eight hours per day on regular business days (Monday through Friday), and a minimum of four hours per day on weekends and holidays.

The facility shall provide notification of the rules and hours for legal visitation as specified above. This information shall be prominently posted in the waiting areas and visiting areas and in the housing units.

On regular business days, legal visitations may proceed through a scheduled meal period, and the detainee shall receive a tray or sack meal after the visit.

In emergency circumstances, facilities may consider requests from legal representatives for extended visits or visits outside normal facility visiting hours.

### 3. Persons Allowed to Visit

Subject to the restrictions stated below, individuals in the following categories may visit detainees to discuss legal matters:

a.  Attorneys and Other Legal Representatives: An attorney is any person who is a member in good standing of the bar of the highest court of any state, possession, territory, commonwealth or the District of Columbia, and is not under an order of any court suspending, enjoining, restraining, disbarring or otherwise restricting him/her in the practice of law.

    A legal representative is an attorney or other person representing another in a matter of law, including: law students or law graduates not yet admitted to the bar under certain conditions; accredited representatives; and accredited officials and attorneys licensed outside the United States. See 8 C.F.R. § 292.1 for more detailed definitions of these terms.

b.  Legal Assistants: Upon presentation of a letter of authorization from the legal representative under whose supervision he/she is working, an unaccompanied legal assistant may meet with a detainee during legal visitation hours. The letter shall state that the named legal assistant is working on behalf of the supervising legal representative for purposes of meeting with the ICE/ERO detainee(s).

c.  Translators and Interpreters: The facility shall permit translators and interpreters to accompany legal representatives and legal assistants on legal visits, subject to "Visitor Identification and Search Procedures" detailed above.

d.  Messengers: The facility shall permit messengers (who are not legal representatives or legal assistants) to deliver documents to and from the facility, but not to visit detainees.

### 4. Identification of Legal Representatives and Legal Assistants

Prior to each visit, all legal representatives and assistants shall be required to provide appropriate identification, such as a bar card from any state, a document demonstrating partial or full accreditation from the U.S. Department of Justice (DOJ) Executive Office for Immigration Review (EOIR), or a letter of authorization from the legal representative or attorney under whose supervision the individual is working as detailed above.

Legal representatives and legal assistants shall not be asked to state the legal subject matter of the meeting.

Legal representatives and legal assistants are subject to a non-intrusive search—such as a pat-down search of the person or a search of the person's belongings—at any time for the purpose of ascertaining the absence of contraband.

### 5. Identification of Detainee to Be Visited

While identification by A-number is preferable, a facility may not require legal representatives and assistants to submit a detainee's A-number as a condition of visiting. Where the legal representative or assistant provides alternative information sufficient to reasonably identify the specific detainee, the facility shall make a good-faith effort to locate a detainee

### 6. Call-Ahead Inquiries

Each facility shall establish a written procedure to allow legal representatives and assistants to telephone the facility in advance of a visit to determine whether a particular individual is detained there. The request must be made to the on-site ICE/ERO staff or, where there is no resident staff, to the ICE/ERO office with jurisdiction over the facility.

### 7. Pre-Representation Meetings

During the regular hours for legal visitation, the facility shall permit detainees to meet with prospective legal representatives or legal assistants.

The facility shall document such "prerepresentation meetings" in the logbook for legal visitation.

To meet with a detainee, a legal service provider's representative need not complete a Form G-28 (stating that he/she is legal representatives of the detainee) at the "pre-representation" stage.

### 8. Form G-28 and Attorney/Client Meetings

Attorneys representing detainees on legal matters unrelated to immigration are not required to complete a Form G-28.

Once an attorney-client relationship has been established, or if an attorney-client relationship already exists, the legal representative shall complete and submit a Form G-28, available in the legal visitation reception area. Staff shall collect completed forms and forward them to ICE/ERO.

### 9. Private Meeting Room and Interruption for Head Counts

Visits between legal representatives or legal assistants and an individual detainee are confidential and shall not be subject to auditory supervision. Private consultation rooms shall be available for such meetings.

Officers may terminate legal visits at the end of the allotted time or to maintain security, but not for routine official counts.

Staff shall not be present in the confidential area during the meeting unless the legal representative or legal assistant requests the presence of an officer; however, as long as staff cannot overhear the conversation, staff may observe such meetings visually through a window or camera, to the extent necessary to maintain security.

When a situation arises in which private conference rooms are in use and the attorney wishes to meet in a regular or alternate visiting room, the request shall be accommodated to the extent practicable. Such meetings shall be afforded the greatest possible degree of privacy under the circumstances.

### 10. Materials Provided to Detainees by Legal Representatives

The facility's written legal visitation procedures must provide for the exchange of documents between a detainee and the legal representative or assistant, even when contact visitation rooms are unavailable.

Documents or other written material provided to a detainee during a visit with a legal representative shall be inspected but not read. Detainees are entitled to retain legal material received for their personal use. Quantities of blank forms or self-help legal material in excess of those required for personal use may be held for the detainee with his/her property. The detainee shall be permitted access to these documents utilizing the established avenues of communication.

### 11. Administrative and Disciplinary Segregation

Detainees in administrative or disciplinary segregation shall be allowed legal visitation. If the facility administrator considers special security measures necessary, he/she shall notify the legal service provider of the security concerns prior to the meeting.

### 12. Group Legal Meetings

Upon request of a legal representative or assistant, the facility administrator may permit a confidential meeting (with no officer present) involving the requester and two or more detainees. This may occur for various purposes (e.g., pre-representational, representational, removal-related). The facility shall grant such requests to the greatest extent practicable, if it has the physical capacity and if the meeting shall not interfere with the safety, security and good order of the facility. Each facility administrator shall limit detainee attendance according to the practical concerns of the facility, or the security concerns associated with the meeting in question.

See also standard "6.4 Legal Rights Group Presentations."

### 13. ICE/ERO-Provided List of Free Legal Service

### Providers and Detainee Sign-Up

ICE/ERO shall provide each facility the official list of local free legal service providers, updated quarterly by the local DOJ Executive Office for Immigration Review. The facility shall promptly and prominently post the current list in detainee housing units and other appropriate areas.

Any legal organization or individual on the current list may write the facility administrator to request the posting and/or general circulation of a sign-up sheet.

The facility administrator shall then notify detainees of the availability of the sign-up sheet and according to established procedures, ensure coordination with the pro bono organization.

### 14. Legal Visitation Log

Staff shall maintain a separate log to record all legal visitors, including those denied access to the detainee. The log shall include the reason(s) for denying access.

*Log entries shall include the following information:*

a. *date;*

b. *time of arrival;*

c. *visitor's name;*

d. *visitor's address;*

e. *supervising attorney's name (if applicable);*

f. *detainee's name and A-number;*

g. *whether the detainee currently has a G-28 on file;*

h. *time visit began; and*

i. *time visit ended.*

*Staff shall also record any important comments about the visit.*

### 15. Availability of Legal Visitation Policy

The facility's written legal visitation policy shall be available upon request. The site-specific policy shall specify visitation hours, procedures and standards

and address, at a minimum, the following:

a. telephone inquiries;

b. dress code;

c. legal assistants working under the supervision of an attorney;

d. pre-representational meetings;

e. Form G-28 requirements;

f. identification and search of legal representatives;

g. identification of visitors;

h. materials provided to detainees by legal representatives;

i. confidential group legal meetings; and

j. detainee sign-up.

## K. Consultation Visits for Detainees Subject to Expedited Removal

### 1. General

Detainees who are subject to expedited removal and who have been referred to an asylum officer are entitled by statute and regulation to consult with persons of the detainee's choosing, both prior to the interview and while the asylum officer's decision is under review. Such consultation visitation is for the general purpose of discussing immigration matters, not for purely social visits covered earlier.

a. The consultation visitation period begins before any interview with an asylum officer and continues while the asylum officer's determination is under review by the supervisory asylum officer or immigration judge.

b. The consultation visitation period ends with the issuance of a Notice to Appear and once the detainee is placed in removal proceedings before an immigration judge; however, the detainee retains legal and other visitation privileges in accordance with this standard.

"Consultation visitation" may neither incur government expense nor unduly delay the removal process.

### 2. Method of Consultation

Because expedited removal procedures occur within short time frames, each facility shall develop procedures that liberally allow for consultation visitation, to ensure compliance with statutory and regulatory requirements and to prevent delay in the expedited removal process. Given the time constraints, consultation by mail is highly discouraged.

Facility staff shall ensure that consultation, whether in person, by telephone or by electronic means, proceed without hindrance. Staff shall be sensitive to individual circumstances when resolving consultation-related issues.

Consultation visitation shall be allowed during legal visitation hours and during general visitation hours. If necessary to meet demand, the facility administrator shall increase consultation visiting hours.

### 3. Persons Allowed to Visit for Consultation Purposes

Detainees subject to expedited removal may consult whomever they choose, in person, by phone or by other electronic needs, at any time during the first 48 hours of detention. Consultants might include, but are not limited to, attorneys and other legal representatives, prospective legal representatives, legal assistants, members of non-governmental organizations (NGOs) and friends and family.

Consultants are subject to the same identification and security screening procedures as general visitors. If documented security concerns preclude an in-person visit with a particular individual, the facility administrator shall arrange for consultation by telephone or other electronic means. If security reasons also preclude consultation by telephone or other electronic means, the facility administrator, through the Field Office Director, shall consult the respective ICE Office of Chief Counsel.

### 4. Privacy

Consultation visits, whether in person, by telephone or other electronic means, shall receive the same privacy as communications between legal representatives and detainees.

### 5. Admittance for Asylum Officer Interview

Detainees subject to expedited removal may bring and consult advisors during the asylum officer interview. The presence of persons to consult is also allowed during the Immigration Judge's review of a negative credible fear determination, at the judge's discretion.

### 6. Log

Staff shall record consultation visits in the legal visitation log.

### 7. Form G-28 for Consultation Visits

Visitors are not required to file a Form G-28 to participate in a consultation visit or provide consultation during an asylum officer interview or Immigration Judge's review of a negative credible fear determination. This stipulation applies even if the visitor is an attorney or legal representative.

### 8. Other Considerations for Consultation Visits

The above procedures for "Visits by Legal Representatives and Legal Assistants" apply to other considerations in regard to consultation visits such as the following:

a.  group consultations;

b.  call-ahead inquiries;

c.  searches;

d.  detainee identification;

e.  materials provided to detainees by the visitor;

f.  consultation visits for detainees in administrative and disciplinary segregation;

g.  pro-bono list and detainee sign-up; and

h.  availability of consultation visitation policy.

## L. Consular Visitation

According to international agreements and under regulation 8 C.F.R. § 236.1, detainees must be advised of their right to consular access and ICE/ERO shall facilitate the detainee's access to consular officers. ICE/ERO policy and practice stipulate that all detained individuals be provided with notice, through the facility administrator, of their right to contact their consular representative(s) and receive visits from their consulate officer(s).

The facility administrator shall ensure that all detainees are notified of and afforded the right to contact and receive visits from their consular officers. The same hours, privacy and conditions that govern legal visitation apply to consular visitation. Consular visits may be permitted at additional times outside normal visitation hours, with the facility administrator's prior authorization.

To conduct such visits, consular officers must present Department of State-issued identification.

## M. Visits from Representatives of Community Service Organizations

The facility administrator may approve visits to one or more detainees by individuals or groups representing community service organizations, including civic, religious, cultural, therapeutic and other groups. Volunteers may provide a special religious, educational, therapeutic or recreational activity.

The facility administrator's approval shall take into account such factors as:

1.  safety and security considerations;

2.  availability of detention personnel to supervise the activity; and

3.  sufficient advance notification to the facility administrator.

*Detainees' immediate family and other relatives, friends and associates, as detailed above under*

*"Persons Allowed to Visit," may not serve as volunteers.*

To inform the facility administrator's decision, facility staff (such as chaplains and recreation specialists) shall verify the organization's bona fide interests and qualifications for this kind of service.

*Groups and/or individuals from those groups must:*

1. *Provide the facility with advance notification of the names, dates of birth and social security numbers or unexpired passport number of the group members who shall be visiting;*

   *All volunteers, regardless of title or position, are subject to a background check that includes, but is not limited to, a criminal history check, verification of identity and occupation and verification of credentials for the type of activity involved;*

2. *Provide identification for individual members of the group upon arrival at the facility.*

   *Standard "2.4 Facility Security and Control" details procedures for checking a visitor's identity, issuing visitor passes and accounting for visitors while they are in the facility;*

3. *Comply with visitation rules: each approved volunteer shall receive an appropriate orientation to the facility, and shall acknowledge his/her understanding of rules and procedures by signing an agreement to comply with them, particularly in regard to permissible behavior and relationships with detainees. The orientation and signed agreement shall include at a minimum, the following functions:*

   a. *specify lines of authority, responsibility and accountability for volunteers; and*

   b. *prohibit volunteers from:*

      1) *using their official positions to secure privileges for themselves or others;*

      2) *engaging in activities that constitute a*

   *conflict of interest; and*

      3) *accepting any gift from or engaging in personal business transactions with a detainee or a detainee's immediate family.*

   *All volunteers shall be held accountable for compliance with the rules and procedures.*

4. *Read and sign a waiver of liability that releases ICE/ERO of all responsibility in case of injury during the visit before being admitted to any secure portion of the facility or location where detainees are present.*

## N. Other Special Visits

### 1. Independent Medical Service Providers and Experts

A detainee or his/her legal representative may seek an independent medical or mental health examination to develop information useful in administrative proceedings, in accordance with "EE. Examinations by Independent Medical Service Providers and Experts" found in standard 4.3 "Medical Care." Once the Field Office Director has approved the request for an independent examination, the facility shall provide a location for the examination but no medical equipment or supplies and the examination must be arranged and conducted in a manner consistent with maintaining the security and good order of the facility.

### 2. Law Enforcement Officials' Visits

Facility visitation procedures shall cover law enforcement officials requesting interviews with detainees. Facilities shall notify and seek approval from ICE/ERO of any proposed law enforcement officer visit with a detainee.

### 3. Visitation by Former Detainees or Aliens in Proceedings

Former ICE/ERO detainees, individuals with criminal records and individuals in deportation proceedings shall not be automatically excluded from visitation. Individuals in any of these categories

must so notify the facility administrator before registering for visitation privileges. The facility administrator shall weigh the nature and extent of an individual's criminal record and/or prior conduct against the benefits of visitation in determining visitation privileges. A potential visitor's failure to disclose such matters may preclude visitation privileges.

### 4. Business Visitors

A detainee may not actively engage in business or professional interests or activities; however, in the event that a detainee must make a decision that shall substantially affect the assets or prospects of a

business, the facility administrator may permit a special visit.

ICE/ERO does not recognize or sanction any work-release program.

### 5. Visiting Rules Regarding Animals

Each facility shall establish and disseminate a policy and implementing procedures governing whether and, if so, under what circumstances animals may accompany human visitors onto or into facility property.

However, service animals shall be permitted to accompany all persons with disabilities.

# 5.8 Voluntary Work Program

## I. Purpose and Scope

This detention standard provides detainees opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of the safety, security and good order of the facility.

While not legally required to do so, ICE/ ERO affords working detainees basic Occupational Safety and Health Administration (OSHA) protections.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);
- Contract Detention Facilities (CDFs); and
- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Detainees may have opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of the safety, security and

good order of the facility.

2. Detainees shall be able to volunteer for work assignments but otherwise shall not be required to work, except to do personal housekeeping.

3. Essential operations and services shall be enhanced through detainee productivity.

4. The negative impact of confinement shall be reduced through decreased idleness, improved morale and fewer disciplinary incidents.

5. Detainee working conditions shall comply with all applicable federal, state and local work safety laws and regulations.

6. There shall be no discrimination regarding voluntary work program access based on any detainee's race, religion, national origin, gender, sexual orientation or disability.

7. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or

who is illiterate.

# III. Standards Affected

This detention standard replaces "Voluntary Work Program" dated 12/2/2008.

This detention standard incorporates the requirements regarding detainees' assigned to work outside of a facility's secure perimeter originally communicated via a memorandum to all Field Office Directors from the Acting Director of U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) (11/2/2004).

# IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-5C-06, 5C-08, 5C-11(M), 6B-02.

ICE/ERO *Performance-based National Detention Standards 2011:*

- "1.2 Environmental Health and Safety"; and
- "4.1 Food Service."

# V. Expected Practices

## A. Voluntary Work Program

Detainees shall be provided the opportunity to participate in a voluntary work program. The detainee's classification level shall determine the type of work assignment for which he/she is eligible. Generally, high custody detainees shall not be given work opportunities outside their housing units/living areas. Non-dedicated IGSAs will have discretion on whether or not they will allow detainees to participate in the voluntary work program.

## B. Work Outside the Secure Perimeter

ICE detainees may not work outside the secure

perimeter of non-dedicated IGSA facilities.

*In SPCs, CDFs, and dedicated IGSAs, low custody detainees may work outside the secure perimeter on facility grounds. They must be directly supervised at a ratio of no less than one staff member to four detainees. The detainees shall be within sight and sound of that staff member at all times.*

## C. Personal Housekeeping Required

Work assignments are voluntary; however, all detainees are responsible for personal housekeeping.

*Detainees are required to maintain their immediate living areas in a neat and orderly manner by:*

1. *making their bunk beds daily;*
2. *stacking loose papers;*
3. *keeping the floor free of debris and dividers free of clutter; and*
4. *refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture.*

## D. Detainee Selection

The facility administrator shall develop site-specific rules for selecting work detail volunteers. These site-specific rules shall be recorded in a facility procedure that shall include a voluntary work program agreement. The voluntary work program agreement shall document the facility's program and shall be in compliance with this detention standard.

*The primary factors in hiring a detainee as a worker shall be his/her classification level and the specific requirements of the job.*

1. *Staff shall present the detainee's name to the shift supervisor or the requesting department head.*
2. *The shift supervisor or department head shall review the detainee's classification and other relevant documents in the detainee's detention file.*
3. *The shift supervisor or department head shall*

*assess the detainee's language skills because these skills affect the detainee's ability to perform the specific requirements of the job under supervision. To the extent possible, work opportunities shall be provided to detainees who are able to communicate with supervising staff effectively and in a manner that does not compromise safety and security.*

4. *Inquiries to staff about the detainee's attitude and behavior may be used as a factor in the supervisor's selection.*

*Staff shall explain the rules and regulations as well as privileges relating to the detainee worker's status. The detainee shall be required to sign a voluntary work program agreement before commencing each new assignment. Completed agreements shall be filed in the detainee's detention file.*

## E. Special Details

Detainees may volunteer for temporary work details that occasionally arise. The work, which generally lasts from several hours to several days, may involve labor-intensive work.

## F. Discrimination in Hiring Prohibited

Detainees shall not be denied voluntary work opportunities on the basis of such factors as a detainee's race, religion, national origin, gender, sexual orientation or disability.

## G. Detainees with Disabilities

The facility shall allow, where possible, detainees with disabilities  to participate in the voluntary work program in appropriate work assignments. Consistent with the procedures outlined in Standard 4.8 "Disability Identification, Assessment, and Accommodation," the facility shall provide reasonable accommodations and modifications to its policies, practices, and/or procedures to ensure that detainees with disabilities have an equal opportunity to access, participate in, and benefit from the voluntary work programs.

