# EXHIBIT G

```
 1            IN THE UNITED STATES DISTRICT COURT FOR THE
                       DISTRICT OF COLORADO
 2
                  CASE NO. 1:14-cv-02887-JLK
 3

 4    ALEJANDRO MENOCAL, et al.,

 5                    Plaintiffs,

 6    -vs-

 7    THE GEO GROUP, INC.,

 8                    Defendant.
      _____/
 9

10

11

12

13            DEPOSITION OF AMBER MARTIN
                 Pages 1 Through 209
14

15

16

17            Wednesday, October 9, 2019
                8:58 a.m. - 3:21 p.m.
18
                951 Yamato Road
19                  Suite 285
              Boca Raton, Florida 33431
20

21

22

23

24          Stenographically Reported By:
              Nancy Cannizzaro, RMR
25            Registered Merit Reporter
```

1          Q.    Is this the sanitation policy we were just

2     discussing?

3          A.    It appears so, yes.

4          Q.    Okay.  So if you look at section -- take a

5     minute to review Section B and Section C on the first and

6     second page respectfully.  Let me know when you finish

7     reviewing it.

8          A.    Okay.

9          Q.    So these describe housekeeping tasks that

10    detainees are required to perform, correct?

11         A.    Yes.

12         Q.    So these are not part of the Voluntary Work

13    Program?

14         A.    No.

15         Q.    Okay.  And these tasks are unpaid, correct?

16         A.    Correct.

17         Q.    What are the consequences if a detainee

18    refuses to participate in the activities listed in

19    Sections B and C?

20         A.    We ask them --

21         Q.    B or C, I should say.

22         A.    We ask them to voluntarily do it, we ask

23    them to clean it.  If they don't, we let ICE know that

24    they won't be cleaning it.  There's really not any

25    repercussions for this.

1          Q.    Your testimony is that if they refuse to

2     clean, there's no repercussion?

3          A.    No.  I mean, we can file a report or

4     whatever on them, but there's nothing that we can really

5     do about it.

6          Q.    Okay.

7          A.    I think by ICE policy that we can file a

8     report, et cetera, and, you know, give them restrictions

9     or that, but nothing like that's been done.

10         Q.    Nothing like that has been done during what

11    period?

12         A.    During any period.

13         Q.    So there's no report that's been filed

14    about detainees refusing to clean?

15         A.    Well, I'm saying there may be a report, but

16    nothing has necessarily come out of that report.

17         Q.    The detainees ever been disciplined for

18    refusing to clean?

19         A.    As far -- I don't -- as far as taking

20    things away from them or food, no.

21         Q.    Any kind of discipline?

22         A.    No.

23         Q.    Your testimony is that there's never been

24    discipline issued for detainees?

25         A.    I don't know if --

```
 1                    MR. BARNACLE:  Object to the form.

 2          A.    I don't know if there's been discipline,

 3  but as far as taking anything away from them or anything

 4  like that, I mean, there's not much we can do, is what

 5  I'm saying.

 6                    (Plaintiff Exhibit No. 15 was marked for

 7          identification.)

 8  BY MR. SCIMONE:

 9          Q.    Before I go into this exhibit, how do you

10  know that?

11          A.    Well, I know what the performance-based

12  standards say, and that we can give them solitary

13  confinement.  What I'm saying is that's never occurred.

14  We don't give solitary confinement for refusing to clean

15  up their area.

16          Q.    And how do you know that that's --

17          A.    It's always been an informal policy that we

18  made sure -- it was a formal policy that there was

19  clarity on that.

20          Q.    When did that become a formal policy?

21          A.    Well, a few years -- a couple years ago.

22  But it's also been an informal policy.  We've never given

23  a detainee solitary confinement for refusing to clean

24  their areas.

25          Q.    How do you know that that's never been
```

1    done?

2         A.    Like I said, it's been an informal policy.

3    We've never allowed that to happen.  If somebody did that

4    on their own without letting somebody know, then I

5    wouldn't know something like that.  But it's never --

6    it's never been a policy of GEO to put somebody in

7    solitary confinement, a detainee, for not cleaning their

8    area.

9         Q.    And if that did happen, notwithstanding

10   that policy, is that something that would likely come to

11   your attention?

