# EXHIBIT 1

Page 1

1          IN THE UNITED STATES DISTRICT COURT FOR THE
                        DISTRICT OF COLORADO
2
                   CASE NO. 1:14-cv-02887-JLK
3


4    ALEJANDRO MENOCAL, et al.,

5                    Plaintiffs,

6    -vs-

7    THE GEO GROUP, INC.,

8                    Defendant.
     _____/
9


10


11


12


13              DEPOSITION OF AMBER MARTIN
                    Pages 1 Through 209
14


15


16


17          Wednesday, October 9, 2019
              8:58 a.m. - 3:21 p.m.
18
                 951 Yamato Road
19                  Suite 285
             Boca Raton, Florida 33431
20


21


22


23


24          Stenographically Reported By:
               Nancy Cannizzaro, RMR
25          Registered Merit Reporter

Page 2

```
 1                    APPEARANCES
 2
 3   On Behalf of the Plaintiffs:
         OUTTEN & GOLDEN, LLP
 4       685 Third Avenue
         25th Floor
 5       New York, New York 10017
         212.245.1000
 6       mscimone@outtengolden.com
         BY:  MICHAEL J. SCIMONE, ESQUIRE
 7
 8   On Behalf of the Defendant:
         AKERMAN, LLP
 9       1900 Sixteenth Street
         Suite 1700
10       Denver, Colorado 80202
         303.260.7712
11       colin.barnacle@akerman.com
         BY:  COLIN L. BARNACLE, ESQUIRE
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              INDEX OF PROCEEDINGS
 2   WITNESS                              PAGE
     AMBER MARTIN
 3      DIRECT EXAMINATION BY MR. SCIMONE    6
        CROSS-EXAMINATION BY MR. BARNACLE  205
 4
     CERTIFICATE OF OATH                  208
 5   CERTIFICATE OF REPORTER              209
 6
 7
 8
 9              PLAINTIFF EXHIBITS
10   EXHIBIT        DESCRIPTION           PAGE
11   No. 1   Preliminary Statements         21
12   No. 2   E-mail chain, with attachment -  26
             Bates No. GEO-MEN 000797976 through
13           GEO-MEN 00079805
                 CONFIDENTIAL
14
     No. 3   E-mail chain, with attachment -  40
15           Bates Stamp GEO-MEN 00071642
             through GEO-MEN 00071701
16               CONFIDENTIAL
17   No. 4   E-mal chain, with attachment -   44
             Bates No. GEO_MEN 00037752 through
18           GEO_MEN 00037759
                 CONFIDENTIAL
19
     No. 5   HSCEOP-06-R-00013 Amendment 02 -  62
20           Bates No. GEO_MEN 00030577 through
             GEO_MEN 00030583
21               CONFIDENTIAL
22   No. 6   WCC Technical Proposal - Technical  66
             and Management Plans - Sanitation
23           and Hygienic Living Conditions -
             Bates No. GEO_MEN 00042206 through
24           GEO_MEN 00042209
                 CONFIDENTIAL
25
```

Page 4

```
 1   No. 7    The GEO Group, Inc. Technical      72
              Proposal & Past Experience - Part
 2            1:  Demonstrated
              Technical/Management Capability -
 3            Bates No. GEO_MEN 00040665 through
              GEO_MEN 00040670
 4                CONFIDENTIAL
 5   No. 8    Award/Contract - Bates No. GEO-MEN  78
              00059635 through GEO-MEN 00059743
 6                CONFIDENTIAL
 7   No. 9    Award/Contract - Bates stamp Nos.  90
              GEO_MEN 00019613 through GEO_MEN
 8            00020037
 9                CONFIDENTIAL
     No. 10   Summary of Major Changes Between   95
10            the 2008 and 2011 Performance-Based
              National Detention Standards -
11            Bates stamp Nos. GEO_MEN 00105553
              through GEO-MEN 00105592
12                CONFIDENTIAL
13   No. 11   Detainee Handbook - LaSalle       108
              Processing Center, Jena, LA - Bates
14            stamp Nos. 2018-ICLI-0052 2141
              through 2018-ICLI-0052 2169
15
     No. 12   06/16/2014 E-mail from James D.   120
16            Adams to Amber Martin, Subject:
              Volunteer work program - Bates
17            stamp No. GEO_MEN 00007300
                  CONFIDENTIAL
18
     No. 13   The GEO Group, Inc Aurora ICE     124
19            Processing Center, Aurora, Colorado
              - 400-Bed Staffing Plan - Bates
20            stamp Nos. GEO_MEN 00038920 through
              GEO_MEN 00038925
21                CONFIDENTIAL
22
23
24
25
```

Page 5

```
 1   No. 14   The GEO Group, Inc. Aurora/ICE    130
              Processing Center Policy and
 2            Procedure Manual - Chapter:
              Sanitation - Bates stamp Nos.
 3            GEO_MEN 00001419 through GEO_MEN
              00001421, GEO_MEN 00001505 through
 4            GEO_MEN 00001509, and GEO_MEN
              00001510 through GEO_MEN 00001513
 5                CONFIDENTIAL
 6   No. 15   Performance-Based National        134
              Detention Standards 2011, excerpt -
 7            Bates No. GEO_MEN 00064018
              through GEN_MEN 00064020, GEN_MEN
 8            00064209 through GEN_MEN 00064222,
              and GEO_MEN 00064344
 9            through GEO_MEN 00064348
10   No. 16   04/17/2014 E-mail chain, Subject:  167
              Re: Urgent HQ Tasking: Voluntary
11            Work Programs at ICE Detention
              Facilities, with attachment
12                CONFIDENTIAL
13   No. 17   Performance-Based National        182
              Detention Standards 2011, complete
14            manual - Bates stamp Nos. GEO-MEN
              00064018 through GEO_MEN 00064414
15
     No. 18   The GEO Group, Inc./Aurora        201
16            Detention Center - Aurora, Colorado
              - Standards Compliance Checklist -
17            Bates stamp Nos. GEO_MEN 00014702
              through GEO_MEN 00014717
18                CONFIDENTIAL
19
20                CERTIFIED QUESTION
21   Page 10,   How many documents did you review?  10
     Line 16
22
23
24
25
```

Page 6

1    Deposition taken before Nancy Cannizzaro, Registered
2   Merit Reporter and Notary Public and for the State of
3   Florida at Large, in the above cause, at 8:58 a.m.
4                        - - - - - - -
5            THE COURT REPORTER:  Ma'am, I'll have you
6   raise your right hand for me so that I can swear
7   you in.
8            Do you swear or affirm testimony you're
9   about to give shall be the truth, the whole truth,
10   and nothing but the truth?
11      THE WITNESS:  Yes, I do.
12   Thereupon,
13            AMBER MARTIN,
14   A WITNESS CALLED by the Plaintiffs, being first duly
15   sworn or affirmed, testified as follows:
16            DIRECT EXAMINATION
17   BY MR. SCIMONE:
18      Q.   Good morning, Ms. Martin.
19      A.   Good morning.
20      Q.   My name is Michael Scimone.  I'm an
21   attorney representing the plaintiffs in this case.
22            Have you ever been deposed before?
23      A.   Yes.
24      Q.   So I'm going to go over just a couple of
25   ground rules, which I'm sure you've heard before.

Page 7

1            How recently, by the way, were you deposed?
2      A.   About three months ago.
3      Q.   Okay.  So this should all be pretty fresh
4   in your mind.  Ground rules are worth repeating.
5            You have to give a verbal answer to my
6   questions today.  No nods, shrugs, or gestures.  And
7   please wait for me to finish asking my question before
8   you start to answer.  It's a natural speech pattern that
9   just about everybody has that we start to answer as soon
10   as we know where the person is going or think we do, but
11   I sometimes change direction, which I try not to do, but
12   it sometimes happens.  So wait until you hear the whole
13   question so you can be sure exactly what it is that I'm
14   asking and answer that question and not have kind of a
15   false start.  And it also makes it easier, of course, for
16   the court reporter to take down everything that happens
17   today.
18            So you're under oath today.  And you
19   understand that's the same oath that you would take if
20   you were in court testifying before a judge or jury,
21   correct?
22      A.   Correct.
23      Q.   Okay.  And so just one thing about that
24   oath that I always sort of remind people, is that it's an
25   oath to tell the whole truth, and so we're going to be

Page 8

1   talking about things that happened in the past and you
2   may have a partial memory of something, but part of the
3   oath you take is to tell the whole truth.  And so to the
4   extent that you have a partial memory of something or you
5   recall some aspect of a conversation or part of a
6   transaction or series of events, I'm entitled to know
7   that part of it.  And it's helpful to me if you let me
8   know that it's only a partial recollection and you don't
9   remember the other part.  So that makes for a clearer
10   record.  We would all appreciate that.
11            You can take a break at any time as long as
12   there's no pending question.  You've heard all this
13   before, I'm sure.
14            And your attorney may state an objection at
15   some point, but the rule at a deposition is that unless
16   he instructs you not to answer the question, you go ahead
17   and answer the question anyway.
18            All familiar territory, I assume?
19      A.   Yes.
20      Q.   Okay.  You said you were deposed about
21   three months ago.  What kind of matter was that in?
22      A.   It was in the election committee matter.
23      Q.   Election committee for what?
24      A.   For the federal government.
25      Q.   Oh, okay.

Page 9

1      A.   It was a legislative branch deposition.
2      Q.   Okay.  Which legislature?
3      A.   Oh, God.  I want to say House.
4      Q.   Got it.  And so that was a legislative
5   committee deposition.  Have you ever given a deposition
6   in a lawsuit?
7      A.   Yes.
8      Q.   Okay.  How many times have you been
9   deposed?
10      A.   Approximately about 20, 25 times.
11      Q.   Okay.  So you're an old hand at this.
12            So what did you do to prepare for today's
13   deposition?  And I'm not asking -- please don't disclose
14   the content of anything you discussed with your attorney.
15   But just in general, what have you done to prepare for
16   today?
17      A.   Spoke to my attorney, spoke to in-house
18   counsel.
19      Q.   How many times did you meet with your
20   attorney?
21      A.   Once.
22      Q.   For about how long?
23      A.   Two hours.
24      Q.   And how long ago was that?
25      A.   Yesterday.

Page 10

```
1      Q.    Was that in person?
2      A.    Yes.
3      Q.    And how many times have you spoken with
4  in-house counsel to prepare?
5      A.    Once or twice.
6      Q.    When was that?
7      A.    Probably about two months ago.
8      Q.    Okay.  Was anybody else present for your
9  meeting with your attorney outside counsel?
10     A.    Just in-house counsel.
11     Q.    So in-house counsel and outside counsel?
12     A.    Uh-huh.
13     Q.    Got it.  Did you review any documents to
14 prepare for today?
15     A.    Yes.
16     Q.    What did you review?
17         MR. BARNACLE:  I'm going to object on
18     work-product privilege.  I'm going to instruct her
19     not to answer the question.
20 BY MR. SCIMONE:
21     Q.    How many documents did you review?
22     A.    Probably five or six.
23         MR. SCIMONE:  And so you're instructing the
24     witness not to answer about what she looked at to
25     prepare for today's deposition?
```

Page 11

```
1          MR. BARNACLE:  The content, yes.
2          MR. SCIMONE:  Okay.  We're going to mark
3      that for a ruling.
4          MR. BARNACLE:  Sure.
5  BY MR. SCIMONE:
6      Q.    Okay.  Did you do anything else outside of
7  your preparation sessions to prepare for today or refresh
8  your memory?
9      A.    No, I did not.
10     Q.    Okay.  When did you first find out about
11 this lawsuit?
12     A.    It's been probably about four years ago.
13     Q.    And how did you come to learn about it?
14     A.    In conversation with my in-house counsel.
15     Q.    Okay.  Have you had any involvement in
16 searching for documents related to this lawsuit?
17     A.    Yes, I have.
18     Q.    And have you provided documents to your
19 attorneys in connection with this lawsuit?
20     A.    Yes, I have.
21     Q.    Okay.  What's your educational background?
22     A.    I have a bachelor's degree in criminal
23 justice.
24     Q.    Okay.  Any post-college education?
25     A.    No.
```

Page 12

```
1      Q.    And any other kind of certification or
2  training other than bachelor's degree?
3      A.    I'm a member of the American Corrections
4  Association and a member of the Executive Women in
5  Corrections.
6      Q.    And so do those come with educational
7  certifications?
8      A.    Continuing education, yes.
9      Q.    Okay.  What's your current title at The GEO
10 Group?
11     A.    Executive vice president for contract
12 administration.
13     Q.    How long have you been in that position?
14     A.    I've been in that position since -- the
15 executive position since 2014.
16     Q.    What was your title prior to 2014?
17     A.    Vice president of contract administration.
18     Q.    So you've given executive and vice
19 president in 2014.  That was the change?
20     A.    Yes.
21     Q.    What was the difference between being vice
22 president and then executive vice president?
23     A.    More responsibility.
24     Q.    And when you say "more responsibility,"
25 does that mean a difference in scope in terms of, like,
```

Page 13

```
1  number of facilities you were responsible for or
2  something else?
3      A.    Yes.  We acquired several companies and so
4  my scope grew.
5      Q.    About when did those acquisitions happen?
6      A.    Well, there's several acquisitions over the
7  years.  The last acquisition was in 2016.
8      Q.    Okay.  And how long were you in the
9  position of vice president for contract administration?
10     A.    I became vice president of contract
11 administration in 2011.
12     Q.    Prior to that, what title did you hold?
13     A.    Vice president of contract administration,
14 contract compliance.
15     Q.    So just let me try to unpack the title.
16         So is that vice president for contract
17 administration within the contract compliance department
18 or did you have two separate responsibilities?
19     A.    I had two separate responsibilities.
20     Q.    I see.  And so broadly speaking, can you
21 just describe kind of what those two areas were.
22     A.    Contract compliance is the audit function
23 of the contractual team.  Contract administration is the
24 administration of contracts dealing with modifications
25 and negotiations.
```

Page 14

1    Q.    And did the contract compliance function
2  shift to a different person?
3    A.    Yes.
4    Q.    Okay.  And who now fills that role?
5    A.    The current -- it's Dan Ragsdale.
6    Q.    And was that about 2011 that he became
7  that?
8    A.    No.
9    Q.    When did he become the person in charge of
10  contract compliance?
11    A.    I think he's been there about two years, so
12  probably 2017, if I'm right.
13    Q.    And who preceded him in that role?
14    A.    Patricia Persante.
15    Q.    And does that take us back to 2011?
16    A.    Yes.
17    Q.    Okay.  How long were you vice president
18  responsible for contract administration and compliance?
19    A.    Since 2000.
20    Q.    Okay.  Prior to 2000, what role did you
21  hold?
22    A.    Regional director for contract compliance.
23    Q.    And how long were you in that position?
24    A.    A little over a year.  Since November of
25  1998.

Page 15

1    Q.    Did you hold any other positions at The GEO
2  Group prior to that?
3    A.    No.
4    Q.    And did you work anywhere else before 1998?
5    A.    Yes.  I was with the Department of Criminal
6  Justice for the State of Texas.
7    Q.    For about how long?
8    A.    Fifteen years.
9    Q.    And prior to that, did you have any
10  employment?
11    A.    Yes.  I was -- where was I?  I was a cop.
12  And then I was, before that, a manager in the Hilton
13  hotels.
14    Q.    Okay.  About how long were you a police
15  officer?
16    A.    About eight months.
17    Q.    And where were you a police officer?
18    A.    San Antonio, Texas.
19    Q.    And about how long were you manager at
20  Hilton?
21    A.    Approximately year and a half.
22    Q.    Any employment prior to that?
23    A.    College and Pizza Hut.
24    Q.    Okay.  Got the good-old college jobs.
25    A.    Thank you.  You're making me remember.

Page 16

1    Q.    Okay.  So you said -- so your current --
2  well, I'm going to focus most of my questions today on
3  the period from 2004 to 2014.
4    A.    Okay.
5    Q.    And so just keep that in mind.  It's kind
6  of a framing point.  But please specify if it's unclear
7  or ask me to clarify if it's unclear what time period I'm
8  focusing on.  So I'm going to focus, I think, mostly on
9  the role in contract administration.
10    So can you -- you said that involves
11  responsibility for administration and negotiation of
12  contracts and modifications.  Did I get that right?
13    A.    Yes.
14    Q.    Okay.  And is that -- you have an executive
15  role at that --
16    A.    Yes.
17    Q.    -- in that area?
18    And so how many direct reports do you have?
19    A.    Seventeen.
20    Q.    I won't ask you to name them all, but can
21  you describe their roles or titles?
22    A.    I have two particular departments within
23  contract administration.  One is research and
24  development; so I have a senior director over that.  And
25  then the other is basically administering the

Page 17

1  modifications and clarifying all the financial aspects;
2  so I have a senior director over finance.  And there are
3  people underneath both of them.
4    Q.    Who is the senior for R&D?
5    A.    His name is Dan O'Donnell.
6    Q.    And the other person, is that a director of
7  finance, did you say?
8    A.    Yes.  Senior director of finance.
9    Q.    Senior director.  Who is in that title?
10    A.    Andrew Grossman.
11    Q.    And when you say "administering contract
12  modifications," what does that entail?
13    A.    Once modifications have been finalized --
14  negotiated and finalized, they will come through.
15  They're tracked.  They make sure that everything is, you
16  know, complete and correct and accurate on the
17  modification.  If there is anything that's not accurate,
18  then they go back to the client and, you know, work those
19  things out.  Once that comes in, then we have a database.
20  They distribute things.  They make sure they're, you
21  know, up in the database with the contracts and
22  everything is correct.
23    Q.    And has that general sort of overview you
24  described been consistent in the period from 2004 to
25  2014?

Page 18

1    A.    It became more formal in 2011.
2    Q.    Okay.  In what way?
3    A.    That we introduced a contract database.  It
4  came more to put the technology more up to date.
5    Q.    So when you say that you review the
6  modifications to make sure they're complete, correct, and
7  accurate, what are you reviewing for accuracy?  Is that a
8  preexisting contract you're looking at or something else?
9    A.    When we're talking about modifications,
10  we're modifying the existing contracts and we're looking
11  for accuracy, as far as terminology, financial aspects,
12  dates, you know, and everything that we've agreed to is
13  in the modification.
14    Q.    Okay.  About how many people work in the
15  research and development department?
16    A.    Well, the research and development
17  department also has the satellite office, which is in
18  Boulder.
19    Q.    About how many people work there?
20    A.    There's four people that work there and
21  then there's four that work in the corporate office.  So
22  eight.
23    Q.    Okay.  And where is the finance department
24  located?
25    A.    In Boca, the corporate office.

Page 19

1    Q.    And are there about nine people in that
2  office?
3    A.    Yes.
4    Q.    I meant in that department, not the Boca
5  office as a whole.
6    A.    I'm sorry.  There's six.  I'm off on the
7  17.  I apologize.
8    Q.    Okay.  So you have, in total, about 14
9  direct employees?
10    A.    I actually have an administrative assistant
11  also.
12    Q.    Got it.  Whom do you report to?
13    A.    The CEO.
14    Q.    Who is that?
15    A.    George Zoley.
16    Q.    Are you familiar with the Aurora, Colorado
17  facility?
18    A.    Yes, I am.
19    Q.    Have you been there before?
20    A.    Yes, I have.
21    Q.    About how often do you visit the Aurora
22  facility?
23    A.    I hadn't visited the Aurora facility in
24  years.  The last time I was there was approximately two
25  months ago.

Page 20

1    Q.    And prior to that, how long ago?
2    A.    Probably about six years would be a guess.
3    Q.    And prior to that, did you visit Aurora
4  infrequently or frequently?
5    A.    Infrequently.
6    Q.    Can you say on average about how often you
7  visited Aurora prior to that?
8    A.    Maybe once every three years.
9    Q.    Okay.  And what was the purpose of those
10  visits?
11    A.    Which ones?
12    Q.    Okay.  Fair enough.  What was the purpose
13  of your visit two months ago?
14    A.    I was actually visiting our satellite
15  office in Boulder, and since it had been a while since I
16  had been to Aurora, I decided to take a side visit to
17  Aurora.
18    Q.    And what did you do at the Aurora facility
19  when you visited two months ago?
20    A.    I toured the facility and talked to the
21  warden.
22    Q.    Did you talk to anyone else there?
23    A.    I'm sure I did with the staff, but I
24  couldn't tell you who it was I talked to.
25    Q.    Who is the current warden?

Page 21

1    A.    Johnny Choate.
2    Q.    And do you recall what the purpose of your
3  visit six years ago was?
4    A.    No, I don't.
5         (Plaintiff Exhibit No. 1 was marked for
6         identification.)
7  BY MR. SCIMONE:
8    Q.    Ms. Martin, the court reporter has just
9  handed you an exhibit which we've marked as A. Martin
10  Exhibit 1.  And have you ever seen this document before?
11    A.    No, I haven't.
12    Q.    Okay.  I can represent to you that this is
13  a document that was created as part of this litigation by
14  The GEO Group and served on plaintiffs' counsel, and it's
15  a discovery document providing answers to certain
16  questions that we've posed called interrogatories.
17         Have you ever answered interrogatories --
18    A.    Yes.
19    Q.    -- as part of a lawsuit before?
20    A.    Yes, I have.
21    Q.    Have you answered any interrogatories as
22  part of this lawsuit?
23    A.    No, I haven't.
24    Q.    Okay.  If you could please turn to
25  page 8 -- sorry, page 7 of the document.  So you'll see

Page 22

1   there is -- I'm going to direct your attention to the top
2   half of the page, which is a continuation from page 6 of
3   a response to one of our interrogatories, and I'm just
4   going to direct your attention to the last paragraph
5   here.  And so this is written by The GEO Group and it's
6   in response to our question saying: Subject and without
7   waiving any above-stated objections, GEO Group responds:
8            "The following GEO Group employee was
9   responsible for communicating with ICE regarding
10  compliance with the contractual and legal requirements
11  associated with GEO's contract with ICE to operate the
12  Aurora detention facility between October 22, 2004, and
13  October 22, 2014: Amber Martin; executive vice president,
14  contract administration," and then provides your dates of
15  employment.
16           So is this statement accurate, that you
17  have knowledge about those matters?
18       A.    Yes.
19       Q.    Okay.  And that's true throughout this time
20  period that they -- that's stated in this document?
21       A.    Yes.
22       Q.    Okay.  During that time period, was there
23  anyone else who was responsible for communicating with
24  ICE about the Aurora facility?
25       A.    In what respect?

Page 23

1        Q.    It's a broad question, and I'm trying to
2   get an answer about anyone at The GEO Group who was
3   responsible for that.  Can you let me know how many --
4   generally speaking, you know, what's the scope of the
5   answer there?  Are we talking about a lot of people, a
6   handful?
7        A.    Are you specifically talking about people
8   specifically communicating with ICE about these issues?
9        Q.    That's correct.
10       A.    I would guess it would be several people.
11  It would be operations people, there would be regional
12  people, there would be compliance people.  That pretty
13  much would -- health services possibly.
14       Q.    Okay.  Who are the officers with principal
15  responsibility for those communications other than
16  yourself, if any?
17       A.    When you say responsible for communications
18  with ICE, I'm not understanding the question.
19       Q.    Sure.  So as I understand it, GEO has
20  contact with ICE in many different capacities; is that
21  fair to say?
22       A.    Yes.
23       Q.    For example, there are ICE personnel
24  on-site at Aurora, correct?
25       A.    Correct.

Page 24

1        Q.    So it's possible there's a number of
2   communications that happen between people at ICE and
3   people at GEO.  But my question is really who has
4   responsibility for those communications and speak -- in
5   terms of speaking on behalf of The GEO Group and making
6   official communications.
7            So this answer says that you are
8   responsible for communicating with ICE regarding
9   compliance with the contract and legal requirements
10  associated with the contract.  And I'm wondering if there
11  are other people who have kind of a principal
12  responsibility in their official capacity at The GEO
13  Group for communicating with ICE about Aurora?
14       A.    Well, obviously the on-site ICE staff would
15  be communicating with the warden.
16       Q.    Okay.  The warden --
17       A.    The facility administrator.
18       Q.    Those two terms are used interchangeably?
19       A.    Yes.
20       Q.    Okay.  Anyone else?
21       A.    As far as official communications, I would
22  be the main point of contact.
23       Q.    And is it fair to say that if other people
24  are having official communications with ICE, that you
25  should generally be made aware of that given your role

Page 25

1   and position?
2        A.    Yes, sir.
3        Q.    Okay.  Who was your primary point of
4   contact at ICE during the 2004 to 2014 time period?  And
5   if people changed, the title or position is sufficient.
6        A.    Well, it would be the contracting officers
7   who are stationed out of DC and Laguna Nigel, in
8   California.  During that time, there was also contracting
9   officers in Dallas, I believe.  The contracting officer
10  is obviously the warrant of the contract, and that would
11  be my counterpart, for their leadership.
12       Q.    You said, I think, Laguna Nigel.  I didn't
13  catch that reference.  Is that a person or --
14       A.    Contracting office.  I'm just telling you
15  where contracting offices are.
16       Q.    Oh, I see.  That's where the office is
17  located?
18       A.    Uh-huh.
19       Q.    Got it.
20       A.    During that tenure of time, those positions
21  have changed over several times.
22       Q.    Understood.  But, generally, the
23  contracting officer is the primary point of contact?
24       A.    The contracting officer and the office of
25  acquisition would be my general point of contact.

