UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 17-2514 JGB (SHKx)** | Date | November 26, 2019 |
|---|---|---|---|
| Title | ***Raul Novoa, et al. v. The GEO Group, Inc.*** | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**    **Order (1)  GRANTING Plaintiffs' Motion for Class Certification (Dkt. No. 192); (2) DENYING Defendant's Motion to Exclude (Dkt. No. 211); and (3) VACATING the December 2, 2019 Hearing (IN CHAMBERS)**

Before the Court is Plaintiffs' motion for class certification, ("Motion," Dkt. No. 192), and Defendant's motion to exclude certain declarations submitted by Plaintiffs in support of the Motion, ("MTE," Dkt. No. 211).  After considering the papers filed in support of, and in opposition to, the Motion and the arguments of counsel, the Court GRANTS the Motion.  The Court considers the MTE appropriate for resolution without a hearing.  See Fed. R. Civ. P. 78; L.R. 7-15.  After considering the papers filed in support of, and in opposition to, the MTE, the Court DENIES the MTE.  The hearing set for December 2, 2019 on the MTE is VACATED.

## I.  BACKGROUND

### A.  Procedural Background

On December 19, 2017, Raul Novoa ("Novoa") filed a putative class action complaint against Defendant The GEO Group, Inc. ("GEO").  (Dkt. No. 1.)  Novoa filed a first amended complaint on July 6, 2018,  (Dkt. No. 47), and a second amended complaint on December 24, 2018, which added Jaime Campos Fuentes ("Fuentes") as a Plaintiff, ("SAC," Dkt. No. 108).  On August 16, 2019, Plaintiffs sought leave to file a third amended complaint.  (Dkt. Nos. 167, 169.)  The Court granted leave, (Dkt. No. 183), and Plaintiffs filed the third amended complaint, which is operative, ("TAC," Dkt. No. 184).  The TAC added Abdiaziz Karim ("Karim") and

Ramon Mancia ("Mancia") as Plaintiffs, amended the class definitions, and added two causes of action.  (see Dkt. No. 183 at 2.)

The TAC alleges seven causes of action arising from Plaintiffs' detention at California's Adelanto Detention Center ("Adelanto"): (1) violation of California's Minimum Wage Law, Cal. Labor Code §§ 1194, 1197, 1197.1; (2) unjust enrichment; (3) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq.; (4) violation of California's Trafficking Victims Protection Act ("CTVPA"), Cal. Civ. Code § 52.5; (5) forced labor under the Federal Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589(a), 1594(a); (6) forced and attempted forced labor under the TVPA; and (7) retaliation.[1]  The TAC defines three putative classes (four, including sub-classes), which are discussed in greater detail below.

Plaintiffs filed the Motion on September 27, 2019.  (Mot.)  In support of the Motion, they included the following declarations and related exhibits: the Declaration of Lydia Wright, ("Wright Declaration," Dkt. No. 193 (attaching Exhibits 1 to 34)); the Declaration of Raul Novoa, ("Novoa Declaration," Dkt. No. 192-3); the Declaration of Jaime Campos Fuentes, in Spanish and English, ("Fuentes Declaration," Dkt. No. 192-4); the Declaration of Abdiaziz Karim, ("Karim Declaration," Dkt. No. 192-5); the Declaration of Ramon Mancia, ("Mancia Declaration," Dkt. No. 192-6); the Declaration of Gagandeep Marwaha, ("Marwaha Declaration," Dkt. No. 192-7); the Declaration of Fernando Munoz Aguilera, in Spanish and English, ("Aguilera Declaration," Dkt. No. 192-8);  the Declaration of Daniel Charest, ("Charest Declaration," Dkt. No. 192-10); the Declaration of Tina Wolfson, ("Wolfson Declaration," Dkt. No. 192-11); the Declaration of R. Andrew Free, ("Free Declaration," Dkt. No. 192-12); and the Declaration of Hannah Lopez, ("Lopez Declaration," Dkt. No. 192-9).

Defendant filed an opposition on October 28, 2019, ("Opposition," Dkt. No. 205), and included in support the following declarations and exhibits: Declaration of Damien DeLaney, ("DeLaney Declaration," Dkt. No. 205-1 (attaching two volumes of Exhibits, Dkt. No. 206 (Exhibits A to I[2]) and Dkt. No. 207 (Exhibits J to R, and U))); Declaration of Dan Ragsdale, ("Ragsdale Declaration," Dkt. No. 205-2 (attaching Exhibit T)); Declaration of Gregory Hillers, ("Hillers Declaration," Dkt. No. 205-3 (attaching Exhibit S)).

Plaintiffs replied on November 4, 2019, ("Reply," Dkt. No. 209), and attached a second declaration by Lydia Wright, ("Wright Declaration II," Dkt. No. 210 (attaching Exhibits 1 to 5)). On November 12, 2019, Defendant filed a notice of supplemental authority. ("Defendant's Notice," Dkt. No. 215 (attaching Ex. A).)

---

[1] Plaintiffs do not define the proposed classes to cover the retaliation claim, and the parties generally ignore this claim in their briefing on the Motion.  The retaliation claim involves GEO's counterclaim to the original complaint for unjust enrichment and declaratory relief.  (Dkt. Nos. 45, 58.)  GEO filed an Answer to the TAC, which includes only a conditional counterclaim for declaratory relief, on October 15, 2019.  (Dkt. No. 200).  Plaintiffs filed an answer to the counterclaim on October 28, 2019.  (Dkt. No. 204.)

[2] GEO resubmitted Exhibit D with a notice of Errata.  (Dkt. Nos. 212, 212-1)

On the same day as Plaintiffs' Reply, Defendant filed a motion to exclude the declarations of non-Plaintiff declarants Aguilera and Marwaha. ("MTE," Dkt. No 211.) Plaintiffs opposed the Motion to Exclude, ("Opposition to MTE," Dkt. No. 213), and attached the Declaration of Lydia Wright in support of the Opposition to the Motion to Exclude, ("Wright Declaration III," Dkt. No. 213-1). Defendant filed a response. ("MTE Response," Dkt. No. 216.)

**B. Factual Background**

This putative class action is brought by current and former immigration detainees against the operator of an immigration detention facility located in the City of Adelanto, California ("Adelanto"). Plaintiffs were held at Adelanto while their immigration cases were pending. GEO is a business that operates more than a dozen immigration detention centers around the country. Since May 2011, GEO has operated the Adelanto facility as a subcontractor for the City of Adelanto, which entered into an Intergovernmental Service Agreement ("IGSA") with Immigration and Customs Enforcement ("ICE") to hold immigration detainees at the facility. (Wright Decl. at Exs. 2, 3.)

Under the IGSA, GEO is required to comply with ICE's Performance Based National Detention Standards, ("PBNDS," Wright Decl. at Ex. 14; Opp'n at 4), which set out "expected outcomes" and "minimum requirements" for the management of contract facilities like Adelanto. These outcomes and requirements touch on nearly all aspects of operating an immigration detention facility, including emergency planning, environmental health and safety, use of force and, as relevant to this action, arrangements for detainee labor within the facility. (Id. at Ex. 2, p. 8.) GEO has either companywide or facility-specific policies that must meet or exceed the minimum standards in the PBNDS, and which apply across the company or facility. (Id. at Ex. 4, pp. 28-29 (referencing both company-wide and facility-specific policies).) Under the IGSA and the PBNDS, GEO is required to provide immigrants with basic necessities such as food, shelter, utilities, clothing, bedding, and health services. The PBNDS also require recreation, religious practice opportunities, and visitation, among other activities. Under the PBNDS § 5.8, GEO must create a detainee "voluntary work program" that complies with the PBNDS requirements. (Id. at Ex. 5, pp. 60, 62.)

**1. PBNDS "Voluntary Work Program" Requirements**

The expected outcomes and minimum requirements of the "Voluntary Work Program" are located in Section 5 of the PBNDS, which deals with multiple detainee activities, such as religion and correspondence. PBNDS § 5.8. Under § 5.8, detainees "shall be provided the opportunity to participate in a voluntary work program." Id. They "shall not be required to work, except to do personal housekeeping." Id. Required personal housekeeping is defined in § 5.8:

//
//

---

**CIVIL MINUTES—GENERAL**

Detainees are required to maintain their immediate living areas in a neat and orderly manner by:
1. making their bunk beds daily;
2. stacking loose papers;
3. keeping the floor free of debris and dividers free of clutter; and
4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture.

Id. More labor-intensive tasks beyond such "required personal housekeeping" or outside the "immediate living area" of each detainee must follow the PBNDS requirements for voluntary work. The PBNDS direct the facility administrator to develop written rules for selecting "work detail volunteers," including a work program agreement. Id. The volunteers must receive "at least" $1.00 per day. Id.

Plaintiffs claim GEO takes advantage of the voluntary work program to benefit from free or nearly-free detainee labor, which is not truly voluntary and which GEO exploits on a daily basis as a "round-the-clock cleaning, sanitation, and maintenance staff." (Mot. at 16.) Plaintiffs describe four problematic policies or practices, under which they claim detainees are effectively compelled to work beyond required housekeeping or compelled to "volunteer" for work details: (1) Work Program Policy; (2) Uncompensated Work Program Policy; (3) Housing Unit Sanitation Policy, and (4) Deprivation Policy. (Mot. at 5.) GEO responds that Plaintiffs mischaracterize the nature of detainee labor at Adelanto. The company states that it complies with the PBNDS and that its work policies are approved by ICE. (Opp'n at 8; Ragsdale Decl. at ¶ 4.)

