Daniel H. Charest (admitted *pro hac vice*)
dcharest@burnscharest.com
TX Bar # 24057803
Warren Burns (admitted *pro hac vice*)
wburns@burnscharest.com
TX Bar # 24053119
E. Lawrence Vincent (admitted *pro hac vice*)
lvincent@burnscharest.com
TX Bar # 20585590
**BURNS CHAREST LLP**
900 Jackson St., Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002

Counsel for Plaintiffs

***Additional Counsel on Signature Page***

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION

| | |
|---|---|
| **RAUL NOVOA, JAIME CAMPOS FUENTES, ABDIAZIZ KARIM, AND RAMON MANCIA**, individually and on behalf of all others similarly situated,<br><br>    *Plaintiffs*,<br><br>v.<br><br>**THE GEO GROUP, INC.**,<br>    *Defendant*. | Civil Action No. 5:17-cv-02514-JGB-SHKx<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER REQUIRING COVID-19 PREVENTION MEASURES FOR NATIONWIDE HUSP CLASS** |

MEMORANDUM OF POINTS AND
AUTHORITIES  IN SUPPORT OF PLAINTIFFS'
EX PARTE APPLICATION FOR TRO – COVID-
19 PREVENTIVE MEASURES

5:17-cv-02514-JGB

# **TABLE OF CONTENTS**

I.    INTRODUCTION .............................................................1

II.   FACTS SUPPORTING EMERGENCY INJUNCTIVE
      RELIEF.......................................................................1

      A.    The Coronavirus Global Pandemic and the National
            Emergency. ...............................................................2

      B.    HUSP Class Members Face a Severe Risk of Contracting
            COVID-19 as a Result of GEO's HUSPs in Each Covered
            Facility....................................................................5

            1.    GEO's HUSP programs expose Class Members to
                  the COVID-19 virus on a daily basis. ........................5

            2.    Class Members are especially susceptible to
                  immediate and significant harm from contracting
                  COVID-19. ....................................................7

            3.    GEO has failed to protect Class Members while
                  requiring adherence to the HUSP Program. ........... 11

III.  ARGUMENT ............................................................... 14

      A.    The Court should grant injunctive relief to protect Class
            Members during the pendency of this action. ................... 15

            1.    Movants are likely to succeed on the merits because
                  compelled participation in the HUSP program under
                  threat of serious illness or death, or violent reprisals
                  from guards, violates the TVPA's forced labor
                  prohibition.................................................. 15

            2.    Class Members face immediate, irreparable harm
                  because the HUSP program puts Class Members in a
                  heightened risk of exposure to COVID-19, a serious,
                  potentially life threatening incurable disease........... 18

            3.    The balance of the equities favors injunctive relief
                  because life and health of Class Members outweighs
                  GEO's profits from slave labor. ............................ 21

i

          4.     Injunctive relief is in the public interest because the requested relief helps sever the chain of exposure to COVID-19. ................................................................................ 22

    B.    The Court should grant the relief without requiring a bond............. 23

IV.    CONCLUSION................................................................................. 23

1

## <u>TABLE OF AUTHORITIES</u>

2

3

<u>Cases</u>

4

*All. for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ......................................................... 15

5

6

*Amoco Prod. Co. v. Vill. of Gambell,*
  480 U.S. 531 (1987) ...................................................................... 21

7

8

*Arc of Cal. v. Douglas,*
  757 F.3d 975 (9th Cir. 2014) ......................................................... 21

9

10

*Barrientos et al. v. CoreCivic, Inc.,*
  No. 18-15081 (Feb. 28, 2020 11th Cir.) ........................................ 17

11

12

*Caribbean Marine Servs. Co. v. Baldrige,*
  844 F.2d 668 (9th Cir. 1988) ......................................................... 18

13

14

*Fruth, Inc. v. Pullin,*
  No. CV 3:15-16266, 2015 WL 9451066 (S.D. W. Va. Dec. 23,
  2015) ............................................................................................. 22

15

16

*Garcia v. Google, Inc.,*
  743 F.3d 1258 (9th Cir. 2014) ....................................................... 20

17

18

*Gen-Probe Inc. v. Bayer Healthcare LLC,*
  No. 05-CV-1668 BEN (WMC), 2006 WL 8455600  (S.D. Cal.
  Mar. 3, 2006) ................................................................................. 22

19

20

*Granny Goose Foods,*
  415 U.S. 423 (1974) ...................................................................... 15

21

22

*Harris v. Bd. of Supervisors, Los Angeles Cty.,*
  366 F.3d 754 (9th Cir. 2004) .................................................... 19, 22

23

24

*Hernandez v. Wolf,*
  No. 5:20-cv-00617-TJH (KS), at 4 (C.D. Cal. Apr. 1, 2020) ........... passim

25

26

*Jones v. Tex. Dep't. of Crim. Justice,*
  880 F.3d 756 (5th Cir. 2018) ......................................................... 19

*Jorgensen v. Cassiday*,
  320 F.3d 906 (9th Cir. 2003) ............................................................. 23

*Orantes–Hernandez v. Smith*,
  541 F. Supp. 351 (C.D. Cal. 1982) .................................................... 23

*Pashby v. Delia*,
  709 F.3d 307 (4th Cir. 2013) ............................................................. 22

*People v. Halim*,
  14 Cal. App. 5th 632 (2017) .............................................................. 16

*Reno Air Racing Ass'n v. McCord*,
  452 F.3d 1126 (9th Cir. 2006) ........................................................... 15

*Rodde v. Bonta*,
  357 F.3d 988 (9th Cir. 2004) ............................................................. 22

*Spark Indus., LLC v. Kretek Int'l, Inc.*,
  No. CV 14-5726-GW(ASX), 2014 WL 12600262 (C.D. Cal.
  July 29, 2014) ................................................................................... 18

*State of California v. Picayune Rancheria of Chukchansi Indians of Cal.*,
  No. 1:14-CV-01593 (LJO-SAB), 2015 WL 9304835 (E.D. Cal.
  Dec. 22, 2015) .................................................................................. 22

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
  240 F.3d 832 (9th Cir. 2001) ............................................................. 15

*Toussaint v. Rushen*,
  553 F. Supp. 1365 (N.D. Cal. 1983) .................................................. 23

*U.S. v. Dann*,
  652 F.3d 1160 (9th Cir. 2011) ........................................................... 16

*Unknown Parties v. Johnson*,
  No. CV-15-00250-TUC-DCB, 2016 WL 8188563 (D. Ariz.
  No. 18, 2016) .................................................................................... 19

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .............................................................................. 15

**Statutes**

iv

18 U.S.C. § 1589 ................................................................................ 15, 16

Cal. Penal Code § 236.1(h)(3) .............................................................. 16

The California Trafficking Victims Protection Act, Cal. Civ. Code
    § 52.5 .............................................................................................. 16

**Rules**

11A Charles A. Wright & Arthur R. Miller, Federal Practice and
    Procedure § 2948.1 (3d ed. rev. 2014) ........................................ 18

Fed. R. Civ. P. 23(b)(2) ........................................................................ 1

v

# I.    INTRODUCTION

This Court has certified a class under Fed. R. Civ. P. 23(b)(2) which includes any person who is (a) civilly detained at any GEO immigration detention center in the United States and (b) subject to a GEO Housing Unit Sanitation Policy (HUSP) at any point during their detention (collectively the "HUSP Class," and individually "Class Members").[1] Dkt. 229 at 2.

