UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **EDCV 17-2514 JGB (SHKx)** | Date | April 22, 2020 |
| Title | *Raul Novoa, et al. v. The GEO Group, Inc.* | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

Attorney(s) Present for Plaintiff(s):     Attorney(s) Present for Defendant(s):

None Present                             None Present

**Proceedings:**   Order (1) DENYING Plaintiffs' Ex Parte Application for Temporary Restraining Order (Dkt. No. 252); and (2) DENYING Plaintiffs' Motion for Expedited Discovery (Dkt. No. 254) (IN CHAMBERS)

Before the Court is Plaintiffs' ex parte application for a temporary restraining order requiring COVID-19 prevention measures for a nationwide class, ("Application," Dkt. No. 252), and Plaintiffs' motion for expedited discovery, ("Motion," Dkt. No. 254). The Court held a telephonic hearing on these matters on April 16, 2020. After considering the papers filed in support of, and in opposition to, the matters, and the oral argument of the parties the Court DENIES the Application and DENIES the Motion.

## I. BACKGROUND

### A. Procedural Background

On December 19, 2017, Raul Novoa ("Novoa") filed a putative class action complaint against Defendant The GEO Group, Inc. ("GEO"). (Dkt. No. 1.) Novoa filed a first amended complaint, (Dkt. No. 47), and a second amended complaint, which added Jaime Campos Fuentes ("Fuentes") as a Plaintiff, (Dkt. No. 108). Plaintiffs then filed a third amended complaint, which is operative, ("TAC," Dkt. No. 184). The TAC added Abdiaziz Karim ("Karim") and Ramon Mancia ("Mancia") as Plaintiffs, amended the class definitions, and added two causes of action. (see Dkt. No. 183 at 2.)

The TAC alleges seven causes of action arising from Plaintiffs' detention at California's Adelanto Detention Center ("Adelanto"): (1) violation of California's Minimum Wage Law, Cal. Labor Code §§ 1194, 1197, 1197.1; (2) unjust enrichment; (3) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq.; (4) violation of California's Trafficking Victims Protection Act ("CTVPA"), Cal. Civ. Code § 52.5; (5) forced labor under the Federal Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589(a), 1594(a); (6) forced and attempted forced labor under the TVPA; and (7) retaliation. The TAC defines three putative classes and one subclass.

On November 26, 2019, the Court granted Plaintiffs' motion for class certification, and certified the three classes. ("Class Certification Order," Dkt. No. 223; see also Dkt. No. 229 (separate order).) As relevant to the Application, the Court certified a national Housing Unit Sanitation Policy ("HUSP") Class, as follows:

> All civilly detained immigrants who (i) were detained at any civil immigration detention center owned or operated by GEO in the United States between December 19, 2007 and the date of final judgment in this matter, and (ii) were subject to a GEO Housing Unit Sanitation Policy (HUSP) at any point during their detention.
>
> Excluded from the definition of the Nationwide HUSP Class are the following: (1) individuals detained in GEO's family residential detention facility in Karnes City, Texas; (2) individuals detained in the Alexandria Staging Facility in Alexandria, Louisiana; (3) any individual detained in the custody of the U.S. Marshal or any other law enforcement agency at a GEO facility where the company also detains civil immigration detainees pursuant to contracts with ICE; and (4) civilly detained immigrants detainees held at the Aurora ICE Processing Center in Aurora, Colorado at any time before October 22, 2014

(Id.) The Nationwide HUSP class was certified under Federal R. Civ. P. 23(b)(2). The only claim relevant to the Nationwide HUSP class the fifth claim for relief, which arises under the TVPA. (TAC ¶¶ 231-243.) The Court also certified two other classes, which are not relevant to the Application. (Class Cert. Order.)

Plaintiffs filed the Application on April 6, 2020. (App.) In support of the Application, they filed the Declaration of Daniel H. Charest, ("Charest Declaration," Dkt. No. 253 (attaching further declarations as Exhibits A to D).) Plaintiffs concurrently filed the Motion, (Mot.), and included in support proposed interrogatories and requests for admission, (Mot., Ex. A.), and a proposed Rule 30(b)(6) deposition, (Mot. Ex. B).

