```
 1                 UNITED STATES DISTRICT COURT
                 CENTRAL DISTRICT OF CALIFORNIA
 2                EASTERN DIVISION - RIVERSIDE

 3

 4   RAUL NOVOA,                ) Case No. EDCV 17-2514-JGB (SHKx)
                                )
 5        Plaintiff,            ) Riverside, California
                                ) Wednesday, May 20, 2020
 6             v.               ) 10:00 A.M. to 11:33 A.M.
                                )
 7   THE GEO GROUP, INC.,       ) TELEPHONIC HEARING
                                )
 8        Defendant.            )
     _____)
 9

10

11                 TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE SHASHI H. KEWALRAMANI,
12              UNITED STATES MAGISTRATE JUDGE.

13

14   Appearances:              See Page 2

15   Deputy Clerk:             D. Castellanos

16   Court Reporter:           Recorded; CourtSmart

17   Transcription Service:    JAMS Certified Transcription
                               16000 Ventura Boulevard #1010
18                             Encino, California  91436
                               (661) 609-4528
19

20

21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
```

```
 1  APPEARANCES:

 2

 3  For the Plaintiff:        Ahdoot & Wolfson PC
                              By:  THEODORE W. MAYA
 4                            10728 Lindbrook Drive
                              Los Angeles, California  90024
 5                            (310) 474-9111
                              tmaya@ahdootwolfson.com
 6
                              Law Office of R. Andrew Free
 7                            By:  R. ANDREW FREE
                              2004 8th Avenue South
 8                            Nashville, Tennessee  37209
                              (844) 321-3221
 9                            Andrew@ImmigrationCivilRights.com

10                            Burns Charest LLP
                              By:  DANIEL H. CHAREST
11                                 E. LAWRENCE VINCENT
                              900 Jackson Street, Suite 500
12                            Dallas, Texas  75202
                              (469) 904-4550
13                            dcharest@burnscharest.com
                              lvincent@burnscharest.com
14
                              Burns Charest LLP
15                            By:  LYDIA A. WRIGHT
                              365 Canal Street, Suite 1170
16                            New Orleans, Louisiana  70130
                              (504) 799-2845
17                            lwright@burnscharest.com

18

19  For the Defendant:        Akerman LLP
                              By:  ADRIENNE SCHEFFEY
20                            1900 Sixteenth Street, Suite 1700
                              Denver, Colorado  80202
21                            (303) 260-7712
                              adrienne.scheffey@akerman.com
22
                              Akerman LLP
23                            By:  DAVID VAN PELT
                              601 West Fifth Street, Suite 300
24                            Los Angeles, California  90071
                              (213) 688-9500
25                            david.vanpelt@akerman.com
```

1    RIVERSIDE, CALIFORNIA, WEDNESDAY, MAY 20, 2020, 10:00 A.M.

2          THE CLERK:  Calling Case No. 5:17-CV-2514,

3    *Raul Novoa v. The GEO Group, Inc.*

4          Counsel, please state your appearances beginning

5    with the plaintiff.

6          THEODORE W. MAYA:  Ted Maya for plaintiffs, and

7    with me is Andrew Free.

8          R. ANDREW FREE:  Good morning, Your Honor.

9          MR. MAYA:  And Daniel Charest is here also for the

10   plaintiffs.

11         THE COURT:  Good morning.

12         DANIEL H. CHAREST:  Good morning.

13         ADRIENNE SCHEFFEY:  Adrienne Scheffey for

14   The GEO Group, and I believe my colleague David Van Pelt is

15   joining as well.  I don't know if he has gotten on the call

16   or not.

17         David, are you there?

18         (Pause.)

19         MS. SCHEFFEY:  Let me ping him real quick.

20         THE COURT:  Is there -- I thought when I logged on

21   -- this is Shashi Kewalramani.  I thought, when I called in,

22   there were ten people on the call.  Are there any other

23   people besides Mr. Maya, Mr. Free, Mr. Charest, Ms. Scheffey,

24   and the courtroom deputy, and myself?  Is there anybody else

25   on the line?

1      E. LAWRENCE VINCENT:  Yes, Your Honor.
2  Larry Vincent.  I'm with counsel for plaintiffs, but I won't
3  be participating.
4      THE COURT:  Okay.  I'm sorry.  Can you state your
5  name again?
6      MR. VINCENT:  Larry Vincent, V-i-n-c-e-n-t.
7      THE COURT:  Very good.  Thank you.
8      LYDIA A. WRIGHT:  And this is Lydia Wright also for
9  the plaintiff.
10      THE COURT:  Okay.
11      DAVID VAN PELT:  Your Honor, this is David Van Pelt
12  on behalf of GEO.
13      THE COURT:  Very good.  Thank you, Mr. Van Pelt.
14      Ms. Scheffey, is that everybody else -- is that
15  everybody from the defense team, then?
16      MS. SCHEFFEY:  Yes, Your Honor.
17      THE COURT:  Very good.
18      And who's going to be taking the lead for
19  plaintiffs?
20      MR. MAYA:  Your Honor, I think, as with our last
21  hearing, it will be me and with no small amount of assistance
22  from Andrew Free.
23      THE COURT:  Got it.  And --
24      MR. MAYA:  And Dan Charest is also on the line, and
25  I believe he may speak to the deliberative process privilege

1  that GEO has asserted in the privilege logs if and when we

2  get to that.

3          THE COURT:  Okay.  Did somebody else just log on?

4          (Pause.)

5          THE COURT:  Okay.  For defense who's going to be

6  taking the lead for GEO?

7          MR. VAN PELT:  Your Honor, it will be Ms. Scheffey.

8          THE COURT:  Very good.

9          All right.  So let me -- I've reviewed the item

10 that was filed yesterday regarding -- it was a declaration by

11 Mr. Maya and -- as part of the motion to compel.  Did -- have

12 the -- has defense counsel had an opportunity to review that?

13         MS. SCHEFFEY:  Yes, Your Honor.  This is

14 Adrienne Scheffey.

15         I briefly reviewed it, and to add to that, we sent

16 a letter, like, late last night indicating that the privilege

17 logs, that section where it was redacted by ICE, we provided

18 all information that was provided to us from ICE.

19         THE COURT:  Got it.  Okay.

20         All right.  So let me -- here's what I'm proposing

21 on doing:  I have -- it's going to be quicker than the last

22 hearing.  I'm just going to go through and the pointed

23 questions I have to supplement the RFPs at issue as well as

24 what was provided in the papers.  So with respect to general

25 -- well, I don't want to do it -- and then we'll get through

1    -- we'll get to the attorney-client -- I'm sorry -- the

2    privilege log.

3             I also received in an email last week a copy of the

4    production, which is the two-page financial document that we

5    had been discussing, as well as a copy of the transcript of

6    the deposition of a Mr. James Hill.  I didn't read the entire

7    deposition.  I was looking for particular things that were, I

8    thought, relevant to my inquiries as to the relevancy and the

9    other objections raised, but as I go through these, if

10   there's anything that you would like to add from that

11   deposition transcript, please feel free to do so.

12            Does anybody have any different -- do plaintiffs

13   have any different suggestions on how to proceed?

14            Mr. Maya?

15            MR. MAYA:  Your Honor, I think that sounds great.

16            THE COURT:  Ms. Scheffey?

17            MS. SCHEFFEY:  No, Your Honor.  That sounds good to

18   me.  I just also would let you know that we have produced the

19   monthly financial statements mirroring that document you have

20   but showing each month's breakdown as well --

21            THE COURT:  Okay.  Well, let me -- very good.  And

22   so we'll -- so let's go first to RFP No. 6, which is the

23   monthly and annual operating costs, and as I remember from my

24   notes previously, the time period the parties have agreed to

25   is from 2011 to the present.

1          Is that correct, Mr. Maya?

2          MR. MAYA:  I mean, that is correct, yes,

3   Your Honor, with respect to the --

4          THE COURT:  Okay.

5          MR. MAYA:  -- Adelanto facility.

6          THE COURT:  Very good.

7          Mr. -- Ms. Scheffey, is that correct?

8          MS. SCHEFFEY:  Yes, Your Honor.

9          THE COURT:  Got it.

10          And then with respect to the monthly and annual

11   operating costs, you said, Ms. Scheffey, that it has been

12   provided on a monthly basis now?

13          MS. SCHEFFEY:  Yes.  We provided that this morning.

14   I'm not sure if plaintiffs' counsel has had time to review

15   it, but we did provide that about 20 minutes ago.

16          THE COURT:  Okay.  Why did it take so long to

17   produce it, then?

18          MS. SCHEFFEY:  We had to go through a number of

19   channels at -- through our client to get that, but also, that

20   is more than is produced in the *State of Washington*.  We

21   didn't produce that, and we didn't understand that to be part

22   of our agreement, produce that on a monthly basis.

23          THE COURT:  Got it.  Understood.

24          And so with respect to the quality of the

25   information that is being presented or provided in that, is

1   there an issue that the plaintiffs would like to raise?  I've

2   reviewed it so I have a sense of the line items on the -- if

3   looking at the document -- and I'm looking at Document Bates

4   No. GEONOVOA00037767 -- it has various line items on the

5   right-hand side, followed by columns for the years 2011

6   through 2019, and numbers underneath those.  Is there

7   anything that the plaintiffs would like to add to that?

8           MR. MAYA:  Your Honor, I apologize.  I'm trying to

9   pull -- there are so many documents here.  Which document are

10  -- you're looking at the two-page?

11          THE COURT:  This is the document that was sent to

12  me.  Correct; the two-page.

13          MR. MAYA:  Yes.

14          THE COURT:  Now, let me ask Ms. Scheffey.

15          Ms. Scheffey, the documents that have been provided

16  on a monthly basis, do they follow the same format?

17          MS. SCHEFFEY:  Yes, Your Honor.

18          THE COURT:  Got it.  So they'll have the same

19  category on the right-hand side, followed by the columns on

20  the left-hand side?

21          MS. SCHEFFEY:  Correct.  Yes.

22          THE COURT:  Great.  Thank you.

23          Okay.  Mr. Maya?

24          MR. FREE:  Your Honor, this is --

25          MR. MAYA:  Your Honor, Andrew Free is going to

1   speak to this.

2              MR. FREE:  Yeah.  Your Honor, this is Mr. Free.

3              We were able to take a look at the documents that

4   GEO produced about 20 minutes ago.  They're substantially

5   similar in format.  They look like they come from the

6   Hyperion system, and with respect to this aspect of that

7   request, we think that they've met their burden.  There were

8   -- Your Honor asked us -- so the answer to your question is

9   we think that that is worked out with respect to that

10  category of documents about which we had a colloquy during

11  the last hearing.  GEO's --

12             THE COURT:  Got it.  So is plaintiff --

13             MR. FREE:  -- provided the records for the time

14  period.

15             THE COURT:  Understood.  So is plaintiff

16  withdrawing its motion to compel with respect to RFP No. 6?

17             MR. FREE:  Not yet, Your Honor.  There's been some

18  correspondence, and we conferred, pursuant to the Court's

19  order from last week, about ensuring there's no daylight

20  between what was produced in the *State of Washington* and

21  what's been produced here.  That was the agreement.  The --

22  one of the things that came in the discovery in the

23  *State of Washington* after the Ninth Circuit mandamus, as

24  referenced during the last hearing, were these detainee wage

25  documents to help understand the operating costs because

1  that's what they were paying each month to detained workers.

2  Those were produced in native format from the Keefe --

3  K-e-e-f-e -- system in the *State of Washington* case, and we

4  just ask that they be produced in native format here so

5  they're in a database.

