```
 1                    UNITED STATES DISTRICT COURT
                      CENTRAL DISTRICT OF CALIFORNIA
 2                    EASTERN DIVISION - RIVERSIDE

 3

 4   RAUL NOVOA,                  )  Case No. EDCV 17-2514-JGB (SHKx)
                                  )
 5        Plaintiff,             )  Riverside, California
                                  )  Friday, August 7, 2020
 6            v.                  )
                                  )  TELEPHONIC HEARING
 7   THE GEO GROUP, INC.,         )
                                  )
 8        Defendant.             )
     _____)
 9

10

11                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE SHASHI H. KEWALRAMANI,
12                 UNITED STATES MAGISTRATE JUDGE.

13

14   Appearances:                 See Page 2

15   Deputy Clerk:                 N/A

16   Court Reporter:               Recorded; CourtSmart

17   Transcription Service:        JAMS Certified Transcription
                                   16000 Ventura Boulevard #1010
18                                 Encino, California  91436
                                   (661) 609-4528
19

20

21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
```

```
 1   APPEARANCES:

 2

 3   For the Plaintiff:        Ahdoot & Wolfson PC
                               By:  THEODORE W. MAYA
 4                             10728 Lindbrook Drive
                               Los Angeles, California  90024
 5                             (310) 474-9111
                               tmaya@ahdootwolfson.com
 6
                               Law Office of R. Andrew Free
 7                             By:  R. ANDREW FREE
                               2004 8th Avenue South
 8                             Nashville, Tennessee  37209
                               (844) 321-3221
 9                             Andrew@ImmigrationCivilRights.com

10                             Burns Charest LLP
                               By:  LYDIA A. WRIGHT
11                             365 Canal Street, Suite 1170
                               New Orleans, Louisiana  70130
12                             (504) 799-2845
                               lwright@burnscharest.com
13

14
     For the Defendant:        Akerman LLP
15                             By:  ALICIA Y. HOU
                               601 West Fifth Street, Suite 300
16                             Los Angeles, California  90071
                               (213) 688-9500
17                             alicia.hou@akerman.com

18

19

20

21

22

23

24

25
```

1                RIVERSIDE, CALIFORNIA, FRIDAY, AUGUST 7, 2020

2              THE CLERK:  Calling Case No. 5:17-CV-2514,

3    *Raul Novoa v. The GEO Group.*

4              Counsel, please state your appearances beginning

5    with the plaintiffs.

6              LYDIA A. WRIGHT:  Lydia Wright of Burns Charest for

7    the plaintiffs.

8              THEODORE W. MAYA:  Theodore Maya, Ahdoot & Wolfson,

9    for the plaintiffs.

10             R. ANDREW FREE:  Andrew Free for the plaintiffs.

11             (Pause.)

12             THE COURT:  Let's start with the defendants.

13             ALICIA Y. HOU:  This is Alicia Hou for Defendant

14   The GEO Group.  And I believe I am the only counsel present

15   for GEO and will be attending this hearing, Your Honor.

16             THE COURT:  Very good.  Okay.

17             So who's going to be taking the lead for

18   plaintiffs?

19             MS. WRIGHT:  I will, Your Honor.  Lydia Wright.

20             THE COURT:  Very good, Ms. Wright.

21             And, Ms. Hou, I presume you'll be taking the lead,

22   then, for defendants.

23             MS. HOU:  Yes, Your Honor.

24             THE COURT:  Very good.

25             All right.  So let's look to the first issue, which

1    is the production of spreadsheets containing voluntary work

2    product -- work -- voluntary work program data.  There seems

3    to be an issue -- well, why don't I let you, Ms. Wright,

4    specify what you're seeking at this point.

5            MS. WRIGHT:  Yes, Your Honor.  On July 22nd,

6    plaintiffs deposed a GEO official, Mary Wise-McCormick

7    (phonetic).  She's a classification officer at the Adelanto

8    facility, and for the first time plaintiffs learned that

9    Ms. McCormick, in the course of her duties managing the

10   voluntary work program, maintains three separate spreadsheets

11   -- Excel spreadsheets, all of which detail the voluntary work

12   program, and there's -- there was a copious discussion of

13   these three worksheets in the deposition.  We're happy to

14   provide the Court with the deposition transcript and

15   citations to these spreadsheets.

