Korey A. Nelson (admitted *pro hac vice*)
knelson@burnscharest.com
Lydia A. Wright (admitted *pro hac vice*)
lwright@burnscharest.com
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765

Counsel for the Certified Classes
*Additional Counsel on Signature Page*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### EASTERN DIVISION

| | |
|---|---|
| **RAUL NOVOA, JAIME CAMPOS FUENTES, ABDIAZIZ KARIM**, and **RAMON MANCIA**, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**THE GEO GROUP, INC.,**<br><br>Defendant. | Civil Action No. 5:17-cv-02514-JGB-SHKx<br><br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OF DR. JEFFREY KROPF** |

i

# TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................... 1

II.    LEGAL STANDARD ........................................................................ 1

III.   ARGUMENT ..................................................................................... 2

       A.   Kropf is not qualified to opine about civil immigration
            detention or to evaluate empirical research. ........................... 3

       B.   Kropf's opinions are not reliable. ............................................. 5

            1.   Kropf failed to employ any recognized methodology
                 to evaluate GEO's performance at Adelanto. ........................... 6

            2.   Kropf's opinions minimizing the harms of solitary
                 confinement rest on his conjecture and discredited,
                 cherry-picked literature. ................................................. 9

       C.   Kropf's opinions are not relevant to any issue to be
            determined by the jury. ............................................................ 13

IV.    CONCLUSION ................................................................................ 14

**<u>Cases</u>**

*AFMS LLC v. United Parcel Serv. Co.*,
   2014 WL 12515335 (C.D. Cal. Feb. 5, 2014) .......................................... 5, 14

*Apodaca v. Raemisch*,
   139 S. Ct. 5 (2018) ....................................................................................... 12

*Burrows v. BMW of N. Am., LLC*,
   2018 WL 6314187 (C.D. Cal. Sept. 24, 2018) ............................................. 5

*Daubert v. Merrell Dow Pharm., Inc.*,
   43 F.3d 1311 (9th Cir. 1995) ............................................................... 2, 5, 13

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) .............................................................................. passim

*Dobrosky v. Arthur J. Gallagher Serv. Co., LLC*,
   2014 WL 10988092 (C.D. Cal. July 30, 2014) ........................................... 14

*Domingo ex rel. Domingo v. T.K.*,
   289 F.3d 600 (9th Cir. 2002) ...................................................................... 10

*Elbert v. Howmedica, Inc., a Div. Pfizer Hosp. Products Group, Inc.*,
   59 F.3d 174, 1995 WL 383409 (9th Cir. 1995) ...................................... 5, 10

*G. v. Hawaii*,
   2010 WL 1372319 (D. Haw. Apr. 2, 2010) ................................................ 14

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ................................................................................... 5, 8

*Grissom v. Roberts*,
   902 F.3d 1162 (10th Cir. 2018) ................................................................... 12

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
   984 F. Supp. 2d 1021 (C.D. Cal. 2013) ........................................................ 5

*Karn v. Ingersoll-Rand Co.*,
   168 F.R.D. 633 (N.D. Ind. 1996) .................................................................. 1

*Linares v. Crown Equip. Corp.*,
   2017 WL 10403454 (C.D. Cal. Sept. 13, 2017) ....................................... 9, 14

*Mukhtar v. Cal. State Univ.*,
    299 F.3d 1053 (9th Cir. 2002) .................................................................... 1

*Nelson v. Matrixx Initiatives*, 2012 WL 3627399 (N.D. Cal. Aug. 21, 2012) ...........i, 5, 15

*Porter v. Clarke*,
    923 F.3d 348 (4th Cir. 2019) .................................................................... 12

*Rimbert v. Eli Lilly & Co.*,
    2009 WL 2208570 (D.N.M. July 21, 2009) .................................................. 8

*Roman v. MSL Capital, LLC*,
    2019 WL 1449499 (C.D. Cal. Mar. 29, 2019) ............................................. 8

*Ruiz v. Texas*,
    137 S. Ct. 1246 (2017) .......................................................................... 12

United States v. Cantrell,
    999 F.2d 1290 (8th Cir. 1993) ................................................................ 13

**<u>Rules</u>**

Fed. R. Evid. 702 .................................................................... 1, 2, 5, 14

# I. INTRODUCTION

Expert testimony is admissible only where (i) the expert is qualified, (ii) the testimony is reliable, and (iii) the testimony is relevant and will assist the trier of fact. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). The proffered testimony of Dr. Jeffrey Kropf fails on all three counts.

