# EXHIBIT B

1                   UNITED STATES DISTRICT COURT

2                 CENTRAL DISTRICT OF CALIFORNIA

3                       EASTERN DIVISION

4

5      RAUL NOVOA, JAIME CAMPOS
       FUENTES, ABDIAZIZ KARIM,
6      and RAMON MANCIA,
       individually and on behalf
7      of all others similarly
       situated,

8
                         Plaintiffs,
9         vs.                        No. 5:17-cv-02514-JGB-SHKx
10     THE GEO GROUP, INC.,
11                 Defendant.
       _____/

12

13

14        DEPOSITION OF SERENA MORONES, CPA, ASA, ABV, CFE

15           appearing remotely at Portland, Oregon

16                Thursday, September 24, 2020

17

18

19

20

21

22

23     Reported by:
       Natalie Y. Botelho
24     CSR No. 9897

25     Job No. 4264454

                                              Page 1

**Page 2**

```
 1        UNITED STATES DISTRICT COURT
 2        CENTRAL DISTRICT OF CALIFORNIA
 3             EASTERN DIVISION
 4
 5  RAUL NOVOA, JAIME CAMPOS
    FUENTES, ABDIAZIZ KARIM,
 6  and RAMON MANCIA,
    individually and on behalf
 7  of all others similarly
    situated,
 8
           Plaintiffs,
 9
       vs.          No. 5:17-cv-02514-JGB-SHKx
10  THE GEO GROUP, INC.,
11        Defendant.
    _____/
12
13
14        Videotaped remote deposition of SERENA
15  MORONES, taken on behalf of Plaintiffs, at Portland,
16  Oregon, beginning at 9:13 a.m. and ending at 5:40
17  p.m. on Thursday, September 24, 2020, before NATALIE
18  Y. BOTELHO, Certified Shorthand Reporter No. 9897.
19
20
21
22
23
24
25
```

**Page 3**

```
 1  APPEARANCES:
 2
 3  For Plaintiffs:
 4     BURNS CHAREST LLP
       BY:  DANIEL CHAREST, ESQ.
 5     BY:  LARRY VINCENT, ESQ.
       BY:  LAUREN CROSS, ESQ.
 6     900 Jackson Street, Suite 500
       Dallas, TX  75202
 7     (469)904-4555
       dcharest@burnscharest.com
 8     lvincent@burnscharest.com
       lcross@burnscharest.com
 9
       BURNS CHAREST LLP
10     BY:  LYDIA WRIGHT, ESQ.
       365 Canal Street, Suite 1170
11     New Orleans, LA  70130
       (504)799-2844
12     lwright@burnscharest.com
13  For Defendants:
14     AKERMAN LLP
       BY:  ADRIENNE SCHEFFEY, ESQ.
15     1900 16th Street, Suite 1700
       Denver, CO  80202
16     (303)640-2512
       adrienne.scheffey@akerman.com
17
18  Also Present:
19     JULIANNA GRAVOIS, paralegal, Burns Charest,
    LLP
20
21
22
23
24
25
```

**Page 4**

```
 1              INDEX
 2  WITNESS                        PAGE
 3  Serena Morones
 4
 5  EXAMINATION
 6  By Mr. Charest                 8
 7  By Ms. Scheffey                305
 8  FURTHER EXAMINATION
 9  By Mr. Charest                 316
10        ---oOo---
11
12        E X H I B I T S
13  NUMBER      DESCRIPTION        PAGE
14  Exhibit 203   Rebuttal Expert Report of    9
               Serena Morones, dated
15             August 31, 2020, CPA, ASA,
               ABV, CFE
16
    Exhibit 204   Expert Declaration of        10
17             Professor Michael Childers
18  Exhibit 205   Amended Expert Report of Jody  10
               Bland dated September 2, 2020
19
    Exhibit 206   Performance-Based National    68
20             Detention Standards 2011,
               Bates GEO-Novoa_00015059
21             through 00015534
22  Exhibit 207   A GEO Group document dated   109
               06/19/2018 re: Job Title:
23             Janitor, Bates GEO-Novoa_00062408
               through 00062416
24
25
```

**Page 5**

```
 1        E X H I B I T S (continued)
 2  NUMBER      DESCRIPTION        PAGE
 3  Exhibit 208   A screenshot of page 16 of 43  179
               entitled "Table 3:  Shift
 4             Lengths by Job Type," with
               annotations in red
 5
    Exhibit 209   Expert Report of Peter H.      262
 6             Nickerson, Ph.D. dated
               September 20, 2018, Bates
 7             GEO-Novoa_00086951 through
               00086992
 8
    Exhibit 210   Memorandum to La Rond Baker,   286
 9             from Peter H. Nickerson, Ph.D.,
               dated October 9, 2018, RE:
10             Amended Expert Report of
               Peter H. Nickerson, Ph.D. and
11             attachments GEO-Novoa_00161980
               through 00162016
12
    Exhibit 211   A document entitled "The GEO   236
13             Group Inc. Initial/Hazardous
               Communications Safety Training,"
14             Bates GEO-Novoa_00000116
               through 00000129
15
    Exhibit 212   An e-mail thread, the most     247
16             recent e-mail from Patricia
               Love, to Michelle Keeney, sent
17             3/7/2018, Bates
               GEO-Novoa_00001227 through
18             00001229
19  Exhibit 213   A GEO Group document dated     255
20             06/20/2018 for Job Title: Food
               Service Worker, Bates
21             GEO-Novoa_00062421 and 00062422
22
23        ---oOo---
24
25
```

2 (Pages 2 - 5)

1  Portland, Oregon, Thursday, September 24, 2020
2        9:13 a.m.
3
4        PROCEEDINGS
5        THE VIDEOGRAPHER:  Good morning.  We are
6  going on the record at 9:13 a.m. on September 24th,
7  2020.  Audio and video recording will continue to
8  take place unless all parties agree to go off the
9  record.
10       This is Media Unit 1 of the video recorded
11  deposition of Serena Morones, taken by counsel for
12  Plaintiff in the matter of Raul Novoa, Jaime Campos
13  Fuentes, Abdiaziz Karim, and Ramon Mancia,
14  individually and on behalf of all others similarly
15  situated versus The GEO Group, Inc., filed in the
16  United States District Court, Central District of
17  California, Eastern Division, Case
18  No. 517-cv-02514-JGB-SHKx.
19       The deposition is being conducted using
20  Veritext Zoom technology, and all parties are
21  appearing remotely.  The videographer is Brittany
22  Rohan, and the court reporter is Natalie Botelho,
23  both appearing on behalf of Veritext Legal
24  Solutions.  I am not related to any party in this
25  action, nor am I financially interested in the

Page 6

1  outcome.
2        Counsel and all present in the remote room
3  will now state their appearances and affiliations
4  for the record.  If there are any objections to
5  proceeding, please state them at the time of your
6  appearance, beginning with the noticing attorney.
7        MR. CHAREST:  Daniel Charest, for the
8  plaintiffs, joined by, remotely here, Lydia Wright,
9  Lauren Cross, and Larry Vincent, also for
10  Plaintiffs.
11       MS. SCHEFFEY:  Adrienne Scheffey, on
12  behalf of the GEO Group, and we don't have any
13  objection to remote swearing in and the videography.
14       While I have a moment, Dan, the magistrate
15  judge in this case has previously suggested to the
16  parties that they should try to stipulate, if
17  possible, in the beginning of a deposition that all
18  objections other than to form are preserved, to kind
19  of speed up the process.  Are Plaintiffs willing to
20  agree to that today?
21       MR. CHAREST:  Yes.
22       MS. SCHEFFEY:  Thank you.
23       MR. CHAREST:  As long as the responsive --
24  the other side of that is that the objections are
25  made "Objection; form," and that's it, yeah.

Page 7

1        MS. SCHEFFEY:  Yes.  Other than privilege
2  where I instruct her to answer that's --
3        MR. CHAREST:  Fair.
4        THE VIDEOGRAPHER:  You can swear the
5  witness, please.
6
7        SERENA MORONES,
8  having been administered an oath, was examined and
9        testified as follows:
10
11       EXAMINATION BY MR. CHAREST
12       MR. CHAREST:  Q.  Good morning,
13  Ms. Morones.  Can you state your name for the
14  record, please?
15  A.     Serena Morones.
16  Q.     And where are you located right now?
17  A.     In my office in downtown Portland, Oregon.
18  Q.     And do you live in Portland, Oregon or
19  thereabouts?
20  A.     Yes.
21  Q.     Is your house okay?
22  A.     Thank you for asking.  Yes.
23  Q.     That's good.  I'm glad.
24       You issued a report in connection with the
25  case before the court here, what we call the Novoa

Page 8

1  case, correct?
2  A.     Yes.
3  Q.     All right.  And I know you are probably
4  fairly well versed in remote depositions, but I just
5  want to make sure that we both understand each
6  other.  You have access to a share screen where
7  exhibits are being posted, correct?
8  A.     Yes.
9        (Whereupon Exhibit 203 was marked for
10       identification.)
11       MR. CHAREST:  Q.  Okay.  So I've marked
12  for the record Exhibit 203 as your rebuttal report.
13  Can you confirm for me that that is, in fact, your
14  rebuttal report?
15  A.     Okay.  I will open it.  I hadn't clicked
16  on anything yet.  Yes, this is -- well, wait.  Let
17  me just get comfortable with moving around.  I see
18  the first page.  Yes.  Okay.  This is my rebuttal
19  report.
20  Q.     Great.  And do you have a hard copy of
21  that in your office now?
22  A.     I don't.  If you want me to, I would need
23  to print it out.  I could do that.  Wouldn't take
24  long, but I didn't bring anything.
25  Q.     Fair.  Well, I guess what I'd say is, on

Page 9

3 (Pages 6 - 9)

1 that, if you need one and you find it more
2 expedient, let's just cut a break and print it, but
3 let's just see how it goes. Okay?
4 A.     Okay.
5         (Whereupon Exhibit 204 was marked for
6         identification.)
7         MR. CHAREST: Q. All right. Similarly,
8 available to you are Exhibits 204, which is a report
9 issued by an expert in the case named Michael
10 Childers, correct?
11 A.     Yes, I see that.
12        (Whereupon Exhibit 205 was marked for
13        identification.)
14        MR. CHAREST: Q. And the other one that's
15 available to you is Exhibit 205, which is an amended
16 expert report of Jody Bland, correct?
17 A.     Correct.
18 Q.     And just -- those are the three exhibits
19 you have available to you now, and if you need to
20 refer to any of them to answer a question, I'd
21 please encourage you to do that. Okay?
22 A.     Okay.
23 Q.     And the report that you issued, which is
24 Exhibit 203, is a rebuttal report to both the
25 Childers report and the Bland report, correct?

Page 10

1 A.     Yes.
2 Q.     And you were hired as a rebuttal expert by
3 GEO, the defendant in this case, to evaluate those
4 reports and provide your opinions about them,
5 correct?
6 A.     Correct.
7 Q.     And in broad strokes, my -- I would
8 describe your observation as follows, and I'll see
9 if you agree with me: No. 1, you question and
10 sometimes contradict assumptions that are made by
11 the experts; is that fair?
12 A.     Yes.
13 Q.     You -- No. 2, you show the impact
14 vis-a-vis bottom line, if you will, of changed
15 assumptions or changed inputs, correct?
16 A.     Correct.
17 Q.     And No. 3, you purport to correct what you
18 perceive as math errors or, I would call,
19 analytical, but fundamentally math errors that were
20 done either by Mr. Bland or by Mr. Childers in the
21 report, correct?
22        MS. SCHEFFEY: Object to form.
23        THE WITNESS: I'm sorry, I couldn't hear.
24        MR. CHAREST: Q. She objected to form.
25 It's okay. You can answer.

Page 11

1        THE WITNESS: Yeah, Adrienne, your volume
2 is a little low. I was struggling to hear it
3 earlier, so...
4        Yes, that's correct.
5        MR. CHAREST: Q. Okay. In -- aside from
6 those three broad strokes of kind of things you did
7 in your report, can -- is there anything else you
8 think that you did beyond those three things:
9 Question the assumptions, show the sensitivity of
10 the different assumptions, and address math errors?
11        MS. SCHEFFEY: Object to form.
12        THE WITNESS: I believe -- at a high
13 level, I believe those are the categories of -- of
14 opinions and information provided. As we go along,
15 if something else comes out, I might raise it, but I
16 think that sounds reasonable.
17        MR. CHAREST: Q. Okay. Very good. Thank
18 you.
19        Adrienne, what's your -- what was your
20 objection?
21        MS. SCHEFFEY: Oh, form. That's all.
22        MR. CHAREST: Yeah, but when I ask you
23 "what," I want to know what it is exactly.
24        MS. SCHEFFEY: Compound.
25        MR. CHAREST: Compound? Okay.

Page 12

1 Q.     Okay. So let's talk about your background
2 and experience. Is "Ms. Morones" okay?
3 A.     Yes.
4 Q.     Thank you. Let's talk about your
5 background and experience. You own and run a
6 professional expert witness farm, correct?
7 A.     I've never had anyone call it that. It's
8 a CPA firm that specializes in damage analysis,
9 business valuation, forensic accounting, data
10 analytics.
11 Q.     Yeah, but for litigation, right?
12 A.     For litigation and for other purposes too,
13 but largely, yes, for litigation.
14 Q.     Right. I mean, there's nothing wrong with
15 being a professional damages expert. That's --
16 people do that for a living. But that is, in fact,
17 what you are, right?
18        MS. SCHEFFEY: Object to form.
19        THE WITNESS: Yes.
20        MR. CHAREST: What's your objection?
21        MS. SCHEFFEY: Object to form.
22        MR. CHAREST: What's the form objection?
23        MS. SCHEFFEY: Argumentative, and also, I
24 would probably move to strike your testimony
25        MR. CHAREST: Q. And if I read your

Page 13

4 (Pages 10 - 13)

1 opinions correctly, Ms. Morones, you don't have
2 any -- you don't have an independent opinion about
3 what damages are appropriate in this case. You just
4 critique the presentations of Mr. Bland and
5 Mr. Childers; is that correct?
6 A.     That's correct.
7 Q.     Okay. The analytical aspect of your
8 firm's work, I suspect, is -- I'm just shifting back
9 to your experience in your firm. I'm sorry. Are
10 you with me on topic?
11 A.     I think so. I'll wait to hear your
12 question.
13 Q.     Of course. The -- your firm is not -- and
14 you are not an expert on evaluating facts, correct?
15     MS. SCHEFFEY: Object to form.
16     THE WITNESS: I -- I don't know that I can
17 agree to that. In my work as a forensic accountant,
18 I do evaluate information and accumulate support for
19 our calculations and opinions. However, there are
20 always disputed facts in cases that it isn't within
21 my assignment or expertise to evaluate. It's going
22 to be something that the Court ultimately concludes?
23     MR. CHAREST: Q. Or the jury, right?
24 A.     Or the jury, yes.
25 Q.     And so when, for example, you make in your

Page 14

1 reports an observation about, "Well, this fact is X
2 or Y," you're not saying that that thing you're
3 asserting is necessarily true or a better fact about
4 the thing that's being talked about. It's just
5 you're bringing some fact to the table and saying
6 "Probably this should be considered as well"; is
7 that fair?
8     MS. SCHEFFEY: Object to form.
9     THE WITNESS: That's generally fair.
10 There are some exceptions to what you said in a
11 forensic accounting analysis where part of our work
12 is to try to determine the most well-supported fact.
13 In this particular case, I cannot -- you know, I'd
14 have to look at a more specific to determine if
15 that's something that we did.
16     MR. CHAREST: Q. But ultimately you would
17 agree with me that your position as an expert is not
18 to determine which facts are true or not. It's in
19 the province of the judge and the jury, correct?
20 A.     That's correct. We assumed facts and make
21 calculations based on those facts.
22 Q.     And the assumptions you get are based on
23 information you receive from the lawyers for whom
24 you've -- you are working or the records that the
25 lawyers provided for you or, if you've done it, an

Page 15

1 independent evaluation or research, correct?
2 A.     That's --
3     MS. SCHEFFEY: I'm going to instruct you
4 not to answer to the extent that calls for
5 information about things we've discussed, but beyond
6 that, you can answer.
7     THE WITNESS: Yes, that's generally
8 correct. Those are our sources of information in a
9 case.
10     MR. CHAREST: Q. Did you limit your
11 answer at all in respect to that instruction you
12 took?
13 A.     No.
14 Q.     Okay. In this specific case, you did
15 receive information from attorneys about facts of
16 the case, correct?
17 A.     Correct.
18 Q.     And you relied on those factual assertions
19 and statements by counsel in developing and
20 presenting your opinions, correct?
21     MS. SCHEFFEY: Object to form.
22     THE WITNESS: I would say so, yes.
23     MR. CHAREST: What's your objection?
24     MS. SCHEFFEY: Where I object to form?
25     MR. CHAREST: Yes.

Page 16

1     MS. SCHEFFEY: That was vague. I wasn't
2 sure which one of the two you were asking her what
3 she relied on, the facts she received or the
4 statements from counsel. Two separate things in
5 there.
6     MR. CHAREST: Q. Ms. Morones, you
7 received statements of counsel on which you premised
8 at least some of your report, correct?
9 A.     That's correct. We've cited conversations
10 with counsel in our report.
11 Q.     I've seen at least two such citations, and
12 I suspect we'll talk about whether there was other
13 sources of information through counsel. But you at
14 least cited twice conversations with counsel as a
15 basis for an opinion you rendered, correct?
16 A.     I don't recall the number, but I do
17 remember citing conversations with counsel.
18 Q.     Right. And the documents you received
19 from -- well, let me -- can I start that question
20 again? Can I start the question again, please?
21     I was asking the witness if I can start
22 the question again.
23 A.     Yeah, I also don't understand what you're
24 asking me. So just if you want to ask the question
25 again or ask a new question, go ahead.

Page 17

5 (Pages 14 - 17)

1 Q.      In addition to receiving information
2 orally from counsel, you also received documents
3 from counsel, correct?
4 A.      Yes.
5 Q.      You did not conduct an independent review
6 of GEO documents to find things that you might think
7 were relevant, correct?
8 A.      I would not have the ability to obtain GEO
9 documents outside of counsel providing them.
10 Q.      Well, in fact, in fairness, you could have
11 been given a console and a host of documents and
12 spent time reviewing them yourself.  That's a thing
13 that could have happened, correct?
14      MS. SCHEFFEY:  Object to form.
15      THE WITNESS:  Yes, that happens sometimes
16 in cases, yes.
17      MR. CHAREST:  Q.  That did not happen in
18 this case, correct?
19 A.      That's correct.
20 Q.      All right.  The documents that you cite
21 and you rely on in your report were given to you and
22 have been selected prior by counsel, correct?
23 A.      Not necessarily.  We go through a process
24 of asking for things, and some documents may have
25 been provided upon our request.

Page 18

1 Q.      Okay.  Then there's two subsets of
2 documents let's talk about.  One set was provided by
3 counsel without your asking, correct?
4      MS. SCHEFFEY:  Object to form.
5      THE WITNESS:  Yes.  In every case, we
6 receive an initial set of documents, yes.
7      MR. CHAREST:  Q.  Well, I'm not -- I'm not
8 suggesting anything nefarious.  I'm just trying to
9 understand what's going on.
10      So aside from the documents you receive
11 from counsel unprompted, you also received other
12 documents from counsel in response to requests,
13 correct?
14 A.      Yes, that's very likely.  I don't have a
15 specific recall of which documents were received
16 that way, but throughout this case, we had many
17 discussions about information and made requests.
18 Q.      Did you ever make a request of counsel for
19 information not provided?
20 A.      I don't recall anything that fits that
21 category.
22 Q.      So there's no unanswered questions on your
23 part that GEO did not provide information?
24 A.      Well, there are categories of information
25 that I understand do not exist that we asked about,

Page 19

1 such as literal time records of length of time spent
2 on specific detainee details, but I don't recall
3 anything that I understand exists that we didn't --
4 that wasn't provided.
5 Q.      In response to a question from you,
6 correct?
7 A.      Correct.
8 Q.      So if there's -- if there's an issue about
9 which there is no information, can we conclude,
10 then, that either you didn't ask, the materials
11 don't exist, or GEO did not provide it to you?
12      MS. SCHEFFEY:  Object to form.
13      THE WITNESS:  I wouldn't want to conclude
14 that without looking at a specific example because I
15 may not remember every situation, every scenario.
16 So it's not fair to -- for me to say everything fits
17 within those three, because I can't remember
18 every -- every document asked and received
19 throughout the whole process.  Generally, what you
20 described is how we receive information.  I would
21 agree with that.
22      MR. CHAREST:  Q.  All right.  And sitting
23 here, as we're discussing it, you can't conceive of
24 any other scenario, other than you not asking, GEO
25 not providing it, or the materials not existing and

Page 20

1 GEO telling you, "Yeah, that doesn't exist,"
2 correct?
3 A.      Nothing comes to mind.
4 Q.      This case is not about lost profits, is
5 it?
6      MS. SCHEFFEY:  Object to form.
7      THE WITNESS:  Not strictly.  It's about
8 lost earnings.  And so according to your strict
9 definition of "lost profits," no.
10      MR. CHAREST:  Q.  Okay.  It's not about IP
11 damages, correct?
12 A.      Correct.
13 Q.      It's not a personal injury/wrongful death
14 case, right?
15 A.      Correct.
16 Q.      It's not a business valuation case or
17 issue, correct?
18 A.      Not according to a strict definition of
19 "business valuation."
20 Q.      The other -- I'm -- you maybe have caught
21 on to it, but maybe not.  I'm looking at the
22 different categories of expertise you have on your
23 website.  Okay.  The remainder are forensic
24 accounting/fraud investigation and data analytics
25 And you also say -- and those are the other two

Page 21

6 (Pages 18 - 21)

1 topics. I'm curious to see if you think the work
2 you did fits within one of those two buckets.
3 A.      Of data analytics or forensic accounting?
4 Q.      The other two areas of expertise you
5 purport to have in your -- on your website.
6 A.      The work definitely falls within a
7 category of forensic accounting, and to some degree
8 data analytics. It's very -- data analytics is very
9 open-ended in terms of what it means.
10 Q.      Okay. And so I take your point, I think,
11 the concept being, again, you're not trying to
12 divine what damages are appropriate, but rather did
13 the experts do their job properly; is that fair?
14 A.      Did the experts adequately support their
15 opinions, are the assumptions adequately supported,
16 are the calculations made accurately.
17 Q.      But by -- I'm trying to talk about the
18 application of your experience and expertise to the
19 work you did. I understand that's the work you did,
20 but I'm trying to see do you have the tools to do
21 that work. That's my question. So are you applying
22 data analytics to that work?
23 A.      Yes, to some degree, and probably to a
24 larger degree, forensic accounting.
25 Q.      Okay. But again, neither forensic

Page 22

1 assignment.
2 Q.      Right. And you have no opinion about the
3 appropriate damage number for lost earnings under
4 any of the theories, whether presented by Mr. Bland
5 or by Mr. Childers, correct?
6      MS. SCHEFFEY: Object to form.
7      THE WITNESS: I have not -- correct. I
8 have not reached an opinion about overall damages.
9      MR. CHAREST: Q. And not only did not
10 reach one. Not been asked to do one and not
11 presented one in the disclosures, correct?
12 A.      Correct.
13 Q.      And don't have any plan to testify about
14 the appropriate damage amount for this case if
15 called at trial, correct?
16 A.      Correct.
17      MS. SCHEFFEY: Object to form.
18      MR. CHAREST: What's your objection?
19      MS. SCHEFFEY: Object to form.
20      MR. CHAREST: What's the form objection?
21      MS. SCHEFFEY: Appropriate damage amount,
22 I think that -- I don't want to tell her, but it
23 sounds like that that's vague because, insofar as
24 she critiques what your expert set forth, what is
25 the appropriate damage amount to encompass that. I

Page 24

1 accounting nor data analytics are fields that are
2 used to determine the amount of unpaid wages for a
3 class of workers, correct?
4      MS. SCHEFFEY: Object to form.
5      THE WITNESS: I would disagree with that.
6 Forensic accounting encompasses lost earnings
7 calculations, damage calculations, broadly within
8 the training that the AICPA provides. For example,
9 there's quite a bit of training on lost earnings
10 calculations. So forensic accounting does cover
11 concepts of damage quantification in a wide variety
12 of categories of damage.
13      MR. CHAREST: Q. Right. From an
14 evaluative perspective, meaning did the person that
15 generated this number do it correctly, but not in
16 the sense of generating a number of what an
17 appropriate damage amount is, correct?
18 A.      I disagree with that. The forensic
19 accounting profession includes training and the
20 development of expertise in quantifying damages for
21 lost earnings and lost profits.
22 Q.      Okay. But that's not what you did in this
23 case, correct? You have not quantified what you
24 believe an appropriate damage measure is, correct?
25 A.      That's correct. That was not my

Page 23

1 just don't think that's a very clear term.
2      MR. CHAREST: Well, let's -- I'll just
3 take that. Let's put that term on the table and
4 talk about it.
5 Q.      Ms. Morones, you show different
6 sensitivity analyses in your report, correct?
7 A.      Correct.
8 Q.      But you don't purport to say that the
9 answer you conclude is the correct number to use,
10 right?
11 A.      That's correct. I do not reach a final
12 opinion of damage.
13 Q.      Well, not just a not final opinion, but
14 literally you're not trying to say that, "Oh, you
15 should subtract a million dollars, and therefore,
16 the correct amount would be X." That's not what
17 you're doing in your report, right?
18      MS. SCHEFFEY: Object to form.
19      THE WITNESS: Not as a whole. In the
20 categories of correcting errors, in quantifying the
21 impact of an error, it would be -- it would be
22 correct in terms of quantifying that error, but I
23 have, as I've said, not reached an opinion of
24 damages as a whole.
25      MR. CHAREST: Q. "Reached an opinion of

Page 25

7 (Pages 22 - 25)

1 damages as a whole." What do you mean? What's the
2 difference between what you're saying and what I'm
3 saying? Do you have an opinion about the
4 appropriate measure of damages in this case or not,
5 ma'am?
6 A.      I did not reach an opinion of one final
7 number of damage. I talked about in my report the
8 impact of errors made by the other experts and the
9 amount. Quantified the amount of those, in some
10 cases, errors; other cases, questioned the
11 assumptions.
12 Q.     Well, what you talked about in your report
13 was, "I'm showing the sensitivity of the
14 calculations to different inputs," not, "And
15 their" -- "but" -- "and my assumption is better than
16 their assumption." So I'm a little confused now.
17 A.      Well, there is some of that, but there is
18 also other calculations that show the impact of what
19 appear to be errors, so I would need to separate
20 those in the discussion. I do agree that some are
21 sensitivity analyses; other, quantification of
22 errors.
23 Q.      And the sensitivity error -- the
24 sensitivity aspect is the second thing we talked
25 about, showing the impact of different assumptions,

Page 26

1 correct?
2         MS. SCHEFFEY: Object to form.
3         THE WITNESS: Yes.
4         MR. CHAREST: What's your objection?
5         MS. SCHEFFEY: Object to form. I thought
6 it misstates prior testimony.
7         MR. CHAREST: Q. And so while you don't
8 have an opinion about the appropriate measure of
9 damages in this case, you do have opinions -- I
10 guess quantifiable opinions is the better way to
11 think about it -- about reductions that would be
12 appropriate for what you perceive to be math errors;
13 is that right?
14 A.      Correct.
15 Q.      And outside of the math error
16 categorization, the math that you show is intended
17 to show the effect of one assumption versus another,
18 but not to say that that assumption is correct or
19 this assumption is correct, right?
20 A.      Well, in some categories of the
21 assumptions -- I'm sure we'll walk through them -- I
22 do assert a more logical assumption. So I'm saying
23 in some categories that it is my opinion that an
24 alternate assumption is more reasonable, whereas
25 what you're describing is merely indifference

Page 27

1 between two assumptions.
2 Q.      Okay. And the reasonableness or not of an
3 assumption is, in your view, the exercise of your
4 expert skills and ability?
5 A.      Yes, it can be, in some categories of
6 assumptions that directly support a quantification
7 in terms of evaluating evidence and understanding
8 whether that evidence directly supports that
9 quantification.
10 Q.      But you agree with me that ultimately,
11 whatever assumption you endorse and whatever
12 assumption someone else might endorse at the end of
13 the day will turn on the facts that are presented to
14 the jury and the judge, correct?
15 A.      Yes, that's correct.
16 Q.      And so just because you think your
17 assumption is more reasonable doesn't mean you're
18 trying to take that issue out of the province of the
19 jury's hands?
20 A.      That's correct.
21 Q.      And at the end of the day, the
22 reasonableness of an assumption is -- it turns on a
23 determination of fact?
24 A.      Yes.
25 Q.      Again, within the province of the jury and

Page 28

1 not one for an expert to opine on, correct?
2         MS. SCHEFFEY: Object to form.
3         THE WITNESS: The expert will opine on it,
4 but it's ultimately within the province of the jury.
5         MR. CHAREST: Q. Fair enough. I
6 appreciate a distinction. I think you and I are
7 both saying the -- doing the same thing, so I'll try
8 and articulate it again. Okay?
9 A.      Sure.
10 Q.      So while you may have opinions on what
11 facts exist or don't exist, ultimately the jury and
12 the judge are the people that will decide those
13 things, correct?
14 A.      Yes, that's correct.
15 Q.      And the facts as you know them, 100% of
16 them came through the counsel for GEO, right?
17         MS. SCHEFFEY: Object to form.
18         THE WITNESS: Well, 100% is a pretty tall
19 number. There may be some background information
20 about GEO that came elsewhere.
21         MR. CHAREST: Q. Okay.
22 A.      But in terms of the detailed calculations,
23 yes, the information is provided through the
24 litigation process. And when you say "the litigation

Page 29

8 (Pages 26 - 29)

1 process," we're talking about conversations with the
2 lawyers that hired you and their provision of work
3 and materials and documents to give you information,
4 correct?
5 A.     Yes, that's correct.
6 Q.     All right.  Did you or your -- any of your
7 associates or anyone at your firm conduct any
8 independent research with respect to any facts that
9 you can think of in this case?
10 A.     Well, as I previously mentioned, we
11 familiar -- we became familiar with GEO by just
12 doing general research, and nothing else
13 specifically comes to mind in terms of outside of
14 materials provided.
15 Q.     Can you describe in any kind of detail the
16 general research?
17 A.     I'm not sure I understand your question.
18 You want me to describe it now, or are you asking if
19 I described it in the report?
20 Q.     Well, I didn't see it in the report, so
21 yes, I'd like you to describe it now, please.
22 A.     I just couldn't remember if we cited
23 any -- any -- you know, sometimes we'll cite the
24 company website.  I just couldn't remember if we did
25 in this case.  I know that I've reviewed the company

Page 30

1 website several times, looking -- just looking at
2 general descriptions of the facility, familiarizing
3 myself with the company, what it does.
4 Q.     You cite the annual report a few times.
5 Did you get that independently, or did you get that
6 through the lawyers?
7 A.     I don't recall.
8 Q.     You do cite on footnote 11 the website,
9 "Facility Detail."  Did you get that information
10 independent, or did you get that the -- by the
11 lawyers where to find that information?
12 A.     I don't recall.  We very -- we most likely
13 have obtained it independently.
14 Q.     Aside from -- well, let me ask this:  Did
15 you find anything on -- in the independent research
16 that gave you information on which you relied to
17 challenge any assumption made by either of the
18 experts to which you offered a rebuttal opinion?
19 A.     Not outside of the GEO litigation
20 materials, no, nothing comes to mind.
21 Q.     Right.  And so just -- you used a phrase
22 "GEO litigation materials."  And to be really clear,
23 what we're talking about there is information and
24 documents provided to you by GEO counsel for the
25 purposes of your report, correct?

Page 31

1     MS. SCHEFFEY:  Object to form.
2     THE WITNESS:  Yes.  I would say that's
3 correct.
4     MR. CHAREST:  What's your objection?
5     MS. SCHEFFEY:  Object to form.
6     MR. CHAREST:  Yeah.  What's the form
7 objection?
8     MS. SCHEFFEY:  Leading.  If you want to
9 know what a certain term is, you can ask that.  It's
10 not an adverse or a complicated question.  You can
11 simply ask what it means by the term.  Leading.
12     MR. CHAREST:  Leading.  Okay.
13 Q.     How many times have you been deposed,
14 Ms. Morones?
15 A.     I'm not hearing you very well.  I'm not
16 sure why, but...
17 Q.     I talk too fast.  I'll try and go slower.
18 A.     Okay.  You're a little muddled, so --
19 right.
20 Q.     How many times have you been deposed?
21 A.     I would estimate around 30.
22 Q.     Do you typically work for plaintiff
23 lawyers or defense lawyers?
24 A.     I don't typically work for one or the
25 other, as far as I know.

Page 32

1 Q.     What was the -- the case against
2 Starbucks, were you on the plaintiff's side or the
3 defendant's side?
4 A.     I was on the defense side.
5 Q.     So you were representing Starbucks?
6 A.     Yes.
7 Q.     Or working for Starbucks?
8 A.     Yes.
9 Q.     In your CV, which is attached to your --
10 as Exhibit A to your report, you list about a page
11 worth of cases.  Can you flip to that, please?  It's
12 Attachment A.
13     MS. SCHEFFEY:  Do you have a PDF page?
14 Are you on page --
15     MR. CHAREST:  Find it.
16     MS. SCHEFFEY:  Looks like it's --
17     THE WITNESS:  Sorry.  I blew past it.
18     MS. SCHEFFEY:  I think it's 26, page 26 on
19 the Exhibit Share.
20     THE WITNESS:  Are you referring to --
21 could you ask you the question again?  My CV page or
22 my list of cases in the report?
23     MR. CHAREST:  Q.  Yeah, I kind of was
24 treating them as one, but yeah, the list of cases,
25 which comes after the page with your picture on it.

Page 33

9 (Pages 30 - 33)

1 Do you want to put it up so we just can look to see
2 what we're talking about here?
3 A.      Are you asking me to do that?  I don't
4 know how to --
5 Q.      No, I'm asking if you would like that.  Is
6 that easier for you or not?
7 A.      I have it up.  I found it.
8 Q.      All right.  So let's go down the list.
9 The Starbucks case, you were on the defense side,
10 right?
11 A.      Yes.
12 Q.      How about the next one, Vesta?
13 A.      Vesta.  The plaintiff.
14 Q.      And Columbia Sportswear?
15 A.      Plaintiff.
16 Q.      Reser Fine Foods?
17 A.      It was on behalf of the defendant, Bob
18 Evans Farms.
19 Q.      Are these just a selection of your overall
20 body of work?
21 A.      Yes.  The CV with my picture is a, as it
22 says, selected case history, whereas the attachment
23 to the report is the federal disclosure requirement
24 of testimony and depositions within the past four
25 years.  So some of the cases on my CV did not result

Page 34

1 in testimony, they resulted in settlement, but
2 they're on my CV because they're interesting cases.
3 Q.      That's fine.  Let's not waste too much
4 time with that.
5        Let's look at your report, if you would,
6 please.  Actually, before we do that, I want to ask
7 you whether you have any opinions whatsoever on the
8 merits of the case.  Are you with me?
9 A.      Do you mean the legal claims?
10 Q.      Yeah, that's -- I'm just shifting.  I'm
11 trying to articulate the topic.  Okay?
12 A.      I do not have opinions on the legal
13 claims.
14 Q.      Well, let me ask you a question, and you
15 can answer it, rather than doing it that way.  Okay?
16        Do you have an opinion as to whether or
17 not GEO should be able to pay a dollar a day to
18 people that are forced to work?
19 A.      I don't have an opinion.
20 Q.      Do you think GEO should be forced to pay
21 people that it forces to work for nothing?
22 A.      I don't have an opinion.  I don't know.
23 Q.      You don't have an opinion as to whether or
24 not making people who are being civilly detained
25 work on fear of punishment is right or wrong?

Page 35

1 A.      I don't have an opinion on the legal
2 claims.  It's not my -- it's not my role to form an
3 opinion about them.
4 Q.      Do you think it's good to threaten people
5 with detention solitary confinement if they refuse
6 to work when they're not required to?
7        MS. SCHEFFEY:  Object to form.
8        THE WITNESS:  I don't know.
9        MR. CHAREST:  Q.  You don't know?
10 A.      No, I don't know.  I don't know anything
11 about the morality of -- I just haven't given it
12 thought -- of a detention center operation.
13 Q.      You strike me as a very smart person.
14 Just sitting here today, you don't have any views on
15 that at all?
16 A.      I haven't formed any views.  It's --
17 Q.      Do you need some time?
18 A.      No.  I don't -- I don't feel that I have
19 enough information to be able to form a -- if you're
20 asking for a personal opinion, I don't believe I
21 have enough information to form a personal opinion.
22 Q.      So no personal opinion about whether or
23 not -- well, you understand -- let's back up a
24 second.  You understand that the detainees that live
25 in Adelanto are being civilly detained, not

Page 36

1 criminally?  You understand that, right?
2 A.      Yes, I understand that, although I do
3 understand -- I understand that that's what is at
4 issue in this case.  I believe I read that Adelanto
5 might have another -- some of these facilities -- I
6 got to remember if Adelanto has other -- other
7 detainees, but I understand that that's what is at
8 issue in this case.
9 Q.      What's at issue in this case?  When you
10 say "this," what's the "this" that you're talking
11 about?
12 A.      Civil detainees.
13 Q.      Well, do you think that's disputed,
14 whether or not these people are civil detainees as
15 opposed to criminal?
16 A.      I'm not aware of any dispute about that.
17 Q.      You understand, based on your review of
18 the record, that the folks that we're talking about
19 are civil detainees, meaning they have not done
20 anything criminal, correct?
21 A.      That's my understanding, yes.
22 Q.      You understand also that GEO is paid by
23 the U.S. Government to take care of these people,
24 correct?
25 A.      That's my understanding, yes.

Page 37

10 (Pages 34 - 37)

1 Q.     To provide shelter and food and
2 recreational services during the time of their
3 detention. That's GEO's job that it gets paid by
4 the government to do, correct?
5      MS. SCHEFFEY: Object to form, foundation.
6      THE WITNESS: I understand that GEO gets
7 paid to take care of them while they are detained.
8      MR. CHAREST: Q. Right. And "get taken
9 care of" means specifically provide them room and
10 shel- -- board and shelter and food and access to
11 entertainment, or at least recreational activities,
12 correct?
13      MS. SCHEFFEY: Object to form.
14      THE WITNESS: I have not studied the
15 extent of what they're obligated to provide. What
16 you're saying sounds reasonable. I just don't know
17 about if they're obligated to provide the
18 recreation. You're probably right. I just don't
19 know.
20      MR. CHAREST: Q. Leave that aside. GEO's
21 obligation under the contracts it has with the
22 United States Government is to provide clean,
23 livable shelter to these -- to the detainees,
24 correct?
25      MS. SCHEFFEY: Object to form.

Page 38

1      THE WITNESS: I'm -- I don't even know. I
2 don't know -- it sounds reasonable, but I just don't
3 know for sure.
4      MR. CHAREST: Q. You reviewed the
5 contracts where it talked about workers and their
6 jobs in the facility, correct?
7 A.     Yes.
8 Q.     And some of those workers are janitors,
9 correct?
10 A.     Yes.
11 Q.     The janitors are used to clean the
12 facility, correct?
13 A.     Yes.
14 Q.     All right. Similarly, you saw
15 recreational services being -- as job listings,
16 correct?
17 A.     There were job listings that included
18 recreation, so I understand there is recreation. I
19 just don't know the scope of what GEO is obligated
20 to provide.
21 Q.     Leave aside recreation. How about food?
22 Is GEO obligated to provide food to the people that
23 it has in the detainee centers?
24 A.     I would assume so, but as I said, I'm just
25 not familiar with the scope of what -- I mean, it's

Page 39

1 a logical conclusion. I'm not trying to be
2 argumentative. I just haven't familiarized myself
3 with all of what they're obligated to provide.
4 Q.     You cited the services contract in your
5 report, and one of the services that's addressed
6 there is kitchen workers, right?
7 A.     Yes.
8 Q.     Yeah. And the kitchen workers are there
9 to provide food for people in the cell -- in the
10 detention center, correct?
11 A.     Yes.
12 Q.     Right. And so we can agree on this much
13 at least: No. 1, GEO has a contract with the United
14 States Government to run Adelanto?
15 A.     Yes.
16 Q.     GEO gets paid for that contract by the
17 United States Government for the services it
18 provides, correct?
19 A.     Yes.
20 Q.     Among the services GEO is obligated to
21 provide are food for the detainees?
22      MS. SCHEFFEY: Object to form.
23      THE WITNESS: I assume so.
24      MR. CHAREST: Q. Among other services
25 GEO's obligated to provide are shelter, meaning a

Page 40

1 room and a place for the folks to live, correct?
2 A.     I assume so.
3 Q.     Yeah. And you know that GEO's getting
4 paid for the services it provides, correct?
5 A.     Yes.
6 Q.     You understand as a forensic accountant
7 and an obviously very smart person, that GEO just
8 doesn't build a facility and hope it works out. It
9 has to hire people to do these things, correct?
10 A.     Yes, absolutely, GEO has to have
11 employees.
12 Q.     Right. And the choices to GEO are either
13 hire non-detainees or hire -- or use detainee labor.
14 You understand those are both available, apparently,
15 to GEO, correct?
16      MS. SCHEFFEY: Object to form.
17      THE WITNESS: I -- I'm sorry that I'm
18 pausing. I'm just trying to remember the words that
19 you used. "The choices available to them." I don't
20 know. They may have other choices. They may --
21 they may be able to use contract labor.
22      MR. CHAREST: Q. Sure.
23 A.     I know that they -- I mean -- I'm sorry.
24 It sounds reasonable. Those are two of their
25 choices. They may have other choices that I haven't

Page 41

11 (Pages 38 - 41)

1 considered.
2 Q.     I think your choice is another great one.
3 They can -- GEO can use contract labor to provide
4 the services that are necessary to run the facility.
5 You agree with that, right?
6 A.     They could do that, yes.
7 Q.     As given -- do you understand that the
8 nature of the contract between GEO and the United
9 States Government is that GEO gets paid a fixed
10 amount per bed, regardless of its cost?
11 A.     It -- not entirely.  I understand that
12 that is true, but that in addition, for this
13 Voluntary Work Program at issue in this case, that
14 that additional amount is paid separately.
15 Q.     "The additional amount," the dollar a day,
16 we're talking about?
17 A.     Yes.
18 Q.     Yeah.  Okay.  For the work that is
19 provided through detainee labor, you as a person
20 that is well versed in economics -- I'll start
21 again.  It's okay.
22        You, Ms. Morones, as a person who's well
23 versed in economic theory and business valuation and
24 the cost of labor, would understand that if the
25 bottom line of revenue to GEO doesn't change, it's

1 cheaper for it and it makes more profit to use
2 detainee labor over either direct laborers or
3 contract labor, correct?
4        MS. SCHEFFEY:  Object to form.
5        THE WITNESS:  If the revenues could not
6 change contractually under any circumstances, that
7 assumption may be correct, but it's my understanding
8 that if the -- if GEO had to use employees, that
9 they would be able to modify their contract.
10       MR. CHAREST:  Q.  What's your basis for
11 that understanding?
12 A.     Discussion with counsel.
13 Q.     Who?
14 A.     I don't recall.
15 Q.     Which counsel told you that, ma'am?
16 A.     I don't recall.
17 Q.     When did they tell you?
18 A.     Early on in my engagement with the
19 Washington case.
20 Q.     So one of the lawyers in defense of the
21 Washington case told you that GEO could get
22 increased pay if its labor cost went up; is that
23 right?
24 A.     Essentially, yes, that GEO would
25 renegotiate their contract to be able to cover its

1 costs.
2 Q.     Did you ever see any contract or document
3 to support that, or did you just accept that
4 statement for -- as true?
5 A.     I don't recall.
6 Q.     And your answer to my question turns on
7 your reliance on that information, correct?
8 A.     On that assumption, yes.  My answer to
9 your question was your scenario might be reasonable
10 if there is no way for GEO's revenues to change.
11 Q.     Right.  And you say, "But I think they can
12 change their revenue" -- "GEO can change its revenue
13 because of what a lawyer in the Washington case told
14 me," right?
15 A.     That's correct.
16 Q.     Yeah.  But you don't, sitting here today,
17 have any independent knowledge about the
18 truthfulness or not of what that lawyer apparently
19 told you, do you?
20 A.     I can't recall.
21 Q.     No, see -- no, no.  That's not how it
22 goes.  Sitting here today, do you have any
23 independent knowledge of the truthfulness or not of
24 what that lawyer apparently told you?
25        MS. SCHEFFEY:  Object to form.

1        THE WITNESS:  I don't -- I don't -- I'm
2 not sure I understand the distinction, but I don't
3 recall the source of that assumption, other than a
4 conversation.
5        MR. CHAREST:  Q.  Right.  So aside from
6 the conversation, you don't have any basis to know
7 what that lawyer told you is true, correct?
8 A.     Sitting here today, no.
9 Q.     And so if you are right, then GEO could
10 pay the detainees California minimum wage and still
11 maintain its profit line because it would just then
12 renegotiate with the government, right?
13       MS. SCHEFFEY:  Object to form.
14       THE WITNESS:  I don't know whether they
15 could do that or not based on their contract.  It's
16 a legal question.  But just from a financial
17 perspective, in terms of maintaining their profit
18 margin, that's my understanding, but I don't -- I
19 don't know whether or not they can pay California
20 minimum wage to the detainees.
21       MR. CHAREST:  Q.  Do you know of any --
22 anything that prevents GEO from doing so?
23       MS. SCHEFFEY:  Object to form.
24       THE WITNESS:  I understand that they have
25 a contract with ICE to operate the Voluntary Work

Veritext Legal Solutions
800-336-4000

1 Program according to the -- according to the
2 contract. So I don't know -- to me it's a legal
3 question. I don't know what they would be able to
4 do within their contract with ICE.
5      MR. CHAREST: What was your objection,
6 Adrienne?
7      MS. SCHEFFEY: It was that I thought your
8 question was vague, and it calls for a legal
9 opinion.
10      MR. CHAREST: Q. So your testimony today
11 is you think that the contract that GEO has with ICE
12 prevents GEO from paying detainees more than a
13 dollar a day; is that right?
14      MS. SCHEFFEY: Object to form.
15      THE WITNESS: That's not my testimony. I
16 don't know what GEO would be able to do within the
17 requirements of the contract, but I'm aware that
18 there is a contract that requires GEO to operate the
19 Voluntary Work Program. I'm not going to draw a
20 legal conclusion. I don't -- it's just not my --
21      MR. CHAREST: Q. Right. I'm not asking
22 you to draw a legal conclusion. I'm trying to
23 understand what you understand the situation to be
24 based on what you're being told by the lawyers. And
25 the two things I've learned so far are these. And

Page 46

1 correct me if I'm wrong: No. 1, you say GEO can
2 renegotiate its contract with ICE if it has labor
3 costs, right?
4      MS. SCHEFFEY: Object to form.
5      THE WITNESS: That's my understanding,
6 yes.
7      MR. CHAREST: Q. Based on what a lawyer
8 told you, and nothing else, right?
9 A.      I don't recall what the other support was.
10 Q.      If there was any other support either,
11 right?
12 A.      That's correct.
13 Q.      Right. So not what it was, but if it even
14 exists, correct?
15 A.      Correct.
16 Q.      Right. And the No. 2 thing was that you
17 think there's a contract with ICE that prohibits
18 somehow GEO from paying the detainees more than a
19 dollar a day, based on what a lawyer told you,
20 right?
21      MS. SCHEFFEY: Object to --
22      THE WITNESS: I believe you're
23 mischaracterizing my question. I didn't say that
24 it -- that my understanding is that it prohibits it.
25 I said that I understand there's a contract that

Page 47

1 requires GEO to operate the Voluntary Work Program,
2 and I don't know what would be possible within that
3 contract.
4      MR. CHAREST: Q. Okay. So you don't know
5 whether or not GEO has any prohibition on paying
6 detainee laborers more than a dollar a day?
7      MS. SCHEFFEY: Object to form.
8      THE WITNESS: I don't know.
9      MR. CHAREST: What's your objection?
10      MS. SCHEFFEY: I couldn't hear the first
11 half of your sentence, so I'm going with vague.
12 "You don't know whether GEO has..."
13      MR. CHAREST: Q. Did you understand my
14 question, Ms. Morones? I mean, you answered it,
15 right?
16 A.      Yes.
17 Q.      Thank you.
18      Okay. Do you agree with me, from an
19 economic perspective, that the more labor GEO can
20 push off onto the detainees, the more it profits
21 under the arrangement it has with ICE?
22      MS. SCHEFFEY: Object to form.
23      THE WITNESS: I would agree with you if
24 GEO is not able to increase its revenues based on
25 increased labor costs.

Page 48

1      MR. CHAREST: Q. Right. Well, let's
2 unpack that answer just a little bit. Assuming the
3 contract as it exists today remains unchanged -- are
4 you with me?
5 A.      Yes.
6 Q.      All right. The more labor GEO can obtain
7 from the detainees, the more it profits, correct?
8 A.      I don't know. I -- because I don't recall
9 all of the contract, so I -- I don't know. I would
10 still say, if GEO's revenues cannot change, then
11 your hypothetical is correct.
12 Q.      My hypothetical is, the more GEO uses
13 detainee labor, the more it profits, right?
14      MS. SCHEFFEY: Object to form.
15      THE WITNESS: Correct, assuming GEO cannot
16 increase its revenues.
17      MR. CHAREST: Q. Or just does not.
18 Cannot/does not, right?
19 A.      Either one does --
20 Q.      So another way to say that is, assuming
21 facts as they are now, the contract as it exists
22 now, the more GEO uses detainee labor, the more
23 profits, correct?
24      MS. SCHEFFEY: Object to form.
25      THE WITNESS: I am -- I still -- I don't

Page 49

13 (Pages 46 - 49)

1  know what all is in the contract.  I don't know
2  if -- if --
3      MR. CHAREST:  Q.  Ma'am, you've said if
4  GEO can renegotiate its contract, then maybe not,
5  but the hypothetical is, the contract has not been
6  renegotiated.  The contract is what it is.  Are you
7  with me?
8  A.    I hear your question, but I don't know all
9  of what's in the contract to know whether within the
10  bounds of the contract there is a mechanism for GEO
11  to increase its revenues.
12  Q.    Well, what the lawyer told you is that GEO
13  could renegotiate its contract, right?  That's what
14  you told me under oath, right?
15  A.    That was my understanding of what that
16  meant.  It could have meant GEO has the ability
17  within the contract to increase its revenues.
18  Q.    Well, let's -- let's stick to what you've
19  been told by the lawyers and not what you think
20  maybe hopefully happens elsewhere.  Are you with me?
21  So far what you've testified under oath is that GEO
22  could renegotiate the contract if necessary to -- in
23  the face of the increased labor costs, right?
24      MS. SCHEFFEY:  Object to form.
25      THE WITNESS:  That may be -- I'm sorry.

1  Go ahead.
2      MS. SCHEFFEY:  I was just objecting to
3  form and moving to strike the colloquy before the
4  question.
5      THE WITNESS:  That is what I -- what I
6  said, but the conversation happened so long ago, I
7  don't remember the literal words that they could
8  renegotiate their contract.
9      My purpose in making that statement is the
10  understanding that GEO has the ability to increase
11  its revenues if their labor costs increase.  Whether
12  it's within the current contract or a different
13  contract, I don't know.  So when I said that, I
14  didn't mean to be literally that's exactly what they
15  said.
16      MR. CHAREST:  Q.  So are you changing your
17  answer when you're -- when I'm asking you what the
18  lawyer told you now?
19  A.    I'm not changing it.  I'm elaborating on
20  what I meant.
21  Q.    Okay.  So that's changing it, right?  I
22  mean, you're not speaking what you first said?
23      MS. SCHEFFEY:  Object to form.
24      THE WITNESS:  I -- I don't know how to
25  answer your question.  I'm just really telling you

1  what I meant by what I said.
2      MR. CHAREST:  Q.  Sure.  But what you're
3  saying now is different than what you said before,
4  right?
5  A.    Literally, it is.
6  Q.    That's literally the answer.
7  A.    But I'm not -- but I'm not -- but I'm not
8  changing the essence of what I meant.  The essence
9  is, I have the understanding that GEO could increase
10  their rev- -- their pricing or revenues with ICE to
11  accommodate increased labor costs.  Whether it's a
12  renegotiated contract, however that happens, those
13  were the words I used based on my own understanding,
14  my non-legal understanding.
15  Q.    Okay.  So as things stand today, with the
16  revenues being what they are, the more GEO can use
17  detainee labor at Adelanto, the more GEO profits at
18  Adelanto, correct?
19      MS. SCHEFFEY:  Object to form.
20      THE WITNESS:  With revenues staying as
21  they are, yes, that would be correct.
22      MR. CHAREST:  Q.  Thank you.
23  What's your objection?
24      MS. SCHEFFEY:  Asked and answered.
25      MR. CHAREST:  Q.  Do you have any moral

1  view on whether it's appropriate for GEO to have
2  been paid by the United States Government to provide
3  food and service -- food and shelter for the
4  detainees and then turn around and use the detainee
5  labor as the workforce behind its contract to the
6  increase of its profits?
7      MS. SCHEFFEY:  Object to form, foundation.
8      THE WITNESS:  I don't.
9      MR. CHAREST:  Q.  Not at all?
10  A.    No.
11  Q.    No reaction to that at all?
12  A.    No.
13      MS. SCHEFFEY:  Dan, we've been going for a
14  bit over an hour.  At some point I'll just need a
15  restroom break.
16      MR. CHAREST:  I was about to shift gears,
17  so we can do it now.
18      MS. SCHEFFEY:  I saw a pause so I thought
19  I'd interject it.  Thank you.
20      MR. CHAREST:  We can go off the record,
21  please.
22      THE VIDEOGRAPHER:  One moment.  We're
23  going off the record.  The time is 10:14 a.m.
24      (Recess taken from 10:14 a.m. to
25      10:23 a.m.)

1    THE VIDEOGRAPHER: We're back on the
2 record. The time is 10:23 a.m.
3    MR. CHAREST: Q. All right. Ms. Morones,
4 can you refer to your report, please. I want to run
5 through a couple parts of it, just to identify the
6 basis and discuss the underlying facts. In
7 particular, page 3, please. We're going to start
8 with your discussion of GEO.
9    MS. SCHEFFEY: Paragraph 11, just to --
10    MR. CHAREST: Yes.
11    MS. SCHEFFEY: Thanks.
12    MR. CHAREST: Q. You have a section
13 called, in this "B" under the outline, that's called
14 "The GEO Group," and you talk about The GEO Group,
15 the Adelanto ICE Processing Center, the Voluntary
16 Work Program, and the sanitation policy. Do you see
17 those parts there, ma'am?
18 A.    Yes.
19 Q.    Now, you state a series of things in there
20 as fact, but I want to know whether you know, in
21 fact, that the things you're saying are true or not.
22 A.    Independent from the sources, I don't.
23 Q.    Okay. So let's tease that out a little
24 bit. On paragraph 12 -- we talked about this a
25 little bit -- "GEO performs services to provide

Page 54

1 housing and care of the incarcerated individuals."
2 So you knew what we were talking about before,
3 right? To be true, right?
4 A.    Yes.
5 Q.    And GEO gets paid for those services by
6 the United States Government, right?
7 A.    Yes.
8 Q.    And the housing and care are the
9 obligations GEO undertakes in exchange for that pay
10 from the United States Government, right?
11 A.    Are you asking -- would you repeat the
12 question?
13 Q.    Housing and care that you reference in
14 your sentence are the services GEO performs in
15 exchange for the pay it receives from the United
16 States Government?
17    MS. SCHEFFEY: Object to form.
18    THE WITNESS: Yes, I understand that GEO
19 provides services in exchange for compensation.
20    MR. CHAREST: Q. From the United States
21 Government, our tax dollars?
22 A.    Yes, from the United States Government.
23 Q.    Our tax dollars?
24 A.    I'm sure our tax dollars contribute to the
25 budget of the United States Government.

Page 55

1 Q.    Yeah. You describe the detainees as
2 "incarcerated individuals." More accurate to say
3 they are civil detainees, correct?
4    MS. SCHEFFEY: Object to form.
5    THE WITNESS: It is accurate that they are
6 civil detainees, is my understanding.
7    MR. CHAREST: Q. They're not criminals.
8 They're not convicted of anything. In fact, they're
9 waiting adjudication on their immigrant status,
10 correct?
11 A.    That's correct.
12 Q.    And the services you describe are 24-hour
13 care and supervision, right?
14 A.    Yes.
15 Q.    Including medical, transportation, food
16 service, laundry service, and various programming
17 activities. That was the entertainment we had a
18 hard time remembering before, right?
19    MS. SCHEFFEY: Object to form.
20    THE WITNESS: I -- I'm not sure what you
21 meant by that, but yes, this is what -- you've cited
22 my report correctly.
23    MR. CHAREST: Q. Okay. Those are the
24 services that GEO is obligated to perform in
25 exchange for the money it receives from the United

Page 56

1 States Government, right?
2    MS. SCHEFFEY: Object to form.
3    THE WITNESS: As I said before, I'm not
4 familiar with what they are obligated to perform.
5 My sentence cites what they say they do.
6    MR. CHAREST: Q. Okay. And when you say
7 "what they do," you mean to say the sentence cites
8 what GEO says GEO does, correct?
9 A.    Correct.
10 Q.    And do you know whether GEO employs for
11 food service, for example, any employees outside of
12 detainee labor?
13    MS. SCHEFFEY: Object to form.
14    THE WITNESS: I believe for food service,
15 yes, there are employees outside of detainee labor.
16    MR. CHAREST: Q. Do you know what
17 population of the workforce non-detainee labor makes
18 up in the food service portion of the work?
19 A.    I don't.
20 Q.    Would you be surprised to know it was
21 very, very little?
22 A.    I don't have a -- I just don't recall.
23 Q.    How about the laundry service, ma'am? Do
24 you know whether that is entirely made up of
25 detainee labor?

Page 57

1 A.      I don't recall. I know that there are
2 employee supervisors. I don't recall the ratio.
3 Q.      Okay. You understand, though, the work,
4 cleaning the medical facilities, doing the grunt
5 work for the food service, doing the grunt work for
6 the laundry service, and also maintaining the
7 facility in terms of cleanliness, is done through,
8 by and large, if not exclusively, detainee labor,
9 right?
10      MS. SCHEFFEY: Object to form.
11      THE WITNESS: I -- I would assume so, but
12 I don't know.
13      MR. CHAREST: Q. And you think it's
14 correct, right? Not just you're willing to accept.
15 You think that's -- what I said is correct?
16 A.      I understand that there is a significant
17 number of detainees who are involved in the
18 Voluntary Work Program by design, and it wouldn't
19 surprise me that those detainees are doing the more
20 simple tasks that are -- that need to be done within
21 these categories of care provided or activities that
22 happen within these detention centers.
23 Q.      Right. So you referenced the Voluntary
24 Work Program. Do you understand that detainees also
25 are asked to work outside of the Voluntary Work

Page 58

1 Program?
2      MS. SCHEFFEY: Object to form, foundation.
3      THE WITNESS: I understand that they were
4 asked to keep their personal space clean.
5      MR. CHAREST: Q. Anything else?
6 A.      I remember seeing reference to some amount
7 of time, some amount of probationary time relating
8 to the Voluntary Work Program.
9 Q.      I don't know what you mean by that,
10 "probationary time."
11 A.      I just remember reading a reference that
12 there were occasions where detainees worked on a
13 probationary basis.
14 Q.      What do you mean by "worked in a
15 probationary basis"?
16 A.      I don't know. It was just, in reviewing
17 documents, I remember seeing the allegation. I
18 think it was an allegation made by the plaintiffs,
19 so I don't remember the source of that information.
20 Q.      Okay. So you don't know, sitting here
21 today, whether or not detainees do, quote, unquote,
22 "voluntary work" outside of the Voluntary Work
23 Program, right?
24 A.      In terms of voluntary work, I don't.
25 Q.      So let's leave aside the voluntary or

Page 59

1 unvoluntary (sic) nature of it, because that's an
2 unnecessarily confusing construct for our purposes.
3 Are you with me?
4 A.      Yes.
5 Q.      Do you know whether or not people,
6 detainees, perform work services within Adelanto
7 under GEO's supervision and request outside of the
8 Voluntary Work Program?
9 A.      Yes.
10 Q.      Okay. What people do those types of
11 things? What are we talking about?
12 A.      I understand that detainees are required
13 to clean their personal space, living space, as well
14 as personal or some common area space within
15 their -- within their pods.
16 Q.      Okay. So that's the personal living area
17 space. We'll talk about that in a second. Let's
18 put a pin in that. Is there anything else aside
19 from what you just described where you understand
20 that detainees perform labor at Adelanto outside of
21 the Voluntary Work Program?
22      MS. SCHEFFEY: Object to form.
23      THE WITNESS: I am not specifically
24 familiar with any other categories of work,
25 although, as I said, I remember reading a reference

Page 60

1 to an allegation that there were some tasks that
2 were performed that were not recorded in the sign-in
3 sheets. I don't have a specific recall of the basis
4 for that.
5      MR. CHAREST: Q. Well, you know for a
6 fact that the Court has certified a class involving
7 people that worked in the Voluntary Work Program,
8 people that worked in what's called the Unvoluntary
9 Work Program, and people that were working pursuant
10 to what we call the HUSP, the Housing Unit
11 Sanitation Policy, correct?
12      MS. SCHEFFEY: Object to form.
13      THE WITNESS: I am not familiar with
14 exactly which classes are certified. That's a legal
15 part of the case. But I'm familiar with those
16 categories of -- work categories.
17      MR. CHAREST: Q. It's in your report.
18 It's paragraph 9, page 3. I'm really literally
19 reading from it. Does that help refresh your
20 recollection?
21 A.      Yeah. Well, yes, those are my
22 understanding of the two classes. You described
23 them differently. So -- a little bit differently.
24 You described three classes. And with respect to
25 our calculations at issue here, I've been instructed

Page 61

16 (Pages 58 - 61)

1 that there are two classes with these different
2 dates involved. So I wasn't familiar with your
3 characterization of them.
4 Q.    Okay. I was reading it from your page,
5 but okay. Do you agree with me that the Court
6 certified a class that addresses folks that
7 participated in the Voluntary Work Program, folks
8 that were working without compensation under the
9 uncompensated work program, and folks that worked
10 without compensation under the Adelanto Housing Unit
11 Sanitation Policy, correct?
12 A.    As I said before, I'm not familiar with
13 the description you're citing, but I accept it. I
14 don't have a reason to dispute the certification of
15 the classes.
16 Q.    Okay. Do you know what work is going on
17 in connection with the uncompensated work program?
18 A.    I do not.
19 Q.    And do your opinions reach at all the
20 quantifications of unpaid wages in connection with
21 the uncompensated work program?
22 A.    I don't believe so.
23 Q.    Do you know what work was going on in
24 connection with the Adelanto Housing Unit Sanitation
25 Policy?

Page 62

1 A.    I have read some descriptions, some
2 general descriptions of keeping personal spaces
3 orderly and shared spaces -- general cleaning of
4 shared spaces.
5 Q.    Okay. And do your opinions reach at all
6 the quantification of unpaid wages associated with
7 the Housing Unit Sanitation Policy?
8 A.    No.
9 Q.    So your opinions reach only the
10 quantification of damages associated with the
11 Voluntary Work Program, correct?
12 A.    Yes, as addressed by the plaintiff
13 experts. So just responding to the plaintiff
14 experts' quantifications.
15 Q.    Now, you've said a couple times you
16 understand that -- well, let me -- can I start
17 again? Do you mind?
18 A.    Sure.
19 Q.    We, in the case, have been using a term
20 "HUSP" -- H-U-S-P, all caps, for the reporter -- to
21 denote, or connote, I guess, the Housing Unit
22 Sanitation Policy. Are you familiar with that
23 acronym?
24 A.    I am not, but I'm familiar with the
25 concept.

Page 63

1 Q.    Okay. And if I use the term "HUSP," do
2 you understand that I'm referring to the Housing
3 Unit Sanitation Policy?
4 A.    Yes, I do now.
5 Q.    Thank you very much. You said a few times
6 that you understand the work associated with the
7 Housing Unit Sanitation Policy, the HUSP, to be the
8 obligation/the requirement that detainees keep their
9 personal space and parts of the pod in common areas
10 clean, without compensation, correct?
11 A.    Correct.
12 Q.    And you addressed it in paragraph 17. You
13 say, "In accordance with the PBNDS, Adelanto's
14 Facility Policy and Procedure -- Procedures Manuals
15 notes that detainees are not required to work,
16 except to," quote, "'maintain their immediate living
17 areas in a neat and orderly manner,'" end quote.
18 And you cite the manual for that perspective.
19     And then you go on to say, "According to
20 the PBNDS," quote, "'all detainees are responsible
21 for their personal housekeeping,'" end quote, and
22 you cite the PBNDS for that. Have I read your
23 report correctly, ma'am?
24 A.    Yes.
25 Q.    Now, the PBNDS says more than what you

Page 64

1 quoted about what limitations are imposed on
2 detainee work, doesn't it, ma'am?
3 A.    I don't recall.
4 Q.    Okay. You understand that the immediate
5 living areas is including not just the dorm rooms
6 where the folks live, but also the common areas,
7 the -- where they spend time during the day,
8 correct?
9 A.    Yes --
10     MS. SCHEFFEY: Object to form and
11 foundation.
12     THE WITNESS: I didn't complete my answer.
13 It was, yes, that's my understanding.
14     MR. CHAREST: Q. And were you the one
15 that was told -- I mean, did someone tell you that
16 that interpretation complies with the PBNDS, or is
17 that a conclusion you drew on your own?
18 A.    I don't recall having a discussion about
19 what complies with the PBNDS. Because there are no
20 quantification of that issue in this case, I don't
21 recall having any discussion about it.
22 Q.    So if you didn't have a discussion, then
23 it follows by reason that you made the determination
24 on your own; is that right?
25 A.    No. Your question is what complies, and I

Page 65

17 (Pages 62 - 65)

1  don't recall having a discussion about what complies
2  in context of the personal housing requirement.
3  Q.      So I think we may be talking past each
4  other, so let's just try and clean it up.  You say
5  that the sanitation policy, which you describe by
6  reference to the manual that you quote in paragraph
7  17, is in accordance with the PBNDS, right?
8  A.      I say that in accordance with the policy,
9  detainees are not required to work except to
10 maintain their immediate living areas in a neat and
11 orderly manner.  I have not said anything about what
12 the Adelanto facility actual practices are and
13 whether or not they comply with the policy.
14 Q.      Well, you say that the manual is in
15 accordance with the PBNDS.  That's the import of
16 what your first sentence in paragraph 17 is,
17 correct?
18 A.      So your question is, does my statement
19 indicate that the manual is in accordance with
20 PBNDS.
21 Q.      Well, do the words "in accordance with the
22 PBNDS" mean that this is in accordance with the
23 PBNDS?  That's my question.
24 A.      That's my understanding.
25 Q.      All right.  So then your understanding is

Page 66

1  that the manual is in accordance with the PBNDS,
2  right?  That's your statement is.  I mean, I'm
3  not trying --
4  A.      I'm sorry, I'm just trying to think about
5  your question.  Many of your questions are, to me,
6  legal questions, so I'm trying to be careful.  Just
7  trying to be careful that I don't misstate
8  something.
9  Q.      Let me rephrase it, rather than have you
10 struggle with what you don't understand.  You wrote
11 the words "in accordance with the PBNDS" and
12 referred to a manual from Adelanto, right?
13 A.      Yes.
14 Q.      Did you mean to say that that manual is in
15 accordance with the PBNDS when you said those words?
16 A.      I didn't specifically mean to say that.
17 Q.      Okay.  So you don't have any opinion about
18 whether or not the manual accords with the PBNDS or
19 not, correct?
20 A.      I don't.
21 Q.      And any statement to the contrary to
22 suggest that maybe you do think that one is in
23 accordance with the other is incorrect and a
24 misunderstanding, based on your report, correct?
25 A.      That's correct.  I would not interpret a

Page 67

1  manual's compliance with a standard in my report.
2  Q.      So specifically, when you said in
3  paragraph 17 that the manual was in accordance with
4  the PBNDS, that was poor language?
5  A.      I did not intend it to suggest that it is
6  in compliance with PBNDS.
7  Q.      Okay.  And you cite the PBNDS, footnote
8  18, in the Voluntary Work Program, Section 5.8,
9  correct?
10 A.      Correct.
11 Q.      Trying to find -- where are we?  A
12 document that's massive that you cited, I'm trying
13 to pull it up to put it into the record here, but
14 just it's slowing down my Internet too much.  Here
15 we go.  So that is it.
16        I'm going to introduce as the next
17 exhibit, which I guess is 206 -- is that right,
18 Natalie?  Yes.  Don't worry about it.  I got it.
19        (Whereupon Exhibit 206 was marked for
20        identification.)
21        MR. CHAREST:  Q.  Introducing Exhibit 206,
22 which I will warn you is a massive document.  It is
23 the PBNDS document that you cited in your report.
24 This is -- if you're able to open it up, please do
25 so and go to the page that you cited, which is

Page 68

1  GEO-Novoa_000154162.  Okay?
2  And while that's loading, I want to ask you some
3  more questions about this paragraph 17.  Are you
4  saying you never had any conversation with counsel
5  about whether or not the HUSP qual-- -- is in accord
6  with or not in accord with the PBNDS?
7  A.      I don't recall any.
8  Q.      So -- sorry.  Go ahead.
9  A.      It's just since it's not quantified in
10 this -- by the plaintiff's experts, I don't recall
11 discussing it or raising it.
12 Q.      But you said it -- you said what you said
13 in your report, but you're just saying that was just
14 you sort of trying to give a framework and not
15 making any opinions about whether one thing applies
16 with the other, correct?
17 A.      Correct.
18        MS. SCHEFFEY:  Object to form.
19        MR. CHAREST:  Has anyone seen the exhibit
20 yet?
21        MS. SCHEFFEY:  No.  I think I've like
22 frozen my browser, but I'm working on it.
23        MR. CHAREST:  Me too.
24        MS. SCHEFFEY:  I hit refresh, which I
25 actually think was a mistake.

Page 69

18 (Pages 66 - 69)

1      THE WITNESS:  Yeah, my browser is doing an
2 infinite buffering circle.
3      MR. CHAREST:  Q.  Okay.  Let's just move
4 on.  We can come back and mess with that.  We can
5 have some fun later on that.  I'll just put a little
6 flag there, and we'll save that for later.
7      Can you flip back in your report to
8 paragraph 13, where you talk about the Voluntary
9 Work Program.  Are you with me?
10 A.      Not yet.  I apologize.  Got to get back
11 into my report.  And just to let you know, 206
12 didn't come up after it -- so...
13 Q.      Okay.
14 A.      Deal with that.  So paragraph -- repeat
15 the paragraph, please.
16 Q.      Fifteen.
17 A.      Okay.
18 Q.      Let me know when you're there.
19 A.      I'm there.
20 Q.      Okay.  You say in this paragraph, "GEO
21 manages a Voluntary Work Program at the Adelanto
22 Facility in accordance with the PBNDS."  So there's
23 that phrase again that I was asking about.  Is that
24 serially, you're not making any opinion about
25 whether or not the Voluntary Work Program at

Page 70

1 Q.      And you go on to say that other "expected
2 outcomes of the Voluntary Work Program include
3 reducing the negative impact of confinement through
4 decreased idleness, improved morale, and fewer
5 disciplinary incidents and an enhancement of
6 essential operations and services through detainee
7 productivity," correct?
8 A.      Correct.
9 Q.      Again, quoting the PBNDS, right?
10 A.      Yes.
11 Q.      One of the other results of Voluntary Work
12 Program is a dirt cheap labor force, right?
13 A.      Well, they're paid a dollar a day, and so
14 it would -- that's a complex statement.  It would
15 depend on whether or not GEO can get compensation
16 for higher cost labor, but at its essence, they are
17 paid a dollar a day.
18 Q.      Doesn't matter what GEO can get paid for
19 it.  My question is literally the cost of the labor
20 force under the Voluntary Work Program is
21 extraordinarily low by comparison to any other
22 source of labor, correct?
23 A.      Correct.
24      MS. SCHEFFEY:  Object to form.
25      MR. CHAREST:  What's your objection?

Page 72

1 Adelanto, in fact, is in accordance with or is not
2 in accordance with the PBNDS?
3 A.      That's correct.  I don't have an opinion
4 that it is or it isn't.
5 Q.      That was -- my frustration was not at you.
6 It was at the Veritext thing here.  Not that -- not
7 at the Veritext folks.  I just tried to upload the
8 same document again.  I think I bundled the
9 numbering, but we'll figure it out.
10      Okay.  So the answer was no, you don't
11 have any opinion about whether or not the Voluntary
12 Work Program at Adelanto complies with or does not
13 comply with the Performance-Based National Detention
14 Standards, correct?
15 A.      Correct.
16 Q.      And did you have any discussion with
17 counsel about whether or not the Voluntary Work
18 Program complied with those standards?
19 A.      I did not.
20 Q.      You mention in paragraph 16 that the --
21 that ICE says the Voluntary Work Program, quote,
22 "provides detainees opportunities to work and earn
23 money while confined," end quote.  And you cite the
24 PBNDS for that proposition, correct?
25 A.      Correct.

Page 71

1      MS. SCHEFFEY:  Because the documents are
2 not in front of her, I don't know what the
3 comparison is to.  I don't see the phrase
4 "extraordinarily low" in her report.  He says he's
5 reading from her report.  I don't see the comparison
6 he's asking about.
7      MR. CHAREST:  Q.  Okay.  Have you reviewed
8 the actual PBNDS to make any evaluation about
9 whether or not the Voluntary Work Program complies
10 or does not comply with its -- with its terms?
11 A.      I have not.  That would be outside the
12 scope of my expertise.
13 Q.      And have you reviewed the PBNDS to
14 determine whether or not the sanitation policy, the
15 HUSP at Adelanto, complies or does not comply with
16 the PBNDS?
17 A.      I have not.
18 Q.      And that's outside your expertise as well,
19 correct?
20 A.      Correct.
21      MR. CHAREST:  Okay.  Has anyone -- can we
22 go off the record, please, for this document issue,
23 please?
24      THE VIDEOGRAPHER:  Yes.  One moment.
25 We're going off the record at 10:52 a.m.

Page 73

19 (Pages 70 - 73)

1      (Discussion off the record.)
2      THE VIDEOGRAPHER:  Okay.  We're back on
3  the record.  The time is 10:57 a.m.
4      MR. CHAREST:  Q.  All right.  Sorry about
5  the technical issues.  Ms. Morones, are you looking
6  at Exhibit 206 with -- and at GEO-Novoa_00015462?
7  A.    Yes, I am.
8  Q.    Great.  And that's the source that you
9  cited and quoted part of in your report on paragraph
10  17, correct?
11  A.    I believe so.  The report's down, but I'm
12  assuming it is.
13  Q.    I'm going to try and share with y'all this
14  image.  Let me know if that's working, please.
15      THE VIDEOGRAPHER:  Okay.  Counsel, I have
16  a question for you.  So now the witness and the
17  document are being recorded.  Do you just want the
18  witness still recorded, just like at a regular
19  deposition, or do you want them side by side while
20  this is recording?
21      MR. CHAREST:  Both is fine.  Thank you.
22      THE VIDEOGRAPHER:  Okay.
23      MR. CHAREST:  Q.  All right.  Ms. Morones,
24  can you see the page that you're -- you cited in
25  your report when you're talking about the PBNDS?

Page 74

1      THE WITNESS:  I would assume so.
2      MR. CHAREST:  Q.  And the other things
3  that are addressed are beds, right?  And their
4  own personal papers, right?
5  A.    Well, it doesn't say "personal."  It says
6  "stacking loose papers."
7  Q.    Sure.  But it doesn't say "pods" anywhere,
8  does it?
9  A.    The word "pods" is not in this section.
10  Q.    It doesn't say "shared living space," does
11  it?
12  A.    It does not.
13  Q.    And it doesn't say "common areas," does
14  it?
15  A.    It does not.
16  Q.    Okay.  But, again, the determination of
17  whether or not the PBNDS, which we're looking at,
18  complies with Adelanto's manual and/or its policies
19  and/or its actual practices is not within the scope
20  of your opinions or expertise, correct?
21  A.    That's correct, but I think you meant to
22  say the opposite, that the manual complies with
23  this, but either way, it's correct it's not within
24  the scope of my assignment.
25  Q.    Did I get the question backwards?  I'm

Page 76

1  A.    Yes.
2  Q.    All right.  I've highlighted Section 508
3  (sic), part C here of the "Personal Housekeeping
4  Required."  Is that the -- that's the provision you
5  cited in your report, correct?
6  A.    I believe so.
7  Q.    And you quoted from the introductory
8  sentence to that, where specifically "detainees are
9  responsible for personal housekeeping," right?
10  A.    Yes.
11  Q.    You did not quote the remainder that
12  describes the four things that that makes up, right?
13  A.    Correct.
14  Q.    Do you see where it says anything about
15  keeping the common areas and the pods clean as an
16  obligation under the personal housekeeping brand?
17  A.    I -- I don't see those specific words.  I
18  don't know what "immediate living area" means,
19  though.
20  Q.    "Immediate" and "living area" is what
21  you're looking at here, right?
22  A.    Yes.
23  Q.    All right.  So "immediate" has a sense of
24  proximity, right?  Immediacy, correct?
25      MS. SCHEFFEY:  Object to form.

Page 75

1  sorry.  I'm going to try again.
2  A.    You said that I don't have an opinion that
3  this complies with the manual.
4  Q.    Ah.  You're exactly right.
5  A.    But either way, I don't have an opinion.
6  Q.    Whether or not the manual -- the actual
7  practices or the policies at Adelanto comply or
8  don't comply with the PBNDS is not within the scope
9  of your expertise, and also not the subject of any
10  opinion you know you have, correct?
11  A.    Correct.
12  Q.    I'm going to turn to the -- I'm going to
13  go through your report in sort of reverse fashion,
14  where I'm going to talk about the Childers aspects
15  first, and then we'll return to the Bland critiques
16  second.  Are you with me in terms of concept there?
17  A.    Yes.
18  Q.    You start talking about Mr. Childers
19  report on page 16 of your report.  And so I think
20  you have both available to you.  And again, if you
21  need to refer to either one to answer a question,
22  I'd encourage you to do so.  All right?
23  A.    Okay.
24  Q.    And I misspoke.  You actually started
25  talking about Mr. Childers at the bottom of page 14,

Page 77

1 but the text begins on page 15 of your report,
2 right?
3 A.      Correct.
4 Q.      Okay.  In paragraphs 44, you list six
5 assumptions, as you describe them, that Mr. Childers
6 made, right?
7 A.      Correct.
8 Q.      Now, as to the first one, fundamentally,
9 it's the base -- the premise that, given that GEO
10 pays a dollar a day, each dollar paid reflects a
11 dollar of someone working -- a day of someone
12 working, correct?
13 A.      Correct.
14 Q.      Do you dispute that assumption or the
15 validity of it?
16 A.      I don't.
17 Q.      All right.  So you think that's a valid
18 assumption to make?
19 A.      Yes.
20 Q.      And you have no criticism of Mr. Childers
21 for using that assumption, correct?
22 A.      I did not mention any criticism about
23 that, correct.
24 Q.      But you mention -- but sitting here today,
25 under your testimony, you have no criticism of that?

Page 78

1      MR. CHAREST:  Q.  Right.  And therefore,
2 it is a conservative measure, using that assumption,
3 right?
4 A.      Well, it's only meant to address the
5 Voluntary Work Program.
6 Q.      Well, let's say it this way:  It's
7 conservative as to the whole of the claims to just
8 use dollars per day to reflect days of work, right?
9 A.      I don't even -- I don't mean to be
10 difficult, but I just don't know anything about the
11 validity of those other claims to say, "This is a
12 conservative approach," because it -- because this,
13 to me, stands alone inside of this claim related to
14 the Voluntary Work Program.
15 Q.      That's your -- that's your perspective on
16 it.  Okay.  I see.  All right.
17      Well, okay.  But we both agree that, as
18 applied to the Voluntary Work Program, you would
19 think this is a valid assumption?
20 A.      Yes.
21 Q.      Okay.  Goes on -- you go on to note that
22 Mr. Childers relies in the Bland report for the
23 number of hours -- number of hours worked, in the
24 second assumption, right?
25 A.      Correct.

Page 80

1 A.      I don't.
2 Q.      And if anything, it underreports the
3 issues in the case because the case involves not
4 only people that are paid in the Voluntary Work
5 Program, but people that are not paid in the
6 unvolunteer -- Unvoluntary Work Program, and also
7 the HUSP, right?
8      MS. SCHEFFEY:  Object to form.
9      THE WITNESS:  This calculation relates --
10 as I understand it, relates to time reported only in
11 the Voluntary Work Program, or relates to not only
12 time, but relates to sign-in or participation in the
13 Voluntary Work Program only.
14      MR. CHAREST:  Q.  But in terms of
15 assumptions and quality of assumptions, my question
16 is a little bit different than that.  Assuming $1
17 per -- means one day of work necessarily counts less
18 days of work because of work that is done that is
19 uncompensated, correct?
20      MS. SCHEFFEY:  Object to form.
21      THE WITNESS:  Does not count activities --
22 the other activities alleged, whether it's formally
23 going -- assumed to be work that's compensable, I
24 don't know, but it does not count those other
25 activities.

Page 79

1 Q.      And aside from whatever critiques you have
2 of Mr. Bland's work -- and we'll talk about those in
3 detail later -- there's nothing independent that you
4 would criticize Mr. Childers for relying on
5 Mr. Bland's data, correct?
6 A.      I -- no, because he didn't do anything
7 else besides rely -- he relied, so our criticisms
8 already addressed by this point apply.  There's
9 nothing additional in terms of time worked that
10 went --
11 Q.      My question is this.  I'm sorry, I thought
12 you were done.  I'm sorry.  Go ahead.
13 A.      There are no additional criticisms related
14 to amount of time worked.
15 Q.      Okay.  So you don't criticize him for
16 relying on the Bland data.  You do criticize the
17 Bland data in ways that we'll discuss later; is that
18 fair?
19 A.      Correct.
20 Q.      You say, "Dr. Childers assumes that
21 employees or subcontractors would have required the
22 same amount of time as detainees performing tasks
23 under the VWP."  Is that a -- do you believe that
24 that assumption is invalid or valid?
25 A.      I didn't reach an opinion about it.  I

Page 81

21 (Pages 78 - 81)

1 just stated that that was a key assumption.
2 Q. But one you do not challenge?
3 A. Correct.
4 Q. And have not attempted to quantify the
5 impact of that assumption in any way?
6 A. Correct.
7 Q. And do you find that it's an unreasonable
8 assumption?
9 A. As I said, I don't -- I don't have an
10 opinion about it. I haven't analyzed it in enough
11 depth to express an opinion about it.
12 Q. Well, this is our chance to understand
13 your rationale. Are you doing work on that now, or
14 do you plan to do work on it in the future?
15 A. I do not.
16 Q. And you have not?
17 A. I have not analyzed this assumption or --
18 and I don't intend to express an opinion about it.
19 Q. And moreover -- well, if you don't intend
20 to address an opinion, then that's -- that is what
21 it is.
22     The next assumption you identify, the
23 fourth one, is that Dr. Childers categorized
24 workers -- work hours, rather, into four categories,
25 being janitor, food prep, laundry, and barber. Does

Page 82

1 that accurately describe your articulation of the
2 assumption?
3 A. Yes.
4 Q. Do you have any critique of that
5 assumption?
6 A. No. It's just for understanding purposes,
7 to explain what he did.
8 Q. But you're not sitting here saying that
9 that is an improper organization of the work hours,
10 is it?
11 A. No, I'm not.
12 Q. The next assumption you point out is that
13 "Dr. Childers uses wages and benefits data from the
14 Bureau of Labor and Statistics (sic) to determine
15 the but-for cost of hiring employees," right?
16 A. Correct.
17 Q. It's the fifth assumption in your list of
18 six. Do you have any criticisms of the use of
19 Bureau of Labor and Statistics data for the purposes
20 that Mr. Childers used them?
21 A. Yes. As explained later in the report, I
22 believe he should have considered GEO's
23 contractually required hourly rates as opposed to
24 BLS statistics. I don't know how the BLS statistics
25 would come to pass in his scenario when GEO has

Page 83

1 specified rates in their contracts.
2 Q. Okay. And that statement you're just
3 making about specified rates in the contracts and
4 required rates in the contracts is based on your
5 reference to the wage determination schedules in the
6 GEO contract that you reviewed, correct?
7 A. Correct.
8 Q. And it's your understanding, is it not,
9 that those wages are mandated in the contract such
10 that GEO cannot pay above that amount. Is that your
11 understanding?
12     MS. SCHEFFEY: Object to form.
13     THE WITNESS: I did not assume whether GEO
14 could pay above or below. I assumed that those
15 would be the appropriate wages.
16     MR. CHAREST: Q. So when you said
17 "contract requires," that's not what you meant, what
18 you just answered me earlier?
19 A. Could you repeat the question?
20 Q. I'll take another pass at the issue so we
21 don't have to talk past each other. You ready?
22 A. Yes.
23 Q. Is it your understanding that the wage
24 determination schedules mandate the amount of pay
25 GEO can pay its employees?

Page 84

1 A. Yes.
2 Q. What is the basis of that understanding?
3 A. Just seeing the wages determination
4 schedules in the contracts and making the assumption
5 that those would be the appropriate rates to apply
6 in any scenario of analysis that, if GEO paid other
7 than minimum wage, what would they -- what would
8 they pay. They would pay their contractual rates.
9 Q. So if you as a service provider have a
10 contract with a party that wants services, and that
11 contract dictates $6 an hour, does that mean you can
12 only pay $6 an hour to the people that you hire to
13 do the work?
14     MS. SCHEFFEY: Object to form.
15     THE WITNESS: I don't know. It would
16 depend on the contract. I don't know.
17     MR. CHAREST: Q. This time -- so let me
18 be more clear. Let me be less vague about my
19 question to you. You said in your report, I
20 thought, that the contract required a certain amount
21 to be paid, but what you just said in your answer is
22 that you thought it was a reasonable measure of the
23 amount to be paid. Which one is your actual
24 understanding?
25     MS. SCHEFFEY: Object to form.

Page 85

22 (Pages 82 - 85)

1      THE WITNESS: I -- both. I understand
2 that these are contractually required rates, and
3 because of that, they're reasonable for an expert to
4 assume when making this calculation.
5      MR. CHAREST: Q. Okay. So let's start
6 with the first step there. You understand as a
7 matter of fact that the wage determination schedules
8 require GEO to pay the amounts set out in the
9 schedule, correct?
10 A.     Correct.
11 Q.     What is the basis for that understanding?
12 A.     My own review of the contract and seeing
13 the schedules.
14 Q.     So flip, if you would, to par-- footnote
15 58, which is on page 18 of 22 of your report. Let
16 me know when you're there, please.
17 A.     Okay.
18 Q.     Footnote 58 is appended to the last
19 sentence in paragraph 56, in which -- in which you
20 said, "I understand that GEO Group's" -- "GEO Group
21 employees' wages and benefits are based upon Wage
22 Determination schedules issued by the Department of
23 Labor in accordance with ICE agreements." And you
24 have the footnote 58. And in footnote 58 you say,
25 "My understanding of the GEO Group compensation

Page 86

1 the litigation counsel?
2 A.     It would have been litigation counsel.
3 Q.     So someone at the Akerman law firm?
4 A.     Yes.
5 Q.     Was it a man or a woman?
6 A.     I don't recall.
7 Q.     Was there more than one lawyer on the
8 phone at this time?
9 A.     There may have been. There were typically
10 two or three, sometimes more attorneys on the phone
11 when we would have a discussion.
12 Q.     Who was your primary source of contact at
13 the Akerman firm?
14 A.     It would often be Adrienne. For logistics
15 issues, it would often be Alicia.
16 Q.     And then for the receipt of information,
17 who would it be?
18 A.     In terms of data transmission? I don't --
19 I don't know. I'd have to look back at my e-mails
20 and see who would typically transmit data to us.
21 Q.     And the contract, then, that this lawyer
22 told you about, did the lawyer suggest to you that
23 the wage determination schedules were binding or
24 limiting on what GEO could pay its contractors, or
25 its employees, rather?

Page 88

1 practices is based on my August 27th, 2020
2 conversation with GEO Group's counsel and a review
3 of the ICE contract amendment at
4 GEO-Novoa_00018147." Have I accurately described
5 the contents of your report, ma'am?
6 A.     Yes.
7 Q.     Okay. What lawyer told you anything about
8 GEO compensation practices on August 27th, 2020?
9 A.     I don't recall which lawyer. There were
10 often in our conversations multiple lawyers on the
11 phone.
12 Q.     What did that lawyer tell you about the
13 compensation practices of the GEO Group that you
14 relied on and wrote as noted in par- -- in footnote
15 58?
16 A.     That GEO's contracts have wage
17 determination schedules.
18 Q.     Did the lawyer tell you that the wage
19 determination schedule -- wage determination
20 schedules are mandatory on GEO vis-a-vis the
21 employees?
22 A.     I don't recall a discussion about them
23 being mandatory.
24 Q.     Do you remember whether the lawyer that
25 you were talking to was in-house at GEO or one of

Page 87

1      MS. SCHEFFEY: Object to form, and asked
2 and answered.
3      THE WITNESS: I don't recall a discussion
4 about what's binding. I'm assuming, because it's
5 included in the contract, that those rates would be
6 the most appropriate rates to use for a calculation
7 of what employees would be paid by GEO.
8      MR. CHAREST: Q. You understand that the
9 contract that you're talking about is a contract
10 between ICE ultimately and GEO in a roundabout way,
11 right?
12 A.     I understand that, yes.
13 Q.     And its amount -- it's an amount that GEO
14 is going to get reimbursed, not necessarily an
15 amount that GEO is going to pay. You understand
16 that?
17      MS. SCHEFFEY: Object to form, foundation.
18      THE WITNESS: I understand that the rates
19 that GEO is paid in the contract is what they are
20 going to be paid, not -- not representing their
21 cost.
22      MR. CHAREST: Q. Right. And so the rates
23 that you're looking to as -- in the contract are
24 revenue to GEO, not necessarily reflective of cost
25 to GEO, correct?

Page 89

23 (Pages 86 - 89)

1 A.      In terms of the per-bed-per-day rates,
2 yes.
3 Q.      Not just the rates for per bed per day,
4 but the wage rates that are identified in those
5 contracts?
6          MS. SCHEFFEY: Object to form.
7          THE WITNESS: I don't have an
8 understanding that those represent strictly revenue.
9 My assumption is that those are the wage rates that
10 GEO should pay based on the contract.
11         MR. CHAREST: Q. So that was your
12 assumption. Did you ask the validity of that
13 assumption to the lawyers?
14 A.      I didn't see any reason to question that
15 assumption, so no, I didn't ask.
16 Q.      You're on the phone with the lawyers who
17 handed you this contract and said, "Hey, look at the
18 rates here," and you assumed you could use it to be
19 a source for what GEO pays, and you didn't bother to
20 ask like the six-letter question, "Is this what GEO
21 pays its employees?"
22         MS. SCHEFFEY: Object to form and
23 argumentative.
24         THE WITNESS: I did not ask. I received
25 an assumption and instruction about what the

1 contract provides, and I assumed that these are the
2 rates that GEO should pay -- would pay.
3          MR. CHAREST: Q. No. Did you receive an
4 instruction? What was the instruction?
5          MS. SCHEFFEY: I instruct you not to
6 answer.
7          MR. CHAREST: Whoa, careful.
8          MS. SCHEFFEY: I said that there's a
9 foundation, if you can find out if it was in this
10 conversation.
11         MR. CHAREST: Q. What instruction are you
12 talking about, ma'am?
13 A.      The contract between GEO and ICE includes
14 wage determination schedules that would represent
15 what GEO would pay for these various -- for various
16 job categories.
17 Q.      So you were told by lawyers that the
18 schedules reflect what GEO would pay, even though
19 that's not the subject matter of the contract,
20 right?
21         MS. SCHEFFEY: Object to form, foundation.
22         THE WITNESS: I don't know what you mean
23 by "not the subject matter of the contract," but
24 that's what I understood the wage determination
25 schedules to be, what GEO would pay their employees

1 for different positions.
2          MR. CHAREST: Q. And you were told that
3 by lawyers at GEO -- for GEO?
4          MS. SCHEFFEY: Object to form, asked and
5 answered.
6          THE WITNESS: Yes.
7          MR. CHAREST: Q. And you did not bother
8 to ask, "Is this, in fact, what they pay their
9 employees?"
10 A.      I did not ask that.
11 Q.      Even though you were on the phone with
12 them talking about this, and they were saying, "Use
13 this as a proxy," you didn't say, "Well, what do
14 they actually pay," right?
15 A.      I did not ask.
16 Q.      Even --
17         MS. SCHEFFEY: At that point, it's been
18 asked and answered about ten times now. I'm giving
19 you a little more rope, but we're near the end of
20 it.
21         MR. CHAREST: You're not giving me
22 anything.
23 Q.      Ma'am, is it your normal practice, when
24 trying to figure out what GEO paid or what any
25 client pays, to not ask what that client pays?

1 A.      I received this as a legal instruction,
2 and when I receive a legal instruction, it is not my
3 place to challenge the legal instruction.
4 Q.      So then now we've gone a step further than
5 what you first said. You first said it was an
6 assumption that you found to be reasonable, and now
7 you're telling me you were instructed to use these
8 numbers as a representation of what GEO pays its
9 employees. Which one is it, ma'am?
10 A.      It's -- it's both. The attorneys informed
11 me that the contract includes a wage determination
12 schedule which represents what GEO should pay its
13 employees. I looked at the wage determination
14 schedule and assumed that it would be the reasonable
15 basis to use in making any calculation of what
16 employees would be paid for the various positions.
17 Q.      Instead of asking for what GEO actually
18 paid, right?
19 A.      That's what I did; that's correct.
20 Q.      Right. So when trying to figure out the
21 answer to what is X, the one thing you did not do is
22 ask, "What is X," right?
23         MS. SCHEFFEY: Object to form.
24         THE WITNESS: I disagree with you. The
25 question isn't what does GEO actually pay. The

1 question is what are they contractually obligated to
2 pay.
3        MR. CHAREST: Q.  Why is that the
4 question?
5 A.      I was instructed that, and so I assumed
6 that that was a reasonable basis for the
7 calculation, as apparently did your -- as apparently
8 did your expert as well.
9 Q.      Now, you're saying GEO's contractually
10 obligated to pay that amount, which is I think
11 different than what you said before.  Was that the
12 instruction you received?
13        MS. SCHEFFEY: Object to form, asked and
14 answered.
15        THE WITNESS: No one said specifically
16 they're contractually obligated to pay these
17 amounts.
18        MR. CHAREST: Q.  Except for --
19 A.      It was much more simple than that.
20 Q.      You just said that in your answer.  So is
21 that not --
22 A.      But that is my understanding.  I don't
23 have literal memory of conversations.  My
24 understanding is, based on the conversation, as
25 these wages are provided in the contract, that these

Page 94

1 are contractually obligated amounts.  That's my
2 understanding.
3        I'm not a lawyer.  I could be wrong.  I
4 could be wrong in a legal understanding, but that's
5 the basis of why I believed it was a -- the most
6 reasonable source of wage rates to use in any
7 calculation, other than minimum wage, of what GEO
8 would pay.
9 Q.      Because the lawyers told you to use it as
10 a proxy for what was actually paid, and you assumed
11 it was required that GEO must only pay that, right?
12        MS. SCHEFFEY: Object to form, misstates
13 prior testimony.
14        MR. CHAREST:  "Misstates testimony" is
15 what she's saying.
16 Q.      Go ahead.
17 A.      I didn't make an assumption that it is
18 what -- I don't remember exactly what you said --
19 that it is only what they would pay, but it -- my
20 assumption was it is the most reasonable set of
21 hourly rates to use for a calculation of what they
22 would pay.  I don't know if they can -- if they can
23 pay something else, they may be able to pay
24 something else.  My assumption is it is the most
25 reasonable basis for using rates in a calculation of

Page 95

1 what they would pay.
2 Q.      And that, you believe, applies to the
3 entire class period, right?
4 A.      Well, I understand the rates change
5 different times, but...
6 Q.      Yeah.  And...?
7 A.      So to the extent they change, then
8 different rates would be applicable when the rate --
9 wage determination schedules change.
10 Q.      Were you given those new, updated, higher
11 rates by your counsel?
12 A.      I believe so, but if you're trying to
13 indicate there are more rates, I don't know.  I
14 believe I have them all.
15 Q.      Well, let's be really clear.  You
16 criticize Mr. Childers for not using these wage rate
17 determinations.  You cited to one from 2014 as what
18 he should have used, and you know there's amendments
19 later that increase the rates?  Is that right?
20        MS. SCHEFFEY: Object to form.  And I
21 think we need to stick to her report, because I
22 think you're misstating it.  It's about the third
23 time now.
24        THE WITNESS: It can be, depending on what
25 the category of employee is.  There are some of

Page 96

1 these schedules that have some positions in some,
2 but not others, so you would need to direct me to
3 whatever it is that you think is not right.
4        MR. CHAREST: Q.  We can talk about that
5 later.  I'm trying to figure out what you used.
6 Here's my -- here's my conundrum:  You have GEO
7 there at your beck and call to answer any questions
8 you can ask, right?
9        MS. SCHEFFEY: Object to form.
10        THE WITNESS: I'm able to ask questions to
11 GEO's counsel.
12        MR. CHAREST: Q.  Right.  And if the
13 question is "What's a reasonable number about what
14 people" -- "what GEO pays people to do these
15 services" --
16 A.      I'm sorry.  There's -- so you -- there's a
17 protest going by my office, so we'll just -- I don't
18 know how loud it's going to get.
19 Q.      Do you want to take a break, or are you
20 okay?
21 A.      I don't know.  Might want to take a -- go
22 off the record for a second and maybe just see.
23        MR. CHAREST: Let's go off the record.
24 That's fine.
25        MS. SCHEFFEY: Take a five-minute.

Page 97

25 (Pages 94 - 97)

1    THE VIDEOGRAPHER: We're going off the
2  record. The time is 11:29.
3    (Recess taken from 11:29 a.m. to
4    11:34 a.m.)
5    THE VIDEOGRAPHER: We're back on the
6  record. The time is 11:34 a.m.
7    MR. CHAREST: Q. All right. Ms. Morones,
8  we were talking about your criticism of
9  Mr. Childers' use of Bureau of Labor Statistics data
10  and your preference, apparently, for the wage
11  determination schedules as a way to measure what it
12  would cost GEO to hire non-detainee labor. Do you
13  remember that?
14  A.    Yes.
15  Q.    Let's start -- let's do what I think might
16  be the easy thing first. Do you disagree with the
17  Bureau of Labor Statistics?
18  A.    I don't know how to answer that question.
19  I mean, I understand what it is, so I'm not sure
20  what you mean by "disagree."
21  Q.    Do you under -- do you disagree that it's
22  a valid source? Do you think the data are wrong?
23  Do you think that the analysis that the Bureau does
24  is incorrect?
25  A.    I don't have a basis to say it's

Page 98

1    MR. CHAREST: Q. Right. But the
2  employment market as it exists in the city of
3  Adelanto, what it might cost GEO to pay
4  non-detainees to do the work it uses detainees for,
5  that's the thing we're trying to figure out, right?
6    MS. SCHEFFEY: Object to form.
7    THE WITNESS: That's -- yes, that's
8  reasonable.
9    MR. CHAREST: What's your objection.
10    MS. SCHEFFEY: Is it misstates both the
11  testimony in the report and your expert's opinions,
12  which is not just to substitute out other employees,
13  but potentially pay the detainees those rates.
14    MR. CHAREST: Q. Given that -- do you
15  agree with me that the market, like the market value
16  of something, is the best indicator of what the
17  market value for that thing is?
18  A.    Well, your statement just all by itself,
19  it's -- yeah, I mean, you're using one thing to
20  define the same thing. So you said, "The market
21  value is the best indication of market value."
22  So...
23  Q.    Right. Tautology. But it is a tautology,
24  and it's true. If you're trying to figure out
25  market value, the best place to do -- to look is the

Page 100

1  incorrect.
2  Q.    So -- okay. Well, you're an expert. And
3  having no basis to say it's incorrect, you have no
4  challenge to the validity of the data that are
5  contained in the report that Mr. Childers used,
6  right?
7    MS. SCHEFFEY: Object to form.
8    THE WITNESS: Right.
9    MR. CHAREST: What's your objection?
10    MS. SCHEFFEY: Object to form. Compound.
11  It was two questions.
12    MR. CHAREST: Q. You think there's a
13  better source than what he used, is your fundamental
14  observation, correct?
15  A.    A -- I would say a more relevant source.
16  Q.    Okay. And the source of the thing we're
17  trying to measure, which is the cost in the market,
18  the real-world market, to staff these positions with
19  non-detainee labor, correct?
20  A.    I would say the cost to GEO, their cost of
21  staffing these positions.
22  Q.    With non-detainee labor in the real world,
23  in the market.
24    MS. SCHEFFEY: Object to form.
25    THE WITNESS: Just employees, yes.

Page 99

1  market and see what the market value is, right?
2  A.    Yes.
3  Q.    In this situation, we know that there is a
4  labor market in Adelanto for some activity that
5  exists, right? Like what GEO actually pays its
6  actual employees is a thing that is true. That
7  exists, that number, right?
8  A.    Yes, it does.
9  Q.    Right. But instead of asking your client,
10  GEO, what that number was, you accepted the
11  representation from the lawyers and referred to this
12  2014 schedule as the best assumption, right?
13  A.    Yes, I accepted the assumption that this
14  is what GEO would pay.
15  Q.    Would pay, does pay, should pay, must pay;
16  which one is it?
17  A.    I don't have to make a -- I don't have to
18  distinguish between all of those in critiquing your
19  expert. It's my assumption that it is the most
20  reasonable source of rates for what GEO would pay,
21  in a hypothetical that didn't happen.
22  Q.    Not what it actually pays its employees,
23  but what it is scheduled to -- what it uses as a
24  schedule for its contract with ICE?
25  A.    Yes.

Page 101

26 (Pages 98 - 101)

1 Q.     And you think that's a better source of
2 data than the -- what GEO actually pays its
3 employees in the actual market?
4      MS. SCHEFFEY: Object to form.
5      THE WITNESS: I didn't make a -- didn't
6 decide between those two sources. I accepted this
7 source as the most reasonable source for rates.
8      MR. CHAREST: Q. You accepted it. My
9 question is did you, in the exercise of your
10 expertise, which is evaluating the quality of
11 assumptions and the support for them, agree that the
12 better source of information would be the actual
13 market transaction data, what GEO actually pays its
14 employees?
15 A.     Could you -- could you repeat the
16 question -- the first part of the question? I'm
17 sorry.
18 Q.     It's okay.
19      Can you read it back for me, please?
20      (Record read.)
21      THE WITNESS: I -- the information about
22 what GEO actually pays its employees would be a
23 credible source of assumptions. I don't know
24 whether -- I haven't formed an opinion about whether
25 it would be a better source in this situation. I

Page 102

1 don't know if GEO is compliant with the wage
2 determination schedule.
3      There might be issues about what GEO
4 actually pays that I'm not aware of. I have assumed
5 that the wage determination schedule is the most
6 reasonable assumption or is a more -- certainly more
7 reasonable assumption than the BLS data. Your
8 expert did not use actual rates paid by GEO. Your
9 expert used BLS data. And so in my critique of the
10 BLS data, I'm assuming the wage determination
11 schedule is a more reasonable assumption because I
12 understand that's what GEO is obligated to pay.
13      MR. CHAREST: Q. All of that discussion
14 led -- ended with because you understand that's what
15 GEO is obligated to pay. What is the basis for your
16 understanding that GEO is obligated to pay that
17 amount?
18 A.     A discussion with GEO's counsel that the
19 contract includes a wage determination schedule,
20 looking at that schedule, seeing that it sets out
21 rates for all the different categories of employees,
22 and my own -- my own interpretation understanding
23 that those would be required by the contract.
24 Q.     So you interpreted the contract to
25 determine that GEO was required to pay it?

Page 103

1 A.     Yes.
2 Q.     And that's the premise for your assumption
3 or your critique of Mr. Childers?
4 A.     Yes.
5 Q.     And then you quantify the impact of the
6 different -- of using different assumptions in
7 paragraph 58, right?
8 A.     Yes.
9 Q.     Okay. So looking at paragraph 58.
10 A.     Okay.
11 Q.     You should see it on the screen. I said
12 58, but I guess I meant 50 -- I'm on the wrong page.
13 Sorry. Here we go. 58. Are you with me now? Or
14 am I with you? Do you see paragraph 58 up on the
15 screen?
16 A.     Yes.
17 Q.     Okay. And you say, "Using the revised
18 rates per the Wage Determination schedules, and the
19 revised 2011 hours," which we'll talk about in a
20 second, "as described above, yields a damage
21 calculation approximately $2.951 million lower than
22 Dr. Childers," right?
23 A.     Yes.
24 Q.     Which wages -- well, let me ask it
25 differently. Did you use the wages that are

Page 104

1 reflected in the ICE contract that you referred to
2 in footnote 58 as the source data for the wage
3 determination schedules that are reflected in the
4 calculations in paragraph 58?
5 A.     I believe there are multiple sources, so I
6 would have to trace them through the schedules,
7 Series 6 schedules.
8 Q.     Okay. Tell me where to look for that,
9 please.
10      MS. SCHEFFEY: I am hopefully not going to
11 disconnect, but I'm exiting full screen so I can
12 scroll to the document.
13      MR. CHAREST: Q. I think I found it.
14 You're talking about Schedule 6B, correct?
15 A.     Correct. 6A, 6B. Yes.
16 Q.     So you're saying these numbers that are
17 reflected in Schedules 6A and 6B come from rate
18 determination schedules over time? Is that your
19 understanding?
20 A.     I -- I said that I would need to trace
21 through -- that they may come from rates over time,
22 but I would need to trace through the schedules.
23 Q.     Okay. So tell me. Trace away.
24 A.     Top of the schedule says, "The source of
25 the hourly rates shown below are wage determination

Page 105

27 (Pages 102 - 105)

1 schedules for each contract period as shown on the
2 following three" -- the listed three documents. And
3 then the footnotes mention which positions from the
4 documents are used for each wage rate.
5 Q.    Okay. And so if, in fact -- if your
6 assumption is correct, then during the period of
7 June 20 -- let's see here -- August 7th, 2014
8 through June 24, 2019, a janitor would get paid $11
9 an hour, correct, ma'am?
10 A.    I'm reading the footnotes and thinking.
11 For that period, I used information from the most
12 recent period. The average rate for
13 janitor/maid/houseman for the most recent period,
14 because no relevant position was included in that
15 period, August 14th through June 2019.
16 Q.    Say that again. I'm not understanding.
17 A.    Footnote 1 says, "For the janitor role, I
18 used the average rate for the positions janitor and
19 maid or houseman for the most recent period. No
20 relevant position was included in the earlier
21 contract periods. As such, I used the changes
22 between periods for the cook rate, which was
23 included in all three wage determination schedules,
24 to calculate rates for the earlier period."
25 Q.    I don't understand when you say "there's

1 no" -- how can you use janitor as an average for
2 determining janitor when you say janitor doesn't
3 exist? You said, "For the janitor role, I used the
4 average rate of the position of janitor, maid, and
5 house maid" -- "houseman," right?
6 A.    From the most recent period.
7 Q.    Okay.
8 A.    Yes.
9 Q.    If I'm reading this foot -- schedule 6B
10 correctly, you say the janitor position is $11 an
11 hour based on the wage determination scale --
12 schedule, correct?
13 A.    It's a calculated rate based on the latest
14 wage determination schedules.
15 Q.    And in your understanding, based on your
16 conversation with counsel and your interpretation of
17 these documents on your own, apparently, is that GEO
18 is obligated to pay and, in fact, does pay only
19 what's on the schedule, right?
20 A.    I don't have an understanding of if they
21 pay only what's on the schedule.
22 Q.    Oh. So this schedule is not what it pays,
23 or is it?
24    MS. SCHEFFEY: Object to form.
25    MR. CHAREST: Q. Because I think you said

1 about 600 times that schedule is what it pays.
2 A.    I've never testified that it -- that it is
3 what it actually pays. It's my understanding that
4 it's what it would pay based on its contract.
5 Q.    And if that -- so then -- okay. Let's use
6 that as the proxy. You understand that, based on
7 your view of the contract, GEO is supposed to pay
8 $11 an hour for janitor services, right?
9 A.    Based on my calculation, extrapolating
10 from a later period, that's my calculation of what
11 the wage determination schedule rate would be for
12 that period.
13 Q.    And have you ever seen -- well, first off,
14 have you ever seen any documents supporting that
15 assumption? Like maybe you just said, "Hey, how
16 about you show me someone's pay scale of what's
17 actually being paid to see if my assumption is
18 correct." Did you ever ask for that or see that
19 kind of thing?
20 A.    I have seen some -- some documents that
21 reflect hourly rates, but I did not reconcile them
22 directly to these rates.
23 Q.    Why not?
24 A.    I don't know. I just didn't.
25

1    (Whereupon Exhibit 207 was marked for
2    identification.)
3    MR. CHAREST: Q. I've popped up Exhibit
4 No. 207. Let me know when you have it.
5    MS. SCHEFFEY: Form objection.
6    THE WITNESS: Okay.
7    MR. CHAREST: Q. All right. 207 is a
8 document marked GEO-Novoa_00062408 through 416.
9 Have I accurately described the document, ma'am?
10 A.    Yes.
11 Q.    All right. And you see in the date of the
12 document is June 16, 2018?
13 A.    Yes.
14 Q.    And it's an offer letter to someone who's
15 been -- whose name and information has been
16 redacted. The job title is janitor, and the hourly
17 rate is $11, correct?
18 A.    Yes.
19 Q.    That is completely consistent with what
20 you have in your report, right?
21 A.    Let's go back to the time periods in the
22 report. It's $11. The dollar amount is the same.
23 I'm not recalling specifically the time periods.
24 Q.    The report is -- if you want to see that,
25 we can look at both at once.

28 (Pages 106 - 109)

1 A.      I don't know --
2 Q.      I think I can, actually.
3 A.      -- if I can look at them both at once.
4 Q.      Amazing.  All right.  Here we go.  So on
5 the left of the screen, you're seeing your report
6 Schedule 6B, right?
7 A.      Yes.
8 Q.      And during at least two time periods, you
9 have $11 as the wage rate for janitors, right?
10 A.     Correct.
11 Q.     Do that better here.  Hold on.  That's not
12 what I want to do either.  That's all right.
13        And then on what is 207, the first page
14 shows also an $11 rate for janitors, which is
15 consistent with what you understand the world to be,
16 right?
17 A.     It's consistent with the rates assumed on
18 Schedule 6B.
19 Q.     Okay.  Well, let's dig down and see what
20 else it shows.  What rate is being paid to this
21 janitor in June of 2019, June 12, 2019?
22        MS. SCHEFFEY:  Object to form.
23        THE WITNESS:  14.04.
24        MR. CHAREST:  Q.  And how does that
25 compare to the rates that your report says GEO is

Page 110

1 paying and what GEO's actually paying, and you did
2 not reconcile that difference, right?
3        MS. SCHEFFEY:  Object to form.
4        THE WITNESS:  I did not reconcile any
5 actual information to the assumed wage determination
6 rates.
7        MR. CHAREST:  Q.  Well, that's -- why?
8 A.     Is that the question?
9 Q.     It is a question.
10 A.    I'm sorry.  Didn't sound -- I don't know.
11 I just didn't.  I assumed the wage determination
12 schedule was contractual and that it was a
13 reasonable basis to assume --
14 Q.    Turns out that assumption was not
15 accurate, based on GEO's own records, right?
16       MS. SCHEFFEY:  Object to form.
17       THE WITNESS:  I don't know.  Based on this
18 one document that you showed me, there is at least
19 one hourly rate that was offered that was higher
20 than what I've assumed in the wage determination
21 schedule.  I don't know the degree to which other
22 rates paid would be higher.
23       MR. CHAREST:  Q.  I didn't mean to stop at
24 that one.  I just thought that the point was pretty
25 clear.  But the next one, the next offer letter, has

Page 112

1 paying janitors in the same time period?
2 A.     I'm assuming 12.92.
3 Q.     No, you're not, ma'am.  You're still in
4 the $11 an hour period here.
5 A.     All right.  Let me look back at the date.
6 It says, "Start date December" -- I just looked at
7 the start date.  2019.
8 Q.     Well --
9 A.     But it -- if you assume June 12th, 2019,
10 it's $11.  If you assume the start date of
11 December 2019, I'm assuming 12.92.
12 Q.     And both $11 and 12.92 are less than what,
13 in fact, this person is getting paid, according to
14 GEO's records, right?
15 A.     Yes.
16 Q.     Yeah.  Did GEO's lawyers give you this
17 document?
18 A.     They may have.  As I said, I --
19 Q.     Did you ignore it, then?
20 A.     Excuse me?
21 Q.     Did you ignore it, then?
22 A.     As I said, I did not reconcile these
23 two -- the assumed wage determination rates.
24 Q.     So the data that you have shows expressly
25 inconsistent information about what you think GEO's

Page 111

1 the same amount, right?  14.04, which is higher than
2 the contract rate that you relied on?
3 A.     Yes.
4 Q.     Yeah.  Did -- do you know whether or not
5 this document was provided to you?
6 A.     I believe so.
7 Q.     So it wasn't GEO not giving it to you.  It
8 was you not using the information that was given to
9 you that led you to the mistake that you made; is
10 that right?
11 A.    I don't see it as a mistake.  It's a --
12 it's an assumption about what is a reasonable source
13 of hourly rates to assume.  If -- if GEO has rates
14 that are contractually provided in their contract,
15 it's reasonable for me to assume that they would
16 compensate at those rates.  So I don't see it as a
17 mistake.
18 Q.    Well, it's reasonable to assume unless, in
19 fact, it doesn't and you know it, right?  Then the
20 assumption's not reasonable, is it?
21 A.    I don't know.  I would have to think more
22 about the purpose of the -- I don't know.
23 Q.    You don't know.  You don't know that when
24 you make an assumption that is disproven by data
25 from your own client, it's unreasonable to follow

Page 113

29 (Pages 110 - 113)

1 that assumption? You don't know?
2 A.     I don't know whether it's more reasonable
3 to assume contractually provided rates or
4 information about actual rates in the scenario -- in
5 the damage claim scenario of unjust enrichment.
6 Q.     When we're trying to measure what the
7 market would actually require, right?
8 A.     Yes.
9 Q.     Okay. I think that's enough on that for
10 now. We actually got on this topic by talking about
11 the assumptions, the fifth one being Mr. Childers'
12 use of the Bureau of Labor Statistics, right?
13 A.     Yes.
14 Q.     And your criticism was he should have used
15 the wage determination schedules, which we've talked
16 about ad nauseam now, correct?
17 A.     Yes.
18 Q.     You still happy with that criticism?
19 A.     I don't know. I mean, I don't have a
20 basis to -- I don't know.
21 Q.     Because you don't know, in fact, what GEO
22 paid in relation to what that schedule that you were
23 given to by the lawyers, right?
24 A.     You've shown me two rates that at that
25 time were higher than what I calculated. I don't

Page 114

1 know across the board to what extent actual rates
2 differ from the wage determination schedules.
3 Q.     Do you know who does know?
4 A.     I'm not sure what you mean by -- excuse
5 me?
6 Q.     GEO has that data, right?
7 A.     I assume that GEO would have data about
8 their compensation.
9 Q.     Right. But they didn't give that to you,
10 did they?
11 A.     No.
12 Q.     Right. They gave you the schedule, which
13 has been disproven, right?
14     MS. SCHEFFEY: Object to form.
15     THE WITNESS: You've shown me two
16 documents that show higher rates than I've assumed
17 from the schedule. I don't know what extent their
18 actual rates are different.
19     MR. CHAREST: Q. And the only one that
20 has the information is GEO, and GEO didn't give it
21 to you, right?
22 A.     I did not receive actual -- other than a
23 few documents like that you've just shown me, I did
24 not receive comprehensive set of actual rates.
25 Q.     Even though GEO's the client that's trying

Page 115

1 to criticize the expert on Mr. Childers, right? It
2 has the data. It didn't give it to you, correct?
3     MS. SCHEFFEY: Object to form.
4     THE WITNESS: Correct.
5     MR. CHAREST: What's your form objection?
6     MS. SCHEFFEY: You had two different
7 questions in there. One is whether GEO had the
8 data. One is whether they're asking you to
9 criticize it. Compound. There's at least two
10 questions.
11     MR. CHAREST: Cool. Let's do that, then.
12 This will be fun.
13 Q.     You were hired to criticize Dr. Childers'
14 report, right?
15 A.     I was hired to review it and express my
16 opinion about the level of support.
17 Q.     You were hired by GEO?
18 A.     Yes.
19 Q.     GEO has the data that would allow you to
20 make an actual criticism about actual wages actually
21 paid, right?
22 A.     GEO has data on actual wages.
23 Q.     And GEO didn't give you that data, right?
24 A.     That's correct, not in a complete form.
25 Q.     Not in a complete form? Not in any form,

Page 116

1 other than the stray pieces of paper here and there,
2 right?
3 A.     Yes, there were a few documents that
4 showed hourly rates, such as the ones you showed me.
5 Q.     Do you think if GEO had data that actually
6 supported its theory, it would give it to you?
7 A.     I don't -- I don't have a basis to know.
8 Q.     Well, I mean, you're a human being. You
9 understand that people do things to try and achieve
10 whatever they're trying to get done, right? I
11 mean -- that's a bad question.
12     If GEO has the data, which you know they
13 do, and the data supported the thing that they're
14 trying to get you to assume, don't you think GEO
15 would give you the data?
16     MS. SCHEFFEY: Object to form.
17     THE WITNESS: I don't have an opinion.
18 I've been doing litigation a long time, and I get or
19 I don't get things for reasons that I don't
20 understand. I can't place motive on a party.
21     MR. CHAREST: Q. Or refuse to anyway.
22 That's fine. But in your experience --
23 A.     I'm not sure what you -- would you expand
24 on what you just said?
25 Q.     Sure. You refuse to place motive on a

Page 117

30 (Pages 114 - 117)

1 party. That's fine.
2 A.    Well, I don't know how I could place a
3 motive on a party. It's just not --
4 Q.    Sure. In your experience in litigation,
5 have you ever been not given something that would be
6 dispositive against the position you're taking?
7 A.    Could you repeat that and use more simple
8 language, non-legal -- non-legal language?
9 Q.    In your experience in litigation, have you
10 ever not been given something from the client that,
11 if it had been given, it would have disproven their
12 position?
13 A.    Well, nothing comes to mind that fits that
14 exactly. I certainly have been asked questions in
15 deposition or trial that I was unaware of, you know,
16 facts that I was unaware of. I don't recall whether
17 or not any of those disproved a position, as you've
18 described.
19 Q.    But you under- -- you've been doing the
20 game long enough where you know that the lawyers
21 give you what they give you, and sometimes they give
22 you everything, and sometimes they don't, right?
23      MS. SCHEFFEY: Object to form.
24      THE WITNESS: It's certainly true that
25 they don't give me everything. It's not appropriate

Page 118

1 Q.    Okay. Well, let's be real clear. You
2 don't decide what the lawyers give you. The lawyers
3 decide what the lawyers give you, right?
4 A.    I can ask for things, but ultimately
5 they -- I can't control them. They give me what
6 they have, what is available to them, if they
7 understand that it's responsive. I don't have any
8 of my own ability to obtain data from the client.
9 Q.    And in this situation, you're giving
10 something -- you were given something to use as a
11 proxy as a critique for someone else using a
12 different thing as a proxy when, in fact, the thing
13 that you were given is disproven by the -- by GEO's
14 own data; is that right?
15      MS. SCHEFFEY: Object to form.
16      THE WITNESS: I don't know. I don't know
17 if it's disproven based on the two sheets that you
18 gave me. I don't know the extent to which those
19 rates are used or to the extent to which rates are
20 actually different from the contracted --
21      MR. CHAREST: Q. Well, if you assume that
22 GEO's records are accurate, then those rates are
23 higher than what you say should be assumed, right?
24      MS. SCHEFFEY: Object to form.
25      THE WITNESS: Those rates were higher than

Page 120

1 for me to have everything in a case. It's too much
2 information.
3      MR. CHAREST: Q. How about everything
4 that matters to what you're talking about, like, for
5 example, market data about cost of employees?
6 A.    I don't understand your question. Could
7 ask it maybe in a more complete way?
8 Q.    Well, you said, "It's not appropriate for
9 me to have everything." And I said, "How about
10 things that are relevant to what you're talking
11 about, like, for example, market data about the cost
12 of employees?"
13 A.    I would expect the attorneys to give me
14 what they have that's relevant.
15 Q.    So the absence of having market data about
16 the cost of employees means either GEO doesn't have
17 it, which is implausible, or GEO doesn't want you to
18 see it, right?
19      MS. SCHEFFEY: Object to form.
20      THE WITNESS: I can't agree to that, that
21 there's a motive that they don't want me to see it.
22      MR. CHAREST: Q. Well, if they wanted you
23 to see it, you'd have it, right?
24 A.    I don't know. That's -- I said I can't
25 place a motive.

Page 119

1 I assumed in determining the wage determination
2 schedules.
3      MR. CHAREST: Q. Okay. So on to the
4 sixth assumption here, which is on page 16 of 22 of
5 your report. You say that Mr. Childers used the
6 California minimum wage rates increased for workers'
7 compensation, unemployment insurance, and
8 medical/Social Security withholding to calculate the
9 but-for cost of using subcontracted employees. Is
10 there -- do you think that's an invalid assumption
11 on his part?
12 A.    Let me get to that space.
13 Q.    Sure.
14 A.    That page.
15      (Pause.)
16      THE WITNESS: I -- other than his
17 application of math, I don't have a criticism of
18 that approach.
19      MR. CHAREST: Q. Did you attend the
20 Childers deposition and/or read any transcript of
21 it?
22 A.    I have not. I did not, and I have not.
23 Q.    So let's leave aside the application of
24 math. As a construct, you agree that using the
25 minimum wage rates increased for workers'

Page 121

31 (Pages 118 - 121)

1 compensation, unemployment insurance, and Social
2 Security withholding is an appropriate approach, if
3 done correctly, right?
4 A.      I don't see anything wrong with it as an
5 approach for calculating a contract rate.
6 Q.      And similarly, would you agree that when
7 you're calculating the contract rate that GEO would
8 have to pay, that the contractor should -- you
9 should also account for the contractor's profit
10 and/or overhead?
11 A.      I didn't -- in terms of this -- his
12 calculation, I didn't make that determination, and I
13 think contract rates are negotiated.  They can
14 sometimes include that.  I think it depends on -- I
15 mean, it's just a contracted rate.
16 Q.      Right.  But most -- there's vendors that
17 provide services, don't do it for $0, that do it for
18 a profit, and they don't do it in a vacuum.  They do
19 it through some sort of infrastructure, right?
20 A.      I think -- I think there are all types of
21 contractors.  Some do that.  Some who are smart do
22 that and are well organized.  There are many who
23 don't, who charge some basic level just as a job
24 replacement.
25 Q.      Okay.  But it's not an unreasonable
Page 122

1        MS. SCHEFFEY:  Object to form and
2 foundation, since his transcript isn't available.
3        MR. CHAREST:  Q.  And I guess you also
4 don't know because you didn't attend his deposition
5 and listen in, right?
6 A.      That's correct.
7 Q.      Okay.  So we've just looked at the six
8 assumptions, and I've got checkmarks next to five of
9 them, meaning that you agree with the assumption.
10 And I'm just going to run through them to make sure
11 that we're on the same page.  You agree with the
12 dollar a day, right?
13 A.      I agree that that's a representation of
14 participation in a work program.
15 Q.      And on No. 2, while you don't agree with
16 the calculation, you agree that it's okay to rely
17 on -- or one expert to rely on another, but you have
18 to take into account whatever criticisms you have of
19 the underlying expert, right?
20 A.      That's correct.
21 Q.      And you have -- you agree that the --
22 well, you don't have any criticism of the work
23 efficiency, assumption No. 3, right?
24 A.      That's correct.
25 Q.      And you don't have any criticism of the
Page 124

1 assumption to include a profit margin and/or
2 overhead costs when you're trying to determine the
3 but-for cost of using subcontract employees,
4 correct, as a construct?
5 A.      As a construct, it's not unreasonable.
6 I -- he hasn't done it, so I haven't -- I haven't
7 evaluated what those assumptions might be.
8 Q.      So you say he hasn't done it.  I think --
9 we can talk about it later, but I think it's fair to
10 say that you don't know whether or not he's done it
11 because, in fact, he has done it, and he talks about
12 it in his deposition, but it's okay.  You're not --
13 A.      I --
14        MS. SCHEFFEY:  Move to strike testimony of
15 counsel.
16        THE WITNESS:  He didn't do what he said he
17 was doing, so if he said that he meant to do
18 something else, I'm not aware of it yet.
19        MR. CHAREST:  Q.  That's fair.  You have
20 not read his deposition, so you don't know that he
21 did that step too, right?
22 A.      I have not read his deposition.
23        MS. SCHEFFEY:  Object to form and
24 foundation.
25        MR. CHAREST:  Say again.
Page 123

1 categorization, the assumption No. 4, right?
2 A.      Correct.
3 Q.      We've talked a while about No. 5, the
4 Bureau of Labor Statistics versus the wage
5 determination rates.  So those have a checkmark next
6 to it.  Okay.
7        And then No. 6, you agree that those are
8 valid considerations to use when you determine a
9 but-for cost of the subcontractor, right?
10 A.      Yes.
11 Q.      And you also agree that, as a matter of
12 construct, it's also appropriate, when you talk
13 about a subcontractor, to think about the cost of
14 overhead and the profit margin, right?
15 A.      Yes, some do include those considerations
16 in their rate.
17 Q.      Right.  When you as an expert try and
18 evaluate what the cost of a contractor would be,
19 that's one of the elements that you think would be
20 reasonable to contemplate, right?
21 A.      Yes.  It's reasonable to contemplate the
22 individual's costs and -- yes, it's reasonable to
23 contemplate their costs, which is what a profit
24 margin tries to do.
25 Q.      Fair.  Okay.  And overhead, too.  You left
Page 125

32 (Pages 122 - 125)

1 that out, but that was part of my question.
2 A.       Well, I would include that in it's
3 reasonable to contemplate their costs.
4 Q.       Okay. Then you've answered "yes" to both
5 of my points, which is fine. Right?
6        MS. SCHEFFEY: Is that -- object to form.
7        THE WITNESS: Yes.
8        MR. CHAREST: Q. All right. Then you
9 say, the next paragraph after running through those
10 six, "but I note that there are mathematical errors
11 and assumptions that are inaccurate," right?
12 A.       Yes.
13 Q.       So we must be talking about assumptions
14 No. 2 and 5, and I guess 6 because of the
15 mathematical point, right?
16 A.       Yes.
17 Q.       Okay. So the support for hours. You say
18 Dr. Childers relied on Exhibit 3B of the Bland
19 report, and Exhibit 3B has flaws, which we'll talk
20 about later, and therefore, his reliance on that set
21 of data are -- is inappropriate for the same reasons
22 as you criticized Dr. Bland for the 3B?
23 A.       Yes.
24 Q.       Okay. The next paragraph down, you say,
25 "Dr. Childers uses kitchen hours from 3B and does

Page 126

1 subtract time for a meal. So if -- using --
2 completely using the hours from Bland's report, then
3 it would not have subtracted for a meal.
4 Q.       Do you know if any of the detainees that
5 are doing this work, in fact, get meals or breaks?
6 A.       I -- I don't know actually. I would
7 assume that they have to.
8 Q.       But you don't know one way or the other?
9 A.       I don't recall. I might have cited that
10 information in my report, but I don't recall,
11 sitting here.
12 Q.       Did you ever ask anyone at GEO whether or
13 not folks get breaks for meals?
14 A.       I did not ask anyone at GEO.
15 Q.       Can you think of any better source of data
16 than GEO to tell you at least its view of whether or
17 not folks get meals and breaks?
18 A.       GEO would be the source of information
19 about whether detainees get breaks.
20 Q.       You just decided to assume that there must
21 be breaks, and Dr. Childers is wrong for not taking
22 into account breaks, without asking anyone?
23 A.       No, that's not correct. I'm just not
24 remembering the source of information. Let me look
25 at my report.

Page 128

1 not consider a meal break, and therefore overstates
2 the number of hours." Did I generally describe the
3 criticism there?
4 A.       Yes.
5 Q.       Does Dr. Childers evaluate the cost on a
6 per-hour basis or on a per-day basis?
7 A.       I don't know that it makes a difference.
8 Q.       And when you're doing things on a per-day
9 basis, you think that the meal hours are not
10 subsumed in that analysis?
11 A.       I'm not -- I'm not -- I don't know. I'm
12 not following your question, so maybe you could
13 expand.
14 Q.       I'm sorry, I didn't mean to cut you off.
15 A.       Yeah. Maybe you could expand on it
16 because I'm not following on what difference it
17 would make to assume the per-hour basis or a per-day
18 basis.
19 Q.       Well, if Dr. -- if Dr. Childers says, "Oh,
20 we need to replace ten days of labor," how do you
21 know that he's not -- how that day of labor does or
22 does not account for a meal break?
23 A.       Because the hours that -- the five hours
24 assumed by Mr. Bland assume the entire schedule -- a
25 median of the entire schedules, which didn't

Page 127

1        (Pause.)
2        THE WITNESS: So footnote 48 cites a
3 document that is the source for the assumption that
4 kitchen workers are entitled to a break.
5        MR. CHAREST: Q. Footnote 48. Where did
6 you get footnote 48 from?
7 A.       It was within the documents produced to us
8 in the case.
9 Q.       Did you find it yourself as a source for
10 the break information, or did a lawyer point it out
11 to you?
12 A.       I don't know. My staff associate, Brent
13 Boutwell, who assisted on this case, obtained that
14 document, found that document, and pointed it out to
15 me. So I don't know.
16 Q.       Do you remember what those documents
17 actually say?
18 A.       I don't.
19 Q.       Well, you know what: Offhand, I don't
20 either, but we're going to find out. Without regard
21 to what the documents actually say or don't say, do
22 you -- you don't know, in fact, what happens in
23 Adelanto with respect to people actually working and
24 actually getting breaks and lunch and food?
25 A.       I don't have personal knowledge, no.

Page 129

33 (Pages 126 - 129)

1 Q.    Okay.  And I guess that criticism is only
2 as applied to breaks if they're applicable to
3 kitchen staff only, right?
4 A.    Yes.
5 Q.    Do you know what percentage the kitchen
6 staff makes up of the whole entire workforce?
7 A.    Sitting here, I don't.  I've seen
8 different -- I could probably find that answer in my
9 schedules, but if you want to point it out, that
10 would be great.  The janitors are the most -- the
11 most prevalent.  However, the kitchen staff have
12 longer hours.  So it depends on whether you're
13 talking about number of details or total hours.
14 Q.    Okay.  But if the -- in terms of workers,
15 it's far less.  In terms of hours, it's still not
16 more than like 20% or 15%, depending on which source
17 you're looking at; is that about right?
18        MS. SCHEFFEY:  Object to form.
19        THE WITNESS:  I don't know based on hours.
20 I would have to find a different schedule.  But
21 certainly the janitors are the most significant
22 number of details.
23        MR. CHAREST:  Q.  Do you know if the
24 janitors get breaks?
25 A.    I don't.  Because they're assumed --

Page 130

1 length of detail is so short, I wouldn't expect a
2 break within that.
3 Q.    "Length of detail," what do you mean by
4 that?
5 A.    The amount -- the assumed amount of time
6 spent on a particular category of job.
7 Q.    "Assumed amount of time."  What's your
8 basis for any statement about the length of time
9 anyone spends in any job?
10        MS. SCHEFFEY:  Object to form.
11        THE WITNESS:  My basis is reviewing the
12 Bland report and evaluating the information cited.
13        MR. CHAREST:  Q.  So your testimony about
14 the shift length is based on the Bland report; is
15 that right?
16 A.    I might have.  I also have experience in
17 other GEO cases evaluating some of the same issues,
18 and I'm aware generally that the custodial position,
19 janitor position, has the assume -- shortest assumed
20 shift length in all of these analyses, whereas the
21 kitchen position has typically the longest -- the
22 longer shifts.
23 Q.    Okay.  Let's unpack that a little bit.
24 You are an expert in another case, in at least one
25 other case that I'm aware of involving GEO and

Page 131

1 forced labor and unpaid detainees, right?
2 A.    Yes.
3 Q.    And that is the case in Washington state.
4 I think it's called Nwauzor; is that right?
5 A.    That's correct.
6        MR. CHAREST:  Nwauzor.  I'm going to have
7 to give you the spelling later.  I think it's
8 N-W- --
9        MS. SCHEFFEY:  I can give it.
10 N-W-A-U-Z-O-R.
11        MR. CHAREST:  Thank you.
12 Q.    You're an expert in that case, right?
13 A.    Correct.
14 Q.    All right.  So let's be real.  This is an
15 important thing with respect to like what the expert
16 knows and the basis of its opinions.  So be really
17 careful about what you say and what I'm asking you.
18 Are you clear?  I need really precise answers here.
19        Are you saying you know what the shift
20 lengths are of the different workers based on your
21 own experience working in the Nwauzor case?
22 A.    Does your question mean I know what shift
23 lengths are in this case, based on my experience in
24 the Nwauzor case?
25 Q.    At Adelanto.

Page 132

1 A.    No.
2 Q.    Do you have any information whatsoever
3 about shift lengths at Adelanto?
4 A.    Yes.
5 Q.    What information do you have about shift
6 lengths at Adelanto?
7 A.    I have what Mr. Bland cited in his report,
8 as well as other information or considerations I
9 cited in my critique, such as -- such as the
10 existence of meal breaks with the kitchen workers.
11 Q.    Okay.  I'm not talking about breaks.  I'm
12 talking about shift lengths.  And I'm not talking
13 about Northwest Detention Center.  I'm talking about
14 Adelanto.  Do you understand those limitations?
15 A.    Yes.
16 Q.    Okay.  What information do you have about
17 shift lengths at Adelanto?
18 A.    Other than what I just said, I don't have
19 any additional information.
20 Q.    All right.  The two things you said are,
21 No. 1, the Bland report, and No. 2, the kitchen
22 break information, right?
23 A.    And there is additional information cited
24 in our critique.  So -- so I would want to look at
25 the specifics of those to see -- to refresh my

Page 133

34 (Pages 130 - 133)

1 memory about any additional information cited in my
2 critiques.
3 Q.      Okay. So there's three things, then.
4 One, Bland report; two, kitchen breaks; three, other
5 stuff in my report. Right?
6 A.      Yes.
7 Q.      Okay. What, if anything, does the Bland
8 report have to do with Adelanto?
9 A.      What does the Bland report have to do with
10 Adelanto? It's your expert's opinion about damages
11 related to your claims.
12 Q.      Okay. Let's -- I'm going to take a pause
13 and clear that up. You're saying my claims, my
14 expert. What are you talking about?
15 A.      I don't know if I'm not understanding your
16 question. Mr. Bland is the plaintiff's expert.
17 Q.      In which case?
18 A.      This Novoa case.
19 Q.      Who told you that?
20 A.      Says it in his report.
21 Q.      Okay. I'm sorry. I was thinking about
22 Nickerson. I'm so sorry.
23 A.      I'm sorry. I feel like I'm going crazy.
24 Q.      That's my fault. That's entirely my
25 fault. I apologize.

Page 134

1 Q.      What did you do to determine whether the
2 assumption -- whether it's reasonable to assume that
3 the information contained in the Nickerson report
4 relates at all to Adelanto?
5 A.      I didn't do anything specifically in
6 addition to my general knowledge of the Washington
7 case and reviewing the materials in that case.
8 Q.      My question is, how do you know -- how, if
9 at all, does the information in the Nickerson report
10 pertain to the facts as they exist in Adelanto?
11 A.      The Nickerson report asserts a shift --
12 average shift length for another GEO facility that
13 operates a Voluntary Work Program with many of the
14 same activities, and I cite it simply as a
15 reasonableness cross-check in this case.
16 Q.      What do you mean by "a reasonableness
17 cross-check"?
18 A.      Just another indication of another data
19 point based on, as I said, a concept of a yardstick,
20 that it's a similar -- not the same, but similar
21 activity. And when looking at whether or not the
22 conclusion reached is reasonable, one can look at
23 another -- at another similar activity as a
24 reasonableness check.
25 Q.      Are the two facilities the same size?

Page 136

1      So the things that are in the Bland report
2 are information you have about shift lengths, right?
3 A.      Yes.
4 Q.      The information about kitchen breaks are
5 information you have about shift lengths, right?
6 A.      Yes.
7 Q.      Then you say "other stuff cited in my
8 report," right?
9 A.      Yes.
10 Q.      Is any of the "other stuff that's cited in
11 my report" the Nickerson report? Is that included?
12 A.      Yes, I've cited the Nickerson report.
13 Q.      What, if anything -- that's what I thought
14 you were talking about. That's why I was confused.
15 I'm sorry. What, if anything, does the Nickerson
16 report say about shift lengths at Adelanto?
17 A.      It doesn't say anything about shift
18 lengths at Adelanto.
19 Q.      In what way is the Nickerson report at all
20 relevant to shift lengths at Adelanto?
21 A.      It's an indication of shift lengths at
22 another GEO facility.
23 Q.      And...?
24 A.      Benchmarks -- yardsticks can be relevant
25 in analyzing reasonableness of an assumption.

Page 135

1 A.      They are not.
2 Q.      Are they the same construction type?
3 A.      I don't know.
4 Q.      Do they have the same layout?
5 A.      I don't know.
6 Q.      Are they the same square footage?
7 A.      No.
8 Q.      Do they involve the same number of workers
9 cleaning up the areas?
10 A.      No.
11 Q.      Do they have more pods or less pods?
12 A.      I don't know, but I know that Adelanto is
13 larger.
14 Q.      Do any of those things that I just asked
15 you that you don't know matter in comparing whether
16 looking at the activities in Northwest Detention
17 Center pertain to the activities at Adelanto?
18 A.      Not necessarily because yardsticks don't
19 have to be perfectly matched. They don't have to be
20 identical. They are meant to be a reasonableness
21 check, not meant to be a replacement.
22 Q.      If a yardstick is 38 inches long, is it
23 still a yardstick?
24 A.      I -- if it -- I don't know how to answer
25 that. If it still shows you how big a yard is, it

Page 137

35 (Pages 134 - 137)

1 could be.
2 Q.     If you give me a four-foot-long yardstick
3 with 36 differentiating marks in it and say "Oh,
4 it's a yardstick," is it any good to me?  I mean,
5 the point being -- and I think you understand what
6 I'm saying -- there's an issue when you're comparing
7 two different things.  You want to make sure you're
8 comparing apples to apples, right?  You agree with
9 that?
10 A.     Well, in concept, but in reality, in the
11 practice of using yardsticks, we understand that
12 they're not perfectly comparable.  The market does
13 that on a daily basis, the stock market.  When it's
14 using other companies to price a company, they're
15 not identical comparables, but they're still useful
16 to inform what would be reasonable by looking
17 outside of just the information, the limited
18 information here, looking at what exists somewhere
19 in a -- in a comparable operation.  "Comparable"
20 doesn't mean identical.
21 Q.     Sure, but they should be also comparable,
22 right?  And like for -- let me think of it -- let me
23 ask this:  Would it be -- would a facility of the
24 same exact size be more comparable or less
25 comparable than a facility of a different size?

Page 138

1 of do I have a rational answer here, what kind of
2 cross-check could I use, if I have -- and I've done
3 this a lot in my career -- if I have another
4 division within the same company that's doing the
5 same program, might be configured a little bit
6 differently, but it's essentially the same company,
7 doing the same program, many of the same activities,
8 I'm going to look at the output of that to compare
9 it to this to see if I -- if I might be in the right
10 ballpark.  It's just another data point to consider.
11 They don't have to be identical.
12 Q.     How many -- how many -- before we -- how
13 many chow halls do they have at Adelanto?
14 A.     I don't know.
15 Q.     How many at Northwest Detention Center?
16 A.     I don't know.
17 Q.     How many kitchen staff are employed on any
18 given day at Adelanto versus Northwest Detention
19 Center?
20 A.     I don't know.
21 Q.     How about laundry staff?
22 A.     I don't know, sitting here.  I'm sure
23 that's in the data.  I've seen a lot of listings of
24 staff, but sitting here, I don't know.  I know that
25 Adelanto is larger.  There are more -- more

Page 140

1 A.     It would be more comparable.
2 Q.     And would a facility with the same
3 configuration or a different configuration be more
4 or less comparable?
5 A.     It would be more comparable.
6 Q.     And would a facility with the same number
7 of detainee employees be more or less comparable?
8 A.     It would be more comparable.  You're
9 getting closer to identical.
10 Q.     The closer you can get to identical, the
11 better, right?
12 A.     Yes.
13 Q.     Because we like to use 36-inch yardsticks
14 to measure 36 inches, don't we?
15 A.     You can use a measuring tape to measure
16 36 inches.
17 Q.     Yeah.  If the inches are actually an inch
18 long, that's right.  Right?
19 A.     Yes.
20 Q.     But if they're not and they're different,
21 then measuring one or the other doesn't tell you
22 anything, does it?
23 A.     In terms of measuring inches, but in --
24 that's correct, but in an analysis that is looking
25 for a yardstick in some kind of analytical process

Page 139

1 detainees.
2 Q.     Do you know what the Nickerson says about
3 the average shift length for janitors or custodial
4 services?
5 A.     I can't recall specifically what his
6 comment was about that.
7 Q.     It's half an hour per shift length, okay,
8 on average.
9      MS. SCHEFFEY:  Object to form, foundation.
10      MR. CHAREST:  Q.  You want to look?
11 Before we get to the Nickerson report, when you --
12 you were an expert in the State of Washington case,
13 right?
14 A.     Yes.
15 Q.     You have full access to everything that
16 Mr. Nickerson has, right?  When he makes a report,
17 you get all the underlying data, right?
18      MS. SCHEFFEY:  Object to form.
19      THE WITNESS:  That's the practice.  That's
20 the hope.  That's the expectation, yes.
21      MR. CHAREST:  Q.  Yeah.  And if you didn't
22 have it, you would be entitled to ask your lawyers
23 to get it.  Your lawyers would be entitled to get
24 that, right?
25 A.     Yes, I assume so.

Page 141

36 (Pages 138 - 141)

1 Q.      Were you able to provide us with the data
2 that underlies the Nickerson report?
3 A.      I don't know.
4 Q.      You don't know?  Do you think it's fair
5 for us to have -- look at the Nickerson report
6 without having the underlying data?
7 A.      I don't know.  It's a production question.
8 I don't understand that -- procedures for it.
9 Q.      Well, you understand as an expert --
10 you've been around the block 100 times on -- in
11 litigation -- that you're entitled to get the
12 information that underlies an expert report.  You
13 understand that as a framework, right?
14 A.      Understand that for this case, yes.  I
15 don't know how it extends to another case.
16 Q.      Well, not just this case, but any case.
17 Like any case you have been in, if an expert cites
18 something, you're entitled to get the underlying
19 materials, right?
20        MS. SCHEFFEY:  Form.
21        THE WITNESS:  I assume so, within this
22 case.  Like I said, I don't know how it relates if
23 it's a different case that's being discussed.
24        MR. CHAREST:  Q.  Well, in your
25 experience --

1 A.      I don't know.
2 Q.      -- in all the litigation you've been
3 involved in, have you ever received an expert report
4 from someone that cites information that you were
5 not allowed to get from the other side?
6 A.      I -- not on a direct -- that's an expert
7 report for this case.  I've definitely received
8 information from other cases that I couldn't get
9 full access to, and I don't know why.  It's not
10 my -- I don't understand what happens between legal
11 counsel to know why or -- why I did or didn't get
12 something related to another case.
13 Q.      Right.  But you've seen everything that
14 Dr. -- Mr. Nickerson or Dr. Nickerson relied on in
15 his report, right?
16 A.      Yes.
17 Q.      Yeah.  But you know that we have not.  You
18 understand that?
19 A.      You're telling me that.  I had no -- I
20 have no visibility about what you're involved with
21 and which cases that you're working on.  You're -- I
22 just -- you're telling me that.
23 Q.      And your lawyers didn't tell you anything
24 about that?
25 A.      Excuse me?

1 Q.      Your lawyers didn't tell you anything
2 about the issue around the Nickerson report?
3 A.      No.
4        MS. SCHEFFEY:  I'm going to instruct her
5 not to answer any more questions about what her
6 lawyers told her about the Nickerson report.
7        MR. CHAREST:  Q.  Did the lawyers ask you
8 for the underlying data for the Nickerson report?
9 A.      No.
10 Q.      They didn't ask you if you could provide
11 it?
12        THE WITNESS:  Am I supposed to answer
13 questions about discussion with counsel?  I don't
14 know what to do.
15        MS. SCHEFFEY:  Do not answer questions
16 about discussion with counsel about the Nickerson
17 report.
18        MR. CHAREST:  My question still stands.
19 If the instruction -- are you --
20        MS. SCHEFFEY:  I'm instructing her not to
21 answer about questions with counsel, yeah,
22 conversations with counsel.  Privileged information.
23        MR. CHAREST:  Q.  Are you going to answer
24 my question or not, Ms. Morones?
25 A.      I'm not, because I understand I'm

1 instructed not to answer.
2 Q.      Do you have the underlying material from
3 the Nickerson report?  Do you have access to it?
4 A.      Yes.
5 Q.      And you could provide it if someone asked
6 you to, right?
7        MS. SCHEFFEY:  Object to form.
8        THE WITNESS:  If I understood it was
9 compelled, required to be provided, yes.
10        MR. CHAREST:  Q.  I mean, you physically
11 possess it or can access it?  You physically could
12 produce it if requested, right?
13 A.      Yes.
14 Q.      You're just saying you've never been
15 requested, right?
16        MS. SCHEFFEY:  Object to form, and I'm
17 going to ask you not to talk about anything we said
18 or the underlying protective orders in other cases.
19        THE WITNESS:  I understand I'm instructed
20 not to answer.
21        MR. CHAREST:  Q.  And you're going to
22 follow that instruction?
23 A.      Yes.
24 Q.      Was the Nickerson report that you cited
25 ever amended?

1 A.     I understand that there was an update -- a
2 date update, a date range update.
3 Q.     I'm sorry.  Was that a "yes" or "no"?  Was
4 it amended or not?
5 A.     Yes.
6 Q.     You didn't cite the amended report.  You
7 cited the pre-amended report in your report to us,
8 correct?
9 A.     That's correct.  I don't believe that
10 issue was changed in the date update.
11 Q.     That issue was shift length at the
12 Northwest Detention Center?
13 A.     Correct.
14 Q.     You don't remember there being an
15 extensive discussion in the amendment about other
16 data that was -- that came up around shift length?
17 A.     I don't.
18 Q.     You don't?
19 A.     I don't.
20 Q.     Do you know if that (inaudible) --
21      I asked Ms. Morones if she knows whether
22 or not the amendment has been provided.
23 A.     I believe I have an amendment, but it -- I
24 don't recall it -- it was very short.  I don't
25 recall it including what you're describing.

Page 146

1 Q.     You have an amendment.  My question is, do
2 you know whether the amendment has been provided to
3 the counsel in the Novoa case?
4 A.     As I said, I don't know anything about
5 what's happening with you all.
6 Q.     Okay.  So I was asking you the basis for
7 your understanding of shift length.  You identified
8 information in the Bland report, you identified the
9 document about the kitchen break, and you said,
10 "other stuff in my report."  Is there anything other
11 than the Nickerson report that you can think of that
12 qualifies in that third category, "the other stuff
13 in my report"?
14 A.     I would want to look through my report to
15 answer that question.
16 Q.     Okay.  Oh, you're not going to do it?
17 Just that's what you want -- would like to do?
18 A.     If you would like me to do it, I will.  I
19 would just say I don't recall specifically.  I would
20 have to look through the report.
21 Q.     Okay.
22      MS. SCHEFFEY:  Are we going on a lunch
23 break?
24      MR. CHAREST:  I'll just do whatever the
25 witness wants.

Page 147

1      MS. SCHEFFEY:  Yeah, I just want to check.
2      THE WITNESS:  Yeah, a break would be
3 great.
4      MR. CHAREST:  Off the record.
5      MS. SCHEFFEY:  How long -- I don't know,
6 Dan, if you have a few more questions.  I just see
7 that it's 12:45 there.  I don't want us to get too
8 far past.
9      MR. CHAREST:  Let's go off the record
10 first.
11      MS. SCHEFFEY:  Okay.  Thanks.
12      THE VIDEOGRAPHER:  We're going off the
13 record.  The time is 12:46 p.m.
14      (Recess taken from 12:46 p.m. to
15      1:16 p.m.)
16      THE VIDEOGRAPHER:  We're back on the
17 record.  The time is 1:16 p.m.
18      MR. CHAREST:  Q.  Welcome back,
19 Ms. Morones.  Turn, if you would, please, to page 16
20 of 22 of your report.  Specifically the number --
21 the No. 2, which I think is addressed in paragraphs
22 48, 49, and 50 and 51.
23 A.     Okay.
24 Q.     You have "Inaccurate 2011 Hours."  The
25 discussion begins with, it looks like, a review of

Page 148

1 the hours that Childers used for his report, right?
2 And you note some anomalies with respect to 2011 and
3 2019.  And that's paragraph 48.  Is that fair?
4 A.     Yes.
5 Q.     Okay.  And looks like in paragraph 49 --
6 I'm not clear, but it looks like to me you're saying
7 you did the calculation and agree with
8 Dr. Childers's work with respect to 2019; is that
9 right?
10 A.     Yes.
11 Q.     And then going on to paragraph 50, you
12 note there was an extrapolation error for the 2011
13 time, right?
14 A.     Yes, that's what it appears to be.
15 Q.     And there were four months of data, but
16 should be eight months of time, and he counted it as
17 12 months of time, adding then an additional four
18 months of data into the time calculation; is that
19 right?
20 A.     That's what it appears.
21 Q.     Right.  And so the correction would be to
22 use those four months of data for just the eight
23 months of time, right?
24 A.     Yes.
25 Q.     And that would be appropriate if

Page 149

38 (Pages 146 - 149)

1 Mr. Childers did that for 2011, right?
2 A.      Yes.
3 Q.      Did you measure -- it says in paragraph 51
4 that you did the extrapolation.  Did you measure the
5 quantum of dollars that that change in and of itself
6 resulted in?
7 A.      I may have.  It's not -- I didn't put it
8 in the report.  My staff may have.  I don't recall.
9 Q.      Would it surprise you to know that the
10 difference is roughly $180,000?
11 A.      I don't recall.  I do recall, though, that
12 the 2011 hours are small relative to later years, so
13 it doesn't surprise me that -- that doesn't surprise
14 me.
15 Q.      Okay.  But you point it out, but you don't
16 calculate in and of itself, but you just note that
17 there is that deficiency, that issue, right?
18 A.      Yes.  Yes.
19 Q.      And that's one of the math issues that you
20 have identified in your work here?
21 A.      Yes.
22 Q.      And with respect to Mr. Childers, at least
23 the first one you've identified, right, in terms of
24 math issue?
25 A.      Yes.

1 I did -- yeah, maybe you could ask it again or
2 differently.
3 Q.      Sure.  You say, "Dr. Childers computes the
4 lowest legal cost contractor expenses using
5 California minimum wage with 10% added for workers'
6 comp, unemployment insurance, and medical/Social
7 Security withholding.  And then he adjusted" --
8 "adjusts those minimum wage rates, uses the adjusted
9 minimum wage rates times the multiple total hours to
10 arrive at a number."
11        Now, in terms of, you know, things to
12 focus on and assumptions to make, you don't
13 criticize anything about those assumptions, right?
14 A.      Correct.
15 Q.      And we talked about a little bit other
16 assumptions that are reasonable to make are overhead
17 and profit for the vendor, right?
18 A.      They're reasonable to consider.  I haven't
19 evaluated what they would be, but they're reasonable
20 to consider.
21 Q.      Okay.  And then it looks like you try to
22 recreate the -- the math that Dr. Childers
23 described, and arrive in paragraph 55 at a different
24 number, right?
25 A.      Yes.

1 Q.      And then you use -- you say, the bottom of
2 51, "This revised estimate of 2011 hours in your
3 analyses that follow," meaning all of the analyses
4 that follow embed the change in 2011 hours in
5 whatever conclusions you draw from it, right?
6 A.      Yes.
7 Q.      Why did you conduct analyses that bundled
8 two different purported errors together when you're
9 trying to figure out the quantum of any particular
10 error?
11 A.      I didn't want to leave an error in a
12 revised -- a math error in a revised analysis.
13 Q.      Okay.
14 A.      I could have separated it out, but I'm
15 flagging the issue, so I chose not to separate it
16 out in making the recalculations of the other
17 categories.
18 Q.      Okay.  Moving on to -- the first of the
19 next categories of critiques is the inaccurate
20 subcontract -- sorry -- the inaccurate subcontractor
21 scenario calculation.  And if I -- again, my
22 interpretation of your report is that you basically
23 restate what Mr. -- Dr. Childers did, and agree with
24 it in paragraph 52.  Is that right?
25 A.      I don't really understand your question.

1 Q.      And your conclusion on that is that based
2 on your analysis, Dr. Childers may have made a
3 mathematical error or he has made an undisclosed
4 assumption, correct?
5 A.      Yes.
6 Q.      All right.  And we talked about it a
7 little bit.  You did not attend the Dr. Childers
8 deposition, and so don't know what additional
9 assumptions he made in his calculation, right?
10 A.      That's right.
11 Q.      But the impact -- when you say below
12 "impact of revised minimum wage and benefit rates,"
13 which is the table below paragraph 55, that number
14 doesn't just show the delta that you calculated
15 because of the additional assumptions, does it?
16        MS. SCHEFFEY:  Object to form.
17        THE WITNESS:  It -- well, as we previously
18 discussed, it would have corrected for the 2011
19 period also.
20        MR. CHAREST:  Q.  Right.  So just to be
21 really clear, the table that follows paragraph 55
22 shows two of your criticisms, not one, right?
23 A.      Yes.
24 Q.      And so you can't look at that and
25 determine, "Oh, well, we know that he's off by

1 $3.1 million because of this one issue." It's two
2 issues bundled together, right?
3 A.    Yes.
4 Q.    All right. The next one down is the
5 inaccurate employee scenario wage benefits, with
6 your title. We talked about the wage determination
7 schedules and whether or not those are really good
8 or not. Fundamentally, this whole section is the
9 math that flows from the use of those wage
10 determination schedules as compared to the math that
11 flows from the Bureau of Labor and Statistics,
12 correct?
13 A.    Yes.
14 Q.    But the table that reflects that work,
15 which is below paragraph 58, does not reflect just
16 that issue, does it?
17 A.    It reflects the 2011 correction also.
18 Q.    Right. So again, the table below
19 paragraph 58 reflects two of your criticisms, not
20 just one, correct?
21 A.    Yes.
22 Q.    And if you're trying to figure out the
23 quantum of impact from the use of the Bureau of
24 Labor and Statistics data versus the wage
25 determination schedules, you can't look at the

Page 154

1 inaccurate hours, yes, that's correct.
2      MR. CHAREST: Q. Now -- and we are. I
3 mean, if I want to just isolate that one issue,
4 paragraph 58 table does not show me that, correct?
5 A.    Just that one issue, using his inaccurate
6 hours, that's correct.
7 Q.    You say it's hard to look at one thing
8 without the other one, and all that sort of thing,
9 but if an expert wanted to, an expert could first
10 normalize the hour issue and then compare the second
11 thing, right?
12 A.    Yes.
13 Q.    But you didn't do that here?
14 A.    No.
15 Q.    Okay. You say "no," but yes, you did not
16 do that here, correct?
17 A.    That's correct.
18 Q.    All right. So then you say the conclusion
19 you draw from these two tables is that "The analysis
20 above shows that Dr." -- "Mr. Childers' opinions are
21 based on mathematical errors and are shown
22 assumptions that are inaccurate." Again, this is
23 sort of like a broad statement, without any
24 specifics, but you still agree with me as to the --
25 our discussion about the six assumptions you

Page 156

1 calculations under paragraph 58 and have a clear
2 answer or an accurate answer, can you?
3      MS. SCHEFFEY: Object to form.
4      THE WITNESS: I don't agree with that
5 because you would never start with his 26 million
6 735 as a comparison on that topic because it
7 includes the wrong number of hours. So this is the
8 difficulty of when you're trying to isolate the
9 impact of any one issue, that it's rare that any one
10 issue operates completely independent. Any issue
11 depends also on other issues.
12      So the way you just said that question I
13 don't completely agree with because I wouldn't want
14 to extrapolate the difference over the wrong number
15 of hours.
16      MR. CHAREST: Q. Well, one way to do
17 it -- well, first off, let's be real clear about
18 what my question is and what the answer is there.
19 If I want to know the impact of simply changing the
20 wage determination schedule data for the Bureau of
21 Labor and Statistics data, I cannot look at
22 paragraph 58 for that answer, correct?
23      MS. SCHEFFEY: Object to form.
24      THE WITNESS: If you're talking about
25 simply changing it within his model using the

Page 155

1 identified. Your testimony hasn't changed as to any
2 of those six, right?
3 A.    No.
4 Q.    And the only mathematical error that we've
5 identified is the extrapolation issue for 2011,
6 correct?
7 A.    And potentially the contractor scenario
8 because he didn't calculate what he said he
9 calculated. So as I said, it's either a
10 mathematical error or an undisclosed assumption, but
11 it doesn't calculate out as precisely how he
12 described it.
13 Q.    Those are the only two things that could
14 possibly be mathematical errors, and you don't --
15 you didn't attend the Childers deposition, so you
16 don't know that the second thing, in fact, is an
17 assumption, right?
18 A.    I did not attend the deposition. I don't
19 know what he said.
20 Q.    And -- okay. And the first part of what I
21 said is true as well, right?
22      MS. SCHEFFEY: Object to form.
23      THE WITNESS: Could you repeat the first
24 part? Sorry. When it's disconnected from another
25 discussion, I don't have it in my head anymore.

Page 157

40 (Pages 154 - 157)

1    MR. CHAREST: Q. The only two possible
2  mathematical errors you identified in Childers are
3  the extrapolation error and the thing that you
4  describe as a potential mathematical error in
5  paragraph 55, correct?
6  A.    Those are the only two I identified.
7  Q.    And you've quantified neither of those in
8  isolation, correct?
9  A.    Yes, correct.
10 Q.    Were there any other critiques you had of
11 the Childers report, to your mind, that were not in
12 the report that you -- that we just discussed?
13 A.    Yes. I thought his calculation of hours
14 or his conclusion of hours required to clean,
15 comparing that to the total number of hours in the
16 Voluntary Work Program, was an illogical comparison
17 because his quantification of hours required to
18 clean represented cleaning, and then comparing that
19 to the Voluntary Work Program with a variety of
20 tasks, I wasn't really sure what he meant by that or
21 why he did that. I didn't write it in the report
22 because he didn't directly rely -- he didn't use
23 those hours that he calculated in any of his
24 calculations, so I didn't raise the issue, but I
25 didn't understand why he made the comparison the way

Page 158

1  to the best of your understanding, as you and I are
2  here today in this deposition and you're prepared to
3  testify about your opinions, you don't know how, if
4  at all, that observation that he made or your
5  criticism of it that you've made impacts the damage
6  analysis at all, correct?
7  A.    I don't because he didn't elaborate on
8  what that comparison meant to his assumption of
9  adopting the Bland numbers. He just drew the
10 comparison, so I don't.
11 Q.    Okay. And you just call into question the
12 logical connection between his observation and his
13 conclusion, right?
14 A.    His observation and then the assumption
15 that he later used in terms of number of hours.
16 Q.    And does that assumption not affect the
17 damage calculation at all?
18 A.    Well, his assumption of what he used
19 affects the damage calculation, but I don't know how
20 his quantification of number of people required to
21 clean the facility connects to his use of the Bland
22 hours. I don't understand that.
23 Q.    Okay. We talked about the -- was it the
24 APPA custodial service, the staffing guidelines,
25 right?

Page 160

1  he did.
2  Q.    Does that issue that you just identified
3  impact at all the damage number or any critique
4  about the damage number, to the best of your
5  understanding?
6  A.    It doesn't impact the numbers directly as
7  I under- -- as -- following his math, it's not
8  included in his math. If he thinks -- if he is
9  using that as a yardstick, to use the word
10 "yardstick," I didn't understand it because he was
11 talking about cleaning, square foot to clean, and
12 then he compared that to all of the hours in the
13 Voluntary Work Program that includes other
14 activities. So -- and didn't comment on that. So I
15 don't know -- he didn't say -- he didn't elaborate
16 on what he was thinking, and I didn't attend his
17 deposition, so I don't know what he was thinking in
18 terms of that comparison.
19 Q.    But you didn't raise that issue in your
20 report, right?
21 A.    I did not, but you asked the question if
22 there's anything not in the report --
23 Q.    I certainly --
24 A.    -- so I answered it.
25 Q.    That's correct. And just so I understand,

Page 159

1  A.    I believe so.
2  Q.    Yeah. And do you have any basis to
3  dispute his application of those data to the Bland
4  data?
5  A.    I don't.
6  Q.    Okay. We're going to go now to the --
7  your observations with respect to Mr. Bland. You
8  ready? And that starts in your report at page 6 of
9  22. Okay?
10 A.    Sure.
11    MS. SCHEFFEY: Give me one second. I'm
12 getting there. I just need one second. I'm there.
13    MR. CHAREST: Q. Okay. I think I did
14 this last time. It actually starts on page 5 of 22.
15 I apologize. Let me know when you're at 5 of 22.
16    MS. SCHEFFEY: I'm there now.
17    MR. CHAREST: Q. Ms. Morones, are you
18 there?
19 A.    Yes.
20 Q.    Thank you. Paragraph 19 sets out a series
21 of assumptions, as you put it, that Mr. Bland used
22 for his report, correct?
23 A.    Correct.
24 Q.    The first one is the dollar paid services
25 for a day's work under the VWP, right?

Page 161

41 (Pages 158 - 161)

1 A.     Yes.
2 Q.     And just like you did with Dr. or
3 Mr. Childers, whichever it is, you agree that that's
4 a valid assumption, correct?
5 A.     Yes.
6 Q.     Put a checkmark next to that.  The next
7 one is, "Mr. Bland relies on a variety of sources,
8 including daily activity schedules, to determine
9 shift lengths and job types."  And "Mr. Bland
10 identifies four primary job types:  Custodial
11 Services, Kitchen Services, Laundry and Recreation."
12        And then you go on to say that, for job
13 types that don't correspond to the original four,
14 Mr. Bland applies a weighted average shift length.
15        So let's break that down a little bit to
16 see what part, because I think there's a few things
17 stuffed into that number too.  Okay?
18 A.     Okay.
19 Q.     The first thing:  Do you have any
20 disagreement with Mr. Bland's categorization of job
21 types:  Custodial services, kitchen services,
22 laundry, and recreation?
23 A.     No.
24 Q.     Okay.  So that's okay.
25        Do you have any disagreement with

Page 162

1 Mr. Bland's use of a weighted average to deal with
2 job types outside of the four main
3 characterizations?
4 A.     No.
5 Q.     Okay.  There's that one.  The other part
6 in there is the shift lengths, the determination of
7 shift length by job type.  Do you disagree with
8 Mr. Bland's assumptions relating to shift length by
9 job type?
10 A.     I -- yes.  I have explained more fully
11 that I believe the -- that the way he has
12 interpreted the evidence is questionable.  And so
13 yes.
14 Q.     Okay.
15 A.     And the evidence is less extensive than --
16 is not very extensive and subject to significant
17 swings in outcomes if alternate assumptions are
18 made.
19 Q.     Okay.  Any other high-level disagreements?
20 We'll talk about it in more detail.  This is not the
21 only chance.
22 A.     No.
23 Q.     Going on, then, to the third assumption:
24 Mr. Bland relies on detainee sign-in sheets for a
25 certain period of 11 weeks to estimate mixtures of

Page 163

1 job types.  Do you have a disagreement with the
2 assumptions that Mr. Bland made around job type
3 mixtures?
4 A.     Yes.  As more fully explained, I believe
5 he should have obtained a larger set of data.  I
6 don't disagree with the use of the sign-in sheets to
7 identify the mixture.  I just believe that the
8 amount of time -- known amount of time was
9 insufficient to extrapolate over such a long period.
10 Q.     That strikes me as a criticism of the
11 underlying data, but I want to cut right to the end
12 of this and ask you the question.  Do you disagree
13 with the conclusion, the assumption itself of the
14 mix of job types?
15 A.     Could you clarify your question?  Do you
16 mean do I have an alternate opinion of mixture?
17 Q.     Well, I mean, the actual question is, he
18 identified a mix of job types that he used in his
19 calculation.  Do you think his mix is incorrect?
20 A.     I don't know if it's incorrect.  I believe
21 it is inadequately supported, so it could be
22 incorrect.
23 Q.     Well, you're not an expert on accuracy of
24 evidence, are you, ma'am?
25 A.     I would assume the Court would make

Page 164

1 that -- a Court would make that decision or a jury
2 would make that decision, but I can express an
3 opinion on whether or not I think he has used too
4 little data to reach that conclusion.
5 Q.     Well, we can all have an opinion on
6 whatever.  That's not the point.  It's an expertise
7 that allows you to testify about an opinion.  Okay?
8 So do you have an expertise in determining what is
9 and what is not enough evidence to support a
10 conclusion?
11 A.     I do.  I practice in forensic accounting
12 and in evaluating information, gathering information
13 adequate to support a conclusion.  While there are
14 no bright-line definitions of how much is enough,
15 that I'm aware of, even though this is something I
16 do every day, I do believe it's within my expertise
17 to express an opinion about something being
18 insufficient or too narrow or too little, given the
19 long period of time at issue here.
20 Q.     Like, for example, a statistical analysis
21 having a sample set that's too small, that could be
22 given through the application of statistics, right?
23 A.     That -- yes, that could be done.
24 Q.     That's akin to what your complaint is
25 about this, correct?

Page 165

42 (Pages 162 - 165)

1  A.    Yes.
2  Q.    The difference is, statistics has rules
3  that can be measured and verified and applied,
4  whereas this one, you're just telling us "It's not
5  enough to my eye," right?
6       MS. SCHEFFEY: Object to form, foundation.
7       THE WITNESS: It's correct that I'm not
8  referring to any specific rules. I am -- it is my
9  opinion it is a very narrow set of data that could
10 leave it subject to substantial fluctuations using
11 different sets of data.
12      MR. CHAREST: Q. Well, all that last
13 thing you said is just that math is math, and it --
14 math works, right? If you multiply A times B, one
15 situation, you get an answer. And if B gets bigger,
16 then in that situation, you get a bigger end result,
17 right?
18 A.    I'm not sure what you mean by "math is
19 math, and math works," but --
20 Q.    We'll figure that out later. It's okay.
21 A.    Right.
22 Q.    It's okay. We're definitely going to talk
23 about it, so it's okay. But back to my fundamental
24 question. With respect to the assumption, leaving
25 aside the basis for it, with respect to the

Page 166

1  assumption that Mr. Bland uses with respect to the
2  mixture of job types, do you have any critique of
3  the numbers he used?
4  A.    Other than it's based on too little data,
5  no.
6  Q.    Okay. Again, I'm not asking you about the
7  reason why he got to where he got. If he had just
8  written down numbers on a piece of paper and used
9  them, could you say that they are right, wrong,
10 accurate, or inaccurate?
11 A.    I don't have an opinion of a different
12 number, so no.
13 Q.    Those are two different things. And I'm
14 happy to talk about the first thing in a second, but
15 I want to be really clear. You do not dispute the
16 result of his work. You dispute the process by
17 which he arrived at the result, correct?
18 A.    One leads to the other, so I do dispute
19 the result of his work as being unreliable because
20 it's based on too little data.
21 Q.    So you're an expert on reliability, then?
22 That's a question.
23 A.    Reliability is something I have to
24 consider and apply in the course of my work.
25 Q.    Well, in fairness --

Page 167

1  A.    There are no bright lines to it, but it is
2  something that I have to consider, evaluate, strive
3  to improve throughout the course of my work. And
4  so --
5  Q.    I don't disagree that, as an expert, a
6  professional expert in cases, you understand the
7  need to provide reliable methodologies and
8  practices. Okay? And I don't dispute the notion
9  that you are aware of what those standards are. But
10 my question is entirely different. Do you have any
11 basis to say that the assumption that Mr. Bland used
12 are actually wrong with respect to mixture of job
13 type?
14 A.    I do not.
15 Q.    Thank you. The next one, the fourth one,
16 which is the last of your list of assumptions you've
17 identified, you say, "Mr. Bland uses the detainee
18 payments, job type mixtures and assumed shift
19 lengths to estimate the total number of hours worked
20 by detainees for each month." Does that accurately
21 reflect your observation of that assumption?
22 A.    Yes.
23 Q.    Yeah. And leave aside the inputs. As a
24 construct, you agree with that approach, correct?
25 A.    Yes.

Page 168

1  Q.    And so the detainee payments, that's using
2  dollars to measure the days. You agree with that
3  part. So construct and data you agree with,
4  correct?
5  A.    I'm sorry. Repeat the last -- repeat the
6  last part of the question. I just didn't hear it
7  all the way.
8  Q.    The construct end data, you agree with
9  that part?
10 A.    "Construct end data," I just don't
11 understand what you mean.
12 Q.    Well, when I'm talking about "construct,"
13 I'm talking about like, well, I'm going to figure
14 out where this A is, and I'm going to apply -- and
15 I'm going to multiply by whatever this B is, and I'm
16 going to multiply it by whatever this C is. That's
17 the construct. That's the formula --
18 A.    Okay.
19 Q.    -- and the data going into what is the A,
20 B, or C. Are you with me?
21 A.    Yes.
22 Q.    So with respect to the detainee payment
23 element of the calculation, you agree with both the
24 basis for the assumption, the assumption, and the
25 output of the data, correct?

Page 169

43 (Pages 166 - 169)

1 A.     Just in terms of a formula and a
2 calculation, yes.
3 Q.     Well, not just in terms of formula and
4 calculation, but as an appropriate step on how to
5 measure the total hours worked by the detainee
6 population, right?
7 A.     Yes.
8 Q.     Now, on the job type mixtures, you agree
9 that it is a proper element in the formula, correct?
10        MS. SCHEFFEY:  Object to form.
11        MR. CHAREST:  Q.  You still have to
12 answer.
13 A.     Oh, you didn't finish the question.
14 Q.     I did.
15 A.     Did you?
16 Q.     Yeah.
17 A.     The job type mixture.  Yes, it's a
18 necessary part of the formula.
19 Q.     Okay.  And a correct element in the
20 formula too, right?
21 A.     Yes, you need to know the weighting of
22 jobs, yes.
23 Q.     And while you might disagree with the
24 basis by which he arrived at his conclusion, you
25 have no basis to say his conclusion is incorrect,
Page 170

1 off and gets me in the back of throat sometimes.
2        All right.  The actual substantive
3 response is here B in paragraph 20, you say, like
4 you did with Dr. Childers, that several assumptions
5 are not adequately supported, and minor changes to
6 his assumptions have a significant impact on
7 conclusions.  Those are the two kind of overarching
8 themes, correct?
9 A.     Yes.
10 Q.     I note that you didn't say anything about
11 mathematical errors, so can I draw from that that
12 you did not find any mathematical errors in the
13 Bland report?
14 A.     Well, it depends on what you -- how you
15 want to characterize failing to subtract actual
16 wages, but other than that, I don't recall just
17 calculation errors.
18 Q.     You've seen the amended report from
19 doc- -- of Mr. Bland, right?
20 A.     Yes.
21 Q.     Where he addresses that the -- the problem
22 with his spreadsheet?
23 A.     Yes.
24 Q.     And so that issue that you identify about
25 failing to subtract, that's been addressed, right?
Page 172

1 right?
2 A.     Yes.
3 Q.     And then that leaves us with the last
4 part, the assumed shift length, which I expect we'll
5 be discussing in detail.  But as a matter of
6 construct, you believe that it should be part of the
7 equation, right?
8 A.     Yes.
9 Q.     And your point there is you don't think he
10 has enough information to draw the conclusion he's
11 used, A; and B, you have data from another facility
12 which is different than his conclusion, and
13 therefore, name it as a problem, B; is that right?
14 A.     Yes.  And C, his interpretation of what he
15 does have is -- I question some of the
16 interpretation, such as using entire schedule
17 lengths to assume the length of a detail.
18 Q.     Okay.  So that's -- anything else?
19 A.     Not that comes to mind.
20 Q.     All right.  So the A, B, C there are other
21 facility; B, not enough data; C, wrong conclusions
22 from the data, right?
23 A.     Yes.
24 Q.     Okay.  Now we go to the actual -- excuse
25 me.  I ate an orange for lunch, and the skin comes
Page 171

1 A.     Yes.
2 Q.     So in light of everything you know, can
3 you identify any mathematical errors in the Bland
4 amended report?
5 A.     We did not, although my associate who
6 reviewed the calculations informed me that there are
7 two that he still can't entirely tie out, but we
8 don't have a specific criticism about the reason or
9 that issue.
10 Q.     Okay.  So then the two things that you did
11 identify was the bases for assumptions, and what I
12 think you describe as sensitivity to changed inputs;
13 is that fair?
14 A.     Yes, that's fair, but in addition,
15 misinterpreting some of the underlying data in the
16 category of the recreation position.  So I would say
17 it's beyond just the two that you said.
18        MR. CHAREST:  Okay.  Can we go off the
19 record for just a second, please?
20        MS. SCHEFFEY:  Sure.
21        THE VIDEOGRAPHER:  One moment.  We're
22 going off the record.  The time is 1:53.
23        (Recess taken from 1:53 p.m to 1:56 p.m.)
24        THE VIDEOGRAPHER:  We're back on the
25 record at 1:56 p.m.
Page 173

44 (Pages 170 - 173)

1      MR. CHAREST:  Thank you.
2  Q.      My understanding, Ms. Morones, is that the
3  issue that was identified in paragraph -- and
4  calculated in paragraph 22 of the report has been
5  addressed in the amended Bland report.  Do you
6  agree?
7  A.      Yes.
8  Q.      Okay.  And so the criticism that's
9  launched in paragraph 23 no longer applies to the
10  live report, correct?
11  A.      Correct.
12  Q.      And then I think you said you couldn't get
13  two of the calculations to tie up, but apparently
14  you do within -- you were able to replicate within
15  1% of the number that was arrived at; is that right?
16      MS. SCHEFFEY:  Object to form.
17      THE WITNESS:  Brent didn't say this time
18  around how close it was, but he didn't raise it as a
19  concern that we needed to bring up, so I don't
20  believe it's very much.
21      MR. CHAREST:  Q.  Whoever that person you
22  just named was, that's your research assistant
23  that's helping with the calculations?
24  A.      Brent Boutwell, yes.
25  Q.      Then the only of the -- if I'm not

Page 174

1  Q.      Okay.  Which number, please -- I'm going
2  to -- if you would turn to page 14 of 19 of the
3  Bland report.  If you like, I can put it up on the
4  screen.
5      MS. SCHEFFEY:  Which page?
6      MR. CHAREST:  I'm sorry, I didn't hear
7  that.
8      MS. SCHEFFEY:  Which page?  I'm trying to
9  pull it up so I'm in the same spot as you.
10      MR. CHAREST:  14 of 19.
11      MS. SCHEFFEY:  Thank you.
12      MR. CHAREST:  And I'll just go ahead and
13  share the screen, so y'all can see what we're
14  talking about here.
15  Q.      All right.  Ms. Morones, we're looking at
16  the top half of page 14 of 19, Table 3, which is
17  underneath at the end of paragraph 31.  Which number
18  is incorrect?
19  A.      I dispute the kitchen services median of
20  five based on the absence of the meal break that we
21  discussed previously, as well as the recreation
22  number of 2.5, based on the interpretation -- his
23  interpretation of what that -- what that position is
24  that I believe the job description indicates it is a
25  custodial position, whereas I understand he's

Page 176

1  mistaken -- well, let me -- let me ask the question
2  more directly.  With respect to the assumptions that
3  Mr. Bland used with respect to shift lengths --
4  leave aside again the basis for them -- do you
5  dispute the validity of the assumptions he made?
6  A.      Do you mean -- could you be more precise
7  what you mean by "validity"?  Do you mean the number
8  of hours per --
9  Q.      Yeah, let me do it in a better question,
10  because validity throws something in there that I
11  think that you might object to.  Mr. Bland
12  identified average shift lengths for each job type
13  in his report ultimately, correct?
14  A.      Yes.
15  Q.      And they're set out in, I think,
16  paragraph -- Table 3 in his report, and the
17  discussion in around that, correct?
18  A.      That sounds right.
19  Q.      Do you dispute that those numbers are
20  correct?
21  A.      Yes.
22  Q.      Okay.  On what basis do you dispute that
23  the numbers are correct?
24  A.      In some cases, interpreting the evidence
25  that he relies on differently than he does.

Page 175

1  assuming some other -- I'm sure his word is in there
2  somewhere -- some type of activity supervisor.
3  Q.      So what is the median kitchen service
4  hours, in your estimation?
5  A.      I have calculate -- well, using his median
6  of five and subtracting the 25-minute meal break,
7  it's 4.6-something, approximately four and a half.
8  Q.      Said 4.6-something?
9  A.      Sure, yeah, 4.6.
10  Q.      Okay.  And then is your testimony that
11  recreation should be -- well, in terms of shift
12  length -- sorry about that.  Do you have any changes
13  to this table for the recreation row?
14  A.      Yes.  I would change recreation to the
15  custodial number of 1.5.
16  Q.      Across the board?
17  A.      Yes.
18  Q.      So as is reflected on the screen now, you
19  think those numbers are correct?
20  A.      Yes.
21      MR. CHAREST:  Going to take a screenshot
22  of that, and we'll enter into it as an exhibit here
23  as soon as I figure out how to do that.  Oh, my
24  goodness.
25      MS. SCHEFFEY:  You might want to stop

Page 177

45 (Pages 174 - 177)

1 screen sharing.
2          MR. CHAREST: How to figure out how to get
3 there. This is the problem with having gadgets.
4 Q.     We'll get that up as soon as we can, and
5 we'll just have you confirm that what I show you as
6 an exhibit is what we just talked about. Okay?
7          Now, in the discussion about the shift
8 lengths in your report, you say, "Like Adelanto, the
9 Northwest Detention Center houses detainees for ICE
10 and operates VWP in accordance with the PBNDS."
11 That's in paragraph 29. Are you with me?
12 A.     Yes.
13 Q.     Not to beat a dead horse, but you're not
14 saying that either the Northwest Detention Center or
15 the Adelanto facilities actually, in fact, operates
16 the VWP in compliance with the PBNDS, right?
17 A.     Correct.
18 Q.     And you have no opinion as to the
19 compliance or non-compliance with PBNDS by the VWP
20 in either location, right?
21 A.     Correct.
22 Q.     Do you know that, in fact, that the VWP is
23 operated in the same manner in either location?
24 A.     I don't know if they're operated in
25 identical manners, but I can see several

Page 178

1 the shift length by job type table that we were
2 talking about, correct?
3 A.     Yes.
4 Q.     And those are the numbers you believe are
5 correct, right?
6 A.     Those are the minimum adjustments that I
7 would make to those categories. I haven't validated
8 all of the underlying data to know that -- that
9 laundry is 2.5, custodial services is 1.5. So I
10 would say that those numbers reflect the minimum
11 adjustments that should be made to that -- to those
12 assumptions.
13 Q.     Okay. So I asked you to make every
14 correction you thought was necessary, and these are
15 the corrections you identified, right?
16 A.     Yes.
17 Q.     And you don't have any basis in fact to
18 suggest that any other changes are appropriate to
19 the data that are reflected as amended by you on
20 Exhibit 208, correct?
21 A.     Correct.
22 Q.     Now, back to the shift length discussion.
23 We were at paragraph 29 of your report. Are you
24 with me there?
25 A.     No.

Page 180

1 similarities in the voluntary work programs.
2 Q.     You see similarities in the voluntary work
3 programs. What are those similarities?
4 A.     The prevalence of janitor positions, the
5 length of time for the kitchen workers, the dollar a
6 day that's paid for the details, the -- yeah, that's
7 what comes to mind.
8 Q.     Okay. So the three things you identified
9 as being similar are the fact that dollar a day is
10 paid in both facilities, that the kitchen time is
11 similar, and the janitor is the most prevalent
12 occupation, the largest -- I'll leave it at that,
13 the most prevalent occupation. Is that right?
14 A.     Yes.
15 Q.     Okay. I'm introducing into the share
16 folder Exhibit 208. Let me know when you have it,
17 please.
18          (Whereupon Exhibit 208 was marked for
19          identification.)
20 THE WITNESS: Okay.
21 MS. SCHEFFEY: The title "Marked," is that
22 what --
23          MR. CHAREST: Yes.
24 Q.     And just to confirm, Exhibit 208 is a
25 screenshot of the amendments that you would make to

Page 179

1 Q.     Please do. When you're ready, let me
2 know.
3 A.     Okay.
4 Q.     Thank you. You say, "Due to the
5 similarities between the Novoa Matter and the state
6 of Washington Matter, the plaintiff expert report on
7 lost wages in Washington Matter offers a useful
8 comparison to the Bland Report." Did I read that
9 correctly?
10 A.     Yes.
11 Q.     We talked about the similarities, in your
12 view, between fundamental -- what we're talking
13 about is the Voluntary Work Program and compensation
14 for that, right?
15 A.     Yes.
16 Q.     And we talked about your observations that
17 there were similarities in the two programs between
18 Adelanto and Northwest Detention Center, correct?
19 A.     Yes.
20 Q.     And the three things that you offered were
21 that the janitors were the most prevalent employment
22 type, the kitchen timing seemed about the same, and
23 everyone got paid a dollar a day, right?
24 A.     That is what came to mind, yes.
25 Q.     And you can't think of any other

Page 181

46 (Pages 178 - 181)

1 similarities that support your observation of
2 similarities, correct?
3 A.      Well, they're both operated by GEO.
4 They're both voluntary work programs.  They're both
5 civilly detained individuals based on their
6 immigration status.  They both -- which causes the
7 detainees to have a relatively short amount of time
8 in -- average time in detention.  They both, under
9 the voluntary -- I mean, just under the philosophy
10 under the Voluntary Work Program, there is an
11 attempt to involve a significant number of
12 detainees.  So just because I raised a few doesn't
13 mean there aren't more comparisons.  I'm just -- I
14 was just listing a few that came to mind.
15 Q.      Okay.  So you listed the philosophy of
16 inclusion, short time of detention, that they're all
17 Volunteer Work Programs, that they're all civil
18 detainees, that they're all operated by GEO, in
19 addition to the first three you mentioned, right?
20 A.      Yes.
21 Q.      Okay.  How did the philosophy of inclusion
22 apply or affect in any way shift length?
23 A.      It's my understanding that GEO attempts to
24 include -- to provide as many details as possible to
25 include as many detainees as possible, as opposed to

Page 182

1 the document was that we've referred to a bunch of
2 times, their description of the Voluntary Work
3 Program.
4 Q.      The PBNDS?
5 A.      Yes.
6 Q.      What exactly did the counsel in Washington
7 tell you about the philosophy of conclusion, this
8 wonderful ability to work and not get paid?
9 A.      Just as I've -- my understanding is based
10 on just their description of what this is.  These
11 are not traditional jobs that you would find out in
12 the marketplace.  They are tasks that have been
13 created by GEO under the concept of the Voluntary
14 Work Program to be completed by detainees, and many
15 of them are not very long.  They could be longer if
16 they were traditional workers, but they're not very
17 long in order to include more detainees.
18 Q.      Is that what the lawyers told you?  My
19 question was what did the lawyers tell you?
20 A.      I don't recall.  It's been too long.  I
21 don't know their exact words.  That's the
22 understanding of the Voluntary Work Program that I
23 gained based on discussions with them and also
24 reading the materials.
25 Q.      The materials being what?  I mean, you're

Page 184

1 offering a few random jobs that might be possible
2 for detainees to do.
3        It's my understanding that the Voluntary
4 Work Program exists to create participation
5 opportunities for more detainees as opposed to less,
6 and that that would necessarily shorten the detail
7 lengths, because you could have one janitor working
8 eight hours, whereas instead, they break it up and
9 into more pieces so that more can participate.
10       So that philosophy of inclusion creates
11 more of a concept of a detail than a typical job
12 that would be 8:00 to 5:00 or whatever.  That's a
13 very unique type of program in terms of work-related
14 tasks.  You don't really see it out in the
15 commercial market space.
16       So the fact that both were GEO facilities
17 operating a Voluntary Work Program was an important
18 part of using this other facility as a useful
19 comparison.
20 Q.      Who told you that that was the philosophy
21 of GEO or the Voluntary Work Program?  What's your
22 basis for that statement, is my question.
23 A.      It's discussions with counsel in the
24 Washington case, as well as just reading the --
25 reading the -- whatever the detention -- whatever

Page 183

1 painting this utopia of like "everybody gets to
2 work, and it's wonderful."  What's the basis, other
3 than lawyers telling you that?
4 A.      The large number of detainees
5 participating in the program.
6 Q.      Oh.  So --
7 A.      It's obvious that there -- that there is
8 an inclusion of a large number of detainees.
9 Q.      Right, which you perceive to be a
10 voluntary act that they're not compelled to do,
11 right?
12       MS. SCHEFFEY:  Object to form,
13 argumentative.
14       THE WITNESS:  That's my assumption,
15 just -- it's not my basis to say, but that's my
16 assumption based on the description of the program.
17       MR. CHAREST:  Q.  What is the basis of
18 that assumption, ma'am, that people want to work for
19 nothing?
20       MS. SCHEFFEY:  Object to form, foundation.
21       THE WITNESS:  I don't have any basis to
22 know what they want to do.  I'm talking about my
23 understanding based on the description of the policy
24 statements and my observations about the way the
25 program is working.

Page 185

47 (Pages 182 - 185)

1    MR. CHAREST: Q. Do you understand that
2 if people don't work as instructed, they get sent to
3 seg- -- segregation, solitary confinement?
4    MS. SCHEFFEY: Objection to form,
5 foundation.
6    THE WITNESS: I don't have an
7 understanding about what happens if they choose not
8 to work.
9    MR. CHAREST: Q. You're not aware of any
10 allegations at all about being forced to do this
11 work? Is that your statement under oath, ma'am?
12 A.    I may have been. I may have read that in
13 pleadings, but I have not focused on that, and I
14 don't recall anything about it. It's not my part of
15 the case to have an opinion about.
16 Q.    Well, I don't disagree with it
17 necessarily, but you're the one that's talking --
18 trying to spin this utopia of like, "Oh, look,
19 everyone gets to work and is so happy to do it, and
20 you can tell that this program of inclusion because
21 so many people participate." Those are -- that's
22 your statement, not mine.
23    MS. SCHEFFEY: Object to form. It
24 misstates prior testimony.
25    MR. CHAREST: Q. Right?

Page 186

1 A.    Yes, I did use the word "inclusion,"
2 meaning more participants as opposed to less. You
3 can have less participants if you're working eight
4 hours a day. You can have more participants if
5 they're working shorter -- shorter details.
6 Q.    And you pointed to the fact of lots of
7 people doing it as having a reflection of this
8 inclusive ability and this openness and allowing
9 everyone to be there, rather than everyone's forced
10 to do it, right? That's -- you can have the same
11 data and draw the opposite conclusion, can't you?
12 A.    Well, maybe "inclusion" is too charged of
13 a word. I meant more individuals participating, as
14 opposed to fewer.
15 Q.    And I offer you a lifeline of what I think
16 you're trying to say without stepping in this
17 minefield. Are you ready? In the ordinary course,
18 a janitor would work for eight hours a day, and in
19 this situation, we have evidence, I think is what
20 you're saying, of more than one person doing those
21 eight hours of work. Is that fair?
22 A.    Yes.
23 Q.    Without with regard to why they're doing
24 it, we can leave that aside for your purposes,
25 because that's not your part of the case, right?

Page 187

1 A.    Well, other than listed in their policy
2 manual, which I read; that there is a philosophy
3 about the program stated in the policy manual. I'm
4 not trying to read into it beyond that. That's just
5 my understanding based on what their information
6 says about it.
7 Q.    Yeah. The policy manual I think you're
8 talking about is the PBNDS, right?
9 A.    Yes.
10 Q.    And what the PBNDS doesn't say, but is
11 also true, is that GEO benefits from this free
12 labor, right?
13 A.    I can't agree to that.
14 Q.    Okay. Do you think a cotton plantation is
15 more or less expensive with free labor?
16 A.    The cost of labor is cheaper if it's free,
17 but it doesn't mean that GEO is benefiting if they
18 can increase their revenues to cover their cost.
19 Q.    That's depending on an if things change
20 that are different than what they actually are,
21 correct?
22 A.    If the -- if the revenues increase to
23 cover the costs, yes.
24 Q.    A counterfactual position that would bail
25 you out of the answer "yes" to my question, right?

Page 188

1    MS. SCHEFFEY: Object to form.
2    THE WITNESS: I feel like that's
3 unnecessarily argumentative.
4    MR. CHAREST: Q. Golly. You still need
5 to answer it.
6 A.    I don't even understand it. "A
7 counterfactual position that bails you out of
8 answering my question."
9 Q.    Well, you understand the hypothetical,
10 right?
11 A.    Yes.
12 Q.    The hypothetical being imagine we had a
13 facility that requires labor, but we have a free
14 labor source, or virtually free labor source, on one
15 hand, and a facility where we actually have to pay
16 for the labor that we need to run. Which of those,
17 assuming the income is the same to the operator of
18 the facility, makes the operator more money?
19    MS. SCHEFFEY: Object to form.
20    THE WITNESS: We've been over this several
21 times, and I've agreed that if the income stays the
22 same, the labor that costs less is more beneficial.
23 That wasn't the question you asked a few minutes
24 ago.
25    MR. CHAREST: Q. Well, history will

Page 189

48 (Pages 186 - 189)

1 determine what I asked.
2        Okay.  So we were talking about the
3 similarities between the Northwest Detention Center
4 and Adelanto, and you said they both have the same
5 philosophy, which is this philosophy of conclusion.
6 And I think fundamentally, with respect to shift
7 lengths, you're saying that more than -- more than
8 one person will work an eight-hour shift or parts of
9 an eight-hour shift, and therefore, shift lengths
10 are overall shorter, correct?
11 A.        Than you would find out in the market
12 where someone would work an eight-hour shift, yes.
13 Q.        Do you have any data to suggest that the
14 same number of people are used per eight-hour shift
15 in Adelanto as are used in an eight-hour shift in
16 Northwest Detention Center?
17 A.        No.
18 Q.        So any suggestion that Adelanto shift
19 lengths and Northwest Detention Center shift lengths
20 is based on speculation because you have no data to
21 show that they are, in fact, related to each other,
22 correct?
23        MS. SCHEFFEY:  Object to form.
24        THE WITNESS:  Yes, that's correct.
25        MR. CHAREST:  Q.  And so an understanding
Page 190

1 right?
2 A.        Yes.
3 Q.        Do you have any basis to say that that is
4 true, ma'am?
5 A.        No.
6 Q.        Okay.  So that assumption is founded on no
7 facts, right?
8 A.        The assumption -- yes, that's correct.  I
9 have not investigated the specifics of the
10 operations to say they have uniform operational
11 policies.
12 Q.        Right.  And, you know, if they did have
13 that data, GEO could give it to you, right?
14 A.        I assume that they could give me something
15 that they have, yes.
16 Q.        And GEO never gave you anything to show
17 that the shift lengths in Northwest Detention Center
18 are the same as the shift lengths in Adelanto,
19 correct?
20 A.        Not directly, no.
21 Q.        Not directly?  So let's leave at that for
22 a second.  To be really clear, GEO has not provided
23 you with any data to support any analog between
24 shift length at Northwest Detention Center and shift
25 lengths at Adelanto, correct?
Page 192

1 of what a shift length is in Northwest Detention
2 Center is not demonstrably relevant to the
3 determination of what a shift length is in Adelanto,
4 correct?
5 A.        Could you repeat the question?  Maybe I
6 just don't have a vocabulary you have, but maybe use
7 more simple vocabulary.
8 Q.        I'll do my best.
9 A.        Sorry.
10 Q.        Yeah.  That's no problem.  You're entitled
11 to get a question you understand.
12        If I know that the shift lengths in
13 Adelanto are five hours, and I know -- do I know
14 that that actually tells me anything about the shift
15 lengths in Northwest Detention Center, as a matter
16 of fact?
17        MS. SCHEFFEY:  Object to form.
18        THE WITNESS:  It may, in my opinion.  It
19 may because they're operated by the same company,
20 and so -- and so they may.  They may be similar.
21        MR. CHAREST:  Q.  So they're operated by
22 the same company, the presumption in that
23 observation is that there is a uniform policy
24 applying to both Adelanto and Northwest Detention
25 Center, correct?  Or practice?  Or both, actually,
Page 191

1 A.        Correct.
2 Q.        You said "directly" in response to a
3 question earlier.  Did you mean to say indirectly
4 you may have seen data?
5 A.        Not to make a comparison.  They haven't
6 provided data to make -- where they have made a
7 comparison.  There is only what exists just in terms
8 of the sources of information within each case that
9 has come -- ultimately come from GEO.
10 Q.        Okay.  So data about Northwest Detention
11 Center in the Nwauzor case exists and was provided
12 for the Nwauzor case about Northwest Detention
13 Center, right?
14        MS. SCHEFFEY:  Object to form.
15        THE WITNESS:  Yes.
16        MR. CHAREST:  Q.  And data exists around
17 the Adelanto facility and was provided in the Novoa
18 case, and that data exists, right?
19        MS. SCHEFFEY:  Object to form.
20        THE WITNESS:  Yes.
21        MR. CHAREST:  Q.  But do you -- have you
22 ever seen anything, ever, that says the data that
23 applies to Northwest Detention Center also applies
24 to Adelanto?
25 A.        No.
Page 193

49 (Pages 190 - 193)

1 Q.    You reference an expert report by Peter H.
2 Nickerson, Ph.D. in your report, at paragraph 30,
3 correct?
4 A.    Yes.
5 Q.    We started talking about it a little
6 bit -- a little ahead of schedule, and I want to
7 dwell on that for a moment.  First off, you cite in
8 your report, Footnotes 50 -- sorry -- 35 and 36, two
9 different sections of the Nickerson report, correct?
10 A.    Yes.
11 Q.    Now, you say expressly that you do not
12 assert that the average hours per shift used by
13 Dr. Nickerson in the State of Washington matter are
14 accurate for the use in calculating lost wages in
15 the Novoa matter.  That's at paragraph 31 of your
16 report.  Did I read that correctly?
17 A.    Yes.
18 Q.    All right.  So to be really super-duper
19 clear, you are not saying that the information
20 contained in the Nickerson report, Appendix C1 that
21 is cited in your report, is accurate in any way,
22 correct?
23 A.    That's correct.  I've issued a rebuttal
24 report to that report, so I wouldn't say it was
25 accurate.

Page 194

1 Q.    Right.  So -- but -- and you draw -- the
2 thing that you really draw from the Nickerson
3 report, for the purposes of this case, is his
4 articulation of average shift length, which you say
5 on a weighted average basis is lower than Mr. Bland,
6 and that Mr. Bland is higher by 38% from the
7 Nickerson report, on that issue, correct?
8 A.    Yes.
9 Q.    So you're measuring the Bland calculated
10 average shift length, on one hand, by the Nickerson
11 calculated average shift length, on the other hand,
12 noting a 38% delta in favor of Bland, correct?
13 A.    Yes.
14 Q.    Right.  But to be sure, you don't agree
15 that the Nickerson number is valid, right?
16 A.    That's correct.  I've critiqued it.
17 Q.    But not only have you critiqued it, you've
18 previously said "I don't believe it's valid," right?
19 A.    Yes.
20 Q.    And sitting here today, you don't think
21 the Nickerson articulation of average shift length
22 is valid, correct?
23 A.    That's correct.
24 Q.    All right.  So then when you're comparing
25 the Bland number to a knowingly invalid number,

Page 195

1 what's the point?
2 A.    The point is that as -- the point is that
3 as a plaintiff expert, one might want to look to the
4 other available highest number and question whether
5 or not, if you're higher than that number, what
6 might be the reasons, are there valid reasons.  It's
7 just, for purposes of asking the question is there
8 anything that I have over-assumed, is there anything
9 I'm stretching on.
10       My critiques to the 1.72 bring that number
11 down, so when I say it's not valid, my critiques are
12 adjustments downward, but for purposes of a
13 comparison, if one took the highest number, compared
14 it to Bland's highest number, Bland might have
15 wanted to ask why am I higher?  Is there anything --
16 any reason?  Does this make sense that I'm higher
17 than the expert from another case, another plaintiff
18 expert from another case?
19       Now, there might be perfectly good
20 reasons.  There might be perfectly good reasons why
21 they're different.  Offers just a useful comparison.
22 Q.    Okay.  So there is, I think, a couple
23 things going on there, and I'll try and unpack them.
24 The first one that you said is Mr. Bland, as a
25 plaintiff's hired expert, should look at the other

Page 196

1 plaintiff's hired expert and say, "Well, here's his
2 top line number.  How do I compare to that," right?
3 A.    Yes.
4 Q.    Okay.
5 A.    And I'm not saying it needs to be the
6 same.  I'm saying it's a useful comparison.
7 Q.    Okay.  Leave that aside.  The first
8 question is how is Mr. Bland supposed to get the
9 Nickerson report to do that work?
10 A.    I don't know.  I don't know how all the
11 plaintiff attorneys work together.  I don't know.
12 Q.    Well, there's a protective order in the
13 State of Washington case, right?
14 A.    I would assume so, but I don't even know
15 who are the attorneys for the plaintiffs, to know
16 whether it's the same attorneys.  I don't know if
17 the experts are working together.  So if he didn't
18 have access to it, then it's not a fair criticism by
19 me, but I don't have a basis to know that.
20 Q.    Okay.  Well, let me tease that out again,
21 that next level down.  If, in fact, Mr. Bland did
22 not have access to the Nickerson report when he was
23 evaluating his steps -- not just the Nickerson
24 report, but all of the data that underlies it --
25 then it's not a fair criticism of him to say, "Hey,

Page 197

50 (Pages 194 - 197)

1 look, Adelanto number is fine, but look at these
2 Northwest Detention Center numbers," right? That's
3 an unfair criticism, right?
4 A.     It's an unfair criticism of him. It might
5 be something for me to consider, but -- because I
6 have access to it, but in terms of what he was able
7 to consider, I agree. If he doesn't -- if he can't
8 have access to it, he can't know it and make a
9 comparison.
10 Q.     Is it fair for you to be able to access
11 data and information that he does not have and then
12 turn around and say he's done something wrong with
13 that data and information?
14        MS. SCHEFFEY: Object to form, asked and
15 answered.
16        THE WITNESS: I don't know. I think
17 that's a question about document product -- I just
18 don't know. I didn't even know that he wouldn't
19 have access to it. So I don't know.
20        MR. CHAREST: Q. Okay. Now, about the
21 information that gives rise to the Nickerson report,
22 there are -- it's not just -- I mean, you might
23 disagree with me, but Nickerson didn't just pull
24 these numbers out of thin air. There were documents
25 and deposition testimony that form the basis of his
Page 198

1 opinion. Whether you agree with the conclusion or
2 not, those materials exist, and he relied on them,
3 correct?
4 A.     Those materials exist, yes.
5 Q.     Yeah. And do you think that Mr. Bland has
6 those materials?
7 A.     Are we talking about the same thing we
8 just talked about? I don't know. I really don't
9 know.
10 Q.     Okay. Is it fair to criticize Mr. Bland
11 for not having taken into account those materials to
12 which he does not have access?
13 A.     In terms of suggesting that he failed to
14 look at something that he should have, yes, it's
15 unfair. It might still be reasonable for me to do
16 it.
17 Q.     Okay. Keeping in mind, of course, that
18 ultimately what the Nickerson report does, insofar
19 as the part that you rely on here as a concern about
20 the Bland report, is talk about shift lengths, which
21 you've already said you don't have any data to show
22 that shift lengths at Adelanto have any bearing at
23 all on shift lengths at the Northwest Detention
24 Center, right?
25 A.     I don't have data that would show that,
Page 199

1 correct.
2 Q.     Okay. And GEO could have provided that
3 data if it existed, right?
4 A.     Yes.
5 Q.     Right. But it didn't, to you at least,
6 that you know of, right?
7 A.     Correct.
8 Q.     And I would assume you -- but I'll ask
9 anyway -- do you ascribe any reason as to why the
10 owner of the data would not provide the data if it
11 supported the owner of the data's position?
12        MS. SCHEFFEY: Object to form.
13        THE WITNESS: No.
14        MR. CHAREST: Q. Do you have any reason
15 to -- doesn't matter.
16        And all of this is talk about trying to
17 figure out what shift lengths are at Adelanto,
18 right?
19 A.     Yes.
20 Q.     And similarly, GEO, more than anyone in
21 the universe, any other thing in the universe, would
22 have data around what those numbers are, correct?
23 A.     If it exists, I would -- you know, they
24 would be the only one that has it.
25 Q.     Right. And GEO never provided you with
Page 200

1 that data, did it?
2 A.     No.
3 Q.     Do you know why?
4 A.     No.
5 Q.     Did you ask for it?
6 A.     Yes. In every case, I've asked what data
7 exists regarding shift lengths.
8 Q.     What are the answers you get back on that
9 question?
10 A.     There is some data that serves -- some
11 documents that have been provided. GEO doesn't
12 track the amount of time spent by detainees
13 conducting these details.
14 Q.     That's what they tell you?
15 A.     Yes.
16 Q.     So aside from interpreting, then, the data
17 that Mr. Bland did rely on, and -- well, I guess, is
18 there anything else that you can point to to say any
19 conclusion he had on shift length is incorrect?
20 A.     Other than what's already discussed in the
21 report -- which some things you haven't gotten to,
22 though I'm sure you'll get to them -- beyond that,
23 no.
24 Q.     Well, let me -- let me be more clear about
25 it, because when we talked about it, you said the
Page 201

51 (Pages 198 - 201)

1  things that -- the three things you identified were
2  the things that he addressed in the Bland report,
3  which I take to mean you have interpretation --
4  interpretive -- can I start again?  I'm sorry.  May
5  I?
6  A.      Yes.
7  Q.      You identified three things with which you
8  disagreed with Mr. Bland about his shift length
9  estimates.  You said the Bland -- the materials in
10 the Bland report, the kitchen break issue, and then
11 other things in your report.  And the other things
12 in your report, if I recall correctly, was
13 fundamentally the Nickerson report.  Is there
14 anything else that you can think of?
15 A.      No, I'm not aware of any other data.
16 Q.      And the kitchen break issue is addressed
17 by the annotation you made to his table in
18 Exhibit 208, correct?
19 A.      Yes.
20 Q.      And the, I guess I'll call it,
21 reallocation of recreational workers to custodial
22 services was also addressed in the annotations you
23 made to the table in Exhibit 208, correct?
24 A.      Yes.
25 Q.      And then all that leaves out there is the

Page 202

1  Nickerson report, which you've already said, and I
2  think we all agree, is only about Northwest
3  Detention Center, correct?
4  A.      Yes.
5  Q.      And there's nothing in the Nickerson
6  report that talks about anything about shift lengths
7  in Adelanto?
8  A.      That's correct.
9  Q.      Your observation is, assuming Bland had
10 access to this Nickerson report, he should have
11 looked at what this other expert had and compared it
12 to his numbers to see, "Well, look, is it a check I
13 should use or not," right?
14 A.      Yes, that's correct.
15 Q.      But that's an unfair criticism if, in
16 fact, Mr. Bland did not have access to that report,
17 correct?
18 A.      It's an unfair criticism of him.  It may
19 be a fair observation for me to draw.
20 Q.      Okay.  But again, the Nickerson report
21 itself you say is inaccurate, including specifically
22 with respect to the shift lengths, right?
23 A.      Yes.
24 Q.      And then finally, this is kind of where --
25 the big windup here is I'm trying to -- I'm trying

Page 203

1  to understand in paragraph 31, you say, "I use the
2  Bland" -- sorry -- "the Nickerson report to," quote,
3  "'illustrate the sensitivity of Mr. Bland's
4  calculation,'" right?
5  A.      Yes.
6  Q.      And to -- sometimes I use words that are
7  hard to understand.  Sometimes everybody does.  When
8  you say there "to illustrate the sensitivity," what
9  you're doing -- what you're saying is, if I use
10 Mr. Nickerson's variable -- Nick- -- can I start
11 again?
12 A.      Yes.
13 Q.      When you use the term "illustrate the
14 sensitivity," what you're talking about there is, if
15 I use Mr. Nickerson's shift length in place of the
16 shift length variable rather than Mr. Bland's shift
17 length in place of the shift length variable, then
18 the product of that math equation is different,
19 right?
20 A.      Yes.
21 Q.      And nothing more, nothing less, correct?
22 A.      Yes, correct.
23 Q.      Right.  So when we go back to the fourth
24 observation of assumptions in paragraph 19, we
25 describe -- remember the construct of the equation?

Page 204

1  Are you with me?
2  A.      Yes.
3  Q.      You said, "the detainee payments as a
4  proxy for days as applied to the job type mixtures
5  as applied to the assumed shift lengths."  So it's
6  that factor, that variable that you're placing the
7  Bland data with the Nickerson data and saying, "Oh,
8  it's different.  The result is different," right?
9  A.      Yes.
10 Q.      And that is the output that's reflected in
11 the bottom of paragraph 31 on page 10 of 22 of your
12 report, right?
13 A.      Yes.
14 Q.      Using data from a report you dispute, from
15 a facility that is not our facility, that is based
16 on information that we don't have access to, to show
17 that when you multiply one time -- one number by a
18 different number, the number changes, right?
19 A.      Yes.  Yes.
20 Q.      Moving on to the inadequate support --
21 well, hold on.  Let me just -- I have to do this.
22         MS. SCHEFFEY:  Could we go off for a -- or
23 I mean -- oh, sorry.  You're not taking a break?
24         MR. CHAREST:  I'm not, actually.  The --
25 but I am shifting gears, and I'm -- if you want a

Page 205

52 (Pages 202 - 205)

1 break, I'm happy to do it.
2        MS. SCHEFFEY: I was going to say at some
3 point in the next 15, if you have it. I just need
4 to --
5        MR. CHAREST: Well, let's knock this out
6 real quick, then.
7        MS. SCHEFFEY: Yeah, do that. That's what
8 I'm saying. It's not a rush. Go ahead.
9        MR. CHAREST: I'm trying to introduce --
10 well, tell you what: Let's take the break because
11 I'm having a problem with the Exhibit Share anyway.
12 So let's just take a break now.
13        THE VIDEOGRAPHER: All right. We're going
14 off the record. The time is 2:45.
15        (Recess taken from 2:45 p.m. to 2:55 p.m.)
16        THE VIDEOGRAPHER: We're back on the
17 record. The time is 2:55 p.m.
18        MR. CHAREST: Q. Ms. Morones, as a final
19 set of questions on the calculations that are
20 reflected on paragraph 31 in your report, just to be
21 really clear, it is not your opinion that an
22 appropriate reduction of damages is reflected in
23 that calculation, the $4.6 million, right?
24 A.      Correct.
25 Q.      It's a sensitivity analysis only, and not

Page 206

1 any kind of measure of appropriate or inappropriate
2 damage calculation, correct?
3 A.      Yes.
4 Q.      In paragraph 32 we talk about the things
5 that Mr. Bland himself relied on and your criticism
6 of his interpretation of those. You with me?
7 A.      Yes.
8 Q.      All right. So paragraph 32 you note that
9 Mr. Bland looked at sign-in data from a 78-day
10 period, and you say, "That data may not be
11 representative of the mixture of job types," right?
12 A.      Yes.
13 Q.      What factual basis do you have to say that
14 those sign-in sheets are not representative of a
15 mixture of job types?
16 A.      Well, only within the dataset, when you
17 look at just one of the shorter periods within the
18 dataset, how sensitive the numbers are to just the
19 data within that dataset. So -- so that would lead
20 me to believe that his conclusion rests on
21 insufficient data.
22 Q.      That's not my question, though. My
23 question is, what factual information do you have
24 that refutes the job type mixture that Mr. Bland
25 calculated?

Page 207

1 A.      I don't -- I'm not offering anything that
2 refutes his number, that says -- offers an
3 alternative number.
4 Q.      All right. So sitting here today, you
5 cannot say on any basis that, in fact, the job
6 mixtures that Mr. Bland calculated are incorrect,
7 right?
8 A.      Right.
9 Q.      And you work for the company who oversees
10 this entire project, right?
11        MS. SCHEFFEY: Object to form.
12        THE WITNESS: I assume GEO oversees this
13 project.
14        MR. CHAREST: Q. Hope somebody does,
15 right?
16 A.      I don't really know, but I'm hired by
17 GEO's attorneys.
18 Q.      All right. You're hired by GEO's
19 attorneys, really by GEO, to be strictly speaking.
20 GEO pays your bill, right?
21 A.      Yes.
22 Q.      GEO is the company that oversees the work
23 at Adelanto, right?
24 A.      Yes.
25 Q.      If GEO had any basis -- any factual basis

Page 208

1 to dispute Mr. Bland's job type mixture evaluation,
2 it could have given that to you, right?
3 A.      Yes, I would assume so. And I do want to
4 say that we did receive, the day of or the day
5 before a report -- our report, a production of more
6 sign-in sheets, but we did not evaluate them. We
7 didn't have time to evaluate them. So GEO did
8 provide some additional data, and I have not yet
9 evaluated it.
10 Q.      Let me tease that out a little bit. The
11 day before or in that proximity before your report
12 was due, you received new other sign-in sheet data
13 from GEO; is that correct?
14 A.      Yes.
15 Q.      Those materials were not part of your
16 evaluation in your report?
17 A.      Correct.
18 Q.      You have not since evaluated those
19 materials, to be able to talk about them today?
20 A.      Correct.
21 Q.      How long ago was that, ma'am?
22 A.      Whatever the date of the report was.
23 Q.      August 31st.
24 A.      Correct.
25 Q.      So 25 days ago, you received data

Page 209

53 (Pages 206 - 209)

1 regarding sign-in sheets from GEO, and have not yet
2 looked at them before this deposition, correct?
3 A.     Well, we looked at them, but we have not
4 quantified them because it's a very substantial
5 project to be able to do that, and we just -- I
6 haven't done it.
7 Q.     Is that project underway now?
8 A.     I have not been asked to do that.
9 Q.     That's not my question.  Is the project
10 underway, ma'am?
11 A.     Oh, "underway."  I'm sorry.  No.
12 Q.     Do you have any intention to testify about
13 the import of those sign-in sheets that were
14 provided by GEO the day before your report that you
15 have not yet reviewed for your deposition?
16 A.     I do not.  I would leave it up to the
17 attorneys to decide whether or not that would be
18 permitted, but at this point -- at this time, I
19 don't have any plan to do that.
20 Q.     The attorneys didn't meet with the judge
21 and have a word with the two on that issue, right?
22 A.     Absolutely.  I don't -- I just don't know
23 whether -- whether there's still time to do that.
24 Q.     Do you know why GEO waited until the day
25 before your report was due to provide this amount of

Page 210

1 sign-in data?
2 A.     I do not.
3 Q.     Did you ask for them to wait before your
4 report, until just before your report was due, to
5 give you the data about sign-in data -- sign-in
6 information?
7 A.     No.
8 Q.     Did your cursory review of those sign-in
9 sheets indicate that they had all just happened and
10 GEO only just found them, or were they historic,
11 years-old documents that were around already?
12 A.     I didn't see anything about them that
13 indicated one way or the other.  They just looked
14 like sign-in sheets.
15 Q.     Sign-in sheets had dates on them, right?
16 A.     Yes.
17 Q.     Were the dates August of 2020?
18 A.     No.  I mean, the time period represented
19 was pretty extensive.  Beyond that, I don't remember
20 anything else.
21 Q.     When you say -- I'm sorry.  Are you done?
22 A.     Yes.
23 Q.     And when you say "the time period was
24 extensive," what you mean to say, to be really
25 clear, is it covered a lot of time, including years

Page 211

1 before they were provided to you, correct?
2 A.     Yes.
3 Q.     So if there's any like -- well, let's
4 leave aside the reasons why things happened.  Do you
5 know of any reason why the -- GEO decided to wait
6 until the day before your report was due to provide
7 these -- these data to you?
8 A.     No.
9 Q.     You -- on paragraph 33, you say, "Due to
10 the volume of sign-in sheets received and the format
11 of the records, I have not yet evaluated the
12 accuracy of the job mixture summary table shown in
13 Table 4," right?
14 A.     Correct.
15 Q.     Have you, since you wrote this report in
16 August of 2020, completed that work?
17 A.     No.
18 Q.     Is that work ongoing?
19 A.     No.  I don't plan to offer any opinion
20 about the accuracy of the tabulation of that data.
21 Q.     And to be real -- when you say "that
22 data," I want to be real.  Let's tie it all
23 together.  You don't plan to offer any opinions and
24 have no opinions, as we sit here today, about the
25 accuracy of the data reflected in Table 4 of the

Page 212

1 Bland report?
2 A.     That's correct.
3 Q.     And that includes the comment in paragraph
4 34, then, when you say your analysis reflects a
5 difference in the period summarized in Table 4?
6 That's not an opinion you intend to offer?
7 A.     I'm not sure what you mean by that
8 question because paragraph 34 talks about
9 Mr. Bland's observation that there's a general
10 consistency in the mix, and according to my view of
11 just -- even just visually looking at it, it doesn't
12 appear consistent to me.  So that's a difference of
13 opinion about consistency of the data.  It's not
14 accuracy of the data accumulation.
15 Q.     And you look at Table 4 and say they're
16 not that consistent over time, and he says they are
17 consistent over time; is that right?
18 A.     Right.
19 Q.     You're not applying any kind of standards
20 or metrics or anything other than your personal
21 definition of the word consistent to the Table 4
22 that anyone can look at and observe, correct?
23 A.     Well, I've provided an alternate
24 calculation.  If you used one of the periods that
25 is -- where the data is not the same as the other

Page 213

54 (Pages 210 - 213)

1  periods, you get a different answer. So I'm drawing
2  the observation that the 78 days of data has some
3  periods that are internally inconsistent with other
4  periods.
5  Q.      Yeah. So let's talk about that really
6  quickly, your alternate job assumption. And what
7  we're talking about there begins on paragraph 35.
8  Well, begins and ends on paragraph 35, but starts on
9  page 11 and rolls over to page 12, correct?
10 A.      Yes.
11 Q.      So the first point is, you say you see
12 differences in the data, and the data we're talking
13 about is the Bland Table 4, right?
14 A.      Yes.
15 Q.      So I'm going to try and share my screen
16 again so we can have a common understanding. Are
17 you looking at Table 4 from the amended Bland
18 report, ma'am?
19 A.      Yes.
20 Q.      All right. And the inconsistency that
21 you're describing is that -- like, for example, the
22 column November 2017 is different than the column
23 for November -- sorry -- December of 2017, which is
24 different than the column for January 2018, correct?
25 A.      Yes.

1  Q.      And the variation goes from 61% --
2  sorry -- from 61% to 64.6%, correct?
3  A.      Yes, for that first line, yes.
4  Q.      And you were just saying that like 13 is
5  different than 15 is different than 13, right?
6  A.      Yes. And it's most significant on the
7  "multiple" line. And those changes of mix
8  assumptions do have an impact on the total dollars.
9  That's the point, is that it's sensitive to fairly
10 minor variations in the mix used.
11 Q.      So the "multiple" and "other" -- isn't it
12 true that those were all duly sort of reapportioned
13 amongst the first four categories through a weighted
14 average process?
15         MS. SCHEFFEY: Object to form.
16         THE WITNESS: In terms of the shift
17 lengths, I don't know that that's the case. I would
18 have to look back at Mr. Bland's report about the
19 ratio, the distribution of --
20         MR. CHAREST: Q. We're looking at the
21 shift lengths now, and it has those four categories
22 that we talked about and you amended earlier. Do
23 you recall that?
24 A.      We're not -- but this discussion, we're
25 not talking about shift lengths.

1  Q.      You're the one that just said "shift
2  length." That's why I --
3  A.      I said in terms of shift lengths, what
4  you're saying is true.
5  Q.      Okay.
6  A.      But in terms of shift distribution, with
7  respect to having all those sign-in sheets, I don't
8  know that they're just a calculation of the others
9  as opposed to the literal -- the literal categories
10 where he slotted them.
11 Q.      Can you tell me, sitting here today, how
12 Mr. Bland dealt with -- and when I say "dealt with,"
13 which job type he treated "multiple"?
14 A.      In situations where the sign-in sheets
15 indicated two different types -- two different
16 descriptions.
17 Q.      Is that your answer?
18 A.      Yes.
19 Q.      Okay. And then for "other," he applied
20 the weighted average shift length to those
21 categories, correct? Trying to help (indicating).
22 A.      Well, that paragraph 36 is where he -- so
23 if we could go to the prior paragraph, Table 4 --
24 that describes Table 4.
25 Q.      Okay.

1  A.      Right. So he's saying, basically -- the
2  way I understand this, these paragraphs, is that
3  they have tabulated the entries on the time sheets
4  and tallied them by the job categories, and then he
5  computes the mixture, and then Table 4 shows the
6  results of that analysis.
7          Then the paragraph after the table that
8  you were referring to talks about how he multiplies
9  those by the hour -- by the length assumed, the
10 length of each shift, and that's when he -- when he
11 multiplies by the length of these shifts -- each
12 shift, that's where "multiple" and "other" are
13 relying on the other categories.
14         So when you're asking me that question, I
15 was stopping, hesitating because it's my
16 understanding that Table 4, which just counts the
17 shifts by job category, came from his tallying of
18 sign-in sheets, literally. No extrapolations. Just
19 counting -- putting them in the bucket "custodial,"
20 "kitchen," "laundry," "recreation," "multiple" if
21 there was two descriptions noted, and then "other."
22 Q.      I don't want to interrupt you because it
23 sounds like you were trying to get to a point, but
24 if that's the --
25 A.      Well, just you asked me a question about

1 Table 4 and said, "Is it multiple and other just
2 based on an extrapolation of custodial, kitchen, and
3 laundry?" Not in this table. When it's multiplied
4 by the length of the shift, it is. So that's what I
5 was -- just wanting to stop and pause and make sure
6 I was right about that, that this is a literal
7 tabulation of the sign-in sheets.
8 Q.     Okay. Assuming what you said is correct,
9 the fact that in the math that happens is that the
10 time that's associated -- the shifts that are
11 associated with -- whoops, that's wrong. Can I
12 start again, please?
13 A.     Sure.
14 Q.     The shifts that are associated with these
15 "other" and "multiple" entries are assigned a shift
16 length that is the weighted average shift length
17 across the entire group, right?
18 A.     Yes, but not in that table. That comes
19 after. This table is just the ratio of the number
20 of shifts, the count of shifts.
21 Q.     Yes. Okay. I think we're saying -- I
22 think we understand each other. I'm not sure it
23 matters too, too much. But anyway, the statement
24 that the differences between periods summarized in
25 Table 4 are not consistent is your visual

Page 218

1 total-total.
2 Q.     So then going back to your report, ma'am,
3 you have this alternative job mixtures assumption,
4 and that's what you were referring to earlier. Was
5 like, "Look, if I pick any one of these, there's
6 going to be impact," right?
7 A.     Well, I didn't say if I -- I didn't say if
8 I picked any one. I just picked one and showed the
9 impact.
10 Q.     Well, of necessity, if you pick any one of
11 three component parts, each component part being
12 different, they are going to result in a different
13 number than the total, right?
14 A.     Yes, very likely, if the component parts
15 are different, yes.
16 Q.     I mean, it's math. It's a ratio, right,
17 ultimately what we're talking about, right?
18 A.     Yes.
19 Q.     Yeah. And so you just happened to pick
20 January 18th, which led to a half-a-million or
21 million-dollar reduction, right?
22 A.     Well, I didn't happen to pick. I picked
23 it because it appeared to be significantly different
24 than November, say.
25 Q.     Did you run the same analysis for the

Page 220

1 observation of these numbers and your conclusion
2 that they are not the same column by column,
3 correct?
4 A.     Yes. And then showing the result of using
5 the January 18 column. If we just use a subset of
6 that period, you get a different number.
7 Q.     I was going to get that, but I just want
8 to make sure I understand what you're saying. So
9 the first thing is, you're looking at these numbers
10 and saying, "Oh, 5.4 and 5.9 and 6, those are
11 different," right?
12 A.     Yes.
13 Q.     Okay.
14 A.     But when if you asked me how do I -- why
15 do I say they're inconsistent, it's both. It's both
16 visual and it's both looking at what happens if you
17 use one column as opposed to the total.
18 Q.     Okay.
19 A.     Both of those add together to -- for me to
20 say they're incon- -- they're inconsistent where he
21 says they're consistent.
22 Q.     Is a total just a tabulation, so all
23 custodial services for each set of data listed in
24 the total, or is it an average across the three?
25 A.     It's my understanding that it's just the

Page 219

1 other two sub -- datasets?
2 A.     I did not.
3 Q.     Would you be shocked to find out that
4 using any one of the other two datasets would make
5 the number go up?
6 A.     I don't know. I didn't -- I didn't do it
7 because I believed this was sufficient to make the
8 point.
9 Q.     I'll -- I know -- you're saying -- you're
10 going to tell me as a CPA, you don't know what I
11 just said is true?
12       MS. SCHEFFEY: Object to form,
13 argumentative.
14       THE WITNESS: I don't recall doing the
15 analysis. You might be right. I don't disbelieve
16 you. I just didn't do it.
17       MR. CHAREST: Q. So going back to the
18 Bland report, what we're talking about here is you
19 picked the January 2018 column randomly, right? And
20 ran that to see how it compared to using this total
21 column here?
22 A.     No. As I said, I didn't pick it randomly.
23 I picked it because of the significant difference,
24 primarily in the multiple, just that the numbers are
25 fairly different, to show -- to illustrate the

Page 221

56 (Pages 218 - 221)

1 sensitivity of using a subset of the data.
2 Q.     Yeah.  Is your testimony under oath that
3 neither you nor any of your cohorts did the same
4 analysis with the November or December 2017 date
5 set?
6 A.     I don't know if Brent did it or not.  We
7 didn't talk about it.  He didn't show it to me.  I
8 know that I didn't.
9 Q.     Okay.  Do you know why Brent happened to
10 pick January 2018?
11 A.     I just told you, it's got the most
12 significant difference in one of the -- one of the
13 columns.
14 Q.     Columns.  So --
15 A.     One of the lines.  I'm sorry.  And
16 multiple.
17 Q.     So the difference between custodial
18 services is 2%, right?
19 A.     Yes.
20 Q.     The difference for kitchen services is
21 1.1, right?
22 A.     Yes.
23 Q.     The difference from laundry is 0.2?
24 A.     Yes.
25 Q.     I hate this.  The difference in "multiple"

Page 222

1 "other," right?
2 A.     That sounds about right.
3 Q.     Yeah.
4 A.     That and "multiple" is a pretty big
5 difference to say the data is consistent across
6 these periods.
7 Q.     Since you're comparing November 2017 and
8 January 2018 in this version of the answer, why did
9 Brent run the numbers for January 2018 as opposed to
10 the November 2017 to see what the sensitivity was?
11 A.     To illustrate the impact to the number.
12 Q.     Well, guess what happens if you use the
13 2000 -- the November 2017 numbers in the same exact
14 way?
15 A.     We --
16     MS. SCHEFFEY:  Objection; asks for a
17 guess.
18     THE WITNESS:  You've already said that it
19 results in a higher answer.  I believe you, as the
20 multiple, which means multiple shifts, is higher in
21 November '17 compared to the total.  But that
22 question -- the question -- the whole point of this
23 discussion in my report was the issue of
24 consistency.
25     MR. CHAREST:  Q.  How does running the

Page 224

1 is 1%, right?
2 A.     Yes.
3 Q.     And the difference for "other" is 0.1,
4 right?
5 A.     Yes.
6 Q.     And that is demonstrably less, by the way,
7 of a variable from the total than any other one,
8 right?
9     MS. SCHEFFEY:  Object to form.
10     THE WITNESS:  The "multiple" line is -- I
11 don't understand.  I don't agree with you.
12     MR. CHAREST:  Q.  Okay.  Your statement
13 under oath is that Brent picked this one because of
14 the delta between the numbers in the column of
15 January 18th and the numbers in the column in total,
16 right?
17 A.     No.
18 Q.     No?
19 A.     I meant to say that I was concerned about
20 the difference between January '18 and November '17
21 Just visually looking at those two columns, I see
22 significant differences in those two columns.
23 Q.     The differences being 3.5% in custodial
24 services, .1% in kitchen services, .3% in laundry,
25 .6% in recreation, 5% in "multiple," and 1.1% in

Page 223

1 numbers out with one data point, meaning
2 January 2018, show inconsistency across the time?  I
3 mean -- yeah, that's my question.  If you don't
4 understand it, it's fine, but...
5 A.     It really just a more simple point that
6 these columns -- Mr. Bland suggested that the data
7 within these periods were consistent, and I'm saying
8 I don't see them as being consistent.  I see them as
9 being enough different that it matters to the
10 overall calculation, that if you use one of these
11 periods, you get a million-dollar difference in the
12 outcome.  It's just a point about consistency or
13 inconsistency.
14 Q.     And if you use the other ones, you also
15 get a different outcome, but they're higher, right?
16 A.     Yes.  So it's an issue of sensitivity to
17 this set of data.
18 Q.     And you just happened to pick the one that
19 showed the lower number difference, not the one that
20 showed the higher number difference?  That's your
21 testimony under oath?
22 A.     Yes.
23 Q.     Okay.  I'll be curious to hear Brent's
24 discussion with the lawyers about that process, but
25 anyway...

Page 225

57 (Pages 222 - 225)

1      MS. SCHEFFEY:  Move to strike colloquy of
2  counsel.
3      MR. CHAREST:  Q.  Isn't it true that, by
4  and large, with this job shift, the driver behind
5  the analysis, the prime -- the prime driver behind
6  the analysis is the custodial services, which is
7  steadily between 61 and 64%?
8  A.      Well, it's certainly a significant driver.
9  Q.      It is, by order of magnitude, more than
10  three times larger than any other one, correct?
11  A.      Correct.  However, the -- I would have to
12  do the -- play with the models.  The kitchen
13  services is a big driver too because of the number
14  of hours.  So --
15  Q.      The kitchen services bounced between 13
16  and 15% consistently across all the time frames,
17  right?
18  A.      Yes.
19  Q.      So the two big drivers that you've
20  identified are the ones that are all within 4% of
21  each other, of themselves across time, right?
22  A.      Yes.
23  Q.      But you still think it's inconsistent
24  because the multiple changed by 5%?
25  A.      Yes.

Page 226

1  Q.      And the multiple, by the way, is the one
2  that, when you do the math, receives the weighted
3  average shift length, so it has no effect on the
4  outcome, right?
5      MS. SCHEFFEY:  Object to form.
6      THE WITNESS:  No, because the shift
7  lengths are based on a weighted average, but the
8  ratio of the number of shifts that are multiple
9  compared to all of them are based on a literal
10  counting.  So it does have an effect on the outcome.
11  We calculated the effect on the outcome.
12      MR. CHAREST:  Q.  No, you calculated the
13  effect of the outcome by picking one time frame, the
14  one that resulted in a lower number as opposed to
15  the total.  That what you -- the calculation that
16  you did does not reflect the inclusion or not
17  inclusion or the effect of using the weighted
18  average shift length on the multiple, right?
19      MS. SCHEFFEY:  Object to form.
20      THE WITNESS:  That wasn't the subject of
21  the calculation.  The assumed shift length wasn't
22  the subject of the calculation.  It was the ratio of
23  shifts to total shifts.
24      MR. CHAREST:  Q.  Moving on to page 12 of
25  22.  Are you with me?

Page 227

1  A.      Yes.
2  Q.      You note in footnote 42 conversation with
3  GEO counsel about this specific topic.  Who told you
4  what, and when, and what did they say?
5  A.      I don't recall who it was.  As I said
6  before, there are typically at least two, probably
7  more often three, attorneys on the phone.  One of
8  them raised the issue that the recreation category
9  was likely a janitor based on their discussions with
10  GEO representatives, and then they provided this
11  document, this job description document, to support
12  that assertion.
13      When was it?  Within two weeks prior to
14  our report, in that time period.
15  Q.      How many conversations did you have like
16  that with GEO's counsel when they were providing you
17  with facts for you to rely on?
18  A.      I don't know.  I would have to look at my
19  time records.  Maybe -- I don't know.  Less than
20  ten, more than three.
21  Q.      Bigger than a breadbox?
22      Did you take notes during those meetings?
23  A.      I likely did.
24  Q.      How about Brent?  Did Brent take notes
25  too?

Page 228

1  A.      Yes, that would be likely.
2  Q.      Do you have those notes now, still?
3  A.      I believe so.  I don't know if they're
4  scanned and on our network, but they're probably in
5  existence somewhere.
6  Q.      Was anyone else other than you and Brent
7  involved in these meetings with GEO counsel when
8  they were telling you factual information on which
9  you should rely?
10  A.      I don't believe so.
11  Q.      And you're saying that the notes exist?
12  You could collect them and produce them to show
13  what, in fact, the GEO attorneys told you to rely
14  on, correct, factually?
15  A.      If that conversation was written down,
16  yes, we could produce that, and that could be
17  available.  I don't know.  I haven't checked the
18  notes to see what exists for those conversations.
19  Q.      And you can't remember the substance of
20  those conversations, but you did include information
21  that's in your brain now as a foundation for at
22  least some of the observations you made in this
23  case, correct?
24  A.      Yes.
25  Q.      Would you provide those inform -- those

Page 229

58 (Pages 226 - 229)

1 notes for us, please?
2 A.     Yes, if they exist and if GEO's counsel
3 tells me that it qualifies under what's to be
4 produced. I, you know, go by what's my instruction
5 on that. I know that not all discussions with
6 counsel have to be produced.
7 Q.     But you know that when you receive factual
8 instructions from counsel, you're supposed to
9 disclose what those instructions are, right?
10 A.     Yes, which is why I cited it as a
11 conversation.
12 Q.     A conversation about what?  Well, I don't
13 know. So we need the notes to know, right?
14 A.     Okay. Well, if you're asking me, I will
15 take a look and see if -- what we have for that
16 conversation.
17 Q.     Great.
18     MS. SCHEFFEY:  And send them to me, and we
19 can work the legal part out with Mr. Charest. And
20 I'm not saying I disagree with your legal analysis
21 on facts of data. Just saying best not to waste
22 deposition time.
23     MR. CHAREST:  Q.  Okay. Which GEO person
24 did this attorney identify as the person who had
25 noted this potential issue with respect to the

Page 230

1 recreation sanitation worker being a janitor?
2 A.     I don't know.
3 Q.     Would -- and GEO, when it identified
4 something that it factually disagreed with, told its
5 lawyers and provided a document in this instance,
6 correct?
7 A.     I don't know if the lawyers already had
8 the document or not.
9 Q.     Well --
10 A.     Provided to us.
11 Q.     I'm sorry. I thought you told me in the
12 answer that the GEO contact gave the document to the
13 lawyers, and the lawyers gave it to you. Is that
14 not right?
15 A.     If I said that, I'm sorry. I might have
16 been imprecise. I had a conversation with GEO
17 attorneys. Their knowledge was based on having had
18 a conversation with the GEO representative, and then
19 we received this document as support. I don't know
20 when and where and how, the timing of them obtaining
21 the document.
22 Q.     So in all the other times we've been
23 talking about, "Well, GEO should know, and if they
24 have information, they could provide it to you,"
25 this is an example of when it actually happened,

Page 231

1 right?
2 A.     Well, this is an example where they
3 provided a document that described the sanitation
4 worker relating to recreation.
5 Q.     Yeah. So this is an example of GEO
6 providing information to actually factually rebut
7 something that the experts have said that you called
8 into question, correct?
9 A.     As I said, I don't know the timing of when
10 the attorneys obtained the document, whether it was
11 already in production or not.
12 Q.     You're missing the point, because I don't
13 differentiate, with respect to you, between the GEO
14 attorneys and GEO, right?  Because the GEO attorneys
15 work for GEO. So when I say "GEO," I mean the
16 attorneys too. You understand that, right?
17 A.     Yes.
18 Q.     Okay. So this is an example when GEO or
19 its attorneys provided you with a document that you
20 could rely on and say, "Ah-hah. Look at this.
21 Here's actual evidence that I can rebut this factual
22 assertion that Mr. Bland has made," correct?
23 A.     Yes, that's correct.
24 Q.     Because in this specific case, they
25 actually found something that is actually tangible

Page 232

1 to actually rebut, hypothetically, Mr. Bland, right?
2 A.     I assume so, yes.
3 Q.     And in all the other instances, when you
4 were asked "did GEO provide anything," they had the
5 same power to do so, but did not, correct?
6 A.     They had the power to give me what they
7 had. I don't know what exists.
8 Q.     Right. And the point being, if it
9 existed, GEO would have it, and if GEO had something
10 to rebut anything else that the experts had said,
11 they could have provided it to you, just like they
12 did with this document that's noted in 40 -- in
13 footnote 42, correct?
14     MS. SCHEFFEY:  Object to form.
15     THE WITNESS:  That was very compound. I
16 believe what you're saying. I'm just going to
17 repeat it, just because it was long. If they had
18 it, they could have given it to me. That's my
19 simple understanding of what you just asked.
20     MR. CHAREST:  Q.  Right. And in every
21 other instance, you received no such contradictory
22 information or data from GEO, correct?
23 A.     I don't recall if there is anything else.
24 Q.     There were two things you cited in your
25 report where a lawyer or GEO told you something, one

Page 233

59 (Pages 230 - 233)

1 of which they give you a document, and this is it,
2 right?
3 A.      I'm believing you.  I just don't remember.
4 Q.      Yeah.  But in every other instance, if
5 there existed something to rebut what the
6 plaintiff's experts are saying, GEO could have
7 provided it to you, and either chose to not or did
8 not because it doesn't exist, right?
9          MS. SCHEFFEY:  Object to form.
10          THE WITNESS:  I believe so.  If it didn't
11 exist or they -- yes, one or the other.
12          MR. CHAREST:  Q.  We talked about the -- I
13 guess at the bottom of paragraph 38, you say, "It's
14 more accurate to assume that the shift lengths for
15 recreational job types correspond to other shifts
16 classified as custodial services," and you identify
17 1.5 hours as the reasonable assumption for that,
18 correct?
19 A.      Yes.
20 Q.      You stand by that assumption?
21 A.      I stand by the assumption that it's more
22 accurate to assume a custodial-length job shift than
23 the full schedule of recreation activity, which is
24 what Mr. Bland assumed.
25 Q.      Have you done any sensitivity analysis to

Page 234

1 determine what the impact of recharacterizing the
2 recreational job types as custodian job types is?
3 A.      By itself, no.  The sensitivity analysis
4 is combined with taking the meal off of the kitchen
5 shift as well.
6 Q.      So that's on the bottom of paragraph 41;
7 is that correct?
8 A.      Yes.
9 Q.      All right.  We talked about -- we'll get
10 to that, then.  I appreciate you pointing that out
11 to me.
12          The next issue you talk about is the
13 kitchen services assumption, which is again the
14 assumption that you say Mr. Bland makes that people
15 in the kitchen get time -- don't get time off, where
16 you assume that people in the kitchen do get time
17 off, right?
18 A.      Correct.
19 Q.      And you base your assumption on a document
20 that talks about, "Don't eat when you're in the
21 kitchen unless you're here to eat," right?
22          MS. SCHEFFEY:  Object to form.
23          THE WITNESS:  I would want to pull up
24 those documents.  I can't recall what they say.
25          MR. CHAREST:  Q.  The thing I'm looking at

Page 235

1 says -- it's a list of worker rules and regulations,
2 right?  That's the thing that you had in mind that
3 you cited in footnote 48?
4 A.      I would prefer that you put them on the
5 screen than test my literal memory of those
6 documents.
7 Q.      Yeah, I'm going to try and see if I can't
8 figure that out.
9          (Whereupon Exhibit 211 was marked for
10          identification.)
11          MR. CHAREST:  Q.  Okay.  I'm entering
12 Exhibit 211, which is Bates labeled
13 GEO-Novoa_00000118, if I'm not mistaken.  Let me
14 know when you have it.  Actually, let me start
15 again, if you don't mind.  Just nod when you see the
16 exhibit first.
17 A.      I don't have it yet.
18          MS. SCHEFFEY:  It's still loading.
19          THE WITNESS:  Must have been a large
20 document.
21          MR. CHAREST:  Q.  No, it's not, actually.
22 You still don't have it?
23          MS. SCHEFFEY:  No.  It's loading.
24          MR. CHAREST:  Could we go off the record,
25 then, while this gets sorted, please?

Page 236

1          THE VIDEOGRAPHER:  One moment.  We're
2 going off the record.  The time is 3:39 p.m.
3          (Discussion off the record.)
4          THE VIDEOGRAPHER:  We're back on the
5 record.  The time is 3:44 p.m.
6          MR. CHAREST:  Q.  All right.  Ms. Morones,
7 you've cited two documents in footnote 48 in which
8 you use to criticize Mr. Bland for not adjusting the
9 assumptions for a lunch break taken by kitchen
10 workers, correct?
11 A.      Yes.
12 Q.      So the first question:  Do you know, as a
13 matter of fact, that kitchen workers at Adelanto get
14 any kind of break for lunch at all?
15 A.      Outside of this representation in these
16 documents, I don't.
17 Q.      Okay.  So you said, "this representation
18 in these documents."  What was --
19 A.      Discussion with counsel.  The
20 representation from counsel, and then these
21 documents.
22 Q.      Okay.  So I don't see a reference to
23 representation from counsel in this particular one.
24 Do you?
25 A.      I'm sorry.  I'm tired.  No.  No.  You're

Page 237

1 right. You're correct.
2 Q.     That's fine.
3 A.     Sorry. I was confusing the last issue.
4 Q.     No worries at all. I understand.
5        So then let's tee that up and run around
6 again. You have no basis in fact, aside from these
7 two documents that you've cited, to suggest that
8 detainees actually get a lunch break that is of
9 sufficient time and consistency to be removed from
10 the calculation of payable time, correct?
11 A.    Outside of these documents, I do not.
12 Q.    And how did you come across these two
13 documents?
14 A.    I don't know. Mr. -- Brent, my assistant,
15 pointed them out to me and indicated that he thought
16 we should subtract a meal break, and I don't know
17 how he obtained them.
18 Q.    Do you know whether or not Brent had
19 independent discussions with counsel that you were
20 not privy to?
21 A.    I don't know. He may have.
22 Q.    So it's possible that he learned this from
23 counsel; you just don't know?
24 A.    That's correct, yes.
25 Q.    But again, this is one of those examples

Page 238

1 A.     I don't know.
2 Q.     Do you have anything in your report,
3 outside your report, in any document that you've
4 ever seen, that supports a 25-minute lunch break
5 given to anyone ever at Adelanto?
6 A.     I'm not recalling anything as I sit here.
7 Q.     Right. Now, leave aside the specific
8 time, whether it's 25 minutes, 30 minutes, ten
9 minutes, five minutes. Do you know of anything that
10 actually confirms that workers in the kitchen at
11 Adelanto get breaks regularly to eat while they're
12 on their shift?
13 A.     Outside of these documents that indicate
14 that the -- that the detainees did take breaks, I
15 don't know of anything that any document, as I sit
16 here, that says that they have to or regularly take
17 breaks.
18        So aside from these documents that you've
19 cited in footnote 48, you're not aware of anything
20 that supports the existence of any break whatsoever,
21 correct?
22 A.     As I sit here right now, I'm not.
23 Q.     Well, not just as you sit here right now,
24 but your report doesn't reflect anything, right?
25 A.     That's correct.

Page 240

1 where, if it was true, GEO could have connected you
2 with someone that could say, "Ms. Morones, this is
3 true, and I can prove it," right?
4 A.     I assume so, yes.
5 Q.     I mean, they could -- you could have
6 talked to the warden. You could have talked to
7 whoever's in charge of the lunch program there,
8 right?
9 A.     I assume so, yes.
10 Q.    Not just assume. That is a fact. You
11 could have talked to those people, right?
12     MS. SCHEFFEY: Object to form.
13     THE WITNESS: I -- as I said, I don't know
14 what they're doing in their lives or whether they
15 would be available, but I assume so.
16     MR. CHAREST: Q. But instead, you've got
17 these two mystery documents that you then say, "Oh,
18 I think it's fair to assume that there are lunch
19 breaks," right?
20 A.     Yes.
21 Q.     How long are the lunch breaks?
22 A.     I -- we have assumed 25 minutes. I
23 don't -- I don't -- that's -- yeah, that's the
24 assumption.
25 Q.     Why?

Page 239

1 Q.     Including a conversation with counsel,
2 whether or not Brent adds those on the side, right?
3 A.     That's correct.
4 Q.     All right. Let's look at these documents
5 that are the basis for this assumption. You cite
6 GEO-Novoa_000018 (sic) as the first document in
7 footnote 48, correct?
8 A.     Yes.
9 Q.     Where in that document does it say people
10 get a lunch break or any kind of break?
11 A.    Let me open the document.
12 Q.    Please.
13 A.    This document indicates that they are not
14 allowed to eat in the kitchen, except at your
15 scheduled mealtime in the designated eating area,
16 and -- and I would assume, with a five-hour shift,
17 that they're allowed to eat during a five-hour
18 shift.
19 Q.    Okay. So the basis for the assumption
20 that there is a lunch break is the assumption that
21 they're allowed to eat, right?
22 A.    Yes.
23 Q.    And the basis for that assumption is a
24 document saying you're not allowed to eat, right?
25 A.    That they're not allowed to eat in the

Page 241

61 (Pages 238 - 241)

1 kitchen.
2 Q.      The place where they work, right?
3 A.      Right.
4 Q.      Okay. Any other reason why this document,
5 in your view, supports the concept of uniformly
6 applicable 25-minute breaks for everyone that works
7 in the kitchen?
8 A.      Because it also says they have a scheduled
9 mealtime. And I would assume that they have a
10 scheduled mealtime -- a breakfast/lunch/dinner
11 scheduled lunchtime, and if we're working the
12 five-hour shift, that necessarily means that they
13 have a scheduled mealtime within the five-hour
14 shift. Otherwise, you're going to make them not
15 have a scheduled mealtime.
16 Q.      So don't you think everyone has a
17 scheduled mealtime in this place?
18 A.      Yes.
19 Q.      Yeah.
20 A.      So that's -- that's the necessary
21 assumption, is that there is a scheduled mealtime
22 within the time period that they're working.
23 Q.      Well, no. Now you've combined -- you've
24 added a condition onto the assumption with no basis,
25 right? Because we start with this proposition:

Page 242

1 Everyone has a scheduled mealtime. Okay? Some of
2 those people that have scheduled mealtimes also work
3 in the kitchen. You're assuming that their
4 scheduled work time is not scheduled around their
5 mealtime, right?
6 A.      That's correct. I'm assuming that their
7 mealtime occurs within the five-hour shift.
8 Q.      Is there any basis to support that
9 assumption?
10 A.      The other document that talks about the
11 workers leaving for their mealtime.
12 Q.      So first off, before we go to the other
13 document, any basis to answer my question in this
14 one, 211, that you cited as the first document in
15 support of your position?
16 A.      Not overtly in the document. Just common
17 sense, that for the long shift of a mealtime that's
18 before and after the mealtime, that somewhere in
19 that -- within that breakfast shift, they would be
20 allowed to eat. Otherwise, they have to skip
21 breakfast and eat after the breakfast shift, which
22 is pretty late.
23 Q.      And you just think that that's a not good
24 way to treat people, and people -- and therefore,
25 didn't happen, right?

Page 243

1 A.      It doesn't seem logical -- like a logical
2 assumption.
3 Q.      Have you ever heard of being satellite
4 fed? Are you aware of the practice of giving the
5 workers paper bag lunches and sent back to their
6 dorm after their shift is over?
7      MS. SCHEFFEY: Object to --
8      MR. CHAREST: Q. Either one of those
9 concepts?
10 A.      Not specifically. I'm aware that some
11 detainees were fed in their pods, not in cafeterias.
12 Q.      And do you know how, if at all, that
13 practice applies to kitchen workers?
14 A.      I don't know.
15 Q.      Did you ask anyone at GEO if this actually
16 works?
17 A.      I did not talk to a GEO person.
18 Q.      Did you ask anyone at GEO if the workers
19 in the kitchen actually get a 25-minute break every
20 day, every shift?
21 A.      As I said, I didn't talk to a GEO.
22 Q.      About this topic on which you're opining,
23 correct?
24 A.      Correct.
25 Q.      That would have been a simple and easy

Page 244

1 thing to do, wouldn't it have been?
2 A.      I don't know how available they were.
3 Q.      You talked to the lawyers somewhere
4 between ten and three times in the month before your
5 report was due, right?
6 A.      Yes.
7 Q.      Yeah. And during those conversations, you
8 could have brought this up, right?
9 A.      "Brought this up"?
10 Q.      The lunch break issue, ma'am.
11 A.      Yes.
12 Q.      Yeah. And they saw drafts of your report
13 before it was issued, correct?
14 A.      Yes.
15 Q.      And did anyone bother to think "Maybe we
16 should actually discuss what actually happens here,"
17 or did they just rely -- let you rely on two
18 documents that you picked out of an unknown pile?
19 A.      They didn't raise this as a concern or an
20 issue.
21 Q.      And neither did you, correct?
22 A.      Correct.
23 Q.      Yeah. Even though either one, you or the
24 GEO lawyers, could have raised that issue and said,
25 "Well, golly gee, I know we're talking about an

Page 245

62 (Pages 242 - 245)

1 assumption here that may or may not have factual
2 basis, the facts of which everyone in this room can
3 find out. Let's not talk about it," right?
4        MS. SCHEFFEY: Object to form,
5 argumentative.
6        THE WITNESS: I don't understand your
7 question.
8        MR. CHAREST: Q. Okay. My question is
9 this: Even though in the ten -- three to ten
10 conversations you had with GEO counsel leading up to
11 the issuance of your report in which drafts of your
12 report were discussed at length, and the fact that
13 the GEO lawyers had access to GEO for factual
14 information, neither you nor the lawyers bothered to
15 even think about whether or not the assumption that
16 you're proposing here, this 25-minute food break for
17 kitchen workers, is reasonable, right?
18        MS. SCHEFFEY: Object to form.
19        THE WITNESS: We did not discuss it as
20 being an unreasonable assumption.
21        MR. CHAREST: Q. Didn't discuss it at
22 all.
23 A.     I didn't discuss it. Brent may have. I
24 didn't.
25 Q.     Whatever Brent discussed with the lawyers,

Page 246

1 you don't know what happened there, right?
2 A.     That's correct.
3 Q.     And here you are having to answer for it
4 with no basis, right?
5 A.     I don't know whether he discussed it or
6 not.
7 Q.     Well, here you are having to answer for it
8 with these two documents?
9        MS. SCHEFFEY: Object to form.
10        MR. CHAREST: Q. Right?
11 A.     Yes, we're talking about these two
12 documents that we cite as support.
13 Q.     Yeah. And the first one doesn't say
14 anything about a break. You assume they must get a
15 break because of the length of the shift, right?
16 A.     Yes.
17 Q.     And the second one talks about a break,
18 kind of. Let's talk about that one, 212. You
19 ready?
20 A.     Yes.
21        (Whereupon Exhibit 212 was marked for
22        identification.)
23        MR. CHAREST: Q. Okay. It's a March 4th,
24 2018 e-mail sent at 4:50 p.m. on a Sunday by
25 Mr. Hauser, who is a watch sergeant, apparently, for

Page 247

1 GEO. Did I accurately describe the document?
2 A.     Yes.
3 Q.     Yeah. What about this document -- well,
4 let's walk through it. Mr. Hauser's upset because
5 the staff can't eat because the detainees are
6 eating, right?
7 A.     Yes, that's my understanding.
8 Q.     Says, "We're lacking detainee workers, and
9 the kitchen staff took their lunch." Those are the
10 two reasons why they're only running three chow
11 halls at the time, right?
12 A.     Yes.
13 Q.     And he's -- and that's a basis, you say,
14 for, "Oh, well, the kitchen staff gets a break from
15 their work," right?
16 A.     Yes.
17 Q.     But then is that the final answer on what
18 happens here or not? What actually happened here?
19 A.     I don't understand your question.
20 Q.     Well, they keep talking about it, right?
21 I mean, my point is, just because Mr. Hauser says
22 they want a break, doesn't mean that, in fact,
23 there's a break given every single day of the year,
24 right?
25 A.     That's possible, yes.

Page 248

1 Q.     Possible? What do you mean? On one day,
2 on Sunday, he walks in there and people are eating.
3 That means on every single day, every single shift,
4 everyone gets a 25-minute break?
5        MS. SCHEFFEY: Object to form.
6        MR. CHAREST: Q. Ma'am?
7 A.     Yes.
8 Q.     That was my question. Let me do it -- let
9 me do it a little more scientifically. The fact
10 that, even if this description of what happened is
11 accurate, that there was -- the detainees were
12 taking a break and eating while the kitchen was
13 open -- assume that to be true -- do you, as a
14 forensic accountant and a fraud detector, think that
15 one data point means it is always true in every
16 other day of the year and throughout the entire
17 class period?
18 A.     No.
19 Q.     And then in response to the e-mail
20 exchange, the second e-mail from the top, we have
21 Michelle Keeney, who is the food service production
22 supervisor. Sounds like someone that might know
23 what's going on, right?
24 A.     Yes.
25 Q.     Did you ever talk to Ms. Keeney?

Page 249

63 (Pages 246 - 249)

1   A.      I have not.
2   Q.      She might know the answer to your
3 questions here, right?
4   A.      She might.
5   Q.      She says, "On Sunday afternoon food
6 service workers all took their lunches and were back
7 in the kitchen to make satellite trays in time. The
8 only person who takes their lunch break at or during
9 chow time is the cook supervisor," one person, "and
10 that is because he is finished cooking."  Do you
11 know if the cook supervisor, the one person that
12 gets a break during that window, is a detainee
13 worker or not?
14   A.      I don't.
15   Q.      All right.  So based on that clarification
16 of what was going on that Mr. Hauser was complaining
17 about, how solid do you think this assumption that
18 every detainee gets a 25-minute work break from
19 every shift at the kitchen in Adelanto?
20       MS. SCHEFFEY:  Object to form.
21       THE WITNESS:  The statement that the
22 kitchen -- the one supervisor is the only one
23 allowed to take lunch during chow time doesn't
24 correlate to the five-hour -- I would assume doesn't
25 correlate to the five-hour shift.  I don't expect

Page 250

1 chow time to be five hours.  I interpret that to
2 mean, while the other inmates are coming in and
3 eating, during that time, the meal break shouldn't
4 be taken.
5       So that statement doesn't tell me that
6 there's only one person that gets a meal break.
7 That makes sense to me, that when the other
8 detainees are coming in and eating, the workers
9 should not be taking their meal break during that
10 time.
11       MR. CHAREST:  Q.  Do you know whether or
12 not food service people or the kitchen staff are
13 detainees or GEO employees?
14   A.      I understand that there's a combination.
15   Q.      Do you know the people that were taking
16 this break that we're talking about here were even
17 detainees?
18   A.      I don't.
19   Q.      You assume that, right?
20   A.      Yes, I assume that.
21   Q.      But if kitchen staff are GEO employees,
22 that assumption is just fundamentally flawed,
23 correct?
24       MS. SCHEFFEY:  Object to form.
25       THE WITNESS:  If all of the people taking

Page 251

1 breaks in this e-mail are GEO employees, then I
2 would agree that it's not valid support for the
3 assumption that the detainees get breaks.
4       MR. CHAREST:  Q.  Right.  And sitting here
5 today, can you swear under oath that the people that
6 are discussed here taking breaks are, in fact,
7 detainees?
8       MS. SCHEFFEY:  Object to form.
9       THE WITNESS:  I have assumed that they
10 are.  I don't know one way or the other absolutely.
11 I have assumed that they are.
12       MR. CHAREST:  Q.  Well, absolutely?  This
13 is real.  Okay?  We're testifying.  You're under
14 oath.  My question is, do you know whether or not
15 the people that are taking breaks are, in fact,
16 detainees?
17   A.      I don't.  Not from this information.
18   Q.      Not from any information, right?
19   A.      That's correct.
20   Q.      Right.  So this document on which you rely
21 doesn't actually, to the best of your knowledge,
22 indicate that detainees actually get breaks,
23 correct?
24   A.      It suggests that they do, that they take
25 breaks.

Page 252

1   Q.      It suggests that people that work in the
2 kitchen in some capacity take breaks, but not
3 necessarily that those people are detainees, right?
4   A.      It does not distinguish between detainees
5 and non-detainees in this description.
6   Q.      And you've assumed it applies to detainees
7 without basis at all, right?  Ma'am?
8   A.      I'm sorry, I'm reading the document.  Do
9 you mind if I --
10   Q.      Of course.  I thought you might have been
11 drifting, but okay.
12   A.      Oh, no.  Just -- yeah, I'm just reading
13 the document.
14   Q.      Feel free.
15   A.      Okay.  So point No. 2 on this e-mail, on
16 the first page of it, says, "On Sunday afternoon the
17 food service workers all took their lunches."
18 They're all there.  They're food service workers,
19 and they all took their lunches.  I would assume
20 that means detainees, non-detainee, everyone who's
21 related to food service, took their lunches.
22   Q.      During the shift is your assumption?
23   A.      Yes.  Because the way the shift is defined
24 is the time they show up to the time they leave, the
25 way I interpret those schedules.  So if they're

Page 253

64 (Pages 250 - 253)

1 there and they're taking their lunches, it's during
2 the shift.
3 Q.      If, as you suppose, the food service
4 workers are detainees, right?
5 A.      But it says, "The food service workers all
6 took their lunches," so yes, I assume that includes
7 detainees.
8 Q.      Because they're eating there?
9 A.      Because it says they all took their
10 lunches.
11 Q.      Yes, ma'am.  My question -- I don't know
12 if you understand it.  How do you know that the food
13 service workers that are described in paragraph 2 of
14 the first page of the e-mail that's marked as
15 Exhibit 212 are, in fact, detainees?
16      MS. SCHEFFEY:  Object to form.
17      THE WITNESS:  Because I understand that
18 the kitchen operation is staffed by a few employees
19 and many detainees.  So to read the statement "The
20 food service workers all took their lunches," I
21 would expect that to mean everybody present.
22      MR. CHAREST:  Q.  Okay.  That's your
23 interpretation of what "food service worker" means,
24 right?
25 A.      Yes.

Page 254

1 Q.      I'm going to be adding another document
2 here in just a second, please.
3      (Whereupon Exhibit 213 was marked for
4      identification.)
5      MR. CHAREST:  Q.  You should be able to
6 see a document that's been marked Exhibit 213.  It's
7 entitled "Food Service Worker."  Let me know when
8 you have it.
9 A.      Okay.
10 Q.      Document that's been marked as Exhibit 213
11 is Bates labeled GEO-Novoa_00062421.  It's a
12 two-page document dated June 20, 2018, with a GEO
13 letterhead at the top.  Have I accurately described
14 the document, ma'am?
15 A.      Yes.
16 Q.      But similar in connection to the offer of
17 employment letter that we saw by GEO for janitors,
18 right?
19 A.      It's a similar form, yes.
20 Q.      But this one offers a different job title.
21 What's the job title on this one?
22 A.      Food service worker.
23 Q.      Okay.  Is that a detainee?
24 A.      I would -- no.  This is a employee.
25 Q.      Okay.  Having seen this Exhibit 213, what

Page 255

1 do you think about the validity of your assumption
2 about the word "food service worker" in Exhibit 212,
3 ma'am?
4 A.      It tells me that there are employees that
5 are food service workers.
6 Q.      Right.  But my question is, what does it
7 tell you about the quality of your assumption that
8 the food service workers discussed in 212 are, in
9 fact, detainees?
10 A.      It doesn't tell me anything because
11 detainees could very well be described as food
12 service workers.
13 Q.      Do you have any basis in fact, in the
14 record, in the universe, to support what you just
15 said?
16 A.      I -- there's no basis to contradict what I
17 said, and a food service worker is a very generic
18 concept description.  So it could include detainees.
19 It could include employees.
20 Q.      Well, we know it does include employees
21 because that's literally the job title that's being
22 offered in Exhibit 213, right?
23 A.      Yes.
24 Q.      All right.  So it's not "could include
25 employees."  It does include employees, right?

Page 256

1 A.      I would assume so, based on this letter,
2 yes.
3 Q.      Well, you're the one that has this
4 expertise about the quality of underlying documents.
5 Show me an underlying document that supports the use
6 of food service workers as a moniker for detainee
7 workers, please.
8 A.      I do not know of one.
9 Q.      Okay.  So we discussed now Exhibit 211 and
10 Exhibit 212, those being the only two documents,
11 only two pieces of information in the universe that
12 you're aware of that supports even the existence of
13 a break for food -- for restaurant worker detainee
14 workers, right?
15 A.      These are the ones I'm aware of.
16 Q.      The only ones you're aware of, right?
17 A.      That's correct.
18 Q.      With a full level of information available
19 to GEO, that's all you have, correct?
20 A.      Yes.
21 Q.      You don't know where they came from.  You
22 don't know who identified them for your man --
23 what's his name -- Brent?  They just appear in your
24 report, and you relied on them, right?
25 A.      They didn't just appear in my report and I

Page 257

65 (Pages 254 - 257)

1 relied on them. He discussed the issue of the meal
2 break and talked to me about that that was a
3 deduction that he believes should be made, and that
4 these documents indicate the existence of a meal
5 break. Sounded very logical and rational to me, so
6 we did it.
7 Q.    Right. You stand by that, that assumption
8 now?
9 A.    Yes. I believe it's very likely that the
10 detainees get a meal break during their five-hour
11 shift that transpires during a meal. I believe it's
12 more likely than not. Your expert assumed no meal
13 break.
14 Q.    Do you have any facts to support it, aside
15 from the two documents we've discussed?
16 A.    Aside from these two documents, no.
17 Q.    What else? What else? When you
18 conclude -- the math that you did in the bottom of
19 paragraph 41 reflects the, what, removal of the
20 25-minute shift length for all restaurant workers
21 for each shift, right?
22 A.    Yes.
23 Q.    That starts with the five-hour shift that
24 you -- that you've discussed, right?
25 A.    Yes.

Page 258

1 Q.    Minus 25 minutes --
2 A.    Yes.
3 Q.    -- that you generated through those
4 documents, right?
5 A.    Reduces, yes. It assumes 4.6 hours.
6 Q.    4.6? Okay.
7       And then this also reflects the commentary
8 about the recreation job be classified as a
9 custodial job, right?
10 A.    Correct.
11 Q.    So did the math that's reflect -- does the
12 math that's reflected in the bottom of paragraph 41
13 reflect any other of your commentary or issues?
14 A.    Let me take a look at the schedule. I
15 don't believe so, but I'm going to review the
16 schedule and see if anything else comes to mind.
17       (Pause.)
18       THE WITNESS: No. The calculation
19 addresses the lunch break and the change assumption
20 for recreation that includes both shift length and
21 hourly rate.
22       MR. CHAREST: Q.  Okay. So if I wanted to
23 look at either one in isolation, I could not find
24 the answer in the math that was reflected in
25 paragraph 41, correct?

Page 259

1 A.    That's correct.
2 Q.    Now, you describe the break as a lunch
3 break. Did your -- your criticism, your
4 recalculation, eliminate only 25 minutes from the
5 midday shift, or did it eliminate 25 minutes from
6 each shift?
7 A.    Each shift.
8 Q.    What's the basis to say that the workers
9 get a breakfast break or a dinner break?
10 A.    It's the same assumption, that over the
11 course of a five-hour shift, that they take a meal
12 break.
13 Q.    Okay. So then you agree that the shifts
14 are five hours, right?
15 A.    I don't disagree.
16 Q.    Okay. That's fair, because you're
17 rebuttal, so you don't have to have opinions
18 necessarily, but you don't challenge the length of a
19 five-hour shift for the kitchen staff, correct?
20 A.    Correct.
21 Q.    But you say it's reasonable to assume that
22 for every five-hour shift, there is a .4-hour
23 reduction that should be made for all -- some sort
24 of mealtime during that five-hour shift, correct?
25 A.    Correct.

Page 260

1 Q.    The basis for one mealtime per shift still
2 being those two documents that are reflected in
3 footnote 48 that we've discussed, correct?
4 A.    Correct.
5 Q.    Now, again, these are data points that GEO
6 could provide if they actually had to rebut the
7 Bland report, correct?
8       MS. SCHEFFEY: Object to form.
9       THE WITNESS: I would assume so.
10       MR. CHAREST: Q. I mean, you could have
11 got on the phone with Michelle Keeney, the food
12 service production supervisor, and had a
13 conversation with her about do these folks get to
14 have breaks on these shifts, right?
15 A.    I assume that would be possible.
16 Q.    Now, I'm not -- I was first thinking about
17 just lunch, but you could have had that same
18 conversations for breakfast, lunch, or dinner, which
19 you've assumed, right?
20 A.    Correct.
21 Q.    But you didn't do it?
22 A.    I did not.
23 Q.    And that was a choice that either you or
24 the GEO counsel actually both made, right?
25 A.    We didn't ask them -- we didn't ask for

Page 261

66 (Pages 258 - 261)

1 it, I don't -- so I would -- I don't know what they
2 thought about it. We didn't ask for that.
3 Q.     Well, you didn't ask to talk to anyone
4 involved in the food service production, and GEO
5 didn't offer to put you in contact with anyone
6 involved in the food service production, correct?
7 A.     That's correct.
8 Q.     Even though it was an available thing that
9 could happen?
10 A.     Yes.
11 Q.     Okay. Let's talk about -- I don't really
12 care, to be honest with you, what his data are, but
13 let's talk about the Nickerson report, and
14 specifically, the things that we have and the things
15 that we don't have. Okay? So the Nickerson report
16 is in your documents at Exhibit 209. Let me know
17 when you're there, please.
18       (Whereupon Exhibit 209 was marked for
19       identification.)
20       THE WITNESS: Okay.
21       MR. CHAREST: Q. It's still --
22       MS. SCHEFFEY: Do you want us to open 209
23 or 209 and 210?
24       MR. CHAREST: We'll talk about 210 in a
25 second. We'll do them one at a time.

Page 262

1 Q.     You referred in your report to Appendix C1
2 of this report, this Nickerson report, as an
3 alternative shift length measurement, which you
4 don't think accurate, right?
5 A.     I have certainly critiqued Mr. Nickerson's
6 report. His assumption about overall shift length.
7 Q.     All right. But you've said now, I think,
8 three times already, you don't think his work is
9 accurate, right?
10 A.     I'm not sure why you're asking me it for
11 if I've said it three times.
12 Q.     A bad habit I have.
13       The document that's listed here as being
14 sort of the progenitor of the information that's
15 reflected in Exhibit C1 is called Exhibit 20. Do
16 you know what Exhibit 20 is?
17 A.     I vaguely remember Exhibit 20. I have a
18 general recollection.
19 Q.     The Exhibit 20 is an exhibit from a
20 deposition of a GEO corporate rep, the name of the
21 individual being Ryan Kimble, correct?
22 A.     That sounds accurate.
23 Q.     And you have available to you Exhibit 20
24 and Mr. Kimble's deposition, right?
25 A.     I believe so. I know I have Exhibit 20.

Page 263

1 I don't recall about his deposition, but I would
2 assume so.
3 Q.     Well, it's listed as "Materials reviewed"
4 by Mr. Nickerson in his Appendix B, the sixth entry
5 down. I'm sorry. That's just exhibits. I'm sorry.
6 Where are we? There it is. Well, it's in Exhibit
7 B. I can show it to you if you want me to.
8 A.     No, that's okay. I would assume that I
9 have it. I just don't have a recall about it.
10 Q.     Right. But in order to know anything
11 about the validity or non-validity of Appendix C1 in
12 the Nickerson report, you would have to look at the
13 underlying documents, right?
14 A.     Yes.
15 Q.     The underlying documents being the --
16 Exhibit 20 and the deposition transcript that
17 discusses the exhibit, right?
18 A.     I probably did. I just don't recall.
19 Q.     Right. But from our perspective, from the
20 plaintiff's perspective, to evaluate the validity or
21 not of Exhibit C1, it's impossible, would you not
22 say, without an access to the Exhibit 20 and the
23 underlying transcript from the deposition?
24       MS. SCHEFFEY: Object to form.
25       THE WITNESS: That -- it sounds

Page 264

1 reasonable; that to evaluate Exhibit 20, you need to
2 understand what it's based on.
3       MR. CHAREST: Q. Well, to evaluate
4 Appendix C1, I would need to know what it's based
5 on, right?
6 A.     Yes.
7 Q.     And it's based on Exhibit 20 to the Kimble
8 deposition, right?
9 A.     Yes.
10 Q.     And he discussed Exhibit 20, which was the
11 progenitor for Appendix C1 in his deposition, right?
12 A.     I assume so. I don't remember, but I
13 assume so.
14 Q.     But beyond that, we just have a series of
15 numbers that have no basis in fact for us to
16 evaluate, right?
17 A.     Yes. If you don't have the underlying
18 information, you won't -- you won't be able to
19 evaluate it.
20 Q.     Right.
21       Flip, if you would, please, to page GEO --
22 it's a Bates label -- GEO-Novoa_00086956.
23 A.     Can you say the last three again?
24 Q.     956.
25 A.     Could you tell me the PDF page?

Page 265

1 Q.      Maybe.
2 A.      Oh, I think I'm almost there.
3 Q.      6 is the PDF page.  Actually, go back one.
4 We'll get there. I'm sorry.
5 A.      That must be on a different page.  I'm
6 completely -- the PDF page 6.  Okay.  Okay.  No,
7 wait.  I think I'm good.  Go ahead.
8 Q.      Try the PDF page 5, actually.  That's when
9 it starts talking about Exhibit 20 under the
10 description of the data, section Roman IV.  Are you
11 there?
12 A.      Yes.
13 Q.      Describes Exhibit 20, which we've
14 discussed as being referenced in Appendix C1 as a
15 table showing the work area, number of workers
16 assigned to the work area, and the total number of
17 hours worked for some given point in time.  He notes
18 that there are no dates associated with that table,
19 correct?
20 A.      That's what it says, yes.
21 Q.      Did the fact that the table was undated
22 mean it's more or less or not at all -- no
23 difference -- reliable?
24 A.      It would depend on what else we know about
25 it, so I don't know.

Page 266

1 Q.      And sitting here today, you don't know?
2 A.      I don't remember.
3 Q.      Okay.  Do you know if Exhibit 20 is a
4 GEO-produced document or a State of Washington or
5 Nwauzor-produced document?
6 A.      I don't know.
7 Q.      Do you know if, in fact, Exhibit 20
8 accurately reflects the work area or the number of
9 workers assigned or the total number of work hours?
10 A.      I hesitate to say.  It's been a while, but
11 I do believe that it is based on quantification of
12 the check-in sheets in terms of its distribution of
13 how it distributes jobs.  I don't remember, sitting
14 here, what was the basis for the length of time.
15 Q.      And the shift length is the key point on
16 which you rely for the reference to this report in
17 the first place, right?
18 A.      Well, no, both work together equally
19 importantly.  The distribution of shifts and the
20 shift length are both important in determining the
21 total average shift length.
22 Q.      Okay.  I'll let -- that's -- I accept what
23 you're saying there.  I understand what you're
24 saying there.  But fundamentally, you looked at this
25 document as the average shift length source for

Page 267

1 Northwest Detention Center, right?
2 A.      Mr. Nickerson did.
3 Q.      Well, you're the one that reflected --
4 that referred to it, not Mr. Nickerson, not anyone
5 else.
6 A.      Right, but I was saying that in this other
7 case, plaintiff's expert indicated or relied on this
8 assumed average shift length, and in my rebuttal
9 analysis, I point out areas where I found
10 contradictory information, but I didn't directly
11 rely on Exhibit 20.
12 Q.      You relied on, in your report in this
13 case, Appendix C1, which itself relied on
14 Exhibit 20, right?
15       MS. SCHEFFEY:  Object to form.
16       THE WITNESS:  Just to the extent of saying
17 that the plaintiff's expert in the Washington case
18 or the Nwauzor case relied on that, just to report
19 what he did and to suggest it could have been a
20 comparison for the expert in this case.  So to that
21 extent, I relied on it.
22       MR. CHAREST:  Q.  Well, if you're trying
23 to suggest to comparison, you're saying that it's --
24 you're comparing it to something that matters, that
25 makes sense.  Is the comparison of something that

Page 268

1 doesn't matter at all?  I mean, if you tell me that
2 the Nickerson report doesn't play any impact in your
3 analysis whatsoever, and whatever you said about the
4 Nickerson report in your report doesn't really
5 matter, that's done, but if you're going to rely on
6 the Nickerson report in any way, I need to
7 understand exactly how.  So which is it?
8 A.      It's difficult to answer because it's not
9 so simple.  In the Nwauzor case, where Mr. Nickerson
10 issued his opinion, I critiqued it as being based on
11 Exhibit 20 and pointed out categories where other
12 testimony contradicted the assumptions in
13 Exhibit 20.  So my critique resulted in reductions
14 to the 1.72.
15       But for purposes of comparison, I still
16 think it's a valid comparison because your expert's
17 opinion in this case is a higher average rate.  So
18 to the extent that it's a reasonable comparison at
19 this ceiling of 1.72, I've relied on it, keeping in
20 mind that I've criticized some of the inputs to it
21 that results in a reduction even more.
22       I apologize if that's a complex answer,
23 but sometimes questions are just not so simple and
24 easy to say, "Yes, I relied," "No, I didn't."
25 Q.      I think I completely understand what

Page 269

68 (Pages 266 - 269)

1 you're saying. You relied on the Nickerson report
2 as being, though wrong, still lower than Mr. Bland's
3 report, right?
4 A. Yes.
5 Q. But you know that they're different
6 facilities with different number of workers,
7 different activities, and you still think it's okay
8 to compare one over the other?
9 A. Yes, because that's what we do in a
10 yardstick-type comparison. They're not identical,
11 but they're still similar enough to look at one and
12 say, "Hey, how does this one operate? Well, if this
13 one operates this way, why is mine different? Does
14 that make sense? Can I reconcile them?"
15 Q. And how are they different? How are
16 they -- have you done any attempt to do the
17 reconciliation between Northwest Detention Center
18 and Adelanto?
19 A. We've talked about this extensively, and I
20 pointed out several areas that I felt like they're
21 similar, acknowledged areas where they're different.
22 Q. What have you done to reconcile the
23 differences between -- the factual differences
24 between the two facilities to then compare one
25 average shift length to another, ma'am?

Page 270

1 A. I have not conducted a formal quantitative
2 analysis.
3 Q. Or an informal quantitative analysis,
4 right?
5 A. No.
6 Q. No, I'm not right, or no, you have not
7 done it?
8 A. I have not conducted any analysis other
9 than say the plaintiff expert in this other case
10 opined on this. It's -- it's lower --
11 Q. I heard what you said.
12 A. -- offer a useful comparison.
13 Q. We're trying to talk about your efforts
14 to, as you put it out, harmonize the two to see if
15 they could be -- if the differences between the
16 facilities could be normalized to then compare
17 actually apples to apples. Right? And the answer
18 is, you have not done a formal qualitative analysis,
19 right?
20 A. My criticism is of your expert. My
21 criticism is that there's another indicator out
22 there that he didn't consider. I understand he
23 didn't have it, so that's not fair. I was not aware
24 of that. But it wouldn't be my burden to provide --
25 to do the -- to do the work I'm suggesting could be

Page 271

1 done.
2 Q. You're the one that pulled the Nickerson
3 report off the shelf and said, "Hey, look, there's a
4 different average shift length," and you didn't
5 bother to ask the question, "Are the two shift
6 lengths comparable," right?
7 MS. SCHEFFEY: Object to form.
8 THE WITNESS: Well, I considered the
9 question, so it's not true that I didn't bother to
10 ask the question.
11 MR. CHAREST: Q. Okay. You did not do
12 anything to try and actually see on a mathematical
13 basis that one is comparable to the other, correct?
14 A. That's not entirely correct either.
15 Q. Tell me what you did. Tell me what you
16 did on a mathematical basis.
17 A. I'm not sure what you mean by
18 "mathematical," but I can observe -- based on
19 looking at the job categories and the similarities
20 in the kitchen shift and the number -- significant
21 number of janitorial custodian-type jobs, I can
22 observe similarities in the programs. I didn't put
23 any numbers in a spreadsheet and say, "Because this
24 is this, then this equals this."
25 Q. Yeah. So you saw that the jobs are

Page 272

1 similar, but you know that the shifts are
2 dissimilar, which is -- has to be in order to have a
3 dissimilarity in the overall average shift length,
4 right?
5 A. Yes.
6 Q. What did you do to normalize or to
7 identify the validity of comparing the shift length,
8 for example, for a janitor at Adelanto to a janitor
9 at Northwest Detention Center?
10 A. I didn't.
11 Q. Right. And on average, the janitor length
12 of shift in the Northwest Detention Center is half
13 an hour, right?
14 A. Yes.
15 Q. And it's an hour and a half at Adelanto,
16 right?
17 A. Yes.
18 Q. And you --
19 A. Well, that's the assumption. That's the
20 assumption, and I have not rebutted that assumption,
21 but that's the assumption.
22 Q. Right. And you have offered no opinions
23 as to any reason as to why the 1.5-hour assumption
24 at Adelanto was wrong, correct?
25 A. That's correct.

Page 273

69 (Pages 270 - 273)

1 Q.     Right.  And so if the 1.5-hour assumption
2 at Adelanto is not incorrect, then it is, of
3 necessity, incorrect to rely on a report where the
4 average shift length for janitors is .5 hours,
5 right?
6 A.     That may be correct, yes.
7 Q.     Yeah.  And that is the fundamental
8 driver -- take away all the fancy talk -- of the
9 difference in shift length, is the fact that, in the
10 data that is presented through Exhibit 20, which we
11 don't have, reflected in Appendix Exhibit C1, which
12 you only provided after we demanded it from your
13 lawyers, shows that the Northwest Detention Center
14 averages .5 hours, and when you compare it to the
15 1.5 hours in Adelanto, you have a complete
16 disconnect, right?
17       MS. SCHEFFEY: Object to form.
18       THE WITNESS:  Yes, those assumed shift
19 lengths are different.
20       MR. CHAREST: Q.  Yeah.  And more
21 importantly, it's not appropriate to compare shift
22 lengths in Northwest Detention Center, which are .5
23 hours, to shift lengths in Adelanto, which are an
24 hour and a half, correct?
25 A.     Not necessarily.  You know, you blocked me

Page 274

1 into a conclusion that assuming the 1.5 hours is
2 correct.  I haven't specifically found alternative
3 data that says it's not correct.  However, one of
4 the general assumptions was that your expert used
5 kind of basically, like, schedules, these basic just
6 time schedules, and didn't account for the
7 possibility that the actual task should have been --
8 was actually shorter.
9       In the Nwauzor case, there was a lot of
10 deposition testimony taken to obtain more specific
11 information about how long did those tasks take.
12 So -- so I agreed with you because you said
13 "assuming the one and a half hours is correct."
14 Well, I haven't rebutted it because I haven't found
15 other alternative data, but on a general sense, your
16 expert, using these overall schedules to kind of say
17 it's going to be an hour and a half, indicates that
18 it could be a reach in many of these categories.
19       So to make this comparison on an overall
20 basis I still thought was reasonable because you
21 have this other case that has all of these positions
22 that results in a different answer.  Maybe your
23 expert's answer is not super tight.  Maybe the
24 assumption is that this overall schedule is the
25 length of the detail isn't accurate because there's

Page 275

1 no -- there's not as much evidence in this case as
2 there was in the Nwauzor case.
3 Q.     Yeah, if only he had an e-mail on a Sunday
4 afternoon talking about a one-and-a-half-hour shift
5 length, that would be perfect, right?
6       MS. SCHEFFEY: Object to form.
7       MR. CHAREST: Q.  Listen.  What do you
8 have, as a matter of fact, to say that the use of
9 .5-hour shift lengths at Northwest Detention Center
10 is at all relevant to the evaluation of shift
11 lengths for janitors in Adelanto, a different
12 facility that is a different layout?
13 A.     All the reasons that we've been talking
14 about all day long.  That it's a GEO facility.  It
15 has the Voluntary Work Program.  It has all of these
16 features, these positions.  Just that the -- that
17 it's another GEO operation.  And one can look to
18 that.  Doesn't have to be identical.  When you do a
19 comparable analysis, they never are identical.  You
20 can look to that to make a comparison, and you can
21 learn from that.  That might give you a clue about
22 something that's going on over here that -- an
23 assumption that may not be correct.
24 Q.     When you're talking about janitorial
25 services in particular, do you think the layout of

Page 276

1 the facility has any -- has any bearing on the time
2 it takes to do the work?
3 A.     Well, it certainly would, but that doesn't
4 mean, if you think of it in terms of a
5 traditional -- total number of hours, yes, certainly
6 would have an impact on the total number of hours.
7 How that's conducted under this Voluntary Work
8 Program that's broken up into little pieces, it may
9 not have any impact.
10 Q.     So your testimony is that, because GEO
11 operates the Voluntary Work Program kind of
12 uniformly in different places and breaks up into
13 little pieces, the little pieces being .5 hours in
14 Adel- -- in Northwest Detention Center, therefore,
15 they must be broken up into .5-hour pieces in
16 Adelanto?  Is that your -- is that your -- is that
17 the logic that we're hearing now?
18 A.     That's not what I'm saying.  You're trying
19 to take my big-picture comparison -- and I know
20 that's your job to do it.  You're taking my
21 big-picture comparison, which is how comparables
22 work -- you look at it in a big picture.  You're
23 trying to break it down into smallest detail and say
24 that doesn't work, but it doesn't need to work when
25 you're making a comparison on that super high level.

Page 277

70 (Pages 274 - 277)

1 This is a comparable facility in terms of its -- who
2 owns it, its operation, how the program works. It
3 doesn't need to be identical on that little
4 itty-bitty level.
5 Q.      It's like saying two cars are the same
6 because they're both red, right?
7 A.      No, it's not.
8 Q.      Well, the fact that you have one similar
9 trait doesn't mean that everything about both places
10 is the same, right?
11 A.      The fact that you have one similar trait?
12 Q.      Yes, ma'am.
13 A.      What's the one similar trait?
14 Q.      They both house detainees and have them go
15 through a Voluntary Work Program that's run by GEO.
16 That seemed to be your overarching theme, the big
17 picture you keep talking about. All right?
18 A.      Well, that's a pretty big similar trait.
19 Same owner, same type of detainees, same type of
20 Voluntary Work Program. Those are pretty big.
21 Those are not one thing. Those are really big
22 similarities.
23 Q.      So are you saying that there's a policy at
24 GEO where the janitorial shifts are held at a half
25 an hour as a matter of policy?

Page 278

1 Q.      Do you know the basis for the half-hour
2 shift length that's reflected in Exhibit 20 that
3 then got converted into Appendix C1 that was
4 attached to the Nickerson report that you -- that
5 you identified in your report?
6 A.      I don't recall.
7 Q.      Would it surprise you to know that it was
8 the guards talking about how long they thought it
9 would take something to get done?
10 A.      I -- I just don't recall, so doesn't --
11 Q.      We'll talk -- I'm going to show you in a
12 second, but if that's the basis, that completely
13 undermines the rationale that you have of this
14 inclusive "a lot of people got to get into the game,
15 you know, and that's how GEO does it" concept,
16 right?
17        MS. SCHEFFEY: Object to form.
18        THE WITNESS: I don't understand your
19 point about how that undermines the rationale.
20        MR. CHAREST: Q. If half hour is based on
21 an estimate of a guard on how long it takes to clean
22 a certain area, how does that relate to GEO's
23 overall policy and how it runs the Voluntary Work
24 Program?
25        MS. SCHEFFEY: Object to form.

Page 280

1 A.      No.
2 Q.      Okay. Because that would be something
3 that would be on matters you run across all planes,
4 right? That would make sense, but that's not what
5 you're saying, correct?
6 A.      That's correct.
7 Q.      You're saying, as a matter of
8 happenstance, because GEO runs it like this here, if
9 it does, which you don't even agree with, then it
10 must run it like -- the same way at Adelanto, right?
11        MS. SCHEFFEY: Object to form.
12        THE WITNESS: Yes. I'm saying that it's
13 likely -- it's very likely consistent because
14 they're owned by the same company, and it's a
15 Voluntary Work Program in -- with both places, so
16 they're likely consistent.
17        MR. CHAREST: Q. Likely consistent why,
18 ma'am? Because there's a policy, or just luck?
19 A.      Because that's how organizations work.
20 There's one organization running two locations.
21 Q.      Do you have any facts to suggest that
22 volun- -- that GEO runs the Voluntary Work Program
23 the same in Adelanto as it does in the Northwest
24 Detention facility? Facts.
25 A.      As I sit here right now, no.

Page 279

1        THE WITNESS: It doesn't surprise me that
2 a shift would be -- or a detail would be short
3 because I understand they're trying to create many
4 opportunities to participate. It doesn't surprise
5 me that one would be short.
6        MR. CHAREST: Q. That's not my question.
7 My question is this: If the basis for a
8 one-half-hour shift length assumption that is
9 reflected in Exhibit 20 and then turned into
10 Appendix C1 is some guard telling somebody how long
11 they thought it took to clean a particular area,
12 how, if at all, does that pertain to shift lengths
13 in Adelanto?
14 A.      That's the part I guess I misunderstood.
15 I thought you were talking about how does it pertain
16 to shift lengths. Just all the same reasons.
17 It's -- it's -- it's what one facility -- it's
18 how -- it's specific observation about one -- how
19 one facility works where the specific observations
20 are not available for the other ones.
21 Q.      A specific observation about how long it
22 takes to clean a certain area at Northwest Detention
23 Center, which is a different layout than Adelanto,
24 right?
25 A.      I assume so.

Page 281

71 (Pages 278 - 281)

1 Q.      Yeah.  So if it takes a half hour for a
2 detainee to clean a certain area in Northwest
3 Detention Center, how long does it take that same
4 detainee to clean an area in Adelanto?
5 A.      Doesn't mean that it would take -- that
6 one person would take twice as long in Adelanto.
7 Q.      Well, don't you need to know how big the
8 areas are to make -- to do that math?
9      MS. SCHEFFEY:  Object to form.
10      THE WITNESS:  No.
11      MR. CHAREST:  Q.  Really?
12 A.      No, no, because shift lengths are not --
13 the way I understand them, shift lengths are not
14 based on traditional job concepts that --
15 Q.      Let's pause right there because I've heard
16 your view on that.
17      MS. SCHEFFEY:  Let the witness finish.
18      MR. CHAREST:  Q.  The question is not
19 about your view of what you think the traditional
20 view of shift lengths is.  The issue is this:  The
21 data that Mr. Nickerson relays is described as a
22 guard telling somebody about how long it takes to
23 clean an area, not about, "Oh, well, it takes two
24 hours, but let's cut it in half to give them more
25 time."  It's an area, period.

Page 282

1 conclusion reached for the Adelanto facility is
2 high.  It doesn't necessarily mean it is, but it
3 could indicate that.
4 Q.      Because it takes a half hour for a
5 detainee to clean a certain area at Northwest
6 Detention Center, that indicates that the
7 hour-and-a-half shift length at Adelanto is high?
8 A.      It indicates that it could be.
9 Q.      Is it -- do you think that the detainees
10 are asked to clean a half hour at a time, however
11 much you get done, or do you think there's whole
12 "clean this room"?
13 A.      It's my understanding that there are tasks
14 assigned.  That's what "detail" means.  And I've
15 seen that word referenced so that there are, you
16 know, "complete the task."  It's not so much, "Hey,
17 you're here assigned here for this amount of time."
18 It's, "This is your task.  Finish this task."
19 Q.      And do you think the tasks that are
20 assigned in Adelanto are one-half-hour tasks for
21 janitors?
22 A.      I don't know.
23 Q.      You have no idea, right, about that?
24 A.      I don't know.
25 Q.      But you have zero facts to tell you how

Page 284

1      And if that's true -- and I'll show you in
2 a second.  But if that is true, how can you say that
3 that information has anything to do with how long it
4 takes to clean a different area in a different
5 facility?
6      MS. SCHEFFEY:  Object to form, foundation.
7      THE WITNESS:  Your hypothetical assumes
8 that only one person would clean the larger area.
9      MR. CHAREST:  Q.  My hypothetical assumes
10 that the different areas might be different, and you
11 don't know, right?
12 A.      I know that the Adelanto facility overall
13 is larger.
14 Q.      Do you know the size of the areas of any
15 particular detainee's assignment as a janitor in
16 either location?
17 A.      I don't.
18 Q.      But yet you're willing to compare shift
19 lengths from one to the other and treat them as
20 equivalents?
21 A.      I didn't treat them as equivalents.  I
22 said it provides a useful comparison.  That's the
23 way a comparable analysis works.
24 Q.      How is it useful?
25 A.      Because it could indicate that the

Page 283

1 long the tasks that the janitors are assigned in
2 Adelanto actually take, correct?
3 A.      I have not seen evidence of the length of
4 the tasks.
5 Q.      Apart from the material that Mr. Bland
6 collected, right?
7 A.      Which included schedules.  Daily
8 schedules.
9 Q.      Why did you cite to the Nickerson report
10 and not the Nickerson amended report?
11 A.      It was just an oversight.
12 Q.      Sorry?
13 A.      It was just an oversight.
14 Q.      So you think the amended Nickerson report
15 is the more accurate one?
16 A.      I'm not aware that it's changed that -- in
17 the amended report.  Changed that 1.72.
18 Q.      Talks about all kinds of new other
19 material that supports a position in the amended
20 report, though, right?
21      MS. SCHEFFEY:  Object to form.
22      THE WITNESS:  I have not seen an amended
23 report that you describe that talks about a lot of
24 new material.  I have not received that or reviewed
25 it, if that exists.

Page 285

72 (Pages 282 - 285)

1        (Whereupon Exhibit 210 was marked for
2    identification.)
3        MR. CHAREST:  Q.  Can you look at
4    Exhibit 210, please.  Let me know when you're there.
5    A.    Okay.
6    Q.    So Exhibit 210 is what I understand to be
7    an amended report issued by Dr. Nickelson --
8    Nickerson.  Have you seen this before?
9    A.    I believe so, yes.
10   Q.    You did see the amended report?
11   A.    Well, but you described something --
12   Q.    You've seen it?
13       MS. SCHEFFEY:  Let her finish, please.
14       THE WITNESS:  I have seen this, but I have
15   not spent much time with it based on my
16   understanding of just a quick review.  I haven't
17   done any more work in that case since I issued my
18   report; that it appeared he made minor changes, and
19   I don't -- your description of extensive, a bunch of
20   additional information, is not consistent with this
21   report.  So I'm confused.  I don't -- but I've spent
22   very little time with this report, so maybe there is
23   more here and I just am not aware of it.
24       MR. CHAREST:  Q.  My description is
25   inconsistent, but you don't know what's in the

Page 286

1    report?
2    A.    As I said, I haven't done any work on that
3    case since issuing the report, so I haven't reviewed
4    this report extensively to understand, but -- all of
5    what it's changed, but my understanding was that the
6    1.72 hours is not changed.
7    Q.    Turn, if you would, to page 4 of 12.  Oh,
8    I'm sorry.  3 of 12.
9        MS. SCHEFFEY:  Past the exhibits?
10       MR. CHAREST:  I'm sorry?
11       MS. SCHEFFEY:  Do we have to go past the
12   exhibits, or are you talking about PDF pages?
13       MR. CHAREST:  No, it's marked 3 of 12.
14   It's GEO-Novoa-00161995.
15       THE WITNESS:  Okay.
16       MR. CHAREST:  Q.  Are you there?
17   A.    Yes.
18   Q.    He talked -- he starts the section there
19   about hours worked, right?
20   A.    I must not be on the right page.
21   Q.    It's the bottom of the page.  I mean, it's
22   a header near the bottom, above some footnotes.
23   A.    I'm on page PDF page 3.
24   Q.    No.  It's 3 of 12.  It's marked on the
25   bottom of the page.

Page 287

1    A.    Oh, okay.  Maybe on the appendix.  I'm
2    struggling.  Could you give me the Bates number
3    instead?  I don't see the "of" -- oh, wait.  Okay.
4    There I am.  Okay.
5    Q.    So it starts "Hours Worked," correct?
6    A.    Yes.
7    Q.    What's the first line that he says?
8    A.    "Since my last report, I have received
9    additional documents and spreadsheets upon which to
10   base my analysis."
11   Q.    Okay.  And he goes on to talk about those
12   additional documents and spreadsheets, which we
13   don't have, but he had, and you have, right?
14   A.    I don't know.  As I said, I haven't done
15   any work after issuing my first report, so I haven't
16   looked to see what he cites and haven't requested
17   any additional information, haven't received any
18   additional information.
19   Q.    Do you know that you haven't -- let's be
20   really clear because we're (garbled) -- are you sure
21   that you have not received any additional
22   information that's associated with this amended
23   report, or you just don't remember it?
24       MS. SCHEFFEY:  Object to form.
25       THE WITNESS:  Well, if it happened back in

Page 288

1    2000 -- whenever it was that I issued my report --
2        MR. CHAREST:  Q.  2018, ma'am.
3    A.    '18, '19.  I don't believe I did because I
4    just don't believe that I worked on this case after
5    my report.  Just went quiet for me, so --
6    Q.    Brent received it.  When I'm talking about
7    you received, I'm talking about the royal "you."
8    Your group received --
9    A.    Right, right, right.  I -- I'm -- I
10   believe that we did not, but it's been a while, so I
11   could be wrong, but I just don't remember.
12   Q.    Under oath today, can you swear that you
13   did not receive this information?
14   A.    No, because my memory's not that reliable,
15   but it's my belief that I didn't.
16   Q.    Right, but you are -- your belief, based
17   on what?
18       MS. SCHEFFEY:  Argue -- come on.
19       THE WITNESS:  Just based on my memory and
20   what I just said of -- I just had no activity after
21   issuing my report.  I don't recall any activity.
22       MR. CHAREST:  Q.  You don't know whether
23   or not the other side's expert produced to you
24   workpapers from an amended report, and the lack of
25   that memory is therefore basis to say you didn't

Page 289

73 (Pages 286 - 289)

1 receive it; is that right?
2 A.    I said it's my belief that I didn't
3 receive it because I don't recall receiving it.
4 Q.    Well, this is how it describes some of
5 this information.  Looking at page 4 of 12, the
6 first full paragraph, he says the analysis continues
7 to rely on two primary sources of evidence:  One is
8 the payments made, and No. 2 is Exhibit 20 of the
9 GEO deposition, with the individual being named Ryan
10 Kimble, correct?
11 A.    Yes.
12 Q.    And then he says there's a summary chart
13 compiled by GEO which is evidence of the hours
14 worked each day and the categories that -- of that
15 work, and that's how he describes Exhibit 20, right?
16 A.    Yes.
17 Q.    He goes on to say, "I have also reviewed
18 other sources of information that support the
19 information contained in Exhibit 20, including
20 additional information pertaining to detainee work
21 categories and the associate daily hours worked,"
22 and he cites footnote 11, with a series of
23 information there.  So that's the new information
24 that you said he didn't have?
25     MS. SCHEFFEY:  Object to form.

Page 290

1     THE WITNESS:  The new inform- -- would you
2 repeat that last part?  The new information that he
3 didn't have or I didn't have?
4     MR. CHAREST:  Q.  Well, I don't know if
5 you have it or not.  You don't know either,
6 apparently.  My point is, this is the report, the
7 amended report that talks about new information that
8 supports his position that you said didn't exist.
9 A.    I didn't say it didn't exist.  I said I
10 don't recall receiving it.
11 Q.    Okay.  Do you remember it now?
12 A.    Well, give me a minute.  There's a lot on
13 footnote 11.
14     (Pause.)
15     THE WITNESS:  So footnote 11 has a lot of
16 information.  Some of that I recognize as having
17 received before I issued my rebuttal report, and
18 it's cited in my rebuttal report, such as year-end
19 reports, Northwest Detention Center year-end
20 reports, those included charts that summarized the
21 check-in sheets.
22     Those other descriptions, I just don't
23 have enough of a recall of what they are to know --
24 to know if I had them and when I had them, but based
25 on just those -- the financial statements, I

Page 291

1 remember having those and citing those before
2 issuing my report.
3     MR. CHAREST:  Q.  So you did have this
4 information?
5 A.    Well, some -- I don't recognize it all,
6 but some of this might have been what I obtained for
7 purposes of my report, and then it was produced to
8 him when my report was issued, and that's why he's
9 calling it new information.  I don't know.  I don't
10 know that.  I just -- I recognize one set of
11 information in his footnote 11.
12 Q.    Okay.  And that's information that we
13 don't have, right?
14     MS. SCHEFFEY:  Object to form.
15     THE WITNESS:  I assume so.  I don't know.
16     MR. CHAREST:  Q.  In the second full
17 paragraph, there's a description of what's in
18 Exhibit 20 and the source of it.  Are you with me?
19 A.    Yes.
20 Q.    Says, "Exhibit 20 summarizes the number of
21 detainee workers inside the 'Pod' and 'Outside
22 Detail' jobs at the facility, together with
23 estimates of the average amount of time these
24 detainee workers spend completing their job" --
25 "each job on a daily basis."  Did I read that

Page 292

1 correctly?
2 A.    Yes.
3 Q.    Yeah.  I may have missed it, but is there
4 any commentary here about "and the need to make sure
5 everyone's involved, and therefore, could keep short
6 shifts," or is it just the jobs and how long it
7 takes to get them done?
8 A.    I understand he's describing his
9 understanding of Exhibit 20.
10 Q.    Okay.  Do you have any basis to dispute
11 what he's saying about the description of
12 Exhibit 20?
13 A.    Not sitting here, no.
14 Q.    Goes on to say, "There are 20 different
15 'Pods' listed on the table, with 11 to 19 jobs in
16 each one; and there are 10 different outside detail
17 jobs."  Did I read that correctly?
18 A.    Yes.
19 Q.    Yeah.  He says, "This table estimates a
20 total of 470 detainee workers at the Northwest
21 Detention Facility every day, for a total of 810
22 hours of work per day," correct?
23 A.    That's what it says.
24 Q.    Do you know how many detainee workers work
25 on average every day in Adelanto?

Page 293

74 (Pages 290 - 293)

1 A.    I -- sitting here, I don't.
2 Q.    Do you know how many total hours of work
3 are done every day in Adelanto?
4 A.    I don't.  I know it's in the inform- -- I
5 mean, I don't know it's calculated per day.  I know
6 that there are some annual totals in the reports.  I
7 just don't, off the top of my head, know.
8 Q.    Yeah, that would be useful information if
9 you're trying to measure the average daily shift
10 length, right?
11 A.    I'm not sure I follow why the total number
12 of workers per day impacts the average daily shift
13 length.
14 Q.    You don't see any connection between the
15 two?
16 A.    Well, there is -- I mean, we're going to
17 have the same conversation -- I don't know if we're
18 going to go another hour on the same conversation,
19 but -- but I -- my understanding of the program is
20 that there is a desire for more workers
21 participating, and by necessity that means that
22 shift lengths or detail lengths have to be shorter
23 than if there were traditional jobs.
24     So if there are more workers per day in
25 Adelanto, it could be simply a function of having

Page 294

1 of the distribution of jobs times the assumed shift
2 length.  You asked me is that how he calculated
3 1.72.  It doesn't matter how many days or hours a
4 day are worked.
5 Q.    Is that how you think the 1.72 is
6 calculated, what you just said?
7     MS. SCHEFFEY:  Object to form.
8     THE WITNESS:  That's how I remember it.
9 It's been quite a while.  I remember it being a
10 function of just the same as it is in the Bland
11 report, a function of the distribution of jobs, the
12 ratio of jobs to each other, times their weighted
13 average -- or times their assumed shift length gives
14 you that weighted average.
15     MR. CHAREST:  Q.  That's not how any of
16 this works.
17 A.    Well, I apologize.  It's been quite a
18 while since I looked at Exhibit 20.
19 Q.    Yeah, but you're the one that's saying
20 Exhibit 20 and Exhibit -- Appendix C1 is like this
21 source that we need to pay attention to because of
22 the overarching commonality between the facilities
23 and how they're run, right?
24     MS. SCHEFFEY:  Object to form.
25     MR. CHAREST:  Q.  You're the one that's

Page 296

1 more detainees.  I don't know.  It could be a
2 function of -- it could be a function of shorter
3 shift lengths.  I mean, so I'm not really sure what
4 you're asking in terms of the connection.
5 Q.    If you knew the number of hours worked per
6 day and the total number of workers, you would know
7 the average length of the workers' work each day,
8 right?
9     MS. SCHEFFEY:  Object to form.
10     MR. CHAREST:  Q.  I mean, it's math.
11 A.    The total number -- say that again.
12 Q.    Look at the sentence I just read to you.
13 810 hours of work per day, 470 detainees, and he
14 uses those data to calculate the 1.72 hours, right?
15 A.    Well, yes, but the 810 hours is based on
16 assumptions about the length of each -- of each
17 detail.  So it's not -- it's not like a time sheet
18 record or anything.  It's the length of each detail.
19 Q.    I didn't ask about a time sheet or the
20 basis of it or anything.  I asked you what I asked
21 you, and the answer is "yes," right?
22 A.    That's not the way I understand Exhibit 20
23 in terms of how 1.72 is reached, but I don't know if
24 it matters.  Maybe I'm not understanding your
25 question.  The 1.72 is reached by the multiplication

Page 295

1 saying that, right?
2 A.    Yes, I'm the one who said that 1.72 could
3 be a useful comparison.
4 Q.    Yeah.  And you don't even know how 1.72 is
5 calculated?
6 A.    I don't -- I don't remember.  I didn't
7 rereview my work in that case.
8 Q.    What if it's calculated by asking a guard
9 how long it takes to take a -- to do a task,
10 multiplying that number by the worker count, and
11 then getting a total number of hours, adding those
12 all up, and then dividing it by the total number of
13 worker count?  What if that's the answer?  Is it
14 still a useful comparison?
15 A.    I don't see why it isn't.
16 Q.    Okay.  Well, do you think the guard's view
17 on how long it takes to take -- to complete a task
18 at Northwest Detention Center has any bearing
19 whatsoever on average shift length in Adelanto?
20 Because that's really what we're doing here.  We're
21 taking the guard saying this job takes a half hour,
22 times the number of people, average it all -- add it
23 all up and divide it up for a weighted average, and
24 then saying, "Oh, but it's different than Adelanto."
25 That's what you're saying, right?

Page 297

75 (Pages 294 - 297)

1      And so the fundamental thing that's being
2 compared is a guard's view on how long it takes to
3 do a task in Northwest Detention Center to average
4 shift length in Adelanto, correct?
5      MS. SCHEFFEY: Object to form.
6      THE WITNESS: I think that's a useful
7 comparison.
8      MR. CHAREST: Q. Really?
9 A.    Yes.
10 Q.    Are the tasks the same?
11 A.    We don't know because their records aren't
12 kept. The guard is making an observation -- we've
13 been through deposition testimony -- making an
14 observation about how long these things take. Over
15 on the Adelanto side, I have not seen that level of
16 detailed, "This is how long these things take."
17 It's more of a "Here's the overall schedule
18 approach." So yes, I think it is useful to refer to
19 another situation where there's been more detailed
20 observations. They may not be identical. That's
21 not --
22 Q.    Do you know if the tasks have any relation
23 to each other, other than it being janitorial work?
24 A.    They're -- on a specific task-by-task
25 basis, no.

Page 298

1 kitchens --
2      MS. SCHEFFEY: Counsel, we're not going to
3 talk over each other. Let the witness finish, and
4 then you can speak.
5      THE WITNESS: There's different sources of
6 those assumptions. One is the guard saying "I've
7 seen this, and this is what" -- "this is how long I
8 think it takes." The other is based on a schedule
9 for the day kind of concept. And so -- so I'm
10 saying it might be useful to go up to the top level
11 and look at it as a whole, to see whether or not the
12 Adelanto conclusion seems rational based on this
13 other analysis where there's more detailed
14 information about the lengths of shifts.
15      MR. CHAREST: Q. So you think that a
16 guard was under oath and told people how long
17 different tasks take at Northwest Detention Center?
18 Is that what you now think is the basis for Exhibit
19 20?
20 A.    I don't recall all of the -- well, there
21 is a large list of sources of assumptions in that
22 case. I don't recall the basis of those assumptions
23 specifically.
24 Q.    Yeah, but you just testified the guard was
25 under oath, and therefore --

Page 300

1 Q.    Right. And so if I'm doing Task A in
2 Northwest Detention Center and it takes me 30
3 minutes, how long does it take you to complete Task
4 Z in Adelanto?
5 A.    I don't think that the comparison has to
6 be made on that micro level for the overall
7 comparison to be valid. It doesn't have to work
8 that way when you're using a comparable at a higher
9 level. It doesn't have to flow all the way down to
10 the detailed tasks.
11 Q.    You keep saying "a comparable at a higher
12 level," and we're talking about back to this notion
13 that the Voluntary Work Program is being run
14 similarly at the different facilities, for which you
15 have no factual basis, correct?
16      MS. SCHEFFEY: Object to form.
17      MR. CHAREST: Q. You have no
18 factual basis to say that the Voluntary Work Program
19 is run similarly, as you allege, in any one of the
20 different detention centers, correct?
21 A.    That's not correct. I see similar job
22 categories. I see similar lengths of the kitchen
23 shift. I see --
24 Q.    But you see different lengths of shifts
25 per janitors, so the similarity in the shift length

Page 299

1 A.    I didn't say he was under oath. You said
2 he was under oath.
3 Q.    It was a deposition. You did. And that's
4 fine. You're guessing, but you're wrong. Okay?
5 That's not what happened.
6      MS. SCHEFFEY: Object to form. Move to
7 strike testimony of counsel.
8      MR. CHAREST: Q. Do you even know the
9 basis by which the shift lengths were measured and
10 evaluated in Exhibit 20?
11 A.    I cannot recall, sitting here.
12 Q.    Yeah. Can you swear under oath that it is
13 accurate in any way?
14 A.    Exhibit 20?
15 Q.    Yes, ma'am.
16 A.    As far as shift lengths, I have issued a
17 report criticizing its accuracy. As far as the
18 distribution, I felt that it was relatively
19 reasonable. It's a narrow period of time that's
20 reflected in Exhibit 20, but I felt like the
21 distributions were -- I understood what the
22 underlying data was for the distributions.
23 Q.    We're talking about shift lengths here.
24 You understand that, right? Do you have any
25 basis --

Page 301

76 (Pages 298 - 301)

1 A.      Not necessarily, because 1.72 is based on
2 both.
3         MS. SCHEFFEY:  And can we get the time on
4 the record?
5         MR. CHAREST:  You can take a break.  We'll
6 do it on the next break.
7 Q.      The question is this:  Do you have any
8 basis in fact to say that Exhibit 20's shift
9 lengths, the entering arguments of the data are
10 correct?
11 A.      Do I have basis in fact to say that they
12 are correct?
13 Q.      Yeah.
14 A.      The shift lengths.  No, not sitting here
15 today.
16 Q.      All right.  And you understand the math is
17 shift lengths times number of workers equals total
18 amount of time for that particular job.  Add it all
19 up, divide it by the total number of workers, and
20 that's your shift length.  That's the math.  So as
21 an entering argument, you don't know whether the
22 beginning data are accurate or not, correct?
23 A.      I know that some are inaccurate because
24 I've issued a report about that.
25 Q.      Yeah.

Page 302

1 A.      There are others that I haven't supported,
2 and there are some that I've criticized.
3 Q.      You don't know that any of them are, in
4 fact, accurate, correct?
5 A.      Independently from -- other than the
6 evidence that I've presented in my report, no.
7 Q.      Yeah.  And you don't know that the shift
8 lengths, in fact, have any relation to shift lengths
9 in Adelanto, correct?
10 A.      I do not conclusively know, correct.
11         MR. CHAREST:  Take a break, please.
12         THE VIDEOGRAPHER:  Did you say "take a
13 break"?
14         MR. CHAREST:  Yes.
15         THE VIDEOGRAPHER:  We're going off the
16 record at 5:17.
17         (Recess taken from 5:17 p.m. to 5:21 p.m.)
18         THE VIDEOGRAPHER:  Okay.  We're back on
19 the record.  The time is 5:21 p.m.
20         MR. CHAREST:  Q.  Ms. Morones, did
21 Mr. Kimble say anything in his deposition about the
22 applicability or not of the data that was used to
23 derive the shift length in Exhibit 20 and ultimately
24 reflected in the Nickerson report to facilities
25 other than Northwest Detention Center?

Page 303

1 A.      I don't recall his deposition.
2 Q.      You would need to see his transcript to
3 know the answer to that question, correct?
4 A.      Yes.
5 Q.      Did GEO ever present you with any data
6 that was contradictory of the 1.5-hour shift length
7 assumption with respect to custodial services in
8 Adelanto?
9 A.      I don't recall any.
10 Q.      So sitting here today under oath in your
11 deposition, defending your opinions, you can't
12 identify anything you received from GEO that calls
13 into question the 1.5-hour assumption with respect
14 to shift length for custodial services; is that
15 correct?
16 A.      That's correct.
17         MR. CHAREST:  Pass the witness.
18         MS. SCHEFFEY:  Can we get the time on the
19 record just right now, so I know how much Dan has
20 left?
21         THE VIDEOGRAPHER:  We've been on the
22 record for a minute and 30 seconds.  Three and a
23 half.
24         MS. SCHEFFEY:  Mr. Charest has three and a
25 half left?

Page 304

1
2         EXAMINATION BY MS. SCHEFFEY
3         MS. SCHEFFEY:  Q.  So Ms. Morones, first I
4 wanted to direct you to Exhibit 211.  You don't have
5 to open it, but can you see the title of that
6 document?
7 A.      Yes.
8 Q.      What is the title?
9 A.      "Detainee Training English."
10 Q.      Okay.  And in that document earlier today,
11 you referenced that there is a reference to a
12 scheduled mealtime; is that correct?
13 A.      It's a reference to a rule about eating at
14 the regularly scheduled time.
15         MR. CHAREST:  So the answer is "no."
16         THE WITNESS:  Something like that.
17         MS. SCHEFFEY:  Dan, please let the witness
18 speak.  You don't need to --
19         MR. CHAREST:  The answer's "no," though.
20 Go ahead.
21         MS. SCHEFFEY:  Dan, I think that's an
22 inappropriate deposition tactic.
23         MR. CHAREST:  Okay.  Go ahead.
24         THE WITNESS:  The document says, "There
25 will be no eating in the kitchen, except at your

Page 305

77 (Pages 302 - 305)

1 scheduled mealtime in the designated eating area."
2      MS. SCHEFFEY: Q. Do you have any reason
3 to believe that detainees would be trained about a
4 meal break and not get a meal break?
5 A.      No.
6 Q.      Have you seen any information indicating
7 that detainees do not get a meal break?
8      MR. CHAREST: Objection; form.
9      THE WITNESS: No.
10      MS. SCHEFFEY: Q. Okay. You testified
11 earlier about the Nickerson report. Do you remember
12 that?
13 A.      Yes.
14 Q.      There was some question about the
15 October 9th, 2018 Nickerson report and whether you
16 had seen it. Do you remember that?
17 A.      Is that the amendment?
18 Q.      Yes.
19 A.      I don't have dates in my head. Yes.
20 Q.      That would be, just for clarity on the
21 record, Exhibit 210 amendment.
22 A.      Okay.
23 Q.      Your report in the Nwauzor case was dated
24 September 11th, 2019. Do you have any reason to
25 believe it was not created close to that date?

Page 306

1 the questions, please let me know.
2 A.      Nothing comes -- you know, it's been a
3 long day. Nothing comes to mind that I would say
4 that I would want to change anything.
5 Q.      Okay. Earlier today, do you remember a
6 long colloquy about what people were actually paid
7 to perform work at the Adelanto facility?
8 A.      Yes.
9 Q.      Were you provided information about what
10 detainees were actually paid to perform the work at
11 the Adelanto facility?
12 A.      In terms of payroll records, no. I only
13 recall those offer -- those offer sheets or -- I'm
14 not sure what to call them, but...
15 Q.      And I know it's been a long day, but my
16 question is were you provided information about what
17 detainees were actually --
18 A.      Oh, I'm sorry.
19 Q.      -- paid to perform the work in their
20 positions?
21      MR. CHAREST: Form.
22      THE WITNESS: Yes.
23      MS. SCHEFFEY: Q. And what amount were
24 detainees actually paid?
25 A.      As far as I understand, a dollar per day,

Page 308

1 A.      No.
2 Q.      And if your report references this
3 October 9th, 2018 report, do you have any reason to
4 believe that that report is inaccurate?
5      MR. CHAREST: Form.
6      THE WITNESS: Which one?
7      MS. SCHEFFEY: Q. Yeah. If your Nwauzor
8 expert report -- expert rebuttal report references
9 the October 9th, 2018 Peter Nickerson amended
10 report, do you have any reason to believe you did
11 not see it before issuing your report?
12 A.      No.
13      MR. CHAREST: Form.
14      MS. SCHEFFEY: Q. Excluding the Nickerson
15 report, do the remainder of your critiques remain
16 unchanged?
17      MR. CHAREST: Form.
18      MS. SCHEFFEY: What is your form
19 objection?
20      MR. CHAREST: Vague. Which critique are
21 we talking about?
22      MS. SCHEFFEY: Remainder of her critiques
23 in her report. She takes away the Nickerson report.
24      MR. CHAREST: Still form.
25      MS. SCHEFFEY: Q. If you don't understand

Page 307

1 dollar per detail, dollar per day.
2 Q.      Okay. And so would the actual amount that
3 detainees were paid for those positions be helpful
4 in the analysis you performed in your report?
5 A.      I'm not sure I understand the question
6 because they're taken into account. They're
7 subtracted out in any of the claims.
8 Q.      Okay. And so as for determining that rate
9 that they could have been paid, is the actual amount
10 that they were paid a helpful comparison compared
11 to, for example, the SCA rates you used?
12      MR. CHAREST: Form.
13      THE WITNESS: No.
14      MS. SCHEFFEY: Q. Can you turn to
15 Schedule 6B of your report, page 24. It's
16 Exhibit 203.
17      MR. CHAREST: Which schedule?
18      MS. SCHEFFEY: B, page 24. PDF page 24.
19      MR. CHAREST: 6B; is that what you said?
20      MS. SCHEFFEY: Yes, 6B.
21      MR. CHAREST: Okay.
22      THE WITNESS: Okay.
23      MS. SCHEFFEY: Q. Do you have that chart
24 in front of you that starts with "Contract Period
25 5/27/2011" that's the first line I see in the top

Page 309

78 (Pages 306 - 309)

1 left?
2 A.      Yes.
3 Q.      Are you able to open Exhibit 207 at the
4 same time?
5 A.      If you tell me how.  I haven't done it all
6 day, so I don't know how.
7 Q.      I downloaded it and opened them side by
8 side, but if not, I can maybe Screen Share one, if
9 you're able to still look at your report.
10 A.      Yeah, I'll look at the report.  If you
11 want to show me the other one, that would be great.
12 Q.      Okay.  Give me one second.  Okay.  Can you
13 see my screen right now, which has your report on
14 it?
15 A.      Yes.
16 Q.      So I have pulled up Exhibit 207.
17 A.      Okay.
18 Q.      I understand it's been a long day, but
19 looking at this first paragraph, do you see that it
20 says, "An hourly rate of 10.50 per hour plus a
21 pro-rated Health and Welfare rate of 4.27 per hour
22 will be provided for this position"?
23 A.      That's what it says, yes.
24 Q.      Are you able to add those up today,
25 sitting here?  I know it's been long.

Page 310

1 A.      Yes.  Hold on.  Yes.  14.77.
2 Q.      Okay.  14.77.  And what is the date of
3 this letter?
4 A.      October 3rd, 2017.
5 Q.      Okay.  I want to take you back to your
6 report.  So the period of October 3rd, 2017 would
7 fall within this second period of your chart, right?
8 A.      That's correct.
9 Q.      Okay.  And for that, calculating for wages
10 and benefits, what is the total hourly rate that you
11 identify for janitor?
12 A.      14.81.
13 Q.      Okay.  So is that number higher or lower
14 than the amount they were actually paid in this?
15 A.      I don't know if that's what they were
16 actually paid.  It's what they were offered, but it
17 is higher when you combine the two.
18 Q.      Okay.  And what is the difference between
19 the number in your estimate and the number in this
20 2017 letter, which is marked as Exhibit 207?
21 A.      Four cents.
22 Q.      Four cents?
23 A.      Yes.
24 Q.      Okay.  So assuming that someone was
25 actually paid the amount expressed in this

Page 311

1 October 3rd, 2017 letter, your estimate would only
2 vary by 4 cents an hour?
3        MR. CHAREST:  Form.
4        THE WITNESS:  That's correct.
5        MS. SCHEFFEY:  Q.  If you were to be given
6 a different input that was more reliable than the
7 one you used, would your calculation still be able
8 to be applied to that new input?
9        MR. CHAREST:  Form.
10        THE WITNESS:  I don't understand your
11 question.
12        MS. SCHEFFEY:  Q.  Yeah.  So let's say the
13 Court were to find that the SCA rate for 2018 should
14 apply to every year, for example.  Would you still
15 be able to execute your calculations using the wage
16 rates, the benefit rates, and come to a total hourly
17 rate?
18        MR. CHAREST:  Form.
19        THE WITNESS:  I am still not 100% sure I
20 understand, but this is -- this is an Excel schedule
21 essentially, so I certainly could change any of the
22 calculations using any other rates, if that's what
23 you're asking.
24        MS. SCHEFFEY:  Q.  And if there was a new
25 rate, would you have to change your methodology for

Page 312

1 assessing the pay rates that detainees could have
2 obtained?
3 A.      It's not a different methodology per se.
4 I guess I'm still struggling with the question.  I'm
5 sorry.  It's not a different methodology.  It just
6 would be updating their rates assumed that they
7 would be paid by GEO.
8 Q.      Did you use an equation to reach your
9 conclusions?
10        MR. CHAREST:  Form.
11        THE WITNESS:  Yes.
12        MS. SCHEFFEY:  Q.  Would you have to
13 change that equation if an input changed?
14 A.      No.
15 Q.      I'll stop sharing real quick.  So if you
16 go to the amended Nickerson report, which is
17 Exhibit 210.
18 A.      Okay.
19 Q.      If you can turn to page 4 of 12, which is
20 Bates ending in 1996.
21 A.      Okay.
22 Q.      Okay.  So here, this -- there was some
23 confusion earlier about whether this amended report
24 relied upon the 1.72 number.  Do you remember that?
25 A.      Yes.

Page 313

1  Q.     So if you'll see here about -- in the last
2  paragraph on page 4, about midway through, it says,
3  "The table estimates a total of 470 detainee workers
4  at the Northwest Detention Center facility every
5  day." Do you see that sentence?
6  A.     Yes.
7  Q.     If you read that sentence and the sentence
8  after it, can you tell me if it's your impression,
9  sitting here today, that Mr. Nickerson used the
10 1.72-hour number in his amended report?
11        MR. CHAREST: Form.
12        THE WITNESS: Well, the 810 is -- it's a
13 comparison of 470 detainees to 810 hours a day. So
14 that, sure, it multiplies out to 1.72 hours per
15 detainee.
16        MS. SCHEFFEY: Q. And what does the next
17 sentence following footnote 12 state? Can you read
18 it into the record?
19 A.     "It is my understanding that the estimated
20 hours for each work category included in this table
21 are based on observations by detention officers on
22 how long each job takes on the average and are not
23 estimates provided by detainees who perform the work
24 themselves."
25 Q.     And does that clear up your understanding

Page 314

1 don't recall any other mathematical errors.
2        MS. SCHEFFEY: Q. Is it your
3 understanding that Mr. Bland updated his report
4 subsequently to be more consistent with your
5 criticisms?
6 A.     Yes.
7        MR. CHAREST: Form.
8        MS. SCHEFFEY: Q. Have you taken any
9 position about whether the one point -- or 1.72
10 number that was used in the Nickerson report is a
11 more accurate number than the one used in the Bland
12 report?
13 A.     I specifically did not take a position.
14        MS. SCHEFFEY: Thank you. No further
15 questions.
16        FURTHER EXAMINATION BY MR. CHAREST
17        MR. CHAREST: Q. So when you looked at
18 Exhibit 207 and found the one price that was
19 consistent with your report, does that change your
20 observation of the other prices, the rates that were
21 not consistent with your report?
22 A.     I don't know. I would have to look back
23 and do the comparison.
24 Q.     The comparison being they were paying
25 janitors more than $11 an hour during the time you

Page 316

1 at all about any of Dan's prior questions?
2        MR. CHAREST: Form. Which question?
3        MS. SCHEFFEY: I said "prior questions."
4        MR. CHAREST: All of them?
5        MS. SCHEFFEY: Yes.
6        THE WITNESS: It's Mr. Nickerson's
7 understanding of the source of hours per job in
8 Exhibit 20.
9        MS. SCHEFFEY: Q. Okay. And then just a
10 few more questions. So in terms of your assessment
11 of this report, did you look at Mr. Childers' and
12 Mr. Bland's reports with the goal of reaching
13 different conclusions?
14 A.     I did not. I did not have an assignment
15 to express an overall opinion of damages.
16 Q.     Okay. What did you do?
17 A.     I reviewed the reports and analyzed the
18 support, checked the math, pointed out areas that I
19 thought the support was weak or the math was
20 incorrect.
21 Q.     And did you find mathematical errors in
22 Mr. Bland's report?
23        MR. CHAREST: Form.
24        THE WITNESS: As I said before, if you
25 consider the failure to deduct actual, then yes. I

Page 315

1 say they were getting paid $11 an hour. Do you
2 remember that?
3        MS. SCHEFFEY: Object to form.
4        THE WITNESS: Unfortunately, I don't
5 remember because it's been a long day, so I don't
6 remember the quantitative comparisons from several
7 hours ago.
8        MR. CHAREST: Q. Okay. The fact that you
9 found one consistent document doesn't change the
10 other documents that are inconsistent with your
11 report, right?
12 A.     I -- not necessarily. I don't know. I'd
13 have to go back and look at them.
14 Q.     Do you want to? Okay. Exhibit 207. You
15 there?
16 A.     Yes.
17 Q.     The first one is $11 an hour, which is
18 consistent with your report, correct?
19 A.     Yes.
20 Q.     The next one is 14.04. The next one after
21 that is 14.04, neither one of which are consistent
22 with your report, correct?
23        MS. SCHEFFEY: Object to form.
24        THE WITNESS: This letter doesn't specify
25 the benefit rate. The base hourly rate is -- from

Page 317

80 (Pages 314 - 317)

1  what I recall, it's higher.
2          MR. CHAREST:  Right.  Pass the witness.
3          MS. SCHEFFEY:  We're done.  Thank you so
4  much.
5          MR. CHAREST:  You're free.  We're off the
6  record.
7          THE VIDEOGRAPHER:  One moment.  This marks
8  the end of the video-recorded deposition of Serena
9  Morones.  We're going off the record at 5:39 p.m.
10         THE REPORTER:  Ms. Scheffey, did you need
11 a copy?
12         MS. SCHEFFEY:  Yes, please.
13         (Whereupon the deposition concluded at
14         5:40 p.m.)
15
16              ---oOo---
17
18
19
20
21
22
23
24
25
                                              Page 318

1              CERTIFICATE OF REPORTER
2
3          I, Natalie Y. Botelho, a Certified
4  Shorthand Reporter, hereby certify that the witness
5  in the foregoing deposition was by me duly sworn to
6  tell the truth, the whole truth, and nothing but the
7  truth in the within-entitled.
8          The said deposition was taken down in
9  shorthand by me, a disinterested person, at the time
10 and place therein stated, and that the testimony of
11 said witness was thereafter reduced to typewriting,
12 by computer, under my direction and supervision;
13         That before completion of the deposition,
14 review of the transcript [ ] was|[X] was not
15 requested.  If requested, any changes made by the
16 deponent (and provided to the reporter) during the
17 period allowed are appended hereto.
18         I further certify that I am not of counsel
19 or attorney for either or any of the parties to the
20 said deposition, nor in any way interested in the
21 event of this cause, and that I am not related to
22 any of the parties thereto.
23         DATED: September 29, 2020
24
                 _Natalie Y. Botelho_
25         Natalie Y. Botelho, CSR No. 9897
                                              Page 319

Veritext Legal Solutions
800-336-4000

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.