Daniel H. Charest (admitted *pro hac vice*)
dcharest@burnscharest.com
TX Bar # 24057803
**BURNS CHAREST LLP**
900 Jackson St., Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002

Class Counsel
***Additional Counsel on Signature Page***

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### EASTERN DIVISION

| | |
|---|---|
| **RAUL NOVOA, JAIME CAMPOS FUENTES, ABDIAZIZ KARIM**, and **RAMON MANCIA**, individually and on behalf of all others similarly situated, | Civil Action No. 5:17-cv-02514-JGB-SHKx |
| *Plaintiffs*, | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| **THE GEO GROUP, INC.**, | |
| *Defendant*. | Hearing Date: February 1, 2021<br>Time: 9 a.m. PT<br>Courtroom: 1<br>Judge Hon. Jesus G. Bernal |

i

# TABLE OF CONTENTS

I.     INTRODUCTION.................................................................................1

II.    FACTUAL BACKGROUND ............................................................3

       A.    GEO is a For-Profit REIT with a Fiduciary Duty to
             Shareholders to Deliver Profits.................................................3

       B.    GEO's Contracting Practices......................................................3

       C.    GEO's Use of Detained Immigrant Labor Must Meet or
             Exceed the Minimum Standards Set Forth by ICE in
             PBNDS § 5.8....................................................................................4

       D.    GEO's Operation of the Adelanto ICE Processing Center.............6

             1.    The Voluntary Work Program.........................................7

             2.    The Uncompensated Work Program..............................8

             3.    The Adelanto Housing Unit Sanitation Policy............8

III.   LEGAL STANDARD........................................................................9

IV.    GEO IS LIABLE TO THE ADELANTO WAGE CLASS..........................9

       A.    GEO is an "Employer" Under the California Minimum
             Wage Law and the Class Members are its "Employees"..............10

       B.    GEO's Failure to Pay Lawful Wages Constitutes an
             Unlawful Business Practice under the UCL...........................13

       C.    GEO Unjustly Enriches Itself by Shortchanging its
             Detained Workforce...................................................................14

V.     GEO'S AFFIRMATIVE DEFENSES SHOULD BE
       DISMISSED...................................................................................15

       A.    GEO is Not Entitled to Derivative Sovereign Immunity.............15

             1.    GEO did not perform as ICE directed...................17

             2.    ICE cannot validly confer GEO authorization to
                   violate California's Minimum Wage Law...............18

       B.    GEO is Not Entitled to Intergovernmental Immunity..............20

ii

1.      The California Minimum Wage Law does not directly regulate the federal government..............................................20

2.      The California Minimum Wage Law does not discriminate against the federal government............................23

C.     Each of GEO's Remaining Affirmative Defenses Fail.....................24

VI.    GEO'S CONDITIONAL COUNTERCLAIM FOR DECLARATORY RELIEF SHOULD BE DISMISSED..........................27

V.     CONCLUSION................................................................................28

# TABLE OF AUTHORITIES

## Cases

*Aleksick v. 7-Eleven, Inc.*,
  205 Cal. App. 4th 1176 (2012) ................................................................. 13

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................... 9

*Barrientos v. CoreCivic, Inc.*,
  951 F.3d 1269 (11th Cir. 2020) ................................................................ 5

*Boone v. MountainMade Found.*,
  684 F. Supp. 2d 1 (D.D.C. 2010) ............................................................ 28

*Brinker Rest. Corp. v. Superior Court*,
  53 Cal. 4th 1004 (2012) ........................................................................... 10

*California v. Trump*,
  379 F. Supp. 3d 928 (N.D. Cal. 2019) .................................................... 20

*Campbell-Ewald Co. v. Gomez*,
  136 S. Ct. 663 (2016) ................................................................. 2, 15, 16

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................... 9

*Chen v. GEO Grp., Inc.*,
  287 F. Supp. 3d 1158 (W.D. Wash. 2017) ............................................. 19

*Confederated Tribes & Bands of the Yakama Indian Nation v. Gregoire*,
  658 F.3d 1078 (9th Cir. 2011) ................................................................. 20

*Cortez v. Purolator Air Filtration Prod. Co.*, 23 Cal. 4th 163, 177 (2000) .......................... 14

*Cty. of San Bernardino v. Walsh*,
  158 Cal. App. 4th 533 (2007) ................................................................. 15

*Daily v. Federal Ins. Co.*,
  2005 WL 14734 (N.D. Cal. Jan. 3, 2005) .............................................. 28

*Dep't of Employment v. United States*,
  385 U.S. 355 (1966) ................................................................................. 21

*Dombrowski v. Pfister*,
  380 U.S. 479 (1965) ................................................................................. 27

iv

*Dynamex Operations W. v. Superior Court*,
    4 Cal. 5th 903 (2018) ............................................................................. 11

*Fasano v. Fed. Reserve Bank of New York*,
    457 F.3d 274 (3d Cir. 2006).................................................................. 22

*Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*,
    314 U.S. 95 (1941) .........................................................................21, 22

*Gratke v. Andersen Windows, Inc.*,
    2010 WL 5439763 (D. Minn. 2010) ..................................................... 28

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ............................................................................. 27

*In re Facebook, Inc. Internet Tracking Litig.*,
    956 F.3d 589 (9th Cir. 2020) ............................................................... 15

*In re KBR, Inc., Burn Pit Litig.*,
    744 F.3d 326 (4th Cir. 2014) ............................................................... 17

*James v. Dravo Contracting Co.*,
    302 U.S. 134 (1937) ............................................................................. 21

*Kasky v. Nike, Inc.*,
    27 Cal. 4th 939 (2002) ......................................................................... 13

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) ....................................................................... 14

*Martinez v. Combs*,
    49 Cal. 4th 35 (2010) .................................................................. passim

*Medmarc Cas. Ins. Co. v. Pineiro & Byrd PLLC*,
    783 F. Supp. 2d 1214 (S.D. Fla. 2011).................................................. 28

*Menocal v. GEO Grp., Inc.*,
    113 F. Supp. 3d 1125 (D. Colo. 2015)................................................... 17

*Mille Lacs Band of Chippewa Indians v. State of Minnesota*,
    152 F.R.D. 580 (D. Minn. 1993) .......................................................... 28

*Munoz v. Atl. Express of L.A., Inc.*,
    2012 WL 5349408 (C.D. Cal. Oct. 30, 2012) ....................................... 10

*Myers v. United States,*
   323 F.2d 580 (9th Cir. 1963) ................................................................16, 17

*Nisei Farmers League v. Labor & Workforce Dev. Agency,*
   30 Cal. App. 5th 997 (2019) ................................................................ 27

*North Dakota v. United States,*
   495 U.S. 423 (1990) ................................................................20, 24

*Nwauzor v. GEO Grp., Inc.,*
   2020 WL 1689728 (W.D. Wash. Apr. 7, 2020) ........................................ 17

*Osborne v. Ohio,*
   495 U.S. 103 (1990) ................................................................ 27

*People v. Brown,*
   14 Cal. App. 5th 320 (2017) ................................................................ 27

*Peterson v. Cellco P'ship,*
   164 Cal. App. 4th 1583 (2008) ................................................................ 14

*Pinnacle Fitness & Rec. Mgmt., Ltd. Liab. Co. v. Jerry & Vickie Moyes Family
Tr.,*
   844 F. Supp. 2d 1078 (S.D. Cal. 2012) ................................................................ 9

*Ramah Navajo Chapter v. Salazar,*
   644 F.3d 1054 (10th Cir. 2011) ................................................................ 19

*Rayman v. Peoples Sav. Corp.,*
   735 F. Supp. 842 (N.D. Ill. 1990) ................................................................ 28

*Rhodeman v. Ocwen Loan Servicing, LLC,*
   2020 WL 1698709 (C.D. Cal. Apr. 3, 2020) ................................................................ 4

*Ridgeway v. Wal-Mart Stores, Inc.,* 2017 WL 363214 (N.D. Cal. 2017)............................ 14

*Rust v. Johnson,*
   597 F.2d 174 (1979) ................................................................ 21

*Salim v. Mitchell,*
   268 F. Supp. 3d 1132 (E.D. Wash. 2017) ................................................................ 17

*Sullivan v. Oracle Corp.,* 51 Cal. 4th 1191 (2011) ................................................................ 14

