# EXHIBIT A

```
 1                    UNITED STATES DISTRICT COURT
                     CENTRAL DISTRICT OF CALIFORNIA
 2                          EASTERN DIVISION
 3      RAUL NOVOA, JAMIE CAMPOS      §
        FUENTES, ABDIAZIZ KARIM, and §
 4      RAMON MANCIA, individually    §
        and on behalf of all others  §
 5      similarly situated,           §
                                      § CIVIL ACTION NO:
 6               Plaintiffs,          §
                                      § 5:17-cv-02514-JGB-SHKx
 7      vs.                           §
                                      §
 8      THE GEO Group, INC.,          §
                                      §
 9               Defendant.           §
10      * * * * * * * * * * * * * * * * * * * * * * * * *
11           ORAL DEPOSITION OF THE GEO Group, INC.,
                        30(b)(1) BRIAN EVANS
12                        September 3, 2020
        * * * * * * * * * * * * * * * * * * * * * * * * *
13         ORAL DEPOSITION OF THE GEO Group, INC.,
14      30(b)(1) BRIAN EVANS, produced as a witness and duly
15      sworn, was taken in the above-styled and numbered
16      cause on September 3, 2020, from 11:34 a.m. until
17      p.m., before Suzanne Kelly, CSR Number 1260, in and
18      for the State of Texas, reported by stenographic
19      method with all participants appearing remotely,
20      pursuant to emergency orders related to the COVID-19
21      crisis, pursuant to the Federal Rules of Civil
22      Procedure and the provisions stated on the record, if
23      any.
24      Reported by:  Suzanne Kelly, CSR, RDR, CRR
25      Job Number:  TX 4226194
```

Page 1

APPEARANCES

FOR THE PLAINTIFFS:
Larry Vincent, Esq.
Lauren Cross, Esq.
BURNS CHAREST LLP
365 Canal Street, Suite 1170
New Orleans, Louisiana 70130
Phone: (504) 799-2854
Fax: (504) 881-1765
lwright@burnscharest.com
lcross@burnscharest.com

FOR THE CLASS ACTION:
R. Andrew Free, Esq.
LAW OFFICE OF R. ANDREW FREE
P.O. Box 90568
Nashville, Tennessee 37209
Phone: (844) 321-3221
Fax: (615) 829-8959
andrew@immigrantcivilrights.com

FOR THE DEFENDANT:

David Van Pelt, Esq.
AKERMAN LLP
601 West Fifth Street
Suite 300
Los Angeles, California 90071
Phone: (213) 688-9500
Fax: (213) 627-6342
david.vanpelt@akerman.com

ALSO PRESENT:

Mr. Patrick Salvant, Videographer
Ms. Julianna Gravois
Ms. Cheryl Wilke

Page 2

INDEX
PAGE
Appearances.................................   2
  BRIAN EVANS
    Examination by Mr. Free ............   6
Signature and Changes .......................   188
Reporter's Certificate .......................   190


EXHIBITS

NO.        DESCRIPTION                  PAGE
Exhibit 67   Adelanto ICE Processing      179
             Center Facility Financial
             Summaries - Budget 2011
             through 2019
             (Previously marked.)
Exhibit 192   Form 10-K                    45
Exhibit 198   Rebuttal Expert Report      160
              of Serena Morones,
              August 31, 2020
Exhibit 199   Supplemental Information,    25
              Second Quarter and YTD
              2020
Exhibit 201   e-mail from James Black     133
              to David Venturella sent
              4/17/2014

Page 3

PROCEEDINGS

THE VIDEOGRAPHER:  We are now on the record.  Please note the microphones are sensitive and may pick up whispering and private conversations.  Recording will continue until all parties agree to go off the record.

My name is Patrick Salvant, representing Veritext.  The date today is September 3rd, 2020, and the time is approximately 11:34 a.m.

This deposition is being held as a virtual remote deposition via Zoom and is being taken by counsel for the Plaintiffs.

The caption of this case is Raul Novoa, et al. -- excuse me -- et al., versus The GEO Group, Inc.  This case is being held in the United States District Court, Central District of California, Eastern Division, Case Number 5:17-cv-02514-JGB-SHKx.

The name of the witness is Brian Evans as a 30(b)(1) witness.  At this time the attorneys present and everyone attending remotely will identify themselves and the parties they represent.

MR. FREE:  My name is Andrew Free.

Page 4

I am one of the co-lead counsel for Plaintiffs in the Certified Class.  I am being joined today by my co-counsel, Larry Vincent and Lauren Cross, and our paralegal Julianna Gravois who is not -- none of those folks will have speaking roles today.

MR. VAN PELT:  Good morning.  My name is David Van Pelt.  I represent The GEO Group.

MS. WILKE:  My name is Cheryl Wilke.  I'm the Vice President and Corporate Counsel of The GEO Group.

THE VIDEOGRAPHER:  Our Court Reporter, Suzanne Kelly representing Veritext, will swear in the witness, and we can proceed.

THE COURT REPORTER:  If you would please raise your right hand, I will administer the witness's oath to you.

THE WITNESS:  (Complies.)

THE COURT REPORTER:  Do you solemnly swear or affirm that the testimony which you will give in this case will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

Page 5

2 (Pages 2 - 5)

1      THE COURT REPORTER:  Thank you.
2           BRIAN EVANS,
3    having sworn to testify the truth, the whole
4  truth, and nothing but the truth testifies on the
5        witness's oath as follows:
6           EXAMINATION
7  BY MR. FREE:
8      Q.  Okay, Mr. Evans.  As you know, we have
9  just completed your 30(b)(6) deposition on behalf
10  of The GEO Group, and now we are going to
11  commence your deposition in your individual
12  capacity as GEO's Chief Financial Officer.
13         You understand you are now
14  testifying not regarding just the Notice topics
15  that the Plaintiffs sent but about any relevant
16  topics we are going to ask about?  Do you
17  understand that?
18      A.  Yes.
19      Q.  Okay.  And I think we did a pretty good
20  job not talking over each other last time.  I
21  think one thing that I want to make sure we do is
22  to just give a little pause after I've asked my
23  questions so that Mr. Van Pelt, your counsel, can
24  launch his objection if he has one.  Is that
25  fair?

Page 6

1      A.  Yes.
2      Q.  Great.  Okay.  Not to cover any
3  territory over and over again, but I will just
4  say, if you need a break, please let us know, and
5  we'll be happy to accommodate you unless there is
6  a question pending unless you need a break to
7  confer with your counsel about asserting a
8  privilege.  Do you understand that?
9      A.  Yes.
10      Q.  And do you understand that you are not
11  to communicate with anyone during your deposition
12  even though it's remote?
13      A.  Yes.
14      Q.  And the same admonition regarding text
15  messages, any sort of messenger apps.  Doesn't
16  just need to be oral communication.  It can be
17  written communication.  You are not going to do
18  that during your deposition; right?
19      A.  Yes.  No.
20      Q.  Good.  Okay.  Good.  All right.  Sir,
21  what's your full name?
22      A.  Brian Robert Evans.
23      Q.  And what year were you born?
24      A.  1967.
25      Q.  Where were you born?

Page 7

1      A.  Grand Rapids, Michigan.
2      Q.  Where do you live now?
3      A.  Boynton Beach, Florida.
4      Q.  What is your current -- who is your
5  current employer?
6      A.  GEO Group, Inc.
7      Q.  What is your current job title?
8      A.  Senior Vice President and Chief
9  Financial Officer.
10      Q.  How long have you held that title?
11      A.  Since August, 2009.
12      Q.  What was your title prior to becoming
13  the Chief Financial Officer?
14      A.  Vice President of Finance and Treasurer.
15      Q.  When did you begin in that role?
16      A.  Approximately 2007.
17      Q.  When did you start working for GEO or
18  its predecessor, the Wackenhut Corrections
19  Corporation?
20      A.  October, 2000.
21      Q.  What role did you begin in when you
22  began working for, was it GEO or Wackenhut in
23  October of 2000?
24      A.  It was Wackenhut Corrections.
25      Q.  Okay.  So when you began working for

Page 8

1  Wackenhut, what role did you start in, in October
2  of 2007?
3      A.  Controller, Corporate Controller.
4      Q.  What was your next position after that?
5      A.  2003 or '04, I was promoted to Vice
6  President and Chief Accounting Officer.
7      Q.  And what was your next position after
8  that?
9      A.  The VP of Finance and Treasurer job in
10  2007.
11      Q.  Then in August of 2009, you assumed your
12  corporate role; is that right?
13      A.  Yes.
14      Q.  What is your highest level of education?
15      A.  Some -- some college after four years.
16      Q.  Okay.  So you got a bachelor's degree?
17      A.  Yes.
18      Q.  And where did you earn your bachelor's
19  sir?
20      A.  Notre Dame.
21      Q.  Okay.  And what was your bachelor's
22  degree in?
23      A.  Business.
24      Q.  What were the -- what was the coursework
25  you did some of after you graduated from

Page 9

3 (Pages 6 - 9)

1 undergraduate?
2     A. Just additional accounting and finance
3 courses to complete my requirements for Florida
4 to be a licensed CPA.
5     Q. Did you attain licensure as a CPA in
6 Florida, sir?
7     A. Yes.
8     Q. What year did you attain your CPA
9 license in Florida?
10     A. Probably like '96, 1996, thereabouts.
11     Q. Okay.
12     A. My license is not active anymore,
13 though, but...
14     Q. Okay. Where did you take the coursework
15 that you took in accounting and finance?
16     A. The coursework that wasn't at Notre Dame
17 was at Florida Atlantic University in Boca Raton.
18     Q. Okay. And do you recall approximately
19 how many hours you had to do?
20     A. I think it was 30 credit hours.
21     Q. Okay. Those were in accounting and
22 finance courses; is that correct?
23     A. Yeah. Maybe some other general business
24 courses but both finance and accounting.
25     Q. I would like just a rough sketch of your

Page 10

1 employment prior to joining Wackenhut
2 Corporation. I don't need exact dates. I am not
3 going to hold you to them. But where were you
4 working in 1996, if anywhere, while you were
5 doing your CPA certification?
6     A. So I graduated from college in 1990. I
7 was in the military, in the U.S. Navy, for
8 approximately four years through 19- -- August or
9 thereabouts of 1994, after which I started with
10 Arthur Andersen, one of the big accounting the
11 firms which is no longer in business. And I was
12 with them from August, 1994, until I started with
13 Wackenhut Corrections, now The GEO Group, in
14 October, 2000.
15     Q. Prior to working for Wackenhut
16 Corrections, did you do any work for Wackenhut at
17 Arthur Andersen?
18     A. Yes.
19     Q. How many years did you do work for
20 Wackenhut at Arthur Andersen?
21     A. Cumulatively, probably about two.
22     Q. Were those consecutive leading right up
23 to you going to Wackenhut, or were those over the
24 course of your employment at Arthur Andersen?
25     A. Probably between years like two and

Page 11

1 four, two and five maybe. So probably a year to
2 two years before I came to work for Wackenhut, I
3 hadn't worked on the account.
4     Q. Okay. What other accounts did you work
5 on at Arthur Andersen, sir?
6     A. Well, I worked on the parent company for
7 this company, which I am including in that two to
8 three years of work. I worked for a company, SBA
9 Communications, which is currently a public
10 company based in Boca Raton.
11         I worked on AutoNation; another
12 company, Nations Rent.
13         I worked on some government clients
14 like the Palm Beach County School Board, the Palm
15 Beach County -- the County of Palm Beach, and
16 then other miscellaneous smaller clients.
17     Q. And when you say "you worked on," can
18 you just give a general explanation --
19     A. I was an auditor. So I did audit
20 work --
21     Q. Okay.
22     A. Audit work, the type of work you would
23 do to issue a set of financial statements in an
24 audit opinion. I was not in the tax field, so it
25 was just strictly financial accounting, financial

Page 12

1 auditing work.
2     Q. Okay. And what does that entail?
3     A. You know, evaluating the accuracy of the
4 financial statements from an auditor's
5 perspective. We would do, you know, random
6 sampling transactions, looking at the client's
7 internal controls and making sure that the
8 audit -- audited -- the financial statements that
9 they were going to issue were in accordance with
10 Generally Accepted Accounting Principles and
11 financial accounting standards.
12     Q. Was Wackenhut publicly traded at the
13 time that you were auditing its financial
14 statements?
15     A. Yes.
16     Q. I believe you testified that SBA
17 Communications was, as well?
18     A. Yes. They were private, and then they
19 became public. So I audited them both when they
20 were private and public.
21     Q. Okay.
22     A. Mind you, I was like a staff auditor or
23 an audit manager. I was not the partner that
24 signed the audit opinion for Author Andersen. I
25 did, you know, a lot of the work under their

Page 13

4 (Pages 10 - 13)

1  supervision, but I was not the person who signed
2  the audit opinion.
3      Q. I understand.  So what does that work
4  look like on a day to day basis?
5      A. Like I said, it's a lot of verifying
6  transactions, you know, reviewing documents.
7          You know, if it was auditing
8  revenue, you would look at the invoices.  You
9  might trace things back to the general ledger to
10 make sure it was properly recorded.
11         You might look to see that the
12 client paid it.
13         You would send letters out to
14 clients to see that they actually existed.  You
15 would circularize the attorneys to see what kind
16 of legal exposure existed.
17         You would confirm their bank
18 accounts.  A lot of different types of
19 activities.
20     Q. Except for any tax activities; is that
21 correct?
22     A. I did a little bit but not really from a
23 technical perspective.  There is a little bit
24 that the audit side might do, but mostly that
25 will be done by people with expertise in the tax

Page 14

1      A. Probably around 2003 to 2005.  Somewhere
2  in that time frame, I would guess.
3      Q. By that time, you had other people, I am
4  assuming, at Wackenhut or GEO, whatever the
5  corporate form was, who were able to do the CPA
6  work that needed be to done; correct?
7      A. You don't have to have a CPA license to,
8  you know, be in accounting in a corporation.  If
9  you are going to issue financial statements -- if
10 you are going to issue an audit opinion on
11 financial statements, you need to have a license,
12 or if you are going to practice or hold yourself
13 out as a public accountant and provide advice on
14 public accounting matters, you would need to have
15 that.
16     Q. But you didn't do that?
17     A. But I never -- that was never part of my
18 background, no.
19     Q. Okay.  Let's move now just to the roles
20 that you played at Wackenhut.  And, again, I
21 don't want a treatise on each one.  I am just
22 trying to understand how your functions differed
23 with your job title as you moved up through the
24 corporation from 2000 until today during your 20
25 years of employment for Wackenhut and GEO.

Page 16

1  area.
2      Q. Okay.  What are the Generally Accepted
3  Accounting Principles in the United States of
4  America?  Do you know what that refers to?
5      A. GAAP?
6      Q. Yes, sir.
7      A. It's a whole body of, you know,
8  principles, written guidance on how different
9  things should be accounted for consistently
10 across industries and companies that issue
11 financial statements in the U.S.
12     Q. Okay.  Is that -- are the GAAP -- is
13 that what we should call them, GAAP?
14     A. Yeah.
15     Q. Are you familiar --
16     A. Often referred to as GAAP.
17     Q. Okay.  Are you familiar with those
18 principles, sir?
19     A. Yes.
20     Q. Okay.  Is that something that was
21 encompassed in your certification when you became
22 a CPA?
23     A. Yes.
24     Q. Okay.  When did your CPA certification
25 run out?

Page 15

1          Can you kind of talk me through,
2  beginning in October of 2000 when you joined as a
3  Corporate Controller, what your day-to-day
4  activities were?
5          And, again, it's not exhaustive or
6  comprehensive.  I am just trying to get a sense
7  and to be able to give the jury a sense of what
8  you did.
9      A. So obviously, when I started in 2000,
10 the company was a lot smaller.  So oftentimes, I
11 was wearing many hats that other folk -- there
12 are maybe more people doing that work today.  But
13 as a Corporate Controller, I oversaw the
14 company's sort of day-to-day accounting processes
15 at the corporate level.  So the accounts payable
16 department reported to me; accounts receivable,
17 that's our billing and collections function.
18         Payroll reported to me at that
19 time.  And then also reporting to me was the
20 financial reporting group, those are the people
21 that prepared our publically issued quarterly
22 reports and our annual report; and then within
23 the accounting group, preparation of the internal
24 monthly financial reporting that we would provide
25 to senior management.

Page 17

5 (Pages 14 - 17)

1      So that was the bulk of my
2  responsibilities from approximately 2000
3  through -- you know, even when I got promoted as
4  Chief Accounting Officer, I was still doing a lot
5  of those same activities.
6          The main difference is that as a
7  Chief Accounting Officer, that title was taken
8  from the person who was the VP of Finance.  He
9  was a Vice President of Finance and Treasurer and
10 Chief Accounting Officer.  And then when I became
11 Vice President, that title, Chief Accounting
12 Officer, was transferred to me, which is relevant
13 for a public company because the Chief Accounting
14 Officer, the Chief Financial Officer, and the CEO
15 signed the company's financial statements.
16         So beginning in about 2003 or '04,
17 whenever it was that I became Chief Accounting
18 Officer, I signed the financial documents as
19 asserting that, you know, I had knowledge of the
20 accounting and what was going on in the company's
21 records.  But the roles and responsibilities that
22 I had for that period, up really until I was
23 promoted to VP of Finance, were mostly the same.
24 Same types of functions, maybe more people
25 reported to me.  They might have become a little

Page 18

1  bit more complex.
2          I also was in charge of the
3  budgeting group, so every year that we would
4  prepare the budgets and the planning for the
5  company.  And then in 2007, I became the Vice
6  President of Finance.  And in that role, I was
7  more involved with -- directly involved with
8  financial issues of the company, so our bank and
9  lending agreements, equity offerings.  So capital
10 markets type activity.
11         And then I still had some oversight
12 of the other areas just because I had so much
13 experience with those areas, and I still oversaw
14 like the budgeting and planning.  But then
15 another person became the Chief Accounting
16 Officer, who still is today.  I mentioned him
17 previously, but that was Ron Brack, who is the
18 Chief Accounting Officer today.
19         And then in 2009, obviously, I
20 became the CFO.  And all of those
21 responsibilities that I had, I still oversaw the
22 people that oversaw those functions.  And tax
23 then reported to me.  And, also, the Chief
24 Information Officer reported to me as well when I
25 became the CFO in 2009.

Page 19

1      So Chief Information Officer, he's
2  dealing with, you know, the technology, supports,
3  software, hardware within the company.  And then
4  taxes, you know, self-explanatory.  All of our,
5  you know, corporate income tax responsibilities,
6  state and local taxes, property taxes,
7  payroll -- payroll-related taxes, et cetera.
8      Q.  Thank you.  That was really helpful.  I
9  really appreciate you going through it in that
10 way.
11         You said that when you started at
12 Wackenhut, words to the effect of it wasn't as
13 big as it is now.  Can you explain how the
14 company that you have worked for, for last 20
15 years has grown?
16         And I am asking specifically if you
17 can just give a rough estimate of the size of the
18 company, either by market cap or by the beds
19 under management, however you would determine a
20 significant indicator of the growth you have
21 alluded to.
22         Can you kind of give us a sense of
23 the scale by which Wackenhut and then GEO has
24 grown since you started?
25      A.  Sure.  So when I started at Wackenhut

Page 20

1  Corrections, we were a subsidiary of the
2  Wackenhut Corporation.  We were a publicly held
3  subsidiary.  So they controlled the voting shares
4  of our stock.  They had about 52 percent of the
5  outstanding stock, and then the rest was all
6  publicly traded.  So we were a public company,
7  but we were a subsidiary of the Wackenhut
8  Corporation.  We were about, I want to say, 550
9  to 600 million in revenue at the time.
10         In 2002, Wackenhut, the Wackenhut
11 Corporation, our parent, was acquired by an
12 international security conglomerate, Group 4
13 Falck, and they did not want to retain their
14 ownership in our business.  So they basically
15 held us for sale, and we ended up acquiring their
16 ownership interest.  We went and borrowed money,
17 Wackenhut Corrections did, and bought out their
18 ownership interest.
19         So then, in approximately 2003, we
20 became a completely independent public company.
21 We had no parent company anymore at that point.
22 That's also when we changed our name to The GEO
23 Group.
24         And we made -- we grew both
25 organically -- by "organically," I mean we won

Page 21

1 new business through sort of the contracting
2 process and entering into new agreements with
3 government.
4            And then we also grew by acquiring
5 other businesses.  We acquired the first company
6 in about 2005, which was CSC.  I don't remember
7 what those initials stand for -- stood for, but
8 it was a smaller, public company.
9            We then bought Cornell Corrections
10 in approximately 2010 when I was CFO.  That was a
11 fairly large acquisition at the time.  They were
12 the third largest publicly traded company in the
13 industry.
14            We bought BI, which is in the --
15 sort of the reentry business, the electronic
16 monitoring business, in 2011.
17            And we've made one or two other
18 acquisitions, also, since then.  We bought a
19 company based out of New Jersey, CEC, which was
20 Community Education Centers.  And we bought LCS
21 Corrections, had six or seven facilities, they
22 were based out of Louisiana.
23            So today, we are about 2.5 billion
24 or, you know, between 2.4 and 2.5 billion in
25 revenue from the 600 million or so that we were
Page 22

1 when I started.
2      Q.  Okay.  I just want to ask a couple of
3 follow-up questions about what you have
4 explained, but I really appreciate that
5 explanation.
6            You referred to Cornell Corrections
7 as the third largest publicly traded company in
8 your industry.  What is your definition of "the
9 industry"?
10      A.  The privatized corrections industry in
11 the U.S. they were the third largest service
12 provider.
13      Q.  Who was the second largest at the time
14 that you purchased them?
15      A.  We were.
16      Q.  Who was the largest?
17      A.  Core Civic was the largest.
18      Q.  And I think in 2010, CoreCivic would
19 have been called the Corrections Corporation of
20 America.  Do we agree on that?
21      A.  Yes.  Yes.
22      Q.  So it sounds like up until 2011, the
23 core business that you said The GEO Group
24 essentially raised the funds to buy from this
25 international conglomerate and just be a
Page 23

1 stand-alone company, that core business was
2 privatized corrections; is that correct?
3      A.  From -- yeah, up until we acquired BI
4 really.
5      Q.  Okay.
6      A.  That's when we diversified outside of
7 just corrections, I would say.
8      Q.  Okay.
9      A.  And residential facilities.
10      Q.  All right.  So did -- if you know, the
11 Wackenhut Corporation, Wackenhut Corrections
12 specifically, have any contacts or agreements
13 with U.S. Immigration and Customs Enforcement or
14 Legacy INS at the time that GEO became a public
15 entity in 2003?
16      A.  Yes.
17      Q.  Okay.  Do you have any idea as to the
18 number of those contracts?
19      A.  I don't.
20      Q.  That's okay.
21      A.  I don't know the exact number, no.
22      Q.  That's Okay.  So for the rest of my
23 questions, I know we have been kind of covering a
24 lot of history here, unless I tell you otherwise,
25 the period at issue in this lawsuit is from
Page 24

