# EXHIBIT B

1                    UNITED STATES DISTRICT COURT
                     CENTRAL DISTRICT OF CALIFORNIA
2                         EASTERN DIVISION
3      RAUL NOVOA, JAIME CAMPOS    )
       FUENTES, ABDIAZIZ KARIM,    )
4      and RAMON MANCIA,           )
       individually and on         )
5      behalf of all others        )
       similarly situated,         )
6         Plaintiffs,              ) Civil Action No.
                                   ) 5:17-cv-02514-JGB-SHKx
7      v.                          )
                                   )
8      THE GEO GROUP, INC.,        )
          Defendant.               )
9

10

11     ********************************************************

12           REMOTE ORAL AND VIDEOTAPED DEPOSITION OF

13                         AMBER MARTIN

14          AS 30(b)(6) FOR THE GEO GROUP, INC.

15                      AUGUST 11, 2020

16     ********************************************************

17

18

19

20

21

22

23

24

25

                                                     Page 1

**Page 2**

1    REMOTE ORAL AND VIDEOTAPED DEPOSITION OF AMBER

2  MARTIN, produced as a witness at the instance of the

3  Plaintiffs, and duly sworn, was taken remotely in the

4  above-styled and numbered cause on the 11th day of

5  August, 2020, from 8:28 a.m. to 3:19 p.m., via Zoom,

6  before Julie C. Brandt, RMR, CRR, and CSR in and for the

7  State of Texas, reported by machine shorthand, with the

8  witness located in Boca Raton, Florida, pursuant to the

9  Federal Rules of Civil Procedure and the provisions

10  stated on the record or attached hereto.

**Page 4**

1  FOR THE DEFENDANT:

2    David Van Pelt

3    Alicia Y. Hou

4    AKERMAN LLP

5    601 West Fifth Street, Suite 300

6    Los Angeles, California 90071

7    213-688-9500

8    david.vanpelt@akerman.com

9    alicia.hou@akerman.com

10

11  ALSO PRESENT:

12    Cheryl Wilke - The GEO Group, Inc. In-House Counsel

13    Juliana Gravois - Burns Charest Paralegal

14    Claire Bosarge - Burns Charest Summer Associate

15

16  VIDEOGRAPHER:

17    Keith Mize - Veritext Legal Solutions

**Page 3**

1            REMOTE APPEARANCES

2  FOR THE PLAINTIFFS:

3    Lydia A. Wright

4    BURNS CHAREST LLP

5    365 Canal Street, Suite 1170

6    New Orleans, Louisiana 70130

7    504-799-2845

8    lwright@burnscharest.com

9  -and-

10    Larry Vincent

11    Lauren Cross

12    BURNS CHAREST LLP

13    900 Jackson Street

14    Suite 500

15    Dallas, Texas 75202

16    469-904-4550

17    lvincent@burnscharest.com

18    lcross@burnscharest.com

19  -and-

20    R. Andrew Free

21    LAW OFFICE OF R. ANDREW FREE

22    P.O. Box 90568

23    Nashville, Tennessee 37209

24    844-321-3221

25    andrew@immigrantcivilrights.com

**Page 5**

1              INDEX
                          PAGE
2
   Appearances.................................  3
3  Proceedings.................................  7
   Stipulations................................ 152
4
   AMBER MARTIN
5
   Examination by Ms. Wright...............  8
6  Examination by Mr. Van Pelt........... 146
   Further Examination by Ms. Wright........ 148
7
   Signature and Changes..................... 153
8  Reporter's Certificate........................ 155
9
10 DEPOSITION EXHIBITS              IDENTIFIED
11 Exhibit 1    Services Contract May 17, 2011..  25
12 Exhibit 152   Amended Notice of Rule 30(B)(6)
                 Deposition of The GEO Group,
13               Inc.............................   24
14 Exhibit 153   Performance-Based National
                 Detention Standards 2011........  91
15
   Exhibit 154   Award Contract.................   94
16
   Exhibit 155   Solicitation/Contract/Order for
17               Commercial Items...............  101
18 Exhibit 156   Amendment of Solicitation/
                 Modification of Contract, P00002  58
19
   Exhibit 157   Amendment of Solicitation/
20               Modification of Contract, P00003  67
21 Exhibit 158   Amendment of Solicitation/
                 Modification of Contract, P00008  70
22
   Exhibit 159   Amendment/Modification No.
23               P00009.........................   77
24 Exhibit 160   ICE/DRO Detention Standard
                 Voluntary Work Program.........  81
25

2 (Pages 2 - 5)

1  Exhibit 161   April 3, 2012 letter, subject:
            Implementation of 2011
2           Performance Based Detention
            Standards (PBNDS)............... 84
3
   Exhibit 162   5.8 Voluntary Work Program...... 86
4
   Exhibit 163   Amendment of Solicitation/
5           Modification of Contract, P00024  89
6  Exhibit 164   Housekeeping/Maintenance Plan
            17.1.2-AUR Sanitation & Housing
7           Attachment A.................... 150
8  Exhibit 165   Aurora ICE Processing Center
            POLICY and PROCEDURE MANUAL
9           17.1.2-AUR..................... 150
10 Exhibit 166   Amber Martin Depo Docs.pdf...... 151
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

P R O C E E D I N G S

1
2         THE VIDEOGRAPHER:  We are going on the
3  record at 8:28 a.m. Central Standard Time on August
4  the 11th, 2020.
5         This is Media 1 of the oral and video recorded
6  deposition of Amber Martin, Corporate Representative for
7  The GEO Group Incorporated, taken by counsel for
8  plaintiff in the matter of Raul Novoa, et al. versus The
9  GEO Group, Incorporated, filed in the United States
10 District Court, Central District of California, Eastern
11 Division, Civil Action No. 5:17-cv-02514-JGB-SHKx.
12        This deposition is being held by remote video
13 conference.
14        My name is Keith Mize, the videographer.  The
15 court reporter is Julie Brandt.  We are from the firm
16 Veritext Legal Solutions.
17        Will counsel please state your appearances for
18 the record, after which the court reporter will swear in
19 the witness.
20        MS. WRIGHT:  Lydia Wright of Burns
21 Charest for the plaintiffs.
22        And I am joined by Lauren Cross, Juliana
23 Gravois and Claire Bosarge, all of Burns Charest.
24        MS. HOU:  Alicia Hou for the defendant
25 GEO Group and for the witness Amber Martin.

1         AMBER MARTIN,
2  having been first duly sworn and having confirmed that
3  she is Amber Martin, testified remotely as follows:
4         EXAMINATION
5  BY MS. WRIGHT:
6     Q.  Good morning, Ms. Martin.
7     A.  Good morning.
8     Q.  Would you please state your whole name for the
9  record?
10    A.  Amber Dawn Martin.
11    Q.  Ms. Martin, you are the executive vice
12 president for contract administration at The GEO Group.
13 Is that right?
14    A.  Yes.
15    Q.  You've been in that position since 2014?
16    A.  Yes.
17    Q.  And in that role, you have oversight over all
18 of GEO's contracts to operate immigration detention
19 centers in the United States.  Is that correct?
20    A.  Yes.
21    Q.  From 2011 to 2014, you were vice president of
22 contract administration at GEO.  Is that right?
23    A.  Yes.
24    Q.  From 2000 to 2011, you were vice president of
25 contract administration/contract compliance at GEO.  Is

1  that correct?
2     A.  Yes.
3     Q.  And from 1998 to 2000, you were regional
4  director for contract compliance at GEO.  Is that right?
5     A.  Yes.
6     Q.  Have you held any other positions at GEO aside
7  from the ones we've just discussed?
8     A.  No, I haven't.
9     Q.  Ms. Martin, have you ever been deposed as a
10 30(b)(6) witness before?
11    A.  Yes.
12    Q.  Do you understand that GEO has designated you
13 as its corporate representative today?
14    A.  Yes.
15    Q.  Do you understand that the testimony you are
16 going to be giving today is on behalf of GEO?
17    A.  Yes.
18    Q.  All testimony that you'll be giving today is
19 under oath just as if you were testifying in a court of
20 law.  Do you understand that?
21    A.  Yes.
22    Q.  Are you taking any medications that would
23 prevent you from answering fully and truthfully today?
24    A.  No.
25    Q.  And there's somebody in the room with you

1  right now during your deposition.  Is that correct?
2     A.  Yes.
3     Q.  Can you identify that individual, please?
4     A.  Cheryl Wilke, in-house counsel.
5     Q.  She's in-house counsel for The GEO Group?
6     A.  Yes.
7     Q.  I want to make clear the expectations of
8  communications with you during this deposition.
9          During this proceeding you will have an
10 opportunity to speak with your counsel off the record at
11 the appropriate time, just as if the deposition was
12 taking place in person; but in this virtual setting, my
13 expectation is that you will not be communicating with
14 your counsel during the deposition.  That includes by
15 text message, by email or by other electronic means, or,
16 because your in-house counsel is in the room with you,
17 through any gestures or notes passed back and forth.  Do
18 you understand that?
19    A.  Yes.
20    Q.  Any exchanges that I have just listed, any of
21 those exchanges can be viewed as taking place in my
22 presence and are not the subject of the protections of
23 attorney/client privilege.  It's just like you passing
24 a note right in front of me during an in-person
25 deposition.  Do you understand that?

Page 10

1     A.  Yes.
2     Q.  Do you have any questions about what I have
3  just said?
4     A.  No.
5     Q.  How did you prepare for your testimony today?
6     A.  I had a prep Friday afternoon with counsel for
7  about an hour, and I looked over the Court papers and
8  filings.
9     Q.  Without telling me the substance of your
10 conversation, when you say you had a conversation with
11 counsel, do you mean with Ms. Wilke?
12    A.  With Ms. Wilke and Ms. Hou.
13         THE WITNESS:  Thank you.  Sorry.
14    A.  Hou.
15    Q.  (BY MS. WRIGHT)  And I just want to remind you
16 of the admonition that I just gave, which is you are in
17 the room with someone right now, but please don't have
18 any conversations or exchange any communications with
19 that person.
20    A.  Understood.
21    Q.  You said that you reviewed some documents.
22 What documents were those?
23    A.  I reviewed the deposition filings and the
24 PBNDS standards, some policies, some housekeeping plans.
25    Q.  Which deposition filings did you review?

Page 11

1     A.  The one where I'm being deposed and Dan
2  Ragsdale and David Venturella are being deposed.
3     Q.  Was that in this case?
4     A.  Yes.
5     Q.  You haven't previously been deposed in this
6  case?
7     A.  Not in this case, no.
8     Q.  Which case were you deposed in that you
9  reviewed the transcript of?
10    A.  No.  I reviewed --
11         MS. HOU:  For the record -- sorry.
12 Objection, misstates testimony.
13         For the record, I think to provide clarity,
14 she means the deposition notice.
15         THE WITNESS:  Thank you.
16    Q.  (BY MS. WRIGHT)  Oh, I see.  So you reviewed
17 the 30(b)(6) deposition notice and the depositions of
18 Mr. Ragsdale and Mr. Venturella which were taken in this
19 case?
20    A.  No.  I have reviewed the deposition notices,
21 the same notice that has the notice of Dan Ragsdale and
22 David Venturella in it.
23    Q.  Understood.  Thank you.
24         So you have not reviewed a deposition
25 transcript?

Page 12

1     A.  No, I have not.
2     Q.  Which housekeeping plans did you review?
3     A.  I reviewed all the housekeeping plans that
4  were noticed in the deposition notice.
5     Q.  For the Adelanto facility?
6         (Reporter clarification.)
7     Q.  (BY MS. WRIGHT)  For the Adelanto facility?
8     A.  Yes, for the Adelanto facility.
9     Q.  Did you review housekeeping plans for other
10 facilities as well?
11    A.  Yes, I did.
12    Q.  Did you communicate with any GEO employees
13 aside from Ms. Wilke in preparation for your deposition?
14    A.  No, I have not.
15    Q.  Did you communicate with any ICE officials in
16 preparation for your deposition?
17    A.  No, I have not.
18    Q.  Did you bring any documents with you today?
19    A.  I brought the deposition notice.
20    Q.  Anything else?
21    A.  I brought the housekeeping plans as well.
22    Q.  Anything else?
23    A.  No.
24         MS. WRIGHT:  Okay.  Alicia, we're going
25 to need copies of the documents that are in front of

Page 13

4 (Pages 10 - 13)



**Page 14**

1 Ms. Martin, just as we did with the deposition of Mary
2 Wise-McCormick.
3         MS. HOU:  That's fine.  I believe that we

20    A.   Yes.
21    Q.   When was that?
22    A.   The last time I was at the Adelanto facility
23 was probably maybe two years ago.
24    Q.   What was the purpose of your visit?
25    A.   It was a site visit.  I can't -- I can't

**Page 15**

1 recall exactly why I was visiting, but it was a site
2 visit.  I believe I was in California at the time and
3 made visits to several facilities.
4    Q.   Was it prior to the audit or inspection?
5    A.   No.
6    Q.   Is it your practice to make site visits to GEO
7 facilities?
8    A.   It is if I'm in the vicinity, yes, or I need
9 to be there.
10    Q.   Any other times that you can recall that you
11 visited the Adelanto facility?
12    A.   Several times in the last 22 years.
13    Q.   Prior to two years ago, do you recall when you
14 last visited?
15    A.   I couldn't recall the last time I visited the
16 Adelanto facility prior to two years ago.
17    Q.   My understanding is that from May 2011 until

**Page 16**

1    Q.   Do you pronounce it "IGSA" --

6 say "IGSA," will you understand I am talking about the
7 intergovernmental service agreement?
8    A.   Yes.
9    Q.   And now my understanding is also that GEO
10 undertook, without limitation, the City's
11 responsibilities and obligations as set forth in the
12 IGSA.  Is that correct?
13    A.   Yes.
14         MS. HOU:  Object as to form.
15    Q.   (BY MS. WRIGHT) I am sorry.  Your answer?
16    A.   Yes.
17    Q.   And it's correct -- I think you just testified
18 that period of performance of the IGSA was from May 2011
19 to June 2019.  Is that correct?
20    A.   Yes.
21    Q.   The IGSA has been terminated.  Right?
22    A.   I am sorry?
23    Q.   The IGSA has been terminated.  Is that right?
24    A.   Yes, it has.
25    Q.   And it's also correct that GEO and ICE can

**Page 17**

1 modify the IGSA by mutual consent.  Is that correct?

8 communications.  I will ask my question again.
9    Q.   (BY MS. WRIGHT) Is it correct that GEO and
10 ICE could modify the IGSA by mutual consent?
11    A.   No, it's not correct.
12    Q.   What's incorrect about the statement that I
13 just made?
14    A.   The GEO and ICE cannot modify the IGSA.  The
15 IGSA is between ICE and the Adelanto -- the City of
16 Adelanto.  So that modification would have to be between
17 those two parties.
18    Q.   Is it correct that GEO -- well, it's correct
19 that the IGSA was, in fact, modified several times
20 during its term.  Is that right?
21    A.   Yes.
22    Q.   What was the process by which the IGSA was
23 modified?
24         MS. HOU:  Object as to form.
25    A.   What modification?  I mean, the process is

5 (Pages 14 - 17)

**Page 18**

1 that depending on which party is trying to modify or
2 what needs to be modified, there's communication between
3 the City, obviously with ICE and GEO as the operator,
4 and negotiations are something that, you know, ICE wants
5 to modify. It just depends on the modification.
6    Q. (BY MS. WRIGHT) I understand.
7       You testified earlier that GEO undertook
8 without limitation the City of Adelanto's
9 responsibilities and obligations under the IGSA. Do you
10 remember that?
11   A. Yes.
12      MS. HOU: Object, misstates testimony.
13   Q. (BY MS. WRIGHT) My question is if -- well, if
14 GEO undertook the City's responsibilities, how did the
15 City know if the IGSA needed to be modified?
16   A. When I say that GEO took responsibility, we
17 took over the responsibility of the requirements of the
18 IGSA. As far as negotiations or party negotiations, we
19 did not have authority to do that without the City.
20   Q. Were there ever occasions when the GEO felt
21 the IGSA needed to be modified?
22      MS. HOU: Object as to form.
23   A. If there was a financial issue or an
24 operational issue that needed to be modified, I guess we
25 could relay that to the City.

**Page 19**

1    Q. (BY MS. WRIGHT) Okay. So that's the process
2 then, if GEO felt that a modification was needed, GEO
3 would relay that to the City?
4       MS. HOU: Object, misstates testimony.
5    A. GEO would probably relay that to the City and
6 to ICE, but I don't recollect on hand any specific
7 modifications --
8    Q. (BY MS. WRIGHT) Okay.
9    A. -- that that would require.
10   Q. It's correct that the IGSA required GEO to
11 comply with the Performance Based National Detention
12 Standards or the PBNDS. Is that right?
13   A. Yes, if the IGSA required the City to, which
14 as the operator in our contract with the City we were
15 required to.
16   Q. Okay. What are the PBNDS's?
17   A. The Performance Based National Detention
18 Standards.
19   Q. What does that mean?
20   A. Those are ICE's standards for all the
21 facilities, as far as what the requirements are for the
22 performance of the IGSA or our contract.
23   Q. You said the PBNDS are ICE standards. Is that
24 right?
25   A. Yes.

**Page 20**

1    Q. And it's correct that there are three versions
2 of the PBNDS. Is that correct?
3    A. I think there's more than three.
4    Q. Okay.
5    A. When you say versions, are you saying -- what
6 exactly are you asking?
7    Q. I'm aware of the 2008 PBNDS, the 2011 PBNDS,
8 which is what had an errata in 2013, and the 2011 PBNDS
9 that were revised in 2016. Those are the three versions
10 that I am talking about. Are there additional versions
11 that you're thinking of?
12   A. I believe there was a previous version, but
13 you're right about these three versions.
14   Q. Okay. Thank you.
15      And is it correct that every time the PBNDS
16 was revised by ICE, the IGSA would be modified to
17 incorporate the new version of the PBNDS?
18      MS. HOU: Object --
19   A. Yes.
20      MS. HOU: -- as to form.
21   A. Yes.
22   Q. (BY MS. WRIGHT) Is it correct that ICE -- I'm
23 sorry. Strike that.
24      Is it correct that GEO had to comply with the
25 ICE policy and procedures in its operation of the

**Page 21**

1 Adelanto facility?
2    A. They would have to comply with the PBNDS,
3 would have to comply with the IGSA requirements, would
4 have to comply with ACA, several things. When you're
5 saying ICE policy procedure, unless it was outlined in
6 the PBNDS or the IGSA, those are the specific compliance
7 requirements.
8    Q. Okay. I understand. So GEO had to comply or
9 abide by the PBNDS in its operation of Adelanto.



21 detention standards through the American Correctional
22 Association. It's just --
23   Q. Is that --
24
25   Q. I didn't mean to interrupt. I am sorry. Go

Veritext Legal Solutions
800-336-4000

11    A.  OSHA standards, Environmental Health Safety
12  standards, everything that's outlined in the IGSA, the
13  PB -- or the PBNDS, which are referenced.
14    Q.  Which are referenced in the --
15    A.  Either the PBNDS or the IGSA, FAR clauses.
16  You know, anything that's outlined in the IGSA, any
17  standard or any requirement.
18    Q.  I didn't quite catch what you last said.  Did
19  you say "bar" clauses?
20    A.  Well, like Service Contract Act.
21    Q.  Okay.  Oh, FAR, F-A-R, clauses?
22    A.  Yes, Federal Acquisition Regulations.  Sorry.
23    Q.  So you have to comply with the Federal
24  Acquisition Regulations in its operations --
25    A.  Whatever -- whatever is cited in the IGSA.

