# EXHIBIT C

```
 1              UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3                  EASTERN DIVISION

 4    RAUL NOVA, et al.,           )
      individually and on behalf  )
 5    of all others similarly     )Civil Action No.
      situated,                   )5:17-cv-02514-JBG-SHKx
 6                                 )
           Plaintiff,             )
 7                                 )
      vs.                          )
 8                                 )
      THE GEO GROUP, INC.,        )
 9                                 )
           Defendant.             )
10    _____)

11

12

13     VIDEOTAPED DEPOSITION OF JAMES JANECKA(PMQ)

14            LOS ANGELES, CALIFORNIA

15         WEDNESDAY, DECEMBER 11, 2019

16                  VOLUME I

17

18

19

20

21    REPORTED BY:

22    KATHLEEN M. ALONA

23    CSR NO:  14219

24    JOB NO:  3789116

25    Pages 1 -
```

                                        Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

```
RAUL NOVA, et al.,         )
individually and on behalf )
of all others similarly    )Civil Action No.
situated,                  )5:17-cv-02514-JBG-SHKx
                           )
    Plaintiff,             )
                           )
vs.                        )
                           )
THE GEO GROUP, INC.,       )
                           )
    Defendant.             )
_____)
```

Videotaped deposition of JAMES JANECKA (PMQ), taken on behalf of Plaintiff, RAUL NOVOA, at Veritext, located at 316 West 2nd Street, Suite 200, Los Angeles, California, beginning at 11:35 a.m., on Wednesday, December 11, 2019, before Kathleen M. Alona, Certified Shorthand Reporter No. 14219.

Page 2

INDEX

EXAMINATION

Witness Name                                    Page
JAMES JANECKA (PMQ)
    BY MR. FREE ........................ 8

EXHIBITS

Exhibit    Description                          Page

EXHIBIT 76  LETTER FROM ANNE ROSE DATED 12/4/2019    11
EXHIBIT 77  STANDARD FORM 26 BATES NO.               19
    GEO-NOVA 35044 TO 35249 DATED 6/25/2019
EXHIBIT 78  SERVICES CONTRACT BATES NO.              22
    GOWER-GEO 468 TO 544 DATED 5/17/2011
EXHIBIT 79  EMAIL FROM DONALD DUTCHER TO             73
    ANGELICA HERNANDEZ
EXHIBIT 80  POWERPOINT BATES NO. GEO-NOVA 35038      110
EXHIBIT 81  DETAINEE PAYROLL SHEET              133
EXHIBIT 82  DETAINEE PAYROLL SHEET              140
EXHIBIT 83  AUGUST 22 EMAIL BATES NO.                196
    GEO-NOVA 5919 TO 5920
EXHIBIT 84  EMAIL FROM MICHELLE KEENEY TO PATRICIA LOVE 198
    BATES NO. GEO-NOVA 5702 TO 5703
EXHIBIT 85  EMAIL FROM JOSE BARR                201
EXHIBIT 86  EMAIL FROM SHARON BUCZKOWSKE TO GREGORY  203
    HILLERS BATES NO. GEO-NOVA 13212 TO 13213
EXHIBIT 87  ICE TOOL 6 VERSION 5                205
EXHIBIT 88  BATES NO. 7377 TO 7379              208
EXHIBIT 89  BATES NO. 29287 TO 29289            212

Page 3

EXHIBIT 90  EMAIL FROM TONYA ANDREWS TO ANGELICA     219
    HERNANDEZ 12/30/2013
EXHIBIT 91  EMAIL BATES NO. 8233                220
EXHIBIT 92  EMAIL FROM ALFRED CLARK TO WESLEY LEE    222
    06/20/2013
EXHIBIT 93  EMAIL FROM VICTOR ALVARADO TO KYLE FOUTS 225
    BATES NO. GEO-NOVA 6745 TO 6746 08/23/2013
EXHIBIT 94  EMAIL FROM JAMIE DAVIS TO ALEJANDRA      227
    PALACIOS BATES NO. GEO-NOVOA 5988 TO 5989

Previously Marked Exhibits

                                                Page

                                                9

                                                11

                                                93

                                                113

                                                122

                                                144

                                                183

                                                214

                                                229

                                                233

Page 4

APPEARANCES:


FOR PLAINTIFF RAUL NOVOA:
    LAW OFFICES OF R. ANDREW FREE
    BY:  R. ANDREW FREE, ESQ.
    PO BOX 90568
    NASHVILLE, TN 37209
    PHONE NUMBER (844) 321-3221
    ANDREW@IMMIGRANTCIVILRIGHTS.COM


FOR PLAINTIFF RAUL NOVOA:
    BURNS CHAREST, LLP
    BY:  LYDIA A. WRIGHT, ESQ.
    365 CANAL STREET
    SUITE 1170
    NEW ORLEANS, LA 70130
    PHONE NUMBER (504) 799-2844
    LWRIGHT@BURNSCHAREST.COM

Page 5

2 (Pages 2 - 5)

1  APPEARANCES CONTINUED:
2
3      FOR DEFENDANT THE GEO GROUP:
4      AKERMAN LLP
5      BY:  COLIN BARNACLE, ESQ.
6      1900 16TH STREET
7      SUITE 1700
8      DENVER, CO 80202
9      PHONE NUMBER (303) 260-7712
10     COLIN.BARNACLE@AKERMAN.COM
11
12     FOR DEFENDANT THE GEO GROUP:
13     AKERMAN LLP
14     BY:  ADRIENNE SCHEFFEY, ESQ.
15     1900 16TH STREET
16     SUITE 1700
17     DENVER, CO 80202
18     PHONE NUMBER (303) 260-7712
19     ADRIENNE.SCHEFFEY@AKERMAN.COM
20
21
22  ALSO PRESENT:
23     JULIO PENA - VIDEOGRAPHER
24
25
Page 6

1      LOS ANGELES, CALIFORNIA; WEDNESDAY,
2          DECEMBER 11, 2019
3          11:35 a.m.
4
5      THE VIDEOGRAPHER:  Good morning, we're on
6  the record at 11:35 a.m., on December 11, 2019.
7      Please note that microphones are sensitive
8  and might pick up whispering and private
9  conversations.  Audio and video recording will
10  continue to take place, unless all parties agree to
11  go off the record.
12      This is the video recorded deposition of
13  James Janecka taken by counsel for Plaintiff in the
14  matter of Novoa versus The GEO Group.
15      This deposition is being held at Veritext,
16  located in Los Angeles, California.
17      My name is Julio Pena from Veritext, and I
18  am the videographer.  The court reporter is Kathy
19  Alona from Veritext.
20      I am not related to any party in this
21  action, nor am I financially interested in the
22  outcome.
23      If there are any objections, state them at
24  the time of your appearance beginning with noticing
25  attorney.
Page 7

1      MR. FREE:  Andrew Free, for the Plaintiffs
2  in the certificated classes.
3      MS. WRIGHT:  Lydia Wright, for the
4  Plaintiffs in the classes.
5      MR. BARNACLE:  Colin Barnacle, for The GEO
6  Group.
7      MS. SCHEFFEY:  Adrienne Scheffey, for The
8  GEO.
9      THE VIDEOGRAPHER:  Will the court reporter
10  please swear in the witness?
11
12      JAMES JANECKA (PMQ),
13  the witness herein, having been first duly sworn,
14      was examined and testified as follows:
15
16          EXAMINATION
17
18  BY MR. FREE:
19  Q   Good morning, Mr. Janecka, Thanks for
20  coming in again.  As you know, I represent Raul
21  Novoa and a number of other people who were formerly
22  detained at Adelanto in the case against The GEO
23  Group.
24      You've already given testimony in this
25  case, in your individual capacity as the warden of
Page 8

1  the Adelanto Facility.
2      You understand you're here today to give
3  testimony on GEO's behalf on certain topics, within
4  the certain agreed upon limitations; right?
5  A   Yes, sir.
6      MR. FREE:  Okay.  In front of you, there's
7  a document that's been marked previously as Exhibit
8  67 -- excuse me -- 64.  That is your 30(b)(6)
9  deposition notice as amended.  It's dated December
10  6, 2019, and it specifies several topics in which
11  the Plaintiffs have sought testimony from a
12  corporate representative of The GEO Group.
13      (Previously marked Exhibit No. 64 was
14  identified for the record.)
15      MR. FREE:  Those topics, which you've been
16  designated for, are Topic 5, which deals with:
17      Policies, procedures, written or otherwise,
18      concerning GEO's operation of Adelanto
19      between -- well, including, but not limited
20      to, ICE's 2011 Performance Based National
21      Detention Standards, and policies
22      contained in GEO's Adelanto policy and
23      procedure manual.
24  Q   Are you prepared regarding those policies
25  today?
Page 9

Page 10

1    A   Yes, sir.
2    Q   Good. The next topic that you've been
3 designated to testify about regards:
4      GEO's policies procedures and practices at
5      the Adelanto Facility relating to
6      environmental health and safety, detainee
7      care, activities, operation of the
8      commissary, the Voluntary Work Program, and
9      the grievance system as set forth in the
10      30(b)(6) notice.
11      And as agreed by the Plaintiff's and the
12 Defendant's counsel with some help from ICE.
13      Are you prepared regarding Topic 6 today?
14    A   Yes, sir.
15    Q   Okay. Topic 7 regards:
16      "GEO's knowledge of the deaths of
17      immigrants detained at the Adelanto
18      Facility since May 1st, 2011, including the
19      circumstances and investigations of those
20      deaths, as well as GEO's standard practices
21      and responses upon learning of a detainee
22      death at the Adelanto Facility."
23      We have also previously marked, as an
24 exhibit, to prior 30(b)(6) Deponent's deposition,
25 Mr. Hill, a document that's marked as Exhibit 65,

Page 11

1 which is a letter from GEO's counsel, Mr. Barnacle
2 to me setting -- excuse me, it's an email -- a
3 letter sent by email of December 4th, 2019, setting
4 forth our understanding of what you're going to
5 testify about.
6      (Previously marked Exhibit No. 65 was
7      identified for the record.)
8      MR. FREE: And then I've already put in
9 ████████████████████████████████
10 Office of Principal of Legal Advisor, that's going
11 to be marked as Exhibit 76 to your deposition.
12      (Exhibit 76 was marked for identification
13 by the court reporter and is attached hereto.)
14 BY MR. FREE:
15    Q   Have you seen Exhibit 76 before?
16    A   Yes.
17    Q   Okay. When did you see this document?
18    A   Last night.
19    Q   Okay. Me too. That's when we got it.
20 ████████
21 tells Ms. Wright, my co-counsel, you are not
22 authorized to provide information regarding Topic 7;
23 do you see that, it's in the second full
24 paragraph?
25    A   Yes.

Page 12

1    Q   GEO has information regarding deaths of
2 immigrants at Adelanto between May 1st, 2011 and the
3 present; right?
4    A   Yes.
5    Q   Are you prepared to testify regarding Topic
6 7 today?
7    A   According to this, I'm not authorized to.
8    Q   Okay. Does any of the information that you
9 have, on behalf of GEO, about detainee deaths relate
10 to ICE's deliberations, as far as you're aware?
11    A   Excuse me?
12    Q   Does any of the information -- first of
13 ████████████████████████████████
14    A   Not that I'm aware of, no.
15    Q   Have you ever given information to your
16 ██████████████████████████████████
17      In other words, you didn't speak to her, ████████████████
18 ████████████████████████████████████████
19 about this deposition?
20    A   Not to my knowledge.
21    Q   Has anyone from ICE ever asked you what you
22 know about Topic 7?
23    A   Anyone --
24    Q   Anyone in ICE's Office of Principal Legal
25 Advisor, how about that?

Page 13

1    A   No.
2    Q   Okay. Okay. Moving forward. Topic 8, are
3 you prepared to testify today on GEO's behalf
4 regarding:
5      GEO's interpretation of its obligations
6      with ICE with respect to the voluntary work
7      program at Adelanto since it opened in
8      May 2011, including, but not limited to:
9      The total number of detainees participating
10      in the VWP each year, starting in May 1st
11      2011. That's A.
12      B. Detainee work assignments and shifts;
13      C. Would be training supervision and
14      evaluation of detainee workers;
15      D. Would be payroll, compensation, and the
16      process by which wages are collected,
17      and;
18      E. Would be the hiring and termination of
19      detainee workers.
20      That's Topic 8. Are you prepared to
21 provide testimony on GEO's behalf regarding Topic 8
22 today?
23    A   Yes.
24    Q   We have included some definitions, for your
25 benefit, in the 30(b)(6) notice.

1      So when I say "Voluntary Work Program" and
2  when you're testifying about the Voluntary Work
3  Program, what we should both -- or at least what I
4  hope we're both talking about, is the work program
5  that's defined on page 2 No. 4.
6      Which is:
7      Any program that GEO operates involving
8      labor performed by detainees for
9      remuneration of any kind that includes
10     tasks outside those 5.8.4.C of ICE's 2011
11     Performance Based National Detention
12     Standards.
13  A   Yes.
14  Q   Do we understand that that's what we're
15  talking about when we're talking about the volunteer
16  work program?
17  A   Yes.
18  Q   Great. Thanks. With respect to Topic 10.
19  You've been designated by GEO to testify to:
20     The division of duties betwen GEO and ICE
21     with respect to the operation of the of the
22     Adelanto Facility, including which entity
23     (GEO or ICE) bears the responsibility for;
24     proposing or setting the number of work
25     participants in the VWP, creating work

Page 14

1      Are you prepared to testify on GEO's behalf
2  Regarding this topic today?
3  A   Yes.
4  Q   Topic 12 is:
5      GEO's operation of a housing unit,
6      sanitation facility.
7      And you have been designated to testify
8  regarding the Adelanto ICE Processing Center Housing
9  Unit Sanitation Policy or HUSP, H-S-U-P, as defined
10 in the notice.
11     Are you prepared to provide testimony on
12 the HUSP at Adelanto today?
13 A   Yes, sir.
14 Q   Topic 16. You have been designated to
15 testify regarding Topics 16 C, D, E, G, H, J, and K.
16     With respect to Topics 16 D and E as listed
17 in the notice, we are in receipt of Ms. Rose's
18 letter, as are you, can you tell me how, if at all,
19 you plan to limit your testimony on Topics 16 D and
20 E based on this letter?
21     I'm referring to the letter from Ms. Rose.
22 A   Do you mind if I look through it a little?
23 Q   Not at all. I will just point you to --
24 I'm sorry. Can I see the letter?
25     I'll point you to the bottom of page 2,

Page 16

1  crews, assigning detainee workers to the
2  work crews, setting the detainee workers
3  schedules, providing tools and equipment to
4  the workers crews, supervising or
5  instructing those workers, setting the
6  scope of the labor to be completed by the
7  detainee details and crews, assessing
8  detainee job performance, proposing changes
9  to VWP wage rates, and determining, in the
10 first instance, whether a detainee will be
11 sent to administrative segregation.
12     Are you prepared to testify on GEO's behalf
13 regarding Topic 10 today?
14 A   Yes.
15 Q   Thank you. Topic 11 you've been designated
16 to testify on GEO's behalf regarding:
17     GEO's understanding of what role, if any,
18     the City of Adelanto played in the
19     contracts to operate the Adelanto Facility
20     prior to the cancellation of those
21     contracts, and what role, if any, the City
22     of Adelanto plays in the operation of those
23     contracts, including any payments GEO or
24     its agents may continue to remit to the
25     City or its representatives.

Page 15

1  begins 16(d) and (e), and then the top of page
2  three.
3  A   Thank you.
4  Q   Take a second and look at it.
5  A   I'm limited to speak to janitorial,
6  maintenance, laundry, and kitchen Staff.
7  Q   Okay. And then what are you excluded from
8  speaking about?
9  A   I'm excluded to speaking to any and all --
10 all policies related to all staffing at the
11 facility, without regard staffing, and also C;
12 current staffing at the facility rather than during
13 the class period.
14     I cannot speak to any other staffing, as it
15 could be law enforcement sensitive.
16 Q   Okay. Thank you. And then Topic 18
17 regards GEO's policies and practices -- excuse me.
18     Before we move on, have you actually spoken
19 with anyone from ICE's legal department regarding
20 Topic 16?
21 A   No.
22 Q   As far as you understand, has anyone
23 attempted from ICE to speak with you regarding Topic
24 16, even if you didn't end up speaking with them?
25 A   Nobody's attempted to.

Page 17

5 (Pages 14 - 17)

1    Q    All right.  Has anyone passed messages
2  through maybe GEO or your counsel regarding
3  limitations on Topic 16?
4    A    No.  I --
5    Q    So in other words, the information that you
6  are purportedly prohibited for providing to the
7  Plaintiffs is not based on any conversation between
8  you and ICE; right?
9    A    No.
10   Q    It's not based on any information that ICE
11 received from you; right?
12   A    No.
13   Q    In fact the assertion of any privilege that
14 ICE has supposedly asserted, is not based on any
15 information you've provided on GEO's behalf to ICE;
16 correct?
17   A    No.
18   Q    No.  Topic 18 is:
19       "GEO's policies and practices since May
20       1st, 2011, relating to the provision of
21       extra food, clothing, batteries, and/or
22       personal hygiene items to detainees at the
23       Adelanto Facility who perform work, tasks,
24       or other labor, and the origins and
25       objectives for those policies and

Page 18

1       practices."
2       Are you prepared to testify on GEO's behalf
3  regarding topic 18 today?
4    A    Yes, sir.
5    Q    Excellent.  Okay.  Let's dive in then.
6  Clear these two out of the way so that you're not
7  distracted by them.
8       Okay.  Thanks.
9       Did you bring any documents with you
10 today?
11   A    No, sir.
12       MR. FREE:  Excellent.  Okay.  Okay.  I'm
13 going to lay in front of you a package of documents
14 that we're going to mark as Exhibit 77.
15      (Exhibit 77 was marked for identification
16 by the court reporter and is attached hereto.)
17      MR. FREE:  I'm not going to ask you to
18 review this entire document, but I will represent to
19 you that it is GE -- GEO-Novoa 35044 through
20 GEO-Novoa 35249.  So we're looking at about 255
21 pages.
22      This was produced by GEO in response to the
23 counsel for the Plaintiff's request for the contract
24 that Adelanto is currently operating under.
25      And the very first page of this document,

Page 19

1  which is a Standard Form 26, an SF 26, contains a
2  date that Amber Martin signed it at the bottom box,
3  Box 19C.
4  BY MR. FREE:
5    Q    What date was this signed?
6    A    June 25, '19.
7    Q    Of 2019?
8    A    2019.
9    Q    Excellent.  Now, prior to -- and I'm going
10 to call this document that is in front of you,
11 Document 77, I'm going to call it the "bridge
12 contract."
13       Okay?
14   A    Yes.
15   Q    Because it is not for, you know, an
16 extended period of time.
17       Do you understand why I would call it the
18 bridge contract?
19   A    Yes, sir.
20   Q    In fact, there's going to be another
21 contract?
22       Is that right?
23   A    That's -- that's above me.  I'm -- I'm not
24 involved in that process.
25   Q    I'm asking GEO, I'm not asking you.

Page 20

1       There's going to be another contract;
2  right?
3    A    To my knowledge, we're currently under this
4  contract.
5    Q    Okay.  What is the period, as far as you
6  know, for this contract?
7    A    If I'm not mistaken, it runs through March
8  or -- I don't know the exact date, but March of
9  2020.
10   Q    Yeah.  If we turn to the second page of
11 this document, 35045, kind of the top it says the
12 period performance is June 26, 2019, through March
13 25, 2020.
14      Is Adelanto going to close on March 2020,
15 or is it going stay open?
16   A    I haven't been confirmed of which way it's
17 going to go.
18   Q    Is there a chance that Adelanto discloses
19 on March 25, 2020?
20   A    According to this document, if there is
21 anything new before then.
22   Q    Okay.  So that's why I'm calling it the
23 bridge contract.  I think that this is a contract
24 that's in the middle, between previous
25 Intergovernmental Services Agreement and whatever

Page 21

1 comes in March 25, 2020.  So that's what I'm going
2 to call it.
3     If you don't think that that's right, tell
4 me what I should call it.
5     A   That's fine.
6     MR. FREE:  Okay.  The other document that
7 we're going to put in front of you is the
8 Intergovernmental Services Agreement between ICE,
9 and just kind of keep that handy.
10    Okay?
11    THE WITNESS:  Okay.
12    MR. FREE:  Because we're going to keep
13 coming back to it, and I would just recommend care
14 be taken with the paper because we get it out of
15 order it's going to be a pain.  This is document
16 78.
17    THE COURT REPORTER:  8.
18    MR. FREE:  8.  Excuse me.  Exhibit 78.
19    (Exhibit 78 was marked for identification
20 by the court reporter and is attached hereto.)
21    MR. FREE:  Here you go.  She's going to
22 mark it and then give it to you.
23 BY MR. FREE:
24    Q   Have you ever seen this document before,
25 Mr. Janecka?

Page 22

1     A   Okay.
2     Q   I see that you're there.
3     How many beds are at the Adelanto Detention
4 Facility?
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 24

1     A   Yes, sir.
2     Q   All right.  Is this the prior
3 Intergovernmental Services Agreement between the
4 City of Adelanto and GEO?
5     A   Yes.
6     Q   It was entered into on May 17, of 2011?
7     A   Yes.
8     Q   This is GOWER-GEO, so G-O-W-E-E -- excuse
9 me.  The letter G-O-W-E-R dash G-E-O, 468 through
10 542.
11    This Intergovernmental Services Agreement
12 and the associated contract between the City of
13 Adelanto and ICE form the basis of GEO's operations
14 of the facility prior to the bridge contract; right?
15    A   Correct.
16    Q   Okay.  So I'm going to call this the "old
17 contract" or the IGSA, the I-G-S-A, and we'll call
18 that one the bridge agreement.
19    Okay?
20    A   Yes, sir.
21    Q   All right.  Now, I'm going to ask you to
22 turn to GEO-Novoa 35195 in the bridge contract.
23    A   35 --
24    Q   195.  At the very top of it it's going to
25 say "statement of work."

Page 23

1
2
3
4
5
6
7
8
9
10
11
12
13    A   I cannot.
14    Q   Does the City of Adelanto have an agreement
15 with GEO to develop additional beds for use by
16 ICE?
17    A   Not to my knowledge.
18
19
20
21    MR. BARNACLE:  Object to the form of the
22 question.
23    What -- what topic are you referring to?
24    MR. FREE:  I'm referring to Topic 11, and
25 that's not an objection.

Page 25

7 (Pages 22 - 25)

1    MR. BARNACLE:  Well, I'm going to object
2  that you're asking questions far outside of the
3  scope of any noticed topic.
4    MR. BARNACLE:  Maybe take a look at Topic
5  11.
6    You can answer the question.
7    THE WITNESS:  Can you repeat it again?
8    MR. FREE:  Sure.
9  BY MR. FREE:

[redacted]

15    A   Not to my knowledge.
16    Q   And I'm not asking for your personal
17  knowledge, I'm asking for testimony on behalf of
18  GEO.
19    Is there a development agreement between
20  the City of Adelanto and GEO to create additional
21  beds at Adelanto for civil immigration detention,
22  "yes" or "no"?
23    A   There's a developmental agreement, specific
24  bed space I'm not aware of.
25    Q   But it is a development agreement that

Page 26

1  would allow GEO to add beds; correct?
2    A   With some negotiations or talks with the
3  City, there would be an opportunity.  The
4  developmental agreement's in place.  I don't know
5  the exact language.
6    Q   How many beds does that agreement cover?
7    A   I don't know.
8    Q   How much, in payments, would GEO make to
9  the City of Adelanto to continue that agreement?
10   A   The current agreement, the current
11  agreement pays the City of Adelanto for $1 a day for
12  any bed that's in the City of Adelanto.
13   Q   Under the bridge contract?
14   A   The bridge contract is separate from the
15  developmental agreement.
16   Q   So there is an agreement between City of
17  Adelanto and GEO, in which GEO pays City of Adelanto
18  $1 per day, per detainee, under the current bridge
19  contract; correct?
20   A   The developmental agreement that is in
21  place with the City, separate from the bridge
22  contract, I don't know the length of the
23  developmental agreement.
24   Q   That's not my question.  My question is,
25  there is a agreement -- actually let me ask you,

Page 27

1  what document would reflect the situation that
2  you've just described, in which GEO pays the City of
3  Adelanto $1 a day a detainee for people at the
4  facility?
5    A   It would be the specific developmental
6  agreement.
7    Q   Okay.  So that is going to be reflected in
8  the development agreement between the City and
9  GEO?
10   A   Correct.
11   Q   When is the last time you reviewed that
12  agreement?
13   MR. BARNACLE:  I'll lodge an objection that
14  this topic is related to the operation of the
15  Adelanto Facility, and any developmental agreement
16  is outside the scope of any agreement to operate the
17  Adelanto Facility.
18   MR. FREE:  You can answer the question.
19   MR. BARNACLE:  To the extent that you know
20  the answer.
21   MR. FREE:  He should know the last time he
22  reviewed the agreement.
23  BY MR. FREE:
24   Q   Do you know the last time you reviewed the
25  development agreement?

Page 28

1    A   Approximately a year ago.
2    Q   So that's been in place for a year, has it
3  changed since then as far as you know?
4    A   Not to my knowledge.
5    Q   Okay.  Why did the City notify ICE that it
6  was canceling the agreement, if you know?
7    MR. BARNACLE:  Object to the form.  He's
8  asking for ICE information.
9    MR. FREE:  I'm asking why the City notified
10  ICE that it was canc -- canceling the agreement.
11   MR. BARNACLE:  Object to the form of the
12  question.
13   MR. FREE:  You can answer the question.
14   THE WITNESS:  I don't know.
15  BY MR. FREE:
16   Q   What do you think?
17   MR. BARNACLE:  Object to the form of the
18  question.
19   THE WITNESS:  I'm not going to provide an
20  opinion.
21  BY MR. FREE:
22   Q   What role did the City of Adelanto play in
23  the contract to operate the facility prior to the
24  cancellation of the IGSA?
25   MR. BARNACLE:  Object to the form of the

Page 29

8 (Pages 26 - 29)

1  question.
2      MR. FREE:  I'm reading Topic 11, Colin.
3      MR. BARNACLE:  Object to the form of the
4  question, Andrew.
5      MR. FREE:  Okay.
6  BY MR. FREE:
7      Q   What role did the City of Adelanto play in
8  the contract to operate the Adelanto Facility prior
9  to the cancellation of the IGSA?
10     A   They contracted with GEO to manage and
11 operate the facility.  They provided our -- we did
12 our billing, which would be the billing for the
13 mandays for ICE, we would take it to the City for
14 review, and the City would then sign off on the
15 billing and it was processed through ICE for
16 payment.
17     Q   What payment did the city receive from GEO,
18 if any, for playing that role?
19     A   There was, to my knowledge, nothing tied to
20 the contract.
21     Q   Again, I'm not asking for your personal
22 knowledge, I'm asking for your testimony on behalf
23 of GEO.
24         Same answer?
25     A   Yes.

Page 30

1      Q   No fee to the City for the IGSA?
2      A   Not in the contract, no.
3      Q   Anywhere else, other than the contract?
4      A   The bridge -- or the -- excuse me.
5          The developmental agreement.
6      Q   Okay.  So the City and GEO have a
7  developmental agreement that would cover any fees
8  that the City of Adelanto would receive for the role
9  that it plays in the contract; am I understanding
10 that correctly?
11     A   No.  The developmental agreement's totally
12 separate.  There's no payment to the City tied to
13 either the bridge or the IGSA.
14         The City was in contract with the
15 Department of Homeland Security, and the City
16 contracted us to operate and manage.  The City had
17 authority under the IH -- IGSA to tour the facility,
18 inspect the facility, request information from the
19 facility; it was all in the IGSA.
20     Q   And so it's GEO's testimony today that
21 there are no payments from GEO to the City of
22 Adelanto for administering the IGSA?
23     A   For administering --
24     Q   The Intergovernmental Services Agreement,
25 which is Document 78, Exhibit 78.

Page 31

1      A   Not that I'm aware of.
2      Q   I'm asking for -- did you -- what --
3          What steps did you take to prepare to
4  testify on GEO's behalf for Topic 11 before you came
5  today?
6      A   Met with the counsel yesterday -- or excuse
7  me, Monday.
8      Q   What else?
9      A   Looked through my previous -- as of my
10 personal deposition, looked at the IGSA, the bridge
11 and, that's about it.
12     Q   Anything else?
13     A   Few other documents.
14     Q   Which ones?
15     A   Let's see.  I looked at our housekeeping
16 policy, that I can recall.
17     Q   I'm going to specifically focus just on
18 Topic 11.
19         Did you review any additional documents,
20 apart from the IGSA and the bridge contract, to
21 describe GEO's understanding of what role, if any,
22 the City of Adelanto played in the contracts to
23 operate the Adelanto Facility before the contracts
24 were canceled, and what role, if any, the City of
25 Adelanto still plays in the operation of those

Page 32

1  contracts; including payments GEO or agents may
2  continue to remit to the City or its
3  representatives?
4      A   I did not look at any other documents.
5      Q   Did you ask anyone at GEO if GEO still pays
6  the City of Adelanto?
7      A   No.
8      Q   Did you ask anyone at GEO whether GEO's
9  representatives pay the City of Adelanto?
10     A   No.
11     Q   Did you ask anyone at GEO whether GEO pays
12 representatives of the City of Adelanto, even if it
13 doesn't remit money to the City itself?
14     A   No.
15     Q   Is there anything else that you can tell me
16 regarding Topic 11 about GEO's understanding of the
17 role that the City of Adelanto played in the IGSA?
18     A   The contract?
19     Q   Yes, sir.
20     A   The IGSA, as you're referring?
21     Q   Uh-huh.
22     A   It speaks to it.  The City has the
23 authority to come in tour, inspect, request
24 information.  There was no other role that I'm aware
25 of.

