# EXHIBIT E

```
 1              UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF CALIFORNIA
 2                    EASTERN DIVISION
 3    RAUL NOVOA, JAMIE CAMPOS     §
      FUENTES, ABDIAZIZ KARIM, and §
 4    RAMON MANCIA, individually   §
      and on behalf of all others  §
 5    similarly situated,          §
                                   § CIVIL ACTION NO:
 6            Plaintiffs,          §
                                   § 5:17-cv-02514-JGB-SHKx
 7    vs.                          §
                                   §
 8    THE GEO GROUP, INC.,         §
                                   §
 9            Defendant.           §
10    * * * * * * * * * * * * * * * * * * * * * * * * *
11         ORAL DEPOSITION OF THE GEO GROUP, INC.,
           30(b)(6) COURT REPRESENTATIVE BRIAN EVANS
12                    September 3, 2020
13     * * * * * * * * * * * * * * * * * * * * * * * * *
14        ORAL DEPOSITION OF THE GEO GROUP, INC.,
15    30(b)(6) COURT REPRESENTATIVE BRIAN EVANS, produced as
16    a witness and duly sworn, was taken in the
17    above-styled and numbered cause on September 3, 2020,
18    from 9:34 a.m. until 11:00 a.m., before Suzanne Kelly,
19    CSR Number 1260, in and for the State of Texas,
20    reported by stenographic method with all participants
21    appearing remotely, pursuant to emergency orders
22    related to the COVID-19 crisis, pursuant to the
23    Federal Rules of Civil Procedure and the provisions
24    stated on the record, if any.
25    Job Number: 4226194
```

Page 1

APPEARANCES

FOR THE PLAINTIFFS:
Linda A. Wright, Esq.
- and -
Lauren Cross, Esq.
BURNS CHAREST LLP
365 Canal Street, Suite 1170
New Orleans, Louisiana 70130
Phone: (504) 799-2854
Fax: (504) 881-1765
lwright@burnscharest.com
lcross@burnscharest.com

FOR THE CLASS ACTION:

R. Andrew Free, Esq.
LAW OFFICE OF R. ANDREW FREE
P.O. Box 90568
Nashville, Tennessee 37209
Phone: (844) 321-3221
Fax: (615) 829-8959
andrew@immigrantcivilrights.com

FOR THE DEFENDANT:

David Van Pelt, Esq.
AKERMAN LLP
601 West Fifth Street, Suite 300
Los Angeles, California 90071
Phone: (213) 688-9500
Fax: (213) 627-6342
david.vanpelt@akerman.com

ALSO PRESENT:

Patrick Salvant, Videographer
Julianna Gravois
Cheryl Wilke, Esq.

Page 2

INDEX
PAGE

Appearances....................................  2
THE GEO GROUP, 30(b)(6) CORPORATE
REPRESENTATIVE, BRIAN EVANS
Examination by Mr. Free ............  4
Request to mark the transcript (Line 23)......  12
Signature and Changes ........................  68
Reporter's Certificate .......................  70

EXHIBITS

NO.     DESCRIPTION        PAGE
Exhibit 67     Adelanto ICE Processing        17
               Center Facility Financial
               Summaries - Budget 2011
               through 2019

Exhibit 190    Amended Notice of Rule         10
               30(b)(6) Deposition of
               The GEO Group, Inc.

Exhibit 191    Adelanto ICE Processing        40
               Center Facility Financial
               Summaries - Actual 2011
               through 2019

Exhibit 193    A copy of a document entitled,  47
               The GEO Group, Inc.,
               Adelanto East & West & Expand
               West Adelanto, California
               (8/14/13 CBA) 1940 Detainee
               Beds for ICE (No Transportation
               Included)

Page 3

PROCEEDINGS

THE VIDEOGRAPHER:  We are now on the record.  Please note that the microphones are sensitive and may pick up whispering and private conversations.

Recording will continue until all parties agree to go off the record.  My name is Patrick Salvant representing Veritext and the date today is September 3rd, 2020, and the time is approximately 9:34 a.m.

This deposition is being held as a virtual remote deposition via Zoom and is being taken by counsel for the Plaintiffs.  The caption of this case is Raul Novoa, et al., versus the GEO Group, Inc.  This case is being held in the United States District, Court Central District of California, Eastern Division, Case Number 5:17-cv-02514-JGB-SHKx.  The name of the witness is Brian Evans.

At this time, the attorneys present in the room and everyone attending remotely will identify themselves and the parties they represent.

MR. FREE:  My name is Andrew.  My name is Andrew Free, and I represent the

Page 4

Plaintiffs in this matter.  I am joined by co-counsel, Linda Wright and Lauren Cross and our paralegal, Julianna Gravois, who is not going to be speaking today.

THE VIDEOGRAPHER:  If I can have the other counsel state their appearances.

MR. FREE:  David, you are on "mute."

You are still on "mute."  There we go.

MR. VAN PELT:  Am I still on mute?

MR. FREE:  We can hear you now.

MR. VAN PELT:  David Van Pelt on behalf of Defendant GEO Group.

THE COURT REPORTER:  Anyone else present remotely?

MR. FREE:  Ms. Wilke, do you want to identify yourself?

MS. WILKE:  Sure.  I usually don't.  My name is Cheryl Wilke.  I'm the Vice President and Corporate Counsel here at GEO Group in Boca Raton, Florida.  I will not be speaking during the course of the deposition.

THE VIDEOGRAPHER:  Okay.

MR. FREE:  And who is the "Doc

Page 5

2 (Pages 2 - 5)

1  Review" box in this?  It says, "Document Review."
2  Who is that?
3         THE WITNESS:  Oh, I think that's my
4  other computer.  I have one set up so I can look
5  at the document while also talking into the other
6  one.  So there's two.  That must be the "Doc
7  Review."
8         MS. WILKE:  It is.  We set it up
9  with the videographer and the Court Reporter
10  beforehand so that he can look at documents at
11  the same time he can see the speakers.
12         MR. FREE:  That's great.  Okay.
13  All right.
14         THE VIDEOGRAPHER:  Our Court
15  Reporter, Suzanne Kelly representing Veritext,
16  will swear in the witness; and we can proceed.
17         THE COURT REPORTER:  Mr. Evans, if
18  you would please raise your right hand, I will
19  administer the witness's oath to you.
20         THE WITNESS:  (Complies.)
21         THE COURT REPORTER:  Do you
22  solemnly swear or affirm that the testimony which
23  you give in this case will be the truth, the
24  whole truth, and nothing but the truth, so help
25  you God?

Page 6

1  counsel during this deposition about a privilege,
2  please do so once we've gone off of the record.
3  I know that you are in the room, but that
4  shouldn't mean that you don't testify as though
5  you are sitting on a witness stand.  Do you
6  understand that?
7     A.  Yes.
8     Q.  Okay.  And the same goes for any e-mails
9  or text communications or messenger apps,
10  anything you might use to communicate with anyone
11  should not happen during your time on the record.
12  Do you understand that?
13     A.  Yes.
14     Q.  Okay.  And as I informed you before we
15  went on the record, if you do need a break,
16  please just let me know.  It's not an endurance
17  contest.  We are not trying to wait you out to
18  get your better testimony.  We need to know if
19  you need to go to the bathroom or need a cup of
20  coffee.  Will you agree to tell me if you need a
21  break?
22     A.  Yes.
23     Q.  And if you don't understand a question
24  that I ask, I would ask that you please ask me to
25  clarify that question or just tell me that you

Page 8

1         THE WITNESS:  I do.
2         THE COURT REPORTER:  Thank you.
3         THE GEO GROUP, INC.,
4  30(b)(6) COURT REPRESENTATIVE BRIAN EVANS,
5     having sworn to testify the truth, the whole
6  truth, and nothing but the truth testifies on the
7     witness's oath as follows:
8            EXAMINATION
9  BY MR. FREE:
10    Q.  Good morning, Mr. Evans.  My name is
11  Andrew Free.  I represent the certified classes
12  of Plaintiffs in this action.  I understand that
13  you have been deposed before remotely; is that
14  correct?
15    A.  Yes.
16    Q.  Okay.  We had a brief off the record
17  discussion with your counsel.  I understand you
18  are sitting in the same room with GE0's counsel.
19  Your litigation counsel is across the country, I
20  believe.  As we discussed off the record as I
21  think you understand, if you are speaking to your
22  counsel while we are on the record, we are going
23  to treat that as a waiver of the attorney-client
24  privilege.
25         If you do need to speak with your

Page 7

1  don't understand.  Sometimes your counsel may
2  object, and I may just reframe the question based
3  on his good objection, but otherwise, if you
4  answer a question that I've asked, I am going to
5  assume that you understood that question.
6         So can we just agree that, if you
7  don't understand a question that I've asked, that
8  you'll tell me?
9     A.  Yes.
10    Q.  Okay.  Is there any reason that you
11  can't give your best testimony today?
12    A.  No.
13    Q.  Are you under the influence of any
14  substances?
15    A.  No.
16    Q.  Are you taking any medications that
17  might affect your memory or your recall?
18    A.  No.
19    Q.  Are you being treated for any medical
20  conditions that might affect your ability to
21  testify here today?
22    A.  No.
23    Q.  Okay.  Do you have any questions for me
24  before we get started?
25    A.  No.

