# EXHIBIT F

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                  EASTERN DIVISION

4

5     RAUL NOVOA, JAIME CAMPOS         )

6     FUENTES, ABDIAZIZ KARIM, and    ) Civil Action No.

7     RAMON MANCIA, individually and  ) 5:17-cv-02514-JGB-SHKx

8     on behalf of all others         )

9     similarly situated,             )

10            Plaintiffs,             )

11    v.                              )

12    THE GEO GROUP, INC.,            )

13            Defendant.              )

14    _____)

15

16

17        VIDEOTAPED DEPOSITION OF PAMELA SPAGNUOLO

18             TAKEN NOVEMBER 3, 2020

19

20

21    REPORTED REMOTELY BY:

22

23    Beverly A. Benjamin, CSR No. 710

24

25    Notary Public

                                        Page 1

1      THE VIDEOTAPED DEPOSITION OF PAMELA SPAGNUOLO
2   was taken on behalf of the Plaintiffs, commencing at
3   8:58 a m  Pacific Time on November 3, 2020, remotely
4   before Beverly A  Benjamin, Certified Shorthand Reporter and
5   Notary Public within and for the State of Idaho, in the
6   above-entitled matter
7      A P P E A R A N C E S [via Zoom]:
8   For the Plaintiffs:
9      Burns Charest LLP
10     BY MR  DANIEL H  CHAREST
11       MS  LAUREN CROSS
12       MR  LARRY VINCENT
13       MS  LYDIA WRIGHT
14     900 Jackson Street, Suite 500
15     Dallas, Texas 75202
16     dcharest@burnscharest com
17     lcross@burnscharest com
18   For the Defendant:
19     Akerman LLP
20     BY MS  HALEY C  GREENBERG
21     601 West Fifth Street, Suite 300
22     Los Angeles, California 90071
23     haley greenberg@akerman com
24
25   (Appearances continued )

Page 2

1   VIDEOGRAPHER:  Fritz Sperberg
2
3   ALSO PRESENT:  Julianna Gravois, paralegal, Burns
4             Charest
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1            I N D E X
2   TESTIMONY OF PAMELA SPAGNUOLO            PAGE
3   Examination by Mr. Charest
4   Examination by Ms. Greenberg
5   Further Examination by Mr. Charest
6
7            E X H I B I T S
8   NO.    DESCRIPTION                PAGE
9   Exh 217 - GEO Corrections Adelanto Detention
10      Facility Welcome Book, American
11      Correctional Association Audit, Bates
12      Nos. GEO-Novoa_00006795-6807
13   Exh 218 - GEO Corrections Adelanto Detention
14      Facility Policy and Procedure Manual,
15      Food Service, General Food Service
16      Operations, Bates
17      Nos. GEO-Novoa_00004559-4564
18   Exh 219 - Email from Pamela Spagnuolo to
19      Angelica Hernandez, 11/30/2012,
20      Subject: Detainee Weekly Work
21      Schedule, with attached Detainee Work
22      Schedule, Bates
23      Nos. GEO-Novoa_00032814-32815
24
25

Page 4

1   Exh 220 - Email chain ending from Pamela
2      Spagnuolo to Raymond Smith,
3      6/29/2012, Subject: RE: Detainee work
4      program, Bates No. GEO-Novoa_00008233
5   Exh 221 - Email chain ending from Pamela
6      Spagnuolo to Jose G. Barr,
7      10/30/2012, Subject: FW: Detainee
8      Workers, Bates No. GEO-Novoa_00027359
9   Exh 222 - Email chain ending from Pamela
10      Spagnuolo to Jose G. Barr, 11/2/2012,
11      Bates No. GEO-Novoa_00027358
12   Exh 223 - Email chain ending from Pamela
13      Spagnuolo to Jose G. Barr, 11/3/2012,
14      Subject: RE:, Bates
15      Nos. GEO-Novoa_00033543-33545
16   Exh 224 - Email chain ending from Angelica
17      Hernandez to Pamela Spagnuolo,
18      11/30/2012, Subject: RE: KITCHEN
19      WORKERS, Bates
20      Nos. GEO-Novoa_00032655-32656
21   Exh 225 - Email chain ending from Dean Macur to
22      Pamela Spagnuolo, Sharon Buczkowske,
23      5/14/2013, Subject: FW: DSM
24      Compliance Rounds, Bates
25      Nos. GEO-Novoa_00024343-24345

Page 5

2 (Pages 2 - 5)

| | |
|---|---|
| 1    Exh 226 - Email chain ending from Dean Macur to | 1    Counsel and all others attending please now |

Exh 226  - Email chain ending from Dean Macur to
Pamela Spagnuolo, 5/14/2013, Subject:
RE: Disapproved d/t's working
kitchen, Bates
Nos. GEO-Novoa_00024438-24439
Exh 227  - Email from Pamela Spagnuolo to Jaime
Davis, 12/27/2012, Subject: GEO
Corrections MEMO-templateADF, with
attached Memorandum from Pam
Spagnuolo to Captain Davis,
12/27/2017, RE: Detainee Solorzano,
Jose, Bates
Nos. GEO-Novoa_00032817-32818
Exh 228  - Email chain ending from Sarah Mayne
to Pamela Spagnuolo, 1/9/2013,
Subject: RE: Verify Kitchen Workers
Cleared, Bates
Nos. GEO-Novoa_00032737-32738

Page 6

---

Counsel and all others attending please now
state your appearances and affiliations for the record.
And if there are any objections, please state them at
the time of your appearance, beginning with our noticing
attorney.

MR. CHAREST:  Daniel Charest for the
Plaintiffs. I'm joined by the phone with Lauren Cross,
an attorney within my shop, and Julianna Gravois who is
a paralegal that will be helping with the video side of
all this.

MS. GREENBERG:  I'm Haley Greenberg on behalf
of GEO.

THE VIDEOGRAPHER:  Would the reporter please
swear in the witness.

THE REPORTER:  Yes.  First I have a short
read-on to get the agreement that this is being done
remotely.

The attorneys participating in this proceeding
acknowledge I'm not physically present in the proceeding
room and that I will be reporting this proceeding
remotely.  They further acknowledge the witness will be
sworn in remotely by me, and the testimony will have the
same force and effect under the rules as an in-person
deposition.  The parties and their counsel consent to
this arrangement and waive any objections to this manner

Page 8

---

THE VIDEOGRAPHER:  Good morning.  We're going
on the record at 8:58 a.m. on November 3, 2020.

Just a reminder that the microphones on these
devices are sensitive.  They'll pick up whispering,
private conversations, sometimes even cellular
interference.  So if you could turn off all cell phones
or simply move them away from your viewing device.

Also a caution regarding Zoom.  If two people
speak at the same time, Zoom's code is written so that
one voice will not go through to the reporter.  So try
to avoid overspeaking.  It will make it very difficult
for her.

This is media unit No. 1 in the video-recorded
deposition of Pamela Spagnuolo taken by counsel for the
Plaintiff in the matter entitled Novoa, et al., versus
The GEO Group, Incorporated, filed in the United States
District Court for the Central District of California,
Eastern Division.  This is Case No. 5:17-cv-02514-SHKx
[sic].  This deposition is taking place using Remote
Counsel technology.

My name is Fritz Sperberg from the firm of
Veritext Legal Solutions.  I'm the videographer.  The
court reporter is Beverly Benjamin also of Veritext.  We
are not related to any party in this action nor are we
financially interested in the outcome.

Page 7

---

of reporting.

Please indicate your agreement by stating your
name and agreement on the record.  Also, if anyone else
is present in the room with you not on video, please so
indicate.

THE WITNESS:  Pamela Spagnuolo.

THE REPORTER:  Is anyone present?

THE WITNESS:  No.

MR. CHAREST:  Yes, I agree.

MS. GREENBERG:  Yes, I agree.

PAMELA SPAGNUOLO,
first duly sworn to tell the truth relating to said
cause, testified remotely as follows:

EXAMINATION

QUESTIONS BY MR. CHAREST:

Q.  Good morning, Ms. Spagnuolo.

A.  Good morning.

Q.  My name is Daniel Charest.  I represent the
Plaintiffs in this case.

For the record, please state your name.

A.  Pamela Spagnuolo.

Q.  And for the record spell it, please.

A.  P-a-m-e-l-a, S-p-a-g-n-u-o-l-o.

Q.  And where are you located presently?

Page 9

3 (Pages 6 - 9)

1    A. I am in the admin building at the Adelanto ICE
2 Processing Center in Adelanto, California.
3    Q. And what is your home address?
4    A. 18165 Kalin Ranch Drive in Victorville,
5 California 92395.
6    Q. How long have you worked at Adelanto?
7    A. I've been in Adelanto, this is my second
8 stint, and I have been here since May of this year.
9    Q. You said your "second stint." Does that mean
10 you worked at Adelanto, left, you worked somewhere else,
11 and then returned?
12    A. Correct.
13    Q. So when was your first stint at Adelanto?
14    A. I believe it was in 2012 and '13.
15    Q. Where did you work between 2013 and May of
16 this year?
17    A. I worked in Desert View and I worked in Big
18 Spring, Texas, for GEO, and then for 3 years I didn't
19 work for the company.
20    Q. Where did you work for those 3 years?
21    A. My daughter had opened a restaurant, we opened
22 a restaurant together.
23    Q. Where was the restaurant located?
24    A. In Hesperia, California.
25    Q. Is Desert View a different facility than Big

Page 10

1 Spring?
2    A. It is.
3    Q. What dates, that you can recall, did you work
4 at Desert View and then Big Spring?
5    A. I believe I worked in Desert View from about
6 2006 until about 2007, and I was in Big Spring, Texas,
7 for a year, and then they sent me back here to the ICE
8 Processing Center. And I was here until Desert View
9 reopened and then I went back next door.
10    Q. So you did two stints in Desert View as well?
11    A. Yes.
12    Q. Where is Desert View located?
13    A. Right next door to the ICE Processing Center.
14 It was a California Department of Corrections contract.
15    Q. So when you say right next door to the
16 California processing center, you're talking about
17 Adelanto?
18    A. Correct.
19    Q. So when I -- obviously the name Adelanto can
20 mean the city or the facility. When I use it, unless
21 I'm saying something to the contrary, I'm talking about
22 the facility that you work at now. Do you understand?
23    A. Yes.
24    Q. And to the extent you use the term, let's try
25 and use it for that purpose as well. And if you want to

Page 11

1 talk about the city in particular, say the City of
2 Adelanto. We'll just do our best to work through that.
3 Okay?
4    A. All right.
5    Q. So then just reading back the dates that I've
6 got here, I've got from 2006 roughly to 2011 you worked
7 at Desert View, which is a California correctional
8 facility located in the City of Adelanto; is that right?
9    A. That is correct.
10    Q. Then 2011 to 2012, you worked for GEO at Big
11 Spring?
12    A. Correct; that's in Texas.
13    Q. Correct. I'm in Texas. Excellent.
14      And then after 2012, you went to the Adelanto
15 ICE processing facility from 2012 to 2013; correct?
16    A. Yes.
17    Q. And then in 2013, is that when you opened the
18 restaurant with your daughter?
19    A. No. We got our contract back from the State
20 at Desert View; so I went back next door as food service
21 manager.
22    Q. So 2013 you go back to Desert View. How long
23 are you there?
24    A. Approximately 3 years.
25    Q. So that gets us to 2016?

Page 12

1    A. Yes.
2    Q. And then in '16 is when you opened the
3 restaurant with your daughter?
4    A. Yes.
5    Q. And that was for about 3 years, getting us to
6 about 2019-ish?
7    A. Correct.
8    Q. And then where did you work after you left
9 working with your daughter?
10    A. We opened a second restaurant in Apple Valley.
11    Q. And how long were you there?
12    A. That restaurant is still open. I was there
13 approximately 8 or 9 months.
14    Q. So from 2016 until when were you not working
15 for GEO?
16    A. Until 2020.
17    Q. And was it May of '20 that you returned?
18    A. Correct.
19    Q. And that's the beginning of your second stint
20 at Adelanto.
21    A. Yes.
22    Q. So you've worked at the processing facility in
23 Adelanto for roughly a year and a half over that time.
24    A. Yes.
25    Q. 2012 to '13, and then from May 2020 to the

Page 13

4 (Pages 10 - 13)

1  present; correct?
2      A.  Correct.
3      Q.  Thank you.
4          What is your actual job title at the Adelanto
5  processing facility?
6      A.  Food service administrator.
7      Q.  Let's talk real quickly about Adelanto itself.
8  Every once in a while we're going to have to take a
9  detour and talk about the process of doing a deposition
10 by video.  This is one of those times.
11         You should have an exhibit share folder and
12 you should be able to see in it at least one exhibit
13 which has been marked 217.  Are you seeing that?
14     A.  No, I'm not.  Let me get in the share screen.
15     Q.  And you might have to refresh it because as it
16 gets fed into you have to refresh the web browser.
17     A.  So is it -- it's asking me what I want to
18 share.
19     Q.  Nothing.  You should be seeing --
20         MR. CHAREST:  I don't know, Haley, do you want
21 to walk her through this?
22         MS. GREENBERG:  This is --
23     Q.  (BY MR. CHAREST)  Like on the left of folder
24 structure that has at least one saying Novoa, Raul, The
25 GEO Group, and then depositions, and you click down

Page 14

1  through into your deposition.  Are you there?
2      A.  No.
3          MR. CHAREST:  Let's go off the record while we
4  work this out.
5          MS. GREENBERG:  Because I don't see it either
6  actually.
7          THE VIDEOGRAPHER:  Off the record.  The time
8  is 9:09.
9          (Off the record.)
10         (Exhibit 217 marked.)
11         THE VIDEOGRAPHER:  We're back on the record at
12 9:12.  Go ahead.
13     Q.  (BY MR. CHAREST)  So Ms. Spagnuolo, are you
14 seeing Exhibit 217?
15     A.  I am.
16     Q.  Great.
17         And have you seen this document before?
18     A.  I don't think I have.
19     Q.  Well, the title says Welcome Book, and I'm not
20 sure exactly who the welcome-to person is, but it
21 provides some details about Adelanto, including a little
22 bit about your work there.  So I'm going to flip to
23 Bates label GEO-Novoa_00006803, which should be on the
24 screen now.  Are you seeing that, ma'am?
25     A.  Yes, I am.

Page 15

1      Q.  It talks about the food service manager and
2  the food production manager.  Those titles don't match
3  up with the title you gave me.  So have the titles
4  changed?
5      A.  Ms. Buczkowske is gone.  At the time my first,
6  when I worked here the first time, I was food production
7  manager.
8      Q.  And is the food service administrator title
9  that you have effectively the same as the food service
10 manager that Ms. Buczkowske held when she was there?
11     A.  That is correct.
12     Q.  So whereas before you were maybe second in
13 command on the food service chart, you are now the top
14 person?
15     A.  Yes.
16     Q.  It talks about the facility's state-of-the-art
17 kitchen facilities, then it talks about in the second
18 full paragraph where my -- I don't know if you can see,
19 can you see my little cursor?
20     A.  Yes.
21     Q.  Great.
22         It talks about:  "Detainees who have been
23 cleared by our medical department and classification
24 level are able to work in the kitchen facility."  That
25 was true and remains true today; correct?

Page 16

1      A.  Yes.
2      Q.  How many people on any given day, how many
3  detainees on any given day work in the kitchen
4  facilities?
5      A.  We haven't had any for the last 2 months due
6  to COVID.  However, anywhere from, we may have one, we
7  may have two, we might have five.
8      Q.  What drives the variation in those numbers?
9      A.  Just that they want to come to work or they
10 don't want to come to work.
11     Q.  So if you had five volunteers you would have
12 five slots every day?
13     A.  No.  And of course, on a day like chicken day
14 when they're going to get extra leg quarters, then we
15 would have a lot of detainees come to work.
16     Q.  I'm sorry, say that again.
17     A.  On a day when maybe we serve chicken leg
18 quarters, because the detainees are allowed to eat extra
19 food before and after the meal; so we may have a lot of
20 detainees come that day because they really like the
21 food on that particular day.
22     Q.  So sometimes what's on the menu drives the
23 volunteerism and sometimes their just willingness to
24 volunteer or not drives it; is that right?
25     A.  Correct.

Page 17

5 (Pages 14 - 17)

1    Q. But if a hundred people wanted to work on any
2  particular day, the food service group could not
3  accommodate a hundred volunteers; right?
4    A. No. We've never had that many on the
5  schedule.
6    Q. That's not my question. My question is more
7  about, like, what is the upper limit of people that the
8  food service group could employ if it wanted to?
9    A. I'm going to say eight.
10    Q. Eight, okay.
11       So what's the cap there? Like, what would
12  those eight people be doing that you could not possibly
13  have another person?
14    A. They would come in and work the food line, do
15  cleaning.
16    Q. When you say "work the food line," you mean
17  serving the food to other detainees; correct?
18    A. Correct; serving the food.
19    Q. And then cleaning would be just what you
20  think, keeping surfaces clean, sweeping the floor,
21  mopping the floor, bringing the trash out, that sort of
22  thing?
23    A. Yes.
24    Q. Do any detainees do any actual food handling,
25  whether it be prep work or cooking?

Page 18

1    Q. Is the maximum number of eight, was that like
2  some sort of policy decision or is it just -- how did
3  you arrive at that number?
4    A. Well, it's not GEO's number, but in a
5  detention setting it's rather having staff to oversee
6  without anybody getting in trouble or stealing or what
7  have you.
8    Q. So that's a policy-driven decision that GEO
9  needs to have sufficient number, sufficient ratio I
10  guess between detainees and staff that the staff can
11  maintain supervision over the detainees; correct?
12    A. Correct.
13    Q. If GEO only has one detainee volunteer who
14  instead does the work that the other seven would do?
15    A. My staff or myself.
16    Q. Do you have to hire additional people to cover
17  for the lack of detainee help?
18    A. No.
19    Q. So let's talk about the staff size for the GEO
20  side of the house. How many people -- well, first off,
21  let's talk from the top down. Who reports to you?
22    A. I have food service workers, I have one
23  production manager, and I have cook supervisors.
24    Q. What was the second one?
25    A. Production manager, food service workers, and

Page 20

1    A. No, I have not seen that since I've been back.
2    Q. So did you see it before you left?
3    A. Yes; once in a while.
4    Q. Explain to me how that once in a while would
5  play out, please.
6    A. If we had a detainee that came in and maybe
7  had cooking experience and wanted to do that, then we
8  would allow that.
9    Q. And was it a change in policy at GEO to no
10  longer allow detainees to do food handling, food prep
11  work, or is it just a matter of you haven't had the
12  right cast of characters that volunteered and had the
13  skill set?
14    A. I think we just haven't had the right cast of
15  characters.
16    Q. So there's no policy limitation preventing
17  detainees from handling food or doing the cooking so
18  much as it is a skill set issue; right?
19    A. Correct.
20    Q. And so then am I right to understand that
21  given your maximum number is eight and your typical
22  number is between one and five on a daily basis, that
23  GEO does not always get the number of volunteers it
24  could accept for the food service group?
25    A. Correct.

