# EXHIBIT K

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                         EASTERN DIVISION

4

5       RAUL NOVOA, JAIME CAMPOS
        FUENTES, ABDIAZIZ KARIM,
6       and RAMON MANCIA,
        individually and on behalf
7       of all others similarly
        situated,

8
                            Plaintiffs,
9           vs.                      No. 5:17-cv-02514-JGB-SHKx
10      THE GEO GROUP, INC.,
11                    Defendant.
        _____/

12

13

14          VIDEOTAPED DEPOSITION OF MARY WISE-McCORMICK

15         appearing remotely from Adelanto, California

16                  Wednesday, July 22, 2020

17

18

19

20

21

22

23      Reported by:
        Natalie Y. Botelho
24      CSR No. 9897

25      Job No. 4137785


                                           Page 1

```
 1        UNITED STATES DISTRICT COURT
 2        CENTRAL DISTRICT OF CALIFORNIA
 3             EASTERN DIVISION
 4
 5  RAUL NOVOA, JAIME CAMPOS
    FUENTES, ABDIAZIZ KARIM,
 6  and RAMON MANCIA,
    individually and on behalf
 7  of all others similarly
    situated,
 8
          Plaintiffs,
 9
       vs.            No. 5:17-cv-02514-JGB-SHKx
10  THE GEO GROUP, INC.,
11        Defendant.
    _____/
12
13
14       Videotaped remote deposition of MARY
15  WISE-McCORMICK, taken on behalf of Plaintiffs, at
16  Adelanto, California, beginning at 10:09 a.m. and
17  ending at 5:49 p.m. on Wednesday, July 22, 2020,
18  before NATALIE Y. BOTELHO, Certified Shorthand
19  Reporter No. 9897.
20
21
22
23
24
25
                                              Page 2
```

```
 1                 INDEX
 2  WITNESS                      PAGE
 3  MARY WISE-McCORMICK
 4
 5  EXAMINATION
 6  By Ms. Wright                  9
 7  By Ms. Hou                   257
 8
 9         ---oOo---
10
11      E X H I B I T S
12  NUMBER      DESCRIPTION      PAGE
13  Exhibit 95   Amended Notice of Deposition   14
               to Mary Wise-McCormick
14
    Exhibit 96   An e-mail from Theodore    173
15             Hauser, to Mary Wise-McCormick
               and others, sent 1/2/2018,
16             Bates GEO-Novoa_00000002
17  Exhibit 97   An e-mail from Reyna        178
18             Inchausti, to Mary
               Wise-McCormick, sent 7/10/2018,
19             Subject: Kitchen Workers,
               Bates GEO-Novoa_00000004
20  Exhibit 98   An e-mail from Michelle     187
               Keeney, to Mary Wise-McCormick,
21             sent 3/30/2018, Bates
               GEO-Novoa_00000697
22
    Exhibit 99   An e-mail from Theodore     190
23             Hauser, to Michelle Keeney
               and others, sent 7/2/2018,
24             Bates GEO-Novoa_00001195 and
               00001196
25
                                              Page 4
```

```
 1  APPEARANCES:
 2
 3  For Plaintiffs (appearing remotely):
 4     BURNS CHAREST LLP
          BY:  LYDIA WRIGHT, ESQ
 5        BY:  LAUREN CROSS, ESQ
          900 Jackson Street, Suite 500
 6        Dallas, TX  75202
          (504)799-2844
 7        lwright@burnscharest.com
 8  For Plaintiffs (appearing remotely):
 9     LAW OFFICE OF R  ANDREW FREE
          BY:  R  ANDREW FREE, ESQ
10        P O  Box 90568
          Nashville, TN  37209
11        (844)321-3221
          andrew@immigrantcivilrights.com
12
13  For Defendants (appearing remotely):
14     AKERMAN LLP
          BY:  ALICIA HOU, ESQ
15        1900 Sixteenth Street, Suite 1700
          Denver, CO  80202
16        (303)260-7712
          alicia.hou@akerman.com
17
          AKERMAN LLP
18        BY:  DAVID VAN PELT, ESQ
          601 West Fifth Street, Suite 300
19        Los Angeles, CA  90071
          (213)688-9500
20        david.vanpelt@akerman.com
21
22  Also present (appearing remotely):
23     JULIANNA GRAVOIS, paralegal, Burns Charest
24     BRITTANY ROHAN, Videographer
25
                                              Page 3
```

```
 1      E X H I B I T S (continued)
 2  NUMBER      DESCRIPTION      PAGE
 3  Exhibit 100   A document entitled  Adelanto   206
               ICE Processing Center, West,
 4             Detainee Job Description,
               Bates GEO-Novoa_00000089
 5             through 00000092
 6  Exhibit 101   An e-mail from Patricia Love,   216
               to Aimee Crickenberger, Re:
 7             Detainees Fired, sent 4/1/2017,
               Bates GEO-Novoa_00006604 and
 8             00006605
 9  Exhibit 102   A document entitled  Detainee   226
               Payroll, Adelanto ICE
10             Processing Center, Date:
               1/17/18 Day: Wednesday,
11             Bates GEO-Novoa_00011001
               through 00011003
12
    Exhibit 103   A document entitled  Detainee   234
13             Payroll, Adelanto ICE
               Processing Center, Date:
14             1/21/18 Day: Sunday,  Bates
               GEO-Novoa_00011181 through
15             00011192
16  Exhibit 104   A group of various documents   255
               produced by the witness
17
18          ---oOo---
19
20      PREVIOUSLY MARKED EXHIBITS
21  NUMBER      DESCRIPTION      PAGE
22  Exhibit 22   GEO Corrections and Detention   119
               Policy & Procedure Manual,
23             Bates GEO-Novoa_00000221
               through 00000227
24
25
                                              Page 5
```

2 (Pages 2 - 5)

PREVIOUSLY MARKED EXHIBITS (continued)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 26 | An e-mail from Joanne Langill, to Daniel Penafiel, sent 9/4/2018, Subject: Detainee Applications with attached Detainee Work Detail Application, Bates GEO-Novoa_00003292 through 00003294 | 110 |
| Exhibit 35 | An e-mail from Patricia Love, to Michelle Keeney, RE: Kitchen staff and the their lunches, sent 3/7/2018, Bates GEO-Novoa_00001227 through 00001229 | 181 |
| Exhibit 82 | Detainee Payroll, Adelanto ICE Processing Center, Date: 11/12/2017, Day: Sunday | 199 |

---oOo---

Page 6

---

1   Adelanto, California, Wednesday, July 22, 2020
2           10:09 a.m.
3
4           PROCEEDINGS
5       (Mr. Free was not present at the
6   commencement of the deposition.)
7       THE VIDEOGRAPHER: Good morning. We are
8   going on the record at 10:09 a.m. on July 22nd,
9   2020. Audio and video recording will continue to
10  take place unless all parties agree to go off the
11  record.
12      This is media unit 1 of the video recorded
13  deposition of Mary Wise-McCormick, taken by counsel
14  for Plaintiff in the matter of Raul Novoa, Jaime
15  Campos Fuentes, Abdiaziz Karim, and Ramon Mancia,
16  individually and on behalf of all others similarly
17  situated, versus The GEO Group, Inc., filed in the
18  United States District Court, Central District of
19  California, Eastern Division, Case
20  No. 5:17-cv-2514-JGB-SHKx.
21      The deposition is being conducted using
22  Veritext Zoom technology, and everyone is appearing
23  remotely. The videographer is Brittany Rohan, and
24  the court reporter is Natalie Botelho, both
25  appearing on behalf of Veritext Legal Solutions. I

Page 7

---

1   am not related to any party in this action, nor am I
2   financially interested in the outcome.
3       Counsel and all present in the remote room
4   will now state their appearances and affiliations
5   for the record. If there are any objections to
6   proceeding, please state them at the time of your
7   appearance, beginning with the noticing attorney.
8       MS. WRIGHT: This is Lydia Wright, with
9   the law firm of Burns Charest, and I'm joined today
10  by Julianna Gravois and Lauren Cross, also with
11  Burns Charest.
12      MS. HOU: Good morning. This is Alicia
13  Hou, and I am attorney for Defendant The GEO Group
14  and attorney for the witness, Mary Wise-McCormick,
15  from the law firm Akerman.
16      THE WITNESS: My name is Mary
17  Wise-McCormick. I work for The GEO Group.
18      MR. VAN PELT: This is David Van Pelt,
19  also counsel for The GEO Group.
20      THE VIDEOGRAPHER: Okay. If that is
21  everyone, the court reporter can now swear the
22  witness.
23          MARY WISE-McCORMICK,
24  having been administered an oath, was examined and
25          testified as follows:

Page 8

---

1           EXAMINATION BY MS. WRIGHT
2       MS. WRIGHT: Q. Good morning,
3   Ms. McCormick.
4   A.      Good morning.
5   Q.      Can you please state your full name for
6   the record?
7   A.      With my middle name?
8   Q.      Yes, please.
9   A.      Or just -- okay. Mary Elizabeth
10  Wise-McCormick.
11  Q.      And Ms. McCormick, have you ever been
12  deposed before?
13  A.      To -- I'm sorry?
14  Q.      Have you ever been deposed before?
15  A.      Yes. Yes, I have.
16  Q.      How many times have you been deposed
17  before?
18  A.      Once.
19  Q.      When was that?
20  A.      About a year and a half ago. I don't
21  recall the exact date.
22  Q.      What was the matter in which you were
23  deposed?
24  A.      Oh, it was one of my members, an officer,
25  was suing The GEO Group, and I am the union

Page 9

3 (Pages 6 - 9)

1 president. Therefore, I was called upon.
2 Q.    What was the officer suing The GEO Group
3 for?
4 A.    Sexual harassment.
5 Q.    And what was the officer's name?
6 A.    Broussard.
7 Q.    As the union president, what was your
8 role?
9        MS. HOU: Object as to form.
10       MS. WRIGHT: Q. You still have to answer.
11 A.    I'm sorry.
12       MS. HOU: Yes, go ahead, Mary. I'll
13 assert objections through the deposition, so --
14       THE WITNESS: Okay.
15       MS. HOU: -- go ahead and still answer,
16 though.
17       THE WITNESS: It was in regards to things
18 that she had came to me about, documentation, memos
19 that she had given me. The other -- the other
20 person was also a member; therefore, it was about
21 conversations on both sides that had taken place.
22 And then any memos that they had given me.
23 Unfortunately, as union president, I have to
24 represent both sides.
25       MS. WRIGHT: Q. That was my next

Page 10

1 question. Were you appearing on behalf of one of
2 the parties?
3 A.    No. No. It was -- it was about the --
4 the procedure that GEO had taken. They were asking
5 if they followed -- or what we requested, was it
6 done. That's pretty much what they were asking for.
7 Q.    Do you know if that litigation is ongoing?
8 A.    I believe it has been settled. But I'm
9 not positive. I've just never been called back, but
10 I do -- I believe I have heard that it had been
11 settled.
12 Q.    Have you been deposed on any other
13 occasion?
14 A.    No.
15 Q.    Let's go over some of the framework, the
16 ground rules for a deposition. Because this
17 deposition is occurring by video conference, it's a
18 little bit strange, so there are some ground rules
19 that we can all follow to make it a little bit
20 easier on all of us. The first is that all of your
21 testimony today is under oath, just as if you were
22 testifying in a court of law. Do you understand
23 that?
24 A.    Yes.
25 Q.    And it's extremely important that we speak

Page 11

1 clearly and loudly so that the court reporter can
2 record what we're saying. Will you agree to give
3 verbal responses rather than nodding your head or
4 saying "uh-huh"?
5 A.    I will do my best.
6 Q.    Thank you. And I will do my best to let
7 you finish an answer before I ask my next question.
8 Would you agree to do your best to allow me to
9 finish a question before you state your answer?
10 A.    Yes.
11 Q.    Thank you. And as you know, everything
12 that is being said is being taken down by the court
13 reporter verbatim. We'll take breaks periodically.
14 If you need a break for any reason, just ask, and
15 we'll -- we'll take a break.
16       And then, finally, I just want to make
17 clear the expectations of communications with your
18 counsel during this deposition. During this
19 proceeding, you and your counsel will have an
20 opportunity to speak off the record at appropriate
21 times, just as if the deposition was happening in
22 person, but in this virtual setting, the expectation
23 is that counsel will not be communicating with you
24 during the deposition while I'm on the record. So
25 by text, e-mail, or any other electronic means.

Page 12

1 Those exchanges can be viewed as taking place in my
2 presence and not subject to the protections of
3 attorney-client privilege. Sort of like if you were
4 passing a note to your attorney in front of me
5 during a deposition while we're all in the same
6 room.
7        So it's my understanding that you are not
8 with anybody else physically in the room where you
9 are at right now.
10 A.    No. No, I'm completely by myself in here,
11 with the door closed.
12 Q.    Okay. If there's anybody present with you
13 at any time, if anybody walks in during the
14 deposition, we need to put that on the record. So
15 please let us know. Will you --
16 A.    Okay.
17 Q.    Okay. I am going to introduce -- I'm
18 going to mark as Exhibit 95 --
19       I'm so sorry. Can we go off the record
20 for just a moment? We're having a technical issue.
21 Thank you.
22       THE VIDEOGRAPHER: One moment. We're
23 going off the record at 10:18.
24       (Recess taken from 10:18 a.m. to
25       10:21 a.m.)

Page 13

4 (Pages 10 - 13)

1    THE VIDEOGRAPHER: We're back on the
2 record at 10:21 a.m.
3    MS. WRIGHT: I'm introducing a document as
4 Exhibit 95. And per the agreement of the parties, I
5 will share the document on my screen.
6    (Whereupon Exhibit 95 was marked for
7    identification.)
8    MS. WRIGHT: Q. Ms. McCormick, can you
9 see the document on your screen?
10 A.    Yes, I can.
11 Q.    Do you recognize this document?
12 A.    Yes.
13 Q.    What is this?
14 A.    It was the notice for me to do the
15 deposition, is how I took it.
16 Q.    So you understand that you are here today
17 to testify in the matter of Raul Novoa versus The
18 GEO Group?
19 A.    Yes.
20 Q.    How did you prepare for your deposition
21 testimony today?
22 A.    I spoke with our attorneys yesterday on
23 the phone for about two hours. That's it. Just
24 going over --
25    MS. HOU: Oh, Mary, I'll remind you that,

Page 14

1 you know, what you and I talked about was -- is
2 privileged, so they don't have to know what you and
3 I spoke about.
4    THE WITNESS: Just pretty much what to
5 expect.
6    MS. HOU: Right.
7    THE WITNESS: How a deposition goes, and
8 things like that. Answer the question clearly.
9 Don't nod. You know, things like that.
10    MS. WRIGHT: Q. Great. Did you speak to
11 any GEO employees in preparation for your
12 deposition?
13 A.    No.
14 Q.    Did you speak to any ICE officials in
15 preparation for your deposition?
16 A.    No.
17 Q.    Did you review any documents?
18 A.    No. I printed them, but no, I did not
19 review them, to be honest with you. I had a lot to
20 do yesterday afternoon. I just didn't have time.
21 Q.    Which documents did you print?
22 A.    The copy of the deposition, the GEO Policy
23 on voluntary work program, the ICE Process --
24 Adelanto ICE Processing Center's Supplemental
25 Detainee Handbook, a copy of the Detainee Work

Page 15

1 Detail Application, the PBNDS Detention Standards
2 that have to do with the voluntary work program, and
3 then some very -- it looks like some various
4 e-mails. That's it.
5 Q.    Which e-mails did you print out?
6 A.    They were all together, to be honest with
7 you.
8    MS. HOU: Lydia, they were -- the e-mails
9 that we've previously produced. I don't have the
10 Bates stamp number on right now with me, but we can
11 identify them for you later on, but they've been
12 produced before.
13    MS. WRIGHT: Q. Ms. McCormick, are you
14 looking at those documents?
15 A.    Yes.
16 Q.    Are they in front of you right now?
17 A.    Yes.
18 Q.    Are there any other documents in front of
19 you right now?
20 A.    Just the e-mail that Lydia had sent me
21 (sic). I printed it out because it has her cell
22 phone number on it, in case I needed to speak to
23 her. That's it.
24    MS. HOU: I think she meant Alicia.
25    THE WITNESS: Alicia. I'm sorry. Too

Page 16

1 many names.
2    MS. WRIGHT: Q. Ms. McCormick, we're
3 going to ask for copies of all of the documents that
4 you have in front of you.
5 A.    Okay.
6    MS. WRIGHT: So Alicia, we're going to ask
7 you to produce any of the documents that
8 Ms. McCormick has, including any --
9    MS. HOU: That's fine. They were --
10 again, they were previously produced. I would ask,
11 though, that that e-mail where I had -- between her
12 and I would -- is obviously privileged, so we would
13 withhold that.
14    MS. WRIGHT: And on a break, we can
15 discuss how to produce those.
16    MS. HOU: Yeah, absolutely. I can --
17 yeah. Again, they were -- they've been produced in
18 this action and/or attached to various declarations,
19 so I can either point them out to you or just
20 reproduce them, whatever you think.
21    MS. WRIGHT: Yeah, I think we'll want
22 photocopies of the actual documents that she has in
23 front of her.
24    MS. HOU: Okay.
25    MS. WRIGHT: Q. Is there anything else in

Page 17

5 (Pages 14 - 17)

1 front of you?
2 A.      No. It's not my -- well, I do have a
3 notepad in case I need to write something down.
4 Q.      Okay. Ms. McCormick, during the course of
5 this deposition, I'm going to be showing you
6 exhibits and marking them as exhibits on your screen
7 through Zoom. Some of those documents you might
8 have printed out in front of you as well, but I'm
9 going to ask you to answer questions based on the
10 documents that I show you --
11 A.      Okay.
12 Q.      -- unless -- unless I ask you otherwise.
13 Okay?
14 A.      Okay.
15 Q.      Did you review any deposition transcripts
16 in preparation for your deposition today?
17 A.      No.
18 Q.      Are you taking any medications that would
19 prevent you from being able to answer my questions
20 honestly and truthfully today?
21 A.      No.
22 Q.      I'm hoping that, just in order to
23 facilitate this deposition and for efficiency
24 purposes, that we can agree on some terminology
25 going forward. When I say -- when I talk about

Page 18

1 Adelanto or the Adelanto facility, I'm talking about
2 the Adelanto ICE Processing Center in Adelanto,
3 California. Can we agree that that's -- do you
4 understand that that's what I mean when I say
5 "Adelanto"?
6 A.      Correct.
7 Q.      And when I -- when I say "the voluntary
8 work program" or "VWP," I'm talking about the
9 program that's operated by GEO where detainees work
10 in exchange for a dollar a day at Adelanto.
11 A.      Correct.
12      MS. HOU: I'm going to insert an
13 objection. And then also, I think if you could
14 repeat yourself, Lydia, in how you want to define
15 that again.
16      MS. WRIGHT: Q. When I use the phrase
17 "voluntary work program" or the acronym "VWP," I'm
18 talking about the program that's operated by GEO at
19 Adelanto where detainees work for a dollar a day.
20 Will you agree -- do you understand that that's what
21 I mean when I say "voluntary work program" or "VWP"?
22      MS. HOU: I'll object to the term
23 "operated." I think we can say it's implemented at
24 the GEO facility, but -- but, Mary, for the most
25 part, do you agree that -- her characterization?

Page 19

1      THE WITNESS: Yes.
2      MS. WRIGHT: Q. Ms. McCormick, do you
3 know what at the -- what ICE's Performance-Based
4 National Detention Standards are?
5 A.      I have it handy. On a general --
6 generalized basis, yes, but if I have any questions,
7 obviously, I need to refer to their standards. I
8 don't have it memorized.
9 Q.      What are the PBNDS?
10 A.      I'm sorry?
11      MS. HOU: Objection -- object as to form.
12      MS. WRIGHT: Q. Are you familiar with the
13 acronym PBNDS?
14 A.      Yes.
15 Q.      What does it mean?
16 A.      Performance -- oh, shit.
17 Performance-Based Detention Standards, I believe is
18 what the -- that's what the acronym means.
19 Q.      And what are the Performance-Based
20 National Detention Standards?
21      MS. HOU: Object as to form. You can
22 still answer.
23      THE WITNESS: Those are -- I look at it
24 as -- and I don't know if this is accurate, but I
25 look at it as the rules that ICE sets forward for us

Page 20

1 to follow in order to take care of their detainees.
2      MS. WRIGHT: Q. When you say "us to
3 follow," who do you mean?
4 A.      The GEO Group.
5 Q.      Do you use the PBNDS in your work?
6 A.      Yes, I do.
7 Q.      How do you use the PBNDS in your work?
8      MS. HOU: Object as to form.
9      THE WITNESS: We use it every day because
10 we need to follow -- we as employees, myself as a
11 classification officer, use it every day because we
12 need to follow ICE's standards on pretty much
13 everything that we do, from detainees coming into
14 our facility to us caring for the detainees to us
15 releasing them either on bond or deportation.
16 Everything is laid out.
17      MS. WRIGHT: Q. Do you look at the PBNDS
18 every day?
19 A.      Not every day, but I do refer to it quite
20 often.
21 Q.      How often would you say?
22 A.      At least once a week.
23 Q.      Are there any specific sections of the
24 PBNDS that you refer to once a week?
25 A.      Yes. That would be the classification

Page 21

6 (Pages 18 - 21)

1 portion.  We classify the detainees based on their
2 criminal history, and ICE has a breakdown of how to
3 grade each criminal act.
4    Q.    What do you mean, "how to grade each
5 criminal act"?  Can you explain?
6    A.    Well, depending on the -- depending on
7 their criminal history will depend on whether it is
8 a -- the highest level, a high level, moderate
9 level, or low level, and it depends on the crime.
10 ICE has it stipulated on what crime falls into what
11 category.
12    Q.    Do you refer to any other sections of the
13 PBNDS in your work?
14       MS. HOU:  Objection as to form.
15       THE WITNESS:  Not usually.
16       MS. WRIGHT:  Q.  Do you ever refer to the
17 section of the PBNDS on the voluntary work program,
18 Section 5.8?
19       MS. HOU:  Objection as to form.
20       THE WITNESS:  I don't recall referring to
21 it recently.  I don't recall the last time I did
22 refer to it, to be completely honest with you.
23       MS. WRIGHT:  Q.  Let's talk a little bit
24 about your background.  Can you walk me through your
25 educational background?  What's the highest degree
Page 22

1 that you've obtained?
2    A.    Some college.
3    Q.    Where did you go to college?
4    A.    Citrus College in Azusa, California.
5    Q.    What did you study there?
6    A.    Criminal justice.
7    Q.    Did you obtain a degree?
8    A.    No.
9    Q.    Is that a four-year college?
10    A.    No.  It was a junior college.
11    Q.    And when were you there?  What years?
12    A.    Oh, my goodness.  In the early '80s.  I
13 can't tell you exactly when.
14    Q.    How many years did you study at Citrus
15 College?
16    A.    I want to say it was approximately a year
17 and a half.
18    Q.    And were you studying for an associate's
19 degree?
20    A.    Yes.
21    Q.    And you did not obtain the associate's
22 degree?
23    A.    Correct.
24    Q.    When did you begin working for GEO?
25    A.    2012.
Page 23

1    Q.    What were you hired to do?
2    A.    Originally I was hired in Fontana as a
3 jailer for Fontana Police Department.
4    Q.    Is Fontana the name of a city?
5    A.    Yes.
6    Q.    Where is that?
7    A.    Fontana, California.
8    Q.    Is that near Adelanto?
9    A.    It's about 30, 45 minutes away, yes.
10    Q.    What did you do as a jailer?
11    A.    I processed people who were arrested,
12 transported them to West Valley, which is a county
13 jail, stood by while they were being booked in, just
14 cared for them while they were in the custody of
15 Fontana Police Department, things like that.
16 Fingerprinted.
17    Q.    Fontana Jail is a GEO facility?
18    A.    They contract their jail portion out to
19 The GEO Group.  Fontana Police Department is part of
20 the -- I believe the City of Fontana, but the jail
21 portion, they do contract that out to GEO.
22    Q.    And how long did you work as a jailer at
23 the Fontana Jail?
24    A.    Just shy of a year.
25    Q.    So from 2012?
Page 24

1    A.    To -- yes, from April of 2012 to March of
2 2013.
3    Q.    Where did you work after Fontana Jail?
4    A.    I transferred here to Adelanto ICE
5 Processing Center.
6    Q.    Was that in March of 2013?
7    A.    Correct.
8    Q.    What was your job title when you
9 transferred to Adelanto ICE Processing Center in
10 March of 2013?
11    A.    Detention officer.
12    Q.    What were your responsibilities as
13 detention officer?
14    A.    Direct supervision of detainees.
15    Q.    Did you work in any specific location in
16 the facility?
17    A.    I worked in the housing units on second
18 shift.
19    Q.    What does "second shift" mean?
20    A.    It starts at 2:00 o'clock, ends at
21 at night.  We're a 24-hour/seven-day-a-week
22 facility, so we have different shifts.
23    Q.    Which housing units did you work in?
24       MS. HOU:  Object as to form.
25       THE WITNESS:  The 2 side housing unit and
Page 25

7 (Pages 22 - 25)

1 the 3 side housing unit.
2       MS. WRIGHT:  Q.  What does that refer to,
3 "2 side" and "3 side"?  What's that mean?
4 A.      It just means that that's how they
5 identify a housing unit.  So they have -- how can I
6 explain this.  They have two, three, four, and five
7 housing units at the west facility, so it's a way to
8 identify which housing unit you're in.
9 Q.      And that was -- so 2 side and west side
10 (sic) are both in the west facility?
11 A.      Yes, yes.  The 2 and the 3 side are both
12 in the west facility.
13 Q.      Were you supervising male detainees or
14 female detainees?
15 A.      Male detainees.
16 Q.      When you say that you were supervising
17 male detainees, what exactly were you doing?
18 A.      Ensuring that they were following the
19 program, that their -- they were acting nicely
20 towards each other, that we were, you know, able to
21 make sure that they were all there.  We counted.
22 We, you know, walked around to make sure that nobody
23 was trying to injure themselves.  Just general --
24 giving them things that they possibly needed or --
25 you know, toothpaste, toothbrushes, notating, you

1 know, that everybody was there and in good health.
2 Q.      Is there anything else that you did as a
3 detention officer?
4       MS. HOU:  Object as to form.
5       THE WITNESS:  I -- when it was their time
6 to go to the mini rec yard, I would open up the mini
7 rec yard and supervise their -- their time to, you
8 know, exercise.  I would keep count if they left or
9 came back to the -- the unit.  I would open up the
10 door to the janitor closet, allow them to get the
11 cleaning supplies if they were interested in
12 cleaning their unit.
13       MS. WRIGHT:  Q.  Did you -- during this
14 period when you were a detention officer in the west
15 unit, did you supervise detainees who were
16 participating in the voluntary work program?
17 A.      Sure.
18 Q.      Can you tell me what you did?  What did
19 you do to supervise detainees who were working in
20 the voluntary work program?
21       MS. HOU:  Object as to form.
22       THE WITNESS:  Well, we were given -- as a
23 dorm officer, you are given a pay sheet, and it's
24 usually broken down on first, second, and third
25 shift.  So I would ask them if they -- you know,

1 "It's time to clean.  Why don't we, you know, see if
2 anybody wants to clean."  And if they did, which
3 normally they did -- they lived there, so they want
4 it to be as clean as possible -- I would open the
5 janitor closet, obviously view them taking out the
6 supplies, making sure that they're doing it safely.
7 Pretty much that's it.  Then I would sign off on
8 their pay sheet that they either, you know, worked
9 or didn't, or whatever they decided to do.
10       MS. WRIGHT:  Q.  And were those
11 individuals being paid to clean in their housing
12 unit?
13 A.      If they're on the pay sheet, yes.
14 Q.      Did you ever write somebody's name in on
15 the pay sheet?
16 A.      No.
17 Q.      Let me ask it again.  Let me back up,
18 actually.  The pay sheets -- you said that you were
19 given pay sheets.  How often were you given pay
20 sheets?
21 A.      Daily.
22 Q.      And what did these pay sheets look like?
23 A.      They're broken down into it -- kind of
24 looks like an Excel sheet, and the top portion
25 states like "dorm porters," first, second, and third

1 shift.  The middle will say "barbers," who's
2 authorized to -- to be able to cut hair.  Then
3 there's dorm floor -- floor porters and then mini
4 rec yard.
5       So they're just broken into sections, and
6 depending on what the detainee has applied for will
7 depend on -- when there's an opening, you know,
8 they'll go with that job, whatever they applied for.
9 Q.      Are these pay sheets still used at
10 Adelanto?
11 A.      Yes.
12 Q.      Are they sometimes called rosters?
13 A.      They shouldn't be.
14 Q.      "Pay sheet" is the correct term?
15 A.      Yes.  It's a pay sheet.
16 Q.      And so you would be -- who would give you
17 the pay sheets every day?
18 A.      They --
19       MS. HOU:  Sorry.  I just want to clarify.
20 Are we still talking -- time period-wise, are we
21 still talking about Ms. McCormick's role as a --
22 when she was a detention officer?
23       MS. WRIGHT:  Yeah.
24       MS. HOU:  Okay.  Sorry.  Just want to make
25 sure we're all on the same page.

