**AKERMAN LLP**
ELLEN S. ROBBINS (SBN 298044)
ALICIA Y. HOU (SBN 254157)
601 West Fifth Street, Suite 300
Los Angeles, California 90071
Telephone: (213) 688-9500
Facsimile: (213) 627-6342
Email: ellen.robbins@akerman.com
Email: alicia.hou@akerman.com

LAWRENCE D. SILVERMAN (admitted *pro hac vice*)
98 Southeast Seventh Street, Suite 1100
Miami, Florida 33131
Telephone: (310) 374-5600
Facsimile: (305) 374-5095
Email: lawrence.silverman@akerman.com

ADRIENNE SCHEFFEY (admitted *pro hac vice*)
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: (303) 260-7712
Facsimile: (303) 260-7714
Email: adrienne.scheffey@akerman.com

Attorneys for Defendant
THE GEO GROUP, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

| | |
|---|---|
| RAUL NOVOA, JAIME CAMPOS FUENTES, ABDIAZIZ KARIM, and RAMON MANCIA, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>THE GEO GROUP, INC.,<br><br>Defendant.<br><br>―――<br><br>AND RELATED COUNTERCLAIM. | Case No. 5:17-cv-02514-JGB-SHK<br><br>Assigned to Hon. Jesus G. Bernal<br><br>**DEFENDANT THE GEO GROUP, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>Date: February 1, 2021<br>Time: 9:00 a.m.<br>Place:  Courtroom 1<br>  3470 Twelfth Street<br>  Riverside, California 92501<br><br>ORAL ARGUMENT REQUESTED |

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on February 1, 2021 at 9:00 a.m., or as soon thereafter as counsel may be heard in the above-captioned action, Defendant and Counter-Claimants THE GEO GROUP, INC. ("**GEO**"), shall appear before the Honorable Jesus G. Bernal, in Courtroom 1 of the above-described Court, located at 3470 Twelfth Street, Riverside, California 92501-3801, and shall then and there present its MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. RULE 56. Defendant respectfully moves for an Order granting judgement in GEO's favor on the basis that Plaintiffs and Counter-Defendants RAUL NOVOA, JAIME CAMPOS FUENTES, ABDIAZIZ KARIM, and RAMON MANCIA ("Plaintiffs") cannot establish their claims as a matter of law. As detailed in the attached memorandum, there are no genuine issues as to any material fact and GEO is entitled to judgment as to each of Plaintiffs' claims as follows:

First, Plaintiffs' nationwide class claim fails as a matter of law. Plaintiffs concede the nationwide class seeks only injunctive relief under the Trafficking Victims Protection Act ("TVPA"); however, there is no private right of action for injunctive relief under the TVPA.

Second, GEO cannot be liable under either the California Trafficking Victim's Protection Act ("CTVPA") or the TVPA because the uncontroverted material facts demonstrate GEO did not knowingly obtain Plaintiffs' labor by means of force, Plaintiffs did not suffer serious harm, and the possibility of segregation was a legitimate consequence not an unlawful means of coercion.

Third, any claim that GEO has violated California's minimum wage laws fails, as the detainees do not fall within California's definition of "employees."

Fourth, the definition of "employer' within the California Labor Code violates the U.S. Constitution's Supremacy Clause in two ways: (1) it directly regulates the federal government (via GEO); and (2) it discriminates against the federal government and those with whom the federal government deals. GEO is therefore entitled to

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

intergovernmental immunity under clear Supreme Court and Ninth Circuit precedent.

<u>Fifth</u>, GEO is immune from suit under the doctrine of derivative sovereign immunity. GEO indisputably follows the directive of the federal government and the unambiguous terms of its contract with ICE.

<u>Sixth</u>, Plaintiffs claims under the California Trafficking Victims Protection Act and the California Labor Code are preempted by federal law.

<u>Seventh</u>, GEO was not unjustly enriched because the facts demonstrate GEO would have made more money, not less, had GEO hired employees to perform detainee tasks. Furthermore, there is no evidence that GEO could not operate without detainee volunteers.

<u>Last</u>, Plaintiffs' Unfair Competition Law ("<u>UCL</u>") claims fail as they are derivative of their wage and hour claims, which fail for the reasons stated above.

As detailed more fully herein, this Court should grant GEO's Motion for Summary Judgment and dismiss Plaintiffs' claims in their entirety. This Motion is supported by the memorandum of points and authorities, filed herewith, and on the pleadings on file in this action and any other evidence or argument that the Court may properly receive at or before the Hearing, if any.

This Motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on October 6, 2020.

Dated: December 21, 2020          **AKERMAN LLP**


By: */s/ Alicia Y. Hou*
                                          Ellen S. Robbins
                                          Alicia Y. Hou
                                          Attorneys for Defendant
                                          THE GEO GROUP, INC.

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**DEFENDANT THE GEO GROUP INC.'S MOTION FOR SUMMARY JUDGMENT**
55779921;8

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................ 1

I.    INTRODUCTION ........................................................................................ 1

II.   SUMMARY OF UNDISPUTED MATERIAL FACTS ................................ 2

    A.   The Parties ........................................................................................ 2

    B.   GEO's Authority is Derived from ICE ............................................ 2

    C.   GEO Provides for Safe and Secure Conditions of Confinement ................. 3

    D.   The Voluntary Work Program ......................................................... 4

    E.   GEO Does Not Profit From the Voluntary Work Program. ................ 6

    F.   Similar VWPs Are Operated By Political Subdivisions of the State of California ........................................................................................... 6

    G.   ICE requires detainees to keep their living areas clean. ................. 7

    H.   The ICE-Mandated Disciplinary Policy .......................................... 8

    I.   Plaintiffs Were not Harmed By the Disciplinary Policy. ................. 9

III.  SUMMARY JUDGMENT STANDARD ..................................................... 9

IV.   LEGAL ARGUMENT ............................................................................... 10

    A.   Plaintiffs' Nationwide Forced Labor Class Fails as a Matter of Law ....... 10

    B.   Plaintiffs' CTVPA and TVPA Claims Fail on the Merits ................ 12

    C.   Detainees are Not Employees Under California Law ...................... 18

    D.   GEO is Immune from Suit Under Immunity Principles ................... 23

    E.   The CTVPA and California Labor Code, under Plaintiffs' Interpretation, Would Be Preempted. .............................................. 33

    F.   Plaintiffs' Unjust Enrichment Claim Fails on the Merits ............... 35

    G.   Plaintiffs' Unfair Competition Claim Fails on the Merits .............. 36

V.    CONCLUSION .......................................................................................... 36

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aguilera v. Aegis Communications Group,*
   LLC, 72 F. Supp. 3d 975 (W.D. Mo. 2014) ............................................................13

*Alvarado Guevara v. Immigration and Naturalization Service,*
   902 F.2d 394 (5th Cir. 1990) ............................................................20

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)............................................................9

*Barnhart v. Sigmon Coal Co.,*
   534 U.S. 438 (2002)............................................................11

*Barrientos v. CoreCivic, Inc.,*
   951 F.3d 1269 (11th Cir. 2020) ............................................................13

*Bennett v. Clark Cty. Sch. Dist.,*
   24 F.3d 244 (9th Cir. 1994) ............................................................20

*Bennett v. Frank,*
   395 F.3d 409 (7th Cir. 2005) ............................................................20

*Bijeol v. Nelson,*
   579 F.2d 423 (7th Cir.1978) ............................................................14

*Blackburn v. United States,*
   100 F.3d 1426 (9th Cir. 1996) ............................................................23, 24, 26

*Boeing v. Movassaghi,*
   768 F.3d 832 (9th Cir. 2014) ............................................................23, 24

*Boyle v. United Techs. Corp.,*
   487 U.S. 500, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988) ............................................................28

*California,*
   821 F.3d at 881. Here, the Wage Order on which the Plaintiffs ............................................................25

*Campbell-Ewald Co. v. Gomez,*
   136 S. Ct. 663 (2016)............................................................28, 29

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1985)...................................................................................................9

*Channer v. Hall*,
  112 F.3d 214 (5th Cir. 1997) ...............................................................................14

*Comm. of Cent. Am. Refugees v. INS*,
  795 F.2d 1434 (9th Cir. 1986) .............................................................................30

*Davis v. Michigan Dept. of Treasury*,
  489 U.S. 803 (1989).......................................................................................22, 25

*English v. Gen. Elec. Co.*,
  496 U.S. 72 (1990)................................................................................................33

*Garcia v. Curtright*,
  No. 6:11-06407-HO, 2012 WL 1831865 (D. Or. May 17, 2012) ...................13, 15

*Gartrell Construction Inc. v. Aubry*,
  940 F.2d 437 (9th Cir. 1991) ...............................................................................34

*Gilbreath v. Cutter Biological, Inc.*,
  931 F.2d 1320 (9th Cir. 1991) .............................................................................21

*Hale v. State of Ariz.*,
  967 F.2d 1356, 1363 (9th Cir. 1992), on reh'g, 993 F.2d 1387 (9th Cir. 1993) ........18

*Hall v. Time Inc.*,
  158 Cal. App. 4th 847 (2008), *as modified* (Jan. 28, 2008) ...................................35

*Harisiades v. Shaughnessy*,
  342 U.S. 580 (1952)..............................................................................................30

*Harold A. Newman Co. v. Nero*,
  31 Cal. App. 3d 490 (1973) ..................................................................................34

*Hause v. Vaught*,
  993 F.2d 1079 (4th Cir.1993) ..............................................................................14

*Headley v. Church of Scientology Int'l*,
  687 F.3d 1173 (9th Cir. 2012) .............................................................................13

*In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*,
  928 F.3d 42 (D.C. Cir. 2019)................................................................................28

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**DEFENDANT THE GEO GROUP INC.'S MOTION FOR SUMMARY JUDGMENT**

55779921;8

*Jackson v. Siringas,*
2013 WL 3810301 (E.D.Mich. July 23, 2013).........................................................14

*Jobson v. Henne,*
355 F.2d 129 (2d. Cir. 1966) ....................................................................................14

*Juino v. Livingston Parish Fire Dist. No. 5,*
717 F.3d 431 (2013) .................................................................................................19

*Lujan v. National Wildlife Federation,*
497 U.S. 871 (1990)..................................................................................................10

*Lyles v. Sangadeo-Patel,*
225 Cal. App. 4th 759 (2014) ...................................................................................34

*Martinez v. Turner,*
977 F.2d 421 (8th Cir. 1992) ...................................................................................14

*Martinez-Rodriguez v. Giles,*
391 F. Supp. 3d 985 (D. Idaho 2019) ......................................................................16

*Matherly v. Andrews,*
859 F.3d 264 (4th Cir. 2017) .............................................................................20, 21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986)....................................................................................................9

