**AKERMAN LLP**
ELLEN S. ROBBINS (SBN 298044)
ALICIA Y. HOU (SBN 254157)
601 West Fifth Street, Suite 300
Los Angeles, California 90071
Telephone: (213) 688-9500
Facsimile: (213) 627-634depri
Email: ellen.robbins@akerman.com
Email: alicia.hou@akerman.com

LAWRENCE D. SILVERMAN (admitted *pro hac vice*)
98 Southeast Seventh Street, Suite 1100
Miami, Florida 33131
Telephone: (305) 374-5600
Facsimile: (305) 374-5095
Email: lawrence.silverman@akerman.com

ADRIENNE SCHEFFEY (admitted *pro hac vice*)
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: (303) 260-7712
Facsimile: (303) 260-7714
Email: adrienne.scheffey@akerman.com

Attorneys for Defendant
THE GEO GROUP, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

| | |
|---|---|
| RAUL NOVOA, JAIME CAMPOS FUENTES, ABDIAZIZ KARIM, and RAMON MANCIA, individually and on behalf of all others similarly situated<br><br>Plaintiff,<br><br>vs.<br><br>THE GEO GROUP, INC.,<br><br>Defendant.<br><br>_____<br><br>AND RELATED COUNTERCLAIM | Case No. 5:17-cv-02514-JGB-SHK<br><br>Assigned to Hon. Jesus G. Bernal<br><br>**DEFENDANT THE GEO GROUP, INC.'S NOTICE OF MOTION AND MOTION TO DECERTIFY THE CLASS**<br><br>Date: February 1, 2021<br>Time: 9:00 a.m.<br>Place:　　　Courtroom 1<br>　　　　3470 Twelfth Street<br>　　　　Riverside, California 92501<br><br>ORAL ARGUMENT REQUESTED |

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342
**AKERMAN LLP**

54743754;18

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT that on February 1, 2020 at 9:00 A.M., or as soon thereafter as the matter can be heard, THE GEO GROUP, INC. ("GEO"), shall appear before the Honorable Jesus G. Bernal, in Courtroom 1 of the above-described Court, located at 3470 Twelfth Street, Riverside, California 92501-3801, and shall then and there present its Motion to Decertify the Class Action. GEO respectfully moves for an order decertifying Plaintiffs Forced Labor classes.

As detailed in the attached memorandum and points of authorities, along with all papers and records on file herein, Plaintiffs claims are highly individualized and not suited for class treatment. Accordingly decertification is proper.

This Motion is made following a conference of counsel pursuant to L.R. 7-3 which took place October 6, 2020.

Dated: December 22, 2020                  **AKERMAN LLP**


By:   _/s/ Ellen S. Robbins_
      Ellen S. Robbins
      Alicia Y. Hou
      Adrienne Scheffey
      Attorneys for Defendant
      THE GEO GROUP, INC.

**AKERMAN LLP**
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

54743754;18

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...................................................................................................1

II. RELEVANT FACTS AND PROCEDURAL HISTORY .....................................2

    A. Procedural History of Class Certification ................................. 2

    B. Menocal v. The GEO Group. Inc. .............................................. 6

    C. The Nationwide Facility Sanitation Policies. ............................ 7

    D. ICE's Disciplinary Severity Scale. .......................................... 13

    E. Detainee Provisions. ................................................................ 16

    F. Individual Responses to a Warning of Segregation ................. 18

ANALYSIS .................................................................................................................18

III. The Court Has a Continuing Duty to Ensure Compliance with Class Action Requirements and the National "HUSP" and Adelanto Forced Labor Classes Do Not Do So. ..........................................................................................18

    A. Class Must Continue to Meet the Requirements for Certification. .............. 18

    B. The Elements of Proof for TVPA Claims .................................. 20

    C. Plaintiffs cannot establish that GEO implemented classwide policies that satisfy the commonality and predominance requirements. ................... 22

        i. Plaintiffs' Nationwide TVPA Class. .................................................. 24

        ii. Plaintiffs' Adelanto CTVPA & TVPA Class. .................................... 26

    D. Plaintiffs' Claims Require Individualized Inquires of Harm. ..................... 26

        i. Plaintiffs' Nationwide TVPA Class. .................................................. 27

        ii. Plaintiffs' Adelanto CTVPA & TVPA Class. .................................... 28

    E. Individual Issues Predominate in Both the Application and Effect of ICE's Disciplinary Policy. ............................................................... 30

        i. Under ICE's disciplinary severity scale, discipline varies on a case-by-case basis and is not suitable for class determination. ......... 30

        ii. The TVPA's Test for "Serious Harm" Requires an Individualized Analysis that Is Not Suitable for Classwide Resolution. ........................................................................................ 32

        iii. There was no threat of discipline related to the Voluntary Work Program. .......................................................................................... 34

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**TABLE OF CONTENTS**

IV.     TVPA claims of any class member detained prior to December 23, 2008 are time barred.........................................................................................................34

CONCLUSION ...............................................................................................................35

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abarca v. Little*,
  54 F. Supp. 3d 1064 (D. Minn. 2014) ............................................................... 33

*Andrews v. Plains All Am. Pipeline, L.P.*,
  777 Fed. App'x 889 (9th Cir. 2019) ................................................................. 26

*Campbell v. Best Buy Stores, L.P.*,
  2013 WL 5302217 (C.D. Cal. Sept. 20, 2013) ................................................. 23

*CGC Holding Co. v. Broad & Cassel*,
  773 F.3d 1076 (10th Cir. 2014) .......................................................................... 7

*Chavez v. Plan Benefit Servs., Inc.*,
  957 F.3d 542 (5th Cir. 2020) ............................................................................ 20

*Colapinto v. Esquire Deposition Services, LLC*,
  No. CV 09-07584 SJO 2011 WL 913251 (C.D. Cal. Mar. 8, 2011) ................ 26

*David v. Signal Intern LLC*,
  No. 08-1220, 2012 WL 10759668 (E.D. La. Jan. 4, 2012) ......................... 20, 32

*Davidson v. O'Reilly Auto Enterprises, LLC*,
  968 F.3d 955 (9th Cir. Aug. 3, 2020) .......................................................... 22, 25

*Doe v. Siddig*,
  810 F.Supp.2d 127 (D.D.C.2011) ..................................................................... 34

*Dominguez v. UPS Co.*,
  No. EDCV 18-1162 ........................................................................................... 23

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ....................................................................... 19, 22

*Gene And Gene LLC v. BioPay LLC*,
  541 F.3d 318 (5th Cir. 2008) ............................................................................ 30

*Guido v. L'Oreal, USA, Inc.*,
  No. CV 11-1067 CAS, 2012 WL 2458118 (C.D. Cal. 2012) ........................... 18

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ...................................................................19

*Headley v. Church of Scientology Int'l*,
  687 F.3d 1173 (9th Cir. 2012) ................................................................20

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018).............................................................26, 29

*In re Rail Freight Fuel Surcharge Antitrust Litig. - MDL No. 1869*,
  934 F.3d 619 (D.C. Cir. 2019)................................................................26

*Marlo v. UPS*,
  639 F.3d 942 (9th Cir. 2011) ............................................................18, 22

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) ..................................................................26

*Menocal v. GEO*,
  882 F.3d 905 (10th Cir. 2018) ..........................................................passim

*Menocal v. GEO*,
  992 F.3d at 911 ....................................................................................4, 6

*Menocal v. GEO Grp., Inc.*,
  320 F.R.D. 258 (D. Col. 2017), *aff'd* 882 F.3d 905 (10th Cir. 2018) .................6

*Ms. L. v. U.S. Immigration and Customs Enforcement*,
  330 F.R.D. 284 (S.D. Cal. 2019) ............................................................19

*Muchira v. Al-Rawaf*,
  850 F.3d 605 (4th Cir. 2017) ........................................................21, 25, 31

*Officers for Justice v. Civil Service Com'n of City and Cty of San Francisco*,
  688 F.2d 615 (9th Cir. 1982) ..................................................................18

*Panwar v. Access Therapies, Inc.*,
  2015 WL 329013 (S.D. Ind. 2015)..........................................................32

*Patel v. Facebook, Inc.*,
  932 F.3d 1264 (9th Cir. 2019) ................................................................18

*Poulos v. Caesars World, Inc.*,
  379 F.3d 654 (9th Cir. 2004) ...................................................................7

*Rai v. CVS Caremark Corp.*,
   No. CV 12-08717-JGB ...................................................................................19

*Romo v. GMRI, Inc.*,
   2014 WL 12588646 (C.D. Cal. Aug. 12, 2014) ...........................................23, 33

<u>*Roy v. County of Los Angeles*, No. CV 13-04416-AB (FFMx),
   2018 WL 3435417 (C.D. Cal. July 11, 2018)</u> .....................................................19

*Sarviss v. General Dynamics Info. Technology, Inc.*,
   663 F. Supp. 2d 883 (C.D. Cal. 2009) .................................................................23

*Tanedo v. East Baton Rough Parish School Bd.*,
   2011 WL 7095434 (C.D. Cal. Dec. 12, 2011)......................................................32

*U.S. v. Dann*,
   652 F.3d 1160 (9th Cir. 2011) .............................................................................20

*United States v. Kalu*,
   791 F.3d 1194 (10th Cir. 2015) ...........................................................................20

*United States v. Rivera*,
   799 F.3d 180 (2d Cir. 2015) ................................................................................31

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)..................................................................19, 23, 29, 30

*Wang v. Chinese Daily News*,
   737 F.3d 538 (9th Cir. 2013) ...............................................................................22

*Willis v. City of Seattle*,
   943 F.3d 882 (9th Cir. 2019) ...............................................................................22

*Wright v. Renzenberger, Inc.*,
   656 F. App'x 835 (9th Cir. 2016).........................................................................22

**Statutes**

18 U.S.C. § 1589(a) ...................................................................................20, 21

18 U.S.C. § 1589(c) ..........................................................................................31

18 U.S.C. § 1589(c)(2).......................................................................................21

18 U.S.C. § 1595(c) ...........................................................................................33

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

California's Labor Code, Unjust Enrichment, and California's Unfair
    Competition Law ................................................................................5

California Trafficking Victims Protection Act .........................................2

CTVPA ...........................................................................................passim

Trafficking Victims Protection Act .........................................................2

TVPA .............................................................................................passim

**Rules**

Fed.R.Civ.P. 23(a) ................................................................................19

Fed. R. Civ. P. 23(c)(1) ........................................................................18

Fed. R. Civ. P. 56(a) ............................................................................29

Rule 23 .............................................................................................18, 19

Rule 23(b)(2) .................................................................................19, 22

Rule 23(b)(3) .................................................................................19, 26

Rule 23(c)(1)(C) ..................................................................................19

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

At the class certification stage, Plaintiffs alleged the existence of "corporate policies and uniform practices … [of f]orcing or coercing [detainees] to perform uncompensated janitorial, maintenance, or other work at a GEO civil immigration detention facility above and beyond the four personal housekeeping tasks enumerated in the ICE PBNDS." ECF 184 at 237. Specifically, Plaintiffs alleged GEO obtained unpaid labor by "[t]hreatening Plaintiffs and Nationwide HUSP Class Members with physical restraint and/or serious harm including solitary confinement, referral to an ICE officer, or criminal prosecution." *Id.* Plaintiffs further claimed that there was a pervasive policy of depriving detainees of basic necessities at the Adelanto ICE Processing Center ("Adelanto"). But the facts elicited during discovery demonstrate that no such common proof exists and that the opposite is true.

