Daniel H. Charest (admitted *pro hac vice*)
dcharest@burnscharest.com
TX Bar # 24057803
E. Lawrence Vincent (admitted *pro hac vice*)
lvincent@burnscharest.com
TX Bar # 20585590
**BURNS CHAREST LLP**
900 Jackson St., Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002

Class Counsel
*Additional Counsel on Signature Page*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# EASTERN DIVISION

| | |
|---|---|
| **RAUL NOVOA, JAIME CAMPOS FUENTES, ABDIAZIZ KARIM**, and **RAMON MANCIA**, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br>v.<br><br>**THE GEO GROUP, INC.**,<br><br>*Defendant*. | Civil Action No. 5:17-cv-02514-JGB-SHKx<br><br>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO GEO'S MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: February 1, 2021<br>Time: 9 a.m. PT<br>Courtroom: 1<br>Judge Hon. Jesus G. Bernal |

i

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................1

II.   SUMMARY JUDGMENT STANDARD ...........................................2

III.  ARGUMENT ......................................................................................2

   A.   GEO's attempt to eliminate the Nationwide HUSP Class should be rejected because Plaintiffs may pursue several remedies – including their request for injunctive relief – under the Trafficking Victims Protection Act. .......................................2

        1.   Injunctive relief is not the sole relief Plaintiffs seek under the TVPA. ............................................................3

        2.   Victims of trafficking may seek injunctive relief. ........................4

   B.   A jury could find that GEO violated the California and Federal Trafficking Victims Protection Acts. .........................................7

        1.   GEO's actions are not "warning of legitimate consequences;" GEO threatens serious harm to detainees who do not comply with its illegal, illegitimate work requirements. .......................................8

        2.   Plaintiffs need not prove they "suffered serious harm as defined by the statute;" only that GEO's threats could coerce a reasonable person to accede to GEO's demands. ....................................................................... 13

        3.   The record supports a jury finding that GEO acted with the required intent under the Act. ............................ 16

   C.   GEO is an "Employer" Under the California Minimum Wage Law and the Adelanto Forced Labor Class Members are its "Employees." ...................................................... 18

   D.   GEO is not entitled to intergovernmental immunity. ........................ 23

        1.   The Adelanto Wage Class's state law claims do not directly regulate the federal government. ................................ 23

        2.   Plaintiffs' claims do not discriminate against the federal government. .................................................... 25

E.      GEO is not entitled to derivative sovereign immunity. ..................... 29

        1.      GEO did not perform at the direction of ICE. ...................... 30

        2.      ICE cannot validly confer GEO authorization to
                violate the law. ................................................................ 31

F.      Application here of the California Trafficking Victims
        Protection Act and/or the California Labor Code is not
        preempted by federal law. ...................................................... 32

G.      A jury could find that GEO was unjustly enriched and/or
        violated the California Unfair Competition Law by utilizing
        detainee labor to render services it had contracted to
        provide. ................................................................................... 33

IV.     CONCLUSION .................................................................................. 34

iii

# TABLE OF AUTHORITIES

## Cases

*Arnold v. United Artists Theatre Circuit, Inc.*,
  158 F.R.D. 439 (N.D. Cal. 1994) ................................................................. 3

*Barnhart v. Sigmon Coal Co.*,
  534 U.S. 438 (2002) .................................................................................. 4

*Barrientos v. CoreCivic, Inc.*,
  951 F.3d 1269 (11th Cir. 2020) .................................................... 10, 12, 31

*Blackburn v. United States*,
  100 F.3d 1426 (9th Cir. 1996) ................................................................ 28

*Boeing v. Movassaghi*,
  768 F.3d 832 (9th Cir. 2014) .................................................................. 28

*Brassinga v. City of Mountain View*,
  66 Cal. App. 4th 195 (Cal. Ct. App. 1998) .............................................. 19

*Bridges v. Poe*,
  No. 19 Civ. 1399, 2020 WL 5408915 (N.D. Ala. Sept. 9, 2020) ............. 14

*Cabalce v. Thomas Blanchard & Assocs., Inc.*,
  797 F.3d 720 (9th Cir. 2015) .................................................................. 29

*Campbell–Ewald Co. v. Gomez*,
  136 S. Ct. 663 (2016) ............................................................................. 31

*Chen v. GEO Grp., Inc.*,
  287 F. Supp. 3d 1158 (W.D. Wash. 2017) ............................................... 32

*Confederated Tribes & Bands of the Yakama Indian Nation v. Gregoire*,
  658 F.3d 1078 (9th Cir. 2011) ................................................................ 23

*Cunningham v. General Dynamics Information Technology*,
  888 F.3d 640 (4th Cir. 2018) .............................................................30, 31

*David v. Signal Int'l, LLC*,
  No. CIV. A. 08-1220, 2015 WL 75276 (E.D. La. Jan. 6, 2015) ............... 17

*Davis v. Ayala*,
  135 S. Ct. 2187 (2015) ........................................................................... 15

*Dep't of Employment v. United States,*
  385 U.S. 355 (1966) ................................................................................ 24

*Dynamex Operations West, Inc. v. Superior Court of Los Angeles,*
  4 Cal. 5th 903 (2018) .............................................................................. 18

*Fasano v. Fed. Reserve Bank of New York,*
  457 F.3d 274 (3d Cir. 2006) .................................................................... 24

*Fed. Land Bank of St. Paul v. Bismarck Lumber Co.,*
  314 U.S. 95 (1941) ................................................................................... 24

*Franklin v. Gwinnett County Public Schools,*
  503 U.S. 60 (1992) ..................................................................................... 4

*Garcia v. Audobon Communities Mgmt., LLC,*
  No. 08-cv-01291 (E.D. La. Apr. 15, 2008) ................................................ 6

*Gartrell Construction Inc. v. Aubry,*
  940 F.2d 437 (9th Cir. 1991) ................................................................... 33

*Gonzales v. CoreCivic, Inc.,*
  No. 1:18-CV-169-LY, 2019 WL 2572540 (W.D. Tex. Mar. 1, 2019) ..................... 14

*Gov't Employees Ins. Co. v. Dizol,*
  133 F.3d 1220 (9th Cir. 1998) ................................................................... 3

*Headley v. Church of Scientology Int'l,*
  687 F.3d 1173 (9th Cir. 2012) ................................................................... 9

*Hoppmann v. Workers' Comp. Appeals Bd.,*
  226 Cal. App. 3d 1119 (1991) ................................................................. 19

*In re KBR, Inc., Burn Pit Litig.,*
  744 F.3d 326 (4th Cir. 2014) ................................................................... 30

*In re Nat'l Sec. Agency Telecomms. Records Litig.,*
  633 F. Supp. 2d 892 (N.D. Cal. 2007) ..................................................... 27

*James v. Dravo Contracting Co.,*
  302 U.S. 134 (1937) ................................................................................. 24

*Kasky v. Nike, Inc.,*
  27 Cal. 4th 939 (2002) ............................................................................. 34

*LeBlanc v. Great American Ins. Co.*,
    6 F.3d 836 (1st Cir. 1993) ...................................................................... 2

*Martinez v. Combs*,
    49 Cal. 4th 35 (2010) ........................................................ 18, 20, 21, 22

*Matherly v. Andrews*,
    859 F.3d 264 (4th Cir. 2017) ............................................................. 18

*Medina Tovar v. Zuchowski*,
    982 F.3d 631 (9th Cir. 2020) ............................................................... 6

*Menocal v. GEO Grp., Inc.*,
    113 F. Supp. 3d 1125 (D. Colo. 2015) ............................................... 30

*Muchira v. Al-Rawaf*,
    850 F.3d 605 (4th Cir. 2017) ............................................................... 9

*Munoz v. Atl. Express of L.A., Inc.*,
    2012 WL 5349408 (C.D. Cal. Oct. 30, 2012) .................................... 20

*Myers v. United States*,
    323 F.2d 580 (9th Cir. 1963) .........................................................29, 30

*North Dakota v. United States*,
    495 U.S. 423 (1990) ............................................................... 23, 26, 27

*Nwauzor v. GEO Grp., Inc.*,
    2020 WL 1689728 (W.D. Wash. Apr. 7, 2020) ...............................28, 30

*Owino v. CoreCivic, Inc.*,
    2018 WL 2193644 (S.D. Cal. May 14, 2018) ................................... 14

*Paguirigan v. Prompt Nursing Emp't Agency LLC*,
    No. 17 Civ. 1302, 2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019) ............ 8

*People v. Superior Court of Los Angeles Cty.*,
    57 Cal. App. 5th 619 (2020) ............................................................. 18

*People v. Uber Techs., Inc.*,
    56 Cal. App. 5th 266 (2020) ............................................................. 18

*Peterson v. Cellco P'ship*,
    164 Cal. App. 4th 1583 (2008) ........................................................ 34

*Porter v. Warner Holding Co.*,
 328 U.S. 395 (1946) ............................................................................................ 4

*Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*,
 970 F.2d 552 (9th Cir. 1992) ............................................................................ 5

*Rhodeman v. Ocwen Loan Servicing, LLC*,
 No. CV 18-2363 JGB (KKx), 2020 WL 1698709 (C.D. Cal. Apr. 3,
 2020) ......................................................................................................... 2, 3

*Ridgeway v. Wal-Mart Stores, Inc.*,
 2017 WL 363214 (N.D. Cal. 2017) ................................................................ 34

*Rust v. Johnson*,
 597 F.2d 174 (1979) ......................................................................................... 24

*S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*,
 769 P.2d 399 (1989) ......................................................................................... 20

*Salim v. Mitchell*,
 268 F. Supp. 3d 1132 (E.D. Wash. 2017) ................................................... 30

*Souder v. Brennan*,
 367 F. Supp. 808 (D.D.C. 1973) .................................................................... 32

*Tae Youn Shim v. Lawler*,
 2019 WL 2996443 (N.D. Cal. July 9, 2019) ................................................ 34

*Talley v. Cty. of Fresno*,
 51 Cal. App. 5th 1060 (2020) ......................................................................... 19

*The Geo Group, Inc., v. Newsom, et al.*,
 No. 19-CV-2491 JLS (WVG), 2020 WL 5968759 (S.D. Cal. Oct. 8,
 2020) ................................................................................................................... 23

*U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, L.L.C.*,
 554 F. Supp. 2d 523 (S.D.N.Y. 2008) .......................................................... 17

