# EXHIBIT C

Michael R. Childers, Ph.D.
September 21, 2020

```
                 UNITED STATES DISTRICT COURT

        CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION



                           ---oOo---


RAUL NOVOA, JAIME CAMPOS FUENTES, )
ABDIAZIZ KARIM, and RAMON MANCIA, )
individually and on behalf of all )
others similarly situated,        ) Case No.
                                  ) 5:17-cv-02514-JGB-SHK
     Plaintiffs/Counter-Defendants,)
                                  )
     vs.                          )
                                  )
The GEO Group, INC.,              )
                                  )
     Defendant/Counter-Claimant.  )
                                  )
_____ )
```

```
                    VIRTUAL DEPOSITION OF

            EXPERT MICHAEL R. CHILDERS, PH.D.

             Monday, September 21, 2020

                      8:03 A.M.
```

```
  REPORTED BY:

  GISELLE GIRARD

  CSR #12901
```

```
 1    VIRTUAL APPEARANCES:

 2
      For Plaintiffs:
 3
              BURNS CHAREST, LLP
 4            BY:  E. LAWRENCE VINCENT, ESQ.
              900 Jackson Street
 5            Suite 500
              Dallas, Texas  75202
 6            469-904-4550
              469-444-5002  Fax
 7            lvincent@burnscharest.com

 8
              BURNS CHAREST, LLP
 9            BY:  LYDIA A. WRIGHT, ESQ.
              365 Canal Street
10            Suite 1170
              New Orleans, Louisiana  70130
11            504-799-2845
              504-881-1765  Fax
12            lwright@burnscharest. Com

13
      For Defendant/Counter-Claimant:
14
              AKERMAN, LLP
15            BY:  ADRIENNE SCHEFFEY, ESQ.
              1900 16th Street
16            Suite 1700
              Denver, Colorado  80202
17            303-260-7712
              303-260-7714  Fax
18            adrienne.scheffey@akerman.com

19
      Also Present:
20
              JULIANNA GRAVOIS, PARALEGAL
21

22

23

24

25
```

September 21, 2020

```
1                    EXAMINATION INDEX

2
    September 21, 2020
3
    WITNESS                    EXAMINATION BY          PAGE
4

5   MICHAEL R. CHILDERS,  MS. SCHEFFEY     5, 171, 186, 201
    PH.D.
6                          MR. VINCENT    152, 184, 192, 202

7

8

9

10

11

12

13

14

15                 INFORMATION REQUESTED

16                  PAGE         LINE

17                   42           12

18                   77           11

19                  151           16

20

21

22

23

24

25
```

```
 1                          EXHIBITS

 2              EXPERT MICHAEL R. CHILDERS, PH.D.

 3         Raul Novoa, et al. vs. The GEO Group, Inc.

 4                   Monday, September 21, 2020

 5


 6    DEFENDANT'S          DESCRIPTION              PAGE

 7     EXH 1   Expert Declaration of Professor       13
               Michael Childers (34 pgs.)
 8
       EXH 2   BSCAI Production Rate                  33
 9             Recommendations (4 pgs.)

10     EXH 3   Housekeeping/Maintenance Plan,        49
               (6 pgs.)
11
       EXH 4   Custodial Staffing Guidelines for     57
12             Educational Facilities 1998
               (20 pgs.)
13
       EXH 5   Detainee Payroll Adelanto ICE         67
14             Processing Center 1/21/18
               (12 pgs.)
15
       EXH 6   Proposal to USD Homeland Security,   106
16             Requirement D 12/19/19 (252 pgs.)

17     EXH 7   Request for Authorization of         146
               Additional Classification and Rate
18             5/31/11 (4 pgs.)

19     EXH 8   Location Dimensions, Square Feet     149
               and Comments (2 pgs.)
20
       EXH 9   Subpoena to Produce 9/3/20           151
21             (7 pgs.)

22     EXH 10  The GEO Group Offer Letters          180
               (9 pgs.)
23


24                        ---oOo---

25
```

```
 1                    Monday, September 21, 2020

 2

 3                    MICHAEL R. CHILDERS, PH.D.,

 4        having been first duly affirmed, was examined and

 5                      testified as follows:

 6

 7         MS. SCHEFFEY:  Okay.  And just a moment ago,

 8    Mr. Vincent, we agreed that even though this is

 9    happening over video, we're going to stipulate to remote

10    swear-in; is that correct?

11         MR. VINCENT:  Yes.

12         MS. SCHEFFEY:  Thank you.

13

14                         EXAMINATION

15    BY MS. SCHEFFEY:

16      Q.  Good morning, Mr. Childers.  My name is Adrienne

17    Scheffey, and I represent The GEO Group.  I'm going to

18    be asking you a series of questions today about a

19    lawsuit captioned Novoa versus GEO, for which you

20    provided a report.  Do you recall providing a report for

21    that case?

22      A.  Yes.

23      Q.  The purpose of this deposition is to record your

24    responses for use at trial and other purposes in this

25    case.  It's important that you answer truthfully.  Do
```

1    you understand?

2        A.   Yes.

3        Q.   I note that you're under oath.  Even though we're

4    in a video conference today, this proceeding has the

5    same effect as if we were in a court of law.  Do you

6    understand you're sworn to tell the truth?

7        A.   Yes.

8        Q.   The court reporter is going to take down

9    everything we say.  She's going to prepare a transcript.

