# EXHIBIT A

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION

| | |
|---|---|
| RAUL NOVOA, et al., | Civil Action No. 5:17-cv-02514-JGB-SHK |
| **Plaintiffs,** | |
| v. | **CLASS ACTION** |
| THE GEO GROUP, INC. | **EXPERT DECLARATION OF CRAIG HANEY** |
| **Defendant.** | |

I, Craig Haney, Ph.D., J.D., declare as follows:

1.      I have been provided with the "Psychological Report of Jeffrey Kropf, Ph.D.," dated August 17, 2020, and asked by counsel for Plaintiffs in *Raul Novoa, et al. v. The GEO Group, Inc.*, Civil Action No. 5:17-cv-02514 (C.D. Cal.) to analyze and respond to the opinions that it contains.  My analysis is set out in this Expert Declaration.

### I.      Expert Qualifications

2.      I am a Distinguished Professor of Psychology and the UC Presidential Chair at the University of California, Santa Cruz. My area of academic specialization is in what is generally termed "psychology and law," which is the application of psychological data and principles to legal issues. I teach graduate and undergraduate courses in social psychology, psychology and law, and research methods. I received a bachelor's degree in psychology from the University of Pennsylvania, an M.A. and Ph.D. in Psychology and a J.D. degree from Stanford University, and I have been the recipient of a number of scholarships, fellowships, and other academic awards.

3.      I have published numerous scholarly articles and book chapters on topics in law and psychology, including encyclopedia and handbook chapters on the psychological effects of confinement in correctional settings (such as jails and prisons) and the nature and consequences of being housed in segregated or solitary-type confinement. In addition to these scholarly articles and book chapters, I have published three sole-authored books: *Death by Design: Capital Punishment as a Social Psychological System* (Oxford University Press, 2005), *Reforming Punishment: Psychological Limits to the Pains of Imprisonment* (American Psychological Association Books, 2006) and, most recently, *Criminality in Context: The Psychological Foundations of Criminal Justice Reform* (American Psychological Association Books, 2020). I was also a member of the National Academy of Sciences committee that co-authored *The Growth of Incarceration in the United States: Exploring the Causes and Consequences* (Washington, DC: The National Academies Press, 2014).

4.      In my capacity as an expert on the psychological effects of incarceration, I also have served as a consultant to numerous governmental, law enforcement, and legal agencies and organizations on jail-and prison-related issues. Those agencies and organizations include the Palo Alto Police Department, various California Legislative Select Committees, the National Science Foundation, the American Association for the Advancement of Science, the United States Department of Justice, the Department of Health and Human Services (HHS), the Department of Homeland Security, and the White House.

5.      In 2012, I testified as an expert witness before the Judiciary Committee of the United States Senate in a hearing that focused on the use and effects of solitary confinement and was appointed as a member of a National Academy of Sciences

committee analyzing the causes and consequences of high rates of incarceration in the United States.

6.      A copy of my curriculum vitae is attached to this Report as **Exhibit 1**, and a copy of my rate of compensation and testimony in prior cases is attached as **Exhibit 2.**

7.      My academic interest in the psychological effects of living and working in total institutional settings (such as jails and prisons) is long-standing and dates back to 1971, when I was still a graduate student. I was one of the principal researchers in what has come to be known as the "Stanford Prison Experiment," in which my colleagues Philip Zimbardo, Curtis Banks, and I randomly assigned normal, psychologically healthy college students to the roles of either "prisoner" or "guard" within a simulated prison environment that we had created in the basement of the Psychology Department at Stanford University. The study has since come to be regarded as a "classic" study in the field, demonstrating the power of institutional settings to change and transform the people who enter them.[1]

8.      Since then I have been studying the psychological effects of living and working in real (as opposed to simulated) institutional environments, including juvenile facilities, mainline adult prison and jail settings, specialized correctional housing units (such as solitary and "supermax"-type confinement), and immigration detention

---

[1] For example, *see* Haney, C., Banks, C. & Zimbardo, P., Interpersonal Dynamics in a Simulated Prison, 1 *International Journal of Criminology and Penology*, 69 (1973); Haney, C. & Zimbardo, P., The Socialization into Criminality: On Becoming a Prisoner and a Guard, in Tapp, J. & Levine, F. (eds.), *Law, Justice, and the Individual in Society: Psychological and Legal Issues*, 198-223 (1977); Haney, C. & Zimbardo, P., The Past and Future of U.S. Prison Policy: Twenty-Five Years After the Stanford Prison Experiment, 53 *American Psychologist*, 709-727 (1998); Haney, C. & Zimbardo, P., Persistent Dispositionalism in Interactionist Clothing: Fundamental Attribution Error in Explaining Prison Abuse, 35 *Personality and Social Psychology Bulletin*, 807-814 (2009).

facilities.  In the course of that work, I have toured and inspected numerous jails and prisons and related facilities (in Alabama, Arkansas, Arizona, California, Florida, Georgia, Hawaii, Idaho, Illinois, Louisiana, Massachusetts, Mississippi, Montana, Nevada, New Jersey, New Mexico, New York, Ohio, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, and Washington), many maximum security federal prisons (including the Administrative Maximum or "ADX" facility in Florence, Colorado), and prisons in Canada, Cuba, England, Ireland, Hungary, Mexico, Netherlands, and Norway. I also have conducted numerous interviews with correctional officials, officers, and inmates to assess the impact of penal confinement, and statistically analyzed aggregate data from numerous correctional documents and official records to examine the effects of specific conditions of confinement on the quality of institutional life and the ability of persons housed there to adjust to them.[2]

9.      I have been qualified and have testified as an expert in various federal courts, including: United States District Courts in Alabama, Arkansas, California, Georgia, New Mexico, Pennsylvania, Texas, and Washington, and in numerous state courts, including courts in Arizona, Colorado, Florida, Montana, New Jersey, Nevada, New Mexico, Ohio, Oregon, Tennessee, Utah, and Wyoming. My research, writing, and

---

[2] For example, see Haney, C., *Reforming Punishment: Psychological Limits to the Pains of Imprisonment*. Washington, DC: APA Books (2006). See also Haney, C., Psychology and Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law, 3 *Psychology, Public Policy, and Law*, 499-588 (1997); Haney, C., The Consequences of Prison Life: Notes on the New Psychology of Prison Effects, in Canter, D. & Zukauskiene, R. (eds.), *Psychology and Law: Bridging the Gap*, 143-165, Burlington, VT: Ashgate Publishing (2008); Haney, C., On Mitigation as Counter-Narrative: A Case Study of the Hidden Context of Prison Violence, 77 *University of Missouri-Kansas City Law Review*, 911-946 (2009); Haney, C., Demonizing the "Enemy": The Role of Science in Declaring the "War on Prisoners," 9 *Connecticut Public Interest Law Review* 139-196 (2010); Haney, C., The Perversions of Prison: On the Origins of Hypermasculinity and Sexual Violence in Confinement, 48 *American Criminal Law Review*, 121-141 (2011) [Reprinted in: Ferguson, S. (ed.), *Readings in Race, Ethnicity, Gender and Class*, Sage Publications (2012)]; Haney, C., Prison Effects in the Age of Mass Imprisonment, 92 *The Prison Journal*, 1-24 (2012).

testimony have been cited by state courts, including the California Supreme Court, and by Federal District Courts, Circuit Courts of Appeal, and the United States Supreme Court.[3]

10.     In 2004, I was appointed by the Commission on International Religious Freedom to serve as the detention expert on a research project that examined the treatment of asylum seekers subject to expedited removal in the United States. I oversaw and conducted the portion of the project that focused on conditions of confinement in immigration detention facilities nationwide. After the study was completed, we briefed members of Congress and their staffs as well as other governmental officials (including the Secretary of Homeland Security, Michael Chertoff) on our findings. I testified about our findings before the Congressional Subcommittee on Immigration, Border Security and Claims, in an Oversight Hearing on Immigration Enforcement Resources. Our work received the Arthur C. Helton Human Rights Award from the American Immigration Lawyers Association.

11.     I am being compensated at a rate of $250 per hour for my time in preparing this Declaration.  This compensation is not contingent upon my opinions, my conclusions, or the outcome of this matter. I reserve the right to respond to, rebut, opine on, or incorporate additional facts or opinions offered by other experts in these matters.

## II.     Basis and Summary of Expert Opinion

12.     As noted, I have been retained by counsel for Plaintiffs to analyze and respond to the opinions in this matter expressed by Dr. Jeffrey Kropf. Among other things, Dr. Kropf has opined that: a) although detainees can be punished for not

---

[3] For example, *see Brown v. Plata*, 563 U.S. 493 (2011); *see also* Exhibit 1, which includes a list of prison conditions cases citing my work.

meeting the "behavioral expectations" of the Adelanto Facility (including by being
placed in solitary confinement), their compliance with the Facility's disciplinary system
is not coerced; b) the detainees' perception that they are being "threatened and/or
coerced" to participate in Adelanto's work program is merely "subjective and may be
unfounded"; and c) that Adelanto's use of, and threat to use, the punishment of solitary
confinement is unproblematic because solitary confinement does not "cause serious
psychological harm."

13.     I fundamentally disagree with each of these assertions. I believe that they
are based on an inadequate consideration of the full range of available facts in this case,
an ill-informed view of the nature and psychological impact of total institutional life,
and a flawed understanding of the harmfulness of solitary confinement.

14.     Contrary to the views that Dr. Kropf has expressed, immigration detention
facilities like the Adelanto Facility—the focus of the pending litigation—are constructed
and operated very much like penal institutions (despite the fact that they impose civil
rather than criminal detention). The many dehumanizing, authoritarian, and punitive
characteristics of these environments ensure that they are not only painful places in
which to live, but also are inherently coercive.

15.     The coercive nature of prison-like environments very much affects and
conditions whatever behaviors persons are able to engage in and whatever "choices"
they are able to make during their confinement. This is particularly true for the
especially vulnerable population of immigration detainees housed in the Adelanto ICE
Processing Center and facilities like it. Many immigration detainees have extensive pre-
existing trauma histories and backgrounds that render them especially vulnerable to
coercion and highly sensitive to punishment or threats of punishment. Many are

experiencing high levels of anxiety over their precarious immigration status and the consequential decisions that are being made about their futures. Their lack of cultural familiarity with the legal process in which they are enmeshed and the limited English proficiency that many have add to this already substantial vulnerability.

16.     Moreover, Dr. Kropf's assertion that solitary confinement does not cause serious psychological harm (including, apparently, even for the mentally ill) is an outlier position that he premises on a deeply flawed, inexpert analysis of the existing scientific literature. That literature consists of a largely undisputed empirically based, theoretically coherent, and widespread professional consensus that solitary confinement subjects everyone exposed to it to a significant risk of serious harm. That harm includes psychological and even physical damage that can prove long-lasting and even fatal.

17.     In additional to my own knowledge and experience with respect to these issues, and my professional familiarity with the existing scientific literature that pertains to them (which I have cited throughout whenever I explicitly relied on a specific source), I have been provided with and relied on a number of documents and materials by counsel for Plaintiffs. Those documents are listed separately in **Exhibit 3**, appended to this Declaration. Where appropriate, I reference those materials in the pages that follow.

### III.     The Coercive Nature of Total Institutional Environments Such as Jails, Prisons, and Immigration Detention Centers

18.     There is a large literature in psychology and related fields that establishes the various ways in which the experience of involuntary confinement in a total institutional setting negatively affects a person's behavioral, cognitive, and emotional functioning. Although most of the research is focused on jails and prisons, the principles that have been established apply as well to other settings that share many or all of the

characteristics of these kinds of environments. Those other settings include immigration detention centers, many of which are virtually indistinguishable from jails and prisons in many respects, as I will discuss in a subsequent section of this Declaration.

19.     To state the obvious: environments like jails and prisons are difficult, painful places in which to live. However, beyond this obvious fact, the pains of this kind of confinement can translate into actual psychological harm; that is, they can produce negative and even disabling changes in persons who experience them.

20.     Social scientists use the term "institutionalization" to describe the process by which inmates are shaped and transformed by the institutional environments in which they live. This process is sometimes called "prisonization" when it occurs in coercive correctional settings; it is the shorthand expression for the broad negative psychological effects of being housed in a jail- or prison-like environment.[4] Prisonization has been studied extensively by sociologists, psychologists, psychiatrists, and others, and involves a unique set of psychological adaptations that typically occur, in varying degrees, in response to the extraordinary demands of total institutional life.

---

[4] Sociologist Donald Clemmer defined "prisonization" as "the taking on in greater or less degree of the folkways, mores, customs, and general culture of the penitentiary." Clemmer, D., *The Prison Community*, 299, New York: Holt, Rinehart & Winston (1958). But there are significant psychological components to the process as well. For additional writing about this prisonization, *see* Homant, R., Employment of Ex-Offenders: The Role of Prisonization and Self-Esteem, 8 *Journal of Offender Counseling, Services, & Rehabilitation*, 5-23 (1984); Irwin, J., Sociological Studies of the Impact of Long-Term Confinement, in Ward, D. & Schoen, K. (eds.), *Confinement in Maximum Custody*, Lexington, MA: Lexington Books (1981); Peat, B., & Winfree, T., Reducing the Intra-Institutional Effects of "Prisonization": A Study of a Therapeutic Community for Drug-Using Inmates, 19 *Criminal Justice and Behavior*, 206-225 (1992); Thomas, C. & Peterson, D., A Comparative Organizational Analysis of Prisonization, 6 *Criminal Justice Review*, 36-43 (1981). Institutionalization is by no means limited to prisoners. *See*, for example, Goffman, E., *Asylums: Essays on the Social Situation of Mental Patients and Other Inmates*, New York: Anchor (1961) (examining the process as it occurs in mental patients); and Jansson, D., Return to Society: Problematic Features of the Re-Entry Process, 13 *Psychiatric Care*, 136-142 (1975) (describing similar changes that took place in Peace Corps volunteers who encountered much difficulty reintegrating back in U.S. society).

EXPERT DECLARATION OF DR. CRAIG HANEY                                         8

In general terms, the process involves the incorporation of the norms of life inside these very unique settings into one's own habits of thinking, feeling, and acting.

21.     The negative effects that persons involuntarily confined in a total institutional setting experience typically begin to occur in the very first stages of the experience. When most people first enter a jail or prison, for example, they often balk at the deprivation, indignities, and restrictions that they are forced to experience. Inmates (and detainees) must adapt to what is typically a very harsh and rigid institutional routine. They are deprived of much of their privacy and freedom of movement, assigned to a diminished, stigmatized status, and forced to live under extremely sparse conditions. The experience is stressful, unpleasant, and difficult. Institutionalization describes the process by which these persons are changed—sometimes permanently—by this experience. Because institutionalization is a progressive or cumulative process of gradual psychological change, the longer someone is subjected to it, the more significant the nature of the institutional transformation that takes place

22.     There are several distinct components to the process of institutionalization (or, when it occurs in a correctional setting, prisonization). One of the most important ones derives from the fact that total institutions require inmates to relinquish much of their freedom and autonomy to make many of their own choices and decisions. Over time, residents become increasingly dependent on the many institutional contingencies with which they must comply, including ones that they may have once resisted. They depend increasingly on institutional decision-makers to make choices for them and they rely on the structure and schedule of the institution to organize their daily routine and, especially, to provide them with needed or essential services.

23.     Inmates also are denied basic privacy rights and lose control over the most mundane aspects of their day-to-day existence. Thus, they generally have no choice over when they get up or have their lights on, when or what or where they eat, whether and for how long they shower or can make a phone call. Access to articles of clothing, writing paper and utensils, cleaning supplies, toothbrushes, toilet paper and so on is tightly regulated and controlled. Possession of even the most seemingly insignificant (yet necessary) pieces of personal property depends on the authorization or permission from the institution and its staff. In short, persons housed involuntarily inside total institutional settings must have permission, or depend entirely on the institutional staff, to make most of the countless daily decisions that citizens in the free society naturally take for granted. Many feel infantilized and humiliated by this level of dependency and loss of autonomy and control. The conditions under which they live serve as constant reminders of their compromised social status. A diminished sense of self-worth, personal value, and individual autonomy often result.

24.     In fact, confinement in harsh and punitive total institutions is so psychologically painful for some persons that it becomes a form of trauma severe enough to produce post-traumatic stress reactions during confinement or after release. Inmates may experience unexplained emotional reactions in response to stimuli that are psychologically reminiscent of painful events that occurred at earlier times in their lives or during their incarceration. Some suffer free floating anxiety, an inability to concentrate, sleeplessness, emotional numbing, isolation, and depression that are connected to their prison traumas. Indeed, psychiatrist Judith Herman has proposed that a special diagnostic category—what she termed "complex PTSD"—be used to describe the trauma-related syndrome that persons are likely to suffer in the aftermath

of their "captivity." As she defined it, complex PTSD is a disorder that comes about as a result of "prolonged, repeated trauma or the profound deformations of personality that occur in captivity."[5]

25.     Because of the way they are structured and operated, harsh and punitive total institutional environments expose prisoners to traumatic experiences and forms of mistreatment that are psychologically analogous to those that at least some residents have suffered earlier in their lives, in their homes and neighborhoods. If and when this happens, then these institutional experiences can add to the psychologically destructive impact of the earlier mistreatment and trauma; in this sense, institutional trauma represents a form of "retraumatization"—*repeated* trauma-related experiences and events of the sort that can adversely affect inmates or detainees throughout their time in confinement and beyond.[6]

26.     More specifically—especially in total institutions that fail to provide meaningful programming and caring therapeutic intervention, and that operate with authoritarian disciplinary procedures—inmates can be subjected or exposed to experiences and events that strikingly parallel those that they experienced inside the

---

[5] Herman, J., A New Diagnosis, in Herman, J. (ed.), *Trauma and Recovery*, 119, New York: Basic Books (1992). *See also* Herman, J., Complex PTSD: A Syndrome in Survivors of Prolonged and Repeated Trauma, in Everly Jr., G. & Lating, J., (eds.), *Psychotraumatology: Key Papers and Core Concepts in Post-Traumatic Stress*, 87-100, New York: Plenum (1995).

[6] E.g., see: Duckworth & Follette (2012), *Retraumatization: Assessment, treatment, and prevention*. New York: Taylor & Francis. See, also: Yehuda, R., & Spertus, I., & Golier, J. (2001). Relationship between childhood traumatic experiences and PTSD in adults, in Eth, S. (Ed.), *PTSD in Children and Adolescents. Review of Psychiatry* (pp. 117-158). Volume 20. Washington, DC: American Psychiatric Association; Glodich, A. (1998). Traumatic Exposure to Violence: A Comprehensive Review of the Child and Adolescent Literature, 68 *Smith College Studies in Social Work* 321-345; Straker, G., & Moosa, F. (1994). Interacting with trauma survivors in contexts of continuing trauma. *Journal of Traumatic Stress, 7,* 457-465; Everstine, D., & Everstine, L., *The Trauma Response: Treatment for Emotional Injury*. New York: W.W. Norton (1993).

abusive places in which they were raised and from which they have come. These experiences include the dangerousness of their immediate environment, the imminent threat of physical, sexual, and psychological abuse, the rigid and overly punitive control by "caretakers" who occupied positions of authority, and the neglect of many of their basic, essential physical and psychological needs.

27.     Thus, persons with an extensive pre-existing trauma history are at greater risk than others in harsh and punitive institutional settings.  They are especially vulnerable, not just to the painfulness of institutional confinement but also to the potentially deleterious, personality-changing effects that it can bring about.

28.     Dr. Kropf appears to ignore most or all of these issues. His opinions portray Adelanto detainees as making largely free and autonomous decisions that are unencumbered by the inherently coercive context in which they are involuntarily confined. For the above stated reasons, Dr. Kropf's report presents an inaccurate and significantly incomplete picture of the powerful psychological forces that operate in total institutional settings to significantly and coercively influence the perceptions, thought processes, emotional reactions, and behaviors of residents.

## IV.     Solitary Confinement Is a Harmful Experience That Adds to the Coercive Nature of a Total Institutional Environment

29.     In addition to the painfulness and inherently coercive nature of confinement in total institutions in general, *solitary confinement* significantly increases these pains, imposes even greater levels of coercion, and elevates the risk that persons subjected to it will suffer serious psychological harm. "Solitary confinement" is a term of art in corrections and in the research studies that pertain to it. For perhaps obvious reasons, the *complete* isolation of persons from others is not possible and never has

been. Instead, solitary confinement is the generic term used to refer to the confinement of person in his or her cell for upwards of 22 hours per day, with little or no access to meaningful social contact or positive environmental stimulation (such as congregate activities, meaningful programming, and the like). It often also entails other forms of deprivation, such as limitations on property, access to telephones, and the prohibition of contact visiting.[7]

30.      A great deal of research has consistently documented the extremely harmful consequences of this kind of confinement.[8] For example, a number of case studies of isolated persons have found that they suffer from a higher number of appetite and sleep disturbances, anxiety, panic, rage, loss of control, and self-mutilations. In addition, self-harm and suicidality are more prevalent in solitary confinement, as is the

---

[7] "Solitary confinement" is defined less by the purpose for which it is imposed, or the exact amount of time during which prisoners are confined to their cells, than by the degree to which they are deprived of *normal, direct, meaningful* social contact and denied access to positive environmental stimulation and activity. See, e.g., Haney, C., The Science of Solitary: Expanding the Harmfulness Narrative, 115(1) *Northwestern Law Review* 1-44 (2020). The adverse effects of solitary confinement obviously do not depend on the number of bunks in a cell. In fact, inmates in isolated confinement who are double-celled (i.e., housed with another person), nonetheless *may* suffer some of the same kind of negative psychological effects that single-celled isolated inmates do *if* they are denied all other forms of social interaction. In fact, in some ways, inmates who are double-celled in isolation units suffer the worst of two very difficult institutional worlds: they are "overcrowded" by virtue of being confined nearly around-the-clock with another person inside a typically very small cell, but they are at the same time kept apart from the rest of the mainstream inmate or detainee population as well as being deprived of even minimal freedom of movement, prohibited from access to meaningful institutional programs, and denied opportunities for normal, meaningful social interaction. This is especially problematic if the inmates or detainees are involuntarily double-celled, have no control over the identity of the person with whom they are housed, and have no practical or feasible means of changing cellmates if they are (or become) incompatible. Because of the inevitable tensions that are created by forcing persons to live around-the-clock in such cramped, deprived conditions, double-celling in isolation units increases the likelihood of interpersonal conflict.

[8] Much of this research is summarized in: Haney, C., & Lynch,  M., Regulating Prisons of the Future: The Psychological Consequences of Solitary and Supermax Confinement, 23 *New York Review of Law & Social Change*, 477-570 (1997); and Smith, P., The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature, in M. Tonry (Ed.), *Crime and Justice* (pp. 441-528). Volume 34. Chicago: University of Chicago Press (2006).

deterioration of mental and physical health (beyond self-injury). Somewhat counterintuitively, other-directed violence, such as stabbings, attacks on staff, and property destruction, and collective violence also can occur at higher rates in solitary confinement as opposed to general population housing units.

31.     Many direct studies of the effects of solitary confinement have documented a wide range of harmful psychological effects. These include: increases in negative attitudes and affect, insomnia, anxiety, panic, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control, aggression, rage, paranoia, hopelessness, lethargy, depression, emotional breakdowns, self-mutilation, and suicidal impulses. In fact, many of the negative effects of solitary confinement are analogous to the acute reactions suffered by trauma victims, and the psychiatric consequences are often so severe that they resemble those experienced by victims of what are called "deprivation and constraint torture" techniques.

32.     In addition to the work of other researchers, my own research on solitary confinement led me to conclude that it is truly painful and potentially extremely damaging.[9] Solitary or isolated confinement not only adds to the pains of incarceration but also can be especially debilitating; it can significantly undermine a person's sense of self and compromise their emotional stability. Because it subjects them to overwhelming levels of psychic stress, many persons are unable to tolerate or endure the experience of solitary confinement. As I will discuss later in this Declaration, there is an initial period of risk during which some people react with "isolation panic" and heightened distress.

---

[9] For example, see: Haney & Lynch, supra note 8; Haney, C., Infamous Punishment: The Psychological Effects of Isolation, 8 *National Prison Project Journal*, 3 (1993); Haney, C., Mental Health Issues in Long-Term Solitary and "Supermax" Confinement, 49 *Crime & Delinquency*, 124-156 (2003).

For others, the experience becomes increasingly intolerable the longer the period during which they are exposed to it.

33.     The harmfulness of solitary confinement led two well-known commentators, psychiatrist Jeffrey Metzner and attorney Jaimie Fellner, to acknowledge that "[i]solation can be harmful to any prisoner."[10] They described a host of potentially adverse effects of isolation, as identified in much of the research I summarized above, including "anxiety, depression, anger, cognitive disturbances, perceptual distortions, obsessive thoughts, paranoia, and psychosis."[11] However, Metzner and Fellner went even further. Their deep concerns over the harmfulness of solitary confinement led them to recommend that professional organizations "should actively support practitioners who work for changed segregation policies and they should use their institutional authority to press for a nationwide rethinking of the use of isolation" in the name of their "commitment to ethics and human rights."[12]

34.     In fact, many professional organizations have taken exactly the steps that Metzner and Fellner recommended. For example, the American Psychological Association acknowledged that solitary confinement was associated with heightened risk of self-mutilation and suicidality, a range of adverse psychological symptoms such as anxiety, depression, sleep disturbance, paranoia and aggression as well as the

---

[10] Metzner J, Fellner J., Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics, 38 *Journal of the Academy of Psychiatry and Law*, 104-108 (2010). http://www.hrw.org/sites/default/files/related_material/Solitary%20Confinement%20and%20Mental%20Illness%20in%20US%20Prisons.pdf

[11] *Id*. at 104.

