# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION**

| | |
|---|---|
| **RAUL NOVOA, et al.,** | **Civil Action No. 5:17-cv-02514-JGB-SHK** |
| **Plaintiffs,** | **CLASS ACTION** |
| **v.** | **EXPERT DECLARATION OF** |
| **THE GEO GROUP, INC.** | **MARGO SCHLANGER** |
| **Defendant.** | |

I, Margo Schlanger, declare as follows:

1.      I am the Wade H. and Dores M. McCree Collegiate Professor of Law at the University of Michigan. I have substantial expertise in the law, policy, and procedures affecting both criminal and civil detention, including standards and practices relating to immigration detention and immigrant detainees. I have been retained by Plaintiffs' counsel in this case as an expert on these topics.

2.      I have been asked to render my opinion on the nature, purpose, regulation, and oversight of civil immigration detention; the vulnerabilities of immigration detainees and standards in place to safeguard humane conditions of confinement; whether the facts in the record (if proven) demonstrate that the policies and practices of The GEO Group, Inc. (GEO) violate ICE's standards; and whether ICE/DHS oversight of immigration detention facilities reliably induces compliance with ICE's standards.

# I.      PROFESSIONAL QUALIFICATIONS

## A. Appointments and Experience

3.      I have been a tenured law professor at the University of Michigan since 2009, although for a two-year period in 2010 and 2011 I was on leave to serve as the Officer for Civil Rights and Civil Liberties (CRCL) at the U.S. Department of Homeland Security (DHS). CRCL reviews and investigates civil rights and civil liberties complaints filed by the public regarding DHS policies and activities, including violation of rights of immigration detainees or subjects of immigration enforcement. It also advises DHS and its components on policy development and implementation. A true and correct copy of my *curriculum vitae* is attached as **Exhibit 1**.

4.      I teach a variety of courses at the University of Michigan, including Torts; Constitutional Law, including advanced classes about the Equal Protection Clause; and Prisons and the Law. I have taught seminars on many topics, including Homeland Security and Civil Rights. I also founded and serve as the Director of the Civil Rights Litigation Clearinghouse, http://clearinghouse.net. I am a faculty affiliate of the University of Michigan Center for Forensic Psychiatry Fellowship in Forensic Psychiatry and in that capacity teach and advise forensic psychiatrists-in-training. In two weeks, I will become the co-director of the University of Michigan Law School's Empirical Legal Studies Center.

5.      I previously held faculty appointments at Harvard Law School (associate professor), Washington University Law School (professor), and UCLA Law School (visiting professor).

6.      I have had many relevant non-academic appointments. Among them (in reverse chronological order):

a.  I have served since June 2015 as the court-appointed Settlement Monitor in *Adams & Knights v. Kentucky Department of Corrections*, No. 3:14-cv-00001 (E.D. Ky.), a state-wide case about deaf and hard-of-hearing prisoners' access to programs, services, and activities offered by the Kentucky Department of Corrections and the constitutionality of their conditions of confinement.

b.  After appointment by DHS Secretary Jeh Johnson, I served from November 2015 through October 2016 as a member of the Immigrations and Customs Enforcement (ICE) Advisory Committee on Family Residential Centers, which recommended improved policies and practices relating to family immigration detention of noncitizens.

c.  In 2012-2013, as part-time Counsel to the Secretary, I advised DHS Secretary Janet Napolitano on civil rights matters, including reducing the use of solitary confinement and minimizing sexual assault and abuse in immigration detention, and appropriate oversight and administrative mechanisms to implement those goals.

d.  As the presidentially appointed Officer for Civil Rights and Civil Liberties at DHS in 2010 and 2011, I was the head of civil rights protection and enforcement for DHS, with responsibility for, among other things, civil rights complaints and advice on civil immigration detention conditions policy. Relevant to this case, I played a particularly active role in policy development relating to reducing the use of solitary confinement and improving language access. As head of CRCL, I was also the senior DHS official with responsibility for assessing and

2

improving compliance with Section 504 of the Rehabilitation Act of
1973, the statute banning disability discrimination by federal agencies.

e.  From 2007 to early 2010, I served as the Reporter for the American Bar
Association task force on Standards relating to the Treatment of
Prisoners. In that capacity, I was the principal drafter of both the
standards themselves and the associated published commentary.

f.  From 2006 to 2008, I served as a member of the Commission on Safety
and Abuse in America's Prisons, a blue-ribbon panel sponsored by the
Vera Institute of Justice and chaired by former Attorney General
Nicholas de B. Katzenbach and former Judge John Gibbons, which made
recommendations for civil rights improvements in prisons and jails.

g.  From 1995 to 1998, I served as a Trial Attorney and then a Senior Trial
Attorney in the U.S. Dept. of Justice, Civil Rights Division, Special
Litigation Section. Among other activities, I conducted investigations of
jails and prisons and their compliance with the Constitution and the
Americans with Disabilities Act, and related litigation.

7.     I have also been retained as an expert in: *Sabata v. Nebraska Department of
Correctional Services*, Case No. 4:17-cv-03107-RFR-MDN, 2019 WL 3975373, at *4 (D.
Neb. Aug. 22, 2019), where the court held my expert declaration on disability-related
policies, practices, and procedures appropriate under *Daubert v. Merrell Dow Pharms.,
Inc.*, 509 U.S. 579 (1993); and *Fraihat v. U.S. Immigration and Customs Enforcement*, 5:19-
cv-01546 (C.D. Cal.), a putative nationwide class action challenging conditions of
confinement at civil immigration detention centers nationwide, including the Adelanto
ICE Processing Center.

8.     I serve as one of four class counsel in *Hamama v. Adducci*, 2:17-cv-11910-
MAG-DRG (E.D. Mich.), a case in which plaintiffs challenge planned mass
deportations of Iraqi nationals and are currently defending ICE's appeal of a district
court order ending the indefinite detention of members of the plaintiff class.

**B. Relevant Publications**

9.     I have written widely on the topic of civil rights, incarceration/detention,
and agency governance structures that assist with effective civil rights implementation.
My *curriculum vitae* includes a list of both academic and non-academic publications.
Among my published and forthcoming writing is:

a.  *Incrementalist vs. Maximalist Reform: Solitary Confinement Case Studies*, 115
NORTHWESTERN U. L. REV. (forthcoming 2020).

b.  *Accommodating Disabilities*, in PUBLIC HEALTH BEHIND BARS—FROM

PRISONS TO COMMUNITIES (forthcoming 2020).

c. THE LAW OF INCARCERATION: CASES AND MATERIALS (West Academic 2020). With Sheila Bedi, David Shapiro and Lynn Branham. I am the lead author of this law school casebook.

d. *The Constitutional Law of Incarceration, Reconfigured*, 103 CORNELL L. REV. 357 (2018).

e. *Prisoners with Disabilities: Individualization and Integration*, in ACADEMY FOR JUSTICE, A REPORT ON SCHOLARSHIP AND CRIMINAL JUSTICE REFORM (Erik Luna ed., 2017).

f. *Anti-Incarcerative Remedies for Illegal Conditions of Confinement*, 6 U. MIAMI RACE & SOCIAL JUSTICE L. REV. 1 (2016).

g. *How the ADA Regulates and Restricts Solitary Confinement for People with Mental Disabilities*, ACS Issue Brief (May 19, 2016).

h. *The Just-Barely-Sustainable California Prisoners' Rights Ecosystem*, 664 ANNALS OF THE AM. ACAD. OF POL. & SOC. SCI. 62 (2016).

i. *Trends in Prisoner Litigation, as the PLRA Enters Adulthood*, 5 U.C. IRVINE L. REV. 153 (2015).

j. *Prisoners' Rights Lawyers' Strategies for Preserving the Role of the Courts*, 69 U. MIAMI L. REV. 519 (2015).

k. *Intelligence Legalism and the National Security Agency's Civil Liberties Gap*, 6 Harv. Nat. Sec. L.J. 112 (2015).

l. *Offices of Goodness: Influence Without Authority within Federal Agencies*, 36 Cardozo L. Rev. 53 (2014).

m. *Plata v. Brown and Realignment: Jails, Prisons, Courts, and Politics*, 48 HARV. CIV. RGHTS-CIV. LIB. L. REV. 165 (2013).

n. *Regulating Segregation: The Contribution of the ABA Criminal Justice Standards on the Treatment of Prisoners*, 47 AM. CRIM. L. REV. 1421 (2010).

o. *Operationalizing Deterrence: Claims Management (in Hospitals, a Large Retailer, and Jails and Prisons)*, 2 J. TORT L., issue 1, article 1 (2008).

p. *Civil Rights Injunctions Over Time: A Case Study of Jail and Prison Court Orders*, 81 N.Y.U. L. REV. 550 (2006).

q. *Determinants of Civil Rights Filings in Federal District Court by Jail and Prison Inmates*, 1 J. EMPIRICAL LEGAL STUD. 79 (2004) (with Anne Morrison Piehl).

r. *Inmate Litigation*, 116 HARV. L. REV. 1555 (2003).

s. *Beyond the Hero Judge: Institutional Reform Litigation as Litigation*, 97 MICH. L. REV. 1994 (1999).

10.     I have substantial expertise in quantitative and qualitative social science methods. Beginning fall 2020, I will be co-director of the University of Michigan Law School's Empirical Legal Studies Center. I am the former Chair of the Association of American Law School's Section on Law and the Social Sciences. I have taught a law school class titled "Empirical Inquiries in Civil Litigation." I also have published both quantitative and qualitative empirical papers in both law reviews and peer-reviewed journals such as the Journal of Empirical Legal Studies and the Annals of the American Academy of Political and Social Science.

## II.     SUMMARY OF OPINIONS

11.     My opinions, as outlined herein, are informed by my knowledge, skill, experience, training, and education, including my substantial experience in this area at the Department of Homeland Security as head of DHS's CRCL, as Counsel to the Secretary, and as a member of the Advisory Committee on Family and Residential Centers. My opinions are also based on my knowledge of ICE detention standards and other standards relating to incarceration/detention such as the 2000 National Detention Standards (NDS), revised in 2019[1]; the Family Residential Standards, issued in 2007 and revised in 2020[2]; the 2008 Performance Based National Detention Standards[3] (PBNDS 2008); the 2011 Performance Based National Detention Standards (PBNDS 2011), revised in 2016[4]; the American Correctional Association's *Performance-Based Standards for Adult Correctional Institutions* and *Performance-Based Standards for Adult Local Detention Facilities*; and the American Bar Association's *Treatment of Prisoners Standards* (2011), which I played a lead role in drafting.

12.     My opinions herein are also informed by my review of numerous DHS/ICE reports and documents regarding the Adelanto ICE Processing Center and

---

[1] *2000 Detention Operations Manual*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice.gov/detention-standards/2000; *2019 National Detention Standards for Non-Dedicated Facilities*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice.gov/detention-standards/2019.

[2] *Family Residential Standards 2020*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice.gov/detention-standards/family-residential; for the 2007 version, *see* https://www.ice.gov/detention-standards/family-residential/2007.

[3] *2008 Operations Manual ICE Performance-Based National Detention Standards*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice.gov/detention-standards/2008 (last updated Dec. 18, 2019).

[4] *Performance-Based National Detention Standards 2011*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT (rev. Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf; the pre-revision PBNDS 2011 is available at https://www.hsdl.org/?view&did=732246.

other GEO civil immigration detention facilities; GEO's contracts to operate Adelanto; and various other reports, documents, and data sets regarding civil immigration detention. The documents and data upon which I rely are the type of documents and data commonly relied upon by others in my field. I have also reviewed numerous documents in the record of this case, including the Third Amended Complaint, the Motion and Memorandum for Class Certification and its exhibits, and the deposition transcripts and declarations of the class representatives and other witnesses. A list of materials I have reviewed and relied upon in making this declaration is attached as **Exhibit 2**. Where it seemed appropriate, I reference certain materials I have reviewed and relied upon in the footnotes of this declaration.

13.     Based on my education, training, experience and work in this matter, it is my opinion that:

   a.  Immigrant detainees are held in ICE detention for civil purposes and civil immigration detention must be nonpunitive in nature.

   b.  Immigration detainees are a vulnerable population, particularly because ICE is both their custodial authority and their prosecuting authority.

   c.  Compliance with ICE standards for treatment of civil immigrant detainees is an important part of safeguarding humane conditions of confinement.

   d.  GEO has contracted to comply with ICE's standards for treatment of civil immigrant detainees.

   e.  If proven, the GEO policies and practices documented in the record evidence I have reviewed violate the standards for treatment of civil immigrant detainees.

   f.  ICE's oversight of its immigration detention facilities does not reliably induce compliance with the standards for treatment of civil immigrant detainees.

14.     My work on this matter is ongoing and my opinions are based on the information I have reviewed to date. It is my understanding that additional documents and information may be forthcoming during the course of this litigation, and that discovery is ongoing. Based on the information I have reviewed I am confident in the opinions contained in this declaration. I reserve the right to supplement my opinions as additional information becomes available.

## III.   THE U.S. CIVIL IMMIGRATION DETENTION SYSTEM AND THE STANDARDS REGARDING DETAINEE TREATMENT

### A. An Overview of the U.S. Civil Immigration Detention System

15.     The U.S. has two chief systems of immigrant detention, run by two different DHS components. U.S. Customs and Border Protection (CBP) has a large network of short-term detention facilities, often referred to as hold rooms. These are the rough equivalent of police lock-ups; they are intended to house recent entrants to the United States for a few days pending their speedy removal, transfer to longer term detention, or release. My report does not concern any CBP facilities.

16.     U.S. Immigration and Customs Enforcement (ICE) has an even larger network of both short- and longer-term detention facilities, which house non-citizen immigrant detainees who are (a) awaiting the start of removal proceedings, (b) in the process of removal adjudication, or (c) post-adjudication awaiting removal.

17.     The population figures set out in Table 1 below tally the number of ICE detainees at various times.[5] Until a significant decrease in the immigration detainee population caused by the COVID pandemic, ICE had approximately 50,000 immigrant detainees housed at hundreds of facilities.

---

[5] FY 1995-2000 data are from ALISON SISKIN, CONG. RESEARCH SERV., RL32369, IMMIGRATION-RELATED DETENTION: CURRENT LEGISLATIVE ISSUES (2004), *available at* https://www.everycr sreport.com/files/20040428_RL32369_77874a3cf7c9d27cd54bae1d9af93f1519de940a.pdf. FY 2001-2012 data are from ALISON SISKIN, CONG. RESEARCH SERV., RL32369, IMMIGRATION-RELATED DETENTION: CURRENT LEGISLATIVE ISSUES (2012), *available at* https://www. everycrsreport.com/files/20120112_RL32369_7fe4a01746c3b02572a0d42e9358de259539898d.pdf. FY 2013-2016 data are from U.S. DEP'T OF HOMELAND SEC., U.S. IMMIGR. & CUSTOMS ENFORCEMENT, BUDGET OVERVIEW: CONGRESSIONAL JUSTIFICATION 14 (2018), https://www.dhs. gov/sites/default/files/publications/ICE%20FY18%20Budget.pdf. FY 2017-2018 data are from U.S. DEP'T OF HOMELAND SEC., U.S. IMMIGR. & CUSTOMS ENFORCEMENT, BUDGET OVERVIEW: CONGRESSIONAL JUSTIFICATION 6 (2020), https://www.dhs.gov/sites/default/files/publications/ 19_0318_MGMT_CBJ-Immigration-Customs-Enforcement_0.pdf. FY 2019 data are from U.S. DEP'T OF HOMELAND SEC., U.S. IMMIGR. & CUSTOMS ENFORCEMENT, U.S. IMMIGR. AND CUSTOMS ENFORCEMENT FISCAL YEAR 2019 ENFORCEMENT AND REMOVAL OPERATIONS REPORT 5 (2019), https://www.ice.gov/sites/default/files/documents/Document/2019/eroReportFY2019.pdf. July 2020 data are from *Detention Statistics*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice. gov/detention-management, https://perma.cc/6XTP-RVYH.

**Table 1: ICE Detention Statistics**

| Fiscal Year | Detainee Population |
|:---:|:---:|
| 1995 | 7,475 |
| 2000 | 19,458 |
| 2005 | 19,619 |
| 2010 | 30,885 |
| 2015 | 28,449 |
| 2016 | 34,376 |
| 2017 | 38,106 |
| 2018 | 42,188 |
| 2019 | 50,165 |
| July 2020 | 21,884 |

## B. An Overview of the Standards for Treatment of Civil Immigrant Detainees

18.     ICE has issued four different sets of standards governing ICE detention: the 2000 National Detention Standards (NDS), revised in 2019[6]; the Family Residential Standards, issued in 2007[7]; the 2008 Performance Based National Detention Standards[8] (PBNDS 2008); and the 2011 Performance Based National Detention Standards (PBNDS 2011), revised in 2016[9] largely to reflect civil rights initiatives—sexual abuse prevention, disability and language access, use of solitary confinement, use-of-force reporting, and others.[10]

---

[6] *See 2000 Detention Operations Manual*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice.gov/detention-standards/2000; *2019 National Detention Standards for Non-Dedicated Facilities*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice.gov/detention-standards/ 2019.

[7] *Family Residential Standards 2020*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice.gov/ detention-standards/family-residential.

[8] *2008 Operations Manual ICE Performance-Based National Detention Standards*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice.gov/detention-standards/2008.

[9] *Performance-Based National Detention Standards 2011*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT (rev. Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf. The pre-revision versions are available at https://www.hsdl.org/?view&did=732246.

[10] *See Summary of Revisions to the ICE Performance-Based National Detention Standards, Dec. 2016,* U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice.gov/detention-standards/2011#tab1.

19.     ICE's detention standards were developed from penal detention models. The first set of standards developed, the NDS, was at its introduction in 2000 jointly applicable to facilities incarcerating DOJ contracted detainees, whether criminal or civil.[11] The American Correctional Association Adult Local Detention Facilities (that is, jail) standards were the starting point for the drafting of the NDS, and this origin in criminal justice practice remains evident in the other detention standards as well.

20.     Operational policies and procedures are likewise penal in approach. And—setting to one side the family residential centers (which have their own serious issues[12])—immigration detention facilities are nearly indistinguishable from criminal confinement settings. "Non-dedicated" facilities house criminal detainees/prisoners along with immigrant detainees, and even "dedicated" facilities look and feel like jails or prisons.[13]

21.     Yet wherever they are housed, it is important to remember that immigrant detainees are held for *civil* purposes. Like jail pretrial detainees, their detention is *not* premised on conviction of a crime. But even more, their detention is not premised even on *accusation* of a crime. The immigration proceedings in which they are involved are civil, not criminal, and immigration violations (for those who have committed immigration violations) are likewise civil, not criminal.[14] Conditions

---

[11] *See Detention Standards and Compliance Division: History of the Federal Performance-Based Detention Standards*, OFFICE OF THE FEDERAL DETENTION TRUSTEE, https://www.justice.gov/archive/ofdt/qap-brochure.pdf.

[12] *See* REPORT OF THE ICE ADVISORY COMMITTEE ON FAMILY RESIDENTIAL CENTERS (Oct. 7, 2016), https://www.ice.gov/sites/default/files/documents/Report/2016/acfrc-report-final-102016.pdf.

[13] For example, Adelanto was constructed as a prison in 1991 and housed California State prisoners. GEO bought Adelanto in 2010 and converted it for use as an ICE detention facility. *See* Memorandum from Jay M. Brooks, Dep. Ass't Dir., Detention Mgt. Div., to Tae D. Johnson, Ass't Dir. Custody Mgt., Request for Waiver of Number of Detainee Showers, Toilets, and Sinks at Adelanto Correctional Facility (June 3, 2016), *available in* https://www.ice.gov/doclib/facilityInspections/2019waivers1.zip.

[14] While some immigrant detainees have been convicted of criminal offenses, the majority have not. The most recent data available (July 2019) show that 70% of ICE detainees have no criminal convictions. *See Immigr. and Customs Enforcement Detention: ICE Data Snapshots*, TRAC IMMIGRATION, https://trac.syr.edu/phptools/immigration/detention/ (last visited Aug. 10, 2020). *See also Growth in ICE Detention Fueled by Immigrants with no Criminal Conviction*, TRAC IMMIGRATION (Nov. 26, 2019), https://trac.syr.edu/immigration/reports/583. Even among the minority of detainees with criminal convictions, the seriousness of those convictions has been declining in recent years and is usually quite minor, particularly when compared to a typical prison, or even jail, population. For over half (of the 30% with any conviction), the most serious crime of conviction is a misdemeanor. *See Immigr. and Customs Enforcement Detention: ICE Data Snapshots*, TRAC IMMIGRATION, https://trac.syr.edu/phptools/immigration/detention/ (last visited Aug. 10, 2020) (misdemeanor statistics are marked as

9

of confinement in immigration detention are required to be nonpunitive in nature.

22.     The particular set of standards applicable to each detention facility are negotiated with and incorporated into ICE's contract with its operator. ICE negotiated with detention facility operators beginning in 2008 to bring them under the PBNDS—but then decided that for non-dedicated facilities, it would no longer seek this change.[15] Thus for non-dedicated facilities, the 2000 NDS are the operative detention standards and are expected to remain so. In addition, as revised in 2019, the current version of the NDS are less strict than either the PBNDS 2011 or the 2000 NDS. As ICE explained when it circulated the revision:

> While the agency's goal is to expand the proportion of the detainee population under the 2011 Performance-Based National Detention Standards (PBNDS), which include many correctional best practices and are tailored for dedicated ICE populations, many smaller local facilities cannot meet these extensive standards.[16]

And ICE explains further on its website:

> Based on ICE's experience with its state and local law enforcement partners, and the understanding that local practice appropriately covers many requirements that were explicitly enumerated in NDS, NDS 2019 streamlines several prior standards.[17]

The 2000 NDS set an even lower bar than the PBNDS, and the 2019 NDS lower still.

---

"Level 3"). *See also ICE Detains Fewer Immigrants with Serious Criminal Convictions Under Trump Administration*, TRAC IMMIGRATION (Dec. 6, 2019), https://trac.syr.edu/immigration/reports/585/.

