# EXHIBIT B

Margo Schlanger, J.D. - Volume I
September 25, 2020

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

RAUL NOVOA, JAIME CAMPOS
FUENTES, ABDIAZIZ KARIM, and
RAMON MANCIA, individually                Case No.
and on behalf of all others
similarly situated,                       5:17-cv-02514-JGB-
                                          SHK
   Plaintiffs/Counter-Defendants,

   vs.

THE GEO GROUP, INC.,

   Defendant/Counter-Claimant.
_____


VIDEOCONFERENCED DEPOSITION OF MARGO SCHLANGER, J.D.

VOLUME I

FRIDAY, SEPTEMBER 25, 2020

8:03 A.M.


APPEARING REMOTELY FROM

ANN ARBOR, MICHIGAN


REPORTED BY:

Stephani L. Loder

CSR No. 13884

```
 1   APPEARANCES:

 2

 3   For Plaintiffs/Counter-Defendants:

 4          BURNS CHAREST LLP
            BY:  E. LAWRENCE VINCENT, ESQ.
 5          900 Jackson Street
            Suite 500
 6          Dallas, Texas 75202
            469.904.4550
 7          Lvincent@burnscharest.com

 8          BURNS CHAREST LLP
            BY:  LYDIA A. WRIGHT, ESQ.
 9          365 Canal Street
            Suite 1170
10          New Orleans, Louisiana 70130
            469.904.4550
11          Lwright@burnscharest.com

12          LAW OFFICES OF R. ANDREW FREE
            BY:  R. ANDREW FREE, ESQ.
13          P.O. Box 90568
            Nashville, Tennessee 37209
14          844.321.3221
            Andrew@immigrationcivilrights.com

15

16   For Defendant/Counter-Claimant:

17          AKERMAN LLP
            BY:  ADRIENNE SCHEFFEY, ESQ.
18          1900 Sixteenth Street
            Suite 1700
19          Denver, Colorado 80202
            702.634.5000
20          Adrienne.scheffey@akerman.com

21

22   Also Present:

23          JULIANNA GRAVOIS, Paralegal, Burns Charest LLP

24

25
```

Margo Schlanger, Volume I
September 25, 2020

```
 1                    INDEX TO EXAMINATION

 2    WITNESS:  MARGO SCHLANGER, J.D., VOLUME I

 3    EXAMINATION                                PAGE

 4    BY MS. SCHEFFEY                               5

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

September 25, 2020

```
 1                    INDEX TO EXHIBITS

 2            MARGO SCHLANGER, J.D., VOLUME I

 3                 Novoa vs. The GEO Group

 4                Friday, September 25, 2020

 5            Stephani L. Loder, CSR No. 13884

 6
```

| | MARKED | DESCRIPTION | PAGE |
|---|---|---|---|
| 8 | Exhibit 1 | Margo Schlanger Resume | 17 |
| 9 | Exhibit 2 | Expert Declaration of Margo Schlanger | 37 |
| 10 | | | |
| 11 | Exhibit 3 | Letter from U.S. Department of Homeland Security dated September 24, 2020, Re: Expert Declaration of Margo Schlanger | 43 |
| 12 | | | |
| 13 | | | |
| 14 | Exhibit 4 | Exhibit 2 to the Expert Declaration of Margo Schlanger | 72 |
| 15 | | | |
| 16 | Exhibit 5 | Performance-Based National Detention Standards 2011 (PBNDS) | 102 |
| 17 | | | |
| 18 | Exhibit 6 | NPR article dated December 24, 2012 titled "Obama Administration Deported Record 1.5 Million People" | 123 |
| 19 | | | |
| 20 | | | |
| 21 | Exhibit 7 | ICE News Release dated 9/24/20 titled "FY 2012: ICE announces year-end removal numbers, highlights focus on key priorities and issues new national detainer guidance to further focus resources" | 123 |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

```
 1                    ANN ARBOR, MICHIGAN;

 2                FRIDAY, SEPTEMBER 25, 2020;

 3                       8:03 A.M.

 4

 5                  MARGO SCHLANGER, J.D.,

 6  having been first duly sworn, was examined and testified

 7                    as follows:

 8

 9                    EXAMINATION

10  BY MS. SCHEFFEY:

11      Q. Good morning, Ms. Schlanger.  How are you

12  today?

