# EXHIBIT A

**Page 1**

```
 1         UNITED STATES DISTRICT COURT
           CENTRAL DISTRICT OF CALIFORNIA
 2              EASTERN DIVISION
           CIVIL ACTION NO. 5:17-cv-02514-JGB
 3
 4   RAUL NOVOA and JAIME CAMPOS FUENTES,
     individually and on behalf of all
 5   others similarly situated,
 6           Plaintiffs,
     vs.
 7
     THE GEO GROUP, INC.,
 8
             Defendant,
 9   _____/
10
11
12
13   VIDEOTAPED DEPOSITION OF DAVID J. VENTURELLA
14
15       VOLUME I, PAGES 1-146
16       THURSDAY, JUNE 13th, 2019
         515 EAST LAS OLAS BOULEVARD, SUITE 1200
17       FORT LAUDERDALE, FLORIDA
         9:03 a.m. - 5:40 p.m.
18
19
20
21
22
23   STENOGRAPHICALLY REPORTED BY:
     VALERIE LEHTO, REGISTERED PROFESSIONAL REPORTER
     NOTARY PUBLIC, STATE OF FLORIDA
24   ESQUIRE DEPOSITION SERVICES
     FORT LAUDERDALE OFFICE
25
```

**Page 2**

```
 1   APPEARANCES:
 2
     APPEARING ON BEHALF OF THE PLAINTIFFS:
 3
     BURNS, CHAREST, LLP.
 4   BY:  DANIEL H. CHAREST, ESQUIRE.
     BY:  LYDIA A. WRIGHT, ESQUIRE.
 5   365 CANAL STREET, SUITE 1170
     NEW ORLEANS, LOUISIANA  70130
 6   (504) 799-2845
     dcharest@burnscharest.com
 7   lwright@burnscharest.com
 8
 9   LAW OFFICE OF R. ANDREW FREE.
     BY:  R. ANDREW FREE, ESQUIRE.
10    BY:  HENRIETTE VINET-MARTIN, ESQUIRE.
     2004 8th AVENUE SOUTH
11   NASHVILLE, TENNESSEE 37204
     (844) 321-3221
12   andrew@immigrantvivilrights.com
13
14
     APPEARING ON BEHALF OF THE DEFENDANT:
15
     HOLLAND & KNIGHT.
16   BY:  J. MATTHEW DONOHUE, ESQUIRE.
     BY:  SHANNON L. ARMSTRONG, ESQUIRE.
17   111 SOUTHWEST FIFTH AVENUE
     2300 U.S. BANCORP TOWER
18   PORTLAND, OREGON  97204
     (503) 517-2913
19   shannon.armstrong@hklaw.com
     matt.donohue@hklaw.com
20
21   ALSO PRESENT:  FRANCES E. SIMKINS.
     U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
22   DON SAVOY/VIDEOGRAPHER
23
24
25
```

**Page 3**

```
 1              INDEX
 2
 3   WITNESS                      PAGE
 4   DAVID J. VENTURELLA
 5   DIRECT EXAMINATION BY MR. FREE        5
 6
          INDEX TO EXHIBITS
 7
     EXHIBITS                      PAGE
 8
     EXHIBIT 10  STANDARD FORM 30          90
 9   EXHIBIT 11  STANDARD FORM 30          94
     EXHIBIT 12  SUPPLEMENTAL AGREEMENT      97
10   EXHIBIT 13  STANDARD FORM 30          101
11
13   (PREVIOUSLY MARKED EXHIBITS REFERENCED RAGSDALE
     EXHIBIT 1)
14
15
17   (ORIGINAL EXHIBITS INCLUDED WITH ORIGINAL TRANSCRIPT)
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1       DEPOSITION OF DAVID J. VENTURELLA
 2            JUNE 13th, 2019
 3
 4       THE VIDEOGRAPHER:  We are now on the video
 5   record.
 6       Today is Thursday, the 13th day of June, 2019.
 7   The time is 8:50 a.m.
 8       We're here at 515 East Las Olas Boulevard,
 9   Suite 1200, Fort Lauderdale, Florida for the
10   purpose of taking the videotaped deposition of
11   David Venturella.  The case is Raul Novoa and Jaime
12   Campos Fuentes versus The GEO Group, Inc.
13       The court reporter is Valerie Lehto and the
14   videographer is Don Savoy, both from Esquire
15   Deposition Solutions.
16       Will counsel please announce their appearances
17   for the record.
18       MR. FREE:  Andrew Free for the Plaintiffs.
19       MS. WRIGHT:  Lydia Wright for the Plaintiffs.
20       MR. CHAREST:  Daniel Charest for the
21   Plaintiffs.
22       MR. DONOHUE:  Matt Donohue, Holland & Knight
23   - of - for the Defendant and also with me is Shannon
24   Armstrong.
25   Thereupon,
```

DAVID J. VENTURELLA Volume I
NOVOA vs THE GEO GROUP

June 13, 2019
5–8

Page 5

1 DAVID J. VENTURELLA
2 having been first duly sworn or affirmed, was examined
3 and testified as follows:
4
5 DIRECT EXAMINATION
6 BY MR. FREE:
7 Q. Good morning, sir. How are you feeling today?
8 A. Good.
9 Q. Good.
10 Where do you work?
11 A. I work for The GEO Group.
12 Q. What is your position?
13 A. I'm the Senior Vice-President of Business
14 Development.
15 Q. When did you begin in that role?
16 A. I think in February of 2014.
17 Q. Did you work for The GEO Group prior to
18 February, 2014?
19 A. Yes. I was the Executive - Executive
20 Vice-President for Business Development starting in July
21 of 2012.
22 Q. And so your current position is a promotion
23 from your previous one?
24 A. Correct.
25 Q. Where did you work prior to July of 2012?

Page 6

1 A. Before that I worked for the U.S. Immigration
2 and Customs Enforcement in Washington D.C.
3 Q. What did you do there?
4 A. My last position was the Assistant Director
5 for Field Operations.
6 Q. When did you leave your employment with ICE?
7 A. May of 2012.
8 Q. Did you have any employment between ICE and
9 GEO?
10 A. No.
11 Q. That was your last position at ICE. What
12 position or positions did you hold prior to your last
13 one?
14 A. Prior to that one I served as the Executive
15 Director for the Secure Communities Program. I was the
16 Acting Director for Enforcement and Removal Operations,
17 and I believe that's it.
18 Q. If I understand your background correctly --
19 It's okay. We're just going to have a conversation.
20 A. Yes. Sure.
21 Q. So if I understand your background correctly,
22 there was a period where you left ICE and then went back
23 or left DHS employment and went back; is that right?
24 A. That is correct.
25 Q. Okay, and so the two jobs - the jobs that

Page 7

1 you've just told me about were jobs that you held after
2 you went back to ICE?
3 A. Correct.
4 Q. Okay, when did you go back to ICE for the last
5 time?
6 A. I think it was June of 2008.
7 Q. All right, what did you do before that in the
8 private sector?
9 A. In the private sector I was Director of
10 Business Development for L3 Communications and then
11 before that I was the Vice-President for Homeland
12 Security in a company called USIS.
13 Q. What does USIS do?
14 A. They were primarily a government services
15 provider in the area of personnel secured.
16 Q. And did you hold any other positions in the
17 private sector during that sort of interstitial period
18 between your employment at ICE and going back?
19 A. No.
20 Q. Okay, so just USIS and L3?
21 A. Correct.
22 Q. Okay, and right before you went into the
23 private sector in the I think -- What was your last
24 position at ICE?
25 A. Can you repeat that?

Page 8

1 Q. So right before you went to work for USIS you
2 were working for ICE, right?
3 A. Correct.
4 Q. What were you doing right before you left at
5 that time?
6 A. I was the Acting Director for the Enforcement
7 and Removal Operations Program.
8 Q. Also in Washington D.C.?
9 A. Correct.
10 Q. Okay, and prior to -- And kind of what were
11 the - generally the date ranges when you were the Acting
12 Director for - for ERO?
13 A. It was a short period of time, so I would say
14 months, but I - you know, four, five months.
15 Q. Okay, prior to that?
16 A. Prior to that I held the position of Deputy
17 Director for the same program.
18 Q. And the rough periods that you held that
19 position?
20 I'm not going to hold you to like exact dates.
21 A. Yeah.
22 Q. Just years, maybe.
23 A. Yeah, it was a few years. It's a little fuzzy
24 when I actually started.
25 Q. Okay, you've been in the Agency prior to your

Page 9

1  leaving ICE in 2004, you've been in the Agency for
2  eighteen years or something like that, right?
3      A.  I started in 1986 and then through 2002,
4  right.
5      Q.  Okay, so '86 to '02?
6      A.  Yeah.
7      Q.  And then you go into the private sector in
8  '02?
9      A.  Again a little fuzzy.  '02 --
10     Q.  Sure.
11     A.  -- maybe '03, but --
12     Q.  Okay.
13     A.  -- it was a four year break in between the
14  two --
15     Q.  Okay.
16     A.  -- stints with the government.
17     Q.  Did you always work in Washington D.C.?
18     A.  No.  I started off in Chicago.
19     Q.  All right, what was the highest level position
20  that you - that you held when you were working I guess
21  then for INS in Chicago?
22     A.  Correct.
23        The highest level --
24     Q.  Yes, sir.
25     A.  -- position would be -- I'm trying to remember

Page 10

1  what the title was back then, but it would have been
2  Deputy District Director.
3      Q.  Was that kind of the equivalent of what we
4  would think of as a Field Office Director today?
5      A.  Yeah.  I would say it's equivalent.
6      Q.  Okay, did you -- But within INS you were on
7  the enforcement side.  Do you understand what I mean
8  after INS gets broken up in 2002 under the Homeland
9  Security Act --
10     A.  Right.
11     Q.  -- and then to ICE and USCIS?
12     A.  Right.
13     Q.  You were not doing the benefits part of INS,
14  you were on the enforcement side, right?
15     A.  That's correct.
16     Q.  Okay, and that was the whole time?  You were
17  never like a benefits officer granting green cards or
18  adjudicating applications?
19     A.  After 2002?
20     Q.  At any time in your career --
21     A.  Oh, well --
22     Q.  -- in ICE.
23     A.  -- sure.  I mean between '86 and 2002 I did
24  have - I worked as an immigration inspector as a
25  collateral duty, not - you know, part of my primary

Page 11

1  function.  I also worked on the benefits side,
2  naturalization, green card renewals, et cetera.
3      Q.  Okay, so you did some application
4  adjudications?
5      A.  Yeah.  Absolutely.
6      Q.  Okay, did you also do enforcement activities?
7      A.  Yes.
8      Q.  Okay, what is your highest level of education?
9      A.  A Bachelor of Science in Political Science.
10     Q.  Okay, have you ever supervised a detention
11  center?
12     A.  Yes.
13     Q.  Which one?
14     A.  The Broadview staging facility.  It's in
15  Chicago.
16     Q.  When did you do that?
17     A.  Sometime in the 90's.
18     Q.  Yeah, roughly again.
19     A.  Right.  Okay.
20     Q.  Twenty years ago.
21        And for how long were you the person in charge
22  of that facility?
23     A.  I would say at least a couple years.
24     Q.  Okay, let's get back to your current
25  employment.

Page 12

1      A.  Okay.
2      Q.  What are your current responsibilities?
3      A.  Well, I'm responsible for all of the business
4  development activities for the company which means
5  identifying opportunities that we would be interested
6  in, we would be well suited for, analyzing, qualifying
7  and then making recommendations to our senior leadership
8  whether or not we should pursue such opportunities and
9  then if we do decide to pursue such opportunities then I
10  have a team of folks that manage the proposal process,
11  scheduling and coordination.
12     Q.  Is it correct to say -- I want to make sure
13  that we understand each other and we're using the same
14  language.  Is it correct to say that the people who work
15  with you are in the business development part of GEO as
16  opposed to the contract compliance part of GEO?
17     A.  Oh, that's correct.
18     Q.  Okay, and to whom do you report?
19     A.  To the CEO.
20     Q.  That's George Zoley?
21     A.  That's correct.
22     Q.  Okay, approximately how many people work for
23  you?
24     A.  About eleven.
25     Q.  And are they all here in Florida?

DAVID J. VENTURELLA  Volume I
NOVOA vs THE GEO GROUP

June 13, 2019
13–16

Page 13

1    A.  Yes.
2    Q.  Okay, how do you go about identifying new
3  business opportunities that might enhance GEO's revenue?
4    A.  Well, you can do it a number of different
5  ways.  Certainly we have a current portfolio or clients
6  that we service now and so certainly in having
7  discussions with them asking them if there are
8  additional opportunities that they foresee in the future
9  is one way.  You know, we attend a lot of conferences,
10  we speak to a lot of people on the ground again figuring
11  out if there are opportunities that are coming.
12  Sometimes you look at - you look at the news, you read,
13  for example, like Miami-Dade is in need of a new
14  facility, a county facility so, you know, that - that
15  then sparks the - the additional activity to - to make
16  some contacts and reach out to see if it's actually a
17  real opportunity.
18    Q.  Sure.
19       It is my understanding, and you tell me if I'm
20  incorrect, that you don't just do business development
21  regarding GEO's ICE detention portfolio but you also do
22  business development on other activities that GEO
23  conducts vis-a-vis Corrections or community supervision
24  or other residential treatment centers; is that right?
25    A.  Correct.

Page 14

1    Q.  Okay, so you're not limited to ICE detention?
2    A.  That is correct.
3    Q.  Okay, but you are responsible for identifying
4  new opportunities and increasing corporate profits,
5  finding new sources of revenue within the immigration
6  detention space, right?
7    A.  Not limited to the immigration detention
8  space.
9    Q.  Okay, but that's one of your --
10    A.  Sure.
11    Q.  -- pieces of work, right?
12    A.  Yes.
13    Q.  Okay, is there anybody who specifically works
14  for you that's tasked with that end of it, the ICE
15  detention end of it?
16    A.  No.
17    Q.  Okay, and prior to getting your promotion and
18  taking over your current role, how did your job differ
19  from what it is today?
20    A.  It was more focused on domestic and very
21  specifically to Detention and Corrections, so Federal,
22  State and local level.
23       When I received the promotion then additional
24  areas of responsibility were added to include
25  international and supporting some of our reentry and

Page 15

1  community Corrections services as well.
2    Q.  Do you advice or suggest to senior leadership
3  potential acquisitions of other companies or -- Yeah,
4  other companies.  Let's start there.
5    A.  No.
6    Q.  You do not?
7    A.  I do not.
8    Q.  Okay, were you here when GEO acquired BI?
9    A.  I was not.
10    Q.  Okay, what was your highest GS level before
11  you - when you left ICE?
12    A.  I was in the Senior Executive Service.
13    Q.  Were you on the executive pay scale?
14    A.  Yes.
15    Q.  Did you seek or receive ethics advice prior to
16  leaving ICE and taking on your employment with GEO --
17    A.  Yes.
18    Q.  -- in July?
19       What was that advice?
20    A.  What were my limitations, what could I do,
21  could not do.  Basically the one-on-one on leaving the
22  government and going into the private sector.
23    Q.  And I want you to understand I'm not asking
24  you for an exhaustive list of things you could or
25  couldn't do, but did you understand there to be certain

Page 16

1  guardrails vis-a-vis GEO's business with ICE?
2    A.  Correct.  Yes.
3       MR. DONOHUE:  Object to the form.
4  BY MR. FREE:
5    Q.  Okay, what did you understand those limits to
6  be?
7    A.  I could not have contact with ICE officials
8  for - or I shouldn't say just ICE officials, DHS, any of
9  the component agencies for a twelve month period, I
10  could not sign correspondence that went to those
11  agencies.  I could certainly advise my company
12  behind-the-scenes, but I could not participate in any
13  meetings, discussions that they would have with any of
14  those components within DHS.
15    Q.  It's correct - it's correct to say that those
16  ethical guidance pieces that you got from your Agency
17  pertained to communications and contacts between your
18  new boss and your old boss, right?
19       MR. DONOHUE:  Object to the form.
20  BY MR. FREE:
21    Q.  Yeah, let's - let me those -- What you've
22  just described to me --
23    A.  Sure.
24    Q.  -- pertains to communications and contacts.
25  Did I understand you correctly?

DAVID J. VENTURELLA  Volume I
NOVOA vs THE GEO GROUP

June 13, 2019
17–20

Page 17

1    A.  With me and -- Yeah.

2    Q.  You directly?

3    A.  Yes.  Me directly.

4    Q.  I'm sorry to interrupt you.

5    A.  Yeah.  No, it's okay.

6    Q.  But that's right?  It's just you individually?

7    A.  Correct.

8    Q.  Okay, it didn't preclude GEO from talking to

9  DHS?

10    A.  That's correct.

11    Q.  All right, and it doesn't preclude you, I

12  think, I understand the rules to be, it doesn't preclude

13  you from taking the information that you've gained in

14  your twenty-two years of experience at ICE and applying

15  some of that information to GEO?

16        MR. DONOHUE:  Object to the form.

17  BY MR. FREE:

18    Q.  You can answer the question.

19    A.  Oh, okay.  I wasn't sure of the process there.

20        Sure, so I could provide advice to - to GEO

21  behind the scenes, yes.

22    Q.  And that was an added benefit to your hire by

23  this company, right?

24        MR. DONOHUE:  Object to the form.

25        THE WITNESS:  I - that I don't know.

Page 18

1  BY MR. FREE:

2    Q.  You probably had a better understanding of how

3  ICE and DHS work than someone who didn't work there?

4  Would you just generally say --

5    A.  I would.

6    Q.  -- that that's probably true?

7        MR. DONOHUE:  Let me just make an objection.

8        Object to the form, calls for speculation.

9        THE WITNESS:  I think my experience and

10        expertise certainly was helpful.

11  BY MR. FREE:

12    Q.  You're a very senior official at ICE?

13        MR. DONOHUE:  Object to the form.

14        THE WITNESS:  I --

15        MR. DONOHUE:  Vague.

16        THE WITNESS:  I wouldn't say - I wouldn't

17  say --

18  BY MR. FREE:

19    Q.  You told me earlier you were a very senior?

20    A.  No.  No.  I said I was in the senior executive

21  service which is just a pay scale.

22    Q.  Okay, I got it.  All right.  Okay, cool.

23        Why did you leave DHS employment?

24    A.  I'm sorry?

25    Q.  Why - what made you want to leave DHS?

Page 19

1    A.  It was for me a time for a change.  I had

2  achieved my twenty years of covered service which is a

3  milestone for law enforcement personnel.

4    Q.  You're on a pension?

5    A.  I'm eligible for a pension.  I don't receive

6  one now.

7    Q.  Do you have to wait it out or is there --

8    A.  I do.  I have to wait.

9    Q.  How far away?

10    A.  Fifty-seven or sixty-two.  It just depends on

11  when I choose to exercise it and how much reduction I

12  get from that.

