Daniel H. Charest (admitted *pro hac vice*)
dcharest@burnscharest.com
TX Bar # 24057803
E. Lawrence Vincent (admitted *pro hac vice*)
lvincent@burnscharest.com
TX Bar # 20585590
Mallory Biblo (admitted *pro hac vice*)
mbiblo@burnscharest.com
TX Bar # 24087165
**BURNS CHAREST LLP**
900 Jackson St., Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
**Class Counsel**
*Additional Counsel on Signature Page*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION**

| | |
|---|---|
| **RAUL NOVOA, JAIME CAMPOS FUENTES, ABDIAZIZ KARIM**, and **RAMON MANCIA**, individually and on behalf of all others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> **THE GEO GROUP, INC.**, <br><br> *Defendant*. | Civil Action No. 5:17-cv-02514-JGB-SHK <br><br> **PLAINTIFFS' MEMORANDUM IN OPPPOSITION TO GEO'S MOTION TO EXCLUDE EXPERT TESTIMONY OF MICHAEL CHILDERS** <br><br> Hearing Date: March 29, 2021 <br> Time: 9 a.m. PT <br> Courtroom: 1 <br> Judge: Hon. Jesus G. Bernal |

i

# TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................................1

II. LEGAL STANDARDS ........................................................................................1

III. ARGUMENT .......................................................................................................2

   A. Overview of Childers's Opinions ...................................................................2

      1. The APPA Analysis. ..................................................................................2

      2. The Replacement-Cost Analysis. ...............................................................3

   B. GEO does not attack Childers's damages calculations. ..................................3

   C. Childers is qualified. ......................................................................................4

   D. Professor Childers's APPA Analysis is reliable. ...........................................5

      1. APPA Guidelines apply almost universally to any space that must be cleaned. ...........................................................................................5

      2. GEO's quibbles with various inputs to the APPA Analysis are meritless and do not support exclusion. .......................................................6

         (a) Room categories, comparisons, and cleanliness levels. .....................6

         (b) GEO's paid staffing levels are irrelevant to Professor Childers's analysis. ................................................................................8

         (c) Square footage estimates. ...................................................................9

         (d) Data from other facilities. ...................................................................9

   E. GEO misstates Professor Childers's the issues addressed in order to label Professor Childers's work "confusing." .......................................10

   F. Professor Childers disclosed all required information. ................................11

IV. CONCLUSION ..................................................................................................12

# TABLE OF AUTHORITIES

**Cases**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
   738 F.3d 960 (9th Cir. 2013) ................................................................................ 10

*Bordegaray v. Cty. of Santa Barbara*,
   No. 214CV8610CASJPRX, 2016 WL 7260920 (C.D. Cal. Dec. 13,
   2016) ......................................................................................................................... 2

*City of Pomona v. SQM N. Am. Corp.*,
   750 F.3d 1036 (9th Cir. 2014) .............................................................................. 13

*Cty. of San Bernardino v. Walsh*,
   158 Cal. App. 4th 533 (2007) ............................................................................... 10

*Daubert v. Merrell Dow Pharm., Inc.*,
   43 F.3d 1311 (9th Cir. 1995) .................................................................................. 1

*Goebel v. Denver & Rio Grande W. R.R.*,
   346 F.3d 987 (10th Cir. 2003) ................................................................................ 2

*Good v. BioLife Plasma Servs., L.P.*,
   834 F. App'x 188 (6th Cir. 2020) .......................................................................... 2

*In re Facebook, Inc. Internet Tracking Litig.*,
   956 F.3d 589 (9th Cir. 2020) ................................................................................ 10

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (2003) ........................................................................................ 10

*Mitchell v. Gencorp Inc.*,
   165 F.3d 778 (10th Cir. 1999) ................................................................................ 2

*Niam v. Ashcroft*,
   354 F.3d 652 (7th Cir. 2004) .................................................................................. 4

*United States v. Langan*,
   263 F.3d 613 (6th Cir. 2001) .................................................................................. 4

*United States v. Ruvalcaba-Garcia*,
   923 F.3d 1183 (9th Cir. 2019) ................................................................................ 6

*United States v. Sandoval–Mendoza*,
   472 F.3d 645 (9th Cir. 2006) ................................................................................ 13

**Rules**

Fed. R. Evid. 702; ......................................................................................................... 1

## I. INTRODUCTION

The fundamental error in GEO's Motion to Exclude Testimony of Michael Childers (ECF 449) (the "Motion") appears in its first sentence. Professor Childers did not, as GEO writes, base his damages calculations on the Association of Physical Plant Administrators Custodial Staffing Guidelines (the "APPA Guidelines") that GEO spends the bulk of its Motion attacking. Rather, Professor Childers conducted two separate analyses: an APPA Guidelines-based analysis and an analysis to determine the cost to replace detainee labor with actual paid labor. Each analysis used separate data and arrived at a separate result for a separate purpose.

