# EXHIBIT E

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

---oOo---

RAUL NOVOA, JAIME CAMPOS FUENTES, )
ABDIAZIZ KARIM, and RAMON MANCIA, )
individually and on behalf of all )
others similarly situated,        ) Case No.
                                  ) 5:17-cv-02514-JGB-SHK
     Plaintiffs/Counter-Defendants,)
                                  )
     vs.                          )
                                  )
The GEO Group, INC.,              )
                                  )
     Defendant/Counter-Claimant.  )
                                  )
_____)

VIRTUAL DEPOSITION OF

EXPERT MICHAEL R. CHILDERS, PH.D.

Monday, September 21, 2020

8:03 A.M.

REPORTED BY:

GISELLE GIRARD

CSR #12901

Page 2

```
1   VIRTUAL APPEARANCES:
2
    For Plaintiffs:
3
        BURNS CHAREST, LLP
4       BY:  E. LAWRENCE VINCENT, ESQ.
        900 Jackson Street
5       Suite 500
        Dallas, Texas  75202
6       469-904-4550
        469-444-5002  Fax
7       lvincent@burnscharest.com
8
        BURNS CHAREST, LLP
9       BY:  LYDIA A. WRIGHT, ESQ.
        365 Canal Street
10      Suite 1170
        New Orleans, Louisiana  70130
11      504-799-2845
        504-881-1765  Fax
12      lwright@burnscharest. Com
13
    For Defendant/Counter-Claimant:
14
        AKERMAN, LLP
15      BY:  ADRIENNE SCHEFFEY, ESQ.
        1900 16th Street
16      Suite 1700
        Denver, Colorado  80202
17      303-260-7712
        303-260-7714  Fax
18      adrienne.scheffey@akerman.com
19
    Also Present:
20
        JULIANNA GRAVOIS, PARALEGAL
21
22
23
24
25
```

Page 3

```
1               EXAMINATION INDEX
2
    September 21, 2020
3
    WITNESS            EXAMINATION BY      PAGE
4
5   MICHAEL R. CHILDERS,  MS. SCHEFFEY    5, 171, 186, 201
    PH.D.
6                      MR. VINCENT    152, 184, 192, 202
7
8
9
10
11
12
13
14
15          INFORMATION REQUESTED
16              PAGE      LINE
17               42        12
18               77        11
19              151        16
20
21
22
23
24
25
```

Page 4

```
1               EXHIBITS
2       EXPERT MICHAEL R. CHILDERS, PH.D.
3    Raul Novoa, et al. vs. The GEO Group, Inc.
4          Monday, September 21, 2020
5
6   DEFENDANT'S        DESCRIPTION          PAGE
7   EXH 1   Expert Declaration of Professor     13
            Michael Childers (34 pgs.)
8
    EXH 2   BSCAI Production Rate               33
9           Recommendations (4 pgs.)
10  EXH 3   Housekeeping/Maintenance Plan,      49
            (6 pgs.)
11
    EXH 4   Custodial Staffing Guidelines for   57
12          Educational Facilities 1998
            (20 pgs.)
13
    EXH 5   Detainee Payroll Adelanto ICE       67
14          Processing Center 1/21/18
            (12 pgs.)
15
    EXH 6   Proposal to USD Homeland Security,  106
16          Requirement D 12/19/19 (252 pgs.)
17  EXH 7   Request for Authorization of        146
            Additional Classification and Rate
18          5/31/11 (4 pgs.)
19  EXH 8   Location Dimensions, Square Feet    149
            and Comments (2 pgs.)
20
    EXH 9   Subpoena to Produce 9/3/20          151
21          (7 pgs.)
22  EXH 10  The GEO Group Offer Letters         180
            (9 pgs.)
23
24
                    ---oOo---
25
```

Page 5

```
1          Monday, September 21, 2020
2
3          MICHAEL R. CHILDERS, PH.D.,
4    having been first duly affirmed, was examined and
5               testified as follows:
6
7       MS. SCHEFFEY:  Okay.  And just a moment ago,
8   Mr. Vincent, we agreed that even though this is
9   happening over video, we're going to stipulate to remote
10  swear-in; is that correct?
11      MR. VINCENT:  Yes.
12      MS. SCHEFFEY:  Thank you.
13
14               EXAMINATION
15  BY MS. SCHEFFEY:
16      Q.  Good morning, Mr. Childers.  My name is Adrienne
17  Scheffey, and I represent The GEO Group.  I'm going to
18  be asking you a series of questions today about a
19  lawsuit captioned Novoa versus GEO, for which you
20  provided a report.  Do you recall providing a report for
21  that case?
22      A.  Yes.
23      Q.  The purpose of this deposition is to record your
24  responses for use at trial and other purposes in this
25  case.  It's important that you answer truthfully.  Do
```

Page 6

1  you understand?
2      A.  Yes.
3      Q.  I note that you're under oath.  Even though we're
4  in a video conference today, this proceeding has the
5  same effect as if we were in a court of law.  Do you
6  understand you're sworn to tell the truth?
7      A.  Yes.
8      Q.  The court reporter is going to take down
9  everything we say.  She's going to prepare a transcript.
10 You're going to have an opportunity to review that and
11 sign it.  If you make any corrections, we can comment
12 and quote on any of those alterations.  Do you
13 understand that?
14     A.  Sure.
15     Q.  So especially because we're remote today, your
16 answers need to be clear and verbal.  The court reporter
17 isn't going to be able to record nods or other sounds
18 that are not clear or understandable, like uh-huh or
19 huh-uh.
20         Because we're on video, this is particularly
21 important:  I'm going to do my best to let you finish
22 your answer, and I ask you to do your best to let me
23 finish asking my question; and we can try not to talk
24 over each other because the court reporter is only going
25 to be able to take down testimony of one person at a

Page 7

1  time.
2      A.  (Nodding.)
3      Q.  Additionally if you have any technical issues
4  such that you cannot hear me or my audio is not coming
5  through clearly, will you agree to let me know?
6      A.  Of course.
7      Q.  If you do not let me know, I'm going to assume
8  you heard my questions clearly or that we're not having
9  any technical issues.
10     A.  Okay.
11     Q.  If you do not know at any point or don't remember
12 the answer or information necessary to answer a
13 question, please let me know.  If you do not hear a
14 question, please let me know, and I will repeat it.  If
15 you do not understand a question, please say so, and I
16 will rephrase it.
17         If you do not ask me to repeat or rephrase a
18 question, I'm going to assume that you heard and
19 understood the question.  Does that sound fair?
20     A.  I understand.
21     Q.  If at any point today you realize that an earlier
22 answer you gave was inaccurate or incomplete, please let
23 me know that you want to correct or supplement your
24 earlier answer, and I will allow you to do so.
25     A.  Okay.  Thank you.

Page 8

1      Q.  There are some times today when I'm going to ask
2  you to provide an estimate.  An estimate is different
3  from a guess.  For example, if I ask you how long the
4  table in front of you is, you're capable of providing an
5  estimate.
6         If I ask you, however, the length of my table in
7  my home where I'm sitting, that answer would be a guess
8  because you've never seen it before, and, therefore, you
9  have no reasonable basis for knowing that information.
10 Do you understand the difference?
11     A.  I do.
12     Q.  Okay.  And so today I only want you to provide
13 estimates, not guesses.
14     A.  I understand.
15     Q.  This is not an endurance test; if you need a
16 break, let me know.  I'll probably need a break at some
17 point, same with the court reporter; we can take a break
18 at any time.  I just ask you answer any question that's
19 pending before we take a break; is that fair?
20     A.  Yes, I understand.
21     Q.  Do you have any questions about anything I've
22 said so far?
23     A.  Nope.
24     Q.  All right.  Are you taking any medication that
25 may interfere with your understanding of my questions

Page 9

1  today?
2      A.  No.
3      Q.  Are you under the influence of any drugs or
4  alcohol?
5      A.  No.
6      Q.  Okay.  Is there anything else that would affect
7  your ability to give truthful and complete testimony
8  today?
9      A.  No.
10     Q.  Can you provide your full name and date of birth
11 for the record.
12     A.  Sure.  It's Michael Ryan Childers,
13 C-h-i-l-d-e-r-s.  Birth date is February 23rd, 1967.
14     Q.  And can you confirm that you don't have anyone
15 else in the room with you.
16     A.  Yes.
17     Q.  Okay.  And if you have electronic devices, can
18 you agree that you won't use those to communicate with
19 counsel or anyone else while you're on the record.
20     A.  Yes.
21     Q.  Okay.  And by that I mean, you know, a cell phone
22 or something else other than the computer.
23     A.  I understand.
24     Q.  Okay.  What did you do to prepare for your
25 deposition today?

Page 10

```
1    A.  I printed out and reviewed a copy of my report,
2  and I briefly reviewed the report of a rebuttal expert
3  for the section that was related to the rebuttal of my
4  report.
5    Q.  Did you meet with anyone?
6    A.  Yes.  I met with Larry Vincent for -- on
7  Saturday.
8    Q.  Okay.  For how long?
9    A.  About 90 minutes.
10   Q.  Was that the only person you met with?
11   A.  Yes.
12   Q.  Other than your report and the rebuttal report,
13 did you review any other documents for today's
14 deposition?
15   A.  Yes.  I reviewed my spreadsheet that was the
16 basis for the numbers in my report.
17   Q.  Anything other than the spreadsheet?
18   A.  No.
19   Q.  And who selected the documents for you to review
20 in preparation for your deposition?
21   A.  As Larry and I spoke, he said that, "You need to
22 be familiar with your report so you're prepared to
23 answer questions about them."
24   Q.  And at any point prior to today, have you spoken
25 with any other experts in this case?
```

Page 11

```
1    A.  No.
2    Q.  In rendering your opinion, did you rely upon any
3  facts provided by any other expert in this case?
4    A.  Only as designated in my report.
5    Q.  Okay.  And what expert would that be?
6    A.  It's Jody Bland.  I used data from Bland to
7  complete my report.
8    Q.  And you've never spoken with Mr. Bland?
9    A.  No.
10   Q.  Now we can get into your background a little bit.
11 Can you tell me about your educational background
12 starting with college.
13   A.  Sure.  I have an undergraduate degree in
14 industrial engineering, and masters and Ph.D. in
15 workforce education and development.
16   Q.  And where did you get those degrees?
17   A.  My undergrad at Illinois and Champaign Urbana,
18 and my graduate degrees are from SIU Carbondale.
19   Q.  And what was the focus of each of those degrees
20 when you studied?
21   A.  Some undergraduate degrees in industrial
22 engineering, and my graduate degrees are in workforce
23 education and development.
24   Q.  What does workforce education and development
25 mean?
```

Page 12

```
1    A.  It's a pretty broad discipline but generally
2  related to the -- I guess there's many different fields
3  within it, but the one that I was most focused on was
4  that of preparing workers to participate in the
5  workforce.
6    Q.  And how does that study inform you how to prepare
7  workers to participate in the workforce?
8    A.  I'm sorry.  Could you rephrase the question.
9    Q.  Yeah.  In your studies, how did you learn to
10 prepare workers for the workforce?  What kinds of
11 methodologies did you learn or practice?
12   A.  Oh, sure.  So, I mean, in the course of the Ph.D.
13 program, you take all core courses within your
14 discipline as well as similar to what some people would
15 call a minor for an undergraduate degree.  You can pick
16 a cognate area, and, in my case, I used the educational
17 psychology program as my cognate.
18       I took basically all of their educational
19 statistics courses through that program.  And
20 again -- yeah, I mean, the workforce development has to
21 do with, yeah, training workers, best practices in
22 management and supervision, conducting research.
23   Q.  And of those -- I think you just said that the
24 ways in which that degree could be used would be
25 training workers in management and supervision or
```

Page 13

```
1  conducting research.  Which one do you do in your
2  current profession?
3    A.  So currently I'm a professor in the Department of
4  Labor Education at the University of Wisconsin.  And I
5  teach many courses, but one thrust of my service in
6  research is related to basically industrial engineering
7  issues related to workforce around the determination of
8  the amount of time required to perform duties, job
9  classification and job evaluation systems, pay for
10 performance, gain sharing, goal sharing programs --
11 those sorts of things.
12       MS. SCHEFFEY:  I'm going to introduce Exhibit 1
13 into the chat.
14       (Defendant's Exhibit 1 was marked for
15 identification and attached hereto.)
16       THE WITNESS:  I have a question.
17       MS. SCHEFFEY:  Yeah.
18       THE WITNESS:  Should I -- I see it.  I got my pad
19 open.  Do you want me to download these as you put them
20 here?
21       MS. SCHEFFEY:  Yes.  And please open it and let
22 me know when.  One of the new parts of remote
23 depositions is that we do this all electronically
24 instead of printing paper and handing it to you.
25       THE WITNESS:  Sure.  Okay.  I have it downloaded
```

Page 14

1  and open.
2  BY MS. SCHEFFEY:
3      Q.  Okay.  Do you know what this is?
4      A.  Yes.  This looks like a copy of my report.
5      Q.  Okay.  Can you take a minute or two to review it
6  and confirm that it is a copy of your report.
7      A.  Okay.  Okay.
8      Q.  And so now that you've reviewed it, is that a
9  copy of your report?
10     A.  Yes, it is.
11     Q.  And it looks like you have some paper documents
12 in front of you as well.  What are those?
13     A.  It is my report.
14     Q.  If you are confident that those two are the same
15 or if you prefer to look at the paper report today,
16 that's fine as well.
17     A.  Okay.  Thank you.  Either way I don't mind.
18     Q.  Okay.  So for now, I'm going to have you turn to
19 Exhibit 1, which should be your C.V.
20     A.  Oh, okay.
21     Q.  Page 12 of the --
22     A.  Okay.  I have it.
23     Q.  Do you recognize this?
24     A.  Yes.
25     Q.  Okay.  Is this an accurate copy of your current

Page 15

1  C.V.?
2      A.  As of that time, yes.  I update it from time to
3  time, but yes.
4      Q.  Okay.  Has anything changed since the time you
5  submitted your report?
6      A.  I don't think so.  I could study it if you want
7  me to, but I would say this is pretty accurate.
8  There -- I might have added -- let me think of what I
9  might have added.  So one minor change -- and there's a
10 probably a couple more -- but as of July 1st, I'm no
11 longer a department chair, so it's just professor now.
12     Q.  Okay.  And that was on July 1st of this year?
13     A.  Uh-huh.
14     Q.  What was the reason for the change?
15     A.  Oh, I'd already done it for eight years; I needed
16 a break.
17     Q.  Okay.  And you remain a professor in the same
18 department?
19     A.  Yes, yes.
20     Q.  Is there any other information that you did not
21 include on this C.V. that is relevant to your
22 background?
23     A.  No.
24     Q.  Are there any new publications or other
25 experience that you would have added since the time you

Page 16

1  submitted your report?
2      A.  Again, I don't believe so, nothing earth
3  shattering.
4      Q.  So if you look at the selected publications on
5  your C.V., it's Page 3 of the C.V., 14 of the PDF.
6      A.  Okay.
7      Q.  Can you identify for me any of those publications
8  that you relied upon in rendering your opinions in this
9  case?
10         MR. VINCENT:  Object to form.
11         THE WITNESS:  From Page 3, I didn't rely on any
12 of this stuff.
13 BY MS. SCHEFFEY:
14     Q.  Okay.  What about the Selected Presentations, did
15 you rely upon any of those in rendering your opinions in
16 this case?
17     A.  No.
18     Q.  Okay.  If you go to Page 6 of your C.V., 17 of
19 the PDF, there is Labor Management Facilitations.  Did
20 you rely on any of those in rendering your opinions in
21 this report?
22     A.  I guess, can you rephrase the question.
23     Q.  Yeah.  In rendering your opinions in this report,
24 did you rely upon the Labor and Management Facilitations
25 listed in your C.V. here?

Page 17

1          MR. VINCENT:  Object to the form.
2          THE WITNESS:  I mean, as far as direct
3  information specific to these instances, no.
4  BY MS. SCHEFFEY:
5      Q.  Okay.  Let's go to your prior work experience.
6  Let's start with your current position at University of
7  Wisconsin-Madison.  I know you said you're no longer the
8  department chair, but tell me about what your job
9  consists of now and what it consisted of before you
10 stopped being the department chair.
11     A.  Sorry.  I was getting back to the beginning.
12     Q.  No problem.
13     A.  So as department chair, I guess the additional
14 duties that you take on are that you're responsible for
15 the day-to-day supervision of all the staff, doing
16 performance appraisals, managing the budget, interfacing
17 with the administration of the dean.
18         Like I said, I've been relieved of those duties
19 as of July 1st to where I'm now able to focus solely on
20 the duties of a professor.
21     Q.  And how many courses do you teach?
22     A.  This -- it depends on the semester --
23     Q.  Let's go --
24     A.  -- each spring -- I'm sorry.
25     Q.  I was going to say you can start with a semester,

Page 18

1  if that's easiest or if there's a standard schedule
2  between spring and fall, that's fine as well.
3      A.  It varies, but usually about four courses per
4  year.
5      Q.  And what are those four courses this fall?
6      A.  This fall, I'm teaching -- I'm coordinating a
7  program about production standards, and I'm teaching in
8  a collective bargaining course, as well as a leadership
9  development course.
10     Q.  What do you teach in production standards?
11     A.  This fall, the course is focused mostly on both
12 the genesis of these systems -- sort of their roots and
13 where they came from -- and important considerations for
14 workers to keep in mind when they're working under these
15 systems.
16     Q.  And did you consider any of the material you
17 teach in production standards when rendering your
18 opinions in this report?
19     A.  Again, I'm not sure how to answer the question.
20 If you mean is there any direct curriculum items that I
21 have planned for this course that were part of my
22 report, that answer is no.
23     Q.  Did you generally consider production standards
24 in rendering your opinions in this report?
25     A.  Well, obviously I'm relying on my experience and

Page 19

1  knowledge of standards in the generation of the report
2  we're talking about today, yes.
3      Q.  So at some point, when we get to the report in
4  detail, then can you describe how production standards
5  played a role in your opinion; is that correct?
6      A.  Sure.
7      Q.  What about leadership development, did that area
8  of your expertise play into your report here?
9      A.  No.
10     Q.  What about collective bargaining?
11     A.  No.
12     Q.  In addition to teaching, the third bullet point
13 of your resume states that you "Provide expert
14 consulting technical assistance as well as arbitration
15 and court testimony for international and local unions
16 and FLSA plaintiff attorneys."  Do you see that bullet?
17     A.  Yes.
18     Q.  Can you describe to me what you do that led you
19 to put that bullet on your resume.
20     A.  Sure.  It's things like what we're doing today.
21 I've been involved in a number of donning and doffing
22 cases where I've worked as part of a team or leader of
23 team to develop the amount of time that was
24 uncompensated and provided reports and testimony
25 regarding those reports.

Page 20

1      Q.  And did you provide a list of those cases that
2  you've been involved in with your report?
3      A.  I'm sorry.  Could you repeat the question.
4      Q.  Yeah.  Did you provide a list of prior cases in
5  which you've been involved with your report?
6      A.  No.
7      Q.  Why not?
8      A.  I wasn't asked for that.
9      Q.  What was the most recent case before this one
10 that you were involved in?
11     A.  So I guess I would say the most recent one where
12 I've had contact with counsel, it's a case in
13 Louisville, Kentucky.
14     Q.  And what is that case called?
15     A.  I would have to look.  The defendant is Rohm and
16 Haas; it's a chemical plant.
17     Q.  Do you know who the plaintiff is?
18     A.  I don't remember the name plaintiff.  I'm sorry.
19     Q.  Okay.  And approximately how long ago did you
20 provide expert testimony in that matter?
21     A.  I have not yet been deposed on that case.
22     Q.  Have you provided a report?
23     A.  I did.
24     Q.  When did you provide a report approximately?
25     A.  Two years ago.

Page 21

1      Q.  Approximately how many times have you served as
2  an expert witness?
3      A.  15 times.
4      Q.  About how many of those occurred in the last five
5  years?
6      A.  Half a dozen.
7      Q.  Other than the Louisville Kentucky case, can you
8  recall any others from the past five years?
9      A.  Sure.  There's one in California; it's Dole.  I
10 don't remember the main plaintiff.  It was in Merced.  I
11 did a report for a meat packing place in Wisconsin; it's
12 Valley Pride.  I'm trying to think.  That's what I
13 remember off the top of my head.
14     Q.  Okay.  So in Louisville, Kentucky, what opinion
15 did you provide?
16     A.  Oh, in Louisville?
17     Q.  Yeah.
18     A.  It's a donning and doffing case, so I helped
19 establish the amount of time required for the changing
20 of uniform items and transit from the locker room to the
21 work areas.
22     Q.  And in that case, were you asked to estimate the
23 amount of time it took to don and doff?
24     A.  That's correct.
25     Q.  And what methodology did you apply there?

Page 22

1    A.  In that case, we used the study of video to
2  establish a time.
3    Q.  Is that the same methodology that you used in
4  this case?
5    A.  No.
6    Q.  What about the California Dole case, what
7  opinions did you provide in that case?
8    A.  Similarly the amount of time for donning, doffing
9  and walking activities.
10    Q.  What methodology did you employ in that case to
11  determine the amount of time donning and doffing?
12    A.  That case, video and stopwatch time study after
13  the video.
14    Q.  Is that the same methodology you employed in this
15  case?
16    A.  No.
17    Q.  What about the Wisconsin meat packing case, what
18  opinions did you provide there?
19    A.  Similarly donning and doffing activities.
20    Q.  And what methodology did you employ in that case
21  to determine how long donning and doffing took?
22    A.  Stopwatch time study, some standard data as well
23  as video study.
24    Q.  Okay.  And is that the same methodology you
25  employed in this case?

Page 23

1    A.  Somewhat in that use of standard data was -- and
2  actually in the Louisville Rohm and Haas case, I
3  actually used standard data for the walking times as
4  well.
5    Q.  Can you tell me what you mean by standard data.
6    A.  Sure.  Standard data is established parameters
7  accepted by the industrial engineering profession for
8  the amount of time it takes to perform a set specific
9  activity.
10        In this case, as I mentioned, what I was looking
11  at is the actual walk times both just across level
12  ground and then to, like, ascend and descend stairs,
13  that sort of thing.
14    Q.  And what standard data did you use in the
15  Wisconsin case?
16    A.  The same thing, it was for the actual walking
17  time.
18    Q.  Okay.  And the organization where that
19  standardized data came from was called what, again?  I'm
20  sorry.
21    A.  Again, it's in numerous textbooks, Barnes.  Most
22  of the predetermined motion time systems utilize these
23  as standard data.
24    Q.  And did you use that same standard data here?
25    A.  I actually used a more specific system that's

Page 24

1  specifically matched with what I was being asked about
2  in this case.
3    Q.  Okay.  And the standard data that you used here,
4  have you ever used that in any other case before?
5    A.  Not in any cases, no.
6    Q.  Insofar as we're talking about the past five
7  years, has more of your income come from teaching or
8  from your consulting and expert testimony?
9    A.  Teaching.
10    Q.  And what about the bulk of your time, do you
11  spend more of it teaching or providing expert testimony?
12    A.  Teaching.
13    Q.  I think we can move on from your University of
14  Wisconsin to talk a little bit about your time at the
15  University of Carbondale --
16    A.  Okay.
17    Q.  What did -- what did you do at the University of
18  Carbondale in your five years there?
19    A.  So I was a graduate student, earned my master's
20  and doctorate degrees; worked as a research assistant;
21  and also I was awarded a postdoctoral fellowship after
22  graduation.
23    Q.  Okay.  Did you teach any courses while you were
24  there?
25    A.  Yes.

Page 25

1    Q.  What courses did you teach?
2    A.  I taught -- for the department of workforce ed, I
3  taught the assessment of learner performance.
4    Q.  Are those related to your opinions in this case?
5    A.  No, not directly.
6    Q.  Tell me about your time at GS Metals Corp.  What
7  was your position there?
8    A.  I was Director of Manufacturing & Engineering.
9    Q.  What did you do in that role?
10    A.  Oversaw the day-to-day operations of a
11  manufacturing facility and engineering staff.
12    Q.  How many engineering staff?
13    A.  About six.  It came -- I mean it went up and down
14  but...
15    Q.  Is that similar to your job now in any way?
16    A.  No.  I'm a professor now.
17    Q.  And what about at Mattel Toys and Fisher-Price,
18  what was your position there?
19    A.  I was a Senior Plastics Process Engineer.
20    Q.  What does that mean?
21    A.  It means I did a little bit of everything.  I
22  worked with the plants around their manufacturing
23  issues, with the designers and the tooling engineers
24  around how to design the best tools to create the
25  products; and then acted as a liaison, basically making

Page 26

1 sure that what was drawn up was actually able to be
2 executed in the manufacturing facilities.
3     Q.  And did your experience there play any role in
4 your opinions you provided in this case?
5     A.  Not directly, no.
6     Q.  What about Solar Plastics, what did you do there?
7     A.  Again, I was the engineer for a manufacturing
8 facility.
9     Q.  And was that similar to your role at Mattel Toys?
10     THE REPORTER:  We've lost the witness, or sound.
11     MS. SCHEFFEY:  You can still hear me?
12     THE REPORTER:  I can hear you.
13     MS. SCHEFFEY:  Okay.  We'll go off the record for
14 a sec until he's back.
15     (Brief recess.)
16 BY MS. SCHEFFEY:
17     Q.  So before we went off the record, I was asking
18 you if your position at Solar Plastics was similar to
19 your position at Mattel Toys.
20     A.  Similar, sure.  I mean, again, I had a lot more
21 responsibilities and covered more plants at Mattel, but
22 yes.
23     Q.  Okay.  How were the roles different?
24     A.  At Mattel, again, I was focused -- I was based in
25 the headquarters, worked with the design team

Page 27

1 extensively and then traveled and worked with the
2 manufacturing facilities.
3     At Solar Plastics, I was at a manufacturing
4 facility, so in addition to those other duties, I would
5 be part of, like, facilities issues, like if we wanted
6 to relocate pieces of equipment and supervising
7 contractors to do that sort of, you know, electrical or
8 plumbing work, that sort of thing.  So you basically
9 have a role in everything that's going on in your
10 facility.
11     Q.  Okay.  And so for any of the positions listed
12 here in your resume, were you responsible for staffing a
13 facility?
14     A.  Sure.  I mean, at GS I was the plant manager
15 so...
16     Q.  Any other positions other than GS?
17     A.  I guess as the department chair, I was the chair
18 of search committees and also determining when and how
19 we wanted to recruit people.
20     Q.  So what process did you go through at GS to
21 determine how many staff you needed?
22     A.  Again, it would depend on the needs of the
23 business, on the volume of production, on the mix of
24 products.  Working the sales and marketing in HR, we
25 would come up with what we needed to do and execute on

Page 28

1 that.
2     Q.  Did you rely on itemized data in staffing that
3 facility?
4     A.  Yes, to the extent that we had on our own
5 internal benchmarks as far as what our normal throughput
6 on different operational lines would be.
7     Q.  Did you rely upon the external standardized data
8 that you rely upon here or in other cases?
9     A.  On standard data, sure.  On a specific one around
10 cleaning, no.
11     Q.  What about at University of Wisconsin, did you
12 rely upon the standardized data around cleaning for
13 staffing your department?
14     A.  No.
15     Q.  Are you responsible for balancing the profits and
16 losses of your department at the University of
17 Wisconsin?
18     A.  I was until July 1st, yes.
19     Q.  Okay.  And tell me about your approach for doing
20 that.
21     A.  Again, it was to work with the faculty, talk
22 about our program mix, encourage faculty to write for
23 and obtain grant funding -- all of those things.
24     Q.  Okay.  Did you have to take into consideration
25 your staffing levels in connection with your budget?