## H. Hours of Work

Detainees who participate in the volunteer work program are required to work according to a schedule.

The normal scheduled workday for a detainee employed full time is a maximum of 8 hours. Detainees shall not be permitted to work in excess of 8 hours daily, 40 hours weekly.

Unexcused absences from work or unsatisfactory work performance may result in removal from the voluntary work program.

## I. Number of Details in One Day

The facility administrator may restrict the number of work details permitted a detainee during one day.

*In SPCs, CDFs, and dedicated IGSAs a detainee may participate in only one work detail per day.*

## J. Establishing Detainee Classification Level

If the facility cannot establish the classification level in which the detainee belongs, the detainee shall be ineligible for the voluntary work program.

## K. Compensation

Detainees shall receive monetary compensation for work completed in accordance with the facility's standard policy.

The compensation is at least $1.00 (USD) per day. The facility shall have an established system that ensures detainees receive the pay owed them before being transferred or released.

## L. Removal of Detainee from Work Detail

A detainee may be removed from a work detail for such causes as:

1.  unsatisfactory performance;

2.  disruptive behavior, threats to security, etc.;

3.  physical inability to perform the essential

elements of the job due to a medical condition or lack of strength;

4. prevention of injuries to the detainee; and/or

5. a removal sanction imposed by the Institution Disciplinary Panel for an infraction of a facility rule, regulation or policy.

When a detainee is removed from a work detail, the facility administrator shall place written documentation of the circumstances and reasons in the detainee detention file.

Detainees may file a grievance to the local Field Office Director or facility administrator if they believe they were unfairly removed from work, in accordance with standard "6.2 Grievance System."

## M. Detainee Responsibility

The facility administrator shall establish procedures for informing detainee volunteers about on-the-job responsibilities and reporting procedures.

The detainee is expected to be ready to report for work at the required time and may not leave an assignment without permission.

1. The detainee shall perform all assigned tasks diligently and conscientiously.

2. The detainee may not evade attendance and performance standards in assigned activities nor encourage others to do so.

3. The detainee shall exercise care in performing assigned work, using safety equipment and taking other precautions in accordance with the work supervisor's instructions.

4. In the event of a work-related injury, the detainee shall notify the work supervisor, who shall immediately implement injury-response procedures.

## N. Detainee Training and Safety

All detention facilities shall comply with all applicable health and safety regulations and standards.

The facility administrator shall ensure that all department heads, in collaboration with the facility's safety/training officer, develop and institute appropriate training for all detainee workers.

1. The voluntary work program shall operate in compliance with the following codes and regulations:

   a. Occupational Safety and Health Administration (OSHA) regulations;

   b. National Fire Protection Association 101 Life Safety Code; and

   c. International Council Codes (ICC).

   Each facility administrator's designee is responsible for providing access to complete and current versions of the documents listed above.

   The facility administrator shall ensure that the facility operates in compliance with all applicable standards.

2. Upon a detainee's assignment to a job or detail, the supervisor shall provide thorough instructions regarding safe work methods and, if relevant, hazardous materials, including:

   a. safety features and practices demonstrated by the supervisor; and

   b. recognition of hazards in the workplace, including the purpose for protective devices and clothing provided, reporting deficiencies to their supervisors (staff and detainees who do not read nor understand English shall not be authorized to work with hazardous materials).

   A detainee shall not undertake any assignment before signing a voluntary work program agreement that, among other things, confirms that the detainee has received and understood training from the supervisor about the work assignment.

The voluntary work program agreement, which each detainee is required to sign prior to commencing each new assignment, shall be placed in the detainee's detention file.

3. For a food service assignment, medical staff, in conjunction with the U.S. Public Health Service, shall ensure that detainees are medically screened and certified before undertaking the assignment.

4. The facility shall provide detainees with safety equipment that meets OSHA and other standards associated with the task performed.

5. The facility administrator shall ensure that the facility operates in compliance with all applicable standards.

## O. Detainee Injury and Reporting Procedures

The facility administrator shall implement procedures for immediately and appropriately responding to on-the-job injuries, including immediate notification of ICE/ERO.

If a detainee is injured while performing his/her work assignment:

1. The work supervisor shall immediately notify facility medical staff. In the event the accident occurs in a facility that does not provide 24-hour medical care, the supervisor shall contact the on-call medical officer for instructions.

2. First aid shall be administered as necessary.

3. Medical staff shall determine what treatment is necessary and where that treatment shall take place.

4. The work supervisor shall complete a detainee accident report and submit it to the facility administrator for review and processing and file it in the detainee's detention file and A-file.

# 6.1 Detainee Handbook

## I. Purpose and Scope

This detention standard requires that, upon admission, every detainee be provided comprehensive written orientation materials that describe such matters as the facility's rules and sanctions, disciplinary system, mail and visiting procedures, grievance system, services, programs and medical care, in English, Spanish and other languages and that detainees acknowledge receipt of those materials.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

For all types of facilities, procedures that appear in italics with a marked (**) on the page indicate optimum levels of compliance for this standard.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Upon admission to a facility, each detainee shall be provided the comprehensive written orientation materials, which shall consist of the *ICE National Detainee Handbook* (ICE Handbook) and a local detainee handbook supplement. The facility shall develop the local detainee handbook supplement, which shall describe such matters as:

   a. the grievance system;

   b. services and programs;

   c. medical care;

   d. access to legal counsel;

   e. law libraries and legal material;

   f. correspondence and other material;

   g. staff-detainee communication;

   h. the classification system;

   i. visitation; and

   j. the disciplinary system.

2. Each detainee shall verify, by signature and date, receipt of those orientation materials, and that acknowledgement shall be maintained in the detainee's detention file.

3. The ICE Handbook will be provided to the facility in English, Spanish and other languages made available by ICE. The facility administrator shall ensure that the facility has sufficient quantities of the English and all translated versions of the ICE Handbook, and shall request additional copies of the ICE Handbook from the Field Office Director as needed.

4. The local handbook supplement provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

   Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate. Materials may be provided via audio or video recordings.

The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

# III. Standards Affected

This detention standard replaces "Detainee Handbook" dated 12/2/2008.

# IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-2A-27, 2A-28, 2A-29.

ICE/ERO *Performance-based National Detention Standards 2011*:

- "2.2 Custody Classification System";
- "2.13 Staff-Detainee Communication";
- "3.1 Disciplinary System";
- "4.3 Medical Care";
- "5.1 Correspondence and Other Mail";
- "5.7 Visitation";
- "6.2 Grievance System"; and
- "6.3 Law Libraries and Legal Material."

# V. Expected Practices

## A. Distribution

The facility administrator shall distribute the ICE Handbook, and shall develop and distribute a local written supplement to the handbook.

For consistency among detention facilities, the ICE Handbook shall be used as a comprehensive orientation resource. In each facility, the local supplement contents shall be customized and adapted for that specific facility.

## B. Contents of Local Supplement

Upon admission to a facility, prior to placement in general population, each detainee shall be provided a copy of the handbook and that facility's local supplement to the handbook.

Staff shall require each detainee to verify, by signature, receipt of the handbook, and shall maintain that signed acknowledgement in the detainee's detention file.

While all applicable topics from the handbook must be addressed, it is especially important that each local supplement notify each detainee of:

1. the rules, regulations, policies and procedures with which every detainee must comply;

2. detainee rights and responsibilities;

3. procedures for requesting interpretive services for effective communication;

4. Procedures for requesting reasonable accommodations

5. the facility's zero tolerance policy for all forms of sexual abuse and assault;

6. the facility's rules of conduct and prohibited acts, the disciplinary severity scale, the sanctions imposed for violations of the rules, the disciplinary process, the procedure for appealing disciplinary findings, and detainees' rights in the disciplinary system, as required by standard "3.1 Disciplinary System," at Section B of Expected Practices;

7. information about the facility's grievance system including medical grievances, as required by standard "6.2 Grievance System," at Section B of Expected Practices;

8. the facility's policies on telephone access and on the monitoring of telephone calls, if telephone calls are monitored;

9. the facility's visitation rules and hours;

10.  rules and procedures governing access to the law library as required by standard "6.3 Law Libraries and Legal Material," at Sections E(2) and N of Expected Practices;

11. content and procedures of the facility's rules on legal rights group presentations, and the availability of legal orientation programs;

12. the facility's rules on correspondence and other mail, including information on correspondence procedures as required by standard "5.1 Correspondence and Other Mail," at Section C of Expected Practices;

13. the facility's policies and procedures related to personal property, as required by standard "2.5 Funds and Personal Property," at Section C of Expected Practices;

14. the facility's marriage request procedures;

15. contact information for the ICE/ERO Field Office and the scheduled hours and days that ICE/ERO staff is available to be contacted by detainees at the facility; and

16. procedures to submit written questions, requests, or concerns to ICE/ERO staff, as well as the availability of assistance to prepare such requests.

## C. Translations and Access for Limited English Proficient Detainees

The ICE Handbook shall be provided in English, Spanish and other predominant languages as determined necessary by the Field Office Director.

The facility administrator shall ensure that the facility has sufficient quantities of the English and all translated versions of the ICE Handbook and shall request additional copies of the ICE Handbook from the Field Office Director as needed.  The local handbook supplement provided to detainees shall generally be translated into Spanish.  Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

If a detainee cannot read or does not understand the language of the handbook, the facility administrator shall provide the material using audio or video tapes in a language the detainee does understand, arrange for the orientation materials to be read to the detainee, or provide a translator or interpreter within a reasonable amount of time.

## D. Detention Support Staff

The facility administrator shall provide a copy of the ICE Handbook and the local supplement to every staff member who has contact with detainees, and shall address their contents in initial and annual staff training.

## E. Updates

The ICE Handbook will be updated as necessary by ICE/ERO.  The facility administrator shall appoint a committee to review the local supplement annually and recommend changes. While the handbook does not have to be immediately revised and reprinted to incorporate every change, the facility administrator shall establish procedures for immediately communicating such changes to staff and detainees through methods including but not limited to the following:

1. posting changes on bulletin boards in housing units and other prominent areas;

2. notifying staff by memos and other means; and

3. informing new arrivals during orientation.

On occasion, ICE/ERO may require a specific and

immediate change to the handbook.

## F. Reporting Allegations

The ICE Handbook will explicitly address how detainees shall report allegations of abuse and civil rights violations, along with violations of officer misconduct, directly to ICE/ERO headquarters or the DHS Office of Inspector General.

# 6.2 Grievance System

## I. Purpose and Scope

This detention standard protects a detainee's rights and ensures that all detainees are treated fairly by providing a procedure for them to file both informal and formal grievances, which shall receive timely responses relating to any aspect of their detention, including medical care.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices"):

1. Detainees shall be informed about the facility's informal and formal grievance system in a language or manner they understand.

2. In their daily interaction, staff and detainees shall mutually resolve most complaints and grievances orally and informally.

3. Detainees shall be able to file formal grievances, including medical grievances, and shall receive written responses, including the basis for the decision, in a timely manner.

4. Detainees shall be able to file emergency grievances for incidents that involve an immediate threat to health, safety, or welfare, and shall receive written responses, including the basis for the decision, in a timely manner.

5. Detainees shall be able to appeal initial decisions on grievances to at least one higher level of review.

6. Facilities shall allow any ICE/ERO detainee dissatisfied with the facility's response to a grievance or those fearing retaliation to be able to appeal or communicate directly with ICE/ERO.

7. Accurate records shall be maintained for filed grievances and their resolution in a grievance log and the detainee's detention file.

8. No detainee shall be harassed, disciplined, punished or otherwise retaliated against for filing a complaint or grievance.

9. The facility shall assist detainees with disabilities and other special needs in preparing and pursuing a grievance, including those with serious mental illness, known intellectual or developmental disabilities, or who are blind or have low vision.

10. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance,

including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Detainee Grievance Procedures" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-2A-27, 6A-07, 6B-01.

ICE/ERO *Performance-based National Detention Standards 2011:*

- "2.13 Staff-Detainee Communication"

- "5.1 Correspondence and Other Mail."

"*Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities,*" 79 Fed. Reg. 13100 (Mar. 7, 2014).

## V. Expected Practices

### A. Written Procedures Required

Each facility shall have written policy and procedures for a detainee grievance system that:

1. establish a procedure for any detainee to file an informal or formal grievance;

2. establish a procedure to track or log all ICE detainee grievances separately from other facility

populations;

3. establish reasonable time limits for:

   a. processing, investigating and responding to grievances;

   b. convening a grievance committee (or actions of a single designated grievance officer) to review formal complaints; and

   c. providing written responses to detainees who filed formal grievances, including the basis for the decision;

4. ensure a procedure in which all medical grievances are received by the administrative health authority within 24 hours or the next business day, with a response from medical staff within five working days, where practicable;

5. establish a special procedure for time-sensitive, emergency grievances, including having a mechanism by which emergency medical grievances are screened as soon as practicable by appropriate personnel;

6. ensure each grievance receives appropriate review;

7. provide at least one level of independent appeal that excludes individuals previously involved in the decision making process for the same grievance;

8. include guarantees against reprisal; and

9. ensure information, advice and directions are provided to detainees in a language or manner they can understand, or that interpretation/translation services are utilized.

### B. Informing Detainees about Grievance Procedures

The facility shall provide each detainee, upon admittance, a copy of the detainee handbook and local supplement (see also standard "6.1 Detainee Handbook"), in which the grievance section provides notice of the following:

1. The expectation that, to the greatest extent possible, complaints and grievances shall be handled orally and informally by staff in their daily interaction with detainees (at all times, the detainee shall be granted the right to file a formal grievance and pursue the formal grievance process);

2. The right to file a grievance, including medical grievances, both informal and formal;

3. The process for filing emergency grievances;

4. The procedures for filing and resolving a grievance, including the availability of assistance in preparing a grievance (assistance for detainees with impairments or disabilities, interpretation/translation services for detainees with limited English proficiency (LEP) and assistance for detainees with limited literacy);

5. The procedures for filing and resolving an appeal, including the right to appeal to specified higher levels if the detainee disagrees with the lower decisions;

6. The procedures for contacting ICE/ERO to appeal a decision;

7. The policy prohibiting staff from harassing, disciplining, punishing or otherwise retaliating against any detainee for filing a grievance or contacting the Office of the Inspector General (OIG); and

8. The opportunity at any point to file a complaint directly to the Department of Homeland Security (DHS) OIG about staff misconduct, physical or sexual abuse or civil rights violations; complaints may be filed by calling the DHS OIG Hotline at 800-323-8603 or by writing to: Department of Homeland Security Attn: Office of the Inspector General Washington, DC 20528

## C. Grievance Procedures

### 1. Informal Grievances

Informal grievance resolution offers a detainee the opportunity to expediently resolve his/her cause for complaint before resorting to the more time-consuming written formal procedure. Staff at every facility shall make every effort to resolve a detainee's complaint or grievance at the lowest level possible, in an orderly and timely manner.

The facility administrator, or designee, shall establish written procedures for detainees to orally and informally present the issue of concern (as addressed in standard "2.13 Staff-Detainee Communication"). Upon request, additional assistance will be provided for detainees with impairments or disabilities, interpretation/translation services for detainees who are LEP, and assistance for detainees with limited literacy. Detention facility staff is encouraged to provide assistance if a detainee cannot properly communicate their concern.

A detainee is free to bypass or terminate the informal grievance process at any point and proceed directly to the formal grievance stage.

If an informal grievance is resolved, the employee need not provide the detainee written confirmation of the outcome, but shall document the result for the record in the detainee's detention file and in any logs or data systems the facility has established to track such actions.

Staff members who receive a detainee's informal complaint or grievance shall:

a. attempt to resolve the issue informally, if the issue is within his/her scope of responsibility; or

b. notify the appropriate supervisor of the grievance as soon as practical.

The supervisor may try to resolve the matter or advise the detainee to initiate a written grievance.

If the grievance is resolved at this informal level, the individual who resolved the issue shall document the circumstances and resolution in the detainee's detention file and in the facility's grievance log.

### 2. Emergency Grievances

Each facility shall implement written procedures for identifying and handling a time-sensitive emergency grievance that involves an immediate threat to health, safety or welfare. Written procedures shall also cover urgent access to legal counsel and the law library. All staff shall be trained to respond appropriately and in an expeditious manner to emergency grievances. Once the receiving employee determines that the detainee is raising an issue requiring urgent attention, emergency grievance procedures shall apply. Translation and interpretation services shall be made available to those who need it.

Emergency grievances may be brought by a detainee to a designated grievance officer (GO) or directly to the facility administrator or their designee. If these personnel are not available, a shift supervisor may be informed of the complaint.

A report of the grievance, including the nature of the complaint, the name of the detainee and the action taken to resolve the issue, shall be prepared in written form and forwarded to the facility administrator, or designee.

If the facility administrator determines that the grievance is not an emergency, standard grievance procedures shall apply.

All emergency grievance reports, to include the circumstances of the grievance and the resolution, shall be placed in the detainee's detention file and documented in the facility's grievance log.

Medical emergencies shall be brought to the immediate attention of proper medical personnel for further assessment. If it is determined that it is not a medical emergency, standard grievance procedures shall apply.

### 3. Formal Written Grievances

The detainee may file a formal grievance at any time during, after, or in lieu of lodging an informal complaint.  The facility may not impose a time limit on when a detainee may submit a formal grievance.

In preparing and pursuing a grievance, the facility administrator, or designee, shall ensure procedures are in place to provide the assistance to detainees with impairments or disabilities, interpretation/translation services for detainees who are LEP, and assistance for detainees with limited literacy.

Facility grievance procedures shall be communicated to a detainee in a language or manner the detainee can understand. All written materials provided to detainees shall be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Staff shall provide the number of forms and envelopes requested by the detainee. Within reason, detainees are not limited in the number of forms and envelopes they may request.

Each facility shall establish three levels of formal grievance review. These reviews shall consist of: 1) GO review; 2) grievance appeals board (GAB) review; and 3) appellate review. ICE will issue guidance on the designation of representatives and additional guidelines for conducting hearings.

a. Grievance Procedure Guidelines

   1) To prepare a grievance, a detainee may obtain assistance from another detainee, the housing officer or other facility staff, family members or legal representatives. Staff shall take reasonable steps to expedite requests for assistance from these other parties.

   2) Another detainee, facility staff, family member, legal representative or non-governmental organization may assist in the preparation of a grievance with a detainee's consent.

      a) If the detainee claims that the issue is sensitive or that his/her safety or well-being may be jeopardized if others in the facility learn of the grievance, the detainee

must:

- describe in the grievance the reason for circumventing standard procedures; and

- be given the right to seal the grievance in an envelope clearly marked "sensitive" or "medically sensitive," and submit it directly to the facility administrator, administrative health authority or designee.

b) Each grievance form shall be delivered by authorized facility personnel (not detainees) without being read, altered or delayed.

b. Grievance Process

1) GO review

a) Designated GO shall conduct the initial adjudication of a formal or informal grievance.

b) Detainee shall be provided with a written or oral response within five days of receipt of the grievance.

c) GO or designee shall note the grievance log with the following information:

- date grievance filed;

- name of detainee that filed grievance;

- nature of the grievance;

- date decision provided to detainee; and

- outcome of the adjudication.