12        A.    Definitely.

13        Q.    How would that come to your attention?

14        A.    I think that there would have been an

15   incident report filed or an internal -- what do we

16   call it? -- SIS if somebody was disciplined in that

17   manner.  Not necessarily to my attention, but at least to

18   the attention of, you know, somebody in the regional

19   office or that nature.

20        Q.    And how are those typically reported up the

21   chain of command?

22        A.    We give number -- well, during different

23   phases and different periods of this time period, I mean,

24   there was reports about how many people have been

25   disciplined, and there were monthly reports, those type

Amber Martin
October 09, 2019                                         181

1    exhibit, I just want to be sure that I -- that we're good

2    about it.

3              So you haven't had any communications with

4    ICE specifically about the scope of the duties under the

5    Housing Unit Sanitation Policy, correct?

6         A.    No, I haven't.

7         Q.    You're not aware of any specific

8    communications to ICE about the scope of those duties,

9    correct?

10        A.    No.  Just this one, I guess.

11        Q.    Right.  Other than this, sure.  And

12   generally speaking, given your position in contract

13   compliance -- current position in contract compliance and

14   also earlier contract administration position, are those

15   generally communications you would expect to be directed

16   to your office or that your office would be aware of?

17        A.    Yes.

18        Q.    And --

19        A.    Well, as far as the housekeeping plan?

20        Q.    Yes.

21        A.    Not necessarily.  That wouldn't be to a

22   scale that I -- like if there was a major issue going on

23   with it that I would think would be directed towards me.

24        Q.    Okay.  So -- because we talked about cases

25   where your office would be involved if there was a

1    question or ambiguity about what the contract would be

2    required.

3              A.    Or if there was a change of scope or if

4    there what a negotiation or a change that ICE wanted to

5    make, those type of things.

6              Q.    Okay.  And you're not aware of any issues

7    like that going up to your office?

8              A.    As far as housekeeping, no.

9              MR. SCIMONE:  Okay.  Let me take a break

10             and see if I can get a status on this.

11             (Recess from 2:13 p.m. to 2:33 p.m.)

12             (Plaintiff Exhibit No. 17 was marked for

13             identification.)

14   BY MR. SCIMONE:

15             Q.    Ms. Martin, Exhibit 17 that you've just

16   been handed is a full copy of the 2011 PBNDS, and the

17   full Bates range is GEO-MEN 64018 through 64414.  And so

18   we're looking at this because earlier we talked about the

19   scope of cleaning duties under the Housing Unit

20   Sanitation Policy.  I had identified a portion of PBNDS

21   and asked whether the Housing Unit Sanitation Policy went

22   outside of those duties.  You had testified there were

23   other aspects of the PBNDS that didn't encompass those

24   duties.  And so what we're doing now, I hope, is that you

25   can point to the sections of the document that you're

```
 1   referring to that comport with GEO's policy.  So please

 2   take your time to read it.

 3           A.    Under Section 1.2, sanitation --

 4   Environmental Health and Safety, Subsection A.

 5           Q.    Can you point to a Bates number.

 6           A.    I'm sorry.  64041.  Environmental Health

 7   and Safety:  "Environment health conditions shall be

 8   maintained at a level that meets recognized standards of

 9   hygiene, including those from the:  American Correctional

10   Association, Occupational Safety and Health

11   Administration, Environmental Protection Agency," et

12   cetera, et cetera.

13           Q.    I see.

14           A.    I would reference the American Correctional

15   Association as being incorporated into PBNDS, that we

16   would have to follow, as far as sanitation.

17           Q.    And you're saying that this authorizes

18   GEO-required detainees to do that work?

19           A.    Because the American -- ACA standard has

20   that as part of living areas.

21           Q.    Okay.

22           A.    Before we were talking about ACA being

23   separate from PBNDS.  PBNDS incorporates ACA.  Further,

24   it talks about "shall ensure that" -- number two -- 042:

25   It says:  "Staff and Detainee Safety.  The facility
```

1    administrator shall ensure that adequate provisions are

2    made for staff and detainee safety, in accordance with

3    these standards and applicable law.  Standard '7.3 Staff

4    Training' further addresses employee training-related

5    issues.  Standard '5.8 Voluntarily Work Program'

6    addresses" -- "detainee shall receive" -- "such as

7    working with cleaning products to clean general use

8    areas."