Page 26

1       Q.      The contracting officer sits within the
2    office of the contracting --
3       A.      Yes.
4       Q.      -- sorry, office of acquisitions?
5       A.      Office of acquisitions, uh-huh.
6       Q.      Okay.  Are there other officials at the
7    office of acquisitions who have ongoing contact about the
8    Aurora facility with GEO Group?
9       A.      With me?
10      Q.      You or others at GEO.  I'm just trying to
11   get a picture of who else besides the contracting officer
12   may be in communication.
13      A.      Well, there's supervisors that have a
14   relationship with the LRQ.
15      Q.      Is that a particular title or official?
16      A.      There's assistant directors, there's
17   directors.
18              MR. SCIMONE:  Okay.  Let's mark another
19          exhibit.
20              (Plaintiff Exhibit No. 2 was marked for
21          identification.)
22   BY MR. SCIMONE:
23      Q.      Okay.  The court reporter has just handed
24   you Exhibit 2, which is Bates stamped GEO-MEN 00079796
25   through 798.  And take a minute to look through this

Page 27

1    document.  It's fairly short.  Let me know when you've
2    finished reviewing it.
3              MR. SCIMONE:  While you're reviewing, let
4          me also state for the record there's also an
5          attachment to this e-mail Bates stamped GEO-MEN
6          79799 through 805.
7       A.      Okay.
8    BY MR. SCIMONE:
9       Q.      Okay.  Do you recognize this to be an
10   e-mail exchange between various employees of The GEO
11   Group?
12      A.      Yes.
13      Q.      Okay.  And how do you recognize this to be
14   an e-mail among those people?  What tells us that that's
15   what it is?
16      A.      The e-mail addresses.
17      Q.      Okay.  And so in particular, there's a
18   domain name here for several of these, and that's
19   GEOGroup.com.  Is that what you're referring to?
20      A.      Yes.
21      Q.      Okay.  And there are signature blocks as
22   well?
23      A.      Yes.
24      Q.      And so on the first page we see Johnny
25   Choate, warden at The GEO Group.  You testified he's the

Page 28

1    warden at the Aurora facility currently, correct?
2       A.      Correct.
3       Q.      Okay.  And do you recognize the attachment
4    to this e-mail?
5       A.      Yes.
6       Q.      What do you recognize it to be?
7       A.      It's the table of contents for the
8    corporate policies.
9       Q.      And if you'll turn to the last page of that
10   attachment and look at the bottom, there is a statement
11   and a signature block there with your name printed.
12              Do you see that?
13      A.      Correct.
14      Q.      Is that your signature on the signature
15   line?
16      A.      That's my electronic signature, yes.
17      Q.      Okay.  And it's dated September 24, 2014.
18   You see that?
19      A.      Yes.
20      Q.      Did you sign this document?
21      A.      Yes.
22      Q.      And the statement above that is that all of
23   the preceding GEO corporate policies and procedures were
24   reviewed on an ongoing basis throughout the calendar year
25   2013.  Do you see that?

Page 29

1       A.      Yes.
2       Q.      Does that give you any further indication
3    of what this document is?
4              MR. BARNACLE:  Object to the form.
5       A.      I don't understand the question.
6    BY MR. SCIMONE:
7       Q.      Well, you testified that this was a table
8    of contents, and I'm pointing out that it also has a
9    statement and signature block at the end.  And I'm just
10   wondering if that causes you to reevaluate what this
11   attachment is?
12      A.      Oh, I'm sorry.  Yes.  It's a statement
13   indicating that there was a review of corporate policies
14   during the year 2013.
15      Q.      Okay.  And if you'll turn to the e-mail,
16   just looking at the -- looking at the second page of the
17   document, there's an e-mail from Marilyn Van Valkenburgh.
18   And just based on her signature block, was she your
19   administrative assistant at this time?
20      A.      Yes, she was.
21      Q.      And she describes the attachment here.  It
22   says: "Attached please find the forms signed by Amber
23   Martin declaring that all the policies and procedures
24   from 2013 have been reviewed."  Do you see that?
25      A.      Yes.

Page 30

1    Q.    Okay.  What was the purpose of this form or
2  declaration?
3    A.    It was in accordance with the ACA
4  requirements that the policies have to be reviewed on an
5  annual basis, and it was a declaration saying that they
6  were.
7    Q.    ACA is the American Correctional
8  Association?
9    A.    Yes.
10    Q.    And if you turn to the first page, the
11  e-mail at the very top is from Kevin Martin.  First of
12  all, is he any relation to you?
13    A.    No.  I don't know who he is.
14    Q.    Did you say you don't know who he is?
15    A.    I don't recognize -- I don't remember him.
16  I don't remember his name.
17    Q.    Okay.  Turning back to -- looking at the
18  bottom of that page and continuing on to the next,
19  there's a long list of people that your assistant is
20  sending this to.  Do you have an understanding looking at
21  that sort of generally who the distribution group is
22  supposed to be for this?
23    A.    It's to all the -- it looks like to all the
24  regional people, the vice -- corporate wide.
25    Q.    And if you look at her e-mail, it follows,

Page 31

1  there's a reference there to GEONet.  Do you see that?
2    A.    Yes.
3    Q.    What is GEONet?
4    A.    It's our internal electronic system that
5  holds policies and procedures, forms, internal documents,
6  technically.
7    Q.    You referred earlier to a database.  Is
8  that the same thing or is that a different system?
9    A.    It's a different system.
10    Q.    Okay.  What is that system called, that
11  database that holds -- I think you said contains the
12  contract?
13    A.    The contract database.  I think it's called
14  Determine now.  It's changed names a couple times.
15    Q.    Can you spell that.
16    A.    Determine, D-e-t-e-r-m-i-n-e.
17    Q.    Okay.  So GEONet stores policies?  Is that
18  what you --
19    A.    It holds policies, among other corporate
20  documents.  I'm not exactly sure what all it holds, but
21  policies and procedures are one of them.
22    Q.    Okay.  Is the primary purpose to store
23  policies and documents related to policies, you said
24  procedures?
25    A.    Uh-huh.

Page 32

1    Q.    So that general universe of documents that
2  are related to the policies?
3    A.    Yes.
4    Q.    Okay.  And does it also store
5  correspondence with ICE about policies --
6    A.    No.
7    Q.    -- and communications with ICE?
8    A.    No.
9    Q.    Are those stored somewhere else?
10    A.    In what respect?
11    Q.    Stored in any respect.
12    A.    Communications with ICE about our corporate
13  policies?
14    Q.    Yes.
15    A.    I don't really have communication with ICE
16  about corporate policies.
17    Q.    Are there communications between The GEO
18  Group and ICE about GEO's policies at the various
19  facilities that it runs for ICE?
20    A.    Yes.  ICE has to approve all the facility
21  policies.
22    Q.    Okay.  And those communications are, I
23  assume, stored and maintained over time.  Is that fair to
24  say?
25    A.    I'm not sure how the communications are

Page 33

1  done.  I know the policies are signed off by ICE or they
2  could have been e-mailed.  I'm not sure what the...
3    Q.    In your communications with the contracting
4  officer, are those typically by e-mail?
5    A.    By e-mail or by formal letter usually.
6    Q.    And so those formal letters, do they get
7  stored anywhere or saved as a record?
8    A.    Yes.
9    Q.    Okay.
10    A.    Anything that is a communication about
11  modifications or anything like that is in the contract
12  database.
13    Q.    Okay.  So it gets stored in the contract
14  database?
15    A.    Uh-huh.
16    Q.    That's really what I was just trying to --
17    A.    Anything having to do with contracts.
18    Q.    Understood.
19          Okay.  And you said that database Determine
20  has been in use since 2011; is that right?
21    A.    A form of it.  It's now expanded
22  considerably.  And it wasn't Determine back then.  It was
23  kind of our own database-type thing.  So we've expanded
24  to where it is now.
25    Q.    Was it a different database prior to 2011

Page 34

```
1   that was used?
2        A.    Just internal files.  I mean, just -- not
3   really.
4        Q.    Okay.
5        A.    It was -- you know, we were trying to get
6   up to gear.
7        Q.    So were those files saved on just a hard
8   drive or a share drive or something like that?
9        A.    They wouldn't have been shared on a share
10  drive.  Most of it would have been paper at that time.
11       Q.    Okay.  Is that the case going back to 2004?
12       A.    Oh, definitely.
13       Q.    If you'll look back at the declaration --
14  and I'm turning to your statement on the last page, in
15  the back.
16             So you write here that the policies and
17  procedures were reviewed.  Who was conducting that
18  review?
19       A.    We had a policy and procedure committee.  I
20  was the head of the committee.  And then there were
21  representatives from each of the departments, such as
22  operations, legal, human resources.
23       Q.    Any other departments?
24       A.    Back in 2013, I believe we had -- not sure
25  what company we had.  Maybe -- it would have been health
```

Page 35

```
1   services also.  I'm sure there may have been more, but
2   that's all I can recollect back then.
3        Q.    You referred to a company --
4        A.    Well, any time we acquire a company, we
5   would have representatives from that company.
6        Q.    I see.  And so that was in 2013?
7        A.    Yes.
8        Q.    Has the general composition of that --
9   well, withdrawn.
10             Has there been a policy and procedure
11  committee in existence throughout the 2004 to 2014 time
12  frame?
13       A.    Yes.
14       Q.    And has the composition of that committee
15  been approximately the same as what you just described?
16       A.    I would say approximately.  Maybe even less
17  than that.  It's grown, like I said.
18       Q.    Approximately how many people in total are
19  on that committee?
20       A.    In 2013?
21       Q.    Yes.
22       A.    Probably -- what did I give you there?
23       Q.    Yourself and you mentioned three
24  departments: legal, HR, and health services.
25       A.    I would say probably six people, because
```

Page 36

```
1   there would have been different representatives from
2   different departments.
3        Q.    Okay.  And you write here that these were
4   reviewed on an ongoing basis.  Can you sort of describe
5   the timing and time frame that it was that -- I see there
6   are a lot of policies here, so is that something that
7   began in the beginning of the year and continued in a
8   straight review throughout?
9        A.    Right.  You would section it off, as far as
10  this group is reviewed in this quarter, this group is
11  reviewed in this quarter, and this group is reviewed in
12  this quarter.  So they were all reviewed throughout the
13  year, one time throughout the year, on an annual basis,
14  each policy.
15       Q.    And that was for the purpose of certifying
16  to ACA that they had been reviewed?
17       A.    That, and it was also an internal policy
18  that we had for GEO Group.
19       Q.    Was that a review that was required by ICE
20  as well?
21       A.    For corporate policies?
22       Q.    Yes.
23       A.    No.
24       Q.    Was it required for any other policies?
25       A.    An annual review?  It would have been
```

Page 37

```
1   required because of contract requirements that we had to
2   abide by ACA.  So, yes, I would guess it would be, as far
3   as that's concerned.
4        Q.    So, in other words, the ACA requirement was
5   incorporated in the ICE contract?
6        A.    Yes.
7        Q.    Okay.  Did ICE require any other sort of
8   independent review of policies relevant to ICE
9   facilities?
10       A.    Only if the policies would change, and they
11  would have to review and approve them.
12       Q.    If you'll turn to the first page, I'm just
13  going to direct your attention to Kevin Martin's e-mail.
14  Looking at the third sentence, he writes -- I mean, you
15  can read the whole e-mail if that helps refresh your
16  recollection, but he writes: "We ended up having to make
17  all local policy in order to comply with ACA."
18             Do you have any understanding what he's
19  referring to here?
20       A.    I have no understanding.
21       Q.    Okay.  Reading the rest of this e-mail from
22  him, does that refresh your memory at all?
23       A.    I can make an assumption.  Corporate, from
24  my perspective, has given a declaration every year for
25  the corporate policies, and it looks like he's mixing up
```

Page 38

1   corporate policies and local policies.  The declaration
2   is for corporate policies, and that's the ACA
3   requirement, even though there is a policy and committee
4   review on a local level.
5           So I'm thinking he's talking about -- it
6   used to be done in a memo format and now it's done in
7   this format.  So from reading this, I think he's
8   intertwining a couple of things, but I'm not sure what
9   he's alluding to.
10      Q.    Can you talk a little more about sort of
11  what you mean by the difference between corporate
12  policies and local policies.  You've drawn that
13  distinction a couple of times.  I'm trying to get a sense
14  of where that line is.
15      A.    Well, the corporate policies -- we have
16  several different divisions obviously.  There's secure
17  operations, there's Abraxas, there's BI.  There's several
18  different divisions within the corporation.  The
19  corporate policies go out with everyone on -- such as HR
20  and ethical policies, and those type of things that
21  affect everything.  Then you have the local policies, at
22  the local level, that are, in respect, dedicated to those
23  local policies to the facilities.  So corporate policies
24  are the overbroad policies for all the divisions.
25      Q.    So you mentioned HR, for example.  So I

Page 39

1   would assume that -- well, you know, HR policies are in
2   some ways somewhat more internal to GEO and less related,
3   for example, to how a facility is going to run, how food
4   service will operate, for example, in a given facility.
5           So is that sort of a partial dividing line
6   that the local policies have to do more with running the
7   facility?
8       A.    Correct.
9       Q.    Okay.
10      A.    It's specific to the operations of the
11  facility.
12      Q.    And the corporate policies have to do more
13  with administrative functions?
14      A.    That would be --
15      Q.    Fair?
16      A.    -- fair.
17          MR. BARNACLE:  And I know you're not
18          feeling well, so if you need a break, let us know.
19  BY MR. SCIMONE:
20      Q.    Yeah.  By all means.
21      A.    I apologize.
22      Q.    Once I get started, I tend to get
23  distracted on time.
24      A.    Well, you'll just have to bear with me a
25  little bit.

Page 40

1           (Plaintiff Exhibit No. 3 was marked for
2           identification.)
3   BY MR. SCIMONE:
4       Q.    The court reporter has just handed you
5   Exhibit 3, which is Bates stamped GEO-MEN 71642 through
6   43, with an attachment running from 71645 through 701.
7   And my question will be mostly confined to the first
8   document.  Do you recognize this document?  Let me
9   rephrase the question.
10          Do you recognize this to be an e-mail among
11  various employees of The GEO Group?
12      A.    Yes.
13      Q.    Okay.  I'm just going to ask you about some
14  of the cast of characters here.  So if you turn to the
15  second page, I'll start at the bottom there.
16      A.    All right.
17      Q.    Who is -- or who at the time was Tonya
18  Andrews?
19      A.    It says here training director.
20      Q.    And she's writing to Teresa Hunt.  Who was
21  Teresa Hunt?
22      A.    I think she worked in the regional office,
23  but I'm not absolutely sure.  I'm not recognizing the
24  name.
25      Q.    Tonya writes "Warden Hunt" in the e-mail at

Page 41

1   the bottom.  Does that jog your memory at all?
2       A.    Yes.  I guess she was the warden at the
3   time.
4       Q.    And Teresa then writes to James Black.  Do
5   you know who that is?
6       A.    He was the regional vice president.
7       Q.    Okay.  And turning the page, he responds
8   copying Cheryl Nelson and Ed Brown.  Do you know who
9   Cheryl Nelson is?
10      A.    Cheryl Nelson was compliance director.
11  This is -- let me look at the dates.  I apologize.
12      Q.    Sure.
13      A.    This says this is Ed Brown.  Ed Brown was a
14  regional VP before James Black.  James Black was in a
15  compliance position and operations position, and Cheryl
16  Nelson was in compliance position.  So they were all
17  under region.
18      Q.    Okay.  And if you'll turn back to the
19  second page and look at Teresa's e-mail to James Black,
20  she writes: "James, COTR wants quarterly
21  requalifications on firearms."
22          What does COTR refer to?
23      A.    Contracting officer technical
24  representative.
25      Q.    And who or what is that?

Page 42

1    A.    That is the on-site, basically, ICE monitor
2  for the Aurora facility.
3          Q.    Do you know what "requalifications" means
4  in this context?
5          A.    Yes.  They have to qualify for firearms
6  before this on an annual basis.
7          Q.    Okay.  Have you read through the e-mail
8  exchange here?
9          A.    Yes.
10         Q.    Okay.  So my understanding, just to
11 summarize the exchange a little bit, there's a discussion
12 about the COTR wanting quarterly requalifications as
13 opposed to yearly requalification, which had been GEO
14 policy at the time.  And there's a discussion about
15 whether the contract requires quarterly requalifications.
16         Does that comport with your understanding?
17         A.    No.
18         MR. BARNACLE:  Object to the form.
19         A.    Actually, the annual policy -- the annual
20 firearms requalification had been ICE policy at the time.
21 ICE was attempting to change the policy -- their policy
22 and incorporate it into the contract.
23 BY MR. SCIMONE:
24         Q.    I see.  All right.  And then, if you look
25 at the very top of the first page, the last e-mail in the

Page 43

1  thread, James writes:  "I am still of the opinion that we
2  don't do anything without either being directed to by
3  Amber for a contract mod."
4          You understand that to be referring to you?
5          A.    Yes.
6          Q.    Okay.  And "contract mod" means contract
7  modification, I take it?
8          A.    Yes.
9          Q.    Okay.  So my question is just sort of about
10 in cases like this, where there's a question about
11 whether the contract requires GEO to do something, is
12 that something that you generally have authority to
13 resolve or weigh in on?
14         A.    Yes.  I mean, any time a contract is
15 modified, I would be obviously leading that.
16         Q.    Okay.  Is there anyone else at The GEO
17 Group who would have authority to deal with or resolve
18 situations like that?
19         A.    Well, I'm over that division, so I'm the
20 one that does that.
21         Q.    Right.
22         A.    And my staff.  You know, I'm not saying
23 that somebody, like the senior VP over operations, can't,
24 you know, be involved in the resolution.  Obviously the
25 regional vice presidents are involved in resolutions.  I

Page 44

1  mean, it's a joint effort, but I'm the final authority.
2          Q.    Understood.
3          THE WITNESS:  Before you go, I'm going to
4          have to take a break.
5          MR. SCIMONE:  No problem.
6          I'm going to mark this.
7          (Plaintiff Exhibit No. 4 was marked for
8          identification.)
9          (Recess from 9:46 a.m. to 9:49 a.m.)
10 BY MR. SCIMONE:
11         Q.    Okay.  Ms. Martin, the court reporter has
12 handed you Exhibit 4, which is Bates stamped 3 -- GEO_MEN
13 37752 through 757, with a series of attachments, which I
14 won't be spending much time on so I'm going to omit the
15 Bates number, but they're here for completeness.  Let me
16 know when you finish reading.
17         A.    Okay.
18         Q.    Okay.  Do you recognize this to be an
19 e-mail among various GEO employees?
20         A.    Yes.
21         Q.    And if you turn to the last page of the
22 thread, the first e-mail on 37756, those first couple of
23 e-mails, you're on that part of the thread, correct?
24         A.    Yes.
25         Q.    Okay.  And I'll again ask you about some of

Page 45

1  the folks here.  So the first one is -- e-mail is from
2  Roberta Halls.  Do you recognize that name?
3          A.    Yes.
4          Q.    Who was she at this time?
5          A.    She was contracting officer for the Aurora
6  facility in Laguna Nigel.
7          Q.    Okay.  And she's writing to you and Diane
8  Kaplan?
9          A.    Yes.
10         Q.    Who's Diane Kaplan?
11         A.    At the time, she was my manager of
12 contracts.  She was handling the database and those type
13 of things.
14         Q.    Okay.  And I won't go through all of the
15 CCs here, but do you recognize generally who these people
16 are in terms of their role or position?
17         A.    Yes.
18         Q.    Who are they?
19         A.    They're all ICE headquarters.
20         Q.    Okay.  And --
21         A.    I believe there's also COTR and another
22 contracting officer.
23         Q.    Who do you recognize to be the COTR?
24         A.    I want to say it was Sanchez, I believe.
25         Q.    Okay.  And then Diane sends this to

Page 46

1  Patricia Persante and James Black, who we spoke about a
2  minute ago, copying you and your assistant Marilyn,
3  correct?
4      A.    Yes.
5      Q.    And Patricia Persante, you mentioned
6  earlier.  She's currently in contract compliance, right?
7      A.    No.  She is retired from GEO.  She was in
8  contract compliance at the time.
9      Q.    I see.  At this time, in 2013?
10     A.    Yes.
11     Q.    Okay.  And then who is Jeff Wrigley, the
12  next e-mail?
13     A.    He is a warden.
14     Q.    At which facility?
15     A.    At the time, I believe he was at Adelanto,
16  but I'm not absolutely sure.
17           He was a warden in the western region.
18     Q.    And --
19     A.    Or he may have been the warden at Aurora at
20  the time.
21     Q.    Okay.
22     A.    Yeah.  It looks like that.
23     Q.    Okay.  And who is Mark Bowen?  He's CC'd
24  there.
25     A.    He was the western regional director of

Page 47

1  operations, I believe.
2      Q.    And Jeff Wrigley then sends this to Johnny
3  Choate, who you talked about before.
4      A.    Yeah.  Jeff Wrigley was the director of
5  operations.  I'm sorry.  He's had several positions with
6  GEO.
7      Q.    Okay.
8      A.    So Jeff Wrigley, from reading this e-mail,
9  would have been the director of operations.
10     Q.    Okay.
11     A.    For the western region.  And Mark Bowen and
12  Cheryl Nelson would have probably been assistant director
13  of -- in compliance.
14     Q.    Okay.
15     A.    Johnny Choate was the warden.
16     Q.    And who at the time was Dawn Ceja?
17     A.    The assistant warden.
18     Q.    Okay.  And how about Lowell Clark?  Do you
19  know who he or she was?
20     A.    I know the name, but I'm not real sure
21  where he was at the time.
22     Q.    Okay.
23     A.    He was at one time the warden in Tacoma, I
24  believe.
25     Q.    And how about Jennifer Rozean?

Page 48

1      A.    She was an admin assistant in the western
2  regional office.
3      Q.    Okay.  So going back to the original e-mail
4  from Roberta Halls at ICE, based on her e-mail, do you
5  understand what sort of process this e-mail exchange
6  reflects?
7      A.    Yes.
8      Q.    And what is that?
9      A.    There was modification to incorporate the
10  PBNDS 2011 standards that had some standards that were
11  changed and were agreed on.
12     Q.    What is the PBNDS?
13     A.    Performance-Based National Detention
14  Standards.
15     Q.    And those were modified in 2011?
16     A.    There was some optimal standards that they
17  wanted to incorporate in 2013.  They were modified in
18  2011, modified in 2008, and then there was additional
19  optimal standards that they wanted to see if the
20  contractors could incorporate into the contract.
21     Q.    And so this exchange is from 2013.  So most
22  likely referring to those optimal standards?
23     A.    Yes.
24     Q.    And so what is the purpose of circulating
25  those changes in standards among this group here?

Page 49

1      A.    Once the modification was done, it was to
2  distribute so everybody would know what they needed to be
3  doing, and everybody was involved in this process anyway,
4  and make sure all the local policies are up to date and,
5  you know, that we abide by that standard -- I mean, by
6  that modification.
7      Q.    And so part of the follow up here is to
8  make sure that those policies comply with the changes to
9  the PBNDS.  Is that --
10     A.    Yes.
11     Q.    Okay.  And so how does that process of
12  translating changes in the PBNDS into policies work?  If
13  you can kind of walk me through the process.  So who is
14  responsible and is there a series of steps that is
15  involved?
16     A.    As far as the facility policies?
17     Q.    That's right, yes.
18     A.    This would be the series of steps.  We
19  would send it out to the regional offices and to be -- so
20  they can oversee the facilities and to make sure that
21  everything is in compliance with the new modification.
22     Q.    And then, from the regional offices, what's
23  the next step?
24     A.    Well, ICE would have to approve the
25  policies.

Page 50

1   Q.   So are those facility policies modified, if
2   they are modified, at the regional level?
3   A.   No.  I mean, the regional -- it's just a
4   regional oversight.  It would be modified at the facility
5   level.
6   Q.   So the regional office receives these
7   changes from ICE.  I guess it runs through your office
8   first?
9   A.   Yes.
10   Q.   And then you push that out to the regions,
11   and then they push that out to the specific facilities?
12   A.   Correct.
13   Q.   And so the policies are then modified at
14   the facility level?
15   A.   Correct.
16   Q.   Okay.  And you mentioned oversight at the
17   regional level.  Who is responsible for that oversight?
18   A.   Ultimately the regional vice president.
19   Then, you know, whoever he assigns to it, probably a
20   compliance director or the regional -- you know, they're
21   just included into the knowledge of all this that's going
22   on through the process.  So it's whoever that person
23   assigns that duty to.
24   Q.   Is there anyone above that level who has
25   further oversight role?

Page 51

1   A.   As far as?
2   Q.   Within GEO Group.  Just to review policies
3   and to ensure they are in fact compliant.
4   A.   At the facility level?
5   Q.   No.  I mean above the regional level.
6   A.   Okay.  But for facility policies?
7   Q.   Yes.  That's right.
8   A.   Not necessarily, but they would be reviewed
9   possibly doing compliance on it.  But as far as making
10   sure that the facility -- I mean, the facility is
11   responsible for facility operations.  So they're
12   responsible for, you know, reviewing their policies and
13   then updating their policies.
14   Q.   You mentioned audits.  What sort of
15   compliance audits are you referring to?  Are those
16   internal to GEO?  Are they done by an outside group,
17   something else?
18   A.   Well, we have several audits.  We have
19   internal audits, we have outside audits, we have ICE
20   audits.  I mean, obviously ICE would be monitoring this
21   to make sure that our policies are in compliance with
22   PBNDS and the contract.
23   Q.   And you had mentioned that in the context
24   of review at the, I guess, corporate level above
25   regional?

Page 52

1   A.   During --
2   Q.   Is that right?
3   A.   Yeah.  Well, there's facility level
4   reviews, there's regional level reviews, and there's
5   corporate level reviews.
6   Q.   Right.  And so we have been talking about
7   how the policies initially modified at the facility level
8   are then reviewed for compliance at the regional level,
9   but then only reviewed again at the corporate level if
10   that's in relation to the audit.  Is that correct?
11   A.   No.  That's not what I'm saying.
12   Q.   I misunderstood.
13   A.   They're done at the facility level, they're
14   reviewed at the facility level.  If the regional goes in
15   to do an audit, they would most likely review these
16   policies to make sure that a new modification was in
17   place.
18   Q.   Okay.
19   A.   So they would probably review during an
20   audit.
21   Q.   Okay.  So the policies -- once the
22   policy -- I'm focusing more now on the modification of
23   the policy at the time that there's a change to something
24   like the PBNDS.  The policy is modified at the facility
25   level.  Does it then go directly from the facility to ICE

Page 53

1   for review?
2   A.   Yes.
3   Q.   Okay.  It doesn't go up through the
4   corporate chain first, in other words?
5   A.   No.
6   Q.   Okay.
7   A.   In this instance, we did have -- I believe
8   there was some audits that made sure that all these --
9   because it was a new addition to the PBNDS, that all of
10   these were in place.  It would have been a one-off, but
11   normal process would have been facility does their
12   policies and then region comes in and audits or corporate
13   comes in and audits and makes sure they're approved, but
14   ICE has the ultimate approval.
15   Q.   What's the difference in this review
16   process?  You said this was a one-off.
17   A.   Well, because this was an update to some
18   optimal policies, optimal standards in PBNDS, and PBNDS
19   is, you know, very much part of our contract, obviously,
20   and we wanted to make sure that everything got updated.
21   Q.   Okay.  So --
22   A.   And, basically, we covered, "Did you update
23   your policies?"
24        "Yes."
25   Q.   I see.  So that's the level of oversight

Page 54

1   from corporate?