## 2. Work Program Policy

First, Plaintiffs state GEO operates a detainee Work Program Policy ("Work Program"), (Mot. at 6-9), at Adelanto, which is recorded in § 8.1.8 of GEO's Adelanto Policy and Procedure Manual. (Adelanto Work Program, Wright Decl. at Ex. 15.) GEO also issues an Adelanto Supplemental Detainee Handbook with more specific rules, regulations, policies, and procedures concerning the Work Program. (Adelanto Supp. Detainee Handbook, Wright Decl. Ex. 16.) Available work assignments include food service, laundry, dorm cleaning, cores/hallway, court/visit, recreation, floor crew, barbershop, intake, medical detail, paint detail, and warehouse. (Work Detail Application, Wright Decl. at Ex. 17; Opp'n at 9 (citing Wright Decl. at Ex. 2, p. 63 ("the detainee work plan must be voluntary, and may include work or program assignments for industrial, maintenance, custodial, service, or other jobs.").)

GEO sets work schedules, assigns detainee workers to shifts and workdays of no more than 8 hours, and provides needed equipment and instructions. (Mot at 7-8.) GEO maintains records of detainee work hours, and pays detainees by depositing money into their commissary accounts. (Id. at 10; Wright Decl. at Ex. 22.) At Adelanto, detainee workers earn $1.00 per day for participating in the program. (Mot. at 9.)

### 3.   Uncompensated Work Program Policy

Second, Plaintiffs state that an unwritten Uncompensated Work Program Policy exists, (Mot. at 9-10), under which applicants for the Work Program must work for an arbitrary period of time for no compensation whatsoever, in the hopes that they will eventually be hired into the Work Program.  GEO failed to respond to a request for admission, and so admitted pursuant to Fed. R. Civ. P. 36(a)(3) that it "permits detainees at the Adelanto Facility to work for no compensation at all if all paid Work Program positions are filled."  (Mot. at 9 (Wright Decl. at Ex. 34, p. 7).)  The work detail application states there are only 40 paid positions available at a time.  (Wright Decl. at Ex. 17.)  In its Answer to the TAC, GEO denies that an Uncompensated Work Program exists as such, but admits Work Program participants may "choose to perform self-care tasks" including meal preparation and basic housekeeping chores.  (Dkt. No. 200 ¶¶ 57-58.)

In addition to the GEO work detail application, Plaintiffs attach detainee declarations regarding such unpaid "volunteer" work.[3]  (Fuentes Decl. ¶ 9; Karim Decl. ¶¶ 7, 10;  Mancia Decl. at ¶ 8 ("I have never been compensated for my labor as a porter.  Instead GEO officials occasionally give me extra food or milk."); Aguilera Decl. at ¶ 9 ("I worked as a porter from approximately January 2019 until June 2019. . . . During this period, the GEO employees demanded that I worked for free.").)  Plaintiffs also attach several emails from GEO employees showing that detainees worked throughout the facility, (Wright Decl. at Ex. 6 ("We need all shifts to start putting detainees to work in the hallways, medical, intake, the 'D-Spaces,' and the hallways leading to the housing units, etc. . . . I don't want excuses, just action."), Ex. 8 (listing areas outside of detainee bunks "that can use improvement with attention and detainee labor" and noting "no detainee workers were present working (I know shifts are short staffed today)"), Ex. 9 (stating ahead of inspection that facilities "need to be sparkling" and to "use as many detainee crews as necessary"),  Exs. 10-11, 21 (noting the receipt of detainee complaints about not being paid).).  Plaintiffs also demonstrate that unpaid workers were tracked in the same system used for paid workers.  (Wright Decl. at Ex. 22, p. 2 (tracking duty assignments for a single day far in excess of the 40 paid positions, and including handwritten notes such as "volunteer" and "[redacted name] was a worker for seg; wants to know why she was not on payroll.  She works every day.").)

### 4.   Housing Unit Sanitation Policies ("HUSPs")

Plaintiffs also describe a GEO company-wide practice of Housing Unit Sanitation Policies ("HUSPs") that apply at GEO immigration detention centers nationwide.  (Mot. at 10 (citing

---

[3] Novoa's Declaration does not state he worked without receiving $1.00 per day. The other named Plaintiffs do state they worked without pay at jobs clearly outside of the required personal housekeeping tasks.

**CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk <u>MG</u>

Plaintiffs' requests for admission as to each facility, which GEO failed to answer).)[4]  Plaintiffs contend these HUSPs impermissibly expand the scope of "required personal housekeeping" otherwise permissible under the PBNDS.

Plaintiffs emphasize facts tending to show that the scope of GEO's HUSPs is far beyond the four "required personal housekeeping" tasks in the PBNDS.  Whereas the PBNDS limit required tasks to a detainee's "immediate living area" and define minimal practices of tidiness such as stacking papers, making the bed, and clearing clutter from the floor, the Adelanto policy makes detainees responsible for the cleanliness of walls, floors, sinks, toilets, windows within the "cell, room, or living area."  (Wright Decl. at Ex. 3.)  At 6 a.m. each Detainee is issued mops, buckets, brooms, scrub brushes, cleaning rags, and chemicals, and officers supervise the mandatory cleaning.  (Id.)  Another section of the GEO policy expands the area of responsibility to "all commonly accessible areas of the unit" including "microwaves, tables, and chairs," and notes "each and every detainee must participate."  (Id. at Ex. 24.)  A third plan provides that on a weekly basis or as needed each unit as a whole is subject to a "total sanitation mission."  (Id. at Ex. 18.)

Under GEO's written policy, detainee compliance may be obtained by the imposition of sanctions, because refusal to clean one's living area is classified in the Supplemental Detainee Handbook as a "High Moderate" offense.  (Id. at Ex. 16, p. 29.)  Punishments can vary from a warning or reprimand to 72 hours in disciplinary restriction, the initiation of criminal proceedings, disciplinary transfer (which is "recommended"), monetary restitution ("if funds are available"), loss of privileges, change of housing, restriction of the detainee to the living unit, or other sanctions.  (Id.)

GEO does not dispute the existence of these policies, but argues they are within the scope of what the PBNDS allow, and also note Plaintiffs were never placed in "solitary confinement"[5]

---

[4] GEO argues Plaintiffs attach no evidence that the HUSPs exist at other GEO facilities other than the Adelanto facility, but does not respond to Plaintiffs' argument that GEO effectively admitted the HUSPs existence by failing to respond to Plaintiffs RFAs on this subject. (Opp'n at 3 n.4 (arguing narrowly that GEO did not admit in its previous briefing the application of an Adelanto-specific "Housekeeping Plan" at other facilities, and failing to address the RFAs).)  GEO also does not adequately address Plaintiffs' argument that, at minimum, the Menocal litigation shows the existence of a HUSP at the Aurora, Colorado facility.  Menocal v. GEO Grp., Inc., 320 F.R.D. 258 (D. Colo. 2017), aff'd, 882 F.3d 905 (10th Cir. 2018), cert. denied, 139 S. Ct. 143 (2018).

[5] GEO also attaches excerpts from the deposition of Amber Martin to refute Plaintiffs' claims that detainees may be subjected to disciplinary segregation for failure to perform cleaning tasks.  (DeLaney Decl. at Ex. G.)  GEO does not define Martin's role, but notes her deposition was taken as part of the Menocal case.  (Opp'n at 7.)  Martin stated, "We've never given a detainee solitary confinement for refusing to clean their areas." (DeLaney Decl. at Ex. G, p. 134.) It does not seem the statement covers Adelanto, because the deposition was on the subject of the

**CIVIL MINUTES—GENERAL**

and did not personally suffer "abuse of legal process." (Opp'n at 3.) GEO highlights portions of an ICE Detainee Handbook that uses more expansive language than the PBNDS, which instructs: "you must keep areas that you use clean, including your living area and any general use areas that you use." (DeLaney Decl. at Ex. F, p. 12.) The ICE Detainee Handbook also warns "you may be disciplined" if you do not keep your areas clean. (Id.) GEO also notes that the PBNDS contemplate discipline for a detainee's "refusal to clean assigned living area," and includes many of the same sanctions as GEO, including criminal proceedings, transfer, or segregation for 72 hours, and lesser punishments. PBNDS § 3.1.

Although Plaintiffs rely principally upon Adelanto-specific policies in their description of the HUSP, they note GEO's default admission that HUSPs exist at twelve other facilities. (Id. at Ex. 34.) They also cite Menocal v. GEO Grp., Inc., in which the U.S. District Court for the District of Colorado certified a class challenging a similar HUSP at a GEO facility in Aurora Colorado. 320 F.R.D. 258 (D. Col. 2017) (certifying a Work Program class and HUSP class on similar evidence); aff'd, 882 F.3d 905 (10th Cir.), cert. denied, 139 S. Ct. 143 (2018).