As those appointed to represent the HUSP Class with regard to how GEO "has acted or refused to act on grounds that apply generally to the class," Movants Raul Novoa, Jaime Campos Fuentes, Abdiaziz Karim, and Ramon Mancia request this Court order injunctive relief regarding Class Members' exposure to Coronavirus Disease 2019 ("COVID-19") requiring GEO to either (a) halt the use of Class Members in the provision of work or services under the HUSP program or (b) protect those detainees who provide HUSP services by (i) providing protective clothing and antiseptic supplies and (ii) conducting testing of all Class Members to detect COVID-19. Given the ongoing HUSP program, the prevalence of COVID-19 in GEO facilities, and the dire and immediate threat of death or serious illness resulting from exposure to COVID-19, the Class Members need immediate help.

## II.    FACTS SUPPORTING EMERGENCY INJUNCTIVE RELIEF

COVID-19 has found its way into GEO detention facilities. The living conditions encourage the rapid transmission of the virus and exposure to COVID-19 throughout the GEO facilities. And yet, GEO's HUSPs still force Class Members to clean the

---

[1] The HUSP Class excludes (1) individuals detained in GEO's family residential detention facility in Karnes City, Texas; (2) individuals detained in the Alexandria Staging Facility in Alexandria, Louisiana; (3) any individual detained in the custody of the U.S. Marshall or any other law enforcement agency at a GEO facility where the company also detains civil immigration detainees pursuant to contracts with ICE; and (4) civilly detained immigrants detainees held at the Aurora ICE Processing Center in Aurora, Colorado at any time before October 22, 2014.

1

epicenter of COVID-19's spread at its facilities—the common spaces. GEO provides no protection to these workers, so they are unnecessarily exposed to COVID-19 because of GEO's HUSP program. The circumstances call for immediate action to protect the Class Members where their ward, GEO, has completely failed.

## A.     The Coronavirus Global Pandemic and the National Emergency

COVID-19 is a disease caused by a coronavirus that has reached pandemic status. It spreads easily from person to person.[2] This Court has recognized the ease by which COVID-19 is spread:

> According to the United States Centers for Disease Control and Prevention, the coronavirus is spread mainly through person-to-person contact. More specifically, the coronavirus is spread between people who are in close contact—within about 6 feet with one another through respiratory droplets produced when an infected person coughs or sneezes. The droplets can land in the mouths or noses, or can be inhaled into the lungs, of people who are within about 6 feet of the infected person. Moreover, studies have established that the coronavirus can survive up to three days on various surfaces.[3]

As of April 5, 2020, 304,826 people in the United States have confirmed diagnoses, and 7,616 Americans have died after contracting COVID-19.[4] These numbers are expected to grow exponentially. The Centers for Disease Control and

---

[2]   Centers for Disease Control and Prevention, *How COVID-19 Spreads*, available at https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html (last accessed Apr. 3, 2020).

[3] *Hernandez v. Wolf*, No. 5:20-cv-00617-TJH (KS), at 4 (C.D. Cal. Apr. 1, 2020) (Temporary Restraining Order and Order to Show Cause); Centers for Disease Control and Prevention, *How COVID-19 Spreads*, available at https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html (last accessed Apr. 3, 2020) (noting the virus spreads "between people who are in close contact with one another (within about 6 feet)" and "through respiratory droplets produced when an infected person coughs or sneezes").

[4]   Centers for Disease Control and Prevention, *Cases in U.S.* (updated Apr. 6, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last accessed Apr. 6, 2020).

PLAINTIFFS' EX PARTE MOTION FOR A                                    5:17-cv-02514-JGB
TEMPORARY RESTRAINING ORDER

Prevention (CDC) expects that most people in the United States will be exposed to the virus "[i]n the coming months."[5] Projections by the CDC indicate that over 200 million people in the United States could be infected with COVID-19 without effective public health intervention.[6] The CDC estimates COVID-19 could kill between 200,000 and 1.7 million people in the United States and hospitalize between 2.4 and 21 million.[7]

COVID-19's prolific growth is particularly troublesome in light of its devastating health effects. COVID-19 can cause pneumonia, multi-organ failure, and death.[8] There is no vaccine for COVID-19, and there is no known medication to prevent or treat the disease.[9] The only known effective measures to reduce the risk for vulnerable people

---

[5] Centers for Disease Control and Prevention, *Situation Summary* (updated Mar. 26, 2020), available at http://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html (last accessed Apr. 3, 2020); *see also Hernandez v. Wolf*, No. 5:20-cv-00617-TJH (KS), at 5 (C.D. Cal. Apr. 1, 2020) (Temporary Restraining Order and Order to Show Cause) ("COVID-19 is highly contagious and has a mortality rate ten times greater than influenza. Most troublesome is the fact that people infected with the coronavirus can be asymptomatic during the two to fourteen-day COVID-19 incubation period. During that asymptomatic incubation period, infected people are, unknowingly, capable of spreading the coronavirus.").

[6] Sheri Fink, *Worst-Case Estimates for U.S. Coronavirus Deaths,* N.Y. Times, Mar. 13, 2020, (updated Mar. 18, 2020), available at https://www.nytimes.com/2020/03/13/us/coronavirus-deaths-estimate.html (last accessed Apr. 3, 2020).

[7] Sheri Fink, *Worst-Case Estimates for U.S. Coronavirus Deaths,* N.Y. Times, Mar. 13, 2020 (updated Mar. 18, 2020), available at https://www.nytimes.com/2020/03/13/us/coronavirus-deaths-estimate.html (last accessed Apr. 3, 2020); *see also Hernandez v. Wolf*, No. 5:20-cv-00617-TJH (KS), at 5 (C.D. Cal. Apr. 1, 2020) (Temporary Restraining Order and Order to Show Cause) ("[N]o age group is safe from COVID-19. While older people with pre-existing conditions are the most vulnerable to COVID-19-related mortality, young people without preexisting conditions have, also, succumbed to COVID-19.").

[8] Centers for Disease Control and Prevention, *What you need to know about coronavirus disease 2019 (COVID-19)*, available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf (last accessed April 3, 2020).

[9] Centers for Disease Control and Prevention, *Situation Summary* (updated Mar. 26, 2020), available at http://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html (last accessed April 3, 2020); Centers for Disease Control and Prevention, *Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission*, available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf (last accessed April 3, 2020).

PLAINTIFFS' EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER

5:17-cv-02514-JGB

from injury or death from COVID-19 are to prevent them from being infected in the first place. Social distancing, i.e., physical separation from known or potentially infected individuals, and vigilant hygiene, including washing hands with soap and water, are the only known effective measures for protecting vulnerable people from COVID-19.[10] "The science is well established—infected, asymptomatic carriers of the coronavirus are highly contagious."[11]

As a result, health organizations worldwide have recognized the severity of the COVID-19 outbreak. The World Health Organization declared the outbreak a "public health emergency" on January 30, 2020.[12] Health and Human Services Secretary Alex M. Azar II did the same a day later.[13] On March 11, the WHO characterized COVID-19 as a pandemic.[14] Two days later, the President of the United States declared the COVID-19 outbreak a "national emergency."[15]

---

[10] Centers for Disease Control and Prevention, *Situation Summary* (updated Mar. 26, 2020), available at http://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html (last accessed April 3, 2020).

[11] *Hernandez v. Wolf*, No. 5:20-cv-00617-TJH(KS), at 11 (C.D. Cal. April 1, 2020) (Temporary Restraining Order and Order to Show Cause).

[12] Centers for Disease Control and Prevention, *Situation Summary* (updated Mar. 26, 2020), available at http://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html (last accessed Apr. 3, 2020).