Defendant opposed the Application on April 8, 2020, ("Application Opposition," Dkt. No. 255), and included in support the Declaration of David Van Pelt, ("Van Pelt Declaration," Dkt. No. 256 (attaching further declarations as Exhibits 1 to 5).) Defendant opposed the Motion on the same day, ("Motion Opposition," Dkt. No. 258). On April 12, 2020, Plaintiffs filed a

reply, ("Reply," Dkt. No. 259), along with a supplemental declaration and exhibits from Daniel H. Charest, ("Charest Declaration II," Dkt. No. 260 (attaching further declarations as Exhibits A to AA).)  Defendant in turn filed supplemental declarations on April 13, 2020.  ("Staiger Declaration," Dkt. No. 262-1 (attaching Exhibits A to B).)

On December 17, 2020, the parties filed supplemental briefs and supporting exhibits.  ("Plaintiffs' Supplement," Dkt. No 264 (attaching Exhibits A to C); "Defendants' Supplement," Dkt. Nos. 256, 258; "Van Pelt Declaration II," Dkt. No. 266 (attaching Exhibits A to E).)

**B.   Factual Background**

    **1.   The Parties**

This class action is brought by current and former immigration detainees against the operator of an immigration detention facility located in the City of Adelanto, California ("Adelanto").  Plaintiffs were held at Adelanto while their immigration cases were pending.  GEO is a business that operates more than a dozen immigration detention centers around the country.  The HUSP class members ("Class Members") include civil immigration detainees currently held at GEO facilities nationwide, with the exceptions noted in the class definition.

GEO is required to comply with ICE's Performance Based National Detention Standards, ("PBNDS") which set out "expected outcomes" and "minimum requirements" for the management of contract facilities like Adelanto.  These outcomes and requirements touch on nearly all aspects of operating an immigration detention facility, including arrangements for detainee labor within the facility.  GEO has either companywide or facility-specific policies that must meet or exceed the minimum standards in the PBNDS, and which apply across the company or facility.

Plaintiffs describe a GEO company-wide practice of Housing Unit Sanitation Policies ("HUSPs") that apply at GEO immigration detention centers nationwide.  Class Members contend these HUSPs impermissibly expand the scope of "required personal housekeeping" otherwise permissible under the PBNDS.  They contend that GEO compels them to clean common areas under the threat of disciplinary confinement, criminal prosecution, or threat of other harm.

    **2.   COVID-19 and Housing Unit Sanitation Policies**

COVID-19 is a disease caused by a novel coronavirus, and it reached pandemic status in March 2020, approximately four months after the Court certified that Nationwide HUSP class.  At time of this Order, the United States has more known COVID-19 cases than any other country in the world, and more than 35,000 people have died from the disease in this country alone.  Many tens of thousands of deaths are expected in the coming weeks.

COVID-19 is highly contagious, and there is no known cure. It can spread through respiratory droplets and high-touch surfaces, and is especially likely to spread quickly in congregate settings such as detention centers. (App. at 7.) One effective way to prevent the spread of the disease is physical separation from others, because even asymptomatic carriers of the disease can infect others. (App. at 2-4.) Beyond that, the best prevention is aggressive hygiene (use of hand sanitizer and frequent hand washing), and if available, the use of personal protective equipment ("PPE"), including gloves, eye and face shields, and masks when in public spaces. (Id.)

Class Members argue that the GEO's HUSPs expose them to unsanitary spaces and surfaces such as floors, showers, and toilets, and to possible COVID-19 infection. (App. at 5.) They assert that GEO does not provide detainees with PPE to prevent the spread of disease. (Id. at 6.) GEO requires all detainees to participate in mandatory general cleanups of their housing units, every day, and every week subjects the units to a more rigorous "total sanitation" mission. (Id.) GEO's detainee handbook classifies refusal to clean assigned living areas as an offense punishable by disciplinary segregation or even criminal prosecution, or by suspension of programs and recreation. (Id.)