6          So I think that that's the parties' remaining

7  dispute.  We haven't raised that with GEO's counsel so I

8  don't expect them to necessarily stick to a position right

9  now, but we've got a lot more than we had at the hearing last

10 time.

11          THE COURT:  Got it.

12          And who -- I remember from the last hearing that

13 Akerman is counsel for GEO in the *Washington* matter as well;

14 is that correct, Mr. Van Pelt?

15          MR. VAN PELT:  Yes, Your Honor.

16          THE COURT:  Very good.

17          So, Mr. Van Pelt, were you personally involved in

18 the discovery issues that were decided by the Ninth Circuit

19 in the mandamus proceeding?

20          MR. VAN PELT:  I was not, Your Honor.

21          THE COURT:  Got it.

22          Mr. Free, were you involved in that briefing or the

23 -- anything to do with that matter?

24          MR. FREE:  Only -- I did not brief it, Your Honor.

25 I was only involved to the extent that our cases were

1  consolidated for discovery purposes at the time, and so we

2  were receiving the same discovery that the State of

3  Washington was getting, and we were following that dispute.

4  I did not brief it.

5         THE COURT:  Got it.  And so with respect to -- what

6  I'm getting at is if somebody here has firsthand knowledge

7  regarding how difficult or oppressive obtaining this

8  information from the Keefe database would be, and it doesn't

9  sound like that is the case because nobody was personally

10 involved in that aspect in the --

11        MS. SCHEFFEY:  Your Honor, this --

12        THE COURT:  Go ahead.

13        MS. SCHEFFEY:  I haven't --

14        THE COURT:  Got it.

15        MS. SCHEFFEY:  -- been totally involved as kind of

16 a laboring-oar associate in some of the *Washington* case, and

17 I do recall that it was typically possible to get it, but

18 there were some timeframes in which Keefe didn't maintain the

19 data in Excel format.  So I would just have to check with the

20 client and Keefe, which is a third party, to find out if

21 there are any timeframes in this current case, which is

22 different than the *Washington* timeframe, in which Excel

23 documents weren't maintained.

24        THE COURT:  Got it.

25        And specifically, with respect to the data in the

1    native format that plaintiffs are seeking, is it to better

2    identify the hourly rate that is paid to the detainees,

3    Mr. Free?

4              MS. SCHEFFEY:  I think -- oh.  Go ahead.

5              MR. FREE:  Your Honor, no.  The hourly rate will be

6    static at Adelanto.  It'll always be a dollar.  What won't be

7    static is the number of people who worked each day and how

8    many shifts were covered, and just doing that in native

9    format is so much easier than going through a PDF and

10   collecting the number of names that got a dollar a day and

11   collect the -- and trying to understand and sort which

12   positions they worked.

13             THE COURT:  Got it.  So, as I look at the line item

14   on the document number that I mentioned previously, detainee

15   payroll was a lump-sum number, but you can't identify from

16   that how many detainees constitute the number of employees

17   that got paid that amount?  Is that the inquiry that the

18   plaintiffs need to get down to?

19             MR. FREE:  Your Honor, this is Mr. Free again.

20             You could reverse engineer detainee payroll by

21   number of shifts and just divide by a dollar so the detainee

22   payroll amount would represent the number of shifts that GEO

23   paid.  However, there's an allegation here and a class has

24   been certified here about an unpaid work program that has

25   been, in part, based on the detainee -- the folks who've been

1    listed on the detainee payroll sheets and have been

2    compensated outside of the work program who have been listed

3    as working and yet haven't been paid, and we think that

4    having that Keefe data, where we can sort it and see for each

5    -- you know, for each worker for each day how many people are

6    working the shifts and then comparing it with what we've

7    already received in discovery, we're going to be able to show

8    that there's a delta between the number of people who worked

9    and the number of people who were getting paid.

10           THE COURT:  Ms. Scheffey or Mr. Van Pelt, any

11   response to that?

12           MS. SCHEFFEY:  Yes, Your Honor.

13           I'm not sure, Andrew, exactly which line item

14   you're talking about but I -- my understanding of the reason

15   plaintiffs wanted the native document was just because it's

16   easier for their experts to process the data, but my

17   understanding is that they won't show anything different than

18   the total line item of how many dollars were paid to

19   detainees and how many shifts that corresponded to, which

20   should be equivalent to the number of dollars.

21           THE COURT:  Well --

22           (Pause.)

23           MS. SCHEFFEY:  That -- and I'm happy to look into

24   what we have.  I just don't have it in front of me right now.

25           THE COURT:  -- (indecipherable) I'm just trying to

1   figure out what I need to type up in my order.

2           So, Mr. Free, what would you like me to -- with

3   respect to the order on Request for Production No. 6, what

4   would you like me to say?

5           MR. FREE:  GEO is ordered to produce in native

6   format all expand detainee payroll records from the Keefe

7   system.

8           THE COURT:  Is that -- was that of your RFP No. 6?

9   I mean, right now it just says (reading) Documents related to

10  -- on a monthly and annual operating cost of the Adelanto

11  facility.

12          MR. FREE:  Yes, Your Honor.  This will show

13  document -- this is a document that relates to the monthly

14  and annual operating costs because it's part of what's being

15  paid.  So it's a subset --

16          THE COURT:  Got it.

17          MR. FREE:  -- and it can be understood by the

18  parties' joint stipulation, by the colloquy we had during

19  these hearings, I think.

20          THE COURT:  Okay.  Native format -- how do you

21  spell "Keefe"?

22          MR. FREE:  K-e -- like "echo" -- e -- like "echo"

23  -- f -- like "foxtrot" -- e -- like "echo."

24          THE COURT:  And I'm not saying I'm going to put

25  this in.  It just may be that based upon the RFP, it's -- the

1   motion of compel is granted, and you guys can figure out what

2   it means, but I'm just trying to see -- if I can put it

3   granular, I may.

4          Ms. Scheffey or Mr. Van Pelt, any further argument

5   on this particular point?

6          MS. SCHEFFEY:  No, Your Honor.  Only that any order

7   that would order us to compel this would say something about

8   "to the extent available" or be limited in some way so it's

9   not appearing to grant more than we've discussed here.

10          THE COURT:  Well, do you want to tell me what the

11   -- I haven't seen any declaration or anything like that

12   attached to show that it's burdensome or somehow not -- that

13   there are certain documents that are available and some that

14   are not.  So is this -- is the information in the Keefe

15   system going to be available or not?

16          MS. SCHEFFEY:  Well, yes, Your Honor, as I think

17   Mr. Free discussed, we hadn't previously identified this as

18   falling within the realm of RFP 6 and hadn't discussed this

19   before this call.  I can look into it.  It should be

20   available.  The question is whether it is Excel documents for

21   each year and month or whether some of those are only

22   available in PDF.  So, as long as "native" is understood to

23   be however it's maintained by Keefe, that's fine.

24          THE COURT:  I -- yes, it's going to be however --

25   as maintained by Keefe.

1          I'm not -- I don't think it's fair, and I don't

2     think, Mr. Free, you're asking that, if it is not maintained

3     in native, that it be converted to native by defendants.  Are

4     you saying that, Mr. Free?

5          MR. FREE:  I'm not saying that, Your Honor.  This

6     is Mr. Free.

7          THE COURT:  Very good.  Okay.

8          All right.  Anything further with respect to

9     RFP No. 6, then?

10          MR. FREE:  Not from the plaintiffs, Your Honor.

11          THE COURT:  From defendants?

12          MS. SCHEFFEY:  Not from defense, Your Honor

13          THE COURT:  Very good.

14          With respect to RFP No. 7, again, this is the -- is

15     the 2011-to-current timeframe agreeable amongst the parties?

16          Mr. Free?

17          MR. FREE:  Your Honor, it is.

18          THE COURT:  Okay.

19          Ms. Scheffey or Mr. Van Pelt?

20          MS. SCHEFFEY:  Yes, Your Honor.

21          THE COURT:  Very good.  Okay.

22          Next, with respect to RFP No. 7, has there been any

23     movement?

24          Mr. Free?

25          MR. FREE:  Your Honor, the parties have conferred

1    on this, and I don't think that we have resolved all of it.

2    We received something from GEO last night, and I want to let

3    Ms. Scheffey state GEO's position on where we are.  So maybe

4    that's -- because we're -- yeah.  That's kind of where we are

5    is we -- we're kind of waiting to hear back.

6              THE COURT:  Okay.  Hear back what?  I'm sorry.

7    What were you expecting to get a response to, Mr. Free?

8              MR. FREE:  Whether GEO is standing on its

9    objections, whether they believe the production is complete

10   based on what they've given us in advance of today's hearing.

11   Because we received some production just 19 minutes before

12   the hearing after we got the letter from Ms. Scheffey.  So I

13   want to be fair and (indecipherable) they have more to say

14   about RFP 7 (indecipherable).

15             THE COURT:  Understood.

16             Ms. Scheffey, is there anything -- or Mr. Van Pelt

17   -- is there anything that defendants would like to add with

18   respect to the supplemental response and the argument made

19   with respect to RFP No. 7?

20             MS. SCHEFFEY:  Not at this time, Your Honor.  We

21   hadn't further conferred on this, and we have already

22   produced a number of document responses.

23             THE COURT:  Okay.  So they -- so, as I understand

24   it, then, defendants are standing on the arguments and

25   objections made in the paper that was filed?

```
 1              MS. SCHEFFEY:  Yes, Your Honor.

 2              THE COURT:  Very good.

 3              (Pause.)

 4              THE COURT:  Sorry.  The clacking is just me taking

 5    notes.

 6              And now with respect to RFP No. 22, which are the

 7    interim financial statements at issue, has there -- again, is

 8    the time period at this point agreeable from January 1, 2014,

 9    to present, Mr. Free?

10              MR. FREE:  It is, Your Honor.

11              THE COURT:  Very good.

12              Is that agreeable to defendants?

13              MS. SCHEFFEY:  Yes, Your Honor.

14              THE COURT:  Okay.  So --

15              (Pause.)

16              THE COURT:  Excuse me for a second.

17              (Pause.)

18              THE COURT:  Oh, you know what?  I apologize.  Let

19    me -- I went over RFP No. 8.

20              Is there anything -- that, again, is going to be

21    from 2011 to present; is that correct, Mr. Free?

22              MR. FREE:  Your Honor, that's correct.

23              THE COURT:  Okay.

24              And is that agreeable, Ms. Scheffey?

25              MS. SCHEFFEY:  Yes, Your Honor.
```

```
 1              THE COURT:  Very good.
 2              And has there been any movement on this RFP, or is
 3    it still outstanding?
 4              Mr. Free?
 5              MR. FREE:  Your Honor, are you referring to RFP 22?
 6              THE COURT:  RFP 8.
 7              MR. FREE:  Or --
 8              THE COURT:  Sorry.  I --
 9              MR. FREE:  8?
10              THE COURT:  Yes.
11              MR. FREE:  I'm not certain that that was in this
12    motion, and I can -- I'm toggling between a bunch of
13    documents right now --
14              THE COURT:  As am I so --
15              MS. SCHEFFEY:  I'm not sure either to the extent
16    that --
17              THE COURT:  Oh, you know what?  No.  I found an
18    earlier one.  I apologize.  You're right.
19              MR. FREE:  That's all right.
20              THE COURT:  I'm also toggling between too many
21    documents and -- so, yes, RFP, then, 22.
22              (Pause.)
23              THE COURT:  Okay.  So RFP 22 the time period is
24    agreeable from January 1, 2014, to the present.  With respect
25    to -- has there been any movement regarding production of
```

1  documents in response to this request, Mr. Free, or this RFP

2  motion to compel still outstanding?