16           GEO has not produced these spreadsheets to us at

17   all.  We seek an order compelling GEO to immediately produce

18   in native format all documents in GEO's possession that

19   (inaudible) spreadsheets related to the voluntary work

20   program, including any and all spreadsheets which

21   Ms. McCormick has produced to auditors of the facility.

22           With respect to one of these spreadsheets -- and,

23   Your Honor, I'll just briefly describe to you the three

24   separate sets of spreadsheets, if that's all right.

25           THE COURT:  Yes, please.

1          MS. WRIGHT:  The first is what Ms. McCormick calls

2    the "application list."  She testified that it shows all

3    applicants, whether working or not.  She maintains this

4    spreadsheet in the course of her duties, and she produces it

5    during audits by the American Correctional Association, GEO

6    itself, and ICE.  So this spreadsheet is produced when an

7    auditor comes to visit the Adelanto facility.

8          Ms. McCormick testified that she sorts this

9    spreadsheet based on -- she compiles information on detained

10   workers that includes data on where they're working, what job

11   they're looking for.  It's a color-coded spreadsheet that

12   indicates who's waiting for medical clearance for a job in

13   the kitchen.  It also contains a wait list that she maintains

14   -- she testified that she maintains to fill vacant positions.

15         The second spreadsheet is what Ms. McCormick calls

16   the "authorized detainee work schedule."  This is a weekly

17   work schedule that she sends as an email attachment to

18   Warden James Janecka's assistant every Monday.  She testified

19   that she just began maintaining this spreadsheet on June 1st.

20   Opposing counsel has since clarified that she's actually

21   started maintaining this spreadsheet on May 31st.  This has

22   not been produced to us in discovery.

23         And the third spreadsheet is what she calls the

24   "pay sheets."  She testified that, to her best recollection,

25   there's a worksheet entitled "Worksheet for West" and a

1   second worksheet entitled "Worksheet for East," and these are

2   Excel spreadsheets, like the others, and they're comprised of

3   detainee work assignments, and she uses these spreadsheets to

4   create detainee payroll lists, which some samples of those

5   are in the record already.  These spreadsheets -- these pay

6   sheets are spreadsheets that she provides to auditors during

7   audits.

8          Ms. McCormick also testified that GEO has never

9   asked her about the documents in her (inaudible).  So we

10  think that, based on all of this, we're -- you know, it

11  appears that there's spoliation of evidence, it appears that

12  GEO's counsel, by failing to ask Ms. McCormick to preserve

13  these documents and by failing to produce them to us, have

14  allowed for spoliation of evidence related to plaintiffs'

15  claims.

16         And I will also note that the current schedule in

17  this case has discovery cutoff on September 14th.  Our expert

18  disclosures are due on August 17th, and trial is set for

19  February 2nd of 2021.  You know, these spreadsheets are

20  responsive to discovery that we served well over two years

21  ago.

22         THE COURT:  Ms. Hou?

23         MS. HOU:  Thank you, Your Honor.

24         So, you know, we -- I can speak to each of those

25  spreadsheets that counsel has just described.  I think that

1   might be the easiest.

2          So that first spreadsheet she mentioned --

3   Ms. Wright mentioned, the spreadsheet that's called the

4   "Application Roster," that actually has been discussed at

5   length in this case.  So we were not in any way -- her

6   representation that this was something that was just brought

7   up for the first time at Ms. McCormick's deposition is

8   inaccurate.  We, in fact, had spoken about it at the May 20

9   hearing before you, Your Honor.

10          It's a live spreadsheet that Ms. McCormick keeps

11   and continually updates and writes over.  It's an Excel

12   spreadsheet that just helps her manage her day-to-day

13   function as -- to essentially assign the detainees to each of

14   the -- each of their job posts for the day.  So what she does

15   is she takes applications as they roll in, and she just goes

16   ahead and updates the spreadsheet with those applications

17   with the various information on there, including their name,

18   their detainee number, and as well what work assignment that

19   they applied for, and what date the application was

20   submitted.  So then once those dates get fulfilled -- or once

21   the jobs get filled, she takes it off of her spreadsheet.  So

22   it's a live spreadsheet that just continually helps her

23   manage the job assignments so -- and she just saves over

24   them.