<u>First</u>, Kropf is not qualified by any specialized knowledge, training, insight, or experience to offer any opinions about the circumstances of civil immigration detention or empirical research on the effects solitary confinement. Kropf admits he had no familiarity with the subject of his testimony prior to his enlistment as an expert witness, and educated himself by performing a Google search of terms he believed might return relevant information. <u>Second</u>, Kropf employs no recognizable or reliable methodology in reaching his conclusions. Other than repeating the results of his Google search that support GEO's position, he concedes that he conducted no independent study or analysis of any evidence. Instead, Kropf merely parrots GEO's ill-fated argument (namely, that the company did nothing wrong). <u>Finally</u>, Kropf's opinions—which range from the benefits of a work ethos to the dictionary definition of "threat"—are not probative of any issues and would cause significant jury confusion.

Kropf formed his opinions specifically for this litigation. And his opinions only support the conclusions he wanted to find. His testimony is "nothing more than a willing musical instrument upon which manipulative counsel can play whatever tune desired," and should be excluded. *Karn v. Ingersoll-Rand Co.*, 168 F.R.D. 633, 639 (N.D. Ind. 1996).

# II. LEGAL STANDARD

Courts must carefully scrutinize proposed expert testimony "considering the aura of authority experts often exude, which can lead juries to give more weight to their testimony." *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1063-64 (9th Cir. 2002).

As a threshold matter, the Court must determine whether the witness is "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702;

1

*see also Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*") (expert testimony is admissible only if it is first established that the individual whose testimony is being proffered is an expert in a particular field). If the proposed witness is qualified to give opinion testimony, a two-part inquiry follows to determine whether: (1) the reasoning or methodology underlying the testimony is scientifically valid (the reliability prong); and (2) whether that reasoning or methodology properly can be applied to the facts in issue (the relevancy prong). *Daubert*, 509 U.S. at 592-93. Failure at any step requires exclusion of the proffered testimony.

## III.   ARGUMENT

Kropf was retained by Defendant The GEO Group, Inc. ("GEO") to opine as to the psychological effects of solitary confinement and institutional work programs. Declaration of Lydia Wright at Ex. C, Deposition of Jeffrey Kropf (hereinafter "Kropf Dep.") at 11:19-23.

In his Report (Ex. A) and Rebuttal Report (Ex. B) Kropf offers the following overarching opinions:

a) GEO complies with all applicable contractual, regulatory, statutory, client, and jurisdictional requirements in its operation of the Adelanto ICE Processing Center ("Adelanto"). *See, e.g.*, Report at 4 (Voluntary Work Program); 6 ("all detainee work activities"); 8 (cleanliness); 11 (placement of detainees in segregated housing); 12 (conditions of confinement in segregated housing); 13 (provision of medical, dental, and mental healthcare); 15 (due process); 16 (access to programming); 26-27 (nutrition); *see also* Rebuttal at 12 (provision of sufficient personal hygiene items); 15-16 (HUSPs).

b) The Voluntary Work Program ("VWP") at Adelanto "provides detainees who are physically and mentally able to work the opportunities to work and earn money during their detention. As expressed in the name of the program, detainee participation in the Voluntary Work Program at the Facility is voluntary." Report at 2; *see also id.* at 7 ("Detainees are not coerced to participate in the VWP, and detainee participants in the program are not coerced to remain in the VWP.").

2

c) "Participating in the Voluntary Work Program and meeting responsibilities related to maintaining cleanliness offer numerous benefits to detainees and can enhance their behavioral, psychological, interpersonal, and/or occupational functioning both during and following their detention." *Id.* at 2.

d) Testimony by the Class Representatives that they were "coerced to meet cleaning responsibilities by reason of awareness of placement in solitary confinement in segregated housing as a potential sanction for not meeting the responsibilities . . . are subjective and may be unfounded." *Id.* at 2; *see also id.* at 28; Rebuttal at 3 ("perceptions of threat, coercion, and deprivation do not invariably or inevitably indicate that threats were made or that coercion or deprivation actually existed.").

e) "[T]here is absolutely no credible research evidence indicating either that placement in typical conditions of solitary confinement for a period of 72 hours or less causes serious psychological harm or that awareness of placement in solitary confinement for a period of 72 hours or less as a potential sanction for misconduct causes serious psychological harm." *Id.* at 2-3.