*Tae Youn Shim v. Lawler,*
   2019 WL 2996443 (N.D. Cal. July 9, 2019) ................................................................ 14

vi

*Tenneco Inc. v. Saxony Bar & Tube, Inc.*,
  776 F.2d 1375 (7th Cir. 1985) ................................................................... 28

*The Geo Group, Inc., v. Newsom, et al.*,
  No. 19-CV-2491 JLS (WVG), 2020 WL 5968759 (S.D. Cal. Oct. 8,
  2020) ........................................................................................................... 23

*U.S. Dep't of Navy v. Fed. Labor Relations Auth.*,
  665 F.3d 1339 (D.C. Cir. 2012) ................................................................ 18

*United States v. Boyd*,
  378 U.S. 39 (1964) ........................................................................... 20, 21, 22

*United States v. California*,
  921 F.3d 865 (9th Cir. 2019) ......................................................... 23, 24, 25

*United States v. Calimlim*,
  538 F.3d 706 (7th Cir. 2008) ..................................................................... 27

*United States v. Hollingshead*,
  672 F.2d 751 (9th Cir. 1982) ............................................................... 21, 22

*United States v. Muskegon Twp.*,
  355 U.S. 484 (1958) .................................................................................... 22

*United States v. Paul*,
  885 F.3d 1099 (8th Cir. 2018) ................................................................... 27

*United States v. State of Mich.*,
  851 F.2d 803 (6th Cir. 1988) ..................................................................... 21

*Washington v. United States*,
  460 U.S. 536 (1983) .................................................................................... 23

*Yearsley v. W.A. Ross Construction Co.*,
  309 U.S. 18 (1940) ............................................................................. passim

**Statutes**

Cal. Lab. Code § 1171 ...................................................................................... 10

Cal. Lab. Code § 1194 ...................................................................................... 10

**Other Authorities**

GAO, Principles of Federal Appropriations Law, 4th ed., 2016 rev., ch. 2,
§ B.4.d ............................................................................................................ 19

Kathleen Kim, *The Thirteenth Amendment and Human Trafficking: Lessons &*
*Limitations*, 36 GA. ST. U. L. REV. 1005, 1014 (2020) .................................. 27

**<u>Rules</u>**

Cal. Code. Regs., tit. 8 § 11050 ......................................................................... 10

**<u>Constitutional Provisions</u>**

U.S. Const. art. I, § 9, cl. 7 ............................................................................... 18

# I.      INTRODUCTION

Plaintiffs request entry of summary judgment (a) finding Defendant The GEO Group, Inc. ("GEO") liable on Counts I, II, and III of the Third Amended Complaint (Dkt. 184); (b) rejecting each of GEO's affirmative defenses; and (c) dismissing GEO's conditional counterclaim for declaratory relief.

Undisputed facts support Plaintiffs' requested relief. GEO is a private, for-profit real estate investment trust ("REIT") with a fiduciary duty to deliver maximum profits to its shareholders. In pursuit of those profits, GEO sells detention services to federal, state, municipal, and foreign governments. Relevant to this action, GEO contracts with the federal government to house and care for detained immigrants at facilities across the country, including the Adelanto ICE Processing Center ("Adelanto").

GEO is contractually required to perform to pre-established standards in its provision of services at Adelanto. However, GEO has complete discretion to decide how to perform its government contracts on a day-to-day basis. GEO made two business decisions relevant to the motion before the Court. First, GEO chose to hire detained immigrants by the hundreds to perform essential tasks at Adelanto. Second, GEO chose to pay its detained workforce at Adelanto only $1 per day for their labor, or nothing at all.

The Adelanto Wage Class members are entitled to summary judgment on liability as to all three of their claims against GEO. First, there is no genuine dispute that an employment relationship exists between GEO and its detained workforce as a matter of law, because GEO exercises absolute control over every aspect of detained immigrant labor at Adelanto and has failed to stop the exploitation of that labor, even though it could. *See Martinez v. Combs*, 49 Cal. 4th 35 (2010), *as modified* (June 9, 2010). Indeed, GEO admits that it could pay its detained immigrant workers more than $1 per day— as it does at several other facilities in its ICE portfolio—but it chooses not to do so at Adelanto. There is similarly no dispute that GEO chooses to pay some detained

1

immigrant workers nothing at all for their labor. By shortchanging its detained workforce, GEO has violated both the California Minimum Wage Law and the California Unfair Competition Law. And, on the undisputed record, Adelanto Wage Class members are entitled to summary judgment on liability as to both claims.

Second, the Adelanto Wage Class members are entitled to summary judgment as to GEO's liability on their claim of unjust enrichment. GEO's business decision to limit detained immigrant pay at Adelanto to $1 per day—the amount ICE will reimburse the company for such labor—or nothing at all has provided GEO a significant monetary benefit at Plaintiffs' expense.

Third, all Plaintiffs are entitled to summary judgment dismissal of every GEO affirmative defense, as well as the company's conditional counterclaim for declaratory relief. Because the corporate policies at issue are not "directed by the Government," *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 673 (2016) (quoting *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 20 (1940)), as required for a contractor to share in the government's immunity, GEO is not shielded by derivative sovereign immunity. And GEO is not entitled to intergovernmental immunity because it is a not a federal instrumentality, and because the California Minimum Wage Law is a neutral law of general application neither directly regulates nor discriminates against the federal government. GEO's affirmative defenses also lack merit; indeed, the Court has already considered and rejected most as a matter of law. *See e.g.* Dkt. 44 at 4-8 (preemption); Dkt. 61 at 9-10 (vagueness); Dkt. 223 at 12-13 (standing); Dkt. 223 at 21 (statute of limitations).

Plaintiffs thus seek summary judgment as to liability on Counts I, II, and III of the Third Amended Complaint (Dkt. 184), as to each of GEO's affirmative defenses, and as to GEO's conditional counterclaim for declaratory relief.

## II.   FACTUAL BACKGROUND

### A. GEO is a For-Profit REIT with a Fiduciary Duty to Shareholders to Deliver Profits.

GEO is a multinational, for-profit business that contracts with municipal, state, federal, and foreign governments to provide privately-run correctional, detention, and community reentry services. Statement of Undisputed Facts ("SUF") 1-2. GEO's revenues in 2016, 2017, and 2018 were over $2 billion. SUF 3. Its stock is traded under the symbol "GEO" on the New York Stock Exchange. SUF 4. As a publicly-traded REIT, GEO has a fiduciary duty to its shareholders to maximize profits. SUF 5-6.

GEO's commercial activities in the United States include the operation of more than a dozen civil immigration detention facilities in the United States (collectively, the "Facilities") pursuant to performance-based contracts with the U.S. Immigration and Customs Enforcement agency ("ICE"). SUF 7. Under these contracts, GEO provides detention services and bed space to individuals awaiting adjudication of their civil immigration cases. SUF 8; *see also* Dkt. 236-1 at 9.

### B. GEO's Contracting Practices.

To bid for an ICE contract, GEO calculates a per diem or bed-day rate that includes all costs to perform under the contract—including as personnel, food, health care, supplies, utilities, maintenance, infrastructure, depreciation, cost of capital and overhead—as well as GEO's desired profit margin, which is up to 15% of the total cost. SUF 9-10. The staffing plan is the most important component of GEO's pricing model because the costs associated with the overall staffing of a facility constitute approximately 65% or more of total operating costs. SUF 11. A facility staffing plan contains every position GEO intends to employ or retain for the operation of the facility and includes calculations of the hourly or annual wages, payroll tax, and benefit costs for each position. SUF 12. These calculations and considerations can and will affect the overall cost calculation associated with a facility's labor costs. SUF 13. GEO includes

detained immigrant payroll in its per diem calculation at the rate of $1 per day, which is the amount ICE will pay. SUF 14-15.

The winner of almost every federal procurement competition for detention contracting is the lowest bidder, unless that bidder has an unsatisfactory performance record. SUF 16. GEO lowered its per diem rate to increase its competitive advantage by reducing its staffing and labor costs. SUF 17.