1 mid-2011 until the present.
2      A.  Okay.
3      Q.  All right.  I am not going to be asking
4 you questions, and I don't want you to have to
5 wrack your brain for stuff, unless I am
6 specifically instructing you to do it, that
7 happened before mid-2011.
8      A.  Okay.
9      Q.  Does that make sense?
10      A.  Yes.
11      Q.  Okay.  Great.  So you said about 550
12 million to 600 million in revenue then compared
13 to 2.4 to 2.5 billion in revenue now; correct?
14      A.  Yes.
15      Q.  It's like a five-fold increase depending
16 on the range?
17      A.  Yes.
18      Q.  Okay.  I am going to put up on the
19 screen what we are marking as "Exhibit Number
20 199."
21            (Exhibit Number 199 is marked.)
22 BY MR. FREE:
23      Q.  This is GEO's -- it's a set of slides,
24 financial summary slides, from Quarter 2.  So
25 this is your supplemental information for the
Page 25

7 (Pages 22 - 25)

1 second quarter and year to date in 2020. Have
2 you ever seen this document before, sir?
3   A. Yes.
4   Q. Okay. What would you call this
5 document?
6   A. It's just every quarter when we issue
7 our press release, we issue some supplemental
8 financial and non-financial information. This is
9 the document that we use to do that.
10   Q. Okay. Is there a shorthand term for
11 this document in case we want to refer back to
12 it? I am not saying there has to be. I am just
13 asking.
14   A. Call it the "Second Quarter Supplement."
15   Q. Okay. I have been calling these the
16 "Slides," which is what some analysts have
17 described them as.
18   A. Okay.
19   Q. Is that an industry term you are
20 familiar with?
21   A. I don't remember hearing people use it,
22 but whatever. I am fine with using that. That's
23 okay.
24   Q. That's okay. We will call it the Second
25 Quarter Supplemental Information. How about

1 that?
2   A. Okay. Sounds good.
3   Q. All right. I am going to Page 3 of this
4 document, which has previously been marked
5 as -- not previously been marked, but which is
6 Novoa 22956. Do you see that on your screen?
7   A. Yes.
8   Q. Okay. True or false, the 93,000 beds
9 that GEO currently has are the most GEO has ever
10 had?
11     MR. VAN PELT: Object as lacks
12 foundation. May call for speculation.
13     The witness will -- you can answer.
14 BY MR. FREE:
15   Q. Let's lay some foundation. Do you see
16 here where it says, "GEO's worldwide operations
17 include the ownership and/or management of 125
18 facilities totalling approximately 93,000 beds"?
19   A. Yes, I see that.
20   Q. Okay. And the way that we get that, I
21 believe, is you take the REIT beds, which are
22 60,258, that's on the right-hand side of the
23 graphic, and you add the Taxable REIT Subsidiary
24 or TRS managed only beds, which is 33,037 beds,
25 and you add those up and you've got about 93,000

1 beds. We agree that GEO has 93,000 beds right
2 now?
3   A. Yes.
4   Q. Has GEO ever had any more beds than it
5 has right now?
6   A. Yes.
7   Q. When?
8   A. You know, I don't know the exact date,
9 but I think several years ago we were closer to
10 100,000 beds.
11   Q. Okay. So it's down from its top level
12 at 96 to 100 down to 93 now; correct?
13   A. Correct.
14   Q. Okay. What about revenues? We've got a
15 low-end 2020 revenue guidance number of 2.3
16 billion here on the right-hand bottom quadrat of
17 the page. A high-end revenue guidance of
18 2.345 billion.
19   A. Yes.
20   Q. Has GEO's revenue ever been higher?
21   A. I would have to look at last year, but I
22 think last year it was higher.
23   Q. Okay. Let's look at last year.
24   A. Yeah. There you go.
25   Q. Where would you look -- am I on the

1 right page, sir? I am on 22957.
2   A. Yes.
3   Q. I'm just looking at revenues.
4   A. So total revenues, you can see the
5 green -- first green line. The columns that says
6 "Year To Date 2020."
7   Q. Yes, sir.
8   A. And "Year To Date 2019."
9   Q. Yes, sir.
10   A. The year to date, same six-month period
11 in 2019, the revenues were higher than they were
12 in the same six-month period in 2020.
13   Q. Okay. Has the global pandemic wrought
14 by the COVID-19 virus affected GEO's revenues?
15   A. Yes.
16   Q. Okay. But for COVID, would GEO have
17 expected to have higher revenues this year than
18 last year?
19     MR. VAN PELT: I am going to
20 object. It calls for speculation.
21     The witness can answer.
22     THE WITNESS: I think we actually
23 had projected about the same or slightly less.
24 BY MR. FREE:
25   Q. Okay. Do you have any idea one way or

1  the other as to why that projection remained
2  about the same or was slightly less?
3      A.  Probably slightly less because we had a
4  contract or two going away that had expired.
5  And, also, that we had projected lower
6  populations in some of our programs, especially
7  some of the detention programs due to the changes
8  in the level of border apprehensions.
9      Q.  Do you recall one way or the other which
10  contracts were going away?
11     A.  The one that I am thinking of that I am
12  most familiar with was there was a contract in
13  Australia for a facility that we operated that
14  expired, I believe, at the end of June.
15     Q.  Is the James D. Ray facility in Georgia
16  that just ended another one of the contracts that
17  GEO was expecting to go away?
18     A.  That contract is expiring.  We announced
19  that in the last quarter.  But at the time, when
20  we prepared our budgets, it was not -- it was not
21  planned for.  However, the guidance that you have
22  up there for the second quarter, that would have
23  reflected the D. Ray James contract expiring at
24  the end of September.  As well as the McFarland
25  facility, which is a California facility, I

Page 30

1      Q.  Okay.  I have got U.S. Immigrations and
2  Customs Enforcement using 19.3 percent of the
3  beds, this is on Novoa 22965.  And that's about
4  20.6 -- 21.6 percent of GEO's revenue; correct?
5      A.  (No audible response.)
6      Q.  Sir?
7      A.  Yeah.  I'm just looking at the chart.
8      Q.  Okay.
9      A.  So it's 20- -- in that caption of the
10  chart, it's 21.6 percent of our revenue for our
11  owned and leased facilities.
12     Q.  As opposed to your managed Taxable REIT
13  Subsidiary or TRS facilities; correct?
14     A.  Or the -- or the non-residential,
15  international business, all of that stuff.
16     Q.  Okay.  So with respect to owned and
17  leased facilities that GEO owns and leases, ICE
18  makes up a little bit over one-fifth of the
19  revenues; correct?
20     A.  Yes.
21     Q.  Okay.  What percentage of GEO's
22  revenues, if you know offhand, comes from ICE?
23     A.  I think it was on that same page.
24     Q.  Okay.  Let me show you the page and you
25  tell me where I can look and find it.  So we're

Page 32

1  believe, that was also expected to expire.
2      Q.  Okay.  Does GEO --
3      A.  A few others.
4      Q.  I understand.  The McFarland facility is
5  the ICE facility or a BOP facility?
6      A.  The McFarland facility is a
7  California -- it's a facility that we operate in
8  California that we own that houses female inmates
9  from the State of California.
10     Q.  So that's the California Department of
11  Corrections and Rehabilitation; correct?
12     A.  Yes.  Yes.
13     Q.  Okay.  Sir, who is GEO's biggest
14  customer in the United States?
15     A.  Our single biggest customer is the
16  federal -- the U.S. federal government.
17     Q.  Which agency of the U.S. federal
18  government is the largest user of GEO's services
19  within the United States, sir?
20     A.  ICE, Immigration and Customs
21  Enforcement.
22     Q.  Okay.  And GEO disclosed a bed
23  percentage that should be on your screen now.  Do
24  you see it?
25     A.  Yes.

Page 31

1  looking at 22965, which the Bates number is Novoa
2  22965.
3      A.  So I believe that pie chart above says,
4  "GEO revenue by customer type, year to date
5  2020."
6      Q.  Uh-huh.
7      A.  So for the six months, 2020, I can't
8  read the number, but the yellow piece of the pie
9  there has a percentage and that's the amount
10  that, at least through six months, looks like 28
11  percent was from ICE.
12     Q.  Okay.  Now, do you have an understanding
13  as to whether this document contained a revenue
14  breakdown between GEO's owned and leased
15  facilities versus its managed-only facilities?
16          So could we tell based on this
17  document how much of GEO's revenue comes from
18  owning and leasing contracts versus managed
19  contracts?
20     A.  I think so.  What page are you at?
21     Q.  We're on page --
22     A.  Yeah.  You probably need to go up in
23  your page numbers.  Not -- yeah.  Keep going.
24  Slow down.  Right there.  Hold on.
25     Q.  Okay.  Sorry.  Okay.  Let's look at it.

Page 33

9 (Pages 30 - 33)

1  What I am going to do, do you have access to
2  the -- to a mouse where you could scroll?
3      A.  I do.
4      Q.  All right.  I am going to give you a
5  remote control and allow you to just scroll
6  yourself.  I am going to put it in your court.  I
7  would ask that you not click out of the here and
8  go onto my desktop and look at my outline.  Is
9  that fair?
10     A.  Sure.
11     Q.  Okay.  Cool.
12     A.  I will certainly try not to do that.
13     Q.  Cool.  All right.  Well, joke is on you.
14  I don't have an outline.  So here we go.
15         Let's do this:  Can you test and
16  see if you can move the screen up and down?
17     A.  With my mouse?
18     Q.  Uh-huh, yeah.  There you go.  Looks like
19  it's working.
20     A.  Okay.  I don't know if I am able to move
21  the page.
22     Q.  I think if you hold down the mouse.
23     A.  Okay.
24     Q.  And then scroll either with a roller or
25  you can also use the page up and down arrows.

Page 34

1  will see -- no, this is just excluding federal in
2  versus federal.  Let me keep scrolling up.  Hold
3  on.
4      Q.  Is there another document that would
5  make it easier for you to find?  I could provide
6  you the 10K or --
7      A.  No.  I believe it's in here.
8      Q.  Okay.
9      A.  I just need to find it.
10     Q.  I think so, too.  But I want to make
11  sure that we agree on what it is.
12     A.  Okay.  The pages are the same.
13         Here we go.  So if you look on
14  page -- well, the page that's up now.
15  Whatever page this is, Page 4.
16     Q.  So that's Novoa 22957.  Go ahead, sir.
17     A.  So we have Owned and Leased Secure
18  Services, which would be U.S. Corrections; Owned
19  and Leased Community-Based, which is part of GEO
20  Care, that's reentry type facilities, halfway
21  houses; Owned and Leased Youth, that's our youth
22  facilities; Managed Only is all of the other
23  business that's not owned but it's facility type,
24  and it could include from GEO Care or GEO -- GEO
25  Corrections or GEO Care, which is the reentry

Page 36

1      A.  Let me try that.
2      Q.  Excellent.
3      A.  Okay.  So can you repeat your question
4  just so I make sure I am answering the correct
5  question?
6      Q.  Sure.  Of course.  I am looking to
7  understand what percentage of GEO's revenues
8  comes from managed and owned facilities versus
9  any other business activities, whether it's the
10  TRS, the Taxable REIT Subsidiary income, BI
11  income, reentry income.  I'm just trying to
12  figure out how much of GEO's revenues
13  comparatively come from each bucket.
14         So you've got the managed and owned
15  facility bucket and you've got the everything
16  else bucket.  Is that discernible from this
17  document or no?
18     A.  I think so.  If we look at the next,
19  this page here 11 --
20     Q.  You see.
21     A.  -- you see, it shows -- let me just look
22  closely here for a second.  Bear with me.
23     Q.  Take your time.
24     A.  So on this page, it feels like I am
25  missing a header or something somewhere, but we

Page 35

1  side of the business; and then Non-Residential is
2  probably going to mostly include our electronic
3  monitoring services through BI.
4          So that's probably the closest
5  breakdown that you are going to get to, I think,
6  the question that you were asking before.
7      Q.  Okay.  So I can look at the field Q2
8  2020 Unaudited, and I can see by adding up the
9  Owned and Leased Secure Services, as opposed to
10  the Community-Based ones, how much revenue GEO
11  derived from its Owned and Leased activities
12  versus its Managed Only activities, which would
13  listed in the Managed Only portion; correct?
14     A.  Yes.
15     Q.  Okay.  The Owned and Leased activities,
16  those first three, which total 295,000 -- I am
17  going to leave out the specific numbers.  So I'll
18  just give you the numbers behind the comma or to
19  the left of the comma.
20         So you've got 295,000; 36,000; and
21  19 -- almost 20 grand -- or 20 million.  This is
22  in millions; correct?
23     A.  This is millions, yeah.
24     Q.  Okay.  So you got 295 million, 36
25  million, and 19 million in Owned and Leased

Page 37

10 (Pages 34 - 37)

1 activities; is that right?
2    A. Yes.
3    Q. And then the Managed Only Facilities are
4 around 150 million.  149,391,000 -- excuse me --
5 yeah, 391,000.
6    A. Yeah.
7    Q. And then you got another 6 for Facility
8 Construction and Design.  And that's revenues;
9 right?
10    A. Yes.
11    Q. And that's -- where does the $6 million
12 in Construction and Design revenue come from?
13    A. Mostly likely, an international project
14 that was ongoing at the time.
15    Q. You're building a facility?
16    A. Or a BOP, yeah.  I think it's just a
17 small expansion at a facility.
18    Q. Okay.  And then the Non-Residential
19 Services, is that -- is that BI?
20    A. Mostly BI, yes.
21    Q. Okay.  The Managed Only -- I am going to
22 take back control of the scroll, if that's okay.
23    A. Sure.
24    Q. So the Managed Only Facilities, those
25 are the Taxable REIT Subsidiary Facilities;

1    A. Okay.
2    Q. All right.  And I think what you have
3 told me is that I understand that by looking at
4 Novoa 22957, and I could add up the owned and the
5 leased income --
6    A. Those should approximately equate to the
7 blue side up there, if you will.
8    Q. Okay.  And is that -- okay.  And I
9 understand that I would need to add up not just
10 the Secure Services but also the Community-Based
11 Services and the Youth Service as well; right?
12    A. Right.
13    Q. Okay.  Because I am looking at the
14 Reentry and Youth here on the left side of this
15 22956.  Do you see that?
16    A. It's basically those three buckets,
17 yeah.
18    Q. Okay.  And then if it's not in those
19 three buckets, then it's in the other TRO -- the
20 Taxable REIT Subsidiary bucket; right?
21    A. Yes.
22    Q. Okay.  So I am going to do a rough
23 calculation, and I am going to add up the first
24 three lines.
25    A. Uh-huh.

1 right?
2    A. Yes.
3    Q. Okay.  So you should be able to see my
4 screen again.  Up on the right-hand side, do you
5 see on the right column?
6    A. Uh-huh.
7    Q. All right.  So we've got these 33,000
8 beds that are Managed Only.  And then on the left
9 side, we've got 60,000 beds that are REIT;
10 correct?
11    A. Yes.
12    Q. All right.  And I can -- if I understand
13 your testimony correctly, I can roughly figure
14 out how much the Managed Only -- the Taxable REIT
15 Subsidiary Facilities made based on the page that
16 I am showing you now, which is 22957, by looking
17 at Managed Only in that line item; correct?
18    A. Say that one more time.
19    Q. I am just trying to figure out on
20 that -- when I scroll back to Novoa 22956 and I
21 go to this top right-hand corner where it says
22 "GEO REIT Structure," I am trying to understand
23 the income that GEO derives, the revenue that GEO
24 derives from the right side, which is TRS, versus
25 the left side.  Okay?

1    Q. And I got 350 million in revenue.  So
2 295,92 plus 36,32 plus 19,809 comes out to
3 350,933,000.
4       Now I am going to add the bottom,
5 which is 149,391 plus 66,17 plus 88,88.  And
6 that's 236,000.
7       So the first number I got was 350
8 million.
9       The second number I got was 236
10 million.
11    A. Yes.
12    Q. Give or take.  It's 236,896.  So we
13 could call it 237 if we wanted to.  I don't think
14 it really matters for my inquiry.  But based on
15 this publication by GEO, GEO, unaudited, received
16 revenues in the amount of around 350 million from
17 its REIT activities and around 236 million from
18 its non-REIT activities.  Does that sound right?
19    A. Yes.
20    Q. How many ICE facilities does GEO
21 currently have under contract?  And I am not
22 going to ding you if it's like one or two off.
23 If you could just give us a ballpark.
24    A. I don't have the exact number.  I would
25 say over a dozen.  Like probably 12 to 15.

1     Q.  Okay.  Let's go ahead.  I believe that
2  we can discern this from this report.  I am going
3  to pull the page up.  But before I do, we have
4  now been on the record for around 5-0, 50
5  minutes.  Do you need a break, or do you want to
6  take a second?
7     A.  No.  I am fine.
8     Q.  Okay.  Will you let me know if you need
9  to take a break?
10    A.  Yes.
11    Q.  All right.  Cool.  So I think that the
12 way that a person could determine how many GEO
13 facilities ICE has under contact -- or how many
14 ICE contracts GEO has is another way putting it,
15 is by looking at this page and the following
16 pages of GEO's supplemental Q2 information for
17 2020.
18       I'm going to zoom in a little bit,
19 because I can barely see this even on my giant
20 screen that I've got.  And I think if I were
21 going to try to show a jury how many ICE
22 facilities GEO has, I would look in this primary
23 customer column.
24    A.  Yes.
25    Q.  And I would then count up, okay.  You

1     Q.  Okay.  It's just the 10K?
2     A.  The 10K and the 10Q.
3     Q.  So apart from the K and the Q, the
4  supplemental information, you would agree, sir, I
5  think, that the supplemental information can't be
6  false; right?
7     A.  No.  We include the press release, I
8  believe our conference call script, and this
9  document and an 8K filing, which is a separate
10 filing.  So the table that we just looked at is
11 also included in our annual filing, our 10K.  But
12 it's not included in each of our quarterly 10Q
13 filings, I don't believe.
14       So this same format, but this one
15 would be more up to date because it's for the
16 second quarter -- or as of the end of the second
17 quarter versus the one that was included in the
18 10K is at the end of December 2019.
19    Q.  Okay.  That's helpful.  And so this
20 is -- this is also -- to be fair, this is
21 unaudited; right?
22    A.  Yeah.  It's unaudited.  But to your
23 point, yes, of course, we try to make sure it's
24 accurate.
25    Q.  And it shouldn't diverge from the

1  know, GEO's got the ICE facility -- the ICE --
2  the Adelanto ICE Processing Center here, that's
3  one; Central Valley Annex, that's two; Desert
4  View Annex, that's three; Golden State Annex,
5  that's four.
6        Is that the way that you would do
7  that, sir?
8     A.  Yes.  That would be a way to calculate
9  it.
10    Q.  Okay.  All right.  And then similarly,
11 the Mesa Verde ICE Processing Center, you got 400
12 beds there.  I could go so on and so forth and
13 determine, at least as of the date that this was
14 published, which and how many ICE facilities GEO
15 has under contract; correct?
16    A.  Yes.
17    Q.  All right.  Would there be any more
18 authoritative statement of that information
19 anywhere that you can think of?
20    A.  No.
21    Q.  Okay.  Is it your understanding that
22 these documents are documents that you would have
23 to certify for accuracy as the Chief Financial
24 Officer?
25    A.  No.

1  information, particularly historical information
2  not forward looking information?  It should
3  basically match the numbers as in categories
4  that's in the 10K?
5     A.  Except for however things might change
6  over time, but yeah.
7        (Exhibit Number 192 is marked.)
8  BY MR. FREE:
9     Q.  Okay.  All right.  I am going to show
10 you now what we marked as "Exhibit 192" during
11 your 30(b)(6) deposition.  We ended up not
12 getting to that.  Do you recognize this document,
13 sir?
14    A.  Yes.
15    Q.  Okay.  What's this document?
16    A.  Our 10K for the year ended 2019, I am
17 guessing.  I am looking for it.
18    Q.  I believe it says --
19    A.  There it is right there.  Yes.
20    Q.  Okay.  What's a 10K?
21    A.  It's our required filing as a public
22 company with the SEC that, you know, meets
23 numerous SEC regulations around annual reporting
24 for the company, disclosures.  It includes our
25 audited financial statements as well as a section

1 of the document that's often referred to as
2 Management's Discussion and Analysis. It
3 includes the company's risk factors and other
4 legal disclosures. So it's a regulatory-required
5 filing.
6     Q. What's your role in preparing the 10K,
7 sir?
8     A. Well, as a Chief Financial Officer, I am
9 one of the signers of the document; myself, and
10 the CEO, and I believe the Chief Accounting
11 Officer. I don't prepare it, per se, but I
12 certainly review it and have input and am
13 responsible for the preparation of the document.
14     Q. Okay. And when you say you're
15 responsible for it, do you understand that
16 responsibility to include legal responsibilities
17 under Sarbanes-Oxley?
18     A. Yes. Exactly.
19     Q. Okay. What's your understanding of
20 consequences to you or to GEO if you sign this
21 document knowing that there is false information
22 in it?
23         MR. VAN PELT: We object as vague
24 and ambiguous and calls for a legal conclusion.
25         THE WITNESS: Yeah. No. I was

Page 46

1 just going to say, I mean, obviously, there are
2 consequences, but I am not familiar with what all
3 of those are at this point. I don't recall.
4 BY MR. FREE:
5     Q. Okay. Now, in the 10K, we could look
6 and we could find the asset structure; is that
7 correct?
8     A. The balance sheet, yes.
9     Q. Okay. I am going to show you the table
10 of contents for the 10K, and if you could, I just
11 want you to tell me, because I think you are
12 going to know better than I will, where we should
13 go to look at the asset structure. Does that
14 make sense?
15     A. Sure.
16     Q. All right. I'll put it up on the
17 screen. And if you think it's easier to do a
18 remote control, again, I generally don't have any
19 problem with that.
20         All right. So it's probably pretty
21 big where you are seeing it. I can't tell what
22 your view looks like, but I am looking at the
23 Table of Contents in the 10K. Can you see that,
24 sir?
25     A. Yes.