Page 22

1    Q.  Did GEO ask the City of Adelanto to terminate
2  the IGSA?
3    A.  No.  The City of Adelanto asked GEO to
4  terminate the IGSA.
5    Q.  Do you know why?
6    A.  I don't know.  They didn't want to do a direct
7  contract anymore -- I mean, they didn't want to do and
8  IGSA anymore.
9    Q.  Did you ask --
10       MS. HOU:  Object.  I am going to insert
11  my objection before Ms. Wright's last question before
12  Ms. Martin testified, but go ahead.
13       THE WITNESS:  Sorry.  What was the
14  question?
15    Q.  (BY MS. WRIGHT)  The question is did you ask
16  the City of Adelanto why they wanted to terminate the
17  IGSA?
18    A.  No, I did not ask the City of Adelanto.
19    Q.  I am going to show you an exhibit that has
20  been marked already.
21       MS. HOU:  Lydia, how are we doing
22  exhibits?  Are we doing it the way we did during
23  Ms. McCormick's where you're just going to share your
24  screen?
25       MS. WRIGHT:  I think that's easiest, if

Page 23

1  that works for everyone.
2       MS. HOU:  Yes.  Thank you.
3       THE WITNESS:  Am I doing this?
4       MS. WILKE:  Ms. Wright, just to let you
5  know, we set Amber up with two computers in case you
6  wanted to have the -- what we did in several of the
7  depos is the documents were uploaded through the chat.
8  So neither Amber nor I are particularly technology
9  savvy.  So if you could walk us through how you want us
10  to get the documents, that would be awesome.
11       MS. WRIGHT:  No problem.  In fact, let's
12  try it out with the -- so I have previously marked as
13  Exhibit 152 the 30(b)(6) notice.  And I am going to --
14  what I am going to do is share my screen.  If I could
15  ask the host for permission to share my screen, please.
16       (Exhibit 152 marked.)
17       THE VIDEOGRAPHER:  Please re-access.
18    Q.  (BY MS. WRIGHT)  Okay.  Ms. Martin, you should
19  be able to see a PDF document that is the Amended Notice
20  of Rule 30(b)(6) Deposition of The GEO Group, Inc. on
21  your screen.  Do you see it?
22    A.  Yes.
23    Q.  I am sorry.  I couldn't quite hear you.
24    A.  I'm sorry.  Yes, I do.
25    Q.  Okay.  Great.

Page 24

1       And is this the deposition notice that you
2  reviewed prior to your deposition today?
3    A.  Yes, it is.
4    Q.  I am now going to show you what has previously
5  been marked as Exhibit 1.
6       (Exhibit 1 marked.)
7    Q.  (BY MS. WRIGHT)  I am going to share my
8  screen.  Okay.  Do you see a document titled "Services
9  Contract"?
10    A.  Yes.
11    Q.  Do you recognize this document?
12    A.  Yes.
13    Q.  What is this?
14    A.  This is the -- I believe it's the contract
15  between GEO Group and the City of Adelanto.
16    Q.  Okay.
17    A.  For the operation of the Adelanto facility.
18    Q.  Great.
19       And can you see me scrolling down through the
20  document?
21    A.  Yes, very fast.
22    Q.  I will represent to you that this is the --
23  this is the document that we're talking about.  And do
24  you recognize this document?
25    A.  Yes.

Page 25

7 (Pages 22 - 25)

1   Q.   And this is Bates labeled GOWER-GEO 0477.
2   A.   It's the IGSA between the City of Adelanto and
3   the -- and ICE.
4   Q.   Okay.  And the IGSA that we are looking at
5   right now is what outlines GEO's responsibilities with
6   respect to the operation of the Adelanto facility.  Is
7   that correct?

12       I am going to show you the statement of work
13   that is appended on to the IGSA.  Do you recognize this
14   document?
15   A.   Yes.
16   Q.   Okay.  And the Bates label is GOWER-GEO 0531.
17   Do you see where I am highlighting here on the screen?
18   A.   Yes.
19   Q.   This text says the service provider is
20   required in units housing US Immigration and Customs
21   Enforcement, or ICE, detainees, to perform in accordance
22   with the 2008 ICE Performance Based -- Performance Based
23   National Detention Standards, PBNDS, American
24   Correctional Association, ACA, standards, for Adult
25   Local Detention Facilities, ALDF, and standards

Page 26

1   supplement, Standards For Health Services in Jails,
2   latest edition, National Commission on Correctional
3   Health Care, NCCHC.  Did I read that correctly?
4   A.   Yes.
5   Q.   I will note there appears to be a
6   typographical error, but I read the text exactly as
7   written.
8       What is GEO's understanding of this sentence?
9   A.   That we -- that the City of Adelanto is to
10   abide by these standards and these requirements, as
11   outlined in the IGSA, and that we are to per the Service
12   Contract Act.
13   Q.   When you say we, who do you mean?
14   A.   GEO.
15   Q.   So it's correct that GEO has to abide by these
16   standards that are set forth in this paragraph that we
17   just read in its operation of the Adelanto facility.
18   Correct?
19   A.   Yes.  Yes.

23   Care.
24   Q.   What is that, though?
25   A.   That is a -- just like ACA or PBNDS, another

Page 27

1   organization that has requirements with regard to
2   specifics in the health care.
3   Q.   In health care.  Do the NCCHC standards have a
4   provision about the Voluntary Work Program?
5   A.   Not that I know of.
6   Q.   And you're testifying on behalf of GEO.  So to
7   GEO's knowledge, the NCCHC standards do not have a
8   provision regarding Voluntary Work Program?
9   A.   I am sorry.  I have not looked at NCCHC
10   standards in a long time, and I do not have personal
11   knowledge that that is inside the National Care -- NCCHC
12   standards.  I don't believe so, but I can't specifically
13   tell you yes or no.
14   Q.   Did GEO comply with the NCCHC standards in its
15   performance of the IGSA?
16   A.   Yes.
17   Q.   How do you know?
18   A.   Because we were audited and certified by NCCHC
19   at the Adelanto facility.
20   Q.   How often were you audited and certified by
21   NCCHC at the Adelanto facility?
22   A.   I believe NCCHC is every three years, but I am
23   not quite -- I am not sure how -- what the durations
24   are, but I believe it's every three years, just like ACA
25   is.

Page 28

1   Q.   Did NCCHC produce a report of its findings
2   from these audits?
3       MS. HOU:  Object as to form.  Which
4   audits are you talking about?
5   Q.   (BY MS. WRIGHT)  You can answer the question.
6   A.   I know.  I believe that, yes, they did
7   perform -- I mean, if they audited and they certified
8   us, they would have a report, yes.
9   Q.   Is it the practice of NCCHC auditors to
10   provide that report to GEO?
11   A.   They would have provided it, yes, to GEO.
12   Q.   To GEO corporate or to GEO at the facility
13   level?
14       MS. HOU:  Object as to form, asks her to
15   speculate as to another entity's practice.
16   A.   I am not quite sure who they would have
17   provided it to.  You know, we would have seen it at a
18   corporate level, but who it was actually provided to, I
19   am not quite sure.
20   Q.   (BY MS. WRIGHT)  Now what are the -- we've
21   talked a little bit already about the American
22   Correctional Association standards for Adult Local
23   Detention Facilities, or ALDF?
24   A.   Yes.
25   Q.   To the best of GEO's understanding, do the

Page 29

8 (Pages 26 - 29)

Page 30

```
 1  ALDF standards have a provision regarding the Voluntary
 2  Work Program?
 3      A.  I know it has a provision regarding programs,
 4  but I am not quite sure if it's specifically on
 5  Voluntary Work Programs.
 6      Q.  Are there any other ACA standards aside from
 7  the ALDF standards that are incorporated into the IGSA?
 8      A.  Okay.  Well, there's going to be several
 9  standards throughout the statement of work, such as
10  OSHA, Environmental Health Safety standards, the PBNDS.
11  So there's quite a few more standards besides ACA
12  standards in the IGSA.
13      Q.  I understand.  What I am asking is
14  specifically American Correctional Association
15  standards.  Are there any other standards that are
16  promulgated by the ACA, aside from the ALDF, that are
17  incorporated into the contract?
18      A.  Well, the -- maybe I am not understanding.
19  The ALDF is part of the ACA standards.  That is the
20  governing standards, because it's a local detention
21  facility that would govern this contract.
22      Q.  So the ACA puts forth the ALDF standards?
23      A.  Yes.
24      Q.  Is that right?
25      A.  Yes.
```

Page 31

```
 1      Q.  Does the ACA put forth any other standard?
 2      A.  Yes.
 3      Q.  And what are those?
 4      A.  I believe -- well, there's juvenile
 5  corrections.  There's re-entry programs.  There's prison
 6  programs.
 7      Q.  Do any of those standards apply to the
 8  Adelanto facility?
 9      A.  No, it would just be the ALDF.
10      Q.  Does GEO comply with the ALDF in its
11  requirements of the IGSA?
12      A.  Yes.
13      Q.  And how do you know that?
14      A.  Well, we've been audited by ACA and Adelanto
15  and have passed and been certified through ACA, so we
16  [redacted]
17  [redacted]
18  [redacted]
19  [redacted]
20      Q.  How often is the Adelanto facility audited by
21  ACA?
22      A.  I believe ACA is every three years again.
23  You're dating me.
24      Q.  Is it the case that in the same year the
25  facility will be audited by both ACA and NCCHC or are
```

Page 32

```
 1  they staggered audits?
 2      A.  Sometimes they're staggered; sometimes they
 3  are at the same time.  I would have to review to see
 4  when these were audited.
 5      Q.  The next sentence in this paragraph that we
 6  were just reading, GOWER-GEO 0531 says, quote, Some ACA
 7  standards are augmented by ICE policy and/or procedure.
 8  Do you see that where I've highlighted?
 9      A.  Yes.
10      Q.  Did I read that correctly?
11      A.  Yes.
12      Q.  Is that a true and correct statement?
13      A.  Yes.
14      Q.  What does that mean?  What is GEO's
15  understanding of that statement?
16      A.  There may be a standard where ICE wants to
17  augment the ACA standard to be at a higher standard, and
18  then they would let us know that we would go by that
19  requirement.
20      Q.  And who is they?
21      A.  ICE.
22      Q.  And what is GEO's understanding of the word
23  "augment" as it's used in this sentence?
24      A.  Enhance, add to.
25      Q.  So it's correct that there are some ACA
```

Page 33

```
 1  standards which the ICE PBNDS -- let me start that
 2  question again.
 3          It's correct that the ICE PBNDS are more
 4  strict than the ACA with respect to some standards.  Is
 5  that correct?
 6      A.  I am sorry --
 7          MS. HOU:  Object as to form.
 8      A.  Repeat that again.
 9      Q.  (BY MS. WRIGHT)  Is it correct that there are
10  some provisions of the PBNDS that are more strict than
11  provisions of the ACA standards?
12      A.  It's correct --
13          MS. HOU:  Object to form.
14      A.  It's correct that could be a possibility.  Do
15  I know a specific standard where it's more stringent
16  than the ACA?  No, I don't.
17      Q.  (BY MS. WRIGHT)  The next sentence in this
18  same paragraph reads, In cases where other standard
19  conflict with ICE policy or standards, ICE policy and
20  standards prevail.  Did I read that correctly?
21      A.  Yes.
22      Q.  Is that a true and accurate statement?
23      A.  Yes.
24      Q.  What is GEO's understanding of this provision
25  of the IGSA?
```

9 (Pages 30 - 33)

1    A.   That the ICE policy and standards prevail over
2  all other standards.
3    Q.   And ICE policy and standards refers to the
4  PBNDS?
5    A.   In part, yes.
6    Q.   What do you mean when you say in part?
7    A.   There may be another policy or directive out
8  there that, you know, is part of the contract that I
9  don't know offhand, but there could be other policies.



25  have to work with ICE on waiving certain ACA standards

1    Q.   If a GEO policy conflicts with the PBNDS, the
2  PBNDS will prevail.  Is that correct?
3    A.   If the GEO policy conflicts with PBNDS and ICE
4  does not want us to go by that GEO policy, then we will
5  have to redo that policy.
6    Q.   So that it complies with the PBNDS?
7    A.   So it complies, yes, or it complies with what
8  ICE wants us to do.
9    Q.   Is it generally correct that the more
10  stringent policy is the one that applies?
11    A.   Depending on the policy.
12        MS. HOU:  Object as to form before
13  Ms. Martin's answer.  Go ahead.
14    A.   When you say the most stringent policy would
15  apply, if the most stringent policy is PBNDS, that would
16  apply, yes.
17        MS. HOU:  Object, vague as to the word
18  "stringent."
19    Q.   (BY MS. WRIGHT)  What do you understand the
20  word "stringent" to mean, Ms. Martin?
21    A.   The most -- the most stringent.  I mean, the
22  higher -- the higher the requirement.
23    Q.   Do you understand the word "stringent" to mean
24  strict, exacting or precise?
25    A.   Yes.

1  or NCCHC standards if they wanted a different standard
2  to apply.
3    Q.   GEO can negotiate with ICE in the event that
4  there are conflicting standards?
5    A.   Through the City of Adelanto, yes.
6    Q.   Is it correct that if the PBNDS and a GEO
7  corporate policy conflict, GEO should apply the PBNDS in
8  its operation of the contract?
9    A.   Correct.  However, our policies and procedures
10  are approved by ICE, so that would -- they would -- our
11  policies would govern that as well because they were
12  already approved, and we're required to develop our own
13  policies and procedures.
14    Q.   I just asked you about GEO corporate policies.
15  So just drilling down a little bit further.  If the
16  PBNDS and a GEO facility specific policy conflict, GEO
17  should apply the PBNDS.  Is that right?
18    A.   Well, that's a two-edged sword.  Again, when I
19  mentioned corporate, it's not actually corporate
20  policies that are approved by ICE.  It's the actual
21  facility policies that are approved by ICE.
22    Q.   We're talking about GEO policies.
23    A.   Uh-huh.
24    Q.   Okay.
25    A.   Yes.

1    Q.   So just for a clear record, the more strict,
2  exacting or precise standard applies in GEO's operation
3  of the Adelanto facility.  Is that correct?
4        MS. HOU:  Object, vague, form.



10  if it's more stringent in one place and stringent in the
11  policy, I can't -- you know, I would say that we would
12  go by the policy, our GEO policy --
13    Q.   (BY MS. WRIGHT)  Okay.
14    A.   -- because that's what's been approved by ICE.
15    Q.   So you go by whatever's been approved by ICE?
16    A.   Yes.
17    Q.   I am going to show you now a provision of the
18  statement of work that is Appendix A to the IGSA, Bates
19  labeled GOWER-GEO 0538.  This is still Exhibit 1.  Can
20  you see this on your screen?
21    A.   Yes.
22    Q.   We're going to look at Section 7 on the
23  detainee work program.  It says, quote, Detainee labor
24  shall be used in accordance with the detainee work plan
25  developed by the service provider and will be in

**Page 38**

1 accordance with the ICE Performance Based National
2 Detention Standards on detainee Voluntary Work Program.
3 Did I read that correctly?
4   A.  Yes.
5   Q.  What's GEO's understanding of this provision
6 of the IGSA?
7   A.  That we're going to develop a policy in
8 accordance with the PBNDS standards on detainee
9 Voluntary Work Program.
10   Q.  And by we, who do you mean?
11   A.  GEO, sorry.
12   Q.  And did GEO develop a detainee work plan in
13 accordance the PBNDS?
14   A.  Yes.
15   Q.  The last sentence in this same paragraph on
16 the same page says the detainee work program shall not
17 conflict with any other requirements of the contract and
18 must comply with all applicable laws and regulations.
19 Did I read that correctly?
20   A.  Yes.
21   Q.  What is GEO's understanding of this provision
22 of the IGSA?
23   A.  Exactly what it says, the work program shall
24 not conflict with any other requirements of the contract
25 and it's going to be specifically by the PBNDS

**Page 39**

1 standards.
2   Q.  And is it also correct that the detainee work
3 program at Adelanto must comply with all applicable laws
4 and regulations?
5   A.  Yes.
6         MS. HOU:  Object to the extent it calls
7 for a legal conclusion.
8         MS. WRIGHT:  Alicia, your audio cut out.
9         MS. HOU:  Oh.  I just said object, legal
10 conclusion.
11      Can you guys hear me okay?
12         MS. WRIGHT:  You're back now.
13         MS. HOU:  Okay.  Great.
14   Q.  (BY MS. WRIGHT)  All right.  So is it correct
15 that GEO was contractually obligated to comply with all
16 applicable laws and regulations in its operation of the
17 detainee work program at Adelanto?
18   A.  Yes.
19   Q.  Is that a correct statement today as well?
20   A.  Yes.
21   Q.  Does the IGSA require GEO to pay detainees
22 participating in the Voluntary Work Program exactly $1 a
23 day?
24   A.  The PBNDS does, yes.
25   Q.  My question was different.  My question was

**Page 40**

1 does the IGSA require GEO to pay detainees participating
2 in the work program exactly $1 a day?
3         MS. HOU:  Objection, legal conclusion.
4   A.  Well, since the PBNDS is part of the IGSA, I
5 would say yes.
6   Q.  (BY MS. WRIGHT)  GEO's testimony today is that
7 under the IGSA, GEO is contractually required to pay
8 detainees exactly $1 a day for their labor in the
9 Voluntary Work Program.  Is that right?
10   A.  Yes.
11   Q.  Let's go to the page Bates stamped GOWER-GEO
12 0502.  Do you see on your screen a section entitled "33,
13 Voluntary Work Program"?
14   A.  Yes.
15   Q.  Subsection 2 of this paragraph says detainees
16 will be able to volunteer for work assignments but
17 otherwise not be required to work, except to do personal
18 housekeeping.  Did I read that correctly?
19   A.  Yes.
20   Q.  Is that a true and accurate statement?
21   A.  Yes.
22   Q.  What is GEO's understanding of this provision
23 of the IGSA?
24         MS. HOU:  Object, legal conclusion.
25   A.  That personal housekeeping is not part of the

**Page 41**

1 Voluntary Work Program.
2   Q.  (BY MS. WRIGHT)  I didn't quite understand
3 your answer.  I am sorry.  Could you repeat that?
4   A.  That detainee's personal housekeeping is not
5 part of the Voluntary Work Program.
6   Q.  Okay.  And how did GEO reach that
7 understanding?
8   A.  By exactly what the sentence says, detainees
9 will be able to volunteer for work assignments, but
10 otherwise not be required to work except to do personal
11 housekeeping.
12   Q.  What is GEO's understanding of the definition
13 of term "personal housekeeping" as it appears in this
14 provision?
15   A.  The detainees living in general use spaces
16 within their housing area.
17   Q.  What do you mean by -- you said detainees
18 living in general use spaces within their housing area.
19 Is that right?
20   A.  Yes.
21   Q.  What do you mean by living in general use
22 spaces?
23   A.  Their immediate living space, such as their
24 beds, et cetera, and their housing -- the general use
25 housing, such as bathrooms, floor, tables.  Their

11 (Pages 38 - 41)

1  housing areas.

2      Q.   So you said immediate living areas refers to

3  beds, et cetera.  Is there anything aside from beds that

4  immediate living area refers to?

5      A.   Their personal property.  Again, it's all

6  their general use areas in their housing area.

7      Q.   So what is a general use area?

8          MS. HOU:  Asked and answered.

9      A.   The housing area that they're living in, that

10  the detainee is living in.

11      Q.   (BY MS. WRIGHT)  So is a detainee's cell a

12  general use area?

13      A.   No.  The detainee's cell would be their

14  personal space, their personal living space.

15      Q.   Okay.  So personal living space is the cell.

16  And what about in dormitories where there's 80 bunks?

17  What's the personal living space in that situation?

18      A.   Their bunks, plus the general housing area.

19  Most of our detention facilities are not cells, they're

20  dormitories.  The only cells are very limited.  But

21  they're dormitories.

22      Q.   I am not understanding the distinction

23  between -- that you're drawing between personal living

24  space and general use area.  In the context of a

25  dormitory, is it correct that GEO understands personal

Page 42

1  living space to mean the bunk, an individual's bunk

2  area?

3      A.   Yes.  I mean, that would be where they would

4  make, you know, their -- their bed would be their

5  personal space.