Page 33

9 (Pages 30 - 33)

Page 34

1  Q   Did the City receive money under IGSA?
2  A   I'm sorry?
3  Q   Did the City receive money under the
4  IGSA?
5  A   There was no money that tied IH -- IGSA for
6  payment to the City.
7  Q   But without the IGSA, the City would not
8  have received payments under the development
9  agreement; correct?
10  A   I -- I don't -- I'm not aware of how that
11  would work.
12  Q   Imagine for a moment that there is no
13  Intergovernmental Services Agreement between GEO and
14  the City of Adelanto to operate the Adelanto
15  Detention Facility, so the contract goes away.
16  Okay?
17      And so there for there are no 1,944 beds
18  that ICE can use at the facility in Adelanto.
19      Would GEO make any payments to the City of
20  Adelanto related to the facility?
21  A   I'm not sure of the exact language in the
22  developmental agreement, and I'm not an attorney to
23  interpret how that's tied to the IGSA.
24  Q   Okay.  But as you sit here today, you can't
25  tell me what payments GEO, or its agents, may

Page 35

1  continue to remit to the City or its
2  representatives?
3  A   It's tied to the developmental agreement as
4  it speaks.
5  Q   What do you mean "as it speaks"?
6  A   As it's written, the developmental
7  agreement.
8  Q   So what are those payments?
9  A   $1 per bed, per day, that the company owns
10  in the city limits of Adelanto.
11  Q   That GEO owns?
12  A   That GEO owns.
13  Q   And that $1 per bed, per day is paid by
14  GEO; correct?
15  A   Correct.
16  Q   From what funds does GEO expend the $1 per
17  bed, per day?
18  A   I -- I don't know.
19  Q   How much has GEO paid the City of Adelanto,
20  since Adelanto opened?
21  A   I don't know.
22  Q   How much did GEO pay the City of Adelanto
23  under this $1 per bed, per day last year?
24  A   So you'd figure approximately --
25  approximately 950,000, that's rough math.

Page 36

1  Q   Based on what?
2  A   Just calculating in my head 1,940 times $1
3  times 365.
4  Q   So it's assuming full occupancy so that's
5  the max --
6  A   It's per bed, not per detainee.
7  Q   Oh, it's per bed, so it doesn't matter if
8  people are all there; right?
9  A   It's per bed --
10  Q   Okay.
11  A   -- is how it's written.
12  Q   So if you were to write a contract that has
13  1,000 more beds into it, then the City would get
14  1,000 more dollars for each day; is that right?
15  A   If that's how the language in the
16  developmental agreement's written.  I don't know the
17  exact language off the top of my head.



23  A   Correct.
24  Q   Do you expect -- do you have a date when
25  there will be?

Page 37

1  A   I haven't been given any dates.
2  Q   Do you have a general time frame when the
3  statement of work, that's attached to the bridge
4  contract, that will actually reflect the number of
5  beds?
6  A   I don't.
7  Q   No estimate?
8  A   No, sir.
9  Q   Do you have any idea when those beds are
10  supposed to come online?
11  A   No, sir.
12  Q   Okay.  Who at GEO would I ask for the
13  answers to these questions that I've just asked you
14  regarding the payments by GEO to the City of
15  Adelanto?
16  A   That would have to be someone in our
17  contracting department.
18  Q   Who?
19  A   Amber Martin.
20  Q   Okay.  Anyone else?
21  A   Not that I'm aware of.
22  Q   All right.  What reason did the City give
23  for canceling the Intergovernmental Services
24  Agreement to GEO?
25  A   To my knowledge, something to the effect

10 (Pages 34 - 37)

1 that they felt that it was in the best interest of
2 the City.
3    Q    Why?
4    A    I don't know why.  I wasn't given a reason
5 why that I'm aware of.
6    Q    Have you ever read the public statements of
7 Jessie Flores about the consolation of the
8 contract?
9    A    Not that I recall.
10    Q    Any other reasons that GEO was provided, by
11 the City of Adelanto, for canceling the
12 Intergovernmental Services Agreement in March of
13 2019?
14    A    Not that I recall.
15    Q    Were you in -- were you personally involved
16 in any discussions regarding the cancelation of the
17 contract, the IGSA?
18    A    I personally didn't have discussions with
19 them.
20    Q    That wasn't my question.  Were you
21 personally involved in any discussions regarding the
22 cancellation of the IGSA, by the City of Adelanto,
23 in 2019?
24    A    I was in a couple meetings.
25    Q    Okay.  Which meetings are you thinking

Page 38

1 of?
2    A    There was a, that I can think of, a meeting
3 maybe in the January or February of 2019, when there
4 was a meeting with some City officials and some
5 other corporate executive Staff.
6    Q    Who were the City officials?
7    A    If I recall Jessie Flores.
8    Q    That's the City manager; correct?
9    A    Correct.  Gabriel Reyes.
10    Q    And what's Gabriel's title?
11    A    The mayor.
12    Q    Okay.  Was Ray Carmago in that meeting?
13    A    Not that I can recall.
14    Q    Who from GEO corporate was in this
15 meeting?
16    A    Dave Venturella, Kyle Schiller, gentleman
17 by the name of Phil Mosciski.
18    Q    I'm going to have you spell that for the
19 court reporter later, but we'll get back to it.
20    A    I can try.  I don't know if I can spell
21 it.
22    Q    All right.  Who's Mr. Mosciski?
23    A    He's with -- he's with our design
24 department I believe.
25    Q    Design of what?

Page 39

1    A    I -- it's -- the design department.  I'm
2 not sure what his role or title, I really don't
3 know.
4    Q    Do they design signs, or do they design new
5 jails?
6    A    He's an engineer --
7    Q    Okay.  Is he --
8    A    -- to my understanding.
9    Q    Is he an electrical engineer or structural
10 engineer?
11    A    He's in construction.
12    Q    It's okay.  You can tell us --
13    A    Well, I --
14    Q    -- during the meeting, you talked about the
15 bigger facility.  It's okay.  It's all right.
16        MR. BARNACLE:  Object to the form.
17 BY MR. FREE:
18    Q    The engineer talked about what during this
19 meeting?
20    A    He didn't say a word that I recall.
21    Q    Well, what was his role at the meeting, why
22 was he there?
23    A    He was part of the group that came into
24 town.
25    Q    What did they come to town for?

Page 40

1    A    To meet with the City.
2    Q    About what?
3    A    I don't recall the just of it.
4    Q    You were in the meeting, and you recall --
5 you do not recall the topic of it?
6    A    There were discussions.
7    Q    What were they?
8    A    It ranged from our Continuum of Care
9 Program to some things that the City would like to
10 have done -- have done in their community, things to
11 improve it.  There was discussions about the
12 contract.  I don't recall the exact meeting.  It's
13 been almost a year ago.
14    Q    So Continuum of Care --
15    A    Uh-huh.
16    Q    -- community improvement, and the contract;
17 anything else?
18    A    Not that I can recall.
19    Q    What is the Continuum of Care Program?
20    A    It's -- it's a program that the company
21 runs in its correctional facilities with inmates.
22 It's educations, vocations, trades.  It's a
23 educational/vocational program.
24    Q    And what about that was discussed during
25 the meeting, if you can recall?

Page 41

11 (Pages 38 - 41)

1    A   Just that the company provides the program,
2   the number of GEDs, the number of certificates --
3    Q   Right.
4    A   In general that was the just of it.
5    Q   Okay.  But it doesn't provide that at the
6   Adelanto Facility does it?
7    A   No.
8    Q   You can't get a GED if you're at Adelanto;
9   right?
10   A   No.
11   Q   Why not?
12   A   Because we have detain -- detainees and the
13  average length of stay is approximately 75 days, so
14  there's no education requirement by ICE to provide
15  the programs.
16   Q   Do other contracting partners require you
17  to provide a GED detained or convicts or inmates?
18   A   There are State agencies and other Federal
19  agencies.
20   Q   What did Adelanto convey to GEO about
21  improvements in the community during this January or
22  February meeting of 2019?
23   A   It was just general conversation regarding
24  different needs in the community where the City
25  would -- was thinking about building a rec center or

Page 42

1   a youth-type center.  There was nothing real
2   specific that I recall.
3    Q   Any funding requests come up?
4    A   Not that I can recall.
5    Q   Possible?
6       MR. BARNACLE:  Object to the form.
7       THE WITNESS:  I mean, may have.  I don't
8   know.  I don't recall.
9   BY MR. FREE:
10   Q   Okay.  And why was the City talking to GEO
11  about this, GEO doesn't build rec centers; does
12  it?
13      MR. BARNACLE:  Object to the form.
14      THE WITNESS:  GEO doesn't what?
15      MR. FREE:  Build rec centers.
16      THE WITNESS:  No.  I can't speak for the
17  City.  They just brought it up.
18  BY MR. FREE:
19   Q   Well, what was GEO's response?
20   A   It was a general response.
21   Q   Generally what was it?
22   A   Generally understand your needs, we
23  understand.  There was no -- that I can recall, any
24  agreements made.  It was conversation.
25   Q   So does the rec center include like

Page 43

1   baseball facilities, like sports; is that what
2   you're talking about?
3    A   They didn't get into specifics that I
4   recall, just something for the youth.
5    Q   For the youth, what would the youth do?
6    A   They called it a "youth center."
7    Q   Okay.
8    A   I don't recall any specifics --
9    Q   Okay.
10   A   -- if they spoke about sports --
11   Q   Got it.
12   A   -- if they spoke about education.
13   Q   Has GEO made any payments to the City of
14  Adelanto to fund this rec center, as far as GEO can
15  testify to here today?
16   A   No, not that I'm aware.
17   Q   Has GEO made any donations to City of
18  Adelanto representatives or causes requested on
19  their behalf?
20   A   Since -- or any time?
21   Q   Since that meeting.
22   A   We donate every year to the City Christmas
23  parade.
24   Q   How much?
25   A   I don't know how much that was, but

Page 44

1   there --
2    Q   Ballpark, 100s, 1,000s?
3    A   Maybe 5,000.
4    Q   Okay.  Do you know if the funding needs --
5   if GEO has, in fact, made payments to the City to
6   help with the community development projects
7   discussed during this meeting?
8    A   No.
9    Q   Okay.  What did you talk about this
10  January, February 2019, about the contract?
11   A   The -- it was talked in -- about the
12  differences between the IGSA and the developmental
13  agreement, there was discussions about that.
14   Q   And what were those discussions?
15   A   I don't recall.  I wasn't in the actual
16  conversation.
17   Q   What were you doing then?
18   A   I was just -- I actually picked the
19  gentleman up from the corporate office that flew in
20  and drove him to City Hall.
21   Q   What are the differences between the IGSA
22  and development agreement?
23   A   The IGSA speaks to the operation of the
24  facility.
25   Q   Uh-huh.

Page 45

12 (Pages 42 - 45)

1    A    The developmental agreement speaks to the
2  payments to the City for the beds that GEO owns in
3  the city limits.
4    Q    Does the City have more or less
5  responsibility after changing from -- after the
6  operation of Adelanto changed from operating under
7  an Intergovernmental Services Agreement to a bridge
8  contract?
9    A    Ultimately they would have less.
10    Q    They don't have to remit invoices anymore;
11  right?
12    A    No.
13    Q    What else does the City not do anymore
14  Because the IGSA is over?
15    A    Their authority to inspect and tour is no
16  longer in the bridge contract.
17    Q    Is the City incurring any cost at all
18  administering the Intergovernmental Services
19  Agreement that is no longer in play?
20    A    They were tied to -- they were liable in
21  the IGSA.  They're no longer tied to any -- being
22  liable.
23    Q    Okay.  So as far as you know, as of today,
24  now that the Intergovernmental Services Agreement is
25  over, with respect to the operation of the Adelanto

Page 46

1    Q    Facility, the City's responsibilities have
2  terminated; is that right?
3    A    To my knowledge, yes.
4    Q    But under the development agreement, they
5  get the same amount of money; is that right?
6    A    The developmental agreement is totally
7  separate.  That has not changed.
8    Q    Okay.  It's totally separate from the
9  canceled IGSA, but it's completely dependent upon
10  the continued existence of a facility at Adelanto;
11  correct?
12    A    It's tied to that.  I don't know the exact
13  language.
14        MR. FREE:  All right.  Okay.  I think lunch
15  is here.  It's 12:23.  Let's go off the record, and
16  take a bathroom break and eat some lunch.  We'll
17  come back at 1:30.
18        Okay?
19        THE VIDEOGRAPHER:  The time is 12:23, and
20  we're going off the record.
21        (Whereupon, at 12:23 p.m., a luncheon
22  recess was taken.)
23
24
25

Page 47

1  APPEARANCES OF COUNSEL:
2        R. ANDREW FREE, ESQ.
3        LYDIA A. WRIGHT, ESQ.
4        COLIN BARNACLE, ESQ.
5        ADRIENNE SCHEFFEY, ESQ.
6
7
8
9  ALSO PRESENT:
10        JULIO PENA - VIDEOGRAPHER
11
12
13
14
15
16
17
18
19
20
21
22
23  REPORTED BY:
24  KATHLEEN M. ALONA
25  CSR NO. 14219

Page 48

1        (The deposition of JAMES JANECKA (PMQ) was
2              reconvened at 1:27.)
3
4        THE VIDEOGRAPHER:  The time is 1:27, and
5  we're back on the record.
6
7        JAMES JANECKA (PMQ),
8  the witness, having been previously administered an
9  oath by the Court Reporter testified further as
10              follows:
11
12        EXAMINATION (CONTINUING)
13
14  BY MR. FREE:
15    Q    So, Warden Janecka, is there anything about
16  your testimony about this morning that you need to
17  change after having some more time to think about
18  it?
19    A    Not that I can think of.  No, sir.
20    Q    Anything you need to add or correct?
21    A    No, sir.
22    Q    If you take a look at the 30(b)(6)
23  Deposition Notice, which is to -- there you go, and
24  we're going to look at Topic 10.
25        Actually, that's the wrong topic.  Sorry.

Page 49

13 (Pages 46 - 49)

1      Let's look at Topic 8.  This is GEO's
2  interpretation of its obligations to ICE with
3  respect to its Voluntary work program, which I might
4  call the VWP at Adelanto since May 2011.
5      Including, but not limited to, the total
6      number ot detainees participating in the
7      VWP each year starting May 2011; detainee
8      work assignments, and shifts; training,
9      supervision, and evaluation of detainee;
10     workers payroll, compensation, and the
11     process by which wages are calculated; and
12         hiring and termination of detainee
13  workers.
14     A   Yes, sir.
15     Q   Okay.  What did you do to prepare for this
16  topic's testimony on behalf of GEO?
17     A   I checked to see if I could come up with a
18  number of detainees that participated in the program
19  since 2011.
20     Q   Okay.  And could you?
21     A   I was unable to ascertain.  I can tell you
22  what the -- the number was as of yesterday, but for
23  those years aren't kept for what the specific
24  question was.
25     Q   Can we just stop there on this one because

Page 50

1  instead of you telling me what you did for each
2  subpart, maybe we just ask the questions --
3     A   Okay.
4     Q   -- that I'm asking your way and then we'll
5  get them answered and it will go quicker.
6         Okay?
7     A   Okay.
8     Q   So when you said you could tell me what it
9  "was as of yesterday," what did you mean?
10     A   The total number of detainees that were
11  participating in the Volunteer Work Program.
12     Q   On yesterday, or cumulative from May '11
13  until yesterday?
14     A   No, sir.  Just as of the day yesterday.
15     Q   What was that number?
16     A   Approximately 690.
17     Q   Okay.  How did you arrive at that
18  conclusion?
19     A   Spoke with my classification officer.
20     Q   Who is that?
21     A   With Ms. Mary Wise McCormick.
22     Q   Do you have any understanding as to what
23  Ms. McCormick did to arrive at that number?
24     A   She checked the work applications or that
25  detainees had applied, and that were actively

Page 51

1  authorized and approved to work for a volunteer
2  position.
3     Q   Do you know what those records would have
4  been called?
5     A   Not off the top of my head, no.
6     Q   Okay.  Anything else that she did to arrive
7  at that 690 number?
8     A   Not to my knowledge.
9  ███ ███████████████████████████████████
10 ████ ██████████████████████████████████████
11 ████ █ █████████████████████████████████████
12 ████ █ ████████████████████████████████████
13 ████████████████████████████████████████████
14
15     A   They were approved to work in the volunteer
16  program.
17     Q   Okay.  So those are -- when we say
18  participating in, it seems like we may have a
19  terminological question here.
20         When you say "approved to work" in the
21  voluntary work program, there are 690 people who
22  have been approved to work; do I understand that
23  testimony correctly?
24     A   Correct.
25     Q   How many people actually worked in the work

Page 52

1  program as of yesterday?
2     A   I can -- I don't know that number.
3     Q   So GEO cannot tell us today how many people
4  were working in The Adelanto Facility, under the
5  voluntary work program, yesterday?
6     A   I do not know how many volunteered to go to
7  work.
8     Q   So GEO cannot provide that information
9  today?
10     A   No.
11     Q   And similarly GEO cannot provide the total
12  number of detainees who participated in the
13  Voluntary Work Program each year?
14     A   Correct.  No.
15     Q   Okay.  What additional steps, if any, did
16  you take to try and arrive at the total number of
17  detainees who worked in the Voluntary Work Program
18  each year?
19     A   I went to the person that's responsible at
20  this time, Ms. McCormick, and she advised me that
21  that information was not available to us.
22     Q   Okay.  Let's look at Topic 8B, which is
23  GEO's interpretation of its obligations to ICE with
24  respect to the Voluntary Work Program.  Before we --
25         Before we move to Topic B, does GEO believe

Page 53

14 (Pages 50 - 53)

1  that ICE requires any specific number of
2  participates to be in the Voluntary Work Program?
3     A   No.
4     Q   Okay.  Is it correct to say that the
5  numbers of participates who'll be in the Voluntary
6  Work Program in Adelanto is going to be determined
7  by the number of people who submit an application,
8  and those who are approved to work?
9     A   Yes.  And the need of a department.
10    Q   Would the approval to work piece be
11 separated from the need of the department, or is
12 that part of the same inquiry?
13    A   The detainee will fill out a form, then
14 request to work -- or to volunteer to be part of a
15 certain job assignment.
16       If we were to have 500 that applied to work
17 in food service, there would be no way that we could
18 accommodate 500 to work in the food service.
19    Q   So the needs of -- or availability of
20 positions is going to determine the number of
21 participates; is that right?
22    A   Yes.
23    Q   Anything else that would help determine the
24 availability of participants in the work program?
25    A   It would be there are some criterias for

Page 54

1  different job assignments.  Some jobs, if a person
2  has a act of violence to include arson, precludes
3  them from being assigned to certain jobs.
4        There are a couple jobs that are available
5  in the program that if an individual has been
6  convicted of stealing, that they're not eligible.
7  And their classification level itself plays a role
8  if they can be approved.



17    Q   Okay.  GEO's obligations to ICE with
18 respect to the Voluntary Work Program draw, at least
19 in part, from the Intergovernmental Services
20 Agreement sections about the VWP, and then once the
21 IGSA goes away, from the bridge contract
22 requirements; is that correct?
23    A   Yes.
24    Q   Okay.  Let's just do a real quick top line
25 of those requirements if you would.

Page 55

1        So we're going to turn to GOWER-GEO 495.
2  Actually, excuse me.  GOWER-GEO -- what's the VWP
3  one, 50 -- 502.
4        At the top of page 502, you'll see -- we're
5  looking currently at Exhibit 78.  There's a
6  Voluntary Work Program heading, which is No. 33 in
7  list of things that the service provider will do
8  under the Intergovernmental Services Agreement
9  between GEO and Adelanto.
10       Do you see the 33, Voluntary Work
11 Program?
12    A   Yes.
13    Q   Okay.  So first:
14       "Detainees may have opportunities to work
15       and earn money while confined."
16       Right?
17    A   Yes.
18    Q   Okay.  And as you've just explained, that's
19 going to be subject -- those opportunities are going
20 to be subject to the number of work opportunities
21 available within the constraints of safety,
22 security, and good order.
23       You can't put 500 workers in the kitchen if
24 there's not 500 kitchen positions; right?
25    A   Correct.

Page 56

1     Q   Number 2 is:
2        "Detainees will be able to volunteer for
3        work assignments, but otherwise not be
4        required to work, except to do personal
5        housekeeping."
6        Does GEO agree that detainees, under the
7  Voluntary Work Program, must be working voluntarily;
8  they can't be required to work in the Voluntary Work
9  Program, in other words, pursuant to its obligations
10 to ICE?
11    A   If they signed up or filled out an
12 application voluntarily, submitted it, and were
13 approved, then they can volunteer on a daily basis
14 or as needed to go to work.
15    Q   They have to do so -- detainees have to
16 submit an application to participate in the
17 Voluntary Work Program of their own freewill;
18 correct?
19    A   Correct.
20    Q   And GEO can't force them to do that;
21 correct?
22    A   Correct.
23    Q   GEO can't coerce them to do that;
24 correct?
25    A   Correct.

Page 57

15 (Pages 54 - 57)

1    Q   GEO can't put them in a -- an impossible
2  position where they're forced to choose between
3  doing something that could harm them or working in
4  the Voluntary Work Program; correct?
5        MR. BARNACLE:  Object to the form of the
6  question.
7        THE WITNESS:  They voluntarily freely on
8  their own pick the form out of the box.
9        If they choose to fill it out, they submit
10 it, we have no influence over if they fill it out or
11 not.
12 BY MR. FREE:
13   Q   So GEO has no influence over whether a
14 detained immigrant chooses to volunteer in the
15 Voluntary Work Program; correct, that's your
16 testimony on behalf of GEO today?
17   A   Correct.
18   Q   Okay.  So we can agree, I believe, that all
19 work in the Voluntary Work Program should be paid;
20 correct?
21   A   If they're approved and authorized and go
22 to work on a day, they'll be paid.
23   Q   Okay.  So if you're a VWP worker, you
24 should be paid for the work that you've done if
25 you've been approved and authorized; correct?

Page 58

1    A   If you're approved, authorized, assigned to
2  a job, go to work, you'd be paid.
3    Q   Okay.
4    A   For that day.
5    Q   I'm having trouble with the clarification.
6        What's assigned to a job?
7        Is there a situation in which -- with your
8  qualifiers, I'm having trouble understanding them.
9        Let's say you're approved, you're
10 authorized, you go to work, you sign the sheet, you
11 get paid, but you are not assigned to a job; should
12 you be paid under the Voluntary Work Program?
13   A   Can you clarify that?
14   Q   I'm just understanding your -- I'm just
15 trying to understand.
16       I asked, is it true that if you work in the
17 VWP, if you're a detained immigrant, GEO should pay
18 you?
19       And I think you said -- not yes.  I think
20 you said, "yes, if."
21       And what you said is, you have to be
22 approved, authorized, go to work, and assigned to a
23 job -- were there any other conditions that I
24 missed?
25   A   Right.

Page 59

1    Q   Okay.  So that's it, that's what you need
2  to do to get paid?
3    A   Yes.  You get --
4    Q   Who assigns you to a job if you're a
5  detained immigrant?
6    A   Once the detainee fills out an application,
7  it goes to our classification staff, they review the
8  individual's criminal history to make sure they meet
9  the criteria, they make sure that the classification
10 level is correct, and then if it's a job that
11 requires a medical or mental health clearance, then
12 it would have to -- that individual would have to be
13 reviewed by medical and mental health.
14   Q   Understood.  So is there ever a situation
15 where the person working in the Voluntary Work
16 Program is not entitled to the money that they
17 earned?
18   A   If they don't go to work on a certain day,
19 they won't get paid for not --
20   Q   Okay.
21   A   -- they can still be in the program, but if
22 they choose not to go to work, they don't get
23 paid.
24   Q   Understood.  Detainees have that choice
25 because it's supposed to be voluntary; correct?

Page 60

1    A   Correct.
2    Q   The penalty for not going to work could
3  potentially be termination from the program;
4  right?
5    A   Poor attendance is a reason for that they
6  could be removed from the program.
7    Q   So did you just answer that question as
8  "yes"?
9        If you don't go to work, you could be
10 removed from the pro -- from the VWP; correct?
11   A   You could be.
12   Q   Okay.  Who would make that -- that
13 recommendation?
14   A   It would be the department -- head of the
15 department, to whomever they were working with or
16 for.
17   Q   And when you say "department," what does
18 that mean?
19   A   Like food service has a food service
20 manager.
21   Q   All right.  Like Ms. B, in the kitchen,
22 would be able to make the decision; the person's not
23 showing up for work, they can't be in the program;
24 correct?
25   A   She would communicate that to

Page 61

16 (Pages 58 - 61)

1  classification.
2  Q    Okay.  Similarly, if the laundry supervisor
3  noticed that workers were not coming to work,
4  those -- whoever's in charge of that department, the
5  laundry department, would communicate to
6  classification, this person's not showing up, this
7  person's out of the program; correct?
8  A    Correct.
9  Q    However, if you do show up, you should be
10 paid; correct?
11 A    Correct.
12 Q    Okay.  I want to now turn to page 538, this
13 is also Exhibit 78, and now we're in the statement
14 work.
15      Do you know what a statement of work is?
16 A    Yes, sir.
17 Q    What is it?
18 A    It provides the parameters of the
19 contract -- or outlines the different programs and
20 the parameters of -- of -- of what's expected by the
21 contract.
22 Q    Who created it?
23 A    Statement of work was provided by the
24 dep -- ICE.
25 Q    To whom?

Page 62

1       assignments or industrial, maintenance,
2       custodial, service, or other jobs.
3       "The detainee work program shall not
4       conflict with any other requirements of the
5       contract and must comply with all
6       applicable laws and regulations."
7       Did I read that correctly?
8  A    Correct.
9  Q    Section B says -- Paragraph B says:
10      "Detainees shall not be used to perform the
11      responsibilities or duties of an employee
12      of the service provider."
13      Do you see that?
14 A    Yes.
15 Q    This statement of work applies to GEO's
16 performance at Adelanto from May 1st, 2011, until
17 the bridge contract effective date on June 26, 2019;
18 correct?
19 A    Correct.
20 Q    How does GEO determine what
21 responsibilities or duties of an employee detainees
22 may not perform?
23 A    Detainees do not have authority over other
24 detainees, cannot provide direction.  Detainees do
25 not have access to any security devices, keys,

Page 64

1  A    In the IGSA it would have went through the
2  City to GEO.
3  Q    And so what we're looking at here,
4  functionally, is the attachment of ICE's statement
5  of work that it provided to City of Adelanto, and
6  then the City of Adelanto has contracted out the
7  work in the statement of work to GEO; correct?
8  A    Correct.
9  Q    Section Roman numeral 7 is entitled,
10 "detainee work program," do you see that?
11 A    Yes.
12 Q    "Detainee labor shall be used in accordance
13      with the detainee work plan developed by
14      the service provider, and will be in
15      accordance with the ICE Performance Based
16      National Detention Standards on Detainee
17      Voluntary Work Program."
18      Did I read that correctly?
19 A    Yes.
20 Q    Is that what happened at Adelanto?
21 A    Yes.
22 Q    "The detainee work plan must be voluntary."