Page 9

3 (Pages 6 - 9)

1    Q. All right. So this is your 30(b)(6)
2  deposition. Do you know what that means?
3    A. I believe so.
4    Q. Okay. We have entered into evidences as
5  an exhibit, 190, the Notice of 30(b)(6)
6  Deposition.
7        (Deposition Exhibit Number 190 is
8  marked.)
9  BY MR. FREE:
10    Q. Can you see it on the screen?
11    A. I see a document there.
12    Q. Sure. Okay. Well, let's just clarify.
13  What do you -- and before I go on, what do you
14  think a 30(b)(6) deposition means for you?
15    A. I believe that's testifying in my
16  capacity as the CFO.
17    Q. Okay. Do you understand that you are
18  testifying on behalf of GEO today?
19    A. Yes.
20    Q. Okay. And not just on behalf of GEO in
21  your official capacity, but you are testifying
22  for the company. You are the company's voice
23  today. Do you understand that?
24    A. Yes.
25    Q. Okay. After we go off the record in

Page 10

1    Q. All right. There should be a two-page
2  financials spreadsheet, and then there is one
3  that has financials for each year at Adelanto.
4  Do you have those in front of you?
5    A. Yes.
6    Q. Without telling me anything that you
7  discussed with Mr. Van Pelt or Ms. Wilke, how
8  long did you speak with them in preparation for
9  your 30(b)(6) deposition, sir?
10    A. Probably a little less than an hour.
11    Q. Okay.
12        THE COURT REPORTER: I'm sorry. If
13  there was an objection, I was not able to hear
14  it.
15        MS. WILKE: David, you need to turn
16  your microphone up. We can't hear you here in
17  Boca.
18        MR. VAN PELT: I apologize. I will
19  turn up the volume here. But I object to the
20  question. Basically, it violates the
21  attorney-client privilege, and I move to strike
22  the answer.
23        THE COURT REPORTER: Thank you.
24        MR. FREE: Let's mark that for the
25  record, please, Court Reporter.

Page 12

1  this deposition, we will take your personal
2  capacity deposition. So these questions for the
3  next hour or so are only going to be about the
4  Noticed topics in Plaintiff's 30(b)(6)
5  Deposition. Do you understand that?
6    A. Yes.
7    Q. Okay. What did you do to prepare for
8  today's deposition, Mr. Evans?
9    A. We had a brief conversation with the
10  attorneys yesterday or two days just about
11  the content or what we were going to be talking
12  about today, and then I also received copies of a
13  few documents that were financial in nature to
14  review beforehand.
15    Q. And who is "we," when you said we had a
16  conversation with the attorneys?
17    A. It was myself, Ms. Wilke, and Mr. Van
18  Pelt.
19    Q. Okay. The documents that you received
20  that were financial in nature, were those
21  received last night from your counsel?
22    A. I believe so.
23    Q. Okay. Do you have those printed out in
24  front of you?
25    A. Yeah.

Page 11

1  BY MR. FREE:
2    Q. Without revealing anything that you or
3  your counsel discussed, did you review any
4  records in preparation for your deposition today?
5    A. Just the two documents that we already
6  mentioned.
7    Q. No other documents? Is that correct,
8  sir?
9    A. Yes.
10    Q. Okay. Thanks. Throughout this
11  deposition, we need you to give a verbal yes or
12  no for the Court Reporter's benefit. This is
13  going to be very much like a conversation but not
14  exactly because we have to record each person's
15  answer. Do you understand?
16    A. Yes.
17    Q. Okay. Thanks.
18        So less than an hour of prep with
19  your attorneys, the two documents that we sent,
20  any other documents that you reviewed before you
21  came to testify today?
22    A. No.
23    Q. Okay. And you're prepared to testify on
24  GEO's behalf regarding the two subjects for which
25  you've been designated, which are Topic 16(k),

Page 13

4 (Pages 10 - 13)

1 GEO's budget for cleaning and otherwise
2 maintaining the Adelanto facility; is that
3 correct?
4     A. Yes.
5     Q. And you are also prepared to testify
6 today regarding Topic 22, the monthly and annual
7 operating costs of the Adelanto Facility from May
8 1st, 2011, until the present?  You are prepared
9 to testify on that as well, sir?
10    A. Yes.
11    Q. Okay.  Sir, what is your corporate
12 title?
13    A. Senior Vice President and Chief
14 Financial Officer.
15    Q. How long have you held that position?
16    A. Since August of 2009.
17    Q. How many people report to you
18 approximately?
19    A. Direct reports?
20    Q. Yes, sir.
21    A. Probably somewhere around 100.
22    Q. Are those people that you supervise
23 directly, sir?
24    A. Four people that I supervised directly.
25    Q. I'm sorry.  I couldn't hear your answer.

Page 14

1 Could you repeat it, please?
2     A. There's four people that I supervise
3 directly.
4     Q. Okay.  Who are those people?
5     A. The Vice President of Tax, Executive
6 Vice President of Tax.  I'm sorry.
7         Executive Vice President of
8 Finance.
9         Executive Vice President of
10 Accounting and Chief Accounting Officer; that's
11 one person.
12        And the chief information officer.
13    Q. And to whom do you report, sir?
14    A. The Chief Executive Officer.
15    Q. Okay.  What's the Chief Executive
16 Officer's name?
17    A. George Zoley.
18    Q. What's the Executive Vice President of
19 Tax's name?
20    A. Marcel Maier, M-a-i-e-r.
21    Q. The EVP of Finance?
22    A. Shayn March, S-h-a-y-n, March, like the
23 month.
24    Q. Accounting and --
25    A. Chief Accounting Officer --

Page 15

1     Q. Yes, sir.
2     A. -- is Ron Brack.
3     Q. And the Chief Information Officer, sir?
4     A. Jose Rosario, R-O-S-A-R-I-O.
5     Q. And the only person to whom you report
6 directly is Dr. Zoley; correct?
7     A. Yes.
8     Q. Okay.  Sir, what is GEO's budget for
9 cleaning the Adelanto Facility?
10        MR. VAN PELT:  Objection.  Vague as
11 to -- vague and ambiguous as to that term.
12 BY MR. FREE:
13    Q. You can answer.
14    A. Okay.  The budget -- I mean, the amount
15 or what it represents?  I'm not sure exactly what
16 you are looking for.  Because the amount varies
17 from year to year, obviously.
18    Q. Okay.  For the last year, let's say
19 2019, what was GEO's amounted -- budgeted amount
20 for cleaning the Adelanto Facility?
21    A. Umm.  Hold on.
22    Q. Thank you.  I believe you are looking at
23 a document right now; is that right?
24    A. Yes.
25    Q. Okay.  If you'll tell me which document

Page 16

1 you are looking at, I will go ahead and put it up
2 on the screen so we can share it.
3     A. I think it's labeled "Exhibit 67."
4     Q. Okay.  That's what I thought you were
5 looking at.  I will go ahead and put that up, and
6 we'll be on the same page literally.
7         (Deposition Exhibit Number 67 is
8 marked.)
9     A. So the -- there is a line item here,
10 "Repair and Maintenance," that for year to date
11 through September has an amount of $661,672.
12        And there is another line item
13 operations, "Operations," which is approximately
14 $203,265 through September.
15        Cleaning expenses would mostly
16 occur in the repair and maintenance category.
17 All of the repair and maintenance category isn't
18 just cleaning supplies, but that's where that
19 would show up.  The exact amount, I'm not sure,
20 but it would be maybe a few hundred thousand
21 dollars for chemicals and supplies and things of
22 that nature.
23    Q. Can you tell me, sir, the line that
24 you're looking at?
25    A. Yeah.  There's --

Page 17

5 (Pages 14 - 17)