Page 19

1  then cook supervisors.
2    Q. Is there anyone below the cook supervisor?
3    A. The food service workers are.
4    Q. I see. I thought you were giving me in the
5  order.
6       Who reports to you?
7    A. All of them do.
8    Q. Directly?
9    A. Yes.
10    Q. So you called the cook, you said cook/
11  supervisor. Is the cook not in charge of the particular
12  kitchen?
13    A. No, they're not.
14    Q. So what are they supervising?
15    A. They are supervising detainees, making sure
16  the food is prepared correctly and on time.
17    Q. How many cooks -- well, maybe I need to
18  understand the facility better.
19       How many -- you have two kitchens, one East
20  and one West; correct?
21    A. Yes.
22    Q. Are the staffs equal in size for each one?
23    A. No. East is a smaller facility so we have
24  less people on the schedule at East.
25    Q. Let's talk about East first then. How many

Page 21

6 (Pages 18 - 21)

1   cooks do you have -- well, maybe I need to break it down
2   even further.  How many shifts of workers does GEO
3   employ, and I'm talking about staff workers, on any
4   given --
5       A.  Two.
6       Q.  Is that true for East and West?
7       A.  Yes.
8       Q.  So is it like a morning shift and an evening
9   shift basically?
10      A.  That's correct.
11      Q.  So the a.m. shift for East, how many people in
12  terms of staff does GEO employ?
13      A.  One cook and one cook supervisor or food
14  service worker.
15      Q.  Can you say that again, please.  One cook?
16      A.  Yes.  One person does the cooking and then we
17  have another person that would set up the line.  It
18  could either be a food service worker or a cook
19  supervisor.
20      Q.  So two people in the morning shift at the East
21  facility every day.
22      A.  Yes.
23      Q.  And then how about for the p.m. shift?
24      A.  Same; two.
25      Q.  And the same kind of disparity where it might

Page 22

1   be it's one cook and then one supervisor and/or food
2   service worker.
3       A.  Yes.
4       Q.  Do the food service workers ever do cooking or
5   is it all sort of prep?
6       A.  Sometimes they help.
7       Q.  So they have titles but the job, the work they
8   actually do is more malleable than the rigid title.  Is
9   that fair?
10      A.  Yes.
11      Q.  And then in addition to these two -- how
12  many -- let's go to the West before I move on from
13  there.  For the West in the morning shift what's your
14  GEO staffing?
15      A.  Probably two cooks and three food service
16  workers.
17      Q.  And how about the p.m. staff?
18      A.  The same; two cooks, three food service
19  workers.
20      Q.  Now, when we talk about the East, you
21  suggested that the supervisors and the food service
22  workers were perhaps interchangeable.  Is that also true
23  for the West?
24      A.  Yes.  But we have to have the cooks do the
25  cooking; they are union.

Page 23

1       Q.  And the supervisors, food service workers are
2   not?
3       A.  They are union.  They just don't do the
4   cooking; they are paid a less wage.
5       Q.  What is the union?
6       A.  I don't know the name of the union.
7       Q.  Do they work on a collective bargaining
8   agreement?
9       A.  Yes.
10      Q.  Are you involved in the negotiations of the
11  wages under that collective bargaining agreement?
12      A.  No, I'm not.
13      Q.  Do you know what the workers get paid by the
14  hour?
15      A.  The cook supervisors make about $27 an hour,
16  and the food service workers I believe at are about 18.
17      Q.  Do you know what drives the cost for those
18  hourly wages?
19      A.  I believe federal prevailing wage.
20      Q.  When you say "federal prevailing wage," what
21  are you talking about?
22      A.  For example, if you had a federal job working
23  for ICE and you did not work for GEO, I believe that's
24  considered a prevailing wage.
25      Q.  Do you know, is there any kind of document

Page 24

1   that you can think of, like some contract or regulation
2   that you have in mind when you're thinking about that?
3       A.  No.
4       Q.  Okay.  So then we have two shifts of two
5   people each on the eastern kitchen and two shifts of
6   five people each on the western kitchen; correct?
7       A.  Correct.
8       Q.  Those numbers are for GEO-employed staff
9   workers; right?
10      A.  Yes.
11      Q.  And then if you have the maximum eight people,
12  eight detainees working, is the distribution four and
13  four East and West?
14      A.  No.  We have our own detainees for each side;
15  East has their own detainees that would work in the
16  kitchen and West has theirs.
17      Q.  So then if I'm in the East facility I can't
18  volunteer to work in the West kitchen; is that right?
19      A.  No.
20      Q.  You say "no" but you mean yes, you cannot;
21  right?
22      A.  You cannot; correct.
23      Q.  So when you gave me the number of up to eight
24  detainees working for any particular shift, is that
25  eight for East and eight for West or is it eight in

Page 25

7 (Pages 22 - 25)

1 total?
2     A. Eight for each.
3     Q. Eight for each.
4        And is that per shift?
5     A. Correct; per shift.
6     Q. So then there's room for, I'm going to do some
7 math here, I guess 32 volunteer or detainee workers per
8 day under the kitchen as you see it.
9     A. Yes. That rarely happens.
10    Q. Are all of the detainees that work -- well, I
11 guess I asked this a little bit but let me just clarify.
12 Can I start the question again? Do you mind? May I
13 restart my question, ma'am?
14    A. Yes.
15    Q. Do the detainees that are working in the
16 kitchen do any work that the cooks and/or food service
17 workers otherwise would do?
18    A. Otherwise would do? We all would do the same
19 work.
20    Q. So how many meals, how many -- well, let's
21 talk about that. What is the food schedule for East and
22 West?
23    A. They serve breakfast at about 4:30 in the
24 morning, lunch at about 11 a.m., and dinner at about
25 4 p.m.

Page 26

1     Q. So then people actually start eating breakfast
2 at 4:30 in the morning?
3     A. Yes.
4     Q. So what time do the workers arrive to prepare
5 that breakfast?
6     A. About 2:00 in the morning, 2:00 to 2:30 in the
7 morning.
8     Q. So then the morning shift starts between
9 and 2:30 in the morning; correct?
10    A. Correct.
11    Q. Service for breakfast begins at 4:30 in the
12 morning. When does it end?
13    A. At approximately 5:30 to 6:00 a.m.
14    Q. And then between 6:00 and 11:00, is that when
15 the workers begin preparing the lunch?
16    A. That is correct; cleaning and cooking.
17    Q. And then service for lunch begins at
18 a.m.?
19    A. Yes.
20    Q. How long does that service run?
21    A. The same; about an hour to an hour and a half.
22    Q. So lunch then is 11:00 in the morning until
23 12:00 or 12:30.
24    A. Correct.
25    Q. And then between 12:30 and 4:00 is it cleaning

Page 27

1 and prep for dinner?
2     A. That is correct.
3     Q. And then at 4:00 dinner service starts?
4     A. Yes.
5     Q. And how long does that last?
6     A. About an hour and a half.
7     Q. And then how long after service stops for
8 dinner at roughly 5:30 p.m. does it take to finish the
9 cleaning process?
10    A. Maybe an hour to an hour and a half.
11    Q. So the afternoon shift, the p.m. shift, should
12 expect to be clocking out around 7 p.m.; is that right?
13    A. That is correct.
14    Q. So you're live for roughly 17 out of 24 hours
15 of the day. Is that fair?
16    A. Yes.
17    Q. And that's two shifts; correct?
18    A. Yes.
19    Q. The a.m. shift starting at 2:00 in the morning
20 and ending at 11:30?
21    A. Correct. But that would be my employees. The
22 detainees would normally go back to their housing much
23 sooner than that; they're not there the whole time.
24    Q. We can talk about that in just a second.
25        And then the afternoon shift starts at

Page 28

1 and runs until roughly 7:00 p.m.; correct?
2     A. Yes.
3     Q. So the 2:00 in the morning until 11:30 is
4 9 1/2 hours. Do the union members work a 9 1/2-hour
5 shift daily?
6     A. No. They would work 2:30 to 11:00.
7     Q. Okay.
8     A. And then the p.m. shift comes in from 11:00 to
9 7:30.
10    Q. That makes more sense.
11        So that's 8 1/2 hours of time, they get a half
12 hour break during that time?
13    A. They do.
14    Q. So it's an 8-hour shift worked with 30 minutes
15 of break time; correct?
16    A. Correct.
17    Q. And that's the same for East and West;
18 correct?
19    A. It is.
20    Q. Now, what time do detainees that are working
21 the a.m. shift arrive?
22    A. They would come in at about 2:00 to --
23 probably 2:30 to 3:00 in the morning.
24    Q. 2:30 to 3:00?
25    A. Yes.

Page 29

8 (Pages 26 - 29)

1      Q.  And they are starting, they're going to be
2  helping with the prep and the cleaning I guess.
3      A.  Yes.  Setting up the line, getting ready for
4  the meal, and they get to eat before we serve.
5      Q.  What time do they eat?
6      A.  Probably about 4 a.m.
7      Q.  How long do they -- is it like a set time that
8  they get to break or is it they just get to eat and come
9  back to work?
10      A.  They eat and then once we start the line they
11  come back and work the line.
12      Q.  So in terms of -- well, I guess my question is
13  different than what you just said then.  Do they get,
14  Okay, you're on the clock, you have 30 minutes break
15  time and now go eat and then come back, or is it, Take
16  your food and come back when you're done?
17      A.  They actually have a table in the kitchen, a
18  break area, where they can go sit and eat.
19      Q.  Yeah, my question is about timing, ma'am, not
20  where they were eating.  Are they --
21      A.  They're never there long enough to take a
22  half-hour lunch break.  So however long they want to sit
23  there until we need them to start serving they can.
24      Q.  I don't know what you mean by they're not
25  there long enough to take a lunch break.  What do you

Page 30

1  mean by that?
2      A.  They come in at approximately 2:30 or 3:00 in
3  the morning, and then by 4:00 a.m. when the meal is
4  prepared, they're allowed to sit and eat until we need
5  them again to help serve maybe at 4:30.
6      Q.  And then they serve from 4:30 until 6:00 when
7  the breakfast ends; correct?
8      A.  Yes.
9      Q.  And then how long is the morning shift there
10  for the cleanup, for detainees now?
11      A.  Maybe a half hour after breakfast.
12      Q.  So your testimony is that the detainees leave
13  around 6:30 in the morning?
14      A.  Probably closer to 7:00, yeah; 6:30 or 7:00.
15      Q.  Closer to 7:00 you said?
16      A.  Yes; between 6:30 and 7:00.
17      Q.  But closer to 7:00 is what you said; correct?
18      A.  Correct.
19      MS. GREENBERG:  Objection; misstates
20  testimony.
21      MR. CHAREST:  Actually it doesn't misstate the
22  testimony.  It literally states the testimony.  But
23  thanks.
24      Q.  (BY MR. CHAREST)  Okay.  And then what time --
25  what time do the detainees that are serving the lunch

Page 31

1  meal arrive?
2      A.  They usually don't come in until about the
3  time we serve; so at about 10:30 in the morning or
4  11:00.
5      Q.  So they don't, the detainees don't help
6  prepare the line for serving lunch?
7      A.  No, that's usually set up by the a.m. people.
8  Because we have count during that time.  Count doesn't
9  clear until about 11 a.m.
10      Q.  Meaning the detainees have to be somewhere
11  else other than the kitchen?
12      A.  Yes.  They're usually in their dorm for that
13  count.
14      Q.  They don't do count in the kitchen?
15      A.  That is not normally the practice; no.
16      Q.  Does it ever happen?
17      A.  They bring them in after count.  It's easier.
18      Q.  Does it ever happen?
19      A.  I'm sure it probably has.  I have not seen
20  that.
21      Q.  So the count happens around 11:00 and around
22  that same time the kitchen detainee workers arrive to
23  help serve the lunch out; correct?
24      A.  The count starts at 10:30 and it's usually
25  finished by 11:00, and that's when they come in, after

Page 32

1  count clears.
2      Q.  Gotcha.
3      A.  Some of them go to lunch with their dorm when
4  they were going to lunch, and then they would just
5  report to work after they ate in the chow hall.
6      Q.  How does that get decided?  I mean, that seems
7  like a lot of variables.
8      A.  Well, that's up to them.  We don't force them
9  to work.  So if they don't report at the beginning of
10  chow and they want to come in after they've eaten with
11  their dorm in the chow hall, we allow it if they are on
12  the schedule.
13      Q.  And if they're not on the schedule your
14  testimony is that there's no negative consequence to
15  them for if they are on the schedule and they don't want
16  to work?
17      A.  No, that's up to them completely.
18      Q.  But they lose their job, right, if they don't
19  show up on the scheduled times; right?
20      A.  They would have to not show up an awful lot of
21  times before they would lose their job.
22      Q.  But that is a consequence of not showing up is
23  losing the job; correct?
24      A.  Correct.
25      Q.  And being ineligible for further volunteer

Page 33

9 (Pages 30 - 33)

1  work for what, 6 months?
2      A. No. This year it's much shorter than that.
3  I've seen them say that they just can't work for 2 weeks
4  and come back.
5      Q. So your testimony is here under oath that
6  you've not enforced a 6-month moratorium on volunteering
7  if you get terminated?
8      A. No, we haven't. Depends on what they were
9  terminated for.
10     THE REPORTER: Excuse me. Was there an
11 objection, Haley, a couple questions ago?
12     MS. GREENBERG: Yes, there was. Thank you.
13     Objection; misstates testimony.
14     Q. (BY MR. CHAREST) So your answer was a little
15 bit contradictory I think. Let me just try and clarify.
16     Have you or have you not on behalf of GEO
17 enforced, or at least told the detainees that there was
18 a 6-month moratorium if they get terminated for not
19 showing up?
20     A. No, I have not been told 6 months.
21     Q. No, not been told; told, been the one to tell.
22     A. No, I have not.
23     Q. So let's go back to the detainees' schedule.
24 The folks that show up for the lunch help for service,
25 are they a.m. shift or p.m. shift?

Page 34

1      A. P.m.
2      Q. So then the a.m. shift for the detainees runs
3  roughly 2:30 in the morning until roughly 7:00 or
4  in the morning; correct?
5      A. Correct.
6      Q. And the p.m. shift for the detainees starts
7  either after count or after the detainees have their
8  lunch then come in; correct?
9      A. Yes, that is correct.
10     Q. The count being the one that starts at
11 and usually is done by 11:00.
12     A. Yes.
13     Q. And so the p.m. shift, for detainees now,
14 after they serve food, lunch, which ends around 12:30,
15 and then they start cleaning up and preparing for
16 dinner; correct?
17     A. Correct.
18     Q. Are they there for that entire window between
19 the end of lunch and the beginning of dinner?
20     A. No. Most will eat again after lunch as much
21 as they want or they're allowed to prepare extra food
22 for themselves. Different, we'll give them different
23 ingredients; same food but some like to season it up.
24 And they return to their dorm, and then sometimes they
25 report back for dinner; sometimes they don't.

Page 35

1      Q. Well, GEO tells the detainees the schedule it
2  wants the detainees to appear; correct?
3      A. That is correct.
4      Q. So what schedule does GEO tell the detainees
5  it wants the detainees to appear for the p.m. shift?
6      A. We cannot make them work. If they show up to
7  the kitchen for 5 minutes and request to go back to
8  their dorm, they are paid for the whole day.
9      Q. You're not answering my question. So I
10 understand what you're wanting to tell me, and that's
11 fine, we can talk about that.
12     But the question is: What schedule does GEO
13 ask the p.m. detainees to maintain for the kitchen?
14     A. It would be the same as the employees.
15     Q. So --
16     A. We can use them from 11:00 to 7:30.
17     Q. And your testimony is sometimes they do that
18 and sometimes they do not; is that right?
19     A. That is correct.
20     Q. Do you have any data or statistics to show the
21 frequency of how long any particular detainees stay or
22 not?
23     A. No.
24     Q. So it's anecdotal, your memory about sometimes
25 they do and sometimes they don't?

Page 36

1      A. Yes.
2      Q. So is that also true for the a.m. shift where
3  they are welcome to be there for the full shift that the
4  GEO staff workers are there?
5      A. Yes; that is correct.
6      Q. So when you were telling me about they arrive
7  around 2:30, that's again sort of anecdotal because
8  they're -- wait a minute. I think I understand that.
9  Okay.
10     How many meals does GEO prepare in any given
11 day for the East facility?
12     A. Three hot meals.
13     Q. Sure. But for how many people? I guess it
14 depends on the number of detainees; correct?
15     A. That is correct; what population is. Plus
16 staff, we feed a lot of staff.
17     Q. How many staff members does your kitchen feed?
18     A. Last month I had about 2,300 staff meals that
19 they came to the kitchen and ate the food.
20     Q. So 2,300 last month. Is there any kind of
21 limitation on the amount of meals the staff can eat?
22     A. They can have one free tray per shift.
23     Q. One free tray per shift.
24     Do the staff typically work an 8-hour shift as
25 well?

Page 37

10 (Pages 34 - 37)

1      A. Yes. There is a lot of overtime here.

2      Q. So people are more likely to be there for

3  12 hours than for 8 for the staff members; is that

4  right?

5      A. The officers, yes.

6      Q. How much time in advance does GEO tell the

7  kitchen how many people to prepare for? You can't just

8  magic up a thousand meals. How much lead time do you

9  have in terms of population?

10      A. We get our population counts every morning and

11  prepare according to those counts plus 10 percent over.

12      Q. I'm sorry, say that again. I looked away.

13  Can you say it again, please.

14      A. We have our count, so we get our population

15  count every morning and prepare food accordingly for the

16  population.

17      Q. Plus 10 percent?

18      A. Plus 10 percent over.

19      Q. Does the count ever -- I guess then the count

20  probably doesn't fluctuate by more than 10 percent

21  because then you'd run out of food for people; is that

22  right?

23      A. Correct. We prepare for population but then

24  out of that we have kosher meals that come out of that.

25  Kosher meals are like a TV dinner. They're a shelf-

Page 38

stable meal that we order in. So we don't take that

2  into consideration so we always have plenty of extra

3  food.

4      Q. And you talked about the detainees being able

5  to eat both before with their dorm and again after

6  lunch, for example. Is that a common practice where GEO

7  allows detainee workers to eat food outside of what's

8  prepared for the run-of-the-mill detainees?

9      A. No, they eat the same food but they're just

10  allowed to eat as much as they want.

11      Q. How about the people that are not working in

12  the kitchen, are they allowed to come back for seconds,

13  for example?

14      A. For free staff, for my staff or officers?

15      Q. Detainees, ma'am.

16      A. No.

17      Q. So the run-of-the-mill detainee gets one tray

18  per meal three times a day; correct?

19      A. Correct.

20      Q. And if they want more they can't have it;

21  right?

22      A. No. Our menus and portions are done by a

23  registered dietician. So they're given about 2,500 to

24  3,000 calories a day.

25      Q. But this is one of those examples where you

Page 39

said "no" but I think you mean yes. So I'll try it

2  again.

3      If someone wants to eat more than the one tray

4  that person received, a detainee received on any

5  particular serving, that person is not allowed to have

6  more; correct?

7      A. Yes; that is correct.

8      Q. And that person gets three meals preordained

9  by GEO, the size that GEO says, whatever amount of

10  calories and/or servings, and that's all they get from

11  the kitchen; correct?

12      A. That is correct.

13      Q. And then by contrast the detainees that are

14  working in the kitchen are allowed to eat another meal,

15  or I think you said as much as they want when they're

16  working or when they've done their work for the

17  facility; is that correct?

18      A. Correct.

19      Q. And in addition they're allowed to season the

20  meal however they want; correct?

21      A. Yes.

22      Q. And that's all fine according to GEO and not a

23  problem for its policies in terms of the kitchen workers

24  are not being punished for that, that's permitted;

25  correct?

Page 40

1      A. Correct.

2      Q. But if they're having, say, chicken on the

3  menu for the general population, the detainees can't go

4  and cook steak, for example; right?

5      A. That is correct; they cannot.

6      Q. Now, the staff that eats from the GEO

7  kitchens, are they allowed to get more than one tray?

8      A. No.

9      Q. So if I'm a staff member and I come back and

10  say, I missed breakfast, I'm starving, I'm really hungry

11  for lunch and I want some more food, I'm just going to

12  get turned away?

13      A. That is correct.

14      Q. And is that a GEO policy?

15      A. Yes. They're allowed one free tray per shift,

16  and that's a standard tray.

17      Q. Can the staff members buy another tray?

18      A. That I have not seen, that they came in and

19  asked to do that.

20      Q. Can the detainees buy another tray?

21      A. No.

22      Q. How does GEO -- well, I've seen -- let me

23  frame the issue.