1      THE WITNESS: Yes. They're -- they were
2 usually given in briefing by either the lieutenant
3 or the sergeant.
4      MS. WRIGHT: Q. Is the lieutenant a
5 GEO -- a GEO lieutenant?
6 A.    Yes, a GEO lieutenant.
7 Q.    Or a GEO sergeant?
8 A.    Mm-hmm.
9 Q.    Okay. So they would hand you a pay sheet,
10 and the pay sheet would have names printed on it of
11 detainees who had been authorized to clean in the
12 housing unit; is that correct?
13 A.    Yes.
14 Q.    And then you would -- when it was time to
15 clean, you would see if any of those individuals
16 wanted to clean?
17 A.    Correct.
18      MS. HOU: Object as to form.
19      MS. WRIGHT: Q. Is that correct?
20 A.    Yes, correct.
21 Q.    And those who wanted to clean, you would
22 help them access cleaning supplies in the janitor's
23 closet; is that correct?
24 A.    Correct.
25 Q.    And then they would clean; is that

Page 30

1 confusing. My understanding is that there are some
2 housing units that look like dormitories and some
3 housing units that have cells arranged around a
4 common space known as a pod.
5 A.    Okay. Yes.
6 Q.    That's not a term that you are familiar
7 with?
8 A.    No, I've never heard that term.
9 Q.    Okay. The detainees that you supervised
10 who were engaged in this cleaning work in the
11 housing units, what did they clean specifically? Or
12 what did they do?
13 A.    Oh, they would wipe down the tables, wipe
14 off the phones. We -- we as The GEO Group supply
15 them with microwaves. So they would clean out the
16 microwaves if somebody had previously spilled
17 something. Sweep and mop the floor. Just your
18 general wiping down everything. I'm -- you know, if
19 there's smudges maybe on the window, maybe they want
20 to clean that. It wasn't an everyday occurrence,
21 but some people, they like to live a certain way,
22 and that's up to them. They're living there. I'm
23 not. So pretty much I just supervise and make sure
24 everybody's safe and doing the right thing.
25 Q.    Would those detainee workers clean the

Page 32

1 correct?
2 A.    Correct.
3 Q.    The 2 side housing units, what kind of
4 housing units are those?
5 A.    Each -- well, it's like 2 Alpha, 2 Bravo.
6 So each housing unit has individual -- it has an
7 open space in the middle. It has a top tier, and
8 then just the open space where it has tables. And
9 the phones are on the one side, and then up against
10 or towards the back and the side, there are
11 individual -- well, there are cells that house
12 usually four detainees. There are two cells in that
13 unit that house eight detainees apiece on the top
14 and bottom tier, but all the other units house four
15 individuals.
16 Q.    And is 3 side arranged in the same way?
17 A.    Correct. Yes, it is.
18 Q.    Are these pods? Are these known as pods?
19 A.    I call them cells. I don't know. I
20 believe I have seen -- and this has nothing to do
21 with GEO, but I have seen a prison being built. And
22 yes, it does look like a pod. When it's being
23 built, it's dropped in. It does look like that,
24 yes.
25 Q.    I'm sorry. I think my question was

Page 31

1 bathroom?
2 A.    In -- okay. So their restrooms are in
3 their cells. Their toilets and sinks. There are --
4 there is a shower area. And yes, some detainees
5 scrub the showers.
6 Q.    So inside each cell is a toilet?
7 A.    Correct.
8 Q.    And then there are common -- there's a
9 communal shower area; is that correct?
10 A.    Correct.
11 Q.    And is it correct that every detainee who
12 lives in the housing unit uses a communal shower?
13 A.    If they choose to shower.
14      MS. HOU: Object as to form, yeah.
15      MS. WRIGHT: That's not my best question.
16 Q.    As opposed to -- detainees don't have
17 individual personal showers; is that correct?
18 A.    Correct. Correct.
19 Q.    And the individuals who clean the showers,
20 those are detainees who participate in the voluntary
21 work program; is that --
22 A.    Correct, yes.
23 Q.    So you said that they wipe down tables,
24 wipe down the phones, clean the shower area, you
25 mentioned cleaning windows, cleaning floors. Are

Page 33

9 (Pages 30 - 33)

1 there any other tasks that detainees who were
2 responsible for cleaning the housing units did under
3 your supervision?
4        MS. HOU:  Object as to form.
5        THE WITNESS:  Their individual cells, when
6 it wasn't time to clean the common area, they could
7 ask for the cleaning supplies to clean their
8 individual little cells, rooms, per se.  And that
9 could be at any time throughout the day.  And that's
10 just what they're personally doing, whatever they
11 decide that they want to personally do.  That has
12 nothing to do with the dorm porter position or
13 anything like that.  That's just -- we obviously
14 monitor it just to make sure that they're safe in
15 using those supplies.
16        MS. WRIGHT:  Q.  So detainees aren't paid
17 to clean their -- inside their cells; is that right?
18 A.      No, no.
19 Q.      If they don't want to clean inside their
20 cells, do -- will somebody else come and do it for
21 them?
22        MS. HOU:  Object as to form.
23        THE WITNESS:  I assume that their
24 roommates will clean it, but if they decide to all
25 not clean it, if they want to live that way, that's
Page 34

1 So you're asking, "Hey" -- you know, you're going
2 down the list, "You guys want to go ahead and clean
3 up, you know, a little bit, make it nice?"  And if
4 they said "yes," they came out and cleaned.  If they
5 didn't want to clean, then they didn't clean.
6 Q.      And if they didn't clean, they didn't get
7 paid the dollar a day, right?
8 A.      Correct.
9 Q.      So did your pay sheet as dorm porters, did
10 it list more than six names?
11 A.      For each -- well, it just -- it's broken
12 down.  So the sheet itself lists more than six
13 names, but it's broken down on first shift, second
14 shift, third shift.
15 Q.      So about how many names would be listed
16 for second shift, which was your shift?
17        MS. HOU:  Object as to form.
18        THE WITNESS:  There's about six per shift.
19        MS. WRIGHT:  Q.  So if you called out
20 those six names and none of those six people wanted
21 to clean, what names would you go to next?
22 A.      I wouldn't.  They obviously don't have a
23 problem with the way things were.  I mean, I'm not
24 sitting there chitchatting with my friends.  I'm
25 standing at a podium, just supervising, looking --
Page 36

1 on them.  I mean, we don't live there.  I personally
2 don't live there, so however they want to live is
3 pretty much their business.
4        MS. WRIGHT:  Q.  How many dorm porters did
5 you supervise on any given day?
6 A.      It's usually broken up.  There's about six
7 for every shift.  I would say there's about six for
8 every shift.  So you just ask who wants to clean.
9 You name or, you know, call out whoever's on -- at
10 that time I was on second shift, so I would just
11 call out whoever was on the list for second shift,
12 and then I would, you know, let them know that, you
13 know, "It's looking a little messy.  Maybe we want
14 to clean up a little bit."
15 Q.      And what would happen if there were not
16 six dorm porters who were available or willing to
17 clean?
18 A.      Then whoever was available would clean, or
19 it wouldn't get cleaned.
20 Q.      When you say "whoever was available," what
21 do you mean?
22 A.      When I'd call out their names, if they're
23 available to -- what I mean by availability is if
24 they want to clean or not.  I mean, obviously,
25 you're asking them.  It's a voluntary work program.
Page 35

1 direct supervision, just making sure that
2 everybody's safe.  If they don't want to clean, they
3 don't want to clean.
4 Q.      Okay.  I see.  So I think my confusion is
5 that I thought that you had testified that if the
6 people on your list weren't able, there was some
7 other list that you would go to, but that's --
8 A.      No, no.  That is --
9 Q.      Okay.  So you're -- just so that I'm
10 clear, your pay sheet would have six names on it for
11 second shift.  Your practice was to call out those
12 names when it was time to clean and see if any of
13 those people wanted to work for a dollar a day; is
14 that accurate?
15 A.      Correct.
16 Q.      And if somebody who's on your list did not
17 want to work, what would happen?
18 A.      Then I would put next to their name "DW,"
19 which stands for "didn't work," and be done with it.
20 Q.      And if nobody wanted to work?
21 A.      Then everybody would have a "DW."
22 Q.      And who would do the cleaning?
23 A.      It just wouldn't be cleaned.
24 Q.      Okay.
25 A.      I mean, like I said, I don't live there,
Page 37

10 (Pages 34 - 37)

1 so most of the time they want to live in a clean
2 area, though. I don't know too many detainees that
3 want to live in a mess. It usually doesn't happen.
4 Q.      And you mentioned that you would sometimes
5 say, "It's time to clean." How did you know when it
6 was time to clean?
7 A.      Usually we would do it just before like
8 count, so that everything's fresh after they -- we
9 get done with count and they come out. You know,
10 they'll go to dinner shortly after. So it just --
11 you know, it made it nice to kind of relax after
12 dinner and have a clean area. So we would kind of
13 determine, you know, based on our count times, when
14 was a good time. You know, in the morning,
15 obviously it's going to be before count. Just so
16 it's kind of straightened up and it just makes
17 everybody, you know, happier to be hanging out.
18 Q.      When you say "we," who do you mean?
19 A.      Us as detention officers.
20 Q.      Okay. So you worked with other GEO
21 detention officers?
22 A.      There is -- yeah, there's many detention
23 officers, and there's one in every housing unit. So
24 in like your 2 Alpha, there is detention officers in
25 that dorm. In 2 Bravo, there's a detention officer
Page 38

1       So, I mean, a lot of times they just want
2 to keep busy, they want to keep their mind maybe off
3 of their situation. I guess it helps them. I mean,
4 I could see where it could, but many, many times
5 I've had detainees say that to me. "Can I do
6 something?" You know, "Can I sweep this or can I
7 wipe this down? I just want to keep busy."
8       MS. WRIGHT: Q. And those individuals
9 would not get paid?
10 A.      No, they're not on the pay sheet.
11 Q.      Was there ever a time where an individual
12 who was volunteering would ask to be put on the pay
13 sheet?
14 A.      Yes. They always ask to be put on the pay
15 sheet, but it's on a first-come-first-serve basis,
16 so --
17 Q.      What does that mean?
18 A.      That means that when they submit their
19 application, it's dated, and then that's the date
20 that is used to determine who gets the openings
21 first. Whatever -- I mean, it changes every single
22 day because people leave, so there's openings all
23 the time in all different areas of the facility.
24 Q.      At this period of your career, when you
25 were a detention officer supervising dorm porters --
Page 40

1 in that dorm. So we all just kind of, you know, do
2 the same thing. It makes sense to, since we're
3 going to be counting and everybody's going to be,
4 you know, next to their cell just before that, just
5 clean it up a little about it, and then everybody's
6 happy.
7 Q.      Is this -- and so you were the detention
8 officer for -- for an individual dorm?
9 A.      Correct.
10 Q.      Is this system still used today at
11 Adelanto?
12 A.      I do believe so.
13 Q.      And was there ever a time, while you were
14 a detention officer supervising dorm porters, where
15 somebody who was not on the list was asked to clean
16 the showers?
17       MS. HOU: Object as to form.
18       THE WITNESS: I don't believe they would
19 have been asked. They could always volunteer. I
20 mean, I'm -- I had, obviously, people say, "Oh, can
21 I help do that?"
22       And I said, "Well, sure, but you're not on
23 the list."
24       And they say, "Oh, it doesn't matter. I
25 just want to keep busy."
Page 39

1 A.      Mm-hmm.
2 Q.      -- and housing units, did you control
3 which names were on the pay sheet?
4 A.      No.
5 Q.      So if a detainee came to you and said "I
6 volunteer to clean the shower as something to do
7 today, but I'd like to get on the pay sheet so I get
8 paid for it," what would you do?
9 A.      Tell them to submit a kite to the detainee
10 work program. That's how we addressed it. And
11 state that they, you know, were really interested in
12 a job. And I assume that they must have gotten a
13 response, so -- and the response would probably be,
14 you know, "When there's an opening."
15 Q.      If none of the dorm porters wanted to
16 clean, none of this -- let me start over. If none
17 of the six dorm porters wanted to clean, would the
18 detention officer ask for volunteers to --
19       MS. HOU: Object as -- object as to form.
20       THE WITNESS: As I said, I have never
21 personally asked for volunteers. When I had to work
22 overtime going into third shift, I didn't even call
23 the detainees out on third shift. I just did it
24 myself because it kept me awake. I didn't want to
25 lose my job over closing my eyes and falling asleep,
Page 41

11 (Pages 38 - 41)

1 so I would just do it myself.  I mean, everybody's
2 asleep.  Why not keep yourself awake and just sweep
3 and mop?
4          MS. WRIGHT:  Q.  So you said that those
5 individuals who volunteered to clean who were not on
6 the pay sheet didn't get paid the dollar a day?
7 A.    Correct.
8 Q.     Did they receive anything else?
9          MS. HOU:  Object as to form.
10          MS. WRIGHT:  Q.  Did they receive anything
11 else for their work?
12 A.     I have not ever given them anything else.
13 Q.     Are you aware of the detainees who
14 volunteer receiving anything from any other
15 detention officer in exchange for their work?
16          MS. HOU:  Object as to form.
17          THE WITNESS:  No.  Are you -- I'm sorry.
18 Let me clarify.  Are we talking as payment or are we
19 just talking as "Thank you for doing this for me"?
20 I guess I'm confused on -- you know, a lot of times,
21 if a detainee does a really extra special job, you
22 know, you may give them a -- an extra sack lunch,
23 or, you know, GEO has in the past, you know, had
24 like little special bags with candy and chips in it,
25 and when somebody does a real, you know, extra

1 special job for you or really makes something shine,
2 you might want to give them an extra little "thank
3 you," but I don't think it was payment.  I think it
4 was just more of a gratitude.
5          MS. WRIGHT:  Q.  Were there any other of
6 these special kind of gratitude items that you can
7 recall?  You mentioned extra sack lunches and these
8 special candy bags.
9 A.     No, nothing else that I can recall.  I
10 mean, like I said, those were only -- I mean, we
11 don't have like the extra candy bags all the time.
12 Usually it's by the holidays, because I do believe
13 that those were just extras.  I know around the
14 holidays we give like a little treat to everybody,
15 and those might just be extras that we're able to,
16 you know, show our gratitude to just that special
17 job that they did, but on a norm, no.
18 Q.     So you were a detention officer in the
19 housing units starting in March of 2013?
20 A.     Correct.
21 Q.     Is that --
22 A.     Yes.
23 Q.     How long did you do that job?
24 A.     I want to say it was approximately six
25 months or so.

1 Q.     So about through the end of 2013?
2 A.     Approximately, yes.
3 Q.     What was your next position?
4 A.     I worked in segregation, which is a
5 disciplinary housing unit.  Difference being is that
6 they didn't have free rein to come and go into the
7 common area.  It -- there was more a confined
8 movement.  And then I was a visitation officer for
9 approximately a year and a half, maybe -- maybe a
10 little over a year and a half.
11 Q.     So starting at the beginning of 2014, you
12 were a detention officer in segregation; is that
13 correct?
14 A.     Correct, yes.
15 Q.     And how long did you do that job?
16 A.     I want to say approximately six months.
17 Q.     And what exactly did you do as a detention
18 officer in segregation?
19          MS. HOU:  Object as to form.
20          THE WITNESS:  Pretty much the same thing
21 that I did in the dorms.  The difference being is
22 that they didn't have free movement.  Therefore, we
23 had 15-minute checks that we would walk by and make
24 sure that they were okay.  They didn't come out to
25 eat.  We actually took their food to them.  We

1 brought them out one at a time to shower.  So took
2 them out of their individual cell to go to their
3 smaller like mini rec yard so that they could get
4 their exercise.  It was just a smaller unit and a
5 little bit more restrictive as far as the movement.
6          MS. WRIGHT:  Q.  Why are some detainees
7 put in segregation?
8          MS. HOU:  Object as to form.  If you know.
9          THE WITNESS:  Well, that would be they
10 broke one of the major rules.  Usually it's fighting
11 or -- you know, amongst each other.  Gives them --
12 kind of gives them a time out, you know, time to
13 cool off and think about what they were, you know,
14 fighting with each other about.  Some of our
15 detainees are aggressive, and they've lashed out at
16 staff members.  Some of them, they -- they're
17 challenged, I want to say, and can't be in general
18 population.
19          What I mean by "challenged," I mean like
20 mentally they're -- it's just sometimes it's for
21 their safety.  So that they don't get hurt or hurt
22 themselves in a general population area, sometimes
23 it's better to have the -- you know, be by
24 themselves in the cell and just have constant
25 supervision to make sure that they don't hurt

12 (Pages 42 - 45)

1 themselves.
2       MS. WRIGHT: Q. Were you working in
3 disciplinary segregation or administrative
4 segregation?
5 A.       Disciplinary.
6 Q.       And what's the difference between
7 disciplinary and administrative segregation?
8 A.       Administrative segregation means that they
9 just -- they don't feel safe in general population
10 with a large amount of people around them. Maybe
11 they have sanctity or they're scared, and they
12 feel more comfortable in a smaller area. They have
13 their own cells. They don't have to share with
14 anybody. Their program is a little bit -- I guess a
15 little bit more restrictive. You know, they watch
16 TV at a certain time. They eat at a certain time.
17       Everything's -- it's just -- I guess it's
18 just a little bit more restrictive, more regiment,
19 and they're more comfortable with that. A lot of
20 times, you know, maybe their crimes, they just feel
21 more comfortable being by themselves.
22 Q.       And what is disciplinary segregation?
23 A.       I'm sorry?
24 Q.       What is disciplinary segregation?
25 A.       That is where somebody, like I said, needs

Page 46

1 a time out. That's how I perceive it. They've
2 broken some major rule, maybe gotten into a fight,
3 tried to hurt another detainee, or it was a mutual
4 combat, or they've lashed out towards staff members
5 and tried to harm them. You know, and to be honest
6 with you, in some cases, it could be they got some
7 bad news and, you know, they've just lost it for a
8 little while, and they just need some time to think
9 about it and work it out.
10       So it just gives them some time to
11 understand the -- you know, that's not the proper
12 way to act. And usually they pretty much know
13 that -- you know, what they are and are not supposed
14 to do. I mean, we do give a detainee handbook that
15 lays it all out on what they can and can't do.
16 Q.       Did you ask to be transferred from the
17 housing units to segregation?
18 A.       Many -- well, usually it is administrative
19 seg. Yes, they can PC up. It's called protective
20 custody. And yes, they can request that.
21 Q.       I'm sorry. I meant you specifically.
22 When your job transitioned from being a detention
23 officer in a housing unit to being a detention
24 officer in segregation, did you, Ms. McCormick,
25 request to be moved from housing to segregation?

Page 47

1 A.       My previous employment history? I guess I
2 had experience in that type of environment. I
3 worked for the State of Colorado at a maximum
4 security prison. So I was already trained in that
5 area, so I was just a good candidate, to be
6 completely honest with you.
7 Q.       What prison did you work for in Colorado?
8 A.       Colorado State Penitentiary.
9 Q.       When was that?
10 A.       2000 -- 2008 to 2010, somewhere around
11 there. Estimated.
12 Q.       When you were a detention officer in
13 segregation, did you supervise detainees who were
14 participating in the voluntary work program?
15 A.       Well, in the -- on the disciplinary side,
16 we do not have any that can come out and participate
17 in that. On the administrative side, yes, we do
18 have them that can come out. And it's usually only
19 two per shift. And we don't allow them to volunteer
20 if they're not on the list. At least we didn't at
21 the time that I was in there. That was not
22 something that we allowed to happen. It was
23 strictly if they were on the list.
24       And it had a lot to do with -- you have to
25 understand that people are in there because they

Page 48

1 want to feel protected, so we can't just let anybody
2 walking around. We have to make sure that
3 they're -- they have good behavior and they're not
4 going to hurt the next person, so it's a little bit
5 more restrictive. Only for that reason. People are
6 there so that they can feel safe. So it's a
7 different situation than in a regular housing unit.
8 Q.       Okay. So about two detainees per shift
9 could work if they were in administrative
10 segregation --
11 A.       Correct.
12 Q.       -- is that right?
13       But if a detainee was in disciplinary
14 segregation, that detainee was not eligible to
15 participate --
16 A.       Correct.
17 Q.       -- for the work program?
18 A.       Correct.
19 Q.       The two detainees who would work per shift
20 in the administrative segregation side, what would
21 they do?
22       MS. HOU: Object as to form.
23       THE WITNESS: Sweep, mop the floors, wipe
24 down the tables. The -- they would wipe down the
25 law library computer and clean the showers. That's

Page 49

13 (Pages 46 - 49)

1 pretty much all there is to do.  There is a phone
2 that they can move.  It's on -- in that area there
3 is a phone that they could move it.  It moves on
4 little wheels.  So they could wipe that down too.  I
5 don't know that a lot of them did, but they could.
6       MS. WRIGHT: Q.  Were they called porters?
7 A.    Yes.
8 Q.    Okay.  Okay.  So admin would have about
9 two porters per shift?
10 A.    Correct.
11 Q.    And those porters would be paid a dollar a
12 day through the voluntary work program?
13 A.    Correct.
14 Q.    And the practice was not to permit
15 volunteers to work as porters in administrative
16 segregation?
17       MS. HOU:  Object --
18       THE WITNESS:  Correct.
19       MS. HOU:  -- as to form.
20       MS. WRIGHT: Q.  Meaning detainees who
21 weren't on the list, who weren't cleared to work in
22 the program, couldn't volunteer to do tasks; is that
23 right?
24 A.    Correct.
25 Q.    Who cleans the individual cells in

Page 50

1 administrative segregation?
2 A.    The individuals that live there.
3 Q.    Okay.  How many -- is administrative
4 segregation similar to what you described when you
5 were talking about the housing units where it was a
6 cell with several beds?
7 A.    Administrative only has two beds in it, a
8 lower bunk and a top bunk, but when we house in
9 administrative segregation, we house only on the
10 lower bunk.  We don't -- so they use the top bunk
11 for maybe their extra clothes.  Kind of like
12 storage.  We don't house people together in there
13 because the whole reason to be in there is to feel
14 safe.
15 Q.    Okay.  So even though there's two beds in
16 each cell, there's still -- GEO only houses one
17 individual per room?
18 A.    Correct.
19 Q.    And what about for disciplinary
20 segregation?  Is it the same?
21 A.    Same thing.
22 Q.    So in both disciplinary and administrative
23 segregation, there's a room with bunk beds?
24 A.    Correct.
25 Q.    But there's only one detainee assigned to

Page 51

1 that room at any --
2 A.    Correct.
3 Q.    -- one time?
4       Are disciplinary segregation and
5 administrative segregation, are they in separate
6 buildings?
7 A.    No.
8 Q.    Is it the same physical space?
9 A.    There's a wall between them.
10 Q.    Okay.  Do both sides look the same, in
11 terms of architecture?
12 A.    Yes.
13 Q.    How many -- about how many detainees can
14 be housed in the administrative segregation side?
15       MS. HOU:  Object as to form.
16       THE WITNESS:  Let me think here.  I'm not
17 sure.
18       MS. HOU:  Ms. McCormick --
19       THE WITNESS:  Yes.
20       MS. HOU:  -- just -- and Lydia didn't
21 mention this, Ms. Wright didn't mention this but,
22 you know, we don't -- to the extent you have to
23 guess, we would just hold off and you could just use
24 estimates, but if you have to guess, then we'd
25 rather -- and Lydia, you can go ahead and give her

Page 52

1 this admonishment.  But no one wants you to provide
2 answers that aren't accurate, so if you feel like
3 you have to guess, just say you don't know or you --
4 she's entitled to your best estimate, though, if
5 that makes sense.
6       THE WITNESS:  Okay.  I would estimate --
7 and this -- it's about 16 to 20, but I don't know
8 absolutely.
9       MS. WRIGHT: Q.  That's okay.  So 16 to 20
10 in admin, administrative segregation?
11 A.    Mm-hmm.
12 Q.    And --
13 A.    In a single cell.  And the same would be
14 on the disciplinary side.
15 Q.    Okay.  And when you say "single cell," do
16 you mean basically that there are 16 to 20 cells
17 on --
18 A.    Correct.
19 Q.    -- admin and 16 to 20 cells on
20 disciplinary?
21 A.    Correct.
22 Q.    And each of those cells has two bunk beds,
23 but GEO's policy is to only house one detainee in
24 each cell?
25 A.    That is norm, yes.

Page 53

14 (Pages 50 - 53)

1  Q.      And then they can use the other bunk bed
2  for whatever?
3  A.      Storage or -- yeah.  I mean, in some
4  cases, I have seen in the past where brothers have
5  came in and wished to be in the same cell.  That has
6  happened, but it's not normal practice.  It's
7  usually them requesting it.
8  Q.      How long did you work as a detention
9  officer in segregation?  About six months, you said?
10 A.      Yeah, I would estimate about six months.
11 Q.      So that takes us to the end of 2013 --
12 A.      Mm-hmm.
13 Q.      -- is that right?  What did you do next?
14 A.      I was a visitation officer.
15 Q.      And that was starting in January of 2014?
16 A.      I would say approximately, yes.
17 Q.      And how long did you do that job?
18 A.      Approximately 18 months.
19 Q.      And to be clear, these are all jobs that
20 you've done at the Adelanto ICE Processing Center;
21 is that right?
22 A.      Correct.
23 Q.      Have you worked at any other immigration
24 detention center?
25 A.      No, I have not.

Page 54

---

1  Q.      So what did you do as a visitation
2  officer?
3  A.      I monitored and -- I monitored visitations
4  between detainees and their families.
5  Q.      What does that mean exactly?
6  A.      Well, detain -- we have a visitation
7  schedule for each of the housing units, and based on
8  that schedule, it allows the detainees to have
9  visitors, their family members or friends, come and
10 visit them.  And they -- we have a large room where
11 there's a bunch of tables and chairs around it.
12         So, you know, when their visitors come to
13 visit, we make a list, we go to the housing units,
14 pick up the detainees, bring them to visitation, and
15 then bring in their family members, and then they
16 have an hour to visit their family, speak, you know,
17 face to face.  And once the hour's over,
18 visitation's over, we escort the family out and then
19 escort the detainees back to the housing units.
20 Q.      Did you supervise any detainees who were
21 participating in the voluntary work program during
22 the 18 months when you were a visitation officer?
23 A.      Yes.  I had visitation porters because
24 visitation runs certain hours.  It ran -- at the
25 time that I was doing it, it ran from

Page 55

---

1  11:00 o'clock -- I'm sorry -- 12:00 o'clock in the
2  afternoon until 8:00 o'clock at night.  So we would
3  do our cleaning of visitation, which would be wiping
4  down the tables and chairs and sweeping and mopping
5  the floor.  We would do that after the 8:00 o'clock
6  mark, and I only had two, maximum three, detainees
7  that worked on the voluntary work program at any
8  given time.
9  Q.      Was there only one shift for a visitation
10 officer?
11 A.      Yes.
12 Q.      And did you ever have what you've called
13 volunteers or detainees who are not being paid the
14 dollar a day?  Did you ever have those individuals
15 help you as visitation porters?
16 A.      No, that's not allowed.  They had to be
17 cleared in order to work in visitation.
18 Q.      What does it mean to be cleared?
19 A.      ICE has guidelines on who they allow or
20 don't allow to come out of the unit to participate
21 in the voluntary work program.  And those guidelines
22 for visitation is that they have no weapon --
23 previous weapons charges, no -- no violent crimes,
24 no arson, and no drug trafficking.  Those are all
25 major crimes, and they don't -- they did -- they lay

Page 56

---

1  out that they do not want detainees coming out of
2  their units that have any of those crimes.  So the
3  people that I had as far as porters did not have
4  those crimes, and they were all cleared.
5  Q.      So ICE had to clear detainees to work as
6  visitation porters; is that right?
7  A.      No.  No, ma'am.  No, ICE has guidelines
8  that we must follow.  And in following those
9  guidelines, they have none of the -- none of those
10 four things in their criminal history.
11 Q.      What -- what are these ICE guidelines?
12 Can you point me to what -- where they're written
13 down?
14         MS. HOU:  Object as to form.
15         THE WITNESS:  They're in the PBNDS.
16         MS. WRIGHT:  Q.  Does this -- these
17 four -- I don't know.  This criminal history that
18 you've just described, does that relate to how a
19 detainee is classified with respect --
20 A.      Yes.
21         MS. HOU:  Object as to form.
22         MS. WRIGHT:  Q.  Let me do it again.  The
23 criminal history guidelines that you just described,
24 does that relate to how a detainee is classified for
25 security purposes?

Page 57

---

15 (Pages 54 - 57)

1    MS. HOU:  Same objection.
2        THE WITNESS:  Yes.  We -- I mean,
3  obviously, we're looking at the whole criminal
4  history.  When we're classifying, we are giving them
5  a certain amount of points based on the severity of
6  the previous criminal history.  So it's not exactly
7  the same, but I mean, obviously we're looking at the
8  criminal history in both aspects.
9        As far as coming out of the -- or having
10  the ability to come and volunteer for a position
11  outside the dorm, no high levels can come outside
12  and volunteer for any positions outside the dorm.
13  Your medium-highs, medium-lows, and lows, it would
14  be based on their criminal history.  And that's just
15  for the safety and security of the facility.
16        MS. WRIGHT:  Q.  So detainees who are
17  classified as a high -- high level of security
18  risk -- is that the correct way to say it?
19  A.      It's just they're a high level.  I don't
20  know if it's a security risk.  I just know that
21  their history says that there's a security risk.
22  Q.      Okay.  But so detainees who are a high
23  level are not allowed to work outside the housing
24  units; is that right?
25  A.      Correct.  Correct.

Page 58

1  Q.      The jobs that they can do at a voluntary
2  work program are limited to housing unit porters; is
3  that right?
4  A.      Correct.
5  Q.      Are there any other jobs that high level
6  detainees can do?
7  A.      No.  Just inside the dorm only.
8        MS. HOU:  I'm going to -- sorry -- assert
9  an objection to that question.
10        MS. WRIGHT:  Q.  So there are no voluntary
11  work program positions that take place inside the
12  housing units other than porters; is that right?
13  A.      No, they can be a barber.  It's just
14  inside the housing unit, but they have to be cleared
15  for that medically and criminally.
16  Q.      So can high levels be barbers?
17  A.      Yes, depending on their criminal history.
18  Q.      So high levels can be barbers because
19  barbering takes place inside the housing units; is
20  that right?
21  A.      Correct.
22  Q.      And they can be porters inside the housing
23  units?
24  A.      Correct.
25  Q.      Are there any other jobs that high levels

Page 59

1  can do?
2  A.      Outside the high -- housing unit, no.
3  Q.      Okay.  Thank you.
4        Okay.  So you were a visitation officer --
5  A.      Yes.
6  Q.      -- for about 18 months.  In 2014 -- so
7  we're about July of 2015?  Does that sound about
8  right?
9  A.      It was actually the end of May 2015.
10  May 29th, 2015, to be exact.
11  Q.      Why do you know that precise date?
12  A.      Because that's the day that they changed
13  my title to classification officer.
14  Q.      Okay.
15  A.      And I interviewed and applied for it and
16  very anxious to get it, so that's why I know the
17  date.
18  Q.      Was it a promotion?
19  A.      Not money-wise, but yes, I feel that -- I
20  feel it was a promotion.
21  Q.      And you currently hold that title,
22  classification officer; is that right?
23  A.      Yes, I do.
24  Q.      Are there any other classification
25  officers at Adelanto?

Page 60

1  A.      Yes.  We have two others presently.
2  Q.      And what are their names?
3  A.      That would be T. Brown and B. Toliver.
4  Q.      What is T. Brown's first name?  What does
5  the "T" stand for?
6  A.      I'm going to end up tearing up her first
7  name.  It's Tehani.  I think it's Tehani,
8  T-E-H-A-N-I.  I'm sorry.
9  Q.      That's okay.
10  A.      I'm just not used to saying -- we call --
11  we call each other by our last names, so I'm not
12  used to saying her first name.
13  Q.      Quite all right.  What about B. Toliver?
14  A.      That would be Brandi Toliver.
15  Q.      Do you supervise Ms. Brown or Ms. Toliver?
16  A.      No.  We're equals.
17  Q.      The three of you are all equals as
18  classification officers?
19  A.      Yes.
20  Q.      Were either Ms. Brown or Ms. Toliver
21  already working as a classification officer when you
22  started?
23  A.      No.
24  Q.      You were the first one?
25  A.      Well, I replaced somebody else.  There

Page 61

16 (Pages 58 - 61)

1 were previous classification officers to me, but
2 they are no longer with the company.  So Ms. Toliver
3 and Ms. Brown came after I was already a
4 classification officer.
5 Q.      Who did you replace as classification
6 officer?
7 A.      That would have been Ms. Hernandez.  She's
8 the one who trained me, and she has since left.
9 Q.      Do you know why she left?
10        MS. HOU:  Object as to form.
11        THE WITNESS:  She went to Spectrum, which
12 is another contracting company for ICE.
13        MS. WRIGHT:  Q.  Do you know what Spectrum
14 does?
15        MS. HOU:  Object as to form.
16        THE WITNESS:  ICE's paperwork.  That's
17 what I understand.
18        MS. WRIGHT:  Q.  That doesn't sound fun to
19 me.
20 A.      I'm sorry.  We have our own terminology
21 for it, but ICE's paperwork.
22 Q.      What is your terminology for it?
23 A.      I don't know if I should say that.  We
24 call them ICE's bitches.  That's what we call them.
25 Sorry.
                                          Page 62

1 Q.      So Ms. Hernandez, does she still work at
2 the Adelanto facility in the building?
3 A.      I'm not -- I haven't seen her in some
4 time.  I'm not sure.
5 Q.      Okay.
6 A.      Because we technically work for two
7 different companies, so I don't see them all the
8 time.  I don't know if she's still here or not.
9 Q.      Do you know if Spectrum maintains officers
10 at Adelanto in the building?
11 A.      Spectrum is mixed in with ICE.
12 Q.      I see.
13 A.      So yeah.  They don't have like a separate
14 quarters here at the building.  They're mixed in
15 with ICE.
16 Q.      Does ICE have offices at Adelanto?
17 A.      Yes.
18 Q.      Do detainees participating in the
19 voluntary work program clean ICE's offices at
20 Adelanto?
21 A.      No.
22 Q.      Why not?
23 A.      They're not allowed in any of the
24 administrative areas.  Those are restricted areas,
25 because there would be clear access outside.
                                          Page 63

1 They're not secured.  So they do not clean our
2 administrative offices.  They don't clean ICE's
3 administrative offices.  We have janitors at GEO
4 that actually clean those.
5 Q.      How many janitors at GEO would you
6 estimate that there are?
7        MS. HOU:  Objection as to form.  Are we
8 talking about the Adelanto facility?
9        MS. WRIGHT:  Yeah.  I'll ask it again for
10 a cleaner transcript.
11 Q.      You just testified that there are janitors
12 who are not detainees who clean in the
13 administrative areas where detainees are not allowed
14 to go.  Is that accurate?
15 A.      Yes.
16 Q.      How many of those janitors are there at
17 the Adelanto facility?
18 A.      I believe there are five, between both
19 buildings, East and West.
20 Q.      Do those janitors supervise detainees
21 in -- who participate in the voluntary work program?
22 A.      No, they do not.
23 Q.      Who supervises the detainees who do
24 janitorial work in the VWP?
25 A.      That would be the detention offices or --
                                          Page 64

1 it would be the officers.  Whether it -- I mean,
2 even as a classification officer, I have supervised
3 a detainee cleaning the floor in front of me, but it
4 would be officers who actually supervise them.  So
5 whether it be a visitation officer, a detention
6 officer, a classification officer, an intake
7 officer, it would always be an officer.
8 Q.      A GEO officer?
9 A.      Correct.  A GEO officer.
10 Q.      The five janitors that we're discussing,
11 do they clean inside the housing units?
12        MS. HOU:  Object as to form.
13        THE WITNESS:  Not normally, but I have
14 heard that they have cleaned the showers.  And I
15 believe that it's usually a couple -- I wouldn't
16 say -- and it's a deep clean.  They're using power
17 washers and other types of scrubbing brushes.  And
18 they have done that in the housing units, but I
19 don't know how much they do it.  But I have heard of
20 them doing it, yes.  They go in with the machinery
21 to, I guess, sanitize and get off any hard water or
22 anything like that.  They do the deep cleaning of
23 those showers, yes.  I have -- our janitors do do
24 that.
25        MS. WRIGHT:  Q.  And are detainees allowed
                                          Page 65

17 (Pages 62 - 65)

1 to use power washers or the scrubbing brushes that
2 you're describing?
3 A.      The buffers and scrubbers?
4 Q.      Right.
5 A.      Well, supervised, if they know how.  If
6 not, the officer will give them instructions on how
7 to use it.  And if they're comfortable, they can use
8 it.  There are many detainees that just aren't
9 comfortable using it, so they're not made to.
10 Usually the officer will just use that machinery.
11 Q.      Why don't detainees just do the power
12 washing and the deep cleaning in the showers in the
13 housing units?
14 A.      Well, as I said, we --
15      MS. HOU:  Objection as to form.  Sorry.
16 Yeah, objection.  Go ahead.
17      THE WITNESS:  We don't make them do it if
18 they're not comfortable doing it.  I mean, we don't
19 have power washers in every unit.  They're -- you
20 know, we're limited on how many we have, so normally
21 that's what our janitors or it's our officers who
22 are using them.  We just -- we don't have them
23 available for every unit for them to use.
24      MS. WRIGHT:  Q.  Is it --
25 A.      And then to make sure that they know how

Page 66

1      THE VIDEOGRAPHER:  We're going off the
2 record at 11:37.
3      (Recess taken from 11:37 a.m. to
4      11:53 a.m.)
5      THE VIDEOGRAPHER:  We're back on the
6 record.  The time is 11:53 a.m.
7      MS. WRIGHT:  Q.  Ms. McCormick, welcome
8 back.  I had -- was looking at my notes during the
9 break, and just had a couple of cleanup questions
10 regarding your work as a detention officer in the
11 segregation units.
12 A.      Mm-hmm.
13 Q.      Did you say that you had asked to be
14 transferred to the segregation units?
15 A.      No, I didn't ask to be transferred, but I
16 was transferred based on my previous experience.  I
17 didn't object.
18 Q.      Did you -- did you welcome the transfer?
19 Did you want to be transferred?
20 A.      Sure.  It was easy.
21 Q.      What do you mean?
22 A.      Well, I was already used to doing that.  I
23 mean, I had spent ample amount of time with the
24 State of Colorado doing exactly that.  I worked
25 maximum security.  It's identical to segregation.

Page 68

1 to use it.
2 Q.      So somebody has to train them to use
3 these --
4 A.      Correct.
5 Q.      So the detainees who do porter work or
6 janitorial work in the housing units, they're not
7 using power washers or deep cleaning scrubbing
8 brushes on a daily basis; is that right?
9 A.      No.
10      MS. WRIGHT:  Why don't we -- we've been on
11 the record for a little over an hour.  Why don't we
12 take a ten-minute break, go back on the record at
13 1:50 my time?
14      MS. HOU:  It's 11:37 here local time.
15      MS. WRIGHT:  Thank you.  So at 11:50 we'll
16 go back on the record your time.  Is that okay?
17      MS. HOU:  Yeah, that sounds good.  I also
18 just want to be considerate of the court reporter
19 and the videographer.  Do we -- and Ms. McCormick as
20 well.  Do -- how do -- what do you guys want to do
21 about lunch break and all of that?  Should we --
22      THE VIDEOGRAPHER:  Do you guys want to do
23 this on the record or off the record?
24      MS. WRIGHT:  Let's go off the record.
25      MS. HOU:  Let's go off the record.