*Mendez v. Haugen,*
No. CV 14-4792 ADM/BRT, 2015 WL 5718967 (D. Minn. Sept. 29, 2015) .....14, 15

*Menocal v. GEO Grp., Inc.,*
113 F. Supp. 3d 1125, 1129 (D. Colo. 2015), 1992 WL 1369347, at *1 ..................22

*Miller v. Dukakis,*
961 F.2d 7 (1st Cir. 1992)..................................................................................20, 21

*Muchira v. Al-Rawaf,*
850 F.3d 605 (4th Cir. 2017) ..............................................................................12, 14

*Nadarajah v. Gonzales,*
443 F.3d 1069 (9th Cir. 2006) .................................................................................10

*Ndambi v. CoreCivic, Inc.,*
No. CV RDB-18-3521, 2019 WL 4735428 (D. Md. Sept. 27, 2019) .......................22

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

*North Dakota v. United States,*
  495 U.S. 423 (1990)................................................................22, 23, 33

*Nw. Cent. Pipeline v. State Corp. Comm'n of Kan.,*
  489 U.S. 493 (1989)..........................................................................33

*Peterson v. Cellco P'ship,*
  164 Cal. App. 4th 1583 (2008) ........................................................35

*S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations,*
  48 Cal. 3d 341, 769 P.2d 399 (Cal. 1989) ..............................19, 20

*Sacramento Reg'l Cty. Sanitation Dist. v. Reilly,*
  905 F.2d 1262 (9th Cir. 1990) ........................................................10

*Sanders v. Hayden,*
  544 F.3d 812 (7th Cir. 2008) ...................................................20, 21

*Savage v. Jones,*
  225 U.S. 501 (1912).........................................................................33

*Scott v. J.P. Morgan Chase & Co.,*
  296 F. Supp. 3d 98 (D.D.C. 2017)...................................................28

*Sperry v. Florida,*
  373 U.S. 379 (1963).........................................................................33

*Student Loan Servicing All. v. District of Columbia,*
  351 F. Supp. 3d 26 (D.D.C. 2018)...................................................33

*T.W. Elect. Service Inc.,* 809 F.2d 626, 63 ...........................................9

*Talley v. Cty. of Fresno,*
  51 Cal. App. 5th 1060 (2020) ...................................................18, 19

*Tourscher v. McCullough,*
  184 F.3d 236 (3d Cir. 1999) .....................................................20, 21

*Transamerica Mortgage Advisors, Inc. v. Lewis,*
  444 U.S. 11 (1979)...........................................................................11

*United States v. California,*
  921 F.3d 865 (9th Cir. 2019) .............................................24, 25, 26

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

v

CASE NO. 5:17-CV-02514-JGB-SHKx

**DEFENDANT THE GEO GROUP INC.'S MOTION FOR SUMMARY JUDGMENT**

55779921;8

*United States v. Calimlim*,
  538 F.3d 706 (7th Cir. 2008) ...................................................................13

*United States v. Dann*,
  652 F.3d 1160 (9th Cir. 2011) .................................................................13

*United States v. Kalu*,
  791 F.3d 1194 (10th Cir. 2015) ...............................................................15

*United States v. Kozminski*,
  487 U.S. 931, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988) ...........................14

*United States v. Toviave*,
  761 F.3d 623 (6th Cir. 2014) ...................................................................14

*Villarreal v. Woodham*,
  113 F.3d 202 (11th Cir. 1997) .................................................................20

*Yeagley v. Wells Fargo & Co.*,
  No. C 05-03403 CRB, 2006 WL 193257 (N.D. Cal. Jan. 23, 2006) ..........11

*Yearsley v. W.A. Ross Constr. Co.*,
  309 U.S. 18 (1940)...................................................................28, 30, 32

**Statutes**

8 U.S.C. §§ 1103(a)(11), 1231(a)(2), (g) ......................................................30

8 U.S.C. § 1226 ...........................................................................................2

8 U.S.C. § 1231(g) ...............................................................................2, 3, 5

8 U.S.C. § 1555(d) ......................................................................................32

18 U.S.C. § 1589(a) .....................................................................................12

18 U.S.C. § 1589(c)(2)..................................................................................16

18 U.S.C. § 1595(a) .....................................................................................11

18 U.S.C § 1595A(a) ....................................................................................11

29 U.S.C. § 203(e)(1)....................................................................................20

42 U.S.C. § 2000e(f) ....................................................................................18

**AKERMAN LLP**
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**DEFENDANT THE GEO GROUP INC.'S MOTION FOR SUMMARY JUDGMENT**

55779921;8

42 U.S.C. § 18083(a), (b)(2), (e) ...................................................................29

Cal. Code Regs. Tit. 15, § 3064 ....................................................................27

Cal. Lab. Code § 2775 ..............................................................................17, 18

Cal. Lab. Code § 2775(b) ..............................................................................17

Cal. Penal Code § 2811 .................................................................................26

California Minimum Wage Act ......................................................................22

Dep't of Justice Appropriations Act of 1979, Pub. L. 95-431, 92 Stat 1021, 1027
    (Oct. 10, 1978)..........................................................................................32

Fair Employment Housing Act ......................................................................18

Fair Labor Standards Act ........................................................................18, 20

Section 1182 of the Labor Code ....................................................................26

Telephone Consumer Protection Act........................................................29, 30

**Rules**

Fed. R. Civ. P. 56(c) ......................................................................................9

Rule 23(b)(2).................................................................................................10

**Other Authorities**

Thirteenth Amendment ..................................................................................14

U.S. Const., Art. VI .......................................................................................22

**AKERMAN LLP**
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CASE NO. 5:17-CV-02514-JGB-SHKx

**DEFENDANT THE GEO GROUP INC.'S MOTION FOR SUMMARY JUDGMENT**

55779921;8

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant The GEO Group, Inc. ("GEO"), by and through its undersigned counsel, hereby submits its motion for summary judgment.

## I.  INTRODUCTION

Plaintiffs Raul Novoa, Jaime Campos Fuentes, Abdiaziz Karim, and Ramon Mancia ("Plaintiffs") seek to change the fundamental nature of the relationship between Immigration and Customs Enforcement ("ICE") and those in its custody. Plaintiffs ask this Court to find, based upon anecdotal accounts from less than ten detainees, that the individuals housed at GEO's facilities are not immigration detainees lawfully held in the custody of ICE who have an opportunity to volunteer to help with basic tasks while detained, but instead, that they are "employees" and the victims of a human trafficking scheme. The undisputed facts demonstrate that detainees are neither.

First, Plaintiffs challenge the ICE-mandated Voluntary Work Program ("VWP"), which has been implemented at ICE facilities nationwide for at least 15 years, under three different presidential administrations. The VWP requirement is contained within the Performance Based National Detention Standards ("PBNDS"), which were developed in connection with Congress as part of a mission to reform the immigration detention system to ensure that detainees are treated in the "most humane manner possible." 2011 PBNDS, *preface*; §5.8. The VWP's purpose is to reduce the negative impacts of confinement by diminishing idleness and improving morale in exchange for a small stipend. *Id*. § 5.8.II.4. Ignoring the benefits the VWP provides to detainees, and that the program is completely voluntary, Plaintiffs ask this Court to find that all detainees at the Adelanto ICE Processing Center ("Adelanto") are "employees" under California's Labor Laws, rather than individuals in the custody of the United States Government who are provided an opportunity to stay busy while detained. The VWP, as set forth in the PBNDS, does not create an employment relationship between detainees and GEO (or ICE).

Second, Plaintiffs seek a determination that detainees at ICE's facilities

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**PROOF OF SERVICE**

55779921;8

nationwide are trafficking victims. To the contrary, detainees are held in the custody of ICE "for no purpose other than to secure their presence both for immigration proceedings and their removal." 2011 PBNDS, Preface. ICE's requirement that detainees "living in a group housing unit share[] a co-responsibility to keep the dormitory, dayroom, shower and bathroom areas tidy and clean" or face legitimate disciplinary consequences described in the PBNDS does not indicate otherwise. Because the PBNDS disciplinary policies are legitimate consequences—not illicit threats – Plaintiffs' claims fail to establish they are victims of human trafficking as a matter of law. Third, Plaintiffs cannot establish that GEO unjustly benefitted from the VWP and therefore, their unjust enrichment claims similarly fail. Finally, even if Plaintiffs could prove their claims should succeed on the merits, GEO would be entitled to immunity.

In short, because the undisputed facts make plain that detainees are neither "employees" under California law, nor plausibly classified as victims of a human trafficking scheme, GEO is entitled to summary judgment.

## II.   SUMMARY OF UNDISPUTED MATERIAL FACTS

### A.   The Parties

GEO owns and operates the ICE immigration detention facilities that are the subject of this lawsuit. (Uncontroverted Material Fact ("UMF") 1.) ICE detainees are housed at these facilities while they await the results of immigration proceedings or deportation. (UMF 2.) The named Plaintiffs here are former detainees of the Adelanto Facility located in the City of Adelanto, California. (UMF 3.)

### B.   GEO's Authority is Derived from ICE

As part of its Enforcement and Removal Operations, Congress has directed ICE to detain immigrants in the United States pending a decision of removal. 8 U.S.C. § 1226; (UMF 4.) In order to comply with Congress' mandate, ICE contracts with government contractors, such as GEO, to provide safe and secure housing for detainees pending the resolution of their immigration cases. 8 U.S.C. § 1231(g). (UMF 5.) As is

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

relevant here, ICE entered into an Intergovernmental Service Agreement ("IGSA") with the City of Adelanto for operation of an immigration detention facility. (UMF 6.) In turn, the City of Adelanto contracted with GEO to operate the Facility as a subcontractor. (UMF 7.) In June 2019, coinciding with the City of Adelanto's decision to end the IGSA, ICE entered into a short-term contract with GEO to continue operating the Facility ("Bridge Contract"). (UMF 8.) On December 19, 2019, GEO entered into a long-term contract with ICE to continue managing the Facility ("ICE Contract"). (UMF 9.)[1] Under the ICE Contracts, GEO was contractually obligated to follow ICE's 2008 and 2011 PBNDS and the American Correctional Association ("ACA") Standards. (UMF 10.)

GEO's compliance with the PBNDS and ACA standards is constantly monitored. At Adelanto, ICE Assistant Field Office Director Gabriel Valdez is onsite at the Facility on a daily basis and can raise concerns about non-compliance with ICE regulations. (UMF 11.) No one at ICE, including Mr. Valdez, has ever raised concerns about GEO's implementation of the PBNDS disciplinary policy. (UMF 12, 13.) In addition, GEO is audited multiple times per year for compliance with the relevant standards. (UMF 14.) To date, no audit has *ever* found that GEO violated the PBNDS as it relates to the issues herein: detainee discipline, detainee's cleaning obligations, and detainee access to necessities. (UMF 15.)