Though Plaintiffs all shared the common experience of being detained at the Adelanto Facility while their cases proceeded through the immigration court system or they awaited deportation, that is where their commonality ends. Plaintiffs' claims in this case are anecdotal at best and cannot fairly be extrapolated to other detainees at Adelanto, let alone the nationwide class. Discovery has made clear that no uniform policy exists that would justify continued class certification. The housekeeping policies at each facility varied greatly, as did the imposition of disciplinary sanctions. Detainees' motivations also varied significantly. Thus, the Court would need to assess each individual detainee's claims on their own merits, including individualized rebuttal evidence. For example, GEO will rebut Plaintiff Novoa's claims by presenting individualized evidence that he was not deprived of necessities and was never asked to clean (without compensation) any area of Adelanto outside of that which Plaintiffs deem permissible. GEO will also rebut the other named Plaintiffs' claims with individualized evidence of their unique experiences. As a result, each Plaintiff's claim must be analyzed on its own merits and subject to

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**DEFENDANT THE GEO GROUP, INC.'S MOTION TO DECERTIFY THE CLASS**

individualized defenses presented by GEO. Common issues do not predominate, and decertification is appropriate.

## II.    RELEVANT FACTS AND PROCEDURAL HISTORY

### A.    Procedural History of Class Certification

Last year, Plaintiffs filed a motion for class certification, seeking to certify three classes: (1) the Adelanto Wage Class; (2) the Adelanto Forced Labor Class comprised of two subclasses, (a) the uncompensated work program, and (b) the work program subclass; and (3) the Nationwide Housing Unit Sanitation Policy Class. ECF 192-1 at 1. In support of their motion, Plaintiffs identified two questions common to the class: (1) whether detained immigrants (some allegedly unpaid) are GEO's employees; and (2) "whether GEO unlawfully obtains free or underpaid detainee labor at Adelanto and its other civil immigration detention facilities nationwide." [1] ECF 192-1 at 22, 24-25. The instant motion focuses exclusively on the second issue, which underlies the Adelanto Forced Labor Class and the Housing Unit Sanitation Policy Class ("HUSP Class"). This motion does not seek to decertify the Adelanto Wage Class.

Section 5.8 of the Performance Based National Detention Standards ("PBNDS") provides for the Voluntary Work Program ("VWP") through which detainees may volunteer to perform a wide variety of tasks for compensation of at least $1 per day. ECF 422-1, Brooks Dec. ¶ 11; ECF 422-2, Nguyen Dec. ¶ 9. Section 5.8 contains a clear purpose, it "provides detainees opportunities to work and earn money while confined." ECF 415-2 Martin Dec. Ex. D, PBNDS, § 5.8.I. Section 5.8 contemplates a variety of VWP positions, but makes clear that not every task performed by a detainee will be compensated.

---

[1] Plaintiffs' framing of the second issue, however, is superficial and does not address the Plaintiffs' burden of proof for their Trafficking Victims Protection Act ("TVPA") and the California Trafficking Victims Protection Act ("CTVPA") claims. Whether GEO "unlawfully" obtained detainee labor from each member of the class requires Plaintiffs to establish the detainee's motivation for the "labor"; whether that each detainee's motivation arose from a threat of "serious harm"; and whether on each individual occasion GEO acted with the requisite intent. No classwide proof exists that can create an inference as to why each detainee chose to keep their area clean and how each detainee perceived the possible consequences of not cleaning. Instead, each of these questions goes to the motivations behind each detainee's actions, requiring individualized inquiries to resolve each question. Thus, decertification is warranted.

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

*Id.* To that end, the PBNDS explain that detainees are responsible for "personal housekeeping," or, put differently, the tasks associated with keeping their living area clean. Section 5.8 provides examples of tasks that fall within the ambit of "personal housekeeping" and are therefore noncompensable under the VPW. ECF 422-1, Brooks Dec. ¶ 14.

Under Plaintiffs' interpretation[2] of Section 5.8 of the PBNDS, not all "personal housekeeping" is noncompensable, but instead, detainees cannot be asked to perform any tasks outside of the following four items (absent a promise of $1 per day): (1) making their bunk beds daily; (2) stacking loose papers; (3) keeping the floor free from debris and dividers free of clutter; and (4) refraining from hanging/draping clothing, pictures keepsakes, or other objects from beds, overhead lighting fixtures or other furniture. ECF 192-1 at 5 (citing 2011 PBNDS 5.8 V.C.). Plaintiffs construe this list as establishing a "clear prohibition on mandatory labor" outside of the four items listed. ECF 192-1 at 13.[3] Plaintiffs argue that because they were asked to perform cleaning tasks beyond the four items enumerated in PBNDS 5.8, and because they were subject to various potential sanctions for non-compliance, the basic housekeeping chores they completed under these circumstances were impermissibly forced under the TVPA and the CTVPA.

Plaintiffs assert they were not sporadically asked to clean outside of the four items listed in Section 5.8, but instead, were consistently required to complete cleaning tasks per written policies that applied to all detainees housed in Adelanto and GEO's other facilities

---

[2] Plaintiffs' interpretation of Section 5.8 of the PBNDS is directly contrary to the interpretation of ICE, the agency that drafted the PBNDS. ECF 422-1, Brooks Dec. at ¶ 14; Ex. A, Brooks Dep. at 254:10-15.
[3] GEO disputes that Plaintiffs' interpretation of the PBNDS is accurate. Plaintiffs' interpretation improperly relies upon a single excerpt of the PBNDS, without references to other applicable sections or standards. Indeed, the PBNDS use the phrase "living area" throughout to refer to a larger area than that which surrounds a detainee's bunk or a detainee's cell. In some portions, the PBNDS even make clear that "living areas" are synonymous with "pods" as opposed to cells. PBNDS, 2.13 V.A (stating that the detainee handbook should be posted in "living areas (or 'pods')") *see also* ECF 422-1, Brooks Dec. at ¶ 15-17. That said, for purposes of this motion, GEO assumes *arguendo* that Plaintiffs' interpretation applies. Even doing so, Plaintiffs' claims are clearly unsuited for classwide treatment.

across the country.[4] In support, Plaintiffs cited to the Adelanto Sanitation Procedures which provide that "[e]ach detainee will be responsible for the cleanliness of his or her cell or living area, including walls, floors, sink, toilet, windows, and other property within the cell, room, or living area." ECF 192-1 at 19 (citing to Adelanto Sanitation Procedures, ECF 193-23). Plaintiffs interpreted the policy as requiring a mandatory uncompensated cleaning each morning wherein every detainee would clean the facility from top to bottom. *Id.* In support they cited testimony of Facility Administrator Janecka ("FA Janecka") who explained the daily opportunity to clean as follows: "at approximately 6:00 a.m. the officer opens up the janitorial supply room and makes it available to the detainees that live in that living area. . . . [additionally] dorm porters that are part of the Voluntary Work Program . . . get paid to do detailed cleaning of the living area[.]" Ex. B, Janecka Dep. 6/19 58:19-21; 59:6-10. Plaintiffs did not provide any evidence of how such a policy would *require* uncompensated cleaning outside of the four enumerated items in PBNDS 5.8. Nor did they provide evidence of how the policy provides for specific consequences for a detainee who does not clean up their living area.

Acknowledging that not every possible consequence for refusing to clean could violate the CTVPA or TVPA, Plaintiffs allege that detainees who are part of the <u>nationwide</u> class were threatened with "serious harm (including solitary confinement) and abuse of the legal process," which constitutes unlawful means under the applicable laws. ECF 192-1, 21, 41. In support, Plaintiffs cited *Menocal v. GEO*, 882 F.3d 905 (10th Cir. 2018) and a *single line* from the 2010 version of the detainee handbook for the Northwest ICE Processing Center. *Id.* 192-1 at 22. Common to both were ICE's disciplinary severity scale ("ICE Disciplinary Policy"), which is incorporated into GEO's local detainee handbooks

---

[4] Plaintiff has not identified the specific GEO facilities housing the nationwide class in its Third Amended Complaint or Motion for Class Certification, and the Court's Certification Order is also without a list. GEO understands the following facilities to be at issue in this lawsuit: Adelanto, Aurora ICE Processing Center ("Aurora"), Broward Transitional Center, Folkston ICE Processing Center, LaSalle ICE Processing Center, Mesa Verde ICE Processing Center, Montgomery Processing Center, Northwest ICE Processing Center, Pine Prairie ICE Processing Center, South Louisiana ICE Processing Center, and South Texas ICE Processing Center.

**DEFENDANT THE GEO GROUP, INC.'S MOTION TO DECERTIFY THE CLASS**

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

1  (as required by ICE). The ICE Disciplinary Policy provides that a detainee who is charged

2  with "refusal to clean assigned living area" is subject to up to 13 different possible

3  sanctions, including "disciplinary segregation up to 72 hours." ECF 193-25 at 4; *Menocal*

4  *v. GEO*, 992 F.3d at 911; ECF 415-2, Martin Dec. Ex. D, PBNDS 3.1.

5  In addition, the detainees who comprise the Adelanto class allege that their Adelanto

6  Forced Labor claims[5] are premised upon a "deprivation policy." Plaintiffs assert that at the

7  Adelanto facility, there is an unwritten policy or practice whereby detainees are compelled

8  to participate in the VWP in order to purchase hygiene supplies, water, and food. At the

9  certification stage, Plaintiffs did not identify a written policy or evidence of an unwritten

10  common practice, but instead relied upon their own anecdotal testimony about sporadic

11  incidents where they subjectively felt the food was inadequate or unappetizing. ECF 192-

12  1 at 24.