*U.S. v. Dann*,
 652 F.3d 1160, 1170 (9th Cir. 2011) ............................................................ 14

*United States v. Alexander*,
 106 F.3d 874 (9th Cir. 1997) ............................................................................ 2

*United States v. Boyd*,
 378 U.S. 39 (1964) ............................................................................... 23, 24, 25

*United States v. Bradley,*
    390 F.3d 145 (1st Cir. 2004) ................................................................. 5, 8

*United States v. California,*
    921 F.3d 865 (9th Cir. 2019) ........................................... 26, 29, 32

*United States v. Calimlim,*
    538 F.3d 706 (7th Cir. 2008) ............................................................... 8, 9

*United States v. Callahan,*
    801 F.3d 606 (6th Cir. 2015) ............................................................. 12, 13

*United States v. County of Fresno,*
    429 U.S. 452 (1977) ........................................................................... 27

*United States v. Dann,*
    652 F.3d 1160 (9th Cir. 2011) ................................................ 5, 6, 14, 16

*United States v. Hollingshead,*
    672 F.2d 751 (9th Cir. 1982) ............................................................. 24

*United States v. Kozminski,*
    487 U.S. 931 (1988) ........................................................................... 5

United States v. MacPherson,
    424 F.3d 183 (2d Cir. 2005) ............................................................. 17

*United States v. Muskegon Twp.,*
    355 U.S. 484 (1958) ........................................................................... 25

*United States v. New Mexico,*
    455 U.S. 720 (1982) ........................................................................... 24

*United States v. Robinson,*
    702 F.3d 22 (2d Cir. 2012) ............................................................... 17

*United States v. State of Mich.,*
    851 F.2d 803 (6th Cir. 1988) ............................................................. 25

*United States v. Thompson,*
    109 F.3d 639 (9th Cir. 1997) ......................................................... 14, 35

*United States v. Toviave,*
    761 F.3d 623 (6th Cir. 2014) ......................................................... 12, 13

*Washington v. United States,*
    460 U.S. 536 (1983) ........................................................................ 26

*Wynn v. Astrue,*
    No. 11-C-639, 2012 WL 4501009 (E.D. Wis. Sept. 28, 2012) ................................. 3

*Yeagley v. Wells Fargo & Co.,*
    No. C 05-03403 CRB, 2006 WL 193257 (N.D. Cal. Jan. 23, 2006) ........................ 4

**Statutes**

18 U.S.C. § 1589 ................................................................................5, 6, 14

26 U.S.C. § 7421 ........................................................................................ 4

28 U.S.C. § 1341 ........................................................................................ 4

28 U.S.C. § 1342 ........................................................................................ 4

28 U.S.C. § 2283 ........................................................................................ 4

Cal. Bus. & Prof. Code § 17200 ................................................................ 34

Cal. Code Regs. tit. 15, § 3064 ................................................................ 27

Cal. Lab. Code § 1171 .............................................................................. 20

Cal. Lab. Code § 1194 .............................................................................. 20

Cal. Lab. Code § 2775 .............................................................................. 18

Cal. Labor Code § 1194 ............................................................................ 22

Cal. Labor Code § 1720.4 ......................................................................... 19

Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No.
    110-457, 122 Stat. 5044 ........................................................................ 6

U.S.C. § 1590 ............................................................................................ 5

**Other Authorities**

149 Cong. Rec. E1383-01, 149 Cong. Rec. E1383-01, E1383, 2003 WL
    21485516. ............................................................................................ 7

7A C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE § 1775 ................. 4

H.R. Conf. Rep. No. 106-939, at 101 (2000) ............................................. 6

ix

K. Kaufka, *T Nonimmigrant Visas and Protection and Relief for Victims of Human Trafficking: A Practitioner's Guide*, 06-09 IMMIGR. BRIEFINGS 1 (Sept. 2006) ........................................................................................................ 7

Laura Shoop, *Uncovering the "Hidden Crime" of Human Trafficking by Empowering Individuals to Respond*, 36 GA. ST. U. L. REV. 1173, 1206 (2020) ................................................................................................................. 6

## **Regulations**

Federal Acquisition Regulation, 48 C.F.R. § 52.236-7 (1990) ........................................ 34

## I.   INTRODUCTION

Defendant The GEO Group, Inc. ("GEO") seeks summary judgment dismissal of all claims in this case based on irrelevant facts and inapplicable legal authorities. That GEO provides "safe and secure housing" and "nutritious and appetizing meals" to immigrant detainees means nothing more than it meets the contractual requirements for which it is paid **billions** of dollars. And the testimony from three GEO <u>wardens</u> that some detainees "enjoy participating in the [Voluntary Work Program] because they like to stay busy and be productive" is similarly ***not*** probative.

The issues in this case are different than GEO pretends. These are the relevant issues:

A.  Whether the certified Nationwide HUSP Class can obtain injunctive relief pursuant to the Federal Trafficking Victims Protection Act.

B.  Whether a jury could find that GEO violated the California and Federal Trafficking Victims Protection Acts.

C.  Whether civil detainees qualify as employees for purposes of the California Labor Code.

D.  Whether GEO's actions are immune from challenge based on the doctrines of intergovernmental or derivative sovereign immunity.

E.  Whether the California Trafficking Victims Protection Act or California Labor Code is preempted by federal law.

F.  Whether a jury could find that GEO was unjustly enriched or violated the California Unfair Competition Law by utilizing detainee labor to render services it had contracted to provide.

The record in this matter, including the findings and determinations already established and binding as law of the case over the past three-plus years of discovery and motion practice, requires denial of GEO's motion. And the questions are not really close.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is warranted if the record evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material so long as it "might affect the outcome of the suit under the governing law," and only if a reasonable jury could <u>not</u> return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a summary judgment motion is "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." *LeBlanc v. Great American Ins. Co.*, 6 F.3d 836, 841 (1st Cir. 1993). As part of that analysis, because GEO has not shown the applicability of any exception, this Court must apply the law of the case doctrine and reject those argument advanced by GEO that have been previously ruled against by this Court. *Rhodeman v. Ocwen Loan Servicing, LLC*, No. CV 18-2363 JGB (KKx), 2020 WL 1698709, at *3 (C.D. Cal. Apr. 3, 2020) ("Failure to apply the doctrine of the law of the case absent one of the requisite conditions constitutes an abuse of discretion." (quoting *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997)).

## III.    ARGUMENT

**A. GEO's attempt to eliminate the Nationwide HUSP Class should be rejected because Plaintiffs may pursue several remedies – including their request for injunctive relief – under the Trafficking Victims Protection Act.**

GEO argues that the Nationwide HUSP Class should be jettisoned because, even if GEO is found liable on Claims V and VI of the Third Amended Complaint, this Court can provide no remedy to the Class Members. GEO's motion is based on two false assertions: (1) that the Nationwide HUSP Class seeks only a single remedy – injunctive relief and (2) that injunctive relief is not available under the TVPA.

Because both of GEO's premises are wrong, the claims of the Nationwide HUSP Class should remain for trial.

2

### 1.  Injunctive relief is not the sole relief Plaintiffs seek under the TVPA.

GEO's first manufactured assumption is simply untrue. Plaintiffs seek both declaratory and injunctive relief under the TVPA.[1]

In addition to requesting an injunction to end GEO's violation of the TVPA, the Third Amended Complaint also seeks a declaratory judgment regarding its disregard of the statute. *See* Plaintiffs' Third Amended Complaint for Declaratory and Injunctive Relief and Damages, ECF 184 at ¶¶ 242, 249, at 56 ¶(e). Those remedies are available under the TVPA. *See Gov't Employees Ins. Co. v. Dizol*, 133 F.3d 1220 (9th Cir. 1998) (declaratory relief available where jurisdiction otherwise exists).

This Court has already determined that both declaratory and injunctive relief are available to members of the Nationwide HUSP Class and the Adelanto Forced Labor Class when it rejected GEO's two prior attempts to dismiss Plaintiffs' TVPA claims. *See* ECF 44 at 15-18; ECF 61 at 7-10; *see also* ECF 223 at 12 (noting Plaintiffs have standing "to bring declaratory and injunctive relief" under the TVPA).[2] GEO's failure to demonstrate any reason why this Court's prior findings should be reversed requires (again) the rejection of GEO's renewed attack. *Rhodeman*, 2020 WL 1698709, at *3.

Declaratory judgment is an appropriate relief for a Rule 23(b)(2) class. *See* 7A C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE § 1775 (3d ed. Oct. 2020 update) (noting "a class action seeking solely declaratory relief may be certified under subdivision (b)(2)"); *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 453 (N.D. Cal. 1994) (certifying Rule 23(b)(2) class seeking statutory damages). Plaintiffs' request for declaratory relief defeats GEO's first summary judgment argument since, even if this Court were to find injunctive relief is not an available remedy under the TVPA, Plaintiffs' other remedy supports Claims V and VI.

---

[1] The Court should reject GEO's invitation to ignore the Third Amended Complaint and applicable law based on a single exchange between Court and counsel during the hearing on Plaintiffs' motion to approve class notice. ECF 141 at 10. Counsel's statement, which GEO misconstrues, does not mean what GEO says. *Wynn v. Astrue*, No. 11-C-639, 2012 WL 4501009, at *2 (E.D. Wis. Sept. 28, 2012) (finding no intention by counsel to waive argument or issue not directly and clearly addressed).

[2] Of course, the Adelanto CTVPA and TVPA class seeks these same remedies plus damages.

### 2. Victims of trafficking may seek injunctive relief.

Independently, injunctive relief is an available remedy for violation of the TVPA.

First, as noted, this Court has already recognized that injunctive relief is available to members of the Nationwide HUSP Class regarding GEO's TVPA violations. ECF 44 at 15-18; ECF 61 at 7-10. Law of the case precludes GEO's argument.