10   You're going to have an opportunity to review that and

11   sign it.  If you make any corrections, we can comment

12   and quote on any of those alterations.  Do you

13   understand that?

14       A.   Sure.

15       Q.   So especially because we're remote today, your

16   answers need to be clear and verbal.  The court reporter

17   isn't going to be able to record nods or other sounds

18   that are not clear or understandable, like uh-huh or

19   huh-uh.

20           Because we're on video, this is particularly

21   important:  I'm going to do my best to let you finish

22   your answer, and I ask you to do your best to let me

23   finish asking my question; and we can try not to talk

24   over each other because the court reporter is only going

25   to be able to take down testimony of one person at a

1    time.

2        A.   (Nodding.)

3        Q.   Additionally if you have any technical issues

4    such that you cannot hear me or my audio is not coming

5    through clearly, will you agree to let me know?

6        A.   Of course.

7        Q.   If you do not let me know, I'm going to assume

8    you heard my questions clearly or that we're not having

9    any technical issues.

10       A.   Okay.

11       Q.   If you do not know at any point or don't remember

12   the answer or information necessary to answer a

13   question, please let me know.  If you do not hear a

14   question, please let me know, and I will repeat it.  If

15   you do not understand a question, please say so, and I

16   will rephrase it.

17            If you do not ask me to repeat or rephrase a

18   question, I'm going to assume that you heard and

19   understood the question.  Does that sound fair?

20       A.   I understand.

21       Q.   If at any point today you realize that an earlier

22   answer you gave was inaccurate or incomplete, please let

23   me know that you want to correct or supplement your

24   earlier answer, and I will allow you to do so.

25       A.   Okay.  Thank you.

1    Q.  There are some times today when I'm going to ask

2    you to provide an estimate.  An estimate is different

3    from a guess.  For example, if I ask you how long the

4    table in front of you is, you're capable of providing an

5    estimate.

6        If I ask you, however, the length of my table in

7    my home where I'm sitting, that answer would be a guess

8    because you've never seen it before, and, therefore, you

9    have no reasonable basis for knowing that information.

10   Do you understand the difference?

11   A.  I do.

12   Q.  Okay.  And so today I only want you to provide

13   estimates, not guesses.

14   A.  I understand.

15   Q.  This is not an endurance test; if you need a

16   break, let me know.  I'll probably need a break at some

17   point, same with the court reporter; we can take a break

18   at any time.  I just ask you answer any question that's

19   pending before we take a break; is that fair?

20   A.  Yes, I understand.

21   Q.  Do you have any questions about anything I've

22   said so far?

23   A.  Nope.

24   Q.  All right.  Are you taking any medication that

25   may interfere with your understanding of my questions

```
 1    today?

 2       A.  No.

 3       Q.  Are you under the influence of any drugs or

 4    alcohol?

 5       A.  No.

 6       Q.  Okay.  Is there anything else that would affect

 7    your ability to give truthful and complete testimony

 8    today?

 9       A.  No.

10       Q.  Can you provide your full name and date of birth

11    for the record.

12       A.  Sure.  It's Michael Ryan Childers,

13    C-h-i-l-d-e-r-s.  Birth date is February 23rd, 1967.

14       Q.  And can you confirm that you don't have anyone

15    else in the room with you.

16       A.  Yes.

17       Q.  Okay.  And if you have electronic devices, can

18    you agree that you won't use those to communicate with

19    counsel or anyone else while you're on the record.

20       A.  Yes.

21       Q.  Okay.  And by that I mean, you know, a cell phone

22    or something else other than the computer.

23       A.  I understand.

24       Q.  Okay.  What did you do to prepare for your

25    deposition today?
```

1    Q.  And did you provide a list of those cases that

2   you've been involved in with your report?

3    A.  I'm sorry.  Could you repeat the question.

4    Q.  Yeah.  Did you provide a list of prior cases in

5   which you've been involved with your report?

6    A.  No.

7    Q.  Why not?

8    A.  I wasn't asked for that.

9    Q.  What was the most recent case before this one

10   that you were involved in?

11    A.  So I guess I would say the most recent one where

12   I've had contact with counsel, it's a case in

13   Louisville, Kentucky.

14    Q.  And what is that case called?

15    A.  I would have to look.  The defendant is Rohm and

16   Haas; it's a chemical plant.

17    Q.  Do you know who the plaintiff is?

18    A.  I don't remember the name plaintiff.  I'm sorry.

19    Q.  Okay.  And approximately how long ago did you

20   provide expert testimony in that matter?

21    A.  I have not yet been deposed on that case.

22    Q.  Have you provided a report?

23    A.  I did.

24    Q.  When did you provide a report approximately?

25    A.  Two years ago.

1    Q.   Approximately how many times have you served as

2    an expert witness?

3    A.   15 times.

4    Q.   About how many of those occurred in the last five

5    years?

6    A.   Half a dozen.

7    Q.   Other than the Louisville Kentucky case, can you

8    recall any others from the past five years?

9    A.   Sure.  There's one in California; it's Dole.  I

10   don't remember the main plaintiff.  It was in Merced.  I

11   did a report for a meat packing place in Wisconsin; it's

12   Valley Pride.  I'm trying to think.  That's what I

13   remember off the top of my head.