[12] *Id*. at 107.

exacerbation of pre-existing mental illness and trauma-related symptoms.[13] The American Public Health Association issued a statement in which it detailed the public-health harms posed by solitary confinement, urged correctional authorities to "eliminate solitary confinement for security purposes unless no other less restrictive option is available to manage a current, serious, and ongoing threat to the safety of others," and recommended that "[p]unitive segregation should be eliminated."[14] And, finally, a National Academy of Sciences Committee concluded that solitary confinement could precipitate such "serious psychological change" in persons that the practice itself "is best minimized, and accompanied by specific criteria for placement and regular meaningful reviews for those that are thus confined."[15]

35.    Importantly, the Commission on Crime Prevention and Criminal Justice's (2015) *Standard Minimum Rules for the Treatment of Prisoners* passed by the United Nations defined "prolonged solitary confinement" as lasting "for a time period in excess of 15 consecutive days," and mandated that such prolonged confinement "shall be prohibited."[16] Even more recently—in April 2016—the National Commission on Correctional Health Care ("NCCHC"), a professional organization of prison healthcare providers, issued a Position Statement on solitary confinement. Relying on many of the

---

[13] American Psychological Association. 2017. *Solitary confinement of juvenile offenders.* https://www.apa.org/about/gr/issues/cyf/solitary.pdf

[14] American Public Health Association. 2013. *Solitary Confinement as a Public Health Issue.* Policy No. 201310. http://www.apha.org/advocacy/policy/policysearch/default.htm?id=1462

[15] National Research Council, *The Growth of Incarceration in the United States: Exploring Causes and Consequences.* Washington, DC: The National Academies Press (2014), p. 201.

[16] Commission on Crime Prevention and Criminal Justice, *United Nations Standard Minimum Rules for the Treatment of Prisoners.* United Nations Economic and Social Council, May 21 (2015), Rules 43.1 and 44).

scientific sources that I summarized and cited earlier, the NCCHC declared, among other things, that solitary confinement of longer than 15 days constitutes "cruel, inhumane, or degrading treatment of inmates" and something in which correctional health professionals should not participate.[17]

36.     Solitary confinement is recognized by researchers and practitioners as *especially* problematic and harmful for persons who are mentally ill. Thus, the American Psychiatric Association recommended that "Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates."[18] The position statement of the Society of Correctional Physicians similarly acknowledged "that prolonged segregation of inmates with serious mental illness, with rare exceptions, violates basic tenets of mental health treatment," and recommended against holding these prisoners in segregated housing for more than four weeks).[19]

37.     Other organizations have gone even further and actually *banned* the use of solitary confinement outright for use with persons who are mentally ill. Among organizations that have taken this step are the United Nations,[20] and the National

---

[17] National Commission on Correctional Health Care, *Position Statement: Solitary Confinement (isolation)*, 22 Journal of Correctional Health Care, 257-263 (2016). http://www.ncchc.org/solitary-confinement

[18] American Psychiatric Association. 2012. *Position Statement on Segregation of Prisoners with Mental Illness*. http://www.psych.org/File%20Library/Learn/Archives/ps2012 _PrisonerSegregation.pdf

[19] Society of Correctional Physicians. 2013. *Position Statement, Restricted Housing of Mentally Ill Inmates*. http://societyofcorrectionalphysicians.org/resources/position-statements/restricted-housing-of-mentally-ill-inmates

[20] Commission on Crime Prevention and Criminal Justice, United Nations Standard Minimum Rules for the Treatment of Prisoners, supra note 16.

Commission on Correctional Healthcare.[21] Similarly, the National Alliance on Mental Illness issued a statement "oppos[ing] the use of solitary confinement and equivalent forms of extended administrative segregation for persons with mental illnesses."[22]

38.     This level of heightened concern for mentally ill persons who are placed in solitary confinement is not difficult to understand. Persons who are mentally ill are more likely to react adversely to the additional stress of solitary confinement. In addition, many of the adverse reactions that solitary confinement produces (including depression and anxiety) are similar to or parallel the symptoms of mental illness, which are compounded or intensified as a result. Mentally ill persons are also especially vulnerable to self-harm and suicidality, which occurs at higher rates in solitary confinement units than elsewhere inside institutional settings.[23] These observations apply to any mentally ill person placed in solitary confinement—jail inmates, prisoners, and immigration detainees.

39.     In addition to the immediate psychological toll that solitary confinement takes on persons subjected to it, there is now scientific support for the notion that the adverse effects of this experience can persist *long after* solitary confinement,[24] including

---

[21] Specifically, the NCCHC Position Statement included the provision that juveniles, mentally ill individuals, and pregnant women should be "excluded from solitary confinement of <u>any</u> duration" (emphasis added), and that health care staff should advocate to correctional officials that solitary confinement never exceed 15 days continuous duration, and also advocate to them that they should bar juveniles and mentally ill prisoners entirely from such confinement.

[22] National Alliance on Mental Illness. 2016. *Public Policy Platform of the National Alliance on Mental Illness*. 12th Edition. Arlington, VA: NAMI. https://www.nami.org/About-NAMI/Policy-Platform, Section 9.8.

[23] For example, see: Kaba, F., Lewis, A., Glowa-Kollisch, S., Hadler, J., et al., Solitary Confinement and Risk of Self-Harm Among Jail Inmates, 104 *American Journal of Public Health*, 442-447 (2014).

[24] For example, a group of Stanford researchers found that behavioral patterns and psychological reactions developed in the course of adapting to solitary confinement were persistent and problematic when formerly long-term isolated prisoners attempted to transition back to mainline

even after a person has been released from the institution itself. For example, solitary confinement survivors suffer post-institution adjustment problems at higher rates than the already high rates experienced by formerly incarcerated persons in general, including being more likely to manifest symptoms of PTSD.[25]

40.     Relatedly, and in some ways even more dramatically, the stressfulness and long-term damage inflicted by solitary confinement can adversely affect someone's life expectancy. A recent study done by medical researcher Lauren Brinkley-Rubinstein and her colleagues, analyzing the experiences of more than 200,0000 people who were released from a state prison system between 2000 and 2015, confirmed this. The researchers found that those persons who spent *any amount of time* in solitary-type confinement (such as administrative or disciplinary segregation) were 24% more likely to die in the first year after release."[26] Prisoners who spent time in solitary-type confinement also were more likely to commit suicide (78% more likely than other inmates) and to die from homicide (54% more likely) after being released from prison,[27]

---

prison housing. *See* Human Rights in Trauma Mental Health Lab, *Mental Health Consequences Following Release from Long-Term Solitary Confinement in California*. Palo Alto, CA: Stanford University (2017) available at https://ccrjustice.org/sites/default/files/attach/2018/04/CCR_StanfordLab-SHUReport.pdf [https://perma.cc/5WGK-UBBN]. Psychiatrist Terry Kupers, who has written extensively about the mental health risks of solitary confinement, has termed the lingering effects of the experience "SHU postrelease syndrome." See: Kupers, T. (2017). *Solitary: The Inside Story of Supermax Isolation and What We Can Do to Abolish It*. Oakland, CA: University of California Press, especially pp. 151-167.

[25] See e.g., Hagan, B., et al., History of Solitary Confinement Is Associated with Post-Traumatic Stress Disorder Symptoms among Individuals Recently Released from Prison, 95 *Journal of Urban Health* 141, 146 (2018); and DeVylder, J. (2020). Previously Incarcerated Individuals with Psychotic Symptoms Are More Likely to Report a History of Solitary Confinement. *Psychiatry Research,* 290, 113064 (2020). https://doi.org/10.1016/j.psychres.2020.113064.

[26] Brinkley-Rubinstein, L., et al., Association of Restrictive Housing During Incarceration With Mortality After Release, *Journal of American Medicine* (October 4, 2019), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2752350.

[27] *Id.*

and they were "127% more likely to die of an opioid overdose in the first 2 weeks after release."[28]

41.     These data and the other studies that I have summarized and cited above confirm what I have observed in my own work: time spent in solitary confinement is not only painful but harmful. It can and routinely does have extremely damaging psychological and physical effects on persons exposed to it.

42.     Dr. Kropf inexplicably minimizes the scientifically well-documented harmfulness of solitary confinement, taking the indefensible position that it does *not* "cause serious psychological harm or exacerbate pre-existing mental illness."[29] In order to do so, Dr. Kropf initially cites publications that are between 36 and 45 years old— "Vantour (1975)" and "Gendreau and Bonta (1984)."[30] He surprisingly fails to cite well-known, much more recent treatises on the topic, including my own comprehensive 2018 analysis of the *current* status of solitary confinement research (showing that it is not only painful and harmful but has become a widely disfavored and even prohibited practice among legal, human rights, mental health, and even correctional organizations).[31] Later he presents a lengthy but extremely inaccurate literature review that, although it contains somewhat more recent references (a number of which he mischaracterizes), relies on several thoroughly discredited studies that purport to show

---

[28] *Id.*

[29] Psychological Report of Jeffrey Kropf, Ph.D., in In re Novoa et al. v. GEO Group, Inc., August 17, 2020 [hereinafter "Kropf Report"], p. 9.

[30] Kropf Report, p. 10.

[31] Haney, C., Restricting the Use of Solitary Confinement, 1 *Annual Review of Criminology*, 285-310 (2018).

little or no damage.[32] Here, too, he fails to acknowledge recent, devastating critiques of

the studies on which he relies. He also fails to cite my 52-page published critique of the

discredited studies that he uncritically cites and ignores my detailed explanation of the

numerous fatal methodological flaws from which those studies suffer.[33]

43.     Dr. Kropf includes a lengthy discussion the "O'Keefe et al. 2011" study,

which he terms the "Colorado Study" and lavishly praises.[34] This study is one of the

most thoroughly discredited in the entire solitary confinement literature. The

methodological flaws from which "O'Keefe et al. 2011" suffers are not just serious but

"fatal"—that is, they literally preclude any meaningful interpretation or inference to be

drawn from the results. Among these many methodological flaws is the fact that:

"O'Keefe et al. 2011" exposed all of the participants (including those supposedly in the

"control" group) to a very harsh form of solitary confinement for unspecified periods at

the outset of the study; the researchers hopelessly contaminated the control and

treatment groups throughout the study by allowing them to be co-mingled (i.e., moving

solitary confinement and general population prisoners back and forth between these

different conditions); the lead researcher used what she herself characterized as a

"haphazard" method of sampling to obtain prisoner participants; the study included

especially large numbers of protective custody prisoners and gang members in the

solitary confinement group whose special status may have affected the results; the study

relied on general population prisoner data from many different prisons (including one

---

[32] Kropf Report, pp. 19-23.

[33] Haney, C., The Psychological Effects of Solitary Confinement: A Systematic Critique, 47 *Crime and Justice*, 365-416 (2018).

[34] Kropf Report, pp. 21-23.

EXPERT DECLARATION OF DR. CRAIG HANEY                                            21

plagued by a history of violence) but failed to specify any of the conditions of
confinement that existed at any of them; the researchers failed to measure or specify
exactly what conditions of confinement any solitary confinement prisoner was actually
exposed to or the privileges they were afforded; the study relied on only a single,
inexperienced research assistant to collect all of the data analyzed (which required her
to conduct five to six testing sessions in which between 10 and 12 tests were
administered to each of 247 prisoners at 10 different prisons); the research assistant
provided prisoner participants with inaccurate and misleading information about the
study's actual purpose at the outset in ways that may have affected their responses; the
research assistant questioned prisoners about the veracity of their responses anytime
she doubted them but nonetheless included responses that she thought were "abnormal
or untruthful" in the data analysis; the scales and instruments used in the study were
not validated with prisoner populations and were subsequently broken up into
idiosyncratic sub-scales that precluded comparisons with data from other studies; and,
finally, the researchers ignored the behavioral data that they had collected that was
inconsistent with the questionnaire responses on which their data analysis was based.[35]

44.    In light of these fatal flaws, I do not believe that any thoughtful, informed,
and experienced researcher could carefully read the "O'Keefe et al., 2011" study and then
pronounce it "methodologically sound," as Dr. Kropf has.[36]

45.    Dr. Kropf also praises and relies heavily on a "meta-analysis" or
quantitative synthesis of other existing research, "Morgan et al. (2016). Unfortunately,

---

[35] See Haney, *supra* note 33, at pp. 380-398 for a more detailed discussion of these issues.

[36] Kropf Report, p. 21.

this study is similarly flawed and cannot be reliably interpreted, in large part because it
is itself based almost entirely on the results of the fatally flawed "O'Keefe et al. (2011)"
study. In addition to basing its findings on the methodologically compromised "O'Keefe
et al. (2011)" study, "Morgan et al. (2016)" suffered from that fact that the authors
ignored approximately 90 percent of the existing literature on solitary confinement;
repackaged the results of studies in ways that inflated their significance; included
methodologically flawed studies that comingled voluntary and involuntary solitary
confinement participants; failed to take into account significant amounts of attrition (up
to 80 percent) that occurred in some of the included studies; and the meta-analysis
included studies that either were not comparisons of solitary versus non-solitary
confinement or in which they reported an effect size from a publication in which no
effect size appeared.[37]

46.     Dr. Kropf's attempt to use the "Morgan et al. (2016)" to support his own
view that the effects of solitary confinement are not much different from or worse than
"routine incarceration"[38] is thus misguided and problematic. However, given the fact
that Dr. Kropf seems partial to meta-analyses, devoting several pages to a discussion of
the findings of the badly flawed "Morgan, et al. (2016)" meta-analysis, I was surprised to
see that he failed to acknowledge results of a more recent meta-analysis that is precisely
on point. Specifically, Luigi et al. (2020) concluded that time spent in solitary
confinement "was related to deleterious effects with regard to mood symptoms, PTSD-

---

[37] See Haney, *supra* note 33, at pp. 399-407 for a more detailed discussion of these issues.

[38] Kropf Report, p. 23.

related outcomes, psychotic experiences, hostility, self-injurious behavior, and mortality."[39] Yet Dr. Kropf failed to make any mention of these published findings.

47.     In fact, Dr. Kropf's overall review of the solitary literature contains a number of other mistaken or misleading statements and incorrect or incomplete characterizations of research. For example, on p. 23 of his report, he cites a study that Peter Suedfeld published in 1982—one that he erroneously cites as "Suedfeld and Roy (1982)" when the actual citation is Suedfeld, Ramirez, Deaton, & Baker-Brown (1982).[40] He cites this study as one of several he discusses to minimize the harmfulness of solitary confinement. Unfortunately, not only did Dr. Kropf say very little about the study's methodology, he also did not accurately or fully report the study's findings. Thus, in addition to the fact that Suedfeld et al. (1982) acknowledged that "[i]ndividuals who were completely unable to adapt to [solitary confinement] and became psychotic or committed suicide were obviously not included" in their study,[41] a careful look at the actual results of Suedfeld et al. (1982) reveals that, despite several caveats about the actual circumstances of the prisoners' confinement that would limit the degree to which negative consequences might be found,[42] Suedfeld and his colleagues actually *did* find and *did* report that prisoners who had spent more time in solitary confinement were

---

[39] Luigi, M., Dellazizzo, L., Giguere, C., Goulet, M., & Dumais, A. Shedding Light on "the Hole": A Systematic Review and Meta-Analysis on Adverse Psychological Effects and Mortality Following Solitary Confinement in Correctional Settings, *Frontiers of Psychiatry*, 11, Article 840, 1-11, at p. 6.

[40] Suedfeld, P., Ramirez, C., Deaton, J., & Baker-Brown, G., Reactions and Attributes of Prisoners in Solitary Confinement, _Criminal Justice and Behavior_, *9*, 303-340 (1982).

[41] Suedfeld, et al. (1982), at p. 335.

[42] For example, an unspecified number of Suedfeld et al.'s participants were not actually in solitary confinement (SC) at the time they were assessed, and the participants in general were described as having "experienced SC at this or another institution." At p. 324. Moreover, 12 of the participants were in solitary confinement either voluntarily or for their own protection. At p. 325.

nonetheless "inhibited, anxious, cautious, dissatisfied, dull, submissive to authority, and lacking in self insight."[43] In addition, Suedfeld et al. reported that "inmates who had spent longer periods of time in segregation scored higher on depression… and hostility," and there was a "significant correlation between length of the current sentence and hostility."[44]

48.     Indeed, at the one institution among the several Suedfeld and his colleagues studied that appeared to be most similar to an actual solitary confinement unit, they reported that "longer time in SC [solitary confinement] was associated with suspicion, distrust, and forceful and self-seeking behavior" and also that there was "a significant relationship" between "longer time in SC [and] higher levels of hostility."[45] In fact, Suedfeld et al. (1982) concluded their study with this statement: "We would strongly recommend that attempts be made to assess prisoners' ability to adapt to [solitary confinement], and that close and objective monitoring and release procedures be set up to identify and transfer individuals for whom the experience may be damaging."[46] Dr. Kropf inexplicably failed to mention any of this.

49.     It is especially surprising that a prison system employee who has worked in solitary confinement units (and perhaps still does) has remained so uninformed about the painfulness of these conditions and the degree to which they place persons at significant risk of serious psychological and physical harm. Dr. Kropf's lack of

---

[43] Suedfeld, et al. (1982), at p. 328.

[44] Suedfeld, et al. (1982), at p. 328.

[45] Suedfeld, et al. (1982), at p. 329.

[46] Suedfeld, et al. (1982), at p. 337.

understanding and/or his dismissal of existing knowledge notwithstanding, the scientifically well-documented painful, harmful nature of solitary confinement underscores the potential damage that immigration detainees who are placed in such a unit are at risk of incurring. It also underscores why a person would fear being placed in such a unit. In this case, the threat and the reality of being placed in a painful and potentially damaging solitary confinement unit is likely to greatly contribute to the overall coerciveness of the environment in which Adelanto Facility immigration detainees are housed.

50.     In addition, and perhaps even more surprisingly, although Dr. Kropf acknowledges that there is likely to be a greater concentration of mentally ill persons housed in solitary confinement units, he refuses to concede the *heightened* (and, as many professional mental health organizations argue, unacceptable) risks that are associated with placing mentally ill persons there. He thus concedes that "a disproportionately high percentage of persons placed in segregated housing were mentally ill at the time of their placement,"[47] but appears oblivious to the institution's (in this case, the immigration detention facility's) responsibility to screen these detainees out of solitary confinement in the first place.

51.     In fact, his 27-page report fails to acknowledge or discuss evidence that the screening mechanisms employed at the Adelanto ICE Processing Center were deemed ineffective in the past and that they allowed seriously mentally ill detainees to be inappropriately (and dangerously) housed in solitary confinement.[48] Nor does he

---

[47] Kropf Report, at p. 14.

[48] Corrections Expert Report on Adelanto Correctional Facility, November 16, 2017, p. 7.

acknowledge evidence in the record that the Facility's cell-front monitoring of mentally ill detainees who were housed in solitary confinement in the past was deemed inadequate.[49]

52.     Dr. Kropf's minimization of the heightened risk of harm for mentally ill persons placed in solitary confinement also ignores the findings of a federal district court that pertains to the very California Department of Corrections and Rehabilitation solitary confinement units in which he worked, at the very time in which it appears he worked in them. Specifically, Judge Lawrence Karlton ruled in 2014 that: "[T]he overwhelming weight of evidence in the record is that placement of seriously mentally ill inmates in California's segregated housing units can and does cause serious psychological harm, including decompensation, exacerbation of mental illness, inducement of psychosis, and increased risk of suicide."[50] He ordered the state to reduce the number of mentally ill persons in these units and to create alternative, more therapeutic, less dangerous in which they could be housed. Dr. Kropf fails to mention this ruling. Nor does he any similar set of recommendations of his own for the Adelanto Facility—to reduce or eliminate the practice of placing mentally ill detainees in solitary confinement and provide alternative, more therapeutic places in which to house them.

53.     In addition, Dr. Kropf ignores a damning characterization of the egregious quality of mental health care at Adelanto, offered in a report containing observations by two psychiatric experts who toured the facility, reviewed records, and interviewed

---

[49] Id. at p. 8.

[50] *Coleman v. Brown*, 28 F.Supp.3d 1068 (E.D. Cal. 2014), at p. 1095.

detainees.[51] They found that, despite the fact that Adelanto detainees were especially

vulnerable to suffering mental health problems, the Facility mental health staff

conducted no more than "cursory" clinical contacts with detainees, offered them non-

individualized treatment, failed to provide detainees with meaningful therapeutic

programming and activities, and employed deficient medication practices. In addition,

the report noted that Adelanto's "response to detainees in acute mental health crisis can

be violent or punitive, lacking in appropriate therapeutic intervention, and ultimately

psychologically damaging."[52] Moreover, the report concluded that "conditions in

[Adelanto's] segregation units put people with mental health disabilities at substantial

risk of psychological and even physical harm."[53] Unfortunately, Dr. Kropf makes no

mention of this report and appears to have overlooked the broad patterns of neglect that

characterizes Adelanto's treatment of its mentally detainees and the dangerous

conditions to which it subjects them in solitary confinement.

54.     Dr. Kropf's views on the issue of harmful effects of solitary confinement in

general are thus incorrect and uninformed. In addition, he fails to acknowledge the well-

known heightened risks and dangers of solitary confinement for mentally ill persons,

and fails to condemn the fact that the Adelanto Facility permits mentally ill detainees to

be placed in solitary confinement as punishment (or to acknowledge that the Facility has

actually placed a disproportionate number of them in solitary confinement in the past).

---

[51] Fischer, A., Gonzalez, P., & Diaz, R., *There Is No Safety Here: The Dangers for People with Mental Illness and Other Disabilities in Immigration Detention at GEO Group's Adelanto ICE Processing Center*. Disability Rights California (2019), p. 20.

[52] Id. at p. 25.
[53] Id. at p. 29.

55.     Dr. Kropf maintains further that even if detainees are threatened with placement in solitary confinement, and are in fact placed there, their fears and their actual punishment are inconsequential because "there is absolutely no credible research evidence indicating either that placement in a typical conditions of solitary confinement for a period of 72 hours or less causes serious psychological harm or that awareness of placement in solitary confinement for a period of 72 hours or less as a potential sanction for misconduct causes serious psychological harm."[54]

56.     These assertions are problematic for several reasons. For one, note that the *Supplemental Detainee Handbook* actually provides for punishments of 30 days and 60 days in solitary confinement for a number of rule violations. Moreover, the *Handbook* does not prohibit the Adelanto Facility from imposing multiple, successive terms of solitary confinement on detainees for subsequent infractions. Thus, a period of "72 hours" is hardly the outer limit of the time that an Adelanto Facility detainee may be forced to spend in solitary confinement and, as I will note later in this Declaration, there is evidence that detainees have been kept there for a year or more.

57.     However, I assume that Dr. Kropf has focused on the "72 hour" time period because Adelanto Facility rules provide that immigration detainees can be confined in solitary confinement for 72 hours merely for failing to clean their assigned living areas. Indeed, as he explicitly acknowledges, detainees in the Adelanto Facility who commit the rule violation of "Refusal to clean assigned living *are* placed in disciplinary segregation."[55] Setting aside the question of whether what Dr. Kropf has

---

[54] Kropf Report, p. 2.

[55] Kropf Report, p. 9 (my emphasis).

apparently decided is the key threshold here—whether or not the punishment of placing detainees in solitary confinement for failing to clean their assigned living areas "causes serious psychological harm"—is the most important issue, his factual assertion about even this are incorrect.

58.     For example, in classic research conducted some years ago, distinguished psychologist Professor Hans Toch conducted a large-scale psychological study of prisoners "in crisis" in New York State correctional facilities and made a number of important observations about the effects of isolation.[56] After he and his colleagues had conducted numerous in-depth interviews of prisoners, Toch identified a phenomenon that he termed "isolation panic," which he identified as an extreme psychological reaction that some prisoners had, including in the early stages when they were first placed alone in a solitary confinement cell. The symptoms of isolation panic that Toch reported included rage, panic, loss of control and breakdowns, psychological regression, and a build-up of physiological and psychic tension that led to incidents of self-mutilation.[57] Professor Toch noted that although isolation panic could occur under other conditions of confinement, it was "most sharply prevalent in segregation." Moreover, it marked an important dichotomy for prisoners: the "distinction between imprisonment, which is tolerable, and isolation, which is not."[58]

59.     In fact, the early, initial period just after someone has been placed in solitary confinement is known to be especially high risk time. For example, a study done

---

[56] Hans Toch, MEN IN CRISIS: HUMAN BREAKDOWNS IN PRISONS. Aldine Publishing Co.: Chicago (1975).

[57] Id. at p. 54.