[15] U.S. DEP'T OF HOMELAND SEC., U.S. IMMIGR. & CUSTOMS ENFORCEMENT, PROGRESS IN IMPLEMENTING 2011 PBNDS STANDARD AND DHS PREA REQUIREMENTS AT DETENTION FACILITIES: FY 2017 REPORT TO CONGRESS 12 (2018), https://www.dhs.gov/sites/default/files/publications/ICE - Progress in Implementing 2011 PBNDS%20Standards and DHS PREA Requirements _0.pdf ("ICE believes that pursing adoption of PBNDS 2011 at a majority of existing NDS facilities would be cost-prohibitive and have a negative impact on operations through the extensive negotiations required and the likelihood of losing facilities that would not comply with the standards or where an agreement on cost could not be reached."). For a description of the jettisoned efforts to move facilities from the NDS to the PBNDS, *see* U.S. GOV'T ACCOUNTABILITY OFFICE, GAO 15-153, IMMIGRATION DETENTION: ADDITIONAL ACTIONS NEEDED TO STRENGTHEN MANAGEMENT AND OVERSIGHT OF FACILITY COSTS AND STANDARDS 32-34 (2014), https://www.gao.gov/assets/670/666467.pdf.

[16] Email from U.S. Immigr. and Customs Enforcement, to congressional committee staffer (Nov. 15, 2019, 2:03 PM EST) (on file with author).

[17] *2019 National Detention Standards for Non-Dedicated Facilities*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice.gov/detention-standards/2019.

(ICE did identify a few exceptions where the 2019 revisions added to rather than subtracted from the 2000 NDS, relating to medical care, solitary confinement, language access, sexual abuse prevention, and disability.[18])

23.      The PBNDS 2011, in particular, reflected what ICE described as its attempt to detain people "in the most humane manner possible with a focus on providing sound conditions and care." When ICE announced its 2011 standards revision, it stated, "The PBNDS 2011 are crafted to improve medical and mental health services, increase access to legal services and religious opportunities, improve communication with detainees with no or limited English proficiency, improve the process for reporting and responding to complaints, and increase recreation and visitation."[19]

24.      The PBNDS 2011 include some provisions whose application varies depending on the type of facilities. Provisions printed in italics in the standards are "specifically required for SPCs, CDFs, and Dedicated IGSA facilities. Nondedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures."[20] See Table 3 for ICE's GEO facilities and their type. In addition, there are some 2011 PBNDS standards provisions denominated "optimal." These are marked with asterisks in the standards; compliance with them is required only when contracted. (Adelanto's contract does so require. See ¶¶ 44-45, *infra*.)

25.      While ICE's standards are far from perfect, they are a key part of providing humane conditions of confinement for immigration detainees.

## C. The Detainee Population and Resulting Vulnerabilities to Intimidation

*Many ICE detainees are not present illegally and have a robust basis to fight deportation.*

26.      Not all ICE detainees are in the United States unlawfully, and not all are removable. Detainees include longtime lawful permanent residents, asylum seekers, and even individuals eventually determined to be U.S. citizens.[21] A large percentage of

---

[18] *Id.*

[19] *Performance-Based National Detention Standards 2011*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT i (rev. Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

[20] *See, e.g., id.* at § 5.8.C.

[21] *See Immigr. and Customs Enforcement Detention: ICE Data Snapshots*, TRAC IMMIGRATION, https://trac.syr.edu/phptools/immigration/detention/ (last visited Aug. 10, 2020) (providing snapshot counts of Lawful Permanent Residents and asylum seekers). For reporting about American citizens held in detention, *see* Paige St. John & Joel Rubin, *ICE Held an American Man in Custody for*

the immigrant detainee population is "pre-order"—that is, in the midst of removal proceedings that determine their right to remain in the United States.[22] ICE is not only their custodial authority, but also their prosecuting authority.

27.     These removal proceedings do not always end in removal. The government may be unsuccessful in demonstrating that an individual is removable. Or the noncitizen may successfully demonstrate an entitlement to relief or protection from removal. Immigration courts may terminate cases, which may set a detainee on a path towards citizenship. They may grant or restore lawful permanent resident status. Or they may grant other types of protection or relief. Many individuals in immigration custody are eligible for release on bond—but cannot afford a lawyer to help them prepare a bond motion or cannot afford to pay the bond assessed.

28.     That so many immigration detainees are fighting their immigration cases—and that so many of them have robust bases to do so—renders them particularly vulnerable to threats and intimidation during detention. They are concerned about the impact of conflict in detention on their immigration cases, and are often concerned that raising any complaints about their detention might induce ICE to respond more harshly in their immigration cases. In this case, for example, Plaintiff Abdiaziz Karim testified that "[I]f I don't do those things, it will affect my case; I was not going to get bond; I was not going to get released."[23] Another immigrant detainee testified before Congress that:

> I watched one woman refuse to clean (she had already cleaned the dorm next door) and as a result she was put in isolation for several weeks. . . If you refused to clean, it would be written on your record. We were made to believe that refusing any orders would lead to write ups which

---

*1,273 Days. He's Not the Only One Who Had to Prove His Citizenship*, L.A. Times (Apr. 27, 2018), https://www.latimes.com/local/lanow/la-me-citizens-ice-20180427-htmlstory.html.

[22] *See, e.g.*, U.S. Dep't of Homeland Sec., U.S. Immigr. & Customs Enforcement, U.S. Immigr. and Customs Enforcement Fiscal Year 2019 Enforcement and Removal Operations Report 4 (2019), https://www.ice.gov/sites/default/files/documents/Document/2019/eroReportFY2019.pdf ("ERO detains individuals to ensure their presence for immigration proceedings and to secure their departure from the United States once they become subject to an executable final order of removal."). ICE data on pre-order and post-order detention obtained by the ACLU under FOIA and posted at https://www.law.umich.edu/facultyhome/margoschlanger/Pages/Resources.aspx shows, for example, that in FY 2019, at least 39% of individuals who entered ICE detention were pre-order.

[23] Abdiaziz Karim Dep. 88:23-90:3, Dkt. No. 206-4.

would then directly affect our immigration cases.[24]

29.    Detainees frequently lack legal representation; in a study of removal proceedings from 2007 to 2012, only 14% of detained noncitizens with pending removal cases managed to retain paid or pro bono counsel for their immigration proceedings.[25]

30.    For the small minority of detainees with counsel, counsel access is very important—and very much at the discretion of their custodian institution. Detainees with counsel know that their access to their lawyer can be reduced or even eliminated if they are, for example, placed in solitary confinement.[26]

31.    For detainees *without* counsel the situation is even worse. The ability to manage their own pending immigration cases is fragile and highly vulnerable to custodial decision making. Solitary confinement can pose an insurmountable challenge to self-representation, making it impossible for the non-citizen to assemble what is needed to seek relief or protection from deportation.

32.    So for detainees fighting their immigration cases, avoiding conflict with detention authorities is a high priority; this renders them vulnerable to coercion and intimidation.

*Language barriers are common and cause additional vulnerabilities.*

33.    Immigrant detainees are demographically varied, coming from dozens of countries and speaking dozens of languages.[27] For example, Table 2 sets forth the citizenship of individuals present just at Adelanto in July 2019. And like any large group of people, detainees have a wide range of medical and mental health needs. Critically for the analysis here, certain aspects of their situation make immigrant detainees particularly vulnerable to intimidation by authorities.

---

[24] Selene Saavedra-Roman, written testimony, *The Expansion and Troubling Use of ICE Detention, Hearing Before the Subcomm. on Immigr. and Citizenship of the H. Judiciary Comm.*, 116th Cong. 4 (2019), Dkt. No. 210-2.

[25] *See* Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 PENN. L. REV. 1, 32 (2015); Ingrid Eagly & Steven Shafer, *Access to Counsel in Immigration Court*, AM. IMMIGRATION COUNSEL 2-9 (2016), https://www.americanimmigrationcouncil.org/sites/default/files/research/access_to_counsel_in_immigration_court.pdf.

[26] *See, e.g.*, Abdiaziz Karim Dep. 88:23-90:3, Dkt. No. 206-4.

[27] *See also* Xavier Becerra, Cal. Att'y Gen., *Review of Immigration Detention in California*, CAL. DEP'T OF JUSTICE 22 (Feb. 2019), https://oag.ca.gov/sites/all/files/agweb/pdfs/publications/immigration-detention-2019.pdf (Novoa_0006854 at 22).

Table 2: Citizenship of Adelanto Detainees, July 2019

| Country | # | % |
|---|---|---|
| Mexico | 545 | 31.6% |
| El Salvador | 187 | 10.9% |
| Guatemala | 137 | 8.0% |
| Honduras | 125 | 7.3% |
| India | 122 | 7.1% |
| Cuba | 107 | 6.2% |
| China, Peoples Republic of | 86 | 5.0% |
| Cameroon | 82 | 4.8% |
| Nicaragua | 32 | 1.9% |
| All Other | 300 | 17.2% |
| **TOTAL** | **1723** | **100%** |

34.     Many immigration detainees have limited English proficiency—written, verbal, or both—and language access is a significant barrier for these individuals. Many Latin American immigrant detainees also do not speak and/or write Spanish; they may speak any of a dozen or more indigenous languages such as Quiche, Mam, Achi, Awakatek, Popti, Ixil.[28]

35.     Facility and ICE handbooks and posted notices are generally available in English and Spanish. For detainees who do not have adequate proficiency in English or Spanish, it can therefore be particularly difficult to understand facility rules and how to seek accommodations. The inability to understand facility staff can come at a great price in detention. Officers can get angry or frustrated, or simply punish detainees who fail to comply with orders they do not understand. A detainee's inability to understand facility rules can lead to discipline including loss of visitation and recreation privileges. Uninformed detainees who do not understand the basis for facility action can experience these events as arbitrary, intimidating, and abusive.

*Other important aspects of immigrant detainee backgrounds*

36.     Detainees whose country of origin is repressive often fear to challenge the authority of detention authorities, worrying about retaliation for any legal

---

[28] *See* U.S. DEP'T OF HOMELAND SEC., U.S. IMMIGR. & CUSTOMS ENFORCEMENT, LANGUAGE ACCESS PLAN 10 (2015), https://www.ice.gov/sites/default/files/documents/Document/2015/LanguageAccessPlan.pdf.

14

challenge they pursue.

37.     And because detention is such a disorienting environment, detainees highly value stability and any relationships they are able to forge with their fellow detainees. The threat of being transferred to a new housing unit or detention facility, away from routines that have become manageable, perhaps away from compatriots or fellow language speakers, can be very significant. As GEO's own classification officer testified, "It wouldn't be fair if somebody spoke Korean and we put them in a dorm that he couldn't speak to anybody."[29]

## D. As an ICE Contractor, GEO is Governed by Contracted Detention standards.

38.     According to ICE's posted data, which is the basis of Table 3, GEO operates 23 facilities (or 20, if the Folkston, Denver, and Rio Grande facilities are counted as one rather than two per location).[30] As of July 2019 (the most recent data available), defendant GEO was the facility operator with the most ICE detainees; GEO facilities held 15,939 immigration detainees—over 28% of the national total.[31]

39.     Most GEO facilities are "dedicated" facilities, meaning that they house only ICE detainees. Five, marked in Table 3, are non-dedicated; they also house individuals who are not immigrant detainees—in particular, for these facilities, federal criminal detainees for the U.S. Marshals Service. Facility-type classifications as marked in Table 3 are:

a.  **CDF** (Contract Detention Facility). These are facilities owned and operated by private companies and contracted directly by ICE.

b.  **DIGSA** (Dedicated Inter-Governmental Service Agreement). These are facilities that house only ICE detainees, operated under an inter-governmental service agreement. The DIGSAs generally involve a

---

[29] Mary Wise-McCormick Dep. 142:10-12.

[30] I used data from TRAC, *Immigr. and Customs Enforcement Detention: ICE Data Snapshots*, TRAC IMMIGRATION, https://trac.syr.edu/phptools/immigration/detention/ (last visited Aug. 10, 2020), to obtain the list of GEO-operated facilities and their July 2019 detainee counts. TRAC gets those data from ICE. *See About the Data—ICE Detention*, TRAC IMMIGRATION, https://trac.syr.edu /phptools/immigration/detention/about_data.html. I used ICE's posted information on facility inspections for the rest of Table 2. *See Facility Inspections*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice.gov/facility-inspections.

[31] *Immigr. and Customs Enforcement Detention: ICE Data Snapshots*, TRAC IMMIGRATION, https://trac.syr.edu/phptools/immigration/detention/.

further contract with a private company that actually operates them.[32] This contracting tool allows ICE "much greater flexibility than a traditional procurement agreement," because ICE believes IGSAs are not covered by the Federal Acquisition Regulations (FARs).[33]

c. **USMS CDF** (United States Marshals Service Contract Detention Facility). These are facilities contracted by U.S. Marshals Service that ICE also agrees to use as a contract rider. At the USMS CDF facility listed in Table 3, the USMS has a contract for hundreds of beds for federal criminal detainees.[34] ICE uses a few dozen of those.

d. **FAMILY** (Family Residential Center). These house mothers or fathers with their children.

e. **USMS IGA** (United States Marshals Service Inter-Governmental Agreement). These are facilities contracted by U.S. Marshals Service that ICE also agrees to use as a contract rider. At the USMS IGAs listed in Table 3, the USMS has contracts with the USMS for hundreds of beds for federal criminal detainees.[35] ICE uses a small number.[36]

---

[32] The only exception appears to be the Caroline Detention Facility, in Bowling Green, Virginia; it is operated by county authorities. *See* Adele Uphaus, *Illegal Immigrants to be Held in Former Peumansend Jail in Caroline*, FREE LANCE-STAR (July 3, 2018), https://www.fredericksburg.com/news/local/illegal-immigrants-to-be-held-in-former-peumansend-jail-in/article_319641c0-c011-5d2f-aa58-6ddefa3ceefa.html; *Peumansend Creek Regional Jail Authority Operator of the Caroline Detention Facility*, CAROLINE DETENTION FACILITY, http://carolinedf.org/peumansend-creek-regional-jail-authority/.

[33] OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC., OIG-18-53, IMMIGRATION AND CUSTOMS ENFORCEMENT DID NOT FOLLOW FEDERAL PROCUREMENT GUIDELINES WHEN CONTRACTING FOR DETENTION SERVICES 7 (Feb. 21, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-02/OIG-18-53-Feb18.pdf.

[34] *See Our Locations: Robert A. Deyton Detention Facility*, GEO GROUP, https://www.geogroup.com/FacilityDetail/FacilityID/79.

[35] *Our Locations: Coastal Bend Detention Center*, GEO GROUP, https://www.geogroup.com/FacilityDetail/FacilityID/43; *Our Locations: East Hidalgo Detention Center*, GEO GROUP, https://www.geogroup.com/FacilityDetail/FacilityID/48; *Our Locations: Val Verde County Detention Facility*, GEO GROUP, https://www.geogroup.com/FacilityDetail/FacilityID/41.

[36] ICE also has Service Processing Centers, SPCs, which are owned by ICE and generally operated by contract detention staff. GEO does not operate any SPCs.

Table 3: ICE's GEO facilities: Location, Type, Population, Standards, and Inspection

| Facility Name | Location | Type | July 2019 Count | Inspection Standard | Most Recent Inspection |
|---|---|---|---|---|---|
| Adelanto ICE Processing Center ("IPC") | Adelanto, CA | DIGSA | 1,723 | PBNDS 2011 | 11/21/2019 |
| South Texas IPC | Pearsall, TX | CDF | 1,996 | PBNDS 2011 | 2/27/2020 |
| Tacoma IPC (NW Det. Ctr.) | Tacoma, WA | CDF | 1,309 | PBNDS 2011 | 5/16/2019 |
| Karnes County Residential Center | Karnes City, TX | FAMILY | 1,237 | JFRMU Family | 2/25/2020 |
| Lasalle IPC (Jena) | Jena, LA | DIGSA | 1,096 | PBNDS 2011 | 9/26/2019 |
| Montgomery IPC | Conroe, TX | CDF | 1,014 | PBNDS 2011 | 12/19/2019 |
| Pine Prairie IPC | Pine Prairie, LA | DIGSA | 939 | PBNDS 2011 | 4/25/2019 |
| Basile Det. Center (South Louisiana IPC) | Basile, LA | IGSA | 858 | PBNDS 2011 | 11/7/2019 |
| Denver Contract Det. Fac. | Aurora, CO | CDF | 817 | PBNDS 2011 | 11/27/2019 |
| Montgomery County Jail | Montgomery City, MO | IGSA | 773 | NDS | 11/7/2019 |
| Rio Grande Det. Ctr. | Laredo, TX | USMS CDF | 707 | PBNDS 2008 | 3/14/2019 |
| Rio Grande IPC | Laredo, TX | IGSA | Unknown | PBNDS 2008 | 3/12/2020 |
| Broward Transitional Center | Pompano Beach, FL | CDF | 687 | PBNDS 2011 | 10/31/2019 |
| Folkston IPC (D Ray James) | Folkston, GA | DIGSA | 648 | PBNDS 2011 | 6/6/2019 |
| Coastal Bend Det. Facility (non-dedicated) | Robstown, TX | USMS IGA | 371 | PBNDS 2008 | 1/9/2019 |
| Denver Contract Det. Fac. | Aurora, CO | CDF | 358 | PBNDS 2011 | 11/27/2019 |
| Mesa Verde IPC | Bakersfield, CA | CDF | 354 | PBNDS 2011 | 6/27/2019 |
| Alexandria Staging Facility | Alexandria, LA | Staging | 338 | None noted | None noted |
| Annex - Folkston IPC | Folkston, GA | DIGSA | 279 | PBNDS 2011 | 6/6/19 |
| Val Verde Corr. Fac. (non-dedicated) | Del Rio, TX | USMS IGA | 256 | NDS | 9/19/19 |
| Brooks County Jail (non-dedicated) | Falfurrias, TX | USMS IGA | 95 | NDS | 2/21/20 |
| Robert A. Deyton Det. Fac. (non-dedicated) | Lovejoy, GA | USMS CDF | 43 | NDS | 12/5/19 |
| East Hidalgo Det. Ctr. (non-dedicated) | La Villa, TX | USMS IGA | 41 | NDS | 9/6/19 |

40.     GEO has several different contracts with ICE: three have been posted on ICE's FOIA page (one for Aurora and two for the South Texas Detention Complex).[37] The advocacy organization National Immigrant Justice Center has posted several more, obtained under the Freedom of Information Act.[38]

41.     I have reviewed the Intergovernmental Services Agreement (IGSA) and Services Contract for the Adelanto facility (collectively, the "2011 Adelanto contract") which went into effect in mid-2011. In June 2019, ICE and GEO entered into a direct contract governing Adelanto known as the "Bridge Contract." I have also reviewed that contract. I understand that the Bridge Contract was replaced on December 19, 2019 by another new direct contract between ICE and GEO governing Adelanto. I have also reviewed that contract.

42.     The 2011 Adelanto Contract incorporated the "2008 edition of ICE Performance Based National Detention Standards (PBNDS)," stating:

> The Service Provider is required, in units housing U.S. Immigration and Customs Enforcement (ICE) detainees, to perform in accordance with the 2008 ICE Performance Based Performance Based National Detention Standards (PBNDS), American Correctional Association (ACA) Standards for Adult Local Detention Facilities (ALDF), and Standards Supplement, Standards for Health Services in Jails, latest edition, National Commission on Correctional Health Care (NCCHC). Some ACA standards are augmented by ICE policy and/or procedure. In cases where other standards conflict with ICE Policy or Standards, ICE Policy and Standards prevail. ICE Inspectors will conduct periodic inspections of the facility to assure compliance of the ICE Performance Based Performance Based National Detention Standards.[39]

The specifics of the PBNDS "expected outcomes" are also repeated in the contract.[40]

---

[37] *See FOIA Library*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice.gov/foia/library. The South Texas Detention Complex contracts are available at https://www.ice.gov/doclib/foia/contracts/GEO%20Group%20-%20HSCEDM12D00001.pdf and https://www.ice.gov/doclib/foia/contracts/geogrouphscedm09f00001.pdf; the Aurora contract is available at https://www.ice.gov/doclib/foia/contracts/hsceop06d00010geo.pdf.

[38] *See Transparency and Human Rights Project*, NAT'L IMMIGR. JUSTICE CTR., https://immigrantjustice.org/issues/transparencyandhumanrights.

[39] *Id.*, Statement of Work, Exhibit A (GOWER-GEO_0000531).

[40] *Id.*, EROIGSA-11-0003, 8-37 (GEO-Novoa_00037692 at 37538-67).

43.     The 2011 Adelanto contract includes a Quality Assurance Surveillance Plan.[41] It includes a "Performance Requirements Summary" and states: "The Performance Requirements Summary (PRS) communicates what the Government intends to qualitatively inspect.[42] The PRS is based on the American Correctional Association (ACA) Standards for Adult Local Detention Facilities (ALDF) and ICE 2011 Performance Based National Detention Standards (PBNDS)."[43]

44.     Adelanto's 2019 Bridge Contract incorporates the PBNDS 2011, as revised in 2016, stating:

> The Contractor is required . . . to perform in accordance with the 2011 ICE Performance Based Performance Based [sic] National Detention Standards (PBNDS), 2016 Revisions dated December 2016 (PBNDS 2011, 2016 revisions), including optimal provisions. Optimal provisions are listed in Attachment 5 to the agreement with the contractor, American Correctional Association (ACA) Standards for Adult Local Detention Facilities (ALDF), and Standards Supplement, Standards for Health Services in Jails, latest edition, National Commission on Correctional Health Care (NCCHC). Some ACA standards are augmented by ICE policy and/or procedure. In cases where other standards conflict with ICE Policy or Standards, ICE Policy and Standards prevail. ICE Inspectors will conduct periodic inspections of the facility to assure compliance of the ICE Performance Based Performance Based National Detention Standards.[44]

45.     The Performance Work Statement of the subsequent 2019 Adelanto Contract provides (materially identically):

> The Contractor is required . . . to perform in accordance with the 2011 ICE Performance Based Performance Based National Detention Standards (PBNDS), with 2016 Revisions dated December 2016 (PBNDS 2011, 2016 Revisions), including optimal provisions. Contractor will also need to comply with American Correctional Association (ACA) Standards for Adult Local Detention Facilities (ALDF), and the Standards Supplement, as well as Standards for Health Services in Jails, latest edition, and National Commission

---

[41] *Id.*, Quality Assurance Surveillance Plan, Exhibit D, 1-6 (GEO-Novoa_00037692 at 37692-97).

[42] *Id.* at 1 (GEO-Novoa_00037692 at 37692).