13      A. Fine.  Thank you.

14      Q. Good.  My name is Adrienne Scheffey, and I

15  represent GEO.  I'm going to be asking a series of

16  questions today about the lawsuit captioned Novoa versus

17  GEO.

18         Is that a lawsuit in which you remember

19  providing a report?

20      A. Yes.

21      Q. Okay.  The purpose of this deposition is to

22  record your responses to these questions for use at

23  trial and other purposes in this case.  It's important

24  that you answer truthfully.

25         Do you understand?
```

September 25, 2020

```
 1      A. Yes.

 2      Q. And so even though we're on videoconference

 3  today, this proceeding has the same effect as if we were

 4  in a court of law.

 5          Do you understand that you have sworn to tell

 6  the truth?

 7      A. Yes.

 8      Q. Okay.

 9          MS. SCHEFFEY:  And, Larry, do you have any

10  objection to this oath being administered remotely?

11          MR. VINCENT:  Not at all.

12          MS. SCHEFFEY:  Thank you.

13  BY MS. SCHEFFEY:

14      Q. The court reporter is going to take down

15  everything we say.  I myself am going to try and speak

16  slower because I'm a fast talker.  It would be helpful

17  if you could do the same.

18          Is that okay?

19      A. Yes.

20      Q. Additionally, we need to try not to speak over

21  each other.  She can only write down one of us at a

22  time.  One thing that might be helpful is to take a

23  pause in case your attorney wants to insert an objection

24  so we're not all speaking over each other.

25          Is that okay?
```

```
 1       A. Yes.

 2       Q. For all of your responses -- so far you've done

 3  great -- they have to be clear and verbal.  The court

 4  reporter cannot record nods or other sounds that are not

 5  clear and understandable like uh-huh or huh-uh.  Because

 6  we're on video, this is particularly important.

 7          Can you agree to try and give verbal responses

 8  today?

 9       A. Yes.

10       Q. Additionally, if at any time we have technical

11  issues such that you cannot hear or my audio is not

12  coming through clearly, will you agree to let me know?

13       A. Yes.

14       Q. If you do not let me know, I will assume you

15  heard my questions clearly.

16          Is that fair?

17       A. Sure.

18       Q. If you do not know or do not remember the

19  information necessary to answer a question today, please

20  let me know.  If you don't hear a question, please also

21  let me know.

22          If you don't understand a question, please say

23  so, and I will rephrase it.  If you don't ask me to

24  clarify or speak up, I'm going to assume that you heard

25  and understood the questions and that your answers are
```

 1  responsive to that question.

 2          Does that seem fair?

 3      A. Yes.

 4      Q. If at any point today you realize an earlier

 5  answer you gave was inaccurate or incomplete, just let

 6  me know that you want to correct or supplement your

 7  earlier answer, and you will be allowed to do so.

 8          If you want to take a break, please let me

 9  know, and I only ask that you let me -- that you finish

10  answering any questions pending before we take a break.

11          Just so you know, I've already told Mr. Vincent

12  I may have to take a break in about an hour.  I have a

13  dog in surgery; so if I get a call, I might be taking a

14  break at some point.

15          Do you understand all the instructions so far?

16      A. Yes.

17      Q. Do you have any questions about anything I've

18  said so far?

19      A. I actually am wondering where you all are.  Are

20  you in the same time zone?

21      Q. I am in Colorado.  So I am, I think, an hour

22  behind you.

23      A. No.  Two hours.  I'm on Eastern time zone.

24      Q. You're in Eastern?  Okay.  I assume

25  [indiscernible].

```
 1        MS. SCHEFFEY:  And, Larry, are you in

 2   California?

 3        MR. VINCENT:  Heavens, no.  I'm in Dallas.

 4   BY MS. SCHEFFEY:

 5        Q. Any other questions?

 6        A. No.

 7        Q. Are you taking any medication that may

 8   interfere with your understanding my questions or the

 9   truthfulness of your answers today?

10        A. No.

11        Q. Are you under the influence of any other drugs

12   or alcohol today?

13        A. No.

14        Q. Is there any other reason you can't give your

15   best testimony today?