13    Q.  All right.  Okay, have you ever visited the

14  Adelanto facility?

15    A.  I have.

16    Q.  And I want to be really clear.  When I'm

17  referring to the Adelanto facility I'm referring to the

18  immigration detention facility that's operated under a

19  contract currently, I believe, with GEO and ICE and the

20  City of Adelanto.  I'm not referring to the prison

21  next-door and for the rest of these questions we're just

22  going to talk about the ICE processing center.  Can we

23  agree on that?

24    A.  Yes.

25    Q.  Great.

Page 20

1        When is the most recent time you visited

2  Adelanto?

3    A.  I think in February of this year.

4    Q.  What brought you there?

5    A.  We had a series of visits scheduled throughout

6  the State of California and so we had just stopped by,

7  visited, said - said hello to our folks and just toured

8  around that facility as well as the Desert View

9  facility.

10    Q.  Who's we?

11    A.  Myself, George Zoley, Kyle Schiller who is an

12  employee of the Operations Division, I think John

13  Christakis who's our Chief Medical Officer, our Regional

14  Vice-President.  There may have been a few other people

15  that attended as well.

16    Q.  Is the Regional Vice-President James Black?

17    A.  No.

18    Q.  Who is that?

19    A.  That is Paul Laird, L-a-i-r-d.

20    Q.  Thanks.

21        Is that a regular occurrence or an annual

22  occurrence where you go and tour these facilities or was

23  there some special reason why you were going there in

24  February of this year?

25    A.  As I stated, we had other meetings scheduled

Page 21

1  throughout the state and so since we were in - in the
2  State of California we decided to make that - that trip
3  out there.
4      Q.  How many times had you been there before going
5  in February?
6      A.  I would say at least once annually again
7  mostly to - to visit because we've had meetings or
8  conferences out there and so it's always good when
9  you're in the area to stop by, say hello, see how things
10  are going.
11      Q.  If I understand the timeline of your
12  employment and the existence of Adelanto correctly, you
13  would not have been at DHS when GEO was operating
14  Adelanto, you would not have visited as a DHS official;
15  is that right?
16      A.  Correct.  I did not visit --
17      Q.  Okay.
18      A.  -- that facility.
19      Q.  And so every visit that you've taken has been
20  in your employment with GEO?
21      A.  To Adelanto?
22      Q.  Yes, sir.
23      A.  Correct.
24      Q.  Okay.  Great.
25          How long did you spend there?

Page 22

1      A.  An hour.
2      Q.  Okay, did you actually go inside the secure
3  area or did you go to the sort of office area over on
4  the west side?
5      A.  We did go inside the secure area.
6      Q.  What did you see?
7      A.  Detainee hold rooms, the medical food service,
8  so I mean usually when we go we - we look at all
9  aspects.
10      Q.  Was there somebody responsible for being your
11  point of contact, the person who led your tour?
12      A.  That would have been the Facility
13  Administrator, James Janecka.
14      Q.  Okay, did you go anywhere else within the
15  facility?
16      A.  I think we covered all of the facility.
17      Q.  Okay, did Mr. Janecka or anyone else provide
18  you any written materials in advance of your visit?
19      A.  No.
20      Q.  Okay, did you have any substantive discussions
21  about GEO's performance at the facility or was it more
22  of just a meet and greet?
23      A.  More --
24          MR. DONOHUE:  Object to the form.
25          Go ahead.

Page 23

1          THE WITNESS:  More of a meet and greet.
2  BY MR. FREE:
3      Q.  Okay, nobody sat down in a conference room and
4  said here are the five things that we need to talk
5  about?
6      A.  No.
7      Q.  Okay.  All right.
8      A.  We did sit in the conference room though,
9  okay, so --
10      Q.  What did you talk about?
11      A.  Well, again how - how are things going, you
12  know, so there wasn't a particular agenda, but again
13  more of a meet and greet, okay, let's go look at the
14  facility.
15      Q.  Do you have any recollection as to how things
16  were going?
17      A.  At the facility?
18      Q.  Yes, sir.
19          When you were sitting in the conference room
20  talking about it what was the general sense?
21      A.  That we were performing well.
22      Q.  Okay, at that time was the facility almost at
23  full occupancy or near, near it?
24      A.  I don't recall.
25      Q.  Okay, that wasn't discussed?

Page 24

1      A.  No.
2      Q.  Okay, any discussions of expansion of the
3  facility?
4      A.  No.
5      Q.  Any discussions of alterations in the contract
6  of the facility?
7      A.  No.
8      Q.  Were ICE officials present on your tour?
9      A.  I mean there's always ICE officials around --
10      Q.  Okay.
11      A.  -- but they were not participating in the
12  tour, but certainly if we encountered one we spoke to
13  them.
14      Q.  Who was that?
15      A.  Well, I don't know.  There's a number of
16  officers that work there.
17      Q.  Nobody that sticks out in your mind?
18      A.  No.
19      Q.  Okay, but they weren't on the tour with you,
20  they were just physically located on the site because
21  they have offices, if I understand you correctly?
22      A.  Right, and they're performing their functions
23  and duties.
24      Q.  Okay, this was a GEO event, this wasn't GEO
25  and ICE doing any sort of meet and greet, if I

DAVID J. VENTURELLA  Volume I
NOVOA vs THE GEO GROUP

June 13, 2019
25–28

Page 25

1   understand your recollection?

2       A.   That is correct.

3       Q.   How often have you done visits like that prior
4   to February of 2018?

5       MR. DONOHUE:  Object to the form, vague.

6       THE WITNESS:  At the Adelanto facility?

7   BY MR. FREE:

8       Q.   Yes, sir.

9       A.   Like I said, I think I visited at least once a
10  year.

11      Q.   Okay.  Okay, so The GEO Group is a private
12  publicly traded real estate investment trust; is that
13  right?

14      A.   Yes.

15      Q.   Okay, your main business as an - as a
16  government contractor is to service the needs of your
17  government partners; is that right?

18      A.   Yes.

19      Q.   Okay, and it's my understanding that almost
20  all of the revenue from GEO's - almost all of GEO's
21  revenue comes from government contract partners; is that
22  correct?

23      A.   That is correct.

24      Q.   In fact, governments supply almost exclusively
25  the - the revenues each year that GEO takes in for its

Page 26

1   shareholders; is that right?

2       A.   That's correct.  We are a government services
3   provider.

4       Q.   Right.

5           ICE is GEO's largest customer right now; is
6   that right?

7       MR. DONOHUE:  Object to the form, vague.

8   BY MR. FREE:

9       Q.   Okay, let me - let make it real clear.  I want
10  you to understand my question, okay?

11      A.   Sure.

12      Q.   Where does GEO get the majority of its
13  revenues?

14      A.   From the Federal Government.

15      Q.   Okay, and the largest Federal Government
16  contracting partner by revenue for GEO is ICE; is that
17  right?

18      A.   I think that is correct as of today.

19      Q.   Okay, who are GEO's key competitors in the
20  immigration detention space for Federal Government
21  contracts here in the United States?

22      A.   That would be CoreCivic, LaSalle Corrections,
23  MTC and then, you know, thousands of county jails that
24  provide similar services to ICE.

25      Q.   You see those - those jails as potential

Page 27

1   competitors in the bidding process or -- Is that right?

2       A.   Correct.

3       Q.   Okay, do you have a rough understanding of how
4   much of GEO's revenues come from ICE each year?

5       A.   I do not.

6       Q.   Okay, and do you have any understanding of
7   what portion of ICE's immigration detention needs are
8   serviced by GEO each year in terms of beds?

9       A.   I do not.

10      Q.   Do you have any idea roughly but current
11  average daily population that ICE is detaining for adult
12  immigration detention?

13      A.   Other than what I read in the media reports
14  which I think is north of fifty thousand.

15      Q.   Okay, would you agree that that average daily
16  population that's been reported publicly is an increase
17  from years past?

18      MR. DONOHUE:  Object to the form.

19  BY MR. FREE:

20      Q.   In other words, in this year where ICE is
21  detaining let's say fifty-two thousand it's been
22  reported?

23      A.   Okay.

24      Q.   That's more than ICE has detained ever before
25  on a daily basis?

Page 28

1       MR. DONOHUE:  The same objection.

2       THE WITNESS:  That would be correct.

3   BY MR. FREE:

4       Q.   Okay, do you expect that number to go up?

5       MR. DONOHUE:  Object to the form.

6       THE WITNESS:  I do not know.

7   BY MR. FREE:

8       Q.   As the person responsible for business
9   development for GEO do you anticipate that the Agency
10  will continue to have a need for adult immigration
11  detention into the future?

12      A.   Can you repeat that?

13      MR. FREE:  Can you just read it back, please.

14      (Whereupon, the requested portion of the
15  record was read back).

16      THE WITNESS:  Yes.

17  BY MR. FREE:

18      Q.   Do you think that that need will provide GEO
19  opportunities to enhance its revenues if you can get
20  contracts?

21      MR. DONOHUE:  Object to the form, vague and
22  calls for speculation.

23      THE WITNESS:  I would say it is my opinion
24  that GEO has a very limited inventory of beds at
25  this point, so I don't know if we can offer anymore

DAVID J. VENTURELLA  Volume I                                    June 13, 2019
NOVOA vs THE GEO GROUP                                                  29–32

Page 29

1    additional capacity to ICE, so it remains to be
2    seen if - if we would benefit from any increase.
3  BY MR. FREE:
4      Q.   When you say a limited inventory of beds, what
5  I understand that to mean, and tell me if I'm wrong, is
6  GEO has a certain number of facilities with a certain
7  number of beds available that it could make available to
8  ICE and that number is limited at this moment?
9      A.   Yes.
10     Q.   Okay, how would GEO go about increasing its
11  supply of beds that it could offer to ICE?
12     A.   We would have to build more, more beds.
13     Q.   Could you enter into intergovernmental
14  services agreements with counties or states instead of
15  building?  In other words, take existing space and
16  manage the facility.
17     A.   As a REIT that's not what we would prioritize.
18     Q.   Why not?
19     A.   Because there are REIT rules that determine or
20  govern how much of your business can be non REIT and
21  that would be non REIT, so that would not be our
22  preference.
23     Q.   Do you have any idea, I'm not going to hold
24  you to an exact number, but do you have any idea how
25  much of GEO's business is non REIT right now?

Page 30

1      A.   I do not know.
2      Q.   Okay, so you don't - you can't tell me today
3  as you're sitting here how much room GEO has to kind of
4  maximize that non REIT income?
5      A.   No, I do not.
6      Q.   Okay, is the contract with Adelanto a REIT or
7  non REIT activity?
8      A.   It is a REIT activity.
9      Q.   Why is that?
10     A.   Because we own and operate the facility.
11     Q.   Okay, so do you have any understanding
12  generally of the benefits of being a REIT to GEO?
13     MR. DONOHUE:  Object to the form.
14     THE WITNESS:  My understanding of the benefit
15     is more tax related and I can't get - I don't know
16     the specifics of that, but I know there's a benefit
17     and then there's certainly a requirement to
18     distribute, I'm not sure if I'm going to get this
19     term right, but your profits back to shareholders.
20  BY MR. FREE:
21     Q.   Do you happen to know the percentage that has
22  to go back to the shareholders?
23     A.   I don't.
24     Q.   Okay.  That's okay.
25         Has GEO always been a REIT since you've worked

Page 31

1  there?
2      A.   No.
3      Q.   Do you recall approximately when that
4  corporate change occurred?
5      A.   I - I'm guessing it might have been around
6  2014.
7      Q.   Did you have any role in shifting the
8  corporate structure from what it was before to what it
9  is now?
10     A.   No.
11     Q.   Okay, that's not something that you were
12  working on?
13     A.   Correct.
14     Q.   Okay, but it does in some way limit the --
15  GEO's REIT structure does in some way limit, if I
16  understand your testimony, the number of beds that GEO
17  can offer ICE?
18     MR. DONOHUE:  Object to the form.
19     THE WITNESS:  I don't think that REIT
20     structure necessarily limits.  It's basically what
21     we - our capacity is and --
22  BY MR. FREE:
23     Q.   Okay.
24     A.   -- I think that's what defines our - our
25  capabilities.

Page 32

1      Q.   Okay, yeah.  I take your point.  I think what
2  you're trying to tell me is in order to provide ICE more
3  beds we would have to own and build more facilities and
4  we don't have many more right now?
5      A.   That is correct.
6      Q.   Thank you.
7         Okay, do you happen to know as you sit here
8  today how many facilities GEO owns that it contracts
9  with ICE to house adult immigration detainees?
10     A.   You said you're not going to hold me to the
11  exact number?  I think fourteen.
12     Q.   I'd like you to do the best you can.
13     A.   I think - I think it's fourteen.
14     Q.   But, yeah.  No, we're --
15     A.   Yeah.
16     Q.   Okay, how many in California?
17     A.   Two.
18     Q.   Okay, which ones are those?
19     A.   That would be the Adelanto facility and the
20  facility known as Mesa Verde.
21     Q.   That's in Bakersfield?
22     A.   Correct.
23     Q.   Okay, do you have any understanding as you sit
24  here today as to the main groups of shareholders that
25  own GEO stock, like who's the biggest?

Page 33

1    A.  I don't know.
2        MR. DONOHUE:  Object to the form.
3        THE WITNESS:  I do not.
4  BY MR. FREE:
5    Q.  Okay.
6        If I understand your position correctly,
7  you're - you're in a position of a corporate officer at
8  GEO?  Do you understand what I mean by that?
9    A.  Yes.
10    Q.  Do you believe that you have a fiduciary duty
11  to the shareholders?
12        MR. DONOHUE:  Object to the form.
13        THE WITNESS:  Yes.
14  BY MR. FREE:
15    Q.  What in your understanding is that fiduciary
16  duty?
17        MR. DONOHUE:  The same objection.
18        THE WITNESS:  Well, I believe that, you know,
19    I have a responsibility of making sure that our
20    company in my capacity as a business development
21    executive that we're pursuing opportunities that
22    would benefit our company.
23  BY MR. FREE:
24    Q.  Is it your understanding as part of your
25  fiduciary duty that -- I'm going to ask it in two parts,

Page 34

1  but I'm going to tell you the whole thing, okay?  I
2  think -- Tell me if I'm wrong here.  I think that you at
3  least have fiduciary duties to maximize profits and make
4  sure the shareholders make as much money as possible off
5  of their share from your activities.  Is that your
6  understanding as well?
7        MR. DONOHUE:  Object to the form.
8        THE WITNESS:  Again I think my responsibility
9    is to make sure that the opportunities we pursue
10    benefit our shareholders --
11  BY MR. FREE:
12    Q.  Financially?
13    A.  -- and our company, yeah.
14    Q.  And that means profit, right?
15        MR. DONOHUE:  Object to the form.
16        THE WITNESS:  Yes.
17  BY MR. FREE:
18    Q.  Okay, what other benefit would a shareholder
19  derive from your activities?
20        MR. DONOHUE:  Object to the form.
21        THE WITNESS:  None come to mind right now.
22  BY MR. FREE:
23    Q.  Yeah, it's just money, right?
24        MR. DONOHUE:  The same objection.
25        THE WITNESS:  Yes.

Page 35

1  BY MR. FREE:
2    Q.  Okay, I also think that, and tell me if I'm
3  wrong again and these are not - you can correct me is
4  what I want you to understand about --
5    A.  Sure.
6    Q.  -- this, okay?  But I also think that you have
7  a fiduciary duty to make sure that your operations in
8  any contract and broadly are compliant with the terms of
9  those contracts so that you can keep getting those
10  contracts, right?  In other words, you have an - you
11  have a duty to make sure that GEO does what it says it's
12  going to do when it contracts with a government partner?
13        MR. DONOHUE:  Object to the form.
14        THE WITNESS:  I think in my role and capacity
15    that directing how certain parts of our company
16    perform are just outside the scope of my authority.
17  BY MR. FREE:
18    Q.  Okay.
19    A.  However, if people are seeking my advice or
20  opinion I will certainly provide it to them.
21    Q.  What would it be on the specific issue of
22  whether GEO should as a general matter comply with its
23  contracts?
24        MR. DONOHUE:  Object to the form.
25        THE WITNESS:  I believe we have to comply with

Page 36

1    our contracts, the terms and conditions.
2  BY MR. FREE:
3    Q.  Right.  Okay, are you familiar with the terms
4  and conditions of the Adelanto Detention Center's
5  contract?
6    A.  No.
7    Q.  Okay, have you ever seen the contract?
8    A.  I've seen pieces of it.
9    Q.  Do you recall which pieces you've seen?
10    A.  The first couple of pages.  Yeah, it's -- I
11  know it's a very lengthy contract so, no.
12    Q.  How long has it been since you looked at those
13  couple of pages?
14    A.  A few days ago.
15    Q.  Okay, was it in connection with your daily
16  activities or in preparation for this deposition?
17        Please don't tell me anything that you talked
18  about with your lawyers.
19    A.  In preparation for this --
20    Q.  Okay.
21    A.  -- testimony.
22    Q.  All right.  Okay, but you have a -- As part of
23  your role at GEO you have a high level understanding of
24  the different types of immigration detention contracts
25  that exist; is that right?

DAVID J. VENTURELLA  Volume I
NOVOA vs THE GEO GROUP

June 13, 2019
37—40

Page 37

1    A.  Yes.

2    Q.  Can you tell me what those types of contracts

3  are.

4    A.  Well, there's two types of contracts.  There -

5  there's what we call a direct contract, and I don't know

6  if that's the proper term, which is where an RFP is

7  issued, the government follows the Federal Acquisition

8  Regulations, we provide a response, they accept it or

9  reject it, if they accept it then we enter into

10  negotiations and then a - a contract is finalized and

11  executed and there's a number of activities and

12  deliverables from that point forward in executing the

13  contract.

14        The other is an intergovernmental service

15  agreement which I think is maybe covered by the FAR as

16  well, but that's - those are the only two types of

17  contracts I'm aware of.

18    Q.  Within the first bucket, the direct contract,

19  it's my understanding that those are contracts that are

20  directly between GEO and ICE; is that right?

21    A.  That's correct.

22    Q.  And then the intergovernmental service

23  agreements or IGSAs are contracts between GEO, ICE and

24  some third-party; is that right?

25    A.  Correct.

Page 38

1    Q.  And in the case of immigration detention

2  that's going to be a state or local government

3  typically; is that right?

4    A.  Correct.

5    Q.  Anybody else who could be the third-party in

6  an IGSA?

7    A.  Not - not that I'm aware of.

8    Q.  Okay, and you can't think of any GEO contracts

9  that don't involve an IGSA - GEO intergovernmental

10  services agreements, excuse me, that are not a state or

11  local government contracting with ICE and GEO?

12    A.  Right.  I'm not aware of any.

13    Q.  Now within the first category that you have

14  described, direct contracts, can you tell me the

15  difference between a service processing center and a

16  contract detention facility?