GEO's attacks focus almost exclusively on Professor Childers's APPA analysis, but it never raises any complaint with Professor Childers's replacement-cost value analysis. GEO's criticisms of the APPA Analysis simply presents a long list of "we disagree with what he did" items that are better raised via cross-examination, if at all. And GEO's claims that Professor Childers failed to disclose required information are easily proven false. GEO presents no valid basis for excluding Professor Childers's APPA Analysis (and no basis at all for excluding his Replacement-Cost analysis). The Motion should be denied in full.

## II. LEGAL STANDARDS

As a threshold matter, the Court must determine whether the witness is "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*"). If the proposed witness is qualified, a two-part inquiry follows to determine whether (1) the reasoning or methodology underlying the testimony is scientifically valid (the reliability prong) and (2) whether that reasoning or methodology properly can be applied to the facts in issue (the relevancy prong). *Daubert*, 509 U.S. at 592-93.

Because the trial court reviews an expert's opinions for admissibility, rather than weight, the proponent of expert testimony is not required to prove that the expert is "undisputably correct." *Goebel v. Denver & Rio Grande W. R.R.*, 346 F.3d 987, 991 (10th Cir.

2003) (citing *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999)).

Accordingly, courts in this district and elsewhere recognize that "rejection of expert testimony is the exception rather than the rule." *Bordegaray v. Cty. of Santa Barbara*, No. 214CV8610CASJPRX, 2016 WL 7260920, at *12 (C.D. Cal. Dec. 13, 2016) (quoting Fed. R. Evid. 702 Advisory Committee's notes to 2000 Amendments); *see also, e.g.*, *Good v. BioLife Plasma Servs., L.P.*, 834 F. App'x 188, 198 (6th Cir. 2020) (same). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993).

## III.  ARGUMENT

The Motion should be denied for many reasons.

### A.  Overview of Childers's Opinions

Professor Childers offers expert testimony on the conclusions he reached after performing two separate analyses: an "APPA Analysis" and a "Replacement Cost Analysis." Because GEO's Motion conflates the two analyses, an understanding of each is helpful.

#### 1. The APPA Analysis.

The APPA Analysis is described in paragraphs 13 through 20 of Professor Childers's report. Using the APPA Guidelines, Professor Childers prepared an estimate of the number of worker-hours and corresponding full-time janitors that would be expected to be required to maintain the detainee-cleaned spaces inside the Adelanto detention center at a certain level of cleanliness. ECF 449-2, Report ¶¶19-20. The APPA Analysis requires as inputs (1) the type of space being cleaned; (2) the size of the space; and (3) the desired level of cleanliness (e.g., "spic-and-span" or pigsty). *Id.* ¶¶13-15.

Using his expertise in production standards and work management, Professor Childers assigned each detainee-cleaned space within Adelanto to its APPA equivalent, determined the total square footage of each type of space included, and then selected an appropriate level of cleanliness based on the room type and GEO's own cleaning policy. *Id.* ¶15. Professor

Childers then calculated the total number of man-hours and equivalent full-time janitors needed to clean the spaces that are now cleaned by detainees. *Id.* ¶¶19-20.

Professor Childers's APPA Analysis serves two purposes. First, it corroborates Plaintiffs' expert Jody Bland's analysis and confirms that Mr. Bland's analysis was a reliable starting point for Professor Childers's Replacement Cost Analysis. *Id.* ¶20 (AAPL Analysis and Bland Analysis within less than 3% difference); Ex. F, Decl. of Michael Childers ¶7. Second, the APPA Analysis provides strong, independent evidence rebutting GEO's arguments that its detainee population "likes" to clean the facility and that GEO simply allows them to do so as a means of "busy-work" and to help keep the detainees out of trouble. It is no coincidence that the number of hours APPA estimates it would take to maintain the detainee-cleaned spaces is within a few percentage points of the number of actual detainee hours spent cleaning the facility. This similarity shows that GEO uses detainee labor because that is what the facility requires, not because detainees enjoy the work.