Page 29

1     A.  Could you rephrase the question.
2     Q.  Yeah.  Did you ever limit your number of staff
3 based upon budgetary concerns?
4     A.  Absolutely.
5     Q.  How often did you do that?
6     A.  As-needed.
7     Q.  And so if it came to a push and pull between
8 profit and loss or standardized data, which one would
9 you go with?
10     A.  I don't understand the question.
11     Q.  Yeah.  So standardized data told you that you
12 needed a certain number of people to fulfill your
13 department at University of Wisconsin.  Would you go to
14 that recommendation as an absolute, or would you also
15 consider the budget in following that guidance?
16     A.  The question lands on me sort of like do I walk
17 to school or do I bring my lunch.  I'm not sure I
18 understand the connection there.  They're both
19 intricately tied --
20     Q.  Okay.  Tell me about when you say they're both --
21     A.  -- I don't know how to answer.
22     Q.  When you say they're both intricately tied, tell
23 me what you mean by that.
24     A.  Obviously we're not going to take make any
25 staffing decisions of any abstract without considering

Page 30

1 the availability of the funds to pay people.
2 Q. And are your funds determined by the State of
3 Wisconsin or by another --
4 A. Partially, yes.
5 Q. Okay. Do you work within a budget provided for
6 by the government; is that correct?
7 A. And managed by the department.
8 Q. Okay. Do you have any other experience that's
9 not listed here that I haven't asked you about about --
10 that involved staffing of facilities?
11 A. No, I think we've covered it.
12 Q. Okay. I'm going to to go to -- there's No. 4 of
13 your paragraphed report. I'm going to have you turn
14 there now.
15 A. Okay. Got it.
16 Q. So can you read that paragraph out loud for me.
17 A. Sure. "During my career, I have worked on
18         dozens of unions and companies on issues
19         related to production standards, work loads
20         and staffing levels in which I have
21         developed estimates of the time that should
22         be allowed to perform work activities.
23              "I have conducted hundreds of time
24         studies in manufacturing, warehousing
25         service and governmental organizations.

Page 31

1         Some of these projects have involved
2         collecting, analyzing or drawing conclusions
3         from large amounts of data."
4 Q. Okay. What companies have you worked for that
5 you're referencing in Bullet Point 4?
6 A. I guess I'm -- I have a question for counsel.
7     MS. SCHEFFEY: Okay. Do you want to talk to him
8 privately?
9     MR. VINCENT: Do you want to go off the record
10 for just a second?
11         And I can give you a call, Michael.
12     MS. SCHEFFEY: I don't want to risk it. Thanks.
13     THE WITNESS: Okay. Thank you.
14     (Brief recess.)
15 BY MS. SCHEFFEY:
16 Q. So I was wondering what companies you referenced
17 in Paragraph 4.
18 A. Sure. I mean, it's literally dozens, but a
19 couple of the bigger ones -- or the ones that have been
20 longer-term engagements, I would say probably the single
21 largest one would have been the work that I've done with
22 the TJX companies --
23 Q. Can you --
24 A. -- as do --
25 Q. Go ahead. Keep going.

Page 32

1 A. I was done. That's fine.
2 Q. Okay. What kind of work did you do for the TJX
3 company?
4 A. So I've worked with them and their unions as
5 they've installed and implemented a new manufacturing
6 standard system across their entire distribution
7 network.
8 Q. And what kind of analysis did you provide to
9 them?
10 A. In different locations, different types of
11 assistance, both from training on these systems to
12 actually going in in concern areas or departments to
13 troubleshooting the standard systems to make sure that
14 they were implemented properly.
15 Q. And did you perform any analysis of the time that
16 it took for certain employees to perform certain tasks?
17 A. Yes.
18 Q. Okay. What kind -- tell me about that analysis.
19 A. Again, it's back to their installing systems that
20 are set up to measure people's work. And using
21 industrial engineering tools, I've gone in there and
22 validated and verified their work, or we pointed out
23 reports of places where their systems are not working
24 properly.
25 Q. What industrial engineering tools did you use?

Page 33

1 A. Again, work measurement, most broadly, but all
2 elements of that including stopwatch time study,
3 predetermined motion time system standard data -- all of
4 those things.
5 Q. What is the predetermined -- I'm sorry -- motion
6 time system?
7 A. It is one method that is broadly used where,
8 again, certain set specified tasks have already been
9 measured; and, therefore, if you know the set specified
10 task, they have systems where that time needed to
11 perform those tasks is already determined, has already
12 been measured for you.
13 Q. Are you familiar with the Building Service
14 Contractors Association?
15 A. I've heard of them.
16 Q. So if they had something called Production Rate
17 Recommendations, would you think that would be one of
18 these types of measurements?
19 A. I'm not familiar enough with it. I would be
20 willing to take a look and consider it.
21     MS. SCHEFFEY: Yeah, why don't I put in Exhibit 2
22 here. So Exhibit 2 is going to be the Building Service
23 Contractors Association International Production Rate
24 Recommendation.
25         (Defendant's Exhibit 2 was marked for

Page 34

1          identification and attached hereto.)
2    BY MS. SCHEFFEY:
3       Q.  And this provides a time that relates to a task,
4    so essentially how long it takes to do a certain task
5    based upon their measurements.  I'm wondering if that's
6    the type of tool you're talking about, and let me know
7    when you have it open.
8       A.  Okay.  It's downloading.  Okay.  It's open.
9       Q.  Okay.  Take a look at that.  I just want you to
10   familiarize yourself with it.
11      A.  Okay.  I mean, I scanned through it.  Obviously I
12   have not read it exhaustively.
13      Q.  And are you familiar with this type of a tool?
14      A.  So, sure, this is what they are putting forward
15   as standard data for certain specific elements.
16      Q.  And would you call this an industrial engineering
17   tool as you've described earlier today?
18      A.  Perhaps.  Again, having not been familiarized
19   with this, I don't know how widely it's used or how
20   reliable it is, but that's the way it presents.
21      Q.  And so before this, we were talking about how you
22   used stopwatch analysis and then a few other types of
23   industrial engineering tools.  Would this fall into any
24   of those categories?
25      A.  Yes.

Page 35

1       Q.  Which category?
2       A.  Well, as we've already said, this presents as a
3    four-pager that lists out specific tasks with their
4    recommendation on how much time it would take for these
5    tasks.
6       Q.  And is that standardized data, or is that a
7    different type of tool?
8       A.  No, that would be standardized data.
9       Q.  Okay.  And how does standardized data differ from
10   the tool you described where you already know how long
11   something should take from actually timing them?
12      A.  They're similar.  Predetermined motion time
13   systems, their foundation literally comes from the
14   documentation and study of work either through stopwatch
15   time study or actual video analysis, where they
16   literally have tapes of micromotions and add up all
17   these micromotions to develop the time.  Standard data
18   is more rule of thumb, often developed in-house and then
19   many times proprietary.
20      Q.  And which one of those mechanisms did you use in
21   your report in this case?
22      A.  Oh, I used the APPA standard data for janitorial.
23      Q.  Did you have any other engineering tools
24   available to you, such as stopwatch time or production
25   motion -- the word I can't remember?

Page 36

1       A.  None that would be suitable for this project, no.
2    I chose the most suitable tool.
3       Q.  Other than TJX, are there any other companies
4    that you recall sitting here that you have performed
5    analyses of as described in Paragraph 4?
6       A.  Sure.  I mean, again, it's a regular thing that I
7    do as a faculty member.
8       Q.  Okay.  And when you're performing that as a
9    faculty member, is that part of your teaching or part of
10   your research --
11      A.  It can be both.  It's used -- I'm sorry --
12      Q.  Oh, no, go ahead --
13      A.  -- finish your question.
14      Q.  I'm finished.  You can go ahead.
15      A.  So it can be either as part of a class or as part
16   of a project.
17      Q.  So are these mostly theoretical analyses, then?
18      A.  No.  They're always done because we're addressing
19   a specific issue that's at hand.
20      Q.  And can you give me an example of a specific
21   issue you would be addressing.
22      A.  Sure.  I was contacted by a union and their
23   employer around a production standard issue in a grocery
24   warehouse recently and consulted with them in terms of
25   trying to understand why workers were not able to meet

Page 37

1    the standards that the company were setting and also
2    what should be done or adjusted to correct that.
3       Q.  And what is your standard methodology for
4    analyzing that kind of a question?
5       A.  As far as a standard methodology, that's
6    something that I would teach in a time study class, but
7    I'll try to distill it down because I know you don't
8    want to be here all afternoon.  I mean, briefly it's
9    back to identifying what the problem may be.
10          Again, production standard systems are based on a
11   set of assumptions, and one key thing, sometimes, when
12   systems that previously worked are no longer working is
13   to revisit those assumptions and see if they're still
14   valid or not.
15      Q.  Okay.  And so what type of information do you
16   usually need to perform that type of an analysis, the
17   revisiting the data to see if they're valid?
18      A.  It depends.  It's very situational.  In this
19   specific instance, I was asking for both staffing levels
20   before and after, looking at overall performance in the
21   departments of overtime, looking for trends, looking for
22   the data basically to point in the direction of where
23   the next place to investigate was.
24          Where we're currently at is we've pretty much
25   determined that both changes in the staffing pattern and

Page 38

1  in the processes, now post COVID, have both changed
2  those parameters under which the standard work and
3  explain why now the system shows workers as not meeting
4  their standard, when in fact they're probably even
5  exceeding it, based on the new duties or the new
6  requirements to social distance, et cetera, that hadn't
7  been incorporated into the original standards
8  calculations.
9      Q.  And you used the phrase the system.  As it
10  applies here in this case, what is the system you were
11  analyzing?
12     A.  There's not a system.  I was asked by Plaintiffs'
13  counsel to determine -- first if I could and then to go
14  ahead and perform the calculations to estimate how long
15  it would take for the janitorial services to be done at
16  these facilities.
17     Q.  Okay.  And in the companies and the analyses you
18  reference in Bullet Point 4, have you ever performed an
19  analysis similar to the one you did in this case?
20     A.  In terms of determining the amount of time needed
21  to perform work, sure.
22     Q.  Okay.  Can you recall any of those companies off
23  the top of your head or any of those studies?
24     A.  Like the example I just gave you, whether it was
25  in the grocery warehouse or the example from TJX, both

Page 39

1  involved in specific instances as specific questions
2  arise, computing and figuring out how much time should
3  be allowed a normal worker to perform these duties.
4      Q.  And I think you mentioned that one of the pieces
5  of information you looked at was current and prior
6  staffing; is that correct?
7      A.  I'm sorry.  Can you reframe the question.
8      Q.  Yeah.  In approaching one of these issues where
9  you're trying to identify the core issue, it sounds like
10  you said one piece of data you might look at was
11  staffing plans; is that correct?
12     A.  If you're referring to the example I most
13  recently was discussing with the grocery warehouse?
14     Q.  Yes.
15     A.  Sure.  Yes, from the perspective that that
16  informed one of the things I suspected may be
17  contributing to the issues; and it was borne out in that
18  as more and more people have gone to online grocery
19  shopping and grocery volume has been increasing, they
20  have increased the number of selectors that are out
21  there trying to fill the orders to replenish grocery
22  stores, which again contributes -- it's a fixed physical
23  space which contributes to the amount of interference
24  they have with each other, which then impacts their
25  ability to not be delayed, which means that their

Page 40

1  balance for delay needs to be adjusted appropriately
2  so...
3      Q.  So in what circumstances would you want to look
4  at a staffing problem to identify how long it would take
5  to perform a certain task?
6      A.  I'm not sure I understand the question.  I'm
7  sorry.
8      Q.  Yeah.  So looking at prior or current staffing
9  levels as something at that you mentioned, what drives
10  your need for that type of information in analyzing one
11  of these issues?
12     A.  It depends on the problem that I'm trying to
13  solve or the issue that I'm trying to help the parties
14  work through.
15     Q.  And so here you were asked to determine an
16  estimation of time for each task; is that correct?
17     A.  No.
18     Q.  What were you asked to determine?
19     A.  I was asked to determine what the required
20  staffing would be to perform the cleaning duties at this
21  facility.
22     Q.  Okay.  So you were not asked to determine how
23  much time that would take?
24     A.  Well, not directly, no.
25     Q.  And did you ask to look at prior staffing models?

Page 41

1      A.  No.
2      Q.  Why not?
3      A.  Because my task was to develop what a staffing
4  plan would look like based on the level of cleanliness
5  and the area to be cleaned.
6      Q.  So why would a prior staffing plan not be useful
7  to your knowledge?
8      A.  Again, that's -- it wasn't what I was asked to
9  do, and as far as I knew, that was not available.
10     Q.  Okay.  If there had been one available, might
11  that have changed your opinion?
12     A.  Not in the pursuit of the goal that I was given
13  as my task.  I was asked to -- to, based on this
14  information, develop the -- an estimate of what would be
15  required and then also to -- well, we'll talk about the
16  rest of the calculations later, but yes.
17     Q.  And what information did you request in this
18  case?
19     A.  I guess the initial -- it's detailed in my
20  report, but briefly the initial -- you'll have to help
21  me with the legal term -- the initial complaint, I
22  guess.
23     Q.  Okay.
24     A.  And then the responses to information as far as
25  the blueprints of a facility, information about policies

Page 42

1  and procedures as far as the cleaning, which are all
2  documents that I listed in my report.
3     Q.  So looking at Bullet Point 5 of your report, it
4  discusses work on numerous FLSA projects with your
5  colleague Ken "Mersile" --
6     A.  Mericle.
7     Q.  Mericle.  Okay.  Do you see that portion in your
8  report?
9     A.  Sure, yeah.
10    Q.  Are these projects mainly litigation?
11    A.  Yes.
12    MS. SCHEFFEY:  And, Larry, I'm going to mark that
13  we did not get a list of prior expert testimony that he
14  provided in this case, and we'll need to follow up on
15  that after the deposition.
16    MR. VINCENT:  Sure.
17  BY MS. SCHEFFEY:
18    Q.  So I'm poking in the dark here because I don't
19  know what cases and which ones are subject to protective
20  order, but without invading any protective orders, can
21  you tell me about those projects that you describe in
22  Bullet Point 5?
23    A.  In general they're similar to this project in the
24  sense that Plaintiffs' counsel reached out to ask for
25  assistance to -- in these cases related specifically to

Page 43

1  the Fair Labor Standards Act -- come up with the
2  compensable time estimates.
3     Q.  And other than donning and doffing, have you
4  analyzed any other issues that arise under FLSA?
5     A.  Yes.
6     Q.  What are those issues?
7     A.  In general it would be activities performed by
8  workers that would fall under the legal definition of
9  compensable time, whether that be the time to travel to
10  the work location or to power on computers and boot into
11  different systems -- those sorts of things.
12    Q.  And have you ever performed an analysis like the
13  one you did here, where you had to create a staffing
14  model?
15    A.  To create a staffing model, no.
16    Q.  So that's unique to this case?
17    A.  It's not unique.  It's -- you're asking for the
18  answer converted in a different way.  Because obviously
19  the number of people required flows from the amount of
20  time needed to perform the duties.
21    Q.  Okay.  But in your prior cases, as mentioned in
22  Paragraph 5 of your report, have you ever created a
23  staffing model as you did here?
24    A.  No.
25    Q.  And what about in Paragraph 4 of your report

Page 44

1  which we just discussed, have you ever created a
2  staffing model as you did here?
3     A.  No.  That's never been the question.
4     Q.  Okay.  And so moving on a bit, what is your
5  experience in connection with the staffing of detention
6  facilities?
7     A.  I've never been to one.
8     Q.  Okay.  Are you familiar with the Adelanto
9  detention facility in any way other than having been to
10  it?
11    A.  I'm sorry.  Can you repeat the question.
12    Q.  Yeah.  Are you familiar with the Adelanto
13  Detention Facility in any other way than having been --
14  or not having been to it, I guess.
15    A.  Only through the documents I've reviewed for my
16  report.
17    Q.  Have you ever created a staffing plan for a
18  detention facility?
19    A.  No.
20    Q.  Have you ever provided a lecture or seminar in
21  the area of staffing detention facilities?
22    A.  No.
23    Q.  Have you ever published an article in the area of
24  staffing detention facilities?
25    A.  No.

Page 45

1     Q.  And we talked briefly about your prior work as an
2  expert.  Have you ever testified at trial?
3     A.  No.
4     Q.  And do you know if any of your opinions or
5  reports have ever been excluded by a court?
6     A.  No.
7     Q.  And other than in this case, have you ever served
8  as an expert for a defendant?
9     A.  Not in a trial.
10    Q.  You say not in a trial.  Have you served as an
11  expert for a defendant in any other capacity?
12    A.  In arbitration hearings.
13    Q.  What opinions did you provide for defendants in
14  those cases?
15    A.  Again, I've both generated reports related to
16  questions that are posed and also done mediation.
17    Q.  Do you have a list of those cases somewhere?
18    A.  No.
19    Q.  Okay.  Prior to this case, have you ever worked
20  as an expert for Burns and Charest or any other
21  attorneys in this action?
22    A.  I'm sorry.  For what?
23    Q.  One of the law firms that's retained you is Burns
24  Charest or --
25    A.  Oh.

Page 46

1    Q. -- I don't know if you've ever worked with them
2  or with Mr. Vincent before.
3    A. No.
4    Q. How did you first learn about this case?
5    A. A Plaintiffs' attorney reached out to me.
6    Q. What was the name of that Plaintiffs' attorney,
7  if you remember?
8    A. Yeah, it was Andrew Free.
9    Q. Andrew Free. Okay. And without telling me about
10  your conversation with him, what was your impression of
11  the opinion you were asked to provide?
12    A. Andrew didn't really get into those details. He
13  just inquired about my interest and availability.
14    Q. And then who provided you the information about
15  the opinions you were to provide?
16    A. Larry Vincent.
17    Q. Okay. Did Mr. Vincent provide you with any facts
18  that you relied upon in your report?
19    A. Again, the materials I relied on are the ones
20  that I listed in my report so -- and I believe, if I
21  scroll down, I go through the sort of assumptions and
22  methodology -- and, yes, those were provided by
23  Plaintiffs' counsel.
24    Q. Okay. And besides the documents you were
25  provided, did they -- did Plaintiffs' counsel provide

Page 47

1  you with any facts where you asked a question -- you
2  know, for example, where is that Adelanto facility --
3  and they gave you the answer? I don't want their
4  opinions here or anything they told you to do. I just
5  want to know if they gave you an actual fact that was
6  relevant to your analysis.
7    A. No, not that I can think of.
8    Q. How much have you received in compensation for
9  your work in connection with this case?
10    A. So far $1,000.
11    Q. How much do you charge per hour?
12    A. $200.
13    Q. How do you keep track of your time?
14    A. I just keep a log.
15    Q. Is your compensation in this matter in any way
16  dependent upon the outcome of the case?
17    A. No.
18    Q. Do you have any support staff working with you on
19  this matter?
20    A. No.
21    Q. I think you mentioned a few times the documents,
22  so I think we should just turn to Exhibit 2, and that
23  will be easier to finalize. And I have Exhibit 2 as
24  starting at Page 19 of the PDF of Exhibit 1 to this
25  deposition.

Page 48

1    A. Okay.
2    Q. So do you recognize this document?
3    A. Yes.
4    Q. What is it?
5    A. It's the appendix to the report that lists the
6  documents I was provided by the plaintiffs' attorney.
7    Q. Who selected these documents for your review?
8    A. The plaintiffs' attorney.
9    Q. Did you make any requests for documents that are
10  not included on this list?
11    A. No.
12    Q. Is this everything you've reviewed listed on this
13  list?
14    A. Yeah, I see they have the footnotes, so yes.
15    Q. And you mentioned that you had reviewed a
16  different expert's report. Which number is that?
17    A. No. I said that I had reviewed a rebuttal report
18  related to the rebuttal of my report.
19    Q. Okay.
20    A. Which would be after this existed.
21    Q. What about Exhibit 15 or Bullet Point No. 15?
22    A. Oh, the table of hours data, yes.
23    Q. And so you reviewed that data from Mr. Bland; is
24  that correct?
25    A. Right. I received that table of data, correct.

Page 49

1    Q. And are you aware that Mr. Bland has subsequently
2  created a new table and report to correct a mathematical
3  error?
4    A. No.
5    Q. So have you reviewed anything from Mr. Bland
6  since the time you submitted this report?
7    A. No. But it sounds like I will be.
8    Q. Are there any of these documents listed here that
9  you reviewed but did not rely upon in forming your
10  opinions?
11    A. I -- I mean, I was provided all these documents.
12  I wouldn't say I read them exhaustively, but I've looked
13  at them all.
14        MS. SCHEFFEY: I'm going to introduce Exhibit 3
15  here, which is going to be Paragraph 11, the sanitation
16  and housing policy.
17        (Defendant's Exhibit 3 was marked for
18        identification and attached hereto.)
19        THE WITNESS: Okay.
20  BY MS. SCHEFFEY:
21    Q. Do you have it?
22    A. It's almost done. I said okay when it popped up
23  in the chat. Okay. It's done.
24    Q. Do you have it open now?
25    A. I do.

Page 50

1    Q.  Can you scroll to the last page of that document.
2    A.  Okay.
3    Q.  Do you see the phrase Warden J. Choate and the
4    signature above it?
5    A.  Yes.
6    Q.  Do you know who Warden Choate is?
7    A.  No.
8    Q.  Did you assume for purposes of your report that
9    Mr. Choate worked at the Adelanto facility?
10   A.  I would assume that.  I mean, I honestly don't
11   even remember that there were signatures at the bottom.
12   I was most interested in the data that's in the table
13   above there.
14   Q.  Right.  And if the data that's in the table above
15   there was not applicable to the facility that you were
16   analyzing, would that change the opinions in your
17   report?
18   A.  Possibly.
19   Q.  So if I told you that Johnny Choate is the warden
20   at the Aurora facility, would that be new information to
21   you?
22   A.  Yes.
23   Q.  Did you believe you were reviewing the
24   housekeeping plans for the Adelanto facility when you
25   reviewed this document?

Page 51

1    A.  I think I knew that it was a GEO policy.
2    Q.  But did you know whether it applied to the
3    specific facility you were addressing?
4    A.  I was operating under that assumption.
5    Q.  And if the information in this document changed,
6    would that potentially change the analysis in your
7    report?
8    A.  It might.
9    Q.  Did you at any point inquire with Plaintiffs'
10   counsel about whether that policy applied to the
11   Adelanto facility?
12   A.  No.
13   Q.  I know you've confirmed this is your report and
14   gone through all of it.  I want to go to Page 10 quickly
15   of your report, PDF Page 10.  Is that your signature?
16   A.  I'm sorry.  I have a lot of PDFs open now.
17   Q.  Sorry.  You can close the Aurora housekeeping
18   document.
19   A.  I mean, it's a digital facsimile, but, yes, I put
20   that on there.
21   Q.  So we just went over the housekeeping policy.
22   Can you tell me what role that policy played in your
23   report.
24   A.  Yes.  Using APPA standards, it's necessary to
25   understand the level of cleanliness as one of the key

Page 52

1    inputs to the determination of the amount of square
2    footage that a janitor can be expected to be able to
3    clean.
4    Q.  And so did you attribute every task on the
5    housekeeping policy that was performed by detainees?
6    A.  I didn't really make any assumptions about tasks.
7    Again, the benefit of this document was to allow me to
8    figure out where to properly slot the level of
9    cleanliness using the APPA system.
10   Q.  So explain to me why you did not try and
11   differentiate between detainee labor and labor performed
12   by detention officers.
13   A.  Because it was unnecessary for my estimate.
14   Q.  And why was it unnecessary for your estimate?
15   A.  Because, again, the APPA system is a macro-level
16   system that -- based on the type of area, the
17   characteristics of the area and the level of
18   cleanliness -- you can generate an estimate of the
19   number of square feet that a janitor can clean.
20   Q.  So I'm going to have you go to Paragraph 9 of
21   your report.
22   A.  Okay.
23   Q.  So in Paragraph 9, you state that, "Plaintiffs
24   allege detainee participation in the work programs at
25   Adelanto enabled GEO to become unjustly enriched."  Do

Page 53

1    you see that?
2    A.  Yes.
3    Q.  And then the last sentence says, "I have been
4    asked to provide computations for GEO's gains associated
5    with these avoided costs"; correct?
6    A.  That's correct.
7    Q.  So is it your interpretation of Paragraph 9 that
8    your computations related to both detainee labor -- or
9    detainee labor and also the labor of GEO employees?
10   A.  Can you repeat the question, please.
11   Q.  Yeah.  So you say you've been asked to provide
12   computations for GEO's gains "associated with these
13   avoided costs."  When you say these avoided costs, are
14   you looking at detainee labor alone or detainee labor
15   and GEO employee labor?
16   A.  In my computations, I used the table of data from
17   blank (sic), which is the hours estimate for detainee
18   labor.
19   Q.  Can you explain to me how that's an hours
20   estimate for detainee labor.  I guess I didn't
21   understand your answer.
22   A.  For the computations -- for the dollar
23   computations in my report, I utilized that table of data
24   from blank that lists by month the number of hours
25   detainees performed work.