2) GAB review

a) The detainee shall have the option to file an appeal if the detainee is dissatisfied with a GO decision, and shall be informed of that option.

b) The designated members of the GAB shall review and provide a decision on the grievance within five days of receipt of the

appeal. The GAB shall not include any individuals named in the grievance.

c) The GAB shall issue a written decision to the detainee in all cases.

d) The GAB shall note the grievance log with the following information:

- date appeal filed;

- name of detainee that filed grievance;

- nature of the grievance;

- name of the GO that conducted the initial adjudication;

- date decision provided to detainee; and

- outcome of the adjudication.

e) Officials previously involved in adjudicating the grievance shall not participate on the GAB.

f) If the grievance involves a medical issue, at least one member of the GAB shall be a medical professional.

g) If the outcome of the appeal is unfavorable to the detainee, the GAB shall forward the grievance and all supporting documentation to the facility administrator within 24 hours of issuing a decision.

3) Appellate Review

a) The detainee shall have the option to file an appeal if the detainee is dissatisfied with a GAB decision, and shall be informed of that option.

b) The facility administrator, in some cases in conjunction with the Field Office Director, shall review the grievance appeal and issue a decision within five days of receipt of the appeal. A written decision shall be issued to the detainee in all cases and forwarded to the Field Office Director.

c) The appellate reviewer shall note the

grievance log with the following information:

- date appeal received;

- name of detainee that filed grievance;

- nature of the grievance;

- basis of the GAB decision;

- date decision provided to detainee; and

- outcome of the adjudication.

d) Facilities shall allow any ICE/ERO detainee dissatisfied with the facility's response to a grievance or those fearing retaliation to be able to appeal or communicate directly with ICE/ERO.

## 4. Medical Grievances

Formal written grievances regarding medical care shall follow the same procedures per section "3. Formal Written Grievances" above, and shall be submitted directly to medical personnel designated to receive and respond to medical grievances at the facility. Medical grievances may be submitted in a sealed envelope clearly marked "medically sensitive."

Designated medical staff shall act on the grievance within five working days of receipt and provide the detainee a written response of the decision and the rationale. This record shall be maintained per the following section "D. Record-Keeping and File Maintenance."

## D. Record-Keeping and File Maintenance

Each facility shall maintain a detainee grievance log that shall be subject to regular inspection by the Field Office Director and ICE headquarters staff. Documentation shall include the following information:

- date grievance filed;

- name of detainee that filed grievance;

- nature of the grievance;

- date decision provided to detainee; and

- outcome of the adjudication.

Medical grievances shall be maintained in the detainee's medical file.

Facility staff shall assign each grievance a log number, enter it in the space provided on the detainee grievance form, and record it in the detainee grievance log in chronological order, according to the following stipulations:

1. the log entry number and the detainee grievance number must match;

2. the log shall include the receipt date and the disposition date; and

3. nuisance or petty grievances and grievances rejected or denied must also be logged with the appropriate notation and justification (for example, "petty").

A copy of the grievance disposition shall be placed in the detainee's detention file and provided to the detainee within five days.

ICE may audit grievance logs and individual cases as often as necessary to ensure compliance with the established grievance procedures and to assess the implementation of decisions within the facility. The ICE Office of Professional Responsibility may conduct trend analysis to determine the nature of grievances being filed across ICE facilities, resources expended on their resolution and outcomes.

## E. Established Pattern of Abuse of the Grievance System

If a detainee establishes a pattern of filing nuisance complaints or otherwise abusing the grievance system, the facility administrator may identify that person, in writing, as one for whom not all subsequent complaints must be fully processed. However, feedback shall be provided to the detainee, and records shall be maintained of grievances

"rejected."

For a detainee so identified by the facility administrator:

1. staff shall continue to attempt to resolve all informal oral grievances at the lowest level possible, as described above;

2. if designated staff at the facility's first grievance system level make the initial determination that the grievance is one that should not be fully processed due to its frivolous nature, they shall forward the grievance to the next grievance level;

3. if staff at that level concurs that the grievance is frivolous, the grievance shall be logged in the detainee grievance log showing the disposition (e.g., "rejected"), and a copy of the grievance shall be placed in the detainee's detention file;

4. the facility's written policy and procedures may also require that each rejected grievance be forwarded to the facility administrator for review or concurrence; and

5. the designated final authority may decide to return the grievance to a lower level for full processing.

If the GO designated to receive grievances believes the grievance is one that should not be fully processed, he or she shall document that determination and refer the grievance to the GAB for second-level review. If the GAB concurs, the grievance shall be logged in the detainee grievance log with "rejected" as the disposition, and a copy of the grievance shall be placed in the detainee's detention file.

## F. Allegations of Staff Misconduct

Upon receipt, facility staff must forward all detainee grievances containing allegations of staff misconduct to a supervisor or higher-level official in the chain of command. While such grievances are to be processed through the facility's established grievance system, CDFs and IGSA facilities must also forward a copy of any grievances alleging staff misconduct to ICE/ERO in a timely manner with a copy going to ICE's Office of Professional Responsibility (OPR) Joint Intake Center and/or local OPR office for appropriate action.

Facilities shall send all grievances related to sexual abuse and assault and the facility's decisions with respect to such grievances to the appropriate Field Office Director at the end of the grievance process.

## G. Retaliation Prohibited

Staff shall not harass, discipline, punish or otherwise retaliate against a detainee who files a complaint or grievance or who contacts the DHS Office of the Inspector General.

Actions are considered retaliatory if they are in response to an informal or formal grievance that has been filed and the action has an adverse effect on the resident's life in the facility.

Immediately following any indication or allegation of retaliation, the facility and ICE/ERO shall conduct an investigation of alleged acts of retaliation in a timely manner, and take all steps necessary to remedy any retaliation determined to have occurred.

## H. Review of Detainee Grievances

The ICE Office of Detention Oversight may review on a periodic basis a statistical sampling of grievances at a facility to evaluate compliance with this grievance standard and the associated grievance procedures; to assess the reasonableness of final decisions; and to generate data showing trends in the types of grievances, time frames for resolution and outcomes at various facilities. Detainee grievances will also be reviewed during ICE/ERO-initiated facility inspections.

# 6.3 Law Libraries and Legal Material

## I. Purpose and Scope

This detention standard protects detainees' rights by ensuring their access to courts, counsel and comprehensive legal materials.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

For all types of facilities, procedures that appear in italics with a marked (\*\*) on the page indicate optimum levels of compliance for this standard.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Detainees shall have access to a properly equipped law library, legal materials and equipment (including photocopying resources) to facilitate the preparation of documents.

2. Detainees shall have meaningful access (no less than five hours per week) to law libraries, legal materials and equipment.

3. *\*\*When requested and where resources permit, facilities shall provide detainees meaningful access to law libraries, legal materials and related materials on a regular schedule and no less than 15 hours per week.*

4. Special scheduling consideration shall be given to detainees facing deadlines or time constraints.

5. Detainees shall not be required to forgo recreation time to use the law library. Requests for additional time to use the law library shall be accommodated to the extent possible, including accommodating work schedules when practicable, consistent with the orderly and secure operation of the facility.

6. Detainees shall have access to courts and counsel.

7. Detainees shall be able to have confidential contact with attorneys and their authorized representatives in person, on the telephone and through correspondence.

8. Detainees shall receive assistance where needed (e.g., orientation to written or electronic media and materials; assistance in accessing related programs, forms and materials); in addition, detainees who are illiterate, limited-English proficient or **have disabilities** shall receive appropriate special assistance.

9. Detainees in the Special Management Unit (SMU) shall have access to legal resources and materials on the same basis as the general population.

10. Detainees shall be notified of the facility's rules on law libraries and legal material through the detainee handbook.

11. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective

communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Access to Legal Material" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-6A-01, 6A-02, 6A-03, 6A-09, 2A-62.

ICE/ERO *Performance-based National Detention Standards 2011:*

- "5.1 Correspondence and Other Mail," in regard to correspondence with attorneys and other legal representatives, judges, courts, embassies and consulates;

- "5.6 Telephone Access," in regard to phone calls to legal representatives or to obtain legal representation; and

- "5.7 Visitation," in regard to visits from attorneys, other legal representatives and legal assistants.

## V. Expected Practices

### A. Law Library

Each facility shall provide a properly equipped law library in a designated, well-lit room that is reasonably isolated from noisy areas and large enough to provide reasonable access to all detainees who request its use. It shall be furnished with a sufficient number of tables and chairs to accommodate detainees' legal research and writing needs.

### B. Supervision

The facility shall develop procedures that effectively prevent detainees from damaging, destroying or removing equipment, materials or supplies from the law library.

Facilities are encouraged to monitor detainee use of legal materials to prevent vandalism.

Supervision shall not be used to intimidate or otherwise impede detainees' lawful use of the law library.

### C. Hours of Access

Each facility administrator shall devise a flexible schedule that:

1. permits all detainees, regardless of housing or classification, to use the law library on a regular basis;

2. enables maximum possible use without interfering with the orderly operation of the facility (law library hours of operation shall generally be scheduled between official counts, meals and other official detention functions);

3. determines the number of detainees permitted to use the law library at any given time; and

4. takes into consideration any rules and regulations that prohibit or regulate the intermingling of differently classified detainees.

Each detainee shall be permitted to use the law library for a minimum of five hours per week. Detainees may not be forced to forego their minimum recreation time in order to use the law library (see standard "5.4 Recreation"). Staff shall accommodate detainee requests for additional law library time to the extent possible, and requests for the accommodation of work schedules to the extent practicable, consistent with the orderly and secure operation of the facility, and with special priority given to such requests from detainees facing a court deadline.

## D. Equipment

The law library shall have an adequate number of computers and printers to support the detainee population. Sufficient writing implements, paper, photocopiers and related office supplies shall be provided to detainees to prepare documents for legal proceedings, special correspondence or legal mail. The law library shall also provide access to two-hole punches, folders, and, where appropriate, computer disk containers.  A sign-in sheet shall be maintained to establish fair and orderly use, based on demand.

Typewriters, with replacement ribbons, carbon paper and correction tape may be temporarily substituted for computers and printers only until such time as the facility can provide computers and printers, and if approved by ICE/ERO. However, typewriters are not an adequate substitute if any library materials listed in "Appendix 6.3.A: List of Legal Reference Materials for Detention Facilities" are unavailable in hard copy and only available through electronic access on a computer.

Consistent with the safety and security of the facility, detainees shall be provided with a means of saving any legal work in a secure and private electronic format, password protected, so they may return at a later date to access previously saved legal work

products.

Each facility administrator shall designate an employee to inspect equipment daily, at a minimum, to ensure it is in good working order, and to stock sufficient supplies.

## E. Maintaining Up-to-Date Legal Materials

### 1. Materials for Law Libraries

Each law library shall contain the materials listed in "Appendix 6.3.A: List of Legal Reference Materials for Detention Facilities" (unless any are found to be out of print) and may also include the optional legal reference materials in "Appendix 6.3.B: Optional Legal Reference Materials."  Each law library shall also contain any materials provided to the facility by ICE/ERO, including electronic media for legal research systems (e.g. CD-ROMs or External Hard Drives) and any accompanying written training or reference materials.

a.  Form of Materials

1) Paper Publications

Facilities are encouraged to make available paper versions of the materials listed in "Appendix 6.3.A: List of Legal Reference Materials for Detention Facilities," by ordering copies from the publisher.  (See "Appendix 6.3.C:  Publishers' Addresses and Phone Numbers."  Ordering information can also be obtained from the ICE Office of the Principal Legal Advisor law librarian, at (202) 732-5000.)

2) Electronic legal research media

Regardless of whether paper versions are provided, facilities must make available in the law library any electronic media  provided by ICE/ERO, containing the required publications or other supporting legal research platforms for detainees. This may include CD-ROMs or External Hard Drives developed by legal research services vendors utilized by ICE.

The facility administrator must certify to the respective Field Office Director, with verification from the Field Office Director, that the facility provides detainees sufficient access to:

a) operable computers capable of running the electronic legal research media;

b) operable printers;

c) supplies for both; and

d) instructions on basic use of the system.

The facility shall provide technical assistance to detainees as needed in using electronic materials, as well as any usage guides or other supporting materials supplied by ICE/ERO.

## 2. Updating and Replacing Legal Materials

Each facility administrator shall designate a facility law library coordinator to be responsible for inspecting legal materials weekly, updating them, maintaining them in good condition and replacing them promptly as needed. The detainee handbook shall also provide detainees with information regarding the procedure for notifying a designated employee that library material is missing, out of date, or damaged.

a. ICE/ERO Headquarters Coordinator

At ICE/ERO headquarters, the Detention Standards Compliance Unit (DSCU) in the Detention Management Division is designated as the coordinator to assist facilities and Field Offices in maintaining up-to-date law library materials.

Facilities must take care to ensure that the most updated statutes, regulations, and other required legal materials are in the library at all times.

ICE/ERO shall arrange a subscription to the updating service, if available, for each publication on the list.

b. List of Publishers

Information regarding updating can be obtained

directly from the publishers. The facility administrator (or designee) may also seek assistance from the DSCU coordinator. Procedures for Replacement of Materials

When a facility receives replacement supplements or other materials, the law librarian or other designated individual shall dispose of the outdated ones.

Damaged or stolen materials shall be replaced promptly. In addition to conducting regular inspections, the facility shall encourage detainees to report missing or damaged materials. The facility may obtain replacements by contacting the DSCU coordinator.

If materials from outside organizations need to be replaced, the facility shall contact ICE/ERO to obtain replacements from the submitting organization.

## F. Materials from Outside Persons or Organizations

Outside persons and organizations may submit published or unpublished legal material for inclusion in a facility's law library. If the material is in a language other than English, an English translation must be provided.

### 1. Published Material

If a facility receives published material, the facility administrator shall accept or decline this material based on considerations of usefulness and space limitations. If published materials related to immigration law or procedures are declined, the facility administrator shall notify the submitter and the Field Office Director in writing of the reason(s).

### 2. Unpublished Material

If the facility receives any unpublished legal material, the facility administrator shall forward this material as soon as possible to the Field Office Director for review and approval. Unpublished immigration-related material can include intake questionnaires

from non-governmental legal service provider organizations.

Unpublished material must have a cover page that:

a. identifies the submitter and preparer of the material;

b. clearly states that ICE/ERO did not prepare and is not responsible for the contents; and

c. provides the date of preparation.

If unpublished materials related to immigration law or procedures are declined, ICE/ERO will notify the facility administrator and the submitter in writing of the reason(s). Within 30 days of receipt of the decision to deny the use of submitted material, the submitter may appeal the ICE/ERO decision to the DSCU. ICE headquarters will respond to the appeal in writing within 30 days.

## G. Requests for Additional Legal Material

Detainees who require legal material not available in the law library may make a written request to the facility law library coordinator, who shall inform the Field Office of the request as soon as possible.

ICE/ERO will answer all requests within five business days of receipt. Requests from detainees facing imminent deadlines for ER proceedings will be responded to within two (2) business days of receipt. Requests for copies of court decisions will normally be answered within three business days.

If the request is not approved, ICE/ERO shall inform the submitter in writing of the reason for the denial.

## H. Photocopying Legal Documents

The facility shall ensure that detainees can obtain at no cost to the detainee photocopies of legal material and special correspondence when such copies are reasonable and necessary for a legal proceeding involving the detainee. This may be accomplished by providing detainees access to a copier, or by making copies for detainees.

Detainees shall also be permitted to photocopy

grievances and letters regarding conditions of confinement. Detainees shall not be prohibited from photocopying sick call requests, disciplinary decisions, special needs forms, photographs, newspaper articles or other documents that are relevant to the presentation of any type of immigration proceeding.

The number of copies of documents to be filed with a particular court, combined with the number required for ICE/ERO records and the number required for the detainee's personal use shall determine the number of photocopies required.

Requests for photocopies of legal material may be denied only if:

1. the document(s) might pose a risk to the security and orderly operation of the facility;

2. copying would constitute a violation of any law or regulation;

3. the request is clearly abusive or excessive; or

4. there are other legitimate security reasons.

Facility staff shall inspect documents offered for photocopying to ensure that they comply with these rules. However, staff may not read a document that on its face is clearly a legal document involving that detainee.

## I. Assistance to Detainees with Disabilities, Detainees with Limited-English Proficiency (LEP), and Illiterate Detainees

1. Assistance from Facility Staff

   Facility staff shall provide assistance to detainees in accessing legal materials where needed (e.g. orientation to written or electronic media and materials; assistance in accessing related programs, forms and materials).

2. Assistance from Other Detainees

   The facility shall permit detainees to assist other

detainees in researching and preparing legal documents upon request, except when such assistance poses a security risk. Such assistance is voluntary, and no detainee shall be allowed to charge a fee or accept anything of value for assistance.

Facilities are encouraged to allow outside volunteers and programs who train detainees to help other detainees to access legal materials.

The facility administrator may not provide compensation to a detainee for researching or preparing legal documents.

3. Assistance to Illiterate, Limited-English Proficient, and Disabled Detainees

Detainees with disabilities, LEP detainees and illiterate detainees who wish to pursue a legal claim related to their immigration proceedings or detention, and who request assistance or otherwise indicate difficulty with the legal materials, must be provided assistance beyond access to a set of English-language law books.

The facility shall make efforts to assist detainees who are illiterate, LEP and have disabilities  in using the law library. Facilities shall establish procedures to meet this requirement, such as:

a. having the facility's law librarian assist the detainee's legal research;

b. permitting the detainee to receive assistance from other detainees in using the law library;

c. assisting in contacting pro bono legal-assistance organizations from the ICE/ERO-provided list; and

d. in the case of detainees with disabilities, providing reasonable accommodations and or auxiliary aids and services identified through the facility's reasonable accommodation process.

If such attempts are unsuccessful in providing the detainee sufficient assistance, the facility shall contact the ICE/ERO Field Office to determine appropriate further action.

## J. Personal Legal Materials

The facility shall permit a detainee to retain all personal legal material upon admittance to the general population or to Administrative Segregation or Disciplinary Segregation units, unless retention of materials creates a safety, security or sanitation hazard.

For a detainee with a large amount of personal legal material, the facility shall make the following provisions.

1. A portion of the materials may be placed in a personal property storage area, with access permitted during designated hours.

2. The facility shall provide an explanation to the detainee as to why the material presents a safety, security or sanitation hazard.

3. Requests for access shall be granted as soon as feasible, but no later than 24 hours after receipt of the request, unless documented security concerns preclude action within that timeframe.

4. Detainees who have a documented, scheduled immigration hearing within 72 hours shall be provided access to their personal legal materials to the extent practicable.

## K. Law Library Access for Detainees in Special Management Units (SMUs)

Detainees housed in Administrative Segregation or Disciplinary Segregation units shall have the same law library access as the general population, unless compelling security concerns require limitations.