9           Q.    So this references the Voluntary Work

10   Program?

11          A.    Detainee living area.  Housekeeping plan.

12   Maybe that's -- well, okay.  349 -- the fact that 6.1

13   detainee handbook is incorporated into PBNDS --

14          Q.    Let me just find that page.

15          A.    I'm sorry.

16          Q.    Page 349?

17          A.    64349, yes.

18          Q.    Okay.  Where are you looking on the page?

19          A.    6.1 the Detainee Handbook.

20          Q.    Okay.

21          A.    Because the ICE National Detention Handbook

22   is incorporated into that and it refers to general living

23   areas.

24          Q.    I'm sorry, where are you?

25          A.    Well, you have to have the handbook.

Amber Martin
October 09, 2019                                              185

```
 1          Q.    I'm sorry, I didn't see the reference.

 2          A.    The handbook -- because the detainee

 3  handbook is incorporated into this and it refers to

 4  general living areas in the detainee handbook, and the

 5  fact that the ACA is incorporated and refers to general

 6  living areas in the ACA, then I -- you know, we would

 7  have to go back to those two things.  And on your exhibit

 8  that you showed, as far as the Exhibit 15.

 9          Q.    That's the excerpt of the PBNDS?

10          A.    Yes.

11          Q.    With Section 5.8?

12          A.    Right.

13          Q.    Okay.

14          A.    Even under -- I'm sorry.  64220.  Even

15  under the offense category, refusal to clean assigned

16  living area is not specific to cells as a requirement.

17  Number 306.

18          Q.    You said not specific to cells?

19          A.    Right.  It's an assigned living area, which

20  would be their housing area as well as their cells.  And

21  then the approval of ICE of our housekeeping policy

22  itself, exhibit -- the last one you showed me.

23          Q.    You're referring to Housing Unit Sanitation

24  Policy?

25          A.    Yeah.
```

Amber Martin
October 09, 2019                                    186

1        Q.    Okay.  You're just saying the fact that

2    that was approved by ICE?

3        A.    Yes.  Signed off and approved by ICE.

4        Q.    And that was approved by -- at what level?

5    By the contracting officer or the COTR?

6        A.    I'm guessing, because I can't recognize the

7    signature, it would be at the facility level.  Probably

8    the COTR.

9        Q.    The COTR, okay.

10       A.    So those three areas and the PBNDS, which

11   incorporates the ACA, incorporates the inmate -- I'm

12   sorry, detainee handbook, it talks about refusal to clean

13   assigned living areas, even in the disciplinary portion

14   of it, although we don't put them in solitary for that, I

15   will say that section shows me that those four areas is

16   just a partial section and doesn't incorporate the whole

17   thing and that there would be no reason for me to think

18   that there was anything am- -- I can't say that word.

19       Q.    Ambiguous.

20       A.    Thank you.

21             -- ambiguous to this.

22       Q.    Okay.  So the ACA, which we don't have in

23   front of us, you say that -- you're saying that that

24   specifically states that detainees may be required to do

25   cleaning?

1          A.     I'm saying -- yes, yes.

2          Q.     Okay.  And because that's incorporated into

3     the PBNDS as stated at the page you identified here?

4          A.     20.

5          Q.     Yeah.  That that implies that or tells you

6     that a greater scope of cleaning is permitted, greater

7     than what's in that other section you looked at?

8          A.     Yes.  There's several different sections in

9     there that would encompass the general living area.

10         Q.     Let's look at that page, 64041.

11         A.     Yes.

12         Q.     I just want to understand what we're

13    describing here.  So section A1 -- before I go into this,

14    anything else in here that you would refer to?

15         A.     Just briefly looking through this, that I

16    could find.

17         Q.     Okay.  So this says:  "Environmental health

18    conditions shall be maintained at a level that meets

19    recognized standards of hygiene, including those from

20    the:"  A through F.  The first being is the American

21    Correctional Association.

22         A.     Right.

23         Q.     Now, your testimony is that because this

24    says that the health conditions shall be maintained at a

25    level that meets the standards of hygiene here, that also

1     incorporates the provisions of the ACA that says who can

2     be assigned to perform those tasks to maintain the

3     standards?