2        A.   From my office.

3        Q.   From your office?

4        A.   Corporate compliance would have been a
5   different thing.  They may have gone in and reviewed them
6   afterwards, during an audit.  I don't know.  But from my
7   perspective, I wanted to make sure that the modifications
8   were in place, everybody knew what they needed to do, and
9   that they told me that they did it.

10       Q.   Okay.  And the purpose of that oversight
11  was just because it was important to make sure, as you
12  said, that this complies with PBNDS because that's part
13  of the contract?

14       A.   Yes.  It's part of contract administration
15  to make sure that it's being done properly.

16       Q.   Okay.  I think we'll go into this a little
17  more later.

18            You had mentioned optimal standards.
19  What's the difference between -- well, what's the -- I
20  guess if not an optimal standard, what other kind is
21  there?

22       A.   Well, they're all optimal, but what
23  happened was the PBNDS came out in 2008, 2011 with
24  different revisions, and then there was some other
25  additional things that ICE wanted to see if we could do

Page 55

1   that, you know, may change the scope of the contract,
2   such as more recreation time or more days or things.  So
3   change the scope of the contract.  May increase staff,
4   may increase cost.  So we went through the process with
5   Kevin Landy and -- Kevin Landy, and went through all the
6   standards and said, "Okay, you know, structurally, we're
7   going to have to do some construction on this, so maybe
8   we don't" -- "maybe, you know, it's going to cost you
9   because we have to do construction."

10            Because the physical plant is not able to
11  handle this optimal standard, as far as more square
12  footage in a library or something.  I'm just giving you
13  an example.  So it was up to ICE to decide whether or not
14  they wanted us to go ahead and do that.  That's all this
15  was, was just enhancing the standards.

16       Q.   Okay.  Who was Kevin Landy?  I don't think
17  I got his position.

18       A.   He was -- I think he was over what they
19  call policy.  He worked in, I believe, at the time, ERO
20  operations.

21       Q.   That's an ICE subdivision?

22       A.   ICE.  Yeah, ICE headquarters.

23       Q.   Okay.  So this is within the ICE structure
24  a little bit.  So you had spoken before about the office
25  of acquisitions.  Is that part of ERO?

Page 56

1        A.   No.

2        Q.   Is it a separate division within ICE?

3        A.   Yes.

4        Q.   Okay.

5        A.   It's contracts.  ERO is operations.

6        Q.   So do you have -- I guess, who -- do you
7   have other communication with Kevin Landy outside of this
8   process on a regular basis throughout --

9        A.   I wouldn't say a regular basis.  I would
10  say intermittently, you know.  Anything to do where he
11  was involved in modifications or of that nature.

12       Q.   That's when you would typically get
13  involved?

14       A.   Yes.

15       Q.   Okay.  All right.  One question in Jeff
16  Wrigley's e-mail on 37755, at the very bottom of that
17  page.

18       A.   On the first page?

19       Q.   37755.

20       A.   Okay.  I'm sorry.

21       Q.   No problem.  The very bottom, you see where
22  it says --

23            MR. BARNACLE:  37755?

24            THE WITNESS:  3775.

25                      / / / /

Page 57

1   BY MR. SCIMONE:

2        Q.   37755.

3        A.   Okay.  I'm sorry.  I'm missing a 5.

4        Q.   Just above the Bates number in the last
5   line of the e mail, you see where it says "NLT"?

6        A.   No later than.

7        Q.   I'm sorry, what is that?

8        A.   No later than.

9        Q.   Oh, no later than.  Got it.  I was
10  wondering about that.

11            So once these PBNDS changes are
12  incorporated into facility-level policies, you said
13  they're communicated typically to ICE.  Who at ICE are
14  they communicated to?

15       A.   Their on-site auditor, their COTR.

16       Q.   That's the technical representative?

17       A.   Yes.

18       Q.   Okay.  And do you know what ICE -- ICE's
19  review process is from there?

20       A.   I don't know.

21       Q.   Okay.  You have no visibility into that
22  process at all?

23       A.   No.  I don't think they think I need to
24  know that.

25       Q.   Okay.  And -- withdrawn.

Page 58

1    Okay.  Let me back up a little bit.  I'm
2  going to take a step back.  So how long has GEO had a
3  contract to operate the Aurora facility?
4    A.    The Aurora facility was the first facility
5  for GEO, so it's around the 1986, '87 era.
6    Q.    First facility for ICE?
7    A.    First facility ever.
8    Q.    Oh, okay.  And that contract has been
9  renewed over time, I take it?
10    A.    Yes.
11    Q.    How many times has it been renewed?
12    A.    I can't recollect.
13    Q.    Okay.  When was the current version signed,
14  the current contract?
15    A.    I think a couple of years ago.  I have to
16  look.
17    Q.    Do you know when the prior iteration of a
18  contract was signed before that one?
19    A.    No.  I'm assuming they're five-year
20  contracts.
21    Q.    Okay.
22    A.    Okay.
23    Q.    Okay.  Typically -- just about sort of the
24  process from one version of the contract to the next, is
25  it typical that there are modifications from one period

Page 59

1  of -- one term of a contract to the next one?
2    A.    Okay.  When you're saying from one contract
3  to the next or one term?
4    Q.    Yeah.  So you had said you assume they're
5  typically five-year contracts.  So when one contract
6  period is ending, there's a renewal of the contract?
7    A.    Well, it usually goes out for an RFP and
8  there's a competition.  So it's not necessarily a
9  renewal; it's a brand new contract.
10    Q.    Okay.  RFP is request for proposal?
11    A.    Yes.
12    Q.    Okay.  And can you just kind of walk me
13  through what overall process of the RFP.  How does that
14  work?
15    A.    Request for proposal goes out on a
16  government data line, which is called FedBizOpps.  So
17  it's open to whoever wants to bid on those contracts.  It
18  gives timelines as far as, you know, ability to ask
19  questions, to respond to the RFP.  And then there's a
20  review process, just like any other request for proposal
21  process.  It's pretty much standard throughout federal,
22  state governments, local governments.  And then they
23  grade the proposal and award the contract.
24    Q.    Okay.  I don't have a lot of familiarity
25  with the federal contracting process, so I'm going to ask

Page 60

1  you to walk me through a couple of those.  You talked
2  about a timeline to question and then respond.  So I'm
3  going to be focusing, I think, mostly on the process in a
4  case where GEO has a prior contract and is bidding to
5  renew that contract, as has happened in Aurora between
6  2004 and 2014.
7    A.    Okay.
8    Q.    So typically the RFP goes out.  There would
9  typically be a period where, if GEO had any questions
10  about the RFP, they could go back and forth with ICE to
11  understand it better?
12    A.    No.  It's a more formal process than that.
13  It's not just GEO.  It's if any vendors has a question
14  about the RFP.
15    Q.    Are those questions -- are the
16  communications and response to those questions public to
17  all the bidders?
18    A.    Yes.
19    Q.    How does that process work?  Is it --
20    A.    Usually the questions go in and then we get
21  answers back, and they are a combination of all the
22  vendors' questions and all the answers.
23    Q.    Okay.
24    A.    Or if they say that they can't answer it
25  and they won't answer it, say they won't answer it.

Page 61

1    Q.    Okay.  And then, I take it, a bid is
2  submitted once that time -- that time period, that
3  question process is ended?
4    A.    Well, there's set dates.  I mean, it's a
5  very formal process.  There's set dates.  You have until
6  this time to respond to the proposal -- I mean, to the
7  RFP, and then we submit a proposal by the due date.
8    Q.    Is there a further exchange before a
9  proposal is accepted, in terms of specific aspects of the
10  proposal?
11    A.    No.  It's pretty much, like I said, a
12  formal process.  I mean, I'm not over proposals, but I'm
13  very involved with them obviously.
14    Q.    Okay.
15    A.    With the contracts and the language and all
16  that, but it's very regimented.
17    Q.    Right.  Is the contract language negotiated
18  as part of that process or does that come after the
19  proposal?
20    A.    No.  The part of the proposal is the
21  Performance Work Statement, and that's your primary
22  contract, which also includes the proposal, the RFP, and
23  all the attachments.  That's why I say I'm involved in
24  the proposals, because I'm looking at that PWS,
25  Performance Work Statement.

EXHIBIT 1

Page 62

```
 1        Q.     Okay.  Let's talk about a couple of
 2   documents.
 3               MR. SCIMONE:  This is, I think, 5.
 4               (Plaintiff Exhibit No. 5 was marked for
 5        identification.)
 6   BY MR. SCIMONE:
 7        Q.     The court reporter has just handed you
 8   Exhibit 5, which is Bates stamped GEO_MEN 30577
 9   through 83.  And the first question would be, do you
10   recognize the document?  But take your time to read it.
11        A.     It looks like an amendment to an RFP.
12        Q.     Okay.
13        A.     Which one, I don't know.
14        Q.     Okay.  So let me direct your attention to
15   the number at the very, very top of the document:
16   HSCEOP-06-R-0013.  Is that notation format familiar to
17   you?
18        A.     Yes.  I mean, as far as the RFP numbers, I
19   guess it would be -- I don't know this particular one.
20        Q.     Is that a notation system used by ICE as
21   part of the RFP process?
22        A.     It could be, yes.
23        Q.     Does the 06 here refer to a year?
24        A.     I don't know.
25        Q.     Okay.
```

Page 63

```
 1        A.     I don't know what the numbers mean.
 2        Q.     Okay.  Do you recognize this from having
 3   seen similar documents?
 4        A.     Yes.
 5        Q.     Okay.  And so this section from number 1 to
 6   number 2 begins with a reference to a page and then
 7   there's a question or questions and then a response in
 8   boldface at the bottom of it.  Does that shed any light
 9   on what this exchange is?
10        A.     Like I said, this is the
11   question-and-response stage.
12        Q.     Okay.
13        A.     And this is how they do.  They amend the
14   contract -- I mean, they amend the RFP if they need to
15   restate something in the RFP.
16        Q.     I see.  And so the questions here are
17   questions that have been submitted by one of the entities
18   bidding on the contract?
19        A.     Yes.
20        Q.     And then the response is from ICE?
21        A.     Yes.
22        Q.     I see.  Are you involved in the
23   question-and-answer process during these renewals?
24        A.     Each department gets the RFP -- the
25   operations, contracts, legal HR, IT, health services --
```

Page 64

```
 1   so they can look through and see if there's anything that
 2   they want to question or they don't understand.  In that
 3   respect, I do -- my research and development team does
 4   review all the RFPs.
 5        Q.     Okay.  So -- and then are all of those
 6   questions aggregated before being sent to ICE?
 7        A.     Yes.
 8        Q.     Who is responsible for that?
 9        A.     They go through the proposal development
10   group, which David Venturella is over.
11        Q.     Okay.  And what is David Venturella's
12   position?
13        A.     He's the senior VP for right now in
14   business development.
15        Q.     Okay.  And so he's a parallel level to you
16   then in terms of level of hierarchy?
17        A.     Uh-huh.
18        Q.     Okay.  And what is -- you said your R&D
19   group, research and development group, reviews the RFPs.
20   Is there a particular part of the contract or the RFP,
21   rather, that your group is responsible for?
22        A.     No.  We read the whole thing.  Basically
23   what we're reviewing is, you know, standards and older
24   contracts and those type of things.
25        Q.     Okay.  And is there a particular aspect
```

Page 65

```
 1   that you're sort of focused on -- when you say -- let me
 2   try to ask a more specific question.
 3               So when you say you review prior contracts,
 4   are you being attentive to changes that have happened
 5   between one RFP and the previous contract?
 6        A.     Yes.
 7        Q.     And so whereas, like, for example, the
 8   health division would be focused on health care issues
 9   and other sort of specific subject matter, you would have
10   sort of oversight over the entire contract for any
11   changes in language.  Is that a fair characterization?
12        A.     Yes.
13        Q.     All right.  So I guess my sort of takeaway
14   from this process is that -- well, let me -- my takeaway
15   from this process, and I guess your role in it is just
16   that there's a sort of very close attention being paid to
17   the language of the RFP to make sure that there's a good
18   understanding of what exactly is entailed.  Is that fair
19   to say?
20        A.     Yes.
21        Q.     And your department specifically is
22   attentive to any changes that might happen from one
23   version of the contract to the RFP that you might receive
24   from the next version?
25        A.     Yes.
```

Page 66
1    (Plaintiff Exhibit No. 6 was marked for
2    identification.)
3 BY MR. SCIMONE:
4    Q.   Okay.  The court reporter has just handed
5 you Exhibit 6, which is Bates stamped GEO_MEN 42206
6 through 09.  Please take a minute to review.
7    A.   Okay.
8    Q.   Do you recognize this document?
9    A.   I recognize it as part of a proposal for an
10 RFP.
11    Q.   Is this a proposal made by The GEO Group?
12    A.   It's made by Wackenhut Corrections
13 Corporation, which is our entity before The GEO Group.
14    Q.   I see.  What tells you that?
15    A.   "WCC" at the top.
16    Q.   Okay.  I see.  And can you tell from
17 anything in this document what the time frame of this
18 document is?
19    A.   WCC would have been pre 2012, but no.
20    Q.   If I may direct your attention to the top
21 right of the first page.  In small print you'll see it's
22 a solicitation number.  Does that give you any indication
23 of the time frame?
24    A.   No.  Again, I don't know these numbers
25 until they become contract numbers.

Page 67
1    Q.   Okay.  The reference to "INS," do you
2 understand that to refer to Immigration and
3 Naturalization Services?
4    A.   Yes.
5    Q.   And that's what ICE was prior to 2002,
6 correct?  That was the agency that preceded ICE?
7    A.   Yes.
8    Q.   So this would have to be prior to 2002 then
9 based on that?
10    A.   It would be my assumption.
11    Q.   Okay.  So is this typical of the kind of
12 proposals that The GEO Group submits during part of the
13 RFP process?
14    A.   Yes.  Partial.
15    Q.   So this deals with a specific aspect of a
16 contract?
17    A.   Yes.
18    Q.   In this case, sanitation and hygiene?
19    A.   Yes.
20    Q.   Are sanitation standards a typical term of
21 a contract between ICE and GEO?
22    A.   I'm sorry?
23    Q.   Are sanitation standards a typical term of
24 a contract between ICE and GEO?
25    A.   I mean, yes, we would have to cover

Page 68
1 sanitation and hygiene.
2    Q.   So, in other words, there's certain
3 standards of sanitation that GEO has to maintain and
4 uphold?  If it falls below that level, it would not be in
5 compliance with the contract.  Fair to say?
6    A.   Yes.  I mean, there's a section of the
7 contract that deals with sanitation.  We have to abide by
8 anything that's in the contract.
9    Q.   For a -- this refers to itself as a
10 "Technical Proposal."  Is that terminology still in use?
11    A.   Yes.
12    Q.   For a subset of a larger RFP?
13    A.   Well, technical -- okay.  There's different
14 sections of a proposal.
15    Q.   Yeah.
16    A.   You have the tech proposal, which is
17 basically outlining all the operational aspects.  You
18 have a past performance section.  You have, you know, a
19 pricing section.  You have different sections.  Technical
20 Proposal is overall encompassing everything within that
21 RFP, as far as the language.
22    Q.   And that tech proposal has subsections that
23 refer to particular aspects, like, in this case,
24 sanitation?
25    A.   Yes.

Page 69
1    Q.   Okay.  And so for the sanitation aspect,
2 who -- I'll ask, from the 2004 to 2014 time frame, who or
3 what office was responsible for drafting those aspects of
4 the Technical Proposal?
5    A.   It could have been a combination.  I don't
6 know.
7    Q.   Okay.
8    A.   I don't know if it would have been our
9 operations folks.  I know that that would have all fallen
10 under the business development people to identify who
11 their subject-matter expert was.  So I couldn't answer
12 who they would have picked.
13    Q.   So not a particular department then?
14    A.   Not necessarily.
15    Q.   Okay.  In a case like that, would it be
16 typical to identify a subject-matter expert from the
17 facility level to be responsible for that?
18    A.   Sometimes they brought facility level in,
19 sometimes they brought regional level in.  Like I said,
20 it was their determination on who they wanted to bring in
21 to assist in responding to the proposal.
22    Q.   Okay.  Do you know who was responsible for
23 drafting the sanitation policies that are currently in
24 place at Aurora?
25    A.   It would have been the facility.

Page 70

1    Q.    Okay.  And the sanitation policies that
2  were in effect from 2004 to 2014, do you have any idea
3  who was responsible for drafting those originally?
4    A.    No.
5    Q.    If I wanted to find out that information,
6  is there a way to do that?  Is there someplace --
7    A.    For the policies?
8    Q.    Yeah.  Who was responsible for originally
9  drafting those?
10    A.    Let me go back.  When a facility is
11  awarded -- when we're awarded a contract and it's a brand
12  new facility, there's regional oversight starting
13  policies and operations and all of that, because you
14  don't have all your facility administration there.
15    Q.    Right.
16    A.    So regional takes the lead on you, know,
17  developing policies when a facility first opens.
18          Now, after that, you know, all of it goes
19  through the client to get approved before being
20  instituted on the facility.  After that, any updates and
21  changes and policies and procedures are handled by the
22  facility.  From a contract to a contract, it would most
23  likely have been the same policies and updated along the
24  timelines, you know, when they needed to be updated, when
25  they were reviewed annually, those type of things.

Page 71

1          So when I say "the facility is responsible
2  for," they're responsible for maintaining those
3  operations on a day-to-day, but there's things that began
4  when a new contract begins.
5    Q.    Okay.  Thank you.  So the original policies
6  from Aurora would have been created probably back in 1986
7  at least?
8    A.    And that would have probably been at the
9  corporate level, because we were a smaller group then.
10    Q.    And that was the first facility that was
11  opened?
12    A.    Yes.
13    Q.    Okay.
14    A.    We've evolved.
15    Q.    I'm sure.  Can you speak to the process
16  again during a renewal for the RFP process.  When there's
17  a Technical Proposal on a particular aspect like this,
18  can you speak to the process of how that's developed
19  internally at GEO.  In other words, it's created -- you
20  mentioned the subject-matter expert.  Is there then a
21  further process of renewing that?
22    A.    Yes.  Like I said, business development has
23  a whole process on how they answer, review, et cetera.
24  I'm not really involved in that.
25    Q.    Okay.

Page 72

1    A.    I'm involved in an initial review and
2  that's pretty much it.
3    Q.    I'm sorry.  Did you just say you were --
4    A.    I'm just involved in the initial review of
5  the RFP to see what the language changes are and that
6  sort of thing, because that's from a contractual
7  perspective.  But from a business -- I don't know the
8  intricacies of their process.
9    Q.    Understood.
10    A.    Just overall.
11          MR. SCIMONE:  Okay.  Let's do one more
12          document and then we'll take another break.
13          (Plaintiff Exhibit No. 7 was marked for
14          identification.)
15  BY MR. SCIMONE:
16    Q.    All right.  The court reporter has just
17  handed you a document Bates stamped GEO_MEN 400665
18  through 69 -- sorry 70.  Take a moment to review and let
19  me know when you're ready.
20    A.    Okay.
21    Q.    Okay.  Do you recognize this document?
22    A.    Not specifically.  It looks like a response
23  to our RFP, again, Technical Proposal response.
24    Q.    So it was in response to a typical
25  response?

Page 73

1    A.    Right.
2    Q.    And this would be submitted as part of the
3  RFP process?
4    A.    Yes.
5    Q.    Okay.  And this one deals with detainee
6  services and programs; is that correct?
7    A.    Yes.
8    Q.    I think you had mentioned a section dealing
9  with past experience?
10    A.    Uh-huh.  Past performance.
11    Q.    Past performance, all right.  Can you
12  explain what that means, what role it plays.
13    A.    There's a section on -- identifies where
14  our past performance is.  We usually put -- they usually
15  ask for references from different clients and different
16  contracts, you know, a number or whatever.  And we give
17  what the past performance is, you know, as far as with
18  different clients.  I mean, the specifics of that, like I
19  said, I'm not really involved in either, but just kind of
20  outlines it.
21    Q.    Okay.  Let me take another step back just
22  to get a sense of where you are in the process so I'm not
23  asking questions outside your purview.
24          But -- so do you end up developing some of
25  the technical proposals as part of the RFP process?

Page 74

1    A.   No.  Not usually.
2    Q.   Okay.
3    A.   I -- no.  Like I said, I don't do the
4  writing, the technical writing of this.
5    Q.   That's all handled by business development?
6    A.   Yes.
7    Q.   Okay.  Do you -- and do you review these
8  technical proposals before they go to ICE?
9    A.   No.
10   Q.   Okay.
11   A.   Only, like I said, if there's an issue that
12 they want me to look at, they'll bring it to me and I'll
13 look at it.  But as far as overall, no.
14   Q.   Okay.  What sorts of issues typically are
15 brought to your attention as part of this process?
16   A.   If there's contractual language that looks
17 like it's conflicting or something, they'll ask my advice
18 on that.  From a legal perspective, they'll ask if, you
19 know -- about some type of language.  Just very, very
20 rare and very, very -- it's mainly to do with contractual
21 language or conflicts that they want to make sure they
22 understand.
23   Q.   Okay.  And does that include ambiguities in
24 what ICE is asking for, where it's not really clear what
25 the language requires?

Page 75

1    A.   It may.
2    Q.   Do you know generally what the category
3  "detainee services and program" refers to?
4    A.   Yes.
5    Q.   What does it refer to?
6    A.   The programs that -- like religious
7  services and recreation, legal services, all the services
8  provided to them.
9    Q.   Is there a particular group within GEO that
10 develops those at the corporate level or is that done at
11 the facility level?
12   A.   As far as we --
13   Q.   As far as developing the Technical Proposal
14 submitted to ICE for this category.
15   A.   It would be at the corporate level.  I
16 mean --
17   Q.   Okay.
18   A.   -- it's all developed at the corporate
19 level.  They bring regional people in or facility people
20 in, subject-matter experts, they can do that, but it's
21 all developed through business development.
22   Q.   Right.  Just, for example, though, I guess
23 the first one here is mail and correspondence, and then
24 the next one you mentioned religious services.  Would
25 they typically bring in a subject-matter expert for each

Page 76

1  one of those categories?
2    A.   Well, we have people in operations that are
3  over programs.  So a lot of the programs are developed at
4  the corporate level, and then they can be enhanced or
5  whatever at the regional levels.  This would probably be
6  at a corporate level to answer these questions.
7    Q.   Okay.  Can you speak -- who is in charge of
8  the operations division?
9    A.   Dave Donohue.
10   Q.   And that's a GEO corporate office?
11   A.   Yes.
12   Q.   And their -- your understanding is there
13 are subdivisions within operations for different aspects
14 of facility management?
15   A.   Yes.
16   Q.   Are you familiar with those subdivisions?
17   A.   Yes.
18   Q.   How many are there?
19   A.   Oh, goodness.
20   Q.   I'm not -- I asked how many just so I
21 wouldn't necessarily have to ask you to list them all,
22 but just to get a scope.
23   A.   Health services, risk management,
24 transportation, corporate, security, training, programs.
25 I think I've captured everything.

Page 77

1    Q.   Okay.  Would programs be the subdivision in
2  charge of a Technical Proposal for this category of
3  services and programs?
4    A.   Could be.
5    Q.   You're not sure?
6    A.   Yeah.  I mean, as far as -- what are you
7  asking me?  If somebody from programs wrote this?
8    Q.   Well, if you know, sure.  That's kind of
9  where I'm going.  But I just want to know generally who
10 within GEO is responsible for developing this kind of
11 category.
12   A.   It would have been probably somebody from
13 programs.  Right now, programs is kind of encaptured in
14 training, so I'm not really sure who would have wrote
15 this.
16   Q.   Okay.
17   A.   Or it could have just been business
18 development using templates that they've used before.
19   Q.   Okay.  If you'll turn to the page labeled
20 40669, there's a section here titled "Work Program."
21   A.   Uh-huh.
22   Q.   Do you know if there's a particular
23 subdivision of operations with responsibility for that
24 program?
25   A.   No.  It would be -- the actual work program

EXHIBIT 1

Page 78

1  at the facility would be the facility's responsibility.
2           MR. SCIMONE:  Okay.  Let's take a break
3  here.
4           (Recess from 10:35 a.m. to 10:42 a.m.)
5           (Plaintiff Exhibit No. 8 was marked for
6  identification.)
7  BY MR. SCIMONE:
8      Q.   Okay.  The court reporter has just handed
9  you a document Bates stamped GEO-MEN 59635 through 59743.
10 It's a fairly long document.  I'll direct you to specific
11 pages.  But take a look at whatever you need to to be
12 able to answer the question.
13          Do you recognize this document?
14     A.   It appears to be a contract award for the
15 Aurora facility.
16     Q.   Okay.  And on the first page, at the
17 bottom, there are signatures here.  Who is the signature
18 on the left?
19     A.   That's Ron Maddox.
20     Q.   And he's signing on behalf of the
21 contractor.  That's The GEO Group in this case?
22     A.   Yes.
23     Q.   And on the right, the signature is by
24 Deborah Locke on behalf of the United States of America.
25 Do you know what her position is or was at the time?

Page 79

1      A.   Contract development.
2      Q.   This was signed September 29, 2006,
3  correct?
4      A.   Yes.
5      Q.   Okay.  And please turn to page 59642.
6      A.   Okay.
7      Q.   And if you can just direct your attention
8  to the bottom paragraph at the bottom of the page, the
9  second sentence, it says:  "Unless explicitly stated
10 otherwise, the Contractor is responsible for all costs
11 associated with and incurred as part of providing the
12 services outlined in this contract."
13          The contractor here refers to The GEO
14 Group?
15     A.   Yes.
16     Q.   Okay.  Is that an accurate statement about
17 the relationship between ICE and GEO?
18     A.   Yes.
19     Q.   Okay.  And on the following page, the
20 second paragraph up from the bottom, beginning "unless":
21 "Unless otherwise specified, all plans, policies and
22 procedures, including those identified in the ACA
23 standards, shall be developed by the Contractor and
24 submitted in writing to the CO for review and concurrence
25 prior to issuance of the NTP."