### 5. Deprivation Policy

Plaintiffs and GEO largely agree on the existence of the Work Program, and Defendant does not seriously dispute that detainees often work without pay under the Uncompensated Work Program as Plaintiffs describe it. Rather, the parties' factual disputes center on whether participants join or participate voluntarily, or are coerced to join by an alleged "Deprivation Policy." (Mot. at 15.) Under this policy, Plaintiffs claim[6] GEO deprives Adelanto detainees of "basic living necessities, including sufficient food." (Mot. at 15.)

Defendant denies that detainees are deprived of necessities such as food, water, and hygiene products, and draws attention to apparent inconsistencies in Plaintiffs' individual accounts of "deprivation." (Opp'n at 10 (noting some Plaintiffs had sources of outside funding, or received certain basic necessities, and pointing to disparities between detainee deposition testimony and their declarations).) To demonstrate the existence of such a policy, Plaintiffs cite not only their individual experiences, (Mot. at 16 (citing detainee declarations)), but also OIG reports finding PBNDS violations at Adelanto. (Id.; Wright Decl. at Exs. 28-30.) Plaintiffs argue the reports and their experience establish Adelanto detainees often lack sufficient food, clothing,

---

Aurora Colorado facility. Similarly, a GEO official distinguished between solitary confinement cells and GEO's "disciplinary rooms," which he stated are double bunked. (Opp'n at 7.) Thus, GEO's denial that it punishes detainees with solitary confinement does not rule out that it punishes detainees with disciplinary segregation or with the other sanctions outlined in its policy.

[6] Plaintiffs first introduce the phrase "Deprivation Policy" in the Motion, not the TAC. However, the TAC alleges GEO maintains a "corporate policy and uniform practice of withholding sufficient food, water, and hygiene products from the immigrants detained at Adelanto," (TAC ¶ 43), and asserts facts which, if true, would support the existence of such a policy. (TAC ¶¶ 6, 43 100-107, 122, 126-30, 150, 152, 167.)

or personal hygiene items, and work without pay only to receive such necessities as gifts from officers, or to increase their commissary balance and purchase those necessities.  (Mot. at 15.-16.)

Plaintiffs also attach evidence of the economic incentives for GEO to compel detainees to work.  If detainees are not available to staff a job, GEO must pay its own staff to complete the work, which may include overtime if the task cannot be completed within normal business hours. (Mot. at 8, 17-18 (citing Janeka Deposition, Wright Decl. at Ex. 4, pp. 221-222) (explaining that ICE pays GEO the same bed-day rate regardless of GEO's actual operating costs).)  According to the Statement of Work attached to the IGSA, "[d]etainees shall not be used to perform the responsibilities or duties of an employee of [GEO]."  (Wright Decl. at Ex. 2, pp. 63.)  Plaintiffs note deposition testimony that, for the nearly 2,000-bed facility, GEO employs six non-detainee janitors, and previously employed only three.  (Opp'n at 13 (citing Wright Decl. at Ex. 4, pp. 52-53).)  The janitors clean ICE and GEO offices outside the secured perimeter of the facility, where detainees are not allowed.  (Opp'n at 13.)[7]

## II.  LEGAL STANDARD

### A.  Rule 23

Federal Rule of Civil Procedure 23 ("Rule 23") governs the litigation of class actions.  A party seeking class certification must establish the following prerequisites:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  After satisfying the four prerequisites of numerosity, commonality, typicality, and adequacy, a party must also demonstrate one of the following: (1) a risk that separate actions would create incompatible standards of conduct for the defendant or prejudice individual class members not parties to the action; (2) the defendant has treated the members of the class as a class, making appropriate injunctive or declaratory relief with respect to the class as a whole; or (3) common questions of law or fact predominate over questions affecting individual

---

[7] GEO counters that it does not determine its staffing needs by taking into account the number of detainee workers, (Opp'n at 14), but the deposition excerpts to which GEO cites do not support the proposition.  The factual assertion is also contradicted by the PBNDS requirement that any voluntary workers receive instruction and oversight from a work supervisor. PBNDS § 5.8.  Finally, GEO argues that ICE reimburses it for the $1.00 per day detainee labor expense.  This fact shows only that GEO does not ultimately pay at all for detainee work that must otherwise be completed by GEO staff.

members and that a class action is a superior method for fairly and efficiently adjudicating the action.  See Fed. R. Civ. P. 23(b)(1)-(3).[8]

A trial court has broad discretion regarding whether to grant a motion for class certification.  See Bateman v. Am. Multi-Cinema, Inc., 623 F.3d 708, 712 (9th Cir. 2010).  However, "[a] party seeking class certification must affirmatively demonstrate compliance with [Rule 23]—that is, the party must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc."  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).  A district court must conduct a "rigorous analysis" that frequently "will entail some overlap with the merits of the plaintiff's underlying claim."  Id. at 351.  "Courts typically proceed claim-by-claim in determining whether the Rule 23 requirements have been met, particularly as to the Rule 23(a)(2) and (b)(3) requirements of common questions and predominance."  Allen v. Verizon California, Inc., 2010 WL 11583099, at *2 (C.D. Cal. Aug. 12, 2010).  The Court sets out the legal standards for each of Plaintiffs' claims in this section, because the commonality and predominance inquiries require an understanding of the claims.

Rule 23 further provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues," Fed. R. Civ. P. 23(c)(4), or the "class may be divided into subclasses that are each treated as a class under this rule," Fed. R. Civ. P. 23(c)(5).  "This means that each subclass must independently meet the requirements of Rule 23 for the maintenance of a class action."  Betts v. Reliable Collection Agency, Ltd., 659 F.2d 1000, 1005 (9th Cir. 1981).

## B. California Employment Tests

The California Supreme Court articulated the general common law test for determining whether an employment relationship exists for the purposes of California labor law in S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations, 48 Cal. 3d 341 (1989).  Under Borello, "[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired[.]"  Id. at 350 (internal quotation marks omitted).  In applying the Borello test, courts also consider the following secondary factors:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the

---

[8] While some circuits have adopted an "ascertainability" prerequisite to certification, the Ninth Circuit has not.  Briseno v. ConAgra Foods, Inc., 844 F.3d 1121, 1124 n.4 (9th Cir. 2017) ("ConAgra cites no other precedent to support the notion that our court has adopted an 'ascertainability' requirement.  This is not surprising because we have not.  Instead, we have addressed the types of alleged definitional deficiencies other courts have referred to as 'ascertainability' issues . . . through analysis of Rule 23's enumerated requirements.").

principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

Id. at 351.

Claims governed by California's Industrial Welfare Commission's (IWC) definition of employment, however, are subject to a broader standard, which "incorporates the common law definition as one alternative." Martinez v. Combs, 49 Cal. 4th 35, 64 (2010), as modified (June 9, 2010). In Martinez, the California Supreme Court held that the IWC's definition of "to employ" included three alternative definitions: "(a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship." Id. As to the first definition, the court noted that it "encompasses 'any person . . . who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person[.]'" Id. at 71 (quoting Wage Order No. 14 (Cal. Code Regs., Tit. 8, § 11140, subd. 2(F)).

With regard to the "suffer or permit to work" prong, the court elaborated that "the basis of liability is the defendant's knowledge of and failure to prevent the work from occurring." Id. at 70. It concluded that the defendants had not "suffered or permitted plaintiffs to work because neither had the power to prevent plaintiffs from working." Id. Specifically, it considered the defendants' lack of control over hiring and firing decisions, setting wages and hours, and determining when and where workers would report to work. Id. The court did not elaborate on the third definition, as the plaintiffs advanced arguments under only the first two definitions. See id. at 68. The court declined to decide whether the Borello test had any relevance to wage claims. Id. at 73.

In Dynamex Operations W. v. Superior Court, the California Supreme Court adopted a test known as the "ABC test" for interpreting the "suffer or permit to work" prong of the IWC's definition of employ. 4 Cal. 5th 903, 956–57 (2018), reh'g denied (June 20, 2018). Under that test, the hiring entity bears the burden of establishing that a worker is an independent contractor rather than an employee. Id. at 957. In order to meet that burden, it must establish each of the test's three factors:

(A) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and* (B) that the worker performs work that is outside the usual course of the hiring entity's business; *and* (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed.

CIVIL MINUTES—GENERAL

<u>Id.</u>  Thus, if the putative employer fails to establish any one of the three prongs with regard to a
worker, the worker is properly classified as an employee for the purposes of IWC wage orders.

## C.  TVPA and CTVPA

Enacted as part of the Trafficking and Victims Protection Act of 2000 ("TVPA"), 18
U.S.C. § 1589 proscribes a party from "knowingly provid[ing] or obtain[ing] the labor or services
of a person" through force, physical restraint, serious harm, abuse of law or legal process, threats
of any of those means, or any combination of those methods. 18 U.S.C. § 1589(a).  Also liable is a
party who "knowingly benefits, financially or by receiving anything of value, from participation in
a venture" involving forced labor. 18 U.S.C. § 1589(b).  Title 18 U.S.C. § 1595 provides the civil
remedy to a victim of forced labor. 18 U.S.C. § 1595.  A ten-year statute of limitations applies to
claims under the TVPA.  <u>Deutsch v. Turner Corp.</u>, 324 F.3d 692, 717 & n.18 (9th Cir. 2003),
<u>cert. denied</u>, 540 U.S. 820 (2003).