[13] Centers for Disease Control and Prevention, *Situation Summary* (updated Mar. 26, 2020), available at http://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html (last accessed Apr. 3, 2020).

[14] Centers for Disease Control and Prevention, *Situation Summary* (updated Mar. 26, 2020), available at http://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html (last accessed Apr. 3, 2020). A pandemic is a global outbreak of disease. Pandemics happen when a new virus emerges to infect people and can spread between people sustainably. Because there is little to no pre-existing immunity against the new virus, it spreads worldwide. *Id.*

[15] Centers for Disease Control and Prevention, *Situation Summary* (updated Mar. 26, 2020), available at http://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html (last accessed Apr. 3, 2020).

4

**B.    The HUSP Class face a severe risk of contracting COVID-19 as a result of GEO's HUSPs in each covered facility.**

The COVID-19 pandemic has also cast GEO's treatment of HUSP Class member in a new and dire light.

### 1.    GEO's HUSP programs expose Class Members to the COVID-19 virus on a daily basis.

The HUSPs at each GEO facility require detained immigrants to perform a wide range of services that needlessly expose them to the spread of COVID-19. For example, Adelanto's HUSP requires that "<u>each and every</u> detainee must participate in the facility's sanitation program," which includes cleaning "all commonly accessible areas of the unit."[16] The housing unit officer develops a list of detainees each day to assign to housing unit sanitation, though "[d]uring a general cleanup all detainees must participate."[17] In addition, "[a]ll detainees must participate" in a mandatory, general cleanup of their housing units every day.[18] The policies apply to all detained immigrants at Adelanto.[19] Moreover, GEO's Housekeeping Plan provides that "[o]n a weekly basis or as needed, all Housing Units will be subject to a total sanitation mission to assure standards are met and maintained."[20] This "total sanitation mission" is carried out by detained immigrants pursuant to the HUSP.[21] GEO's HUSP program exposes Class Members to un-sanitized

---

[16] Dkt. 193 (Wright Decl.) at Ex. 24 ("Policy 10.3.5") at 3, 4 (emphasis added).

[17] *Id.*

[18] Wright Decl. (Dkt. 193), at Ex. 4 (Janecka Dep.) at 87:8–88:21.

[19] Wright Decl. (Dkt. 193), at Ex. 4 (Janecka Dep.) at 62:11–63:8.

[20] Wright Decl. (Dkt. 193), at Ex. 18 (Housekeeping Plan) at 2.

[21] Wright Decl. (Dkt, 193), at Ex. 23 ("Policy 12.1.4") at 1.

1    surfaces, floors, showers, and toilets all of which increase the threat of contracting and

2    spreading COVID-19.[22]

3         Class Members cannot "opt-out" of the HUSP program to self-isolate during the

4    COVID-19 crisis.[23] GEO ensures that Class Members comply with its HUSPs by

5    threatening them with punishment.[24] The Supplemental Detainee Handbook at

6    Adelanto, for example, classifies "[r]efusal to clean assigned living area" as a 300-level

7    "High Moderate" offense punishable by up to 72 hours in disciplinary restriction (also

8    known as solitary confinement) or even criminal prosecution.[25] GEO also suspends

9    programs and recreation unless and until detainees clean the housing units, hallways,

10   kitchens, laundry, and intake area upon demand and without compensation.[26] Indeed,

11   GEO's  HUSP  prohibits  detained  immigrants  from  participating  in  "any

12   activities/programs until the unit is cleaned," and threatens that "[c]ontinued refusal to

13   clean the area will result in further disciplinary action."[27]

14        All  immigrants  detained  in  GEO's  civil  immigration  detention  facilities

15   nationwide are subject to the HUSP.[28] Like at its Adelanto facility, GEO threatens

16   _____

17   [22] *Hernandez v. Wolf*, No. 5:20-cv-00617-TJH (KS), at 5 (C.D. Cal. April 1, 2020) (Temporary Restraining
     Order and Order to Show Cause) ("Because of the highly contagious nature of the coronavirus and
18   the, relatively high, mortality rate of COVID-19, the disease can spread uncontrollably with
     devastating results in a crowded, closed facility, such as an immigration detention center.").

19   [23] Wright Decl. (Dkt. 193) at Ex. 24 ("Policy 10.3.5") at 3.

20   [24] Dkt. 192-3 (Novoa Decl.) ¶ 13; Dkt. 192-4 (Campos Fuentes Decl.) ¶¶ 14, 15; Dkt. 192-5 (Karim
     Decl.) ¶¶ 10–13; Dkt. 192-6 (Mancia Decl.) ¶¶ 10–11; Dkt. 192-8 (Munoz Decl.) ¶¶ 5, 6, 9; Dkt. 192-
21   7 (Marwaha Decl.) ¶¶ 11–13.

22   [25] Wright Decl. (Dkt. 193), at Ex. 16 (Supp. Detainee Handbook) at 29; Ex. 4 (Janecka Dep.) at 67:17–
     68:14.

23   [26] Wright Decl. (Dkt. 193), at Ex. 4 (Janecka Dep.) at 232:11-23; *see also* Karim Decl. (Dkt 192-5) ¶ 11.

24   [27] Wright Decl. (Dkt. 193), at Ex. 24 (Policy 10.3.5) at 3.

25   [28] *See* Dkt. 174 at 7; 8; 12; 13 (conceding the existence of a nationwide corporate HUSP); Wright Decl.
     (Dkt. 193), at Ex. 34 (Requests for Admission) at Nos. 11-22 (admitting that GEO operates HUSPs
26   at twelve civil immigration detention centers nationwide). According to Acting ICE Director Matt

PLAINTIFFS' EX PARTE MOTION FOR A                                    5:17-cv-02514-JGB
TEMPORARY RESTRAINING ORDER

detained immigrants nationwide with serious harm or abuse of legal process for refusing or failing to perform uncompensated work pursuant to each HUSP.[29] As a result of GEO's policies, which compel participation by "<u>each and every detainee</u>" in cleaning and housekeeping activities for "<u>all commonly accessible areas of the unit</u>" in which they are housed, Dkt. 223 at 6, the continuation of the HUSP program threatens thousands of Class Members' life, health, and well-being <u>every day</u>.[30]

## 2. Class Members are especially susceptible to immediate and significant harm from contracting COVID-19.

Class Members at GEO's detention facilities are highly likely to contract COVID-19 and suffer severe health effects as a result of the HUSPs.

COVID-19 is a disease that spreads easily "[b]etween people who are in close contact with one another (within about 6 feet)," and does so "[t]hrough respiratory droplets produced when an infected person coughs or sneezes."[31] Not surprisingly, the CDC has concluded immigration detention centers—such as those in which GEO enforces the HUSP program—are particularly susceptible to the spread and contraction of COVID-19 because they are congregate environments, i.e., places where people live

---

Albence, the Adelanto Facility is "representative of all our detention centers. That is how we run our detention facilities." Fox News, *Fox and Friends*, at 4:55–5:13 (July 26, 2019), available at https://www.youtube.com/watch?v=SdgN4jfxiqU&feature=youtu.be.

[29] *See* Wright Decl. (Dkt. 193), at Ex. 25 (Northwest Detention Center Detainee Handbook) at 18 (classifying "[r]efusal to clean assigned living area" as a 300-level "High Moderate" offense punishable by up to 72 hours in disciplinary restriction—*i.e.*, solitary confinement—or even criminal prosecution); Ex. 34 (Requests for Admission) at No. 24.