All Class Members are subject to the HUSP. (Id. at 6-8.) Class Members contend that the HUSPs are particularly unreasonable at this time, because people with serious underlying medical conditions or old age are more likely to die from COVID-19. (Id. at 8-9.) Eighty percent of all COVID-19 deaths in the United States have been among adults 65 years of age or older. (Id. at 9.) And, COVID-19 poses severe risks even to those not in a medically vulnerable population. (Id. at 10.)

### 3. Conditions of Confinement at GEO Facilities

The Class Members are or were confined at twelve GEO facilities operated as ICE Processing or Transitional Centers nationwide: Adelanto, Aurora, Broward, Folkston, Joe Corley, LaSalle, Mesa Verde, Montgomery, Northwest, Pine Prairie, South Louisiana, and South Texas. (Pls.' Supp. at 2 n.5.) As of the writing of this Order, ICE reports positive cases at three of the twelve facilities. See ICE Guidance on Coronavirus, https://www.ice.gov/coronavirus.

It appears that the HUSPs continue to apply, and that Plaintiffs' cleaning duties have been intensified. The extent to which detainees on work duty have access to different PPE (gloves, masks, etc.) is disputed, and appears to be changing.

For example, in support of their initial briefs, Plaintiffs attach declarations from GEO detainees or their attorneys, which do not state outright but suggest that the HUSPs continue to be enforced during the pandemic. (Charest Decl., Exs. A to D.) Defendant counters with the declarations of several facility administrators, which neither acknowledge nor deny the existence of HUSPs. (Van Pelt Decl., Exs. 1- 5). Defendant's declarations suggest gloves are available for cleaning but do not explicitly state that detainees, as distinct from GEO staff, have been able to wear gloves when completing sanitation tasks. At Adelanto ICE Processing Center in California,

GEO has implemented "intensified cleaning" and GEO "has gloves for use with cleaning." (Id., Ex. 1 ¶ 16.) The same is true at Aurora ICE Processing Center in Colorado, where cleanings occur "throughout the day multiple times," (id., Ex. 2 ¶ 17), LaSalle ICE Processing Center in Louisiana, (id., Ex. 3 ¶ 9), and at the Northwest ICE Processing Center in Washington state, (id., Ex. 4 ¶ 17).

In support of their Reply, Plaintiffs attach declarations addressing somewhat more directly the cleaning policies at GEO facilities. For example, the Declaration of Rebecca Merton, ("Merton Declaration," Charest Decl. II, Ex. A), notes that a national nonprofit, Freedom for Immigrants has received reports through the National Immigration Detention Hotline that detainees continue to clean within their dorms, pods, or common areas without PPE, (id. ¶¶ 5-10 (discussing reports from Adelanto (detainees continue to clean, no soap-based products to clean bathrooms, no hand sanitizer), LaSalle (detainees continue to clean), Northwest (detainees work as usual without PPE), Aurora (detainees work but have gloves), South Louisiana (detainees continue to clean), Mesa Verde (detainees continue to clean, were not allowed to use masks they made from their own clothing)).) Additional declarations bolster the claim that detainees are still required to clean and in many cases do not have PPE. (Charest Decl. II, Ex. G (noting that as of early April 2020, Pine Prairie detainees continue cleaning without access to masks or gloves); id., Ex. I (noting that as of April 4, 2020 at Adelanto "detainees do all of the cleaning, laundry, and kitchen work," that declarant is currently working in the kitchen, and that declarant has observed other detainees cleaning with gloves but no masks); id., Exs. J to J (noting that as of late March 2020, at Northwest ICE Processing Center, detainees are the ones required to do the cleaning); id. Exs. P to R (noting at Aurora, detainees clean common areas and dorms only once per day, with inadequate supplies, and without gloves, as of April 10, 2020); id. Ex. T (noting at Broward Transitional Center dorm cleaning programs continue under threat of punishment and without masks or other PPE); id. Ex. X (noting detainees at Mesa Verde the dorms and phones); id., Ex. AA (noting at the Montgomery and Corely facilities in Texas detainees are required to clean and sanitize their own living areas). Defendant's supplemental declaration on the Pine Prairie facility states that as of April 13, 2020, detainees do have access to gloves while cleaning, and that GEO staff sanitize hard surfaces and high-touch areas multiple times during their shifts. (Staiger Decl. ¶ 19 ("[D]etainees are issued these gloves to clean.").)