3       MR. FREE:  Your Honor, this motion to compel is

4  partially still outstanding.  The documents that have been

5  provided by GEO include month-by-month, essentially, P-and-Ls

6  out of Hyperion are partially responsive to RFP 22.  There

7  was some discussion during the last hearing about RFP 6 and

8  RFP 22 potentially having overlapping in information.

9       What we don't have that we've had some discussion

10 with opposing counsel about are the flash reports that are

11 referenced in Document No. 297-1 at Exhibit 187, and my

12 understanding of the difficulty in producing those flash

13 reports, which detail what the expected revenue and

14 expenditures of the Adelanto facility are on a given month or

15 for a given period of time versus what they actually had and

16 then identify where the revenue and expenditure numbers came

17 in short, why it was different -- we've already been -- we've

18 already received at least one of these in discovery, and what

19 we see is that it explains, you know, there was too much

20 overtime, there's -- you know, "we need to shift this

21 staffing in this way."

22       So we think it's relevant to our claims.  We've

23 already seen a memo to ICE that says, "We need four janitors

24 instead of one because" of these variances.  So we think that

25 those are responsive.  Our understanding of the objection is

1   relevance and burden, and so I'll let Ms. Scheffey speak to

2   that, but we have conferred on it, and we think it's still

3   outstanding.

4           THE COURT:  Okay.

5           Ms. Scheffey, anything to add to what is a -- newly

6   obtained information that has not been briefed in the paper

7   already?

8           MS. SCHEFFEY:  Yes, Your Honor.  So it's our

9   position that RFP 22 should be resolved by the financial

10  documents we've produced as well as the Keefe document that

11  plaintiffs have asked for in relation to RFP 6.

12          As for these flash reports, one, it's our position

13  that they're not relevant because they just show certain

14  points in time of the data that plaintiff now has or GEO may

15  have pulled the report from Hyperion and circulated it

16  amongst itself to discuss its own financials.  We don't think

17  that's relevant, and the burden in getting them is great

18  because we'd have to go through emails and try and pull those

19  because they'd be attached, and there's not really any good

20  system in Hyperion to see prior reports.  All of those

21  reports would only show snapshots of the information that now

22  plaintiffs have in their totality for each month.

23          THE COURT:  So are you saying under the Hyperion

24  system you can't pull previous-year cash flow statements and

25  balance sheets --

 1          MS. SCHEFFEY:  Well, we --

 2          THE COURT:  -- and income statements?

 3          MS. SCHEFFEY:  We can.  That's what they've done,

 4  but that's not what the flash report shows.  The flash

 5  reports are essentially if someone says, "Hey, I want to look

 6  at why this category is high.  Can you send me a report of

 7  that?"  Those are prior reports from Hyperion, and it's not

 8  easy to find out all the prior reports that have been pulled

 9  from Hyperion.

10          THE COURT:  Got it.  So it may not have a history

11  of prior reports that have been run?  Is that what you're

12  saying, Ms. Scheffey?

13          MS. SCHEFFEY:  Yes.  Yeah.  Correct.

14          THE COURT:  Understood.

15          MS. SCHEFFEY:  So we'd either have to --

16          THE COURT:  So --

17          MS. SCHEFFEY:  -- recreate them and figure out what

18  they were or find them in prior emails as attached.

19          THE COURT:  Okay.  So from a prior email, have the

20  parties, Ms. Scheffey, agreed to an ESI protocol regarding

21  keywords that would allow for a searching of this information

22  or any information relevant in this matter?

23          MS. SCHEFFEY:  We do not have a keyword agreement

24  for an ESI protocol at this time.

25          THE COURT:  Okay.

1        MS. SCHEFFEY:  And beyond that, I would add, just

2    so it's crystal clear, underlying data we've now produced.

3    So anything that you would have pulled, you know, on -- in

4    that month is now provided to plaintiffs.  They know how GEO

5    did on a month-to month basis.

6        THE COURT:  Got it.  Okay.

7        And as far as the variance analyses, is that --

8    again, some of these -- some of the terminology has a unique

9    use in different types of cases.  The "variance analyses" --

10   are these reports -- informational reports that are provided

11   at a particular time, or can they be -- well, let me stop

12   myself.  I think it's -- we're running into the same issue

13   where, based on your representation that Hyperion does not

14   allow for historical reports to be re-run or the identity of

15   the particular historical reports, the only way to get this

16   information would be to see if they reside in some other

17   repository or an email account?  Is that fair to say,

18   Ms. Scheffey?

19       MS. SCHEFFEY:  Yes, Your Honor, that's my

20   understanding.

21       THE COURT:  Got it.  Okay.

22       Mr. Free, is there anything further to add before I

23   move on?

24       MR. FREE:  Just, Your Honor, that I think as the

25   Court is laying the burden, the Court should consider that

1   these requests were served on October 9th of 2019, and so at

2   least on October 9th, GEO's counsel and then subsequently

3   GEO, would have known that these reports were the subject of

4   discovery, and the burden of going through emails after

5   October 9th should be much less.  That's number one.

6          Number two, we would take issue with the

7   characterization of these documents as simply recreating

8   what's in the aggregate Hyperion printouts because there's

9   analysis that happens and an explanation as to why there are

10  these divergences from predicted revenues, and those are

11  highly relevant to plaintiffs' claims because they deal

12  directly with staffing.

13         THE COURT:  And this is a general question I have:

14  This case has been going on for quite a while, and e-

15  discovery was presumably anticipated.  Any reason the

16  plaintiffs haven't engaged in negotiations to do some keyword

17  searches?

18         MR. FREE:  Your Honor, this is Mr. Free again.

19         The plaintiffs have engaged in, what I believe to

20  be, at least 25 hours' worth of negotiations with defense

21  counsel about an ESI protocol --

22         THE COURT:  Let's focus on e-searches here.

23         MR. FREE:  We were told that there -- that the

24  search are going to be now -- would be too burdensome in

25  response to this request of GEO, and so we never got to

1    search terms.

2              THE COURT:  Got it.

3              Ms. Scheffey, do you want to speak to that?

4              MS. SCHEFFEY:  I'll let David Van Pelt add on, but

5    it's my understanding that this year we did discuss

6    potentially using keywords but that didn't go anywhere.

7              David --

8              THE COURT:  Okay.  Do you know, Mr. Van Pelt --

9    also, in your response if you know whether any of the prior

10   two law firms engaged in any sort of efforts to narrow this

11   down by keyword search?

12             MR. VAN PELT:  I do not know whether the prior law

13   firms engaged in that dialogue.  So I don't know the answer

14   to that question.

15             THE COURT:  Got it.  And, Mr. Van Pelt, then, let

16   me ask you:  It sounds like the plaintiffs have received a

17   blanket "Looking through email is too hard.  So sorry.  End

18   of story."  Is that a fair characterization?

19             MR. VAN PELT:  I -- I mean, not exactly.  We're --

20   certainly have been open to exploring keyword searches and

21   other methods, as we usually do, and that's the normal

22   approach is not to open up, you know, the wholesale discovery

23   of emails, and it's burdensome, and it produces just a huge,

24   you know, cache of irrelevant and potentially, you know,

25   confidential information, but, I mean, my recollection is we

 1  have been open to discussing keywords and other ways to limit

 2  the search to what is most likely to be easily, you know,

 3  obtainable and also, you know, relevant.

 4          MS. SCHEFFEY:  Your Honor, this is

 5  Adrienne Scheffey.

 6          I would add on that yesterday in my correspondence

 7  to plaintiffs' counsel about RFP 32, I did recommend that we

 8  limit it to custodians and search terms to try and identify a

 9  smaller universe of documents.

10          THE COURT:  Okay.

11          Is there anything further you'd like to add,

12  Mr. Free, to 22?

13          MR. FREE:  No, Your Honor.

14          THE COURT:  Ms. Scheffey or Mr. Van Pelt?

15          MS. SCHEFFEY:  No, Your Honor.

16          MR. VAN PELT:  I don't believe so, Your Honor.

17  Thank you.

18          THE COURT:  Very good.  Thank you.

19          Okay.  RFP 23, then, and that is projections,

20  forecasts, and analyses.  Again, is the time period from

21  January 2014 to the present sufficient for the parties?

22          Mr. Free?

23          MR. FREE:  Yes, Your Honor.

24          THE COURT:  Ms. Scheffey --

25          MS. SCHEFFEY:  Yes.

 1              THE COURT:  -- and Mr. Van Pelt?

 2              MS. SCHEFFEY:  Yes.

 3              THE COURT:  Very good.  Okay.  Okay.

 4              And so with respect -- has there been any movement

 5     with regard to projections for cap and breakeven analysis?

 6              Mr. Free?

 7              MR. FREE:  Your Honor, our understanding of GEO's

 8     position is that its documents supplied since last Friday's

 9     hearing satisfy this request.  We disagree, and we think that

10     there are additional analyses that are responsive and they

11     should be produced.

12              THE COURT:  Okay.  Is there any -- very good.

13              Mr. -- I'm sorry.  Ms. Scheffey, is there any

14     information -- new information since the filing of the joint

15     statement that weighs on this subject?

16              MS. SCHEFFEY:  No, Your Honor.  Only that we've

17     provided the monthly financial reports as well as a number of

18     other documents showing staffing and pricing for labor to

19     satisfy our burden here.

20              THE COURT:  Got it.  And you guys haven't done a --

21     it's not -- or have you done a email search or a document

22     search on the systems for projections for cap and breakeven

23     analyses of the Adelanto facility?

24              MS. SCHEFFEY:  No, Your Honor.  My understanding

25     was we were agreeing only to what was produced as the scope

 1    in the *State of Washington*, which is -- we've now gone

 2    beyond.

 3              THE COURT:  Okay.  And what's the delta between

 4    what is being sought here versus what was ordered in

 5    *Washington* that you believe?

 6              MS. SCHEFFEY:  To me, it appears that it's the

 7    flash reports which Mr. Free is seeking.  I'll let him

 8    correct me if he's seeking something else, but those were the

 9    subject of (indecipherable) briefing and disagreement in

10    *Washington* and were never ultimately produced other than a

11    few that were inadvertently produced and subject to

12    discussion about claw-back.

13              THE COURT:  I'm sorry.  I didn't quite -- so were

14    financial projections, forecasts, and breakeven analyses

15    produced in *Washington*?

16              MS. SCHEFFEY:  To the extent they've been produced

17    here.  So the document you have was the same one --

18              THE COURT:  That two pages?

19              MS. SCHEFFEY:  The two-pager, yes.  That's -- same

20    thing was produced in *Washington*.

21              THE COURT:  As I see projections, forecasts, and

22    analyses, they're usually forward-looking documents.  The

23    document that I see appears to be a backward-looking

24    document.  Is -- am I missing something, Ms. Scheffey?

25              MS. SCHEFFEY:  So there's one page of that which is

1   the budget, and one page which is the actual.  So it would

2   show the budget --

3              THE COURT:  Okay.

4              MS. SCHEFFEY:  -- that's what was projected, and

5   then what actually happened.  Obviously, it doesn't go beyond

6   the time period.

7              THE COURT:  Got it.

8              MS. SCHEFFEY:  And then we also have -- which have

9   been produced in this case -- the staffing plans, which show

10  how many people and what -- in what position will be needed

11  per year at each for the facility.

12             (Pause.)

13             THE COURT:  So I'm just pulling up that document

14  again.

15             MS. SCHEFFEY:  Okay.

16             THE COURT:  The 37767.

17             MS. SCHEFFEY:  Uh-huh.

18             THE COURT:  So there's actual, and the second page

19  is budget.

20             MS. SCHEFFEY:  Yeah.

21             THE COURT:  Okay.

22             (Pause.)

23             THE COURT:  How is this budget document created,

24  because it does contain historical forward-looking estimates,

25  then, under the Hyperion system?