25          This was something that, again, we discussed at the

1   May 20 hearing.  So that we've actually not -- our

2   understanding is that we've told counsel that we can produce

3   it.  It just doesn't contain any historical data.  It's not

4   something that shows something historical on a certain date.

5   There's no way for her to pull up how it existed on -- I

6   don't know --

7           THE COURT:  I get it but --

8           MS. HOU:  -- you know -- right.

9           THE COURT:  -- if she had saved it as of June 1st,

10  it'd be historical as of today; correct?

11          MS. HOU:  Right.  So if she saved it.  And I don't

12  think -- her testimony is she doesn't save it as separate

13  dates; she'll just save over them.

14          THE COURT:  I understand.  So let me ask you this

15  -- and let's just take each of these three subcategories in

16  turn.

17          MS. HOU:  Sure.

18          THE COURT:  With respect to this "Application

19  Roster," it was discussed with plaintiffs' counsel.  Have

20  there been any agreement reached with respect to its

21  production?

22          MS. HOU:  I was under the impression that we were

23  going to -- if they identified -- if they wanted it, we could

24  produce it to them.  I think we last left off with saying

25  that -- they -- they're -- I guess the issue is that they're

1  accusing us of spoliation.  So we can't produce it on a

2  certain date as it existed, but we can certainly produce it

3  as of today how it exists -- or whenever she -- we can ask

4  her, certainly, to save them as different dates as they exist

5  if that's not burdensome to her.

6          THE COURT:  Well, okay.  So let's start doing that.

7  Start having her save it -- any copy -- and then produce it

8  to plaintiffs' counsel.

9          With respect to any spoliation motion or anything

10 that the plaintiffs want to raise, they can file that motion

11 separately.  Okay?

12         MS. HOU:  Okay.

13         THE COURT:  With respect to the second category of

14 documents, then, the "authorized detainee work schedule," is

15 that similar?

16         MS. HOU:  That's -- so that's -- our understanding

17 is that she started -- she created that beginning of June of

18 this year -- or May 31st, and so, yeah, we've agreed to

19 produce them to her -- all of them to plaintiffs.

20         THE COURT:  Very good.  All right.  That seems to

21 take care of that.

22         Is that correct, Ms. Wright?

23         MS. WRIGHT:  Yes.

24         THE COURT:  Okay.  And the third category is going

25 to be the "pay sheets."

1          MS. HOU:  So these, again, Your Honor, is a

2     misrepresentation that they're not aware.  The other side is

3     well aware of these pay sheets and worksheets, and, in fact,

4     we have produced them, at least a sampling, and I have to

5     identify Bates stamp numbers, but as Ms. Wright mentioned, we

6     have produced them before.  I don't know exactly -- they

7     haven't clarified -- and in fact, that wasn't the subject of

8     our conferrals prior to this hearing, Your Honor.  I don't

9     know exactly which ones that they want or are at issue that

10    we haven't already produced.

11          MS. WRIGHT:  Your Honor, if I may?

12          THE COURT:  Ms. Wright?  Please.

13          MS. WRIGHT:  GEO's not produced any of these

14    spreadsheets at all.  What GEO has produced are PDF copies of

15    documents that Ms. McCormick uses the spreadsheets to create.

16    Those hard-copy documents are then distributed to detention

17    officers throughout the facility, who write on them to record

18    detainee labor throughout the day.  GEO has produced some of

19    those detainee payroll sheets, and those are what are in the

20    record appended to our class certification motion -- some of

21    them are.  GEO has not produced any of the spreadsheets that

22    Ms. McCormick testified, for the first time in July, that she

23    creates to then transfer the data into these hard-copy

24    spreadsheets.

25          These are the spreadsheets, again, that

1    Ms. McCormick testified that she produces during audits by

2    the ACA, by GEO itself, and by ICE.  So three -- at least

3    three separate auditing agencies ask Ms. McCormick for these

4    spreadsheets, historically, and she provides these

5    spreadsheets to the auditing agencies.  They exist.

6              And these -- again, with respect to all three

7    categories of spreadsheets, again, Ms. McCormick testified

8    that GEO has never asked them -- asked her to produce them --

9    or to look for these documents in her possession.