Kropf offers these conclusions despite having no expert qualifications to do so, employing no recognizable methodology, and offering no explanation why his opinions are probative of any relevant legal issues. His testimony should be excluded.

**A. Kropf is not qualified to opine about civil immigration detention or to evaluate empirical research.**

Kropf obtained a Ph.D in clinical psychology from the California School of Professional Psychology in 1991. *See* Kropf Dep. at 71:1-6. From 1993 until 1999, he worked as the staff psychologist on the segregated housing unit at the Stark Youth Correctional Facility ("Stark"), known at the time as "California's Most Violent Juvenile Prison" due to the abuse and neglect of juveniles there. *Id.* at 274:5-280:22. Kropf has worked since 1999 as a psychologist for the California Department of Corrections and Rehabilitation's ("CDCR") Mentally Disordered Offender Unit. *Id.* at 75:24-25.

Kropf has never held a position in academia or taught an academic course. *Id.* at 83:10-13; 83:25-84:1. He has not authored, published, edited, or peer-reviewed any

3

research, articles, scholarly papers, book chapters, books, or manuals.[1] *Id.* at 83:15-84:25. He has never served on the editorial board of a scholarly journal or press, and he is not a member of any professional organizations. *Id.* at 89:1-8. No federal court has qualified Kropf as an expert in any subject. *Id.* at 272:13-15.

Kropf has no experience whatsoever in the field of civil immigration detention. *Id.* at 37:25-38:9; 40:14-16; 183:18-184:25 ("I've not worked in a civil detention facility . . . And I've not stepped foot in one either."). Although he purports to have expertise in the regulations and standards governing civil immigration detention, <u>he could not even identify which of those standards applies to Adelanto</u>. *Id.* at 97:4-7. And he first reviewed the ICE National Detention Handbook and the Adelanto Supplemental Detainee Handbook only after he was retained by GEO. *Id.* at 28:12-30:15. Kropf's work as a psychologist in correctional settings does not qualify him as an expert in civil immigration detention. *See* Ex. D, Report of Professor Margo Schlanger, at ¶¶ 21-37 (distinguishing civil immigration detention from correctional detention). Kropf is not qualified to opine about any aspect of civil immigration detention, whether by specialized training <u>or</u> by experience, let alone to speak to whether GEO complies with the standards and practices governing civil immigration detention.

Nor is Kropf qualified to testify as to the reliability of any empirical research on the issues at hand. Aside from his 1991 dissertation, he has no experience conducting or evaluating any qualitative research, quantitative research, statistical analysis, or study design. *Id.* at 85:5-87:23; 88:3-12. That is, until he was retained by GEO to provide expert testimony as to the psychological harms attendant to solitary confinement.

In determining whether individuals have sufficient expertise to offer expert testimony, "[a] very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have

---

[1] Kropf's only published writing is a continuing medical education lesson he co-wrote entitled "The Mentally Disordered Offender's Path Within the California Correctional System: California's Mentally Disordered Offender Act."

conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert II*, 43 F.3d at 1317 (emphasis added). Kropf presents the worst case scenario: lacking any insight on civil immigration detention or the empirical research related to solitary confinement, he learned his client's position and formed his opinions specifically for this litigation. *See Nelson v. Matrixx Initiatives*, 2012 WL 3627399, at *12 (N.D. Cal. Aug. 21, 2012), *aff'd sub nom. Nelson v. Matrixx Initiatives, Inc.*, 592 F. App'x 591 (9th Cir. 2015) ("'[C]linical judgment does not provide an adequate basis for an opinion on an issue foreign to [an expert's] clinical practice. This is the type of subjective belief and unsupported speculation that *Daubert* guards against."); *Elbert v. Howmedica, Inc., a Div. Pfizer Hosp. Products Group, Inc.*, 59 F.3d 174, 1995 WL 383409, *1 (9th Cir. 1995) (excluding expert testimony where "prior to his enlistment as an expert witness" he had no familiarity with the subject of his testimony).