The per diem rates and staffing plans contained in GEO's proposal or bid are incorporated into the final contract and cannot be changed absent subsequent negotiations and contract modifications approved by ICE. SUF 18-20. As a result, GEO bears the risk of any increased costs of operating the facility beyond what GEO budgets under the contract. SUF 21-23. This risk is to GEO's profit: for it to achieve the 15% profit it anticipates on a contract, GEO must maintain its operating costs at the established per diem rate. *Id.*

GEO's labor expenses at Adelanto would increase substantially if the company did not use detained immigrants to clean and maintain the facility. SUF 24-26. GEO concedes that "[i]f detainees choose not to work, GEO staff will complete any work that would have otherwise been performed by a detainee," sometimes incurring overtime costs. Dkt. 205 at 17. As this Court has explained, limiting detained worker pay to $1 per day—the amount ICE will reimburse the company—means "that GEO does not ultimately pay at all for detainee work that must otherwise be completed by GEO staff." Dkt. 223 at 8, n.7; *see also* SUF 24-26.[1]

**C. GEO's Use of Detained Immigrant Labor Must Meet or Exceed the Minimum Standards Set Forth by ICE in PBNDS § 5.8.**

GEO must comply with the 2011 PBNDS at every civil immigration detention facility the company operates in the United States, including Adelanto. SUF 27. As this

---

[1] Plaintiffs request that the Court apply the law of the case doctrine with regard to its prior findings and rulings in this matter. *See Rhodeman v. Ocwen Loan Servicing, LLC*, 2020 WL 1698709, at *3 (C.D. Cal. Apr. 3, 2020) (discussing and applying the doctrine).

Court has explained, the PBNDS establish minimum standards which GEO must meet or exceed:

> GEO is required to comply with ICE's [PBNDS] which set out "expected outcomes" and "minimum requirements" for the management of contract facilities like Adelanto. These outcomes and requirements touch on nearly all aspects of operating an immigration detention facility, including arrangements for detainee labor within the facility. GEO has either companywide or facility-specific policies that must meet or exceed the minimum standards in the PBNDS, and which apply across the company or facility.

Dkt. 268 at 3; Dkt. 223 at 3-4; *see also* SUF 28. GEO must comply with the PBNDS, even where the PBNDS conflict with other detention standards. SUF 29.

ICE requires GEO to operate a Voluntary Work Program ("VWP") that complies with PBNDS § 5.8. Dkt. 223 at 3; *see also* SUF 30. However, detained immigrants "shall not be required to work, except to do personal housekeeping." SUF 31-32. As this Court and others have observed, tasks beyond "required personal housekeeping" or outside the "immediate living area" of each detained immigrant must follow the PBNDS requirements for voluntary work. Dkt. 223 at 4; *see also Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1272 (11th Cir. 2020) ("Beyond these basic required tasks, detainees shall not be required to work, and all other work assignments are voluntary.").

With respect to "voluntary work," the PBNDS direct GEO to develop "site-specific rules" for voluntary work assignments and worker selection. SUF 33-34; *see also* Dkt. 223 at 4. These rules "shall be recorded in a facility procedure that shall include a voluntary work program agreement" which "document[s] the facility's program." SUF 33.

The PBNDS also require GEO to establish a "standard policy" for compensating detained workers. SUF 34. In 2008, ICE purported to set VWP compensation at $1 per day. SUF 35. In 2011, ICE changed the PBNDS to state that "[t]he compensation is **at least** $1.00 (USD) per day." (emphasis added). SUF 34; *see also* Dkt. 223 at 4 ("The volunteers must receive 'at least' $1.00 per day."). While ICE does not prohibit contractors from paying detainee workers more than $1 per day, the agency will only

reimburse at that rate. SUF 15; 36-37; 74-75. Thus, GEO could pay detained workers higher wages, but the company would have to bear the costs of doing so. *Id.*

### D. GEO's Operation of the Adelanto ICE Processing Center.

In May 2011, ICE entered into an Intergovernmental Service Agreement ("IGSA") with the City of Adelanto (the "City") for the operation of Adelanto pursuant to its authority under 8 U.S.C. §§ 1103(a)(11) and 1231(g). SUF 38. The City, in turn, contracted with GEO to fulfill its obligations under the IGSA. SUF 39. GEO undertook, without limitation, the City's responsibilities and obligations as set forth in the IGSA. SUF 40.

On March 27, 2019, the City informed ICE and GEO that it would terminate the IGSA effective June 2019. SUF 41. On June 25, 2019, GEO entered into a temporary contract (the "Bridge Contract") with ICE to continue operating Adelanto. SUF 42. And on December 19, 2019, GEO entered into a new contract (the "Direct Contract") with ICE to continue running Adelanto until December 19, 2034. SUF 43.

Each of these contracts—the IGSA, the Bridge Contract, and the Direct Contract—are fixed-price, performance-based contracts, which do not designate *how* GEO is to perform the work, but rather establishes the expected outcomes and results that the government expects. SUF 44-47. The contracts do not reserve to ICE **any** direct control of any part of the contracted work. SUF 46. GEO agreed to carry out each contract in accordance with "all applicable laws and regulations." SUF 48.

GEO developed three labor programs at Adelanto: the VWP, the Uncompensated Work Program ("UWP") and the Housing Unit Sanitation Policy ("HUSP"). Each program violates the California Minimum Wage Law, the California Unfair Competition Law, and the common law of unjust enrichment. Each program violates the "applicable laws and regulations" requirement of GEO's contract.

1.  **The Voluntary Work Program.**

GEO developed and implemented "site-specific rules" and "a facility procedure" concerning the operation of the VWP at Adelanto. *See generally* SUF 49-75; *see also* Dkt. 223 at 4. According to GEO's Work Program Policy, "[p]hysically and mentally able detainees are gainfully employed while contributing to the orderly operation of the facility." SUF 50. GEO developed and operates the Adelanto VWP based on the needs of the facility and the availability of detained immigrant labor there. SUF 51.

GEO exercises absolute control over every aspect of detained labor at Adelanto (*see generally* SUF 52-75):

- GEO notifies detained immigrants about its Work Program Policy via the Adelanto Supplemental Detainee Handbook, which outlines GEO's rules, regulations, policies, and procedures concerning detained immigrant work. SUF 53.
- GEO creates work details and maintains job descriptions for each VWP position. SUF 54-56.
- GEO solicits, collects, reviews, and evaluates Work Detail Applications and determine what job, if any, a new hire will perform. SUF 57-59.
- GEO assigns detained workers to shifts and sets their work schedules. SUF 60-61.
- GEO provides its detained workforce with all equipment, tools, supplies, and uniforms necessary to complete their jobs. SUF 62-63.
- GEO provides detained workers with all training, instructions, and supervision necessary to complete their jobs. SUF 64-66.
- GEO evaluates detained worker job performance and decides whether to suspend or terminate workers for cause. SUF 67-70.

GEO also developed a "standard policy" at Adelanto for compensating detained workers, including a roster system to record their work hours and ensure they receive

pay they earn. SUF 71-73. GEO pays detained workers in the VWP $1 per day for their labor, which is all ICE will reimburse the company for detained worker payroll. SUF 74. GEO admits that it **could** pay its detained workers higher wages out of the corporate coffers—as it does at several other facilities in its ICE portfolio—but it chooses not to do so at Adelanto. SUF 15; 36-37; 74-75.

### 2. The Uncompensated Work Program.

Despite ICE's requirement in PBNDS § 5.8.V.K that detained workers must receive "at least $1.00 (USD)" for their labor, GEO assigns Adelanto detained immigrants to work VWP shifts for no compensation at all. SUF 34; 76-80; *see also* Dkt. 223 at 5 (describing GEO's Uncompensated Work Program Policy). Although GEO's Work Detail Application states—falsely—that only 40 "paid positions" are available at Adelanto, the company requires and utilizes hundreds of detained workers per day to feed, clean, maintain, and operate the facility. SUF 77-78. In all aspects other than compensation, GEO's control over detained immigrant labor in the Uncompensated Work Program ("UWP") is identical to GEO's control of detained labor in the VWP. SUF 79. Though it does not pay them, GEO even tracks unpaid detained workers using the same payroll rosters it uses to track paid workers. SUF 80; *see also* Dkt. 223 at 5. GEO pays VWP workers for their labor, but not UWP workers. SUF 76.