Page 47

1     Q. All right. Where would I look for the
2 asset structure of GEO?
3         I can scroll down or give it to you
4 and you can scroll down.
5     A. I think you want to go to the line that
6 says, "Item 8."
7     Q. Okay. That's Quantitative and
8 Qualitative Disclosure -- I'm sorry. Financial
9 Statements and Supplementary Data; right?
10     A. Yes.
11     Q. So that will be Page 71 of the 10K.
12 Let's go there. Sir, just while I'm getting
13 there, is it accurate to say that you have been
14 the signer of the 10K at least since you became
15 the Chief Financial Officer?
16     A. Yes.
17     Q. Okay. All right. I'm at page 71, and
18 it says "Management's Responsibility for
19 Financial Statements." Do you see that?
20     A. Yes.
21     Q. And then your name is at the bottom. Do
22 you see that?
23     A. Yes.
24     Q. Great. Okay. It says that these
25 statements -- can you just tell me about this

Page 48

1 audit by Grant Thornton? Are the statements that
2 are in this 10K, are they audited or unaudited?
3 What's the status of them?
4     A. Audited.
5     Q. Okay. So everything that's in here has
6 been subject to an audit?
7     A. Yes.
8     Q. All right. I got it.
9         Okay. So I'm going to move down.
10 And this is the annual report. I don't -- will
11 you tell me when to stop when I can get to the
12 asset structure and ask you some questions about
13 it? I am just kind of scrolling through it Novoa
14 22756.
15         Is that where to stop?
16     A. That's the account statement so one
17 more.
18     Q. Is this it?
19     A. No. Keep going. Right there.
20     Q. Okay. All right. So that's your
21 balance sheet. Yeah?
22     A. Yes.
23     Q. Okay. It says GEO's current assets are
24 $4.3 billion; right?
25     A. Yes. Total assets.

Page 49

13 (Pages 46 - 49)

1    Q.  Total assets.  We're not talking about
2  liabilities.  We're just looking at the asset
3  side of the ledger.
4        Where in this Assets box at the top
5  of GEO Novoa 22760, can I determine GEO's
6  revenues for the Adelanto Detention Facility?
7        And I am not asking specifically
8  like the amount.  I am just trying to figure out
9  what line items those go into.
10    A.  It wouldn't be on the balance sheet.
11    Q.  Okay.
12    A.  The revenues are on the income
13  statement.
14    Q.  Okay.
15    A.  The ownership interest is on the balance
16  sheet.
17    Q.  Okay.  So if GEO says that the Adelanto
18  Facility has a book value of $141 million, is
19  that in the Property and Equipment Net line?  Is
20  that where that goes?
21    A.  Yes.
22    Q.  Okay.  And I am going to represent to
23  you, I think that that's what GEO has said in its
24  10K or another filing.
25        Okay.  So these are your assets.

Page 50

1  This is what GEO has in assets; correct?
2    A.  Yes.
3    Q.  Okay.  And that's -- I am highlighting
4  the Property and Equipment, the net of that.
5  Does the top line of this current Assets
6  section -- does the top line -- it says 32
7  million?
8    A.  Yes.
9    Q.  32.463 million; is that right?
10    A.  Yes.
11    Q.  All right.  So GEO has about 32 million
12  of cash and equivalents on hand as of this 10K;
13  correct?
14    A.  Yes.
15    Q.  All right.  You were at GEO for the
16  conversion to the Real Estate Investment Trust
17  corporate form, weren't you?
18    A.  Yes.
19    Q.  Just very briefly, why did GEO make the
20  determination to convert to a REIT?
21        MR. VAN PELT:  We object as it may
22  call for spec- -- may lack personal knowledge.
23  BY MR. FREE:
24    Q.  Let's make some personal knowledge.
25  Mr. Evans, were you involved in the decision to

Page 51

1  convert to a Real Estate Investment Trust?
2    A.  Yes.
3    Q.  Okay.  What was your involvement?
4    A.  I worked with the tax and legal advisors
5  as well as financial advisors to make the request
6  and provide support and analysis to the IRS to
7  obtain a ruling, what's referred to as a private
8  letter ruling, that -- where they basically
9  give -- sign off in advance that if we meet
10  certain requirements and rules and regulations
11  under the code, that they would interpreter
12  our -- our status change to a REIT as being
13  qualified under the IRS rules.
14    Q.  And did you think that was a good idea
15  for the company?
16    A.  Yes.
17    Q.  Why?
18    A.  I felt at the time that it would improve
19  shareholder value.  It would take into account
20  the structure of our business, which is very
21  asset-intensive.
22        We do own a significant amount of
23  the facilities that we operate and they're
24  long-term assets.  We have long-term contracts
25  with government or relatively long-term

Page 52

1  contracts, which supported the predictability of
2  our cash flows and the ability to be able to both
3  service our debt and provide a dividend to
4  shareholders, which is required under the REIT
5  structure.
6    Q.  Do you had any idea as you sit here
7  today how much GEO needs to pay out as a
8  percentage in dividends?
9    A.  We pay approximately 70 percent of our
10  cash flow in the form of a dividend.  We are
11  required under the IRS Rules to pay 90 percent of
12  our pre-tax income, which is not the same as our
13  total cash flow.
14        So cash flow is more than our
15  pre-tax income.  So we end up paying out more
16  than the amount that we are required to by the
17  IRS, but it ends up being about 70 percent of our
18  cash flow.
19    Q.  Okay.  What other requirements does GEO
20  have to follow to maintain its REIT statues?
21        MR. VAN PELT:  Objection.  Vague
22  and ambiguous?
23        THE WITNESS:  There's a number of
24  them. But, you know, the most important one is
25  the one that I described relative to the

Page 53

14 (Pages 50 - 53)

1 dividend, making sure that it's paid out, you
2 know, in the proper amount or the minimum proper
3 amount. And then we also have to have a certain
4 percentage of our assets include as real
5 estate -- or real estate assets, qualifying real
6 estate assets, and a certain amount of our income
7 being generated from those assets.
8         And there's a complicated formula
9 and process that that's developed under, but
10 those are kind of the basic broad requirements.
11     Q. Okay. Do you see your --
12     A. You've got some of them up there on the
13 screen, actually, right there.
14     Q. Yeah. So this is a document that's
15 publically available. I don't know why it says
16 "Company Confidential."
17         Do you see "Company restructuring
18 toward 2013 REIT conversion"?
19     A. Yes.
20     Q. All right. Forward looking. This
21 happened in 2012, December of 2012; right?
22     A. Yes.
23     Q. So you would have been the CFO at that
24 time?
25     A. Yes.

Page 54

1     Q. All right. You have notified
2 shareholders this contains forward-looking
3 statements; right?
4     A. Yes.
5     Q. And you needed to do that as a safe
6 harbor; correct?
7         MR. VAN PELT: Objection. Calls
8 for speculation and also a legal conclusion.
9         But the witness can answer if he
10 knows.
11         THE WITNESS: We do that with any
12 public disclosure we make before our conference
13 calls. This was probably part of a conference
14 call setting, so...
15 BY MR. FREE:
16     Q. Okay. Is it your understanding as CFO
17 and a corporate officer for a publicly traded
18 entity that you're require to identify which
19 statements are forward-looking when you are
20 giving that sort of information to the market?
21         MR. VAN PELT: Again, objection
22 that it calls -- may call for spec-- -- witness
23 may lack personal knowledge and calls for a legal
24 conclusion.
25         The witness can answer to the best

Page 55

1 of his knowledge.
2         THE WITNESS: Are you asking before
3 each specific statement that we make?
4 BY MR. FREE:
5     Q. No, sir. I am not. I am not saying
6 that you have to go through and highlight the
7 forward-looking statements in your 10K. I am
8 just saying, as a general matter, I think we can
9 agree, notwithstanding your counsel's objections,
10 that you as the CFO know, you got to put one of
11 these forward-looking statement disclosures on
12 your communication or else an investor can turn
13 around and sue you?
14     A. Generally, that's correct --
15         MR. VAN PELT: Same objection
16 (technological interruption).
17 BY MR. FREE:
18     Q. Okay. All right. Were you involved in
19 the preoperation of this document, if you recall,
20 sir?
21     A. Yes.
22     Q. And when I asked you -- I thought
23 putting it up might be a little quicker than
24 having you go through memory. Because, again, we
25 are just doing table setting. It says, "A REIT

Page 56

1 is an entity that," and then there is four bullet
2 points. Do you see that?
3     A. Yes.
4     Q. All right. The third bullet point
5 includes deriving at least 75 percent of its
6 gross income from real estate related sources and
7 at least 95 percent of gross income from real
8 estate related sources, dividens, and interest.
9 Do you see that?
10     A. Yes.
11     Q. All right.
12         MR. FREE: Let's take a quick
13 break, because we have been on the record for an
14 hour now, and I need to use the restroom. Okay?
15 So let's do just five minutes, if that's okay
16 with you.
17         THE WITNESS: Sure. Sounds good.
18         MS. WILKE: Okay.
19         THE VIDEOGRAPHER: Okay. We are
20 off the record at 12:35 p.m. This is the end of
21 File Number 1.
22         (Recess taken.)
23         THE VIDEOGRAPHER: We are back on
24 the record at 12:43 p.m. This is the beginning
25 of File Number 2.

Page 57

15 (Pages 54 - 57)

BY MR. FREE:

Q. Okay. Mr. Evans, anything about your testimony from before the break that we need to revisit at all?

A. No.

Q. Okay. Historically, where is GEO's stock price right now compared to where it has been in the past?

MR. VAN PELT: I am going to object as to vague and ambiguous as to "in the past" as to time frame.

The witness can answer.

THE WITNESS: Did you want to specify a time frame?

BY MR. FREE:

Q. I'd like the question -- I would like the answer to the question I asked.

A. I would say over the last 12 to 18 months it's low, lower than certainly over the last three or four years.

Q. What's the highest the stock price has ever been?

A. Relative to our current stock price, like taking into account stock splits and so forth, I think probably 33 to $35.

Page 58

Q. What's it at now?

A. It's at 11 to 12.

Q. GEO has more beds under management than almost ever in its history. You are down from a high of around 100,000 to 93,000. And GEO's revenues are higher than they have been at any time except for last year; correct?

A. Yes.

Q. And its stock price is at a third of what it was trading five years ago?

A. Within the last five years.

MR. VAN PELT: Objection.

BY MR. FREE:

Q. Okay. Do -- what do you attribute that to?

MR. VAN PELT: Object. It's vague and ambiguous and calls for speculation.

BY MR. FREE:

Q. Do you have an opinion as to why GEO's stock price is lower than it was when it was at 33, $35 a share?

A. There's a lot of factors impacting that. There is a significant amount of political -- I call it political overhang on the stock, speculation about what will occur if there is a

Page 59

Democratic administration, specifically if you know, president Biden wins or Vice President Biden becomes the next president, what that would mean with regards to the company's business prospects, you know, the services that we provide to the government, et cetera. So I think a lot of its overhang relative to then.

There has been what's referred to, it's relatively new in the last five years, I think, within the U.S. equity markets, an increased focus on what's known as ESG issues, environmental, social, and governance related issues. And we've received negative press relative to that, and it's put pressure on some of our lending institutions. So some of those lending institutions have made public comments about whether or not they will lend to the industry and our company specifically in the future. So that's put pressure on the equity price as well.

So there's a number of different factors, but those are probably some of the biggest factors. As far as, as you point out, the company's actual performance throughout that period has been consistent. It's been strong if

Page 60

not even improving consistently throughout that period. But those -- those non- -- those factors that really are outside our control and that we don't -- you know, that don't have any necessarily relationship to our financial performance are overweighing the stock price right now.

Q. And if I could just say back to you what I heard you say to make sure I heard it correctly, I heard you list the uncertainty around the election in November of 2020 as one factor. And the second would be the ESG concerns and the follow-on impact of those concerns on your lending institutions who have made public statements that they will no longer lend to not to just GEO, to be fair, but other private prison corporations. Is that the a fair summarization of the two factors you've told me so far?

A. I guess I would be -- relative to the election, I would say it's uncertainty with regards to what will occur under a new Democratic executive administration.

Q. Okay. Do you remember the shareholder call in August of 2020, sir?

A. Yes.

Page 61

16 (Pages 58 - 61)

1     Q.  Do you remember Dr. Zoley stating that
2  he thought that the stock price would rebound
3  after the 2020 election, sir?
4     A.  Yes.
5           MR. VAN PELT:  Object as facts not
6  in evidence.
7           THE WITNESS:  Sorry.
8  BY MR. FREE:
9     Q.  That's okay.  And just remember to take
10  a quick pause for your counsel to object.  Okay?
11     A.  Yep.
12     Q.  And I will slow down as well.
13           Okay.  Did you hear Dr. Zoley state
14  that he expected the stock price to recover after
15  the 2020 election during the 2020 call?
16           MR. VAN PELT:  Same objection.  It
17  assumes facts that are not in evidence.
18           THE WITNESS:  I recall some
19  comments along those lines.
20  BY MR. FREE:
21     Q.  Have you spoken with Dr. Zoley about
22  that, sir?
23     A.  We have conversations.
24     Q.  Around that?
25     A.  Around those issues, yes.

Page 62

1     Q.  Okay.  The specific of issue of GEO's
2  stock price rebounding after the 2020 election,
3  you have spoken with Dr. Zoley about that issue?
4     A.  Yes.
5     Q.  Okay.  What is, if you know, the basis
6  of that belief?
7     A.  Well, and I think he's articulated, if
8  not in that call, in other calls, and I've
9  articulated as well that -- as I just articulated
10  with you as well, that there is uncertainty
11  around the election and the outcome of the
12  election.  And I think after the election there
13  will be clarity one way or the other.  There
14  either will be the incumbent will remain or there
15  will be a new administration.  And that will also
16  provide clarity.
17     Q.  Can we agree generally that markets like
18  predictability and they don't like uncertainty?
19     A.  That's a reasonable assumption, yes.
20     Q.  Okay.  It sounds like Dr. Zoley's
21  representation during the call and your belief
22  about the potential impact on the stock price
23  after the election has something to do with that
24  premise, that markets don't like unpredictability
25  and they do like stability.  Is that fair?

Page 63

1           MR. VAN PELT:  Objection.  Calls
2  for speculation as to Mr. Zoley's belief and in
3  general.
4           THE WITNESS:  Yeah.  I guess I can
5  speak to my own personal belief.  I can't speak
6  to his, but I --
7  BY MR. FREE:
8     Q.  You are his CFO and we are talking about
9  the stock price.  I am a little confused.  You
10  guys don't talk about that?
11           MR. VAN PELT:  Objection.  It's
12  argumentative.  It's been -- the question has
13  been asked and the witness is trying to answer.
14  BY MR. FREE:
15     Q.  You can answer.  You don't speak with
16  Dr. Zoley about the company's stock price?
17     A.  Yes.  We have spoken, as you described,
18  that he expects the price to improve after the
19  elections.  He hasn't given me all of the
20  specific reasons that he believes that to be the
21  case.
22     Q.  Okay.  Well, what about you?  What do
23  you believe?
24     A.  I believe, as I said, I think that when
25  there's --

Page 64

1           MR. VAN PELT:  Objection.  It calls
2  for speculation.  Same objection.  It calls for
3  speculation.
4           The witness can answer as to his
5  own personal knowledge and belief.
6  BY MR. FREE:
7     Q.  The question was:  What do you believe?
8  Mr. Evans, what's the answer?
9     A.  As I said, I believe that after the
10  election that there will be clarity and that will
11  help the stock price overall.  It may -- if it's
12  a Democrat that's elected, if it's Vice President
13  Biden, it may take longer for that clarity to
14  materialize, but I do believe that when that
15  clarity is -- comes through, that the company's
16  equity value will improve.
17     Q.  Thank you.  I appreciate that.  If I
18  were to try and understand GEO's explanation of
19  the -- I am going to put it up on your screen so
20  we can be on the same page literally -- of the
21  difference between a REIT -- not a REIT, but a
22  managed and owned facility versus a TRS facility.
23  So I am really -- the question that I am about to
24  ask is just understanding the difference between
25  what's up here, okay?

Page 65

1    A. Uh-huh.
2    Q. I am trying to understand the difference
3    between the left side and the right side. And I
4    think that I could do that if I were to look at
5    GE0's 10K, which is Exhibit 192 that we were
6    looking at earlier for 2019, this is Novoa 22766,
7    and I think that the highlighted paragraph that
8    I've got -- can you see that highlighted
9    paragraph?
10    A. Yes.
11    Q. Okay. It says "Through the TRS" -- and
12    that's Taxable REIT Subsidiary; correct?
13    A. Yes.
14    Q. All right. "Through the TRS structure,
15    the portion of GEO's businesses which are
16    non-relate related, such as managed-only
17    contracts, international operations, electronic
18    monitoring services, and non-residential and
19    community-based facilities, are part of
20    wholly-owned taxable subsidiaries of the REIT."
21    Did I read that correctly?
22    A. Yes.
23    Q. All right. It says, "Most of GEO's
24    business units which are real estate related and
25    involve company owned and company leased

Page 66

1    facilities are part of the REIT"; is that right?
2    A. Yes.
3    Q. "The TRS structure allows the company to
4    maintain the strategic alignment of all of its
5    diversified business segments under one entity.
6    The TRS assets and operations will continue to be
7    subject to federal and state corporate income
8    taxes and to foreign taxes as applicable in the
9    jurisdictions in which those assets and
10    operations are located."
11    Do you see that?
12    A. Yes.
13    MR. VAN PELT: I am going to object
14    (technological interruption).
15    BY MR. FREE:
16    Q. Did I read that correctly? Did I read
17    that correctly, Mr. Evans?
18    A. Yes.
19    Q. Okay. It says "The TRS assets and
20    operations will continue to be subject to federal
21    and state corporate income taxes" in the
22    second -- in the last sentence on the
23    second-to-last line.
24    What about the non-TRS assets? Are
25    those subject to federal and state corporate

Page 67

1    income taxes at the same levels?
2    MR. VAN PELT: I am going to object
3    that it calls for a legal conclusion and we are
4    sort of --
5    MR. FREE: David, we are not going
6    to tolerate speaking occasions. You need to make
7    your objections, and that's going to be the end
8    of it.
9    MR. VAN PELT: I made my
10    objection --
11    MR. FREE: Thank you. We are done.
12    MR. VAN PELT: -- but I want to put
13    it on the record that we are straying from the
14    relevant issues in this case. I have been very,
15    you know, patient and understanding.
16    MR. FREE: David, would you like to
17    halt the deposition and call Magistrate Judge
18    Claramonte.
19    MR. VAN PELT: Not yet. But I am
20    lodging my objection that we have let it go --
21    this line of questioning go quite far, and I
22    am -- I am concerned that it's beyond the
23    relevance to this case. I'd like you to --
24    MR. FREE: Well, put your money
25    where your mouth is. Call the judge. That's

Page 68

1    what you've got to do if you are going to make a
2    relevance objection. Do you want to do it?
3    MR. VAN PELT: It's harassing. I
4    am making an objection and --
5    MR. FREE: It's 9:55 right now.
6    The Court's open, David. Should we get them on
7    the line?
8    MR. VAN PELT: I am just -- I am
9    not going to halt the deposition now, but I am
10    letting you know that --
11    MR. FREE: No. Because you know
12    your objection is baseless. Stop talking over my
13    questions. Make your form objection or be done.
14    If you want to make a relevance objection and
15    instruct him not to answer, call the judge. No
16    more. Do you understand? No more.
17    MR. VAN PELT: I have made my
18    objection. I made my objection.
19    MR. FREE: Good.
20    BY MR. FREE:
21    Q. Mr. Evans, the question that I have for
22    you is: Are the Non-Taxable REIT Subsidiary
23    entities, that's the managed and owned
24    facilities, are they subject to the same tax
25    structure as the TRS entities?

Page 69

18 (Pages 66 - 69)

1        MR. VAN PELT:  Same objection.  It
2 calls for a legal conclusion.
3        THE WITNESS:  So --
4        MR. VAN PELT:  And may call for
5 speculation, too.
6        THE WITNESS:  I look at it simply
7 as they are all subject to the IRS rules and
8 regulations and taxes.  The difference between
9 the real estate or the REIT qualifying assets is
10 that they -- those entities -- and that's why I
11 talked earlier about the pre-tax income and the
12 90 percent dividend requirement under the IRS.
13 As long as, as a company, we pay out a dividend
14 that's at least equal to 90 percent of that
15 pre-tax income, we get to deduct that dividend as
16 an expense.
17        So non-REIT companies, regular C
18 corporations, their dividends -- and some of them
19 pay dividends -- are not tax deductible.  Our
20 dividend is tax deductible just like other
21 regular expenses our pre-tax income as
22 long as it's more than 90 percent of our pre-tax
23 income.
24        As I said to you before, we pay
25 more than the 90 percent amount of our pre-tax
Page 70

1 income.  But if we only paid 90 percent, the 10
2 percent of pre-tax income that was left over in
3 the REIT would still be taxed at the same rates
4 as any other corporation.  It's just that we pay
5 over 100 percent so there is nothing left to tax.
6 Make sense?
7 BY MR. FREE:
8    Q.  It does make sense.  I really appreciate
9 that.
10        And when you say you pay "over 100
11 percent," that's paying to shareholders in the
12 form of a dividend; right?
13    A.  Yes.
14    Q.  And when you say "over 100 percent," the
15 metric -- the 100 percent that we are talking
16 about, is that -- is that all income or is that
17 the TRS income excluded or what is the 100
18 percent?  100 percent of what, is my question?
19    A.  More than 100 percent of our taxable
20 income in the REIT.  So the REIT's income -- you
21 know, looking at this is now getting into, like,
22 the tax calculations and the tax books and
23 records, which there is actually different
24 accounting in tax than there is in financial
25 accounting.  Both of which are legal, and I am
Page 71

1 not going to get into all of the differences
2 between the two.
3        But the REIT, as you mentioned
4 earlier, owns the Taxable REIT Subsidiary.  So
5 the income in the REIT consists of all of the
6 income that the REIT generates from its real
7 estate facilities, what you call the managed and
8 owned facilities.
9        It also includes income from the
10 non-real estate activities that are transmitted
11 to the REIT in the form of a dividend.  So it
12 includes all of the earnings in the facilities
13 plus any dividends to it from Taxable REIT
14 Subsidiaries.  That all gets calculated as
15 taxable income in the REIT, and we have to pay
16 out more than 90 percent of that in the form of a
17 dividend.
18    Q.  That's really helpful.  Thank you.
19        I just want to make sure that -- I
20 am going to try to apply this principle so that I
21 make sure I understand it.  I am looking at the
22 dividend payouts from the 10K.  Do you see that
23 on your screen?
24    A.  Yes.
25    Q.  All right.  Do we agree these are GEO's
Page 72

1 dividends between February 6th, 2017 -- these are
2 the declaration dates -- and October 14th, 2019?
3        MR. VAN PELT:  I would object that
4 the document speaks for itself.  The witness --
5        MR. FREE:  What does it say, David?
6        MR. VAN PELT:  The document speaks
7 for itself.
8        MR. FREE:  I can't hear it.  What's
9 it say?
10        MR. VAN PELT:  Read --
11        MR. FREE:  Yeah.  Sure.  What does
12 it say?
13        MR. VAN PELT:  It's your
14 deposition.
15        MR. FREE:  Well, you are telling me
16 the document speaks for itself.  I can't hear it.
17 Okay?  I don't think you can either.  Documents
18 don't have voices.  They don't have mouths.
19        I am asking your witness whether
20 these are the dividends that were paid out from
21 February 6th, 2017, to October 14th, 2019.
22 BY MR. FREE:
23    Q.  Mr. Evans, are those the dividends paid
24 out?
25        MR. VAN PELT:  And my objection is
Page 73

19 (Pages 70 - 73)

1  this document speaks for itself, and the question
2  is -- it's argumentative, but the witness can
3  answer.
4      THE WITNESS:  Yes.
5  BY MR. FREE:
6      Q.  Thanks.  Each aggregate payment totalled
7  between 52.5 million and 58.2 million; right?
8      A.  Yes.
9      Q.  Okay.  So what is the difference between
10 qualified and non-qualified?
11 The second to the last -- or the
12 third-to-last and the fourth-to-last column on
13 this document?
14     A.  Let me see.
15     Q.  I think it -- can I ask a simpler
16 question?  It might be easier and just move it
17 along.
18     A.  Yes.
19     Q.  All right.  So this -- I think that
20 these are numbers that go into the distribution
21 per share.  Do you agree with me on that?
22     A.  Yes.  Those are components.  The
23 qualified, the non-qualified, and the
24 non-dividend distribution, those three columns
25 should add up to the distribution per share.