6      Q.   And they're required to do personal

7  housekeeping to maintain their personal space in their

8  bunk area.  Is that correct?

9      A.   Yes.

10      Q.   Okay.  And then the general use area inside

11  the dorm, is that everything except for the bunk, the

12  individual's bunk?

13      A.   Yes, I would say.

14          MS. HOU:  Objection, vague.

15      Q.   (BY MS. WRIGHT)  You said yes.  Correct?

16      A.   Yes.

17      Q.   If ever you need a break, Ms. Martin, just let

18  me know and we'll take one.

19      A.   Okay.

20      Q.   So -- okay.  So just so that I am clear, just

21  for the record, GEO interprets personal living area to

22  mean the bunk area of where a detainee sleeps and keeps

23  their personal belongings.  Is that correct?

24      A.   Yes.

25      Q.   And GEO interprets the phrase "general use

Page 43

1  area" to mean everywhere in the housing unit aside from

2  the individual's bunk.  Is that correct?

3      A.   I would say general use area includes

4  everything, their personal area and their general use

5  area as far as the dormitory.

6      Q.   Okay.  So the general use area encompasses

7  everything inside a housing unit?

8      A.   Yes.

9      Q.   Is that right?

10      A.   Yes.

11      Q.   Including an individual's bunk?

12      A.   Yes.

13      Q.   And the personal living area includes just an

14  individual's bunk?

15      A.   Yes.

16      Q.   How is an individual's bed or bunk a general

17  use area?  Does general use mean that --

18      A.   It's --

19      Q.   Go ahead.

20      A.   It's in the area of -- I mean, there's bunks,

21  there's top bunks, there's lower bunks.  So that's all

22  in the general area.  They're responsible for their own,

23  obviously, bunk and personal property.  So I would

24  refer -- or GEO would refer to that as a personal use

25  area.

Page 44

1      Q.   But GEO would also refer to it as a general

2  use area, if I'm understanding your testimony correctly?

3      A.   Because of the dormitory setting, yes, I

4  would.

5      Q.   Okay.  I understand.

6          So is a detainee responsible for making

7  someone else's bed?

8      A.   No.

9      Q.   Why not?

10      A.   Because they're responsible for making their

11  own bed.

12      Q.   But if detainees's bunks count as general

13  living areas, are detainees responsible for maintaining

14  sanitation in general living areas?

15      A.   Yes, they are, but they're responsible for

16  making their own bunks.

17      Q.   So there is a distinction between personal

18  living area and general use or common areas.  Is that

19  right?

20      A.   Again, as I said, the personal living area

21  would probably be their bunks.  That's how I would

22  interpret it.

23      Q.   Okay.  Has GEO ever sought clarification from

24  ICE on the distinction between an immediate living area

25  or a personal living area and a general or common use

Page 45

12 (Pages 42 - 45)

1 area?
2    A.  No.
3    Q.  How does GEO reach the understanding about
4 those definitions that you just testified to?
5    A.  Through the PBNDS and the ACA requirements.
6    Q.  What specific provisions of the PBNDS are you
7 referring to?
8    A.  I believe it's under the Environmental Health
9 Safety section and under the Voluntary Work Program
10 section and under the Detainee Handbook section.
11    Q.  And what about the ACA standards?  What
12 provisions of the ACA standards are you referring to?
13    A.  I believe it's under health and sanitation and
14 also -- I think it's work program also.
15    Q.  And when you say it, what are you referring to
16 exactly?
17    A.  What you just asked, as far as general and
18 personal use areas.
19    Q.  Okay.  And just so that I am clear, because
20 there was a lot of back and forth about this, GEO's
21 testimony today is that a general use area constitutes
22 every space within a housing unit?
23    A.  Yeah.
24    Q.  Is that right?
25    A.  Yes.

Page 46

1    Q.  And GEO's testimony today is that a detainee's
2 immediate living area is the detainee's bed, bunk.  Is
3 that correct?
4    A.  Yes, bunk, property.
5    Q.  And --
6    A.  Immediate area around the bunk.
7    Q.  What do you mean by immediate area around the
8 bunk?
9        MS. HOU:  Objection, asked and answered.
10    A.  The area around the bunk.  The area close to
11 them.  You know, their area where they use the restroom.
12 I mean, there's a lot of personal space that they use
13 or -- I can't speak -- the detainee uses.
14        So their personal living space would
15 automatically be their bunk and their personal property,
16 but they also have, you know, personal space in the
17 shower.  They have personal space in the bathrooms.
18 There's personal space at the microwaves, personal space
19 at tables.
20    Q.  (BY MS. WRIGHT)  How does a detainee have
21 personal space in the microwave?
22    A.  Again, they would be using the microwave by
23 themselves.  That's their personal space at the time.  I
24 mean --
25    Q.  Oh, so you're -- you're talking about personal

Page 47

1 space just as personal autonomy, wherever the individual
2 is is their personal space?
3    A.  Yes.
4    Q.  I understand.
5        So, for example, your personal space right now
6 is in the room where you're sitting in Boca Raton?
7    A.  Yes.
8    Q.  Okay.  I am asking about specifically -- so
9 then it's your testimony that detainees in GEO
10 facilities are required to maintain cleaning and
11 sanitation wherever they are because their personal
12 space travels with them?
13        MS. HOU:  Objection, misstates testimony.
14    A.  No.  No.  I am just saying that, you know,
15 their housing area is their personal space.  Their bunk
16 is their sole responsibility.  But they also travel
17 within the housing area and use those things within the
18 housing area, so -- but their personal space that they
19 live that nobody else touches would be their bunk and
20 their property, and general use space would be the
21 entirety of the housing area.
22    Q.  (BY MS. WRIGHT)  Is the kitchen a detainee's
23 personal space?
24    A.  I'm sorry?
25        MS. HOU:  Objection, vague.

Page 48

1    Q.  (BY MS. WRIGHT)  Is the kitchen part of a
2 detainee's personal space?
3    A.  No, not in that context.  No.
4    Q.  Why not?
5    A.  Because the detainee doesn't live in the
6 kitchen.  That's a work space.
7    Q.  Okay.  So let me ask you again about this
8 provision that's highlighted on your screen.  Detainees
9 will be able to volunteer for work assignments but
10 otherwise not be required to work except to do personal
11 housekeeping.
12    A.  Okay.
13    Q.  So detainees at Adelanto are not required to
14 participate in the Voluntary Work Program.  Is that
15 right?
16    A.  Correct.
17    Q.  So they're not required to work in the
18 kitchen.  Is that right?
19    A.  Correct.
20    Q.  Because a detainee cannot work in the kitchen
21 unless he's participating in a Voluntary Work Program
22 work crew.  Right?
23    A.  Right.
24    Q.  Same thing with laundry.  GEO cannot, per the
25 terms of the contract, require a detainee to work in

Page 49

13 (Pages 46 - 49)

1 laundry.  Right?
2     A.  Correct.
3     Q.  A detainee can only work in laundry if that
4 person is participating in the work program crew.
5 Right?
6     A.  Correct.
7     Q.  But GEO can require detainees to do personal
8 housekeeping in their immediate living area.  Right?
9     A.  Correct.
10     Q.  And GEO's definition of immediate living area
11 is any space within their housing unit.  Correct?
12         MS. HOU:  Objection, misstates testimony.
13     A.  There's a personal living area and their
14 general use living area.
15     Q.  (BY MS. WRIGHT)  But you've testified that
16 wherever an individual is in the housing unit
17 constitutes personal living area.
18     A.  Okay.
19         MS. HOU:  Objection, misstates testimony.
20     A.  Again, there's -- I said personal space, as
21 far as their bunk and property is concerned, and then
22 the general use area that they utilize.
23     Q.  (BY MS. WRIGHT)  Okay.  So is a detainee
24 required to engage in personal housekeeping in their
25 bunk and property area?

Page 50

1     A.  Yes.
2     Q.  Is a detainee at Adelanto required to engage
3 in personal housekeeping in the common use or general
4 use areas of the housing unit?
5     A.  Yes.
6     Q.  And those common areas or general use areas
7 include the dayrooms?
8     A.  Yes.
9     Q.  And it includes the microwaves, you said?
10     A.  Yes, part of the dayroom.
11     Q.  Okay.  And it includes the shower?
12     A.  And the bathrooms, yes.
13     Q.  Okay.  And so GEO -- so you've now described
14 about five different tasks.  You've described
15 housekeeping tasks related to a detainee's bunk,
16 personal property, the dayroom of the housing unit, the
17 showers and bathrooms, the microwaves.  I think earlier
18 you mentioned furniture.
19     A.  No, I did not mention furniture.
20     Q.  Okay.  I apologize.
21         It's GEO's testimony today that all of those
22 tasks constitute personal housekeeping.  Is that right?
23     A.  Yes.
24     Q.  Okay.  And just for the sake of the record --
25 and I am sorry to move back and forth.

Page 51

1       Just for the transcript, what is GEO's
2 definition of the phrase "immediate living area"?
3     A.  Immediate --
4         MS. HOU:  Objection, asked and answered.
5     A.  Immediate living area would be their immediate
6 living area, bunks.  A detainee's immediate living area,
7 bunks, private property, anything surrounding that
8 living area that they're utilizing.
9     Q.  (BY MS. WRIGHT)  Which could include
10 microwaves and items in the dayroom and the showers?
11     A.  Yes, it could.
12     Q.  Can -- do you know who is James Janecka is?
13     A.  Yes.  He's the facility administrator for the
14 Adelanto facility.
15     Q.  Can the facility administration of the
16 Adelanto facility modify the IGSA?
17     A.  No.
18     Q.  Can any detention officer at the Adelanto
19 facility modify the IGSA?
20     A.  No.
21     Q.  You mentioned earlier that the process for
22 modifying the IGSA has to be routed through the City of
23 Adelanto.  Is that right?
24     A.  Yes.
25         MS. HOU:  Objection, form.

Page 52

1     Q.  (BY MS. WRIGHT)  Who at GEO -- who at GEO
2 would bring a potential modification to the attention of
3 the City?
4     A.  My office.
5     Q.  And specifically you, Ms. Martin?
6     A.  It could be me or one of my staff, yes.
7     Q.  How many people do you supervise?
8     A.  Let me count.  I think 13, including a
9 satellite office.  I have to confirm that, but I believe
10 it's 13 because I've lost a couple of people.
11     Q.  And you report to George Zoley?
12     A.  Yes, Dr. Zoley.  Yes, I report to George
13 Zoley.
14     Q.  Do you know what Mr. -- Dr. Zoley is a doctor
15 in?
16     A.  No.
17     Q.  Does Mr. -- we can try to find out.
18         MS. HOU:  Lydia?
19         MS. WRIGHT:  Yes.
20         MS. HOU:  Is this a good time to take a
21 break?  I have to run to the restroom.  I'm sorry.
22         MS. WRIGHT:  Yes, absolutely.  Is ten
23 minutes sufficient?
24         MS. HOU:  Yeah, absolutely.
25         Is 10 minutes good for everyone?

Page 53

14 (Pages 50 - 53)

1     THE WITNESS:  Sure.

2     MS. WRIGHT:  So we'll come back at about
3  10:40.

4     THE VIDEOGRAPHER:  We are off the record
5  at 9:28 a.m.

6     (Break from 9:28 a.m. to 9:44 a.m.)

7     THE VIDEOGRAPHER:  We are back on the
8  record at 9:44 a.m., Media 2.

9     Q.  (BY MS. WRIGHT)  Ms. Martin, do you understand
10  that you're still under oath?

11     A.  Yes, I do.

12     Q.  Did you speak with anybody aside from your
13  attorney during the break?

14     A.  No.

15     Q.  Did you review any documents during the break?

16     A.  No.

17     Q.  Is there anything about the testimony that you
18  just gave that you want to amend or change or elaborate
19  on?

20     A.  No.

21     Q.  Before we move on, I just want to be clear in
22  my understanding of your testimony with respect to the
23  provision of the IGSA that we were just discussing.  Do
24  you see it on your screen?

25     A.  Yes.

Page 54

---

1     Q.  Again, this is Bates stamped GOWER-GEO 0502,
2  the provision on the Voluntary Work Program.  The
3  provision is detainees will be able to volunteer for
4  work assignments but otherwise are not required to work,
5  except to do personal housekeeping.  And it's GEO's
6  testimony today that personal housekeeping refers to
7  maintenance and sanitation tasks wherever the individual
8  detainee is inside a housing unit.  Is that correct?

9     A.  Yes.

10     MR. VAN PELT:  Object as to form.

11     A.  It refers to the housing area.

12     Q.  (BY MS. WRIGHT)  I'm sorry.

13     A.  It refers to the housing area that they live
14  in, yes.

15     MS. WRIGHT:  Mr. Van Pelt, I think you
16  are on mute if you were attempting to.

17     If we need to go to off the record to fix a
18  technical issue, we can, but, Alicia, we can't hear
19  David to the extent he's speaking on the record.

20     MR. VAN PELT:  Is that better?

21     MS. WRIGHT:  That's better.

22     MR. VAN PELT:  Okay.  Apologies.
23  Apologies for that.

24     MS. WRIGHT:  No problem.

25     Court reporter, could you please read back my

Page 55

---

1  last question?

2     (Requested testimony read.)

3     MR. VAN PELT:  Same objection.

4     Q.  (BY MS. WRIGHT)  Ms. Martin, who at ICE is
5  authorized to make modifications to the IGSA?

6     MR. VAN PELT:  Objection, witness may
7  lack personal knowledge, calls for speculation.

8     A.  The contracting officer.

9     Q.  (BY MS. WRIGHT)  Who is the contracting
10  officer that is responsible for making modifications to
11  the IGSA?

12     A.  The ICE contracting officer I believe at
13  Adelanto is Natasha Nguyen.

14     Q.  Do you know how long Ms. Nguyen has been the
15  contracting officer at Adelanto?

16     A.  She's been the contracting officer at Adelanto
17  for a minimum of the last two years.  There was one
18  prior to that for a couple of years, and then she was
19  contracting officer probably all together for that
20  contract a little over ten years in different phases.

21     Q.  Is the contracting officer's technical
22  representative authorized to modify the IGSA?

23     A.  No.

24     (Reporter clarification.)

25     A.  No.

Page 56

---

1     Q.  (BY MS. WRIGHT)  And with respect to the
2  current contract between GEO and ICE to operate the
3  Adelanto facility, are those statements also true that
4  the contracting officer is authorized to modify the
5  contract and the COTR is not?

6     A.  Correct.

7     MR. VAN PELT:  Objection, may call for
8  speculation or may lack personal knowledge.  The witness
9  can answer if she knows.

10     A.  Yes, that's true.

11     Q.  (BY MS. WRIGHT)  Now you testified earlier
12  that when a -- when GEO identified an area of the
13  contract that it wished to modify, it approached the
14  City and then the City negotiated the modification with
15  ICE.  Is that accurate?

16     A.  It was a joint effort as far as the City and
17  GEO and ICE, yes.

18     Q.  What do you mean, it was a joint effort?

19     A.  Obviously where GEO is operating the facility,
20  we would know what needs to be modified.  We would alert
21  the City, and we would alert ICE and enter negotiations
22  together.

23     Q.  All three entities: the City, ICE and GEO?

24     A.  The City has to be involved because they have
25  the contract with ICE.

Page 57

15 (Pages 54 - 57)

1  Q.  Okay.  I am going to -- I am going to mark an
2  exhibit as Exhibit 156.
3      (Exhibit 156 marked.)
4  Q.  (BY MS. WRIGHT)  And I will share my screen.
5      Ms. Martin, can you see a PDF of a contract
6  modification labeled P00002?
7  A.  Yes.
8  Q.  And the Bates stamp is Adelanto-CPRA 09032.
9  Do you see that?
10  A.  Yes.  Yes.
11  Q.  Is this an example of a contract modification
12  of the IGSA?
13  A.  Yes.
14  Q.  Who is Roberta J. Halls?
15  A.  She was the contracting officer at the time.
16  Q.  And so she had authority to modify the
17  contract because she was a contracting officer.  Is that
18  correct?
19  A.  Correct.  Correct.
20  Q.  And would a City of Adelanto employee sign --
21  be the other signatory to a contract modification?
22  A.  This is a unilateral, not a bilateral,
23  modification, so no.
24  Q.  What is the difference between a unilateral
25  and bilateral modification?

Page 58

1 stamped Adelanto-CPRA 9303.  Do you see that on your
2 screen?
3  A.  Yes.
4  Q.  What does CLIN0007 refer to?
5  A.  It's the contract -- contract line item
6 number, and it says detainee work program reimbursement.
7  Q.  Does CLIN0007 always refer to detainee work
8 program reimbursement?
9  A.  No.  It could be a different number.  It
10 just -- in this contract, yes, I would say it would have
11 to be 007 because it would be the same CLIN number.
12      (Reporter clarification.)
13  A.  CLIN, contracting line item number.
14  Q.  (BY MS. WRIGHT)  What is GEO's understanding
15 of the term "detainee work program reimbursement"?
16  A.  That is the reimbursement line item for
17 Voluntary Work Program for the detainees.
18  Q.  So it's correct that it's the -- it refers to
19 the amount that ICE will reimburse GEO for detainee
20 payroll?
21      MR. VAN PELT:  I am going to object as to
22 misstates testimony.
23  A.  It's the amount that the ICE will reimburse
24 for the detainee work program, yes.
25  Q.  (BY MS. WRIGHT)  What --

Page 60

1  A.  Bilateral takes both parties.  Unilateral, the
2  government can modify without permission nor
3  negotiations with the other party.
4  Q.  Who are the two parties that engage in a
5  bilateral modification?
6  A.  It would be the City and the contracting
7  officer.
8  Q.  So the City and ICE?
9  A.  Yes.
10  Q.  Does GEO have any role in a bilateral contract
11  modification?
12  A.  If the City has given us permission to sign on
13  behalf of the City, yes, we could.
14  Q.  Does GEO have any other role in bilateral
15  contract modification?
16      MR. VAN PELT:  Object as to vague, as to
17  the term "role" there.
18  A.  It depends on the modification, the type of
19  modification.
20  Q.  (BY MS. WRIGHT)  What do you mean?
21  A.  Again, if we had responsibility or we had a
22  role in modifying the contract, it would probably be an
23  operational issue or a financial issue or anything --
24  you know, because we're their primary operator.
25  Q.  Okay.  Let's look at the page that's Bates

Page 59

1  A.  Well --
2  Q.  I'm sorry, go ahead.
3  A.  Go ahead.  I am sorry.
4  Q.  When I use the phrase "detainee payroll," what
5 I am talking about is payments made to detainees
6 pursuant to the detainee work program dollar a day work
7 policy.  Do you understand that?
8  A.  Yes.
9  Q.  Okay.  So your testimony, if I'm understanding
10 correctly, is that this phrase "detainee work program
11 reimbursement" refers to the amount of money that ICE
12 reimburses to GEO to cover detainee payroll.  Correct?
13  A.  Yes, correct.
14  Q.  What does DA stand for?
15  A.  That's the quantity or the item -- yeah, the
16 unit item.
17  Q.  What does that mean, DA?
18  A.  DA, I believe, would be detainee, but I am not
19 absolutely sure.
20  Q.  What does the 48 in the quantity column refer
21 to?
22  A.  The number of detainees that they anticipate
23 will be in the work program.
24  Q.  Okay.  And what does the 1.00 refer to in the
25 unit price column?