Page 63

10 Q    Those are GEO staff?
11 A    Yes.
12 Q    Okay.  But you've described things that the
13 detainees can't do, and I think it's responsive to
14 my question about what the responsibilities or
15 duties of an employee of the service provider are.
16 I think I understand that response.
17      But my question was, how does GEO determine
18 what the responsibilities or duties of an employee
19 of the service provider are, that detainees can't be
20 made to do under the --
21 A    It's outlined in our job description.
22 First you have to be 21 years of age --
23 Q    Okay.
24 A    -- United States citizen, pass a federal
25 background check --

Page 65

17 (Pages 62 - 65)

1    Q   Can you answer my question?
2        The question was how is it determined, and
3    I think the answer is, it's outlined in your job
4    description; right?
5    A   It's outlined in job description, as well
6    as in our clearances with the Department of Homeland
7    Security.
8    Q   Okay.  But the clearances deal with your
9    background, they don't deal with what your duties
10   are; correct?
11   A   There's different levels of clearance,
12   yes.
13   Q   Does any level of clearance deal with what
14   your duties are -- define what the duties of a GEO
15   employee are?
16   A   The clearance levels for individuals, such
17   as officers, management, are higher than those of
18   clerical staff that do not interact with detainee
19   population.  But the -- ultimately it's in our job
20   description's outline what our duties are for each
21   position.
22   Q   Okay.  So the job descriptions for GEO
23   employees at the Adelanto Facility, will determine
24   the contours of what can be required of a detained
25   immigrant working in the Voluntary Work Program and

Page 66

1    what cannot, if GEO is going to comply with 7B;
2    right?
3    A   Can you say that again?
4    Q   Sure.  The job descriptions of GEO's
5    employees will set the parameters of what detained
6    immigrants can and can't do; because if it's listed
7    in a job description of a GEO employee, then it
8    would be a responsibility or duty of an employee of
9    the service provider; right?
10   A   Correct.
11   Q   And Section 7b says:
12       "Detainees shall not be used to perform the
13       responsibilities or duties of an employee
14       of the service provider."
15       Right?
16   A   Correct.
17   Q   Okay.  So just basic thing about the work
18   program; when you're working as a detainee volunteer
19   worker, we know it's voluntary, we know you have to
20   be paid for every shift that you show up and work
21   for and sign for, and now we know also that you
22   can't be doing a responsibility or duty of an
23   employee of GEO; correct?
24   A   Correct.
25   Q   Good.  The Voluntary Work Program also has

Page 67

1    some safety limitations in the statement of work
2    that we're reading.  7C says:
3        "Appropriate safety/protective clothing and
4        equipment shall be provided to detainee
5        workers as appropriate.
6        "Detainees shall not be assigned work that
7        is considered hazardous or dangerous."
8        What does GEO believe is work that is
9    hazardous or dangerous?
10   A   What do we do?
11   Q   What does GEO believe is work that is
12   hazardous or dangerous that detainees could not
13   perform under 7C?
14   A   If -- if detainees were working with open
15   electrical equipment, and never been trained.  If
16   detainees were working with high elevations, and
17   didn't have the proper safety equipment or training;
18   could be a couple of safety or hazard issues.
19   Q   Okay.  So the next sentence is:
20       "This includes, but is not limited to,
21       areas or assignments requiring great
22       heights."
23       Is that what you're referring to?
24   A   Yes.
25   Q   And then:

Page 68

1        "Extreme temperatures, use of toxic
2        substances, and unusual physical demands."
3        Right?
4    A   Yes.
5    Q   Okay.  What is an extreme hight or hight
6    elevation, as you've just described it according to
7    GEO?
8    A   I couldn't give you a specific number.
9    Q   Could you give me a range base?
10   A   If I was guessing, an approximate height
11   may be anything over 10, 12 feet.
12   Q   Are there any areas of the facility at
13   Adelanto where detained immigrant workers could
14   access more than 10 feet in height?
15   A   For working?
16   Q   Yes, sir.
17   A   Not -- I've never seen a detainee on a
18   scaffolding or ladder or anything of that nature.
19   Q   If you had to get a ladder for it, would
20   that get you into the extreme height risk zone for
21   this standard?
22   A   For the kitchen?
23   Q   Any -- anyplace.  I'm not just speaking
24   about the kitchen.
25       I'm just asking -- GEO is precluded, under

Page 69

18 (Pages 66 - 69)

1  this contract and this standard in this statement of
2  work, from assigning detainees to work that's
3  considered hazardous or dangerous and that includes,
4  but isn't limited to, areas or assignments requiring
5  great heights.
6      My question is just; if you have to get a
7  ladder to access it, does that fall within the
8  standard?
9    A   Not if it's a two-foot ladder or four-foot
10  ladder.  If we were to have to go up to the top of a
11  sixteen-foot ladder, and a person is on it without
12  proper equipment, that would be extreme and
13  dangerous.

25   Q   Okay.  Section 7D says:

Page 70

1    Q   And it is also correct that GEO determines,
2  based on those classification parameters set for by
3  ICE, where each qualified worker will go?
4    A   Correct.
5    Q   Okay.
6    A   Along with their criminality.
7    Q   Sure.  But GEO is making that
8  determination, not ICE; correct?
9    A   There's ICE -- ICE speaks to -- as to which
10  jobs detainees, as far as violence or theft, if they
11  have a criminal history, but it's all tied to the
12  classification.
13   Q   Right.  And so that ICE is speaking to that
14  it's general, not specific to any one detained
15  immigrant; correct?
16   A   Correct.
17   Q   And so if GEO does determine -- gets an
18  application and wants to put a person to work in the
19  Voluntary Work Program, as long as it's complying
20  with the parameters that ICE has set forward for
21  where people who are detained can work, based on
22  their classification and their criminality; the only
23  other questions that ICE needs to answer,
24  potentially, are medical screening and mental health
25  screaming -- screening for where they're going to

Page 72

1    The service provider shall supply
2    sufficient staff to monitor and control
3    detainee work.  Unless approved by the
4    COTR, C-O-T-R, these work details must be
5    Does GEO apply that standard while the IGSA
6
7  was in effect at Adelanto?
8    A   Yes.
9    Q   Okay.  And then the next page, GOWER-GEO
10  539 -- you described earlier what I believe is an
11  accommodation that's been made, based on some
12  documents we received, between GEO and ICE.
13   7E says:
14   "It will be the sole responsibility of ICE
15   to determine whether a detainee will be
16   allowed to perform on voluntary work
17   details and at what classification level.
18
19
20   So this kind of gets into the next topic
21  about division of labor, but it is it --
22   It is correct, isn't it, that ICE dictates
23  to GEO what classification level detainees can work
24  in which areas under the Voluntary Work Program?
25   A   Correct.

Page 71

1  work; is that right?
2    A   Correct.
3    Q   Okay.  And ICE how subcontracted out
4  medical and mental health care in part to GEO; is
5  that right?
6    A   Yes.
7    Q   And GEO has in turn subcontracted some more
8  of that out to Correct Care Solutions; is that
9  right?
10   A   Wellpath.
11   Q   They've now merged?
12   A   Yes.
13   Q   It was previously Correct Care, and now
14  it's Wellpath; right?
15   A   Correct.
16   Q   Did the merger affect anything
17  contractually?
18   A   No.
19   MR. FREE:  Okay.  Okay.  So just to button
20  this up I'm going to put you -- put in front of
21  you -- let's mark as Exhibit 79.
22   (Exhibit 79 was marked for identification
23  by the court reporter and is attached hereto.)
24   MR. FREE:  This is for Colin.  And I
25  apologize, but for some reason, the Bates pages -- I

Page 73

19 (Pages 70 - 73)

Page 74

1  think these were printed from TIFF, and so we don't
2  have a Bates page on this document.
3       We can get you a Bates page for it, but I
4  just don't have it on this document.
5       MR. BARNACLE:  Okay.  Please do.



Page 76

1  heading labeled "food service."  Again, in the
2  Intergovernmental Services Agreement between the
3  City of Adelanto.  Food service has 12 subpoints on
4  495.
5       The 12th is:
6       "Food will never be used for reward or
7       punishment."
8  BY MR. FREE:
9   Q   Another basic fact about the Voluntary Work
10  Program is you get paid in money; right, you don't
11  get paid anything else?
12  A   Correct.
13  Q   Okay.  So GEO interprets its requirements,
14  under this IGSA, as precluding GEO from paying -- or
15  regarding detained immigrants, whether they're in
16  the Voluntary Work Program or not, with food;
17  right?
18       MR. BARNACLE:  Object to the form.
19       THE WITNESS:  Correct.
20  BY MR. FREE:
21  Q   Okay.  And similarly GEO -- does GEO
22  acknowledge that withholding of food can never be
23  used as a punishment?
24  A   Correct.
25  Q   Okay.  Let's turn to the bridge contract.

Page 75

1       Do you see that?
2  A   Yes.
3  Q   Okay.  So when we're looking at the Section
4  E, GOWER 539, in Exhibit 78, when it says:
5       It's going to be the sole responsibility by
6       ICE to determine whether a detainee will be
7       allowed to perform on voluntary work detail
8       and what classification.
9       That responsibility is global; in other
10  words, it's applicable to all detained immigrant
11  workers, ICE doesn't pick and choose which detained
12  workers will go to each spot, that's GEO; right?
13  A   If the -- if the individual has applied for
14  that position.
15  Q   Okay.  Great.
16       MR. FREE:  Okay.  Can you mark that as
17  78 -- 79.  Excuse me.  Great.
18       So let's also look back at the IGSA.  And
19  you can slide that back.  We're not going to come
20  back to it -- actually, yeah.  Keep it, or she can
21  get it.
22       There are a couple other pieces of this
23  contract that may inform GEO's interpretation of its
24  requirements for the VWP.
25       One of them is GOWER-GEO 495.  It's a

Page 77

1       It is not in the IGSA, but is it GEO's
2  understanding that ICE required each detainee
3  immigrant who participated in the Voluntary Work
4  Program between May 1st, 2011, and June 26, 2019,
5  when the bridge contract took affect; is it GEO's
6  understanding ICE required GEO to keep signed
7  Voluntary Work Program agreements on file, in their
8  detainee file?
9  A   Is to keep one on file.  I'm not sure where
10  it was kept, but to keep one on file.
11  Q   Okay.  So regardless of whether it is in
12  the detainee file or somewhere else, GEO understands
13  that ICE requires each participant in the Voluntary
14  Work Program to have signed and GEO to have retained
15  a Voluntary Work Program assignment sheet; right --
16  or agreement, excuse me?
17  A   Yes.
18  Q   Okay.  And if the Plaintiffs wanted to know
19  how many people worked in the Voluntary Work Program
20  from May 1st, 2011, until the present, one of the
21  places that the Plaintiffs could look would be at
22  those sheets; right?
23  A   Yes.
24  Q   Okay.  Those are in GEO's possession?
25  A   It would be in file.

20 (Pages 74 - 77)

1    Q   Okay.  It's also GEO's interpretation, I
2  assume, that GEO's responsible for supplying
3  sufficient staff to supervise detained immigrant
4  workers while they're working in the Voluntary Work
5  Program; correct?
6    A   Correct.
7    Q   Now, we're going to look at the bridge
8  contract.  I'm going to start at 35053, which is
9  kind of early on, maybe 10 pages in.
10       It's very -- it's like just this far
11  (indicating) in.  You're way too far down.
12       You got it, 35053?
13    A   35053.
14    Q   You got it.  Great.  All right.  So under
15  general, it says:
16       "The contractor shall abide by all rules
17       and regulation in the following sources:
18       1. Post Orders.
19       2. General Directives."
20       What's a "general directive"?
21    A   It would be any direction that ICE was to
22  provide.
23    Q   Okay.  So these are when -- GEO's position
24  is that general directives refers to general
25  directives from ICE?

Page 78

1    A   Would be from ICE.
2    Q   Okay.
3       3. ACA standards for adult local detention
4       facilities and the most remaining sent
5       copies of supplements.
6       Do you see that?
7    A   Yes.
8    Q   "4. Officers' handbook."
9       Do you see that?
10    A   Yes.
11    Q   What is that?
12    A   I am not familiar with the officers'
13  handbook.
14       We have an employee handbook, but I'm not
15  familiar with an officers' handbook(M-68).
16    Q   How does GEO abide by all rules and
17  regulations in that source?
18    A   Can't speak to that.  Our staff follow the
19  employee handbook that we provide to them.
20    Q   So the testimony today is that GEO doesn't
21  know what the officers' handbook is; correct?
22    A   Not familiar with that document, correct.
23    Q   And that GEO has no information to provide
24  today about how it would abide by all rules and
25  regulations in the officers' handbook?

Page 79

1    A   Correct.
2    Q   Okay.  Number 5 is:
3       The 2011 performance-Based National
4       Detention Standards, 2016s revisions dated
5       December 2016.
6       And then there's a paren (Note:  The
7       provisions of the PBNDS 2011, 2016s
8       revisions should be interpreted as minimum
9       requirements.
10       Do you see that?
11    A   Yes.
12    Q   Is that how GEO interprets them?
13    A   Yes.
14    Q   Facilities are encouraged to design and
15       operate the facility to provide the least
16       restrictive conditions appropriate to
17       maintain security and safety of the staff
18       and detainees.)
19       Do you see that?
20    A   Yes.
21    Q   Okay.  Is that what GEO does at Adelanto?
22    A   Yes.
23    Q   Subpart -- No. 6 is Subpart A of the PREA
24  recs.
25       Do you see that?

Page 80

1    A   Yes.
2    Q   7 is:
3       "Federal, state and local laws governing
4       use of firearms fire safety, and
5       environmental health."
6       Do you see that?
7    A   Yes.
8    Q   And then:
9       "All other regulations provided to the
10       contractor by authority of the CO."
11       Do you see that?
12    A   Yes.
13    Q   What regulations have been provided to GEO
14  by authority of the contracting officer that governs
15  the performance at Adelanto?
16    A   None that I can think of.
17    Q   Okay.  Let's move forward now to GEO-Novoa
18  35078.  Again, we're still in Exhibit 77.
19       With me?
20    A   Yes.
21    Q   Okay.  Bottom of the page there's a heading
22  that says, "manage a detainee work program."
23       Do you see that?
24    A   Yes.
25    Q   And I'm going to submit to you, this is on

Page 81

21 (Pages 78 - 81)

1  page 35 of 76, the document that is 76-pages long is
2  the performance work statement, Section C of the
3  contract, that begins on 3547.
4        So this is -- what's a performance work
5  statement?
6     A   It's a statement of work.
7     Q   Who crea -- who creates the performance
8  work statement?
9     A   It would be ICE.
10    Q   And who's required to abide by it?
11    A   GEO.
12    Q   Okay.  So under A, general:
13        "The facility may offer a voluntary
14        detainee work program that allows eligible
15        detainees to participate in purposeful
16        activities and reduce detainee idleness."
17        Do you see that?
18    A   Yes.
19    Q   Does this require GEO to operate the work
20  program at Adelanto?
21    A   Doesn't require.  It says "may offer."
22    Q   Okay.  Turning the page again this is the
23  top of the next page 35079, the word that's missing
24  here from this sentence is "it."  So:
25        "It will be the sole responsibility of ICE

Page 82

1        to determine whether a detainee is eligible
2        to participate on voluntary work details."
3        Do you see that?
4     A   Yes.
5     Q   Same deal as before though where ICE is
6  providing eligibility parameters, and GEO is making
7  the individual work assignment decisions; correct?
8     A   Correct.
9     Q   Skipping a sentence about searches and
10  moving to:
11        "Detainees shall not be used to perform the
12        responsibilities or duties of an employee
13        of the contractor."
14        Do you see that?
15    A   Yes.
16    Q   Nothing has changed about GEO's
17  understanding, from the IGSA to the bridge contract,
18  about that prohibition on having detained immigrants
19  perform the responsibilities or duties of an
20  employee of GEO; right?
21    A   Correct.
22    Q   Same thing:
23        Detainees shall not be used to perform work
24        in areas where sensitive documents are
25        maintained -- and then it puts in parens --

Page 83

1        (designated ICE workspace).
2        Do you see that?
3     A   Yes.
4     Q   Does GEO agree detainees should not be used
5  to perform work in areas where sensitive documents
6  are maintained?
7     A   Correct.
8     Q   Same understanding as to GEO's
9  responsibilities with respect to dangerous or
10  hazardous work by detainees; under this bridge
11  contract that took effect this year; right?
12        In other words, GEO is not to give detained
13  immigrants work that would be hazard -- hadar --
14  considered hazardous or dangerous?
15    A   Correct.
16    Q   And the examples that you provided on GEO's
17  behalf earlier of hazardous or dangerous work, they
18  don't change from the IGSA to the bridge contract;
19  right?
20    A   Correct.
21    Q   Okay.  ICE acknowledges -- I'm skipping
22  ahead a bit.
23        "ICE acknowledges that GEO shall pay the
24        minimum of $1.00 per day for each detainee
25        that participates in the Voluntary Work

Page 84

1        Program."
2        Do you see that?
3     A   Yes.
4     Q   Okay.  Now, this again, sets forth the
5  presumption that if you participate in the detainee
6  Voluntary Work Program, you will be paid by GEO $1
7  per day; is that correct?
8     A   If -- as long as you go to work and you've
9  been approved for that position.
10    Q   Under what circumstances would a detained
11  immigrant be able to go to work for -- in a position
12  that they've not been approved for?
13    A   No.  I'm just saying, if they -- if they
14  have volunteered and have been approved and they
15  show up, they get paid.  If they don't show up, they
16  don't get paid.
17    Q   Okay.  But -- but detained immigrants
18  couldn't just show up to a kitchen shift if they
19  hadn't been approved to do so; correct?
20    A   Not to my knowledge.
21    Q   And that's because GEO -- part of GEO's
22  responsibilities, under this contract, are
23  controlling and securing the movement of people
24  within the facility, to a certain extent; right?
25    A   Can you say that again?

Page 85

22 (Pages 82 - 85)

1    Q   Sure.  Part of GEO's responsibilities, in
2  this contract, is to control the movement of people
3  inside the Adelanto Facility; right?
4    A   To make sure it's safe and secure,
5  correct.
6    Q   Yeah.  People don't have the freedom to
7  just go to the kitchen when they want to; right,
8  they're locked in?
9        MR. BARNACLE:  Object to the form.
10       THE WITNESS:  Correct.
11 BY MR. FREE:
12   Q   Okay.  So if you've shown up to the
13 kitchen, it's because GEO has allowed you to be
14 there; right --
15   A   Correct.
16   Q   -- to work a shift?  Okay.
17       Now, to ensure that everybody is paid who
18 shows up and works, within the Voluntary Work
19 Program, GEO keeps certain records; is that right?
20   A   Correct.
21   Q   What are the records that GEO keeps to
22 ensure that everyone is paid the dollar a day for
23 the time that they work?
24   A   There's a -- a list or a roster of
25 detainees that are assigned to work in a specific

Page 86

1    Q   Okay.  So the statement of work, same deal,
2  ICE created it, GEO's responsible for abiding by it;
3  right?
4    A   Correct.
5    Q   Okay.  This part of the statement of work
6  deals with the detainee work program; right?
7    A   Correct.
8    Q   And the contractor that's GEO has to
9  develop the detainee work program; right?
10   A   Correct.
11   Q   Okay.  And the contractor, that's GEO, has
12 to develop the detainee work program; right?
13   A   Correct.
14   Q   And that detainee work program, and the use
15 of detainee labor, has to be in accordance with the
16 PBNDS standard on the detainee voluntary work;
17 correct?
18   A   Correct.
19   Q   Okay.  And that means it has to be
20 voluntary; right?
21   A   Yes.
22   Q   Has to com -- same standards that we went
23 through before about not overlapping with the duties
24 of the contractors' employees; right?
25       MR. BARNACLE:  Object to the form.

Page 88

1  area, and if they show up for work, it's documented
2  on the list or the roster.  At the end of the day,
3  that roster is submitted to the payroll office and
4  then payroll is -- processes payment for the $1.
5    Q   Okay.  Now going to turn to GEO-Novoa
6  35202, which is nearly to the end of this document,
7  the Exhibit 77.
8    A   Oh, shoot.  Might have these out of order.
9  Oh, Jesus.
10       35202?
11   Q   Yes, sir.
12   A   I don't know if I have it.
13       Do I have it?
14       Oh, wait a minute.  I'm sorry.  Wait a
15 minute.  I have it here.
16   Q   Okay.
17   A   I'm sorry.  It was under this other part.
18   Q   No worries.  That's all right.
19       So at 35202, section 7 -- so this is page 8
20 of 14, Appendix A to the bridge agreement, which is
21 a statement of work.
22       I believe earlier you said the performance
23 work statement is the statement of work, but can we
24 agree that they're separate?
25   A   Correct.

Page 87

1        MR. FREE:  You see 7B?
2        THE WITNESS:  Yes.
3  BY MR. FREE:
4    Q   Okay.  GEO doesn't have any different
5  interpretation of 7B here than it did in the IGSA,
6  does it?
7        MR. BARNACLE:  Object to the form.
8        THE WITNESS:  No.
9  BY MR. FREE:

Page 89

23 (Pages 86 - 89)

1 staff receive.
2    Q   Okay.  Now I'm going to look at 35211.
3    A   35 --
4    Q   It's toward the end, so if you're moving
5 toward the back of the package, you're going to find
6 it.
7        Got it?  35211.  I think you're at it.
8 Yeah.
9        This is:
10       "Attachment 4 - deliverables of written
11       documentation detention (food)."
12       It states:
13       One hard copy of each deliverable should be
14       submitted to the contractor and the COR, as
15       described in the "delivery/days after award
16          column."
17       Unless otherwise specified, deliverables
18       may be submitted via email (this list is
19       not all inclusive other reports may be
20       required as directed by COR, the
21       contracting officer's representative).
22       Do you see the first row under
23 "deliverable," where it says, "detainee work and
24 assignment sheet"?
25   A   Yes.

Page 90

1    Q   What is that?
2    A   It would be the list or the roster of
3 detainees that are assigned to work for -- been
4 approved for the Voluntary Work Program.
5    Q   Who creates that?
6    A   It would be our classification officer,
7 Ms. McCormick.
8    Q   And she's a GEO employee; correct?
9    A   Correct.
10   Q   When is that due to be submitted to the
11 contracting officer's technical representative?
12   A   According to this document, weekly or in
13 advance.
14   Q   If you look about halfway down, there's a
15 big font entry that says:
16       "Food handler certification."
17       And then right below that it says:
18       "Detainee Volunteer Work Program training
19       form."
20       Do you see that?
21   A   Yes.
22   Q   What is that?
23   A   If detainee is in a department, in say food
24 service, there's a training sheet for detainees to
25 learn how to do specific tasks for food service or

Page 91

1 other departments.
2    Q   Who creates it?
3    A   I'm not 100 percent sure.
4    Q   Does GEO create it, or does ICE create
5 it?
6    A   GEO creates it.
7        MR. FREE:  Let's go off the record for five
8 minutes.
9        It's 2:17.
10       THE VIDEOGRAPHER:  The time is 2:17, and
11 we're off the record.
12       (Off the record.)
13       THE VIDEOGRAPHER:  The time is 2:34, and
14 we're back on the record.
15 BY MR. FREE:
16   Q   Mr. Janecka, is there anything about your
17 testimony that you need to alter, amend, elaborate,
18 correct, since you've had time to think about it on
19 the break?
20   A   No, sir.
21   Q   Great.
22       MR. FREE:  I've got in front of you now
23 what's previously been marked as Exhibit 2 to the
24 deposition of Mr. Ragsdale.
25       Submit this is a full printout of the

Page 92

1 Performance Based National Detention Standards
2 promulgated by ICE, the 2011 version, but it's also
3 the 2016 revision from December 2016, which you'll
4 see at the bottom right-hand corner of every page.
5        I've opened Exhibit 2 for you to page No.
6 8446, that's Novoa 8446.
7        (Previously marked Exhibit No. 2 was
8 identified for the record.)
9        MR. FREE:  And that is Section 5.8 of the
10 PBNDS, the Voluntary Work Program Standard.
11 BY MR. FREE:
12   Q   Do you see that?
13   A   Yes.
14   Q   You can -- yeah.  You can unattach the
15 clip.  We're only going to be working in this
16 section for now.
17   A   That should be fine.
18   Q   All right.  This section of the PBNDS is
19 the one to which the bridge contract is referring
20 when it lists the Performance Based National
21 Standards Voluntary Work Program rule; correct?
22   A   Correct.
23   Q   Okay.  There's no other authority that GEO
24 looks to from ICE for running the Voluntary Work
25 Program; correct?

Page 93

24 (Pages 90 - 93)

| | |
|---|---|
| 1    MR. BARNACLE:  Object to the form. | 1    Do you see that? |
| 2    THE WITNESS:  We look to the PBNDS, the | 2    A   Correct. |
| 3 statement of work and -- | 3    Q   What's "personal housekeeping"? |
| 4    MR. FREE:  Right. | 4    A   Personal housekeeping would be their living |
| 5    THE WITNESS:  That's correct. | 5 area, and any general use space in their living |
| 6 BY MR. FREE: | 6 area. |
| 7    Q   And so we just went through the list of | 7    Q   Where does GEO get that interpretation? |
| 8 things in GEO's contract, the bridge contract, that | 8    A   It's -- doesn't specify the general use in |
| 9 shall govern the things the contractor, GEO, has to | 9 this section, but it's in the National Handbook that |
| 10 abide by, the rules and regulations, and the PBNDS | 10 ICE provides to the detainee population. |
| 11 is listed as one of them; right? | 11    Q   Where in GEO's contract does it say that |
| 12    A   Correct. | 12 GEO is bound by the ICE National Detainee |
| 13    Q   And then specifically in the Voluntary Work | 13 Handbook? |
| 14 Program section -- the Voluntary Work Program PBNDS | 14    A   It's part of their -- it's part of their |
| 15 chapter is what GEO is applying at Adelanto; | 15 intake process, and the intake process is required |
| 16 correct? | 16 to provide them with a National Handbook. |
| 17    A   Correct. | 17    Q   But how does the National handbook that ICE |
| 18    Q   So on 8446, which is in front of you, | 18 provides -- or that GEO provides to detainees, on |
| 19 expected outcomes, No. 2, it says: | 19 ICE's behalf, bind GEO's contract -- conduct with |
| 20    "Detainee shall be able to volunteer for | 20 respect to the work program at Adelanto? |
| 21    work assignments, but otherwise shall not | 21    A   It's just part of the detainee handbook |
| 22    be required to work, except to do personal | 22 that's a part of the issue during the intake |
| 23    housekeeping." | 23 process -- |
| 24    Is that cor -- do you see that? | 24    Q   How do you know -- |
| 25    A   Yes. | 25    A   And the way that this reads personal |
| Page 94 | Page 96 |

| | |
|---|---|
| 1    Q   Did I read that correctly? | 1 housekeeping is in their living area that they're |
| 2    A   Yes. | 2 assigned to. |
| 3    Q   Isn't that GEO's interpretation to the | 3 [redacted] |
| 4 PBNDS? | 4 [redacted] |
| 5    A   To this standard -- | 5 [redacted] |
| 6    Q   Yeah.  Right. | 6 [redacted] |
| 7    A   Right. | 7 [redacted] |
| 8    Q   GEO applies this specific outcome and seeks | 8 [redacted] |
| 9 to achieve it at Adelanto; correct? | 9 [redacted] |
| 10    A   For the Voluntary Work Program, yes. | 10 [redacted] |
| 11    Q   Okay.  Turning the page, there's a section | 11    Q   What question were you just answering? |
| 12 at the top of 8447, it's the first full paragraph in | 12    A   That personal housekeeping that is |
| 13 the right column, and in italics -- so this -- we're | 13 considered their house. |
| 14 now in the expected practices section. | 14    Q   But what was the question that I asked that |
| 15    Do you see that? | 15 you were just answering? |
| 16    A   Six? | 16    A   That if we apply -- |
| 17    Q   Just the next page.  Yeah.  You got it. | 17    MR. BARNACLE:  Object to form. |
| 18    A   Okay. | 18    THE WITNESS:  If we apply this standard to |
| 19    Q   So I'm looking at C, personal housekeeping | 19 personal housekeeping, and that is -- |
| 20 required. | 20    MR. FREE:  I don't think I asked that |
| 21    Do you got that in front of you? | 21 question.  Let me ask it a different way.  And |
| 22    A   Okay. | 22 maybe -- |
| 23    Q   "Work assignments are voluntary; however | 23    If you don't understand the question, just |
| 24    all detainees are responsible for personal | 24 ask me. |
| 25    housekeeping." | 25    Okay? |
| Page 95 | Page 97 |

1    THE WITNESS:  Okay.
2 BY MR. FREE:
3    Q    My question is how does GEO know that ICE's
4 National Detainee Handbook defines what personal
5 housekeeping is?
6    A    How do we know?
7    Q    Yes, sir.
8    A    We read it.
9    Q    What did you read in ICE's National
10 Detainee Handbook that says GEO is bound by the
11 detainee handbook?
12    A    It doesn't state GEO is, it states that a
13 detainee is.
14    Q    Okay.  Is ICE's National Detainee Handbook
15 referenced anywhere, in the Voluntary Work Program
16 standards that we just read, in the IGSA or in the
17 bridge contract?
18    A    Not that I know of off the top of my
19 head.
20    Q    Do you remember us reading those sections
21 in the IGSA and the bridge contract a few minutes
22 ago?
23    A    Yes.
24    Q    Do you remember any mention of ICE's it?
25    A    No.

Page 98

1    Q    Do you see below, in personal housekeeping,
2 the sentence beginning "detainees are required?
3    A    Yes.
4    Q    What does it mean that these words are in
5 italics?
6    A    It's telling us what the standard
7 applies -- what they're required to do.  They --
8 it's giving us the -- the examples of what it's
9 required to do.
10    Q    Agian, that might have been an answer to a
11 question, but that's -- the question that I'm
12 answering is, why -- why --
13    Do you know why these words are in italics,
14 and the sentences above are not?
15    MR. BARNACLE:  Object to the form of the
16 question.
17    THE WITNESS:  No.
18 BY MR. FREE:
19    Q    So as you -- as you sit here today, on
20 GEO's behalf, GEO doesn't under -- doesn't have any
21 testimony as to the significance of italicizing
22 these words that begin "detainees are required?
23    A    It's a descriptive example of what the
24 standard is reading.
25    Q    Okay.  So GEO's testimony here today is,

Page 99

1 that this is in italics is because it's a
2 descriptive example?
3    A    Correct.
4    Q    Okay.  In the next section, detainee
5 selection:
6    "The Voluntary Work Program shall document
7    the facilities program and shall be in
8    compliance with this detention standard."
9    Do you see that?
10    A    Yes.
11    Q    And on the next page, 8448:
12    "The detainee shall be required to sign a
13    Voluntary Work Program agreement before
14    commencing each new assignment.
15    "Completed agreements shall be filed in the
16       detainee's detention file."
17    Do you see that?
18    A    Yes.
19    Q    Okay.  Does GEO follow this standard?
20    A    Which one is it again?
21    Q    It's the one I just read.  It says --
22    A    Which letter?
23    Q    We're on page 8448, this is under detainee
24 selection.
25    A    Uh-huh.