1    Q. If you're looking at operating expenses,
2 in the operating expenses family of --
3    A. Yeah.  There is a line about four or
4 five down that says, "Repair and Maintenance."
5    Q. I see.  Okay.  So I see.  So your
6 testimony today is that GEO -- that's year to
7 date.  So let's try 2018.
8    A. Yes.
9    Q. About 850,000 is the budget for -- not
10 the budget, but that's what actually was -- this
11 is the budget, and then let's look at the actual.
12    A. Yeah.
13    Q. Actually, let me just ask a question.
14 $850,000 was the amount budgeted for repair and
15 maintenance at the Adelanto Facility in 2018;
16 correct?
17    A. Yes.
18    Q. And then the actual spend for repair and
19 maintenance at the Adelanto Detention Facility in
20 2018 was 875,000; correct?
21    A. Yes.
22    Q. Okay.  I see that this is a separate
23 line in GEO's -- what would you call this
24 document, by the way, that we're looking at?
25    A. I mean, it's just a summary of the

Page 18

1 financials that we were required, I think, to
2 provide for one of the diligence requests.
3    Q. Okay.  So can I just call it "The
4 Financials Summary" and you'll know what I am
5 talking about?
6    A. Yes.
7    Q. Okay.  Great.  And we agree that it's
8 basically two pages.  There is a budgeted page on
9 the first and then there's the actual on the
10 second; right?
11    A. Yes.
12    Q. Okay.  So let's look at the budgeted on
13 the first.  Repair and maintenance appears in a
14 budgeted line that is separate from labor.  Do
15 you see that?
16    A. Yeah.
17    Q. Okay.  Do you have any way of knowing
18 how much GEO budgeted for the labor associated
19 with cleaning and maintaining the Adelanto
20 Facility during any given year?
21    A. I don't have it off the top of my head.
22 Oh, sorry.
23       MR. VAN PELT:  Objection; assumes
24 facts not in evidence.
25 BY MR. FREE:

Page 19

1    Q. You can answer.
2       MR. VAN PELT:  You can go ahead and
3 answer.
4       THE WITNESS:  I don't have that
5 exact number, no.
6 BY MR. FREE:
7    Q. Where would I look for it?
8    A. For the labor costs for people that did
9 cleaning and maintenance?
10    Q. Yes, sir.
11    A. It would be in the gross wages category.
12 It's included in there.
13    Q. Okay.  So if I am looking at the actual
14 gross wages paid out by GEO in 2018 I see
15 $21,640,656.  Do you see that, sir?
16    A. Yes, sir.
17    Q. Okay.  You are telling me that in
18 addition to the repair and maintenance line item
19 in expenses, the labor cost of cleaning and
20 maintaining the facility would be some subset of
21 this gross wages amount?
22    A. Yes.
23    Q. Okay.  Would it also potentially be in
24 the overtime amount?
25    A. It could be.  I mean, it would be, in

Page 20

1 theory, like for instance, the people that run
2 the Maintenance Department, you know, they incur
3 vacation, sick, holiday, overtime, all of those
4 categories, so their time is spread throughout
5 those different categories.
6    Q. And when I am thinking about those
7 different categories, I am also looking at the
8 vacation, sick, holiday, training.  You are
9 telling me that some of the cost of maintaining
10 the Adelanto Facility year-over-year spreads out
11 into these line items as well?  Do I understand
12 that correctly?
13    A. The personnel costs.
14    Q. Okay.  And that's what we are talking
15 about right now is the human labor costs.  Okay.
16 So your testimony today is that the
17 cost -- excuse me -- the budget of maintaining
18 and cleaning the Adelanto Facility is reflected
19 in this document.
20    A. Yes.
21    Q. Okay.  I'd like you to take a look if
22 you can at the top of this budgeted document.
23    A. Okay.
24    Q. Okay.  You see the Pass Through Revenue?
25    A. Uh-huh.

Page 21

6 (Pages 18 - 21)

1    Q.  And you see the Billable Inmate Payroll
2  revenue?
3    A.  Yes.
4    Q.  Okay.  I don't see anything budgeted
5  there.  Do you agree there?
6    A.  Yes.
7    Q.  Okay.  I am now looking at the actual,
8  in The Financial Summary, and I see Billable
9  Inmate Payroll at -- do you see that line item,
10  sir?
11    A.  Yes.
12    Q.  And you've got a range from when the
13  facility started in 2011 of $5,261; correct?
14    A.  Yes.
15    Q.  All the way up to as much as $127,000.
16  Do you see that, sir?
17    A.  Yes.
18    Q.  Okay.  Separate from that, we also have
19  a Detainee Payroll line item.  Do you see that?
20    A.  Yes.
21    Q.  And you may or may not be aware -- are
22  you aware of Mr. Hill's testimony about what this
23  line item represents?
24    A.  I'm not aware of his testimony.  I have
25  a rough idea of what the line item represents,

Page 22

1  that -- and maybe it's just a difference of
2  degrees or semantics, but the line that's the
3  Billable Inmate Payroll, that's the amount that
4  we incur.  The actual reimbursement from the
5  government is the line -- is included in the line
6  above that's the Pass Through Revenue line.
7        So there is what we incur in the
8  payroll line and bill the government, and then
9  the line above is -- you know, is the actual
10  billing and then paying us that.  Makes sense?
11    Q.  No.  You're telling me that the Pass
12  Through Revenue is all attributable -- at the
13  very top line under "Earned Revenue," you are
14  telling me today that the Pass Through Revenue
15  line is all attributable to the voluntary work
16  program?
17    A.  No.  It's attributable to both the items
18  below it, Inmate Payroll and then there is other
19  miscellaneous, Billable Other.  But you can see
20  that the two negative amounts in each year zero
21  out the amount of revenue that we charge the
22  government for.
23    Q.  Okay.  And is the --
24    A.  So the one is the cost that we incur,
25  and then the positive amount is the reimbursement

Page 24

1  but I don't know --
2    Q.  Okay.
3    A.  -- exactly what his testimony was.
4    Q.  Okay.  Well, let me just ask you then.
5  He testified on behalf of GEO that Detainee
6  Payroll is separate from Billable Inmate Payroll.
7  He testified, in essence, that -- and this was in
8  his 30(b)(6) deposition -- that the Billable
9  Inmate Payroll is just the pass-through from ICE
10  to the detained immigrant.  It's just a dollar a
11  day.
12        And so GEO is taking the total
13  number of shifts worked by each day, each month,
14  and sending an invoice to ICE.  Invoice goes to
15  ICE.  ICE sends back $1 for each of those costs
16  that GEO has already paid to reimburse GEO for
17  the $1 they paid the detained immigrant.
18        Do we have a shared understanding
19  of what that -- that 5813 line item is, sir?
20    MR. VAN PELT:  I object that
21  Mr. Hill's testimony speaks for itself and may
22  misstate the testimony.
23        The witness can answer the
24  question, but --
25    THE WITNESS:  Yeah.  I would say

Page 23

1  or the revenue from the government, them paying
2  us for incurring those costs.
3    Q.  I think I understand.  Do we also agree
4  that this Billable Other line, while it may be a
5  pass-through amount that is a subset of this Pass
6  Through Revenue line --
7    A.  Uh-huh.
8    Q.  -- you add these two up and you get the
9  one on top; right?
10    A.  Yes.
11    Q.  You add the Billable Other with Billable
12  Inmate Payroll --
13    A.  Yes.
14    Q.  -- and you get Pass Through Revenue?
15        Okay.  Do we agree that the
16  Billable Inmate Payroll line is the only line
17  that reflects payments made to detained
18  immigrants?
19    A.  Yes.
20    Q.  Okay.  So the Billable Other line could
21  reflect other payments that are not related to
22  the voluntary work program?  But it does not
23  cover the voluntary work program payments; does
24  it?
25    A.  No.