24      I've seen discussions about medical clearance

25  and classification clearance, I want to probe that so I

Page 41

11 (Pages 38 - 41)

1   understand kind of the process.  Do you understand the
2   focus of what we're talking about?
3       A.  Yes, I do.
4       Q.  Cool.
5           Describe for me if you would the process by
6   which any particular detainee who volunteers to work in
7   the kitchen is approved internally and/or externally
8   through ICE for work in the kitchen.
9       A.  They would have to submit an application, and
10  that goes to classification, and then they have to go to
11  medical and be medically cleared to make sure they don't
12  have any illnesses, open sores, et cetera.
13      Q.  When you say "classification," what does
14  that -- what's the name of the person that does that
15  primarily for GEO?
16      A.  Ms. McCormick.
17      Q.  McCormick.  Can you spell that, please.
18      A.  M-c-C-o-r-m-i-c-k.
19      Q.  Now, she's not always been the classification
20  person; correct?
21      A.  I believe that's correct.  She has been since
22  I've been here this time.
23      Q.  Since the second time; correct?
24      A.  Correct.
25      Q.  Was Angela Hernandez a classification officer

Page 42

1   at some point in time?
2       A.  Yes.
3       Q.  Does the classification officer work for GEO?
4       A.  Yes, they do.
5       Q.  And so the -- are you involved at all in the
6   interaction between GEO and the detainee for the initial
7   application, when the detainee says, Yes, I would like
8   to volunteer, how do I do it?  What do I fill out?  Are
9   you involved in that process at all?
10      A.  No.  They have applications in their dorm and
11  they fill those out and they make their way to
12  classification.
13      Q.  And then what does classification actually
14  look at and do?
15      A.  They look at the application and place them
16  where they think they would best fit.
17      Q.  Are they looking for -- what are the types of
18  things that might disqualify a detainee from working as
19  a volunteer?
20      A.  Well, there's certain levels.  So you can't
21  have a high-level detainee with a low-level detainee.
22      Q.  What does that mean, the levels?
23      A.  The high level would be the largest risk of a
24  detainee.
25      Q.  Risk of what, ma'am?

Page 43

1       A.  Of violence, the violent detainees, violent
2   crimes.
3       Q.  So the detainees are classified in terms of
4   heightened risk?
5       A.  High, medium, and low.
6       Q.  So what does a high-risk detainee mean?  What
7   does that mean?
8       A.  Well, I'm not privy to their criminal records
9   but a high risk would be probably a violent crime.
10      Q.  And what is a medium risk?
11      A.  A medium would probably be like maybe car
12  thieves, bank robbers, drug transportation, nonviolent
13  crimes but high crimes.
14      Q.  And then what's the low risk?
15      A.  Low risk would be maybe drunk drivers.
16      Q.  So there is, there are I assume some people
17  that are not criminals at Adelanto; correct?
18      A.  And they would probably be low level.
19      Q.  So drunk drivers and regular people are low
20  level.
21      A.  That's what I would say, yes, classified.
22      Q.  And you mentioned you can't put what, a high
23  risk with a low risk together; is that right?
24      A.  That is correct.
25      Q.  So are high-risk detainees allowed to work in

Page 44

1   the kitchen?
2       A.  Yes.
3       Q.  But only with other high-risk detainees?
4       A.  Correct.
5       Q.  And have you ever worked with the high-risk
6   detainees in the kitchen?
7       A.  Yes.
8       Q.  What else?  So the classification person just
9   organizes around the risk classification and makes sure
10  that there's no classification mixtures.  Is that fair?
11      A.  That would be fair that I know, yes.  But I've
12  never worked classification.
13      Q.  And does classification interact with ICE in
14  any way to get the job done?
15      A.  That I don't know.
16      Q.  Well, you know that lists are submitted to ICE
17  and then ICE approves them or doesn't approve them;
18  correct?
19          MS. GREENBERG:  Objection; misstates
20  testimony.
21          THE WITNESS:  Correct.  I'm not sure who
22  classifies them from ICE, in other words, when we
23  receive them.
24          (Reporter clarification.)
25      Q.  (BY MR. CHAREST)  So classification interacts

Page 45

12 (Pages 42 - 45)

1   in some regard with ICE, you don't know exactly how, but
2   you do know that ICE, by not responding timely, delays
3   classification clearance of detainees; right?
4       A. I would assume so. I don't know.
5       Q. You don't have memory of that happening?
6       A. No. I don't know anything about what
7   classification does as far as how they get them into the
8   kitchen or what have you.
9       Q. Do you know who Jose Barr is?
10      A. Yes.
11      Q. Who's Jose Barr?
12      A. He used to work for ICE.
13      Q. In what capacity?
14      A. I'm not sure exactly what he did. He was an
15  ICE officer.
16      Q. Did you work with Jose Barr in connection with
17  getting detainees approved to work in the kitchen?
18      A. I think he kind of oversaw a lot of things.
19      Q. Can you answer my question though, please?
20      A. I would probably say yes.
21      Q. Thank you.
22          Do you know what Mr. Barr did for ICE with
23  respect to approving or not approving detainees to work
24  in the kitchen?
25      A. I do not.

Page 46

1       Q. You just know he was involved.
2       A. Yes. I'm not even sure what his job title
3   was.
4       Q. Were you friendly with Mr. Barr?
5       A. Yes. He was a very nice coworker.
6       Q. To be clear, he didn't work at GEO; correct?
7       A. Correct.
8       Q. So when you say "coworker," you're talking
9   about working with an ICE employee?
10      A. Yes.
11      Q. Do you know where Mr. Barr is now?
12      A. I do not.
13      Q. Does the kitchen staff have visibility into
14  any particular detainee's actual classification as high,
15  low, or medium?
16      A. No.
17      Q. So you don't know whether the classification
18  group did its job correctly and prevented the mixtures
19  that it sought to be avoided or did not; correct?
20      A. We do, because when they come into the kitchen
21  they're wearing their colors. So they're either orange
22  or red or what have you when they report to the kitchen,
23  and then they change into a clean uniform.
24      Q. Gotcha.
25          So what is the high-risk detainee?

Page 47

1       A. Red.
2       Q. And what about the medium?
3       A. Orange.
4       Q. And how about the low?
5       A. I'm trying to think what -- blue.
6       Q. So the kitchen staff sees the detainees as
7   they come in wearing whatever color they are wearing and
8   then they change into kitchen clothes; right?
9       A. Correct. The officer will bring them in.
10      Q. What efforts, if any, does the kitchen make to
11  encourage detainees to volunteer?
12      A. Just treat them with respect and show them
13  that we're doing the same, we will do the same work as
14  anyone else.
15      Q. So that sounds like interaction with people
16  who have volunteered, right, but I'm talking about what,
17  if anything, does the kitchen staff or you included do
18  to entice people to volunteer?
19      A. Nothing at this time. It's usually word of
20  mouth. We usually get the detainees that enjoy coming
21  out of their dorm and not staying in their dorm and
22  doing something.
23      Q. Have you ever gone out into the dorms to try
24  and encourage folks to volunteer?
25      A. I think when I was a production manager we

Page 48

1   would go to the dorms and see if anyone was interested
2   in working in the kitchen.
3       Q. Did you find that was a successful effort?
4       A. Sometimes; not always.
5       Q. Did you tell the folks some of the benefits of
6   working in the kitchen?
7       A. I think they all, I think they all know from
8   the ones that work in there that if they want to work in
9   there they're going to be able to eat extra food.
10      Q. Are detainees allowed to bring food out of the
11  kitchen?
12      A. Never.
13      Q. Never.
14          Even the smallest thing is forbidden; is that
15  right?
16      A. I absolutely do not allow that.
17      Q. Why is that?
18      A. Because they take that back and they've been
19  known to sell things or trade things for the food that
20  comes out of the kitchen, or we don't want to allow them
21  to take things out of the kitchen that could spoil in
22  the dorm and then they eat bad food.
23      Q. So part of it is to prevent a barter system of
24  using food as currency in order to gain things. Another
25  thing you just said is to protect people from eating bad

Page 49

13 (Pages 46 - 49)

1  food; yeah?
2      A. Absolutely, yes.
3      Q. How long is the shelf life of Sweet'N Low? Do
4  you know?
5      A. Sweet'N Low would be several years, 2 or
6  3 years.
7      Q. So if someone stole a packet of Sweet'N Low,
8  would that be a fireable offense?
9      A. One packet, no.
10     Q. How much Sweet'N Low would someone have to
11 steal to get fired?
12     A. A baggy, maybe a baggy full.
13     Q. How many packets are in a baggy?
14     A. I wouldn't have any clue.
15     Q. Well, how big is a baggy?
16     A. A sandwich baggy holds a sandwich; so I'm sure
17 you could fit a hundred or 200 packets of Sweet'N Low in
18 there.
19     Q. I'm just trying to understand. When you said
20 "baggy," I was trying to understand what your volume
21 metric measurement was. You're talking about a sandwich
22 bag; yeah?
23     A. Yes.
24     Q. So you think if someone brought a baggy out, a
25 sandwich bag full of Sweet'N Low, that would be enough

Page 50

1  to get terminated but less than that probably not?
2      A. If somebody was caught with one packet of
3  Sweet'N Low we probably would not fire them.
4      Q. Okay.
5      A. We would probably counsel them.
6      MR. CHAREST: Can we go off the record just
7  briefly? I'm sorry, something just came up I have to
8  answer. Sorry.
9      THE VIDEOGRAPHER: Ms. Greenberg.
10     MS. GREENBERG: Should we take a 10-minute
11 break then? Is this a good...
12     MR. CHAREST: Sure. That's fine.
13     THE VIDEOGRAPHER: Off the record. The time
14 is 10:04.
15     (Recess taken.)
16     THE VIDEOGRAPHER: We're back on the record at
17 10:16. Go ahead.
18     Q. (BY MR. CHAREST) Ms. Spagnuolo, we were
19 looking at Exhibit 217 earlier, and I've put it back on
20 the screen again. Do you see it now?
21     A. Yes.
22     Q. I'm turning now to page GEO-Novoa_00006805.
23 And on the right-hand column do you see where it talks
24 about three levels of classification, 1, 2, and 3?
25     A. Yes.

Page 51

1      Q. That's the classification high, medium, and
2  low that you were talking about earlier; correct?
3      A. Correct.
4      Q. So is it fair to say that these
5  classifications are better articulations of how
6  detainees are classified than your memory?
7      A. Yes, I would.
8      Q. And Level 1 here correlates with what you were
9  describing as low; right?
10     A. Yes.
11     Q. And Level 2 correlates with what you were
12 describing as medium; right?
13     A. Yes; correct.
14     Q. And Level 3 correlates with what you were
15 describing as high; correct?
16     A. Yes.
17     Q. The Adelanto facility is not a detention
18 facility for criminals; correct?
19     A. No.
20     Q. When you say "no" you mean yes I think; right?
21     A. We have criminals here, yes; but that is
22 not -- it's a detention facility.
23     Q. When you say "we have criminals here," you
24 mean just like in society there are people that have
25 been convicted of crimes; correct?

Page 52

1      A. Exactly, yes.
2      Q. But not like it's all criminals but something
3  else. They are actually not in Adelanto because of any
4  high criminal implication at all; correct?
5      A. That is correct.
6      Q. So it is a civilian detention facility;
7  correct?
8      A. Yes, it is.
9      Q. And you work in the -- you have worked, aside
10 from the time working with your daughter in her
11 restaurant, preparing food within both the civil
12 detention facility like Big Spring, and criminal
13 detention facilities like Desert View; correct?
14     A. That is correct.
15     Q. So your history is one of dealing with people
16 who are convicted criminals; right?
17     A. Correct.
18     Q. Even though that is not, by and large, the
19 case in Adelanto; correct?
20     A. That is correct.
21     Q. The next document I want to talk with you
22 about, if you would, is Exhibit 218.
23     (Exhibit 218 marked.)
24     Q. (BY MR. CHAREST) I'm bringing that up on the
25 screen now.

Page 53

14 (Pages 50 - 53)

1    It's titled Food Service, General Food Service
2  Operations, has an effective date and a number in the
3  top right-hand corner, and the Bates label is GEO-
4  Novoa_00004550 through 564.  Have I accurately described
5  the document, ma'am?
6    A.  Yes.
7    Q.  And are you familiar with this policy manual?
8    A.  Yes, I am.
9    Q.  In fact, it's issued by GEO and it's intended
10  to guide the operations at Adelanto; correct?
11    A.  Correct.
12    Q.  Now, it is effective as of 2011, this version
13  here.  Do you know if there is a more recent version out
14  there?
15    A.  I'm sure that there probably is.  I would have
16  to say because the policies and procedures are updated
17  yearly, we go over them and review them.
18    Q.  Do you know of any reason why the more recent
19  policy and procedures have not been produced in this
20  case?
21    A.  I do not.
22    Q.  I mean, they're not hard to find; correct?
23    A.  Correct.
24    Q.  And if anyone wanted to find them at all, it
25  would be easy to find those policies and procedures;

Page 54

1  the ordering and inventory as opposed to cooking.
2    Q.  So I might think of it as logistics and
3  planning for the meals and getting the raw materials to
4  the kitchen as opposed to cooking those raw materials
5  and getting them out to the population; is that right?
6    A.  That is correct.
7    Q.  And then within this description, we see
8  sometimes the description of food service workers.  Is
9  food service workers GEO staff or detainees, or can it
10  be kind of applied to either one as it's used?
11    A.  This would be GEO staff.
12    Q.  So on the bottom of page 1 of 6, the bottom
13  line on paragraph Roman IIA2, it says:  "The KS" --
14  kitchen supervisor -- "is also responsible for
15  developing the food service work force, including staff
16  and detainees."
17    In what way does the kitchen supervisor or
18  anyone in GEO develop detainee food service workers?
19    A.  Well, when they're assigned to the kitchen,
20  they have to fill out a training packet and go through
21  some chemical training and what have you, equipment
22  training.  So everybody is responsible for that, the
23  kitchen supervisors.
24    Q.  So we're not talking about recruitment so much
25  as developing volunteers going forward; correct?

Page 56

1  correct?
2    A.  Yes.
3    Q.  So we're limited to what we have.  So we're
4  going to work through this one.  And I'd ask you to tell
5  me if you run across a policy or a policy statement or
6  anything in this document that is outdated, to the best
7  of your ability, let me know.  Okay?
8    A.  All right.
9    Q.  So it talks about the administration and the
10  top level is described as the food service
11  administrator.  Is that fundamentally the title that you
12  now carry at Adelanto?
13    A.  It is.
14    Q.  In fact, it is exactly the title you carry at
15  Adelanto; right?
16    A.  Correct.
17    Q.  Then you have kitchen supervisors on No. 2;
18  correct?
19    A.  Yes.
20    Q.  And are the kitchen supervisors the folks you
21  described to me as cook/supervisors?
22    A.  Yes; and the production manager.
23    Q.  What does a production manager do as opposed
24  to kitchen supervisors or cooks?
25    A.  A production manager is more hands-on in doing

Page 55

1    A.  Correct.
2    Q.  And one of the things that GEO does when it
3  has a slate of volunteers, is it evaluates the
4  candidates and determines which one is suitable for
5  which job; right?
6    A.  Yes.
7    Q.  It determines which job any one of the
8  detainee volunteers will perform; correct?
9    A.  Correct.
10    Q.  And GEO is responsible for developing the
11  details of work and how many detainees will work any one
12  of those particular details; right?
13    A.  That is correct.
14    Q.  GEO also evaluates the detainee workforce for
15  their performance; correct?
16    A.  Correct.
17    Q.  And like you mentioned just a second ago, GEO
18  provides all the job training and instruction to the
19  detainee workers to get them up to speed; correct?
20    A.  Correct.
21    Q.  And GEO also is responsible for providing any
22  safety equipment or tools or uniforms for use for the
23  detainee workers; right?
24    A.  Correct.
25    Q.  And ultimately, it's GEO's decision as to

Page 57

15 (Pages 54 - 57)

1 whether to suspend or terminate or reassign detainee
2 workers that don't quite comply with GEO's demands;
3 right?
4     A. That would be correct.
5     Q. Are you involved at all in the selection of
6 what amount to pay detainee workers?
7     A. Not at all.
8     Q. But you know that those parties, those
9 detainees that work through the voluntary work program
10 are supposed to be paid a dollar a day. You know that;
11 right?
12     A. That's correct.
13     Q. And you know that GEO processes that payroll
14 and handles like keeping track of who works when and
15 either giving them cash or putting money on their
16 commissary account; right?
17     A. Yes.
18     Q. And that's true, in your experience, for the
19 kitchen staff; right?
20     A. Yes.
21     Q. But it's also true, given your experience at
22 the facility for these many years, for other detainee
23 workers; right?
24     A. Correct.
25     Q. Now, in keeping with what we just talked

Page 58

1 about, paragraph 3, Work Schedules: "All work schedules
2 shall be posted." Where does GEO post work schedules
3 for the kitchen?
4     A. In my office.
5     Q. So it's not posted in the kitchen; it's posted
6 in your office?
7     A. Yes. And I have a kitchen in each -- I have
8 an office in each kitchen.
9     Q. That's my faulty assumption then. When you
10 say your "office," you're talking about an office that's
11 associated with and, in fact, inside of each kitchen,
12 East and West; yes?
13     A. Correct.
14     Q. So do those work schedules show staff employee
15 time or detainee and staff schedules?
16     A. Staff only.
17     Q. But GEO does generate and circulate detainee
18 work schedules; correct?
19     A. Correct.
20     Q. And those get sent to whoever the security
21 detail is to allow and inform them to know -- can I
22 start that question again? I mangled it.
23     A. Yes.
24     Q. Those schedules inform the security staff of
25 who can be moved from one location to another and keep

Page 59

1 everyone up to speed to know where those detainees
2 should be during those particular hours; correct?
3     A. That is correct.
4     Q. How often do the detainee work schedules get
5 disseminated?
6     A. We get a pay sheet every morning.
7     Q. So every morning you fill out a list of which
8 detainees are scheduled to work on any particular day?
9     A. Yes. We fill them in, either they didn't work
10 or they do work, and they have to initial that pay stub
11 or the sheet.
12     Q. What do you do with that document?
13     A. Turn it in to detainee accounts.
14     Q. Which person at detainee accounts receives
15 that from you in the ordinary course?
16     A. It would be, we have a detainee account box in
17 each facility. So over here it's Ms. Tabitha, and I'm
18 not sure who handles that at West.
19     Q. So you're primarily located in East; is that
20 right?
21     A. No; I work both facilities back and forth.
22     Q. You just happen to be in East now?
23     A. I'm in the admin building now.
24     Q. So neither; right?
25     A. Correct.

Page 60

1     Q. Do you spend more time in East or West or are
2 your duties equal between the both of them?
3     A. West.
4     Q. Why is that?
5     A. It's the larger facility. It needs more
6 management, larger storerooms, more staff.
7     Q. Who is the training lieutenant at Adelanto
8 presently?
9     A. Ms. Walker is the training director, filling
10 in --
11     Q. So -- I'm sorry, go ahead. I cut you off.
12     A. No, go ahead.
13        Ms. Walker.
14     Q. Can you finish your sentence, please.
15     A. Ms. Walker is the training director at this
16 time, acting training director.
17     Q. Who is she filling in for?
18     A. I'm not sure. It was someone that left before
19 I was here.
20     Q. And whereas this policy-procedure manual that
21 is Exhibit 218 identifies a capital T Training capital L
22 Lieutenant, that's the same person that you think
23 Ms. Walker's role is now?
24     A. Yes.
25     Q. And does the GEO -- that's a GEO employee;

Page 61

16 (Pages 58 - 61)

1  correct?
2      A. Yes, it is.
3      Q. That GEO employee oversees the whatever
4  training food service workers, both staff employees and
5  detainee workers, require; correct?
6      A. Detainee workers, we have those packets
7  in-house, and our food service workers, cook
8  supervisors, or myself or the production manager makes
9  sure that those training manuals get filled out with the
10 detainees.
11     Q. So when we're talking about training
12 lieutenants work here for training to service personnel,
13 we're talking about GEO staff being trained and not
14 detainees being trained, because the detainees get
15 trained by the GEO staff; is that right?
16     A. Correct.
17     Q. Thank you for that clarification.
18         In paragraph D the policy talks about
19 shakedowns and searches.  Is it right that a detainee --
20 that daily the work area, the entire kitchen, wherever
21 the detainees can reach, is searched?
22     A. That is correct.
23     Q. Both beginning and at the end of a shift and
24 possibly even during a shift; correct?
25     A. Correct.