Page 67

1 There's no movement unless you move them.
2 Q.      I see.  So administrative and disciplinary
3 segregation are similar to maximum detention?  Did I
4 get that right?
5      MS. HOU:  Objection as to form.
6      THE WITNESS:  Okay.  So disciplinary is,
7 and administrate -- administrative is not fully or
8 exactly like it, but there are some pieces that
9 do -- I mean, that do -- that are similar, such as
10 not everybody's out and about at the same time.
11 It's, I guess, a little bit more controlled than in
12 a general population unit.
13      MS. WRIGHT:  Q.  Okay.  And you said that
14 you supervised two -- two or three porters per
15 shift.  Did -- you said that you supervised two or
16 three detainee porters while you were working as a
17 detention officer or a DO in segregation; is that
18 right?
19 A.      Yes, but I only worked second shift.  So
20 that was the only time we brought the porters out.
21 Q.      And there are three shifts?
22 A.      Yes, but on the other shifts, other things
23 were scheduled for them, so there was no time for
24 that.
25 Q.      Were there any other work program

Page 69

18 (Pages 66 - 69)

Page 70

1 positions or jobs that detainees could do in
2 segregation --
3 A.      No.
4 Q.      -- other than being a porter?
5 A.      No.
6 Q.      So the only time that detainees in
7 segregation could participate in the voluntary work
8 program was during second shift as porters?
9 A.      Correct.
10 Q.      Did any detainees who were not housed in
11 segregation work inside the segregation units?
12      MS. HOU: Objection as to form.
13      THE WITNESS: To the best of my knowledge
14 no.
15      MS. WRIGHT: Q. So there were -- there
16 were no porters who cleaned inside of segregation
17 who were not themselves housed in segregation?
18 A.      To the best of my knowledge, no.
19 Q.      And who cleaned the detainees' cells in
20 segregation? Were those the porters too?
21 A.      No. The detainees themselves, whoever
22 lived there, cleaned if they wanted to.
23 Q.      Okay. So the detainee's responsible for
24 cleaning his or her own cell?
25      MS. HOU: Object as to form.

Page 71

1      THE WITNESS: If that's what they want to
2 do. I mean, we don't force them. If -- if they
3 want to live with dirt, they live with dirt. If
4 they don't, then they clean it. I mean, I don't --
5 there's no requirement.
6      MS. WRIGHT: Q. Okay. There's no
7 requirement that detainees in segregation have to
8 clean their own cells?
9 A.      No, there is not. Once they leave, we as
10 officers go in and obviously spruce it up and clean
11 it up for if somebody else is going to come in. If
12 it's dirty, we're going to clean it ourselves as
13 officers.
14 Q.      Why wouldn't a porter clean a detainee's
15 cell when there's a transfer?
16 A.      Most of the time they don't. I'm not
17 saying it has never happened, but the majority of
18 the time, it would just be the officer to go in
19 there and clean it, you know, for whatever reason.
20 Q.      Did you do that when you were an officer
21 in segregation?
22 A.      I have done that, yes.
23 Q.      What kind of tasks did you do to clean an
24 individual detainee's cell?
25 A.      Just wiping everything down, cleaning the

Page 72

1 floors. We had one gentleman that wrote all over
2 the walls, all over the walls, with a pencil and
3 pens. And so we had to scrub them down to prep them
4 so that we can paint the cell.
5 Q.      Do you remember when that was, roughly?
6 A.      No. No, I don't. We moved him -- I
7 don't -- it was within that time period that I was
8 in there. You know, as I said before, you know, we
9 would go in and clean up. Now, in some cases, if --
10 if they broke sprinklers in their cells and had to
11 be taken out of the cell, if they did other things
12 to their cells and once they were removed from that
13 cell and maybe put into another one, officers would
14 go -- we as officers would go in and clean up
15 whatever that mess was.
16      And it could be anything from flooding the
17 cell to urinating in the cell to breaking the
18 sprinkler to drawing on the walls. It just -- those
19 are things that we do. You can't expect -- I would
20 never ask a detainee to do anything like that. I
21 mean, that's not their -- they didn't -- that's not
22 things that they did.
23      To me, that's rude. Why would I ask them
24 to do that? I mean, I'm not going to ask them to
25 clean up somebody else's pee or when they break a

Page 73

1 sprinkler and, you know, the -- whatever's in the
2 sprinkler system goes all over the place and there's
3 black soot everywhere, I'm not going to ask them to
4 clean that. That's -- that's just -- doesn't make
5 any sense.
6      I mean, cleaning after themselves, you
7 know, that's their choice, but I'm not going to ask
8 them to clean up after a detainee that's being
9 disruptive and inconsiderate, is how I look at it.
10 They're being inconsiderate. So we usually go in
11 and clean those.
12 Q.      And was that the -- what you just
13 described, was that the practice among other
14 detention officers?
15      MS. HOU: Objection as to form.
16      THE WITNESS: To the best of my knowledge
17 yes. That practice is pretty common. And the
18 reason that I say that is because the same
19 practice -- I abided by that same practice when I
20 worked for the State of Colorado. So it wasn't
21 foreign to me, so to the best of my knowledge, that
22 is the practice.
23      MS. WRIGHT: Q. And the practice that
24 we're talking about, just to be clear for the
25 record, is the practice of not asking one detainee

19 (Pages 70 - 73)

**Page 74**

1 to clean up another's mess --
2 A.      Correct.
3 Q.      -- is that right?
4 A.      Correct.
5 Q.      And that applies even if the detainee is a
6 porter who's being paid to clean; is that right?
7 A.      It doesn't really matter, yeah.  We
8 don't -- I mean, like even if there's -- let me give
9 you a prime example.  If there's a fight in a dorm
10 and two detainees get into a fight and there's blood
11 on the floor, they don't clean that up either.
12 Medical comes and cleans that up.  GEO's medical
13 staff comes and cleans that up, for obvious reasons.
14      You know, we don't know -- there's, you
15 know, HIPAA guidelines.  You don't know what
16 somebody has or doesn't have.  We're not going to
17 endanger anybody, so we don't even clean that up.
18 That's medical's job if there's types of blood or
19 anything like that.
20      The most that usually we do -- and we
21 usually wear protective gear -- is obviously clean
22 up urine and, unfortunately, sometimes feces.
23 Q.      That makes sense.  So what you just
24 described happens in segregation, where it was --
25 it's the practice that detainees aren't asked to

**Page 75**

1 clean up other people's messes, right?
2 A.      Correct.
3 Q.      Is that also the practice in other housing
4 units?
5 A.      Yes.  Yes.  As I described, if two
6 detainees get into a fight in, let's say, the common
7 area of a dorm and somebody gets their -- a bloody
8 nose and there's blood, that -- no porters are going
9 to clean that up.  Medical is going to come down and
10 clean that up.  If a detainee breaks a sprinkler,
11 they're not going to -- you know, the other
12 detainees or porters are not going to clean up after
13 them.  You know, we're going to go in there and
14 clean that up.  We're going to move everybody out
15 away from that mess and clean that up.
16 Q.      And by "we," you mean GEO --
17 A.      Officers, yes.  GEO officers.  Or
18 maintenance will be involved.
19 Q.      You're talking about GEO's non-detainee
20 maintenance workers will come in and clean a broken
21 sprinkler?
22 A.      Correct.
23 Q.      What about tasks like cleaning out a
24 microwave in the common area of a housing unit?
25 Would you ask a detainee to clean the microwave even

**Page 76**

1 if the detainee hadn't used the microwave?
2 A.      I'm not going to ask them to clean
3 anything.  They're the ones who put their food in
4 it, so if they want to -- I've seen some microwaves
5 that they have had overspills and it's dirty, and
6 they still put their food in it.  That's on them.
7 I'm not going to put my food in it, so -- I'm not
8 going to ask them to clean it.  That's something
9 that they automatically on a norm are going to do.
10      Have I seen microwaves in the units that
11 are dirty?  Yes, I have, but it's their choice on
12 whether they want to put their food in it or and/or
13 clean it.  That's their choice.
14 Q.      When you say "they," who are you referring
15 to?
16 A.      The detainees, the porters.  It's their
17 choice.
18 Q.      So all detainees, not just porters that
19 are working in the voluntary work program?
20 A.      Well, as far as using the microwave, all
21 detainees have access.  As far as the porters, if
22 they decide to clean it, they do.  If they decide
23 not to clean it, then they don't.
24 Q.      Who -- who tells the porters what to do on
25 the job?  Who --

**Page 77**

1      MS. HOU:  Object to form.
2      MS. WRIGHT:  Q.  Who provides detainee
3 porters with direction on how to complete their
4 tasks?
5 A.      The dorm officer will obviously -- they
6 just say to clean.  The detainees -- okay.  These
7 are grown men.  I mean, they can see that the floor
8 needs to be washed or -- I mean, they live there.
9 They know what needs to be done.  We don't have to
10 give step-by-step instructions.  They pretty much
11 know, or maybe another detainee will say, "Hey, why
12 don't you get this, I'll get this," or, you know,
13 they talk amongst themselves.
14      All we ask is, "Did you guys want to clean
15 this area?"  That's kind of -- you know, so we're
16 not giving detailed instructions on what they
17 must -- must do.  We just say, "Do you guys want to
18 get this all cleaned up," type thing, you know.
19 Q.      And they either say "yes" or "no"?
20 A.      Yes.
21 Q.      And if they say "no"?
22 A.      Then it doesn't get clean.
23 Q.      No porter will come forward to clean the
24 area, then what happens?
25 A.      Then it doesn't get clean.

20 (Pages 74 - 77)

1 Q.      Would you as a detention officer get in
2 trouble for not having a clean housing unit under
3 your control?
4 A.      No.  If it is bothering me, I would go
5 clean it.  I mean, there has been many times, like I
6 said, when I've been held over into the next shift
7 that I just went around and cleaned it.  That's just
8 what I wanted to do.  I assume that most of my
9 coworkers are the same way.  We want things a
10 certain way.  So if push comes to shove, we're going
11 to clean it ourselves, just because we have to stand
12 in there.
13      You have to understand, we're in there for
14 eight hours minimum every single day.  So I'm not
15 going to look at spills on the floor.  I'm not going
16 to look at trash around.  I'm going to do it myself,
17 but most of the time detainees don't want to live
18 that way.
19      I mean, so it's not like they say, "I'm
20 not going to clean."  I've -- I can honestly say, in
21 all my years, I've never ever came across detainees
22 in a dorm, when I say, "Hey, let's get this cleaned
23 up," they say, "Oh, no, we're not going to clean it.
24 We're just going to leave it all dirty."  They don't
25 do that.  They live there.

Page 78

1 Q.      My question was actually a little bit
2 different, and I'll try to ask it better.  I'm
3 wondering if -- do you know who James Janecka is?
4 A.      Yes.
5 Q.      Can you answer again, for the record?  You
6 do?  And who is Mr. Janecka?
7 A.      He is the facility administrator.
8 Q.      Is that also known as the warden?
9 A.      Yes.
10 Q.      If Mr. Janecka walked into the housing
11 unit that you were responsible for as a detention
12 officer and it was a mess, would the detention
13 officer be disciplined?
14      MS. HOU:  Objection.  Object as to form.
15      THE WITNESS:  No.  There would probably be
16 an explanation, though, on why it was such a mess,
17 and then they would just explain.  "The" -- "I
18 have" -- you know, "I as a detention officer have
19 not had time to clean up as of yet.  I've asked the
20 porters.  They refused.  So I'll have to fit it into
21 my schedule."
22      I mean, he's not going to be happy, but
23 he'll -- he knows it's going to get done, because
24 the next shift is not going to accept that dorm.
25      MS. WRIGHT:  Q.  Okay.  So it's -- are --

Page 79

1 it sounds like you're saying -- and help me
2 understand this, please.  So correct me if I'm
3 wrong.  It sounds like the ultimate responsibility
4 for maintaining a clean facility falls to the
5 officers; is that right?
6 A.      Yes.
7 Q.      It's not the detainees?
8 A.      No.
9 Q.      It's not ICE?
10 A.      No.
11 Q.      It's GEO detention officers?
12 A.      Yes.
13 Q.      And GEO detention officers are responsible
14 for maintaining a clean kitchen; is that right?
15 A.      Yes.
16 Q.      Clean hallways?
17 A.      Yes.  Ultimately the responsibility falls
18 on us.  We can ask all day long, but if they
19 don't -- they don't want to participate, then we end
20 up doing it.  There's many, many times they hold us
21 over to do it.  We get overtime to do that, to paint
22 the walls, to buff the floors.  We actually do that.
23 Q.      "We" meaning...?
24 A.      All the officers.
25 Q.      The GEO officers?

Page 80

1 A.      The GEO officers.
2 Q.      And so when you are held overtime -- when
3 you're held over and paid overtime to do the things
4 like painting and buffing the floors, is that
5 because detainee work crews didn't want to do that
6 work?
7      MS. HOU:  Object as to form.
8      THE WITNESS:  Possibly in some cases.  I'm
9 not exactly sure.  I just know that we have a
10 certain standard that GEO has in place, and that
11 standard must be fulfilled on a daily base.  We're
12 paid the same.  Whether I'm washing a floor or I'm
13 classifying, I'm paid the same.  It doesn't matter.
14      MS. WRIGHT:  Q.  Okay.  That makes sense.
15 Speaking of what you do when you're classifying,
16 before the break you mentioned that you work in the
17 classification office with Tehani Brown and Brandi
18 Toliver; is that right?
19 A.      Mm-hmm, yes.
20 Q.      And you said that you're all equals?
21 A.      Yes.
22 Q.      So nobody supervises anybody else?
23 A.      Just our supervisor.  We have a department
24 supervisor.
25 Q.      And who is that person?

Page 81

21 (Pages 78 - 81)

1 A.     Right now it is Sergeant Penafiel.
2 Q.     Is there anybody else?
3 A.     There is Lieutenant White, but he's on
4 leave right now.
5 Q.     Is there anybody else who you report to?
6 A.     Well, anybody with a higher rank than I
7 have.  I just do what I was told.
8 Q.     What about a direct supervision, a direct
9 report?
10 A.     No, it would be Sergeant Penafiel.
11 Obviously, if the warden comes in or the assistant
12 warden comes in or the chief of security, I mean,
13 I'm just going to do what I'm told.  So -- excuse
14 me.  So it just moves on up.
15        I mean, anybody with a higher rank, we're
16 just going to do what we're told.  Do they all
17 supervise us?  Well, they can at any given time,
18 just depending on if they come into our department.
19 Q.     Okay.  And what is your rank?
20 A.     I'm a classification officer.  That's it.
21 Q.     That's -- okay.  Okay.  Is that a higher
22 rank than a detention officer?
23 A.     No.  We are -- we are paid the same.  We
24 have a slightly higher clearance because we look at
25 sensitive information, so we have a slightly higher

Page 82

1 Q.     Are your roles -- and I'm talking now
2 about you, Ms. Brown, and Ms. Toliver.  As
3 classification officers, are your roles different?
4        MS. HOU:  Object as to form.
5        THE WITNESS:  Yes and no.  We all
6 classify.  We all have individual areas that we do.
7 I mainly do the detainee payroll and keep track of
8 the applications and things like that, but I do show
9 my counterparts, you know, in case I'm not
10 available, on things, you know, that they need to
11 know about it.  So -- but it's mainly my
12 responsibility.
13        MS. WRIGHT:  Q.  What is Ms. Toliver's
14 main responsibility?
15 A.     Just classification of detainees coming
16 in, new arrivals, and then the reclassifications of
17 the 60- to 90-day reclassification.  Those are her
18 main responsibilities.
19 Q.     Are detainees automatically eligible for
20 reclassification after 60 days?
21 A.     It is automatic.
22        MS. HOU:  I just objected.  Form
23 objection.
24        MS. WRIGHT:  Q.  And when you're saying
25 that Ms. Toliver handles mostly classification of

Page 84

1 clearance.  That doesn't put us above them.  It
2 just -- as far as clearances go, we are -- we have
3 access to things that your normal detention officer
4 wouldn't.
5 Q.     Like what?
6 A.     Like criminal histories, like
7 information -- the ICE file, the information that,
8 you know, ICE provides us.  The 213.  We just
9 have -- we have knowledge of or access to things
10 that ICE wouldn't -- you wouldn't normally see that
11 laying around.
12 Q.     Okay.
13 A.     It's kept classified.
14 Q.     Do you manage anybody?
15 A.     No, I do not.
16 Q.     So nobody reports to you?
17 A.     No.
18 Q.     And Ms. Brown and Ms. Toliver, do they
19 supervise anybody?
20 A.     No.
21 Q.     And do they both report to Sergeant
22 Penafiel and Lieutenant White when he's --
23 A.     Yes.
24 Q.     -- available?
25 A.     Yes.

Page 83

1 new arrivals, by "classification" do you mean the
2 low/medium/high security --
3 A.     Yes.
4 Q.     -- that you talked about earlier?
5 A.     Yes.  We classify for housing purposes
6 only.  So we want to make sure that we're putting
7 like with like.  You don't want to put somebody who
8 has never been in a facility into a unit with
9 somebody who has spent 20 years, because they're not
10 going to act the same way, and there's going to be
11 problems.  Somebody's going to get hurt.  I can
12 guarantee you.  So we put like for like.
13        If somebody has a criminal history,
14 they're familiar with how to act in a facility.
15 Somebody who doesn't have a criminal history is
16 going to be housed with other people that don't have
17 a criminal history because they've never been in
18 this situation.
19 Q.     Are there any other considerations that go
20 into classifying detainees for housing purposes
21 aside from criminal history?
22 A.     Their disclosure.  Sometimes a detainee
23 will tell you in their country they've done all
24 kinds of things criminally that we're unaware of,
25 and we will take that into consideration, yes.  They

Page 85

22 (Pages 82 - 85)

1 just admitted to everything, so, you know...
2 Sometimes it happens.  They do.  They'll boast about
3 things that they've done, and we're shocked because,
4 based on what we're looking at, there is no criminal
5 history.
6        But we definitely have to take that into
7 consideration because we -- it's obviously the
8 safety and security of all the detainees here.  We
9 got to make sure that we're putting them in the
10 right category.
11 Q.      Is there anything other than criminal
12 history that you take into consideration when you're
13 classifying detainees for housing purposes?
14 A.      Their behavior here.  After they've been
15 classified, I do special reclassifications, and that
16 is based on their behavior here.  If they get into
17 numerous fights, we're going to notate that, we're
18 going to give them additional points, and we could
19 change their level based on their behavior.
20 Q.      More points means a higher level; is that
21 right?
22 A.      Correct, correct.
23 Q.      And a higher level means -- what does it
24 mean?
25 A.      Higher level means that if they go from a

Page 86

1 low level to the points that add up to a high level,
2 I'm going to have to move them into a different dorm
3 with the like-for-likes.  So if somebody goes from a
4 medium-low and then keeps getting in trouble and I
5 keep adding points and now their points add up to a
6 medium-high, I have to move them to a high dorm
7 because I have to keep the like-for-like.
8 Q.      Okay.  And the more points, the higher the
9 level, that correlates to a higher security risk; is
10 that right?
11        MS. HOU:  Object -- object as to form.
12        THE WITNESS:  I as -- I guess, yes, it
13 would, because they could end up getting enough
14 points to where they would have to go into red,
15 and -- which is a high level, and they wouldn't be
16 able to come out of the dorm anymore.
17        MS. WRIGHT:  Q.  Okay.  So when you say
18 they go into red, you mean that they wear red
19 uniforms?
20 A.      Yes.
21 Q.      Okay.  So detainees that are classified at
22 the high level wear red uniforms?
23 A.      Yes.
24 Q.      What do detainees who are classified at
25 the middle level wear?

Page 87

1 A.      Orange.
2 Q.      And what about low level?
3 A.      Blue.
4 Q.      Are there any other levels besides these
5 three, blue --
6 A.      No.
7 Q.      -- orange, red?
8        And you mentioned points earlier.  Can you
9 tell me what you mean by "points"?
10 A.      Yes.  ICE's guidelines -- we had went over
11 this earlier.  ICE has guidelines in the PBNDS that
12 certain crimes give a certain amount of points.  So
13 depending on what the crime is, it's either highest,
14 which is seven points; high, which is six points;
15 moderate, which is four points; and low, which is
16 two points.  So depending on if they have a criminal
17 history would depend -- and what that criminal
18 history consists of.  And then that would depend on
19 how we give the points.  From zero to two is a low
20 level.  From three to five is a medium-low.  From
21 six to eleven is a medium-high, and twelve and above
22 is a high.
23 Q.      Okay.  Thank you for explaining that.
24        So Ms. Toliver's main responsibility is to
25 do this classification, intake, and then after 60 to

Page 88

1 90 days, to reclassify detainees --
2 A.      Correct.
3 Q.      -- is that right?
4 A.      Correct.
5 Q.      And what about Ms. Brown?  What is her
6 main role?
7 A.      Well --
8        MS. HOU:  Object as to form.
9        THE WITNESS:  She classifies incoming.
10 She also does the reclassifications of the 120 days,
11 which is automatic, every 120 days, per ICE's
12 standards.  And then I am in the process of, I
13 guess, training her to do the detainee payroll and
14 to respond to kites, inputting applications, the
15 things that I do.
16        MS. WRIGHT:  Q.  Why are you training her
17 to do the things that you do?
18 A.      Because our supervisor has expressed that
19 he wants everybody to be trained so that if one
20 person is out, they can always be taken care of.
21 Q.      And that's Sergeant Penafiel?
22 A.      Correct.
23 Q.      So right now are you the classification
24 officer who manages the voluntary work program?
25 A.      Yes.

Page 89

23 (Pages 86 - 89)

1      MS. HOU:  Object as to form.

2      MS. WRIGHT:  Q.  Does Ms. Toliver or
3  Ms. Brown manage the voluntary work program in any
4  way?

5      MS. HOU:  Object as to form.

6      THE WITNESS:  Ms. Brown and I work
7  together on it.  Obviously, I'm still training her,
8  but it's still new, so I oversee everything.  But
9  she's in the process of learning it.  I've done it
10  for many years.  So she's still in the process of
11  learning.

12      MS. WRIGHT:  Q.  How long have you been
13  training her?

14  A.     I started training her probably mid May of
15  this year.  So it's been approximately two months.

16  Q.     And with respect to tasks related to the
17  voluntary work program, do you and Ms. Brown divide
18  those tasks?

19  A.     We work together on them.  The
20  classification -- classification only has one
21  office.  So we sit together and work together on
22  them quite often.  In some cases, she's in intake,
23  maybe doing classifications on new arrivals, and I'm
24  in there by myself, or maybe I need to go and speak
25  to detainees in regards to some requests.  So maybe

Page 90

1  she's in there, you know, to answer the phone or --
2  so we just work together a lot.

3  Q.     How much of your time as a classification
4  officer do you spend on duties related to the
5  voluntary work program?

6  A.     The majority of the day.

7  Q.     Do you work eight-hour shifts?

8  A.     Without overtime, yes.

9  Q.     How often do you work overtime?

10  A.     You know, I've tapered off now.  It just
11  really depends.  Our population's a little low, so
12  I'm not working as much as, you know, I used to.
13  Previously I would probably average two to three
14  days, 12-hour shifts, and then the other days, just
15  eight-hour shifts.

16  Q.     So when the population is higher, there's
17  more need for officers?

18  A.     There's more demand.  The detainees demand
19  a lot more.  More applications, more requests.  You
20  need to finish those within a timely manner.
21  There's filing.  There's, you know, all -- there's a
22  lot of things to do.

23  Q.     And you said that population is low right
24  now?

25  A.     Correct.

Page 91

1  Q.     What do you mean by that?

2  A.     It's lower than normal due to the -- what
3  we're dealing with, the -- we have certain
4  requirements.  You know, social distancing, things
5  like that, are taking place.  So there's not four
6  people per unit.  Now there's only two.  So with all
7  that in consideration, obviously the population is
8  low.

9  Q.     Do you have any estimate of what the
10  population is right now?

11  A.     To be honest with you, no, I don't.  I
12  think it's somewhere around 1,000, but I'm really
13  not positive on that.

14  Q.     I'm just trying ascertain what you mean by
15  "low."  Is there anything --

16  A.     Half of what we normally have.

17  Q.     Oh, okay.

18      In your duties pertaining to the voluntary
19  work program, do you report to ICE?

20  A.     No.

21  Q.     Do you report to ICE in your duties that
22  pertain to classification?

23  A.     No, not unless there's an issue.  There
24  would be no need.  We're following the guidelines
25  that they have given us, so all of our documents are

Page 92

1  ICE documents.  All of our standards are ICE
2  standards.  So unless there is a discrepancy, there
3  would be no reason to report in -- they would never
4  come to us.  So the only time that that happens is,
5  you know, maybe we've classified somebody and that
6  person doesn't agree, and so ICE will question it
7  and we'll have to go through the criminal history
8  and explain why.  And then once we lay it out,
9  they're like, "Okay.  You didn't tell me he had all
10  that."

11  Q.     What about with respect to the voluntary
12  work program specifically?  Are there ever any
13  discrepancies, to use your word, that -- where ICE
14  will step in and ask a question about the
15  administration of the voluntary work program?

16      MS. HOU:  Object as to form.  But go
17  ahead.

18      THE WITNESS:  No, not that I've ever
19  experienced as of yet.  I've had numerous detainees
20  say, "Well, I want a job.  I talked to my ICE
21  officer."

22      And I explain to them, "It's first come,
23  first serve."  We go by the date of their first
24  application.  I don't look at names.  I don't look
25  at dorms.  I just place whatever person's next in

Page 93

24 (Pages 90 - 93)

1 the opening.
2        As far as I'm concerned, everybody can
3 have a job here or volunteer -- participate in the
4 voluntary work program if they want to. If they
5 don't want to, then I don't have an application for
6 them. Or they quit after they've done it, or, you
7 know, applied for it. They just decided they didn't
8 want to, and we take them off the list.
9        MS. WRIGHT: Q. Any detainee -- are you
10 saying that all detainees are entitled to a position
11 in the voluntary work program?
12 A.        I don't discriminate against anybody. The
13 only -- the only time that we are unable to
14 accommodate somebody is if mental health says that
15 it is not safe for them to work. Because of the
16 chemicals, they're afraid they're going to harm
17 themselves.
18        I did have one gentleman at one time, he
19 was prone to seizures, and although he was qualified
20 and cleared to work in kitchen, I did have to remove
21 him from that position and give him a dorm position
22 as a dorm porter because we -- medical was concerned
23 that he would have a seizure and possibly hurt
24 himself in the environment of the kitchen.
25 Q.        When did that happen?

1 A.        It was probably about a year and a half
2 ago maybe. I don't remember exactly. I mean, he
3 wasn't upset. He understood, once I went and
4 explained to him. You know, we have metal tables
5 in -- you know, prep tables in the kitchen, and I
6 said, "You know, if something happens, you know, you
7 could crack your head open." He understood. He
8 ended up getting the other job, and he was happy
9 with that, but, you know, I did have to go explain
10 it to him.
11 Q.        In that context, did you take his name off
12 the kitchen list and put it on the dorm porter list?
13 A.        Yes.
14 Q.        Did you have to get approval from your
15 supervisor to do that?
16 A.        No. No. He had marked -- on his
17 application he had marked both boxes. So they
18 usually put checkmarks on everything that they're
19 interested in. So I was able to move him after I
20 explained it to him. I don't like to shock anybody
21 that causes a disruption in just the flow of things.
22 So I went over and explained it to him, and he said,
23 "Well, okay."
24        You know, I mean, obviously he wasn't
25 happy. He enjoyed working in the kitchen, but, you

1 know, it was for his safety, and he understood.
2 Q.        Is there ever a time where somebody marks
3 that they want to work in the kitchen, but there
4 just aren't any openings in the kitchen?
5 A.        No. Kitchen always has openings. They
6 don't always qualify.
7 Q.        Okay. What do you mean by that?
8 A.        I mean that they -- based on ICE's
9 guidelines, their criminal history does not permit
10 them to come out of the dorm and work. So even -- I
11 have high levels that apply for kitchen all the
12 time. They're not qualified. I have medium-highs
13 that apply for it that I cannot allow them to come
14 out of the dorm because of their criminal history.
15        So even though they're -- even though
16 their points aren't putting them in a high level, it
17 could be one crime that I just can't allow them,
18 based on ICE's guidelines. I just -- I can't.
19 Q.        Which ICE guidelines are you referring to?
20 A.        In the PBNDS. So violent crimes, they
21 want them to stay in the dorms as a dorm porter.
22 They don't want them out and about in the other
23 positions.
24 Q.        Are you talking about the PBNDS guidelines
25 on the voluntary work program?

1 A.        Mm-hmm.
2 Q.        But is there ever a situation where there
3 just aren't positions? There's too many detainees
4 who want to apply for positions, but there aren't
5 any open positions?
6 A.        Yes.
7        MS. HOU: Object as to form.
8        MS. WRIGHT: Q. Tell me about that.
9 A.        They're on a waiting list. I keep a Excel
10 spreadsheet of all the applicant -- applications
11 that come in. Sometimes -- I mean, there's
12 approximately 20 positions in the dorm. When we're
13 at full capacity, there's 80 gentlemen in the dorm
14 in any housing unit. So yes, more than 20 people
15 can apply in the housing unit for a porter position,
16 and they'll have to wait for an opening.
17 Q.        And so then there's a wait list?
18 A.        Yes.
19 Q.        And who maintains the wait list?
20 A.        I do.
21 Q.        Okay. And you've said a couple times that
22 it's first come, first serve, so can you tell me
23 what that means?
24 A.        Mm-hmm. As I receive the applications,
25 the first application I receive, I annotate it onto

1 this list with their A number, their name, their
2 dorm, what they've applied for, and the date that
3 they sign the application.  That date never changes.
4 Even if I get new applications in, the first date is
5 the one that stays.
6          So when I have an opening in a specific
7 dorm, I go to the list, I high -- I sort it by the
8 dorms.  So let's say that it's in 2 Alpha.  I'll go
9 to 2 Alpha, I'll highlight all the detainees that
10 are in 2 Alpha, and then I'll sort it by date.  I go
11 down the list, all of those that have jobs already.
12 That one that doesn't have the job, has the oldest
13 date, they're the first ones to get the job.
14 Q.     Okay.
15 A.     So it's first come, first serve.
16 Q.     How did you decide to use a
17 first-come-first-serve basis as opposed to using
18 some other metric to get people off the wait list?
19 A.     Well, that's how I was trained by
20 Ms. Hernandez, and that's the fairest way to do it.
21 I can't think of another way that wouldn't maybe be
22 taken as giving preferential treatment to one
23 detainee over the other.
24          You know, by keeping it first come, first
25 serve, then there's no question on whether I like

Page 98

1 one or do a favor for another.  It's just -- it is
2 the same with everybody.  I never look at names.
3 I'm just looking for a date.  So I -- once I explain
4 that, they're all very understanding.  "Okay.  Well,
5 this guy was here before me.  Makes sense that he
6 gets the job first."
7 Q.     So this spreadsheet where you keep all of
8 this information, where do you -- is that saved on
9 your desktop?
10 A.     Yeah, well, it's in GEO's system.  It's on
11 a shared -- shared drive for intake.
12 Q.     What is the GEO system called?
13 A.     GEOtrack.
14 Q.     Does anybody else input information into
15 the spreadsheet?
16 A.     No.  Just when Ms. Brown and I work
17 together, obviously she has access to it.  We have
18 access as classification officers, but nobody else
19 is going to go into it because they don't know what
20 to do with it.  Ms. Brown -- we're still in the
21 training process.  Obviously, she has other duties,
22 so we fit it in when we can.
23 Q.     What do you do with the information in the
24 spreadsheet?
25 A.     It just stays there.

Page 99

1          MS. HOU:  I'm sorry.  Object as to form.
2          MS. WRIGHT:  Q.  Do you put the
3 information from the spreadsheet into the rosters, for example?
4 for example?
5 A.     Do you mean the detainee pay sheets?
6 Q.     I do, yeah.  Thank you.
7 A.     Not a roster.
8 Q.     I don't know why I'm stuck on this word
9 "roster," but I --
10 A.     Yes.  I will transfer the A number, the
11 bed number, and the name.
12 Q.     And then what do you do with those -- or
13 how often do you make that transfer of information?
14 A.     How often do I make any transfer or
15 change?
16 Q.     Well, I'm asking how often do you transfer
17 that information from the spreadsheet to the
18 detainee pay sheet?
19 A.     That would depend on what goes on.
20 This -- it's nonstop movement.  So every time
21 somebody leaves, they're taken off the list
22 completely.  I just erase them.  So then there
23 becomes an opening on the pay sheet, and then I
24 would go and figure out who was next to go on it.
25          It could happen daily, it could happen

Page 100

1 weekly, and every dorm is going to be different
2 depending on new arrivals, depending on departures,
3 depending on bed moves.  A lot of things take place.
4 Q.     Mm-hmm.
5 A.     So we have movement every day, whether it
6 be an arrival, a departure, or a bed move.
7 Q.     What -- I'm sorry.  Did I interrupt you?
8 A.     I was -- I was just going to say, it's an
9 everyday occurrence.  Something's happening every
10 day.
11 Q.     Okay.  When was the last time that you
12 created a detainee pay sheet?
13 A.     Yesterday, for today.  They're created
14 every day.
15 Q.     Oh, I see.  Okay.
16 A.     Every day the updates are put in, and
17 there's change -- there could or could not be
18 changes.  It just depends on that dorm.  If nobody
19 arrives, nobody departs, nobody moves beds, then the
20 pay sheet will stay the same.  But if any of those
21 things happen, now the pay sheet has to change.
22 Q.     Okay.  You've mentioned that you refer to
23 the PBNDS in the course of your work.
24 A.     Mm-hmm.
25 Q.     Is that right?