## C.     GEO Provides for Safe and Secure Conditions of Confinement

It is GEO's priority to ensure the safety and health of the detainees housed at Adelanto. To that end, detainees are provided with three "nutritious and appetizing meals" each day. (UMF 16.) During their shifts, GEO detention officers also eat the same meals provided to detainees. (UMF 17.) Because meals can "significantly influence[] morale and attitudes of detainees and staff," GEO ensures the "highest possible quality, relative to flavor, texture, temperature, appearance and palatability."

---

[1] Together, the IGSA, Bridge Contract, and ICE Contract will be collectively referred to as the "ICE Contracts."

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

(*Id.*) The meals at Adelanto are designed by a nutritionist to ensure that each detainee receives between 2,500 and 3,000 calories per day. (UMF 18.) Detainees are offered varied selections each week, including scrambled eggs, pancakes, chicken enchiladas, hamburgers, pumpkin pie, brownies, vegetables, and fresh fruit. (UMF 19.)There is also clean drinking water available to detainees in their housing units through water jugs that are regularly refilled. (UMF 20.)

GEO also has policies in place to ensure detainees always have access to sufficient hygiene items. Upon arrival to Adelanto, each detainee receives "[p]ersonal hygiene items, such as toothbrushes, toothpaste, combs," shampoo, soap, and feminine hygiene items. (UMF 21.) Detainees who prefer different brands than those that are provided can purchase alternatives in the commissary. (UMF 22.) Per Adelanto's written policy, hygiene items are replenished at least weekly, but in practice, detainees can ask for replacement items at any time. (UMF 23.) If a detainee is in need of additional supplies, he or she can request these items through a standard form called a "Kite." (UMF 24.) Adelanto maintains a sufficient supply of hygiene supplies, food, clothing, and other necessities; indeed, between November 2013 and April 2020, Adelanto spent over $2 million purchasing hygiene items for detainees. (UMF 25.) Dorm officers inspect and record *daily* whether there is an adequate supply of hygiene items in each dorm. (UMF 26.) Consistent with these policies, Plaintiffs testified that during their detention GEO (at no cost) provided them with soap, toothpaste, shampoo, water, and other personal hygiene items. (UMF 27.) Detainees were also provided non-hygiene items, such as batteries, at no cost, by submitting a kite form and indicating they were "indigent." (UMF 28.) Thus, detainees at Adelanto do not need to participate in the VWP to obtain basic necessities. (UMF 29.)

### D.   The Voluntary Work Program

As part of its comprehensive care for detainees awaiting the results of their immigration proceedings, GEO must provide detainees with access to various "leisure-time activities" including access to recreation, the law library, news, sports, and video

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**PROOF OF SERVICE**

games. (UMF 30.) In addition, GEO is contractually required to implement and maintain a VWP at Adelanto. (UMF 31.) The VWP is not intended to create an employment relationship, but rather to serve as another activity in which detainees may choose to participate to reduce the "negative impact of confinement . . . through decreased idleness, improved morale and fewer disciplinary incidents." (UMF 32.) To that end, all VWP tasks within the GEO facility are designed to assist with the basic aspects of communal living. (UMF 33.) Detainees enjoy participating in the VWP because they like to stay busy and be productive. (UMF 34.) While each detainee has an opportunity to volunteer for a position in the VWP, no detainee is required to participate and participation is completely voluntary. (UMF 35.) Indeed, the named Plaintiffs testified that there were periods of time during their detention where they chose not to participate in the VWP without consequence. (UMF 36.) Although any detainee may apply, ICE has the "sole responsibility . . . to determine whether a detainee will be allowed to perform on voluntary work details." (UMF 37.)

Through the 2008 PBNDS, ICE set the compensation for participation in the VWP as *exactly* $1 per day. (UMF 38, 39.) Thereafter, in the 2011 PBNDS,[2] ICE modified the requirement to be at least $1 per day. (UMF 40.) At no point did ICE ever require a stipend equivalent to minimum wage. (UMF 41.) Despite the change in the 2011 PBNDS phrasing, GEO's current contract with ICE requires it to pay exactly $1 per day to each detainee participant, stating that "[d]etainee labor shall be used in accordance with the approved detainee work plan and will [sic] shall be paid $1 day." (UMF 42.) (emphasis added). In turn, ICE provides GEO with the stipend for detainees in the form of a pass-through payment to GEO. (UMF 43.) Consistent with the contract, the pass-through payment provides $1 per day per detainee VWP participant. (*Id.*) ICE has declined requests from GEO to pay more at that facility and has made explicit that GEO "is not required to pay more than $1 a day. There's a contract modification

---

[2] GEO was not contractually required to comply with the 2011 PBNDS until January 1, 2013. ECF 205-2 at 6.

**PROOF OF SERVICE**

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL: (213) 688-9500 – FAX: (213) 627-6342

55779921;8

required if [GEO] wanted to pay more and be in compliance with the contract." (UMF 44, 45.)

### E.  GEO Does Not Profit From the Voluntary Work Program.

GEO does not take into account any set number of detainee workers in determining its staffing because the number of individuals in the VWP varies each day since detainees are free to refuse to work at any time. (UMF 46, 48.) In the event that detainee participation in the VWP is low, GEO staff complete any necessary work that would have otherwise been performed by a detainee. (UMF 47, 49.) Indeed, due to COVID-19, participation in the VWP has been significantly curtailed, but the operations of the facility have not been impacted. (UMF 50.) To that end, GEO does not profit from its operation of the VWP. (UMF 51.) In fact, if GEO were to use employees, rather than detainees, to accomplish the tasks the detainee volunteers perform, GEO would *increase* its profits due to the markup to ICE on the new services and increased labor costs needed to provide them. (UMF 52.)

### F.  Similar VWPs Are Operated By Political Subdivisions of the State of California

The VWP at Adelanto is not unique, but instead is commonly operated at most ICE-contracted detention facilities. (UMF 53.) A number of counties within the State of California contract with ICE (or have during the class period) to house ICE Detainees. (UMF 54.) These government-operated facilities, such as Theo Lacy and Yuba County also implement a VWP as required by ICE. (UMF 55.) Like GEO's VWP, consistent with the PBNDS, the government-operated VWPs are established for the benefit of detainees. (UMF 56; https://www.calpia.ca.gov/about/).[3] Detainees in these voluntary work programs are required to perform the same type of tasks that detainees in the Adelanto VWP perform, such as laundry, janitorial, kitchen, and barber services. (UMF 58.) Like the Adelanto Detainees, ICE detainees in the Theo Lacy Facility and

---

[3] Unlike the California Prison Industries Programs, the labor of the ICE detainees is not used to produce goods or services that can be sold in the open market. (UMF 57.)

CASE NO. 5:17-cv-02514-JGB-SHKx

**PROOF OF SERVICE**

55779921;8

Yuba County work programs are also paid $1 per day. (UMF 59.) The California Attorney General has inspected ICE VWPs at both GEO facilities and government-owned and operated facilities, and has not thereafter brought suit against GEO or otherwise sought a change in the daily VWP stipend at any of ICE's facilities in California—despite its acknowledgement that detainees were not paid minimum wage. (UMF 61.)[4]

### G.     ICE requires detainees to keep their living areas clean.

Irrespective of whether a detainee chooses to join a work program, all detainees must take personal responsibility for the cleanliness of their living area or be subject to possible sanctions. (UMF 62.) In addition, like GEO, California's government-operated facilities require detainees to maintain the cleanliness and sanitation of their individually assigned cells or sleeping locations without compensation. (UMF 60.) The PBNDS seek to create a safe environment for detainees, staff, volunteers, and contractors by, among other things, "maintaining high facility standards of cleanliness and sanitation." (UMF 63.) As part of the sanitation standards, Section 5.8V(C) of the PBNDS state in relevant part, "[d]etainees are required to maintain their immediate living areas in a neat and orderly manner," (UMF 64.) Section V(C) provides examples of a detainee's obligation to clean their living area, such as making their bed daily and cleaning up debris from the floor in their living area. (UMF 65.) Despite Plaintiffs' theory that the list in Section V(C) is exhaustive, ICE has made abundantly clear that while the PBNDS provide some examples, it is not an exhaustive list describing what constitutes a detainee's "living area." (UMF 66.) Instead, ICE has clarified that depending upon the layout of the facility, any part of a detainees' assigned dorm or pod must be kept clean. (UMF 67.) To that end, ICE requires GEO to inform all detainees

---

[4] The California Attorney General's Office has a history of seeking injunctions when it disagrees with ICE policies. *See e.g.* California Becomes First State to Sue Trump Administration of Student Visas, *available at* https://www.nbcnews.com/news/us-news/california-becomes-first-state-sue-trump-administration-over-student-visa-n1233381 (last visited December 16, 2020).

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL: (213) 688-9500 – FAX: (213) 627-6342

7                                              CASE NO. 5:17-cv-02514-JGB-SHKx

55779921;8

they "must keep areas that you use clean, including your living area and any general-use areas." (*Id.*) ICE further requires GEO to admonish detainees that if they "do not keep [their] areas clean, [they] may be disciplined." (UMF 68.) While the specific cleaning tasks vary among the different GEO facilities, at Adelanto, each morning detainees are provided access to cleaning supplies if they want to clean their bunk area. (UMF 69.) All other areas are cleaned by GEO staff and VWP participants. (*Id.*) This is consistent with the detainee requirements at all other ICE facilities, regardless of whether or not they are operated by GEO. (UMF 70.)

### H.    The ICE-Mandated Disciplinary Policy

While there are differences between GEO's contracts for its ICE facilities in other jurisdictions, all of GEO's contracts require the implementation of ICE's Disciplinary Severity Scale, ("Disciplinary Policy") which is set forth in the PBNDS. (UMF 71.) Upon arrival at the Facility, each detainee receives two handbooks detailing his or her rights and responsibilities while in ICE custody: (i) a facility-specific handbook, ("Facility Handbook") which is developed in cooperation with ICE and sets forth the standards and requirements of detainees reflected in the PBNDS, and (ii) the ICE National Detainee Handbook ("ICE Handbook"), which is compiled and maintained solely by ICE and also sets forth additional and requirements of detainees reflected in the PBNDS. (UMF 72, 73, 74.)

The ICE Disciplinary Policy is copied verbatim into each Facility Handbook. The Disciplinary Policy provides for a myriad of prohibited acts and corresponding potential sanctions. (UMF 75-78.) The Disciplinary Policy instructs GEO officers to first attempt to resolve infractions informally, and if they are unable, to select an appropriate sanction from the list provided in the PBNDS. (UMF 79.) As is relevant here, the Disciplinary Policy includes the infraction of "[r]efusing to clean assigned living area." (UMF 80.) The PBNDS list thirteen potential sanctions that *could* be imposed: including a warning, a loss of privileges, or in more serious circumstances, disciplinary segregation for up to 72 hours. (*Id.*) While ICE authorizes the use of up to 72 hours in segregation as a

sanction for refusing to clean, lesser sanctions should be used where possible. (UMF 82.) In the event a detainee is sanctioned, the detainee has the opportunity to appeal any disciplinary finding directly to ICE. (UMF 83.)