13  Ultimately, this Court certified three classes: (1) The Adelanto Wage class, which

14  includes the claims brought under California's Labor Code, Unjust Enrichment, and

15  California's Unfair Competition Law; (2) The Adelanto Forced Labor Class which

16  includes claims brought under the CTVPA and the TVPA; and (3) the Housing Unit

17  Sanitation Policy Class, which encompasses the nationwide claims brought under the

18  TVPA.[6] ECF 229 and 223.

19  At the time of certification, other than the fact that each facility had some type of

20  sanitation procedures and that each incorporated the ICE required disciplinary scale into its

21  policies,[7] no additional information about the policies and practices at the nationwide

22  facilities was before the Court. ECF 192-1 at 14. With the benefit of more robust discovery,

24  [6] The class is defined to include all civilly detained immigrants who were detained at a
25  facility owned or operated by GEO (with several exceptions) and who "were subject to a GEO Housing Unit Sanitation Policy ("HUSP") at any point during their detention." ECF
26  223 at 14. The definition is not limited to those detainees who were allegedly injured by performing cleaning tasks based on allegedly improper policies that went beyond the tasks
27  listed in Section 5.8.
[7] Plaintiffs relied upon Requests for Admission that were deemed admitted. While those
28  requests asked GEO to admit that policies existed at each facility, none of them sought an admission that the contents of the plans were the same. *See* ECF 193-34.

it is now clear that the key issues in this case are individualized. Importantly (1) the implementation of housekeeping policies varied between facilities; (2) GEO did not have a uniform policy of imposing segregation or warnings of segregation as a sanction for the refusal to clean, but instead utilized lesser sanctions as authorized by ICE; (3) detainees' motivations for cleaning varied significantly; (4) detainees' reactions to the possible sanctions for the refusal to clean were wide-ranging; and (5) there is no evidence that at Adelanto the food or hygiene supplies were routinely or regularly insufficient such that they could be the subject of classwide allegations. Further complicating the classwide analysis, the merits of Plaintiffs' claims turn on what type of cleaning each detainee was asked to do (whether it was contained within the four enumerated items or not) and if he or she was warned that failure to clean beyond the four enumerated tasks could result in possible segregation—requiring an individualized inquiry for each instance described by the named Plaintiffs.[8]

### B. Menocal v. The GEO Group, Inc.

In their class certification motion, Plaintiffs relied heavily on the decision in *Menocal v. GEO Grp., Inc.*, 320 F.R.D. 258 (D. Col. 2017), *aff'd* 882 F.3d 905 (10th Cir. 2018) for "the proposition that the HUSP at Aurora applies uniformly." ECF 223 at 22. In turn, this Court also relied upon *Menocal*, and did not consider whether the policies at issue varied from facility to facility, even though *Menocal* involved only the Aurora Facility. *Id.* at 23. In its review of the *Menocal* certification, the Tenth Circuit observed that the written handbook provided to class members when they arrived at Aurora was the common question "'glue' that holds together the class members' reasons for performing housing unit cleaning duties assigned by GEO." 992 F.3d at 920. The court went on to clarify: "[h]ad GEO presented evidence that could rebut the Plaintiffs' common inference of causation on an individualized basis, we and the district court might have concluded that

---

[8] Under Plaintiffs' theory, some forms of cleaning, such as the requirement that detainees clean the dorm floors, was permissible even under the possible sanction of segregation, while other tasks, such as wiping tables could not be the subject of the same sanction. ECF 223 at 6. This interpretation is wholly inconsistent with ICE's position. Ex. A, Brooks Dep. 302:7-15.

**DEFENDANT THE GEO GROUP, INC.'S MOTION TO DECERTIFY THE CLASS**

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

1  individual issues would predominate at trial. In any event, the district court may revisit its

2  decision and chose to decertify the class should GEO eventually produced individualized

3  rebuttal evidence." 882 F.3d at 921.[9]

4  As the evidence described herein establishes, the *Menocal* decision no longer

5  supports continued certification of the class but instead counsels in favor of decertification:

6  detainees' uncompensated cleaning tasks varied from facility to facility (and even detainee

7  to detainee), as did their motivations. Given the individualized rebuttal evidence before the

8  Court, *Menocal* now has little bearing.[10]

9  ## C.    The Nationwide Facility Sanitation Policies.

10  The facility policies produced in discovery and the deposition testimony of the

11  Facility Administrators make clear that not all cleaning policies and procedures encouraged

12  (or required) cleaning outside of the four items in Section 5.8 of the PBNDS. Further, not

13  all policies were applied uniformly as Plaintiffs describe. These differences make

14  classwide resolution unwieldy. At the certification stage, the Court gave weight to

15  Plaintiffs' contention that the housekeeping policies challenged in *Menocal* were nearly

16  identical to those challenged in Adelanto. ECF 223 at 23. This is not the case. As FA

17  Janecka explained in testimony relied upon by Plaintiffs at class certification, routine

18  cleaning is not a mandatory task, but instead, cleaning supplies are simply made available

19  to detainees each morning. Ex. B Janecka Dep. 6/19 58:19-21; 59:6-10. Ms. McCormick,

20  a GEO officer, corroborated FA Janecka's testimony, explaining that each morning she

21  would "open up the door to the janitor closet, allow them to get the cleaning supplies if

22  they were interested in cleaning their unit." Ex. C, McCormick Dep. 27:9-12. Plaintiff

23  Novoa confirmed this policy, testifying that detainees were only responsible for "their own

24  living area, which is their bunk" whereas any other cleaning would have been completed

---

[9] GEO filed a motion to decertify the class in *Menocal* which is fully briefed.

[10] The *Menocal* decision relies heavily on the reasoning of *CGC Holding Co. v. Broad & Cassel*, 773 F.3d 1076 (10th Cir. 2014) to find that proof could be made through a common inference. Because *CGC Holding* is not the law of the Ninth Circuit, GEO denies that the *Menocal* reasoning is applicable to this case. Instead, as explained below, the TVPA claims require individualized proof. *See Poulos v. Caesars World, Inc.*, 379 F.3d 654, 668 (9th Cir. 2004).

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

by VWP participants. Ex. D, Novoa Dep. 52:18-23. Thus, at Adelanto, only paid VWP participants (not uncompensated detainees) clean outside of the tasks enumerated in Section 5.8. ECF 421-1, Janecka Dec. at ¶ 23-25.

In contrast, at Aurora, detainees are subject to rotating assignments whereby each day six detainees are asked to help clean up after each of the three meals by wiping down the tables and ensuring the floors are free from debris. ECF 426-1, Ceja Dec. at 4, ¶ 22. At Aurora, these positions are *not* part of the VWP, but instead are uncompensated. While these differences may seem trivial to anyone who regularly cleans up after him or herself at home, under Plaintiffs' theory the differences are significant. If, as Plaintiffs claim, Section 5.8 sets forth an exclusive list of tasks that may be performed without compensation, then a detainee may not be asked to clean up milk he spills during a meal or pick up trash that he threw on the floor. As a result, under Plaintiffs' theory, the policy at Aurora does not comply with the PBNDS, while the policy at Adelanto is compliant. This conflict favors decertification.

Additionally, the document titled "Sanitation Procedures" which Plaintiffs relied upon at class certification is not provided to detainees and does not form the basis for what tasks detainees must complete either as part of the VWP or as part of their general housekeeping responsibilities. ECF 421-1, Janecka Dec. at 3 ¶ 12; Ex. E, Castro Dep. at 108:9-22. Rather, it provides only the overall plan for the level of sanitation for the facility. Instead, to understand the tasks that detainees may be asked to complete as part of their housekeeping duties, one must review the detainee handbook and the general practices of that facility. A full review of the nationwide housekeeping policies shows a large variation in the housekeeping tasks performed without compensation, many of which comply entirely with Plaintiffs' strained interpretation of the PBNDS:

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

| Facility | Written Policy[11] | Practical Application |
|---|---|---|
| Adelanto | "The living units are to be kept clean throughout the day. The hanging of sheets, towels, blankets or clothing from bunks, rails, tables etc. is prohibited. Hooks are provided: wet towels are to be hung from these or over your property box. Personal items including hygiene items are to be stored in the facility issued plastic container." ECF 421-1 Janecka Dec. Ex. A at 7. | Each morning, detainees are provided access to cleaning supplies in the janitorial closet. They may use them if they choose. This cleaning is limited to an individual's bunk area. Ex. D, Novoa Dep. 52:18-23. Any additional cleaning is completed by VWP participants. ECF 421-1 Janecka Dec. at 5 ¶ 22-29. |
| Aurora | "Each and every detainee must participate in the facility's sanitation program. A list of detainees is developed each day by staff and is posted daily for viewing. During a general cleanup all detainees must participate." ECF 426-1, Ceja Dec. Ex. A at 17. | Detainees are asked on a rotating basis to help clean up after each meal without compensation. The clean-up lasts no more than 15 minutes and each detainee is asked once every several weeks. Detainees are also asked to make their beds and clean up a mess that they made. ECF 426-1, Ceja Dec. at 4-5 ¶ 22-26. |
| Broward | "Detainees are required to keep their bed and immediate area clean and neat in order to maintain appropriate housing sanitation and safety." ECF 422-4, Plumley Dec. Ex. A at 5. | Up to six detainees share a room with bunks, a living area, and a bathroom with toilet, sink and shower. Ex. F, Plumley Dep. at 29:15-30:11. Detainees clean their rooms without compensation, but a paid VWP "tub and toilet crew" cleans the bathrooms periodically. *Id.* at 89:2-8. General use areas are cleaned by paid VWP crews. *Id.* at p. 91:16-24. Detainees do not clean outside their own room except in paid VWP positions or to clean their own mess. *Id.* at 91:25-92:5. |
| Folkston | "Detainees are required to keep their housing areas clean at all times. When their bed is not in use it must be made up to facility standards. Detainees are required to keep their bed and immediate area clean and neat in order to maintain appropriate housing sanitation | Detainees clean up their bunk area in open dormitories and their cells in the cell house units. Ex. G, Warren Dep. at 61:9-22. The day rooms, restrooms and common areas are cleaned by paid VWP clean teams and by GEO sanitation officers (not detainees). *Id.* at 39:16-40:4. No detainee is asked to clean a general use area, but if a detainee spills a drink, he normally |

---

[11] Because there are not housekeeping policies called "HUSP" at each facility, GEO compiles here the enumerated housekeeping policies from the detainee handbooks at each facility. The titles of each policy included here can be found in the referenced declarations.