Second, neither of the two cases GEO cites in support of its argument either address or concern the TVPA. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002) (addressing tax implications of the Coal Industry Retiree Health Benefit Act of 1992); *Yeagley v. Wells Fargo & Co.*, No. C 05-03403 CRB, 2006 WL 193257, at *1 (N.D. Cal. Jan. 23, 2006) (addressing the Fair Credit Reporting Act). Congress certainly knows how to prohibit equitable relief. *See, e.g.*, 28 U.S.C. § 1341 ("The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law . . . ."); 26 U.S.C. § 7421 ("[N]o suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed."); 28 U.S.C. § 1342 ("The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility . . . ."); 28 U.S.C. § 2283 ("A court of the United States may not grant an injunction to stay proceedings in a State court . . . ."). Never does GEO explain why two generic statements regarding statutory construction should apply here to overcome the Supreme Court's admonition that, "absent clear direction to the contrary by Congress, the federal courts have the power to award <u>any</u> appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 70-71 (1992) (emphasis added); *see also Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) ("Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction."). Similarly, in this Circuit Congress's intent to divest the court of power to award equitable remedies "must be clear: a strong

4

presumption militates against any such finding." *Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 561 (9th Cir. 1992).

And GEO's argument ignores the TVPA's legislative history, which distinguishes the scope and import of that statute from those cited by GEO. In passing (and repeatedly amending and extending) the TVPA, Congress has never expressly excluded equitable remedies from the private cause of action provided by the statute. Instead, Congress has consistently increased, not limited, a party's empowerment acting as a private attorney general under the TVPA. *See* Laura Shoop, *Uncovering the "Hidden Crime" of Human Trafficking by Empowering Individuals to Respond*, 36 GA. ST. U. L. REV. 1173, 1206 (2020) ("The TVPA was reauthorized in 2003, 2005, 2008, and 2013, adding new protections with each reauthorization.").

Congress enacted the TVPA in response to the Supreme Court's decision in *United States v. Kozminski*, 487 U.S. 931 (1988), to provide tools to "combat severe forms of worker exploitation that do not rise to the level of involuntary servitude as defined in *Kozminski*." *See* H.R. Rep. No. 106-939, 2000 WL 1479163, at *91. The purpose was to combat the "increasingly subtle" means of coercion used to compel modern-day forced labor. *United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011) (quoting H.R. Rep. No. 106-939, at 101, (2000) (Conf. Rep.), as reprinted in 2000 U.S.C.C.A.N. 1380, 1392-93, 2000 WL 1479163, at *91); *see also United States v. Bradley*, 390 F.3d 145, 150 (1st Cir. 2004), *vacated on other grounds*, 545 U.S. 1101 (2005) (noting the statute encompasses "not only physical violence, but also more subtle psychological methods of coercion").

In passing 18 U.S.C. §§ 1589 and 1590, Congress originally sought to "provide federal prosecutors with the tools to combat severe forms of worker exploitation" and to address situations in which "traffickers threaten harm to third persons" or "restrain their victims without physical violence," all while taking into account "the individual circumstances of [the] victim[ ]. . . including [ ] age and background." H.R. Conf. Rep. No. 106-939, at 101 (2000). In accordance with these purposes, the TVPA defines

serious harm "broadly" to include any harm (whether physical or nonphysical, including psychological, financial, or reputational harm) that is sufficiently serious under all the surrounding circumstances to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm. *Dann*, 652 F.3d at 1169; 18 U.S.C. § 1589(c)(2).

When Congress reauthorized the TVPA in 2003, it added to the statute a private right of action for the express purpose of <u>supplementing</u> the government's enforcement of criminal statutes prohibiting forced labor crimes. 149 Cong. Rec. E1383-01, 149 Cong. Rec. E1383-01, E1383, 2003 WL 21485516, at 1. And in 2008, Congress <u>expanded</u> that private right of action to include additional violations, provide liability against those who knew or should have known that they benefited from any violation, and extend the statute of limitations to ten years. *See* Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 5044. Significant among those 2008 amendments was the new availability of "continued presence"—a temporary form of immigration relief for plaintiffs who pursue civil litigation under § 1595 and which expressly provided the opportunity for non-monetary relief under the Act. *See Garcia v. Audobon Communities Mgmt., LLC*, No. 08-cv-01291, slip op. at 7 (E.D. La. Apr. 15, 2008) (granting U visa certifications to plaintiffs for TVPA-related immigration relief); *see also* K. Kaufka, *T Nonimmigrant Visas and Protection and Relief for Victims of Human Trafficking: A Practitioner's Guide*, 06-09 IMMIGR. BRIEFINGS 1 (Sept. 2006) ("The TVPA allows for the continued presence (short-term immigration relief) for victims of trafficking identified by law enforcement and amends the Immigration Nationality Act to include the creation of the T nonimmigrant visa, providing longer-term legal relief and protections to victims of human trafficking in the United States...."). And in *Medina Tovar v. Zuchowski*, 982 F.3d 631, 637 (9th Cir. 2020), an *en banc* Ninth Circuit permitted a suit for declaratory and injunctive relief by plaintiffs seeking the grant of a derivative U visa for a spouse if the marriage existed at the time the principal applicant received a U visa.

Given the lack of an express prohibition on injunctive relief in the statute, the recognition of injunctive relief as an available remedy in prior orders of this Court, controlling authority that refuses arbitrary limits on this Court's power to impose any appropriate remedy, and the intent to provide ever-expanding means of combating the evils of forced human labor expressed in the statute's legislative history, GEO's attempt to eradicate the Nationwide HUSP Class by combining an illegitimate claim of waiver with an invalid legal analysis of the TVPA should be rejected.

## B. A jury could find that GEO violated the California and Federal Trafficking Victims Protection Acts.[3]

Rhetorically, GEO seeks to evade application of the TVPA and CTVPA by declaring GEO "is not an illicit human trafficking operation." ECF 414 at 12. Of course, courts have routinely <u>rejected</u> GEO's argument that the TVPA "only protects victims from the most heinous human trafficking crimes." *Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F. Supp. 2d 1134, 1145 (C.D. Cal. 2011). It governs GEO too.

Substantively, GEO argues that Plaintiffs' forced labor claims should be dismissed for three reasons: (1) because the disciplinary policy it enforces "constitutes a warning of legitimate consequences, not impermissible threats of serious harm;" (2) because "there is no evidence Plaintiffs suffered serious harm as defined by the statute;" and (3) because "there is no evidence that GEO acted with the requisite scienter to cause harm." ECF 414 at 13.

GEO's arguments not only misrepresent the applicable standards for liability, it also ignores the record evidence that that GEO coerces detained immigrants to clean, sanitize, and maintain its facilities for no compensation under threat of physical restraint or serious harm. This Court has previously noted that members of the Nationwide HUSP Class are "likely to succeed on the merits of their claim that GEO violates the TVPA." ECF 268 at 9. The record developed since that finding has only strengthened

---

[3] Like GEO, *see* ECF 414 at 12 & n.5, for purposes of the liability inquiry Plaintiffs herein also treat the state and federal forced labor claims collectively and address them in terms of the TVPA.

Plaintiffs' claims. Because a jury could agree with this Court's assessment that GEO violates the TVPA, GEO's request for summary judgment should be denied.

    **1.    GEO's actions are not "warning of legitimate consequences;" GEO threatens serious harm to detainees who do not comply with its illegal, illegitimate work requirements.**

GEO's argument that a "warning of legitimate consequences" is not actionable under the TVPA, *see* ECF 414 at 14-15, fundamentally misinterprets legal precedent. While some courts have observed that factual statements of lawful consequences for refusing to perform labor may not rise to the level of a TVPA violation, that finding is a fact-bound determination and hinges on the way the threats are deployed as well as the surrounding circumstances—in other words, a quintessential jury question. *See Bradley*, 390 F.3d at 151. Even factually or legally accurate statements (such as a statement to an undocumented employee that she could suffer immigration consequences) may be improperly coercive when made for the purpose of compelling labor. *See, e.g.*, *United States v. Calimlim*, 538 F.3d 706, 713 (7th Cir. 2008). Many TVPA cases involve employers who combine "legitimate" means of obtaining labor (such as paying wages) with unlawful coercion. *See, e.g.*, *Bradley*, 390 F.3d at 154 (affirming jury instruction that payment of a salary is not determinative of forced labor); *Paguirigan v. Prompt Nursing Emp't Agency LLC*, No. 17 Civ. 1302, 2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019) (granting summary judgment for class plaintiffs under the TVPA even though plaintiffs earned $29 an hour). GEO's assertion that its officers merely provide "warnings of legitimate consequences" is invalid as a matter of law to secure summary judgment.

Indeed, several cases have upheld a jury's verdict under the TVPA <u>despite</u> the defendants' protestations that they had "merely given neutral warnings of potential negative outcomes." For example, while the court in *Bradley* noted it might not violate the TVPA to inform workers that they will stop earning wages if they stop working, the panel rejected the defendant's argument that he had provided only "innocent warnings"

where the record showed that he had taken his employees' passports, threatened them
with violence, and restricted their local travel. 390 F.3d at 151-52.

Similarly, in *Calimlim*, the Seventh Circuit upheld a jury verdict finding employers
guilty of violating the TVPA for providing "warnings" to their employee that she was in
the United States illegally and therefore subject to deportation. 538 F.3d at 714, 718.
Although the statements were true, they could also "reasonably be viewed as a scheme
to make [the employee] believe that she or her family would be harmed if she tried to
leave." *Id.* at 713. The judgment as to whether the statements constituted threats was
therefore properly left to the jury. *Id.*

And courts that have granted summary judgment for defendants on such a claim
(including those cited by GEO) have faced circumstances contrary to those present here;
situations where the negative consequences of failing to work were simply objective facts
<u>outside the employer's control</u> or <u>unrelated to the work itself</u>. For example, in *Muchira v.
Al-Rawaf*, 850 F.3d 605, 624 (4th Cir. 2017), there was no evidence that the plaintiff's
employers had even warned her of the possibility of deportation; she just understood
that was a potential consequence under the terms of her visa. And, in *Headley v. Church
of Scientology Int'l*, 687 F.3d 1173, 1179-80 (9th Cir. 2012), the record "overwhelmingly"
showed that the plaintiffs worked for the Church of Scientology because "they believed
that it was the right thing to do, because they enjoyed it, and because they thought that
by working they were honoring the commitment that they each made and to which they
adhered." The consequences of which the *Headley* plaintiffs complained – that they
would lose contact with family, friends, or each other – were associated with leaving
their church, not their jobs, and were constitutionally protected as "shunning" under the
Constitution's Free Exercise Clause. *Id.* at 1180.