14   Q.   Okay.  So in Louisville, Kentucky, what opinion

15   did you provide?

16   A.   Oh, in Louisville?

17   Q.   Yeah.

18   A.   It's a donning and doffing case, so I helped

19   establish the amount of time required for the changing

20   of uniform items and transit from the locker room to the

21   work areas.

22   Q.   And in that case, were you asked to estimate the

23   amount of time it took to don and doff?

24   A.   That's correct.

25   Q.   And what methodology did you apply there?

1    that.

2        Q.  Did you rely on itemized data in staffing that

3    facility?

4        A.  Yes, to the extent that we had on our own

5    internal benchmarks as far as what our normal throughput

6    on different operational lines would be.

7        Q.  Did you rely upon the external standardized data

8    that you rely upon here or in other cases?

9        A.  On standard data, sure.  On a specific one around

10   cleaning, no.

11       Q.  What about at University of Wisconsin, did you

12   rely upon the standardized data around cleaning for

13   staffing your department?

14       A.  No.

15       Q.  Are you responsible for balancing the profits and

16   losses of your department at the University of

17   Wisconsin?

18       A.  I was until July 1st, yes.

19       Q.  Okay.  And tell me about your approach for doing

20   that.

21       A.  Again, it was to work with the faculty, talk

22   about our program mix, encourage faculty to write for

23   and obtain grant funding -- all of those things.

24       Q.  Okay.  Did you have to take into consideration

25   your staffing levels in connection with your budget?

 1   the Fair Labor Standards Act -- come up with the

 2   compensable time estimates.

 3       Q.  And other than donning and doffing, have you

 4   analyzed any other issues that arise under FLSA?

 5       A.  Yes.

 6       Q.  What are those issues?

 7       A.  In general it would be activities performed by

 8   workers that would fall under the legal definition of

 9   compensable time, whether that be the time to travel to

10   the work location or to power on computers and boot into

11   different systems -- those sorts of things.

12       Q.  And have you ever performed an analysis like the

13   one you did here, where you had to create a staffing

14   model?

15       A.  To create a staffing model, no.

16       Q.  So that's unique to this case?

17       A.  It's not unique.  It's -- you're asking for the

18   answer converted in a different way.  Because obviously

19   the number of people required flows from the amount of

20   time needed to perform the duties.

21       Q.  Okay.  But in your prior cases, as mentioned in

22   Paragraph 5 of your report, have you ever created a

23   staffing model as you did here?

24       A.  No.

25       Q.  And what about in Paragraph 4 of your report

September 21, 2020

1    which we just discussed, have you ever created a

2    staffing model as you did here?

3        A.   No.   That's never been the question.

4        Q.   Okay.   And so moving on a bit, what is your

5    experience in connection with the staffing of detention

6    facilities?

7        A.   I've never been to one.

8        Q.   Okay.   Are you familiar with the Adelanto

9    detention facility in any way other than having been to

10   it?

11       A.   I'm sorry.   Can you repeat the question.

12       Q.   Yeah.   Are you familiar with the Adelanto

13   Detention Facility in any other way than having been --

14   or not having been to it, I guess.

15       A.   Only through the documents I've reviewed for my

16   report.

17       Q.   Have you ever created a staffing plan for a

18   detention facility?

19       A.   No.

20       Q.   Have you ever provided a lecture or seminar in

21   the area of staffing detention facilities?

22       A.   No.

23       Q.   Have you ever published an article in the area of

24   staffing detention facilities?

25       A.   No.

1    Q.  And so I guess the question is how did you

2  account for the hours that GEO's employees already

3  provide work?

4    A.  I didn't.  I utilized that table.

5    Q.  Okay.  So your analysis does not take into

6  consideration work already performed by GEO's employees?

7    A.  No.

8    Q.  And so to the extent any of that -- the items on

9  the housekeeping policy are performed by GEO's

10  employees, you've attributed all of those tasks to

11  detainees; is that correct?

12        MR. VINCENT:  Object to form.

13        THE WITNESS:  Sorry.  I got distracted.  Could

14  you repeat it, please.

15  BY MS. SCHEFFEY:

16    Q.  Yeah.  Let's go back to Exhibit 3, if you can

17  open that up.

18    A.  Okay.

19    Q.  So on the last page, there's Kitchen Cleaning

20  Schedule.  Let me know when you're there.

21    A.  I'm sorry.  I was looking at Exhibit 3 in my PDF,

22  so let me get the right one.  You're talking Exhibit 3

23  of --

24    Q.  In this deposition, it's the document called

25  Aurora Housekeeping Policy.

1    A.   Okay.  One moment.  Okay.  I have it.

2    Q.   So on that last page, there's the Kitchen

3  Cleaning Schedule.  Do you see that?

4    A.   Yes.

5    Q.   Did you use this chart in reaching your opinions

6  in this report?

7    A.   Yes.  It informed the level of cleanliness that

8  would be appropriate to use from the APPA tables.

9    Q.   And tell me how this informed the level of

10  cleanliness.

11    A.   Both the instructions of what to clean, how to

12  clean it and how often to clean it.

13    Q.   And so did you assume that these tasks were

14  performed by detainees?

15    A.   For the kitchen, no.

16    Q.   So did you assume these were performed by GEO

17  employees?