[58] Id. at 54.

in the California Department of Corrections and Rehabilitation—the prison system

where Dr. Kropf was and apparently is still employed—underscored the dangerous

nature of solitary confinement and the heightened risks that occur *in the first 72 hours*

of such confinement. Thus, an analysis of suicides in the California Department of

Corrections and Rehabilitation in 2015 corroborated the well-known fact that a

disproportionate number of them occurred in segregated housing. Specifically, although

only 6.5% of prisoners were housed in segregation, 37.5% of suicides occurred there.[59]

As I noted above, research done in other prison systems have corroborated that persons

placed in solitary confinement are at much greater risk of suicide as well as self-harm as

compared to those in the general population.[60] In addition, however, the same analysis

of California data found that: "In 2015, nearly half of the suicides that occurred in

segregated housing occurred soon after placement. Three of the nine suicides occurred

in intake cells, indicating stays of less than 72 hours."[61] Moreover, this finding was not

limited to a single year: Over the seven-year period from 2009 to 2015, California prison

analysts found that "suicides tended to occur shortly after placement, *particularly in the*

*first 72 hours* after placement."[62]

      60.    Disregarding these findings, Dr. Kropf forcefully asserts near the end of

his report that "[m]y professional experience has led me to conclude unequivocally that

---

[59] Annual Report on Suicides in the California Department of Corrections and Rehabilitation, January 1, 2015-December 31, 2015, p. 29.

[60] For example, see Kaba, et al., *supra* note 23.

[61] Annual Report on Suicides in the California Department of Corrections and Rehabilitation, January 1, 2015-December 31, 201, at p. 30.

[62] Id. at p. 30.

placement of a confined person in solitary confinement on a segregated housing unit for a period of 72 hours or less does not cause serious psychological harm."[63] He goes even further several pages later, asserting that the "number of inmates reported to have expressed or evidenced distress related... to placement in a segregated housing unit for a period of 72 hours or less... is precisely zero."[64] Yet, remarkably, as I say, much of his corrections experience was obtained in exactly the prison system where a heightened risk of suicide with the first 72 hours of placement in solitary confinement has been clearly established.

61.     Dr. Kropf's dismissive stance with respect to the harmfulness of solitary confinement in general, the heightened risk of harm for mentally ill persons in particular, and the significant risk posed by stays of even 72 hours or less are outlier positions that are not justified by existing scientific knowledge.

## V.         The Nature of the Inherently Coercive, Prison-Like Environment at the Adelanto ICE Processing Center

62.     As I noted above, the general psychological dynamics that govern total institutional environments are not limited to jails and prisons. They occur in and are applicable to all total institutional environments that are structured and operated in the same way as correctional institutions, including immigration detention facilities. In fact, immigration detention facilities such as the Adelanto ICE Processing Center are indistinguishable in many ways from actual jails and prisons, despite the fact that they house civil detainees instead of persons accused or convicted of criminal offenses. Thus, because many of the nation's immigration detention centers are constructed and

---

[63] Kropf Report, at p. 16.

[64] Kropf Report, at p. 19.

operated on the basis of the same inherently punitive institutional model as correctional facilities in general, they create the same inherently coercive dynamics and impose the same level of psychological risk on detainees.

63.     For example, much like jails and prisons, immigration detention facilities promulgate and enforce numerous rules and regulations that govern virtually every aspect of a detainee's existence. Detainees are carefully monitored or surveilled by institutional staff to ensure that they comply. In addition to the numerous rules themselves, there is an equally long list of punishments to which detainees are subjected if detention facility staff decide that they have violated any of the many rules and regulations to which they are subjected. In addition, the architecture and internal physical structure of immigration detention facilities are based explicitly on jails and prisons, designed inside and out to maximize the surveillance, control, and regulation of the residents. In fact, as I discuss in more detail below, a large portion of the Adelanto Facility itself was converted from a state prison, and for the last six years has been run by a "Warden" whose entire prior professional career had been spent working in and overseeing prisons.[65]

64.     Immigration detention facilities also house an especially vulnerable group of residents. Thus, as a group, immigration detainees have special vulnerabilities that typical jail or prison populations do not. Many of them have extensive trauma histories that predate their detention experiences.[66] Indeed, for some, the severe traumas to

---

[65] Deposition of Warden James Janecka, June 26, 2019, pp. 9-12.

[66] See, e.g., Fischer, A., Gonzalez, P., & Diaz, R., *There Is No Safety Here: The Dangers for People with Mental Illness and Other Disabilities in Immigration Detention at GEO Group's Adelanto ICE Processing Center*. Disability Rights California (2019) to the effect that many Adelanto detainees described "traumatic experiences before immigration, including rape, childhood sexual assault, and targeted political violence such as home burnings or police violence" (at p. 15).

which they were exposed are the reason that they sought refuge in the United States. In

addition, a number of detainees have prior experience with repressive governmental

regimes that administered extreme punishments in retaliation for any sign of resistance

or opposition. Thus, many detainees have been taught to fear authority. Many are also

unfamiliar with the cultural and legal norms to which they must adhere in the United

States, and are anxious about the life-altering outcome of a process they do not entirely

understand.[67]

65.     Many immigration detainees also have limited English proficiency that

prevents them not only from fully understanding the operation of the legal system that

will decide their fate but also interferes with their ability to adequately comprehend all

of the institutional directives and contingencies that govern their day-to-day lives.[68] In

punishment-oriented institutional settings like these, any failure to understand written

rules and regulations and staff directives can increase the risk that detainees will be

punished. Moreover, detainees who do not understand why they are being punished are

more likely to experience the environment as unpredictable, arbitrary, and especially

cruel. Limited English proficiency and cultural unfamiliarity also place a premium on

finding and maintaining contact with other detainees from their native countries and/or

who speak their native language. This means that the threat or reality of being moved to

---

[67] *See, e.g.*, Deposition of Abdiaziz Karim (Dkt. No. 206-4).

[68] *See* Xavier Becerra, Cal. Att'y Gen., Review of Immigration Detention in California, CAL. DEP'T
OF JUSTICE 22 (Feb. 2019),
https://oag.ca.gov/sites/all/files/agweb/pdfs/publications/immigrationdetention-
2019.pdf (Novoa_0006854 at 22).

EXPERT DECLARATION OF DR. CRAIG HANEY                                    34

other housing units or other facilities, away from persons whom they trust and on whom they have come to depend, is an especially frightening prospect.

66.     Adelanto ICE Processing Center is among the largest such facilities in the United States, housing nearly 2000 detainees, the size of what would be considered, in my experience, a very large prison. It is operated by a publicly traded, for-profit company, The GEO Group. The documents I have reviewed indicate that this Facility was intended to operate very much like a correctional facility from its very conception.

67.     Despite ICE's expressed intention in its original Intergovernmental Service Agreement ("IGSA") with the City of Adelanto, signed in May, 2011, to "reform" immigration detention and "move away from a penal model of detention," I saw little evidence in the materials I reviewed that much progress had been made in doing so.[69] Thus, even though it has been nearly a decade since ICE administrators sought to create "a whole new generation of detention facilities" better suited to a civil than penal detention mission, the Adelanto Facility continues to operate much like a prison. In fact, as I noted, the Adelanto Facility itself is a former prison—literally a place where California prisoners were once housed.

68.     Indeed, from its very inception, the Adelanto Facility was contemplated as a distinctly prison-like regime that explicitly included the most severe form of punishment any jail or prison can impose—solitary confinement. Thus, among other things, the original IGSA with Adelanto provided that "[s]pecial security and control

---

[69] Declaration of Lydia Wright in Support of Plaintiffs' Motion for Class Certification, Exhibit 2, EROIGSA-11-0003, *Intergovernmental Service Agreement Between the United States Department of Homeland Security Immigration and Customs Enforcement Office of Enforcement and Removal Operations and the City of Adelanto*, signed in May, 2011, p. 2.

measures will consistently be applied to Special Management Unit entrances."[70] The
IGSA also provided for searches of the detainees, including strip searches and body
cavity searches, as well as "metal detector screening" and the use of "dry cells."[71]

69.     More specifically, the IGSA explicitly permitted the use of a Special
Management Unit ("SMU") at Adelanto for "any detainee" whom the staff believed
"represents an immediate, significant threat to safety, security or good order" and
needed to be "immediately controlled by staff," as long as supervisory approval was
obtained.[72] Placement in the more restrictive section of the SMU— "Disciplinary
Segregation"—could be imposed whenever a Disciplinary Hearing Panel found that a
detainee was guilty of a "prohibited act or rule violation" that met the "Greatest,"
"High," or "High-Moderate" level "as defined in the Detention Standard on Disciplinary
System." Placement in Disciplinary Segregation was authorized for as long as 60 days
for a single incident.

70.     The conditions inside these harsh punishment units were not well-
specified, except that they were supposed to "approximate" those in general population
while being "consistent with the safety and security considerations that are inherent in
more controlled housing…"[73] However, the nature of the specific "considerations" were
not themselves enumerated in the IGSA. Detainees housed in these SMUs were
supposed to be given "regular" access to staff, but this too was not further clarified.

---

[70] Id. at 11.

[71] Id. at 12-13.

[72] Id. at 14.

[73] Id. at 14.

Detainees housed in Disciplinary Segregation could be limited to only "one hour of recreation per day, five days a week, unless documented security or safety considerations" dictated *less*. Persons held in the SMUs were to be given "opportunities" for personal and legal visits but, here too, these could be withheld if there were what were described as "substantial, documented reasons" for doing so, although the nature of those reasons remained unspecified.[74]

71.     Mental health screening was supposed to occur at intake and the IGSA provided that "[d]etainees with suspected or known mental health concerns will be referred as need for evaluation, diagnosis, treatment, and stabilization," as well as "placement in a non-detention facility or special unit within the facility specifically designated for the care of the severely mentally ill or developmentally disabled."[75] It was not made clear whether or how often that occurred, what the "special unit(s)" consisted of, and whether, how, and how often detainees who had "suspected or known mental health concerns" that emerged after intake were provided "evaluation, diagnosis, treatment, and stabilization."

72.     Importantly, there was nothing in the IGSA that prohibited the placement of seriously mentally ill prisoners in solitary confinement (either in Administrative Segregation or Disciplinary Segregation). This was true despite the fact that solitary confinement was known to be an extremely dangerous place in which to put seriously mentally ill prisoners. Yet, as I note below, there is evidence that not only was this egregious practice contemplated at the outset of the Adelanto Facility's operation but

---

[74] Id. at 15.

[75] Id. at 20.

also that a number of seriously mentally ill immigration detainees have in fact been subjected to it.

73.     Equally importantly, there was no indication of whether any *additional* mental health monitoring and treatment was to be afforded to detainees who were held in harsh SMU conditions and, if so, how much. The fact that "[d]etainees in Special Management Units will have the *same* access to the same health care services as detainees in the general population" suggests that no special mental health monitoring was required to be conducted in these units.[76]

74.     The use of physical force was also explicitly authorized in the IGSA, in response "to instances of justifiable self-defense, protection of others, protection of property, and prevention of escapes." Although supposedly prohibited as "punishment," the use of "physical force or restraint devices" was explicitly permitted, including "four/five point restraints" and "chemical agents" and "firearms."[77]

75.     If the original IGSA that ICE signed with the City of Adelanto contemplated an immigration detention center that was structured and operated very much like a prison, little or nothing that The GEO Group has done since has ameliorated or softened that punitive model. The materials I reviewed indicated not only that GEO has structured and operated the Adelanto Facility very much like a prison. In fact, Adelanto has functioned in some ways that, even for a prison, would be considered especially harsh and coercive. Safeguards and protections that well-run prisons

---

[76] Id. at 21 (my emphasis).

[77] Id. at 16.

implement to safeguard the well-being of prisoners are *not* being routinely employed at Adelanto.

76.     For example, a November 16, 2017 report by a corrections expert found a number of serious problems with the way that the Adelanto Facility was being run. Noting that a prior onsite investigation had uncovered "deficiencies in the areas of admission and release, special management units, population counts, grievance system, staff misconduct, retaliation, staff-detainee communication, staffing, training, legal access, visitation, language access, health and mental healthcare, and management team assistance,"[78] the expert found that many of these "operational deficiencies"[79] were nonetheless *continuing* at Adelanto.

77.     As the corrections expert acknowledged, "[b]ecause of the risks associated with the isolation of a detainee in segregation," the detention standards that govern these units "mandate specific requirements for any detainee held in segregation to protect their rights."[80] Indeed, the expert also conceded that "[i]solation alone can create physical safety concerns and can result in mental decompensation." Yet the expert's inspection of the Adelanto Facility revealed that approximately a *third* of the persons housed in its SMU were seriously mentally ill, that one detainee had been held in Administrative Segregation for 426 days, and that a number of others had "spent over three hundred days in the SMU based on multiple stays."[81]

---

[78] *Corrections Expert Report on Adelanto Correctional Facility*, November 16, 2017, p. 2.

[79] Id. at 3.

[80] Id. at 7.

[81] Id. at 7.

78.     Further, the same corrections expert determined that Adelanto's monitoring of the mental health conditions of the detainees who were being held in the Facility's SMU was inadequate, even though, as I noted, many of them were seriously mentally ill and others had been kept there for a year or more. Specifically, the facility's apparently exclusive reliance on so-called "cell-front interviews" (in which staff interacted with and attempted to evaluate and counsel detainees while standing in the unit hallway and conversing through the cell doors) was notably insufficient. Thus, as the corrections expert concluded, Adelanto was failing to conduct mental health monitoring "in a more therapeutic manner which should include removing the detainee from the cell."[82]

79.     Nearly a year later, the Office of the Inspector General (OIG") noted in September, 2018 that it had found "multiple violations" at the Adelanto Facility that "pose[d] a significant threat to maintaining detainee rights and ensuring their mental and physical well-being."[83] These violations included placing detainees in Disciplinary Segregation prematurely and inappropriately,[84] inappropriately co-mingling Administrative Segregation detainees with those in Disciplinary Segregation,[85] imposing

---

[82] Id. at 8.

[83] Office of the Inspector General, *Management Alert—Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California*, September 27, 2018, p. 5.

[84] Id. at 5.

[85] Id. at 5. Administrative Segregation at Adelanto imposes conditions that are intended to be somewhat less onerous than Disciplinary Segregation. Unlike Disciplinary Segregation, where detainees are placed as punishment for violation of Facility rules, Administrative Segregation is a placement that some detainees request for protection from members of the mainline Facility population. Because these two populations are placed in segregated housing for very different reasons, and especially because a high percentage of persons in Administrative Segregation are there because they are particularly vulnerable and require additional safety protections, the co-mingling of these groups is generally regarded as dangerous and ill-advised.

sanctions that went beyond those listed in the disciplinary panel's decision in individual cases,[86] failing to properly house and medically monitor a disabled detainee who was inappropriately placed in Disciplinary Segregation,[87] improperly and unnecessarily placing detainees housed in Disciplinary Segregation "in physical restraints, including handcuffs and shackles,"[88] "physically restraining all disciplinary segregation detainees whenever they are outside their cells,"[89] failing to give "auxiliary aids or translated materials for the detainee to read or understand documents he was given,"[90] failing to provide detainees with proper medical care (including failing to perform sufficient medical checks on those in Disciplinary Segregation that would effectively "ensure detainee well-being"),[91] and failing to require medical and mental health staff to conduct more than "cursory walk-throughs" of Disciplinary Segregation to monitor detainee well-being.[92]

80.     The OIG also voiced concerns about how the Adelanto Facility addressed the issue of detainee suicides, whether in Disciplinary Segregation or elsewhere in the Facility. The OIG observed that "many cells we visited had nooses hanging from the vents." Moreover, the report noted: "One detainee told us, 'I've seen a few suicide

---

[86] Id. at 5-6.

[87] Id. at 6.

[88] Id. at 6.

[89] Which the OIG correctly noted "gives the appearance of criminal, rather than civil, custody." Id. at 6.

[90] Id. at 6.

[91] Id. at 7.

[92] Id. at 7. These walk-throughs apparently may have included professional staff "communicating" with detainees in a language the detainees did not necessarily understand.

attempts using the braided sheets by the vents and then the guards laugh at them and call them 'suicide failures' once they are back from medical."[93] Further:

> In March 2017, a 32-year old male died at an area hospital after being found hanging from his bedsheets in an Adelanto cell. In the months after this suicide, ICE compliance reports documented at least three suicide attempts by hanging at Adelanto, two of which specifically used bedsheets. Media reports based on 911 call logs indicate at least four other suicide attempts at the center from December 2016 to July 2017. In total these reports represent at least seven suicide attempts at the Adelanto Facility from December 2016 to October 2017.[94]

81.     A more recent report, based on an investigation that included on-site inspections and interviews conducted by the Disability Rights California, was published in 2019, and described a number of egregious problems. The report reached a number of similar conclusions as the OIG but, if anything, contained even more damning observations about the operations and procedures at Adelanto, especially with respect to the Facility's treatment of mentally ill detainees.[95]  Among other things, this report found that Adelanto Facility operated a largely punitive "prison-like" environment, that there were a substantial number of mentally ill detainees confined there (upwards of 300 or more), that the mentally ill detainees were provided substandard mental health care, were subjected to punitive and potentially very dangerous conditions of solitary confinement, and that the Adelanto Facility under-reported the number of suicides that actually occurred there.

---

[93] Office of the Inspector General, *Management Alert—Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California*, September 27, 2018, p. 3.

[94] Id. at p. 4 (footnote omitted).

[95] Fischer, A., Gonzalez, P., & Diaz, R., *There Is No Safety Here: The Dangers for People with Mental Illness and Other Disabilities in Immigration Detention at GEO Group's Adelanto ICE Processing Center*. Disability Rights California (2019).

82.     Based on my review of the materials I have been provided, included the
latest version of the *Supplemental Detainee Handbook*, the Adelanto Facility continues
to be structured and operated in these inherently coercive and punitive ways. For
example, there is an extensive list of rule violations that result in detainees being
punished with a wide range of potential punishments, including being placed in solitary
confinement. Detainees are dehumanized by, among other things, being clothed in
colored uniforms (blue, orange, and red) that indicate their "category" or status within
the institution.[96] Their day-to-day lives inside the Facility are extremely limited and
constrained. For example, indoor recreational activities appear to be limited to "cards
and games" and access to television after "morning cleaning duties are completed," with
"[t]elevision settings... controlled by the Officer in each living unit by remote control."[97]
Work assignments are limited to menial tasks that are connected to facility
maintenance—as kitchen workers, janitors, laundry workers, and
"recreation/library/barber").[98] There are six (6) "official counts" per day, during which
detainees must be at "their assigned beds" or will be subject to punishment.

83.     The emphasis on punishment is underscored in the current *Supplemental
Detainee Handbook*. This booklet is distributed to all detainees upon entrance to the
Adelanto Facility and lists 13 different punishments that can be imposed on detainees
for committing "a prohibited act or rule violation."[99] The punishments range from a

---

[96] *Adelanto Supplemental Inmate Handbook* (2018), p. 8-9.

[97] Id. at p. 33.

[98] Id. at p. 9.

[99] Id. at p. 27.

warning to the initiation of criminal proceedings.[100] The offenses are grouped into
categories according to severity, ranging from Category I or "100-Level" violations
(which are the most serious or "Greatest") down to Category IV or "400 Level" violations
(which are the least serious or designated as "Low Moderate").

84.     The list of potential violations is truly extensive: I counted 84 separate
"prohibited acts or rule violations" for which detainees could be punished (including
several of them, such as "conduct that disrupts or interferes with the security or orderly
operation of the facility duties," that are repeated at each level of severity).[101]

85.     The total institutional conditions under which detainees are kept are not
only extremely restrictive but also include severe limitations that are placed on their
contacts with the outside world. Visitation is described as a "privilege," and visitors are
subject to search, are "not allowed to bring or chew gum in the facility," are prohibited
from "passing or attempting to pass any item to a detainee," and "are not allowed to
carry any items into the visiting area." There is a "dress code" as well as a behavior code
(that prohibits, among other things, "prolonged hugging, kissing, French kissing, or
excessive displays of affection").[102] Moreover, detainees are limited to one social visit
per day that cannot last longer than one hour (unless prior approval is provided by the
Facility Administrator).[103]

86.     Detainees can be punished by having even greater restrictions placed on
their visitation. For example, detainees who are held in the East Unit's Restrictive

---

[100] Id. at p. 27.

[101] Id. at pp. 27-31.
[102] Id. at p. 18.

[103] Id. at p. 17.

Housing are permitted only *non-contact* visits (except for a four hour time period on Wednesdays). In the West Unit, visiting schedules alternate between hours when contact visits are allowed and others when only non-contact are permitted, except that detainees on "disciplinary" and "administrative" status are permitted only non-contact visits (except that those on "administrative" status have a four-hour Wednesday time period during which they can have contact visits).

87.     The *Handbook* informs detainees that those who have been "found to have committed a prohibited act or rule violation... may be subject to any combination of the following sanctions" that include Disciplinary Segregation that can last as long as 60 days.[104] Some specific aspects of Disciplinary Restriction are described in the *Handbook*, including the fact that "[r]ecreation will be offered for at least one hour, seven days per week, but may be limited for safety and security of the facility" (which is nowhere defined), "detainees in disciplinary restriction will only receive non-contact visit," and they also lose all commissary privileges.[105] Although the longest period of time the *Handbook* indicates a detainee can be kept in Disciplinary Segregation is 60 days (which, as I have indicated above, is *four times* longer than the 15-day maximum after which the United Nations characterizes the punishment as torture), there does not appear to be any limit on the number of times someone can be subjected to this onerous, harmful, and potentially very dangerous punishment.

88.     The most severe violations (Category I or Greatest offenses) not only include a number of obviously serious infractions but also contain these vague and

---

[104] Id. at p. 27.

[105] Id. at p. 31.

open-ended provisions: "Interfering with a staff member in the performance of duties" and "Conduct that disrupts or interferes with the security and orderly operation of the facility." Although each come with the requirement that this kind of conduct "must be of greatest severity," that term is nowhere defined.[106]

89.     The next level of violation ("Category II or High Offenses") includes such minor things as "horseplay," and "[a]dulteration of food or drink," and also "[e]ncouraging others to participate in a work stoppage or to refuse to work," "[s]igning, circulating or soliciting support for prohibited group petitions," "[a]ny act that could endanger… property," and any ""[a]ttempt to commit any of the above acts…" In addition, detainees are warned that even three or more "low moderate offenses within 90 days" can result in Category II punishments. A Category II punishment can include 30 days of disciplinary restriction (i.e., solitary confinement).

90.     Even the next lower level of infractions, Category III violations (deemed "High Moderate Offenses") can result in a range of severe punishments, including "disciplinary transfer," "disciplinary restriction up to 72 hours," "loss of privileges (e.g., commissary, movies, recreation, etc.)," "[r]emoval from program and/or group activity," and the "impound" of a detainee's personal property.[107] The list of Category III transgressions includes possessing items of property that are "not authorized," "[r]efusal to clean an assigned living area," "insolence," "p]articipating in an unauthorized meeting or gathering," and "[u]nauthorized contact with public."[108]

---

[106] Id. at p. 28.

[107] Id. at p. 29.

[108] Id. at pp. 29-30.

91.     The lowest-level infractions, Category IV violations ("Low Moderate Offenses") cannot result in disciplinary restriction, but may incur any of the other punishments. These offenses include "obscene language," "[m]alingering or feigning illness," "[p]ossessing unauthorized clothing," "[p]ossession of money or currency," "being unsanitary or untidy," or the "attempt to commit" any of these acts.[109]

92.     The punitive terms of the *Detainee Handbook* thus helped to establish and maintain the prison-like nature of the Adelanto environment. In addition, day-to-day operations at the Facility are overseen from a distinctly correctional perspective. The Adelanto Facility "Warden," James Janecka, began his career as a correctional officer in the notorious Texas prison system in 1985.[110] In the four decades before taking over at Adelanto, he was employed in one or another capacity in correctional facilities, including at a state prisons in California, New Mexico, Pennsylvania as well as Texas.[111] He acknowledged that, other than what he referred to as an "annual refresher training," he had no special training to oversee an immigration detention facility and, instead, "managed—from past experience."[112]

---

[109] Id. at pp. 30-31.

[110] The Texas prison system was the subject of a scathing federal district court opinion issued in 1980. See *Ruiz v. Estelle,* 503 F. Supp. 1265 (S.D. Texas 1980). I was an expert witness who toured and inspected the prison system in the mid-1980s, preparing for a subsequent trial about ongoing unconstitutional conditions and the mistreatment of prisoners. The hearing was postponed when Texas prison officials admitted that they were still using a brutal "building tender" system in which certain prisoners ("building tenders") were given authority to physically enforce prison rules and to administer punishments to other prisoners. I continued to monitor conditions there and returned to testify about them in 1999. See *Ruiz v. Johnson*, 37 F. Supp. 2d 855 (S.D. Texas 1999).

[111] Deposition of Warden James Janecka, June 26, 2019, p. 9-10.

[112] Id. at p. 15.

93.     Warden Janecka confirmed that if detainees do not "keep clean and sanitary all commonly accessible areas of the unit including walls, floors, windows, window ledges, showers sinks, microwaves, tables and chairs," then the televisions in their housing unit will be turned off, they will be prohibited from participation in any programs and activities, and they may be subject to future disciplinary sanctions.[113]

94.     The Warden characterized the Work Program in seemingly altruistic terms, not as facility maintenance but rather as a way to "offer these many jobs or opportunities for a detainee to get out of their—or if they can work outside of their living area, to work and learn some new skills, make a $1 a day."[114] Yet it is clear from his other testimony that the Adelanto Facility depends on detainee workers to operate in a normal fashion. For example, when the kitchen was "lacking detainee workers," Adelanto had to resort to "running three chow halls" instead of the normal four.[115] Similarly, when sanitation "slipped backward several notches" at the Facility, Warden Janecka informed his staff that "[w]e need all shifts to start putting detainees to work in the hallways, medical intake, the D-spaces and the hallways leading to the housing units, et cetera."[116] On another occasion, when the Warden toured the Facility and was "totally frustrated with the lack of cleaning" he observed, he ordered staff to suspend "all TV, Xbox and recreation" for the detainees "until the building is clean and presentable."[117]

---

[113] Id. at p. 63.