[43] *Id.*

[44] 2019 Bridge Contract between the United States Department of Homeland Security U.S., Immigration and Customs Enforcement and GEO Group (GEO-Novoa_00035044 at 35195).

on Correctional Health Care (NCCHC). Some ACA standards are augmented
by ICE policy and/or procedure. In cases where other standards conflict with
ICE Policy or Standards, ICE Policy and Standards prevail. ICE Inspectors will
conduct periodic inspections of the facility to assure compliance of the ICE
Performance Based Performance Based National Detention Standards.[45]

46.     It is not unusual for incarceration facilities such as civil immigration
detention facilities to be subject to multiple sets of standards. Differences between
those standards do not ordinarily constitute conflicts because facility compliance with
the most restrictive standard usually is allowed under the others. A true conflict
occurs only when it is actually impossible to comply with all the applicable standards
at the same time—if, for example, one standard requires something that another
standard forbids. I am not aware of any such conflicts in any applicable standards that
are material to my opinions here.

## IV.   IF PROVEN, THE RECORD EVIDENCE DEMONSTRATES THAT GEO'S POLICIES AND PRACTICES VIOLATE IMMIGRATION DETAINEES' RIGHTS.

47.     Compliance with immigration detention standards is a key part of
ensuring that conditions of compliance are humane and that the rights of civil
detainees are not violated.

48.     If the record evidence I have reviewed (as set forth in Exhibit 2) is
proven, it establishes that the policies and practices GEO admits it administers—
GEO's Voluntary Work Program and its housing unit sanitation policies—violate
ICE's standards for treatment of civil immigrant detainees. In particular:

- GEO's "Voluntary Work Program" is not voluntary.

- Some detainees who do the tasks covered by the "Voluntary Work Program" are uncompensated.

- GEO's Housing Unit Sanitation policies impose mandatory work requirements not authorized by the PBNDS.

## A. GEO's "Voluntary Work Program" Is Not Voluntary.

49.     In my opinion, GEO's policies and practices regarding detainee

---

[45] 2019 Contract between the United States Department of Homeland Security U.S., Immigration
and Customs Enforcement and GEO Group, Requirement D, PWS Addendum (GEO-
Novoa_00041146).

participation in its "Voluntary Work Program" do not comply with the PBNDS.

50.    Under § 5.8 of the PBNDS 2011, GEO must create a detainee Voluntary Work Program ("VWP") that complies with the PBNDS requirements. The PBNDS permits detainees to "have opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of the safety, security and good order of the facility." It therefore directs that they "shall be able to volunteer for work assignments," while mandating that detainees "otherwise shall not be required to work, except to do personal housekeeping."

51.    The standard explicitly and repeatedly requires that detention work programs must be voluntary, outside of personal housekeeping (discussed below in ¶¶ 58-65).

52.    Yet—if the evidence plaintiffs have placed in the record is proven—GEO has threatened detainees with negative consequences, including solitary or disciplinary confinement, housing transfers, loss of privilege, if they refuse to provide their labor either without pay or by participation in the "voluntary" work program.[46] For all the reasons described in ¶¶ 28-37, detainees are especially susceptible to such threats. Because coerced participation is *not* voluntary, in my opinion such threats violate the PBNDS.

53.    In addition, ICE detention standards require that detainees be given appropriate food and personal hygiene items and services (PBNDS 2011 §§ 4.1, 4.5). Withholding necessities from detainees in an effort to compel them to work in order to buy such necessities for themselves would similarly violate the requirement that the program be voluntary.[47]

---

[46] For examples of threats related to the "voluntary work program," *see* Raul Novoa Dep. 44:15-18, Dkt. 206-2 (when plaintiff Novoa wished to stop working as a barber, "I wouldn't get some things that I needed. My bunk was scattered. They would go through my bunk."); Abdiaziz Karim Dep. 88:23-90:3, Dkt. 206-4 (describing GEO staff message that participating in the work program would be good for his case); Selene Saavedra-Roman, written testimony at 4, *The Expansion and Troubling Use of ICE Detention: Hearing before the Subcomm. on Immigr. and Citizenship of the H. Judiciary Comm.,* 116th Cong. 2019, Dkt. 210-2. For examples of threats related to mandatory cleaning of living areas that exceeded the PBNDS's permissible personal housekeeping, *see* Jaime Campos Fuentes Dep. 75:12-24, Dkt. 206-1 ("GEO or the officers would lock us up in our rooms or cells until somebody went to do it."); Karim Dep. 88:23-90:3, Dkt. 206-4 ("[I]f I don't do those things, it will affect my case; I was not going to get bond; I was not going to get released.").

[47] For instance, the record in this case includes individual detainees' accounts that they lacked sufficient food, clothing, or personal hygiene items. They explain that they worked, with or without pay, in order to receive such necessities as gifts from officers, or to increase their commissary

## B. Some Detainees Who Do the Tasks Covered by the "Voluntary Work Program" are Uncompensated.

54.     ICE requires that "Detainees shall receive monetary compensation for work completed in accordance with the facility's standard policy," and that "[t]he compensation is at least $1.00 (USD) per day." (PBNDS § 5.8.K.)

55.     The evidence in the record demonstrates that GEO permits detainees at the Adelanto Facility to perform work outside their housing units—often doing the same tasks as detainees in the voluntary work program who are paid $1/day—for no compensation at all.[48] These unpaid detainees apparently "volunteer," sometimes in order to get onto a waiting list for the compensated work program,[49] and other times because they believe their participation is mandatory.[50]

56.     In addition, detainees apparently sometimes work for no compensation in hopes of receiving benefits from GEO staff, such as "an extra sack lunch," or "little special bags with candy and chips in it."[51]

---

balance and purchase those necessities. *See* Ramon Mancia Decl. ¶8, Dkt 192-6; Raul Novoa Decl. ¶15, Dkt 192-3; Jaime Campos Fuentes Decl. ¶11, Dkt 192-4; Abdiaziz Karim Decl. ¶17, Dkt 192-5.

[48] Detainee Work Detail Application, Dkt. 193-17 ("There are 40 paid positions in the work member detail program. If all paid positions are filled, would you be interested in working on a voluntary basis?"); Mary Wise-McCormick Dep. 198:7-17 (describing this form); GEO Email re Particular Detainee payroll issues, Dkt. 193-20 (asking, regarding detainee "porter," "Could you please verify if he is in fact a detainee worker in a paid position or a volunteer."); GEO Email re Detainee Workers, Dkt. 193-21 ("Have these detainees been cleared by ice [sic] yet? They are volunteering."); ADC Detainee Payroll, Dkt. 193-22 (GEO's detainee payroll list describing some detainee workers as "volunteers" and others as paid). *See also* Abdiaziz Karim Decl.  ¶¶ 7, 9, 10, Dkt. 192-5; Ramon Mancia Decl. ¶¶ 8, 9, Dkt. 192-6; Gagandeep Marwaha Decl. ¶¶ 8, 9, 10, Dkt. 192-7; Fernando Munoz Decl. ¶¶ 9, 10, Dkt. 192-8.

[49] See, e.g., Mary Wise-McCormick Dep. 41:5-14, 97:2-20, 122:18-22; 168:3-11(discussing work program wait lists and detainees' desire to get into compensated work program); sources cited supra note 48.

[50] See, e.g., Abdiaziz Karim Decl. ¶ 10, Dkt. 192-5; Fernando Munoz Decl. ¶¶ 9, 10, Dkt. 192-8.

[51] Mary Wise McCormick Dep. 42:13-24. *See also* Jaime Campos Fuentes Decl. ¶¶9, Dkt. 192-4; Ramon Mancia Decl. ¶¶ 8, 10, Dkt. 192-6; Second Request for Admissions No. 26, Dkt. 193-34 (requesting admission that "GEO occasionally provides extra food, clothing, batteries, and/or personal hygiene items to detainees at the Adelanto Facility who perform work, tasks, or other labor") (I understand this has been deemed admitted). Extra food is also sometimes provided to detainee workers who do get their dollar per day. *See* GEO Monthly Food Service Department Minutes pp. 2, Dkt. 193-13 ("We have been granted permission from Warden Janecka to treat our

57.     If proven, both these practices violate the PBNDS 2011 because detainee workers are not paid the required dollar per day.

## C. GEO's Housing Unit Sanitation Policies Impose Mandatory Work Requirements Not Authorized by the PBNDS.

58.     ICE has authorized its contractors to require "personal housekeeping" by detainees. The requirement is set forth in PBNDS § 5.8.C, which states in full:[52]

> Work assignments are voluntary; however, all detainees are responsible for personal housekeeping.
>
> *Detainees are required to maintain their immediate living areas in a neat and orderly manner by:*
>
> *1. making their bunk beds daily;*
> *2. stacking loose papers;*
> *3. keeping the floor free of debris and dividers free of clutter; and*
> *4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture.*

59.     The words "personal" and "immediate" are important to this standard. "Personal housekeeping" is not the same as (unmodified) housekeeping. And "immediate living areas" is not the same as (unmodified) living areas.

60.     At Adelanto, numerous GEO documents expand on how the facility's sanitation program/policy works.

61.     GEO's Adelanto Sanitation Procedures/Housekeeping Plan (Adelanto SP/HP) requires detainees to perform a wide range of duties beyond the basic housekeeping chores permitted by the PBNDS, which (as quoted above, ¶ 58), limits required tasks to those involving a detainee's "immediate living area" and elaborates only minimal practices of tidiness—making their beds, stacking loose papers, keeping

---

detainee workers to treats, such as extra dessert, ice cream, peanut butter & jelly sandwiches, breakfast tacos, monkey bread, etc.").

[52] The italics appear in the original. As it explains "Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities. Nondedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures." *Performance-Based National Detention Standards 2011*, U.S. Immigr. & Customs Enforcement 405 (rev. Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf. Adelanto is a Dedicated IGSA facility. *See* Table 3, ¶ 39.

the area free of debris/clutter. By contrast, the Adelanto SP/HP states explicitly[53]:

> Each detainee will be responsible for the cleanliness of his or her cell or living area, including walls, floors, sink, toilet, windows, and other property within the cell, room, or living area. . .

> At 6:00 a.m. each day, the following items will be issued:

> • Mops and buckets
> • Brooms
> • Scrub brushes
> • Cleaning rags
> • Cleaning Chemicals

62.     Adelanto's instructions to its staff amplify that detainees' mandatory cleaning obligations extend not just to their "immediate living area" as the PBNDS specifies, but far beyond—to entire living units[54]:

> Living Area/Bed and Locker Assignments
> All detainees in a unit are required to keep clean and sanitary all commonly accessible areas of the unit including walls, floors, windows, window ledges, showers, sinks, microwaves, tables, and chairs.
> 1. Cleaning supplies will be provided as needed to maintain the highest sanitation standards.
> 2. Detainees will take turns cleaning the area.
> 3. The day room area will be kept clean at all times. Should an Officer notice that the area is not clean, the Officer will make available necessary cleaning supplies. If the detainees in the unit do not clean the area after being instructed to do so, the television will be turned off and the detainees will not be permitted to participate in any activities/programs until the unit is cleaned. Continued refusal to clean the area will result in further disciplinary action. . . .

> Housing Unit Sanitation
> Each and every detainee must participate in the facility's sanitation program. A list of detainees is to be developed each day by the housing unit Officer. During a general cleanup all detainees must participate.

---

[53] Adelanto Sanitation Procedures/Housekeeping Plan, Exh. 23 to Wright Dec. at 2, Dkt. No. 193-23.

[54] Adelanto Policy and Procedure Manual, Post Orders, 10.3.5, Exh. 24 to Wright Dec. at 3-4, Dkt. No. 193-24.

The housing unit Officer will be responsible for assuring this general cleanup is done on a regular basis and that adequate supplies needed for cleaning are present.

63.     An Adelanto Detainee Handbook makes the threat of discipline explicit, stating, "Detainees are required to keep their assigned living areas clean at all times." The handbook assigns as a "high moderate" disciplinary offense "Refusal to clean assigned living area." By policy, high moderate disciplinary offenses may be punished by, among other penalties[55]:

> Disciplinary restriction up to 72 hours . . .
> Loss of privileges (e.g, commissary, movies, recreation, etc.)
> Change of housing
> Removal from program and/or group activity
> Loss of Job. . .
> Restrict to living unit

64.     In short, at Adelanto, GEO policy makes detainees responsible, under threat of loss of privileges or harsher discipline, for cleaning not just their "immediate living area," but entire housing units, including day spaces, eating and cooking areas, bathrooms, and more. Moreover, the tasks covered by Adelanto's mandatory cleaning policies are not mere straightening—as § 5.8 allows in the "immediate living area"— but much more intensive cleaning, requiring supervision and using chemicals and cleaning implements. GEO's extensive mandatory cleaning requirements for detainees conflict on their face with the PBNDS provisions about "personal housekeeping" and "voluntary work programs." The tasks required go far beyond any reasonable understanding of what "personal housekeeping" in detainees' "immediate living area" may permissibly encompass. And they are neither voluntary nor paid for, so not compliant with the PBNDS requirements for detainee "voluntary work programs."

65.     To be clear, ICE does require, via the PBNDS, that "[r]efusing to clean assigned living area" be classified as a "high moderate" disciplinary offense.[56] But the only reasonable way to read this provision is in conjunction with § 5.8's "personal housekeeping provision," which as already described, states that "detainees are responsible for personal housekeeping," and therefore "required to maintain their immediate living areas in a neat and orderly manner by: 1. making their bunk beds daily; 2. stacking loose papers; 3. keeping the floor free of debris and dividers free of

---

[55] Supplemental Detainee Handbook for Adelanto, Dkt 193-16 at 28.

[56] *Performance-Based National Detention Standards 2011*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT 405, Appendix 3.1.A: Offense Categories, item 306 (rev. Dec. 2016), https://www.ice.gov/doclib/ detention-standards/2011/pbnds2011r2016.pdf.

clutter; and 4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture." Under the other parts of § 5.8, other cleaning assignments are to be made only as part of the minimally compensated "voluntary work program."

## V.   DHS OVERSIGHT FAILS TO RELIABLY INDUCE FACILITY COMPLIANCE WITH ICE STANDARDS.

66.    DHS has several overlapping detention conditions oversight processes, described below. Some types of oversight happen routinely on a set schedule; others—generally the more thorough inquiries—occur based on complaints, adverse incidents, or special initiatives. In general, those more thorough inquiries demonstrate that the routine oversight mechanisms are insufficient to detect non-compliance or induce compliance with the applicable detention standards.

### A. ICE Routine Inspections

67.    ICE carries out three types of routine detention inspections. First, ICE's Enforcement and Removal Operations (ERO) unit, which runs ICE detention, has arranged for a private contractor, the Nakamoto Group, to conduct inspections of over-72-hour facilities. For inspections from May 2018 to March 2020, ICE has posted a cover memo and a summary document concerning the Nakamoto Group's reports; the underlying inspection reports/worksheets are not public.[57] Family Residential Centers are inspected monthly by a different contractor, Danya International; summaries from June 2019 to March 2020 for those reports are posted.[58] (Contracted inspections were halted by April 2020 due to the COVID pandemic.[59])

68.    Second, pursuant to DHS's Prison Rape Elimination Act regulation, 6

---

[57] *See Facility Inspections*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice.gov/facility-inspections. In addition, there are some posted "Annual Review", "6-Month Review", "Field Office Detention Review Worksheet", "Conditions of Confinement Inspection Worksheet" and similar documents, from 2002 to 2012 (and one from 2016), at *FOIA Library*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice.gov/foia/library. The earlier of these appear to have been written/filled in by ICE officials in the Enforcement and Removal Operations (ERO) (earlier Detention and Removal Operations or DRO) Detention Standards Compliance Unit or other ICE officials; many of the later documents seem to have been filled in by contractors, including Creative Corrections, MGT of American, and Nakamoto Group.

[58] *See Facility Inspections*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice.gov/facility-inspections.

[59] *See id.*, under the 2020 tab ("Due to the current COVID-19 CDC guidance and restrictions, no annual facility inspections were conducted during the months of April, May and June.")

C.F.R. Part 115, the Nakamoto Group also conducts triennial audits of detention facilities' PREA regulatory compliance.[60] There are about three dozen reports dated from 2017 and 2018 (and one in 2019) posted.[61] I do not know whether additional PREA inspections have been done but not posted.

69.    And third, ICE's Office of Detention Oversight (ODO)—part of the Office of Professional Responsibility (OPR), and therefore somewhat separate from ERO—conducts about 30 inspections a year, reaching ICE's largest facilities more or less every three years. There are reports posted from 2011 to June 2019.[62]

70.    There is abundant evidence that neither the ERO/Nakamoto inspections nor the ODO inspections reliably induce compliance with ICE's detention standards. The Nakamoto inspections are demonstrably worse—but even the ODO inspection system is inadequate to reliably deter, detect, and cure problems.

71.    The problems with ICE's detention inspection methodology, resourcing, and followup are longstanding. The DHS Office of Inspector General's June 2018 report on inspections pointed out:

> As some of our previous work indicates, ICE's difficulties with monitoring and enforcing compliance with detention standards stretch back many years and continue today. In 2006, the Office of Inspector General (OIG) identified issues related to ICE detention facility inspections and implementation of corrective actions. In our 2006 report, we recommended that ICE "improve the inspection process and ensure that all non-compliance deficiencies are identified and corrected." In a December 2017 report, which related to OIG's unannounced inspections of five detention facilities, we identified

---

[60] Not all facilities are covered by the PREA regulation: "As of the end of Fiscal Year (FY) 2018, ICE successfully implemented DHS PREA Subpart A standards at 50 over-72-hour facilities. These include all dedicated ICE adult facilities (i.e., facilities that exclusively hold ICE detainees), all family residential facilities and 18 non-dedicated ICE detention facilities." *PREA*, U.S. Immigr. & Customs Enforcement, https://www.ice.gov/prea. USMS IGA and CDF facilities are covered by the DOJ PREA regulation, 28 C.F.R. Part 115.

[61] PREA audits are available at *FOIA Library*, U.S. Immigr. & Customs Enforcement, https://www.ice.gov/foia/library (under PREA Audit Reports); *FOIA Categories – PREA Audit Reports*, U.S. Immigr. & Customs Enforcement, https://www.ice.gov/foia-category/prea-audit-reports; and *PREA - Audits*, U.S. Immigr. & Customs Enforcement, https://www.ice.gov/prea#tab4.

[62] *See FOIA Library – Office of Detention Oversight – Detention Facility Compliance Inspections*, U.S. Immigr. & Customs Enforcement, https://www.ice.gov/foia/library.

problems in some of the same areas noted in the 2006 report.[63]

72.    In 2016, a subcommittee of the Homeland Security Advisory Council (HSAC, an independent but DHS-appointed committee that advises the Secretary of Homeland Security), suggested that if DHS was going to continue using private contractors and local jails for immigration detention, it needed a "more robust, effective and coordinated inspection regime," including:

    a.   Conducting "qualitative review of outcomes"

    b.   Doing unannounced inspections

    c.   Improving "recognition of, and follow-up on, problematic practices identified in earlier inspections"

    d.   Improving "the array of tools and procedures used to assure effective response to identified deficiencies, including monetary withholding or contract reductions, plus rigorous follow-on review by ERO and other personnel"

    e.   Adding processes apart from inspections that would "connect[] more directly to timely remedy of deficiencies"[64]

73.    As far as I have been able to determine, very little has been done along the lines of the HSAC subcommittee report. DHS Inspector General John V. Kelly testified to a House Appropriations subcommittee in March 2019, "neither the inspections nor the onsite monitoring ensure consistent compliance with detention standards, nor do they promote comprehensive deficiency corrections."[65] Nor do the more thorough inquiries themselves induce such compliance; they demonstrate problems but not their correction. The oversight deficits that prompted the HSAC

---

[63] *Id.* at 4–5 (citing OFFICE OF INSPECTOR GEN., U.S. DEPT. OF HOMELAND SEC., OIG-07-01, TREATMENT OF IMMIGRATION DETAINEES HOUSED AT IMMIGRATION AND CUSTOMS ENFORCEMENT FACILITIES (Dec. 22, 2006), https://www.oig.dhs.gov/assets/Mgmt/OIG_07-01_Dec06.pdf; OFFICE OF INSPECTOR GEN., U.S. DEPT. OF HOMELAND SEC., OIG-18-32, CONCERNS ABOUT ICE DETAINEE TREATMENT AND CARE AT DETENTION FACILITIES 7 (Dec. 11, 2017), https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf).

[64] HOMELAND SECURITY ADVISORY COUNCIL, U.S. DEP'T OF HOMELAND SEC., REPORT OF THE SUBCOMMITTEE ON PRIVATIZED IMMIGRATION DETENTION FACILITIES 11–17 (Dec. 1, 2016), https://www.dhs.gov/sites/default/files/publications/DHS%20HSAC%20PIDF%20Final%20Report.pdf.

[65] *DHS Office of the Inspector General, Hearing before the Subcomm. on Homeland Sec. of the H. Comm. on Appropriations*, 116th Cong. (2019), https://www.oig.dhs.gov/sites/default/files/assets/TM/2019/oigtm-jvk-030619.pdf (testimony of Acting Inspector General John V. Kelly).

subcommittee's recommendations remain and are described below.

## B. Nakamoto Inspections

74.     The reputation of the Nakamoto inspection process is that it is a surface-level inquiry, insufficient to detect problems. For example, in 2016, the DHS Homeland Security Advisory Council (HSAC) criticized Nakamoto's inspection process for its focus on written policy rather than on-the-ground implementation. Rather than "assess[ing] the extent to which policies are implemented in daily practice," the HSAC found that Nakamoto inspectors ask input questions like, "Does the facility have a written policy that meets the applicable ICE standards on outdoor recreation or on staff training? Did the facility follow all the sequential steps in the prescribed procedures for video recording of use-of-force incidents?"[66]

75.     In the past couple of years, the DHS Office of the Inspector General (DHS OIG or IG) has undertaken a number of reviews of immigration detention and its control systems. The IG is formally a DHS official; the office provides internal but "independent oversight."[67] In a 2018 report on ICE inspection/monitoring, the IG concluded that "Nakamoto's inspection scope is too broad; ICE does not provide clear guidance on procedures; and the Nakamoto inspectors are not always thorough."[68] The IG report pointed out that Nakamoto teams include three to five inspectors, who have "3 days to complete the inspection, interview 85 to 100 detainees, brief facility staff, and begin writing their inspection report for ICE." The inspectors themselves told IG investigators that "it was difficult to complete their work in the allotted time."[69] The IG report also uncovered numerous failures by Nakamoto inspectors to do more than review written policies and procedures; they did not take steps to "ensure the facility was actually implementing" those policies.[70] Their inspections did not include effective detainee interviews.[71] And the reports of

---

[66] HOMELAND SECURITY ADVISORY COUNCIL, U.S. DEP'T OF HOMELAND SEC., REPORT OF THE SUBCOMMITTEE ON PRIVATIZED IMMIGRATION DETENTION FACILITIES 14 (Dec. 1, 2016), https://www.dhs.gov/sites/default/files/publications/DHS%20HSAC%20PIDF%20Final%20Report.pdf.