16        A. No.

17        Q. Can you provide your full name and date of

18   birth for the record?

19        A. Margo Schlanger.  I was born on December 20th,

20   1967.

21        Q. Okay.  And other than the computer you're using

22   for Zoom, do you have other electronic devices with you

23   today?

24        A. I do.  I have a phone.  And I am actually

25   sitting in front of -- because of the way my setup is
```

 1   might ask you to refer back to one, or you may want to

 2   refer back to one.  So...

 3        A. Yes, I see this.

 4        Q. Do you know what this is?

 5        A. This looks like my résumé.

 6        Q. Okay.  And I will represent to you that I

 7   extracted this from the one attached to your report in

 8   order to make the document smaller.

 9        Looking at it, do you see any obvious changes

10   or alterations?

11        A. The spacing, I'm hoping, is a little bit

12   different because it's ugly.  There's a couple weird

13   line breaks.  It's possible that that's different.

14        But, no, I don't see anything else.

15        Q. Okay.  And is there anything, looking at this

16   résumé right now, that you see that's a job position

17   that is not included in this first section under

18   employment that you currently have or previously had?

19        A. Let's see.

20        No.  I think this covers it all.

21        Q. Okay.  So let's start with where you currently

22   work.

23        Where do you currently work?

24        A. I'm a law professor at the University of

25   Michigan.

1    Q. And how long have you been a professor at the

2  University of Michigan?

3    A. Well, it depends how you count.

4    I accepted the job there -- I did a visit for a

5  semester quite some time ago.  I think in -- oh, I don't

6  remember -- 2008, maybe.

7    And then I accepted the job and did a semester

8  as a professor in 2009, but I was on leave that

9  semester.  So although I was on the payroll, I actually

10  was living in Washington, D.C., and not teaching.  And

11  then I was on leave and really not working.

12    I mean, I wasn't that -- that first leave was a

13  research leave; so I was still on payroll, still

14  working, but not teaching.  Then I did a full-on leave

15  for 2010 and 2011 and came back in January of 2012.

16    And so, in some ways, I've been a professor

17  since 2009, and in some ways, since 2012.

18    Q. Okay.  And so considering only the time where

19  you were a full-time professor, teaching courses and,

20  you know, performing research as in your job

21  description, would you say that was since 2012 or since

22  2008?

23    A. Well, neither.

24    The semester that I was on a research leave in

25  2009, I was full-time performing research, but I didn't

 1  live in Ann Arbor, and I didn't teach.

 2       But research leaves are part of our job.  We do

 3  a research leave every several semesters.  So, you know,

 4  I was on the website and so on.

 5       So I was full-time for a semester in 2009, and

 6  I've been full-time since January of 2012.

 7     Q. But you were not full-time in 2010 and 2011; is

 8  that correct?

 9     A. No.  I was entirely on leave in 2010 and 2011.

10     Q. Okay.

11     A. And to be clear, I was full-time in 2008 also

12  as a visiting professor, but it wasn't a permanent job.

13  It was just a visit.

14     Q. Okay.  And so in 2009, I think you just said

15  you were researching and you were not teaching classes;

16  is that correct?

17     A. That's correct.

18     Q. What were you researching?

19     A. Goodness.  You see me flipping because I'm

20  trying to see what I published in 2009.

21       So that would have been -- I might have been

22  finishing up that how to study district judge

23  decision-making, maybe, or maybe that was done already

24  by then.

25       I was definitely -- I mean, I definitely wrote

 1  that, again, secret regulation piece that you can see on

 2  my résumé.  I wrote that then.

 3       And I'll be honest.  I don't remember what else

 4  I was doing.  I mean, I was working on other research,

 5  but I don't remember the details of it.

 6       Q. Okay.  And then starting in 2012, did you begin

 7  teaching courses?

 8       A. Yes.

 9       Q. And what percentage of your time did you spend

10  teaching courses versus doing research?

11       A. I would say that my teaching is -- you know,

12  it's about half and half.

13       Q. And has it always been half and half since

14  2012?

15       A. No.  I had had a sabbatical since 2012; so I

16  wasn't teaching.  That was for a year.  I think I've had

17  other research leaves.  I have definitely had other

18  research leaves.

19       So there have been semesters in which I don't

20  do more than a little bit of teaching.  And so in those

21  semesters, the research is more.

22       And, obviously, the semester -- our semesters

23  are three months long.  So by the time you work it out,

24  you know, you're really only teaching -- maybe they're

25  four months long.  I think they are four months long.