17    A.  A service processing center is typically a

18  government - a Federal Government owned facility, so I

19  think they have four or five of those throughout the

20  country and a contract detention facility is one that is

21  privately owned.

22    Q.  So the only part, if I understand your

23  testimony correctly, the only one of those that GEO

24  would compete for then is a contract detention facility;

25  is that right?  You couldn't -- If a service -- In other

Page 39

1  words, if a service processing center is federally owned

2  and GEO is not the Federal Government and therefore does

3  not own any Federal facilities then you couldn't enter

4  into a service processing center agreement?

5    A.  That's not correct because --

6    Q.  Okay.

7    A.  -- the operations, the transportation, the

8  medical, the food is all outsourced at NSPC, so

9  potentially, yes, we could bid on any one of those

10  services should the government issue a procurement --

11    Q.  Okay.

12    A.  -- in which they have.

13    Q.  And do you, in fact, provide any of those

14  services at SPCs?

15    A.  We do not.

16    Q.  Okay, would those be REIT activities or non

17  REIT activities?

18    A.  Those would be non REIT activities we wouldn't

19  pursue.

20    Q.  Why?

21    A.  Because we don't own the property.

22    Q.  Okay, so what we're really talking about then

23  are contract detention facilities and IGSAs when we're

24  talking about a detention contract as opposed to

25  services contracts?

Page 40

1        Let me clear this up and say it a different

2  way.

3        The Adelanto ICE Processing Center is operated

4  pursuant to an intergovernmental services agreement,

5  right?

6    A.  Correct.

7    Q.  It's not a contract detention facility?

8    A.  We consider it a contract detention facility

9  because we own and operate that facility.  The mechanism

10  by which ICE is able to obtain our services is through

11  the IGSA, but we consider it a contract detention

12  facility.

13    Q.  And by we you mean GEO?

14    A.  Yeah.  Yes, GEO.

15    Q.  Okay, so you do not consider it an

16  intergovernmental services agreement or you acknowledge

17  that it's an intergovernmental services agreement but

18  you treat it internally as a CDF?

19    A.  Correct.

20    Q.  The second one I said is right?

21    A.  Treated as a CDF?

22    Q.  Yeah.

23    A.  Yes.

24    Q.  Understanding that there is this third-party

25  Adelanto, right?

Page 41

1     A.  Uh-huh.  (Affirmative response).  Yes.
2         I'm sorry.
3     Q.  You're doing great.
4         Okay, do you have any understanding as to
5  whether Adelanto would be able to continue as an
6  intergovernmental services agreement after the end of
7  this month?
8         MR. DONOHUE:  Object to the form.
9         THE WITNESS:  Can you repeat the question?
10 BY MR. FREE:
11    Q.  Sure.
12        Do you have any understanding as to whether
13 the facility at Adelanto will be able to continue as an
14 intergovernmental services agreement after the end of
15 this month?
16        MR. DONOHUE:  The same objection.
17        THE WITNESS:  So my understanding is that the
18 City of Adelanto provided notice of termination to
19     ICE, so the answer would be no.
20 BY MR. FREE:
21    Q.  No, you don't have any understanding or --
22    A.  No.  I'm sorry.  No that it will not continue
23 as an IGSA.
24    Q.  In other words, if I understand your testimony
25 and the structure correctly, it's going to have to be a

Page 42

1  straight contract detention facility with a contract
2  directly between GEO and ICE if Adelanto's like
3  withdrawal from the intergovernmental services agreement
4  actually happens?
5         MR. DONOHUE:  Object to the form.
6         THE WITNESS:  That would be correct.
7  BY MR. FREE:
8     Q.  As - as you sit here today do you have any
9  reason to believe that once Adelanto follows through on
10 its termination of the intergovernmental services
11 agreement operations will stop at Adelanto?
12    A.  Can you repeat that?
13    Q.  I'll just say it a different way.
14    A.  Sure.
15    Q.  Once Adelanto's out the facility's not going
16 to shut down, is it?
17    A.  I can't say that with absolute a hundred
18 percent certainty.
19    Q.  Okay, why not?
20    A.  Because we don't have a contract in place with
21 the Federal Government, with ICE.
22    Q.  What do you see as the impediments from your
23 perspective to getting that contract, if any?
24    A.  Bureaucracy.  I don't know what's going on
25 because I'm not involved in the - the negotiations.  I

Page 43

1  just know that there's a process in place and we're
2  getting close to the end of the IGSA term, so --
3     Q.  I think I know what you mean when you say
4  bureaucracy, but I think you're talking about Federal
5  Government bureaucracy as opposed to GEO's bureaucracy?
6  Am I correct?
7     A.  Correct.
8     Q.  Okay.
9     A.  Correct.
10    Q.  It's probably a little easier to get contracts
11 done here than in the government I think just generally,
12 right?
13    A.  Yes.
14    Q.  Okay, do you know who's responsible within GEO
15 for the process that you've described that's underway to
16 figure out what the structure's going to be after
17 Adelanto pulls out?
18    A.  I don't think I quite understand.  I mean I -
19 we have an individual in a department that administers
20 the contract and then you have operations that actually
21 service - you know, provide the people and the - and the
22 transportation assets, et cetera, so there are different
23 components of GEO that will provide those activities and
24 services, so depending on what you mean.
25    Q.  Yeah, let me clarify.

Page 44

1     A.  Okay.
2     Q.  You said earlier there's a process that's
3  ongoing?
4     A.  Yes.
5     Q.  Okay, who to your understanding is in charge
6  of that process for GEO?
7     A.  That would be Amber Martin who's our head of
8  Contract Administration.
9     Q.  Okay, and she to the extent that there are
10 negotiations back and forth between GEO and ICE,
11 Miss Martin is the person who is the point of contact,
12 probably not exclusively, but she's the person who's
13 talking to ICE; is that right?
14    A.  That is correct.
15    Q.  Okay, anybody else?
16    A.  In her absence whoever she designates under
17 her.
18    Q.  Where does she work physically?
19    A.  At the Boca Raton office.
20    Q.  She's here in Florida?
21    A.  Yes.
22    Q.  Okay, is there anybody regionally who would
23 serve underneath Miss Martin on - on these negotiations
24 with ICE and GEO for whatever the next phase in the
25 contract at Adelanto is?

DAVID J. VENTURELLA  Volume I
NOVOA vs THE GEO GROUP

June 13, 2019
45–48

Page 45

1    A.  No.  That's all performed out of the Boca
2  office.
3    Q.  Okay, have you been apprised of any
4  discussions between Miss Martin and ICE regarding
5  Adelanto?
6    A.  I mean I'm aware that the process is not
7  concluded.  I don't know the specifics and what they've
8  said to each other, but I just know it hasn't concluded.
9    Q.  Do you have any idea what the rough annual
10  revenues to GEO are from the current agreement?
11    A.  I do not.
12    Q.  Okay, do you know why the City of Adelanto
13  issued its termination notice?
14    A.  I do not.
15    Q.  Do you have any information as you sit here
16  today about the process that the City of Adelanto used
17  to issue that termination notice?
18    A.  I do not.
19    Q.  Okay, and I think I know the answer to this,
20  but I'm just going to ask, you, yourself, have not had
21  any discussions with anybody in the City of Adelanto
22  about the termination of the contract; is that right?
23    A.  That is correct.
24    Q.  Okay.  I'm going to hand you an exhibit that's
25  been marked as Exhibit One.  It's the contract.

Page 46

1    MR. DONOHUE:  Yes.
2  BY MR. FREE:
3    Q.  This is the -- I'm going to represent to you
4  that this is an intergovernmental services agreement
5  entered into May of 2011 between the City of Adelanto
6  and GEO to perform functions that the City entered into
7  a contract with ICE to perform.  Now I understand that
8  this is not necessarily the end of the discussion
9  between these contracting parties.  In other words,
10  there may have been modifications to this contract.  Is
11  that your understanding as well?
12    MR. DONOHUE:  Object to the form.
13    THE WITNESS:  I believe there are
14    modifications to this, yes.
15  BY MR. FREE:
16    Q.  Okay, have you been involved in any of those
17  contract modifications, if they happened, to this
18  intergovernmental services agreement?
19    A.  No.
20    Q.  No.
21    Okay, are you aware of any of the
22  modifications to this agreement that may have happened?
23    A.  I'm aware of a collective bargaining agreement
24  that was renegotiated between GEO and the union that
25  services Adelanto and that there was a request for an

Page 47

1  adjustment based on the change in the CBA terms and
2  conditions, but I mean I'm not sure when that was, but I
3  know that was certainly an activity that required a
4  modification.
5    Q.  All right, and why do you know about that?
6    A.  It came up in a --
7    MR. DONOHUE:  Objection.
8    THE WITNESS:  -- in a business development
9    meeting that was presented by our HR executive.
10  BY MR. FREE:
11    Q.  What do you recall about that meeting?
12    A.  Well, just as it reported.  He reported that
13  the CBA had been successfully renegotiated and the terms
14  and conditions needed to be communicated to ICE.
15    Q.  Do you have any understanding as you sit here
16  today about who is covered within the collective
17  bargaining agreement and employed by GEO?
18    A.  I do not.
19    Q.  All right, if I told you it's just the guards,
20  does that sound about right to you?
21    MR. DONOHUE:  Object to the form.
22    THE WITNESS:  It would make sense.
23  BY MR. FREE:
24    Q.  Okay, do you think that the medical
25  professionals would be subject to a collective

Page 48

1  bargaining agreement?
2    MR. DONOHUE:  Object to the form.
3    THE WITNESS:  I don't know.
4  BY MR. FREE:
5    Q.  Okay, do you remember anything else about that
6  meeting?
7    A.  No.
8    Q.  And who's the Human Resources person that told
9  you about that?
10    A.  Chris Ryan.
11    Q.  What's his title?
12    A.  Executive Vice-President of Human Resources.
13    Q.  And when did that occur roughly, if you can
14  recall?
15    A.  I don't know.
16    Q.  Okay, as a result of the renegotiation of the
17  collective bargaining agreement you said GEO had to
18  notify ICE; is that right?
19    A.  Correct.
20    Q.  Okay, do you know whether the collective
21  bargaining resulted in the members of the union getting
22  paid more or getting more benefits or whether they got
23  less benefits, fewer benefits?
24    MR. DONOHUE:  Object to the form.
25    THE WITNESS:  I don't know the nature of the

Page 49

1    agreement.
2    BY MR. FREE:
3        Q.  Okay.
4        A.  No.
5        Q.  Did it increase or decrease GEO's costs?
6        A.  It would have increased.
7        Q.  Do you have any understanding about whether
8    GEO sought help from ICE in covering those costs?
9            MR. DONOHUE:  Object to the form.
10           THE WITNESS:  We had requested a request for
11   equitable adjustment.
12   BY MR. FREE:
13       Q.  Did it - did you get it?
14       A.  I do not know.
15       Q.  Okay.  All right, if you could please turn to
16   page - at the bottom.  It's page two, I believe.  At the
17   bottom says page 308.  Do you see that?
18           Okay, do you see in paragraph four facility
19   capacity the second to last line it says, "Costs
20   reimbursed by the fixed per day per detainee payment
21   rate that is paid to GEO"?  Do you see where that is?
22       A.  Yes.
23       Q.  Okay, is this contract to the best of your
24   understanding a fixed cost contract?
25       A.  Yes.

Page 50

1        Q.  Okay, what does that mean?
2        A.  That means all of the services that we
3    proposed to ICE is included in the bed-day per diem, so
4    medical, food, guard services are all included in that.
5    It's not billed separately.
6        Q.  Are there other types of government contracts
7    apart from fixed costs contracts?
8            MR. DONOHUE:  Object to the form.
9            THE WITNESS:  I - I don't understand.
10   BY MR. FREE:
11       Q.  Do you know what a cost plus contract is?
12       A.  I know what it is, yes.
13       Q.  Okay, what's your understanding of what a cost
14   plus contract is?
15       A.  A bed you can bill the client for the costs of
16   the services plus a profit or margin.
17       Q.  Is GEO's -- But you understand that that's not
18   what this contract is.  This is a fixed cost contract,
19   right?
20       A.  I would agree.
21       Q.  Okay, if I understand correctly, and help me
22   because this is, I think, part of your job, the way that
23   you arrive at your proposal about the fixed costs that
24   you're going to get is by calculating a per diem rate
25   and proposing it to the government counter party; is

Page 51

1    that right?
2            MR. DONOHUE:  Object to the form.
3            THE WITNESS:  Yes, we calculate a per diem
4    rate.
5    BY MR. FREE:
6        Q.  So that the cost, the measure of the cost that
7    you're presenting to the government that they're then
8    going to pay you at a flat rate, I think, is the per
9    diem?  Do I have that basically right?
10           MR. DONOHUE:  Object to the form.
11           THE WITNESS:  That would -- Yes, that would --
12   BY MR. FREE:
13       Q.  Okay.
14       A.  -- be my understanding.
15       Q.  Okay, tell me what's encapsulated in the per
16   diem rate with a bed-day rate.  Can we use those things
17   interchangeably?
18       A.  Yes.
19       Q.  Okay, so what's encapsulated in the per diem?
20           MR. DONOHUE:  Object to the form.
21           THE WITNESS:  So that would include personnel
22       costs, food costs, uniform costs, utilities.  I
23       mean it's a pretty exhaustive list of categories
24       that are required to run the facility and provide
25       the services that we propose to include, you know,

Page 52

1        equipment, copiers, desks, et cetera.
2    BY MR. FREE:
3        Q.  When you say that we propose your - I think
4    you mean that GEO proposes to ICE; is that right?
5        A.  Correct.
6        Q.  Okay, do you have a government website that
7    you can look at and see a - a rate that the Federal
8    Government sets for how much you should buy a desk for
9    or some of the other things that you've listed or do
10   you, GEO, go ahead and figure out what's the best, you
11   know, cost we can get for a desk?
12       A.  We figure that out.
13       Q.  Okay, so that's not set?  Your costs in terms
14   of acquisition of what you need to do the contract
15   that's not set by the Federal Government, that's
16   something you as the contractor figure out and then
17   present to the Federal Government?
18       A.  Correct.
19       Q.  Is that right?
20       A.  Correct.
21       Q.  Is it fair to say that part of your
22   competitive advantage as a government contractor would
23   be in figuring out the way to get the lowest cost on
24   certain items so that you can have the best bed-day
25   rate?

Page 53

1       MR. DONOHUE:  Object to the form.
2       THE WITNESS:  Yeah, I would agree that we try
3   to provide the - the lowest cost that would be
4   sufficient to provide the services or equipment
5   that we propose to provide to the government.
6 BY MR. FREE:
7       Q.   Okay, do you have any understanding as to
8   whether this contract was competitively bid?
9       A.   This was before my time --
10      Q.   Okay.
11      A.   -- so I don't know.
12      Q.   Do you know since this contract was entered
13  into in 2011 whether ICE has announced or, in fact,
14  re-competed this contract and solicited other bids to do
15  the same thing?
16      A.   There was --
17      MR. DONOHUE:  Object to the form.
18      THE WITNESS:  There was recently a request for
19  information issued by ICE a few months ago about
20  bed space in that part of the - the state.  I think
21  it's for the entire state, so potentially this
22  facility could be part of a - a new procurement.
23 BY MR. FREE:
24      Q.   Do you recall when that request for
25  information went out approximately from ICE?

Page 54

1       A.   A couple months ago.
2       Q.   Okay, so this year?
3       A.   Yes.  This year.
4       Q.   What else do you remember about it?
5       A.   Again they were seeking information, location,
6   capacity.  I think those were the two primary
7   requisites, of capacity and location.
8       Q.   How did you find out about it?
9       A.   It was issued through the government website.
10      Q.   How did you find out it was on the government
11  website?
12      A.   We have alert notices that let us know when a
13  particular agency issues that type of activity.
14      Q.   Okay, I think you originally said for that
15  part of the state and then you may have said also that
16  it could be the whole state.
17      A.   Yeah, I think it's for the entire state, but
18  I'm not entirely sure.
19      Q.   Okay, do you know as you sit here today
20  whether it was for the Los Angeles field office or a
21  different field office or whether it was simply the
22  State of California?
23      A.   I don't recall --
24      Q.   Yeah.
25      A.   -- if it was --

Page 55

1       Q.   Okay.
2       A.   -- our field office.
3       Q.   Do you know whether the government website is
4   public and publicly accessible, or is it just available
5   to existing contractors?
6       A.   It's public.
7       Q.   So any competitor can look at it?
8       A.   Anyone.
9       Q.   Anyone?
10      A.   Yeah.
11      Q.   If you knew where to look?
12      A.   Yeah.
13      Q.   Yeah.
14      Okay, is GEO actively preparing a response to
15  the request for information?
16      A.   We prepared our response to the request for
17  information --
18      Q.   And --
19      A.   -- and it was submitted.
20      Q.   Okay, when?
21      A.   In May.
22      Q.   All right, roughly what was the content of the
23  response?
24      A.   That we had a facility available in the City
25  of Adelanto, that we had a facility available in

Page 56

1   Bakersfield and that was it, yeah.  I mean those are the
2   only two facilities we have that could meet those
3   requirements.
4       Q.   What else did you tell the government about
5   that?
6       MR. DONOHUE:  Object to the form.
7       THE WITNESS:  Just the size, the location,
8   when it would be available.
9 BY MR. FREE:
10      Q.   And I believe the facilities that you would be
11  referring to are basically out of a - in the Adelanto
12  Processing Center, both of which are in existence; is
13  that right?
14      A.   That is correct.
15      Q.   Okay, so you don't have another facility in
16  Adelanto?
17      A.   No.
18      Q.   Okay.
19      A.   No.
20      Q.   All right, do you recall roughly the numbers
21  of beds that ICE is looking to fill?
22      A.   I do not.
23      Q.   Do you have any idea as to whether ICE has
24  responded to your request for information?
25      A.   They have not.

---

Page 57

1    Q.  What's the next step for ICE to take after
2    they've gotten your response?
3        A.  I would anticipate a request for proposal to
4    be issued.
5        Q.  Do you know approximately how long that takes
6    for ICE to do?
7        A.  Historically very long, so I - but I don't
8    know.
9        Q.  What's very long in this time space?  Is it
10   three months?  Is it a year?
11       A.  It could be years.
12       Q.  Okay.
13       A.  It could be years.
14       Q.  Do you have any understanding as to whether
15   the Adelanto - The City of Adelanto's notice of
16   termination was a reason stated by ICE for submitting
17   the request for information?
18       A.  No, I do not know.
19       Q.  Okay, do you know whether they're related at
20   all?
21       A.  I do not know.
22       Q.  Okay, do you know of any competitors in the
23   State of California who could meet the needs of ICE
24   potentially responsive to this request for information?
25       A.  Yes.