### 2. The Replacement-Cost Analysis.

Professor Childers also opines on the results of a separate analysis in which he calculates GEO's cost to replace its near-free detainee labor force with actual paid custodians. ECF 449-2, Report ¶¶20-27. To do so, Professor Childers begins with the total number of detainee hours worked (as calculated by Mr. Bland) and then calculates the value of that labor (including hourly wages and benefits) to GEO. *Id.* ¶20 & n.7; Ex. F, Childers Decl. ¶8. He does so for alternative scenarios in which GEO could either hire full-time custodial employees or a lowest-legal-cost contractor. ECF 449-2, Report ¶¶25, 27. The results serve as independent measures of the economic value of forced labor to GEO and of GEO's motivation to use coerced labor in lieu of paying for it on the open market. GEO does not challenge any part of the Replacement Cost Analysis in its Motion.

### B. GEO does not attack Childers's damages calculations.

To the extent GEO's Motion implies that the Court should exclude all of Professor Childers's testimony, it is improperly broad and should be denied. GEO's Motion exclusively

attacks only Professor Childers's APPA analysis and does not address in any way Professor Childers's opinions and conclusions that flow from his calculations of the cost to replace detainee labor with paid labor. *See generally id.* ¶¶20-27. GEO's request to exclude all of Professor Childers's testimony should therefore be rejected.

Although its Motion conflates APPA Analysis and the Replacement-Cost Analysis, GEO knows the difference. GEO's expert, Serena Morones, provided her own analysis of Professor Childers's replacement cost conclusions, including a few criticisms of that analysis (the correctness of which are disputed). GEO did not move on those criticisms here, and, indeed, Morones agrees with Childers at least as much as she disagrees. *See, e.g.*, ECF 355-4, Morones Dep. at 78:8-79 (agreeing that each dollar paid by GEO represents a day of detainee labor); 81:13-14 (no criticisms for relying on Bland's data); 81:20-82:3 (agreeing that employees and detainees would require the same amount of time to complete the same tasks); 82:22-83:11 (agreeing with categorization of detainee workers); 121:16-18 (no criticism of approach to calculating the but-for cost of using subcontracted employees).

**C.     Childers is qualified.**

Professor Childers is well-qualified to testify as an expert in this case. He is a Professor in the Department of Labor Education at the University of Wisconsin. ECF 449-2, Report ¶1. He has a PhD in Workforce Education and Development. *Id.*

Professor Childers teaches classes on time study and production standards, among others. *Id.* He has neither taught a class specifically focused on the staffing of detention facilities nor published an article examining detention facility staffing requirements. But who has? "There is no ironclad requirement that an academic, to be qualified as an expert witness, must publish academic books or articles on the precise subject matter of her testimony." *Niam v. Ashcroft*, 354 F.3d 652, 660 (7th Cir. 2004) (rejecting argument that witness with experience in post-communist Eastern European politics needed specific expertise in post-communist *Bulgarian* politics) (citing *United States v. Langan*, 263 F.3d 613, 623 (6th Cir. 2001)).

Although he has never created a staffing plan for a detention center or prison facility,

Professor Childers has extensive, <u>specific</u> expertise working on "issues related to production standards, workloads, and staffing levels in which [he has] developed estimates of the time that should be allowed to perform work activities" and has performed "hundreds of such studies." *Id.*; Ex. F, Childers Decl. at ¶¶4-5. Professor Childers is qualified on these topics.

**D.     Professor Childers's APPA Analysis is reliable.**

Professor Childers's APPA Analysis is reliable and appropriately used here.

**1.  APPA Guidelines apply almost universally to any space that must be cleaned.**

GEO's first criticism—that APPA Guidelines do not apply to detention facilities—is wrong and only highlights the primary <u>strength</u> of the guidelines. *See* ECF 449, Motion at 6. For APPA Guidelines to be useful, one need only know (1) the type of space being cleaned; (2) the size of the space; and (3) the desired level of cleanliness. Ex. E, Childers Dep. at 52:14-19, 76:11-14; Ex. F, Childers Decl. ¶10. They can be applied to almost any space whether or not it appears on a university campus. *Id.* ¶¶10-12. Indeed, APPA Guidelines have been incorporated into the well-known "LEEDS" certification for environmentally friendly buildings. Ex. F, Childers Decl. ¶12. It does not matter that Professor Childers could not identify a specific example where the guidelines have been used for a detention facility because "[c]leaning is cleaning. It's more about how analogous the different areas are and [what] the different levels of cleanliness are." Ex. E, Childers Dep. at 69:15-17.