Page 54

1    Q. And so I guess the question is how did you
2 account for the hours that GEO's employees already
3 provide work?
4    A. I didn't. I utilized that table.
5    Q. Okay. So your analysis does not take into
6 consideration work already performed by GEO's employees?
7    A. No.
8    Q. And so to the extent any of that -- the items on
9 the housekeeping policy are performed by GEO's
10 employees, you've attributed all of those tasks to
11 detainees; is that correct?
12       MR. VINCENT: Object to form.
13       THE WITNESS: Sorry. I got distracted. Could
14 you repeat it, please.
15 BY MS. SCHEFFEY:
16    Q. Yeah. Let's go back to Exhibit 3, if you can
17 open that up.
18    A. Okay.
19    Q. So on the last page, there's Kitchen Cleaning
20 Schedule. Let me know when you're there.
21    A. I'm sorry. I was looking at Exhibit 3 in my PDF,
22 so let me get the right one. You're talking Exhibit 3
23 of --
24    Q. In this deposition, it's the document called
25 Aurora Housekeeping Policy.

Page 55

1    A. Okay. One moment. Okay. I have it.
2    Q. So on that last page, there's the Kitchen
3 Cleaning Schedule. Do you see that?
4    A. Yes.
5    Q. Did you use this chart in reaching your opinions
6 in this report?
7    A. Yes. It informed the level of cleanliness that
8 would be appropriate to use from the APPA tables.
9    Q. And tell me how this informed the level of
10 cleanliness.
11    A. Both the instructions of what to clean, how to
12 clean it and how often to clean it.
13    Q. And so did you assume that these tasks were
14 performed by detainees?
15    A. For the kitchen, no.
16    Q. So did you assume these were performed by GEO
17 employees?
18    A. I assumed neither.
19    Q. So tell me how that works.
20    A. So --
21       MR. VINCENT: Object --
22       THE WITNESS: -- I utilized the APPA standards to
23 develop an estimate of the time that would be required
24 to perform the janitorial functions necessary in the
25 facility. As I mentioned already, the subsequent

Page 56

1 monitor calculations were based off of the blank table
2 and the other information that I researched and
3 collected.
4 BY MS. SCHEFFEY:
5    Q. Did you apply any offset for the tasks that are
6 already performed by GEO employees?
7    A. No, because I just used the hours estimates
8 provided to me in that table.
9    Q. And did you make any effort to connect the hours
10 estimates with the tasks in the housekeeping plan?
11    A. No.
12    Q. So if the hours estimate included barbers, for
13 example, you just included that in your analysis?
14    A. I'm not sure I understand your question. I'm
15 sorry.
16    Q. Yeah. So if the hours analysis included the
17 hours spent by someone as a barber, you included that in
18 your analysis as part of them being a housekeeper?
19    A. No.
20    Q. So how did you account for those differences?
21    A. Those hours are broken out separately, so I
22 utilized just the hours related to each individual
23 category.
24    Q. Okay. What categories did you use?
25    A. So it was custodial, kitchen, laundry and barber.

Page 57

1    Q. So you did use barber.
2    A. I'm sorry. There was a glitch.
3    Q. Oh. So you did use barber?
4    A. Yes, I did.
5    Q. And how did the barber hours connect to the
6 housekeeping policy description?
7    A. It doesn't.
8    Q. Okay. What about the laundry hours, how do those
9 connect to the housekeeping descriptions in the
10 housekeeping policy?
11    A. They don't.
12    Q. How do the kitchen hours relate to the
13 housekeeping description in the policy?
14    A. It's not related.
15       MS. SCHEFFEY: Okay. I'm going to introduce
16 another. I'm introducing Exhibit 4 in the chat.
17       (Defendant's Exhibit 4 was marked for
18       identification and attached hereto.)
19 BY MS. SCHEFFEY:
20    Q. If you can look at it, and let me know when you
21 have it open.
22    A. Okay. There it is. Okay. I have it open.
23    Q. So following your Footnote 6 -- this is the
24 document I got. Can you review it and confirm that this
25 is an accurate copy of what you reviewed.

Page 58

1    A.  Yeah, that looks like it.
2    Q.  Do you know if this has ever been used in the
3  detention context?
4    A.  I don't.
5    Q.  Do you know if the APPA accounts for the general
6  cleaning that detainees would be expected to do for
7  themselves?
8    A.  I don't.
9    Q.  Does the APPA make any consideration for
10 detention officers or an equivalent position performing
11 their own cleaning?
12   A.  You trailed off.  I'm sorry.
13   Q.  Oh, sorry.  Did does the APPA provide any analog
14 for detention officers that you can use to account for
15 the cleaning they may perform?
16   A.  No.
17   Q.  How did you choose to use the APPA analysis?
18   A.  It's a tool that I'm familiar with.  It's
19 appropriate from the perspective that I only had access
20 to very macro data, and this is a macro standard data
21 system.  And unfortunately, given the conditions that
22 are going on in our university, many of the
23 facilities -- for example, dormitories versus the
24 residence halls -- are pretty analogous, so I felt
25 pretty comfortable that this would provide me a useful

Page 59

1  estimate.
2    Q.  So when you say you only have access to macro
3  data, what do you mean by that?
4    Whoops.  Looks like he's frozen now.  There he is
5  he's moving now.
6    THE WITNESS:  Sorry.  Can we reboot by repeating
7  the question.
8    MS. SCHEFFEY:  Yeah, can we get it read back,
9  Giselle.
10   (Record read.)
11   THE WITNESS:  Macro data would mean that you
12 don't have necessarily every detail about every element.
13 You have the overall data about the type of an
14 environment it is in terms of, you know, bathrooms
15 versus hard floors versus carpeted.
16   And this system, based on those descriptors,
17 descriptors of the level of cleanliness, provide
18 estimates for the amount of time or, frankly, the number
19 of square footage that can be expected to be cleaned by
20 a person.
21 BY MS. SCHEFFEY:
22   Q.  Okay.  And what data were you missing?
23   A.  No.  Based on the data that I had available, this
24 is the system that I had the necessary data to be able
25 to utilize.

Page 60

1    Q.  Right.  But you mentioned that you had to look at
2  it on a macro level because there were certain data
3  points that were missing.  What were those data points?
4    A.  Detailed Chronos time records from time clocks
5  that tracked employees' activities.
6    Q.  Anything else?
7    A.  I mean, that's an example where if that data is
8  available, the approach would be completely different;
9  right?
10   Q.  Okay.  And then you mentioned that the APPA is
11 applicable given your personal experience with the dorm.
12 Is it your understanding that under this APPA analysis,
13 the janitors would clean each individual dorm?
14   A.  Not at all.  No.  This is a system that -- again,
15 it's a system that's been around for almost 100 years.
16 It's broadly published and utilized in both higher ed
17 and other areas as well, and provides useful estimates
18 to determine the number of janitorial crew that are
19 necessary based off of given parameters and a given
20 cleanliness level.
21   Q.  So what is the analog to a classroom in a
22 detention center?
23   A.  I'm sorry.  I'm scrolling back to my report just
24 so I can look at --
25   Q.  Sure.

Page 61

1    A.  Okay.  I just wanted to explain.
2    Q.  No problem.
3    A.  So I'm looking back at Page 25 of the first
4  exhibit you had me put up.
5    Q.  Okay.
6    A.  As far as the analog, I don't think I utilized
7  classroom in this study.
8    Q.  What did you utilize?
9    A.  Sure.  For the first section in the Medical, I
10 utilized the Patient Treatment Area, Hard Floor from the
11 APPA standard, which is 2900.  Would you like me to go
12 through them all?
13   Q.  Yeah.  And then we'll go through the APPA
14 standards.
15   A.  I'm sorry.  I didn't hear the second part.
16   Q.  Yes, please tell me what you used, and then we'll
17 go back to the APPA standards so we're not going back
18 and forth.
19   A.  Okay.  So, yes, for Medical, I used the Patient
20 Treatment Area, Hard Floor.  For the Intake area, I
21 utilized the Public Circulation Area with Hard Floor.
22 For the Kitchen/Laundry -- hold on.  I need to look at
23 one other place in my report.  Oh, I have it right here.
24 Sorry.  For the kitchen and laundry area, I utilized the
25 actual Washroom area;

September 21, 2020

Page 62

1    For the Visitation area, I utilized -- I'm sorry.
2 For the Visitation area, I used the Dormitory Lounge.
3 For Housing, it was Dormitory, Sleep/Study area.  And
4 the Corridors -- so for the Corridors, honestly, I'm not
5 sure.  I'm going to have to go back and look at my
6 notes.  I'm not sure what category I used.
7    Q.  And are those categories that you used listed
8 anywhere in your report?
9    A.  No.
10    Q.  Why not?
11    A.  I was trying to be breviloquent.
12    Q.  Okay.  If you could turn for me back to the APPA
13 document, now that we know which categories we're
14 looking at, and go to Page 18 of that PDF, which is
15 Figure 1.
16    A.  Yes.
17    Q.  Is this the chart you used to apply values to
18 those areas?
19    A.  It is.
20    Q.  Okay.  Explain to me how to read this chart.
21    A.  So for each type of area, based on each level of
22 cleanliness, the number in the corresponding grid is the
23 number of square feet that a janitor could be expected
24 to clean.
25    Q.  In how many hours?

Page 63

1    A.  I'm sorry?
2    Q.  In how many hours?
3    A.  In -- that would be for a whole -- I mean, that's
4 for a person's shift, so I guess for eight hours.
5    Q.  Does this document anywhere say that this is the
6 number of square feet that you can clean in eight hours?
7    A.  I don't know.  I need to read it.  It doesn't say
8 directly, but it infers it both in the examples and in
9 the Staffing Level Summary section.
10    Q.  So this table doesn't provide an amount of time
11 that it would take to clean each square footage level?
12    A.  No, it does.
13    Q.  Where?  Can you point me to the page.
14    A.  Sure.  So it would be Page 3 under
15 general -- sorry -- under Staffing Level Summary,
16 it's -- they assume 420 productive minutes per shift per
17 custodian.
18    Q.  So are you --
19    A.  Page 3 of the APPA document you provided to me,
20 so it would be Page 16 of the PDF.
21    Q.  Right.
22    A.  Sorry.  Page 17 of the PDF, yes.
23    Q.  So under Staffing Level Summary?
24    A.  Right.
25    Q.  So they assume 420 productive minutes per shift?

Page 64

1    A.  Right.
2    Q.  So is that seven hours?
3    A.  Well, it's a shift -- it's -- the assumption
4 there being that it's a full shift with breaks and
5 lunch.
6    Q.  What does that mean?
7    A.  That people take breaks and eat lunch.
8    Q.  So is it your understanding that when it says 420
9 productive minutes, productive minutes includes breaks
10 and lunch?
11    A.  Well, it's 700 -- no.  When industrial engineers
12 use the word productive minutes, they mean the number of
13 minutes available per shift to perform work.
14    Q.  So that would exclude breaks and lunch; correct?
15    A.  Exactly.
16    Q.  Okay.  So 420 productive minutes is approximately
17 seven hours; is that correct?
18    A.  Well, again, the context here is that you would
19 have that many minutes available in an eight-hour shift.
20    Q.  Right.  But 420 productive minutes is
21 approximately seven hours; is that correct?
22    A.  Seven hours of work time, yes.
23    Q.  So for each of these, it is -- for example,
24 Classroom with Hard Floor, 8500 square feet at Level 1
25 in seven hours?

Page 65

1    A.  In seven work hours.
2    Q.  Seven work hours, right; is that correct?
3    A.  Yes.
4    Q.  Did you use that seven-hour number in your
5 equations in this report?
6    A.  No.
7    Q.  Why not?
8    A.  Because the table is set up to tell you the
9 number of square foot per shift.
10    Q.  Does GEO use eight-hour shifts?
11    A.  I'm not aware.
12    Q.  Do you know if GEO has three shifts per day?
13    A.  I don't know.
14    Q.  Would that information impact your analysis?
15    A.  Perhaps.
16    Q.  How would you take into consideration the number
17 of shifts per day?
18    A.  Again, this is a system predicated on eight-hour
19 shifts.  It would have to be adopted appropriately if
20 you were going to potentially staff in a different
21 manner.
22    Q.  So then in your report, you didn't consider the
23 seven hours which are anticipated in the APPA standards?
24    A.  Again the APPA document is the square footage per
25 shift, and that's what I utilized.

Page 66

1  Q. Okay. And did you assume that detainee shifts
2  were equivalent to a shift in the APPA standards?
3  A. No. The detainee estimates are irrelevant to
4  this part of the report.
5  Q. Okay. So why are they irrelevant to this part of
6  the report?
7  A. They have no bearing on the finding for the
8  number of janitors required.
9  Q. So the amount of time it actually takes to clean
10 the facility has no bearing on the time it takes in your
11 estimate to clean the facility?
12 A. Can you restate that.
13 Q. Yeah. Is it your testimony today that the amount
14 of time it actually took to clean the facility has no
15 bearing on your analysis?
16 A. I didn't -- that's the question that I was being
17 posited, was can you determine an estimate based on this
18 facility and the level of cleaning how much work is
19 required for a janitorial crew.
20 Q. And your understanding is that the detainees kept
21 it clean at the level that you used in your report; is
22 that correct?
23 A. Correct. Based on the those exhibits that, one
24 of which, we looked at earlier.
25 Q. And did you look at how many detainees worked in

Page 67

1  each position per day?
2  A. No.
3  Q. Why not?
4  A. I utilized the table that I received from blank
5  to complete the monetary calculations.
6  Q. When you say blank, do you mean Bland?
7  A. Bland. Sorry. Thank you.
8  Q. Just clarifying. That's fine.
9     If significantly fewer detainees worked in each
10 position than your estimates, what would that tell you
11 about your estimates?
12 A. Again, I don't have access to that data. It's a
13 hypothetical question. I don't know how to answer it.
14 Q. So you didn't review the detainee invoices to ICE
15 as part of your report?
16 A. The only information available to me was the
17 number of shifts worked. There were no hours estimates
18 other than the table that I utilized for my
19 calculations.
20    MS. SCHEFFEY: I'm going to introduce an exhibit
21 here, Exhibit 5.
22    (Defendant's Exhibit 5 was marked for
23    identification and attached hereto.)
24    THE WITNESS: It's loading.
25 ///

Page 68

1  BY MS. SCHEFFEY:
2  Q. Do you recall looking at this document as part of
3  your report?
4  A. It's still loading.
5  Q. Okay.
6  A. Yeah, I feel like we should have the Jeopardy
7  theme or something for these types of interludes. It's
8  open, but hold on, it's rotated so let me... No, I've
9  never seen this document.
10 Q. Have you ever seen anything similar to it?
11 A. No.
12 Q. So if you listed detainee payroll sheets with
13 these Bates numbers on your documents reviewed for your
14 report, that would be incorrect?
15 A. Or it was a document that I didn't review
16 closely. I don't recall ever seeing sheets, no.
17 Q. So you didn't make any analysis of the number of
18 individuals who were actually assigned to each position
19 or the different shifts at the facility?
20 A. No, no, I didn't.
21 Q. Would that have changed your analysis?
22 A. Perhaps.
23 Q. If there were fewer than 60 detainees working
24 less than seven-hour shifts and you concluded that 60
25 individuals full time were needed to clean a certain

Page 69

1  area, which one would go with, the number of people it
2  actually took or your estimate?
3  A. It's a hypothetical. I guess I would question --
4  knowing that the APPA model is pretty widely used and
5  accepted, I would question if either of the square
6  footage information was wrong, the level of cleanliness
7  information was wrong, because, again, I would expect
8  that they would be close.
9  Q. But you testified before -- and correct me if I'm
10 wrong -- that the APPA to your knowledge has never been
11 used in the detention context; is that correct?
12 A. Not that I'm aware of, no.
13 Q. So is it possible that a different form of
14 standardized data would be necessary?
15 A. Again, cleaning is cleaning. It's more about how
16 analogous the different areas and the different level of
17 cleanliness are.
18 Q. When you say cleaning is cleaning, we talked
19 earlier about the dorms; correct?
20 A. I --
21 Q. Do you remember that, that we mentioned the dorms
22 at the University of Wisconsin?
23 A. I think I mentioned them in the context passingly
24 that we have several dorms that are locked down pretty
25 similarly to what a detention center would be like for

Page 70

1  quarantine due to our COVID-19 outbreak.
2      Q.  And in applying the APPA to those dorms, would it
3  change your analysis if the janitors actually had to
4  clean inside each individual student's dorm as opposed
5  to if they only cleaned the hallways and common areas?
6      A.  Sure.  You need to know the square footage of the
7  areas that are being cleaned.
8      Q.  And so similarly here, did you make any attempt
9  to exclude the actual living areas of each detainee from
10  your calculations?
11      A.  I utilized the blueprints that showed the square
12  footage of these various areas in question, and those
13  are the numbers I used.
14      Q.  Did you exclude any areas when you were looking
15  at those blueprints as areas that should have been
16  cleaned by a detainees and not a custodial staff?
17      A.  No.
18      Q.  So your assumption was that in the dorm context,
19  every dorm was cleaned fully top to bottom by the
20  custodial staff as well?
21      A.  I'm not sure I utilized the square footage data
22  without specific knowledge of that aspect.
23      THE REPORTER:  And Mr. Vincent -- I'm sorry.
24      MS. SCHEFFEY:  No, go ahead.
25      THE REPORTER:  Mr. Vincent, if you said

Page 71

1  something, I didn't hear you.
2      MR. VINCENT:  Oh, object to the form of the prior
3  question.
4      THE REPORTER:  Okay.  Thank you.
5      MS. SCHEFFEY:  Thanks, Giselle.
6      Q.  Okay.  So in your report, you assumed that every
7  single area of the GEO facility would be cleaned by
8  custodial staff; is that correct?
9      MR. VINCENT:  Same objection.
10      THE WITNESS:  I utilized the square footage data
11  as detailed in the report from the blueprints that I was
12  given.
13      MS. SCHEFFEY:  Okay.  I'm about to go to another
14  step.  I know it's probably about noon, your time.  I
15  don't know if you needed a lunch break or if you wanted
16  to keep going for a little bit longer.
17      THE WITNESS:  I mean, I could stand up for five
18  minutes.  I don't know how much -- I mean, if it's going
19  to be three more hours, yeah, I better eat --
20      MS. SCHEFFEY:  I probably have at least two and a
21  half.  So if you want to eat now, or you can stand up
22  for five minutes and go for 30 minutes and then take
23  lunch.  I just don't want to make you go too far without
24  food.
25      THE WITNESS:  I could do another half an hour, if

Page 72

1  that's what you're talking about.
2      MS. SCHEFFEY:  Do you want a five-minute break
3  before that?
4      THE WITNESS:  No, that's fine.
5      MS. SCHEFFEY:  And, Larry, are you okay?
6      MR. VINCENT:  (Indicating.)
7      MS. SCHEFFEY:  And, Giselle, are you okay?
8      THE REPORTER:  (Indicating.)
9  BY MS. SCHEFFEY:
10      Q.  So going back to your report, Paragraph 15
11  discusses the level of APPA Custodial Service Levels.
12  Do you see that?  Sorry.
13      A.  No, it's okay.  I can save myself a lot of
14  scrolling if I just --
15      Q.  Yes.
16      A.  -- I have the printout of that.  Sorry.  We're on
17  15?
18      Q.  Yeah.
19      A.  Yes.
20      Q.  Of those levels listed there, which one did you
21  use in this report?
22      A.  Both Level 1 and Level 2.
23      Q.  Did you use both Level 1 and Level 2 for all
24  areas?
25      A.  No.

Page 73

1      Q.  Can you tell me how you broke out Level 1 and
2  Level 2 for each area.
3      A.  Sure.  Yeah, it's detailed in Table 1 and 19.
4      Q.  So for Medical, Intake, Kitchen, Laundry,
5  Visitation, you used Level 1; and for Housing and
6  Corridors, you used Level 2.  Is that correct?
7      A.  Yes.
8      Q.  Why did you use Level 2 for housing and
9  corridors?
10      A.  Because based on the descriptions of the other
11  documents that I found, that was a better fit to the
12  APPA standard.  That was the most appropriate fit.
13      Q.  Do you remember what specifically in the other
14  documents led you to classify those areas as Level 2?
15      A.  Yeah, I mean, generally -- I could go back and
16  re-read all the documents very meticulously, but in
17  general, it was that these are areas that are outward
18  facing, aren't related to sanitation -- whether that be
19  hygiene, personal hygiene from a bathroom or a laundry
20  or a food situation.
21      And, again, based on those documents around what
22  the expectations were, again, were a better fit with the
23  way it's described as Level 1 versus -- sorry -- as
24  Level 2 versus the extreme cleaning of a Level 1 or the
25  inattention level cleaning of a Level 3.

Page 74

1    Q.  Okay.  And did you speak with any of the
2  plaintiffs in this action about how clean the facility
3  was?
4    A.  No, I haven't.
5    Q.  Did you review any photographs of the facility to
6  determine how clean it was?
7    A.  No.
8    Q.  So then the next thing is Paragraph 16.  It
9  states that you gathered data about the work activities
10  performed by immigrant detainees in the VWP and their
11  duration from APPA data to compute the time that a
12  worker would spend to perform various labor activities.
13  Can you explain to me what you did that you're
14  describing in Photograph 16.
15    A.  Yeah, that's the review of the GEO documents
16  around the job descriptions and then those expectations
17  from a cleaning perspective to understand the job and
18  the expectations to be able to classify it.
19    Q.  So what work activities did you look at?
20    A.  The custodial, janitorial.
21    Q.  Does that include dormitories or dorm quarters?
22    A.  I don't know.
23    Q.  Do you know the specific activities you looked
24  at?
25    A.  I would have to go back and read the -- the

Page 75

1  description, I believe it just said janitor.
2    Q.  Okay.  How much time did you determine a VWP
3  janitor would take to perform each specific task?
4    A.  Well, based on the square footage of the areas to
5  be cleaned and those estimates from APPA, that's what's,
6  again, in Table 1 and Paragraph 19.
7    Q.  Right.  And I understand that that's about the
8  square footage.  But how did the specific job
9  descriptions weigh into your opinion?
10    A.  To understand the cleaning from the perspective
11  of what -- how it slotted into the level of cleanliness
12  to make sure that it wasn't -- that it was being
13  classified correctly.
14    Q.  So Paragraph 16 discusses your classification of
15  Level 1, 2 and 3; is that correct?
16    A.  Right.  That coupled with the APPA table that we
17  had viewed previously, correct.
18    Q.  And how did you account for the fact that the
19  detainee VWP shifts were shorter than the shifts
20  anticipated in the APPA?
21    A.  It's -- could you rephrase it.
22    Q.  Yeah.  Did you account for the fact that the
23  detainees' VWP shifts were shorter than the shifts
24  anticipated by APPA?
25    A.  No.

Page 76

1    Q.  Why not?
2    A.  That's -- so the APPA system tells you how many
3  people per shift would be required to clean a set area
4  at a set cleanliness level based on its characteristics.
5  So that's not -- the inputs that are required are the
6  square footage to be cleaned and the cleanliness level
7  of the area.
8    Q.  And APPA doesn't instruct you to look at your
9  current staffing and compare it to the those square
10  footages?
11    A.  It's exactly the converse:  APPA is a tool to
12  give you an estimate of the staffing level required
13  based off of area, characteristics and cleanliness
14  level.
15    Q.  So APPA does not consider at all the current
16  staffing and what's being done?
17    A.  No.
18    Q.  So Paragraph 18 states that you used a computer
19  to perform calculations and tabulate results.  Have you
20  provided us with those equations?
21    A.  It's the exhibit at the end of -- which one -- 3,
22  I guess.  Those are the -- that's pictures of the
23  spreadsheets.
24    Q.  Right.  But what about the underlying
25  calculations, did you provide those?

Page 77

1    A.  No.  That's --
2    Q.  So tell me what those calculations are.
3    A.  Sure.  Can you specifically -- like where -- what
4  do you want me to explain?
5    Q.  Well, first why don't you tell me what computer
6  program you used to perform these calculations.
7    A.  Oh, it's a Microsoft Excel.
8    Q.  And do you have that Excel document that contains
9  the calculations within it, embedded within it?
10    A.  Sure.
11    Q.  So for -- could you provide us with a copy of
12  that Excel spreadsheet if asked?
13    A.  I defer to the attorney, but I have no problem
14  with that.
15    MR. VINCENT:  No problem.
16    MS. SCHEFFEY:  Okay.  No problem.  All right.
17    Q.  So, for example, in -- I guess we can look at
18  this.  I'm trying to figure out the underlying
19  calculations.  Am I looking at the spreadsheet that
20  starts on Page 32 of the PDF, that says Values or -- is
21  this all one spreadsheet?  I'm sorry.  It's just very
22  hard to tell when it turns into a PDF --
23    A.  Sure --
24    Q.  -- I'm looking at Exhibit 3, and there's a number
25  of, looks like, spreadsheets that stated a different

Page 78

1  task.
2      A.  They are, that's exactly right.  It's different
3  sheets in a workbook.
4      Q.  Okay.
5      A.  So -- I'm sorry -- again, Adrienne, what's the
6  question?
7      Q.  So let's look at -- there's one that says
8  Row 11/1/17 Barber, Custodial -- all of those data
9  points.  Do you see that going across?  Grand total is
10  645, Page 26 of the PDF first line?
11     A.  Okay.  Great.  Thank you.  Okay.  I'm with you.
12  Go ahead.
13     Q.  Okay.  So where do those numbers come from in
14  Row 1?
15     A.  Row 1?
16     Q.  Yeah, the 11/1/17 going across left to right,
17  first number as 50, what does that number mean?
18     A.  Oh, this is a sheet that I didn't actually use in
19  the completion of the rest of the calculations.  This
20  was a spreadsheet that I had built just initially when I
21  was starting the work that is an attempt to summarize
22  data that I'd received from the plaintiffs' attorney.
23     Q.  Okay.  So in this case, the number 50, what does
24  that represent?
25     A.  I would have to -- I don't even remember,

Page 79

1  honestly.  I have to look -- because like I said, this
2  was, like, early on.  It's just -- I just kept adding
3  tabs, and I didn't delete any.
4      Q.  So you did not use Page 26 and 27 of this PDF in
5  calculating --
6      A.  No.
7      Q.  -- your estimations in this -- okay.
8      A.  No, I didn't.
9      Q.  Let's go to the next page, which is 28.
10     A.  Okay.
11     Q.  It says Month 11 September, Year 2011.  Do you
12  see that in the first row?
13     A.  Yes.
14     Q.  Custodial 584; Kitchen, 438 -- what do these
15  numbers mean?
16     A.  This is the Bland table data just put into Excel.
17     Q.  Okay.  And do you know what these numbers
18  represent?  So what does the 584 in Custodial represent?
19     A.  The estimate of hours performing that task.
20     Q.  And where does that come from?
21     A.  Again, that was the table that I was provided
22  from Bland.
23     Q.  So you don't know if -- what is that 584 supposed
24  to represent, how many hours that someone worked in
25  custodial when?