Facilities may supervise library use by a detainee housed in an SMU, as warranted by the individual's conduct.  Violent or uncooperative detainees may be temporarily denied access to the law library, as necessary to maintain security and until such time as their behavior warrants resumed access. Detainees

who are temporarily denied access to the law library under such circumstances shall be provided legal materials upon request.

Detainees segregated for protection must be provided access to legal materials. Such detainees may be required to use the law library separately or, if that is not feasible, legal materials and a computer must be brought to them upon request and they must be provided with assistance and have access to the list of the law library's holdings.

Denial of access to the law library must be:

1. supported by compelling security concerns;

2. limited to the shortest duration required for the safety, security and orderly operation of the facility;

3. fully documented in the SMU housing logbook; and

4. documented, with reasons listed, in the detention file.

The facility shall notify the Field Office every time access is denied, and shall send a copy of the proper documentation.

## L. Envelopes and Stamps for Indigent Detainees

Ordinarily, a detainee is considered "indigent" if he/she has less than $15.00 in his/her account. Facilities shall make a determination without unreasonable delay as to whether a detainee is indigent.

The facility shall provide indigent detainees with free envelopes and stamps for domestic mail related to a legal matter, including correspondence to a legal representative, a potential legal representative, or any court. Requests to send international mail may also be honored.

Indigent detainees may receive assistance from local consular officials with international mail. As noted above in this standard, envelopes and stamps are provided to indigent detainees for delivery of mail to consulates in the United States.

## M. Notaries, Certified Mail and Miscellaneous Needs Associated With Legal Matters

The facility shall provide assistance in a timely manner to any unrepresented detainee who requests a notary public, certified mail, or other such services to pursue a legal matter, if the detainee is unable do so through a family member, friend or community organization.

If it is unclear whether the requested service is necessary, the respective ICE Office of Chief Counsel shall be consulted. A reply shall be received in a timely manner; pressing legal matters with a deadline shall be prioritized.

Telephone access for indigent unrepresented detainees requesting legal materials shall be in compliance with standard "5.6 Telephone Access."

## N. Notice to Detainees

The detainee handbook or supplement shall provide detainees the rules and procedures governing access to legal materials, including the following information:

1. that a law library is available for detainee use;

2. the scheduled hours of access to the law library;

3. the procedure for requesting access to the law library;

4. the procedure for requesting additional time in the law library (beyond the five-hours-per-week minimum);

5. the procedure for requesting legal reference materials not maintained in the law library; and

6. the procedure for notifying a designated employee that library material is missing or damaged;

7. the status of required access to computers,

printers and other supplies; and

8. if applicable, that LexisNexis is used at the facility and that instructions for its use are available.

These policies and procedures shall also be posted in the law library, along with a list of the law library's holdings. The list of the law library's holdings shall be kept up to date, and shall include the date and content of the most recent updates of all legal materials available to detainees in print and electronic media.

## O. Retaliation Prohibited

Staff shall not permit a detainee to be subjected to reprisals, retaliation or penalties because of a decision to seek judicial or administrative relief or investigation of any matter, including but not limited to the following:

1. the legality of his/her confinement;

2. the conditions of confinement or treatment while in detention;

3. any issue relating to his/her immigration proceedings;

4. any allegation that the Government is denying rights protected by law; or

5. any investigation conducted by the DHS Office for Civil Rights and Civil Liberties or the DHS Office of the Inspector General.

A detainee may be denied access to the law library or to legal material only in the event that the safety or security of the facility or detainee is a concern.

A detainee shall not be denied access to law libraries and legal materials as a disciplinary measure, reprisal, retaliation or penalty.

# Appendix 6.3.A: List of Legal Reference Materials for Detention Facilities

Revised December 2016

The information in "Appendix 6.3.A: List of Legal Reference Materials for Detention Facilities," and Appendix 6.3.B: "Optional Legal Reference Materials" was updated as of December 2016. Further information may be obtained directly from the publishers.

## 1. *Constitution of the United States of America: Analysis and Interpretation*

Legal analysis and interpretation of the United States Constitution, based primarily on Supreme Court case law.

Order from U.S. Government Bookstore at: http://bookstore.gpo.gov/.

Also available at: https://www.congress.gov/constitution-annotated/.

## 2. *United States Code, Title 18, Crimes and Criminal Procedure*

Federal criminal code and procedure.  Order from GPO U.S. Government Bookstore at: https://bookstore.gpo.gov/catalog/laws-regulations/united-states-code.

## 3. *United States Code, Title 8, Aliens and Nationality*

Outlines the role of aliens and nationality in the United States Code. Order from the U.S. Government Bookstore at: https://bookstore.gpo.gov/catalog/laws-regulations/united-states-code.

## 4. *Code of Federal Regulations, Title 8, Aliens and Nationality*

A collection of general and permanent rules initially published in the Federal Register. Order from the U.S. Government Printing Office (GPO) at https://bookstore.gpo.gov.

Also available at: https://www.uscis.gov/ilink/docView/SLB/HTML/SLB/8cfr.html.

## 5. *Bender's Immigration and Nationality Act Set*

This is a private service that compiles the Immigration and Nationality Act and updates it quarterly to reflect new amendments and other changes.

Order from LexisNexis Matthew Bender (Publication Number 132) at: http://www.lexisnexis.com/store/catalog/booktemplate/productdetail.jsp?pageName=relatedProducts&skuId=SKU10725&catId=cat10920003&prodId=10725.

## 6. *Bender's Immigration Regulations Service*

This is a private service that compiles immigration-related regulations from the federal government and updates them monthly to reflect any changes.

Order from LexisNexis Matthew Bender (Publication Number 695) at: http://www.lexisnexis.com/store/catalog/booktemplate/productdetail.jsp?pageName=relatedProducts&prodId=10521.

## 7. Administrative Decisions Under Immigration and Nationality Laws

Board of Immigration Appeals (BIA) decisions consisting of bound volumes and loose-leaf decisions. Published, precedential decisions from Volume 8 forward are available at: https://www.justice.gov/eoir/ag-bia-decisions.

## 8. National Immigration Project of the National Lawyers' Guild Publications

The following are available for order at: https://www.nationalimmigrationproject.org/publications.html.

a. *Immigration Law and Defense*: A procedural handbook for immigration proceedings, with extensive references to judicial decisions and regulations and many official forms.

b. *Immigration Law and Crimes*: Strategies, advice, and analysis for deportation defense.

## 9. Immigrant Legal Resource Center Publications

The following are available for order at: https://www.ilrc.org/publications.

a. *A Guide for Immigration Advocates*: A two-volume manual covering the basics of immigration law and research.

b. *Inadmissibility & Deportability*: A manual introducing all common grounds of inadmissibility and deportability, as well as waivers.

c. *Essentials of Asylum Law*: A comprehensive survey of the basic elements of asylum law, including an overview of asylum procedure.

d. *Removal Defense:* A quick reference to key issues in removal defense, with overviews of immigration proceedings, grounds of inadmissibility and deportability, pleadings, and common forms of relief.

e. *The U Visa: Obtaining Status for Immigrant Victims of Crime:* A step-by-step guide through the process of handling an immigration case for a U visa applicant.

f. *The VAWA Manual: Immigration Relief for Abused Immigrants*: A comprehensive guide for immigrant survivors of domestic violence.

## 10. American Immigration Lawyers Association Publications

The following are available for order at: http://agora.aila.org/.

a. Asylum Primer: A comprehensive guide to U.S. asylum law and procedure.

b. Representing Clients in Immigration Court (4th Edition): Strategies, advice, and analysis for deportation defense

## 11. Tooby's Guide to Criminal Immigration Law

A summary of criminal and immigration law and the connections between the two evolving areas of law.

Available for order at: https://nortontooby.com/node/657.

## 12. Country Reports on Human Rights Practices

Department of State annual reports to Congress on human rights practices in individual countries. Available for order from the U.S. Government Bookstore: http://bookstore.gpo.gov/.

Also available at: www.state.gov/g/drl/rls/hrrpt/.

### 13. *Human Rights Watch: World Report*

The annual World Report summarizes key human rights issues in more than 90 countries and territories worldwide.

Available for order or online from Human Rights Watch at http://www.hrw.org.

### 14. *UNHCR Handbook on Procedures and Criteria for Determining Refugee Status*

A guide for government officials, judges, practitioners, and United Nations High Commissioner for Refugees (UNHCR) staff in applying the refugee definition.

Available at: http://www.unhcr.org/en-us/publications/legal/3d58e13b4/handbook-procedures-criteria-determining-refugee-status-under-1951-convention.html.

The latest versions of the "Guidelines on International Protection," which complement and update the Handbook, are available online at http://www.unhcr.org/.

### 15. *USCIS RAIO and Asylum Division Lessons Plans*

The Asylum Officer Basic Training Course lesson modules are used to train Asylum Officers and to articulate and communicate Asylum Division guidance on the substantive adjudication of asylum cases.

Available at: https://www.uscis.gov/humanitarian/refugees-asylum/asylum/asylum-division-training-programs.

The Refugee, Asylum and International Operations (RAIO) Combined Training Lesson Plans are used to train all RAIO Officers.

Available at: https://www.uscis.gov/about-us/directorates-and-program-offices/refugee-asylum-and-international-operations-directorate/raio-training-materials.

### 16. *Immigration Court Practice Manual*

This is a publicly-accessible practice manual for immigration court proceedings from the U.S. Department of Justice (DOJ) Executive Office for Immigration Review (EOIR).

Available at: https://www.justice.gov/eoir/office-chief-immigration-judge-0.

### 17. *Board of Immigration Appeals Practice Manual*

This is a publicly-accessible practice manual for appellate immigration court proceedings from DOJ EOIR.

Available at: https://www.justice.gov/eoir/office-chief-immigration-judge-0.

### 18. *Directory of Nonprofit Agencies that Assist Persons in Immigration Matters*

Immigration legal services providers by state, county, or detention facility. Only nonprofit organizations that provide free or low-cost immigration legal services are included in this directory. State by state lists are available at: https://www.immigrationadvocates.org/nonprofit/legaldirectory.

### 19. *Rights of Prisoners* (3rd Edition), by Michael B. Mushlin

Order from Thompson Reuters at: http://legalsolutions.thomsonreuters.com/law-products/Treatises/Rights-of-Prisoners-4th/p/100008943.

### 20. *Federal Habeas Corpus, Practice & Procedure (*5th Edition)

Order from LexisNexis at: http://www.lexisnexis.com/store/catalog/booktemplate/productdetail.jsp?pageName=relatedProducts&prodId=7228.

### 21. *Criminal Procedure (Hornbook)* by LaFave, Israel and King

Order from Thomson Reuters at: http://legalsolutions.thomsonreuters.com/law-products/Treatises/Criminal-Procedure-4th-Wests-Criminal-Practice-Series/p/101763705.

### 22. *Legal Research in a Nutshell* (9th Edition), by Cohen and Olson

Order from Thomson West at: http://store.westacademic.com/s.nl/it.A/id.78526/.f.

### 23. *Legal Research, Writing and Analysis* by Murray and DeSanctis

Order from Thomson West at: http://store.westacademic.com/s.nl/it.A/id.15966/.f.

### 24. *Federal Rules of Practice and Procedure*

   A. Rules of Appellate Procedure

   B. Rules of Civil Procedure

   C. Rules of Criminal Procedure

   D. Rules of Evidence

   E. Rules Governing Section 2254 (Habeas Corpus) and Section 2255 (Vacatur) Proceedings

Published when updated by the U.S. Courts, and available at:

http://www.uscourts.gov/rules-policies/current-rules-practice-procedure

### 25. *Federal Civil Judicial Procedure and Rules*

Order from Thomson West at: http://legalsolutions.thomsonreuters.com/law-products/Statutes/Federal-Civil-Judicial-Procedure-and-Rules-2016-Revised-ed/p/103257254.

### 26. *ICE Detainee Handbook*

 To be provided by ICE.

### 27. *Legal Orientation Program (LOP) Self-Help Materials*

These are materials from the EOIR LOP program that educates detainees about their rights and the immigration court process. To be provided by ICE.

### 28. *Legal Dictionaries*

   A. *Black's Law Dictionary* (8th Edition)

   Order from Thomson Reuters at: http://legalsolutions.thomsonreuters.com/law-products/law-books/blacks-law-dictionary.

   B. English-Spanish Legal Dictionary

The specific dictionary may be selected by the facility administrator or law librarian. Examples include the following:

i.   McGraw-Hill's Spanish-English Legal Dictionary

ii.  Butterworth's Spanish/English Legal Dictionary

iii. English-Spanish Legal Dictionary, Kaplan, (4th Edition)

## 29. *Other Translation Dictionaries*

To be selected in accordance with the most common languages spoken by the respective detainee population.

# Appendix 6.3.B: Optional Legal Reference Materials

Revised December 2016

## 1. *Bender's Immigration Case Reporter*

Decisions from Federal Court, BIA, AAU and BALCA from 1984 forward

Order from LexisNexis Matthew Bender at: http://www.lexisnexis.com/store/catalog/booktemplate/productdetail.jsp?pageName=relatedProducts&prodId=10436.

## 2. *Kurzban's Immigration Law Sourcebook*

Reference on U.S. immigration law with comprehensive concise analysis.

Available for order from AILA at: https://agora.aila.org/product/detail/2521.

# 6.4 Legal Rights Group Presentations

## I. Purpose and Scope

This detention standard protects detainees' rights by providing all detainees access to information presented by authorized persons and organizations for the purpose of informing them of U.S. immigration law and procedures.

Consistent with the security and orderly operation of each facility, ICE/ERO encourages such presentations. All facilities are required to cooperate fully with authorized persons seeking to make such presentations.

This detention standard applies to the following types of facilities housing ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Detainees shall have access to group presentations on United States immigration law and procedures and all other relevant issues related to the immigration court, appeals and removal processes, including a detainee's legal rights.

2. Persons and organizations requesting to make such group presentations shall be able to obtain clear information about how to become authorized to provide legal rights group presentations, including regularly scheduled presentations.

3. Facility safety, security and good order shall be maintained.

4. Detainees shall not be subject to reprisals, retaliation or penalties for attending legal rights group presentations.

5. Detainees shall be able to communicate and correspond with representatives from the legal groups that make presentations at the facilities.

6. Detainees shall have access to information and materials provided by legal groups. Organizations shall be permitted to distribute information in response to specific legal inquiries.

7. Detainees shall have access to group presentations by diplomatic representatives.

8. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

9. Detainees shall be notified of all scheduled

presentations at least 48 hours in advance.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Group Presentations on Legal Rights" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-6A-04, 6A-06.

## V. Expected Practices

### A. Requests to Make Group Presentations on Legal Rights

Attorneys or legal representatives interested in making a group presentation on legal rights must submit a written request to the ICE/ERO Field Office Director. ICE/ERO shall accommodate, to the greatest extent possible, the presenters' need to amend the information contained in the written request to reflect the changes that may have occurred since the initial request was made, including, but not limited to, distribution materials, informational posters, languages and participants.

Requests must be submitted to ICE/ERO at least ten (10) days in advance of the proposed presentation. The ICE/ERO Field Office Director may allow a presentation to take place on shorter notice at his or her discretion, or when circumstances arise that compel presentations on shorter notice. ICE/ERO will notify the approved presenter ten days in

advance of the scheduled presentation, or within one week of the request having been made, whichever date is earlier.

The written request must contain the following information:

1. a general description of the intended audience;

2. a syllabus or outline of the presentation;

3. a list of any published or unpublished materials proposed for distribution in accordance with "I. Written Materials" in this standard;

4. an informational poster as described in "E. Detainee Notification and Attendance" of this standard;

5. a statement of the languages in which the presentation will be conducted;

6. the name, date of birth, social security number (or passport number if social security number is not available), profession and specific function of each person requesting permission to enter the facility (including interpreters);

7. certification that each person making the presentation is an attorney, legal representative, legal assistant or interpreter;

8. a proposed date (or range of dates) for the presentation; and

9. a telephone number and contact person.

10. if a party contains more than four persons (including legal assistants and interpreters), a special request must be made as described in "F. Who May Present" of this standard.

In order for a legal assistant or law student to help with the presentation, the supervising attorney must submit a letter in advance of the presentation, as described in "F. Who May Present" of this standard.

In order to distribute written materials, a presenter must apply for approval as described in "I. Written Materials" of this standard.

## B. Request Granted

If the request is granted, the Field Office Director shall notify the facility administrator, who shall telephone the listed contact person to arrange a mutually acceptable date and time for the presentation. Upon request, five days prior to a scheduled legal rights group presentation, ICE/ERO staff shall notify the legal representative contact of the following characteristics of the detainee population:

1. number of immigration detainees in custody at the facility and the number of residential areas (or "pods") in which they are housed;

2. countries of origin of those detainees; and

3. gender breakdown of immigration detainees.

When presentations are scheduled on short notice, such as in response to an enforcement action, the information above shall be provided in full or partial form as available.

ICE shall accept updated lists of presenters no less than five days prior to the presentation date.

## C. Scheduling Presentations

Presentations must be scheduled during normal visiting hours, excluding weekends and holidays. If feasible, presentations may be conducted daily, immediately before detainees' first immigration court appearances and/or under other circumstances, such as after an influx of detainees subsequent to an ICE enforcement action or a transfer of detainees from one facility to another. Legal rights group presentations shall be accommodated to the greatest extent possible absent significant logistical or security-related concerns.

To request ICE/ERO permission to conduct additional presentations or for access to a facility on a continuing basis, the requester may include in its initial letter to the Field Office Director the request to make recurring presentations for a set range of dates or an indefinite period.

Facilities are not required to arrange presentations if attorneys or other legal representatives make no requests, or if ICE/ERO does not approve any requests.

## D. Legal Orientation Programs (LOPs)

Though similar to legal rights group presentations, legal orientation programs (LOPs), as carried out by the Department of Justice Executive Office for Immigration Review (EOIR), are distinct, government-sponsored programs and are authorized by congressional appropriation. The specific requirements and procedures outlined in this standard may not apply to LOPs. EOIR carries out LOPs through contracts with non-governmental organizations (NGOs), and in consultation with ICE/ERO. As such, EOIR and ICE/ERO may establish separate program operation plans for an LOP at each detention site.

EOIR LOPs operate in a limited number of ICE/ERO facilities and, subject to available funding, shall be developed and implemented in other facilities as designated by both EOIR and ICE/ERO.

## E. Detainee Notification and Attendance

The requestor must provide a one-page poster (no larger than 8.5 by 11 inches) to inform detainees of the general nature and contents of the presentation, the intended audience and the language(s) in which the presentation shall be conducted. For poster text in languages other than English, an English translation must be provided. The poster shall instruct detainees to contact the housing officer if they wish to attend.

Once approved by an ICE representative, designated facility staff shall prominently display the informational posters provided by the presenter in housing units at least 48 hours before the scheduled presentation, and each housing unit officer shall provide a sign-up sheet at least 48 hours in advance of a presentation for detainees who plan to attend; however, detainees that fail to sign up shall not be

deprived of the opportunity to attend a presentation for that reason.

. Detainees with disabilities, detainees who are LEP, and illiterate detainees shall be notified in a language and manner they understand about such presentations.