4           A.    Yes.

5           Q.    Have you ever raised that understanding

6     with ICE?

7           A.    Well, obviously it was raised with the

8     understanding that they agreed to the policy, that they

9     reviewed the policy.

10          Q.    So -- okay.  But you didn't explicitly

11    raise that concept with them, that because the ACA is

12    incorporated here, we can do the same thing that the ACA

13    allows us to do in terms of who does what, because it's

14    referenced here in the Section 8.1?

15                MR. BARNACLE:   Object to the form.

16          A.    What I'm saying is, because there's several

17    different things that are incorporated into the PBNDS,

18    such as ACA, the National Detention Handbook, you know,

19    even description of living areas and disciplinary

20    process, and that is all incorporated, there's no reason

21    I would raise anything to ICE.  I would put it in a

22    policy outlining that was part of the PBNDS, part of the

23    contract requirements, and let them review it and approve

24    it.

25                        / / / /

```
 1    BY MR. SCIMONE:

 2         Q.    And so I'm not trying to argue with you

 3    about this, but I want to understand why this -- you did

 4    or did not -- just to lay the basic background, my sort

 5    of overarching question here is what -- whether anything

 6    caused you to discuss the very specific topic with ICE

 7    about what detainees were doing.  And so pursuant to

 8    that, you say that it's -- the ACA standards are

 9    incorporated into PBNDS?

10         A.    That, as well as the contract.

11         Q.    As well as the contract.  And what I'm

12    pointing to here is a section that describes the ACA

13    standards in a particular context.  That's my

14    understanding when I read this, that it says:  "The

15    environmental health conditions shall be maintained at a

16    level that meets recognized standards of hygiene."

17              And so you don't see any discrepancy

18    between maintaining standards at a level and maintaining

19    them in a specific way that the ACA permits in terms of

20    who does what?

21         A.    No.  Because I think that there's different

22    sections and it's incorporating all the sections and all

23    the definitions into one policy.

24         Q.    This language here incorporates that?

25         A.    The ACA standard incorporates it.
```

1          Q.    But you're saying that that ACA standard is

2     incorporated here by this language?

3          A.    Yes.

4          Q.    And you also say independent of this,

5     what's in the PBNDS, that the contract incorporates the

6     ACA standards.  I understand that.

7          A.    Correct.

8          Q.    And we talked a little bit earlier about

9     what happens if there's an apparent conflict between the

10    ACA standards and the PBNDS.  And in that situation, that

11    would be something that ICE would need to basically give

12    GEO an indication what should govern, right?

13         A.    Yes.

14         Q.    But you haven't raised any conflict between

15    the ACA standards and the PBNDS in this area?

16         A.    No.  Because I don't believe there is a

17    conflict.

18         Q.    Right.  Now let's look at the second

19    section you identified, okay.  So page 3289 of the PBNDS,

20    that's Bates stamp 64349.

21         A.    Okay.

22         Q.    So --

23         A.    Yes.

24         Q.    Okay.  So this section is titled:

25    "Detainee Handbook."  It says:  "This detention standard

 1    requires that, upon admission, every detainee be provided

 2    comprehensive written orientation materials that describe

 3    such matters as the facility's rules and sanctions,

 4    disciplinary system, mail and visiting procedures,

 5    grievance system, services, programs, and medical care,

 6    in English, Spanish and other languages and that

 7    detainees acknowledge receipt of those materials."

 8                  So this handbook that's being referred to,

 9    is that an ICE publication?

10         A.    Yes.

11         Q.    Okay.  And your contention is that this

12    provision of the PBNDS incorporates that handbook?

13         A.    Yes.

14         Q.    Okay.  And there's a section of that

15    handbook that you say refers to general living areas?

16         A.    Yes.

17         Q.    And I realize I'm asking you just based on

18    your recollection, but what's your recollection of what

19    it says about living areas?

20         A.    I think it's assigned living areas.

21         Q.    Okay.

22         A.    Or assigned housing areas or something of

23    that nature.  It's not just independent cells.  It's

24    general assigned housing areas or something of that

25    nature.