Page 80

1      A.   Yes.
2      Q.   "CO" refers to contracting officer?
3      A.   Yes.
4      Q.   What does "NTP" refer to?
5      A.   Notice to proceed.
6      Q.   Okay.  Is that an accurate statement about
7  how plans, policies and procedures are developed for the
8  Aurora facility?
9      A.   For new contract, yes.
10     Q.   And what about a renewed contract?
11     A.   They're all new contracts.
12     Q.   Okay.  So new in the sense of this being a
13 new document?
14     A.   Uh-huh.
15     Q.   Even though it's a continuation of the
16 prior contract?
17     A.   It's not a continuation.  It's a brand new
18 contract.
19     Q.   Continuation of services provided?
20          It's okay.  We don't need to go down that.
21          On the following page -- well, before we go
22 on to the next page, I guess the continuation that I sort
23 of have in mind and the reason I do think it's a little
24 bit relevant is we talked about how, when there's a
25 facility where, there's a new contract, but it's one

Page 81

1  that's been previously operated by Aurora, some of those
2  policies are carried over and modified in certain
3  respects.
4      A.   However, those policies, just like this
5  says, would be also given to the contracting officer for
6  review as a brand new contract, whether they went -- what
7  I'm saying is, they would probably not be rewritten all
8  the way through because we were already doing it, these
9  are the policies in place.  We've changed the policies in
10 accordance with RFP.  But they would still be considered
11 part of a new contract, so they still have to be reviewed
12 by ICE.
13     Q.   So that's the relevant point you're making,
14 is that ICE has -- at the time of contract, initiation in
15 2006 here, that's when ICE has a review process?
16     A.   Yes.
17     Q.   Or there is a review process at that time?
18     A.   Yes.
19     Q.   Okay.  Fair enough.
20     A.   And throughout.  If anything has changed
21 policy-wise, they have a review process also.
22     Q.   Does ICE have a review process outside of
23 changes?
24     A.   As far as?
25     Q.   Yeah.  So you say they -- well, they review

Page 82

1  it at the time that the contract is signed and then they
2  would review again, you said, if there's a modification.
3  I'm wondering if there's any sort of periodic review by
4  ICE of the policies that happens just in the normal
5  course of business or oversight?
6       A.   Definitely.
7       Q.   Definitely?
8       A.   Definitely.
9       Q.   How is that -- who conducts that oversight?
10      A.   Most -- most of the time, the COTR.
11      Q.   That's the person at the facility level?
12      A.   Yes.  The contracting officer technical
13  representative.
14      Q.   And is -- so is that a review of the
15  policies themselves or the implementation of the
16  policies?
17      A.   It could be either-or.
18      Q.   Okay.
19      A.   It could be not one policy, two policies.
20  They have full access.  And it happens quite a bit.
21      Q.   Okay.  On the next page, 644, I'm looking
22  at the, I guess, fourth paragraph up from the bottom.  It
23  says: "The contractor is responsible for a
24  quality-control program."  Do you see that?
25      A.   Yes.

Page 83

1       Q.   All right.  What does that quality-control
2  program consist of or what does it refer to?
3       A.   It's -- we have to establish a
4  quality-control program that oversees all aspects of the
5  facility, the policies and procedures, to make sure we're
6  in compliance with the contract.  Like I said, there's a
7  quality -- a compliance division that oversees that
8  program for every facility, and there's -- it includes
9  self-audits at the facility level and includes regional
10 audits and it includes corporate audits and follow-ups.
11      Q.   Okay.  Are audits the primary mechanism for
12 ensuring contract compliance?
13      A.   Yes.
14      Q.   Are there other mechanisms?
15      A.   Well, reviews or -- that would be the
16 primary source.  You wouldn't know unless you weren't
17 audited.  Unless there's an outside audit as well.  Then,
18 you know, that would be another source.
19      Q.   Okay.  Who deals with outside audits?  In
20 other words, who at GEO Group is the point of contact for
21 outside auditors?
22      A.   We're not appointed contact for outside
23 auditors.
24      Q.   Okay.  So GEO doesn't receive the results
25 of those audits?

Page 84

1       A.   We do.  We do.
2       Q.   Okay.
3       A.   I thought you meant them coming and
4  auditing or whatever.  I mean, they audit what they want
5  to audit.
6       Q.   Is there someone at GEO who is responsible
7  for reviewing the results of those audits?
8       A.   Yes.  That would be the compliance
9  division.
10      Q.   Okay.  And who currently is in charge of
11 that?
12      A.   Dan Ragsdale.
13      Q.   And at the time of 2004 to 2014 who was
14 responsible for that?
15      A.   Me.
16      Q.   You?
17      A.   Me.
18      Q.   So let me turn you to page 646.
19      A.   When you say "2004 to 2014," it would be
20 2004 to 2011.
21      Q.   I see.  And from 2011 to 2014?
22      A.   It would have been Patricia Persante.
23      Q.   Right.  Thank you.
24           On page 646, if you look at Section 3.3.
25      A.   Okay.

Page 85

1       Q.   So I think this is referring to what you
2  were just speaking about.  This talks about the
3  contractors representatives meeting with the COTR and the
4  CO on a regular basis.  So those meetings take place at
5  the Aurora facility?
6       A.   Yes.
7       Q.   How often are those meetings held?
8       A.   At this time, I don't know.  Sometimes
9  they're held monthly, sometimes they're held weekly,
10 sometimes they're held quarterly, sometimes they're ad
11 hoc.  It's just whenever they're needed.  Most facilities
12 have a formal process, but I couldn't tell you exactly
13 what the time frame for Aurora at that time would be.
14      Q.   What determines the frequency?
15      A.   The COTR probably.
16      Q.   Okay.
17      A.   Whether or not they want to meet.
18      Q.   Who participates in those meetings?
19      A.   It would be the --
20      Q.   Go ahead.
21      A.   Sorry.  Let me read the whole thing and
22 make sure I got it.
23           Yeah.  This is a meeting between the
24 on-site people -- on-site ICE people with the on-site
25 management of GEO.  So it would most likely be the

Page 86

1  facility warden, his department heads, the COTR,
2  sometimes other ICE representatives, such as the
3  directors and assistant directors.  But this would
4  definitely be at the facility level.
5          Q.    Where is the contracting officer's office
6  located?
7          A.    In this case, it would have been Laguna
8  Nigel.  And the meeting would have been probably by
9  phone, if necessary.  There are times that we have issues
10 that we bring the facility, the region, myself, and the
11 contracting officer and we have a conference call.  I
12 mean, these performance meetings are a lot of different
13 variances of meetings.
14         Q.    I think you anticipated my next question,
15 which is, how often do you participate in these meetings?
16         A.    Whenever there's a problem, a big problem.
17         Q.    Okay.  Can you describe sort of by type
18 what sorts of problems would typically involve you?
19         A.    Any time that we thought there was going to
20 be a modification to the contract and we needed to get
21 all the players involved so everybody understood what was
22 going on and how we can make sure that we're getting all
23 the relevant information.  Not a lot.
24         Q.    You said not a lot?
25         A.    Not at the facility level.  Usually we can

Page 87

1  handle it differently, but there are times that we get
2  everyone involved in a joint conference, in a joint call.
3          Q.    It's more difficult for you to handle that
4  issue with a contracting officer directly; is that
5  correct?
6          A.    Yes, it is.  And that's after I've done all
7  my research, as far as a facility and region; that person
8  has done all their research, as far as staff; and then we
9  collectively, but sometimes we all get together.
10         Q.    For the meetings that you're not involved
11 in, do you -- is there any sort of reporting back to you
12 that you receive?
13         A.    Again, unless there's a problem or a
14 question that they have.
15         Q.    Okay.
16         A.    Warden comes back and says, "This came up
17 in a meeting and we're not sure" -- "we wanted to get
18 back.  We're not really sure how to interpret this or how
19 to answer this."  That's one time I would, at that level,
20 get involved.
21         Q.    So not in the ordinary course of business?
22         A.    No.
23         Q.    Turn ahead a few pages to page 656.  Under
24 Section 7.8, it refers to a staffing plan.  What is the
25 staffing plan that this refers to?

Page 88

1          A.    The staffing plan of the facility, which is
2  part of the contract.
3          Q.    Does the staffing plan need to be submitted
4  with a proposal when a contract RFP is sent out?
5          A.    Yes.
6          Q.    That happens before the notice to proceed
7  is issued?
8          A.    Yes.  Notice to proceed is after contract
9  award.
10         Q.    Okay.
11         A.    So it's already been awarded.
12         Q.    Do staffing plans change from time to time
13 during the life of a contract?
14         A.    Yes.
15         Q.    And so this paragraph speaks to changes and
16 says: "Written requests to change the number, type,
17 and/or distribution of staff described in the staffing
18 plan must be submitted to the CO through the COTR for
19 approval prior to implementation."
20         So let me know if I have the process right.
21 If there's a change, GEO sends it to the COTR, who then
22 submits it to the contracting officer; and then once it's
23 approved, it's approved, it's implemented?
24         A.    Yes.  Or sometimes it's sent directly to
25 the contracting officer and copied to the COTR.

Page 89

1          Q.    Okay.  Who at GEO initiates changes to the
2  staffing plan?
3          A.    It could be a variety of reasons.  A
4  facility can say, you know, "We need an additional person
5  here and we really don't need this person here; can we
6  exchange positions."  It goes up through region.  Region
7  goes up through corporate.  There's a process for all of
8  this.  And they -- corporate then -- the operations part
9  of it comes to us and says, "Can we contractually change
10 this or do we need to, you know, pay for it on our own?"
11 or those type of things.  So it can go from a variety of
12 levels.
13         Q.    Okay.
14         A.    From a GEO perspective.  Now, ICE can come
15 back and say, "We want this and this and that," and it
16 comes from the ICE level and we have to change staffing
17 levels.  But either way, the contract has to be modified.
18         Q.    Okay.  It sounds like it's initiated from
19 the facility level before going through all those levels
20 of review --
21         A.    Yes.
22         Q.    -- and approval?
23         A.    Most -- yes.  They are the ones that have
24 the day-to-day operations.  They know the staffing that
25 they need.

Page 90

1     Q.    So when a proposal is submitted pursuant to
2     an RFP, who develops the staffing plan that's submitted
3     at that time?
4         A.    The operations division.
5             (Plaintiff Exhibit No. 9 was marked for
6         identification.)
7     BY MR. SCIMONE:
8         Q.    Okay.  The court reporter has just handed
9     you Exhibit 9, which is Bates stamped GEO_MEN 19613
10    through 20037.  It's a big exhibit.
11            Do you recognize what it is?
12        A.    It's the contract in 2011 for the Aurora
13    facility.
14        Q.    And do you know how long this contract was
15    in effect?
16        A.    Well, I can tell you after I read the
17    contract.
18            From 2011 to 2019.
19        Q.    All right.  And did this contract supersede
20    the one signed in 2006, to your knowledge?
21        A.    I don't --
22        Q.    Let me ask you, on the current Exhibit 9,
23    where are you looking to see the term of the contract?
24        A.    I'm looking at the CLINs, which are the
25    cost line item proposals.

Page 91

1         Q.    What page is that on?
2         A.    This is on 623.
3         Q.    Okay.
4         A.    This says -- you can just look at any of
5     them.  Option Period 4 (Option Line Item) 9/16/2019.
6         Q.    And so you said this runs through 2018?
7         A.    '19.
8         Q.    Oh, '19.  I misheard.
9             All right.  So then looking back at
10    Exhibit 8 --
11        A.    I don't know if it has the CLINs.  Yeah, it
12    does.  I'm sorry.
13        Q.    On page 637, I see --
14        A.    It's 2010.
15        Q.    Okay.  This one's through 2010.
16        A.    Yes.
17        Q.    So did the 2011 one supersede this
18    contract?
19        A.    Yes.
20        Q.    Or follow it?
21        A.    Follow it, yes.
22        Q.    All right.  We can turn back to Exhibit 9.
23    Thank you.
24            Okay.  And on the first page, this is
25    signed on behalf of GEO by Ron Maddox, correct?

Page 92

1         A.    Yes.
2         Q.    Who was he at the time?
3         A.    He was the vice president over business
4     development.  I'm sorry, he was the executive vice
5     president over business development.
6         Q.    And on the right side, on behalf of the
7     United States, by Roberta Halls?
8         A.    Uh-huh.
9         Q.    Was she the contracting officer at that
10    time?
11        A.    Yes.
12        Q.    So if you'll look at page 625.  This
13    contract seems to be formatted a bit differently from the
14    previous one.
15        A.    Yes.
16        Q.    And, well, do you know what the reason is
17    for that change in format?
18        A.    Again, they evolved.  They got technically
19    more inclusive, make sure they were covering all bases,
20    et cetera.
21        Q.    Do you know what prompted that change?
22        A.    No.  I think it's a pure involvement, as
23    far as, you know, getting more contracts and making sure
24    that all the bases are covered.
25        Q.    Okay.  If you'll turn to page 717.  This is

Page 93

1     titled "Statement of Objectives" at the top.  Under the
2     introduction, Section A, second sentence in -- well, the
3     first sentence -- I'm just picking up about halfway --
4     no, the second sentence: "ICE is reforming the
5     immigration detention system to move away from a penal
6     model of detention."  Do you see that?
7         A.    I'm sorry.  Oh, yes.
8         Q.    Okay.  What's your understanding of what
9     that means?
10        A.    I don't know.  I mean, I guess from the
11    prison-life atmosphere to a civil atmosphere.
12        Q.    Are you familiar with that policy?  Has
13    that been something that's part of your work?
14        A.    I'm sorry?
15        Q.    Well, are you familiar with that policy,
16    moving from a penal model to a more civil detention
17    model?
18        A.    I know that's where ICE has been -- is
19    heading, just like everyone else is.
20        Q.    And the next sentence begins:  "A key goal
21    of reform is to create a civil detention system that is
22    not penal in nature..."
23            What is that -- do you understand what the
24    reference to "reform" refers to?  Is there a particular
25    initiative or project that's referring to?

Page 94

1    A.    No.  Not that I know of.
2    Q.    Do you know when that shift began?
3    A.    No.  I guess during this time period.
4    Q.    From your experience at The GEO Group
5  during this time frame, do you have a general sort of
6  sense of the time frame in which there was a shift from a
7  penal model to a civil detention model?
8    A.    Well, the shifts began with the new ICE.
9  Obviously, with the 2008 PBNDS standards, reforms in the
10 2011 PBNDS standard, the optimal standards that came out
11 after that.  I mean, there's been reform, as you put it,
12 all along.
13   Q.    So is that -- those reforms reflect
14 principally to the changes in the PBNDS?  Is that --
15   A.    Yeah.  That's definitely a big influence.
16   Q.    If you'll turn to page 656.
17         MR. BARNACLE:  I'm sorry, what did you just
18 say?
19         MR. SCIMONE:  Page 656.
20 BY MR. SCIMONE:
21   Q.    This section actually begins on the prior
22 page titled "Constraints."  And it says:  "The following
23 constraints comprise the statutory, regulatory, policy
24 and operational considerations that will affect the
25 Contractor."  And to direct your attention down to

Page 95

1  Item 10 on the following page, it lists the PBNDS there.
2  I think you said this earlier, but does this mean that
3  the PBNDS is effectively incorporated as part of this
4  contract?
5    A.    Yes, it is.
6    Q.    All right.  And these other line items are
7  also -- and compliance with these other items here is
8  also part of the contract?
9    A.    Yes.  They're all included in the contract.
10   Q.    Okay.  You can put that aside.
11   A.    Okay.
12   Q.    We're going to refer back to all these, I'm
13 sure.
14         (Plaintiff Exhibit No. 10 was marked for
15         identification.)
16 BY MR. SCIMONE:
17   Q.    Exhibit 10 is Bates stamped GEO-MEN 10553
18 through 592.  Take a moment to review and let me know
19 when you're ready.
20   A.    Okay.
21   Q.    Do you recognize this document?
22   A.    I don't recognize this document, no.
23   Q.    It's titled "Summary of Major Changes
24 Between the 2008 and 2011 Performance-Based National
25 Detention Standards," just to give a sense of time frame.

Page 96

1         From looking through, do you have any sense
2  of how this document was used or it may have originated?
3    A.    This appears to be during a time that the
4  optimal non-mandatories and optimal mandatories came out,
5  as I was referring to before.  But without specifically
6  looking through and making sure of that, but this appears
7  to be when those reviews came about.  So I'm guessing
8  about 2013.
9    Q.    Does this appear to you to be a document
10 that originated with ICE?
11   A.    I don't know.  It's not numbered or
12 anything, so I don't know where it would be originated
13 from.
14   Q.    Okay.  If you'll look near the bottom of
15 the first page, bottom third or so, there's a reference
16 here to optimal provisions.  I think you spoke earlier
17 about optimal aspects of the PBNDS.
18   A.    Uh-huh.
19   Q.    Can you explain your understanding of what
20 that means in practice.
21   A.    There's optimal provisions and there's
22 optimal non-mandatory provisions and optimal mandatory
23 provisions.  Some of these non-mandatory provisions, like
24 I said, came about to enhance some of these provisions
25 that possibly had issues with physical structure, some

Page 97

1  things that a facility -- standalone facilities could not
2  comply with, but they were researched to see "How many of
3  these can you comply with?" "How many of these can you
4  comply with that's going to be a larger cost?" and that
5  was a process.  And that happened, like I said, back in
6  2013.
7    Q.    The second sentence here says:  "Optimal
8  provisions in the standards are not unilaterally
9  binding."
10   A.    Correct.
11   Q.    "However, implementation of these
12 provisions furthers effective operation of a facility at
13 the level intended by ICE under revised standards."
14   A.    Correct.
15   Q.    Does that comport with your understanding
16 that an optimal provision is not necessarily a binding
17 one?
18   A.    It's not unilaterally binding.  It can be
19 bilaterally binding.
20   Q.    What does that mean in practice?
21   A.    Well, unilateral is if there's -- the
22 change and scope of the contract doesn't affect anything
23 financial, physical structure or change of scope and
24 services so that ICE can unilaterally bind the contractor
25 to that change in the contract even though it's a change

Page 98

1  of scope.

2        Q.    Okay.

3        A.    And bilaterally means that we both agree

4  and there's a change -- there's a modified portion of

5  that that may change the price of the contract or may

6  change something else that, you know, changes the

7  operation and gives -- you know, those type of things.

8              But there's two different kinds.

9  Unilateral is, ICE says do it, you do it, and there's no

10 negotiation, et cetera.  Unless they say, "You do it,"

11 and we come back and say, "But there is a financial, you

12 know, stance to this that we need to make you aware of,

13 and there's a provision to raise that level up to."

14       Q.    So for those -- I think I understand the

15 two categories.  Is GEO always required to meet all of

16 the optimal standards or are some of them, I guess,

17 optional?

18       A.    No.  There's -- okay.  In this process, the

19 ones that were optional, as you say, or non-mandatory --

20       Q.    Right.

21       A.    -- we agreed to -- we mutually agreed to

22 which ones we could follow without having to change or

23 which ones we could follow that the government wanted to

24 pay for.  And so those are the standards we have to meet,

25 whatever we agree to bilaterally.

Page 99

1        Q.    And that happened around 2013, I think you

2  said?

3        A.    Yeah.  I think it was.  It may have been a

4  little later, but I think it was 2013, 2014.

5        Q.    So the second paragraph under "Optimal

6  Provisions" says: "The PBNDS 2011 thus allows for a

7  range of compliance, to facilitate the immediate

8  implementation of these standards..."

9              What does that mean?

10       A.    I have no idea.  I'm hoping there's not a

11 range of compliance as far as meeting standards.

12       Q.    Okay.  You understand that to mean that

13 there are some areas where a contractor might not

14 bilaterally agree with ICE to meet a certain standard and

15 ICE might then permit that even though it's not -- in

16 other words, it's not a mandatory sort of minimum

17 standard under the PBNDS; it's something that ICE would

18 like to see happen but doesn't necessarily require?

19       A.    That's your non-mandatories.

20       Q.    Okay.

21       A.    That's what your non-mandatories are.  It's

22 like ICE would like to see this happen, but it's not

23 required or we mutually agree that it's going to be

24 required.  Once it's embedded into the contract, it

25 doesn't matter.  If it's non-mandatory, mandatory,

Page 100

1  whatever, it's part of the contract and it's required.

2        Q.    Okay.  But there is a category of

3  non-mandatory PBNDS standards that exist?

4        A.    Well, they're called optimal non-mandatory.

5  It's just an enhancement of what the standards are

6  already: more square footage or -- I'm just trying to

7  think off the top of my head.

8        Q.    Yeah.  Just, I guess, for example --

9        A.    There is one other issue.  There may be

10 where there's a mandatory standard that the facility

11 can't meet it because of restrictions, mainly usually

12 because of physical structure, and there's a process of

13 waivers that ICE can waive.

14       Q.    Okay.  Who deals with the waiver process at

15 ICE?

16       A.    I don't know.  I mean, it probably would go

17 through the contracting officer.

18       Q.    Okay.

19       A.    You know, but it's handled through

20 compliance.

21       Q.    Okay.

22       A.    It's public.  I mean, there's a -- it says

23 what -- it's not only GEO.  There's other people that

24 waive standards.  I don't know what committee that is.

25       Q.    Right.  Did you deal with that when you

Page 101

1  were in -- when you dealt with contract compliance in

2  2000 to 2011?

3        A.    No.  I mean, the standards 2008, 2011

4  were -- they're kind of probably fairly new in that

5  time frame, because I dealt with these in 2013, after I dealt

6  with the contract administration.  But as far as

7  compliance levels, we dealt with -- we didn't have any

8  waivers or anything like that.  This was the first

9  process of really changing things.

10       Q.    Okay.

11       A.    Or agreeing to new things.

12       Q.    Okay.  So maybe this is helpful to talk

13 about in the context of an example.  Let me see.  Bear

14 with me a minute.  Here we go.  If you look at 580, so

15 Section 5.4 is recreation.  And so there's -- this is

16 major changes in the PBNDS under recreation and detention

17 standard.  It says: "Expanded Recreation for General

18 Populations."  And below that you'll see "Optimal

19 Recreation for General Populations."  And so the first

20 one is, you know: "Detainees shall have at least four

21 hours a day access, seven days a week, to outdoor

22 recreation, weather and scheduling permitted.  Outdoor

23 recreation shall support leisure activities, outdoor

24 sports and exercise as referenced and defined by the

25 National Commission on Correctional Health Care

Page 102

1  Standards, provided outside the confines of the housing
2  structure and/or solid enclosures."
3          So I'm sort of -- I guess I'm trying to
4  understand how this sort of works with respect to the
5  contract.  Would GEO, I guess, be asked to provide this
6  level of recreation and then there would be a discussion
7  about whether or not it could in fact comply with that?
8      A.   Yes.
9      Q.   And then would that typically become a term
10 of the contract or would it simply be left as this is
11 something you can comply -- you can meet, but you don't
12 necessarily have to meet the standard?
13     A.   No.  They were modified, as you can see
14 with the earlier documentation you showed me.  The
15 contract was actually modified.
16     Q.   Okay.  And if you'll turn to page 105585 --
17 actually, 84.  So this deals with Section 5.8, Voluntary
18 Work Program.  Are you familiar with that program?
19     A.   Yes.
20     Q.   Okay.  Just in general terms, so that we
21 have a working understanding, what is the Voluntary Work
22 Program?
23     A.   It's a program that's offered to the
24 detainees if they want to voluntarily work in
25 subcategories, and they get paid a fee for their service.

Page 103

1  And it helps with their skills and that type of thing.
2      Q.   If you look at the next page, 585, at the
3  very top, it says: "Compensation: The required
4  compensation for work was increased from $1.00 per day to
5  'at least $1.00 per day.'"  Do you see that?
6      A.   Yes.
7      Q.   Before this change, it was just $1 per day?
8      A.   Yes.
9      Q.   And this increased it?
10     A.   Increased the ability to do more than $1 a
11 day.
12     Q.   So --
13     A.   From a contractor's perspective.
14     Q.   Okay.  In other words, paying more than $1
15 a day was optional?
16     A.   Yes.
17     Q.   So does that mean ICE left GEO discretion
18 as to how much it would pay in that program?
19     A.   No.
20     Q.   Okay.  Can you explain.
21     A.   The only -- this is a pass-through cost.
22 So the only amounts legislatively that they were allowing
23 was $1 a day.  So that's the only amount that was, you
24 know, like I said, passed through through the contract
25 and invoiced.