A victim of human trafficking may bring a civil action for damages or injunctive relief
under California Civil Code § 52.5 ("CTVPA").  Cal. Civ. Code § 52.5(a).  California's human
trafficking statute provides in pertinent part that "[a] person who deprives or violates the
personal liberty of another with the intent to obtain forced labor or services, is guilty of human
trafficking."  Cal. Penal Code § 236.1.  The elements of the criminal offense are (1) the defendant
either deprived another person of personal liberty or violated that other person's personal liberty;
and (2) when the defendant did so, he or she intended to obtain forced labor or services from that
person.  <u>People v. Halim</u>, 14 Cal. App. 5th 632, 643 (2017), <u>reh'g denied</u> (Sept. 12, 2017), <u>review
denied</u> (Nov. 29, 2017), <u>cert. denied sub nom. Halim v. California</u>, 138 S. Ct. 1564 (2018).
Forced labor services are defined as "labor or services that are performed or provided by a person
and are obtained or maintained through force, fraud, duress, or coercion, or equivalent conduct
that would reasonably overbear the will of the person."  Cal. Penal Code § 236.1(h)(5).

## III.  DISCUSSION

## A.  Preliminary Matters: Motion to Exclude and Standing

### 1.  Motion to Exclude

GEO moves to exclude the declarations of non-plaintiff detainees Aguilera and Marwaha
on the grounds that it learned of their identity for the first time on September 27, 2019, when
Plaintiffs filed their Motion, which included Aguilera and Marwaha's declarations.  (MTE at 3.)
Defendant argues the non-disclosure of Aguilera and Marwaha until the filing of the Motion is a
violation of Rule 26's requirement that initial disclosures be supplemented in a timely manner.
(<u>Id.</u> at 5 (citing Fed. R. Civ. P. 26(e), and 37(c)(1)).)

According to the MTE and MTE Opposition, the chronology is as follows.  Plaintiffs'
first initial disclosure was made on July 27, 2018.  On June 17, 2019, Plaintiffs made their first
supplemental disclosure.  The declarations in question were signed the next month, on July 26,

2019.  About two months later, on September 27, 2019, Defendant learned about Aguilera and Marwaha's declarations when Plaintiffs served the Motion and declarations supporting class certification.  At that point, GEO had 30 days to oppose the Motion.  However, GEO did not serve a deposition notice for Aguilera and Marwaha until October 7, 2019, ten days after Plaintiffs filed the Motion.  The next day, Plaintiffs filed their third Rule 26 supplement, which listed Marwaha and Aguilera.

The Court DENIES the MTE for five reasons.  As an initial matter, it is not clear to the Court why GEO would not already be aware of the identity and contact information of every detainee likely to possess knowledge of the Work Program, which is evidenced by GEO's own rosters of detainee names and work details.  Second, the MTE is procedurally improper.  GEO should have simply objected to the declarations in its Opposition, or filed the request to exclude as an ex parte application.  Instead it filed a motion which must be filed not later than 28 days before the date set for hearing.  L.R. 6-1.  GEO noticed the MTE hearing for December 2, 2019, while the hearing for the Motion was set for November 18, 2019.  Third, the MTE effectively demands reconsideration of the Court's prior decision denying GEO's ex parte request for enlargement of time to respond to the Motion, in which GEO first raised the issue, four days before its Opposition was due.  (Dkt. Nos. 201, 208.)  Fourth, the record shows that GEO in fact had sufficient time and notice to depose Aguilera.  GEO failed to do so because it attempted to notice six depositions on a week's notice, delayed filing proper deposition notices, and/or failed to depose Aguilera when given an opportunity to do so before its Opposition was due.  (Dkt. No. 202-1 -Exs. C.)  Fifth, the Court notes that neither Marwaha nor Aguilera are named Plaintiffs.  Neither declaration is of such importance or centrality to class certification that it merits the time-consuming back-and-forth between the parties on this issue.

## 2. Standing

GEO's Notice of Supplemental Authority attaches a recent order in <u>Owino v. CoreCivic, Inc.</u>, No. 17-cv-1112 (S.D. Cal. Nov. 7, 2019), in which Judge Sammartino sua sponte ordered the parties to submit additional briefing on standing, with class certification pending.  (Def.'s Notice at Ex. A.)  In that case, the plaintiffs seek declaratory relief against CoreCivic as to their claims under the TVPA and CTVPA.  (<u>Id.</u>)  In the order, Judge Sammartino observes that neither of the named plaintiffs were detained at the time of the commencement of the action in May 2017.

GEO does not explain how the order is relevant to this case.  Novoa commenced this action in December 2017.  (Dkt. No. 1).  He then filed the SAC, which added Fuentes as a Plaintiff and alleged Fuentes was detained at Adelanto at the time of the commencement of the action, from December 2016 through January 2018.  (SAC ¶ 16.)  The TAC adds Karim, who alleges he was detained from August 2017 until August 2019, (TAC ¶ 19), and Mancia, who alleges he is currently detained at Adelanto.  (<u>Id.</u> ¶ 20.).  Mancia has standing to bring declaratory and injunctive relief, as do Fuentes and Karim.  Either they were detained at the time of the filing of one of the complaints, or the amendments adding them as Plaintiffs relate back to the time of filing of the original complaint under Rule 15.  Under Rule 15(c)(1)(B) an amendment relates back

where it asserts "a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B).

**B. Proposed Classes**

The Court turns now to the question of class certification. Plaintiffs seek to certify four classes, including subclasses. First, they seek to certify an "Adelanto Wage Class," (Mot. at 18), for the first three causes of action: (1) violation of California's Minimum Wage Law, Cal. Labor Code §§ 1194, 1197, 1197.1; (2) unjust enrichment; and (3) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq. They define the class as:

> All civilly detained immigrants who (i) were detained at the Adelanto ICE Processing Center any time between December 19, 2014 and the date of final judgment in this matter, and either (ii) participated in the Voluntary Work Program at any point during their detention, or (iii) performed work for no compensation in the Uncompensated Work Program pending their participation in the Voluntary Work Program, or (iv) performed work for no compensation pursuant to the Adelanto Housing Unit Sanitation Policy.

(Id. at 19.)

Second, Plaintiffs propose an "Adelanto Forced Labor Class" for the fourth through sixth causes of action: (4) forced labor under CTVPA, Cal. Civ. Code § 52.5; (5) forced labor under the TVPA, 18 U.S.C. §§ 1589(a), 1594(a); and (6) forced and attempted forced labor under the TVPA. The class is defined as follows:

> All civil immigration detainees who were detained at the Adelanto ICE Processing Center any time between May 1, 2011 and the date of final judgment in this matter.

(Id.) Plaintiffs urge that the Adelanto Forced Labor Class be divided into two subclasses:

(1) The Work Program Subclass: All individuals who participated in the Voluntary Work Program at any point during their detention.
(2) The Uncompensated Work Program Subclass: All individuals who participated in the Uncompensated Work Program at any point during their detention.

(Id.)

Finally, Plaintiffs propose a "Nationwide HUSP Class," for the fifth and sixth causes of action: (5) forced labor under the TVPA; and (6) forced and attempted forced labor under the TVPA. The HUSP class is defined as:

---

**CIVIL MINUTES—GENERAL**

> All civilly detained immigrants who (i) were detained at any civil immigration
> detention center owned or operated by GEO in the United States between
> December 19, 2007 and the date of final judgment in this matter, and (ii) were
> subject to a GEO Housing Unit Sanitation Policy (HUSP) at any point during
> their detention.

(Id.)  Plaintiffs propose to exclude four categories of detainee from the nationwide class:

> (1) individuals detained in GEO's family residential detention facility in Karnes
> City, Texas; (2) individuals detained in the Alexandria Staging Facility in
> Alexandria, Louisiana; (3) any individual detained in the custody of the U.S.
> Marshalls [sic] or any other law enforcement agency at a GEO facility where the
> company also detains civil immigration detainees pursuant to contracts with ICE;
> and (4) civilly detained immigrants held at the Aurora ICE Processing Center in
> Aurora, Colorado at any time before October 22, 2014.

(Id. at 19-20.)  The Court includes a summary chart below for ease of comparison
between the proposed classes.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

**CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk MG

**Summary of Proposed Classes and Subclasses**

| Proposed Class | Adelanto Wage | Adelanto Forced Labor (and subclasses) | Housing Unit Sanitation Policy ("HUSP") |
|---|---|---|---|
| Cut-off Date | 12/19/2014 | 5/1/2011 | 12/19/2007 |
| Facility | Adelanto | Adelanto | GEO facilities Nationwide, including Adelanto |
| Causes of Action | Cal. Wage law, Unfair Competition Law, and Unjust Enrichment (claims 1 - 3) | CTVPA, TVPA, attempted TVPA (claims 4 - 6) | TVPA (claims 5, 6) |
| Relevant GEO Program Alleged[9] | Work Program ("WP"), Uncompensated Work Prog. ("UWP"), HUSP | WP Subclass: WP, Deprivation Policy UWP Subclass: UWP, Deprivation Policy | HUSPs |
| Type of Rule 23(b) certification sought | 23(b)(3) | 23(b)(3) 23(b)(2) | 23(b)(2) |

//
//
//
//
//
//

---

[9] Plaintiffs' summary chart, (Wright Decl. at Ex. 32), includes the Deprivation Policy for some classes and not others. However, the class definitions do not explicitly mention the Deprivation Policy, and the recently-filed TAC also makes no mention of the Deprivation Policy. The Court understands "Deprivation Policy" as a catchall term for the alleged custom at Adelanto of failing to provide certain necessities.

**CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk <u>MG</u>

## C.  Rule 23(a) Requirements

### 1.  Numerosity

Rule 23(a)(1) requires the class to be so numerous that joinder of individual class members is impracticable.  See Fed. R. Civ. P. 23(a)(1).  There is no particular number cut-off, as the specific facts of each case may be examined.  Ballard v. Equifax Check Servs., Inc., 186 F.R.D. 589, 594 (E.D. Cal. 1999).  Courts have not required evidence of exact class size or the identities of class members to satisfy the requirements of Rule 23(a)(1).  See Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993).

#### a.  Contentions of the Parties

Plaintiffs  argue numerosity is satisfied with regard to the Adelanto Wage and Adelanto Forced Labor classes because Adelanto houses up to 1,940 individuals each day, with a "guaranteed minimum" of 1,455 beds  (Mot. at 20.)  Likewise, the Adelanto "Facility Administrator/Warden" estimated at his deposition that 200 to 300 detainees were eligible to report for a Work Program shift in the kitchen alone.  (Id. (citing Wright Decl. at Ex. 4, pp. 190:5-191:6 (attaching the Deposition of James Janeka)).)  Furthermore, Plaintiffs argue, GEO sought reimbursement from ICE for more than 30 thousand Work Program Shifts from September 2014 to August 2015.  (Id. at 21 (citing Wright Decl. at Ex. 33).)  Plaintiffs argue this evidence is sufficient to establish numerosity for the Adelanto Wage and Adelanto Forced Labor Classes.  The Nationwide HUSP Class is even more numerous, Plaintiffs contend, because GEO facilities house thousands of immigration detainees each day, and the same HUSP and discipline policy applies to each.  (Id.; see also Wright Decl. at Ex. 34.)

Defendant argues that assertions of numerosity must be accompanied by evidence.  (Opp'n at 31 (citing Newberry v. Cty. of San Bernardino, 2015 WL 9701153, at *4 (C.D. Cal. July 23, 2015), aff d, 750 F. App'x 534 (9th Cir. 2018)).  GEO claims that although Adelanto may have a capacity for 1,950 detainees, the maximum capacity does not bear on the number of individuals who likely participated in the Work Program, let alone those who were aggrieved by it.  (Id. at 32.)  Similarly, with regard to the testimony of the Adelanto warden, GEO contends that the number of workers eligible for kitchen work on a given day does not prove the number of workers actually participating.  (Id.)  GEO then points to Plaintiffs' depositions and argues that Plaintiffs personally knew only 21 to 38 individuals who "may" be potential class members.  (Id. at 33.)  Plaintiffs have no way of knowing, Defendant argues, who "voluntarily chose" to work.  (Id.)  Detainees might choose to work "for personal reasons" or because they "wished to make new friends."  (Id. at 34.)  As to the nationwide HUSP, Defendant objects that the Motion is devoid of evidence that the HUSPs applied at other facilities.

#### b.  Analysis

As to the numbers of detainees who experience GEO's HUSPs, the capacity of GEO facilities is surely relevant, as the HUSPs allegedly apply throughout Adelanto and other GEO

facilities.  Although Plaintiffs only include details of the HUSP at Adelanto, GEO does not
respond to Plaintiffs' argument that it conceded that the HUSPs are a companywide policy by
failing to respond to RFAs on this subject.  (Wright Decl. at Ex. 34.)

Plaintiffs also satisfy the numerosity requirement as to the Work Program-related classes
by attaching evidence that large numbers of detainees participated in the Work Program.  GEO
has no response to Plaintiffs' evidence that GEO requested reimbursement for more than 30,000
work program shifts over roughly a year.  GEO also concedes that Plaintiffs alone knew up to 38
individuals who participated in the work program.

As to the number of detainees likely impacted by the alleged Uncompensated Work
Program, the Court notes the following evidence.  Plaintiffs attached a GEO form for detainees to
apply for paid position in the Work Program.  (Wright Decl. Ex. 17, Dkt. No. 193-17).  The form
states that 40 paid positions exist in the "work member detail program."  (Id.)  On the same
form, detainees are asked if they were willing to work voluntarily, if paid positions were filled.
(Id.)  The balance of the evidence is clear that a large number of individuals, far more than 40,
participated in the Work Program over the months and years.  In combination with Plaintiffs'
declarations regarding uncompensated work details, the Court finds many detainees performed
uncompensated labor.  The numerosity requirement is therefore satisfied.

### 2.  Typicality of claims

The Court next turns to the typicality element of Rule 23(a).  "The purpose of the
typicality requirement is to assure that the interest of the named representative aligns with the
interests of the class."  Wolin v. Jaguar Land Rover North Am., LLC, 617 F.3d 1168, 1175 (9th
Cir. 2010).  "The test of typicality 'is whether other members have the same or similar injury,
whether the action is based on conduct which is not unique to the named plaintiffs, and whether
other class members have been injured by the same course of conduct.'"  Ellis v. Costco
Wholesale Corp., 657 F.3d 970, 984 (9th Cir. 2011) (quoting Hanon v. Dataproducts Corp., 976
F.2d 497, 508 (9th Cir. 1992)).  Thus, typicality is generally satisfied if the plaintiff's claims are
"reasonably co-extensive with those of absent class members; they need not be substantially
identical."  Caput v. NTT Sec. US Inc., 2019 WL 3308771, at *3 (C.D. Cal. Apr. 19, 2019)
(quoting Hanlon v. Chrysler Corp, 150 F.3d 1011, 1020 (9th Cir. 1998)).  Moreover, satisfying the
typicality prong requires, in the least, that "a class representative must be part of the class."
General Telephone Co. of Sw. v. Falcon, 457 U.S. 147, 156 (1982).

### a.  Contentions of the Parties

Plaintiffs contend that they satisfy the typicality requirement, because they all suffered
the same alleged injury: they are current or former immigration detainees held at Adelanto,
which applied the "same uniform policies and practices" to them, resulting in the "same injuries
as all absent class members."  (Mot. at 26.)  Each Plaintiff, and absent class member, claims they
received no wages or below minimum wages and suffered the same kind of financial injury,
because GEO threatened, or made detainees believe, that they would suffer physical or legal

consequences if they did not work, under the Uncompensated Work Program, Work Program, and Deprivation Policy  (Id.)  With regard to the HUSPs, each Plaintiff shares the same theory, that they completed cleaning assignments because they were threatened with or were made to believe they would otherwise suffer "serious harm or physical restraint."  (Mot at 26-27 (citing Menocal, 882 F.3d at 917.)

GEO argues that Plaintiffs' concerns are not the result of a common policy, and that they will be preoccupied fending off attacks on their individual credibility.  (Opp'n at 27.)  GEO contends Plaintiffs never encountered adverse legal consequences and cannot point to any serious harm they suffered.  (Id.)  The company states Plaintiffs' own declarations and commissary records show they were not deprived of necessities such as soap, water, or toothpaste, and could purchase candy and snacks.  (Id.)  Nor were Plaintiffs subjected to a common policy, because they were supervised by different guards or were in different dorms, and engaged in different cleaning tasks.  (Id. at 28.)  GEO also argues Plaintiffs cannot represent a nationwide class, because they have no knowledge of other facilities.  (Id. at 29.)  GEO concludes by challenging typicality based on (1) the different limitations periods applicable to each Plaintiff, and (2) Karim's location in Somalia, which they argue puts him out of reach of this Court and will consume class resources.  (Id. at 30-31.)

Plaintiffs reply that the their somewhat different experiences are no bar to typicality if they were subjected to a common practice or policy.  (Reply at 17 (citing Brown v. Abercrombie & Fitch Co., 2015 WL 9690357, at *15 (C.D. Cal. July 16, 2015).)  Similarly, Plaintiffs, who were detained at Adelanto, can represent a nationwide class of individuals subjected to an "enterprise-wide policy or practice" such as the HUSP.  (Id.)  As to the statute of limitations argument, Plaintiffs point again to the Menocal decision, which found typicality where the named class representatives were not detained for the full period of operation covered in the class definition.  (Id. at 18.)  As to Defendant's argument regarding Karim, Plaintiffs state simply that his current location and status as a deportee do not impact the typicality analysis, which turns on the typicality of his claims as compared to the class he wishes to represent.

### b.  Analysis

The key inquiry for typicality in this case is whether each Plaintiff states he suffered an injury arising from each of the programs described.  If a Plaintiff did not suffer injury arising from a program, he is not a member of a proposed class based on the alleged illegality of that program, and cannot represent members of the proposed class.