[30] Wright Decl. (Dkt. 193), at Ex. 4 (Janecka Dep.) at 190:5-191:6; Dkt. 45, at 6.

[31] *See* Centers for Disease Control and Prevention, *How COVID-19 Spreads*, available at https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html (last accessed April 3, 2020); Centers for Disease Control, *Interim Recommendations for US Households with Suspected/Confirmed Coronavirus Disease 2019*, available at https://www.cdc.gov/coronavirus/2019-ncov/prepare/cleaning-disinfection.html (last accessed Apr. 3, 2020).

7

and sleep in close proximity.[32] Infectious diseases like COVID-19 that are communicated by air or touch are more likely to spread in these environments.[33] People who are confined to these congregate environments find it virtually impossible to engage social distancing and hygiene practices as urged by the CDC in order to mitigate the risk of transmission.[34]

There are "many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members"—a circumstance exacerbated by the potential for "high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions."[35]

Another court from this District has taken judicial notice of the risk of exposure to COVID-19 and lack of safeguards at the Adelanto facility:

> At Adelanto, a holding area can contain 60 to 70 detainees, with a large common area and dormitory-type sleeping rooms housing four or six detainees with shared sinks, toilets and showers. Guards regularly rotate through the various holding areas several times a day. At meal times—three times a day—the 60 to 70 detainees in each holding area line up together, sometimes only inches apart, in the cafeteria. The guards,

---

[32] *See* Centers for Disease Control and Prevention, *Situation Summary* (updated Mar. 26, 2020), available at http://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html (last accessed Apr. 3, 2020).

[33] *Id.*

[34] *See* Centers for Disease Control and Prevention, *How to Protect Yourself*, available at https://www.cdc.gov/coronavirus/2019-ncov/prepare/prevention.html (last accessed Apr. 3, 2020).

[35] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (updated March 23, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last accessed Apr. 3, 2020).

PLAINTIFFS' EX PARTE MOTION FOR A
TEMPORARY RESTRAINING ORDER

5:17-cv-02514-JGB

detainees and cafeteria workers do not regularly wear gloves or masks to prevent the spread of the coronavirus. While detainees have access to gloves, there is no requirement that they wear them. Detainees do not have access to masks or hand sanitizer—though thorough hand washing could be more effective than hand sanitizers at preventing the spread of the coronavirus.[36]

The risk of exposure at Adelanto is not unique among GEO's facilities. Indeed, similar COVID-19 spread has happened to the Class Members at GEO's Pine Prairie ICE Processing Center in Pine Prairie, Louisiana. ICE officials transferred an inmate from the Federal Correctional Center in Oakdale, Louisiana,[37] where five inmates have died from COVID-19 in less than a week.[38] The virus is so widespread that Bureau of Prisons officials ceased testing and simply assumed everyone is presumptively positive,[39] and Attorney General Barr declared an emergency urged the BOP to immediately de-populate the prison.[40]

Some people are especially vulnerable to COVID-19. In particular, older adults and people with serious underlying medical conditions like heart disease, diabetes, and

---

[36] *Hernandez v. Wolf*, No. 5:20-cv-00617-TJH (KS), at 5 (C.D. Cal. April 1, 2020) (Temporary Restraining Order and Order to Show Cause).

[37] Maria Clark, "ICE detainee test positive for COVID-19 in Pine Prairie, Louisiana", The Daily Advertiser, Apr. 3, 2020, available at https://www.theadvertiser.com/story/news/american-south/2020/04/03/coronavirus-ice-detainee-tests-positive-pine-prairie-louisiana/2946110001/.

[38] Caroline Habetz, "Fifth inmate at Oakdale federal prison dies from COVID-19", KPLC, Apr. 3, 2020 available at https://www.kplctv.com/2020/04/03/fifth-inmate-oakdale-federal-prison-dies-covid-/.

[39] Nicholas Chrastil, "Louisiana federal prison no longer testing symptomatic inmates for coronavirus due to 'sustained transmission'", The Lens, Mar. 31, 2020 available at https://thelensnola.org/2020/03/31/louisiana-federal-prison-no-longer-testing-symptomatic-inmates-for-coronavirus-due-to-sustained-transmission/.

[40] Memorandum for Director of Bureau of Prisons from William G. Barr re Increasing the Use of Home Confinement at Institutions Most Affected by COVID-19, Apr. 3, 2020, available at https://www.politico.com/f/?id=00000171-4255-d6b1-a3f1-c6d51b810000.

9

PLAINTIFFS' EX PARTE MOTION FOR A                                    5:17-cv-02514-JGB
TEMPORARY RESTRAINING ORDER

lung disease are at a higher risk of getting sick from COVID-19.[41] The CDC estimates that for people over the age of 65 or with medical conditions that increase the risk of serious COVID-19 infection, shortness of breath can be severe.[42] Eight out of 10 deaths attributed to COVID-19 have been in adults 65 and older.[43] For adults between 65–84 years old that contract COVID-19, the CDC estimates that 31–59% required hospitalization, 11–31% required admission to an intensive care unit, and 4–11% died.[44] For adults 85 years old or older, 31–70% required hospitalization, 6–29% required admission to an intensive care unit, and 10-27% died.[45] Eighty percent of all COVID-19 deaths in the United States have been among adults 65 years of age or older.[46]And, even for those not in a medically vulnerable population, the risks posed by COVID-19 are severe. COVID-19 creates serious illness in 16% of all cases.[47] Though older adults account for the vast majority of deaths, 38% of those hospitalized for COVID-19 have been people between 20–54 years old.[48]

---

[41] Centers for Disease Control and Prevention, *People Who Are at Higher Risk for Severe Illness*, available at https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html (last accessed Apr. 3, 2020).

[42] *Id.*

[43] Centers for Disease Control and Prevention, *Older Adults*, available at https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications/older-adults.html (last accessed Apr. 3, 2020).

[44] *Id.*

[45] *Id.*

[46] Centers for Disease Control and Prevention, *Situation Summary* (updated Mar. 26, 2020), available at http://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html (last accessed Apr. 3, 2020).

[47] *Id.*

[48] CDC COVID-19 Response Team, *Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) — United States, February 12–March 16, 2020,* Morbidity & Mortality Wkly. Report (MMWR), available at http://dx.doi.org/10.15585/mmwr.mm6912e2 (last accessed Apr. 3, 2020).

PLAINTIFFS' EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER                    5:17-cv-02514-JGB

HUSP Class Members' risk of exposure exceeds the normal risk an inhabitant would face in congregative environments. Rather than simply live in close quarters (which presents a risk in and of itself), **Class Members must clean these common areas day after day without protection from COVID-19** . **By design, GEO requires Class Members to enter and clean common areas by coercion and, thereby, risks—nearly guarantees—exposure to COVID-19.** As this Court recently noted, "[t]he Government, here, cannot say, with any degree of certainty, that no one—staff or detainee—at Adelanto has not been, or will not be, infected with the coronavirus."[49]

### 3. GEO has failed to protect Class Members while requiring adherence to the HUSP Program.

Class Members cannot rely on GEO to protect them from the risk of contracting COVID-19 through participation in the HUSP program because GEO regularly fails to provide detainees basic personal hygiene items—even in this time of unprecedented crisis. For instance, at the LaSalle Detention Facility, Class Member Griselda del Bosque reports that "[v]ery little has changed in the facility to address the virus."[50] And Ms. Del Bosque confirms that "[t]he prisoners are the ones who do the cleanings in the dorms" but that the conditions fall well short of CDC guidelines for COVID-19 because Class Members "clean what [they] can with what they [i.e., GEO] give us, [but] usually [they] just have to use soap and water" or "one towel . . . to clean everything."[51] Even after the advent of COVID-19, GEO has failed to provide sufficient cleaning materials: "We sometimes don't have soap or toilet paper for days if it's not replaced. We were told by

---

[49] *Hernandez v. Wolf*, No. 5:20-cv-00617-TJH (KS), at 11.