### 4. ICE's Pandemic Response Requirements and CDC Guidelines

On March 23, 2020, the Centers for Disease Control and Prevention ("CDC") issued interim guidance on the management of COVID-19 for correctional and detention facilities.[1] ("CDC Interim Guidance," Pls.'s Supp., Ex. B (also attached at Van Pelt Decl. II, Ex. C).) That guidance counsels facilities to "[e]nsure that staff and incarcerated/detained persons performing cleaning wear recommended PPE," then directs the reader to a PPE section and table. (Id. at 18.) The PPE section states that "persons who will have contact with infectious materials in their work placements" should be trained to "don, doff, and dispose of PPE relevant to the level

---

[1] The Court cites to CDC Interim Guidance PDF pages. The PDF is available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidancecorrectional-detention.pdf.

of contact they will have with confirmed and suspected COVID-19 cases." (Id. at 23.) For detainees "in work placement cleaning areas where a COVID-19 case has spent some time" the CDC's table for recommended PPE states gloves and a gown/coveralls should be used. (Id., Table 1 at 25.) The CDC recommends the same PPE for staff cleaning in such areas. (Id.) N95 respirators, face masks, and eye protection are not recommended in this context. (Id.)

About two weeks after the CDC Interim Guidance was published, ICE Enforcement and Removal Operations released its COVID-19 pandemic response requirements for all facilities housing ICE detainees. ("Pandemic Response Requirements," Van Pelt Decl. II, Ex. A.) The Pandemic Response Requirements state that facilities "must . . . [c]omply with the CDC's Interim Guidance." (Id. at 5, 6 (requiring compliance for both dedicated and non-dedicated facilities).) All facilities are required to "[a]dhere to CDC recommendations for cleaning and disinfection during the COVID-19 response." (Id. at 9.) The Pandemic response requirements also incorporate by reference the CDC's guidance for cleaning and disinfection for community facilities. (Id. at 9 n.7 (referencing "CDC Community Facilities Guidance"); see also Pls.' Supp., Ex. C.)

The CDC Community Facilities Guidance comports with the CDC Interim Guidance, in that it calls for gloves and a gown or gown substitute while cleaning spaces where a confirmed or suspected COVID-19 case has been, but does not call for a mask.[2]

CDC guidance on the use of masks and face coverings has changed over the course of the pandemic. In early April 2020, the CDC recommended the use of cloth face coverings (as distinct from surgical or N95 masks) in "public settings" where social distancing measures are "difficult to maintain."[3] In apparent recognition of this new guidance, ICE's April 10, 2020 Pandemic Response Requirements state that cloth face coverings "should be worn by detainees and staff (when PPE supply is limited) to help slow the spread of COVID-19." (Pandemic Response Requirements at 8-9.) It is not clear whether this is a mandate to use cloth face coverings only where face masks are called for, or whether ICE intends for all facilities to mandate detainee use of cloth face masks.

//
//
//
//
//
//

---

[2] The CDC Community Facilities Guidance is available at https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/cleaning-disinfection.html.

[3] CDC, Use of Cloth Face Coverings to Help Slow the Spread of COVID-19, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/diy-cloth-face-coverings.html.

## II.  LEGAL STANDARD

### A.  Temporary Restraining Order

The purpose of a temporary restraining order is to preserve the status quo and prevent irreparable harm until a hearing may be held on the propriety of a preliminary injunction.  See Reno Air Racing Ass'n, Inc. v. McCord, 452 F.3d 1126, 1131 (9th Cir. 2006).  The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction.  Lockheed Missile & Space Co. v. Hughes Aircraft Co., 887 F. Supp. 1320, 1323 (N.D. Cal. 1995); see Stuhlbarg Intern. Sales Co., Inc. v. John D. Brushy and Co., Inc., 240 F.3d 832, 839 n.7 (9th Cir. 2011).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  The Ninth Circuit employs the "serious questions" test, which states "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011).  "A preliminary injunction is an 'extraordinary and drastic remedy.  It should never be awarded as of right."  Munaf v. Geren, 553 U.S. 674, 690 (2008) (citation omitted).