1          MS. SCHEFFEY:  I could ask, but I believe it's a

2    report that is pulled from a number of people at the

3    corporate office and at the regional office.

4          THE COURT:  So this indicates, to me, there is the

5    ability under the Hyperion system, then, to obtain interim

6    financial statements because it can collect information that

7    is put in in the past and it's somehow maintained in the

8    Hyperion system.

9          Mr. Free, is there -- do you see what I'm saying?

10          MR. FREE:  Your Honor, I do.

11          THE COURT:  Okay.

12          Can you -- Ms. Scheffey, do you understand what I'm

13    saying, then?

14          MS. SCHEFFEY:  Yes, Your Honor, and we can produce

15    information from a certain point in time if we were given

16    that point in time.  The question is do we have to identify

17    each time that someone went into the Hyperion system, pulled

18    a flash report for a certain subset of data and sent that to

19    someone else?

20          THE COURT:  Got it.  So --

21          MS. SCHEFFEY:  Does that make sense?

22          THE COURT:  It does.  It does.  So there could be,

23    let's say, one month 30, and the way the system appears to

24    operate is that you have to put an end time by which

25    information is collected and so a report -- so you basically

1    don't have to do a daily report in case people were putting

2    in different projections at different times?  Is that fair to

3    say, Ms. Scheffey?

4              MS. SCHEFFEY:  Yes, Your Honor.  And beyond that,

5    just I think there are a number of different people who have

6    access to Hyperion and may pull a report at some point in

7    time.  Let' say -- you know, for example, right now Covid

8    happens and they want to see what's happening with the

9    financials and is that changing, "Do we need to change our

10   budget?" and that might be pulled on day 15 of the month

11   versus day 30 of the month and sent to someone, and it

12   doesn't necessarily track every single report that's pulled

13   by each person with all the parameters.

14             THE COURT:  Okay.  But let's take it, then, to the

15   budget page that is on -- ending in 37768.  When would that

16   budget information be pulled to get a 2012 budget?  Is it

17   January -- I'm sorry -- December 31st?  Or I don't know if

18   you guys are on a calendar year or a different operational

19   year.

20             MS. SCHEFFEY:  I'd have to ask them if -- what

21   operational year they're on.  It's my understanding they're

22   on a calendar year, but I am not sure sitting here today.

23             THE COURT:  Got it.

24             MS. SCHEFFEY:  But they can pull the information

25   that is -- yeah, that is entered in there.  I don't know if

1  they do a true-up at the end of the year or not, or if it's

2  on a monthly basis and it just stays the same if they make

3  those at the very beginning of the year.  I'm not sure about

4  how that system works.

5          THE COURT:  Oh, so a true-up in the sense that, if

6  there's a budget that is run on January 2nd of a year, it may

7  be different on December 31st of that year because other

8  input -- the inputs have changed?  Is that what you're

9  saying, Mr. Scheffey?

10          MS. SCHEFFEY:  Yes.  And I'm not sure which one

11  they do, but, yes, I could see that just --

12          THE COURT:  Okay.

13          MS. SCHEFFEY:  -- based on, you know, different

14  clients having different financial system.

15          THE COURT:  Got it.  So based on the budget that

16  has been provided on a monthly basis now, those should show

17  the various true-ups that occurred throughout the year?

18  Would that -- is that a fair assessment -- assumption,

19  Ms. Scheffey?

20          MS. SCHEFFEY:  Yes, Your Honor.

21          THE COURT:  Got it.

22          Mr. Free, so with respect to the statements that

23  are sought in RFP 22, then, are you seeking more than a

24  monthly statement -- financial statement?

25          MR. FREE:  No, Your Honor.  We are, however,

 1  seeking those flash reports, and we understand --

 2          THE COURT:  Okay.

 3          MR. FREE:  -- I think we've discussed why those are

 4  important and why they're also potentially difficult to get

 5  the farther back you go.

 6          THE COURT:  Okay.  So the flash reports, then, let

 7  me -- where are those kept, Ms. Scheffey?

 8          MS. SCHEFFEY:  So that was -- what we discussed is

 9  that that might be something that is pulled where one

10  employee emails another employee and says, "Can you tell me

11  where we are with our expenditures for" X (indecipherable),

12  and then they have a colloquy about that.  They would be in

13  --

14          THE COURT:  I understand but --

15          MS. SCHEFFEY: -- emails, and I don't know if

16  they're anywhere else.

17          THE COURT:  No, I get it, but, like, the flash

18  reports are kept -- that same report that's generated to the

19  Hyperion system?

20          MS. SCHEFFEY:  That would be someone going in, I

21  believe, and, yeah, pulling certain data from a -- the

22  Hyperion system, just like we've done here --

23          THE COURT:  Got it.

24          MS. SCHEFFEY:  -- but I don't think it's

25  traditionally flash --

 1                THE COURT:  And so --

 2                MS. SCHEFFEY:  -- because it's not in

 3  (indecipherable) but same idea.

 4                THE COURT:  So tell me about the terminology.

 5  What's a "flash" report as compared to -- is a "flash" --

 6  Mr. Free, what do you understand the "flash" report to be,

 7  then?

 8                (Pause.)

 9                MR. FREE:  Sorry, Your Honor.  I was on mute.

10                So a flash report is a document that we understand,

11  based on the one that we have, to be generated by Hyperion --

12  well, by data that's in Hyperion that is facility specific --

13  Adelanto's facility is No. 196 -- and that has the budgeted

14  and then the actual financial information for several

15  categories and then discussed -- and then has the delta, has

16  the price difference in red in another column, and then it

17  has a percentage of how different it was, and then it

18  provides comments in the final column to why -- explaining

19  why the discrepancy existed.  So --

20                THE COURT:  And, Mr. Free, do you understand these

21  flash reports to be customizable by the person who goes into

22  the Hyperion system to seek the data they want?

23                MR. FREE:  I don't know the answer to that

24  question, Your Honor.

25                THE COURT:  Okay.

1          Ms. Scheffey, is that your understanding?

2          MR. FREE:  I think the answer is yes, but I don't

3  know.

4          THE COURT:  Okay.

5          Ms. Scheffey, do you know?

6          MS. SCHEFFEY:  Yes, Your Honor, that's my

7  understanding.  I had a call with James Hill, who goes by

8  "Chuck" Hill, after our hearing and asked him to explain to

9  me those flash reports, and that was how he described them to

10  me.

11          THE COURT:  And you indicated previously that these

12  flash reports -- there's -- that there doesn't appear to be a

13  mechanism within the Hyperion system to be able to pull

14  historical flash reports.  Is that accurate, Ms. Scheffey?

15          MS. SCHEFFEY:  Yes, Your Honor, that's what we have

16  discovered so far.

17          THE COURT:  Got it.  So the only way to discover

18  them would be from reports that have been downloaded and

19  reside on people's computers or accounts or emailed to other

20  people?  Is that fair to say, Ms. Scheffey?

21          MS. SCHEFFEY:  Yes, Your Honor, that's my

22  understanding.  And I would note the other way, of course, in

23  full transparency, would be to recreate them through

24  Hyperion, which would have its own complications, but if we

25  knew what data set plaintiffs were looking at.  But that's

1  kind of, I think, where my confusion is about why those are

2  so critical or relevant here when they have the underlying

3  data for every line item and those might only show a snapshot

4  of what they already have.

5        THE COURT:  Got it.  And so when you -- I don't

6  quite understand.  Like, you would -- to "recreate" them,

7  meaning you would -- in an email search you identified

8  "person A" was talking about particular parameters to

9  "person B," and then you would try and recreate the flash

10  report that was created by "person A"?  Is that what you're

11  indicating, Ms. Scheffey?

12        MS. SCHEFFEY:  Yeah.  Just to -- in total candor

13  here, you know, obviously, Hyperion is a system where we can

14  pull reports based on parameters.  So, if we knew the

15  specific parameters that were -- that someone was looking

16  for, we could try and pull a report, presuming that the

17  system allowed us to do it with those parameters, just like

18  we've done here.  Let's say you just wanted, you know, what

19  amount was spent -- I'm looking at that document that you

20  have, GEONOVOA37768.  Let's say you wanted to know in 2012

21  how much was spent on holiday, you could pull a report that

22  just shows that $305,000 number.

23        THE COURT:  But the way you would find out would be

24  having to look through emails if somebody -- or

25  communications where somebody was asking another person for

1   this information?  Or --

2           MS. SCHEFFEY:  Yes, Your Honor.

3           THE COURT:  -- is there another way?

4           Okay.  Got it.  So you're basically having to

5   divine from emails or other things information that is being

6   sought from the Hyperion system?

7           MS. SCHEFFEY:  Yes, Your Honor, or if they're

8   attached to an email and someone's pulled it.

9           THE COURT:  Got it.  And so if they're already

10  attached and already created in electronically searchable or

11  obtainable form from email systems; is that correct,

12  Ms. Scheffey?

13          MS. SCHEFFEY:  Yes.  If that would be the case, we

14  would be doing it that way as well.

15          THE COURT:  Okay.  Got it.  Okay.

16          This seems -- with respect to the flash reports,

17  Mr. Free, then, it seems burdensome absent some agreement on

18  ESI search protocols.  Do you disagree with that, Mr. Free?

19          MR. FREE:  Only partially, Your Honor.  I don't

20  think that there's any burden after October 8th when -- of

21  2019 when GEO was on notice that these were subject to a

22  discovery request.  So it shouldn't require doing anything.

23  But even if we set that aside, there would be a way to just

24  go and look at the attachments to -- so, if an email has an

25  Excel spreadsheet attachment that says "Flash February" or

 1   "Flash March," and the actual document is called a "Facility

 2   Variance Report," and we were able to run it for that time

 3   period, we think we would be able to scoop up most of what's

 4   responsive here, and we would be open to such an order.

 5           MS. SCHEFFEY:  And, Your Honor -- this is

 6   Ms. Scheffey -- I would add, I just still struggle with the

 7   relevance when they have all the underlying data.  I really

 8   don't see what else could be required here.

 9           THE COURT:  Okay.

10           MS. SCHEFFEY:  They have everything they need for

11   their expert.

12           THE COURT:  Okay.

13           Mr. Free, you want to --

14           MR. FREE:  Your Honor --

15           THE COURT:  -- make your argument on relevance.

16           MR. FREE:  I do.

17           THE COURT:  Go ahead.

18           MR. FREE:  Yeah.  The premise that we have all of

19   the underlying data rests on the premise that we have the

20   budgeted financials for each of the years.  GEO has only

21   provided us with the actual numbers.  So the document that we

22   have --

23           THE COURT:  Well, Mr. Free, but didn't -- I thought

24   you did get budget -- facility financial summary budget, and

25   now you have it on a monthly basis, though?

 1              MR. FREE:  We don't have it on a monthly basis.  We

 2    have -- so the page that you have in front of you,

 3    Your Honor, that 37 page, has two sides.  So there's the

 4    actual and the budgeted.

 5              THE COURT:  Right.

 6              MR. FREE:  What GEO provided us before this hearing

 7    is just the actual.  There's no budget.

 8              MS. SCHEFFEY:  And --

 9              THE COURT:  Got it.

10              MS. SCHEFFEY:  -- Andrew I can tell you that we

11    intended to produce the budgeted.  So, if the budgeted hasn't

12    come yet, I can ping that person who is sending that out.

13    Our goal is to have that out to you as soon as possible.

14              THE COURT:  Okay.

15              MR. FREE:  That alleviates -- I'm sorry.  Go ahead.

16              THE COURT:  Go ahead, Mr. Free.  Now, it sounds

17    like you're going to get the budget, then, on a monthly

18    basis.