10             THE COURT:  Ms. Hou?

11             MS. HOU:  Your Honor, what we don't -- just to --

12   so that Ms. Wright understands, we don't specifically ask

13   Ms. McCormick for her documents.  We ask the warden's

14   assistant to cull those documents directly.  So she would --

15   Ms. McCormick wouldn't have knowledge of whether or not

16   someone has gone to her to ask for these specific documents.

17   And certainly we have produced these pay sheets in another

18   format -- and I guess in EF format so we have certainly

19   produced them, and it's without Ms. McCormick's input.

20             But I guess the issue -- and, again, this wasn't

21   raised during our conferrals.  So for the first time I'm

22   hearing about these third categories -- these pay sheets.

23   We've had no problem producing them the way that we have,

24   which is the PDF, and what they are, Your Honor, is --

25             THE COURT:  Well, let me do this:  Before we get

 1   into -- I want you guys to resolve it.  You've seen how I've

 2   ruled on the other two issues.  Go back and talk about this

 3   particular category of documents.  If you can't reach an

 4   agreement, reach out to me, and we'll set a phone call really

 5   quick.

 6          MS. WRIGHT:  Thank you.

 7          MS. HOU:  Sounds good, Your Honor.

 8          THE COURT:  Okay.  Let's, then, go to the

 9   production of emails dated after November 14, 2018.

10          This is -- before we get into this discussion,

11   Ms. Wright, my general understanding is that in a lot of

12   cases there's a party -- there's agreement between the

13   parties regarding limitations on emails that are usually sent

14   after the initiation of litigation because it would result --

15   if that were the case, result in massive attorney work

16   product and attorney-client-privilege privilege logs being

17   created in relation to communications.  Is there -- has there

18   been any such agreement in this case?

19          MS. WRIGHT:  No, Your Honor.

20          THE COURT:  Okay.  So have you guys provided all

21   your emails and privilege logs, including all emails

22   internally, regarding this case?

23          (Pause.)

24          THE COURT:  Ms. Wright?

25          MS. WRIGHT:  I'm sorry.  Have we produced all of

1  our emails?

2          THE COURT:  Sure.  Yeah.  All emails related to

3  this litigation.  Have you put them on a privilege log?

4          MS. WRIGHT:  No, Your Honor.

5          THE COURT:  Okay.

6          MS. WRIGHT:  That --

7          THE COURT:  Okay.  So they -- defendants haven't

8  requested all communications related to this matter?

9          MS. WRIGHT:  Not that I'm aware of, no.

10          Your Honor, just to clarify, we're not seeking

11  attorney work product.  GEO has produced emails that are sent

12  between detention officers, for example -- or GEO officers

13  and ICE related to the voluntary work program.  The issue

14  here is not -- we're not seeking attorney work product at

15  all.  We're seeking communications and documents that are

16  exchanged between GEO officers related to the claims at issue

17  in our litigation.  GEO has --

18          THE COURT:  Okay.

19          MS. WRIGHT:  GEO has not produced any of those

20  documents dated after November 14, 2018, and it produced that

21  email a year ago.  The issue is that we are concerned, again,

22  with spoliation of evidence and that GEO is withholding more

23  recently -- more recent documents.  The facility, of course,

24  is still up and running.  GEO is still operating a voluntary

25  work program and, we believe, an uncompensated work program

1    and a housing unit sanitation policy that is illegal at

2    Adelanto.  Those documents are all in the period of our

3    certified classes and responsive (inaudible).

4              THE COURT:  Okay.

5              Ms. Hou?

6              MS. HOU:  Your Honor, first, you're correct,

7    Your Honor, that a lot of the correspondence that has been

8    culled in years since litigation began would, in fact, be

9    privileged, and so it takes time to cull -- review the

10   voluminous documents that we have culled through those search

11   terms that we have previously agreed upon.  So that is one

12   factor, Your Honor, that we touched upon.

13             One -- another correction:  We have requested

14   correspondence from plaintiffs.  Those are the subject of the

15   most recent discovery requests that we've sent to counsel.

16   So that's neither here nor there.

17             Related to the communications -- so there are about

18   four requests in the entirety of their RFPs that request

19   communications.  Those are RFPs 15, 18, 32, and 35.  Of those

20   four requests, we've reached agreement on all of them.  15,

21   actually, Your Honor, was denied by you in their motion to

22   compel.  So those are dealt with.  And 18 and 35 would not

23   encompass emails that date -- that follow November 2018.  So

24   those are dealt with there.