Kropf's recent exposure to civil immigration detention and empirical research does not substitute for expertise. His proposed testimony should be precluded altogether. *See Burrows v. BMW of N. Am., LLC*, 2018 WL 6314187, at *2 (C.D. Cal. Sept. 24, 2018) (Bernal, J.) (excluding expert who lacked "specialized training and experience specific to the subject" of lawsuit); *AFMS LLC v. United Parcel Serv. Co.*, 2014 WL 12515335, at *6 (C.D. Cal. Feb. 5, 2014) (Bernal, J.) (excluding testimony of individual not qualified by special knowledge as an expert in the relevant area of expertise); *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 984 F. Supp. 2d 1021, 1027 (C.D. Cal. 2013) (same).

## B. Kropf's opinions are not reliable.

Expert testimony is properly admitted only if it is "the product of reliable principles and methods" and "based on sufficient facts or data." Fed. R. Evid. 702. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the

expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Kropf's proposed testimony presents the paradigmatic *ipse dixit* of which the Supreme Court has warned. He employed no recognized methodology. He possessed no pre-litigation expertise. He conducted no independent analysis or evaluation of evidence. Instead, Kropf merely summarizes various policies, parrots GEO's arguments, and cherry-picks literature—which he collected on Google and read for the first time in preparation of his expert report—to prop up GEO's arguments. Fundamentally, his opinions are not reliable and should be excluded.

1.    **Kropf failed to employ any recognized methodology to evaluate GEO's performance at Adelanto.**

Kropf cannot articulate any steps he took to analyze the facts of this case because he took none. Instead, he simply <u>assumes</u> that GEO implements policies as set forth in the PBNDS, the ICE National Detention Handbook, and the Adelanto Supplemental Detainee Handbook. *See* Kropf Dep. at 32:13-18; 260:17-261:6. Kropf concedes that he undertook <u>no</u> independent evaluation to determine whether his assumptions were accurate or whether GEO actually follows those policies:

> Q:    But you have no evidence that the Adelanto Supplemental Detainee Handbook is actually implemented at Adelanto; correct?
>
> A:    In the form of my having conducted independent investigation of the matter, I do not.
>
> Q:    And you have no evidence to suggest that the ICE National Detention Handbook is actually implemented at Adelanto; correct?
>
> A:    In terms of my having conducted an individual personal investigation of the issue, no.
>
> Q:    And you have no evidence to suggest that the PBNDS are actually implemented at Adelanto; is that correct?

6

A:     Yes.

*Id.* at 261:7-20; *see also id.* at 36:7-10 (Q: "Did you conduct any independent review for materials that might indicate whether GEO does or does not comply with those standards?" A: "No, I did not."); 116:7-22 (same).

Each of Kropf's proffered opinions amount to an *ipse dixit* pronouncement, rather than an evaluation of facts or data.[2] For instance, he opines that detained immigrants are not coerced to clean because the PBNDS and "GEO guidelines" state that detainees "may volunteer to participate in those activities." *Id.* at 180:5-181:1; *see also id.* at 151:8-25 (concluding without evidence or analysis that GEO imposes no negative consequences on detainees who withdraw from the VWP because the PBNDS prohibit such action). Similarly, he opines that GEO does not coerce detainees to participate in the VWP at Adelanto because "it's been my experience that confined persons can volunteer to participate in any activities." *Id.* at 128:3-19. No facts or analysis support his facile statements. And assuming compliance with policies does not make it so.

---

[2] *See, e.g.,* Kropf Dep. at 117:9-11 (concluding without evidence or analysis that GEO actually complies with all rules and regulations); 99:18-21 (approval to participate in the voluntary work program is subject to adjudication by ICE); 114:4-8 (detainee volunteers are utilized and managed in accordance with all contract, client, and jurisdictional requirements); 116:7-117:1 (GEO complies with all applicable contractual, regulatory, statutory, contract, client, and jurisdictional requirements at Adelanto); 216:24-217:2 (GEO actually provides detained immigrants placed in disciplinary housing with due process rights); 219:10-19 (GEO actually provides detainees with handbooks); 223:6-11 (GEO actually provides adequate medical, dental, and mental health services to detainees in segregation); 225:13-17 (GEO actually monitors detainees in segregation); 228:9-19 (GEO actually removes detainees from segregation if a healthcare professional concludes that continued segregation is detrimental to the detainee's health); 229:22-24 (GEO actually takes measures to mitigate psychological distress associated with placements in disciplinary housing); 233:6-10 (GEO clearly conveys disciplinary policies and practices to detainees); 257:18-258:9 (GEO actually advises detainees of the process for filing grievances or kites); 258:13-24 (GEO actually responds to each detainee grievance and kite); 259:20-260:16 (GEO actually provides detainees with food and drink that meet or exceed nutritional guidelines).