### 3. The Adelanto Housing Unit Sanitation Policy.

At Adelanto, GEO subjects detained immigrants to compulsory manual labor outside their immediate living areas without compensation. *See generally* SUF 81-84; *see also* Dkt. 223 at 5-6 (observing that GEO's HUSP at Adelanto expands the area of responsibility to "all commonly accessible areas of the unit" including "microwaves, tables, and chairs," and notes "each and every detainee must participate" in a "total sanitation mission."). Detained immigrants are not compensated for this labor. *Id.* Detained immigrants who refuse to participate in the Adelanto HUSP are subject to "any combination" of a range of sanctions, which a GEO officer may recommend based

upon his or her discretion. SUF 82-84. Those penalties include the initiation of criminal proceedings, disciplinary transfer to another facility or housing area, disciplinary segregation (i.e. solitary confinement) for up to 72 hours, loss of privileges, removal from the VWP, impoundment of personal property, and restriction to the housing unit. *Id.*

## III.   LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). This Court may grant partial summary judgment on any claim or defense—"or the part of each claim or defense"—on which summary judgment is sought. *Id*; *see also Pinnacle Fitness & Rec. Mgmt., Ltd. Liab. Co. v. Jerry & Vickie Moyes Family Tr.*, 844 F. Supp. 2d 1078, 1093 (S.D. Cal. 2012). The moving party has the initial burden of identifying the elements of the claim or defense for which it believes there exists absence of an issue of dubitable material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party has sustained its burden, the non-moving party must then make an affirmative showing that there is a genuine issue of material fact on all matters placed at issue by the motion as to which it bears the burden of proof. *Id.* at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The burden on GEO in defending against summary judgment is not a light one; a genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## IV.   GEO IS LIABLE TO THE ADELANTO WAGE CLASS.

The Adelanto Wage Class brings claims under the California Minimum Wage Law, the California Unfair Competition Law, and the California common law of unjust enrichment. GEO admits all facts material to liability for all three claims. Accordingly, the Court should enter partial summary judgment as to liability on Counts I, II, and III of the Third Amended Complaint, leaving only the quantum of damages for

1    determination at trial.

2    **A. GEO is an "Employer" Under the California Minimum Wage Law and the**

3    **Class Members are its "Employees."**

4    Employees in California "have a non-waivable, non-negotiable right to

5    compensation for all hours worked." *Munoz v. Atl. Express of L.A., Inc.*, 2012 WL

6    5349408, at *4 (C.D. Cal. Oct. 30, 2012) (citing Cal. Lab. Code § 1194(a)). Employees

7    enjoy this right "regardless of immigration status." Cal. Lab. Code § 1171.5. The

8    California Supreme Court has established that "the statutory provisions [of the

9    California Labor Code] are to be liberally construed with an eye to promoting such

10   protection." *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1026-27 (2012) (internal

11   quotation and citation omitted); *accord Murphy v. Kenneth Cole Prods., Inc.*, 40 Cal. 4th 1094,

12   1103 (2007) ("[S]tatutes governing conditions of employment are to be construed

13   broadly in favor of protecting employees.").

14   "[T]he essential predicate of each employer's obligation to pay a minimum wage"

15   is the issuance of an applicable Wage Order by the California Industrial Welfare

16   Commission ("IWC") fixing the minimum wage and providing the legal basis for an

17   action by the employee to recover unpaid minimum wages. *Martinez v. Combs*, 49 Cal. 4th

18   35, 56 (2010), *as modified* (June 9, 2010). This Court has already determined that Wage

19   Order 5 applies in this case. Dkt. 44 at 11 ("[T]he Court concludes Wage Order 5 applies

20   to Defendant."); *see also* Dkt. 223 at 10, 24 (*Martinez* supplies the applicable standard for

21   determining the existence of an employment relationship); Cal. Code. Regs., tit. 8

22   § 11050 (Wage Order 5).

23   In *Martinez*, the California Supreme Court held that the IWC's definition of "to

24   employ" includes three alternative definitions: "(a) to exercise control over the wages,

25   hours or working conditions, <u>or</u> (b) to suffer or permit to work, <u>or</u> (c) to engage, thereby

26   creating a common law employment relationship." 49 Cal. 4th at 64 (emphasis added).

27   Here, GEO satisfies **<u>both</u>** the "control" and "suffer or permit to work" tests articulated

28

by the California Supreme Court.

The first alternative definition of "to employ" under *Martinez*—the control test— "encompasses 'any person . . . who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person[.]'" Dkt. 223 at 10 (citing *Martinez*, 49 Cal. 4th at 71). The California Supreme Court has observed that "because the IWC's delegated authority has always been over wages, hours, and working conditions, it made sense to bring within the IWC's regulatory jurisdiction an entity that controls any one of these aspects of the employment relationship." *Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903, 937 (2018), *reh'g denied* (June 20, 2018) (citing *Martinez*, 49 Cal. 4th at 59).

Though GEO is only required to control either detained workers' wages, hours, <u>or</u> working conditions to satisfy the test, GEO in fact controls all three: (1) GEO decides what to pay its detained workforce; (2) GEO processes detained worker payroll and pays some detained workers by periodically depositing money into their commissary accounts; (3) GEO creates work details and determines how many detained immigrants work in each detail; (4) GEO controls when and where detained immigrants work; (5) GEO evaluates VWP job candidates and determines their suitability for a job; (6) GEO determines which job a detained immigrant will work; (7) GEO evaluates the work performance of the detained workers; (8) GEO provides all job training and instruction to detained workers; (9) GEO provides all safety equipment, tools, and uniforms necessary for detained workers to complete their job assignments; (10) GEO directs and supervises detained workers for the duration of their shifts; and (11) GEO controls the decision of whether to suspend, terminate, and reassign detained workers. *See* SUF 49-81. GEO's admissions render the "control" test satisfied as a matter of law. *Martinez*, 49 Cal. 4th at 70.

As to the second *Martinez* definition—the "suffer or permit to work" test—"the basis of liability is the defendant's knowledge of and <u>failure to prevent</u> the work from occurring." Dkt. 223 at 10 (citing *Martinez*, 49 Cal. 4th at 70). The California Supreme Court has explained that the "suffer or permit" definition, used in wage orders since 1916, has its roots in the language of early 20th century statutes prohibiting child labor. *Martinez*, 49 Cal. 4th at 69 ("Statutes so phrased were generally understood to impose liability on the proprietor of a business who knew child labor was occurring in the enterprise but failed to prevent it, despite the absence of a common law employment relationship."). This "historical meaning continues to be highly relevant today: A proprietor who knows that persons are working in his or her business without having been formally hired, or while being paid less than the minimum wage, clearly suffers or permits that work by failing to prevent it, while having the power to do so." *Id.* at 69. An employment relationship arises where a defendant fails "to prevent the unlawful condition" or "to perform the duty of seeing to it that the prohibited condition does not exist." *Id.* (citation omitted). And, that employment relationship "reache[s] irregular working arrangements the proprietor of a business might otherwise disavow with impunity." *Id.* at 58.

GEO admits all facts necessary to establish the company knows detained immigrants work at Adelanto for subminimum wages—or nothing at all—and fails to prevent that unlawful condition despite having the power to do so. *See Martinez*, 49 Cal. 4th at 69. Neither the 2011 PBNDS nor ICE impose a $1 cap on detained worker wages. SUF 34, 36-37; *see also* Dkt. 61 at 6; Dkt. 44 at 6 (explaining that Congress has abandoned direct appropriations for detained worker allowances under 8 U.S.C. § 1555(d)). And neither the 2011 PBNDS nor ICE permit GEO to withhold payment from detained workers. SUF 34; 76-80; *see also* Dkt. 223 at 4. The decision of how much to pay detained workers is squarely within GEO's discretion. SUF 15; 36-37; 74-75.  GEO admits it could pay higher wages at Adelanto; indeed, it does so at several other facilities in its

ICE portfolio. *Id.*; *see also* Dkt. 61 at 6 ("Even assuming that ICE contracted to reimburse GEO at a rate of $1 per day per detainee, such contract would not necessarily preclude GEO from paying detainees a higher rate."). GEO has the power to prevent the unlawful condition of wage theft. But, in violation of law, it chooses not to. *Martinez*, 49 Cal. 4th at 69.

Accordingly, the Adelanto Wage Class members are "employed by" GEO under **both** the "control" and "suffer or permit to work" tests established by the California Supreme Court in *Martinez*. Therefore, California labor law protects all members the Adelanto Wage Class. *See* Cal. Labor Code § 1194(a) ("Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorney's fees, and costs of suit."). On this record, the Adelanto Wage Class is entitled to summary judgment on liability as to their claim arising under the California Minimum Wage Law and Wage Order 5. *See Aleksick v. 7-Eleven, Inc.*, 205 Cal. App. 4th 1176, 1187 (2012) (if neither the evidence nor inferences are in conflict, then the question of whether an employment relationship exists is a question of law).