Page 74

1  BY MR. FREE:
2      Q.  How?
3      A.  Well, this is talking about gross income
4  that the -- this is talking about gross income,
5  which is not the same as revenue.  So gross
6  income would be more in line with when we were
7  looking -- I don't know if I can refer back to
8  the other deposition, but when we looked at those
9  financial schedules --
10     Q.  Wait.  Wait.  Wait.  Wait.  Stop.  Stop.
11 I have to stop you, because while I am party to
12 that Protective Order, nobody on my team is party
13 to your prior depositions -- to the Protective
14 Orders that cover your prior depositions.  Okay?
15     I take those things very seriously.
16 GEO has a right to its confidential financial
17 information remaining confidential.  Okay?  I
18 don't want you to testify in -- like by just
19 incorporating your testimony, but I don't think
20 you have to.  Do you understand?
21     A.  I can do it differently.
22     Q.  All right.  Cool.  And if there is a
23 document that helps you explain this, I am happy
24 to look at it or put it up.  I think it might be
25 in the slides, but I am not sure.

Page 76

1      Q.  Okay.  Thank you.  All right.  So we're
2  going to go back to the revenues that we looked
3  at before.
4      A.  All right.
5      Q.  And I was asking you before how I would
6  determine what's a REIT -- what's a Taxable REIT
7  Subsidiary revenue versus what's an owned and
8  leased revenue.  Do you remember we did the math?
9      Now we're looking at
10 Exhibit -- this is Novoa 22957.  The Q2 2020
11 revenue for owned and leased added up to, I
12 believe we said around 350 million.  Do you
13 remember that?
14     A.  Yes.
15     Q.  All right.  Then the Q2 2020 revenue for
16 non-owned and leased, in other words, the
17 non-REIT part of the business, added up to, I
18 believe, around 236 million?
19     A.  Yes.
20     Q.  So does GEO comply with bullet point
21 Number 3?
22     MR. VAN PELT:  We will object it
23 calls for a legal conclusion and calls for -- may
24 call for speculation.
25     THE WITNESS:  Yes.

Page 75

1      A.  Yeah.  So if you go back to the slide --
2      Q.  Okay.
3      A.  -- we were looking at before --
4      Q.  Yeah.
5      A.  Keep going.
6      Q.  Yeah.
7      A.  You are bringing it up.  I'm sorry.
8      Q.  I am bringing it up.  All right.  Is
9  this -- wait.  Is that the right one?
10     A.  Yeah.
11     Q.  I am just going to give you remote
12 control, and if you want to --
13     A.  I don't need it.  It's right there.
14     Q.  Okay.
15     A.  The -- so where it's referring to gross
16 income, it's not exactly the same because there
17 are certain adjustments and calculations that are
18 allowed to be made to various components of
19 income under the tax rules and the REIT rules.
20 But if you look at the section that's titled "Net
21 Operating Income" that's right below Revenues,
22 you can start to see that there is a significant
23 percentage of our -- a much more significant
24 percentage of the earnings coming from the real
25 estate-related assets than from the non-real

Page 77

20 (Pages 74 - 77)

1  estate related businesses.
2       The real estate related assets, as
3  we've said in many of our public filings, have
4  higher margins and higher level of condition
5  to the company's overall financial largely
6  because of the significant capital investment
7  that's been made.
8       So I don't -- so the combination of
9  the income from those three real estate related
10 ones, as well as, as I said before, the REIT gets
11 to take -- take -- and that's where the 95
12 percent comes in -- gets to take the earnings
13 from the non-real estate related business in the
14 form of a dividend, and that gets included with
15 this.  So the 75 goes to 95 percent by including
16 the dividends that are coming up from the Taxable
17 REIT Subsidiaries for any income that they have.
18 And the income in the non-real estate related
19 businesses is adjusted and reduced by things like
20 interest expense and -- as well as some
21 allocation of overhead expenses.
22       So those things adjust the income
23 in the non-real estate related businesses, and
24 then they're all compared together to meet those
25 requirements that you showed on the other slide.

Page 78

1  But we go through that process every quarter to
2  evaluate our compliance with those requirements.
3       And it's much more in depth than
4  what I described and there is, you know,
5  significant calculations behind that but, you
6  know, those are minimum necessary requirements we
7  make sure we meet every quarter.
8       Q.  So -- okay.  Is there any functional
9  distinction between the services GEO provides at
10 its ICE detention facilities that are Taxable
11 REIT Subsidiaries versus those like at Adelanto
12 that GEO owns and manages?
13      A.  No.  Generally, it's -- the difference
14 is mainly that for it to be a REIT asset, we have
15 to own it.  But for the Managed Only facilities,
16 I mean, the institutional services that are going
17 on day to day are generally the same.
18      Q.  So if an ICE facility that's operated --
19 or a GEO facility that operates pursuant to an
20 ICE contract is a Taxable REIT Subsidiary or
21 managed and owned facilities, the difference is
22 that GEO actually owns the property?  That's the
23 difference?
24      A.  That's the main difference that I am
25 aware of, yes.

Page 79

1       Q.  Okay.  Thank you.  All right.  Sir,
2  under the GAAP, do you have any understanding as
3  to what good will is?
4       A.  Yes.
5       Q.  What is it?
6       A.  Generally or broadly, good will on our
7  balance sheet relates to companies that we
8  acquired, that is the value of the company, what
9  we paid for the company, that was in excess of
10 the fair market value of its tangible
11 identifiable assets.
12      Q.  Okay.  I am going to try saying that
13 back to you, because I am not an accountant and
14 you are.  I just want to make sure I got it
15 right.  All right?
16      So you buy a company.  Let's call
17 it BI.  All right?
18      A.  Uh-huh.
19      Q.  At some point in that purchase and sale
20 agreement or in the process of buying the
21 company, you figure out what is it -- what is it
22 worth in terms of just tangible hard assets;
23 right?
24      A.  Right.
25      Q.  And then you purchase at a price that

Page 80

1  may be higher than that calculation; is that
2  right?
3       A.  That's correct.
4       MR. VAN PELT:  Objection.  It's an
5  incomplete hypothetical.
6       MR. FREE:  I am not done with the
7  question.  Well, Okay.  Whatever.
8  BY MR. FREE:
9       Q.  The difference between the tangible
10 assets of the company and the purchase price is
11 what GEO considers or what the accounting
12 practices consider to be good will; is that
13 right?
14      A.  That's correct.
15      Q.  Okay.  Does good will appreciate or
16 depreciate?
17      A.  It stays the same.  It can be adjusted
18 depending on -- there are -- there are reasons
19 that you might impair or reduce the value of good
20 will, but generally, it stays the same.  It
21 doesn't change.  It doesn't appreciate or
22 depreciation.
23      Q.  Okay.  What would be the reasons that
24 you would adjust the value of good will?
25      MR. VAN PELT:  I'll object that

Page 81

21 (Pages 78 - 81)

1 calls for speculation, and it's an incomplete
2 hypothetical.
3         THE WITNESS:  So generally good
4 will is reduced in value if there is an erosion
5 in the value of the underlying businesses that
6 you acquired.  Typically, as a result of a loss
7 of cash flows or a loss of -- you know, a loss of
8 cash flows.
9 BY MR. FREE:
10     Q.  Anything else?
11     A.  No.  That would generally be the reason
12 that you are writing off good will.
13     Q.  What about if you were to sell the
14 assets of a business that you required -- that
15 you had acquired?  Would that affect the good
16 will amount?
17     A.  Well, whatever good will you had
18 associated with that business, when you sell it,
19 you know, you take all of the assets off of the
20 books, including -- you know, all of assets and
21 liabilities related to any business that you
22 sell, including good will associated with that
23 business from when you acquired it, and you would
24 write those -- you know, that would be how you
25 accounted for your sale of the asset.  For the

Page 82

1     Q.  Yeah.  Well, let me cut to the end of
2 it, and then I will try and understand if there
3 is any, like, intermediary steps that we need to
4 get to.  Okay.
5         Is there a good will value that is
6 currently attached to the Adelanto Detention
7 Facility?
8     A.  Not in our -- not included in our
9 financial statements.
10     Q.  Okay.  Is there a good will value that's
11 attached to any ICE detention facility under
12 contract with GEO?
13     A.  No.
14     Q.  Okay.  And I think that the answer to
15 that question is that GEO didn't really buy any
16 of those facilities, and so there won't be any
17 good will hanging over, or do I have -- is that
18 the wrong answer to why that is?  What's the
19 right answer, if my --
20     A.  Well --
21         MR. VAN PELT:  I am going to
22 object.  I am going to object that calls for --
23 that calls for speculation.
24         THE WITNESS:  So just to -- you are
25 testing my financial accounting but --

Page 84

1 business, I should say.
2     Q.  In your business, does a facility have
3 to have a contract to have a value with respect
4 to good will, or can you just look at the
5 underlying land and sort of physical tangible
6 assets and make a valuation?
7         MR. VAN PELT:  Object as vague and
8 ambiguous.  You can answer.
9         THE WITNESS:  So I would say
10 for -- we don't have good will associated with
11 facilities that we developed ourselves.  We would
12 only have good will -- and good will is not
13 typically associated with a facility.  It's just
14 broadly associated.
15         If we acquired a company that had a
16 bunch of facilities, after we valued those
17 facilities and put them on our books for whatever
18 value they were at the time we acquired them, as
19 I described before, the excess becomes good will.
20         Facilities that we build ourselves
21 are just whatever our initial cost investment in
22 the facility was, and that's it.  There is no
23 good will on those.  So did I answer your
24 question or did you have --
25 BY MR. FREE:

Page 83

1 BY MR. FREE:
2     Q.  It's okay.
3     A.  The good will -- good will is not --
4 when you acquire a business, there is -- as I
5 said, there is the tangible assets, which
6 property and equipment and accounts receivable,
7 those types of things, then there is the excess
8 of the purchase price over those tangible type
9 assets that I described.
10         There is two pieces.  There is
11 identifiable intangible asset, and then there is
12 good will after that.  Identifiable intangible
13 asset would be where we go as a company and we
14 look at, for instance, contracts.  We bought a
15 business that had facilities.  Those facilities
16 had a value, a hard value, but they also had a
17 contract on them.  And that contract is then
18 valued under certain principles, valuation
19 principles.
20         So you have -- you may have certain
21 identifiable intangible assets associated with
22 contracts that have a value, and those depreciate
23 or amortize over time, similar to like a property
24 and equipment.
25         And then the good will is whatever

Page 85

22 (Pages 82 - 85)

1 is left. And it's associated with the business
2 overall. It not tied to a specific asset. And
3 generally, the identifiable intangible assets,
4 those are more -- there may be some of those
5 where we acquired a company that had ICE
6 contracts on some of the facilities that we
7 acquired, and there has then been a value imputed
8 to those contracts that we acquired.
9     Q. Do you know one way or the other whether
10 the Adelanto Facility which GEO acquired prior to
11 its opening in 2011, had any good will associated
12 with it?
13     A. No. There was none.
14     Q. All right. There was none?
15     A. There was none.
16     Q. That's helpful. Okay. I think we
17 understand.
18         Okay. Is it correct that GEO
19 borrowed money or used money that it had borrowed
20 out of its revolving debt account to buy back
21 stocks in 2018?
22     A. Yes. I belive so. I mean, I know we
23 bought back stock. I don't know the exact year,
24 but 2018 sounds right.
25     Q. Yeah. This is an open-book test. So I

Page 86

1 am just going to look at the 10K, 22785. I am
2 looking at the Stock Buyback Program. It says,
3 "On February 14th, 2018, the Company announced
4 that its Board authorized a stock buyback
5 program."
6         And then I am looking at, during
7 the year ended 20 -- December 31st, 2018, the
8 company purchased 4.2 million and change shares
9 of its common stock at a cost of 95.2 million,
10 primarily purchased with proceeds from the
11 company's revolver; is that correct?
12     A. Yes.
13     Q. The company has a revolving debt -- or
14 credit facility of, I believe, up to
15 $900 million; is that right?
16     A. Correct.
17     Q. And there is about 352 left on it; is
18 that right?
19     A. Sounds about right.
20     Q. And they purchased $95 million worth of
21 stock in 2018 with the money from the revolver;
22 right?
23     A. Correct.
24     Q. Why did GEO do that?
25         MR. VAN PELT: I will object as may

Page 87

1 call for speculation.
2 BY MR. FREE:
3     Q. Do you know, Mr. Evans, as you sit here
4 today, why GEO bought back $95 million of its
5 stock in 2018?
6     A. At the time, it was to -- we felt that
7 the stock was undervalued, and it was to support
8 the stock price as well as reduce the amount of
9 shares outstanding. So it has -- it has an
10 accretive impact to earnings, and it -- it's a
11 way of providing additional return technically to
12 shareholders.
13     Q. Is it true that you and Dr. Zoley and
14 several other members of GEO's executive team
15 have compensation in GEO's stock?
16         MR. VAN PELT: Let me object as
17 vague as to time and scope.
18 BY MR. FREE:
19     Q. Do you understand my question,
20 Mr. Evans?
21     A. Yes.
22     Q. How much is your compensation package in
23 stock?
24     A. Well, it varies from year to year. It
25 depends on the value of the shares and whatnot,

Page 88

1 but it's -- generally, I get issued about 30 to
2 50,000 shares as a target. And it just depends
3 on a number of factors how much that ends up
4 actually being. It's over a three-year period
5 that it's looked at.
6     Q. So it's 30 to 50,000 shares that you
7 would get issued, depending on some things. Is
8 it true to say that the most important -- the
9 most important determiner of what's that worth is
10 the stock price?
11         MR. VAN PELT: Let me object as
12 assumes facts not in evidence.
13         THE WITNESS: Well, the value of
14 the shares when they vest are going to be, yeah,
15 what's the share price of the stock times the
16 number of shares that I have outstanding.
17 BY MR. FREE:
18     Q. Yeah. So if you have 50,000 shares
19 outstanding today, and we are at $11, you've got
20 $550,000 in value. If you have 50,000 shares
21 outstanding in 2015, we are three times that;
22 right?
23     A. I don't know what the stock price
24 was but it was certainly more.
25     Q. Well, we were talking -- yeah. We are

Page 89

23 (Pages 86 - 89)

1 talking about a range of -- you know, a high, a
2 five-year high, of around 33, 35. Do you
3 remember that testimony?
4     A. Yes.
5     Q. Okay. Each of GEO's corporate officers,
6 then, stands to benefit from buying back stocks
7 with this borrowed money; correct?
8     A. Nominally, but yes.
9     Q. What impact did the stock buyback have
10 on the share price, if you know?
11     A. Well, typically, most companies, and
12 what we were trying to do at the time, was buy it
13 when the stock was sort of on a downward
14 trajectory and kind of level that off. So I
15 don't know if it really -- on a net basis, if you
16 looked at it three to six months afterwards, if
17 it really did anything to increase the price.
18 But I think it stabilized it when we -- when we
19 were buying it. Probably between 18 and $22 is
20 when most of our acquisitions were made.
21     Q. Okay. That was in 2018?
22     A. Yes.
23     Q. If I understand correctly, GEO spent $95
24 million worth of borrowed money to buy stocks at
25 the 18-dollar range that are now worth $11 a

1 share, about?
2     A. Correct.
3     Q. Do you understand that? Okay.
4         So that $95 million that GEO owes
5 with interest has not appreciated?
6         MR. VAN PELT: Let me object as
7 vague.
8 BY MR. FREE:
9     Q. You can go ahead.
10     A. Well, the $95 -- the 95 million hasn't
11 changed in value as far as the -- the amount of
12 debt that's outstanding.
13     Q. Sure. You still owe the same 95 with
14 interest?
15     A. Right. And the shares have been
16 retired. They were put into treasury. So the
17 company doesn't own on its balance sheet those
18 shares moving up and down in value. They are
19 just retired.
20     Q. Okay.
21         THE COURT REPORTER: Mr. Free,
22 would it be possible to have a pause here? Go
23 off the record for just a moment.
24         MR. FREE: Of course. This is a
25 good stopping place. I don't have it more.

1 Okay. Thank you. Let's take, how about 10? Is
2 that okay? We'll go to half past the hour?
3         MR. VAN PELT: Sounds good.
4         THE VIDEOGRAPHER: All right.
5 We're off the record at 1:22 p.m. This is the
6 end of File Number 2.
7         (Recess taken.)
8         THE VIDEOGRAPHER: We're back on
9 the record at 1:33 p.m. This is the beginning of
10 file Number 3.
11 BY MR. FREE:
12     Q. Mr. Evans, did you speak with anyone
13 other than your counsel during the break?
14     A. No.
15     Q. All right. What do you understand this
16 lawsuit to be about?
17     A. It's regarding the voluntary work
18 program and whether or not the participants in
19 the voluntary work program should have been paid
20 something other than a dollar a day.
21     Q. Anything else?
22     A. Not that -- you know, there's a couple
23 of these. So some of them have claims under the
24 Trafficking and Victims Protection Act, but I am
25 not sure if this is one of them or not.

1     Q. So I am going to go ahead and put up the
2 disclosures from the most recent 10K. Maybe that
3 will help refresh your recollection. I will just
4 tell you, this is the one with the nationwide
5 force labor class.
6     A. Okay.
7     Q. Are you aware one of them was certified
8 for a nationwide force labor class?
9     A. Novoa, yes.
10     Q. Okay. Have you ever heard of the
11 Federal Acquisition Regulations?
12     A. Yes.
13     Q. Do you have some rough understanding of
14 what they are?
15     A. Yes.
16     Q. Okay. What's your understanding of the
17 Federal Acquisition Regulations?
18     A. Well, it's an exhaustive set of
19 regulations, I would say, generally providing the
20 rules and regulations around the relationship
21 between the federal government and contractors as
22 it relates to contracting, especially as it
23 relates to the financial aspects of federal
24 government contracting.
25     Q. Okay. Is it your understanding as you

24 (Pages 90 - 93)

1 sit here today that GEO is subject to the Federal
2 Acquisition Regulations in its contracts for ICE?
3          MR. VAN PELT:  I'm going to object
4 it calls for a legal conclusion and lacks
5 foundation.
6 BY MR. FREE:
7     Q.  You can answer.
8     A.  Yes.
9     Q.  Okay.  I've turned to Novoa 22819 in
10 Exhibit 192, which is GEO's 2019 10K.  Do you see
11 the portion that I have highlighted?
12     A.  Yes.
13     Q.  All right.  There is a note here --
14 what's the -- let's back up.  What does this
15 section mean to you, this Litigation, Claims, and
16 Assessments?  As the CFO at GEO, what is the
17 purpose of this section in GEO's 10K?
18     A.  Is this in the NDA or in the footnotes
19 to the financial statements?  I mean, it's
20 similar --
21     Q.  This is the NDA.  This is not the
22 note -- this is not Note 11.  I know what you are
23 talking about.  We will get to that in a second,
24 but I am just talking about this particular
25 disclosure.

Page 94

1     A.  It's just to provide disclosure around
2 potential litigation, claims, and assessments,
3 especially those that may have some sort of
4 material -- potential material outcome, or not
5 material but, you know, that could -- that aren't
6 necessarily apparent on the balance sheet because
7 there is no -- no accrual or no loss liability
8 that may have been recognized associated with
9 those.  So it's like a disclosure around
10 contingent liabilities.
11     Q.  It's a disclosure to the shareholders
12 and to the SEC; correct?
13     A.  Shareholders, SEC, potential investors,
14 et cetera.
15     Q.  Okay.  Do you see the paragraph that
16 begins "December 30th, 2019"?
17     A.  Yes.
18     Q.  All right.  So we know that this 10K at
19 least happened after December 30th, 2019, because
20 December 30th, 2019, is in the 10K.
21          GEO has not disclosed the existence
22 of the nationwide class in this case to the
23 shareholders.  You can read the paragraph
24 yourself, but the District Court in California
25 certified the class in 2019 for both Adelanto and

Page 95

1 nationwide.
2          Is there a reason GEO did not
3 disclose the nationwide class certification order
4 under the TVPA?
5          MR. VAN PELT:  Objection.  Calls
6 for speculation, a legal conclusion, and lacks
7 foundation.
8          THE WITNESS:  None that I am aware
9 of.  I don't know.  When was it -- when was it
10 certified?
11 BY MR. FREE:
12     Q.  It was certified early December of 2019
13 going back to late November.
14          Okay.  GEO says to its
15 shareholders, the market, and potential investors
16 that the company it has not recorded an accrual
17 relating to these matters at this time, as a loss
18 is not considered probable nor reasonably
19 estimatable at this stage of the lawsuit.  Do you
20 see that?
21     A.  Yes.
22     Q.  Has that changed since then 10K came
23 out?
24          MR. VAN PELT:  I object it calls
25 for a legal conclusion and lacks foundation.

Page 96

1 BY MR. FREE:
2     Q.  You can answer.
3     A.  No.  In our subsequent quarterly
4 filings, I think we have similar language.
5     Q.  Yeah.  I think that's fair, too.
6          So after -- are you aware that the
7 U.S. District Court for the Central District of
8 California held in April that, while the Court
9 didn't grant the Plaintiffs' Temporary
10 Restraining Order, Plaintiffs were likely to
11 succeed on the merits of the nationwide TVPA
12 claim?
13          MR. VAN PELT:  I object that calls
14 for a legal conclusion and assumes facts not in
15 evidence and the witness -- it lacks foundation.
16 BY MR. FREE:
17     Q.  You can answer.
18     A.  No.
19     Q.  You didn't know that, sir?
20     A.  I don't -- not specifically.  I mean,
21 there is a number of these lawsuits going on.  I
22 don't keep up with each of them individually, you
23 know, granularly.  But I know they exist, so we
24 continue to disclose if there is material
25 changes.