Page 61

16 (Pages 58 - 61)

1    A.   The dollar amount that will be paid to the
2  quantity, per quantity.
3    Q.   So putting it all together, this means that
4  ICE will reimburse GEO $48 for detainee payroll.  Is
5  that right?
6    A.   Yes.  I think -- now I am looking at -- DA, I
7  believe, is daily.
8    Q.   I understand.
9       So ICE will reimburse GEO $48 every day for
10  detainee payroll?
11    A.   Up to -- yes.
12    Q.   What do you mean, up to?
13    A.   Well, I mean, that's the amount that is in
14  this CLIN for 48 detainees, a dollar a day, $48 a day.
15    Q.   How does ICE know how many detainees are going
16  to work per day?
17    A.   This is just an estimate.  The actual detainee
18  numbers would be invoiced on the ICE invoice.
19    Q.   So if more than 48 detainees work per day,
20  would ICE still reimburse GEO $48 per day?
21    A.   No.  They would reimburse GEO the actual
22  amount of the detainees that worked that day.  Again,
23  this is just an estimate.
24    Q.   Okay.  And by the same token, if fewer than 48
25  detainees worked per day, would ICE reimburse $48 a day

Page 62

1    Q.   (BY MS. WRIGHT)  If GEO paid detainees $2 a
2  day for their work in the work program, would ICE
3  reimburse GEO $2 a day?
4    A.   No.
5       MR. VAN PELT:  Object as incomplete
6  hypothetical, calls for speculation.
7    Q.   (BY MS. WRIGHT)  Why not?
8       MR. VAN PELT:  The witness can answer.
9    A.   Because they are only authorized by statute to
10  pay a dollar per day per detainee, so they will only
11  reimburse a dollar per day per detainee.
12    Q.   (BY MS. WRIGHT)  Who is they?
13    A.   ICE.
14    Q.   Is GEO prohibited from paying detainees in
15  excess of a dollar a day out of pocket?
16       MR. VAN PELT:  I am going to object as
17  vague, vague and ambiguous.  The witness can answer if
18  she understands the question.
19    A.   No, we're not prohibited.



25       MR. VAN PELT:  Same objection.

Page 64

1  to GEO?
2    A.   No.  They would reimburse how many detainees
3  worked that day.
4    Q.   Does ICE reimburse GEO for 100 percent of its
5  detainee payroll expenses?
6    A.   At a dollar a day, yes.
7    Q.   So ICE reimburses GEO $1 for every crew
8  detainee per day?
9    A.   In the work -- in the work program.
10    Q.   And your testimony on behalf of GEO is that
11  there's no excess costs associated with detainee payroll
12  that ICE does not reimburse GEO for?
13    A.   I am sorry --
14       MR. VAN PELT:  Object as misstates
15  testimony.
16    A.   I don't understand the question.
17    Q.   (BY MS. WRIGHT)  Your testimony today is that
18  there's no costs associated with detainee payroll for
19  which ICE does not reimburse GEO.  Is that correct?
20       MR. VAN PELT:  Same objection, and vague
21  and ambiguous.
22    A.   What costs are you -- the only costs that ICE
23  reimbursed GEO for is the dollar a day for the detainee
24  that's worked that day in the Voluntary Work Program.
25  There's no other cost associated with this.

Page 63

1    Q.   (BY MS. WRIGHT)  And GEO does not pay more
2  than $1 a day for detainee labor.  Is that right?
3    A.   In some cases they do, we do, GEO does.
4    Q.   At Adelanto?
5    A.   No.
6    Q.   But at other civil immigration detention
7  centers that GEO owns or operates, GEO pays detainees
8  more than $1 a day for their labor in the Voluntary Work
9  Program.  Is that correct?
10    A.   Yes.
11    Q.   Which facilities are those?
12    A.   I believe there's only two.  I think -- I
13  believe in the State of Texas, depending on the skill
14  set of the actual job duty, we paid up to $2 or $3 a day
15  for barber shop services or food service.  I can't
16  recollect exactly which facilities, but there's only a
17  couple.
18    Q.   Is LaSalle Processing Center one of those
19  facilities?
20       MR. VAN PELT:  Objection.
21    A.   I am not sure.
22       MR. VAN PELT:  Calls for speculation.
23    Q.   (BY MS. WRIGHT)  Why does GEO pay detainee
24  workers participating in the Voluntary Work Program in
25  these three -- two or three facilities -- let me start

Page 65

17 (Pages 62 - 65)

1 that again.
2      You just testified that GEO pays detainee
3 workers in the Voluntary Work Program at some GEO
4 facilities more than $1 a day.  Is that right?
5      A.  Correct.
6      Q.  Why does GEO pay detainee workers at some
7 facilities more than a dollar a day and at other
8 facilities exactly a dollar a day?
9           MR. VAN PELT:  Object.  Object, witness
10 may lack personal knowledge, and it's vague and
11 ambiguous.
12      A.  We would pay a dollar -- more than a dollar a
13 day at facilities that we had additional budget to be
14 able to do so, as far as funds are concerned, and in
15 high level skill sets that we thought would require more
16 skills, such as, like I said, barber shop or food
17 service.
18      Q.  (BY MS. WRIGHT)  When you say when you have
19 additional budget to do so, what do you mean?
20      A.  Each facility has their own budget.  If they
21 have additional moneys that they're able to, you know,
22 put into the workforce, then we would, you know, be able
23 to pay out of our pocket.
24      Q.  So at some facilities GEO chooses to pay more
25 than a dollar a day to detainees participating in the

Page 66

1 Voluntary Work Program for specific work assignments.
2 Right?
3      A.  At a couple, yes.
4      Q.  And of those facilities, GEO pays
5 out-of-pocket for the difference between what they pay
6 the detainee and the $1 that GEO is reimbursed by ICE.
7 Is that correct?
8      A.  Correct.
9      Q.  Did GEO request permission from ICE at these
10 facilities to pay more than a dollar a day?
11           MR. VAN PELT:  Objection, calls for
12 speculation and vague and ambiguous as to ask
13 permission.
14      A.  I can't say for sure.  I believe that they
15 have at certain facilities, but I can't say for sure if
16 it's at both or two or three facilities.
17      Q.  (BY MS. WRIGHT)  I am going to mark an
18 exhibit.  I am marking Exhibit 157 --
19           (Exhibit 157 marked.)
20      Q.  (BY MS. WRIGHT)  -- and I will share my
21 screen.  Do you see a contract modification that is
22 numbered P00003?
23      A.  Yes.
24      Q.  And the Bates stamp is Adelanto-CPRA 09304.
25      A.  Yes.

Page 67

1      Q.  See that?
2      Okay.  Is this an example of a unilateral
3 contract modification?
4      A.  Yes.
5      Q.  And we know that because the contracting
6 officer has signed it but nobody else has.  Is that
7 correct?
8      A.  Well, we know that because the contracting
9 officer signed it and Section E states the contractor is
10 not required to sign.
11      Q.  And would GEO be the contractor, or would the
12 City of Adelanto be the contractor?
13      A.  The City of Adelanto would be the contractor.
14      Q.  Let's skip to the page that is Bates labeled
15 Adelanto-CPRA 09306.  Do you see that?
16      A.  I am sorry.  Yes.
17      Q.  Do you see where it says changes for line
18 item 0007, detainee work program?
19      A.  Yes.
20      Q.  And it says quantity changed from 30,048 to
21 30,344.  Do you see that?
22      A.  Yes.
23      Q.  What does that mean?
24      A.  That means they changed the amount, which is
25 Section F or Column F, from 30,048 to 30,344.

Page 68

1      Q.  And who is they?
2      A.  ICE.
3      Q.  And this refers to the reimbursement that --
4 the amount of reimbursement that ICE is going to
5 reimburse GEO for detainee payroll.  Is that right?
6      A.  Correct.
7      Q.  So this means that in this context
8 modification, ICE has increased detainee payroll.  Is
9 that right?
10      A.  No.  It appears that -- yes, they have
11 increased it.
12      Q.  Okay.  And then it says obligated amount for
13 this modification $296.  Do you see that?
14      A.  Yes.
15      Q.  What does that mean?
16      A.  This is a funding task order, which happens
17 probably every 30 days.  When ICE gets money into their
18 budgets, they have to fund certain CLINs, and all this
19 is doing is increasing that CLIN probably for this time
20 period.  What's the modification?  It's just increasing
21 the obligated amount.
22      Q.  So it's increasing the amount that ICE has to
23 reimburse GEO for detainee payroll?
24      A.  Yes.
25           MR. VAN PELT:  Object.

Page 69

18 (Pages 66 - 69)

1  Q.  (BY MS. WRIGHT)  And does this mean $296 total
2  or per day?
3        MR. VAN PELT:  Object, may call for
4  speculation.  The witness can answer if she knows.
5  A.  It looks like it's the difference between the
6  30,048 and 30,344, if my math is correct.
7  Q.  (BY MS. WRIGHT)  So is your testimony that
8  it's a total amount, not a daily amount?
9  A.  Yes, total amount.  It's an obligated amount.
10  Q.  Okay.  I am going to mark Exhibit 158.
11        (Exhibit 158 marked.)
12  Q.  (BY MS. WRIGHT)  Do you see on your screen
13  contract modification P00008?
14  A.  Yes.
15  Q.  The Bates stamp is GEO-Novoa 024810.  Do you
16  see that?
17  A.  Yes.
18  Q.  Is this a bilateral or a unilateral
19  modification?
20  A.  It is a unilateral modification.
21  Q.  And we know that because it says in box E that
22  the contractor is not required to sign?
23  A.  Correct.
24  Q.  Is this your signature --
25  A.  Yes.

Page 70

1  Q.  -- in box 15B?
2  A.  Yes, it is.
3  Q.  Why did you sign this contract?
4  A.  Probably out of habit or mistake.  I don't
5  know.  I didn't -- it was not required, but I signed it.
6  Q.  Okay.  Let's look at the page labeled
7  GEO-Novoa 24811.  Do you see that on your screen?
8  A.  Yes.
9  Q.  It says changes from line item 0007, detainee
10  work program reimbursement, and we've already -- you've
11  already testified that this refers to the amount that
12  ICE will reimburse GEO for detainee payroll.  Right?
13  A.  Correct.
14  Q.  Then it says quantity changed from 55,444 to
15  73,444.  Do you see that?
16  A.  Yes.
17  Q.  What does that mean?
18  A.  Again, they changed the quantity from 55,444
19  and upped it to 73,444.
20        MR. VAN PELT:  Objection, that the
21  document speaks for itself as well.
22  Q.  (BY MS. WRIGHT)  Who is they?
23  A.  ICE.
24  Q.  Okay.  So this means that ICE has increased
25  the reimbursement that it is paying to GEO for detainee

Page 71

1  payroll.  Is that correct?
2  A.  Correct.
3        MR. VAN PELT:  Objection, the document
4  speaks for itself.
5  Q.  (BY MS. WRIGHT)  If GEO's detainee payroll is
6  higher than expected, does GEO have to approach the City
7  who has to approach ICE to modify the contract for a
8  higher reimbursement amount?
9        MR. VAN PELT:  Objection, may call for
10  speculation.  The witness can answer to the extent she
11  knows.
12  A.  No.
13  Q.  (BY MS. WRIGHT)  What is the process -- well,
14  let me ask this.  If GEO has higher than expected
15  detainee payroll, does GEO just swallow the excess cost?
16  A.  No.
17  Q.  So what happens -- I mean, how does GEO get
18  reimbursed?
19  A.  Again, the detainee payroll is invoiced on a
20  monthly basis, and if the CLIN number runs out of that
21  money, they will increase the money to cover that
22  payroll.
23  Q.  Who is they?
24  A.  ICE.
25  Q.  Okay.  So if GEO has higher than expected

Page 72

1  detainee payroll costs for a period of time, GEO can
2  approach ICE to be reimbursed for the full expenditures.
3  Is that correct?
4        MR. VAN PELT:  I am going to object that
5  it misstates the witness's testimony.
6  A.  It's not an approach matter.  It's what's
7  based on the invoice.  If they decide -- if they see
8  that they need more money to cover that CLIN, they will
9  add more money in this next task order, which is this is
10  what this is.
11  Q.  (BY MS. WRIGHT)  Who is they?
12  A.  ICE.
13  Q.  Okay.  So I am just trying to understand the
14  process here.  So if GEO has higher than expected
15  detainee payroll expenditures, GEO will note that on an
16  invoice that GEO sends to ICE.  Is that correct?
17        MR. VAN PELT:  Objection, misstates
18  the --
19  A.  No.
20        MR. VAN PELT:  -- witness's testimony.
21  A.  This CLIN amount is for a specific time
22  period.  If we -- GEO invoices on a monthly basis.  If
23  it looks like that more money is going to be needed,
24  then they'll increase that CLIN amount, which is -- they
25  is ICE.  So it's not an approachable matter; it's just

Page 73

19 (Pages 70 - 73)

1 what is the actual cost.  All this is putting money to
2 the contract.
3     Q.  (BY MS. WRIGHT)  Okay.  So let me see if I
4 finally understand.
5        Okay.  So you said that GEO invoices ICE on a
6 monthly basis for detainee payroll.  Correct?
7     A.  Through the City, yes.
8     Q.  Through the City.  Understood.
9        And if GEO has higher than expected expenses
10 related to detainee payroll, GEO will note that on the
11 invoice.  Is that correct?
12    A.  There's no notation.
13        MR. VAN PELT:  Misstates the testimony.
14    A.  We're not keeping --
15        MR. VAN PELT:  And it's been asked and
16 answered.  This has been asked and answered.
17    A.  We're not keeping up with the CLINs.  We're
18 just charging what the actual detainee workforce cost
19 is.
20    Q.  (BY MS. WRIGHT)  Great.  Okay.  So GEO
21 invoices through the City -- let me start again.
22        Through the City, GEO invoices ICE on a
23 monthly basis for detainee payroll.  Correct?
24    A.  Correct.
25    Q.  Occasionally GEO will need to reimburse ICE

Page 74

1 for more -- for higher expenditures related to detainee
2 payroll than was anticipated in the contract
3 modification.  Is that correct?
4     A.  No.  You just said GEO will reimburse ICE.
5     Q.  Thank you.
6        ICE will reimburse GEO for whatever the
7 difference is between what was stated in the contract
8 modification and what GEO actually expended on detainee
9 payroll.  Is that right?
10    A.  Yes.
11    Q.  Is there anything about what I just said that
12 you would change?
13    A.  It's -- like I said, this is a task order.
14 It's just putting estimated moneys in there.  We bill on
15 the actual use.  So if they need to put more money into
16 a separate CLIN or into this CLIN, they'll do so.
17    Q.  Okay.  At those facilities where you pay
18 detainees more than a dollar a day for their labor, do
19 you -- does GEO invoice ICE for --
20        MR. VAN PELT:  Objection.  Objection.  Do
21 you mean like personal knowledge?
22        MS. WRIGHT:  David, what is your basis
23 for these last personal knowledge objections?  This is a
24 30(b)(6).  Are you saying that the witness is not
25 prepared to testify on this topic?

Page 75

1        MR. VAN PELT:  No, not generally, but
2 there may be specific questions in which the witness
3 does lack personal knowledge and that's the basis for
4 the objection.
5     Q.  (BY MS. WRIGHT)  The question again,
6 Ms. Martin, is at those facilities where you pay
7 detainees -- excuse me -- at those facilities where GEO
8 pays detainees more than $1 a day for their labor in the
9 Voluntary Work Program, does GEO seek $1 a day per
10 detainee for -- as reimbursement from ICE?
11    A.  Yes.
12    Q.  So just so I am clear, where -- I think you
13 mentioned that at a facility in Texas detainees might
14 make $2 or $3 a day working in food service or the
15 barber shop.  Do you remember that testimony?
16    A.  Yes.
17    Q.  GEO pays detainees more than a dollar a day
18 for that work.  Right?
19    A.  In a couple of facilities, correct.
20    Q.  But GEO still is reimbursed by ICE only $1 a
21 day for that work.  Is that correct?
22    A.  Correct.
23    Q.  Does GEO -- in those facilities where GEO pays
24 more than a dollar a day, does GEO invoice ICE for the
25 $1 a day per detainee rate?

Page 76

1     A.  Yes.
2     Q.  I am going to mark an exhibit as 159.
3        (Exhibit 159 marked.)
4     Q.  (BY MS. WRIGHT)  And I will share my screen.
5        Do you see a contract modification numbered
6 P00009 on your screen?
7     A.  Yes.
8     Q.  And the Bates label is Adelanto-SDT 02159.
9     A.  Yes.
10    Q.  Who is Cindy Herrera.
11    A.  The city manager at the time, interim city
12 manager.  For Adelanto, I'm sorry.
13    Q.  Do you see on the page that's Bates labeled
14 Adelanto-SDT 02160 where it says changes for line
15 item 0008 detainee work program?
16    A.  Yes.
17    Q.  Does this line item 0008 detainee work program
18 refer to reimbursements that ICE pays to GEO for
19 detainee payroll?
20        MR. VAN PELT:  Objection, the document
21 speaks for itself.
22    A.  Yes, it does, but this is the obligation
23 modification.
24    Q.  (BY MS. WRIGHT)  What does that mean?
25    A.  They are deobligating funds that they didn't

Page 77

20 (Pages 74 - 77)

1 use in this particular line item.

2 Q. Who is they?

3 A. ICE.

4 Q. What does it mean to deobligate funds?

5 A. Pull funds from that contract that are not

6 necessary. They're subtracting from the amount charged.

7 Q. What do you mean, the amount charged? Who

8 does ICE charge?

9 A. No. They're subtracting for the amount that

10 was in the quantity section by the amount that they have

11 not used.

12 Q. They meaning ICE?

13 A. ICE, sorry.

14 Q. Okay. So if I understand this correctly, in

15 this contract modification, ICE is seeking a

16 reimbursement from GEO for $1,242?

17 A. No, this is not a reimbursement. This is a

18 deobligation of funds. That means they have leftover

19 funds for a time period that they did not use in this

20 particular CLIN that they are now taking away from this

21 CLIN and obligating it elsewhere.

22 Q. I understand. And by they, you mean ICE?

23 A. ICE, sorry.

24 Q. Okay. So ICE -- correct me if I'm wrong here.

25 ICE originally obligated or set aside $50,500 for this

Page 78

---

1 CLIN, for detainee work program payroll. Is that

2 correct?

3 A. Well, I would have to see the CLIN before,

4 but, yes, that was the most recent CLIN.

5 Q. Okay. And then it turned out that GEO's

6 expenditures for detainee payroll pursuant to the

7 invoices for this period were only $49,258. Is that

8 correct?

9 MR. VAN PELT: Objection, the document

10 speaks for itself.

11 A. Correct.

12 Q. (BY MS. WRIGHT) And so ICE deobligated $1,242

13 from this CLIN or this bucket of funds. Correct?

14 A. Correct.

15 Q. And ICE then moved that $1,242, applied it

16 elsewhere to something else. Is that --

17 MR. VAN PELT: I am going to object. It

18 calls for speculation. The witness is not here to

19 testify on behalf of ICE, but on behalf of GEO. To the

20 extent the witness knows what ICE did with this -- these

21 funds, she can answer.

22 A. I don't know what ICE did with the funds, but

23 they deobligated it from this contract.

24 Q. (BY MS. WRIGHT) At any of GEO's detention

25 facilities that we've been discussing today, does GEO

Page 79

---

1 invoice ICE for more than $1 per day per detainee for

2 detainee payroll?

3 A. No.

4 Q. At any of the civil immigration centers that

5 we've been discussing today, does GEO get reimbursed by

6 ICE for more than $1 per detainee per day for detainee

7 payroll?

8 A. No.

9 Q. It's correct that the IGSA incorporated the

10 2008 version of the PBNDS. Right?

11 A. I am sorry. Say -- I didn't hear you.

12 Q. Is it correct that the IGSA incorporates the

13 2008 version of the PBNDS?

14 MR. VAN PELT: I am going to object as

15 vague and ambiguous.

16 A. Depending on when it was incorporated, yes, it

17 would. Current or the most recent IGSA, yes.

18 Q. (BY MS. WRIGHT) I am going to show you what

19 has been marked as Exhibit 1, which we've already talked

20 about today. Do you see the statement of work to the

21 IGSA on your screen?

22 A. Yes.

23 Q. The Bates stamp is GOWER-GEO 0531. Do you see

24 that?

25 A. Yes.

Page 80

---

1 Q. Do you see where it says -- we've already

2 talked about this today -- that the service provider is

3 required to perform in accordance with the 2008 ICE

4 performance based -- Performance Based National

5 Detention Standards, or PBNDS?

6 A. Yes.

7 MR. VAN PELT: The document speaks for

8 itself.