Page 100

1    Q    And this is the paragraph below No. 4.  So
2 it doesn't really have a letter.
3    A    Okay.
4    Q    We're on -- the PBNDS section's 407.  So if
5 that helps.
6    Does GEO follow this standard?
7    A    Yes.
8    Q    Section E, special details:
9    "Detainees may volunteer for temporary work
10    details that occasionally arise.
11    "The work, which generally lasts for
12    several hours to several days, may involve
13    labor intensive work."
14    Do you see that?
15    A    Yes.
16    Q    Does that happen at Adelanto?
17    A    Detainees can volunteer to work.
18    Q    So the answer to my question is "yes"?
19    A    Yes.
20    Q    Okay.  Is there any limit on the number of
21 days a detainee can work per week at Adelanto?
22    A    As part of the Voluntary Work Program,
23 there are up to 40 hours per week.
24    Q    Okay.  Is there a limited -- outside of the
25 Voluntary Work Program limit to the days that a

Page 101

26 (Pages 98 - 101)

1 detainee can work at Adelanto?
2     MR. BARNACLE: Object to the form.
3     THE WITNESS: Not to my knowledge. There's
4 not a limit as to one or any.
5 BY MR. FREE:
6 Q   When you say "as part of the Voluntary Work
7 Program," in my response to the question about how
8 many days a detainee can work; is another work
9 program at Adelanto?
10 A   No.
11 Q   Okay. Just one; right?
12 A   Correct.
13 Q   And so when I ask the question is there a
14 limit to the number detainees -- number of days a
15 detainee can work in the Voluntary Work Program at
16 Adelanto, the answer is they can only work 48
17 hours -- excuse me -- a total of 40 hours per week;
18 is that right?
19 A   Correct.
20 Q   How does GEO keep track of detainee's
21 hours?
22 A   It's part of the list or rosters that we
23 spoke about earlier.
24 Q   Okay. So how does GEO use rosters and work
25 lists to keep track of detainee hours?

Page 102

1 week; right?
2 A   Correct.
3 Q   Okay. Looking at letter I, Voluntary Work
4 Program is only -- by the way, what's SPC?
5 A   That, to my knowledge, is a contract that's
6 run by ICE.
7 Q   What's a CDF?
8 A   It would be a -- I'm not sure.
9 Q   Contract --
10 A   Contract detention facility.
11 Q   Is Adelanto currently a contract detention
12 facility?
13 A   Yes.
14 Q   Was it previously a dedicated IGSA,
15 Intergovernmental Services Agreement, facility?
16 A   It was an IGSA, yes. Previously.
17 Q   All right. And so do you see where it says
18 in italics that in SPCs, S -- CDFs, and dedicated
19 IGSAs a detainee may participate in only one work
20 detail per day, do you see that?
21 A   Correct.
22 Q   What mechanism does GEO have in place to
23 ensure that that occurs at Adelanto?
24 A   I'm not sure.
25 Q   Look at K, compensation:

Page 104

1 A   It -- they'll have -- detainees have a
2 schedule. If their by department -- if food
3 service -- I'll just use them for an example --
4 their schedule may be 9:30 to 1:00; well, track
5 those hours, those rosters are turned in on a daily
6 basis to the payroll department, and the
7 classification officer keeps track of them.
8 Q   Okay. So would you agree that the
9 Performance Based National Detention Standard
10 Section 5.8 H, hours of work -- I guess it's 5.85.
11 Yeah. 5H, Roman numeral 5 letter H.
12     Puts a responsibility on GEO to prevent
13 detained immigrant workers from working more than 40
14 hours per week under the Voluntary Work Program?
15 A   Yes.
16 Q   And indeed GEO is responsible for ensuring
17 that no detainee is permitted to work in excess of 8
18 hours per day as well; correct?
19 A   Yes.
20 Q   And in order to do that, GEO needs to track
21 the times that detainees are working; correct?
22 A   Has to be a mechanism, yes.
23 Q   All right. If you don't know how many
24 hours a detainee has worked, you can't ensure that
25 they are working fewer than 8 per day and 40 per

Page 103

1     "Detainees shall receive monetary
2     compensation for work completed in
3     accordance with the facility's standard
4     policy.
5     "The compensation is at least one U.S.
6     dollar per day.
7     "The facility shall have an established
8     system that ensures detainees receive the
9     pay owed them before being transferred or
10     released."
11     Do you see that?
12 A   Yes.
13 Q   Is every detainee who is authorized to work
14 and shows up and works a shift at Adelanto in the
15 Voluntary Work Program paid at least $1?
16 A   Yes.
17 Q   If -- if GEO failed to pay detainees who
18 show up and work for shifts at least $1, would that
19 be a violation to its obligations to ICE?
20     MR. BARNACLE: Object to the form.
21     THE WITNESS: Yes.
22     MR. FREE: Okay. Now I'm going to turn
23 your attention to a different document. So you can
24 put that one away. We may revisit it in a few
25 minutes, but we're going to revisit the same pages,

Page 105

27 (Pages 102 - 105)

1  so no fumbling is necessary.
2  BY MR. FREE:
3      Q    Without me going through -- I can do it,
4  but can we agree that the IGSA requires GEO to
5  inform detained immigrants of their ability to
6  participate in the Voluntary Work Program?
7      A    Yes.
8      Q    Okay.  And can we agree that GEO's
9  obligations to ICE require GEO to provide them
10  information about their rights in the Voluntary Work
11  Program?
12      A    With the -- the rules and of the PBNDS
13  standards of the -- yes.
14      Q    Okay.  Subject to the detainee work plan
15  that GEO has created and submitted to ICE; right?
16      A    Yes.
17      Q    Okay.  Can we also agree that GEO has an
18  obligation to ICE to provide accurate information to
19  the detainees about the Voluntary Work Program?
20      A    Yes.
21      Q    Okay.  And that obligation would not be
22  fulfilled if GEO were providing incorrect
23  information about the Voluntary Work Program; would
24  it?
25      A    Can you say that again?

Page 106

1      Q    Yeah.  GEO's obligation to ICE to provide
2  accurate information to detained immigrants about
3  their participation in the Voluntary Work Program;
4  that obligation wouldn't be fulfilled if GEO were
5  providing them with inaccurate information; right?
6      A    Correct.
7      Q    Okay.  In other words, GEO wouldn't be
8  upholding its obligations to ICE if there's
9  information that it's required to provide that's
10  either inaccurate or that it doesn't provide; is
11  that right?
12      A    Correct.
13      Q    Okay.  So how do -- how do you, as a
14  detained immigrant at Adelanto, know to -- or how do
15  you go about signing up for the Voluntary Work
16  Program?
17      A    The form is available in the housing
18  unit.
19      Q    Okay.
20      A    And the detainee can pick a form out of
21  the -- commonly referred to as the rack where we
22  keep forms, fill it out, and drop it into the into a
23  box so that classification can pick it up.
24      Q    Okay.  Let's start -- how would the
25  detained immigrant now that the form is there in the

Page 107

1  housing unit?
2      A    It's right there in front -- in the common
3  area along with their -- any other form that's
4  available for the population.
5      Q    GEO creates an orientation for everybody
6  who steps into the Adelanto Facility as a detainee;
7  correct?
8      A    Correct.
9      Q    That orientation video has been shown to
10  every person, probably multiple times, because it's
11  on a loop; right?
12      A    Correct.
13      Q    Okay.  Where in the facility is GEO's
14  orientation video shown?
15      A    It's shown in our intake unit for all new
16  arrivals, and it's shown in our housing area.
17      Q    How often is it shown?
18      A    Once a day.  In intake, it runs all day.
19      Q    Right.  It's on a loop; right?
20      A    Yes.
21      Q    And is it in any language other that
22  English?
23      A    Spanish.
24      Q    Okay.  Is any of it audio, or is it all
25  words on a screen?

Page 108

1      A    Both.
2      Q    Both; there's an audio component to it?
3      A    Yes.
4      Q    What is the audio component to it?
5      A    It's actual words of what's being
6  represented, being communicated, on the video.
7      Q    Okay.  Are the words in the audio
8  different, at all, from the words that appear on the
9  screen?
10      A    Not to my knowledge.
11      Q    As you sit here today, you can't tell me
12  whether the words in GEO's orientation video are
13  verbatim reading or what's in the video or whether
14  there's something different?
15      A    I can't -- can't tell you verbatim.
16      Q    I'm not asking you to tell me verbatim.
17  I'm just asking you if you think that there is --
18  whether GEO can tell us whether there's an audio
19  component to this that differs, in anyway, from
20  what's written on these pages?
21      A    Not to my knowledge.
22      Q    Okay.  Thank you.
23          MR. FREE:  I'm going to show you what's
24  being marked as Exhibit 80.
25          I'm going to represent to you this was

Page 109

28 (Pages 106 - 109)

1  produced by GEO to Plaintiffs in response to
2  discovery requests.
3       (Exhibit 80 was marked for identification
4  by the court reporter and is attached hereto.)
5       MR. FREE:  The Bates number is GEO-Novoa
6  00035038.
7       And what we've done -- because we've
8  received the video, which appears to be a collection
9  of powerpoint slides, we've taken each slide from
10 the video and we've reduced the video to written
11 form.
12 BY MR. FREE:
13 Q   Does that make sense?
14 A   Yes.
15 Q   And I'm going to represent to you that
16 every side in the video is rep -- is included in
17 this document that's in front of you as Exhibit 80.
18 Let's talk about it.
19       Ready?
20       MR. BARNACLE:  Do you have a copy for me?
21       MR. FREE:  Yeah.  Sorry.  Think I may have
22 given him -- sorry.
23       Can I see that back, please?
24       Thank you.  Here you go, Colin.  Here you
25 go.  Okay.

Page 110

1  specifications?
2  A   Yes.
3  Q   Okay.  And the process in bulletproof --
4  bullet point B describes what I believe you've told
5  me about earlier regarding filling out an
6  application and submitting it to classification for
7  coordination.
8       Do you see that?
9  A   Yes.
10 Q   Okay.  And then the next says:
11       "Once approved, you will be placed on a
12       roster so that GEO officers and staff can
13       identify you when projects are open."
14       Do you see that?
15 A   Yes.
16 Q   "And all compensation for the work will be
17       applied to you personal trust fund managed
18       by the GEO business department."
19       Do you see that?
20 A   Yes.
21 Q   So this is what detained immigrants are
22 told every day during the orientation video, but
23 also as they -- they get into the -- the facility at
24 intake; right?
25 A   Yes.

Page 112

1       These are not paginated because of the way
2  that we've reduced them, and I apologize for that.
3  But I think we're going to be able to muscle through
4  here.
5       I would like you to turn to the page that
6  has "Voluntary Work Program" across the top of it.
7  It's about midway to 60 percent through the
8  document.  It comes right after "how to access pro
9  bono services," and right before "visitation."  If
10 you see those, that's the warning.
11 BY MR. FREE:
12 Q   Do you see that?
13 A   Yes.
14 Q   So it says:
15       For those do --
16       It says:
17       "For those detainees who are physically
18       capable and desire to work while staying
19       here, GEO manages several work projects
20       under a program called Volunteer Work
21       Program."
22       Do you see that?
23 A   Yes.
24 Q   Okay.  Is that the Voluntary Work Program
25 that GEO has implemented pursuant to ICE's contract

Page 111

1  Q   Okay.  We're going to put that aside.
2       The -- are they told anything else?
3       Are detainees told anything else by GEO
4  about the Voluntary Work Program?
5  A   Not that I'm aware of.
6  Q   Okay.  How about in the handbook that
7  they're given?
8  A   The handbook has a section pertains to the
9  detainee work pro -- or Voluntary Work Program.
10 Q   So that's the local supplement; right?
11 A   Yes.  And the national.
12 Q   Right.  And you also give them the National
13 Handbook, but the National Handbook doesn't provide
14 any information about the Voluntary Work Program at
15 Adelanto, does it?
16 A   Not specific to Adelanto.
17       MR. FREE:  We're now going to introduce
18 what's previously been marked as Exhibit 25 to your
19 deposition.
20       So we've been down some of this road
21 before?
22       (Previously 25 marked Exhibit No. was
23 identified for the record.)
24       MR. FREE:  Let's look at page 3833.
25       These are.

Page 113

29 (Pages 110 - 113)

Veritext Legal Solutions
800-336-4000

1        MR. BARNACLE:  Can I have a copy of that?
2        MR. FREE:  Yeah.  Sorry.  Sorry, Colin.
3        MR. FREE:  This is GEO-Novoa 3825 through
4   3863.
5   BY MR. FREE:
6    Q    This is the Adelanto ICE Processing Center
7   Supplimental Detainee Handbook, version 10/9/2018.
8   Final page -- well, yeah.
9        See the very last page?
10   A    Yes.
11   Q    Is that your signature?
12   A    Yes.
13   Q    Okay.  So if we look at page 3833, this is
14   a standard regarding classification.
15        It starts under -- not even a standard, a
16   part of the hand -- the local supplement regarding
17   classification.

Page 114

---

1        Do you see what I mean?
2    A    Yes.

10   Q    Okay.  Turn the page to "meals," 3834.
11        It says:
12        "All meals are nutritionally balanced,
13        dietician approved, and properly prepared
14        and served.
15        "The use of food, i,e, the withholding of
16        or variation from the standard menu as a
17        disciplinary measure or reward is
18        prohibited."
19        Do you see that?
20   A    Yes.
21   Q    Does GEO abide by its own policy manual
22   that you signed at Adelanto?
23   A    Yes.
24   Q    Okay.  And then we're going to move to
25   3836, "sleeping area sanitation."

Page 116

---

1   detained immigrants about the Voluntary Work
2   Program, as we've discussed previously; right?
3    A    It's part of it, yes.
4    Q    Right.  It's not all of it.  We've looked
5   at the orientation video, and now we've got this
6   supplemental handbook in front of us; right?
7    A    Yes.

Page 115

---

1        "You are required to keep your bed and
2        immediate area clean and neat."
3        Do you see that?
4    A    Yes.
5    Q    "The living units must be cleaned and beds
6        are to be made every day by 8:00 a.m."
7        Do you see that?
8    A    Yes.
9    Q    Then we're going to move on to 3838.  3838
10   has a section called "Voluntary Work Program."
11        Do you see that?
12   A    Yes.
13   Q    It says:
14        "Wages are $1 per day."
15        Do you see that?
16   A    Yes.
17   Q    "And ordinarily you will not be permitted
18        to work more than 8 hours per day or 40
19        hours per week."
20        Do you see that?
21   A    Yes.
22   Q    Under what circumstances would a person at
23   Adelanto, in the Voluntary Work Program, be
24   permitted to work more than 8 hours per day or 40
25   hours per week?

Page 117

---

30 (Pages 114 - 117)

| | |
|---|---|
| 1    In other words, what's not ordinary? | 1    out and turned into classification." |
| 2    A   Be something that's not ordinary.  I can't | 2    Do you see that? |
| 3  think of anything.  It may be -- I can't think of | 3    A   Yes. |
| 4  anything. | 4    Q   The very last sentence: |
| 5    Q   So on behalf of GEO today, even though it | 5    "Detainees who choose to participate in the |
| 6  is in this Adelanto handbook from 2018, the | 6    Voluntary Work Program must meet acceptable |
| 7  testimony of The GEO Group is that there could be | 7    levels of house neatness." |
| 8  situations that are out of the ordinary which | 8    What's "house neatness"? |
| 9  detainees could be working more than 8 hours a day | 9    A   Their living area. |
| 10  or 40 hours a week? | 10    Q   Cleanliness and sanitation standards; what |
| 11    MR. BARNACLE:  Object to the form. | 11  is the difference between house neatness and |
| 12    THE WITNESS:  It would have to be something | 12  cleanliness? |
| 13  really out of the ordinary that we would contact ICE | 13    A   It all ties together; being neat, clean, |
| 14  and -- and speak to them about what was out of the | 14  sanitary. |
| 15  ordinary that day, but definitely not the -- the | 15    Q   Which standards are -- is GEO pointing |
| 16  norm or the routine. | 16  detainees to when it says detainees who choose to |
| 17  BY MR. FREE: | 17  participate must meet acceptable levels of these |
| 18    Q   Okay.  Is there any mention of detainees | 18  things? |
| 19  being permitted to work more than 8 hours of a day | 19    A   That falls into the standard of the |
| 20  or 40 hours a week in any of the contracting or | 20  housekeeping standard for ICE. |
| 21  government standards documents we've just | 21    Q   Is that housekeeping standard included in |
| 22  discussed? | 22  this handbook? |
| 23    A   Not that I recall. | 23    A   Can you say that again? |
| 24    Q   In fact they prohibit GEO from working | 24    Q   Is the housekeeping standard included in |
| 25  detainees more than 8 hours a day or 40 hours a per | 25  this handbook? |
| Page 118 | Page 120 |

| | |
|---|---|
| 1  week; right? | 1    A   I'm not 100 percent sure. |
| 2    A   The language speaks to no more than 40 | 2    Q   Okay.  So in addition to an application, |
| 3  hour -- or 8 hours a day or 40 hours per week. | 3  are you supposed to fill out a kite if you are a |
| 4    Q   Okay.  But this standard, that is conveyed | 4  detained immigrant who wants to participate in the |
| 5  to every single person who could apply in the | 5  Voluntary Work Program? |
| 6  Adelanto Facility, doesn't reflect that, does it? | 6    A   Not to my knowledge. |
| 7    A   It says you ordinarily will not be | 7    Q   Going back to 3838, it says: |
| 8  permitted -- so -- to work more than 40 hours per | 8    "You must complete a kite indicating you |
| 9  week. | 9    wish to participate in the Voluntary Work |
| 10    Q   So GEO is not allowed to permit detainees | 10    Program and are encouraged to list any |
| 11  to work more than 8 hours a day or 40 hours by ICE's | 11    special skills or experience that you may |
| 12  standards, according to our conversation earlier; | 12    have on the form." |
| 13  right? | 13    Do you see that? |
| 14    A   That's the PBNDS standard, yes. | 14    A   Yes. |
| 15    Q   And the contract because it's incorporated; | 15    Q   Well, do you fill out an application, or do |
| 16  right? | 16  you submit a kite? |
| 17    A   Yes. | 17    A   To my knowledge, it's an application. |
| 18    Q   Okay.  But here GEO says that you could, | 18    Q   Okay.  So why does the handbook say that |
| 19  but it would be out of the ordinary; that's the | 19  detainees have to submit a kite? |
| 20  implication of this sentence; correct? | 20    A   Can't speak to that. |
| 21    A   Yes. | 21    Q   As you sit here today, on behalf of The GEO |
| 22    Q   All right.  Then it says: | 22  Group, you can't tell me why there's a discrepancy, |
| 23    "Wages earned are calculated and credited | 23  at least between the way you join the program, |
| 24    to your account daily. | 24  whether it's filling out a work application or |
| 25    "A detainee work application must be filled | 25  submitting a kite? |
| Page 119 | Page 121 |

31 (Pages 118 - 121)

1    A    No detainees fill out kites for numerous
2  reasons.  They're more than welcome to submit one.
3    Q    It says here "you must"; right?
4    A    Yes.
5        MR. FREE:  Okay.  Let's look at that
6  application.
7        You can put that aside for now.  Okay.
8        So now we're going to look at Exhibit 26
9  from your deposition.
10        (Previously marked Exhibit No. 26 was
11  identified for the record.)
12        MR. FREE:  On the back page -- so this was
13  an email dated September 4th, 2018, from Joann
14  Lango.
15  BY MR. FREE:
16    Q    Who's she?
17    A    She's a currently the compliance
18  administrator.
19    Q    And was the compliance administrator when
20  she sent this email as far as it looks from the
21  form?
22    A    As far as I know, yes.
23    Q    Under her name it says "compliance
24  administrator," can we agree that she was the
25  compliance administrator when she sent this form?

Page 122

1    A    Yes.
2    Q    Okay.  GEO-Novoa 3292 is the email,
3  GEO-Novoa 3294 in on the back.
4        Do you see that?
5    A    Yes.
6    Q    What is that?
7    A    Detainee work detail application.
8    Q    And that's 3294.  On the front, page
9  Ms. Lango says:
10        I was -- as I was conducting my rounds, the
11        old forms were still being used.
12        Attached is the current form that detainees
13        use for applying to work.
14        Please this form moving forward.  Thanks.
15        Did I read that correctly?
16    A    Yes.
17    Q    Why was the old form still being used, and
18  what's the difference between the -- well --
19    A    I don't know.
20    Q    So as you sit here today, you can't tell
21  me, on behalf of GEO, why there was a form, what
22  Ms. Lango called "old," being used for detainee
23  voluntary work assignments?
24    A    I can't speak for Ms. Lango, no.
25    Q    Well, you're speaking for GEO, so.

Page 123

1    A    No, I can't.
2    Q    All right.  The work detail application
3  lists several positions; do you see that?
4    A    Yes.
5    Q    Who determines what these positions are?
6    A    The -- the facility need.  We have
7  departments, and PBNDS allows for those jobs and
8  that's how it's determined.
9    Q    Okay.  So GEO determined to put food
10  service, kitchen, laundry, dorm cleaning, cores,
11  hallway, court visit -- court/visit -- sorry --
12  recreation, floor crew, barber shop, intake, medical
13  detail, paint detail, and warehouse as the positions
14  for which detained immigrants can apply; is that
15  correct?
16    A    Correct.
17    Q    This covers both east and west at Adelanto;
18  correct?
19    A    Correct.
20    Q    And then GEO, underneath that table, would
21  indicate areas for which the detained immigrant has
22  been approved; correct?
23    A    Correct.
24    Q    The bottom of the form shows a detainee
25  Voluntary Work Program agreement; right?

Page 124

1    A    Yes.
2    Q    Detainees participating -- that participate
3  in the Voluntary Work Program will not be permitted
4  to work in excess of 8 hours daily or 40 hours
5  weekly; right?
6    A    Correct.
7    Q    Is this the agreement that's -- that GEO
8  was keeping pursuant to its obligations to ICE, this
9  Voluntary Work Program agreement at the bottom
10  here?
11    A    Yes.
12    Q    There's no other Voluntary Work Program
13  agreement; right?
14    A    No other voluntary --
15    Q    Work program agreement; right?
16    A    Not that I'm aware of.
17    Q    Okay.  So this is the form that a person
18  who's at Adelanto must fill out in order to
19  participate in the Voluntary Work Program;
20  correct?
21    A    Correct.
22    Q    And so if a person wants to get paid for
23  the work that they've performed, and in fact, if
24  they want to perform any work outside of their
25  immediate living area, their common area, they've

Page 125

32 (Pages 122 - 125)

1 got to fill this form out to get paid for it;
2 right?
3    A   It's my understanding, yes.
4    Q   Well, is that what GEO's position is?
5    A   Yes.
6    Q   Okay.  What's the difference between the
7 old form and the new form?
8    A   I -- must have been a revision to this
9 form.  I don't recall.
10    Q   Do you know what was revised?
11    A   I don't.
12    Q   Did you look at this form be -- as you
13 prepared for your disposition today?
14    A   Not that I recall.
15    Q   Okay.  This form says:
16        "There are 40-paid positions in the work
17        member detail program."
18        Do you see that?
19    A   Yes.
20    Q   Is that true?
21    A   There are more positions available than
22 that.
23    Q   So that's not true?
24    A   It doesn't seem to be accurate.
25    Q   Well, it's either true or it's false; are

Page 126

1 volunteer.
2    Q   As you hit sit here today, on behalf of The
3 GEO Group, you cannot tell the Plaintiffs why GEO
4 asks detainees applying for the Voluntary Work
5 Program if they would be interested in working on a
6 voluntary basis if the 40-paid positions are filled;
7 you have no answer to that; is that right?
8    A   May reference the PBNDS standard that you
9 referred to earlier; where it spoke to detainees can
10 volunteer to do work.
11    Q   While we were referencing that standard,
12 you agreed with me that any work that's performed by
13 a detainee in the Voluntary Work Program must be
14 compensated at $1 per shift, per day; correct?
15    A   If they've been approved and authorized to
16 work, correct.
17    Q   Well, we also agreed that they couldn't
18 work in the Voluntary Work Program if they weren't
19 approved and authorized.
20    A   Correct.
21    Q   So that's baked into the cake; right?
22        MR. BARNACLE:  Object to the form.
23 BY MR. FREE:
24    Q   Is it GEO's position that the Performance
25 Based National Detention Standard allows GEO to have

Page 128

1 there 40, or not?
2    A   It doesn't appear to be true or accurate.
3    Q   Okay.  Then it says:
4        If all paid positions are filled -- in
5        other words, all 40-paid positions -- would
6        you be interested in working on a voluntary
7        basis?
8        Do you see that?
9    A   Yes.
10    Q   What work in the voluntary program --
11 Voluntary Work Program would not be performed on a
12 voluntary basis?
13    A   Say that again.
14    Q   What work that a detainee could perform in
15 the Voluntary Work Program, that they're applying
16 for here, would be performed that would not be on a
17 voluntary basis?
18    A   It's all volun --
19        MR. BARNACLE:  Object to the form.
20        THE WITNESS:  It's all voluntary.
21 BY MR. FREE:
22    Q   Then why is GEO asking if detainees, on
23 this form, would be interested in working on a
24 voluntary basis?
25    A   I can't speak to the language, but it's all

Page 127

1 people working in the Voluntary pro -- Work Program
2 and not being paid $1?
3    A   No.
4    Q   Then why are people asked if they would be
5 interested in working on a voluntary basis on this
6 form?
7    A   I do not know.
8    Q   Sitting here today, on behalf of The GEO
9 Group, you do not know?
10    A   No.
11    Q   What is the purpose of this "yes" or "no"
12 question mark?
13    A   I don't know.
14    Q   If GEO receives a Voluntary Work Program
15 application from a person, and they check "no," is
16 that person considered for the Voluntary Work
17 Program?
18    A   I don't know the specifics of this form.
19    Q   As you sit here today you cannot tell the
20 Plaintiffs, whether GEO will not consider a person
21 who checks "no" as an applicant for the VWP?
22    A   No.
23    Q   Okay.  Where on this form does it inform
24 detained immigrants that they have 14 days to make a
25 complaint about not being paid in order to receive

Page 129

33 (Pages 126 - 129)

1  the monies that they are due?
2      A    Where does it state what now?
3      Q    That a detainee who wishes to get paid for
4  work performed under the Voluntary Work Program, has
5  14 days to submit that request?
6      A    I -- I don't see where it says about the 14
7  days.
8      Q    But that is GEO's policy; correct?
9      A    I don't recall that.
10     Q    Sitting here today, on behalf of The GEO
11 Group, you are not aware whether GEO requires
12 detained immigrants working in the Voluntary Work
13 Program to submit any complaints about pay within 14
14 days of their shifts?
15     A    Oh, complaint.  You said complaints?
16     Q    Well, if you want --
17     A    Okay.
18     Q    My question -- let me clarify because I
19 want to make sure we're on the same page.  It's not
20 a trick.
21         The question is, GEO has a policy that if
22 you didn't get paid, you have 14 days to bring it to
23 GEO's attention, if you want to get paid for the
24 shift that you worked and you're a detained
25 immigrant working in the VWP; can we agree on
                                              Page 130

1  that?
2      A    I'm not sure on the 14-day limit.  I know
3  they have a grievance system.  They can fill out a
4  kite, the matter will be looked into.  And if we owe
5  money for hours or days worked, they'll be
6  compensated.
7      Q    What if they file the request for payment
8  on the 15th day, will they be compensated?
9      A    To my knowledge, yes.
10     Q    Okay.  Who prepared Exhibit 26 to your
11 deposition; who within The GEO Group is responsible
12 for preparing this -- this work application?
13     A    Not 100 percent sure.  I'm not sure.
14     Q    It's The GEO Group, isn't it?
15     A    The GEO Group.
16     Q    And so as you sit here today, we can agree
17 that there are not, in fact, 40-paid positions in
18 the Work Member Detail Program; correct?
19     A    Correct.
20     Q    Do you happen to know the average number of
21 people that work in the Voluntary Work Program each
22 day at Adelanto?
23     A    Not the av -- I can tell you yesterday how
24 many were assigned approximately.  How many actually
25 volunteered to go to work, I don't know.
                                              Page 131

1      Q    What was the assigned number?
2      A    It was approximately 660.
3      Q    Okay.  So those were people who were
4  specifically assigned to --
5      A    They were -- they had been approved and
6  authorized and assigned to a position.
7      Q    Okay.  And GEO has not provided any
8  explanation for why it's asking if a detainee would
9  be interested in working on a voluntary basis and
10 then having them check a "yes" or "no"?
11     A    No.
12     Q    You have no explanation as you sit here
13 today?
14     A    I have no explanation.
15     Q    And you cannot tell me whether a person who
16 checks "no" will be considered for work in the VWP;
17 correct?
18     A    No.
19     Q    Okay.  And further, if GEO did have a
20 14-day pay grievance policy, we can agree that
21 detained immigrants are not notified of that policy
22 in this application or in the agreement at the
23 bottom; right?
24     A    There's nothing on this document that
25 speaks to that.
                                              Page 132

1      Q    Okay.  So that's a "yes"; right?
2      A    It's not on this document, correct.
3      Q    Correct.  Okay.
4          MR. FREE:  I am now going to hand you what
5  we'll mark as Exhibits 81 and 82.
6          (Exhibit 81 was marked for identification
7  by the court reporter and is attached hereto.)
8          MR. FREE:  I will -- did you get the second
9  one?  Okay.  So you've got both of them, and they're
10 just stacked on top of each other.  Okay.  Good.
11         I will represent to you that what we've put
12 in front of you does not have a Bates range.  Okay?
13 Because of the way that it printed out.
14         Do we have the --
15         We're -- she's going to get you the Bates
16 range.
17 BY MR. FREE:
18     Q    Have you ever seen a document like this
19 before, Mr. Janecka?
20     A    Yes.
21     Q    What is it?
22     A    It's the detainee payroll sheet.
23     Q    Who creates it?
24     A    It would be -- I'm not sure.  GEO creates
25 it.  Who specifically, I don't know.
                                              Page 133

34 (Pages 130 - 133)

1    Q    Okay.  Is this something that the people in
2  the business office would do or the classification
3  office?
4    A    Possibly classification.  I'm not 100
5  percent sure.
6    Q    All right.  So as you sit here today, on
7  behalf of The GEO Group, you can't tell me who --
8  like what department at Adelanto created this
9  document; right?
10    A    No.
11    Q    We're not going to go page by page, but I
12  do have some specific questions.  The second page
13  here -- it looks like this.  It's a handwritten
14  sheet.
15        It says:
16        "No detainee sheet found."
17        Do you see that?
18    ████  ████████████████████████
19    █████████████████████████████████████
20    ████████████████████████████████████
21    ████████████████████████████
23        Do you see that?
24    A    Yes.
25    Q    Okay.  And then on the page right behind

Page 134

1    Q    Why would someone write the word volunteer
2  twice?
3    A    I don't know.
4    Q    Do these look like the last five numbers of
5  either -- maybe four or five numbers of a Alien
6  Registration Number or Alien ID?
7    A    No.
8    Q    No.  Can you -- do you have any
9  understanding as to what these numbers next to the
10  words "volunteer" might mean?
11    A    I really can't make -- make them out.
12    Q    Okay.  Maybe turn to page 12, top
13  right-hand corner.  See that?
14    A    Trying.
15    Q    Third from the bottom of the row, has an
16  ███████████████████████████████████
17  volunteer?
18    A    Okay.
19    Q    Do you see that?
20    A    Yes.
21    Q    It's handwritten; right?
22    A    Yes.
23    Q    And then it's got that person's bed; where
24  █████████████████████████
25    A    Okay.