Page 25

7 (Pages 22 - 25)

1    Q. Okay. Those are really --
2    A. I think to clarify what you said, there
3  is also -- it's not the only line. Right?
4  Because there is the Detainee Payroll line below
5  that also reflects some payments to detainees but
6  that have not been reimbursed by government.
7    Q. Right. That I was my next question.
8  And I think that you have given me my next
9  answer, which is the Detainee Payroll line is out
10 of GEO's pocket; correct?
11   A. Yes.
12   Q. Okay. So we've got the actual
13 expenditures here. On the -- on the sheet above,
14 there is no budgeted amount for that. Can you
15 explain why?
16   A. Well, on the pass-through side, it's
17 just, you know, obviously, it's going to be
18 reimbursed from the government so it's a $0
19 amount. There is no concern from a budgeting or
20 bottom line perspective.
21      And then I think on the Detainee
22 Payroll line where it's the excess, it's just
23 it's relatively immaterial and, I think,
24 fluctuates. There is no way to know exactly how
25 much that's going to be. So we don't -- we don't

*Page 26*

1 $17,963 to detained immigrants; is that correct?
2    A. Yes.
3    Q. Is it your understanding that each of
4  these payments represent $1 per day payment to a
5  person?
6    A. Yes.
7    Q. So this would represent -- this $27,041
8  in 2014 would represent a total of 27,041 shifts
9  that were worked by detained immigrants; correct?
10      MR. VAN PELT: I object as to the
11 term "shifts." It's vague and ambiguous, but the
12 witness can answer.
13      THE WITNESS: Yes.
14 BY MR. FREE:
15   Q. Okay. Does GEO ever pay immigrants
16 detained at Adelanto more than a dollar?
17   A. I don't believe so.
18   Q. But they do pay detained immigrants
19 elsewhere more than a dollar?
20   A. There is a few locations.
21   Q. So GEO -- GEO does pay more than a
22 dollar at a few of its locations; correct?
23   A. Yes.
24      MR. VAN PELT: I am going to object
25 that's beyond the scope of the category for which

*Page 28*

1 bother budgeting it.
2    Q. Okay. And if I am reading this
3  correctly, there is not in -- there's not three
4  zeros behind these numbers. These are just
5  actual figures; correct?
6    A. Yes.
7    Q. Okay. So the Detainee Payroll amount,
8  for instance, I am looking at 37767, which is the
9  actual, for 2014 that was $27,000 -- $27,041. Do
10 you see that?
11   A. Yes.
12   Q. Okay. For the next year, it was $15,359
13 that GEO paid to detained immigrants at Adelanto?
14   A. Yes.
15   Q. The following year it was $18,740?
16   A. Yes.
17   Q. Okay. Then $17,411 --
18   A. Yes.
19   Q. -- in 2017?
20   A. Yes.
21   Q. And then in 2018, we have $17,599;
22 correct?
23   A. Yes.
24   Q. And then up through September of 2019,
25 GEO had paid more than the previous two years,

*Page 27*

1 the witness is testifying.
2 By MR. FREE:
3    Q. Now, this is 27,000 payments for work
4  that detainees performed; correct? This number
5  in 2014 in the Detainee Payroll line?
6    A. Yes.
7    Q. Okay. And the reason that GEO does not
8  actually take the time to budget this is because
9  $27,000 is just not that. Do I understand your
10 testimony correctly?
11      MR. VAN PELT: I object that it
12 misstates testimony and is vague and ambiguous.
13      THE WITNESS: Well, we just
14 don't -- we don't budget the detainee -- the
15 voluntary work program because we expect most of
16 it to be pass-through.
17 BY MR. FREE:
18   Q. Okay. Well, in 2014 at least, at least
19 half of it wasn't pass-through. You had
20 54 -- excuse me -- at least you had 54,000 in
21 pass-through and you had 27,000 in actual
22 payments; right?
23   A. So two-thirds of it was pass-through.
24   Q. All right. Okay. So a third of it was
25 not; right?

*Page 29*

8 (Pages 26 - 29)

**Page 30**

1  A.  A third was not.  Correct.
2  Q.  Okay.  Good.  I think I understand.
3  Now, what would GEO -- what would
4  happen to this balance sheet with respect to the
5  cleaning and maintenance of the Adelanto
6  Detention Facility if these shifts in the
7  Billable Inmate Payroll line and the Detainee
8  Payroll line were eliminated?
9  A.  I don't understand your question by
10  "eliminated."
11  Q.  If GEO did not have the benefit of the
12  labor reflected in the 58013, which is the third
13  line from the top, and Detainee Payroll, which is
14  the top in line in the Operating Expenses part,
15  if GEO did not have the benefit of those shifts,
16  how would that affect the operating budget for
17  the Adelanto Detention Facility?
18  A.  I'm not sure.  I mean, we'd have -- I
19  guess there would be more labor expense.
20  Q.  Okay.  We had a total, it appears, for
21  the last year for which we have data of 98,999 in
22  the Billable Inmate Payroll?
23  A.  Yes.
24  Q.  That's 98,999 people who got paid a
25  dollar a day.  It might not be actual

**Page 31**

1  individuals, but that's dollar a day payments.
2  Can we agree on that?
3  A.  Yes.
4  Q.  Okay.  And then we have an additional
5  17,599 people who are getting Detainee Payroll
6  directly from GEO because it's not pass-through,
7  it's not coming from ICE; is that correct?
8  A.  Yes.
9  Q.  Okay.  So you've got about 115,000
10  shifts of detainee labor represented in 2018; is
11  that correct?
12  A.  I wouldn't say shifts.
13  Q.  What would you say?
14  A.  Well, I would say that 115,000 payments
15  were made for somebody doing something that day,
16  but they are not a shift in a traditional sense
17  of an eight-hour shift.  It could be an hour.  It
18  could be two hours.  It could be three hours.  It
19  could be half an hour.  It's -- it varies, you
20  know.  So there -- most likely, it's much less
21  than a normal what you would consider a shift of
22  eight hours or 12 hours.
23  Q.  Okay.  But you would agree with me,
24  wouldn't you, that a shift could last as little
25  as 30 minutes; right?

**Page 32**

1  A.  It could be as little as 30 minutes.
2  Q.  Okay.  So I appreciate your clarifying.
3  We're not talking about eight-hour shifts
4  necessarily.  We might not be talking about
5  12-hour shifts -- we are certainly not, I don't
6  think, talking about 12-hour shifts; right?
7  A.  Right.
8  Q.  Because ICE doesn't allow GE0 to work
9  people for more than eight hours; right?
10  A.  I don't know exactly what the rules are
11  around the program --
12  Q.  Okay.
13  A.  -- and how long --
14  MR. VAN PELT:  Object to the form.
15  MR. FREE:  And you are not
16  designated to testify on that.  That's fine.
17  MR. VAN PELT:  Thank you.
18  MR. FREE:  I will withdraw that
19  question, David.  You don't have to worry about
20  that one.
21  BY MR. FREE:
22  Q.  Okay.  So we are talking about 115,000
23  times that GEO paid someone inside the Adelanto
24  Facility to do a task.  Do I have that right?
25  A.  Right.

**Page 33**

1  Q.  In 2018?
2  A.  Yes.
3  Q.  Okay.  And when you say the labor
4  expense would increase if those shifts didn't
5  exist, how would you determine the price of that
6  labor?
7  A.  How would I determine the price of the
8  labor?
9  Q.  Yes, sir.
10  A.  Well, we'd have to go through a process
11  to, you know, do a different staffing pattern.
12  Q.  Okay.  You would have to adjust GEO's
13  staffing pattern at Adelanto and then look and
14  see what you get; is that right?
15  A.  Yes.
16  Q.  Okay.  And you are talking about
17  non-detainee staffing; right?
18  A.  Yes.
19  Q.  Okay.  So I'm going to take the screen
20  share off, and i just want to take a quick
21  temperature check.  We have been going for about
22  30 minutes.  How are you doing?  Do you need a
23  break, or are you doing okay?
24  A.  I am fine right now.
25  Q.  Okay.  Now, I'm going to ask you to look

9 (Pages 30 - 33)

1  at the Gross and Net Margin lines of the same
2  spreadsheet.  Do you see those?
3      A.  You took the spreadsheet down.  But,
4  yeah, I have it in front of me.
5      Q.  I will put it back up here.  Let's just
6  both literally be on the same page.
7          Okay.  I have got it back up.  Do
8  you see it?
9      A.  Yes.
10     Q.  So now I have highlighted the Gross
11 Margin line and I've highlighted the Net Margin
12 line.  Do you see that?
13     A.  Yes.
14     Q.  My understanding from the testimony of
15 Chuck Hill is that this represents the profit
16 that GEO can attribute to this facility.  Do I
17 misunderstand that?
18     A.  Which line?  Any of those lines or...
19     Q.  So I'll tell you my understanding, and
20 then you can correct me if I'm wrong.  Okay?  And
21 I'm not saying that this is exactly what Chuck
22 Hill said.  So just help me know if this is true
23 or not.  Can you do that?
24     A.  Yes.
25     Q.  All right.  So when we have this Gross

Page 34

1  Margin line, this is essentially subtracting your
2  operating expenses and labor expenses from the
3  revenues and finding out how much GEO made in
4  each year at the facility.
5          And then when we have -- do we
6  agree on that much?
7      A.  Yes.
8      Q.  I'm sorry.  The revenues are subtract --
9  you take the revenues and you subtract the
10 expenses?
11     A.  Those are -- you're basically taking the
12 revenues and subtracting the direct operating
13 costs of the facility.
14     Q.  Okay.
15     A.  I would say all of those costs there
16 that are above that line, they are incurred at
17 the facility.
18     Q.  Right.  And then I also understand --
19 and this understanding is from Mr. Hill, who
20 testified on GEO's behalf earlier, but I want you
21 to correct me if it's not correct.  I understand
22 that the Indirect Costs have to do with costs
23 that are spread over facilities by GEO for things
24 like regional administration and the corporate
25 operation of the facility that happens apart from