Page 62

1      Q. And then it says that detainees are subject to
2  search when they leave the work area; correct?
3      A. Correct.
4      Q. Is that a strip search?
5      A. No, it is not.  It's a pat down.
6      Q. And is that, does that search happen every
7  time no matter what or is it random and can happen
8  sometimes and doesn't happen all the time?
9      A. I know when I'm there they know I expect that
10 and so the officers do pat them down.  I can't tell you
11 the other times that I don't see.
12     Q. So it's your policy that it should happen
13 every time, enforcement uncertain.  Fair?
14     A. Absolutely.
15     Q. And the pat down is done by either guards or
16 the actual food service personnel, the cooks and the
17 food service workers; correct?
18     A. No; only the officers.
19     Q. I'm looking at the last sentence here right
20 under D, it says: "Food service personnel as well as
21 facility detention staff will conduct shakedowns."  Does
22 that mean that both of those types of personnel, GEO
23 personnel, will search the area but only guards will do
24 the pat downs?
25     A. That is correct.

Page 63

1      Q. Thank you.
2          Looking onward down to what is actually the
3  bottom of -- well, let's start at the bottom of 2 as it
4  rolls into 3.  Are you with me?
5      A. Yes.
6      Q. It talks about the count.  Here it suggests
7  that the counts happens inside the kitchen.  Is that an
8  outdated policy or is it wrong?  Or what's going on
9  here?
10     A. No, if there are detainees in the kitchen
11 during count time they would be out-counted.
12     Q. Okay.
13     A. It's easier to leave them in their dorm during
14 count and bring them after.
15     Q. But that doesn't always happen; right?
16     A. No, it doesn't.
17     Q. In fact, there's a policy for counting
18 detainees in the kitchen; correct?
19     A. Correct.
20     Q. So paragraph F, please.  It says: "The FSA,"
21 which is you, "shall establish the meal schedules for
22 detainee food service workers."  Did I read that
23 correctly?
24     A. Yes.
25     Q. And in effect, we talked about the timing of

Page 64

1  detainees eating when we went through the sort of
2  a.m./p.m. schedules; correct?
3      A. Correct.
4      Q. And it says here, the second line:  Detainees
5  "will receive the same fare as other detainees."  When
6  it says "same fare," I guess that should be read to mean
7  only type of food not amounts of food; correct?
8      A. Correct.
9      Q. So giving detainee workers in the kitchen
10 additional food, i.e., more than the general population
11 gets, is not in violation of that second sentence in
12 your mind; correct?
13     A. No; in my mind it is.
14     Q. It is in violation?
15     A. Yes.
16     Q. So has the policy changed or is the kitchen
17 violating the policy?
18     A. The policy has not changed.
19     Q. The kitchen is violating the policy?
20     A. Yes.  When I came back here, I was told that's
21 what they were allowed to do; so leave it alone.
22     Q. Well, we're going to talk about that again in
23 the next sentence.  It says: "Kitchen supervisors shall
24 not allow detainees to prepare 'special' dishes or
25 condiments for their own (or other detainees')

Page 65

17 (Pages 62 - 65)

**Page 66**

1 consumption." Did I read that correct?
2    A. You did.
3    Q. But that's a policy that, even though it's
4 written in the manual here, that GEO does not adhere to;
5 correct?
6    A. Correct.
7    Q. Because, in fact, kitchen supervisors
8 expressly allow detainees to prepare special dishes with
9 condiments, using the same core stock as is being served
10 in the general population; correct?
11    A. Correct.
12    Q. Then it says: "Kitchen supervisors shall also
13 ensure that detainee workers do not eat between meals."
14 That's also a policy that GEO does not enforce; correct?
15    A. Well, I think where that is coming from,
16 they're not allowed to eat on the line when they're
17 serving food or what have you.
18    Q. Okay.
19    A. If they're working in the kitchen they're not
20 eating at the same time as the population; so they eat
21 before or after.
22    Q. But if someone has, say someone is on the p.m.
23 shift and they show up and have lunch, and then turn to
24 after lunch, as you said is the case typically, and then
25 they can have a second meal after that, they're eating

**Page 67**

1 between meals; right?
2    A. Correct.
3    Q. And that practice, which you admit exists and
4 happens, in fact, suggest it happens a lot, violates
5 this policy that's set out in food service paragraph F
6 on page 00004561; correct?
7    A. Correct.
8    Q. Has anyone told you from higher above that
9 it's okay to violate this policy?
10    A. Yes. I was told that they are allowed to have
11 that extra food and that that's just the way it is.
12    Q. Who told you that?
13    A. One of the chiefs.
14    Q. Which one?
15    A. Dutcher.
16    Q. Can you give me the first and last name,
17 please.
18    A. Donald Dutcher.
19    Q. Donald Dutcher. When you say "chief," what
20 does that mean?
21    A. He is chief over operations.
22    Q. Chief of operations. Is that a GEO employee?
23    A. Yes.
24    Q. And he told you that notwithstanding what this
25 food service policy is respecting meal for food service

**Page 68**

1 workers, the kitchen was allowed to permit the detainees
2 to have more food than other general population
3 detainees, to prepare special dishes, and to eat beyond
4 the designated times; correct?
5    A. That is correct.
6    Q. Moving on to H. H says: "The number of
7 detainees assigned to the food service department will
8 be based on a quota developed by the FSA and approved by
9 the Facility Administrator." Did I read that correctly?
10    A. Yes.
11    Q. Who is the facility administrator at Adelanto
12 presently?
13    A. Yes.
14    Q. No, I said "who."
15    Who is the food service, the facility
16 administrator?
17    Q. Yes, ma'am.
18    A. Warden Janecka.
19    Q. So when this paragraph talks about the "FSA,"
20 that means you; right?
21    A. Yes.
22    Q. And when the paragraph talks about the
23 "Facility Administrator," that means Warden Janecka;
24 correct?
25    A. Correct.

**Page 69**

1    Q. So did you and Warden Janecka develop a quota
2 based on actual needs for detainee staffing?
3    A. No.
4    Q. So even though this policy exists, both you
5 and Warden Janecka have proceeded in disregard of it;
6 correct?
7    A. I don't think we've ever had enough detainees
8 at once to go over any kind of quota --
9    Q. Well, it says --
10    A. -- as far as working in the kitchen.
11    Q. The paragraph doesn't talk about the
12 availability of any detainees. It talks about
13 developing a quota based on actual needs; right?
14    A. Correct.
15    Q. And you're telling us under oath that that
16 just never happened; right?
17    A. Correct.
18    Q. The next line down -- next paragraph down,
19 I, Detainee Job Descriptions, it says: "The [food
20 service administrator]," which is you, "shall review
21 detainee job descriptions annually to ensure they are
22 accurate and up-to-date." Have you done that yet this
23 year?
24    A. Yes.
25    Q. When was the last time you did that, ma'am?

18 (Pages 66 - 69)

1    A. When I started, probably the end of May.
2    Q. And what changes, if any, did you make on --
3    A. I didn't make any changes.
4    Q. It's important that you let me finish my
5 question before you answer. Okay? Because just for the
6 court reporter. I'll try not to talk over you and you
7 need to do the same back. Okay? Okay?
8    A. Yes.
9    Q. Thank you.
10       So you didn't make any changes. And are the
11 job descriptions that exist and have been approved by
12 you from your annual review the same as you and I
13 discussed with respect to detainee workers?
14    A. Yes.
15    Q. And it says that: "A copy of the detainee's
16 job description shall remain on file for as long as the
17 detainee remains assigned to the food service
18 department." Did I read that correctly?
19    A. Yes, you did.
20    Q. So for every volunteer, that detainee has a
21 copy of the job description that that detainee does for
22 the kitchen in some file somewhere in your control; is
23 that right?
24    A. Correct.
25    Q. Has that practice been followed prior to your

Page 70

1 arrival?
2    A. That I couldn't tell you.
3    Q. Has that practice been followed subsequent to
4 your arrival?
5    A. Yes.
6    Q. So as we stand here today, there is a file
7 somewhere that lists every detainee that worked in the
8 kitchen and shows the job description of that detainee;
9 correct?
10    A. Correct.
11    Q. What happens when the detainee is either I
12 guess unassigned from the food service department, i.e.,
13 fired, or released from Adelanto in one direction or
14 another?
15    A. Those files are archived.
16    Q. Archived how, ma'am?
17    A. Put in a file box and marked with what they
18 contain and put into our records room.
19    Q. Is there a records room at Adelanto that
20 physically stores these files?
21    A. There is.
22    Q. And have you been aware, made aware of any
23 sort of litigation hold on any of your files?
24    A. No.
25    Q. No one's ever told you to not delete emails

Page 71

1 and documents regarding the work program?
2    A. No.
3    Q. Have you deleted emails in the ordinary course
4 of business relating to the work program?
5    A. No, I don't believe so.
6    Q. Have you ever thrown any detainee files away?
7    A. No.
8    Q. So it's your testimony under oath as the
9 person that is in charge of this process that those
10 files should be stored somewhere at Adelanto in hard
11 copy.
12    A. Correct.
13    Q. How big is this room?
14    A. Maybe 20 by 20, 20 by 30.
15    Q. How many boxes can it hold?
16    A. I couldn't tell you.
17    Q. 20 by 30, we're talking about bankers boxes;
18 right?
19    A. Yes.
20    Q. Are they stacked floor to ceiling or are they
21 on shelves or how --
22    A. They're on shelves.
23    Q. And obviously you can walk between the
24 shelves; right?
25    A. Yes.

Page 72

1    Q. Does it -- is the room full?
2    A. No, I don't think it's completely full.
3    Q. Do you know how long records are maintained in
4 that location?
5    A. Until it's full and then they're moved to
6 off-site storage.
7    Q. So your understanding is that even when the
8 on-site records facility fills up, the hard copies are
9 nonetheless maintained, just in a different location;
10 correct?
11    A. Correct.
12    Q. So if that's right, teasing it out, from at
13 least 2011, when this policy became effective, through
14 the present, there should be a copy of every detainees'
15 job description in a file for every detainee somewhere
16 within GEO's possession; correct?
17    A. That is correct.
18    Q. Have you ever been asked anything like that
19 from anyone about how to find records in this case?
20    A. No.
21    Q. Rolling forward to page 4 of 6, which is
22 GEO-Novoa_00004562 of this Exhibit 218, I want to look
23 at paragraph K. Are you with me?
24    A. Yes.
25    Q. It's pretty simply stated but I just want to

Page 73

19 (Pages 70 - 73)

Page 74

1 make sure we're on the same page.  It reads:  "Detainees
2 shall work and be paid in accordance with the 'Voluntary
3 Work Program' Policy," and there's another reference.
4 Did I read that correctly?
5     A. Yes.
6     Q. So when we talked about pay for work and GEO
7 setting the rate for payment, you don't know how that's
8 done but you understand the policy by GEO is to pay
9 detainees that work for the voluntary work program
10 whatever they're entitled to under the voluntary work
11 program which is established by GEO; correct?
12     A. Correct.
13     Q. I think that's it for that document.
14        I'm introducing another exhibit but
15 Ms. Gravois is not with me so I'm doing it slowly.  So
16 this is going to be a little bit bumpy but I'll do my
17 best to share my screen.  I'm going to show you -- first
18 let me explain to everyone what's going on.  There is an
19 email and some attachments which are in my folders as
20 separate PDFs.  They're being introduced as one
21 document, which will be Exhibit 219.
22        (Exhibit 219 marked.)
23     Q. (BY MR. CHAREST)  This is the cover email
24 which is GEO-Novoa_00032814.  And it's an email
25 November 30, 2012, from you, Ms. Spagnuolo, to Angelica

Page 75

1 Hernandez, subject:  Detainee work schedule.  Have I
2 accurately described the document, ma'am?
3     A. Yes.
4     Q. And then you'll see there are attachments
5 listed in the email; correct?
6     A. Correct.
7     Q. And those attachments -- I can try and stop
8 the share.  Here's one anyway, I'll share it with you
9 now.  Are you all seeing the spreadsheet that shows
10 Detainee Work Schedule?
11     A. Yes.
12     Q. Great.
13        So this is one of the two attachments, I'll
14 represent to you, in that email.  I just wanted to --
15 there are a bunch of these around.  But this one in
16 particular it just lists in groups, there's three in one
17 group, five in another group, and then three in another
18 group.  And this is for the a.m. shift detainee work
19 schedule.
20        Is this, first as a general construct, a fair
21 example of your submission of a detainee work schedule
22 to classification?
23     A. Yes.
24     Q. And it will change day to day but you use this
25 type of form for a.m. shift and for p.m. shift; correct?

Page 76

1     A. Correct.
2     Q. Then is this the document that gets printed
3 out and signed by the detainees for then submission to
4 payroll processing?
5     A. It is not.
6     Q. So it's a different document that the
7 detainees sign in the kitchen when they actually show up
8 for a shift; correct?
9     A. Correct.
10     Q. So what is the purpose of this document then?
11     A. Just so we would know who was supposed to show
12 up for work.
13     Q. This is more the security and accountability
14 kind of thing; is that right?
15     A. Yes.  And this must be an old document because
16 we don't do this now.
17     Q. How long -- it is an old one, it's from 2012.
18 It just happened to be on your email so I wanted to make
19 sure that we connected it with you.
20        This practice no longer exists at Adelanto?
21     A. No.  We haven't done a work schedule like this
22 since I've been here.  We just go off the payroll sheet.
23     Q. So since you've been here the second time I
24 guess; is that right?
25     A. That is correct.

Page 77

1     Q. So the first time you were at Adelanto this
2 was a record that you would maintain every day and
3 circulate every day; correct?
4     A. Yes.
5     Q. Now, this one shows 11 workers for the a.m.
6 shift.  Can you tell if it's East or West or both?
7     A. It says it's for East but of course they don't
8 work 7 days a week; they get their 2 days off.  So I'm
9 not really understanding why this doesn't show which
10 days they're off.  But the detainees don't work 7 days a
11 week.
12     Q. The detainees work 5 days a week typically?
13     A. Correct.
14     Q. Can a detainee ask to work 1 day a week?
15     A. Yes.  They don't have to work.
16     Q. Right.  But to maintain the schedule is my
17 question.  If someone just decides, I would like to be
18 on a schedule every Monday, is that something that GEO
19 would allow?
20     A. Yes, I would assume so.
21     Q. Have you never been confronted with that
22 particular circumstance?
23     A. I have not.
24     Q. But GEO's, for the -- there are 7 days in a
25 week, so on the 2 days of the week when a particular

20 (Pages 74 - 77)

1  detainee is not working is a different detainee working
2  that day?
3      A. Correct.
4      Q. I think that's all for that.
5          What does the detainee payroll sheet look like
6  so I know what to look for in the records that we have,
7  if we have them?
8      A. It just has all their names on it for the a.m.
9  shift and p.m., and then a free staff -- when I say
10 "free staff" I'm referring to my employees or myself --
11 we initial it when the detainee works, and then before
12 they leave the kitchen they initial it that they worked.
13     Q. Okay.
14     A. And then it's turned in every day to detainee
15 accounts.
16     Q. Do you have like a Word document that is your
17 baseline and you just update it with the names every day
18 or sort of periodically?
19     A. Those come from classification.
20     Q. So classification sends the kitchen --
21 classification sends the kitchen a list, this payroll
22 sheet, and then the kitchen initials when folks show up
23 and the detainees initial when they leave; is that
24 right?
25     A. Correct.

Page 78

1      Q. Is that communicated to the kitchen by email?
2      A. No; it's hand delivered.
3      Q. Is that generated by Ms. McCormick or her
4  staff?
5      A. It is.
6      Q. Which one; Ms. McCormick or her staff?
7      A. I believe she generates it.  And I know during
8  the week she brings it in 5 days a week, she hand
9  carries it in.
10     Q. Who does it, how does it get delivered on the
11 weekends?
12     A. I'm not sure.  It's usually brought to the
13 kitchen by someone or put in the food service box.
14     Q. And then, again, hand delivered back at the
15 end of the shift.
16     A. Correct.
17     Q. The shift or the day?  I should be more clear.
18     A. The day.
19     Q. So each document will show both the a.m. and
20 the p.m. shifts; correct?
21     A. Yes.
22     Q. And how does classification know who is
23 scheduled for that particular day?  Are they told by the
24 kitchen or they just tell you who you get?
25     A. They tell us who we get; they assign them.

Page 79

1      Q. And does the kitchen have regular workers that
2  have been there for weeks or is it kind of completely
3  ad hoc?
4      A. It's just however they come in.  They're -- I
5  think the average stay here is about 17 days.
6      Q. And then you used the term "free staff."  That
7  means, that's vernacular that you use for GEO employees;
8  correct?
9      A. Correct.
10     Q. And let me be even more clear.  When you say
11 "free staff," you're talking about workers in the
12 kitchen that are not detainees; correct?
13     A. That is correct.
14     Q. What do you call non-free staff?
15     A. Detainee workers, kitchen workers.
16     Q. But that free staff, I take it, is not like
17 a -- I won't find it in any policy or manual; right?
18     A. No.
19     Q. You when you say "no" you mean yes, I will not
20 find it; correct?
21     A. That is correct.
22     Q. All right.
23         MR. CHAREST:  Just a note to the lawyers, I'm
24 going to have to circulate by email the full copy of 219
25 because all that's in the record now is just the cover

Page 80

1  email but we'll get that sorted on a break.  Okay?
2      Q. (BY MR. CHAREST)  The next document I want to
3  talk about is the PBNDS.  Do you know what I mean by the
4  "PBNDS"?
5      A. The contract, the PB -- I've heard that term.
6  I don't know what all the letters stand for.
7      Q. You've heard the term the Performance-Based
8  National Detention Standards; correct?
9      A. Correct.
10     Q. I'm showing you a document that has been
11 marked as Exhibit I think 153, I think that's what it
12 is, in a prior deposition.  It is a copy of the PBNDS.
13 I'm not showing it to you yet, I'm about to be.
14         Are you seeing anything at all, first?  Are
15 you seeing my share screen?
16     A. I am.
17     Q. I've got an error.  Let me pull this down for
18 a second.  Sorry.
19         MR. CHAREST:  I'm going to need to take a
20 quick break, I'm sorry.  Can we take a break for just
21 2 minutes until I sort this out.
22         THE VIDEOGRAPHER:  Off the record.  The time
23 is 10:55.
24         (Recess taken.)
25         THE VIDEOGRAPHER:  We're back on the record at

Page 81

21 (Pages 78 - 81)

1   10:59. Go ahead.
2       Q. (BY MR. CHAREST) Ms. Spagnuolo, are you in
3   your room alone there?
4       A. I am.
5       Q. Was someone in there during the break?
6       A. No.
7       Q. Were you speaking with someone during the
8   break?
9       A. I was not.
10      Q. All right. I'm showing on the screen
11  previously marked Exhibit 206, which is a copy of the
12  PBNDS for 2011. And PBNDS, of course, is an acronym for
13  Performance-Based National Detention Standards. Have I
14  accurately described the document, ma'am?
15      A. Yes.
16      Q. And this is the document we were talking about
17  before the break when I referred to the PBNDS; correct?
18      A. Correct.
19      Q. Now, before digging into this, you mentioned
20  Mr. Dutcher. Is Mr. Dutcher someone that works at
21  Adelanto or at GEO corporate?
22      A. He works at Adelanto.
23      Q. Now, I'm going to flip in this document to
24  section 5.8, which is the Voluntary Work Program. And
25  specifically I'm looking for GEO-Novoa_00015461, which

Page 82

1   probably will take me a while to get there.
2           Okay. Are you looking at section 5.8,
3   Voluntary Work Program?
4       A. Yes.
5       Q. Have you ever read this document before,
6   ma'am?
7       A. No.
8       Q. But you understand that it governs
9   fundamentally at least some aspects of how detainees are
10  supposed to be treated and housed in GEO-sanctioned --
11  sorry, ICE-sanctioned GEO-run facilities; correct?
12      A. Absolutely. We learned all about this in
13  class.
14      Q. What did you learn about this in class?
15      A. We had to have a 4-week class about the
16  Performance-Based Standards.
17      Q. When and where did you take this class?
18      A. It was given at Desert View, and it was before
19  I actually physically started working inside the
20  facility.
21      Q. What did you learn about this document during
22  your 4-week class before you started working for GEO?
23      A. The standards we were taught in class were
24  based on this document.
25      Q. What standards did you learn in class, ma'am?