Page 101

26 (Pages 98 - 101)

1 A.      Yes.
2 Q.      And specifically, you've mentioned the
3 chapter on the voluntary work program?
4 A.      Yes.
5 Q.      I think you said earlier that you haven't
6 looked at that section recently?
7 A.      It's just because I've been doing it for
8 so long, I've done it the same way for five years.
9 So you asked me if I look at it on an ongoing basis,
10 and no, I do not, because I've done the same thing
11 for five years.
12 Q.      Okay.  Has the voluntary work program at
13 Adelanto changed over the course of the five years
14 that you've been administering it?
15      MS. HOU:  Object as to form.
16      THE WITNESS:  I guess, yes, it has.  When
17 we received -- we started receiving females, we
18 found that there weren't enough positions for them,
19 and they really needed to keep busy.  So Mr. Janecka
20 asked me to create another sheet to give them more
21 opportunity to work.  It just -- they're more
22 emotional.  It seemed to settle them a little bit
23 better.  It was a very tough transition for them.
24      So at any given time, if I'm given
25 direction, I can create more jobs.  I just duplicate

Page 102

1 the sheets and, you know, then fill in the spots,
2 but I have to be given that direction.  I don't do
3 that on my own.
4      MS. WRIGHT:  Q.  What do you mean by
5 "duplicate the sheets"?
6 A.      I mean that the sheet is laid out in a
7 Excel form, so I can -- let's say that there's one
8 sheet for 1 Delta.  I can create another sheet, one
9 of two, for 1 Delta.  So I can have double the
10 amount of jobs if necessary.
11 Q.      I see.  Okay.  And you said that you don't
12 create job -- how to put this.  You don't
13 necessarily, by your own initiative, create the
14 jobs.  Somebody gives you a direction to do it; is
15 that right?
16 A.      Correct.
17 Q.      And you mentioned that Warden Janecka told
18 you to create some jobs for female detainees?
19 A.      Yes.  I'm sorry.  What he said was can we
20 get -- have more jobs for them to, you know, keep
21 them busy.
22 Q.      Okay.  So did you under --
23 A.      Go ahead.
24 Q.      -- understand that he was meaning jobs in
25 the voluntary work program?

Page 103

1 A.      Yes.
2 Q.      Is there anybody aside from Warden Janecka
3 who has asked you to create more jobs or more work
4 positions for detainees?
5      MS. HOU:  Object as to -- as to form.
6      THE WITNESS:  I don't believe so.  I
7 believe I only had that conversation with Warden
8 Janecka the one time, and that was in the beginning.
9 When the females first got here, they were a little
10 bit upset, and it seemed to calm them, give them
11 something to do.
12      MS. WRIGHT:  Q.  What kind of jobs did you
13 open up for the female detainees?
14 A.      Porters.  Just porter -- general porter
15 jobs.  Instead of having the standard six, now we
16 had ten.  So -- and for each -- you know, for each
17 shift, we just -- we just increased it to -- they
18 did -- you know, they're paid no matter what.  Even
19 if they take a rag and wipe -- wipe across the
20 table, they're paid.  So it didn't matter if it was,
21 I guess, the real job or not, we were going to pay
22 them because it made them feel good.
23 Q.      Did you have to get approval from anybody
24 to create additional positions?
25 A.      Just Mr. Janecka.

Page 104

1 Q.      You didn't have to get approval from ICE
2 to create additional positions in the work program?
3      MS. HOU:  Objection as to form.
4      THE WITNESS:  Not that I was instructed.
5      MS. WRIGHT:  Q.  If -- if you can create
6 additional positions, why maintain wait lists at
7 all?  Why not just have as many porters as there is
8 a desire for?
9 A.      I haven't been given those instructions.
10 That's above my pay grade.
11 Q.      Okay.  Do you recall when it was that
12 Mr. Janecka asked you to create -- you know, to have
13 more jobs for female detainees?
14 A.      To be honest, no, I don't.  I really don't
15 know when that was brought up.  It's been a while.
16 I just -- I can't recall.
17 Q.      It was around the time that the facility
18 opened to female detainees?
19 A.      Yes, somewhere around there.  It was
20 probably within a few months, and it was just
21 they're more emotional, so he just felt it would
22 help them a little bit more.  And it did.  It did.
23 It keeps them busy.  You know, it felt like they
24 were doing something, so...
25 Q.      Are there any specific jobs that female

Page 105

27 (Pages 102 - 105)

1 detainees cannot do, but male detainees can, or that
2 only male detainees are assigned to do, and female
3 detainees are not?
4        MS. HOU: Object as to form.
5        MS. WRIGHT: Q. I'm sorry? Your answer.
6 A.     No, they are not. Everybody's equal.
7 Q.     Do you ever -- in the course of your
8 duties as a classification officer, do you ever
9 train detention officers about the voluntary work
10 program?
11 A.     No, not -- not officers. Just class --
12 just Ms. Brown in classification.
13 Q.     Okay.
14 A.     And once she's trained, I'll train
15 Ms. Toliver, but that's a -- because it's considered
16 sensitive information that we are looking at, only
17 classification officers are allowed to do that,
18 because we're looking at criminal histories. We're
19 looking at private information.
20 Q.     Let me ask you some pretty dry questions
21 that I think are just yes or no questions, so
22 hopefully this section will go quickly, but just
23 want to warn you that, if you're not bored already,
24 here it comes.
25        In your responsibilities as a

Page 106

1 classification officer, are you responsible for
2 assigning detainees to work crews?
3 A.     I'm sorry. Could you repeat that?
4 Q.     Are you responsible for assigning
5 detainees to work details or work crews?
6        MS. HOU: Object as to form.
7        THE WITNESS: Yes, I do assign them to the
8 pay sheets. Is that what you're asking me?
9        MS. WRIGHT: Q. Well, let me ask it this
10 way: If a detainee applies to work as a porter and
11 in the kitchen, are you the person who makes the
12 decision about whether that person works as a porter
13 or in the kitchen?
14 A.     Yes.
15 Q.     Are you responsible for removing detainees
16 from work details?
17 A.     Yes.
18 Q.     When I say "work details," I mean job
19 assignments or positions. If there's a different
20 term that would be better, please just let me know.
21 A.     No, that's fine. I do not personally fire
22 anybody. In some cases, somebody will -- or a
23 detainee will do something where they change levels,
24 and I have to take them out of a position and then
25 put -- they'll be in line to go to the next

Page 107

1 available, which would be a dorm position. Or in
2 some cases, somebody maybe that works in kitchen has
3 shown some extremely bad behavior, and maybe a
4 supervisor will ask me to remove them from that
5 position. And then they'll go on the list to wait
6 for a dorm porter position.
7 Q.     Okay. So in the example that you just
8 gave about somebody in the kitchen, a supervisor
9 might ask you to remove a kitchen worker from the
10 list; is that right?
11 A.     Yes. Yes.
12 Q.     What do you mean by "supervisor"?
13 A.     Sergeant or above. So a sergeant, a
14 lieutenant, or maybe the kitchen manager, maybe
15 their -- maybe -- you know, there are cases where we
16 have a lot of people come from different countries,
17 and sometimes they don't understand that they'll
18 maybe have to listen to a female staff member, and
19 they'll be rude, not listening, and they just --
20 they can't understand that that's just part of it.
21 And so we'll have to remove them because they're
22 uncooperative. They're not doing things either the
23 right way or just refusing to do them. So we'll
24 remove them, and then they'll go back on the list to
25 wait for a dorm porter position.

Page 108

1 Q.     So the supervisors are in GEO?
2 A.     Yes, they're GEO.
3 Q.     And when you say that the detainees will
4 go back on the list to wait for a dorm position, is
5 there ever a time where detainees are removed from
6 the list altogether, where they're not allowed to
7 have any -- where they're not allowed to participate
8 in the voluntary work program at all?
9 A.     Well, if they're in segregation, they're
10 not allowed to participate. If it -- if the
11 facility deems them as maybe being dangerous to
12 others or themselves, they could be removed from the
13 list. I don't know that that has happened other
14 than segregation for small periods of time.
15        We did have one female that medical deemed
16 her not to have a position, and that was for her own
17 safety. They were afraid she was -- she had
18 attempted numerous times to harm herself, and they
19 felt it was too big of a risk, so she was deemed not
20 to have a position in our facility. And that was
21 for her own safety. But normally, no. Normally
22 it's not forever.
23        You know, right on the application it
24 indicates that they can be removed for 60 days, and
25 I always make notate -- you know, notations who and

Page 109

28 (Pages 106 - 109)

1 then the date. So...
2 Q.     Let's look at the application, since you
3 just mentioned it. I am going to introduce what has
4 been previously marked in this litigation as
5 Exhibit 26.
6 A.     Mm-hmm.
7 Q.     And then I will share my screen, if I'm
8 doing this right.
9       (Pause.)
10     MS. WRIGHT: Q. Okay. Do you see
11 Exhibit 26 on your screen?
12 A.    Uh-huh, yes, I do.
13 Q.     Okay. And you see that this is an e-mail
14 from Joanne Langill, L-A-N-G-I-L-L?
15 A.    Mm-hmm.
16 Q.     And do you see your e-mail address in the
17 cc line?
18 A.    Yes, I do.
19 Q.     And this was sent on September 4th, 2018?
20 A.    Yes.
21 Q.     Okay. And this e-mail is attaching a
22 document, a single-page document, Bates stamped
23 GEO-Novoa 3294 that is entitled "Detainee Work
24 Detail Application."
25 A.    Yes.

Page 110

1 Q.     You see that? Okay.
2       Is this what you're talking about when you
3 mentioned the --
4 A.     Yes.
5 Q.     -- application form?
6 A.     Yes.
7 Q.     Is this the current version of the
8 Detainee Work Detail Application form?
9 A.     I do believe so. It looks that way, yes.
10 Q.     And you were just saying that the
11 application form mentions grounds for termination.
12 Were you referring to this sentence --
13 A.     Yes.
14 Q.     -- "Work detail members charged with a
15 rule violation will be suspended pending the outcome
16 of a disciplinary hearing. You will be required to
17 wait 60 days to reapply for a job assignment." Did
18 I read that correctly?
19 A.     Yes, that is in there, but I do want to
20 clarify that I don't take everybody out of their job
21 when they violate a rule. I only keep them out when
22 they go to segregation. Then when they come back to
23 the housing unit, they immediately go back on the
24 list, or the waiting list. Not per se on the dorm
25 porter list, but they do go on the waiting list. If

Page 111

1 they're next in line, they'll get it. I don't -- I
2 don't hold them to the 60 days unless a supervisor
3 indicates that, you know, they needed some cooling
4 off time maybe, you know. Maybe they've had
5 repeated problems in a certain area or something.
6 Q.     Okay. But it sounds like you make the
7 decision about how long a detainee has to wait, how
8 long that waiting requirement is; is that right?
9 A.     No. I only take them off when they're not
10 qualified to work, and that's when they go to
11 segregation. I don't make the decision they're no
12 longer qualified at that moment because they're in
13 segregation, and nobody can work when they're in
14 segregation. So they're being taken off the pay
15 sheet only during that time.
16 Q.     What about the two porters who work in
17 administrative segregation?
18 A.     Yes, only --
19     MS. HOU: Object as to form.
20     THE WITNESS: It's only on disciplinary
21 segregation.
22     MS. WRIGHT: Q. Okay. So I'm still a
23 little bit unclear. If -- is your testimony that if
24 a detainee breaks a rule and a GEO supervisor comes
25 to you and says "This detainee can't work in the

Page 112

1 kitchen anymore because they're stealing," for
2 example, what's -- what do you do next? What steps
3 do you take to evaluate that situation?
4 A.     I ask the supervisor what they -- they
5 usually will tell me what they want. And if they're
6 not fit to work in the kitchen, then a supervisor
7 will ask me to take them out of that assignment, and
8 then I will obviously just put them back on the
9 waiting list for a dorm position.
10 Q.     Okay. How did you decide to develop that
11 process, where if someone is removed from a non-dorm
12 position, they're put on a wait list for a dorm
13 position automatically? Why did you decide to do
14 that?
15     MS. HOU: Objection. Object as to form.
16     THE WITNESS: Well, that's the only fair
17 thing to do. Just because you're not good at one
18 job or you're incapable of doing one job doesn't
19 mean you can't do the other. This is about keeping
20 people busy, giving them something to do. This
21 is -- it's not supposed to be punitive. It's
22 supposed to just be for something for them to do.
23     MS. WRIGHT: Q. What do you mean by "it"?
24 A.     I'm sorry?
25 Q.     What do you mean by "it," the word "it"?

Page 113

29 (Pages 110 - 113)

1 A. It's giving the detainee something to do.
2 So the voluntary work program, yes, they do benefit
3 that dollar, but it's more about giving them
4 something to do during the day. It's about keeping
5 busy, being able to feel productive. It's not about
6 anything else. That's -- it's about feeling
7 productive, being able to move forward, you know,
8 with whatever they're working on.
9 I mean, I don't know what each case is
10 about. What I know is that it helps. It helps if
11 they have something to do. They have a purpose. So
12 that's what this program is about. It's not about
13 anything else.
14 I mean, I can sweep and mop a floor. I'm
15 going to be paid the same no matter what, but then
16 I'm not giving them the opportunity to feel like
17 they're doing something.
18 Q. Okay. You testified earlier that you are
19 responsible for maintaining the detainee payroll
20 list; is that right?
21 A. Yes.
22 Q. I almost called it a roster again.
23 A. I know. The list was really hard for you
24 to come out with.
25 Q. It's going to happen again too.

Page 114

1 Okay. Are you responsible for creating
2 the Work Detail Application that we're looking at
3 right now, Exhibit 26?
4 MS. HOU: Object as to form.
5 THE WITNESS: No. I was given this
6 application, and then I -- it was in the system. I
7 just make copies of it. So it's not my
8 responsibility to create it or to make changes on
9 it. That would be obviously way above my pay grade.
10 I assume it would be compliance or corporate that
11 did those types of things, or legal.
12 MS. WRIGHT: Q. Okay. So when you add a
13 new position to the voluntary work program, how do
14 you add it to this -- to the list on the application
15 form?
16 MS. HOU: Object as to form.
17 THE WITNESS: So let me clarify. I am not
18 adding a new position. I am adding more
19 availability of existing positions. So instead of
20 having, for example, six dorm porters, I may add
21 more dorm porter positions. So now it would be ten
22 dorm porters. So I'm not adding any -- I'm not
23 adding a position. I'm adding more availability.
24 MS. WRIGHT: Q. Thank you for that
25 clarification.

Page 115

1 A. Mm-hmm.
2 Q. And how do you know when to add more
3 positions?
4 A. When I'm instructed to.
5 MS. HOU: Object. I think her testimony
6 was availability, not positions. She's not adding
7 positions.
8 THE WITNESS: Oh.
9 MS. WRIGHT: Q. She just used the word
10 "positions," but the transcript will tell us.
11 MS. HOU: I think she said "availability."
12 That was your clarification. That was her
13 clarification. She's not adding positions. She's
14 adding availability.
15 MS. WRIGHT: Thank you.
16 Q. How often are you instructed to add
17 availability?
18 A. To the best of my knowledge, it has only
19 been the one time, and that was when the females
20 arrived, or shortly after.
21 Q. Are you responsible for creating or
22 maintaining detainee job descriptions?
23 A. No. The job descriptions are clearly laid
24 out, and those are in the system, GEO's system, and
25 they've already -- I don't know who created those.

Page 116

1 I just know that they exist.
2 Q. Are you involved in detainee payroll?
3 A. Only to create the pay sheets. That's
4 the -- and to update them. That's the extent of my
5 involvement.
6 Q. Do those pay sheets ever come back to you
7 at the end of the day?
8 A. No.
9 Q. Where do they go at the end of the day?
10 A. They go to a mailbox that goes to detainee
11 accounts so that they can be processed and paid.
12 Q. Do you know who at GEO is responsible for
13 processing and paying those -- that detainee
14 payroll?
15 A. Whoever is working in detainee accounts.
16 The clerks or -- I don't know what their position
17 consists of. I know that they work in detainee
18 accounts. I assume that they're clerks, but I'm not
19 clear on what their position is. And they would be
20 responsible for that.
21 Q. Are you involved in developing the
22 detainee work plan at the Adelanto facility?
23 A. No.
24 Q. Do you know --
25 MS. HOU: Sorry, Lydia. I just want to

Page 117

30 (Pages 114 - 117)

1 remind you of the time. I know you're a couple
2 hours ahead, but it is 1:00 o'clock here, so I don't
3 know if people need to take a lunch break.
4        MS. WRIGHT: Yeah, let me -- if I could
5 just finish --
6        MS. HOU: Sure.
7        MS. WRIGHT: -- one question, we'll take a
8 break in about a minute. Is that okay?
9        MS. HOU: Yeah, absolutely.
10       MS. WRIGHT: Q. So Ms. McCormick, I had
11 asked you, are you involved in developing the
12 detainee work plan at the Adelanto facility?
13 A.     No, I am not.
14 Q.     Do you know what that is?
15 A.     No, I do not.
16 Q.     Do you ever consult the GEO policy and
17 procedure manual in the course of your job?
18 A.     I have read it, but no, I've just done
19 the -- my job duties the same way for as many years
20 as I've been doing them. So I was originally
21 trained, and obviously I read through everything,
22 but then I just do the same thing every day.
23       MS. WRIGHT: And with that, why don't we
24 take a break. Let's go off the record.
25       THE VIDEOGRAPHER: Okay, great. One
Page 118

1 A.     Yes, I can.
2 Q.     Okay. And you see that it's numbered
3 8.1.8, and it is a chapter from the GEO Adelanto ICE
4 Processing Center Policy and Procedure Manual?
5 A.     Yes.
6 Q.     You see the chapter is called "Detainee
7 Work Program," and the title is "Detainee Work
8 Plan"?
9 A.     Yes.
10 Q.     Have you seen this document before?
11 A.     Yes, I have.
12 Q.     When was the last time that you reviewed
13 this document?
14 A.     It's been quite some time. They update
15 them. To be honest with you, I can't tell you the
16 last time I reviewed it. I know that they up --
17 that our compliance updates them periodically and
18 sends them over. I just can't remember the last
19 time that I reviewed it in its entirety.
20 Q.     Okay. And do you mean the GEO compliance
21 department?
22 A.     Yes, the GEO compliance department, yes.
23 Q.     Okay. Do you have any input into what
24 goes into this policy that we're looking at right
25 now, No. 8.1.8?
Page 120

1 moment. We're going off the record at 1:06 p.m.
2        (Recess taken from 1:06 p.m. to 1:42 p.m.)
3        THE VIDEOGRAPHER: We're back on the
4 record. The time is 1:42 p.m.
5        MS. WRIGHT: Q. Welcome back,
6 Ms. McCormick.
7 A.     Thank you.
8 Q.     Did you speak with anybody during the
9 break?
10 A.     My sister-in-law, about a property I'm
11 going to purchase, but other than that, no.
12 Q.     Right before the lunch break, I had just
13 asked you about the detainee work plan, which is
14 part of the GEO policy and procedure manual. And
15 you testified that you were not familiar with that
16 document. Do you remember that?
17 A.     I'm sure that I -- yes, I do remember
18 that. I've read it in the past, but not currently.
19 I have not --
20 Q.     Just going to show you the document, just
21 so we can be sure that we're talking about the same
22 thing. So I am introducing -- oh, shoot. I am
23 introducing what has previously been marked as
24 Exhibit 22. And I'm going to share my screen. Can
25 you see this document, Ms. McCormick?
Page 119

1 A.     I did not have any input into this. In
2 some cases we are asked for input, but I don't
3 recall being asked for my input in this whatsoever.
4 Q.     Do you participate in drafting the section
5 of the Supplemental Detainee Handbook that deals
6 with the voluntary work program?
7 A.     No.
8        MS. HOU: Object as to form.
9        MS. WRIGHT: Q. Are you familiar with the
10 Supplemental Detainee Handbook?
11 A.     Yes, I am.
12 Q.     Are you familiar with the section of the
13 Supplemental Detainee Handbook that pertains to the
14 voluntary work program?
15 A.     I'm familiar with it, yes.
16 Q.     Do you review it during the course of your
17 work?
18 A.     No, I do not.
19 Q.     Same thing. I'm just going to show you
20 what I am talking about so we can be sure we're
21 talking about the same thing. I'm introducing what
22 has been previously marked as Exhibit 25. And I'm
23 going to share my screen.
24        Do you see a document labeled "Adelanto
25 ICE Processing Center Supplemental Detainee
Page 121

1 Handbook"?
2 A.      Yes, I do.
3 Q.      Okay.  And do you recognize this document?
4 A.      Yes.
5 Q.      I'm going to scroll to page 14, which
6 bears the Bates stamp GEO-Novoa 3838.  Do you see
7 the section entitled "Voluntary Work Program"?
8 A.      Yes, I do.
9 Q.      When was the last time that you reviewed
10 this section of this document, if you recall?
11 A.      I don't recall the last time, but all
12 detainees are given this document upon arrival, so I
13 have had many detainees refer to it when it comes to
14 the voluntary work program, but I don't recall the
15 last time I actually sat down and read it.
16 Q.      What do you mean that you've had detainees
17 refer to it?
18 A.      Like they don't -- sometimes they think
19 that it's taking too long for them to get on the pay
20 sheet, so they'll refer to it and say, "Well, this
21 says, you know, I can have a job," and so they'll
22 just bring it to my attention.  And I explain to
23 them that we do it on a first-come-first-serve
24 basis.  And, you know, usually they understand
25 thereafter, but they refer to it quite often because

Page 122

1 they think that it should be immediate.
2 Q.      Do you participate in any audits of the
3 facility as part of your job as a classification
4 officer?
5          MS. HOU:  Object as to form.
6          THE WITNESS:  Yes.
7          MS. WRIGHT:  Q.  Which audits?
8 A.      For classification?
9 Q.      Which audits do you participate in?
10 A.      Oh, as far as who is auditing or what
11 category of the audit?
12 Q.      Let's do both.  Let's start with who's
13 auditing.
14 A.      Well, I mean, our internal audits that
15 come in, the ACA comes in.  My gosh.  We have an
16 audit about every three months, so I'm not -- every
17 single audit, I participate in it if it has
18 something to do with my job duties, which would be
19 classification or the detainee work program.  If it
20 has something to do with those two items, then yes,
21 I participate.
22          I answer questions.  I show them the
23 documentation that they need to see.  I go over -- I
24 show them the app -- like I said, the applications
25 or the training packets, any of that stuff, I'll

Page 123

1 disclose everything.  So they usually come to me if
2 they have questions on classification or the
3 detainee work program.
4 Q.      What documents has ACA -- well, first of
5 all, what does "ACA" stand for?
6 A.      To be honest with you, I'm not sure.
7 Q.      Is it the American Correctional
8 Association?
9 A.      Yeah, I guess that's what it would be.
10 Q.      I'll represent to you that that's what --
11 A.      Yeah, I went total blank.
12 Q.      What documents has ACA requested from you
13 with respect to the voluntary work program?
14 A.      They have asked to see the applications
15 where I, you know, keep the applications.  They've
16 asked to see the Excel sheet that I -- you know, I
17 keep track of all the applications.  I usually print
18 that out for them, where it show -- and I color code
19 everything.  So if they're a kitchen worker, it's in
20 yellow.  If they're a medical worker, it's in blue.
21 So on, so forth.  I color code like the approvals on
22 what they're approved for or if they're denied.
23          So I usually print that out for them, and
24 then they can get a better picture of, I guess, how
25 I keep track of the applications.  They ask to see

Page 124

1 the book where all the applications are.  They're in
2 alphabetical order, so...  And then the clearances
3 that we get back from medical, those are attached to
4 the applications.
5 Q.      Are there any other documents that ACA has
6 asked to see from you as pertains to the voluntary
7 work program?
8 A.      No.
9 Q.      What about --
10 A.      Not that I -- not that I recall.
11 Q.      What about internal GEO audits?  What
12 documents are you asked to produce during internal
13 audits?
14 A.      Pretty much the same documents.  They'll
15 ask to -- -- on the internal audits, they'll come over
16 and say, "Where are your applications?  How are you
17 keeping track of them?"  You know, almost identical.
18          I mean, obviously, they're going to follow
19 the ACA guidelines.  So pretty much every audit's
20 exactly the same.  They're asking for the same
21 things.
22 Q.      Are you ever audited by ICE?
23 A.      I know that ICE does the audits.  They
24 have done quite a few audits.  I'm trying --
25 Q.      Have you ever participated in an audit by

Page 125

32 (Pages 122 - 125)

1 ICE?
2 A.      I don't recall if I have or haven't.  I
3 don't recall if it was classification that they were
4 talking to me about or if it was a detainee work
5 program.  They're on site and they're always here,
6 so I'm unfamiliar on, you know, what part they were
7 asking me, but they have done several audits, and
8 they always ask for information.
9 Q.      What information has ICE asked -- what
10 documents has ICE requested from you?
11 A.      Well, the same as --
12      MS. HOU:  Object as to form.
13      THE WITNESS:  The same as ACA.  I mean,
14 they'll want to know if, you know, we have track
15 of -- we're keeping track of all the applications,
16 if we're -- you know, obviously, if we're doing them
17 in a timely manner.  It's just a standard -- pretty
18 much all the auditors are asking the exact same
19 questions, if that makes any sense.
20      MS. WRIGHT:  Q.  And how are ICE's
21 requests for documents communicated to you?
22 A.      Usually through compliance, or if they
23 feel the need, they'll just come to the office, sit
24 down and ask for them.  So I mean, if it -- if they
25 feel like it's a lot of documentation, I guess, as

Page 126

1 far as like maybe policies and procedures, they're
2 going to go through compliance, but if it's about
3 the applications or how I keep track of them,
4 they're going to just come in the office, I'm going
5 to show them, and then it's -- they check it off
6 their list that they've seen it and it's acceptable.
7 Q.      So it's generally a face-to-face, in
8 person?
9 A.      Yes.
10 Q.      And how often does it occur that ICE does
11 an audit and requests your participation?
12 A.      If I'm not mistaken, I believe it's
13 approximately once a year.
14 Q.      Do you remember when the last occurrence
15 was?
16 A.      No, I do not.  And I apologize, I just --
17 I don't remember.  I remember them coming in, but I
18 don't remember really when it was.  A lot has
19 happened this year, and I'm just -- I'm not able to
20 keep track of exactly when that happened.  I
21 remember them coming in my office and sitting down
22 and asking me all the questions.  I just don't
23 remember when it was.
24 Q.      Do you recall who the individual was from
25 ICE?

Page 127

1 A.      No.  I'm sorry, I don't.  I -- no, I can't
2 remember his name.
3 Q.      Do you consult with ICE to carry out any
4 of your job duties?
5 A.      On a daily base?
6      MS. HOU:  Object as to form.
7      MS. WRIGHT:  Q.  On -- sure, on a daily
8 basis.
9 A.      Not on a daily basis.  If a problem
10 arises, obviously I'm going to consult with them.  I
11 can give you an example.
12 Q.      Please.
13 A.      The high-level detainees wanted to be able
14 to do a shift in the kitchen, and, you know, they're
15 not allowed to come -- per the guidelines, they're
16 not allowed to come out of the dorm, but they wanted
17 to do a shift in the kitchen because they stated --
18 their argument was, "In prison I worked in the
19 kitchen.  I was allowed to there, I should be
20 allowed to here."
21      So I did go to Mr. Valdez, who is ICE.
22 He's the AFOD.  Or he's called something else now,
23 but technically, he's in charge of everything, at
24 least for this facility.  And I went to him and
25 consulted with him about possibly doing a shift for

Page 128

1 just the high levels.  And he explained to me, per
2 the PBNDS and Congress, that that's not -- it's
3 above his pay grade, and he can't allow that to
4 happen.  So per the ICE guidelines, we can't create
5 a shift for just the high levels.
6      So Mr. Valdez is always available because
7 he's here, and he's the highest -- I believe the
8 highest representative of ICE that we have here at
9 this facility.
10 Q.      When did that conversation occur?
11 A.      Oh, that was quite a few -- that was
12 probably about -- I want to say that that was about
13 three and a half, maybe even four years ago.  So it
14 was a casual conversation in the hallway right
15 outside of intake, and I proposed it, explained to
16 him that, you know, the detainees had came to me and
17 said, you know, they really wanted to work in
18 kitchen.  He said, unfortunately, it was outside of
19 his authority, and he just -- he couldn't permit it
20 to happen.
21      So I went back to the detainees and
22 explained to them that it just -- it couldn't
23 happen, but, you know, at least I gave it a shot.
24 Q.      Was anybody else with you when you had
25 that conversation with Mr. Valdez?

Page 129

33 (Pages 126 - 129)

1 A.      No.  I don't recall that anybody else was
2 with me.  I think it was just him and I, you know,
3 kind of in passing.  I heard him in the hallway, and
4 I shot out of my office and said, "Oh, wait.  I have
5 a question.  Can we do this?"  So it was kind of a
6 casual conversation.  It wasn't anything formal.
7 Q.      And did you take notes of that
8 conversation or send an e-mail about it, reduce it
9 to writing in any way?
10 A.      No.  I just reported back to the detainees
11 that I had asked and they said no.  So...
12 Q.      Are there any other examples of times when
13 you've consulted with ICE as you've carried out your
14 duties with respect to the voluntary work program?
15 A.      Well, I mean, on a daily base, ICE is
16 around us.  I mean, they're here all the time.  So I
17 mean, I -- for the detainee work program, no, not
18 usually.  Usually -- I mean, because we're following
19 all of their guidelines, there's usually never an
20 issue.  You know, they -- I mean, in the past -- and
21 I can't give you exact dates -- they've asked, you
22 know, why this person or that person, you know --
23 maybe a detainee goes to them and says "I want to be
24 a barber," and I can't clear them based on their
25 criminal history.

Page 130

1 application and send it to me.  I notate it in the
2 system, file it, and then we just kind of wait.
3       As -- probably weekly I'll go out to the
4 units to deliver their kites or their excess --
5 excessive applications.  Some of them do believe
6 that if they send me, you know, ten or fifteen in
7 one day, that that's going to get them the job
8 faster.
9       So I usually staple them all together,
10 write on there, "You're on the waiting list," or
11 they'll ask me, "Where am I on it?  What number am
12 I?"  And so I'll go through and I'll highlight, you
13 know, that dorm and then count where they are, if
14 they're No. 2 on the list, you know, next or they're
15 No. 6, and I'll let them know, you know, "You're
16 No. 6 on the list, as of today."
17       Because things change.  If bed moves
18 happen, somebody might come -- you know, might get
19 transferred in there that has an older date on their
20 application than they do, so they might get the job
21 first.  That could happen.
22       So I explain that to them while I'm out in
23 the dorms.  They're usually pretty understanding.  I
24 know that I have -- quite a few, you know, detainees
25 will come to me and say, "Oh, well, so-and-so

Page 132

1       You know, they may ask me casually, but
2 nothing very in depth.  They'll just ask in passing,
3 you know, "Why is this guy not the barber for
4 such-and-such dorm?"  And I just explain to them
5 that, "Sorry, I can't approve him based on his
6 criminal history."
7 Q.      Can you give me -- we've -- we've kind of
8 talked in bits and pieces about the overall process
9 for how a detainee becomes a participant of the
10 voluntary work program.  Can -- and I want to go a
11 little bit deeper into that process.  Can you give
12 me kind of a high-level-view description of how do
13 detainees become part of the voluntary work program
14 at Adelanto?
15 A.      Sure.  They obviously arrive at the
16 facility.  They're classified.  It's determined on
17 what security level they are.  They're placed in a
18 housing unit.  In that housing unit there are
19 applications on the -- it's usually on the side --
20 the side wall.  There's a little -- I guess it's the
21 little file thing where all the papers -- you know,
22 all the different papers can be accessed by the
23 detainees, whatever they might need.  Grievance
24 forms, kites, things like that.  There are
25 applications in there.  They just fill out the

Page 131

1 shouldn't be on the list because he doesn't work."
2 Not my place.  I'm not in the dorm.  I can't make
3 that determination.  So what I usually tell them is,
4 "Well, why don't you go talk to the" -- "your buddy
5 over there and ask him to quit."  If he quits, I'll
6 take him off the list and put the next guy that's in
7 line on.
8       But I mean, that's pretty much how it
9 goes.  They'll either -- they'll send the request
10 either on a kite form, which is a small little
11 three-copy form, and they're just asking a question,
12 I'll answer the question, or I'll write on the
13 bottom of their excessive applications and -- you
14 know, what their status is, and then I'll give it
15 back to them.  I go around, like I said, about once
16 a week and I deliver back to the dorms, and they can
17 hand them back to them.
18 Q.      Okay.  So the Work Detail Application,
19 which we have looked at, but I will put it back up,
20 this is what we've marked as Exhibit 26.  Do you see
21 the Work Detail Application on your screen?
22 A.      Yes, I do.
23 Q.      Okay, great.  Okay.  So then it's correct
24 that detainee will pick up a paper Work Detail
25 Application, what we're looking at here, Exhibit 26,

Page 133

34 (Pages 130 - 133)

1 and fill it out and submit it to you in the
2 classification office; is that right?
3 A.        Mm-hmm.  They put it in the kite box, and
4 then we get them delivered to us, yes.
5 Q.        Okay.  And then you review the
6 application?
7 A.        Mm-hmm.
8 Q.        You have to say "yes."  Sorry.
9 A.        Yes.  I'm sorry.
10 Q.        Thank you.  So you reviewed the
11 application, and then you determine which job, if
12 any, the detainee will perform; is that right?
13 A.        Yes, based on what they've applied for and
14 what's available.
15 Q.        Does every detainee who fills out the Work
16 Detail Application receive a voluntary work program
17 job at some point?
18        MS. HOU: Object as to form.
19        THE WITNESS: At some point, yes.  I mean,
20 depending on how long they've been here, eventually
21 they're going to get a job.  But it just depends
22 on -- I mean, if somebody's here -- let's say they
23 came in two weeks ago and then they leave.  I can't
24 guarantee that person's going to get a job.  It just
25 depends on their length of stay, and it depends on
Page 134

1 the availability of the porter positions being
2 opened.
3        MS. WRIGHT: Q.  The porter positions are
4 kind of the backstop job, right?  If somebody
5 applies for, say, food service in the kitchen and
6 they don't qualify to work in the kitchen because of
7 their classification level, you will kind of bump
8 them down to a porter position and fill that
9 position when it becomes available?  Is that --
10 A.        Yes.
11 Q.        Is there anything that you would change
12 about how I just described that?
13 A.        No.  That's pretty accurate.  I mean,
14 everybody has the opportunity to at least
15 participate.  It just may not be their first choice.
16 Q.        Are some jobs more popular than others?
17        MS. HOU: Object as to form.
18        THE WITNESS: I don't know that it's more
19 popular.  I think it's a personal preference.
20        MS. WRIGHT: Q.  Are some of the wait
21 lists for these jobs longer than others?
22 A.        Yeah, I would say that the dorm position
23 is probably the longest wait list.  It's the easiest
24 job.
25 Q.        By "dorm positions," do you mean dorm
Page 135

1 cleaning?
2 A.        Dorm cleaning is the easiest position in
3 the facility.  Technically -- technically, all they
4 have to do is wipe a table, and they're being paid.
5 So it could take them two seconds, and they're still
6 going to get the same dollar as somebody who works
7 in the kitchen for three hours.  It's going to be
8 the -- it's the easiest job, so every -- that list
9 is definitely long.
10 Q.        Okay.
11 A.        It doesn't take them long to figure out
12 what the easiest job is around here.
13 Q.        Is there a set number of positions within
14 each work crew?
15        MS. HOU: Object as to form.  If you
16 understand, you can answer.
17        THE WITNESS: I don't understand the
18 question.
19        MS. WRIGHT: Q.  I'll try again.  So the
20 form Exhibit 26, Exhibit 26, the Work Detail
21 Application, says, "This Facility has a work member
22 detail program for the following areas.  If you
23 would like to participate please indicate by
24 checking the box following the position."  Do you
25 see where I've read that?
Page 136

1 A.        Mm-hmm.
2 Q.        And then there are 11 positions listed?
3 A.        Mm-hmm, yes.
4 Q.        Is there a specific number of openings for
5 each position?  For instance, is there a specific
6 number of detainees who can work in food service at
7 any given time?
8 A.        Yes.  On the pay sheet, it ranges
9 depending on the spacing.  It will range anywhere
10 from 25 to, let's say, 30 positions for any given
11 shift.
12 Q.        And there's three shifts?
13 A.        Correct.
14 Q.        And two kitchens, one in East and one in
15 West?
16 A.        Correct.
17 Q.        And so each shift in each kitchen
18 requires -- I'm sorry.  Did you say 25 to 30 --
19 A.        Yes.
20 Q.        -- detainee workers?
21 A.        Well, it doesn't require 25 to 30.  It has
22 the availability of 25 to 30.
23 Q.        Understood.  Okay.  You said, "depending
24 on spacing."  What did you mean by that?
25 A.        The spacing of the lines on the pay sheet.
Page 137

35 (Pages 134 - 137)

1 Some of them -- I try to get them all the same, but
2 for some reason, they don't stay.  Some of them are
3 like at point 20, some are at point 21, so it --
4 that's why I said it differs from page to page.
5 Q.      You're talking about the font?
6 A.      Yeah, the font.  Yeah, the font size.  So
7 like I said, it's 25 to 30.  It really depends on
8 the page.
9 Q.      What about for laundry?  What is the --
10 what is the availability -- the number of available
11 spots in laundry?
12 A.      Well, I have a morning and an afternoon
13 laundry, and I believe that there are eight to ten
14 spots on each one.  The morning laundry usually
15 washes the clothes, and the afternoon laundry
16 usually folds the clothes.  We don't -- we do have
17 the availability for, obviously, low levels, and we
18 have the availability for medium-highs to work in
19 there.  We just can't mix them.  That's why we have
20 the two different shifts.  So then both areas get to
21 participate.
22 Q.      Is there one laundry facility for both
23 East and West?
24 A.      No.  There are two separate laundry
25 facilities, one at East, one at West.