Despite authorization in the PBNDS, it is GEO's policy that the sanction of segregation should not be used where a detainee's only infraction is the refusal to clean his or her assigned living area. (UMF 81, 84, 85.) GEO officers are trained to use lesser sanctions wherever possible, with a preference for informal resolution. (UMF 82.) Indeed, a review of the segregation records at Adelanto reveals no evidence that an Adelanto detainee has *ever* been placed in segregation for refusing to clean his or her living area. (UMF 86.)

## I. Plaintiffs Were not Harmed By the Disciplinary Policy.

In fact, the named Plaintiffs concede that that they were never placed in segregation for refusing to clean. (UMF 87.) Nor can they establish that the mere possibility of segregation as a sanction would cause serious harm. Indeed, Plaintiffs' expert, Dr. Craig Haney, could not identify even one study that demonstrated that a threat of 72 hours in segregation could cause psychological harm—negating any claim that the class suffered from a known condition in the field of psychology. (UMF 88.) And, even if it *could* Haney further admitted that "whether and how much somebody is psychologically harmed [by segregation] would depend on the person" and that the experience "may or may not actually result in serious harm." (UMF 89.)

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole,

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**PROOF OF SERVICE**

55779921;8

1   could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec.*

2   *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Conversely, a genuine

3   dispute over a material fact exists if there is sufficient evidence supporting the claimed

4   factual dispute, requiring a judge or jury to resolve the differing versions of the truth.

5   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). The nonmoving party may

6   not merely state that it will discredit the moving party's evidence at trial. *T.W. Elect.*

7   *Service Inc.*, 809 F.2d 626, 630. Conclusory, non-specific statements in affidavits are

8   not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife*

9   *Federation*, 497 U.S. 871, 888-89 (1990).

10  **IV.   LEGAL ARGUMENT**

11       **A.   Plaintiffs' Nationwide Forced Labor Class Fails as a Matter of Law**

12       Plaintiffs initially sought both monetary and injunctive relief in connection with

13  their Nationwide Class claim under the TVPA. The operative Third Amended

14  Complaint ("TAC") states in relevant part:

15           Plaintiffs and Nationwide [Housing Unit Sanitation Policy

16           ("HUSP")] Class Members are entitled to recover from GEO

17           all amounts that GEO has wrongfully and improperly

18           obtained, and . . . the benefits it has unjustly obtained . . .

19           Plaintiffs and Nationwide HUSP Class Members are also

20           entitled to recover compensatory and punitive damages.

21  ECF 184, ¶¶ 240, 241. This Court thereafter certified the Nationwide TVPA class under

22  Rule 23(b)(2). ECF 229. Following discovery, Plaintiffs amended their claim, stating

23  that rather than monetary damages, they now seek <u>exclusively</u> injunctive relief in

24  connection with the Forced Labor Class. (UMF 91.) Because there is no private right of

25  action for injunctive relief under the TVPA, GEO is entitled to judgment as a matter of

26  law on the Nationwide TVPA claims.

27       Under principles of statutory construction, courts look to the plain language of

28  the law to determine its meaning. *Sacramento Reg'l Cty. Sanitation Dist. v. Reilly*, 905

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

F.2d 1262, 1268 (9th Cir. 1990). "The first step of statutory construction is to apply the plain meaning of the statute since there is a strong presumption that Congress expresses its intent through the language it chooses." *Id*. (internal quotations omitted). "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *Nadarajah v. Gonzales*, 443 F.3d 1069, 1076 (9th Cir. 2006). Where two subsections use differing language, this Court must "refrain from concluding [] that the differing language . . . has the same meaning in each." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 454 (2002).

Section 1595(a) of the TVPA states that an individual may bring "a civil action against the perpetrator [of a TVPA violation] . . . in an appropriate district court of the United States <u>and may recover damages</u> and reasonable attorney fees." 18 U.S.C. § 1595(a) (emphasis added). Section 1595(a) of the TVPA therefore establishes a private right of action for damages; however, the statute does <u>not</u> create a private right of action for injunctive relief. In contrast, Section 1595A provides that whenever a violation of the TVPA has occurred or is about to occur, "the <u>Attorney General</u> may bring a civil action in a district court of the United States <u>seeking an order to enjoin such act</u>." 18 U.S.C § 1595A(a) (emphasis added). Section 1595A does not provide a private right of action, nor does it provide for damages as a remedy. Instead the Attorney General is limited to injunctive relief. In contrast, Section 1595(a) provides for damages for private litigants. "[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979)).

With this cannon of interpretation in mind, courts have found that "[b]y limiting the remedies for private right of actions to damages and attorneys' fees Congress demonstrated that it did not intend for private litigants to obtain injunctive or declarative relief." *Yeagley v. Wells Fargo & Co.*, No. C 05-03403 CRB, 2006 WL 193257, at *2 (N.D. Cal. Jan. 23, 2006). Because Congress used different language in each section of

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**PROOF OF SERVICE**
55779921;8

the TVPA, its intent is clear that the remedies available under each section are separate and distinct. *Barnhart*, 534 U.S. at 452 ("[I]t is a general principle of statutory construction that when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotations omitted). Accordingly, the unambiguous language in the statute, which provides for damages only in a private right of action, clearly indicates that Congress intended to allow injunctive relief only in those cases brought by the Attorney General.

Here, the Nationwide TVPA class is not represented by the Attorney General. Instead, Plaintiffs are members of a class action brought by individual class representatives through private sector attorneys. The Attorney General has not weighed in or otherwise intervened in this action. Thus, injunctive relief is not available. Accordingly, because the Nationwide TVPA class seeks exclusively injunctive relief, and because there is no private right of action for injunctive relief under the TVPA, GEO is entitled to summary judgment as to its Nationwide Class' TVPA claims.

## B. Plaintiffs' CTVPA and TVPA Claims Fail on the Merits

Plaintiffs' TVPA and CTVPA[5] claims for damages also fail on their merits. Adelanto is a lawfully run contract facility carrying out ICE-appointed duties; it is not an illicit human trafficking operation. To prevail on their claim under the TVPA, Plaintiffs must establish that GEO knowingly obtained Plaintiffs' labor through the illicit means detailed in the statute, including, threats of force or the use of force; threats of serious harm or the use of serious harm; or through a scheme intended to cause detainees to believe harm would befall them if they did not render their labor. 18 U.S.C. § 1589(a). The undisputed facts make plain that Plaintiffs have failed to uncover

---

[5] This Court has already made plain that elements of a CTVPA and TVPA claim overlap significantly. ECF 223 at n.11. Accordingly, GEO refers to the claims collectively as arising under the "TVPA" to streamline the arguments and eliminate unnecessary repetition.

**PROOF OF SERVICE**

55779921;8

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

evidence of a nationwide or Adelanto-specific trafficking claim.

First, the ICE-mandated Disciplinary Policy constitutes a warning of legitimate consequences, not impermissible threats of serious harm. Second, there is no evidence Plaintiffs suffered serious harm as defined by the statute. Third, there is no evidence that GEO acted with the requisite scienter to cause harm. Not all harsh disciplinary actions amount to a TVPA violation. *Muchira v. Al-Rawaf*, 850 F.3d 605, 619-20 (4th Cir. 2017), as amended (Mar. 3, 2017) (affirming summary judgment for defendants where plaintiff's claim was "based solely upon her assertion that the Saudi cultural 'house rules,' coupled with her long work hours and verbal reprimands, caused her to experience serious psychological harm in the form of depression, acute stress, and panic attacks."); *see also United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011) ("[N]ot all bad employer-employee relationships or even bad employer-immigrant nanny relationships will constitute forced labor."); *Aguilera v. Aegis Communications Group*, LLC, 72 F. Supp. 3d 975, 978 (W.D. Mo. 2014) (same); *Garcia v. Curtright*, No. 6:11-06407-HO, 2012 WL 1831865, at *4 (D. Or. May 17, 2012) (same). Instead, liability turns on whether the individual faced warnings of "legitimate adverse consequences" as opposed to "illicit threats." *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012) ("In applying the Act, we must distinguish between [i]improper threats or coercion and permissible warnings of adverse but legitimate consequences."); *United States v. Calimlim*, 538 F.3d 706, 714 (7th Cir. 2008) ("[W]arnings of legitimate but adverse consequences or credible threats of deportation, standing alone, are not sufficient to violate the forced labor statute."). In the ICE detention context, any construction of the TVPA should not "call into question longstanding requirements that detainees or inmates be required to perform basic housekeeping tasks." *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1278 (11th Cir. 2020). Accordingly, Plaintiffs cannot establish a TVPA violation by simply stating that detainees were required to clean their dormitories, showers, and bathrooms or potentially face sanctions including (in the most severe circumstances) the possibility

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

13

of up to 72 hours in disciplinary segregation.

### 1. The Disciplinary Policy Constitutes Warnings of Legitimate Consequences, Not a Threat of Serious Harm.

The undisputed facts make clear that Plaintiffs' TVPA claims rest upon warnings of legitimate consequences—not impermissible threats. *Calimlim*, 538 F.3d at 714. Just as a "church is entitled to stop associating with someone who abandons it," *Headley*, 687 F.3d at 1180; an immigration detention facility can implement the "basic disciplinary measures" in Section 3.1 without giving rise to TVPA liability. *Barrientos*, 951 F.3d at n.5. Indeed, the TVPA was "passed to implement the Thirteenth Amendment against slavery or involuntary servitude." *Muchira* , 850 F.3d at 617. In enacting the TVPA, Congress did not intend to overturn longstanding precedent under the Thirteenth Amendment that certain actions are permissible and do not constitute human trafficking, such as parents who require their children to perform household chores. *United States v. Kozminski*, 487 U.S. 931, 944, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988); *see also United States v. Toviave*, 761 F.3d 623, 628 (6th Cir. 2014).