**DEFENDANT THE GEO GROUP, INC.'S MOTION TO DECERTIFY THE CLASS**

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

| | | | |
|---|---|---|---|
| | | and safety." ECF 424-1, Greenwalt Dec. Ex. A at 7. | asks for cleaning supplies and cleans it up. *Id.* at 90:1-10. |
| | LaSalle | "Detainees are required to keep their housing areas clean at all times. When their bed is not in use it must be made up to facility standards. Detainees are required to keep their bed and immediate area clean and neat in order to maintain appropriate housing sanitation and safety. ECF 423-10, Bowen Dec. Ex. A at 7. | Detainees are required to keep their immediate living area clean. Ex. H, Bowen Dep. at 57:16-17. VWP participants are assigned to clean shared areas, including shower and bathroom facilities, clean up after meals, mop aisles between bunks, and common areas. *Id.* at 53:12-15, 56:2-12. If a detainee spills his milk in the day room, the detainee would be expected to clean it up, but if milk leaks from a trash bag, a VWP crew would clean it while mopping up. *Id.* at 57:4-10. |
| | Mesa Verde | "Detainees are required to make their bed daily before 8:00 a.m. or before reporting for their voluntary activity when they begin their daily routine. The hanging of sheets, blankets or clothing from bunks, rails, tables, etc. is prohibited, damp towels/washcloth can be hung at the end of the bed. Personal items including hygiene items are to be stored in the MVIP issued plastic container." ECF 424-4, Allen Dec. Ex. A at 7. | Detainees are expected to clean the areas they use. For example if they make a mess in the microwave, they should clean it up. Ex. I, Allen Dep. at 59:18-20. VWP participants clean inside the dorms, and the common areas outside of the dorms. *Id.* at 130:2-5. |
| | Montgomery | "You are responsible for keeping your assigned living area clean at all times. Upon getting up for the morning meal, you are to make your bed. … You shall clean assigned common areas such as showers, sinks, dayroom, multi-purpose rooms and recreation areas." ECF 425-1, Tate Dec. Ex A at 10. | Each day two bunk groups are designated on a rotating basis to tidy up the housing units including general use areas. Ex. J, Tate Dep. at 63:10-22. VWP participants clean after meals. ECF 425-1, Tate Dec. at 5 ¶ 22-25. |
| | Northwest (Tacoma) | "You are required to keep your bed and immediate area clean and neat. The living units must be cleaned and beds are to be made every day by 8:00 a.m. … The living units are to be kept clean throughout the day." ECF 423-4, Scott Dec. Ex. A at 13. | Detainees are expected to clean their immediate areas and clean up after themselves. If they are housed in a cell with its own sink and toilet, they are expected to clean them. Ex. K, Scott Dep. at 92:17-93:8. Showers are cleaned by VWP crews *Id.* at 93:23-94:4. VWP porters clean the tables after meals, and also clean the microwave and sink in the general use area. *Id.* at 96:8-97:13. |
| | Pine Prairie | "Detainees are required to keep their assigned living areas clean at all times. … You are required | Detainees who are not in VWP do not clean general use areas such as bathrooms. Ex. L, Staiger Dep. at |

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

| | | | |
|---|---|---|---|
| | | to keep your bed and immediate area clean and neat. The living units must be cleaned and beds are to be made every day by 7:30 a.m." ECF 423-7, Staiger Dec. Ex A at 8. | 202:14-18. They are required to clean the immediate confines of the room or their bunk area and clean up after themselves if they make a mess in the general use area. *Id.* at 44:19-22. VWP workers clean general use areas of the dorms. *Id.* at 80:11-17, 205:3-7. If the VWP does not have sufficient participants, then the GEO staff will clean. *Id.* 205:10-17. |
| | South Louisiana | "Detainees are required to keep their assigned living areas clean at all times. … Approved chemical orderlies shall ensure restrooms, showers, floors, and windows are cleaned daily. You are required to keep your bed and immediate area clean and neat." ECF 425-4, Ramos Dec. Ex. A at 7. | Detainees are responsible for cleaning their immediate area which is their bunk area, or their cell if they are not in a dorm. Ex. M, Ramos Dep. at 69:20-70:1, 126:11-25. VWP crews clean the day room, corridors, common areas, and the general use areas of the living quarters. *Id.* at 64:24-65:4, 84:5-9. |
| | South Texas | "Maintain your assigned living area clean at all times. Upon getting up for the morning meal, you are to make your bed and leave it made during the day." ECF 423-1, Castro Dec. Ex. A at 10. | In dorm housing, detainees are responsible to clean their immediate living area; in cells the immediate area includes the sink and toilet. Ex. E, Castro Dep. at 63:12-25. Only VWP workers clean outside of the bunk/cell area including the day rooms and showers. *Id.* at 48:4-6, 64:9-65:1, 88:4-10. A detainee is expected to pick up something he throws on the ground. *Id.* at 85:2-15. |

As is clear from the table above, the written policies (and their application) at most of GEO's ICE facilities nationwide *do not* ask detainees to clean areas outside of the tasks enumerated in Section 5.8, contrary to Plaintiffs' contention that GEO "require[s] all detained immigrants to perform almost any janitorial work necessary in the dormitories or pods." ECF 192-1 at 22. Further, the policies from Adelanto, Aurora, Mesa Verde, Montgomery, Northwest and South Texas do not include any explicit or implicit reference to a consequence for not complying with the described cleaning tasks. In contrast, the detainee handbooks at Broward, Folkston and LaSalle specify that "[f]ailure by detainees to keep their housing areas clean will be subject to progressive sanctions addressed in the Detainee Prohibited Acts of conduct section of this handbook." ECF 423-10, Bowen Dec. Ex. A at 7; ECF 424-1, Greenwalt Dec. Ex. A at 7; ECF 422-4, Plumley Dec. Ex. A at 5.

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

As Amber Martin, GEO's Executive Vice President of Contract Administration and 30(b)(6) witness on the nationwide housekeeping policies testified, the different facility structures necessitate variance in the housekeeping policies. Ex. N, Martin Dep. 147:23-148:11. The PBNDS does not define the "immediate living area." ECF 422-1, Brooks Dec. at ¶ 15. Instead, the term is left open to accommodate different facility layouts. For example, some facilities have dorm style housing where everyone shares one large room. Ex. H, Bowen Dep. at 49:7-12. Others have pod-style housing where detainees share "cells" and then watch tv and spend their days in the living space with televisions and tables. Ex. O, Greenwalt Dep. at 25:17-24. Those cells may or may not have their own bathrooms. *Id.* at 24:13-20, 31:20-32:2. At Broward, each room holding up to six detainees includes bunks, a small living area, and a bathroom with a shower. Ex. F, Plumley Dep. at 29:15-30:11. In other facilities, the showers are separate. Ex. H, Bowen Dep. at 49:9-12.

Likewise, some facilities have a separate cafeteria or dining hall, which are cleaned by VWP crews after meals. Ex. L, Staiger Dep. at 184:20-185:6; Ex. M, Ramos Dep. at 54:3-20. Elsewhere detainees eat within their housing units. Ex. H, Bowen Dep. at 59:23-24; Ex. E, Castro Dep. at 56:2-15. At Adelanto, the "West" housing unit detainees eat in dining halls and the "East" housing units eat within their housing units. Ex. B, Janecka Dep. 9 at 35:5-9, 40:8-11. At Aurora, all detainees take turns cleaning up after meals, but at, for example, LaSalle, cleanup is done by a VWP crew. Ex. H, Bowen Dep. at 51:14-17. These differences are important because Plaintiffs' theory relies upon the distinction between "common" areas and "personal" living areas.

Finally, there is also an ICE policy that is relevant to Plaintiffs' claims, but disregarded by Plaintiffs. Per ICE's directive, each detainee received a copy of the ICE National Detainee Handbook while detained. ECF 422-1, Brooks Dec. ¶ 16-17; Ex. A, Brooks Dep. 268:5-17. That handbook explicitly states:

**Will I get paid for keeping my living area clean?**
No. You must keep areas that you use clean, including your living area and any general-use areas that you use. If you do not keep your areas

clean, you may be disciplined. It is up to you to know the rules for the work program. Also see your facility's local rules.

Despite the handbook's clear instruction that detainees must keep "any general-use area" that they use clean, and the warning of potential discipline, Plaintiffs have not alleged any harm resulting from this policy or ICE's actions.

### D.   ICE's Disciplinary Severity Scale.

In *Menocal*, which this Court principally relied upon in certifying the forced labor classes, Plaintiffs created the term "HUSP" by combining multiple sanitation and discipline policies to allege a larger policy existed, consisting of an amalgamation of different written policies. To allege a violation of the TVPA, the *Menocal* Plaintiffs relied upon the disciplinary severity scale which is contained within detainee handbooks nationwide to establish the "threat of harm," specifically the possible sanction of 72 hours in segregated housing for the refusal to clean the living area. ECF 223. That sanction, while included in the local handbook, comes directly from the ICE PBNDS. ECF 426-1, Ceja Dec. at 5 ¶ 27. Here too, Plaintiffs allege that they were coerced into cleaning their living areas because of the possible sanction of 72 hours of segregation. ECF 223 at 6. As this Court noted at class certification, this disciplinary severity scale is part of Plaintiffs' alleged classwide "HUSP."

Each facility has incorporated the PBNDS disciplinary scale into its handbook as required by ICE. ECF 415-2, Martin Dec. at ¶ 15. The disciplinary severity scale, contained within the PBNDS (which Plaintiffs concede govern detainee care), provides for a number of prohibited acts and potential sanctions. ECF 415-2 Martin Dec., Ex. D, PBNDS 3.1. The sanctions are divided into multiple categories ranging from "Greatest" to "Low Moderate" offenses, and for each category there is a list of possible disciplinary sanctions. *Id*. In the "High Moderate" offense category, there are a number of prohibited acts listed including stealing (theft), gambling, and insolence towards a staff member. *Id.* Of relevance here, "refusing to clean assigned living area" is a "High Moderate" offense. *Id.* Thirteen possible sanctions are provided for violations of "High Moderate" offenses ranging from warning,

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**DEFENDANT THE GEO GROUP, INC.'S MOTION TO DECERTIFY THE CLASS**

or loss of privileges, to disciplinary segregation for up to 72 hours and initiation of criminal proceedings. *Id.* Plaintiffs allege that "refusing to clean assigned living area" read in the context of the housekeeping policies, coupled with the potential sanctions for the same, constitutes a threat of harm in violation of the TVPA insofar as a violation could lead to a brief period in segregation.

While the ICE discipline policy provides for broad sanctions, in practice, they also provide for broad discretion and favor informal resolution. ECF 415-2 Martin Dec., Ex. D, PBNDS 3.1.II.4 ("Where permitted by facility policy, staff shall informally settle minor transgressions through mutual consent, whenever possible."). Thus, there is broad discretion to impose the lesser sanctions contained within the disciplinary severity scale, or no sanction at all. This is exactly what GEO does at each of its facilities. *See e.g.* Ex. L, Staiger Dep. at 66:1-3 ("we are complying with the [PBNDS] standards by informally resolving and fixing issues at the lowest level …"); Ex. M, Ramos Dep. at 78:14-24 (detainees are encouraged to clean through photographs of the expectations and "any type of de-escalation techniques in communication with the population."); Ex. H, Bowen Dep. at 142:3-4 (issues like cleaning "can typically be handled with a conversation.").