GEO's assertion that its "warnings" about punishment reflect "legitimate
consequences" presumes that punishment for not cleaning under the HUPSs (i.e.,
cleaning outside immediate living areas) is legitimate. But that is neither reality nor the

9

law. Indeed, the Eleventh Circuit has held that a government contractor may violate the TVPA if it forces (through similar enforcement policies) detainees to perform labor other than the "basic required tasks" specified in the PBNDS such as "'making their bunk beds daily,' 'stacking loose papers,' and 'keeping the floor free of debris.'" *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1272, 1277-78 & n.5 (11th Cir. 2020) (noting that nothing in the PBNDS "permits CoreCivic, or other private contractors operating immigration detention facilities," to force detainees to perform labor beyond personal housekeeping tasks). The decision in *Barrientos* acknowledges the significance of the distinction between basic housekeeping and forced labor, holding that while the disciplinary measures set forth in the ICE disciplinary severity scale do not, "on their own," give rise to liability under the TVPA, a government contractor may violate the TVPA if it forces detainees to perform forced labor <u>beyond</u> personal housekeeping tasks. *Id.* (applying the plain language of the PBNDS to limit permissible unpaid labor to "basic required tasks," such as detainees "'making their bunk beds daily, stacking loose papers, and keeping the floor free of debris," and noting that "[b]eyond these basic required tasks, detainees "shall not be required to work"'). *Id.* at 1272 (quoting the PBNDS).

And the record in <u>this</u> case supports a jury finding that GEO <u>insists</u> every detainee <u>know</u> the potential consequences for their failure to perform <u>all</u> labor tasks directed by GEO staff (including, expressly, those <u>directly</u> concerning the cleaning work under the HUSPs). Indeed, as applied to cleaning, the detainee handbook includes thirteen potential sanctions for a detainee's refusal to clean, refusal to follow any staff order, or mere "insolence" toward a member of GEO's staff – including segregation – which may be imposed at the discretion of the GEO officer for a detainee's refusal to clean. *See, e.g.*, **Exhibit M**, *Deposition Exhibit* 254 (GEO Supplemental Detainee Handbook for Mesa Verde Facility):[4]

---

[4] Each GEO handbook for the facilities in the Nationwide HUSP Class contains these same sections.

**Category III Offenses**:

These are considered to be Category III or "High Moderate Offenses".  Any combination of the following penalties may be imposed:

1) *Initiate criminal proceedings*
2) *Disciplinary transfer (recommend)*
3) *Disciplinary segregation (up to 72 hours)*
4) *Make monetary restitution, if funds are available*
5) *Loss of privileges (e.g. commissary, vending machines, movies, recreation, etc.)*
6) *Change housing*
7) *Remove from program and/or group activity*
8) *Loss of job*
9) *Impound and store detainee's personal property*
10) *Confiscate contraband*
11) *Restrict to housing unit*
12) *Reprimand*
13) *Warning*

| | |
|---|---|
| 300 | Indecent Exposure |
| 301 | Stealing (theft) |
| 302 | Misuse of authorized medication |
| 303 | Loss, misplacement or damage of a less restricted tool |
| 304 | Lending property or other item of value for profit / increased return |
| 305 | Possession of item(s) not authorized for receipt or retention, not issued through regular channels |
| 306 | Refusal to clean assigned living area |
| 307 | Refusing to obey a staff member Officer's order (may be categorized and charged as a greater or lesser offense depending on the kind of disobedience; continuing to riot is Code 105-Rioting, continuing to fight, Code 201-Fighting) |
| 308 | Insolence towards a staff member |

Page 46 of 62

Rev. 06/2018

Confidential                                GEO-Novoa_00073262

Being charged with <u>any</u> of the Category III Offenses can result in being subjected to any one of the thirteen penalties, including "*3) Disciplinary segregation (up to 72 hours)*" – and GEO makes <u>certain</u> every detainee knows that fact. GEO's argument that it lacks intent cannot stand. Surely sufficient evidence exists for a jury to reach a conclusion opposite to GEO's assertion.

In addition, every warden at each of the GEO facilities in this case testified that (a) GEO detention officers have the discretion regarding which sanction to inflict on a detainee, and (b) that sanctions can be imposed for a myriad of offenses directly related to a detainee's refusal to perform labor as directed by the GEO officer including refusing to clean assigned areas, refusing to obey an order of any GEO staff member or security officer, and "insolence towards a staff member." Plaintiffs' Statement of Supplemental Material Facts Nos. 2, 3. And the possible punishments for noncompliance are among the first things detainees learn upon arrival at a GEO facility. *See e.g.*, Deposition of Randy Tate, Facility Administrator - Montgomery Processing Center, at 75:23-76:10:

> Q. And when do detainees typically receive the detainee handbook, sir?
> A. Upon arrival.
> Q. So upon arrival … the detainees are informed that you either comply or you're subject to sanctions correct?
> A. They're issued the National Detention Standard handbook and a local handbook.
> Q. Which says exactly what I just said, comply or you're subject to sanction, correct?
> …
> A. Correct.

*See also* Plaintiffs' Statement of Supplemental Material Facts Nos. 4-6.

GEO's attempt to use the reach of the Thirteenth Amendment to limit that of the TVPA should be rejected as well. *See* ECF 414 at 14 (asserting that conduct which falls "outside of the bounds of the Thirteen Amendment" likewise falls "outside of the TVPA"). The TVPA simply does not exclude chores or housekeeping tasks from the definition of forced labor; in fact, "domestic tasks . . . certainly constitute labor or service under the ordinary meaning of those words." *United States v. Callahan*, 801 F.3d 606, 620 (6th Cir. 2015);[5] *see also Barrientos*, 951 F.3d at 1277 ("[N]othing in the PBNDS permits

---

[5] In *Callahan*, the Sixth Circuit expressly rejected GEO's proffered reading of its opinion in *United States v. Toviave*, 761 F.3d 623 (6th Cir. 2014) that the TVPA does not prohibit requiring the performance

CoreCivic, or other private contractors operating immigration detention facilities, to force detainees to perform labor (beyond personal housekeeping tasks), and certainly not through the illegal coercive means explicitly listed in the TVPA.").

The facts in this record distinguish GEO's authority <u>and</u> tie its discretion and threatened sanctions <u>directly</u> to a detainee's refusal to perform work not required by the PBNDS. Upon these facts, a jury could find for Plaintiffs, so the Court should deny GEO's motion.

### 2. Plaintiffs need not prove they "suffered serious harm as defined by the statute;" only that GEO's threats could coerce a reasonable person to accede to GEO's demands.

GEO's summary judgment argument "there is no evidence Plaintiffs suffered serious harm as defined by the statue," ECF 414 at 13, is both mistaken and misleading. And no matter how many times GEO repeats it, the argument is still wrong. The TVPA does <u>not</u> require proof that Plaintiffs were actually subjected to serious harm; only that some combination of serious harm <u>or</u> restraint <u>or</u> threats of the same exist that were sufficient to compel a reasonable person of the same background and in the same circumstances to work. 18 U.S.C. § 1589(a). The standard is objective. And the record contains significant evidence to support a jury finding that GEO repeatedly violated that standard.

Initially, GEO's motion focuses solely on its assertion that the threat of a 72-hour rendition to solitary confinement <u>cannot</u>, as a matter of law, constitute "serious harm" under the TVPA. No viable evidence exists to support this assertion. And GEO's only expert willing to assert this nonsense has been stricken. ECF 409. GEO's myopic focus on solitary confinement dooms its motion. As this Court has already, held serious harm is <u>only one aspect</u> of the coercive means prohibited by the TVPA which also include

---

of "household chores." ECF 414 at 14. As the *Callahan* court explained, *Toviave* "did not hold that household chores do not constitute labor or services." 801 F.3d at 620. Instead, *Toviave* held that the TVPA did not apply to matters implicating "the rights of parents and guardians to the custody of their minor children and wards," *id.* at 626, which is not relevant to this case

force, physical restraint, abuse of law or legal process, threats of any of those means, or any combination of those methods. *See* ECF 61 at 9; *see also* 18 U.S.C. § 1589(c)(2) ("serious harm" can be "physical or non-physical, including psychological, financial, or reputational"); *U.S. v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011); *Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 2011 WL 7095434, at *7-8 (C.D. Cal. Dec. 12, 2011). GEO does not argue (and it is hard to imagine how it could) that solitary confinement does not constitute <u>physical restraint</u>—which is an <u>independent</u> basis upon which a jury could find GEO liable <u>regardless</u> of the acknowledged psychological harm it inflicts. *See* 18 U.S.C. § 1589(a) (prohibiting "threats of physical restraint"); *see also Bridges v. Poe*, No. 19 Civ. 1399, 2020 WL 5408915, at *7 (N.D. Ala. Sept. 9, 2020) ("'Confinement' to a jail cell that restricts an inmate's freedom of movement certainly meets the ordinary meaning of 'physical restraint.'"); *and see generally United States v. Thompson*, 109 F.3d 639, 641 (9th Cir. 1997) ("physical restraint" as used in sentencing guidelines means, inter alia, "tied, bound, or locked up").

Moreover, GEO's attempt to belittle the threat of solitary confinement has been rejected previously; indeed, the threat of solitary confinement <u>alone</u> constitutes a prohibited means to achieve forced labor. As the court in another civil detainee case, *Gonzales v. CoreCivic, Inc.*, No. 1:18-CV-169-LY, 2019 WL 2572540 at *2 (W.D. Tex. Mar. 1, 2019), noted "[s]olitary confinement <u>alone</u> constitutes serious harm, which Congress defined to include psychological harm. *See* 18 U.S.C. § 1589(c)(2). Thus, the court finds that solitary confinement, or the threat of solitary confinement, sufficiently alleges the means to achieve forced labor." *Id.* (emphasis added); *see also Owino v. CoreCivic, Inc.*, 2018 WL 2193644, at *11 (S.D. Cal. May 14, 2018), *reconsideration denied*, 2019 WL 1367815 (S.D. Cal. Mar. 26, 2019) ("At the very least, solitary confinement constitutes serious harm, which Congress defined to include psychological harm. 18 U.S.C. § 1589(c)(2). Here, solitary confinement, or the threat of solitary confinement, sufficiently alleges the means to achieve forced labor."). Courts have long recognized "solitary confinement

14

bears a further terror and peculiar mark of infamy." *Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (citing *In re Medley*, 134 U.S. 160, 170 (1890)).