18    A.   I assumed neither.

19    Q.   So tell me how that works.

20    A.   So --

21        MR. VINCENT:  Object --

22        THE WITNESS:  -- I utilized the APPA standards to

23  develop an estimate of the time that would be required

24  to perform the janitorial functions necessary in the

25  facility.  As I mentioned already, the subsequent

 1   monitor calculations were based off of the blank table

 2   and the other information that I researched and

 3   collected.

 4   BY MS. SCHEFFEY:

 5       Q.  Did you apply any offset for the tasks that are

 6   already performed by GEO employees?

 7       A.  No, because I just used the hours estimates

 8   provided to me in that table.

 9       Q.  And did you make any effort to connect the hours

10   estimates with the tasks in the housekeeping plan?

11       A.  No.

12       Q.  So if the hours estimate included barbers, for

13   example, you just included that in your analysis?

14       A.  I'm not sure I understand your question.  I'm

15   sorry.

16       Q.  Yeah.  So if the hours analysis included the

17   hours spent by someone as a barber, you included that in

18   your analysis as part of them being a housekeeper?

19       A.  No.

20       Q.  So how did you account for those differences?

21       A.  Those hours are broken out separately, so I

22   utilized just the hours related to each individual

23   category.

24       Q.  Okay.  What categories did you use?

25       A.  So it was custodial, kitchen, laundry and barber.

 1     A.  Yeah, that looks like it.

 2     Q.  Do you know if this has ever been used in the

 3  detention context?

 4     A.  I don't.

 5     Q.  Do you know if the APPA accounts for the general

 6  cleaning that detainees would be expected to do for

 7  themselves?

 8     A.  I don't.

 9     Q.  Does the APPA make any consideration for

10  detention officers or an equivalent position performing

11  their own cleaning?

12     A.  You trailed off.  I'm sorry.

13     Q.  Oh, sorry.  Did does the APPA provide any analog

14  for detention officers that you can use to account for

15  the cleaning they may perform?

16     A.  No.

17     Q.  How did you choose to use the APPA analysis?

18     A.  It's a tool that I'm familiar with.  It's

19  appropriate from the perspective that I only had access

20  to very macro data, and this is a macro standard data

21  system.  And unfortunately, given the conditions that

22  are going on in our university, many of the

23  facilities -- for example, dormitories versus the

24  residence halls -- are pretty analogous, so I felt

25  pretty comfortable that this would provide me a useful

 1    A.   Okay.  I just wanted to explain.

 2    Q.   No problem.

 3    A.   So I'm looking back at Page 25 of the first

 4  exhibit you had me put up.

 5    Q.   Okay.

 6    A.   As far as the analog, I don't think I utilized

 7  classroom in this study.

 8    Q.   What did you utilize?

 9    A.   Sure.  For the first section in the Medical, I

10  utilized the Patient Treatment Area, Hard Floor from the

11  APPA standard, which is 2900.  Would you like me to go

12  through them all?

13    Q.   Yeah.  And then we'll go through the APPA

14  standards.

15    A.   I'm sorry.  I didn't hear the second part.

16    Q.   Yes, please tell me what you used, and then we'll

17  go back to the APPA standards so we're not going back

18  and forth.

19    A.   Okay.  So, yes, for Medical, I used the Patient

20  Treatment Area, Hard Floor.  For the Intake area, I

21  utilized the Public Circulation Area with Hard Floor.

22  For the Kitchen/Laundry -- hold on.  I need to look at

23  one other place in my report.  Oh, I have it right here.

24  Sorry.  For the kitchen and laundry area, I utilized the

25  actual Washroom area;

 1          For the Visitation area, I utilized -- I'm sorry.

 2   For the Visitation area, I used the Dormitory Lounge.

 3   For Housing, it was Dormitory, Sleep/Study area.  And

 4   the Corridors -- so for the Corridors, honestly, I'm not

 5   sure.  I'm going to have to go back and look at my

 6   notes.  I'm not sure what category I used.

 7       Q.   And are those categories that you used listed

 8   anywhere in your report?

 9       A.   No.

10       Q.   Why not?

11       A.   I was trying to be breviloquent.

12       Q.   Okay.  If you could turn for me back to the APPA

13   document, now that we know which categories we're

14   looking at, and go to Page 18 of that PDF, which is

15   Figure 1.

16       A.   Yes.

17       Q.   Is this the chart you used to apply values to

18   those areas?

19       A.   It is.

20       Q.   Okay.  Explain to me how to read this chart.

21       A.   So for each type of area, based on each level of

22   cleanliness, the number in the corresponding grid is the

23   number of square feet that a janitor could be expected

24   to clean.

25       Q.   In how many hours?

1   area, which one would go with, the number of people it

2   actually took or your estimate?

3       A.   It's a hypothetical.  I guess I would question --

4   knowing that the APPA model is pretty widely used and

5   accepted, I would question if either of the square

6   footage information was wrong, the level of cleanliness

7   information was wrong, because, again, I would expect

8   that they would be close.

9       Q.   But you testified before -- and correct me if I'm

10  wrong -- that the APPA to your knowledge has never been

11  used in the detention context; is that correct?

12      A.   Not that I'm aware of, no.

13      Q.   So is it possible that a different form of

14  standardized data would be necessary?

15      A.   Again, cleaning is cleaning.  It's more about how

16  analogous the different areas and the different level of

17  cleanliness are.