[114] Id. at p. 201.
[115] Id. at p. 222.

[116] Id. at p. 227.

[117] Id. at p. 230.

95.     As recently as this month, August 11, 2020, the GEO Group's Executive Vice President for Contract Administration, Amber Dawn Martin, testified on behalf of GEO that civil immigration detention was intended to be "not penal in nature," which she understood to mean not like "prison or disciplinary" in the way that Adelanto functioned.[118] Yet apparently this kind of "non-penal" operation at Adelanto could still encompass the handcuffing and pepper-spraying of detainees.[119] In addition, despite the supposedly "non-penal" nature of the Facility, Ms. Martin acknowledged that there were a range of specific "violations" for which detainees could be sanctioned (including being "unsanitary," refusing a staff member's order, or "insolence") and that there were a number of punishments that could be applied, ranging to a "loss of privileges" (e.g., commissary, access to vending machines, movies, and recreations) to solitary confinement—placement in Disciplinary Segregation.[120]

96.     Although Ms. Martin initially seemed uncertain about the actual purpose for which Disciplinary Segregation was used at Adelanto—suggesting that it was segregation that detainees were subjected to "while disciplinary investigation is going on"[121]—she later acknowledged that it could be and was imposed as punishment for a number of different violations.[122] Contrary to the detainee declarations that I read and

---

[118] Deposition of Amber Dawn Martin, Executive Vice President for Contract Administration at the GEO Group, August 11, 2020, p. 97.

[119] Id. at 97.

[120] Id. at 120-121.

[121] Id. at 99.

[122] Id. at 129. Although Ms. Martin also said that Disciplinary Segregation was "rarely used" (id. at 131), she could not quantify by what "rarely" specifically meant (id. at 133).

that I summarize below, Ms. Martin also said that "[i]t's always been GEO's policy not to discipline a detainee for refusing to clean their living area" (which apparently was put into writing in July, 2019).[123] Yet, as I indicated earlier, that sanction (72 hours in Disciplinary Segregation) is explicitly listed in the *Detainee Handbook* as one of the sanctions that can be imposed when a detainee fails to clean his or her living area. It is also a sanction that Dr. Kropf explicitly acknowledged was employed for this violation at Adelanto (although, as I noted earlier, he dismissed it as unproblematic because, he claimed, it did not cause serious psychological harm).

97.     There are also factual disputes and inconsistencies in the way Adelanto Facility officials describe the nature and operation of the Facility's "voluntary" work program as opposed to the way the detainees themselves describe it. Dr. Kropf is correct that "[a]s expressed in the name of the program, detainee participation in the Voluntary Work Program is voluntary."[124] Unfortunately, based on the declarations and depositions that I reviewed, the only thing that may be "voluntary" about the Adelanto Work Program is its name.

98.     In fact, I have read a series of declarations by current or former detainees at the Adelanto Facility that, if accurate, call into question the nature and operation of Adelanto's work program and suggest that it is anything but voluntary. Although they differ in some minor details, all of the declarations convey much the same essential points: the detainees' work assignments in the GEO "Work Program" are entirely controlled by GEO; the detainees are not allowed to seek work elsewhere, outside the

---

[123] Id. at 133

[124] Kropf Report, p. 2.

Adelanto Facility; and each person's work assignment from GEO staff requires them to engage in a variety of menial, facility-maintenance tasks (such as food service, janitorial services, barbershop) in which they are typically required to work at least four hour shifts (sometimes much longer), often seven days a week, for a "salary" of $1 per day.

99.    In addition, the declarations I reviewed explained the basic institutional contingency that led the detainees to participate in the Work Program. On the one hand, they reported very much needing the extremely meager renumeration they received ($1 per day). On the other hand, they were responding to the implicit and explicit threat of severe punishment if they declined. That is, on the one hand, detainees noted that the scant wages they received were needed in order to purchase a number of essential things that GEO did not provide them, at least not in adequate amounts (e.g., food and personal hygiene items). On the other hand, per their reading of the *Supplemental Detainee Handbook* and their own direct observations, they were believed that, if they did not participate, they would be punished (including by potentially being placed in solitary confinement).

100.   For example, Raul Novoa was involuntarily detained at the Adelanto Facility for several years and participated in the GEO Work Program while he was there. GEO trained, supervised, and oversaw his work in the course of his participation in this program. He was not permitted to seek employment in any job outside the facility. Mr. Novoa reported working daily four-hour shifts on a janitorial crew, as well as up to as much as 10 hours a day as a barber; in both jobs he worked seven days per week. He was paid $1 per day, no matter what kind of work he did or how many hours he worked.[125]

---

[125] Declaration of Raul Novoa, September 11, 2019, p. 2.

101.     Based on his reading of the *Detainee Handbook*, Mr. Novoa was afraid that he would be punished if he refused to work, and that he would be subject to being placed in solitary confinement. He reported being explicitly threatened with Disciplinary Segregation (i.e., solitary confinement) for refusing to work, for encouraging others to refuse to work, and for questioning his sub-minimum wage payments for his work. In addition to these threats, he felt "harassed, intimidated, threatened, and embarrassed" by the punishment that he did receive—being moved to a new housing unit away from his peers and friends, having his cell and property "tossed" by detention officers.[126]

102.     Mr. Novoa acknowledged the fundamentally "carrot and stick" nature of the coercive contingency to which he was exposed: he both feared the punishment with which he was threatened and needed the meager pay he received in order to obtain daily necessities such as "food, bottled water, shampoo, lotion, soap, sunscreen, and even shoes" that GEO would not provide and that he could not obtain unless he purchased them. As he said: "I knew that if I stopped participating in the Work Program, I would not have access to these items."[127]

103.     Jaime Campos Fuentes was involuntarily detained at the Adelanto Facility for more than a year and participated in the GEO Work Program while he was there. GEO trained, supervised, and oversaw his work in the course of his participation in this program. He was not permitted to seek employment in any job outside the facility. He worked as a janitor at the facility, on daily three hours shifts (and sometimes multiple

---

[126] Id. at p. 2-3.

[127] *Id.* at p. 3.

shifts), and also as a laundry worker, working three hour shifts. In each case, he worked seven days per week.[128] He was paid a total of $1 per day for his labor. He participated in the Work Program to "buy food and personal hygiene items from commissary" that he otherwise would not have been provided by Adelanto.[129] He also understood that, if he refused to work as instructed by GEO officials, he was subject to their punishment, including being placed in solitary confinement.[130] He also reported that GEO officials "would require us to clean bathrooms, showers, sinks, and furniture" at the facility and, if they refused, the could be locked in their cell, have attorney and personal visits suspended, or be prohibited "from interacting with other detained immigrants." He understood the punishment for refusing the staff's orders to work could include being placed in solitary confinement.[131]

104.    Abdiaziz Karim is an asylum seeker from Somalia who was detained at the Adelanto Facility from August, 2017 through August, 2019. I understand he has been deported. He worked as a porter in the GEO Work Program, cleaning windows, floors, showers, and communal areas.[132] Mr. Karim worked up to seven days a week and, except for the first three months of working (when GEO required him to work for free), he was paid $1.00 a day for this labor. In addition, at times Mr. Karim was instructed by Adelanto staff to perform other work for free. Mr. Karim observed that if detainees

---

[128] Declaration of Jaime Campos Fuentes, September 16, 2019, p. 2.

[129] Id. at p. 2.

[130] Id. at p. 3.

[131] Id. at p. 3.

[132] Declaration of Abdiaziz Karim, July 26, 2019, p. 2.

refused to perform this uncompensated labor, GEO officials would turn off the TV and Xbox and prohibit detainees from using the telephones or the showers, evacuate the day room, and force them to "remain in their cells."[133] Mr. Karim participated in the Work Program to obtain necessities—food and personal hygiene items—that GEO otherwise does not provide, and because he knew from the Detainee Handbook that, if he does not, he is "subject to disciplinary action, including solitary confinement."[134]

105.    I found no evidence in these and other materials I reviewed to suggest that the detainees' complaints and characterizations of the coercion they experienced were fabricated. Dr. Kropf does not offer any. Yet, despite explicitly stating that it was not his intention to "trivialize" the allegations the detainees made, or "impugn their sincerity"— and setting aside his later dismissal of the detainees' complaints of deprivation by saying that, after all, "experiences of hunger and thirst are not necessarily evidence of deprivation"[135]—Dr. Kropf dismisses their basic claims of coercion anyway, characterizing them as mere "perceptions"—indeed, *mistaken* perceptions— "perceiv[ing] a threat when no threat was made."[136]

106.    Dr. Kropf's belabored argument that the detainees' representations of the coercive contingencies that they faced at the Adelanto Facility amounted to little more than perceiving a threat "when no threat was made or actually existed"[137] completely

---

[133] Declaration of Abdiaziz Karim, July 26, 2019, p. 3.

[134] Declaration of Abdiaziz Karim, July 26, 2019, p. 3.
[135] Kropf Report, p. 26. Hunger and thirst, he instructs us, are also merely "subjective experiences" that are "not definitive of evidence of deprivation." At p. 27.

[136] Kropf Report, p. 24.

[137] Kropf Report, 25.

ignores the fact that the rules and regulations at Adelanto explicitly *do* provide for serious sanctions if and when detainees fail to comply with the elaborate set of "behavioral expectations" that are laid out in the *Supplemental Detainee Handbook*, and those sanctions *are* imposed. The many enumerated sanctions include, as I have said, and as Dr. Kropf himself has repeatedly acknowledged, solitary confinement. Dr. Kropf asserts that all the detainees have to do is to comply—after all, as he says, they are "afford[ed] the opportunity to abstain from potential misconduct and avoid attendant sanctions."[138] But that is the very essence of institutional control and precisely the inherent coercion to which the Adelanto detainees are being subjected: comply or be punished.

107.    The detainees' statements about their feelings and fears are clearly reasonable under the circumstances as I understand and have described them—ones in which a highly vulnerable population is involuntarily confined inside a heavily sanction-laden, inherently coercive environment. Dr. Kropf is certainly correct that "[p]erceptions of threat and deprivation are subjective,"[139] but that does not in any way diminish their power over people's behavior. Moreover, in this case, as I have noted, the threats and deprivations are not merely subjective; at Adelanto they are objective as well.

108.    Thus, it clearly *does* appear, at least from the from the declarations and depositions of detainees that I read, that they *feel* they are being threatened. But it is equally clear that the detainees *are* being subjected to actual deprivations. The long list

---

[138] Kropf Report, p. 25-26.

[139] Kropf Report, p. 3.

of punishments imposed on them for failing to meet the "behavioral expectations" of staff, including being placed in solitary confinement, are not mere "subjective perceptions"; they are written in the *Supplemental Detainee Handbook*, apparently posted throughout the Facility, acknowledged by GEO officials, and actually imposed on detainees. Dr. Kropf is hard-pressed to dispute these facts and it is difficult to understand why he refuses to concede their potential power over this vulnerable population.

109.    Dr. Kropf devotes a section of his report to praising the value of work in institutional settings, citing mostly to published studies of prison work programs. His reference to this literature is unfortunately inapt. I certainly agree with Dr. Kropf that there is solid evidence that work that prisoners are allowed to engage certainly can "promote appropriate institutional conduct,"[140] and even enhance functioning. However, in this context, it is important not to exaggerate the true nature of the "numerous benefits" Dr. Kropf claims are brought about by the kind of work to which Adelanto detainees have access—largely to engage in menial kitchen and janitorial services.  There is little or no evidence that the "vocational instruction or apprenticeship training" to which he refers in the prison work programs that have been studied take place anywhere at the Adelanto Facility.[141]

110.    Dr. Kropf cites statistics showing that a high percentage of correctional facilities in the United States "offered" work programs,[142] which is true, and that some of

---

[140] Kropf Report, p. 2.

[141] Kropf Report, p. 5.

[142] Kropf Report, p. 3.

the work programs "promote employability following release,"[143] which is also true. Yet, these statistics and research findings are irrelevant to the case at hand. The crux of the issue here is not whether truly voluntary work of a certain kind *could be* beneficial and, if so, how much and to whom, but rather whether the nature and effect of the coercive contingencies that are used at Adelanto to "persuade" Facility detainees to participate makes the work "involuntary" (therefore coercive and not beneficial).

111.    More to the point, Dr. Kropf fails to cite any studies on the alleged benefits of prison work programs, including research on the "mental health benefits of work,"[144] in which participants were paid $1/day to engage in work that was limited to menial labor. He similarly fails to cite any studies on "voluntary" work programs in which inmates were threatened with discipline (that might include solitary confinement) if they did not participate.

112.    In addition, this entire section of Dr. Kropf's report appears to be based on the misconception that immigration detainees are in need of vocational training, enhanced employability, and what he terms "soft skills" (such as punctuality), in the same the way that chronically un- and under-employed jail and prison inmates often are. He presents absolutely no evidence that immigration detainees lack vocational skills, employment opportunities in the free world, or lack "soft skills" of any kind. Not only do Adelanto Facility detainees report being coerced into participating in a "voluntary" work program that is anything but that, but in addition none of the alleged benefits of prison work programs that Dr. Kropf cites likely apply or are valuable to

---

[143] Kropf Report, p. 5.

[144] Kropf Report, p. 7.

them. Unlike even jail inmates and prisoners who are sometimes afforded opportunities
to participate in voluntary work programs that may teach them useful skills that they do
not have and that might assist them in obtaining post-prison employment, Adelanto's
detainees appear to be forced to participate in an involuntary work program that does
not offer long-term benefits of any kind.

## VI.        Conclusion

113.    For the reasons I have stated in the above paragraphs, I believe that the
opinions in this matter that have been expressed by Dr. Jeffrey Kropf are based on an
inadequate consideration of the full range of available facts in this case, reflect an ill-
informed view of the nature and psychological impact of total institutional life, reveal a
deeply flawed understanding of the harmfulness of solitary confinement, and
demonstrate an unjustifiable willingness to minimize or dismiss much of the available
firsthand information about the actual operation and effects of the Adelanto ICE
Processing Center.

114.    Among other things, Dr. Kropf fails to recognize the fact that immigration
detention facilities like the Adelanto Facility are constructed and operated very much
like penal institutions. Failing to recognize this, he then ignores the many
dehumanizing, authoritarian, and punitive characteristics of the kind of environment
that has been created inside Adelanto. He is unwilling or unable to recognize the fact
that Adelanto is not only a painful place in which to live but also an inherently coercive
one.

115.    The coercive nature of the Adelanto Facility very much affects and
conditions the behavior of the detainees housed there and, as they have reported, it

greatly influences whatever "choices" they are able to make. This is particularly true for
an otherwise especially vulnerable population of immigration detainees like those
housed at Adelanto. These coercive conditions and contingencies are real—actual rather
than merely "subjective" misunderstandings—and they are described not only by the
personal accounts of the detainees but also reflected in the *Supplemental Detainee
Handbook* that is intended to govern numerous aspects of the detainees' behavior, as
acknowledged even by Facility staff and GEO officials.

116.    Finally, Dr. Kropf's knowledge of and assertions about the harmfulness of
solitary confinement reflect a set of uninformed, outlier views on the topic. In fact,
knowledgeable experts now know that placing people in solitary confinement puts them
at significant risk of serious psychological harm. That harm can and sometimes does
occur very early in the course of the experience, is potentially harmful for everyone
exposed but especially to the mentally ill, and the resulting damage can be long-lasting.
Indeed, when it leads to self-harm and suicide, the consequences can be permanent and
even fatal. There is a large, empirically based, and theoretically coherent scientific body
of knowledge that Dr. Kropf mischaracterizes, does not know about, or chooses to
ignore. The painful and even dangerous nature of solitary confinement and the fact that
it is just one of the many threatened and imposed punishments that are available to
sanction Adelanto detainees for failing to comply with the orders, instructions, and
expectations of Facility staff underscore and buttress the coercive power of the total
institutional environment that may, and apparently does, compel their behavior.

I hold the above stated opinions to a reasonable degree of scientific certainty.

Craig Haney, Ph.D., J.D.          August 31, 2020          Santa Cruz, California

# EXHIBIT 1

CURRICULUM VITAE

Craig William Haney
Distinguished Professor of Psychology
UC Presidential Chair, 2015-2018
University of California, Santa Cruz 95064

Co-Director,
UC Consortium on Criminal Justice Healthcare

Co-Director,
AMEND at UCSF: US-Norway Correctional Change/Exchange Program

home address:      317 Ocean View Ave.
                   Santa Cruz, California 95062
phone:             (831) 459-2153
fax:               (831) 425-3664
email:             psylaw@ucsc.edu

## PREVIOUS EMPLOYMENT

| | |
|---|---|
| 2015-2018 | University of California Presidential Chair |
| 2014-present | Distinguished Professor of Psychology, University of California, Santa Cruz |
| 1985-2014 | University of California, Santa Cruz, Professor of Psychology |
| 1981-85 | University of California, Santa Cruz, Associate Professor of Psychology |
| 1978-81 | University of California, Santa Cruz, Assistant Professor of Psychology |
| 1977-78 | University of California, Santa Cruz, Lecturer in Psychology |
| 1976-77 | Stanford University, Acting Assistant Professor of Psychology |

EDUCATION

| | |
|---|---|
| 1978 | Stanford Law School, J.D. |
| 1978 | Stanford University, Ph.D. (Psychology) |
| 1972 | Stanford University, M.A. (Psychology) |
| 1970 | University of Pennsylvania, B.A. |

HONORS AWARDS GRANTS

| | |
|---|---|
| 2018 | Emerald Literati Award for "Outstanding Paper" (for "Reducing the Use and Impact of Solitary Confinement in Corrections"). |
| 2016 | Vera Institute of Justice "Reimagining Prisons" Initiative Advisory Council. |
| | Psychology Department "Most Inspiring Lecturer" |
| 2015 | University of California Presidential Chair (2015-2018 Term) |
| | Martin F. Chemers Award for Outstanding Research in Social Science |
| | Excellence in Teaching Award (Academic Senate Committee on Teaching). |
| | President's Research Catalyst Award for "UC Consortium on Criminal Justice Healthcare" (with Brie Williams and Scott Allen). |
| | Vera Institute of Justice "Safe Alternatives to Segregation" (SAS) Initiative Advisory Council. |
| | Who's Who in Psychology (Top 20 Psychology Professors in California) [http://careersinpsychology.org/psychology-degrees-schools-employment-ca/#ca-psych-prof] |
| 2014 | Distinguished Faculty Research Lecturer, University of California, Santa Cruz. |
| 2013 | Distinguished Plenary Speaker, American Psychological Association Annual Convention. |

| | |
|---|---|
| 2012 | Appointed to National Academy of Sciences Committee to Study the Causes and Consequences of High Rates of Incarceration in the United States. |
| | Invited Expert Witness, United States Senate, Judiciary Committee. |
| 2011 | Edward G. Donnelly Memorial Speaker, University of West Virginia Law School. |
| 2009 | Nominated as American Psychological Foundation William Bevan Distinguished Lecturer. |
| | Psi Chi "Best Lecturer" Award (by vote of UCSC undergraduate psychology majors). |
| 2006 | Herbert Jacobs Prize for Most Outstanding Book published on law and society in 2005 (from the Law & Society Association, for <u>Death by Design</u>). |
| | Nominated for National Book Award (by American Psychological Association Books, for <u>Reforming Punishment: Psychological Limits to the Pains of Imprisonment</u>). |
| | "Dream course" instructor in psychology and law, University of Oklahoma. |
| 2005 | Annual Distinguished Faculty Alumni Lecturer, University of California, Santa Cruz. |
| | Arthur C. Helton Human Rights Award from the American Immigration Lawyers Association (co-recipient). |
| | Scholar-in-Residence, Center for Social Justice, Boalt Hall School of Law (University of California, Berkeley). |
| 2004 | "Golden Apple Award" for Distinguished Teaching, awarded by the Social Sciences Division, University of California, Santa Cruz. |
| | National Science Foundation Grant to Study Capital Jury Decision-making |
| 2002 | Santa Cruz Alumni Association Distinguished Teaching Award, University of California, Santa Cruz. |
| | United States Department of Health & Human Services/Urban Institute, "Effects of Incarceration on Children, Families, and Low-Income Communities" Project. |

American Association for the Advancement of Science/American Academy of Forensic Science Project: "Scientific Evidence Summit" Planning Committee.

Teacher of the Year (UC Santa Cruz Re-Entry Students' Award).

2000      Invited Participant White House Forum on the Uses of Science and Technology to Improve National Crime and Prison Policy.

Excellence in Teaching Award (Academic Senate Committee on Teaching).

Joint American Association for the Advancement of Science-American Bar Association Science and Technology Section National Conference of Lawyers and Scientists.

1999      American Psychology-Law Society Presidential Initiative Invitee ("Reviewing the Discipline: A Bridge to the Future")

National Science Foundation Grant to Study Capital Jury Decision-making (renewal and extension).

1997      National Science Foundation Grant to Study Capital Jury Decision-making.

1996      Teacher of the Year (UC Santa Cruz Re-Entry Students' Award).

1995      Gordon Allport Intergroup Relations Prize (Honorable Mention)

Excellence in Teaching Convocation, Social Sciences Division

1994      Outstanding Contributions to Preservation of Constitutional Rights, California Attorneys for Criminal Justice.

1992      Psychology Undergraduate Student Association Teaching Award

SR 43 Grant for Policy-Oriented Research With Linguistically Diverse Minorities

1991      Alumni Association Teaching Award ("Favorite Professor")

1990      Prison Law Office Award for Contributions to Prison Litigation

1989      UC Mexus Award for Comparative Research on Mexican Prisons

4

| 1976 | Hilmer Oehlmann Jr. Award for Excellence in Legal Writing at Stanford Law School |
|------|------|
| 1975-76 | Law and Psychology Fellow, Stanford Law School |
| 1974-76 | Russell Sage Foundation Residency in Law and Social Science |
| 1974 | Gordon Allport Intergroup Relations Prize, Honorable Mention |
| 1969-71 | University Fellow, Stanford University |
| 1969-74 | Society of Sigma Xi |
| 1969 | B.A. Degree Magna cum laude with Honors in Psychology |
| | Phi Beta Kappa |
| 1967-1969 | University Scholar, University of Pennsylvania |

UNIVERSITY SERVICE AND ADMINISTRATION

| 2010-2016 | Director, Legal Studies Program |
|------|------|
| 2010-2014 | Director, Graduate Program in Social Psychology |
| 2009 | Chair, Legal Studies Review Committee |
| 2004-2006 | Chair, Committee on Academic Personnel |
| 1998-2002 | Chair, Department of Psychology |
| 1994-1998 | Chair, Department of Sociology |
| 1992-1995 | Chair, Legal Studies Program |
| 1995 (Fall) | Committee on Academic Personnel |
| 1995-1996 | University Committee on Academic Personnel (UCAP) |
| 1990-1992 | Committee on Academic Personnel |
| 1991-1992 | Chair, Social Science Division Academic Personnel Committee |

5

1984-1986          Chair, Committee on Privilege and Tenure


WRITINGS AND OTHER CREATIVE ACTIVITIES IN PROGRESS

Books:

Counting Casualties in the War on Prisoners: Toward a Just and Lasting Peace (working title, in preparation).

Articles:

"The Psychological Foundations of Capital Mitigation: Why Social Historical Factors Are Central to Assessing Culpability," in preparation.


PUBLISHED WRITINGS AND CREATIVE ACTIVITIES

Books

2020          Criminality in Context: The Psychological Foundations of Criminal Justice Reform. APA Books, in press.

2014          The Growth of Incarceration in the United States: Exploring the Causes and Consequences (with Jeremy Travis, Bruce Western, et al.). [Report of the National Academy of Sciences Committee on the Causes and Consequences of High Rates of Incarceration in the United States.] Washington, DC: National Academy Press.

2006          Reforming Punishment: Psychological Limits to the Pains of Imprisonment, Washington, DC: American Psychological Association Books.

2005          Death by Design: Capital Punishment as a Social Psychological System. New York: Oxford University Press.


Monographs and Technical Reports

1989          Employment Testing and Employment Discrimination (with A. Hurtado). Technical Report for the National Commission on Testing and Public Policy. New York: Ford Foundation.

<u>Articles in Professional Journals and Book Chapters</u>

2019     "Continuing to Acknowledge the Power of Dehumanizing Environments: Responding to Haslam, et al. (2019) and Le Texier (2019)" (with Philip Zimbardo), <u>American Psychologist</u>, in press.

"Afterword," in Robert Johnson, <u>Condemned to Die: Life Under Sentence of Death</u> (pp. 136-141). Second Edition. New York: Routledge.

"Changing correctional culture: Exploring the role of U.S.-Norway exchange in placing health and well-being at the center of U.S. prison reform" (with Cyrus Ahalt, Brie Williams, and Kim Ekhaugen), <u>American Journal of Public Health</u>, in press.