[67] *About Us*, OFFICE OF INSPECTOR GEN., https://www.oig.dhs.gov/about.

[68] OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC., OIG-18-67: ICE'S INSPECTIONS AND MONITORING OF DETENTION FACILITIES DO NOT LEAD TO SUSTAINED COMPLIANCE OR SYSTEMIC IMPROVEMENTS 5 (Jun. 26, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf.

[69] *Id.* at 6.

[70] *Id.* at 6-7.

[71] *Id.* at 8.

inspections did not reflect the observed results.[72] Nakamoto interviews are scheduled in advance and announced to facility staff.

76.    Many ICE officials are aware of the deficits in the Nakamoto inspection process. The IG report stated:

> Several ICE employees in the field and managers at ICE ERO headquarters commented that Nakamoto inspectors "breeze by the standards" and do not "have enough time to see if the [facility] is actually implementing the policies." They also described Nakamoto inspections as being "very, very, very difficult to fail." One ICE ERO official suggested these inspections are "useless."[73]

77.    ICE has not superintended the Nakamoto inspections. For the IG report covering a time period through 2017, the IG reported that ERO was not able to document any quality assurance visits evaluating Nakamoto inspection performance from 2014 to 2017, and "ERO officials in Custody Management admitted . . . that there were no planned visits for FY 2017 because ERO does not have 'the right tools' to evaluate Nakamoto performance."[74]

78.    In addition, the same June 2018 IG report documented "ICE's failure to ensure that identified deficiencies are consistently corrected."[75] Some of this was a failure of ICE follow-through. Sometimes, detention facilities asked about deficient practices simply decline to fix them. For example, the IG report documented:

> A detention standard requires the facility to allow detainees to help other detainees voluntarily and free-of-charge prepare legal documents. In addressing a deficiency in this area, the facility responded that it did not permit such assistance, stating, "It is the policy of the [facility] not to allow inmates/detainees to assist others with their legal issues.... The [facility] chooses not to change its policy regarding the issues noted."

The IG report suggests that this kind of resistance is documented in Uniform Corrective Action Plan (UCAP) documents. These are apparently not publically available—although one of them, a 2017 document relating to Adelanto, has been posted by the advocacy organization National Immigrant Justice Center, after it was

---

[72] *Id.* at 9.

[73] *See id.* at 7 n.12.

[74] *Id.* at 10.

[75] *Id.* at 11.

obtained via a FOIA request.[76] DHS OIG also reports that it is very common for responses to deficiencies simply to be omitted, or to fail to include corrective actions. Moreover, even once ICE receives a response, it "does not appear to have a comprehensive process to verify whether facilities implemented all the corrective actions until the next Nakamoto or ODO inspection."[77] Unsurprisingly, deficiencies go uncorrected.[78]

79.     Both IG and ODO reviews demonstrate that the Nakamoto reviews are failing to detect many compliance issues. The IG compared ODO and Nakamoto inspection reports in FY 2016 for the same 29 facilities, and found that the ODO teams, looking at many fewer of the relevant standards, found more than double the number of deficiencies.[79] Similarly, the Government Accounting Office compared ODO and ERO (that is, contracted) inspection results from FY 2013, and found that for 29 of 35 inspected facilities, ODO found many more deficiencies—448 compared to 343.[80]

80.     Using publicly available information about inspections of GEO facilities, I have compared Nakamoto reports with ODO reports conducted close to the same time. Table 4 summarizes, and ¶¶81-83 present more detail. I included facilities in Table 4 if I was able to obtain copies of both inspections and they were conducted close together in time.

---

[76] See *Transparency and Human Rights Project - Adelanto, CA (Geo Group)*, NAT'L IMMIGR. JUSTICE CTR. https://immigrantjustice.org/issues/transparencyandhumanrights/adelanto-ca-geo-group. I was also able to review a spreadsheet summarizing all UCAPs from Oct. 1, 2010 to Aug. 1, 2018—which amply substantiated the repetition of reported deficiencies, but offered insufficient information about the source of that repetition. (This spreadsheet was obtained by Professor César García Hernández, via FOIA, and shared with me; it is posted at https://www.law.umich.edu/facultyhome/margoschlanger/Pages/Resources.aspx.)

[77] OIG-18-67, *supra* note 68, at 12.

[78] *Id.* at 13.

[79] *Id.* at 7-8.

[80] GAO 15-153, *supra* note 15, at 40-41.

**Table 4: Nakamoto and ODO Inspection Findings, GEO Facilities**

| Facility | Nakamoto Inspection | | ODO Inspection | |
|---|---|---|---|---|
| | Date(s) | Deficiencies | Date(s) | Deficiencies |
| Adelanto | 11/21/2019 10/11/2018 | 2019: 7 2018: 1 | 7/11-13/2017 | 9 |
| Denver / Aurora | 11/27/2019 | 5 | 6/15-18/2020* | 16 |
| Broward | 10/31/2019 | 0 | 7/9-11/2019 | 5 |
| Coastal Bend | 6/9/2020 | 4 | 2/25-27/2020 | 17 |
| Folkston | 6/6/2019 | 2 | 12/10-12/2019 | 38 |
| Mesa Verde | 6/27/2019 | 0 | 7/23-25/2019 | 30 |
| Montgomery | 12/19/2019 | 1 | 12/10-12/2019 | 17 |
| Pine Prairie | 4/25/2019 | 2 | 8/27-29/2019 | 17 |
| Rio Grande | 3/14/2019 | 4 | 6/11-13/2019 | 4 |

**\*** Telephonic and partial inspection, due to COVID pandemic.

81.     As Table 4 shows, ODO inspections nearly always find more deficiencies than Nakamoto inspections at close to the same point in time—and sometimes many more.

82.     The deficiencies identified by ODO but not Nakamoto range from minor paperwork issues (failure to obtain ERO sign-off on a particular policy, although there is no substantive issue with the policy) to very serious problems, apparently undetected by close-in-time Nakamoto inspectors. For example:

   a.   At Aurora, mental health requests went unanswered in the requisite timeframe.[81]

   b.   At Aurora, no documented review was conducted of potential alternatives to solitary confinement for protective custody.[82]

   c.   At Coastal Bend, no documentation demonstrated return of cash and

---

[81] OFFICE OF DETENTION OVERSIGHT: COMPLIANCE INSPECTION, DENVER CONTRACT DETENTION FACILITY 9 (June 15-18, 2020), https://www.ice.gov/doclib/foia/odo-compliance-inspections/denverCDF_AuroraCO_Jun15-18_2020.pdf.

[82] *Id.*

valuables to detainees on their release.[83]

    a.  At Coastal Bend, detainees were assigned to housing without adequate consideration of their criminal history.[84]

    b.  At Folkston, detainees were not shown an orientation video to facilitate their understanding of rules and duties.[85]

    c.  At Folkston, detainee intercom call boxes were broken, so detainees were unable to communicate with staff in an emergency.[86]

    d.  At Folkston, kitchen refrigerator temperatures were inappropriately low,[87] risking illness.

    e.  At Folkston, shower temperatures ranged from lukewarm to cold.[88]

    f.  At Montgomery Processing Center, in one recorded Use of Force incident, a detainee was left lying naked on the floor. More generally, no after-action review team consistently reviewed such incidents to consider whether the force was appropriate, supervision adequate, or medical care provided promptly.[89]

    g.  At Pine Prairie, several sexual abuse allegations were not reported as required to ICE.[90]

    h.  At Pine Prairie and Rio Grande, some housing units did not provide an

---

[83] OFFICE OF DETENTION OVERSIGHT: COMPLIANCE INSPECTION, COASTAL BEND DETENTION FACILITY 10 (Feb. 25-27, 2020), https://www.ice.gov/doclib/foia/odo-compliance-inspections/2020-CoastalBend.pdf.

[84] *Id.* at 9.

[85] OFFICE OF DETENTION OVERSIGHT: COMPLIANCE INSPECTION, FOLKSTON ICE PROCESSING CENTER 5 (Apr. 24-26, 2018), https://www.ice.gov/doclib/foia/odo-compliance-inspections/2018FolkstonICEProcessingCenter.pdf.

[86] OFFICE OF DETENTION OVERSIGHT: COMPLIANCE INSPECTION, FOLKSTON ICE PROCESSING CENTER AND ANNEX 7-8 (Dec. 10-12, 2019), https://www.ice.gov/doclib/foia/odo-compliance-inspections/2019-FolkstonPC-FolkstonGA-1210-122019.pdf.

[87] *Id.* at 12.

[88] *Id.* at 14.

[89] OFFICE OF DETENTION OVERSIGHT: COMPLIANCE INSPECTION, MONTGOMERY ICE PROCESSING CENTER 9 (Dec. 10-12, 2019), https://www.ice.gov/doclib/foia/odo-compliance-inspections/2019-MontgomeryICEPC.pdf.

[90] OFFICE OF DETENTION OVERSIGHT: COMPLIANCE INSPECTION, PINE PRAIRIE ICE PROCESSING CENTER AND ANNEX 9 (Aug. 27-29, 2019), https://www.ice.gov/doclib/foia/odo-compliance-inspections/2019-PinePrairieICEPC.pdf.

adequate number of toilets, washbasins, and showers.[91]

83.     Focusing on Adelanto in particular, Nakamoto's 2017 and 2018 reported all-but-full compliance. (In 2018, the cover letter to the inspection report cited one issue: "Funds and Personal Property - 1 [issue], which is a repeat deficiency."[92]) And in 2019, Nakamoto's site inspection of Adelanto found that the facility "meets standards" for all inspected standards. It flagged only a few compliance issues, without details:

> Classification System – 1 [deficiency]
> Medical Care – 2 [deficiencies]
> Terminal Illness, Advance Directives, and Death – 3 [deficiencies][93]

Other evidence, described next in ¶¶ 84-98, suggests that these sanguine assessments of Adelanto's standards compliance were likely flawed.

84.     As is true for ICE inspections generally, non-Nakamoto reviews of standards compliance at Adelanto have consistently found more and more serious deficiencies than the Nakamoto inspections document. ODO's 2012 review found noncompliance with 6 of the 17 reviewed standards, identifying 26 deficiencies. Among them were untimely medical triage attention and inadequate law library

---

[91] *Id.* at 10; Office of Detention Oversight: Compliance Inspection, Rio Grande Detention Center 7 (June 11-13, 2019), https://www.ice.gov/doclib/foia/odo-compliance-inspections/rioGrandeDetCntrLaredoTX_Jun_11-13_2019.pdf.

[92] Letter from Lead Compliance Inspector, Nakamoto Grp., to Assistant Dir. for Detention Mgmt. 2 (Oct. 11, 2018), https://www.ice.gov/doclib/facilityInspections/ adelantoEastCa_CL_10_11_2018.pdf; Letter from Lead Compliance Inspector, The Nakamoto Grp., to Assistant Dir. for Detention Mgmt. 2 (Oct. 11, 2018), https://www.ice.gov/doclib/ facilityInspections/adelantoWestCa_CL_10_11_2018.pdf. *See also Detention Review Summary Form for Adelanto ICE Processing Center - West,* U.S. Immigr. & Customs Enforcement, https:// www.ice.gov/doclib/facilityInspections/adelantoWestCa_SIS_10_11_2018.pdf; *Detention Review Summary Form for Adelanto ICE Processing Center - West*, U.S. Immigr. & Customs Enforcement, https://www.ice.gov/doclib/facilityInspections/adelantoEastCa_SIS_10_11_2018.pdf.

[93] *See* Letter from Lead Compliance Inspector, Nakamoto Grp., to Assistant Dir. for Detention Mgmt., Adelanto East (Nov. 21, 2019), https://www.ice.gov/doclib/facilityInspections /adelantoEast_CL_11-21-2019.pdf; *Facility Significant Incident Summary, Adelanto East*, U.S. Immigr. & Customs Enforcement (Nov. 21, 2019), https://www.ice.gov/doclib/facilityInspections/ adelantoEast_SIS_11-21-2019.pdf; Letter from Lead Compliance Inspector, Nakamoto Grp., to Assistant Dir. for Detention Mgmt., Adelanto West (Nov. 21, 2019), https://www.ice.gov/doclib/ facilityInspections/adelantoWest_CL_11-21-2019.pdf; *Facility Significant Incident Summary, Adelanto West*, U.S. Immigr. & Customs Enforcement (Nov. 21, 2019), https://www.ice.gov/doclib/ facilityInspections/adelantoWest_SIS_11-21-2019.pdf.

resources.[94] ODO's 2014 review similarly found noncompliance with 6 of 16 standards, with 26 deficiencies, mostly related to sexual assault/abuse prevention and response protocols.[95] ERO conducted an inspection in 2016,[96] which found four deficiencies, serious enough to prompt adoption of a Uniform Correction Action Plan.[97] And ODO's 2017 review identified 9 deficiencies, including, among others many unhygienic areas, among them: dirty counters, walls, and floors in the medical area; soap scum and stains on shower floors, walls, and sinks in housing areas; debris and trash in housing area bathrooms, and food debris in housing areas and in and adjacent to the dining room.

85. In addition, ICE Detainee Death Reviews identify ongoing medical care deficiencies at Adelanto in recent years. For example, the review of a March 2017 suicide at Adelanto identified failures including language access failures,[98] failure to monitor medication refusals,[99] failure to appropriate assess sexual assault allegations,[100] failure in procedures leading to administration segregation,[101] failure to monitor detainees in solitary confinement;[102] and failures in the adequacy of medical care and follow up.[103]

---

[94] OFFICE OF DETENTION OVERSIGHT: COMPLIANCE INSPECTION, ADELANTO CORRECTIONAL FACILITY (Sept. 18-20, 2012), https://www.ice.gov/doclib/foia/odo-compliance-inspections/adelantoCorrectionalFac_Adelanto-CA-Sept_18-20-2012.pdf.

[95] OFFICE OF DETENTION OVERSIGHT: COMPLIANCE INSPECTION, ADELANTO CORRECTIONAL FACILITY (July 8-10, 2014), https://www.ice.gov/doclib/foia/odo-compliance-inspections/2014AdelantoJuly.pdf.

[96] OFFICE OF DETENTION OVERSIGHT: COMPLIANCE INSPECTION, ADELANTO WEST CORRECTIONAL FACILITY (Oct. 4-6, 2016), https://perma.cc/8UV3-TDT5; OFFICE OF DETENTION OVERSIGHT: COMPLIANCE INSPECTION, ADELANTO EAST CORRECTIONAL FACILITY (Oct. 4-6, 2016), https://perma.cc/PA82-MPT5.

[97] Memorandum from Field Office Director of the Los Angeles Field Office to Unit Chief of Detention Standards and Compliance Unit, 2016 Adelanto Detention Facility Performance Based National Detention Standards Review Uniform Corrective Action Plan (Feb. 17, 2017), *available at* https://perma.cc/KEM2-499H.

[98] U.S. IMMIGR. & CUSTOMS ENFORCEMENT, DETAINEE DEATH REVIEW – GONZALEZ GABDA (May 5, 2017), https://www.ice.gov/doclib/foia/reports/ddrGonzalez.pdf (NOVOA_0003101).

[99] *Id.* (NOVOA_0003096-104).

[100] *Id.* (NOVOA_0003102).

[101] *Id.* (NOVOA_0003101-02).

[102] *Id.* (NOVOA_0003103-05).

[103] *Id.* (NOVOA_0003104).

86.     Likewise, a review of the April 2017 death of an Adelanto detainee identified failures including failure to notify medical provider of drug withdrawal symptoms,[104] medication delays,[105] failure to implement appropriate detoxification dosing or monitoring,[106] medical care delays,[107] what a nurse called a "sporadic and disorganized" sick call process,[108] failure to implement appropriate hypertension monitoring,[109] failure to document all medical contacts,[110] and failure to document medication refusals.[111]

87.     A May 2018 unannounced DHS OIG inspection visit to Adelanto found a failure to take appropriate suicide precautions, an overuse of solitary confinement, the imposition of harsher solitary confinement conditions than was appropriate or authorized by the standards, an inappropriate deprivations of medical monitoring of detainees in solitary confinement (which continued notwithstanding the discussion of the same issue in the prior Detainee Death Review), deprivation of language and other communication assistance to detainees in solitary confinement, inappropriate and damaging delays in dental and medical care (again, continuing notwithstanding prior Detainee Death Reviews pointing to them), inappropriate deprivations of dental care, "egregious" food safety issue including spoiled and "foul" food, and unhealthful environmental conditions in bathrooms.[112]

88.     The Nakamoto October 2018 inspection reports for Adelanto quarreled with the OIG assessment, describing it as credulous and uninformed.[113] I do not have the full documentation of these inspections (I have seen cover memos and Form

---

[104] U.S. IMMIGR. & CUSTOMS ENFORCEMENT, DETAINEE DEATH REVIEW – ALONSO LOPEZ (June 19, 2017), https://www.ice.gov/doclib/foia/reports/ddrLopez.pdf (NOVOA_0003110).

[105] Id. (NOVOA_0003111-13).

[106] Id. (NOVOA_0003112-22).

[107] Id. (NOVOA_0003113-17, 0003122).

[108] Id. (NOVOA_0003117).

[109] Id. (NOVOA_0003116).

[110] Id. (NOVOA_0003119).

[111] Id. (NOVOA_0003123).

[112] See OFFICE OF INSPECTOR GEN., U.S. DEPT. OF HOMELAND SEC., OIG-18-86, MANAGEMENT ALERT–ISSUES REQUIRING ACTION AT THE ADELANTO ICE PROCESSING CENTER IN ADELANTO, CALIFORNIA (Sept. 27, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-86-Sep18.pdf; OFFICE OF INSPECTOR GEN., U.S. DEPT. OF HOMELAND SEC., OIG-19-49, CONCERNS ABOUT ICE DETAINEE TREATMENT AND CARE AT FOUR DETENTION FACILITIES (June 3, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf.

[113] See sources cited supra note 92.

324As, but I do not have access to the additional documentation on Form 324s). But I note that the Nakamoto report itself seems to accept inspection-day adjustments as evidence of compliance, when in fact, such ad hoc fixes suggest more systematic *non*-compliance. For example, the report states that detainee interviews yielded "seven complaints regarding medical services": "Three were regarding the lack of follow-up appointments, and the Medical SME determined that all three were scheduled for follow-up appointments the next day."[114] It seems that Nakamoto's medical subject matter expert checked on necessary follow-up, and in response, medical staff hurriedly scheduled those follow-up appointments for some unspecified date in the future. This is evidence of medical delay, not its absence. I note, as well, that ICE concurred in the OIG recommendations.

89.    In addition, a corrections expert brought to Adelanto in November 2017 for a DHS Office for Civil Rights and Civil Liberties (CRCL) inspection found systemic standards violations.[115] Among the findings:

- "ACF [that is, Adelanto] continues to fail to meet the Admission and Release, Intake Screening Standard as interpreters or language lines are not consistently used for LEP detainees during the intake screening process and completion of the numerous intake forms."[116]

- Numerous violations of standards relating to overuse of solitary confinement for detainees with mental illness.[117]

- An ineffective grievance process: "A lack of follow through and failure to correct reported complaints and failure to address issues of staff disrespect toward detainees are contributing factors to the detainees' lack of faith in the grievance system. GEO does not effectively track detainee's grievances regarding staff misconduct and does not provide ICE with a copy of each staff complaint as mandated by the PBNDS. Critical healthcare issues are raised in the grievances and failure to timely respond to the raised concerns can create life threatening situations for the detainees. . . . ACF's healthcare

---

[114] Letter from Lead Compliance Inspector, Nakamoto Grp., to Assistant Dir. for Detention Mgmt. (Oct. 11, 2018) 2, https://www.ice.gov/doclib/facilityInspections/adelantoEastCa_CL_10_11_2018.pdf.

[115] Corrections Expert's Report on Adelanto Correctional Facility (Nov. 16, 2017), for U.S. Dept. of Homeland Sec., Office for Civil Rights and Civil Liberties, available at https://www.documentcloud.org/documents/6278922-HQ-Part2-Copy.html.

[116] *Id.* at 7.

[117] *Id.* at 7-8.

grievance process (medical, mental health and dental) is currently unreliable.
"[118]

- "Detainees suffer retaliation, verbal harassment and treated with disrespect by ACF staff."[119]

- "ACF and ICE do not currently comply with providing language access to LEP detainees. . . . In non-medical settings, ICE and ADF staff do not routinely use language line or translate official documents from English to Spanish for Spanish speaking detainees. LEP detainees are required to sign documents that they do not understand which invalidates the content of the documents and purpose of having detainees sign documents."[120]

90.    CRCL had other experts participate in the same inspection, and summarized the resulting CRCL findings in a memo to ICE leadership.[121] In addition to summarizing the corrections-related findings identified in the prior paragraph, CRCL found many standards violations related to systematically inadequate medical and mental health care. These were sufficiently serious and widespread that CRCL took the unusual step of recommending that all detainees with significant medical or mental health issues and all over age 55 be removed from the facility.[122]

91.    In February and August 2018, Disability Rights California (DRC) conducted on-site monitoring of Adelanto. (DRC is California's designated "protection and advocacy" organization, which gives it the legal authority to inspect and investigate conditions in facilities that house people with mental illness and other disabilities. See 42 U.S.C. § 10805(a)(3); 42 C.F.R. § 51.42 (b); Cal. Welf. & Inst. Code § 4902(b)(2). DRC reported deficiencies relating to mental health care and psychotropic medication management and to medical care. It described overuse of solitary confinement and disability discrimination.[123]

92.    I cannot vouch for any particular conclusion of the inspections just

---

[118] *Id.* at 10-11.

[119] *Id.* at 10.

[120] *Id.* at 13.

[121] U.S. Dept. of Homeland Sec., Office for Civil Rights and Civil Liberties, Memo to ICE Exec. Assoc. Dir. Matthew Albence (Apr. 25, 2018), available at https://www.pogo.org/document/2019/09/dhs-office-for-civil-rights-and-civil-liberties-review-of-adelanto-sent-to-ice-in-april-2018/.

[122] *Id.* at 2-6.