```
 1          You're really only teaching eight months out of

 2   the year, and I work 12 months out of the year.

 3          So, no, it's not the case that it's always half

 4   and half.  It depends on the month, and it depends on

 5   whether I'm on some kind of a research leave or

 6   sabbatical.

 7      Q. And what year did you take your sabbatical?

 8      A. The sabbatical was 2017.  And I mean academic

 9   year 2017.

10          It was actually -- to be very precise, one of

11   the semesters was a research leave, and one of the

12   semesters was a sabbatical.  I didn't teach during

13   either of them, but they have different governance

14   responsibilities depending on whether you're doing a

15   sabbatical or a research leave.

16      Q. And just so I understand, academic year 2017

17   would be fall of 2017 and spring of 2018; is that

18   correct?

19      A. Correct.  Although, here in Michigan, we call

20   it winter.

21      Q. Winter.  Well, you know, not winter here in

22   Colorado.  So spring is a very generous term for --

23      A. Yeah.  I mean, we have a -- there's another

24   semester here called spring, and that's not what you

25   mean.  So we call the semester you're referring to
```

 1  winter.

 2      Q.  Okay.  Thank you.

 3          Is Michigan on trimesters or semesters?

 4      A.  No.  We do -- we do semesters.  We just -- the

 5  two main semesters are fall and winter, and then

 6  there's -- summer school is spring and summer.

 7      Q.  Okay.  I'm sure my aunt has [indiscernible]

 8  told me this and I just...

 9      A.  Yeah.  You know, it snows in April here.

10      Q.  Yeah.  We've had snow in May.  So...

11          You know, you take what you can get.  I'm sure

12  they've never had snow in many [indiscernible].

13          So from 2012 to now, has your research focused

14  on one area, or is it focused on multiple different

15  areas?

16      A.  Multiple different areas.

17      Q.  And what are those areas?

18      A.  I do a good deal of work on incarceration and

19  the law that governs incarceration.  That's one big

20  area.

21          I do work on court processes and understanding

22  court processes.  That's another area.

23          And I do work on issues to do with -- excuse

24  me -- constitutional law and the border.  Although,

25  much, much less so far.  That's kind of an area that I'm

1    starting to do major research on, but it's been less in

2    my work.

3        Q. Okay.  And for the courses you teach, do you

4    have a specific subject you focus on?

5        A. Yes.  I teach torts.

6            I teach an advanced constitutional law course

7    called different things, but it's basically an equal

8    protection class.

9            I teach a class on the law of incarceration

10   which covers jails, prisons, and immigration detention.

11           Those three are the most common, but I

12   occasionally teach other classes.  Last year I taught a

13   class on surveillance, for example.

14       Q. Okay.  And for your research, if you were to

15   assign percentages to the three categories you gave me,

16   which were incarceration, court processes, and common

17   law on the border, what percentage would you say of your

18   research falls in incarceration and law?

19       A. Most.

20       Q. Okay.

21       A. You know, a pretty big majority.

22       Q. More than 50 percent?

23       A. Yes.

24       Q. Okay.  And what about court processes?

25       A. A smaller portion.

1       I just had a piece come out that's on that

2  topic.  So while we were working that piece, it was a

3  little more.  The piece is done now, and it will go back

4  down to being a much smaller number.

5       Q. Okay.  Would you say that's more than

6  25 percent or less than 25 percent?

7       A. Oh, no.  Less.  Less.

8       Q. And other than publishing articles,

9  researching, and teaching courses, is there anything

10  else you -- that's part of your day-to-day duties at

11  University of Michigan?

12       A. I run a website called The Civil Rights

13  Litigation Clearinghouse.  I supervise a great many

14  students who participate in putting that website

15  together, and I do a lot of work on that website.  So

16  that's a big chunk of time.

17       Q. And what is the goal of that website?

18       A. It's to make available to the public and to

19  researchers and to advocates and policymakers

20  information about large-scale civil rights cases around

21  the country on a very large variety of topics.

22       Q. Can you list some of the topics when you talk

23  about a large variety of topics?

24       A. Sure.  Prison and jail conditions, immigration

25  class actions, policing, fair housing, equal employment,

Margo Schlanger
September 25, 2020