Page 58

1        MR. DONOHUE:  Object to the form.
2        THE WITNESS:  Yes.
3    BY MR. FREE:
4        Q.  Who?
5        A.  CoreCivic.
6        Q.  How?
7        MR. DONOHUE:  The same objection.
8        THE WITNESS:  They have a facility in
9        California City that is currently leased to the
10       State of California, but potentially they could
11       offer that to ICE.
12   BY MR. FREE:
13       Q.  Where is California City just geographically?
14   Is it in Southern California or Northern California?
15       A.  I think it's central.
16       Q.  Okay, and it's currently leased to the State?
17       A.  That's my understanding, yes.
18       Q.  Do you know how many beds?
19       A.  Over two thousand.
20       Q.  Okay, do you have any understanding as to any
21   limitations in the State of California that could affect
22   these contracts?
23       MR. DONOHUE:  Object to the form.
24       THE WITNESS:  Yeah, I'm not sure how to answer
25       that.

Page 59

1        The current contracts or future contracts?
2    BY MR. FREE:
3        Q.  Let me ask a better question.
4        A.  Okay.
5        Q.  Does the State of California impose any
6    limitations on private contracting with immigration
7    detention to your understanding?
8        A.  Between the Federal Government and a private
9    provider, not to my knowledge.
10       Q.  Okay, does the State of California impose any
11   limitations on its own state and local governments in
12   permitting sites, in other words, issuing permits to
13   sites that will serve as Federal detention, private
14   immigration detention sites --
15       MR. DONOHUE:  Objection.
16   BY MR. FREE:
17       Q.  -- as far as you understand?
18       MR. DONOHUE:  Sorry.
19       Object to the form.
20       THE WITNESS:  My understanding that there is a
21       process in place for any activity related to the
22       siting of a - a detention facility for the purposes
23       to hold immigration detainees.  I don't know if it
24       prevents them, but I know there's a process.
25   BY MR. FREE:

Page 60

1        Q.  What else do you know about that?
2        A.  I think that's probably the key component of
3    it, but --
4        Q.  Okay, can you tell me what the process is or
5    what you understand about the process?
6        A.  I think there's - there's a requirement to
7    have two public hearings within a hundred and eighty
8    days before a decision is rendered.
9        Q.  A requirement for whom?  Who has to hold the
10   hearings?
11       A.  The - the government entity.  I would assume
12   it was the Planning Commission or the -- Whoever's
13   responsible for permitting and granting those kind of
14   zoning variances, et cetera.
15       Q.  Do you know whether new contracts between
16   private immigration detention contractors and state and
17   local governments are California - in California would
18   be permissible under California law currently?
19       MR. DONOHUE:  Object to the form.
20       THE WITNESS:  Can you repeat that?
21   BY MR. FREE:
22       Q.  Let me ask a better question.
23       A.  Okay.
24       Q.  Do you know whether cities and counties could
25   respond to this request for information under current

DAVID J. VENTURELLA  Volume I
NOVOA vs THE GEO GROUP

June 13, 2019
61–64

Page 61

1  California law?
2      A.  I don't know.
3      Q.  Okay, do you have any understanding as to
4  whether California law permits to your knowledge and
5  understanding a city or a county or a jail to enter into
6  a new detention contract for ICE detention?
7          MR. DONOHUE:  Object to the form.
8          THE WITNESS:  Enter into a new contract with
9      whom?
10  BY MR. FREE:
11      Q.  With you.  With GEO.
12      A.  I don't know.
13      Q.  Okay, are you aware of anybody else who
14  submitted a request for information response?
15      A.  I -- No, I'm not.
16      Q.  Okay, are you aware of any other competitor
17  who could meet the needs laid out in the request for
18  information by ICE apart from CoreCivic?
19      A.  I do not.
20      Q.  Okay, have you or anybody who works for you as
21  far as you know had any direct conversations with ICE
22  about the request for information?
23      A.  No.
24          MR. DONOHUE:  Okay, can we take a break?
25          MR. FREE:  What time is it?

Page 62

1          Yeah.  Sure.
2          9:52.
3          THE VIDEOGRAPHER:  We are going off the video
4      record 9:52 a.m.
5          (Whereupon, there was a brief recess observed)
6          THE VIDEOGRAPHER:  We are back on the record
7      10:08 a.m.
8  BY MR. FREE:
9      Q.  Mr. Venturella, before our break we were
10  talking about this request for information from ICE for
11  immigration detention beds in California that GEO
12  responded to in May.  I want to pick up with that
13  discussion if I can, okay?
14          Was that for adult immigration detention?
15      A.  Yes.
16      Q.  Okay, it does not include any family detention
17  centers to your knowledge?
18      A.  It does not.
19      Q.  Okay, is - as you sit here today do you recall
20  approximately the number of beds ICE is looking to fill
21  with this contract?
22      A.  I do not.
23      Q.  Do you know whether this request for
24  information represents an increase in the total capacity
25  that ICE would have to detain people in California or

Page 63

1  whether it could essentially if you - if GEO does not
2  get the contract whether ICE could fill its current
3  capacity by using this request for information?
4          Do you understand my question?
5          MR. DONOHUE:  Well, I don't, so I --
6          MR. FREE:  Okay, let me --
7          MR. DONOHUE:  -- object to the form.
8  BY MR. FREE:
9      Q.  Let's try it again.
10          So you don't know how many beds the RFI has,
11  right?
12      A.  I don't recall the specific number.
13      Q.  Do you know if it's a hundred or a thousand?
14  Any sort of order of magnitude?
15      A.  I think it's over a couple thousand.
16      Q.  Okay, how many beds are at Adelanto right now?
17      A.  The capacity is one thousand nine hundred and
18  forty.
19      Q.  Okay, do you know as you sit here today
20  whether the RFI asks for more or less than
21  nineteen-forty?
22      A.  It would be more than nineteen-forty.
23      Q.  Okay, do you know how much more?
24      A.  I do not.
25      Q.  Okay, so help me understand.  You've submitted

Page 64

1  a response to this request for information and you've
2  said we have two facilities, we have Mesa Verde and we
3  have Adelanto, right?
4      A.  Correct.
5      Q.  Okay, and those are the two facilities that we
6  propose to use to meet the Agency's needs?
7          MR. DONOHUE:  Object to the form.
8          THE WITNESS:  GEO proposed those two
9      facilities.
10  BY MR. FREE:
11      Q.  In response to the RFI?
12      A.  In response to the RFI.
13      Q.  Okay, so approximately three hundred beds at
14  Mesa Verde?  Do you know?
15      A.  Four.
16      Q.  Four hundred.
17          Okay, so you're talking a total of
18  twenty-three hundred and forty beds, right?
19      A.  Correct.
20      Q.  In two different places?
21      A.  Correct.
22      Q.  Okay, do you know whether ICE asked for more
23  than twenty-three forty in its RFI?
24      A.  I don't recall the exact number.
25      Q.  Okay, as part of your preparation of the

Page 65

1 response to the RFI did you conduct a business analysis
2 of how you would pay for the services that you're
3 offering to the government?
4     MR. DONOHUE: Object to the form.
5     THE WITNESS: I don't understand the question.
6 BY MR. FREE:
7     Q. Do you know approximately -- Let me ask it a
8 different way.
9         Do you think it would increase or decrease
10 GEO's revenues to get awarded whatever contract comes at
11 the end of this RFI, RFP process?
12     MR. DONOHUE: Object to the form.
13     THE WITNESS: That would be hard to determine
14     or to answer without knowing what the requirements
15     would be of the - of the final RFP.
16 BY MR. FREE:
17     Q. Okay, I'm not fully versed in all of your
18 operations and so just help me understand, okay?
19 Because this is not a gotcha or a trick. None of these
20 are. I'm just trying to understand.
21         I don't understand why a company would bid for
22 a contract if they were going to make less on that
23 contract than what they're making now. In other words,
24 if my revenues as a company were going to go down by
25 entering into this new agreement unless I was going to

Page 66

1 eliminate the existing revenue altogether I probably
2 wouldn't bid that agreement. Do you see what I'm
3 saying? So my assumption would be that if GEO submitted
4 a response to the RFI, it thought it - it probably
5 thinks it's going to make more money if it gets the
6 contract?
7     MR. DONOHUE: Object to the form.
8     THE WITNESS: I think that's an incorrect
9     assumption.
10 BY MR. FREE:
11     Q. Okay.
12     A. In a competitive procurement to be competitive
13 you might have to lower your per diem and therefore
14 lower your revenues and profit to win.
15     Q. Okay, any other reasons that assumption would
16 be incorrect?
17     A. No.
18     MR. DONOHUE: Object to the form.
19     Sorry.
20 BY MR. FREE:
21     Q. So you say in a competitive -- Would you call
22 this a bid structure at this point? Would you call this
23 like you and CoreCivic, GEO and CoreCivic bidding for
24 this contract at this point or are we not there yet?
25     A. We are not there yet.

Page 67

1     Q. Okay, do you have any idea what the - whether
2 GEO has already thought through what the per diem would
3 look like?
4     A. We have not.
5     Q. Okay, and so I guess what I hear you saying,
6 and I really appreciate this answer is, you may have to
7 take a lower per diem in order to get the contract --
8     MR. DONOHUE: Object.
9 BY MR. FREE:
10     Q. -- in order to be competitive? Is that what
11 you're implying here?
12     MR. DONOHUE: Object to the form.
13     THE WITNESS: We would have to do an analysis
14     and understand what the competition, the
15     competitive landscape and make a determination
16     at some point what the per diem should be.
17 BY MR. FREE:
18     Q. At this point I think the only competitor that
19 you've told me about is CoreCivic. Are there any
20 others?
21     A. That's the only one I'm aware of at this
22 point.
23     Q. Okay, how would you go about doing that
24 analysis of the competitive landscape to determine what
25 per diem you would propose to the Federal Government?

Page 68

1     MR. DONOHUE: Object to the form.
2     THE WITNESS: Again we would determine the
3     potential number of competitors, the locations
4     where their facilities are, the labor rates, the
5     utility rates, the tax rates, all of that kind of
6     information that is - that would be necessary in
7     understanding how much it potentially would cost to
8     operate a facility in those locations, so we would
9     gather that information and crunch it into a model
10     and then - and then figure out where we needed to
11     be to be competitive.
12 BY MR. FREE:
13     Q. So there's one competitor, if I understand
14 your testimony, and that's CoreCivic; is that right?
15     MR. DONOHUE: Object to the form.
16     THE WITNESS: I only know of one competitor.
17     There could be more.
18 BY MR. FREE:
19     Q. Who else could that be?
20     MR. DONOHUE: Object to the form.
21     THE WITNESS: It could be Management and
22     Training Corporation, it could be LaSalle
23     Corrections, and again I don't know if counties or
24     other law enforcement, local law enforcement or
25     state - law enforcement could participate in - in

DAVID J. VENTURELLA  Volume I                          June 13, 2019
NOVOA vs THE GEO GROUP                                      69–72

Page 69

1     that procurement.  I just don't know.
2  BY MR. FREE:
3     Q.  You don't know whether California or some
4  local governments could participate in its procurement?
5     A.  I don't.
6     Q.  Okay, so that's the competitor.
7         The location I think you told me was
8  California City?  That's the one that you know about,
9  this two thousand bed facility that's currently leased
10 to the State of California?
11    A.  Correct.
12    Q.  The utility rates would be I think the same
13 for both companies.  Is there any reason that they
14 wouldn't?
15        MR. DONOHUE:  Object to the form.
16        THE WITNESS:  I don't know what the utility
17    rates would be in California City, so I - I don't
18    know.
19 BY MR. FREE:
20    Q.  Oh, okay.  So you're saying the utility rates
21 could be lower there than in Adelanto?
22    A.  Yes.
23    Q.  But those - both of those things would be
24 knowable to each company, right?
25    A.  Yes.

Page 70

1         MR. DONOHUE:  Object to the form.
2  BY MR. FREE:
3     Q.  You can't do like a private PG&E contract for
4  your power bill, or do you know?  I don't know.
5     A.  Not that I'm aware of.
6     Q.  Okay, and the utilities, they're the rate,
7  right?
8     A.  Right.
9     Q.  Okay, the same thing with taxes; is that
10 right?
11        MR. DONOHUE:  Object to the form.
12 BY MR. FREE:
13    Q.  These things are known and knowable and
14 they're equal to both competitors?
15    A.  Correct.
16    Q.  California's not going to give you a better,
17 you know, land - land tax rate?
18        You know what?  Forget it.
19        Did you say labor costs already?
20    A.  I did.
21    Q.  Okay, so what would you think about when
22 you're talking about labor costs?
23    A.  What the hourly rate would be with the - for
24 the various positions to support a detention facility.
25    Q.  How would you go about determining the hourly

Page 71

1  rate?
2     A.  We would start off looking at the Federal -
3  the Department of Labor wage determination for those
4  positions, we would see if there's an equivalent state
5  labor assessment and then go as far down as a local
6  assessment to see what - what those rates of pay would
7  be.  We would want to know if there was a collective
8  bargaining agreement in place if it would carry over, et
9  cetera.  That would be difficult to find out the terms
10 and conditions, but understanding if one was in place it
11 would be certainly helpful.
12    Q.  What else?
13    A.  About?
14    Q.  Labor costs.
15    A.  I think that's - I think that's it.
16    Q.  The prevailing wage rates that the Federal
17 Government sets shouldn't change based on the
18 contractor, should they?
19    A.  They change based on location.
20    Q.  Right.  Okay, but the company -- All things
21 being equal, if they're doing the same task like the
22 same labor like job determination, let's call it a cook,
23 you know, one, so you're saying -- Let me back up.
24        You're saying they could be different?  The
25 Federal Government's prevailing wage rate could be

Page 72

1  different in California City than Adelanto?
2     A.  Correct.
3     Q.  Okay, do you know whether they are?
4     A.  I do not.
5     Q.  All right, and is the same true about the
6  State's determinations if any have been made?
7         MR. DONOHUE:  Object to the form.
8  BY MR. FREE:
9     Q.  That they could be different from --
10 California could have a different prevailing rate in
11 Adelanto than it does in --
12    A.  I haven't done the analysis, so I don't know.
13    Q.  Okay, what else would you plug into your
14 model?  What other factors in coming to understand how
15 to bid this contract to be competitive?
16        MR. DONOHUE:  Object to the form.
17        THE WITNESS:  We would try to figure out the
18    age of the structure, the value of the structure,
19    whether or not there was any outstanding debt or
20    bond on the structure because that would be a
21    factor into determining what's included potentially
22    in a competitor's per diem, whether they own the
23    facility or lease the facility.  Again it's a
24    myriad of factors, but you just want to know what -
25    what their costs would be.

DAVID J. VENTURELLA  Volume I
NOVOA vs THE GEO GROUP

June 13, 2019
73–76

Page 73

1   BY MR. FREE:
2       Q.   I presume you know your costs at Adelanto,
3   right?
4           MR. DONOHUE:  Object to the form.
5           THE WITNESS:  I don't know all of the costs at
6       Adelanto, but somebody in the company does.
7   BY MR. FREE:
8       Q.   GEO - GEO knows what the - the facility
9   structure is, what the bond allegations are?  GEO has
10  that information at its disposable, right?  At its
11  disposal, right?
12      A.   Correct.
13      Q.   Okay, and so the thing that you're trying to
14  figure out if you're competing in this contract is what
15  are those factors that you described for California City
16  in that facility, right?
17          MR. DONOHUE:  Object to the form.
18          THE WITNESS:  California City or any --
19  BY MR. FREE:
20      Q.   Or any other competitor.
21      A.   Yes.
22      Q.   Okay, but we've only identified one, right?
23          MR. DONOHUE:  Object to the form,
24      mischaracterizes --
25          THE WITNESS:  As of --

Page 74

1           MR. DONOHUE:  -- asked and answered.
2           THE WITNESS:  As of now that's the only one I
3       know, but we haven't initiated our analysis yet.
4   BY MR. FREE:
5       Q.   Okay, when would you do that typically?  When
6   would you initiate the analysis?  Would it be once the
7   RFP goes out?
8       A.   When the RFP goes out.
9       Q.   Okay.  All right, anything else that you would
10  take into consideration when you're thinking about how
11  to submit to the Federal Government the most competitive
12  bid if this RFI eventually gets to an RFP and you're
13  trying to get the contract?  What else would you take
14  into consideration?
15          MR. DONOHUE:  Object to the form.
16          THE WITNESS:  Can you repeat that?
17  BY MR. FREE:
18      Q.   Sure.
19          So GEO's going to submit something to the
20  Federal Government to try and get this contract is my
21  understanding of what's going to happen; is that right?
22      A.   Correct.
23      Q.   Okay, and you've just described to me a number
24  of factors that GEO will consider and plug into a model
25  before it makes that submission to the Federal

Page 75

1   Government?  Did I understand that testimony correctly?
2       A.   Correct.
3       Q.   Okay, and I understand those not exhaustively,
4   but I - you've talked about labor, right?
5       A.   Yes.
6       Q.   Okay, you talked about I'm going to call it
7   facility overhead.  I know that that's probably not what
8   you would use.  If there's another term that you would
9   use let me know, but when I'm talking about facility
10  overhead I'm talking like the debt obligations of owning
11  it or having a bond on it.  That's what I understand
12  you're talking about when you're saying --
13      A.   Yes.
14      Q.   Yeah.
15          Okay, and then we've got taxes and we've got
16  like property taxes; is that right?
17      A.   Correct.  Yeah.
18      Q.   And utilities?
19      A.   Correct.  Right.
20      Q.   What else do you take into consideration when
21  you're building your model to make the most competitive
22  bid to the Federal Government on behalf of your
23  shareholders?
24          MR. DONOHUE:  Object to the form.
25          THE WITNESS:  Again it's not my area of

Page 76

1       expertise on what all of the categories are, but I
2       can say a lot of it is also going to be driven by
3       the requirements of the RFP and right now those
4       aren't known to us, so it's hard to speculate what
5       else would we have to consider in - in building up
6       our - our costs, but again I'm just not the expert
7       on it.  This is not what I do at the company.
8   BY MR. FREE:
9       Q.   Is that Miss Martin that you talked about
10  earlier who would be primarily responsible for that or
11  is it somebody else?
12      A.   All pricing determinations would come out of
13  our CFO's office.
14      Q.   Who's that?
15      A.   Who's our CFO?
16      Q.   Uh-huh.
17      A.   Brian Evans.
18      Q.   And so when you say I'm not the expert on
19  that, it's somebody else, it's Mr. Evans?
20      A.   All of -- So he is responsible for that.
21  Obviously he has -- I shouldn't say obviously.  He has
22  staff that have the appropriate backgrounds to help
23  determine the pricing and the cost, et cetera.
24      Q.   Okay, have you personally seen GEO's model
25  that you would -- I think you said model earlier, right?