Nor does it matter whether the evaluator has personally visited the facility being evaluated. APPA Guidelines do not require an intimate understanding of the layout of the subject facility so long as the square footage to be cleaned is known. And, in this instance, Professor Childers relied on GEO's own blueprints of the Adelanto facility, obviating the need for him to visit it personally. ECF 449-2, Report ¶13; Ex. B, Childers Depo. Ex. 6; Ex. E, Childers Dep. at 103-11.

GEO next argues that Childers should have determined whether the cleaning needs of colleges are similar to those of the Adelanto detention center, but that is not the right question. The APPA system "generates results based off of the expected level of cleanliness,

not off of, like, a starting point." *Id.* at 99:21-100:03. The right question is therefore not whether the subject facility has the same cleaning needs as a college, but what the subject facility's cleaning needs are and which APPA cleaning level best equates to those needs. Professor Childers addressed both inquiries by reviewing GEO's "Housekeeping/Maintenance Plan" and matching GEO's own self-described needs to the equivalent APPA Custodial Service Level. ECF 449-2, Report ¶15. If GEO wants to argue that Childers did not account for the possibility that the people who are held in its facilities must eat, sleep, and labor in greater squalor than college students, it is welcome to make that argument to the trier of fact.[1]

Finally, GEO's criticism that the APPA data is unreliable because it comes from colleges and universities is misplaced. That is a strength of the data, not a weakness. Not only do universities require cleaning of an immense variety of facility and space types, but they are also ideally placed to collect, verify, report, and collaborate on the data shared.

**2. GEO's quibbles with various inputs to the APPA Analysis are meritless and do not support exclusion.**

GEO's more-specific criticisms of Professor Childers's work focus on aspects of the APPA Analysis that GEO claims should have or could have been done differently. They do not merit exclusion. "[Q]uestions about the correctness of an expert's conclusions are a matter of weight, not admissibility." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1191 (9th Cir. 2019)) (internal quotation omitted).

**(a) Room categories, comparisons, and cleanliness levels.**

GEO complains that Childers did not provide information about what category he used for "corridors" or other room comparisons. Not so. Childers's Report included it in

---

[1] GEO also contends that APPA Guidelines are inappropriate standards because they do not offer any data on the cost of cleaning services. ECF 449, Motion at 2. But, as covered above, that was not the goal of the APPA Analysis Professor Childers performed here.

Exhibit 3.[2] ECF 449-2, Report Ex. 3 at 1-3. Specifically, with respect to corridors, the chart on page 3 shows an APPA code of "4300" for "Corridors," corresponding to an "Entranceway, Level #1." *Id.* And Childers testified directly as to what he used at deposition. Ex. E, Childers Dep. at 61:8-62:11 (listing spaces and analogous comparators).

GEO's argument that Professor Childers's selected his comparators arbitrarily or made "guesses" as to the best analog are equally unfounded. There is nothing "arbitrary," for instance, about analogizing "Patient Treatment Area, Hard Floor" to the "medical" area at Adelanto or "Dormitory" to "housing." *Id.* at 61:8-62:11. And GEO's argument that he did not account for cafeterias is contrary to his testimony. Professor Childers testified that <u>he accounted for it within the space assigned to "housing"</u> because "[cafeteria] square footage was not on the blueprints" and was not "individually broken out." Ex. E, Childers Dep. at 104:13-17, 113:23-25.

At base, GEO's quibbling with Professor Childers's choice of comparator rooms for corridors, visitation rooms, and kitchen/laundry areas does not materially change his final APPA result or the conclusions to be drawn. For example, if those rooms were removed from the analysis entirely, the APPA estimate decreases by only 2.7, 1.7, or 12.3%, respectively. Ex. F, Childers Decl. ¶14. And it is only that much if those categories are zeroed out <u>completely</u>, as opposed to simply replacing Childers's choice of comparator with whatever comparison GEO thinks would be more appropriate.[3]

Professor Childers also did not, as GEO alleges, simply make an arbitrary or subjective determination of the appropriate level of cleanliness for each room type. ECF 449, Motion

---

[2] Professor Childers's testimony that he did not list the comparators in the Report because he wanted to be brief makes more sense when one understands what GEO leaves out; namely, that while the information was not in the Report proper, it was included in the Exhibits to the Report.