Page 80

1      A.  That month.  It's each month is a row.
2      Q.  Okay.  So each one of those is a month?
3      A.  Yes.
4      Q.  And you used each of these columns in calculating
5  your estimates?
6      A.  Right, the monetary estimates, exactly.
7      Q.  And did these play into your square footage
8  estimates at all or your APPA estimates?
9      A.  No.
10     Q.  And what does multiple stand for?
11     A.  I can hypothesize, but I don't really know.
12     Q.  And did you compare any of these hours numbers to
13  your estimates in how many hours it would take to keep
14  the facility clean?
15     A.  Yes.
16     Q.  How did you do that?
17     A.  I used the custodial hours.
18     Q.  So, for example, for the month of September 11th,
19  tell me the equation for custodial hours and how that
20  was used to calculate how many individuals you would
21  need to clean the facility.
22     A.  So that's actually detailed in No. 20 of my
23  report.
24     Q.  That's fine.  You can tell me what's the
25  calculation.

Page 81

1      A.  So I utilized the estimate from APPA to multiply
2  that out into the number of hours that would be required
3  per year to clean it and compared that to this data over
4  the three years from 2016 through 2019.
5      Q.  And can you provide me with a calculation that I
6  can replicate, an equation that you used?
7      A.  Sure.
8      Q.  What's that?
9      A.  I think that's probably in the package, which
10  would be on Page 32 of 34, so the third to the last
11  page.  And do you want me to -- right in the middle
12  there, like below that table and then a little bit to
13  the right, it says 16 to 19 Average APPA and the number,
14  and then it shows a percentage below that.  That was
15  just me doing a quick calculation to see how far apart
16  they actually were.
17     Q.  Okay.  And so that doesn't really answer my
18  question.  I'm trying to figure out what is the equation
19  you used.  What numbers, what variables did you put into
20  an equation to get these numbers?
21     A.  Oh, it's the sum of the three years divided by
22  three, is where the average comes from.  And 16 -- like
23  16 through 19, so I guess actually four.  And then the
24  APPA is the number that was generated by using the APPA
25  method.

Page 82

```
 1      Q.  So tell me how you generated that APPA method
 2   number --
 3      A.  Sure.  It's taking that number of people
 4   times -- well, let me verify it.  I was going to grab my
 5   cell phone and use it as a calculator.
 6      Q.  That's fine.
 7      A.  Okay.  Cool.  Because I don't even have a
 8   calculator anymore.  But, yeah, I'm pretty confident
 9   that I know, but I want to say it correctly.  Well, I
10   took that 63.53 people --
11      Q.  So how did you get that, first?  63.53, where
12   does that number come from?
13      A.  Sure.  So that's -- let me look for it.  So if
14   you go back up to Page 25.
15      Q.  Okay.
16      A.  It will show you -- well, actually it shows you
17   both of those numbers.  For each area and then the APPA
18   standard, they calculated out how many custodians per
19   shift would be required.  And then the bottom number is
20   the sum of all those, right, all those added together.
21          And then the number to the right -- I mean,
22   actually if I opened the Excel, I can tell you, but I
23   mean, yeah, that number to the right is just the -- that
24   number of people times the -- to annualize it to times
25   2080 hours in a work year.
```

Page 83

```
 1      Q.  So why did you annualize it to 2080 hours in a
 2   work year when the APPA standards already assume a
 3   certain amount of time?
 4      A.  Well, that's per shift, and multiply it by how
 5   many hours in a year people work so -- or comparing
 6   these averages across years, so I needed to convert that
 7   number per shift into how many work hours per year that
 8   would equate to.
 9      Q.  So, for example, for Medical, is the number of
10   custodians saying approximately four and a half
11   custodians per day?
12      A.  Right.
13      Q.  And so, then, rather than multiply it by the
14   number of days, you just multiplied it by the number of
15   hours in a work year?
16      A.  Well, right, to put it in the same nomenclature
17   of the data that I was provided from Bland, yes.
18      Q.  And then what did you do with that number, then?
19      A.  I -- nothing with that sum, I mean, other than,
20   yeah, compared it to the sum of the data that I had
21   received in that table.
22      Q.  Okay.  And then when we were talking earlier
23   about the number of people used, the 63.53 number, and
24   you used that to calculate something on Page 32, where
25   did you use that 63.53 number on Page 32?
```

Page 84

```
 1      A.  Well, no, if you notice, that's that other
 2   number, the hours number, because, again, it has to be
 3   hours to hours to be able to compare them.
 4      Q.  And so you took that hours number and you did
 5   something with it; what did you do with it?
 6      A.  Yeah, multiplied it -- no.  I took the number of
 7   custodians times 2080 to get the annual hours per year
 8   of custodial labor required.
 9      Q.  And then did you use that number on Page 32?
10      A.  Right, which was the basis of the statement that
11   I have in Paragraph 20 of my report.
12      Q.  And what was the calculation for that, for your
13   using that number?
14      A.  The percent difference between those two.
15      Q.  So when you say "between those two," between
16   which two?
17      A.  Between the average number of hours from the
18   blank table -- or Bland table, I apologize -- and the
19   APPA estimate that I arrived at.
20      Q.  And did you make any independent effort to verify
21   the numbers in the Bland table?
22      A.  No.
23      Q.  Did you check his equations to see if his math
24   was right?
25      A.  All I was provided was a table of numbers, which
```

Page 85

```
 1   is -- you know, begins on Page 28 and continues.  That's
 2   what I had.
 3      Q.  And you weren't provided the underlying data for
 4   that table?
 5      A.  No.
 6      Q.  And the way you read that, for example, was that
 7   on 11/1/17, there were 50 hours of barber work
 8   completed; is that correct?
 9      A.  I'm trying to find where you're at.  I'm not sure
10   where -- can you help me.
11      Q.  I'm on Page 26 of the PDF, the first row --
12      A.  Oh.
13      Q.  -- says 11/1/17, and then the first number to the
14   right is number 50.
15      A.  Oh, again, those two pages were, like I said, a
16   preliminary work that I had done that's not related to
17   this table that starts on Page 28 -- or 27 and
18   continues.
19      Q.  And what documents did you review to get those
20   numbers when you were putting this preliminary work
21   together?
22      A.  I'm sorry.  Which numbers?
23      Q.  The numbers in your chart, you said you have --
24   it's preliminary.  We're on this Page 26 again.  What
25   documents did you look at to put this together?
```

Page 86

1    A.  It was a spreadsheet -- like I had mentioned
2  before, it was a spreadsheet that had been provided by
3  Plaintiffs' attorney.
4    Q.  And did you provide a copy of that spreadsheet
5  with your report?
6    A.  No.
7    Q.  Why not?
8    A.  I didn't rely on that for my report.
9    Q.  But you relied upon it in making this spreadsheet
10  here?
11    A.  Right.  This is a -- this is like the first tab
12  of this workbook that I created.
13    Q.  So there's a spreadsheet that is not included in
14  your list of documents considered that you didn't
15  provide?
16    A.  I have listed everything that I relied on for the
17  report.
18    Q.  So even though this was preliminary, what was the
19  purpose of this spreadsheet on Page 26?
20    A.  I honestly -- I don't remember.  I think it was
21  to try to get the type of data that I was provided from
22  the table that I received from Bland's report.
23    Q.  Okay.  So were you trying to estimate the number
24  of hours per day that detainees worked in each position?
25    A.  Actually that's where I would have liked to have

Page 87

1  gone, but this was not even that.  This was just trying
2  to summarize some data that I had been given by the
3  plaintiffs' attorney.
4    Q.  And what was that data?
5    A.  It was a spreadsheet of -- I don't even -- I have
6  to look.  It was, like, trying to be a day by
7  day -- like a record of what people did.
8    Q.  Okay.  And I know you only performed a small
9  amount of analysis for that.  Did you compare that at
10  all to the information provided to you by Bland to see
11  if they were consistent?
12    A.  No, I didn't.
13    Q.  Why not?
14    A.  I didn't need to.  I'd been given data that I
15  needed to perform the rest of the calculations I had
16  been asked to do.
17    Q.  Are your estimates only as good as the data
18  you're provided?
19    A.  Yes.
20    Q.  So look at the Bland spreadsheet on Page 28.
21    A.  Uh-huh, yes.
22    Q.  If you look under Kitchen, the numbers increase
23  quite rapidly each month.  Do you see that?  Start at
24  438; and by December 12, they're at 3,754.
25    A.  Okay.

Page 88

1    Q.  Do you know why that is?
2    A.  I infer it's because the facility was moving
3  towards being fully engaged, but I don't know that.
4    Q.  And do you know if detainee labor, like the hours
5  worked, has anything to do with the population at the
6  facility?
7    A.  I don't.
8    Q.  Okay.  And if the facility was trying to keep as
9  many people busy as possible to keep them out of
10  trouble, would that account for some of the increase in
11  these numbers?
12    MR. VINCENT:  Object to form.
13    THE WITNESS:  I'm not sure I understand the
14  question.
15  BY MS. SCHEFFEY:
16    Q.  So did you make any effort to analyze whether all
17  these hours were productive hours or not?
18    A.  No.  I utilized the table that I was given for
19  the calculations.
20    Q.  And the APPA standards, did those presume that
21  the hours worked were productive minutes; is that
22  correct?
23    A.  Yes.
24    Q.  And do you have any knowledge sitting here today
25  about whether these hours in this chart include breaks

Page 89

1  or lunches?
2    A.  I don't know.
3    Q.  If they did, would that change your analysis?
4    A.  Perhaps.
5    Q.  Let's go back to Table 1, which is Paragraph 19
6  of your report.
7    A.  Okay.  I have it.
8    Q.  So walk me through the calculation for Line 1 to
9  make sure we're on the same page.  How do you get to the
10  4.52 full time custodians required?
11    A.  Sure.  You would add up those two square footage
12  numbers and then divide it by the APPA number, which is
13  actually on -- I'll get you the page number.  Honestly,
14  all these calculations can be seen on Page 25, about the
15  middle of Exhibit 3.
16    Q.  So when you say they can be seen in 25, I still
17  have to guess what it is that you did, right, to get to
18  these numbers.  It doesn't show the equation, does it?
19    A.  I'm happy to explain it.
20    Q.  Okay.  Yeah.  So that's what I'm thinking as far
21  as Paragraph 19; just walk me through the calculations
22  that you used for the first line, Medical.
23    A.  Sure.  So you add the two square footages and
24  then divide by the 2900, and that will give you the
25  4.516.

Page 90

```
 1        Q.  And so if the medical is more analogous to a
 2   different type of area under the APPA, that would change
 3   the figure substantially; is that correct?
 4        A.  Again, it would depend on what they changed to.
 5   So, yes, it would matter how you -- the level of
 6   cleanliness and the corresponding area would affect --
 7   in this example, the 2900, that could possibly be a
 8   different number, yes.
 9        Q.  So if I -- I'm going to give you a second, if you
10   can open up the APPA and go to the last page of that
11   PDF, Page 20.
12        A.  Sorry.  It got closed.  Okay.  Here it is.  To
13   Page 20, 20 is the end.
14        Q.  Yep.  And at the top, there's Example 3.  Do you
15   see that?
16        A.  Okay.
17        Q.  So Example 3 says, "You have a Workers'
18   Compensation hearing scheduled in which a worker is
19   claiming job stress due to overwork and wants to be
20   awarded a disability.  He's assigned 18,000 CSF of
21   carpeted offices and seven-productive-hour shift with
22   activities to be performed at Level 2 frequencies."
23            Okay.  So it says, "As shown in Figure 1, the
24   APPA guidelines say a worker can do 18,200 CSF.  This
25   was his actual experience.  The claim was denied."
```

Page 91

```
 1            Do you see that?
 2        A.  Yes.
 3        Q.  So if, for example, you look at the housing
 4   square footage that you used in your report and if you
 5   were to assume that Exhibit 3 -- or Example 3, sorry --
 6   applied and that one person could clean 18,200 square
 7   feet, you would end up with significantly fewer
 8   employees needed; is that correct?
 9        A.  I'm not clear how that relates to this example.
10   But I think I've already said yes, you have to classify
11   the area properly in that -- for example, this 18,200 in
12   the example is just a -- based on the cleanliness level
13   and the type of area from that original table, Figure 1.
14        Q.  Right.  And we agree that housing is a Level 2
15   frequency, and so is this Example 3; is that correct?
16        A.  Level 2 cleanliness, yes.
17        Q.  So if I were to say, okay, one person can clean
18   18,200 square feet at Level 2 cleanliness, that's only
19   for Adelanto East and West, nine employees?
20        MR. VINCENT:  Object to form.
21        THE WITNESS:  I'm sorry, Counsel.  What's the
22   question?
23   BY MS. SCHEFFEY:
24        Q.  So the question is -- okay.  So if I were to
25   determine that the 18,200 square footage standard
```

Page 92

```
 1   applied, I would take the square footage of the
 2   housing -- so let's say for West 139,940 -- and divide
 3   it by 18,200; is that correct?
 4        A.  Yes.
 5        MR. VINCENT:  Object to form.  Assuming he's --
 6        MS. SCHEFFEY:  Would that --
 7        MR. VINCENT:  -- right?
 8        MS. SCHEFFEY:  I'm just asking.
 9        MR. VINCENT:  Yeah, I know, but you're misleading
10   in your question.  The example you used is for carpeted
11   offices.  They're not living in carpeted offices.  I
12   mean, I've let it go for a long time because it's just
13   completely irrelevant, but now it's getting ridiculous.
14        MS. SCHEFFEY:  I get -- it's my deposition.  I
15   can ask the questions I want.  You can work on those
16   later --
17        MR. VINCENT:  Okay.
18        MS. SCHEFFEY:  -- relevance is definitely a good
19   objection in depositions --
20        MR. VINCENT:  It's not a good --
21        MS. SCHEFFEY:  -- waste of time.
22        Q.  Is that how would you do the calculation, sir, is
23   that you would divide the 139,940 by 18,200?
24        A.  What you would -- yes, correct.  What you would
25   do is depending on the cleanliness level and the
```

Page 93

```
 1   category of room, the APPA provides the -- you know, the
 2   denominator for the quotient that you're calculating,
 3   that's correct.
 4        Q.  Okay.  And so your counsel has objected that that
 5   is for carpeted.  Let's look at Example 1 in the APPA
 6   guideline, which is on Page 5 of the document and
 7   Page 19 of the PDF.
 8        A.  Okay.
 9        Q.  And you see that that example states that, "Your
10   campus has 251,876 square feet of space assigned to
11   classrooms with hard floors and six custodians to clean
12   that space."
13            Do you see that?
14        A.  Yeah, I see it.
15        Q.  Okay.  And it says, "Identify your current
16   theoretical cleaning level on Figure 1 and calculate the
17   number of custodians required to clean at Level 2."
18            Is that correct?
19        A.  Yes.
20        Q.  So in this example, they divide the CSF by the
21   current number of custodians to figure out how many
22   square feet are cleaned per custodian and find out that
23   it's 49,979 square feet for existing custodians.  Is
24   that a correct reading of what's in the APPA guidelines?
25        A.  That's this example, sure.
```

Page 94

```
1     Q.  So why do they divide the square footage by the
2  number of existing custodians?
3     A.  Because in this example, that's what they're
4  trying to illustrate as a method to utilize this table.
5     Q.  And why didn't you use that method to utilize
6  this table?
7     A.  Because my task was to determine the number of
8  custodians.
9     Q.  Okay.  And if APPA contemplates cleaning 251,876
10  square footage with six custodians, why does yours for
11  housing contemplate 46?
12     A.  Again, your -- it sort of feels like do I walk to
13  school or do I bring my lunch.  I'm not understanding
14  how the two are related.  I would just say that the next
15  sentence of this example says that based on the
16  calculation, it implies that your cleaning level is
17  somewhere between 4 and 5.
18     Q.  Okay.  And so you -- the sample says cleaning at
19  Level 2 would be 15 custodians; is that correct?  15.08
20  to be exact; is that right?
21     A.  Yes.
22     Q.  So why is a common area of a detention facility,
23  which is hard floors and a few tables to sit at, not
24  like a classroom in a college?
25     A.  I don't know.
```

Page 95

```
1     Q.  So is it possible that the correct APPA
2  guidelines would be comparing classrooms with the common
3  areas of the GEO dorms?
4     A.  I'm sorry.  Could you restate the last question.
5     Q.  Yeah --
6     A.  I'm not sure that I answered it correctly.
7     Q.  Well, what do you think you answered?
8     A.  I'm not sure.
9         Could I have the court reporter read it back for
10  me.
11     MS. SCHEFFEY:  Sure.
12     (Record read.)
13     THE WITNESS:  Thank you.
14         I guess I would say I don't have a category
15  called common area.  And I kind of already walked
16  through what analog I had chosen from the APPA table
17  based on the descriptors that I received of these areas.
18  BY MS. SCHEFFEY:
19     Q.  Okay.  And so for a classroom, you would use
20  Dormitory Sleep/Study; is that correct?
21     A.  No.
22     Q.  What did you use?
23     A.  Oh, apologies.  Yes, that's correct.
24     Q.  So what is a Dormitory Sleep/Study -- describe
25  what that looks like in a college as used in the APPA
```

Page 96

```
1  guidelines.
2     A.  Sure.  That's an area, a common area, that most
3  residence halls have on each floor that's for general
4  congregation, has some tables, sometimes like a couch;
5  depending on the situation, may have a TV.
6     Q.  Are they carpeted?
7     A.  Again, that depends on the residence hall.
8     Q.  Okay.  So does this APPA standard contemplate the
9  Dormitory Sleep/Study is carpeted?
10     A.  It says it explicitly when they are.  So unless
11  it says it, you're to assume that they're hard floors.
12     Q.  So why does it also explicitly say when it's hard
13  floors?
14     A.  I don't know.  You'd have to ask them.
15     Q.  Is there anything in here, in the APPA, that says
16  that you assume when it doesn't say hard floor or carpet
17  that it's not a combination of both but that it's hard
18  floor?
19     A.  In this excerpt, I'm not sure.  I'd have to read
20  it.
21     Q.  And this is the excerpt you say is in your
22  report; correct?
23     A.  That's correct.
24     Q.  And so you're not sure if that includes carpeted
25  area, or you're pretty sure it does not?
```

Page 97

```
1     A.  Oh, the sleep/study area?
2     Q.  Yeah.
3     A.  No, I'm saying it does not.
4     Q.  Okay.  And can you point me to the portion of the
5  APPA that states that?
6     A.  I -- in this excerpt -- again, I can re-read it
7  right now, but I don't know if it's in here or not.
8     Q.  Sure.  And what is the difference between the
9  Classroom with Hard Floor, High Use and the Dormitory
10  Sleep/Study?  Why did the square footages change in the
11  APPA?
12     A.  Again, this is data that's based off of the
13  reporting of hundreds of universities over many years
14  as, you know, reasonable guidelines that are used for
15  estimating the amount of janitorial crew needed.
16     Q.  Right.  But without more specific information,
17  it's hard to draw analogies between this and the
18  detention facility.  So what factors did you consider to
19  classify this as a Dormitory Sleep/Study as opposed to a
20  Classroom With Hard Floor, High Use?
21     A.  The housing example?
22     Q.  Yes.
23     A.  Because both are related directly to where people
24  habituate and sleep.
25     Q.  Okay.  And so the Dormitory Sleep/Study includes
```

Page 98

1   the actual dorms where students live; is that correct?
2       A. Yes.
3       Q. Yes. Okay.
4       So -- and the dorms where students live are
5   cleaned by housekeeping?
6       A. It depends on the university, but sometimes yes;
7   sometimes it's just common areas like the restrooms.
8       Q. So this aggregate number of Dormitory Sleep/Study
9   would include both situations where the housekeeping
10  cleans the dorms where students live and places where
11  they only clean the common areas?
12      MR. VINCENT: Object to form.
13      THE WITNESS: Can you repeat the question. I'm
14  sorry.
15  BY MS. SCHEFFEY:
16      Q. Yeah. So this Dormitory Sleep/Study category
17  would include both colleges -- estimates from colleges
18  where the cleaning staff cleaned the actual dorms where
19  the students lived and where the cleaning staff only
20  cleaned common areas; is that correct?
21      A. No. It would include estimates from universities
22  that are reporting that this is areas that their
23  cleaning crews service.
24      Q. Okay. So how would I figure out what types of
25  areas are included in Dormitory Sleep/Study?

Page 99

1       A. I guess I'm not sure -- can you rephrase the
2   question. I'm not --
3       Q. Okay. So you said earlier that a Dormitory
4   Sleep/Study, it could include a couch, for example;
5   correct?
6       A. Include what? I'm sorry.
7       Q. A couch. A couch --
8       A. Sure.
9       Q. Okay. Did GEO facilities include couches?
10      A. I don't know.
11      Q. And if there were no couches in the GEO
12  facilities, would that change the cleaning tasks
13  required?
14      A. Maybe.
15      Q. Presumably this includes a cleaning staff that
16  would vacuum a couch that students eat and spilled
17  crumbs on; right?
18      A. It's -- correct, it's to clean an area that's
19  classified as this, that's right.
20      Q. Right. So how do I determine that the number of
21  fixtures that were included in the Dormitory Sleep/Study
22  are similar to the number of fixtures that are included
23  in the Adelanto Detention Facility's housing unit?
24      A. Well, again, these are aggregate numbers. These
25  aren't based off of any one specific example. These are

Page 100

1   literally based off of the -- an accumulation of data
2   from, you know, literally hundreds of data points so...
3       Q. And are any of those data points from detention
4   facilities or jails or correctional facilities?
5       A. No.
6       Q. And do any of these data points contemplate that
7   students will assist with the cleaning tasks?
8       A. No.
9       Q. And why do you think that detainees are similar
10  to college students in terms of a population and
11  cleanliness generally?
12      MR. VINCENT: Object to form.
13      THE WITNESS: I don't.
14  BY MS. SCHEFFEY:
15      Q. Why not?
16      A. I don't know anything about that.
17      Q. So you don't know if detainees and college
18  students are generally the same level of cleanliness?
19      A. It's -- that's not relevant in terms of the level
20  of cleaning that's being performed by janitors.
21      Q. So you don't think it would change a janitor's
22  job if the area they start with is dirtier than an area
23  they start with is cleaner?
24      MR. VINCENT: Object to form.
25      THE WITNESS: No. The system generates the

Page 101

1   results based off of the expected level of cleanliness,
2   not off of, like, a starting point.
3   BY MS. SCHEFFEY:
4       Q. Right. But if a janitor walks into a hallway and
5   three college students have vomited in the hall, is it
6   going to take them longer to clean that than if they
7   just had to vacuum that hallway and there's no vomit on
8   it?
9       A. Yes.
10      Q. So the base level of cleanliness could impact the
11  amount of time it takes to clean an area?
12      A. Which is one reason that I found this system to
13  be useful, is that it's not based off of any one sample;
14  it's based off of literally hundreds of samples.
15      Q. But all of those samples involve college
16  students; is that correct?
17      A. Yes.
18      Q. And in your experience as a professor, are
19  college students particularly clean?
20      A. I don't want to over-generalize, but it varies.
21      Q. Okay. Would you generally consider them cleaner
22  than your colleagues with whom you work?
23      A. It depends on the colleague.
24      MS. SCHEFFEY: I think I've done in Larry now.
25      MR. VINCENT: As long as I'm not included in

Page 102

1   those colleagues, it's fine.
2       THE WITNESS:  Well, you know your camera is on
3   so...
4       MR. VINCENT:  Oh, yeah, yeah.
5   BY MS. SCHEFFEY:
6       Q.  Would you say that -- if you had to choose which
7   one was cleaner, would you choose your colleagues or the
8   college students as a whole, the whole population?
9       A.  Again, it depends on my colleague.  I would say
10  generally you're best focused on housekeeping at a
11  younger age.
12      Q.  And do you know the average age of individuals in
13  the detention facilities?
14      A.  I do not.
15      MS. SCHEFFEY:  Okay.  I think I went a little
16  longer than 30 minutes.  I don't have that much longer,
17  but I definitely have over an hour.  Do you want to take
18  a quick lunch break?
19      THE WITNESS:  I would appreciate that, if that's
20  okay.
21      MS. SCHEFFEY:  That's absolutely fine.  So let's
22  go off.
23      (Lunch recess from 10:53 a.m. to 11:33 a.m.)
24  BY MS. SCHEFFEY:
25      Q.  We're back on the record.  So before we went off,

Page 103

1   we were talking about Table 1 on Page 6 of your report
2   which discusses the APPA Service Level.  So when you
3   just list Housing here, does that refer to the pods in
4   which detainees are housed?
5       A.  Right.  It's -- those square footage numbers are
6   ones I obtained off the blueprints I was provided.
7       Q.  When you looked at the blueprints, did that
8   include the segregation area?
9       A.  I don't recall.
10      Q.  Did you attempt to differentiate the different
11  types of housing in any way?
12      A.  No.  I used the numbers straight from the
13  blueprints.
14      Q.  And did the blueprints have a scale?
15      A.  They did.
16      Q.  And did you make those measurements yourself?
17      A.  No.  I used the numbers they provided right on
18  the blueprints.
19      Q.  And did they break those down by housing areas
20  and other areas?
21      A.  I don't recall specifically.
22      Q.  Do you have the document with you that you
23  referenced?
24      A.  I have it stored on my computer somewhere.
25      Q.  We can come back to that if we need to.

Page 104

1       All right.  Are you aware that there are
2   different layouts of housing units in Adelanto?
3       A.  No, I didn't know that.
4       Q.  If they're laid out differently or have different
5   materials, does that change what APPA category they
6   might fall into?
7       A.  It's possible.
8       Q.  So, for example, there are some dorms where the
9   detainees eat within the dorms all of their meals, and
10  they call that satellite feeding.  In other dorms, the
11  detainees go to a cafeteria type area to eat their
12  meals.
13      I notice you don't include a cafeteria on here.
14  Is that because you assumed all housing units had meals
15  within the housing units?
16      A.  Right.  And I don't believe that that square
17  footage information was on those blueprints.
18      Q.  And so in your recollection, did you look at an
19  actual schematic of the building?
20      A.  Yes.
21      Q.  And did you account for all square footage in the
22  building in these estimates?
23      A.  No.
24      Q.  How did you select which square footage to
25  include?