The facility administrator may limit the number of detainees attending a single session based on the number of interested detainees or the need to separate groups of detainees for safety and security. Therefore, the presenter must be prepared to conduct several presentations, and shall be advised to contact the facility administrator the day before the presentation to determine the number of sessions that shall be required.

Presentations shall be open to all detainees, regardless of the presenter's intended audience, except when a particular detainee's attendance may pose a security risk. ICE/ERO and /or facility staff shall notify detainees in segregation in advance of legal rights group presentations and provide these detainees an opportunity to attend. If the attendance of a detainee in segregation would pose a security risk, staff shall make arrangements with the presenters to offer a separate presentation and individual consultation to the detainee. Prior to the visit of the presenters, ICE/ERO and/or facility staff shall notify presenters of any detainees in segregation who request an individual presentation and consultation.

## F. Who May Present

One or more legal assistants may assist with a presentation if the supervising attorney and/or legal representative:

1. submits a letter identifying his/her legal assistants and affirms that the legal assistant presence is directly related to the presentation; and

2. attends any presentation in which any such assistant participates or prepares a letter identifying the presenter(s) and affirming that the

supervisory relationship directly relates to the presentation.

The facility shall admit properly identified interpreters to assist the presenters in accordance with the standards on "2.4 Facility Security and Control" and "5.7 Visitation." ICE/ERO is not responsible for providing interpreters for presenters.

As a general rule, presentation parties may not exceed four persons, including legal assistants, supervised law students and interpreters; however, a facility may waive this rule upon advance receipt of a written request.

## G. Entering the Facility

Facility staff shall require each person seeking entry to present an official form of picture identification (e.g., driver's license or state identification card). Attorneys must also present state-issued bar cards or, in states where these are not available, other proof of bar membership. If such documentation is not readily available to attorneys licensed in a particular state, they must indicate where they are licensed as attorneys and how that may be verified prior to their approval for admittance. Provided the presenter has made a special request, the facility may admit interpreters, supervised law students and legal assistants to assist attorneys and other legal representatives.

The facility may require presenters to arrive at least 30 minutes before the scheduled start of the presentation. A presentation should not be cancelled because presenters arrive late, if the late arrival does not present an issue with maintaining the good order of the facility or security or safety concerns.

After check-in, facility staff shall escort the presenters to the presentation site and shall escort the detainees to that location.

## H. Presentation Guidelines

The facility shall select and provide a private environment that is conducive to the presentation

and is consistent with the security and good order of the facility. Once detainees have been assembled, presenters shall ordinarily be granted a minimum of one hour for the presentation and additional time for a question-and-answer session. The facility administrator may extend that time period on a case-by-case basis.

The facility shall require presenters to abide by all rules and regulations applicable to visitors to the facility. Presentations must be conducted in a manner consistent with the security and orderly operation of the facility. Presenters may neither charge any fee nor solicit business for remuneration during any presentation.

At their discretion, ICE/ERO and/or facility staff may observe and monitor presentations, assisted by interpreters as necessary. ICE/ERO and facility personnel shall not interrupt a presentation, except to maintain safety and security, or if the allotted time has expired.

## I. Written Materials

If approved in advance by ICE/ERO, presenters may distribute brief written materials that inform detainees of U.S. immigration law and procedure. The request for approval of a presentation must list any published or unpublished materials proposed for distribution, and the requestor must provide a copy of any unpublished material, with a cover page that:

1. identifies the submitter and the preparer of the material;

2. includes the date of preparation; and

3. states clearly that ICE/ERO did not prepare, and is not responsible for, the contents of the material.

If any material is in a language other than English, an English translation must be provided.

Distribution of other than ICE-approved material or material that poses a threat, real or suspected, to the security and good order of the facility, constitutes grounds for discontinuation of presentation

privileges.

The volume of materials to be distributed must be kept to a minimum. If the facility administrator determines they are too voluminous for distribution at the presentation, they may be made available to detainees in the facility's law library.

Presenters shall distribute materials at the presentation to detainees and ICE/ERO and/or facility staff simultaneously. At the request of the presenter and with the requisite approval in accordance with standard "6.3 Law Libraries and Legal Material," copies of presentation materials may be included in the law library.

## J. Individual Counseling Following a Group Presentation

Following a group presentation, the facility shall permit presenters to meet with small groups of detainees to discuss their cases as long as meetings do not interfere with facility security and orderly operations.

ICE/ERO and facility staff may not be present during these meetings. Standard "5.7 Visitation" sets forth the rules and procedures for "Visits by Legal Representatives and Legal Assistants."

## K. Suspension or Termination

The facility may discontinue or temporarily suspend group presentations by any or all presenters, if:

1. the presentation or presenters pose an unreasonable security risk;

2. the presentation or presenters interfere with the facility's orderly operation;

3. the presentation deviates materially from approved presentation materials or procedures; or

4. the facility is operating under emergency conditions.

The facility administrator shall notify the affected presenters in writing of the reasons for termination

or suspension, and shall send a copy to the respective ICE/ERO Field Office Director.

A presenter may appeal a suspension or termination in writing to the Field Office Director. The Field Office Director shall promptly consider the appeal and consult with the respective ICE Office of Chief Counsel and the facility administrator to determine means of addressing the concerns causing the suspension/termination.

Within 30 days of receiving the appeal, the Field Office Director shall inform the presenter in writing of the decision made on any appeal request, and shall explain the rationale behind the decision and the means, if any, to rectify the situation.

## L. Electronic Presentations

ICE/ERO encourages qualified individuals and organizations to submit electronically formatted presentations (e.g., videotape, DVD) on legal rights. ICE/ERO must review and approve these presentation(s) prior to dissemination. If ICE/ERO approves an electronic presentation(s), the originators may provide that presentation to individual detention facilities for viewing by detainees.

### 1. Requesting ICE/ERO Approval

The requestor must submit the electronic presentation(s), along with a transcript in English and in the language(s) used in the presentation(s), to both the Field Office Director and the respective ICE Office of Chief Counsel. ICE/ERO may object to all or part of the electronic presentation(s) if:

a.  the material may present a threat to the facility's safety, security or good order;

b.  the presentation contains misleading or inaccurate statements of ICE/ERO policy, immigration procedure or law; or

c.  any part is inconsistent with this detention standard.

### 2. Detainee Viewing of Approved Electronic Presentations

The facility shall provide regularly scheduled and announced opportunities for detainees to view or listen to electronic presentation(s). At a minimum, the presentation shall be made available to the general population once a week. The facility shall also provide detainees in administrative or disciplinary segregation for more than one week at least one opportunity to view pre-approved presentation(s) during their placement in segregation, unless precluded by security concerns regarding a particular detainee.

The facility may also make such electronic presentations available in the law library, if accessible through computer (e.g. DVD format), for detainee viewing.

Each facility shall present only ICE/ERO-approved electronic presentations on detainee legal rights. If it is not technically feasible to show such pre-approved electronic presentations, the facility shall contact ICE/ERO for equipment options.

The facility shall maintain electronically-formatted presentations and equipment in good condition. However, in the event that electronic copies of the presentation(s) are stolen, destroyed or otherwise become unusable, the facility shall promptly request that ICE/ERO obtain replacement copies of the presentation(s) from the originator. The facility shall check the operability of the presentation once a week at minimum.

An electronic presentation shall not be considered a replacement or substitute for an in-person or live presentation, when available.

# 7.1 Detention Files

## I. Purpose and Scope

This detention standard contributes to efficient and responsible facility management by maintaining, for each detainee booked into a facility for more than 24 hours, a file of all significant information about that detainee. This standard also addresses security for electronic files.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. A detention file shall be maintained on each detainee admitted to a detention facility for more than 24 hours.

2. Each detention file shall include all documents, forms and other information specified herein.

3. The security and confidentiality of each detention file and its contents shall be maintained.

4. Staff shall have access to detention files as needed for official purposes only.

5. Information from a detention file shall be released to an outside third party only with the detainee's signed release-of-information consent form, consistent with the resources and security of the facility. Any release of information shall be in accordance with applicable federal and state regulations.

6. Electronic record-keeping systems and data shall be protected from unauthorized access.

7. Field Offices shall maintain detention files for a minimum of 18 months after release of the detainee, for auditing purposes.

8. Closed detention files shall be properly archived.

## III. Standards Affected

This detention standard replaces "Detention Files" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-7D-19, 7D-20, 7D-21. 7D-22.

Privacy Policy Guidance Memorandum Number 2007-1 "DHS Privacy Policy Regarding Collection, Use, Retention and Dissemination of Information on Non-U.S. Persons" from the DHS chief privacy officer (1/19/2007).

ICE/ERO *Performance-based National Detention Standards 2011:* "2.5 Funds and Personal Property."

## V. Expected Practices

### A. Creation of a Detainee Detention File

When a detainee is admitted to a facility, staff shall create a detainee detention file as part of admissions processing.

1. For every new arrival whose stay shall exceed 24 hours, a designated officer shall create a detainee detention file.

2. The officer completing the admissions portion of the detention file shall note that the file has been activated. The note may take the form of a generic statement in the acknowledgment form described below in this standard.

3. The facility administrator shall develop procedures to ensure the admissions processing unit always has on hand all necessary supplies and that equipment is maintained in good working order, including photocopier(s) and paper. The equipment shall have the capacity to handle the volume of work generated.

4. The facility shall always have on hand a paper shredder where defective and/or extra photocopies not placed in the detainee's detention file should be shredded, or a locked paper bin in which such defective and/or extra photocopies that are not placed in the detention file should be placed to be shredded or otherwise destroyed.

## B. Required Contents of File

1. The detainee detention file shall contain either originals or copies of all forms and other documents generated during the admissions process. Defective or extra copies shall be disposed of properly. If necessary, the detention file may include copies of material contained in the detainee's A-File.

   The file shall, at a minimum, contain the following documentation:

   a. I-385, Alien Booking Record, with one or more original photograph(s) attached;

   b. Classification Work Sheet;

   c. Personal Property Inventory Sheet;

   d. Housing Identification Card;

   e. G-589, Property Receipt or facility equivalent; and

   f. I-77, Baggage Check(s).

   The file shall also contain the following original documents, if used in the facility:

   g. acknowledgment form, documenting receipt of handbook, orientation, locker key, etc.;

   h. work assignment sheet;

   i. identifying marks form; and

   j. original detainee summary form.

2. The detainee's detention file shall also contain documents generated during the detainee's time in the facility.

## C. Additions to File

During the course of the detainee's stay at the facility, staff shall add documents associated with normal operations to the detainee's detention file. Such documentation may include, but is not limited to, the following:

1. special requests;

2. any G-589s or facility equivalent, or I-77s closed-out during the detainee's stay;

3. disciplinary forms;

4. grievances, except medical grievances which are maintained in the medical file, complaints and their disposition;

5. all forms associated with disciplinary or administrative segregation;

6. strip search forms;

7. other documents, as needed, e.g., staff reports about the detainee's behavior, attitude, commendations; and

8. any privacy waivers, including release-of-information consent forms.

## D. Location of Files

Detainee detention files shall be located and maintained in a secured area.

1. Active detainee detention files shall be maintained in the admissions processing area, unless the facility administrator designates another area;

2. The cabinet containing the files does not need to be securable if located in a controlled access area; however, if the cabinet is located in a congested work area or in a high traffic area, it must be locked;

3. The Chief of Security or equivalent shall determine the key distribution for file cabinets that lock; and

4. Archived files shall be placed in storage boxes, with the dates covered clearly marked (e.g., from [mm/dd/yy] to [mm/dd/yy]). The facility administrator shall designate a restricted access storage space.

## E. Archiving Files

Each detention file shall remain active during the detainee's stay at a facility, and shall be closed and archived upon the detainee's transfer, release or removal. When requested, IGSA facilities shall make inactive detention files available to ICE/ERO personnel.

1. Upon the detainee's release from the facility, staff shall add final documents to the file before closing and archiving the file and after inserting the following:

   a. copies of completed release documents;

   b. the original closed-out receipts for property and valuables; and

   c. the original I-385 and other documentation.

2. The officer closing the detention file shall make a notation (on the acknowledgement form, if applicable) that the file is complete and ready for archiving.

3. The closed detention file shall not be transferred

with the detainee to another facility. However, staff may forward copies of file documents at the request of supervisory personnel at the receiving facility or office. When forwarding requested documents, staff at the sending office shall update the archived file, noting the document request and the name and title of the requester.

4. The archival and disposal of files must be done in accordance with agency policies and regulations.

## F. Access to File

1. Detention file contents are subject to the same Privacy Act regulations as A-file contents. Unless release of information is required by statute or regulation, a detainee must sign a release-of-information consent form prior to the release of any information, and a copy of the form shall be maintained in the detainee's detention file. This information contained in the form shall be explained to the detainee in a language or manner which he/she understands.

   The Privacy Act of 1974 provides statutory privacy rights to U.S. citizens and Legal Permanent Residents (LPRs), but the law does not cover aliens who are not legal permanent residents. As a matter of policy, however, DHS treats any personally identifiable information (PII) that is collected, used, maintained or disseminated in a DHS records system as being subject to the Privacy Act regardless of whether the information pertains to a U.S. citizen, LPR or alien. Treating such records systems as covered by the Privacy Act establishes efficient and uniform business practices for handling PII without necessitating maintenance of two parallel records systems.

2. Appropriate staff or other law enforcement agencies with ICE approval may have access to the detention file for official purposes.

3. Staff shall accommodate all requests for detainee detention files from other departments that

require the material for official purposes, such as disciplinary hearings. A representative of the department requesting the file is responsible for obtaining the file, logging it out and ensuring its return. Unless the Chief of Security or equivalent determines otherwise, each borrowed file must be returned by the end of the administrative workday.

At a minimum, a logbook entry recording the file's removal from the cabinet shall include the following information:

a.  the detainee's name and A-File number;

b.  date and time removed;

c.  reason for removal;

d.  signature of person removing the file, including title and department;

e.  date and time returned; and

f.  signature of person returning the file.

4.  Upon request by the detainee, the detention file shall be provided to the detainee or his/her designated attorney of record.

## G. Electronic Files

Electronic record-keeping systems and data shall be protected from unauthorized access. All electronic data on individual detainees is subject to the same Privacy Act regulations as the contents of traditional paper detention files and A-files.

Unless release of information is required by statute or regulation, a detainee must sign a release-of-information consent form prior to the release of any information, and a copy of the form shall be maintained in the detainee's detention file.

## H. Field Office Responsibilities

Field Offices shall maintain files as needed to carry out their responsibilities, and shall retain all inactive files for a minimum of 18 months for auditing purposes. Generally, such records contain information about more than one detainee, and are most easily retrieved by process or subject, rather than by individual detainee.

For some purposes, records are most easily retrieved by the detainee's name. While some material may duplicate materials maintained in the facility detention files, there is no intention to create a duplicate file for IGSA contract facilities.

Some detention standards require that copies of certain documents on individual detainees be sent to Field Offices. Especially where approval of the Field Office Director or designee is required, records of correspondence and approvals or denials are to be maintained in the A-file.

# 7.2 Interviews and Tours

## I. Purpose and Scope

This detention standard ensures that the public and the media are informed of events within the facility's areas of responsibility through interviews and tours.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. The public and the media shall be informed of operations and events within the facility's areas of responsibility.

2. The privacy of detainees and staff, including the right of a detainee to not be photographed or recorded, shall be protected.

## III. Standards Affected

This detention standard replaces provisions on media visits and tours that were removed from the detention standard on "Visitation" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ADLF-7D-21, 7F-01.

## V. Expected Practices

### A. News Media Interviews and Tours

#### 1. General

ICE/ERO supports the provision of public access to non-classified, non-sensitive and non-confidential information about its operations in the interest of transparency. Access will not be denied based on the political or editorial viewpoint of the requestor.

ICE/ERO also has a responsibility to protect the privacy and other rights of detainees, including the right of a detainee to not be photographed or recorded.

By regulating interviews in the detention setting, the facility administrator ensures the secure, orderly and safe operation of the facility. Interviews by reporters, other news media representatives, non-governmental organizations, academics and parties not included in other visitation categories in standard "5.7 Visitation" shall be permitted access to facilities only by special arrangement and with prior approval of the respective ICE/ERO Field Office Director. ICE may designate Public Affairs Officers (PAO) to serve in Field Offices as liaisons with media representatives for some or all requests and communications covered by this standard.

#### 2. Media Representatives

The term "media representative" is intended to refer to persons whose principal employment is to gather, document or report news for any of the following entities:

a. a newspaper that circulates among the general

public and publishes news of a general interest (e.g., political, religious, commercial or social affairs):

b. a news magazine with a national circulation sold to the general public by newsstands and mail subscriptions;

c. a national or international news service;

d. a radio or television news program of a station licensed by the Federal Communications Commission (FCC); or

e. other representatives or entities that gather information in accordance with the definition of "representative of the news media" contained in the Freedom of Information Act (5 U.S.C. § 552(a)(4)(A)(ii)) as amended by section 3 of P.L.110-175.

In addition to those persons listed above, such representatives may include, but are not limited to, individuals reporting for certain electronic media outlets, online media publications and other media freelance journalists or bloggers.

## 3. Media Visits and Tours

Media representatives may request advance appointments to tour those facilities, according to the following stipulations.

a. To tour an SPC or CDF, visitors will contact the Field Office Director or the Assistant Field Office Director assigned to the facility. The Chief of Security shall be responsible for implementing the necessary security procedures.

b. To tour an IGSA facility, visitors will contact the Field Office Director responsible for that area of responsibility, who will in turn notify the facility. Local facilities' policies and procedures shall govern.

Visitors will abide by the policies and procedures of the facility being visited or toured. Visitors must obtain advance permission from the facility administrator and Field Office Director before taking

photographs in or of any facility. Detainees have the right not to be photographed (still, movie or video), and not to have their voices recorded by the media. Thus, the facility administrator shall advise both visitors and detainees that use of any detainee's name, identifiable photo or recorded voice requires that individual's prior permission. Such permission will be recorded by the visitor's completion of a signed release from the detainee before photographing or recording the detainee's voice. The original form shall be filed in the detainee's A-file with a copy placed in the facility's detention file.

If the presence of video, film or audio equipment or related personnel poses a threat to the safety or security of the facility, its staff or its detainees, the Field Office Director may limit or prohibit such access. Prior to the tour, the Field Office Director shall explain the terms and guidelines of the tour to the visitors.

During and after an emergency, or when indications exist that extra security measures may be needed due to a possible disturbance in the facility, the Field Office Director may suspend visits for an appropriate period.

## 4. Personal Interviews

A media representative or member of the public, including non-governmental organizations and academics, planning to conduct a personal interview at a facility shall submit a written request to the responsible Field Office Director, preferably 48 hours prior to, and no less than 24 hours prior to, the time slot requested. The Field Office Director may waive the 24-hour rule if convinced of the need for urgency.

Through facility staff, the Field Office Director shall inform the detainee of the interview request. Before the Field Office Director considers the interview request, the detainee must then indicate his/her willingness to be interviewed by signing a consent form. The original written consent shall be filed in the detainee's A-file, and a copy shall be placed in the

facility's detention file.