Andrew Martin
October 09, 2019                                    192

```
 1              Q.    So it's assigned housing areas.  And so you
 2    read that to mean something beyond?
 3              A.    Their cells.
 4              Q.    The cells, okay.
 5              A.    It's common area.
 6              Q.    The common area of the pod?
 7              A.    Yes.
 8              Q.    That encompasses areas outside of the bunk
 9    and the immediate area around the bunk that are described
10    in --
11              A.    Yes.
12              Q.    -- that section of PBNDS that we looked at
13    earlier?
14              A.    Yes.
15              Q.    Okay.  Have you ever raised through the
16    contracting process or any other context with ICE a
17    question about whether that section of the handbook means
18    more than just the cells?
19              A.    No.
20              Q.    That's GEO's reading of that section?
21              A.    Like I said, I've never raised it because I
22    didn't think there was a conflict.
23              Q.    Okay.
24              A.    And they've already reviewed the policy, so
25    obviously they didn't think it was a conflict.
```

Andrew Martin
October 09, 2019                                            193

1          Q.    Well, I guess as we saw when we looked

2    earlier at the policy -- and that's exhibit -- what's the

3    number again?

4               MR. BARNACLE:   14.

5    BY MR. SCIMONE:

6          Q.    14.  So as we talked about earlier, when

7    you look at the policy, the policy describes various

8    kinds of housekeeping, including some things that are, as

9    I understand, part of the Voluntary Work Program.  Is

10   that your understanding as well?

11         A.    Does it include the voluntary program?

12   Where?

13         Q.    Well, it doesn't say it explicitly.  I

14   guess that's what I'm pointing out, is that there are --

15   so if we look at -- well, let me just ask you this, given

16   what he have on the face the document:  Is there anything

17   in here that describes whether these tasks are part of a

18   required housekeeping that all detainees are required to

19   do as opposed to voluntary work that's done as part of

20   the VWP and that people are paid $1 a day for?

21         A.    Well, yes, under Section B, each detainee

22   will be responsible for the cleanliness of his or her

23   cell or living area, including walls, floors, sink,

24   toilet, windows, and other property within the cell room

25   or living area.

Andrew Martin
October 09, 2019                                                194

1       Q.    Okay.  But that doesn't explicitly say that

2   that's required as part of the policy and not paid?

3       A.    If it was part of the paid Voluntary Work

4   Program, it would be under that policy.  I think we would

5   be very explicit under the Voluntary Work Program what's

6   paid and what's not paid or assignments.  This is

7   explicit to sanitation procedures, and if it's not

8   identified as being paid, I would say it's not paid.

9       Q.    If you look on Bates No. GEO_MEN 1508 on

10  that document, at the very top, above the table you see

11  the last line of that text it says "housing unit

12  trustee"?

13      A.    Uh-huh, yes, I do.

14      Q.    Is it your understanding that the trustee

15  generally refers to someone in a Voluntary Work Program?

16      A.    Yes, it would.

17      Q.    Okay.  And this is part of the Housing Unit

18  Sanitation Policy, correct?

19      A.    Yes.

20      Q.    So there is at least one job there that's

21  described as part of this sanitation policy that refers

22  to someone working in the VWP, correct?

23      A.    It could be, yes.

24      Q.    Do you have any -- are you certain as you

25  look through this sanitation policy in the schedule

Amber Martin
October 09, 2019                                          195

1    whether or not other jobs here are part of the VWP?

2         A.    I would consider a housing unit trustee

3    probably someone that was cleaning a segregation area,

4    someplace -- the common area where a detainee couldn't

5    come out into that area and clean themselves.

6         Q.    Okay.  And there's also, if you'll look --

7    on the policy, on the next page, there's a kitchen

8    cleaning section as well.  You see that, right?

9         A.    Yes.

10        Q.    This doesn't say whether this is work being

11   done by a GEO employee or a VWP trustee worker, correct?

12        A.    Correct.

13        Q.    This isn't part of the required cleaning

14   that all detainees are required to do, is it?

15        A.    No, it's not.

16        Q.    Okay.  So it's part of the Housing Unit

17   Sanitation Policy, but it's outside of what detainees are

18   required to actually do, correct?

19        A.    Correct.

20        Q.    Okay.  So let's look back at the PBNDS.  So

21   we've looked at the handbook and -- the reference here to

22   the handbook.  And so your testimony is that because the

23   handbook refers to general living areas, you understand

24   that to mean areas outside of just the cell?

25        A.    Yes.