Page 104

1      Q.   You say the amounts they were legislatively
2  allowing.
3      A.   There was a conflict with this and what ICE
4  was paying for.
5      Q.   Can you explain the conflict?
6      A.   Well, this said that it was at least $1 a
7  day, but --
8      Q.   Right.
9      A.   -- but ICE could not pay for more than $1 a
10 day according to the statute.
11     Q.   Okay.  But notwithstanding the fact that
12 ICE couldn't reimburse more than $1 a day, it was
13 allowing GEO to pay more than $1 a day?
14     A.   Well, we had to get permission from ICE to
15 do that, so that also conflicted with this.
16     Q.   Did GEO ever seek permission to pay more
17 than $1 a day?
18     A.   I don't know.
19     Q.   This would have been around the 2011 time
20 frame?
21     A.   I don't believe that we, at Aurora, did
22 that, no.
23     Q.   Okay.  So Aurora didn't seek permission to
24 pay more than $1 a day?
25     A.   No.  Because we couldn't get paid more than

Page 105

1  $1 a day or the detainee couldn't get paid more than $1 a
2  day.
3      Q.   Okay.  Let me see if I have it straight.
4  So ICE changed the standards to permit GEO to pay more
5  than $1 a day, but because GEO wasn't getting reimbursed
6  more than $1 a day, it didn't seek to increase that
7  amount?
8      A.   And ICE couldn't pay more than $1 a day.
9      Q.   But it didn't seek permission from ICE to
10 pay more than $1 a day?
11     A.   Right.  Because there wasn't the
12 possibility to pay more.
13     Q.   And GEO didn't want to pay it if it wasn't
14 getting reimbursed by ICE?
15     A.   Well, it's a contractual requirement as
16 far as we're concerned and we've already priced this.
17     Q.   Right.  But I guess I'm -- what I'm saying
18 is, the decision was based on the pricing, not whether --
19 not whether GEO was permitted to pay more than $1 a day.
20 In other words, GEO could have paid more than $1 a day
21 notwithstanding the fact it wasn't getting reimbursed?
22     A.   Well, again, we had to seek permission from
23 ICE to do that.
24     Q.   Sure.
25     A.   I think the person that put this together

Page 106

1  was trying to open the door for future issues, so it was
2  more broad and they didn't have to, you know, change this
3  again.  ICE couldn't pay more than $1 a day; we couldn't
4  get reimbursed more than $1 a day.  So this was all
5  conflicted in this statement.
6      Q.   Well, I guess I'm trying to understand
7  "conflicted."  Because as I --
8      A.   If I wanted to go modify a contract and pay
9  $1.50 a day, ICE could not pay that.  So the contract
10  could never be modified.
11     Q.   Well, you could pay something without
12  getting reimbursed from ICE if ICE gave you permission to
13  do that, right?
14     A.   Yeah.  But they couldn't give permission to
15  do that because they couldn't pay more than $1 a day.
16     Q.   No.  I understand they couldn't pay more,
17  but they could give permission for GEO to pay more; it
18  would just be a cost borne by GEO, right?
19     A.   I guess.
20     Q.   Okay.  We saw earlier there was a term in
21  the 2006 contract that says that all costs are -- of
22  complying with the contract are to be borne by the
23  contractor?
24     A.   Right.
25     Q.   So that would then become a cost that GEO

Page 107

1  would have to bear if it got permission from ICE to pay
2  more than $1 a day but was still being reimbursed only at
3  $1 a day?
4      A.   Yes.  But it would be difficult to modify
5  the contract to do that.
6      Q.   More so than any other contract
7  modification?
8      A.   Again, because there's strict parameters
9  of ICE can't pay more than $1 a day, we can't -- if we
10  can't be reimbursed more than $1 a day, in order to give
11  permission to do something that is outside the realm, it
12  would -- I don't know how that would be done in a
13  contract modification.
14     Q.   Well, there are contract modifications --
15     A.   I think this would be done outside that.  I
16  don't know.
17     Q.   Outside what?  I'm sorry?
18     A.   Like I said, I don't see ICE permitting
19  that as a contract modification since statutorily they
20  can't pay more than $1 a day and we can't get reimbursed
21  more than $1 a day.  It wasn't just asked along those
22  bases.  I guess we could do it on our own dime.
23     Q.   Right.
24     A.   But the contract was priced this way, et
25  cetera.

Page 108

1      Q.   Right.  I guess, procedurally, if GEO made
2  that decision to do this, as you put it, on your own
3  time -- on its own dime, the process for getting that
4  permission from ICE would be -- would it be the same as
5  any other contract modification?
6      A.   Yes.
7      Q.   So there's a process that's well
8  established to do that, and we talked about it earlier
9  today, right?
10     A.   Yes.
11          MR. SCIMONE:  Okay.  Off the record for a
12     minute.
13          (A discussion was held off the record.)
14          (Plaintiff Exhibit No. 11 was marked for
15     identification.)
16  BY MR. SCIMONE:
17     Q.   Okay.  Ms. Martin, the court reporter has
18  just handed you Exhibit 11.  This has a document
19  identification number at the bottom, a little different
20  than the others.  This is 2018-ICLI-0052 2141, running
21  through 2169.  I was just getting all that on the record.
22          Do you recognize this document?
23     A.   No.  I mean, it looks like a detention
24  handbook -- Detainee Handbook for LaSalle Processing
25  Center, but I haven't seen it specifically.

Page 109

1      Q.   Okay.  LaSalle Processing Center is a
2  facility operated by The GEO Group?
3      A.   Yes, it is.
4      Q.   Okay.  Is that an ICE detention facility?
5      A.   Yes, it is.
6      Q.   If you'll look at page 10, there's a
7  section here titled "Voluntary Work Program" at the
8  bottom of the page.
9      A.   Okay.
10     Q.   First of all, before I ask about this, do
11  you have any responsibility for the contract at LaSalle?
12     A.   Yes.
13     Q.   Okay.
14     A.   I have responsibility over all contracts.
15     Q.   Okay.  So this Voluntary Work Program
16  section, if you look at the second sentence, says:  "Any
17  detainee assigned to work in the kitchen will be paid
18  $4.00 per day."  Do you see that?
19     A.   Uh-huh.
20     Q.   And laundry work details and barbershop
21  workers will be paid $3 per day?
22     A.   Uh-huh.
23     Q.   And then special detail workers are paid $2
24  a day?
25     A.   Yes.

Page 110

1      Q.    And then all other job assignments are $1
2  per day, correct?
3      A.    Correct.
4      Q.    The same PBNDS provision applies at LaSalle
5  as applies at Aurora, correct?
6      A.    Yes.
7      Q.    Okay.  So the reimbursement for the LaSalle
8  facility is also $1 per day for the VWP, right?
9      A.    Correct.
10     Q.    So this is an example of a case where GEO
11 did in fact opt to pay more, at least in certain jobs,
12 than it was getting reimbursed by ICE, correct?
13     A.    Yes.
14     Q.    Did GEO get permission from ICE to do that?
15     A.    I'm assuming they did.
16     Q.    Were you involved in seeking that
17 permission?
18     A.    No.
19     Q.    Do you know when that happened?
20     A.    No.  Just an assumption on my part reading
21 this.
22     Q.    Okay.  Do you know why GEO pays more for
23 these jobs at LaSalle than it does at Aurora?
24     A.    No.
25     Q.    Do you know if that's still the case at

Page 111

1  LaSalle?  This says, if you look at the first page,
2  revised June 2017.
3      A.    I don't know.
4      Q.    Okay.  And do you know what the -- what the
5  term of the contract at -- of the current contract at
6  LaSalle is?
7      A.    LaSalle is an IGSA, which is a different
8  type.  It's not a direct contract.  It's an
9  Intergovernmental Service Agreement.  The actual contract
10 is between the LaSalle Economic Development Division and
11 ICE, and LaSalle then contracts with us to operate the
12 facility.  So we don't have a direct contract.  This may
13 be why the differences.
14     Q.    Okay.  So the contract is between GEO and
15 LaSalle?
16     A.    Yes.
17     Q.    Is that a municipal division: LaSalle?
18     A.    Yes.  Well, it's a parish, but it's --
19 LaSalle Economic Development Division is who the contract
20 is with.
21     Q.    Do you know who pays the difference in the
22 cost of VWP program?  The difference meaning the amount
23 over $1 per day for these specific jobs.
24     A.    They would be -- LaSalle would be
25 responsible or GEO would be responsible.

Page 112

1      Q.    You're not sure which, though?
2      A.    I'm sure it would be GEO.
3            MR. SCIMONE:  Okay.  All right.  Let's take
4  a lunch break at this point.
5            (Lunch recess was held from 11:30 a.m. to
6      12:22 p.m.)
7  BY MR. SCIMONE:
8      Q.    Okay.  We're back from lunch.
9            Ms. Martin, you understand, of course,
10 you're still under oath, of course?
11     A.    Yes.
12     Q.    Okay.  All right.  So I would like you to
13 take a look back at Exhibit G.  It's one of the
14 technical --
15     A.    Exhibit G?
16     Q.    7, I think.
17     A.    7, okay.
18     Q.    That's the one.
19     A.    Okay.
20     Q.    And if you could, turn to page 40669.  And
21 I'm looking at the section entitled "Work Program."  And
22 it says about midway down the page:  "The objectives of
23 the Work Program..."  Do you see that line?
24     A.    Yes.
25     Q.    It has a series of bullet points.  So the

Page 113

1  objectives of the work program are designed to provide
2  the following, and look down at the fourth one.  The
3  fourth bullet point is:  "Activities necessary to the
4  maintenance of the daily operation of the facility."  And
5  then underneath the bullet points, there's a paragraph
6  that begins:  "Detainees will not be used to perform the
7  responsibilities or duties of a GEO employee."
8            Do you see any kind of tension or conflict
9  between those two statements?
10     A.    No.  Because I think that the RFP and the
11 contract laid out very specifically what is involved in
12 the work program.  So I think this is just a very general
13 comment and, you know, it could have to do with a minute
14 part of a daily operation but not the whole facility.
15     Q.    "It" being the tasks done by people in the
16 work program?
17     A.    Right.
18     Q.    Is it true that detainees in the Voluntary
19 work program perform activities that are necessary to the
20 maintenance of the facility?
21     A.    Not as themselves.  They work along with
22 correctional staff and food service staff and are trained
23 in those areas.  So as far as them operating -- doing the
24 daily functions of the operation of the facility, no.
25     Q.    The statement that detainees will not be

Page 114

1  used to perform the responsibilities or duties of a GEO
2  employee, does that stem from language in the contract?
3      A.   I believe this is under -- yeah.  I think
4  that there is some ICE language and PBNDS language that
5  would say, you know, contractor staff.
6      Q.   Okay.  That detainees are not supposed to
7  perform functions -- perform the responsibilities of a
8  GEO employee?
9      A.   Yeah.  I mean, the contract is over --
10  however responsible.  I would have to look at the
11  contract, but I believe there's some language along the
12  lines of us having to manage the contract.
13      Q.   Okay.  Let's look back at Exhibit 8.  And
14  the page number is 59662.
15      A.   I really can't count.
16      Q.   That's okay.
17      A.   All right.
18      Q.   So on 662, the second full paragraph down,
19  it says:  "Detainees shall not be used to perform the
20  responsibility or duties of an Employee of the
21  Contractor."  So this is the 2006 contract.  Is that the
22  language that you were referring to?
23      A.   Yes.
24      Q.   Okay.  And then, if you'll turn in the same
25  document to page 642, this paragraph at the bottom of the

Page 115

1  page says:  "Contractor shall furnish all personnel,
2  management, equipment, supplies and services necessary
3  for performance of all aspects of the contract.  Unless
4  explicitly stated otherwise, the Contractor is
5  responsible for all costs associated with and incurred as
6  part of providing the services outlined in this
7  contract."
8          Is that in keeping with that statement we
9  just saw, that the necessary responsibilities -- the
10  necessary functions of the contract is supposed to be
11  done by GEO employees?
12      A.   Yes.
13      Q.   Let's turn to page 676.  Are you on -- I'm
14  sorry, 675, and it continues on to 676.  So there's this
15  table here, and it shows -- in the left column there's a
16  series of what are described as "Functional Areas."
17  Generally speaking, what are functional areas?
18      A.   Those are the functional areas of the QASP,
19  Quality Assurance Surveillance Program, that the
20  government monitors and reviews the contract for.
21      Q.   Okay.  And on that next page, 70 -- 676,
22  the third functional area includes a number of items, but
23  the second one up from the bottom is "personal
24  hygiene/well-being."
25      A.   Correct.

Page 116

1      Q.   Does that refer to keeping the facility
2  clean?
3      A.   I think that refers to making sure that
4  detainees have personal hygiene items and they have
5  access to what they need as far as, you know,
6  cleanliness, individual hygiene items, those type of
7  things.
8      Q.   Okay.
9      A.   Clothes, laundry, that type of issue.
10      Q.   In the box at the top of that page, the
11  first functional area includes sanitation requirements.
12          Does that refer to the cleanliness of the
13  facility as a whole?
14      A.   Yes.  I would say that.
15      Q.   So as a functional area, is that one of the
16  core areas that employees are responsible -- employees of
17  the contractor are responsible for maintaining?
18      A.   Yes.
19      Q.   Do you know what types of jobs are done by
20  detainees in the Voluntary Work Program?
21      A.   From a broad perspective, I believe there's
22  volunteer positions in the kitchen, laundry, sometimes
23  barbershop, maybe environmental, janitorial services.  I
24  don't think there's any -- there used to be, but there's
25  not anymore groundskeeping, that type of thing.  So I

Page 117

1  think that's pretty close to it.  There may have been a
2  couple more.
3      Q.   That box at the top of the page that we
4  just looked at, if you'll turn to actually just the page
5  before, 675, there's a header for that.  That's "Food
6  Service."  Do you see that?
7      A.   Yes.
8      Q.   So you said VWP workers work in the
9  kitchen, but food service also appears to be one of these
10  functional areas that GEO was responsible for providing,
11  correct?
12      A.   Yes.
13      Q.   And you mention the laundry, but -- well,
14  clothing and bedding here is listed here under the third
15  box as one of the functional areas that GEO is
16  responsible for providing.  That's what's done in the
17  laundry, correct?
18      A.   Yes.
19      Q.   And you mentioned janitorial services, but
20  as we see at the top, sanitation requirements are one of
21  the responsibilities that GEO has to provide.  So aren't
22  those responsibilities supposed to be done by employees
23  of the contractor under the terms of the contract?
24      A.   They are.
25      Q.   Those are also done by the workers in the

Page 118

1  Voluntary Work Program as well?
2       A.   Yes.  As a Voluntary Work Program for the
3  detainees to work alongside the contractor.  If we didn't
4  have volunteers in those areas, then we wouldn't have
5  anybody working in those areas.  It's for the detainees.
6       Q.   And as we saw in the last exhibit, 7 --
7  this was GEO's Technical Proposal for the work program --
8  the activities provided include those that are necessary
9  to the maintenance of the daily operation of the
10 facility.  It comports with what you just said, right?
11      A.   I'm sorry, where are you reading from?
12      Q.   The fourth bullet point down.
13      A.   "Activities necessary to the maintenance of
14 the daily operation of the facility."  Again, that's a
15 broad statement.  If we had a program or a job available
16 in that area, then we could -- they could voluntarily
17 work in that area.
18      Q.   Who decides what jobs are provided as part
19 of the Voluntary Work Program?
20      A.   ICE.
21      Q.   And in what form does that guidance come to
22 GEO from ICE?
23      A.   They have to -- I don't know specifics as
24 far as the facility process is concerned, but ICE has to
25 approve all the job assignments for the detainees.

Page 119

1       Q.   So are they approving a proposal that's
2  created in the first instance by GEO?
3       A.   I don't know if it has anything to do with
4  the proposal.  They have to approve the specific job
5  assignments for the detainees.
6       Q.   My question about who decides is about who
7  selects initially what those job assignments are going to
8  be.  Is it initiated by GEO or is it initiated by ICE?
9       A.   I think it's a combination.  They're pretty
10 much normal procedures for kitchen, laundry, janitorial,
11 that type of thing.  But the job assignments itself, I
12 mean, if we propose something, they would still have to
13 be approved by ICE.  I'm not really sure who instigates
14 that process.
15      Q.   Okay.  But it's based on a proposal that's
16 created by The GEO Group?
17           MR. BARNACLE:  Object to the form.
18      A.   I don't know that.  I mean, like I said,
19 we're proposing -- there's a Technical Proposal that will
20 have detainee job assignments, voluntary job assignments,
21 but the actual job assignments have to be approved by
22 ICE.
23 BY MR. SCIMONE:
24      Q.   Okay.  And --
25      A.   This is just a general broad perspective.

Page 120

1       Q.   Who would be involved in that process at
2  The GEO Group?  Who would know, I guess, where that
3  proposal initiated?  Would that be someone in the
4  operations group?
5       A.   No.  It would probably be done at the
6  facility level.  Specific job assignments would be done
7  at the facility level and approved by the ICE COTR at the
8  facility level.  Job assignments may vary at different
9  facilities.
10           (Plaintiff Exhibit No. 12 was marked for
11           identification.)
12 BY MR. SCIMONE:
13      Q.   You've just been handed a document Bates
14 stamped GEO_MEN 00073000.  Do you recognize this
15 document?
16      A.   I've -- well, it's from Dana Adams to
17 myself.
18      Q.   Do you recognize this to be an e-mail?
19      A.   Yes.
20      Q.   Who is Dana Adams?
21      A.   He was contracting officer for ICE.
22      Q.   And this is dated June 16, 2014, correct?
23      A.   Yes.
24      Q.   And he's writing to you at your GEO Group
25 e-mail address?

Page 121

1       A.   Yes.
2       Q.   Okay.  And what -- he's within the Office
3  of Acquisition Management; is that correct?
4       A.   Yes.
5       Q.   So he's -- is he then superior to the
6  contracting officer in terms of rank?
7       A.   He is a contracting officer or was a
8  contracting officer.  He no longer works for ICE.  At
9  this time, back in '14, I'm not sure if he had a
10 supervisory role at the time or not.  He started as a CO
11 and he did have a supervisory role later.
12      Q.   And is this -- here he's the deputy
13 assistant director.  Was this one of the supervisory
14 roles?
15      A.   Yes.  I'm sorry.  I didn't see his title.
16      Q.   No problem.
17           So he writes here:  "Dear Amber, Another
18 question has come up."
19           And this is -- by the way, the subject line
20 here is "Volunteer Work Program."  Do you see that?
21      A.   Yes.
22      Q.   Okay.  So he writes:  "Detainees work in
23 some facilities for a dollar a day.  What might they be
24 doing in terms of the work they do?  I have always
25 thought menial tasks, maybe cleaning, moving things,

Page 122

1  helping in the cafeteria?"  Do you see that?
2        A.    Yes.
3        Q.    Do you agree with the -- would you
4  categorize a task that is actually done by the workers in
5  VWP as menial tasks?
6        MR. BARNACLE:  Object to the form.
7  BY MR. SCIMONE:
8        Q.    At the Aurora facility.
9        A.    As far as -- yes, I would.  I mean, working
10  in the cafeteria, cleaning, laundry.
11       Q.    Menial in what sense?
12       A.    As far as the tasks themselves, I don't
13  know.  Putting clothes in a washer and dryer.
14       Q.    And in terms of the janitorial work we
15  mentioned earlier, would you characterize that as menial
16  as well?
17       A.    Yes.  Emptying trash, dusting, that type of
18  thing.
19       Q.    So by menial, you mean -- are you speaking
20  in terms of level of skill required to do the work?
21       A.    The level of skill and the skill -- I mean,
22  the task itself.
23       Q.    The task itself, meaning what aspect of the
24  task is -- are you characterizing as menial or would you
25  characterizing as menial?

Page 123

1        A.    Picking up trash, I would characterize as
2  menial.  Putting clothes in a washer or dryer.  I'm not
3  real sure.
4        Q.    Well, I guess what I'm asking is whether by
5  menial you're referring to the level of the skill or the
6  level of difficulty and the amount of actual labor
7  involved, if you would describe that as menial.
8        MR. BARNACLE:  Object to the form.
9        A.    I think they're both the same thing.  The
10  level of skill and the level of labor involved.
11  BY MR. SCIMONE:
12       Q.    Well, I guess maybe the distinction I'm
13  drawing is, digging a ditch may be menial in terms of
14  requiring low skill, but it can be very laborious.
15       A.    Okay.
16       Q.    As opposed to picking up paper, which might
17  be low skill but also not terribly burdensome or
18  difficult.
19       A.    I would say, again, the same thing.  As far
20  as the labor level and the skill level, it would be what
21  I would consider menial.
22       Q.    You mentioned earlier that ICE approves
23  tasks that are done by detainees in the Voluntary Work
24  Program.  Are you involved in that approval process?
25       A.    No, I'm not.

Page 124

1        Q.    Do you know who is at GEO?  Do you know who
2  at The GEO Group is involved in the process?
3        MR. BARNACLE:  Object to the form.
4        A.    The facility administrator.  Like I said,
5  it's done at the facility level.
6  BY MR. SCIMONE:
7        Q.    Facility administrator is --
8        A.    Warden.
9        Q.    The warden?
10       A.    Or whoever his designee is.  Sorry.
11       Q.    Go ahead and finish the answer.  Whoever is
12  designated as --
13       A.    Yes.  His ARW.  I mean, depending -- I
14  don't know who he assigned that to, but it would be
15  ultimately his responsibility.
16       (Plaintiff Exhibit No. 13 was marked for
17       identification.)
18  BY MR. SCIMONE:
19       Q.    Okay.  You have been handed Exhibit 13,
20  Bates stamped GEO_MEN 38920 through 925.  Do you
21  recognize the form of this document?
22       A.    It appears to be a staffing plan for
23  Aurora.
24       Q.    Okay.  And I think we spoke earlier briefly
25  about staffing plans.  These are submitted as part of a

Page 125

1  contract proposal to ICE, correct?
2        A.    Correct.
3        Q.    And this first page at the top, it says
4  "400-Bed Staffing Plan."  Do you see that?
5        A.    Uh-huh.
6        Q.    So this reflects the staffing that was
7  needed at this time to run the facility at a level of 400
8  beds?
9        A.    Uh-huh.  Yes.  Sorry.
10       Q.    And if you look at -- on that first page,
11  in the second section, titled "Business/Support," the
12  second title up from the bottom is "Janitor."  Do you see
13  that?
14       A.    Yes.
15       Q.    And then to the right there are some
16  numbers.  There's "1" under non shift, "1" under relief,
17  "1" under FTE.  What does this mean in terms of the level
18  of staffing in this job title?
19       A.    It means there's one janitor assigned to
20  this facility.
21       Q.    And that's to run the facility at the level
22  of 400 beds?
23       A.    Yes.
24       Q.    And to the extent that there's other
25  cleaning work in the facility, who's responsible for

EXHIBIT 1

Page 126

1  doing that besides the janitor?
2      A.     It would be probably whatever division or
3  department that it was in or a correctional officer.
4      Q.     And detainees also perform janitorial work,
5  correct?
6      A.     Yes.
7      Q.     Through the Voluntary Work Program?
8      A.     Yes.
9      Q.     If you'll turn to page 923, at the top
10 you'll see it says "423-Bed Staffing Plan."
11     A.     Uh-huh.
12     Q.     And so is what follows the level of
13 staffing that will be needed to run the facility level of
14 432 beds?
15     A.     Yes.
16     Q.     And if you'll look down in that
17 Business/Support section, the number provided for janitor
18 is still "1," correct?
19     A.     Yes.
20     Q.     So there's still one janitor in the
21 facility despite the fact that there's an additional 32
22 beds?
23     A.     Yes.  This doesn't include any outside
24 cleaning services, I should probably note.
25     Q.     Are there outside cleaning services used in

Page 127

1  the Aurora facility?
2      A.     I believe so, in the area of the ICE
3  office, because employees can't go back there or
4  detainees can't go back there.
5      Q.     And what's your reason -- for how long has
6  that been the case, that there were cleaning services
7  used?
8      A.     As far as I know, from the beginning of the
9  contracts.
10     Q.     And how do you know that, that there's a
11 cleaning service used to clean those areas?
12     A.     Because we usually -- because, like I said,
13 ICE doesn't allow in their offices detainees or
14 employees, so we have to provide a cleaning service for
15 them.  We always have.  And there's other areas that, you
16 know, as far as the executive offices and those type of
17 things that we have a cleaning service.
18     Q.     Does the janitor, in the staffing plan,
19 ever do that work?
20     A.     Not that I know of.  I think the janitor is
21 more of an overall checking out, you know, everything is
22 cleaned and that type of thing.  I'm not really sure what
23 the janitor does or where he goes, but he would be
24 overseeing the cleaning services, he would be
25 overseeing -- his function as far as control centers and

Page 128

1  that type of thing.
2      Q.     Look back at Exhibit 8, the contract, and
3  turn to page 19891.
4      A.     19891?
5      Q.     That's right.
6          MR. BARNACLE:  Are you talking about the
7      large contract or the --
8          MR. SCIMONE:  Yeah.  The large contract.
9          MR. BARNACLE:  It's Exhibit 9, for the
10     record.
11         MR. SCIMONE:  Sorry.  Exhibit 9.  Thank
12     you.
13     A.     198 --
14 BY MR. SCIMONE:
15     Q.     -- 91.
16     A.     Okay.
17     Q.     So this speaks to what we were just talking
18 about, I think.  So this is a job description for the
19 janitor at Aurora that's been incorporated into the
20 contract, correct?
21     A.     Correct.
22     Q.     And under "Primary Duties and
23 Responsibilities," if you'll look down to the seventh
24 bullet point, it says:  "Direct work, provides training
25 and performs inspections of work performed by detainee

Page 129

1  maintenance staff."  Do you see that?
2      A.     Yes.
3      Q.     Okay.  So that would -- you testified that
4  the janitor would supervise work done by the outside
5  cleaning service, but part of their job is to also
6  supervise work done by detainee maintenance staff; is
7  that correct?
8      A.     Yes.
9      Q.     Let's turn to page 901.  This is a job
10 description for a food service officer at Aurora that's
11 been incorporated into the contract, correct?
12     A.     Yes.
13     Q.     And under the primary duties and
14 responsibilities there, the first bullet point is:
15 "Supervises detainees specifically assigned to food
16 services."  Do you see that?
17     A.     Yes.
18     Q.     So that's a part of the job of the food
19 service officer, is to supervise detainees working in
20 that part of the facility?
21     A.     Yes.  If they have volunteer detainees,
22 they're going to supervise them in that work assignment.
23     Q.     And if you'll turn to page 927.  This is a
24 job description for an administrative lieutenant also
25 incorporated into the contract, correct?