The Court begins by analyzing typicality with regard to the Work Program-related classes. Novoa states he worked as a janitor and as a barber in the Work Program, (Novoa Decl. ¶¶ 7, 8). He states he participated in order to buy certain necessities.  (Id. ¶ 15.)  Fuentes similarly joined the Work Program as a janitor, cleaning windows, floors, showers, bathrooms, and communal areas, and as a laundryman.  (Fuentes Decl. ¶¶ 7, 8.)  He participated in order to obtain daily necessities.  (Id. ¶ 11.)  Karim, likewise, participated as a porter, and in the kitchen, for the purpose of buying necessities.  (Karim Decl. ¶¶ 6, 8, 17.)  Finally, Mancia currently works in the

kitchen under the Work Program, with a dozen others. (Mancia Decl. ¶ 7.) He works to buy necessities such as food and hygiene items.

The Court finds Plaintiffs' experiences typical of the proposed Work Program class. Although their situations were not identical, they all have the same theory of injury, which if proven, could establish their California wage law, unfair competition, and unjust enrichment claims. Each Plaintiff provides evidence that GEO prevented him from doing outside work, and provided the equipment and training necessary to complete required tasks. All Plaintiffs participated in the same facility-wide Work Program policy, and for similar reasons. Although their individual perceptions of need and motivations for joining the Work Program undoubtedly vary, Plaintiffs allege a facility-wide custom of providing insufficient daily necessities.[10] The Court therefore finds the typicality requirement satisfied for each named Plaintiff.

Next, the Court considers the Uncompensated Work Program-related classes. Novoa does not state in his declaration that he participated in Work Program crews without being paid, and so his claim is not typical of the Uncompensated Work Program Subclass, and he might not be a member. However, the remaining Plaintiffs' claims are typical of the proposed classes. Fuentes states he joined in work shifts and was sometimes paid nothing at all or was only given extra portions of food. (Fuentes Decl. ¶ 9.) Karim states he was not paid at all for his work as a porter for the first three months on the job and he was required to work for free before being "hired" into the work program. (Karim Decl. ¶ 7.) GEO officials also required him to work without compensation for certain periods after he was hired as a porter and before receiving pay for kitchen work. (Id. ¶¶ 7, 9.) Mancia, who is still detained, works without pay as a porter. (Mancia Decl. ¶ 8.) As a result, three of the four named Plaintiffs suffered injuries and bring claims typical of the Uncompensated Work Program Subclass. The conduct they complain of is not unique to them and they show a strong likelihood that other detainees may have been harmed in the same way.

---

[10] GEO's Opposition includes a chart listing inconsistencies between the above-cited declarations and deposition testimony by each Plaintiff. (Opp'n at 22.) The chart is unpersuasive, because the cited discrepancies are trivial and do not rebut the gravamen of each Plaintiffs' claim. Some of the inconsistencies may be explained by the passage of time or language differences. For instance, GEO remarks that Karim declared he was denied hygiene items, then later stated he was not familiar with deodorant. (Opp'n at 25.) But the deposition transcript shows Karim did not recognize the word. (DeLaney Decl. at Ex. D, pp. 30-31, 84 ("I didn't know English very well.").) Likewise, the fact that a detainee is sometimes provided with free shampoo, soap, or toothpaste does not establish that there were not times they were not. (Id. at 32 ("sometimes when you need it at the right time . . . they don't used to give it to us.").) Similarly unpersuasive is GEO's emphasis on Plaintiffs' purchase of unhealthy snacks such as chips, cookies, or candy. Plaintiffs point out the commissary "does not sell fresh fruit, vegetables, lean proteins, or complex carbohydrates." (Reply at 15 (citing Hillers Decl. at Ex. S).)

As to the HUSP-related classes, Plaintiffs state as follows.  Novoa understood from his review of the detainee handbook, refusing orders to clean subjects detainees to disciplinary action, and was threatened with disciplinary action on several occasions.  (Novoa Decl. ¶ 12.)  He was forced to transfer units after complaining, and thought officers retaliated against him by "tossing" his cell.  (Id.).  Fuentes also cleaned areas of Adelanto for no compensation, but under threat of being restricted to his cell or having rights, such as attorney visits, suspended.  (Fuentes Decl. ¶ 14.)  Karim states he had to clean areas of Adelanto, apparently outside the work program, without pay, including visitation areas, the kitchen, and the yard.  (Karim Decl. ¶ 10, 11.)  Karim was threatened with disciplinary action, and found the threats credible based on his review of the detainee handbook.  (Id. ¶ 13.)  Mancia notes that GEO officials routinely "require detainees to clean areas of [Adelanto] for no compensation."  (Mancia Decl. ¶ 10.)  He personally has been instructed to paint the dining hall, clean the medical unit, and clean the recreation yard.  (Id.)  Both Mancia and Karim state they believed, based on the handbook, they could be disciplined for failure to complete such cleaning orders.  Based on these declarations and the Adelanto policies comprising the HUSP submitted by Plaintiffs, the Court finds Plaintiffs suffered the same or similar injuries, and satisfy typicality as to members of a nationwide HUSP class.  The Court is also persuaded the injuries Plaintiffs allege are "reasonably co-extensive" with those of detainees at other GEO facilities, in light of (1) the Menocal decision certifying a similar HUSP class, 320 F.R.D. 258, and GEO's failure to respond to Plaintiffs' RFAs or to otherwise show similarly expansive sanitation policies do not exist at its other facilities.  Hanlon, 150 F.3d at 1020.

The Court disagrees with GEO that Karim's status as a deportee in Somalia makes him atypical and thus an inappropriate class representative.  The Court also disagrees with Plaintiffs that his current location has no bearing on the typicality analysis.  Although the focus of typicality is the injury claimed, it also extends to the interests of class members.  That Karim is located outside of the United States positions him well to represent the interests of others similarly situated.  Certainly, the claims of the named Plaintiffs, including Karim, and the claims of class members "are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  Dukes, 564 U.S. at 349 n.5.  The geographic dispersion of class members speaks to the impracticability of joinder and the judicial economy of class certification.

Nor does a difference in the amount of damages or the type of relief sought destroy typicality for any of the proposed classes.  "[T]he mere fact that there might be differences in damage calculations is not sufficient to defeat class certification."  In re Hyundai & Kia Fuel Econ. Litig., 926 F.3d 539, 560 (9th Cir. 2019) (quoting Pulaski & Middleman, LLC v. Google, Inc., 802 F.3d 979, 987 (9th Cir. 2015)); Leyva v. Medline Indus. Inc., 716 F.3d 510, 513–514 (9th Cir. 2013) (holding the need for individualized damages determinations alone will not defeat certification, even under the more stringent predominance requirement).  The typicality requirement can be met notwithstanding varying fact patterns supporting class member claims, and this extends to disparity in damages by the representative plaintiffs.  The benchmark is similarity of interest and of injury.

**CIVIL MINUTES—GENERAL**

The relevant statutes of limitation also do not preclude a finding of typicality here. Although some district courts have rejected certification where the representative's claims are subject to a statute of limitations defense, Vizzi v. Mitsubishi Motors N. Am., Inc., 2010 WL 11515266, at *2 (C.D. Cal. Feb. 22, 2010) (collecting cases), that is not GEO's contention here. (Opp'n at 29.)  GEO does not show that for each claim there is not at least one named Plaintiff whose claim is within the limitations period, and only argues that the named Plaintiffs were detained at different times.  Unlike many cases where courts have found typicality lacking, this action does not involve a sole named plaintiff whose claims are obviously time barred and where denial of class certification, and dismissal of the action, would be warranted.

GEO also protests the fact that the cut-off date for the Nationwide HUSP class extends to December 2007, long before May 2011, the date GEO started operating Adelanto.  (Opp'n 1 n.2.) Plaintiffs presumably chose this cut-off date because of the TVPA's ten-year limitations period, calculating back from the date they commenced the action.  The Court agrees the date would be unreasonable as applied to Adelanto.  But the proposed HUSP class is nationwide in scope. GEO may have operated other facilities and applied the HUSPs prior to May 2011.  Thus, the proposed cut-off date is appropriate, with a clarification that members must have been at a facility while GEO operated it.

### 3. Commonality

Courts have construed Rule 23(a)(2)'s commonality requirement permissively.  See Staton v. Boeing Co., 327 F.3d 938, 953 (9th Cir. 2003).  All questions of fact and law need not be common to satisfy the rule.  The existence of shared legal issues with divergent factual predicates is sufficient, as is "a common core of salient facts coupled with disparate legal remedies [within the class]."  Jimenez v. Allstate Ins. Co., 765 F.3d 1161, 1165 (9th Cir. 2014) (quoting Hanlon, 150 F.3d at 1019).  Nevertheless, "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" which "does not mean merely that they have all suffered a violation of the same provision of law."  Dukes, 131 S. Ct. at 2551 (citation omitted). The "claims must depend upon a common contention" and that common contention "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  Id.  The common question or questions must also generate common answers that will be "apt to drive the resolution of the litigation," which turns on the nature of the underlying legal claims in the case.  Jimenez, 765 F.3d at 1165 (quoting Abdullah v. U.S. Sec. Associates, Inc., 731 F.3d 952, 962 (9th Cir. 2013)).  Thus, commonality requires an understanding of the nature of the underlying claims.  Id. (citing Parsons v. Ryan, 754 F.3d 657, 676 (9th Cir. 2014)).