[50] *See* Decl. of Griselda Del Bosque ("Del Bosque Decl."), ¶ 5, *Dada v. Witte*, ECF No. 2-8 (E.D. La.) filed Apr. 1, 2020, available at https://ccrjustice.org/sites/default/files/attach/2020/04/2-8%20Griselda%20Del%20Bosque.pdf., attached as Exhibit A to the Declaration of Daniel H. Charest (Charest Decl.).

[51] *See* del Bosque Decl., ¶ 8.

PLAINTIFFS' EX PARTE MOTION FOR A
TEMPORARY RESTRAINING ORDER

5:17-cv-02514-JGB

a guard that the soap we are given in the bathrooms is for hands and body only but that it's not disinfecting."[52]

This is not an isolated incident. Class Members report facing similar shortages of basic necessities at other GEO facilities elsewhere in the United States:

- "Conditions in our dorm are unsanitary. We don't have any sinks to clean our bowls, so people clean their bowls in the bathrooms. I work cleaning the showers in my dorm for one dollar a day. I am not given any masks. Sometimes I run out of cleaning supplies and have to wash the floor of the showers with shampoo. The showers are only cleaned twice a day."[53]

- "Counting me, there are currently 10 people being detained together [in the same room]. We sleep in bunk beds. . . . Staff does not clean the room where we stay. We ask in the morning for disinfectant to clean with. I use shampoo to wash my hands with, but we do have bars of white soap. . . . We were told about COVID-19 when [GEO staff] took away the [roommate] detainee for quarantine. We asked for hand sanitizer but were told to use disinfectant spray. Staff had on masks, but detainees cannot get masks. . . . I clean everything because I fear getting an infection, but not everyone I am detained with is as careful about infection as I am.[54]

- "Morales Diaz said she saw a Cuban detainee yelling at a guard for not wearing a mask or gloves. The guard ignored the detainee. Often, media is denied to the women. 'They refuse to clean the living areas to protest that we don't have proper cleaning supplies,'

---

[52] *See* del Bosque Decl., ¶ 7.

[53] *See, e.g.,* Decl. of Sonia Lemus Tejada Dejaso ("Tejada Dejaso Decl."), ¶¶ 1, 8-9, *Dada v. Witte*, ECF No. 2-19 (E.D. La.) filed Apr. 1, 2020 (from LaSalle ICE Processing Center in Jena, Louisiana), available at https://ccrjustice.org/sites/default/files/attach/2020/04/2-19%20Sonia%20Lemus%20Tejada%20Dejaso.pdf, attached as Exhibit B to Charest Decl.

[54] Declaration of Abby Frazer ("Frazer Decl."), ¶¶ 30, 35-37, 40-42 (describing GEO's Denver Contract Detention Facility in Aurora, Colorado), attached as Exhibit C to Charest Decl.

PLAINTIFFS' EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER

5:17-cv-02514-JGB

Morales Diaz said. 'The staff punishes them by turning off the TV.'"[55]

When Class Members attempt to raise concerns about COVID-19, GEO has reacted with brutal force and consistent failure to address detainees' lack of access to basic hygienic necessities like soap and hand sanitizer. Following a COVID-19 presentation at LaSalle, GEO responded by tear-gassing as many as 80 detained immigrant women.[56] GEO reportedly approved similar uses of force at two other facilities the same week.[57] These deprivations and unlawful threats and uses of force by GEO are consistent with those alleged by the Class Representatives[58] and others at Adelanto.[59]

---

[55] Debbie Nathan, "Women in ICE Detention, Fearing Coronavirus, Make Video to Protest Unsafe Conditions," The Intercept, Mar. 30, 2020, (addressing conditions at the South Louisiana ICE Processing Center), available at https://theintercept.com/2020/03/30/coronavirus-ice-detention.

[56] *See generally* Decl. of Mariel Villareal, *Dada v. Witte*, ECF No. 2-32 (E.D. La.) filed Apr. 1, 2020, available at https://ccrjustice.org/sites/default/files/attach/2020/04/2-32%20Mariel%20Villarreal.pdf, attached as Exhibit D to Charest Decl.; Tejada Dejaso Decl., ¶¶ 9-12. *See also* Camilo Montoya-Galvez, "'Don't let us die': Women in ICE custody plead for release amid coronavirus pandemic," CBS News, Apr. 3, 2020, available at https://www.cbsnews.com/news/coronavirus-women-ice-custody-louisiana-release-covid-19/.

[57] Hamed Aleaziz, "Immigrants Afraid of the Outbreak Are Protesting Inside ICE Facilities," BuzzFeed News, Mar. 26, 2020, available at https://www.buzzfeednews.com/article/hamedaleaziz/immigrants-coronavirus-outbreak-ice-protests ("Since Monday, guards at three ICE detention facilities in Louisiana and Texas — LaSalle ICE Processing Center, Pine Prairie ICE Processing Center, and South Texas ICE Processing Center — have used force to quell inmate protests. Advocates and attorneys have reported that ICE detainees have had limited access to soap and are worried that the coronavirus, which causes COVID-19, could spread undetected, leaving those with underlying medical conditions and the elderly at risk.").

[58] *See also* Novoa Decl. (Dkt 192-3) ¶ 14; Campos Fuentes Decl. (Dkt 192-4) ¶ 11; Karim Decl. (Dkt 192-5) ¶ 17; Mancia Decl. (Dkt 192-6) ¶ 14; Marwaha Decl. (Dkt 192-7) ¶ 17.

[59] Tom Dreisbach, "Exclusive: Video Shows Controversial Use of Force Inside An ICE Detention Center," NPR, February 6, 2020, available at https://www.npr.org/2020/02/06/802939294/exclusive-video-shows-controversial-use-of-force-inside-an-ice-detention-center. *See also* Memorandum and Order Granting in Part and Denying in Part Motions for Summary Judgment, *Rivera-Martinez v. The GEO Grp., Inc.*, Case No. ED CV 18-1125-SP, ECF No. 160 at (C.D. Cal. Jan. 7, 2020).

13

Even before the onset of COVID-19, GEO's detention facilities had a history of inadequate medical care. For example, following an unannounced inspection at one of GEO's detention facilities, OIG issued a report on September 27, 2018 identifying "a number of serious issues that violate ICE's 2011 [PBNDS] and pose significant health and safety risks at the facility."[60] The report concluded that detainees do not have timely access to proper medical care.[61] The OIG described wait times for "acute illnesses," which would include illnesses like COVID-19, as "excessively long." Thus it is reasonable to expect COVID-19 will also readily spread in detention centers, especially when people cannot engage in proper hygiene and isolate themselves from infected residents or staff.[62]

### III.   ARGUMENT

Movants herein seek limited, temporary relief to protect the health and safety of the Class Members. The relief they seek will also protect the health and safety of GEO personnel and healthcare workers at GEO's detention facilities as well and the healthcare infrastructure and communities where these facilities are located. Specifically, Movants seek an order requiring GEO to either (a) halt the use of Class Members in the provision of work or services under the HUSP program; or (b) protect those detainees who provide HUSP services by (i) providing protective clothing and antiseptic supplies and (ii) conducting testing of all Class Members to detect COVID-19.