### B.  Expedited Discovery

Under the Court's standing order, all discovery matters are referred to a United States Magistrate Judge.  ("Standing Order," Dkt. No. ¶ 7.)  And under Local Rule 37-3, discovery motions:

> [M]ay be noticed to be heard on the particular judge's regular Motion Day which shall not be shall be not earlier than twenty-one (21) days after the filing of the motion.  Unless the Court in its discretion otherwise allows, no discovery motions shall be filed or heard on an ex parte basis, absent a showing of irreparable injury or prejudice not attributable to the lack of diligence of the moving party.

L.R. 37-3 (emphasis added).

While generally formal discovery may not commence until after parties have conferred as required by Fed. R. Civ. P. 26(f), expedited discovery may be granted upon a showing of good cause.  Am. LegalNet, Inc. v. Davis, 673 F. Supp. 2d 1063, 1066 (C.D. Cal. 2009).  Expedited discovery may be appropriate when it is needed to prepare for a pending preliminary injunction hearing.  Id.  In such circumstances, good cause may be found where "the need for expedited discovery outweighs the prejudice to the responding party."  Sas v. Sawabeh Info. Servs. Co., 2011 WL 13130013, at *7 (C.D. Cal. May 17, 2011) (citations omitted).  Other factors commonly

considered in determining the reasonableness of expedited discovery include "the breadth of the discovery requests; [] the purpose for requesting the expedited discovery; [] the burden on the defendants to comply with the requests; and [] how far in advance of the typical discovery process the request was made." Am. LegalNet, Inc. v. Davis, 673 F. Supp. 2d 1063, 1067 (C.D. Cal. 2009) (citation omitted).

### III. DISCUSSION

The Court finds Plaintiffs have standing to apply for injunctive relief, and that they are likely to succeed on their claim. The Court does not decide whether the harm to which Plaintiffs are exposed is irreparable, because Plaintiffs falter on the public interest prong. They ignore the consequences of an injunction reallocating scarce PPE to Class Members or requiring GEO to hire additional staff to clean common areas. As a result, a temporary restraining order for immediate relief is not warranted, and the Application fails. The Court rejects the Motion as procedurally deficient.

**A. Standing**

"Constitutional standing concerns whether the plaintiff's personal stake in the lawsuit is sufficient to make out a concrete 'case' or 'controversy' to which the federal judicial power may extend under Article III, § 2." Pershing Park Villas Homeowners Ass'n v. United Pacific Ins. Co., 219 F.3d 895 (9th Cir. 2000). "[T]he irreducible constitutional minimum of standing" is comprised of three elements: (1) an injury-in-fact; (2) a causal connection between the injury and challenged conduct such that the injury is "fairly traceable" to the challenged action; and (3) it must be "likely," not merely "speculative" that the injury can be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992). The injury-in-fact must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Id. at 560. "The party invoking federal jurisdiction bears the burden of establishing these elements." Id. at 561.

The harm asserted is concrete, particularized, and can be traced to GEO's sanitation policies and reliance on detainee labor. Plaintiffs state that the primary harm which they seek to avoid by means of a TRO is forced labor, not exposure to COVID-19. (Reply at 16.) GEO concedes that housing unit sanitation work has been "intensified" or doubled, and so it is clear that there is a probable harm attributable to Defendant. The harm is likely caused by GEO, because were it not for the HUSPs, professional cleaning staff or GEO staff would perform the work instead of the detainees.

Similarly, there is a "substantial likelihood" the harm of forced labor is redressable by a Court order. Mayfield v. United States, 599 F.3d 964, 971 (9th Cir. 2010). An order stating that Class Members cannot be used to provide sanitation services in the common areas of the facility would stop the asserted harm. (See "Proposed Order," Dkt. No. 252-3.) GEO's standing argument is really a factual question about whether class members are exposed to a serious risk of infection, and whether the requested relief is practical. (App. Opp'n at 9.) These arguments go

more to irreparability of the asserted harm or perhaps the public interest, not whether it is concrete, particularized, or redressable.