19              MR. FREE:  Right.  Even still, the facility

20    variance reports are pretty significant for what they say in

21    the "comment" column, and specifically, you know, there's a

22    section there called "Operating Margin," or "Op Margin," and

23    it has -- when it has a -48 percent variance, we're not going

24    to get from the sheet that they've provided us or from what

25    you've got in front of you the comment that says "lower than

 1   budgeted ADP" -- or "average daily population" -- "higher

 2   than anticipated payroll cost for remote post hours" --

 3   that's taking people out of the facility to go to the

 4   hospital or otherwise -- and "higher than budgeted costs for

 5   contract doctors" account for negative variance to operating

 6   margin.  So that's from this one flash report that we have.

 7          We believe that -- based on some other documents

 8   that we've gotten, that GEO was looking at this over time and

 9   making decisions about how detainee labor was going to be

10   deployed.  Specifically, we have a document from 2013 or 2014

11   where GEO petitions ICE to have more janitors and add that to

12   the contract and ask for a variance because they're not able

13   to clean an entire facility with the detained immigrant

14   workers that they have.  So for these reasons, the flash

15   report -- the facility variance reports are the best evidence

16   of the deprivation scheme and the unjust enrichment insomuch

17   as they show how GEO's using detained labor and its own labor

18   interchangeably.  And --

19          MS. SCHEFFEY:  And why.

20          Your Honor, I would just add, I still don't see the

21   relevance because I think they have the evidence about how

22   many VWP shifts were used in any (indecipherable) time -- all

23   the labor -- how that fluctuated over time, and they can make

24   that argument.  I don't see how the operating margin would

25   give them that information.

1          THE COURT:  Okay.

2          MR. FREE:  (Indecipherable) --

3          THE COURT:  Is there anything further to add?

4   Sure.

5          MR. FREE:  Just -- yeah.  The answer to the

6   question that (indecipherable) poses is just that, when

7   there's a "comment" section and there's prose, it's going to

8   reflect on the decision that the company was making with

9   respect to labor, not just the sort of numbers that are on

10  the page.  It's going to provide an explanation for them, and

11  that can be highly relevant to the plaintiffs' claims.

12          THE COURT:  Okay.  All right.

13          (Pause.)

14          THE COURT:  Okay.  I got sidetracked on RFP No. 23.

15  Now let me -- 22.  Let me go back to 23 again.  My notes

16  indicate this RFP is still outstanding partially; is that

17  correct, Mr. Free?

18          MR. FREE:  That's correct, Your Honor.

19          THE COURT:  Okay.  And what partial segment of

20  documents are you seeking?

21          MR. FREE:  So, Your Honor, RFP 23 calls for

22  financial projections, operating forecasts, or breakeven

23  analyses.  I think -- and the present -- between January 21,

24  2014 -- January 1, 2014 and the present, including supporting

25  analyses or the basis of assumptions.  So to the extent that

```
 1  there's anything that we haven't discussed -- facility

 2  variance reports or the actual and budget sheets -- we

 3  haven't received any of that.  We think it's still

 4  outstanding.  We don't know what we don't have, and so, you

 5  know, we'll take GEO's counsel's at its word that there's

 6  nothing else, but we suspect that for a company like GEO, an

 7  operating forecast or a breakeven analysis is going to show

 8  up somewhere in the Hyperion system, and that's what our

 9  experts have told us -- our financial expert, and so that's

10  why we asked for it.

11            THE COURT:  Okay.

12            Ms. Scheffey, do you want to respond?

13            MS. SCHEFFEY:  Yes, Your Honor.  I mean, I feel

14  like this is a moving target with the financial documents.

15  We're providing the raw data, everything they need for their

16  experts.  I'm not really sure what that forecast would do --

17            THE COURT:  Okay.

18            MS. SCHEFFEY:  -- to show that the detainees are

19  employees, to show that the detainees were engaged in forced

20  labor.  I just don't see the relevance to this claim, and I

21  think that that changes, you know, everything we've produced,

22  and it becomes a -- you know, a cascade of what documents

23  we're going to produce for financials.  We've already

24  produced more than we produced in *Washington*, which was our

25  agreement.
```

```
 1              THE COURT:  Okay.  All right.  I think I have all
 2   the briefing on this and the positions.
 3              So let's move on to 27.  Is the time period, again,
 4   agreeable here to 2014 to the present?
 5              MR. FREE:  It is for the plaintiffs, Your Honor.
 6              THE COURT:  Okay.
 7              MS. SCHEFFEY:  It is for the defense, Your Honor.
 8              THE COURT:  Very good.
 9              So paystubs of all the folks -- for these
10   particular non-detainee janitors, warehouse employees,
11   laundry personnel, maintenance staff, and food service
12   workers.  I reviewed the objections -- is there anything that
13   plaintiffs would like to add beyond what is in their
14   arguments or any new information since that?
15              MR. FREE:  Your Honor, we took up the Court's
16   suggestion to meet and confer with counsel for the defendants
17   on RFP 27, and we reformatted and reposited RFP 27, I
18   believe, on either Sunday night or Monday morning, and we've
19   had a chance to confer and exchange some paper and speak on
20   the phone.
21              So we reformatted RFP 27 and asked GEO to, quote,
22   (reading) Please provide documents sufficient to show the
23   following for all non-detainee janitors, warehouse employees,
24   laundry personnel, maintenance staff, and food services
25   workers employed at the Adelanto facility for any time period
```

 1  between January 1, 2014, and the present -- and then there

 2  are three subparts -- (reading) (a) the hourly wage they

 3  received; (b) the number of hours they worked; and, (c) any

 4  explanation of any benefits they received.

 5          GEO's counsel provided us staffing documents that

 6  satisfy subparts (a) and (c), and we were able to thank them

 7  for that yesterday during our call.  They provided us

 8  essentially a list of everybody who was employed at the

 9  facility by position and then broken down by their

10  compensation.  So that's going to get us where we need to go

11  in terms of hours -- hourly wage received and benefits for

12  the expert calculations.

13          What we don't have and what's still outstanding is

14  the number of hours worked, and GEO's counsel sent us a

15  letter that reconfirms that (a) and (c) we had agreement, and

16  GEO's position -- I'll let Ms. Scheffey talk about it but is

17  that plaintiffs compare the recently produced staffing plans

18  to the actual expenditures for each year to identify any

19  variance, and GEO also says that it will be producing monthly

20  financial statements that show actual expenditures.  I'm not

21  sure if what we've got is what they agreed to produce.  But

22  they also say that they're not aware of any method for easily

23  producing the number of hours each individual worked and

24  believe that doing so by combing through payroll from 2011 to

25  the present is burdensome and not proportional to the needs

1    of the case, particularly when we have the staffing plans.

2    We tend to agree.  That's not what we would propose.

3            What we would propose is that GEO would help us

4    answer the question in 27(b) as reposited, which is the

5    number of hours these people worked, and the way to do that

6    is to provide us with what GEO provided ICE in conformance

7    with its contract, which is proof that it came within

8    10 percent of its staffing guarantee to ICE, which is

9    contractually required, and, I mean, we've reviewed what

10   they've got, and we think that's the simplest way to do it.

11   GEO had to tell ICE, pursuant to its contract, whether its

12   staffing levels and in which positions the staffing levels

13   diverged from what they've given us -- the staffing plan.

14   It's called a "Workforce Integrity Section," and they can be

15   docked up to 10 percent of their monthly invoice if they

16   don't show that to the contracting officer, and so we just

17   want to see what they showed the contracting officer each

18   month, which should be available.

19           THE COURT:  Ms. Scheffey?

20           MS. SCHEFFEY:  Yes, Your Honor.  That's the first

21   time I've heard the compromise.  So I'm working through it.

22   I think --

23           THE COURT:  Okay.

24           MS. SCHEFFEY:  Sorry.

25           THE COURT:  No.  That's --

1          MS. SCHEFFEY:  Sorry.  Go ahead.

2          THE COURT:  No, no, no.  I appreciate that it was,

3    like -- it sounds like there's a workaround that would be

4    able to satisfy plaintiffs.

5          I need to -- for my order that I'm typing up,

6    Mr. Free, what would you like -- if you were to be -- what

7    would it say with respect to numbers, hours worked?

8          MR. FREE:  Any documents sufficient to show the

9    actual numbers and hours worked by non-detained -- let me get

10   the exact language -- by non-detainee janitors, warehouse

11   employees, laundry personnel, maintenance staff, and food

12   service workers for January 1, 2014, to the present.  We

13   believe that that --

14         THE COURT:  Ms. --

15         MR. FREE:  Yeah.  Sorry.

16         THE COURT:  Okay.

17         Ms. Scheffey, do you guys -- did GEO use ADP or

18   some other similar type of system for its payroll at

19   Adelanto?

20         MS. SCHEFFEY:  I have not been able to get that

21   information yet.  I actually did send that request out and

22   just haven't gotten it back in the timeframe, and I

23   apologize.

24         THE COURT:  Okay.  No, no.  That's okay.

25         MS. SCHEFFEY:  But --

 1          THE COURT:  I just note from my -- at least, in my

 2    experience, what -- they can run basically not necessarily

 3    even by name but by employee number the -- on spreadsheets

 4    the payments made to people including the withholdings and so

 5    that we give the dollar amount.  So -- go ahead.

 6          MS. SCHEFFEY:  Right.  And I apologize --

 7          MR. FREE:  -- Free --

 8          MS. SCHEFFEY:  -- that we don't have that yet.  I

 9    did try to get it, just wasn't able to in this timeframe.

10          It sounds like, though, that plaintiffs' counsel

11    wants just proof that we --

12          (Party joins or leaves call.)

13          MS. SCHEFFEY:  -- go over -- that GEO didn't go

14    over 10 percent and that, if it did, there would have been

15    letters to ICE.  So maybe it's just a matter of identifying

16    any months in which GEO went over that 10 percent and giving

17    plaintiffs' counsel that information.

18          THE COURT:  Mr. Free?

19          (Pause.)

20          THE COURT:  Hello?  Mr. Free?

21          (Pause.)

22          THE COURT:  Mr. Maya?

23          MR. MAYA:  Yeah.  I'm here.  This is Mr. Maya.  I'm

24    sorry.  I don't know if Mr. Free is still on but I -- if that

25    ADP information is --

 1              THE COURT:  No, no, no.  Let's go back to what Mr.

 2  --

 3              MR. MAYA:  Yeah.

 4              THE COURT:  -- Ms. Scheffey just said about the

 5  10 percent --

 6              (Party joins or leaves call.)

 7              THE COURT:  -- variance -- I'm sorry.  Is that,

 8  Mr. Free?

 9              MR. MAYA:  Oh, sure.  I --

10              MR. FREE:  I'm sorry, Your Honor.

11              MR. MAYA:  -- produce the monthly information that

12  they're --

13              MR. FREE:  Sorry about that.

14              MR. MAYA:  -- required to produce to ICE -- sorry.

15              MR. FREE:  Your Honor, two things.  I'm really

16  sorry about that.

17              THE COURT:  It's okay.

18              MR. FREE:  So first of all, Ms. Scheffey was kind

19  enough to point us to GEONOVOA9052, which is the end-of-shift

20  packet that's done at the end of each -- one of the three

21  shifts at Adelanto.  In it -- it's a 39-page document.  In it

22  there's a printout from 2017 from the Kronos system, and we

23  believe the Kronos system is what they use at Adelanto for

24  staffing, and we also believe, based on this printout --

25  (indecipherable) third page so it's 9054, maybe,

1   Ms. Scheffey, that there's an ability to show -- we know that

2   every day they show who worked in which position, and we

3   think that they should be able to do that longitudely through

4   Kronos.  We're not sure when Kronos started at Adelanto,

5   though.