25             And 32 is the production that's currently under

1    review that has -- basically, we have massive amounts of

2    documents and pages that we are going through that we are

3    having -- we've assigned multiple associates to that are

4    reviewing on a daily basis, and so, you know, those -- that's

5    a rolling production that's coming.  To the extent that there

6    are emails that are dated 2019 and 2020, they're forthcoming

7    -- they're coming in the productions.  We're just trying to

8    work through this as diligently as we can, and they will --

9    the other side -- plaintiffs will get the documents before

10   the discovery cutoff.  We're just trying --

11             THE COURT:  No --

12             MS. HOU:  -- our best right now to get through it.

13             THE COURT:  Well, here's the thing:  That's not

14   fair to plaintiffs either because they -- if there's any

15   follow-on discussion or documents that can be used during

16   depositions, to drop them on the eve of close of discovery is

17   not fair.  So it sounds --

18             MS. HOU:  -- Your Honor.

19             THE COURT:  Let me first go back to the categories

20   of RFPs that Ms. Hou mentioned.

21             Ms. Wright, is that -- I'm sorry.  Before I -- is

22   it okay if I call you "Ms. Wright"?

23             MS. WRIGHT:  Of course.

24             THE COURT:  And is it okay if I call you "Ms. Hou"?

25             MS. HOU:  Yes.  Absolutely.

1          THE COURT:  I apologize for that.

2          So, Ms. Wright, with respect to the RFPs -- 15, 18,

3   32, and 35 -- are those the correct ones that these documents

4   -- to which they would be responsive?

5          MS. WRIGHT:  No, Your Honor.  It's --

6          THE COURT:  Okay.

7          MS. WRIGHT:  In plaintiffs' first set of discovery

8   requests, which we served on July 27, 2018, plaintiffs

9   defined the term "document" and "documents" to be synonymous

10  with the meaning and the scope as they're defined in the

11  Federal Rules of Civil Procedure 34(a)(1)(A) and that the

12  term includes video and audio recordings.  GEO never objected

13  to that definition.  Rule 34(a)(1)(A), of course, encompasses

14  any designated documents or electronically stored

15  information, including writings, drawings, graphs, charts,

16  photographs, sound recordings -- I know that Your Honor is

17  well acquainted with the rule.

18          So to the extent that Ms. Hou seeks to limit the

19  universe of emails that are discoverable in this case to

20  those four RFPs, it's simply incorrect.

21          MS. HOU:  Well, Your Honor, if I may.  If they

22  could just -- if the -- if plaintiffs could identify, then,

23  the RFPs that they believe would be -- would result in these

24  email communications, we're happy to go -- and we can

25  prioritize those productions too.  They just have not

1    identified the RFPs as -- despite us requesting them to do

2    so.

3              THE COURT:  Let me ask this:  In the course of ESI

4    that's being sought and produced, have there been search

5    terms that the parties have agreed to?

6              MS. WRIGHT:  Yes, Your Honor.

7              MS. HOU:  Yes.

8              THE COURT:  Okay.  Are these search terms, then,

9    being applied to those post-November 14, 2018, emails?

10             MS. HOU:  Yes, Your Honor.

11             THE COURT:  Okay.  Wouldn't that encompass

12   everything, Ms. Wright?

13             MS. WRIGHT:  I believe so, Your Honor.

14             THE COURT:  Okay.  So, Ms. Hou, you have the

15   universe in the sense that, if those emails are being

16   searched with the particular ESI terms that the parties have

17   agreed to, wouldn't that resolve the issue of "Why should we

18   have to go back and tie a particular email to an RFP?"

19   Presumably, the search terms have narrowed it down to be

20   relevant material.  I mean, that's the whole purpose of

21   search terms.

22             MS. HOU:  Correct, Your Honor.  And so that's what

23   we're doing.  We've applied them, and we're just (inaudible)

24   through the --

25             THE COURT:  Okay.

1          MS. HOU:  -- production right now.

2          THE COURT:  When do you think you'll be able to

3     produce -- complete the production by?