Emblematic of Kropf's failure to utilize any methodology or data is his opinion that "few, if any, current [or] former detainees at the facility were ever placed in solitary confinement as a sanction for failing to meet behavioral expectations related to cleaning." *Id.* at 52:21-53:8. The source of this "information" was not facts or data, but GEO's counsel. *Id.* at 147:11-148:10. Kropf took no steps whatsoever to corroborate this purported evidence (or even to ascertain what "few" means) before simply regurgitating the statement under the guise of an expert conclusion. *Id.* at 53: 20-54:13; 59:5-23; 148:9-10 ("I did not undertake an investigation to ascertain if that information was correct or not."); 149:16 ("Yes, I assumed the information was valid.").

Kropf repeatedly defends his conclusions as accurate because he has seen no "compelling evidence" to suggest otherwise. *See, e.g., id.* at 30:10-18 (testifying that Adelanto complies with "the standards set forth in the handbook or implied content in the handbook" based on "the absence of compelling evidence to the contrary"). But, when pressed for detail, he admits that he engaged in no investigation or analysis of any facts or data that would either identify "evidence to the contrary" or affirmatively support his conclusions. *Id.* at 43:18-48:2 (conceding he did not review any data, statistics, reports, investigations, audits, segregation logs, diagrams, detainee death reviews, or even news articles about Adelanto). This no-data approach cannot stand. *See Rimbert v. Eli Lilly & Co.*, 2009 WL 2208570, at *20 (D.N.M. July 21, 2009) ("A methodology that inexplicably ignores material facts and relies only on selective evidence does not lead to a reliable opinion.").

Kropf's willingness to reach broad conclusions based on documents that he does not understand and factual assertions he did not validate (or challenge) demonstrates that he simply wanted to reach a particular conclusion. His opinions are not tethered to any analysis—methodic or otherwise—of the conditions at issue. As a result, they cannot help the jury assess any facts at issue and should be excluded. *See Joiner*, 522 U.S. at 146 ("[T]here is simply too great an analytical gap between the data and the opinion

8

proffered."); *Roman v. MSL Capital, LLC*, 2019 WL 1449499, at *4 (C.D. Cal. Mar. 29, 2019) (Bernal, J.) (excluding expert who "does not state steps he took to analyze the facts of this case, but instead simply states a conclusion"); *Linares v. Crown Equip. Corp.*, 2017 WL 10403454, at *12 (C.D. Cal. Sept. 13, 2017) (Bernal, J.) (finding an expert's opinions unreliable where he "merely parrots the opinions of others" and failed to conduct an independent evaluation of that evidence).

**2.      Kropf's opinions minimizing the harms of solitary confinement rest on his conjecture and discredited, cherry-picked literature.**

Kropf opines that GEO does not coerce detainee labor because "there is absolutely no credible research evidence" indicating that solitary confinement or the threat of solitary confinement for 72 hours or less causes "serious psychological harm." Report at 6; *see also id.* at 12-27. He bases this conclusion on anecdotal experiences as a psychologist at Stark and CDCR and on a review of literature which he located (through a Google search) and reviewed for the first time after he was hired by GEO. As with his other proposed testimony, Kropf's opinions minimizing the harm of solitary confinement must be excluded because he lacks any expertise independent of this litigation, failed to conduct any independent analyses, and cherry-picks evidence that supports his pre-determined conclusions.

<u>First</u>, Kropf concludes that "serious psychological harm" is not attendant to solitary confinement of 72 hours or less because "precisely zero" of his patients at Stark or CDCR ever "reported or evidenced distress" related to their placement in solitary confinement. *See* Report at 16-19. He reaches his conclusion without conducting any independent analysis or evaluation of actual conditions at Adelanto or any other civil immigration detention facility. Indeed, Kropf admits he took no steps to investigate whether the Class Members have ever "reported or evidenced distress" related to solitary confinement. Kropf Dep. at 229:1-24; 60:12-25. Leaving aside the obvious shortcoming of relying on the absence of complaints to demonstrate the absence of harm, his

application of his experience prior to Adelanto finds no support. Kropf failed to review any evidence pertaining to actual conditions at Adelanto, so he has no basis—other than his unblinking say-so—to conclude that conditions at Adelanto are similar to conditions at Stark or CDCR. *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) (affirming the exclusion of the *ipse dixit* testimony of an expert that was not based upon objective, verifiable evidence).