## B. GEO's Failure to Pay Lawful Wages Constitutes an Unlawful Business Practice under the UCL.

"California's unfair competition law (UCL) . . . defines 'unfair competition' to mean and include 'any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law (§ 17500 et seq.)].'" *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 949 (2002) (quoting Cal. Bus. & Prof. Code § 17200). "By defining unfair competition to include any 'unlawful . . . business act or practice', the UCL permits violations of other laws to be treated as unfair competition that is independently actionable." *Id.* (citations omitted).

The California Supreme Court has made clear that a violation of California Labor Code § 1194 constitutes an unlawful business act or practice under the UCL, and that payment of those wages is available as a restitutionary remedy. *See, e.g., Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1206 (2011); *Cortez v. Purolator Air Filtration Prod. Co.*, 23 Cal. 4th 163, 177 (2000) (an employer that has unlawfully withheld wages from an employee "has acquired the money . . . by means of an unlawful practice that constitutes unfair competition as defined by section 17200"). *See also Ridgeway v. Wal-Mart Stores, Inc.*, 2017 WL 363214, *2 (N.D. Cal. 2017) ("having previously found that [employer's] pay policies violate California minimum wage law, plaintiffs were entitled to summary judgment on their UCL claim").

No fact issues exist. And the law is clear: GEO violated the California Labor Code through its failure to pay its detained workers the legal minimum wage. Because GEO has engaged in unfair business practices in violation of the UCL, the Adelanto Wage Class members are entitled as a matter of law to a finding of liability on Count II of the TAC and to restitution of the amounts they have earned but have not been paid.[2]

## C. GEO Unjustly Enriches Itself by Shortchanging its Detained Workforce.

In California, "[t]he elements of an unjust enrichment claim are the receipt of a benefit and [the] unjust retention of the benefit at the expense of another." *Tae Youn Shim v. Lawler*, 2019 WL 2996443, at *20 (N.D. Cal. July 9, 2019), *appeal dismissed*, 2020 WL 529711 (9th Cir. Jan. 24, 2020) (citing *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1593 (2008)). This Court has explained that unjust enrichment is "a claim for restitution." Dkt. 223 at 24. California law recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a

---

[2] The UCL provides a restitution remedy which may be measured by the "profits unfairly obtained to the extent that these profits represent monies given to the defendant or benefits in which the plaintiff has an ownership interest." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1148 (2003); *see also Cortez v. Purolator Air Filtration Prod. Co.*, 23 Cal. 4th 163, 173 (2000) (holding that unlawfully withheld wages may be recovered as restitution in a UCL action).

14

corresponding loss:

> The emphasis is on the wrongdoer's enrichment, not the victim's loss. In particular, a person acting in conscious disregard of the rights of another should be required to disgorge all profit because disgorgement both benefits the injured parties and deters the perpetrator from committing the same unlawful actions again.

*Cty. of San Bernardino v. Walsh*, 158 Cal. App. 4th 533, 542 (2007) (citation omitted); *see also In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 600 (9th Cir. 2020) ("California law recognizes a legal interest in unjustly earned profits.").

The record proves that GEO obtained an economic benefit by paying detained workers $1 per day—or nothing at all—for their labor. SUF 24-26; *see also* Dkt. 223 at 8, n.7 (observing that the fact that ICE reimburses GEO for the $1 per day detained immigrant labor expense "shows only that GEO does not ultimately pay at all for detainee work that must otherwise be completed by GEO staff"). If GEO did not have the benefit of the free (or nearly free) labor provided by Adelanto Wage Class members, GEO would incur higher costs—and corresponding lower profits—on its existing fixed-price contracts with ICE. *See generally* SUF 9-26. The Court should enter summary judgment on Plaintiffs' unjust enrichment claim and require GEO to disgorge the benefit it has retained at the expense of the Adelanto Wage Class in an amount to be established at trial.

## V.   GEO'S AFFIRMATIVE DEFENSES SHOULD BE DISMISSED.

Plaintiffs are also entitled to summary judgment dismissal of every GEO affirmative defense. *See* Dkt. 200 at 30-31. Plaintiffs will address each, as none find support in the record or the law.

### A.   GEO is Not Entitled to Derivative Sovereign Immunity.

As GEO's second affirmative defense, the company contends that "Defendant has immunity from this lawsuit." *Id.* at 30. But the derivative sovereign immunity doctrine does not provide a free pass for government contractors to violate the law. *See Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016) (derivative sovereign immunity

1  "is not absolute" and will not attach where a contractor "violates both federal law and

2  the Government's explicit instructions"). It has long been recognized that derivative

3  sovereign immunity does not protect a contractor that is sued for actions that are "over

4  and beyond acts required to be performed by it under the contract." *Myers v. United States*,

5  323 F.2d 580, 583 (9th Cir. 1963). Derivative sovereign immunity is limited to cases in

6  which a contractor "had no discretion in the design process and completely followed

7  government specifications." *Cabalce v. Thomas Blanchard & Assocs., Inc.*, 797 F.3d 720, 732

8  (9th Cir. 2015). And that limitation precludes GEO's resort to the defense.

9      *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940), provides the seminal

10  framework of the derivative sovereign immunity test. In *Yearsley*, a contractor who had

11  been hired to build dikes along the Missouri River asserted it was immune from claims

12  that the construction had caused the erosion of local property. 309 U.S. at 19. In finding

13  for the contractor, the Supreme Court noted that the work which led to the erosion "was

14  all authorized and directed by the Government of the United States." *Id.* at 20. The Court

15  held that, if the authority to carry out the project was validly conferred, "there is no

16  liability on the part of the contractor for executing [the government's] will." *Id.* at 20-21.

17  The Court noted, however, that a government agent could be liable if the contractor

18  "exceeded [its] authority or . . . it was not validly conferred." *Id.* at 21.

19      The Supreme Court's most recent discussion of the doctrine came in *Campbell-*

20  *Ewald Co.*, where it held that a federal contractor was not automatically immune from

21  suit for violating the Telephone Consumer Protection Act for sending text messages to

22  nonconsenting recipients in furtherance of a United States Navy recruiting campaign.

23  136 S. Ct. at 672. After tracing the history of the doctrine, the Court reaffirmed that a

24  federal contractor cannot "share the Government's unqualified immunity" from liability

25  absent proof that both (1) the challenged actions were ones regarding which it had no

26  discretion and were carried out as the government directed and (2) the authority to carry

27  out the challenged action was validly conferred. *See id.*

28

GEO is not entitled to derivative sovereign immunity under either required *Yearsley* prong. GEO cannot show (1) that the federal government directed its illegal acts **or** (2) that any authority to carry out those acts was validly conferred. *Yearsley*, 309 U.S. at 20-21. Indeed, **every** federal court to have considered the issue has concluded that the PBNDS do not provide GEO with immunity it seeks. *See Menocal v. GEO Grp., Inc.*, 113 F. Supp. 3d 1125, 1135 (D. Colo. 2015) (ICE "does not prohibit [GEO] from paying detainees in excess of $1/day in order to comply with Colorado labor laws."); *Nwauzor v. GEO Grp., Inc.*, 2020 WL 1689728, at *9 (W.D. Wash. Apr. 7, 2020) (denying GEO derivative sovereign immunity because "GEO has, in the past, paid workers more than a $1 a day").

### 1. GEO did not perform as ICE directed.

GEO's derivative sovereign immunity defense fails because GEO took steps "over and beyond acts required to be performed by it under the contract." *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 345 (4th Cir. 2014) (quoting *Myers*, 323 F.2d at 583); *see also Yearsley*, 309 U.S. at 20 (governmental immunity applies only when a contractor's work is "authorized and directed" by the government); *Salim v. Mitchell*, 268 F. Supp. 3d 1132, 1150 (E.D. Wash. 2017) (where defendant could choose the government-approved interrogation technique to use, immunity defense failed).