Page 97

25 (Pages 94 - 97)

1    Q. You don't believe a federal judge
2  determining that we are likely to succeed on the
3  merits of a trafficking claim constitutes a
4  material change?
5         MR. VAN PELT: I object as
6  argumentative. It's harassing and assumes facts
7  not in evidence and calls for a legal conclusion
8  by the witness.
9  BY MR. FREE:
10   Q. You can answer.
11   A. Yes. I think -- yeah, I think the
12  disclosure as we have it stands for itself,
13  our -- our opinion as stated in there.
14   Q. So if I understand your testimony
15  correctly, you are telling me today that, as the
16  CFO of GEO, you do not believe that the District
17  Court's determination the Plaintiffs are likely
18  to succeed on the merits of their trafficking
19  claims is a material change?
20   A. If the judge had said the opposite,
21  would you say it was a material change? Would
22  you stop?
23         MR. VAN PELT: I am going to
24  object. It misstates the witness's testimony and
25  it's harassing and argumentative. It calls for a
                                               Page 98

1  legal conclusion. It's an improper question.
2         MR. FREE: Okay. Thanks for your
3  objection.
4  BY MR. FREE:
5    Q. You asked me: If the judge said the
6  opposite, would I stop?
7    A. Would it change your view?
8    Q. Would what -- so here is the problem,
9  the judge -- GEO has tried to get the judge to
10  say the opposite about a half dozens times and he
11  hasn't.
12   A. Yeah.
13   Q. So the answer is, you know, I'll wait
14  for the judge to tell us.
15         My question to you, though, is
16  whether a finding by a U.S. District Judge that
17  GEO likely violates the Trafficking Victims
18  Protections Act is a material change in this
19  litigation that you think investors should know
20  about. That is my question.
21         MR. VAN PELT: I am going to
22  object. It's been asked and answered. He has
23  answered the question. It calls for a legal
24  conclusion. It calls for speculation.
25         You can answer the question, and I
                                               Page 99

1  am going to instruct him not to answer it again.
2  He's already answered it. He has answered the
3  question several times.
4         MR. FREE: What was the answer,
5  David?
6         MR. VAN PELT: Well, let's read the
7  question and answer back. He's answered the
8  question.
9         MR. FREE: Let's ask a new
10  question.
11  BY MR. FREE:
12   Q. I am going to assume, based on your
13  answers, that you do not believe that the
14  District Court's order in April finding
15  Plaintiffs are likely to succeed on the merits of
16  their TVPA claim is a material change in this
17  litigation. Is my assumption correct?
18         MR. VAN PELT: Same objection. He
19  has answered this question. It calls for a legal
20  conclusion. The witness lacks foundation, and it
21  calls for speculation and it's been asked and
22  answered several times in whatever minute format
23  you wish to ask the question.
24         So I'm going to instruct him not to
25  answer this question. It's been asked and he's
                                               Page 100

1  answered it.
2         MR. FREE: On what basis? On what
3  basis, sir?
4         MR. VAN PELT: Improper question,
5  it calls for a legal conclusion, and he's already
6  answered it in his personal capacity, his
7  individual capacity, which is why he's being
8  deposed today.
9         MR. FREE: Any other reason you are
10  instructing your witness not to answer, Mr. Van
11  Pelt?
12         MR. VAN PELT: It also potentially
13  breaches the attorney-client privilege. We could
14  mark this section of the transcript if you want
15  to, Andrew, but it's been asked. It's been
16  answered. And it's harass -- at this point, it's
17  become harassing. So, you know, I let it go as
18  far as I thought would be even arguably
19  permissible, but at this point, it's totally
20  improper. So that's my basis.
21         MR. FREE: Okay. Well, it's now
22  your duty to call the Court. Go for it.
23         MR. VAN PELT: I have given the
24  instruction.
25         MR. FREE: You can't just give him
                                               Page 101

26 (Pages 98 - 101)

1 the instruction. If you are instructing him not
2 to answer to a basis other than privilege, you
3 have to call the Court. Go for it.
4        MR. VAN PELT: I also do -- I also
5 mentioned the privilege (technological
6 interruption.)
7        THE COURT REPORTER: I'm sorry.
8 You cut out, Mr. Van Pelt.
9        MR. VAN PELT: You've asked the
10 question and he has answered it, so...
11       MR. FREE: Mr. Van Pelt, you are
12 the one who has derailed this deposition. You
13 have instructed him not to answer.
14 BY MR. FREE:
15    Q. You can answer anything that's not
16 privileged, not a conversation that you've had
17 with your attorney, about the decision in April
18 that you didn't even know about. Is there
19 anything non-privileged that you could answer,
20 Mr. Evans?
21    A. No.
22    Q. Okay.
23       MR. FREE: Okay. Mr. Van Pelt, do
24 you want to call the Court?
25       MR. VAN PELT: I had made -- he has

Page 102

1 been instructed. And I want to move ahead with
2 this deposition, Andrew. And we can -- if you
3 want to call the Court, feel free.
4        MR. FREE: It's not my job, David.
5 You have instructed him not to answer, not based
6 on a privilege but based on a form objection.
7 That's not proper. I'm sorry. You have a duty
8 under the rules. Do you want to fulfill that
9 duty or not?
10       I can't hear you.
11       MR. VAN PELT: I have made the
12 instruction. Why don't we continue with the
13 deposition. I don't want to do -- I don't want
14 to -- if you have additional questions, please
15 feel free. I want the deposition to go forward,
16 but I have given him the instruction and the
17 instruction stands. So let's --
18       MR. FREE: You have an obligation
19 to call the Court, David. You can't just give
20 him the instruction. That's not what the Federal
21 Rules say. If you are going to instruct the
22 witness not to answer on a basis other than
23 privilege, then you have an obligation to call
24 the Court. Are you going to do that?
25       MR. VAN PELT: Not at this moment,

Page 103

1 Andrew.
2        MR. FREE: Okay. Then I would ask
3 that you withdraw your objection and allow this
4 witness to testify, David.
5        MR. VAN PELT: I am not going to do
6 that, Andrew.
7        MR. FREE: Okay.
8        MR. VAN PELT: If you want to
9 adjourn -- adjourn the deposition and call the
10 Court, please do, but I want to move ahead with
11 the deposition.
12       MR. FREE: It's not my job. It's
13 not my job. Okay? It's your job. You can read
14 the Rules. We were just in front of the
15 magistrate judge on this with your law firm a
16 week ago. It's completely improper. Completely
17 improper. It's abusive.
18 BY MR. FREE:
19    Q. Mr. Evans?
20    A. Yes.
21    Q. Do you have any understanding one way or
22 the other as to what happens if GEO is found by a
23 court to violate the Trafficking Victims
24 Protection Act?
25       MR. VAN PELT: Object that it calls

Page 104

1 for -- I will object that it calls for a legal
2 conclusion and the witness lacks foundation,
3 Andrew. Also, it's vague and ambiguous.
4 BY MR. FREE:
5    Q. I believe your answer was "no," sir?
6    A. "No."
7    Q. Okay. Are you aware of any
8 communications between the GEO Group and the
9 Department of Homeland Security's Office of
10 Inspector General regarding the allegations in --
11 the forced labor allegations in this or any of
12 the other three pieces of TV- -- any of the other
13 Trafficking Victims Protection Act lawsuits?
14       MR. VAN PELT: Can we read the
15 question back again? I'm sorry.
16       MR. FREE: You don't know what
17 you're objecting to?
18       MR. VAN PELT: I want to hear the
19 question, Andrew.
20       MR. FREE: I will just ask it. How
21 about that?
22 BY MR. FREE:
23    Q. Are you aware of any communications
24 between the GEO Group and the Department of
25 Homeland Security's Office of Inspector General

Page 105

27 (Pages 102 - 105)

1 regarding the allegations of forced labor at
2 issue in these lawsuits?
3    A. I am not.
4         MR. VAN PELT: Object that it lacks
5 for -- calls for speculation.
6         (Inaudible voice from Zoom
7 proceedings.)
8         MR. FREE: All right. I have -- I
9 have stomached this for a while. But,
10 Mr. Gallion, you are going to need to enter an
11 appearance if you are going to puppeteer Mr. Van
12 Pelt.
13         Can you step on camera, please, and
14 enter an appearance?
15         MR. VAN PELT: He is not
16 puppeteering anything. He is not even on camera
17 or on audio. So let's just move ahead.
18         MR. FREE: I can hear Mr. Gallion's
19 voice, Mr. Van Pelt. He is here for the
20 deposition. Can he please enter an appearance?
21         MR. VAN PELT: (Technological
22 interruption.)
23         THE COURT REPORTER: I'm sorry. I
24 can't hear Mr. Van Pelt.
25         MR. VAN PELT: I'm sorry.

Page 106

1         THE COURT REPORTER: Could you
2 repeat, Mr. Van Pelt?
3         MR. VAN PELT: Yes. Mr. Gallion is
4 not going to enter an appearance anymore than the
5 individual that you referred to at the beginning
6 of the deposition, Andrew.
7         MR. FREE: We identified them,
8 David. Are you going to identify him for the
9 record? Or are there other people in the room?
10         MR. VAN PELT: No one is in the
11 room, Andrew.
12         MR. FREE: Except for Mr. Gallion,
13 who has not been identified for the record yet,
14 but now he is?
15         Okay.
16 BY MR. FREE:
17    Q. Mr. Evans, you previously have said in a
18 number of shareholder calls and earnings calls
19 that GEO's future earnings may be affected by a
20 number of factors, including the use of ICE
21 detention beds and the cancellation of contracts.
22 Do you recall saying words to those effect during
23 the shareholder calls?
24         MR. VAN PELT: I am going to object
25 as vague and ambiguous.

Page 107

1 BY MR. FREE:
2    Q. You can answer, sir.
3    A. I don't recall exactly. I mean, it's
4 reasonable that I may have said some of those
5 things. If you have transcripts or whatever that
6 say I say that, that's fine.
7    Q. Okay. Is the potential for a contract
8 termination a risk that would affect GEO's
9 earnings?
10    A. Yes.
11    Q. Okay. Do you have any understanding one
12 way or the other as to whether a finding that GEO
13 violated the Trafficking Victims Protection Act
14 would constitute a risk to GEO's ability to
15 continue to contract with the federal government?
16         MR. VAN PELT: I object that it
17 calls for a legal conclusion and lacks
18 foundation.
19         THE WITNESS: Yeah. I don't have
20 specific knowledge of those penalty provisions
21 that you are referring to.
22 BY MR. FREE:
23    Q. Do you know that they exist?
24    A. No.
25    Q. Okay. Do you have any idea what the

Page 108

1 projected revenue from the Adelanto facility is
2 next year?
3    A. We have not done our projections for
4 next year. We are in the middle of our budgeting
5 process at this time. So I don't have a number.
6 I would say it would be consistent with where we
7 are in 2020, but -- so I want to say, at
8 Adelanto -- I mean, I can look here for a
9 second -- probably in the 65 to $70 million
10 range.
11    Q. Okay. If GEO were no longer to be able
12 to perform under that contract, that 65 to
13 $70 million would no longer be coming to GEO; is
14 that right?
15    A. Yes.
16         MR. VAN PELT: Object it's
17 hypothetical -- incomplete hypothetical and calls
18 for speculation.
19 BY MR. FREE:
20    Q. What was your answer, sir?
21    A. "Yes."
22    Q. Okay. Do you have any idea when the
23 Adelanto contract is supposed to end?
24    A. Yes. I belive so.
25    Q. Okay. As far as you can remember today,

Page 109

28 (Pages 106 - 109)

1 when is the contract over?
2    A. So it was just renewed under a new
3 10-year agreement in approximately December of
4 2019. So I -- I guess that would be about
5 December of 2029.
6    Q. Are you certain it's ten years, or do
7 you think it might be 15 years?
8    A. I think it's 10.
9    Q. Okay. What's the value of that
10 contract, sir?
11    A. Actually, it is 15. It is 15. It was
12 three five-year agreements, I believe.
13    Q. All right. What's the value of that
14 contract, sir?
15       MR. VAN PELT: We object as vague
16 with respect to that term "value."
17 BY MR. FREE:
18    Q. How about the dollar value? Let's do
19 that. What's the dollar value of that contract
20 to GEO?
21    A. I don't have that number off the top of
22 my head.
23    Q. Does $2.1 billion sound about right?
24    A. It sounds reasonable.
25    Q. In GEO's risk disclosures, GEO disclosed

Page 110

1 contractors to provide bed capacity for the
2 Department of Corrections with a number of, you
3 know, different exceptions that would allow them
4 to still do that over some period of time, and
5 then it also attempts to prohibit the federal
6 government from entering into contracts with
7 private providers in the state of California to
8 provide detention or correctional facilities or
9 operations.
10    Q. Has GEO estimated what its losses would
11 be if that law is upheld?
12    A. No.
13    Q. But GEO has disclosed those losses, or
14 at least that risk, in that 10K; correct?
15    A. We have disclosed the existence of the
16 lawsuit or the lawsuit and the law.
17    Q. Right. That would materially affect
18 GEO's bottom line; correct?
19    A. If what?
20    Q. If the law is valid and your lawsuit
21 loses.
22    A. Yes.
23       MR. VAN PELT: Object as assumes
24 facts not in evidence and calls for speculation.
25 BY MR. FREE:

Page 112

1 some litigation that the company brought against
2 the State of California on December 30th of 2019.
3 Do you remember me showing you that date earlier?
4    A. Yes.
5    Q. Do you remember what that litigation was
6 about, sir?
7    A. No.
8    Q. All right. Are you aware that the State
9 of California has attempted to make it
10 functionally impossible for GEO to operate
11 private immigration detention centers in the
12 state of California?
13    A. AB-32, yes.
14       MR. VAN PELT: I object as -- I am
15 going to object it assumes facts not in evidence
16 and calls for a legal conclusion. Lack of
17 foundation of the witness, also.
18 BY MR. FREE:
19    Q. Okay. You said it AB-32, Mr. Evans?
20    A. Yes.
21    Q. Okay. What do you understand about
22 AB-32?
23    A. Well, it has at least two components.
24 One is it prevents the State of California from
25 entering into arrangements with private

Page 111

1    Q. You testified earlier about the federal
2 acquisition regulations. Who at GEO determines
3 what -- is there someone at GEO who is
4 responsible for making a determination about the
5 profit margin GEO will ask the government to
6 include in its contract proposals?
7    A. Yes.
8    Q. Who is that?
9    A. Generally myself and the CEO.
10    Q. How do you make those determinations?
11    A. Well, it depends on the bidding process.
12 But if it's a -- typically an ICE contract,
13 it's -- it's going to be an owned facility. So
14 based on the fact that we have an ownership and a
15 significant investment in the facility, that's
16 going to support a higher level of profitability
17 under the federal acquisition regulations with
18 the government. So that percentage could be
19 anywhere from zero to 15 percent. But typically,
20 on our contracts, it's 10 to 15 percent of our
21 direct operating costs as well as our indirect
22 operating costs or our overhead costs associated
23 with that project.
24    Q. And if I understand the process
25 correctly -- and I would like for you to tell me

Page 113

29 (Pages 110 - 113)

1  if I am wrong -- the testimony we took earlier
2  last year from Mr. Venturella, and I think
3  Mr. Ragsdale, that profit margin that you have
4  determined and proposed to the federal government
5  is included in the per diem rate that the
6  government pays GEO; is that correct?
7      A. Yes.
8      Q. Okay. GEO can then -- and the Adelanto
9  contract and the other ICE contracts are fixed
10 price contracts; correct?
11     A. A significant component of them is. Not
12 entirely but there is a fixed price component.
13     Q. Okay. Some of them are like straight
14 reimbursement for hospital runs or medical care;
15 right?
16     A. Uh-huh.
17     Q. Where the actual cost, as opposed to the
18 fixed price, is being reimbursed from the federal
19 government; correct?
20         MR. VAN PELT: I object it assumes
21 facts not in evidence. And -- go ahead. The
22 witness can answer.
23         THE WITNESS: What I -- there is a
24 fixed price contract for -- component like at
25 Adelanto, and it covers the cost to operate the

Page 114

1  facility for the most part. There is typically
2  an incremental per diem for detainees or
3  residents in excess of that fixed price. That
4  component is on a per-person, per-day basis.
5         It's usually much lower per diem.
6  If you converted the fixed price to a per diem,
7  it's much higher because it includes all of the
8  fixed costs, all the labor, et cetera, whereas
9  the incremental per diem only includes the
10 variable costs associated with an individual
11 incremental detainee.
12         And then as you stated in your
13 question, there may be other costs or other
14 components of revenue that are just
15 reimbursements, like the reimbursement for the
16 voluntary work program or reimbursement for
17 off-site labor to monitor or conduct medical
18 visits, et cetera.
19 BY MR. FREE:
20     Q. I think the other big category of
21 reimbursements at Adelanto and most of GEO's
22 other ICE facilities is transportation costs; is
23 that true?
24     A. And there is also a trans- -- oftentimes
25 a transportation contract.

Page 115

1      Q. Okay. So there is a bed minimum. I
2  think you said during the last shareholder call
3  that most of the facilities that GEO manages
4  under contract with ICE, in other words, owned or
5  managed, are under -- they have a bed minimum;
6  right?
7      A. Yes.
8      Q. Okay. What's a bed minimum?
9      A. I'm sorry. Say that again.
10     Q. To the best of your understanding, what
11 do you understand a bed minimum to be?
12     A. That's what is the fixed price for the
13 contract. So the government -- the government
14 says -- puts it into a bed minimum. We really
15 look at it from the perspective of its fixed
16 price to operate the contract.
17         So the government is contracting
18 for a 1,000-bed facility, but they can't, with
19 certainty, say a what their utilization level of
20 the facility is going to be. ICE typically
21 operates between 70 and 80 percent or 85 percent
22 occupancy. They have a much more volatile
23 population than a correctional facility.
24         And so they want to make sure that,
25 regardless of what their utilization is of the

Page 116

1  facility, that they have a certain level of staff
2  on board, a certain level of medical services.
3  There is obviously -- the utilities aren't going
4  to change much, whether there is one person in
5  the facility or, you know, 100 percent of the
6  people there.
7         So all of the fixed costs go into
8  that minimum occupancy guaranty that they
9  provide, what we refer to as a fixed price, so
10 that they have certainty of a level of consistent
11 operation regardless of the number of detainees
12 in the facility.
13     Q. Is another word for that or another term
14 for that concept a guaranteed bed minimum?
15     A. Guaranteed minimum occupancy is usually
16 what they refer to.
17     Q. Okay. And I believe Dr. Zoley both
18 testified in front of Congress and said during
19 the shareholder call that GEO's ICE facilities
20 are way below their guaranteed minimums; right?
21     A. They are below their guaranteed minimum
22 currently because of the COVID crisis or
23 pandemic.
24     Q. I believe it was also attributed,
25 because it was also below -- occupancy was down,

Page 117

1  you know, to 40 percent at some places, according
2  to Dr. Zoley, even before COVID based on some of
3  the policies you mentioned earlier cutting off
4  entry at the border.
5       Do you recall telling me earlier
6  about that forecasted reduction in usage by ICE?
7       MR. VAN PELT:  I object that it
8  misstates testimony and calls for speculation.
9  BY MR. FREE:
10      Q.  You can answer.
11      A.  None of our facilities that I am aware
12  of were at 40 percent utilization levels
13  pre-COVID.  Most of our facilities pre-COVID, so
14  going back into January, February, early March,
15  were at least at their minimum utilization
16  levels, maybe slightly above.
17      Might have been a few slightly
18  below but nothing like at 40 percent.  That has
19  occurred since the COVID pandemic.  ICE's total
20  bed count has declined to right around 20 to 23
21  or 22,000.  Maybe 19 to 22,000.  It's gone down
22  significantly in the last -- you know, whatever
23  since mid-March.  End of March.
24      Q.  That was down from a high of roughly 51
25  to 54,000; correct?

1  a -- that's a fixed price, GEO gets it one way or
2  the other; correct?
3       A.  Yes.
4       Q.  Okay.  Now, if GEO is able to -- I am
5  getting a background.  Is someone else on?
6       MS. WILKE:  No.  That's me.  I'm
7  sorry.  I have been kicked out, and I have to get
8  back into the screen.  Give me one second, guys.
9       MR. FREE:  I tell you what, Cheryl,
10  let's go off the record real quick.
11      MS. WILKE:  No.  I am fine.  I got
12  it fixed.  I'm sorry.
13      MR. FREE:  Okay.
14      MS. WILKE:  I got -- wireless
15  kicked me out, and I had to get back in and turn
16  off all my stuff.
17      MR. FREE:  Okay.
18      MS. WILKE:  So I'm sorry to
19  interrupt.
20      MR. FREE:  Okay.  That's okay.
21  Just as long as you are able to participate and
22  you are on.
23      MS. WILKE:  I am right here.
24      MR. FREE:  Okay.  Good.
25  BY MR. FREE:

1       A.  Yeah.  But that high was last year in
2  2019 when there was a significant surge of border
3  crossings in really the first half of 2019.
4       Q.  That high actually also happened before
5  the boarder was sealed and no -- and there were
6  immediate turnarounds.  Is that your
7  understanding as well?
8       MR. VAN PELT:  Objection.  Assumes
9  facts not in evidence.
10      The witness can answer.
11      THE WITNESS:  I mean, there are a
12  number of policies.  I don't know which ones
13  exactly you are referring to.  But there were a
14  number of policies implemented during that surge
15  and subsequently that reduced the number of
16  border crossings.
17      But the most significant
18  reduction -- well, maybe not in numbers, but to
19  the levels we are at today is because I think the
20  border has really been shut as a result of the
21  pandemic.  And people just, themselves, don't
22  seem to be moving around as much right now.
23  BY MR. FREE:
24      Q.  Thank you.  You testified earlier that
25  at least as a guaranteed minimum price, that is

1       Q.  Okay.  Would you agree, Mr. Evans, that
2  in a fixed-price contract, the person who is
3  getting the money bears the risks that the costs
4  go up?
5       A.  Yes.
6       Q.  Okay.  And correspondingly, if the
7  person who is getting the money can reduce their
8  costs, that person can essentially increase the
9  margin that they're making off of the fixed price
10  in the contract?
11      A.  Generally, yes.
12      Q.  Okay.  So you reduce your expenses and
13  you can increase your profit if you are the
14  recipient of a fixed price contract; right?
15      A.  Well, I would say you can control your
16  costs within reason.  I mean, you know, I think
17  there is a misperception in the market that
18  private contractors can cut their costs
19  drastically to increase their profits and
20  maintain their contracts.  That's --
21      there -- there are many guardrails, if you will,
22  or barriers within the contracts that prevent
23  them from doing that.  We have significant
24  performance standards.
25      As I mentioned, within the fixed

31 (Pages 118 - 121)

1  price arrangement with the government, they
2  expect us to maintain a certain staffing level.
3  So typically that's 90 to 95 percent of the
4  authorized staffing.  If we were to cut our
5  staffing level to try to improve our margins,
6  then they are going to penalize us for that, up
7  to and including defaulting it's under the
8  contract.
9       So, you know, our effort to control
10 our costs is about implementing best management
11 practices.  But you can't -- you can't cut your
12 costs -- you can't control your costs by cutting
13 your costs in a -- in the sense of cutting
14 corners, if you will, as I think sometimes people
15 refer to in the market.  Because that's going to
16 have a significant impact on your ability to
17 retain business, grow business, and perform the
18 contract in a way that's acceptable to the
19 government.
20      Q.  Okay.  I think a shorter way of saying
21 what you just said might just be, you can't
22 maximize the profits you are getting off of a
23 contract with the government by breaching that
24 contract.  Did I kind of fairly summarize what
25 you just said?