9 Q. (BY MS. WRIGHT) I am going to pull up what

10 has been previously marked -- actually, it's not. I am

11 going to mark as an exhibit Exhibit 160.

12 (Exhibit 160 marked.)

13 Q. (BY MS. WRIGHT) Do you see on your screen a

14 document that's labeled ICE/DRO detention standard

15 Voluntary Work Program?

16 A. Yes.

17 Q. The Bates stamp is NOVOA 14079?

18 A. Yes.

19 Q. Do you recognize this document?

20 A. It looks like -- yes.

21 Q. What is it?

22 A. It's the ICE/DRO detention standard Voluntary

23 Work Program.

24 Can you pull it up a little bit? I am sorry.

25 Q. And it's dated December 2, 2008?

Page 81

---

21 (Pages 78 - 81)

1    A.   Yes.
2    Q.   Okay.  This is the -- these are the provisions
3  on the Voluntary Work Program per the 2008 PBNDS?
4    A.   Where is this coming from?  Is it coming from
5  the PBNDS?  Is it coming from the statement of work?  Is
6  it coming from a policy?
7    Q.   This is a provision of the PBNDS, the 2008
8  PBNDS provision on Voluntary Work Program?
9       Let's look at Section K, which is on the page
10  Bates stamped NOVOA 14082.  Do you see what I have
11  highlighted here?
12    A.   Yes.
13    Q.   It says, Compensation, detainees shall receive
14  monetary compensation for work completed in accordance
15  with the facility's standard policy.  Did I read that
16  correctly?
17    A.   Yes.
18    Q.   Was this provision of the 2008 PBNDS optional
19  or mandatory with respect to GEO's contract at Adelanto?
20    A.   It's mandatory.
21    Q.   And it's correct that the Adelanto facility
22  during the term of the IGSA was an IGSA, not a CDF or --
23       (Reporter clarification.)
24    Q.   (BY MS. WRIGHT)  Let me rephrase the question.
25       During the term of the IGSA, the Adelanto

Page 82

---

1  facility was an IGSA.  Is that correct?
2    A.   Yes.
3    Q.   It was not an SPC?
4    A.   Correct.
5    Q.   What does SPC stand for?
6    A.   Special processing centers.
7    Q.   Nor was it a CDF.  Right?
8    A.   Well, it was a contracted detention facility,
9  yes.
10    Q.   You're saying that the Adelanto facility was a
11  contract detention facility during the term of the IGSA?
12    A.   Yes.
13    Q.   Okay.  What is GEO's understanding of this
14  provision, that detainees shall receive monetary
15  compensation for work completed in accordance with the
16  facility's standard policy?
17       MR. VAN PELT:  Objection, the document
18  speaks for itself.
19    A.   That they'll receive compensation for work
20  completed in accordance with a facility's policy,
21  standard policy.
22    Q.   (BY MS. WRIGHT)  What was the Adelanto's
23  facility standard policy regarding detainee compensation
24  during the period when the 2008 PBNDS applied to the
25  facility?

Page 83

---

1    A.   If they were in the Voluntary Work Program,
2  they would be compensated a dollar a day.
3    Q.   Who is they?
4    A.   The detainees.
5    Q.   So GEO complied with this provision in its
6  execution of the IGSA?
7    A.   Yes.
8    Q.   The IGSA was modified when the 2011 version of
9  the PBNDS was released.  Is that correct?
10    A.   Yes, I believe it was.  I would have to check
11  the contract, but I believe it was.
12    Q.   I am introducing an exhibit as 161.
13       (Exhibit 161 marked.)
14    Q.   (BY MS. WRIGHT)  Okay.  Do you see a contract
15  modification that's labeled P00001?
16    A.   Yes.
17    Q.   And the Bates stamp is Adelanto-CPRA 9230?
18    A.   Yes.
19    Q.   Let's look at the page that's labeled
20  Adelanto-CPRA 9232.  Do you see where it says -- do you
21  see this on your screen, Ms. Martin?
22    A.   Yeah.  Yes.
23    Q.   Do you see where it says, quote, Compliance
24  with 2011 PBNDS will begin on January 1, 2013?
25    A.   Yes.

Page 84

---

1    Q.   Do you see where it says should there be a
2  conflict between the 2011 Performance Based National
3  Detention Standards, PBNDS, and any other term and
4  condition of the agreement identified in Block 10A on
5  this modification, you are to contact the contracting
6  officer for clarification?  Do you see that?
7    A.   Yes.
8    Q.   What does this mean?  What is GEO's
9  understanding of this provision?
10    A.   If there's a conflict between the two editions
11  of the standards, we -- we or the City should contact
12  the contracting officer for clarification.
13    Q.   Is that the contracting officer at ICE?
14    A.   Yes.
15    Q.   Has GEO contacted the contracting officer at
16  ICE for clarification regarding the 2011 PBNDS?
17       MR. VAN PELT:  Object as vague and
18  ambiguous.
19    A.   Not to my personal knowledge.  I wouldn't know
20  as far as -- I haven't.
21    Q.   (BY MS. WRIGHT)  You're testifying on behalf
22  of GEO.  Is it your testimony that GEO has not contacted
23  the contracting officer for clarification on the 2011
24  PBNDS?
25    A.   As far as I know, I would probably be the

Page 85

---

22 (Pages 82 - 85)

1 person contacting the contracting officer as the
2 contracting authority for GEO, and I don't recollect
3 contacting the contracting officer for clarification
4 between the two standards.
5 Q. I am going to pull up what has previously been
6 marked --
7 THE WITNESS: Excuse me. I'm sorry.
8 Could you go back to that exhibit, because there was --
9 I had a question about that. It was a bilateral
10 exhibit, but it hasn't been signed by both parties.
11 Q. (BY MS. WRIGHT) You know, your counsel is
12 welcome to ask questions about it on redirect, but we're
13 going to move on and discuss another exhibit.
14 A. Okay.
15 Q. Okay. I am going to mark as Exhibit 162 a
16 document that I will share with you.
17 (Exhibit 162 marked.)
18 Q. (BY MS. WRIGHT) Do you see on your screen a
19 document entitled "5.8 Voluntary Work Program"?
20 A. Yes.
21 Q. And at the bottom, it says PBNDS 2011 as
22 modified by February 2013 errata?
23 A. Yes.
24 Q. And the Bates stamp is NOVOA 15339. Correct?
25 A. Correct.

Page 86

1 Q. All right. Section K of this provision, which
2 is on page NOVOA 15342, provides compensation.
3 Detainees shall receive monetary compensation for work
4 completed in accordance with the facility's standard
5 policy. The compensation is at least $1 (USD) per day.
6 The facility shall have an established system that
7 ensures the detainees receive the pay owed them before
8 being transferred or released. Did I read that
9 correctly?
10 A. Yes.
11 Q. Did GEO comply with this provision of the 2011
12 PBNDS in its operation of the Adelanto facility?
13 A. Yes.
14 Q. What is GEO's understanding of provision K in
15 the 2011 PBNDS as modified by the February 2013 errata?
16 MR. VAN PELT: I am going to object as
17 vague and ambiguous. The document speaks for itself.
18 A. That the detainee shall receive monetary
19 compensation for the work in the Voluntary Work Program
20 for at least a dollar a day.
21 Q. (BY MS. WRIGHT) What is GEO's understanding
22 of the term "at least" as it's used in this provision?
23 A. A minimum of a dollar a day.
24 Q. Was Section 5.8 V, K, what we're looking at
25 now, compensation, in the 2011 version of the PBNDS

Page 87

1 mandatory?
2 A. When you say mandatory, if we had a voluntary
3 work program, yes, it would be mandatory.
4 MR. VAN PELT: Objection, vague and
5 ambiguous.
6 Q. (BY MS. WRIGHT) GEO had to comply with this
7 provision in its operation of the contract at Adelanto.
8 Is that right?
9 (Reporter clarification.)
10 Q. (BY MS. WRIGHT) GEO had to comply with this
11 provision of the PBNDS in its operation of the Adelanto
12 facility. Is that right?
13 MR. VAN PELT: Object to vague and
14 ambiguous, and the witness can answer --
15 A. Yes.
16 MR. VAN PELT: -- to the extent she
17 understands the question.
18 Q. (BY MS. WRIGHT) Your answer is yes?
19 A. Yes.
20 Q. What was the Adelanto facility's standard
21 policy on detainee compensation from January 1, 2013
22 through June 30, 2017, which I will represent to you is
23 the time period when the 2008 -- excuse me -- the 2011
24 PBNDS, this version was applicable at Adelanto?
25 A. I am sorry. You're going to have to

Page 88

1 elaborate. What do you mean, standard policy? We paid
2 the detainees that were involved in the Voluntary Work
3 Program a dollar a day.
4 Q. Thank you.
5 There is another version of the PBNDS that we
6 have discussed a little bit, and that's the 2011 PBNDS
7 as revised in 2016. Is that correct?
8 A. Yes.
9 Q. And the IGSA was modified to incorporate that
10 version of the PBNDS. Is that correct?
11 A. I'd have to see the document, but I would
12 assume so.
13 Q. I am introducing Exhibit 158, I believe. And
14 I will share my screen. I'm sorry, 163. I was way off.
15 I am introducing Exhibit 163.
16 (Exhibit 163 marked.)
17 Q. (BY MS. WRIGHT) Do you see on your screen a
18 contract modification that's labeled P00024?
19 A. Yes.
20 Q. It's Bates stamped Adelanto-SDT 02099. Do you
21 see that?
22 A. Yes.
23 Q. It's signed by Roberta Halls as the
24 contracting officer. Do you see?
25 A. Yes.

Page 89

23 (Pages 86 - 89)

Page 90

1    Q.   And by Cynthia Herrera --
2    A.   Yes.
3    Q.   -- as the other signatory?
4    A.   Yes.
5    Q.   Do you see where it says the purpose of this
6  modification is to incorporate the Performance Based
7  Detention Standards 2011, PBNDS 2011, 2016 revisions.
8  The service provider shall comply with all of the ICE
9  PBNDS 2011, 2016 revisions, by June 30, 2017.  Is that
10 right?
11   A.   Yes.
12        MR. VAN PELT:  The document speaks for
13 itself.
14   Q.   (BY MS. WRIGHT)  So does this mean that by
15 June 30 of 2017, GEO contractually had to comply with
16 all versions of the 2011 PBNDS revised in 2016?
17        MR. VAN PELT:  I am going to object that
18 the document speaks for itself, and it's vague and
19 ambiguous.
20   A.   Yes.
21        MR. VAN PELT:  Lydia, we've been going a
22 while now.  Is now a good time to take a ten minute
23 break?
24        MS. WRIGHT:  Let's take a break in about
25 five minutes, if that's okay, when we get to the end of

Page 91

1  this set.
2        MR. VAN PELT:  Sure.
3        (Exhibit 153 marked.)
4    Q.   (BY MS. WRIGHT)  Okay.  I am going to show you
5  now what's been previously marked as Exhibit 163 (sic).
6  I am going to share my screen.  Do you see on your
7  screen the 5.8 Voluntary Work Program?
8    A.   Yes.
9    Q.   And at the bottom, it is -- it's labeled PBNDS
10 2011, revised December 2016.  Do you see that?
11   A.   Yes.
12   Q.   And it says -- it's Bates labeled NOVOA 8446?
13   A.   Yes.
14   Q.   And I am sorry, this is actually Exhibit 153.
15 It's been previously marked Exhibit 153.
16        Okay.  Do you recognize this as the section of
17 the PBNDS Voluntary Work Program?
18   A.   Yes.
19   Q.   We'll skip to the page that is Bates labeled
20 NOVOA 8448.  Do you see that?
21   A.   Yes.
22   Q.   Okay.  And here we have, again, Section K,
23 Compensation.  And do you see this on your screen?
24   A.   Yes.
25   Q.   It provides, quote, Detainees shall receive

Page 92

1  monetary compensation for work completed in accordance
2  with the facility's standard policy.  The compensation
3  is at least 1 US dollars per day.  The facility shall
4  have an established system that ensures detainees
5  receive the pay owed them before being transferred or
6  released.  Did I read that correctly?
7    A.   Yes.
8    Q.   Do you agree that this provision Section 5.8.5
9  K of the 2011 PBNDS, as revised in 2016, is identical to
10 the same section in the 2011 PBNDS as modified by the
11 2013 errata?
12   A.   Yes.
13        MR. VAN PELT:  Object as the documents
14 speak for themselves.
15   Q.   (BY MS. WRIGHT)  What is GEO's understanding
16 of this section of the PBNDS?
17        MR. VAN PELT:  Same objection.  The
18 document speaks for itself, and it's ambiguous.
19   A.   That GEO will compensate the detainee that's
20 involved in the Voluntary Work Program at least a dollar
21 a day.
22   Q.   (BY MS. WRIGHT)  Is this provision optional or
23 mandatory with respect to GEO's contract at Adelanto?
24   A.   It's mandatory.
25   Q.   Is it mandatory today at Adelanto?

Page 93

1    A.   Yes.
2    Q.   And did GEO comply with this provision of the
3  PBNDS?
4    A.   Yes.
5        MS. WRIGHT:  With that, let's take a
6  break, ten minute break.  We'll reconvene at 10:50 my
7  time, 11:50 for Ms. Martin.
8        MS. WILKE:  Ms. Wright, it is 11:39 here.
9  We are fine taking a break now or whenever.  Did you
10 contemplate -- we would like to take lunch around maybe
11 12:35 or --
12        THE WITNESS:  -- or now.
13        MS. WILKE:  Yeah.  Would that be okay?
14        MS. WRIGHT:  Yeah, sure.  We'll take a
15 ten minute break now, and we'll come back for another,
16 you know, 45 minutes or so and then take a lunch break,
17 if that works for everyone.
18        THE VIDEOGRAPHER:  We're off the record
19 at 10:40 a.m.
20        (Break from 10:40 a.m. to 11:48 a.m.)
21        THE VIDEOGRAPHER:  We are back on the
22 record at 11:48 a.m., Media 3.
23   Q.   (BY MS. WRIGHT)  Ms. Martin, do you understand
24 that you're still under oath?
25   A.   Yes.

24 (Pages 90 - 93)

1    Q.   Did you speak with anybody aside from your
2    counsel during the lunch break?
3    A.   No.
4    Q.   I am going to show you a document that has
5    been marked as Exhibit 154.
6         (Exhibit 154 marked.)
7    Q.   (BY MS. WRIGHT)  Do you see a PDF that is in
8    the number 2 box, it says 70 CDC R19D00000011?
9    A.   Yes.
10   Q.   And the Bates stamp on the bottom is GEO-Novoa
11   35044.  Do you see this?
12   A.   Yes.
13   Q.   Do you know what this document is?
14   A.   Yes.
15   Q.   What is it?
16   A.   It's the direct contract between GEO and ICE
17   for the operation of the Adelanto facility.
18   Q.   Okay.  Do you know what the period of
19   performance of this contract is?
20   A.   You'll need to go down.  Keep on going.  Hold
21   on.  From 6/26/2019 to 3/25/2020.
22   Q.   So this -- this is also known as the bridge
23   contract.  Is that right?
24   A.   Not necessarily a bridge contract.  It is a
25   contract for that period of time, but it's not

Page 94

1    necessarily a bridge contract.
2    Q.   But this contract is no longer in effect.  Is
3    that correct?
4    A.   Correct.  Well, yes, that's correct.
5    Q.   Was there something else that you were going
6    to --
7    A.   No.
8    Q.   So this contract is directly between GEO and
9    ICE.  Is that correct?
10   A.   Yes.
11   Q.   And this contract replaced the IGSA and the
12   services contract.  Is that right?
13   A.   Yes.
14   Q.   The City of Adelanto is not a party to this
15   contract?
16   A.   Correct.
17   Q.   Why did GEO enter into a contract with ICE
18   that would terminate on March 25, 2020?
19        MR. VAN PELT:  I am going to object as
20   vague and ambiguous and -- yeah, vague and ambiguous.
21   A.   Because the IGSA was no longer in place, so we
22   entered into an interim contract.
23   Q.   (BY MS. WRIGHT)  So this contract was -- this
24   contract was always intended to be an interim contract.
25   Is that correct?

Page 95

1    A.   Yes.
2    Q.   Was there ever a question on GEO's part that
3    the Adelanto facility would close when this contract
4    expired in March of 2020?
5         MR. VAN PELT:  Object as vague and
6    ambiguous.
7    A.   I'm sorry.  Was there a question that it would
8    be closed?  If we didn't have another contract in place,
9    yes, it would close.
10   Q.   (BY MS. WRIGHT)  Let me show you a portion of
11   the performance work statement of this contract.  Do you
12   see that on your screen?
13   A.   Yes.
14   Q.   And the Bates label is GEO-Novoa 35047.  Do
15   you see that?
16   A.   Yes.
17   Q.   It says here a key goal of immigration
18   detention reform is to create a civil detention system
19   that is not penal in nature and serves the needs of ICE.
20   And then it goes on.  Do you see where I'm reading this?
21   A.   Yes.
22   Q.   What is GEO's understanding of this portion of
23   the paragraph that a civil detention system that is not
24   penal in nature.  What does that mean?
25        MR. VAN PELT:  I am going to object that

Page 96

1    the document speaks for itself and it's vague and
2    ambiguous, the question.
3    A.   Exactly what it says, that a civil detention
4    system is not penal in nature.
5    Q.   (BY MS. WRIGHT)  But what does that mean?
6    What does penal mean?
7    A.   Prison or disciplinary.
8    Q.   So detainees are not held at GEO detention
9    facilities as punishment?
10   A.   Correct.  Correct.
11   Q.   Are detainees at Adelanto ever handcuffed?
12   A.   I'm sorry?
13   Q.   Are detainees at Adelanto ever handcuffed?
14   A.   Yes.
15        MR. VAN PELT:  I'm sorry.  Could you
16   repeat that?  I didn't hear that.  Could you repeat the
17   question?  I wasn't able to hear it.
18        MS. WRIGHT:  I asked if detainees at
19   Adelanto are ever handcuffed, and the response was, I
20   believe, yes.
21   A.   Yes.  Yes, if necessary.
22   Q.   (BY MS. WRIGHT)  Do detention officers at
23   Adelanto ever use pepper spray on detainees?
24   A.   Yes, if necessary.
25   Q.   Are detainees at Adelanto permitted to move

Page 97

25 (Pages 94 - 97)

1 about the facility freely?
2          MR. VAN PELT:  I am going to object as
3 vague and ambiguous.
4     A.   When you say the facility, can you be more
5 specific?
6     Q.   (BY MS. WRIGHT) The Adelanto facility.  Are
7 detainees who are held at the Adelanto facility allowed
8 to come and go as they please throughout the facility?
9          MR. VAN PELT:  Same objection.  I object
10 that it's vague and ambiguous as to come and go.
11     A.   There's obviously places in the facility that
12 detainees are not allowed, in the administration
13 building, ICE detention offices.  So in the entirety of
14 the facility, no, they would not be allowed to come and
15 go.
16     Q.   (BY MS. WRIGHT) Are detainees at Adelanto
17 permitted to leave their housing units whenever they
18 want to?
19     A.   I don't believe so.
20     Q.   Are detainees at Adelanto permitted to go to
21 the kitchen or the chow hall whenever they want to?
22     A.   I don't believe so.  I believe there's a
23 building schedule.
24     Q.   So detainees are moved together pursuant to
25 some schedule?

Page 98

1 visitation, maintenance and recreation, among other
2 services, in a manner appropriate to the needs of the
3 immigration detention population.  Did I read that
4 correctly?
5     A.   Yes.
6     Q.   Is that a true and correct statement as
7 applied to Adelanto?
8     A.   Yes.
9     Q.   What is GEO's understanding of this portion of
10 the sentence, in a manner appropriate to the needs of
11 the immigration detention population?
12          MR. VAN PELT:  Object that the document
13 speaks for itself.
14     A.   What it says in a manner that -- appropriate
15 to the needs of the immigration detention population.
16     Q.   (BY MS. WRIGHT) What does -- what does it
17 mean to be appropriate to the needs of the immigration
18 detention population?
19     A.   Depending on -- well, they would need, you
20 know, health services.  They would need food.  They
21 would need laundry.  We would need to be able to do
22 intake.  They would need visitation.  Everything it
23 says, I mean, that's appropriate to that population.
24     Q.   Are those needs unique to an immigration
25 detention population?