Page 136

1  that, you see those names listed on the laundry;
2  right?
3    A    Yes.
4    Q    Okay.  So it appears then that this Officer
5  Dreighton perhaps indicated, to whoever the officer
6  that's reviewing this at GEO is, that they needed to
7  be added to the payroll sheet; right, because
8  they're on the payroll sheet?
9    A    Yes.  Apparently she couldn't find a
10  payroll sheet, so she submitted this, yes.
11    Q    Got it.  Okay.  Then on page 5 -- it's the
12  top right-hand corner, that's what I'm referencing.
13        Do you see that?
14        Very bottom.  There's some markings.
15        Can you read those two handwritten
16  notations next to the numbers, please?
17    A    At the bottom?
18    Q    Yeah.
19    A    201.
20    Q    After the numbers, sorry.  Do you see the
21  words?
22    A    Yes.  Volunteer.
23    Q    What does that mean?
24    A    Some -- there was volunteer.  They wrote
25  the word volunteer twice.

Page 135

1  ██  ██  ████████████████████
2    A    Doesn't specifically state where he worked,
3  or she worked.
4    Q    Under what circumstances would this
5  volunteer notation appear on detainee payroll?
6    A    I don't know.
7    Q    Turning to the next page, page 13, middle
8  column, there's a handwritten notation; the name
9  ████████████████████████████████████
10    A    Yes.
11    Q    Where'd that person work?
12    A    Doesn't specifically state.  It's --
13  ██████████████████████████████████
14  do you see that handwritten notation there, by
15  █████████████████████████
16    A    Yes.
17    Q    Any idea where that person worked?
18    A    Doesn't indicate.
19  ██  ██  ████████████
20  volunteer, handwritten, about halfway down -- about
21  three-quarters of the way down; do you see that?
22    A    Yes.
23    Q    How did these people get onto this
24  roster?
25    A    Someone wrote their name in.

Page 137

35 (Pages 134 - 137)

1    Q    But why?
2    A    I can't speak to that.
3    Q    On behalf of The GEO Group, you can't tell
4    us?
5    A    I don't know.

████  ██  ███████████████████████████████
████████████████████████████████████████████
██████████████████████

9    A    Yes.
10   Q    Same answers; you have no idea where they
11   worked or got on this list; right?
12   A    No.
13   Q    This was preprinted though; right, because
14   the other names are typed out and printed on to the
15   form; correct?
16   A    Correct.
17   Q    Who would have preprinted this form?
18   A    It would have been -- it would have been
19   GEO.
20   Q    Okay.  Do you know which -- was it -- would
21   it be the classification office or someone else?
22   A    Possibly.  I'm not 100 percent sure.
23   Q    Okay.  If GEO is complying with the rules
24   of the road that we went through earlier about the
25   Performance Based National Detention Standard, the
                                              Page 138

1    applied at Adelanto?
2    A    To my knowledge.
3    Q    On behalf of GEO, not to your knowledge, as
4    GEO's corporate representative, is that the standard
5    that's applied at Adelanto?
6    A    Yes.  To the best of my knowledge, yes.
7    Q    Nope.  It's not about the best of your
8    knowledge.  You prepared for today's testimony to
9    testify on behalf of GEO.
10        So again, does GEO allow detained immigrant
11   workers in the Voluntary Work Program to work in
12   more than one detail per day?
13   A    Not to my knowledge.
14        MR. FREE:  Okay.  Now turning to Exhibit
15   82.  This is November 12, 2017, a Sunday and this
16   begins at GEO-Novoa it's not marked but I'm giving
17   it for Counsel it's GEO-Novoa 00097 --
18        I can't read this.
19        MS. WRIGHT:  GEO-Novoa 000970 to --
20        MR. FREE:  972?
21        MS. WRIGHT:  Let me double check that.  I'm
22   sorry.  Go ahead.
23        MR. FREE:  That's what I think it is.
24        (Exhibit 82 was marked for identification
25   by the court reporter and is attached hereto.)
                                              Page 140

1    contract, and the Voluntary Work Program, there
2    should never be an instance in which a detained
3    immigrant works two shifts on these pay sheets;
4    right?
5    A    Shouldn't be more than 8 hours in a day.
6    Q    Actually, I think the rules say you can
7    only work one shift per day at CDS, don't they;
8    didn't we read that?
9    A    I don't recall specifically.
10   Q    And you don't know specifically, on behalf
11   of GEO, whether their detainees at Adelanto are
12   limited to one shift per day?
13   A    To my knowledge, they only work one.
14   Q    I know, but does ICE limit that?
15   A    I don't recall the specific language.
16   Q    All right.  Well, we spoke about it
17   earlier.  Actually, the Performance Based National
18   Detention Standard 5.8 it says:
19        "In SPC's, CDS, and dedicated IGSAs, a
20        detainee may participate in only one work
21        detail per day."
22        Do you see that?
23   A    One -- one job, yes.
24   Q    Well, not what I said.  Only one work
25   detail per day; now is that the standard that's
                                              Page 139

1    BY MR. FREE:
2    Q    Do you see this, it's the same document;
3    right, it's a detainee payroll sheet?
4    A    Yes.
5    Q    It's created by GEO; right?
6    A    Yes.
7    Q    Probably the classification office, since
8    at the bottom it says:
9        "If detainees are not on the list, please
10       let classification know so I can verify
11       that they have been cleared and added to
12       the list.  Thank you."
13       Do you see that?
14   A    Yes.
15   Q    All right.  Page -- it's the third page of
16   this sGEOuence.  We have three volunteers; do you
17   see that?
18   A    Yes.
19   Q    Same question, what -- what did they do?
20   A    I don't know.  It doesn't state.
21   Q    How did they get on this list?
22   A    I'm not sure.
23   Q    Okay.  And I'm assuming the answer will be
24   the same for every one of the notations on this
25   page; correct?
                                              Page 141

36 (Pages 138 - 141)

Page 142

1    A   Correct.
2    Q   Okay.  Now, if we went through and counted
3  all of the -- let me back up.
4        These are all paid positions; right?
5    A   Payroll sheets, yes.  Paid positions.
6    Q   Okay.  So everybody on here should be
7  receiving $1 for the work that they performed;
8  correct?
9    A   To my knowledge, yes.
10   Q   All right.  And so this is well over
11 40-paid positions; isn't it?
12   A   Yes.
13   Q   And GEO creates one of these every day;
14 doesn't it?
15   A   Yes.
16   Q   Okay.  And in fact, GEO prefills the
17 assignments for each section.  As you can see, first
18 page is first shift intake, second shift intake,
19 third shift intake.  We've got some workers, second
20 page is laundry.
21       Are you following along with me?
22   A   Yes.
23   Q   All right.  Third page is B dorm, barber;
24 do you see all that?
25   A   Yes.

Page 143

1    Q   Okay.  So GEO creates this every single
2  day; right?
3    A   Yes.
4    Q   GEO knows that there are more than 40-paid
5  positions; correct?
6    A   Yes.
7    Q   What's a clean team?
8    A   Sir?
9    Q   What is a clean team?
10   A   Be a team of individuals to go in and deep
11 clean any specific area of the facility.
12   Q   Who are these individuals?
13   A   Could be staff, it could be detainees that
14 are a part of a work program.
15   Q   Whose responsibility is it to perform the
16 deep cleans?
17   A   It can be staff, it can be part of detainee
18 Volunteer Work Program.
19   Q   Okay.  So if a detained immigrant worker is
20 participating in a clean team, then those
21 individuals should be paid; correct?
22   A   Yes.
23   Q   Okay.  How often are clean teams used at
24 Adelanto?
25   A   I don't know the specific times.

Page 144

1  Periodically.
2    Q   As you sit here today testifying on behalf
3  of The GEO Group, about the sanitation policy at
4  Adelanto, among other things; you don't know and you
5  cannot tell the Plaintiffs how often a clean team is
6  used?
7    A   Not exactly, no.
8    Q   Approximately?
9    A   Periodically.
10       MR. FREE:  This was previously marked as
11 Exhibit 32 to your deposition.
12       (Previously marked Exhibit No. 32 was
13 identified for the record.)
14       MR. FREE:  So you've seen this before,
15 you've testified about it before.
16       These are GEO-Novoa 1216 through 1219.  I'm
17 going to start at 1219.  Actually, 1218.  Excuse me
18 BY MR. FREE:
19   Q   Who's Todd Larson?
20   A   He is a corporate employee with the food
21 service department.
22   Q   And does -- I would submit that your name
23 appears in the cc line, but the names that appear in
24 the two lines are all food service workers;
25 correct?

Page 145

1    A   Correct.
2    Q   Okay.  Subject is clean team:
3        "Good day everyone.  As you all know, we
4        need a clean team in place in each of your
5        facilities.
6        "This is a requirement."
7        So Todd Larson works at GEO corporate in
8  Florida; correct?
9    A   Yes.
10   Q   And among the facilities that GEO needs a
11 clean team present in -- in place for, is Adelanto;
12 correct?
13   A   Yes.
14   Q   And this was going to be discussed during
15 Mr. Donahue's conference call on April 4th, 2018;
16 correct?
17   A   That's what it says, yes.
18   Q   Who is Mr. Donahue?
19   A   He is the president and senior vice
20 president of the company.
21   Q   Okay.  The second to last paragraph on 28,
22 the 1218, it says:
23       Please take out the items you don't have
24       or are not relevant and put it in items
25       like; base boards, under sinks, behind

1      equipment and mop closet, grates, ceiling
2         vents, under chow hall tables, doors and
3         handles, and any other items of relevance.
4      You may have -- only have one or two shifts
5         instead of four, but put the roster of
6         inmates/detainees on the schedule.
7         Do you see that?
8    A    Yes.
9    Q    Okay.  Is it correct to read Mr. Larson's
10   email to Ms. Buczkowske and you, among others, as
11   requiring GEO's food service personnel to make a
12   list of tasks that the clean team is going to
13   complete?
14   A    Yes.
15   Q    And then the last paragraph on 1219 says:
16        "FYI:  The clean team is not just your
17        regular inmate detainee workforce that
18        washes dishes and cooks and serves.
19        "This is a totally separate clean team
20        crew.
21        "Also if you can't do this or get it
22        started, we need documentation in memo
23        format, not the body of the email, stating
24        why you cannot with your AW or warden's
25        acknowlegdement."

Page 146

1      Do you see that?
2    A    Yes.
3    Q    Is there a clean team at Adelanto?
4    A    They've been used.
5    Q    Okay.  That first page of this document has
6    an email actually second page has an email from you,
7    Mr. Janecka, that says:
8        "Please do not forget to have this
9        completed today.
10       Have Deputy Warden Alan review it prior to
11       sending.  I am planning to leave at noon
12       today."
13       And that's March 27, 2018, at 6:05 p.m.
14   You sent that email to Patricia Love.
15       Who's Patricia Love?
16   A    She's a former assistant facility
17   administrator.
18   Q    Okay.  You sent this email; right?
19   A    Yes.
20   Q    Okay.  The first page, 1216, it says:
21       We will utilize -- this is Patricia Love to
22   you, on March 27, 2018, at 6:05 p.m.  So not before
23   you left at noon, but close enough.
24       "Please find attached the clean crew
25       documents for east and west.

Page 147

1      "As you will note, Michelle and Dionne did
2         a great job of going the extra mile to
3         formulate a document inclusive of daily,
4         weekly, biweekly, and monthly clean crew
5         work schedule."
6         Do you see that?
7    A    Yes.
8    Q    "We will utilize four crews of three
9         detainees from 7:00 a.m. to 1200 hours,
10        1500 to 7:30 hours at west.
11        "And four crews of two detainees from 7 to
12        1200 hours, and 1400 to 1800 hours at east
13        on a daily basis."
14        Do you see that?
15   A    Yes.
16   Q    "We have requested the new jobs through
17        classification work crew assignments."
18        Do you see that?
19   A    Yes.
20   Q    "We will fill the crews as we have
21        detainees available."
22        Now, why did Ms. Love request these jobs
23   through the classification work crew assignments
24   part of GEO?
25   A    It's part of the Voluntary Work Program.

Page 148

1    Q    Okay.  So if you're a GEO employee and you
2    need to get workers for the clean team, like
3    Ms. Love did or Ms. Buczkowske, the place to email
4    is the worker classification?
5    A    Right.
6    Q    Okay.  Ms. Love didn't just broadcast an
7    all east or an all west email saying we need
8    workers; right?
9        She went to the place where the Voluntary
10   Work Program is run; right, which is the
11   classification work crew assignments?
12   A    Correct.
13   Q    Okay.  Then the final email on this chain
14   is on the top.  It says in the second paragraph:
15       If we don't have detainees currently
16       assigned to the project or if there's the
17       need to make a new job within the detainee
18       work program, we should identify that in
19       memo format, as well as what we are doing
20       to fill those positions.
21       It can also be explained how fast
22       kitchen -- our detainee kitchen crew turns
23       over from week to week.
24       We need to think outside the box on this
25       one, as I can only assume Mr. Donahue will

Page 149

38 (Pages 146 - 149)

1     be.
2         It wouldn't be good to have an "I don't
3     know" answer on the 4th.
4         That's from Nathan Allan to Patricia Love
5     and cc'ing Joanne Crowder.  It also went to Michelle
6     Keeney, Dionne Schocky, and you were listed on this
7     email as well.
8         Do you see that?
9     A   Yes.
10    Q   After March 28, 2018, did GEO create a
11    clean crew or a clean team?
12    A   Yes.
13    Q   And that clean team now operates in the
14    kitchen; right?
15    A   Currently?
16    Q   Yes, sir.
17    A   Not to my knowledge.  Periodically it
18    does.
19    Q   It says:
20        We will utilize four crews of three
21        detainees from 7:00 a.m. to 12:00 a.m.,
22        1500 to 1730, on west, and then same on
23        east, different hours on a daily basis.
24        When did that change?
25    A   I don't know the specific time, but it

Page 150

1     doesn't run, to my knowledge, at that -- at this
2     time on that schedule.
3     Q   Do you have any knowledge of the April 4th
4     call with Mr. Donahue about clean teams?
5     A   Not that I can remember, no.
6         MR. FREE:  Okay.  Let's take a break and
7     come back at 3:50.
8         So let's do 9 minutes.
9         Okay?
10        THE VIDEOGRAPHER:  The time is 3:41, and
11    we're going off the record.
12        THE VIDEOGRAPHER:  The time is 3:55 and we
13    are back on the record.
14    BY MR. FREE:
15    Q   Mr. Janecka, is there anything about your
16    testimony so far that you need to alter or amend?
17    A   No, sir.
18    Q   Okay.  Beginning this part of today's
19    deposition we agreed that all work in the Voluntary
20    Work Program should be voluntary, didn't we?
21    A   Yes.
22    Q   We also agreed that ICE's Performance Based
23    National Detention Standard, Section 5.8, contains a
24    section called personal housekeeping; right?
25    A   Yes.

Page 151

1     Q   And that section specified that detained
2     immigrants at Adelanto -- well, not -- it doesn't
3     specify specific to Adelanto, but as applied through
4     the contracts, that work should be voluntary, with
5     the exception of personal housekeeping; correct?
6     A   The voluntary -- yes.
7     Q   Okay.  And GEO can't force detainees at
8     Adelanto to work, except for personal housekeeping;
9     correct?
10    A   Correct.
11    Q   What is personal housekeeping?
12        MR. BARNACLE:  Objection to form.
13        THE WITNESS:  Personal housekeeping is
14    their assigned living areas.
15    BY MR. FREE:
16    Q   What does that mean?
17    A   That means you make your bunk, you clean
18    your room that you live in, which includes your
19    lights, your walls, your floors, your toilets, your
20    sinks, and any general use area in your living area,
21    which is the dayroom area; which includes the TVs,
22    the tables, telephones; it's a common use area.
23    Q   It sounds a lot to me like just
24    housekeeping.
25        What's personal about cleaning a general

Page 152

1     area?
2     A   In any general use area.  Just like anybody
3     in your own house; you have your bedroom, you have
4     your kitchen, you have your living room.  You clean
5     where you live.  It's your living area.
6     Q   I might, if I wasn't paying a janitor to do
7     that.
8         So if I was paying a housekeeper to do
9     that, why would I clean it?
10        MR. BARNACLE:  Object to the form.
11        THE WITNESS:  The PBNDS standards allows
12    for personal housekeeping.
13        MR. FREE:  Okay.
14        THE WITNESS:  It's -- it's -- it's a
15    sanitary practice to clean up after yourself.
16    BY MR. FREE:
17    Q   Who's responsible for sanitation at
18    Adelanto?
19    A   Everyone.
20    Q   Including the detained immigrants?
21    A   Yes.
22    Q   What cleaning tasks does GEO maintain it
23    can require detainees to perform under the personal
24    housekeeping exception?
25    A   In their living areas, they can clean the

Page 153

39 (Pages 150 - 153)

1 floors, the walls, the sinks, the toilets, the
2 showers, the lights, the tables, the phones;
3 anything that's in their general use area.
4    Q    Not just they can, it's that GEO maintains
5 that they must; correct?
6    A    PBNDS standard states that they are
7 required to.
8    Q    No.  It doesn't.  The PBNDS standard simply
9 says "personal housekeeping," doesn't it?
10       MR. BARNACLE:  Object to form.
11       THE WITNESS:  Uh-huh.
12 BY MR. FREE:
13    Q    Is there anything in the PBNDS about floors
14 and windows and walls?
15    A    It's my interpretation that when you have a
16 house you have floors, you have walls, you have
17 ceilings, sinks; so it's housekeeping.
18    Q    That's your interpretation on GEO's behalf;
19 right?
20    A    Yes.
21    Q    Okay.  But Adelanto isn't a house, is it?
22       MR. BARNACLE:  Object to the form.
23 BY MR. FREE:
24    Q    It's a prison; right?
25    A    It's a detention facility.

Page 154

1    Q    Okay.  And the detained immigrants there
2 don't own it, do they?
3    A    No.
4    Q    In fact, they're not free to leave, are
5 they?
6    A    No.
7    Q    And The GEO Group is responsible for
8 ensuring they don't leave, isn't it?
9    A    Unless ICE authorizes their release.
10    Q    Correct.  And GEO receives tens of millions
11 of dollars each year from ICE to ensure that the
12 facility, among other things, is secured and
13 sanitary doesn't it -- sanitary, doesn't it?
14    A    Yes.
15    Q    And GEO submits to ICE a detainee voluntary
16 work plan that encompasses paid cleaning of each
17 dorm, doesn't it?
18    A    Yes.
19    Q    Then why is that personal housekeeping?
20       MR. BARNACLE:  Object to the form.  Asked
21 and answered.
22       THE WITNESS:  When you speak to the paid,
23 you're speaking to the detainee Voluntary Work
24 Program.
25       MR. FREE:  Yes, sir.

Page 155

1       THE WITNESS:  Yeah.  Part of the jobs that
2 are allowed by PBNDS is to have a janitorial-type
3 work or positions, and they have paid positions in
4 the living areas, if they've been approved.
5 BY MR. FREE:
6    Q    So GEO's position today is that the PBNDS
7 allows it to both pay janitors to clean the dorms,
8 but also to require everybody who lives in the dorms
9 to clean them; correct?
10    A    To clean up after themselves, personal
11 housekeeping, correct.
12    Q    Which detainee left any discernible impact
13 on a cieling or a wall that they're being asked to
14 clean?
15    A    Say that again.
16    Q    GEO, through you, describes this personal
17 housekeeping as not being limited to a bunk or a
18 living area, but extending through the entire dorm
19 or common area that everyone uses; correct?
20    A    To the -- to their pod -- to their living
21 area, yes.
22    Q    Whether it's a pod?
23    A    Yes.
24    Q    And that includes the windows and the
25 walls; right?

Page 156

1    A    It's part of the living area, yes.
2    Q    Right.  And so how do the detainees that
3 are selected to do mandatory labor, under the
4 sanitation policy, how did they make the walls
5 dirty?
6    A    Typically with pencils or coffee or --
7    Q    Okay.  And GEO is empowered to require
8 people to refrain from writing on the walls; isn't
9 it?
10    A    Correct.
11    Q    And so an individual who is -- you know,
12 written on a wall or spilled coffee on a wall could
13 be made to clean that up; right?
14    A    Can't be made to.  They can be told or
15 asked to, but we can't force them to clean
16 anything.
17    Q    What happens if they say no?
18    A    Then they say no.  They may be written --
19 there are a list of standards that PBNDS allows for
20 12 or 13 different sanctions that could be
21 applied.
22    Q    One of them is administrative segregation;
23 correct?
24    A    That is one of the sanctions.
25    Q    And up to 72 hours of disciplinary

Page 157

1  segregation, in addition to 72 hours in
2  administrative segregation, if you're found guilty
3  of refusing to clean your assigned living area;
4  correct?
5      A   No.  It states up to 72 hours -- I can't
6  quote the exact language, but there is a PBNDS
7  standard and sanction to that effect, yes.
8      Q   Do you have any reason to doubt that what I
9  just said is accurate?
10     A   No.
11     Q   Okay.  So GEO can force someone either to
12  clean or to be punished; right?
13     A   No.  I can't force them to do anything.
14     Q   But you can punish them if they don't, if
15  you're GEO; correct?
16     A   You could, within the PBNDS standards.
17     Q   In fact, that's also in the local handbook;
18  correct?
19     A   Correct.
20     Q   And in fact, being neat and sanitary and
21  having cleanliness is a prerequisite, according to
22  GEO, for participating in the Voluntary Work
23  Program; right?
24     A   Yes.
25     Q   And so if you do not complete your housing
                                              Page 158

1  unit sanitation policy tasks, which is the
2  sanitation policy, then you cannot participate in
3  the VWP; right?
4      A   If it's been documented that you do not
5  clean your living area -- you don't make your bed,
6  you don't clean your cell, you never flush your
7  toilet -- it can be part of a process of taking a
8  look at what their sani -- daily sanitary habits
9  are, if you're going to apply for a position.
10     Q   So the answer to my question is "yes"?
11     A   Can be, yes.
12     Q   Okay.  What is personal about scrubbing a
13  shower that you yourself didn't use in the personal
14  housekeeping requirement?
15     A   I'm not saying a shower they didn't use.
16  You should clean up after yourself after you use a
17  shower.  That's personal housekeeping.
18     Q   That's personal housekeeping, is if you use
19  the shower, clean it up; if you use the toilet,
20  flush it; is that what you're saying?
21     A   Yes.
22     Q   But GEO requires additional tasks that it
23  calls personal housekeeping; right?
24     A   We have volunteer janitorial program in the
25  Voluntary Work Program that does the deep cleaning
                                              Page 159

1  of the living areas.
2      Q   Okay.
3      A   And they can work anywhere from 30 seconds
4  to 4 hours and still get paid their $1.
5      Q   So those are the people who are working for
6  $1, can do these deep cleans; right?
7      A   Yes.
8      Q   The personal housekeeping, if I understood
9  what you just said, is limited, in GEO's
10  interpretation, to keeping the area clean that
11  you've used; is that right?
12     A   Where you live.
13     Q   So it's tied -- well, not just where you
14  live but -- just because we live in a pod, you and
15  I, for example, doesn't mean that if I never use the
16  microwave, I should clean the microwave; right?
17         I mean, if it -- I'm trying to understand
18  GEO's definition of personal housekeeping, because I
19  can't find it anywhere.
20         Is there a -- is there a place I could look
21  to find what GEO defines as personal housekeeping?
22     A   It's their liv -- it's their living area.
23  Any general use areas.
24     Q   How do I know that, what's the document
25  that shows us?
                                              Page 160

1      A   I don't have a document to show you.
2      Q   Okay.  And so all I've got is your
3  testimony, on behalf of GEO, under oath, and you're
4  telling the Plaintiffs that there is no document
5  that defines personal housekeeping at Adelanto,
6  first of all; correct?
7      A   Not that I'm aware of.
8      Q   Well, you're testifying about GEO, you're
9  testifying about the PBNDS, your're testifying about
10  the housing and the sanitation policy, that there's
11  a document that you can think of?
12     A   There's none that I can think of.
13     Q   Okay.  And then I'm also trying to
14  understand -- I think I understand you to say that
15  if you use the area of a facility and you make a
16  mess, you should clean that mess up; so in other
17  words, if you write on the wall in pencil, you
18  should clean that up; is that right?
19     A   You should.
20     Q   And if you -- and GEO can require you to;
21  right?
22     A   Can tell you to, or ask you to.
23     Q   And if you do not, GEO can punish you;
24  correct?
25     A   Allowed within PBNDS, yes.
                                              Page 161

41 (Pages 158 - 161)

1    Q   And within GEO's applicability -- or
2  application of the PBNDS at Adelanto; right?
3    A   Yes, it's allowed.
4    Q   But that's for cleaning up your own messes,
5  your own personal messes; right?
6        In other words, does GEO maintain that it
7  can require detained immigrants to clean up other
8  peoples messes in common living areas as a personal
9  housekeeping requirement?
10   A   Just speaks to the general use areas and
11 their living areas.
12   Q   So if you've made a mess -- I don't think
13 that's the answer to my question.
14       If you've made a mess, in your general use
15 area, does the personal housekeeping requirement
16 require you to clean that mess up?
17   A   You should.
18   Q   But does it require it?
19   A   I can't make them but they should, yes.  I
20 can't require anybody.  I can't -- staff cannot take
21 a rag and put it in their hand and make them clean
22 anything.  Can't require them, they can refuse.
23   Q   Okay.  Well, they can refuse, but then
24 they're subject to discipline; right?
25       I'm not talking about physically forcing
Page 162

1  them to grab the rag.  I'm talking about the rules.
2        Okay?
3        I'm talking about like the handbook that
4  they get.  I'm talking about GEO's policies.
5        Nobody's alleging, I don't believe, that
6  anybody from GEO is going to take a rag and force it
7  into a detained immigrant's hand.  That's not what
8  I'm talking about.
9        So just "require," when I'm using it, so
10 that we're clear, and GEO can testify to my question
11 is; do GEO's rules allow guards in a common area to
12 make a detainee clean up a mess that he or she did
13 not make?
14   A   Can't make them, but we can say clean that
15 area up.
16   Q   So you can order -- instead of "make," why
17 don't we call it "order."
18       GEO would be well within its rights, under
19 its own policy, to order a detained immigrant, in a
20 living area, to clean up -- let's say to scrub a
21 wall that's dirty, even though that person did not
22 create that mess; is that correct?
23   A   Can ask them to, yes.
24   Q   When you say "ask," it's not an ask when
25 there's a policy, and there's a penalty behind it,
Page 163

1  is it?
2    A   You can still ask first because the --
3    Q   Okay.
4    A   It all starts with the housekeeping plan,
5  and then it will go to the Volunteer Work Program.
6  If someone -- a detainee in a living area, and if
7  you asked them, told them, ordered, whatever words
8  you want to use --
9    Q   I want to use --
10   A   -- to clean that mess whatever it is and he
11 doesn't -- he or she decides not to, then you ask
12 your voluntary approved workers; can you -- will you
13 clean that up for me, and then from there if they
14 refuse to do it, staff will clean it up.  It's a
15 three-step process.
16   Q   Where's that process laid out?
17   A   It's not laid out.  That's just the process
18 that's available.
19       You have your housekeeping -- daily
20 housekeeping that PBNDS speaks to, the Detainee
21 National Handbook speaks to it, our handbook speaks
22 to it, and then we have our Voluntary Work Program,
23 which some can be janitorial-type workers in the
24 living areas.
25       And if it still isn't getting done, then
Page 164

1  staff step in and get the place clean.
2    Q   When is the last time -- well, actually
3  never mind.
4        I still don't have an answer to my question
5  I don't think.  If I can ask it in a different way
6  that would make it easier to answer, please tell me
7  what part of it would be easier to answer.
8        Does GEO's housing unit sanitation policy,
9  the HUSP at Adelanto, require detained immigrants to
10 clean up after messes that they did not make?
11   A   They can.
12   Q   It does.  It's "yes" or "no."
13       Does it, or does it not?
14   A   Without reading it, I don't know off the
15 top of my head.
16   Q   Does the personal housekeeping exception,
17 in the PBNDS, to the general rule that all work must
18 be paid and that all work must be voluntary?
19       We agreed they're going to work, they've
20 got to get paid generally; right?
21       Detained immigrants have to get paid for
22 work they're doing, and it has to be voluntary GEO
23 can't make them do it, except for personal
24 housekeeping; right?
25   A   Correct.
Page 165

1    Q   Okay. So does the personal housekeeping
2  exception cover work that is performed by detained
3  immigrants cleaning things or scrubbing things or
4  sweeping floors or mopping, that cleans up messes
5  that the individual detained immigrant, him or
6  herself, did not make?
7       MR. BARNACLE: Object to the form.
8       THE WITNESS: It can, but I cannot speak --
9  I didn't write that definition of pers -- there is
10 no definition that speaks to the question you're
11 answer -- asking.
12 BY MR. FREE:
13   Q   Who at GEO have you spoken with about the
14 definition of personal housekeeping?
15   A   I haven't, other than -- I haven't spoke to
16 anyone about it.
17   Q   When was the first time you came to a
18 definition of personal housekeeping?
19   A   With the understanding of PBNDS, the
20 Detainee National Handbook, and our written handbook
21 and policies that speaks to their housing area,
22 living area.
23   Q   Anything else?
24   A   No.
25   Q   That was a response to how you came to that

Page 166

1  understanding.
2       My question was when; like this year, last
3  year, beforehand?
4    A   Approximately four or five years ago.
5    Q   Okay. And why do you remember that time as
6  being the time when you came to that
7  understanding?
8    A   Because that's about the time I became
9  employed at Adelanto.
10   Q   How did you -- you came to that
11 understanding by reading the authorities that you've
12 just come up with; right?
13   A   Correct.
14   Q   So under GEO's interpretation of personal
15 housekeeping, the housekeeping that a detained
16 immigrant can be required to perform -- they're not
17 going to put a rag in their hand, but under the
18 policies they can be required to do it; that can
19 include housekeeping tasks that are not personal
20 specifically to the detainee?
21   A   It can.
22   Q   Okay. Why?
23   A   It's their general living area. It's part
24 of their house. They share it with several other
25 individuals.