Page 35

1  it.  Do we share that understanding?
2      A.  That's correct.  Costs incurred to
3  support the facility, incurred outside the
4  facility.
5      Q.  All right.  And then separately you've
6  got the Cost of Capital, which I understand --
7  and I will admit, I am kind of hazy on this one,
8  so maybe you can just help me.  What is the Cost
9  of Capital?
10     A.  Simply the costs, our costs, for the
11 investment in the facilities.  So we've -- you
12 know, there is approximately 150 to $170 million
13 that we've spent to build, improve, et cetera,
14 expand the facility over years.  And we've
15 incurred costs to do that, financing costs.  So
16 borrowing equity market costs, et cetera.  And
17 that's what that is.  That represents that
18 allocation of that cost for the amount that we
19 have invested in the facility.
20     Q.  Is another way of describing cost to
21 capital -- Cost of Capital "debt"?
22     A.  It's -- it's a -- it's a component of
23 the interest costs that we incur on our debt.
24     Q.  Okay.  And is that facility specific,
25 like the numbers above the Gross Margin, or is

Page 36

1  that a Cost of Capital that is kind of cumulative
2  to GEO and then you spread it by some formula out
3  to Adelanto or are these costs of capital that
4  are specific to the facility?
5      A.  No.  It's an allocation of our total
6  capital cost to the facility.  It's pretty simply
7  based on the amount of money that we have
8  invested in that facility compared to the total
9  amount of our investment in facilities.
10     Q.  I see.  So it's not -- it doesn't
11 reflect anything necessarily specific to the
12 Adelanto except from the fact Adelanto is in this
13 bigger pool of capital investments that GEO has
14 made and the debt that it's taken on?
15     A.  Well, it's specific in the sense that
16 it's specific to the amount that we have invested
17 in that facility.
18     Q.  Okay.  And I believe you said a moment
19 ago that the amount that you have invested in the
20 Adelanto Facility, "you" being GEO, is between
21 150 and $170 million?  Did I get that correct?
22     A.  I don't have the exact number in front
23 of me --
24     Q.  Okay.
25     A.  -- but it's somewhere in that range.

Page 37

10 (Pages 34 - 37)

1     Q. All right. What's the book value of the
2   facility?
3     A. About the same. About 170 million.
4     Q. Any reason why you disclose it as 141
5   million in the last public filing, or does that
6   sound -- does that refresh your recollection?
7     A. So that book value, then, would be the
8   original vestment less depreciation.
9     Q. Okay. Thank you. So if looking at
10  this, I could be pretty sure that before you add
11  in all of the company expenses, GEO made around
12  15 million out of the Adelanto Facility in 2018;
13  is that -- is that correct?
14    A. Gross Margin. Yes.
15    Q. Gross Margin. And then once you add in
16  all of the company's expenses, whether it's an
17  Indirect Cost or a Cost of Capital, the Net
18  Margin was 2.8 million in 2018; correct?
19    A. Correct.
20    Q. GEO lost nearly half a million dollars
21  in 2014; is that correct?
22    A. On a Net Margin basis, correct.
23    Q. But GEO made 9.9 million on a Gross
24  Margin basis at the Adelanto Facility in 2014;
25  correct?

Page 38

1   Adelanto Facility from May 1st, 2011, until the
2   present accurately reflected in this spreadsheet?
3     A. Well, yes, through September, 2019.
4   Obviously not to today's.
5     Q. Okay. All right. So if we were to get
6   an updated version of this Financial Summary,
7   then that updated version would go through, let's
8   say, the end of August, and that would tell us
9   what the monthly -- excuse me -- what the annual
10  operating costs are; is that correct?
11    A. Yeah. It would be the same as this
12  sheet except, you know, a longer time period.
13    Q. Okay. Great. Just so you know, I am
14  going to pull up that other longer set of
15  spreadsheets that has a Bates label beginning at
16  305. So if you want to put those in front of
17  you. I will put them up on the screen. Okay.
18    A. Sure.
19    Q. We've marked this exhibit, and it is in
20  the shared marked exhibit folder as
21  "Exhibit 191."
22        (Deposition Exhibit Number 191 is
23  marked.)
24  BY MR. FREE:
25    Q. And on the screen -- we have produced it

Page 40

1     A. The contribution from the facility, yes.
2     Q. Excuse me. I am looking at the
3   budgeted, and I should have been looking at the
4   actual. I am really sorry about that.
5     A. That's okay.
6     Q. Let's look at the actual. Okay?
7     A. Okay.
8     Q. So the actual -- and I am just going to
9   go back over this testimony. The actual for
10  2018, Gross Margin, so that's how much GEO made
11  at the facility before the corporate sort of
12  bucket of costs, that's 10.4 million; right?
13    A. Yes.
14    Q. And then after you add in all of the
15  Indirect Costs and Cost of Capital, GEO lost
16  1.8 million on paper at the Adelanto Facility;
17  correct?
18    A. Yes.
19    Q. Okay. The most GEO has ever made out of
20  the Adelanto Facility on paper is $1.9 million
21  net; is that correct?
22    A. Yes.
23    Q. Okay. All right. Are the monthly and
24  annual operating costs of the Adelanto -- excuse
25  me -- are the annual operating costs of the

Page 39

1   in the form that we got it, and so it's going to
2   look a little weird. But I've omitted for your
3   benefit the first two pages. Can you see my
4   screen?
5     A. Yes.
6     Q. All right. So the first two pages I
7   took off because those are from something else.
8   And then here is the Adelanto ICE Processing
9   Center Facility financial summary for 2011. Do
10  you see that?
11    A. Yes.
12    Q. All right. My understanding of the way
13  that this document interacts with the one we were
14  just looking at, which was Exhibit 67, the
15  two-pager, the Financial Summary document, is
16  that this is essentially a month-by-month
17  compilation of expenses that GEO incurred at the
18  Adelanto Facility in the same categories as
19  appear on the annual financial budget and summary
20  spreadsheet.
21        Is that the correct way to read
22  this, sir?
23    A. Yes.
24    Q. Okay. So similarly, we have a total of
25  5,261 payroll shifts in 2011; correct?

Page 41

11 (Pages 38 - 41)

1       That's that third line from the
2   top.  Do you see that?
3       A.  Yes.
4       Q.  Okay.  And then again, no budgeted
5   Detainee Payroll.  And when we look at the
6   actual, it seems as though there was no money
7   paid to detainees that didn't come from ICE in
8   2011 -- excuse me -- in 20-- actual in 2012.
9       So I'm looking at the Detainee
10  Payroll line on Page 52806.  And I see nothing.
11  So we can agree that the only shifts -- the only
12  payments that were made to people working in the
13  voluntary work program at Adelanto were made as
14  pass-throughs from ICE?
15      MR. VAN PELT:  Objection.  It
16  assumes facts not in evidence.
17      THE WITNESS:  I'm sorry?
18  BY MR. FREE:
19      Q.  You can answer, Mr. Evans.
20      A.  Yes.
21      MR. VAN PELT:  Assumes facts not in
22  evidence.
23      MR. FREE:  Your objection has been
24  made, Mr. Van Pelt.
25  BY MR. FREE:

Page 42

1       Q.  You can answer the question, sir.
2       A.  Yes.
3       Q.  Okay.  Similarly, it appears that the
4   actual number in 2013, that GEO paid out of
5   pocket for Detainee Payroll was $0.  Do we agree
6   on that?
7       A.  Yes.
8       Q.  Okay.  And now I'm looking at the
9   following page, which is 52808.  And it appears
10  that in -- in 2014, GEO began paying
11  between -- as low as $1,100 a month and as high
12  as $4,900 a month out of pocket for detained
13  immigrant labor.  Do you see that?
14      A.  Yes.
15      Q.  Okay.  Can you tell me, sir, why GEO
16  received no money from ICE for the months of
17  February, April, and May to pay workers in the
18  voluntary work program and yet GEO was able to
19  pay $4,100 in February of 2014, $4,500 in April
20  of 2014, and $3,600 in May?
21      A.  I don't have the answer to that.
22      Q.  Okay.  Who would have the answer to
23  that?
24      A.  I mean, I don't know.  I would have to
25  probably go back and inquire of the facility and

Page 43

1   find out why that -- why that occurred.
2       Q.  But you could not do so before today?
3       A.  No.
4       Q.  Okay.  I am going to look now at 2015.
5       A.  Yes.
6       Q.  Actually, I have one more question, do
7   you -- about 2014.  Do you know why GEO paid
8   negative $517, or at least booked negative $517
9   as an Operating Expense, for Detainee Payroll in
10  December of 2014?
11      MR. VAN PELT:  Object --
12      THE COURT REPORTER:  I'm sorry.
13  Could you repeat the he objection?  I could not
14  quite hear.
15      MR. VAN PELT:  It assumes facts not
16  in evidence.
17      THE WITNESS:  Again, I don't know.
18  I would have to go investigate.
19  BY MR. FREE:
20      Q.  Do you have any understanding of why the
21  Detainee Payroll line would contain a negative
22  number in any of these spreadsheets?
23      A.  No.  Not without speculating.  So I'm
24  not going to speculate.  I would have to
25  investigate.