Page 83

1       A. How to treat detainees, how to work with
2   detainees, how they should be treated, all those things.
3   Security, safety, CPR, first aid.
4       Q. So the PBNDS was in addition to CPR and first
5   aid; right? That's not covered by the PBNDS; right?
6       A. Correct.
7       Q. So you went to a 4-week class before working
8   at Desert View, and what you learned is sort of how GEO
9   employees are supposed to interact with the detained
10  wards; correct?
11      A. That is correct.
12      Q. And one of the things that -- did you have
13  specific lessons about the voluntary work program during
14  those classes?
15      A. No. Just that it was volunteer and they
16  didn't have to work.
17      Q. And it's improper, right, for anyone at GEO to
18  force someone that is a detainee to work; correct?
19      A. Correct.
20      Q. And to the extent detainees are made to work
21  or coerced into work for GEO, you would understand that
22  that would be a violation of not only the PBNDS but of
23  GEO's sort of open mandate on how to treat the people
24  that it's supposed to be looking out for; correct?
25      A. Correct.

Page 84

1       Q. I'm going to start with H, which is at page
2   409 of this particular version, GEO-Novoa_00015463. Are
3   you with me?
4       A. Yes.
5       Q. The first paragraph under H says: "Detainees
6   who participate in the voluntary work program are
7   required to work according to a schedule." You
8   understand that that's a proper articulation of the
9   policy; correct?
10      A. Yes.
11      Q. So when you circulate a schedule, whether it
12  was through the form that you used in the old days or in
13  the current pay sheets, it is a requirement that the
14  volunteers show up according to that schedule; correct?
15      A. That is what is supposed to happen, yes. But
16  if they do not, there are no repercussions.
17      Q. Not none; right? Let's not overstate.
18  Because people do get terminated from the voluntary work
19  program for not showing up; right?
20      A. Correct; if they don't want to work.
21      Q. Or if they're late or if they don't show up as
22  scheduled; right?
23      A. No, because --
24          MS. GREENBERG: Objection; misstates
25  testimony, not in evidence.

Page 85

22 (Pages 82 - 85)

1     Q.  (BY MR. CHAREST)  You still have to answer.
2     A.  That they don't have to show up for work.
3   Sometimes they come in late because they don't come in
4   at their scheduled time; they come in the middle of
5   lunch, and they're still allowed to come in.
6     Q.  The people that do not adhere to the schedules
7   are subject to being terminated from the program;
8   correct?
9     A.  They are subject to that; correct.
10    Q.  And the next paragraph down, it says:  "The
11  normal scheduled workday for a detainee employed full
12  time is a maximum of 8 hours," and detainees are not
13  permitted to work more than 8 hours and 40 hours weekly.
14  Did I articulate that correctly?
15    A.  Correct.
16    Q.  So those are the upper limits on the amount of
17  time detainees are allowed to work, according to this
18  policy, which you learned about before you even became a
19  GEO employee; correct?
20    A.  Correct.
21    Q.  And it goes on to say:  "Unexcused absences
22  from work or unsatisfactory work performance may result
23  in removal from the voluntary work program."  Right?
24    A.  Correct.
25    Q.  You understand that that is, whether it's

Page 86

1   enforced consistently or not, a sanction that is
2   available to the supervisors for detainee workers;
3   correct?
4     A.  Correct.
5     Q.  And so if detainees are absent from work,
6   i.e., not showing up according to the schedule, they can
7   be terminated from the voluntary work program; right?
8     A.  That is correct.
9     Q.  And if they perform unsatisfactorily in the
10  eyes of the supervisor, the detainee may be terminated
11  from the voluntary work program; correct?
12    A.  Correct.
13    Q.  Next we're rolling on to K, which is at 410,
14  GEO-Novoa_00015464.  Are you with me in paragraph K,
15  ma'am?
16    A.  I am.
17    Q.  Compensation; right?
18    A.  Yes.
19    Q.  It says:  "Detainees shall receive monetary
20  compensation for work...in accordance with the
21  facility's standard policy."  Did I read that correctly?
22    A.  Yes.
23    Q.  And you understand that to be the policy that
24  governs Adelanto; correct?
25    A.  Yes.

Page 87

1     Q.  Do you know, it says this policy, the PBNDS,
2   effectively defers to whatever the facility standard
3   policy is; right?
4     A.  Yes.
5     Q.  What is the Adelanto facility standard policy
6   with respect to compensation?
7     A.  A dollar per day.
8     Q.  And then the next paragraph down, the PBNDS
9   says:  The compensation must be at least $1 per day;
10  correct?
11    A.  Correct.
12    Q.  So Adelanto with its facility standard policy
13  could pay and compensate more than a dollar a day,
14  correct, and not be in violation with this policy?
15    A.  Correct.
16       MS. GREENBERG:  Objection; calls for
17  speculation.
18    Q.  (BY MR. CHAREST)  Can you say your answer
19  again, please.  You were talking at the same time.
20  Ma'am?
21    A.  That is correct.
22    Q.  Thank you.
23       Have you ever been involved in any discussions
24  about setting the compensation rate at Adelanto?
25    A.  Never.

Page 88

1     Q.  Have you ever worked at any facility within
2   GEO where the compensation rate is higher than a dollar
3   a day?
4     A.  No.
5     Q.  But you know that they do exist; right?
6     A.  I don't know that.
7     Q.  You don't know one way or the other?
8     A.  No.
9     Q.  You mean yes, you don't know one way or the
10  other; right?
11    A.  Yes; I don't know one way or the other.
12    Q.  And rolling down to paragraph M, which is on
13  the same page.  Are you with me, Detainee
14  Responsibility?
15    A.  Yes.
16    Q.  It talks about:  "The facility administrator,"
17  being Warden Janecka, "shall establish procedures for
18  informing detainee volunteers about on-the-job
19  responsibilities and reporting procedures."  Correct?
20    A.  Yes.
21    Q.  We saw in the policy that that duty is
22  effectively deferred down to you as the food service
23  administrator, and you're the one that's supposed to set
24  the policies for what the folks, the detainees, are
25  doing within the kitchen; correct?

Page 89

23 (Pages 86 - 89)

Page 90

```
 1      A. Correct.
 2      Q. And then the detainee responsibility under
 3  this program is that: "The detainee is expected to be
 4  ready to report for work at the required time and may
 5  not leave an assignment without permission"; correct?
 6      A. Correct.
 7      Q. A violation of which subjects the detainee to
 8  termination from the voluntary work program; correct?
 9      A. Correct.
10      Q. It goes on to say: The detainee shall perform
11  all tasks, and it lists four different things the
12  detainee is obligated to do under the voluntary work
13  program; correct?
14      A. Correct.
15      Q. And violation of any one of those four things
16  that are enumerated in section 5.8 M subjects the
17  detainee to termination from the voluntary work program;
18  correct?
19      A. That is correct.
20      Q. And just because I can't leave a hanging chad,
21  I'm going to run down to paragraph N subparagraph 3,
22  just because it refers to food service. I just want to
23  make sure we're on the same page. Are you with me here
24  on the page, on 411?
25      A. I am, yes.
```

Page 91

```
 1      Q. It reads: "For a food service assignment,
 2  medical staff, in conjunction with the US Public Health
 3  Service, shall ensure that detainees are medically
 4  screened and certified before undertaking the
 5  assignment."
 6      Does that refer to the medical screening that
 7  you mentioned when we talked about medical and
 8  classification both have to approve a detainee?
 9      A. It is.
10      Q. Thank you.
11      Have you ever in your experience working for
12  GEO had detainees work in the kitchen that, whether you
13  knew it at the time or not, were not subscribed in the
14  voluntary work program?
15      A. No, not on my watch. That is not allowed,
16  absolutely.
17      Q. I understand it's not allowed. Are you saying
18  under oath that that's never happened?
19      A. No, I can't say that that's never happened.
20      Q. Because, in fact, you can say the opposite,
21  you know that it's happened before and it's been caught
22  and addressed maybe but it's happened; right?
23      A. I'm sure it has, yes.
24      Q. And those folks that were listed as volunteers
25  were supplied to the kitchen as workers had not actually
```

Page 92

```
 1  subscribed to the voluntary work program; correct?
 2      A. Correct.
 3      Q. And as soon as you found out about it you took
 4  corrective actions; right?
 5      A. No, it has not happened. If I had heard about
 6  it, I would make sure that my staff had been reaffirmed
 7  in the fact that they were not allowed to do that.
 8      Have I actually walked in and had someone
 9  working in there that was not assigned to the kitchen?
10  No.
11      Q. Not that you recall or never?
12      A. Not that I recall.
13      Q. How long does it take for a detainee from the
14  concept of, I would like to volunteer, to having been
15  approved by medical and certification -- classification
16  rather, to be then ready to work in the kitchen?
17      A. It depends on how long classification has
18  their paperwork and then how long it takes them to get
19  in to see medical to be cleared.
20      Q. But anyone that volunteered on day one would
21  not be ready to work on day one within the confines of
22  the voluntary work program; correct?
23      A. That is correct; they would not.
24      Q. So if you were out in the dorms encouraging
25  people to work and had them work that same day, that
```

Page 93

```
 1  would be work outside of the voluntary work program;
 2  correct?
 3      A. That is correct.
 4      Q. And are you telling me under oath that that's
 5  never happened?
 6      A. I can't say that that's never happened.
 7      Q. I'm talking about your own experience, not
 8  just random people that you may have been overseeing and
 9  didn't notice. Have you ever gone out and asked a
10  person to work on day one and turned them out that same
11  day?
12      A. Not unless I had all their paperwork and got
13  them cleared.
14      Q. And how would you know -- for them to have
15  paperwork and have been cleared, they would had to have
16  been a volunteer prior; correct?
17      A. Correct. They would have to have a medical
18  clearance that was still current.
19      Q. And how long do the medical clearances last?
20      A. Those have to be redone I believe it's every
21  6 months.
22      Q. I'm going to introduce an exhibit as No. 220.
23      (Exhibit 220 marked.)
24      Q. (BY MR. CHAREST) Okay. I'm going to show you
25  an email, ma'am, it's dated -- it's an email chain
```

24 (Pages 90 - 93)

1  between you, Pamela Spagnuolo, and Raymond Smith, dated
2  June 28th and then 29th, Bates labeled
3  GEO-Novoa_00008233. Have I accurately described the
4  document?
5      A. Correct.
6      Q. And you are the author of the initial email
7  which is at the bottom; correct?
8      A. That is correct.
9      Q. This is during your first stint at Adelanto in
10  2012; correct?
11      A. Yes.
12      Q. And you say: "This morning, I tried another
13  angle at getting the detainees to come to work, and it
14  really seemed to help. I hope it continues." You say
15  you and Ms. Wrigley, who is Ms. Wrigley?
16      A. Yes, she doesn't work here any longer.
17      Q. What's her name?
18      A. Amber.
19      Q. What position did she hold at Adelanto?
20      A. Cook supervisor.
21      Q. So you and a cook supervisor personally went
22  into the dorm with an officer, woke up detainees for
23  work; is that right?
24      A. Yes; kitchen workers.
25      Q. Existing kitchen workers.

Page 94

1      A. Existing kitchen workers.
2      Q. And it was hard for them to tell you no. Why
3  was it hard for the detainee workers to tell you no when
4  you went into the dorms and woke them up at what, I
5  guess 3:00 in the morning?
6      A. Because we asked them if they wanted to learn
7  how to bake and cook, so it was something new for them.
8      Q. But it was you waking people up at 3:00 in the
9  morning asking if they want to work that day; correct?
10      A. Correct; if they were on the schedule for that
11  work program that morning.
12      Q. So your testimony is under oath that you
13  recall that the people that you woke up on June 28,
14  2012, were on the schedule for that day?
15      A. I wouldn't have woken them up otherwise.
16      Q. So we're not just talking about prior kitchen
17  workers but rather scheduled kitchen workers; correct?
18      A. Correct.
19      Q. And you're trying to entice them to go out and
20  work, you're promising them that they were going to be
21  trained on cooking and baking; correct?
22      A. Yes. I asked them if that would interest
23  them.
24      Q. After waking them up at 3:00 in the morning.
25      A. Correct.

Page 95

1      Q. Or 2:30, whatever time; right? Right?
2      A. Correct.
3      Q. And you thought it was easier to tell officers
4  no than it was to tell you, the administrator no;
5  correct?
6      A. Correct.
7      Q. Because you have a position of power at the
8  facility higher than the officers do; correct?
9      A. No, I wouldn't say that.
10      Q. Okay.
11      A. I think -- it was more of the mutual respect
12  we had for one another.
13      Q. Okay. So you woke them up to entice them to
14  try and volunteer; correct?
15      A. Yes.
16      Q. And this is something you did more than just
17  on this one particular day; right?
18      A. I don't know if I ever went into the dorm or
19  not. I wasn't always there at 2:30 in the morning.
20      Q. But you hoped it would continue. What did you
21  hope would continue?
22      A. If we taught them new things in the kitchen
23  that they would be interested in coming in and working.
24      Q. They were sleeping in the dorm.
25      A. Correct.

Page 96

1      Q. And an officer had already woken them up and
2  they didn't turn to or how on that?
3      A. No, we went in there with the officers. Back
4  then that's what we did; we went to the dorms and got
5  our own detainee workers. Now a kitchen officer goes to
6  the dorms and gets them. Back then that was our
7  procedure.
8      Q. So I misunderstood, because I thought you just
9  said a second ago you weren't sure if it ever happened
10  other than this one time. But what you're telling me is
11  that was the standard procedure was for you to go in
12  there and wake them up.
13      A. Not necessarily me but my kitchen staff; cook
14  supervisors, food service workers.
15      Q. Then the training that you talk about in the
16  fourth paragraph down is training on cooking?
17      A. Cooking or baking.
18      Q. But they would still have to do their regular
19  duties, correct, like the service and the cleaning?
20      A. Correct. If they were baking, then they
21  wouldn't be on the food line. We would be teaching them
22  how to bake and they wouldn't have to serve the food.
23  So it would be something different for them.
24      Q. But someone has got to serve the food; right?
25      A. Correct.

Page 97

25 (Pages 94 - 97)

1     Q.  So who was serving the food when they're
2   baking, learning how to bake?
3     A.  My staff or other detainees.
4     Q.  But your staff is busy teaching them how to
5   bake; right?
6     A.  One of them would be, yes.
7     Q.  One of the two --
8     A.  Um-hmm.
9     Q.  -- of the workforce is taking care of one
10   detainee, teaching that detainee how to work, and who's
11   doing all the other work?
12     A.  Well, back then on East we had a much higher
13   population.  We had more staff on duty at a time.  Right
14   now our population is so low we have two per shift at
15   East.
16     Q.  When the facility is full what is the normal
17   staff on East?
18     A.  Probably four per shift.
19     Q.  And is that true for West as well?
20     A.  West would have even more.  West would still
21   have their five per shift.
22     Q.  So on max population West is still five but
23   East is four; on the current population West is five and
24   East is two?
25     A.  Correct.

Page 98

1   Beginning of August, middle of August, or beginning of
2   September.
3     A.  I could not tell you the exact date, I'm
4   sorry.
5     Q.  So somewhere between August into September,
6   Adelanto stopped using detainee labor for kitchen help
7   because of COVID; is that right?
8     A.  That is correct.
9     Q.  And your testimony is that at that time the
10   facility had full population?
11     A.  Yes.  We were still heavily populated at that
12   time compared to now.
13     Q.  Do you remember what the population was, say,
14   in the first quarter of 2020?
15     A.  I'm going to say probably 700 next door and
16   500 at East.
17     Q.  700 and 500 in the first quarter?
18     A.  Yeah, 11 or 1,200 overall.
19     Q.  And then how about second quarter?
20     A.  Probably about the same.  It was just recently
21   we started reducing the population.
22     Q.  Recently when, ma'am?
23     A.  The last 3 to 4 months.
24     Q.  So it wouldn't be right to say that the
25   kitchen would ever be hurting for a lack of detainee

Page 100

1     Q.  Does being short on detainee workers impinge
2   the ability of the kitchen to perform its functions?
3     A.  No.
4     Q.  So you wouldn't expect then the kitchen to
5   actually need any detainee workers because the free
6   staff, as you call them, are enough to cover all the
7   work.
8     A.  That is correct.  That's what we've been doing
9   for several months now because of COVID.
10     Q.  Sure.  Under reduced population as well;
11   right?
12     A.  When I got here our population wasn't that low
13   when we started.
14     Q.  How about now, ma'am?
15     A.  Our population is very low right now.
16     Q.  And when did, because of COVID, the detainees
17   stop working in the kitchen?
18     A.  I'm going to say at least 2 months ago.
19     Q.  Two months ago, this being November, so
20   what --
21     A.  September --
22     Q.  -- September?
23     A.  -- beginning of September, beginning of August
24   probably, middle of August, somewhere in there.
25     Q.  So which?  Those are three different times:

Page 99

1   labor; correct?
2     A.  That is correct.  We just all have to work
3   harder.
4     Q.  So anyone that described the situation as
5   hurting would be mischaracterizing what's going on?
6     A.  Well, yes, I wouldn't say we were hurting at
7   all.  We haven't done any meals late, we haven't --
8   everything is running fine.
9     Q.  I'm sharing with you -- I am now sharing with
10   you Exhibit 221.
11         (Exhibit 221 marked.)
12     Q.  (BY MR. CHAREST)  It's an email exchange
13   between you and Ms. Hernandez on October 30, 2012, Bates
14   labeled GEO-Novoa_00027359.  Have I accurately described
15   the document, ma'am?
16     A.  Yes.
17     Q.  Who is the person that says:  "We are really
18   hurting" at the top of the email?
19     A.  That is myself.  We are really hurting for
20   kitchen workers.
21     Q.  Because you were short on detainee labor;
22   correct?
23     A.  We are short on detainees, yes.
24     Q.  And that's the reason the kitchen is really
25   hurting; correct?

Page 101

26 (Pages 98 - 101)

1    A. Well, I wouldn't say the kitchen was hurting;
2  nothing suffered, no one suffered because of it.
3    Q. But I don't --
4    A. We were really --
5    Q. Ma'am, I'm not done with my question. I don't
6  need to ask you whether you would say, "We are really
7  hurting," because, in fact, you actually said, quote:
8  "We are really hurting," end quote, when discussing the
9  lack of detainee labor; correct?
10    A. That is correct.
11    Q. Thank you.
12      So before when you said anyone that described
13  us as hurting would be inaccurate, that's not really
14  right; right?
15    A. Correct.
16    Q. Because you yourself said that; right?
17    A. That is correct.
18    Q. Have you ever been desperate in the kitchen
19  for detainee labor?
20    A. No.
21    Q. Never; is that right? That's your testimony
22  under oath?
23    A. I would say I've never been desperate.
24    Q. Have you ever been getting desperate for
25  detainee labor?

Page 102

1    A. Getting desperate?
2    Q. Yes.
3    A. No.
4      (Exhibit 222 marked.)
5    Q. (BY MR. CHAREST) I'm sharing with you a
6  document that's been marked as Exhibit 222. It's an
7  email exchange between you and Mr. Barr at ICE, dated
8  November 2, 2012, Bates labeled GEO-Novoa_00027358.
9  Have I accurately described the document, ma'am?
10    A. Yes.
11    Q. You said here when you're talking to the ICE
12  representative about the lack of detainee workers and
13  the need to clear them, that, quote, "we're getting
14  desperate"; right?
15    A. Yes.
16    Q. That's exactly the opposite of what you just
17  said not 30 seconds ago; right?
18      MS. GREENBERG: Objection; misstates
19  testimony.
20    Q. (BY MR. CHAREST) You still have to answer.
21    A. Okay. Yeah, we needed workers. Would I say
22  we were in desperate? No, the kitchen still ran.
23    Q. Well, you don't have to say -- you keep saying
24  would I say it, you're talking about a hypothetical,
25  when, in fact, you did say "we're getting desperate";

Page 103

1  right?
2    A. I did say that.
3    Q. Because of the lack of detainee labor;
4  correct?
5    A. Correct.
6    Q. And we talked about getting desperate, you
7  said, No, I never said that. Now you just admit that
8  you did.
9      Have you ever described the kitchen as
10  actually desperate because of the lack of detainee
11  labor?
12    A. That I couldn't recall.
13    Q. Now we're not going to deny it, we're just
14  going to not remember; right?
15      MS. GREENBERG: Objection; misstates
16  testimony.
17    Q. (BY MR. CHAREST) Right?
18    A. It's 8 years ago.
19    Q. Yeah.
20    A. If you're talking about 2012.
21    Q. Sure. But the notion that the kitchen doesn't
22  rely on and need detainee labor for work is one that's
23  made up for this litigation not --
24      MS. GREENBERG: Objection; argumentative.
25    Q. (BY MR. CHAREST) -- reality; right?