Page 138

1 Q.      And so there's a morning and afternoon
2 shift in the laundry at East and a morning and
3 afternoon shift in the laundry at West?
4 A.      Yes.  Well, there -- the availability is
5 there.  It's whether they want to apply for it and
6 work it.
7 Q.      Okay.  Can a detainee work in the kitchen
8 in the morning and in laundry in the afternoon?
9 A.      Yes, they can, but we do not promote that.
10 We try to keep them with one job or one position and
11 one position only, but in the past there has been
12 people that have decided that that's what they
13 wanted to do.  They wanted -- they want to keep
14 busy.  So there are people that have two positions,
15 but most of them we try to keep on a -- just one
16 position.  It just makes it -- makes it easier for
17 the detainee.  We don't want them, you know, to get
18 overwhelmed.
19 Q.      If the detainee is working in two
20 positions and works two shifts in a day, how much
21 does that person get paid?
22 A.      Still the same dollar a day.
23 Q.      And when you permit a detainee to work in
24 two positions, do you have to get approval from ICE
25 to do that?

Page 139

1 A.      No.
2          MS. HOU:  Object as to form, but...
3          MS. WRIGHT:  Q.  How about dorm cleaning?
4 This, you testified earlier, was the most popular
5 job.
6 A.      It is.
7 Q.      Do you -- can you -- can you identify the
8 number of available spots in the dorm cleaning
9 position?
10 A.      There's approximately 18 to 20 available
11 spots in the dorm for every housing unit.  So for
12 every dorm, there's approximately 18 to 20.  The
13 reason that that differs is because we have barbers.
14 In some dorms, maybe we'll only have two barbers,
15 but in other dorms, because of the diversity of the
16 dorm, there may be four barbers.
17          Believe it or not, they are particular on
18 who cuts their hair.  So sometimes they only want
19 their own kind to cut their hair.  So I allow them
20 to have maybe a few more barbers, if that makes any
21 sense.
22 Q.      I'm sorry.  Can you -- I'm not sure I
23 understand.
24 A.      Okay.  So let's say our low-level dorms,
25 we have a broader diversity as far as ethnicity.  So

Page 140

1 a lot of times they only want their own kind to cut
2 their care, so I allow them to have more than two
3 barbers.
4          So maybe there will be an Asian barber, a
5 Hispanic barber, and a black barber, you know,
6 versus maybe some will just have two Hispanic
7 barbers.  It just depends on the dorm, and it
8 depends on how set they are in their ways.
9          So it just makes sense.  I mean, I don't
10 want somebody to not get a haircut because they
11 don't want this guy to cut his -- their hair, you
12 know, or he doesn't know how to cut his hair.
13 Q.      And to -- to add additional spots within
14 the barbering work crew, do you have to get approval
15 from Warden Janecka?
16 A.      No.  Usually what I'll do is I'll just
17 alleviate maybe the third shift floor crew position
18 or the floor -- dorm floors.  I'll alleviate that to
19 add it to barber, because like I said, on third
20 shift, a lot of times the officers -- GEO's officers
21 are pretty much doing that job anyway.
22 Q.      Oh, the -- I'm sorry.  The third shift
23 porter cleaning in the housing units?
24 A.      Right.  Yeah, I'll alleviate, you know, an
25 open spot or whatever because the GEO officer can

Page 141

36 (Pages 138 - 141)

1 obviously cover that without a problem.
2 Q.      Okay.  When you allocate more barbers
3 based on kind of the diversity of the dorm that you
4 were talking about, is it the case at Adelanto that
5 when you're classifying detainees at intake, do you
6 try to keep people of the same ethnicity or the same
7 language group in the same housing unit?
8       MS. HOU:  Object as to form.
9       THE WITNESS:  Not ethnicity, but language,
10 yes.  It wouldn't be fair if somebody spoke Korean
11 and we put them in a dorm that he couldn't speak to
12 anybody.  So we try to have at least one other
13 person that they could at least communicate with.
14 That's pretty important, that, you know, if by
15 chance there isn't, you know, maybe we'll have to
16 move somebody from one dorm to the next to
17 accomplish that, but it's important that they're at
18 least able to communicate.
19       MS. WRIGHT:  Q.  Mm-hmm.  So -- so when
20 you're classifying individuals at intake, you try to
21 ensure that they're going to be housed with people
22 who speak the same language as them?
23 A.      Yes, yes.  When we're housing them, we
24 definitely do look at that.  And we know whether
25 they can or can't speak English because we're using

Page 142

1 a translator line, so we know how limited they are.
2 And we'll even ask the question.  Sometimes I'll
3 ask, "Do you understand any other language besides,
4 you know, Korean?"  And then they'll translate, and
5 they'll be able to answer it.  We have people who
6 speak Punjabi and they don't know English at all.
7 It's only Punjabi.  So...
8 Q.      And how would you find out that there is a
9 need for a barber of a certain ethnicity in a given
10 dorm?
11 A.      Oh, they'll send me a kite and tell me.
12 They'll send a request.
13 Q.      "They" meaning...?
14 A.      The detainees will tell me, "I don't want
15 them cutting my hair.  I want a black barber," or,
16 "I want an Asian barber.  I want somebody from my
17 kind to cut my hair."
18 Q.      Okay.
19 A.      They'll tell me.  They have no problems
20 with that.
21 Q.      Okay.  So you said that there were 18 to
22 20 positions.  Let's agree on a -- some terminology
23 here, because I have a lot more of these questions
24 to ask, as you can see from the chart.  When I say
25 "position," I want to know how many spots are

Page 143

1 available in each work crew.  So if I ask how
2 many -- or you tell me what word you want to use to
3 convey that.
4 A.      That's fine.  I mean, positions, that's
5 positions in the unit, correct?  In each of the
6 housing units?
7       MS. HOU:  If I could interject a little
8 bit, I think to provide clarity and for the record
9 to be clear, since the term "position" could mean
10 the number of positions or it could mean the type of
11 positions, I think we should use -- if we're talking
12 about how many spots there are for each position, we
13 should just say "availability," how much
14 availability for -- in laundry or in dorm cleaning,
15 if that makes sense.
16       MS. WRIGHT:  That makes sense to me.
17 Q.      Does that make sense to you,
18 Ms. McCormick?
19 A.      Yes, it does.
20 Q.      Okay.  So the availability in dorm
21 cleaning, you testified about 18 to 20 spots in
22 every dorm on a daily basis --
23 A.      Correct.
24 Q.      -- is that right?
25 A.      Yes.

Page 144

1 Q.      How about for cores (hallway)?  Same
2 question.  What is the availability on a daily basis
3 for that work crew?
4 A.      We have three shifts on the cores
5 (hallway), and I believe that it is ten per shift
6 available.  The availability is ten per shift,
7 first, second, and third.
8 Q.      Ten positions per shift?
9 A.      Yes.
10       MS. HOU:  Ten spots.  How about that?
11       THE WITNESS:  Ten spots.
12       MS. WRIGHT:  Q.  I apologize for the
13 trouble.  Okay.  Ten spots are available in cores
14 (hallway) per shift.  And what is cores (hallway)?
15 What does that mean?
16 A.      Corridors.  So hallway corridors.  That's
17 what "cores" means.  It's a -- I -- it's just an
18 acronym for "corridors."  So that's why we put
19 "hallways" next to it, to kind of indicate that it's
20 the corridors.
21 Q.      How about court/visit?  How much spots are
22 available on the court/visit work crew on any given
23 day?
24 A.      Five.
25 Q.      Is that per shift or for the whole day?

Page 145

37 (Pages 142 - 145)

1    A.      Just per day. It's shift 5 because it's
2    only the day shift. It usually -- it wouldn't
3    happen early in the morning. It wouldn't happen too
4    late at night. It's just during the day.
5    Q.      And what do detainees who are assigned to
6    court/visit do?
7    A.      Courts would be cleaning the hallway by
8    the tanks, and then cleaning the tanks themselves.
9    Those are --
10   Q.      Are you saying "tanks"?
11   A.      Tanks. Those are holding tanks. When
12   they're waiting to go into court, they're set into a
13   secured area with -- and so there's a toilet in
14   there, and there's benches. So they'll go -- the
15   porters would go in and maybe sweep, mop, and clean
16   the toilet. When there's three of those in the
17   court area.
18   Q.      Three of those --
19   A.      Tanks, yes.
20   Q.      I'm sorry.
21   A.      Yeah, tanks, T-A-N-K-S, tanks. They're
22   holding tanks, is what they are.
23   Q.      Okay. And how about for recreation? How
24   many spots are available in the recreation work
25   crew?

Page 146

1    A.      We have -- that's mixed in with the dorm
2    cleaning. At this time I only have the mini rec
3    yard. The exterior, the large rec yards, are
4    usually maintained by the rec officer. So it's only
5    the mini rec yard, and those are usually two -- two
6    available spots, but those are in conjunction with
7    the dorm port-- or the dorm sheet.
8    Q.      With respect to the large rec yard, that's
9    maintained by an officer?
10   A.      Mm-hmm.
11   Q.      Is that officer assisted by detainees in
12   maintaining the large rec yard?
13   A.      Not that I know of.
14   Q.      Ms. McCormick, do you have any documents
15   in front of you right now?
16   A.      No. Just my strawberries. Sorry.
17   Q.      And what tasks -- what do detainees do in
18   the recreation work crew? Apologies if you already
19   answered this. Refresh my --
20   A.      The mini rec yard is all -- the mini rec
21   yard is the only one listed, and it's listed on the
22   dorm pay sheets at the bottom. And on the mini rec
23   yard, they would sweep, wipe down the equipment. I
24   mean, it's a fairly easy job. Just make sure that
25   it's neat.

Page 147

1    Q.      Okay. Moving on to floor crew, how many
2    spots are available in the floor crew?
3    A.      Three to five, depending on the dorm and
4    depending on, I guess, their access. Some dorms
5    want to have a dorm floor position more than they
6    want a porter position. Others -- it's on the dorm
7    porter sheet, the pay sheet. So some of them only
8    have three spots, one for first, second, and third.
9    Others have maybe two for first, two for second, and
10   one for third. It just depends on their preference.
11            Sometimes the detainees just want to see
12   that there's dorm floors instead of that additional
13   porter on each of the spots up above where it says
14   "dorm porter." Instead of having, you know, six or
15   instead of having, let's say, five spots on first
16   shift, they only want to see four, and then they
17   want to have two assigned to the floors, for
18   whatever reason.
19   Q.      So it's up to -- it's up to each housing
20   unit to decide how many -- how to allocate spots
21   among these positions?
22   A.      Normally I only have three positions, but
23   if they ask for more, I don't see any problems in
24   changing it.
25   Q.      Three spots in the floor crew position?

Page 148

1    A.      Yes, yes. Okay. So normally on the pay
2    sheet, it will say "dorm floor," and there will be
3    one for first, one for second, one for third. But
4    if the detainees as a group send me a kite and say
5    "Can we take away a couple of these porters and just
6    put them on floor crew so it's more defined," then
7    I'll put them on floor crew. I'll just make it --
8    I'll move the stuff around.
9             It's the same amount of workers. It's
10   just that they want it named something else. It's
11   not that big of a deal, so why not just make them
12   happy? If they're happier being called a dorm --
13   you know, dorm floor porter than they are a dorm
14   porter, then it really doesn't matter to me. It's
15   all the same.
16   Q.      Do you have to get approval from anyone to
17   make those changes?
18   A.      No.
19   Q.      What exactly is the difference between
20   floor crew and a dorm porter? What is floor crew?
21   A.      They're the ones who sweep and mop the
22   floor. They sweep and mop the whole floor. So
23   you're -- if -- if all the common area, they're
24   sweeping and mopping it. So for some of them, the other

Page 149

38 (Pages 146 - 149)

1 one's mopping. Some of them don't care. They're --
2 whether they're a porter and they sweep and mop
3 or -- some of them just want it defined. I just
4 define it for them. That's all the -- that's the
5 only difference on it.
6 Q.      Okay. I understand. So -- well, just so
7 that I understand, floor crew, there are three to
8 five spots available in every dorm per day; is that
9 right?
10 A.      Yes. Yes.
11 Q.      Not per shift. Per day. And the floor
12 crew is responsible for cleaning the floors in the
13 housing units; is that right?
14 A.      Yes.
15 Q.      Is the floor crew responsible for cleaning
16 the floors inside detainees' cells?
17 A.      No.
18 Q.      Who is --
19 A.      That falls on the detainee that lives
20 there.
21 Q.      And in contrast, the dorm cleaning
22 position or dorm porter position, they are
23 responsible for the other cleaning tasks that take
24 place in the housing units other than the floors; is
25 that right?

Page 150

1 A.      However --
2        MS. HOU: Objection.
3        THE WITNESS: However they split it up. I
4 don't -- just because somebody's a dorm porter
5 doesn't mean he can't clean the floor. It's how
6 they want to do it. I'm not going -- and this is of
7 the common area of the housing unit. This is not of
8 the individual cells. It's of the common area.
9        So however they want to do it, the
10 position's the same. Even if you're a dorm floor
11 porter and today want to wipe the tables instead of
12 sweeping the floor, it doesn't matter. It's still a
13 dorm position.
14        MS. WRIGHT: Q. Okay.
15 A.      It's just the availability. And that's
16 how they wanted to see it, so I gave them the
17 verbiage that they wanted.
18 Q.      Understood.
19        Barbershop. We've talked about that a
20 little bit already. How many spots are available in
21 the barbershop?
22 A.      As I said before, normally it's two, but
23 it depends on the request of the unit. Because of
24 the diversity, sometimes there's three spots.
25 Sometimes there's four spots. And it truly does

Page 151

1 depend on the diversity of the unit and what they're
2 requesting.
3 Q.      And when you say there are two -- you mean
4 there are two spots per housing unit?
5 A.      Correct.
6 Q.      Or more depending on --
7 A.      Yes.
8 Q.      -- the factors?
9 A.      Yes, two or more depending on what the
10 actual unit is going to request.
11 Q.      Okay. Intake. How many spots are
12 available in intake?
13 A.      I have the availability of five spots per
14 shift. First, second, and third.
15 Q.      But if you wanted to increase it to ten
16 spots per shift, could you do that?
17 A.      As long as it can all fit on the one
18 sheet. If I'm going to have to increase the sheet,
19 then I need to speak to Mr. Janecka.
20 Q.      Okay. Right. Because the number of spots
21 that are available for any of these positions is
22 based on the sheets?
23 A.      Yeah. How many -- so I only have one
24 sheet for intake. If I'm going to increase it past
25 that sheet, then that's when I need to speak to him.

Page 152

1 Q.      Okay. Do you ever have to speak to ICE
2 about increasing the number of spots available for
3 any position?
4 A.      I do not speak directly to ICE in regards
5 to that. I would assume that Mr. Janecka has that
6 conversation with them.
7 Q.      Have you ever asked Mr. Janecka if he has
8 that conversation with ICE?
9 A.      No.
10 Q.      Medical detail. How many spots are
11 available in medical detail?
12 A.      I want to say that there are three to five
13 spots for each shift.
14 Q.      And what do detainees do in medical
15 detail?
16 A.      They clean the floors. There's a restroom
17 in there that they clean. There's quite a bit of
18 flooring, though, that they do sweep and mop. There
19 is a holding tank that they do clean, that has
20 benches and a toilet and sink. I believe it's
21 mostly the floors, though. They keep them very
22 shiny, so there's a lot of buffing and waxing that
23 goes on in there. They're very shiny.
24 Q.      Paint detail. How many spots are
25 available in the paint detail work crew?

Page 153

39 (Pages 150 - 153)

1 A.      I want to say five to eight per shift, but
2 it's hardly ever filled.  Not a lot of people -- if
3 they ask for paint detail and I grant it to them, I
4 can honestly say that they probably won't work more
5 than maybe a month, and they'll want to be taken off
6 that list, because there's not -- it's not an
7 everyday occurrence; therefore, they don't feel it's
8 worth their time.  So they'll just want to be put on
9 a dorm cleaning or dorm porter position versus paint
10 detail.  And as I said before, in a lot of cases,
11 our officers do the paint, or the painting.
12 Q.      Where in the facility does the paint
13 detail work?
14 A.      In the hallways, the main hallways.  The
15 hallways that go off to each of the housing units.
16 In intake the -- on the holding tanks, the doors on
17 the interior, you know, they get scratched up, and
18 so there's a lot of painting that's done on an
19 ongoing basis.
20 Q.      With respect to paint detail, because it's
21 not a daily job --
22 A.      Yes.
23 Q.      Not a daily occurrence, I think is what
24 you said.
25 A.      Correct.

Page 154

1 was alleviated when they moved our warehouse to a
2 exterior building.
3 Q.      Okay.  So all of these positions aside
4 from warehouse are completed inside the security --
5 A.      Secure area.
6 Q.      I'll ask it again, just for the
7 transcript.  So all of the positions on the Detainee
8 Work Detail Application, except for warehouse, all
9 take place inside the secured area or the secured
10 perimeter of the Adelanto facility, right?
11 A.      Correct.
12 Q.      Why don't you just update the sheet to
13 remove the warehouse position?
14 A.      I don't have that authorization.  I can
15 recommend it.  I just -- to be honest with you, I've
16 not even noticed it until I'm looking at it right
17 now.
18 Q.      So do detainees ever check the box
19 indicating that they want to be a warehouse worker?
20 A.      Most detainees check every box.
21 Q.      Oh, okay.  How do you determine where to
22 assign them?
23 A.      What they qualify for.  This is open.  I
24 mean, it's whatever they qualify for.  Obviously,
25 the least -- the easiest one is the dorm cleaning,

Page 156

1 Q.      With respect to paint detail, how do
2 detainees who are assigned to paint detail know what
3 to paint?
4 A.      Oh, they're -- they're supervised by an
5 officer.  So the officer's right next to them
6 painting, or at least showing them what needs to be
7 painted, what needs to be taped off.  The officer's
8 standing right there.  We don't just hand somebody
9 paint and a roller and say, "Here.  Go do whatever."
10 No, doesn't work that way.  They're very specific on
11 their colors.
12 Q.      I understand.  That makes sense to me.
13 And the officers are GEO officers?
14 A.      Yes, GEO officers.
15 Q.      And warehouse.  How many spots are
16 available on the warehouse crew?
17 A.      Zero.
18 Q.      Why?
19 A.      Zero.
20 Q.      There's no warehouse crew?
21 A.      No, there isn't.  Let me explain why.
22 When we did our expansion a few years ago, we moved
23 our warehouse to an exterior building, and per ICE
24 guidelines, no outside work can be done by
25 detainees.  It's only interior.  So that position

Page 155

1 other than the waiting list.  Everything else,
2 pretty much you have to clear -- be able to come out
3 of the dorm, for one.  Or they have to clear --
4 either medically or criminally, they have to be able
5 to clear to do those positions.
6 Q.      Which are the positions that a detainee
7 has to be cleared medically to perform?
8 A.      Food service, barbershop, and medical
9 detail.
10 Q.      And who does the medical clearance?
11 A.      Medical here at GEO.
12 Q.      Food service, the barber, and medical
13 detail have to be cleared by medical; is that right?
14 A.      Yes.  Food service, barber, and medical
15 detail need to be cleared by medical here at GEO.
16 Q.      Are there any other ways that you assess
17 whether a detainee would be suitable for any
18 particular position, aside from the classification
19 level and medical clearance?
20 A.      No.
21 Q.      I'm going to show you -- we've previously
22 marked Exhibit -- we've previously introduced what's
23 been marked as Exhibit 25, which is the Supplemental
24 Detainee Handbook.  And I will share my screen with
25 you now.  Do you see the Supplemental Detainee

Page 157

40 (Pages 154 - 157)

1  Handbook on your screen?
2  A.      Yes, I do.
3  Q.      Okay.  Specifically, we're looking at the
4  section entitled "Voluntary Work Program," with the
5  Bates range of GEO-Novoa 3838.  I'm going to
6  highlight a section of this paragraph.  Please let
7  me know if you can see this on your screen, what I'm
8  highlighting.
9  A.      Yes, I can.
10  Q.      Okay.  And I'll read it for the record.
11  It says, "You must complete a kite indicating that
12  you wish to participate in the voluntary work
13  program and are encouraged to list any special
14  skills or experience that you may have on the form."
15  Did I read that correctly?
16  A.      Yes.
17  Q.      Okay.  So I think you said earlier that
18  detainees can fill out a kite to request a position,
19  but they also have to fill out a Work Detail
20  Application; is that right?
21  A.      Correct.
22  Q.      Okay.  So do they have to complete a kite
23  in order to get a position?
24  A.      No, they do not.
25  Q.      And it says that they're encouraged to

Page 158

1  Q.      Okay.  So then it sounds like individuals
2  will list special skills or experience on the Work
3  Detail Application form, and then you read that and
4  you assess if they have special skills that might
5  make them more appropriate for one position over
6  another; is that accurate?
7  A.      Well, they put it on there, and it makes
8  them feel good, but to be completely honest with
9  you, when I'm filling the positions, I'm not looking
10  at that.  It's first come, first serve.  So does it
11  make me more comfortable on putting a barber into a
12  barber position that knows how to cut hair?
13  Absolutely.  And I'll do everything I can to get
14  them approved.  But I also need to know, "Yes, I
15  understand you have the experience, but I'm sorry,
16  you don't qualify."  Per ICE guidelines, I can't do
17  anything.
18        So does make -- maybe makes it a little
19  more personal, you know.  We know a little bit about
20  them, and we understand, you know, what they're
21  asking for, and if we can -- it's easier for us to
22  say, "I'm glad that you know how to do this.  We
23  just can't qualify you."  You know, it's just -- it
24  gives -- it's more personal.  I guess more
25  personable.  We're not just brushing them off.

Page 160

1  list any special skills or experience.  Why would
2  they be encouraged to list special skills or
3  experience in order to get a position in the work
4  program?
5  A.      Well, imagine being a dorm barber, but not
6  knowing how to cut hair, and another detainee goes
7  to you to get his haircut and has court the next
8  day, and you mess it up.  When you do that, you're
9  probably going to cause some hostility within that
10  dorm.
11        So usually if somebody doesn't know how to
12  cut hair, they probably shouldn't be a barber, but
13  we do ask.  You know, some people have excellent
14  skills.  You know, they're licensed barbers outside,
15  or they've done it for 25 years.  That's something
16  that we really want to look at because we want to
17  make sure that they're happy with what they're
18  getting.
19        I mean, anybody can obviously take some
20  clippers and shave somebody's head, but to get some
21  lines straight is a different question.  Believe it
22  or not, it has happened where somebody applied for
23  it and had no idea how to cut hair and messed
24  somebody's hair up.  It was -- it was not a good
25  thing.

Page 159

1  Q.      Do you ever do interview -- job interviews
2  with detainees before you place them in a position?
3  A.      No, because anybody and everybody has the
4  availability to do the voluntary work program.  So I
5  can't base it off of an interview.  Some people
6  interview terrible.  That's not fair to them if I
7  were to do that.
8  Q.      When you say --
9  A.      Some of them don't even speak English.
10  Q.      When you say "anybody and everybody has
11  the availability to be in the voluntary work
12  program," what do you mean?
13  A.      I mean, every detainee here has the
14  opportunity to apply for the voluntary detainee work
15  program.  I do not pick and choose.  It's strictly
16  first-come-first-serve basis.  But having this
17  little tidbit of information does give you a little
18  bit of a comfort level, you know, especially when
19  you're placing a barber.
20  Q.      Do you -- do you know how many
21  individuals -- how many detainees are working in any
22  voluntary work program position at any one time?
23        MS. HOU:  Object to form.
24        MS. WRIGHT:  Q.  Do you know how many
25  people are working today?

Page 161

41 (Pages 158 - 161)

1 A.      Yes. 498.
2 Q.      Wow. Okay. How do you know that?
3 A.      Because I update a list that goes to ICE
4 every day with all the changes of who I've taken off
5 the list because they have now left or who I've put
6 on the list because there was an opening. So I do a
7 report every day. I started it maybe -- maybe a
8 month ago. Not even a month. No, about -- it was
9 about a month. I think that it was mid June that I
10 started this report.
11      It was just kind of a tracking system to
12 see how many people have jobs, how it's moving back
13 and forth. Prior to that, you know, it was just
14 they were there one day and not there the next, and
15 I didn't really have a clear picture of how many
16 jobs we were able to offer every single day or on a
17 weekly basis, and now we've created that. So I work
18 on that every morning to kind of give an idea of how
19 many opportunities we're offering.
20 Q.      So there are 498 detainees at Adelanto who
21 are working today, right? Am I understanding that
22 correctly?
23 A.      Yes.
24 Q.      As opposed to 498 spots that are available
25 today?

Page 162

1 A.      No. There are more spots available.
2 There are approximately -- and this is an
3 approximation. There are approximately 750 --
4 between 700 and 750 spots available, but not all of
5 them are filled.
6      As you know, I have approximately 25 to 30
7 spots for each shift in kitchen. I don't have 25 or
8 30 detainees assigned to first, second, and third
9 shift. So there's -- there are availabilities that
10 I have not filled, and it's either because there's
11 no applicants for it, I'm waiting on medical
12 clearances, or they don't qualify based on their
13 criminal history.
14 Q.      Okay. Now, how do you know that 498
15 people -- detainees are working in the voluntary
16 work program today, considering that it's not --
17 it's only 3:00 p.m.?
18 A.      Okay. Oh, okay. So let me rephrase that.
19 498 detainees are assigned to work in the program
20 today. Have they worked or are they going to work
21 is their choice.
22 Q.      Okay. That makes sense. Thank you. So
23 just so I'm clear, there are 498 detainees who are
24 assigned a spot in a voluntary work program crew
25 today at Adelanto --

Page 163

1 A.      Correct.
2 Q.      -- is that right?
3 A.      Correct.
4 Q.      And there are a total of 700 to 750 spots
5 available at Adelanto today?
6 A.      Correct.
7 Q.      Okay. Are there more spots available when
8 the population at Adelanto is larger?
9 A.      No. The spots stay the same unless I'm
10 asked to increase the availability of spots by
11 Mr. Janecka.
12 Q.      And you testified earlier that you've only
13 been asked to increase the availability of spots by
14 Mr. Janecka one time, and that was to increase spots
15 available to female detainees; is that right?
16 A.      Correct.
17 Q.      Are there any other times where you've
18 been asked to increase the number of spots?
19 A.      I don't believe so. Not that I recollect.
20 Q.      Does the number of detainees who are
21 assigned to work in the program, does that number
22 increase when the population at Adelanto increases?
23 A.      Yes, because there's more availability.
24 So as I said, 25 to 30 spots per shift on kitchen.
25 Right now maybe I only have ten people working on

Page 164

1 each shift because I don't have the -- I don't have
2 the applicants there. I don't have the interest
3 there. So the higher our population goes, the more
4 applicants I have to be able to qualify.
5 Q.      And is it a goal of yours to ensure that
6 everybody who applies gets a position in the
7 voluntary work program?
8 A.      That would be ideal. That would -- I
9 mean, truly it would be ideal. It would cut down on
10 the amount of kites and applications I got. I mean,
11 sometimes I'll get a stack of, you know, two,
12 three inches every day. So it would be really nice
13 if I could just have everybody work.
14 Q.      So it would be ideal to have all 700 and
15 750 spots filled?
16 A.      Yes.
17 Q.      The documentation that you started
18 creating in mid June of this year, you said that you
19 send that to ICE every day; is that right?
20 A.      No, I send it to Ms. Crowder, and I don't
21 send it daily. I only send it once a week, and it's
22 what has happened the previous week.
23 Q.      Who is Ms. Crowder?
24 A.      She is the warden's secretary. So I send
25 it to her, and then she sends it to whoever, and I

Page 165

42 (Pages 162 - 165)

1 assumed it was tracking for ICE.
2 Q.     Do you know one way or the other where it
3 goes after you send it to Ms. Crowder?
4 A.     No, I'm not privy to that.
5 Q.     Have you ever had a conversation with
6 Warden Janecka about the list?
7 A.     No. I was just instructed to create it
8 and do it, and I just do it.
9 Q.     Who instructed you to do it?
10 A.     Warden Janecka, via e-mail.
11 Q.     And that was around mid June --
12 A.     Yes.
13 Q.     -- of this year?
14 A.     Yes, it was.
15 Q.     What is that document called?
16 A.     Authorized Detainee Work Schedule.
17 Q.     And is it --
18 A.     That's what I address it as, Authorized
19 Detainee Work Schedule. It's a weekly work
20 schedule, weekly work schedule. I'm sorry.
21 Q.     And is that a spreadsheet or what --
22 A.     It's a spreadsheet.
23 Q.     It's an Excel spreadsheet?
24 A.     Yes.
25 Q.     And you send it as an e-mail attachment to

Page 166

1 individualized information?
2 A.     Correct, correct.
3 Q.     Okay. Are there currently any wait lists
4 for any of the voluntary work program positions?
5 A.     Yes. There is -- there are some people
6 that are waiting for a dorm position. They're all
7 currently filled, so we do have some people waiting.
8 I don't know how many. Maybe facility-wide -- and
9 this would be a guesstimate -- but I want to say
10 maybe 100 to 150 detainees with both facilities are
11 waiting for some type of position.
12 Q.     You mean -- by "both facilities," you mean
13 an east and west?
14 A.     Yeah, east and west.
15 Q.     Okay. So there are, a guess, 100 to 150
16 detainees in the entire Adelanto facility who are
17 waiting for a position in the work program?
18 A.     That's a guesstimate, yes.
19 Q.     Okay. Let's go back and look at what
20 should still be on your screen from the Supplemental
21 Detainee Handbook. Are you still showing --
22 A.     Yes.
23 Q.     -- the handbook?
24 A.     Yes.
25 Q.     I'm going to highlight a sentence here at

Page 168

1 Ms. Crowder once a week?
2 A.     Yes, I send it on Monday morning, what
3 happened the previous week, from Monday through
4 Sunday.
5 Q.     And what -- what information is in the
6 spreadsheet?
7        MS. HOU: Object as to form.
8        THE WITNESS: It indicates the A number,
9 the detainee's name, the -- it says "ICE" on it, and
10 then it has what position they're currently assigned
11 to. It gives their bed number, and then it gives
12 the dates of Monday, whatever day -- like this
13 week's said 7/20/2019, and then it has an end date,
14 and that end date is either the end of the week,
15 which is Sunday, or when they ended working during
16 that week. So if they leave or quit, the end date
17 will be sooner than the end of the week. Am I
18 making any sense?
19        MS. WRIGHT: Q. I understand, I think.
20 A.     Okay. And then as I add them, the start
21 date will be different than -- you know, than,
22 obviously, Monday. If I put them on today, it's
23 going to say today's date instead of Monday's date.
24 Q.     So it's -- so each line on the spreadsheet
25 is -- tracks an individual, and so there's