Extensive precedent makes clear that civil detainees' housekeeping duties fall outside of the bounds of the Thirteenth Amendment and, in turn, outside of the TVPA. Myriad courts have found that the requirement that a civil detainee who is required to clean her living area or face disciplinary sanctions is indicative of "the type[s] of normal housekeeping duties that fall outside the Thirteenth Amendment." *Mendez v. Haugen*, No. CV 14-4792 ADM/BRT, 2015 WL 5718967, at *5 (D. Minn. Sept. 29, 2015), aff'd (Feb. 22, 2016); *see Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992) (pretrial detainees may be compelled, under threat of administrative segregation, "to perform general housekeeping chores"); *Channer v. Hall*, 112 F.3d 214, 219 (5th Cir. 1997) ("[T]he federal government is entitled to require a communal contribution by an INS detainee in the form of housekeeping tasks...."); *Hause v. Vaught*, 993 F.2d 1079, 1081, 1085 (4th Cir.1993) (pretrial detainees may be required to "assist in cleaning the common areas of their cell-block"); *Bijeol v. Nelson*, 579 F.2d 423, 424–25 (7th

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL: (213) 688-9500 – FAX: (213) 627-6342

**PROOF OF SERVICE**

Cir.1978) (a pretrial detainee may be compelled to perform "general housekeeping responsibilities" in his own cell and community areas); *Jobson v. Henne*, 355 F.2d 129, 131–32 (2d. Cir. 1966) (civil detainees may be required to perform "chores of a normal housekeeping type and kind"); *Jackson v. Siringas*, 2013 WL 3810301, at *10 (E.D.Mich. July 23, 2013) ("[R]equiring a pretrial detainee to help clean his living unit, including common areas, does not amount to involuntary servitude as prohibited by the Thirteenth Amendment."). As the District of Minnesota recently recognized, a claim that "pretrial and civil detainees may not be required to perform any type of work outside their own cells or immediate living quarters is not supported by existing precedent." *Mendez*, 2015 WL 5718967 at *5. Thus, it is clear that the disciplinary measures that GEO detainees may have faced under the ICE PBNDS were not impermissible illicit threats, but instead were acceptable warnings of legitimate consequences.

### 2.   Placement in segregation for 72 hours or a warning of the same does not constitute "serious harm" under the TVPA

To establish a § 1589 violation, Plaintiffs must prove that the unlawful means of coercion <u>caused them</u> to render labor. *See e.g. United States v. Kalu*, 791 F.3d 1194, 1211-12 (10th Cir. 2015). It is not enough that an individual or entity obtain the labor of another through persuasion or compulsion; rather the labor must be obtained through illegal coercive means as detailed in the statute. *Garcia*, 2012 WL 1831865, at *4. Accordingly, it is simply not enough for plaintiffs to demonstrate that cleaning up their living areas was inconvenient, frustrating, tedious, or even unfair. Instead, Plaintiffs must show that to the average person, a warning of the possibility of spending up to 72 hours in segregation was so psychologically coercive as to make them more likely to labor than risk segregation. Plaintiffs cannot do so here.

Following significant discovery, there is no evidence that up to 72 hours in segregation rises to the level of "serious harm" from the perspective of a reasonable detainee. (UMF 87-89.) Further, there is no evidence that an average layperson would

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL: (213) 688-9500 – FAX: (213) 627-6342

15

**PROOF OF SERVICE**

55779921;8

perceive a brief period of segregation as a highly coercive motivator. To the contrary, many detainees prefer to be placed in segregation to avoid issues that arise in group living. (UMF 90.) Further, Plaintiffs' expert, Dr. Craig Haney, could not identify even one study that demonstrated that a threat of 72 hours in segregation could cause psychological harm—negating any claim that the mere possibility of possible segregation amounts to "serious harm." (UMF 88.)[6] And, significantly, none of the Plaintiffs have presented any evidence in discovery that they are outliers from Dr. Haney's research and were actually subject to "serious harm," to the contrary none of the detainees were sent to segregation. (UMF 86, 87.) Furthermore, Plaintiffs cannot establish that the use of segregation for refusal to clean was so prevalent as to lead a <u>reasonable person</u> to believe it was a likely consequence. Rather, it is GEO's policy not to send detainees to segregation for refusing to clean. (UMF 81, 84), and consistent with GEO's policy, segregation records reflect that detainees were not sent to segregation for refusing to clean. (UMF 86.) Thus, Plaintiffs cannot meet their burden to establish that up to 72 hours in segregation (or the threat of the same) is sufficiently serious to constitute a violation of the TVPA.

### 3.   Plaintiffs Cannot Show GEO Possessed the Requisite Intent.

In order to prevail on a claim under the TVPA, Plaintiffs bear the burden to establish GEO acted with the requisite scienter. 18 U.S.C. § 1589(c)(2). In other words, to create a triable issue for a jury, Plaintiffs must establish that GEO "intended to deceive the group collectively from the beginning in furtherance of a forced labor scheme." *Martinez-Rodriguez v. Giles,* 391 F. Supp. 3d 985, 992 (D. Idaho 2019). Plaintiffs cannot meet their burden: there is no evidence that GEO intended to compel detainees to clean their living areas or participate in the VWP.

---

[6] Plaintiffs' expert was merely a rebuttal expert to GEO's now excluded expert Dr. Kropf, as such his testimony is no longer be admissible at trial as there is nothing to rebut. But, even if his testimony was admissible, it would not fill Plaintiffs' evidentiary gap.

55779921;8

The undisputed facts also refute Plaintiffs' argument that GEO intended to deprive detainees of basic necessities in order to coerce participation in the VWP. Plaintiffs only evidence that they were deprived of necessities or placed in segregation comes from anecdotal accounts from a very small number of detainees. None of the accounts detail a pervasive policy or a common practice, but instead highlight a few specific instances where detainees felt they were treated unfairly. For example, Plaintiffs Novoa and Mancia took issue with the brand of hygiene products they were provided, not the quantity. (UMF 22.) These accounts vary for each individual. Plaintiffs have no evidence that these instances were authorized or condoned by GEO (as opposed to unauthorized acts by staff) nor do they provide evidence that these actions were part of a broader corporate policy. To the contrary, as detailed above, Adelanto provides each detainee with sufficient hygiene and food items while detained. (UMF 16-29.) And, Adelanto has a number of policies to ensure that detainee hygiene and food requirements are not overlooked. (UMF 17-24; 26.) The evidence demonstrates that these polices are effective, because each Plaintiff received their hygiene items and food from GEO at no cost. (UMF 27.) Thus, any detainee experience to the contrary would be an outlier, not a class wide policy or the result of GEO's intentional acts.

There is also no evidence that GEO intended for detainees to believe that if they did not clean their living areas, they would be sent to segregation. GEO only incorporated the Disciplinary Policy into its detainee handbook to fulfill a contractual obligation to ICE. (UMF 71, 77.) Even so, GEO adopted its own policy to minimize, if not wholly eliminate, the use of segregation in connection with the refusal to clean. (UMF 81, 84.) GEO did not emphasize that segregation was a possible consequence for refusing to clean, leaving all thirteen potential sanctions in the handbook, including the sanction of a "warning," and there is no evidence that GEO intended for detainees to believe segregation was a likely sanction for refusing to clean. Accordingly, the evidence is undisputed that GEO did not have an intent to require detainees to work or

**PROOF OF SERVICE**

55779921;8

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

clean or instead face segregation. (UMF 77-87.)[7] Thus, Plaintiffs cannot establish the requisite element of scienter.

### C.   Detainees are Not Employees Under California Law

In its order on November 26, 2019, this Court found Plaintiffs could pursue their claim that they are GEO's "employees," not volunteers or simply residents of the Adelanto Facility (ECF 44 at 8). While previously, the common law filled the gap in defining the term "employee," effective September 4, 2020, the California legislature amended the California Labor Code ("Labor Code") to provide a specific definition for "employee," including under all wage orders of the Industrial Welfare Commission. Cal. Lab. Code § 2775. The new definition applies "retroactively to existing claims." *Id.* § 2775(b). In relevant part, the codified definition of "employee" contains a threshold renumeration test. *Id.* § 2775. ("[an individual] providing labor or services *for remuneration* shall be considered an employee rather than an independent contractor . . . ." ). This test helps courts distinguish volunteers and those in custody from "employees" as defined by California law.

Recently, *Talley v. Cty. of Fresno*, 51 Cal. App. 5th 1060, 1080 (2020), clarified the application of the minimum renumeration test for individuals for government-operated voluntary work programs, explaining that "[i]n cases where the association or work performed does not involve a salary or wage, the threshold-remuneration test is then expressly considered and applied." *Id.* at 1080. In *Talley*, the California Court of Appeal considered whether individuals participating in the Fresno County Probation Department's Program Adult Offender Work Program ("AOWP") were employees.[8]

---

[7] To the extent Plaintiffs argue that outlier GEO officers acted contrary to GEO's written and corporate policies, the intent of those officers cannot be imputed to GEO.

[8] The Court considered whether the individuals were employees for purposes of California's FHEA. The FHEA's definition of "employee" is nearly identical to the definition in the California Labor Code which is at issue here. The analogous federal law, Title VII, contains the same definition. 42 U.S.C. § 2000e(f). *See also Hale v. State of Ariz.*, 967 F.2d 1356, 1363 (9th Cir. 1992), on reh'g, 993 F.2d 1387 (9th Cir. 1993) ("Although the FLSA and Title VII are different statutes, "cases construing the

18

CASE NO. 5:17-cv-02514-JGB-SHKx

55779921;8

Talley was injured while performing work as part of the AOWP. *Id.* He filed suit alleging that Fresno County failed to accommodate his disability, as required by the Fair Employment Housing Act ("<u>FEHA</u>."). *Id.* The County moved for summary judgment, arguing that because AOWP participants weren't provided any remuneration for their work, but instead were merely volunteers, they couldn't be deemed employees under FEHA. *Id.* at 1066. The court found in favor of the County, concluding that because the AOWP participants did not receive sufficient remuneration, they were not "employees" but instead were properly classified as volunteers. *Id.* at 686.

To establish an employment relationship under *Talley*, as a threshold matter, a plaintiff must establish he or she received remuneration that was "financially significant and quantifiable." *Id.* at 1086. If the individual can establish he or she received minimum renumeration, the claims may proceed to the multi-factor common law analysis to determine whether there was in fact an employment relationship. *Id.* at 1091. Remuneration must consist of substantial benefits, not merely incidental to the activity performed. *Id*. at 1086. at 1080.

Accordingly, for Plaintiffs to establish they are "employees" they must first meet their burden satisfy the minimum renumeration test. To do so, Plaintiffs must demonstrate that the benefit they receive is quantifiable and "significant"—not merely incidental to the work activities performed. *Talley*, 51 Cal. App. 5th at 1084. Here, the benefits Plaintiffs received are not significant, and therefore do not constitute renumeration. The undisputed facts demonstrate Plaintiffs received $1 per day for their participation in the VWP. (UMF 38-40, 42.) This one dollar stipend was merely incidental to the VWP which serves to reduce idleness and increase detainee morale. *See Juino v. Livingston Parish Fire Dist. No. 5*, 717 F.3d 431, 439-440 (2013) (holding that $2 per fire/emergency earned by a volunteer firefighter deemed merely incidental

---

definitional provisions of [Title VII] are persuasive authorities when interpreting [the FLSA or the ADEA]" because the definition of "employee" in the three Acts is virtually identical.").