Using this broad discretion, GEO's general practice is not to discipline a detainee for refusing to clean his or her living area. Ex. N, Martin Dep. 133:19-23; Ex. G, Warren Dep. at 86:18-88:8 (if an officer wrote up a detainee for a failure to clean the housing unit, Warren would consider that to be a mistake "that would be an issue for that staff member"). Instead, a refusal to clean would most likely be met with a warning or no consequence at all. Ex. L, Staiger Dep. at 123:25-125:19 (FA Staiger is not aware, including through a review of the discipline log, of any detainee having been written up for a refusal to clean); Ex. M, Ramos Dep. at 94:24-95:2, 127:21-24 (FA Ramos has never seen any incident reports written up for detainees who did not follow a directive related to cleaning); Ex. F, Plumley Dep. at 92:9-93:11 (same); Ex. O, Greenwalt Dep. at 122:1-15 (same). Indeed, there is no evidence that a refusal to clean without an additional aggravating offense, has *ever* been sanctioned with segregation. This is borne out by a review of the Adelanto

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

segregation records. Of over 3,000 segregation reports reviewed, there is no evidence *any* Adelanto detainee was placed in segregation for the failure to clean and no additional offense. ECF 426-4, Erickson Dec. at ¶ 6.

And, even for those detainees that read the handbook and learn of the possibility of segregation, whether it is reasonable to fear the same depends on the specific facility. For example, Broward *does not have a segregation unit*. Ex. F, Plumley Dep. at 24:13-15. No detainee has been placed in segregation for any reason at South Louisiana since the facility opened, so even though segregation is a "possible" sanction there, it is unlikely that a detainee would fear it. Ex. M, Ramos Dep. at 124:1-7. At Folkston, segregation has only been used for a few months in the past year and a half. Ex. G, Warren Dep. at 32:20-25.

The differences between facilities were noted among detainees who resided at various GEO facilities. As Mr. Hernandez-Ceren, who had been housed in approximately 20 different ICE facilities explained, his fears of segregation derived only from Aurora, not any other facilities. Ex. P, Hernandez-Ceren Dep. 63:9-21. Although he testified that he had a fear while at Aurora that if he didn't clean as assigned, he would be "sent to the hole," he did not have that fear at any other facility, including LaSalle where he was housed at the time of his deposition. *Id.* Likewise, the testimony of the other named Plaintiffs does not support the existence of the alleged segregation policy.

The Plaintiffs' testimony demonstrates a critical fact: fear of segregation (or any other punishment) derives from detainees' personal experiences, not the language in the handbook. A detainee who read the handbook and saw thirteen possible sanctions for the failure to clean would have no reason to fear segregation instead of a less onerous consequence when he or she observes that officers simply speak to detainees who are not cleaning. Mr. Hernandez-Ceren testified that he did not fear segregation when housed at LaSalle, and FA Bowen notably testified that matters like a failure to clean "can typically be handled with a conversation" at LaSalle. Ex. H, Bowen Dep. at 142:3-4. Class certification is premised on the assumption that any reasonable detainee would fear serious

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

harm based on a belief that the most serious consequences available in the handbook will be imposed. In the face of the evidence, this premise fails.

### E. Detainee Provisions.

In addition to the disciplinary severity scale, Plaintiffs also make an Adelanto-specific claim. ECF 223 at 15 (noting that alleged deprivation policy is limited to Adelanto-specific classes). Under this theory, any participation in the VWP at Adelanto (for any scope of tasks) was also forced in violation of the TVPA/CTVPA. Plaintiffs allege that detainees felt compelled to participate to get $1 per day in order to purchase soap, shampoo, basic provisions, and water because they were not provided the same while housed at Adelanto.[12] ECF 184 at 12. In addition to their own anecdotal experiences, at class certification, Plaintiffs provided three oversight reports to support their claims. *Id.* But, none of these reports indicate that detainees in GEO's facilities were not provided sufficient hygiene products.[13] Discovery has made clear that there was no classwide policy to this effect.

To the contrary, the Adelanto detainee handbook provides that detainees are provided personal hygiene items upon arrival to the facility. ECF 421-1 Janecka Dec. ¶ 40 and Ex. A at 11; *see also* ECF 415-2, Martin Dec., Ex. D, PBNDS 4.5.V.D. The written policy provides that detainees will receive new items weekly, but in practice, detainees can ask for a replacement item at any time. *Id.* at ¶ 42-42.

Similarly, the written polices at Adelanto, including PBNDS 4.1, provide for all detainees to receive three nutritious and appetizing meals per day. ECF 421-1, Janecka Dec. ¶ 46-47. Adelanto serves meals that have been reviewed by a dietician for their caloric and nutritional sufficiency. *Id.* . The meals are designed to give each detainee between

---

[12] To be clear, because Plaintiffs allege the incentive for working was $1 per day, this does not include any tasks that are alleged to be uncompensated.

[13] ECF 193-29 (addressing Irwin County Detention Center, Johnson County Detention Center, Eloy Detention Center, and Steward Detention Center; none of which are operated by GEO); ECF 193-30 (not addressing food or hygiene at Adelanto); ECF 193-30 (noting food storage concerns but not raising any issue regarding nutrition or sufficiency).

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

2,500 and 3,000 calories per day. Ex. Q, Spagnuolo Dep. 39:20-24. All perishable items are delivered fresh weekly. *Id.* 150:14-16. Many staff eat the prepared meals at the facility each day *Id.* at 37:15-19. Indeed, Ms. Spagnuolo would feed every meal she cooks to her own family. *Id.* 151:15-17. There is also clean drinking water available to detainees in their housing units through water jugs that are regularly refilled. ECF 421-1, Janecka Dec. ¶ 48; Ex. R, Mancia Dep. 31:13-32:10.

The named Plaintiffs' experiences were also consistent with GEO's policies. Plaintiff Novoa testified that GEO provided soap, shampoo, and toothpaste but he did not like the brands. Ex. D, Novoa Dep. 58:16-21. Similarly, Mr. Mancia received shampoo (which he did not consider to be a necessity) while housed at Adelanto, but when the brand changed, he did not like it. Ex. R, Mancia Dep. 67:17-68:5. Plaintiff Karim purchased hair gel and baby oil at the commissary, but never purchased shampoo, soap, or deodorant. ECF 207-3 Ex. L. None of the named Plaintiffs purchased bottled water, shampoo or soap. ECF 206-09 Ex. I; ECF 207-01 Ex. J; ECF 207-02 Ex. K; ECF 207-3 Ex. L. Instead each spent the majority of his commissary money on snacks such as cookies, candy and chips. *Id.* In addition, each of the named Plaintiffs received deposits from other detainees, from people outside the facility, or as prizes from contests held at Adelanto. Ex. D, Novoa Dep. 77:22-79:15, Ex. R, Mancia Dep. 39:20-40:12; Ex. S, Karim Dep. 34:4-37:15; Ex. T, Fuentes Dep. 66:6-69:9. Thus, even among the named Plaintiffs' experiences, there is no indication of a classwide policy to deprive individuals of basic necessities products to coerce them to work.

Furthermore, the evidence shows that detainees did not overwhelmingly participate in the VWP in order to obtain hygiene products or sufficient food. To the contrary, many detainees "enjoy coming out of their dorm and not staying in their dorm and doing something." Ex. Q, Spagnuolo Dep. 48:20-23; s*ee also* Ex. J, Tate Dep. at 121:16-18 (detainees "volunteer because they like to clean. They like to stay busy. They like to do things."); Ex. G, Warren Dep. at 27:5-7 ("A lot of them like to pass their time while they're here [participating in VWP]. It gives them something to do."). In short, each detainee was

provided three meals a day. Those meals were nutritionally balanced to ensure adequate nutrition for each individual. While there may have been occasions where detainees did not like the meal served or the brand of soap supplied, this is not enough to establish "deprivation."

### F.      Individual Responses to a Warning of Segregation

Whether a detainee perceives a brief stay in segregation as a threat requires an individualized determination based on a detainee's unique background. Plaintiffs' expert, Dr. Craig Haney, acknowledged that perceptions of threat and deprivation are subjective. Ex. U, Haney Dep. Ex. 1 at 55 ¶ 107. Dr. Haney highlighted myriad of factors such as pre-existing trauma histories, limited English proficiency, and serious mental illness which might make detainees more vulnerable to coercion and sensitive to punishment or threats of punishment. Ex. U, Haney Dep. Ex. 1 at 6 ¶ 15, 33 ¶ 65. Dr. Haney further admitted that "whether and how much somebody is psychologically harmed [by segregation] would depend on the person." Ex. U, Haney Dep. 43:14-15, 51:12-18. Likewise, Dr. Haney conceded that there are no studies indicating that the that awareness of the possibility of 72 hours of segregation could cause serious psychological harm and admitted that even if it could, whether a detainee experienced harm "would depend on how much anxiety that threat or possible consequence created in someone." *Id.* 52:2-18. This is borne out by the evidence, whereby some detainees felt threatened by possible segregation while others preferred to be placed in segregation and felt fearful of the general population. *Id.* 55:23-56:2; Ex. C, McCormick Dep. at 46:8-21; ECF 421-1, Janecka Dec., Composite Ex. C (segregation records).

## ANALYSIS

### III.    The Court Has a Continuing Duty to Ensure Compliance with Class Action Requirements and the National "HUSP" and Adelanto Forced Labor Classes Do Not Do So.

### A.      Class Must Continue to Meet the Requirements for Certification.

"The Court has a continuing duty to ensure compliance with class action requirements pursuant to Rule 23, and therefore may decertify a class at any time." *Guido*

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**DEFENDANT THE GEO GROUP, INC.'S MOTION TO DECERTIFY THE CLASS**

*v. L'Oreal, USA, Inc.*, No. CV 11-1067 CAS (JCx), 2012 WL 2458118 *14 (C.D. Cal. 2012). The burden of proof remains on the plaintiff. *Marlo v. UPS*, 639 F.3d 942, 947 (9th Cir. 2011). Accordingly, an order certifying a class "may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1). "[B]efore entry of a final judgment on the merits, a district court's order respecting class status is not final or irrevocable, but rather, it is inherently tentative." *Officers for Justice v. Civil Service Com'n of City and Cty of San Francisco*, 688 F.2d 615, 632 (9th Cir. 1982); *see also Patel v. Facebook, Inc.*, 932 F.3d 1264, 1276 (9th Cir. 2019) (noting that "if future decisions or circumstances lead to the conclusion that [the application of the statute] must be evaluated on an individual basis, the district court can decertify the class."). Likewise, "modification of the class definition falls squarely within the confines of Supreme Court precedent and Rule 23(c)(1)(C), which give courts broad discretion to alter or amend a class definition considering subsequent developments in a case." *Ms. L. v. U.S. Immigration and Customs Enforcement*, 330 F.R.D. 284 (S.D. Cal. 2019).