And GEO is simply <u>wrong</u> when it mischaracterizes the opinions of Plaintiffs' expert Dr. Craig Haney. *See* Plaintiffs' Statement of Disputed GEO "Facts" Nos. 88-89. In truth, it is irrelevant whether GEO segregated the four class representatives for refusal to clean, or whether GEO has developed a policy not to send detainees to segregation for refusing to clean, or even whether no detainee has ever actually been subjected to solitary confinement for a refusal to clean. ECF 414 at 15-16. The undisputed fact is that GEO informs every detained immigrant that "refusal to clean assigned living area" is punishable by, among other sanctions, disciplinary segregation. *See* ECF 411-2 at SUF 53 ("GEO's Supplemental Detainee Handbook sets forth the specific rules, regulations, policies, and procedures that detained workers must follow."); at 81 ("Detained immigrants are responsible for cleaning common use areas in their housing units for no compensation."); *See also* Plaintiffs' Statement of Supplemental Material Facts Nos. 1-6.

And despite GEO's assertions that "it is GEO's policy not to send detainees to segregation for refusing to clean," and that "segregation records reflect that detainees were not sent to segregation for refusing to clean," ECF 414-1 at UMF 81, 84, 86; discovery has shown otherwise. *See* GEO-Novoa_00159160, GEO-Novoa_00159171 (daily segregation roster and a segregation order for Aurora that document a detainee being placed in administrative segregation for "Refusing to clean. Insolence of staff.").

Because a jury could conclude that these circumstances heightened Plaintiffs' vulnerability to threats—including the threat of solitary confinement—sufficient to coerce the detainees to provide GEO free labor, GEO's argument based on the actual imposition of such penalties is irrelevant. GEO has never grappled with the reality that the TVPA presents an objective standard. And its motion reflects the same shortfall.

### 3.   The record supports a jury finding that GEO acted with the required intent under the Act.

GEO also seeks summary judgment on Plaintiffs' TVPA claims on the basis that "there is no evidence that GEO intended to compel detainees to clean their living areas or participate in the VWP." ECF 414 at 16. GEO must ignore the record to argue this.

To defeat GEO's motion, Plaintiffs need only provide evidence from which a factfinder could determine "that the employer intended to cause the victim to believe that she would suffer serious harm—from the vantage point of the victim—if she did not continue to work." *United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011). Evidence of intent can be inferred from the circumstances. *Id.* at 1171 (upholding jury's verdict based on "reasonable inferences" drawn from the evidence); *id.* at 1173 (when there were "two reasonable interpretations" of a single statement—one threatening and one non-threatening—a juror could reasonably conclude that the defendant intended the threatening one). Here, the record strongly supports the inference (which must be drawn in favor of Plaintiffs) that GEO intended detainees to believe they could be harmed for refusing to clean. The PBNDS expressly point out that the very purpose of the disciplinary system is to "discipline anyone whose behavior does not comply with facility rules and regulations." PBNDS § 2.12.V.B. The entire point is to compel compliance.

Indeed, as shown above, the detainee handbook includes thirteen potential sanctions for a detainee's refusal to clean, refusal to follow any staff order, or mere "insolence" toward a member of GEO's staff – including segregation – which may be imposed at the discretion of the GEO officer for a detainee's refusal to clean; and each GEO handbook for the facilities in the Nationwide HUSP Class contains those same provisions. Being charged with <u>any</u> of the Category III Offenses can result in being subjected to any one of the thirteen penalties, including "*3) Disciplinary segregation (up to 72 hours)*" – and GEO makes <u>certain</u> every detainee knows that fact. *See* Plaintiffs' Statement of Supplemental Material Facts Nos. 1-6. GEO's argument that it lacks intent

cannot stand. Surely sufficient evidence exists for a jury to reach a conclusion opposite to GEO's assertion.

In addition, as discussed before, as a for-profit private company with a fiduciary duty to generate profits for its shareholders, GEO has a significant motivation to use forced and underpaid labor since ever dollar it saves goes right to bottom profits. ECF 411-2 at SUF 21-24. Without detainee labor, GEO would instead have to employ more staff (at higher wages and benefit expenses) and/or pay overtime to accomplish the work needed to run Adelanto and its other Facilities. ECF 411-2 at SUF 25-26. As GEO itself has calculated, the loss of cheap (or free) detainee labor would cost it $2.3 million per year at Adelanto alone. *See* GEO-Novoa_00178340. A jury can certainly infer the requisite intent since GEO has tens of millions of reasons to compel detainees to clean beyond their "immediate living areas" and participate in the VWP. *See United States v. Robinson*, 702 F.3d 22, 36 (2d Cir. 2012) (noting in a TVPA case that "the *mens rea* elements of knowledge and intent can often be proved through circumstantial evidence and the reasonable inferences drawn therefrom. In fact, 'a verdict of guilty may be based entirely on circumstantial evidence as long as the inferences of culpability drawn from the circumstances are reasonable.'") (*quoting United States v. MacPherson,* 424 F.3d 183, 189-90 (2d Cir. 2005)); *David v. Signal Int'l, LLC*, No. CIV. A. 08-1220, 2015 WL 75276, at *2 (E.D. La. Jan. 6, 2015) ("Plaintiffs have introduced evidence from which a jury could infer Signal knowingly threatened immigration consequences in order to maintain its labor force. Plaintiffs have also introduced evidence tending to establish Signal was aware its workers had limited financial resources and intentionally leveraged this situation to its advantage."); *U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, L.L.C.*, 554 F. Supp. 2d 523, 533 (S.D.N.Y. 2008) ("These alleged profit motives render the inference of intent even more plausible.").

### C. GEO is an "Employer" Under the California Minimum Wage Law and the Adelanto Forced Labor Class Members are its "Employees."

This Court has explained repeatedly that *Martinez v. Combs*, 49 Cal. 4th 35  (2010), *as modified* (June 9, 2010) supplies the pertinent test for whether GEO is an "employer" for purposes of the California Labor Code. *See* ECF 44 at 8-9;  ECF 61 at 7; ECF 223 at 10. Yet GEO's motion ignores *Martinez* entirely; it is never even cited.

Instead, to analyze Plaintiffs' <u>state law</u> claims, GEO imports a test from the U.S. Circuit Court of Appeals for the Fourth Circuit concerning whether a prisoner performing labor while in the custody of the Federal Bureau of Prisons is entitled to the federal minimum wage under the Fair Labor Standards Act. ECF 414 at 21-22 (applying analysis from *Matherly v. Andrews*, 859 F.3d 264, 278 (4th Cir. 2017)). Accompanying its reliance on inapposite case law, GEO likewise distorts California statutory law in its attempt to evade *Martinez* and this Court's prior rulings. GEO's antics should be rejected.

GEO argues that the recent addition of § 2775 to the California Labor Code *sub silentio* overruled *Martinez* to set the definition of employee applicable to this case. ECF at 18. That is false. Section 2775 simply codifies the decision of the California Supreme Court in *Dynamex Operations West, Inc. v. Superior Court of Los Angeles* which adopted a three-prong "ABC" test <u>to determine whether a worker is properly classified as an independent contractor</u>. *Dynamex Operations West, Inc. v. Superior Court of Los Angeles*, 4 Cal. 5th 903 (2018). Cal. Lab. Code § 2775 ("[A] person providing labor or services for remuneration shall be considered an employee <u>rather than an independent contractor</u> unless the hiring entity demonstrates that all of the following conditions are satisfied ....") (emphasis added). *See also People v. Uber Techs., Inc.*, 56 Cal. App. 5th 266, 270 (2020), *as modified on denial of reh'g* (Nov. 20, 2020) ("AB 5 codified the holding in *Dynamex*"); *People v. Superior Court of Los Angeles Cty.*, 57 Cal. App. 5th 619 (2020) (same). Plaintiffs do not allege that GEO misclassified them as independent contractors and thus California Labor Code § 2775 has no bearing on this case.

GEO next seeks to avoid its legal obligations under the California Labor Code by

claiming that its detained workers are "volunteers" when they work—willfully or otherwise—to clean, feed, and maintain Adelanto. *See* ECF 414 at 28. But California law does not support GEO's position: no "minimum renumeration test" exists to classify an employee for purposes of the minimum wage statute, and the case GEO relies upon does not support its untenable position. *See Talley v. Cty. of Fresno*, 51 Cal. App. 5th 1060 (2020) (analyzing the Fair Employment and Housing Act, not California labor law).

California law narrowly defines a "volunteer" as "an individual who performs work for civic, charitable, or humanitarian reasons for a public agency or corporation qualified under Section 501(c)(3) of the Internal Revenue Code as a tax-exempt organization, without promise, expectation, or receipt of any compensation for work performed." Cal. Labor Code § 1720.4(a). GEO presents not one shred of competent evidence to suggest that detained workers qualify under this (or any) "volunteer" definition. The focus is not on how the parties characterize their relationship, but instead on the economic reality of the situation. *See Hoppmann v. Workers' Comp. Appeals Bd.*, 226 Cal. App. 3d 1119, 1126-27 (1991) (worker's compensation claimant was an "employee" despite his referring to himself as a church "volunteer"). *See also Brassinga v. City of Mountain View*, 66 Cal. App. 4th 195, 214 (Cal. Ct. App. 1998) ("The mere fact that an employee is given the freedom to decline a particular assignment does not mean that, when the employee accepts an assignment and engages in compensated work, he or she is transformed into a volunteer.").

GEO is a for-profit REIT whose stock is publicly traded, not a civic, charitable, or humanitarian public agency or tax-exempt organization. ECF 411-2 at SUF 1, 4-5. Nor has GEO provided <u>any</u> evidence that Plaintiffs perform work at Adelanto "without promise, expectation, or receipt of any compensation for work performed." Cal. Labor Code § 1720.4(a). Instead, Plaintiffs worked <u>with</u> the PBNDS guaranteed "promise, expectation, or receipt" of compensation—$1 per day—for work performed. ECF 411-2 at SUF 27, 30, 34-35, 73-74. At least, they were supposed to.