18      Q.   When you say cleaning is cleaning, we talked

19  earlier about the dorms; correct?

20      A.   I --

21      Q.   Do you remember that, that we mentioned the dorms

22  at the University of Wisconsin?

23      A.   I think I mentioned them in the context passingly

24  that we have several dorms that are locked down pretty

25  similarly to what a detention center would be like for

1        Q.   Okay.  And did you speak with any of the

2    plaintiffs in this action about how clean the facility

3    was?

4        A.   No, I haven't.

5        Q.   Did you review any photographs of the facility to

6    determine how clean it was?

7        A.   No.

8        Q.   So then the next thing is Paragraph 16.  It

9    states that you gathered data about the work activities

10   performed by immigrant detainees in the VWP and their

11   duration from APPA data to compute the time that a

12   worker would spend to perform various labor activities.

13   Can you explain to me what you did that you're

14   describing in Photograph 16.

15       A.   Yeah, that's the review of the GEO documents

16   around the job descriptions and then those expectations

17   from a cleaning perspective to understand the job and

18   the expectations to be able to classify it.

19       Q.   So what work activities did you look at?

20       A.   The custodial, janitorial.

21       Q.   Does that include dormitories or dorm quarters?

22       A.   I don't know.

23       Q.   Do you know the specific activities you looked

24   at?

25       A.   I would have to go back and read the -- the

1    Q.  Why not?

2    A.  That's -- so the APPA system tells you how many

3    people per shift would be required to clean a set area

4    at a set cleanliness level based on its characteristics.

5    So that's not -- the inputs that are required are the

6    square footage to be cleaned and the cleanliness level

7    of the area.

8    Q.  And APPA doesn't instruct you to look at your

9    current staffing and compare it to the those square

10   footages?

11   A.  It's exactly the converse:  APPA is a tool to

12   give you an estimate of the staffing level required

13   based off of area, characteristics and cleanliness

14   level.

15   Q.  So APPA does not consider at all the current

16   staffing and what's being done?

17   A.  No.

18   Q.  So Paragraph 18 states that you used a computer

19   to perform calculations and tabulate results.  Have you

20   provided us with those equations?

21   A.  It's the exhibit at the end of -- which one -- 3,

22   I guess.  Those are the -- that's pictures of the

23   spreadsheets.

24   Q.  Right.  But what about the underlying

25   calculations, did you provide those?

1    A.  No.  That's --

2    Q.  So tell me what those calculations are.

3    A.  Sure.  Can you specifically -- like where -- what

4  do you want me to explain?

5    Q.  Well, first why don't you tell me what computer

6  program you used to perform these calculations.

7    A.  Oh, it's a Microsoft Excel.

8    Q.  And do you have that Excel document that contains

9  the calculations within it, embedded within it?

10   A.  Sure.

11   Q.  So for -- could you provide us with a copy of

12  that Excel spreadsheet if asked?

13   A.  I defer to the attorney, but I have no problem

14  with that.

15       MR. VINCENT:  No problem.

16       MS. SCHEFFEY:  Okay.  No problem.  All right.

17   Q.  So, for example, in -- I guess we can look at

18  this.  I'm trying to figure out the underlying

19  calculations.  Am I looking at the spreadsheet that

20  starts on Page 32 of the PDF, that says Values or -- is

21  this all one spreadsheet?  I'm sorry.  It's just very

22  hard to tell when it turns into a PDF --

23   A.  Sure --

24   Q.  -- I'm looking at Exhibit 3, and there's a number

25  of, looks like, spreadsheets that stated a different

1     Q.  So why do they divide the square footage by the

2   number of existing custodians?

3     A.  Because in this example, that's what they're

4   trying to illustrate as a method to utilize this table.

5     Q.  And why didn't you use that method to utilize

6   this table?

7     A.  Because my task was to determine the number of

8   custodians.

9     Q.  Okay.  And if APPA contemplates cleaning 251,876

10   square footage with six custodians, why does yours for

11   housing contemplate 46?

12     A.  Again, your -- it sort of feels like do I walk to

13   school or do I bring my lunch.  I'm not understanding

14   how the two are related.  I would just say that the next

15   sentence of this example says that based on the

16   calculation, it implies that your cleaning level is

17   somewhere between 4 and 5.

18     Q.  Okay.  And so you -- the sample says cleaning at

19   Level 2 would be 15 custodians; is that correct?  15.08

20   to be exact; is that right?

21     A.  Yes.

22     Q.  So why is a common area of a detention facility,

23   which is hard floors and a few tables to sit at, not

24   like a classroom in a college?

25     A.  I don't know.

1    literally based off of the -- an accumulation of data

2    from, you know, literally hundreds of data points so...

3        Q.  And are any of those data points from detention

4    facilities or jails or correctional facilities?

5        A.  No.

6        Q.  And do any of these data points contemplate that

7    students will assist with the cleaning tasks?

8        A.  No.

9        Q.  And why do you think that detainees are similar

10   to college students in terms of a population and

11   cleanliness generally?

12          MR. VINCENT:  Object to form.

13          THE WITNESS:  I don't.

14   BY MS. SCHEFFEY:

15       Q.  Why not?

16       A.  I don't know anything about that.

17       Q.  So you don't know if detainees and college

18   students are generally the same level of cleanliness?

19       A.  It's -- that's not relevant in terms of the level

20   of cleaning that's being performed by janitors.