"Solitary Confinement, Loneliness, and Psychological Harm," in Jules Lobel and Peter Scharff Smith (Eds.), <u>Solitary Confinement: Effects, Practices, and Pathways to Reform</u>. New York: Oxford University Press, in press.

2018     "Restricting the Use of Solitary Confinement," <u>Annual Review of Criminology</u>, <u>1</u>, 285-310.

"Death Qualification in Black and White: Racialized Decision-Making and Death-Qualified Juries" (with Mona Lynch), <u>Law & Policy</u>, in press.

"Balancing the Rights to Protection and Participation: A Call for Expanded Access to Ethically Conducted Correctional Research. <u>Journal of General Internal Medicine</u>, 33(22). DOI: 10.1007/s11606-018-4318-9.

"The Plight of Long-Term Mentally-Ill Prisoners" (with Camille Conrey and Roxy Davis), in Kelly Frailing and Risdon Slate (Eds.), <u>The Criminalization of Mental Illness</u> (pp. 163-180). Durham, NC: Carolina Academic Press.

"The Psychological Effects of Solitary Confinement: A Systematic Critique," <u>Crime and Justice</u>, <u>47</u>, 365-416.

"The Media's Impact on the Right to a Fair Trial: A Content Analysis of Pretrial Publicity in Capital Cases (with Shirin Bakhshay), <u>Psychology, Public Policy, and Law</u>, <u>24</u>, 326-346.

7

2017     "Mechanisms of Moral Disengagement and Prisoner Abuse" (with Joanna Weill). <u>Analyses of Social Issues and Public Policy</u>, <u>17</u>, 286-318.

"'Madness' and Penal Confinement: Observations on Mental Illness and Prison Pain," <u>Punishment and Society</u>, <u>19</u>, 310-326.

"Contexts of Ill-Treatment: The Relationship of Captivity and Prison Confinement to Cruel, Inhuman, or Degrading Treatment and Torture" (with Shirin Bakhshay), in Metin Başoğlu (Ed.), <u>Torture and Its Definition in International Law: An Interdisciplinary Approach</u> (pp.139-178). New York: Oxford.

Special Issue: "Translating Research into Policy to Advance Correctional Health" (guest editor with B. Williams, C. Ahalt, S. Allen, & J. Rich), Part II, <u>International Journal of Prisoner Health</u>, <u>13</u>, 137-227.

"Reducing the Use and Impact of Solitary Confinement in Corrections" (with Cyrus Ahalt, Sarah Rios, Matthew Fox, David Farabee, and Brie Williams), <u>International Journal of Prisoner Health</u>, <u>13</u>, 41-48.

2016     "Examining Jail Isolation: What We Don't Know Can Be Profoundly Harmful" (with Joanna Weill, Shirin Bakhshay, and Tiffany Winslow), <u>The Prison Journal</u>, <u>96</u>, 126-152.

"On Structural Evil: Disengaging From Our Moral Selves," Review of the book <u>Moral Disengagement: How People Do Harm and Live With Themselves</u>, by A. Bandura], <u>PsycCRITIQUES</u>, 61(8).

2015     "When Did Prisons Become Acceptable Mental Healthcare Facilities?," Report of the Stanford Law School Three Strikes Project (with Michael Romano et al.) [available at: http://law.stanford.edu/wp-content/uploads/sites/default/files/child-page/632655/doc/slspublic/Report_v12.pdf ].

"Emotion, Authority, and Death: (Raced) Negotiations in Capital Jury Negotiations" (with Mona Lynch), <u>Law & Social Inquiry</u>, <u>40</u>, 377-405.

"Prison Overcrowding," in B. Cutler & P. Zapf (Eds.), <u>APA Handbook of Forensic Psychology</u> (pp. 415-436). Washington, DC: APA Books.

"The Death Penalty" (with Joanna Weill & Mona Lynch), in B. Cutler & P. Zapf (Eds.), <u>APA Handbook of Forensic Psychology</u> (pp. 451-510). Washington, DC: APA Books.

"'Prisonization' and Latinas in Alternative High Schools" (with Aida Hurtado & Ruby Hernandez), in J. Hall (Ed.), <u>Routledge Studies in Education and Neoliberalism: Female Students and Cultures of Violence in the City</u> (pp. 113-134). Florence, KY: Routledge.

2014    "How Healthcare Reform Can Transform the Health of Criminal Justice-Involved Individuals" (with Josiah Rich, et al.), <u>Health Affairs</u>, <u>33:3</u> (March), 1-6.

2013    "Foreword," for H. Toch, Organizational Change Through Individual Empowerment: Applying Social Psychology in Prisons and Policing. Washington, DC: APA Books (in press).

"Foreword," for J. Ashford & M. Kupferberg, <u>Death Penalty Mitigation: A Handbook for Mitigation Specialists, Investigators, Social Scientists, and Lawyers</u>. New York: Oxford University Press.

2012    "Politicizing Crime and Punishment: Redefining 'Justice' to Fight the 'War on Prisoners,'" <u>West Virginia Law Review</u>, <u>114</u>, 373-414.

"Prison Effects in the Age of Mass Incarceration," <u>Prison Journal</u>, <u>92</u>, 1-24.

"The Psychological Effects of Imprisonment," in J. Petersilia & K. Reitz (Eds.), <u>Oxford Handbook of Sentencing and Corrections</u> (pp. 584-605). New York: Oxford University Press.

2011    "The Perversions of Prison: On the Origins of Hypermasculinity and Sexual Violence in Confinement," <u>American Criminal Law Review</u>, <u>48</u>, 121-141. [Reprinted in: S. Ferguson (Ed.), <u>Readings in Race, Gender, Sexuality, and Social Class</u>. Sage Publications (2012).]

"Mapping the Racial Bias of the White Male Capital Juror: Jury Composition and the 'Empathic Divide'" (with Mona Lynch), <u>Law and Society Review</u>, <u>45</u>, 69-102.

9

"Getting to the Point: Attempting to Improve Juror Comprehension of Capital Penalty Phase Instructions" (with Amy Smith), Law and Human Behavior, 35, 339-350.

"Where the Boys Are: Macro and Micro Considerations for the Study of Young Latino Men's Educational Achievement" (with A. Hurtado & J. Hurtado), in P. Noguera & A. Hurtado (Eds.), Understanding the Disenfranchisement of Latino Males: Contemporary Perspectives on Cultural and Structural Factors (pp. 101-121). New York: Routledge Press.

"Looking Across the Empathic Divide: Racialized Decision-Making on the Capital Jury" (with Mona Lynch), Michigan State Law Review, 2011, 573-608.

2010    "Demonizing the 'Enemy': The Role of Science in Declaring the 'War on Prisoners,'" Connecticut Public Interest Law Review, 9, 139-196.

"Hiding From the Death Penalty," Huffington Post, July 26, 2010 [www.huffingtonpost.com/craig-haney/hiding-from-the-death-pen-pen_b_659940.html]; reprinted in Sentencing and Justice Reform Advocate, 2, 3 (February, 2011).

2009    "Capital Jury Deliberation: Effects on Death Sentencing, Comprehension, and Discrimination" (with Mona Lynch), Law and Human Behavior, 33, 481-496.

"The Social Psychology of Isolation: Why Solitary Confinement is Psychologically Harmful," Prison Service Journal UK (Solitary Confinement Special Issue), Issue 181, 12-20. [Reprinted: California Prison Focus, #36, 1, 14-15 (2011).]

"The Stanford Prison Experiment," in John Levine & Michael Hogg (Eds.), Encyclopedia of Group Processes and Intergroup Relations. Thousand Oaks, CA: Sage Publications.

"Media Criminology and the Death Penalty," DePaul Law Review, 58, 689-740. (Reprinted: Capital Litigation Update, 2010.)

"On Mitigation as Counter-Narrative: A Case Study of the Hidden Context of Prison Violence," University of Missouri-Kansas City Law Review, 77, 911-946.

10

"Persistent Dispositionalism in Interactionist Clothing: Fundamental Attribution Error in Explaining Prison Abuse," (with P. Zimbardo), Personality and Social Psychology Bulletin, 35, 807-814.

2008 "Counting Casualties in the War on Prisoners," University of San Francisco Law Review, 43, 87-138.

"Evolving Standards of Decency: Advancing the Nature and Logic of Capital Mitigation," Hofstra Law Review, 36, 835-882.

"A Culture of Harm: Taming the Dynamics of Cruelty in Supermax Prisons," Criminal Justice and Behavior, 35, 956-984.

"The Consequences of Prison Life: Notes on the New Psychology of Prison Effects," in D. Canter & R. Zukauskiene (Eds.), Psychology and Law: Bridging the Gap (pp. 143-165). Burlington, VT: Ashgate Publishing.

"The Stanford Prison Experiment," in J. Bennett & Y. Jewkes (Eds.), Dictionary of Prisons (pp. 278-280). Devon, UK: Willan Publishers.

"Capital Mitigation," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 60-63). Volume I. Thousand Oaks, CA: Sage Publications.

Death Qualification of Juries," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 190-192). Volume I. Thousand Oaks, CA: Sage Publications.

"Stanford Prison Experiment," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 756-757) (with P. Zimbardo). Volume II. Thousand Oaks, CA: Sage Publications.

"Supermax Prisons," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 787-790). Volume II. Thousand Oaks, CA: Sage Publications.

2006 "The Wages of Prison Overcrowding: Harmful Psychological Consequences and Dysfunctional Correctional Reactions," Washington University Journal of Law & Policy, 22, 265-293. [Reprinted in: N. Berlatsky, Opposing Viewpoints: America's Prisons. Florence, KY: Cengage Learning, 2010.]

11

"Exonerations and Wrongful Condemnations: Expanding the Zone of Perceived Injustice in Capital Cases," <u>Golden Gate Law Review</u>, <u>37</u>, 131-173.

"Preface," D. Jones (Ed.), <u>Humane Prisons</u>. San Francisco, CA: Radcliffe Medical Press.

2005    "The Contextual Revolution in Psychology and the Question of Prison Effects," in Alison Liebling and Shadd Maruna (Eds.), <u>The Effects of Imprisonment </u>(pp. 66-93). Devon, UK: Willan Publishing.

"Achieving Educational Equity: Beyond Individual Measures of Merit," (with A. Hurtado), <u>Harvard Journal of Hispanic Policy</u>, <u>17</u>, 87-92.

"Conditions of Confinement for Detained Asylum Seekers Subject to Expedited Removal," in M. Hetfield (Ed.), <u>Report on Asylum Seekers in Expedited Removal</u>. Volume II: Expert Reports. Washington, DC: United States Commission on International Religious Freedom.

2004    "Special Issue on the Death Penalty in the United States" (co-edited with R. Weiner), <u>Psychology, Public Policy, and Law</u>, <u>10</u>, 374-621.

"Death Is Different: An Editorial Introduction" (with R. Wiener), <u>Psychology, Public Policy, and Law</u>, <u>10</u>, 374-378.

"The Death Penalty in the United States: A Crisis of Conscience" (with R. Wiener), <u>Psychology, Public Policy, and Law</u>, <u>10</u>, 618-621.

"Condemning the Other in Death Penalty Trials: Biographical Racism, Structural Mitigation, and the Empathic Divide," <u>DePaul Law Review</u>, <u>53</u>, 1557-1590.

"Capital Constructions: Newspaper Reporting in Death Penalty Cases" (with S. Greene), <u>Analyses of Social Issues and Public Policy (ASAP)</u>, <u>4</u>, 1-22.

"Abu Ghraib and the American Prison System," <u>The Commonwealth</u>, <u>98 (#16)</u>, 40-42.

"Disciplinary Segregation," in Mary Bosworth (Ed.), <u>Encyclopedia of U.S. Prisons and Correctional Facilities</u> (240-244). Volume 1. Thousand Oaks, CA: Sage Publications.

"Super-Maximum Secure Prisons," in Mary Bosworth (Ed.), Encyclopedia of U.S. Prisons and Correctional Facilities (pp. 938-944). Volume 2. Thousand Oaks, CA: Sage Publications.

2003   "Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement," Crime & Delinquency (special issue on mental health and the criminal justice system), 49, 124-156. [Reprinted in: Roesch, R., & Gagnon, N. (Eds.), Psychology and Law: Criminal and Civil Perspectives. Hampshire, UK: Ashgate (2007).]

"The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment," in Travis, J., & Waul, M. (Eds.), Prisoners Once Removed: The Impact of Incarceration and Reentry on Children, Families, and Communities (pp. 33-66). Washington, DC: Urban Institute Press.

"Comments on "Dying Twice": Death Row Confinement in the Age of the Supermax," Capital University Law Review.

2002   "Making Law Modern: Toward a Contextual Model of Justice, Psychology, Public Policy, and Law, 7, 3-63.

"Psychological Jurisprudence: Taking Psychology and Law into the Twenty-First Century," (with John Darley, Sol Fulero, and Tom Tyler), in J. Ogloff (Ed.), Taking Psychology and Law into the Twenty-First Century (pp. 35-59). New York: Kluwer Academic/ Plenum Publishing.

"Science, Law, and Psychological Injury: The Daubert Standards and Beyond," (with Amy Smith), in Schultz, I., Brady, D., and Carella, S., The Handbook of Psychological Injury (pp. 184-201). Chicago, IL: American Bar Association. [CD-ROM format]

2001   "Vulnerable Offenders and the Law: Treatment Rights in Uncertain Legal Times" (with D. Specter). In J. Ashford, B. Sales, & W. Reid (Eds.), Treating Adult and Juvenile Offenders with Special Needs (pp. 51-79). Washington, D.C.: American Psychological Association.

"Afterword," in J. Evans (Ed.), Undoing Time (pp. 245-256). Boston, MA: Northeastern University Press.

13

2000        "Discrimination and Instructional Comprehension: Guided Discretion, Racial Bias, and the Death Penalty" (with M. Lynch), Law and Human Behavior, 24, 337-358.

"Cycles of Pain: Risk Factors in the Lives of Incarcerated Women and Their Children," (with S. Greene and A. Hurtado), Prison Journal, 80, 3-23.

1999        "Reflections on the Stanford Prison Experiment: Genesis, Transformations, Consequences ('The SPE and the Analysis of Institutions')," In Thomas Blass (Ed.), Obedience to Authority: Current Perspectives on the Milgram Paradigm (pp. 221-237). Hillsdale, NJ: Erlbaum.

"Ideology and Crime Control," American Psychologist, 54, 786-788.

1998        "The Past and Future of U.S. Prison Policy: Twenty-Five Years After the Stanford Prison Experiment," (with P. Zimbardo), American Psychologist, 53, 709-727. [Reprinted in special issue of Norweigian journal as: USAs fengselspolitikk i fortid og fremtid, Vardoger, 25, 171-183 (2000); in H. Tischler (Ed.), Debating Points: Crime and Punishment. Englewood Cliffs, NJ: Prentice-Hall (2001); Annual Editions: Criminal Justice. Guilford, CT: Dushkin/McGraw-Hill, in press; Herman, Peter (Ed.), The American Prison System (pp. 17-43) (Reference Shelf Series). New York: H.W. Wilson (2001); and in Edward Latessa & Alexander Holsinger (Eds.), Correctional Contexts: Contemporary and Classical Readings. Fourth Edition. Oxford University Press (2010).]

"Riding the Punishment Wave: On the Origins of Our Devolving Standards of Decency," Hastings Women's Law Journal, 9, 27-78.

"Becoming the Mainstream: "Merit," Changing Demographics, and Higher Education in California" (with A. Hurtado and E. Garcia), La Raza Law Journal, 10, 645-690.

1997        "Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement," (with M. Lynch), New York University Review of Law and Social Change, 23, 477-570.

"Psychology and the Limits to Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law," Psychology, Public Policy, and Law, 3, 499-588.

"Commonsense Justice and the Death Penalty: Problematizing the 'Will of the People,'" <u>Psychology, Public Policy, and Law</u>, <u>3</u>, 303-337.

"Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death," <u>Stanford Law Review</u>, <u>49</u>, 1447-1486.

"Mitigation and the Study of Lives: The Roots of Violent Criminality and the Nature of Capital Justice." In James Acker, Robert Bohm, and Charles Lanier, <u>America's Experiment with Capital Punishment</u>: <u>Reflections on the Past, Present, and Future of the Ultimate Penal Sanction</u>. Durham, NC: Carolina Academic Press, 343-377.

"Clarifying Life and Death Matters: An Analysis of Instructional Comprehension and Penalty Phase Arguments" (with M. Lynch), <u>Law and Human Behavior</u>, <u>21</u>, 575-595.

"Psychological Secrecy and the Death Penalty: Observations on 'the Mere Extinguishment of Life,'" <u>Studies in Law, Politics, and Society</u>, <u>16</u>, 3-69.

1995        "The Social Context of Capital Murder: Social Histories and the Logic of Capital Mitigation," <u>Santa Clara Law Review</u>, <u>35</u>, 547-609. [Reprinted in part in David Papke (Ed.), <u>Law and Popular Culture</u>, Lexis/Nexis Publications, 2011)].

"Taking Capital Jurors Seriously," <u>Indiana Law Journal</u>, <u>70</u>, 1223-1232.

"Death Penalty Opinion: Myth and Misconception," <u>California Criminal Defense Practice Reporter</u>, <u>1995(1)</u>, 1-7.

1994        "The Jurisprudence of Race and Meritocracy: Standardized Testing and 'Race-Neutral' Racism in the Workplace," (with A. Hurtado), <u>Law and Human Behavior</u>, <u>18</u>, 223-248.

"Comprehending Life and Death Matters: A Preliminary Study of California's Capital Penalty Instructions" (with M. Lynch), <u>Law and Human Behavior</u>, <u>18</u>, 411-434.

"Felony Voir Dire: An Exploratory Study of Its Content and Effect," (with C. Johnson), <u>Law and Human Behavior</u>, <u>18</u>, 487-506.

"Broken Promise: The Supreme Court's Response to Social Science
Research on Capital Punishment" (with D. Logan), <u>Journal of Social
Issues</u> (special issue on the death penalty in the United States), <u>50</u>,
75-101.

"Deciding to Take a Life: Capital Juries, Sentencing Instructions,
and the Jurisprudence of Death" (with L. Sontag and S. Costanzo),
<u>Journal of Social Issues</u> (special issue on the death penalty in the
United States), <u>50</u>, 149-176. [Reprinted in Koosed, M. (Ed.), <u>Capital
Punishment</u>. New York: Garland Publishing (1995).]

"Modern' Death Qualification: New Data on Its Biasing Effects,"
(with A. Hurtado and L. Vega), <u>Law and Human Behavior</u>, <u>18</u>, 619-
633.

"Processing the Mad, Badly," <u>Contemporary Psychology</u>, <u>39</u>, 898-
899.

"Language is Power," <u>Contemporary Psychology</u>, <u>39</u>, 1039-1040.

1993  "Infamous Punishment: The Psychological Effects of Isolation,"
<u>National Prison Project Journal</u>, <u>8</u>, 3-21. [Reprinted in Marquart,
James & Sorensen, Jonathan (Eds.), <u>Correctional Contexts:
Contemporary and Classical Readings</u> (pp. 428-437). Los Angeles:
Roxbury Publishing (1997); Alarid, Leanne & Cromwell, Paul
(Eds.), <u>Correctional Perspectives: Views from Academics,
Practitioners, and Prisoners</u> (pp. 161-170). Los Angeles: Roxbury
Publishing (2001).]

"Psychology and Legal Change: The Impact of a Decade," <u>Law and
Human Behavior</u>, <u>17</u>, 371-398. [Reprinted in: Roesch, R., & Gagnon,
N. (Eds.), <u>Psychology and Law: Criminal and Civil Perspectives</u>.
Hampshire, UK: Ashgate (2007).]

1992  "Death Penalty Attitudes: The Beliefs of Death-Qualified
Californians," (with A. Hurtado and L. Vega). <u>Forum</u>, <u>19</u>, 43-47.

"The Influence of Race on Sentencing: A Meta-Analytic Review of
Experimental Studies." (with L. Sweeney). Special issue on
Discrimination and the Law. <u>Behavioral Science and Law</u>, <u>10</u>, 179-
195.

1991  "The Fourteenth Amendment and Symbolic Legality: Let Them Eat

16

Due Process," <u>Law and Human Behavior</u>, <u>15</u>, 183-204.

1988        "In Defense of the Jury," <u>Contemporary Psychology</u>, <u>33</u>, 653-655.

1986        "Civil Rights and Institutional Law:  The Role of Social Psychology in Judicial Implementation," (with T. Pettigrew), <u>Journal of Community Psychology</u>, <u>14</u>, 267-277.

1984        "Editor's Introduction.  Special Issue on Death Qualification," <u>Law and Human Behavior</u>, <u>8</u>, 1-6.

"On the Selection of Capital Juries:  The Biasing Effects of Death Qualification," <u>Law and Human Behavior</u>, <u>8</u>, 121-132.

"Examining Death Qualification:  Further Analysis of the Process Effect," <u>Law and Human Behavior</u>, <u>8</u>, 133-151.

"Evolving Standards and the Capital Jury," <u>Law and Human Behavior</u>, <u>8</u>, 153-158.

"Postscript," <u>Law and Human Behavior</u>, <u>8</u>, 159.

"Social Factfinding and Legal Decisions:  Judicial Reform and the Use of Social Science."  In Muller, D., Blackman, D., and Chapman, A. (Eds.), <u>Perspectives in Psychology and Law</u>.  New York:  John Wiley, pp. 43-54.

1983        "The Future of Crime and Personality Research:  A Social Psychologist's View," in Laufer, W. and Day, J. (Eds.), <u>Personality Theory, Moral Development, and Criminal Behavioral Behavior</u>. Lexington, Mass.:  Lexington Books, pp. 471-473.

"The Good, the Bad, and the Lawful:  An Essay on Psychological Injustice," in Laufer, W. and Day, J. (Eds.), <u>Personality Theory, Moral Development, and Criminal Behavior</u>.  Lexington, Mass.: Lexington Books, pp. 107-117.

"Ordering the Courtroom, Psychologically," <u>Jurimetrics</u>, <u>23</u>, 321-324.

1982        "Psychological Theory and Criminal Justice Policy:  Law and Psychology in the 'Formative Era,'" <u>Law and Human Behavior</u>, <u>6</u>,

17

191-235. [Reprinted in Presser, S. and Zainaldin, J. (Eds.), Law and American History: Cases and Materials. Minneapolis, MN: West Publishing, 1989; and in C. Kubrin, T. Stucky & A. Tynes (Eds.) Introduction to Criminal Justice: A Sociological Perspective. Palo Alto, CA: Stanford University Press (2012).]

"Data and Decisions: Social Science and Judicial Reform," in P. DuBois (Ed.), The Analysis of Judicial Reform.  Lexington, Mass.: D.C. Heath, pp. 43-59.

"Employment Tests and Employment Discrimination:  A Dissenting Psychological Opinion," Industrial Relations Law Journal, 5, pp. 1-86.

"To Polygraph or Not:  The Effects of Preemployment Polygraphing on Work-Related Attitudes," (with L. White and M. Lopez), Polygraph, 11, 185-199.

1981          "Death Qualification as a Biasing Legal Process," The Death Penalty Reporter, 1 (10), pp. 1-5. [Reprinted in Augustus: A Journal of Progressive Human Sciences, 9(3), 9-13 (1986).]

1980          "Juries and the Death Penalty:  Readdressing the Witherspoon Question," Crime and Delinquency, October, pp. 512-527.

"Psychology and Legal Change: On the Limits of a Factual Jurisprudence," Law and Human Behavior, 6, 191-235. [Reprinted in Loh, Wallace (Ed.), Social Research and the Judicial Process. New York: Russell Sage, 1983.]

"The Creation of Legal Dependency:  Law School in a Nutshell" (with M. Lowy), in R. Warner (Ed.), The People's Law Review. Reading, Mass.: Addison-Wesley, pp. 36-41.

"Television Criminology:  Network Illusions of Criminal Justice Realities" (with J. Manzolati), in E. Aronson (Ed.), Readings on the Social Animal. San Francisco, W.H. Freeman, pp. 125-136.

1979          "A Psychologist Looks at the Criminal Justice System," in A. Calvin (Ed.), Challenges and Alternatives to the Criminal Justice System. Ann Arbor: Monograph Press, pp. 77-85.

18

"Social Psychology and the Criminal Law," in P. Middlebrook (Ed.), Social Psychology and Modern Life. New York: Random House, pp. 671-711.

"Bargain Justice in an Unjust World:  Good Deals in the Criminal Courts" (with M. Lowy), Law and Society Review, 13, pp. 633-650. [Reprinted in Kadish, Sanford and Paulsen, Robert (Eds.), Criminal Law and Its Processes. Boston: Little, Brown, 1983.]

1977    "Prison Behavior" (with P. Zimbardo), in B. Wolman (Ed.), The Encyclopedia of Neurology, Psychiatry, Psychoanalysis, and Psychology, Vol. IX, pp. 70-74.

"The Socialization into Criminality:  On Becoming a Prisoner and a Guard" (with P. Zimbardo), in J. Tapp and F. Levine (Eds.), Law, Justice, and the Individual in Society: Psychological and Legal Issues (pp. 198-223).  New York: Holt, Rinehart, and Winston.

1976    "The Play's the Thing:  Methodological Notes on Social Simulations," in P. Golden (Ed.), The Research Experience, pp. 177-190. Itasca, IL: Peacock.