[123] Aaron J. Fischer et al., *There Is No Safety Here*, DISABILITY RIGHTS CAL. (Mar. 2019), https://www.disabilityrightsca.org/system/files/file-attachments/DRC_REPORT_ADELANTO-IMMIG_DETENTION_MARCH2019.pdf.

described. But my opinion—based both on reviewing the reports cited above and on my general experience addressing the oversight of detainee facilities—is that in general at GEO's facilities, and at Adelanto in particular, reliability of the Nakamoto inspections is entirely undermined by the consistency of the evidence against Nakamoto's upbeat assessments, offered by a variety of informed on-the-scene assessors and by internal critics of Nakamoto's processes.

## C. Office of Detention Oversight (ODO) Inspections

93.     The ODO inspections are more thorough than the Nakamoto inspections. But they too fail to induce compliance with the standards, or reliably report non-compliance.

94.     The ODO inspections cover only some ICE facilities, and only every several years. DHS OIG reports that in 2015, 2016, and 2017, ODO looked at 23, 29, and 33 facilities, respectively.[124] The Homeland Security Advisory Council subcommittee reports that ODO inspects "roughly 100 of the largest ICE detention facilities . . . on a three year schedule."[125] Posted reports number just 27, 19, 39 for the years from 2017 to 2019, and 20 so far in 2020 (unlike Nakamoto, ODO has been carrying out remote/telephonic inspections during the COVID pandemic).[126]

95.     System-wide, a comparison of ODO inspections to non-routine inspections of ICE detention demonstrates, as with Nakamoto inspections, that the ODO assessments are extremely incomplete. For example, the DHS OIG has since 2016 conducted about a dozen unannounced site visits of immigration detention facilities, nearly all reporting serious standards violations.[127] Drawing on ICE's posted

---

[124] OIG-18-67, *supra* note 68, at 3, 5.

[125] HOMELAND SEC. ADVIS. COUNCIL, REPORT OF THE SUBCOMMITTEE ON PRIVATIZED IMMIGRATION DETENTION FACILITIES 14 (Dec. 1, 2016), https://www.dhs.gov/sites/default/files/publications/DHS%20HSAC%20PIDF%20Final%20Report.pdf.

[126] *FOIA Library – Office of Detention Oversight – Detention Facility Compliance Inspections*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice.gov/foia/library.

[127] *See* OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC., OIG-20-45, CAPPING REPORT: OBSERVATIONS OF UNANNOUNCED INSPECTIONS OF ICE FACILITIES IN 2019 (July 1, 2020), https://www.oig.dhs.gov/sites/default/files/assets/2020-07/OIG-20-45-Jul20.pdf; OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC., OIG-19-47, CONCERNS ABOUT ICE DETAINEE TREATMENT AND CARE AT FOUR DETENTION FACILITIES (June 3, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf; OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC, OIG-19-20, ISSUES REQUIRING ACTION AT THE ESSEX COUNTY CORRECTIONAL FACILITY IN NEWARK, NEW JERSEY (Feb. 13, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-20-Feb19.pdf; OIG-18-86, *supra* note 112; OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC., OIG-18-32,

list of ODO inspection reports for the same facilities, I systematically identified all the cases where there were close-in-time ODO inspections, and then compared the two reports; I found that ODO's inspections only rarely reported the deficiencies identified in the OIG reports.

96.     As discussed above, the 2012, 2014, and 2017 ODO Adelanto inspections found numerous standards violations. See ¶ 84. Even so, there is reason to think they did not find all applicable violations—or even all the important ones.

97.     First, the same inspections of Adelanto cited above to demonstrate deficits in Nakamoto's inspections suggest the same conclusion about ODO's inspections. See ¶¶ 85-92.

98.     So, to further assess the comprehensiveness of ODO's inspections, I compared the ODO reviews of medical care at Adelanto to findings in Detainee Death Reviews done during similar time frames. The September 2012 ODO report about Adelanto identifies three medical care deficiencies: delays in physician TB reviews, delays in sick call triage, and failure to maintain current CPR, automated external defibrillator, and first aid certifications.[128]

99.     One Detainee Death Review looked at a death in custody about six months before the ODO inspection; the death review took about four months. (I had access to another Detainee Death Review in 2012, but it did not include a medical review, so this comparison relies on the review excerpted below.) It presents a far more sweeping—and damning—assessment of medical care at Adelanto (abbreviated ADF in the document:

> A medical review of the care provided to DOMINGUEZ while housed at the ADF determined the ADF was not compliant with the ICE Performance Based National Detention Standards (PBNDS) for medical care. Specifically, ADF failed to perform proper physical examinations in response to symptoms and complaints, failed to pursue

---

CONCERNS ABOUT ICE DETAINEE TREATMENT AND CARE AT DETENTION FACILITIES (Dec. 11, 2017), https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf; OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC., OIG-17-43, MANAGEMENT ALERT ON ISSUES REQUIRING IMMEDIATE ACTION AT THE THEO LACY FACILITY IN ORANGE, CALIFORNIA (Mar. 6, 2017), https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-43-MA-030617.pdf.

[128] OFFICE OF DETENTION OVERSIGHT: COMPLIANCE INSPECTION, ADELANTO CORRECTIONAL FACILITY 18 (Sept. 18-20, 2012), https://www.ice.gov/doclib/foia/odo-compliance-inspections/adelantoCorrectionalFac_Adelanto-CA-Sept_18-20-2012.pdf.

any records critical to continuity of care, and failed to assure appropriate, timely follow up and access to off-site care. Additionally, a doctor's review of the medical care provided to DOMINGUEZ determined that DOMINGUEZ's demise could have been prevented and that DOMINGUEZ received an unacceptable level of medical care while detained at ADF.[129]

Details of the many missteps are recounted in the report.[130] The review concluded, "This review revealed the ADF did not comply with the ICE PBNDS Medical Care Standard. The Medical Care standard ensures detainees have access to emergent, urgent, or non-emergent medical care to ensure their health care needs are met in a timely and efficient manner."[131] The Detainee Death Review reports that some of the evidence reviewed had been altered by Adelanto staff.[132]

100.    Also, while the 2014 ODO inspection, dated July 2014, found no notable problems with respect to medical care, a Detainee Death Review of a death that occurred in April 2015 found deficiencies relating to scheduling, followup, and emergency medical transport, all in violation of the PBNDS 2011 standards. The review reported several additional "areas of note," including:

> ADF medical staff interviewed by ODO shared that they face serious challenges related to the use of hard copy medical files. As discussed in the narrative, the providers stated it is common to have to postpone appointments when records cannot be located. Medical staff also raised concerns over delays in the filing of diagnostic studies, medical treatment authorizations, and physician orders, as well as the disconnect between the two separate clinics, particularly because of the increasing medical and mental health needs of ADF's population. . . . Also, because of the limited availability of a laboratory technician, it is not unusual for non-urgent offsite appointments to be delayed, cancelled, and/or rescheduled when required laboratory tests cannot be completed in time for the scheduled appointment.[133]

101.    And another Detainee Death Review, for a death in December 2015,

---

[129] U.S. IMMIGR. & CUSTOMS ENFORCEMENT, DETAINEE DEATH REVIEW – Dominguez Valivia (March 12, 2012), https://perma.cc/U2NZ-KDJB (NOVOA_0003417).

[130] *Id.* (NOVOA_0003433-37).

[131] *Id.* (NOVOA_0003417-18).

[132] *Id.* (NOVOA_0003437).

[133] *Id.* (NOVOA_0003490-91).

found numerous areas of PBNDS non-compliance related to medical care, including delays in initial assessment and subsequent care; vacancies and staff turnover that "impact[ed] delivery and quality of care"; systematic medical record deficiencies such that, often, "medical records cannot be reviewed prior to medical encounters because the medical files are not located in time."[134] The review specifically mentioned delays in physician TB reviews—one of the deficiencies ODO's 2012 inspection had highlighted. See ¶ 94.

102.    The point of these comparisons of the ODO Adelanto reports to the several Detainee Death Reviews just described is to demonstrate that even though ODO inspections are demonstrably more complete than Nakamoto inspections, they are nonetheless incomplete. It would not be accurate to make firm conclusions about standards compliance based on the absence of ODO-noted deficiencies.

103.    Even when ODO inspections uncover deficiencies, that does not lead to corrections. The example described in ¶ 101, above, is not atypical. The DHS OIG has explained that (as with Nakamoto inspections), ICE does not have any system by which it (a) requires development of a corrective action plan, or (b) monitors whether any such plan has been successfully implemented. Subsequent inspections—years later—cannot substitute for this kind of monitoring.[135]

## D. Contracting oversight

104.    Additional oversight possibilities are available through contract administration. ICE's Office of Acquisitions Management administers its contracts with facility operators. The lead individual for ICE contract management and enforcement are Contracting Officers or Contracting Officers' Representative (COR),[136] who I believe work for regional ERO offices.

105.    For IGSAs, the contracting arrangements can be complex and may interfere with efforts to use contracting authorities to superintend conditions. The DHS OIG concluded in a 2018 report that "Because ICE's agreement and legal relationship is with the [middleman government authority, which does not operate the

---

[134] U.S. IMMIGR. & CUSTOMS ENFORCEMENT, DETAINEE DEATH REVIEW – JOSE AZURDIA (December 24, 2015), https://www.ice.gov/doclib/foia/reports/ddr-Azurdia.pdf (NOVOA_0003413-15).

[135] OIG-19-47, *supra* note 127, at 4.

[136] OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC., OIG-19-18, ICE DOES NOT FULLY USE CONTRACTING TOOLS TO HOLD DETENTION FACILITY CONTRACTORS ACCOUNTABLE FOR FAILING TO MEET PERFORMANCE STANDARDS 5 (Jan. 29, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf.

facility], [the private operator's] performance is effectively insulated from government scrutiny."[137]

106.    When ICE inspection processes reveal a violation of applicable standards, ICE can respond by (a) trying to elicit compliance, (b) imposing contract penalties, (c) formally waiving non-compliance and authorizing the detention facility to violate the standard; or (d) simply dropping the matter.

107.    ICE's frequent use of option (d) is described above, ¶ 78. The more formal waiver process is also very prevalent; ICE has posted 175 waivers applicable in 2019, with supporting documentation.[138] ICE does not post information on corrective action plans, quality assurance surveillance plans, or sanctions, but as described below, ICE rarely imposes fines or other formal penalties and only extraordinarily rarely pulls its detainees out of a facility based on standards non-compliance.

108.    It seems that in ICE's employees' view, in order for ICE to use contracting authorities to elicit standards compliance, detention contracts must first include a quality assurance surveillance plan (QASP). As described by the DHS OIG,

> [T]he QASP is a standard template that outlines detailed requirements for complying with applicable performance standards, including detention standards, and potential actions ICE can take when a contractor fails to meet those standards. When facilities are found to be noncompliant, CORs may submit a Contract Discrepancy Report (Discrepancy Report), which documents the performance issue.[139]

109.    The DHS IG concluded in January 2019 that "ICE fails to consistently use contract-based quality assurance tools" relating to detention conditions. More specifically:

> [O]nly 28 out of 106 contracts we reviewed included the QASP. Because the QASP contains the only documented instructions for preparing a Discrepancy Report and recommending financial penalties,

---

[137] OIG-18-53, *supra* note 33, at 11-13.

[138] *Facility Inspections*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice.gov/facility-inspections. Waivers are listed in a spreadsheet at *Facility Inspections – Inspection Waiver Master File*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice.gov/doclib/facilityInspections/2019waivers.xlsx; supporting documentation is available at https://www.ice.gov/doclib/facilityInspections/2019waivers1.zip and https://www.ice.gov/doclib/facilityInspections/2019waivers2.zip.

[139] OIG-19-18, *supra* note 136, at 6.

there is confusion about whether ICE can issue Discrepancy Reports
and impose financial consequences absent a QASP. Between October 1,
2015, and June 30, 2018, ICE imposed financial penalties on only two
occasions, despite documenting thousands of instances of the facilities'
failures to comply with detention standards. Instead of holding facilities
accountable through financial penalties, ICE issued waivers to facilities
with deficient conditions, seeking to exempt them from having to
comply with certain detention standards. However, ICE has no formal
policies and procedures about the waiver process and has allowed
officials without clear authority to grant waivers. ICE also does not
ensure key stakeholders have access to approved waivers. Further, we
determined that the organizational placement and overextension of
CORs impede monitoring of facility contracts. Finally, ICE does not
adequately share information about ICE detention contracts with key
officials, such as CORs and DSMs, which limits their ability to access
information necessary to perform core job functions.[140]

110.    It is crystal clear that contracting oversight is not filling the gaps left
from the oversight failures described above.

## E. Detention Service Managers and Detention Monitoring Council

111.    ICE has non-inspection monitoring methods, as well: ERO has several
dozen onsite Detention Service Managers—ICE employees who have, since 2010,
monitored compliance at selected facilities. In December 2017, 35 DSMs monitored
compliance with ICE detention standards at 54 facilities.[141] I have not been given
more recent data.

112.    DSMs spend time at the larger ICE facilities, and one of their roles is to
routinely identify deficiencies and get them corrected. The DHS OIG reports that
"DSMs noted 6,216 and resolved 4,331 deficiencies in FY 2017." But even though it
is their job to "provide technical guidance to the facilities on implementing corrective
action plans," the IG report explains that DSMs do not solve the monitoring gap:

Although ICE's inspections, follow-up processes, and DSMs'
monitoring of facilities help correct some deficiencies, they do not
ensure adequate oversight or systemic improvements in detention

---

[140] OIG-19-18, *supra* note 136, at 7.

[141] OIG-18-67, *supra* note 68, at 3.

conditions; certain deficiencies remain unaddressed for years.[142]

113.    Among the reasons is that the DSMs "typically must rely on local ERO field office assistance because corrective actions are a field office responsibility."[143] This can lead to inaction:

> DSMs at a few facilities portrayed local ERO management as "disengaged" or "reluctantly responsive" in detention issues; they described the relationship between DSMs and ERO field management as "not very productive." One Custody Management supervisor said that some ERO field office managers are "hands off" and consider DSMs "a nuisance."[144]

114.    Since 2010 there has been a Detention Monitoring Council at ICE headquarters, which ICE has described as "an ICE intra-agency council that ensures that senior leadership from all ICE programs with detention responsibility jointly examines serious issues, incidents, findings, and allegations related to conditions of detention."[145] In 2012, an ICE official testified before a House Judiciary subcommittee that the Council was "meets regularly to review issues found by the agency's oversight entities and discuss policy implications, including immediately after any detainee death or other critical incident. In cases where more serious problems have been identified, ICE leadership can determine whether ICE will discontinue using particular facilities or impose monetary sanctions."[146]

115.    But the Detention Monitoring Council relies on facts and concerns reported to it by others, and while it has been in operation for nearly a decade, there is no sign that it is actually living up to the purposes stated in the prior paragraph. The identified oversight deficits have persisted—and, as just explained (¶¶ 107-109) ICE hardly ever "discontinue[s] using particular facilities or impose[d] monetary

---

[142] *Id.* at ii.

[143] *Id.* at 14.

[144] *Id.* at 14-15.

[145] U.S. DEP'T OF HOMELAND SEC., U.S. IMMIGR. & CUSTOMS ENFORCEMENT, PROGRESS IN IMPLEMENTING 2011 PBNDS STANDARDS AND DHS PREA REQUIREMENTS AT DETENTION FACILITIES 10 (2018), https://www.dhs.gov/sites/default/files/publications/ICE%20-%20Progress%20in%20Implementing%202011%20PBNDS%20Standards%20and%20DHS%20PREA%20Requirements_0.pdf.

[146] *ICE: The U.S. Dep't of Homeland Sec.'s New Immigration Detention Standards, Hearing Before the Subcomm. on Immigr. Policy and Enforcement of the H. Comm. on the Judiciary*, 112th Cong. (2012) (statement of Kevin Landy), https://www.aila.org/File/Related/12032846c.pdf.

sanctions."[147]

## F. ICE Non-routine Inspections: Detainee Death Reviews.

116.    The discussion above—¶¶ 67-113—concerns routine monitoring methods. ICE also conducts non-routine reviews of detainee in-custody deaths. As ICE describes the process,

> ICE Health Service Corps (IHSC) reviews the case to determine whether the detainee received appropriate health services in relation to nationally recognized standards of detention health care and practices. Additionally, the ICE Office of Professional Responsibility, in coordination with contract subject matter experts in correctional healthcare and security, conducts an objective examination of the facts and circumstances surrounding each individual's passing, to determine whether or not the relevant detention standards were complied with and to identify any other areas of concern regarding the individual's care and custody. Upon their completion, the results of these reports are provided to ICE senior management and the Department of Homeland Security's Office of Civil Rights and Civil Liberties.[148]

117.    In the past, ICE's Detainee Death Reviews were quite detailed and included information allowing evaluation of the circumstances surrounding the death. I discuss several of those above, ¶¶ 85-87; 99-102. More recently, this seems to no longer be the case. Reports from April 2018 through May 2020 are posted on ICE's website;[149] they are short and summary.

118.    Detainee Death Reviews are somewhat akin to Sentinel Event Root Cause Analysis,[150] although my understanding of both the ICE process and Root Cause Analysis suggests that Detainee Death Reviews do not actually follow key precepts of such analyses. The Death Reviews are certainly an important component of an appropriate oversight system. And for my purposes here—evaluating oversight—Detainee Death Reviews shed useful light on the informational and corrective gaps created by more routine practices. But they do not solve those gaps,

---

[147] *See supra* ¶ 114.

[148] *Death Detainee Reporting*, U.S. Immigr. & Customs Enforcement, https://www.ice.gov/death-detainee-report.

[149] *See id.*

[150] *See Sentinel Event,* The Joint Commission, https://www.jointcommission.org/resources/patient-safety-topics/sentinel-event/.

both because they are (thankfully) fairly rare, and because when they occur, they are far from systematic. That is, they look, deeply into the circumstances of the detainee death under review, but not at practices more broadly. Moreover, there does not seem to be any real follow-through on the problems they reveal.

## G. DHS Oversight Mechanisms

119.    DHS, the cabinet agency of which ICE is a component, adds two oversight mechanisms to the mix—inspections/reviews by the DHS Office of Inspector General (DHS OIG), and by the DHS Office for Civil Rights and Civil Liberties (CRCL).

120.    DHS OIG has, in recent years, done significant work on detention inspections and more general review of policies and procedures. These reports are referenced above.

121.    In addition, CRCL (which reports directly to the Secretary of Homeland Security) receives complaints and information about detained conditions from detainees or their counsel, or from advocacy organizations. It conducts some intensive site visits each year to ICE detention facilities, led by CRCL staff with consulting subject matter experts. On the basis of these site visits, CRCL makes both facility-specific and more systemic recommendations.[151] Unfortunately, ICE frequently delays even responding to these recommendations, much less adopting them. CRCL's impotence in this regard has occasionally been publicly visible. For example, CRCL's 2015 Report to Congress stated:

> CRCL issued the first of a new type of recommendations memorandum in FY 2015 to address long-standing concerns about specific detention facilities used by ICE. This new type of memorandum, colloquially termed a "super-recommendations memorandum," is an avenue to inform Component leadership of areas where there has been no significant implementation of CRCL recommendations despite repeated follow-up, CRCL continues to receive complaint allegations on the issues raised in the recommendations, and the issues presented raise serious civil rights concerns. In this instance, the memorandum

---

[151] *See* Letter from Community Initiatives for Visiting Immigrants in Confinement (CIVIC) to HSAC 8 (Oct. 3, 2016), https://www.dhs.gov/sites/default/files/publications/DHS%20HSAC%20PIDF%20Final%20Report.pdf ("CRCL did conduct a three-day investigation in December 2015 of the Adelanto Detention Facility, resulting in a change in the medical provider at Adelanto.").  For a select few of CRCL's investigation memos, see https://www.dhs.gov/publications-library/collections/crcl-onsite-investigation-memos.

addressed a detention facility in Alabama. CRCL highlighted the seriousness of problems found in previous investigations, the continued receipt of additional correspondence raising similar concerns, and CRCL's belief that additional fact-finding is unnecessary as the prior recommendations are likely not being fully implemented. In these limited circumstances, CRCL made significant and far-reaching recommendations to fix identified problems, including a request that ICE no longer use the facility to house detainees.[152]

122.    Sure enough, CRCL's 2017 "follow-up review" found many of these recommendations unimplemented. See supra ¶¶ 89-90.

123.    Both OIG and CRCL site inspections are helpful oversight mechanisms. The IG site visits are helpful in terms of the public documentation and attention they promote. But their rarity means they do not solve the oversight problems identified above. CRCL's program has, at least at some points in the past, been somewhat more sustained than the OIG program in terms of the number of reviews and the follow up from them—but CRCL's disempowerment within the agency and DHS's decision not to make public the expert reports, investigation memos, and recommendations, undermine their useful effect.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed on August 17, 2020 at Ann Arbor, Michigan.

_Margo Schlanger_

Margo Schlanger

---

[152] U.S. Dept. of Homeland Sec., Office for Civil Rights and Civil Liberties, Fiscal Year 2015 Annual Report to Congress 28-29 (June 10, 2016).

# EXHIBIT 1

# MARGO SCHLANGER

http://margoschlanger.net
mschlan@umich.edu
734-615-2618

## EMPLOYMENT

**Professor of Law, University of Michigan** (2009–present; on leave 2010 and 2011)(Wade H. and Dores M. McCree Collegiate Prof. of Law, 2017-present; Henry M. Butzel Professor of Law, 2014-2017; Professor of Law, 2009-2014; Visiting Professor of Law, Fall 2009). **Director**, Civil Rights Litigation Clearinghouse, http://clearinghouse.net. Faculty affiliate, UM Center for Forensic Psychiatry Fellowship in Forensic Psychiatry (May 2017-present).

**Litigating Expert**, Sabata v. Nebraska Dep't of Correctional Services, No. 4:17-cv-3107 (D. Neb.) (2018 to present) (disability and corrections); Fraihat v. U.S. Immigration and Customs Enforcement, No. 5:19-cv-01546 (C.D. Cal.) (2019 to present) (detention oversight); Novoa v. GEO Group, No. 5:17-cv-02514 (C.D Cal.) (2019 to present) (detention oversight).

**Settlement Monitor**, Adams & Knights v. Kentucky Department of Corrections, No. 3:14-cv-00001 (E.D. Ky.) (June 2015–present). Court-appointed monitor in settlement of state-wide case about deaf prisoners.

**Counsel to the Secretary**, U.S. Department of Homeland Security (Special Government Employee, part-time, 2012-2013).  Advised Secretary of Homeland Security on civil rights matters.