```
1        A. I don't mind opening it, but --
2        Q. Well, then you can open it.  I am going to ask
3   you to point out in the preface where it says that
4   detention is civil, not criminal.  Nonpunitive.
5        A. "ICE detains people with no purpose other than
6   to secure their presence both for immigration
7   proceedings and their removal."
8            That's what it says, which is a civil purpose,
9   not a criminal purpose.
10       Q. And how do you know that is a civil purpose?
11   Is that a legal determination?
12       A. I know that because I know how to read.
13       Q. Okay.  So tell me what you mean by that, that
14   you know how to read.
15       A. I mean, there's nothing in there about criminal
16   conviction, and there's nothing in there about criminal
17   proceedings.  So therefore, it's not criminal; it's
18   civil.
19       Q. So it also states that "ICE is charged with
20   removing aliens who lack lawful status in the United
21   States and focuses its resources on removing criminals."
22       A. Yes, it does say that.
23       Q. Well, how would one reconcile that everyone is
24   civilly detained, not criminally detained, without any
25   legal background?
```

1     A. The fact that somebody has been convicted of a

2   crime doesn't make their detention criminal.

3     Q. Right.  But without your legal background, how

4   do you know that?

5     A. I don't know.  I don't think you need to be a

6   lawyer to know that.  It seems like you disagree, but

7   you asked me my opinion, and my opinion is that I don't

8   need to be a lawyer to know that.

9     Q. So what do you -- you relied upon your

10  background as a professor and scholar to determine that

11  immigration is --

12    A. I mean, sure, but, also, the fact that I know

13  how to read.

14    Q. Okay.

15    A. It also talks about unique purpose; right?  If

16  it's -- I mean, criminal detention is not unique.  Every

17  state in America has criminal detention.  Every county

18  in America has criminal detention.

19        If ICE is going to have a unique purpose, then

20  what that purpose is, you know, unique.

21    Q. So anyone who could read could figure that out?

22    A. I think so.

23    Q. Okay.  And then opinion B is "immigration

24  detainees are a vulnerable population, particularly

25  because ICE is both their custodial authority and their

1    prosecuting authority."

2         Do you see that opinion in your report, 13?

3    A. I have to go back to it, but, yes.  Hang on.

4         What number is this?

5    Q. 13(b).

6    A. 13(b).  Yes, I see that.

7    Q. What is the background for your -- sorry.  Let

8    me reask that.

9         What is the basis for that opinion?

10   A. All of the background that we've been talking

11   about.  That's how I know that.

12   Q. Okay.  And is that based on your experience

13   interacting with ICE detainees?

14   A. Some -- some of it is.  More -- more of it is

15   based on understanding -- some of it is.  More of it is

16   based on understanding the circumstances in which people

17   are detained.

18   Q. Are there -- okay.  Is that based upon any of

19   your scholarly research?

20   A. No.  I haven't written about detainees as

21   vulnerable.  That's not something that I've done

22   academic research on.

23   Q. Do you teach any course that instructs your

24   students that ICE detainees are vulnerable?

25   A. I don't really instruct my students about

1   conclusions like that.  That's not really how law school

2   works.

3       Q. Okay.  So that wouldn't be a subject of your

4   courses?

5       A. No, that's not the same thing.  I don't -- I

6   don't tell my students what to think.

7       Q. And so whether or not ICE is a vulnerable

8   population is a conclusion that reasonable minds could

9   differ upon?

10      A. No, I don't think that either.

11          But I think that the only reasonable conclusion

12   is that -- is that ICE detainees are vulnerable, but

13   that's just not how I teach my law school classes.

14          If I was going -- if I was teaching a law

15   school class about ICE detainees, I would give them

16   materials from which they could develop their own views.

17      Q. Okay.  And do you think there are materials

18   that could lead to different views on that position?

19      A. On the vulnerability of ICE detainees?  Not

20   easily, but -- you know.  No.  Not easily, no.

21      Q. But a law student could reach their own

22   conclusion by simply reviewing materials that you give

23   to them?

24      A. About vulnerability?  I mean, if they were

25   properly instructed, sure.  I mean, but you'd have to --

1        So the PBNDS doesn't have enough description to

2   say that it describes a voluntary work program.  It just

3   sets up some rules for a work program and requires that

4   that work program be voluntary.

5        Q. Okay.  So you don't think that the PBNDS

6   provides a complete description of the voluntary work

7   program.

8        A. No.  For example, it doesn't say -- it requires

9   that it be voluntary, and so it's possible to -- so

10  that's what it does.  It requires that it be voluntary.

11  And that's an important feature of any work program.

12        No work program satisfies the PBNDS unless it

13  actually is voluntary.

14        Q. Okay.  Would the ability to leave your position

15  in the voluntary work program at any time make it

16  voluntary?

17        A. The ability to leave is a part of what makes a

18  program voluntary, yes.

19        Q. Would the ability to not participate if you

20  don't want to qualify [indiscernible]?

21        A. I'm sorry.  When you moved your head, I

22  couldn't hear the words.

23        Q. Yeah.  Would the ability to not participate at

24  all, if you didn't want to, be a quality of a voluntary

25  work program?