DAVID J. VENTURELLA  Volume I                                    June 13, 2019
NOVOA vs THE GEO GROUP                                           77—80

Page 77

1    A.  I -- No, I have not personally seen the model.
2         You know, I think model is kind of used
3    loosely.  I don't know what - all the algorithms and
4    formulas that go into that so, no, I haven't seen --
5    Q.  Okay.
6    A.  -- that.  I've seen a screen shot of the
7    categories or a printout of the categories, but I don't
8    know all the math that goes behind it.
9    Q.  When you say the categories, are you talking
10   about the inputs that we've discussed so far or
11   something else?
12   A.  It would be those - those inputs.
13   Q.  Okay, and can you think of any other inputs
14   that would go into the - the model, for lack of a better
15   word, that you've seen the screen shot of?
16        MR. DONOHUE:  Object to the form.
17        THE WITNESS:  Again I just can't recall all of
18   the categories.
19   BY MR. FREE:
20   Q.  Okay, in addition to the prevailing wage
21   determinations and collective bargaining agreements do
22   you include as a labor cost nonexempt executive
23   compensation or administrators who might not have their
24   salary or their wage determined by the Federal
25   Government or the State Government?

Page 78

1         MR. DONOHUE:  Object to the form.
2         THE WITNESS:  Can you be a little more
3    specific?
4    BY MR. FREE:
5    Q.  Yeah.  Sure.
6         So the Federal Government and the prevailing
7    wage sets, you know, wages for like various positions,
8    right?
9    A.  Correct.
10   Q.  All right, warden, an assistant warden are not
11   within those wage rates, right?  GEO gets to figure out
12   what it's going to pay those people?
13   A.  I don't know if they are or aren't in those --
14   Q.  Oh, okay.
15   A.  -- DOL.
16   Q.  Do you know the difference between exempt and
17   nonexempt labor?
18   A.  I don't.  I'm not a labor expert.
19   Q.  Fair enough.
20        I'm going to put the turtle on the table.
21        MR. DONOHUE:  Oh, please don't.
22   BY MR. FREE:
23   Q.  Is profit one of the considerations that you
24   put into the model when you're figuring out what - that
25   bed rate you're going to propose to the government?

Page 79

1         MR. DONOHUE:  Object to the form.
2         THE WITNESS:  Profit is a category.
3    BY MR. FREE:
4    Q.  That's a factor in your model, right?
5    A.  Correct.
6    Q.  Okay, as it should be, right?  You're a
7    publicly traded company?
8         MR. DONOHUE:  Object to the form.
9         THE WITNESS:  It's a consideration.
10   BY MR. FREE:
11   Q.  Okay, do you have any understanding right now
12   whether -- I'm going to -- These next set of questions
13   are going to be about Adelanto, okay, and I know that
14   you're not an expert on that and you haven't reviewed
15   more than a couple pages of the agreement, so if you
16   don't know, you just tell me you don't know, okay?
17   A.  Okay.
18   Q.  All right, do you have any understanding of
19   whether or not Adelanto if your assumptions about what
20   it's going to cost you, GEO, to provide the services to
21   the Federal Government are wrong, right, so, you know,
22   you've --
23   A.  I'm sorry.  I didn't hear.
24   Q.  Sure.  Okay, so I understand that you have a
25   bed-day rate that you're paid by the Federal Government

Page 80

1    as part of your contract?
2    A.  Uh-huh.  (Affirmative response)?
3    Q.  Yeah?
4         And I understand it's a fixed price agreement?
5    A.  Yes.
6    Q.  Not a cost plus agreement, not any other type
7    of agreements, a fixed price agreement, right?
8    A.  Correct.
9    Q.  Okay, and I understand that to mean that you
10   have calculated - GEO has calculated all of the costs
11   that it's going to incur in order to meet the
12   requirements that the Federal Government has set forth,
13   you figure that out and you've built it into your per -
14   your bed-day rate, right, and if your costs are more you
15   don't get to just as a matter of course pass those
16   increased costs on to the Federal Government; is that
17   right?
18        MR. DONOHUE:  Object to the form.
19        THE WITNESS:  That is correct.  If our model
20        was wrong we eat those costs.
21   BY MR. FREE:
22   Q.  Okay, so under a fixed price agreement if
23   your - if you can find ways to say save like a dollar on
24   the - maybe like the clothing that you would procure for
25   the people who are there under what you thought then you

DAVID J. VENTURELLA  Volume I
NOVOA vs THE GEO GROUP

June 13, 2019
81–84

Page 81

1  can really get more out of the per diem than what the
2  expectation was, right?
3      MR. DONOHUE:  Object to the form.
4      THE WITNESS:  Again if our cost estimates were
5  high or low, yes, it would have an impact.
6  BY MR. FREE:
7      Q.  So if they're higher you eat the costs,
8  conversely if they're lower you keep what the Federal
9  Government's giving you, right, under a fixed price
10  agreement?
11      MR. DONOHUE:  Object to the form.
12      THE WITNESS:  Yes.
13  BY MR. FREE:
14      Q.  Okay, so GEO will do everything it can I would
15  think in this round of procurement to make sure that
16  you're able to ascertain as much as you can what
17  everything that you're going to give the government is
18  going to cost GEO?
19      MR. DONOHUE:  Object to the form.
20      THE WITNESS:  We're certainly going to
21  validate the - the model to make sure that the cost
22  is correct.
23  BY MR. FREE:
24      Q.  Okay, how would you validate the model?
25      A.  I don't know how they would validate the

Page 82

1  model.  Again it's just not my area of expertise, so --
2      Q.  All right, as a dumb guy when I think validate
3  the model I would think you figured out what it's going
4  to cost you to buy soap.  GEO doesn't make soap, right,
5  so you're going to have to buy it from someone.  You
6  figured out what it's going to cost you to buy soap and
7  you want to make sure that that cost is correct and
8  validating the model would be just confirming that that
9  is the actual price that it's going to cost us for soap,
10  you know, as an input into this model.  Is that kind of
11  what you're talking about?
12      MR. DONOHUE:  Object to the form.
13      THE WITNESS:  I wouldn't - I wouldn't argue
14  with that.  I mean it's I'm sure one way of
15  validating.  I just don't know who does the
16  validation, how they do it, what they compare
17  against.
18  BY MR. FREE:
19      Q.  Okay, but someone at GEO does that?
20      A.  I'm sure there are many people that do that.
21      Q.  Okay, does the Federal Government as part of
22  any of GEO's contracts set a ceiling on the profit
23  margin the company can take?
24      A.  Yes.
25      Q.  Which contracts?

Page 83

1      A.  All of the contracts.
2      Q.  Are they in the text of the contract, these
3  ceilings?
4      A.  No.
5      Q.  How does the Federal Government set that
6  ceiling?
7      A.  Through the -- Well, how do they set it?  I
8  think it's set in the Federal Acquisition Regulations
9  certain types of contracts that are permissible profit
10  or profit margins, I don't know how that's defined
11  there, and through the negotiation process through the
12  review of our proposal, cost proposal in particular they
13  will determine whether or not that profit is reasonable
14  within the FAR.
15      Q.  Do you as you sit here today know what the
16  ceiling, if any, is at Adelanto on the acceptable level
17  of profit that the Federal Government has set?
18      A.  I don't know what the FAR ranges are.
19      Q.  Okay, so I think I understand your testimony
20  to be that if I wanted to know what the Federal
21  Government's using in setting that limit I could look at
22  the Federal Acquisition Regulations; is that right?
23      MR. DONOHUE:  Object to the form.
24      THE WITNESS:  That's where I would go.
25  BY MR. FREE:

Page 84

1      Q.  Okay.
2      A.  Yes.
3      Q.  All right, do you know any facilities as you
4  sit here today where a profit ceiling is included in the
5  contract between GEO and ICE?
6      MR. DONOHUE:  Object to the form.
7      THE WITNESS:  I'm not aware.
8  BY MR. FREE:
9      Q.  Okay.
10      Do you know whether GEO is still serving any
11  debt obligations on its purchase of the Adelanto
12  Detention Facility?
13      A.  I do not know.
14      Q.  If GEO ends up having to spend more than it
15  thought it was going to spend on any particular item,
16  let's say the collective bargaining agreement, for
17  example, I believe you said they can seek an equitable
18  adjustment?  Are you -- Not about this specific
19  question, but there's an equitable adjustment process
20  where you go back to the Federal Government and say it's
21  going to cost us more, can we have more money?  Is that
22  basically the way it works?
23      MR. DONOHUE:  Object to the form.
24      THE WITNESS:  There is a process to request a
25  rate adjustment.  I don't know all the

Page 85

1  circumstances that would trigger that, but there is
2  a process.
3  BY MR. FREE:
4      Q.  Okay, but unless the government agrees to pay
5  GEO more, GEO is going to receive the per diem rate that
6  was proposed and agreed upon regardless of what GEO
7  actually ends up having to pay to deliver the service?
8      MR. DONOHUE:  Object to the form.
9      THE WITNESS:  Right.  The per diem rate is
10     what we would be paid.
11  BY MR. FREE:
12     Q.  Okay, so if costs go up or down to GEO again
13  you eat the up and you keep -- GEO eats the, you know,
14  the increased costs and it keeps the benefit of the
15  lower costs generally; is that right?
16     MR. DONOHUE:  Object to the form, asked and
17     answered.
18     THE WITNESS:  Correct.
19  BY MR. FREE:
20     Q.  Okay, cool.
21         What is a blended per diem rate?
22     A.  A blended per diem rate is - it's the - the
23  guaranteed rate plus the incremental per diem, so if the
24  government decides to use the extra capacity the -
25  there's a different per diem rate for that and I believe

Page 86

1  you add the two, divide it and come up with a blended
2  per diem rate.
3      Q.  How does GEO determine the difference between
4  what it's going to offer as the per diem, like the
5  guaranteed capacity and then the per diem for whatever
6  in addition that the government decides to use?
7      MR. DONOHUE:  Object to the form.
8      THE WITNESS:  That's all determined by the
9      costs required to support the - the minimum
10     guaranteed and all the services that we propose and
11     in the same for the incremental, so whatever costs
12     are required to provide those services are factored
13     in.
14  BY MR. FREE:
15     Q.  Okay, do you happen to know the blended per
16  diem at Adelanto?
17     A.  I do not.
18     Q.  Do you know what the minimum bed guaranteed
19  cost is?
20     A.  The cost?
21     Q.  The per diem, the minimum bed guaranteed per
22  diem rate.
23     A.  I do not.
24     Q.  Okay, if you would please flip to page 480 on
25  the document in Exhibit One that's in front of you.

Page 87

1  It's at the bottom here.  It's 480.
2      A.  Oh.
3      Q.  Okay, and I'm looking at the table at the top
4  and I think this is what you've just kind of talked
5  about.  There's a seventy-five percent minimum
6  guaranteed in the first row of this table in this
7  contract.  Do you see that?
8      A.  Yes.
9      Q.  And in May when this contract was entered into
10  that was ninety-nine dollars per detainee; is that
11  correct?
12     A.  Based on this, yes.
13     Q.  And that is per bed, right?
14         So basically it's for each of the six hundred
15  and fifty people in this seventy-five percent, right, so
16  it's ninety-nine bucks for them that the Federal
17  Government will pay GEO --
18     MR. DONOHUE:  Object to the form.
19  BY MR. FREE:
20     Q.  -- per day?
21     A.  Correct.
22     Q.  Okay, and then you get this third and fourth
23  row that's set a rate of fifty-nine --
24     THE VIDEOGRAPHER:  Microphone.
25  BY MR. FREE:

Page 88

1      Q.  You get this third and fourth row that's at a
2  rate of fifty-nine dollars and thirty-seven cents per
3  detainee per day for the incremental increase; is that
4  right?
5      A.  Correct.
6      Q.  Okay, and a blended bed-day rate would be, I
7  think you explained you put these together, you divide
8  them and that's the blended bed-day rate; is that right?
9      A.  Correct.
10     Q.  Okay, do these bed-day rates change over the
11  life of the contract in your experience?
12     A.  They do.
13     Q.  Okay, so would you expect that ninety-nine
14  dollars per detainee per day that's in this contract as
15  of 2011 would have increased as we sit here in 2019?
16     A.  Yes.
17     Q.  Okay, what factors drive those increases, if
18  you know?
19     A.  There could be again depending on what the
20  terms and conditions of the contract are they could
21  allow for a CPI, increase of consumer price index,
22  increase based on inflation, if any terms or conditions
23  change that required GEO to re-submit a proposal to ICE
24  for their approval that could be factored in and any
25  expansion or changes to the physical plant that were

Page 89

1  required by ICE could drive the change in the per diem.
2      Q.  Anything else?
3      A.  Staffing, additional staffing increases if
4  they were to approve any requests for equitable
5  adjustment that could change the per diem.
6      Q.  Is it fair to say that either ICE or GEO could
7  initiate that change in per diem or try to initiate it
8  if you're going to try and agree, so GEO could ask to
9  increase the per diem or ICE could ask to reduce the per
10  diem?  Is that fair?
11      MR. DONOHUE:  Object to the form.
12      THE WITNESS:  I don't think that the premise
13      is correct.  I mean there certainly is a process
14      that allows for GEO or a provider to initiate a
15      request for an equitable adjustment and I would
16      assume there's the same for the government to again
17      initiate GEO to submit a proposal for additional
18      services or they could reduce services which could
19      impact the per diem as well.
20  BY MR. FREE:
21      Q.  So what part of the premise did you think was
22  incorrect in my question?
23      A.  Well, I guess I just didn't completely
24  understand where you're going with it, but there are
25  prescribed processes in the FAR that allow either party

Page 90

1  to initiate.  For us it's a request I think on GEO.  On
2  the Feds it would be not a request but you shall, but
3  I - again I know there is a process.
4      Q.  Yeah?
5      A.  Yeah.
6      Q.  Just as a layperson it would seem to me that
7  the only other option that GEO would have if the
8  government says we're going to reduce your rate is,
9  well, we don't want to do the contract anymore, right?
10      MR. DONOHUE:  Object to the form.
11  BY MR. FREE:
12      Q.  You're saying for the government it's not
13  really a request?
14      MR. DONOHUE:  Object to the form.
15      THE WITNESS:  If the government determines
16      that they don't no longer need specific services
17      then we would have to adjust.
18  BY MR. FREE:
19      Q.  Okay, I'm going to hand you what we are
20  marking as Exhibit Ten.
21      (Whereupon, Exhibit 10 was marked)
22  BY MR. FREE:
23      Q.  So Exhibit Ten is what I think you were
24  talking about earlier or an example of what I think you
25  were talking about earlier when there's a different

Page 91

1  collective bargaining agreement between GEO and the
2  people who work there that might increase GEO's costs
3  that is then going to need to be reflected in the - the
4  costs to GEO and therefore the bed-day rate.  Is that a
5  fair summarization of what's happening in this document?
6      MR. DONOHUE:  Object to the form.
7      THE WITNESS:  Your question again?
8  BY MR. FREE:
9      Q.  Do you recognize this document?
10      A.  I don't.  It's the first time I've seen it.
11      Q.  Okay, do you know generally what this
12  government form, Standard Form 30 is?
13      A.  By the title it's an amendment of the
14  solicitation or modification of a contract.
15      Q.  Who are the parties?
16      A.  ICE and the City of Adelanto.
17      Q.  When you see in box two it says amendment
18  modification number P19, do you see that?
19      A.  Excuse me.  Yes.
20      Q.  To me that means there's probably eighteen
21  modifications before that happens.  Is that what that
22  means to you?
23      MR. DONOHUE:  Object to the form.
24      THE WITNESS:  I do not know.
25  BY MR. FREE:

Page 92

1      Q.  Okay, it's signed by the mayor on
2  October 28th, 2015.  That's box 15C.  Do you see that?
3      A.  I do.
4      Q.  So I understand this to mean that that's -
5  that's when this modification at least was signed by the
6  City of Adelanto?  Is that your understanding of it as
7  well?
8      A.  That's what it appears to be.
9      Q.  Okay, and in box E14 - or excuse me - 14,
10  description of amendment modification, do you see that?
11      A.  Yes.
12      Q.  The, I guess, third line of text says, "The
13  purpose of this modification is to incorporate the
14  following:"  Have I read that right?
15      A.  Yes.
16      Q.  Okay, and then there's numeral one, "Change
17  (CLIN) CLIN 0001B bed-day rate at seventy-five percent
18  minimum guaranteed (975) beds.  Bed-day rate from a
19  hundred and fourteen dollars and four cents to" --
20  Excuse me.  "A hundred and eleven dollars and four cents
21  to a hundred and twelve dollars and twenty-six cents due
22  to health and welfare and CBA detention officer hourly
23  rate increase."  Have I read that correctly?
24      A.  Yes.
25      Q.  And the effective date looks like 9/1/2014.

Page 93

1  Do you see that?

2      A.  Yes.

3      Q.  It looks like it was signed on October 28th,

4  2015.  When does the Federal fiscal year start?  What

5  date?

6      A.  October 1st.

7      Q.  Okay.  All right, so you talked earlier about

8  you remembered there having been a modification based on

9  a collective bargaining agreement change.  I'm not

10  representing to you that that is that modification, but

11  is this what you're talking about --

12      MR. DONOHUE:  Object to the form.

13  BY MR. FREE:

14      Q.  -- when you were thinking about changing the

15  bed-day rate based on this additional cost?

16      A.  I mean this is the - the type of activity that

17  would change it.

18      Q.  Okay.  All right, and so this is GEO because

19  of the collective bargaining agreement and its

20  obligations under that agreement is going to increase

21  the detention - the pay of people in the CBA, right?

22      MR. DONOHUE:  Object to the form.

23      THE WITNESS:  Correct.

24  BY MR. FREE:

25      Q.  Okay, and then the bed-day rate is ICE and GEO

Page 94

1  are agreeing, or ICE and the City of Adelanto, which

2  then GEO has assumed its obligations, are agreeing the

3  bed-day rate is going to increase; is that right?

4      MR. DONOHUE:  Object to the form.

5      THE WITNESS:  Correct.

6  BY MR. FREE:

7      Q.  Okay, so I'm going to hand you what we'll mark

8  as Exhibit Eleven.

9      (Whereupon, Exhibit 11 was marked.)

10      THE WITNESS:  Thank you.

11  BY MR. FREE:

12      Q.  This is another Standard Form 30 between it

13  looks like Immigration and Customs Enforcement in the

14  City of Adelanto under the GEO contract, right?

15      MR. DONOHUE:  Object to the form.

16      THE WITNESS:  Yes.

17  BY MR. FREE:

18      Q.  Okay, this - in box number two it says

19  amendment modification number and it says P00003.  Do

20  you see that?

21      A.  Yes.

22      Q.  All right, it looks like it was signed box 16,

23  see all the way on the bottom right on December 12th,

24  2012?  Do you see that?