[3] Plaintiffs note that GEO challenges Professor Childers's specific choices for room comparisons at the same time that it complains Professor Childers never disclosed his specific choices for room comparisons. *See* ECF 449, Motion at 12 (arguing Childers "failed to provide any information about what categories he used from the APPA Guidelines as a baseline for his opinions."). GEO's logic simply fails.

at 1-2, 7. Rather, Childers reviewed GEO's own sanitation policy and applied his experience and judgment in selecting a cleanliness level from the APPA guidelines. Ex. E, Childers Dep. at 115:15-18 ("Again, I placed those into their various categories based off of the descriptions I got from the Adelanto processes and the APPA guidelines for cleanliness.").

### (b) GEO's paid staffing levels are irrelevant to Professor Childers's analysis.

GEO contends at various points throughout its Motion that Professor Childers should have incorporated its current staffing levels into his analysis, but doing so makes no sense and would not change any of Professor Childers's results. The goal of the AAPL analysis was to determine the expected number of cleaning staff necessary to clean the spaces that are currently cleaned by detainees. The resulting number is objective, meaning that it does not vary depending on how many custodial staff GEO employs.

GEO also does not explain how Professor Childers alternatively should have incorporated GEO's current staffing into his analysis. As a point of fact, GEO employed only three janitors at Adelanto until 2016, and six after. Charest Decl. Ex. A, Janecka Dep. at 36:19-37:8. And tellingly, those three (or six) janitors' primary work areas are GEO's administrative spaces where detainees cannot clean. *Id.* at 37:19-38:4; 42:22-23; *id* at 37:11-15. If anything, the comparison between the number of janitors needed per APPA (about 63) to the number of paid janitors GEO actually employed (3 or 6, depending) highlights just how much GEO depends on a coerced workforce to keep its facility up to standards.

GEO's Motion is also incorrect when it contends that Childers did not distinguish areas that are not cleaned by detainees. As a factual matter, detainees do not clean administrative areas because those are cleaned by paid janitors. *Id.* at 245:2-7. And those paid janitors clean the areas <u>outside</u> the secured perimeter, where detainees cannot go. *Id.* at 251:3-17. Professor Childers did not include the square footage of those areas in his analysis. Ex. E, Childers Dep. at 171:22-172:4. As such, GEO's concerns fail.

### (c) Square footage estimates.

GEO's contention that Professor Childers used square footage drawn from "proposed" blueprints of the Adelanto facility is wrong, omits key testimony, and mispresents the document in question. Professor Childers used the square footage taken from blueprints of the <u>existing</u> facility. *See generally id.* at 103-11. Those blueprints were found within a formal proposal that GEO sent to ICE, but Professor Childers clearly testified that he used the square footage found in the blueprints that are clearly identifiable in a table titled "Existing Facility Area Breakdown." Ex. B, Childers Dep. Ex. 6 at 31, 35. Where the necessary data was not in the table, Professor Childers made his own measurements. Ex. E, Childers Dep. at 108:18-25. GEO alludes to other data it claims is in Plaintiffs' possession, but GEO neither identifies that data nor argues that the results would be different. Regardless, it is well-established that disagreements over the proper data to use are issues for cross-examination, not exclusion. *See Quiet Tech. DC-8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003) (rejecting *Daubert* challenge based on argument that the expert used incorrect data or was missing data and used the wrong equations to run his analysis stating "the alleged flaws in [the expert's] analysis are of a character that impugn the <u>accuracy</u> of his results, not the general scientific <u>validity</u> of his methods. The identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination.") (emphasis added).

### (d) Data from other facilities.

Similarly, GEO faults Professor Childers for not using data from other facilities or comparing the results of his APPA Analysis to other facilities. But doing so would have been irrelevant—the point of the analysis was to estimate the required staffing needed for <u>this</u> facility; specifically, the space in the Adelanto facility that would have to be cleaned by paid labor if not cleaned by detainees.