Page 105

1       A.  I used their numbers.
2       Q.  When you say "their numbers," who is their?
3       A.  Whoever drew the blueprint.
4       Q.  Did you receive any information to tell you which
5   areas detainees cleaned and which areas they did not?
6       A.  I don't think so.  I think I asked about that but
7   ultimately just used the numbers on the blueprint.
8       Q.  So who did you ask about which areas --
9       A.  Oh, I would have asked Plaintiffs' attorney.
10      Q.  Do you recall getting an answer about that?
11      A.  I don't.
12      Q.  So without that answer, did you assume that
13  detainees cleaned every piece of square footage within
14  the building?
15      A.  No, just the areas that I detailed.
16      Q.  Are you on the computer where you have the
17  blueprint you used?
18      A.  I think I have it, yes.
19      Q.  Could you pull it up and put it in the chat.
20      A.  I'll try.  I think it's this one, Product 19
21  blueprints.  It's pretty large, but I'll try to upload
22  it if you'd like me to.
23      Q.  Okay.  That would be great, just to make sure
24  we're on the same page.
25      A.  This could take -- let's see how long it takes.

Page 106

```
 1        MS. SCHEFFEY:  Giselle, if this comes through,
 2   we'll mark it as Exhibit 6.
 3        (Defendant's Exhibit 6 was marked for
 4        identification and attached hereto.)
 5   BY MS. SCHEFFEY:
 6   Q.  All right.  I have it open.  Do you have it open
 7   in front of you as well?
 8   A.  It's trying to.  My computer is kind of bogging
 9   down.  It's open, if you can tell me a specific page
10   number.
11   Q.  Yeah, so I guess I'm wondering what page you
12   pulled your numbers from for the square footage.
13   A.  Well, I believe I've located one of them.
14   Q.  What page of the PDF is that?
15   A.  That would be on Page 31.
16   Q.  When you say one of them, do you believe there's
17   more than one?
18   A.  Hold on.  I'm trying to zoom back out.  Yeah, as
19   I recall, there's like an East and West, so that's why I
20   made the table the way I did.
21   Q.  And does this document propose an expansion of
22   Adelanto?  Do you know from your view?
23   A.  I don't remember, honestly.  I just remember
24   looking for the blueprint that reflected what I was
25   looking for.
```

Page 107

```
 1   Q.  So I see, for example, on Page 35 of this PDF, it
 2   says As Modified.  Did you use Page 35?
 3   A.  Page 35 -- hold on a second.  I'm still trying to
 4   get Page 31 to load.
 5   Q.  Okay.
 6   A.  I'm sorry.  Which page would you like me to go
 7   to?
 8   Q.  35.
 9   A.  Okay.  Okay.  It's loading.  It's still fuzzy,
10   but I can kind of see it.
11   Q.  Did you take any notes that would identify which
12   one of these diagrams you relied upon?
13   A.  Well, I'm just looking at the Existing Facility
14   Area Breakdown block towards the bottom right corner of
15   the drawing.
16   Q.  Is that on Page 31, or what page?
17   A.  On Page 35.
18   Q.  And do you know if you relied on Page 35 or on
19   Page 31?
20   A.  I would have to verify.  I cannot recall off the
21   top of my head.
22   Q.  What would you have to check to verify that?
23   A.  Well, I would check the numbers in this table
24   against what you see in their title blocks.
25   Q.  Okay.  And do you know if the one you used is how
```

Page 108

```
 1   Adelanto currently exists?
 2   A.  I believe that's correct.
 3   Q.  What leads you to believe that?
 4   A.  I utilized the document I got from the attorney.
 5   Q.  And did you read the bulk of this document?
 6   A.  No.
 7   Q.  So do you have any understanding of whether these
 8   blueprints are current or if they're proposed?
 9   A.  No.  My understanding is this is the facility as
10   it exists.
11   Q.  So you didn't read that this is a proposal on the
12   first page of the document?
13   A.  No.
14   Q.  And so those aren't the -- if the facility does
15   not exist as depicted, then these numbers would have to
16   change in your chart; is that correct?
17   A.  Yes.
18   Q.  And so, then, presuming that it was correct, you
19   said you used the numbers in the bottom corner?
20   A.  Right, the numbers provided in these documents.
21   Q.  So does it break them down as you had from
22   Medical, Intake, Kitchen, Visitation, Housing and
23   Corridors?
24   A.  Some of them directly.  For example, the Medical,
25   I had to measure that myself.
```

Page 109

```
 1   Q.  So Medical you measured yourself.  And in
 2   measuring that yourself, did you presume that detainees
 3   cleaned every square inch of medical?
 4   A.  Right.  Per the APPA method, it's wall to wall
 5   square footage.
 6   Q.  So if detainees do not clean all of medical, that
 7   estimate would have to change, that you're trying to
 8   estimate how to replace detainee labor; correct?
 9   A.  Yes.
10   Q.  What about Intake, how did you get that number?
11   A.  All of the square footage numbers were based off
12   of examination of these drawings.
13   Q.  So you examined the drawings?
14   A.  Yes.
15   Q.  And how were you able to identify which ones were
16   dorms that were occupied and which ones weren't?
17   A.  Could you repeat the question.
18   Q.  Yeah.  So in looking at this drawing, let's start
19   with a basic question first.  How did you identify which
20   areas constitute currently existing dorms?
21   A.  You trailed off at the very end.  How did I
22   identify?
23   Q.  Currently existing dorms.
24   A.  Oh, that one, for that number, I'm pretty
25   confident I used the 34,985 from their block.
```

Page 110

1    Q.  So where is that block found that has that exact
2  number?
3    A.  On the bottom right where it says Existing
4  Facility Area Breakdown.
5    Q.  And what is the title it has for that square
6  footage?
7    A.  The title it has...  It says Housing Buildings,
8  each building at 34,985 square feet.
9    Q.  Housing Buildings.  Okay.  And so for which
10  diagram were you looking at?  Is that the diagram on
11  Page 31, 32, 33, 34?
12    A.  I don't know.  I'd have to go back and refresh my
13  memory.
14    Q.  And sitting here today, that's difficult to do
15  because of the slow loading of the document, I assume?
16    A.  That's correct.
17    Q.  Do you know if you paid attention to whether that
18  was a currently existing building or a proposed
19  building?
20    A.  Yes.
21    Q.  And how do you know that?
22    A.  You jogged my memory.  I recall verifying what
23  areas were to be included.
24    Q.  Did you take into account the fact that not all
25  dorms are occupied all the time?

Page 111

1    A.  No.
2    Q.  Why not?
3    A.  I didn't have that information.
4    Q.  Does your staffing plan assume that all dorms are
5  occupied all the time at full capacity?
6    A.  Not exactly.  It just assumes that they're all
7  being cleaned to a specified level of cleanliness.
8    Q.  And so if a dorm is not being used, does it
9  require the same number of hours cleaning it as a dorm
10  that is being used?
11    A.  I would expect not.
12    Q.  And how would you account for that under the
13  APPA?
14    A.  Again, this is used to estimate based on the
15  square footage.  If there's square footage that's taken
16  out of the equation, then it's going to change the
17  estimate on the number of janitors required.
18    Q.  Okay.  But you can't provide me the specific
19  location of where you got the square footage here?
20    A.  Where I got what?  I'm sorry.
21    Q.  The square footage for this document.
22    A.  Not at this moment.  I mean, it was from this
23  Product 19.
24    Q.  Did you -- what about the kitchen and laundry
25  areas, did you measure those yourself?

Page 112

1    A.  I believe it's a combination.  I think the block
2  calls out parts of it, but -- well, let me -- so you can
3  see in that same block it says Kitchen/Dining Area.  It
4  doesn't have a listing separately broken out of the
5  laundry, so that would be a combination where I used the
6  number from this for the kitchen area and then measured
7  the laundry area and added it on myself.
8    Q.  And if they're different physical areas, why did
9  you use the same APPA number for both -- or APPA
10  category, if that's an easier way?
11    A.  Just I was trying to -- so parsimony, I guess I
12  was making it as simple and straightforward as possible.
13    Q.  Do you think cleaning in the kitchen and cleaning
14  in the laundry are equivalent?
15    A.  I think that they both had to be cleaned to a
16  certain cleanliness level, yes.
17    Q.  But for purposes of selecting an APPA Staffing
18  Service Levels and APPA Standard Space, you considered
19  the kitchen and laundry to be the same?
20    A.  No.  And I used different numbers for those.
21    Q.  But you didn't break them out in your table?
22    A.  It's in -- not in the table in the report.  It's
23  in Exhibit 3.
24    Q.  And Exhibit 3, the numbers would have come from
25  different areas, then?  I don't see it broken out in

Page 113

1  Exhibit 3.
2    A.  Okay.  Let me find it.  I have too much stuff
3  open.
4    Q.  I closed that big spreadsheet, that big document
5  that was causing chaos.
6    A.  Yeah, for me as well.  Okay.  Here we go.  So
7  that would be -- again, reflected in the difference --
8  and I went through these earlier, the difference in
9  Page 25 of that PDF document where the APPA number is
10  different based on the area.  But, yes, in both the
11  kitchen and laundry area, I used the 2,000.
12    Q.  So you considered the kitchen and laundry to be
13  the same as the washroom?
14    A.  Well, I mean, yeah, I pulled that off
15  of -- correct.  I mean, that's one way to say it.
16    Q.  Why not a Cafeteria With Hard Floor?
17    A.  Because, again, we're talking about a food prep
18  area versus a food consumption area.
19    Q.  Do people typically prep food in the washroom?
20    A.  No, but it would be -- hopefully if I'm eating
21  there -- maintained to that highest level of
22  cleanliness.
23    Q.  Well, wouldn't a cafeteria need to be maintained
24  at that same level of cleanliness because you're eating
25  there?

Page 114

1    A.  Not necessarily, no.
2    Q.  Okay.  So do you have any idea of whether the
3  cafeteria is what is also called the kitchen in the
4  Adelanto facility?
5    A.  No.
6    Q.  So where did you account for the cafeteria?  Is
7  it part of the kitchen square footage, the housing
8  square footage, the visitation square footage -- another
9  area?
10    A.  I would have to go back and re-review these
11  blueprints.
12    Q.  So you don't know where the cafeteria is
13  accounted for in this calculation?
14    A.  I would have to check to verify.
15    Q.  And if the common areas of the housing units are
16  like cafeterias, you didn't use that number there
17  either?
18    A.  Can you repeat that.
19    Q.  Yeah.  So you also didn't use the cafeteria
20  numbers on the APPA standard for the housing units, did
21  you?
22    A.  No.
23    Q.  So your staffing plan assumes that there is no
24  cafeteria, no place for all the detainees to eat?
25    A.  No.  It's that it's not individually broken out.

Page 115

1    Q.  Okay.  But so the difference between a Washroom,
2  for example, is 2,000 square feet, and a Cafeteria With
3  Hard Floors is 11,200 square feet.  Quite significant;
4  right?
5    A.  Yes, it varies.
6    Q.  And nowhere in this staffing plan does it account
7  for cleaning a cafeteria with a hard floor under the
8  11,200 square footage number; is that correct?
9    A.  Yes.
10    Q.  All right.  And is that just because the 2,000
11  number is smaller, so, therefore, the staffing number is
12  bigger?
13    A.  No.
14    Q.  So why is the kitchen like a washroom?
15    A.  Again, I placed those into their various
16  categories based off of the descriptions I got from the
17  Adelanto processes and the APPA guidelines for
18  cleanliness.
19    Q.  And why is a laundry room like a washroom?
20    A.  Again, I was looking from a sanitation
21  standpoint, particularly in the COVID-19 area, but,
22  yeah, these are areas that are going to be maintained at
23  a high level of cleanliness.
24    Q.  So you looked at these particularly in light of
25  COVID-19?

Page 116

1    A.  Well, in light of those descriptions of the
2  thoroughness of, I guess, the expectations.
3    Q.  So this assumes expectations of cleaning in the
4  COVID-19 realm?
5    A.  I don't know if they have been modified.
6    Q.  But your assumption was that they were COVID-19
7  level cleaning?
8    A.  No.  My assumption was that they were cleaned to
9  the level that the Adelanto documents provided to me
10  described.
11    Q.  And for the laundry, is it your understanding
12  that detainees cleaned the laundry room or that they
13  actually washed laundry?
14    A.  My understanding is they do both.
15    Q.  Where did you get that understanding from?
16    A.  I don't remember specifically.  But I can say for
17  the purposes of my tables, it's the hours that -- the
18  things that are labeled as laundry are labeled as
19  laundry because the task being performed is to do
20  laundry.
21    Q.  So for purposes of Mr. Bland's table, all of the
22  laundry hours are performing the task of cleaning
23  laundry, not cleaning the laundry room; is that correct?
24    A.  Yes, that's correct.
25    Q.  And so where on APPA does it provide for time and

Page 117

1  square footage for laundry cleaning?
2    A.  It doesn't directly.
3    Q.  So then in determining the average APPA --
4  remember you discussed earlier you did a percentage
5  change in the sum of laundry and sum of kitchen and
6  custodial to figure out if your calculations were
7  different.  Do you recall testifying about that?
8    A.  That's not correct.
9    Q.  Okay.  So let's go to that page of your report,
10  then, which is Page 32 of the PDF.
11    A.  The paragraph number?
12    Q.  There's no paragraph number.  It's a chart; it's
13  a table.
14    A.  Oh, okay.
15    Q.  Page 32 of your report.
16    A.  Okay.  Yes.
17    Q.  So you said Average APPA here, right next to 16
18  through 19.
19    A.  Oh, right.  That -- well, you read that across
20  but...
21    Q.  So for that, were you comparing the number of
22  hours that you obtained in your staffing plan for
23  custodial work under APPA to the number of hours that
24  Mr. Bland estimated detainees worked?
25    A.  For custodial work, yes.

Page 118

```
1      Q.  Did you remove the laundry hours from that
2   calculation?
3      A.  It's just for the custodial hours.
4      Q.  So I see -- how does that work?  Tell me how you
5   got just the custodial hours.  Because that's not the
6   calculation I have before so...
7      A.  I'm sorry.  I missed the last part.
8      Q.  That's not the number I got from your prior
9   calculation that you just read to me, so I just must be
10  misunderstanding.
11     A.  Okay.  So could you please tell me the question
12  right now.
13     Q.  Yeah, I'm trying to figure out how this
14  calculation works that it only accounts for custodial
15  hours in the plan chart, this Average APPA number.
16     A.  Oh, okay.  Sure.  This is somewhat redundant of
17  Paragraph 20 of the report, but it, in essence, is
18  taking the average of those years for the row of
19  custodial hours; and that number, if you add them up and
20  divide by four will give you the 1-3-6-0-2-9.
21     Q.  Okay.  And then you compared that to your APPA
22  of -- from the Paragraph 19?
23     A.  Paragraph 20, correct.
24     Q.  Paragraph 20.
25     A.  Yes.
```

Page 119

```
1      Q.  And in that APPA on Paragraph 20, you're assuming
2   that detainees currently clean the laundry room;
3   correct?
4      A.  Yeah, it's without regard for -- it's the
5   cleaning standards as the way I wrote them down in the
6   prior tables, yes.
7      Q.  And does it account at all for detention officers
8   who would both do cleaning and act as, you know, in a
9   supervisory capacity in the dorms?
10     A.  No.
11     Q.  So how do you take the total number of staff and
12  compare that to the current staff?
13     A.  I'm sorry.  The question is?
14     Q.  So in Paragraph 20 of your report, you say, "The
15  total number of staff to clean these areas is 63.53
16  full-time custodial workers."
17     A.  Right.
18     Q.  How would I compare how many additional staff
19  that would need for the current level if the current
20  staff are doing two jobs at once?
21     A.  I don't understand the question, I guess.
22     Q.  Yeah -- I'm sorry.  Go ahead.  I'm trying to
23  figure out how, with that 53.53 number, I can determine
24  how many of those positions were already covered by GEO
25  existing staff.
```

Page 120

```
1      A.  That's not what my report was trying to do.
2      Q.  Is your report trying to identify the amount of
3   additional profits that GEO realized by not employing
4   additional staff?
5      A.  Yes.  It's to calculate out based on the labor
6   required what the value of that labor would be.
7      Q.  Right.  So how do you account for the labor
8   that's already existing and already fully paid?
9      A.  I'm not aware of any.
10     Q.  Do you think that the facility is run exclusively
11  by detainees?
12     A.  That's my understanding, is these areas are
13  cleaned by immigrant detainees.
14     Q.  Your understanding is that there are no GEO
15  employees throughout the facility?
16     A.  That's correct, I'm not aware of that.
17     Q.  No GEO employees at all?
18         MR. VINCENT:  Object to form.
19  BY MS. SCHEFFEY:
20     Q.  Did you request a staffing plan so you could
21  identify how many GEO employees worked at the facility?
22         MR. VINCENT:  Object to form.
23         THE WITNESS:  No.
24  BY MS. SCHEFFEY:
25     Q.  Did you request job descriptions of GEO
```

Page 121

```
1   employees?
2          MR. VINCENT:  Object to form.
3          THE WITNESS:  I requested job descriptions for
4   the jobs in question that I was supposed to provide an
5   estimate for.
6   BY MS. SCHEFFEY:
7      Q.  How would one use your conclusion in Paragraph 20
8   to identify how many additional staff are needed beyond
9   what's currently there?
10     A.  I don't know.
11     Q.  So the next thing you discuss is the average wage
12  in Riverside/San Bernardino from the BLS data?
13     A.  Yes.
14     Q.  Do you know if those are the wages paid at the
15  GEO facility?
16     A.  I don't.
17     Q.  Do you know if they're the union workforce?
18     A.  I'm not aware of that.
19     Q.  In your experience working with unions, are their
20  pay rates typically the same as the average hourly wages
21  in the community, or are they higher or lawyer?
22     A.  It varies.
23     Q.  Do you know if there are specific federal
24  standards that GEO has to follow with regard to paying
25  its employees?
```

Page 122

1    A.  I'm not aware of that.
2    Q.  And then so for these numbers, what did you do to
3    compile them?  Did you look at the BLS data and then
4    insert them into a chart form?
5    A.  Yes.
6    Q.  Did you alter them at all?
7    A.  No.
8    Q.  And for the description when it says Barber, was
9    that a custodial person in a barbershop, or is that
10   someone who actually cuts hair in a barber shop?
11   A.  It's someone who cut hair.
12   Q.  And what about the Laundry, is it someone who is
13   in the custodial function in the laundry area, or is it
14   someone who actually washes laundry?
15   A.  No, someone who washes laundry.
16   Q.  And so for Food Prep, is that someone who helps
17   with the cleanliness standards in the kitchen or someone
18   who actually cooks the food?
19   A.  Cooks the food.
20   Q.  Okay.  So then Paragraph 22 talks about the
21   average benefit costs beyond wages are 30.33 percent of
22   payroll.  Can you explain to me what you mean by that.
23   A.  Sure.  Most workers get some amount of fringe
24   benefits in addition to their hourly wages.
25   Q.  Okay.

Page 123

1    A.  That can take many forms, 401K match, health care
2    benefits.
3    Q.  Could one of those benefits be housing?
4    A.  Not typically, no.
5    Q.  What about free healthcare?
6    A.  Yes.  As I mentioned already, healthcare and some
7    sort of retirement are the two most common.
8    Q.  What about if -- what about meals, is that
9    something that an employer gives meals to their
10   employees as a fringe benefit?
11   A.  I would have to go back and verify exactly what
12   the BLS includes in that.
13   Q.  So the detainees at the Adelanto facility have
14   free access to medical care; that's correct, right?
15   A.  I'm not aware of that.
16   Q.  Did you ask about whether they get medical care
17   benefits?
18   A.  No.
19   Q.  What did you think the medical facility was that
20   they were cleaning?
21   A.  I hadn't really thought about it.
22   Q.  So knowing that the detainees received medical
23   care at no cost, does that change your calculations?
24   A.  No.
25   Q.  So you didn't include a benefit number, benefit

Page 124

1    cost, in your calculations?
2    A.  Yes.
3    Q.  You did include a benefit cost in your
4    calculations?
5    A.  Yes, I did.
6    Q.  And did you discount that benefit cost for the
7    benefits that are already actively provided at the
8    facility?
9         MR. VINCENT:  Object to form.
10        THE WITNESS:  No.
11   BY MS. SCHEFFEY:
12   Q.  Why not?
13        MR. VINCENT:  Object to form.
14        THE WITNESS:  Because what I was trying to
15   describe was the total cost of employing what people to
16   do this amount of work.
17   BY MS. SCHEFFEY:
18   Q.  So it would be new people, not detainees; is that
19   your assumption?
20   A.  Well, in this instance, in this table we're
21   talking about, yes, employees.
22   Q.  Okay.  So how did you determine, then, the
23   difference in just paying detainees the benefits in the
24   table here in 21?
25        MR. VINCENT:  Object to form.

Page 125

1        THE WITNESS:  So 21 doesn't contain any of --
2    BY MS. SCHEFFEY:
3    Q.  Okay.  21 doesn't refer to detainees at all?
4    A.  Oh, 21 is the BLS market labor rate daily.
5    Q.  And 22 also would not relate to detainees?
6    A.  Correct.
7    Q.  So for 23, you said, using the data in 21 and 22,
8    you computed the wage and benefit cost for The GEO
9    Group; is that correct?
10   A.  Yes.
11   Q.  Can you tell me about these calculations.  Let's
12   start with Janitor in 2011.  How did you reach the
13   number that begins with 323,000?
14   A.  Sure.  It's the number of hours that I received
15   from the Bland report and then multiplied by the
16   OLMS -- or sorry -- the BLS data as far as wages and
17   then adding on the 30.33 percent for fringe benefits.
18   Q.  So that's just a flat 30.33 percent?
19   A.  Yes.
20   Q.  And is that the same equation you use for every
21   category here?
22   A.  Yes.
23   Q.  And so was it your understanding that it would
24   take the exact same number of hours that detainees took
25   to complete the job or employees who were paid to

Page 126

1  complete the job?
2      A.  Right, to replace those hours, that's correct.
3      Q.  And so GEO would not benefit from any increased
4  efficiencies, for example, a trained janitor or a
5  trained barber?
6      A.  I'm sorry.  Could you rephrase the question.
7      Q.  Is it your understanding that the detainees are
8  trained to be barbers?
9      A.  I don't recall for barbers.  I can remember that
10 for the custodial job, there was a pretty specific job
11 description with requirements, et cetera.  I don't
12 remember for the barbers.
13     Q.  Are you aware that there is very high turnover
14 rate at the Adelanto facility for these positions?
15     A.  No.
16     Q.  In your experience, does high turnover affect the
17 productivity of workers?
18     A.  It can.
19     Q.  How can it?
20     A.  Depending on the task and the amount of training
21 required, it can take a while to get people up to full
22 speed.
23     Q.  So for any of these jobs, do you think it would
24 take a certain amount of time to get an individual up to
25 full speed, that is, janitor, food prep, laundry or

Page 127

1  barber?
2      A.  Based on the materials I saw, they seem pretty
3  comprehensive.  I wouldn't think it would take that
4  long.
5      Q.  And is it your understanding that the hours in
6  the Bland report include that training time?
7      A.  No.  My understanding was that's just a total
8  amount of time spent by the immigrant detainees on these
9  tasks.
10     Q.  And you don't know if that includes training
11 time?
12     A.  I don't know.
13     Q.  Did you inquire about whether that included
14 training time?
15     A.  No.
16     Q.  And if you found out that it did include training
17 time, how would you adjust your calculations?
18     A.  These are the actual numbers, so I'm not sure I
19 would adjust them.
20     Q.  So if you were hiring a third party, for example,
21 barber who was a licensed barber, I would imagine.
22     A.  I don't know.
23     Q.  And so then in 24, you say, "The total annual
24 cost of employing full-time GEO staff to perform the
25 duties," and then you have it would be about 27 and a

Page 128

1  half million dollars?
2      A.  Yes.
3      Q.  And did you compare that to any other detention
4  facilities in the area?
5      A.  No.
6      Q.  Did you compare that to any other standardized
7  data?
8      A.  No.
9      Q.  Is there standardized data stating approximately
10 how much it would cost to clean a facility of a certain
11 square feet?
12     A.  Could you repeat that question.
13     Q.  Yeah.  Is there standardized data available to
14 you somewhere that would state approximately how much it
15 costs to do these services in a detention facility or
16 similar facility?
17     A.  Not that I'm aware of.
18     Q.  Did you look into whether there was any?
19     A.  Yeah, again, not that I'm aware of.
20     Q.  Did you compare any of these to the costs to
21 universities to provide the same services?
22     A.  No.
23     Q.  Is that information available for public
24 universities, how much they spend on each type of labor?
25     A.  I would assume so.

Page 129

1      Q.  Let's take the university you work at.  Does it
2  have public reports of where it allocates its money for
3  the citizens of Wisconsin?
4      A.  One could file an open records request.
5      Q.  Do you know if there's any other publicly
6  available area that shows how much it costs to operate
7  the university for a semester or a year?
8      A.  On a macro level, I'm aware of it.  I've heard
9  our chancellor talking about it, but I'm not sure
10 department by department.
11     Q.  But if that data existed, it would be a good
12 comparison for this data, find out if these numbers are
13 reasonable?
14     A.  I'm not sure.
15     Q.  Why not?
16     A.  Again, it would depend on how analogous the
17 situations were.
18     Q.  Well, we've already decided that colleges are
19 completely analogous for this situation; correct?
20     MR. VINCENT:  Object to form.
21     THE WITNESS:  I'm sorry.  What's the question?
22 BY MS. SCHEFFEY:
23     Q.  We've already decided that colleges are a good
24 analogy for detention centers for purposes of your
25 report; is that correct?

Page 130

1    A.  No.  What I've done is used the APPA guidelines
2  for building, cleaning and maintenance and applied them
3  to the building and maintenance in this situation.
4    Q.  Okay.  So you haven't made any analysis of
5  whether colleges and universities are similar to
6  detention facilities?
7    A.  No.
8    Q.  So taking Paragraph 25, Table 24, you discuss,
9  "Additional profit earned by GEO in its use of immigrant
10 labor instead of hiring and assigning their employees to
11 perform the work by calculating the difference between
12 the costs GEO would incur and the actual amount paid to
13 immigrant detainees in the VWP"; is that correct?
14   A.  Paragraph 25?
15   Q.  Yeah.
16   A.  Yes.
17   Q.  How did you account for the existing work
18 performed by GEO employees?
19   A.  I haven't.
20   Q.  So how can you say this is additional profit
21 earned by GEO if you don't account for what it's already
22 paying?
23   A.  Because my numbers reflect that amount of
24 immigrant labor content that if was not available would
25 need to be replaced.