"Appendix 7.2.A: Detainee Interview Release Form" provides a sample news interview authorization form that may be used. The original of the form shall be filed in the detainee's A-file with a copy in the facility's detention file. Detainees should not be pressured or coerced out of granting the interview request, nor should the facility in any way retaliate against a detainee for lawful communication with a member of the media or a member of the public.

ICE/ERO shall normally act in writing within 48 hours of the written request. Possible reasons for disapproval may include, but are not limited to, the following situations.

a.  The news media representative or news organization he/she represents or the visitor does not agree to the conditions established by this policy or has previously failed to abide by them.

b.  The Field Office Director finds it probable that the proposed interview may endanger the health or safety of the interviewer, cause serious unrest within the facility or disturb the orderly and secure operation of the facility.

c.  The detainee is involved in a pending court action and the court with jurisdiction over the matter has issued a gag rule or the Field Office Director, after consultation with the respective ICE Office of Chief Counsel, thinks the proposed interview could affect the outcome of the court case.

If the requesting party believes the request was unfairly or erroneously denied, the requesting party may contact ICE/ERO headquarters.

Interviews shall take place during normal business hours in a location determined by the facility administrator. The facility administrator shall provide a location conducive to the interviewing activity, consistent with the safety, security and good order of the facility. The Field Office Director may limit the number of interviews with a particular detainee to a reasonable number per month. Further,

if interviews are imposing a serious strain on staff or facility resources, the Field Office Director may restrict the time allotted for interviews.

For facility safety and security, ICE/ERO reserves the right to monitor, but not participate in, detainee interviews.

A media representative interested in touring the facility and photographing or recording any other detainees in conjunction with an individual interview must follow all applicable requirements and procedures, and shall indicate this interest at the time of his/her request for an interview.

## 5. Press Pools

A press pool may be established when the PAO, Field Office Director and facility administrator determine that the volume of interview requests warrants such action.

In such an event, the Field Office Director shall notify all media representatives with pending or requested interviews, tours or visits that, effective immediately and until further notice, all media representatives must comply with the press pool guidelines established by the Field Office Director.

All material generated from such a press pool must be made available to all news media, without right of first publication or broadcast.

The press pool shall comprise one member each from the following groups:

a.  a television outlet (for video);

b.  a radio network outlet;

c.  a print outlet; and

d.  a still photographer.

Each group shall choose its representative for the press pool. The Field Office Director shall, upon request, provide the media information about a detainee, provided such information is a matter of public record and not protected by privacy laws, Department of Homeland Security policy, or

ICE/ERO policy. Security and safety concerns for staff and detainees require that specific removal-related data remain confidential.

### 6. Special Conditions for Media Representatives

To be approved to interview or visit a detainee or tour an ICE facility, the media representative must certify that he/she is familiar with and accepts the rules and regulations governing media conduct. He/she must at all times comply with those rules and regulations.

Media representatives shall collect information only from a primary source(s), and shall neither solicit nor use personal information from one detainee about another who is unwilling to be interviewed.

A media request may not delay or otherwise interfere with the admission, in-processing, or departure of any detainee. Routine processing of ICE detainees shall take precedence over media interviews.

## B. Non-Governmental Organization (NGO) and Other Agency Stakeholder Facility Tours, Visitation, or Tours with Visitation

ICE detention facilities will maintain an open and transparent approach to immigration detention through managed access of stakeholders participating in approved tours, visits, or tours with visitation. All tours and visits requests shall be governed by this standard and other applicable ICE policies or procedures on NGO and/or stakeholder access to detention facilities.

All requests by NGOs and other stakeholders (which include, but are not limited to, community service organizations, intergovernmental entities, faith-based organizations, members of academia, and legal groups (e.g., pro bono legal service provider groups)) for tours, visits, or tours with visits must be submitted in writing to the local ICE/ERO Field Office supervising the facility or the ICE Office of

State, Local and Tribal Coordination (OSLTC). Tour requests should not be directed to the facility.

All requests shall be forwarded to the Field Office for review. When deciding whether to approve or deny the request, the Field Office Director, or his or her designee, will take into consideration safety and security, and the availability of personnel to staff the tour, visitation, or tour with visitation. All tour or visit participants will be expected to submit personal information required by applicable ICE policies, so the Field Office can perform background checks as necessary.

When requesting visitation or a tour with visitation, stakeholders may pre-identify any detainee with whom they may wish to speak by providing ICE with a list of specific detainees in advance. Stakeholders are not required to pre-identify a detainee(s) with whom they may wish to meet during their tour and/or visit. In order to meet with detainees who have not been pre-identified, stakeholders shall provide to ICE a sign-up sheet.

All stakeholders shall provide ICE a completed tour/visitation notification flyer and a signed ICE Stakeholder Visitor Code of Conduct.

If the tour/visit is approved, the facility shall post both the ICE sign-up sheet and the ICE stakeholder tour/visit notification flyer at least 48 hours in advance of the tour or visitation in appropriate locations (e.g., message boards, housing areas). The facility staff may also make appropriate oral announcements to detainees about the upcoming tour/visit (e.g., announcement during meal times). The facility staff is not required to inform a detainee's attorney that a stakeholder will tour/visit the facility or for overseeing the content of the consent form or ensuring that the detainee and the stakeholder have completed it.

On the day of the visitation, the facility staff shall give the NGO or stakeholder access to pre-identified detainees and/or to detainees who have signed up in advance to speak with the stakeholder. The facility

staff shall arrange for the visitation to occur in a pre-determined common area or space.

The facility staff may maintain a physical presence in the meeting room to maintain safety and security.

To ensure security and avoid any disruptions in daily operations, all NGOs and other stakeholders touring and/or conducting visitation with detainees shall maintain proper and appropriate decorum, adhere to applicable ICE and facility standards, and may be asked to sign a code of conduct form.

This Standard does not apply to (1) Legal Orientation Program or Know Your Rights presentation providers; (2) law firms, organizations, or sole attorney practitioner providing or seeking to provide legal representation; and (3) health care practitioners with a request from a detainee's counsel to conduct an examination relevant to the detainee's case.

- **Appendix 7.2.A: Detainee Interview Release Form (English)**

- **Appendix 7.2.B: Detainee Interview Release Form (Spanish)**

DEPARTMENT OF HOMELAND SECURITY
## U.S. Immigration and Customs Enforcement

## DETAINEE INTERVIEW RELEASE FORM

Use this form to document news media interview requests of aliens in ICE custody

---

**Part 1. Alien & News Media Information**

Date: _____

Detainee's name and A-number: _____

Name of facility where alien is detained: _____

Name of news media representative: _____

Name of media organization represented: _____

Address of media organization represented: _____

---

**Instruction: Fill out either Part 2 or 3. Not both.**

| | |
|---|---|
| <u>Complete Part 2a and 2b if providing consent to be interviewed.</u><br><br>**Part 2.a. Consent to be interviewed** | I, the ICE detainee named above, do hereby freely give permission to the news media representative named above to interview me on or about (date) _____.<br><br>Detainee's signature: _____<br><br>Witness signature: _____<br><br>Title: _____ |
| **Part 2.b. Consent or Refusal of Photographs and Audio Recordings** (check only one and complete) | I, the ICE detainee named above, (check one):<br><br>☐ give permission   ☐ refuse permission for the news media<br><br>representative named above to make recordings of my voice during this interview and to take photographs of me (still or video).<br><br>Detainee's signature: _____<br><br>Witness signature: _____<br><br>Title: _____ |
| <u>Complete Part 3 only if refusing to provide consent to be interviewed.</u><br><br>**Part 3. Refusal of Interview** | I, the ICE detainee named above, refuse to grant permission for the news media representative named above to interview me.<br><br>Detainee's signature: _____<br><br>Witness signature: _____<br><br>Title: _____ |

---

**Part 4. Notice and Disclaimer**

The use and dissemination of a detainee name, image, statements, or voice recordings by a news media organization requires written permission. Media representatives must obtain a signed release from the detainee before interviewing, photographing, or recording him or her. This document only addresses whether a detainee will permit a media representative to enter an ICE facility to conduct an interview. This form does not provide authorization for a news media representative to further use and/or disseminate any information obtained during an interview. ICE does not control the content or use of any interview statements, images, or recordings obtained by a news media representative. Any agreement regarding use and dissemination of statements or records derived from an interview falls solely within the purview of the detainee and the respective news media representative.

---

ICE Form 71-050 (1/16)                                                                                          Page 1 of 1

DEPARTMENT OF HOMELAND SECURITY
DEPARTAMENTO DE SEGURIDAD NACIONAL
U.S. Immigration and Customs Enforcement
Servicio de Inmigración y Control de Aduanas de EE.UU.

## FORMULARIO DE AUTORIZACIÓN PARA ENTREVISTAR A UN DETENIDO

Utilice este formulario para documentar las solicitudes de los medios de comunicación
para entrevistar a los extranjeros en custodia del ICE

---

**Parte 1. Información del extranjero y del medio de comunicación**

Fecha: _____

Nombre del detenido y número de extranjero (A-number): ————————————————

Nombre del centro donde está detenido el extranjero: ————————————————

Nombre del representante del medio de comunicación: ————————————————

Nombre del medio de comunicación representado: ————————————————

Dirección del medio de comunicación representado: ————————————————

---

**Instrucciones: Llene la Parte 2 o la Parte 3, no ambas.**

| | |
|---|---|
| <u>Complete las Partes 2a y 2b si usted da su consentimiento para ser entrevistado.</u><br><br>**Parte 2.a. Consentimiento para ser entrevistado** | Yo, el detenido en el ICE nombrado arriba, por la presente doy todo mi consentimiento al representante del medio de comunicación nombrado arriba para que me entreviste en o alrededor del (fecha) _____ .<br><br>Firma del detenido: ————————————————<br><br>Firma del testigo: ————————————————<br><br>Cargo: ———————————————— |
| **Parte 2.b. Consentir o negarse a ser fotografiado o grabado en audio** (marque solo una casilla y complete) | Yo, el detenido en el ICE nombrado arriba, (marque una casilla):<br><br>☐ doy permiso, ☐ no doy permiso,<br><br>para que el representante del medio de comunicación nombrado arriba grabe mi voz durante esta entrevista y me tome fotografías (fijas o en video).<br><br>Firma del detenido: ————————————————<br><br>Firma del testigo: ————————————————<br><br>Cargo: ———————————————— |
| <u>Complete la Parte 3 sólo si usted se niega a dar su consentimiento para ser entrevistado.</u><br><br>**Parte 3. Negación de la entrevista** | Yo, el detenido en el ICE nombrado arriba, no doy permiso para que el representante del medio de comunicación nombrado arriba me entreviste.<br><br>Firma del detenido: ————————————————<br><br>Firma del testigo: ————————————————<br><br>Cargo: ———————————————— |

---

**Parte 4. Aviso y descargo de responsabilidad**

El uso y difusión del nombre, imagen, declaraciones o grabaciones de la voz de un detenido por parte de un medio de comunicación, requiere de un permiso por escrito. Los representantes de los medios de comunicación deben obtener una autorización firmada por el detenido antes de entrevistarle, fotografiarle o grabarle. Este documento solamente indica si un detenido permitirá que un representante de un medio de comunicación entre a las instalaciones del ICE para realizar una entrevista. Este formulario no proporciona una autorización para que un representante de un medio de comunicación utilice y/o difunda posteriormente cualquier información obtenida durante la entrevista. El ICE no controla el contenido o uso de ninguna declaración, imágenes o grabaciones obtenidas por un representante de un medio de comunicación durante la entrevista. Cualquier convenio sobre el uso y la difusión de las declaraciones o grabaciones obtenidas en una entrevista recae únicamente dentro del ámbito del detenido y del representante del medio de comunicación respectivo.

---

# 7.3 Staff Training

## I. Purpose and Scope

This detention standard ensures that facility staff, contractors and volunteers are competent in their assigned duties by requiring that they receive initial and ongoing training.

Other detention standards may include additional training requirements specific to each standard.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Before assuming duties, each new employee, contractor, or volunteer will be provided an orientation to the facility and the ICE/ERO detention standards.

2. All part-time staff and contract personnel shall receive formal orientation training appropriate to their assignments. Any part-time, volunteer, or contract personnel working more than twenty hours per week shall receive training appropriate to their position and commensurate with their full-time colleagues.

3. Training for staff, contractors, and volunteers will be provided by instructors who are qualified to conduct such training.

4. Staff and contractors who have minimal detainee contact (such as clerical and other support staff) will receive initial and annual training commensurate with their responsibilities.

5. Professional, support, and health care staff and contractors who have regular or daily contact with detainees, or who have significant responsibility involving detainees, will receive initial and annual training commensurate with their position.

6. Security staff and contractors will receive initial and annual training commensurate with their position.

7. Facility management and supervisory staff and contractors will receive initial and annual training commensurate with their position.

8. Personnel and contractors assigned to any type of emergency response unit or team will receive initial and annual training commensurate with these responsibilities including annual refresher courses or emergency procedures and protocols.

9. Personnel and contractors authorized to use firearms will receive appropriate training before being assigned to a post involving their use and will demonstrate competency in firearms use at least annually.

10. Personnel and contractors authorized to use chemical agents and electronic control devices will receive thorough training in their use and in the treatment of individuals exposed to a chemical agent.

11. Security staff and contractors will be trained in

self-defense and use-of-force procedures to include confrontation avoidance and emergency protocols.

12. New staff, contractors, and volunteers will acknowledge in writing that they have reviewed facility work rules, ethics, regulations, conditions of employment, and related documents, and a copy of the signed acknowledgement will be maintained in each person's personnel file.

## III. Standards Affected

This detention standard replaces "Staff Training" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-7B-05 through 7B-17, 7C-01, 7C-03.

ICE/ERO *Performance-based National Detention Standards 2011:* "7.2 Interviews and Tours."

## V. Expected Practices

### A. Overview of Training

The facility administrator shall ensure that the facility conducts appropriate orientation, initial training and annual training for all staff, contractors and volunteers, consistent with this standard and with appropriate assessment measures.

The facility administrator shall contact the local ICE/ERO Field Offices for access to relevant DHS training resources, such as DHS Office for Civil Rights and Civil Liberties training modules.

The amount and content of training shall be consistent with the duties and function of each individual and the degree of direct supervision that individual shall receive.

The facility administrator shall assign at least one qualified individual, with specialized training for the position, to coordinate and oversee the staff development and training program. At minimum, training personnel shall complete a 40-hour training-for-trainers course.

The training coordinator shall develop and document a facility training plan that is reviewed and approved annually by the facility administrator and reviewable by ICE/ERO. The facility administrator shall ensure that:

1. training is conducted by trainers certified in the subject matter—this is particularly important in life-safety subject areas such as firearms, chemical agents, self-defense, force and restraints, emergency response, first aid and CPR;

2. each trainee shall be required to pass a written or practical examination to ensure the subject matter has been mastered—this is particularly important in life-safety subject areas such as firearms, chemical agents, self-defense, force and restraints, emergency response, first aid and CPR, and in areas of ethical conduct;

3. the formal training received by each trainee shall be fully documented in permanent training records; and

4. formal certificates of completion shall be issued and kept in the appropriate facility files.

### B. Initial Orientation

Each new employee, contractor, and volunteer shall be provided training prior to assuming duties. While tailored specifically for staff, contractors, and volunteers, the orientation programs shall include, at a minimum:

1. ICE/ERO detention standards

2. cultural and language issues, including requirements related to limited English proficient detainees

3. requirements related to detainees with disabilities and special needs detainees

4. code of ethics

5. drug-free workplace

6. emergency plans and procedures

7. signs of suicide risk, suicide precautions, prevention, and intervention

8. use of force

9. key and lock control

10. tour of the facility

11. staff rules and regulations

12. sexual abuse/sexual misconduct awareness and reporting

13. hostage situations and staff conduct if taken hostage

## C. Initial and Annual Training

Each new employee, contractor, and volunteer shall be provided initial and annual training appropriate to their assignments.  While tailored specifically for staff, contractors, and volunteers, the training programs shall include, at a minimum:

1. Employees and contractors who have minimal detainee contact and no significant responsibilities involving detainees:

   a. ICE/ERO detention standards update

   b. cultural and language issues including requirements related to limited English proficient detainees

   c. requirements related to detainees with disabilities and special needs detainees

   d. code of ethics

   e. staff rules and regulations

   f. key and lock control

   g. signs of suicide risk, suicide precautions, prevention, and intervention

   h. drug-free workplace

   i. health- related emergencies

   j. emergency plans and procedures

   k. sexual abuse and sexual misconduct awareness

   l. hostage situations and staff conduct if taken hostage

2. Professional and support employees, including contractors, who have regular or daily detainee contact:

   a. ICE/ERO detention standards

   b. cultural and language issues including requirements related to limited English proficient detainees

   c. requirements related to detainees with disabilities and special needs detainees

   d. security procedures and regulations

   e. sexual harassment and sexual misconduct awareness (including the contents of standard "2.11 Sexual Abuse and Assault Prevention and Intervention")

   f. appropriate conduct with detainees

   g. code of ethics

   h. health-related emergencies

   i. drug-free workplace

   j. supervision of detainees

   k. signs of hunger strike

   l. signs of suicide risk, suicide precautions, prevention, and intervention

   m. use-of-force regulations

   n. hostage situations and staff conduct if taken hostage

   o. report writing

   p. detainee rules and regulations

   q. key and lock control

   r. rights and responsibilities of detainees

s.  safety procedures

t.  emergency plan and procedures

u.  interpersonal relations

v.  communication skills

w.  cardiopulmonary resuscitation (CPR)/First aid

x.  counseling techniques

3. Full-time health care employees and contractors

In addition to the training areas above, the health-care employee training program shall include instruction in the following:

a.  medical grievance procedures and protocols

b.  emergency medical procedures

c.  occupational exposure

d.  personal protective equipment

e.  bio-hazardous waste disposal

f.  overview of the detention operations

4. Security personnel

In addition to the training areas above, instruction for security personnel shall include:

a.  Searches of detainees, housing units, and work areas

b.  Self-defense techniques

c.  Use-of-force regulations and tactics

5. Situation Response Teams (SRTs)

Members of SRTs shall receive specialized training before undertaking their assignments.

6. Personnel authorized to use firearms

Personnel authorized to use firearms will receive training covering use, safety, and care of firearms and constraints on their use before being assigned to a post involving their possible use.

All personnel authorized to use firearms must demonstrate competency in their use at least annually.

## D. Continued Education and Professional Development

Employees should be encouraged to continue their education and professional development.

# 7.4 Detainee Transfers

## I. Purpose and Scope

This detention standard is written to ensure that transfers of detainees from one facility to another are accomplished in a manner that ensures the safety and security of the staff, detainees, and the public; and that the process relating to transfers of detainees is carried out professionally and responsibly with respect to notifications, detainee records, and the protection of detainee funds and property.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Decisions to transfer detainees are made by the Field Office Director or his/her designee on the basis of complete and accurate case information and principles set forth in the ICE/ERO Detainee Transfers Directive and other applicable ICE/ERO policies.  All detainee transfers and transfer determinations shall be based on a thorough and systematic review of the most current information available by ICE/ERO.