**Page 130**

```
1        A.    Yes.
2        Q.    And the second-to-last bullet point on the
3   first page is: "Directs work, provides training, and
4   performs inspections of work performed by
5   detainees/inmate staff."  So that's part of the job of
6   the person in this job title as well, correct?
7        A.    Yes.
8        Q.    Okay.  So we've been talking about work
9   done by workers in the Voluntary Work Program, correct?
10       A.    Correct.
11       Q.    There's also some housekeeping tasks at the
12  Aurora facility that the detainees are required to
13  perform, correct?
14       A.    Correct.
15       Q.    And that's reflected in the Housing Unit
16  Sanitation Policy?
17       A.    Yes.
18             (Plaintiff Exhibit No. 14 was marked for
19             identification.)
20  BY MR. SCIMONE:
21       Q.    So what we've marked as Exhibit 14 is a
22  document that was previously marked in an early
23  deposition in this case as Ceja, C-e-j-a, 3, and it
24  consists of a few documents Bates stamped GEO_MEN 1419
25  through 21, GEO_MEN 1505 through 9, and GEO_MEN 1510
```

**Page 131**

```
1   through 13.  So do you recognize the documents that make
2   up this exhibit?
3        A.    They look like the policy and procedure for
4   the Aurora facility.
5        Q.    Okay.  And what formatting or content tells
6   you that that's what it is?
7        A.    It says "policies and procedure manual,"
8   gives the number of the policy, and the title of the
9   procedure.
10       Q.    So is this typically how the policy and
11  procedure manual sections are formatted?
12       A.    Yes.
13       Q.    And that number on the upper right, under
14  where it says "number," that's a reference for a section
15  of the manual?
16       A.    Yes.
17       Q.    And the title of this one on the first page
18  is "Sanitation Procedures"?
19       A.    Yes.
20       Q.    And so this was -- went into effect in
21  March 2010, correct?
22       A.    Yes.
23       Q.    All right.  That supersedes an earlier
24  version dated July 29, 2009?
25       A.    Yes.
```

**Page 132**

```
1        Q.    Is this the sanitation policy we were just
2   discussing?
3        A.    It appears so, yes.
4        Q.    Okay.  So if you look at section -- take a
5   minute to review Section B and Section C on the first and
6   second page respectfully.  Let me know when you finish
7   reviewing it.
8        A.    Okay.
9        Q.    So these describe housekeeping tasks that
10  detainees are required to perform, correct?
11       A.    Yes.
12       Q.    So these are not part of the Voluntary Work
13  Program?
14       A.    No.
15       Q.    Okay.  And these tasks are unpaid, correct?
16       A.    Correct.
17       Q.    What are the consequences if a detainee
18  refuses to participate in the activities listed in
19  Sections B and C?
20       A.    We ask them --
21       Q.    B or C, I should say.
22       A.    We ask them to voluntarily do it, we ask
23  them to clean it.  If they don't, we let ICE know that
24  they won't be cleaning it.  There's really not any
25  repercussions for this.
```

**Page 133**

```
1        Q.    Your testimony is that if they refuse to
2   clean, there's no repercussion?
3        A.    No.  I mean, we can file a report or
4   whatever on them, but there's nothing that we can really
5   do about it.
6        Q.    Okay.
7        A.    I think by ICE policy that we can file a
8   report, et cetera, and, you know, give them restrictions
9   or that, but nothing like that's been done.
10       Q.    Nothing like that has been done during what
11  period?
12       A.    During any period.
13       Q.    So there's no report that's been filed
14  about detainees refusing to clean?
15       A.    Well, I'm saying there may be a report, but
16  nothing has necessarily come out of that report.
17       Q.    The detainees ever been disciplined for
18  refusing to clean?
19       A.    As far -- I don't -- as far as taking
20  things away from them or food, no.
21       Q.    Any kind of discipline?
22       A.    No.
23       Q.    Your testimony is that there's never been
24  discipline issued for detainees?
25       A.    I don't know if --
```

Page 134

1          MR. BARNACLE:  Object to the form.
2      A.    I don't know if there's been discipline,
3  but as far as taking anything away from them or anything
4  like that, I mean, there's not much we can do, is what
5  I'm saying.
6          (Plaintiff Exhibit No. 15 was marked for
7          identification.)
8  BY MR. SCIMONE:
9      Q.    Before I go into this exhibit, how do you
10  know that?
11      A.    Well, I know what the performance-based
12  standards say, and that we can give them solitary
13  confinement.  What I'm saying is that's never occurred.
14  We don't give solitary confinement for refusing to clean
15  up their area.
16      Q.    And how do you know that that's --
17      A.    It's always been an informal policy that we
18  made sure -- it was a formal policy that there was
19  clarity on that.
20      Q.    When did that become a formal policy?
21      A.    Well, a few years -- a couple years ago.
22  But it's also been an informal policy.  We've never given
23  a detainee solitary confinement for refusing to clean
24  their areas.
25      Q.    How do you know that that's never been

Page 135

1  done?
2      A.    Like I said, it's been an informal policy.
3  We've never allowed that to happen.  If somebody did that
4  on their own without letting somebody know, then I
5  wouldn't know something like that.  But it's never --
6  it's never been a policy of GEO to put somebody in
7  solitary confinement, a detainee, for not cleaning their
8  area.
9      Q.    And if that did happen, notwithstanding
10  that policy, is that something that would likely come to
11  your attention?
12      A.    Definitely.
13      Q.    How would that come to your attention?
14      A.    I think that there would have been an
15  incident report filed or an internal -- what do we
16  call it? -- SIS if somebody was disciplined in that
17  manner.  Not necessarily to my attention, but at least to
18  the attention of, you know, somebody in the regional
19  office or that nature.
20      Q.    And how are those typically reported up the
21  chain of command?
22      A.    We give number -- well, during different
23  phases and different periods of this time period, I mean,
24  there was reports about how many people have been
25  disciplined, and there were monthly reports, those type

Page 136

1  of things.  And I think that, when they go in an audit,
2  they audit disciplinaries, they audit grievances, and I
3  think something like that would have come up.
4      Q.    So you've just been handed Exhibit 15, and
5  that's Bates stamped GEO_MEN 64018 through 64348.  Do you
6  recognize this?
7      A.    Yes.
8      Q.    And what are we looking at here?
9      A.    The Performance-Based National Detention
10  Standards 2011.
11      Q.    Right.  This is what we've been talking
12  about throughout the day: the PBNDS?
13      A.    Yes, sir.
14      Q.    Okay.  And this a copy of the 2011 version
15  of the PBNDS, correct?
16      A.    Yes.  As far as I -- yes.
17      Q.    As we said earlier, this is incorporated
18  with GEO's contract with ICE?
19      A.    Correct.
20      Q.    If you'll turn to page -- let me direct you
21  to -- okay.  And I should -- sorry.  Let me correct what
22  I said earlier.  We've excerpted this document from a
23  larger document.  It appears smaller than I'm sure you're
24  used to.  The full document is 018 through 4014.  In the
25  interest of reducing paper, I've just printed out a few

Page 137

1  sections.  So this has 64018 through 20, and then 64209
2  through 22, and then again 64344 through 348.  All right.
3  Just so we have a clean record.
4          So I'll direct your attention to
5  page 64220.
6      A.    Okay.
7      Q.    So this is a list of offenses, correct?
8      A.    Yes.
9      Q.    And the one at the very bottom right of
10  this page is refusing to clean assigned living area.  Do
11  you see that?
12      A.    Yes.
13      Q.    Number 306.
14      A.    Uh-huh.
15      Q.    Okay.  So I think you referred to this just
16  now that this is an offense that's listed in the ICE
17  Performance-Based National Detention Standards, right?
18      A.    Right.
19      Q.    And if you'll turn to the following page,
20  the list continues.  And afterwards, part B lists
21  sanctions.
22      A.    Correct.
23      Q.    And the third one is disciplinary
24  segregation.  Do you see that?
25      A.    Yes.

Page 138

```
1    Q.   Up to 72 hours?
2    A.   Yes.
3    Q.   That refers to solitary confinement?
4    A.   Yes.
5    Q.   That's what we're referring to when you
6  said that the national detention standards permit
7  solitary confinement for refusal to clean?
8    A.   Correct.
9    Q.   Okay.  Now, it says disciplinary
10 segregation.  Is there another kind of segregation?
11   A.   Administrative segregation.
12   Q.   What's the difference between those two?
13   A.   Administration segregation is usually what
14 we refer to as protective custody or somebody having to
15 move because they're seeking protection or there may be
16 an issue that we're investigating.
17   Q.   Are those all of the uses of administrative
18 segregation, what you just described?
19   A.   I think so, yeah.  Protective custody or we
20 put somebody in there when we're investigating -- do an
21 investigation.
22   Q.   An investigation of what?
23   A.   It could be criminal activity or assault or
24 something like that.
25   Q.   While you're investigating a disciplinary
```

Page 139

```
1  incident?
2    A.   Yes.
3    Q.   Okay.  So this section that we've excerpted
4  here running from page -- and I'm going to use the PBNDS
5  page references -- from 189, where it starts with
6  disciplinary system, 3.1, the large font in the upper
7  left --
8    A.   Yes.
9    Q.   -- through page 198, just before the list
10 of offenses, this describes disciplinary proceedings.
11   A.   Okay.
12   Q.   Right?
13        Take a moment to review if you need to.
14   A.   Yes, yes.
15   Q.   So there's a process to impose any of the
16 disciplinary sanctions that are listed in this document,
17 right?
18   A.   Yes.
19   Q.   There's notice to detainee, Section B,
20 correct?
21   A.   Oh, the notice, yes.
22   Q.   Yeah.  There are incident reports that are
23 to be prepared?
24   A.   Yes.
25   Q.   There's an investigation?
```

Page 140

```
1    A.   Yes.
2    Q.   And then there's a unit disciplinary
3  committee?
4    A.   Yes.
5    Q.   I take it they hear evidence about the
6  investigation?
7    A.   Yes.
8    Q.   And do they make a decision about whether
9  or not sanctions will be imposed?
10   A.   Yes.
11   Q.   It says on the lower right of page 194,
12 Section G, section titled "Staff Representation for the
13 IDP," this refers to the right that a detainee has to
14 have someone represent them to prepare a defense before
15 the disciplinary committee, correct?
16   A.   Correct.
17   Q.   And then on the following page, Section H
18 refers to the institution disciplinary panel.
19   A.   Correct.
20   Q.   Is this different from the unit
21 disciplinary committee?
22   A.   The unit disciplinary committee is the
23 investigational branch -- oh, I think this is like the
24 committee hearing.
25   Q.   I see.
```

Page 141

```
1    A.   And then the institution disciplinary panel
2  is the one that either accepts the recommendation or
3  doesn't.
4    Q.   Okay.  And they make a final decision --
5    A.   Yes.
6    Q.   -- in certain cases?
7    A.   Uh-huh.
8    Q.   Okay.  And so when you said that there's
9  policy of not placing detainees in solitary confinement,
10 you were referring to this disciplinary process here?
11   A.   I'm saying that the level of not cleaning
12 your room would not go to the level of putting a detainee
13 in disciplinary confinement.
14   Q.   Okay.  What's the smaller contract, the
15 2006?  8, I think?
16   A.   Exhibit 8.
17   Q.   I'm sorry.  Not that one.  Exhibit 9.
18   A.   9.
19   Q.   Yeah.
20   A.   Okay.
21   Q.   Okay.  If you'll turn to 632.
22   A.   Yes.
23   Q.   Okay.  So in Section 6 it says:  "Detainee
24 will be placed in Disciplinary Segregation only after a
25 finding by a Disciplinary Hearing Panel..."
```

Page 142

1          Do you see that?
2     A.    Uh-huh.
3     Q.    And that's what we were just describing,
4   that process?
5     A.    Right.
6     Q.    If you look up at No. 3, it says: "Any
7   detainee who represents an immediate, significant threat
8   to safety, security or good order will be immediately
9   controlled by staff for cause, and with supervisory
10  approval, placed in Administrative Segregation."
11         Do you see that?
12    A.    Yes.
13    Q.    That seems a bit different from the uses of
14  administrative segregation that you described earlier.
15    A.    No.  I told you if it was protective
16  custody or if there's an investigation for somebody who
17  had an assault.  So this represents immediate,
18  significant danger would be inclusive of those two
19  things.
20    Q.    Okay.  And so is this something that can be
21  done if there's a detainee who is -- does something that
22  could be subject to discipline and there's a decision
23  made to remove them from the facility to remain good
24  order?
25         MR. BARNACLE:  Object to the form.

Page 143

1     A.    When you say -- if it was significant
2   enough, yes, and that would probably be dealt with an
3   assault or that type of immediate cause.
4   BY MR. SCIMONE:
5     Q.    Who decides whether there's cause to remove
6   someone to administrative segregation in a case like
7   that?
8     A.    Well, it's going to be probably the
9   supervisor on duty.  If the detainee is causing a threat
10  or safety to himself, herself, or to the population, or
11  to the staff, then that person -- that detainee will be
12  removed in administrative segregation until we can find
13  out what's going on.  Or if they wanted protective
14  custody or that type of nature.  It has to be significant
15  in nature just to put somebody in administrative
16  segregation.
17    Q.    How do you ensure -- how does GEO ensure
18  that officers in this position exercise their discretion
19  appropriately?
20    A.    Well, we have policies, we have procedures.
21  They're being reviewed.  There's -- administration
22  segregation is being reviewed by the leadership.  If you
23  place somebody in there, you have to -- I think there's
24  a -- don't get me started on the process, but I believe
25  way back when, when I was involved in these things,

Page 144

1   there's a process that you have to do review within
2   24 hours and medical has to come in and review.  I mean,
3   it's a very, very stringent process about putting anybody
4   in any type of solitary confinement.
5     Q.    So that review that's done within 24 hours
6   of someone being placed in administrative segregation,
7   how do you ensure that people are being placed there for
8   appropriate reasons?
9     A.    Well, that and the incident report.  And,
10  like I said, medical would have to come see that person
11  immediately, that type of thing.  So there would be a
12  variety of ways to make sure that that's being done
13  properly.  Plus the records are kept, audits are being
14  done.  Those type of things would be looked at for sure.
15    Q.    So the auditors have an opportunity to
16  review those reports, and that is how it would come to
17  their attention --
18    A.    During the audit process, yes.
19    Q.    That's how it would come to their attention
20  if somebody is placed in admin seg for an inappropriate
21  reason?
22    A.    Yes.  Like this says, it's supervisory
23  approval.  So it would be the supervisor on duty.
24    Q.    That's the person that you said would make
25  the decision in the first instance, right?

Page 145

1     A.    Right.  Uh-huh.
2     Q.    Okay.  Do you want to take a break?
3     A.    If you don't mind.
4     Q.    That's fine.
5          (Recess from 1:10 p.m. to 1:14 p.m.)
6   BY MR. SCIMONE:
7     Q.    Picking up where we just left off, you
8   described prior to a couple of years ago there being an
9   informal policy prohibiting the use of disciplinary
10  segregation for refusal to clean.  Was that informal
11  policy written or reflected anywhere?
12    A.    No.  Like I said, the "not cleaning your
13  room" would not rise to the level of putting somebody in
14  segregation.
15    Q.    And is there any sort of documents that
16  would reflect that?
17    A.    Currently there is, because I wanted to
18  make sure it was -- there was no doubt the language was
19  clarified, et cetera.  I believe there's an updated -- I
20  don't know if it's an updated directive or if it was
21  updated in the handbook.
22    Q.    Would that be subject to a contract
23  modification?
24    A.    No.
25    Q.    Okay.  Would it have been an update to

Page 146

1  policies in the policy manual?
2      A.    Like I said, I'm not sure if it was a
3  directive, if it came through the detainee handbook, or
4  if it was a policy at the facility level.  I'm not sure.
5      Q.    Were you involved in memorializing that
6  policy?
7      A.    No.
8      Q.    Who was responsible for that?
9      A.    I think it was at the operation level.
10  Probably Dave Donohue overall responsible.
11     Q.    Did you have any communications with ICE
12  about that policy change?
13     A.    I didn't, no.
14     Q.    Do you know whether Dave Donohue did?
15     A.    I don't know.
16     Q.    That would have had to be approved by ICE,
17  correct?
18     A.    What?
19     Q.    That change to the policy.
20     A.    Not necessarily, because these are -- these
21  are layers of what we can -- what we can do, and we have
22  opted not to put anybody in segregation for not cleaning
23  their room.  As you will see in the PBNDS, they have a
24  lot of things that go under high to moderate level.  One
25  of the things is not cleaning your room.  Then they have

Page 147

1  different sanctions.  So we just wouldn't associate a
2  sanction of somebody not cleaning their room to putting
3  them in segregation.
4      Q.    But prior to a couple of years ago, that
5  wasn't written down anywhere?
6      A.    No.  It didn't really need to be, but it
7  wasn't written down anywhere.
8      Q.    What led to that becoming a formal policy?
9      A.    I just think with the clarity of things
10  going on in the political environment, we just wanted to
11  make sure that things were put in writing and that the
12  language was clear.
13     Q.    And a couple of years ago would have been
14  2016?
15     A.    Yeah.  And don't get me holding as to how
16  many years back this has been.  It could have been 2017.
17     Q.    Okay.  But within the last two years or so?
18     A.    Yes.
19     Q.    Give or take?
20     A.    Uh-huh.
21     Q.    That was during the time that this lawsuit
22  was pending, correct?
23     A.    I think this lawsuit was pending -- yes, it
24  was.
25     Q.    This has been pending since 2014.

Page 148

1      A.    Yes.
2      Q.    All right.  And you're aware that there are
3  other lawsuits pending currently against The GEO Group
4  related to work done by detainees in ICE detention
5  facilities?
6      A.    Yes.
7      Q.    And you're aware that one of the
8  allegations in several of those cases has been that GEO
9  requires detainees to do work and threatens them with
10  solitary confinement if they don't.  You understand that
11  that's one of the allegations, correct?
12     A.    Yes, I do.
13     Q.    Okay.  And you understand that's an
14  allegation in this lawsuit?
15     A.    Yes.
16     Q.    Was there any causal connection between
17  those lawsuits being filed and that policy being
18  memorialized and formalized?
19     A.    Again, with the political environment, yes,
20  it's probably -- lawsuits probably contributed to that.
21  Although this was not a practice that we've ever done, we
22  just wanted to make sure that it was clearly clarified
23  that it's not being done and it's not going to be done.
24     Q.    And if we wanted to look back and verify
25  that it wasn't being done prior to that policy being in

Page 149

1  place, the places we would want to look are incident
2  reports?
3      A.    Yes.
4      Q.    Where else?
5      A.    Well, the incident reports.  The incident
6  reports would show you what the sanctions were.  So that
7  would probably be it, pretty much.
8      Q.    All right.  Has there been any sort of
9  policy, formal or informal, restricting the use of
10  administrative segregation in cases where people refuse
11  to clean?
12     A.    That would be -- again, administrative
13  segregation is because there's an urgent threat to the
14  security of that individual, the staff, or -- yeah.  So
15  that wouldn't -- that would also be an informal policy
16  because that would never occur.  If somebody hasn't
17  cleaned their rooms, it not an emergent threat to the
18  facility.
19     Q.    Well, my question is just about whether or
20  not that policy is written anywhere.
21     A.    No.  I don't believe so.
22     Q.    Okay.  So if we wanted to see whether or
23  not -- well, is that an informal policy, that that's not
24  an appropriate use of administrative segregation?
25     A.    Well, I don't think it's an informal policy

EXHIBIT 1

Page 150

1   when the policy says this is what you place in
2   administrative segregation, and that would not encompass
3   anybody just not cleaning their room being placed on
4   administrative segregation.  So I don't think it has to
5   be a policy.  The policy is already there.  It says these
6   are the only times that you place somebody in
7   administrative segregation.
8          Q.   Well, you know, where we talked about was
9   that in -- there's a -- that standard is a bit general,
10  and what we discussed is that there are people in the
11  facility who actually make the decision about how to
12  implement it in practice, about whether something
13  actually represents that kind of a threat.
14         A.   Uh-huh.
15         Q.   And so is there any sort of guidance given
16  to those people to say, "Okay, this is the sort of thing
17  that doesn't rise to the level of a serious-enough
18  incident to merit being placed in administrative
19  segregation"?
20         A.   I think that comes with training of being a
21  correctional professional, detention professional.  We've
22  been in this environment; we know what a threat is.  I
23  just -- I wouldn't say it any other way.
24         Q.   So you would expect that that would be
25  reflected in training materials?

Page 151

1          A.   In training materials or training.  Like I
2   said, this has to have a supervisor approval, and that's,
3   you know, top supervisor, and it would definitely be in
4   the supervisor training.  It's not somebody -- a CO
5   putting somebody into admin seg without approval.
6          Q.   "CO" is corrections officer?
7          A.   Yes.  Or detention officer, yes.
8          Q.   In this context.  Not contracting officer,
9   to keep our terms straight.
10         A.   Yes.  Sorry.
11         Q.   Okay.  So you would expect that that would
12  be part of their training, correct?
13         A.   Yes.
14         Q.   Do you know for a fact whether it is part
15  of the training?
16         A.   I don't know specifically, but -- well,
17  they're trained on policies so, yes, I guess it would be,
18  because they're trained on policies and they're trained
19  on everyday situations.
20         Q.   But I'm assuming you'd say you guess
21  because you don't have actual knowledge of what that
22  training encompasses?
23         A.   Exactly.
24         Q.   Okay.  Is there anywhere else besides
25  training where you would expect that sort of guidance to

Page 152

1   be provided?
2          A.   Again, the policy.  You know, who you place
3   in administrative segregation.  That's about the only
4   places I can think of.
5          Q.   So you think that the -- well --
6          A.   There's a policy and a procedure on who you
7   can place in administrative segregation.  It's very --
8          Q.   And that's what we just looked at in the
9   PBNDS.  Is that what you're referring to?
10         A.   That, and we have -- not in the PBNDS.  We
11  have our facility policies.
12         Q.   Right.  I'm sorry.  We were looking at the
13  contract, I think, where it describes the uses of
14  administrative segregation.
15         A.   Uh-huh.  Which would be reflected in the
16  facility policy.
17         Q.   Okay.  In the policy and procedure manual,
18  for example?
19         A.   Yes.
20         Q.   Okay.  And in terms of what actually
21  happened in practice, if you were to go back to verify
22  whether or not administrative segregation was being used
23  appropriately, the places that you would want to look, I
24  think you mentioned audits might, you know, see in the
25  report who was placed in administrative segregation, the

Page 153

1   reasons, right?
2          A.   Yes.  If there was something that was an
3   audit finding, you would see in the audit that somebody
4   was placed in administrative segregation inappropriately.
5          Q.   And you would expect the reason for them to
6   be placed in administrative segregation to be documented
7   in those 24-hour reviews, correct?
8          A.   Yes.  Plus, the other thing is your
9   top-line supervisors, like your AFA or security, those
10  type of people have to make a daily tour of all
11  segregation units.  So they would be looking at the
12  records too.
13         Q.   What does AFA stand for?
14         A.   Assistant facility administrator.
15         Q.   Is that someone -- so just to get the
16  hierarchy straight, you have detention officers and then
17  what's the --
18         A.   Sergeants.
19         Q.   Sergeants are the supervisory level just
20  above that?
21         A.   And then lieutenants.
22         Q.   And then above lieutenants?
23         A.   Captain.
24         Q.   Captain.  And above the captain?
25         A.   Chief of security.

Page 154

1      Q.    Okay.  Does the chief of security report to
2  the AFA?
3      A.    Yes.  Probably the AFA for security, yes.
4      Q.    And the -- what's -- we had spoken earlier
5  about the -- a minute ago about the officer -- I guess
6  the supervisory officer on duty making the decision about
7  whether or not something rises to the level of being --
8  permitting someone to be sent to administrative
9  segregation.  What rank would typically have that
10  authority of the folks you just mentioned?
11      A.    I don't know firsthand.  I would estimate
12  at least a lieu, captain, chief of security, but I don't
13  know for a fact what level.
14      Q.    Okay.  That would be a question for someone
15  at the facility?
16      A.    Yes.
17      Q.    Is there a corporate policy that governs
18  who has that authority?
19      A.    No.
20      Q.    Okay.
21      A.    That wouldn't be considered corporate
22  policy.  That's a divisional policy.
23      Q.    Okay.  So like western division?
24      A.    No, no.  When I say "corporate," remember
25  we talked about corporate being HR and administrative

Page 155

1  functions.
2      Q.    Right.
3      A.    That specific policy to the facility
4  operations and under our operational policies.
5      Q.    Got it.  So would there be something under
6  operations that would --
7      A.    Possibly.
8      Q.    -- dictate?
9      A.    Possibly.
10      Q.    Possibly, okay.  But you're not sure?
11      A.    I'm fairly sure, but I can't pinpoint it
12  and don't know for a fact which policy it is.
13      Q.    Okay.  You're fairly sure that there is
14  one, but you're not sure which one it is?
15      A.    Yes.
16      Q.    Got it.  Thanks.
17          Okay.  Please take a look at Exhibit 15,
18  the PBNDS.  And I'll use the manual page numbers.  Turn
19  to page 324, the Voluntary Work Program, Section 5.8.  So
20  if you look on the right-hand column, No. 2, it says:
21  "Detainees shall be able to volunteer for work
22  assignments but otherwise shall not be required to
23  work" --
24      A.    Where?  I'm sorry.  Number 2, okay.
25      Q.    Right-hand column, yes, No. 2.

Page 156

1          "Detainees shall be able to volunteer for
2  work assignments but otherwise shall not be required to
3  work, except to do personal housekeeping."
4          Do you see that?
5      A.    Yes.
6      Q.    Okay.  And then on the next page, 325,
7  Section C is titled "Personal Housekeeping Required."
8          Do you see that?
9      A.    Yes.
10      Q.    All right.  And this reiterates that all
11  detainees are responsible for personal housekeeping and
12  then says: "Detainees are required to maintain their
13  immediate living area in a neat and orderly manner by:
14          "1.  Making their bunk beds daily;
15          "2.  Stacking loose papers;
16          "3.  Keeping the floor free of debris and
17  dividers free of clutter;
18          "4.  Refraining from hanging/draping
19  clothing, pictures, keepsakes, or other objects from
20  beds, overhead lighting fixtures or other furniture."
21          Do you see that?
22      A.    Yes.
23      Q.    All right.  So now I want you to keep that
24  handy, but I want to hold that side by side with
25  Exhibit 14.

Page 157

1      A.    Okay.
2      Q.    And I'll refer you again to -- on the
3  first -- on the second page, Section C, and then there's
4  also Section B.  So we established earlier that B and C
5  are the required cleaning, right?
6      A.    Yes.
7      Q.    Okay.  So B says: "Each detainee will be
8  responsible for the cleanliness of his or her cell and
9  living area, including walls, floors, sink, toilet,
10  windows, and other property within the cell, room, or
11  living area."
12          Do you see that?
13      A.    Yes.
14      Q.    Then it talks about making beds, not
15  placing things on windows, personal property being
16  stored, and so on.
17      A.    Yes.
18      Q.    And then Section C says:  "At 6:00 a.m.
19  each day, the following items will be issued:
20          "Mops and buckets, brooms, scrub bushes,
21  cleaning rags, cleaning chemicals."
22          And then "at 10:00 a.m. and 5:00 p.m. each
23  day, the following items with be issued: "Mops and buckets, brooms, cleaning rags."
24          "Mops and buckets, brooms, cleaning rags."
25          And then, if you turn a couple of pages

Page 158

1    after that, to the "Housekeeping/Maintenance Plan" -- do
2    you see that --
3         A.    Yes.
4         Q.    -- where that begins?
5               And then you turn forward a bit, to page 3.
6         A.    Of the housekeeping plan?
7         Q.    Yeah.
8         A.    Okay.
9         Q.    It says:  "On a weekly basis or by the
10   direction of the Shift Supervisor, all pods will be
11   subject to a total sanitation mission to ensure standards
12   are met and maintained."
13              Is this referring to work that's done as
14   part of Section C in what we just looked at?
15        A.    I would assume, yes.
16        Q.    And then the next page, "Housing Unit
17   Cleaning Schedule" lists series of areas that need to be
18   cleaned under scheduled cleaning.  Do you see that?
19        A.    Yes.
20        Q.    Okay.  Now, I'll just represent we've had
21   earlier testimony in this case that, row, that row,
22   and light fixtures, the last row, are generally not part
23   of the daily cleaning done in the housing pods?
24        A.    I wouldn't know that.
25        Q.    You wouldn't know that?