### a. Contentions of the Parties

Plaintiffs point to several common questions of law or fact.  First, with regard to the AWC, there is the question of whether GEO is an "employer" of detained worker "employees" under California minimum wage law; whether GEO violated California minimum wage law; whether GEO was unjustly enriched by paying less than it was required to; and whether federal

law preempts California minimum wage claims.  (Mot. at 22.)  The factual questions presented involve, among other questions:  GEO's degree of control over detainee labor and rate of pay; training and equipment provided; and any restrictions on outside employment.  The "truth or falsity" of Plaintiffs' claims of an employee relationship turn on this same factual predicate.  (Id. (citing Wal-Mart, 564 U.S at 350).)  Plaintiffs point to evidence that the same WP (and by extension the same UWP) applies for all the class members at Adelanto.  (Id. citing Wright Decl. at Ex. 15 (attaching WP policy).)  They contend the nature of the relationship is the same for all putative class members.  (Id.)

With regard to the HUSP class, Plaintiffs state they will each have to demonstrate whether GEO obtained their labor by improper means, including threats of harm, to satisfy the TVPA standard.  (Mot. at 24.)  The "lynchpin" of the serious harm analysis under the TVPA is whether serious harm was threatened and whether the employer intended the employee to believe harm would occur.  (Id. at 23 (citing U.S. v. Dann, 652 F.3d 1160, 1170 (9th Cir. 2011).)  Plaintiffs state that the legal question is common to all: a reasonable person analysis, such that one could determine whether the Defendant's scheme compelled Plaintiffs, who were in a like situation as immigration detainees, to work.  (Id. (citing Tanedo v. East Baton Rouge Parish School Board, 2011 WL 7095434 (C.D. Cal. Dec. 12, 2011).)  Common factual questions may include whether and how GEO forces, coerces or compels detainees at GEO immigration detention centers nationwide to work for no pay, by requiring them to perform work beyond the four personal housekeeping tasks in the PBNDS.  (Id. at 24.)  Plaintiffs point to Menocal for the proposition that the HUSP at Aurora applies uniformly.  (Id. (citing 320 F.R.D. 258 at 264).)  Plaintiffs state the Adelanto Forced Labor Class's legal and factual questions will be substantially similar to those presented by the Nationwide HUSP Class.  (Id. at 24-25)

GEO approaches the commonality (and predominance) inquiry by pointing to factual questions that may produce answers individual to each Plaintiff: (1) whether Plaintiffs were deprived of "necessities" requiring them to work for a dollar a day; (2) whether they risked serious harm if they did not work; and (3) whether uncompensated work is required or permitted by ICE.  (Opp'n at 19.)  On the first point, they argue that the extent to which a particular detainee felt compelled to participate in the VWP is "highly individualized," because each Plaintiff has a different understanding of what constitutes a necessity.  (Id. at 17.)  Second, GEO contests as a factual matter that any detainee was deprived of meals, water or necessities, or placed in solitary confinement for failing to work.  (Opp'n at 19.)  Any alleged threat of harm, Defendant contends, is specific to each Plaintiff.  Third, GEO disputes that the HUSPs violate the PBNDS, because ICE reviewed and signed off on the policies.  (Id. at 20 (citing Ragsdale Decl. ¶¶ 6-7).)  Similarly, each facility has its own "local policies" which reflect the PBNDS standards, (id. citing ECF 193-4 at 9), and Plaintiffs cite no evidence regarding how an HUSP is applied at any other facility, (id.).

### b.  Analysis: Commonality and Predominance

The Court analyzes commonality under Rule 23(a) and predominance under Rule 23(b)(3) together, because the latter is an extension of the former, and is more stringent.

Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013) ("Rule 23(b)'s predominance criterion is even more demanding than Rule 23(a) . . . Rule 23(b) requires that courts take a close look at whether common questions predominate over individual ones.") (citations omitted). "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues. When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1045 (2016) (citations and internal quotations omitted.)

First, the Court notes the commonality and predominance analysis as to the Menocal HUSP Class and TVPA claim was exhaustively covered by the Menocal court. Menocal, 320 F.R.D. 258, 265 (D. Colo. 2017) (finding commonality and predominance satisfied with respect to detainees' TVPA claim, arising out of the HUSP at GEO's Aurora Colorado facility). Menocal is instructive, because Plaintiffs also bring TVPA (and related CTVPA) claims on behalf of the Adelanto Forced Labor Class, which they seek to certify under both Rule 23(b)(2) and (b)(3). Unlike the Menocal plaintiffs, Plaintiffs here seek certification of the Nationwide HUSP Class only under 23(b)(2). The District Court in Menocal found that common issues predominated in plaintiffs' TVPA claim, and the Court agrees with that analysis.[11] Thus,

--------

[11] As described in Part II.C. above, the elements of a CTVPA and TVPA claim overlap significantly. One key similarity is the reasonable person analysis, which is susceptible to class-wide resolution. The first CTVPA element is whether the defendant "either deprived another person of personal liberty or violated that other person's personal liberty." Halim, 14 Cal. App. 5th at 643. The Cal. Penal Code defines deprivation or violation of personal liberty of another as:

> substantial and sustained restriction of another's liberty accomplished through force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person, under circumstances where the person receiving or apprehending the threat reasonably believes that it is likely that the person making the threat would carry it out.

Cal. Penal Code § 236.1(h)(3) (emphasis added). Several aspects of this definition are subject to class-wide demonstration, including (1) generalized threats or duress in the terms of the alleged policies, and (2) the question of whether a reasonable detainee would believe the threats. The second element of a CTVPA offense focuses on the defendant's intent to obtain forced labor or services. Here, the analysis would turn on Defendant's alleged overall scheme, and under Plaintiffs' case theory, the common questions in this regard would be overpowering.

Several courts have also found the CTVPA and TVPA to overlap. See Lesnik v. Eisenmann SE, 374 F. Supp. 3d 923, 954 (N.D. Cal. 2019) (allowing the CTVPA claim to survive to the same extent as the Trafficking Victim Protection Reauthorization Act

--------

Plaintiffs have shown commonality and, where needed, predominance, for their TVPA and
CTVPA claims.  These claims are relevant to the Nationwide HUSP Class and Adelanto Forced
Labor subclasses.

Menocal also analyzed the plaintiffs' unjust enrichment claim under Colorado law, and
found that the claim does not compel individualized inquiry.  320 F.R.D. at 268.  There is a split
of authority in California regarding whether unjust enrichment is an independent cause of action,
or merely another name for restitution.  See Kosta v. Del Monte Corp., 2013 WL 2147413, at *14
n.8 (N.D. Cal. May 15, 2013) (explaining split of authority).  The Court agrees with those cases
holding that unjust enrichment is not an independent cause of action, and is only a claim for
restitution.  See Ang v. Bimbo Bakeries USA, Inc., 2013 WL 5407039, at *11 (N.D. Cal. Sept. 25,
2013) (citing Hill v. Roll Internat. Corp., 195 Cal. App. 4th 1295, 1307 (2011) ("Unjust
enrichment is not a cause of action, just a restitution claim.")).  Thus, the Court focuses its
analysis on the commonality, and eventually the predominance, aspects of Plaintiffs' remaining
causes of action on behalf of the Adelanto Wage Class.

The Court finds that the commonality and predominance requirements of Rule 23 are
satisfied as to the California wage law and unfair competition claims.  Each Plaintiff and proposed
class member would bring the same state law causes of action with the same elements, and the
elements subject to common proof would predominate.

First, the Court examines the wage law claim.  Whether GEO may be deemed an
"employer" under the alternative definitions in Martinez v. Combs, is a dominating question
shared by Plaintiffs and the putative Adelanto Work Program class members.  Their claims of an
employment relationship hinge on the terms and features of GEO's Work Program,
Uncompensated Work Program, and HUSP, which apply uniformly throughout Adelanto.  It is
well-established that "[P]redominance in employment cases is rarely defeated on the grounds of
differences among employees so long as liability arises from a common practice or policy of an
employer."  Senne v. Kansas City Royals Baseball Corp., 934 F.3d 918, 938 (9th Cir. 2019)
(quoting 7 Newberg on Class Actions § 23:33 (5th ed. 2012)).  Blanket corporate policies "often
bear heavily on questions of predominance and superiority."  Id. (quoting In re Wells Fargo
Home Mortg. Overtime Pay Litig., 571 F.3d 953, 958 (9th Cir. 2009)).  Here, Plaintiffs claim
GEO exercised control over their hours or working conditions, and/or "suffer[ed] to permit

---

("TVPRA") claim); Lesnik v. Eisenmann SE, 2018 WL 4700342, at *15 (N.D. Cal. Oct.
1, 2018) ("[T]he California statutes at issue mirror the TVPRA.").  The abbreviations
TVPA and TVPRA are used interchangeably.  Since the passage of the TVPA in 2000,
Public L. No. 106-386, 114 Stat 1464 (2000), several reauthorizations have been passed
amending the TVPA.  For example, the TVPRA of 2003 created a civil right of action for
a victim of criminal trafficking offenses, see Public L. No. 108-193, 117 Stat 2875 (2003),
and the 2008 reauthorization extended the civil remedy provision to allow recovery
against "whoever knowingly benefits, financially or by receiving anything of value . . . ."
Public. L. No. 110-457 § 221, 122 Stat. 5044 (2008).

[them] to work" under the same uniform policies or company-wide practices.  Martinez, 49 Cal. 4th at 64.