---

[60] Wright Decl. (Dkt. 193), at Ex. 27 (OIG-18-86, "Management Alert – Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California").

[61] *Id.* at 7.

[62] *See* Novoa Decl. (Dkt 192-3)at ¶ 15 (GEO does not provide sufficient personal hygiene items; these items must be purchased at the commissary); Campos Fuentes Decl. (Dkt 192-4) at ¶ 11(same); Karim Decl. (Dkt 192-5) at ¶ 17 (same); Mancia Decl. (Dkt 192-6) at ¶ 14 (same); Munoz Decl. (Dkt 192-8) at ¶ 13 (same); Marwaha Decl. (Dkt 192-7) at ¶ 17 (same).

14

**A.      The Court should grant injunctive relief to protect Class Members during the pendency of this action.**

The purpose of a TRO is to preserve the status quo and prevent irreparable harm before a preliminary injunction hearing is held.[63] On a motion for a temporary restraining order, the Movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."[64] A temporary restraining order may issue where "serious questions going to the merits [are] raised and the balance of hardships tips sharply in [plaintiff's] favor."[65] To succeed under the "serious question" test, Movants must show that they are likely to suffer irreparable injury and that an injunction is in the public's interest.[66]

**1.      Movants are likely to succeed on the merits because compelled participation in the HUSP program under threat of serious illness or death, or violent reprisals from guards, violates the TVPA's forced labor prohibition.**

To establish a claim of forced labor under the federal Trafficking Victims Protection Act (TVPA), Movants must show that GEO "knowingly provide[d] or obtain[ed]" their labor "by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."[67] Serious harm is

---

[63] *Granny Goose Foods*, 415 U.S. 423, 439 (1974); *see also Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1130–31 (9th Cir. 2006).

[64] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (noting that preliminary injunction and temporary restraining order standards are "substantially identical").

[65] *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citation omitted).

[66] *Id.* at 1132.

[67] 18 U.S.C. § 1589 (a).

defined as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel <u>a reasonable person</u> of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm."[68] This statutory language makes clear that the first inquiry under the federal forced labor statute is GEO's intent in threatening harm.[69] To determine if the harms threatened were serious, the statute employs a reasonable person test: Was the threat sufficiently serious that a reasonable person of the same background and circumstances would feel compelled to continue working?[70]

A reasonable likelihood of success exists here: GEO's acquisition of free labor by threatening Class Members with reprisal violates the TVPA. GEO forces the HUSP Class to perform uncompensated janitorial and maintenance work in common areas of its detention facilities.[71] GEO obtains this free labor by threatening HUSP Class

---

[68] 18 U.S.C. § 1589 (c) (emphasis added). The California Trafficking Victims Protection Act, Cal. Civ. Code § 52.5, requires the same reasonable person analysis. *See People v. Halim*, 14 Cal. App. 5th 632, 643 (2017), *reh'g denied* (Sept. 12, 2017), *review denied* (Nov. 29, 2017), *cert. denied sub nom. Halim v. California*, 138 S. Ct. 1564 (2018); *see also* Cal. Penal Code § 236.1(h)(3).

[69] *See U.S. v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011) ("The linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall her.").

[70] *See id.*; *see also Nuñag–Tanedo v. East Baton Rouge Parish School Board*, 2011 WL 7095434, (C.D. Cal. Dec. 12, 2011) (Kronstadt, J.) (certifying a federal TVPA class where the putative class members shared the same background and circumstances such that a reasonable person standard could be used to determine whether it was the defendants' scheme that ultimately compelled the plaintiffs to work).

[71] *See* Dkt. 174 at 7, 8, 12, 13 (discussing GEO's HUSPs); Dkt. 193-18 (Housekeeping Plan); 193-23 (Adelanto Sanitation Procedures); 193-24 (Adelanto Housing Unit Post Orders); Dkt. 200 (Answer) ¶ 76 (admitting detained immigrants are not paid to perform labor under the HUSPs); Dkt. 210-1 (Martin Dep.) at 130:11–138:8; 148:7–23, 155:17–161:16 (discussing the HUSP at GEO's Aurora ICE Processing Center); Dkt. 210-3 (ICE Decl.) ¶ 21; Dkt. 210-4 (GEO 30(b)(6) Dep.) at 132:18–136:4.

PLAINTIFFS' EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER                     5:17-cv-02514-JGB

Members with "serious harm," including solitary confinement, disciplinary housing transfers, loss of privileges, referral to ICE, and criminal prosecution.[72]

When asked to opine on the applicability of the TVPA on PBNDS-sanctioned, voluntary work programs—programs less violative than GEO's non-PBNDS HUSP program—the U.S. Court of Appeals for the Eleventh Circuit concluded that coercion of labor violates the TVPA even when the coercion happens in a civil detention center:

> If CoreCivic, or any other private for-profit contractor, actually forces detainees to provide labor (whether through a work program or not) through any of the illegal coercive means explicitly proscribed by the TVPA, it has "obtain[ed] the labor or services of a person" in violation of the TVPA. Again, nothing in the text of the statute excludes federal contractors providing immigration detention services from liability under the TVPA, even when that liability might arise out of the operation of a federally mandated work program. And nothing in the PBNDS permits CoreCivic, or other private contractors operating immigration detention facilities, to force detainees to perform labor (beyond personal housekeeping tasks), and certainly not through the illegal coercive means explicitly listed in the TVPA.[73]

The "personal housekeeping tasks" referred to in *Barrientos* expressly exclude the tasks required under GEO's HUSP program: the point of the HUSP-related claim is that GEO demands Class Members to work and perform janitorial services in common areas not included within the "personal housekeeping tasks" condoned by ICE through Section 5.8.V.C of the PBNDS. When GEO enforces the HUSP program through illegal

---

[72] *See* Dkt. 193-16 at 29 (Adelanto Supp. Detainee Handbook); Dkt. 193-25 (Northwest Detention Center Detainee Handbook); Dkt. 193-34 (RFAs) at No. 24 (admitting that at each facility, "[r]efusal to clean assigned living area" is classified as a 300-level "High Moderate" offense punishable by up to 72 hours in disciplinary restriction); Dkt. 206-1 (Campos Fuentes Dep.) at 75:12–24 ("GEO or the officers would lock us up in our rooms or cells until somebody went to do it."); Dkt. 206-2 (Novoa Dep.) at 44:15–18 ("I wouldn't get some things that I needed. My bunk was scattered. They would go through my bunk."); Dkt. 206-4 (Karim Dep.) at 88:23–90:3 ("[I]f I don't do those things, it will affect my case; I was not going to get bond; I was not going to get released."); Dkt. 210-2 (Saavedra-Roman testimony) at 4.

[73] *Barrientos et al. v. CoreCivic, Inc.*, No. 18-15081, at 17-18 (Feb. 28, 2020 11th Cir.) (Slip Op.) (emphasis added).

PLAINTIFFS' EX PARTE MOTION FOR A                                        5:17-cv-02514-JGB
TEMPORARY RESTRAINING ORDER

coercive means, GEO violates the TVPA. GEO thus violates the TVPA every day in each of the covered facilities as a fundamental business practice.[74]

Plaintiffs are likely to prevail on the merits of their claim that GEO violates the TVPA, so this factor weighs in favor of the Court granting a temporary restraining order.

## 2. Class Members face immediate, irreparable harm because the HUSP program puts Class Members in a heightened risk of exposure to COVID-19, a serious, potentially life threatening incurable disease.