Finally, GEO argues that Plaintiffs lack standing to seek injunctive relief, because none of them are detained. (App. Opp'n at 6-11.) However, the Court has already certified a HUSP Class for individuals seeking injunctive relief to prevent them from being subjected to GEO's policies. The Class includes individuals who are currently detained and who are subjected to the sanitation policies, and therefore the Court rejects this argument. LaDuke v. Nelson, 762 F.2d 1318, 1325 (9th Cir. 1985) ("[C]ertification will preserve a class's standing even after the named individual representatives have lost the required personal stake.").

### B. Temporary Restraining Order

Plaintiffs are likely to succeed on the merits of their TVPA claim and potentially face an irreparable harm if injunctive relief is not granted. However, Plaintiffs do not make an adequate showing that relief is in the public interest.

#### 1. Likelihood of Success on the Merits

Enacted as part of the Trafficking and Victims Protection Act of 2000 ("TVPA"), 18 U.S.C. § 1589 proscribes a party from "knowingly provid[ing] or obtain[ing] the labor or services of a person" through force, physical restraint, serious harm, abuse of law or legal process, threats of any of those means, or any combination of those methods. 18 U.S.C. § 1589(a) (also prohibiting a party from securing labor "by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.") "Serious harm" is defined as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2). Also liable is a party who "knowingly benefits, financially or by receiving anything of value, from participation in a venture" involving forced labor. 18 U.S.C. § 1589(b).

Plaintiffs are likely to succeed on the merits of their claim that GEO violates the TVPA. Plaintiffs contend that GEO has acquired free labor by threatening Class Members, because the Class Members must perform uncompensated janitorial and maintenance work in the common areas of the facilities or face negative consequences including solitary or disciplinary confinement, housing transfers, loss of privileges, referral to ICE and criminal prosecution. (App. at 17.) This janitorial labor in common areas is distinct, they argue, from the more limited "personal housekeeping tasks" sanctioned by ICE's PBNDS. PBNDS Section 5.8.V.C.[4] GEO

---

[4] The Section provides: (continued . . .)

does not dispute that it requires class members to clean common areas, and equivocates on whether detainees are given gloves when they perform their sanitation duties under the HUSP. Although Plaintiffs' Application relies heavily on previous submissions about the existence and scope of the HUSPs and whether a reasonable person in Class Members' position would believe they have to participate in the HUSP, the Court is satisfied that there is at least a serious question whether the intensified cleaning regime exceeds the permissible limits of the PBNDS, which certainly does not contemplate several forced sanitation jobs per day.

### 2. Irreparable Harm

A plaintiff must demonstrate she is likely to suffer irreparable harm in the absence of a preliminary injunction. See Winter, 555 U.S. at 20. The Ninth Circuit cautions that "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." Caribbean Marine Servs. v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988). A plaintiff seeking injunctive relief must demonstrate that "remedies available at law, such as monetary damages, are inadequate to compensate" for the injury. Herb Reed Enters., LLC v. Fla. Entm't Mgmt., 736 F.3d 1239, 1249 (9th Cir. 2013).

The harm here is potentially twofold. Before the COVID-19 pandemic, Plaintiffs claimed they were subjected to an involuntary "total sanitation mission" to clean common areas, just once a week. (App. at 6.) Plaintiffs show—and Defendant apparently concedes—that during the pandemic Class Members are likely to clean common areas daily, if not multiple times a day. Second, Plaintiffs claim they are exposed to a risk of COVID-19 infection, because they do not have proper PPE. (Charest Decl. II, Ex. H, Declaration of Carlos Franco-Paredes ¶ 30.) Plaintiffs argue that the second harm is irreparable. They do not claim that the intensified work duty itself is an irreparable harm, and the Court does not consider that question. (App. at 18-21.)

The Court finds GEO detainees likely face a high risk of COVID-19 infection, due to the inexorable spread of the virus. Indeed, several GEO facilities have already had confirmed detainee or staff cases. By extension, detainees with cleaning duties face an increased likelihood of infection that flows from their duties.