6          THE COURT:  Okay.  So let me -- Mr. Free, just for

7   my -- for the purposes of drafting up this order, plaintiffs

8   withdrew the paystub language and sent a modified RFP 27; is

9   that correct?

10          MR. FREE:  That's correct, Your Honor.

11          THE COURT:  Okay.  All right.  Then I'll draft up

12   something accordingly in light of that modification.

13          MS. SCHEFFEY:  Your Honor?

14          THE COURT:  (Indecipherable.)

15          MS. SCHEFFEY:  We objected to producing the number

16   of hours works worked at this time because we're not aware of

17   an easy system for doing so at this point.

18          THE COURT:  Okay.

19          MS. SCHEFFEY:  So I know you want to draft up your

20   order.  I can ping people after this, but I haven't been able

21   to identify an easy way to find the number of hours worked

22   which would not require pulling different positions because

23   there is some turnover and stuff like that.

24          THE COURT:  Sure.

25          MS. SCHEFFEY:  But they do have -- and just so you

1   know, the staffing plan they received does have an estimate

2   for overtime and all of that, and that is -- as Mr. Free

3   said, complies (indecipherable) 10 percent.

4           THE COURT:  Okay.  All right.

5           Let's go to RFP 29, the staffing schedules.  I

6   reviewed the exhibit -- I'm sorry -- the objections and the

7   arguments.  Is there anything further that plaintiffs would

8   like to add?  New information --

9           MR. FREE:  Your Honor --

10          THE COURT:  -- that's not been -- that's been

11  developed since the filing?

12          MR. FREE:  Indeed, Your Honor.

13          Plaintiffs reformulated RFP 29 as follows following

14  the last call with the Court:  (Reading) Please provide

15  documents sufficient to show the staffing schedule for both

16  detained immigrant workers and non-detained immigrant workers

17  at the -- excuse me -- non-detained workers at the Adelanto

18  facility for any time period between January 4, 2014, and the

19  present.

20          We have agreed in our meet-and-confer with GEO that

21  we have documents sufficient to demonstrate staffing

22  schedules for detainees, and we do not -- a lot of those are

23  handwritten, and producing those handwritten schedules is

24  going to be highly burdensome, and, frankly, we don't need to

25  review them on our side to prove what we need to prove out of

1  these documents.

2         What we have also agreed on is, I believe -- and

3  I'm sure -- she can correct me if I'm wrong, but I think the

4  staffing schedule document is produced by an employee named

5  Mary Wise McCormick (phonetic), who's the classification

6  officer at Adelanto, and that document -- it's in an Excel

7  spreadsheet.  We understand that she just writes over the

8  Excel spreadsheet over a period of time.

9         What we believe is a reasonable compromise on the

10  employee -- on the GEO non-detained employees, which is where

11  the dispute remains, is on showing the schedule for every day

12  and showing what the schedules look like, especially

13  (indecipherable) that GEO's provided so much in the way of

14  staffing plans, and so what we would like is a document

15  similar to the one that GEO pointed us to over time, 90546,

16  which is just a census detail that's printed out from Kronos

17  at the end of the day that shows how many people worked, and

18  that should be available in a database, and it should be

19  easily producible.

20         So that's how we propose to handle this.  We got

21  GEO's response to this and additional documents this morning.

22  So we haven't taken this back to GEO, but that's where the

23  plaintiffs are.  We do stand -- we do think that the amended

24  RFP is proper and that the schedules for non-detained workers

25  at Adelanto should be produced.

1           THE COURT:  And, Mr. Free, do you know how "Kronos"

2   is spelt?

3           MR. FREE:  K-r-o-n-o-s -- like "Samuel."

4           The name of the document -- there's a census -- a

5   document called "Census Detail."  So that's one of the names

6   of the document, and there's also another document that

7   essentially spells out who worked at the end of the day, and

8   it's printed out from Kronos, and it's signed by the warden,

9   we believe, at the end of every shift.  This is all in the

10  document that begins at GEONOVOA506, I think.  Excuse me.

11  It's called the "Workforce Telestaff Roster" in Kronos.

12          THE COURT:  Okay.  So the only issue is with

13  respect to non-detained immigrant workers at the Adelanto

14  facility; is that correct, Mr. Free?

15          MR. FREE:  That's correct, Your Honor.

16          THE COURT:  Okay.

17          Ms. Scheffey --

18          MS. SCHEFFEY:  -- did you mean to include the word

19  "immigrant" or just "non-detained workers"?

20          MR. FREE:  No.  We had tried to clarify.  It's

21  "non-detained workers."

22          MS. SCHEFFEY:  Right.

23          MR. FREE:  Yeah.  Sorry about that.

24          THE COURT:  Okay.  So that's different than the RFP

25  that I'm looking at, then?

 1              MR. FREE:  Yeah.  We -- there's a typo.  So it's
 2   "detained immigrant workers" and then "non-detained immigrant
 3   workers," and the "non-detained immigrant" -- the "immigrant"
 4   in the second part should be out.  Sorry about that.  That
 5   was a typo.
 6              THE COURT:  Got it.  Okay.  So "non-detained
 7   workers."
 8              Ms. Scheffey, do you want to respond to what
 9   Mr. Free indicated?
10              MS. SCHEFFEY:  Yes, Your Honor.
11              We have reached an agreement, and we believe it's
12   resolved as to the detainee VWP participants -- their
13   schedules.
14              I'm not sure exactly what plaintiffs' counsel are
15   seeking -- they said they came up with this morning -- for
16   the GEO employees, but it looks like they're just seeking
17   exemplar staffing schedules from Kronos; is that correct?
18              MR. FREE:  We think that there -- with the -- it's
19   not the staffing schedules but the data about who actually
20   worked.  That's what's remaining in dispute.  We have what we
21   think are the schedules, but we think it should be possible
22   to produce these Kronos "Workforce Telestaff Reports."
23              MS. SCHEFFEY:  Okay.  And I do know that the
24   systems may have changed over time.  Even Hyperion has
25   changed.  So I would have to go back and find out what the

1    burden is of getting that.

2            MR. VAN PELT:  Your Honor, this is Mr. Van Pelt --

3    David Van Pelt.

4            Also, there -- you know, when we are dealing with

5    the GEO employees, the non-detained staff, I mean, to produce

6    documents showing specifically when they worked, the hours

7    they worked, I mean, that does impinge on, you know, the type

8    of employee privacy that Your Honor addressed last time.  So,

9    you know, I think the scope may be something that we have to

10   address to the extent it compromises, potentially, the rights

11   of confidentiality of third-party employees.

12           THE COURT:  Okay.  All right.  Very good.

13           Anything further on 29 that the parties want to

14   tell me before I move on that's not included in the briefing?

15           MR. FREE:  Not from the plaintiffs, Your Honor.

16           THE COURT:  Okay.

17           Ms. Scheffey?

18           MS. SCHEFFEY:  Not from the defendants, Your Honor.

19           THE COURT:  Very good.  Thank you.

20           And I just want to make sure.  So the modified --

21   where plaintiffs modified it to say "sufficient to show"

22   staffing schedules; is that right, Mr. Free?

23           MR. FREE:  Correct, Your Honor.

24           THE COURT:  Got it.

25           Okay.  30, which is the square footage and the --

1    within the -- I guess, physical questions about the Adelanto

2    facility being (indecipherable), which is the average number

3    of meals prepared and served each day.

4            Mr. Free, is there any additional information that

5    plaintiffs would like to provide that is not -- that wasn't

6    included or that has been developed since the briefing?

7            MR. FREE:  Yes, Your Honor.

8            Following the last hearing with the Court, the

9    plaintiffs propounded amended RFP 30 to GEO which reads:

10   (reading) Please provide documents sufficient to show the

11   following:  (a) the square footage of the secured and

12   unsecured areas of the Adelanto facility; (b) the total

13   number of bathrooms, sinks, and toilets in the secured and

14   unsecured portions of the Adelanto facility;, and (c) the

15   average number of meals prepared and served each day at the

16   Adelanto facility for any time period between January 1,

17   2014, and the present.

18           We discussed that amended request with GEO's

19   counsel, and we discussed -- and we got a letter back after

20   our phone call that said it would be less burdensome and more

21   efficient to provide this information in summary fashion

22   rather than through a floor plan of the facility, and to that

23   end, GEO said it would be making a document that breaks down

24   square footage by area on May 20th.  We have received that

25   document.  We're going to need to follow up with GEO about

1   what it means, but I think -- the document also will contain

2   information about toilet, sinks, and showers, and it does.

3   It should also provide all relevant datapoints for the expert

4   witness.  We also discussed providing average number of meals

5   in an interrogatory-style response or a declaration.

6            So based on this conferral, we are prepared to take

7   this RFP down.  We've reached an agreement.

8            THE COURT:  Got it.

9            Is that your understanding, Ms. Scheffey?

10           MS. SCHEFFEY:  Yes, Your Honor.

11           THE COURT:  Very good.

12           So let's go to RFP 32.  The time period here -- is

13   this from 2011 to present?

14           Mr. Free?

15           MR. FREE:  Yes, Your Honor.

16           THE COURT:  Okay.

17           Is that your understanding, Ms. Scheffey?

18           MS. SCHEFFEY:  Yes, Your Honor.

19           THE COURT:  Okay.

20           Mr. Free, is there any other information -- new

21   information that's been developed since the filing of this

22   document that -- or the joint stip that the plaintiffs would

23   like to present?

24           MR. FREE:  Yes, Your Honor.

25           Plaintiffs propounded to GEO's counsel the new

1   RFP 32, which reads: (reading) Please provide any and all

2   documents relating to, constituting, or recording

3   communications between GEO and any representative or employee

4   of ICE dated May 11, 2011, to the present and which

5   constitute reference or discuss any of the following --

6   there's (a) through (e).

7            (a) is housing unit sanitation policies and/or

8   sanitation procedures and housekeeping -- slash-housekeeping

9   plans; (b) is the personal housekeeping requirement of the

10  PBNDS (PBNDS Section 5.8.c.); (c) is any contract discrepancy

11  reports, "CDR," and/or uniform corrective action plan

12  regarding the Adelanto facility; (d) is any audit or

13  inspection of the Adelanto facility; and (e) is any

14  compensation or payments made to detained immigrants who

15  participate in the voluntary work program at the Adelanto

16  facility.

17           We conferred on this request, and the conferral was

18  opening a letter from GEO that says, quote, (reading) As we

19  discussed, we are running these searches, but it appears that

20  there will be a large number, hence, very burdensome to

21  review.  In light of the tangential relevance most of these

22  documents may have, particularly given this request is

23  (indecipherable) request (indecipherable), we will stand our

24  objection absent additional (indecipherable), and as soon as

25  we receive the updated number of hits, we will provide that

1    number to you.  As this number is going to be extremely

2    large, we would large we would recommend that this request be

3    limited to specific (indecipherable) search terms at a

4    starting point for further conferral if appropriate.

5          So our understanding of this request's status is

6    that GEO is standing on its burden objection.  We have not

7    received the number of hits that were received before this

8    hearing.  We would be open to a keyword search, but that's

9    where we are.

10          THE COURT:  Ms. Scheffey?

11          MS. SCHEFFEY:  So, Your Honor, I would note that in

12   our papers we noted that the preliminary searches revealed

13   over 30,000 documents that would need to be reviewed.  I do

14   not believe that that number is going to be reduced

15   significantly given that the date change corresponds with

16   when Adelanto was open, so May 11, 2011, so any documents

17   before then would probably be very few in number related to,

18   you know, beginning the facility.  So I don't think that that

19   number will change and -- that's it.  I think that's all I

20   have to add to that.