4          MS. HOU:  We have a huge production coming this

5     week.  I --

6          THE COURT:  Well, let me do this:  I'm not going to

7     hold your feet to the fire on this today.  I need you to

8     consult with whoever, and if you can provide a date certain

9     by the close of business on next Tuesday to Ms. Wright --

10         MS. HOU:  Sure.

11         THE COURT:  -- or a representative of plaintiffs'

12    counsel because they deserve a -- and this is something I've

13    encouraged in other cases, and different parties view it

14    differently but which is -- what's called a "substantial

15    compliance" date of document production.  I think it would be

16    very fruitful if the parties exchanged that by the close of

17    business on Tuesday.

18         MS. HOU:  Will do, Your Honor.

19         THE COURT:  Ms. Wright, is that agreeable?

20         MS. WRIGHT:  Yes.  Thank you, Your Honor.

21         THE COURT:  Very good.

22         All right.  So now let's then move to the

23    deposition issue that was raised of Mr. Hiller -- is it

24    Gregory Hillers?

25         MS. WRIGHT:  Yes, Your Honor.

1          THE COURT:  Very good.  Okay.  So what's the status

2     there, Ms. Wright?

3          MS. WRIGHT:  Your Honor, we've served a deposition

4     notice for the testimony of Greg Hillers.  He's the business

5     manager at the Adelanto facility.  We served the notice -- I

6     believe it was a second deposition notice on June 26, 2020.

7     GEO has represented that Mr. Hillers is out on medical leave

8     and will not be available for a deposition until on or

9     (inaudible) January 1st of 2021, which is, of course, months

10    after the close of discovery in our case and almost exactly

11    one month before the jury trial in this case commences.

12         We have asked GEO for a stipulation that plaintiffs

13    are permitted to depose Mr. Hillers out of time, after the

14    discovery cutoff, and GEO's -- well, I'll let Ms. Hou speak

15    for herself with respect to GEO's position.  Our position is

16    that we are entitled to depose Mr. Hillers, who has been

17    disclosed in both GEO's initial disclosures and ours.

18         THE COURT:  Okay.

19         Ms. Hou?

20         MS. HOU:  Yes, Your Honor.  So, you know,

21    Ms. Wright is correct.  Mr. Hillers is on a medical leave

22    until January 1, 2021.  What we've offered, instead, as a

23    compromise was that we would allow counsel to depose

24    Mr. Hillers when he -- if he comes back (inaudible) leave, if

25    at all, if we intend not to -- if we intend to use his

1    testimony because had -- if he isn't coming back and still on

2    leave, then, you know, unfortunately we can't produce him and

3    he can't --

4              THE COURT:  Well --

5              MS. HOU:  -- he won't be a witness --

6              THE COURT:  -- let me back up here.

7              MS. HOU:  -- on trial either.

8              THE COURT:  I don't find the argument persuasive

9    that "Hey, if we want to use him, we'll make him available."

10   That's not the scope of discovery.  It's up to the parties to

11   be able to discover information that even -- you may decide

12   to use or may not even decide to use at trial because they

13   may have relevant information.

14             With respect to the medical condition that is

15   preventing Mr. Hillers from being deposed, I don't have

16   enough information to show why he's not being able to be

17   deposed.  I mean, did he have knee surgery?  Okay.  You know,

18   that's -- or hip surgery and that may be a reason why he

19   can't come back to his job but doesn't mean he can't be

20   deposed.  But I don't have that information indicating what

21   type of medical leave he's on, one; two, whether that -- and,

22   two, whether that would prevent his being deposed in a timely

23   fashion.

24             So putting aside the argument, I don't find

25   persuasive that he's only going to be made available if

1  defendants want to use him or are likely to use him at trial.

2  That's not a ground.

3          With respect to extending the discovery deadline,

4  you know, this is something that the parties can agree to

5  with respect to particular witnesses and their depositions.

6  So what I can do is I'd like the parties to continue to speak

7  about this and see if there will be a date.  And one month

8  before, that's not a go.  Okay?  That's not acceptable

9  either.  It's got to be some time that gives plaintiff some

10  additional time, and it may potentially warrant -- and I'm

11  not saying it will, this is totally up to Judge Bernal -- it

12  may warrant, if during his deposition information comes out,

13  that additional documents and some discovery has to be done.

14  We just don't know.

15          So we have to account for every individual's

16  situation and if -- hopefully Mr. Hillers's illness isn't

17  serious.  We'll keep him in our thoughts, and hopefully he's

18  not doing too bad and can be deposed, but let's look for

19  alternatives.