Second, Kropf has no basis to opine that "there is absolutely no credible research evidence" that solitary confinement of 72 hours or less causes "serious psychological harm." *See* Report at 12-27. After he was retained by GEO to provide expert testimony, he conducted a Google search for terms including "solitary confinement," "segregated housing," and "psychological effects." Kropf Dep. at 265:25-266:23. Based on the results of that Google search, he identified and reviewed—for the first time—the studies that comprise his literature review. *Id.* His testimony should be excluded on this basis alone. *Elbert v. Howmedica, Inc., a Div. Pfizer Hosp. Products Group, Inc.*, 59 F.3d 174, 1995 WL 383409, *1 (9th Cir. 1995) (excluding expert testimony where "prior to his enlistment as an expert witness" he had no familiarity with the subject of his testimony).

Perhaps because he has no experience—let alone expertise—conducting or evaluating empirical research, statistical analysis, or study design, Kropf relies primarily on two studies espousing outlier positions that are not justified by existing scientific knowledge: Maureen O'Keefe *et al.*, "One Year Longitudinal Study of the Psychological Effects of Administrative Segregation," Final Report to the National Institute of Justice (2010) (the "Colorado Study") and Morgan*, et al.*, "Quantitative Syntheses of the Effects of Administrative Segregation on Inmates' Well-Being" (the "Morgan Study"). *See* Report at 25-27. Both the Colorado Study and the Morgan Study have been widely discredited in the field and by courts. *See* Rebuttal Report of Dr. Craig Haney (hereinafter, "Haney Rebuttal") (Ex. E) at ¶¶ 43-48 (explaining that the Colorado Study is "one of the most thoroughly discredited [studies] in the entire solitary confinement

literature" and the Morgan study is "similarly flawed and cannot be reliably interpreted, in large part because it is itself based almost entirely on the results of the fatally flawed [Colorado Study]").

The Colorado Study is a longitudinal study of two comparator groups of prisoners in Colorado—one group in administrative segregation and the other in general population—with various sub-groups. *See* Colorado Study (Ex. F). The Colorado Study's goal was to isolate the variable of solitary confinement to determine its effect. But the study selected participants by identifying prisoners who were exposed to solitary confinement first, and <u>then</u> were either sent to administrative segregation (and designated members of the treatment group) or to general population (control group). Because both comparison groups were exposed to the treatment variable (*i.e.*, solitary confinement), the resulting data is not reliable.

In addition, the Colorado Study researchers expressly caution that the study should not be generalized to female offenders, illiterate offenders, prisoners with no prior experience in isolation, and—most importantly—to prison systems with different segregation conditions. *Id.* at 79-80. As to the latter point, Colorado divides its administrative segregation into three levels and provides additional privileges at each level. Those at Level 3 are still in administrative segregation, but they have an array of privileges including institutional work outside of their cells that are not common features of solitary confinement.[3] Adelanto does not have a similar privileges program. Under its

---

[3] These differences led a court in Canada to discount the relevance of the Colorado Study to the Canadian solitary confinement regimen entirely. *See Corp. of the Canadian Civil Liberties Ass'n.*, 2017 ONSC 7491 (Ex. G) ¶¶ 236–37 ("The respondent also relied on the O'Keefe study completed in Colorado in 2010. I do not accept this study is valid in Canada because the system of administrative segregation is different in Canada. Specifically, at page 11 of the study the authors describe the incentive-based Colorado program. This program has three quality-of-life levels. Each level brings with it more privileges which must be earned through appropriate behavior. At quality-of-life level 3, inmates in administrative segregation are allowed four three-hour visits per month, four 20-minute phone sessions, $25 worth of canteen per week and the opportunity to work as a porter or barber in the institution. This is not comparable to the Canadian system.").