ICE did not (and could not, as discussed below) set the $1 per day wage rate. The 2011 PBNDS purport to require that GEO compensate detained workers "at least" a dollar a day. SUF 34. But ICE leaves the decision of how much to pay above that amount to the discretion of GEO itself. SUF 15; 36-37; 74-75. GEO concedes it is not prohibited from paying higher wages at Adelanto, and that it does so at several other facilities in its ICE portfolio. *Id.*

GEO attempts to convert the "reimbursement" rate of $1 per day per worker that ICE agreed to pay GEO into a federal limitation that GEO must pay detained workers the same amount. But, as this Court has observed, "[e]ven assuming that ICE contracted

to reimburse GEO at a rate of $1 per day per detainee, such contract would not necessarily preclude GEO from paying detainees a higher rate." Dkt. 61 at 6.  Similarly, ICE did not direct GEO to permit detained immigrants to work in VWP details for no compensation at all. Instead, ICE <u>requires</u> GEO to pay for all detained immigrant labor. PBNDS § 5.8.V.K ("Detainees shall receive monetary compensation for work completed in accordance with the facility's standard policy.").

ICE did not authorize, direct, or mandate that GEO pay its detained workforce subminimum wages in violation of California labor law. Quite the opposite: ICE required GEO to comply with "all applicable laws and regulations" in its operation of Adelanto. GEO made its own choices from there. And GEO's choices are not shielded by derivative sovereign immunity.

## 2. ICE cannot validly confer GEO authorization to violate California's Minimum Wage Law.

GEO's derivative sovereign immunity defense independently fails under the second *Yearsley* element. Even if ICE authorized GEO to pay subminimum wages to detained workers, such authority would be invalidly conferred because only Congress may set the wage rate. But Congress has not done so since 1978, so no valid Congressional authorization exists that would allow ICE to set any rate of pay for detained immigrants—much less $1 per day in violation of the California Minimum Wage Law.

The Appropriations Clause of the Constitution grants Congress the exclusive authority to make appropriations and bars the government from spending money except "in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. "Congress's control over federal expenditures is absolute." *U.S. Dep't of Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) (internal quotation marks omitted). "[A]ll uses of appropriated funds must be affirmatively approved by Congress" because "the mere absence of a prohibition is not sufficient" to authorize a use of funds.

*Id.* An "appropriation cannot be inferred or made by implication." GAO, Principles of Federal Appropriations Law, 4th ed., 2016 rev., ch. 2, § B.4.d, at 2-23, GAO-16-464SP (Washington, D.C.: Mar. 2016) ("GAO Redbook").

ICE's sole source of statutory authority for the payment of allowances to detained immigrants for work performed, 8 U.S.C. § 1555(d), expressly reserves for Congress the power to set the rate of such payments. *See* § 18 U.S.C. 1555(d) (permitting "payment of allowances [to detained workers] . . . for work performed" but limiting any payments to "such rate as may be specified from time to time in the appropriation Act involved"). By conditioning the rate of pay for detained workers on the amount set "in the appropriation Act involved" and requiring that it be "specified from time to time," Congress withheld from ICE (then INS) the discretion to set the rate of pay and, instead, rendered the rate of pay contingent on the amount specified in each year's appropriation. *See Ramah Navajo Chapter v. Salazar*, 644 F.3d 1054, 1060 (10th Cir. 2011), *aff'd*, 567 U.S. 182 (2012) (language stating that, "[s]ubject to the availability of appropriations, the Secretary shall make available" certain payments only required those payments <u>if</u> Congress appropriated funds for that purpose).

As this Court has already observed, "since 1979, Congress has abandoned direct appropriations for allowances under 8 U.S.C. § 1555(d)." Dkt. 61 at 6; *see also* Dkt. 44 at 6 (8 U.S.C. § 1555(d) "permits appropriations for the payment of allowances for work performed. Congress however, has not directly appropriated such funds since 1979."); *Chen v. GEO Grp., Inc.*, 287 F. Supp. 3d 1158, 1166 (W.D. Wash. 2017) ("At least since fiscal year 1979, Congress has abandoned direct appropriations payment of allowances, despite its awareness of how to do so."). As a result, no Congressionally-mandated detained immigrant wage rate exists.

Nonetheless, ICE has continued to spend agency funds to reimburse contractors for detained immigrant work programs for over 30 years, including during the period at issue here. Because those funds were not appropriated for work programs, ICE was not

19

free to spend them as it saw fit. By doing so, ICE went "beyond what [8 U.S.C. § 1555] permits." *California v. Trump*, 379 F. Supp. 3d 928, 943 (N.D. Cal. 2019). Because ICE lacked authority to set VWP rates, it could not "validly confer[]" authority to pay such allowances onto GEO. *Yearsley*, 309 U.S. at 20.

Accordingly, GEO is not entitled to derivative sovereign immunity under either required *Yearsley* prong, because the company cannot show (1) that the federal government directed its illegal acts **or** (2) that any authority to carry out those acts was validly conferred. *Yearsley*, 309 U.S. at 20-21.

## B. GEO is Not Entitled to Intergovernmental Immunity.

Under the doctrine of intergovernmental immunity, "[a] state regulation is invalid only if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion) (citations omitted). GEO's intergovernmental immunity defense fails because the Adelanto Wage Class's state law claims neither directly regulate nor discriminate against the federal government.

### 1. The California Minimum Wage Law does not directly regulate the federal government.

Direct regulation of the federal government does not occur each and every time a state law regulates a federal contractor's operations. Instead, the federal government is only "directly regulated" when it is subject to a direct legal obligation. *See Confederated Tribes & Bands of the Yakama Indian Nation v. Gregoire*, 658 F.3d 1078, 1084 (9th Cir. 2011) (instructing that a party bearing the "legal incidence" of a tax is the "entity or person [who] bears the ultimate legal obligation to pay the tax to the taxing authority."). GEO bears the legal incidence here, because only GEO has any "ultimate legal obligation" for violating California law. *See Confederated Tribes*, 658 F.3d at 1084; *see also United States v. Boyd*, 378 U.S. 39, 44 (1964) ("The Constitution . . . does not forbid a [regulation] whose

legal incidence is upon a contractor doing business with the United States, even though the economic burden of the [regulation] . . . is ultimately borne by the United States.").

The only way GEO could be shielded by intergovernmental immunity is if it qualifies as an instrumentality "so closely connected to the Government that the two cannot realistically be viewed as separate entities, at least insofar as the activity being [regulated] is concerned." *United States v. New Mexico*, 455 U.S. 720, 735 (1982). To meet this demanding standard, GEO "must actually stand in the Government's shoes" and be "so assimilated by the Government as to become one of its constituent parts." *Id.* at 736 (citation omitted). GEO cannot meet this standard, and is accordingly not a federal instrumentality:

- GEO was not created or owned by the federal government. *See Dep't of Employment v. United States*, 385 U.S. 355, 358 (1966) (Red Cross); *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 102-03 (1941) (federal land bank); *United States v. Hollingshead*, 672 F.2d 751, 754 (9th Cir. 1982) (federal reserve bank); *Rust v. Johnson*, 597 F.2d 174 (1979) (Fannie Mae).

- GEO is not heavily regulated or controlled by the federal government. *See Dep't of Employment*, 385 U.S. at 359 (Red Cross subject to statutes governing entities' activities and leadership); *Hollingshead*, 672 F.2d at 754 (federal reserve bank subject to statutes governing oversight of entity's expenditures and distribution of its profits); *see also United States v. State of Mich.*, 851 F.2d 803, 806-07 (6th Cir. 1988) ("federal credit unions are extensively regulated under federal law").

- GEO is an independent contractor. *See United States v. New Mexico*, 455 U.S. 720, 736-37 (1982) (contractors that operated federal atomic laboratories were not instrumentalities); *United States v. Boyd*, 378 U.S. 39, 48 (1964) (contractors operating and building atomic facilities were not instrumentalities); *James v. Dravo Contracting Co.*, 302 U.S. 134, 149 (1937) (contractor constructing river dams and locks not an instrumentality).

- GEO is a for-profit entity with a fiduciary duty to shareholders to maximize profits. *See Hollingshead*, 672 F.2d at 753-54; *Dep't of Employment*, 385 U.S. at 358; *Fasano v. Fed. Reserve Bank of New York*, 457 F.3d 274, 282-83 (3d Cir. 2006) (federal reserve bank).

- GEO does not serve an "important governmental function." *See Fed. Land Bank of St. Paul*, 314 U.S. at 102 (federal land bank); *Lewis v. United States*, 680 F.2d 1239, 1242 (9th Cir. 1982) (federal reserve bank).