Page 122

1       A.  Yes.
2            MR. VAN PELT:  Misstates testimony.
3       But the witness can answer.
4            MR. FREE:  Just asked and -- that's
5  fine.
6  BY MR. FREE:
7       Q.  What was your answer, Mr. Evans?
8       A.  "Yes."
9       Q.  Okay.  And so on within the limits of
10 GEO's contractual obligations to the federal
11 government and their legal obligations to
12 federal, state, local, the incentive is to
13 minimize the costs in order to increase the money
14 that GEO keeps; correct?
15      A.  No.  That's not generally how we
16 operate, but, you know, our -- our focus as a
17 company has been on operational excellence.  So
18 we have often spent money, I think, where we
19 didn't need to and it's not contractually
20 required.
21      Q.  Can you give me an example?
22      A.  Adelanto is an example of that.  If you
23 go to the facility, we have spent probably
24 several millions of dollars on recreational
25 amenities that are not required under the

Page 123

1  contract.  We have soccer -- AstroTurf soccer
2  fields, and we have implemented those at all of
3  our federal facilities and none of that is
4  required by government.  And it's above and
5  beyond what's required.
6            So we've invested money above and
7  beyond what's required in most of our contracts,
8  especially our ICE contracts, which is why I
9  think we have more business with ICE than any
10 other private provider.
11      Q.  You think the fact that you have two
12 former ICE senior officials on your executive
13 team has anything to do with your ICE contracts?
14      A.  No.
15      Q.  Do you know if --
16           MR. VAN PELT:  Objection.
17 Argumentative.  Lacks foundation.
18           THE COURT REPORTER:  I missed the
19 last part of the objection.
20           MR. VAN PELT:  Calls for
21 speculation.
22 BY MR. FREE:
23      Q.  Do you know if those individual -- who
24 do you think I am talking about?
25      A.  Well, I am assuming -- the only one that

Page 124

1  comes off the top of my head is David Venturella.
2       Q.  What about Dan Ragsdale?
3       A.  And Dan.  Okay.  Yeah, I know Dan.
4       Q.  Okay.  Well, all they'd really done
5  before they went to GEO was work at ICE.  So why
6  were they hired?
7            MR. VAN PELT:  I object -- I am
8  going to object it calls for speculation and is
9  vague and ambiguous.
10 BY MR. FREE:
11      Q.  You can answer.
12      A.  Sure.  As I said before, I mean, our
13 company is committed to quality and excellence.
14 And we have hired many people out of the federal
15 government who, you know, we think have had
16 experience and knowledge that can help bolster
17 the quality of our service.
18           Certainly Mr. Venturella and
19 Mr. Ragsdale within the immigration side
20 certainly have insight into what we could do to
21 provide better service and better quality, and I
22 think that that's been a primary reason that we
23 brought them in.
24           Mr. Ragsdale specifically is
25 heavily focused on quality assurance and contract

Page 125

32 (Pages 122 - 125)

1  compliance. And that -- that fit well with his
2  background and experience at ICE. And so we have
3  done that similarly with -- you know, wardens
4  that we hired at our BOP facilities often come
5  out of or are retired from the BOP. And it's to
6  get that expertise and experience that comes
7  from, you know, their long service with
8  government.
9      Q. Are Mr. Ragsdel or Mr. Venturella's
10  connections with existing ICE personnel a
11  positive factor for GEO?
12          MR. VAN PELT: Object that it
13  assumes facts not in evidence and calls for
14  speculation by the witness.
15          THE WITNESS: Not that I'm aware
16  of.
17  BY MR. FREE:
18      Q. Are you aware of any instance in which
19  Mr. Venturella or Mr. Ragsdale has used their
20  connections with ICE to get advance information
21  from the agency about the agency's bidding
22  process?
23      A. No.
24      Q. Would that be proper if they had done
25  so?

Page 126

1      A. That wouldn't be proper --
2          MR. VAN PELT: Let me object that
3  it calls for a legal conclusion and lacks
4  foundation. Calls for speculation.
5  BY MR. FREE:
6      Q. Let's lay some foundation. I'm sorry.
7  I thought your answer, Mr. Evans, was that
8  wouldn't be proper; is that right?
9      A. Come again with the question.
10      Q. Would it be proper if Mr. Venturella or
11  Mr. Ragsdale obtained advanced pricing
12  information from ICE based on their connections
13  with their former agency?
14          MR. VAN PELT: Same objection. I'm
15  going to object that it's vague and ambiguous,
16  calls for a legal conclusion, and calls for
17  speculation by the witness.
18  BY MR. FREE:
19      Q. You can answer.
20      A. I think generally under certain -- you
21  know, there's rules around these types of things,
22  and it depends on what you mean by bidding
23  information and so forth. But I believe we
24  comply with bidding processes and the rules
25  around the RFPs, and we do not do that.

Page 127

1      Q. Okay. Should GEO be able to obtain
2  through Mr. Venturella or Mr. Ragsdale an advance
3  copy of pricing information that ICE intends to
4  propose to GEO?
5          MR. VAN PELT: Objection.
6          THE WITNESS: I don't know.
7          MR. VAN PELT: Same objection.
8          MR. FREE: Okay.
9  BY MR. FREE:
10      Q. Does GEO get inside information from ICE
11  about its bids?
12          MR. VAN PELT: Same objection.
13          THE WITNESS: There are bids. So
14  when you say "inside information," I don't know
15  what you mean by that.
16          MR. FREE: I mean advice copies of
17  what ICE would tell GEO so that GEO can figure
18  out whether its proposal is reasonable or not.
19          MR. VAN PELT: We object that it
20  calls for a legal conclusion and calls for
21  speculation by the witness.
22          THE WITNESS: Not that I am aware
23  of, no.
24  BY MR. FREE:
25      Q. What would you do if you became aware of

Page 128

1  such an activity?
2          MR. VAN PELT: Same objection. It
3  calls for speculation. It's an incomplete
4  hypothetical as well. Assumes facts that aren't
5  in evidence.
6  BY MR. FREE:
7      Q. You can answer.
8      A. If I was concerned about something like
9  that, I guess I would, you know, talk to our
10  General Counsel about it.
11      Q. That's Ms. Wilke sitting right here?
12      A. Our General Counsel is Joe Negron,
13  Joseph Negron.
14      Q. So you would talk to Joe and not Ms.
15  Wilke?
16      A. Generally, yeah.
17      Q. Okay. Would it be inappropriate for
18  Mr. Venturella to use his former contacts at ICE
19  to get pricing information from the agency?
20          MR. VAN PELT: Objection.
21  BY MR. FREE:
22      Q. In advance of its disclosure to GEO?
23          MR. VAN PELT: I am going to object
24  it's been asked and answered already and calls
25  for a legal conclusion and calls for speculation

Page 129

33 (Pages 126 - 129)

1 by the witness and it's an incomplete
2 hypothetical.
3 BY MR. FREE:
4    Q. You can answer the question, Mr. Evans.
5    A. Yeah. I don't know how -- how that
6 would be. Because in his capacity as an officer
7 for the company, he is in charge of our business
8 development process. So, you know, the only way
9 I could see that is through some sort of
10 negotiation process, in which case it would be
11 proper.
12    Q. The negotiation process wouldn't involve
13 advance copies; would it?
14    A. Advance copies of what?
15    Q. What ICE would counter-propose to GEO?
16    A. If that advice is giving him something
17 that they are going to give to us, haven't they
18 effectively given it to us? I don't understand
19 how it could be considered an advance copy,
20 because he is the representative or the point
21 person for the company typically to receive that
22 type of information.
23    Q. You would agree, then, that ICE should
24 be able to choose when this information is turned
25 over to GEO?

Page 130

1 to know in advance, especially oftentimes because
2 it's on contracts that are existing. We've
3 already established through previous contracting
4 what's an acceptable -- you know, an acceptable
5 level. And the government, you know, maintains
6 those files or oftentimes it's the same
7 Contracting Officer.
8        So, you know, you already have a
9 sense of where government is based on our
10 knowledge and experience bidding on, you know,
11 many ICE contracts and many federal procurements
12 in general. Federal government is our largest
13 customer overall, obviously, and ICE is the
14 largest agency that we do business with.
15    Q. You can't say one way or the other
16 whether it would be appropriate for GEO to obtain
17 a counterproposal from ICE before ICE has made it
18 to GEO; is that right?
19        MR. VAN PELT: I am going to
20 object. The question has been asked and
21 answered. It calls for a legal conclusion. It's
22 vague and ambiguous, and it calls for
23 speculation. The question has been asked, and he
24 has answered it fully and completely.
25 BY MR. FREE:

Page 132

1        MR. VAN PELT: I am going to object
2 that it calls for speculation.
3        THE WITNESS: I was just going to
4 say, I mean, I can't speculate on -- I can't
5 speculate on, you know, ICE's processes and how
6 they determine to negotiate or disclose or
7 what -- when they provide what to us as a bidder
8 or any other bidders that may be participating in
9 a bid process.
10 BY MR. FREE:
11    Q. You told me earlier that you and
12 Mr. Zoley decide how much GEO is going to ask ICE
13 for in terms of profit. Did I get that right?
14    A. We -- we go through the pricings, and
15 determine what the appropriate margin is if we
16 are going to put on the contract to get a profit.
17    Q. Yeah. And it would be helpful to know
18 in advance what margin ICE thinks is reasonable,
19 wouldn't it?
20    A. No. We don't -- I don't need to know
21 it.
22    Q. You don't know whether --
23    A. We have been doing this long enough. We
24 know what they're -- what the range is that's
25 going to be acceptable. So I don't really need

Page 131

1    Q. Mr. Evans, what's your answer?
2    A. Well, my answer, like I said before, is
3 I don't see how that would be -- the only way we
4 would get information from government is through
5 them communicating to us in a negotiation
6 process. So I don't see -- I don't see how that
7 we could obtain something in advance, because
8 they are providing it to our bidding people, you
9 know. I'm not aware of those types of
10 circumstances occurring.
11        (Exhibit Number 201 is marked.)
12 BY MR. FREE:
13    Q. Well, now you are. Here is Exhibit 201.
14 This is an e-mail from David Venturella,
15 April 17th, 2014. And I am just going to go
16 ahead and read under Mr. Venturella.
17        It says "I have advanced copy" --
18 hang on. I am going to read it again.
19        "I have an advanced copy of what is
20 coming from ICE. Once we have had a chance to
21 review, I'll schedule a time to discuss."
22        Do you see that?
23    A. Uh-huh.
24    Q. All right.
25    A. Yes.

Page 133

34 (Pages 130 - 133)

1    Q. You see it says "ICE Counter-offer to
2 GEO Group, Proposal dated 4-11-14."
3       Do you see that?
4    A. Yes.
5    Q. Okay. Do you see this was sent on April
6 17th, 2014?
7    A. Yes.
8    Q. All right. Now, this says "Dear GEO,"
9 which would indicate that it's coming from ICE.
10      Do you see that?
11   A. Yes.
12   Q. All right. It says, "Thank you for the
13 revised offer provided on April 11th, 2014."
14      Do you see that?
15   A. Yes.
16   Q. All right. "Which includes responses to
17 ICE's questions submitted to GEO Group on
18 April 9th, 2014."
19      Do you see that part?
20   A. Yes.
21   Q. All right. Mr. Venturella characterizes
22 this as advanced copy of what is coming from ICE.
23 Can we agree that that indicates that GEO did not
24 have this before Mr. Venturella sent it to these
25 officials?

Page 134

1 going to send us. And I don't know that -- I
2 don't know if he is referring to he has some
3 verbal indication from them what's coming or if
4 he has, you know, like a draft document and they
5 will be providing something more informal at some
6 other point in time. But I don't see this as
7 anything other than part of the negotiation
8 process.
9       We have submitted a bid.
10 Oftentimes during the bid process, there is back
11 and forth between the company and they provide us
12 stuff. They may call David or Mr. -- Ms. Martin
13 and talk to them about specific concerns they
14 have within the procurement and, you know, trying
15 to get some clarification from us before they
16 send us formally what their questions or where
17 their pushback is going to be.
18      And them sometimes when we get
19 that, we'll have conference calls with them to
20 discuss through their concerns, just to make sure
21 everybody is on the same page and we understand
22 specifically what their issues are. So, you
23 know, I don't -- I don't really see anything
24 there specifically, no.
25   Q. You have not read this document before

Page 136

1       MR. VAN PELT: We will object that
2 the witness has never seen this document before.
3 He's --
4       MR. FREE: That's not an objection.
5       MR. VAN PELT: Calls for --
6       MR. FREE: You can make a form
7 objection, but you are not going to coach this
8 witness, Mr. Van Pelt. Object to form.
9       MR. VAN PELT: Calls for
10 speculation, the document speaks for itself, and
11 the witness has no personal knowledge of --
12      MR. FREE: You are now testifying,
13 sir. You will stop testifying. You will make an
14 objection. You can make a personal knowledge
15 objection. You can make a form objection. You
16 are not going to testify for this witness,
17 Mr. Van Pelt.
18      MR. VAN PELT: That's -- that's
19 what I have just done. I made my objections.
20      MR. FREE: Okay. Thank you.
21 BY MR. FREE:
22   Q. What's your answer, Mr. Evans?
23   A. So as I said before, to me, this is just
24 part of the negotiations process. I don't think
25 that he has anything different than what they are

Page 135

1 you gave that testimony, though, had you?
2    A. What's that?
3    Q. You have not read the document that I
4 have got up on the screen before you just gave
5 this testimony?
6    A. I have seen it today.
7    Q. You have never seen it?
8    A. But I have seen -- I have seen documents
9 like this when you go through the bidding
10 process. They -- you know, we will submit our
11 bid. They will have questions back. We will
12 respond to those questions. Some of those
13 questions are technical in nature and some of
14 them relate to, you know, financial or pricing.
15   Q. You have seen other documents in your
16 normal bidding process as the CFO of GEO where
17 David Venturella gets an advanced copy of what is
18 coming from ICE. Is that your testimony?
19   A. No. I have seen the document that you
20 referred to below --
21      MR. VAN PELT: I object it -- let
22 me object it misstates the witness's -- Misstates
23 the witness's testimony and is argumentative.
24      THE WITNESS: Yeah. I am saying I
25 have seen the types of documents. I don't know

Page 137

35 (Pages 134 - 137)

1  if it's an advanced copy or not. What you are
2  referring to --
3  BY MR. FREE:
4      Q. Mr. Venturella says it's an advanced
5  copy. Do you have a reason to disbelieve
6  Mr. Venturella?
7          MR. VAN PELT: Objection;
8  argumentative.
9          THE WITNESS: That could just mean
10 he is getting it before, you know, they send it
11 out to somebody else. I don't know what that
12 means "advance copy." It's certainly not an
13 advance copy in any way that there is anything
14 untoward or problematic with it.
15 BY MR. FREE:
16     Q. And, again, you say that without having
17 even read this document; right? You have never
18 read this document?
19     A. It's a negotiations process, though.
20     Q. Yeah. But you don't need to know;
21 right?
22     A. Don't need to know what?
23     Q. You have never seen this document before
24 today?
25         MR. VAN PELT: Objection.

Page 138

1          THE WITNESS: I don't know. I
2  might have seen this document back when it came
3  through. It might -- I am sure we responded to
4  this document.
5  BY MR. FREE:
6      Q. Right. Every piece of testimony you
7  just gave about how this document is the normal
8  process, that piece of testimony happened and you
9  have not read this e-mail today; right?
10     A. I am not saying I have read that
11 specific e-mail, no.
12     Q. Okay. Do you -- as you sit here in this
13 moment -- I am going to put it back up on the
14 screen -- do you have any independent
15 recollection of reading this e-mail about the
16 expansion of the Adelanto Detention Facility in
17 2014 before today?
18     A. Can you scroll down?
19     Q. Yeah. What I am going to do is I am
20 going to put you in charge. I am going to put
21 the remote control on, and I will expand the
22 -- there you go. You can control it yourself.
23     A. Here. Okay.
24     Q. Okay. Do you remember my question?
25     A. No.

Page 139

1      Q. All right. Do you have any
2  independent --
3      A. I prefer you restate it, yes.
4      Q. Okay. Do you have any recollection as
5  you sit here today of having read this e-mail
6  before this deposition?
7      A. No.
8      Q. Okay.
9          MR. VAN PELT: We have been going
10 about another hour, and I think it might be a
11 good time to take a 10-minute break. I don't
12 know how much more you have, but --
13         MR. FREE: Can I -- yeah. I am
14 amenable to a break. If it's an emergency, we
15 can stop now. I think I can close out this line
16 of questioning in the next to five, 10 minutes.
17         MR. VAN PELT: Okay. Why don't we
18 take a break now if it's that long, and then we
19 can finish up. Do you have any sense of how
20 much -- well, we can go off of the record and you
21 can say how much time you have.
22         MR. FREE: Let's do that. Yeah,
23 let's go off of the record. Take a break.
24 That's fine.
25         THE VIDEOGRAPHER: Okay. We are

Page 140

1  off the record at 2:26 p.m. This is the end of
2  File Number 3.
3      (Recess taken.)
4          THE VIDEOGRAPHER: We are back on
5  the record at 2:38 p.m. This is the beginning of
6  File Number 4.
7          Mr. Free, you are on mute.
8          MR. FREE: Thank you, Mr. Salvant.
9  BY MR. FREE:
10     Q. As I said before the break, I have a few
11 more questions I wanted to ask you about this
12 document, so I want to do that now. I will put
13 this back up on the screen so we can both look at
14 it.
15         All right. I am reading here the
16 sentence that begins, "The government did not
17 deem an increased profit margin tied to a
18 substantial increase in guaranteed revenue,
19 roughly $20 million, as 'fair and reasonable.'"
20         Do you see that?
21     A. Yes.
22     Q. All right. "ICE's counter-offer above
23 also reflects a reduction in profit margin
24 relative to an increased guaranteed revenue that
25 is deemed fair and reasonable."

Page 141

36 (Pages 138 - 141)

1     Do you see that?
2     A.  Yes.
3     Q.  All right.  And then in this page of the
4  proposal, I want to make sure I understand.  This
5  is -- this table at the bottom of 48- -- GEO
6  Novoa 48234 appears to reflect ICE's counter to
7  GEO's proposal setting a per diem of $110.50.  Do
8  you see that?
9     A.  Yes.
10    Q.  With a minimum occupancy rate.  And then
11 the incremental, this is kind of what we talked
12 about earlier, is 42.50.  And so the blended rate
13 at the current facility population is 93.50.  Do
14 you see that?
15    A.  That's their counterproposal, yes.
16    Q.  All right.  Was there ever any risk of
17 the Adelanto Detention Facility shutting down
18 last year?
19        MR. VAN PELT:  I am going to object
20 to vague and ambiguous and calls for spec- --
21 calls for speculation.
22        THE WITNESS:  No.  Not that I am
23 aware of.
24 BY MR. FREE:
25    Q.  Are you aware that the facility's

Page 142

1  contract structure changed several times last
2  year?
3     A.  No.  I mean, I am aware of the rebid in
4  2019.
5     Q.  Okay.
6     A.  Entering into the contract that we
7  talked about earlier.
8     Q.  All right.  Yeah.  I mean, earlier you
9  testified that the rebid in 2019 happened, I
10 believe, in December; right?
11    A.  That the contract was entered into.
12    Q.  Yeah.  And that it has three five-year
13 terms; correct?
14    A.  Yes.
15    Q.  Totalling $2.1 billion; correct?
16    A.  Yes.
17    Q.  All right.  Were you aware of the
18 termination of the contract between the City of
19 Adelanto and GE0 that happened in March?  GEO was
20 notified in March of 2019 and termination was
21 effective June of 2019.  Were you aware of that?
22        MR. VAN PELT:  I am going to object
23 assumes facts not in evidence.  The witness can
24 answer.
25        THE WITNESS:  Yes.