Page 100

1     A.   Yes.
2     Q.   What is the difference between administrative
3 segregation and disciplinary segregation?
4     A.   Administrative segregation usually refers to
5 protective custody or some type of segregation that's
6 not involved with disciplinary.  Disciplinary
7 segregation would be probably segregated while
8 disciplinary investigation is going on.
9     Q.   And are detainees at the Adelanto facility
10 ever subjected to disciplinary segregation?
11     A.   I'd say very rare, but, yes, it's allowed
12 within the rules.
13     Q.   Are detainees at Adelanto ever subject to
14 administrative segregation?
15          MR. VAN PELT:  I object as vague and
16 ambiguous.
17     A.   Yes.  Again, that would be, you know, for
18 protective custody or that type of thing.  Yes, they
19 would be segregated for their own safety.
20     Q.   (BY MS. WRIGHT) Look back to the document
21 that is still on your screen.  I am highlighting a
22 sentence on the same page that we were on before, Bates
23 stamped GEO-Novoa 35047.  It states the facility will
24 provide appropriate support services to include health
25 services, food, laundry, intake, law library,

Page 99

1     A.   Not these type of services, but the type of
2 services that are given, as far as visitation,
3 recreation, those type of things might be different from
4 facility to facility.
5     Q.   How so?
6     A.   Depending on the needs of the facility or the
7 operations of the facility or the type of facility it
8 is.
9     Q.   How do you determine whether GEO is providing
10 services in a manner that is appropriate to the needs of
11 the population?
12     A.   It would be the --
13          MR. VAN PELT:  Again, vague and
14 ambiguous.  Sorry.
15     A.   The appropriateness of the facility, what's
16 required by the contract, what's required by PBNDS,
17 what's required by, you know, any portion of the
18 statement of work, what different facility policies have
19 been approved by ICE, what's required in those policies.
20 There's a variation that we would be monitored to.
21     Q.   (BY MS. WRIGHT) I am going to ask you now
22 about a document that has been marked as 155.
23          (Exhibit 155 marked.)
24     Q.   (BY MS. WRIGHT) Do you see on your screen
25 solicitation/contract that ends in box number 2 with 09?

Page 101

26 (Pages 98 - 101)

| | |
|---|---|
| 1    A.   Yes. | 1  weekly schedule. |
| 2    Q.   And the Bates stamp is GEO-Novoa 40872.  Do | 2    Q.   So this weekly schedule under the terms of |
| 3  you see that? | 3  this contract is produced weekly to ICE or as requested? |
| 4    A.   Yes. | 4    A.   Yes. |
| 5    Q.   Are you familiar with this document? | 5    Q.   What does COR stand for? |
| 6    A.   Yes. | 6    A.   Contracting officer representative. |
| 7    Q.   What is this? | 7    Q.   Who is that individual at the Adelanto |
| 8    A.   It looks like a solicitation -- it looks like | 8  facility? |
| 9  the contract for -- you need to go down further so I can | 9    A.   I don't know.  I believe Dan Pompulin is that |
| 10  see the -- it's incorporating the Desert View facility | 10  individual now. |
| 11  as an annex to the Adelanto facility. | 11    Q.   Do you know who is responsible for creating |
| 12    Q.   Is this the contract that is currently in | 12  this authorized detainee worker list weekly schedule? |
| 13  place between ICE and GEO with respect to the Adelanto | 13    A.   It would be the facility, GEO. |
| 14  facility? | 14    Q.   Do you know who within the facility? |
| 15    A.   I believe.  So there's another modification | 15    A.   I can only assume.  No, I wouldn't know a |
| 16  after that, but I believe so, yes. | 16  specific person that was given that responsibility. |
| 17    Q.   And when was the -- when was this contract | 17    Q.   What about common fare cost for detainees, |
| 18  modified? | 18  which is at line item 66, What does this refer to? |
| 19    A.   You would need to go back up so I can see the | 19    A.   I am not sure.  I do not know that answer. |
| 20  dates.  It was modified -- oh, this was 12/19/2019. | 20  Common fare cost -- |
| 21  This is the last one.  I'm sorry.  This is the contract | 21    Q.   Sorry? |
| 22  that incorporates Desert View.  Yes, this is the current | 22    A.   I don't -- sorry, I am not familiar with that |
| 23  contract. | 23  at all. |
| 24    Q.   Okay.  And when does this contract expire? | 24    Q.   And you said that GEO and ICE have modified |
| 25    A.   You'll need to go to the period of | 25  this contract.  Is that correct? |
| Page 102 | Page 104 |

| | |
|---|---|
| 1  performance.  Hold on.  12/19/2034. | 1    A.   I thought this was the one before.  This is |
| 2    Q.   Okay.  So the period of performance of the | 2  the current contract that we're under. |
| 3  contract we're looking at right now, which is | 3    Q.   Okay.  GEO has not modified this contract? |
| 4  Exhibit 155, is from December 20, 2019 to December 19, | 4    A.   I don't believe we have any modifications for |
| 5  2034.  Is that right? | 5  this contract, no. |
| 6    A.   Correct. | 6    Q.   But -- |
| 7       MR. VAN PELT:  Object that the document | 7    A.   I would have to look.  Yes.  I mean -- well, |
| 8  speaks for itself. | 8  GEO can't modify it.  The contracting officer can modify |
| 9    Q.   (BY MS. WRIGHT)  I am going to show you a | 9  it. |
| 10  portion of this contract.  It's Bates stamped GEO-Novoa | 10    Q.   So ICE can modify the contract? |
| 11  41330.  Do you see that? | 11    A.   Yes. |
| 12    A.   Yes. | 12    Q.   Okay.  And can GEO and ICE modify the contract |
| 13    Q.   On line 66, it says common fair costs for | 13  by mutual consent in one of those bilateral |
| 14  detainees.  And I will just go up to show you what this | 14  modifications that we discussed earlier? |
| 15  chart is.  This is a Section E3 deliverables chart, | 15    A.   Again, ICE is the only one that can modify the |
| 16  which starts on the page Bates labeled GEO-Novoa 41325. | 16  contract if, after negotiations, there's a bilateral |
| 17  In one column, it says deliverable.  In one column, it | 17  modification that both of us have to sign, that's when |
| 18  says due date.  And I am asking specifically about the | 18  GEO would be signing that modification.  But I can't or |
| 19  item in line 67, authorized detainee worker list weekly | 19  GEO cannot actually modify the contract.  It has to come |
| 20  schedule.  What is that document? | 20  from ICE. |
| 21    A.   I would assume it's the building schedule for | 21    Q.   I am going to show you now what's been marked |
| 22  the Voluntary Work Program. | 22  as Exhibit 153.  You should recognize this document. |
| 23    Q.   What -- | 23  We've talked about it already. |
| 24    A.   Okay.  It would be the detainees that are | 24    A.   Yes. |
| 25  authorized to work in the Voluntary Work Program, a | 25    Q.   This is the 2011 PBNDS as revised in 2016. |
| Page 103 | Page 105 |

27 (Pages 102 - 105)

1 And we're going to talk specifically about Section 5.8,
2 which is the Voluntary Work Program section. Do you see
3 that on your screen?
4     A. Yes.
5     Q. Are you familiar with this standard?
6     A. Yes.
7     Q. Let's go to the page that's Bates stamped
8 NOVOA 8447. See that?
9     A. Yes.
10     Q. And Section 5.8.5 C, personal housekeeping
11 required. Do you see that?
12     A. Yes.
13     Q. We've talked about this a little bit. This
14 section says, quote, Work assignments are voluntary.
15 However, all detainees are responsible for personal
16 housekeeping. Do you see that?
17     A. Yes.
18     Q. Okay. So is it correct that it's GEO's
19 position that under the PBNDS a contractor cannot
20 require a detainee to work in the Voluntary Work
21 Program?
22     A. I'm sorry. I could barely hear you.
23     Q. Is it GEO's position that under the PBNDS a
24 contractor like GEO cannot require a detainee to work in
25 the Voluntary Work Program?

Page 106

1     MR. VAN PELT: Object as misstates
2 testimony.
3     A. Again, you need to ask your question one more
4 time, please.
5     Q. (BY MS. WRIGHT) Is it GEO's position that the
6 tasks -- that the mandatory -- let me start over.
7     Is it GEO's position that the mandatory
8 personal housekeeping tasks that we've been discussing
9 include tasks other than or in addition to the four
10 tasks that are enumerated in this section?
11     A. Yes, it does.
12     Q. And what are those mandatory personal
13 housekeeping tasks?
14     A. Again, by anything in their general use area,
15 they would be also mandated to clean.
16     Q. And the general use area is defined as what?
17     A. The housing area.
18     Q. So I think you said earlier the showers, the
19 kitchen, the microwave, the day room.
20     A. Yes.
21     Q. Anything else?
22     A. No, it would be, again, their general use area
23 that they're living in.
24     Q. So anything -- any tasks beyond personal
25 housekeeping or outside of the detainee's immediate

Page 108

1     A. Correct.
2     Q. Is it GEO's position that under the PBNDS a
3 contractor like GEO can require a detainee to engage in
4 personal housekeeping?
5     A. Yes.
6     Q. So put another way, is it correct, according
7 to GEO, that under the PBNDS a contractor like GEO
8 cannot require a detainee to engage in labor that
9 exceeds the scope of personal housekeeping?
10     MR. VAN PELT: I am going to object.
11 It's vague and ambiguous. The witness can answer if she
12 understands the question.
13     A. Well, I am not sure I really understand it. I
14 mean personal housekeeping is not part of the Voluntary
15 Work Program. So, yes, personal housekeeping -- the
16 contractor can have the detainee do their own personal
17 housekeeping, yes.
18     Q. (BY MS. WRIGHT) Okay. But anything beyond
19 personal housekeeping the contractor cannot require the
20 detainee to do. Is that correct?
21     A. Correct.
22     Q. And is it correct that it's GEO's position
23 that the scope of personal housekeeping in this section
24 of the PBNDS exceeds the four tasks that are enumerated
25 in this section?

Page 107

1 living area -- let me start over. Strike that.
2     Is it correct -- am I understand correctly
3 that for any task that is beyond personal housekeeping
4 and beyond the immediate living area, for those tasks
5 GEO has to follow the PBNDS requirement for voluntary
6 work?
7     MR. VAN PELT: Object as vague and
8 ambiguous.
9     A. If it's beyond their housing area, yes.
10     Q. (BY MS. WRIGHT) I am sorry. Can you repeat
11 your answer?
12     A. You're asking -- you asked, if I am not
13 mistaken, if it's GEO's position that any detainee -- or
14 anything beyond personal housekeeping or immediate
15 personal living area is beyond -- or anything beyond
16 that is Voluntary Work Program. Again, I am just making
17 sure that we are on the same page, that the general use
18 or their living area would be considered their personal
19 or immediate living area, and anything beyond their
20 housing area would be considered a Voluntary Work
21 Program.
22     Q. And that's your understanding?
23     A. Yes.
24     Q. Are detainees paid for personal housekeeping?
25     A. No.

Page 109

28 (Pages 106 - 109)

1   Q.   Are detainees paid to maintain their immediate
2 living areas?
3   A.   No.
4   Q.   And this is at Adelanto?
5   A.   This is at Adelanto, yes.
6   Q.   And with respect to GEO's other civil
7 immigration detention facilities, is that the same?
8   A.   Yes, that's the same.
9   Q.   Is there anything about GEO's interpretation
10 of personal housekeeping that you've just described that
11 is different at Adelanto than at GEO's other civil
12 immigration facilities?
13        MR. VAN PELT:  I am going to object as
14 vague and ambiguous.  The witness can answer to the
15 extent she understands the scope of the question.
16   A.   Personal housekeeping would be the same at all
17 facilities, detention facilities.
18   Q.   (BY MS. WRIGHT)  Civil immigration detention
19 facilities.  Right?
20   A.   Correct.
21   Q.   In this same document, which again is Exhibit
22 153 -- Exhibit 153, the 2011 PBNDS.  I am going to show
23 you a page Bates stamped NOVOA 8282.  Do you see that?
24   A.   Yes.
25   Q.   Okay.  And, actually, we'll back up a little

Page 110

1 bit so we can give you some context.  This is the
2 chapter of the PBNDS 3.1 on disciplinary system.  Do you
3 see that?
4   A.   Yes.
5   Q.   Are you familiar with this provision?
6   A.   Yes.
7   Q.   On page NOVOA 8282 of Exhibit 153, it says
8 under Section C, All facilities shall have graduated
9 scales of offenses and disciplinary consequences as
10 provided in this section.  Do you see that?
11   A.   Yes.
12   Q.   Does GEO comply with this requirement in its
13 civil immigration detention facilities?
14   A.   Yes.
15   Q.   Section B says notice to detainees.  Do you
16 see that?
17   A.   Yes.
18   Q.   And it says the detainee handbook or
19 supplement issued to each detainee upon admittance shall
20 provide notice of the facility's rules of conduct and
21 prohibited acts, the sanctions imposed for violations of
22 the rules, the disciplinary severity scale, the
23 disciplinary process and the procedure for appealing
24 disciplinary findings.  Did I read that correctly?
25   A.   Yes.

Page 111

1   Q.   And then it says detainees shall have the
2 following rights and shall receive notice of them in the
3 handbook.  Did I read that correctly?
4   A.   Yes.
5   Q.   Does GEO comply with this provision of the
6 PBNDS in its operation of civil immigration detention
7 facilities?
8   A.   Yes.
9   Q.   Further down that same page, it says copies of
10 the rules of conduct, rights and disciplinary sanctions
11 shall be provided to all detainees and posted in
12 English, Spanish and other languages spoken by
13 significant segments of the population with limited
14 English proficiency.  Copies to be provided and posted
15 are as follows:  1, disciplinary severity scale, 2,
16 prohibited acts, and 3, sanctions.  Did I read that
17 correctly?
18   A.   Yes.
19   Q.   Does GEO comply with this provision of the
20 PBNDS for its operation of civil immigration detention
21 facilities?
22   A.   Yes.
23   Q.   So GEO provides copies of the disciplinary
24 severity scale, prohibited acts and sanctions in a
25 variety of languages to individual detainees at each

Page 112

1 civil immigration detention center?
2        MR. VAN PELT:  Objection, the document
3 speaks for itself.
4   A.   Yes.
5   Q.   (BY MS. WRIGHT)  Where does GEO post these
6 documents in the facilities?
7   A.   I believe --
8        MR. VAN PELT:  Objection, assumes facts
9 not in evidence.  The witness can answer.
10   A.   I believe these documents are in the
11 supplemental detainee handbook.  I am not sure where
12 else it would be posted.
13   Q.   (BY MS. WRIGHT)  Okay.  And the supplemental
14 detainee handbook is a GEO document?
15   A.   Yes.
16   Q.   And it's provided to each detainee upon
17 admittance to the facility?
18   A.   Yes.
19   Q.   And this is at each of GEO's civil immigration
20 detention facilities?
21   A.   Yes.
22   Q.   So it's correct that GEO informs detainees --
23 well, first of all, it's correct that GEO maintains a
24 graduated scale of offenses and sanctions.  Correct?
25   A.   Correct.

Page 113

29 (Pages 110 - 113)

1   Q.   I'm sorry?
2   A.   Correct.
3   Q.   And it's correct that GEO informs each
4 detainee about the facilities graduated scale of
5 offenses and sanctions.  Is that correct?
6   A.   Correct.
7   Q.   And GEO does so in the detainee's native
8 language?
9   A.   Correct.
10   Q.   Do you also post these documents throughout
11 the facility?
12   A.   I am not sure what exactly is posted
13 throughout the facility.
14   Q.   Okay.  GEO endeavors to inform detainees about
15 the disciplinary system.  Is that correct?
16   A.   Yes.
17   Q.   GEO also informs detainees about their rights
18 with respect to discipline?
19   A.   Yes.
20       MR. VAN PELT:  I am going to object as
21 vague and ambiguous as to rights, but the witness can
22 answer.
23   Q.   (BY MS. WRIGHT)  And -- you answered correct,
24 didn't you?
25   A.   Yes.

Page 114

1 speaks for itself.
2   Q.   (BY MS. WRIGHT)  Are there any other offense
3 categories?
4   A.   Not according to the PBNDS, no.
5   Q.   According to GEO, are there any other offense
6 categories?
7   A.   No.
8   Q.   And each offense -- offense category has a
9 list of prohibited acts.  Right?
10   A.   Right.
11       MR. VAN PELT:  Same objection.  The
12 document speaks for itself.
13   Q.   (BY MS. WRIGHT)  And the corresponding list of
14 sanctions.  Is that correct?
15   A.   Correct.
16   Q.   Like a menu of sanctions but that can be
17 applied to a prohibited act.  Right?
18       MR. VAN PELT:  Object as to form.
19   A.   There are sanctions that apply to the
20 offenses, yes.
21   Q.   (BY MS. WRIGHT)  Do all of the sanctions that
22 are listed for any particular category of offenses have
23 to be applied to a prohibited act?
24   A.   Do all of them, no.
25   Q.   So if there's -- who makes the choice of what

Page 116

1   Q.   And GEO also informs detainees about the
2 procedure for appealing disciplinary sanctions.  Is that
3 right?
4   A.   Correct.
5   Q.   GEO actually has a system for appealing
6 sanctions.  Right?
7   A.   Yes.
8   Q.   And at each of GEO's civil immigration
9 detention centers, GEO informs detainees that sanctions
10 for prohibited conduct can range from withholding
11 privileges up to segregation.  Is that right?
12   A.   Correct.
13   Q.   I am showing you a page from the same
14 Exhibit 153, Bates labeled NOVOA 8289.  Do you see this
15 on your screen?
16   A.   Yes.
17   Q.   I think we're still talking about Section 3.1
18 of the 2016 revisions to the 2011 PBNDS disciplinary
19 system.  Now it's correct that there are four offense
20 categories.  Correct?
21   A.   Correct.
22   Q.   Greatest, high, high moderate, low moderate.
23 Is that right?
24   A.   Yes.
25       MR. VAN PELT:  Object, the document

Page 115

1 sanction applied to a prohibited act?
2   A.   Well, it's investigated, and then a
3 determination is made through the investigation of what
4 applies to what offense and what the, you know,
5 surrounding circumstances were.
6   Q.   Okay.  So there's an investigation, and then
7 someone decides what sanction is appropriate?
8   A.   A disciplinary hearing, yes.
9   Q.   Okay.  And who -- is it GEO or ICE that
10 determines which sanction is appropriate?
11   A.   Well, it's GEO, according to the PBNDS and
12 according to the policy, and the detainee has the
13 opportunity to appeal if they don't agree with GEO's
14 decision.
15   Q.   And would the detainee appeal to ICE?
16   A.   It would first appeal to GEO, and then if they
17 didn't like GEO's decision, they would appeal directly
18 to ICE, yes.
19   Q.   Okay.  So the Unit Disciplinary Committee is
20 comprised of ICE -- excuse me.  Let me start other.
21       The Unit Disciplinary Committee that
22 investigates alleged prohibited acts is comprised of GEO
23 officials.  Is that right?
24   A.   Correct.
25   Q.   And a detainee can appeal the Unit

Page 117

30 (Pages 114 - 117)

1 Disciplinary Committee's findings to another GEO
2 committee.  Is that right?
3            MR. VAN PELT:  Object as assumes facts.
4    A.  Yes, to -- I mean, the disciplinary appeal
5 process is outlined in the PBNDS.  So there's levels in
6 place that they can appeal to, yes.
7    Q.  (BY MS. WRIGHT)  Okay.  Eventually, the
8 detainee can appeal up to ICE itself?
9    A.  Correct.  And they can also go direct to ICE
10 directly.  That's also their right to do so as well.
11    Q.  So GEO determines which sanctions from the
12 list of sanctions applies to the prohibited act?
13            (Reporter clarification.)
14    A.  Yes, based on the disciplinary investigation
15 and all circumstances surrounding it, yes.
16    Q.  (BY MS. WRIGHT)  Okay.  We're looking at
17 what's Bates stamped NOVOA 8291.  Do you see that on
18 your screen?
19    A.  Yes.
20    Q.  Again, of Exhibit 153.  Section 4 is low
21 moderate offense category.  Do you see that?
22    A.  Yes.
23            MR. VAN PELT:  Excuse me.  Is this
24 Exhibit 163 or 153?
25            MS. WRIGHT:  153.