Page 167

1    Q   Well, let's talk about that then. If the
2  analogy is to a house, and you're living in a house
3  with 80 people, why is it that you have to clean up
4  the other 79 people's mess?
5    A   Well, if you're going to put it in that
6  context, I lived in a house with five people and we
7  all cleaned up different areas of our house, whether
8  we made the mess or not. We lived there, it was our
9  living area.
10   Q   Was the landlord paying the person to do
11 all of that?
12   A   Excuse me?
13       MR. BARNACLE: Object to the form.
14 BY MR. FREE:
15   Q   Was a landlord paying a person to do all
16 that in your house?
17       MR. BARNACLE: Object to the form.
18       THE WITNESS: It was required by --
19 BY MR. FREE:
20   Q   By your four roommates?
21   A   Yes.
22   Q   Was anybody sent to segregation if they
23 didn't do it?
24       MR. BARNACLE: Object to the form.
25       THE WITNESS: No.

Page 168

1  BY MR. FREE:
2    Q   Was anybody threatened with criminal
3  prosecution if they didn't do it?
4        MR. BARNACLE: Object to the form.
5        THE WITNESS: No.
6        MR. FREE: All right.
7  BY MR. FREE:
8    Q   So there's no definition of personal
9  housekeeping written down anywhere that -- in GEO's
10 records; correct?
11   A   Correct.
12   Q   The personal housekeeping requirement, as
13 GEO interprets it, is not limited to your own
14 personal mess; it's lim -- it's limited only to
15 where GEO houses you.
16       The only limit to the bound that you could
17 be forced to clean, or under threat of sanction, is
18 the room that you're looked inside; right?
19   A   No.
20   Q   What could GEO not require a detained
21 immigrant to do, cleaning wise, under the housing
22 and sanitation policy, what's the limit?
23   A   Could not require him to do anything that
24 is unsafe.
25   Q   Anything else?

Page 169

43 (Pages 166 - 169)

1    A    Just general housekeeping.

2    Q    What is "general housekeeping"?

3    A    Sweeping, mopping, wiping; general

4 housekeeping.

5    Q    Where is general housekeeping defined?

6    A    I don't see a definition in any of the

7 standards.

8    Q    Then how did you come to general

9 housekeeping as a distinguishing factor from

10 personal housekeeping?

11    A    It speaks to housekeeping of a gen -- of

12 their living area and general use areas; and general

13 housekeeping is typically sweeping, wiping, and

14 wiping.

15    Q    What?

16    A    Could be the floor, the table, their desk;

17 the things that are utilized in their living area.

18    Q    Okay.  So how does general housekeeping

19 material differ -- materially differ from personal

20 housekeeping?

21    A    Personal would be your actual -- anything

22 that you've touched, anything that you've messed up,

23 and just being in a living area, is going to become

24 dusty and dirty and what have you.  It's not -- it's

25 part of their living area.

Page 170

9    Q    Okay.

10    A    So may clean the janitor's closet, they may

11 clean under the sinks, under the microwaves.

12          There's other tasks that they can perform,

13 or do it on a much thorough -- or more thorough

14 manner.

Page 172

1    Q    I don't understand your answer to my

2 question.

3          My question was how does general

4 housekeeping differ from personal housekeeping, what

5 is the line?

6    A    It's generally the same.

7    Q    So it's the same thing?

8    A    Pretty close, yes.

9    Q    What's the difference?

10    A    I don't really see a difference.  Personal

11 and general is your living area.

12    Q    Not only does GEO interpret the PBNDS to

13 require detained immigrants to do personal

14 housekeeping, it also requires general housekeeping;

15 correct?

16    A    It requires personal housekeeping, and the

17 cleaning of your general use areas.

18    Q    What's left for the dorm porters to do?

19    A    They may deep scrub, they may do a good

20 thorough mopping, they may clean the phones, they

21 may scrub the walls above, they may clean the

22 recreation areas that are in between the -- that

23 separate two pods.

Page 171

14    Q    And which part of that falls outside of the

15 housekeeping requirements that GEO applies at

16 Adelanto?

17    A    Falls what?

18    Q    Outside of the housekeeping requirement

19 that GEO applies at Adelanto?

20    A    Falls outside of it?

21    Q    Yes, sir.

22    A    None of it.

23    Q    None of it.  It's all required isn't it?

24    A    Can be --

25    Q    Is it or not?

Page 173

44 (Pages 170 - 173)

1    A   -- as part of PBNDS, yes.  You're
2    correct.
3    Q   No.  That's not the question.
4        At Adelanto, GEO requires detained
5    immigrants to be responsible for cleaning all of
6    that for no money; correct?
7    A   For maintaining it in a sanitary and clean
8    manner, yes.
9    Q   Okay.  But you have volunteer workers that
10   you only have to pay $1 a day to do that; why is it
11   that you, as GEO, require detained immigrants to do
12   it?
13       MR. BARNACLE:  Object to the form.  Asked
14   and answered.  Five times.
15       THE WITNESS:  Because the general
16   housekeeping may take two minutes.  The detainee
17   volunteer worker may be assigned a task that can
18   take two hours.
19   BY MR. FREE:
20   Q   Oh, okay.  So the difference is a time?
21   A   It's the thoroughness of the cleaning.
22   There's general housekeeping, which could be
23   sweeping, mopping, and wiping.
24       And then you could have a volunteer
25   janitor, or that's part of the work program that may

Page 174

1    be asked to clean a janitor's closet, may be asked
2    to deep clean the showers, could be asked to wipe
3    down every toilet, every wall.
4        It -- it varies.  They get more of a
5    detailed work assignment.
6    Q   What's a general clean up?
7    A   Could be just picking up the newspapers off
8    the table, organizing them; any trash that's on the
9    floor pick it up, and that can be it.
10   Q   Is that a personal housekeeping task?
11   A   Could be a personal housekeeping.  It's --
12   Q   Is it or is it not, under GEO's
13   interpretation of its obligations to ICE and the
14   PBNDS is a general clean up, as you've just
15   described it, a personal housekeeping task or not?
16   A   Yes.  It would be a personal
17   housekeeping.
18   Q   Okay.
19       MR. FREE:  Can I have the video, please?
20       Kind of like an overview.  This is what it
21   looks like (indicating).  We're back at Exhibit 80.
22   BY MR. FREE:
23   Q   See it?
24   A   Yes.
25   Q   In the second bullet point -- the first

Page 175

1    bullet point it says:
2        "The four basic responsibilities of GEO for
3        you are:
4        "First, you will be living in a facility
5        that is both safe and secure.
6        "The staff perform their duties knowing
7        that the environment is both clean and
8        secure."
9        This is a responsibility that GEO tells
10   detained immigrants it has to them; do you see
11   that?
12   A   Uh-huh.
13   Q   And yet --
14   A   Yes.
15   Q   Okay.
16       "Next, your living conditions will be clean
17       and sanitary."
18       So that's another responsibility that GEO
19   has to detained immigrants; do you see that?
20   A   Yes.
21   Q   And then you say:
22       "However you will play a major role in
23       this.
24       "What I mean is you must take advantage of
25       the shower facilities regularly and

Page 176

1        practice good hygiene.
2        "Also, your bunk and storage area must be
3        clean and free of clutter and food debris."
4        Do you see that?
5    A   Yes.
6    Q   All right.  The next page, which continues
7    this responsibility section, you tell -- this is a
8    message from you; right?
9    A   Okay.
10   Q   "Yes"?
11   A   Yes.
12   Q   Okay.
13       "It can't be emphasized enough how
14       important it is to listen to detention
15       staff in your housing unit and as you are
16       moved about the facility.
17       "The staff is duty bound to abide by our
18       own rules and regulations which will not be
19       explained to you."
20       Do you see that?
21   A   Yes.
22   Q   "Know that the officers will not impose any
23       hardships or any undue danger."
24       Do you see that?
25   A   Yes.

Page 177

45 (Pages 174 - 177)

1    Q   Okay.  Now, then you discuss a detainee
2  handbook.  Next page is intake and classification.
3  Then we've got sanitation in housing unit.
4        Do you see that?
5    A   Yes.
6    Q   "Your bunk and bed area is your own
7    responsibility."
8        Do you see it?
9    A   Yes.
10    Q   Okay.
11        You cannot use it for towel drying or
12    making a quite tent for privacy.
13        Keep your bunk and surrounding floor clean
14    of waste, papers, cups, litter and other
15    trash.
16        Wipe up spills, cleaning supplies are
17    provided to you by the housing unit
18    officer.
19        Is that personal housekeeping?
20    A   That's personal housekeeping, yes.
21    Q   Okay.  And the next slide, housing unit it
22  says:
23        "You may keep one pair of shoes under the
24    bunk while sleeping at night or during the
25    daytime before or after dorm clean up."

Page 178

1  mentioned that that part of the dorm clean up was --
2  could have been done by detainees during a general
3  clean up or by volunteer work program workers.
4    A   Or it could be done by staff if necessary,
5  yes.
6    Q   How often does staff actually clean the
7  dorms?
8    A   Periodically.  You'll see officers with a
9  mop or a broom.
10    Q   Is that part of their job description?
11    A   Any other duties as assigned, yes, sir.
12    Q   Safety and dorm sanitation; do you see
13  that?
14        Here it is.  You got it.  Second bullet
15  point.
16        "Each and every detainee must participate
17    in the sanitation program."
18        It's the housing unit sanitation program;
19  right?
20    A   Uh-huh.
21    Q   And that's the one that purports to require
22  personal housekeeping duties of detained immigrants
23  in their pods; right?
24    A   Yes.
25    Q   "A list of detainees is developed each day

Page 180

1      What's dorm "clean up"?
2    A   It would be the general clean up of the
3  living area, or if the Voluntary Work Program
4  workers were out doing their work.
5    Q   So it could be a general clean up performed
6  for no money by detained immigrants at GEO's
7  insistence, or it could be the Voluntary Work
8  Program participants doing it; right?
9    A   It could be the volunteer program, or it
10  could be the general housekeeping of the unit.
11    Q   So there's no distinction there between
12  what the VWP workers might be doing, or the housing
13  unit sanitation laws state would include --
14        MR. BARNACLE:  Object to the form.
15        MR. FREE:  -- is that right?
16        Is that right?
17        THE WITNESS:  Distinction?
18        MR. FREE:  Yes, sir.
19        THE WITNESS:  This one doesn't speak to the
20  Voluntary Work Program.  This is talking about the
21  personal housekeeping and keeping of your own areas.
22        I think there's another section in here
23  that speaks to the Voluntary Work Program.
24  BY MR. FREE:
25    Q   There is, and we'll get to that.  But you

Page 179

1        and is posted for viewing."
2        Right?
3    A   Yes, that's right.
4    Q   Who develops the list of detainees?
5    A   I'm not familiar with that list of
6  detainees.  It should be their housing unit
7  roster.
8    Q   But who develops it, who makes the list?
9    A   I'm not sure.  I don't know.
10    Q   If I told you that GEO's housing unit
11  sanitation policy invests the dorm officer with the
12  responsibility with creating the list every day and
13  posting it; does that sound right to you?
14    A   It could be, yes.
15    Q   Well, so GEO's testimony today here is
16  you're in the sure who develops the list?
17    A   That's correct.
18    Q   Okay.  Then:
19        "During a general clean up, all detainees
20    must participate."
21        Right?
22    A   Yes.
23    Q   And it is GEO's testimony today, if I've
24  understood you, is that a general clean up is the
25  same as personal housekeeping, because the only

Page 181

46 (Pages 178 - 181)

1   thing that GEO can require detainees to do is
2   personal housekeeping, without paying them, and
3   everybody is required to participate in a general
4   clean up; right?
5        MR. BARNACLE:  Object to the form.
6        THE WITNESS:  It's part of their living
7   area, yes.  It's housekeeping.  Yes.
8   BY MR. FREE:
9   Q   But is it personal housekeeping if it's a
10   general clean up?
11   A   Yes.



Page 182

---

12        MR. FREE:  Okay.  All right.  I think we're
13   done with the video for now.
14        This was previously marked as Exhibit 22 to
15   your deposition.
16        (Previously marked Exhibit No. 22 was
17   identified for the record.)
18        MR. FREE:  We'll look at it now.  It's
19   GEO-Novoa 221 through 227.
20        And this is the detainee work program --
21   this is the detainee work plan, title number 8.1.8.
22   BY MR. FREE:
23   Q   Do you see that?
24   A   Yes, sir.
25   Q   Okay.  This is the plan that GEO is

Page 183

---

1   required by contract to create; correct?
2   A   Yes, sir.
3   Q   And you see, on page 2 of 7, required
4   working assignment -- work assignments, work
5   assignments are voluntary; do you see that?
6   A   Yes.
7   Q   "Detainees are not required to work except
8        to do personal housekeeping, and to clean
9        their housing area."
10        Do you see that?
11   A   Yes.
12   Q   Why is that conjunctive, why is there an
13   "and" there?
14   A   Because that's what they're required to
15   keep.  That's part of their house.  That's their
16   living area.
17   Q   Well, then why do you need to say "and to
18   clean their housing area," if it's included in
19   personal housekeeping?
20   A   To me it's all -- it's all one.  Personal
21   housekeeping is you may make your own bed, you may
22   put your own shoes under your own bunk; and then you
23   have your general use areas of your living area.
24   Q   You approved this policy; right?
25   A   Correct.

Page 184

---

1   Q   You say cleaning their housing area is all
2   the same as personal housekeeping to you; right?
3   A   It can be.  Yes.  It's all general
4   housekeeping, except for your personal items that
5   belong to you.
6        If you ordered your commissary, you paid
7   for it, and you bought it.  These are your shoes
8   that are issued to you and nobody else wears them,
9   personal, but yet you do also take those items into
10   the general use area of the living area.
11        So it's required that you take care of
12   both.
13   Q   We're now going to -- but why would you
14   need to distinguish between the two in this
15   policy?
16   A   To make sure that it is clear.
17   Q   To whom?
18   A   To staff and the population.
19   Q   Do you believe that this -- the language of
20   this policy, which the population cannot read;
21   right?
22        No detained immigrant at Adelanto has
23   access to this policy; correct?
24   A   I'm not for sure.
25   Q   As you sit here today, you're not sure

Page 185

---

47 (Pages 182 - 185)

1 whether GEO detainees have copies of the detainee
2 work program section of the policy and procedural
3 manual that GEO maintains at ICE?
4     A    I'm not sure.  They could maybe request a
5 copy.  I'm not sure.
6     Q    So GEO doesn't know?
7     A    I'm not 100 percent sure if these documents
8 are on our law library computers.  I'm not 100
9 percent sure.  No.  I can't answer that.
10    Q    Okay.  So on behalf of GEO, you're unable
11 to answer that question?
12    A    No.
13    Q    Okay.  We can agree, can't we, that the
14 Performance Based National Detention Standards do
15 not include any term requiring detainees
16 specifically to clean their housing area, they only
17 include the term "personal housekeeping"; correct?
18        MR. BARNACLE:  Object to the form.
19        THE WITNESS:  Speaks to general
20 housekeeping.
21        MR. FREE:  No, it doesn't.  It's -- it's --
22        MR. BARNACLE:  Those are my documents.
23 Thank you.
24        MR. FREE:  Thanks.
25 BY MR. FREE:

Page 186

1     Q    There's nothing in Section C, of the PBNDS,
2 at page 8447.
3     A    Okay.  By whatever this policy also speaks
4 to a contractual -- the ACA standards, which I'm not
5 sure what the ACA standards state.
6     Q    So as you're sitting --
7     A    And the Detainee National Handbook, that
8 we're required upon intake, speaks to the general
9 use areas and personal housekeeping it
10 differentiates -- or separates the two.  But it's
11 all inclusive in one section.
12    Q    So as you sit here, and are testifying on
13 behalf of The GEO Group, you're not sure what the
14 ACA standard says; correct?
15    A    I can't quote every ACA standard, but it
16 relates to -- it appears one, two, three, four,
17 five, six different ACA standards that has to do
18 detainee with this policy.
19    Q    What happens, under ICE's contract with
20 GEO, when two standards that GEO's required to
21 follow conflict?
22        MR. BARNACLE:  Object to the form of the
23 question.  Calls for a legal conclusion.
24        THE WITNESS:  I can't answer that.  I don't
25 know.

Page 187

1 BY MR. FREE:
2     Q    As you sit here today, on behalf of The GEO
3 Group, you can't tell me what ICE's contract with
4 GEO says, it says, regarding the conflict of two
5 standards?
6     A    No.
7     Q    Okay.  Do you concede that the contract
8 states that when the two standards may apply, the --
9 essentially the more favorable one for detained
10 immigrants is the one that applies, or the more
11 restrictive on GEO's conduct is the one that the
12 contract says to apply?
13        MR. BARNACLE:  Object to the form.
14        THE WITNESS:  I don't know.
15 BY MR. FREE:
16    Q    So GEO interprets the contract as not
17 requiring the company to apply the more favorable
18 standard to detainees when they're conflicting
19 contractual standards?
20    A    I don't know that information specifically.
21 I can't speak to it.
22    Q    Today?
23    A    Excuse me?
24    Q    Today; right?
25    A    Correct.

Page 188

1     Q    Okay.  Let's look at it.
2         You just don't know, as GEO's
3 representative, what GEO should do when there's a
4 question as to two standards the company could
5 apply, under the contract, what is required of
6 GEO?
7     A    I can't -- as I said earlier, I can't speak
8 to that.  I'm not familiar with that in the
9 contract.
10    Q    But you have pointed out that there could
11 be a conflict between GEO's housing unit sanitation
12 policy and the ACA, potentially, and the PBNDS;
13 right?
14        MR. BARNACLE:  Objection to form.
15        THE WITNESS:  What I was pointing out is
16 the contract requires us to become ACA accredited.
17 This not only reflects PBNDS, but it also reflects
18 ACA standards that we're contractually obligated to
19 fulfill.
20 BY MR. FREE:
21    Q    And as you sit here today, you don't know
22 what GEO's responsibility is to ICE when those two
23 standards raise a question as to which one
24 applies?
25        MR. BARNACLE:  Object to the form.  Asked

Page 189

48 (Pages 186 - 189)

1  and answered.
2       THE WITNESS:  I can't speak to something
3  that I'm not familiar with the language and the
4  contract, no.
5       MR. FREE:  Okay.  All right.
6  BY MR. FREE:
7    Q    Now, GEO's rules at Adelanto governing the
8  housing unit sanitation policy allow GEO to
9  discipline detained immigrants if they refuse to
10  participate?
11   A    In accordance with PBNDS, yes.
12   Q    I'm not sure why you didn't mention the
13  ACA.
14       Is it PBNDS and the ACA, or is it something
15  else?
16   A    I was referencing PBNDS does allow.
17   Q    But the ACA has disciplinary standards
18  too?
19   A    It does.
20   Q    Why haven't you referenced that?
21   A    Because I'm more familiar with the PBNDS
22  standard.
23   Q    But how would you're required to follow the
24  A -- GEO's required to follow the ACA standards
25  too?

Page 190

1  measured based on the Performance Based National
2  Detention Standards?
3    A    Yes.
4    Q    Isn't GEO required to demonstrate
5  compliance with those standards, in order to get
6  money under its contract?
7    A    We're required to meet those standards,
8  it's performance based.
9    Q    Right.  GEO should follow the Performance
10  Based National Detention Standards at Adelanto;
11  right?
12   A    Correct.
13   Q    Okay.  What's the purpose, to your
14  understanding, of disciplinary sanctions for
15  detained immigrants who violate a rule at
16  Adelanto?
17   A    Violate a rule?
18   Q    Uh-huh.  Any rule.  What's the purpose of
19  discipline at Adelanto?
20   A    The purpose of discipline is to hopefully
21  correct behavior.
22   Q    And why is that discipline, to your
23  understanding, stepped up or escalated with the
24  severity or the frequency of the violations?
25   A    Because you can't let someone continue --

Page 192

1    A    That's correct.
2    Q    Then why do ICE's PBNDS disciplinary
3  standards govern the discipline you can give to
4  detainees at Adelanto?
5    A    Because that's what was -- we've been
6  speaking about today.
7    Q    But -- but there are adult long term
8  detention facility standards for discipline that the
9  ACA promulgates and that are incorporated into your
10  contract; right?
11   A    That's correct.
12   Q    And your required to maintain ACA
13  accreditation; right?
14   A    That's correct.
15   Q    So what do you look to when you're going to
16  discipline somebody; the PBNDS and the disciplinary
17  section of that, or to the ACA standards?
18   A    The PBNDS.
19   Q    Why?
20   A    Because it speaks to this actual standard
21  that we're to apply, which is -- and it speaks to
22  the 12 different -- 12 or 13 different sanctions,
23  under the PBNDS standards, and that's what we
24  enforce.
25   Q    Okay.  But doesn't -- doesn't GEO get

Page 191

1  to continue with behavior and put other detainees or
2  staff in jeopardy in general population.
3    Q    Okay.  So part of it's a safety issue?
4    A    Safety and security, yes.
5    Q    All right.  Is the disciplinary penalty
6  also intended to get the individual that's
7  misbehaving to change their behavior?
8    A    Yes.
9    Q    Okay.  Are the penalties that are
10  applied -- detained immigrants break the rules, are
11  those -- are those penalties meant to change their
12  behavior?
13   A    Hopefully.
14   Q    Okay.  Apart from protective custody
15  situations, solitary confinement or special
16  management units, restrictive housing; that's a --
17  near the top of the disciplinary severity scale;
18  correct, in terms of penalties?
19   A    You're speaking to discipline?
20   Q    Yes, sir.
21   A    Yes.
22   Q    Above restricted housing, could include
23  report to ICE for criminal prosecution; right?
24   A    That would be up to ICE if they would be
25  referred for criminal prosecution.

Page 193

49 (Pages 190 - 193)

1  Q   Yeah. But GEO has the ability, under the
2  PBNDS and its contract, to refer a person to ICE for
3  criminal prosecution; correct?
4     MR. BARNACLE: Object to the form.
5     THE WITNESS: I've never known ICE to
6  prosecute a detainee. It's a -- if a criminal act
7  occurs --
8     MR. FREE: Not the question. Not the
9  question.
10 BY MR. FREE:
11 Q   The question is, can GEO refer that person
12 to ICE for criminal prosecution, not does ICE refer
13 them for criminal prosecution; can GEO, under the
14 rules, not has it happened, not is it likely to
15 result in prosecution; just GEO has the ability,
16 under its contract, under the rules, to refer a
17 detained immigrant to ICE for criminal prosecution;
18 correct?
19    MR. BARNACLE: Object to the form.
20    THE WITNESS: Not that I'm aware of.
21 BY MR. FREE:
22 Q   Okay. Well, you're testifying on behalf of
23 GEO. So it's GEO's testimony today that you're not
24 aware that GEO can refer a detained immigrant to ICE
25 for criminal prosecution; is that your testimony?

Page 194

1     MR. BARNACLE: Object to the form.
2     THE WITNESS: Correct.
3     MR. FREE: Okay.
4  BY MR. FREE:
5  Q   Now, why does GEO start with lower-level
6  punishments and then steps up to segregation?
7     MR. BARNACLE: Object to the form.
8     THE WITNESS: It's repetitive behavior, and
9  it's allowed within the PBNDS standards.
10 BY MR. FREE:
11 Q   Okay. And then there are certain offenses
12 for which you don't have to start at a lower level
13 because they're categorized as high-level offenses;
14 correct?
15 A   Correct.
16 Q   All right. We are going to buzz through
17 some documents.
18    Ready?
19 A   Yes, sir.
20 Q   Do you want a break before we start?
21 A   No.
22 Q   Let's get it done.
23    Are you ready?
24    MR. FREE: All right.
25    Do you guys need a break?

Page 195

1     MR. BARNACLE: We're good.
2     MR. FREE: Okay. All right. So we're
3  going to mark as Exhibit 82.
4     THE COURT REPORTER: 3.
5     MR. FREE: 3. Excuse me.
6     (Exhibit 83 was marked for identification
7  by the court reporter and is attached hereto.)
8     MR. FREE: This is August 22 email
9  GEO-Novoa 5919 to 5920.
10 BY MR. FREE:
11 Q   Correct?
12 A   Correct.
13 Q   The subject is 3rd watch duties, it's from
14 Chris Jenson and Kyle Fouts and Dean Macur.
15    Who's Chris Jenson?
16 A   He's a former jail employee.
17 Q   And who's Kyle Fouts?
18 A   He's a former deputy facility
19 administrator.
20 Q   Who's Dean Macur, M-A-C-U-R?
21 A   He's a former business manager.
22 Q   So this is a former lieutenant of GEO
23 witting to the facility administrator and business
24 manager about third watch duties; do you see that?
25 A   Yes.

Page 196

1  Q   Okay. Second paragraph says:
2     "A detainee dining hall crew supervised by
3     a security staff, again, I feel would be
4     the best option for this task."
5     Do you see that?
6  A   Yes.
7  Q   This --
8     Would this task be seven nights a week, or
9     three or four nights a week?
10    I believe once we get the chow halls a good
11    long cleaning, we should be able to
12    maintain them using three/four day a week
13    crew.
14    This could be handled by any of my floor
15    staff.
16    And the next paragraph says:
17    A detainee paint crew I would think would
18    be the least utilized of the three.
19    In the past, this crew maybe worked a
20    complete five days a month or so.
21    We could use the dining room crew as double
22    duty when projects came up, or find
23    detainee volunteers.
24    Do you see that?
25 A   Yes.