Page 44

1       Q.  Okay.  This is a monthly operating cost
2   of the Adelanto Detention Facility; correct?
3       A.  Yes.
4       Q.  And it's in 2014; correct?
5       A.  Yes.
6       Q.  All right.  Let's look at 2016.  I am
7   assuming based on your prior answer, that you do
8   not know why there would be negative $5,000 in
9   the November 2016 Detainee Payroll cell.  Is that
10  a correct assumption?
11      A.  Correct.
12      Q.  Okay.  And because we are here on a
13  30(b)(6) deposition, when I say "you don't know,"
14  what I am saying is GEO.  Okay?
15      MR. VAN PELT:  I am going to
16  object.  That's argumentative and outside of the
17  scope of the topic.
18  BY MR. FREE:
19      Q.  Let's look at the topic then.  Shall we?
20      A.  Well, I can answer that, then.  I, as
21  representing GEO, there's a lot of things that
22  GEO has in its records.  I would have to go look.
23  I am sure that there is a reason for it, but I
24  don't have it off the top of my head.
25      Q.  Okay.  But you could find it; right?

Page 45

12 (Pages 42 - 45)

1    A.  Absolutely.
2    Q.  Okay.  What process would you use to
3  find it?  Find the answer?
4    A.  I'd probably have to go back through
5  either the Accounting Department or the facility
6  and look and investigate the billings for that
7  month to see, you know, what happened.  There was
8  probably some sort of billing adjustment or
9  correction to a prior month or something of that
10  nature, but I would have to investigate to know
11  definitively what it was.
12    Q.  And prior to today, you did not conduct
13  any such investigation; correct?
14    A.  No.  I didn't look in detail at each
15  specific line.
16    Q.  Well, this case is about the voluntary
17  work program; right?
18    A.  Yeah.
19    Q.  At least in part.  I mean, that's what
20  we are -- this is a lawsuit about detainee labor.
21  Can we agree on that?
22    A.  Yeah.
23    Q.  Okay.  All right.  Let's now look at --
24        MR. VAN PELT:  We have been going
25  close to an hour now.  Do you think it might be a

Page 46

1  good time to take a quick break.
2        MR. FREE:  Yeah.  That's fine.
3  That's good.  Yeah.
4        THE VIDEOGRAPHER:  Okay.  We are
5  off the record at 10:21 a.m.  This is the end of
6  File Number 1.
7        (Recess taken.)
8        THE VIDEOGRAPHER:  We are back on
9  the record at 10:31 -- excuse me -- 10:32 a.m.
10  This is the beginning of File Number 2.
11  BY MR. FREE:
12    Q.  Okay, Mr. Evans.  Is there anything
13  about your testimony that you wanted to add to or
14  subtract from or change in any way?
15    A.  No.
16    Q.  A second ago when you told me that you
17  would have to -- that GEO would have to adjust
18  the staffing levels if the shifts that were
19  performed by detained immigrants weren't
20  performed anymore.  Do you see the document on
21  your screen that's been marked as "Exhibit
22  193"?
23        (Deposition Exhibit Number 193 is
24  marked.)
25  BY MR. FREE:

Page 47

1    A.  Yes.  Not all of it, but I see --
2    Q.  Yeah.  Let me get -- I'm sorry to talk
3  over you.  I won't do that again.
4        Is that the better?
5    A.  Small but better.  I can see all of it
6  now.  It was okay the way before.  At least I
7  could read it.  Yeah.  That's fine.  That's good.
8    Q.  Okay.  Let me know if we -- and I may
9  zoom in on one or two.
10    A.  Okay.
11    Q.  Okay.  My understanding is that this is
12  a set of cost assumptions and a budgeted cost
13  assumptions relating to the number of detained
14  immigrants who are at the facility.  Is that your
15  understanding as well?
16    A.  Well, this looks like a document from a
17  pricing file.
18    Q.  Okay.  Can you -- yeah.  Tell me what
19  this document is.  What do you understand it to
20  be?
21    A.  This would be in our -- our response to
22  a request for proposal or a bid request from the
23  government.  This would be a document that we
24  would provide, it looks like, for an RFP sometime
25  around 2000, (technology disruption) August 2000

Page 48

1  for supporting our costs to operate the facility.
2        THE COURT REPORTER:  Pardon me,
3  Mr. Evans.  You cut out just a little bit.  If
4  you don't mind repeating your answer.
5        THE WITNESS:  I was just saying
6  this is a document that we would include in our
7  response to a government request for proposal
8  supporting all of our costs, also indicating the
9  amount of overhead allocation, cost of capital,
10  and profit percentage for the facility.
11  BY MR. FREE:
12    Q.  Have you ever seen this particular
13  document before, sir?
14    A.  Most likely, yes.  I mean, I don't
15  recall it specifically, but I review all the
16  pricings and would have reviewed this pricing as
17  well.
18    Q.  Okay.  It's my understanding based on
19  what you testified before, that these numbers
20  about operational expenses would need to be
21  changed if there were no more detained immigrant
22  workers performing the 115,000 shifts, let's say,
23  in 2018.  Did I understand that correctly?
24        MR. VAN PELT:  Objection.
25  Objection (technological interruption.)

Page 49

13 (Pages 46 - 49)



**Page 50**

1      THE WITNESS:  Yeah.  Obviously with
2  the clarification that I made earlier about
3  shifts.
4  BY MR. FREE:
5      Q.  Sure.
6      A.  But if we -- if there was no voluntary
7  work program at the facility, then we would have
8  had to -- we would have hired more staff, so you
9  would see an increase in the total labor costs,
10  which also flows down to operational expenses.
11      You can see the profit and
12  overhead, those are percentages of the operating
13  expenses above.  So we would maintain the same
14  profit percentages and actually increase our
15  profitability on the contract if we had more
16  costs.
17      So what this document shows and the
18  way the government uses this is to justify all of
19  our costs, and then we're allowed profit and
20  overhead on top of those costs; on top of the
21  direct costs, which labor is obviously a direct
22  cost.
23      Q.  You said that you would -- your contract
24  would be more profitable if the costs went up; is
25  that correct?

**Page 51**

1      A.  More profitable in dollars.  The
2  percentage would be the same.  Does that make
3  sense?
4      Q.  It does.
5      A.  So we are charging a certain percent of
6  profit and a certain overhead allocation
7  percentage.  So those two percents would stay the
8  same.  But since the direct cost above, which
9  include this additional labor that would
10  theoretically be there because we wouldn't have
11  the voluntary work program, those costs would be
12  higher.  So the cost to government would be
13  higher not only because of the additional expense
14  of us employing, you know, additional staff but,
15  also, because our overhead and profit on those
16  costs would be higher.

24      THE COURT REPORTER:  I'm sorry.
25  I'm sorry.  I couldn't quite make out the whole

**Page 52**

1  objection.
2      MR. VAN PELT:  I objected that it
3  was an incomplete hypothetical and assumed facts
4  and was vague and ambiguous, but the witness can
5  answer.
6      THE COURT REPORTER:  Pardon me.

**Page 53**

3      MR. VAN PELT:  Object.  It's an
4  incompletely hypothetical, but the witness can
5  answer.

20      Q.  Does GEO currently have any agreement
21  with ICE that would compensate GEO for the
22  difference between the dollar it pays to the
23  detained immigrants, regardless of how long they
24  work each day, and a minimum wage of the
25  California -- at the California rate?