Page 104

1    A. What is "not reality"?
2    Q. When you sit here and pretend like the kitchen
3  doesn't need and use detainee labor to help it do its
4  job, that's not reality; correct?
5      MS. GREENBERG: Objection; argumentative.
6      THE WITNESS: We do use --
7    Q. (BY MR. CHAREST) Go ahead.
8    A. We do use detainee workers for labor. It
9  makes everybody's lives easier. We just have to work
10  harder.
11      (Exhibit 223 marked.)
12    Q. (BY MR. CHAREST) I'm showing you a document
13  that's been marked as Exhibit 223. It's a two-page
14  document. It's a continuation of an email exchange
15  between you and Mr. Barr, Bates range
16  GEO-Novoa_00033543, ending in 545. Have I accurately
17  described the document, ma'am?
18    A. Correct.
19    Q. In the middle of the front page which is sort
20  of halfway in the conversation going upward, you say to
21  Mr. Barr -- are you with me, the 10:27 a.m. email?
22    A. Yes.
23    Q. You say to Mr. Barr, "we are desperate,"
24  meaning we in the kitchen are desperate; correct?
25    A. Correct.

Page 105

27 (Pages 102 - 105)

1      Q. And you say, "Two this morning," meaning two
2  detainee laborers this morning; correct?
3      A. Correct.
4      Q. "5 of us total," meaning two detainee laborers
5  and 3 free -- sorry, can I do that again?  May I start
6  that again, please?
7      A. Yes.
8      Q. You say:  "5 of us total," meaning 2 detainee
9  laborers and 3 free staff, as you call them; correct?
10     A. That is correct.
11     Q. And you say that's "Not good."  Why is it not
12  good?
13     A. We just don't have any detainee workers, and
14  they don't like them to sit in their dorms either.
15     Q. It's not good because you have to work harder
16  to get the job done; correct?
17     A. We do have to work harder.
18     Q. Right.  And that's what's not good about a
19  lack of detainee labor in the kitchen; right?
20     A. Correct.
21        MS. GREENBERG:  Objection; misstates
22  testimony.
23     Q. (BY MR. CHAREST)  What was the answer?
24     A. That is correct.
25     Q. Thank you.

Page 106

1  just said; right?
2      A. Yes.
3      Q. Thank you.
4        Back further in that email chain we were just
5  talking about, 223, it starts with on November 2nd at
6  11:53 a.m., you are updating Ms. Hernandez saying,
7  "Detainee Gomez quit," and "Detainee Berumen,"
8  B-r-u-e-u-m-e-n [sic], "has been fired and sent to Seg
9  for telling the AM workers not to come to work
10  tomorrow."  Are you with me?
11     A. I am.
12     Q. So let's tease that out for a second.
13        Detainee Berumen was terminated because he
14  told morning shift workers not to come to work; correct?
15     A. Correct.
16     Q. He or she, I'm sorry, I don't know.  But
17  anyway, the detainee told other detainees not to come to
18  work and that detainee was terminated as a result;
19  correct?
20     A. Correct.
21     Q. What's the basis for terminating Detainee
22  Berumen for telling other workers not to come?
23     A. It would be for inciting.
24     Q. Inciting what, ma'am?
25     A. Inciting, we don't want any problems here,

Page 108

1        At base, you and your staff are tasked with
2  providing three meals, hot meals, per day for the entire
3  population plus 10 percent, whether it's rainy out, it's
4  sunny out, whether it's cold or warm, whatever the
5  conditions, you have to meet that task; correct?
6      A. That is correct.
7      Q. And that's, it's not some sort of gift to the
8  detainees, that's what GEO's job is; right?  GEO has a
9  contract with the United States government and gets paid
10  money for that contract to provide those services;
11  correct?
12     A. That is correct.
13     Q. And in order to meet the task of providing
14  food to the detainees who are housed and are wards
15  literally of the government, the kitchen staff has to
16  either share some of the work with detainee labor or
17  work harder themselves; correct?
18     A. Correct.
19     Q. And as the size of the population increases,
20  sometimes GEO hires more people and sometimes it
21  doesn't; correct?
22     A. Correct.
23        MS. GREENBERG:  Objection; misstates
24  testimony.
25     Q. (BY MR. CHAREST)  But that's correct what I

Page 107

1  fights.
2      Q. Does it say anything about fighting?
3      A. No.
4      Q. So what inciting are we talking about here?
5  We're talking about inciting not working; correct?
6      A. Correct.
7      Q. And that's a terminable offense apparently;
8  correct?
9      A. Yes.
10     Q. So even though the other a.m. workers, you
11  say, can come or go however they want, Detainee Berumen
12  was terminated because that person encouraged other
13  folks to not show up; right?
14     A. Correct.
15     Q. What was Ms. Hernandez's suggestion on how to
16  deal with the population -- the employee shortage?
17     A. I honestly don't remember.
18     Q. Let's look and see.  Are you with me at the
19  3:10 response from Ms. Hernandez to you, Ms. Spagnuolo?
20     A. Which part?  Let me see.
21     Q. The bottom of 33544.  It's right in the middle
22  of the screen I showed you.
23     A. Yes.
24     Q. Great.
25        So she responds to your notice about the

Page 109

28 (Pages 106 - 109)

1 terminating, the quitting and the termination, she says:
2 "Got them thank you!"  Then she says:  "Sent another
3 list to Mr. Barr today to get more workers," meaning
4 Ms. Hernandez, the classification officer, submitted a
5 list of detainees to ICE for approval through the
6 classification process; correct?
7      A. Correct.
8      Q. "If you want you may use volunteers that are
9 waiting [for] ICE's approval, but they just need to be
10 medically cleared."  That's what Ms. Hernandez says;
11 right?
12     A. Correct.
13     Q. So this is a GEO employee, Ms. Hernandez,
14 telling you that you can use in the kitchen detainees
15 that have not cleared the VWP application process;
16 correct?
17     A. Correct.
18     Q. And you ultimately say no to that suggestion;
19 right?
20     A. Right.
21     Q. But do you know whether that was Ms. Hernandez
22 and/or GEO's policy at the time to allow workers who had
23 not cleared to be used as detainee laborers nonetheless?
24     A. No, it is not their policy.
25     Q. But Ms. Hernandez, who was the classification
Page 110

1 officer for GEO, seems to think that that's okay; right?
2      A. Yes.
3      Q. And do you know why Ms. Hernandez thought it
4 was okay to use --
5      A. I do not.
6      Q. I'm not done yet.
7         -- to use detainees that had not been cleared
8 through the VWP application process?
9      A. I do not.
10     Q. And ultimately because you don't accept her
11 offer to use uncleared workers, we roll back up to the
12 beginning of the email, the end of the email chain, and
13 the kitchen is desperate for workers, meaning
14 specifically the volunteer detainee workers; correct?
15     A. Correct.
16     Q. During this time how would you find out
17 whether a detainee was cleared by medical or not?
18     A. We would get a medical form, medical clearance
19 form in our box or brought to the kitchen.
20     Q. So would you for any particular person have to
21 have like a medical clearance form and a classification
22 clearance form of some sort?  Like, physically how did
23 that play out?
24     A. We would just have to have the medical
25 clearance in hand from medical.  Sometimes they would
Page 111

1 email it, but we would have it before they were allowed
2 to come into the kitchen.
3      Q. Would you often, or have you ever is a better
4 question, terminated detainee workers because of poor
5 performance?
6      A. Not that I recall.  Unless there happened to
7 be someone maybe that was really messing around all the
8 time or not working but...
9      Q. So what are the bases that you would have
10 terminated folks for?  What's the minimum offense that
11 you can recall actually having terminated someone for?
12     A. Maybe just not coming to work, so we finally
13 took them off the schedule, or minimum offense, I don't
14 know, stealing something.  I don't know.
15     Q. And have you ever decided to not terminate
16 somebody because they may not be perfect you just need
17 the labor?
18     A. It would depend on how serious the offense
19 was.
20     Q. Well, that's fair.
21     A. No, not because we just needed labor.
22     Q. You're saying under oath that you've never
23 declined to terminate somebody because of a need for the
24 labor?
25        MS. GREENBERG:  Objection; misstates
Page 112

1 testimony.
2         THE WITNESS:  Not that I recall.
3         MR. CHAREST:  I'm sharing a document that's
4 been marked at Exhibit 224.
5         (Exhibit 224 marked.)
6      Q. (BY MR. CHAREST)  It's an email exchange
7 between you and Ms. Hernandez again regarding kitchen
8 workers.  The email exchange dates are November 29 to
9 the 30th, Bates labeled GEO-Novoa_00032655 through 66
10 [sic].  Have I accurately described the document, ma'am?
11     A. Yes.
12     Q. The email exchange starts with Ms. Hernandez
13 telling you that and listing five folks have been
14 cleared, saying that these were the only ones that were
15 cleared through whatever process was going on at that
16 time; correct?
17     A. Correct.
18     Q. And then she goes on to say:  "It's up to you
19 if you decide to fire those workers you wanted to get
20 rid of.  If you do get rid of them please advise me on
21 who they are...I'm sorry it's not that many, but not
22 many detainees are applying at East."  Did I accurately
23 describe the last paragraph of the email?
24     A. Correct.
25     Q. Do you know why you wanted to get rid of
Page 113

29 (Pages 110 - 113)

1 whatever workers you were trying to get rid of in
2 November of 2012?
3     A. I would not remember.
4     Q. Right. But you go on to decide even though
5 you have five new people that you doubt you will fire
6 anyone else; correct?
7     A. Correct.
8     Q. Because you need the labor in the kitchen;
9 correct?
10     A. Or it could --
11         MS. GREENBERG: Objection; calls for
12 speculation.
13         THE WITNESS: Yeah, it could be at that time I
14 didn't have anyone that had done anything to get
15 terminated.
16     Q. (BY MR. CHAREST) Well, except for she's
17 talking about "those workers you wanted to get rid of";
18 right?
19     A. Right.
20     Q. So unless she made that up, you were talking
21 about workers that you wanted to get rid of, "you" being
22 you, Ms. Spagnuolo; right?
23     A. Correct.
24     Q. So with respect to the workers you wanted to
25 get rid of, you decided to not fire them because you

Page 114

1 needed the labor; correct?
2         MS. GREENBERG: Objection; calls for
3 speculation.
4         THE WITNESS: I don't remember going that far
5 back who it was or what it was.
6     Q. (BY MR. CHAREST) Sure. But you don't dispute
7 the fact that you wanted to get rid of some workers and
8 yet decided not to fire them right now in the shortage
9 of labor; right?
10         MS. GREENBERG: Objection; misstates facts.
11     Q. (BY MR. CHAREST) Correct, ma'am?
12     A. I don't recall why I wanted to terminate.
13     Q. Well, I'm not asking you why. I'm asking you,
14 in light of the fact that you don't dispute that you
15 wanted to terminate some detainee laborers, and you only
16 got five replacements, you determined to not terminate
17 them; correct?
18     A. Yes, it says I will doubt if I fire anyone
19 right now.
20     Q. Thank you.
21         MS. GREENBERG: Document speaks for itself.
22     Q. (BY MR. CHAREST) Have you ever been in need
23 of kitchen workers, meaning specifically detainee
24 laborers?
25     A. We always try to keep a good staff, yes.

Page 115

1     Q. That's not what I asked. I said: Have you
2 ever been in need of them in order to do the work that
3 you need to do?
4     A. No, because we always do the work we need to
5 do regardless.
6     Q. So you never would have described the absence
7 of kitchen workers in both East and West as a need for
8 the kitchen?
9     A. It always helps for the kitchen.
10     Q. I said "need" not "help," ma'am.
11         MS. GREENBERG: Objection; vague as to "need."
12     Q. (BY MR. CHAREST) You still have to answer.
13     A. We always like to have a large crew of
14 detainees.
15     Q. Are you saying here under oath that you do not
16 think you ever said that we need workers for the
17 kitchen?
18     A. It always helps to have more workers in the
19 kitchen.
20     Q. That's not how it works. I ask a question and
21 you have to answer it. You don't get to just say
22 something different.
23         My question is: Have you ever said, to the
24 best of your memory, that you need or do not need more
25 kitchen workers?

Page 116

1         MS. GREENBERG: Objection; asked and answered.
2         THE WITNESS: I don't recall.
3     Q. (BY MR. CHAREST) Sorry?
4     A. I don't recall.
5     Q. Have you ever asked the classification group
6 to accelerate the clearance process because of a need in
7 the kitchen for detainee labor?
8     A. I may have if it was taking a long time.
9 Sometimes the process takes forever, same with medical.
10 I'm sure I've contacted medical in the past and asked
11 them to please get the clearances done.
12     Q. Because of the necessity, the need of the
13 kitchen labor; correct?
14         MS. GREENBERG: Objection; vague as to "need."
15     Q. (BY MR. CHAREST) Ma'am?
16     A. Yes; because we use the detainees in the
17 kitchen.
18     Q. And need them for the work that you're doing;
19 right?
20         MS. GREENBERG: Objection; vague as to "need."
21         THE WITNESS: Yes. We do the work either way,
22 and it makes our lives easier when we have detainee
23 workers.
24     Q. (BY MR. CHAREST) It makes the free staff's
25 lives easier when you have detainee workers there;

Page 117

30 (Pages 114 - 117)

1 correct?
2     A. Correct.
3     Q. Have you ever had situations where detainees
4 say they've not been paid for the work they've done in
5 the kitchen?
6     A. Yes, that has happened.
7     Q. And what is your normal practice in dealing
8 with that?
9     A. We would get a copy of their time card and
10 submit it so that they got paid right away.
11     Q. And has it always been resolved in that
12 regard, paid right away?
13     A. That I know of, yes.
14     Q. Has it ever been the result that the person
15 that said they didn't get paid was never actually in the
16 voluntary work program in the first place?
17     A. Not that I am aware of.
18     Q. That would be, if that happened, that would be
19 a violation of the voluntary work program and the PBNDS
20 et cetera, et cetera; correct?
21     A. Yes.
22     Q. And you just don't remember it happening;
23 right?
24     A. Correct.
25     Q. How does a detainee make complaints about

Page 118

1     A. Ms. Buczkowske.
2     Q. Buczkowske, can you spell that for the record,
3 please.
4     A. B-u-c-z-o-w-s-k-i [sic].
5     Q. And were you and Ms. Buczkowske peers?
6     A. She was my supervisor.
7     Q. But she handled --
8     A. She was food service administrator.
9     Q. But she handled West and you handled East?
10     A. Correct.
11     Q. So Ms. Buczkowske was your supervisor;
12 correct?
13     A. Yes.
14         (Exhibit 225 marked.)
15     Q. (BY MR. CHAREST) I will now share with you an
16 exhibit that's been marked as Exhibit 225. It is an
17 email exchange involving you ultimately, dated May 14th
18 through May 10th of 2013, GEO-Novoa_00024343 through
19 345. Have I accurately described the document, ma'am?
20     A. Yes, you have.
21     Q. Excellent.
22         That's the wrong one. Sorry. Let's go get
23 another one then. I'll be right back. Sorry.
24         (Exhibit 226 marked.)
25     Q. (BY MR. CHAREST) Now I'm going to show you a

Page 120

1 something like that in Adelanto?
2     A. They can send a kite or they can file a
3 grievance form.
4     Q. Is a kite, k-i-t-e, kite, is that what you're
5 talking about?
6     A. Correct.
7     Q. And is it an acronym for something or is it
8 just the vernacular?
9     A. I think it's just that a kite means that
10 you're sending something out, you're reaching out with
11 something.
12         And then if they're not satisfied with the
13 answer they get on a kite, then they can file a
14 grievance, and we have a grievance coordinator here.
15     Q. So what does, the email I'm looking at has
16 KITE in all caps so it suggested it was like an acronym
17 but I'm not versed enough to know so I thought I might
18 ask you. But it sounds like you don't know either
19 really.
20     A. I don't.
21     Q. When you were at Adelanto in your first stint,
22 were you more associated with East than West or were
23 you --
24     A. Yes, I was at East. Uh-huh.
25     Q. Who was in charge of West?

Page 119

1 document that's been marked as Exhibit 226. I apologize
2 for that before. 226 is an email exchange. It's the
3 same date, which is why I think we got ourselves
4 confused. It begins May 13, 2013, and ends May 14,
5 2013, Bates range GEO-Novoa_00024438 through 4439. Have
6 I accurately described this document?
7     A. Yes.
8     Q. Excellent.
9         Who is Dean Macur, M-a-c-u-r?
10     A. At the time he was the business manager.
11     Q. What does that mean, a business manager?
12     A. He took care of the payables and what have
13 you. The money man at Adelanto.
14     Q. Paymaster?
15     A. I'm sorry?
16     Q. "Paymaster" is the word I used.
17     A. Yes.
18     Q. Thank you.
19         Who is Alfred Clark?
20     A. Clark, I'm not sure who that is.
21     Q. Okay.
22     A. Mark Bowen, he's a warden somewhere now, I
23 believe.
24     Q. Do you know what he did at Adelanto in 2013?
25     A. Mark Bowen I do not.