Page 167

1 the bottom of the page with the Bates range
2 GEO-Novoa 3838. It says, "Detainees who choose to
3 participate in the voluntary work program must meet
4 acceptable levels of house neatness, cleanliness and
5 sanitation standards." Do you see that?
6 A.     Yes.
7 Q.     What does that mean?
8 A.     Well, I assume that -- you know, to be
9 honest with you, I don't know, because I don't -- I
10 mean, when we ask them to clean, I would assume that
11 they know how to do it or that they do it properly.
12 I've never even really noticed that statement on
13 there. As far as acceptable house neatness, I mean,
14 we don't -- we want them to actually clean, so --
15        MS. HOU: If you have to speculate, Mary,
16 then --
17        THE WITNESS: I don't really know. I
18 don't. I've never even paid attention to that
19 statement.
20        MS. WRIGHT: Q. Okay. But is -- it's not
21 something that you assess when you are assigning
22 detainees to work crews? You're not assessing their
23 acceptable levels of house neatness, cleanliness,
24 and sanitation standards; is that right?
25 A.     Oh, no, not at all. Like I said, I don't

Page 169

43 (Pages 166 - 169)

1 even look at the detainee.  I don't look at names or
2 anything.  It's strictly based on first come, first
3 serve.  So although this is on here, maybe it's just
4 to indicate that we want everybody to be clean, but
5 I don't assess them at all.
6 Q.      What about with respect to the barber
7 positions that you were talking about, where
8 sometimes you wanted diversity of barbers in a
9 specific housing unit?  How do you ensure that you
10 have a diversity of barbers in the housing unit?
11 A.      It's only on their request.
12      MS. HOU:  Object to form.
13      MS. WRIGHT:  Q.  Right, but -- so when
14 they -- oh, well, can you explain to me what you
15 mean?  I don't want to put words in your mouth.
16 A.      Okay.  So it's only on the detainee's
17 request.  So if I have assigned a -- a Hispanic
18 barber has applied and accepted and been cleared to
19 be a barber, but we have a population of some Asians
20 or some -- maybe some black people in the dorm, they
21 may request that somebody of their own kind cut
22 their hair, so they want that pers- -- they'll name
23 a detainee and say, "We want him to be our barber."
24      So then, obviously, I'll go speak to him
25 and then try to clear him to be their barber.  "I

1 intended to be worn.  No sagging pants.  No
2 rolled-up pants, high waters.  No outer shirt
3 without a T-shirt underneath it.  They must be
4 dressed as it -- as the uniform was supposed to be
5 worn.  So, you know, they can't cut off their pants
6 and wear shorts.  They can't cut off their sleeves
7 and make a muscle shirt.  They can't wear their
8 T-shirt, you know, on their head.  They have to wear
9 it as it's supposed to be worn.  They -- you know...
10 Q.      Okay.
11 A.      No alterations.
12 Q.      What happens if a detainee violates the
13 voluntary work dress code?
14 A.      They don't, not while they're working.  I
15 mean, are you talking about just in the dorm on a
16 general day?
17 Q.      Well, no.  I'm talking -- this sentence
18 says, "Proper voluntary work dress code will be
19 enforced as specified for your work" -- "voluntary
20 work detail."  And I'm wondering, what if the
21 detainee shows up to his voluntary work detail out
22 of dress code?  What happens to that detainee?
23      MS. HOU:  Object.  Object as to form.
24      THE WITNESS:  I've not ran across that,
25 but I would assume -- and this is an assumption --

1 don't want this guy to cut my hair."  So, I mean,
2 you try to make them as comfortable as possible, you
3 know, and -- I don't know.  Maybe they -- I don't
4 know.  Maybe there's something to it.  Maybe they
5 don't know how to cut somebody else's hair.  I don't
6 know.
7 Q.      Thank you for explaining that.  Going to
8 highlight one more sentence in this document.
9 A.      Okay.
10 Q.      Here we go.  Do you see where I've
11 highlighted?
12 A.      Yes.
13 Q.      Okay.  It says, "Proper voluntary work
14 dress code will be enforced as specified for your
15 voluntary work detail.  Detainee" -- I think there's
16 supposed to be a period there.  "Detainee uniforms
17 will be worn in the manner that is intended by the
18 manufacturer."  Is that --
19 A.      Correct.
20 Q.      -- an accurate reading?
21 A.      Yes.
22 Q.      What does it mean that "proper voluntary
23 dress code will be enforced as specified for your
24 voluntary work detail"?
25 A.      They must wear the uniform as it is

1 the dorm officer is not going to let him walk out of
2 the dorm with anybody without being properly clothed
3 or with altered clothes.  So what you're asking,
4 I've not experienced that to happen.
5      MS. WRIGHT:  Q.  Thank you.  I'm going to
6 mark as Exhibit 96 a document.  Okay.  And then I
7 will share my screen with you.
8      (Whereupon Exhibit 96 was marked for
9      identification.)
10      MS. WRIGHT:  Q.  Can you see -- can you
11 see an e-mail on your screen?  Can you see?
12 A.      Yes.
13 Q.      What do you see on your screen?
14 A.      I see an e-mail from Theodore Hauser to
15 myself, and it's in regards to -- the subject is
16 "Kitchen Porters."
17 Q.      Perfect.  Okay.  So this is Exhibit 96.
18 It's Bates stamped GEO-Novoa 2.  As you said, it's
19 an e-mail from Theodore Hauser to you.  The subject
20 on it is "Kitchen Porters," and the date is
21 January 2nd, 2018.
22 A.      Mm-hmm.
23 Q.      Who is Theodore Hauser?
24 A.      He is a lieutenant here for -- that works
25 for The GEO Group.

1 Q.     Okay.  This e-mail says that "Mark
2 Ferretiz approached me the end of last week
3 regarding kitchen porters."  Do you see that?
4 A.     Yes.
5 Q.     Do you know who Mark Ferretiz is?
6 A.     Yes, I do.
7 Q.     Who is he?
8 A.     He is a cook supervisor that works in
9 kitchen.  His title is cook supervisor.
10 Q.     Okay.  Is he a GEO employee?
11 A.     He is a GEO employee.
12 Q.     Does he also work for the City of
13 Adelanto?
14 A.     He did at one -- he did not work for the
15 City of Adelanto.  He was -- he had something to do
16 with their City Council or something like that at
17 one time.
18 Q.     Okay.  Now, this e-mail says that --
19 talking about Mark Ferretiz -- "he advised me that
20 he needs approximately 25 additional porters at a
21 minimum hired between all 3 meal shifts.  He has
22 several porters that are inconsistent and refuse
23 regularly, and there are several more that are no
24 longer here or have been fired, quit, et cetera.
25 Mark asked me if I would please write an e-mail

Page 174

1 regarding some much needed kitchen help."  Did I
2 read that correctly?
3 A.     Yes.
4 Q.     What is your understanding of what
5 Mr. Hauser is asking of you in this e-mail?
6 A.     To get more kitchen workers.
7 Q.     So are -- when he says "porters," is he
8 talking about kitchen workers?
9 A.     Yeah, he's talking about kitchen workers.
10 Q.     That term "porter" can be used to describe
11 workers generally?
12 A.     Yes, that is correct.
13 Q.     And do you recall what you did when you
14 received this e-mail?
15 A.     It was 2018.  No, I don't.  My assumption
16 is that I looked through the applications and seen
17 who was interested in becoming a kitchen worker or
18 being assigned to kitchen, or I went to the dorms
19 and took some blank applications and asked them,
20 "Does anybody want to work in the kitchen?"  That's
21 what I would do.  I either looked through the
22 applications of what I have or I'd go the dorms
23 and ask them if we're that short in any given
24 department.
25 Q.     Okay.  So -- so when you receive an e-mail

Page 175

1 like this asking for more -- do you understand this
2 e-mail to be asking for additional spots or to
3 create a new work crew?
4 A.     No, no, no.  I -- they just want -- they
5 want add -- they want additional detainees to fill
6 the spots.  There's not enough workers assigned to
7 it.  They want more assigned.
8 Q.     Okay.  So he's asking you to hire 75
9 additional porters; is that correct?  Total?
10 A.     No, 25.  A minimum of 25 between all three
11 shifts.
12 Q.     Okay.  So he's asking you to hire 25
13 additional porters?
14 A.     Yes, eight -- eight-plus per shift.
15 That's what he's asking for.
16 Q.     Okay.  And is your testimony that, to the
17 best of your recollection, you did that or you tried
18 to do that?  You tried to hire additional porters?
19 A.     Oh, of course.
20 Q.     But do you recall if you were successful
21 in doing that?
22 A.     If the e-mails stopped, I assumed I was
23 successful.  They have no problems re-emailing me
24 over and over and over if it's not up to their
25 satisfaction.

Page 176

1 Q.     I know how that is.  And is that generally
2 your practice when you receive an e-mail like this
3 asking for additional help in the kitchen or
4 wherever --
5 A.     Yeah.
6 Q.     My question was, is that your general
7 practice when you receive a request like this for
8 additional help in a work crew?  Your practice is to
9 go and find detainees who can fill those positions?
10 A.     It is that and asking them, "Well, do you
11 have any applications?  Do you have any interest?"
12 Because they talk to the detainees just as much as I
13 do.  So if --
14 Q.     When you say "they"?
15 A.     The staff.  GEO staff speaks to detainees
16 on an ongoing basis, so if Mr. Ferretiz is asking
17 for specifically 25, does he have 25 in mind that I
18 need to go talk to?  Does he have some applications
19 already?  You know, I mean, obviously I'm going to
20 converse with him.  I'm not going to just, "Oh, let
21 me go find 25 people."
22 Q.     Okay.
23 A.     Going to converse to figure out what's the
24 best way to accomplish this.
25 Q.     Okay.  I'm going to mark as Exhibit 97.

Page 177

45 (Pages 174 - 177)

1       (Whereupon Exhibit 97 was marked for
2       identification.)
3       MS. WRIGHT:  Q.  Okay.  Do you see an
4  e-mail from Reyna Inchausti?
5  A.      Inchausti, mm-hmm.
6  Q.      Okay.  And this is Exhibit 97.  The Bates
7  stamp is GEO-Novoa 4.  It's an e-mail from Reyna
8  Inchausti to you, dated July 10th, 2018.  The
9  subject is "Kitchen Workers."  Who is Reyna
10  Inchausti?
11  A.      She is a clerk that works in the
12  kitchen -- in the department of kitchen, with their
13  paper -- she helps with their paperwork and filing
14  and stuff like that.
15  Q.      Is she a GEO employee?
16  A.      Yes, she is.
17  Q.      Okay.  And she says, "Is there any way we
18  can get new kitchen workers?  A lot of our detainees
19  either quit or have been deported.  Our numbers of
20  detainees have decreased.  We are now only get about
21  three to five detainees per shift, if that."  Do you
22  see that?
23  A.      Mm-hmm.
24  Q.      What is your understanding of what
25  Ms. Inchausti is asking you to do here?

Page 178

1  A.      Get her more kitchen workers.  So, again,
2  I would discuss with her if she had any pending
3  applications that she needed to forward to me.  And
4  I'd probably have a conversation with her and find
5  out, you know, what shift, because we usually split
6  the shifts based on their level.  So what shift they
7  were really needed.  And then I would go to those
8  dorms and ask, "Is anybody interested in working in
9  kitchen?"
10  Q.      Do you recall if you were able to fill --
11  to provide her with new kitchen workers?
12  A.      If she didn't e-mail me again right after
13  this, then yes.
14  Q.      Is it your practice not to respond to
15  these e-mails?
16  A.      There's really no reason to.
17  Q.      Is there another way that you communicate
18  on the job?
19  A.      Yeah.  I just call them.
20  Q.      Okay.
21  A.      Just -- I mean, I don't need to go back
22  and forth on an e-mail.  I just need to call, "Okay.
23  What exactly do you need?  Do you have any
24  applications sitting there pending?  What shift do
25  you need it for?  Are those low levels or are those

Page 179

1  high levels?"  It's easier just to have a
2  conversation.  It makes it a lot quicker.
3  Q.      Sure.  I'm going to -- well, actually, is
4  there ever a case when there are not enough detainee
5  workers to run a particular crew?
6  A.      Yes.
7  Q.      Tell me about that.
8  A.      Sometimes they just refuse to go to work.
9       MS. HOU:  Yeah, I objected to her last
10  question; Ms. Wright's.
11       MS. WRIGHT:  Q.  What happens when there
12  are not enough detainee workers to staff a work
13  crew?
14  A.      The --
15       MS. HOU:  Object as to form.
16       THE WITNESS:  The GEO officers fill in and
17  make it happen.  So, for example, if your kitchen --
18  your detainees that are assigned to kitchen decide
19  they are not going to work today, food still has to
20  be served.  Detainees still have to be fed.  So they
21  pull from all areas that they can of the detainee --
22  or the officers, and the officers serve the food.
23  That's what happens.
24       MS. WRIGHT:  Q.  That's what happens.  I'm
25  going to show you what has been previously marked as

Page 180

1  Exhibit 35.  And I will share my screen.  See this
2  e-mail from Patricia Love --
3  A.      Yes.
4  Q.      -- dated March 7th, 2018?
5  A.      Yes.
6  Q.      Okay.  The Bates stamp on this e-mail
7  chain is GEO-Novoa 1227.
8  A.      Mm-hmm.
9  Q.      I'll -- have you ever seen this e-mail?
10  A.      I don't recall.
11  Q.      I'll represent to you that I don't think
12  that you are copied on the e-mail -- on this e-mail
13  chain, but I just want to ask you about one quick
14  thing.  As part of this e-mail chain, Michelle
15  Keeney is writing to Patricia Love and Theodore
16  Hauser.  Do you know who Patricia Love is?
17  A.      Yes.
18  Q.      Who is that?
19  A.      She was a previous assistant warden of
20  operations.  So she overseen kitchen staff and many
21  of the other departments that are non --
22  non-security members.
23  Q.      Is she a GEO employee?
24  A.      She was.
25  Q.      And do you know where she works now?

Page 181

46 (Pages 178 - 181)

1 A.     I have no idea.

2 Q.     And who is Michelle Keeney; do you know?

3 A.     She was a previous -- I believe production

4 manager was her title.  She is now a officer that

5 works for GEO.  Or a -- I'm sorry.  Not an officer.

6 She is a cook supervisor that works for GEO.

7 Q.     At Adelanto?

8 A.     Yes.

9 Q.     Now, this e-mail says, "On Saturday they

10 were only able to run three chow halls at dinner

11 because they had only six detainee workers."  Do you

12 see that?

13 A.     Yes.

14 Q.     Have you ever heard of a chow hall closing

15 down because there aren't enough detainee workers to

16 run the chow hall?

17 A.     To serve the food, yes.

18 Q.     So how many detainee workers are required

19 to serve the food in the chow hall?

20 A.     To be honest with you, I don't know.

21 Evidently more than this amount, though.

22 Q.     And so when not enough -- when not enough

23 detainee workers show up for their shift, it's

24 correct, then, that operations have to change?

25 A.     Correct.

Page 182

---

1       MS. HOU:  Object as to form.

2       THE VIDEOGRAPHER:  Counsel, it looks like

3 somebody's in the waiting room.  Andrew Free.

4       MS. WRIGHT:  Why don't we -- Mr. Free is

5 an attorney on this case representing the

6 plaintiffs.  We can admit him from the waiting room.

7       THE VIDEOGRAPHER:  Okay.  Proceed.

8       (Whereupon, Mr. Free joined the deposition

9       remotely.)

10       MS. WRIGHT:  Q.  I'm sorry.  The question

11 that I just asked you, I didn't quite hear your

12 response.  My question was, when there aren't enough

13 detainee workers to run all the chow halls, it's

14 correct that the operations of the facility have to

15 change, right?

16 A.     Correct.

17 Q.     And in this case --

18       MS. HOU:  Sorry, Lydia.  I had asserted an

19 objection to that question.  So same objection.

20       MS. WRIGHT:  Q.  And in this e-mail

21 specifically, one of the four chow halls had to

22 close down because there weren't enough detainee

23 workers to run a kitchen; isn't that right?

24       MS. HOU:  Object as to form.

25       THE WITNESS:  Based on what the e-mail

Page 183

---

1 says, yes.

2       MS. WRIGHT:  Q.  And are you familiar with

3 this happening in your own experience at Adelanto?

4       MS. HOU:  Object as to form.

5       THE WITNESS:  It has happened, yes.

6       MS. WRIGHT:  Q.  How often does it happen

7 that GEO has to close out a chow hall because there

8 aren't enough detainee workers?

9       MS. HOU:  Object as to form.

10       THE WITNESS:  To be honest with you, I

11 can't -- I can't even give you an estimate on that.

12 I don't know.  We try other alternatives on an

13 ongoing basis, such as having officers go in and

14 help, but I can't give you that information because

15 I really don't know.

16       MS. WRIGHT:  Q.  Has it happened in the

17 last few months?

18 A.     Yes.

19 Q.     Has it happened more than once in the last

20 few months?

21 A.     Yes.

22 Q.     How many times do you think it's

23 happened -- just ballpark, how many times do you

24 think it's happened in the last few months?

25 A.     Four or five.

Page 184

---

1 Q.     So four or five times --

2       MS. HOU:  Object as to form.

3       MS. WRIGHT:  Q.  Four or five times in the

4 last few months, GEO has had to close a chow hall

5 because there aren't enough detainee workers to work

6 in the kitchen; is that right?

7 A.     Not necessarily close a chow hall.  We've

8 had to make other arrangements.  Maybe we've had to

9 satellite feed them.  Maybe we've had to call

10 officers in.  So we've had to make other

11 arrangements due to the fact that there was not

12 enough detainee workers or they refused to work.  So

13 we've just had to change the normal program.

14 Q.     And when you change the normal program, do

15 you have to get approval from ICE first?

16 A.     That's above my pay grade, ma'am.  I don't

17 know.

18 Q.     What do you mean by "satellite feed"?

19 What does that mean?

20 A.     Feed them in their housing units.  Take

21 the food to them.

22 Q.     And who does that work?

23 A.     The officers.

24 Q.     So the officers will take a meal -- take

25 meals directly to the housing units --

Page 185

---

47 (Pages 182 - 185)

1 A.      Correct.
2 Q.      -- correct?
3       So you mentioned closing chow halls,
4 satellite feeding, officers running the food service
5 program.  Are there any other ways in which GEO has
6 had to alter its normal operations in the last few
7 months because there was an insufficient number of
8 detainee workers in the kitchen?
9 A.      No.  Those are --
10       MS. HOU:  Object as to form.
11       THE WITNESS:  I mean, at any given time,
12 the detainees need to be fed, so we as GEO employees
13 are going to do what we have to do to make sure that
14 happens.  That's in accordance to our contract with
15 ICE.  We're -- they need to be fed, we're going to
16 feed them.  Whether we have to feed them in their
17 housing unit or we feed them in the chow hall, it
18 doesn't matter.  We're going to make that happen.
19       MS. WRIGHT:  Q.  But my question was, were
20 there any other ways in which you make that happen
21 if you cannot have a dinner service in the chow
22 hall?
23 A.      It would only be in the chow hall or
24 satellite feed.  Those would be your only two
25 options.

Page 186

1 Q.      What do you mean, "in the chow hall"?
2 A.      Yeah, so they would either -- either the
3 detainees will eat in the chow hall or they will eat
4 in the housing unit.  There's only two options.
5 They still are going to be fed.  It just depends on
6 what location they're going to be fed in.
7 Q.      Right, but one of the options is to close
8 a chow hall when there's not enough detainee
9 workers, right?
10 A.      Okay.  Yes.
11 Q.      That's correct?
12 A.      Yes.
13 Q.      Okay.
14 A.      That just means that chow takes a little
15 bit longer because you have one less chow hall.
16 That's it.  That's all that it means.  It just takes
17 a little longer.
18 Q.      I'm going to show you -- actually, I'm
19 going to mark -- what number are we on -- as
20 Exhibit 98 an e-mail.  And I will share my screen
21 with you.
22       (Whereupon Exhibit 98 was marked for
23       identification.)
24       MS. WRIGHT:  Q.  Do you see this e-mail
25 from Michelle Keeney to you dated March 30th, 2018?

Page 187

1 A.      Mm-hmm.
2 Q.      And the subject line is "Detainee
3 Payroll"?
4 A.      Yes.
5 Q.      Ms. Keeney says, "I see we have 6 low
6 level detainees that want to work.  Do you have any
7 more that are cleared?  And want to work in kitchen?
8 Maybe we have enough to put on a schedule for
9 breakfast service again?"  What do you understand
10 that Ms. Keeney is requesting with this e-mail?
11 A.      She wants to know if I have any more low
12 levels so that we can move them to the breakfast
13 schedule.  So depending on the detainee's request,
14 sometimes we will rearrange the high levels to work
15 the morning shift or the afternoon shift or the
16 evening shift.  It just depends on the availability
17 of the detainees.  Your low-level detainees during
18 certain religious holidays don't want to work during
19 certain hours, so we have to move detainees around
20 on different shifts, if that makes -- mm-hmm.
21 Q.      I'm so sorry.  I didn't mean to interrupt
22 you.  Please finish.
23 A.      So, I mean, it just -- it depends on where
24 the need is.
25 Q.      And when you move detainees from shifts,

Page 188

1 do you have to get clearance to do that from ICE?
2 A.      No.
3 Q.      What does it mean to put on a -- to put on
4 a schedule for breakfast service?  Do you know what
5 that means?
6 A.      Yes.  It means that -- evidently, this was
7 probably shortly either after or before Ramadan, so
8 they didn't want to work during a certain time.  So
9 we moved them maybe to lunch and dinner.  And now
10 she wants to create and put them back on the morning
11 shift, the breakfast shift.
12 Q.      So "breakfast service," you understand
13 that to mean morning shift?
14 A.      Yes.
15 Q.      So is it correct that there was not a
16 morning shift?
17 A.      Not for the -- not for those low levels.
18 It was possibly for the high levels.
19 Q.      Okay.
20 A.      We put those on the morning shift.
21 Q.      Is it ever the case where a detainee
22 worker works a double or a triple shift in one day?
23       MS. HOU:  Object as to form.
24       THE WITNESS:  Not that I am aware of.
25       MS. WRIGHT:  Q.  Is that permissible at

Page 189

48 (Pages 186 - 189)

1 Adelanto?
2 A.      They're not to work past eight hours in
3 any given day or 40 hours a week.  They're not
4 scheduled for any more than one shift or eight hours
5 a day and 40 hours in one week.
6 Q.      And even if they're not scheduled to work
7 three shifts, is it -- in one day, is it still
8 possible that a detainee will indeed work three
9 shifts in one day?
10 A.      I have no knowledge of it.  I can't answer
11 that question.
12 Q.      I'm going to mark an exhibit.  I'm marking
13 Exhibit 99, and I will now share my screen.
14          (Whereupon Exhibit 99 was marked for
15          identification.)
16          MS. WRIGHT:  Q.  Do you see an e-mail from
17 Theodore Hauser dated July 2nd, 2018?
18 A.      Yes.
19 Q.      Okay.  And do you see your name?
20 A.      Yes.
21 Q.      Do you see your e-mail address --
22 A.      Yes.
23 Q.      -- in the "to" line?  Okay.
24 A.      He actually sent it to my union e-mail,
25 yes.

Page 190

1 did not receive this e-mail?
2 A.      No, we probably did.
3 Q.      And do you have any reason to believe that
4 Lieutenant T. Hauser would not be honest or accurate
5 in his e-mail to you?
6          MS. HOU:  Object as to form.
7          THE WITNESS:  I'm not saying it didn't
8 happen.  I'm just saying I have no direct knowledge.
9 Obviously he stated that it happened, but I have no
10 direct knowledge of it happening.
11          MS. WRIGHT:  Q.  When a worker -- when a
12 detainee works a double or a triple shift, do they
13 get paid a dollar for each shift?
14 A.      No.  Just a dollar a day.
15          MS. HOU:  Object as to form.
16          MS. WRIGHT:  We've been on the record for
17 over an hour and a half now.  Why don't we take a
18 break.
19          THE WITNESS:  Okay.
20          MS. WRIGHT:  Why don't we take a 15-minute
21 break, come back at a quarter to.  Is that all
22 right?
23          THE WITNESS:  Yes.
24          MS. HOU:  Sounds good, yeah.
25          THE VIDEOGRAPHER:  Going off the record

Page 192

1 Q.      The subject of this e-mail is "Satellite
2 Feeding for Dinner Chow," and then the date
3 July 1st, 2018.  We've already talked about
4 satellite feeding.  Your testimony was that
5 "satellite feeding" just means where officers bring
6 food to detainees in their housing units; is that
7 right?
8 A.      Correct.
9 Q.      Okay.  So he says, "With the approval of
10 Assistant Warden Johnson, West Facility will be
11 Satellite Fed on July 1st, 2018 because zero
12 detainee workers wanted to go to work for chow."
13 And then a little bit later, he says, "The other
14 workers are doing double and triple shifts at times
15 which is causing us this issue recently."  Do you
16 see that?
17 A.      Yes.
18 Q.      Does that refresh your recollection about
19 whether workers in the voluntary work program ever
20 do double or triple shifts in one day?
21 A.      As I said before, I have no direct
22 knowledge of it.  So, I mean, that's what it says.
23 That was his perception.  I have no direct knowledge
24 of it; therefore, I can't comment on it.
25 Q.      Do you have any reason to believe that you

Page 191

1 the time is 3:29 p.m.
2          (Recess taken from 3:29 p.m. to 3:46 p.m.)
3          THE VIDEOGRAPHER:  We're going back on the
4 record.  The time is 3:46 p.m.
5          MS. WRIGHT:  Q.  Ms. McCormick, did you
6 speak with anybody during the break?
7 A.      Just Alicia, to -- she asked how I was
8 doing.
9          MS. HOU:  You don't have to tell the
10 substance of our conversation.
11          THE WITNESS:  Okay.
12          MS. WRIGHT:  Q.  Did you speak to anybody
13 else aside from your attorney?
14 A.      I just told my warden that I was still in
15 here.  He said, "Oh."
16 Q.      Okay.  Ms. McCormick, does GEO have a
17 policy regarding detainee workers who have
18 disabilities?
19          MS. HOU:  Object as to form.
20          THE WITNESS:  Do you want to define
21 "disabilities" for me?
22          MS. WRIGHT:  Q.  No, not really.  Let me
23 try the question again.  What happens when a
24 detainee with a disability applies for a job in the
25 voluntary work program?

Page 193

49 (Pages 190 - 193)

1 A.      He's treated the same as everybody else.
2 Q.      Have you ever been trained on disability
3 accommodations?
4      MS. HOU: Object as to form.
5      THE WITNESS: In my general job, yes. As
6 far as if they're deaf, I mean, we have equipment
7 for them. Are you talking about in the job aspect
8 of the detainee work program?
9      MS. WRIGHT: Q. I am, yeah.
10 A.      I don't believe that any of them are
11 incapable of doing -- wiping a table or sweeping a
12 floor. I mean, they could even do that from a
13 wheelchair.
14 Q.      So it's correct to say that GEO does not
15 discriminate against detainees on the basis of
16 disability status --
17 A.      No, not at all.
18 Q.      -- as far as the -- as far as the
19 voluntary work program goes; is that correct?
20 A.      Correct.
21 Q.      I'm going to show you again Exhibit 26,
22 which is the Work Detail Application. Do you see
23 this on your screen, Exhibit 26?
24 A.      I do, yes.
25 Q.      Okay. About a third of the way down the

Page 194

1 clarification, I think we had previously agreed that
2 we would reference the term "positions" for work
3 detail titles, I guess, and that the
4 "availability/spots" would mean how much
5 availability for each of those positions. So I just
6 want to make sure that the record's clear what --
7 you know, if we have an agreement on that term here,
8 which what are we using the term "paid position" for
9 right now?
10      MS. WRIGHT: I'm just reading from the
11 form.
12 Q.      The form says, "There are 40 paid
13 positions in the work member detail program." What
14 do you understand that sentence to mean,
15 Ms. McCormick?
16 A.      It's indicating that there are 40
17 positions, but we have more than 40 positions.
18 Q.      And in this context of this sentence, do
19 you understand the word "position" to mean what
20 we've been referring to as "spot"?
21 A.      Yes.
22 Q.      So it doesn't mean that there are 40
23 different work crews? It means that there are 40
24 different paid spots; is that --
25 A.      Correct. Correct.

Page 196

1 page, it says, quote, "There are 40 paid positions
2 in the work member detail program. If all paid
3 positions are filled, would you be interested in
4 working on a voluntary basis?" And then it says
5 "yes" or "no." Do you see that?
6 A.      Yes.
7 Q.      Does the work member detail program refer
8 to the voluntary work program?
9 A.      I believe so.
10 Q.      Is there another work program for
11 detainees at Adelanto?
12 A.      No, there is not.
13 Q.      And it says, "There are 40 paid positions
14 in the work member detail program." We spent quite
15 a bit of time earlier today talking about the number
16 of spots for each work crew. Is it accurate that
17 there are only 40 paid positions in the voluntary
18 work program?
19 A.      I don't believe so. I don't believe that
20 there are only 40 paid. I don't -- I don't know if
21 that was before. I mean, there's more than 40.
22 Maybe not in the dorm, but there's more than 40
23 available.
24 Q.      Forty --
25      MS. HOU: Sorry. Just for a point of

Page 195

1 Q.      But that's incorrect because there are
2 actually much more than 40 paid spots, correct?
3 A.      It depends if --
4      MS. HOU: Object as to form.
5      THE WITNESS: Yeah, it depends on the
6 detainee and what they qualified for. Some may only
7 have 40 that they are approved for. Some may have
8 more than that. It depends on the detainee. It
9 depends on what they qualify for. I mean, some
10 detainees can qualify for anything throughout the
11 whole facility and it's way more than 40, but I
12 can't -- I can't say that there is obviously 40 for
13 every single person. It depends on what they're
14 qualifying for.
15      MS. WRIGHT: Q. So you read this to mean
16 that there are 40 paid positions per every detainee,
17 so every detainee could potentially qualify for 40
18 spots?
19 A.      Well, if I have 25 to 30 spots in kitchen
20 and they qualified for that, and then I have another
21 20 -- 18 to 20 in the dorm, and then I have another
22 30 that are in the cores, I mean, the positions
23 increase dramatically. So all I'm saying is that I
24 don't know where the 40 came from, but I'm saying
25 it's going to depend on the detainee on how many

Page 197

50 (Pages 194 - 197)

1 positions are going to be available for them.
2 Q.     With respect to the positions in the
3 kitchen that are available, do you assess each
4 individual position -- each individual spot
5 differently?
6 A.     No.
7 Q.     Okay.  The second part of this line says,
8 "If all paid positions are filled, would you be
9 interested in working on a voluntary basis?"  Check
10 "yes" or "no."
11 A.     Mm-hmm.
12 Q.     What do you understand that to mean?
13 A.     That if they're not assigned to an
14 available spot, that they are able to offer to work
15 if they want to.
16 Q.     And who is "they"?
17 A.     The detainees.  They don't have to sit in
18 the corner.  If they want to participate, they can
19 participate.  Even though there is no available spot
20 for their name to go on the pay sheet, they can
21 still participate.  We're not going to stop them
22 from doing that.
23 Q.     So they can still participate in a
24 voluntary work program crew even if they're not
25 going to be paid a dollar for their work?

Page 198

1 A.     As long as -- yeah, as long as they're
2 qualified.
3 Q.     Okay.  Let's talk about some of the
4 detainee pay lists.  Did I get it right?
5 A.     Yes.  Pay sheets, mm-hmm.
6 Q.     Oh, yeah.  I'm trying so hard.
7        Okay.  I am going to share -- actually --
8 okay.  I am going to introduce what has previously
9 been marked in this litigation as Exhibit 82, and
10 then I'm going to share my screen.
11       Okay.  Do you see a document labeled
12 Exhibit 82, titled "Detainee Payroll"?
13 A.     Yes.
14 Q.     Okay.  And it's -- and then it says,
15 "Adelanto ICE Processing Center," and it's dated
16 November 12th, 2017?
17 A.     Yes.
18 Q.     See that?  Is this the sheet that you
19 create that you've been calling a list, detainee
20 list?
21 A.     Yes.
22 Q.     And so you create --
23       MS. HOU:  Objection as to form.  And
24 sorry.  For my clarification, for the record's
25 clarification, I think we're calling it pay sheets,

Page 199

1 correct?  Not pay list?
2       THE WITNESS:  Yes, the pay sheet.
3       MS. WRIGHT:  Q.  Pay sheets.  I'm telling
4 you, if I haven't gotten it by now, all hope is
5 lost.  Pay sheet.
6       Okay.  So this is the pay sheet that you
7 are responsible for managing?
8 A.     Yes, updating daily.
9 Q.     Okay.  And do you -- do you create this in
10 Excel as a spreadsheet?
11 A.     Yes.  It's an Excel form that I update
12 every day.
13 Q.     And what is the Excel file called?
14 A.     Oh, jeez.  I think it says "Worksheet for
15 West" and "Worksheet for East," something like that.
16 I'm sorry, I don't -- I know where it is.  I just
17 don't really pay attention to what it's called.
18 Q.     Now, if we're just looking at the first
19 page, it says "Page 1" in the corner.
20 A.     Mm-hmm.
21 Q.     I see a list in the fifth column over,
22 under "Duty Assignments."
23 A.     Mm-hmm.
24 Q.     The first five jobs are "1st Shift
25 Intake."