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**PROOF OF SERVICE**

55779921;8

to volunteer service and did not constitute remuneration). Furthermore, the main benefit of the VWP was not financial, it was intangible—detainees enjoyed the opportunity to leave their dorms and liked to be productive. (UMF 24.) Plaintiffs do not dispute that this amount was incidental. Nor do they dispute that their participation was part of a volunteer program. (UMF 35, 36, 48, 49, 50.) Accordingly, detainees are not "employees" under the Labor Code.

Should this Court find that Plaintiffs can satisfy the minimum renumeration test, it must next determine what additional factors must be considered. *S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341, 353–54, 769 P.2d 399, 406 (Cal. 1989) is instructive. *Borello* instructs that in determining which variation of the economic realities test applies, a court must consider "[t]he nature of the work, and the overall arrangement between the parties . . . to determine whether they come within the 'history and fundamental purposes' of the statute." *Id.* Thereafter, courts should consider the remaining factors set forth under the economic realities test, detailed in federal case law. *Id.* at 355 (citing *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 754 (9th Cir. 1979) for additional factors).[9] Consistent with the guidance of *Borello*, here, federal case law makes plain that a modified economic realities test is applied in the detention context. *See Alvarado Guevara v. Immigration and Naturalization Service*, 902 F.2d 394 (5th Cir. 1990) (holding that the FLSA does not apply to immigration detainee work programs); *see also Matherly v. Andrews*, 859 F.3d 264, 278 (4th Cir. 2017) (setting forth a modified economic realities test for civilly incarcerated individuals); *Sanders v. Hayden*, 544 F.3d 812, 814 (7th Cir. 2008) (same); *Miller v. Dukakis*, 961 F.2d 7, 9 (1st Cir. 1992) (same); *Tourscher v. McCullough*, 184 F.3d 236, 243 (3d Cir. 1999) (same); *Villarreal v. Woodham*, 113 F.3d 202, 207 (11th Cir. 1997) (same); *cf. Bennett v. Frank*,

---

[9] This makes practical sense here, as the definition contained within Industrial Welfare Commission Wage Order 5 ("IWC 5") is nearly identical to that in the Fair Labor Standards Act, which provides, that an employee is "any individual employed by an employer." *Compare* 29 U.S.C. § 203(e)(1) *with* IWC 5 (an employee is "any person employed by an employer.").

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

20                     CASE NO. 5:17-cv-02514-JGB-SHKx

**PROOF OF SERVICE**

55779921;8

395 F.3d 409, 409 (7th Cir. 2005) ("The Fair Labor Standards Act is intended for the protection of employees, and prisoners are not employees of their prison, whether it is a public or a private one. So they are not protected by the Act."); *Bennett v. Clark Cty. Sch. Dist.*, 24 F.3d 244 (9th Cir. 1994) ("the need for minimum wage protection does not exist in the case of a prisoner whose food, shelter and clothing is provided for by the state").

Under the modified economic realities test, in determining whether detained individuals performing tasks are "employees," courts would consider the following factors: (1) whether the detainee is working to turn a profit for GEO; (2) whether GEO and the detainee have an opportunity to bargain for mutual economic gain, as is present in a traditional employer-employee relationship; and (3) whether GEO provides the detainee with food, shelter, and clothing that employees would otherwise need to purchase in a true employment situation. *See Matherly*, 859 F.3d at 278 (setting forth the three-part test above); *see also Sanders*, 544 F.3d at 814 (same); *Miller*, 961 F.2d at 9 (same); *Tourscher*, 184 F.3d at 243 (same). These factors provide helpful guidance for determining when a detainee is merely completing tasks as a way to keep busy or otherwise build community within a facility as opposed to when a detainee is working within a detention industry in order to generate profits for a third party.

Applying the *Matherly* factors to the instant case it is clear detainees in the Adelanto Facility are not "employees." The undisputed facts demonstrate that detainees do not work to increase GEO's profits—the VWP is a 100% pass-through program, and under the ICE Contracts, ICE reimburses GEO the same amount GEO fronts to detainees participating in the Adelanto VWP, with GEO acting as a mere conduit for the VWP stipends. (UMF 43.) In implementing the program, GEO is not entitled to reduce its own staffing, but instead, must always be prepared that no detainees will participate. (UMF 46, 47.) And, when there are no detainee participants, as during the ongoing pandemic, all operations continue without the need for additional staff. (UMF 48-50.) Further, unlike some prison labor programs, ICE detainees are not creating

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**PROOF OF SERVICE**

products in competition with private industry outside their facility; rather all tasks performed are exclusively related to the communal living environment within the facility. (UMF 32-33, 57.) Moreover, there is no opportunity for mutual economic gain—ICE sets the rate of $1 per day, and GEO lacks authority to pay more without ICE's consent. (UMF 42-45.)

Lastly, GEO provides the detainees with food, shelter, and clothing that employees would otherwise need to purchase. (UMF 25.) Because detainees are provided food and shelter, they are not participants in the economy of the world beyond the Adelanto Facility, where individuals must pay for their rent, food, healthcare, and other necessities. Put simply, detainees are not GEO's "employees." *Gilbreath v. Cutter Biological, Inc.*, 931 F.2d 1320, 1325 (9th Cir. 1991) ("Not only does the state provide the inmates' food, shelter, and clothing, but it is only with the state's permission that prisoners are allowed the privilege of working. The state's absolute power over appellants is a power that is not a characteristic of—and indeed is inconsistent with—the bargained-for exchange of labor which occurs in a true employer-employee relationship."). Any other finding could lead to unexpected policy consequences. For example, detainees who are not able to obtain a position in the VWP could use their proof of application to the VWP as the basis for collecting unemployment benefits while detained. Additionally, classifying detainees as "employees" would give detainees more work rights than they would have outside the facility, where most detainees would be legally prohibited from being employed. And contrary precedent in other Circuits would mean that ICE detainees in some jurisdictions might be able to receive state-mandated minimum wage while others do not.

When faced with the question of whether detainees who participate in the VWP are "employees," other courts have unequivocally concluded they are not. *See e.g., Ndambi v. CoreCivic, Inc.*, No. CV RDB-18-3521, 2019 WL 4735428, at *2 (D. Md. Sept. 27, 2019); *Menocal v. GEO Grp., Inc.*, 113 F. Supp. 3d 1125, 1129 (D. Colo. 2015). The Department of Justice has reached the same conclusion. *The Applicability*

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

*of Employer Sanctions to Alien Detainees Performing Work in INS Detention Facilities*, 1992 WL 1369347, at *1 ("[A]n alien detained in an INS facility does not meet the definition of 'employee,' . . . A detainee performs work for institution maintenance, not compensation."). In sum, it is clear detainees are not "employees" under the California Minimum Wage Act and GEO is entitled to summary judgment on Plaintiffs' California minimum wage claim.

**D.     GEO is Immune from Suit Under Immunity Principles**

**1.     Intergovernmental Immunity**

The doctrine of intergovernmental immunity ("IGI") is derived from the Supremacy Clause, U.S. Const., Art. VI, which mandates that "the activities of the Federal Government are free from regulation by any state." Under IGI, a state law or regulation is invalid "if it [1] regulates the United States directly or [2] discriminates against the Federal Government or those with whom it deals." *See North Dakota v. United States*, 495 U.S. 423, 435 (1990); *see also Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 812 (1989). As a federal contractor, GEO enjoys IGI because "a [state] regulation imposed on one who deals with the Government has as much potential to obstruct governmental functions as a regulation imposed on the Government itself. *See id*. at 438; *see also Boeing v. Movassaghi*, 768 F.3d 832, 842-43 (9th Cir. 2014) ("The federal government's decision to hire Boeing to perform the cleanup rather than using federal employees does not affect our immunity analysis on [the grounds of discrimination]. When the state law is discriminatory, a private entity with which the federal government deals can assert immunity."). Here, both prongs of the *North Dakota* test for intergovernmental immunity are satisfied and GEO is entitled to summary judgment.

**(a)     The California Labor Code improperly regulates the federal government by purporting to set a prevailing wage rate for federal detainees and inmates**

"[U]nder the intergovernmental immunity component of the Supremacy Clause

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**PROOF OF SERVICE**

55779921;8

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

1   to the United States Constitution, states may not directly regulate the Federal

2   Government's operations or property." *Blackburn v. United States*, 100 F.3d 1426, 1435

3   (9th Cir. 1996). In *Blackburn*, the Ninth Circuit concluded that a law, though neutral on

4   its face, impermissibly regulated the federal government's operations. *Id*. At issue was

5   a law requiring placement of warning signs and safety ropes near certain bodies of

6   water. *Id.* at n.3. Under the law, which did not provide an exception for the federal

7   government, Yosemite National Park would have been required to change its operations

8   by placing signs and ropes throughout the park. *Id*. at 1435. The Ninth Circuit found

9   that this regulation, though not explicitly targeted at the federal government, was a

10  "direct and intrusive regulation by the State of the Federal Government's operation of

11  its property at Yosemite." *Id*. Accordingly, the court concluded that applying the state

12  law to the federal government would run afoul of the Supremacy Clause. *Id*.

13       Similarly, in *Boeing*, a California law permitted a state agency to "compel a

14  responsible party or parties" to take certain remedial actions related to toxic waste

15  cleanup. *Boeing*, 768 F.3d at 839. The federal government hired Boeing, a contractor,

16  to perform its cleanup work in California. Boeing filed suit challenging the law. Boeing

17  argued that while the regulation did not explicitly name the federal government as a

18  "responsible party," its application was clear: the federal government was certainly a

19  "responsible party" as defined in the statute—if not *the* responsible party. *Id*. Because

20  the federal government (and by extension Boeing) fell within the definitions in the state

21  statute, *Boeing* argued that the state law directly interfered with the functions of the

22  federal government by "mandat[ing] the ways in which Boeing render[ed] services that

23  the federal government hired Boeing to perform." *Id*. at 840. In so doing, the state law

24  impermissibly attempted to supplant the standards chosen by the federal government

25  with those chosen by the state. *Id*. The Ninth Circuit agreed and concluded that the

26  statute directly regulated the federal government in violation of the Supremacy Clause.

27  *Id*.

28       Similar to *Blackburn* and *Boeing*, the Labor Code here directly regulates the

**PROOF OF SERVICE**

Federal Government, and by extension GEO.[10] The relevant IWC Wage Orders including IWC 5 define "employer" in relevant part, as any person, association, organization, partnership, business trust, limited liability company, or corporation "who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person." *See e.g.* IWC 5. The federal government (and by extension, its contractor GEO) falls squarely within this definition, just as the federal government (and *Boeing*) fell within the definition of "responsible party" in Boeing. There is no exception in the Labor Code for individuals under the jurisdiction, custody, or employ, of the federal government. Thus, as in *Boeing*, the regulation impermissibly "mandates the ways in which [GEO] renders services that the federal government" hired it to perform. *Boeing*, 768 F.3d at 840.