"In considering the appropriateness of modification or decertification, the standard of review is the same as a motion for class certification: whether the Rule 23 requirements are met." *Roy v. County of Los Angeles*, No. CV 13-04416-AB (FFMx), 2018 WL 3435417, at *2 (C.D. Cal. July 11, 2018) (citation omitted).Thus in considering this motion, the Court must determine whether the Plaintiffs continue to meet their burden to demonstrate the following prerequisites: "(1) numerosity of plaintiffs; (2) common questions of law or fact predominate; (3) the named plaintiff's claims and defenses are typical; (4) the named plaintiff can adequately protect the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citing Fed.R.Civ.P. 23(a)). Plaintiffs also bear a continuing burden to establish that certification remains appropriate for classes certified under Rule 23(b)(2), by showing that members complain of a pattern or practice that is generally applicable to the class as a whole. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) ("[T]he key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted."). In addition, because the class is

certified under Rule 23(b)(3), Plaintiffs must also establish that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). The party may not rest on mere allegations, but must provide facts to satisfy these requirements. *Rai v. CVS Caremark Corp.*, No. CV 12-08717-JGB VBKX, 2013 WL 10178675, at *4 (C.D. Cal. Oct. 11, 2013) (Bernal, J.). In considering whether certification remains appropriate, this Court must undertake a "rigorous analysis" of each element. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). "This 'rigorous analysis' mandate is not some pointless exercise . . . foist[ed] on . . . hardworking and conscientious district judges . . . It matters. . . . It is no secret that certification "can coerce a defendant into settling on highly disadvantageous terms regardless of the merits of the suit. And the existence of a class fundamentally alters the rights of present and absent members, particularly for mandatory classes such as the one here." *Chavez v. Plan Benefit Servs., Inc.*, 957 F.3d 542, 547 (5th Cir. 2020).

## B.     The Elements of Proof for TVPA Claims[14]

In order to understand why Plaintiffs' claims cannot be resolved on a classwide basis, it is necessary to review the elements that must be pled and proven under the TVPA. As is relevant here, for Plaintiffs to prevail on their claim they must establish that "[GEO] <u>knowingly</u> obtained Plaintiffs' labor by means of: (a) force, physical restraint, or threats of force or physical restraint; (b) serious harm or threats of serious harm; (c) abuse of the law or threats of abuse of the law or legal process; (d) any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or other person would suffer serious harm or physical restraint." 18 U.S.C. § 1589(a) (emphasis added).

To establish a § 1589 violation, Plaintiffs must also prove that an unlawful means of coercion caused them to render labor. *See United States v. Kalu*, 791 F.3d 1194, 1211-12

---

[14] Class treatment of the CTVPA claims fails for the same reasons as for the TVPA claims. For the sake of brevity and purposes of this motion only, GEO addresses TVPA only. *See* ECF 223 at 23 fn. 11.

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

(10th Cir. 2015); *see also David v. Signal Intern LLC*, No. 08-1220, 2012 WL 10759668 *20 (E.D. La. Jan. 4, 2012) ("[T]he defendant's conduct must be the driving force behind the victim's 'choice' to render the labor.") Importantly, it is not enough that an individual or entity obtain the labor of another through persuasion or compulsion, but rather the labor must be obtained through the illegal coercive means detailed in the statute. *U.S. v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011).[15] Additionally, to establish that a detainee's motivation for cleaning violated the TVPA, they must establish that the "coercive" mechanism at play with not simply a legitimate warnings of a possible consequence, but instead an "illicit threat." *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012) "(In applying the Act, we must distinguish between [i]improper threats or coercion and permissible warnings of adverse but legitimate consequences.").

In addition, Plaintiffs must also prove that GEO "knowingly obtained" their labor through unlawful means. 18 U.S.C. § 1589(a). This express scienter requirement requires evidence from which the fact finder could conclude that the defendant *intended* the victim to believe harm would befall the victim if he or she did not work. *Muchira v. Al-Rawaf*, 850 F.3d 605, 618 (4th Cir. 2017).

Finally, Plaintiffs must show that the harm or threat of harm relayed by the defendant was "sufficiently serious" to compel the victim to continue to work, from the vantage point of a reasonable person in the place of the victim. *Id.* This final element has been described as requiring a "hybrid" test, wherein the victim's decision to provide his or her labor must be "*objectively reasonable* under the circumstances," including a consideration of "the particular vulnerabilities of the [victim]." *Id.* To that end, the factfinder must consider "the victim's background and circumstances. 18 U.S.C. § 1589(c)(2). Because the backgrounds, circumstances and vulnerabilities of each detainee varied, the case cannot be resolved without individualized evidence for each plaintiff.

---

[15] Notably, Plaintiffs have an alternative employment based remedy for the same alleged harm in their wage claim - without proof of illegal threats and coercion.

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

Here Plaintiffs have alleged that GEO threatened detainees with "serious harm" with the intent to coerce them to perform housekeeping tasks beyond those required by the PBNDS, and that they were in fact compelled to do such work by the threatened harm. *See e.g.* Ex. V Novoa Answer to First Interrog., No. 7. For the Adelanto-only trafficking class, plaintiffs allege they were coerced into participating in the VWP to have funds to purchase soap and water from the commissary. In contrast, the nationwide class claims they cleaned up after themselves in their living area to avoid the possible sanction of segregation. Thus, the merits of Plaintiffs trafficking claims turn on (1) why each detainee cleaned up their living area or participated in the VWP; (2) whether the consequence for non-compliance was the same or similar for each detainee; (3) whether the consequences faced by detainees for non-compliance were legitimate; and (4) whether GEO acted with the requisite scienter in order to obtain Plaintiffs' labor.

### C. Plaintiffs cannot establish that GEO implemented classwide policies that satisfy the commonality and predominance requirements.

To demonstrate that class members suffered a common injury and that their claims would produce a common answer, the party seeking certification must present "significant proof" that the employer operated under a generally applicable policy or practice. *Wang v. Chinese Daily News,* 737 F.3d 538, 543 (9th Cir. 2013). Likewise, under Rule 23(b)(2), "[i]f there is no evidence that the entire class was subject to the same allegedly" unlawful policy or practice, then "there is no question common to the class." *Ellis*, 657 F.3d at 983 (9th Cir. 2011); *Willis v. City of Seattle*, 943 F.3d 882, 885 (9th Cir. 2019) ("policies and practices are the 'glue' that holds together the putative class ... either each of the policies and practices is unlawful as to every [proposed member] or it is not."); *Marlo*, 639 F.3d at 947 (affirming decertification where plaintiff failed to show that his alleged misclassification was the result of a classwide policy, or in other words, his treatment "was the rule rather than the exception."); *Wang,* 737 F.3d at 543 (party seeking certification must present "significant proof" that the employer operated under a generally applicable policy or practice); *Ellis,* 657 F.3d at 973 ("If there is no evidence that the entire class was

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**DEFENDANT THE GEO GROUP, INC.'S MOTION TO DECERTIFY THE CLASS**

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

subject to the same allegedly" unlawful policy or practice, then "there is no question common to the class.").

It is not enough to show a common policy; it must also be unlawful as applied in practice to each member of the class. *Davidson v. O'Reilly Auto Enterprises, LLC*, 968 F.3d 955 (9th Cir. Aug. 3, 2020) ("[T]he mere existence of a facially defective written policy – without any evidence that it was implemented in an unlawful manner – does not constitute 'significant proof'.") (citation omitted). Where plaintiff's evidence implicates individual or localized instances of improper conduct or mistreatment, certification is improper. *Willis,* 943 F.3d at 885 ("Allegations of individual instances of mistreatment . . . do not constitute a systemic deficiency or overarching policy of wrongdoing"). When application of a policy or practice is not uniform across the proposed class, common questions do not predominate. *See Wright v. Renzenberger, Inc*., 656 F. App'x 835, 838 (9th Cir. 2016)(denying certification where the employer's policies "do not uniformly deprive employees of rest breaks"); *Dominguez v. UPS Co.,* No. EDCV 18-1162 JGB (SPx), 2020 WL 4390376 (C.D. Cal. June 12, 2020) (J. Bernal) (denying class certification for claim that employer's policies resulted in a failure to schedule required breaks because individual questions of proof were necessary to determine how a particular supervisor applied the policy on a given day, whether the break was waived, and whether the employee was paid a premium); *Sarviss v. General Dynamics Info. Technology, Inc.*, 663 F. Supp. 2d 883, 910 (C.D. Cal. 2009) (certification denied where individual issues would predominate because purposed class members were paid under different payroll policies and held different jobs).

"Plaintiff's anecdotal evidence cannot be the basis to infer that the entire company operated under a general policy…." *Romo v. GMRI, Inc.,* 2014 WL 12588646, * 14 (C.D. Cal. Aug. 12, 2014) (denying certification because evidence did not show a general policy of pressuring employees to interrupt their meal period and work off the clock). Anecdotal evidence, such as that offered by Plaintiffs, is insufficient when it is narrowly focused in place and time. For example, the Supreme Court held that anecdotal evidence relating the

experiences of only 1 for every 12,500 class members and only 235 out of 3,400 stores did not demonstrate that the entire company operated under a general policy of discrimination. *Wal-Mart*, 564 U.S. at 358; *see also Campbell v. Best Buy Stores, L.P.*, 2013 WL 5302217 (C.D. Cal. Sept. 20, 2013).

### i.   Plaintiffs' Nationwide TVPA Class.

Plaintiffs' claims depend upon an alleged uniform policy that explicitly requires detainees to perform tasks outside of the four items in Section 5.8 of the PBNDS. To the contrary, most of the written policies plainly conform with Plaintiffs' reading of the PBNDS. *See supra Section IIC.* And, there is no uniform "HUSP." The only facility using such a term is Aurora. ECF 426-1 Ceja Dec. Ex. A at 16. Indeed, the housekeeping policies within GEO's local handbooks at Adelanto, Broward, Folkston, LaSalle, Mesa Verde, Northwest, Pine Prairie, South Louisiana, and South Texas do not require specific cleaning beyond the four items Plaintiffs concede are permissible and are consistent with Section 5.8. *See supra* at 8-11. In contrast, Aurora and Montgomery do not limit their general clean-up to only the four enumerated tasks in section 5.8 of the PBNDS, but instead assign detainees on a rotating basis to help with general tidiness of their living areas or with cleaning up after each meal. *Id.* Thus, a detainee in Montgomery may be asked to clean a shower shared by the dorm without compensation, while in detainees in South Louisiana would only clean the shower as part of the VWP. Tate Ex. J, Dep. at 68:15-22; Ex. M, Ramos Dep. at 64:24-65:4. There is no uniform policy establishing what detainees were asked to clean for no compensation. Thus, in order to identify what the detainee cleaned and what the impetus for the same was, the Court would have to review each detainee's experience on a case-by-case basis

Additionally, there is no uniform consequence for a detainee's decision not to clean up his or her living area. The Facility Administrators each described various methods for informal resolution of minor infractions. *See e.g.* Ex. M, Ramos Dep. at 78:14-24. As a result, an officer's decision to write up a disciplinary report is highly individualized, depending on the specific situation and officer involved. *See e.g.* Ex. L, Staiger Dep. at

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**DEFENDANT THE GEO GROUP, INC.'S MOTION TO DECERTIFY THE CLASS**

52:9-22. Indeed, none of the dozen Facility Administrators deposed by Plaintiffs described any form discipline for refusal to clean as anything other than extremely rare and unusual.