19

GEO also ignores this Court's application of *Martinez* to this case, and <u>again</u> argues for application of a "modified economic realities test" which was previously rejected. *See* ECF 414 at 20 (urging adoption of a two-step test that would first determine "which variation of the economic realities test applies" under the California Supreme Court's decision in *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 769 P.2d 399 (1989); and then "consider the remaining factors set forth under the economic realities test, detailed in federal case law"). But *Borello* sets forth the California common law test <u>for assessing independent contractor misclassification</u>, which does not apply here. ECF 44 at 8. And this Court has likewise previously rejected GEO's attempt to import FLSA standards into this case. *See* ECF 44 at 8-9 ("[T]he Court heeds the California Supreme Court's directive in *Martinez* that the IWC wage orders be given independent effect from FLSA."); ECF 61 at 7 ("In the prior Order, the Court found Plaintiff's claim was not preempted and the IWC Wage Order 5 applies to Defendant"). Instead, as this Court previously recognized "the appropriate analysis requires construing the IWC wage orders to determine whether immigration detainees such as Plaintiff have a civil action under § 1194 for work performed at a detention facility." *Id.* GEO's reliance on *Borillo* and FLSA cases should be rejected, <u>again</u>.

Over and above GEO's employment of inapposite legal authority, the record supports a finding that – based on the applicable test from *Martinez* – GEO is an "employer" under the California Minimum Wage Law and the Adelanto Forced Labor Class Members are its "employees." GEO runs from *Martinez* because it cannot survive the *Martinez* test.

Individuals in California "have a non-waivable, non-negotiable right to compensation for all hours worked" <u>regardless</u> of their  immigration status. *See Munoz v. Atl. Express of L.A., Inc.*, 2012 WL 5349408, at *4 (C.D. Cal. Oct. 30, 2012) (citing Cal. Lab. Code § 1194(a); Cal. Lab. Code § 1171.5. As this Court has already determined, Wage Order 5 applies in this case to fix the minimum wage and provide the legal basis

for an action by the employee to recover unpaid minimum wages. ECF 44 at 11 ("[T]he Court concludes Wage Order applies to Defendant."); *Martinez v. Combs*, 49 Cal. 4th 35, 56 (2010), *as modified* (June 9, 2010); *see also* ECF 223 at 10, 24 (*Martinez* supplies the applicable standard for determining the existence of an employment relationship). *Martinez* affirmed application of the IWC's three alternative definitions of "to employ": "(a) to exercise control over the wages, hours or working conditions, <u>or</u> (b) to suffer or permit to work, <u>or</u> (c) to engage, thereby creating a common law employment relationship." On this record, a jury could find that GEO satisfies **both** the "control" and "suffer or permit to work" tests articulated in *Martinez*.

<u>First</u>, as this Court has held, under the control test GEO is an employer if it "directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions" of any detainee. ECF 223 at 10 (citing *Martinez*, 49 Cal. 4th at 71). Although GEO is only required to control <u>either</u> detained workers' wages, hours, <u>or</u> working conditions to satisfy the test, GEO in fact controls all three: (1) GEO decides what to pay its detained workforce; (2) GEO processes detained worker payroll and pays some detained workers by periodically depositing money into their commissary accounts; (3) GEO creates work details and determines how many detained immigrants work in each detail; (4) GEO controls when and where detained immigrants work; (5) GEO evaluates VWP job candidates and determines their suitability for a job; (6) GEO determines which job a detained immigrant will work; (7) GEO evaluates the work performance of the detained workers; (8) GEO provides all job training and instruction to detained workers; (9) GEO provides all safety equipment, tools, and uniforms necessary for detained workers to complete their job assignments; (10) GEO directs and supervises detained workers for the duration of their shifts; and (11) GEO controls the decision of whether to suspend, terminate, and reassign detained workers. *See* ECF 411-2 at SUF 49-81. Indeed, GEO's admissions render the "control" test satisfied as a matter of law.

Second, under the "suffer or permit to work" test "the basis of liability is the defendant's knowledge of and failure to prevent the work from occurring." ECF 223 at 10 (citing *Martinez*, 49 Cal. 4th at 70). And again, GEO admits all facts necessary to establish the company knows detained immigrants work at Adelanto for subminimum wages—or nothing at all—and fails to prevent that unlawful condition despite having the power to do so. *See Martinez*, 49 Cal. 4th at 69. Neither the 2011 PBNDS nor ICE impose a $1 cap on detained worker wages. ECF 411-2 at SUF 34, 36-37; *see also* ECF 44 at 6 (explaining that Congress has abandoned direct appropriations for detained worker allowances under 8 U.S.C. § 1555(d)). And neither the 2011 PBNDS nor ICE permit GEO to withhold payment from detained workers. ECF 411-2 at SUF 34; 76-80; *see also* ECF 223 at 4. GEO has discretion of how much to pay detained workers and admits it could pay higher wages at Adelanto—as it does so at several other facilities in its ICE portfolio. ECF 411-2 at SUF 15, 36-37, 74-75; *see also* ECF 61 at 6 ("Even assuming that ICE contracted to reimburse GEO at a rate of $1 per day per detainee, such contract would not necessarily preclude GEO from paying detainees a higher rate."). GEO has the power to prevent the unlawful condition of wage theft, it simply chooses not to.

Accordingly, the Adelanto Wage Class members are "employed by" GEO under both the "control" and "suffer or permit to work" tests established by the California Supreme Court in *Martinez*. Therefore, California labor law protects all members the Adelanto Wage Class. *See* Cal. Labor Code § 1194(a) ("Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorney's fees, and costs of suit."). GEO's motion for summary judgment in this issue should be denied.

### D. GEO is not entitled to intergovernmental immunity.

As one court has recently held, GEO is not shielded under intergovernmental immunity for its violations of state and federal law. *The GEO Group, Inc. v. Newsom*, No. 19-CV-2491 JLS (WVG), 2020 WL 5968759, at *30 (S.D. Cal. Oct. 8, 2020) (GEO does not hold intergovernmental immunity because, "[u]ltimately, GEO and other private detention facility operators are pursuing their own private ends—in connection with commercial activities carried on for profit"). Again, GEO fails to address on-point authority that has rejected the argument it is advancing.

The *Newsom* court got it right. Under the doctrine of intergovernmental immunity, "[a] state regulation is invalid only if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion) (citations omitted). GEO's intergovernmental immunity defense fails because the Adelanto Wage Class's state law claims neither directly regulate nor discriminate against the federal government.

#### 1. The Adelanto Wage Class's state law claims do not directly regulate the federal government.

Direct regulation of the federal government does not occur each and every time a state law impacts a federal contractor's operations. Instead, the federal government is only "directly regulated" when it is subject to a direct legal obligation. *See Confederated Tribes & Bands of the Yakama Indian Nation v. Gregoire*, 658 F.3d 1078, 1084 (9th Cir. 2011) (instructing that a party bearing the "legal incidence" of a tax is the "entity or person [who] bears the ultimate legal obligation to pay the tax to the taxing authority."). GEO—not the federal government—bears the legal incidence here because only GEO has any legal obligation for violating California law *even if* application of the law ultimately costs the federal government more money. *See Confederated Tribes*, 658 F.3d at 1084; *see also United States v. Boyd*, 378 U.S. 39, 44 (1964) ("The Constitution . . . does not forbid a [regulation] whose legal incidence is upon a contractor doing business with the United

States, even though the economic burden of the [regulation] . . . is ultimately borne by the United States.").

GEO is not shielded by intergovernmental immunity because it is not an instrumentality "so closely connected to the Government that the two cannot realistically be viewed as separate entities, at least insofar as the activity being [regulated] is concerned." *United States v. New Mexico*, 455 U.S. 720, 735 (1982). GEO is an independent contractor. *See United States v. New Mexico*, 455 U.S. 720, 736-37 (1982) (contractors that operated federal atomic laboratories were not instrumentalities); *United States v. Boyd*, 378 U.S. 39, 48 (1964) (contractors operating and building atomic facilities were not instrumentalities); *James v. Dravo Contracting Co.*, 302 U.S. 134, 149 (1937) (contractor constructing river dams and locks not an instrumentality). It does not "stand in the Government's shoes" and is not "so assimilated by the Government as to become one of its constituent parts." *Id.* at 736 (citation omitted). GEO was not created or owned by the federal government. *See Dep't of Employment v. United States*, 385 U.S. 355, 358 (1966) (Red Cross); *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 102-03 (1941) (federal land bank); *United States v. Hollingshead*, 672 F.2d 751, 754 (9th Cir. 1982) (federal reserve bank); *Rust v. Johnson*, 597 F.2d 174 (1979) (Fannie Mae). Rather, GEO is a for-profit entity with a fiduciary duty to shareholders to maximize profits. *See Hollingshead*, 672 F.2d at 753-54; *Dep't of Employment*, 385 U.S. at 358; *Fasano v. Fed. Reserve Bank of New York*, 457 F.3d 274, 282-83 (3d Cir. 2006) (federal reserve bank).

GEO does not serve an "important governmental function." *See Fed. Land Bank of St. Paul*, 314 U.S. at 102 (federal land bank); *Lewis v. United States*, 680 F.2d 1239, 1242 (9th Cir. 1982) (federal reserve bank). Nor is it even heavily regulated (much less controlled) by the federal government. *See Dep't of Employment*, 385 U.S. at 359 (Red Cross subject to statutes governing entities' activities and leadership); *Hollingshead*, 672 F.2d at 754 (federal reserve bank subject to statutes governing oversight of entity's expenditures and distribution of its profits); *see also United States v. State of Mich.*, 851 F.2d 803, 806-07

(6th Cir. 1988) ("federal credit unions are extensively regulated under federal law"). Nothing about GEO or its operations bring it within the parameters of the intergovernmental immunity doctrine.

The seminal case of *United States v. Boyd*, 378 U.S. 39 (1964) is instructive. In *Boyd*, Tennessee imposed sales and use taxes on purchases made by two companies contracting with the Atomic Energy Commission, a federal agency. *Id.* at 40-41. One of the contractors "manage[d], operate[d], and maintain[ed] the [federal nuclear] plants and facilities," *id.* at 41-42, while the other "perform[ed] construction services relating both to new facilities and to the modification of the existing plant." *Id.* at 42-43. The contractors and the United States argued that the contractors should be entitled to immunity from the state taxes because their "use of government property [wa]s . . . a use exclusively for the benefit of the United States." *See id.* at 44.