21       Q.  So you don't think it would change a janitor's

22   job if the area they start with is dirtier than an area

23   they start with is cleaner?

24          MR. VINCENT:  Object to form.

25          THE WITNESS:  No.  The system generates the

```
 1    we were talking about Table 1 on Page 6 of your report

 2    which discusses the APPA Service Level.  So when you

 3    just list Housing here, does that refer to the pods in

 4    which detainees are housed?

 5       A.  Right.  It's -- those square footage numbers are

 6    ones I obtained off the blueprints I was provided.

 7       Q.  When you looked at the blueprints, did that

 8    include the segregation area?

 9       A.  I don't recall.

10       Q.  Did you attempt to differentiate the different

11    types of housing in any way?

12       A.  No.  I used the numbers straight from the

13    blueprints.

14       Q.  And did the blueprints have a scale?

15       A.  They did.

16       Q.  And did you make those measurements yourself?

17       A.  No.  I used the numbers they provided right on

18    the blueprints.

19       Q.  And did they break those down by housing areas

20    and other areas?

21       A.  I don't recall specifically.

22       Q.  Do you have the document with you that you

23    referenced?

24       A.  I have it stored on my computer somewhere.

25       Q.  We can come back to that if we need to.
```

1          All right.  Are you aware that there are

2     different layouts of housing units in Adelanto?

3        A.  No, I didn't know that.

4        Q.  If they're laid out differently or have different

5     materials, does that change what APPA category they

6     might fall into?

7        A.  It's possible.

8        Q.  So, for example, there are some dorms where the

9     detainees eat within the dorms all of their meals, and

10    they call that satellite feeding.  In other dorms, the

11    detainees go to a cafeteria type area to eat their

12    meals.

13         I notice you don't include a cafeteria on here.

14    Is that because you assumed all housing units had meals

15    within the housing units?

16       A.  Right.  And I don't believe that that square

17    footage information was on those blueprints.

18       Q.  And so in your recollection, did you look at an

19    actual schematic of the building?

20       A.  Yes.

21       Q.  And did you account for all square footage in the

22    building in these estimates?

23       A.  No.

24       Q.  How did you select which square footage to

25    include?

1    A.  I used their numbers.

2    Q.  When you say "their numbers," who is their?

3    A.  Whoever drew the blueprint.

4    Q.  Did you receive any information to tell you which

5  areas detainees cleaned and which areas they did not?

6    A.  I don't think so.  I think I asked about that but

7  ultimately just used the numbers on the blueprint.

8    Q.  So who did you ask about which areas --

9    A.  Oh, I would have asked Plaintiffs' attorney.

10    Q.  Do you recall getting an answer about that?

11    A.  I don't.

12    Q.  So without that answer, did you assume that

13  detainees cleaned every piece of square footage within

14  the building?

15    A.  No, just the areas that I detailed.

16    Q.  Are you on the computer where you have the

17  blueprint you used?

18    A.  I think I have it, yes.

19    Q.  Could you pull it up and put it in the chat.

20    A.  I'll try.  I think it's this one, Product 19

21  blueprints.  It's pretty large, but I'll try to upload

22  it if you'd like me to.

23    Q.  Okay.  That would be great, just to make sure

24  we're on the same page.

25    A.  This could take -- let's see how long it takes.

```
 1        MS. SCHEFFEY:  Giselle, if this comes through,
 2   we'll mark it as Exhibit 6.
 3        (Defendant's Exhibit 6 was marked for
 4        identification and attached hereto.)
 5   BY MS. SCHEFFEY:
 6     Q.  All right.  I have it open.  Do you have it open
 7   in front of you as well?
 8     A.  It's trying to.  My computer is kind of bogging
 9   down.  It's open, if you can tell me a specific page
10   number.
11     Q.  Yeah, so I guess I'm wondering what page you
12   pulled your numbers from for the square footage.
13     A.  Well, I believe I've located one of them.
14     Q.  What page of the PDF is that?
15     A.  That would be on Page 31.
16     Q.  When you say one of them, do you believe there's
17   more than one?
18     A.  Hold on.  I'm trying to zoom back out.  Yeah, as
19   I recall, there's like an East and West, so that's why I
20   made the table the way I did.
21     Q.  And does this document propose an expansion of
22   Adelanto?  Do you know from your view?
23     A.  I don't remember, honestly.  I just remember
24   looking for the blueprint that reflected what I was
25   looking for.
```

1    Q.  So I see, for example, on Page 35 of this PDF, it

2    says As Modified.  Did you use Page 35?

3    A.  Page 35 -- hold on a second.  I'm still trying to

4    get Page 31 to load.

5    Q.  Okay.

6    A.  I'm sorry.  Which page would you like me to go

7    to?

8    Q.  35.

9    A.  Okay.  Okay.  It's loading.  It's still fuzzy,

10   but I can kind of see it.

11   Q.  Did you take any notes that would identify which

12   one of these diagrams you relied upon?

13   A.  Well, I'm just looking at the Existing Facility

14   Area Breakdown block towards the bottom right corner of

15   the drawing.

16   Q.  Is that on Page 31, or what page?

17   A.  On Page 35.

18   Q.  And do you know if you relied on Page 35 or on

19   Page 31?

20   A.  I would have to verify.  I cannot recall off the

21   top of my head.