1975    "The Blackboard Penitentiary:  It's Tough to Tell a High School from a Prison" (with P. Zimbardo).  Psychology Today, 26ff.

"Implementing Research Results in Criminal Justice Settings," Proceedings, Third Annual Conference on Corrections in the U.S. Military, Center for Advanced Study in the Behavioral Sciences, June 6-7.

"The Psychology of Imprisonment:  Privation, Power, and Pathology"  (with P. Zimbardo, C. Banks, and D. Jaffe), in D. Rosenhan and P. London (Eds.), Theory and Research in Abnormal Psychology.  New York:  Holt Rinehart, and Winston.  [Reprinted in:  Rubin, Z. (Ed.), Doing Unto Others:  Joining, Molding, Conforming, Helping, Loving.  Englewood Cliffs:  Prentice-Hall, 1974.  Brigham, John, and Wrightsman, Lawrence (Eds.) Contemporary Issues in Social Psychology.  Third Edition. Monterey:  Brooks/Cole, 1977. Calhoun, James  Readings, Cases, and Study Guide for Psychology of Adjustment and Human Relationships. New York: Random House, 1978; translated as: La Psicologia del encarcelamiento: privacion, poder y patologia, Revisita de Psicologia Social, 1, 95-105 (1986).]

1973    "Social Roles, Role-Playing, and Education" (with P. Zimbardo), The Behavioral and Social Science Teacher, Fall, 1(1), pp. 24-45. [Reprinted in:  Zimbardo, P., and Maslach, C. (Eds.) Psychology For Our Times. Glenview, Ill.:  Scott, Foresman, 1977.  Hollander, E. and Hunt, R. (Eds.) Current Perspectives in Social Psychology. Third Edition. New York: Oxford University Press, 1978.]

"The Mind is a Formidable Jailer:  A Pirandellian Prison" (with P. Zimbardo, C. Banks, and D. Jaffe), The New York Times Magazine, April 8, Section 6, 38-60.  [Reprinted in Krupat, E. (Ed.), Psychology Is Social:  Readings and Conversations in Social Psychology. Glenview, Ill.: Scott, Foresman, 1982.]

"Interpersonal Dynamics in a Simulated Prison" (with C. Banks and P. Zimbardo), International Journal of Criminology and Penology, 1, pp. 69-97.  [Reprinted in:  Steffensmeier, Darrell, and Terry, Robert (Eds.) Examining Deviance Experimentally. New York: Alfred Publishing, 1975; Golden, P. (Ed.) The Research Experience. Itasca, Ill.: Peacock, 1976; Leger, Robert (Ed.) The Sociology of Corrections. New York:  John Wiley, 1977; A kiserleti tarsadalom-lelektan foarma. Budapest, Hungary: Gondolat Konyvkiado, 1977; Johnston, Norman, and Savitz, L. Justice and Corrections. New York: John Wiley, 1978; Research Methods in Education and Social Sciences. The Open University, 1979; Goldstein, J. (Ed.), Modern Sociology. British Columbia:  Open Learning Institute, 1980; Ross, Robert R. (Ed.), Prison Guard/ Correctional Officer: The Use and Abuse of Human Resources of Prison. Toronto:  Butterworth's 1981; Monahan, John, and Walker, Laurens (Eds.), Social Science in Law: Cases, Materials, and Problems. Foundation Press, 1985; Siuta, Jerzy (Ed.), The Context of Human Behavior. Jagiellonian University Press, 2001; Ferguson, Susan (Ed.), Mapping the Social Landscape: Readings in Sociology. St. Enumclaw, WA: Mayfield Publishing, 2001 & 2010; Pethes, Nicolas (Ed.), Menschenversuche (Experiments with Humans). Frankfurt, Germany: Suhrkamp Verlag, 2006.]

"A Study of Prisoners and Guards" (with C. Banks and P. Zimbardo).  Naval Research Reviews, 1-17. [Reprinted in Aronson, E. (Ed.) Readings About the Social Animal. San Francisco: W.H. Freeman, 1980; Gross, R. (Ed.) Key Studies in Psychology. Third Edition. London: Hodder & Stoughton, 1999; Collier, C. (Ed.), Basic Themes in Law and Jurisprudence. Anderson Publishing, 2000.]

MEMBERSHIP/ACTIVITIES IN PROFESSIONAL ASSOCIATIONS

American Psychological Association

American Psychology and Law Society

Law and Society Association

National Council on Crime and Delinquency


INVITED ADDRESSES AND PAPERS PRESENTED AT PROFESSIONAL ACADEMIC MEETINGS AND RELATED SETTINGS (SELECTED)


2019   "The Recent History of Corrections in Norway and the United States," Plenary Address, Justice Reinvestment Summit, Salem, OR, February.

"The Dimensions of Suffering in Solitary Confinement," Plenary Address, Washington College of Law at American University, Washington, DC, March.

"Implementing Norwegian Correctional Principles to Change Prison Culture in Oregon Prisons," Invited Address, Oregon Department of Corrections Leadership Team, Salem, OR, June.

"Humanizing American Jails and Prisons," Center for Court Innovation, International Summit, New York, NY, June.

"From the Stanford Prison Experiment to Supermax Prisons and Back Again: Changing the Narrative in Criminal Justice Reform," Invited Address, Norwegian Correctional Academy, Oslo, Norway, September.

Plenary Address, "Perspectives on Solitary Confinement," Northwestern University Law Review Symposium, Chicago, IL, November.

2018   "The Art and Science of Capital Mitigation," Federal Death Penalty Training Conference, Atlanta, Georgia, June.

"From Eastern State Penitentiary to Supermax Prisons," Safe Alternatives to Segregation Conference, Vera Institute of Justice, Philadelphia, PA, June.

Plenary Address, "Advancing Prisoners' Rights Through Law and Psychology," Denver Law Prisoners' Advocates Conference, University of Denver Sturm College of Law, Denver, CO, October.

"In Praise of Positivism in the Age of 'Fake News' and 'Alternative Facts,'" Research Frontiers Conference, Santa Cruz, CA, October.

2017    "Neuroscience in Policy: Solitary Confinement in California," Law & Neuroscience Conference, San Francisco, CA, February.

"In My Solitude: The Detrimental Effects of Solitary Confinement on the Brain," Exploratorium-Fisher Bay Observation Gallery, San Francisco, CA, February.

"Brief History of Correctional Reform in the United States," Community Corrections Partnership/Smart on Crime Community Forum, Santa Cruz Civic Auditorium, May.

"Reducing and Eliminating the Use of Solitary Confinement in Irish Prisons," Joint Conference with the Irish Prison Service, Department of Justice, and Irish Penal Reform Trust, Dublin, Ireland, June.

"The Emerging Consensus on When, for How Long, and On Whom Solitary Confinement Should Ever Be Imposed," Leadership, Culture and Managing Prisons: Knowledge Exchange between the USA and Europe (LEADERS), Trinity College, Dublin, Ireland, June.

"Sykes and Solitary: The Transformation of the Penal Subject in the Devolution from a 'Society of Captives' to Supermax Prisons," Power and Authority in Modern Prisons: Essays in Memory of Gresham Sykes Workshop, Centre for Prison Research, Cambridge University, Cambridge, England, September.

"Context Is Everything: The Social Psychology of Imprisonment," Joint USA/Scandinavian Correctional Exchange Program, Oslo, Norway, September.

2016    "The Culture of Punishment," American Justice Summit, New York, January.

"Mental Illness and Prison Confinement," Conference on Race,
Class, Gender and Ethnicity (CRCGE), University of North Carolina
Law School, Chapel Hill, NC, February.

"Reforming the Treatment of California's Mentally Ill Prisoners:
Coleman and Beyond," Meeting of the UC Consortium on Criminal
Justice & Health, San Francisco, April.

"Bending Toward Justice? The Urgency (and Possibility) of
Criminal Justice Reform," UC Santa Cruz Alumni Association
"Original Thinkers" Series, San Jose, CA (March), and Museum of
Tolerance, Los Angeles (April).

"Isolation and Mental Health," International and Inter-Disciplinary
Perspectives on Prolonged Solitary Confinement, University of
Pittsburgh Law School, Pittsburgh, PA, April.

"Mechanisms of Moral Disengagement in the Treatment of
Prisoners" (with Joanna Weill), Conference of the Society for the
Study of Social Issues, Minneapolis, June.

2015    "Reforming the Criminal Justice System," Bipartisan Summit on
Criminal Justice Reform, American Civil Liberties Union/Koch
Industries co-sponsored, Washington, DC, March.

"PrisonWorld: How Mass Incarceration Transformed U.S. Prisons,
Impacted Prisoners, and Changed American Society," Distinguished
Faculty Research Lecture, UC Santa Cruz, March.

"Think Different, About Crime and Punishment," Invited Lecture,
UC Santa Cruz 50th Anniversary Alumni Reunion, April.

"The Intellectual Legacy of the Civil Rights Movement: Two Fifty-
Year Anniversaries," College 10 Commencement Address, June.

"Race and Capital Mitigation," Perspectives on Racial and Ethnic
Bias for Capital and Non-Capital Lawyers, New York, September.

"The Dimensions of Suffering in Solitary Confinement," Vera
Institute of Justice, "Safe Alternatives to Solitary Confinement-A
Human Dignity Approach" Conference, Washington, DC,
September.

"Mental Health and Administrative Segregation," Topical Working
Group on the Use of Administrative Segregation in the U.S.,

National Institute of Justice/Department of Justice, Washington, DC, October.

"The Psychological Effects of Segregated Confinement," Ninth Circuit Court of Appeals "Corrections Summit," Sacramento, CA, November.

"How Can the University of California Address Mass Incarceration in California and Beyond?," Keynote Address, Inaugural Meeting of the UC Consortium on Criminal Justice & Health, San Francisco, November.

2014     "Solitary Confinement: Legal, Clinical, and Neurobiological Perspectives," American Association for the Advancement of Science (AAAS), Chicago, IL February.

"Overcrowding, Isolation, and Mental Health Care, Prisoners' Access to Justice: Exploring Legal, Medical, and Educational Rights," University of California, School of Law, Irvine, CA, February.

"The Continuing Significance of Death Qualification" (with Joanna Weill), Annual Conference of the American Psychology-Law Society, New Orleans, March.

"Using Psychology at Multiple Levels to Transform Adverse Conditions of Confinement," Society for the Study of Social Issues Conference, Portland, OR, June.

"Humane and Effective Alternatives to Isolated Confinement," American Civil Liberties Union National Prison Project Convening on Solitary Confinement, Washington, DC, September.

"Community of Assessment of Public Safety," Community Assessment Project of Santa Cruz County, Year 20, Cabrillo College, November.

"Overview of National Academy of Sciences Report on Causes and Consequences of High Rates of Incarceration," Chief Justice Earl Warren Institute on Law & Social Policy, Boalt Hall Law School, Berkeley, CA, November.

"Presidential Panel, Overview of National Academy of Sciences Report on Causes and Consequences of High Rates of Incarceration," American Society for Criminology, San Francisco, November.

"Presidential Panel, National Academy of Sciences Report on Consequences of High Rates of Incarceration on Individuals," American Society for Criminology, San Francisco, November.

"Findings of National Academy of Sciences Committee on the Causes and Consequences of High Rates of Incarceration," Association of Public Policy Analysis and Management Convention (APPAM), Albuquerque, NM, November.

"Politics and the Penal State: Mass Incarceration and American Society," New York University Abu Dhabi International Scholars Program, Abu Dhabi, United Arab Emirates, December.

2013 "Isolation and Mental Health," <u>Michigan Journal of Race and Law</u> Symposium, University of Michigan School of Law, Ann Arbor, MI, February.

"Social Histories of Capital Defendants" (with Joanna Weill), Annual Conference of Psychology-Law Society, Portland, OR, March.

"Risk Factors and Trauma in the Lives of Capital Defendants" (with Joanna Weill), American Psychological Association Annual Convention, Honolulu, HI, August.

"Bending Toward Justice: Psychological Science and Criminal Justice Reform," Invited Plenary Address, American Psychological Association Annual Convention, Honolulu, HI, August.

"Severe Conditions of Confinement and International Torture Standards," Istanbul Center for Behavior Research and Therapy, Istanbul, Turkey, December.

2012 "The Psychological Consequences of Long-term Solitary Confinement," Joint Yale/Columbia Law School Conference on Incarceration and Isolation, New York, April.

"The Creation of the Penal State in America," Managing Social Vulnerability: The Welfare and Penal System in Comparative Perspective, Central European University, Budapest, Hungary, July.

2011 "Tensions Between Psychology and the Criminal Justice System: On the Persistence of Injustice," opening presentation, "A Critical Eye

on Criminal Justice" lecture series, Golden Gate University Law School, San Francisco, CA, January.

"The Decline in Death Penalty Verdicts and Executions: The Death of Capital Punishment?" Presentation at "A Legacy of Justice" week, at the University of California, Davis King Hall Law School, Davis, CA, January.

"Invited Keynote Address: The Nature and Consequences of Prison Overcrowding—Urgency and Implications," West Virginia School of Law, Morgantown, West Virginia, March.

"Symposium: The Stanford Prison Experiment—Enduring Lessons 40 Years Later," American Psychological Association Annual Convention, Washington, DC, August.

"The Dangerous Overuse of Solitary Confinement: Pervasive Human Rights Violations in Prisons, Jails, and Other Places of Detention" Panel, United Nations, New York, New York, October.

"Criminal Justice Reform: Issues and Recommendation," United States Congress, Washington, DC, November.

2010    "The Hardening of Prison Conditions," Opening Address, "The Imprisoned" Arthur Liman Colloquium Public Interest Series, Yale Law School, New Haven, CN, March.

"Desensitization to Inhumane Treatment: The Pitfalls of Prison Work," panel presentation at "The Imprisoned" Arthur Liman Colloquium Public Interest Series, Yale Law School, New Haven, CN, March.

"Mental Ill Health in Immigration Detention," Department of Homeland Security/DOJ Office for Civil Rights and Civil Liberties, Washington, DC, September.

2009    "Counting Casualties in the War on Prisoners," Keynote Address, at "The Road to Prison Reform: Treating the Causes and Conditions of Our Overburdened System," University of Connecticut Law School, Hartford, CN, February.

"Defining the Problem in California's Prison Crisis: Overcrowding and Its Consequences," California Correctional Crisis Conference," Hastings Law School, San Francisco, CA, March.

2008    "Prisonization and Contemporary Conditions of Confinement,"
Keynote Address, Women Defenders Association, Boalt Law School,
University of California, November.

"Media Criminology and the Empathic Divide: The Continuing
Significance of Race in Capital Trials," Invited Address, Media,
Race, and the Death Penalty Conference, DePaul University School
of Law, Chicago, IL, March.

"The State of the Prisons in California," Invited Opening Address,
Confronting the Crisis: Current State Initiatives and Lasting
Solutions for California's Prison Conditions Conference, University
of San Francisco School of Law, San Francisco, CA, March.

"Mass Incarceration and Its Effects on American Society," Invited
Opening Address, Behind the Walls Prison Law Symposium,
University of California Davis School of Law, Davis, CA, March.

2007    "The Psychology of Imprisonment: How Prison Conditions Affect
Prisoners and Correctional Officers," United States Department of
Justice, National Institute of Corrections Management Training for
"Correctional Excellence" Course, Denver, CO, May.

"Statement on Psychologists, Detention, and Torture," Invited
Address, American Psychological Association Annual Convention,
San Francisco, CA, August.

"Prisoners of Isolation," Invited Address, University of Indiana Law
School, Indianapolis, IN, October.

"Mitigation in Three Strikes Cases," Stanford Law School, Palo Alto,
CA, September.

"The Psychology of Imprisonment," Occidental College, Los
Angeles, CA, November.

2006    "Mitigation and Social Histories in Death Penalty Cases," Ninth
Circuit Federal Capital Case Committee, Seattle, WA, May.

"The Crisis in the Prisons: Using Psychology to Understand and
Improve Prison Conditions," Invited Keynote Address, Psi Chi
(Undergraduate Psychology Honor Society) Research Conference,
San Francisco, CA, May.

27

"Exoneration and 'Wrongful Condemnation': Why Juries Sentence to Death When Life is the Proper Verdict," Faces of Innocence Conference, UCLA Law School, April.

"The Continuing Effects of Imprisonment: Implications for Families and Communities," Research and Practice Symposium on Incarceration and Marriage, United States Department of Health and Human Services, Washington, DC, April.

"Ordinary People, Extraordinary Acts," National Guantanamo Teach In, Seton Hall School of Law, Newark, NJ, October.

"The Next Generation of Death Penalty Research," Invited Address, State University of New York, School of Criminal Justice, Albany, NY, October.

2005     "The 'Design' of the System of Death Sentencing: Systemic Forms of 'Moral Disengagement in the Administration of Capital Punishment, Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

"Humane Treatment for Asylum Seekers in U.S. Detention Centers," United States House of Representatives, Washington, DC, March.

"Prisonworld: What Overincarceration Has Done to Prisoners and the Rest of Us," Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

"Prison Conditions and Their Psychological Effects on Prisoners," European Association for Psychology and Law, Vilnius, Lithuania, July.

2004     "Recognizing the Adverse Psychological Effects of Incarceration, With Special Attention to Solitary-Type Confinement and Other Forms of 'Ill-Treatment' in Detention," International Committee of the Red Cross, Training Program for Detention Monitors, Geneva, Switzerland, November.

"Prison Conditions in Post-"War on Crime" Era: Coming to Terms with the Continuing Pains of Imprisonment," Boalt Law School Conference, After the War on Crime: Race, Democracy, and a New Reconstruction, Berkeley, CA, October.

"Cruel and Unusual? The United States Prison System at the Start of the 21st Century," Invited speaker, Siebel Scholars Convocation, University of Illinois, Urbana, IL, October.

"The Social Historical Roots of Violence: Introducing Life Narratives into Capital Sentencing Procedures," Invited Symposium, XXVIII International Congress of Psychology, Beijing, China, August.

"Death by Design: Capital Punishment as a Social Psychological System," Division 41 (Psychology and Law) Invited Address, American Psychological Association Annual Convention, Honolulu, HI, July.

"The Psychology of Imprisonment and the Lessons of Abu Ghraib," Commonwealth Club Public Interest Lecture Series, San Francisco, May.

"Restructuring Prisons and Restructuring Prison Reform," Yale Law School Conference on the Current Status of Prison Litigation in the United States, New Haven, CN, May.

"The Effects of Prison Conditions on Prisoners and Guards: Using Psychological Theory and Data to Understand Prison Behavior," United States Department of Justice, National Institute of Corrections Management Training Course, Denver, CO, May.

"The Contextual Revolution in Psychology and the Question of Prison Effects: What We Know about How Prison Affects Prisoners and Guards," Cambridge University, Cambridge, England, April.

"Death Penalty Attitudes, Death Qualification, and Juror Instructional Comprehension," American Psychology-Law Society, Annual Conference, Scottsdale, AZ, March.

2003    "Crossing the Empathic Divide: Race Factors in Death Penalty Decisionmaking," DePaul Law School Symposium on Race and the Death Penalty in the United States, Chicago, October.

"Supermax Prisons and the Prison Reform Paradigm," PACE Law School Conference on Prison Reform Revisited: The Unfinished Agenda, New York, October.

"Mental Health Issues in Supermax Confinement," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Roundtable on Capital Punishment in the United States: The Key Psychological Issues," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Psychology and Legal Change: Taking Stock," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Economic Justice and Criminal Justice: Social Welfare and Social Control," Society for the Study of Social Issues Conference, January.

"Race, Gender, and Class Issues in the Criminal Justice System," Center for Justice, Tolerance & Community and Barrios Unidos Conference, March.

2002    "The Psychological Effects of Imprisonment: Prisonization and Beyond." Joint Urban Institute and United States Department of Health and Human Services Conference on "From Prison to Home." Washington, DC, January.

"On the Nature of Mitigation: Current Research on Capital Jury Decisionmaking." American Psychology and Law Society, Mid-Winter Meetings, Austin, Texas, March.

"Prison Conditions and Death Row Confinement." New York Bar Association, New York City, June.

2001    "Supermax and Solitary Confinement: The State of the Research and the State of the Prisons." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"Mental Health in Supermax: On Psychological Distress and Institutional Care." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"On the Nature of Mitigation: Research Results and Trial Process and Outcomes." Boalt Hall School of Law, University of California, Berkeley, August.

"Toward an Integrated Theory of Mitigation." American Psychological Association Annual Convention, San Francisco, CA, August.

Discussant: "Constructing Class Identities—The Impact of Educational Experiences." American Psychological Association Annual Convention, San Francisco, CA, August.

"The Rise of Carceral Consciousness." American Psychological Association Annual Convention, San Francisco, CA, August.

2000        "On the Nature of Mitigation: Countering Generic Myths in Death Penalty Decisionmaking," City University of New York Second International Advances in Qualitative Psychology Conference, March.

"Why Has U.S. Prison Policy Gone From Bad to Worse? Insights From the Stanford Prison Study and Beyond," Claremont Conference on Women, Prisons, and Criminal Injustice, March.

"The Use of Social Histories in Capital Litigation," Yale Law School, April.

"Debunking Myths About Capital Violence," Georgetown Law School, April.

"Research on Capital Jury Decisionmaking: New Data on Juror Comprehension and the Nature of Mitigation," Society for Study of Social Issues Convention, Minneapolis, June.

"Crime and Punishment: Where Do We Go From Here?" Division 41 Invited Symposium, "Beyond the Boundaries: Where Should Psychology and Law Be Taking Us?" American Psychological Association Annual Convention, Washington, DC, August.

1999        "Psychology and the State of U.S. Prisons at the Millennium," American Psychological Association Annual Convention, Boston, MA, August.

"Spreading Prison Pain: On the Worldwide Movement Towards Incarcerative Social Control," Joint American Psychology-Law Society/European Association of Psychology and Law Conference, Dublin, Ireland, July.

31

1998 "Prison Conditions and Prisoner Mental Health," Beyond the Prison Industrial Complex Conference, University of California, Berkeley, September.

"The State of US Prisons: A Conversation," International Congress of Applied Psychology, San Francisco, CA, August.

"Deathwork: Capital Punishment as a Social Psychological System," Invited SPPSI Address, American Psychological Association Annual Convention, San Francisco, CA, August.

"The Use and Misuse of Psychology in Justice Studies: Psychology and Legal Change: What Happened to Justice?," (panelist), American Psychological Association Annual Convention, San Francisco, CA, August.

"Twenty Five Years of American Corrections: Past and Future," American Psychology and Law Society, Redondo Beach, CA, March.

1997 "Deconstructing the Death Penalty," School of Justice Studies, Arizona State University, Tempe, AZ, October.

"Mitigation and the Study of Lives," Invited Address to Division 41 (Psychology and Law), American Psychological Association Annual Convention, Chicago, August.

1996 "The Stanford Prison Experiment and 25 Years of American Prison Policy," American Psychological Association Annual Convention, Toronto, August.

1995 "Looking Closely at the Death Penalty: Public Stereotypes and Capital Punishment," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April.

"Race and the Flaws of the Meritocratic Vision," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April.

"Taking Capital Jurors Seriously," Invited Address, National Conference on Juries and the Death Penalty, Indiana Law School, Bloomington, February.

1994    "Mitigation and the Social Genetics of Violence: Childhood Treatment and Adult Criminality," Invited Address, Conference on the Capital Punishment, Santa Clara Law School, October, Santa Clara.

1992    "Social Science and the Death Penalty," Chair and Discussant, American Psychological Association Annual Convention, San Francisco, CA, August.

1991    "Capital Jury Decisionmaking," Invited panelist, American Psychological Association Annual Convention, Atlanta, GA, August.

1990    "Racial Discrimination in Death Penalty Cases," Invited presentation, NAACP Legal Defense Fund Conference on Capital Litigation, August, Airlie, VA.

1989    "Psychology and Legal Change: The Impact of a Decade," Invited Address to Division 41 (Psychology and Law), American Psychological Association Annual Convention, New Orleans, LA., August.

        "Judicial Remedies to Pretrial Prejudice," Law & Society Association Annual Meeting, Madison, WI, June.

        "The Social Psychology of Police Interrogation Techniques" (with R. Liebowitz), Law & Society Association Annual Meeting, Madison, WI, June.

1987    "The Fourteenth Amendment and Symbolic Legality: Let Them Eat Due Process," APA Annual Convention, New York, N.Y. August.

        "The Nature and Function of Prison in the United States and Mexico: A Preliminary Comparison," InterAmerican Congress of Psychology, Havana, Cuba, July.

1986    Chair, Division 41 Invited Address and "Commentary on the Execution Ritual," APA Annual Convention, Washington, D.C., August.

"Capital Punishment," Invited Address, National Association of Criminal Defense Lawyers Annual Convention, Monterey, CA, August.

1985    "The Role of Law in Graduate Social Science Programs" and "Current Directions in Death Qualification Research," American Society of Criminology, San Diego, CA, November.

"The State of the Prisons:  What's Happened to 'Justice' in the '70s and '80s?" Invited Address to Division 41 (Psychology and Law); APA Annual Convention, Los Angeles, CA, August.

1983    "The Role of Social Science in Death Penalty Litigation." Invited Address in National College of Criminal Defense Death Penalty Conference, Indianapolis, IN, September.