**Officer for Civil Rights and Civil Liberties**, U.S. Department of Homeland Security (Presidential appointment, 2010 & 2011). (Chair, Privacy, Civil Rights, and Civil Liberties Subcommittee of the federal Information Sharing Environment's Information Sharing and Access Interagency Policy Committee; Chair, Interagency Coord. Council on Emergency Preparedness and Individuals with Disabilities; Member, U.S. Delegation, Universal Periodic Review.)

**Visiting Professor of Law**, University of California, Los Angeles (Spring 2009).

**Professor of Law**, Washington University in St. Louis (2004–2009); Director, Civil Rights Litigation Clearinghouse.  Elected 2008 "David M. Becker Professor of the Year" by law students.

**Faculty Fellow**, Harvard University Center for Ethics and the Professions (2001/02).

**Assistant Professor of Law**, Harvard Law School (1998–2004).

**Senior Trial Attorney**, U.S. Dept. of Justice, Civil Rights Division, Special Litigation Section (1995–1998). Division Special Achievement Awards, 1996 and 1997.

**Law clerk,** Justice Ruth Bader Ginsburg; Supreme Court of the United States (1993–1995).

**Fact-checker,** *The New Yorker* (1989–1990).

## OTHER APPOINTMENTS

Class Counsel, Hamama v. Adducci (E.D. Mich. 2:17-cv-11910) (nationwide class action challenging mass deportation of Iraqi nationals)

Member, Michigan Advisory Committee to the U.S. Commission on Civil Rights (May 2017-present).

Member, Dep't Homeland Sec'y Residential Center Fed. Advisory Committee (Nov. 2015–Oct. 2016).

Reporter, American Bar Association task force on Standards relating to the Treatment of Prisoners (2007–Jan. 2010).  See https://www.americanbar.org/groups/criminal_justice/publications/criminal_justice_section_archive/crimjust_standards_treatmentprisoners/.

Comm'r, Comm'n on Safety and Abuse in America's Prisons (2006–2008), http://www.prisoncommission.org.

---

## EDUCATION

**Yale Law School**, J.D. 1993.
Book Reviews Editor, *Yale Law Journal* (Vol. 102); Vinson Prize for excellence in clinical casework.

**Yale College**, B.A. 1989.
Honors: *magna cum laude*, distinction in the History major, National Merit Scholar.

---

## COURSES TAUGHT

Torts; Prisons and the Law; Equal Protection; Constitutional Law. Seminars include Police and Surveillance Reform; Sexual Orientation, Gender Identity, and the Law; Civil Rights and Homeland Security; Empirical Inquiries into Civil Litigation; Institutional Reform Litigation.

---

## SCHOLARLY PUBLICATIONS, forthcoming and published (for links, see margoschlanger.net)

*Accommodating Disabilities*, in PUBLIC HEALTH BEHIND BARS—FROM PRISONS TO COMMUNITIES (forthcoming 2020).

INCARCERATION AND THE LAW: CASES AND MATERIALS (West Academic Publishing 2020) (with David Shapiro and Sheila Bedi); also associated website, http://incarcerationlaw.com.

*Maximalist vs. Incrementalist Reform Strategies: Solitary Confinement Case Studies*, 115 NORTHWESTERN L. REV. (forthcoming 2020).

*The Civil Rights Litigation Clearinghouse: Origins and Goals*, KULA: KNOWLEDGE CREATION, DISSEMINATION, AND PRESERVATION STUDIES (2018).

*The Constitutional Law of Incarceration, Reconfigured*, 103 CORNELL L. REV. 357 (2018).

*Prisoners with Disabilities*, in 4 REFORMING CRIMINAL JUSTICE: PUNISHMENT, INCARCERATION AND RELEASE (Erik Luna ed., 2017).

*Anti-Incarcerative Remedies for Illegal Conditions of Confinement*, 6 U. MIAMI RACE & SOCIAL JUSTICE L. REV. 1 (2016).

*How the ADA Regulates and Restricts Solitary Confinement for People with Mental Disabilities*, ACS Issue Brief (May 19, 2016).

*The Just-Barely-Sustainable California Prisoners' Rights Ecosystem*, 64 ANNALS OF THE AM. ACAD. POL. & SOC. SCI. 62 (2016).

*No Reason To Blame Liberals (Or, The Unbearable Lightness of Perversity Arguments*, THE NEW RAMBLER REVIEW (online, June 15, 2015) (reviewing NAOMI MURAKAWA, THE FIRST CIVIL RIGHT: HOW LIBERALS BUILT PRISON AMERICA).

*Against Solitary Confinement: Jonah's Redemption and Our Need for Mercy*, 16 RUTGERS J. LAW & RELIGION 345 (2015) (symposium: People of the Book).

*Stealth Advocacy Can (Sometimes) Change the World* (review of ALISON L. GASH, BELOW THE RADAR: HOW SILENCE CAN SAVE CIVIL RIGHTS (2015)), 113 U. MICH. L. REV. 897 (2015).

*Trends in Prisoner Litigation as the PLRA Enters Adulthood*, 5 U.C. IRVINE L. REV 153 (2015) (updated and reprinted as *Trends in Prisoner Litigation, as the PLRA Approaches 20*, 28 CORR. LAW REP. 69 (2017).

*Prisoners' Rights Lawyers' Strategies for Preserving the Role of the Courts*, 69 U. MIAMI L. REV. 519 (2015).

*Intelligence Legalism and the National Security Agency's Civil Liberties Gap*, 6 HARV. NAT. SEC. L.J. 112 (2015).

*Offices of Goodness: Influence Without Authority within Federal Agencies*, 36 CARDOZO L. REV. 53 (2014).

*The Equal Employment Opportunity Commission and Structural Reform of the American Workplace* (with Pauline Kim), 91 WASH. U. L. REV. 1519 (2014).

*Prison Segregation: Symposium Introduction and Preliminary Data on Racial Disparities*, 18 MICH. J. RACE & LAW 241 (2013).

Plata v. Brown *and Realignment: Jails, Prisons, Courts, and Politics*, 48 HARV. CIV. RIGHTS-CIV. LIB. L. REV. 165 (2013).

*Women Behind the Wheel: Gender and Transportation Law, 1860-1930*, in Tracy A. Thomas & Tracey Jean Boisseau, eds., FEMINIST LEGAL HISTORY: ESSAYS ON WOMEN AND LAW (2011).

*Regulating Segregation: The Contribution of the ABA Criminal Justice Standards on the Treatment of Prisoners*, 47 AM. CRIM. L. REV. 1421 (2010)

*Against Secret Regulation: Why and How We Should End the Practical Obscurity of Injunctions and Consent Decrees*, 59 DEPAUL L. REV. 515 (2010).

*How to Study District Judge Decision-Making*, 29 WASH. U. J. LAW & POL'Y 83 (2009) (with Pauline Kim, Christina Boyd, Andrew D. Martin).

*Preserving the Rule of Law in America's Prisons: The Case for Amending the Prison Litigation Reform Act*, 11 U. PENN. J. CONST. LAW 139 (2008) (with Giovanna Shay).

*Jail Strip-Search Cases: Patterns and Participants*, 71 LAW & CONTEMP. PROB. 65 (2008).

*Operationalizing Deterrence: Claims Management (in Hospitals, a Large Retailer, and Jails and Prisons)*, 2 JOURNAL OF TORT LAW (Aug. 2008).

*Hedonic Damages, Hedonic Adaptation, and Disability*, 60 VAND. L. REV. 745 (2007) (with Samuel Bagenstos).

*The Washington University Civil Rights Litigation Clearinghouse: Using Court Records for Research, Teaching, and Policymaking*, 75 UMKC L. REV. 153 (2006) (Symposium: Federal Civil Court Records of the National Archives: Opportunities for Empirical, Historical and Legal Research and Curriculum Design) (with Denise Lieberman).

*What We Know and What We Should Know About American Trial Trends*, 2006 J. DISP. RES. 35 (2006) (Vanishing Trial Symposium).

*Civil Rights Injunctions Over Time: A Case Study of Jail and Prison Court Orders*, 81 N.Y.U. L. REV. 550 (2006). Reprinted in 23 CIVIL RIGHTS LITIGATION AND ATTORNEY FEES ANNUAL HANDBOOK (Steven Saltzman, ed., 2007).

*Second Best Damage Action Deterrence*, 55 DEPAUL L. REV. 517 (2006) (Clifford Symposium on Tort Law and Social Policy).

*Determinants of Civil Rights Filings in Federal District Court by Jail and Prison Inmates*, 1 J. EMPIRICAL LEG. STUD. 79 (2004) (with Anne Piehl).

*The Reliability of the Administrative Office of the U.S. Courts Database: An Initial Empirical Analysis*, 78 NOTRE DAME L. REV. 1455 (2003) (with Theodore Eisenberg) (symposium issue)

*Inmate Litigation*, 116 HARV. L. REV. 1555 (2003).

*Gender Matters: Teaching a Reasonable Woman Standard in Personal Injury Law*, 45 ST. LOUIS U. L.J. 769 (2001).

*Beyond the Hero Judge: Institutional Reform Litigation as Litigation*, 76 MICH. L. REV. 1994 (1999).

*Injured Women Before Common Law Courts, 1860-1930*, 21 HARV. WOMEN'S L.J. 79 (1998).

## NON-SCHOLARLY PUBLICATIONS

Commentary on *Lomax v. Ortiz-Marquez*, SCOTUSblog: *Opinion analysis: Strike out* (June 8, 2020); *Argument analysis: Does prejudice matter?* (Feb. 27, 2020); *Argument preview: Calling (PLRA) strikes* (Feb. 19, 2020), https://www.scotusblog.com/case-files/cases/lomax-v-ortiz-marquez/

*Let's Pause Iraqi Deportations*, THE HILL (July 24, 2019), https://thehill.com/opinion/immigration/454376-lets-pause-iraqi-deportations

*What You Need to Know About the Crisis at the Border*, SLATE (June 24, 2019) (with Dahlia Lithwick), https://slate.com/news-and-politics/2019/06/trump-border-crisis-how-to-help.html

*Where are the Jews*, THE FORWARD (Sh'ma Now), Sept. 28, 2018, https://forward.com/shma-now/kavod-habriyot/410479/where-are-the-jews/

*Restoring Objectivity to the Constitutional Law of Incarceration*, ACS ISSUE BRIEF, Sept. 2018, https://www.acslaw.org/issue_brief/briefs-landing/restoring-objectivity-to-the-constitutional-law-of-incarceration/

*Podcast: RBG, Beyond Notorious*, CNN, Aug. 20, 2018 (A Higher Court: 1990s), https://itunes.apple.com/us/podcast/rbg-beyond-notorious/id1424366161?mt=2

*Clerking for Ginsburg: The Equality Lessons*, LAW360, Aug. 1, 2018, https://www.law360.com/aerospace/articles/1068210

*You've heard the calls to #AbolishICE. Here's what that could mean*, WASH. POST: MONKEY CAGE, July 9, 2018 (with Seth Grossman), https://www.washingtonpost.com/news/monkey-cage/wp/2018/07/09/youve-heard-the-calls-to-abolishice-heres-what-that-could-mean/?utm_term=.48e3c8a1fa4c

*Here's how you can help fight family separation at the border: Lawyers, translators, donations, protest*, SLATE, June 15, 2018 (with Dahlia Lithwick), https://slate.com/news-and-politics/2018/06/how-you-can-fight-family-separation-at-the-border.html

*Teachout: Civil Rights in the Trump Era*, University of Michigan, June 2018, https://www.youtube.com/playlist?list=PL5-TkQAfAZFYIA5QRJUMbAaQvVWLuEoee

*Why the Trump Administration is Treating Immigration Detainees Like Criminals (Q&A)*, Mother Jones, June 8, 2018, https://www.motherjones.com/politics/2018/06/ice-detainees-federal-prison-interview/

*This is what's really happening to kids at the border*, WASH. POST: MONKEY CAGE, May 30, 2018 (with Michelle Brané), https://www.washingtonpost.com/news/monkey-cage/wp/2018/05/30/this-is-whats-really-happening-to-kids-at-the-border

*Could this be the end of plenary power?* SCOTUSBlog, July 14, 2017, http://www.scotusblog.com/2017/07/symposium-end-plenary-power/.

*Illegal Immigration and the Book of Ruth*, TABLET MAGAZINE, May 26, 2017, http://www.tabletmag.com/jewish-life-and-religion/235265/illegal-immigration-book-of-ruth.

*Obama should finish what he started and end NSEERS*, The Hill, Dec. 6, 2016, http://thehill.com/blogs/congress-blog/homeland-security/308955-obama-should-finish-what-he-started-and-end-nseers.

*Equality Matters in the National Security Context, Too*, American Constitution Society Blog, Sept. 14, 2016, Sept. 14, 2016, http://www.acslaw.org/acsblog/equality-matters-in-the-national-security-context-too.

*Where Scalia's Vote was Decisive*, Prospect.org, Feb. 15, 2016, http://prospect.org/article/where-scalia's-vote-was-decisive.

*Class-Action Suit Brings Sweeping Changes to Solitary Confinement in New York*, Prospect.org, Dec. 23, 2015 (with Amy Fettig), http://prospect.org/article/class-action-suit-brings-sweeping-changes-solitary-confinement-new-york.

*Solitary Reform Milestones*, Solitary Watch (with Amy Fettig), http://solitarywatch.com/milestones.

*Eight Principles for Reforming Solitary Confinement*, American Prospect, Fall 2015 (with Amy Fettig), http://prospect.org/article/eight-principles-reforming-solitary-confinement-0.

*With one decision, Obama and Lynch could reshape the criminal justice system*, WashingtonPost.com, Aug. 3, 2015 (with Robert Ferguson & Judith Resnik), https://www.washingtonpost.com/posteverything/wp/2015/08/03/with-one-decision-obama-could-totally-reform-the-criminal-justice-system/.

*A Civil Rights Vision for Countering Violent Extremism*, The Hill (Congress Blog), July 14, 2015, http://thehill.com/blogs/congress-blog/civil-rights/247769-a-civil-rights-vision-for-countering-violent-extremism.

*The Declining Prisoner Docket*, Alliance for Justice Blog, Feb. 25, 2015, http://www.afj.org/blog/the-declining-prison-litigation-docket.

*U.S. Intelligence Reforms Still Allow Plenty of Suspicionless Spying on Americans*, JustSecurity.org, Feb. 13, 2015, http://justsecurity.org/20033/guest-post-intelligence-reforms-plenty-suspicionless-surveillance-americans/.

*When is it Ok to Racially Profile?* Politico Magazine, Dec. 18, 2014, http://justsecurity.org/20033/guest-post-intelligence-reforms-plenty-suspicionless-surveillance-americans/.

*Intelligence Legalism and the Torture Report*, JustSecurity.org, Dec. 17, 2014, http://justsecurity.org/18510/intelligence-legalism-torture-report/.

Infiltrate the NSA, Democracy (Issue #35, Winter 2015); Dec. 15, 2014  and TheAtlantic.com, Dec. 30, 2014, http://www.democracyjournal.org/35/infiltrate-the-nsa.php.

*A Civil Rights Lawyer Explains Why Obama's Immigration Order is an Even Bigger Deal than it Seems*, TheNewRepublic.com, Nov. 25, 2014, available at http://justsecurity.org/17117/cult-rules-origins-intelligence-legalism/.

*The Problem with Legalism in the Surveillance State*, JustSecurity.org, Nov. 7, 2014, available at http://justsecurity.org/17163/problem-legalism-surveillance-state/.

*A Cult of Rules: The Origins of Legalism in the Surveillance State*, JustSecurity.org, Nov. 5, 2014, available at http://justsecurity.org/17117/cult-rules-origins-intelligence-legalism/.

*Justice Alito Would Be Just Fine if Congress Undid Yesterday's Landmark Privacy Decision*, TheNewRepublic.com, June 26, 2014, available at http://www.newrepublic.com/article/118403/justice-alito-privacy-reading-his-concurring-opinion-privacy.

*The Bigger No Fly List Problem*, JustSecurity.org, June 25, 2014, available at http://justsecurity.org/12215/guest-post-no-fly-list-problem/.

*The Supreme Court Gives a Subtle Boost to Free Speech*, The New Republic, May 28, 2014, available at http://www.newrepublic.com/article/117925/wood-v-moss-subtle-victory-free-speech.

*Even Conservative Judges Can't Deny the Constitutional Logic of Same-Sex Marriage*, Daily Beast, May 18, 2014, available at http://www.thedailybeast.com/articles/2014/05/18/even-conservative-judges-can-t-deny-the-constitutional-logic-of-same-sex-marriage.html.

*In the Story of Jonah, an Urgent Lesson About the Dangers of Solitary Confinement,* TABLET MAGAZINE, Sept. 11, 2013, available at http://www.tabletmag.com/jewish-life-and-religion/143081/jonah-solitary-confinement.

*ABA Criminal Justice Standards on the Treatment of Prisoners*, CRIM. JUSTICE MAG., Summer 2010, at 14 (with Margaret Colgate Love & Carl Reynolds).

*Prison Litigation Reform Act Update*, in THE STATE OF CRIMINAL JUSTICE, 2007-2008 (American Bar Association, Criminal Justice Section, Apr. 2008).

*Professor Notes PLRA Flaws: Will Congress Act to Correct Them?*, CORRECTIONAL LAW REP., Feb./Mar. 2008, at 65 (reprints testimony before the House Judiciary Committee, Subcommittee on Crime, Terrorism, and Homeland Security: *Review of the Prison Litigation Reform Act: A Decade of Reform or an Increase in Prison Abuses* (Nov. 2007)).

*The Political Economy of Prison and Jail Litigation*, PRISON LEGAL NEWS, June 2007, at 1.

*Preserving the Rule of Law in America's Prisons: The Case for Amending the Prison Litigation Reform Act*, American Constitution Society Issue Brief, Mar. 28, 2007 (with Giovanna Shay).

*National Prison Commission Begins Work*, CORRECTIONAL LAW REP., June/July 2005, at 1, and PRISON LEGAL NEWS, July 2005, at 17.

*Inmate Litigation: Results of a National Survey*, NATIONAL INSTITUTE OF CORRECTIONS LARGE JAIL NETWORK EXCHANGE, July 2003, at 1.

## OTHER WORKS IN PROGRESS

Constitutional Rights at the Border; Unpublished Opinions in the District Courts

## GRANTS

National Science Foundation SES-0718831 (co-PI, with Pauline Kim and Andrew Martin), "The Litigation Process in Government-Initiated Employment Discrimination Suits" (2007), $213,999.

Harvard University William F. Milton Fund (with Anne Morrison Piehl), "Litigated Intervention in the Management of Correctional Facilities" (2002), $33,607.

## SERVICE AND MEMBERSHIPS

### Professional

Bar admissions: New York, District of Columbia (inactive), Missouri, Michigan; Supreme Court; 9th Cir.; 6th Cir.; Eastern District of Missouri.

Organizing committee member, Prisoners' Advocates COVID-19 Webinars (Spring/Summer 2020); Prisoners' Advocates Conference (Denver, Oct. 2018; Los Angeles, Sept. 2016; New Orleans, Feb. 2014). Chair, Prison Litigation: A Workshop for Plaintiffs' Attorneys (DC, Mar. 2008).

Solitary confinement resources development project, with Vera Institute of Justice. See https://www.safealternativestosegregation.org/promising-practices/.

Counsel for amici curiae former corrections officials, Prison Legal News v. Florida (11th Cir. 2015).

Member, expert advisory committee on data collection and confidential reporting, Prison Rape Elimination Act Commission (2007).

Drafter, ABA Litigation Section Project, The Rule of Law in Times of Calamity (2006).

Counsel of record for amici curiae ACLU and other prison advocacy organizations, Woodford v. Ngo, 05-416 (U.S. Supreme Court, filed Feb. 2, 2006).

## General Academic

Member, Editorial Board, Journal of National Security Law & Policy (2015-present)
Co-editor (with Sharon Dolovich), SSRN abstracting "journal," Corrections & Sentencing Law & Policy (2006–2009, 2012-present).  See http://ssrn.com.
Chair, American Association of Law Schools, Remedies Section (2014)
Chair, American Association of Law Schools, Section on Law & the Social Sciences (2007/08).
Member, Law & Society Association Dissertation Prize Committee (2007).
Member, Law & Society Association.