```
 1        A. Yes.  That's part of what would make it
 2   voluntary, yes.
 3        Q. What about the ability to choose the position
 4   for which you're willing to participate?
 5        A. That seems like it's useful.  I'm not sure if
 6   that's essential or not.
 7        Q. And did you review Mr. Novoa's deposition in
 8   this case?
 9        A. Yes, I did.
10        Q. Okay.  Did you review the portion that
11   discussed his time in the voluntary work program?
12        A. Yes, I did.
13        Q. Do you recall him discussing how he did not
14   participate for the first -- I think it was about five
15   or six months he was in the Adelanto facility?
16        A. I don't really recall the details.
17           I recall that several of the named plaintiffs
18   testified that they participated in work that was the
19   same work as covered by the voluntary work program
20   because, otherwise, they needed to get on the list that
21   way.  So I remember that.
22           I don't remember whether, during those five
23   months, some of that was time when Mr. Novoa was trying
24   to get on the list or not.
25           I would describe him, if he was doing the same
```

1  work as under the work program and was just not getting

2  paid, I would describe him as participating in the

3  program but that the program was noncompliant because it

4  didn't pay him.

5      Q. Right.  But you have just added additional

6  facts that weren't in my question and weren't in his

7  deposition.

8      A. Well, I told you that I didn't recall what was

9  deposition, and I was talking about several of the

10 depositions together.  They've blurred in my mind.

11     Q. Do you recall that he was a barber?

12     A. Yes.  I recall that, at some point, he was a

13 barber.  I recall as well that he was, at some point, a

14 porter.

15     Q. Do you recall that he was fired from being a

16 barber?

17     A. Yes.

18     Q. Do you recall reviewing the kites where he kept

19 asking to be placed back in his barber position?

20     A. No.  I actually don't recall reviewing the

21 kites.

22     Q. Okay.  And so if he had continually requested

23 to be placed back in that position, would that be an

24 indicator that his participation was voluntary?

25     A. It's part of the story.  It's not enough to

```
 1                    REPORTER'S CERTIFICATE

 2

 3         I, Stephani L. Loder, CSR No. 13884, Certified

 4    Shorthand Reporter, certify:

 5         That the foregoing proceedings were taken

 6    before me at the time and place therein set forth, at

 7    which time the witness was put under oath by me;

 8         That the testimony of the witness and all

 9    objections made at the time of the examination were

10    recorded stenographically by me and were thereafter

11    transcribed;

12         That a review of the transcript by the deponent

13    was requested;

14         That the foregoing transcript comprises a true

15    record of the testimony and of all objections made at

16    the time of the examination;

17         I further certify that I am in no way related

18    to the parties in this action, nor interested in the

19    outcome thereof.

20         I declare under penalty of perjury under the

21    laws of California that the foregoing is true and

22    correct.

23    Dated:  October 19, 2020.

24    _____

25    STEPHANI L. LODER, CSR NO. 13884
```