25      A.  December 5th?

Page 95

1      Q.  Excuse me.  December 5th, 2012.

2      Thank you.

3      It looks like in box 12 the net increase of

4  the contract is two million one hundred eighty-nine

5  thousand seven hundred seven dollars and forty-eight

6  cents.  Do you see that?

7      A.  Yes.

8      Q.  Have I read that correctly?

9      A.  Yes.

10      Q.  Thanks.

11      And then back in the description of

12  modification - of amendment modification in box 14 it

13  says, "The purpose of this modification is to

14  incorporate the following:"  Do you see that?

15      A.  Yes.

16      Q.  All right, the third line it says - the second

17  and third line of that paragraph below it says, "To

18  increase bed-day rate from ninety-nine dollars to a

19  hundred eleven dollars and four cents due to the

20  increase in medical staffing."  Did I read that

21  correctly?

22      A.  Yes.

23      Q.  Okay, is this another example of a situation

24  in which additional costs that GEO is going to have to

25  pay are resulting in an increase in the per diem rate so

Page 96

1  you -- Do you understand my question?

2      MR. DONOHUE:  Object to the form.

3      THE WITNESS:  I don't know who initiated the

4      request, but there was an agreement that the number

5      of medical staff would increase therefore impacting

6      the per diem rate.

7  BY MR. FREE:

8      Q.  Okay, so the more medical providers you have

9  on site the more you're going to have to pay --

10      MR. DONOHUE:  Object to --

11  BY MR. FREE:

12      Q.  -- generally, right?

13      MR. DONOHUE:  Object to the form.

14      THE WITNESS:  Correct.

15  BY MR. FREE:

16      Q.  Okay, and so GEO - GEO and ICE through the

17  City of Adelanto have agreed to basically a twelve

18  dollar increase in the per diem under this modification?

19  Is that your understanding of this document?

20      MR. DONOHUE:  Object to the form.

21      THE WITNESS:  Yes.

22  BY MR. FREE:

23      Q.  Okay, and the basis for that twelve dollar

24  increase is the increased medical staffing at the

25  facility according to that box 14?  Is that your

Page 97

1   understanding?

2       A.  Yes.

3       Q.  Okay.

4           MR. FREE:  This is going to be marked Twelve,

5   Exhibit Twelve.

6           (Whereupon, Exhibit 12 was marked)

7   BY MR. FREE:

8       Q.  I don't know why they did this, but in Exhibit

9   Eleven it references P00004 in box 14 and I think that

10  that's this.  I think that's this document, okay?

11      A.  I'm sorry.  Which?

12      Q.  Yeah, let me show you.

13          So if you look back at Exhibit Eleven, the one

14  we looked at just a second ago --

15      A.  Okay.

16      Q.  -- and you look at paragraph -- Box 14.  Do

17  you see in accordance with IGSA modification P00004?

18      A.  Yes.

19      Q.  Okay, this is P0004 I'm going to represent to

20  you that you're sitting and that you're looking at, and

21  so we're going to look at Exhibit Twelve now.

22          Do you see in box - box 12 on the first page

23  it says, "This supplemental agreement is entered

24  pursuant to the authority of" and it just has a check

25  box and it says "Mutual agreement."  Do you see that?

Page 98

1       A.  Yes.

2       Q.  All right, I understand this to mean that the

3   parties to the contract have all agreed to this

4   modification.  Do you have the same understanding?

5           MR. DONOHUE:  Object to the form.

6           THE WITNESS:  Yes.

7   BY MR. FREE:

8       Q.  Okay, and it appears to me in box 14 that

9   there's several modifications that are being included,

10  and I'll tell you why that is what I'm seeing.  I'm

11  seeing to change the bed-day rate, this is a quote, so

12  to change the bed -- Do you see where I'm reading?

13  Where it starts A to change the bed-day rate.

14      A.  Yes.

15      Q.  Comma, "CLIN 0001, CLIN 0002, CLIN 0003 and

16  CLIN 0004 due to the increase in medical staffing by

17  22.70 full-time employees, FTEs as outlined in

18  attachment one."  Do you see that?

19      A.  Yes.

20      Q.  Have I read that correctly?

21      A.  Yes.

22      Q.  Okay, and if you turn to page 1744 at the

23  bottom here it says Appendix A, statement of work.  At

24  the very top it says - below the header it says

25  statement of work, medical staffing.  Do you see where

Page 99

1   I'm reading?

2       A.  Yes.

3       Q.  And beneath that it says, "The service

4   provider currently provides a staffing model of 35.80

5   personnel in support of the Adelanto Detention Center

6   staff as outlined below."  Do you see that?

7       A.  What page are you on?

8       Q.  I'm looking at this page.

9       A.  Oh.  I'm sorry.

10      Q.  I'm looking at page 1744.

11      A.  I was looking at the --

12      Q.  That's okay.

13      A.  -- other one.

14      Q.  So I think -- Do you see where I am now?

15      A.  I do.

16      Q.  Okay, and there's 35.80 full-time employees

17  captured at the bottom, very bottom right occupied cell

18  in this table.  Do you see that?

19      A.  Yes.

20      Q.  All right, listed who they are in the column

21  all the way on the left with their positions.  Do you

22  see that?

23      A.  Yes.

24      Q.  I'm pointing to the - the table in the first

25  column.  Do you see where I'm pointing, right?

Page 100

1       A.  Yes.

2       Q.  And then I understand on the next page, page

3   1745 that you were looking at a moment ago that there

4   are new positions being added by this modification.  Do

5   you see total new positions 22.7?

6       A.  Yes.

7       Q.  Okay, so I'm just looking at this agreement

8   and the previous one.  It looks to me like there were

9   some number of medical positions at Adelanto and then

10  that number was increased or needed to be increased by

11  22.7 new positions and so Adelanto, GEO, the Federal

12  Government entered into these modifications based on

13  these increased staffing models.  Am I understanding

14  these documents correctly?

15          MR. DONOHUE:  Object to the form.

16          THE WITNESS:  Yes.  I think based on what I

17      read here that ICE required GEO to add 22.7

18      additional staff, medical personnel, yes.

19  BY MR. FREE:

20      Q.  And as a consequence GEO was going to have to

21  incur more costs to pay those people; is that right?

22      A.  Yes.

23      Q.  And consequently their per day value the per

24  diem rate would increase for GEO, right?

25      A.  Correct.

Page 101

1    Q.  And then GEO and ICE agreed to increase the
2  contracts per day rates; is that right?
3    A.  Correct.
4    Q.  Okay, so the - the -- Okay.  All right.
5      I'm going to hand you a document that we'll
6  mark as Exhibit Thirteen.
7      (Whereupon, Exhibit 13 was marked)
8  BY MR. FREE:
9    Q.  This is another Standard Form 30.  In box 2 it
10  reads the amendment modification number is P00020.  Do
11  you see that?
12    A.  Yes.
13    Q.  Did I read that correctly?
14    A.  Yes.
15    Q.  Then if we look at box 13 or field 13 it
16  says - there's a checkmark by bilateral mutual agreement
17  of both parties.  Do you see where I've read that?
18    A.  Yes.
19    Q.  All right, and then I look at the next box 14
20  and it says, "The purpose of this modification is to
21  issue to" -- Excuse me, "Is issued to replace attachment
22  1-approved staffing plan.  GEO requested to replace
23  three licensed clinical social worker positions with
24  three psychologist positions."  Do you see where I've
25  read that?

Page 102

1    A.  Yes.
2    Q.  Have I read that correctly?
3    A.  Yeah.
4      Sorry.
5    Q.  It's okay.
6      Can you turn the page to 1835 is what it reads
7  at the bottom right and it appears as though GEO is
8  taking the licensed clinical social worker positions
9  from three to zero and the psychologist positions from
10  it says D but I think it says three to six.  Do you see
11  that?
12    A.  Yes.
13    Q.  Did I read that correctly?
14    A.  Yes.
15    Q.  Okay, and then we turn to the next page, 1836.
16  This is it says at the top it says staffing plan.  Do
17  you see that?
18    A.  Yes.
19    Q.  Okay, and then if you could just help me, I
20  think that there are two staffing plans.  I'm going to
21  tell you why and then you can tell me if you think that
22  that's right too, okay?
23    A.  Okay.
24    Q.  So if I'm looking at 1836 it says staffing
25  plan but right above it it says minimum guaranteed (one

Page 103

1  thousand four hundred fifty-five beds).  Do you see
2  that?
3    A.  Yes.
4    Q.  All right, but then when I turn to 1839, do
5  you see where I am?
6    A.  Yes.
7    Q.  And at the top it says staffing plan and right
8  above it it says full capacity (one thousand nine
9  hundred forty beds).  Do you see at the very top where
10  it says that?
11    A.  Yes.
12    Q.  All right.  Cool.
13      So these are -- If I understand this
14  correctly, this is a staffing plan that GEO will have
15  for the minimum guaranteed number of people at Adelanto
16  and this being the one that starts at 1837; is that
17  right?
18      MR. DONOHUE:  Object to the form.
19      THE WITNESS:  Yes.  I think that's correct.
20  BY MR. FREE:
21    Q.  Okay, and then the next one at 1839 is a
22  staffing plan for full capacity.  Do you see on 1839 at
23  the top where it says nineteen-forty?
24    A.  Yes.
25    Q.  Okay, so I'm just going to direct your

Page 104

1  attention to a couple of lines and again tell me if I'm
2  reading this wrong, okay?
3      On 1837 - excuse me - 1836 at fourteen hundred
4  fifty-five beds, the minimum guaranteed, we'll call that
5  the minimum number.  1836, do you see that?
6    A.  Yeah.
7    Q.  All right.
8    A.  Yes.
9    Q.  The staffing plan calls for three full-time
10  employees to serve as janitor-new.  That's row number
11  35, it's highlighted for you and it says there's -- Do
12  you see that line?
13    A.  Yes.
14    Q.  Okay, so I see three janitor positions there.
15  Do you see that?
16    A.  Yes.
17    Q.  All right, to me that means when there's
18  fourteen hundred and fifty-five people in this staffing
19  plan GEO's going to have three janitors for those
20  fourteen hundred and fifty-five people.  Am I correct in
21  that interpretation?
22      MR. DONOHUE:  Object to the form.
23      THE WITNESS:  I'm not sure if it's based on
24      the number of detainees or the bed capacity.
25  BY MR. FREE:

DAVID J. VENTURELLA  Volume I
NOVOA vs THE GEO GROUP

June 13, 2019

105–108

Page 105

1    Q.   What else could it be based on?

2    A.   A need to have additional janitors for other
3    parts of the facility, not necessarily the - where the
4    detainees reside.  I mean I'm saying it's a possibility.

5    Q.   Do you have any personal knowledge as you sit
6    here today what the three positions is based on if it's
7    not based on the number of beds?

8    A.   I do not.

9    Q.   Okay.

10   A.   Sorry.

11   Q.   It's okay.

12        Do you need some water?

13   A.   It's allergies so, no.  I'll power through it.

14   Q.   Then turn to page 1839.  I've highlighted row
15   35 very sloppily, but it's three FTE positions for
16   janitor.  Do you see that?

17   A.   Yes.

18   Q.   Okay, so at fourteen fifty-five there's three
19   janitors.  That's the one we looked at previously.

20   A.   Uh-huh.  (Affirmative response).

21   Q.   At nineteen-forty there's the same number of
22   janitors; is that right?

23        MR. DONOHUE:  Object to the form.

24   BY MR. FREE:

25   Q.   In other words, the staffing plans are for -

Page 106

1    as pertains to janitors are the same in both the minimum
2    guaranteed and the full capacity plan, correct?

3    A.   Correct.

4    Q.   Okay, let's look at on 1836.

5    A.   1836?

6    Q.   Yeah.  We're going to call it the -- Can I
7    just - can we do some shorthand and we'll agree that
8    this is the - the minimum guaranteed plan and the other
9    one is -- I'm going to call it that and the other one's
10   the full capacity plan?  Can we just call it those two
11   things?  And if you think of something else we should
12   call it just tell me.

13   A.   No.

14   Q.   All right.

15   A.   It's okay.

16   Q.   Okay, so if we look at on the bottom of 1836
17   at line 54, row 54 I've highlighted -- This is in the --
18   I've highlighted the cell that says twenty-seven
19   full-time employee positions.  Do you see that on 1836?

20   A.   Yes.

21   Q.   Great.

22        And this in this field it's a row in 47 that
23   says food service.  Do you see that?

24   A.   Yes.

25   Q.   It looks like there's a food service manager,

Page 107

1    food service production manager, there's two of those,
2    there's cook supervisors for lower relief reduction of
3    1.0, I don't know what that means, but it looks like
4    there's thirteen cook supervisors?  Do you see that in
5    row 51?

6    A.   Yes.

7    Q.   And there's a food service - food service
8    worker in row 52, there's ten of those as the full-time
9    employees.  Do you see that?

10   A.   Yes.

11   Q.   And then there's a food service clerk.
12   There's one of those in row 53.

13   A.   Yes.

14   Q.   And so we add all those together and we get to
15   twenty-seven employees.  Do you see that?

16   A.   Yes.

17   Q.   Did I read those things correctly?

18   A.   Yes.

19   Q.   All right, so under the minimum plan it's
20   twenty-seven employees, the minimum guaranteed plan
21   twenty-seven food service employees, right?

22   A.   Yes.

23   Q.   All right, let's look at the maximum plan on
24   1839.

25        So at full capacity how many full-time

Page 108

1    employees working for the service under this maximum
2    staffing plan?

3    A.   Twenty-seven.

4    Q.   The same number?

5    A.   Correct.

6    Q.   Okay, under programs that's on 1837, it's row
7    78.

8    A.   Yes.

9    Q.   All right.

10   A.   78?

11   Q.   Row 78 is programs.  Do you see that?

12   A.   Yes.

13   Q.   All right, and then row 88 has the - all the
14   way in the farthest right column and I think it's column
15   G, G88 there's sixteen full-time employees in the
16   programs part of the staffing plan for the minimum
17   guaranteed rate, right?

18   A.   Yes.

19   Q.   All right, and those include the records
20   supervisor, the chaplain, the classification officer
21   which looks like you deleted one, I don't know what
22   that - that's about, but it's just - that's a
23   classification officer in row 82.  The assistant
24   chaplain, the programs clerk, the library technician,
25   the detainee records clerk and the recreation

Page 109

1  specialist.  Have I read all the positions in the
2  programs part of this staffing plan correctly?
3      A.  Yes.
4      Q.  All right, let's look over at 1840.  We're
5  going to go to the maximum plan.  How many programs
6  positions are there when the - on the staffing plan for
7  full capacity?
8      A.  Excuse me.
9          Sixteen.
10     Q.  And that's the same?
11     A.  The same as the previous, yes.
12     Q.  Yes.
13         Okay, I've not highlighted these, but if
14  you'll turn back to the minimum plan and you look at -
15  it's on 1837, it's cell G77, it's the full-time
16  employees under health care.  Do you see that cell?
17     A.  Yes.
18     Q.  That number's sixty-seven full-time employees
19  to provide health care at the minimum guaranteed rate of
20  fourteen hundred fifty-five beds filled; is that right?
21     A.  Yes.
22     Q.  Okay, if you'll turn to page 1840.  Can you
23  tell me the number of employees under the staffing plan
24  for a maximum capacity, the full capacity to provide
25  health care there, what's the number of employees?

Page 110

1      A.  Sixty-seven.
2      Q.  Is that the same as when you had fourteen
3  hundred and fifty-five at the minimum guaranteed?
4      A.  Yes.
5      Q.  Okay.
6          So those are all easy because those are all
7  the same, I think.
8          I'm looking at security supervisors on page
9  1837 under the minimum plan.  It's field - it's the
10  bottom right cell, G101.  Do you see that?
11     A.  Yes.
12     Q.  Thirty-three full-time employees in the
13  security supervisor part of this staffing plan, right?
14     A.  Yes.
15     Q.  Okay, 1840, the max plan, the bottom
16  right-hand corner G102, how many security supervisors?
17     A.  Thirty-three.
18     Q.  The same, right?
19     A.  Yes.
20     Q.  Okay, so then we have - we have what I think
21  is the difference between these two plans, and you'll
22  correct me if I'm wrong, if you look at the minimum plan
23  on page 1838 it's cell G134.  Do you see it?
24     A.  Yes.
25     Q.  Which - which program does this part of the

Page 111

1  staffing plan address?
2          MR. DONOHUE:  Object to the form.
3          THE WITNESS:  Which program?
4  BY MR. FREE:
5      Q.  Yeah, so, you know, we've been talking about
6  these categories.  You've got food service, you've got
7  recreation, you've got medical.  Which category is this?
8      A.  This would be the security staff or the
9  detention officers.
10     Q.  Yeah, so row 102 says detention officers and I
11  understand the (CBA).  That's the collective bargaining
12  agreement.  Is that your understanding as well?
13     A.  Correct.
14     Q.  All right, and so there's two hundred and
15  fifty-eight detention officers according to G134 under
16  the minimum plan, right?
17         I'm looking at --
18     A.  Yes.
19     Q.  Okay, let's look at the maximum plan.
20     A.  What page are you on?
21     Q.  Yeah, it's page 1841.
22     A.  Okay.
23     Q.  Do you see it?
24     A.  Yes.
25     Q.  What's that number?

Page 112

1      A.  Three hundred and two.
2      Q.  Okay, so when you have fourteen hundred and
3  fifty-five beds under the staffing plan the minimum
4  guaranteed you're at 258.8 full-time employees for
5  detention officers, right?
6      A.  Yes.
7      Q.  Okay, when you have a maximum of nineteen
8  hundred and forty beds occupied, that's the maximum
9  plan, you have three hundred and two detention officers
10  in or officers in that detention officers category; is
11  that right?
12     A.  Correct.
13     Q.  Those are full-time employees, so 258.80 --
14  Can we just call it 258 so I don't have to do decimal
15  points or do you want to do 259?
16     A.  258 is fine.
17     Q.  All right.  Fine.
18         So it's like what is it, forty-four additional
19  detention officers per - approximately just short of
20  five hundred people max?
21     A.  Correct.
22     Q.  All right, why do you need forty-four
23  additional detention officers for a maximum additional
24  five hundred people?
25         MR. DONOHUE:  Object to the form.

Page 113

1  BY MR. FREE:
2     Q.  Why -- I'll ask a different question.
3         Why are the - the detention officers higher
4  for the second plan?
5         MR. DONOHUE:  The same objection.
6         THE WITNESS:  Because you - as you bring on
7  more detainees you bring on or activate more pods
8  or dorms and so whether you have one detainee or
9  five hundred in there you need a certain number of
10 officers to staff it, so it's based on the physical
11 plant and the number of staff needed to - to manage
12 that particular unit.  I'm assuming it -- Excuse
13 me.
14         These are dorm units or beds where they -
15 where they sleep and spend most of their days, so
16 as you activate those you need officers to staff
17 it.
18         Like I said, whether it's one or sixty-four in
19 there you still need the same number of officers,
20 so you can't pull officers from another unit to go
21 staff it.
22 BY MR. FREE:
23    Q.  The officers can't do double duty on one unit
24 and another is what you're saying, right?
25    A.  Correct.