\*   \*   \*

GEO's laundry list of reasons that Professor Childers's APPA analysis is unreliable presents nothing more than an extended and unfounded gripe list with no substance. It is

9

complete lawyer argument. At no point does GEO offer any actual evidence or expert testimony of its own showing how, if at all, incorporating its preferred changes would affect the end result. Challenges to such aspects of an expert's opinion, rather than to his general methodology, "all go to the weight of the testimony and its credibility, not its admissibility." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969–70 (9th Cir. 2013).

### E. GEO misstates Professor Childers's the issues addressed in order to label Professor Childers's work "confusing."

GEO argues that Professor Childers's opinions should be rejected as "confusing" because he cannot assist the jury in determining "the staffing delta between GEO's current employees and the number of employees that Plaintiffs' believe GEO should have employed." ECF 449, Motion at 11. But that is not an issue that the jury must reach, nor was it Professor Childers's task here.

California's Unfair Competition Law provides a remedy that may be measured by the "profits unfairly obtained to the extent that these profits represent monies given to the defendant or benefits in which the plaintiff has an ownership interest." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1148 (2003). California also recognizes a right to disgorgement of profits resulting from unjust enrichment. *Cty. of San Bernardino v. Walsh*, 158 Cal. App. 4th 533, 542 (2007) (citation omitted); *see also In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 600 (9th Cir. 2020) ("California law recognizes a legal interest in unjustly earned profits."). The jury does not need to know the "staffing delta" or the number of "additional staff" that GEO should have employed. What the jury must answer—and where Professor Childers's testimony is helpful—is the question of determining the additional profits that GEO realized by virtue of using coerced labor instead of paying for that work.

Professor Childers's Replacement-Cost Analysis provides the answer. Beginning with Mr. Bland's estimated detainee hours works, Professor Childers calculates the additional

costs (or profits retained) of GEO alternatively hiring custodian employees ($26,735,048) or a "lowest-legal cost" sub-contractor ($19,487, 858). ECF 449-2, Report ¶¶ 25, 27.[4]

### F.     Professor Childers disclosed all required information.

GEO also complains that Professor Childers did not disclose required information. But the record belies GEO's assertion.

To begin, it is true that a listing of the cases in the last four years in which Professor Childers provided testimony was inadvertently not included with his report. Neither party caught the omission until Professor Childers's deposition. Plaintiffs agreed to provide the list, Ex. E, Childers Dep. at 169:2-12, and did. Charest Decl. Ex. C, September 30, 2020 Email from Daniel Charest to Ellen Robbins at 2. The list is one case long. *Id.* at 1-2.

GEO's accusations that Plaintiffs and Professor Childers are hiding information because the list contained fewer cases than it expected encapsulates its Motion in a nutshell. First, GEO misrepresents Professor Childers's testimony to the Court. Professor Childers did not testify that he had "provided expert testimony" in fifteen cases in his career; he testified that he had "served" as an expert witness fifteen times. Ex. E, Childers Dep. at 21:1-3 ("Q: Approximately how many times have you served as an expert witness? A: 15 times."). As this Court is aware, expert witnesses often are never called on to give testimony at a deposition or trial in a particular case.

Second, GEO's claim that it was "deprived" of the ability to question Professor Childers on his prior testimony is bunk. GEO directly questioned Professor Childers about four of the "half a dozen" cases he testified to working on in the previous five years, including questions regarding their subject matter, his opinions, and the data and methods he used. *Id.* at 21:4-24:5. In fact, ***GEO did question Professor Childers on the only case in which he has given testimony in the last four years.*** *Id.* at 21:6-16 ("Q: What about the California Dole

---

[4] Of course, if one did wish to know the difference between the number of paid janitorial staff needed to clean the facility and the number of staff actually employed, it is easy enough to take the result of Prof. Childers's APPA Analysis of ~ 63 staff, ECF 449-2, Report ¶20, and subtract the number of staff actually employed (3, until 2016, and six after 2016).

case, what opinions did you provide in that case?").

<u>Lastly</u>, GEO's accusation that Childers has withheld identifying cases does not comport with even basic logic. It is not inconsistent to serve as an expert witness in 15 cases in a career, or six cases in the last <u>five</u> years (including this one), while only having actually testified at deposition or trial in one case (not including this one) in the last <u>four</u> years. Of course, GEO has no proof that any of this is wrong.