Page 131

1    Q.  Right.  So I guess this goes back to my question
2  before, which is how did your determine what cleaning
3  tasks that detainees did versus the tasks that GEO
4  employees did.
5    A.  I didn't determine tasks.  I used the APPA
6  standard data to develop an estimate for the total
7  number of people.
8    Q.  Right.  So let's take an example.  The Washroom,
9  2,000 square feet per person, seven hours; right?  Let's
10 say GEO has -- and we used Washroom for the Kitchen,
11 2,000 square footage for the Kitchen under the Washroom
12 calculation?
13   A.  Yes.
14   Q.  So let's say GEO has three kitchen workers who
15 clean the kitchen and three detainee workers who clean
16 the kitchen every day.  Okay.
17   A.  Yes.
18   Q.  How did you account for the work done by the
19 kitchen workers who are already fully paid employees
20 which is within that 2,000 square footage that you're
21 counting?
22   A.  I don't need to.  These calculations are based
23 off of the Bland hours data.
24   Q.  So guess I don't understand how your hours data
25 plays into your APPA analysis.

Page 132

1    A.  It's -- no.  The APPA analysis stands alone.
2    Q.  So that's what I'm saying, is if the APPA
3  analysis stands alone, how do you account for the people
4  who are already being paid to perform those cleaning
5  tasks of that square footage that you calculated?
6    A.  And, again, I've said it doesn't.
7    Q.  So you assumed that detainees do every inch of
8  square footage in the perimeter that you've measured?
9    A.  As outlined in the report, yes.
10   Q.  Right.  But the report doesn't exactly make -- it
11 doesn't make it clear -- or if I'm wrong, please point
12 me to it -- which areas are cleaned by detainees versus
13 the staff.
14   A.  No.  It just talks about the square footage of
15 each area.
16   Q.  And so the underlying assumption for each square
17 footage that you provide in here is that detainees clean
18 every inch of that square footage without assistance
19 from paid GEO employees; is that correct?
20   A.  Yes.
21   Q.  And if you were to find out that half of it was
22 cleaned by GEO employees, would that change your
23 analysis?
24     MR. VINCENT:  Object to form.
25     THE WITNESS:  It might.

Page 133

1  BY MS. SCHEFFEY:
2    Q.  So I'm going to go to Paragraph 26 now.
3    A.  Okay.
4    Q.  So tell me how Paragraph 26 changes your analysis
5  from Paragraph 23 -- so 23 you used the wage and
6  benefits cost.  Now it looks like you're using
7  California minimum wage.  What does that equation look
8  like?
9    A.  That's exactly right.
10     And there's actually an oversight on my part in
11 this section, too, that I can clarify for you.
12   Q.  Please do.
13   A.  So it's -- as you said, it's exactly as it reads,
14 computed the labor costs at California minimum wage,
15 with a 10 percent addition to cover the employer's cost
16 for employers Workers' Comp and unemployment insurance
17 withholding, obviously, the FICA.  It also assumes that
18 there's no additional cost to the employer in terms of
19 cleaning supplies, uniforms, anything else.
20     The one oversight is that in addition to that
21 add-on, I added on an additional 20 percent for the
22 coverage of overhead and minimum margin on the job
23 because, as the text reads, they would literally be
24 doing it for free.
25   Q.  What do you mean they would literally be doing

Page 134

```
1    it?
2         A.   That these costs -- without that additional
3    clarity, these are literally the direct labor costs.
4         Q.   I don't think I understand.  Can you rephrase it.
5         A.   Minimum wage plus the 10 percent that an employer
6    is required to pay into UI, Workers' Comp and FICA --
7         Q.   Yeah.
8         A.   -- is literally money that an employer gives to
9    either the state, federal government or the employee
10   themselves.
11        Q.   And did you do any analysis of whether this would
12   be detainees who are paid the minimum wage or private
13   individuals in the community surrounding Adelanto?
14        A.   It wouldn't matter either way.  It was just if
15   those hours had been paid at the California minimum
16   wage.
17        Q.   To your knowledge are detainees -- do they pay
18   into Medicare and Social Security withholdings?
19        A.   I don't know.
20        Q.   Okay.  And then for Table 5, you discuss the
21   "annual additional profit earned by GEO from its use of
22   labor instead of hiring a lowest legal cost
23   subcontractor."
24             Do you see that?
25        A.   Yes.
```

Page 135

```
1         Q.   Did you get any quotes from subcontractors for
2    cleaning the facility?
3         A.   I did not.
4         Q.   Have you ever received quotes for cleaning a
5    facility from a subcontractor?
6         A.   Have I?
7         Q.   Yeah.
8         A.   Sure.
9         Q.   When?
10        A.   When I was a plant manager.
11        Q.   And were those quotes typically equivalent to
12   paying full-time employees minimum wage?
13        A.   I would say for the subs I was considering, no.
14        Q.   How did that differ in your experience?
15        A.   I prefer to use employers that pay their workers
16   beyond the minimum wage.  I find that the work quality
17   is generally better.
18        Q.   So in Table 5, did you assume that the
19   subcontractors would pay their employees beyond minimum
20   wage?
21        A.   No.
22        Q.   So how did you get the numbers in Table 5?
23        A.   Again, it's outlined in Paragraph 26, plus the
24   addition that I just mentioned to you.  You would take
25   the California minimum wage at that time times the
```

Page 136

```
1    number of hours, number of work hours that was performed
2    by the immigrant detainees, multiplied by 10 percent to
3    cover the deductions they would have to be paid; and
4    then, again, times another 20 percent to cover the
5    overhead and a minimum profit for the contractor.
6         Q.   And there's no accounting for the increased
7    efficiency of a contractor?
8         A.   No.
9         Q.   Did you read the Performance-Based National
10   Detention Standards as part of your report?
11        A.   I don't recall.
12        Q.   Do you understand the purpose of the Voluntary
13   Work Program at the Adelanto facility?
14             MR. VINCENT:  Object to form.
15             THE WITNESS:  I guess I'm not sure what the
16   question is.  Can you reframe it.
17   BY MS. SCHEFFEY:
18        Q.   Yeah.  I want to know if you understand the
19   purposes and goals behind the Voluntary Work Program at
20   the Adelanto facility.
21        A.   No, I don't recall the specific language in that.
22        Q.   Did you rely upon any information that stated
23   that detainees work at the most efficient level?
24        A.   No.
25        Q.   Would it be reasonable to presume that if a
```

Page 137

```
1    third-party contractor was used that there would be some
2    efficiencies?
3         A.   I don't know.
4         Q.   Why not?
5             MR. VINCENT:  Object to form.
6             THE WITNESS:  It's hard for me to speculate on
7    that.
8    BY MS. SCHEFFEY:
9         Q.   Well, earlier you talked about how you helped
10   companies figure out where their inefficiencies are in
11   their labor force systems; is that correct?
12        A.   Yes.
13        Q.   So did you do any analysis about the efficiency
14   of the Voluntary Work Program?
15        A.   No.
16        Q.   If you had done an analysis of the efficiency,
17   could you have potentially identified areas where labor
18   could be saved, hours could be saved?
19        A.   It's possible.
20        Q.   And does Table 5 consider that subcontractors may
21   use machinery to make the job quicker?
22        A.   No.
23        Q.   Why not?
24        A.   It literally assumes that they'd be provided the
25   exact same tools and the employer would not be required
```

Page 138

1    to provide anything other than the human capital.
2        Q.  So Table 5 is not considering a true contractor
3    who brings their own machinery to --
4            MR. VINCENT:  Object to form.
5    BY MS. SCHEFFEY:
6        Q.  -- is that correct?
7        A.  Right.
8        Q.  At the university where you work, do the
9    housekeepers typically bring their own cleaning
10   products?
11       A.  I hope not.
12       Q.  The university provides those?
13       A.  I would assume.
14       Q.  You don't know anything about the housekeeping at
15   your university --
16       A.  I'm not positive.  I would say with a high level
17   of confidence, no, they do not bring it from home.
18       Q.  So you're aware that there's more than one GEO
19   facility involved in this lawsuit, or are you not aware?
20           MR. VINCENT:  Object to form.
21           THE WITNESS:  Adelanto.
22   BY MS. SCHEFFEY:
23       Q.  Okay.  So the only facility you're aware of is
24   Adelanto?
25       A.  Yes.

Page 139

1        Q.  Are you aware that Mr. Free is involved in a
2    lawsuit in Colorado for a different GEO facility?
3            MR. VINCENT:  Object to form.
4            THE WITNESS:  I did not know that.
5    BY MS. SCHEFFEY:
6        Q.  And are you aware that there, he had an expert in
7    cleaning identify that it would only require 17.4
8    full-time employees to clean the facility?
9            MR. VINCENT:  Object to form.
10           THE WITNESS:  No, I don't know anything about it.
11   BY MS. SCHEFFEY:
12       Q.  Would reviewing that report potentially change
13   your opinion in this case?
14       A.  It's possible.
15       Q.  Earlier today we talked about the BSCAI, Building
16   Service Contractors Association International
17   productivity standards.
18       A.  Okay.
19       Q.  So if you review those -- I don't know if you
20   have them back in front of you or not.
21       A.  I can do that, if you like me to.
22       Q.  That would be great, yeah.
23       A.  Okay.
24       Q.  So in there it provides minutes per square foot
25   for cleaning certain facilities; it also provides

Page 140

1    minutes per unit.  Do you see those?
2        A.  Yes.
3        Q.  So here I see, for example, damp mopping, which
4    is on the third page of the PDF, and to damp mop floor
5    surfaces following dusting or sweeping 30,000 square
6    feet in 6.25 hours.  Do you see that?
7        A.  I'm sorry.  What page?
8        Q.  It's Page 3 of the PDF, and it starts at
9    Floor Service and Carpets; and then below that, there's
10   Floor Surface, Hard and Resilient, and then near the top
11   of the page, it says Damp Mop.
12       A.  Okay.
13       Q.  And if you look under there, it says 6.25 hours
14   for 30,000 square feet.
15       A.  I see it.
16       Q.  And so in your report for the corridors, were you
17   presuming that detainees would damp mop those floors?
18       A.  No.
19       Q.  What were you presuming they would do?
20       A.  Maintain those areas to the level of cleanliness
21   as described in the APPA.
22       Q.  So what tasks would that include?  What level of
23   cleanliness is that?
24       A.  I can go back and read them.  Again, there's a
25   fundamental disconnect here because I did not have

Page 141

1    detailed levels of information about each and every
2    task, which is why I chose the system that I chose, to
3    give me a more macro view and estimate based off of the
4    square footage and level of cleanliness.
5        Q.  Right.  So you don't know if all detainees do is
6    damp mop the floors; is that correct?
7        A.  That's right.
8        Q.  And presuming they do, that would be a
9    significant change between the BSCAI which provides, you
10   know, you can do 30,000 square feet in seven -- or 6.25
11   hours, and your report which provides you can only do
12   4300 square feet in an hour.
13       A.  I don't know if that's a correct characterization
14   of my report --
15       Q.  So why don't you -- you should look at it and let
16   me know.  If it's incorrect, let me know.
17           MR. VINCENT:  Object to form.  He didn't testify
18   it was incorrect.
19           MS. SCHEFFEY:  Go ahead.
20           THE WITNESS:  What I was going to say is simply
21   that I generated my estimate using a tool that takes
22   into account at the macro level what's the area to be
23   cleaned and the level of cleanliness for it to be clean
24   to.
25           To be able to utilize a tool such as the one that

Page 142

```
 1  you shared with me today, you need a much greater level
 2  of detail of each finite task that's being performed and
 3  then would have to accumulate all those to come up with
 4  a similar estimate.
 5  BY MS. SCHEFFEY:
 6      Q.  So I'm looking at Level 1 Orderly Spotlessness on
 7  your report, and it says, "Floors and base moldings
 8  shine and/or are bright and clean."
 9          What cleaning tasks would be involved in getting
10  the floor to that level?
11      A.  Again, that's not how this tool is designed to be
12  used.  You're achieving those results, and based on the
13  necessary steps, which are built into their estimates on
14  the square footage in the APPA model, that's accounted
15  for.
16      Q.  Right.  And I guess I'm trying to figure out why
17  you think that -- like, what tasks determines you're doing
18  or what other data you're relying upon to determine that
19  detainees are getting the floors, for example, to a
20  Level 1 of cleanliness versus a Level 2.
21      A.  Based on those descriptions from The GEO Group
22  documents around the job tasks and responsibilities.
23      Q.  And those documents, do they describe the tasks
24  that detainees were doing such as damp mopping?
25      A.  It gives some listing of them, as I recall.
```

Page 143

```
 1      Q.  And so how did you compare, for example, a damp
 2  moping to a level of cleanliness?
 3      A.  I didn't.
 4      Q.  Then how did you determine that floors are kept
 5  at Level 1 cleanliness?
 6      A.  Based on the description of the expectations.
 7      Q.  So the Aurora housekeeping facility policy is
 8  what you used?
 9      A.  I'm not sure.
10      Q.  If you look at what was Exhibit 3 to this
11  deposition, the Aurora Housekeeping Policy.
12      A.  Okay.  I have it open.
13      Q.  Is that what you used to determine what level of
14  cleanliness there was?
15      A.  Yes, this is one of those documents, correct.
16      Q.  Okay.  And we discussed that this document is not
17  for this facility.  Do you recall?
18      A.  Yeah, and I told you I wasn't aware of that.
19      Q.  Okay.  So for the floors, can you point me to the
20  portion that you relied upon to determine that it was a
21  Level 1 cleanliness.
22      A.  Well, it's listed multiple times.
23      Q.  Okay.  Point me to the first one.
24      A.  Well, Page 3.  It's the first item in the table.
25      Q.  Yeah.  So they sweep and damp mop; strip, seal
```

Page 144

```
 1  and wax and spray buff as-needed; correct?
 2      A.  Yes.
 3      Q.  So how did you determine that sweeping and damp
 4  mop is a Level 1 cleanliness versus a Level 2?
 5      A.  Again, it's both that and -- if you want to go
 6  down to Page 4.
 7      Q.  Uh-huh.
 8      A.  Again, the first item in the table.
 9      Q.  Right, the sweep and damp mop; correct?
10      A.  Right.  And the scheduled cleaning frequency is
11  stated there, which again, is what led to my judgment on
12  how to classify them.
13      Q.  Okay.  So if it's different at the Aurora
14  facility in that they need to clean every dorm after
15  every meal because that's where they eat than it is at
16  the Adelanto facility, where they don't eat in the
17  dorms, that would change your determination of whether
18  it was Level 1 or Level 2?
19      A.  It could.
20      Q.  Okay.  And a moment ago, we talked about the
21  BSCAI standards, and we had talked about damp mopping
22  and how many hours it takes per square footage.  Do you
23  remember that?
24      A.  Yes.
25      Q.  And you had stated that you did not have the
```

Page 145

```
 1  level of detail to determine whether detainees or even
 2  GEO employees were damp mopping certain facilities; is
 3  that correct?
 4      A.  Right.
 5      Q.  Does this document housekeeping policy not
 6  provide you with that level of detail about sweeping and
 7  damp mop?
 8      A.  It provides some information.
 9      Q.  So how do you account for the difference between
10  30,000 square feet being cleaned in 6.25 hours for damp
11  mopping under the BSCAI versus the mere 4300 square feet
12  in your estimation?
13      A.  It's a different system.
14      Q.  And how would one determine which one is more
15  accurate?
16      A.  Again, I am not familiar with this one.  The
17  APPA, I know, has been used for decades and is relied
18  upon.  There's plenty of published papers that talk
19  about how it's been implemented.
20      Q.  And do any of those discuss implementing it in
21  the detention context?
22      A.  No.
23      Q.  What about the prison context?
24      A.  Not that I'm aware of.
25          MS. SCHEFFEY:  I think I'm almost done.  If you
```

Page 146

1  want to take a five-minute break, I'll confirm.
2      THE WITNESS:  We can take five, sure.
3      MS. SCHEFFEY:  Great.  I'll be right back.
4      (Recess from 12:42 p.m. to 12:53 p.m.)
5      MS. SCHEFFEY:  So I'm going to put a document
6  here, and we're going to call it Exhibit 7.
7      (Defendant's Exhibit 7 was marked for
8      identification and attached hereto.)
9  BY MS. SCHEFFEY:
10     Q.  And you have the document in front of you?
11     A.  I do.
12     Q.  Have you ever seen this document before?
13     A.  No.
14     Q.  And so on this document, do you see that the
15  contractor is the City of Adelanto?  No. 3 on the --
16     A.  Yes.
17     Q.  And then the subcontractor is The GEO Group.
18     A.  Okay.
19     Q.  And it says to list in order of proposed
20  classification titles, job descriptions, duties; that's
21  No. 13A.
22     A.  Oh, right, I see it.
23     Q.  And says Title, Janitor.
24     A.  Okay.
25     Q.  So do you see that this is a request for a

Page 147

1  janitor at the Adelanto facility?
2      A.  I mean, I read the form.
3      Q.  And what is the wage rate proposed?
4      A.  You're asking about 13B?
5      Q.  Uh-huh.
6      A.  It says 9.75.
7      Q.  And then there are fringe benefits as well; is
8  that correct?
9      A.  Yes.
10     Q.  And what amount are those?
11     A.  -C, it says 3.50.
12     Q.  And so did you use these numbers in determining
13  any of your calculations for what a janitor should be
14  paid at the Adelanto facility?
15     A.  No.
16     Q.  If you were told that that is what janitors are
17  paid at the Adelanto facility, would that change your
18  calculations?
19     A.  I mean, I could recompute based off these values,
20  sure.
21     Q.  Would it increase or decrease your estimate?
22     A.  I don't know off the top of my head.  In 2011, I
23  think it would probably increase them based on what the
24  minimum wage in California would be.
25     Q.  And what about for the rest of the class periods?

Page 148

1      A.  (Indicating.)
2      Q.  What about for the rest of the class periods?
3      A.  I would have to see what the provision for wages
4  was for those subsequent years.
5      Q.  If it stayed the same, would it decrease or
6  increase the amount of wages for 2019?
7      A.  As I recall, minimum wage has escalated up to 12
8  at this point in California.
9      MS. SCHEFFEY:  Could the court reporter read back
10  my question.
11     (Record read.)
12     THE WITNESS:  You mean that the wage Adelanto
13  pays janitors stayed at 9.75?
14  BY MS. SCHEFFEY:
15     Q.  Correct.  Would that increase or decrease your
16  estimates for 2019?
17     A.  For 2019, it would decrease it based on both BLS
18  estimates of the mean wage as well as the minimum wage
19  in California.
20     Q.  Can you go to Page 3 of the document that's
21  before you, that's marked as Exhibit 7.
22     A.  Page 3.  Okay.  Yeah, I got it.
23     Q.  What is this?
24     A.  It says Job Description.
25     Q.  And what is the job title?

Page 149

1      A.  Janitor.
2      Q.  And what is the facility?
3      A.  Adelanto.
4      Q.  And do your calculations take into account any
5  janitor at the Adelanto Processing Center?
6      A.  No.
7      Q.  Why not?
8      A.  Because my calculations are based off of Bland's
9  estimate of the total number of hours of immigrant labor
10  performed.
11     Q.  What about your APPA calculations, do they
12  consider that there are paid janitors at the Adelanto
13  facility?
14     A.  No.
15     Q.  Why not?
16     A.  They estimate the total number of janitorial
17  personnel required based on the square footages and
18  cleanliness levels.
19     Q.  Did you make any effort to find out how many
20  square feet this janitor cleaned in a day?
21     A.  No.
22     MS. SCHEFFEY:  I'm going to introduce Exhibit 8.
23     (Defendant's Exhibit 8 was marked for
24     identification and attached hereto.)
25  ///

Page 150

1  BY MS. SCHEFFEY:
2     Q.  Tell me when you have it.
3     A.  Okay.  It's loading now.  Okay.
4     Q.  Have you seen this document before?
5     A.  No.
6     Q.  Would a document like this have been helpful to
7  you in estimating the square footage that would be
8  cleaned by detainees?
9        MR. VINCENT:  Object to form.
10        THE WITNESS:  Possibly.
11  BY MS. SCHEFFEY:
12     Q.  When you say possibly, what would have made it
13  helpful?
14     A.  Again, I used the square footage both off of the
15  title blocks, and, in some instances when I measured,
16  having the actual square footage would have been made
17  applying the APPA method that much easier.
18     Q.  And as we discussed earlier today, you weren't
19  able to identify exactly which schematic you used to
20  calculate the square footage; is that correct?
21     A.  Not in that moment, I couldn't, no.
22     Q.  And in calculating square footage, you did not
23  exclude the sleeping areas of detainees?
24     A.  I'm not sure.
25     Q.  Did you account for any amount of square footage

Page 151

1  that detainees would need to clean of their own volition
2  in an unpaid manner?
3     A.  No.
4     Q.  So you didn't exclude any square footage from the
5  housing units in calculating what custodians would
6  clean?
7     A.  I think that's correct.
8     Q.  Why do you only think it's correct?
9     A.  Again, I would need to go back and find the exact
10  source from my square footage calculations, but that
11  sounds right.
12     Q.  And do you have notes that show you what the
13  exact source is?
14     A.  I'll look.  I'm not sure.  I think it may just be
15  needing to look at that exhibit again.
16     Q.  And if you have notes, could you provide those to
17  us.
18     A.  Oh, sure.
19        MS. SCHEFFEY:  Exhibit 9.
20        (Defendant's Exhibit 9 was marked for
21        identification and attached hereto.)
22  BY MS. SCHEFFEY:
23     Q.  Tell me when you have Exhibit 9 opened.  I'm
24  introducing it into the chat.
25     A.  Okay.

Page 152

1     Q.  Have you seen this document before?
2     A.  Not in this form.  I'm not sure, no.
3     Q.  If you go to the bottom of Page 4 of the
4  document, it lists a number of things that The GEO Group
5  asked you to produce in response to a subpoena.
6     A.  Oh, okay.  I don't think I've seen this before.
7     Q.  Okay.  So do you think you've looked for these
8  documents to identify whether they exist in your
9  records?
10     A.  Again, I don't think I've seen this before, so I
11  haven't even read it.
12     Q.  And so you haven't collected documents to respond
13  to this to your knowledge?
14     A.  No.  Again, I think this is the first time I've
15  seen this.
16     Q.  Okay.  If Mr. Bland's calculations changed in his
17  table, would you need to supplement your report?
18     A.  Yes.
19        MS. SCHEFFEY:  I don't have any further
20  questions.
21        THE WITNESS:  Okay.
22
23               EXAMINATION
24  BY MR. VINCENT:
25     Q.  All right.  Professor Childers, I want to start

Page 153

1  with Exhibit 7 that Ms. Scheffey just introduced.
2     A.  Okay.
3     Q.  This document is from 2011; correct?
4        MS. SCHEFFEY:  Object to form.
5        THE WITNESS:  The Date of Request is May 31st,
6  2011, yes.
7  BY MR. VINCENT:
8     Q.  And -- no, no, no.  I'm looking at Exhibit 7.
9     A.  Okay.  I'm sorry.  Let me make sure I have the
10  right document, then.  Which one is that?
11     Q.  That is the four-page document that starts
12  Request for Authorization of Additional Classification
13  and Rate, where they have the 9.75 wage and the 3.50
14  fringe benefits.
15     A.  Oh, okay.  Yeah, that's what I thought I was
16  looking at.
17     Q.  All right.  Are you familiar with how wages have
18  changed since 2011 to date?
19     A.  Wages in terms of the minimum wage or --
20     Q.  Yes.  Has it gone up or down?
21     A.  Oh, in California, yeah, it's been going up on a
22  regular basis.
23     Q.  Now, if GEO -- can you tell us how these
24  numbers in this request compare to the California
25  minimum wage in 2011?

Page 154

1        MS. SCHEFFEY:  Object to form.
2        THE WITNESS:  Okay.  And I think -- can I get a
3   timeout real quick?
4        MR. VINCENT:  Sure.
5        THE WITNESS:  So my wife just got home, and you
6   asked earlier are you there alone, so she's not in the
7   room, but I thought I better just say something.
8        MS. SCHEFFEY:  Just don't ask her for all the
9   answers --
10       THE WITNESS:  Hey, I need answers over here.  I
11  think she's going to go for a walk without me.  How
12  much -- all right --
13       (Discussion off the record.)
14       THE WITNESS:  Never mind.  I'm alone again.  And
15  I don't get to walk, but anyway, sorry.
16  BY MR. VINCENT:
17       Q.  Do you know what the California minimum wage was
18  in 2011?
19       A.  I would have to check my notes, but I think it
20  was $8.
21       Q.  So GEO's actually paying more than the minimum
22  wage to those people it actually employs; correct?
23       A.  Substantially so.
24       Q.  On that document, Page 4, that counsel asked you
25  about -- Page 3, I'm sorry, the Primary Duties and

Page 155

1   Responsibilities.
2        A.  Yes.
3        Q.  Do you know if a detainee could actually do those
4   duties and responsibilities, like go outside and
5   maintain the facility grounds including lawns, trees,
6   shrubs and plantings?
7        A.  My understanding would be no.
8        Q.  Did you see anything that made this document
9   relevant to any of the analysis you did?
10       A.  No.
11       Q.  Speaking of, I know you were asked about if
12  you're aware this case involved other facilities;
13  correct?
14       A.  Yes.
15       Q.  You only studied Adelanto; correct?
16       A.  That's right.
17       MS. SCHEFFEY:  Object to form.
18  BY MR. VINCENT:
19       Q.  In your review of the pleadings, did you see that
20  the only facility that a wage claim is being made for is
21  at Adelanto?
22       A.  That's all I'm aware of.
23       Q.  So in other words, anything having to do with
24  other facilities is completely irrelevant to your
25  analysis; correct?