2. The legal representative-of-record shall be notified as soon as practicable, but no later than 24 hours after the detainee is transferred, in accordance with sound security practices. Contacting the legal representative-of-record will be the responsibility of ICE/ERO.

3. The detainee shall be informed of the transfer orally and in writing in a language or manner that he/she can understand, immediately prior to transport.

4. Transportation staff, as well as sending and receiving facility staff, shall have accurate and complete records for each transferred detainee.

5. Transfers of detainees shall be accomplished safely and securely.

6. Detainees shall be transferred with appropriate medication(s) and medical and referral information to ensure continuity of care with the receiving facility's medical services.

7. Transferred detainee funds, valuables and other personal property shall be safeguarded and transported in compliance with standards "1.3 Transportation (by Land)," "2.1 Admission and Release" and "2.5 Funds and Personal Property."

8. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Transfer of

Detainees" dated 12-2-2008

# IV. References

American Correctional Association 4th Edition, Standards for Adult Detention Facilities: 4-ALDF-2A-23, 1B-06, 4C-05, 4C-40, 4D-27, 6A-07, 7D-19, 7D-20.

National Commission on Correctional Health Care, *Standards for Health Services in Jails (2014)*

ICE/ERO *Performance-based National Detention Standards 2011:*

- "1.3 Transportation (by Land)";
- "2.1 Admission and Release";
- "2.5 Funds and Personal Property";
- "4.3 Medical Care"; and
- "4.4 Medical Care (Women)."

ICE/ERO Detainee Transfers Directive

# V. Expected Practices

## A. Responsibilities of ICE/ERO

1. Decisions to transfer detainees are made by the Field Office Director or his or her designee on the basis of complete and accurate case information and principles set forth in the ICE/ERO Detainee Transfers Directive and other applicable ICE/ERO policies.

2. Attorney notifications relative to detainee transfers are the responsibility of ICE/ERO, which will make attorney notifications in accordance with the ICE Detainee Transfers Directive and other applicable ICE/ERO policies.  The legal representative-of-record shall be notified as soon as practicable, but no later than 24 hours after the detainee is transferred, in accordance with sound security practices. Contacting the legal representative-of-record will be the responsibility of ICE/ERO.

## B. Responsibilities of the Sending Facility – Notifications

1. Communications with ICE

   A detainee may not be transferred from any facility without the appropriate I-203 (Notice to Detain or Release) or I-216 (Record of Person and Property Transfer) that authorizes the detail.  If the facility administrator or his or her designee believes that a scheduled transfer of a detainee should not take place, the facility administrator shall notify ICE/ERO prior to the transfer.

2. Detainee Notification

   Immediately prior to transfer, the sending facility shall ensure that the detainee is informed, in a language or manner he or she can understand, that he or she is being transferred to another facility and is not being removed (if applicable).

   a. The sending facility shall ensure that specific plans and time schedules are not discussed with detainees and that following notification, the detainee:

      1) is not permitted to make or receive any telephone calls until the detainee reaches the destination facility; and

      2) does not have contact with any detainee in the general population until the detainee reaches the destination facility.

   b.  At the time of the transfer, the sending facility shall provide the detainee, in writing, the name, address, and telephone number of the facility to which he or she is being transferred, using the attached Detainee Transfer Notification Form.

   c. The sending facility shall ensure that the detainee acknowledges, in writing, that:

      1) he or she has received the transfer destination information;

      2) it is his or her responsibility to notify

family members if so desired, upon admission into the receiving facility; and

3) he or she may place a domestic phone call, at no expense to the detainee, upon admission into the receiving facility.

d. The sending facility will place a copy of the Detainee Transfer Notification Form in the detainee's detention file.

3. Notification to the Health Care Provider

Upon receipt of an authorization to transfer a detainee from ICE/ERO, the sending facility staff shall notify the facility health care provider so that the health care provider can prepare a medical transfer summary sheet and the detainee's full medical records to accompany the transfer. The facility health care provider shall be notified sufficiently in advance of the transfer that medical staff may determine and provide for any associated medical needs.

4. Preparation for Transfer, Notification to Escorting Officers

a. The sending facility shall ensure that a properly executed I-203 or I-216 accompanies the transfer.

b. The sending facility shall ensure that escorting officers are advised of any security considerations relative to detainees to be transported so that escorting officers can take necessary precautions.

In SPCs, CDFs, and IGSAs with a sufficient ICE/ERO onsite presence, the authorized ICE official shall check records and ascertain if the detainee has a criminal history, is dangerous or has an escape record. Any information of an adverse nature shall be clearly indicated on the G-391 and the escorting officers shall be warned to take the necessary precautions.

5. Food and Water during Transfer

Food and water shall be provided in accordance with the detention standard on transportation by land. The sending facility is responsible for the preparation and delivery of proper meals prior to departure.

## C. Responsibilities of the Health Care Provider at the Sending Facility

1. Transfer of the Detainee's Medical Information

When a detainee is transferred to another detention facility, the sending facility shall ensure that a Medical Transfer Summary accompanies the detainee.

2. Medical Transfer Summary

a. The sending facility's medical staff shall prepare a Medical Transfer Summary that must accompany the detainee. The Medical Transfer Summary shall include, at a minimum, the following items:

1) patient identification;

2) tuberculosis (TB) screening results (including results date) and current TB status if TB disease is suspected or confirmed;

3) current mental, dental, and physical health status, including all significant health issues, and highlighting any potential unstable issues or conditions which require urgent follow-up;

4) current medications, with instructions for dose, frequency, etc., with specific instructions for medications that must be administered en route;

5) any past hospitalizations or major surgical procedures;

6) recent test results, as appropriate;

7) known allergies;

8) any pending medical or mental health evaluations, tests, procedures, or treatments

for a serious medical condition scheduled for the detainee at the sending facility. In the case of patients with communicable disease and/or other serious medical needs, detainees being released from ICE custody are given a list of community resources, at a minimum;

9) copies of any relevant documents as appropriate; and

10) the name and contact information of the transferring medical official.

The IHSC Form 849 or equivalent, or the Medical Transfer Summary attached as Appendix 4.3.C, which mirrors IHSC Form 849, may be used by facilities to ensure compliance with these standards.

3. Notification of Medical/Psychiatric Alerts or Holds

Upon receiving notification that a detainee is to be transferred, appropriate medical staff at the sending facility shall notify the facility administrator of any medical/psychiatric alerts or holds that have been assigned to the detainee, as reflected in the detainee's medical records.  The facility administrator shall be responsible for providing notice to ICE/ERO of any medical/psychiatric alerts or holds placed on a detainee that is to be transferred.

4. Medical Holds

If a detainee has been placed in a medical hold status, the detainee must be evaluated and cleared by a licensed independent practitioner (LIP) prior to transfer.  If the evaluation indicates that transfer is medically appropriate but that health concerns associated with the transfer remain, medical staff at the sending facility shall notify ICE and shall provide ICE requested information and other assistance, to the extent practicable, to enable ICE to make appropriate transfer determinations.

5. Medical Escort

The CMA or designee must inform the facility administrator in writing if the detainee's medical or psychiatric condition requires a medical escort during transfer.

6. Medications

a. Prior to transfer, medical staff shall provide the transporting officers instructions and, if applicable, medication(s) for the detainee's care in transit.

b. Medical staff shall ensure that the detainee is transferred with, at a minimum, seven (7) days' worth of prescription medications (for TB medications, up to 15 days' supply, and for HIV/AIDS medication a 30 day supply) to guarantee the continuity of care throughout the transfer and subsequent intake process.

c. Medication shall be:

1) placed in a property envelope labeled with the detainee's name and A-number and appropriate administration instructions;

2) accompany the transfer; and

3) if unused, turned over to the receiving medical personnel.

## D. Responsibilities of the Sending Facility Relative to Detainees' Property Prior to Transport

Before transferring a detainee, the sending facility's processing staff shall ensure that all funds and small valuables are properly documented on the G-589 and I-77 or equivalent.

1. Funds and Small Valuables

Before transfer, the sending facility shall return all funds and small valuables to the detainee and close out all Forms G-589 (or local IGSA funds and valuables receipts) in accordance with the Detention Standard on Funds and Personal Property.

During transport, a detainee shall ordinarily have the following items in his or her possession; however, items that might present a security risk or are particularly bulky may be transported separately in the vehicles' storage area. Personal items include:

- Cash

- All legal material

- Small valuables such as jewelry

- Address books, phone lists, correspondence

- Dentures, prescription glasses

- Small religious items

- Photos

- Similar small personal property items.

The receiving facility shall create a new G-589 (or local IGSA funds and valuables receipt) during admissions in-processing in accordance with the Detention Standard on Funds and Personal Property.

2. Large Valuables, Excess Luggage, and Other Bulky Items

Detainee access to large items of personal property during transport is prohibited; however, ordinarily, all items stored at the sending facility shall accompany the transferee to the receiving SPC, CDF or, in most cases, the receiving IGSA facility.

If the property accompanies the detainee, in accordance with the Detention Standard on "Funds and Personal Property":

a. The sending facility shall close out all Forms G-589 (or local IGSA property receipt forms), and

b. The receiving facility shall create a new G-589 and I-77 (or local IGSA property receipt forms) during admissions in-processing.

If the receiving facility does not accept excess, oversized or bulky belongings (including, but not limited to, suitcases, cartons, televisions, etc.), the sending facility shall:

a. Arrange to store the property elsewhere; or process the excess property in accordance with ERO standard operating procedures.

b. If the detainee refuses to provide an appropriate mailing address, or is financially able but unwilling to pay for shipping, notify ICE/ERO. ICE/ERO may dispose of the property after providing the detainee written notice in accordance with the ICE/ERO standard operating procedures.

c. If the detainee cannot provide an appropriate address because one does not exist, the detainee shall keep the property receipts for the stored items, and the facility shall store the property and notify the receiving facility in writing that the transferring facility requires notice, before the detainee's release or further transfer, to ensure the detainee receives the stored property.

## E. Responsibilities of the Transporting Officer

1. The transporting officer may not transport a detainee without the required documents, including:

a. the Medical Transfer Summary; and

b. a properly executed Form I-203 or I-216, or equivalent form.

2. The transporting officer shall review the information for completeness and to make sure that he or she has the supplies required to provide any in-transit care that is indicated.

3. Any transportation officer who reviews the Medical Transfer Summary shall protect the privacy of the detainee's medical information to the greatest extent possible, and may not share

medical information unless necessary to safely fulfill transportation responsibilities.

4. The Transporting Officer is responsible for delivering the Medical Transfer Summary to personnel at the receiving facility and shall advise them of any medications provided to the detainee in transit.

5. The receiving facility must report any exceptions to the ICE/ERO Field Office and the Deputy Assistant Director, Detention Management Division.

## F. Post Transfer Activities

1. After admission into the receiving facility or Field Office, all detainees must be offered the opportunity to make one domestic three-minute phone call at no cost to the detainee.

2. The responsible processing supervisor or his/her designee shall ensure that the detainee is informed promptly that he or she may notify interested persons of the transfer. The offer to make a domestic call, as referenced above, will be documented and signed by processing staff and by the detainee. A copy of the documentation verifying that a detainee was offered a three-minute phone call will be filed in the detainee's detention folder.

# DEPARTMENT OF HOMELAND SECURITY

## U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

### DETAINEE TRANSFER NOTIFICATION

DETAINEE NAME _____A# _____

NATIONALITY _____

### TRANSFER DESTINATION

NAME OF NEW FACILITY _____

ADDRESS _____

_____

_____

TELEPHONE NUMBER _____


I hereby acknowledge that I have received the transfer destination information.  I have also been notified that it is my responsibility to notify family members, if I so desire, and that I will be provided with one free phone call when I arrive at my destination.


DETAINEE SIGNATURE _____ A#_____ DATE _____

OFFICER SIGNATURE _____ DATE _____

# 7.5 Definitions

### A-File, Alien File

The legal file maintained by DHS for each detainee. Contents include but are not limited to the detainee's identification documents (passport, driver's license, other identification cards, etc.), photographs, immigration history, prior criminal record if any, and all documents and transactions relating to the detainee's immigration case.

### ACA

American Correctional Association.

### Administrative Health Authority

The administrative authority is responsible for all access to care, personnel, equipment and fiscal resources to support the delivery of health care services.

### Administrative Segregation

A non-punitive form of separation from the general population used for administrative reasons.  Administrative segregation is available only to ensure the safety of detainees or others, the protection of property, or the security or good order of the facility, as determined by a facility administrator or supervisor.  Administrative segregation may be available, among other reasons, for detainees awaiting investigations or hearings for violations of facility rules, detainees scheduled for release, removal, or transfer within 24 hours, and, under more limited circumstances, detainees who require protective custody or separation from the general population for medical reasons.

### Admission/Admissions Process

In-processing of newly arrived detainees, which includes an orientation to the policies, programs, rules and procedures of the facility. Classification, assignment of living quarters, various inspections, medical screening and safeguarding of funds, valuables and other personal property is completed during this process.

### Ambulatory Restraints

"Soft" or "hard" equipment used to restrict a detainee's movement but leaving him or her able to eat, drink or attend to basic bodily functions without staff intervention.

### Ammunition Control Officer (ACO)

An individual who has been designated in writing as the officer responsible for the physical and administrative control of ammunition in the authorizing official's area of accountability.

### Auxiliary Aids and Services

Services or devices that allow for effective communication by affording individuals with impaired vision, hearing, speaking, sensory, and manual skills an equal opportunity to participate in, and enjoy the benefits of, programs and activities. Such aids or services include interpreters, written materials, note-takers, video remote interpreting services, or other effective methods of making aurally delivered materials available to detainees with hearing impairments; readers, taped texts, materials or displays in Braille, secondary auditory programs, or other effective methods of making visually delivered materials available to detainees with visual impairments; acquisition or modification of equipment or devices; and other similar services and actions.

### Body-cavity Search

The visual inspection or physical probing of body openings (anus, vagina, ears, nose, mouth, etc) where weapons, drugs, or other contraband could be secreted. This is the most intrusive means of searching an individual, reserved for instances where other search techniques have been considered but rejected as ineffective under the particular circumstances of the case. Body-cavity search procedures govern physical probes, but not visual inspections.

For example, the procedures would not be appropriate for a visual inspection of the inside of the mouth, nose, or ears, unless contraband is found during the course of that inspection. Body-cavity procedures apply whenever contraband is found, because retrieving/seizing the item will involve physical entry into or probing within the cavity (in this example, the mouth, nose, or ear).

Caustic

Capable of burning, corroding, eroding or destroying by chemical action.

Census Check

See Informal Count.

Chain of Command

Order of authority (rank); executive, senior management, senior staff, etc. The position titles may vary according to the type of facility (SPC, CDF, or IGSA) and local facility titles. The on-site order of authority at a detention facility descends from the facility administrator to assistant or associate facility administrators to department heads to shift supervisors and other supervisors. Similarly, the ICE/ERO chain-of-command at a detention facility descends from the officer–in-charge (OIC) to the associate OIC to the chief detention enforcement officer/Chief of Security, detention operations supervisor, etc.

Chemical

A substance with a distinct molecular composition produced by or used in a chemical process.

Chief of Security

A generic term for the department head in charge of a detention facility's security employees and operations. The position titles may vary according to the type of facility (SPC, CDF, or IGSA) and local facility titles. Ordinarily, a Chief of Security (chief detention enforcement agent, captain, etc.) is organizationally directly under an assistant or associate facility administrator.

Chronic disease

An illness or condition that affects an individual's well being for an extended interval, usually at least six months, and generally is not curable but can be managed to provide optimum functioning within any limitations the condition imposes on the individual.

Chronic disease program (care clinic)

Incorporates a treatment plan and regular clinic visits. The clinician monitors the patient's progress during clinic visits and, when necessary changes the treatment. The program also includes patient education for symptom management.

Class R (Restricted) Tools

Devices to which detainees are forbidden access except in the presence and constant supervision of staff for reasons of safety or security. Class R includes devices that can be used to manufacture or serve as weapons capable of doing serious bodily harm or structural damage to the facility. All portable power tools and accessories are in this category. Class R also includes ladders and other such items that are not inherently dangerous but could prove useful in unauthorized activities, such as escape attempts.

Classification

A process used to make housing and program assignments by assessing detainees on the basis of objective information about past behavior, criminal records, special needs, etc.

Clinical Director (CD)

A designated individual licensed to practice medicine and provide health services with final responsibility for decisions related to medical judgments.  A CD and CMA are equivalent positions.

Clinical Medical Authority (CMA)

The medical authority is responsible for the delivery of all health care services to the detainee population. These services include, but are not limited to, medical, nursing, dental, mental health and nutritional services. A CD and CMA are equivalent positions.

## Combustible Liquid

A substance with a flash point at or above 100° Fahrenheit.

## Commissary

An area or system where detainees may purchase approved items.

## Contact Visit

A meeting between detainee and another person authorized to take place in an area free of obstacles or barriers that prevent physical contact.

## Container

Any bag, barrel, bottle, box, can, cylinder, drum, reaction vessel, storage tank, or other vessel holding a hazardous chemical; does not include pipes or piping systems.

## Contraband

Any unauthorized item in the facility: illegal, prohibited by facility rules, or otherwise posing a threat to the security or orderly operation of the facility. This includes unauthorized funds.

## Contract Detention Facility (CDF)

A facility that provides detention services under a competitively bid contract awarded by the ICE.

## Contractor

A person who or entity that provides services on a recurring basis pursuant to a contractual agreement with the agency or facility.

## Control Office

An officer who directs security activities from the Control Center.

## Count Slip

Documentation of the number of detainees confirmed present during a population count in a specific area, signed by the officers involved in the count.

## Correspondence

Letters, postcards and other forms of written material not classified as packages or publications. Large envelopes containing papers qualify as correspondence, but boxes, sacks and other shipping cartons do not. Books, magazines, newspapers and other incoming printed matter are not "correspondence."

## Criminal Alien

A foreign national convicted of one or more crimes.

## Dedicated IGSA Facility (Dedicated IGSA)

An IGSA  facility that solely houses ICE detainees.  Also see "IGSA FACILITY" and "INTERGOVERNMENTAL SERVICE AGREEMENT."

## Detainee Handbook

The policies and procedures governing detainee life in the facility: daily operations, rules of conduct, sanctions for rule violations, recreation and other programs, services, etc.; defined in writing and provided to each detainee upon admission to the facility.

## Detention File

Contents include receipts for funds, valuables and other personal property; documentation of disciplinary action; reports on detainee behavior; detainee's written requests, complaints and other communications; official responses to detainee communications; records from Special Management Unit, etc.

## Dietician

A professional trained in foods and the management of diets (dietetics) who is credentialed by the Commission on Dietetic Registration of the

American Dietetic Association, or who has the documented equivalent in education, training, or experience, with evidence of relevant continuing education.

Disability

An individual with a disability is an individual who has a physical or mental impairment that substantially limits one or more major life activities, or an individual who has a history or record of such an impairment. "Major life activities" are basic activities that a detainee without a disability in the general population can perform with little or no difficulty, including, but not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.  A major life activity can also include the operation of major bodily functions, like the immune, endocrine, and neurological systems; normal cell growth; digestion, respiration, and circulation; and the operations of the bowel, bladder, and brain.