Page 159

1         A.    No.
2         Q.    Okay.
3         A.    If they're -- they may be.
4         Q.    Okay.  If you turn back to Section C, there
5    are various times throughout the day that these cleaning
6    implements are distributed.  Is it your understanding
7    that that's part of the daily cleaning that's done, is
8    that the pods are cleaned using those items?
9         A.    Yes.
10        Q.    Okay.  And that's required, correct?
11        A.    Yes.
12        Q.    Detainees are required to do that?
13        A.    Yes.
14        Q.    Okay.  So, as I said, I want you to look at
15   that and compare that with personal housekeeping required
16   in the PBNDS.  So the PBNDS lists four specific items
17   that it -- under personal housekeeping, and this seems to
18   encompass some additional tasks.
19              So I guess my question there is, is there a
20   conflict here between GEO sanitation policy and what the
21   PBNDS allows under the category of required personal
22   housekeeping?
23              MR. BARNACLE:  Object to the form.
24        A.    Not at all.  The actual policy encompasses
25   everything else that's in the contract, the other

Page 160

1    additional contract requirements, such as the ACA.  There
2    is another sanitation and hygiene portion of PBNDS that
3    talks about living areas.  There's a number of other
4    references that is now incorporated into the entire
5    policy.  This is just a section of the contract.
6    BY MR. SCIMONE:
7         Q.    And those sections say that detainees have
8    to do -- are allowed to do those things?
9         A.    Yes.
10        Q.    They're required to do those things?
11        A.    Yes, sir.  There's an ACA requirement that
12   talks about general living areas.  There's another, I
13   think -- and I want to say it's -- I don't know the exact
14   section in PBNDS that talks about sanitation and hygiene,
15   but it also incorporates living areas and common areas.
16        Q.    Do you know what section of the PBNDS that
17   it falls under?
18        A.    No.  I have to research it, but it's
19   definitely in there and in the ACA standards.
20        Q.    What happens if there's a conflict between
21   the ACA standards and the PBNDS at an ICE facility?  What
22   governs?
23        A.    As far as -- that would be up to -- that
24   would be up to ICE.  ICE would be the final authority on
25   which determination, if there was a conflict, that they

Page 161

1    want for us to follow.
2         Q.    Have you ever had communications with ICE
3    about the scope of tasks being done under the Housing
4    Unit Sanitation Policy?
5         A.    Not me, no.
6         Q.    Do you know anyone at GEO who has?
7         A.    Not that I know of.
8         Q.    Are you aware of the scope of tasks done
9    under the Housing Unit Sanitation Policy, the required
10   tasks, ever being specifically discussed by ICE and GEO?
11        A.    Well, ICE would have had to approve this
12   policy so that -- I don't know how much of a discussion
13   that would have been, but ICE would approve the policy.
14        Q.    So you've testified that Section B and C
15   here are required tasks and that they're unpaid, right?
16        A.    Yes.
17        Q.    But is there anything in this policy that
18   says that those tasks are unpaid?  Take your time to
19   review it if you need to.
20        A.    Not that I know of.  This is the
21   housekeeping policy.
22        Q.    So there's nothing here that specifies that
23   these are not paid VWP positions, right?
24              MR. BARNACLE:  Object to the form.  You
25              asked the question and she's reviewing the

Page 162

1          document and then you asked another question.
2    BY MR. SCIMONE:
3          Q.    Take your time to review the document if
4    you're not finished.
5          A.    So you're asking me if there is anything in
6    this policy that says that these are non-paid positions?
7          Q.    That's correct.
8          A.    Functions.
9          Q.    That's correct.
10         A.    It does not appear that there's anything in
11   this policy that says they're non-paid functions.
12         Q.    Okay.  And there's nothing in here that
13   says that they are paid functions under the VWP either,
14   correct?
15         A.    Correct.
16         Q.    So -- and you're not aware of any point at
17   which GEO has brought to ICE's attention the fact that
18   there -- that these functions are unpaid, right?
19               MR. BARNACLE:  Object to the form.
20         A.    No.  I wouldn't see any reason why to do
21   that.
22   BY MR. SCIMONE:
23         Q.    Okay.  You don't think that there's any
24   reason why that would be appropriate to bring to ICE's
25   attention?

Page 163

1               MR. BARNACLE:  Object to the form.
2          A.    Again, these are required by the contract.
3    This policy is encompassing everything that's required as
4    far as housekeeping duties are concerned.  So I didn't
5    see any reason why we would bring this to the attention
6    of ICE because there's nothing to bring to their
7    attention.
8    BY MR. SCIMONE:
9          Q.    So you had said earlier that you're often
10   involved -- not often, but you said you are involved
11   typically in meetings between the facility and the
12   contracting officer if there's an ambiguity in the
13   contract language or something that's unclear sometimes
14   that needs your attention.
15         A.    Yes.
16         Q.    Remember that testimony?
17         A.    Uh-huh.
18         Q.    Okay.  So given that the PBNDS has this
19   section that says:  "Detainee shall not be required to
20   work except other than outside of the volunteer work
21   assignments, shall not be required to work except to do
22   personal housekeeping," and there's a section here saying
23   personal housekeeping required that lists these four
24   functions, you don't see that as creating about whether or
25   ambiguity that might raise a question about whether or

Page 164

1    not a mandatory task outside of these four should be
2    brought to ICE's attention?
3               MR. BARNACLE:  Object to the form.  Asked
4          and answered.
5          A.    No, I don't.  Because there's other things
6    in the PBNDS and there's other things in the contract
7    that is over-encompassing.  There's several different
8    sections of the contract that -- this is one specific
9    section.  There's other sections that talk about living
10   areas.  This is talking about personal cell areas.
11   There's other sections in the ACA that talk about other
12   areas.  So this is just one section.  Inside its context,
13   it looks different or is ambiguous, like you said, but
14   taking the whole thing into consideration, it's not.
15         Q.    And so if there is an ambiguity, you said
16   ICE would have to decide, you know, which provision
17   governs.  So, for example, if there's an ambiguity
18   between the ACA and PBNDS, ICE would normally have to
19   decide which one applies, right?
20         A.    Yes.
21         Q.    So that's why I asked, would that be the
22   kind of thing, given that this is -- there seems to be
23   some ambiguity between this language and what's in the
24   policy, is that something that should be brought to ICE's
25   attention given that you're saying that there's an ACA

Page 165

1    standard that says one thing and then the PBNDS appears
2    to say something else here?
3          A.    But there's also --
4               MR. BARNACLE:  Object to the form.
5          A.    There's also sections in the PBNDS that
6    talk about general living areas.  This is just one
7    section of that PBNDS.  And there's -- and there's
8    sections in the ACA that talk about general living areas.
9    So this is one section that talks about living areas, and
10   you can combine it with the general -- I mean, personal
11   cell areas, and then you combine it with the general
12   living areas, it's a combination.  I don't see any
13   ambiguity at all.
14         Q.    Okay.  If I give you a full and complete
15   copy of the PBNDS, would you be able to point me to that
16   section you're referring to?
17         A.    I'm sure I could.  It will take me time to
18   look it up.
19               MR. SCIMONE:  Okay.  Let's take a break.
20               (Recess from 1:39 p.m. to 1:53 p.m.)
21   BY MR. SCIMONE:
22         Q.    Let me discuss something you mentioned
23   earlier.  I think you mentioned at the start of the day
24   that you have previously given testimony recently before
25   for the House?

Page 166

1       A.   Don't get me -- if it's for the -- the
2  election committee.
3       Q.   Election committee.  Federal elections?
4       A.   Yes.  No.  Yes.  It was federal election
5  committee.  It was a very short, brief deposition.
6       Q.   Was that in your capacity as a GEO employee
7  or GEO officer?
8       A.   Yes.  It was -- what do you call it? --
9  yeah, in my capacity as a GEO officer.
10      Q.   Was that before a committee of the House of
11 Representatives?
12      A.   No, no, no.  It was a three-member
13 committee.
14      Q.   Okay.  But part of the U.S. House of
15 Representatives?
16      A.   Yes.  It was a federal election committee.
17      Q.   Okay.  What was it in connection with?
18      A.   An acquisition that we had, as far as the
19 GEO structure is concerned.  I can get you the details,
20 but off the top of my head, I don't know.
21      Q.   Was it being -- was the site being used as
22 a polling place or something like that?
23      A.   No, no, no.  Something to do with structure
24 of the corporate environment.
25      Q.   Okay.  Let me, just to save some time,

Page 167

1  introduce another exhibit.
2            (Plaintiff Exhibit No. 16 was marked for
3            identification.)
4  BY MR. SCIMONE:
5       Q.   Okay.  You've been handed Exhibit 16, which
6  is Bates stamped GEO_MEN 46793 through 795.  And you
7  recognize this to be an e-mail between GEO and personnel
8  at ICE?
9       A.   Yes.
10      Q.   And there's an attachment as well.  And
11 I'll represent the attachment is a reproduction of a
12 document that was produced to us natively.  It was an
13 Excel file that was an attachment to this e-mail.
14      A.   Okay.
15      Q.   And we selected one particular tab for --
16 to view here.  So let me just go through, I guess, the
17 folks in this chain.  You mentioned Dawn Ceja, I think at
18 the time, in the exhibit we were looking at, she was an
19 assistant warden at Aurora?
20      A.   Yes.
21      Q.   This is in April 2014.  Was she the warden
22 at that time?
23      A.   She was not.  She was never the warden.
24 She was assistant warden.
25      Q.   She was always the assistant warden?

Page 168

1       A.   Yes.
2       Q.   Okay.  And if you look at the first e-mail
3  in the thread, it covers the last two pages, but it
4  starts on the second to last.
5       A.   Okay.
6       Q.   At the top it's from ERO Taskings.  ERO
7  stands for Enforcement and Removal Operations, correct?
8       A.   Yes.
9       Q.   It's a division of ICE?
10      A.   Yes.
11      Q.   Okay.  Do you know what ERO Taskings is,
12 that distribution group or e-mail?
13      A.   I'm guessing it's just their internal
14 group.  I don't know.
15      Q.   Okay.  Like, do you think just from what it
16 is, it's an e-mail distribution group?
17      A.   Where are you looking at?  Sorry.
18      Q.   At the top of that page.
19      A.   Oh, ERO Taskings.  Yeah, I'm sure it's just
20 an administrative group.
21      Q.   Right.  Okay.  It says:  The following
22 message is sent on behalf of Tae D. Johnson.  Do you know
23 who that is?
24      A.   Yes.
25      Q.   Who is or who was Tae D. Johnson at the

Page 169

1  time?
2       A.   I believe he's still the assistant director
3  for custody management.
4       Q.   And that's at ICE?
5       A.   Yes.
6       Q.   And Phillip T. Miller is also mentioned.
7  Who is he?
8       A.   He, at the time, was assistant director for
9  field operations.
10      Q.   And that's also an ICE officer?
11      A.   Yes.
12      Q.   And if you'll turn to the e-mail that
13 follows that on the first page of the document, there's
14 an e-mail here from John P. Longshore.  Do you know who
15 that is?
16      A.   I think he's a -- I'm not -- he's with ICE,
17 but I'm not actually sure in what capacity.
18      Q.   Okay.  Do you know who Carl Zabat is?
19      A.   No.  Again, with ICE, but I don't know what
20 capacity.
21      Q.   Okay.  And I do see he has an ICE e-mail
22 address in the top e-mail in the thread, but you're not
23 sure what office he's in, right?
24      A.   No.
25      Q.   Okay.  How about Jeffrey D. Lynch?  He's

Page 170

1  copied here.
2      A.   Again, don't know what capacity.
3      Q.   Okay.  How about Harry Qualantone?  Do you
4  know who that is?
5      A.   Don't know what capacity.
6      Q.   Okay.  Understood.  So take a minute just
7  to sort of read through this and get an understanding of
8  what this exchange is about.  Let me know when you have
9  finished.
10     A.   Okay.  I get the gist.
11     Q.   Okay.  So what's your understanding of
12  the -- of what's going on in this e-mail exchange.
13     A.   There appears to be a request for
14  information, and that's now filtered down to the field
15  office directors to answer the questions.  And then it
16  comes to us to verify the answers, it looks like.
17     Q.   Okay.  So that information request begins
18  at ICE, with Mr. Johnson and Mr. Miller, and they're
19  filtering it down through other levels of ICE personnel,
20  and that's where ending with Carl Zabat, who then sends
21  it to Dawn Ceja.  And I guess there's a reference in the
22  first e-mail to Johnny.  Any idea who he's addressing
23  there?  It says Johnny and Dawn on the very first page.
24     A.   Johnny would be Johnny Choate, the warden.
25     Q.   Johnny Choate, got it.  So Carl Zabat, from

Page 171

1  ICE, is then sending this to them asking them to supply
2  information?
3      A.   Yes.
4      Q.   Okay.  And so he asks them to review the
5  spreadsheet and then complete it, and then Dawn sends it
6  back and says, "Here you go."
7      A.   Okay.
8      Q.   Is that right?
9      A.   Yes.
10     Q.   And under "attachments," you can see that
11  there's an Excel file attached there, right?
12     A.   Yes.
13     Q.   Okay.  Let's look at the Excel file, the
14  attachment.
15     A.   I was going to say, do you have a
16  magnifying glass?
17     Q.   I thought about it.  I'll try to read it to
18  you.
19          So this is a spreadsheet, and we've
20  selected the "DEN" tab.  You can see that at the bottom.
21     A.   Yes.
22     Q.   Does that refer to Denver?
23     A.   Yes.
24     Q.   All right.  And so that's referring to the
25  ICE detention facility in Aurora.  Is that your

Page 172

1  understanding?
2      A.   Yes.
3      Q.   Okay.  First line says:  "Denver contract
4  facility."  Do you see that?
5      A.   Yes.
6      Q.   There's also El Paso, but I'm going to
7  focus on Denver.  So if you kind of go to the right on
8  that row, I'm going to bring your attention to certain
9  fields there.  So this is information that's supplied by
10  Dawn, correct?
11          MR. BARNACLE:  Object the form.
12     A.   I don't know.
13  BY MR. SCIMONE:
14     Q.   Well, so this is the attachment that was to
15  Dawn's e-mail, where she said, "Here you go."
16          MR. BARNACLE:  Object to the form.
17  BY MR. SCIMONE:
18     Q.   I'm representing to you that this was
19  produced to us as a family member, meaning an attachment
20  to the e-mail sent by Dawn.  And as we said, there's an
21  XLSX file there.  And so based on that, do you understand
22  this to be the spreadsheet returned to Carl Zabat?
23          MR. BARNACLE:  Object to form.
24     A.   Without seeing an e-mail, I'm just taking
25  your word for it that it's part of the e-mail.

Page 173

1  BY MR. SCIMONE:
2      Q.   Okay.  Assuming I'm telling the truth in
3  everything I'm representing to you, that makes sense to
4  you?
5          MR. BARNACLE:  Object to the form.
6      A.   Yes.
7  BY MR. SCIMONE:
8      Q.   Okay.  You don't have any reason to think,
9  based on this document, that that's not the case?
10     A.   Again, without seeing the e-mail and what
11  was attached, I don't know the form it was asked.  I
12  don't know.
13     Q.   Well, just from --
14     A.   It looks like there's a lot more to this
15  than just this one page, if it's an Excel spreadsheet.
16     Q.   Right.  So let's look back at the first
17  page of the e-mail just to try to pin this down.  So on
18  the first page, John Longshore writes to Carl Zabat:
19  "Carl, we have two facilities -- GEO and El Paso."  And
20  Carl then sends this to Johnny and Dawn and says:  "This
21  tasking is due to HQ by COB Monday next week.  Can you
22  please review the spreadsheet and have somebody complete
23  it?"
24          So Johnny and Dawn are both at the Aurora
25  facility, correct?

Page 174

1    A.    Yes.
2    Q.    In Denver?
3    A.    Yes.
4    Q.    Okay.  And if you look at the spreadsheet,
5  the tabs here, they all have three-letter abbreviations.
6  I see "NYC," "LOS," "HOU."
7    A.    Well, that's my concern.
8    Q.    Okay.
9    A.    Because all these tabs have different
10 locations that look like it's internal to ICE, because
11 these are not our facility.
12   Q.    Okay.
13   A.    So I wouldn't know how we would fill out
14 their form with all of these -- we wouldn't be privy to
15 all this other information.
16   Q.    Sure.  And I'm not asking about that,
17 because I'm making the same assumption you are, that ICE
18 is directing this to Johnny and Dawn because they're at
19 Aurora.
20   A.    But you asked me if this was an attachment
21 to the e-mail, and the reason I'm hesitant saying that is
22 because of all these other tabs here.  This would not
23 necessarily be an attachment to this e-mail.  There may
24 have been information that was put into this, but I don't
25 know how this, with all these other facilities, would be

Page 175

1  an attachment to this specific e-mail because those are
2  not dealing with any of our facilities.
3          MR. SCIMONE:  Okay.  So, I mean, I'll just
4  represent, Counsel, for our record, and maybe we
5  can discuss this outside the context of this, the
6  attachment -- I don't think I gave the Bates
7  number, but the attachment to the document that's
8  produced sequentially after the e-mail was
9  GEO_MEN 00046796.  It's an Excel file with all of
10 the tabs.  We've only printed out the one tab
11 because that's what my questions are about.
12         So -- but this was produced to us pursuant
13 to the ESI production standards that counsel have
14 agreed to, and so this was produced sequentially
15 as a family member.  The metadata indicates it is
16 a family member attached to this e-mail.
17         So with that representation, what I'm
18 saying to you is this was produced to us as an
19 attachment to the e-mail.
20         MR. BARNACLE:  For the record, that's fine
21 that you represent that on the record, but sitting
22 here right now, I have no way of independently
23 confirming that that's accurate.  And I think, you
24 know, the witness can certainly tell you about her
25 concerns about whether or not this was a

Page 176

1  spreadsheet attached as you say.
2          MR. SCIMONE:  Fair enough.
3  BY MR. SCIMONE:
4    Q.    My question to you, and I'll ask it again
5  just to be clear, do you have anything on the face of
6  this document that suggests to you that the information
7  contained in this tab, given how it's presented and
8  described in the first e-mail, is not information
9  provided by Dawn Ceja?
10   A.    I -- again, if it was provided by Dawn Ceja
11 and then it was incorporated into this spreadsheet,
12 that's fine.  Without seeing the attachment, I don't
13 know.  And I don't know -- I mean, we can go through
14 whatever you wanted me to go through and I can give you
15 my assumptions or whatever, but I don't -- it's just,
16 like I said, concerning to me that this is a complete
17 spreadsheet.  So it may have been attached someplace else
18 and this information was incorporated into this
19 spreadsheet.
20   Q.    Okay.  I think I can deal with counsel
21 about the authenticity of the document further --
22   A.    Okay.
23   Q.    -- to follow up on that.
24         But let me ask you some questions about
25 what we see here in this attachment.

Page 177

1    A.    Okay.
2    Q.    So looking across that row 9, for the
3  Denver Contract Detention Facility, your understanding is
4  that that refers to the Aurora facility?
5    A.    Yes.
6    Q.    Okay.  And from the e-mail, you understand
7  the information request relates to the Voluntary Work
8  Program?
9    A.    Yes.
10   Q.    Okay.  And they're asking questions about
11 voluntary work programs at different facilities, and ICE
12 is taking a survey of that --
13   A.    Yes.
14   Q.    -- information?
15         Okay.  So -- and this states -- and I'm
16 looking across a few of the columns -- the number of
17 detainees in each -- in this facility that participate in
18 the VWP.  Do you see that?
19   A.    Yes.
20   Q.    It's listed as 64 here.  And then it
21 describes the types of jobs performed.  Do you see that?
22   A.    Yes.
23   Q.    And then the amount of compensation paid?
24   A.    Yes.
25   Q.    Listed here as $1 per day.

Page 178

1        And then over to the right, there are a few
2   boxes that are highlighted.  Do you see those?
3        A.    Yes.
4        Q.    Okay.  So the first one says:  "Does the
5   facility provide a voluntary non-paid trustee program
6   with privileges for ICE detainees?"  And it says here
7   yes?
8        A.    Yes.  I see that.
9        Q.    Does the Aurora detention facility provide
10  a voluntary non-paid work program that has privileges?
11       A.    I don't know.
12       Q.    Okay.
13       A.    That.
14       Q.    That would be a question to direct to
15  someone at the facility?
16       A.    Yes.
17       Q.    Okay.  You're not aware of just in terms of
18  the contract and your area of responsibility of a program
19  like that?
20       A.    No, sir.
21       Q.    Okay.  Two columns to the right of that, it
22  says:  "Does the facility have communal volunteer
23  cleaning opportunities (unpaid or unrewarded) for ICE
24  detainees?"  And it says "no."  Do you see that?
25       A.    Yes.

Page 179

1        Q.    Okay.  And then two columns to the right of
2   that:  "Does the facility have communal cleaning details
3   (non-volunteer or rewarded)?"  And the answer is "no."
4   You see that, correct?
5        A.    Yes.
6        Q.    Okay.  We've talked about how the Housing
7   Unit Sanitation Policy has certain required cleaning
8   tasks that are not paid?
9        A.    Right.
10       Q.    As far as you know, they're not provided
11  with any other sorts of rewards or incentives, correct?
12       A.    As far as I know.
13       Q.    And they are mandatory?
14       A.    The clean --
15       Q.    The cleaning tasks.
16       A.    Yes.
17       Q.    Okay.  So that's a non-volunteer job,
18  correct?
19       A.    Yes.
20       Q.    So does that column describing communal
21  cleaning details, non-volunteer or rewarded, appear to
22  fairly describe the Housing Unit Sanitation Policy?
23       A.    "Does the facility have communal cleaning
24  details (non-volunteer or rewarded)?"  I'm not sure what
25  "communal details" -- I mean, is it a group of people

Page 180

1   volunteers or is it --
2        Q.    So you're not sure what ICE was asking with
3   this?
4        A.    No, no.
5        Q.    Okay.
6        A.    Because it doesn't seem to -- it kind of
7   conflicts with the first one:  Does the facility have
8   communal volunteer clean opportunities unpaid?
9        Q.    Do you feel that you have enough
10  information to be able to say -- as between those three
11  categories, the first one highlighted, where it says,
12  "yes," and then the two that say "no," do you feel that
13  you have enough information in understanding what ICE is
14  asking to be able to describe which of those Housing Unit
15  Sanitation Policy it most closely aligns with?
16       A.    Well, they're asking about communal and not
17  individual housekeeping policies.  I mean, are they
18  asking for -- is there, like, volunteer services within
19  the facility -- within the housing areas?  I'm not
20  absolutely sure.  I mean, it could be that it's part of
21  the housekeeping plan.  But the way they're asking it, as
22  far as communal, I'm hesitant to even ask.
23       Q.    Okay.  You can put that aside.
24       So we -- we spoke about this a little bit
25  earlier -- before I take a break and go check on that

Page 181

1   exhibit, I just want to be sure that I -- that we're good
2   about it.
3        So you haven't had any communications with
4   ICE specifically about the scope of the duties under the
5   Housing Unit Sanitation Policy, correct?
6        A.    No, I haven't.
7        Q.    You're not aware of any specific
8   communications to ICE about the scope of those duties,
9   correct?
10       A.    No.  Just this one, I guess.
11       Q.    Right.  Other than this, sure.  And
12  generally speaking, given your position in contract
13  compliance -- current position in contract compliance and
14  also earlier contract administration position, are those
15  generally communications you would expect to be directed
16  to your office or that your office would be aware of?
17       A.    Yes.
18       Q.    And --
19       A.    Well, as far as the housekeeping plan?
20       Q.    Yes.
21       A.    Not necessarily.  That wouldn't be to a
22  scale that I -- like if there was a major issue going on
23  with it that I would think would be directed towards me.
24       Q.    Okay.  So -- because we talked about cases
25  where your office would be involved if there was a

Page 182

1  question or ambiguity about what the contract would be
2  required.
3       A.   Or if there was a change of scope or if
4  there what a negotiation or a change that ICE wanted to
5  make, those type of things.
6       Q.   Okay.  And you're not aware of any issues
7  like that going up to your office?
8       A.   As far as housekeeping, no.
9            MR. SCIMONE:  Okay.  Let me take a break
10           and see if I can get a status on this.
11           (Recess from 2:13 p.m. to 2:33 p.m.)
12           (Plaintiff Exhibit No. 17 was marked for
13           identification.)
14  BY MR. SCIMONE:
15      Q.   Ms. Martin, Exhibit 17 that you've just
16  been handed is a full copy of the 2011 PBNDS, and the
17  full Bates range is GEO-MEN 64018 through 64414.  And so
18  we're looking at this because earlier we talked about the
19  scope of cleaning duties under the Housing Unit
20  Sanitation Policy.  I had identified a portion of PBNDS
21  and asked whether the Housing Unit Sanitation Policy went
22  outside of those duties.  You had testified there were
23  other aspects of the PBNDS that didn't encompass those
24  duties.  And so what we're doing now, I hope, is that you
25  can point to the sections of the document that you're

Page 183

1  referring to that comport with GEO's policy.  So please
2  take your time to read it.
3       A.   Under Section 1.2, sanitation --
4  Environmental Health and Safety, Subsection A.
5       Q.   Can you point to a Bates number.
6       A.   I'm sorry.  64041.  Environmental Health
7  and Safety:  "Environment health conditions shall be
8  maintained at a level that meets recognized standards of
9  hygiene, including those from the:  American Correctional
10 Association, Occupational Safety and Health
11 Administration, Environmental Protection Agency," et
12 cetera, et cetera.
13      Q.   I see.
14      A.   I would reference the American Correctional
15 Association as being incorporated into PBNDS, that we
16 would have to follow, as far as sanitation.
17      Q.   And you're saying that this authorizes
18 GEO-required detainees to do that work?
19      A.   Because the American -- ACA standard has
20 that as part of living areas.
21      Q.   Okay.
22      A.   Before we were talking about ACA being
23 separate from PBNDS.  PBNDS incorporates ACA.  Further,
24 it talks about "shall ensure that" -- number two -- 042:
25 It says:  "Staff and Detainee Safety.  The facility

Page 184

1  administrator shall ensure that adequate provisions are
2  made for staff and detainee safety, in accordance with
3  these standards and applicable law.  Standard '7.3 Staff
4  Training' further addresses employee training-related
5  issues.  Standard '5.8 Voluntarily Work Program'
6  addresses" -- "detainee shall receive" -- "such as
7  working with cleaning products to clean general use
8  areas."
9       Q.   So this references the Voluntary Work
10 Program?
11      A.   Detainee living area.  Housekeeping plan.
12 Maybe that's -- well, okay.  349 -- the fact that 6.1
13 detainee handbook is incorporated into PBNDS --
14      Q.   Let me just find that page.
15      A.   I'm sorry.
16      Q.   Page 349?
17      A.   64349, yes.
18      Q.   Okay.  Where are you looking on the page?
19      A.   6.1 the Detainee Handbook.
20      Q.   Okay.
21      A.   Because the ICE National Detention Handbook
22 is incorporated into that and it refers to general living
23 areas.
24      Q.   I'm sorry, where are you?
25      A.   Well, you have to have the handbook.