Second, common questions will predominate for Plaintiffs' unfair competition claim, which is derivative of the underlying wage law violation.  California's Unfair Competition Law is a broad remedial statute that permits an individual to challenge wrongful business conduct "in whatever context such activity might occur."  Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tele. Co., 20 Cal. 4th 163 (1999).  A claim under California's Unfair Competition Law requires a showing of either an unlawful, unfair, or fraudulent business act or practice, or an unfair, deceptive, untrue, or misleading advertising.  Lundy v. Selene Finance, LP, 2016 WL 1059423, at *17 (N.D. Cal. Mar. 17, 2016) (citing Steward v. Life Ins. Co. of N. Am., 388 F. Supp. 2d 1138, 1143 (E.D. Cal. 2005)).  Here, the Adelanto Wage Class's claim of unfairness does not hinge on any individualized inquiry specific to Plaintiffs.  Rather they claim GEO fraudulently, unfairly, or unlawfully induced them to work under the same Adelanto and Nationwide policies.  GEO cannot explain why it would be fairer to induce a detainee to scrub a kitchen sink for free than to wax hallway floors, or less fraudulent to induce under threat of discipline a wealthy detainee to work as compared to an indigent one.  Nor do Work Program participants agree to work as a result of their arms-length negotiations with GEO that vary meaningfully from detainee to detainee.  They fill out the same application and work under the same conditions.  Finally, Plaintiffs' Unfair Competition claim involves the market incentives to marshal detainee labor for competitive advantage over rival detention companies that follow the strict letter of the PBNDS, or provide more favorable conditions than required by ICE.  As a result, the Court finds common issues as to the Unfair Competition Law claim, and also finds that those common issues predominate over any individual questions.

### 4.  Adequacy

Under Rule 23(a)(4), the named plaintiffs must be deemed capable of adequately representing the interests of the entire class, including absent class members.  See Fed. R. Civ. P. 23(a)(4) (requiring "representative parties [who] will fairly and adequately protect the interests of the class").  The adequacy inquiry turns on: (1) whether the named plaintiff and class counsel have any conflicts of interest with other class members, and (2) whether the representative plaintiff and class counsel can vigorously prosecute the action on behalf of the class.  See Ellis, 657 F.3d at 985.  Furthermore, pursuant to Rule 23(g), before appointing class counsel, the Court "must consider" the following matters:

    i.    the work counsel has done in identifying or investigating potential claims in the action;

    ii.    counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

    iii.    counsel's knowledge of the applicable law; and

    iv.    the resources that counsel will commit to representing the class

Fed. R. Civ. P. 23(g)(1)(A).  The Court "may" also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(1)(B).

### a.   Contentions of the Parties

Plaintiffs and their counsel state they can vigorously pursue the action on behalf of the class, and that counsel has the requisite experience and resources to litigate this complex case. (Mot. at 27.)  GEO counters that the class representatives are not honest or credible and may have to devote their resources to defending character attacks.  (Opp'n at 21.)  They include in the body of their briefing a chart "providing specific details of each Plaintiffs' dishonest statements made under oath."  (Id. at 22-26.)

### b.   Analysis

The Court discerns no conflict of interest between Plaintiffs, class counsel, and putative class members.  Similarly, each Plaintiff has declared he understands the responsibilities of being a class representative and is prepared to cooperate with counsel, and to pursue the interests of all class members.  (Novoa Decl. ¶ 19; Fuentes Decl. ¶ 17; Karim Decl. ¶ 20; Mancia Decl. ¶ 17.) GEO challenges Plaintiffs' adequacy as representatives only on grounds of credibility.  The Court has already dismissed the challenge as unpersuasive.[12]

The Court has reviewed the declarations of Plaintiffs' counsel and attached credentials and finds they are qualified to vigorously pursue the case on behalf of the class, based on experience handling other class actions.  (Charest Decl.; Wolfson Decl.; Free Decl.)  At least one attorney is licensed to practice law in California, and all counsel have significant federal court experience.  Counsel state they have the resources and staff necessary, and are able to advance the costs of litigation.  (Wolfson Decl. ¶ 5.)  Based on the extensive exhibits submitted in support of the Motion, the Court also concludes counsel has sufficiently investigated the claims.  In sum, Plaintiffs and their counsel have satisfied the adequacy requirements.

## D.  Rule 23(b) Requirements

Rule 23(b) establishes three categories of class action, and each proposed class much fit into one of the three categories authorized.  It is not unusual for a proposed class to be certified under more than one category.  5 Moore's Federal Practice - Civil § 23.40 (2019).

### 1.   Rule 23(b)(2)

Plaintiffs seek certification of three classes under Rule 23(b)(2): the Adelanto Forced Labor class (divided into a Work Program and Uncompensated Work Program class), and a Nationwide HUSP Class.  GEO presents no argument specific to the requirements of Rule

---

[12] Supra note 10.

23(b)(2), and focuses its Opposition on the prerequisites applicable to all class actions under Rule 23(a).

In the Ninth Circuit, "[i]t is sufficient to meet the requirements of Rule 23(b)(2) [when] class members complain of a pattern or practice that is generally applicable to the class as a whole." Rodriguez v. Hayes, 591 F.3d 1105, 1125 (9th Cir. 2010) (internal citation and quotation marks omitted) (finding certification under Rule 23(b)(2) proper where "proposed members of the class each challenge Respondents' practice of prolonged detention of detainees without providing a bond hearing and seek as relief a bond hearing with the burden placed on the government").

This case concerns various policies and practices applicable to each proposed class that, if unlawful, subject proposed members to coerced labor in violation of the TVPA and CTVPA. The classes also seek essentially the same injunctive relief enjoining GEO from continuing these policies or practices. (Mot. at 28.) Rule 23(b)(2)'s requirements are therefore satisfied here. Hayes, 591 F.3d at 1125; Parsons v. Ryan, 754 F.3d 657, 689 (9th Cir. 2014) (Rule 23(b)(2) satisfied where state department of corrections established policies and practices that placed "every inmate in [] custody in peril" and all class members sought essentially the same injunctive relief).

### 2. Rule 23(b)(3)

Plaintiffs seek certification of three 23(b)(3) classes: the Adelanto Wage Class, and the two Adelanto Forced Labor Subclasses. The Court has already addressed the predominance aspect of claims relevant to these classes, in Part III.C.3 above. The remaining analysis therefore focuses on superiority, a pragmatic evaluation of the entire action. After consideration of the guidelines in Rule 23(b)(3)(A)-(D) the Court finds that a class action is the superior method of adjudication of the claims.

GEO argues that the vulnerable position of proposed class members, who may be located in different states or countries or may be undocumented, weighs against superiority. (Opp'n at 34-35.) But the fact class members may otherwise be unable to bring their claims due to their tenuous situations only militates in favor of certification. Gunnells v. Healthplan Servs., 348 F.3d 417, 426 (4th Cir. 2003) (superiority was shown when, in absence of class certification, very few individual claims would be brought, because adjudication through class action is superior to no adjudication at all); Menocal, 320 F.R.D. at 270 ("[M]any of the putative class members are immigrant detainees who lack English proficiency. They have limited financial resources and reside in countries around the world. It is very likely that these claims would not be brought by individual detainees, especially considering the case's innovative nature."). GEO's argument against superiority fails, because it does not point to any alternate means of resolution of detainees' claims. Thus, the superiority analysis here is somewhat truncated by the lack of alternate means. Fear of negative immigration consequences may also deter individual claims, a fact that also weighs in favor of certification. Rodriguez v. Carlson, 166 F.R.D. 465, 479–480

(E.D. Wash. 1996) (class action was preferred where social factors otherwise deterred individual litigation by migrant workers.)

The Court is aware of other lawsuits asserting the claims brought in this case, in particular with regard to the proposed Nationwide HUSP Class.  However, Plaintiffs scope the Nationwide HUSP Class to exclude the Aurora Colorado GEO facility, and thus avoid the creation of a direct overlap with Menocal.  Although it is likely some individuals were detained both at the Aurora Colorado facility and facilities covered by the Nationwide HUSP Class, the Court does not detect any prejudice that would result to class members by certification of the nationwide class.  Nor does the Court find problematic any overlap between the classes proposed here and the recently certified Nwauzor class action.  (Wright Decl. at Ex. 1 (attaching order from Nwauzor v. GEO Group, Inc., No. 17-5769 (W.D. Wash. Sept. 27, 2019)).)  The Nwauzor class only includes detainees who participated in the Work Program at GEO's Northwest Detention Center.  (Wright Decl. at Ex. 1.)  Conceivably some members of the Nationwide HUSP Class would also be members of the Nwauzor class, but they would be asserting claims arising from different GEO policies.  The Court also notes that a member of Plaintiffs' Counsel, R. Andrew Free, is class counsel in both the Nwauzor and the Menocal actions, and so conflict in strategy to the detriment of class members is unlikely.

## IV.   CONCLUSION

For the foregoing reasons, the Court (1) GRANTS Plaintiffs' motion for class certification; (2) DENIES Defendant's motion to exclude; and (3) VACATES the hearing set for December 2, 2019 on the motion to exclude.  A separate class certification order will be filed concurrently herewith, defining the classes and appointing class counsel.

**IT IS SO ORDERED.**