To show irreparable harm a plaintiff "demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief."[75] "Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."[76] This case presents

---

[74] And such threats, as documented in the above-cited declarations and evidence, also violate the detainees' constitutional rights given the threat to their health and safety.

> When the Government detains a person for the violation of an immigration law, the person is a civil detainee, even if he has a prior criminal conviction. . . . Moreover, under the Fifth Amendment's Due Process Clause, a civil detainee cannot be subjected to conditions that amount to punishment. . . . Moreover, the Government may not ignore a condition of confinement that is sure or very likely to cause serious illness. A civil detainee's constitutional rights are violated if a condition of his confinement places him at substantial risk of suffering serious harm, such as the harm caused by a pandemic. . . . Inadequate health and safety measures at a detention center cause cognizable harm to every detainee at that center.

*Hernandez v. Wolf*, No. 5:20-cv-00617-TJH (KS), at 8-9 (C.D. Cal. April 1, 2020) (Temporary Restraining Order and Order to Show Cause).

[75] *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

[76] *Spark Indus., LLC v. Kretek Int'l, Inc.,* No. CV 14-5726-GW(ASX), 2014 WL 12600262, at *3 (C.D. Cal. July 29, 2014) (citations omitted); see also 11A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.1 (3d ed. rev. 2014) ("Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.").

PLAINTIFFS' EX PARTE MOTION FOR A
TEMPORARY RESTRAINING ORDER

5:17-cv-02514-JGB

a paradigmatic example of an imminent threats to health and safety presenting irreparable harm.[77]

More and more evidence of irreparable harm develops each day as the virus spreads throughout the world, the country, and GEO facilities. Simply put, **Class Members risk illness and death from participation in the HUSP**. The argument is as stark as that. By requiring Class Members to participate in the HUSPs at all, let alone without personal protective equipment, **GEO exposes Class Members to potential death and serious illness on a daily basis**. COVID-19 exists in GEO's facilities.[78] And cleaning those facilities, in particular the common areas where detainees gather and interact, without protective equipment nearly guarantees exposure to COVID-19.

The CDC has advised that, when disinfecting common areas, cleaning staff should "wear disposable gloves and gowns for all tasks in the cleaning process."[79] The CDC also recommends that cleaning staff wash their hands often using soap or, if soap

---

[77] *See Harris v. Bd. of Supervisors, Los Angeles Cty.*, 366 F.3d 754, 756 (9th Cir. 2004); *Unknown Parties v. Johnson*, No. CV-15-00250-TUC-DCB, 2016 WL 8188563, at *15 (D. Ariz. No. 18, 2016), *aff'd sub nom Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017); *Jones v. Tex. Dep't. of Crim. Justice*, 880 F.3d 756, 760 (5th Cir. 2018).

[78] Judge John E. Jones, III recently addressed the immediate harm and found it exists:

> Public health officials now acknowledge that there is little that can be done to stop the spread of COVID-19 absent effective quarantines and social distancing procedures. But Petitioners are unable to keep socially distant while detained by ICE and cannot keep the detention facilities sufficiently clean to combat the spread of the virus. Based upon the nature of the virus, the allegations of current conditions in the prisons, and Petitioners' specific medical concerns, detailed below, we therefore find that Petitioners face a very real risk of serious, lasting illness or death. There can be no injury more irreparable.

*Thakker v. Doll*, No. 1:20-cv-00480-JEJ, Memorandum and Order (M.D. Pa. Mar. 31, 2020) (ordering immediate release of 13 medically vulnerable ICE detainees) available at https://aclupa.org/sites/default/files/field_documents/memo_and_order_granting_tro_and_release.pdf.

[79] Centers for Disease Control and Prevention, *Environmental Cleaning and Disinfection Recommendations* (updated Apr. 1, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/cleaning-disinfection.html (last accessed Apr. 3, 2020).

19

PLAINTIFFS' EX PARTE MOTION FOR A                                      5:17-cv-02514-JGB
TEMPORARY RESTRAINING ORDER

is not available, hand sanitizer.[80] But GEO has not even provided hand soap to Class Members, let alone hand sanitizer, disposable gloves, gowns, or any other protective equipment recommended or required by the CDC to protect individuals like Class Members from COVID-19.[81] By forcing Class Members to clean common areas without proper protective equipment and refusing to exempt detainees who are particularly susceptible to COVID-19, GEO increases the risk of additional deaths—"an irremediable and unfathomable" harm.[82]

Moreover, Class Members include older adults and people with underlying medical conditions that increase their likelihood of severe illness or death if they contract COVID-19.[83] And those patients in high-risk categories who do not die from COVID-19 should expect a prolonged recovery, including the need for extensive rehabilitation. For these reasons, public health experts have concluded that people with these characteristics in institutional settings such as immigration detention centers are at grave risk of severe illness and death.

Nor is social distancing—the other primary defense against contracting COVID-19—available to Class Members.[84] As noted, GEO's immigration detention centers are

---

[80] Centers for Disease Control and Prevention, *Environmental Cleaning and Disinfection Recommendations* (updated Apr. 1, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/cleaning-disinfection.html (last accessed Apr. 3, 2020).

[81] Novoa Decl. (Dkt 192-3) ¶ 14; Campos Fuentes Decl. (Dkt 192-4) ¶ 11; Karim Decl. (Dkt 192-5) ¶ 17; Mancia Decl. (Dkt 192-6) ¶ 14; Marwaha Decl. (Dkt 192-7) ¶ 17.

[82] *Garcia v. Google, Inc.*, 743 F.3d 1258, 1268 (9th Cir. 2014) (internal quotations marks omitted).

[83] CDC COVID-19 Response Team, *Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) — United States, February 12–March 16, 2020,* Morbidity & Mortality Wkly. Report (MMWR), available at http://dx.doi.org/10.15585/mmwr.mm6912e2 (last accessed April 3, 2020); see also Frazer Decl., ¶¶ 11-15 (HIV positive and bleeding); Del Bosque Decl., ¶¶ 2-4 (asthmatic and glaucoma), ¶ 9 (other detainee with cancer); Tejada Dejaso Decl., ¶¶3-4 (hypertensive with a history of cardiac issues).

[84] National Institutes of Health, *Coronavirus and "Alternative" Treatments*, Mar. 6, 2020, available at https://nccih.nih.gov/health/in-the-news/in-the-news-coronavirus-and-alternative-treatments (last accessed April 3, 2020).

PLAINTIFFS' EX PARTE MOTION FOR A                    5:17-cv-02514-JGB
TEMPORARY RESTRAINING ORDER

"congregate environments" where people live, sleep, and eat in close quarters.
Immigration detention facilities face even greater risk of infectious spread because of
overcrowding, the proportion of vulnerable people detained, and often scant medical
care resources. People live in close quarters and cannot achieve the "social distancing"
needed to effectively prevent the spread of COVID-19. The inability to maintain the
recommended distance of 6 feet from others, and the sharing and touching of objects
used by others is particularly true with HUSP Class Members who GEO forces to clean
common areas by threatening them with solitary confinement, a loss of privileges, and
criminal prosecution if they do not fulfill their cleaning assignments.

Given the combination of the close quarters in which Class Members are
confined, and their forced exposure to GEO's employees and new detainees, conditions
faced by Class Members pose a significant risk of imminent and irreparable harm absent
the requested injunctive relief.[85]

### 3.     The balance of the equities favors injunctive relief because life and health of Class Members outweighs GEO's profits from illegal, unpaid, forced labor.