However, Plaintiffs fail to address whether the increased risk of infection due to cleaning duties is significant. It is unclear from Plaintiffs' filings what level of risk flows from Class

---

> Work assignments are voluntary; however, all detainees are responsible for personal housekeeping. Detainees are required to maintain their immediate living areas in a neat and orderly manner by:
>
> 1. making their bunk beds daily;
> 2. stacking loose papers;
> 3. keeping the floor free of debris and dividers free of clutter; and
> 4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture.

Members' work duties and lack of PPE specifically, rather than the fact of their detention generally. In other words, the marginal risk of infection posed by the lack of PPE or by increased work duties is difficult to extricate from the more generalized risk of harm posed by being detained. For example, the Class Members are likely to be exposed to COVID-19 in multiple contexts within the facility, including while: using telephones and tablets, visiting shared bathrooms, breathing the air in poorly ventilated housing units, eating, passing too close to fellow detainees, transiting between facility areas, using the law library, or touching virtually any surface within the facility.

Plaintiffs make no attempt to disentangle the degree of risk posed by various activities within the facility. Their expert declaration on this subject is too general and focuses on multiple factors increasing COVID-19 exposure risk in detention. It states vaguely that the risk posed by cleaning duties is "significant," but is not persuasive in light of contrary statements by the CDC.[5] (Charest Decl. II, Ex. H, "Parades Declaration," ¶¶ 10-14, 30, Dkt. No. 260-8 ("[D]etainees would be significantly less likely to contract COVID-19 if they were not being forced to risk exposure by performing mandatory cleaning duties without access to PPE such as masks, gloves, and without reliable testing within the facility.").) Ultimately, the Court need not, and does not, decide this difficult issue. Plaintiffs fail to carry their burden to show the injunctive relief requested is in the public interest.

**C. Balance of the Equities, and Public Interest**

Turning to the next factors, Plaintiffs must demonstrate that "the balance of equities tips in [their] favor." Hernandez v. Sessions, 872 F.3d 976, 995 (9th Cir. 2017) (quoting Winter, 555 U.S. at 20.). When "the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction." Id.

Plaintiffs have met their burden on the first element but fail on the second. First, the Court finds that the balance of equities tips in Plaintiffs' favor, because their health is at stake. Harris v. Bd. of Supervisors, Los Angeles Cty., 366 F.3d 754, 766 (9th Cir. 2004) (holding plaintiffs' risk of medical complications outweighed the potential financial harm to the defendants).

Plaintiffs fail to carry their burden on the public interest prong. The Court is not convinced that the relief requested is demonstrably in the public interest during this pandemic. For example, Plaintiffs suggest that GEO hire additional staff to clean the common areas, so they are not forced to. (App. Reply at 18.) However, it is not clear to the Court that introducing more

---

[5] The CDC Community Facilities Guidance attached by Plaintiffs in their supplemental filing states that the "risk of exposure to cleaning staff is inherently low." (Community Facilities Guidance at 4.) It is not clear whether the risk referenced is laundry duty or cleaning generally. Either way, it is unhelpful to Plaintiffs. The expert declaration also seems to ignore that the CDC Interim Guidance recommends gowns, but does not mention masks.

outsiders to the facility will reduce the risk of infection to Class Members. An injunction to this effect could force GEO to increase staffing, which would increase the ingress and egress of asymptomatic individuals from outside the facility, increasing the risk of a facility outbreak.

Next, Plaintiffs ask the Court to enter an injunction requiring GEO to provide them with PPE. The Court is hesitant to enter an injunction forcing a reallocation of limited PPE resources to favor Class Members over detainees or staff working elsewhere in the facility for several reasons. First, GEO's current distribution of PPE is likely calculated to reduce the overall likelihood of a facility outbreak. Plaintiffs include insufficient evidence for the Court to second guess GEO's hazard assessment for specific job duties.[6]

Second, the Court lacks sufficient evidence on the availability of PPE, specifically gloves and gowns, to GEO. (See Van Pelt Decl. II, Ex. E ¶ 10 (listing GEO's attempts to purchase PPE and supply chain shortages and shipment delays GEO has encountered).) In the abstract, and assuming adequate supplies for all, it would almost certainly be in the public interest to grant relief. However, Plaintiffs simply do not make a case that this is the reality in mid-April 2020, when the country is at near peak resource utilization, and even front-line healthcare workers have at times struggled to secure PPE. For these reasons, the Court agrees with GEO that Plaintiffs' requested relief is not in the public interest at this time.