21          THE COURT:  Okay.  Very good.  So let me just make

22   sure -- I'm sorry.  I was looking at the electronic discovery

23   provision.

24          So it sounds like GEO's standing on its burdensome

25   objection; is that correct, Ms. Scheffey?

1            MS. SCHEFFEY:  Yes, Your Honor.

2            THE COURT:  Very good.

3            MS. SCHEFFEY:  Yes, Your Honor.

4            THE COURT:  Okay.

5            And with respect to the content discrepancy

6    reports, Mr. Free, what's the relevance of those?

7            MR. FREE:  So, Your Honor, GEO's performance of the

8    contract is monitored by ICE.  There's an attachment to its

9    contract called "Performance Requirements," and it sets out a

10   number of specifically listed performance requirements, that

11   include the voluntary work program, and has the criteria that

12   ICE will use to determine where GEO is satisfying these

13   performance requirements.

14           GEO has raised a defense in this case of derivative

15   sovereign immunity, which requires GEO to show as an

16   affirmative defense that it is conducting its activities in

17   compliance with its contract.  We've already seen contract

18   discrepancy reports that indicate that at multiple points

19   it's not.  So GEO's performance of the contract, particularly

20   as to these narrow categories of things, is relevant to GEO's

21   defense.  Moreover, to the extent that GEO is consistently

22   failing and they're getting contract discrepancy reports and

23   not remedying them with respect to areas that are relevant to

24   this case, which is what the request was designed to touch,

25   it's going to bear on plaintiffs' unjust-enrichment

 1  claims.

 2            THE COURT:  Got it.

 3            And, Ms. Scheffey, you said the hits resulted in

 4  over 30,000 documents; is that correct?

 5            MS. SCHEFFEY:  Yes, Your Honor, and that's in our

 6  original papers.

 7            THE COURT:  Got it.  Right.  I saw that.

 8            All right.  Okay.  And so RFP 33.  Is the time

 9  period for this from 2011 to present?  Is that what it's

10  modified to, Mr. Free?

11            MR. FREE:  Yes, Your Honor.

12            THE COURT:  And with respect to -- has there -- are

13  there any new developments or information since the filing of

14  the paper that plaintiff would like to provide with respect

15  to this?

16            MR. FREE:  Your Honor, we conferred with GEO's

17  counsel on this topic.  We had previously, in our meet-and-

18  confer, agreed to narrow to GEO's computer system, and GEO

19  has agreed in writing to look into whether any of the

20  information about incident reports is maintained in a

21  computer system or otherwise maintained electronically.

22  GEO's agreed to provide this update when they get it, but it

23  stands on its objection that it's an unreasonable scope and

24  that GEO is going to continue to object to the request that

25  it's -- because it's not only -- not limited to incidents

 1  that are relevant to the claims and defenses in this

 2  litigation.

 3            THE COURT:  Okay.

 4            Ms. Scheffey?

 5            MS. SCHEFFEY:  Yes, Your Honor.  That's it.  We've

 6  agreed to look into whether this is kept in a summary fashion

 7  electronically somewhere so that we don't have to go through

 8  each individual document and, if so, discuss with plaintiffs

 9  an appropriate scope, but as it stands, this isn't limited in

10  any way to certain people --

11            THE COURT:  And --

12            MS. SCHEFFEY:  -- certain employees, certain groups

13  of people, or certain incidents that are relevant.  So this

14  would include, you know, complaints way beyond the current

15  lawsuit.

16            THE COURT:  Understood.  Okay.  And --

17            (Pause.)

18            (Party joins or leaves call.)

19            THE COURT:  And 34 has the same status; is that

20  correct, Mr. Free?  As 33?

21            (Pause.)

22            MS. SCHEFFEY:  This is --

23            THE COURT:  Okay.

24            MS. SCHEFFEY:  -- Ms. Scheffey.  I don't know if we

25  lost Mr. Free, but my understanding --

 1            THE COURT:  Sounds like we did.

 2            MR. FREE:  I'm here.

 3            MS. SCHEFFEY:  Oh.

 4            MR. FREE:  Sorry.  I was on mute.

 5            Go ahead, Ms. Scheffey.

 6            MS. SCHEFFEY:  My understanding is, yes, we have

 7    reached the same agreement to look into whether this is

 8    maintained electronically because, particularly for

 9    grievances, I think all the parties are aware that typically

10    they're submitted via what's called a (indecipherable)

11    system, which is handwritten carbon-copy paper that detainees

12    submit and are scanned in and copied.  So they're all

13    handwritten, but we're going to look and see if there's any

14    electronic logs that we could pull, again, subject to the

15    incidents and grievances relevant to this --

16            THE COURT:  Okay.

17            And now RFP 35, then.  Is there any new information

18    that plaintiffs would like to provide that have been

19    developed since the filing of the paper?

20            (Pause.)

21            THE COURT:  Mr. Free?

22            MR. FREE:  No, Your Honor.

23            THE COURT:  Okay.

24            Ms. Scheffey, anything to add?

25            MS. SCHEFFEY:  No, Your Honor.  We submit on our

1  papers.

2          THE COURT:  Very good.  Okay.

3          So now I think that's all the RFPs at issue; is

4  that correct; Mr. Free?

5          MR. FREE:  That's correct, Your Honor.  We had

6  conferred with defense counsel on three other issues that I'm

7  happy to talk about at this moment or later.

8          THE COURT:  Okay.  Well, the first thing we're

9  going to take a look at is the -- as raised here, is the

10  sufficiency of the privilege log.  I received the filing that

11  Mr. Maya provided last night -- or yesterday -- I don't know

12  what time it was -- and it indicates -- and it shows the

13  privilege log that has been produced.  So -- well, what would

14  plaintiffs like to add with respect to the sufficiency or

15  insufficiency of the privilege log?

16          MR. FREE:  Your Honor, the plaintiffs' position is

17  that the privilege log remains deficient, and at this point

18  it has prejudiced us because we do not understand what the

19  basis of many of these claimed privileges are.  When it says

20  a "statutory and/or" -- slash -- "regulatory" protection on

21  this information, we have no idea what that means, and so as

22  Mr. Maya or Mr. Charest will discuss, we believe that GEO has

23  waived its privilege.

24          THE COURT:  Okay.

25          Ms. Scheffey?

1         MS. SCHEFFEY:  Yes, Your Honor.  We provided

2    plaintiffs' counsel with -- in writing -- our confirmation

3    that these descriptions are provided from ICE and we have

4    simply been the middleman.  No specific redaction has been

5    challenged, to our knowledge, that would require in camera

6    review.

7         THE COURT:  Okay.  So let me get this straight.

8    GEO's position is that it merely provided the description of

9    the document as provided by the privilege holder; is that

10   correct?

11        MS. SCHEFFEY:  Yeah.  We've provided the exact

12   information we got from ICE about why the document was

13   redacted.  They did not give us statutory reasoning as

14   plaintiffs have asked for.

15        THE COURT:  Okay.  And remind -- in the briefing

16   that I've been provided, was this particular point discussed

17   about what obligation a -- and I'll turn this question first

18   to Mr. Free.

19        I don't know if, Mr. Free, you're going to be

20   answering this or somebody else on your team, but was this

21   point particularly addressed specifically whether a defendant

22   who is holding material or has material but is not the holder

23   of the privilege -- what their responsibilities are with

24   respect to describing items that are withheld?

25        MR. MAYA:  Your Honor --

1          MR. FREE:  -- Mr. Maya.

2          THE COURT:  Yes.  Mr. Maya?

3          MR. MAYA:  That's me.

4          Your Honor, we did not brief GEO's ability to -- I

5    mean, you know, this is -- this -- that assertion has come

6    out since our briefing was filed.  Our briefing addressed the

7    larger point that we can't assess any -- the reasonableness

8    of any of these assertions of privilege, if they are even

9    assertions of privilege -- in some cases that's not clear --

10   without descriptions that -- that would allow --

11         THE COURT:  And --

12         MR. MAYA:  -- to do so.

13         THE COURT:  Sure.  Mr. Maya, what I want to do is

14   -- with respect to, at least, the privilege issue is I can

15   put in the standard and say, "This does not appear to meet

16   the standard."  The next thing I'm going to get is a brief or

17   a document from ICE indicating they're not required to do it,

18   and so I want to try and pull forward that mechanism, rather

19   than make a ruling that's going to be later challenged on

20   other legal bases.

21         MR. MAYA:  Your Honor, and we've -- we have

22   researched these privileges that they're asserting, to the

23   extent we can, and, you know, we need to know who's asserting

24   these privileges from ICE and the basis on which --

25         THE COURT:  I --

1          MR. MAYA:  -- they're asserting them.

2          THE COURT:  -- Mr. Maya --

3          MR. MAYA:  So we'd like a depo.

4          THE COURT:  Mr. Maya, I appreciate that, but I can

5   just -- I can put down the rule -- "This is what's required

6   in a privilege log" -- and whether my finding is that this

7   does or does not meet the requirement of the privilege log,

8   but the next shoe that's going to fall, I think, is a motion

9   or some other by ICE indicating why they're not required to

10  provide more descriptions.  So what is plaintiff proposing to

11  kind of pull that process forward so we can get through this

12  issue quicker?

13         MR. MAYA:  An order to show cause.

14         THE COURT:  Okay.

15         MR. FREE:  Yeah.  Your Honor, this is Mr. Free.

16         In some of the other litigation, the U.S.

17  Attorney's Office has been fairly loathe to get involved, and

18  in, I believe, at least one case -- in the *Menocal* case in

19  the District of Colorado, the judge basically had to say to

20  the U.S. Attorney's Office, "If you're going to be claiming

21  things about discovery, you need to show up for these

22  conferences."  So we don't think that ICE is just going to

23  come forward.  I hoped that GEO would dispute this -- I don't

24  think ICE is just going to come forward and do this without

25  an order from the Court.

1          THE COURT:  Okay.

2          And, Ms. Scheffey, the other issue is going to be

3   from a briefing standpoint of why it is appropriate for GEO

4   just to put in what ICE is claiming, rather than having an

5   independent obligation to comply with the rules when it is

6   creating a privilege log?

7          MS. SCHEFFEY:  Yes, Your Honor, and I think we're

8   going to --

9          THE COURT:  Is that --

10          MS. SCHEFFEY:  -- expand this dispute.  The dispute

11   that was before the Court on the motion to compel was the

12   lack of privilege logs, that they did not have them.  We have

13   now added Bates numbers at the request based on the prior

14   hearing.  This is now going far beyond this dispute --

15          THE COURT:  Okay.

16          MS. SCHEFFEY:  -- and I think it does require

17   briefing, if we're going to do that, because it has been

18   briefed everywhere else, and we have provided what ICE has

19   provided, and I, obviously, would like to give them the

20   opportunity if these are being challenged.  I don't hear any

21   of the specific redactions being challenged.

22          THE COURT:  Well, as I understand it, Mr. Maya is

23   challenging -- was that based on the description provided,

24   they can't meaningfully determine whether something can be

25   challenged.

1          Is that fair, Mr. Maya?

2          MR. MAYA:  Yes, Your Honor.

3          THE COURT:  Okay.

4          MR. CHAREST:  If I may.  This is Daniel Charest,

5     Your Honor.  Just -- I was asked to speak to this issue of

6     the --

7          THE COURT:  Sure.

8          MR. CHAREST:  -- deliberative privilege because I

9     literally just argued it last week in a different case.