20          So, one, I would say the parties need to confer by

21  the close of business on Tuesday as to whether they will

22  agree to allow -- the defendants will agree to allow

23  Mr. Hillers to be deposed after the discovery deadline.

24  Defense counsel should reach out to Mr. Hillers and see how

25  serious and be -- without disclosing private information or

1   HIPAA-protected information regarding Mr. Hillers, to

2   meaningfully discuss this situation with plaintiffs' counsel

3   to see when Mr. Hillers can be practically deposed at the

4   earliest possible time.  And so have --

5          MS. HOU:  Yes, Your Honor.

6          THE COURT:  -- those discussions by close of --

7   Tuesday.  Otherwise, what we can do is, again, set a phone

8   call with me, and what I'll likely do is actually require

9   plaintiffs or defendants to provide me the information

10  regarding Mr. Hillers's medical situation, and we'll -- I'll

11  take it under consideration, and we'll make the decision

12  regarding when he can be deposed.

13         MS. HOU:  Sounds good, Your Honor.  Thank you.

14         THE COURT:  Ms. Wright, is that an agreeable

15  process at this point?

16         MS. WRIGHT:  It is.  Thank you, Your Honor.

17         THE COURT:  Okay.  So I think those are all three

18  issues.

19         Is there anything further in this matter,

20  Ms. Wright?

21         MS. WRIGHT:  May I ask just for a point of

22  clarification, Your Honor?

23         THE COURT:  Sure.

24         MS. WRIGHT:  With respect to the spreadsheets,

25  Your Honor, you mentioned that plaintiffs may file a

1    spoliation motion separately with respect to the

2    spreadsheets.  Just for clarification, would Your Honor like

3    us to start over with the Rule 37 process when we file that

4    motion, or is this -- or can -- come straight to the Court?

5         THE COURT:  Well, I think the first issue is going

6    to be what the documents are precisely that are being -- that

7    haven't been produced, and I think that's going to be

8    determined by what defendants turn over.  And so with respect

9    to the Rule 37 process, I don't think you have to go through

10   the full Rule 37 process but -- and -- if you're going to go

11   down the route of filing a spoliation motion, that's going to

12   be before Judge Bernal because you're presumably going to

13   seek some sort of relief as a result of the spoliation,

14   whether it's a jury instruction or -- I don't know what you

15   guys are going to seek.  That's going to be filed with

16   Judge Bernal.  Now, I can tell you in the past -- and he may

17   not do it in this case, but in the past those have been

18   referred to me, and I've done a report and recommendation on

19   a spoliation motion.  However you feel is going to be most

20   efficient to present the matter is what I would recommend.

21   All right?

22        MS. WRIGHT:  Thank you.

23        THE COURT:  Because within the -- you'll see the

24   case law on spoliation and what you're going to have to show

25   in order to get relief and whether that can be done through

 1  the meet-and-confer process or if you need written letters

 2  going back and forth.

 3          MS. WRIGHT:  Thank you, Your Honor.

 4          THE COURT:  Okay.  All right.  So in light of that,

 5  is there -- after that, Ms. Wright, is there anything

 6  further?

 7          MS. WRIGHT:  No, Your Honor, not from plaintiffs.

 8          THE COURT:  Okay.  Very good.

 9          Ms. Hou, is there anything further?

10          MS. HOU:  Nothing further, Your Honor.  Thank you.

11          THE COURT:  Very good.

12          And Mr. Maya or Mr. Free, anything further?

13          MR. MAYA:  No, Your Honor.  Thank you.

14          THE COURT:  Very good.

15          Okay.  Thank you, counsel.  Everybody have a great

16  day and stay safe.

17          MS. WRIGHT:  Thank you --

18          MS. HOU:  Thank you, Your Honor.  Have a good

19  weekend.

20          THE COURT:  Thank you.  You too.

21      (Proceedings adjourned.)

22  ///

23  ///

24

25

1

2

3

4                                   CERTIFICATE

5          I certify that the foregoing is a correct transcript

6     from the electronic sound recording of the proceedings in the

7     above-entitled matter.

8

9     /s/ Julie Messa_____          August 15, 2020_____
      Julie Messa, CET**D-403           Date
10    Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25