5:17-cv-02514-JGB-SHK

own terms, the Colorado Study cannot apply to Adelanto. *See Joiner*, 522 U.S. at 146 (upholding exclusion of expert opinions extrapolated from far-removed studies, finding that the studies were too "dissimilar to the facts presented in this litigation" to support the experts' conclusions).

The Morgan Study, Ex. H, has also been widely discredited for excluding most relevant data on solitary confinement and instead using unreliable data, including the Colorado Study. *See British Columbia Civil Liberties Ass'n. v. Canada (Attorney General)*, 2018 BCSC 62 (2018) (Ex. I) at ¶¶ 253 & 254 (agreeing with criticisms of the Colorado Study and finding that "the Morgan et al. Study is unhelpful in understanding solitary confinement because of flaws in the Colorado and Zinger studies"); *Brazeau v. Attorney General (Canada)*, 2019 ONSC 1888 (2019) (Ex. J) at ¶ 182 ("I do not give much weight to Dr. Morgan's meta-analysis conclusions."). *See also* Haney Rebuttal at ¶¶ 45-47 (explaining that the Morgan Study "cannot be reliably interpreted, in large part because it is itself based almost entirely on the results of the fatally flawed [Colorado Study]").

Having seized on two discredited studies that support GEO's position, Kropf's literature review entirely ignores the substantial body of research demonstrating that solitary confinement often leads to profound psychological peril. *See* Haney Rebuttal at ¶¶ 29-61 (surveying the literature). *See also Apodaca v. Raemisch*, 139 S. Ct. 5, 6 (2018) (Sotomayor, J., respecting the denial of certiorari) (noting that "[a] punishment need not leave physical scars to be cruel and unusual[,]" and "we do know that solitary confinement imprints on those that it clutches a wide range of psychological scars"); *Ruiz v. Texas*, 137 S. Ct. 1246, 1247 (2017) (Breyer, J., dissenting) (noting that the petitioner "developed symptoms long associated with solitary confinement, namely severe anxiety and depression, suicidal thoughts, hallucinations, disorientation, memory loss, and sleep difficulty"); *Porter v. Clarke*, 923 F.3d 348, 355-57 (4th Cir. 2019) (providing an overview of the literature and studies recognizing the deleterious effects of solitary confinement); *Grissom v. Roberts*, 902 F.3d 1162, 1176-77 (10th Cir. 2018)

(Lucero, J., concurring) (reviewing academic literature and determining that "solitary confinement, even over relatively short periods, renders prisoners physically sick and mentally ill").

Kropf's proposed testimony rests on unsupported speculation, baseless assumptions, and a haphazard review of discredited literature. His should be excluded because it is not the product of reliable principles and methods as required by Rule 702.

## C. Kropf's opinions are not relevant to any issue to be determined by the jury.

Expert testimony must be "relevant to the task at hand." *Daubert II*, 43 F.3d at 1315 (quoting *Daubert*, 509 U.S. at 597). "Relevant evidence, of course, is evidence that helps the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591 (citation omitted). In other words, there must be a proper "'fit' between the testimony and an issue in the case." *Daubert II*, 43 F.3d at 1320.

There is no "fit" between Kropf's proposed testimony and any issues in this case. For example, Kropf seeks to inform the jury that "[p]articipating in the Voluntary Work Program and meeting responsibilities related to maintaining cleanliness offer numerous benefits to detainees and can enhance their behavioral, psychological, interpersonal, and/or occupational functioning both during and following their detention." Report at 2; *see also id.* at 4-8; Rebuttal Report at 13-16. But whether work and cleanliness are generally "good" is not probative of whether GEO engages in wage theft, unfair business practices, and forced labor. *See Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.") (citations omitted); *see also United States v. Cantrell*, 999 F.2d 1290, 1292 (8th Cir. 1993) (an expert's testimony is not helpful if it does not address a matter essential to the case).