*United States v. Boyd*, 378 U.S. 39 (1964) is instructive. In *Boyd*, Tennessee imposed sales and use taxes on purchases made by two companies contracting with the Atomic Energy Commission, a federal agency. *Id.* at 40-41. One of the contractors "manage[d], operate[d], and maintain[ed] the [federal nuclear] plants and facilities," *id.* at 41-42, while the other "perform[ed] construction services relating both to new facilities and to the modification of the existing plant." *Id.* at 42-43. The contractors and the United States argued that the contractors should be entitled to immunity from the state taxes because their "use of government property [wa]s . . . a use exclusively for the benefit of the United States." *See id.* at 44.

The Supreme Court rejected this argument, holding that the contractors were **not** "so incorporated into the government structure as to become instrumentalities of the United States and thus enjoy governmental immunity." *Id.* at 48 (emphasis added). The Court explained that the contractors—like GEO—were business entities with "commercial, profit-making considerations in mind." *Id.* at 45. "'The vital thing' [wa]s that [the contractors] 'w[ere] using the property in connection with [their] own commercial activities.'" *Id.* (quoting *United States v. Muskegon Twp.*, 355 U.S. 484, 486 (1958)).

Like the contractors in *Boyd*, GEO operates Adelanto in pursuit of its "own private ends—in connection with commercial activities carried on for profit." *Boyd* at 44; *see also id.* at 48. GEO is a private, for-profit contractor with a duty to maximize

shareholder profits. *See* SUF 1-6. GEO was not created by the United States. GEO is not owned, heavily regulated, or controlled by the federal government. And GEO does not even contract exclusively with the federal government; indeed, from May 2011 until June 2019, GEO contracted with the City of Adelanto—not the federal government—to operate the Adelanto facility. SUF 38-41. Like the contractors in *Boyd*, GEO is not a federal instrumentality simply because it does business with the federal government.

The Southern District of California recently reached the same conclusion, explaining that "ICE's . . . decision to outsource work to private detention contractors does not transform those contractors into instrumentalities of the federal government" entitled to intergovernmental immunity. *The Geo Group, Inc., v. Newsom, et al.*, No. 19-CV-2491 JLS (WVG), 2020 WL 5968759, at *30 (S.D. Cal. Oct. 8, 2020) (holding that GEO does not hold intergovernmental immunity because, "[u]ltimately, GEO and other private detention facility operators are pursuing their own private ends—in connection with commercial activities carried on for profit"). Here, too, GEO's assertion of intergovernmental immunity must be rejected because the company is not "so closely connected to the Government" to constitute a federal instrumentality. *New Mexico*, 455 U.S. at 735.

**2. The California Minimum Wage Law does not discriminate against the federal government.**

"[I]ntergovernmental immunity attaches only to state laws that discriminate against the federal government <u>and</u> burden it in some way." *United States v. California*, 921 F.3d 865, 880 (9th Cir. 2019), *cert. denied*, 207 L. Ed. 2d 1072 (June 15, 2020) (emphasis added); *see also id.* at 881 ("Since the advent of the doctrine, intergovernmental immunity has attached where a state's discrimination negatively affected federal activities in some way."). "[A] state 'does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them.'" *Id.* at 881 (quoting *Washington v. United States*, 460 U.S. 536, 544-45 (1983)). The Supreme Court "has

1   required that the regulation be one that is imposed on some basis unrelated to the
2   object's status as a Government contractor or supplier, that is, that it be imposed equally
3   on other similarly situated constituents of the State." *North Dakota*, 495 U.S. at 438;
4   *California*, 921 F.3d at 882.

5        There is no evidence in the record that the California Minimum Wage Law treats
6   private companies that contract with the federal government worse than it treats private
7   companies that contract with state or local governments. Indeed, the MWL regulates
8   GEO because of its status as an employer, like any other employer, not because of its
9   status as a federal government contractor. *California*, 921 F.3d at 881. The California
10  MWL does not discriminate against the federal government, and GEO is not entitled to
11  intergovernmental immunity.

12  **C. Each of GEO's Remaining Affirmative Defenses Fail.**

13       In its **<u>first</u>** affirmative defense, GEO asserts "[e]ach purported cause of action of
14  Plaintiffs' TAC fails to allege facts sufficient to state a cause of action against
15  Defendant." Dkt. 200 at 30. GEO's statement is not a valid affirmative defense; rather,
16  it is the allegation asserting a defect in Plaintiffs' case which should be properly brought
17  as a motion to dismiss. *Ross v. Morgan Stanley Smith Barney, LLC*, 2013 WL 1344831, *3
18  (C.D. Cal. Apr. 2, 2013) (failure to state a claim "is not a true affirmative defense"). The
19  Court has already held that Plaintiffs have stated claims for relief and certified classes on
20  that basis. *See* Dkts. 44; 61; 223; 229. Plaintiffs are entitled to summary judgment
21  dismissal of GEO's first affirmative defense.

22       In its **<u>third</u>** affirmative defense, GEO asserts "Plaintiffs[] seek relief barred by the
23  applicable statutes of limitations." Dkt. 200 at 30. The Court has already determined that
24  the relief sought by Plaintiffs is not barred by the applicable statutes of limitations. *See*
25  Dkt. 223 at 21 ("GEO does not show that for each claim there is not at least one named
26  Plaintiff whose claim is within the limitations period. . . ."); Dkt. 229 (defining each Class
27  pursuant to the applicable statutes of limitations). Accordingly, GEO's third affirmative

28

defense should be dismissed.

In its **fourth** affirmative defense, GEO asserts "Plaintiffs' California Minimum Wage law claim, unjust enrichment claim, California Unfair Competition law claim, and California Trafficking Victims Protection Act claim are pre-empted by federal law." Dkt. 200 at 30. This Court has determined that Plaintiffs' claims arising under the California Labor Code are not preempted by federal law. *See* Dkt. 44 at 4 (rejecting GEO's express preemption argument); *id.* at 4-6 (rejecting GEO's field preemption argument); *id.* at 6-8 (rejecting GEO's obstacle/conflict preemption argument). The Court's conflict preemption analysis has now been confirmed by Ninth Circuit, which observed that "nothing in IRCA (or federal immigration policy generally) demands that employers, site owners, or general contractors be absolved from a state's employee-protection efforts whenever undocumented aliens provide labor." *California*, 921 F.3d at 882 (internal quotation marks omitted). GEO's attacks on Plaintiffs' UCL and unjust enrichment claims fail for the same reasoning and, therefore, Plaintiffs are entitled to summary judgment on GEO's fourth affirmative defense.

In its **fifth** affirmative defense, GEO asserts "Plaintiffs' alleged injuries and damages, if any, were caused by the acts of a third party who has not been named a party to this action and over whom Defendant had no control." Dkt. 200 at 30. The Court has determined that ICE is not a necessary party. Dkt. 61 at 7 ("Plaintiff may obtain complete relief from Defendant without joining ICE, and monetary and injunctive relief may not impair ICE's interests or result in GEO facing inconsistent obligations."). Moreover, as demonstrated above, ICE did not control any of GEO's actions in operating Adelanto under the performance-based contracts involved here. GEO's fifth affirmative defense should be dismissed.

GEO's **sixth** affirmative defense asserts the detained worker population is unqualified to receive minimum wages:

> Plaintiffs' requested relief violates the law and is otherwise impossible to attain in conformance with the law. Neither the Plaintiffs nor putative

class members have a legal right to work at minimum wage rates because none has sought approval from the U.S. Attorney General for employment with Defendant, and none are qualified to work for Defendant under ICE's contract terms and federal law. Plaintiffs' participating in the Voluntary Work Program was voluntary.

Dkt. 200 at 31. GEO's stated defense—that it is illegal for Plaintiffs to work—contradicts this Court's determination that federal law "does not forbid undocumented aliens from seeking or maintaining employment." Dkt. 44 at 7. Moreover, the alleged defense provides no basis for GEO to evade the requirements of California labor or unfair competition laws, or its common law of unjust enrichment. *See generally id.* ("Once the employer has committed IRCA violations, there is no conflict with California's MWL in compensating the unauthorized alien at the minimum wage rate for work performed."). And, finally, there exists no process under the law for seeking approval from the U.S. Attorney General for work authorization. *See* 8 C.F.R. § 274a.12 (referencing applications to and approval by the Secretary of Homeland Security). For each reason, Plaintiffs are entitled to summary judgment dismissal of GEO's sixth affirmative defense.