Page 143

1  BY MR. FREE:
2     Q.  Okay.  Tell me what you know about the
3  termination of the service agreement with GEO by
4  the City of Adelanto?
5     A.  I don't know much.  I just know that the
6  City terminated the agreement at that time.  I
7  don't know or recall the reason for it.
8     Q.  Have you ever spoken with Dr. Zoley
9  about the termination of the Adelanto agreements?
10    A.  Well, we had to do revised pricing, if
11 you will, to enter into a separate agreement, a
12 direct contract with the federal government at
13 that time.  So we had, you know, discussions in
14 that -- in that vein.
15    Q.  Adelanto is GEO's largest civil
16 immigration detention facility; correct?
17    A.  Yes.
18    Q.  $2.1 billion over 15 years is GEO's
19 largest ICE contract; correct?
20    A.  Yes.
21    Q.  It's also the longest contract GEO has;
22 isn't it?
23    A.  With ICE.
24    Q.  Correct.  Okay.  Now, what did you do in
25 discussing the pricing terms with Mr. Zoley -- or

Page 144

1  Dr. Zoley for the Adelanto contract, sir?
2     A.  For which one?  The one after the City
3  cancelled it's contract or the final -- the most
4  recently contract?
5     Q.  Thanks.  That's a really good
6  clarification.  So the way we have been referring
7  to this contractual structure in the case is that
8  the City's contracts with GEO and ICE were the
9  Intergovernmental Service Agreement, the IGSA.
10 The IGSA; right?
11    A.  Yes.
12    Q.  City sends a notice of termination to
13 GEO and ICE March 27th, 2019, saying 90 days out,
14 We are terminating.
15    A.  Yes.
16    Q.  June 27th, 2017, maybe it was the 26th,
17 ICE and GEO enter into a direct contract.
18    A.  Yes.
19    Q.  But that's a temporary contract.  It's
20 not the long-term contract.  So we have been
21 calling that, that June 27th, 2019, the "Bridge"
22 contract or the "Bridge" agreement.
23    A.  Okay.
24    Q.  Okay.  And then the December 19 -- the
25 December 2019 contract that's the 2 billion 15

Page 145

37 (Pages 142 - 145)

1 year one, that's just the "Direct" contract
2 between GEO and ICE. That's how we have been
3 discussing it. If you have better terminology,
4 I'm happy to do it. But it's like easier than
5 just doing the dates, for me at least.
6        So do we agree on that chronology
7 essentially of: City terminates, there is a
8 Bridge contract, and then there is a December
9 contract between GEO and ICE?
10 A. Yes.
11 Q. Okay. So when you asked me before,
12 which one was I referring to, let's start with
13 the Bridge Agreement, which was the agreement
14 that happened for like the six months between the
15 City's termination became effective on June 27th,
16 2019, and the entry of the direct agreement on
17 December 24th, 2019. Is that fair?
18 A. Yes.
19 Q. Okay. So what -- what role did you have
20 in pricing or other financial -- really, what
21 role did you have in the Bridge Agreement, in
22 constructing it? In whatever capacity?
23 A. Well, same capacity I have typically in
24 any pricing process. The technical pricing
25 proposal or pricing documents are prepared by,

1 you know, certain staff people. That's their job
2 to do. They will interact with some of the
3 operating people to make sure they have the right
4 staffing, et cetera. They'll build up the
5 pricing.
6        I will review that pricing with
7 them just to look at the overall assumptions, the
8 accuracy of what's going into the pricing, as
9 well as looking at it for being a proper return,
10 et cetera, things like that. So just sort of the
11 general things I look at as a CFO, reviewing the
12 documents, the pricing information, before we
13 meet with the CEO to present it to him for a
14 final sign-off.
15 Q. Okay. Would that have happened before
16 the termination of the IGSA became effective on
17 June 27th, 2019?
18 A. Right. So it would have happened before
19 we entered into the new agreement, the Bridge
20 Agreement as you referred to it. So sometime
21 between when we received the notice of
22 cancellation to the period under which the Bridge
23 contract started.
24 Q. Okay. Did you have any conversations
25 with Dr. Zoley regarding the reason for the

1 termination of the IGSA?
2 A. No. Not that I recall. He just told me
3 that they were canceling.
4 Q. Okay.
5 A. Received a notice.
6 Q. Did you -- did you find that out in
7 March, when they sent the notice, or do you
8 recall knowing about that before then?
9 A. No, I don't.
10 Q. Okay.
11 A. I don't recall.
12 Q. All right. Had GEO worked up a pricing
13 model for the Bridge Agreement before the City
14 sent its termination notice?
15 A. I don't -- I don't know. I don't think
16 so. But, you know, we are oftentimes analyzing
17 contracts. And that contract has had a number of
18 re-pricings, if you will, so I am not really
19 sure.
20 Q. Is it possible that GEO was already
21 working on the pricing for the Bridge Agreement
22 before the City of Adelanto sent its termination
23 notice?
24        MR. VAN PELT: Asked and answered.
25        THE WITNESS: Not that I am aware

1 of.
2 BY MR. FREE:
3 Q. What is your understanding, if any, as
4 you sit here today, of why the City of Adelanto
5 terminated its Intergovernmental Services
6 Agreement?
7        MR. VAN PELT: I object it's been
8 asked and answered and calls for speculation.
9        THE WITNESS: Yeah. I am not -- I
10 am not familiar with why that transpired.
11 BY MR. FREE:
12 Q. Okay. Before the Bridge Agreement went
13 into effect, do you have any understanding as to
14 when the final renewal period on the Adelanto
15 contract would expire? Under the IGSA?
16 A. No. It's typically -- IGSAs are
17 typically, you know, one to two-year agreements,
18 and they're just rolling renewals.
19 Q. Right.
20 A. So they are technically a short term,
21 but they really don't have an end date
22 oftentimes. But I am not sure exactly what it
23 was with Adelanto.
24 Q. Okay. Does a renewal end period of 2021
25 for that IGSA, does that sound familiar to you,

1  or is that new information to you today?
2      A. I wouldn't say neither. I mean, I am
3  sure I was aware. But, you know, so it's not
4  new. But I am not exactly recalling the date.
5      Q. Okay.
6      A. If that makes sense.
7      Q. Yeah. That's helpful. I mean, that's
8  your answer. So is GEO making more on the per
9  diem or less on the per diem at Adelanto now than
10 it was under the Intergovernmental Services
11 Agreement?
12     A. I would say the margin is probably a
13 little bit higher.
14     Q. That means GEO is making more money?
15     A. Yeah. There were changes between those
16 two contracts. There were staffing costs added.
17 And as I indicated before, usually when we
18 have -- the more costs we have, there is going to
19 be a certain mark-up percentage on that. You
20 just have a higher base that you are marking up.
21 You are going to have a higher level
22 profitability.
23     Q. Okay. And that is the case for this
24 contract? It is more profitable than the IGSA;
25 correct?

Page 150

1      A. Yes.
2      Q. All right. And I think that this is
3  true but just confirming if it is. I think that
4  what you just told me is true of both the Bridge
5  Agreement and the Direct Agreement; right?
6          MR. VAN PELT: Calls for
7  speculation.
8  BY MR. FREE:
9      Q. All right. You can answer.
10     A. Yes. Because for much the same reason,
11 there were additional costs that were included in
12 the Bridge Agreement that the government paid us
13 for that we then also marked up and there was
14 additional profit.
15     Q. Okay. At any time during your work to
16 renegotiate or propose terms for the Bridge
17 Agreement or the Direct Agreement, did you or
18 anybody that you communicated with at GEO say,
19 Why don't we pay the detained immigrants there
20 more than a dollar a day?
21     A. No.
22     Q. Was that a request that GEO could have
23 made to ICE, as it has done at several of its
24 other facilities, as you discussed earlier,
25 during this renegotiation process?

Page 151

1      A. I don't know.
2          MR. VAN PELT: Object. Calls for
3  speculation and -- and vague and ambiguous.
4  BY MR. FREE:
5      Q. What's your answer, sir?
6      A. "I don't know."
7      Q. It was never discussed, the issue of
8  paying people who work inside the facility as
9  detainees at Adelanto more?
10     A. Yeah. I don't remember any discussions
11 around the voluntary work programs and the
12 implementation or the reimbursements under it.
13     Q. And so that would include any discussion
14 about upping the reimbursement?
15     A. No.
16     Q. Okay. Do you think a dollar a day is a
17 fair amount to pay people who do work inside the
18 detention facility, sir?
19         MR. VAN PELT: Object as -- as
20 vague and ambiguous and calls for speculation
21 and --
22         THE WITNESS: I don't have an
23 opinion on it. I mean, I think the program does
24 what the government intends, which is to provide,
25 you know, meaningful activity for the detainees

Page 152

1  while they are in the facility.
2  BY MR. FREE:
3      Q. So you do have an opinion --
4      A. That's my understanding of the primary
5  purpose of the program.
6      Q. So you do have an opinion on it. My
7  question is: Is the dollar for the work they are
8  doing a fair amount?
9      A. I don't have an opinion on that.
10         MR. VAN PELT: Asked and
11 answered --
12         THE COURT REPORTER: If there is an
13 objection, I am not able to here it.
14         MR. VAN PELT: I just objected that
15 it's been asked and answered and it's vague and
16 ambiguous.
17         THE WITNESS: Yes. As I said, it's
18 voluntary. I don't have an opinion on whether
19 it's, you know, fair or not. I assume the
20 individuals make that decision when they are
21 deciding whether or not to volunteer for it.
22 BY MR. FREE:
23     Q. What do you base that decision on?
24     A. Because it's voluntary.
25     Q. How do you know that?

Page 153

39 (Pages 150 - 153)

1    A.  Well, that's the -- that's the way the
2  program operates.
3    Q.  How do you know that?
4    A.  Well, I think there's forms and so forth
5  that the volunteers sign off on when they sign up
6  for the program.
7    Q.  And so it's your understanding that if a
8  person signs a form, then it becomes voluntary?
9         MR. VAN PELT:  Objection.
10  Misstates the testimony.
11         THE WITNESS:  Yeah.  I think they
12  are acknowledging that it's -- that they are
13  volunteering for something.  My understanding is,
14  in many locations, that there is a waiting lists
15  for people that, you know, want to do or be
16  involved in those programs.
17  BY MR. FREE:
18    Q.  What's your understanding based on, sir?
19    A.  What's that?
20    Q.  What is that understanding based on?
21    A.  Just discussions with, you know,
22  facility people over the years that I've worked
23  here.
24    Q.  Can you think of any specific
25  discussions?

Page 154

1    A.  No.  I can't think of any specific.
2    Q.  Can you think of any specific people?
3    A.  No.
4    Q.  Is it your understanding that while
5  people are on the waiting list to work at GEO's
6  facilities for a dollar a day, that GEO allows
7  them to volunteer if they want to do work?
8    A.  I don't understand the question.  Say
9  that again.
10    Q.  Is it your understanding that while
11  people are on the waiting list that you just
12  referred to, to get into the dollar a day
13  program, that GEO's ICE detention centers allow
14  those people to do work as volunteers for no
15  money?
16    A.  I'm not aware of that.
17         MR. VAN PELT:  Assumes facts not in
18  evidence.
19  BY MR. FREE:
20    Q.  You are not aware of that?
21    A.  No.
22    Q.  Okay.  What would you say to a person in
23  the detention center in Adelanto who wonders why
24  they are getting a dollar to serve a meal while
25  the person at GEO's facility in LaSalle, in

Page 155

1  Louisiana, the Jena Facility is getting paid $2?
2         MR. VAN PELT:  Object as vague and
3  ambiguous and, also, assumes facts not in
4  evidence.
5         THE WITNESS:  I don't really -- I
6  don't have an answer for that.
7  BY MR. FREE:
8    Q.  So to the best of your knowledge, has
9  GEO ever considered what the cost to the company
10  would be if it were to pay detained immigrants at
11  Adelanto the minimum wage?
12         MR. VAN PELT:  I object that it
13  assumes facts not in evidence regarding the cost.
14         THE WITNESS:  Could you repeat the
15  question?
16         MR. FREE:  Court Reporter, please.
17         THE COURT REPORTER:  "So to the
18  best of your knowledge, has GEO ever considered
19  what the cost to the company would be if it were
20  to pay detained immigrants at Adelanto the
21  minimum wage?"
22         MR. VAN PELT:  Same objection that
23  it's vague and ambiguous and assumes facts not in
24  evidence regarding that term "cost."
25  BY MR. FREE:

Page 156

1    Q.  What's your answer, sir?
2    A.  I am not aware specifically if that's
3  ever been done for Adelanto or not.
4    Q.  Are you aware if it's ever been done for
5  any facility?
6    A.  We may have done some analysis around
7  that, you know, for -- I can't remember which
8  facilities or how many facilities, but I think we
9  did some analysis around that for -- at one
10  point.
11    Q.  Do you recall approximately when that
12  happened?
13    A.  No.  It's been several years.  I know
14  that.  I don't know when exactly it would have
15  been.
16    Q.  Okay.  And so do you recall whether that
17  analysis was submitted to U.S. Immigration and
18  Customs Enforcement?
19    A.  I think there was something along those
20  lines submitted to government either from our
21  General Counsel's office or operations.  I'm not
22  sure which.
23    Q.  Are you aware of the letter the CEO
24  George Zoley wrote to Peter Edge to ICE in 2018?
25    A.  I am aware.  That's what I am referring

Page 157

1 to, yeah.
2     Q. I thought so.
3     A. I thought it was operations or General
4 Counsel, but...
5     Q. Yeah. I want to make sure there is not
6 another letter that I --
7     A. No.
8     Q. Okay. We are talking about the same
9 letter where GEO has estimated for ICE in the
10 form of an equitable adjustment request the cost
11 of compliance; right?
12     A. The letter I recall was regarding,
13 firstly, legal expenses being incurred to defend
14 the government's voluntary work program, which
15 we're required to implement under our contracts,
16 and then I believe there was also a component of
17 that letter that provided some sense of potential
18 cost implications if the government were to have
19 to pay detainees or someone else a higher amount.
20 Whether it was minimum wage or wage
21 determination, I don't recall.
22     Q. Okay. Do you recall one way or the
23 other whether the Adelanto facility was included
24 in those calculations?
25     A. I don't recall if Adelanto was included.

Page 158

1     Q. Do you recall that the letter included
2 all three cases, the Adelanto, the Aurora, and
3 the Tacoma case?
4     A. Okay.
5         MR. VAN PELT: I am going to object
6 it assumes facts not in evidence.
7 BY MR. FREE:
8     Q. Okay. But we can agree, Mr. Evans, that
9 GEO requested equitable adjustments from ICE as
10 to all three facility contracts; correct?
11     A. I think the request for equitable
12 adjustment was around the legal costs being
13 incurred, not around anything to do with the
14 voluntary work program, itself.
15     Q. Okay. To the best of your knowledge,
16 has GEO ever requested that ICE pay the money
17 that it could owe to the Plaintiffs in this case
18 if GEO were found liable?
19         MR. VAN PELT: Objection. It calls
20 for speculation and is an incomplete
21 hypothetical.
22         THE WITNESS: I don't -- I don't
23 recall any of that, no.
24 BY MR. FREE:
25     Q. Okay. Are you familiar with the expert

Page 159

1 report that GEO disclosed to the Plaintiffs, it's
2 a rebuttal report, in this case?
3     A. No.
4         (Exhibit Number 198 is marked.)
5 BY MR. FREE:
6     Q. Okay. That's in your folder as
7 Exhibit 198. Do you know who Serena Morones is?
8     A. No.
9     Q. So I will take you to the first
10 page and then we will go through this.
11     A. Okay.
12     Q. So this is Exhibit 198. This is a
13 response to two expert reports. You can see
14 there is a valuation of the opinions of Jody
15 Bland, who is one of Plaintiffs' experts on the
16 financials, and there's an evaluation of the
17 opinions of Michael Childers, who is another of
18 the Plaintiffs' experts on the financials.
19         Ms. Morones makes a number of
20 conclusions that are essentially pointing out
21 what I believe she thinks are errors or
22 inadequate assumptions, inadequate support for
23 these numbers. Okay?
24         So here is it the summary of
25 damages that Plaintiffs have disclosed at the

Page 160

1 Adelanto facility based on a couple of different
2 wage rates. That's in the middle. Do you see
3 that little table there?
4     A. Uh-huh.
5     Q. So the California minimum wage rate --
6 okay. At the California Minimum Wage rate,
7 you've got 16 million. And at the Service
8 Contract Act Wage rate, Plaintiffs' expert, Dr.
9 Bland -- or Mr. Bland says it's around 25,
10 24.2 million. Do you see that?
11     A. Yes.
12     Q. I am looking at the Wage Class column.
13 All right.
14         And then there is a Forced Labor
15 Class as well, and the damages estimates are to
16 the right. Do you see that?
17     A. Yes. And that's for the whole period?
18 Is that what you are saying?
19     Q. Yeah, that's right.
20     A. From 2011?
21     Q. Well, yeah. There's a little bit of
22 missing information because the most recent
23 financials we have are the ones you got in front
24 of you on your desk today, the September -- the
25 data stops at September 2019.

Page 161

41 (Pages 158 - 161)

1    A. Okay.
2    Q. So we don't have anything after that.
3    A. Okay. But this is for the whole class
4  period?
5    Q. Yeah. This is every -- this is all in,
6  full class period. If you do it this way, you're
7  looking at 24 million under the Service Contract
8  Act Wage or 16 maybe .1.
9    A. For the whole class or just for
10  Adelanto.
11    Q. This is just for Adelanto.
12    A. Okay.
13    Q. Okay. This is -- so now I am scrolling
14  down. And Ms. Marones points out a bunch of
15  things that she thinks are errors in the damages
16  calculations and some downward variances, which
17  she pegs at around 2.3 percent downward, as to
18  the Force Labor Class.
19        And you can get this from your
20  lawyer, but essentially it's what you kind of
21  talked about earlier about how long shifts are.
22  Remember when we had that conversation about how
23  long is a shift?
24    A. Uh-huh.
25    Q. Yeah. Okay. So that's one of the

Page 162

1  looking at 15.5 million.
2        Do you see that?
3    A. Yes.
4    Q. Forced Labor Class, there are similar
5  critiques if we use the Service Contract Act
6  Wage, but you are looking at around 31 million.
7        Do you see that?
8    A. If you are using Service Contract Act
9  Wages?
10    Q. Yeah. That's right. So that's just
11  calculating with a rough understanding of what we
12  have, what Mr. Childers has, and then having
13  GEO's expert go and sort of poke some holes in
14  the assumptions. You know, we're looking at a
15  downward revision of, you know, for payments made
16  and also some revised assumptions. You are
17  talking that amount down about a million bucks.
18        Do you see that?
19    A. Okay. Yes.
20    Q. Still 15 million-ish. And then same
21  thing on the Service Contract Wage, like 30
22  million-ish. Okay?
23    A. Okay.
24    Q. So Childers is a different expect.
25  Childers talks about what it would cost GEO to do

Page 164

1  things that Ms. Marones brings up.
2        MR. VAN PELT: Is that a question,
3  Andrew?
4        MR. FREE: I just asked him, yeah,
5  if he remembered the conversation earlier about
6  the differences in how we think about shifts.
7  And he said, "Yes." So it wasn't really a
8  question. It was just trying to orient him to
9  this.
10  BY MR. FREE:
11    Q. All right. So Ms. Marones concludes
12  that when you have the impact of the shift length
13  assumptions, the damages for the wage class would
14  be not 16 million but 11.4 million.
15        Do you see that?
16    A. Yes.
17    Q. All right. And Ms. Marones also takes
18  issue with the mixture of the jobs. Essentially
19  the Plaintiffs have figured, you know, some --
20  too many people are kitchen workers and not
21  enough people are janitors, and that assumption
22  could affect the damage calculation.
23        And so for that, Ms. Marones
24  suggests that, you know, if you reduce based on
25  alternate job mixture assumptions, you are

Page 163

1  what you said, which is if we eliminated the
2  voluntary work payments and went out and got
3  employees to do the work that detained immigrants
4  are doing for a dollar right now. Do you follow
5  me?
6    A. Hired their -- hired additional
7  employees to do the work?
8    Q. Or -- yeah. So, yeah, you could hire
9  additional employees to do the work, or you could
10  subcontract out some of this work; right?
11    A. Right.
12    Q. You could send the laundry out to a
13  service. You could potentially do some other
14  things, have maintenance crews come in.
15  Although, you know --
16    A. Right.
17    Q. All right. But that's the Childers
18  conclusion, is if we're looking at GEO having to
19  hire people to do what the detained immigrants at
20  Adelanto do, it would be a damages amount
21  of -- or GEO gets additional profits of
22  26.7 million bucks by not having to do that.
23  Okay?
24        MR. VAN PELT: Object. The
25  document speaks for itself and mischaracterizes

Page 165

42 (Pages 162 - 165)

1  the document.  I don't know if there is a
2  question pending or what.
3          MR. FREE:  Yeah.  Okay.  Well, why
4  don't we just get another question?
5  BY MR. FREE:
6      Q.  Hey, Mr. Evans, does GEO have
7  $30 million right now?
8          MR. VAN PELT:  Object
9  (technological interruption).
10         THE WITNESS:  What do you mean.
11         THE COURT REPORTER:  If there was
12  an objection -- pardon me.  If there was an
13  objection, I did not hear it.
14         MR. VAN PELT:  The question -- the
15  objection was that the question was vague and
16  ambiguous.
17  BY MR. FREE:
18     Q.  And I think Mr. Evans asked:  What do I
19  mean?
20         If GEO were required to pay
21  a -- let's start with $15 million.  If GEO were
22  required to pay a $15 million judgment, could GEO
23  afford to do that today?
24         MR. VAN PELT:  Same objection.
25         THE WITNESS:  Yes.

Page 166

1  10K, there was 31 or 32 million cash on hand.
2  That fluctuates, but it's reasonable.
3      Q.  Okay.  But if GEO were forced to pay the
4  entirety of the high end of Plaintiffs' damage
5  figure, that would deplete GEO's cash reserves;
6  correct?
7      A.  No.  Because our -- our cash is
8  constantly up and down.  You know, depends on
9  when we are making payments, when cash is
10  received from our clients.  That's why big
11  companies have the revolving credit facility to
12  supplement in and out of that.  But it certainly
13  wouldn't deplete our cash, because as I said --
14  as you said earlier and I agreed, we have about
15  350 million in capacity under our revolving
16  credit facility.
17     Q.  If that capacity were to be reduced by a
18  judgment in this case, would that threaten GEO's
19  long-term viability?
20     A.  The 30 million?
21     Q.  Yes, sir.
22     A.  No.
23     Q.  Okay.  GEO does have some debt
24  obligations coming up; right?
25     A.  Yes.

Page 168

1          MR. VAN PELT:  Vague and ambiguous.
2  BY MR. FREE:
3      Q.  How?
4      A.  How would we pay -- pay for it?
5      Q.  Yes, sir.
6      A.  Well, we would pay for it from cash or
7  borrowing under our revolver, one of the two.
8      Q.  Okay.
9      A.  Potentially insurance.  I'm not sure.
10     Q.  All right.  It's my understanding, based
11  on the 10K, that GEO has not accrued a loss or
12  assigned this case a value; is that correct?
13     A.  That's correct.
14     Q.  Okay.  It's also my understanding there
15  is about $31 million cash on hand; is that right?
16         MR. VAN PELT:  Object.  Assumes
17  facts not in evidence.
18         MR. FREE:  It is absolutely in
19  evidence.  We went through this, David.  You are
20  just harassing now.  Okay.  We did an entire line
21  of questioning on cash on hand, man.
22  BY MR. FREE:
23     Q.  Go ahead.
24     A.  Certainly at the point that we looked
25  at, I think that was at the end of December, the

Page 167

1      Q.  And GEO is attempting to reduce its debt
2  to the tune of 50 to 100 million a year in
3  advance of those 2022 mature -- the notes
4  becoming mature in 2022; right?
5      A.  That's the first maturity we have, yes.
6      Q.  Okay.  And then there is a huge one,
7  right, in 2024?
8      A.  Right.
9      Q.  That's like 4 billion?
10     A.  No.  Less than -- it's about 2.
11     Q.  Okay.  But it's 2 billion.  It's the
12  current market cap -- or last year's current
13  market cap of the company is what GEO owes in
14  2024; right?
15     A.  No.  We owe --
16         MR. VAN PELT:  Assumes facts not in
17  evidence.
18         MR. FREE:  It's all in the 10K,
19  David.  Stop.  Please don't make that objection
20  again.  It's all in evidence.  Okay?  Read the
21  10K.
22  BY MR. FREE:
23     Q.  Go ahead.
24     A.  The market cap is a function of our
25  stock price times the number of shares

Page 169

43 (Pages 166 - 169)

1 outstanding. The debt that we owe, as disclosed
2 on the balance sheet, is just our debt that's
3 outstanding, which our total debt outstanding is
4 about 2.5 -- 2.4 billion.
5     Q. And what are the total assets right now?
6     A. I think we looked, it was about
7 4.3 billion.
8     Q. Yeah. Okay. GEO has got plenty of
9 money to pay this class if it needs to. I am not
10 saying you are writing us a check today. But GEO
11 is not going to go out of business if it has to
12 pay these detainees, is it?
13         MR. VAN PELT: Object that it's
14 vague and ambiguous. Calls for speculation.
15         MR. FREE: Let's back up.
16 BY MR. FREE:
17     Q. Do you know what "GEO" is, Mr. Evans?
18     A. The GEO Group, yes.
19     Q. Okay. Do you know what "going out of
20 business" means Mr. Evans?
21     A. Yes.
22     Q. Do you know what "pay" means, Mr. Evans?
23     A. Yes.
24     Q. Okay. And do you know who detainees
25 are?