Page 118

1    Q.  (BY MS. WRIGHT)  Prohibited acts 410 is
2 failing to follow safety or sanitation regulations.  Do
3 you see that?
4    A.  Yes.
5    Q.  What does that mean?
6    A.  That means if --
7            MR. VAN PELT:  The document speaks for
8 itself.
9    A.  That if they failed to follow a safety or
10 sanitation regulation, they can be disciplined under the
11 low moderate guidelines.
12    Q.  (BY MS. WRIGHT)  So if a detainee fails to
13 engage in personal housekeeping sanitation that we just
14 discussed, that could be a 410 prohibited act?
15    A.  Yes, it could be.
16    Q.  413 -- offense 413 is, quote, being unsanitary
17 or untidy, failing to keep self and living area in
18 accordance with posted standards.  Did I read that
19 correctly?
20    A.  Yes.
21    Q.  And this is also a low moderate offense.
22 Correct?
23    A.  Yes.
24    Q.  So what is GEO's understanding of this
25 offense?

Page 119

1            MR. VAN PELT:  I am going to object that
2 the document speaks for itself.
3    A.  Again, if they are unsanitary and they fail to
4 keep theirself and living area in accordance with the
5 posted standards, they can fall under this disciplinary
6 guidelines of low moderate discipline.
7    Q.  (BY MS. WRIGHT)  So, again, if the detainee
8 fails to keep their immediate living area clean or
9 engage in personal housekeeping tasks, that could be a
10 413 offense.  Is that right?
11    A.  Correct.
12    Q.  Let's also look at offense 498, interfering
13 with a staff member in the performance of duties.  Did I
14 read that correctly?
15    A.  Yes.
16    Q.  What -- what does that mean?
17    A.  If a staff member is doing something that a
18 staff member is to do and the detainee comes and
19 interferes with that performance -- his performance --
20 his or her performance of duties, a detainee can be
21 disciplined.
22    Q.  Does staff ever mean a GEO -- like a GEO
23 detention officer?
24    A.  Well, this is PBNDS.  It could be GEO or it
25 could be ICE.

Page 120

1    Q.  Now these three prohibited acts that we just
2 discussed, 410, 413 and 498, are punishable by a list of
3 nine sanctions.  Correct?
4    A.  Correct.
5    Q.  And those sanctions include loss of
6 privileges?
7    A.  Correct.
8            MR. VAN PELT:  Objection, the document
9 speaks for itself.
10    Q.  (BY MS. WRIGHT)  And then there's a list of
11 commissary, vending machines, movies, recreation,
12 et cetera.  Correct?
13            MR. VAN PELT:  Same objection.
14            (Reporter clarification.)
15    A.  Correct.
16    Q.  (BY MS. WRIGHT)  Are there any privileges,
17 aside from commissary, vending machines, movies and
18 recreation that they can use to sanction for a low
19 moderate offense?
20    A.  Well, it has an "et cetera" there, so I am
21 assuming there is, but I don't know of any.
22    Q.  It also says that change housing can be a
23 sanction for a low moderate offense.  What is GEO's
24 understanding of change housing?
25            MR. VAN PELT:  Speaks for itself.

Page 121

31 (Pages 118 - 121)

**Page 122**

1    A.   That they are assigned to another housing unit.
2    Q.   (BY MS. WRIGHT)  Why is that considered a
3  sanction?
4    A.   Not necessarily considered a sanction, but it
5  might be other extenuating circumstances where if they
6  were changed, their housing unit, it might be a better
7  situation.  I mean, I can't think of any that would be a
8  sanction, per se.
9    Q.   Well, you see that it's listed under
10  sanctions.
11    A.   I understand, but, again, I don't see that as
12  necessarily a sanction.  It's probably to assist in the
13  situation.  I can't think of anything.
14    Q.   Let's go up to high moderate offenses.  This
15  begins on NOVOA 8290.  Are you with me here?  High
16  moderate offense category?
17    A.   Yes.
18    Q.   Here are a list of prohibited acts.  These
19  prohibited acts are assigned a 300 number.
20    A.   Yes.
21    Q.   Okay.  Prohibited act 306 is refusing to clean
22  assigned living area.  Do you see that?
23    A.   Yes.
24    Q.   Does that mean in GEO's interpretation that a
25  detainee who does not comply with the personal

**Page 123**

1  housekeeping requirements may have committed a 306
2  prohibited act?
3         MR. VAN PELT:  I am going to object that
4  the document speaks for itself.
5    A.   Yes, but, again, a high moderate, there would
6  be different circumstances involved or surrounding that
7  offense.
8    Q.   (BY MS. WRIGHT)  What do you mean?
9    A.   I mean, a detainee refusing to clean their
10  living area would not necessarily be considered a high
11  moderate offense category unless there was something
12  else involved.
13    Q.   But it's open to discretion to assign
14  prohibited acts and sanctions based on the
15  circumstances?
16    A.   That's why there's a disciplinary
17  investigation and a hearing.
18    Q.   307, prohibited act 307 is refusing to obey
19  the order of a staff member or officer.  See that?
20    A.   Yes.
21    Q.   What does that mean to GEO?
22    A.   Again, based on the offense --
23         MR. VAN PELT:  Again, objection, the
24  document speaks for itself.
25    A.   Based on the categories of this offense and

**Page 124**

1  based on the disciplinary investigation refusing to obey
2  the order of a staff member and what that led to.
3    Q.   (BY MS. WRIGHT)  The refusing to obey the
4  order of a GEO detention officer could rise to the level
5  of a 307 prohibited act?
6    A.   Correct.
7         MR. VAN PELT:  Objection, the document
8  speaks for itself.
9    A.   Any staff member of, because it's PBNDS, ICE
10  or GEO.
11    Q.   (BY MS. WRIGHT)  308 is insolence toward a
12  staff member.  What is GEO's interpretation of this
13  prohibited act?
14         MR. VAN PELT:  Same objection, the
15  document speaks for itself as to what the prohibited act
16  is.
17    A.   It's insolence toward a staff member.  I am
18  not understanding the question.
19    Q.   (BY MS. WRIGHT)  I am just asking what GEO's
20  interpretation of this is.
21    A.   That if a detainee is insolent towards a staff
22  member, under these circumstances with a high moderate
23  category and depending on the circumstances under
24  investigation, that they could be disciplined under this
25  category.

**Page 125**

1    Q.   And the staff member, again, refers to either
2  a GEO officer or an ICE officer.  Is that right?
3    A.   Correct.
4    Q.   And then we have, again, interfering with a
5  staff member in the performance of duties, which is here
6  labeled 398.  Is there any difference in GEO's
7  interpretation of 398 as opposed to 498?
8         MR. VAN PELT:  Objection, the document
9  speaks for itself.
10    A.   Just the level of offense.
11    Q.   (BY MS. WRIGHT)  So a more severe circumstance
12  would increase the offense level?
13    A.   Correct.
14    Q.   And prohibited acts 306, 307, 308, 398, these
15  are all punishable by a list of sanctions that are here
16  on page NOVOA 8291.  Is that correct?
17    A.   Correct.
18         MR. VAN PELT:  Objection, the document
19  speaks for itself.
20    Q.   (BY MS. WRIGHT)  These sanctions include
21  disciplinary transfer, and then it says recommend.  What
22  does that mean?  What is disciplinary transfer?
23    A.   It would mean a transfer to probably another
24  facility or -- because it has to be recommended.  ICE is
25  the only one who can, you know, transfer detainees --

32 (Pages 122 - 125)

1 and out of facilities.
2   Q.  Oh, so it means actually move a detainee from,
3 say, Adelanto to LaSalle.  Correct?
4   A.  Yes.  I mean, that would be very extreme, but
5 yes.
6   Q.  And why does it say recommend?
7   A.  Because GEO can only recommend, or it can only
8 be recommended, and then it has to be approved by ICE.
9   Q.  A sanction for a 300 level prohibited act
10 that's calls for disciplinary segregation and then it
11 says up to 72 hours.  Did I read that correctly?
12   A.  Yes.
13   Q.  And practically speaking, what is disciplinary
14 segregation?
15      MR. VAN PELT:  The document speaks for
16 itself.
17   A.  Placing somebody in segregation for
18 disciplinary purposes up to 72 hours.
19   Q.  (BY MS. WRIGHT)  Does that mean -- can you
20 describe disciplinary segregation?  I am trying to
21 understand what disciplinary segregation actually is in
22 practice.
23   A.  Segregating an individual into a cell for up
24 to 72 hours for a sanction after a disciplinary hearing.
25   Q.  Okay.  So a detainee can be put in a cell by

Page 126

1 himself or by herself for up to 72 hours as discipline?
2 That's all it means?
3   A.  Yes.
4   Q.  Does that individual have access to
5 recreation?
6   A.  Yes.
7   Q.  In the same quantity and the same recreation
8 programs as a detainee would have if he was not in
9 disciplinary segregation?
10   A.  An individual has access to recreation in that
11 segregation environment, yes.
12   Q.  And what does that mean, in that segregation
13 environment?
14   A.  There's indoor recreation.  There's outdoor
15 recreation.  It's just a different environment than
16 being with other individuals in the housing area.
17 Different recreation sites, I guess.
18   Q.  Is an individual in disciplinary segregation
19 still able to access the law library?
20   A.  Yes.
21   Q.  Is an individual in disciplinary segregation
22 able to work on a Voluntary Work Program?

Page 127

3 ambiguous as to engage with.
4   Q.  (BY MS. WRIGHT)  Is an individual in
5 disciplinary segregation able to engage or communicate
6 with other detainees?
7   A.  They do --
8      MR. VAN PELT:  Objection.
9   A.  They're next door to each other.  If there's
10 individuals in disciplinary segregation, they talk to
11 each other.  So I guess, yes, they can engage.
12   Q.  (BY MS. WRIGHT)  Okay.  So with the person in
13 the cell adjacent?
14   A.  Yes.
15   Q.  And we also see on this list of sanctions for
16 high moderate offenses loss of privileges and change
17 housing, which we've discussed already.  Is there
18 anything different about GEO's interpretation of these
19 sanctions as applied to 300 level prohibited acts as
20 opposed to 400 level prohibited acts?
21   A.  It just depends on the high level or severity
22 of the disciplinary -- or offense, excuse me.
23   Q.  What do you mean?
24   A.  Well, obviously high to moderate -- high to
25 moderate is going to be a different level than high or

Page 128

1 low to moderate.  So it's the circumstances surrounding
2 the actual offense on what category they go into.
3   Q.  Does change housing mean to move a detainee
4 from one housing unit to another housing unit within the
5 same facility?
6   A.  Yes.
7      MR. VAN PELT:  Object as the document
8 speaks for itself.
9   Q.  (BY MS. WRIGHT)  Is that the same meaning no
10 matter what offense category the sanction is applied to?
11   A.  Yes.
12   Q.  So it's correct that a detainee who disobeys
13 an order of a GEO officer or an ICE officer, a staff
14 member, can be punished by disciplinary transfer,
15 disciplinary segregation, loss of privileges, recreation
16 time, change of housing.  That's an accurate statement?
17   A.  Yes, depending on the offense.
18   Q.  And it's also correct that it is not
19 permissible under the PBNDS for a GEO detention officer
20 to threaten a detainee's immigration proceedings.  Is
21 that right?
22      MR. VAN PELT:  I am going to object as
23 vague and ambiguous.  I didn't understand.
24   A.  And I didn't hear you.  I'm sorry.
25   Q.  (BY MS. WRIGHT)  My question was, is it

Page 129

33 (Pages 126 - 129)

1 correct that it's not permissible under the PBNDS for a
2 GEO detention officer to threaten a detainee -- a
3 detainee's immigration proceeding as --
4          MR. VAN PELT:  Object as -- same
5 objection.
6      A.   Yeah, it's correct, no.  Yes, it's correct
7 that they're not permitted to threaten their -- they
8 have nothing to do with the immigration process.
9      Q.   (BY MS. WRIGHT)  GEO detention officers have
10 nothing to do with the immigration process?
11          (Reporter clarification.)
12      Q.   (BY MS. WRIGHT)  I am just trying to get a
13 clear --
14          So it's correct -- it's correct that the PBNDS
15 does not permit a GEO detention officer to threaten a
16 detainee's immigration proceedings as a sanction for a
17 prohibited act?
18      A.   Absolutely correct.
19      Q.   Going back to our conversation of disciplinary
20 segregation at Adelanto specifically, how large are the
21 cells that detainees are held in when they are sent to
22 disciplinary segregation?
23      A.   Okay.  You're getting into semantics that I
24 don't know the specific footprint, but they are the size
25 attributable to the PBNDS standard and the ACA standard.

Page 130

1 So whatever is outlined in those standards, those are
2 the size of the cells.
3      Q.   And how much time do detainees spend in their
4 cells when they are on disciplinary segregation?
5          MR. VAN PELT:  Object as vague and
6 ambiguous.
7      A.   That could vary.  It could be 12 hours.  It
8 could be 8 hours.  It could vary.
9      Q.   (BY MS. WRIGHT)  What does that depend on?
10      A.   The facility rules and guidelines and how
11 they, you know, give them free time or recreation time
12 or whatever.  Disciplinary segregation is very rarely
13 used, so it would vary.
14      Q.   Administrative segregation is more frequently
15 used?
16      A.   Administrative segregation as far as
17 protective custody, yes, would be more frequently used.
18      Q.   Is there a different form of administrative
19 segregation aside from protective custody?
20      A.   Administration segregation is to segregate for
21 the safety of the detainee or immediate -- let's say
22 there was detainee on detainee.  Immediate, you know,
23 separation in order to get, you know, things resolved.
24 It's just for the safety of the detainee and then the
25 staff.

Page 131

1      Q.   And when you say that disciplinary segregation
2 is very rarely used --
3      A.   Very rarely.  I am sorry.  What was the
4 question?
5      Q.   I am asking what does it mean?  What does very
6 rarely mean?
7      A.   We don't utilize disciplinary segregation that
8 often in a detention environment.  It would have to be
9 pretty extreme.
10      Q.   And how often does GEO utilize disciplinary
11 segregation at its civil immigration detention
12 facilities?
13      A.   I couldn't tell you, you know, specific
14 numbers.  I am just saying as a policy, a GEO policy, we
15 don't use disciplinary segregation for detention
16 facilities or detainees on a regular basis.
17      Q.   You say as a GEO policy.  Is that policy
18 written down?
19      A.   Well, as far as certain things are concerned,
20 yeah, there's a disciplinary policy for segregation.
21 Such things as a detainee cannot be segregated
22 specifically for refusing to clean their living area, as
23 an example.
24      Q.   What policy is that?
25      A.   I don't know the number specifically, but I

Page 132

1 can follow up if you would like.
2      Q.   Are you looking at any documents in front of
3 you right now?
4      A.   I'm not.  That's why I said I don't know the
5 number specifically.
6      Q.   Is this policy one of the documents that you
7 reviewed in preparation for today's deposition?
8      A.   No.  This is a policy we changed just so
9 that -- the newest edition of this policy was changed in
10 July, I believe, of last year.  I mean, I know of the
11 policy.  I don't -- I didn't have to look at it.  I just
12 don't know the number right offhand.
13      Q.   So if I'm understanding your testimony
14 correctly, GEO changed its segregation policy in July of
15 2019 to prohibit the use of segregation for failure to
16 clean assigned living area offenses?
17          MR. VAN PELT:  Object as it may
18 mischaracterize the testimony of the witness.
19      A.   It's always been GEO's policy not to
20 discipline a detainee for refusing to clean their living
21 area.  We made it and put it more specific and updated
22 our disciplinary policy so there was no question with
23 regard to that actual offense.
24      Q.   (BY MS. WRIGHT)  So now it's in writing?
25      A.   Now it's in writing, yes.

Page 133

34 (Pages 130 - 133)

1    Q.  Okay.  And does that written policy apply to
2 all of GEO's civil immigration detention facilities?
3    A.  Yes, it does.
4    Q.  Okay.  And are there any other offenses in the
5 PBNDS that GEO -- well, actually backing up.
6        Did GEO obtain permission from ICE to create
7 that disciplinary policy that we've been discussing?
8    A.  All policies are reviewed and approved by ICE,
9 yes.
10    Q.  And I am sorry, did you say that the policy
11 that we're discussing, the July 2019 policy, is in this
12 stack of documents that you brought with you today?
13    A.  No, it's not.
14    Q.  It's not.  Okay.
15        You said that -- well, so is it correct then
16 that after July 2019, segregation is never used by GEO
17 as a sanction for failure to clean assigned working
18 area; is that correct?
19        MR. VAN PELT:  I am going to object.
20 That misstates the testimony.
21    A.  That's correct, before and after July '19,
22 that GEO's policy never used disciplinary segregation
23 for a detainee who refused to clean their living area.
24    Q.  (BY MS. WRIGHT)  When was that policy first
25 created?

                                            Page 134

1    A.  I am sorry?
2    Q.  When did GEO first create that policy?
3    A.  As far as the written policy, there's been a
4 disciplinary policy all along that really didn't outline
5 living areas as a disciplinary segregation sanction.  We
6 just made it more formal in July of 2019 to specifically
7 say that.
8    Q.  So is it correct that GEO has always had a
9 policy -- an unwritten policy that detainees would not
10 be punished by disciplinary segregation for a violation
11 of 306, refusing to clean assigned living area?  Is that
12 your testimony?
13        MR. VAN PELT:  I am going to object that
14 it's vague and ambiguous and misstates the prior
15 testimony.
16    A.  I am saying that the only offense that was --
17 or the only thing that the detainee did not do was clean
18 their living area and there was no other circumstance
19 surrounding that offense, they would not be segregated
20 or disciplinary segregated for not cleaning their living
21 area.
22    Q.  (BY MS. WRIGHT)  I see.  But if there are
23 other circumstances -- if, for example, a detainee
24 refused to clean assigned living area and possessed an
25 item not authorized for receipt or retention, that could

                                            Page 135

1 escalate to make disciplinary segregation an appropriate
2 sanction.  Is that right?
3    A.  It would be --
4        MR. VAN PELT:  Objection, incomplete
5 hypothetical, but the witness can answer.
6    A.  But the refusing to clean an assigned living
7 area would no longer be an offense.  The offense would
8 be the processing of unauthorized release or retention.
9    Q.  (BY MS. WRIGHT)  Okay.  So your testimony is
10 that refusing to clean assigned living area is no longer
11 an offense at any GEO civil immigration detention
12 facility?
13        MR. VAN PELT:  I am going to object as
14 misstates testimony.
15        (Reporter clarification.)
16    Q.  (BY MS. WRIGHT)  I am trying to understand
17 your testimony.  Is GEO's testimony that refusing to
18 clean assigned living area is no longer a prohibited act
19 at any of GEO's civil immigration detention facilities?
20        MR. VAN PELT:  I am going to object that
21 it misstates the prior testimony.
22    A.  No, I am not saying that.
23    Q.  (BY MS. WRIGHT)  I am just not understanding.
24 Can you just explain to me?  I thought that's what you
25 were just saying.