Page 197

50 (Pages 194 - 197)

1    Q    Appears from this email that Lieutenant
2  Jenson is suggesting to GEO's administrators that
3  people on the dining hall details do a paint crew
4  detail as well; right?
5    A    It appears.  I can't speak for what
6  Mr. Jenson wrote.
7    Q    Okay.
8        MR. FREE:  This is going to be 84.
9        (Exhibit 84 was marked for identification
10  by the court reporter and is attached hereto.)
11        MR. FREE:  This is email GEO-Novoa 5702 to
12  5703.  This is Michelle Keeney to Patricia Love.
13  Kitchen staff detainee handling is the subject.
14        And there is an attachment called:
15        Memo - corrective action - pertaining to
16  doors and detainees employee Sign.dock.
17        I believe the attachment is a page that's
18  on top of this, 5703.
19  BY MR. FREE:
20    Q    Do you see that?
21    A    Yes.
22    Q    This appears to be a memo dated June 12,
23  2017, from Ms. Keeney to all kitchen employees and
24  Ms. Buczkowske and Ms. Love; do you see that?
25    A    Yes.
Page 198

1  court, doesn't matter; right?
2    A    That's what it says.
3    Q    Okay.  Is there any indication that ICE saw
4  or approved this corrective action plan?
5    A    Not that I can see.
6    Q    And Ms. Keeney is the food production
7  supervisor, was the person responsible for making
8  this plan; correct?
9    A    That's her name, yes.
10    Q    And in fact, the second point, in this
11  memo, says:
12        Any employee -- and I'm assuming GEO
13        employee -- violating the above detainee
14        handling guidelines will be given a
15        disciplinary action.
16        Do you see that?
17    A    Yes.
18    Q    Okay.  So this is setting GEO's standards
19  for dealing with detained immigrant workers in the
20  Voluntary Work Program; correct?
21    A    This is something that Ms. Keeney wrote
22  apparently and sent it to kitchen employees.
23    Q    That's not the answer to my question.
24        MR. FREE:  Can you read my question back?
25        (At this time, the record was read by the
Page 200

1    Q    And it says:
2        "Corrective action plan:  West kitchen."
3        What is a "corrective action plan"?
4    A    You're correcting something that was found
5  to be wrong.
6    Q    That's a term of art; right?
7    A    Sir?
8    Q    That's a term of art for the contract?
9    A    Yes.
10    Q    All right.  Who required the corrective
11  action?
12    A    I don't know.
13    Q    All right.  This appears, to me, to set in
14  bullet A1 through F -- excuse me.  1. A through F.
15        It looks like Ms. Keeney is setting forth
16  the number of procedural things about how detained
17  immigrant workers are going to be processed by the
18  staff.  Including if someone doesn't come to the
19  shift they're scheduled, they don't get to work that
20  day; that's one of them; right?
21    A    That's what it says, yes.
22    Q    And there's a -- somebody doesn't come to
23  work when they go to pick them up, they're not
24  allowed to come to the kitchen under any
25  circumstances; it doesn't matter if they were in
Page 199

1  court reporter.)
2        THE WITNESS:  I can't say this is setting a
3  standard.  I -- I can't say that.
4  BY MR. BARNACLE:
5    Q    Okay.  Well, let me ask it a different way.
6        Do you have any reason to doubt that when
7  Ms. Keeney said, "any employee violating the above
8  detainee handling guidelines will be given a
9  disciplinary action," that this memorandum was going
10  to determine how GEO employees were going to treat
11  detained immigrant workers in the Voluntary Work
12  Program?
13    A    That's what --
14        MR. BARNACLE:  Object to the form.
15        THE WITNESS:  That's what Ms. Keeney wrote,
16  yes.
17        MR. FREE:  Okay.  All right.
18        This is going to be marked as Exhibit 85.
19        (Exhibit 85 was marked for identification
20  by the court reporter and is attached hereto.)
21        MR. FREE:  This is GEO-Novoa 28580.  This
22  is one of the ones that came out in TIFF.  That's
23  28580 through 285 -- I believe 83.
24        Two, three.  Okay.
25  BY MR. FREE:
Page 201

51 (Pages 198 - 201)

**Page 202**

14 Q   This is happening in September of 2012;
15 correct?
16 A   Correct.
17 Q   The email says:
18     Good morning Matt, the ICE area next to
19     intake is not being cleaned.
20     When I spoke to the gentleman that does
21     the cleaning, he stated that it was not
22     part of his responsibility.
23     He added that it needed to be detainee
24     workers who clean that area.
25     I'm sure that he was correct about intake,

**Page 204**

1 but if we go all the way down to Tonya Andrews last
2 sentence says -- she says:
3     "Later, while talking with some members of
4     my staff, they stated that this seems to be
5     a recurring issue.
6     "The detainees don't go to work as
7     scheduled, but they will go after they have
8     eaten dinner.
9     "What, if anything, can we do about
10     this?"
11     Do you see that?
12 A   Yes.
13 Q   All right.  So the problem with this email,
14 I would submit, is that they're talking about what
15 to do for people who -- detained workers who don't
16 go to work on time; right?
17 A   Okay.
18 Q   Okay.  And then we have the first line --
19 the first paragraph, last sentence -- those two
20 sentences:
21     "Only three detainees went to the kitchen.
22     I was later informed that we would only be
23     able to run one chow hall, since she did
24     not have enough detainee kitchen workers."
25     Do you see that?

**Page 203**

1     but we cannot have detainees cleaning ICE
2     office space.
3     Do you see that?
4 A   Yes.
8     "I thought this was resolved with GEO a few
9     weeks ago."
10     Do you see that?
11 A   Yes.
12 Q   All right.  Would you agree that it appears
13 that, at least in 2012, a GEO employee told an ICE
14 employee that detained immigrant workers were the
15 ones who cleaned the ICE area?
16     MR. BARNACLE:  Object to the form.
17     THE WITNESS:  That's what he wrote.
18     MR. FREE:  Okay.  We're next going to look
19 at 86.  This is GEO-Novoa 13212 to 13213.
20     (Exhibit 86 was marked for identification
21 by the court reporter and is attached hereto.)
22     MR. FREE:  It's an email from Sharon
23 Buczkowske to Gregory Hillers with you cc'd, in
24 2014.  Subject line detainee kitchen workers.
25     And there's several emails in this chain,

**Page 205**

1 A   Yes.
2 Q   Okay.  Without sufficient numbers of
3 detained immigrant workers, one chow hall had to run
4 on this night, September 28, 2014; right?
5 A   That's what she wrote, yes.
6 Q   Okay.  And so the access of detained
7 immigrants, at Adelanto, to the chow halls was
8 limited by the number of detained immigrants who
9 showed up to work; correct?
10 A   It was apparently, according to this
11 document, only one of four chow hauls were ran.
12 Q   Is it a responsibility of GEO to run the
13 number of chow halls it says it's going to run in
14 its discussions with ICE?
15 A   No.
16     MR. FREE:  Okay.  We're going to look at
17 GEO-Novoa 21596, this is Exhibit 87.
18     (Exhibit 87 was marked for identification
19 by the court reporter and is attached hereto.)
20     MR. FREE:  This is produced to the
21 Plaintiffs by GEO, ICE Tool 6 version 5.
22 BY MR. FREE:
23 Q   Have you ever seen a document like this
24 before?
25 A   No.

1    Q   Okay.  Does this appear to be an audit tool
2  created by GEO's western region auditor, based on
3  the auditor line at the top of the first page?
4    A   It says western.  I'm -- I've never seen
5  this type of document.  I'm not familiar with it.
6    Q   If you turn to page 7 -- excuse me.
7  Page -- so page 7 looks like the audits tools, and
8  one of them is a work program.
9        Do you see there at the bottom?
10    A   Yes.
11    Q   One of the requirements -- the third one,
12  ICEWork3 says:
13        "A current roster/list of approved work
14        assignments and the corresponding
15        classification levels as maintained."
16        Do you see that?
17    A   Yes.
18    Q   At the bottom there you see C. Armant -- or
19  Armant, compliance manager, WR?
20    A   Uh-huh.
21    Q   Does that appear to be compliance manager
22  for GEO's western region?
23    A   That was the former -- she was the former
24  compliance manager.
25    Q   So this is a document that GEO was using to

Page 206

1  determine whether its operation of the VWP in
2  Adelanto, in 2013, was compliant with all of the
3  requirements that it had in the contract; right?
4    A   It appears so.
5    Q   Okay.  And again, this says:
6        Detainees are compensated, at a minimum
7        rate of $1 a day.
8        Right?
9    A   Yes.
10    Q   It says:
11        They can only work one detail per day.
12        Correct?
13        That's ICEWork -- it's No. 5 at the top of
14  the 8th page.
15        Do you see that?
16    A   Yes.
17    Q   Okay.  And it says in ICEWork17:
18        "Detainee work assignments are limited to
19        those identified in policy and any special
20        details approved by the facility
21        administrator."
22        Correct?
23    A   Correct.
24    Q   And currently that's you; right?
25    A   Correct.

Page 207

1        MR. FREE:  Okay.  Now we are going to
2  introduce 88.
3        (Exhibit 88 was marked for identification
4  by the court reporter and is attached hereto.)
5        MR. FREE:  This is GEO-Novoa 7377 through
6  7379.
7  BY MR. FREE:
8    Q   Do you recall seeing this document
9  before?
10    A   Yes.
11    Q   Who's Regina Duran, she's at the top of the
12  second page, 7378?
13    A   Regina Duran?
14    Q   Yes, sir.
15    A   She is currently a captain with Adelanto.
16    Q   And why is she being sent this email, if
17  you recall?
18    A   Where do you --
19    Q   She -- okay.  So she's in the "to line,"
20  right, and then there's all these other people.
21        Are you sending these to the captains and
22  the other supervisors?
23    A   Yes.
24    Q   Okay.  And then Joshua Johnson then
25  forwards it to a host of other people; right?

Page 208

1    A   Yes.
2    Q   Including Regina Duran.  Your words are on
3  the second page.
4        "Below are areas I see that can use
5        improvement with attention and detainee
6        labor."
7        Do you see that?
8    A   Yes.
9    Q   All right.  And the final one says:
10        "No detainee workers were present working
11        (I know shifts are sort staffed today)."
12        Do you see that?
13    A   Yes.
14    Q   Okay.  So why is no detainee workers
15  present working something that could use improvement
16  with attention?
17    A   Because it's part of the detainee work --
18  Voluntary Work Program.  We're supposed to keep the
19  idleness down, keep them occupied, if they volunteer
20  to go to work.  So we should at least be asking them
21  if they want to go to work.
22    Q   Well, weren't detainees instructed that if
23  they want to go to work, they can fill out an
24  application?
25    A   Yes.

Page 209

53 (Pages 206 - 209)

1   Q   And then submit that application to
2   classification?
3   A   Yes.  And appar -- none of those -- I must
4   have not seen any of the volunteer workers out or
5   even being asked.
6   Q   But why would that be a problem, why
7   wouldn't that just indicate there weren't enough
8   volunteers for that day?
9   A   There may have not been.  I didn't have an
10  answer.  I just wrote what I saw.
11  Q   Okay.  And then you see Josh Johnson, on
12  the first page, forwards it to all these people;
13  right?
14  A   Yes.
15  Q   Why didn't you send this to the
16  classification department?
17  A   I didn't feel the need to send it to the
18  classification department.
19  Q   The classification department's responsible
20  for making detainee worklists and documenting
21  detainee workers' shifts; correct?
22  A   Yes.
23  Q   They're responsible for knowing who the
24  detainee workers will be and are; correct?
25  A   Yes.

Page 210

1   we're back on the record.
2   MR. FREE:  89.
3   (Exhibit 89 was marked for identification
4   by the court reporter and is attached hereto.)
5   MR. FREE:  And then appended to 89 -- we're
6   going to -- even though they're not stapled
7   together.  It's all -- so I'm going to get you the
8   Bates number, but --
9   THE COURT REPORTER:  Will they be 89 as
10  well?
11  MR. FREE:  Yes.  I believe this is 29286,
12  but we'll confirm that, and then append to it are
13  several photographs that are marked GEO-Novoa 29287,
14  29288, and then through 29289.

22  BY MR. FREE:
23  Q   Do you see that?
24  A   Yes.
25  Q   Okay.  And he quotes that:

Page 212

1   Q   And yet, you see a email from Josh Johnson,
2   on West Notes, to all these people who are
3   non-classification workers; in fact, I believe
4   they're all correctional officers; right, in the
5   first part?
6   A   Correction supervisors or detention
7   supervisors.
8   Q   "Please review and ensure we are getting
9   detainee workers out."
10  A   Uh-huh.
11  Q   Well, how is -- how is it that these
12  supervisors are going to get detainee workers out?
13  A   They walk into a living area and say, floor
14  crew do you want to go work today?  Kitchen do you
15  want to go to work today?
16  They all know if they're assigned.  There's
17  a list of who the workers are.  So it's a matter of
18  just asking them if you want to go.  If you don't
19  ask, you're not going to know.
20  MR. FREE:  Okay.  Let's go off the
21  record.
22  THE VIDEOGRAPHER:  The time is 5:04, and
23  we're going off the record.
24  (Off the record.)
25  THE VIDEOGRAPHER:  The time is 5:06, and

Page 211

1   Detainee workers "shall receive the same
2   fare as other detainees.  CS shall not
3   allow detainees to prepare "special" dishes
4   or condiments for their own other detain or
5   other detainees' consumption."
6   Correct?
7   A   Correct.

9   about he walked into culinary west and east and saw
10  this clear violation, he says.  And it had been
11  addressed several times last year, and he's taken
12  pictures of detained immigrants cooking eggs and
13  toast on the grills.
14  Do you see that?
15  A   Yes.
16  Q   All right.  Do you remember earlier when we
17  were discussing the standards that GEO is required
18  to meet with respect to the Voluntary Work Program,
19  and in general that preclude GEO from using food as
20  a regard or punishment; do you remember that?
21  A   Yes.
22  Q   Okay.  It appears, at this point, that
23  detained workers who work in the kitchen get more
24  food; right?
25  A   It appears they were cooking some -- some

Page 213

54 (Pages 210 - 213)

1 sort of food, yes.
2 Q So the answer's "yes"?
3 A Yes.
4 Q And so GEO was put on notice by ICE not to
5 use food in violation of the PBNDS; correct?
6 A That's what's stated.
7 MR. FREE: Okay. Now, I'm going to hand
8 you what's previously been marked as Exhibit 29 to
9 your deposition.
10 (Previously marked Exhibit No. 29 was
11 identified for the record.)
12 MR. FREE: These are monthly food service
13 department meeting minutes from July 26, 2018. This
14 is GEO-Novoa 728.
15 Very important aspect of trying to direct
16 detainees. I believe Ms. Buczkowske says, is
17 understanding that folks come from different -- that
18 these folks come from different countries where
19 sanitation and food safety is not a big concern.
20 BY MR. FREE:
21 Q What countries do detained immigrants come
22 from, at Adelanto, where sanitation and food safety
23 aren't big concerns?
24 A I can't speak to what this person wrote.
25 Q And the second page -- what countries do
Page 214

1 Q So Mexico, El Salvador, Honduras, and
2 Guatemala are the countries that we can assume,
3 statistically, are likely to be referred to here?
4 MR. BARNACLE: Object to the form.
5 THE WITNESS: I can't speak to what
6 countries she was referring to.
7 MR. FREE: Okay.
8 BY MR. FREE:
9 Q Second page:
10 We have been granted -- this is 729.
11 We have been granted permission from Warden
12 Janecka to treat our detainee workers to
13 treats; such as extra dessert, ice cream,
14 peanut butter and jelly sandwiches,
15 breakfast tacos, and monkey bread, et
16 cetera, when exceptions are set high for
17 what is needed from the detainees. And we
18 treat detainees well and with respectful
19 voices. We will incur a higher retention
20 rate.
21 Do you see that?
22 A Yes.
23 Q You also see them say:
24 "If we didn't have the detainees doing this
25 work, we would have so much more work to do
Page 216

1 the majority of detained immigrants at Adelanto hail
2 from?
3 A It's a variety. Approximately 80 countries
4 are represented in our population on any given
5 day.
6 Q What are the top five?
7 A Mexico, Central America.
8 Q So when you say --
9 A Central America consists of several
10 different countries.
11 Q Which ones?
12 Which ones?
13 A I'm sorry?
14 Q Which ones?
15 A You have El Salvador, you have Guatemala,
16 you have Honduras. Maybe -- I may not be able to
17 name them all --
18 Q Okay.
19 A -- at this moment.
20 Q So those are the countries we can assume
21 they're referring to in this memo?
22 MR. BARNACLE: Object to the form.
23 MR. FREE: You can answer the question.
24 THE WITNESS: I'm sorry?
25 BY MR. FREE:
Page 215

1 ourselves."
2 Do you see that?
3 A Yes.
4 Q Was your instruction to provide detainees
5 with extra food to work in the kitchen consistent
6 with PBNDS, Mr. Janecka?
7 A It was food items that are part of the food
8 service inventory that we allow them to eat. It's a
9 matter of do you throw it in the trash, or do you
10 allow them to eat it, and if we can allow them to
11 eat it; yes, allowed them to eat it.
12 Q Is food being used as a reward?
13 A I don't see it as a reward.
14 Q What's another word for a "treat"?
15 Do you see on the second page there where
16 it says --
17 A Yeah. I don't know why she used the word
18 "treat."
19 Q If we didn't have detainees doing the work,
20 we would have so much more to do ourselves.
21 We've been granted permission from Warden
22 Janecka to treat our detainee workers to
23 treats.
24 Do you see that?
25 A Yes.
Page 217

1   Q   And you're saying that's not a reward or a
2   punishment?
3   A   The way she worded -- I don't know why she
4   used the word "treat." I can't say that I used the
5   word "treat," but she wrote that. Yes.
6   Q   You testified about this during your
7   deposition on June 26, 2019; right?
8   A   Yes.
9   Q   After you testified about it, did you go
10  back to the facility and instruct GEO to stop using
11  food and giving extra food to detained immigrant
12  workers?
13  A   No.
14  Q   No. Okay. If there is only one work
15  program at GEO -- one Voluntary Work Program at the
16  Adelanto Detention Facility, should there ever be
17  indicators of detained immigrants who are working
18  under GEO's supervision who are not being paid?
19  A   If they are part of the approved and
20  Voluntary Work Program, they should be paid, yes.
21  Q   Okay. And there should not be a separate
22  class of people who are working for GEO, outside of
23  the housing and sanitation policy; so not that, but
24  who are doing VWP tasks in VWP shifts who are not
25  paid; correct?

Page 218

1   states that he has not been paid for the
2   Following dates; and he provides 24, 25,
3   26, 27, and the 28th.
4   Could you please verify if he is in fact a
5   detainee worker in a paid position or a
6   volunteer.
7   Okay.
8   A   Okay.
9   Q   What is a "volunteer"?
10  ██   ██   ████████████████████████████████
11  Q   Okay. Should there be any volunteers at
12  the Adelanto detainee facility -- Detention
13  Facility?
14  A   If he worked -- or -- he or she -- it would
15  have been a he, then he should have got paid.
16  Q   Okay. And there shouldn't be any question
17  of are there paid position or volunteer, should
18  there?
19  A   Not to my knowledge.
20  Q   Okay.
21  MR. FREE: This is going to be 91.
22  (Exhibit 91 was marked for identification
23  by the court reporter and is attached hereto.)
24  MR. FREE: It says GEO-Novoa 8233. Email
██████████████████████████████████████████████

Page 220

1   A   Correct.
2   Q   Okay. And it's GEO's responsibility to get
3   the application from the detained immigrant worker
4   after they submitted the kite or not, to determine
5   their classification, and their medical, mental
6   health, criminal background, and then to assign the
7   worker to a specific job; correct?
8   A   Correct.
9   Q   Okay. And if GEO's records indicate that
10  there's a second group people who are working in
11  Voluntary Work Program jobs, that would violate
12  GEO's obligations to ICE under its contract;
13  correct?
14  A   Correct.
15  MR. FREE: Okay. This is 90?
16  THE COURT REPORTER: 90.
17  (Exhibit 90 was marked for identification
18  by the court reporter and is attached hereto.)
19  MR. FREE: We're going to get you a Bates
20  number, Colin. Sorry.
██████████████████████████████████████████████
████████████████████████████████████████
24  The above named detainee states that he is
25  a detainee worker in 2B as a porter. He

Page 219

1   work program.
██   ████████████████████████████████████████
████████████████████████████████████████████████
██████████████████
5   Third paragraph:
6   "Second, this morning I implemented a work
7   program.
8   "I asked for volunteers to bake and cook.
9   "They were very eager, and immediately had
10  several.
11  "The detainees that we train today are
12  excited to come in tomorrow and do more.
13  "It is new and exciting to them, and may be
14  something to look forward to.
15  "And it certainly made our workload easier.
16  "In the future, I am encouraging training
17  of these detainees, or using their skills
18  to do new things for us, no matter how long
19  their stay.
20  "I am hoping this will help us retain
21  workers on the a.m. shift."
22  BY MR. FREE:
23  Q   Do you see this?
24  A   Yes.
██   ██   ██████████████████████████████████

Page 221

56 (Pages 218 - 221)

1 went to the dorm, and rather than going to
2 classification and asking for new workers, when the
3 dorm workers who were supposed to go to the shift
4 didn't show up; in other words, taking people off
5 the list, she simply asked for volunteers in the
6 dorm.
7     Can we agree on that part?
8     A    That's what she wrote.
9     Q    Okay.  All right.  Now, does this happen at
10 Adelanto?
11    A    Not to my knowledge.
12    Q    Except for this time?
13    A    I don't even know who this person is.
14        MR. FREE:  Okay.  This is going to be 92.
15        (Exhibit 92 was marked for identification
16 by the court reporter and is attached hereto.)
17        MR. FREE:  This is --
18    Do you have a Bates for this?
19    What is it?  It's on the front?  No, it's
20 not.  Okay.  Cool.

23        And the subject is, here's one that says
24 working but not getting paid.
25        "Here is the detainee that says he is not

3        "Here's the one that says working but not
4        getting paid."

6        "Here is the one stating he hasn't been
7    paid for two months."

12        He is currently listed on both payroll
13        sheets to work.
14    Q    Do you see that?
15    A    Yes.
16    Q    So that's the thing that's in violation of
17 the standard; right?
18    A    If he worked both jobs in a day.
19    Q    Well, they've -- they've confirmed in this
20 email that he did; correct?
21        It says:
22        "He is currently listed on both payroll
23        sheets to work."
24    A    He's listed.
25    Q    Yes.  Right?  Okay.

1        being paid, he has been paid every day from
2        April 20 through June 19, except for the
3        21st of May.
4        "He is paid as a 2C porter and not as a
5        kitchen worker.
6        "The standard says he can work 8 hours a
7        day, 5 days a week."
8        And then skip the next:
9        So the National Detainee Handbook says they
10        can work beyond the time with approval.
11        I would guess that we are in violation of
12        the standard, and that the National
13        Detainee Handbook is incorrect.
14        Regardless, the detainee cannot say he has
15        not been paid, although he may feel that he
16        should be paid for the kitchen and porter.
17        We have no work record from the kitchen.
18        Under description, it says work area (2C)
19        and then date.
20 BY MR. FREE:
21    Q    Do you see that?
22    A    Yes.
23    Q    This appears to be a person who claims he
24 was working in two places on the same day; right?
25    A    That's what's written, yes.

1        MR. FREE:  This is going to be 92.
2        THE COURT REPORTER:  93.
3        MR. FREE:  93.  Excuse me.  This is
4 GEO-Novoa 6745 and 6746.  Email dated 8/23/2013,

6        (Exhibit 93 was marked for identification
7 by the court reporter and is attached hereto.)
8        MR. FREE:  We got a version of this email
9 earlier in our exhibits, but this one says:
10        Floor crew dorm setting, we usually have
11 volunteer detainees work on this while being
12 supervised.  Everything else, third shift officers
13 have always done.
14        Either way we look at this, staff
15        supervising detainees or officers doing the
16        brunt of this.  The issue of staffing still
17        remains on this shift.
18        We used to have two officers a night
19        strictly designated floor crew officers.
20        Now we can't afford not utilizing the
21        officers for other procedural matters.
22        Dining hall - deep cleaning fantastic,
23        however here at east Ms. Pam (cook
24        supervisor) usually has her detainees take
25        care of all of that.

1      She's referring to the deep clean down
2  below.
3      These areas require a deep clean each
4  night.
5      Floor crews, it says:
6      Dorm setting, we usually have volunteer
7      detainees to do that; the issue with the
8      floor crews these individuals will be
9      responsible for maintaining all floor
10     surfaces about the units and will have to
11     work off a set schedule.
12     And crew can be officers only or
13     detained -- or detainees supervised by
14     custody staff.
15  BY MR. FREE:
16     Q   Do you see that?
17     A   Yes.
18     Q   Whose responsibility or duty is it to
19  supervise these floor crew activities, GEO's;
20  right?
21     A   Staff, GEO.
22     Q   All right.  And third shift officers have
23  done all the other things listed in the floor crews
24  bullet point; correct?
25     A   That's what it says.

Page 226

1     Q   Okay.  And so this email discusses having
2  detained immigrants do the things, at least some of
3  them, the third shift officers have always done,
4  yeah?
5     A   Stating that either officers or detainees
6  have done the floors, yes.
7     Q   Okay.
8         MR. FREE:  Now this is 94.
9         (Exhibit 94 was marked for identification
10  by the court reporter and is attached hereto.)
11        MR. FREE:  This is GEO-Novoa 5988 and 5989.
12        It's an email from Jamie Davis, in 2012, to
13  Alejandra Palacios and many others regarding the ODO
14  audit.
15        Matt Holm in the second email in this chain
16  says to Raymond Smith and others, the subject audit,
17  and that was the warden at the time, says:
18        This gives us four days to get this place
19        clean.  The auditors will be visiting both
20        facilities so both need to be sparkling.
21        Use as many detainee crews as necessary,
22        just make sure somebody is watching them at
23        all times.
24  BY MR. FREE:
25     Q   Do you see that?

Page 227

1     A   Yes.
2     Q   How does the staff go about using as many
3  detainee crews as necessary?
4     A   Call the detainees out, or ask them to go
5  to work.
6     Q   But how do they know which ones have been
7  approved to do the cleaning?
8     A   They look at the work rosters, the list of
9  detainees approved.
10     Q   Then why isn't this directed toward the
11  classification office, which --
12     A   Because classification only approves them.
13  They don't call them out for work.  The work occurs
14  24/7.
15     Q   But in order to use a detainee cleaning
16  crew, the classification office would first have to
17  put the people on the crew; right?
18     A   Correct.
19     Q   And so why wouldn't this use --
20     A   They would use those payroll sheets you
21  showed me earlier that spoke to the different jobs
22  to call them out to go to work.
23     Q   Okay.  But -- but why would the -- I still
24  don't understand the answer.
25     A   The classification provides a list --

Page 228

1     Q   Uh-huh.
2     A   -- to the different departments or shifts
3  of detainees that are approved to work in different
4  jobs, and then throughout the different shifts
5  they -- day and night staff will call those
6  individuals or ask if they want to go to work.
7         MR. FREE:  This is going to be 95?
8         THE COURT REPORTER:  It's already
9  premarked.
10        MR. FREE:  I'm sorry.  This is Exhibit 36
11  from your deposition.  Excuse me.  It's not 95.
12        (Previously marked Exhibit No. 36 was
13  identified for the record.)
14        MR. FREE:  This is a series of emails from
15  Hussein Hamed from July 1st, 2015, is the last one
16  at 2:45 a.m., to you.
17  BY MR. FREE:
18     Q   Do you see that?
19        It's GEO-Novoa 2294 --
20        MR. BARNACLE:  He doesn't have the
21  document.
22        MR. FREE:  -- through 2301.  Sorry about
23  that.
24  BY MR. FREE:
25     Q   Now, these emails go through 2294 and 2295.

Page 229

58 (Pages 226 - 229)

| | |
|---|---|
| Page 230 | Page 232 |

**Page 230**

1  Would you agree that it appears that Hamed
2 is discussing your email to everyone about walking
3 through west and it being evident that sanitation
4 slipped backwards several notches.
5  We need all shifts to start pushing
6  detainees to work in the hallways, medical,
7  intake, the D spaces, and the hallways
8  leading to the housing units.
9  MR. BARNACLE: Object to the form.
10 BY MR. FREE:
11  Q  Is that what that says, did you write
12 that?
13  A  This paragraph?
14  Q  Yes, sir.
15  A  I wrote that.
16  MR. BARNACLE: You used the word "pushing."
17  MR. FREE: Oh, excuse me. I'm sorry.
18  Putting detainees to work. Thank you for
19 the correction.
20 BY MR. FREE:
21  Q  We need all shifts to start putting
22  detainees to work. The hallways, medical
23  intake, and the D spaces and the hallways
24  leading to the housing units. I don't want
25  excuses, just action.

**Page 231**

1  Do you see that?
2  A  Yes.
3  Q  And then so what you get above is
4 Mr. Hussein Hamed sending you a series of emails
5 discussing responses to your email.
6  Do you see that?
7  A  Yes.
8  Q  Do you see the question came up -- at the
9 very top of this 2295, it says:
10  The question came up can we get better wax
11  than the one we have now -- B-E-S-I-E -- I
12  don't know how you pronounce that --
13  M-S-D-S coast and safety issues.
14  Is there any way to get a better brand?
15  It appears that detained immigrants are
16 waxing all of these areas, in this email, overnight
17 and cleaning and painting as well.
18  Do you see that?
19  A  They can, yes.
20  Q  No. But that's what this appears to
21 reflect, doesn't it?
22  A  It says the main hallway and seg hallways
23 were stripped and waxed, yes.
24  Q  My question is though, this appears to be
25  work that is being completed by detained

**Page 232**

1 immigrants?
2  A  I can't speak to detainees did the work
3 or -- all of it or staff did it. They're just
4 telling me it got done.
5  Q  Well, you didn't instruct staff to do the
6 work, did you?
7  A  No. But if --
8  Q  You said we need all shifts to start
9 putting detainees to work in the hallways;
10 correct?
11  A  Correct.
12  Q  And these are the hallways; right?
13  A  Not all areas.
14  Q  Okay.
15  A  But if detainees don't go to work, then
16 staff do it. This doesn't specify in the chain
17 email to me.
18  Q  Well, this one says:
19  We had two crews out; one the complete
20  stripping wax in the main hallway, and one
21  to clean base boards.
22  A  That's true. On that day, yes.
23  Q  That looks like a detainee work crew;
24 right?
25  A  On that day, yes, sir.

**Page 233**

1  Q  Did you or GEO respond to the safety issues
2 raised on June 3rd, 2015, by Mr. Hamed?
3  A  I would have to make an assumption, yes. I
4 don't know. That's been four years ago -- four and
5 a half years ago.
6  Q  Okay. All right. Is the stripping
7 material you need to strip floors, is that a toxic
8 material?
9  A  It's a chemical that you put on floors to
10 strip the wax. It does give off an odor. Yes.
11  Q  Can be a hazardous material; correct?
12  A  We provide goggles and masks if necessary,
13 gloves.
14  MR. FREE: I've handed you Exhibit 13 --
15 excuse me. Exhibit 37 to your deposition, GEO-Novoa
16 5839, 5840, 5841.
17  (Previously marked Exhibit No. was
18 identified for the record.)
19  MR. FREE: This is a forwarded email in
20 2017. The person forwarding it Vincent Ventle said:
21  Read below. This is what happens when
22  cleaning don't get complete.
23  And is forwarding an email from you. It
24 says:
25  "I was totally frustrated with the lack of

59 (Pages 230 - 233)

1    cleaning that has been done in the last
2    week.  Building honestly looked the worst I
3    have ever seen it in 2.5 years that I have
4    been here.  There is not one detainee
5    working or being asked to work in the
6    entire building; housing units, hallways,
7    kitchen, laundry, intake, et cetera.  Not
8    one.  This is totally unacceptable!!"
9        Once lunch is complete, I expect all TV,
10    Xbox, and recreation to be suspended until
11    the building is cleaned and presentable.
12    We can't shut down CORE, medical visits,
13    attorney visits, et cetera.
14    We have a tour tomorrow and Friday, but a
15    high level of sanitation should be expected
16    and maintained daily, building should
17    always be tour ready.
18    Make sure plenty of cleaning supplies are
19    those available who will be -- available to
20    those who will be tasked with this
21    project.
22    That's what you wrote; right?
23    A    Correct.
24    Q    And you saw this document when you had your
25    deposition on June 26, 2019; correct?