14 (Pages 50 - 53)

1      A.  I don't understand the question.  Can
2  you ask it again.
3      Q.  Sure.
4      A.  Or clarify it.
5      Q.  Let me try and clarify it.  Right now
6  the government reimburses GEO up to a dollar per
7  shift for five shifts a week.  Do we agree on
8  that part?
9      A.  Yes.
10     Q.  And when GEO works people more than five
11 shifts a week, GEO pays out of its own pocket at
12 Adelanto; correct?
13     A.  Shifts or days?  I think it's -- if you
14 are using day and shift interchangeably, then
15 that may be the case.  I think it's five
16 days worth of --
17     Q.  Okay.
18     A.  It could be the same as five shifts.
19     Q.  Sure.  That's fair.  My question is:  At
20 present, are you aware of any agreement between
21 GEO and ICE to cover the difference in the
22 expense that GEO would have to incur if GEO were
23 to pay the minimum wage to people in the
24 voluntary work program?
25          MR. VAN PELT:  Object.  I think

Page 54

1  it's outside the scope of the category for which
2  the witness has been designated.
3          THE WITNESS:  No.
4  BY MR. FREE:
5      Q.  Thank you.  All right.
6          Sir, in your statements
7  accompanying-- you, Brian Evans, made some
8  statements accompanying GEO's most recent 10K,
9  and I just wanted to understand them.  Do
10 you recall speaking in August on an earnings call
11 about GEO?
12     A.  I speak on most of the earnings calls,
13 so I will take your word for it that I did.
14     Q.  You don't recall one way or the other
15 whether you spoke on an earnings call in August?
16     A.  Yes.  We had an earnings call in August.
17     Q.  Okay.  Do you recall saying that GEO
18 intended to go facility by facility and try to
19 find cost savings on its expenses?
20     A.  Yes.
21     Q.  Okay.
22     A.  I recall savings in general, but yeah.
23     Q.  Okay.  Is Adelanto one of the facilities
24 that you were thinking of when you told investors

Page 55

1  in the market that GEO intended to go facility by
2  facility and try to find some cost statement
3  savings?
4      A.  I wasn't thinking of any specific
5  facility when I said it.  It was just a general
6  statement about the budgeting process.
7      Q.  Does that general statement include or
8  exclude Adelanto?
9      A.  It would include.
10     Q.  How would you obtain cost savings at
11 Adelanto, sir?
12     A.  Better overtime control, potentially
13 better purchasing arrangements for some of our
14 products.  We may, you know, be able to put stuff
15 out to bid, get better purchasing pricing.  You
16 know, we may have some staff at the facility that
17 are above and beyond what's contractually
18 required.  We could evaluate whether or not we
19 continue to need those staff, especially if the
20 populations are lower than they've historically
21 been, which they are because of the COVID
22 situation.  So things like that.
23     Q.  Anything else that comes to mind as you
24 sit here today as with respect to operating costs
25 at Adelanto that GEO would look to, to reduce

Page 56

1  those costs?
2      A.  No.
3      Q.  I heard three things.  I heard overtime
4  --
5          MR. VAN PELT:  Objection.
6          THE WITNESS:  Those are just
7  examples.  I mean, the facility would be expected
8  to, you know, go through all of their line items
9  and look where they could be more efficient or
10 obtain better pricing for products in the
11 marketplace, et cetera.
12 BY MR. FREE:
13     Q.  Okay.  I heard two of the potential
14 price productions.  I want to bracket out for a
15 second bidding out bulk orders and purchases.
16 Okay.
17     A.  Okay.
18     Q.  But do you have any specific -- before
19 we bracket it out, do you have any specific type
20 of budgeted purchases that GEO would want to
21 rebid?
22     A.  No, not off the top of my head.
23     Q.  Okay.  So you weren't thinking of
24 anything specific, but just as a general
25 principle that GEO could go through and look and

Page 57

15 (Pages 54 - 57)

1  see if it could do better with pricing?
2      A.  Like we recently re-evaluated our
3  pharmacy services contract.  We put that out to
4  bid.  So, you know, that affects some facilities.
5  But that's a contract that affects multiple
6  facilities.  So we manage that at the corporate
7  level, and then whatever benefit and pricing --
8  better pricing that we get from going through
9  that process then flows to those facilities that
10 participate in that contract.
11     Q.  You get the power of purchasing in bulk
12 for the whole company and getting it at a lower
13 rate than if you were just to purchase facility
14 by facility.  Do I understand that basically
15 okay?
16     A.  Yes.
17     Q.  Is one of the things that you would
18 rebid or try and reduce the operating costs on
19 food?
20     A.  We haven't looked at that.  We did food
21 some years ago.  I don't know that we would
22 re-evaluate that.  We have most of our food
23 services under some sort of national purchasing
24 programs.  Certain products are obtained locally
25 like bread and fresh fruits and vegetables and

1  things like that.  But other products are
2  purchased more in -- not in bulk but to take into
3  account the scale of the organization.
4      Q.  Okay.  Do you recall about -- you said a
5  couple of years ago.  Do you recall about how
6  many years ago that GEO re-examined its food
7  contracts for the Adelanto Detention Center and
8  others?
9      A.  Probably two to three.
10     Q.  Okay.  Was GEO able to arrive at a lower
11 price?
12     A.  On some items.  More efficient --
13     Q.  Like what?
14     A.  Well, I don't have the specific items.
15 It's overall just, you know, buying in bulk or
16 getting credit for all of the purchasing that we
17 do across all of the facilities just gets better
18 overall pricing for many products, many line
19 items.
20     Q.  Okay.  But I just want to make sure that
21 I understand.  GEO reduced the amount that it had
22 to spend on food a couple of years ago; is that
23 right?
24     A.  I don't know if it reduces or just
25 maintains a more steady price instead of seeing,

1  you know, inflationary pressure.
2      Q.  When we are talking about food, I assume
3  we are talking about food for the detained
4  immigrants; right?
5      A.  All of the facilities where we provide
6  food service.
7      Q.  Well, let's just talk about at Adelanto,
8  because that's the only thing you have been
9  designated to talk about today.  Okay?
10     A.  Okay.
11     Q.  When I am talking about food and
12 reductions in the food budget or getting price
13 advantages, in other words, GEO spends less for
14 the same product, is that a thing that
15 happened --
16     A.  Hopefully.
17     Q.  Hopefully.  Okay.  Is that a thing that
18 happened at Adelanto?  If you know?
19     A.  I don't know specifically if it -- if it
20 happened.
21     Q.  Okay.  What line item would that be in
22 on the two-page Financial Summary that I am
23 putting up right now?
24     A.  Food is included in the Resident Related
25 expenses.

1      Q.  Okay.  So Resident Related is this
2  second line item.  And it appears as though there
3  is no breakdown, though; right?
4      A.  No.
5      Q.  Okay.
6      A.  The biggest cost component in that is
7  medical expense.
8      Q.  I see.  Okay.  Is the second biggest
9  cost component labor?
10     A.  The largest component -- you can see the
11 largest component of cost in the facility is
12 labor.
13     Q.  Okay.
14     A.  Which is a separate category above,
15 Labor and Related Expenses.
16         Resident Related, all of those
17 expenses below the line that says, "Labor and
18 Related Expenses," all of those expenses below
19 that line do not include any labor costs in them.
20     Q.  What about Detainee Payroll?
21     A.  That does not include labor costs.
22     Q.  Is one of the things that you -- that
23 you as GEO might want to renegotiate to achieve
24 cost savings at Adelanto, the phone contract?
25     A.  No.

1    MR. VAN PELT: Object. Assumes
2 facts not in evidence.
3 BY MR. FREE:
4    Q. Your answer is "no," sir?
5    A. I don't believe so. I don't think we
6 have any role in the phone contract. I don't
7 think we incur any costs or get any benefit from
8 it.
9    Q. All right. So aside from renegotiating
10 GEO's purchasing agreements to take advantage of
11 its large purchasing power, you also mentioned
12 overtime controls and potential review of the
13 staffing levels at facilities to the extent that
14 they may be overstaffed based on the current low
15 capacity -- or low bed utilization by ICE. Did I
16 basically get that right?
17    A. Well, not overstaffed. Just
18 look -- mostly it's about overtime control.
19    Q. Okay.
20    A. Which a lot of times is going to result
21 from not less staffing but having more staff. If
22 we have -- if we're, you know, closer to our
23 authorized staffing plan, we'll generally incur
24 less overtime.
25    We'll also maybe incur less

Page 62

1 overtime at a facility that has a lower
2 occupancy. Because a big driver of overtime,
3 especially at Adelanto, is off-site medical
4 visits. So when a person has to go to the doctor
5 or some other type of off-site visit, or if they
6 are being hospitalized, they require two persons
7 to be with them at all times, two security
8 personnel 24/7.
9    So that drives -- that can drive
10 overtime. And obviously, if there's more people
11 in the facility, there's going to be more people
12 that need those types of off-site medical visits
13 and you're going to see more of that type of
14 overtime being incurred.
15    Q. I believe you said during the most
16 recent shareholder call that because elective
17 procedures were mostly on hold during the last
18 quarter for COVID, GEO actually made a tremendous
19 cost savings on that line item; is that correct?
20    A. There was some benefit across the
21 company because of that, which is anecdotally
22 consistent with, I think, what's happened in the
23 larger public sector. Obviously, hospitals
24 weren't providing those types of services and so
25 forth.