Page 121

31 (Pages 118 - 121)

1    Q. But you know that he was at least in the chain
2 of command of the wardens at Adelanto during this time
3 frame?
4    A. Yes.
5    Q. In this situation the issue starts with
6 Ms. Hernandez noting that two detainees sent kites
7 saying they had been working in the kitchen and had not
8 been paid. And then she tells Mr. Bowen that both
9 detainees had been denied participation in the VWP
10 because of their prior criminal history; correct?
11    A. Correct.
12    Q. So now the situation that we have here is
13 detainees not in the VWP working in the kitchen; right?
14    A. Correct.
15    Q. That's not -- again, I don't think your
16 testimony is that it never happened; right? Well, let
17 me ask a better question because that's not a fair
18 question to you.
19       It is true to say that detainees that were not
20 in the voluntary work program have worked in the kitchen
21 at Adelanto; correct?
22    A. That's what it looks like according to this
23 email.
24    Q. But not just this email but in your history of
25 being there, you know that it has happened in the past.
Page 122

1    A. Yes, I have heard that in the past. I haven't
2 seen it because I can tell you it would not happen when
3 I was there.
4    Q. Right. If you were aware of it you say you
5 would enforce the policy and prevent it from happening.
6    A. I absolutely would do my best.
7    Q. Right. But being humans and infallible,
8 nothing is perfect. We know it does happen and it may
9 have happened even on your watch; correct?
10    A. Correct.
11       MS. GREENBERG: Objection; misstates
12 testimony.
13    Q. (BY MR. CHAREST) Your answer was?
14    A. I said correct.
15    Q. Thank you.
16       So Mr. Bowen says: Please make sure "these
17 detainees are not permitted to work in the kitchen," and
18 ensure no other detainees are working in the kitchen
19 unless they're approved by both classification and
20 medical. And those are the two review processes we
21 talked about; right?
22    A. That is correct. And both of these detainees,
23 looking at their number, were at West; they were not at
24 East.
25    Q. Okay. In fact, you make that point in the
Page 123

1 next email. Okay? You say in the -- sorry, two emails
2 up: "From what I heard, West had at least one of them
3 working as a 'VOLUNTEER.'" Right?
4    A. Correct.
5    Q. What did you hear? Who did you hear that
6 from?
7    A. Probably one of the staff over there told me
8 that. Somebody must have been allowing it.
9    Q. The somebody that was in charge of that
10 facility was Ms. Buczkowske; right?
11    A. That is correct.
12    Q. Your supervisor at Adelanto during that time;
13 correct?
14    A. Correct.
15    Q. But you know sitting here that that's a
16 violation of a whole host of policies; correct?
17    A. That is correct.
18    Q. Do you know where Ms. Buczkowske works now?
19    A. No. I believe she's retired.
20    Q. Did she retire from Adelanto?
21    A. Yes.
22    Q. Do you know how long she worked there?
23    A. Many, many years.
24    Q. I noted that some folks at Adelanto have
25 military-sounding titles, Corporal this, Lieutenant
Page 124

1 that, whatever, and some folks don't. Is there a
2 classification about who gets, who gets the military
3 classifications and who doesn't?
4    A. That would be security staff. We're food
5 service staff; so that would be security.
6    Q. Are wardens in the military nomenclature or
7 not?
8    A. Well, they're at the top of the pyramid.
9    Q. Okay. Well, what's the highest-ranking person
10 in terms of military-sounding name that you know of at
11 Adelanto?
12    A. I guess chief.
13    Q. Chief. And what's the next one? Because
14 "chief" doesn't actually resonate with any actual
15 military title other than like chief petty officer.
16    A. Assistant warden would be above that and then
17 warden.
18    Q. So warden, assistant warden, chief, then what?
19    A. Lieutenants.
20    Q. So lieutenant is highest military-sounding
21 rank that you know of?
22    A. Well, I would think chief would be but...
23    Q. Well, maybe from a police perspective but not
24 like military. But anyway, I was, I'm trying to figure
25 that out. This is more of a personal question candidly.
Page 125

32 (Pages 122 - 125)

| | |
|---|---|
| 1 | The people that are a lieutenant or a sergeant |
| 2 | or a corporal in whatever nomenclature in Adelanto, |
| 3 | they're not actually in the military at all; right? |
| 4 | A. No. |
| 5 | Q. You said "no" but you mean yes; correct? |
| 6 | A. Yes; they are not in the military. |
| 7 | Q. Those are designations given to them as part |
| 8 | of their employment not through any kind of military |
| 9 | commission or service like in the United States military |
| 10 | at all; right? |
| 11 | A. That is correct. |
| 12 | Q. Okay. |
| 13 | MS. GREENBERG: I think, are you getting to a |
| 14 | good breaking spot any time soon? |
| 15 | MR. CHAREST: Do you want to take a quick |
| 16 | break? That's fine with me. |
| 17 | MS. GREENBERG: Yeah, or maybe a lunch break |
| 18 | soon. |
| 19 | MR. CHAREST: No. I mean, I'd do what the |
| 20 | witness wants to do. I would prefer to power through. |
| 21 | First off, let's go off the record. |
| 22 | THE VIDEOGRAPHER: Off the record. The time |
| 23 | is 12:01. |
| 24 | (Recess taken.) |
| 25 | THE VIDEOGRAPHER: We're back on the record at |

Page 126

| | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. And then the next column over is alien agency, |
| 3 | and then duty assignment, and their bed; correct? |
| 4 | A. Correct. |
| 5 | Q. And then it has spaces for the detainee to |
| 6 | initial when they have completed their shift; right? |
| 7 | A. Yes. |
| 8 | Q. Now, where on this particular example -- and I |
| 9 | can, I'm happy to scroll through this to show you |
| 10 | whatever you want -- do you see the kitchen-related |
| 11 | work? Here, maybe this will help. Is that better? |
| 12 | A. Yes. |
| 13 | Q. I see down here on line 10 on the second page |
| 14 | dorm/k-i-t. Is that kitchen? |
| 15 | A. Yes, it must be. |
| 16 | Q. Well -- |
| 17 | A. Although we would have our own payroll sheet. |
| 18 | It wouldn't be mixed with other payroll. |
| 19 | Q. I see. I see. So this one might be for other |
| 20 | aspects of the program but not for the kitchen. |
| 21 | A. Correct. |
| 22 | Q. I see. Okay. |
| 23 | But it's in the same format as this for the |
| 24 | kitchen? |
| 25 | A. It is. |

Page 128

| | |
|---|---|
| 1 | 12:14. |
| 2 | Q. (BY MR. CHAREST) Ms. Spagnuolo, thank you for |
| 3 | giving me some time to get myself organized. |
| 4 | I'm going to, I would like to talk about the |
| 5 | detainee payroll sheets in a little bit more detail. |
| 6 | You receive in the kitchen a detainee payroll sheet that |
| 7 | lists the A number, the name, the agency, duty |
| 8 | assignment, and their bed assignment, along with like |
| 9 | their shift information all across a row in a |
| 10 | spreadsheet; correct? |
| 11 | A. All that it has on it is their name and their |
| 12 | housing across it, and for them to sign. |
| 13 | Q. So I'm going to show you Exhibit 102, and it |
| 14 | is titled Detainee Payroll Adelanto ICE Processing |
| 15 | Center. It's previously marked as Exhibit 102, and it's |
| 16 | Bates range GEO-Novoa_00011001 through 003. Have I |
| 17 | accurately described the document? |
| 18 | A. Yes. |
| 19 | Q. Is this an example of a detainee payroll sheet |
| 20 | that you working in the kitchen at Adelanto would |
| 21 | receive on a day-to-day basis? |
| 22 | A. It is. |
| 23 | Q. So it does have a number column, the first |
| 24 | column, and a A number column in the second column, and |
| 25 | the name in the third column; correct? |

Page 127

| | |
|---|---|
| 1 | Q. Do you ever have an occasion of -- I guess, |
| 2 | does the line out means folks didn't show up for that |
| 3 | particular shift? |
| 4 | A. That is correct. |
| 5 | Q. And then but the initial means the detainee |
| 6 | did work that shift on that particular day? |
| 7 | A. Yes. |
| 8 | Q. And then what does it mean when the name is |
| 9 | written in by hand here? |
| 10 | A. I don't know. I honestly have no idea. |
| 11 | Q. Have you ever seen a situation in the kitchen |
| 12 | where a name is written in by hand? |
| 13 | A. Not that I recall. Not recently. |
| 14 | Q. "Not recently," what do you mean? |
| 15 | A. Since I've been here this time at Adelanto. |
| 16 | Q. But prior to, in your first stint in Adelanto, |
| 17 | this was not the form that was used; correct? |
| 18 | A. I think it looks a little different to me but |
| 19 | it may be. And I can't imagine why names were written |
| 20 | in unless these weren't updated on a regular basis. |
| 21 | Q. Well, I don't want you to guess as to why they |
| 22 | were or were not written in if you don't know. |
| 23 | So your testimony is you don't know why names |
| 24 | would be written in; correct? |
| 25 | A. Correct. |

Page 129

33 (Pages 126 - 129)

1    Q. And in your practice, in the kitchen at least,
2  you don't have names getting written in. That's your
3  testimony?
4    A. Right now that is correct, yes.
5    Q. Well, how about before? You seem to suggest
6  that maybe in your first stint at Adelanto names were
7  written in.
8    A. I honestly don't remember. But if they were
9  written in, it would have to mean that the payroll sheet
10  was not updated.
11    Q. Well, there are other possibilities as to why
12  a name might be written; correct?
13    A. Correct.
14    MS. GREENBERG: Objection; calls for
15  speculation.
16    MR. CHAREST: It actually calls for
17  non-speculation.
18    Q. (BY MR. CHAREST) The fact is, you're
19  speculating about why it might be written in. The fact
20  being you don't know why they were written in; correct?
21    A. I cannot answer why.
22    Q. Okay. Do you remember having handwritten
23  names on detainee payroll sheets during your first stint
24  at Adelanto?
25    A. I don't remember.
Page 130

1    Q. Fair enough.
2    Looking at this version here that is
3  Exhibit 102, are there -- is the kitchen version
4  identical except in terms of format?
5    A. Yes.
6    Q. And it's just not the practice of the kitchen
7  to have handwritten entries, to the best of your
8  knowledge?
9    A. To the best of my knowledge, that is correct.
10    Q. And if there were handwritten entries in
11  kitchen-related detainee payroll sheets, that would not
12  be something that you sanctioned or knew about; correct?
13    A. I don't remember. Back then we may have
14  written them in once they got cleared if they weren't on
15  there. I really don't know.
16    Q. Okay. But knowing what you do know, you don't
17  know of any basis to have handwritten names on a
18  detainee pay sheet; correct?
19    A. No, unless it was not up to date.
20    Q. Do you see how the duty assignment in some of
21  these handwritten entries is "volunteer"?
22    A. Yes, I do see that.
23    Q. Do you know what that means in the
24  nomenclature of the Adelanto application of the
25  voluntary work program?
Page 131

1    A. I do not. I have never seen that before, that
2  I remember.
3    Q. It's the same name articulation that you used
4  when you were talking about uncleared detainees working
5  as volunteers outside of the VWP though; correct?
6    A. Correct.
7    Q. There is a scale of -- shifting gears. Sorry,
8  I don't like to do that without telling people. It's
9  just not really fair. Are you ready?
10    A. Yes.
11    Q. Within the disciplinary code at Adelanto is it
12  fair to say that there is a severity scale, meaning if a
13  detainee does something that's a minor infraction, they
14  may be disciplined at a minor level, if the detainee
15  does something that's a more major infraction, they can
16  be disciplined at a more major level?
17    A. That would be correct.
18    Q. The details of that are set out in the
19  Adelanto handbook, correct, the detainee handbook?
20    A. Yes.
21    Q. But even within those gradations there still
22  exists a level of discretion to the officer or the GEO
23  employee of what specific type of discipline will be
24  imposed on the specific detainee in light of the
25  circumstances of the specific incident; correct?
Page 132

1    A. Correct. And usually a lieutenant or ICE
2  would make that determination unless it was just a
3  write-up.
4    Q. When you say ICE or a lieutenant would make
5  "that determination," what determination are we talking
6  about?
7    A. What their punishment would be or the severity
8  of it.
9    Q. So you're saying it's up to either ICE or a
10  lieutenant, a lieutenant being a GEO employee, to
11  determine the severity of any particular punishment?
12    A. Yes, and it would depend on what it was.
13    Q. Can you try that answer without any pronouns
14  because I'm confused as to what we're talking about
15  here.
16    MS. GREENBERG: Objection; vague.
17    Q. (BY MR. CHAREST) Let me ask the question
18  better but I'm just, when you say it depends on what it
19  was, I don't know what the "its" are.
20    A. Well, is it an assault on staff, is it
21  stealing, is it -- it would depend on what it was.
22    Q. The "it" being the infraction. The punishment
23  would depend on what the infraction was; correct?
24    A. Correct. And normally we would have to do
25  write-ups.
Page 133

34 (Pages 130 - 133)

Veritext Legal Solutions
800-336-4000

1    Q. How about lower-grade discipline like, for
2  example, disqualification from the VWP?
3    A. Stealing or just not coming to work ever so
4  that we finally took them off the schedule or sleeping
5  on the job.
6    Q. Yeah. But my question is more about who makes
7  that determination about enforcing or applying a
8  particular discipline level for that type of infraction.
9    A. It would not be myself. I don't know where it
10 goes after the write-ups are done or what they do.
11   Q. So are you telling us under oath that you
12 don't have the authority to terminate somebody from
13 employment?
14   A. Yes, I can terminate. I can terminate someone
15 but I have to notify classification. And then a lot of
16 times we've tried to terminate people in the past and
17 classification said, No, you can't terminate them, or
18 No, they just can't come back for 2 weeks, or what have
19 you.
20       Completely different this time around. Before
21 we would do the write-ups to terminate them.
22   Q. So before in your first stint the GEO
23 personnel would do the write-ups and terminate the
24 detainee for whatever infraction the GEO personnel
25 observed; correct?

Page 134

1    A. Yes. And as I recall, we'd have to do the
2  write-ups and then ICE would take them out of the
3  kitchen. This was before.
4    Q. What do you mean "ICE would take them out of
5  the kitchen"? Like physically?
6    A. They would remove them from their job.
7    Q. They just would not be sent --
8    A. They would say, Okay, they are terminated,
9  they don't work in the kitchen anymore.
10   Q. Well, let's be really clear, because I've got
11 a stack of about a dozen different disciplines that I've
12 got from you against different detainees where you say,
13 I have terminated them.
14       So let's be real clear. You had the power to
15 terminate detainees; correct?
16   A. Apparently I did back then if that's what
17 happened, if that's what the case was.
18   Q. And your application -- we both looked at and
19 discussed the fact that simply missing one shift was
20 sufficient basis for termination under the PBNDS but
21 that didn't always get enforced by GEO or whatever the
22 kitchen personnel was; correct?
23   A. That would probably be correct; yes.
24   Q. And it's within the GEO employee's discretion
25 about whether or not to enforce at the maximum level or

Page 135

1  not, depending on the particular infraction and how
2  often it happened, and how severe it was in the mind of
3  the GEO personnel; correct?
4    A. Yes, that would be correct.
5    Q. Have you ever had to discipline GEO workers,
6  that is, the free staff, for having given detainees food
7  outside of what the menu is?
8    A. I don't remember if I've ever written anyone
9  up for that. I honestly don't remember.
10   Q. So I asked if you've ever had to discipline
11 and you said you don't remember having written anyone
12 up. Is there a difference between disciplining anyone
13 and writing people up?
14   A. I think a write-up and a verbal reprimand are
15 different.
16   Q. So you may have had a verbal reprimand but you
17 don't think you ever wrote someone up for having
18 provided, for example, fresh eggs to detainees?
19   A. I don't remember doing a formal disciplinary
20 on that.
21   Q. But that's the kind of thing that you would
22 have at least, if you knew about it, given some sort of
23 warning, whether it be verbal or in writing, to the GEO
24 staff, correct, the free staff?
25   A. Correct.

Page 136

1    Q. Have you ever had to discipline GEO staff or
2  free staff for being overly familiar and too friendly
3  with detainees?
4    A. I have had to discuss that, yes, before.
5    Q. Why? Why is it wrong to be friendly with the
6  detainees?
7    A. It's not wrong to be friendly with them but
8  overly familiar or to let a detainee take your arm and
9  hold your arm and look at your tattoos, I think that's
10 inappropriate.
11   Q. Inappropriate against what measure?
12   A. There's not supposed to be physical contact.
13   Q. And that's a rule that you thought that that
14 was violating?
15   A. Yes.
16   Q. Even though we were talking about familiarity
17 and not physical contact?
18   A. Overfamiliarity, yes.
19   Q. Can people, can detainees be terminated for --
20 we already talked about that. I'll skip that for a
21 second.
22       Have you ever told a detainee that they would
23 be ineligible for any other volunteer work for 6 months
24 if the person did not report to work as instructed?
25       MS. GREENBERG: Objection; asked and answered.

Page 137

35 (Pages 134 - 137)

1      THE WITNESS:  I don't recall that.
2      Q.  (BY MR. CHAREST)  When I asked you the first
3  time --
4      MR. CHAREST:  You're right, Haley, it was
5  asked and answered.
6      Q.  (BY MR. CHAREST)  Ms. Spagnuolo, when I asked
7  you the first time you said no, never.  Do you have a
8  different sense of that now?
9      A.  No, I don't remember ever saying that to
10  anybody for 6 months because I don't know where that
11  6 months that you couldn't work came from.
12      Q.  Well, let's figure it out if we can.
13      (Exhibit 227 marked.)
14      Q.  (BY MR. CHAREST)  I'm introducing Exhibit 227.
15  This is one of those situations where I've got a PDF
16  that splits.  So I have the cover email which has been
17  stamped and labeled and is in the share, but I'm looking
18  at the attached memo.  So I'll find that memo and put it
19  up in the board as well.
20      Okay.  So you should be able to see now a
21  memorandum under GEO letterhead from you yourself,
22  Ms. Spagnuolo, dated December 27, 2012, addressed to
23  Captain Davis and copying RC Smith regarding Detainee
24  Solorzano.  Have I accurately described the document?
25      A.  You are.

Page 138

1  scheduled by GEO?
2      A.  Because he hadn't been reporting so that must
3  have been the policy back then that they could not get a
4  job for 6 months.
5      Q.  "Must have been the policy back then."  Let's
6  be really careful about what we're talking about here
7  because we're under oath and I want to understand what
8  you know and not want you are guessing.
9      Do you have a memory of a policy existing that
10  detainees would not be allowed to participate in the
11  voluntary work program for 6 months if they did not show
12  up for work as instructed?
13      A.  I do not have memory; no.
14      Q.  That's your interpretation of this document,
15  and you think a fair one; correct?
16      MS. GREENBERG:  Objection; that's not what was
17  asked.
18      Q.  (BY MR. CHAREST)  Go ahead.
19      A.  Yes, I wrote this document.
20      Q.  And that's your interpretation of this
21  document, and you think a fair one; correct?
22      A.  Yes.
23      Q.  And in fact, this particular detainee said he
24  didn't care and so you removed him from the roster;
25  correct?

Page 140

1      Q.  And just for the record, it is attached as an
2  attachment to what's in the share file as Exhibit 227,
3  they're intended to be one document together.  And that
4  Bates is GEO-Novoa_00032817.
5      So now here we go to page 2818, which is the
6  memo that we just discussed.  Are you ready,
7  Ms. Spagnuolo?
8      A.  Yes.
9      Q.  You wrote this memo; correct?
10      A.  I did.
11      Q.  You reported an exchange between you and
12  Detainee Solorzano that happened on or about
13  December 27, 2012; correct?
14      A.  Yes.
15      Q.  You did your best to accurately represent in
16  the memo the events that took place between you and the
17  detainee?
18      A.  Correct.
19      Q.  And what you told the detainee was that if he
20  did not report to work he would be terminated from the
21  kitchen, and he would not be able to get another job for
22  6 months; right?
23      A.  That is correct.
24      Q.  Why did you tell the detainee that he could
25  not get a job for 6 months if he did not return to as

Page 139

1      A.  Correct.
2      Q.  Do you know whether or not this detainee was
3  actually denied any other work for the next 6 months?
4      A.  I do not.
5      Q.  But you know you at least threatened him with
6  that sanction; correct?
7      A.  That is correct.
8      Q.  Who is Captain Davis?
9      A.  Captain Davis is, I believe he works in our
10  Colorado facility now.
11      Q.  What was he at the time at Adelanto?
12      A.  Captain.  He was like a chief I guess;
13  captain, chief.
14      Q.  A high-up in the guard structure.  Is that
15  fair?
16      A.  Yes; above the lieutenant.
17      Q.  Sure.  Is he the highest in the guard
18  structure aside from wardens?
19      A.  The chief would be.
20      Q.  So you think maybe there's a chief, then a
21  captain, and then lieutenants?
22      A.  Yes.
23      Q.  Who is RC Smith?
24      A.  Assistant warden.
25      Q.  Where does he work now?