Page 200

1 A.     Yes.
2 Q.     And the second listing there says, "1st
3 Shift Intake/K-I-T-C-H."  Do you see that?
4 A.     "Kitchen."
5 Q.     "Kitchen"?
6 A.     Mm-hmm.
7 Q.     What does that mean, "1st Intake/Kitchen"?
8 A.     It means that he's cleared to work intake
9 or kitchen.
10 Q.     Okay.  And does this mean that there are
11 five first-shift intake positions available on
12 November 12th, 2017?
13 A.     Yes.
14 Q.     Because there are five -- the first five
15 lines are filled in on this sheet --
16 A.     Correct.
17 Q.     -- is that right?
18 A.     Mm-hmm.
19 Q.     Okay.  And similarly, there are -- lines 7
20 through 10 are labeled "2nd Shift Intake."  So does
21 that mean that there are four second-shift intake
22 spots that are available on this date?
23 A.     On that date, yes.
24 Q.     Okay.  And line 10 doesn't have a name
25 assigned to "2nd Shift Intake."  What does that

Page 201

51 (Pages 198 - 201)

1 signify?
2 A.      That nobody was assigned to line 10, just
3 as nobody was assigned to line 4 or 5.
4 Q.      Okay.
5 A.      There were only three people assigned for
6 first shift, three people assigned for second, and
7 one person assigned for third on that date.
8 Q.      So if you look at line 14, the one person
9 who is assigned on the third shift, Ramirez-Macias.
10 Do you see that?
11 A.      Mm-hmm.
12 Q.      Does that mean that that person had to do
13 the work of five people on third-shift intake?
14      MS. HOU: Object as to form.
15      THE WITNESS: No.  It just means that he
16 is available to do the work or help the officers,
17 but there's not always a lot to do on third shift.
18      MS. WRIGHT: Q.  Okay.  So does this form
19 indicate whether that individual, Ramirez-Macias on
20 line 14, whether he actually worked --
21 A.      Yes, it does.
22 Q.      -- that day?
23      And where -- where does it indicate that?
24 A.      It indicates where it says "Detainee
25 Initials," their initials are there.  No, over.  All

Page 202

1 the way -- okay.  So see -- okay.  So where it says
2 "Detainee Initials 3rd Watch," go all the way down.
3 That's his initials, Ramirez-Macias, RM.
4 Q.      Okay.
5 A.      And then if you look three boxes over,
6 "Officer," and that's initialed by the officer.
7 Q.      Okay.  And "3W" refers to third watch?
8 A.      Correct.
9 Q.      Third shift?
10 A.      Yes.
11 Q.      Let's go to page 3, at the top.
12 A.      Mm-hmm.
13 Q.      It's actually the second page in this
14 packet.
15 A.      Okay.
16 Q.      This indicates that there are -- that
17 there were 17 spots available in the laundry crew on
18 Sunday, November 12, 2017; is that accurate?
19 A.      That is accurate.
20 Q.      And that ten people were cleared to work
21 in a laundry position that day; is that accurate?
22 A.      Yes.
23 Q.      So -- and I see initials -- in the
24 "Detainee Initials 1st Watch" column, I see initials
25 for all ten of those individuals.  Do you see that?

Page 203

1 A.      Well, what I see is "DW," which, if you
2 look at the bottom of the sheet, "DW" refers to
3 "didn't work."  And then on line No. 6, I show
4 "MRD," which is his initials.  And then on line 8, I
5 show "GCA," which is that person's initials.  All
6 the rest show "DW," which means that they did not
7 work.
8 Q.      Okay.  I understand.  So from this record,
9 we can tell that there were ten people who could
10 have worked, but only two actually did, in the --
11 A.      Correct.
12 Q.      -- laundry on this day?
13 A.      Correct.  On first watch, yes.
14 Q.      Okay.  Thank you.
15      GEO maintains job descriptions for
16 detainees participating in the voluntary work
17 program, right?
18 A.      I'm sorry.  Can you repeat that?
19 Q.      Is it correct that GEO has job
20 descriptions for each position on the detainee -- in
21 the detainee work program?
22 A.      Yes.
23 Q.      What's the purpose of those job
24 descriptions?
25 A.      Just to kind of give them a general idea

Page 204

1 of what to expect.  We go over that with them when
2 we do their training packets to make sure that they
3 use their gloves and they use all proper safety --
4 take all safety precautions.  They don't play with
5 the mops and the brooms.  I actually go over it with
6 them.  "Don't use the mop and brooms for swords.
7 Don't sword fight.  Don't jump off the tables."  I
8 go over everything with them, and then I do supply
9 them with the printout of what's expected, as far as
10 sanitary workers goes.
11 Q.      So you --
12 A.      Go ahead.
13 Q.      Do you personally do the job training or
14 job orientations for positions in the detainee work
15 program?
16 A.      Not just me, but I do a lot of them, yes.
17 Q.      Who else does those trainings?
18 A.      The dorm officer could do it, or other
19 staff members.  Ms. Brown has helped me with them.
20 Other officers.  I mean, it's pretty much just -- we
21 are all familiar with it, so any officer can
22 actually help us do it.  Any GEO officer can
23 actually go over it with a detainee.
24 Q.      I'm going to introduce Exhibit 100.
25      (Interruption in the proceedings.)

Page 205

52 (Pages 202 - 205)

1     THE WITNESS:  Sorry.
2         MS. WRIGHT:  Q.  I'm introducing
3  Exhibit 100, and I will share my screen.
4         (Whereupon Exhibit 100 was marked for
5         identification.)
6         MS. WRIGHT:  Q.  Do you see a document
7  entitled "Adelanto ICE Processing Center, West,
8  Detainee Job Description"?
9  A.     Yes.
10  Q.     Okay.  And the Bates stamp on this is
11  GEO-Novoa 89, and there are two pages.  Or four
12  pages, actually.  Is this an example of a detainee
13  job description that you can use when you are
14  training a detainee in the voluntary work program?
15  A.     So I need to clarify.  I do not train in
16  kitchen, laundry, or medical, or the barber, because
17  those are specialized.  So your kitchen staff will
18  train kitchen.  So evidently, this is what they use.
19  Your laundry staff will train laundry.  And what I
20  mean by "staff," I mean GEO staff.  Medical will be
21  your medical officer that works for GEO.  And then
22  the barbers are trained by the recreation officer.
23  So for those four positions, I do not train for
24  those.  I only train for sanitary, which is the dorm
25  porters, the floors, or cores, visit intake.  These

Page 206

1  are just generally cleaning, is what I participate
2  in training for.  But yes, this looks like specific
3  duties.  I've just never seen the document before.
4  Q.     Okay.  Are you involved in creating
5  detainee job descriptions?
6  A.     No.  They were already there when I took
7  the position.
8  Q.     Are you involved in creating the
9  curriculum that you use when you train detainee
10  workers in sanitation tasks?
11  A.     No.
12         MS. HOU:  Objection; form.
13         MS. WRIGHT:  Q.  What curriculum --
14  A.     Those were already there.  I just used the
15  forms that were already produced, and I don't know
16  who produced them.
17  Q.     And what specifically -- just a general
18  overview, what do you train detainee workers in?
19  That's a really poor question.  Let me rephrase that
20  for the record.
21         With respect to the trainings that you do
22  for detainees who are working in sanitation jobs,
23  what specifically do you teach them before they
24  begin their work?
25  A.     Safety, using the proper PPE, the location

Page 207

1  of the eye wash, and not to play around.  I mean,
2  that's pretty much it.  That's what I go over and
3  over and over.  "Your eye wash is right here in case
4  something splashes in your eye.  Make sure you wear
5  your gloves, boots if necessary.  Use your signs.
6  Don't play with the mop handles and broom handles.
7  Don't" -- you'd be surprised.  "Don't throw things
8  at each other."  Just standard safety in trying to
9  prevent any accidents from happening.  That's all
10  I'm training.
11  Q.     Where do detainee workers get the boots
12  and the gloves that they need for their jobs?
13  A.     Well, the gloves are in the dorm, and they
14  are -- the dorm officer has them and hands them out
15  as needed whenever they ask for them.  The boots are
16  in the janitorial closet along with the other
17  janitorial supplies.
18  Q.     So the supplies that a detainee needs to
19  do his job are provided by GEO?
20  A.     Yes.
21  Q.     Who keeps track of whether a detainee
22  worker is complying with the specific work duties
23  that are outlined in the detainee job description?
24  A.     Whatever employee is supervising them at
25  that time.  So if it's a kitchen staff that works

Page 208

1  for GEO, they're supervising the detainees to make
2  sure that they're following those guidelines.  If
3  it's a dorm porter, then it's the officer who's
4  assigned to the dorm to ensure that they're using
5  all safety precautions and that they're following
6  the guidelines that we've laid out to them.
7  Q.     Are you responsible for supervising
8  detainees who work in sanitation jobs?
9         MS. HOU:  Object as to form.
10         THE WITNESS:  Only if I'm in the area.  So
11  if they -- if I happen to be in intake or in that
12  area and a detainee is cleaning, then obviously I'm
13  going to supervise what they're doing.
14         MS. WRIGHT:  Q.  Okay.  You told me
15  earlier that detainees can be removed from a
16  position in the voluntary work program and shifted
17  to another position usually, the wait list for a
18  porter job.  Do you remember that conversation?
19  A.     Yes.
20  Q.     And you told me earlier that it's not your
21  practice to terminate detainees from the voluntary
22  work program altogether.  Do you remember that?
23  A.     Correct.
24  Q.     Is that accurate?  Is that an accurate --
25  is my recollection accurate as to your testimony?

Page 209

53 (Pages 206 - 209)

1 A.      I usually don't with how -- I don't
2 terminate unless somebody has requested it.
3 There's -- like I said, there are different
4 circumstances. Maybe medically they can't do the
5 position or somebody's concerned about them doing
6 the position or there's been some disciplinary
7 action which would -- I don't hold spots for
8 anybody, so if somebody gets moved to a
9 disciplinary -- I guess moved to segregation for a
10 disciplinary purpose, I need to take them off the
11 list because I'm not going to hold a job for them.
12 Somebody else is waiting for it. So I don't hold
13 positions for anybody.
14 Q.      But you said that you'd, like, terminate a
15 detainee's job if requested. Who would request
16 that?
17 A.      Management.
18 Q.      What do you mean, "management"?
19 A.      Sergeants, lieutenants, chief of security.
20 I mean, whatever they see fit. If they're -- if
21 they have a -- I don't know -- an issue with a
22 detainee that is not complying, then they might see
23 that, you know, that detainee just needs to be taken
24 out of that position. Maybe they're not being safe
25 in how they're doing it. I don't know.

Page 210

1 Q.      And the --
2 A.      I do require an e-mail usually to be sent
3 or a note to be sent stating, you know, "Take this
4 person out," and signed by somebody or addressed to
5 me by somebody.
6 Q.      Okay. So you -- you'll terminate a
7 detainee from the work program if a GEO official
8 sends you an e-mail or a note asking you to do so;
9 is that accurate?
10 A.      Correct.
11       MS. HOU: Object as to form.
12       MS. WRIGHT: Q. And sergeant, lieutenant,
13 and chief of security, are those all GEO positions?
14 A.      Yes. They're all management.
15 Q.      Okay. Let's look at the detainee job
16 description that's in front of you, that is
17 Exhibit 100.
18 A.      Mm-hmm.
19 Q.      Under "Termination," there's six
20 circumstances that are listed. The first is
21 "Failure to follow Safety Procedures." Do you agree
22 that a detainee's failure to follow safety
23 procedures can lead to that detainee's termination
24 from the work program?
25 A.      Do you mean personally, or do I think that

Page 211

1 it happens?
2 Q.      Do you think that it happens? Is that a
3 basis for termination?
4 A.      Yes, yes.
5 Q.      Is --
6 A.      They can hurt -- they can hurt themselves.
7 Q.      Is failure to follow supervisor's
8 instructions a basis for termination?
9 A.      Yes.
10 Q.      And a supervisor is a GEO --
11 A.      Employee, yes.
12 Q.      Is unexcused absenteeism grounds for
13 termination?
14 A.      I don't believe it's termination. I
15 believe it's they're just taken off the list because
16 they're not interested anymore. It's usually listed
17 under "quit." They just stopped showing up. I
18 mean, there's no requirement that they have to be
19 there. So if after a week or two they're not
20 showing up, obviously you go ask them, "So did you
21 quit?" And they usually say, "Yeah."
22 Q.      Okay. Misconduct and horseplay, are those
23 grounds for termination from the program?
24 A.      For -- to work in the kitchen, yes. Now,
25 you're saying, "for work in the program." Okay.

Page 212

1 We're specifically talking about kitchen right now,
2 correct?
3 Q.      Well, I was actually asking for -- I was
4 asking about the program in general, about any job.
5 Are you answering these questions based just on
6 kitchen work?
7 A.      Yeah, that's how I was answering them,
8 based on the kitchen.
9 Q.      We can do it just on --
10 A.      Kitchen staff.
11 Q.      Okay. So -- so then just to -- just for a
12 clean record, it's your testimony that failure to
13 follow safety procedures, failure to follow
14 supervisor's instructions, unexcused absenteeism,
15 and misconduct and horseplay are all grounds for
16 termination from a kitchen position; is that right?
17 A.      Yes.
18 Q.      And would you add theft and unsatisfactory
19 work performance to that list?
20 A.      I have not seen the -- seen it with theft
21 and unsatisfactory work performance. I think they
22 work with the detainees as much as they can. If
23 it's excessive, then maybe they need to be put on
24 the list -- or the waiting list to wait for another
25 job because they just -- I mean, if they're stealing

Page 213

54 (Pages 210 - 213)

1 a lot, then obviously we have to really look at is
2 that a good fit for them.
3 Q.      Okay.
4 A.      So when we say "termination," it may be of
5 that current position that they're holding, but it
6 doesn't necessarily mean all positions.
7 Q.      Okay.  And is it correct that a detainee
8 in the voluntary work program who is charged with a
9 rule violation is suspended from any work position
10 pending a disciplinary?  Is that an accurate
11 statement?
12 A.      If they go to segregation, they are
13 suspended because being in segregation, they cannot
14 be on any pay sheet.  There's no porters in
15 segregation.
16 Q.      And you're talking about disciplinary
17 segregation, not administrative --
18 A.      Correct.
19 Q.      -- segregation?
20 A.      Correct.  I'm talking about disciplinary
21 segregation.
22      Now, once they're -- either their time is
23 served or charges are dismissed and unfounded and
24 they go back to a dorm, they go right back on the
25 waiting list, and the first available goes by first

Page 214

1 A.      Yes, I do.
2 Q.      So this sentence that says "Work detail
3 members charged with a rule violation will be
4 suspended pending the outcome of a disciplinary
5 hearing.  You will be required to wait 60 days to
6 reapply for a job assignment," that's not
7 implemented at Adelanto?
8      MS. HOU:  Objection as to form.
9      THE WITNESS:  I don't hold them to the 60
10 days, no.
11      MS. WRIGHT:  Q.  Okay.  What is a GIR?
12 A.      It is a General Incident Report.
13      MS. WRIGHT:  I'm going to mark -- I'm
14 marking Exhibit 101.  And I will share my screen.
15      (Whereupon Exhibit 101 was marked for
16      identification.)
17      MS. WRIGHT:  Q.  Okay.  Do you see this
18 e-mail from Patricia Love sent on April 1st, 2017?
19 A.      Mm-hmm.
20 Q.      And you are copied in the cc line.
21 A.      Yes.
22 Q.      Do you see that?
23 A.      Yes.
24 Q.      The subject is "Detainees Fired"?
25 A.      Yes.

Page 216

1 come, first serve.
2 Q.      So is it -- is it accurate that -- so it's
3 not accurate that detainees have to wait for 60 days
4 to reapply for a job assignment after they've been
5 suspended?
6 A.      I don't hold them to the 60 days.  Now, if
7 they want to go back to the same position -- so
8 let's say -- let's say that they were not following
9 safety procedures in kitchen, and kitchen says "I
10 want them" -- they need to come off the list.  They
11 can't come here any -- you know, for now.  I explain
12 to them, "You can take them off for 60 days," but
13 then the detainee has to request, "I want to go back
14 to kitchen," and I usually consult kitchen on
15 whether they can go back or not, and then that would
16 be kitchen management.  You know, "Maybe he learned
17 his lesson.  Do you want him to come back?"  That
18 type of conversation takes place.
19 Q.      Okay.
20 A.      But I don't hold them to the 60 days, if
21 that's what you're asking me.
22 Q.      That's exactly what I'm asking.  And just
23 to clarify for the record, I'm sharing with you
24 Exhibit 26 again, which is the Work Detail
25 Application.  Do you see this on your screen?

Page 215

1 Q.      And the Bates stamp is Novoa -- GEO-Novoa
2 6604.
3 A.      Mm-hmm.
4 Q.      Assistant Warden Love says to you, "Mary,
5 go ahead and terminated them and we will get you the
6 corrected GIRs."  Do you see that?
7 A.      Correct.
8 Q.      What are you understanding Assistant
9 Warden Love to be directing you to do here?
10 A.      She wanted me to terminate workers, and I
11 did so.  I did what I was told.
12 Q.      Does that mean terminate them from the
13 program all -- to get from any -- eligibility for
14 any position in a voluntary work program, or does it
15 mean to move them to the wait list for a porter
16 position?
17 A.      It would depend on -- it would depend on
18 the person sending it to me.  I can't tell you.
19 Sometimes she said "altogether."  Sometimes she just
20 said "the current position."  So it really depend
21 on -- at this point, unless the GIR says -- and it
22 looks like -- it looks like what they wrote on the
23 top -- because I'll read the whole thing -- it looks
24 like for six months from detainee work crews.
25 Q.      Right.  Okay.  So Assistant Warden Love

Page 217

55 (Pages 214 - 217)

1 says to Sharon -- it looks like Sharon Buczkowske?
2 A.     Mm-hmm.
3 Q.     "Can you write in detainee to be
4 terminated from all detainee work crews for 6
5 months."
6 A.     Correct.
7 Q.     So do you understand this to mean that
8 Assistant Warden Love is asking Ms. Buczkowske to
9 write in the GIR that this detainee should be
10 terminated from all work crews for six months?
11 A.     Yes.
12 Q.     And who is Sharon Buczkowske?
13 A.     She was the food service manager.
14 Q.     And when did she leave Adelanto, if you
15 know?
16 A.     I want to say approximately three months
17 ago. Ninety days ago maybe. I'm not exactly sure.
18 I'm going to say that it's been at least 90 days,
19 though.
20 Q.     Did you ask ICE permission to terminate
21 this detainee?
22 A.     No.
23 Q.     Does -- I understand that Assistant Warden
24 Love no longer works with you at Adelanto; is that
25 correct?

1 seek -- your testimony has been that you don't have
2 to seek approval from ICE to terminate a detainee
3 worker from the voluntary work program; is that
4 correct?
5 A.     I don't seek approval. I assume that the
6 higher-ups that are giving me instruction are doing
7 it. I don't do that.
8 Q.     Okay.
9 A.     I don't know if it's required. I'm not
10 sure.
11 Q.     Do you seek approval from ICE during the
12 hiring process when you are bringing a detainee
13 worker into the voluntary work program?
14 A.     No, I've never been instructed that I
15 needed to seek approval from them, as long as I
16 followed their guidelines. And I do.
17 Q.     What happens to the GIRs like the ones
18 that's referenced in this e-mail that's Exhibit 101?
19 A.     They're filed --
20        MS. HOU: Object as to form.
21        THE WITNESS: To the best of my knowledge
22 they're filed in the detainee's files.
23        MS. WRIGHT: Q. Are they stored
24 electronically?
25 A.     I don't know if they're stored

1 A.     Correct.
2 Q.     When she did work with you, what would --
3 was it the practice that she would send you an
4 e-mail or a note asking you to terminate a detainee
5 for a specific amount of time if she supported that
6 termination?
7        MS. HOU: Object as to form.
8        THE WITNESS: Yes.
9        MS. WRIGHT: Q. So she would direct you
10 to terminate someone for whatever reason; is that
11 correct?
12 A.     Correct.
13 Q.     And then you would follow that
14 instruction?
15 A.     Yes. And I would make note on my list,
16 "No job for one year. No job for six months, per
17 Love." I would just make note, and then I always --
18 so let's say they're from kitchen. Right next to
19 their approval for kitchen, I would put "F" for
20 "fired," and then the date, and then I would make
21 note "No job for six months," or whatever. And then
22 I would just go off that date. Once they've
23 exceeded that date, then I take the "no job" out and
24 the put them right back on the list.
25 Q.     Okay. Just to clarify, do you have to

1 electronically or not.
2 Q.     And to clarify, when you remove a detainee
3 from a pay sheet, is that the same thing as
4 terminating the detainee from the work crew?
5 A.     Not necessarily. I remove them because
6 they have moved housing units. Sometimes I remove
7 them because they request it. Sometimes I remove
8 them because they want a different job. So there's
9 many reasons on why they would be removed. And I
10 would indicate if they were fired. I'd always make
11 indication on my sheet that they were fired, if they
12 were, or if they quit.
13 Q.     When you say "on my sheet," are you
14 referring to the Excel spreadsheet -- are you
15 referring to the Excel spreadsheet that you maintain
16 of the detainee pay list?
17 A.     Of the -- when I track the applications, I
18 put it next to their name, or I put it on the line
19 where I'm tracking that application. Whether
20 they're currently employed or it's pending, I put it
21 on that sheet.
22 Q.     What -- is that an Excel spreadsheet,
23 though? How are you tracking the information?
24 A.     I guess it is an Excel spreadsheet, yes.
25 Q.     Is that the same Excel spreadsheet that

1 you told me about earlier that you update every day,
2 that you then print out and turn into these pay
3 sheets, or is that a different Excel spreadsheet?
4 A.      Okay. Yeah, there's several different
5 Excel spreadsheets. There's the pay sheets; there's
6 the application list, which shows all applicants,
7 whether working or not; and then there is the Excel
8 sheet that gives a breakdown of who's working, when
9 they started, and when it ended. And that's a
10 weekly sheet -- weekly sheets.
11 Q.      And that third Excel spreadsheet that's a
12 breakdown of who's working on a weekly basis, is
13 that the spreadsheet that Warden Janecka asked you
14 to start creating in June of this year?
15 A.      Yes.
16 Q.      Okay. So just so I'm clear, there's three
17 Excel spreadsheets that you're talking about. One
18 is -- collects the information that you put on the
19 pay sheets; is that right?
20 A.      Yes.
21 Q.      One shows a list of all the applicants and
22 tracks their applications; is that correct?
23 A.      Yes.
24 Q.      And then the third is a spreadsheet that
25 breaks down who's working in what capacity, and

Page 222

1 that's the spreadsheet that you give to Warden
2 Janecka every Monday?
3 A.      To his admin assistant, yes. I give it
4 every Monday, yes.
5 Q.      Okay. Do any of these three spreadsheets
6 that we're discussing include the length of time or
7 the amount of time that a detainee spends working in
8 any given shift?
9 A.      No.
10 Q.      Do you keep track of that information?
11 A.      No.
12 Q.      The -- where do you keep track of the wait
13 lists for different positions? Is that a fourth
14 spreadsheet?
15 A.      No. That's the application sheet.
16 Q.      Okay.
17 A.      So that's where I will sort it based on
18 where they're located, what job they're looking for.
19 All of that information's on there. So if we're
20 waiting for medical clearance for kitchen, it's
21 color coded. If we're waiting for just an opening
22 in the dorm, obviously I'm just going to sort the
23 dorm and let them know where they are on the list.
24 Or if they're waiting for some other kind of, you
25 know, medical clearance, either for medical or

Page 223

1 barber, all that's indicated on there.
2 Q.      How do you communicate with detainees
3 regarding their status in the voluntary work
4 program?
5      MS. HOU: Object as to form.
6      THE WITNESS: What do you mean, "their
7 status"? I'm not understanding the question.
8      MS. WRIGHT: Q. Well, for example, if a
9 detainee is on the wait list for a particular job
10 and gets moved up, there's an open spot and it's
11 that detainee's turn, how do you communicate with
12 that detainee that there's a spot for them now?
13 A.      I put them on the pay sheet, and then
14 within a day or two I go into the dorm and do their
15 training packet and let them know that they're now
16 on the pay sheet.
17 Q.      Okay. So you -- you physically go and
18 meet with them in person and --
19 A.      Myself or -- yeah, myself or one of the
20 other officers. We've now told them, "Here's" --
21 "you've now been assigned to the dorm. These are
22 your responsibilities. These are your safety
23 precautions. Initial that you understand. Sign
24 that you" -- "this is a voluntary work program, and
25 you're getting paid a dollar a day."

Page 224

1 Q.      When you say you or one of the other
2 officers, do you mean one of the other
3 classification officers that you work with?
4 A.      I mean any GEO officer, dorm officer. Any
5 of us can do it.
6 Q.      Okay.
7 A.      So if I have an excessive amount -- let's
8 say that in one day a bunch of people leave and I
9 have to put -- I don't know -- 50 people on the pay
10 sheets. I may just take the packets to the dorm and
11 have the dorm officer do the training and then go
12 back and pick up the packet later.
13 Q.      Do you ever ask ICE officers to do the
14 trainings?
15 A.      No.
16 Q.      When you do the trainings, do you have a
17 translator with you for detainees who don't speak
18 English?
19 A.      Most of them seem to understand.
20 Sometimes they'll have their friends there maybe
21 explaining a certain part. A lot of our officers
22 speak Spanish. They seem to understand. I mean,
23 I'm not questioning whether they do or don't. Most
24 of them seem to understand, though.
25 Q.      Okay. So sometimes other detainees will

Page 225

57 (Pages 222 - 225)

1 translate?
2 A.      Their friends, yeah.  Like, "I want my
3 friend here."
4      Okay.  I mean, it's a training packet.
5 They're going to talk anyway because they work
6 together.  It's nothing personal.
7 Q.      We're nearing the end.  Just a couple --
8 couple more things.
9      MS. HOU:  Those are famous last words,
10 Lydia.
11      MS. WRIGHT:  Q.  I am going to introduce
12 Exhibit 102, and now I will share my screen.
13      (Whereupon Exhibit 102 was marked for
14      identification.)
15      MS. WRIGHT:  Q.  Do you see a document
16 that's titled "Detainee Payroll, Adelanto ICE
17 Processing Center," dated January 17th, 2018, on a
18 Wednesday?
19 A.      Mm-hmm.
20 Q.      And is this another example of the pay
21 sheet --
22 A.      Yes, it is.
23 Q.      -- that you create?  I'm sorry, I cut you
24 off.
25 A.      Yes, this is an example of the pay sheet.

Page 226

---

1 Q.      Looking at the first page that is Bates
2 stamped GEO-Novoa 11001, I see lines 1 through 13
3 are noted "1st Shift," "2nd Shift," or "3rd Shift 2
4 'D' Dorm."  Do you see that?
5 A.      Hmm-mm.
6 Q.      What does "2 'D' Dorm" mean?
7 A.      2-Delta.  It's a housing unit, 2-Delta.
8 Q.      And can you tell, based on this
9 information, what job these 13 individuals were
10 cleared to do?
11 A.      Those are dorm porters.  1 through 13 is a
12 dorm porter.
13      The next set of four are your barber/dorm.
14 And the reason I do barber/dorm is because they
15 don't cut hair every day, and I don't want to take
16 the opportunity away from them to be able to still
17 work.  So the days that they're not cutting hair,
18 they could still clean up in the dorm and be able to
19 make their dollar.
20      And then the next section shows dorm
21 floors.  Obviously they're broken down in first,
22 second, and third shift.
23      And then mini rec yard, and that's what's
24 adjacent to the dorm.
25 Q.      And can you tell from this document who

Page 227

---

1 worked and who didn't work?
2 A.      Yes.  Yes.
3 Q.      How?
4 A.      Where it says "Detainee Initials," every
5 spot that's filled in with the detainee initials and
6 then signed off by the officer's name, those are
7 verifications that they worked.  If they're left
8 blank, they didn't work.
9 Q.      For example, line 16, Carlos Zamudio, do
10 you see those?
11 A.      Correct.  Correct.
12 Q.      There's no initials in the "Initials"
13 columns.  Does that mean that that individual did
14 not work that day?
15 A.      Correct.
16 Q.      And only -- only individuals who initial
17 the pay sheet are paid their dollar a day; is that
18 right?
19 A.      Yes.
20 Q.      If an individual does not initial for any
21 reason, does that person still get the dollar?
22 A.      No.
23 Q.      Did you write in here on line -- it's
24 unmarked, but line 14, it says, it looks like, maybe
25 "208LV" and then the word "volunteer."  Do you see

Page 228

---

1 that?
2 A.      I see it.
3 Q.      Did you write that?
4 A.      No.
5 Q.      Do you know who did?
6 A.      Most likely the dorm officer.
7 Q.      Do you know what it means?
8 A.      He's trying to indicate that 208 1 up
9 volunteered.  The next one down says 102 2 low
10 volunteered.  He didn't give names.  He just wrote
11 down that they volunteered to work.
12 Q.      So 208 low up?
13 A.      208 1 up.
14 Q.      "1 up."  Does that refer to the bed, the
15 individual's bed?
16 A.      That's their bed number.
17 Q.      Okay.  And what does it mean that this
18 person volunteered?
19 A.      Just means that he asked if he can do
20 something.  He volunteered to -- I don't know
21 exactly what he did.  Maybe he wiped a table down.
22 Maybe he wiped off a phone.  I don't know.  It just
23 says "volunteered."  It's kind of evasive.
24 Q.      Does that person get paid a dollar a day?
25 A.      No.

Page 229

58 (Pages 226 - 229)

1 Q.      Why not?
2 A.      Because -- well, first and foremost, they
3 are not listed on the pay sheet.  Second, there's no
4 initials to indicate that anything even happened.
5 Q.      Are there any other reasons why the person
6 in 208 1 up on this date is not going to get paid a
7 dollar a day?
8 A.      Well, they're not listed on the pay sheet.
9 They don't have the position.  They're just
10 volunteering because they want something to do.  I
11 mean, they're not listed on there.  Remember, I had
12 explained, it's first come, first serve.
13 Q.      By "volunteer," what do you -- what do you
14 mean?
15 A.      I mean that they just want something to
16 do, so -- I don't know.  They asked the dorm
17 officer, "Can I help out?  I'm bored.  Can I, you
18 know, do something?"
19       Maybe he'll say, "Yes."  Maybe -- you
20 know, maybe the guy will just start doing something.
21 Q.      And so this individual came forward to do
22 some kind of work in a voluntary work program crew
23 and didn't qualify for the dollar a day; is that
24 right?
25 A.      Correct.

Page 230

1       MS. HOU:  Object as to form.
2       MS. WRIGHT:  Q.  Looking at the next page
3 in this set, if we look at the third line from the
4 bottom, this is GEO-Novoa 11002.
5 A.      Okay.
6 Q.      I see that somebody has written in the
7 name Angel Perez.  Do you see that?
8 A.      Mm-hmm.
9 Q.      And "dorm/floor."  Do you see that?
10 A.      Mm-hmm.
11 Q.      And then "209 2 up" --
12 A.      Mm-hmm.
13 Q.      -- as a bed number?
14 A.      Yeah.
15 Q.      And then there's initials "PA" in the box
16 "Detainee Initials 3W."  Do you see that?
17 A.      Mm-hmm.
18 Q.      And then the initials "SS" in the "Officer
19 Name 3W" column.  Do you see that?
20 A.      Mm-hmm.
21 Q.      So what does this tell you?  What
22 information does this give us?
23 A.      That somebody volunteered.
24       MS. HOU:  Object as to form.
25       MS. WRIGHT:  Q.  You can tell that Angel

Page 231

1 Perez volunteered on January 17th, 2017?
2 A.      Yes.
3 Q.      And what did he volunteer to do?
4 A.      Well, it states that he did dorm floors.
5 So he did something on the floors, whether it be
6 mopping or sweeping or something.
7 Q.      Okay.  And was he paid?  Can you tell
8 whether he was paid a dollar a day?
9 A.      I can't tell based on this, but he
10 shouldn't have been.
11 Q.      Why do you say that?
12 A.      Because there wasn't an available spot for
13 him.  He knows that.  He knows that he has to wait
14 for the available spot.  It's very, very clear.  It
15 go in and I explain it over and over and over.  They
16 ask me every single time I walk in, "When can I get
17 on the pay sheet?  When can I start getting my
18 dollar?"
19       "As soon as there's room for you on the
20 pay sheet.  It comes first come, first serve."
21       They all know exactly how it works because
22 I explain it each and every time I go in the dorm.
23 It's not a secret, is what I'm trying to say, nor do
24 I see these pay sheets once they're filled out.  I
25 only see the blank ones that are produced.  So I

Page 232

1 cannot indicate whether he did or did not get paid
2 because that's not part of my duties.  I don't pay
3 the pay sheets.
4 Q.      Okay.  If you look at line 5.
5 A.      Yes.
6 Q.      It looks like the name is Ayad Hanna.  Do
7 you see that?
8 A.      Mm-hmm.
9 Q.      And it's crossed out all the way across.
10 A.      I have no idea what that means.
11 Q.      Okay.  And there's a notation next to it
12 that looks like maybe the word "no."  Do you know
13 what that means?
14 A.      No, I don't.
15 Q.      Okay.  You didn't make those notations
16 yourself?
17 A.      No.
18 Q.      Okay.  Is there any way to know from
19 looking at this sheet if any of these individuals
20 are -- were on the wait list for these jobs?
21 A.      I assume that they were on a wait list if
22 they were written in, but I don't know if they were
23 or were not.  I don't know if they had another job
24 that maybe they did get paid for, and then they just
25 wanted something to do.  I have no idea.  Because

Page 233

59 (Pages 230 - 233)

1 that sheet changes every single day, it's impossible
2 for me to know that -- if on 1/17 of 2018 if they
3 were on a wait list or had another job and just
4 wanted something extra to do in the dorm.
5 Q.      Okay.  Going to introduce Exhibit 103.
6 And I will share my screen.
7          (Whereupon Exhibit 103 was marked for
8          identification.)
9          MS. WRIGHT:  Q.  Okay.  Do you see yet
10 another pay list that's titled "Detainee Payroll" at
11 the top?
12 A.      Yes.
13 Q.      And it says, "Adelanto ICE Processing
14 Center," and it's dated January 21st, 2018.  Do you
15 see that?
16 A.      Yes, yes.
17 Q.      Okay.  And this Bates range starts at
18 GEO-Novoa 11181.  Is this another example of a pay
19 sheet that you create every day?
20 A.      Yes.
21 Q.      And so you create this using an Excel --
22 using an Excel spreadsheet, and then you print it
23 and hand it to detainee officers, detention
24 officers; is that correct?
25 A.      Yes.