The Labor Code directly regulates the federal government by mandating the amount of wages the government and its contractor must pay—and to whom. Specifically, here, Plaintiffs seek to utilize its provisions to classify VWP participants as "employees." In the alternative, they seek to utilize its provisions to eliminate the VWP program, despite the federal government's established practice that conditions of confinement improve when idleness decreases. (UMF 31; PBNDS § 5.8.)

**(b)  The California Labor Code discriminates Against the United States Government and Those with Whom it Deals.**

In addition to directly regulating the federal government, the Labor Code discriminates against the federal government by excluding the detainees and inmates of the State of California and its political subdivisions from the definition of "employee" while simultaneously categorizing federal detainees and inmates as "employees." As

---

[10] In *U.S. v. California*, the Ninth Circuit held that in the context of federal immigration detention centers, federal government contractors are treated the same as the federal government itself for purposes of intergovernmental immunity. *United States v. California*, 921 F.3d 865, 882 n.7 (9th Cir. 2019).

CASE NO. 5:17-CV-02514-JGB-SHKx

**PROOF OF SERVICE**

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

55779921;8

the Ninth Circuit recently reiterated, "state laws are invalid if they . . . discriminate[] against the Federal Government or those with whom it deals." *United States v. California*, 921 F.3d at 878. IGI attaches when a state law both discriminates against the federal government and burdens it in some way. *Id.* The Ninth Circuit has also clarified that there is no *de minimis* exception to IGI; rather, "*[a]ny* economic burden that is discriminatorily imposed on the federal government is unlawful." *Id.* at 883-84 (emphasis in original). Even if a state law does discriminate against and burden the Federal Government, it may nonetheless survive if that burden is "justified by[] 'significant differences between the two classes.'" *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 816 (1989). Thus, the Labor Code is discriminatory if (1) it treats a state entity that is similarly situated better, and (2) that discrimination in some way burdens the Federal Government or its contractors. *United States v. California*, 921 F.3d at 878. Both prongs of the intergovernmental immunity test are met here.

First, it is clear the Labor Code discriminates against the United States and its contractors by treating "someone else better than it treats them." *California*, 821 F.3d at 881. Here, the Wage Order on which the Plaintiffs rely upon in their suit exempts from its reach any individual employed by the State of California or a subdivision thereof. (*See* IWC 5) ("…the provisions of th[e] order shall not apply to any employees directly employed by the State or any political subdivision thereof, including any city, county, or special district.") Thus, those in the custody of the State or a California municipality are exempted from the minimum wage laws, while those in federal custody are not. Indeed, the California Penal Code explicitly authorizes the payment of subminimum wages to incarcerated individuals. *See* Cal. Penal Code § 2811 ("[I]n no event shall that compensation [to inmates] exceed one-half the minimum wage provided in Section 1182 of the Labor Code.").

Theo Lacy and Yuba County both implement the same PBNDS-authorized VWP that GEO implements at its facilities. (UMF55.) Through this nearly identical program, Orange County and Yuba County house ICE detainees and pay them $1

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

55779921;8

per day for their participation in nearly identical tasks to those included in GEO's VWP. Yet, in contrast to GEO, Yuba County and Orange County take advantage of the preferential treatment in the IWC and are shielded from a claim that ICE detainees should be classified as "employees." (UMF 58, 59.) Indeed, the California Attorney General reviewed state-operated VWPs, some of which pay less than $1 per day, and did not find any violation of the California Labor Code. (UMF 61.) Accordingly, Orange and Yuba Counties are treated better than GEO. There can be no question the programs are comparable, as both are implemented under ICE standards and include materially similar positions. (UMF 53-61.) By excluding the State, cities, and counties from the Labor Code's minimum wage provisions while including the Federal government (and its contractor GEO), the Labor Code clearly discriminates against the federal government.

This disparate treatment burdens the Federal Government and its contractors. As a result of the discriminatory legislation, the federal government (and GEO) face an economic burden that the State of California and its political subdivisions do not. *See e.g.*, *Blackburn*, 100 F.3d at 1435 (finding intergovernmental immunity applicable where the government would face an incredible administrative burden to comply with the law); *California*, 921 F.3d at 883 ("any discriminatory burden on the federal government is impermissible"). GEO (and the federal government) are subject to an economic burden that the State would not be forced to bear. The difference between $1 a day and minimum wage is significant, particularly where ICE reimburses only up to $1 per day, per detainee, in its contract with GEO. (UMF 38-45.) If minimum wage applied, GEO would be compelled to restructure and renegotiate the pricing of its contracts with ICE, ultimately passing the cost directly to ICE. (UMF_43.) This restructuring will place a significant financial burden on the federal government. At the same time, the State would be free to continue to operate work programs for state-housed detainees and inmates at a fraction of minimum wage. Accordingly, GEO is immune from liability on Plaintiffs' minimum wage claims under the doctrine of

**PROOF OF SERVICE**

55779921;8

intergovernmental immunity.

### (c)    The CTVPA Also Discriminates Against the United States Government and Those with Whom it Deals

Plaintiffs also seek a ruling that detainees who are required to clean-up after themselves in their dorms are victims of human trafficking because detainees' duties to clean up should be narrowly limited to a small number of specific tasks outlined in one segment of the PBNDS. (ECF 184 at ¶ 70.) Under Plaintiffs' reading, GEO would be prohibited from asking a detainee to help clean up toothpaste that spills while a detainee is brushing his or her teeth; clean up milk spilled by a detainee during a meal; or pick up trash the detainee throws on the living area floor.

While GEO (and ICE) firmly disagree with Plaintiffs' tortured interpretation of the PBNDS as limiting clean-up to Plaintiffs' contrived reading of the PBNDS, if the CTVPA were to be read to disallow GEO, and by extension ICE, from requiring detainees to clean their living areas it would discriminate against the federal government in a way it does not discriminate against the State. Under the California Regulations applicable to prisons and detention centers within the State of California, "[i]nmates must keep their quarters and surroundings neat, clean and sanitary. Inmates may not alter their quarters or equipment without specific authorization to do so." Cal. Code Regs. tit. 15, § 3064. To that end, California State facilities require detainees to maintain the cleanliness and sanitation of their individually assigned cells or sleeping locations without violating the CTVPA. (UMF 60.) Thus, applying the law differently to GEO would result in discrimination against the federal government, as is explicitly prohibited by the Supremacy Clause.

### 2.    Derivative Sovereign Immunity

GEO is also immune under the principles of Derivative Sovereign Immunity ("DSI"). Government contractors, like GEO, "obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016) (internal quotation

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**PROOF OF SERVICE**

55779921;8

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

marks omitted).[11] DSI is applicable where a contractor performs work "authorized and directed by the Government of the United States." *Campbell-Ewald*, 136 S. Ct. at 673. DSI ensures that "there is no liability on the part of the contractor who simply performed as the Government directed." *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 69 (D.C. Cir. 2019) (quoting *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 21 (1940)). A contractor asserting DSI must satisfy a two-part inquiry. First, the contractor must show it "performed as the Government directed." *Campbell-Ewald*, 136 S. Ct. at 673. Second, it must show the "authority to carry out the project was validly conferred" by the government. *Yearsley*, 309 U.S. at 20-21. Authority is "validly conferred" if Congress authorized the government agency to perform a task and empowered the agency to delegate that task to the contractor, and it was within Congress's power to grant such authority. *Id.* at 20.

The Fourth Circuit recently addressed facts analogous to those here. In *Cunningham v. General Dynamics Information Technology*, Greg Cunningham received an autodialed call from General Dynamics (a government contractor), advertising the commercial availability of health insurance. 888 F.3d 640, 643 (4th Cir.), *cert. denied*, 139 S. Ct. 417 (2018). Cunningham filed suit arguing that because he had not provided his express consent to receive calls about affordable healthcare, General Dynamics had violated the Telephone Consumer Protection Act ("TCPA"). *Id.* In response, General Dynamics claimed that it was immune from suit under the principle of DSI. *Id.* General Dynamics argued that it called Cunningham pursuant to

---

[11] To avoid any confusion, *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016) makes clear that derivative sovereign immunity is distinct and separate from the "government contractor defense" enumerated in *Boyle v. United Techs. Corp.*, 487 U.S. 500, 508, 108 S. Ct. 2510, 2516, 101 L. Ed. 2d 442 (1988). Cases decided after the Court's 2016 *Campbell-Ewald* decision have treated derivative sovereign immunity as its own distinct defense, separate from the government contractor defense under *Boyle*. *See, e.g., Scott v. J.P. Morgan Chase & Co.*, 296 F. Supp. 3d 98 (D.D.C. 2017) (applying derivative sovereign immunity to state and federal law claims separate from government contractor defense).

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

its contract with the Department of Health and Human Services ("DHHS") wherein General Dynamics was required to make calls informing individuals about their ability to purchase health insurance.[12] *Id.* at 643. DHHS authorized General Dynamics to use an autodialer to make the calls, provided a script for each call, and provided a list of phone numbers to call. *Id.* DHHS provided Cunningham's phone number to General Dynamics, indicating he was an individual who should be notified of his right to purchase health insurance. *Id.* However, Cunningham had previously opted out of the communications. *Id.* The instruction to call him despite his prior opt-out gave rise to potential liability under the TCPA. *Id.*

Interpreting *Campbell-Ewald*, the Fourth Circuit concluded that a contractor was entitled to governmental immunity *except* where the contractor violates its contract with the federal government. In assessing whether DSI applied, the Fourth Circuit concluded that General Dynamics did not violate its contract when it made the call to Cunningham, because the call was explicitly authorized under the contract. *Id.* The Fourth Circuit explained that the contractor's failure to obtain Cunningham's consent prior to placing the phone call—as mandated by the TCPA—was insufficient to establish a violation of the contract which required compliance with "all applicable laws" because its actions were otherwise directed by the contract. *Id.* Thus, General Dynamics was entitled to DSI. *Id.* As applied here, there is no question GEO has "simply performed as [ICE] directed" and that ICE's authority to delegate the care of detainees and their discipline to GEO was validly conferred by Congress.

### (a)     DSI Shields GEO from CTVPA and TVPA Liability

### (i)     ICE validly conferred authority to GEO to discipline detainees as a matter of law

Congress validly conferred authority to ICE to provide and contract for the custodial supervision of detainees using private contractors like GEO. ICE has broad

---

[12] DHHS was authorized to establish a system informing applicants about their eligibility for a qualified health plan pursuant to 42 U.S.C. § 18083(a), (b)(2), (e.