Even relying solely on the written policies from the PBNDS, the decision of whether detainee is disciplined for not cleaning is made after review by a committee. As a result, the sanctions vary consistent with the wide range of options included in the PBNDS. *See* Ex. F, Plumley Dep. at 54:8-18; 55:14-25. The written policies do not establish a single consequence, but instead, provide a range of potential consequences ranging from a warning to the temporary loss of television privileges. ECF 415-2, Martin Dec., Ex. D, PBNDS 3.1.III.B. Indeed, to find the sanction of which Plaintiffs complain, a detainee would have to flip to a different portion of the handbook and draw his or her own conclusions. None of the policies include an explicit warning that segregation is a possible sanction for refusing to clean one's living area. Ex. A, Brooks Dep. at 294:21-295:2. Nor was there an unwritten practice of placing detainees in segregation. To the contrary, there is no evidence segregation was ever used in response to the refusal to clean. As FA Bowen explained, segregation is only used when "a person is not able to control their behaviors to an extent that it might be an issue of safety or security to other people or to the facility itself." Ex. A, Bowen Dep. at 143:4-7. Just as different circumstances would result in different consequences in a GEO Officer's assessment, there is no indication that detainees similarly perceived the likely sanctions. Thus, Plaintiffs fail to show a uniform or prevalent "unlawful" consequence.

Absent an unlawful consequence or "means," Plaintiffs cannot establish a claim under the TVPA or CTVPA, as both require labor be obtained through unlawful means. *See Muchira*, 850 F.3d at 620. Thus, even if the housekeeping policies were similar enough to be considered on a classwide basis, they are not uniformly *unlawful* and therefore fail to justify certification. *Davidson*, 968 F.3d at 955 (finding that to support certification, a uniform policy must be unlawful as applied in practice to each member of the class). In short, the policies at issue are not as they were presented at certification and require a facility-by-facility analysis—not a nationwide adjudication.

**DEFENDANT THE GEO GROUP, INC.'S MOTION TO DECERTIFY THE CLASS**

### ii.    Plaintiffs' Adelanto CTVPA & TVPA Class.

GEO maintains standard policies related to the provision of detainee meals and hygiene products. *See supra Section IIE.* These polices do not give rise to liability under the TVPA or CTVPA. Under Adelanto's standard policies, detainees are provided three nutritious meals per day. *Id.* Detainees can replenish their hygiene supplies at any time by simply asking a GEO officer and at least once per week without request. *Id.* None of the detainees testified that when they asked for replacement supplies they were deprived of the same. There is no written or unwritten "deprivation policy" to support Plaintiffs' class allegations. Plaintiffs have not offered **any** evidence to support a claim of an ongoing, facility-wide policy to deprive detainees of sufficient healthy food, clean water, clothing or necessary hygiene products.[16] Instead, the evidence discussed herein establishes that Adelanto provides food based on nutritionist reviewed menus, and all hygiene items required by ICE. Indeed, about 2,300 of the same meals provided to detainees each month are consumed by GEO staff members without complaint. Ex. Q, Spagnuolo Dep. 37:13-23. Thus Plaintiffs fail to establish a "deprivation policy" that was uniformly applied at Adelanto; an occasional overcooked meal or delay in obtaining more shampoo does not constitute a common policy.

### D.    Plaintiffs' Claims Require Individualized Inquires of Harm.

When a class definition sweeps in so many plaintiffs who are uninjured or potentially uninjured, a Rule 23(b)(3) class cannot be certified because it would require so many individualized inquiries into the question of harm for each plaintiff as to overwhelm the case, thereby failing to meet the predominance requirement of Rule 23(b)(3*). See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012) (holding that predominance requirement was not met because many class members were not injured); *see also Andrews v. Plains All Am. Pipeline, L.P.*, 777 Fed. App'x 889, 892 (9th Cir. 2019)

---

[16] Plaintiffs' Motion for Class Certification based the alleged "deprivation policy" only on inconsistent anecdotes from six individuals and an inspection report that noted some food storage issues and expired food in the freezer, but not that any food served to detainees was spoiled or unsafe. ECF 192-01 at 15.

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

(reversing certification where "many employees in the class likely were not injured"); *Colapinto v. Esquire Deposition Services, LLC*, No. CV 09-07584 SJO (PLAx) 2011 WL 913251 *4 (C.D. Cal. Mar. 8, 2011) (holding that a class cannot be certified when it includes members who have suffered no injury and therefore lack standing to sue). Regardless of the class status of this case, GEO retains its due process right to "contest every element of liability and present every colorable defense." *In re Rail Freight Fuel Surcharge Antitrust Litig. - MDL No. 1869*, 934 F.3d 619, 625 (D.C. Cir. 2019). Consistent with this principle, defendants must be provided with a "meaningful opportunity to contest whether an individual would have, in fact," been injured by the allegedly wrongful conduct. *In re Asacol Antitrust Litig.*, 907 F.3d 42, 54 (1st Cir. 2018). Because neither Plaintiffs nor their experts can identify a method for reliably recognizing the numerous uninjured members of the class, GEO is entitled to challenge whether each member of the class did, in fact, suffer an injury—an essential element of liability in Plaintiffs' case. This inquiry, however, would "predominate and render an adjudication unmanageable." *Id.*

### i.       Plaintiffs' Nationwide TVPA Class.

As described above, the evidence uncovered after this class was initially certified makes clear that there is *no uniform policy* to use segregation as the consequence for a detainee's refusal to clean. As a result, to the extent *any* of the policies at the GEO facilities are found to be in violation of the PBNDS,[17] additional inquires would be required to identify whether a Plaintiff had suffered the harm at issue, including: (1) whether the detainee ever cleaned up his or her living area; (2) if so, if the facility policy contemplated cleaning tasks beyond those enumerated in Section 5.8; (3) why the detainee cleaned, including whether it was because of the consequences listed in the detainee handbook, because he or she was directed by a GEO officer, or if he or she simply cleaned to pass the time or to live in a clean area; and (4) whether the detainee cleaned because of the disciplinary severity scale within the handbook, specifically the possibility of segregation,

---

[17] GEO reiterates that it disputes Plaintiffs extremely narrow interpretation of the PBNDS as limiting detainees to cleaning only the four enumerated items in the list at all times. *See* ECF 422-1, Brooks Dec. at ¶ 14.

or if any cleaning was performed due to an errant comment by a GEO officer that was not found within the disciplinary severity scale. Only after all of these questions were resolved for each individual, at each facility, for each time he or she cleaned outside of the VWP could it be determined whether that individual suffered harm under the TVPA.

Indeed, Mr. Hernandez-Ceren, a named Plaintiff in *Menocal* and class member here, testified that he liked to keep his area clean and felt that only the Aurora policies were unfair—despite being housed at multiple GEO facilities during the class period. Ex. P, Hernandez-Ceren Dep. 49:24-50:1; 63:9-21. On the other hand, Plaintiff Novoa claims that any cleaning he performed outside of his bunk area was compensated as part of his participation in the VWP as a janitor (as is permitted under Plaintiffs' interpretation of the PBNDS). Ex. D, Novoa Dep. 52:18-53:16. Plaintiff Mancia's claims also involve individualized circumstances: he claims he was asked to clean toothpaste off of a light or he would suffer "consequences;" yet, liability would turn on whether the light was in a common area and what specific consequence he feared. Ex. R, Mancia Dep. 47:18-48:6. To the extent the light was in his bunk, GEO could present a defense at trial that the cleaning tasks were permissible under Plaintiffs' interpretation of the PBNDS and that a threat of "consequences" is a legitimate warning, not unlawful means under the TVPA. GEO should be afforded the opportunity to present these individualized defenses. Further, a jury should have the opportunity to determine whether a warning of "consequences" was made "knowingly" by GEO.[18] GEO should likewise be afforded the opportunity to challenge Plaintiffs' other individualized evidence. Indeed, there is be no question that GEO has presented many individualized defenses to each Plaintiffs' claims as detailed in its chart opposing class certification. ECF 205 at 22-26. Thus, the forced labor classes are not well suited for continued certification.

### ii.    Plaintiffs' Adelanto CTVPA & TVPA Class.

---

[18] There is a significant difference between warning a detainee that a written infraction report is a possible consequence as a means to deescalate and threatening to "throw" someone into segregation.

**DEFENDANT THE GEO GROUP, INC.'S MOTION TO DECERTIFY THE CLASS**

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

In addition, any claim of "deprivation" of necessities is inherently subjective. While there is no question that Plaintiffs were provided with three meals a day, clean clothes, water, soap, shampoo, and toothpaste—Plaintiffs did not construe these items as sufficient "necessities." To the contrary, the certified class' amorphous definition of "necessities" is inherently individualized. Plaintiff Novoa testified that he needed Peanut M&Ms for protein. Ex. D, Novoa Dep. 63:16-22. Plaintiff Karim believed hair gel was a necessity. Ex. S, Karim Dep. 30:8-18. Plaintiff Mancia did not consider shampoo to be a necessity. Ex. R, Mancia Dep. 67:17-23.

Similarly each detainee's motivation to participate in VWP is subjective. Each of the named Plaintiffs received deposits into their accounts from sources other than the VWP, and there is no evidence their participation in VWP changed based on their account balances. ECF 207-4, 207-5, 207-6, 207-7. And, there is no classwide way to know whether any class member "needed" VWP funds to purchase commissary items. Finally, at least some class members worked because they simply preferred to be busy. Ex. Q, Spagnuolo Dep. 48:20-23; Ex. J, Tate Dep. at 121:16-18. GEO's defenses to each individual's actions depend upon their own unique circumstances and motivations.