The Supreme Court rejected this argument, holding that the contractors were not "so incorporated into the government structure as to become instrumentalities of the United States and thus enjoy governmental immunity." *Id.* at 48.  The Court explained that the contractors—like GEO—were business entities with "commercial, profit-making considerations in mind." *Id.* at 45. The "vital thing," according to the Court, was that the contractors were using government property "in connection with [their] own commercial activities.'" *Id.* (quoting *United States v. Muskegon Twp.*, 355 U.S. 484, 486 (1958)). Like the contractors in *Boyd*, GEO operates Adelanto in pursuit of its "own private ends—in connection with commercial activities carried on for profit." *Boyd*, 378 U.S. at 44. Like the contractors in *Boyd*, GEO is not a federal instrumentality simply because it does business with the federal government and it carries none of the indicia required to avail itself of the intergovernmental immunity shield.

### 2. Plaintiffs' claims do not discriminate against the federal government.

"[I]ntergovernmental immunity attaches only to state laws that discriminate against the federal government <u>and</u> burden it in some way." *United States v. California*, 921

F.3d 865, 880 (9th Cir. 2019), *cert. denied*, 207 L. Ed. 2d 1072 (June 15, 2020) (emphasis added); *see also id.* at 881 ("Since the advent of the doctrine, intergovernmental immunity has attached where a state's discrimination negatively affected federal activities in some way."). "[A] state 'does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them.'" *Id.* at 881 (quoting *Washington v. United States*, 460 U.S. 536, 544-45 (1983)). The Supreme Court "has required that the regulation be one that is imposed on some basis unrelated to the object's status as a Government contractor or supplier, that is, that it be imposed equally on other similarly situated constituents of the State." *North Dakota*, 495 U.S. at 438; *California*, 921 F.3d at 882.

There is no evidence in the record that the California Minimum Wage Law treats private companies that contract with the federal government worse than it treats private companies that contract with state or local governments. Indeed, the MWL regulates GEO because of its status as an employer, like any other employer, not because of its status as a federal government contractor. *California*, 921 F.3d at 881.

As a threshold matter, a proper comparison requires a proper comparator. GEO sets out a comparison between state and federal detainees. ECF 414 at 26. As a for-profit contractor operating a privately-owned facility, however, the proper comparator for GEO is not the State of California or a federal prison, but rather a similarly situated private, for-profit contractor doing business with the State. But GEO can point to no evidence that the California Minimum Wage Law treats private companies that contract with the federal government worse than it treats private companies that contract with state or local governments. Instead, GEO points to two counties, Orange and Yuba, which operate detention facilities pursuant to contracts with ICE. ECF 414 at 26-27. But Orange and Yuba counties are not private companies.

Even if GEO had provided proof of a proper comparator, the record does not support its claim that <u>as a matter of law</u>, application of the California Labor Code is

discriminatory. Where, as here, a state law is alleged to operate discriminatorily, courts apply intergovernmental immunity with "restraint," meaning that "[t]he nondiscrimination analysis should not 'look to the most narrow provision addressing the Government or those with whom it deals'" because even "'[a] State provision that appears to treat the Government differently on the most specific level of the analysis may, in its broader regulatory context, not be discriminatory.'" *In re Nat'l Sec. Agency Telecomms. Records Litig.*, 633 F. Supp. 2d 892, 903-04 (N.D. Cal. 2007) (quoting *North Dakota*, 495 U.S. at 438). "Applying these principles, the [Supreme] Court has required that regulations be imposed equally on all similarly situated constituents of a state and not based on a constituent's status as a government contractor or supplier." *Id.* at 903 (citing *United States v. County of Fresno*, 429 U.S. 452, 462-64 (1977)).

California's requirement an employer pay a minimum wage, and its prohibition of forced labor, applies equally to all actors, state and federal. GEO argues that the CTVPA discriminates against the federal government because "California State facilities require detainees to maintain the cleanliness and sanitation of their individually assigned cells or sleeping locations without violating the CTVPA." ECF 414 at 38. GEO cites only the California Department of Corrections' Inmate Cell Standards requires state prisoners to engage in certain cleaning activities. Cal. Code Regs. tit. 15, § 3064. But that statute does not apply to Plaintiffs at all, because civil immigration detainees are not inmates in the custody of the California Department of Corrections. Further, Plaintiffs have provided evidence that GEO compels detainees to engage in work <u>outside</u> of personal housekeeping tasks.  GEO's conclusory argument to the contrary lacks any merit.

GEO next argues that it is the victim of discrimination because "[i]f minimum wage applied, GEO would be compelled to restructure and renegotiate the pricing of its contracts with ICE, ultimately passing the cost directly to ICE. This restructuring will place a significant financial burden on the federal government." ECF 414 at 27. But that argument is neither correct, nor relevant.

GEO's contracts with ICE are fixed-cost contracts based on a per diem or bed-day rate, which includes all daily operating costs, such as personnel, food, health care, supplies, utilities, maintenance, infrastructure, depreciation, cost of capital, overhead and profit. ECF 411-2 at SUF 9, 21. ICE awards its contracts based on who submitted the lowest bid, and if GEO's operating costs exceed the per diem rate it used as the basis of its bid, then it is <u>GEO</u> – not the government – that suffers the loss. ECF 411-2 at SUF 16, 22. GEO does not simply "pass the cost directly to ICE." GEO is paid <u>no</u> additional amount unless the government <u>agrees</u> to the additional outlay. ECF 411-2 at SUF 22.

And GEO is wrong that this case is governed by either *Boeing v. Movassaghi*, 768 F.3d 832, 842-43 (9th Cir. 2014), or *Blackburn v. United States*, 100 F.3d 1426, 1435 (9th Cir. 1996). As the court in *Nwauzor v. GEO Grp., Inc.*, No. C17-5769RJB, 2020 WL 1689728, at *7 (W.D. Wash. Apr. 7, 2020), *reconsideration denied*, No. C17-5769RJB, 2020 WL 1955558 (W.D. Wash. Apr. 23, 2020), stated when rejecting an identical attempt by GEO to evade compliance with Washington's minimum wage statute ("MWA"):

> The *Boeing* court noted that the California regulations attempted to mandate the way Boeing cleaned up the site and replaced the federal contract's provisions. GEO has made no such showing here. Application of the MWA does not mandate the way in which GEO runs the VWP. It does not replace or add to the contractual requirements the GEO fulfill in running the program. Application of the statute would not regulate the terms of the contract itself. GEO has not demonstrated that the private Plaintiffs' enforcement of the MWA violates the doctrine of intergovernmental immunity because GEO has not shown that it directly interferes with the functions of the federal government.

And the Court in *Blackburn* considered a claim under the Federal Tort Claims Act by an individual injured when he jumped off the Stoneman Bridge in Yosemite National Park. 100 F.3d at 1428. The Court applied the "intergovernmental immunity component of

the Supremacy Clause" because it found requiring the placement of warning signs and safety ropes on the bridge would constitute "a direct and intrusive regulation by the State of the Federal Government's operation <u>of its property</u> at Yosemite." 100 F.3d at 1435 (emphasis added). Plaintiffs' claims simply do not directly impact any property, function, or activity of ICE.

Instead, the Court should look to *United States v. California*, 921 F.3d 865 (9th Cir. 2019), which rejected invocation the intergovernmental immunity doctrine <u>by the federal government itself</u> seeking to bar enforcement of a California law that prohibited public and private employers from providing voluntary consent to federal immigration enforcement agents to either enter any nonpublic areas of a place of labor <u>or</u> to access, review, or obtain an employee's records without a subpoena or warrant. 921 F.3d at 880. The Court rejected application of the doctrine because—as here—the law was directed at the conduct of *employers*, not the United States or its agents, even though the actions of the federal government were "incidentally targeted." *Id.*

GEO's intergovernmental immunity argument fails because Plaintiffs' state law claims neither directly regulate nor discriminate against the federal government.

### E. GEO is not entitled to derivative sovereign immunity.

Derivative sovereign immunity doctrine does not provide a free pass for government contractors to violate the law. *See Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016) (derivative sovereign immunity "is not absolute" and will not attach where a contractor "violates both federal law and the Government's explicit instructions"). It has long been recognized that derivative sovereign immunity does not protect a contractor that is sued for actions that are "over and beyond acts required to be performed by it under the contract." *Myers v. United States*, 323 F.2d 580, 583 (9th Cir. 1963). Derivative sovereign immunity is limited to cases in which a contractor "had no discretion in the design process and completely followed government specifications." *Cabalce v. Thomas Blanchard & Assocs., Inc.*, 797 F.3d 720, 732 (9th Cir. 2015). And that limitation precludes GEO's resort to the defense.

GEO is not entitled to derivative sovereign immunity because it cannot show (1) that the federal government directed its illegal acts **or** (2) that any authority to carry out those acts was validly conferred. *Yearsley*, 309 U.S. at 20-21. Indeed, **every** federal court to have considered the issue has concluded that the PBNDS do not provide GEO with immunity it seeks. *See Menocal v. GEO Grp., Inc.*, 113 F. Supp. 3d 1125, 1135 (D. Colo. 2015) (ICE "does not prohibit [GEO] from paying detainees in excess of $1/day in order to comply with Colorado labor laws."); *Nwauzor v. GEO Grp., Inc.*, 2020 WL 1689728, at *9 (W.D. Wash. Apr. 7, 2020) (denying GEO derivative sovereign immunity because "GEO has, in the past, paid workers more than a $1 a day").

### 1.   GEO did not perform at the direction of ICE.

GEO's derivative sovereign immunity defense fails because GEO took steps "over and beyond acts required to be performed by it under the contract." *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 345 (4th Cir. 2014) (quoting *Myers*, 323 F.2d at 583); *see also Yearsley*, 309 U.S. at 20 (governmental immunity applies only when a contractor's work is "authorized and directed" by the government); *Salim v. Mitchell*, 268 F. Supp. 3d 1132, 1150 (E.D. Wash. 2017) (where defendant could choose the government-approved interrogation technique to use, immunity defense failed).

In support, GEO's cites *Cunningham v. General Dynamics Information Technology*, 888 F.3d 640 (4th Cir. 2018). In *Cunningham*, the plaintiff alleged GDIT violated the Telephone Consumer Protection Act by robocalling his phone with an advertisement about the availability of health insurance without his prior consent to receive such a call. 888 F.3d at 644. GEO's comment that the *Cunningham* court "concluded that a contractor was entitled to governmental immunity *except* where the contractor violates its contract with the federal government," is misleading at best. The conclusory *dicta* came on the heels of the Fourth Circuit's analysis finding that "GDIT performed *exactly as CMS directed*: GDIT called the number CMS instructed GDIT to call, on the prescribed day, and followed CMS's provided script when leaving the message." 888 F.3d at 647 (emphasis added). The robocall challenged in *Cunningham* was executed at

the explicit direction of CMS, in the precise manner required by CMS, and using the CMS-provided script. *Cunningham* does <u>not</u> involve "facts analogous to those here." ECF 414 at 39.