22   Q.  What would you have to check to verify that?

23   A.  Well, I would check the numbers in this table

24   against what you see in their title blocks.

25   Q.  Okay.  And do you know if the one you used is how

1  Adelanto currently exists?

2      A.  I believe that's correct.

3      Q.  What leads you to believe that?

4      A.  I utilized the document I got from the attorney.

5      Q.  And did you read the bulk of this document?

6      A.  No.

7      Q.  So do you have any understanding of whether these

8  blueprints are current or if they're proposed?

9      A.  No.  My understanding is this is the facility as

10  it exists.

11      Q.  So you didn't read that this is a proposal on the

12  first page of the document?

13      A.  No.

14      Q.  And so those aren't the -- if the facility does

15  not exist as depicted, then these numbers would have to

16  change in your chart; is that correct?

17      A.  Yes.

18      Q.  And so, then, presuming that it was correct, you

19  said you used the numbers in the bottom corner?

20      A.  Right, the numbers provided in these documents.

21      Q.  So does it break them down as you had from

22  Medical, Intake, Kitchen, Visitation, Housing and

23  Corridors?

24      A.  Some of them directly.  For example, the Medical,

25  I had to measure that myself.

September 21, 2020

1    A.  No.

2    Q.  Why not?

3    A.  I didn't have that information.

4    Q.  Does your staffing plan assume that all dorms are

5  occupied all the time at full capacity?

6    A.  Not exactly.  It just assumes that they're all

7  being cleaned to a specified level of cleanliness.

8    Q.  And so if a dorm is not being used, does it

9  require the same number of hours cleaning it as a dorm

10  that is being used?

11    A.  I would expect not.

12    Q.  And how would you account for that under the

13  APPA?

14    A.  Again, this is used to estimate based on the

15  square footage.  If there's square footage that's taken

16  out of the equation, then it's going to change the

17  estimate on the number of janitors required.

18    Q.  Okay.  But you can't provide me the specific

19  location of where you got the square footage here?

20    A.  Where I got what?  I'm sorry.

21    Q.  The square footage for this document.

22    A.  Not at this moment.  I mean, it was from this

23  Product 19.

24    Q.  Did you -- what about the kitchen and laundry

25  areas, did you measure those yourself?

1      A.  Not necessarily, no.

2      Q.  Okay.  So do you have any idea of whether the

3  cafeteria is what is also called the kitchen in the

4  Adelanto facility?

5      A.  No.

6      Q.  So where did you account for the cafeteria?  Is

7  it part of the kitchen square footage, the housing

8  square footage, the visitation square footage -- another

9  area?

10     A.  I would have to go back and re-review these

11 blueprints.

12     Q.  So you don't know where the cafeteria is

13 accounted for in this calculation?

14     A.  I would have to check to verify.

15     Q.  And if the common areas of the housing units are

16 like cafeterias, you didn't use that number there

17 either?

18     A.  Can you repeat that.

19     Q.  Yeah.  So you also didn't use the cafeteria

20 numbers on the APPA standard for the housing units, did

21 you?

22     A.  No.

23     Q.  So your staffing plan assumes that there is no

24 cafeteria, no place for all the detainees to eat?

25     A.  No.  It's that it's not individually broken out.

1    A.  Well, in light of those descriptions of the

2    thoroughness of, I guess, the expectations.

3    Q.  So this assumes expectations of cleaning in the

4    COVID-19 realm?

5    A.  I don't know if they have been modified.

6    Q.  But your assumption was that they were COVID-19

7    level cleaning?

8    A.  No.  My assumption was that they were cleaned to

9    the level that the Adelanto documents provided to me

10   described.

11   Q.  And for the laundry, is it your understanding

12   that detainees cleaned the laundry room or that they

13   actually washed laundry?

14   A.  My understanding is they do both.

15   Q.  Where did you get that understanding from?

16   A.  I don't remember specifically.  But I can say for

17   the purposes of my tables, it's the hours that -- the

18   things that are labeled as laundry are labeled as

19   laundry because the task being performed is to do

20   laundry.

21   Q.  So for purposes of Mr. Bland's table, all of the

22   laundry hours are performing the task of cleaning

23   laundry, not cleaning the laundry room; is that correct?

24   A.  Yes, that's correct.

25   Q.  And so where on APPA does it provide for time and

1       A.   That's not what my report was trying to do.

2       Q.   Is your report trying to identify the amount of

3    additional profits that GEO realized by not employing

4    additional staff?

5       A.   Yes.  It's to calculate out based on the labor

6    required what the value of that labor would be.

7       Q.   Right.  So how do you account for the labor

8    that's already existing and already fully paid?

9       A.   I'm not aware of any.

10      Q.   Do you think that the facility is run exclusively

11   by detainees?

12      A.   That's my understanding, is these areas are

13   cleaned by immigrant detainees.

14      Q.   Your understanding is that there are no GEO

15   employees throughout the facility?

16      A.   That's correct, I'm not aware of that.

17      Q.   No GEO employees at all?

18           MR. VINCENT:  Object to form.

19   BY MS. SCHEFFEY:

20      Q.   Did you request a staffing plan so you could

21   identify how many GEO employees worked at the facility?