1982    "Psychology in the Court:  Social Science Data and Legal Decision-Making." Invited Plenary Address, International Conference on Psychology and Law, University College, Swansea, Wales, July.

1982    "Paradigms in Conflict: Contrasting Methods and Styles of Psychology and Law." Invited Address, Social Science Research Council, Conference on Psychology and Law, Wolfson College, Oxford University, March.

1982    "Law and Psychology: Conflicts in Professional Roles." Invited paper, Western Psychological Association Annual Meeting, April.

1980    "Using Psychology in Test Case Litigation," panelist, American Psychological Association Annual Convention, Montreal, Canada, September.

"On the Selection of Capital Juries: The Biasing Effects of Death Qualification." Paper presented at the Interdisciplinary Conference on Capital Punishment. Georgia State University, Atlanta, GA, April.

"Diminished Capacity and Imprisonment: The Legal and Psychological Issues," Proceedings of the American Trial Lawyers Association, Mid-Winter Meeting, January.

1975            "Social Change and the Ideology of Individualism in Psychology and
               Law." Paper presented at the Western Psychological Association
               Annual Meeting, April.


## SERVICE TO STAFF OR EDITORIAL BOARDS OF FOUNDATIONS, SCHOLARLY JOURNALS OR PRESSES

2016-present       Editorial Consultant, <u>Translational Issues in Psychological Science</u>.

2015-present       Editorial Consultant, <u>Criminal Justice Review</u>.

2014-present       Editorial Board Member, <u>Law and Social Inquiry</u>.

2013-present       Editorial Consultant, <u>Criminal Justice and Behavior</u>.

2012-present       Editorial Consultant, <u>Law and Society Review</u>.

2011-present       Editorial Consultant, <u>Social Psychological and Personality Science</u>.

2008-present       Editorial Consultant, <u>New England Journal of Medicine</u>.

2007-present       Editorial Board Member, <u>Correctional Mental Health Reporter</u>.

2007-present       Editorial Consultant, <u>Journal of Offender Rehabilitation</u>.

2004-present       Editorial Board Member, American Psychology and Law Society
                   Book Series, Oxford University Press.

2000-2003          Reviewer, Society for the Study of Social Issues Grants-in-Aid
                   Program.

2000-present       Editorial Board Member, <u>ASAP</u> (on-line journal of the Society for
                   the Study of Social Issues)

1997-present       Editorial Board Member (until 2004), Consultant, <u>Psychology, Public Policy, and Law</u>

1991               Editorial Consultant, Brooks/Cole Publishing

1989               Editorial Consultant, <u>Journal of Personality and Social Psychology</u>

| 1988- | Editorial Consultant, <u>American Psychologist</u> |
|---|---|
| 1985 | Editorial Consultant, <u>American Bar Foundation Research Journal</u> |
| 1985-2006 | <u>Law and Human Behavior</u>, Editorial Board Member |
| 1985 | Editorial Consultant, Columbia University Press |
| 1985 | Editorial Consultant, <u>Law and Social Inquiry</u> |
| 1980-present | Reviewer, National Science Foundation |
| 1997 | Reviewer, National Institutes of Mental Health |
| 1980-present | Editorial Consultant, <u>Law and Society Review</u> |
| 1979-1985 | Editorial Consultant, <u>Law and Human Behavior</u> |
| 1997-present | Editorial Consultant, <u>Legal and Criminological Psychology</u> |
| 1993-present | <u>Psychology, Public Policy, and Law</u>, Editorial Consultant |

## <u>GOVERNMENTAL, LEGAL AND CRIMINAL JUSTICE CONSULTING</u>

Training Consultant, Palo Alto Police Department, 1973-1974.

Evaluation Consultant, San Mateo County Sheriff's Department, 1974.

Design and Training Consultant to Napa County Board of Supervisors, County Sheriff's Department (county jail), 1974.

Training Consultation, California Department of Corrections, 1974.

Consultant to California Legislature Select Committee in Criminal Justice, 1974, 1980-1981 (effects of prison conditions, evaluation of proposed prison legislation).

Reviewer, National Science Foundation (Law and Social Science, Research Applied to National Needs Programs), 1978-present.

Consultant, Santa Clara County Board of Supervisors, 1980 (effects of jail overcrowding, evaluation of county criminal justice policy).

Consultant to Packard Foundation, 1981 (evaluation of inmate counseling and
guard  training programs at San Quentin and Soledad prisons).

Member, San Francisco Foundation Criminal Justice Task Force, 1980-1982
(corrections expert).

Consultant to NAACP Legal Defense Fund, 1982- present (expert witness, case
evaluation, attorney training).

Faculty, National Judicial College, 1980-1983.

Consultant to Public Advocates, Inc., 1983-1986 (public interest litigation).

Consultant to California Child, Youth, Family Coalition, 1981-82 (evaluation of
proposed juvenile justice legislation).

Consultant to California Senate Office of Research, 1982 (evaluation of causes
and consequences of overcrowding in California Youth Authority
facilities).

Consultant, New Mexico State Public Defender, 1980-1983 (investigation of
causes of February, 1980 prison riot).

Consultant, California State Supreme Court, 1983 (evaluation of county jail
conditions).

Member, California State Bar Committee on Standards in Prisons and Jails, 1983.

Consultant, California Legislature Joint Committee on Prison Construction and
Operations, 1985.

Consultant, United States Bureau of Prisons and United States Department of the
Interior (Prison History, Conditions of Confinement Exhibition, Alcatraz
Island), 1989-1991.

Consultant to United States Department of Justice, 1980-1990 (evaluation of
institutional conditions).

Consultant to California Judicial Council (judicial training programs), 2000.

Consultant to American Bar Association/American Association for Advancement
of Science Task Force on Forensic Standards for Scientific Evidence, 2000.

Invited Participant, White House Forum on the Uses of Science and Technology
to Improve Crime and Prison Policy, 2000.

Member, Joint Legislative/California Department of Corrections Task Force on Violence, 2001.

Consultant, United States Department of Health & Human Services/Urban Institute, "Effects of Incarceration on Children, Families, and Low-Income Communities" Project, 2002.

Detention Consultant, United States Commission on International Religious Freedom (USCRIF). Evaluation of Immigration and Naturalization Service Detention Facilities, July, 2004-present.

Consultant, International Committee of the Red Cross, Geneva, Switzerland, Consultant on international conditions of confinement.

Member, Institutional Research External Review Panel, California Department of Corrections, November, 2004-2008.

Consultant, United States Department of Health & Human Services on programs designed to enhance post-prison success and community reintegration, 2006.

Consultant/Witness, U.S. House of Representatives, Judiciary Committee, Evaluation of legislative and budgetary proposals concerning the detention of undocumented persons, February-March, 2005.

Invited Expert Witness to National Commission on Safety and Abuse in America's Prisons (Nicholas Katzenbach, Chair); Newark, New Jersey, July 19-20, 2005.

Testimony to the United States Senate, Judiciary Subcommittee on the Constitution, Civil Rights, and Property Rights (Senators Brownback and Feingold, co-chairs), Hearing on "An Examination of the Death Penalty in the United States," February 7, 2006.

National Council of Crime and Delinquency "Sentencing and Correctional Policy Task Force," member providing written policy recommendations to the California legislature concerning overcrowding crisis in the California Department of Corrections and Rehabilitation.

Trainer/Instructor, Federal Bureau of Prisons and United States Department of Justice, "Correctional Excellence" Program, providing instruction concerning conditions of confinement and psychological stresses of living and working in correctional environments to mid-level management corrections professionals, May, 2004-2008.

Invited Expert Witness, California Commission on the Fair Administration of Justice, Public Hearing, Santa Clara University, March 28, 2008.

Invited Participant, Department of Homeland Security, Mental Health Effects of
Detention and Isolation, 2010.

Invited Witness, Before the California Assembly Committee on Public Safety,
August 23, 2011.

Consultant, "Reforming the Criminal Justice System in the United States" Joint
Working Group with Senator James Webb and Congressional Staffs, 2011
Developing National Criminal Justice Commission Legislation.

Invited Participant, United Nations, Forum with United Nations Special
Rapporteur on Torture Concerning the Overuse of Solitary Confinement,
New York, October, 2011.

Invited Witness, Before United States Senate Judiciary Subcommittee on the
Constitution, Civil Rights, and Human Rights Hearing on Solitary
Confinement, June 19, 2012.

Member, National Academy of Sciences Committee to Study the Causes and
Consequences of the High Rate of Incarceration in the United States,
2012-2014.

Member, National Academy of Sciences Briefing Group, briefed media and public
officials at Pew Research Center, Congressional staff, and White House staff
concerning policy implications of The Growth of Incarceration in the United
States: Exploring the Causes and Consequences (2014), April 30-May 1.

Consultant to United States Department of Justice and White House Domestic Policy
Council on formulation of federal policy concerning use of segregation
confinement, 2015.


PRISON AND JAIL CONDITIONS EVALUATIONS AND LITIGATION


Hoptowit v. Ray [United States District Court, Eastern District of Washington,
1980; 682 F.2d 1237 (9th Cir. 1982)].  Evaluation of psychological effects of
conditions of confinement at Washington State Penitentiary at Walla Walla for
United States Department of Justice.

Wilson v. Brown (Marin Country Superior Court; September, 1982, Justice
Burke).  Evaluation of effects of overcrowding on San Quentin mainline
inmates.

Thompson v. Enomoto (United States District Court, Northern District of
California, Judge Stanley Weigel, 1982 and continuing).  Evaluation of
conditions of confinement on Condemned Row, San Quentin Prison.

Toussaint v. McCarthy [United States District Court, Northern District of California, Judge Stanley Weigel, 553 F. Supp. 1365 (1983); 722 F. 2d 1490 (9th Cir. 1984) 711 F. Supp. 536 (1989)].  Evaluation of psychological effects of conditions of confinement in lockup units at DVI, Folsom, San Quentin, and Soledad.

In re Priest (Proceeding by special appointment of the California Supreme Court, Judge Spurgeon Avakian, 1983).  Evaluation of conditions of confinement in Lake County Jail.

Ruiz v. Estelle [United States District Court, Southern District of Texas, Judge William Justice, 503 F. Supp. 1265 (1980)].  Evaluation of effects of overcrowding in the Texas prison system, 1983-1985.

In re Atascadero State Hospital (Civil Rights of Institutionalized Persons Act of 1980 action). Evaluation of conditions of confinement and nature of patient care at ASH for United States Department of Justice, 1983-1984.

In re Rock (Monterey County Superior Court 1984).  Appointed to evaluate conditions of confinement in Soledad State Prison in Soledad, California.

In re Mackey (Sacramento County Superior Court, 1985).  Appointed to evaluate conditions of confinement at Folsom State Prison mainline housing units.

Bruscino v. Carlson (United States District Court, Southern District of Illinois 1984 1985).  Evaluation of conditions of confinement at the United States Penitentiary at Marion, Illinois [654 F. Supp. 609 (1987); 854 F.2d 162 (7th Cir. 1988)].

Dohner v. McCarthy [United States District Court, Central District of California, 1984-1985; 636 F. Supp. 408 (1985)].  Evaluation of conditions of confinement at California Men's Colony, San Luis Obispo.

Invited Testimony before Joint Legislative Committee on Prison Construction and Operations hearings on the causes and consequences of violence at Folsom Prison, June, 1985.

Stewart v. Gates [United States District Court, 1987]. Evaluation of conditions of confinement in psychiatric and medical units in Orange County Main Jail, Santa Ana, California.

Duran v. Anaya (United States District Court, 1987-1988).  Evaluation of conditions of confinement in the Penitentiary of New Mexico, Santa Fe, New Mexico [Duran v. Anaya, No. 77-721 (D. N.M. July 17, 1980); Duran v. King, No. 77-721 (D. N.M. March 15, 1984)].

Gates v. Deukmejian (United States District Court, Eastern District of
California, 1989).  Evaluation of conditions of confinement at California
Medical Facility, Vacaville, California.

Kozeak v. McCarthy (San Bernardino Superior Court, 1990).  Evaluation of
conditions of confinement at California Institution for Women, Frontera,
California.

Coleman v. Gomez (United States District Court, Eastern District of California,
1992-3; Magistrate Moulds, Chief Judge Lawrence Karlton, 912 F. Supp. 1282
(1995). Evaluation of study of quality of mental health care in California prison
system, special mental health needs at Pelican Bay State Prison.

Madrid v. Gomez (United States District Court, Northern District of California,
1993, District Judge Thelton Henderson, 889 F. Supp. 1146 (N.D. Cal. 1995).
Evaluation of conditions of confinement and psychological consequences of
isolation in Security Housing Unit at Pelican Bay State Prison, Crescent City,
California.

Clark v. Wilson, (United States District Court, Northern District of California,
1998, District Judge Fern Smith, No. C-96-1486 FMS), evaluation of screening
procedures to identify and treatment of developmentally disabled prisoners in
California Department of Corrections.

Turay v. Seling [United States District Court, Western District of Washington
(1998)]. Evaluation of Conditions of Confinement-Related Issues in Special
Commitment Center at McNeil Island Correctional Center.

In re: The Commitment of Durden, Jackson, Leach, & Wilson. [Circuit Court,
Palm Beach County, Florida (1999).] Evaluation of Conditions of Confinement
in Martin Treatment Facility.

Ruiz v. Johnson [United States District Court, Southern District of Texas,
District Judge William Wayne Justice, 37 F. Supp. 2d 855 (SD Texas 1999)].
Evaluation of current conditions of confinement, especially in security housing
or "high security" units.

Osterback v. Moore (United States District Court, Southern District of Florida
(97-2806-CIV-MORENO) (2001) [see, Osterback v. Moore, 531 U.S. 1172
(2001)]. Evaluation of Close Management Units and Conditions in the Florida
Department of Corrections.

Valdivia v. Davis (United States District Court, Eastern District of California,
2002). Evaluation of due process protections afforded mentally ill and
developmentally disabled parolees in parole revocation process.

Ayers v. Perry (United States District Court, New Mexico, 2003). Evaluation of conditions of confinement and mental health services in New Mexico Department of Corrections "special controls facilities."

Disability Law Center v. Massachusetts Department of Corrections (Federal District Court, Massachusetts, 2007). Evaluation of conditions of confinement and treatment of mentally ill prisoners in disciplinary lockup and segregation units.

Plata/Coleman v. Schwarzenegger (Ninth Circuit Court of Appeals, Three-Judge Panel, 2008). Evaluation of conditions of confinement, effects of overcrowding on provision of medical and mental health care in California Department of Corrections and Rehabilitation. [See Brown v. Plata, 563 U.S. 493 (2011).]

Ashker v. Brown (United States District Court, Northern District of California, 2013-2015). Evaluation of the effect of long-term isolated confinement in Pelican Bay State Prison Security Housing Unit.

Parsons v. Ryan (United States District Court, District of Arizona, 2012-14). Evaluation of conditions of segregated confinement for mentally ill and non-mentally ill prisoners in statewide correctional facilities. [See Parsons v. Ryan, 754 F.3d 657 (9th Cir. 2014)].

Braggs v. Dunn (United States District Court, Middle District of Alabama, 2015-2017). Evaluation of mental health care delivery system, overcrowded conditions of confinement, and use of segregation in statewide prison system. [See Braggs v. Dunn, 257 F. Supp. 3d 1171 (M.D. Ala. 2017).]

# EXHIBIT 2

Exhibit 2

Professor Craig Haney

Statement of Compensation: My rate of compensation is $250/hour for out-of-court legal consulting, $350/hour for deposition and trial testimony.

Trial and Deposition Testimony Over the Past Four Years
(2017 through present)


2017   Braggs v. Dunn (federal), trial testimony.

  United States v. Con-Ui (federal), trial testimony.

  BCCLA v. Attorney General of Canada (Supreme Court of British
   Columbia), trial testimony.


2018   Braggs v. Dunn (federal), hearing testimony.

  People v. Bracamontes, trial testimony.

  Gumm v. Ward, (federal), deposition testimony.


2019   Francis v. Her Majesty the Queen in Right of Ontario (Canada), deposition
   testimony.

  Sabata v. Nebraska Department of Correctional Services (federal),
   deposition testimony.

  Henry Davis et al. v. John Baldwin et al. (federal), deposition testimony.


2020   U.S. v. Alejandro Toledo (federal), hearing testimony.

  Raymond Tarlton, et al. v. Kenneth Sealey, et al. (federal), deposition
   testimony.

# EXHIBIT 3

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION

| | |
|---|---|
| **RAUL NOVOA, et al.,** | **Civil Action No. 5:17-cv-02514-JGB-SHK** |
| **Plaintiffs,** | |
| | **CLASS ACTION** |
| **v.** | |
| | **EXHIBIT 2 TO THE EXPERT DECLARATION OF CRAIG HANEY** |
| **THE GEO GROUP, INC.** | |
| **Defendant.** | |

1.      The Expert Report of Dr. Jeffrey Kropf, Ph.D.

2.      Deposition of Warden James Janecka, June 26, 2019.

3.      Deposition of Abdiaziz Karim (Dkt. No. 206-4).

4.      Declarations of Lydia Wright in Support of Plaintiffs' Motion for Class Certification (Dkt. Nos. 193, 210), and all exhibits thereto.

5.      Deposition of Amber Dawn Martin, Executive Vice President for Contract Administration at the GEO Group, August 11, 2020.

6.      Declaration of Raul Novoa, September 11, 2019.

7.      Declaration of Jaime Campos Fuentes, September 16, 2019.

8.      Declaration of Abdiaziz Karim, July 26, 2019.

9.      Disability Rights California Investigation Report, "There Is No Safety Here – The Dangers for People with Mental Illness and Other Disabilities in Immigration Detention at GEO Group's Adelanto ICE Processing Center" (March 2019) (NOVOA_0008517 - NOVOA_0008586).

10.     Proposal Submitted to ICE for California Contract Detention Facilities (GEO-Novoa_00041372-GEO-Novoa_00041623).

11.     Adelanto Supplemental Inmate Handbook (2018) (Dkt. No. 193-16).

12. Xavier Becerra, Cal. Att'y Gen., Review of Immigration Detention in California, CAL. DEP'T OF JUSTICE 22 (Feb. 2019), https://oag.ca.gov/sites/all/files/agweb/pdfs/publications/immigrationdetention-2019.pdf (Novoa_0006854).

13. Clemmer, D., *The Prison Community, 299, New York: Holt, Rinehart & Winston (1958).*

14. Homant, R., Employment of Ex-Offenders: The Role of Prisonization and Self-Esteem, 8 *Journal of Offender Counseling, Services, & Rehabilitation* (1984).

15. Irwin, J., Sociological Studies of the Impact of Long-Term Confinement, in Ward, D. & Schoen, K. (eds.), *Confinement in Maximum Custody*, Lexington, MA: Lexington Books (1981).

16. Peat, B., & Winfree, T., Reducing the Intra-Institutional Effects of "Prisonization": A Study of a Therapeutic Community for Drug-Using Inmates, 19 *Criminal Justice and Behavior* (1992).

17. Thomas, C. & Peterson, D., A Comparative Organizational Analysis of Prisonization, 6 *Criminal Justice Review* (1981).

18. Goffman, E., *Asylums: Essays on the Social Situation of Mental Patients and Other Inmates*, New York: Anchor (1961).

19. Jansson, D., Return to Society: Problematic Features of the Re-Entry Process, 13 *Psychiatric Care* (1975).

20. Herman, J., A New Diagnosis, in Herman, J. (ed.), *Trauma and Recovery*, 119, New York: Basic Books (1992).

21. Herman, J., Complex PTSD: A Syndrome in Survivors of Prolonged and Repeated Trauma, in Everly Jr., G. & Lating, J., (eds.), *Psychotraumatology: Key Papers and Core Concepts in Post-Traumatic Stress*, New York: Plenum (1995).

22. Duckworth & Follette (2012), *Retraumatization: Assessment, treatment, and prevention.* New York: Taylor & Francis.

23. Yehuda, R., & Spertus, I., & Golier, J. (2001).

24. Relationship between childhood traumatic experiences and PTSD in adults, in Eth, S. (Ed.), *PTSD in Children and Adolescents. Review of Psychiatry.* Volume 20. Washington, DC: American Psychiatric Association; Glodich, A. (1998).

25.     Traumatic Exposure to Violence: A Comprehensive Review of the Child and Adolescent Literature, 68 *Smith College Studies in Social Work*; Straker, G., & Moosa, F. (1994).

26.     Interacting with trauma survivors in contexts of continuing trauma. *Journal of Traumatic Stress, 7*; Everstine, D., & Everstine, L., *The Trauma Response: Treatment for Emotional Injury*. New York: W.W. Norton (1993).

27.     Haney, C., & Lynch,  M., Regulating Prisons of the Future: The Psychological Consequences of Solitary and Supermax Confinement, 23 *New York Review of Law & Social Change*, 477-570 (1997).

28.     Smith, P., The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature, in M. Tonry (Ed.), *Crime and Justice*. Volume 34. Chicago: University of Chicago Press (2006).

29.     Haney, C., Infamous Punishment: The Psychological Effects of Isolation, 8 *National Prison Project Journal*, 3 (1993).

30.     Haney, C., Mental Health Issues in Long-Term Solitary and "Supermax" Confinement, 49 *Crime & Delinquency*, 124-156 (2003).

31.     Metzner J, Fellner J., Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics, 38 *Journal of the Academy of Psychiatry and Law* (2010). http://www.hrw.org/sites/default/files/related_material/Solitary%20Confinement%20and%20Mental%20Illness%20in%20US%20Prisons.pdf

32.     American Psychological Association. 2017. *Solitary confinement of juvenile offenders*. https://www.apa.org/about/gr/issues/cyf/solitary.pdf

33.     American Public Health Association. 2013. *Solitary Confinement as a Public Health Issue.* Policy No. 201310. http://www.apha.org/advocacy/policy/policysearch/default.htm?id=1462

34.     National Research Council, *The Growth of Incarceration in the United States: Exploring Causes and Consequences*. Washington, DC: The National Academies Press (2014).

35.     Commission on Crime Prevention and Criminal Justice, *United Nations Standard Minimum Rules for the Treatment of Prisoners*. United Nations Economic and Social Council, May 21 (2015), Rules 43.1 and 44.

36.     National Commission on Correctional Health Care, *Position Statement: Solitary Confinement (isolation)*, 22 Journal of Correctional Health Care (2016). http://www.ncchc.org/solitary-confinement

37.     American Psychiatric Association. 2012. *Position Statement on Segregation of Prisoners with Mental Illness*. http://www.psych.org/File%20Library/Learn/Archives/ps2012_PrisonerSegregation.pdf

38.     Society of Correctional Physicians. 2013. *Position Statement, Restricted Housing of Mentally Ill Inmates*. http://societyofcorrectionalphysicians.org/resources/position-statements/restricted-housing-of-mentally-ill-inmates

39.     National Alliance on Mental Illness. 2016. *Public Policy Platform of the National Alliance on Mental Illness*. 12th Edition. Arlington, VA: NAMI. https://www.nami.org/About-NAMI/Policy-Platform.

40.     Kaba, F., Lewis, A., Glowa-Kollisch, S., Hadler, J., et al., Solitary Confinement and Risk of Self-Harm Among Jail Inmates, 104 *American Journal of Public Health* (2014).

41.     Human Rights in Trauma Mental Health Lab, *Mental Health Consequences Following Release from Long-Term Solitary Confinement in California*. Palo Alto, CA: Stanford University (2017) available at https://ccrjustice.org/sites/default/files/attach/2018/04/CCR_StanfordLab-SHUReport.pdf [https://perma.cc/5WGK-UBBN].

42.     Kupers, T. (2017). *Solitary: The Inside Story of Supermax Isolation and What We Can Do to Abolish It*. Oakland, CA: University of California Press.

43.     Hagan, B., et al., History of Solitary Confinement Is Associated with Post-Traumatic Stress Disorder Symptoms among Individuals Recently Released from Prison, 95 *Journal of Urban Health* (2018); and DeVylder, J. (2020).

44.     Previously Incarcerated Individuals with Psychotic Symptoms Are More Likely to Report a History of Solitary Confinement. *Psychiatry Research* (2020). https://doi.org/10.1016/j.psychres.2020.113064.

45.     Brinkley-Rubinstein, L., et al., Association of Restrictive Housing During Incarceration With Mortality After Release, *Journal of American Medicine* (October 4, 2019), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2752350.

46.     Haney, C., Restricting the Use of Solitary Confinement, 1 *Annual Review of Criminology* (2018).

47.     Haney, C., The Psychological Effects of Solitary Confinement: A Systematic Critique, 47 *Crime and Justice* (2018).

48.     Luigi, M., Dellazizzo, L., Giguere, C., Goulet, M., & Dumais, A. Shedding Light on "the Hole": A Systematic Review and Meta-Analysis on Adverse Psychological Effects and Mortality Following Solitary Confinement in Correctional Settings, *Frontiers of Psychiatry*, 11, Article 840.

49.     Suedfeld, P., Ramirez, C., Deaton, J., & Baker-Brown, G., Reactions and Attributes of Prisoners in Solitary Confinement, <u>*Criminal Justice and Behavior*</u>, 9 (1982).

50.     Corrections Expert Report on Adelanto Correctional Facility, November 16, 2017.

51.     Hans Toch, MEN IN CRISIS: HUMAN BREAKDOWNS IN PRISONS. Aldine Publishing Co.: Chicago (1975).

52.     Annual Report on Suicides in the California Department of Corrections and Rehabilitation, January 1, 2015-December 31, 2015.