## University of Michigan

Chair, Intellectual Community Committee (2019-present)
Convenor, Prison Law & Scholarship Roundtable (2019, 2017, 2014, 2012)
Convenor, Social Movements cross-university faculty interest group (2014-present), Prison and Reentry cross-university faculty interest group (2016-present)
Chair, Law School Tenure Committee (2016/17, 2013/14), Member (2015/16, 2012/2013)
Member, Provost's Faculty Advisory Committee (2015-2017)
Chair, Senate Advisory Committee on University Affairs, Committee on Civil Rights and Liberties (2014-16), Member (2013/2014)
Member, Law School Curriculum Committee (2014-2016)
Faculty Advisor, Journal of Race & Law symposia: "Innocent until Proven Poor" (2016); solitary confinement (2013)

## Washington University in St. Louis

Member, Law School Promotions Committee (2007/08)
Advisory Board, Washington University Center for Empirical Research in the Law (2007/08)
Standing participant: Workshop on Empirical Research in Law (2004–2009)
Chair, Law School Lateral Appointments Committee (2006/07)
Chair, Law School Dean's Advisory Group on Improving Student Career Prospects (2005/06)
Chair, Law School Rules and Petitions Committee (2005/06)
Chair, Law School Ad Hoc Committee on Tenure Standards and Process (2004/5)
Member, University Committee on Senate By-Laws (2004/5)
Member, Law School Clerkship Committee (Fall 2004)

## PRESENTATIONS (2004–present)

*Maximalist vs. Incrementalist Reform Strategies: Solitary Confinement Case Studies,*
- Law & Society Association Annual Conference (May 2020)
- Northwestern Law School (Nov. 2019)

*Mapping the Iceberg: The Impact of Data Sources on the Study of District Courts*
- Law & Econ workshop, University of Michigan (April 2020)

Panelist/Discussant, 2019/20:
- COVID-19 Prisoners' Advocates Webinars (many, spring/summer 2020)
- *Discovery in Prison Cases*, and *Immigration Detention*, Practicing Law Institute, Prison Law 2019 (Nov. 2019)
- *Teaching Civil Rights*, Michigan Civil Rights Academy (Oct. 2019)

U. Mich. Student Organizations presentations, 2019/20:
- Careers in civil rights law (Mar. 2020)
- Criminal justice reform opportunities (Feb. 2020)
- Prison litigation in Mississippi (with Judge Carlton Reeve) (Feb. 2020)

U. Mich. Student Organizations presentations, 2018/19:
- Lawyers and mental health collaborations to improve prison conditions (Apr. 2019)
- Gender issues in law school classrooms (April 2019)
- Women and the legal profession (March 2019)
- Children and immigration enforcement (March 2019)
- Hamama v. Adducci (Feb. 2019, March 2019)
- Transgender advocacy in Japan and the U.S. (March 2019)
- The Dilley Project (Feb. 2019)
- Challenging incarceration related to fines and fees (Feb. 2019)
- Family detention (Feb. 2019)
- Korematsu and current immigration detention policies (Jan. 2019)
- Law reform and Jewish ethics (Oct. 2018)
- The Trump Administration's policy on transgender discrimination (Oct. 2018)
- The Kavanaugh hearings (Sept. 2018)
- What would it mean to "abolish ICE" (Sept. 2018)

Panelist/Discussant, 2018/19:
- *The Constitution at the Border*, Osher Lifelong Learning Institute (June 2019)
- *What Do Federal Agency Civil Rights Offices Need?* U.S. Commission on Civil Rights (Nov. 2018)
- *Mental Health and Corrections: Legal Issues*, Michigan Dep't of Health and Human Services Conference (June 2018)

U. Mich. Student Organizations presentations, 2018/19:
- Lawyers and mental health collaborations to improve prison conditions (Apr. 2019)
- Gender issues in law school classrooms (April 2019)
- Women and the legal profession (March 2019)
- Children and immigration enforcement (March 2019)
- Hamama v. Adducci (Feb. 2019, March 2019)
- Transgender advocacy in Japan and the U.S. (March 2019)
- The Dilley Project (Feb. 2019)
- Challenging incarceration related to fines and fees (Feb. 2019)
- Family detention (Feb. 2019)

- Korematsu and current immigration detention policies (Jan. 2019)
- Law reform and Jewish ethics (Oct. 2018)
- The Trump Administration's policy on transgender discrimination (Oct. 2018)
- The Kavanaugh hearings (Sept. 2018)
- What would it mean to "abolish ICE" (Sept. 2018)

*Mental Health and Corrections: Legal Issues*
- Michigan Dep't of Health and Human Services Conference (June 2018)
- Midwest American Academy of Psychiatry and the Law (March 2018)

*Civil Rights in the Trump Era*, a "teachout" available via Youtube (May 2018)

*Gender Discrimination Law in the Age of #MeToo*, Michigan Society of Active Retirees (April 2018)

Panelist/Discussant, 2017/18:
- *Solitary Confinement and Prisoners with Disabilities*, John Jay Center for Media, Crime, and Justice (April 2018)
- *Multi-forum Litigation Challenging Iraqi Deportations*, Levin Center at Wayne State University Law School (Nov. 2017)
- Vanderbilt Criminal Law/Procedure Roundtable (Nov. 2017)
- *The Shrinking Plenary Power Doctrine,* Yale Law School Reunion Panel (Oct. 2017)

U. Mich. Student Organizations presentations, 2017/18:
- Federalist Society, Fighting Domestic Terrorism (March 2018)
- Reproductive Rights and Justice, NIFLA v. Becerra (abortion rights and speech) (March 2018)
- ACLU, Bail Reform (March 2018)
- Attica (Jan. 2018)
- Hamama v. Adducci (Jan. 2018)
- National Security Law Society, The Abdulmutallab Case (Nov. 2017)
- Federalist Society, Right on Crime (Can the Right and Left Agree?) (Oct. 2017)
- Reproductive Rights and Justice, Garza v. Hargan (abortion access for immigrant minors in federal custody) (Oct. 2017)
- Michigan Immigration & Labor Law Ass'n, DACA and the Law (Sept. 2017)

*Civil Rights at the Border: National Security, Border Screening, and the Muslim Ban*, Robert H. Jackson Center (June 2017)

*The Constitutional Law of Incarceration, Reconfigured*
- Prison Scholarship roundtable, University of Michigan (Mar. 2017)
- Vanderbilt Law faculty workshop (Jan. 2017)

*Teaching Civil Rights: The Constitution on the Ground*,
- James Madison Legacy Project, Michigan Center for Civic Education Professional Learning Conference (July 2017)
- Institute for Innovation in Education (June 2017)
- Oakland County, day-long workshop for high school teachers (Oct. 2016)

*Disabled Prisoners and Reform*, Conference presentation at Arizona State University, Bridging the Gap Between Scholars and Criminal Justice Reform (Feb. 2017)

*The Supreme Court and Prisoner Treatment Standards* & *Trends in Solitary Confinement Litigation and Policy*, Michigan Department of Health and Human Services (Feb. 2017)

U. Mich. Student Organizations presentations, 2016/17:
- Young Scholars Conference (Apr. 2017)
- American Constitution Society, Private Prisons (Mar. 2017)
- Women Law Students Ass'n, Women Who Lead: Cross-School Viewpoint (Feb. 2017)
- American Constitution Society, The President and the courts (Feb. 2017)
- Women's rights and the presidential election (Nov. 2016)
- U. Mich. Women Law Students Association, Incarcerated women (Oct. 2015)
- OUTLAWS, LGBT issues facing the next president (Sept. 2016)

Panelist/Discussant, 2016/17:
- Practicing Law Institute, Prison Litigation 2017: Practical Strategies (June 2017)
- Arizona State University, Bridging the Gap Between Scholars and Criminal Justice Reform (Feb. 2017)
- Police reform and Black Lives Matter (Oct. 2016)
- Security and privacy in an age of terrorism, UM cybersecurity conference (Oct. 2016)
- Prison Litigation Reform Act 101, Prisoners' Advocates conference (Sept. 2016)
- Decarceration and disability, Prisoners' Advocates conference (Sept. 2016)
- Landmark cases in prisoner civil rights, UM forensic psychiatry fellows seminar (Aug. 2016)

*A New Generation of Noncarcerative Remedies for Unconstitutional Conditions of Confinement*, University of Miami Race & Social Justice Law Review symposium (Mar. 2016)

*Detention of Immigrant Families*, invited lecture, Albion College (Mar. 2016)

U. Mich. Student Organizations presentations, 2015/16:
- Reforming Police Use of Force (Mar. 2016)
- The Prospects of Bail Reform (Mar. 2016)
- Black Law Students Association, Racial Disparities in Drug-Related Policing and Treatment (Feb. 2016)
- U. Mich. American Constitution Society, Is This When Mass Incarceration Ends (Nov. 2015)
- U. Mich. Women Law Students Association, Incarcerated Women (Oct. 2015)

Panelist/Discussant, 2015/16:
- Reimagining Prison, Vera Institute of Justice (June 2016)
- Recent Reforms in the Law of Solitary Confinement, ABA Webinar (May 2016)
- Bazelon Center workshop on decarcerating people with mental illness (Mar. 2016)
- ACLU workshop on solitary confinement litigation (Mar. 2016)
- Innocent until Proven Poor (Feb. 2016)
- 9th Circuit Corrections Summit, Grievances & Gripes: A Problem Solving Approach (Nov. 2015)
- U. Mich. Institute for Research on Women and Gender, Incarcerated Women: A Conversation about Realities (Oct. 2015)
- Society for Empirical Legal Studies annual conference. Discussant for Aziz Huq, The Predicates of Military Detention at Guantanamo; Chang, Chen & Lin, Attorney and Judge Experience in Torts Litigation: An Empirical Study (Oct. 2015)

*Studying Injunctions Quantitatively*, Center for Political Studies, Interdisciplinary Workshop on Politics and Policy (Mar. 2015)

*Intelligence Legalism and the NSA's Civil Liberties Gap*
- Ass'n of Am. Law Schools, Annual Conference, Nat'l Security Section (chosen in call for papers) (Jan. 2015)
- University of Iowa Law School Faculty Workshop (Nov. 2014)
- University of Michigan Law School Legal Theory Workshop (Sept. 2014)
- 7th Annual National Security Law Workshop (May 2014)

*Offices of Goodness: Influence without Authority in Federal Agencies*
- Emory Law School (Mar. 2014)
- Cardozo Law School (Feb. 2014)
- Law & Society Ass'n (May 2013)

Panelist/Discussant (2014/15)
- Brennan Center: Strengthening Intelligence Oversight--Executive Branch Oversight (May 2015)
- Michigan Department of Education, Teaching the Movement in Michigan: Civil Rights Education Forum (May 2015)
- Clifford Symposium (DePaul Law): The Supreme Court, Business and Civil Justice--Civil Procedure (Apr. 2015)
- Columbia University, Deliberate Resistance: LGBT Prisoner Rights 20 Years After Farmer v. Brennan (Nov. 2014)
- 9th Circuit Court of Appeals Pro Se Conference--the Prison Rape Elimination Act (Sept. 2014)

*The Equal Employment Opportunity Commission and Structural Reform of the American Workplace*
- EEOC Datanet Conference (May 2014)
- Labor Law Research Network (June 2013)
- Stanford Law Faculty Workshop (Oct. 2009)
- Brooklyn Law School Faculty Workshop (Sept. 2009)
- Building Theory Through Empirical Legal Studies, Berkeley Ctr for Study of Law & Society (Apr. 2009)
- UCLA Law Faculty Workshop (Feb. 2009)
- University of Arizona Law Faculty Workshop (Feb. 2009)

*The Prison Litigation Reform Act and Litigation Dynamics*
- Loyola University New Orleans College of Law, Prisoners' Advocates Conference (Feb. 2014)

*The Present and Future of Institutional Reform Litigation: Current Trends in Prisoner Cases*
- U.C. Irvine Law School, Prisoners Access to Justice Symposium (Feb. 2014)
- University of Miami Law School, Leading from Below Symposium (Feb. 2014)

*Marriage Equality and the Constitution*, Alma College Constitution Day Speaker (Sept. 2013)

Plata v. Brown *and Realignment: Jails, Prisons, Courts, and Politics,*
- Law & Society Ass'n (May 2013) (as discussant in panel on *Plata v. Brown*)
- University of Illinois faculty workshop (Mar. 2013)

*Race and civil rights injunctions,* Ass'n of American Law Schools, Remedies Section (Jan. 2013)

Chair/discussant, panel on Immigration, Law & Society Association Conference (June 2012)

*Operationalizing Deterrence: Claims Management (in Hospitals, a Large Retailer, and Jails and Prisons)*
- University of Michigan Law Faculty Workshop (Sept.  2008)
- Insurance & Society Seminar, Boston (May 2008)
- Southern Methodist University Law Faculty Workshop (Jan. 2008)
- Law & Society Ass'n, Berlin (July 2007)
- University of North Carolina Law Faculty Workshop (Nov. 2006)
- Law & Society Ass'n, Baltimore (July 2006)

*Seminar teaching*
- Ass'n of American Law Schools, Workshop for New Law Teachers (June 2008)
- Ass'n of American Law Schools, Workshop for New Law Teachers (June 2007)

*Hedonic Damages, Hedonic Adaptation, and Disability*
- University of Illinois Law School, Seminar on Law, Psychology & Economics (Apr. 2008)
- Washington University Law Faculty Workshop (Aug. 2006)

*Civil Rights Injunctions Over Time: A Case Study of Jail and Prison Court Orders*
- University Management Team, Washington University in St. Louis (Apr. 2008)
- Prison Litigation: A Workshop for Plaintiffs' Attorneys (Washington, D.C., Mar. 2008)
- Law and Society Ass'n (Las Vegas, NV, June 2005)
- Junior Scholars Empirical Legal Studies conference, Cornell Law School (Oct. 2004)

The Prison Litigation Reform Act
- *Preserving the Rule of Law in America's Prisons: The Case for Amending the PLRA,* Symposium, Penn. J. of Constitutional Law, Litigating the Eighth Amendment (Feb. 2008)
- Witness, National Prison Rape Elimination Comm'n, *The Role of Courts and Litigation in Regulating Prison and Jail Prevention of Sexual Violence and Misconduct* (Dec. 2007)
- Witness, House Judiciary Committee, Subcommittee on Crime, Terrorism, and Homeland Security, hearing:  *Review of the Prison Litigation Reform Act: A Decade of Reform or an Increase in Prison Abuses* (Nov. 2007)
- Congressional staff briefing, proposed amendments to the PLRA (Sept. 2007)
- *Preserving the Rule of Law in America's Prisons: The Case for Amending the PLRA* American Constitution Society issue brief presentation, Washington DC (Apr. 2007)
- *The Past and Future of the PLRA,* National Association of Attorneys General, Baltimore, MD (Feb. 2007)
- Witness, ABA Criminal Justice Section Council, on proposed ABA policy to amend the Prison Litigation Reform Act (Nov. 2006).

*The Civil Rights Litigation Clearinghouse:  Using Court Records for Research, Teaching, and Policymaking*
- Association of American Law Schools annual conference, Washington University Law breakfast (Jan. 2008)
- Presentation to social studies coordinators, Missouri Cooperating School Districts (Feb. 2007)
- Conference presentation ("Federal Civil Court Records of the National Archives: Opportunities for Empirical, Historical and Legal Research  and Curriculum Design"), University of Missouri at Kansas City & National Archives and Records Administration (Oct.

2005)

Moderator/discussant, panel on Race, Empirical Legal Studies Conference (Nov. 2007).

*Fault and the Constitutional Law of Equality.* Invited response to David Strauss, Childress Lecture (Little Rock and the Legacy of *Brown*), Saint Louis University (Oct. 2007)

*Teaching the Equal Protection Clause.* Presentation to high school teachers, Street Law (Oct. 2007)

*The Plaintiffs' Bar and the Conceptualization of Litigation*
- Law & Society Ass'n, Berlin (July 2007)
- Washington University Law Faculty Workshop (May 2007)
- Conference presentation (The Plaintiff's Bar), New York Law School (Mar. 2006)

*The Litigation Process in Government-Initiated Employment Discrimination Suits* (hypotheses and preliminary evidence). Duke Law School Faculty Workshop (Apr. 2007)

Discussant, Katherine Barnes et al., *Life and Death Decisions: Prosecutorial Discretion and Capital Punishment in Missouri*, St. Louis U. conference (Mar. 2007).

Discussant, J.J. Prescott, *Empirical Evidence of Prosecutorial Charging Manipulation: And What it Tells Us About What Prosecutors are Trying to Do*, Empirical Legal Studies Conference, Austin Texas (Oct. 2006).

Moderator, panel on *Empirical Inquiries in Criminal Justice*, Law and Society Ass'n (July 2006).

*Women and the New Supreme Court*: University of Missouri–St. Louis, Sue Shear Institute for Women in Public Life (Jan. 2006).

Moderator, panel discussion of *Problems and Solutions in American Criminal Justice*, in conjunction with hearing held at Washington University in St. Louis by the Commission on Safety and Abuse in America's (Oct. 2005).

*What We Know and What We Could Know About the Vanishing Trial*: Featured Comment on Marc Galanter, "A World Without Trials," University of Missouri at Columbia, Distinguished Lecture on Alternative Dispute Resolution (Sept. 2005).

*Incarceration, Reform, and Politics*: presentation to undergraduate student groups (Apr. 2005).

*Second Best Damage Action Deterrence*
- University of Missouri at Columbia (Apr. 2005).
- Clifford Conference on Torts and Social Policy, DePaul University College of Law (Apr. 2005).
- UCLA faculty workshop (Mar. 2005)

*Collateral Consequences of Incarceration: Background on the Scope of the Carceral System*: Symposium on Poverty, Wealth & the Working Poor (Apr. 2005).

Respondent to James B. Jacobs, *The Future of Imprisonment: Leadership, and Prison Reform*, St. Louis University Ass'n of Criminal Justice and Sociology (Oct. 2004).

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION

|  |  |
|---|---|
| **RAUL NOVOA, et al.,** | **Civil Action No. 5:17-cv-02514-JGB-SHK** |
| **Plaintiffs,** | |
| **v.** | **CLASS ACTION** |
| **THE GEO GROUP, INC.** | **EXHIBIT 2 TO THE EXPERT DECLARATION OF MARGO SCHLANGER** |
| **Defendant.** | |

## ICE Detention Standards

1. *2000 Detention Operations Manual*, U.S. Immigr. & Customs Enforcement, https://www.ice.gov/detention-standards/2000; *2019 National Detention Standards for Non-Dedicated Facilities*, U.S. Immigr. & Customs Enforcement, https://www.ice.gov/detention-standards/2019.

2. *Family Residential Standards 2020*, U.S. Immigr. & Customs Enforcement, https://www.ice.gov/detention-standards/family-residential; for the 2007 version, *see* https://www.ice.gov/detention-standards/family-residential/2007.

3. *2008 Operations Manual ICE Performance-Based National Detention Standards*, U.S. Immigr. & Customs Enforcement, https://www.ice.gov/detention-standards/2008 (last updated Dec. 18, 2019).

4. *Performance-Based National Detention Standards 2011*, U.S. Immigr. & Customs Enforcement (rev. Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf; pre-revision PBNDS 2011, https://www.hsdl.org/?view&did=732246.

## Background on ICE Detention Standards

5. *Detention Standards and Compliance Division: History of the Federal Performance-Based Detention Standards*, Office of the Federal Detention Trustee, https://www.justice.gov/archive/ofdt/qap-brochure.pdf.

6. *Summary of Revisions to the ICE Performance-Based National Detention Standards, Dec. 2016,* U.S. Immigr. & Customs Enforcement, https://www.ice.gov/detention-standards/2011#tab1.

7. U.S. DEP'T OF HOMELAND SEC., U.S. IMMIGR. & CUSTOMS ENFORCEMENT, PROGRESS IN IMPLEMENTING 2011 PBNDS STANDARDS AND DHS PREA REQUIREMENTS AT DETENTION FACILITIES 10 (2018), https://www.dhs.gov/sites/default/files/publications/ICE%20-%20Progress%20in%20Implementing%202011%20PBNDS%20Standards%20and%20DHS%20PREA%20Requirements_0.pdf.

8. Email from U.S. Immigr. and Customs Enforcement, to congressional committee staffer (Nov. 15, 2019, 2:03 PM EST) (on file with author).

9. *2019 National Detention Standards for Non-Dedicated Facilities*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice.gov/detention-standards/2019.

**Adelanto-related and Other ICE Contracts, and Related Documents**

10. South Texas Detention Complex, https://www.ice.gov/doclib/foia/contracts/GEO%20Group-%20HSCEDM12D00001.pdf and https://www.ice.gov/doclib/foia/contracts/geogrouphscedm09f00001.pdf;

11. Aurora contract. https://www.ice.gov/doclib/foia/contracts/hsceop06d00010geo.pdf.

12. Adelanto Intergovernmental Services Agreement (IGSA) and Services Contract, 2011 (GOWER-GEO_0000531, GEO-Novoa_00037692), Quality Assurance Surveillance Plan (GEO-Novoa_00037692).

13. 2019 Bridge Contract between the United States Department of Homeland Security U.S., Immigration and Customs Enforcement and GEO Group (GEO-Novoa_00035044).

14. 2019 Contract between the United States Department of Homeland Security U.S., Immigration and Customs Enforcement and GEO Group, Adelanto (GEO-Novoa_00041146).

15. Memorandum from Jay M. Brooks, Dep. Ass't Dir., Detention Mgt. Div., to Tae D. Johnson, Ass't Dir. Custody Mgt., Request for Waiver of Number of Detainee Showers, Toilets, and Sinks at Adelanto Correctional Facility (June 3, 2016), *available in* https://www.ice.gov/doclib/facilityInspections/2019waivers1.zip.

16. *Facility Inspections – Inspection Waiver Master File*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice.gov/doclib/facilityInspections/2019waivers.xlsx; supporting documentation is available at https://www.ice.gov/doclib/facilityInspections/2019waivers1.zip and https://www.ice.gov/doclib/facilityInspections/2019waivers2.zip.

## ICE Data

17. *Immigr. and Customs Enforcement Detention: ICE Data Snapshots*, TRAC IMMIGRATION, https://trac.syr.edu/phptools/immigration/detention/ (last visited Aug. 10, 2020). *See About the Data—ICE Detention*, TRAC IMMIGRATION, https://trac.syr.edu/phptools/immigration/detention/about_data.html.

18. ALISON SISKIN, CONG. RESEARCH SERV., RL32369, IMMIGRATION-RELATED DETENTION: CURRENT LEGISLATIVE ISSUES (2004), *available at* https://www.everycrsreport.com/files/20040428_RL32369_77874a3cf7c9d27cd54bae1d9af93f1519de940a.pdf.

19. ALISON SISKIN, CONG. RESEARCH SERV., RL32369, IMMIGRATION-RELATED DETENTION: CURRENT LEGISLATIVE ISSUES (2012), *available at* https://www.everycrsreport.com/files/20120112_RL32369_7fe4a01746c3b02572a0d42e9358de259539898d.pdf.

20. U.S. Dep't of Homeland Sec., U.S. Immigr. & Customs Enforcement, Budget Overview: Congressional Justification 14 (2018), https://www.dhs.gov/sites/default/files/publications/ICE%20FY18%20Budget.pdf.

21. U.S. DEP'T OF HOMELAND SEC., U.S. IMMIGR. & CUSTOMS ENFORCEMENT, BUDGET OVERVIEW: CONGRESSIONAL JUSTIFICATION 6 (2020), https://www.dhs.gov/sites/default/files/publications/19_0318_MGMT_CBJ-Immigration-Customs-Enforcement_0.pdf.

22. U.S. DEP'T OF HOMELAND SEC., U.S. IMMIGR. & CUSTOMS ENFORCEMENT, U.S. IMMIGR. AND CUSTOMS ENFORCEMENT FISCAL YEAR 2019 ENFORCEMENT AND REMOVAL OPERATIONS REPORT 5 (2019), https://www.ice.gov/sites/default/files/documents/Document/2019/eroReportFY2019.pdf.

23. *Detention Statistics*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice.gov/detention-management, https://perma.cc/6XTP-RVYH.

24. ICE data obtained by the ACLU under FOIA and posted at https://www.law.umich.edu/facultyhome/margoschlanger/Pages/Resources.aspx.