Page 114

1     Q.  Okay, so if you're going to have - you said
2  they're - you're going to open different pods?  Did I
3  understand that right?  What did you mean when you said
4  pods, the additional pods?
5     A.  Well, I'm assuming as you increase the
6  capacity you going to have to house detainees in the
7  housing units that are now currently idle and when you
8  do that you have to add the appropriate number of staff.
9     Q.  Why?
10    A.  One, because those are the requirements of the
11 contract.  You need to provide safety and security and
12 all the other services that we proposed to provide to
13 ICE that they agreed to.
14    Q.  By we you're talking about GEO, right?
15    A.  Correct.
16    Q.  Okay, and did I understand you to mean that
17 when you said the requirements of the contract what do
18 you mean?
19    A.  There are specific requirements that are
20 outlined in - in an RFP and any modifications after that
21 that say you shall do this or you shall do that and you
22 propose to GEO how you're going to implement that, how
23 would you manage that, how would you staff that and so
24 as a result of those requirements we'll provide whether
25 it's additional personnel or other services back to ICE

Page 115

1  and provide a - a price to it for them to review and
2  accept or negotiate to another - to another amount or
3  reject it.
4     Q.  How does GEO determine the additional level of
5  people that you would need based on the additional
6  capacity when you're making these proposals to ICE?
7  Like what factors does GEO take into consideration?
8         MR. DONOHUE:  Object to the form.
9         THE WITNESS:  It depends on the size of the -
10 of the unit, it depends on the configuration.  It
11 would also determine what kind of services, the
12 classification of the detainees, et cetera.  You
13 know, it's a number of factors that we consider in
14 determining the appropriate number of staff to
15 support a housing unit.
16 BY MR. FREE:
17    Q.  Is that determination as far as you know
18 something that varies from contractor to contractor?  In
19 other words, does GEO make a determination based on its
20 experience and present that determination to ICE for an
21 agreement that could be different than CoreCivic, for
22 example?
23         MR. DONOHUE:  Object to the form.
24         THE WITNESS:  I don't know what CoreCivic, how
25 they developed their staffing models.

Page 116

1  BY MR. FREE:
2     Q.  You don't?
3     A.  I don't.  No, I don't.
4     Q.  You couldn't reverse engineer it?
5     A.  I don't know.  I haven't seen their staffing
6  plan, so I don't know if I could or could not, but we
7  don't have a need to.  We - we provide our proposal
8  based on like I said a number of factors to include the
9  facility layout and that's up to ICE to accept or not.
10        MR. DONOHUE:  Okay, can we take a break and
11 let him clear up his throat?
12 BY MR. FREE:
13    Q.  Do you need a break?
14    A.  How much longer are we going to go?
15        MR. DONOHUE:  Let's take a break.
16        THE WITNESS:  Okay.
17        MR. FREE:  So you're asking for a break?
18        MR. DONOHUE:  Yeah.
19        THE VIDEOGRAPHER:  We are going off the video
20 record 11:17 a.m.
21        (Whereupon, there was a brief recess observed)
22        THE VIDEOGRAPHER:  We are back on the video
23 record 11:27 a.m.
24 BY MR. FREE:
25    Q.  Okay, Mr. Venturella, prior to the break to

DAVID J. VENTURELLA  Volume I
NOVOA vs THE GEO GROUP

June 13, 2019
117–120

Page 117

1 attend to your allergies, and again if you need a break
2 just let us know, okay?
3      A.  Thank you.
4      Q.  We were looking at this minimum guaranteed
5 staffing plan and this maximum possible staffing plan
6 and kind of walking through what similarities and
7 differences exist.
8         We were left at the difference between three
9 hundred and fifty-eight - eighty full-time -- Excuse me.
10 Was it?  Yeah, 258.80 full-time employee positions on
11 the security part of the staffing plan with the minimum
12 bed guaranteed versus three hundred and two at the
13 maximum part of the guarantee, so just sort of pick up
14 on that thread.  You were telling me, you know, we have
15 more people -- I'm summarizing.  Tell me if I'm
16 summarizing incorrectly, but when you have more people
17 you could - you might have to open new pods and that
18 requires more guards.  Do I understand basically your -
19 the gist of what you're telling me?
20      A.  Correct.
21      Q.  All right, and so you need more guards and so
22 you put them in the staffing plan?  Yeah?
23      A.  Yes.
24      Q.  Okay, GEO is formulating the number of guards
25 GEO needs in order to accommodate potentially nineteen

Page 118

1 hundred and forty people occupying the beds at the
2 facility and you arrive at that - GEO arrives at that
3 number and that number is three hundred and two that's
4 been proposed and accepted by ICE; is that right?
5         MR. DONOHUE:  Object to the form.
6         THE WITNESS:  Based on what I see here, yes,
7      we submitted a - a staffing plan that added
8      additional detention officers to support a higher
9      capacity above the minimum, above the minimum
10      guaranteed.
11 BY MR. FREE:
12      Q.  Okay.
13         THE VIDEOGRAPHER:  Right hand.
14 BY MR. FREE:
15      Q.  As I compare the detention officer positions
16 listed in each version of these staffing plans and the
17 minimum and the maximum I don't just see pods.  I see a
18 pretty granular accounting of where these detention
19 officers would work, and I'll tell you what I mean:
20 There's a - there's a listing, for instance, in rows 110
21 through 113 that encompasses the east side of the
22 facility.  Do you see that?
23      A.  Yes.
24      Q.  And then 114 through 117 it looks like west
25 housing.  Do you see that?

Page 119

1      A.  Yes.
2      Q.  And then 118 through 121 looks like the new
3 west expansion housing.  Do you see that?
4      A.  Yes.
5      Q.  All right, but then -- So those are the pods
6 you're talking about, I think, is that fair?
7      A.  Housing units.
8      Q.  Yeah.
9      A.  Sure.
10      Q.  Okay, but then you also have other things.
11 You have the recreation yard -- I'm on page 1838 -- And
12 GEO has the recreation yard in row 122, GEO has a guard
13 or some staffing for the intake and release area in 123.
14 Do you see those things?
15      A.  Yes.
16      Q.  All right, there's also detention officer
17 positions it looks like in rows 1 - row 130 for food
18 service.  Do you see that?
19      A.  Yes.
20      Q.  All right, and then if we look at page 1848 --
21      I'm sorry?  Which page?
22      Q.  1841.  Excuse me.
23      A.  41.
24      Q.  The max staffing plan.
25         The equivalent basic structure you have east

Page 120

1 housing, west housing, U.S. expansion housing, detention
2 officers who are going to be there.  Those numbers
3 increased from the minimum guaranteed to the max
4 capacity staffing plans, right?
5      A.  Yes.
6      Q.  All right, and then you have - similarly you
7 have detention officers who are going to be in food
8 service in the law library and those are listed under
9 the staffing plan as well?  Yeah?
10      A.  Yes.
11      Q.  All right.
12      A.  That's what I'm reading.
13      Q.  Okay, do you happen to know whether the
14 detention officer positions for, say, food service --
15 Let's take that as an example, okay, so we'll be real
16 specific.
17         Do you know whether those detention officers
18 are actually preparing the food on the one hand or on
19 the other hand whether they're making sure that the
20 people who are working there are secure?  Do you know
21 one way or the other?
22         MR. DONOHUE:  Object to the form.
23         THE WITNESS:  They are not preparing food.
24      They're providing security in the food and dining
25      areas.

Page 121

1  BY MR. FREE:
2      Q.  Why does there have to be security in the food
3  and dining areas?
4      A.  It's a detention facility and you've got to
5  control movements.  You've got to make sure people
6  aren't fighting, you've got to make sure that people are
7  doing what they're supposed to be doing and where
8  they're supposed to be, so there is some level of
9  security and supervision that's required in all areas of
10  the facility.
11      Q.  Who would be fighting in the - the food
12  service areas?
13      A.  I don't --
14          MR. DONOHUE:  Object to form.
15          THE WITNESS:  I don't know.
16  BY MR. FREE:
17      Q.  Would it be GEO employees?
18          MR. DONOHUE:  Object to the form.
19          THE WITNESS:  I - I don't know.
20  BY MR. FREE:
21      Q.  Okay.  Well, let's not beat around the bush.
22  These detention officers are in the food
23  service area because people who are detained there are
24  in the food service area; is that correct?
25      A.  There are detainees in - in that area, yes.

Page 122

1      Q.  Well, that's not my question.  My question --
2      A.  I'm sorry.  I didn't understand your question.
3      Q.  It's okay.
4          My question was the detention officers are in
5  the food service area because that's where detainees are
6  as well; is that right?
7          MR. DONOHUE:  Object to the form.
8          THE WITNESS:  I guess I'm not understanding
9      your question.
10  BY MR. FREE:
11      Q.  Why do you need a detention officer in the
12  food service area was my original question and you said,
13  well, it's a secure facility, you've got to maintain
14  security, you don't want people fighting and I guess
15  what I'm asking and what I'm getting at is it is because
16  there are detainees in the food service area, that a
17  detention officer needs to be incorporated into that
18  staffing plan; is that right?
19          MR. DONOHUE:  Object to the form.
20          THE WITNESS:  I understand so, yes, there are
21      detainees in that area.
22  BY MR. FREE:
23      Q.  Okay, you don't need a detention officer
24  necessarily in GEO's executive offices, you know, in an
25  adjacent little annex, right?

Page 123

1      A.  That is correct.
2      Q.  Because there's no detainees there?
3      A.  That is correct.
4      Q.  You don't need a detention officer necessarily
5  patrolling outside the perimeter or across the street
6  because no detainees are going to be outside the
7  perimeter -- Excuse me.  You don't need them to
8  supervise detainees outside the perimeter?  You need
9  them supervising -- GEO needs to have a food service
10  detention officer, 3.2 full-time employees in the food
11  service area because the people that it is charged with
12  by ICE of ensuring they're safe and cared for are going
13  to be in the food service area; is that right?
14          MR. DONOHUE:  Object to the form.
15          THE WITNESS:  I think I would have to disagree
16      with where detention officers or security officers
17      are placed.  I mean you could have security and
18      detention officers outside the secured perimeter --
19  BY MR. FREE:
20      Q.  That was a bad example, yeah.
21      A.  -- where there are no detainees.
22      Q.  Okay, that's a bad example.  I take your
23  point.  I think that's right.
24          They're not cooking, the detention officers
25  are not cooking, they're there to supervise is the first

Page 124

1  part, that's correct, right?
2          MR. DONOHUE:  Object to the form.
3          THE WITNESS:  They are not cooking.  They're
4      providing security.
5  BY MR. FREE:
6      Q.  Okay, the people over whom they are providing
7  security are the people who are detained in the
8  facility, right?
9      A.  Yes.
10      Q.  Okay, so I looked at these two plans, I'm
11  going to look at the minimum plan and I look at the food
12  service part.  It's row 130.
13      A.  Which page?
14      Q.  On page 1838.
15          Row 130, it's column G.  I'm looking at G130.
16  It's 3.2 full-time employees who are detention officers
17  providing security in the food service area on the east
18  and west side; is that right?  3.2 full - full-time
19  employees?
20      A.  Where do you see that?
21      Q.  I'm looking at -- It's really hard because I
22  didn't highlight.  That's why I tried to highlight these
23  ones and I'm sorry that I didn't highlight this one.
24          I'm looking at G130, so it's column G and it's
25  row 130 and I see 3.2 full-time employees.  Do you see

DAVID J. VENTURELLA  Volume I
NOVOA vs THE GEO GROUP

June 13, 2019
125–128

Page 125

1  that?
2      A.  Yes.
3      Q.  Okay, so we'd agree that's 3.2 full-time
4  employees who are GEO detention officers providing
5  security in the food service area under this minimum
6  staffing plan, correct?
7      A.  Based on this plan, yes.
8      Q.  Okay, let's turn over to the maximum staffing
9  plan, 1841 and - and now we're going to look at row -
10  it's cell G131, so that's -- If I'm looking at this
11  correctly I think it's 6.4 food service Correctional
12  officer - detention officers.  Am I reading that
13  correctly?
14      A.  Yes.
15      Q.  Right.
16      A.  That's what's indicated on this.
17      Q.  So when there's a minimum guarantee of
18  fourteen fifty-five you've got 3.2 full-time employees
19  serving as detention officers providing security in the
20  food service area, that's the minimum plan, the maximum
21  plan nineteen-forty you've got 6.4, correct?
22      A.  Correct.
23      Q.  Twice as many people providing security.  Can
24  we agree on that in that area?
25      A.  Correct.

Page 126

1      Q.  Okay, why do you need double the number of
2  security officers in the food service area, if you know,
3  when you've got - between the two plans?
4      A.  I do not.
5      Q.  You can - can you think of any reason why you
6  would need to double the number of detention officers in
7  the food service area between one plan or the other?
8      A.  No.  I can't guess at that.  I don't know.
9      Q.  Okay, when GEO is constructing this plan I
10  think you explained to me that when there are more
11  people in the facility you may have to have more
12  detention officers because, for instance, GEO has opened
13  a new pod and so there will be more detainees that GEO
14  is responsible for supervising, correct?
15      A.  Correct.
16      Q.  Okay, does the same logic hold with GEO's
17  staffing plan for the food service area?  In other
18  words, there will be more detention officers in the food
19  service area under the second staffing plan because
20  there will be more detained immigrants in the food
21  service area?
22      MR. DONOHUE:  Object to the form.
23      THE WITNESS:  I - I wouldn't say that the same
24      logic follows that, excuse me, because I - I don't
25      know how that is managed at Adelanto.

Page 127

1  BY MR. FREE:
2      Q.  Other than an increased number of detained
3  immigrants in that area of the facility in the food
4  service area of the facility, can you think of anything
5  else that would require GEO to double the number of
6  detention officers there?
7      MR. DONOHUE:  Object to the form.
8      THE WITNESS:  Scheduling.  Scheduling more --
9      Scheduling to accommodate the larger population so
10      they can attend, you know, for breakfast, lunch
11      and - and dinner.  That's about the only reason I
12      could think of that.
13  BY MR. FREE:
14      Q.  Okay, tell me why scheduling took on to
15  accommodate the larger populations would double the
16  position?
17      A.  You would have people coming from another --
18  I'm sorry -- Housing unit into that area, we may have to
19  have the security officers move the other people out to
20  accommodate.  Again I'm just - that would be, I think,
21  the only reason, but I'm not the expert in that, so I
22  don't know.
23      Q.  Would you concede that it is possible that GEO
24  doubled the number of officers in the food service area
25  because there are more detained immigrants in the food

Page 128

1  service area when the population of the facility
2  increases?
3      A.  No.
4      MR. DONOHUE:  Object to the form.
5  BY MR. FREE:
6      Q.  You would not concede that?
7      A.  No.
8      Q.  Okay.
9      A.  Because I don't know.  I don't know --
10      Q.  You don't know?
11      A.  -- the reason or the basis for why the
12  increase.
13      Q.  Do you have any idea?
14      A.  No.
15      MR. DONOHUE:  Object to the form.
16  BY MR. FREE:
17      Q.  Let's do it an easier way.
18      A.  Okay.
19      Q.  The minimum plan, the fourteen fifty-five beds
20  plan has 1.6 full-time employee positions for the law
21  library in the detention officers section.  I'm looking
22  at page 1838.  It's cell G131.  The number that I'm
23  reading is 1.6.  Do you see that?
24      A.  Yes.
25      Q.  I understand that to mean that GEO is going to

Page 129

1  have 1.6 full-time employee detention officers in the
2  law library at the minimum bed guarantee of fourteen
3  fifty-five.  Am I reading that correctly?
4      MR. DONOHUE:  Object to the form.
5      THE WITNESS:  I think you're reading that
6  correctly.
7  BY MR. FREE:
8      Q.  Okay, and then you look at the second staffing
9  plan on 1841.  Do you see that?  It's row or cell G132.
10     A.  Yes.
11     Q.  How many detention officers does GEO have in
12  its staffing plan for the maximum of nineteen hundred
13  and forty beds occupied at the law library?
14     A.  3.2.
15     Q.  That's twice as many, right?
16     A.  Yes.
17     Q.  Who uses the law library at Adelanto?
18     A.  The detainees.
19     Q.  Anybody else?
20     A.  I don't know.
21     Q.  Is it open to the public?
22     A.  No.
23     Q.  Does GEO make it available to ICE officials?
24     A.  I don't know.
25     Q.  Is GEO required to have a law library by this

Page 130

1  contract to your knowledge?
2      A.  Yes.
3      Q.  Why are there twice as many law library
4  detention officer positions in the second staffing plan
5  than on the first?
6      MR. DONOHUE:  Object to the form.
7      THE WITNESS:  I don't know.
8  BY MR. FREE:
9      Q.  No idea?
10     A.  No idea.
11     Q.  What do you think?
12     A.  I don't know.
13     Q.  Let's look at recreation on the same page.
14  It's row 123.
15     Excuse me.  Let's look at 125, utility escort.
16  Do you see that?
17     A.  Yes.
18     Q.  All right, how many utility escort positions
19  in the detention officer category does GEO use at the
20  maximum staffing level?
21     A.  In this plan it indicates twenty-four.
22     Q.  Look back at 1838.
23     The same number, right?
24     A.  Correct.
25     Q.  All right.