GEO next claims that Professor Childers has never provided the information he used to derive the square footage information that informs his APPA analysis. The information GEO tells the Court was never provided is, in fact, in the very same blueprints GEO discusses in its Motion. <u>Those blueprints are identified in the body of Professor Childers's Report</u> at paragraph 13 and footnote 5. ECF 449-2, ¶13, n.5. They are also the third item listed in Professor <u>Childers's list of reliance materials</u>. *Id.* Exhibit 2 ¶3. The blueprints were also <u>marked as Exhibit 6 to his deposition</u>. Ex. E, Childers Dep. at 105:16-106:4. GEO directly questioned Professor Childers—at length—on the blueprints he used to arrive at that data at his deposition. *Id.* at 103-11. And, as Professor Childers pointed out, the blueprints include a table called "Existing Facility Area Breakdown" that lists square footages for various types of spaces. Ex. B, Childers Dep. Ex. 6 at 2-3. GEO cannot claim it did not receive this information. The "missing" information was provided, explained, and examined.

Lastly, GEO complains that Professor Childers "still has not provided" information about what category he used for "corridors" or other room comparisons. ECF 449, Motion at 12. As noted above, that information was included in hard copy with his Report in his Exhibit 3. It was also produced in native form five days after Childers's deposition. Charest Decl. Ex. D, September 16, 2020 Email from Julianna Gravois to Adrienne Scheffey *et al.* Again, GEO's complaint lacks any basis in fact.

## IV. CONCLUSION

At this point, many *Daubert* responses would end with a reference to a "battle of experts" as properly decided by the jury instead of at the *Daubert* stage. But there is no expert

strife here. GEO offers no one—not an engineer, not a production standards or work measurement expert, and not even an experienced custodian—to rebut Professor Childers's APPA Analysis based on professional expertise. The argument that Professor Childers "did it wrong," therefore, does not come from other experts in the field. It comes from GEO's lawyers. "[I]t is the job of the fact finder, not the trial court, to determine which source is more credible and reliable." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (citing *United States v. Sandoval–Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006)).

For the foregoing reasons, Plaintiffs respectfully request that the Court deny GEO's Motion to Exclude Expert Testimony of Michael Childers (ECF 449).

Dated: March 8, 2021

Respectfully submitted,

*/s/ Daniel H. Charest*
Daniel H. Charest (admitted *pro hac vice*)
dcharest@burnscharest.com
TX Bar # 24057803
Warren Burns (admitted *pro hac vice*)
wburns@burnscharest.com
TX Bar # 24053119
Will Thompson (CA Bar # 289012)
wthompson@burnscharest.com
E. Lawrence Vincent (admitted *pro hac vice*)
lvincent@burnscharest.com
TX Bar # 20585590
Mallory Biblo (admitted *pro hac vice*)
mbiblo@burnscharest.com
TX Bar # 24087165
Lauren Cross (admitted *pro hac vice*)
lcross@burnscharest.com
TX Bar # 24105759
**BURNS CHAREST LLP**
900 Jackson St., Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002

Korey A. Nelson (admitted *pro hac vice*)

knelson@burnscharest.com
LA Bar # 30002
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765

R. Andrew Free (admitted *pro hac vice*)
andrew@immigrantcivilrights.com
TN Bar # 030513
**LAW OFFICE OF R. ANDREW FREE**
P.O. Box 90568
Nashville, TN 37209
Telephone: (844) 321-3221
Facsimile: (615) 829-8959

Nicole Ramos (admitted *pro hac vice*)
nicole@alotrolado.org
NY Bar # 4660445
**AL OTRO LADO**
511 E. San Ysidro Blvd., # 333
San Ysidro, CA 92173
Telephone: (619) 786-4866

Robert Ahdoot (CA Bar # 172098)
rahdoot@ahdootwolfson.com
Tina Wolfson (CA Bar # 174806)
twolfson@ahdootwolfson.com
Theodore W Maya (CA Bar # 223242)
tmaya@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
10728 Lindbrook Drive
Los Angeles, California 90024-3102
Telephone:  (310) 474-9111
Fax:  (310) 474-8585

*Class Counsel*

# CERTIFICATE OF SERVICE

I electronically submitted the foregoing document with the clerk of the court for the U.S. District Court, Central District of California, using the electronic case filing system. I hereby certify that I have provided copies to all counsel of record electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

Dated: March 8, 2021

/s/ *Daniel H. Charest*

Daniel H. Charest (admitted *pro hac vice*)
dcharest@burnscharest.com
TX Bar # 24057803
**BURNS CHAREST LLP**
900 Jackson St., Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
mbiblo@burnscharest.com