Page 156

1        A.  That's correct.
2        Q.  On the housekeeping guide, that was from a
3   different facility; correct?
4        MS. SCHEFFEY:  Object to form.
5        THE WITNESS:  That's my understanding, yes.
6   BY MR. VINCENT:
7        Q.  Are you aware of any information that shows that
8   GEO wants one facility cleaner than another so these
9   these are irrelevant standards?
10       A.  No --
11       MS. SCHEFFEY:  Object to form.
12       THE WITNESS:  -- I'm not aware of that.
13  BY MR. VINCENT:
14       Q.  You were asked throughout the day about using
15  other data input or square footage or the number of
16  cleaners and efficiencies.  Do you recall those general
17  questions?
18       A.  Yes.
19       Q.  If you changed any of those inputs to your work,
20  none of that would actually affect the methodology you
21  employed, would it?
22       MS. SCHEFFEY:  Object to form.
23       THE WITNESS:  No, it wouldn't.
24  BY MR. VINCENT:
25       Q.  Counsel asked about GEO getting additional

Page 157

1   benefits from using paid employees versus detainees.  Do
2   you recall those questions?
3        MS. SCHEFFEY:  Object to form.
4        THE WITNESS:  Yes, I do.
5   BY MR. VINCENT:
6        Q.  From your documentation in your work, is it your
7   understanding...to do their work?
8        THE REPORTER:  That came through very muddled.
9   Sorry, Mr. Vincent.
10       MR. VINCENT:  I'll repeat.
11       Q.  From your review of the materials provided, isn't
12  it your understanding that GEO trains the detainees to
13  do the custodial and other jobs that you analyzed?
14       A.  Yes.
15       Q.  You were asked repeatedly if the sources you used
16  examined prisons or detention facilities; correct?
17       MS. SCHEFFEY:  Object to form.
18       THE WITNESS:  Yes.
19  BY MR. VINCENT:
20       Q.  Do you know of any labor -- accepted labor
21  statistics and information and data that examines purely
22  prisons and/or detention facilities that you could have
23  used?
24       A.  No.
25       MS. SCHEFFEY:  Object to form.

Page 158

1 BY MR. VINCENT:
2    Q.  Did you look for it?
3    A.  I did.
4    Q.  The sources you used, the BLS and the APPA, how
5 are they regarded in your field?
6    A.  Again, the Bureau of Labor Statistics is the
7 go-to source for any sort of wage and market data.  And
8 as I mentioned already, the APPA has been around for
9 100 years and is used widely in large institutions with
10 multiple facilities and different physical plant
11 buildings that need to be maintained.
12    Q.  How many years have you been doing this kind of
13 work in terms of advising private companies on the level
14 of labor force -- or the level of labor and the
15 sufficiency of the force that they use?
16    A.  I mean, that would go back to the start of my
17 career when I graduated with my undergraduate degree in
18 1990.
19    Q.  You were unaware of the exhibit that counsel
20 provided today of some organization with its standards
21 out there; correct?
22        MS. SCHEFFEY:  Object to form.
23 BY MR. VINCENT:
24    Q.  BLPS or whatever?
25    A.  I've heard of them.  I've not seen their

Page 159

1 standards.  My assumption is that it's proprietary and
2 would need to be purchased.
3    Q.  Have you ever used those standards in your work?
4    A.  No, I haven't.
5    Q.  Do you know of anyone in your field who as an
6 academic relies upon those standards in their work?
7    A.  I don't.  I haven't done a lit review, but I'm
8 not aware of that, no.
9    Q.  Early on you were asked about the methodology
10 used in this case, and I think you confirmed that it's
11 different than the methodology you used in other cases;
12 correct?
13    A.  That's true.
14    Q.  Why is it different?
15    A.  They all fall within the general umbrella of work
16 measurement, but you pick the most appropriate tool
17 based on the questions that you're trying to answer and
18 the data that you have available to answer them with.
19    Q.  When you were asked about the amount of square
20 footage that you used in your methodology and your
21 calculations to be cleaned, I think you testified that
22 that came from the blueprints and the -- your
23 calculation of that square footage based on the layout
24 at Adelanto from the exhibit we looked at; correct?
25    A.  That's correct.

Page 160

1        MS. SCHEFFEY:  Object to form.
2 BY MR. VINCENT:
3    Q.  You were asked a lot of questions about the
4 proposed expansion of the facility.  Do you remember
5 that?
6        MS. SCHEFFEY:  Object to form.
7        THE WITNESS:  Yeah, I was asked specifically
8 about which page individually I relied on.
9 BY MR. VINCENT:
10    Q.  When you did your work, did you use the actual
11 outline or layout of the facility, or did you use the
12 proposed one?
13    A.  No, I used the actual as existing.
14    Q.  Okay.  And you're aware, I take it, that when
15 counsel was asking you about the amount of square
16 footage in your calculations regarding what needs to be
17 cleaned that all areas at Adelanto are not cleaned by
18 detainees; correct?
19        MS. SCHEFFEY:  Object to form.
20        THE WITNESS:  Yes, I understood that.
21 BY MR. VINCENT:
22    Q.  And you took that into account in your
23 calculations; correct?
24    A.  I did.
25    Q.  You were asked about if you knew about the goals

Page 161

1 of the program and the idea that it can make detainees
2 or workers feel better about themselves if they get
3 work.  Do you remember that?
4        MS. SCHEFFEY:  Object to form; misstates.
5        THE WITNESS:  I do remember that question.
6 BY MR. VINCENT:
7    Q.  Actually I think I misspoke.  Not feel better,
8 but it gives them something to do to keep them out of
9 trouble, I think was the statement.  Do you remember
10 that?
11    A.  Right.
12    Q.  Do the goals of the program -- are they in any
13 way relevant to how much work is actually done by the
14 detainee?
15    A.  Not for --
16        MS. SCHEFFEY:  Object to form.
17        THE WITNESS:  -- in terms of my calculation, no.
18 BY MR. VINCENT:
19    Q.  Are the goals of the program in any way relevant
20 to how much the detainee is or should be paid?
21        MS. SCHEFFEY:  Object to form.
22        THE WITNESS:  No.  It's based off of those two
23 different scenarios as presented in the report.
24 BY MR. VINCENT:
25    Q.  Do you recall being asked if you were aware that

Page 162

1  detainees were fed meals?
2      A.  Yes.
3      Q.  Do you consider, in your line of work and your
4  expertise, that a meal is a fringe benefit?
5      A.  I think being fed is a generic expectation,
6  especially if you're in detention.
7      Q.  Are you aware that GEO has actually paid to
8  furnish those meals, and they're not an employee fringe
9  benefit?
10     MS. SCHEFFEY:  Object to form; foundation.
11     THE WITNESS:  I was not aware of that.  But,
12  again, my assumption was if you're being detained,
13  you're not being starved.
14  BY MR. VINCENT:
15     Q.  And medical care, I think you saw the contracts;
16  correct?
17     A.  The contracts...
18     Q.  Never mind.  I think you were asked about them.
19     I'll just go straight to the question:  Are you
20  aware that GEO is actually paid to provide medical care
21  to the detainees?
22     MS. SCHEFFEY:  Object to form.
23     THE WITNESS:  I'm not.
24  BY MR. VINCENT:
25     Q.  If an employer is paid to provide a benefit to an

Page 163

1  employee, even if it's characterized as a fringe benefit
2  like a meal, does that affect the bottom line of the
3  employer in terms of their profits?
4      A.  No.
5      Q.  Does it affect your calculations?
6      MS. SCHEFFEY:  Object to form.
7      THE WITNESS:  So it wouldn't affect my
8  calculations, and most employees would not consider that
9  a benefit in the sense that it's a passthrough.
10  BY MR. VINCENT:
11     Q.  The same with supplies, you're aware that GEO
12  gives the cleaning supplies to the detainees; correct?
13     MS. SCHEFFEY:  Object to form.
14     THE WITNESS:  Correct.
15  BY MR. VINCENT:
16     Q.  In your private contractor's turnkey scenario, do
17  those private contractors also provide the materials and
18  supplies?
19     A.  No, that's not built into the estimate that I
20  generated.
21     Q.  Okay.  Do you recall being asked about expert
22  reports from other facilities in other litigation?  Do
23  you remember that?
24     A.  Yes.
25     Q.  And I think you were asked whether or not that

Page 164

1  would have aided you in your work; correct?
2      A.  Yes.
3      Q.  You have not been provided with expert reports
4  from other facilities in other litigation, have you?
5      A.  No, I have not.
6      Q.  Are you aware that those reports are under
7  protective orders and --
8      MS. SCHEFFEY:  Object to form and about to
9  misstate the orders in those cases.  That report is not
10  under a protective order.  It's not marked confidential.
11  I can produce it to you right now.
12  BY MR. VINCENT:
13     Q.  Does what is done at a facility with different
14  people, different square footage, different layout and
15  potentially different standards mean anything to the
16  work you've done in this case?
17     A.  No.  I developed and chose the method that I used
18  based on my own professional judgment and the facts that
19  I had available to me.
20     Q.  You were asked about GEO getting a potential
21  benefit from a trained workforce as opposed to detainees
22  in terms of efficiencies.  Do you recall that?
23     A.  Yes.
24     Q.  Do you understand that GEO actually trains these
25  detainees so that the training would be the same?

Page 165

1      MS. SCHEFFEY:  Object to form.
2      THE WITNESS:  My understanding is yes, that they
3  are trained.
4  BY MR. VINCENT:
5      Q.  Do you know of any efficiencies that would be
6  gained from additional training to teach someone how to
7  mop?
8      A.  No.
9      Q.  Do you feel you need to revise your report for
10  any such assumption about additional efficiencies by a
11  trained force?
12     A.  I don't think so, no.
13     Q.  And throughout the day, you were asked about
14  other assumptions that you either did or didn't make
15  when doing your work as opposed to the methodology you
16  applied.  Do you recall that line of questioning?
17     A.  Yes --
18     MS. SCHEFFEY:  Object to form.
19     THE WITNESS:  -- I do.  Yes.
20     MR. VINCENT:  No, I'm thinking.  I'm sorry.  I
21  heard you.  Thanks.
22     THE WITNESS:  I wasn't sure.
23  BY MR. VINCENT:
24     Q.  You were asked about whether or not you took into
25  account any cleaning done by the current GEO staff.  Do

Page 166

1  you recall that?
2      A.  Yes.
3      Q.  Does any cleaning done by the current GEO staff
4  in any way -- is it in any way relevant to the actual
5  work you did?
6      MS. SCHEFFEY:  Object to form.
7      THE WITNESS:  No.  It would have no bearing on my
8  calculations.
9  BY MR. VINCENT:
10     Q.  When you were asked questions today about
11 assumptions and other alternative methodologies that
12 could be used, you answered all of counsel's questions
13 directly and honestly; correct?
14     A.  Yes.
15     MS. SCHEFFEY:  Object to form.
16 BY MR. VINCENT:
17     Q.  Did you view it as your job, or did you ever
18 attempt to correct the idea that the questions were
19 completely irrelevant to the work you did?
20     MS. SCHEFFEY:  Object to form.
21     THE WITNESS:  Yes.  Again, I'm trying to make
22 this productive for everyone, so to the extent that I
23 could reframe a question where it made sense to me -- I
24 think I was trying to insert a little levity that some
25 questions just didn't seem to connect within the

Page 167

1  question, and then, again, tried my best to be
2  responsive.
3  BY MR. VINCENT:
4      Q.  And each time the question didn't connect with
5  what you actually did in this case, did you view it as
6  your job to make that known, or did you just simply
7  answer the question?
8      MS. SCHEFFEY:  Object to form.
9      THE WITNESS:  I mean, I tried to point it out a
10 few times, and then other times I just said, "I don't
11 know."
12 BY MR. VINCENT:
13     Q.  If the court determines that some of the inputs
14 to your work -- square footage, number of hours, shift
15 length, what have you -- should be altered, would those
16 alterations of data input change the methodology as set
17 forth in your report?
18     A.  No.  Those changes would simply provide new
19 inputs for the calculations.
20     Q.  Did you submit -- oh, no.  Let me back that up.
21     I think you testified that you did not see the
22 last exhibit that had been introduced, the formal
23 subpoena, et cetera.  Do you remember that?
24     A.  Correct.
25     Q.  Do you recall receiving from me the notice of

Page 168

1  deposition that was sent?
2      A.  Yes.
3      Q.  Did you review it?
4      A.  I thought I did.  I don't think it was this.
5      Q.  No.  It was different, I will represent to you.
6      Is there anything on that list of documents on
7  the subpoena that you did not provide to us to turn over
8  to GEO's counsel?
9      A.  I need a minute to read it.
10     Q.  Please do.
11     A.  Okay.  Thank you.  Okay.  I'm to 12 now, which is
12 for any and all bills, invoices, time records,
13 calendars.  I've submitted an invoice.  I haven't been
14 paid yet, and I don't know if that was turned over.
15     Q.  So basically, on the record, we haven't actually
16 paid you yet, have we?
17     A.  Well, $1,000, as I said earlier.
18     Q.  Your retainer.
19     A.  And then 13, that was asked about at the start of
20 the deposition, and I can work on that.  I can make a
21 list --
22     Q.  Are you talking about the testimony, et cetera?
23     A.  It says, "documents sufficient to identify the
24 names and dates of court cases during the past five
25 years in which you've served as an expert witness" or as

Page 169

1  a witness for a plaintiff.
2      MR. VINCENT:  Adrienne, that's my bad.  I almost
3  always assume that that is listed in an expert's C.V.,
4  but he's done so little federal expert work that he
5  doesn't know he needs to include that for Rule 26.  I
6  will submit to you that I will have him do that.
7      And, Michael, on the record, I want you to commit
8  to do that.  I want you to give it to me, except for
9  which are included under those protective orders that
10 you talked about earlier.  And if you have copies of any
11 of that, like depositions or reports that are not
12 covered by a protective order, send them to me.
13     THE WITNESS:  Okay.
14     MS. SCHEFFEY:  Larry --
15     MR. VINCENT:  -- make note of that.
16     MS. SCHEFFEY:  Larry, the only other thing I
17 think that came up today was a spreadsheet he was
18 provided for the thing he didn't use.  I think that
19 would probably be relevant even though he didn't
20 ultimately rely upon it --
21     MR. VINCENT:  Okay.  The Excel spreadsheet that's
22 an exhibit in your report that you didn't rely on;
23 remember that one?
24     THE WITNESS:  Yes.
25     MR. VINCENT:  Send that to me.

Page 170

1    THE WITNESS: Okay.
2    MS. SCHEFFEY: Thanks. And this is your turn,
3  but I just wanted to interject that while it was
4  relevant.
5    MR. VINCENT: No. Great. I would have forgot
6  it.
7    THE WITNESS: I think everything else, yes, it's
8  already been produced.
9  BY MR. VINCENT:
10    Q. Did you ask for data and information to do your
11  work?
12    A. Yes, I did.
13    MR. VINCENT: Pass the witness.
14    MS. SCHEFFEY: All right. I think I have a few
15  more just follow-up.
16    MS. SCHEFFEY: Okay. I have your report back up.
17    MR. VINCENT: Oh, before that --
18    MS. SCHEFFEY: Yeah, go ahead.
19    MR. VINCENT: That list of documents, I think, is
20  the same as on the document I sent you. But when you
21  send me that other stuff -- you know, you were going
22  through 12 and you got to 13 -- double-check and make
23  sure if there's anything on that list that you have that
24  you haven't sent me, you send it. Okay.
25    THE WITNESS: You're talking about regarding this

Page 171

1  matter.
2    MR. VINCENT: Yeah, your documents to be
3  produced, yes, sir.
4    THE WITNESS: Okay. Will do.
5
6            EXAMINATION
7  BY MS. SCHEFFEY:
8    Q. So a moment ago, your counsel was asking you
9  about your field in terms of APPA being a document
10  that's used a lot in your field. What field is that?
11    A. Well, I'm employed by an institution of higher
12  education, so the APPA is sort of a gold standard for a
13  physical plant manager, especially in these
14  environments.
15    Q. So what would your field be? How would you
16  describe it in your words?
17    A. My field, I'm a professor.
18    Q. So it's commonly used in your field as a
19  professor?
20    A. The APPA is used by physical plant managers of
21  institutions of higher education, yes.
22    Q. You also testified that there were areas you
23  accounted for not being cleaned by detainees in your
24  report. What areas were those?
25    A. I would need to review my notes, but briefly

Page 172

1  anything that's -- like from a security standpoint,
2  they're not allowed to there. And, again, as I
3  mentioned earlier, I recall that I was told then that by
4  color, these are areas that are cleaned by detainees.
5    Q. And could you provide me with the information of
6  which colors you included in your square footage
7  calculation.
8    A. Sure.
9    Q. Okay. In the kitchen, did you account for any
10  specific areas that were not cleaned by detainees?
11    A. Can you repeat that, please. I'm sorry.
12    Q. Yeah. In the kitchen, did you account for any
13  areas within the kitchen that were not cleaned by
14  detainees?
15    A. No. The kitchen square footage, I'm pretty
16  confident, was straight off of those information blocks
17  on the blueprint, but I'll verify that.
18    Q. You testified a moment ago with your counsel that
19  your calculations wouldn't change if there were GEO
20  employees who also performed some of the cleaning tasks;
21  is that correct?
22    A. As far as the calculations for the monetary, it's
23  not impacted by that in that the Bland data I'm using is
24  for hours performed by detainees. So that wouldn't
25  change.

Page 173

1    Q. So, for example, in Paragraph 25, you summarized
2  the additional profit earned by GEO from the use of
3  detainee labor instead of hiring and assigning employees
4  the work; is that correct?
5    A. Yes.
6    Q. So then the offset that you performed was
7  tracking the amount paid to detainees for their labor
8  from the amount you estimated it would take to complete
9  the task; is that correct?
10    A. For the cost to employ GEO employees at the BLS
11  wages, correct.
12    Q. Did you subtract any amount for the work
13  performed by GEO employees alongside detainees?
14    A. Again, that's irrelevant to this calculation.
15    Q. And why is that?
16    A. Because this is only computing the hours spent by
17  immigrants performing these duties.
18    Q. So this does not take any position about whether
19  all of those hours were productive hours or required
20  hours; is that correct?
21    A. It's the hours spent performing these duties,
22  yes.
23    Q. And there's no position about whether this could
24  be done more efficiently; is that correct?
25    A. No.

Page 174

1    Q.  You were asked by your counsel about whether GEO
2  trains detainees and whether efficiencies could be
3  realized or actualized by using individuals who were
4  already trained.  Do you remember those questions?
5    A.  Yes.
6    Q.  Would there be any inefficiencies if a GEO
7  officer and a detainee didn't speak the same language?
8    A.  Inefficiencies in terms of the training?
9    Q.  Training, productive hours -- anything you can
10  think of.
11    A.  I mean, again, it's something that would have to
12  be overcome, but I think, based on the training
13  materials I received as exhibits, it's -- they have
14  their program in place, and, yeah, you would have to get
15  people trained.  But, again, it's -- I mean,
16  it's -- these are pretty straightforward positions.
17    Q.  So is it your position that it would take the
18  same amount of time to teach someone how to perform work
19  in a position where the two individuals spoke the same
20  language as where they didn't have a common language?
21    A.  No.
22    Q.  Would it take longer in one of those situations
23  to train someone?
24    A.  Yeah, I'd expect potentially it might take a
25  little longer to try to bridge that communication gap,

Page 175

1  sure.
2    Q.  What about if a detainee was illiterate, does
3  that increase the training time required?
4    A.  I'm not sure for these positions, but my
5  assumption being that there's written documents along
6  with OJT.
7    Q.  And would it increase the training required for
8  the written documentation -- or taking in the
9  information on the written documents if someone was
10  illiterate?
11    A.  Well, clearly they're going to be useless to
12  them, so it's just a matter of being able to show people
13  and explain the expectations verbally.
14    Q.  So is it possible that GEO could realize higher
15  efficiencies if they exclude those who were illiterate
16  from its workforce?
17    A.  From a ramp-up perspective, maybe a little.  But,
18  again, it's not like these jobs have a giant learning
19  curve.
20    Q.  You also testified that you're sure that you
21  reviewed the actual layout as opposed to a modified or
22  proposed layout.  Sitting here today, how can you be
23  sure of that?
24    A.  Again, I remember that these documents had
25  multiple drawings, and that's -- as I mentioned already,

Page 176

1  when it jogged my memory, that I had made that query
2  about specifically the areas, and, yes, I was given that
3  information to use.
4    Q.  And when you say you were given that information,
5  what do you mean?  Who gave you that information?
6    A.  Plaintiffs' attorney.
7    Q.  And they pointed you to specific pages in the
8  document --
9    A.  Correct.
10    Q.  -- specific -- okay.
11       And you can be sure sitting here today that those
12  were not modified schematics?
13    A.  Yes.  And I'll verify that.
14    Q.  You testified a moment ago in response to your
15  attorney's questions that the type of work done wouldn't
16  change the amount that a detainee was paid.  Do you
17  remember that?
18    A.  The type of work done would not change rate of
19  pay?
20    Q.  Correct.  And if I heard that incorrectly, please
21  let me know.
22    A.  That doesn't ring a bell for me, but what's your
23  question?
24    Q.  Well, I was going to ask you if individuals are
25  trained to do a specific type of work, couldn't more

Page 177

1  efficiencies be realized?
2    A.  Possibly.
3    Q.  And are you aware of how many times detainees
4  switched jobs within the Adelanto facility?
5    A.  No, I'm not.
6    Q.  Are you aware that they're allowed to change
7  their position at will at any point that they want?
8    A.  No, I did not know that.
9    Q.  Could that create more ramp-up for training time
10  than in a typical workplace?
11    A.  Yeah, it's possible.
12    Q.  And earlier, your counsel asked you about whether
13  the purposes behind the Voluntary Work Program were
14  relevant to your analysis.  Do you remember that line of
15  questioning?
16    A.  Yes, I remember the question.
17    Q.  Do you remember him asking you about whether the
18  purpose of keeping people out of trouble would have any
19  impact on your report?
20    A.  Yes.
21    Q.  So I believe you said it would not have any
22  impact on your report; is that correct?
23    A.  No, I didn't know that, and it doesn't really
24  impact the methodology or calculations.
25    Q.  If you were to learn that the purpose behind the

Page 178

1 Voluntary Work Program is to engage as many detainees as
2 possible regardless of actual need in the facility and,
3 therefore, that the numbers may be inflated, would that
4 change your position?
5    A.  It might.
6    Q.  So if the hours that you received from Mr. Bland
7 are actually just hours that contemplate involving as
8 many people as possible as opposed to getting the
9 specific task done, that might change your analysis?
10   A.  Again, it's possible.
11   Q.  And how would you account for that if you were
12 going to change your analysis or amend your report?
13   A.  I would need a deeper understanding of the
14 details from the perspective that usually when you're
15 crewing any sort of a role, you reach a number that is
16 the right number to accomplish the tasks, and you can
17 reach a point of diminishing returns -- for example, in
18 a hallway, trying to put 12 people in the hallway to
19 damp mop, you're just going to have people bouncing off
20 of each other; right?
21       So, again, I'd need to understand the specific
22 circumstances and how jobs are managed.  But generally
23 people manage the work to accomplish the goals that are
24 set out.
25   Q.  But if ICE told GEO that they had to include as

Page 179

1 many people as possible to keep them out of trouble,
2 that might change your analysis; is that correct?  Even
3 if they're bouncing off each other, you want just
4 people busy as opposed to doing the best work they can.
5    A.  Well, frankly, that sounds like a more dangerous
6 situation than just allowing people to relax in their
7 specific place, but, again, it's something I would
8 consider.  But in my experience, you staff as per your
9 needs, and that's the crew that you use to accomplish
10 what you need to be done.
11   Q.  And you don't have any experience in detention
12 facilities; is that correct?
13   A.  No.
14   Q.  So you don't know if when detainees are busier,
15 if they're less likely to engage in disciplinary acts;
16 is that correct?
17   A.  I'm not aware.
18   Q.  You do work in colleges, though; correct?
19   A.  Yes.
20   Q.  And left to their own devices, are college
21 students less likely to get into trouble if they have a
22 lot of free time?
23   A.  I can't answer that.
24   Q.  Okay.  Is there any study that you're aware of in
25 colleges that when students actually go to class and

Page 180

1 stay productive and busy that they get into less
2 trouble?
3    A.  Not that I'm aware of.
4    Q.  Okay.  Would it make sense to you that that would
5 be true?
6    A.  Again, it depends.
7    Q.  Okay.  Does it make sense that a college student
8 who is in class is probably more likely to be engaging
9 in a productive behavior than a college student who
10 skips class to go drinking?
11   A.  Depends on the class, I suppose.
12   Q.  I'm interested what your colleagues think.
13   A.  Well, I'm in Wisconsin where every corner has,
14 you know, three churches and four bars.
15       MS. SCHEFFEY:  Oh, yeah, that make sense.
16       All right.  This is Exhibit 10, and then I'm
17 done.
18       (Defendant's Exhibit 10 was marked for
19       identification and attached hereto.)
20 BY MS. SCHEFFEY:
21   Q.  Okay.  Tell me when you have it open.
22   A.  It's loading.
23       And I hope you got the shout-out for Wisconsin,
24 Giselle.
25       MS. SCHEFFEY:  Oh, yeah, Badgers.

Page 181

1       THE WITNESS:  Okay.  I have it.
2 BY MS. SCHEFFEY:
3    Q.  Do you see at the top, there's a date?
4    A.  Yes.
5    Q.  What is that date?
6    A.  June 19th, 2018.
7    Q.  And this document says, "We are pleased to offer
8 you the following position with The GEO Group."  Do you
9 see that?
10   A.  I do.
11   Q.  What is the job title?
12   A.  Janitor.
13   Q.  What is the location?
14   A.  Adelanto.
15   Q.  And what is the hourly rate?
16   A.  11.
17   Q.  And so in 2018, what hourly rate did you use in
18 your report for Adelanto county for a janitor?
19   A.  That would be 16.14.
20   Q.  Do you have any reason to believe that GEO would
21 pay additional janitors more than it would pay current
22 janitors that are employed?
23   A.  I don't know.  That would yield a very big wage
24 compression issue for them, but I would imagine most
25 employers avoid that.

Page 182

1    Q. So if a janitor was paid $11 at the Adelanto
2  facility in 2018, would that number be more accurate to
3  rely on in estimating a potential wage loss, or would
4  the average wages in San Bernardino County?
5    A. I guess the question would be what's their --
6  have they been able to recruit the necessary number of
7  people at that wage.
8    Q. Right. And I can represent to you that
9  Plaintiffs' counsel asked for the offer letters for the
10  people who were actually employed, so these are the
11  people who accepted these letters; they are signed at
12  the bottom.
13    A. Okay.
14    Q. So, then, which would be a more accurate number
15  in your expertise? Would it be the rate actually paid
16  to the facility or an average from County statistics?
17    A. Well, this is what they actually paid.
18    Q. Okay.
19    A. So if you're able to staff all your vacancies
20  with this, then, yeah, this is the actual number.
21    Q. And what about Page 3 of the document, with the
22  date October 3rd, 2017?
23    A. Page 3. Okay. Got it.
24    Q. And you see the hourly rate plus prorated health
25  and welfare rate?