Disciplinary Hearing

Non-judicial administrative procedure to determine whether substantial evidence supports finding a detainee guilty of a rule violation.

Disciplinary Committee

One or more impartial staff members who conduct and/or oversee a disciplinary hearing. A lower-level committee (Unit Disciplinary Committee) investigates a formal Incident Report and may impose minor sanctions or refer the matter to a higher-level disciplinary committee. A higher-level committee (Institution Disciplinary Panel) conducts formal hearings on Incident Reports referred from the lower level committee and may impose higher level sanctions for higher level prohibited acts. Also see Institution Disciplinary Panel.

Disciplinary Segregation

A punitive form of separation from the general population used for disciplinary reasons.  Disciplinary segregation is available only after a finding by a disciplinary hearing panel that the detainee is guilty of a serious prohibited act or rule violation.

Dry Cell

A cell or room without running water where a detainee can be closely observed by staff until the detainee has voided or passed contraband or until sufficient time has elapsed to preclude the possibility that the detainee is concealing contraband. Dry cells may be used when there is reasonable suspicion that a detainee has ingested contraband or concealed contraband in a body cavity.

Emergency Changes

Measures immediately necessary to maintain security or to protect the health and safety of staff and detainees.

Exigent Circumstances

Any set of temporary and unforeseen circumstances that require immediate action in order to combat a threat to the security or institutional order of a facility or a threat to the safety or security of any person.

Exposure/Exposed

Subjected or potentially subjected to a hazardous substance by any means (inhalation, ingestion, skin contact, absorption, etc.)

Face-to-photo Count

A process that verifies identity of each detainee by comparing every person present with the photographic likeness on his/her housing card.

Facility Administrator

A generic term for the chief executive officer of a detention facility. The formal title may vary

(warden, Officer In Charge, sheriff, jail administrator, etc.).

### Field Office Directory (FOD)

Individual with chief responsibility for facilities in his assigned geographic area.

### Firearms Control Officer (FCO)

Individual designated responsible for the physical and administrative control of all firearms under the jurisdiction of the authorizing official.

### Flammability Hazard

Has a flash point below 200 degrees Fahrenheit, closed cup, or is subject to spontaneous heating.

### Flammable Liquid

A substance with a flash point below 100 degrees Fahrenheit (37.8 Centigrade).

### Flash Point

The minimum temperature at which the vapor of a combustible liquid can form an ignitable mixture with air.

### Food Service Administrator (FSA)

The official responsible for planning, controlling, directing and evaluating Food Service Department operations.

### Formal Count

When the detainee population is assembled at specific times for attendance check, conducted in accordance with written procedures.

### Four/Five-point Restraint

A restraint system that confines an individual to a bed or bunk in either a supine or prone position. Ordered by the facility administrator when a detainee's unacceptable behavior appears likely to continue risking injury to self or others.

### Funds

Cash, checks, money orders and other negotiable instruments.

### Gender nonconforming

Having an appearance or manner that does not conform to traditional societal gender expectations.

### General Correspondence

All correspondence other than "special correspondence."

### General Population

Detainees whose housing and activities are not specially restricted. The term is ordinarily used to differentiate detainees in the "general population" from those in Special Housing Units.

### Grievance

A complaint based on a circumstance or incident perceived as unjust.

### Hard Contraband

Any item that poses a serious threat to the life, safety or security of the facility detainees or staff.

### Health Assessment

The process whereby an individual's health status is evaluated. This process will address the patient's physical, dental and mental health appropriate to the patient's condition and will include, as determined by the health care provider, questioning the patient about symptoms, a physical examination appropriate to the complaint and, as appropriate, review of screening information, collection of additional information relating to mental, dental and medical health issues, immunization histories, laboratory and diagnostic tests, other examinations, review of results, initiation of therapy and development of a treatment plan.

### Health Authority

The health services administrator (HSA), clinical director (CD), or agency responsible for the provision of health care services at a facility or system of facilities. The responsible physician may be the health authority. Health authority may also be referred to as the medical department.

### Health Care Practitioner

Defined as an individual who is licensed, certified, or credentialed by a state, territory or other appropriate body to provide health care services within the scope and skills of the respective health care profession.

### Health Hazard

Includes carcinogens, toxic agents, reproductive toxins, irritants, corrosives, sanitizers, hepatotoxins, nephrotoxins, neurotoxins and other agents that act on the hemopoietic system or damage the lungs, skin, eyes, or mucous membranes.

### Health Screening

A system for preliminary screening of the physical and mental condition of individual detainees upon arrival at the facility; conducted by health care personnel or by a specially health trained officer. The combination of structured inquiry and observation is designed to obtain immediate treatment for new arrivals who are in need of emergency health care, identify and meet ongoing current health needs, and isolate those with communicable diseases.

### Hold Room

A secure area used for temporary confinement of detainees before in-processing, institutional appointments (court, medical), release, transfer to another facility, or deportation-related transportation.

### Hunger Strike

A voluntary fast undertaken as a means of protest or manipulation. Whether or not a detainee actually declares that he or she is on a hunger strike, staff are required to refer any detainee who is observed to not

have eaten for 72 hours for medical evaluation and monitoring.

### IGSA Facility (IGSA)

A state or local government facility used by ERO through an Intergovernmental Service Agreement.  Also see "INTERGOVERNMENTAL SERVICE AGREEMENT."

### Illegal Contraband

Any item prohibited by law, the possession of which constitutes grounds for felony or misdemeanor charges.

### Indigent

Without funds, or with only nominal funds. Ordinarily, a detainee is considered "indigent" if he or she has less than $15.00 in his or her account.

### Informal grievance

An oral complaint or concern received from a detainee. Informal grievances may be handled at the lowest level in the organization possible to effectively resolve the complaint with no written response.

### Informal Count

Population count conducted according to no fixed schedule, when detainees are working, engaged in other programs, or involved in recreational activities. Unless a detainee is missing, these counts are not reported; also called "census check" or "irregular count."

### Informal Resolution

Brings closure to a complaint or issue of concern to a detainee, satisfactory to the detainee and staff member involved; does not require filing of a written grievance.

### Informed Consent

An agreement by a patient to a treatment, examination, or procedure after the patient receives

the material facts about the nature, consequences, and risks of the proposed treatment, examination or procedure; the alternatives to it; and the prognosis if the proposed action is not undertaken.

### In-processing

Administrative processing of a detainee arriving at a detention facility (See "Admissions").

### Institution Disciplinary Panel (IDP)

Review board responsible for conducting disciplinary hearings and imposing sanctions for cases of detainee misconduct referred for disposition following the hearing. The IDP usually comprises a hearing officer and representatives of different departments in the facility.

### Intergovernmental Service Agreement

A cooperative agreement between ICE and any state, territory or political subdivision for the construction, renovation or acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services. ICE may enter into an IGSA with any such unit of government guaranteeing to provide bed space for ICE detainees, and to provide the clothing, medical care, food and drink, security and other services specified in the ICE/ERO detention standards; facilities providing such services are referred to as "IGSA facilities."

### Intersex

Having sexual or reproductive anatomy or chromosomal pattern that does not seem to fit typical definitions of male or female.  Intersex medical conditions are sometimes referred to as disorders of sex development.

### Investigating Officer

An individual of supervisory or higher rank who conducts an investigation of alleged misconduct and was not involved in the incident; usually a supervisory detention enforcement officer or shift supervisor.

### Irregular Count

See Informal Count.

### Juvenile

Any person under the age of 18.

### Least Intrusive

In the context of a search, terminology used to refer to alternative means of finding contraband, such as questions, metal detectors, pat down searches and boss chairs, prior to conducting a strip search.

### Legal Assistant

An individual (other than an interpreter) who, working under the direction and supervision of an attorney or other legal representative, assists with group presentations and in representing individual detainees. Legal assistants may interview detainees, assist detainees in completing forms and deliver papers to detainees without the supervisory attorney being present.

### Legal Correspondence

See "special correspondence."

### Legal File

See A-File.

### Legal Representative

An attorney or other person representing another in a matter of law, including law students, law graduates not yet admitted to the bar; "reputable individuals"; accredited representatives; accredited officials and attorneys outside the United States (see 8 CFR § 292.1, "Representation and Appearances").

### Leisure-time Activities

Activities which are designed to provide detainees with recreational opportunities both inside and outside the living area, e.g., soccer, basketball, chess, checkers, television.

### Life-sustaining Procedure (Life Support)

A medical intervention or procedure that uses artificial means to sustain a vital function.

Limited English Proficiency (LEP)

A person who does not speak English as his or her primary language and who has a limited ability to read, speak, write, or understand English. LEP individuals may be competent in English for certain types of communication (e.g. speaking or understanding), but still be LEP for other purposes (e.g. reading or writing).

Mail Inspection

Examination of incoming and outgoing letters, packages, etc., for contraband, including cash, checks and money orders.

Master Count

Total number of detainees housed at a facility.

Material Safety Data Sheet (MSDS)

Basic information about a hazardous chemical, prepared and issued by the manufacturer, in accordance with Occupational Safety and Health Administration regulations (see 29 CFR 1910.1200; see also OSHA Form 174); among other things, specifies precautions for normal use, handling, storage, disposal and spill cleanup.

Medical Classification System

A system by which a detainee's medical and mental health  conditions and needs are assessed to allow for appropriate placement in a facility with the resources necessary to provide appropriate level of care to meet those needs.

Medical Discharge Plan

The discharge plan includes: admission diagnosis; discharge diagnosis; brief medical history including the chief complaint and any essential physical findings discovered; all diagnostic test (e.g., x-rays, lab results, ECG's, etc) results; list of any medications prescribed; a brief summary of care provided, the detainee's response to treatment, medical complications encountered, any outside health care referrals that may have interrupted the infirmary period or that be pending; and continuity of care plan.

Medical Personnel

Includes all qualified health care professionals as well as administrative and support staff (e.g. health record administrators, laboratory technicians, nursing and medical assistants, clerical workers).

Mental Health Provider

Psychiatrist, clinical or counseling psychologist, physician, psychiatric nurse, clinical social worker or any other mental health professional who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for the mental health needs of patients. .

Messenger

A person (neither a legal representative nor a legal assistant) whose purpose is to deliver or convey documents, forms, etc., to and from the detainee; not afforded the visitation privileges of legal representatives and legal assistants.

Minor

A juvenile; a person under the age of 18.

Mogul keys

Key and knob operated deadlocking latch/ deadbolt for use in detention institutions as well as commercial, government and industrial buildings for utmost physical security. The large-scale design accommodates an oversized latch and deadbolt plus mogul key cylinder. These institutional grade construction features and tamper resistant fittings afford exceptional structural strength to impede forced and surreptitious entry.

National Commission on Correctional Health Care (NCCHC)

Establishes the standards for health service in correctional facilities on which accreditation is based.

**National Fire Protection Association**

Principal source of fire protection standards and codes.

**NCCHC**

National Commission on Correctional Health care.

**Non-Contact Visit**

Visitation with a barrier preventing physical contact between the detainee and his or her visitors.

**Non-dedicated IGSA Facility (Non-dedicated IGSA)**

An IGSA facility that houses ICE detainees as well as other inmate populations in a shared use facility.  Also see "IGSA FACILITY" and "INTERGOVERNMENTAL SERVICE AGREEMENT."

**Non-Medical Emergency Escorted Trip**

Authorized detainee visit to a critically ill member of his/her immediate family, or to attend the funeral of a member of his/her immediate family. "Immediate family" member refers to a parent (including stepparent and foster parent), child, spouse, sister, or brother of the detainee.

**Non-merit Factor**

Any characteristic or factor immaterial to a detainee's mental or physical ability to perform a given assignment.

**Non-security Key**

A key which if duplicated by unauthorized persons and/or lost, would not constitute an emergency requiring urgent action; not critical to facility safety and security.

**Out Count**

Detainees temporarily away from the facility, but accounted for by the facility and included in the master count.

**Paracentric Keys**

Keys designed to open a paracentric lock. It is distinguishable by the contorted shape of its blade, which protrudes past the center vertical line of the key barrel. Instead of the wards on the outer face of the lock simply protruding into the shape of the key along the spine, the wards protrude into the shape of the key along the entire width of the key, including along the length of the teeth.

**Pat-down Search**

A sliding or patting of the hands over the clothed body of a detainee by staff to determine whether the individual possesses contraband.

**Physical Examination**

A thorough evaluation of an individual's physical condition and medical history conducted by or under the supervision of a licensed medical professional acting within the scope of his or her practice.

**Plan of Action**

Describes steps the facility will take to convert a condition that has caused a determination of noncompliance with a standard.

**Post Orders**

Written orders that specify the duties of each position, hour-by-hour, and the procedures the post officer will follow in carrying out those duties.

**Progressive Restraints**

Control the detainee in the least restrictive manner required, until and unless the detainee's behavior warrants stronger and more secure means of inhibiting movement.

**Protective Custody (PC)**

Administrative segregation for the detainee's own safety.

**Qualified health care professionals**

Include physicians, physicians assistants, nurses, nurse practitioners, dentists, mental health professionals and others who by virtue of their education, credentials and experience are permitted by law and within their scope of practice to evaluate and care for patients.

### Reasonable Accommodations

Any change or adjustment in detention facility operations, any modification to detention facility policy, practice, or procedure, or any provision of an aid or service that permits a detainee with a disability to participate in the facility's programs, services, activities, or requirements, or to enjoy the benefits and privileges of detention programs equal to those enjoyed by detainees without disabilities.  Examples of "reasonable accommodations" include, but are not limited to, proper medication and medical treatment; accessible housing, toilet, and shower facilities; devices like bed transfer, accessible beds or shower chairs, hearing aids, or canes; and assistance with toileting and hygiene. In these standards, reasonable accommodations, disability-related modifications, and auxiliary aids and services are collectively referred to as "accommodations" or "reasonable accommodations."

### Reasonable Suspicion

Not intuition, but specific, articulable facts that would cause a reasonable law enforcement officer to suspect that a particular person is concealing a weapon, contraband, or evidence of a crime.

### Religious Practices

Worship, observances, services, meetings, ceremonies, etc., associated with a particular faith; access to religious publications, religious symbolic items, religious counseling and religious study classes; and adherence to dietary rules and restrictions.

### Sally Port

An enclosure situated in the perimeter wall or fence surrounding the facility, containing double gates or doors, of which one cannot open until the other has closed, to prevent a breach in the perimeter security; handles pedestrian and/or vehicular traffic.

### Sanitation

The creation and maintenance of hygienic conditions; in the context of food, involves handling, preparing, and storing items in a clean environment, eliminating sources of contamination.

### Satellite Feeding

Food served and consumed in a location other than where prepared.

### Security Key

A key which if duplicated by unauthorized persons and/or lost, would jeopardize life, safety, property or security, or would facilitate escape.

### Segregation

Confinement in an individual cell isolated from the general population; for administrative, disciplinary, or protective reasons.

### Service Processing Center (SPC)

A detention facility the primary operator and controlling party of which is ICE.

### Shift Supervisor

A generic term for the detention security supervisor in charge of operations during a shift. The position titles may vary according to the type of facility (SPC, CDF, or IGSA) and local facility titles. Ordinarily, a shift supervisor (detention operations supervisor, lieutenant, etc.) is, organizationally, directly under the Chief of Security (chief detention enforcement agent, captain, etc.).

### Soft Contraband

Any unauthorized item that does not constitute hard contraband, i.e., does not pose a serious threat to human safety or facility security; includes that

quantity of an item possessed in an amount exceeding the established limit.

Special Correspondence or Legal Mail

Detainees' written communications to or from any of the following:

a. private attorneys and other legal representatives;

b. government attorneys;

c. judges and courts;

d. embassies and consulates;

e. the president and vice president of the United States;

f. members of Congress;

g. the Department of Justice (including the DOJ Office of the Inspector General);

h. the Department of Homeland Security (including U.S. Immigration and Customs Enforcement, ICE Health Services Corps, the Office of Enforcement and Removal Operations, the DHS Office for Civil Rights and Civil Liberties, and the DHS Office of the Inspector General);

i. outside health care professionals;

j. administrators of grievance systems; and

k. representatives of the news media.

Special Management Unit (SMU)

A housing unit for detainees in administrative or disciplinary segregation.

Special Needs Detainee

A detainee whose mental and/or physical condition requires different accommodations or arrangements than a detainee who does not have special needs would receive. Special needs detainees include, but are not limited to, those detainees who are chronically ill or infirm, those with disabilities, and those who are addicted to or in withdrawal from drug or alcohol.

Special Vulnerabilities

Detainees with special vulnerabilities include those who are elderly, pregnant, or nursing; those with serious physical or mental illness, or other disability; those who would be susceptible to harm in general population due in part to their sexual orientation or gender identity; and those who have been victims of sexual assault, torture, trafficking, or abuse.

Strip Search

A search that requires a person to remove or arrange some or all clothing so as to permit a visual inspection of the person's breasts, buttocks, or genitalia.

Terminally Ill Detainee

A detainee whose physical condition has deteriorated to the point where the prognosis is less than a year to live.

TJC

The Joint Commission [formerly the Joint Commission on Accreditation of Health care Organizations (JCAHO)]

An independent, not-for-profit organization that evaluates and accredits more than 15,000 health care organizations and programs in the United States. TJC is the Nation's predominant standards-setting and accrediting body in health care.

Toxic

Poisonous; capable of causing injury or death.

Trained Investigators

A person who has been trained in investigative techniques to include interview techniques for victims and proper procedures for collecting and storing evidence.

Training

An organized, planned and evaluated activity designed to achieve specific learning objectives and

enhance personnel performance. Training may occur on site, at an academy or training center, an institution of higher learning, professional meetings, or through contract service or closely supervised on-the-job training. Training programs usually include requirements for completion, attendance records and certification of completion. Meetings of professional associations are considered training where there is clear evidence of the direct bearing on job performance. In all cases, the activity must be part of an overall training program.

### Training Coordinator

A person responsible for ensuring all training requirements are met and documented. This person will often develop and conduct training.

### Transgender

A person whose gender identity (i.e., internal sense of feeling male or female) is different from the person's assigned sex at birth.

### Unencumbered Space

Open, usable space measuring at least seven feet in at least one dimension, free of plumbing fixtures, desk, locker, bed and other furniture and fixtures (measured in operational position).

### Unauthorized Funds

Negotiable instruments (checks, money orders, etc.) or cash in a detainee's possession exceeding the facility-established limit.

### Unauthorized Property

Not inherently illegal, but against the facility's written rules.

### Unit Disciplinary Committee

See Disciplinary Committee.

### Volunteer

An individual who donates time and effort on a recurring basis to enhance the activities and programs of the agency or facility.

### Volunteer Group

Individuals who collectively donate time and effort to enhance the activities and programs offered to detainees; selected on basis of personal qualities and skills (recreation, counseling, education, religion, etc.).

### Work Assignment

Carpentry, plumbing, food service and other operational activities included in the facility's Voluntary Work Program, for which a detainee may volunteer.