Page 185

1       Q.   I'm sorry, I didn't see the reference.
2       A.   The handbook -- because the detainee
3  handbook is incorporated into this and it refers to
4  general living areas in the detainee handbook, and the
5  fact that the ACA is incorporated and refers to general
6  living areas in the ACA, then I -- you know, we would
7  have to go back to those two things.  And on your exhibit
8  that you showed, as far as the Exhibit 15.
9       Q.   That's the excerpt of the PBNDS?
10      A.   Yes.
11      Q.   With Section 5.8?
12      A.   Right.
13      Q.   Okay.
14      A.   Even under -- I'm sorry.  64220.  Even
15 under the offense category, refusal to clean assigned
16 living area is not specific to cells as a requirement.
17 Number 306.
18      Q.   You said not specific to cells?
19      A.   Right.  It's an assigned living area, which
20 would be their housing area as well as their cells.  And
21 then the approval of ICE of our housekeeping policy
22 itself, exhibit -- the last one you showed me.
23      Q.   You're referring to Housing Unit Sanitation
24 Policy?
25      A.   Yeah.

Page 186

1    Q.   Okay.  You're just saying the fact that
2  that was approved by ICE?
3    A.   Yes.  Signed off and approved by ICE.
4    Q.   And that was approved by -- at what level?
5  By the contracting officer or the COTR?
6    A.   I'm guessing, because I can't recognize the
7  signature, it would be at the facility level.  Probably
8  the COTR.
9    Q.   The COTR, okay.
10    A.   So those three areas and the PBNDS, which
11  incorporates the ACA, incorporates the inmate -- I'm
12  sorry, detainee handbook, it talks about refusal to clean
13  assigned living areas, even in the disciplinary portion
14  of it, although we don't put them in solitary for that, I
15  will say that section shows me that those four areas is
16  just a partial section and doesn't incorporate the whole
17  thing and that there would be no reason for me to think
18  that there was anything am- -- I can't say that word.
19    Q.   Ambiguous.
20    A.   Thank you.
21         -- ambiguous to this.
22    Q.   Okay.  So the ACA, which we don't have in
23  front of us, you say that -- you're saying that that
24  specifically states that detainees may be required to do
25  cleaning?

Page 187

1    A.   I'm saying -- yes, yes.
2    Q.   Okay.  And because that's incorporated into
3  the PBNDS as stated at the page you identified here?
4    A.   20.
5    Q.   Yeah.  That that implies that or tells you
6  that a greater scope of cleaning is permitted, greater
7  than what's in that other section you looked at?
8    A.   Yes.  There's several different sections in
9  there that would encompass the general living area.
10    Q.   Let's look at that page, 64041.
11    A.   Yes.
12    Q.   I just want to understand what we're
13  describing here.  So section A1 -- before I go into this,
14  anything else in here that you would refer to?
15    A.   Just briefly looking through this, that I
16  could find.
17    Q.   Okay.  So this says: "Environmental health
18  conditions shall be maintained at a level that meets
19  recognized standards of hygiene, including those from
20  the:" A through F.  The first being is the American
21  Correctional Association.
22    A.   Right.
23    Q.   Now, your testimony is that because this
24  says that the health conditions shall be maintained at a
25  level that meets the standards of hygiene here, that also

Page 188

1  incorporates the provisions of the ACA that says who can
2  be assigned to perform those tasks to maintain the
3  standards?
4    A.   Yes.
5    Q.   Have you ever raised that understanding
6  with ICE?
7    A.   Well, obviously it was raised with the
8  understanding that they agreed to the policy, that they
9  reviewed the policy.
10    Q.   So -- okay.  But you didn't explicitly
11  raise that concept with them, that because the ACA is
12  incorporated here, we can do the same thing that the ACA
13  allows us to do in terms of who does what, because it's
14  referenced here in the Section 8.1?
15         MR. BARNACLE:  Object to the form.
16    A.   What I'm saying is, because there's several
17  different things that are incorporated into the PBNDS,
18  such as ACA, the National Detention Handbook, you know,
19  even description of living areas and disciplinary
20  process, and that is all incorporated, there's no reason
21  I would raise anything to ICE.  I would put it in a
22  policy outlining that was part of the PBNDS, part of the
23  contract requirements, and let them review it and approve
24  it.
25         / / / /

Page 189

1  BY MR. SCIMONE:
2    Q.   And so I'm not trying to argue with you
3  about this, but I want to understand why this -- you did
4  or did not -- just to lay the basic background, my sort
5  of overarching question is what -- whether anything
6  caused you to discuss the very specific topic with ICE
7  about what detainees were doing.  And so pursuant to
8  that, you say that it's -- the ACA standards are
9  incorporated into PBNDS?
10    A.   That, as well as the contract.
11    Q.   As well as the contract.  And what I'm
12  pointing to here is a section that describes the ACA
13  standards in a particular context.  That's my
14  understanding when I read this, that it says: "The
15  environmental health conditions shall be maintained at a
16  level that meets recognized standards of hygiene."
17         And so you don't see any discrepancy
18  between maintaining standards at a level and maintaining
19  them in a specific way that the ACA permits in terms of
20  who does what?
21    A.   No.  Because I think that there's different
22  sections and it's incorporating all the sections and all
23  the definitions into one policy.
24    Q.   This language here incorporates that?
25    A.   The ACA standard incorporates it.

EXHIBIT 1

Page 190

1      Q.    But you're saying that that ACA standard is
2  incorporated here by this language?
3      A.    Yes.
4      Q.    And you also say independent of this,
5  what's in the PBNDS, that the contract incorporates the
6  ACA standards.  I understand that.
7      A.    Correct.
8      Q.    And we talked a little bit earlier about
9  what happens if there's an apparent conflict between the
10 ACA standards and the PBNDS.  And in that situation, that
11 would be something that ICE would need to basically give
12 GEO an indication what should govern, right?
13     A.    Yes.
14     Q.    But you haven't raised any conflict between
15 the ACA standards and the PBNDS in this area?
16     A.    No.  Because I don't believe there is a
17 conflict.
18     Q.    Right.  Now let's look at the second
19 section you identified, okay.  So page 3289 of the PBNDS,
20 that's Bates stamp 64349.
21     A.    Okay.
22     Q.    So --
23     A.    Yes.
24     Q.    Okay.  So this section is titled:
25 "Detainee Handbook."  It says:  "This detention standard

Page 191

1  requires that, upon admission, every detainee be provided
2  comprehensive written orientation materials that describe
3  such matters as the facility's rules and sanctions,
4  disciplinary system, mail and visiting procedures,
5  grievance system, services, programs, and medical care,
6  in English, Spanish and other languages and that
7  detainees acknowledge receipt of those materials."
8        So this handbook that's being referred to,
9  is that an ICE publication?
10     A.    Yes.
11     Q.    Okay.  And your contention is that this
12 provision of the PBNDS incorporates that handbook?
13     A.    Yes.
14     Q.    Okay.  And there's a section of that
15 handbook that you say refers to general living areas?
16     A.    Yes.
17     Q.    And I realize I'm asking you just based on
18 your recollection, but what's your recollection of what
19 it says about living areas?
20     A.    I think it's assigned living areas.
21     Q.    Okay.
22     A.    Or assigned housing areas or something of
23 that nature.  It's not just independent cells.  It's
24 general assigned housing areas or something of that
25 nature.

Page 192

1      Q.    So it's assigned housing areas.  And so you
2  read that to mean something beyond?
3      A.    Their cells.
4      Q.    The cells, okay.
5      A.    It's common area.
6      Q.    The common area of the pod?
7      A.    Yes.
8      Q.    That encompasses areas outside of the bunk
9  and the immediate area around the bunk that are described
10 in --
11     A.    Yes.
12     Q.    -- that section of PBNDS that we looked at
13 earlier?
14     A.    Yes.
15     Q.    Okay.  Have you ever raised through the
16 contracting process or any other context with ICE a
17 question about whether that section of the handbook means
18 more than just the cells?
19     A.    No.
20     Q.    That's GEO's reading of that section?
21     A.    Like I said, I've never raised it because I
22 didn't think there was a conflict.
23     Q.    Okay.
24     A.    And they've already reviewed the policy, so
25 obviously they didn't think it was a conflict.

Page 193

1      Q.    Well, I guess as we saw when we looked
2  earlier at the policy -- and that's exhibit -- what's the
3  number again?
4      MR. BARNACLE:  14.
5  BY MR. SCIMONE:
6      Q.    14.  So as we talked about earlier, when
7  you look at the policy, the policy describes various
8  kinds of housekeeping, including some things that are, as
9  I understand, part of the Voluntary Work Program.  Is
10 that your understanding as well?
11     A.    Does it include the voluntary program?
12 Where?
13     Q.    Well, it doesn't say it explicitly.  I
14 guess that's what I'm pointing out, is that there are --
15 so if we look at -- well, let me just ask you this, given
16 what he have on the face the document:  Is there anything
17 in here that describes whether these tasks are part of a
18 required housekeeping that all detainees are required to
19 do as opposed to voluntary work that's done as part of
20 the VWP and that people are paid $1 a day for?
21     A.    Well, yes, under Section B, each detainee
22 will be responsible for the cleanliness of his or her
23 cell or living area, including walls, floors, sink,
24 toilet, windows, and other property within the cell room
25 or living area.

Page 194

1    Q.   Okay.  But that doesn't explicitly say that
2  that's required as part of the policy and not paid?
3    A.   If it was part of the paid Voluntary Work
4  Program, it would be under that policy.  I think we would
5  be very explicit under the Voluntary Work Program what's
6  paid and what's not paid or assignments.  This is
7  explicit to sanitation procedures, and if it's not
8  identified as being paid, I would say it's not paid.
9    Q.   If you look on Bates No. GEO_MEN 1508 on
10  that document, at the very top, above the table you see
11  the last line of that text it says "housing unit
12  trustee"?
13    A.   Uh-huh, yes, I do.
14    Q.   Is it your understanding that the trustee
15  generally refers to someone in a Voluntary Work Program?
16    A.   Yes, it would.
17    Q.   Okay.  And this is part of the Housing Unit
18  Sanitation Policy, correct?
19    A.   Yes.
20    Q.   So there is at least one job there that's
21  described as part of this sanitation policy that refers
22  to someone working in the VWP, correct?
23    A.   It could be, yes.
24    Q.   Do you have any -- are you certain as you
25  look through this sanitation policy in the schedule

Page 195

1  whether or not other jobs here are part of the VWP?
2    A.   I would consider a housing unit trustee
3  probably someone that was cleaning a segregation area,
4  someplace -- the common area where a detainee couldn't
5  come out into that area and clean themselves.
6    Q.   Okay.  And there's also, if you'll look --
7  on the policy, on the next page, there's a kitchen
8  cleaning section as well.  You see that, right?
9    A.   Yes.
10    Q.   This doesn't say whether this is work being
11  done by a GEO employee or a VWP trustee worker, correct?
12    A.   Correct.
13    Q.   This isn't part of the required cleaning
14  that all detainees are required to do, is it?
15    A.   No, it's not.
16    Q.   Okay.  So it's part of the Housing Unit
17  Sanitation Policy, but it's outside of what detainees are
18  required to actually do, correct?
19    A.   Correct.
20    Q.   Okay.  So let's look back at the PBNDS.  So
21  we've looked at the handbook and -- the reference here to
22  the handbook.  And so your testimony is that because the
23  handbook refers to general living areas, you understand
24  that to mean areas outside of just the cell?
25    A.   Yes.

Page 196

1    Q.   Meaning the common areas of the pod -- the
2  housing pod?
3    A.   Yes.
4    Q.   That's included in what's described in the
5  detainee handbook, according to your reading?
6    A.   Yes.
7    Q.   Okay.  And that's the understanding that
8  GEO applies?  In other words, it's not just your personal
9  reading, but that's what GEO's policy is based on.  Is
10  that your understanding?
11    A.   Yes.
12    Q.   Okay.  And then you mentioned also on
13  page 64220, that's the Bates number, it's describing the
14  offences --
15    A.   Yes.
16    Q.   -- and prohibited acts.  Number 306 says:
17  "Refusing to clean assigned living area."
18       Is it your testimony that that wording
19  suggests something more than just the cells?
20    A.   Yes.
21    Q.   What about those words tells you that it's
22  not just the cells?
23    A.   Because the assigned common area, the
24  living area, is where detainees eat, recreate, watch
25  television, have programs.  That's their area that they

Page 197

1  live in.  It's not just their cell.
2    Q.   So isn't that a question of how ICE is
3  defining living area in that document from ICE?
4    A.   Yes.
5    Q.   And that's -- so you're testifying about
6  GEO's understanding of what assigned living area means?
7    A.   Yes.
8    Q.   Okay.  But there's no communication from
9  ICE, is there, or is there, that defines assigned living
10  area to mean more than just the cell, is there?
11    A.   The policy.  I mean, the review of the
12  policy.  If there was any question about what a common
13  living area is, I mean, in this industry, their housing
14  area is their living area.
15    Q.   Okay.  So -- and you've never raised this
16  specifically with ICE because you don't see any conflict
17  between the way that this is phrased in the Housing Unit
18  Sanitation Policy and that language in Section 5.8 that
19  we looked at that says: "Detainee shall not be required
20  to work except to do personal housekeeping"?
21    A.   No.  I don't see any conflict.  I see this
22  as a part -- part of an entire book of standards that
23  incorporates that part and incorporates ACA and
24  incorporates the detention handbook, and I think they're
25  all-inclusive.

Page 198

1      Q.   And that's never a topic that you
2  specifically sought to clarify with ICE just to be clear?
3           MR. BARNACLE:  Object to the form.
4      A.   No.  I never specifically sought to clarify
5  it because I thought it was clear through the review of
6  the policy.
7  BY MR. SCIMONE:
8      Q.   That was done by the COTR?
9      A.   I think so, without knowing the signature.
10 It's definitely an ICE official.
11     Q.   Okay.  One more topic, I guess.  Bear with
12 me.
13          Okay.  If you can look at Exhibit I and
14 page 19652.
15          MR. BARNACLE:  Do you mean Exhibit 9?
16          MR. SCIMONE:  Yes.
17          MR. BARNACLE:  Sorry.  What's the number
18 again?
19          MR. SCIMONE:  19652.
20     A.   Okay.
21 BY MR. SCIMONE:
22     Q.   I would like to direct your attention to
23 the last full paragraph just above the two bullet points
24 on that page.  It says:  "The COTR is responsible for
25 monitoring the performance of work under this contract.

Page 199

1  In no event, however, will any understanding, agreement,
2  modification, change order or other matter deviating from
3  the terms and conditions of this contract be effective or
4  binding upon the Government unless formalized by proper
5  contractual documents executed by the Contracting
6  Officer."  Do you see that?
7      A.   Yes.
8      Q.   Does that match your understanding of what
9  COTR is authorized to sign off on?
10     A.   Yes.
11     Q.   Have you ever encountered a situation where
12 a COTR had signed off on something that you understood to
13 be in conflict with the contract?
14     A.   I mean, I've encountered where the COTRs
15 directed the facility to do something and the facilities
16 question and ask, "Is this contractually" -- "Can we
17 contractually do this without contracting officer and
18 modification?"  In that instance, yes.
19     Q.   We had an example earlier today with the
20 firearms --
21     A.   Firearms, exactly.
22     Q.   -- certification.
23          Okay.  So if a COTR -- okay.  So that's an
24 example.  Is there a situation where the COTR had
25 authorized something that then was put into effect before

Page 200

1  it was raised to your attention and you subsequently
2  became aware of something that you understood to be in
3  conflict with the contract?
4      A.   I can't think of a particular instance, but
5  if that instance ever happened, I would raise it to the
6  contracting officer.
7      Q.   Okay.  That would be the appropriate next
8  step to ensure that ICE did in fact approve that at the
9  appropriate level?
10     A.   Yes.
11     Q.   Okay.  And to memorialize that, to the
12 extent that it was a contract term that was different
13 from what was happening in practice -- and, again, I'm
14 going by the language here in this exhibit -- that would
15 need to be memorialized in a -- in a proper contractual
16 document executed by the contracting officer, right?
17     A.   What exactly are you referring to?  Are you
18 referring to the policy?
19     Q.   So I'm referring to a situation where
20 there's a practice that comes to your attention that's in
21 conflict with a provision of the contract and ICE wants
22 GEO to continue to do whatever it's doing, according to
23 the practice, even though there's an apparent conflict
24 with the policy or with -- sorry, with the contract
25 terms.  That would need to be modified in the contract

Page 201

1  then in order for there to be proper signoff from ICE?
2      A.   In those cases, yes.
3           MR. SCIMONE:  Okay.  Let's go off the
4      record.
5           (Recess from 3:08 p.m. to 3:11 p.m.)
6           (Plaintiff Exhibit No. 18 was marked for
7      identification.)
8  BY MR. SCIMONE:
9      Q.   All right.  I have one more short thing.
10 It should take maybe five minutes.
11     A.   Okay.
12     Q.   Okay.  You've been handed Exhibit 18, which
13 is Bates stamped GEO_MEN 14702 through 717.  And just
14 take a quick look and let me know if you recognize this
15 document.
16     A.   It looks like an audit checklist or maybe
17 ACA checklist.  I'm not really sure, but it's somewhat
18 familiar.  Yeah.  It looks like an ACA checklist.
19     Q.   Okay.  So is it a checklist, do you think,
20 related to an ACA audit?
21     A.   It's either that or related to getting
22 ready for an ACA audit.
23     Q.   Okay.
24     A.   So I'm not really sure which one.  Well, it
25 says "visiting community agency personnel," so I'm

EXHIBIT 1

Page 202

1 assuming it's an ACA audit.
2      Q.   So on the first page there's a box
3 called -- labeled "protocols," and below that "process
4 indicators."  Do you see that?
5      A.   Uh-huh, yes.
6      Q.   What is a process indicator as used here?
7      A.   That's the backup documentation for the
8 actual policy or standard that they're trying to prove
9 they're in compliance with.
10      Q.   And can you tell from looking at this what
11 this audit is looking to verify on the -- we'll focus on
12 the first page -- with respect to the policy?
13      A.   Under ALDF, inmates are compensated for
14 work performed with incentives such as, but not limited
15 to: monetary, special housing, extra privileges, sentence
16 reductions (when allowed by statute).
17      Q.   So they're -- go ahead.
18      A.   It's about the compensation for work
19 performed.
20      Q.   So they're trying to verify that those
21 facts are true, that inmates are compensated in one of
22 these ways?
23      A.   Under the work program, yes.
24      Q.   You understand that to be an ACA standard?
25      A.   Looks like it's an ACA standard.  For ALDF,

Page 203

1 which would be Adult Local Detention Facility.
2      Q.   And that's a set of standards put out by
3 the ACA; is that right?
4      A.   Yes.  There's different standards for
5 different types of facilities.
6      Q.   If you can turn -- strike that.
7           If you could turn to page 14708, it's a
8 fairly short memo here.  This is -- it says "Memorandum"
9 with the GEO logo at the top.  It's dated November 1,
10 2013.  Do you see that?
11      A.   Yes.
12      Q.   And it's a memo to the ACA file with a
13 reference number here.  Do you see that?
14      A.   Yes.
15      Q.   Okay.  And it's from Barbara Krumpelmann,
16 Assistant Warden For Finance and Administration.  She was
17 the assistant warden at the Aurora facility at this time?
18      A.   Yes.
19      Q.   Do you know Barbara Krumpelmann?
20      A.   Yes.
21      Q.   Okay.  And the memo says:  "Detainees do
22 not receive compensation in the form of special housing,
23 extra privileges, or sentence reduction(s).  They are
24 compensated at the rate of $1.00 per day when entered
25 into the work program."  Do you see that?

Page 204

1      A.   Yes.
2      Q.   And so do you have an understanding of what
3 the purpose of creating this memo is or was?
4      A.   I can make assumptions that they were
5 documenting to the file how -- what type of compensation
6 was being met as far as the work program is concerned.
7      Q.   And that's -- was that being done on your
8 understanding in order to comply with the standard that
9 we just looked at?
10      A.   Yes.
11      Q.   Are you aware -- one more question here.
12           So are you aware of any communications with
13 ICE about using nonmonetary forms of incentive for
14 detainees performing work in the Aurora facility?
15      A.   I'm not aware of -- I'm sure -- I'm not
16 aware of any.
17      Q.   You haven't had those communication with
18 ICE?
19      A.   I haven't had communication, no.
20      Q.   And no one in your department has had, to
21 your knowledge?
22      A.   Exactly.
23      Q.   And if there were a question about whether
24 or not that sort of nonmonetary incentive were permitted
25 under the contract, that's something you would expect to

Page 205

1 flow through your office, correct?
2      A.   Yes.
3           MR. SCIMONE:  Okay.  No further questions
4      at this time.  We are going to hold the deposition
5      open pending production of documents that the
6      parties have been discussing.  And that's it.
7           MR. BARNACLE:  Okay.  I just have a quick
8      clarification question.
9                   CROSS-EXAMINATION
10 BY MR. BARNACLE:
11      Q.   Ms. Martin, can you go back to what was
12 previously identified as Exhibit 3.
13      A.   Yes.
14      Q.   I'm going to point your attention to the
15 e-mail at the very top from James Black to Cheryl Nelson.
16 Again, who is James Black?
17      A.   He was the regional director for the
18 western region.
19      Q.   Do you understand this e-mail was in
20 relation to the request that there be quarterly firearm
21 certifications as opposed to annual?
22      A.   Yes.
23      Q.   And in this top e-mail, Mr. Black says to
24 Cheryl Nelson:  "I am still of the opinion that we don't
25 do anything without either being directed to by Amber or

EXHIBIT 1

Page 206

1    a contract mod."  Do you see that?

2        A.    Yes.

3        Q.    Do you remember how that issue resolved

4    itself?

5        A.    Yes.  There was a contract mod.

6        Q.    Okay.  In reading this language "we don't

7    do anything without either being directed to by Amber or

8    a contract mod," is Mr. Black talking about you having

9    sort of unilateral authority to make a change?

10       A.    No.  He's talking about the fact that I'm

11   the one that negotiates the modifications with ICE, and

12   if I say go ahead and do something, it's because we've

13   already negotiated the modification.  It's ICE's final

14   authority, not mine.

15             MR. BARNACLE:  All right.  I don't have

16       anything further.

17             MR. SCIMONE:  Okay.  Me either.

18             Thank you, Ms. Martin.  I appreciate your

19       time today.  I hope you feel better.

20             MR. SCIMONE:  Regular with a rough.

21             MR. BARNACLE:  Regular with a rough would

22       be great.  Thank you.

23             THE COURT REPORTER:  I will attach the

24       exhibits to the transcript.

25             (Thereupon, the reading and signing of this

Page 207

1    deposition was waived.

2             The proceedings concluded at 3:21 p.m.)

---

Page 208

CERTIFICATE OF OATH

THE STATE OF FLORIDA )

COUNTY OF PALM BEACH )

        I, the undersigned authority, certify that

AMBER MARTIN personally appeared before me and was duly

sworn on the 9th day of October, 2019.

        Signed this 23rd day of October, 2019.

        _____

        Nancy Cannizzaro, RMR

        Notary Public - State of Florida

        My Commission No. FF988509

        My Commission Expires: May 16, 2020

Page 209

CERTIFICATE OF REPORTER

THE STATE OF FLORIDA )

COUNTY OF PALM BEACH )

        I, Nancy Cannizzaro, Registered Merit

Reporter, certify that I was authorized to and did

stenographically report the foregoing deposition of AMBER

MARTIN, pages 1 through 207; that a review of the

transcript was requested; and that the transcript is

a true and complete record of my stenographic notes.

        I further certify that I am not a relative,

employee, attorney, or counsel of any of the parties, nor

am I a relative or employee of any of the parties'

attorneys or counsel connected with the action, nor am I

financially interested in the action.

        DATED this 23rd day of October, 2019.

        _____

        Nancy Cannizzaro, RMR

Amber Martin
Oct. 09, 2019                                            210 to 211

```
                                                      Page 210
 1      I have read the foregoing transcript of

 2   my deposition given on October 9, 2019, and

 3   it is true, correct and complete, to the best

 4   of my knowledge, recollection and belief,

 5   except for the corrections noted hereon

 6   and/or list of corrections, if any, attached

 7   on a separate sheet herewith.

 8

 9

10

11

12        _____

13        AMBER MARTIN

14

15

16

17        Subscribed and sworn to

18        before me this _____ day

19        of _____, 2019.

20

21

22        _____

23        Notary Public

24

25
```

```
                                                      Page 211
 1

 2        E R R A T A  S H E E T

 3        I, AMBER MARTIN, do hereby certify that I

 4   have read the foregoing transcript of my testimony, and

 5   further certify that it is a true and accurate record

 6   of my testimony (with the exception of the corrections

 7   listed below).

 8   PAGE  LINE   CORRECTION

 9   ____  ____   _____

10   ____  ____   _____

11   ____  ____   _____

12   ____  ____   _____

13   ____  ____   _____

14   ____  ____   _____

15   ____  ____   _____

16   ____  ____   _____

17   ____  ____   _____

18   ____  ____   _____

19   ____  ____   _____

20   ____  ____   _____

21   ____  ____   _____

22   ____  ____   _____

23   ____  ____   _____

24

     _____     _____

25   Date                   AMBER MARTIN
```