In considering an order of injunctive relief, "[a] court must balance the competing
claims of injury and must consider the effect on each party of the granting or withholding
of the requested relief."[86] The question is not even close. Class Members face the risk of
serious illness or death from COVID-19. By contrast, GEO faces the risk of hiring and
equipping cleaning staff instead of lining its pockets with profits won from slave labor.

---

[85] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (updated Mar. 23, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last accessed Apr. 3, 2020).

[86] *Arc of Cal. v. Douglas*, 757 F.3d 975, 991 (9th Cir. 2014)(quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)).

PLAINTIFFS' EX PARTE MOTION FOR A                                          5:17-cv-02514-JGB
TEMPORARY RESTRAINING ORDER

1    Ultimately, the question boils down to balancing the health and welfare, including

2    potential death, for Class Members against reduced profits for GEO (when forced to do

3    what it should be doing in any event). When faced with a conflict between financial

4    concerns and preventable human suffering, courts in this Circuit have had little difficulty

5    concluding that "the balance of the hardships tips decidedly in plaintiffs' favor." [87] To

6    ask the question answers it: GEO's profits from slave labor cannot outweigh the health

7    of Class Members.

8    **4.    Injunctive relief is in the public interest because the requested relief helps sever the chain of exposure to COVID-19.**

9

10   With respect to the final element, the requested injunction would serve the public

11   interest because "[p]rotecting public health and safety is clearly in the public interest."[88]

12   Movants seek injunctive relief to prevent the spread of a pandemic. While the HUSP

13   Class Members seek the relief for their own protection, the relief they request will benefit

14   everyone who lives or works in GEO's facilities. Once exposed to COVID-19—as they

15   inevitably will be if the HUSP program continues unabated—Class Members will return

16

17   [87] *Rodde v. Bonta*, 357 F.3d 988, 998 (9th Cir. 2004) (the balance of the equities weighed in favor of the

18   plaintiffs when they would face a lack of necessary treatment, increased pain, and medical complications and the harm to the defendant was "balancing its health care budget and controlling

19   costs"); *Harris v. Bd. of Supervisors, Los Angeles Cty.*, 366 F.3d 754, 766 (9th Cir. 2004) (the balance of the equities weighed in favor of granting a temporary restraining order to prevent a Los Angeles

20   County hospital from reducing the number of hospital beds because the harms to the plaintiffs, which included "pain, infection, amputation, medical complications, and death due to delayed treatment" outweighed the financial harm to the defendants).

21   [88] *State of California v. Picayune Rancheria of Chukchansi Indians of Cal.*, No. 1:14-CV-01593 (LJO-SAB), 2015

22   WL 9304835, at *8 (E.D. Cal. Dec. 22, 2015), *aff'd sub nom. California v. Picayune Rancheria of Chukchansi Indians of Cal.*, 725 F. App'x 591 (9th Cir. 2018); *see also Pashby v. Delia*, 709 F.3d 307, 331 (4th Cir.

23   2013) (stating that "the public interest in this case lies with safeguarding public health rather than with assuaging North Carolina's budgetary woes"); *Fruth, Inc. v. Pullin*, No. CV 3:15-16266, 2015 WL

24   9451066, at *8 (S.D. W. Va. Dec. 23, 2015) ("an injunction here will safeguard the public health and thereby serve the public interest"); *Gen-Probe Inc. v. Bayer Healthcare LLC*, No. 05-CV-1668 BEN

25   (WMC), 2006 WL 8455600, at *6 (S.D. Cal. Mar. 3, 2006) ("the potential impact on public health identified by Dr. Terrault is exactly the type of public interest meant to be considered under this

26   prong of the injunction analysis").

22

PLAINTIFFS' EX PARTE MOTION FOR A                                    5:17-cv-02514-JGB
TEMPORARY RESTRAINING ORDER

to live and mingle with other detainees and interact with GEO's staff. And this cycle will continue without Court intervention. Exempting the Class Members from the HUSP, or providing them with adequate protection, would eliminate that link and, in turn, slow the spread of COVID-19. This factor supports injunctive relief.

### B.   The Court should grant the relief without requiring a bond.

While Federal Rule of Civil Procedure 65(c) generally requires security be posted before a temporary restraining is entered, this Court has the discretion to decide whether, or in what amount, a bond is required.[89]

District courts routinely exercise this discretion to require no security in cases brought by indigent and/or incarcerated people.[90] So too here, Movants ask that this Court exercise its discretion and grant the requested temporary restraining order without requiring payment of security; or in the alternative, a minimal bond.

## IV.   CONCLUSION

For the foregoing reasons, Movants request this Court grant a temporary restraining order in the form submitted and set this matter for determination of extending its ruling in the form of a preliminary injunction.

---

[89] *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003).

[90] *See, e.g., Toussaint v. Rushen*, 553 F. Supp. 1365, 1383 (N.D. Cal. 1983) (state prisoners); *Orantes–Hernandez v. Smith*, 541 F. Supp. 351, 385 n. 42 (C.D. Cal. 1982) (detained immigrants).

23

PLAINTIFFS' EX PARTE MOTION FOR A                                            5:17-cv-02514-JGB
TEMPORARY RESTRAINING ORDER

Dated: April 6, 2020.

Respectfully submitted,

*/s/ Daniel H. Charest*

Daniel H. Charest (admitted *pro hac vice*)
dcharest@burnscharest.com
TX Bar # 24057803
Warren Burns (admitted *pro hac vice*)
wburns@burnscharest.com
TX Bar # 24053119
E. Lawrence Vincent (admitted *pro hac vice*)
lvincent@burnscharest.com
TX Bar # 20585590
**BURNS CHAREST LLP**
900 Jackson St., Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002

Robert Ahdoot (CA Bar # 172098)
rahdoot@ahdootwolfson.com
Tina Wolfson (CA Bar # 174806)
twolfson@ahdootwolfson.com
Theodore W Maya (CA Bar # 223242)
tmaya@ahdootwolfson.com
Alex R. Straus (CA Bar # 321366)
astraus@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
10728 Lindbrook Drive
Los Angeles, California 90024-3102
Telephone: (310) 474-9111
Fax: (310) 474-8585

Korey A. Nelson (admitted *pro hac vice*)
knelson@burnscharest.com
LA Bar # 30002
Lydia A. Wright (admitted *pro hac vice*)
lwright@burnscharest.com
LA Bar # 37926
C. Jacob Gower (admitted *pro hac vice*)
jgower@burnscharest.com
LA Bar # 34564
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765

R. Andrew Free (admitted *pro hac vice*)
andrew@immigrantcivilrights.com
TN Bar # 030513
**LAW OFFICE OF R. ANDREW FREE**
P.O. Box 90568
Nashville, TN 37209
Telephone: (844) 321-3221
Facsimile: (615) 829-8959

Nicole Ramos (admitted *pro hac vice*)
nicole@alotrolado.org
NY Bar # 4660445
**AL OTRO LADO**
511 E. San Ysidro Blvd., # 333
San Ysidro, CA 92173
Telephone: (619) 786-4866

***Attorneys for Plaintiffs***

25

## CERTIFICATE OF SERVICE

On April 6, 2020, I electronically submitted the foregoing document with the clerk of the court for the U.S. District Court, Central District of California, using the electronic case filing system. I hereby certify that I have provided copies to all counsel of record electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

*/s/ Daniel H. Charest*
Daniel H. Charest (admitted *pro hac vice*)
dcharest@burnscharest.com
TX Bar # 24057803
**BURNS CHAREST LLP**
900 Jackson St., Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002

PLAINTIFFS' EX PARTE MOTION FOR A
TEMPORARY RESTRAINING ORDER

5:17-cv-02514-JGB