Accordingly, the Application is DENIED. The Court is not persuaded that immediate relief is warranted in this case. The Court hopes that as PPE becomes more widely available, any gaps[7] between GEO facility conditions and the CDC Guidance now binding on all ICE facilities will be addressed. In the meantime, the Court notes the CDC calls on facility administrators to

---

[6] Given limited availability of N95 and surgical masks, for example, it might not be in the public interest to require these for Class Members cleaning their own unit common areas. Assuming GEO is obtaining as many masks as it can, the public interest factor requires the Court to consider the maximally beneficial distribution of those masks. GEO might prioritize giving masks to kitchen workers or individuals circulating through multiple parts of the facility, for example detainees distributing food. In any case, as noted in the fact section, the CDC does not recommend surgical or N95 masks for cleaning duty. Gloves may also be in short supply, but GEO stated in the April 16, 2020 hearing that gloves are now made available for cleaning tasks. Neither of the parties says much on the subject of gowns, though the CDC recommends several potential gown substitutes.

[7] Plaintiffs' supplement repeatedly hammers the point that GEO must comply with the Pandemic Response Requirements. However, few if any of Plaintiffs' declarations show the conditions of confinement in GEO facilities since the April 10, 2020 Response Requirements were issued, and Plaintiffs provide no new declarations on this point. As a result there is no evidence that GEO "refuses" to comply with the Pandemic Response Requirements. (Pls.' Supp. at 11.)

provide detainees with information about PPE shortages and the recommended PPE for different degrees of COVID-19 contact.[8]  (CDC Interim Guidance at 19.)

### D.  Expedited Discovery

Plaintiffs seek discovery to prepare for a preliminary injunction hearing.  The requested discovery consists of answers to eight (8) interrogatories and twenty-nine (29) requests for admissions, and a corporate representative to give testimony on twelve (12) topics.  (Mot. at 6.)

The Court DENIES the Motion.  Plaintiffs do not deny they failed to meet and confer with Defendant regarding the Motion as required by Local Rules, and they did not file a Reply.  (Mot. Opp'n at 2.)  In addition, discovery matters must be brought before Magistrate Judge Kewalramani, pursuant to the Standing Order.  (Dkt. No. 17.)  Hybrid ex parte applications, those outside the framework of the rules, are "inherently unfair, and they pose a threat to the administration of justice."  Mission Power Eng'g Co. v. Cont'l Cas. Co., 883 F. Supp. 488, 490 (C.D. Cal. 1995).

### E.  Plaintiffs' Abuse of Footnotes

The Court takes this opportunity to address Plaintiffs' abuse of footnotes.  Plaintiffs' Application and Application Reply include close to 160 footnotes, using what appears to be size ten or eleven font.  On some pages, up to half the page is occupied by lengthy string citations and quotes.  Plaintiffs' Counsel seems to have abandoned any attempt to include case and record citations in the body of the main text.

The use of single-spaced footnotes is allowed by Local Rule, but there is no footnote exception for the font size and legibility requirements.  See L.R. 11-3.1.1.  In addition, the overuse of footnotes to scrounge additional lines of argument renders page limitations pointless and is unfair to Defendant.  Questions of fairness aside, it is ineffective advocacy to force the reader to play a dizzying game of optical hopscotch.  The Court directs Plaintiffs to not misuse footnotes in the future and to review Local Rule 11-3.

## IV.  CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiffs' ex parte application for a temporary restraining order, and DENIES Plaintiffs' motion for expedited discovery.

**IT IS SO ORDERED.**

---

[8] The Court notes GEO's proposed "compromise."  (Def.'s Supp. at 8.)  GEO states it is "amenable" to providing cloth face coverings to its detainees nationwide by April 23, 2020, if not sooner.  The proposal is confusing.  As of April 10, 2020 the Pandemic Response Requirements require GEO to provide cloth facemasks.  (Pandemic Response Requirements at 9.)