10         There's a very set-out procedure that the agency

11    itself is supposed to undertake.  The privilege is supposed

12    to be invoked by the agency head or its specific designee

13    after, quote, "personal consideration of the documents" --

14         THE COURT:  Sure.  And, Mr. Charest, I've written

15    an extensive order on this when -- on the deliberative

16    privilege in another case.  So I know there's this sort of --

17    and at least in California it emanates from a case out of the

18    Northern District of California issued back in 1988, where it

19    was discussed of -- if you assert this privilege, there's

20    certain steps that you have to do in order to properly assert

21    it.  It's that kind of what you're getting at, Mr. Charest?

22         MR. CHAREST:  Yes, sir.  Exactly, and you've got

23    it.  So I'll stand back down, but yes, sir.

24         THE COURT:  Okay.  Understood.

25         So -- and so that's just the deliberative privilege

1  aspect of it, but there is statutory and the privilege type

2  -- at least here that was provided -- Mr. Maya indicates it's

3  "redacted pursuant to statutory and/or regulatory

4  provisions."

5       MR. MAYA:  That's right, Your Honor.

6       THE COURT:  I don't --

7       MR. MAYA:  There are --

8       THE COURT:  I don't --

9       MR. MAYA:  There are later in the same document

10 deliberative --

11      THE COURT:  Yeah.  No, I see that.  I'm just

12 looking even at, like, "redacted pursuant to statutory and

13 regulatory provisions."

14      MR. MAYA:  Right.

15      THE COURT:  And then there's "ICE PII law

16 enforcement."  Well, I'm hesitant -- it has -- and I think

17 now that we -- this all goes to the sufficiency of the

18 privilege log.  If -- I don't know who suggested it from the

19 plaintiffs' side.  If I did order a order to show cause, we'd

20 just be back where we are now, which is getting more

21 briefing.  So do we want to cut to the chase now and set a

22 briefing schedule?

23      MR. FREE:  Your Honor, this is --

24      THE COURT:  From the plaintiffs?

25      MR. FREE:  This is Mr. Free.

1          The only concern I have with a briefing schedule is

2    that we may -- I hate to be the bearer of bad news, but it

3    may be the case where ICE will say that it is not subject to

4    the briefing schedule unless the Court orders it to do so and

5    then they further maintain that the Court doesn't have power

6    to order it to do so because ICE is not a party to the

7    litigation, which is why the order to show cause seemed like

8    a way to invoke that judicial power, and so, you know, we

9    would think that, if any party asserting a privilege intends

10   to not have that privilege waived for failure to adequately

11   justify it pursuant to Rule 26(c), that that party should

12   show cause why such waiver, having been effectuated, you

13   know, by failing to provide an adequate privilege log no

14   later than a certain date, and then the plaintiffs could

15   respond either to GEO or to ICE.

16          THE COURT:  Well -- okay.

17          Ms. Scheffey, do you have a suggestion?

18          MS. SCHEFFEY:  Yeah.  Well, just to respond to that

19   quickly for the record, I would state that none of the waiver

20   has been -- the waiver issue has not been raised in the

21   briefing, and no specific document has been challenged.

22          I think that Mr. Free is right that there might be

23   concerns about getting ICE involved.  I do think that they

24   have to be given the opportunity to do so, though.

25          THE COURT:  Well --

1          MS. SCHEFFEY:  -- I'm happy to go --

2          THE COURT:  I would --

3          MS. SCHEFFEY:  -- (indecipherable) --

4          THE COURT:  My concern is this:  Basically, ICE is

5   not a party to this lawsuit.  If these are documents that

6   reside with GEO, perhaps pursuant to a contractual agreement

7   with GEO and ICE, in a normal -- I mean -- not in a normal --

8   but at least in other types of cases, where, let's say,

9   "tech company A" holds information of "tech company B," and

10  "tech company A" is sued by "tech company C," and

11  "tech company C" issues an RFP that touches upon confidential

12  information that "tech company B" has given to

13  "tech company A" as part of a contractual obligation, the

14  contractual obligation usually will say, "If you get a

15  subpoena that touches on our information, you got to notify

16  us so we can fight for it."

17          MS. SCHEFFEY:  Yes, Your Honor.

18          THE COURT:  Are you with me, Ms. Scheffey?

19          MS. SCHEFFEY:  Yes, Your Honor.

20          THE COURT:  Okay.  So this is what I view as

21  equivalent to that.  So, if there's a contract between GEO or

22  an agreement between GEO and ICE -- because, if GEO has it,

23  there's arguably, from a privilege standpoint -- I don't know

24  how that privilege is maintained, but maybe that goes to the

25  quasi-immunity argument, kind of touches on that, but why do

1   I have to invite ICE in?  If ICE doesn't want to fight this

2   fight, that's up to them.  If -- as long as --

3            MS. SCHEFFEY:  Yes, Your Honor.  I --

4            THE COURT:  If I issue an order to you and they --

5   you notify them, it's going to be up to them then.  Is that

6   fair?

7            MS. SCHEFFEY:  Yes, Your Honor.  And that is -- I

8   just -- in my dealings with the U.S. Attorney's Office in

9   Washington and in Colorado, I -- they have been willing to

10  come to hearings with us, they have been willing to produce

11  (indecipherable).  So that is how we have previously done it,

12  but as we've noted, and we've tried to make very clear, we

13  have provided every piece of information they have given us

14  now on the privilege log.

15           THE COURT:  Got it.  But in my tech company

16  situation, it would be like -- it would be akin to a motion

17  for a protective order would have to be filed by

18  "tech company B" to protect their information and --

19           MS. SCHEFFEY:  Yes, Your Honor.  and here it's just

20  a little bit tricky because of the "*Touhy* request" situation

21  with ICE.  They've taken positions that to get that

22  information, you have to get it from the Government, that it

23  belongs to the Government, but, again, without having briefed

24  this, this is -- because this wasn't an issue in the motion

25  to compel, you know, sitting here, I don't have everything in

 1  line to provide you all the citations for that --

 2          THE COURT:  Got it.  Okay.

 3          MS. SCHEFFEY:  -- and what's happened in other

 4  cases.

 5          THE COURT:  So why don't --

 6          MS. SCHEFFEY:  But I'm happy to provide that to

 7  you.

 8          THE COURT:  Sure.  And I've had some experience of

 9  *Touhy* in the past, but any new briefing is welcome.

10          Mr. Free, and to speak to this, rather than doing

11  an order to show cause, it sounds like Ms. Scheffey is going

12  to reach out to the appropriate people at ICE and the

13  U.S. Attorney's Office is going to have to come in.  So, if

14  we set the briefing schedule, they'll be on notice of the

15  briefing schedule, and they can then participate if they

16  choose to.

17          MR. FREE:  Your Honor, normally I would say that

18  that's a perfectly reasonable course of action.  What I'm

19  very concerned about at this -- is that this Court is going

20  to find itself in the same position as the U.S. District

21  Court for the Western District of Washington, which --

22          THE COURT:  Got it.

23          MR. FREE:  -- got a statement of interest from the

24  United States attached to a GEO motion for reconsideration of

25  a denial of summary judgment.  So United States submitted two

1    briefs in that case on reconsideration after a directive was

2    made with no opportunity to, you know, have any hearing about

3    it, really.  And I'm sure GEO would have wanted that

4    statement in sooner and probably asked -- in fact, we know

5    they asked the United States to come in to say things about

6    the case, and they just didn't -- the U.S. Government just

7    didn't.  What you're going to find, I fear, is that by making

8    this permissive, you're going to -- or Judge Bernal later is

9    going to hear back from the Government about why their

10   interests weren't protected and the Court didn't have

11   authority to do what it did but --

12          THE COURT:  Got it.  Okay.

13          MR. FREE:  Which is why we think they need to be

14   ordered to do it if they're going to -- or whoever is

15   claiming the privilege and saying it's not waived, either

16   through a third-party disclosure or for failure to supply

17   justification, that person or that entity should be required

18   to say --

19          THE COURT:  Very good.  So, Mr. Free, can your

20   office do me a favor and email my chambers the order that was

21   -- the order to show cause that was issued in *Washington*, and

22   I'll take a look at it?

23          MR. FREE:  Oh, Your Honor, I don't believe that the

24   judge actually ordered the United States to show cause.  I

25   don't have such an order.  The judge was skeptical, and he's

1  actually written two opinions that I can send you about his

2  lack of ability to do that.  He didn't think he could make

3  ICE produce documents by a date certain.  They happened to

4  come in when, you know, the case got past summary judgment,

5  and they chose to take a legal position but they --

6  Judge Bryan did not issue an order to show cause, to be

7  clear.

8            THE COURT:  Okay.

9            MS. SCHEFFEY:  Your Honor, this is --

10           THE CORT:  Go ahead, Ms. Scheffey.

11           MS. SCHEFFEY:  -- I would just say again that those

12  orders that Mr. Free references provide helpful guidance

13  because I think Judge Bryan also looked into whether he could

14  overrule the privilege asserted by ICE without their

15  appearance there so --

16           THE COURT:  So, Ms. Scheffey, would defendants be

17  agreeable for Mr. Free to send me those two opinions by the

18  judge up in Washington and cc: you on the correspondence to

19  me?  Is that okay, Ms. Scheffey?

20           MS. SCHEFFEY:  Yes, Your Honor, and we'd just ask,

21  if they're not the ones we're referring to, that we would be

22  able to send you one or two other ones if we needed to

23  complete the record.

24           THE COURT:  Got it.  Okay.

25           All right.  So I'll take a look at that, and I'll

1   determine a course of action with respect to the privilege

2   log, then.

3          Absent those things -- those are the only things

4   that I recall seeing in the motion.  Is there anything else,

5   Mr. Free?

6          MR. FREE:  Your Honor, we had briefly discussed

7   initial disclosures as an open question, but I think we've

8   moved toward resolution on that through conferral.  And

9   that's it.

10          THE COURT:  Okay.

11          Okay.  Ms. Scheffey, is there anything further,

12   then?

13          MS. SCHEFFEY:  No, Your Honor.  Only just to

14   reiterate that we would ask to, you know, be able to get --

15   be given the opportunity to brief the privilege issue before

16   anything is determined waived or --

17          THE COURT:  I will do that.  I don't --

18          (Party joins or leaves call.)

19          THE COURT:  -- and especially in light of the

20   rulings by the court in *Washington*, I don't -- I'll take a

21   look at those before I make any ruling.  Okay?

22          Very good.  All right.  Having --

23          MR. MAYA:  Thank you.

24          THE COURT:  Very good.  And so I'll just have one

25   person from plaintiffs -- anything further from plaintiffs,

1    Mr. Maya?

2              MR. MAYA:  No.  Thank you, Your Honor.

3              THE COURT:  Okay.

4              Ms. Scheffey, anything further from defendants?

5              (Pause.)

6              THE COURT:  Ms. Scheffey?

7              (Pause.)

8              Mr. Van Pelt?

9              (Pause.)

10             THE COURT:  Okay.  I guess they dropped off.

11             Hello?  Ms. Scheffey?  Mr. Van Pelt?

12             (Pause.)

13             THE COURT:  All right.  So I guess there's nothing

14   further.  If they need to reach out to us with anything

15   further, we'll notify the other -- the plaintiffs.

16             All right.  Have a good day, everyone.

17             MR. MAYA:  We appreciate it, Your Honor.

18             MR. FREE:  Thank you, Judge.

19             MR. MAYA:  Thank you very much.

20             THE COURT:  Thank you.

21         (Proceedings adjourned at 11:33 a.m.)

22   ///

23   ///

24

25

1

2

3

4                                    CERTIFICATE

5          I certify that the foregoing is a correct transcript

6     from the electronic sound recording of the proceedings in the

7     above-entitled matter.

8

9     /s/ Julie Messa                    May 31, 2020
      Julie Messa, CET**D-403            Date
10    Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25