Kropf's conclusions regarding the subjective nature of perceptions of threat, coercion, and deprivation are similarly irrelevant and, indeed, threaten to cause significant jury confusion. *See* Report at 23-27; Rebuttal at 2; 12-13; 15-16. As the Court has already explained, the TVPA and CTVPA require the application of an <u>objective</u>

13

standard to determine whether a "reasonable person"—in this case, a detained immigrant involuntarily confined in a civil immigration detention facility—would perform the work mandated by GEO. Dkt. 223 at 23, n.11. Kropf's articulation of a subjective standard (even if it were reliable, which Plaintiffs dispute) would counsel the jury as to an inapposite legal standard. The same is true with respect to Kropf's attempts to define "threat," "coercion," and "deprivation" using the dictionary. *See, e.g.* Rebuttal at 9-10; 13. The TVPA and CTVPA define the pertinent terms. Dkt. 223 at 11, 23. Accordingly, Kropf's testimony is not relevant and cannot assist the trier of fact. *See G. v. Hawaii*, 2010 WL 1372319, at *7 (D. Haw. Apr. 2, 2010) (excluding as irrelevant and unable to assist any determination by the jury testimony of an expert that was based on incorrect standards).

Because Kropf's conclusions are not probative of the issues to be decided by the jury in this case, his testimony should be excluded. *See Linares v. Crown Equip. Corp.*, 2017 WL 10403454, at *11 (C.D. Cal. Sept. 13, 2017) (Bernal, J.) (excluding expert testimony unrelated to any claim in the litigation); *AFMS LLC v. United Parcel Serv. Co.*, 2014 WL 12515335, at *4 (C.D. Cal. Feb. 5, 2014) (Bernal, J.) (excluding testimony of expert who failed to explain why his conclusion is probative of the relevant legal issue); *Dobrosky v. Arthur J. Gallagher Serv. Co., LLC*, 2014 WL 10988092, at *4 (C.D. Cal. July 30, 2014) (Bernal, J.) ("Pilcher's opinions are an unhelpful summary of evidence and legal conclusions regarding issues that are not currently before the Court.").

## IV.    CONCLUSION

Expert testimony is admissible only where (i) the expert is qualified, (ii) the testimony is reliable, and (iii) the testimony is relevant and will assist the jury. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Kropf's testimony cannot satisfy any of those requirements, let alone all three. He should not be permitted to testify.

14

Dated: October 1, 2020

Respectfully submitted,

*/s/ Lydia A. Wright*

Korey A. Nelson (admitted *pro hac vice*)
knelson@burnscharest.com
LA Bar # 30002
Lydia A. Wright (admitted *pro hac vice*)
lwright@burnscharest.com
LA Bar # 37926
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765

Warren Burns (admitted *pro hac vice*)
wburns@burnscharest.com
TX Bar # 24053119
Daniel H. Charest (admitted *pro hac vice*)
dcharest@burnscharest.com
TX Bar # 24057803
Will Thompson (CA Bar # 289012)
wthompson@burnscharest.com
E. Lawrence Vincent (admitted *pro hac vice*)
lvincent@burnscharest.com
TX Bar # 20585590
Mallory Biblo (admitted *pro hac vice*)
mbiblo@burnscharest.com
TX Bar # 24087165
**BURNS CHAREST LLP**
900 Jackson St., Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002

R. Andrew Free (admitted *pro hac vice*)
andrew@immigrantcivilrights.com
TN Bar # 030513
**LAW OFFICE OF R. ANDREW FREE**
P.O. Box 90568
Nashville, TN 37209

15

Telephone: (844) 321-3221
Facsimile: (615) 829-8959

Nicole Ramos (admitted *pro hac vice*)
nicole@alotrolado.org
NY Bar # 4660445
**AL OTRO LADO**
511 E. San Ysidro Blvd., # 333
San Ysidro, CA 92173
Telephone: (619) 786-4866

Robert Ahdoot (CA Bar # 172098)
rahdoot@ahdootwolfson.com
Tina Wolfson (CA Bar # 174806)
twolfson@ahdootwolfson.com
Theodore W Maya (CA Bar # 223242)
tmaya@ahdootwolfson.com
Alex R. Straus (CA Bar # 321366)
astraus@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
10728 Lindbrook Drive
Los Angeles, California 90024-3102
Telephone: (310) 474-9111
Fax: (310) 474-8585

*Class Counsel*

# CERTIFICATE OF SERVICE

I, Lydia A. Wright, electronically submitted the foregoing document with the clerk of the court for the U.S. District Court, Central District of California, using the electronic case filing system. I hereby certify that I have provided copies to all counsel of record electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

Dated: October 1, 2020

*/s/ Lydia Wright*

Lydia A. Wright (admitted *pro hac vice*)
lwright@burnscharest.com
LA Bar # 37926
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765

17