In its **seventh** affirmative defense, GEO asserts "Plaintiffs[ ] lack standing to represent the individuals they seek to represent under the claims asserted in the TAC." Dkt. 200 at 31. The Court has already rejected this argument. Dkt. 223 at 12 ("Mancia has standing to bring declaratory and injunctive relief, as do Fuentes and Karim."); *see also* Dkt. 229 at 1 (appointing all four named Plaintiffs as class representatives. Plaintiffs are entitled to summary judgment as to GEO's seventh affirmative defense.

In its **eighth**, **ninth**, and **tenth** affirmative defenses, GEO asserts that the California Minimum Wage Law "and IWC Wage Order," the California Trafficking Victims Protection Act, and the federal Trafficking Victims Protection Act are each unconstitutionally vague and/or overbroad as applied to its administration of the Voluntary Work Program and any other program or allowance under GEO's contract with ICE. Dkt. 200 at 31. This Court has already rejected these arguments. Dkt. 61 at 10 ("[T]he Court finds CTVPA, TVPA, and MWL are not unconstitutionally vague as

applied to GEO's administration of the Work Program."). Independently, the challenged statutes are sufficiently clear so as to allow persons of ordinary intelligence a reasonable opportunity to know what is prohibited. *Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972). And each has been upheld against void-for-vagueness challenges. *See, e.g.*, *United States v. Paul*, 885 F.3d 1099, 1105 (8th Cir. 2018) (TVPA); *People v. Brown*, 14 Cal. App. 5th 320, 336-40 (2017) (CTVPA ); *Nisei Farmers League v. Labor & Workforce Dev. Agency*, 30 Cal. App. 5th 997, 1014 (2019), *review denied* (Apr. 10, 2019) (MWL).

Finally, GEO's "overbreadth" challenges should be rejected since the terms of each statute it has challenged afforded "fair warning" to GEO that its conduct would run afoul of the statutory prohibition. *See Osborne v. Ohio*, 495 U.S. 103, 115 (1990); *Dombrowski v. Pfister*, 380 U.S. 479, 491, n. 7 (1965); *United States v. Calimlim*, 538 F.3d 706, 713 (7th Cir. 2008) (TVPA not unconstitutionally overbroad); *see also* Kathleen Kim, *The Thirteenth Amendment and Human Trafficking: Lessons & Limitations*, 36 GA. ST. U. L. REV. 1005, 1014 (2020) (CTVPA contains a more precise state definition of human trafficking than TVPA, upon which it was based). The Court should grant summary judgment dismissal as to GEO's eighth, ninth, and tenth affirmative defenses.

## VI.   GEO'S CONDITIONAL COUNTERCLAIM FOR DECLARATORY RELIEF SHOULD BE DISMISSED.

In its conditional counterclaim, GEO seeks the following relief:

(1) An order enjoining Counter-Defendants and the putative class members from claiming California's labor laws apply to them; (2) An order declaring California's labor laws do not apply to ICE detainees at the Adelanto Facility, including but not limited to laws requiring payment of minimum wage and overtime wages; (3) An order declaring that there is no employment relationship between GEO and detainees housed at the Adelanto Facility who participate in the Volunteer Work Program, specifically that GEO is not the employer of such detainees, and that such detainees are not employees of GEO; (4) An order declaring that GEO has not violated the TVPA or California TVPA.

Dkt. 200 at 36.

GEO's counterclaim is improper because it simply asks the Court to reject issues already put into controversy by Plaintiffs' complaint. *See Tenneco Inc. v. Saxony Bar & Tube, Inc.*, 776 F.2d 1375, 1379 (7th Cir. 1985) ("The label 'counterclaim' has no magic. What is really an answer or defense to a suit does not become an independent piece of litigation because of its label."); *Mille Lacs Band of Chippewa Indians v. State of Minnesota*, 152 F.R.D. 580, 582 (D. Minn. 1993) ("A redundant declaratory judgment claim is not a proper declaratory judgment claim and should be dismissed."); *Boone v. MountainMade Found.*, 684 F. Supp. 2d 1 at *12 (D.D.C. 2010) (dismissing counterclaim where it was repetitious of issues already before the court via the complaint or affirmative defenses); *Rayman v. Peoples Sav. Corp.*, 735 F. Supp. 842, 852-53 (N.D. Ill. 1990) (dismissing counterclaims as a repackaged set of affirmative defenses). As the record shows, determination of Plaintiffs' claims, along with the affirmative defenses asserted by GEO, will resolve all questions raised by the counterclaim. *Daily v. Federal Ins. Co.*, 2005 WL 14734 at *6 (N.D. Cal. Jan. 3, 2005). Plaintiffs accordingly request summary judgment dismissal of GEO's counterclaim as it serves no useful purpose. *Medmarc Cas. Ins. Co. v. Pineiro & Byrd PLLC*, 783 F. Supp. 2d 1214, 1217 (S.D. Fla. 2011); *Gratke v. Andersen Windows, Inc.*, 2010 WL 5439763, *3 (D. Minn. 2010).

In the alternative, the request for declaratory relief, as set out in GEO's counterclaim, should be rejected on the merits based on the arguments and record presented herein. Plaintiffs therefore request dismissal of the first four GEO sought-after declarations because (1) an employment relationship does exist between GEO and its detained workforce, (2) Plaintiffs are employees of GEO and GEO is their employer, (3) California's labor laws and wage orders apply to Plaintiffs, and (4) Plaintiffs are entitled to disgorgement or other equitable relief.

## V.    CONCLUSION

For the foregoing reasons and on the record before it, the Court should enter summary judgment as to liability on Counts I, II, and III of the Third Amended

28

Complaint (Dkt. 184), dismiss each of GEO's ten affirmative defenses, and enter judgment rejecting GEO's conditional counterclaim for declaratory relief.

Dated: December 21, 2020

Respectfully Submitted,

/s/ Daniel H. Charest

Daniel H. Charest (admitted *pro hac vice*)
dcharest@burnscharest.com
TX Bar # 24057803
Warren Burns (admitted *pro hac vice*)
wburns@burnscharest.com
TX Bar # 24053119
Will Thompson (CA Bar # 289012)
wthompson@burnscharest.com
E. Lawrence Vincent (admitted *pro hac vice*)
lvincent@burnscharest.com
TX Bar # 20585590
Mallory Biblo (admitted *pro hac vice*)
mbiblo@burnscharest.com
TX Bar # 24087165
Lauren Cross (admitted *pro hac vice*)
lcross@burnscharest.com
TX Bar # 24105759
**BURNS CHAREST LLP**
900 Jackson St., Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002

Korey A. Nelson (admitted *pro hac vice*)
knelson@burnscharest.com
LA Bar # 30002
Lydia A. Wright (admitted *pro hac vice*)
lwright@burnscharest.com
LA Bar # 37926
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845

1

Facsimile: (504) 881-1765

2

R. Andrew Free (admitted *pro hac vice*)
andrew@immigrantcivilrights.com

3

TN Bar # 030513

4

**LAW OFFICE OF R. ANDREW FREE**

5

P.O. Box 90568
Nashville, TN 37209

6

Telephone: (844) 321-3221
Facsimile: (615) 829-8959

7

8

Nicole Ramos (admitted *pro hac vice*)
nicole@alotrolado.org

9

NY Bar # 4660445

10

**AL OTRO LADO**

11

511 E. San Ysidro Blvd., # 333
San Ysidro, CA 92173

12

Telephone: (619) 786-4866

13

Robert Ahdoot (CA Bar # 172098)

14

rahdoot@ahdootwolfson.com
Tina Wolfson (CA Bar # 174806)

15

twolfson@ahdootwolfson.com

16

Theodore W Maya (CA Bar # 223242)
tmaya@ahdootwolfson.com

17

**AHDOOT & WOLFSON, PC**

18

10728 Lindbrook Drive
Los Angeles, California 90024-3102

19

Telephone: (310) 474-9111

20

Fax: (310) 474-8585

21

*Class Counsel*

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### CERTIFICATE OF SERVICE

I, Daniel H. Charest, electronically submitted the foregoing document with the clerk of the court for the U.S. District Court, Central District of California, using the electronic case filing system. I hereby certify that I have provided copies to all counsel of record electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

Dated: December 21, 2020

*/s/ Daniel H. Charest*

Daniel H. Charest (admitted *pro hac vice*)
dcharest@burnscharest.com
TX Bar # 24057803
**BURNS CHAREST LLP**
900 Jackson St., Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002