Page 170

1     A. Yes.
2     Q. All of those words -- okay. When we put
3 all of those words together, does any of that
4 become more confusing to you?
5     A. No.
6     Q. All right. Would GEO go out of business
7 if it had to pay these folks?
8     A. No.
9     Q. No. Okay.
10         MR. FREE: I am going to take five,
11 and I think we are getting close to being done.
12 Okay.
13         THE WITNESS: Sounds good.
14         MR. VAN PELT: Okay. Thanks.
15         THE VIDEOGRAPHER: We are off the
16 record at 3:12 p.m.
17         (Recess taken.)
18         THE VIDEOGRAPHER: We are back on
19 the record at 3:17 p.m.
20 BY MR. FREE:
21     Q. Mr. Evans, do you know who Gregory
22 Hillers is?
23     A. Greg Hillers, yes.
24     Q. Who is Greg Hillers?
25     A. I believe he is the current

Page 171

1 acting -- active Business Manager for the
2 Adelanto Detention Facility.
3     Q. Have you ever spoken with Mr. Hillers
4 before?
5     A. I have.
6     Q. When was the last time you spoke with
7 Mr. Hillers?
8     A. I don't know. It's been probably a
9 couple of years.
10     Q. Okay. So not for a couple of years.
11         Is Mr. Hillers -- would you know
12 who the Business Manager at Adelanto is, or is
13 that something that's, like, below your pay
14 grade?
15     A. No. I mean, some of the facilities I
16 know where they have been around longer or
17 they're larger facilities. He has also been with
18 the company for awhile. I don't know most of
19 them, but I know him. For the most part, I would
20 say most of them I don't know who the business
21 manager is specifically. I mean, I have met them
22 and I know them personally, but I don't remember
23 them all without you mentioning something like
24 that.
25     Q. Okay. As you sit here today, do you

Page 172

1 know one way or the other whether the claims in
2 this case, in the California Novoa case, are
3 covered by an insurance agreement that GEO has?
4     A. I do not.
5     Q. Okay. GEO does disclose the insurance
6 that it holds in its 10K; correct?
7     A. Yes.
8     Q. Okay. And I think I read in that 10K
9 that the -- the limits are essentially, depending
10 on what type of claim and whether it's the single
11 occurrence or the whole thing -- I could pull it
12 up if we have to, but I kind of want to save
13 time -- can we agree that the limits of GEO's
14 insurance are between 80 and $100 million?
15     A. Yeah.
16     Q. Total?
17     A. (Nods.)
18     Q. Okay. And they are described as per
19 occurrence. I understand that there may be as
20 much as a $3 million self-insured retention on
21 some of these policies; is that right?
22     A. Yes.
23     Q. And in some places I have seen, it looks
24 like there might be a deductible of 3 million
25 -- of up to $3 million a well; is that right?

Page 173

44 (Pages 170 - 173)

1    A.  Yeah.  It's the same.  It's a high
2  deductible program.
3    Q.  Okay.  All right.  Does GEO maintain any
4  offshore accounts in corporate shell entities?
5    A.  No.
6        MR. VAN PELT:  Object as vague and
7  ambiguous and the witness may lack personal
8  knowledge.
9  BY MR. FREE:
10    Q.  Okay.  Does GEO transfer any of the
11  revenues that it makes from its U.S. activities
12  to off-shore accounts?
13    A.  No.
14    Q.  Okay.  Does GEO maintain any sort of
15  insurance facilities in the Cayman Islands?
16    A.  No.
17    Q.  Does GEO have any -- I don't know how
18  many different ways I can ask this.  I think the
19  answer is just, no, GEO keeps its money in the
20  United States for its U.S. operations.  Is that
21  the answer?
22    A.  For U.S. operations, that's correct.
23    Q.  I am not talking about Australia or the
24  U.K.
25    A.  No.

Page 174

1    Q.  Obviously that's offshore.  That's
2  income.  But all right.
3        How does GEO decide -- well, you
4  told me earlier, I think, that GEO spent millions
5  of dollars on recreational amenities at its ICE
6  facilities, notwithstanding the fact that its
7  contracts with ICE do not require it to do so; is
8  that correct?
9    A.  Yes.
10    Q.  Okay.  We have seen pictures of
11  AstroTurf soccer fields; right?
12    A.  Covered pavilions, yes.
13    Q.  Covered pavilions, yeah.  Including at
14  Adelanto?
15    A.  (Nods.)
16    Q.  How does GEO determine whether to invest
17  that sort of money in the facility?
18    A.  That sort of discretionary money?
19    Q.  Yes, sir.  Yeah.
20    A.  Generally, that's the CEOs decision, you
21  know, based on he wants a certain level of
22  quality and consistency across the facilities,
23  especially at the ICE detention facilities.  So
24  over the years, we have made improvements like I
25  described.  We put in skylights, changed the

Page 175

1  painting scheme for softer colors, and things
2  like that to -- to soften the feel of the
3  facility.
4    Q.  Okay.  Is there any other category of
5  expenditure other than recreational facilities
6  and paint or skylighting that GEO invests in at
7  the discretion of the CEO?
8    A.  So we have made significant investments.
9  Just sticking to detention facilities, we have
10  added staff in the areas of medical at times
11  where we thought that we needed more staff than
12  what we originally had authorized under the
13  contract and were being paid for.  So that would
14  be at our own expensed.  Adelanto had some
15  positions like that.
16        We have added contract compliance
17  and quality control personnel at our ICE
18  facilities that are above and beyond what the
19  contract requires.  We also have more of those
20  staff in our corporate office so that we can
21  spend more effort reviewing facilities,
22  especially ICE facilities, than is necessarily
23  required under the contract.  So, you know, both
24  in area of personnel as well as physical plant.
25    Q.  Are those decisions made on a rolling

Page 176

1  basis, or is there a quarterly or annual review
2  process where the CEO will make a determination
3  based on recommendations?  How does the
4  decision-making process work?
5    A.  It's an ad hoc basis.
6    Q.  Okay.
7    A.  It's, you know, as things come up.
8    Q.  All right.  I am trying to put myself in
9  your shoes.  And I am thinking, after a visit
10  perhaps, you have seen what's going on at the
11  facility, and if you are, you know, Dr. Zoley,
12  maybe you want to make an improvement based on
13  what you have seen.
14        Can you think of other -- is that
15  one of the triggers, or what are the triggers
16  that trigger the ad hoc decision to spend
17  millions of dollars on a facility that you are
18  not required to spend?
19    A.  Well, I think --
20        MR. VAN PELT:  Object.  May call
21  for speculation.
22        THE WITNESS:  Some of it has
23  been -- some of it has been driven by visits from
24  the CEO or other operations personnel.  And then
25  once -- you know, once some of those decisions

Page 177

45 (Pages 174 - 177)

1 were made, the CEO, he wanted consistency.
2     So I think, you know, the first
3 place or two we put the soccer fields in,
4 AstroTurf, and he is like, Well, I want to do it
5 at all of the ICE facilities.  You know, we put
6 skylights in, he wants to do it at other ICE
7 facilities.  We added the staff.  So it's --
8 consistency and it's, you know, whenever he has
9 an idea or somebody has an idea, he likes it, and
10 then he -- then we make sure it's consistent
11 across most of the facilities if we can.
12     Q.  Okay.  And as far as you know, based on
13 your interactions and things that you have
14 personally seen and heard, what is the purpose of
15 doing that?
16     A.  To ensure we have the highest level of
17 quality operations, I think, to go above and
18 beyond what the customer expects, try to exceed
19 expectations.
20     Q.  Okay.  Are you aware that -- are you
21 aware one way or the other whether GEO's -- well,
22 let's back up and do some more foundation.  Who
23 is GEO's chief market competitor?
24     A.  CoreCivic.
25     Q.  Okay.  Do you know how much CoreCivic

Page 178

1 pays to people who work inside their facilities
2 in the dollar a day program?
3     A.  I do not.
4     Q.  Would it surprise you to learn that it's
5 more than a dollar?
6         MR. VAN PELT:  Object as assumes
7 facts not in evidence.
8         THE WITNESS:  Yeah.  I am not
9 surprised one way or the other.
10 BY MR. FREE:
11     Q.  Okay.  Do you have any general sense --
12 I am not going to hold you to a number, but do
13 you have any general sense of how much of these
14 discretionary expenditures GEO has made that are
15 above and beyond the contract rate to make
16 improvements?  In the last five years?
17     A.  At Adelanto?
18     Q.  Yes, sir.
19     A.  No.  I mean, millions.  A couple of
20 million dollars probably.
21 BY MR. FREE:
22     Q.  Okay.  Can you see on your screen
23 Exhibit 67?
24     A.  Yes.
25     Q.  Okay.  Over the last five years -- and,

Page 179

1 again, these are rough numbers -- GEO has spent a
2 couple of million dollars toward improving
3 conditions at Adelanto at the structural
4 investment level, whatever you want to call it,
5 getting better stuff; right?
6     A.  Yeah.
7     Q.  Okay.  If GEO paid the people who work
8 in the dollar a day program $2 a day, that would
9 still be far less than the couple million dollars
10 GEO has invested in recreation fields and all of
11 that; right?
12     A.  Yeah.
13         MR. VAN PELT:  Object it calls for
14 speculation.
15         MR. FREE:  Well, let's not
16 speculate.
17         MR. VAN PELT:  Incomplete
18 hypothetical.  It's an incomplete hypothetical as
19 well.
20 BY MR. FREE:
21     Q.  Go ahead.  What's your answer?
22     A.  "Yes."
23     Q.  Okay.  The total amount of, let's say,
24 Billable Inmate Payroll that's on this line
25 58013.  Let's call it 2018.  It's $98,999.  I am

Page 180

1 looking at GEO Novoa 37767.
2     Let's be fair to each other and
3 just call it 100 grand.  Okay?  If GEO were to
4 pay $4 a day like it does at its Jena Detention
5 Facility for certain shifts, the increased cost
6 for 2018 would just be 300,000; right?
7         MR. VAN PELT:  Object.  Assumes
8 facts not in evidence regarding the pay at the
9 other facility.
10         MR. FREE:  You admitted it under
11 oath, guys.
12 BY MR. FREE:
13     Q.  Go ahead.
14     A.  Four times -- you are saying quadrupling
15 the amount?
16     Q.  Yeah.  You just even out.  Yeah.  I
17 mean, you are just looking at 400 grand for that
18 year; right?
19     A.  Yeah.
20     Q.  All right.  The improvements to the
21 facilities that make them, I think -- I can't
22 remember whether you said "world class," but I
23 know that Dr. Zoley has, those enhance the value
24 of the property, don't they?
25     A.  Yes.

Page 181

46 (Pages 178 - 181)

1   Q. Paying detainees an extra dollar would
2  not enhance the value of the property; would it?
3   A. Not related to the property.
4   Q. It's not. Paying detainees an extra $3
5  would give them each $3 a shift extra in their
6  pocket, wouldn't it?
7   A. Yes.
8   Q. Okay. But -- but investing millions of
9  dollars in the actual facility does not actually
10 put any money into the detainees' pocket, does
11 it?
12  A. If no.
13  Q. All right. It does, however, increase
14 the value of GEO's properties; right?
15  A. Yes.
16  Q. Mr. Evans, I really appreciate your time
17 and your patience. I know this can at times be a
18 trying process. Is -- is there anything about
19 your testimony that you meant to mention and just
20 didn't because things in the discussion of the
21 counsel got unclear?
22      Is there anything that I skipped
23 over or that you meant to say that you weren't
24 allowed to say?
25  A. No.

Page 182

1   Q. All right. Anything else you think I
2  should know?
3   A. No.
4   Q. Okay.
5      MR. FREE: Those are all of my
6  questions. Thank you for your time, sir.
7      THE WITNESS: Thank you.
8      MR. VAN PELT: Is -- is Andrew
9  still there?
10     MR. FREE: Yeah. I'm still here I
11 just went on -- I went off screen so you could do
12 any Re-Direct you want. Do you have Re-Direct?
13     MR. VAN PELT: Yeah. Can we go off
14 the record for two minutes, and then I will let
15 you know if we have questions?
16     THE VIDEOGRAPHER: Okay. We are
17 off the record at 3:32 p.m.
18     (Pause in proceedings.)
19     MR. VAN PELT: We don't have
20 anything further.
21     MR. FREE: Okay. We don't either.
22     THE VIDEOGRAPHER: Okay. Then I
23 guess we don't have to go back on.
24     MS. WILKE: Hold on. Hold on. I
25 just want to be clear, under the laws of the

Page 183

1  State of Florida --
2      THE WITNESS: I'm sorry. I'm
3  sorry. I can't tell who's speaking. If you
4  would please start over, I would appreciate it.
5      MS. WILKE: Sure. This is Cheryl
6  Wilke. Since this deposition is being taken in
7  Florida, Florida Rules allow the deponent to have
8  the opportunity to read the deposition transcript
9  before it is put into final form. I want to make
10 sure that Mr. Evans has that opportunity and that
11 it's set forth on the record, please.
12     MR. VAN PELT: Yes. Andrew, do you
13 want to propose a stipulation, kind of a standard
14 stipulation, or go by the Code?
15     MR. FREE: I mean, we just read and
16 sign. I think if the Court Reporter asks him if
17 he wants to read and sign, that's sufficient.
18     Ms. Wilke, is that okay for you?
19     MS. WILKE: I am fine with that as
20 long as he has the opportunity, because he does
21 want to read the deposition transcript. So as
22 long as it's on the record somehow, I don't care
23 what format it is.
24     THE COURT REPORTER: And if you all
25 could advise me exactly where to send it to him.

Page 184

1      MS. WILKE: Actually, you can send
2  it to me. And it's cwilke@geogroup.com. Make
3  sure you put in the timetable. I don't care what
4  that is. Mr. Evans probably needs at least 10
5  days to review it. 10 regular days, not business
6  days. And then we will provide it back to Madam
7  Court Reporter.
8      THE COURT REPORTER: Thank you.
9      MR. FREE: All right. So I guess
10 what we're going to do, if everybody is agreed,
11 is we'll go back on the record. We'll just note
12 very briefly for the Court Reporter that
13 Mr. Evans is going to -- has requested to read
14 and sign his deposition.
15     THE VIDEOGRAPHER: Really quick.
16 Do you need that on the video or just on the
17 written record?
18     MR. FREE: I don't think -- Cheryl,
19 do you want it on video?
20     MS. WILKE: No.
21     MR. FREE: I don't think so.
22     THE COURT REPORTER: I wonder also
23 if the exhibits could be sent to me to make sure
24 that I do have all that were introduced.
25     MR. FREE: Certainly.

Page 185

47 (Pages 182 - 185)

| | |
|---|---|
| 1        THE COURT REPORTER:  I didn't quite<br>2  pick up on them in my view of the Exhibit Share.<br>3        MR. FREE:  Julianna, are you still<br>4  on?<br>5        MS. GRAVOIS:  Yes, I am.<br>6        MR. FREE:  Will you send those to<br>7  Suzi, please?<br>8        Her e-mail is in the Chat.  I think<br>9  you've got it already.<br>10       THE COURT REPORTER:  Yes.<br>11       MR. FREE:  All right.  Cool.  Thank<br>12  you.<br>13       Okay.  So we are done with video.<br>14  Suzi, let us know when you can go back on the<br>15  record.  Okay?<br>16       THE COURT REPORTER:  I am all set.<br>17       MR. FREE:  Patrick, do you want me<br>18  to call it?  Do you want to call it?<br>19       THE VIDEOGRAPHER:  I think y'all<br>20  can just go.<br>21       MR. FREE:  All right.  So we are<br>22  back on the record at 3:36 p.m. Eastern Time.<br>23  And the parties have conferred off the record,<br>24  and Mr. Evans has requested to read and sign his<br>25  deposition.  He has requested 10 calendar days to<br><br>Page 186 | 1        CHANGES AND SIGNATURE<br>2   TO THE VIDEOTAPED ORAL DEPOSITION OF<br>3     THE GEO GROUP, INC.,<br>4   30(b)(1) COURT REPRESENTATIVE<br>5      BRIAN EVANS<br>6     September 3, 2020<br>7  Page  Line  Change       Reason<br>8  _____<br>9  _____<br>10  _____<br>11  _____<br>12  _____<br>13  _____<br>14  _____<br>15  _____<br>16  _____<br>17  _____<br>18  _____<br>19  _____<br>20  _____<br>21  _____<br>22  _____<br>23  _____<br>24  _____<br>25  Job No. TX4226194<br><br>Page 188 |
| 1  do so.  And the Plaintiffs have no objection to<br>2  that.<br>3       With that, I think the deposition<br>4  is closed.<br>5       Mr. Van Pelt, you had no Re-Direct?<br>6       MR. VAN PELT:  No Re-Direct.<br>7       MR. FREE:  Okay.<br>8       MR. VAN PELT:  So stipulated.  And<br>9  Mr. Evans will have the chance to read and review<br>10  and, you know, make any changes to the transcript<br>11  on the timetable we agreed to.  And -- but no --<br>12  no Re-Direct from our side.<br>13       MR. FREE:  Thank you.<br>14       MS. WILKE:  Thank you, everybody.<br>15       THE VIDEOGRAPHER:  Thank you.<br>16       MR. FREE:  Okay.  We are off the<br>17  record at 3:37.<br>18       (Deposition concluded at 3:37 p.m.)<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br><br>Page 187 | 1     I, BRIAN EVANS, have read the foregoing deposition<br>2  and hereby affix my signature that same is true and<br>3  correct, except as noted above.<br>4       _____<br>5       (Signature of witness)<br>6  STATE OF _____<br>7  COUNTY OF _____<br>8     Before me,_____, on this day<br>9  personally appeared BRIAN EVANS, known to me (proved<br>10  to me under oath or through _____)<br>11  (description of identity card or other document) to be<br>12  the person whose name is subscribed to the foregoing<br>13  instrument and acknowledged to me that he executed the<br>14  same for the purposes and consideration therein<br>15  expressed.<br>16  (Seal)  Given under my hand and seal of office<br>17  this _____ day of _____, 2020.<br>18<br>19<br>20<br>21      _____<br>22      Notary Public in and for<br>23      the State of _____.<br>24<br>25<br><br>Page 189 |

48 (Pages 186 - 189)

**Page 190**

```
 1        UNITED STATES DISTRICT COURT
         CENTRAL DISTRICT OF CALIFORNIA
 2            EASTERN DIVISION
 3  RAUL NOVOA, JAMIE CAMPOS    §
    FUENTES, ABDIAZIZ KARIM, and §
 4  RAMON MANCIA, individually   §
    and on behalf of all others  §
 5  similarly situated,          §
                     § CIVIL ACTION NO:
 6      Plaintiffs,   §
                     § 5:17-cv-02514-JGB-SHKx
 7  vs.              §
                     §
 8  THE GEO Group, INC.,   §
                     §
 9      Defendant.   §
10        DEPOSITION OF
     THE GEO GROUP, INC., 30(b)(1)
11    COURT REPRESENTATIVE
         BRIAN EVANS
12        September 3, 2020
13    I, Suzanne Kelly, RDR, CRR, in and for the State
     of Texas hereby certify to the following:
14
         That the witness, THE GEO GROUP, INC.,
15  30(b)(1) COURT REPRESENTATIVE BRIAN EVANS, was duly
     sworn by the officer and that the transcript of the
16  videotaped oral deposition is a true record of the
     testimony given by the witness;
17
         That the deposition transcript was submitted on
18  the _____ day of _____, 2020, to the witness for
     examination, signature and return to Suzanne Kelly by
19  the _____ day of _____, 2020 (10 days from REIT
     of transcript)
20
         That the amount of time used by each party at the
21  deposition is as follows:
22    Mr. Free:  Four hours and 10 minutes used;
23    That pursuant to the information given to the
     deposition officer at the said testimony was
24  taken, the following includes counsel for all parties
     of record:
25
```

**Page 191**

```
 1  FOR THE PLAINTIFFS:
 2  Linda A. Wright, Esq.
     Lauren Cross, Esq.
 3  BURNS CHAREST LLP
     365 Canal Street, Suite 1170
 4  New Orleans, Louisiana 70130
     Phone: (504) 799-2854
 5  Fax: (504) 881-1765
     lwright@burnscharest.com
 6  lcross@burnscharest.com
 7
 8  FOR THE CLASS ACTION:
 9  R. Andrew Free, Esq.
     LAW OFFICE OF R. ANDREW FREE
10  P.O. Box 90568
     Nashville, Tennessee  37209
11  Phone: (844) 321-3221
     Fax: (615) 829-8959
12  andrew@immigrantcivilrights.com
13
14  FOR THE DEFENDANT:
15  David Van Pelt, Esq.
     AKERMAN LLP
16  601 West Fifth Street, Suite 300
     Los Angeles, California  90071
17  Phone: (213) 688-9500
     Fax: (213) 627-6342
18  david.vanpelt@akerman.com
19    I further certify that I am neither counsel for,
     related to, nor employed by any of the parties or
20  attorneys in the action in which this proceeding was
     taken, and further that I am not financially or
21  otherwise interested in the outcome of the action.
22    In witness whereof, I have this date subscribed my
     name on this 15th day of September, 2020.
23
24
25
```

**Page 192**

```
 1  [signature: Suzanne Kelly]
 2
     Suzanne Kelly, RDR, CRR
 3  VERITEXT LEGAL SOLUTIONS
     Firm Registration No. 571
 4  300 Throckmorton Street
     Suite 1600
 5  Fort Worth, Texas 76102
     817.336.3042 1.800.336.4000
 6
     JOB NO.:  422619
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 193**

```
 1  david.vanpelt@akerman.com
 2        September 15, 2020
 3  RE: Novoa, Raul v. The Geo Gorup
 4  DEPOSITION OF: Brian Evans , 30(b)(1) (# 4226194)
 5    The above-referenced witness transcript is
 6  available for read and sign.
 7    Within the applicable timeframe, the witness
 8  should read the testimony to verify its accuracy. If
 9  there are any changes, the witness should note those
10  on the attached Errata Sheet.
11    The witness should sign and notarize the
12  attached Errata pages and return to Veritext at
13  errata-tx@veritext.com.
14    According to applicable rules or agreements, if
15  the witness fails to do so within the time allotted,
16  a certified copy of the transcript may be used as if
17  signed.
18        Yours,
19        Veritext Legal Solutions
20
21
22
23
24
25
```

49 (Pages 190 - 193)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.