                                            Page 136

1    A.  No.  I said that the offense of refusing to
2 clean the personal living area as -- is and never has
3 been sanctioned by putting that individual in a
4 disciplinary segregation.
5    Q.  At any of GEO's immigration detention
6 facilities?
7    A.  Correct, as far as I know.  That's the policy.
8    Q.  And you're testifying on behalf of GEO.  So as
9 far as GEO knows, that's the policy.  Correct?
10    A.  Yes, correct.
11    Q.  Okay.  Going back to our discussion of the use
12 of disciplinary segregation as a sanction for any
13 prohibited act, you said that it was very rarely used.
14    A.  Correct.
15    Q.  Is that -- that's a correct statement?
16    A.  Yes.
17    Q.  How does GEO define rare?
18        MR. VAN PELT:  Objection, vague and
19 ambiguous.
20    A.  I don't understand.  Very rarely used is --
21 you know, is a sanction that depending on the offense.
22 I couldn't answer that question as far as -- I mean, it
23 would have to be a very severe offense for that sanction
24 to be utilized.
25    Q.  (BY MS. WRIGHT)  Would GEO consider hundreds

                                            Page 137

                                35 (Pages 134 - 137)

1 of times per year to be rare?
2    A.   Depending on what the offense was.  It would
3 really depend on the offense, and in a detention
4 facility, offenses are not that prolific.  So it would
5 be very rare and it would have to be extreme to use
6 disciplinary sanctions.  Riot, hurting somebody, that
7 type of thing.
8    Q.   Use disciplinary segregation, you mean?
9    A.   Yes.
10    Q.   You misspoke.
11    A.   Sorry.  Disciplinary segregation.
12    Q.   And you've discussed this written policy that
13 GEO put in writing in July 2019.  Has anybody asked you
14 for -- to produce that policy?
15    A.   Not asked me, no.
16    Q.   If a GEO detention officer violated that
17 written policy, what consequences would he or she face?
18    A.   Disciplinary.
19    Q.   What does that mean?
20    A.   Well, we have staff disciplinary as well.  If
21 they violate that disciplinary policy and they were
22 going against the guidelines of the GEO policy, then
23 they would be investigated and go under disciplinary
24 hearing and could have, you know, anything up to
25 dismissal.

Page 138

1    Q.   If a facility administrator violated that
2 policy, what sanctions would he face?
3    A.   The same as a detention officer.  There's no
4 differential between somebody violating policy, no
5 matter what their rank is.
6    Q.   Did GEO notify detainees of this new policy?
7    A.   I believe --
8         MR. VAN PELT:  I am going to object as
9 vague and ambiguous.
10    A.   I believe it's outlined in the supplemental
11 handbook, but I am not absolutely sure.  This would not
12 be something that GEO would necessarily have to notify
13 the detainees, as we didn't use it in the first place.
14    Q.   (BY MS. WRIGHT)  Are the PBNDS offense
15 categories that we've been talking about, are these
16 applied at GEO's civil immigration detention facilities?
17    A.   Yes.
18    Q.   And if GEO in the course of this litigation
19 has produced documents showing that GEO officials have,
20 indeed, put detainees into disciplinary segregation for
21 refusing to clean assigned living area, it's GEO's
22 testimony today that those actions would violate GEO's
23 policy?
24         MR. VAN PELT:  I object that it's an
25 incomplete hypothetical, and it's vague and ambiguous.

Page 139

1    A.   I would have to see that -- I mean, those
2 actual documents.
3    Q.   (BY MS. WRIGHT)  Is administrative segregation
4 a permissible sanction for refusing to clean assigned
5 living area?
6    A.   Administrative segregation is not a sanction
7 necessarily.  Administrative segregation is for the
8 safety of the detainee or other detainees or staff or
9 protective custody, et cetera.
10         MS. WRIGHT:  Why don't we take a quick
11 break.
12         And before we go off the record, your counsel,
13 Ms. Hou, has agreed to provide photocopies of the
14 documents that are in front of you, we are going to
15 enter -- or that you've brought with you to the
16 deposition today, exactly as they are in front of you.
17 So with any notes or anything you might have.
18         THE WITNESS:  Actually, they're not in
19 front of me.  They're over on the side, but I can give
20 them to her, yes.
21         MS. WRIGHT:  Yeah, so and we'll enter
22 those as an exhibit into the record today.  So perhaps
23 during this break you and your counsel can arrange for
24 those to be scanned and emailed to our paralegal so that
25 we can enter those into the record.  Is that acceptable?

Page 140

1         MS. WILKE:  Yes.
2         THE VIDEOGRAPHER:  We are off the record
3 at 12:51 p.m.
4         (Break from 12:51 p.m. to 2:21 p.m.)
5         THE VIDEOGRAPHER:  We are back on the
6 record at 2:21 p.m., Media 4.
7    Q.   (BY MS. WRIGHT)  Ms. Martin, do you understand
8 that you're still under oath?
9    A.   Yes.
10    Q.   Did you speak to anybody during the break
11 aside from your counsel?
12    A.   No.
13    Q.   I just have a few final questions for you, and
14 hopefully we'll get you out of here pretty soon.
15    A.   Okay.
16    Q.   You testified about a policy that GEO reduced
17 to writing in July of 2019 regarding the use of
18 disciplinary segregation.  Do you recall that testimony?
19    A.   Yes.
20    Q.   And you testified that GEO reduced to writing
21 GEO's previously unwritten policy that detainees would
22 not be sanctioned by disciplinary segregation for
23 refusing to clean assigned living area.  Is that
24 correct?
25    A.   Yes.

Page 141

36 (Pages 138 - 141)

1   Q.   Does that policy, that written policy apply to
2   all of GEO's civil immigration detention facilities?
3   A.   Yes.
4         MR. VAN PELT:  I am going to object as
5   asked and answered.  She can answer it again.
6   A.   Yes.
7   Q.   (BY MS. WRIGHT)  Did you create a new policy
8   or did GEO just update an existing policy?
9         MR. VAN PELT:  I am going to object as
10  vague and ambiguous.
11  A.   Updated an existing policy.
12  Q.   (BY MS. WRIGHT)  What was the existing policy
13  that GEO updated?
14  A.   It's the disciplinary policy.  So it's the
15  updated the disciplinary policy.
16  Q.   And is that disciplinary policy provided to
17  GEO detention officers?
18  A.   Yes.
19  Q.   Is it provided to detainees?
20  A.   I am not sure if it's provided to detainees in
21  policy form.
22  Q.   And you testified that nobody has asked you
23  for that document in the context of this litigation.  Is
24  that correct?
25  A.   That's correct, that I can recollect.

Page 142

1   Q.   Is there an arm's length negotiation between
2   the detainee and GEO regarding the scope of a detainee's
3   work in the Voluntary Work Program?
4   A.   No.
5         MR. VAN PELT:  I am going to object as
6   vague and ambiguous with respect to arm's length
7   transaction.
8   Q.   (BY MS. WRIGHT)  Is there any negotiation
9   between a detainee and GEO as to the rate of
10  compensation that a detainee will receive for
11  participating in the work program?
12  A.   No.
13        MR. VAN PELT:  Same objections, vague and
14  ambiguous.
15  Q.   (BY MS. WRIGHT)  Can you answer the question
16  again, please?
17  A.   No.
18  Q.   You testified earlier that GEO does not know
19  why the City terminated the IGSA.  Is that accurate?
20  A.   I don't know the exact reasoning why they
21  terminated, no.
22  Q.   Do you know general reasoning why they
23  terminated?
24  A.   They no longer wanted to have a direct
25  contract with ICE.

Page 144

1   Q.   Do you have access to that document?
2   A.   Right here now?  I mean, yes, I could get the
3   document.
4   Q.   When GEO updated its disciplinary policy in
5   July of 2019, did GEO add any other provisions to the
6   policy?
7   A.   I don't know exactly what was added and -- I
8   know that specific issue was added, but I don't know
9   what else was added.  I would have to compare the two.
10  Q.   Do you know why that specific issue was added,
11  that issue being that detainees would not be sanctioned
12  with disciplinary segregation for a violation of
13  refusing to clean assigned living area?
14        MR. VAN PELT:  Let me object to that,
15  calls for speculation.
16  A.   I think it was just to reiterate an unwritten
17  policy around that situation.
18  Q.   (BY MS. WRIGHT)  Ms. Martin, can detainees
19  negotiate the terms of their participation in the
20  Voluntary Work Program?
21  A.   I am sorry.  What type of terms?  I mean, the
22  Voluntary Work Program is -- is a program that is set.
23  They can qualify if they want to volunteer for the work
24  program, but setting their terms, I am not really
25  understanding what you're asking.

Page 143

1   Q.   And who is they?
2   A.   The City.
3   Q.   How did you find out that the IGSA was
4   terminated?
5   A.   The City notified ICE in writing that they
6   were going to terminate the contract, and that's how we
7   found out.  That's how I found out, excuse me.
8         MS. WRIGHT:  Okay.  Those are all the
9   questions that I have for you at this point, Ms. Martin.
10  I will note on the record that we will be
11  reaching out to you, David, for a copy of the policy,
12  the July 2019 policy, that Ms. Martin has testified
13  about today and that she's testified that she has access
14  to today.
15        And we are also still waiting and have not
16  received scanned copies of the documents that Ms. Martin
17  brought with her today to the deposition.  We will be
18  entering that into the record as Exhibit 164.
19        So if you have redirect, David, perhaps we can
20  do that now while we continue to wait for GEO to produce
21  those documents.
22        MR. VAN PELT:  Yes.  Yes.  If we can just
23  take about five minutes, and then hopefully we'll have
24  those documents to you, and then we can take care of the
25  redirect.  It will be very brief.  So we can reconvene

Page 145

37 (Pages 142 - 145)

1 at 35 past the hour.

2      MS. WRIGHT:  Sure.

3      THE VIDEOGRAPHER:  We are off the record

4 at 2:28 p.m.

5      (Break from 2:28 p.m. to 2:42 p.m.)

6      THE VIDEOGRAPHER:  We are back on the

7 record at 2:42 p.m., Media 5.

8      EXAMINATION

9 BY MR. VAN PELT:

10   Q.  Ms. Martin, do you recall testifying about the

11 section of the PBNDS that identifies four ways in which

12 detainees are required to maintain their immediate

13 living areas in a neat and orderly manner?

14   A.  Yes.

15   Q.  There are other sections of PBNDS that

16 identify housekeeping requirements as well?

17   A.  Yes, there is.

18   Q.  Can you identify those sections?

19   A.  One would be under the environmental safety

20 and sanitation section in the PBNDS, which alerts to the

21 other standards that are in reference to PBNDS, such as

22 the ACA standards, which there is an ACA standard, an

23 LDF standard that talks about detainees being

24 responsible for the cleanliness, sanitation of their

25 living and general use areas.

                          Page 146

---

1   Q.  You also testified regarding the personal

2 housekeeping policies at the various -- or how they're

3 applied at the various GEO facilities.  Do you remember

4 testifying about that?

5   A.  Yes.

6      MS. WRIGHT:  Object to form.

7   A.  Yes.

8   Q.  (BY MR. VAN PELT)  Do each of the facilities

9 have their own policies that are derived from the

10 parameters dictated by ICE?

11   A.  Yes, they do.

12      MS. WRIGHT:  Object to form and outside

13 the scope of the direct examination.

14   Q.  (BY MR. VAN PELT)  Each of the facilities

15 apply the HUS policies differently from one another?

16   A.  Yes, they do.

17      MS. WRIGHT:  Object to form and outside

18 the scope of the direct examination.

19      MR. VAN PELT:  (Unclear audio.)

20      MS. WRIGHT:  David, your audio is cutting

21 out.

22      MR. VAN PELT:  Apologies.

23   Q.  (BY MR. VAN PELT)  What are ways in which the

24 HUS policies are implemented differently at the various

25 GEO facilities?

                          Page 147

---

1      MS. WRIGHT:  Object to form and outside

2 the scope of the direct examination.

3   A.  They're different in the facility structures,

4 the outlays, the operations of the facilities.  One

5 facility may have a smaller housing unit.  One facility

6 may have a dayroom or not a dayroom, two tiers instead

7 of one tier.  So each one would have to outline what is

8 in the housing areas and the general use areas.  So they

9 would have different practices, as far as that

10 housekeeping policy, you know, pertinent to the facility

11 itself.

12      MR. VAN PELT:  Thank you.  I didn't have

13 anything further.

14      FURTHER EXAMINATION

15 BY MS. WRIGHT:

16   Q.  One brief question.

17     Ms. Martin, you were asked by your counsel the

18 ways in which the housing unit sanitation policies

19 differ among facilities.  Do you recall that question?

20   A.  Yes.

21   Q.  And you said that the facility outlays are

22 different.  Do you recall that?

23   A.  Yes.

24   Q.  Are there any other ways in which the policies

25 are different from facility to facility?

                          Page 148

---

1   A.  Yes.  I mean, like I said, it would depend on

2 how many -- or the differences in practices, the

3 differences in operations, the differences in the

4 structure of the facility.  It could be a variety of

5 things.  It would have to be specific to the facility.

6   Q.  By the structure of the facility, you mean the

7 architecture of the facility?

8   A.  The architecture, what's in the housing areas

9 themselves.

10     MS. WRIGHT:  Okay.  I have no further

11 questions, but we are still waiting on the documents

12 that you brought with you to your deposition today.  And

13 I will just note for the record that we've been waiting

14 for, I think, an hour and a half for those documents.

15 So I am sorry to be taking up your time with this,

16 Ms. Martin.  I am sure that Mr. Van Pelt is sorry to be

17 billing his client for this time, too, but we will just

18 have to continue to wait until we receive those

19 documents so we can put them in the record.

20     MR. VAN PELT:  Yeah.  Why don't we go off

21 and -- for another ten minutes, and then hopefully

22 we'll -- we're in the process, and we will hopefully

23 have them to you.

24     MS. WILKE:  Would you like Amber to stay

25 here in the room, or is she going to be called back

                          Page 149

                         38 (Pages 146 - 149)

1 again, or is she free to go?

2 　　　MS. WRIGHT:  She is not free to go.  The

3 deposition is not over.

4 　　　MS. WILKE:  Understood.

5 　　　MS. WRIGHT:  Thank you.

6 　　　MS. WILKE:  I tried.

7 　　　THE VIDEOGRAPHER:  Off the record at

8 2:48 p.m.

9 　　　(Break from 2:48 p.m. to 3:17 p.m.)

10 　　　THE VIDEOGRAPHER:  We are back on the

11 record at 3:17 p.m., Media 6.

12 　Q.  (BY MS. WRIGHT)  And we are back on the record

13 at long last.  There are three exhibits that have been

14 marked and introduced.  These are three documents that

15 Ms. Martin and her counsel have represented are the only

16 documents that Ms. Martin brought with her today to the

17 deposition.

18 　　　The first, Exhibit 164, is titled "Attachment

19 A, Housekeeping/Maintenance Plan New Facility" for

20 Aurora.

21 　　　(Exhibit 164 marked.)

22 　Q.  (BY MS. WRIGHT)  Exhibit 165 is titled

23 "Sanitation and Housekeeping," also for Aurora.

24 　　　(Exhibit 165 marked.)

25 　Q.  (BY MS. WRIGHT)  And Exhibit 166 is titled

Page 150

1 　A.  No.

2 　Q.  Okay.

3 　　　MS. WRIGHT:  Okay, and that concludes the

4 deposition.  Thank you very much for your time and your

5 patience, Ms. Martin.  And no further questions.  Thank

6 you.

7 　　　THE WITNESS:  Thank you.

8 　　　THE REPORTER:  Would you like to reserve

9 signature for the witness?

10 　　　MR. VAN PELT:  Yes.  Yes.

11 　　　THE REPORTER:  Thank you.

12 　　　THE VIDEOGRAPHER:  We are off the record

13 at 3:19 p.m.

14 　　　(Proceedings ended at 3:19 p.m.)

15

16

17

18

19

20

21

22

23

24

25

Page 152

1 "Amber Martin Depo Docs."

2 　　　(Exhibit 166 marked.)

3 　Q.  (BY MS. WRIGHT)  Are there any other documents

4 that you brought with you today, Ms. Martin?

5 　A.  I brought the housekeeping plans for the

6 facilities that were identified in the depo.  Without

7 looking at what you're looking at, I can't tell you.

8 　　　MS. HOU:  Those are all -- this is

9 Alicia.  Those are all in the file --

10 　　　THE WITNESS:  Okay.

11 　　　MS. HOU:  -- Amber depo docs, plus the

12 two Aurora ones that were just sent separately just as a

13 function of trying to get those to you ASAP.

14 　　　MS. WRIGHT:  Okay.

15 　Q.  (BY MS. WRIGHT)  So just to the clear on the

16 record, Ms. Martin, you brought with you today the

17 housekeeping policies, the housing unit sanitation

18 policies for all 12 facilities in the nationwide HUS

19 class.  Is that right?

20 　A.  Yes.

21 　Q.  And you have given all of those documents to

22 your counsel, and they have produced it to us.  Is that

23 correct?

24 　A.  Yes.

25 　Q.  Did you write on any of these documents?

Page 151

1 　　　　CHANGES AND SIGNATURE

2 WITNESS NAME:  AMBER MARTIN

3 DATE OF DEPOSITION:  AUGUST 11, 2020

4 PAGE  LINE    CHANGE       REASON

5 _____

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 　Job No. TX4182121

Page 153

39 (Pages 150 - 153)

```
1      I, AMBER MARTIN, have read the foregoing
2   deposition and hereby affix my signature that same is
3   true and correct, except as noted above.
4
5      _____
6             AMBER MARTIN
7
8   THE STATE OF _____)
9   COUNTY OF _____)
10     Before me, _____, on
11  this day personally appeared AMBER MARTIN, known to me
12  (or proved to me under oath or through
13  _____) (description of identity
14  card or other document) to be the person whose name is
15  subscribed to the foregoing instrument and acknowledged
16  to me that they executed the same for the purposes and
17  consideration therein expressed.
18     Given under my hand and seal of office this
19  _____ day of _____, _____.
20
21
22     _____
23     NOTARY PUBLIC IN AND FOR
24     THE STATE OF _____
25     COMMISSION EXPIRES: _____
```

Page 154

```
1   david.vanpelt@akerman.com
2           August 14, 2020
3   RE: Novoa, Raul, Et Al v. The Geo Group, Inc.
4   DEPOSITION OF: Amber Martin , 30(b)(6) (# 4182121)
5      The above-referenced witness transcript is
6   available for read and sign.
7      Within the applicable timeframe, the witness
8   should read the testimony to verify its accuracy. If
9   there are any changes, the witness should note those
10  on the attached Errata Sheet.
11     The witness should sign and notarize the
12  attached Errata pages and return to Veritext at
13  errata-tx@veritext.com.
14     According to applicable rules or agreements, if
15  the witness fails to do so within the time allotted,
16  a certified copy of the transcript may be used as if
17  signed.
18           Yours,
19           Veritext Legal Solutions
20
21
22
23
24
25
```

Page 156

```
1         REPORTER'S CERTIFICATE
2      The undersigned Certified Shorthand Reporter
3   licensed in the State of Texas does hereby certify:
4      I am authorized to administer oaths or
5   affirmations, and prior to being examined, the witness
6   was duly administered an oath by me.
7      I am not a relative or employee or attorney or
8   counsel of any of the parties, nor am I a relative or
9   employee of such attorney or counsel, nor am I
10  financially interested in the outcome of this action.
11     I am the deposition officer who
12  stenographically recorded the testimony in the foregoing
13  deposition, and the foregoing transcript is a true
14  record of the testimony given by the witness.
15     Before completion of the deposition, review of
16  the transcript [X] was [ ] was not requested.  If
17  requested, any changes made by the deponent (and
18  provided to the reporter) during the period allowed are
19  appended hereto.
20     In witness whereof, I have subscribed my name
21  this 14th day of August, 2020.
22
23
24     Julie C. Brandt, CSR, RMR, CRR
25     TX CSR No. 4018, Exp. 10/31/21
```

Page 155

40 (Pages 154 - 156)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.