Page 234

1    detainees, and you need to ask the detainees.  The
2    next step is staff does it.
3    Q    But you didn't say that?
4    A    I didn't put staff in there.  I just said
5    there wasn't one detainee working or being asked in
6    the entire building.  And they should, as part of
7    the program -- of the Voluntary Work Program, is to
8    ask them if they signed up for it.
9        If you don't ask them -- and if they don't
10    go to work, then staff do it.
11    Q    Do the detained immigrant workers who don't
12    want to participate in the Voluntary Work Program or
13    who disagree with the conditions, have the right not
14    to participate?
15    A    Yes.
16    Q    Do they have the right to stop working in
17    their jobs?
18    A    Yes.
19    Q    And yet the reason that they were supposed
20    to be asked to work -- never mind.
21        MR. FREE: I think we're good on the
22    emails.  Yeah.  Circled through all of them.
23        All right.  Let's wrap it up.  Sorry.
24    Thanks.  This is the one.  Thanks.  Okay.
25        Let's --

Page 236

1    A    Correct.
2    Q    And is it the position of GEO that your
3    email is consistent with GEO's requirements to ICE
4    under the Voluntary Work Program?
5    A    This doesn't necessarily refer to the
6    Voluntary Work Program.
7        If the detainees weren't going to do it,
8    then staff were going to do it.
9    Q    Then why didn't you ask staff to do the
10    work?
11    A    Because our first obligation is to see if
12    the detainees want to participate in their program
13    they signed up for.
14    Q    Well, obviously they didn't because nobody
15    was working.
16    A    And if they didn't -- it was either they
17    didn't, or staff didn't ask them.
18        First thing you have to do is ask them.  If
19    you don't ask them, you're not going to know if
20    they're going to go work.
21        And if they don't go to work, then staff
22    will step in and do this.
23    Q    But you didn't ask staff to step in and do
24    it, did you?
25    A    I just told them I didn't see any

Page 235

1    BY MR. FREE:
2    Q    What is GEO's budget for cleaning and
3    maintaining the Adelanto Detention Center?
4    A    Can you repeat that, please?
5    Q    What is GEO's budget for cleaning and
6    maintaining the Adelanto Detention Center?
7    A    I don't know.
8    Q    Did you prepare to respond to questions
9    responsive to topic 16 K before your deposition
10    today?
11    A    Yes.
12    Q    Okay.  What does it say?
13    A    16 A?
14    Q    16 K.
15    A    16 which?
16    Q    K.
17    A    K.  I thought you said A.
18    Q    Sorry.
19    A    "GEO's budget for cleaning and otherwise
20        maintaining the Adelanto facility."
21    Q    How did you prepare for your responses on
22    behalf of The GEO Group to this question?
23    A    I did not prepare for that one.  I don't
24    know the budget.
25    Q    Is that something that you could have

Page 237

60 (Pages 234 - 237)

1 determined?
2    A    Possibly, yes.
3    Q    Okay.  Were you asked to prepare anything
4 regarding that topic?
5    A    No.
6    Q    16 J, how does GEO determine the pay rate
7 for the Voluntary Work Program at Adelanto?
8         You're only going to be talking about
9 Adelanto.
10   A    We talk -- our contract tells us what we'll
11 be reimbursed by ICE, which is $1 a day -- or our
12 work plan states that the payment will be $1 a
13 day.
14   Q    And GEO creates the work plan; right?
15   A    Correct.
16   Q    GEO can expend money on detained immigrants
17 that it is not receiving reimbursement from ICE for;
18 right?
19   A    In regards to?
20   Q    The Voluntary Work Program.
21   A    I'm not aware of that.
22   Q    On behalf of GEO, as you sit here today,
23 you do not know whether GEO can pay a detained
24 immigrant for a shift when it's not going to get
25 that money from ICE as a reimbursement?
                                          Page 238

1    A    You have attrition and turnover.
2    Q    Well, then why didn't you hire new
3 people -- is GEO attempting to hire new janitors?
4    A    Yes.
5    Q    Okay.  How many?
6    A    To fill the entire seven.  I'm not sure, I
7 think we're at five or six today, with some in the
8 background process.
9    Q    And so there are currently only three
10 janitor positions contemplated in the contract.
11        How is GEO paying for the remainder?
12   A    GEO pays for them out of the company
13 budget.
14   Q    Okay.  And so GEO is able to hire
15 additional that are not included in the staffing
16 plan to meet needs that the staffing plan might not
17 address; correct?
18   A    If necessary.
19   Q    If necessary.  Okay.  What is the budget
20 for maintenance at the Adelanto Detention
21 Facility?
22   A    I don't know.
23   Q    What are the general maintenance
24 requirements there?
25   A    We do all preventative maintenance.
                                          Page 240

1    A    Not specific to Adelanto, no.  I've had
2 previous communications and other staff have had
3 communication with ICE.
4    Q    I'm just talking about the reimbursement
5 piece, not the amount.
6    A    Specific to Adelanto, no.
7    Q    Okay.  What are the -- you testified during
8 your deposition in June that GEO had six janitors at
9 Adelanto; do you remember that?
10   A    Yes.
11   Q    And yet, in the bridge contract, GEO's
12 staffing plan only provides for three janitor's; do
13 you remember that?
14   A    Yes.
15   Q    Okay.  Why the reduction from six to three
16 in the June 26 contract?
17   A    There was never a reduction.  The
18 additional positions were never part of the contract
19 staff.
20   Q    Why did you testify that there was six
21 janitors at Adelanto?
22   A    Because that's what I was authorized by
23 the -- actually, authorized seven and six were
24 filled.
25   Q    Okay.  And why aren't those still filled?
                                          Page 239

1    Q    Can you tell me what that is?
2    A    Yes.  There's pieces of equipment that
3 require changing of say an air condition filters,
4 lubes belts, et cetera.  We do all fixing of any
5 plumbing, electrical.
6    Q    Okay.
7    A    If our maintenance staff cannot do that
8 work, then we contract it out to a vendor.
9    Q    Do the pipes burst at Adelanto ever?
10   A    I'm sorry?
11   Q    Do the pipes rupture at Adelanto ever?
12   A    Occasionally.
13   Q    And when that happens, who is responsible
14 for cleaning up the water?
15   A    Any staff, detainee, volunteer workers
16 or --
17   Q    Would staff ever have the right to require
18 detained immigrants, in a pod where the pipes bust,
19 to clean the water up themselves?
20   A    If it has become a safety issue to where
21 the floor water was everywhere and they needed to
22 help get it cleaned up or out of the way.
23   Q    Would the people that GEO's requiring to
24 help get it cleaned up or out of the way get paid?
25   A    If they were part of the Voluntary Work
                                          Page 241

                                    61 (Pages 238 - 241)

1  Program.
2      Q    If they weren't, would they get paid?
3      A    No.
4      Q    Okay.  So that's an instance in which GEO
5  would have detained immigrant workers working, not
6  for personal housekeeping, and not paid?
7      A    Well, it would be a housekeeping issue if
8  it was in a living area, yes.  It would be a
9  spill.
10     Q    It's not a spill.  The pipe ruptured.
11 They -- we're not talking about like coffee, we're
12 talking about a pipe that burst.
13     A    Right.
14     Q    I'm thinking about a specific instance that
15 I think you know about.
16         Would it be appropriate for GEO guards to
17 send a person to administrative segregation for
18 refusing to clean the water from the burst pipe?
19     A    No.
20     Q    Would that be a violation of Performance
21 Based National Detention Standards if it occurred?
22     A    I don't know of it occurring.
23     Q    I'm not asking you that.  I'm asking if it
24 did, would that violate GEO's obligations to ICE and
25 PBNDS?

Page 242

1  to clean up water from a burst pipe?
2          MR. BARNACLE:  Object to the form.
3          THE WITNESS:  No.
4          MR. FREE:  It would not be appropriate.
5  Okay.
6  BY MR. FREE:
7      Q    Now -- and you are, as the warden, unaware
8  of that occuring; correct?
9      A    Correct.
10     Q    And on behalf of GEO, do you have any
11 understanding as to whether that occurred?
12     A    No.
13         MR. FREE:  Let's take a short break.  Okay?
14 Because I think we're going to be wrapping
15 up.  It's 5:40.
16         THE VIDEOGRAPHER:  The time is 5:41 and
17 we're going off the record.
18         (Off the record.)
19         THE VIDEOGRAPHER:  The time is 5:48, and
20 we're back on the record.
21 BY MR. FREE:
22     Q    Mr. Janecka, we're now going to look at
23 Topic 10 and try and do a lightening round.
24         Okay?
25         These should be pretty easy questions.  If

Page 244

1      A    Depends the circumstances around it.  It
2  could be.
3      Q    Assume only the information I've given you,
4  which is that the pipe burst, the detained
5  immigrants had to evacuate, and then GEO guards
6  required them to -- some of them help clean up the
7  water for no pay.
8          MR. BARNACLE:  Object to the form.
9          THE WITNESS:  Yes.  Could be, yes.
10 BY MR. FREE:
11     Q    Okay.  And similarly, the individual or
12 individuals who are tasked with getting other
13 detained immigrants, in this situation, to help
14 clean the water; if that person refused the GEO
15 guard's order to go to solitary -- to clean up the
16 water, would it be appropriate to send that person
17 to administrative segregation?
18     A    It depends on the circumstances.  I don't
19 know if there was an aggressive act, if there was
20 any foul language.  I don't know.
21     Q    Assume only the circumstances that I've
22 provided to you, not any other facts, only on the
23 circumstances that I provided to you.
24         Would it be appropriate to send a detained
25 immigrant to administrative segregation for refusing

Page 243

1  they're not, feel free to tell me.  I can't tell
2  you.  It's more complicated than that, but really
3  the question that we're going to be asking is ICE or
4  GEO.  That's going to be the answer, I think.  Now,
5  if it's more complicated, again, let me know.
6          So we're looking for the division of duties
7  between GEO and ICE with respect to operation of
8  Adelanto, including which entity GEO or ICE bears
9  the responsibility for the following:
10         So proposing or setting the number of
11 participants in the VWP; is that GEO or ICE that
12 does that?
13     A    GEO.
14     Q    Creating work crews; GEO or ICE?
15     A    GEO.
16     Q    Assigning detainee workers to work crews;
17 GEO or ICE?
18     A    GEO.
19     Q    Setting detainee work schedules; GEO or
20 ICE?
21     A    GEO.
22     Q    Providing tools or equipment to detainee
23 workers; GEO or ICE?
24     A    GEO.
25     Q    Supervising and/or instructing detainee

Page 245

62 (Pages 242 - 245)

1 workers in the VWP; GEO or ICE?
2    A    GEO.
3    Q    Setting the scope of labor to be completed
4 by detainee work crews or work detail crews; GEO or
5 ICE?
6    A    GEO.
7    Q    Assessing detainee worker job performance;
8 GEO or ICE?
9    A    GEO.
10    Q    Proposing changes to VWP wage rates; GEO or
11 ICE?
12    A    Would be ICE.
13    Q    ICE proposes the changes?
14    A    To my knowledge, it's set in PBNDS
15 standards.  I've never made a proposal.
16    Q    So GEO's position -- go ahead.  I'm sorry.
17 I didn't mean to interrupt.
18    A    Well, the wage is reflected in PBNDS $1 a
19 day.
20    Q    It's at least $1 a day?
21    A    At least $1 a day.
22    Q    So it can be changed; right?
23    A    Could be.
24    Q    All right.  And so who is the -- could be
25 both.  I should have told you that.

Page 246

1        So proposing changes to VWP wage rates,
2 could GEO do that?
3    A    It's -- it's never occurred.  At Adelanto,
4 And the wage has always been $1, and our localized
5 officials expect it to be $1.
6    Q    My question is could GEO propose a higher
7 rate, "yes" or "no"?
8    A    I guess GEO could propose.
9    Q    Thank you.  In determining the first
10 instance whether a detainee will be sent to
11 administrative segregation, and I'm just talking
12 about VWP violations, GEO or ICE?
13    A    Could be either or.
14    Q    So ICE could say, you, detained immigrant
15 worker, in the Voluntary Work Program, for violating
16 the rules of the Voluntary Work Program, you're
17 going to go to segregation; ICE could do that?
18    A    Yes.
19    Q    Who's responsible for doing that?
20    A    Would be ultimately GEO.
21    Q    Okay.  And similarly segregation --
22 administrative segregation for failure to comply
23 with the housing sanitation policy that GEO's
24 created; GEO or ICE would be responsible for
25 determining the first instance whether a detained

Page 247

1 immigrant goes to administrative segregation?
2        MR. BARNACLE:  Object to the form.
3        THE WITNESS:  Could be either or.
4 BY MR. FREE:
5    Q    Okay.  How would ICE know that a detained
6 immigrant hasn't cleaned up?
7    A    They're in the housing units all day
8 long.
9    Q    There's an ICE officer in the housing units
10 at GEO?
11    A    They make rounds throughout the building
12 all during the day.
13        MR. FREE:  Okay.  Okay.  That's it for that
14 category.  Thank you.
15 BY MR. FREE:
16    Q    If I wanted to know the current staffing at
17 the Adelanto Facility; including janitorial,
18 maintenance, laundry, and kitchen staff, that's on
19 page 13, it's topic 16 E; would one of the places
20 that I would look be in the staffing plan that's
21 included in the bridge contract -- it starts at
22 GEO-Novoa 35212 -- is that how I'd find that out?
23    A    Yeah.
24    Q    You can look at yours or --
25    A    I just want to make sure what I'm speaking

Page 248

1 to.
2    Q    Sure.  You can take a look at it.
3        So the big bridge contract that you've got
4 maybe over here.  Or I can show you mine if you
5 want.
6    A    Okay.
7    Q    You got it?  Because it's already --
8    A    That's the authorized staffing plan.
9    Q    Okay.  So if I wanted to know, for
10 instance, how many janitors -- or excuse me -- like
11 laundry workers, I could look at the specific
12 sections of the staffing plan and determine that;
13 right?
14    A    Yes.
15    Q    Okay.  With the exception of janitors, are
16 you aware of any other deviations from this staffing
17 plan from Adelanto, the one that's in 35212?
18    A    No.
19        MR. FREE:  Okay.  So that's going to finish
20 up 16 E.  Thank you.  Finally.
21        You were telling me before lunch -- we're
22 done with documents.
23 BY MR. FREE:
24    Q    You were telling me before lunch about one
25 or two meetings you could recall, at which you were

Page 249

63 (Pages 246 - 249)

1  present, with the City of Adelanto discussing the
2  future of its contract and its IGSA.
3      What was the second meeting that you were
4  talking about?
5      MR. BARNACLE:  Object to the form.
6      THE WITNESS:  I don't recall a second
7  meeting.  I just know that I was part of contacting
8  the City manager to see if he could set up a meeting
9  with the company, but I don't recall if I was in
10  that meeting.
11  BY MR. FREE:
12  Q   Okay.  Would that have been the meeting
13  with Dr. Zoley and Mr. Flores?
14  A   The first meeting?
15  Q   No.  The one that you just described.
16      Is that the -- when you say the "company,"
17  I'm just trying to understand.
18      During the first meeting, I think you
19  testified -- you did not tell me that Dr. Zoley was
20  there, was he there?
21  A   Yes.
22  Q   He was in the first meeting?
23  A   Yes.
24  Q   Is there anybody that you forgot to mention
25  who was at the first meeting?

Page 250

1      A   Can you refresh my memory as to who I
2  mentioned?
3  Q   You said Venturella.
4  A   Correct.
5  Q   You said the guy with the funny name --
6  A   Mosciski.
7  Q   Yeah.  Why don't we try just fresh.  Do you
8  remember -- so it was Mr. Zoley, Mr. Venturella,
9  Mosciski, you, the architect -- I mean, the
10  engineer.  Excuse me.
11  A   That's Mosciski.
12  Q   Okay.  And then there was --
13  A   Paul Laird.
14  Q   Paul Laird.
15  A   And Kyle Schiller.
16  Q   Kyle Schiller.  That's right.
17      Anybody else?
18  A   Not that I can think of.
19  Q   And then the second meeting where you were
20  going to set up -- that you reached out to Jessie
21  Flores to set up a meeting, was that another meeting
22  with Mr. Zoley or someone else?
23  A   It was with Dr. Zoley and Mr. Flores, and I
24  don't remember if there was anybody else in that
25  meeting.

Page 251

1  Q   Do you recall what month that meeting
2  occurred?
3  A   I don't.
4  Q   Okay.  Do you recall if it occurred in
5  2019?
6  A   Yes.
7  Q   It did?
8  A   I'm pretty sure it would have been in
9  2019.
10  Q   All right.  It would have been before the
11  bridge contract; right, in June 2019?
12  A   Yes.
13  Q   And It also probably would have been before
14  the March announcement by the City of Adelanto that
15  they were canceling the contract; correct?
16  A   I don't know that.
17  Q   Okay.
18  A   I do not remember.
19  Q   All right.  Now, you told me that you
20  understood from Mr. Flores that the City of Adelanto
21  is canceling it's contract with ICE, and therefor
22  canceling the Intergovernmental Services Agreement
23  with GEO, because it wasn't in the best interest of
24  the City to continue; did I understand that answer
25  correctly?

Page 252

1      That's your understanding why Adelanto
2  pulled out?
3  A   That's what I understood.
4  Q   Okay.  As you sit here today, do you have
5  any information regarding -- no.
6      Did GEO influence the decision by the City
7  of Adelanto to cancel the contract?
8  A   Not to my knowledge.
9  Q   You're testifying for GEO now.
10      Okay?
11      You're testifying about the role that the
12  City of Adelanto played.
13      Okay?
14      MR. BARNACLE:  Object to the form.
15      He's testifying to the -- under the topic,
16  the operation facility, not some contract.
17      So you're misrepresenting the scope of the
18  topic.
19      THE WITNESS:  And --
20      MR. FREE:  "GEO's understanding of what
21      role, if any, the City of Adelanto played
22      in the contracts to operate."
23      MR. BARNACLE:  Uh-huh.
24      MR. FREE:  So not playing the operation,
25  but the contracts to operate the Adelanto Facility,

Page 253

64 (Pages 250 - 253)

| | |
|---|---|
| 1 prior to the cancelation of those contracts. | 1 some Bates numbers. |
| 2     "And what role, if any, the City of | 2     You ready Lydia? |
| 3     Adelanto still plays in the operation of | 3     MS. WRIGHT: Yeah.  So just to clean up the |
| 4     those contracts, including payments GEO or | 4 record for those exhibits that we did not have Bates |
| 5     its agents may continue to remit to the | 5 numbers stamped on. |
| 6     City or its representatives." | 6     Exhibit 79, is Bates No. GEO-Novoa |
| 7 BY MR. FREE: | 7 00020567. |
| 8   Q   Did GEO provide a draft of the cancelation | 8     Exhibit 81 is GEO-Novoa 0009566 to |
| 9 letter to the City of Adelanto? | 9 GEO-Novoa 0009604. |
| 10   A   What topic are we on? | 10     Exhibit 82 is GEO-Novoa 0009701 to 9720. |
| 11   Q   11 -- excuse me.  10 -- no.  11.  Yeah. | 11     Exhibit 89 is GEO-Novoa 00029286 to 29289. |
| 12     It's on page 9, but that doesn't involve | 12     Exhibit 90 is GEO-Novoa 00026088. |
| 13 the answer to my question.  The topic that I'm | 13     And the last one is Exhibit 92 that's |
| 14 asking you about doesn't answer the question that | 14 GEO-Novoa 0002479 -- excuse me GEO-Novoa 00024739 to |
| 15 I'm asking. | 15 24740. |
| 16     My question is, did GEO provide to the City | 16     MR. FREE: Okay.  Mr. Janecka, we're going |
| 17 of Adelanto a draft of their termination letter for | 17 to hold your deposition open, which means we don't |
| 18 the agreement? | 18 believe you're done here. |
| 19   A   I don't know that. | 19     There were entire topics that you were not |
| 20   Q   You're testifying today on GEO's behalf | 20 prepared to testify about today.  So we expect that |
| 21 about this role that Adelanto plays, and GEO does | 21 you will be back when you are prepared to testify |
| 22 not know whether it wrote a letter for the City of | 22 about them. |
| 23 Adelanto to terminate the contract; correct? | 23     We need to do a couple of housekeeping |
| 24   A   I don't recall. | 24 pieces. |
| 25   Q   So GEO does not recall? | 25     Colin and I spoke earlier -- can we |
| Page 254 | Page 256 |

| | |
|---|---|
| 1   A   I don't recall. | 1 agree -- both sides are going to do 15 depositions; |
| 2   Q   You don't recall, but same thing for GEO? | 2 right? |
| 3   A   I can't speak for everybody in GEO.  I was | 3     MR. BARNACLE: Sure. |
| 4 here to talk about Adelanto, on behalf of GEO, and I | 4     MR. FREE: Okay.  And we're going to do |
| 5 don't recall. | 5 more 30(b)(6) in Boca Raton. I'm blocking that out |
| 6   Q   I appreciate that.  You're speaking for | 6 for a full day. |
| 7 everybody at GEO today.  You're speaking on behalf | 7     MR. BARNACLE: How much time are we on the |
| 8 of the company. | 8 record? |
| 9     Okay? | 9     THE VIDEOGRAPHER: 4 hours and 44 minutes. |
| 10     That's who GEO -- you're who GEO sent. | 10     MR. BARNACLE: 4 hours and 44 minutes on |
| 11     And I'm asking you if the City of Adelanto | 11 the record today. |
| 12 wrote the termination letter or if GEO wrote it? | 12     So by my calculation you have 2 hours and a |
| 13   A   To my knowledge, Jessie Flores wrote the | 13 couple minutes for your Florida depositions. |
| 14 letter and sent it. | 14     MR. FREE: Okay.  Is that going to be GEO's |
| 15   Q   Okay.  The only thing GEO can provide, in | 15 position, or I'm going to need to take that to the |
| 16 the way of its understanding of why the contract was | 16 court? |
| 17 canceled, was that it was not in the best interest | 17     MR. BARNACLE: It is going to be our |
| 18 of the City; is that correct? | 18 position. |
| 19   A   To the best of my knowledge. | 19     MR. FREE: Is there any reason GEO's |
| 20     MR. BARNACLE: Object to form. | 20 adopting a different position in this case from what |
| 21 BY MR. FREE: | 21 it just told the Federal District Court in |
| 22   Q   Well, there's no other reason that GEO's | 22 Washington? |
| 23 been provided for canceling the contract? | 23     MR. BARNACLE: That's the position we take |
| 24   A   Not that I know of. | 24 in this case because this is an overly expansive |
| 25     MR. FREE: Okay.  We're going to get you | 25 30(b)(6) topics. |
| Page 255 | Page 257 |

65 (Pages 254 - 257)

| | |
|---|---|
| 1 You didn't enter -- you didn't attempt to | 1 MR. BARNACLE: Absolutely not. |
| 2 enter any agreement to expand upon the number of | 2 MR. FREE: Okay. Is there any reason that |
| 3 hours before, and here we are and you just spent | 3 GEO's counsel did not prepare this witness to answer |
| 4 seven hours -- or almost seven hours minus two. | 4 an entire topic? |
| 5 MR. FREE: Four, seven, I mean, it's | 5 MR. BARNACLE: Which topic is that? |
| 6 like -- | 6 MR. FREE: The one he said he had no |
| 7 MR. BARNACLE: Yeah. You're right Andrew. | 7 information about. |
| 8 So if you didn't marshal your time in an | 8 MR. BARNACLE: Which one is that? |
| 9 appropriate way, that's your issue. | 9 MR. FREE: 16 K, GEO's budget for cleaning |
| 10 So we will take it to the court because we | 10 and otherwise maintaining the Adelanto Facility. |
| 11 will not allow for anything more than seven hours. | 11 MR. BARNACLE: Must have been an |
| 12 MR. FREE: Thank you. And GEO has allowed | 12 oversight. |
| 13 testimony today by its 30(b)(6) witnesses, only on | 13 MR. FREE: Okay. So -- and GEO is not |
| 14 GEO's interpretations on ICE polices. | 14 going to pay for us to come back? |
| 15 We would like you to stipulate that you are | 15 MR. BARNACLE: Absolutely not. |
| 16 not going to say that this 30(b)(6) testimony is not | 16 MR. FREE: Okay. Whose oversight was it? |
| 17 admissible because it's GEO's opinion; right? | 17 MR. BARNACLE: I don't -- I don't really |
| 18 Like there's stuff where -- there's some | 18 know. |
| 19 authority that says corporations can't have | 19 MR. FREE: Okay. That's all I have. |
| 20 subjective opinions. You've authorized your witness | 20 Do you have anything else? |
| 21 to testify as to GEO's interpretations. | 21 All right. Thanks for coming. |
| 22 Is GEO going -- willing to agree that this | 22 We'll see you soon. |
| 23 interpretation can be used as part of the record? | 23 THE VIDEOGRAPHER: Time is 6:04, and we're |
| 24 MR. BARNACLE: GEO's interpretation of | 24 going off the record. |
| 25 what? | 25 (Whereupon, at 6:04 p.m., the videotaped |
| Page 258 | Page 260 |

| | |
|---|---|
| 1 MR. FREE: Of -- so each place where we | 1 examination of JAMES JANECKA (PMQ) was concluded.) |
| 2 talked about -- we're not talking about what ICE | 2 |
| 3 policies say. We're saying GEO's understanding or | 3 |
| 4 interpretation of it. | 4 |
| 5 That's not going to be an issue. | 5 |
| 6 MR. BARNACLE: To the extent that there was | 6 |
| 7 testimony that truly was GEO's interpretation, sure. | 7 |
| 8 I can't control -- you know ICE is going to | 8 |
| 9 look at this. I can't control what they say is or | 9 |
| 10 is not GEO's interpretation, or truly what they | 10 |
| 11 think is ICE information. I can't speak for them. | 11 |
| 12 MR. FREE: All right. That's helpful. | 12 |
| 13 The -- you asked for 35 days I think for ICE to | 13 |
| 14 review the transcript. The protective order | 14 |
| 15 provides 30, I think. So we're willing to agree to | 15 |
| 16 that. | 16 |
| 17 That's not going to be an issue; right? | 17 |
| 18 MR. BARNACLE: That's fine. | 18 |
| 19 MR. FREE: We have no financials from GEO. | 19 |
| 20 So we're going to need to come back for a | 20 |
| 21 redeposition of this morning's witness. | 21 |
| 22 We also have significant dearth of records | 22 |
| 23 responsive to this one, and we'll deal with that. | 23 |
| 24 Will GEO concede that we're going to come | 24 |
| 25 back at your expense? | 25 |
| Page 259 | Page 261 |

66 (Pages 258 - 261)

1    I, JAMES JANECKA (PMQ), hereby declare that
2  I am the witness in the within matter, that I have
3  read the foregoing deposition and know the contents
4  thereof, and I declare that the same is true of my
5  own knowledge except as to those matters which are
6  therein stated upon my information and belief, and
7  as to those matters, I believe them to be true.
8    I declare under penalty of perjury that the
9  foregoing is true and correct.
10    Executed on this _____ of _____,
11  2019, at _____, California.
12
13
14    _____
15    JAMES JANECKA (PMQ)
16
17
18
19
20
21
22
23
24
25

Page 262

---

1    CHANGES AND SIGNATURE
    TO THE ORAL DEPOSITION OF
2    James Jenecka
    Volume 1
3    December 11, 2019
4  PAGE  LINE  CHANGE    REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  Job No. TX3789116

Page 264

---

1    I, KATHLEEN M. ALONA, CSR NO. 14219, do
2  hereby certify:
3    That prior to being examined, the witness
4  named in the foregoing deposition was by me duly
5  sworn to testify the truth, the whole truth, and
6  nothing but the truth.
7    That said deposition was taken before me at
8  the time and place herein set forth and was taken
9  down by me in shorthand and thereafter was
10  transcribed into typewriting under my direction and
11  supervision, and I hereby certify the foregoing
12  transcript is a full, true and correct transcript of
13  my shorthand notes so taken.
14    I further certify that I am neither counsel
15  for nor related to any party to said action, nor in
16  any way interested in the outcome thereof.
17    In witness whereof, I have hereunto
18  subscribed my name this 17th day of December, 2019.
19
20
21    _Kathleen Alona_
22    KATHLEEN M. ALONA, CSR NO. 14219
23
24
25

Page 263

---

1  ADRIENNE.SCHEFFEY@AKERMAN.COM
2    December 17, 2019
3  RE: Novoa, Raul, Et Al v. The Geo Group, Inc.
4  DEPOSITION OF: James Janecka (# 3789116)
5    The above-referenced witness transcript is
6  available for read and sign.
7    Within the applicable timeframe, the witness
8  should read the testimony to verify its accuracy. If
9  there are any changes, the witness should note those
10  on the attached Errata Sheet.
11    The witness should sign and notarize the
12  attached Errata pages and return to Veritext at
13  errata-tx@veritext.com.
14    According to applicable rules or agreements, if
15  the witness fails to do so within the time allotted,
16  a certified copy of the transcript may be used as if
17  signed.
18    Yours,
19    Veritext Legal Solutions
20  cc:  All counsel
21
22
23
24
25

Page 265

67 (Pages 262 - 265)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.