Page 63

1    So, yeah, there was a -- and a lot
2 of that was not only the cost of the medical
3 procedures that would have been incurred but,
4 also, the lack of overtime incurred to support
5 taking people out for those procedures.
6    But we expect -- I think that, you
7 know, as things return to normal, there is almost
8 like a backlog that's been built up. And, you
9 know, those expenses will probably still be --
10 still incur, it's just going to be mostly a
11 timing issue.
12    Q. To be clear, it's not that the
13 individuals who needed the elective surgeries or
14 the out-patient procedures or whatever was going
15 to spur the hospital run, it's not that they
16 didn't needed them anymore; right? It's that the
17 hospitals were not doing those activities and so
18 GEO saved on the overtime. Did I understand
19 that?
20    A. Potentially. And the fact that there
21 is, you know, significantly less people in the
22 facility. So there is just less people that need
23 that proportionally.
24    Q. Can you think of any other way in which
25 GEO would re-assess its costs at Adelanto to find

Page 64

1 savings along the lines that you described
2 generally in the recent shareholder call?
3    A. No.
4    Q. Okay.
5    MR. FREE: I am going to take about
6 a two-minute, three-minute break.
7    I am just going to confer with my
8 co-counsel, but I think we are done with this
9 portion of the day. Okay.
10    Mr. Van Pelt may have some
11 questions for you on 30(b)(6) questions, but I
12 don't know that I do have anymore. So let's go
13 off of the record. And we will come at 11:00
14 East, if that's okay.
15    And I expect that at 11:00 East we
16 will either ask just a couple of questions or we
17 will finish the deposition. Is that okay,
18 Mr. Evans?
19    MR. VAN PELT: That's fine.
20    THE WITNESS: Yes, that's fine.
21    MR. FREE: Okay. Thanks.
22    THE VIDEOGRAPHER: Okay. We are
23 off the record at 10:52 a.m. This is the end of
24 File Number 2.
25    (Recess taken.)

Page 65

17 (Pages 62 - 65)

Veritext Legal Solutions
800-336-4000

1       THE VIDEOGRAPHER: We are back on
2 the record at 10:59 a.m. This is the beginning
3 of file Number 3.
4       MR. FREE: Mr. Evans, thank you
5 very much for your time. Those are all of the
6 questions I have for you in the 30(b)(6)
7 deposition.
8       THE WITNESS: Okay.
9       MR. VAN PELT: I have no questions.
10 Thank you, Mr. Evans.
11       MR. FREE: So, David, we've got
12 two privilege/work product production issues I
13 think we need to leave the deposits each for. I
14 am not saying we are going to reopen it -- not
15 reopen it but reconvene it. But I think we just
16 want to leave it open. So that's what Plaintiffs
17 are going to do.
18       MR. VAN PELT: Okay. I have an
19 objection to that, but we will do that
20 separately. That's fine. We will deal with that
21 if we need to. It is what it is.
22       MR. FREE: Great. Let's go off the
23 record.
24       THE VIDEOGRAPHER: We are off the
25 record at 11:00 o'clock a.m. This is the end of

Page 66

1       CHANGES AND SIGNATURE
2     TO THE VIDEOTAPED ORAL DEPOSITION OF
3       THE GEO GROUP, INC.,
4     30(b)(6) COURT REPRESENTATIVE
5       BRIAN EVANS
6       September 3, 2020
7 Page  Line  Change       Reason
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25   Job No. TX4226194

Page 68

1 File Number 3.
2     (Deposition concluded.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 67

1     I, BRIAN EVANS, have read the foregoing deposition
2 and hereby affix my signature that same is true and
3 correct, except as noted above.
4       _____
5       (Signature of witness)
6 STATE OF _____
7 COUNTY OF _____
8     Before me,_____, on this day
9 personally appeared BRIAN EVANS, known to me (proved
10 to me under oath or through _____)
11 (description of identity card or other document) to be
12 the person whose name is subscribed to the foregoing
13 instrument and acknowledged to me that he executed the
14 same for the purposes and consideration therein
15 expressed.
16   (Seal)  Given under my hand and seal of office
17 this _____ day of _____, 2020.
18
19
20
21       _____
22     Notary Public in and for
23     the State of _____.
24
25

Page 69

18 (Pages 66 - 69)

**Page 70**

```
 1        UNITED STATES DISTRICT COURT
          CENTRAL DISTRICT OF CALIFORNIA
 2            EASTERN DIVISION
 3  RAUL NOVOA, JAIME CAMPOS    §
    FUENTES, ABDIAZIZ KARIM, and §
 4  RAMON MANCIA, individually   §
    and on behalf of all others  §
 5  similarly situated,          §
                      § CIVIL ACTION NO:
 6       Plaintiffs,  §
                      § 5:17-cv-02514-JGB-SHKx
 7  vs.               §
                      §
 8  THE GEO GROUP, INC.,    §
                      §
 9       Defendant.   §
10          DEPOSITION OF
       THE GEO GROUP, INC., 30(b)(6)
11     COURT REPRESENTATIVE
            BRIAN EVANS
12         September 3, 2020
13     I, Suzanne Kelly, RDR, CRR, in and for the State
    of Texas hereby certify to the following:
14
        That the witness, THE GEO GROUP, INC.,
15  30(b)(6) COURT REPRESENTATIVE BRIAN EVANS, was duly
    sworn by the officer and that the transcript of the
16  videotaped oral deposition is a true record of the
    testimony given by the witness;
17
        That the deposition transcript was submitted on
18  the _____ day of _____, 2020, to the witness for
    examination, signature and return to Suzanne Kelly by
19  the _____ day of _____, 2020;
20      That the amount of time used by each party at the
    deposition is as follows:
21
        Mr. Free:  1 hour and 10 minutes used;
22
        That pursuant to the information given to the
23  deposition officer at the time said testimony was
    taken, the following includes counsel for all parties
24  of record:
25
```

**Page 71**

```
 1  FOR THE PLAINTIFFS:
 2  Linda A. Wright, Esq.
    Lauren Cross, Esq.
 3  BURNS CHAREST LLP
    365 Canal Street, Suite 1170
 4  New Orleans, Louisiana  70130
    Phone: (504) 799-2854
 5  Fax: (504) 881-1765
    lwright@burnscharest.com
 6  lcross@burnscharest.com
 7
 8  FOR THE CLASS ACTION:
 9  R. Andrew Free, Esq.
    LAW OFFICE OF R. ANDREW FREE
10  P.O. Box 90568
    Nashville, Tennessee  37209
11  Phone: (844) 321-3221
    Fax: (615) 829-8959
12  andrew@immigrantcivilrights.com
13
14  FOR THE DEFENDANT:
15  David Van Pelt, Esq.
    AKERMAN LLP
16  601 West Fifth Street, Suite 300
    Los Angeles, California  90071
17  Phone: (213) 688-9500
    Fax: (213) 627-6342
18  david.vanpelt@akerman.com
19      I further certify that I am neither counsel for,
    related to, nor employed by any of the parties or
20  attorneys in the action in which this proceeding was
    taken, and further that I am not financially or
21  otherwise interested in the outcome of the action.
22      In witness whereof, I have this date subscribed my
    name on this 9th day of September, 2020.
23
24
25
```

**Page 72**

```
 1                    Suzanne Kelly
 2
                   Suzanne Kelly, RDR, CRR
 3       VERITEXT LEGAL SOLUTIONS
         Firm Registration No. 571
 4       300 Throckmorton Street
         Suite 1600
 5       Fort Worth, Texas 76102
         817.336.3042 1.800.336.4000
 6
         JOB NO.:  4226194
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 73**

```
 1  david.vanpelt@akerman.com
 2              September 9, 2020
 3  RE: Novoa, Raul v. The Geo Gorup
 4  DEPOSITION OF: Brian Evans , 30b6 (# 4226194)
 5      The above-referenced witness transcript is
 6  available for read and sign.
 7      Within the applicable timeframe, the witness
 8  should read the testimony to verify its accuracy. If
 9  there are any changes, the witness should note those
10  on the attached Errata Sheet.
11      The witness should sign and notarize the
12  attached Errata pages and return to Veritext at
13  errata-tx@veritext.com.
14      According to applicable rules or agreements, if
15  the witness fails to do so within the time allotted,
16  a certified copy of the transcript may be used as if
17  signed.
18              Yours,
19              Veritext Legal Solutions
20
21
22
23
24
25
```

19 (Pages 70 - 73)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.