Page 141

36 (Pages 138 - 141)

| | |
|---|---|
| 1    A. I'm not sure.  Somewhere in the Midwest.  I | 1   kindler and gentler, as you put it, as compared to a |
| 2  believe that he is still with GEO. | 2   corrective facility; right? |
| 3    Q. Do you know whether he's working at a civilian | 3    A. That is how the client wants it here, yes. |
| 4  detention center or a corrective center? | 4   It's a different standard. |
| 5    A. I do not know. | 5    Q. The "client" is whom? |
| 6    Q. Does GEO provide any like training to guide | 6    A. ICE. |
| 7  employees about the difference in how to treat people | 7    Q. I've got an email here that I just can't get |
| 8  from a detention center, a civilian detention center, | 8   past, and it's not that important I guess.  But you had |
| 9  and a corrective facility? | 9   fired a detainee for stealing Sweet'N Low, in fact, at |
| 10    A. Absolutely. | 10   least that's what you said in your memo.  Do you |
| 11    Q. Like what? | 11   remember that? |
| 12    A. They make it a big deal that it's not the same | 12    A. I don't. |
| 13  thing.  They are just being detained. | 13    Q. Do you remember how much Sweet'N Low this |
| 14    Q. Can you tease that out for me.  Like what | 14   particular person stole? |
| 15  exactly does GEO tell its staff about what the | 15    A. I do not. |
| 16  difference is between detention, civilian detention | 16    Q. That was within your discretion to either fire |
| 17  centers, and criminal conviction facilities? | 17   or not fire when you found out about that situation; |
| 18    A. They call it kindler-gentler.  They're not as | 18   correct? |
| 19  stringent here. | 19    A. Correct. |
| 20    Q. And why does GEO do that? | 20     MS. GREENBERG:  Objection; refers to facts not |
| 21     MS. GREENBERG:  Objection; calls for | 21   in evidence. |
| 22  speculation. | 22    Q. (BY MR. CHAREST)  Your answer, ma'am? |
| 23    Q. (BY MR. CHAREST)  You can still answer. | 23    A. Yes, it would be for stealing. |
| 24    A. Because it's a detention facility. | 24    Q. And in this particular situation you decided |
| 25    Q. Right.  And how is that different from the | 25   to terminate the person's employment for stealing |
| Page 142 | Page 144 |

| | |
|---|---|
| 1  other places that GEO runs? | 1   Sweet'N Low; right? |
| 2    A. Well, for example, California Department of | 2     MS. GREENBERG:  Objection; refers to facts not |
| 3  Corrections is a correctional facility.  So we would do | 3   in evidence. |
| 4  things by the way California Department of Corrections | 4    Q. (BY MR. CHAREST)  Ma'am? |
| 5  wanted them done.  ICE standards are kindler and | 5    A. I do not remember that situation. |
| 6  gentler. | 6    Q. Okay.  What is a DSM facility walk-through? |
| 7    Q. And it's out of respect for the fact that the | 7    A. I'm not sure what DSM stands for. |
| 8  people that are in the civilian detention centers | 8    Q. Does detention services manager make any -- |
| 9  haven't actually done anything illegal that's been | 9   does that ring any bells for you? |
| 10  adjudicated; correct? | 10    A. That would probably be correct. |
| 11     MS. GREENBERG:  Objection; calls for | 11    Q. What is a detention services manager? |
| 12  speculation. | 12    A. I'm not sure. |
| 13     THE WITNESS:  Some have, some haven't.  But | 13    Q. You know the phrase but you don't know who it |
| 14  I'm not privy to their records. | 14   is? |
| 15    Q. (BY MR. CHAREST)  When you say "some have, | 15    A. I wasn't even sure what the initials meant |
| 16  some haven't," you mean some people, just like every | 16   until you told me. |
| 17  other person in every other city, some have been | 17    Q. Okay.  Are you aware as to whether or not ICE |
| 18  convicted and some have not been convicted in their | 18   conducts facility walk-throughs periodically? |
| 19  prior history; right? | 19    A. Absolutely they do. |
| 20    A. That's absolutely correct. | 20    Q. And how much in advance of the actual |
| 21    Q. But the reason for their detention is nothing, | 21   walk-through are the GEO staff made aware the |
| 22  has nothing to do with any criminal activity at all; | 22   walk-through is going to happen? |
| 23  correct? | 23    A. We're not. |
| 24    A. Correct.  Other than -- I'm sorry. | 24    Q. Never, is that your testimony? |
| 25    Q. And that's why GEO instructs its staff to be | 25    A. We know when we're having an audit, a |
| Page 143 | Page 145 |

37 (Pages 142 - 145)

1 prescheduled audit, but if they're just going to do a
2 walk-through...
3    Q. If they just want to go through a walk-through
4 you're saying that the GEO staff is not aware of that.
5 That's your testimony under oath.
6    A. I can't say that they're not aware of that
7 every time. I'm just saying that as a rule when we have
8 a walk-through from ICE, they just walk through.
9 Sometimes they'll show up at a meal and check the chow
10 hall or they'll come in the kitchen; sometimes they
11 won't come in the kitchen. No, we're not notified about
12 any of that.
13    Q. Ever.
14    A. No, I can't say never.
15    Q. Right. But when you just said we're not
16 notified of that, I just don't want the misimplication
17 to be that the GEO staff is never aware of the fact of a
18 walk-through coming because --
19    A. I can't say that we never are.
20    Q. Right. Because you've seen situations where
21 word gets passed that there's a walk-through coming up
22 or some sort of inspection coming up; right?
23       MS. GREENBERG: Objection; misstates
24 testimony.
25    Q. (BY MR. CHAREST) You've seen that; right,

Page 146

1 ma'am?
2    A. Yes.
3    Q. Yeah.
4       And that information is kind of passed by word
5 of mouth and emails amongst GEO staff to make them be
6 more prepared for when that walk-through happens;
7 correct?
8    A. Yes.
9       MR. CHAREST: I'm pretty much done. Let's go
10 off the record and let me look at my notes. I think
11 we're about done. Okay?
12       MS. GREENBERG: And can we get a time count
13 for how much time we've used so far?
14       THE VIDEOGRAPHER: Yes.
15       Off the record. The time is 12:42.
16       (Recess taken.)
17       THE VIDEOGRAPHER: We're back on the record at
18 1:04.
19       MR. CHAREST: Excellent. Thank you.
20    Q. (BY MR. CHAREST) Ms. Spagnuolo, I just have
21 one -- a few more questions to cover over.
22       With respect to the detainees that work in the
23 kitchen, whether or not they've actually been hired, GEO
24 knows that those people are working, performing labor in
25 the kitchen; correct?

Page 147

1    A. Correct.
2    Q. And GEO allows that work to continue in the
3 kitchen by the detainees; correct?
4    A. I don't know who would allow it. I'm just
5 saying if they're in there, there's cameras everywhere.
6 So everybody knows they cannot work for free.
7    Q. No, I'm not talking about free or not. I'm
8 talking about the people that are working in, the
9 detainees that are working in the kitchen, even within
10 the voluntary work program -- so leave that question
11 mark aside about being outside. Are you with me?
12    A. Yes.
13    Q. GEO is aware that those detainees are
14 performing labor in the kitchen; correct?
15    A. Correct.
16    Q. GEO is aware that it's paying them a dollar a
17 day, which is less than the California minimum wage;
18 right?
19    A. Correct.
20    Q. GEO could say, You are not allowed to work in
21 this kitchen. GEO has the power to prevent them from
22 working; correct?
23    A. Correct.
24    Q. But GEO does not prevent those detainees from
25 working; correct?

Page 148

1    A. Correct.
2    Q. And that's true not just with respect to the
3 kitchen staff but all of the detainee labor that happens
4 on facility, all those things we just talked about are
5 true; correct?
6    A. Correct.
7       MR. CHAREST: I pass the witness.
8       MS. GREENBERG: I have a few questions.
9
10       EXAMINATION
11 QUESTIONS BY MS. GREENBERG:
12    Q. So during COVID you said you have not had any
13 detainer workers. That's correct; right?
14    A. That is correct.
15       MR. CHAREST: Form.
16    Q. (BY MS. GREENBERG) And you've been able to
17 perform the work without the detainees?
18    A. Correct.
19       MR. CHAREST: Form again.
20    Q. (BY MS. GREENBERG) And have you ever been
21 unable to prepare or serve a meal because you were low
22 on detainee worker help?
23       MR. CHAREST: Form.
24       THE WITNESS: No, that has never happened.
25    Q. (BY MS. GREENBERG) When you opened your own

Page 149

38 (Pages 146 - 149)

1  restaurants, did you have to get any health inspections
2  that assigned your restaurant a letter grade?
3      A.  Absolutely.
4      Q.  Have you ever in those situations gotten
5  anything below an A?
6      A.  I have not.
7      Q.  And how would you compare the sanitation
8  standards that you use or used at your own restaurants
9  to those that you use at Adelanto?
10     MR. CHAREST:  Form.
11     THE WITNESS:  It's absolutely the same.
12     Q.  (BY MS. GREENBERG)  So how do you source your
13  ingredients at Adelanto?
14     A.  We have a supplier for our main items but any
15  fresh items, milk, bread, produce, that all comes fresh
16  weekly.
17     Q.  And how do you ensure that everything is
18  fresh?
19     A.  We take temperatures when the food arrives, we
20  check the cases for any damage, and we return any items
21  that aren't up to par.
22     Q.  And does everything have expiration dates on
23  it when you receive it?
24     A.  It does.
25     Q.  Do you make sure that everything is before, I

Page 150

1  been -- without being medically cleared?
2      A.  Only the rumors I had heard.
3      Q.  And those rumors -- I guess what percentage of
4  the time are you absolutely sure that the detainees
5  working in your kitchen are medically cleared?
6      MR. CHAREST:  Form.
7      THE WITNESS:  Well, a hundred percent because
8  until they're cleared they're not put on the payroll
9  sheet.
10     Q.  (BY MS. GREENBERG)  So those rumors that you
11  heard are purely rumors and you have no idea whether
12  it's fact or fiction.
13     A.  That is true.
14     (Reporter clarification.)
15     MR. CHAREST:  Form for every one because of
16  the leading questions.  But yeah, that was one as well.
17     Q.  (BY MS. GREENBERG)  And what's under your
18  control you're 100 percent sure that they're medically
19  cleared?
20     MR. CHAREST:  Form.
21     THE WITNESS:  Yes.
22     Q.  (BY MS. GREENBERG)  And in practice, can you
23  just walk me through how you check every day to make
24  sure that the people in your kitchen have already been
25  cleared to work in the voluntary work program.

Page 152

1  guess predates the expiration date?
2      MR. CHAREST:  Form.
3      THE WITNESS:  Yes.  When everything comes in,
4  that's checked and it's also marked the day we receive
5  it for proper rotation.
6      Q.  (BY MS. GREENBERG)  And what do you mean by
7  "proper rotation"?
8      A.  First in-first out.  So if I receive milk
9  today, it's put in the front and we hang a tag from it
10 the date it was received, and we check the code on it to
11 make sure that that milk is used first.
12     Q.  Do you eat the food that you serve at
13 Adelanto?
14     A.  I do.
15     Q.  Would you feed the food to your family?
16     A.  I would.  The only thing I don't eat here is
17 fish, and I don't like seafood of any kind.
18     Q.  You said earlier that detainees need to get
19 cleared medically in order to work in the kitchen.
20     A.  Yes.
21     Q.  And is there any way for them to work in the
22 kitchen without being medically cleared?
23     A.  They are not supposed to; no.
24     Q.  And do you have any memory of a situation in
25 which they were working in the kitchen without having

Page 151

1      A.  The time card or the time sheet goes out with
2  the officer that picks them up from the dorms and brings
3  them to work.  If they're not on the time sheet
4  obviously they can't come to work.
5          Then when they come in the kitchen my staff
6  inspects to make sure they don't have any open sores or
7  they don't have any symptoms of being sick.  And of
8  course at the beginning of COVID their temperature was
9  taken.
10     Q.  And the cleaning that is done in the kitchen,
11 is that done by the voluntary work program orders that
12 are cleared for the kitchen as well as the same job?
13     MR. CHAREST:  Form.
14     THE WITNESS:  Yes; it's done by everyone in
15 the kitchen, anyone that's working.
16     Q.  (BY MS. GREENBERG)  How many emails do you
17 send or receive on a daily basis?
18     A.  A lot.
19     Q.  Can you give an educated guess as to how many
20 emails you send.
21     A.  Just in the last couple hours I've had 20 new
22 emails that I've responded to.  So I don't know, a
23 hundred.  I don't know.
24     Q.  And are you friendly with any of your
25 coworkers?

Page 153

39 (Pages 150 - 153)

1     A. Outside of work, no.
2     Q. How about inside of work?  Would you go grab
3  coffee casually with your coworkers?
4     A. Not outside of work.
5     Q. But in work do you ever talk to them about
6  things that are --
7     A. Oh, sure.
8     Q. Okay.
9     A. Sure.
10        MR. CHAREST:  Form.
11    Q. (BY MS. GREENBERG)  And when you send casual
12  emails, do you sometimes exaggerate things or say things
13  without meaning them with exact precision?
14        MR. CHAREST:  Form.
15        THE WITNESS:  Well, of course.  It would be
16  like when you send somebody a text message or something
17  about something.
18    Q. (BY MS. GREENBERG)  Have you ever said, I need
19  ice cream, but you don't really actually need ice cream,
20  you just want it?
21    A. Of course, yes.  Yes.
22    Q. So in situations where you sent emails 8 years
23  ago, it's possible that when you're sending them to a
24  friendly coworker you didn't exactly mean to a tee every
25  single word that you put in an email?

Page 154

1     A. Correct.
2        MR. CHAREST:  Form.
3     Q. (BY MS. GREENBERG)  When you are short on
4  detainee workers, the free staff that does the work that
5  maybe the detainee workers would do, do they get paid
6  for the extra hours that they have to work?
7     A. Well, they don't work extra hours; they come
8  in for their shift only.  They're not allowed to work
9  double shifts.
10    Q. So I guess when the free workers have to do
11  more work because there are fewer detainees, do they
12  just have to work harder then during their shift or do
13  they work longer?
14    A. Oh, no, they just work harder.  Everybody
15  wants to go home on time.
16    Q. And they don't have a problem completing their
17  work during their shift hours?
18        MR. CHAREST:  Form.
19        THE WITNESS:  No.
20    Q. (BY MS. GREENBERG)  And so when you were
21  pressed to say that you were aware when ICE conducts
22  walk-throughs, and you said you were aware of situations
23  in which people were put on notice that an ICE
24  walk-through was about to happen, what percentage of the
25  time that those walk-throughs do happen would you say

Page 155

1  you are aware that the walk-through is about to happen?
2     A. Probably 80 percent of the time I would say
3  you don't know that they're coming in.
4     Q. And that's different than a formal audit?
5        MR. CHAREST:  Form.
6        THE WITNESS:  Correct.  A formal audit is
7  scheduled.
8        MR. CHAREST:  Did you pass and I missed it?
9  I'm sorry.
10        MS. GREENBERG:  No.  Sorry.  I'm just
11  reviewing my notes really quickly just to make sure I
12  have hit everything I want to hit.
13        That's it for now.
14        MR. CHAREST:  Great.  A couple of follow-up
15  questions on that, ma'am.
16        THE WITNESS:  Yes.
17
18        FURTHER EXAMINATION
19  QUESTIONS BY MR. CHAREST:
20    Q. Excellent.
21        You're not saying medical always gets it right
22  and that people are never in the kitchen that have been
23  uncleared, non-cleared; right?
24    A. Yes.  I can't say that that's never happened.
25  It has happened before.

Page 156

1        (Exhibit 228 marked.)
2     Q. (BY MR. CHAREST)  Right.  And I'm going to
3  show you Exhibit 228 now in light of the questions from
4  GEO's counsel showing an example of just that thing
5  where kitchen workers were working in the kitchen when
6  it says, quote, "the majority of the detainees were not
7  cleared correctly by the nurses"; right?
8     A. Yes, that's what it says.
9     Q. And that's the kind of thing that happens from
10  time to time; right?
11    A. It does.
12    Q. Tell me, if you would, who Sarah Mayne is,
13  M-a-y-n-e.
14    A. My oldest daughter.
15    Q. And then who is Melissa, that might be Melissa
16  Spags, is that another daughter?
17    A. Yes.
18    Q. And who is Nancy Maldonado?
19    A. She's another food service manager.
20    Q. Within Adelanto?
21    A. No, no.  I worked with her in Big Spring.
22    Q. So she's a GEO employee at a different
23  facility?
24    A. Yes.
25    Q. And you just forwarded this list of 26

Page 157

40 (Pages 154 - 157)

1 detainees' name and A numbers to your daughters and your
2 friend at Big Spring; right?
3     A.  Correct.
4     Q.  Are you supposed to send that information
5 outside?
6     A.  No, no, not even thinking about the bottom
7 half.
8     Q.  If your family was eating the food that you
9 served at Adelanto, as you said they would, and they
10 asked for seconds, would you give it to them?
11     A.  If my family asked for seconds?
12     Q.  You served your family --
13     A.  Of course I would.
14     Q.  You served your family at home a meal that you
15 had prepared in the same way as you served at Adelanto,
16 would you give them seconds if they asked for it?
17     A.  Yes.
18     MR. CHAREST:  Pass the witness.
19     MS. GREENBERG:  I don't have anything further.
20     MR. CHAREST:  Thank you very much,
21 Ms. Spagnuolo.  You're done.
22     MS. GREENBERG:  Thank you.
23     THE VIDEOGRAPHER:  This will conclude the
24 testimony by Pamela Spagnuolo.  The total number of
25 media units used was two, and these are retained by

Page 158

1 CERTIFICATE OF WITNESS
2     I, PAMELA SPAGNUOLO, being first duly sworn,
3 depose and say:
4     That I am the witness named in the foregoing
5 deposition, consisting of pages 1 through 162; that I
6 have read said deposition and know the contents thereof;
7 that the questions contained therein were propounded to
8 me; and that the answers contained therein are true and
9 correct, except for any changes that I may have listed
10 on the Change Sheet attached hereto:
11     DATED this _____ day of _____, 20___.
12
13
14     _____
15     PAMELA SPAGNUOLO
16
17     SUBSCRIBED AND SWORN to before me this _____ day
18 of _____, 20___.
19
20     _____
21     NAME OF NOTARY PUBLIC
22     NOTARY PUBLIC FOR _____
23     RESIDING AT _____
24     MY COMMISSION EXPIRES _____
25

Page 160

1 Veritext Legal Solutions.
2     Going off the record, the time is 1:17.
3     (Deposition concluded at 1:17 p.m.)
4     (Signature requested.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 159

1 ERRATA SHEET FOR PAMELA SPAGNUOLO
2 Page ___ Line ___ Reason for Change _____
  Reads _____
3 Should Read _____
4
  Page ___ Line ___ Reason for Change _____
5 Reads _____
  Should Read _____
6
7 Page ___ Line ___ Reason for Change _____
  Reads _____
8 Should Read _____
9
  Page ___ Line ___ Reason for Change _____
10 Reads _____
  Should Read _____
11
12 Page ___ Line ___ Reason for Change _____
  Reads _____
13 Should Read _____
14
  Page ___ Line ___ Reason for Change _____
15 Reads _____
  Should Read _____
16
17 Page ___ Line ___ Reason for Change _____
  Reads _____
18 Should Read _____
19
  Page ___ Line ___ Reason for Change _____
20 Reads _____
  Should Read _____
21
22 Page ___ Line ___ Reason for Change _____
  Reads _____
23 Should Read _____
24 You may use another sheet if you need more room
25 WITNESS SIGNATURE _____

Page 161

41 (Pages 158 - 161)

```
 1              REPORTER'S CERTIFICATE
 2        I, BEVERLY BENJAMIN CSR No. 710, Certified
 3   Shorthand Reporter, certify:  That the foregoing
 4   proceedings were taken before me at the time and place
 5   therein set forth, at which time the witness was put
 6   under oath by me;
 7        That the testimony and all objections made were
 8   recorded stenographically by me and transcribed by me or
 9   under my direction;
10        That the foregoing is a true and correct record
11   of all testimony given, to the best of my ability;
12        I further certify that I am not a relative or
13   employee of any attorney or party, nor am I financially
14   interested in the action.
15        IN WITNESS WHEREOF, I set my hand and seal this
16   16th day of November 2020.
17
18
19
20
21        BEVERLY A. BENJAMIN, CSR No. 710
22        Notary Public
23        P.O. Box 2636
24        Boise, Idaho 83701-2636
25
```

                                          Page 162

```
 1   haley.greenberg@akerman.com
 2              November 16, 2020
 3   RE: Novoa, Raul v. The Geo Group
 4   DEPOSITION OF: Pamela Spagnuola (# 4322355)
 5        The above-referenced witness transcript is
 6   available for read and sign.
 7        Within the applicable timeframe, the witness
 8   should read the testimony to verify its accuracy. If
 9   there are any changes, the witness should note those
10   on the attached Errata Sheet.
11        The witness should sign and notarize the
12   attached Errata pages and return to Veritext at
13   errata-tx@veritext.com.
14        According to applicable rules or agreements, if
15   the witness fails to do so within the time allotted,
16   a certified copy of the transcript may be used as if
17   signed.
18              Yours,
19              Veritext Legal Solutions
20
21
22
23
24
25
```

                                          Page 163

42 (Pages 162 - 163)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.