Page 234

1 Q.      There's a notation.  Somebody has written
2 in on the bottom of the page Bates stamped GEO-Novoa
3 11182, "Galvey (sic) was a worker for seg.  Wants to
4 know why she's not on payroll.  She works every
5 day."  Do you see that?
6 A.      Mm-hmm.
7 Q.      Did you write that?
8 A.      No.
9 Q.      What do you understand that notation to
10 mean?
11 A.      Galvez was on the pay sheet and then off
12 the pay sheet.  What I -- if I was -- because I
13 don't see the pay sheets after they're signed, so if
14 it was brought to my attention, then most likely the
15 next day I put her back on the pay sheet.  I don't
16 know why she came off.  I can't say what happened
17 back in January of 2018.
18 Q.      But it's possible that she is a worker
19 for -- well, going back, you told me earlier in your
20 testimony that there are two positions in seg.  Both
21 are in administrative segregation and both are
22 porters; is that correct?
23 A.      Mm-hmm.
24 Q.      So this must mean that Galvez was a worker
25 doing porter work in administrative segregation; is

Page 235

1 that right?
2 A.      Correct, mm-hmm.
3 Q.      Can you just say "yes," for the record?
4 A.      Yes.  I'm sorry.  Yes.
5 Q.      It's been a long day.
6 A.      It has.
7 Q.      And now, it's possible that she did the
8 porter work in administrative segregation even if
9 she wasn't on the list, right?
10 A.      Yeah.
11 Q.      She volunteered to do it?
12 A.      Yes.
13 Q.      And in that case, if she volunteered to do
14 the porter job in administrative segregation, but
15 she wasn't on the list, then she wouldn't get the
16 dollar a day; is that right?
17 A.      Correct.  If she's not -- if she's not --
18 if her name is not printed on the list, then she
19 would not get the dollar a day.  If her name is
20 printed on the list and it's signed off, initialed
21 that she completed the task, then she would get the
22 dollar a day.
23 Q.      Okay.  I think --
24 A.      She could have been on the list and taken
25 off because she went to medical, she went out to the

Page 236

1 hospital.  There's numerous reasons.  She changed
2 dorms.  There's numerous reasons on why people are
3 taken off a list.  I don't just randomly take them
4 off the list.  There has to be a reason for it.
5 Q.      So I think I'm understanding, but just to
6 make sure, if you look at line 2 on this page Bates
7 stamp 11182, the person's name is Nhung Tran.  Do
8 you see that?
9 A.      Yes.
10 Q.      And that person's name is printed on the
11 sheet.  So you typed in your spreadsheet his name
12 and then printed it out and gave it to the detention
13 officers printed on the --
14 A.      Yes.
15 Q.      -- the computer type, right?
16 A.      Yes.
17 Q.      And then he signed his initials, and the
18 officer signed the initials in the correct spots,
19 right?
20 A.      Correct.
21 Q.      So that person should have gotten paid the
22 dollar a day; is that right?
23 A.      Yes.  Yes.
24 Q.      Okay.  If you go down and look down at the
25 second 4 on the page, which looks like Galvez.

Page 237

60 (Pages 234 - 237)

1 Galvez Munoz maybe.  Do you see that?
2 A.    Yes.
3 Q.    In this case, Galvez Munoz's name is
4 written in handwriting, right?
5 A.    Correct.
6 Q.    So you didn't do that in your Excel
7 spreadsheet that then populated this form that then
8 you gave to the detention officers, right?
9 A.    Correct.
10 Q.    And this detainee initialed the sheet,
11 right?
12 A.    Yes.
13 Q.    And in fact, initialed the sheet under
14 "1W" and "2W," which indicates that she worked two
15 shifts, right?
16 A.    Okay, mm-hmm.
17 Q.    Well, I'm asking you.  Is that right, or
18 am I --
19 A.    That's what it looks like, yes.
20 Q.    And then there's a signature by officers
21 under "1W" and "2W," indicating that this detainee
22 indeed worked those two shifts; is that right?
23 A.    Yes.
24 Q.    Okay.
25 A.    I need to clarify what "shift" means,
Page 238

1 we know that she was -- is eligible to get paid the
2 dollar a day because her name is printed in type on
3 this sheet, right?
4 A.    Correct.
5 Q.    But Ms. Galvez is not eligible to receive
6 the dollar a day, even though it indicates that she
7 worked two shifts, because her name is handwritten
8 on the sheet; is that right?
9 A.    Correct.
10 Q.    Okay.
11     MS. HOU:  And for the record's sake, I
12 believe that Ms. McCormick's testifying as to what
13 she reviews on the list.
14     Or basically it's your understanding of
15 what you read.  This isn't your handwriting, and you
16 didn't personally observe it?
17     THE WITNESS:  No.
18     MS. HOU:  Right.  I'm sorry, I don't mean
19 to coach her.  I just wanted to --
20     MS. WRIGHT:  Yeah, you're welcome to
21 redirect when we're finished.
22     MS. HOU:  Right.  I just wanted to clarify
23 the record as well.  Thank you.
24     MS. WRIGHT:  And on that note, why don't
25 we take a quick break.  I really am almost done.  So
Page 240

1 though.
2 Q.    Okay.
3 A.    So our shift is first shift, second shift,
4 third shift, and that consists of eight hours.  Just
5 because a detainee is on the list for first shift
6 doesn't mean they work eight hours.  It just means
7 within that eight hours, they could have worked for
8 five minutes or 30 minutes.  Nobody works for -- no
9 detainee works for eight hours the same as we do.
10 It's not the same thing.  All that this is
11 indicating is that that's the time that they --
12 within that time frame they prefer to work.
13     So it could be a half hour, it could be
14 five minutes.  They're going to be paid the same
15 amount of money, which is the dollar.  So they could
16 have -- they could have worked first shift for a
17 half hour, and then later on in the day second shift
18 for a half hour.  I don't know the exact time frame,
19 but I am stating that they are not working a full
20 eight hours.  I can guarantee you that.
21 Q.    Okay.  My question is, is it correct that
22 we know that Mr. Tran up here -- or Ms.  I think
23 this is --
24 A.    It's a female, yes.
25 Q.    So Ms. Tran was paid the dollar a day, and
Page 239

1 maybe a ten-minute break, and then we can wrap up.
2     THE WITNESS:  Okay.
3     MS. WRIGHT:  Is that okay?  Okay.  So
4 we'll come back in about ten minutes.
5     THE WITNESS:  Okay.
6     THE VIDEOGRAPHER:  We're going off the
7 record.  The time is 4:54 p.m.
8     (Recess taken from 4:54 p.m. to 5:04 p.m.)
9     THE VIDEOGRAPHER:  We're back on the
10 record.  The time is 5:04 p.m.
11     MS. WRIGHT:  Q.  Okay.  Ms. McCormick, I
12 just have a few random cleanup questions for you
13 before I let you go about your day.
14 A.    Okay.
15 Q.    Have you ever received a paycheck from
16 ICE?
17 A.    No.
18 Q.    You mentioned earlier that you are the
19 union rep?
20 A.    I'm the union president.
21 Q.    The union president.  What union is that?
22 A.    Local 880, UGSOA Local 880.
23 Q.    And who does that union represent or
24 include?
25 A.    It includes the kitchen staff,
Page 241

61 (Pages 238 - 241)

1 non-management hourly. It includes the officers.
2 It includes the laundry work -- or the laundry
3 employees. It includes law library and
4 classification and transportation, GTI, which is a
5 subsidiary of GEO. It's their transportation
6 division.
7 Q.    How long have you been the union
8 president?
9 A.    About four years maybe, four and a half
10 years.
11 Q.    How did you come to become union
12 president?
13 A.    I started out as a treasurer. People
14 left. I moved up to treasurer/secretary. People
15 came -- or more people stepped up so that I moved up
16 to vice president, and then slowly but surely moved
17 up to president. And then in 2018, I was -- I don't
18 want to say "reelected." I -- nobody accepted the
19 nomination but me, so I was stuck doing it again.
20 Q.    Okay. Ms. McCormick, have you ever been
21 encouraged by GEO to attend any Adelanto City
22 Council meetings?
23 A.    As a -- the union president, yes, I have.
24 To -- I guess to support expansion. I mean, it's
25 good for my members. It's good for all of us if we

Page 242

1 Q.    Did anybody ask you to come and speak at
2 these meetings?
3        MS. HOU: Object as to form.
4        MS. WRIGHT: There's a technical glitch
5 maybe. Why don't we go off the record for a moment
6        MS. HOU: Okay.
7        THE VIDEOGRAPHER: One moment. We're
8 going off the record at 5:09.
9        (Interruption in the proceedings.)
10        THE VIDEOGRAPHER: We're back on the
11 record. The time is 5:12 p.m.
12        MS. WRIGHT: Alicia, did you have an
13 objection?
14        MS. HOU: Yeah, I just had a form
15 objection to Ms. Wright's last question prior to the
16 break.
17        MS. WRIGHT: Court Reporter, could you
18 read back my last question prior to the break?
19        (Record read.)
20        MS. HOU: Same objection. Form.
21        THE WITNESS: I believe that we probably
22 had a conversation with -- so over -- for the last
23 two, I believe that we had a conversation with
24 somebody in corporate explaining that -- what they
25 were asking for, and to find out if we supported it

Page 244

1 expand. So that's my personal beliefs, and so I do
2 support them in that, and I have supported GEO at
3 the City Council meetings and expressed that, yes.
4 Q.    How many times have you supported GEO at
5 City of Adelanto City Council meetings?
6        MS. HOU: Objection; form.
7        THE WITNESS: I want to say three or four
8 times.
9        MS. WRIGHT: Q. And when were those
10 times?
11 A.    I want to say February of this year.
12 February 19th of this year I was there, but did not
13 speak. I had to leave for a family emergency.
14 Approximately a month prior to that, I believe I
15 spoke as, obviously, the union president, and
16 explaining how important it was for my members to
17 keep their jobs.
18        And then the time before that wasn't
19 necessarily for GEO. It was more for my members
20 because GEO were -- they were a subcontractor with
21 the City of Adelanto. So I was just trying to get
22 some clarification on the City's standing. So I was
23 speaking to them for my members, not for GEO. One
24 way or another. I was just trying to get some
25 clarification. So three times, I guess.

Page 243

1 or not, and if we did support it, that we could show
2 our support by showing up.
3        MS. WRIGHT: Q. When you say "we had a
4 conversation," who do you mean?
5 A.    Myself and my vice president had a
6 conversation with -- I forgot his name. Emmanuel
7 from corporate. I don't know exactly what his
8 position is.
9 Q.    And who is your VP, your vice president?
10 A.    Shawna Nowicki.
11 Q.    So you and Shawna Nowicki had a
12 conversation with Emmanuel in corporate. Was it a
13 phone conversation? By e-mail?
14 A.    No, he came to the facility. And he
15 discussed, you know, with us what they were trying
16 to accomplish, and asked if we were interested in
17 supporting it, and of course we were. We're
18 interested in our members keeping their job, so we
19 decided to move forward with it and actually go and
20 speak. We had some of our stewards that spoke.
21 That was kind of it.
22 Q.    When you say that you discussed what they
23 were trying to accomplish, what do you mean?
24 A.    With the expansion. They were talking
25 about expanding our facility, possibly getting

Page 245

62 (Pages 242 - 245)

1 permitting for the building next door to be part of
2 our -- our ICE Processing Center, so we'd have
3 actually three buildings instead of two. So it had
4 to do with permitting if the City of Adelanto is
5 going to allow it. I don't think that that
6 conclusion has came up as of yet, but we were
7 soliciting for that.
8 Q.     Did Emmanuel from corporate or anybody
9 else ask you to speak up in support of the expansion
10 plan? Is that correct?
11 A.     They asked if we supported it, and we
12 agreed that we did, yes.
13 Q.     And then did GEO corporate ask you to
14 attend the City Council meetings to speak out in
15 support of the plan?
16 A.     Yeah, if we wouldn't mind. Yeah, if we
17 would show our support and maybe have our members
18 show the support, you know, it would be helpful.
19 That was pretty much all that was asked. It wasn't
20 forced upon us or anything.
21 Q.     Did GEO provide you with remarks just --
22 what to say at the meetings?
23 A.     No. It was all on us.
24 Q.     Were you paid overtime for attending the
25 meetings?

Page 246

1 A.     Actually, we weren't paid at all. That
2 was on our own time.
3 Q.     Was -- was there any consequence if you
4 said "no," that you didn't want to support the
5 meeting?
6 A.     No.
7 Q.     Let me ask that again. To the best of
8 your knowledge, was there any consequence for you
9 for declining to speak up publicly in support of the
10 expansion plan?
11 A.     No. We were just asked if, you know, we
12 wanted to, and then they pretty much left the ball
13 in our court, as far as the union. Either we
14 support it or we don't support it. It didn't seem
15 to matter one way or another.
16     Were they happy that we supported it? Of
17 course. My vice president and myself have been in
18 our offices for quite some time, so we do have a lot
19 of influence over our members. We try to do what's
20 best for them on an ongoing basis, and, you know,
21 they reciprocate and help out where they can. So I
22 know how important this job is for everybody.
23     So was GEO pleased? Yes. Was it a smart
24 move? Yes. We're really good negotiators. I mean,
25 we've already negotiated with them three times, so

Page 247

1 it's not like we don't understand, you know, what's
2 at stake. We do understand it.
3 Q.     And what's -- what do you -- what's at
4 stake? What do you mean?
5 A.     Well, what's at stake is the fact if we
6 all have jobs or not. I mean, that's obviously --
7 it's a personal reason, you know. I'm not ready to
8 retire yet, so... And neither are a lot of people.
9 For some people, this is a good stepping stone for
10 them. For me, I'm just buying out my time until I
11 retire. I've had other careers.
12     So it was good for us to at least voice
13 our opinion and be able to point out how beneficial
14 it is to the City of Adelanto. It is. The city
15 doesn't grow. So doesn't grow without big
16 businesses being here.
17 Q.     My understanding is that the expansion
18 would add more beds or more facilities, not reduce
19 it. So how would not supporting the expansion
20 threaten your position with GEO?
21     MS. HOU: Objection as to form.
22     THE WITNESS: It wouldn't per se re- -- it
23 wouldn't have anything to do with my position. I
24 have a lot of seniority. But as I said, we're
25 always looking out for our members. So if,

Page 248

1 obviously, the need is not there for more officers,
2 then, you know, more people can't have a job.
3     I mean, expansion's always good all the
4 way around. Expansion's good for the city. It's
5 good for GEO. It's good for the community. We all
6 dump money into the city that they wouldn't normally
7 have. You know, we buy our gas here. We shop here.
8 Those are things that the city wouldn't be able to
9 prosper if we're not here and doing what we do.
10     MS. WRIGHT: Q. Did you also speak on
11 behalf of the union before the City of Adelanto
12 Planning Commission at any point?
13 A.     Yes.
14 Q.     When was that?
15 A.     That was -- it was -- I think it was in
16 January. That was the planning commission that we
17 spoke in front of. The one in February, like I
18 said, I had to leave for a family emergency, but I
19 did speak. And so did some of our stewards, and of
20 course the vice president. And, you know, we laid
21 out how important it was. I personally know that
22 it's important for the city, and I explained that to
23 them.
24     And the reason that I know that is
25 because, although I'm in my 50s, 40-plus years ago

Page 249

63 (Pages 246 - 249)

1 my aunt and uncle owned one of the shopping centers
2 here in Adelanto, and I can honestly tell you that,
3 other than this facility and that stadium and the
4 little shopping center down the street that has
5 Stater Brothers, nothing has changed in this city,
6 and that's not good economically.
7      So when you drive down a highway and you
8 see that it looks the same 40 years later, you know
9 how important it is for this city to grow.  No city
10 can stand still.  It doesn't make any sense.  It's
11 not prosperous.
12      So, you know, economically I thought that
13 it was a good decision, not only for myself, but for
14 where I live.  I live up here in the high desert.
15 It makes sense.  We're able to grow because GEO
16 exists.
17 Q.     Has Local 880 ever filed a grievance
18 against GEO on behalf of a GEO employee, to your
19 knowledge?
20 A.     Of course.  We're required to.
21 Q.     How often does that happen?
22      MS. HOU:  Object; form.
23      THE WITNESS:  It just varies.  We just
24 filed one.  It just varies on whether the employee
25 wants to file a grievance or not.  They're asked

Page 250

1 every single time.  So if they receive a write-up or
2 a policy that they've broken or there's a
3 termination or some type of disciplinary action has
4 taken place, they're always asked if they want to
5 file a grievance.  It's their choice on whether they
6 do or don't.
7      MS. WRIGHT:  Q.  Do you know an individual
8 named Anthony Reyes?
9 A.     Yes.
10 Q.     Who is Anthony Reyes?
11 A.     I believe he was a previous employee with
12 GEO.  Unfortunately, from what I understand -- and
13 this was quite a few years ago -- he was dismissed
14 from his position due to losing his clearance, his
15 background clearance.  ICE pulled his background
16 clearance, is what I understood happened.
17      I do not know the details, but I do know
18 that in order to work here, you must have a ICE
19 background clearance.  And then the level of that
20 clearance obviously has to do with your position.
21 But his was pulled, and I don't recall the exact
22 reason on why it was pulled, but I do know that it
23 was pulled, and that was kind of it.
24 Q.     Going back to -- I asked you whether the
25 union represents employees in grievances against

Page 251

1 GEO.
2 A.     Yes.
3 Q.     What percentage of employee terminations
4 would you estimate results in a grievance?
5      MS. HOU:  Objection; form.
6      THE WITNESS:  I really don't know that
7 percentage, to be completely honest with you.  And I
8 negotiate the best for each and every officer that I
9 can.  So I try to always negotiate no termination, a
10 resignation instead, because a termination stays on
11 their record for a minimum of seven years, where a
12 resignation, you don't have to explain as much.  I
13 feel that it's in the best interest of the employee
14 to resign, but that's -- you know, I always offer
15 that.
16      MS. WRIGHT:  Q.  Can you provide -- can
17 you provide an estimate, just a ballpark of the
18 percentage?
19      MS. HOU:  Object as to form.
20      THE WITNESS:  I cannot provide you that
21 ballpark figure because I really don't know.  Each
22 and every time we're asked we do it, but I can't --
23 there are grievances that we send in on an ongoing
24 basis.  I would say -- I --
25      MS. HOU:  You don't have -- if it's a

Page 252

1 guess, then we'd rather you -- we're just
2 entitled -- she's just entitled to your best
3 estimate, so if you're trying to guess --
4      THE WITNESS:  Well, I can tell you what
5 grievance number I'm on.  If that gives you a better
6 estimate, I'm on Grievance No. 716.  So yes, I have
7 filed grievances.  I don't know what the percentage
8 is, though.
9      MS. WRIGHT:  Q.  Does that mean 716
10 grievances --
11 A.     Individual grievances I have filed with,
12 yes.
13 Q.     Does -- sorry.  Does that mean in 2020?
14 A.     No.  That means from 2016 on to now.  For
15 the last four years, I have filed 716 grievances.
16      MS. HOU:  I think we're coming up on -- if
17 we're counting that 30-minute lunch break, and I'm
18 not counting the various breaks we've taken
19 throughout the day, but it's already 5:30, so we're
20 about at the seven-hour mark, not counting the
21 breaks.  So I don't know what you want to do related
22 to that or how much more you have left.
23      MS. WRIGHT:  Well, the lunch break doesn't
24 count as a seven-hour mark, and we have -- well,
25 let's just ask the videographer, what are we at with

Page 253

64 (Pages 250 - 253)

1 respect to time?
2        MS. HOU:  Right.  That -- I'm taking out
3 the lunch break.
4        THE VIDEOGRAPHER:  I'm going to have to go
5 off the record and then add it all up.
6        MS. WRIGHT:  Let's do that.  Let's go off
7 the record and add it all up.
8        MS. HOU:  Can we also just take a quick --
9 I need to run to the ladies' room.  Maybe like a
10 five-minute break, then?
11        MS. WRIGHT:  Sure.
12        MS. HOU:  Thanks.
13        THE VIDEOGRAPHER:  We're going off the
14 record at 5:28 p.m.
15        (Recess taken from 5:28 p.m. to 5:32 p.m.)
16        THE VIDEOGRAPHER:  We're back on the
17 record.  The time is 5:32 p.m.
18        MS. WRIGHT:  Q.  Ms. McCormick, we spent
19 some time talking about some Excel spreadsheets that
20 you maintain.  There are three of them.  One
21 pertained to the pay sheets, one pertained to
22 applicants for the voluntary work program, and the
23 third was a breakdown of who's working at any given
24 time.  Do you recall that testimony?
25 A.     Yes.  Yes.

Page 254

1 Q.     Has anybody asked you about those
2 documents, those spreadsheets, before today?
3 A.     No.
4        MS. HOU:  Object as to form.
5        THE WITNESS:  Other -- no, other than
6 audits.  I mean, obviously they'd ask to see them in
7 audits, but other than that, no.
8        MS. WRIGHT:  Q.  Okay.  I'm going to just
9 put into the record the documents that you brought
10 with you to your deposition today.  They have been
11 produced by your counsel, and your counsel has
12 represented that they are the exact documents that
13 are -- that were in place before you at the
14 beginning of your deposition.  And I'm introducing
15 this exhibit as No. 104.
16        (Whereupon Exhibit 104 was marked for
17        identification.)
18        MS. WRIGHT:  Q.  And do you need me to
19 share my screen with you?  It's just the PDF of the
20 documents that your attorney sent today.
21 A.     No.  I mean, I scanned them in, so pretty
22 clear on what they are, unless she added something
23 to them.
24        MS. HOU:  I'll just say for the record,
25 there's a batch of e-mails that were part of that,

Page 255

1 and they were actually produced in our -- in the
2 course of discovery, but for some reason when I
3 pulled them for Ms. McCormick's review, the Bates
4 label didn't catch, so they are -- they've been
5 previously -- and I, in fact, pulled it from the
6 production, but I don't know.  There was some
7 technical glitch that didn't actually pull the Bates
8 numbers.  So, sorry if that complicates things.
9        MS. WRIGHT:  Thank you for that
10 clarification.
11 Q.     Ms. McCormick, did you make any notes or
12 notations on those documents?
13 A.     No.  To be honest with you, I just didn't
14 even have time to look at them.
15 Q.     Have you reviewed any documents or records
16 during your testimony today while you were under
17 oath that we haven't talked about?
18 A.     No.
19 Q.     Have you sent or received any text
20 messages during the time that you were under oath
21 today?
22 A.     Some personal ones to my sister-in-law.  I
23 received a text from my attorney, but other than
24 that, no.
25 Q.     Okay.  And that includes during breaks as

Page 256

1 well?
2 A.     Yeah, that includes during breaks.  I
3 didn't do it during our deposition.  I did it on the
4 break.
5 Q.     Were any of those text messages -- I'm not
6 asking about the substance of your conversations
7 with your attorney, but were any of those text
8 messages to your sister-in-law about this
9 deposition?
10 A.     No.  Just that I was unavailable.  I was
11 in a deposition.  That's all I said to her.
12 Q.     Has anybody been in the room with you
13 today during your deposition?
14 A.     No.
15 Q.     Is there anything that you would like to
16 change or alter about your testimony today?
17 A.     No.
18 Q.     And everything that you said here today is
19 true?
20 A.     To the best of my knowledge, yes.
21 Q.     And there's no reason that you could not
22 testify truthfully and honestly today?
23 A.     No, no reason whatsoever.
24 Q.     Okay.  Well, those are all of my questions
25 for today.  I truly thank you for being so helpful

Page 257

65 (Pages 254 - 257)

1 and sticking with us through the technical glitches.
2 A.     No problem.
3 Q.     It was lovely to meet you.
4 A.     Nice to meet you too.
5        MS. WRIGHT:  Alicia, do you have any --
6             EXAMINATION BY MS. HOU
7        MS. HOU:  Q.  Yeah, I just have a quick
8 few questions, Mary, that I'm just going to -- these
9 are all topics that were touched upon, and I just
10 want to clarify the record in some places.  So it
11 will seem a little disjointed because I'm just going
12 around.  And it's not in any particular order.
13       So my first question is, what is an ADOF
14 or an ADOF (sic)?
15 A.     It's AFOD.
16 Q.     Oh, AFOD.  Sorry.
17 A.     Yes.  So he is ICE's -- ICE's boss of this
18 facility.  He oversees this facility for ICE.
19 Q.     And who is "he," when you say "he"?
20 A.     Mr. Valdez.
21 Q.     Okay.  And is Mr. Valdez there at the
22 facility -- at the GEO facility, the Adelanto
23 facility, every day?  What are -- as far as you
24 know?
25 A.     As far as I know, he's here every day.  He

Page 258

1 oversees --
2        MS. WRIGHT:  I'm sorry, Ms. McCormick.
3 Now it's my turn to object when your counsel has a
4 question.  So I just want to insert myself.  Object
5 to form.  Now you can answer.
6        MS. HOU:  Q.  Go ahead.
7 A.     So to the best of my knowledge, yes, he
8 has an office here at the facility.  He oversees --
9 Q.     What does --
10 A.     -- everything that happens.
11       He oversees -- he oversees GEO to make
12 sure that we're taking care of his detainees in the
13 matter in which we've agreed to.
14 Q.     And what does he do?  You said that he's
15 at the facility.  What does he do while he's at the
16 facility?
17 A.     Walks around, checks on everybody.
18 Q.     What do you understand his
19 responsibilities are?
20 A.     To make sure that each and every one of
21 his detainees are taken care of, to make sure that
22 we're following the PBNDS, to make sure that we're
23 within the timelines that are given to us.  Pretty
24 much everything.  I mean, he oversees everything.
25 Q.     And then to the extent that he sees that

Page 259

1 something -- if there is a situation where he sees
2 that there is something out of compliance with the
3 PBNDS, does he -- what happens?
4        MS. WRIGHT:  Object to form.
5        THE WITNESS:  He'll immediately talk to
6 you about it, and then I am almost positive
7 Mr. Janecka is getting a phone call like
8 immediately.  No ifs, ands, or buts about it.  I
9 have seen him lose himself over -- I don't know --
10 somebody running down the hall, because we're not
11 supposed to run.  We're supposed to just briskly get
12 to the destination.  I've seen him, yeah, lose
13 himself.
14       MS. HOU:  Q.  Okay.  So --
15 A.     I didn't think it was that serious, but it
16 was.
17 Q.     So it's accurate to say that Mr. Valdez,
18 then, is implementing the ICE guidelines in the
19 Adelanto facility day to day, from your point of
20 view?
21 A.     Yes, from my point of view, yes.
22 Q.     There was also some -- we also talked
23 about -- there was an e-mail that Ms. Wright had
24 brought up.  And I'm sorry, I don't have the exhibit
25 handy, but it was an e-mail where there was a

Page 260

1 reference to certain detainees having to work double
2 or triple shifts.  And you weren't on that e-mail,
3 correct, Ms. McCormick?
4 A.     I don't know if I was or wasn't.  I'm -- I
5 don't recollect.
6 Q.     If you don't remember.  But do you recall
7 the substance of that e-mail, where --
8 A.     Yes.
9 Q.     -- it's -- sorry.  Let me just finish my
10 question for the record.
11       The substance of the e-mail where they had
12 spoken about detainees having to work double or
13 triple shifts.  Do you remember that e-mail?
14 A.     Yes, I do.
15 Q.     And then we had some discussion about what
16 that means when a detainee is assigned possibly to
17 two shifts or more than one shift.  Do you remember
18 that?
19 A.     Yes.
20 Q.     Okay.  And was your -- what -- it was your
21 testimony that that ICE has guidelines wherein a
22 detainee is not supposed to work more than eight
23 hours a day; is that correct?
24 A.     Correct.
25 Q.     Okay.  So -- but if they were assigned to

Page 261

66 (Pages 258 - 261)

1 two shifts per day, if that were the case, would
2 that mean that they were exceeding the eight-hour
3 shift?
4 A.      No.
5 Q.      Or the eight-hour limit in any way?
6 A.      No.  Because their shift and our shift are
7 two different things.  We have an eight-hour shift,
8 but the program doesn't call for them to work eight
9 hours in any given job.  It could be 15 minutes.  It
10 could be a half hour.  It could be two hours maybe
11 in the kitchen serving food, but it's -- it never
12 exceeds that.
13      So if they -- they would never be assigned
14 to first and second shift in kitchen.  It would just
15 be one shift, but it would only be for a couple of
16 hours maximum.  And then they would volunteer
17 possibly for maybe second shift or third shift, but
18 it would still only be a shorter amount of time.  It
19 wouldn't exceed the eight hours.
20 Q.      Okay.  And then when you say that the --
21 certain detainees volunteer outside of the work
22 program, that's just them -- just now, when you said
23 that, they just express a desire, then, that they
24 want to go and -- I don't know -- say assist with
25 cleaning up or cleaning the floors; is that your
Page 262

1 understanding?
2 A.      Yes.
3      MS. WRIGHT:  Object to form.
4      MS. HOU:  Q.  Okay.  And then we looked at
5 those pay sheets, and there are a few of them that
6 were entered into -- entered in as exhibits to your
7 deposition, and we went over some handwritten notes
8 and notations on those pay sheets.  Do you remember
9 that?
10 A.      Yes.
11 Q.      When you hand those pay sheets off, do
12 they have those handwritten notes on them at all?
13 A.      There's no writing on them at all.  The
14 only markings on them are the typed names, A
15 numbers, and job description, or the description of,
16 you know, where they're at, first, second, third
17 shift.
18 Q.      Okay.  So then when you hand those pay
19 sheets off to whomever, is it -- my understanding
20 correct that you hand those pay sheets off to --
21 let's say if it was -- you would hand it off to a
22 detention officer for them to know who was assigned
23 for their shift; is that correct?
24 A.      I would hand it to the lieutenant, who
25 then disperses them in briefing the following
Page 263

1 morning.  So today I did the pay sheets for
2 tomorrow, and I handed them off to the lieutenant.
3 Tomorrow morning he'll disburse them to his officers
4 that are assigned to those dorms.
5 Q.      Okay.  And then once you hand them off, do
6 they ever come back to you again?
7 A.      No.
8 Q.      So those pay sheets that we reviewed
9 earlier today with the handwritten notes, you had
10 not actually ever seen those handwritten notes -- or
11 those pay sheets with the original handwritten notes
12 on them ever, correct?
13 A.      No, I have not.
14 Q.      And do you handle pay related to those pay
15 sheets?
16 A.      No.  I only produce the pay sheets.
17 Q.      Okay.  So to the extent that whether the
18 detainees were paid a dollar or not, you don't have
19 control over that, correct?
20 A.      No.  I have no control and no knowledge of
21 it.
22 Q.      No knowledge, correct.  Okay.
23      And just to clarify the record, there was
24 some discussion about you as the union president.
25 And you had mentioned -- it was somewhat clarified
Page 264

1 later on, but I just want to be absolutely clear.
2 You referenced your vice president.  What was that
3 person's name again?
4 A.      Shawna Nowicki.
5 Q.      Okay.  So Ms. Nowicki, that's your union
6 vice president, not the vice president of a
7 certain -- in her capacity as a worker for GEO,
8 correct?
9 A.      No.  She's the vice president of the
10 union.
11 Q.      Of the union.  Okay.
12 A.      She's an officer.
13 Q.      All right.  And then we talked a little
14 bit about the availability of certain positions, and
15 you had mentioned for each of those job positions in
16 that work detainee application, you went through and
17 gave Ms. Wright a rundown of how many spots are
18 available per position.  Do you remember that?
19 A.      Yes.
20 Q.      So for the dorm porter position, can you
21 remind me how much -- what was your testimony
22 related to how many positions were in the dorm
23 porter position or how many spots were available in
24 the dorm porter position?
25 A.      Most of them -- well, for the dorm porter
Page 265

67 (Pages 262 - 265)

1 position or the whole pay sheet for the dorm jobs?
2 Q.    Just for the dorm porter position, as an
3 example, per shift, how many -- how many spots?
4 A.    Per shift, there's approximately four per
5 shift for the dorm porter position in each of the
6 dorms.
7 Q.    Okay.  Are those generally filled?
8       MS. WRIGHT:  Object to form.
9       THE WITNESS:  Yes.
10      MS. HOU:  Q.  Those are filled up.  Was it
11 your testimony that those positions are the ones
12 that have the longest wait list?
13 A.    Yes.
14 Q.    If a detainee did not or refused to work,
15 were they disciplined in any way?
16      MS. WRIGHT:  Object to form.
17      THE WITNESS:  To the best of my knowledge
18 no.
19      MS. HOU:  Q.  Okay.  Were they ever
20 deprived, to your knowledge, of any sort of basic --
21 or anything like snacks or basic necessities if they
22 refused to work?
23 A.    No.
24      MS. WRIGHT:  Object to form, and beyond
25 the scope of the examination today.

Page 266

1 I, MARY WISE-McCORMICK, do hereby declare
2 under penalty of perjury that I have read the
3 foregoing transcript; that I have made any
4 corrections as appear noted, in ink, initialed by
5 me, or attached hereto; that my testimony as
6 contained herein, as corrected, is true and correct.
7       EXECUTED this _____ day of
  _____,
8
  20__, at _____, _____
9      (City)          (State)
10
11
12
13
14
15      _____
16      Mary Wise-McCormick
17
18
19
20
21
22
23
24
25

Page 268

1      MS. HOU:  Q.  And if -- I believe you
2 testified to this.  If a detainee did not want to --
3 who was assigned to work and did not want to work,
4 would -- they would just not work, then, did anyone
5 force them to actually work?
6 A.    No.
7      MS. HOU:  Okay.  I have no further
8 questions.  Anything, Lydia?
9      MS. WRIGHT:  Nothing from me.  Thank you
10 again so much, everybody.
11      THE WITNESS:  Thank you.
12      THE VIDEOGRAPHER:  This is the
13 videographer.  This marks the end of the video
14 recorded deposition of Mary Wise-McCormick.  We're
15 going off the record at 5:49 p.m.
16      THE REPORTER:  Alicia, did you want a
17 copy?
18      MS. HOU:  Yes, please.
19      (Whereupon the deposition concluded at
20      5:49 p.m.)
21
22        ---oOo---
23
24
25

Page 267

1      CERTIFICATE OF REPORTER
2
3      I, Natalie Y. Botelho, a Certified
4 Shorthand Reporter, hereby certify that the witness
5 in the foregoing deposition was by me duly sworn to
6 tell the truth, the whole truth, and nothing but the
7 truth in the within-entitled.
8      The said deposition was taken down in
9 shorthand by me, a disinterested person, at the time
10 and place therein stated, and that the testimony of
11 said witness was thereafter reduced to typewriting,
12 by computer, under my direction and supervision;
13      That before completion of the deposition,
14 review of the transcript [ ] was[X] was not
15 requested.  If requested, any changes made by the
16 deponent (and provided to the reporter) during the
17 period allowed are appended hereto.
18      I further certify that I am not of counsel
19 or attorney for either or any of the parties to the
20 said deposition, nor in any way interested in the
21 event of this cause, and that I am not related to
22 any of the parties thereto.
23      DATED: August 5, 2020
24
25      Natalie Y. Botelho, CSR No. 9897

Page 269

68 (Pages 266 - 269)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.