**PROOF OF SERVICE**

55779921;8

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

discretion to determine where to house ICE detainees. *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1440 (9th Cir. 1986) ("Congress … placed the responsibility of determining where aliens are detained within the discretion of the Attorney General."); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) ("[A]ny policy toward aliens" is "exclusively entrusted to the [Federal Government]"). To that end, Congress directed ICE to contract with state governments or private entities for the operation or lease of detention facilities before constructing or acquiring new ones. 8 U.S.C. §§ 1103(a)(11), 1231(a)(2), (g). ICE's contract with GEO for the operation of Adelanto is therefore a valid exercise of authority delegated by Congress. Further, the ICE Contracts mandate compliance the PBNDS, including the Disciplinary Policy. (UMF 71.) Thus, the conduct about which Plaintiffs complain in this case has been prescribed by ICE as part of its validly-conferred authority to provide for the custodial supervision of alien detainees. *Yearsley*, 309 U.S. at 20-21.

**(ii)   GEO performed as ICE directed in connection with the sanitation and detainee discipline policies**

ICE also explicitly authorized and directed the activity of which Plaintiffs complain. Plaintiffs claim that GEO obtained Plaintiffs' labor by warning detainees that they were subject to the disciplinary measures in the ICE PBNDS if they did not clean up their living area, as is detailed in the ICE National Detainee Handbook and the local facility handbooks. But the undisputed facts demonstrate that GEO simply followed ICE's explicit contractual requirements. The PBNDS, with which GEO is contractually obligated to comply pursuant to the ICE Contracts, require GEO to provide every detainee with a copy of the ICE National Detainee Handbook. (UMF 72, 74). The ICE National Detainee Handbook directs detainees to keep their living areas clean, without compensation, or face potential disciplinary sanctions. (UMF 80.) Correspondingly, the PBNDS require GEO to incorporate the Disciplinary Policy, as drafted by ICE, into its local facility handbooks. (UMF 71.) In both handbooks, ICE's expectation is that a detainee must keep all areas he or she uses clean, including any general-use areas.

**PROOF OF SERVICE**

(UMF 67.) ICE has also prescribed the exact sanctions for a detainee's failure to clean his or her living area. The PBNDS Disciplinary Policy contains a list of thirteen different potential sanctions for the infraction of "[r]efusing to clean assigned living area" including the sanctions ranging from "warning" to "segregation (up to 72 hours)." (UMF 80.) Thus, the possible sanctions for a detainee's refusal to clean his or her living area—and the communication of those possible sanctions to detainees—were explicitly authorized and directed by ICE.

Additionally, the facts demonstrate GEO does not have an independent policy to discipline detainees with segregation for failure to clean their living areas. (UMF 81, 84.) Indeed, even with this ICE-prescribed sanction, segregation records make clear that detainees in Adelanto *were not* placed in segregation for refusing to clean, nor were detainees routinely warned that segregation was a possible sanction for refusing to clean. (UMF 86.) Rather, GEO officers are trained to use lesser sanctions wherever possible, including informal resolution. (UMF 82.) There can be no question that by merely including the possible sanction of up to 72 hours in segregation as a sanction for refusing to clean one's living area in its policies, GEO was simply doing exactly what the government ordered by warning detainees of this legitimate consequence, as in *Cunningham*. Thus, because the disciplinary practices Plaintiffs challenge are expressly directed, authorized, and required by ICE, GEO immune from liability under the TVPA and CTVPA under the principle of DSI.

> **(b)   DSI Shields GEO from Plaintiffs' remaining claims because ICE instructed GEO to pay detainees $1 per day**
>
> **(i)   ICE validly authorized GEO to create and administer the VWP**

As detailed *supra*, ICE is authorized to contract with private entities for the detention of individuals pending resolution of their immigration proceedings. Similarly, Congress authorized ICE to provide voluntary work programs that pay allowances to detainees of $1.00 per day ( 8 U.S.C. § 1555(d)). *Yearsley*, 309 U.S. at 20-21. This exact

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

amount was explicitly authorized by Congress when it set the rate for detainee allowances at "not in excess of $1 per day." Dep't of Justice Appropriations Act of 1979, Pub. L. 95-431, 92 Stat 1021, 1027 (Oct. 10, 1978).

### (ii)   GEO performed as ICE directed in connection with the VWP and paying $1 per day

ICE's contract with GEO requires it to implement a VWP. (UMF 31.) ICE establishes the terms and conditions of the work program offered, determines which detainees are eligible to participate and what work those approved detainees are eligible to perform, and sets the maximum hours detainees are permitted to work. (UMF 30-33, 37.) ICE also determines the amount of the stipend given to detainees who participate in the VWP ($1.00) and authorizes a system for payment of the stipends whereby GEO advances the allowance and is thereafter reimbursed by ICE. (UMF 38-45.) Indeed, in reviewing the contract, ICE's 30(b)(6) representative was explicit that the ICE Contract "clearly says that detainee labor shall be used in accordance with the approved detainee work plan and will or shall be paid $1 a day. So that is clear." (UMF 45.) Consistent with these requirements, GEO has always paid $1 per day to detainees at Adelanto. (UMF 42, 44.)

ICE's understanding is consistent with GEO's understanding of the contract. Facility Administrator Janecka testified at deposition that ICE told him GEO could not pay more than one dollar a day to detainees at Adelanto. (UMF 44.) There is therefore no ambiguity as to the amount GEO was required to pay to VWP participants. Furthermore, there is no question that GEO complied with ICE's explicit directive to pay *exactly* one dollar per day to detainees in the VWP. Thus, GEO is entitled to immunity from the Adelanto Wage Class claims under the principles of DSI.

### E.   The CTVPA and California Labor Code, under Plaintiffs' Interpretation, Would Be Preempted.

Whereas intergovernmental immunity arises directly from the Supremacy Clause even in the absence of an applicable federal statute, preemption occurs when a state

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**PROOF OF SERVICE**
55779921;8

regulation "conflict[s] with an *affirmative* command of Congress." *North Dakota*, 495 U.S. at 434 (emphasis added). State law "actually conflicts" with federal law, *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990), when it "stands as an obstacle to the accomplishment and execution of congressional objectives," *Nw. Cent. Pipeline v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 509 (1989). And when deciding whether a state law presents such an obstacle, courts consider "the entire scheme of the statute," and "that which needs must be implied is of no less force than that which is expressed." *Savage v. Jones*, 225 U.S. 501, 533 (1912). In other words, if the federal law's "operation within its chosen field . . . must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." *Id.*

If, contrary to GEO's interpretation, the CTVPA prohibits the sanitation and disciplinary policies required by ICE, and detainees are employees who must be paid minimum wage under the California Labor Code, then the CTVPA and California Labor Code are preempted for denying to federal immigration statutes their "natural effect[s]" and for obviously "frustrate[ing]" immigration statutes' operation. *Id.* In particular, the California statutes are preempted by federal law in light of the well-settled principle that "any state law that impedes the federal government's ability to contract . . . [is] preempted." *Student Loan Servicing All. v. District of Columbia*, 351 F. Supp. 3d 26, 62 (D.D.C. 2018); *see Sperry v. Florida*, 373 U.S. 379, 385 (1963); *Leslie Miller, Inc.*, 352 U.S. at 190; *Virginia*, 139 F.3d at 987–88. Notably, in *Gartrell Construction Inc. v. Aubry*, 940 F.2d 437 (9th Cir. 1991), the Court held—consistent with longstanding Supreme Court precedent—that the State's attempt to regulate contractors performing services on a federal construction project was preempted. *Id.* at 438–41. While the federal government had concluded that the contractor in *Gartrell* satisfied the requirements for "responsibility" dictated by the Federal Acquisition Regulations, the State imposed a parallel licensing regime that "effectively attempt[ed] to review the federal government's responsibility determination." *Id.* 439. Such second-guessing of

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**PROOF OF SERVICE**

the federal government's contracting choices "interfere with federal government functions and would frustrate the federal policy." *Id.* at 441.

This analysis from *Gartrell* applies with full force to the CTVPA and California Labor Code: while the federal government has concluded that the contractor in this case, GEO, must enforce certain sanitation and discipline polices and must operate the VWP as directed, the CTVPA and California Labor Code, as interpreted by the Plaintiffs, categorically *prohibit* these policies and thus represent precisely the kind of second-guessing that was rejected in *Gartrell Construction*. Thus, if Plaintiffs correctly interpret the CTVPA and the California Labor Code, those statutes are preempted.

### F.   Plaintiffs' Unjust Enrichment Claim Fails on the Merits

The theory of unjust enrichment requires one who acquires a benefit which may not justly be retained, to return either the thing or its equivalent to the aggrieved party so as not to be unjustly enriched. *Lyles v. Sangadeo-Patel*, 225 Cal. App. 4th 759, 769 (2014). "[I]t is not enough to show that goods or services were furnished to another; it must also be shown that the person to whom the goods or services were furnished received a substantial benefit therefrom and that it would be unconscionable to permit him to retain the benefit without paying for its reasonable value." *Harold A. Newman Co. v. Nero*, 31 Cal. App. 3d 490, 497 (1973).

Here, Plaintiffs claim GEO realized cost savings by implementing the VWP rather than hiring additional employees. The facts, however, demonstrate GEO does not gain a benefit from the VWP. Rather, it must implement the program (accounting for all costs associated with doing so) and provide the detainees with a pass-through stipend of $1 per day. (UMF 43.) If it instead hired employees to perform the work, GEO would be able to realize additional profits on the markup to ICE of its increased labor costs. (UMF 52.) Accordingly, summary judgment is proper because Plaintiffs cannot show GEO obtains any benefit from the VWP, much less under circumstances which would make it unjust for them to do so.

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**PROOF OF SERVICE**

55779921;8

### G.     Plaintiffs' Unfair Competition Claim Fails on the Merits

The UCL's purpose is to protect both consumers and competitors from unlawful, unfair or fraudulent business practices by promoting fair competition in commercial markets for goods and services. *Hall v. Time Inc.*, 158 Cal. App. 4th 847, 852 (2008), *as modified* (Jan. 28, 2008). The UCL prohibits, inter alia, "any unlawful, unfair or fraudulent business act or practice...." (§ 17200.) In order to give substance to this prohibition, a UCL action "borrows violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices." *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1590 (2008). Here, Plaintiffs' UCL claim is derivative of their other claims and fail for the same reasons set forth herein.

## V.     CONCLUSION

For the foregoing reasons, this Court should grant GEO's Motion for Summary Judgment and summarily dismiss Plaintiffs' claims in their entirety.

Dated: December 21, 2020                       **AKERMAN LLP**

By: */s/ Alicia Y. Hou*
Ellen S. Robbins
Alicia Y. Hou
Attorneys for Defendant
THE GEO GROUP, INC.

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**PROOF OF SERVICE**

55779921;8