Furthermore, if the case proceeds to trial, GEO will challenge the claimed "necessity" of many of the items Plaintiffs so classify and as well as whether each detainee could have purchased those items *without participating in the VWP*. Indeed, Plaintiff Novoa had no issue purchasing many items in the over six months he was not a VWP participant. *Compare* ECF 206-09 Ex. I.; ECF 207-04 Ex. M. A reasonable jury could find that candy and junk food were not "necessities" when more substantial food (such as canned fish, beans, or chili) could have been purchased for the same amount or less. ECF 205-3 Ex. S. There is no question that "[t]estimony that is genuinely challenged, certainly on an element of a party's affirmative case, cannot secure a favorable summary judgment ruling disposing of the issue. Fed. R. Civ. P. 56(a)." *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53 (1st Cir. 2018). And any declarations submitted in support of class certification that

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

1    have been credibly challenged, "would be inadmissible hearsay at trial, leaving a fatal gap

2    in the evidence for all but the few class members who testify in person." *Id.*

3        Under these circumstances, it would be impossible to extrapolate the varied

4    experiences of the four Plaintiffs to tens if not hundreds of thousands of class members,

5    including those who were detained at different times and at different facilities. Resolving

6    the issues collectively would require a series of mini trials. Accordingly, the materially

7    disparate factual circumstances, highly individualized defenses available to GEO, and the

8    relevant fairness and procedural concerns compel decertification.

9    **E.    Individual Issues Predominate in Both the Application and Effect of ICE's Disciplinary Policy.**

10       Even where a common policy for discipline exists, the evidence establishes that

11   Plaintiffs cannot meet their burden to show that the TVPA claim can be proven through

12   common evidence. As the Supreme Court explained in *Wal-Mart*, "[w]hat matters to class

13   certification is not the raising of common questions – even in droves – but, rather the

14   capacity of a classwide proceeding to generate common *answers* apt to drive the resolution

15   of the litigation." 564 U.S. at 354 (alteration and quotation marks omitted). Indeed, class

16   certification is inappropriate where, if the case were to proceed "myriad mini-trials cannot

17   be avoided." *Gene And Gene LLC v. BioPay LLC*, 541 F.3d 318, 329 (5th Cir. 2008). Trial

18   of a nationwide class here cannot generate common answers because the questions framed

19   by Plaintiffs require individual determinations.

20       **i.    Under ICE's disciplinary severity scale, discipline varies on a case-by-case basis and is not suitable for class determination.**

21

22       Plaintiffs allege that GEO forced or coerced them to perform uncompensated

23   housekeeping tasks beyond those required by the PBNDS using the discipline policy set

24   forth in the detainee handbook. *See e.g.* ECF 192-1 at 24. As discussed *supra* at 13-14, as

25   both recommended in the PBNDS and as implemented by the facilities, minor issues such

26   as housekeeping are most often resolved informally. Even when formal discipline is

27   appropriate, there are a range of possible sanctions depending upon the circumstances of

28   the infraction. A policy that requires discretion based upon the specific factual

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**DEFENDANT THE GEO GROUP, INC.'S MOTION TO DECERTIFY THE CLASS**

AKERMAN LLP

601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

circumstances at issue cannot be the basis for class certification. *See Wal-Mart*, 564 U.S. at 338. In *Wal-Mart*, female employees alleged Title VII sex discrimination claims arising from the alleged failure to promote woman throughout the defendant's 3,400 stores. The plaintiffs alleged that Wal-Mart's national policy to provide supervisors with discretion over pay and promotions resulted in an unlawful disparate impact on female employees, as evidenced by statistical analysis and testimony from 120 class members. 564 U.S. at 346. The Supreme Court reversed class certification, explaining:

> Here respondents wish to sue about literally millions of disciplinary decisions at once. Without some glue holding the alleged *reasons* for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial questions *why was I disfavored*.

64 U.S. at 352 (emphasis in original).

The same fatal flaw is inherent in Plaintiffs' TVPA theory. There can be no common answer to whether the nationwide class was subject to a "threat of serious harm" because each instance of discipline or warning of possible discipline involves a discretionary decision about which of the possible thirteen sanctions might be imposed based on the particular circumstances. Assuming each member of the class read and understood the disciplinary procedures described in the detainee handbooks (which GEO denies is the case), he or she would understand that staff would first attempt to informally resolve any detainee's refusal to clean their living area, and then if necessary issue an incident report, within their discretion. *See* Facility Handbooks attached as Ex. A to the Declarations of Janecka (ECF 421-1); Plumley (ECF 422-4); Castro (ECF 423-1); Scott (ECF 423-4); Staiger (ECF 423-7); Bowen (ECF 423-10); Greenwalt (ECF 424-1); Allen (ECF 424-4 ); Tate (ECF 425-1); Ramos (ECF 425-4); Ceja (ECF 426-1 ). From there, the disciplinary panel would have discretion to change the charging officer's recommendation and any ultimate sanction could thereafter be appealed for further discretionary review. *Id.* As the Supreme Court held in *Walmart*, a policy based on individual discretionary decisions cannot provide the common question "glue" to support a class action. So too here, the very

nature of the policy on which Plaintiffs base their claim is antithetical to classwide determinations.

### ii.    The TVPA's Test for "Serious Harm" Requires an Individualized Analysis that Is Not Suitable for Classwide Resolution.

There is also no common question as to whether GEO's alleged threats of serious harm compelled the class members to clean. The TVPA's definition of "serious harm" includes a harm "that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances" to work in order to avoid the harm. 18 U.S.C. § 1589(c). Under the TVPA, the court is required to consider an individual victim's vulnerabilities. *Muchira*, 850 F.3d at 618; *United States v. Rivera*, 799 F.3d 180, 186-187 (2d Cir. 2015).

Evidence of that a plaintiff experienced psychological harm is insufficient. *Muchira*, 850 F.3d at 620. Rather, a plaintiff "must present sufficient evidence upon which a jury could reasonably conclude that the [Defendant] *knowingly or intentionally* engaged in actions or made threats that were sufficiently serious to compel a reasonable person in [plaintiff's] position" to continue to work "against her will and in order to avoid such threats of harm." *Id.* (emphasis original). When those actions or threats involve "more subtle types of coercion, particularly psychological coercion, the vulnerabilities and characteristics of the specific victim become extremely important because one individual could be impervious to some types of coercion that cause another to acquiesce in providing forced labor." *David,* 2012 WL 10759668 *20.

The required individualized inquiry is not easily answered by generalized class-wide proof. *David,* 2012 WL 10759668 *21 (observing that the alleged "threats" were often made to individuals, not to the class as a whole). Class treatment may be appropriate where the proposed class "share a large number of common attributes – they are teachers, they are from the Philippines, they are new to the United States, they are educated, they work in Louisiana, they left their homes to work in a new county" and therefore "share the 'same background' and 'same circumstances.'" *Tanedo v. East Baton Rough Parish School Bd.*,

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**DEFENDANT THE GEO GROUP, INC.'S MOTION TO DECERTIFY THE CLASS**

2011 WL 7095434 *8 (C.D. Cal. Dec. 12, 2011). In contrast, where the proposed class members were recruited from various countries, had different contract terms, different promissory note amounts, and worked in different states under different conditions "it would not be appropriate to apply a 'reasonable person' standard to determine whether the Defendants' varying actions constituted a threat of harm for each proposed class member. *Panwar v. Access Therapies, Inc.*, 2015 WL 329013 *6 (S.D. Ind. 2015) (denying class certification).

Here the class members come from more than eighty countries. ECF 421-1, Janecka Dec. at ¶ 3. They vary in age, religion, education, and personal history. As Plaintiffs' own expert, Dr. Haney, opined, some class members have particular vulnerabilities such as past trauma, limited English proficiency, and mental illness which may make them more sensitive to threats of punishment. Ex. U, Haney Dep. Ex. 1 at 33 ¶ 65. The class members cannot, therefore, be said to be "share the same background" so that the same "reasonable person" standard applies to them all.

Moreover, there was no common "threat." Plaintiffs rely on the detainee handbook as a classwide "threat" of serious harm because it explains the PBNDS disciplinary standards as possible consequences for refusing to clean. But there is no evidence that any Plaintiff felt compelled to clean after reading the detainee handbook. Indeed, not all class members read or understood it. Plaintiff Karim, a native Somali speaker, read the handbook in English and "didn't understand very well when [he] read it first time." Ex. S, Karim Dep. 84:15-19; *see also* Ex. W, Vizguerra Dep. 37:14-22 (testifying that he did not read the national or local detainee handbooks). Instead the named Plaintiffs claim to have felt threatened either by stories they heard from others or by specific incidents with particular guards. *See e.g.* Ex. R, Mancia Dep. 47:15-48:17. The particular details of these incidents or stories are inherently individualized. Thus even the nature of the alleged "threat" is not a common question for the class.

///

///

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**DEFENDANT THE GEO GROUP, INC.'S MOTION TO DECERTIFY THE CLASS**

### iii.   There was no threat of discipline related to the Voluntary Work Program.

Plaintiffs have not identified any policy to impose discipline on detainees who did not participate in the VWP. Anecdotal evidence is not sufficient to infer that Adelanto operated under a general policy. *See Romo,* 2014 WL 12588646, *14. Even if the general PBNDS discipline policy directed to "refusing to clean living area" were considered to apply to VWP tasks, the same infirmities fatal to the HUSP Class claims, apply equally to the Adelanto Forced Labor claims. *See supra* Section II.D.

### IV.   TVPA claims of any class member detained prior to December 23, 2008 are time barred.

Finally, a common statute of limitations does not apply to the nationwide class and therefore all members of the class who were detained prior to December 23, 2008 must be decertified. When Congress first enacted the TVPA in 2000, the statute provided for a four-year limitations period. On December 23, 2008, Congress amended the TVPA to include a ten-year limitations period for civil actions. 18 U.S.C. § 1595(c). "Congress did not expressly state or otherwise indicate that the [TVPA] limitations period applies retroactively." *Abarca v. Little*, 54 F. Supp. 3d 1064, 1068 (D. Minn. 2014). Further, the prior version of the TVPA did not provide for the same scope of civil liability, which was expanded under the 2008 amendments. *Id.* Therefore, the statute cannot be applied retroactively. *Id.*; *see also Doe v. Siddig*, 810 F.Supp.2d 127, 135 (D.D.C. 2011) (rejecting proposed retroactive application of the TVPA because doing so would "increase a party's liability for past conduct").

Accordingly, all individuals whose claims accrued prior to December 23, 2008 would have been subject to a four-year limitations period and could not have sought relief under the expanded causes of action added to the TVPA in the 2008 amendments. Because those individuals would be subject to a different limitations period, they would be subject to different fact-based defenses and should be decertified from the class.

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**DEFENDANT THE GEO GROUP, INC.'S MOTION TO DECERTIFY THE CLASS**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**AKERMAN LLP**
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

# CONCLUSION

Accordingly, Defendant The GEO Group, Inc. respectfully requests that this Court issue an order decertifying the class and granting any other relief this Court deems just and proper.

Respectfully submitted, this the 21st day of December, 2020.

**AKERMAN LLP**

By: */s/ Ellen S. Robbins*
Ellen S. Robbins
Alicia Y. Hou
Adrienne Scheffey
Attorneys for Defendant
THE GEO GROUP, INC.

**DEFENDANT THE GEO GROUP, INC.'S MOTION TO DECERTIFY THE CLASS**