Here, ICE did not authorize or direct GEO to secure free detainee labor through threats of serious harm. Quite the opposite: ICE requires GEO to compensate detained workers for their labor and prohibits GEO from engaging in forced labor. *See* ECF 411-2 at 30, 34, 35; *Barrientos*, 951 F.3d at 1277 (noting that the fact that the PBNDS requires a contractor to operate a work program for detainees "does not mean that such a program can never be operated in a manner—i.e., by forcing labor through illegal coercive means—that violates the TVPA"). Nor did ICE <u>direct</u> GEO to permit detained immigrants to work in VWP details for either $1/day or no compensation at all. ECF 411-2 at SUF 36. Instead, ICE <u>requires</u> GEO to pay for all detained immigrant labor. PBNDS § 5.8.V.K ("Detainees shall receive monetary compensation for work completed in accordance with the facility's standard policy."); ECF 411-2 at 34-35. As the *Cunningham* court noted, "[w]hen a contractor violates both federal law and the Government's explicit instructions, ... no 'derivative immunity' shields the contractor from suit by persons adversely affected by the violation." 888 F.3d at 647 (*quoting Campbell–Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016)).

Nor is GEO immune from the requirements of the California Labor Code. As Plaintiffs have explained at length in their Motion for Partial Summary Judgment, ECF 411, ICE did not (and could not) set the $1 per day wage rate. The 2011 PBNDS require that GEO compensate detained workers "at least" a dollar a day, but ICE leaves the decision of how much to pay above that amount to the discretion of GEO itself. GEO concedes it is not prohibited from paying higher wages at Adelanto, and that it does so at several other facilities in its ICE portfolio. ECF 411-2 at SUF 36, 37.

### 2.  ICE cannot validly confer GEO authorization to violate the law.

GEO argues that it was duly authorized by ICE to "discipline detainees" and to pay detained workers exactly $1 per day. ECF 414 at 15. But as this Court has explained

multiple times, "since 1979, Congress has abandoned direct appropriations for allowances under 8 U.S.C. § 1555(d)." ECF 61 at 6; *see also* ECF 44 at 6 (8 U.S.C. § 1555(d) "permits appropriations for the payment of allowances for work performed. Congress however, has not directly appropriated such funds since 1979."). Other courts have confirmed this understanding. *See also Chen v. GEO Grp., Inc.*, 287 F. Supp. 3d 1158, 1166 (W.D. Wash. 2017) ("At least since fiscal year 1979, Congress has abandoned direct appropriations payment of allowances, despite its awareness of how to do so."). Because ICE lacked authority to set wage rates, it could not "validly confer[]" authority to pay such allowances onto GEO. *Yearsley*, 309 U.S. at 20.

GEO styles the worker program as simply a cure for idleness. To be sure, some detained persons participate in the worker program at least in part to address boredom, but this is no defense to complying with minimum wage laws. *Souder v. Brennan*, 367 F. Supp. 808, 813 n.21 (D.D.C. 1973) (emphasis added) (rejecting argument that work performed by mentally-ill and disabled workers was merely "something to occupy the time" as defense to paying minimum wages).

**F. Application here of the California Trafficking Victims Protection Act and/or the California Labor Code is not preempted by federal law.**

This Court has already determined that Plaintiffs' claims arising under the California Labor Code are not preempted by federal law. *See* ECF 44 at 4 (rejecting GEO's express preemption argument); *id.* at 4-6 (rejecting GEO's field preemption argument); *id.* at 6-8 (rejecting GEO's obstacle/conflict preemption argument). The Court's conflict preemption analysis has now been confirmed by Ninth Circuit, which observed that "nothing in IRCA (or federal immigration policy generally) demands that employers, site owners, or general contractors be absolved from a state's employee-protection efforts whenever undocumented aliens provide labor." *California*, 921 F.3d at 882 (internal quotation marks omitted). GEO's attacks on Plaintiffs' CTVPA claims fail for the same reasoning.

And GEO does nothing to assail those rulings. Instead – with <u>no</u> explanation or

analysis – GEO asserts that application of California law somehow "prohibits the sanitation and disciplinary policies required by ICE," or decrees that if "detainees are employees who must be paid minimum wage," then those laws somehow "frustrate" or "impede" federal law and "impedes the federal government's ability to contract." ECF 414 at 34. But there is <u>no</u> explanation how or why requiring GEO pay a fair wage for labor it obtains precludes operation of federal immigration regulations or policies; GEO's *ipse dixit* argument is bogus as the Court has recognized. ECF 44 at 4-6.

And GEO's reliance on *Gartrell Construction Inc. v. Aubry*, 940 F.2d 437 (9th Cir. 1991) gains it nothing. In *Gartrell*, the court held that companies need not meet *state* licensing requirements to work on a *federal* contract because such a requirement was in direct conflict with the specific requirement of Federal Acquisition Regulation, 48 C.F.R. § 52.236-7 (1990), concerning financial responsibility which the federal government applies when selecting contractors. 940 F.3d at 439. In contrast to *Gartrell*, GEO fails to articulate how or why application of the California minimum wage law or CTVPA <u>precludes</u> ICE from contracting with providers of detention services or conflicts with any specific federal statute or regulation. Instead, application of the state laws here would simply make it less profitable for contractors to provide those services by preventing them from coercing members of a vulnerable population to provide free labor in fulfillment of the contract.

### G. A jury could find that GEO was unjustly enriched and/or violated the California Unfair Competition Law by utilizing detainee labor to render services it had contracted to provide.

For the reasons explained in Plaintiffs' Motion for Partial Summary Judgment, members of the Adelanto Wage Class are entitled to summary judgment as to their claims arising under the California Unfair Competition Law and the common law of unjust enrichment. ECF 411-1 at 13-15.

"California's unfair competition law (UCL) . . . defines 'unfair competition' to mean and include 'any unlawful, unfair or fraudulent business act or practice and unfair,

deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law (§ 17500 et seq.)].'" *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 949 (2002) (quoting Cal. Bus. & Prof. Code § 17200). "By defining unfair competition to include any 'unlawful . . . business act or practice', the UCL permits violations of other laws to be treated as unfair competition that is independently actionable." *Kasky*, 27 Cal. 4th at 949 (citations omitted).

One "unlawful, unfair or fraudulent business act or practice" that GEO has utilized is its violation of the California Labor Code through its failure to pay its detained workers the legal minimum wage. ECF 414-1 at 12-14; ECF 411-2 at SUF 9-26; *Ridgeway v. Wal-Mart Stores, Inc.*, 2017 WL 363214, *2 (N.D. Cal. 2017) ("having previously found that [employer's] pay policies violate California minimum wage law, plaintiffs were entitled to summary judgment on their UCL claim").

Another is GEO's realization of excess profits and unfair competitive advantages from using cheap detainee labor when bidding on and performing fixed price contracts with ICE. The record shows (and this Court has recognized) GEO was unjustly enriched by Plaintiffs' labor. ECF 411-2 at SUF 24-26; ECF 223 at 8, n.7 (observing that "GEO does not ultimately pay at all for detainee work that must otherwise be completed by GEO staff"). *See also Tae Youn Shim v. Lawler*, 2019 WL 2996443, at *20 (N.D. Cal. July 9, 2019) ("The elements of an unjust enrichment claim are the receipt of a benefit and [the] unjust retention of the benefit at the expense of another."), *appeal dismissed*, 2020 WL 529711 (9th Cir. Jan. 24, 2020) (citing *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1593 (2008)). GEO's receipt of the underpaid labor provided by Adelanto Wage Class members unjustly enriches it in the form of excess profits and violates the UCL.

## IV.   CONCLUSION

The Motion for Summary Judgment filed by Defendant The GEO Group, Inc., ECF 414, should be denied.

Dated: January 11, 2021                    Respectfully Submitted,

_/s/ Daniel H. Charest_

Daniel H. Charest (admitted _pro hac vice_)
dcharest@burnscharest.com
TX Bar # 24057803
Warren Burns (admitted _pro hac vice_)
wburns@burnscharest.com
TX Bar # 24053119
Will Thompson (CA Bar # 289012)
wthompson@burnscharest.com
E. Lawrence Vincent (admitted _pro hac vice_)
lvincent@burnscharest.com
TX Bar # 20585590
Mallory Biblo (admitted _pro hac vice_)
mbiblo@burnscharest.com
TX Bar # 24087165
Lauren Cross (admitted _pro hac vice_)
lcross@burnscharest.com
TX Bar # 24105759
**BURNS CHAREST LLP**
900 Jackson St., Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002

Korey A. Nelson (admitted _pro hac vice_)
knelson@burnscharest.com
LA Bar # 30002
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765

R. Andrew Free (admitted _pro hac vice_)
andrew@immigrantcivilrights.com
TN Bar # 030513
**LAW OFFICE OF R. ANDREW FREE**

35

P.O. Box 90568
Nashville, TN 37209
Telephone: (844) 321-3221
Facsimile: (615) 829-8959

Nicole Ramos (admitted *pro hac vice*)
nicole@alotrolado.org
NY Bar # 4660445
**AL OTRO LADO**
511 E. San Ysidro Blvd., # 333
San Ysidro, CA 92173
Telephone: (619) 786-4866

Robert Ahdoot (CA Bar # 172098)
rahdoot@ahdootwolfson.com
Tina Wolfson (CA Bar # 174806)
twolfson@ahdootwolfson.com
Theodore W Maya (CA Bar # 223242)
tmaya@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
10728 Lindbrook Drive
Los Angeles, California 90024-3102
Telephone: (310) 474-9111
Fax: (310) 474-8585

***Class Counsel***

# CERTIFICATE OF SERVICE

I, Daniel H. Charest, electronically submitted the foregoing document with the clerk of the court for the U.S. District Court, Central District of California, using the electronic case filing system. I hereby certify that I have provided copies to all counsel of record electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

Dated: January 11, 2021

*/s/ Daniel H. Charest*

Daniel H. Charest (admitted *pro hac vice*)
dcharest@burnscharest.com
TX Bar # 24057803
**BURNS CHAREST LLP**
900 Jackson St., Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002