22           MR. VINCENT:  Object to form.

23           THE WITNESS:  No.

24   BY MS. SCHEFFEY:

25      Q.   Did you request job descriptions of GEO

```
1   employees?

2         MR. VINCENT:  Object to form.

3         THE WITNESS:  I requested job descriptions for

4   the jobs in question that I was supposed to provide an

5   estimate for.

6   BY MS. SCHEFFEY:

7      Q.  How would one use your conclusion in Paragraph 20

8   to identify how many additional staff are needed beyond

9   what's currently there?

10     A.  I don't know.

11     Q.  So the next thing you discuss is the average wage

12  in Riverside/San Bernardino from the BLS data?

13     A.  Yes.

14     Q.  Do you know if those are the wages paid at the

15  GEO facility?

16     A.  I don't.

17     Q.  Do you know if they're the union workforce?

18     A.  I'm not aware of that.

19     Q.  In your experience working with unions, are their

20  pay rates typically the same as the average hourly wages

21  in the community, or are they higher or lawyer?

22     A.  It varies.

23     Q.  Do you know if there are specific federal

24  standards that GEO has to follow with regard to paying

25  its employees?
```

September 21, 2020

1   half million dollars?

2       A.   Yes.

3       Q.   And did you compare that to any other detention

4   facilities in the area?

5       A.   No.

6       Q.   Did you compare that to any other standardized

7   data?

8       A.   No.

9       Q.   Is there standardized data stating approximately

10  how much it would cost to clean a facility of a certain

11  square feet?

12      A.   Could you repeat that question.

13      Q.   Yeah.  Is there standardized data available to

14  you somewhere that would state approximately how much it

15  costs to do these services in a detention facility or

16  similar facility?

17      A.   Not that I'm aware of.

18      Q.   Did you look into whether there was any?

19      A.   Yeah, again, not that I'm aware of.

20      Q.   Did you compare any of these to the costs to

21  universities to provide the same services?

22      A.   No.

23      Q.   Is that information available for public

24  universities, how much they spend on each type of labor?

25      A.   I would assume so.

1    A.   No.   What I've done is used the APPA guidelines

2    for building, cleaning and maintenance and applied them

3    to the building and maintenance in this situation.

4    Q.   Okay.   So you haven't made any analysis of

5    whether colleges and universities are similar to

6    detention facilities?

7    A.   No.

8    Q.   So taking Paragraph 25, Table 24, you discuss,

9    "Additional profit earned by GEO in its use of detainee

10   labor instead of hiring and assigning their employees to

11   perform the work by calculating the difference between

12   the costs GEO would incur and the actual amount paid to

13   immigrant detainees in the VWP"; is that correct?

14   A.   Paragraph 25?

15   Q.   Yeah.

16   A.   Yes.

17   Q.   How did you account for the existing work

18   performed by GEO employees?

19   A.   I haven't.

20   Q.   So how can you say this is additional profit

21   earned by GEO if you don't account for what it's already

22   paying?

23   A.   Because my numbers reflect that amount of

24   immigrant labor content that if was not available would

25   need to be replaced.

1      A.   It's -- no.  The APPA analysis stands alone.

2      Q.   So that's what I'm saying, is if the APPA

3   analysis stands alone, how do you account for the people

4   who are already being paid to perform those cleaning

5   tasks of that square footage that you calculated?

6      A.   And, again, I've said it doesn't.

7      Q.   So you assumed that detainees do every inch of

8   square footage in the perimeter that you've measured?

9      A.   As outlined in the report, yes.

10     Q.   Right.  But the report doesn't exactly make -- it

11  doesn't make it clear -- or if I'm wrong, please point

12  me to it -- which areas are cleaned by detainees versus

13  the staff.

14     A.   No.  It just talks about the square footage of

15  each area.

16     Q.   And so the underlying assumption for each square

17  footage that you provide in here is that detainees clean

18  every inch of that square footage without assistance

19  from paid GEO employees; is that correct?

20     A.   Yes.

21     Q.   And if you were to find out that half of it was

22  cleaned by GEO employees, would that change your

23  analysis?

24          MR. VINCENT:  Object to form.

25          THE WITNESS:  It might.

```
1                    REPORTER'S CERTIFICATE

2

3        I, GISELLE GIRARD, a Certified Shorthand Reporter
   in the State of California, and duly empowered to
4  administer oaths, do hereby certify:

5        That, prior to being examined, the witness named
   in the foregoing proceedings was duly sworn by me
6  pursuant to Section 30(f)(1) of the Federal Rules of
   Civil Procedure; that said proceedings were taken down
7  by me in shorthand and thereafter transcribed into
   typewriting or printing under my direction and
8  supervision; and I hereby certify that the foregoing is
   a full, true and correct transcript of my notes so
9  taken.

10

         ___   That the witness was requested to review the
11             transcript and make any changes to the
               transcript as a result of that review
12             pursuant to Section 30(e) of the Federal
               Rules of Civil Procedure.
13
         X__   No request was made that the transcript be
14             reviewed pursuant to Section 30(e) of the
               Federal Rules of Civil Procedure.
15

16       I further certify that I am neither counsel for
   nor related to any Party to said action, nor in any way
17 interested in the outcome thereof.

18

         IN WITNESS WHEREOF, I have hereunto subscribed my
19
   name and C.S.R. number on this 1st day of
20
   October, 2020.
21

22

23
   _____        12901
24 Certified Shorthand Reporter          C.S.R. No.

25
```