53.     Office of the Inspector General, Management Alert—Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California, September 27, 2018.

54.     Maureen O'Keefe, et al., "One Year Longitudinal Study of the Psychological Effects of Administrative Segregation," Final report to the National Institute of Justice (2010).

# EXHIBIT B

Korey A. Nelson (admitted *pro hac vice*)
knelson@burnscharest.com
Lydia A. Wright (admitted *pro hac vice*)
lwright@burnscharest.com
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765

*Class Counsel*
(Additional Class Counsel on signature page)

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
### EASTERN DIVISION

| | |
|---|---|
| **RAUL NOVOA, JAIME CAMPOS FUENTES, ABDIAZIZ KARIM**, and **RAMON MANCIA**, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>**THE GEO GROUP, INC.,**<br><br>*Defendant.* | Civil Action No. 5:17-cv-02514-JGB-SHKx<br><br>**PLAINTIFFS' RULE 26(a)(2) EXPERT DISCLOSURES** |

Plaintiffs Raul Novoa, Jaime Campos Fuentes, Abdiaziz Karim, and Ramon Mancia, by and through undersigned counsel, hereby disclose the following expert witnesses who may be used at trial pursuant to Federal Rule of Civil Procedure 26(a)(2).

1

**Federal Rules of Civil Procedure 26(a)(2)(B) Retained Expert Disclosure**

**1.      Jody Bland, CFA**

a.      The opinions that may be given at trial by Mr. Bland, if he is called to testify, are summarized in his expert report and attachments thereto. Plaintiffs' reserve the right to supplement, expand the scope of, revise, or add to the basis of the expert opinions, as provided for by the Federal Rules of Civil Procedure or as may be allowed by the Court. Mr. Bland may also provide expert testimony as necessary in response to, or in explanation of, any testimony given at trial by any other party's witnesses or experts concerning these matters

b.      The data or other information that Mr. Bland considered in forming his opinions is referenced in his report accompanying appendices.

c.      References to literature that may be used in Mr. Bland's testimony is included in his report and accompanying appendices.

d.      Mr. Bland's qualifications and experience are contained in his CV, which is attached as Appendix A to his expert report.

e.      Mr. Bland's rate of compensation for this matter is $575 per hour. Mr. Bland also receives assistance from other team members working under his supervision, and their rates range from $200 to $700 per hour.

**2.      Michael Childers, Ph.D.**

a.      The opinions that may be given at trial by Professor Childers, if he is called to testify, are summarized in his expert report and attachments thereto. Plaintiffs' reserve the right to supplement, expand the scope of, revise, or add to the basis of the expert opinions, as provided for by the Federal Rules of Civil Procedure or as may be allowed by the Court. Professor Childers may also provide expert testimony as necessary in response to, or in explanation of, any testimony given at trial by any other party's witnesses or experts concerning these matters

b.      The data or other information that Professor Childers considered in forming his opinions is referenced in his report and accompanying exhibits.

c.      References to literature that may be used in Professor Childers' testimony is included in his report and accompanying exhibits.

d.      Professor Childers' qualifications and experience are contained in his CV, which is attached as Exhibit 1 to his expert report.

e.      Professor Childers' rate of compensation for this matter is $200 per hour.

**3.      Margo Schlanger, J.D.**

a.      The opinions that may be given at trial by Ms. Schlanger, if she is called to testify, are summarized in her expert report and attachments thereto. Plaintiffs' reserve the right to supplement, expand the scope of, revise, or add to the basis of the expert opinions, as provided for by the Federal Rules of Civil Procedure or as may be allowed by the Court. Ms. Schlanger may also provide expert testimony as necessary in response to, or in explanation of, any testimony given at trial by any other party's witnesses or experts concerning these matters

b.      The data or other information that Ms. Schlanger considered in forming her opinions is referenced in her report and accompanying exhibits.

c.      References to literature that may be used in Ms. Schlanger's testimony is included in her report and accompanying exhibits.

d.      Ms. Schlanger's qualifications and experience are contained in her CV, which is attached as Exhibit 1 to her expert report.

e.      Ms. Schlanger's rate of compensation for this matter is $300 per hour.

3

Dated:  August 17, 2020

/s/ Lydia A. Wright
Korey A. Nelson (admitted *pro hac vice*)
knelson@burnscharest.com
LA Bar # 30002
Lydia A. Wright (admitted *pro hac vice*)
lwright@burnscharest.com
LA Bar # 37926
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765

Warren Burns (admitted *pro hac vice*)
wburns@burnscharest.com
TX Bar # 24053119
Daniel H. Charest (admitted *pro hac vice*)
dcharest@burnscharest.com
TX Bar # 24057803
Will Thompson (CA Bar # 289012)
wthompson@burnscharest.com
E. Lawrence Vincent (admitted *pro hac vice*)
lvincent@burnscharest.com
TX Bar # 20585590
Mallory Biblo (admitted *pro hac vice*)
mbiblo@burnscharest.com
TX Bar # 24087165
**BURNS CHAREST LLP**
900 Jackson St., Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002

R. Andrew Free (admitted *pro hac vice*)
andrew@immigrantcivilrights.com
TN Bar # 030513
**LAW OFFICE OF R. ANDREW FREE**
P.O. Box 90568
Nashville, TN 37209

4

Telephone: (844) 321-3221
Facsimile: (615) 829-8959

Nicole Ramos (admitted *pro hac vice*)
nicole@alotrolado.org
NY Bar # 4660445
**AL OTRO LADO**
511 E. San Ysidro Blvd., # 333
San Ysidro, CA 92173
Telephone: (619) 786-4866

Robert Ahdoot (CA Bar # 172098)
rahdoot@ahdootwolfson.com
Tina Wolfson (CA Bar # 174806)
twolfson@ahdootwolfson.com
Theodore W Maya (CA Bar # 223242)
tmaya@ahdootwolfson.com
Alex R. Straus (CA Bar # 321366)
astraus@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
10728 Lindbrook Drive
Los Angeles, California 90024-3102
Telephone:  (310) 474-9111
Fax:  (310) 474-8585

*Class Counsel*

5

# CERTIFICATE OF SERVICE

Plaintiffs Raul Novoa, Jaime Camos Fuentes, Abdiaziz Karim, and Ramon Mancia, by and through undersigned counsel, hereby certify that a true and correct copy of the forgoing was served upon the following counsel in this matter, by email, on August 17, 2020.

Colin Barnacle
Christopher J. Eby
Adrienne Scheffey
**AKERMAN LLP**
1900 Sixteenth Street, Suite 1700
Denver, CO 80202
Telephone: (303) 260-7712
Facsimile: (303) 260-7714
colin.barnacle@akerman.com
christopher.eby@akerman.com
adrienne.scheffey@akerman.com

Damien DeLaney
Michael Gallion
David Van Pelt
Alicia Hou
Jonathan M. Turner
**AKERMAN LLP**
601 West Fifth Street Suite 300
Los Angeles, CA 90071
Telephone: (213) 688-9500
Facsimile: (213) 627-6342
damien.delaney@akerman.com
michael.gallion@akerman.com
david.vanpelt@akerman.com
alicia.hou@akerman.com
jonathan.turner@akerman.com

Dated: August 17, 2020

_/s/ Lydia Wright_
Lydia A. Wright (admitted _pro hac vice_)
lwright@burnscharest.com
LA Bar # 37926
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765

6

# EXHIBIT C

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION


RAUL NOVOA, JAIME CAMPOS
FUENTES, ABDIAZIZ KARIM, and
RAMON MANCIA, individually and
on behalf of all others
similarly situated,

Plaintiffs/Counter-Defendants,

      vs.

THE GEO GROUP, INC.,

Defendant/Counter-Claimant.
_____

Case No.
5:17-cv-02514-JGB-SHK


DEPOSITION OF CRAIG WILLIAM HANEY, PH.D., J.D.

APPEARING REMOTELY FROM SANTA CRUZ, CALIFORNIA

September 25, 2020

10:50 a.m.


REPORTED BY:

Jean F. Holliday

CSR No. 4535, RPR, CRR

APPEARING REMOTELY FROM LOS ANGELES COUNTY, CALIFORNIA

```
 1   REMOTE APPEARANCES:

 2

 3        For the Plaintiffs:

 4            BURNS CHAREST LLP
             BY:  LYDIA A. WRIGHT
 5                DANIEL CHAREST
             365 Canal Street, Suite 1170
 6           New Orleans, Louisiana  70130
             504.799.3853
 7           504.881.1765 Fax
             lwright@burnscharest.com
 8

 9        For the Defendant The GEO Group, Inc.:

10            AKERMAN LLP
             BY:  ELLEN S. ROBBINS
11           601 West Fifth Street, Suite 300
             Los Angeles, California  90071
12           213.688.9500
             213.627.6342 Fax
13           ellen.robbins@akerman.com

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    INDEX TO EXAMINATION

2

3          WITNESS:  CRAIG WILLIAM HANEY, PH.D., J.D.

4    EXAMINATION                                          PAGE

5     By Ms. Robbins                                        6

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Craig William Haney, Ph.D., J.D.
September 25, 2020

```
 1                  INDEX TO EXHIBITS

 2           CRAIG WILLIAM HANEY, PH.D., J.D.

 3       Raul Novoa, et al. vs. The GEO Group, Inc.

 4                Friday, September 25, 2020

 5         Jean F. Holliday, CSR No. 4535, RPR, CRR

 6
```

```
 7   MARKED              DESCRIPTION              PAGE

 8   Exhibit 1     Expert Declaration of Craig Haney    13

 9   Exhibit 2     Subpoena to Produce Documents,       24
                   Information, or Objects or to
10                 Permit Inspection of Premises in a
                   Civil Action
11
                   Exhibit 3     Study authored by Dr. Haney titled   71
12                 "The Psychological Effects of
                   Solitary Confinement: A Systematic
13                 Critique"

14   Exhibit 4     Study authored by Paul Gendreau, et  75
                   al, titled "Changes in EEG Alpha
15                 Frequency and Evoked Response
                   Latency During Solitary
16                 Confinement"
```

```
17

18

19

20

21

22

23

24

25
```

1      Q.   Okay.  And what are your responsibilities in

2   that regard?

3      A.   They are the standard responsibilities of a

4   professor.  I teach courses.  I'm on university and

5   departmental committees.  I am expected to conduct

6   research and to produce published academic scholarship.

7      Q.   Dr. Haney, did you have any job before the

8   University of California Santa Cruz?

9      A.   I was a lecturer for one year at Stanford

10  University in the psychology department, and I taught

11  there periodically as a lecturer in summers while I was

12  still getting my Ph.D.

13     Q.   Okay.  Great.

14          Dr. Haney, do you currently treat patients?

15     A.   No.  I'm a social psychologist.  We don't treat

16  patients.

17     Q.   Okay.  And have you at any time treated

18  patients?

19     A.   No.

20     Q.   Do you take any online courses or training?

21     A.   Not formally, no.  I mean I do participate

22  in -- I participate in conferences, which is a form of

23  training, but I don't -- they are not formal courses.

24     Q.   Have you ever worked in a detention facility or

25  a prison?

 1        A.   No, I've never worked in them.  I've consulted

 2   for them but never worked directly as an employee of the

 3   prison system.

 4        Q.   When you say you've consulted for them, explain

 5   what types of consulting you've done.

 6        A.   I've done a great deal of consulting with law

 7   enforcement in correctional organizations over the years

 8   starting way back when I was a graduate student, so I

 9   was a detention consultant for the Palo Alto Police

10   Department and for the San Mateo County Sheriff's

11   Department relatively early in graduate school.

12             I've been a consultant to the California

13   Department of Corrections on a number of different

14   issues; a consultant to the United States Department of

15   Justice, in a branch of the Department of Justice that

16   deals with conditions of confinement in correctional

17   facilities.

18             I consulted with the Department of Health and

19   Human Services about programs that they were sponsoring

20   in various jails and prisons for people who were coming

21   out of jail and prison, and also for the Department of

22   Homeland Security on detention conditions in facilities.

23             So all of that is in my -- in my background,

24   and most recently I've been involved in an innovative

25   international program where we take corrections

1  officials from different states who volunteer to be part

2  of this program and we take them to the country of

3  Norway where they get training and education in

4  Norwegian prison procedures and philosophies and then we

5  work with them back in the United States to implement

6  some of those changes in their own correctional system.

7       So I've worked with the Department of

8  Corrections in Idaho, in North Dakota, in Rhode Island,

9  Alaska, Oregon, and most recently California, to try to

10  create effective correctional change inside their own

11  systems.

12       Q.   Okay.  Did you work with any of these agencies

13  specifically relating to segregation or solitary

14  confinement?

15       A.   Yes.  In most instances work on the issue of

16  solitary confinement was either part of or entirely what

17  my expertise was -- was used for.  So for example, in

18  the case of -- take the most recent work -- in this

19  international program most of those systems, state

20  systems I mentioned went to Norway in part, not in whole

21  but in part, to try to understand how to reduce their

22  use of solitary confinement.

23       Q.   Okay.  Any other -- any other work that you did

24  in conjunction with any of these agencies or states

25  relating to the issue of segregation?

Craig Haney, Ph.D.
September 25, 2020

```
1              MS. WRIGHT:  Object to form.

2              THE WITNESS:  My consulting with the Department

3    of Homeland Security dealt with segregation, conditions

4    of segregation.

5    BY MS. ROBBINS:

6         Q.   And was that focused on any specific

7    facilities?

8         A.   It was -- no.  It was general consulting about

9    the psychological effects of placing immigration

10   detainees in segregated or isolated confinement.

11             I should also mention I've done the same thing

12   with the United States Department of Justice more

13   broadly in considering their consideration of federal

14   segregation or solitary confinement policies.

15        Q.   And in conjunction with your work for the

16   Department of Homeland Security did you visit any

17   detention facilities?

18        A.   No, I did not.

19        Q.   And can you elaborate a little bit more on what

20   exactly you did for the Department of Homeland Security

21   with respect to policies relating to segregation?

22             MS. WRIGHT:  Object to form.

23             THE WITNESS:  I met with them in -- in their

24   offices in Washington D.C., presented some of my own

25   data and analysis of the psychological effects of
```

```
 1              And who selected the documents for your review?

 2      A.   I asked for -- I asked for many of them

 3  specifically.  I asked for declarations.  I asked for --

 4  and then obviously the scholarly information is

 5  information that I've selected entirely myself.

 6      Q.   Dr. Haney, was there anything that you asked

 7  for that you did not receive?

 8      A.   No.  No.

 9              (Exhibit 2 marked)

10  BY MS. ROBBINS:

11      Q.   Dr. Haney, we are going to go back to your

12  report, so don't put that too far away, but I want to

13  ask you to take a look at what's been marked as Exhibit

14  No. 2.  It's a subpoena.  Do you have that in front of

15  you?

16      A.   Yes.

17      Q.   Did you ever see Exhibit 2 before today?

18      A.   I saw it this morning actually for the first

19  time.

20      Q.   Okay.  All right.  Thank you.  You can put that

21  to the side.

22              Dr. Haney, have you ever visited the Adelanto

23  facility?

24      A.   No, I have not.

25      Q.   In connection with your research have you ever
```

1    interviewed prisoners or detainees?

2        A.    Yes.

3        Q.    At which facilities?

4        A.    I've been interviewing prisoners, both jail and

5    prison inmates, for 40 years.  I couldn't possibly

6    recount all of the different facilities in which I've

7    interviewed them.

8            I've also interviewed immigration detainees but

9    not for as long a period of time.

10       Q.    For how long have you interviewed immigration

11   detainees?

12           MS. WRIGHT:  Object to form.

13           THE WITNESS:  I was involved in a study in, as

14   I recall, 2003, 2005 in which I was asked to analyze

15   conditions of detention in immigration detention

16   facilities and their effects on the detainees in

17   different parts of the country, and as part of that work

18   I visited, inspected a number of immigration detention

19   facilities in different parts of the country, and while

20   there interviewed a significant number of detainees.

21           Also, I interviewed detainees who had been in

22   immigration detention but were no longer -- but were no

23   longer contained or confined to any detention.

24   BY MS. ROBBINS:

25       Q.    Just to --

Craig Weston Haney
September 25, 2020

```
 1       A.   And that would have been either 2004 -- 2003,
 2   2004, 2005, it was a couple-year study period.
 3       Q.   Okay.  And just to confirm what I believe was
 4   your prior testimony, the Adelanto facility was not one
 5   of those facilities that you visited; is that correct?
 6       A.   That's correct.
 7       Q.   In connection with the study that you just
 8   referenced which you did around 2003 to 2004, were any
 9   of the confined persons that you interviewed involved in
10   litigation?
11            MS. WRIGHT:  Object to form.
12            THE WITNESS:  I'm -- I don't know.  I don't
13   know whether they were or not.
14   BY MS. ROBBINS:
15       Q.   Were any of the confined persons that you
16   interviewed seeking some type of reward or other
17   compensation other than litigation?
18            MS. WRIGHT:  Object to form.
19            THE WITNESS:  Again, I don't know.
20   BY MS. ROBBINS:
21       Q.   Dr. Haney, for those you interviewed in
22   connection with this study who were placed in
23   segregation during their period of confinement, what was
24   the average length that they were placed in segregation?
25       A.   I can't recall offhand.
```

```
 1        Q.   Do you recall if any were placed in segregation

 2   for 72 hours or less?

 3        A.   Again, I don't have a specific recollection of

 4   that specific point.

 5        Q.   Do you recall why any of these confined persons

 6   were placed in segregation, in connection with your

 7   study?

 8        A.   Again, no, not -- not specifically.

 9        Q.   Does the study have a name, Dr. Haney?

10        A.   Well, we -- the study that was conducted

11   actually does have a name.  This was a study that was

12   conducted at the behest of Congress by the Committee on

13   International Religious Freedom, and it was a study of

14   detained asylum seekers in expedited removal was the

15   formal name of it.  It was -- there were a group of us

16   who were part of the study team.  Different members of

17   the team focused on different aspects or issues in the

18   expedited removal process, and my focus or concentration

19   was on the conditions of detention in immigration

20   detention facilities.

21        Q.   Okay.  And was the study and its results ever

22   published, Dr. Haney?

23        A.   I don't believe it was formally published.  We

24   produced a document in which this information was

25   summarized and was communicated actually to a number of
```

```
 1   placing them in segregation for a limited amount of
 2   time.
 3        Q.    And what would you deem to be a limited amount
 4   of time?
 5             MS. WRIGHT:  Object to form.
 6             THE WITNESS:  Well, it would depend on the
 7   nature of the violation.  As you may know, the United
 8   Nations has found that segregation of longer than
 9   15 days constitutes torture.  So I think, you know,
10   we're talking about a period of time limited to just a
11   few days rather than weeks or months, but, you know,
12   there are circumstances in which it's appropriate to
13   separate somebody out from the larger general population.
14   BY MS. ROBBINS:
15        Q.    Okay.  Dr. Haney, can you summarize in a few
16   sentences your opinions that you're rendering in this
17   case?
18        A.    Well, you know -- yeah, it's summarized in my
19   report fairly succinctly.  I was asked to read, analyze
20   and comment on the opinions that were expressed by
21   Dr. Kropf done both succinctly and then also at much
22   greater length.  On Page -- Paragraphs 12 and thereafter
23   I summarized my analysis of his opinions and then --
24   briefly, and then later at greater length the ways and
25   the basis upon which I disagreed with him.
```

Craig William Haney

September 25, 2020

```
 1    documents that I reviewed were contained in the exhibit

 2    that we've already discussed.

 3    BY MS. ROBBINS:

 4        Q.   Okay.  Dr. Haney, do you know whether any of

 5    the named plaintiffs were actually placed in

 6    segregation?

 7            MS. WRIGHT:  Object to form.

 8            THE WITNESS:  I don't recall.  I'd have to go

 9    back and look at their declarations and depositions.

10    BY MS. ROBBINS:

11        Q.   Are you aware if any of the named plaintiffs

12    were specifically threatened to be placed in

13    segregation?

14        A.   Again, I'd have to look specifically at their

15    declarations and depositions.

16        Q.   Did you ever speak to any of the four named

17    plaintiffs?

18        A.   I did not.

19        Q.   So any information you have about them was

20    based upon their declarations and/or deposition

21    testimony; is that correct?

22        A.   Yes.

23        Q.   Are you aware of whether any of the four named

24    plaintiffs submitted grievance forms?

25            MS. WRIGHT:  Object to form.
```

```
 1      A.   Yes.  Prison-like environment.
 2      Q.   But again, you've never been to the Adelanto
 3   facility; is that correct?
 4      A.   That's correct.  I've merely read descriptions
 5   of it.
 6      Q.   Okay.  So what is the basis for your concluding
 7   that the Adelanto facility is analogous to a prison
 8   environment?
 9      A.   Well, it looks like one, it operates like one,
10   and the people who are confined in it describe it as
11   one.
12      Q.   And when you say describe as one -- go ahead.
13      A.   Outside investigators also analogize it to one.
14   So people who have seen it -- people who have seen it
15   talk about it as a prison-like environment and describe
16   aspects of it which are prison-like in nature and
17   operation.
18      Q.   When you say people have -- people who have
19   been detained there have described it as such, where
20   have they offered those descriptions?
21          MS. WRIGHT:  Object to form.
22          THE WITNESS:  Well, I've already alluded to the
23   declarations and depositions in which people describe
24   being treated in ways that are virtually identical to
25   the way inmates in prisons are treated.
```

 1  effects of being placed in segregation?

 2      A.   Well, I -- I remember it coming up.  I don't

 3  know how often it came up.  I don't know how common a

 4  practice it was in the particular facilities that I was

 5  in.

 6      Q.   You did not review any medical records for the

 7  named plaintiffs in this case?

 8      A.   I did not.

 9      Q.   Have you reviewed medical records for any

10  detainee at the Adelanto facility?

11      A.   No, I don't believe I have.

12      Q.   Do you know whether Jaime Campos Fuentes was

13  ever sent to segregation?

14      A.   I don't know offhand.

15      Q.   How about Ramon Mancia?

16      A.   Same answer.

17      Q.   Karim Abdiaziz?

18      A.   Again, I don't recall.  I'd have to look at

19  their depositions and their declarations.

20      Q.   And lastly, Raul Novoa?

21      A.   Same answer.

22      Q.   Dr. Haney, did you review any documents that

23  were not consistent with your opinion in this case?

24      A.   I'm not -- I'm not sure that I did.  Obviously

25  Dr. Kropf's report is not consistent with mine, you

 1    know, that's the nature of my --

 2        Q.   Right.

 3        A.   -- declaration.  But I don't think I -- other

 4    than that, I mean other than his report and my

 5    commentary, I don't think I've seen any other documents

 6    that contradicted the opinions that I reached.

 7        Q.   Dr. Haney, have you provided a diagnosis for

 8    any of the plaintiffs in this case?

 9        A.   No.

10        Q.   Why not?

11        A.   I'm not a diagnostician.  It's not my area of

12    training.  It's not something I'm qualified to do and I

13    don't do it.

14             MS. ROBBINS:  Okay.  All right.  That is all --

15    I would like just a few minutes to review my notes and

16    see if I have any other questions, but that's all I have

17    for now.  I don't know if, Lydia, you had any questions

18    or if you want me to just take a short five-minute break

19    and see if I have anything further.  Whatever you

20    prefer.

21             MS. WRIGHT:  Let's take a five-minute break.

22             MS. ROBBINS:  Okay.  Is that okay, Dr. Haney?

23             THE WITNESS:  Fine with me.

24             MS. ROBBINS:  Thank you.

25             (Recess)

1                    DEPOSITION ERRATA SHEET

2

     Page No._____ Line No. _____
3
     Change:_____
4
     Reason for change: _____
5
     Page No._____ Line No. _____
6
     Change:_____
7
     Reason for change: _____
8
     Page No._____ Line No. _____
9
     Change:_____
10
     Reason for change: _____
11
     Page No._____ Line No. _____
12
     Change:_____
13
     Reason for change: _____
14
     Page No._____ Line No. _____
15
     Change:_____
16
     Reason for change: _____
17
     Page No._____ Line No. _____
18
     Change:_____
19
     Reason for change: _____
20
     Page No._____ Line No. _____
21
     Change:_____
22
     Reason for change: _____
23

24
     _____   _____
25
     Craig William Haney, Ph.D., J.D.        Dated

Craig Wm. Harley / 30(b)(6)
September 25, 2020

```
 1                    REPORTER'S CERTIFICATE

 2        I, Jean F. Holliday, CSR No. 4535, Certified

 3   Shorthand Reporter, certify:

 4        That the foregoing proceedings were taken before

 5   me at the time and place therein set forth, at which

 6   time the witness was put under oath by me;

 7        That the testimony of the witness, the questions

 8   propounded, and all objections and statements made at

 9   the time of the examination were recorded

10   stenographically by me and were thereafter transcribed;

11        That a review of the transcript by the deponent

12   was requested;

13        That the foregoing is a true and correct

14   transcript of my shorthand notes so taken.

15        I further certify that I am not a relative or

16   employee of any attorney of the parties, nor financially

17   interested in the action.

18        I declare under penalty of perjury under the laws

19   of California that the foregoing is true and correct.

20        Dated this 4th day of October, 2020.

21

22        _____

23        Jean F. Holliday, CSR No. 4535

24

25
```