25.     Uniform Corrective Action Plans, Oct. 1, 2010 to Aug. 1, 2018, posted at https://www.law.umich.edu/facultyhome/margoschlanger/Pages/Resources.aspx

**Non-governmental Reports on ICE detention**

26.     *Growth in ICE Detention Fueled by Immigrants with no Criminal Conviction*, TRAC IMMIGRATION (Nov. 26, 2019), https://trac.syr.edu/immigration/reports/583

27.     *ICE Detains Fewer Immigrants with Serious Criminal Convictions Under Trump Administration*, TRAC IMMIGRATION (Dec. 6, 2019), https://trac.syr.edu/immigration/reports/585/.

28.     Paige St. John & Joel Rubin, *ICE Held an American Man in Custody for 1,273 Days. He's Not the Only One Who Had to Prove His Citizenship*, L.A. TIMES (Apr. 27, 2018), https://www.latimes.com/local/lanow/la-me-citizens-ice-20180427-htmlstory.html.

29.     Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 PENN. L. REV. 1 (2015)

30.     Ingrid Eagly & Steven Shafer, *Access to Counsel in Immigration Court*, AM. IMMIGRATION COUNSEL 2-9 (2016), https://www.americanimmigrationcouncil.org/sites/default/files/research/access_to_counsel_in_immigration_court.pdf.

31.     Adele Uphaus, *Illegal Immigrants to be Held in Former Peumansend Jail in Caroline*, FREE LANCE-STAR (July 3, 2018), https://www.fredericksburg.com/news/local/illegal-immigrants-to-be-held-in-former-peumansend-jail-in/article_319641c0-c011-5d2f-aa58-6ddefa3ceefa.html;

32.     *Peumansend Creek Regional Jail Authority Operator of the Caroline Detention Facility*, CAROLINE DETENTION FACILITY, http://carolinedf.org/peumansend-creek-regional-jail-authority/.

33.     Aaron J. Fischer et al., *There Is No Safety Here*, DISABILITY RIGHTS CAL. (Mar. 2019), https://www.disabilityrightsca.org/system/files/file-attachments/DRC_REPORT_ADELANTO-IMMIG_DETENTION_MARCH2019.pdf.

34.

**Depositions in *Novoa, et al. v. The GEO Group, Inc.*, Civil Action No. 5:17-cv-02514-JGB-SHK**

35.     Abdiaziz Karim Dep. (Dkt. No. 206-4)

36. Raul Novoa Deposition (Dkt. 206-2)

37. Jaime Campos Fuentes Deposition (Dkt. 206-1)

38. Ramon Mancia Deposition (Dkt. 206-3)

39. Mary Wise-McCormick Deposition

40. Amber Martin Deposition

41. Dawn Ceja Deposition (Dkt, 210-4)

**Declarations in *Novoa, et al. v. The GEO Group, Inc.*, Civil Action No. 5:17-cv-02514-JGB-SHK**

42. Abdiaziz Karim Decl.  (Dkt. 192-5)

43. Ramon Mancia Decl. (Dkt. 192-6)

44. Gagandeep Marwaha Decl. (Dkt. 192-7)

45. Fernando Munoz Decl. (Dkt. 192-8)

46. Jaime Campos Fuentes Decl. (Dkt. 192-4)

**Other testimony**

47. Selene Saavedra-Roman, written testimony, *The Expansion and Troubling Use of ICE Detention, Hearing Before the Subcomm. on Immigr. and Citizenship of the H. Judiciary Comm.*, 116th Cong. 4 (2019), Dkt. No. 210-2.

48. Acting Inspector General John V. Kelly*, testimony, *DHS Office of the Inspector General, Hearing before the Subcomm. on Homeland Sec. of the H. Comm. on Appropriations*, 116th Cong. (2019), https://www.oig.dhs.gov/sites/default/files/assets/TM/2019/oigtm-jvk-030619.pdf.

49. Kevin Landy*, statement, *ICE: The U.S. Dep't of Homeland Sec.'s New Immigration Detention Standards, Hearing Before the Subcomm. on Immigr. Policy and Enforcement of the H. Comm. on the Judiciary*, 112th Cong. (2012), https://www.aila.org/File/Related/12032846c.pdf.

**GEO documents**

50. GEO Monthly Food Service Department Minutes (Dkt. 193-13)

51.     Adelanto Supplemental Detainee Handbook (Dkt 193-16)

52.     Detainee Work Detail Application (Dkt. 193-17)

53.     GEO Email re Particular Detainee payroll issues (Dkt. 193-20)

54.     GEO Email re Detainee Workers (Dkt. 193-21)

55.     ADC Detainee Payroll (Dkt. 193-22)

56.     Adelanto Sanitation Procedures/Housekeeping Plan (Dkt. No. 193-23)

57.     Adelanto Policy and Procedure Manual, Post Orders, 10.3.5 (Dkt. No. 193-24)

58.     *GEO website, Our Locations: Robert A. Deyton Detention Facility*, GEO Group, https://www.geogroup.com/FacilityDetail/FacilityID/79. *Our Locations: Coastal Bend Detention Center*, GEO Group, https://www.geogroup.com/FacilityDetail/FacilityID/43. *Our Locations: East Hidalgo Detention Center*, GEO Group, https://www.geogroup.com/FacilityDetail/FacilityID/48. *Our Locations: Val Verde County Detention Facility*, GEO Group, https://www.geogroup.com/FacilityDetail/FacilityID/41.

**Other litigation documents from *Novoa, et al. v. The GEO Group, Inc.*, Civil Action No. 5:17-cv-02514-JGB-SHK**

59.     Third Amended Complaint (Dkt. 184)

60.     Declaration of Lydia Wright in support of Plaintiffs' Motion for Class Certification (Dkt. 193) and all exhibits.

61.     Defendant's Answer and Counterclaim to Plaintiffs' Third Amended Complaint (Dkt. 200)

**DHS Office of Inspector General Reports**

62.     *About Us*, OFFICE OF INSPECTOR GEN., https://www.oig.dhs.gov/about.

63.     OFFICE OF INSPECTOR GEN., U.S. DEPT. OF HOMELAND SEC., OIG-07-01, TREATMENT OF IMMIGRATION DETAINEES HOUSED AT IMMIGRATION AND CUSTOMS ENFORCEMENT FACILITIES (Dec. 22, 2006), https://www.oig.dhs.gov/assets/Mgmt/OIG_07-01_Dec06.pdf.

64.     Office of Inspector Gen., U.S. Dep't of Homeland Sec., OIG-17-43, Management Alert on Issues Requiring Immediate Action at the Theo Lacy Facility in Orange, California (Mar. 6, 2017), https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-43-MA-030617.pdf.

65.     OFFICE OF INSPECTOR GEN., U.S. DEPT. OF HOMELAND SEC., OIG-18-32, CONCERNS ABOUT ICE DETAINEE TREATMENT AND CARE AT DETENTION FACILITIES 7 (Dec. 11, 2017), https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf.

66.     OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC., OIG-18-53, IMMIGRATION AND CUSTOMS ENFORCEMENT DID NOT FOLLOW FEDERAL PROCUREMENT GUIDELINES WHEN CONTRACTING FOR DETENTION SERVICES 7 (Feb. 21, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-02/OIG-18-53-Feb18.pdf.

67.     OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC., OIG-18-67: ICE'S INSPECTIONS AND MONITORING OF DETENTION FACILITIES DO NOT LEAD TO SUSTAINED COMPLIANCE OR SYSTEMIC IMPROVEMENTS 5 (Jun. 26, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf.

68.     OFFICE OF INSPECTOR GEN., U.S. DEPT. OF HOMELAND SEC., OIG-18-86, MANAGEMENT ALERT–ISSUES REQUIRING ACTION AT THE ADELANTO ICE PROCESSING CENTER IN ADELANTO, CALIFORNIA (Sept. 27, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-86-Sep18.pdf;

69.     OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC., OIG-19-18, ICE DOES NOT FULLY USE CONTRACTING TOOLS TO HOLD DETENTION FACILITY CONTRACTORS ACCOUNTABLE FOR FAILING TO MEET PERFORMANCE STANDARDS 5 (Jan. 29, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf

70.     OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC, OIG-19-20, ISSUES REQUIRING ACTION AT THE ESSEX COUNTY CORRECTIONAL FACILITY IN NEWARK, NEW JERSEY (Feb. 13, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-20-Feb19.pdf

71.     OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC., OIG-19-47, CONCERNS ABOUT ICE DETAINEE TREATMENT AND CARE AT FOUR DETENTION FACILITIES (June 3, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf

72.     OFFICE OF INSPECTOR GEN., U.S. DEPT. OF HOMELAND SEC., OIG-19-49, CONCERNS ABOUT ICE DETAINEE TREATMENT AND CARE AT FOUR DETENTION FACILITIES (June 3, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf.

73.     OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC., OIG-20-45, CAPPING REPORT: OBSERVATIONS OF UNANNOUNCED INSPECTIONS OF ICE FACILITIES IN 2019 (July 1, 2020), https://www.oig.dhs.gov/sites/default/files/assets/2020-07/OIG-20-45-Jul20.pdf

**Office of Detention Oversight Reports**

74.     *FOIA Library – Office of Detention Oversight – Detention Facility Compliance Inspections*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice.gov/foia/library.

75.     OFFICE OF DETENTION OVERSIGHT: COMPLIANCE INSPECTION, ADELANTO CORRECTIONAL FACILITY (Sept. 18-20, 2012), https://www.ice.gov/doclib/foia/odo-compliance-inspections/adelantoCorrectionalFac_Adelanto-CA-Sept_18-20-2012.pdf.

76.     OFFICE OF DETENTION OVERSIGHT: COMPLIANCE INSPECTION, ADELANTO CORRECTIONAL FACILITY (July 8-10, 2014), https://www.ice.gov/doclib/foia/odo-compliance-inspections/2014AdelantoJuly.pdf.

77.     OFFICE OF DETENTION OVERSIGHT: COMPLIANCE INSPECTION, ADELANTO WEST CORRECTIONAL FACILITY (Oct. 4-6, 2016), https://perma.cc/8UV3-TDT5; OFFICE OF DETENTION OVERSIGHT: COMPLIANCE INSPECTION, ADELANTO EAST CORRECTIONAL FACILITY (Oct. 4-6, 2016), https://perma.cc/PA82-MPT5.

78.     OFFICE OF DETENTION OVERSIGHT: COMPLIANCE INSPECTION, FOLKSTON ICE PROCESSING CENTER 5 (Apr. 24-26, 2018), https://www.ice.gov/doclib/foia/odo-compliance-inspections/2018FolkstonICEProcessingCenter.pdf.

79.     OFFICE OF DETENTION OVERSIGHT: COMPLIANCE INSPECTION, RIO GRANDE DETENTION CENTER 7 (June 11-13, 2019), https://www.ice.gov/doclib/foia/odo-compliance-inspections/rioGrandeDetCntrLaredoTX_Jun_11-13_2019.pdf.

80.     OFFICE OF DETENTION OVERSIGHT: COMPLIANCE INSPECTION, PINE PRAIRIE ICE PROCESSING CENTER AND ANNEX 9 (Aug. 27-29, 2019),

https://www.ice.gov/doclib/foia/odo-compliance-inspections/2019-PinePrairieICEPC.pdf.

81.    OFFICE OF DETENTION OVERSIGHT: COMPLIANCE INSPECTION, FOLKSTON ICE PROCESSING CENTER AND ANNEX 7-8 (Dec. 10-12, 2019), https://www.ice.gov/doclib/foia/odo-compliance-inspections/2019-FolkstonPC-FolkstonGA-1210-122019.pdf.

82.    OFFICE OF DETENTION OVERSIGHT: COMPLIANCE INSPECTION, MONTGOMERY ICE PROCESSING CENTER 9 (Dec. 10-12, 2019), https://www.ice.gov/doclib/foia/odo-compliance-inspections/2019-MontgomeryICEPC.pdf.

83.    OFFICE OF DETENTION OVERSIGHT: COMPLIANCE INSPECTION, COASTAL BEND DETENTION FACILITY 10 (Feb. 25-27, 2020), https://www.ice.gov/doclib/foia/odo-compliance-inspections/2020-CoastalBend.pdf.

84.    OFFICE OF DETENTION OVERSIGHT: COMPLIANCE INSPECTION, DENVER CONTRACT DETENTION FACILITY 9 (June 15-18, 2020), https://www.ice.gov/doclib/foia/odo-compliance-inspections/denverCDF_AuroraCO_Jun15-18_2020.pdf.

**Nakamoto Inspection Documents**

85.    *Facility Inspections*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice.gov/facility-inspections.

86.    2013 Adelanto Nakamoto Inspection

- Letter from Lead Compliance Inspector, Nakamoto Grp., to Assistant Dir. for Detention Mgmt., Adelanto East (Oct. 6, 2016) (GEO-Novoa_00046485).

- Letter from Lead Compliance Inspector, Nakamoto Grp., to Assistant Dir. for Detention Mgmt., Adelanto East (Oct. 6, 2016) (GEO-Novoa_00046288).

- Letter from Lead Compliance Inspector, Nakamoto Grp., to Assistant Dir. for Detention Mgmt., Adelanto East (Dec. 12, 2013) (GEO-Novoa_00043714).

- Letter from Lead Compliance Inspector, Nakamoto Grp., to Assistant Dir. for Detention Mgmt., Adelanto East (Dec. 12, 2013) (GEO-Novoa_00043449).

- Letter from Lead Compliance Inspector, Nakamoto Grp., to Assistant Dir. for Detention Mgmt., Adelanto East (Dec. 12, 2013) (GEO-Novoa_00043627-28).

- Letter from Lead Compliance Inspector, Nakamoto Grp., to Assistant Dir. for Detention Mgmt., Adelanto East (Dec. 12, 2013) (GEO-Novoa_00043707).

87. 2014 Adelanto Nakamoto Inspection

- Memorandum from D. Popejoy (GEO Corrections) to K Fouts, LT Belt, LT McCusker, Liz Lopez, SGT Hamed, SGT Meza, SGT Rodriguez, C Jensen; Re: Nakamoto Audit Tool: Week 5 (Sept. 19, 2014) (GEO-Novoa_00019642).

- Memorandum from D. Popejoy (GEO Corrections) to LT Belt, LT McCusker, Liz Lopez, SGT Hamed, SGT Meza, SGT Rodriguez, K. Fouts, P. Love, J. Johnson and C. Jensen; Re: Nakamoto Audit Tool (Aug. 22, 2014) (GEO-Novoa_00019643).

- Memorandum from D. Popejoy (GEO Corrections) to LT Belt, LT McCusker, Liz Lopez, SGT Hamed, SGT Meza, SGT Rodriguez, K. Fouts, P. Love, J. Johnson and C. Jensen; Re: Nakamoto Audit Tool (Aug. 15, 2014) (GEO-Novoa_00019644).

- Memorandum from D. Popejoy (GEO Corrections) to K Fouts, LT Belt, LT McCusker, Liz Lopez, SGT Hamed, SGT Meza, SGT Rodriguez; Re: Nakamoto Audit Tool: Week One (Aug. 22, 2014) (GEO-Novoa_00019647).

- Memorandum from D. Popejoy (GEO Corrections) to K Fouts, LT Belt, LT McCusker, Liz Lopez, SGT Hamed, SGT Meza, SGT Rodriguez, C. Jensen; Re: Nakamoto Audit Tool: Week Two (Aug. 29, 2014) (GEO-Novoa_00019649).

- Memorandum from L. Lopez (GEO Corrections) to K Fouts, LT Belt, LT McCusker, Liz Lopez, SGT Hamed, SGT Meza, SGT Rodriguez,

Chris Jensen; Re: Nakamoto Audit Tool: Week Three (Sept. 8, 2014) (GEO-Novoa_00019650).

- Undated, unattributed notes of interim findings Re: August 2014 records (GEO-Novoa_00019645).

88.   2016 Adelanto Nakamoto Inspection

- Detention Review Summary Form for Adelanto ICE Processing Center – West (Oct. 4, 2016) (GEO-Novoa_00046291).

- Detention Review Summary Form for Adelanto ICE Processing Center – East (Oct. 4, 2016) (GEO-Novoa_00046300).

89.   Memorandum from Field Office Director of the Los Angeles Field Office to Unit Chief of Detention Standards and Compliance Unit, 2016 Adelanto Detention Facility Performance Based National Detention Standards Review Uniform Corrective Action Plan (Feb. 17, 2017), *available at* https://perma.cc/KEM2-499H.

90.   2018 Adelanto Nakamoto Inspection

- Letter from Lead Compliance Inspector, Nakamoto Grp., to Assistant Dir. for Detention Mgmt. 2 (Oct. 11, 2018), https://www.ice.gov/doclib/facilityInspections/adelantoEastCa_CL_10_11_2018.pdf

- Letter from Lead Compliance Inspector, The Nakamoto Grp., to Assistant Dir. for Detention Mgmt. 2 (Oct. 11, 2018), https://www.ice.gov/doclib/facilityInspections/adelantoWestCa_CL_10_11_2018.pdf.

- *Detention Review Summary Form for Adelanto ICE Processing Center - West,* U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice.gov/doclib/facilityInspections/adelantoWestCa_SIS_10_11_2018.pdf

- *Detention Review Summary Form for Adelanto ICE Processing Center - West,* U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice.gov/doclib/facilityInspections/adelantoEastCa_SIS_10_11_2018.pdf.

91.   2019 Adelanto Nakamoto Inspection:

- Letter from Lead Compliance Inspector, Nakamoto Grp., to Assistant Dir. for Detention Mgmt., Adelanto East (Nov. 21, 2019), https://www.ice.gov/doclib/facilityInspections/adelantoEast_CL_11-21-2019.pdf;

- *Facility Significant Incident Summary, Adelanto East*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT (Nov. 21, 2019), https://www.ice.gov/doclib/facilityInspections/adelantoEast_SIS_11-21-2019.pdf;

- Letter from Lead Compliance Inspector, Nakamoto Grp., to Assistant Dir. for Detention Mgmt., Adelanto West (Nov. 21, 2019), https://www.ice.gov/doclib/facilityInspections/adelantoWest_CL_11-21-2019.pdf;

- *Facility Significant Incident Summary, Adelanto West*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT (Nov. 21, 2019), https://www.ice.gov/doclib/facilityInspections/adelantoWest_SIS_11-21-2019.pdf.

**Detainee Death Reviews**

92.    *Death Detainee Reporting*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT, https://www.ice.gov/death-detainee-report.

93.    U.S. IMMIGR. & CUSTOMS ENFORCEMENT, DETAINEE DEATH REVIEW – Dominguez Valivia (March 12, 2012), https://perma.cc/U2NZ-KDJB (NOVOA_0003417).

94.    U.S. IMMIGR. & CUSTOMS ENFORCEMENT, DETAINEE DEATH REVIEW – JOSE AZURDIA (December 24, 2015), https://www.ice.gov/doclib/foia/reports/ddr-Azurdia.pdf (NOVOA_0003413).

95.    U.S. IMMIGR. & CUSTOMS ENFORCEMENT, DETAINEE DEATH REVIEW – GONZALEZ GABDA (May 5, 2017), https://www.ice.gov/doclib/foia/reports/ddrGonzalez.pdf (NOVOA_0003101).

96.    U.S. IMMIGR. & CUSTOMS ENFORCEMENT, DETAINEE DEATH REVIEW – ALONSO LOPEZ (June 19, 2017), https://www.ice.gov/doclib/foia/reports/ddrLopez.pdf (NOVOA_0003110).

**Other Government Reports**

97.    U.S. DEP'T OF HOMELAND SEC., U.S. IMMIGR. & CUSTOMS ENFORCEMENT, LANGUAGE ACCESS PLAN 10 (2015), https://www.ice.gov/sites/default/files/documents/Document/2015/LanguageAccessPlan.pdf.

98.    U.S. DEPT. OF HOMELAND SEC., OFFICE FOR CIVIL RIGHTS AND CIVIL LIBERTIES, FISCAL YEAR 2015 ANNUAL REPORT TO CONGRESS (June 10, 2016).

99.     Corrections Expert's Report on Adelanto Correctional Facility (Nov. 16, 2017), for U.S. Dept. of Homeland Sec., Office for Civil Rights and Civil Liberties, available at https://www.documentcloud.org/documents/6278922-HQ-Part2-Copy.html.

100.    U.S. Dept. of Homeland Sec., Office for Civil Rights and Civil Liberties, Memo to ICE Exec. Assoc. Dir. Matthew Albence (Apr. 25, 2018), available at https://www.pogo.org/document/2019/09/dhs-office-for-civil-rights-and-civil-liberties-review-of-adelanto-sent-to-ice-in-april-2018/

101.    U.S. GOV'T ACCOUNTABILITY OFFICE, GAO 15-153, IMMIGRATION DETENTION: ADDITIONAL ACTIONS NEEDED TO STRENGTHEN MANAGEMENT AND OVERSIGHT OF FACILITY COSTS AND STANDARDS (2014), https://www.gao.gov/assets/670/666467.pdf

102.    HOMELAND SECURITY ADVISORY COUNCIL, U.S. DEP'T OF HOMELAND SEC., REPORT OF THE SUBCOMMITTEE ON PRIVATIZED IMMIGRATION DETENTION FACILITIES 11-17 (Dec. 1, 2016), https://www.dhs.gov/sites/default/files/publications/DHS%20HSAC%20PIDF%20Final%20Report.pdf

103.    REPORT OF THE ICE ADVISORY COMMITTEE ON FAMILY RESIDENTIAL CENTERS (Oct. 7, 2016), https://www.ice.gov/sites/default/files/documents/Report/2016/acfrc-report-final-102016.pdf.

104.    Letter from Community Initiatives for Visiting Immigrants in Confinement (CIVIC) to HSAC 8 (Oct. 3, 2016), https://www.dhs.gov/sites/default/files/publications/DHS%20HSAC%20PIDF%20Final%20Report.pdf

105.    OFFICE OF THE INSPECTOR GENERAL (DOJ), AUDIT OF THE UNITED STATES MARSHALS SERVICE'S CONTRACT AWARDED TO THE GEO GROUP, INC. TO OPERATE THE ROBERT A. DEYTON DETENTION FACILITY, LOVEJOY, GEORGIA (July 23, 2020), https://oig.justice.gov/reports/audit-united-states-marshals-services-contract-awarded-geo-group-incorporated-operate-0.

106.    Xavier Becerra, Cal. Att'y Gen., *Review of Immigration Detention in California*, CAL. DEP'T OF JUSTICE 22 (Feb. 2019), https://oag.ca.gov/sites/all/files/agweb/pdfs/publications/immigration-detention-2019.pdf (Novoa_0006854).

**Miscellaneous**

107.    Reports and documentation from the American Correctional
Association (ACA 001-417, GEO-NOVOA_00019652).