Page 131

1      How - you said that there would be more guards
2  because potentially there would be more people -- You
3  said in essence that one explanation other than the fact
4  that there's more people who were working, more
5  detainees who were working in the food service area an
6  explanation that you offered is that there could be
7  because there are more people, I think, more people
8  going to that area to get food.  Do I understand that
9  explanation as you've described it to me?
10     A.  What was the first part of your question?
11     Q.  Yeah, so the first part of my question is I
12  asked you if the reason you need twice as many detention
13  officers, guards in the food service area if GEO needs
14  twice as many guards in the food service area because
15  there's more - twice as many -- There's more detainees
16  there and I don't think you've said yes to that.
17     A.  Right.  I said I don't know.
18     Q.  Yeah, and I think I asked if it's possible.
19  If I haven't asked, let me just ask you, is it possible
20  that's the reason you need twice - GEO needs twice as
21  many guards?
22     MR. DONOHUE:  Object to the form, vague.
23     THE WITNESS:  I don't know.
24  BY MR. FREE:
25     Q.  Okay, so you don't know whether GEO doubled

Page 132

1  the number of detention officers in the food service
2  area because there would be more detainees there when
3  there's more people in the facility, you don't know the
4  answer to that?
5      MR. DONOHUE:  Object to the form, vague, asked
6      and answered.
7      THE WITNESS:  Correct.  I don't know.
8  BY MR. FREE:
9      Q.  Okay, and you have also told me, I believe,
10  that an alternate explanation is that more people will
11  need meals and so they're coming to the food service
12  area and so maybe that's why you need twice as many
13  detention officers?  Do I understand the gist of that
14  explanation?
15     MR. DONOHUE:  Object to the form, vague, asked
16     and answered, mischaracterizes.
17     THE WITNESS:  Again I speculated on what could
18     be a possible cause but I don't know that for a
19     fact.
20  BY MR. FREE:
21     Q.  Okay.
22     If there are fewer detained immigrants at
23  Adelanto would you agree that GEO needs fewer guards?
24     MR. DONOHUE:  Object to the form.
25     THE WITNESS:  I guess it depends on what

DAVID J. VENTURELLA  Volume I
NOVOA vs THE GEO GROUP

June 13, 2019
133–136

Page 133

1   you're defining as fewer and what the population
2   is.
3   BY MR. FREE:
4       Q.   Are those two variables connected?
5       A.   I'm sorry?
6       Q.   Are those two variables basically connected?
7   Are they related to each other, the number of detained
8   immigrants inside the facility to the number of guards
9   that you must employ?  They have to be, right?
10          MR. DONOHUE:  Object to the form.
11          THE WITNESS:  It depends on the - the number
12      and how ICE wants them housed, so -- It just
13      depends on the requirements of the - of the client
14      in this case.
15  BY MR. FREE:
16      Q.   Okay.
17          How is it that there could be an additional --
18  Strike that.
19          How is it that the number of food service
20  employees stays the same between both plans?
21          MR. DONOHUE:  Object to the form.
22          THE WITNESS:  I don't know.
23  BY MR. FREE:
24      Q.   You have no idea?
25      A.   I don't.

Page 134

1       Q.   How is GEO able to provide potentially almost
2   five hundred more meals without paying any additional
3   people?
4       A.   I don't know.
5          MR. DONOHUE:  Object - object to form.
6   BY MR. FREE:
7       Q.   You don't know?
8          What do you think?
9       A.   I don't know.
10      Q.   Who prepares the meals at Adelanto?
11      A.   I don't know.
12      Q.   You told me earlier that there are detainees
13  in the food service area, didn't you?
14          MR. DONOHUE:  Object to the form, vague.
15  BY MR. FREE:
16      Q.   Are there detainees in the food service area
17  at Adelanto?
18          MR. DONOHUE:  The same objection.
19          THE WITNESS:  Yes.
20  BY MR. FREE:
21      Q.   Yes.
22          What are they doing there?
23      A.   That I don't know.
24      Q.   What do you think they're doing there?
25      A.   I don't know.

Page 135

1       Q.   Really?
2          I mean I'm not trying to be difficult --
3       A.   I know.
4       Q.   -- with you, honestly.
5          You're saying --
6       A.   You're asking me --
7       Q.   -- to me you have no idea what - what a
8   detainee is doing in the kitchen?
9       A.   I don't know what --
10          MR. DONOHUE:  Objection.
11  BY MR. FREE:
12      Q.   They're not for recreation, are they?
13          MR. DONOHUE:  Hang on a second.
14          MR. FREE:  Okay.  Sorry.
15          MR. DONOHUE:  Yeah, let's not - let's not be
16      argumentative.
17  BY MR. FREE:
18      Q.   You - you have - you do not know, you have no
19  idea, let me just say that, do you have any idea what a
20  detained immigrant at Adelanto would be doing in the
21  food service area at that facility?
22          MR. DONOHUE:  Object to the form, vague, and I
23      don't know what a food service area means.
24  BY MR. FREE:
25      Q.   Let's -- This is GEO's staffing plan, right?

Page 136

1       A.   I'm sorry?
2       Q.   Okay, answer my first question.  You don't
3   have any idea what a detained immigrant at Adelanto
4   would be doing in the food service area?
5          MR. DONOHUE:  Yeah, and objection, vague,
6      asked and answered about a thousand times.
7          THE WITNESS:  I don't have any firsthand
8      knowledge what they're - they're doing.
9   BY MR. FREE:
10      Q.   That's not what I asked.  I asked if you had
11  any idea.
12          MR. DONOHUE:  And same objections.
13          THE WITNESS:  I don't.
14  BY MR. FREE:
15      Q.   Have you been in the food service area at
16  Adelanto?
17      A.   Yes.
18      Q.   What did you see there?
19      A.   I saw people in the food service area
20  performing cleaning, mopping, not -- I didn't actually
21  see any meals being served at the time, so it was very
22  early in the day.
23      Q.   What time?
24      A.   Around 10:00 a.m.
25      Q.   Who - who were the people?

DAVID J. VENTURELLA  Volume I                                    June 13, 2019
NOVOA vs THE GEO GROUP                                          137—140

Page 137

1     A.  I -- Both GEO employees and immigration
2  detainees.
3     Q.  Could you tell them apart?
4     A.  Yes.
5     Q.  How?
6     A.  By their uniforms.
7     Q.  Who was mopping?
8     A.  The detainees.
9     Q.  What were the GEO employees doing as you
10  recall?
11     A.  Working in the kitchen.
12     Q.  Okay, so you do have some idea what the
13  detainees are doing in the food service area?
14     A.  I can tell you what I saw.
15     Q.  Please do.
16     A.  That's what I saw.  They were in the - the
17  kitchen area, you say food service area, and they were
18  performing some tasks.
19     Q.  Anything other than mopping that you saw them
20  do?
21     A.  No.  I don't recall any specific activities.
22     Q.  Did you tell me that it wasn't during a meal
23  service?
24     A.  Right.  It wasn't during a meal service.
25     Q.  Okay, did you see any GEO guards there?

Page 138

1     A.  Yes.
2     Q.  What were they doing?
3     A.  Supervising, providing security.
4     Q.  As you read GEO's staffing plan that it
5  developed and submitted to ICE and that ICE agreed to in
6  this modification and you say the food service area part
7  of the detention officer section I'm talking about row
8  130 on page 1838.  Do you see that?
9     A.  Yep.
10     Q.  What do you understand food service to refer
11  to?
12     A.  The kitchen, the cafeteria and I guess the
13  ability to provide meals outside of that area as well.
14     Q.  Okay, did you see any cafeterias while you
15  were there in February?
16     A.  I'm sorry?
17     Q.  Did you see any cafeterias while you were at
18  Adelanto in February?
19     A.  There was a dining hall.
20     Q.  So the answer to my question is yes?
21     A.  Well, if a cafeteria and a dining hall are the
22  same thing then yes.
23     Q.  You used the term cafeteria, so I'm just
24  trying to understand what you mean.
25     A.  So I'm just being -- Yeah, I'm not being as

Page 139

1  specific but, yeah, it's where they dine, where they
2  have their meals.
3     Q.  The same thing though, right?
4     A.  The same thing.
5     Q.  We're talking about the same --
6     A.  Sure.
7     Q.  Okay, did you see any detainees working in the
8  dining hall?
9     A.  No.  There was no one in the dining hall at
10  the time I was there.
11     Q.  So it was empty?
12     A.  Yes.
13     Q.  Okay.
14        Is there anything else that a food service
15  line item could encompass other than the kitchen and the
16  dining hall?
17        MR. DONOHUE:  Object to the form.
18        THE WITNESS:  I don't know.
19  BY MR. FREE:
20     Q.  Can I just -- I'm just going to put -- I'm
21  going to be really honest with you.  I have a hard time
22  understanding how GEO and how you can put together a per
23  diem rate for these facilities without knowing the
24  activities in each area and what the detention officers
25  are doing there.  I just don't - I don't understand why

Page 140

1  you don't know that, and I'm not being argumentative.
2  I'm just asking you like it would seem to me that you
3  saw people working in the kitchen, right?
4     A.  Yes.
5     Q.  You said - you told me you saw people work
6  being in the kitchen?
7     A.  I saw people, yes, in there.
8     Q.  And so GEO knows that detainees work there?
9        MR. DONOHUE:  Object to the form.
10        THE WITNESS:  So there are people within GEO
11     who know what the activities are who participate in
12     putting together the staffing plans and develop the
13     cost.  I am not one of those individuals, so I'm --
14     Basically I'm an outside observer watching what
15     happens there, but I don't know how they put it
16     together, I don't know what they're supposed to be
17     doing, when they're supposed to be doing it.  It's
18     just not my area of expertise in the company.
19  BY MR. FREE:
20     Q.  All right, I think I understand.
21        You're telling me, tell me if I'm right here,
22  that I'm asking you questions about what you don't have
23  personal knowledge?
24     A.  Correct, or no responsibility or no
25  participation.

Page 141

1    Q.  Okay, can you help me understand who at GEO
2    would know that?
3        A.  There are people in Operations that know
4    exactly what - what staffings are required based on
5    facilities, the facility layout, the contract
6    requirements.
7        Q.  Who at - who at GEO within the Operations
8    Department would be responsible for knowing that at
9    Adelanto?
10       A.  Certainly the Facility Administrator.
11       Q.  Was that James Janecka?
12       A.  Yes.
13       Q.  Okay, anybody else?
14       A.  I think all of the - the management team at
15   the facility, the Deputy Facility Administrator and
16   maybe the business manager.
17       Q.  What are their names?
18       A.  I don't -- I don't know.
19       Q.  Do the people that you've just named come up
20   with the staffing plan?
21           MR. DONOHUE:  Object to form.
22           THE WITNESS:  I don't know their level of
23       participation in it.
24   BY MR. FREE:
25       Q.  Who at GEO approves this before giving it to

Page 142

1    ICE, this staffing plan that I'm holding?  These are
2    the -- Thirteen.
3        A.  That would be the - Senior Vice-President of
4    Operations.
5        Q.  Who is that?
6        A.  Currently that is David Donahue.
7        Q.  All right, I appreciate you clarifying.
8            What I think you've told me is that I'm asking
9    you questions about this staffing plan that you don't
10   have personal knowledge of in your role as Senior
11   Vice-President for Business Development.  Did I
12   understand your answers correctly?
13       A.  That is correct.
14       Q.  Okay.  That's really helpful.
15           And similarly when I'm asking about what --
16   Strike that.  I think we - I think I understand what
17   you're saying.
18           So if we wanted to know how GEO determines
19   these deltas between the fourteen fifty-five plan and
20   the nineteen-forty plan you're not the guy to talk to is
21   what I hear you telling me?
22       A.  That is correct.
23       Q.  And is it James Donahue and potentially the
24   Facility Administrator, James Janecka in Operations?
25   Anybody else?  Are those two of the people that we

Page 143

1    should talk to?
2        A.  They would have, one, the responsibility and,
3    two, the expertise and the knowledge.
4        Q.  Anybody else?
5        A.  There are a lot of people who probably possess
6    that.  I don't -- Again I don't know who participates in
7    that process.
8        Q.  All right, but you -- I mean I understand that
9    it would be part of your role to know whether GEO's
10   going to make money off a contract, right?
11           MR. DONOHUE:  Objection to form.
12           THE WITNESS:  You know, I don't know, so when
13       you qualify an opportunity I look at more of are we
14       able to provide those services then after we
15       qualify that then folks in Operations in other
16       parts of the company determine whether or not
17       it's - it's viable from a financial perspective, so
18       I don't have that financial expertise.  My job is
19       simply to qualify and determine whether or not this
20       is an opportunity the company should pursue.  After
21       a contract's awarded I have no involvement, no role
22       in the operations or the administration of the
23       contract.  I move on to the next business
24       development opportunity, so that's why I can't
25       answer a lot of these questions.

Page 144

1    BY MR. FREE:
2        Q.  I appreciate that.
3            I want to make sure I understand some lingo
4    that I think I just heard you use.  The verb was qualify
5    and the noun was opportunity.  What do you mean by
6    qualify?
7        A.  Well, it is -- So you may read something that
8    suggests that there is a need for bed space somewhere
9    whether it's at the Federal, State or local level and so
10   you try to find out whether or not that is a valid
11   opportunity.  Somebody may have a need but they don't
12   have the funding, they don't have the ability to procure
13   it and so once we go through all of that and determine,
14   yeah, there may be a need but there's no ability to -
15   to proceed with a procurement then we back off.  If
16   there is the ability then we'll find out, okay, well,
17   when do you think it's going to be an opportunity, so
18   that's what I mean by qualify.
19       Q.  Okay, and what's an opportunity?
20       A.  Again the opportunity to either deliver a
21   facility, build a facility and deliver the services that
22   we provide to our government providers.
23       Q.  Okay.
24           Are the Operations people that you've
25   described to me in conjunction with the Chief Financial

DAVID J. VENTURELLA  Volume I
NOVOA vs THE GEO GROUP

June 13, 2019
145–146

Page 145

1  Officer the folks at GEO who are responsible for
2  developing the per diem rate?
3        MR. DONOHUE:  Object to the form.
4  BY MR. FREE:
5        Q.  Or is that you?
6        A.  No.  I do not develop the per diem rate.
7        Q.  Do you know how it's developed?
8        A.  I do not.  Not specifically.
9        Q.  Okay, you don't have personal knowledge of
10  like the factors that go into it?
11       A.  I do not.
12       Q.  Okay, you don't -- And I'm not just talking
13  about once the contract's -- Let me be clear.  I'm not
14  just talking about once the contract has been agreed to,
15  once the opportunity's been seized, right?  I'm also
16  talking about proposals.  Is it the same answer as to
17  proposals?
18       A.  Right.  It's - pricing is not within my area
19  of responsibility, so I don't know how that is
20  developed.
21       Q.  Okay.  I understand.
22       MR. FREE:  Did we order lunch?
23       MR. DONOHUE:  Yes.
24       Lunch?  The short answer's yes.
25       MR. FREE:  It's not here though?

Page 146

1        MR. DONOHUE:  It may be here.
2        MS. ARMSTRONG:  It's probably here.
3        MR. DONOHUE:  It's probably here.
4        I'm speculating.
5        MR. FREE:  I think we might be at like a -
6  like a pivot point, but I don't - what I don't want
7  to do is I don't want to go off the record and then
8  wait for lunch because I don't want to keep the
9  witness here longer than he needs to be, so I can
10  move to the next section.
11       MR. DONOHUE:  Well, why don't we take --
12       MS. ARMSTRONG:  Take twenty seconds to check
13  if it's here.
14       MR. FREE:  Let's do it.
15       THE VIDEOGRAPHER:  We are going off the video
16  record 12:04 p.m.
17
18       (Whereupon, there was a lunch recess observed)
19
20
21       (CONTINUED TO VOLUME II)
22
23
24
25

Page 311

```
1                 CERTIFICATE OF OATH
2
3    STATE OF FLORIDA
4    COUNTY OF BROWARD
5
6         I, VALERIE LEHTO, the undersigned authority,
7    certify that DAVID J. VENTURELLA personally appeared
8    before me and was duly sworn.
9
10        Dated this 23rd day of June, 2019.
11
12        Valerie Lehto
          _____
          VALERIE LEHTO, RPR
13        NOTARY PUBLIC - STATE OF FLORIDA
          My Commission Expires:  8/22/2022
14        My Commission No.:  GG 242398
15
16
17
18
19
20
21
22
23
24
25
```

Page 312

```
1                   CERTIFICATE
2
3    STATE OF FLORIDA
4    COUNTY OF BROWARD
5         I, VALERIE LEHTO, Registered Professional
6    Reporter, do hereby certify that I was authorized
7    to and did stenographically report the foregoing
8    deposition as hereinabove shown, and the testimony
9    of said witness was reduced to computer transcription
10   under my personal supervision and direction and that
11   the record is a true record of the testimony given
12   by the witness and that the witness has requested
13   a review of said transcript pursuant to Rule 30(e)
14   (2).
15        I further certify that I am not a relative,
16   employee, attorney or counsel of any of the parties,
17   nor am I a relative or employee of any of the parties'
18   attorney or counsel connected with the action, nor
19   am I financially interested in the action.
20        Dated this 23rd day of June, 2019.
21
22
23        Valerie Lehto
          _____
          VALERIE LEHTO
24        Registered Professional Reporter
          COMMISSION NO. GG 242398
25        MY COMMISSION EXPIRES 8/22/2022
```

Page 313

```
1                 DEPOSITION ERRATA SHEET
2
3    ASSIGNMENT NO. J4138234
4    NOVOA vs. THE GEO GROUP, INC.
5
6         DECLARATION UNDER PENALTY OF PERJURY
7         I declare under penalty of perjury
8    that I have read the entire transcript of
9    my Deposition taken in the captioned matter
10   or the same is true and accurate, save and
11   except for changes and/or corrections, if
12   any, as indicated by me on the DEPOSITION
13   ERRATA SHEET hereof, with the understanding
14   that I offer these changes as if still under
15   oath.
16        Signed on the _____ day of _____,
17   2019.
18
19
20   _____
21             WITNESS NAME
22
23
24
25
```

Page 314

```
1                 DEPOSITION ERRATA SHEET
2    Page No. _____ Line No. _____ Change to: _____
3    _____
4    Reason for change:_____
5    Page No. _____ Line No. _____ Change to: _____
6    Reason for change:_____
7    Page No. _____ Line No. _____ Change to: _____
8    Reason for change:_____
9    Page No. _____ Line No. _____ Change to: _____
10   Reason for change:_____
11   Page No. _____ Line No. _____ Change to: _____
12   Reason for change:_____
13   Page No. _____ Line No. _____ Change to: _____
14   Reason for change:_____
15   Page No. _____ Line No. _____ Change to: _____
16   Reason for change:_____
17   Page No. _____ Line No. _____ Change to: _____
18   Reason for change:_____
19   Page No. _____ Line No. _____ Change to: _____
20   Reason for change:_____
21   Page No. _____ Line No. _____ Change to: _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25             DAVID J. VENTURELLA
```



Page 315

```
 1                   DEPOSITION ERRATA SHEET
 2    Page No. _____ Line No. _____ Change to: _____
 3    _____
 4    Reason for change:_____
 5    Page No. _____ Line No. _____ Change to: _____
 6    Reason for change:_____
 7    Page No. _____ Line No. _____ Change to: _____
 8    Reason for change:_____
 9    Page No. _____ Line No. _____ Change to: _____
10    Reason for change:_____
11    Page No. _____ Line No. _____ Change to: _____
12    Reason for change:_____
13    Page No. _____ Line No. _____ Change to: _____
14    Reason for change:_____
15    Page No. _____ Line No. _____ Change to: _____
16    Reason for change:_____
17    Page No. _____ Line No. _____ Change to: _____
18    Reason for change:_____
19    Page No. _____ Line No. _____ Change to: _____
20    Reason for change:_____
21    Page No. _____ Line No. _____ Change to: _____
22    Reason for change:_____
23
24    SIGNATURE:_____DATE:_____
25           DAVID J. VENTURELLA
```