Page 183

1    A. Yes.
2    Q. And how do those numbers combined, if you can do
3  the math in your head, compare to the rate you used for
4  2017 for a janitor?
5    A. Well, it's 14.77. And '17 would be 15.45 plus
6  roughly 4.50, so around 19 -- around 20.
7    Q. When you say around 20, what do you mean?
8    A. I'm sorry. I was just doing an off-the-cuff
9  estimate.
10    Q. Of the difference between the number you used and
11  this number?
12    A. No. It's roughly a $5 difference.
13    Q. Okay. Roughly a $5 difference.
14     And which would be more accurate in this case,
15  the rate actually paid or the rate you estimated?
16    A. Again, depending on if you could hire the
17  quantity of people necessary at these rates.
18    Q. Okay. And do you know anything about the city of
19  Adelanto?
20    A. No, not really.
21    Q. Do you know about the available workforce there?
22    A. Just what -- I mean, I have the BLS data; that's
23  it.
24    Q. Okay. So if there was a high unemployment rate
25  in Adelanto, would it be more likely you could higher

Page 184

1  people at the lower rates?
2    A. That's how it works.
3    MS. SCHEFFEY: All right. No further questions.
4
5          EXAMINATION
6  BY MR. VINCENT:
7    Q. Mr. Childers, let's pick up right on that, and
8  let's walk through it. That last exhibit showed a pay
9  rate of $11; correct?
10    A. The first page, yes.
11    Q. And for 2017, I think you said it showed a pay
12  rate of 10.50 plus 4.27, so about 16 or --
13    A. Just under 15.
14    Q. Just under 15?
15    A. Correct.
16    Q. In your analysis for 2018, I think you said you
17  used the $16 number; correct?
18    A. For wages, yes.
19    Q. And does that include benefits?
20    A. No.
21    Q. What would be the benefits?
22    A. Well, again, the average for this period was
23  30.33 percent of payroll, so I would add on the
24  30 percent for what they're calling in this health and
25  welfare, but additional fringe.

Page 185

1    Q. So an additional 30 percent on top of your 16 is
2  how much?
3    A. I mean, so it would be another 4.75, so like 21.
4    Q. And I think counsel just represented that
5  Adelanto has a high unemployment, so you would assume
6  that GEO could hire people at what they're actually
7  paying; correct?
8    A. That's possible, sure.
9    Q. Let's assume that counsel's right, and let's take
10  that assumption. So according to that, GEO would only
11  have to pay $11 an hour to somebody as opposed to the 21
12  that you calculated; correct?
13    A. Well, again, I don't know what benefits and what
14  the benefit costs are --
15    Q. We're taking that as an assumption. Listen
16  carefully --
17    A. Okay.
18    Q. -- assuming what counsel just said, that they can
19  hire all the people they want at $11 an hour, that is
20  lower than the amount in your calculations of $21 an
21  hour all in; correct?
22    A. It is.
23    Q. About $10 an hour GEO would realize; correct?
24    A. Based off this information, yes.
25    Q. Okay. The 21 that you assume compared to the 11

Page 186

1  that counsel is saying is actual how?  About twice as
2  much; right?
3      A.  Roughly.
4      Q.  So if we take counsel's analysis and numbers,
5  your numbers as to GEO's benefit to their bottom line --
6  because they're only paid $11 -- double, don't they?
7      A.  Slightly less than that, but yeah.
8      Q.  Slightly less than double.  So in other words,
9  counsel just proved that your numbers are about half as
10 big as they should be; right?
11     A.  That's correct.
12         MR. VINCENT:  I'll pass the witness.
13
14                    EXAMINATION
15 BY MS. SCHEFFEY:
16     Q.  You just testified that your numbers would
17 double.  Can you walk me through how the 2011 numbers
18 would double, for example, in Table 25.  What's the
19 calculation?
20     A.  Hold on.  Let me get that in front of me.  Well,
21 it would make more sense, frankly, to stick with one of
22 these that you gave me as an example.
23     Q.  Like the $11 an hour for 2018?
24     A.  Sure, that's fine.
25     Q.  So let's walk through the $11 an hour for 2018.

Page 187

1      A.  Okay.  So the amount that GEO would actually
2  incur as far as costs you could calculate out based on
3  this versus the number that I used for the BLS.
4      Q.  Right.  So let's make that calculation.  Let's
5  figure out what the cost of GEO's employees is for 2018.
6  So the way I calculate it, your numbers would go down in
7  half if you assume a higher cost to GEO.
8      A.  No.  There's much less cost to GEO but paying
9  less.
10     Q.  Cost of GEO employees would be more expensive or
11 less expensive?
12     A.  No.  The expenditure on GEO's part to pay these
13 people would decrease.
14     Q.  Right.
15     A.  Uh-huh.
16     Q.  And then the amount paid to detainees would stay
17 the same; correct?
18     A.  Yes.
19     Q.  And the difference between those would go down
20 because there's a smaller remainder?
21     A.  Well, the difference would actually be the
22 difference between what they actually spent and what
23 they spent on the -- on the reimbursement of the
24 detainees.
25     Q.  Right.  So that's what I'm saying.  So cost of

Page 188

1  GEO employees -- so let's say -- you're talking about
2  $11 an hour; right?
3      A.  Okay.  Sure.
4      Q.  So let's go easy.  Let's make it a hundred
5  employees.  Okay?
6      A.  Okay.
7      Q.  What is the cost to GEO at $11 an hour for the
8  hundred employees -- or what's the way you want to do
9  that?  What's the calculation?
10     A.  I'm not sure what you want me to calculate out.
11 You want me to calculate out the new cost of GEO hiring
12 people at these wages?
13     Q.  You just told me that the benefit to GEO would
14 double.  Tell me the equation that gets the benefits to
15 double using the $11 an hour number from 2018.
16     A.  What I was saying is that when the -- as the cost
17 of the employee to GEO decreases, then the retained
18 money by GEO obviously increases because they're not
19 having to spend that money.
20     Q.  But that assumes that they have the money to
21 spend in the first place; right?  Do you have any data
22 that GEO is spending that money right now on employees?
23         MR. VINCENT:  Object to form.
24         THE WITNESS:  No.
25 ///

Page 189

1  BY MS. SCHEFFEY:
2      Q.  Or was that budgeted into GEO's contract?
3          MR. VINCENT:  Object to form.
4          THE WITNESS:  I'm not aware of that, no.
5  BY MS. SCHEFFEY:
6      Q.  Right.  So the Extra Profits Realized by GEO
7  would double, you're saying, if the wages went down?
8      A.  Again, I would need to calculate it, but the less
9  they have to pay out, the more they're retaining.
10     Q.  That's what you're testifying to in giving me
11 that equation.  Walk me through that.
12     A.  So if you hire me to mow your yard --
13     Q.  No.  On your numbers here, how does janitor
14 numbers go down?  For example, for 2018, the wage and
15 benefit cost to GEO for janitors, how does that
16 $2 million number change?
17     A.  I would have to -- to get an exact number, I
18 would have to do the work and update my report.  But in
19 general, that's why I was trying to use an analogy to
20 explain the concept.
21     Q.  Right.  I don't want to use an analogy.
22         So for $2,717,818, how did you get there?  What's
23 the equation?
24     A.  I'm sorry, Counsel, which table?
25     Q.  23.

Page 190

```
 1      A.  Okay.  Got it.  And for the year 2018?
 2      Q.  Yes, for janitor only.  $2,717,818, do you see
 3  that --
 4      A.  I do.
 5      Q.  Okay.  So what is the underlying calculation for
 6  that number?
 7      A.  The hours spent by detainees doing that work.
 8      Q.  But how many hours was that for this year?
 9      A.  I would have to look --
10      Q.  You can't find that from looking at your report?
11      A.  I'm trying to tell you the equation --
12      Q.  Okay.
13      A.  -- so let me finish that, and then I can point
14  you to the sources of each of the pieces of information.
15      Q.  Okay.
16      A.  So it would be -- again, all of these numbers are
17  calculated the same.  It's the number of hours spent
18  doing, performing these duties each year times whatever
19  the average BLS wage for these job classifications were
20  times the 30 percent fringe add-on, and that is the
21  answer.
22      Q.  So it would be hours of detainees' labor times
23  $11?
24      A.  Times whatever their fringe rate is, yes.
25      Q.  I believe that your counsel assumed that there
```

Page 191

```
 1  was no additional fringes.
 2      A.  Again, from a back-of-the-envelope estimate,
 3  sure.
 4      Q.  Right.  So what are the hours of detainee labor?
 5      A.  So that would be -- well, it's the blank table.  I
 6  need to bring up my exhibit.  So in Exhibit 3, if you go
 7  down to Page 34, for each of the categories for each of
 8  the years, it shows you the number of hours.  So in this
 9  specific instance, we're talking about 129,203 would be
10  the top line second to the left column.
11      Q.  And then we'd multiply that times $11?
12      A.  Correct.
13      Q.  And then from my phone calculator, I get
14  1,421,233.
15      A.  Okay.
16      Q.  And I know you haven't checked that; I'm just
17  telling you that's what I get.
18      A.  Sure.
19      Q.  So assuming I haven't done my math incorrectly,
20  the cost of obtaining the same amount of labor on the
21  free market would decrease from $2.7 million to $1.4
22  million; is that correct?
23      A.  Uh-huh, would decrease -- right, the actual money
24  expended by GEO Group would decrease, that's correct.
25      Q.  Okay.  And so to get the same amount of labor,
```

Page 192

```
 1  they would pay less than the amount estimated here?
 2      A.  Right.
 3          MS. SCHEFFEY:  That's all.  No further questions.
 4          THE WITNESS:  Okay.
 5          MR. VINCENT:  Professor one last question.
 6
 7                    EXAMINATION
 8  BY MR. VINCENT:
 9      Q.  Having not proved that GEO would actually pay
10  less than the numbers you used, would that necessarily
11  mean GEO's profits increase?
12      A.  Well, they would retain that money.  So whether
13  it gets passed through as profit to shareholders, I
14  don't know, but they certainly would realize more to the
15  bottom line.
16          MS. SCHEFFEY:  One more question so would --
17          MR. VINCENT:  So because --
18          MS. SCHEFFEY:  Okay.
19  BY MR. VINCENT:
20      Q.  So because your -- everything equal except
21  changing the hourly rate.  Okay.  Your hourly rates that
22  you used in your report are less than the hourly rates
23  that counsel showed you GEO actually pays; correct?
24          MS. SCHEFFEY:  Object to form; misstates prior --
25  misstates what we're talking about.
```

Page 193

```
 1  BY MR. VINCENT:
 2      Q.  Let me make it easy.  Let's use the
 3  hundred-person example.  For 2018 how much all in did
 4  you calculate an hourly rate GEO would have to pay on
 5  the open market?
 6      A.  For janitor --
 7      Q.  Yes.
 8      A.  Yes, that's -- sure.  So that's the number from
 9  Table 2, and, yeah, in '18 for janitors, the average was
10  16.14.
11      Q.  Okay.  And then you add onto that the fringe
12  benefits; correct?
13      A.  Correct, yes.
14      Q.  So what's that number all in?
15      A.  I'm going to bust out my calculator this time.
16          MS. SCHEFFEY:  Isn't it the number in your
17  Table 3 under 2018 that we've been using?
18          THE WITNESS:  So it would be $21.04.
19  BY MR. VINCENT:
20      Q.  An hour?
21      A.  Correct.
22      Q.  That's 2018, and that's the number your
23  calculations assume GEO would have to pay rather than
24  the $1 a day it's paying these people now; right?
25      A.  Yes.
```

Page 194

1    Q.  Instead, counsel's document shows that they
2  actually paid janitors $11 an hour; correct?
3    A.  That's what I just saw, yes.
4    Q.  So if GEO could get away with paying $11 an hour
5  and they don't have to pay the $21 an hour that your
6  calculations assume, if you took your $21 in your
7  calculations and changed it to the $11 number that
8  counsel just gave us, how does that affect GEO's bottom
9  line?
10    A.  So in my calculations, it would show a smaller
11  difference between what they actually spent or would
12  purport to have to spend assuming that they could fill
13  all those vacancies; while at the same time, they're
14  retaining all of those monies because they never spent
15  them to begin with.
16    Q.  So instead of spending $21 an hour to do this
17  work, GEO is only spending $11 an hour to do this work;
18  correct?
19    A.  Well, based on those documents and those
20  assumptions, yes.
21    Q.  So based on the documents counsel showed us, that
22  delta, 11 to 21, is -- well, let's make it easier.  They
23  do pay a dollar a day, so let's take a dollar off of it.
24  So 20 over 11, or nine-twentieths, they're now reaping
25  $9 profit out of -- over every employee per hour;

Page 195

1  correct?
2    A.  Based on this $11 scenario, sure.
3    Q.  Your calculations assume GEO has higher
4  expenditures, and, therefore, lower profits than would
5  be the case if you used the $11 figure from 2018;
6  correct?  If you use a lower per-hour rate, the profits
7  go up; correct?  If I have to pay less, I keep more --
8    MS. SCHEFFEY:  Object to form.
9    THE WITNESS:  Yes, that's true.  I guess the
10  reason I paused for a moment is I'm trying to make sure
11  I say this precisely.  The estimate I generated based
12  off of these averages and then calculated a difference
13  based off of the dollar a day that was actually paid out
14  showed a number.
15    If the actual wages paid were different, that
16  difference could be recalculated.  At the same time,
17  what that also reflects is that those dollars would have
18  never been spent to begin with --
19  BY MR. VINCENT:
20    Q.  Correct.  Then let's take exactly what you said.
21  Your calculations resulted in a per-hour rate of $16 and
22  something; correct?
23    A.  Well, that's the BLS average, correct.
24    Q.  Okay.  Your calculations in your report utilized
25  the BLS number; correct?

Page 196

1    A.  Yes.
2    Q.  And the amount of additional compensation, or
3  money, that GEO retains -- it never had to pay out -- in
4  your report is based on those BLS numbers; correct?
5    A.  Right.
6    MS. SCHEFFEY:  Object to form.
7  BY MR. VINCENT:
8    Q.  The BLS number is about 30 percent higher than
9  the number for 2018 counsel just showed us, the 16 to
10  the 11; correct?
11    A.  It is higher, yes.
12    Q.  So using those numbers, the amount GEO retains is
13  actually about 30 percent higher than what's in your
14  report if you used that $11 figure rather than the BLS
15  number?
16    MS. SCHEFFEY:  Object to form.
17  BY MR. VINCENT:
18    Q.  Everything else equal, if you go from $16 an hour
19  that you assumed to the $11 that counsel says they
20  actually paid, they retained more money; right?
21    MS. SCHEFFEY:  Object to form.
22    THE WITNESS:  They -- correct, they would never
23  incur that additional $5 an hour expenditure.  Now, the
24  way I have that summarized in my report will show that
25  there's a smaller difference, but, again, it's -- the

Page 197

1  difference is the difference in what they never had to
2  spend to begin with as well.
3  BY MR. VINCENT:
4    Q.  Right.  If they don't have to spend it, it stays
5  in the company treasury, assuming they don't spend it on
6  something else?
7    MS. SCHEFFEY:  Object to form.
8    THE WITNESS:  Okay.  Sure, yes.
9  BY MR. VINCENT:
10    Q.  Counsel asked you about GEO's budgeting.  Does
11  any of your report or any of these numbers or any of
12  this methodology have anything to do or rely in any way
13  on what GEO, quote, budgets to have to pay?
14    A.  No, I didn't have that information.
15    Q.  She asked whether or not you knew GEO was able to
16  pay it.  We did send you the rebuttal report of
17  Serena Morones; correct?
18    A.  You did.
19    Q.  Did you review that report?
20    A.  Just the section related to my report.
21    Q.  You did not review the initial section about GEO
22  as a public company and its annual profits?
23    MS. SCHEFFEY:  Object to form.
24    THE WITNESS:  I didn't.
25  ///

Page 198

```
 1   BY MR. VINCENT:
 2       Q.  Do you have any reason to believe that if GEO
 3   actually -- well, never mind.  They have got enough
 4   money.
 5           So taking the $11 that counsel says GEO paid in
 6   2018 and inserting it into your report, rather than the
 7   $16 you used for 2018, would increase the amount of
 8   compensation owed of about 30 percent; right?
 9       MS. SCHEFFEY:  Object to form.
10       THE WITNESS:  It would --
11   BY MR. VINCENT:
12       Q.  GEO retained, I should say.  It didn't have to
13   pay.
14       MS. SCHEFFEY:  Object to form.
15       THE WITNESS:  Right.  Well, again, what it's
16   going to do -- so I just want to look at one of the
17   examples.  So I'm looking at Table 4, and the impact of
18   that will be that their calculated net cost per this
19   methodology will actually decrease based on the smaller
20   nominal expenditure; right?
21       MR. VINCENT:  Right.
22       THE WITNESS:  And, again, when you take the
23   difference between that and the actual amount paid to
24   the immigrant detainee, it will change that down as
25   well --
```

Page 199

```
 1       MR. VINCENT:  Right.
 2       THE WITNESS:  -- but also with the understanding
 3   that, yeah, that other part of my calculation is money
 4   that was never -- that never had to be spent.
 5   BY MR. VINCENT:
 6       Q.  So in terms of Table 5, Paragraph 27 of your
 7   report -- are you there?
 8       A.  Yes, I am.
 9       Q.  We go down to the line for 2018.  Okay?
10       A.  Okay.
11       Q.  And we go across to -- well, that's for all
12   subcontracted employees, not just janitors; correct?
13       A.  It's that -- and this table actually refers to a
14   scenario of a low wage, you know, minimum bid
15   subcontractor.  So, honestly, Table 4, I think, is the
16   scenario more we're discussing.
17       Q.  Table 3, the year 2018, where we can just isolate
18   janitor?
19       A.  Okay.  Sure.
20       Q.  Your number there is 2.7 million.
21       A.  Hold on.  Let me get it in front of me.  Sorry.
22   Okay.  Got it.  Sorry.
23       Q.  Sure.  If that number assumes a $16 an hour wage,
24   it would be different if it assumed an $11 an hour wage,
25   wouldn't it?
```

Page 200

```
 1       A.  Yeah, the cost would decrease, correct.
 2       Q.  And if the cost decreased, the amount that
 3   remains in GEO's coffers goes up; right?
 4       A.  Yes.  It's money they don't ever have to spend.
 5       Q.  So that number follows basically to the bottom
 6   line of Table 4, Extra Profits Realized by GEO; right?
 7       A.  Not in the way that it's being calculated
 8   currently in the report.  Because, again, the report
 9   summarizes this estimated actual cost versus the amount
10   actually paid.
11           If we did the actual, if there was an actual --
12   if those data existed -- you could calculate that out,
13   but that still means that the delta between those
14   numbers and these numbers is money that is never ever
15   spent.  It was never incurred as an expense because --
16       Q.  And if it's money --
17       A.  I'm sorry?
18       Q.  If it's money never spent, would that be
19   reflected in your column of Extra Profits Realized By
20   GEO?
21       A.  Not currently the way I have the report currently
22   formatted, no.
23       Q.  But you could go back and use the numbers that
24   counsel wants you to use, and those numbers would go up;
25   right?
```

Page 201

```
 1       A.  Yeah, I could summarize the data in that way.
 2       MR. VINCENT:  All right.  Pass the witness.
 3
 4                    EXAMINATION
 5   BY MS. SCHEFFEY:
 6       Q.  Mr. Childers, if I -- is money -- what?  Sorry.
 7       A.  Just for Professor or Doctor.
 8       Q.  Professor, is money never spent the same as
 9   profit?
10       A.  Potentially.  Again, it's money that's retained
11   by the corporation.  How it gets utilized is -- depends.
12       Q.  So if I buy a $500,000 house because I can't
13   afford a million-dollar house, have I saved half a
14   million dollars?  Is that my profit?
15       A.  I'm sorry.  Could you repeat it.
16       Q.  Yeah.  So if the bank approves me for a
17   half-a-million-dollar mortgage and I go buy a house for
18   half a million dollars as opposed to $1 million, have I
19   now realized a profit of half-million dollars by not
20   buying the million-dollar house?
21       A.  That sounds like Kohl's logic to me and trying to
22   get you to get Kohl's bucks -- sorry.  It's a
23   Wisconsin -- well, maybe they have them out there --
24       Q.  Oh, they do, and they do the same thing.
25       A.  Well, and, again, I think the difference being
```

Page 202

1   that if there was an actual liability for the
2   corporation, in wages in this example, and you're able
3   to pay less in wages, clearly that's retained earnings.
4       Q.  Right.  But does your report and its methodology
5   as it's currently framed analyze the actual money GEO
6   has as leftover profit?
7       A.  No.  And as I said, I have not fully reviewed the
8   extent of that rebuttal report.
9       Q.  And in Table 4, that shows the Extra Profits
10  Realized by GEO from 2011 to 2019.  As wages increased,
11  did the extra profits realized by GEO increase or
12  decrease?
13      A.  In the way they're presented in this table, that
14  delta would increase.
15      Q.  Okay.  So the higher the wages, the extra profits
16  realized by GEO; is that correct?
17      A.  As detailed in this table, yes.
18      MS. SCHEFFEY:  All right.  No further questions.
19
20                  EXAMINATION
21  BY MR. VINCENT:
22      Q.  Let's clear that one up.  The higher the wages
23  they have to pay, did you just say that means the higher
24  the profits to GEO?  Is that what you meant to say?
25      A.  The -- by the way these tables are calculated, it

Page 203

1   shows a greater savings and, thus, a larger extra profit
2   realized by GEO.
3       Q.  But does it go up if the amount GEO has to pay in
4   wages goes up?
5       A.  By the way it's being calculated and summarized
6   in these tables, yes.
7       Q.  I thought if they paid it out, it would be less
8   profits.  I don't think we're communicating.
9       What I'm asking is if GEO has to pay someone $11
10  an hour and then has to pay them $16 an hour, all else
11  being equal, their profits go down; correct?
12      A.  That is correct.
13      Q.  Okay.  So as wages go up, profits -- wage expense
14  goes up, profits go down?
15      A.  That is absolutely true.
16      MR. VINCENT:  Okay.  I just wanted to make sure
17  we were communicating.
18      MS. SCHEFFEY:  As laid out in your report,
19  however, as wages go up, the profits realized by GEO go
20  up; is that right?
21      THE WITNESS:  Yes, the way I currently have those
22  tables formatted and summarized the data, that's what it
23  shows.
24      MS. SCHEFFEY:  Okay.  That's all.
25      MR. VINCENT:  Pass the witness.

Page 204

1       MS. SCHEFFEY:  I'm done.  We're done, I think.
2       THE WITNESS:  Thank you.
3       MS. SCHEFFEY:  Thank you for your time,
4   Professor.
5       (Whereupon, at the hour of 2:15 p.m., the
6       deposition was adjourned.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 205

1           DECLARATION UNDER PENALTY OF PERJURY
2
3       I, MICHAEL R. CHILDERS, PH.D., do hereby certify
4   under penalty of perjury that I have read the foregoing
5   transcript of my deposition taken on September 21, 2020;
6   that I have made such corrections as appear noted on the
7   Deposition Errata Page, attached hereto, signed by me;
8   that my testimony as contained herein, as corrected, is
9   true and correct.
10
11      Dated this _____ day of _____,
12  20____, at _____, California.
13
14
15                        _____
16                        MICHAEL R. CHILDERS, PH.D.
17
18
19
20
21
22
23
24
25

Page 206

DEPOSITION ERRATA SHEET

1
2   Page No.____ Line No. ____
3   Change: _____
4   Reason for Change: _____
5   Page No.____ Line No. ____
6   Change: _____
7   Reason for Change: _____
8   Page No.____ Line No. ____
9   Change: _____
10  Reason for Change: _____
11  Page No.____ Line No. ____
12  Change: _____
13  Reason for Change: _____
14  Page No.____ Line No. ____
15  Change: _____
16  Reason for Change: _____
17  Page No.____ Line No. ____
18  Change: _____
19  Reason for Change: _____
20  Page No.____ Line No. ____
21  Change: _____
22  Reason for Change: _____
23
24  _____    _____
25  MICHAEL R. CHILDERS, PH.D.        DATED

Page 207

REPORTER'S CERTIFICATE

1
2
3       I, GISELLE GIRARD, a Certified Shorthand Reporter
    in the State of California, and duly empowered to
4   administer oaths, do hereby certify:
5       That, prior to being examined, the witness named
    in the foregoing proceedings was duly sworn by me
6   pursuant to Section 30(f)(1) of the Federal Rules of
    Civil Procedure; that said proceedings were taken down
7   by me in shorthand and thereafter transcribed into
    typewriting or printing under my direction and
8   supervision; and I hereby certify that the foregoing is
    a full, true and correct transcript of my notes so
9   taken.
10
        ____ That the witness was requested to review the
11           transcript and make any changes to the
             transcript as a result of that review
12           pursuant to Section 30(e) of the Federal
             Rules of Civil Procedure.
13
        X__  No request was made that the transcript be
14           reviewed pursuant to Section 30(e) of the
             Federal Rules of Civil Procedure.
15
16      I further certify that I am neither counsel for
    nor related to any Party to said action, nor in any way
17  interested in the outcome thereof.
18
        IN WITNESS WHEREOF, I have hereunto subscribed my
19  name and C.S.R. number on this 1st day of
20  October, 2020.
21
22
23  _____           12901
24  Certified Shorthand Reporter    C.S.R. No.
25

Page 208

1   U.S. Legal Support, Inc.        October 1, 2020
    11845 West Olympic Boulevard
2   Suite 600W
    Los Angeles, California  90064
3
4   MICHAEL R. CHILDERS, PH.D.
    C/O:  E. LAWRENCE VINCENT, ESQ.
5   BURNS CHAREST, LLP
    900 Jackson Street
6   Suite 500
    Dallas, Texas  75202
7
8   Re:  Raul Novoa, et al. vs. The Geo Group, Inc.
9   Date of Deposition:  September 21, 2020
10  Dear Dr. Childers,
11      The original transcript of your deposition taken
    in the above-referenced matter is available at this
12  office for your review.  If it is more convenient to
    read a copy of the transcript and waive signature of the
13  original transcript, please notify our office by letter
    sent certified or registered mail of any changes made,
14  with copies sent to all counsel.
        In the event you have not read, corrected and
15  signed your deposition within thirty (30) days of the
    receipt of this letter, it may be used with the full
16  force and effect as though it had been read, corrected
    and signed.
17      If you wish to arrange an appointment to review
    the original transcript, please contact this office at
18  (310) 597-4833.
19
20                          Sincerely,
21                          U.S. Legal Support
                            Production Department
22
    Cc:  All counsel
23       The deponent
24  Original:  Original transcript
25